1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF MARYLAND
2              NORTHERN DIVISION

3


4

     UNITED STATES OF AMERICA
5

          v.                    CRIMINAL CASE NO.
6                                  AMD-04-029

     WILLIE MITCHELL,
7    SHELTON HARRIS,
     SHELLY WAYNE MARTIN,
8    SHAWN GARDNER,

9          Defendants
     _____/
10

11              (Motions Hearing)
               Thursday, June 12, 2008
12             Baltimore, Maryland

13

     Before:  Honorable Andre M. Davis, Judge
14

15   Appearances:
          On Behalf of the Government:
16         Robert Harding, Esquire
           Michael C. Hanlon, Esquire
17        On Behalf of Defendant Mitchell:
           Laura Kelsey Rhodes, Esquire
18         Michael E. Lawlor, Esquire
          On Behalf of Defendant Harris:
19         Gerard P. Martin, Esquire
          On Behalf of Defendant Martin:
20         Thomas L. Crowe, Esquire
           James G. Pyne, Esquire
21        On Behalf of Defendant Gardner:
           Adam H. Kurland, Esquire
22         Barry Coburn, Esquire

23

     Reported by:
24   Mary M. Zajac, RPR
     Room 5515, U.S. Courthouse
25   101 West Lombard Street
     Baltimore, Maryland 21201

1          (Proceedings at 10:05 a.m.)

2          THE COURT:  This is the continued hearing in Case

3    Number AMD-04-0029.  Counsel are present with their clients.

4          Mr. Martin, thank you very much for your letter of June

5    6th.  I appreciate your suggestion that perhaps a telephone

6    conference would have been helpful, but I wanted to take

7    advantage of the time.  In any event, I think we can probably

8    conclude what we need to do today fairly promptly.

9          First, with respect to the jury selection, I wonder if

10   any of counsel have any objection to my including in a mailing to

11   prospective jurors a very short letter on my letterhead

12   indicating that this trial will last for eight to ten weeks, and

13   inviting prospective jurors to indicate in advance whether there

14   is some known hardship that would preclude him or her from

15   serving for the duration of the trial.  Obviously, the intent

16   here is to try to cull out as best we can in advance jurors who

17   will show up at voir dire and indicate some hardship.

18         It's my hope, although I don't expect it to be realized

19   in full, it would be my hope that the only people we would

20   actually encounter in the courtroom would be people who've

21   already considered the fact that it's an eight to ten week trial.

22   And I realize the ten weeks is probably a very generous estimate.

23   I think it is.

24         So any problem with that?  We're not doing a

25   questionnaire.  There's probably good reason why we should do a

1    questionnaire but, frankly, while it's a complicated case and a

2    rather lengthy case, I would prefer to treat it more like just a

3    complicated, lengthy case than something other than that,

4    requiring a lengthy questionnaire.

5         Obviously, the voir dire will be laborious.  And I

6    suspect, my initial sense of it was to call in 150.  That's

7    probably far in excess of what we are likely to need.  But I want

8    to err on the side of getting people in here.  And if we go as

9    high as 150, and maybe if we go as high as 125, I suspect we'll

10   have to do it in two, in at least two sittings because I don't

11   think we can accommodate more than 80 or so at a time in this

12   courtroom.

13        I mean, it would be great if we could pick a jury in

14   one sitting, one full day, but that seems to be unlikely given

15   the circumstances of the case.

16        Finally, on that issue, my sense is, and I just ran it

17   by my colleagues, although this is for some purposes, such as

18   appointed counsel, a capital case, my understanding is that we're

19   back to the 6 and 10 insofar as peremptories are concerned, and

20   the withdrawal of the death notice means that the defense does

21   not get 20 peremptories.

22        Now, having said that, I don't want counsel to be too

23   alarmed.  Obviously, it would be my intention to give the defense

24   well in excess of 10 peremptories here to be exercised jointly,

25   perhaps, perhaps not.  And what I will do is really take an

4

1    assessment of the panel, once we see how many we have who have

2    survived the voir dire.

3         So let me start with the government.  Any problem with

4    anything I propose, Mr. Harding, or any views on any of those

5    issues?

6         MR. HARDING:  Yes.  Thank you, Your Honor.  I just

7    consulted with my colleagues and we are inclined to think eight

8    to ten weeks is pessimistic, that six to eight would probably, in

9    our view -- of course, I have no way of knowing what the defense

10   here intends to do in terms of their case.  And there are always

11   many things that are always unpredictable about trials.  But

12   since this is no longer a capital case and since voir dire

13   especially will be much reduced and there will be no penalty

14   phase, we think that, I think, in fact, when we estimated the

15   length of this trial when it was a capital case, we said six to

16   eight weeks.  So I would feel comfortable with that estimate now.

17   But, of course, it's entirely up to whatever the Court decides.

18        Your Honor said something about including a letter to

19   the prospective jurors informing them of this.  I wasn't clear.

20   Are you anticipating that venire persons would then respond by

21   letter saying whether this would present a hardship to them?

22        THE COURT:  I haven't worked out entirely what I

23   propose to do.  But I think I have in mind, I haven't talked to

24   the jury folks yet, but I think what I have in mind is some kind

25   of postcard return, where they could just very briefly say:  I

1    can't come because I've got a 25th wedding anniversary in the

2    middle of October" or something.  Just very short explanation.

3    And then we would look at those and decide whether that was a

4    sufficient excuse not to call the juror who would otherwise be

5    called.  My hope is that most of them would be fairly clear and

6    that they simply wouldn't be called.

7          Frankly, I have to say, I'm not even sure at all that I

8    would have to consult with counsel in that regard because all we

9    would be doing is going deeper into the pool.  And so we wouldn't

10   be excluding anyone except someone who really, really didn't want

11   to serve and made up a reason or someone who clearly had good

12   reason not to be called for an eight week trial.

13         What prompts this, by the way, is I was under the

14   impression, frankly, until yesterday, that the jury folks already

15   did something like this because we tell them, as you know, it's a

16   six week trial or it's an eight week trial or it's a ten week

17   trial, and I was under the impression that that information was

18   given to the jurors, who then had the opportunity -- in fact, I

19   was under the impression that they were actually told to

20   communicate with the court if this was a hardship.  But now I

21   understand that that really isn't done.  And thus my idea of

22   actually including an explicit letter, short letter, saying this

23   is going to be an eight to ten week trial, let us know by

24   returning this postcard if you know now of some hardship.

25         MR. HARDING:  Well, my position is that that's, that

6

1    sounds like a very good idea, Your Honor.  And I think that would

2    make it much more efficient to select a jury.

3            THE COURT:  By the way, the reason I'm really leaning

4    toward ten weeks is because, just on the basis of what we're

5    going to do and not do today, Mr. Harding, my understanding is

6    that the government, without, not without reason, wants to

7    continue to withhold witnesses for court proceedings until the

8    absolute necessity to do so.  Right?

9            MR. HARDING:  Well, we just face the problem of having

10   to locate these witnesses.

11           THE COURT:  Okay.  All right.  Well, on the

12   identification issues, obviously, the Court can't make a final

13   decision until after there has been a hearing.  And I'm

14   proceeding on the assumption that we're going to have a number of

15   mini hearings during the trial for this witness or that witness

16   on this issue or that issue.

17           And I'm also anticipating, frankly, in the eight to ten

18   weeks of trial there will be I think at least two occasions when

19   we're not going to be in session for a day or two, other than

20   just the Fridays when we won't be in session.  So I'm trying to

21   build in more time than is projected by the government for those

22   kinds of reasons.

23           MR. HARDING:  On the issue --

24           THE COURT:  I certainly hope you turn out to be right,

25   with six weeks.

7

1          MR. HARDING:  We're certainly going to do our best.

2    And in fact, if we don't locate a good number of these witnesses,

3    it may be shorter still.  But we're going to --

4          THE COURT:  Let me ask you this, while we're on that

5    subject.  My understanding of the indictment is that the

6    government will undertake actually to prove five first degree

7    murders with autopsy reports and, I mean, just like a murder

8    trial.  So I've approached this, I mean, even apart from the RICO

9    issues, I've approached this as a, as a five, as five murder

10   trials, five homicide trials.

11         MR. HARDING:  That's correct.  As you know, there are

12   two double murders, so that the crime scene analysis really is

13   three, three murders.

14         THE COURT:  Okay.  All right.  Fine.  And so we just

15   have to build in the time to do that, and for cross examination.

16   It's in some sense a direct case, direct evidence case, and in

17   some very important respects it's a circumstantial case.

18         So I think it's important to build in, build in more

19   time than less time so that we don't disappoint people as we

20   approach Thanksgiving, not yet finished.

21         My sense is, without predicting anything, it's going to

22   take me a full day just to instruct the jury in this case.

23         MR. HARDING:  I if could comment on the suggestion Your

24   Honor made about peremptory challenges.

25         THE COURT:  Yes.

1          MR. HARDING:  The statute, as you know, provides for a

2    ten to six ratio.  I've been in trials in the past, and I'll

3    mention one in particular that I did in front of Judge Nickerson

4    many years ago, and I don't believe any of present defense

5    counsel were present, but the judge allowed the number of

6    peremptory challenges to be doubled.  The defense were given 20

7    peremptory challenges on the condition that they would agree to

8    the government getting 12 peremptory challenges.  In other

9    words --

10          THE COURT:  Sure, maintaining the ratio.

11          MR. HARDING:  Maintaining the ratio.  And there's case

12    law to support that.  So that would be the government's request,

13    if Your Honor wants to increase the number of peremptory

14    challenges.

15          THE COURT:  Okay.  Of course, the government never uses

16    it.  Well, sometimes.  All right.  Thank you, Mr. Harding.

17          Anybody else on any of those issues?  Mr. Kurland?  Or

18    Ms. Rhodes?

19          MS. RHODES:  Thank you, Your Honor.  We don't have an

20    objection to the Court's issuing this letter but we would ask for

21    permission just to submit a very, very brief, maybe two-page

22    questionnaire that would be part of that, that I think on some of

23    the questions would obviate a lot of time in the court in terms

24    of their, in terms of conflict issues with people in the case,

25    with people with neighborhoods, or information like that.  We'd

1    be happy to get that to Your Honor in just a couple days.

2              THE COURT:  No, I would rather not go there.  I realize

3    we're going to lose a lot of people just by -- well, maybe not a

4    lot.  But you're right.  Mention of neighborhoods, mention of rap

5    music, mention of a number of different things is going to result

6    in a lot, a lot of excused jurors.  I realize that.  That's why

7    I'm calling a huge panel.  But I think we can do that, we can

8    manage that in the courtroom.  I like to keep the communication

9    about the length of the trial clean and neat so they can focus on

10   that and get that information to us.

11             MS. RHODES:  All right.  Well, if I can just submit

12   that for the record, I'll do that.

13             THE COURT:  Okay.

14             MS. RHODES:  Thank you, Your Honor.

15             MR. KURLAND:  Judge, we have an objection to what you

16   propose in the letter.  I just have two scheduling things.  Other

17   than the Fridays, I think there's some federal holiday October

18   12th or 13th.  Is that one of the day?  Either Columbus Day or --

19             THE COURT:  There's Columbus day.  There's Veterans

20   Day, if we get that far.  I forget which day of the week it falls

21   on.  Veterans Day is one of those that's not a Monday.  And I

22   believe there are a couple of religious observances that I will

23   probably not, I'm sure I will not be in session.

24             MR. KURLAND:  I'll doublecheck the Jewish holidays, but

25   those might be before September 15th.  I'll doublecheck.

1          If the trial goes through Thanksgiving, I might have an

2     issue with respect to the Wednesday before Thanksgiving.  But

3     I'll take that up with you guys later.

4          THE COURT:  I assure you we will not be in session on

5     the Wednesday before Thanksgiving.

6          MR. KURLAND:  Thank you.  I can get my plane ticket,

7     then, Judge.

8          THE COURT:  I got to protect my reputation somehow.

9     With jurors, I mean.  All right.  Very good.  I'll send you a

10    copy, of course, of the letter in advance, probably by e-mail,

11    that I'm going to include with the jury mailing.

12         All right.  Well, I think we have a lot fewer issues

13    than I was afraid we might have, although I must say, there seems

14    to be some omissions that I'll just mention briefly.

15         Ms. Rhodes, I'm correct, am I not, that the Court still

16    has under submission the Motion to Suppress Mr. Mitchell's

17    statements made at the Homicide Division?  Correct?

18         MS. RHODES:  That's correct.

19         THE COURT:  But all the evidence and, frankly, all the

20    arguments are submitted on that, I believe.

21         MS. RHODES:  Well, we had hit one issue that I don't

22    think had been resolved evidentiary-wise.  That was the affidavit

23    of Judge Brown, I think, and whether or not the Court was going

24    to accept that.

25         THE COURT:  Okay.

1          MS. RHODES:  Because in light of, our position was that

2     he had to come testify.  And if the Court's going to accept the

3     affidavit, we might want to have an evidentiary response to that.

4          THE COURT:  Well, okay.  Then let's assume I accept the

5     affidavit.  What would you want to do?

6          MS. RHODES:  Have another, have a response.  His

7     testimony, I think, was that was a common, a routine procedure.

8     I don't remember exactly the language of it.  But we hadn't -- I

9     thought that we were waiting for something further, some further

10    indication from the Court on that before we finished the legal

11    argument or any other evidentiary issues.

12         THE COURT:  All right.  Well, let's assume that I

13    accept the affidavit.

14         MS. RHODES:  Then we may, I mean, I have to look at it

15    and discuss it with Mr. Lawlor.  But we may want to have another

16    witness come testify about it.

17         THE COURT:  Okay.  Please resolve that as between you

18    and Mr. Lawlor as soon as possible, and no later than two weeks.

19         MS. RHODES:  All right.  I assume we would do that at

20    the August hearing?

21         THE COURT:  Yes.  If there's going to be additional

22    evidence.  I would hope you could do it by proffer and/or by

23    affidavit.  But if you think you need to bring in a witness, then

24    we'll do it on August 8th.

25         MS. RHODES:  All right.

12

1          THE COURT:  Okay.  While you're up there, and I'm not

2     sure if you or Mr. Martin or anybody else wants to address this,

3     Mr. Martin mentions the motion on the RICO count.  Are you versed

4     in that?

5          MS. RHODES:  No, Your Honor.  I'm not sure if that

6     applies across the board.  But I'll let Mr. Martin handle that.

7          THE COURT:  Was it an enterprise issue?

8          MS. RHODES:  There was.  I think there may be two

9     separate issues on it.

10          THE COURT:  Did the superseding indictment take care of

11     the problem?

12          MS. RHODES:  I don't believe so, Your Honor.

13          THE COURT:  Okay.  All right.  I'll look at that.  All

14     right.  Okay.  I think, then, that leaves us with the

15     identification issues to resolve today.  And I think everybody

16     has pretty much said everything they want to say on that.

17          MR. KURLAND:  The government, I have some comments to

18     the government's response that they filed.

19          THE COURT:  Okay, Mr. Kurland.

20          MR. KURLAND:  Do you want me to go first?

21          THE COURT:  Yes.  Go ahead.  I have the government's

22     response and then I have your response on behalf of Mr. Gardner

23     received yesterday or today.  And I've listened to both tapes and

24     watched the Stop Snitching video, that portion of it, that is,

25     according to the government, relevant to this case.

1          MR. KURLAND:  Judge, thank you.  I think some of my

2     other, my co-defense colleagues might also have a couple things

3     to add with respect to this.

4          A couple of things.  In Mr. Harding's fairly detailed

5     response filed earlier in the week that, at least as I understand

6     it, go toward the issue of the overall reliability of the tape,

7     of the inadvertent voice mail, if you want to call it that, much

8     of the information or, quote, "evidence" that Mr. Harding relies

9     on, this is separate and apart from whatever issues come up with

10    respect to live witnesses, is clearly inadmissible evidence.  I

11    mean, the representations that certain --

12          THE COURT:  You mean the Bruton issues?

13          MR. KURLAND:  The Bruton issues, number one.  And then

14    number two, again, I don't want to beat a dead horse on this, but

15    with respect to the colloquy, which is an alleged conversation

16    that Mr. Gardner supposedly had with Mr. Montgomery, which isn't,

17    with is clearly described in the motion --

18          THE COURT:  Now, have I ruled on that?

19          MR. MARTIN:  Yes, you have.  I've got the transcript

20    there.

21          THE COURT:  And how did I rule?

22          MR. KURLAND:  As it stands right now, the Court has

23    ruled, and this is from June 7th at 9:30 a.m., on Page 6, the

24    Court's last word on that, and I don't want the Court to change

25    its mind, the Court says:  "And of course I have an absolutely

1    open mind to receive the evidence.  But having reviewed the grand

2    jury testimony, the recorded statement of Mr. Montgomery, there's

3    just an absence of compelling evidence to support the

4    government's proffer and that's all there's been so far.  I

5    understand that.  The statement by Gardner comes in.  But again,

6    I emphasize, and I agree with the government strongly" -- I'm

7    sorry.

8           It says, "but having reviewed the grand jury testimony,

9    the recorded statement of Montgomery, there's just an absence of

10   compelling evidence to support the government's proffer that the

11   statement comes in under coconspirator's exception."

12          So the current ruling is --

13          THE COURT:  That it doesn't come in.

14          MR. KURLAND:  -- that it doesn't.  And while I have no

15   doubt that the government is going to have, I won't say tons of

16   evidence, but a lot of evidence, including a lot of the witnesses

17   that we haven't heard from, again, along with the Bruton issues

18   that are clearly inadmissible, I think under the current state of

19   the record that that alleged statement by Mr. Gardner, that

20   conversation, also can't be considered under reliability because

21   as it stands right now it's inadmissible evidence.

22          THE COURT:  Okay.  I think you've refreshed my

23   recollection.  In fact, I haven't ruled yet.  Right?  I said on

24   the basis of the proffer --

25          MR. KURLAND:  Yeah.

1       THE COURT:  -- it didn't appear to be admissible.  But

2  I left open --

3       MR. KURLAND:  Sure.

4       THE COURT:  -- the opportunity for the government to

5  actually shore up its showing that these were statements made in

6  furtherance of the conspiracy.

7       MR. KURLAND:  And there's nothing in the additional

8  motion --

9       THE COURT:  I agree.

10      MR. KURLAND:  -- that adds to that.

11      THE COURT:  I agree.  And that's the kind of thing that

12 I was alluding to earlier, exactly, when I said to Mr. Harding,

13 we're going to have some mini hearings in the course of the

14 trial.  And I think that may well be one of those issues that the

15 Court's going to have to excuse the jury on and make a final

16 determination.

17      MR. KURLAND:  And also, I want to also thank the court

18 reporter.  It's obviously vital to actually have the transcripts

19 to be able to actually find stuff.  So I appreciate that.

20      THE COURT:  I thank Ms. Zajac as well.  She's been

21 working like crazy.

22      MR. KURLAND:  I think Mr. Martin -- did you want to --

23 oh, there's one other thing.  With respect to the audiotape,

24 again, that inadvertent voice recording, and again, I think Mr.

25 Martin may have more to say on this, there's a separate related

16

1   issue that we touch on in the motion that we filed yesterday.

2   And that is, separate and apart from the reliability of the

3   identifications is the perplexing ambiguity and unintelligibility

4   of the words, even if the voices are there.  And one of the

5   things that we -- two things to think about, Judge.

6           One is that we cite some cases which indicate that on

7   403 grounds, separate and apart from whether or not the, quote,

8   "unreliability" rises to the level of a constitutional violation,

9   the Court has discretion under 403 to keep it out as being of

10  minimal probative value if it's unintelligible.

11          The other point is, and we feel pretty strongly about

12  this, with respect to, if you get to the issue of what's on the

13  tape and the alleged transcripts, quote, "in aid of

14  understanding" as opposed to being evidence themselves, and

15  again, this is separate and apart from the issue of the problems

16  with the identification, that we would ask the Court to listen to

17  the tape first without looking at the transcripts and get to, to

18  really get a feel as to how unintelligible the transcripts are.

19  And that should be, you know, that's also a factor that goes into

20  the determination as to whether or not under 403 it should be

21  excluded.  Because at some point the tail wags the dog.  You

22  know, you gild the lily.  Whatever metaphor you want to use.  And

23  the transcript sometimes so overpowered the real evidence that it

24  becomes a 403 argument.

25          THE COURT:  All right.  Thank you, Mr. Kurland.

1          MR. KURLAND:  Thank you.

2          THE COURT:  I think everybody's been heard.  I do have

3    a couple of questions for the government before I tell you what

4    my preliminary ruling is on these issues.

5          Mr. Harding, Mr. Hanlon, which one of you wants to

6    handle this?

7          MR. HARDING:  I will, Your Honor.

8          THE COURT:  As I recall, in your memorandum, you

9    assert, I believe what it is you assert is that Mr. Mitchell's, a

10   cell phone associated with Mr. Mitchell was, or maybe you don't

11   say this in your memorandum.  Maybe I remember it from an earlier

12   hearing.  That Mr. Mitchell's cell phone can be shown to have had

13   contact with one of the Wyche brothers' cell phones just before

14   the murder.

15         MR. HARDING:  Yes, Your Honor.

16         THE COURT:  Is that right?  Do you recall how soon

17   before?  And was there more than one contact?

18         MR. HARDING:  Yes.  Just one moment, Your Honor.

19         THE COURT:  You don't need to give me a precise answer.

20         (Pause in proceedings.)

21         MR. HARDING:  Your Honor, the agent recalls about a

22   dozen contacts between Mr. Mitchell's cell phone and Darryl

23   Wyche's cell phone right up to the time of the murder.

24         THE COURT:  Over, what?  Twelve hours?  Eight hours?

25         MR. HARDING:  Over a few hours.

1              THE COURT:  A few hours.

2              MR. HARDING:  And we have other witnesses who are aware

3    of these conversations.  The defense knows Damita Green overheard

4    the conversation.

5              THE COURT:  On whose end?  On whose end?

6              MR. HARDING:  She was with Darryl Wyche and she

7    overheard him talking to Bo that evening before --

8              THE COURT:  All right.

9              MR. HARDING:  So we have good evidence that they were

10   in phone contact.  We also have cell phone records showing the

11   contacts between Mr. Mitchell and Mr. Martin.  And as I mentioned

12   in the --

13             THE COURT:  Again, just before the murders?

14             MR. HARDING:  Just before the murders.

15             THE COURT:  Okay.  And then you have the cell phone

16   contact between Mr. Mitchell, Mr. Mitchell's cell phone, and Mr.

17   Martin or Mr. Harris's girlfriend's residence?

18             MR. HARDING:  Mr. Harris's.

19             THE COURT:  Mr. Harris's girlfriend's residence.

20             MR. HARDING:  The Amity Street location.  That was

21   later.

22             THE COURT:  You say within a minute or two.

23             MR. HARDING:  Right.

24             THE COURT:  Okay.

25             MR. HARDING:  And we think he actually alludes to it at

1    the end of the tape recorded conversation because he's talking on

2    his, on his cell phone.

3          THE COURT:  Right.

4          MR. HARDING:  He's talking to Harris's residence.  And

5    he mentions the fact, and it's picked up by Darryl Wyche's cell

6    phone and transmitted to the voice mail.

7          THE COURT:  All right.  Thank you.  Well, my view on

8    the, on the voice mail is that it is clearly admissible.  I

9    acknowledge and agree that there are parts of it that are both

10   indecipherable in terms of what you can hear and make sense of,

11   and that there are parts of it that you can hear, but have great

12   difficulty making sense of.  There's a certain level of seeming

13   incoherence.

14          But I don't at all find that the quality of the voice

15   mail itself is so poor as to render it inadmissible.  It seems

16   clear that the government has very strong and, apparently, even

17   direct evidence from Ms. Green, and perhaps others, of contact

18   between one or more of the defendants immediately before the

19   murder of the Wyche brothers, which a reasonable fact finder

20   could reasonably infer led up to a meeting between one or more of

21   the defendants and the Wyche brothers at the time the Wyche

22   brothers were murdered.

23          So I really have no hesitation whatsoever in admitting

24   the tapes as probative evidence of the murders themselves and of

25   the identity of those who perpetrated the murders.

1          The government clearly has substantial evidence by

2    virtue of the clearly articulated name "Wayne" on the tape to tie

3    inferentially Mr. Martin to that name and to suggest his

4    presence.  And as Mr. Harding just mentioned, there is more than

5    just a seeming coincidence between the statement on the tape,

6    which can be clearly heard to the effect of, "I'm calling your

7    place now."  And if the government can come in and show that at

8    around the time or shortly after that statement is made on the

9    voice mail, a phone connected to Mr. Mitchell dialed a phone

10   number associated with one of Mr. Mitchell's associates, that

11   becomes very powerful circumstantial evidence of the identity of

12   the persons whose voices appear on that voice mail.

13          Obviously, I'm not yet at the point where the Court can

14   find that any particular identification of any particular voice

15   on that tape by any particular witness is admissible.  I haven't

16   heard from the witnesses.  The defense haven't had a chance to

17   cross examine the witnesses as to their basis of knowledge and

18   their ability to identify anybody's voice, number one, and to

19   identify any particular voice on that tape.

20          Even the government's expert acknowledges that more

21   than one person, and common sense makes it clear when you listen

22   to the tape, that more than one person is speaking on that voice

23   mail.  Frankly, I couldn't tell if there were only two or three

24   or four.

25          What is the government's theory in that regard, by the

1     way, Mr. Harding?  Do you have a theory?

2           MR. HARDING:  I don't have a theory, Your Honor.

3           THE COURT:  Okay.  So, like the Court, you're not sure

4     if it's only two people or maybe three, and perhaps four.  What

5     is your theory, do you have a theory apart from the tape as to

6     who was present at the murder of the Wyche brothers?  How will

7     you argue that to the jury, if you can say?

8           MR. HARDING:  We think that all four of the defendants

9     were present, Your Honor.

10          THE COURT:  Okay.  That's what I thought.  So it

11    certainly, on the face of it, frankly, would appear to be, if not

12    impossible, nearly so, for an individual to listen to that tape

13    and identify any word spoken on that tape with any one of the

14    defendants.  I'm not saying it's impossible, but it strikes me as

15    nearly impossible.

16          On the other hand, the government's entitled to try to

17    establish that your witnesses, who apparently have said to you

18    with a level of assurance, oh, yes, that's X's voice or that's

19    Y's voice, you're going to have, I think, a fairly substantial

20    burden to convince the Court that that's reliable.

21          Now, that's not a ruling.  It's just an observation.  I

22    suppose if somebody has known someone for many, many years and

23    has conversed with that person in various contexts and has deep

24    familiarity with the person's inflections -- and I notice that

25    the word "Shorty" may be one of the clues.  Is it?  Is there any

1    significance to the repeated reference by someone to someone else

2    as Shorty?  Is there significance?  Is there any significance in

3    that usage in the identification?

4              MR. HARDING:  Not very much, Your Honor, because

5    "Shorty" was such a commonly used word.  They called one another

6    Shorty.

7              THE COURT:  Well, that's exactly my point.  That's what

8    I thought.  And I appreciate that.  So much of the language on

9    the tape is just very, very fundamental, kind of colloquial,

10   street usage.  It's the way people who are very familiar with

11   each other talk to each other.

12             And so that's part of why it strikes me as just an

13   extraordinary challenge for anyone to listen to that tape and

14   say, yes, that's X, that's Y, that's A and that's B.  But if

15   you've got a witness or two or three or four who claim to be able

16   to do that, we'll hear their testimony.

17             But again, the ability, it seems to me, and I suspect

18   the defense haven't really approached it quite this way, I don't

19   think, but the admissibility of the tape against these defendants

20   is not subject to any particular witness being able to come in

21   and identify any particular voice.

22             So I think that probably gives the government nearly

23   everything the government wants, anyway.  I suppose from the

24   government's point of view it would be nice if you could get a

25   witness to actually say, yes, this particular voice is Mr.

1    Mitchell's or Mr. Harris's or Mr. Gardner's.

2            On the question of reliability, notwithstanding Mr.

3    Kurland's argument, just as in the eyewitness identification

4    context, all of that other evidence that, even the Bruton

5    evidence, is fair game for consideration by the Court on the

6    question of reliability.  So if you can, if you can carry your

7    heavy burden on a particular identification, ear identification

8    witness to identify any particular voice, the fact that Mr.

9    Gardner can be shown to have said to somebody, yes, that sounds

10   like Mr. Mitchell's voice, then that helps the government.

11           So I'm not ruling that out in my admissibility

12   determination because the question is reliability.  And

13   certainly, you've got already, I don't know that you're going to

14   call Ms. Meade, but you've got --

15           MR. HARDING:  Two of the defendants.

16           THE COURT:  -- you've got fairly substantial evidence

17   from sources extraneous to the identification witnesses that

18   these voices are as you say they are.  So that will be fair game

19   and the Court will certainly take that into consideration.

20           But right now it's not enough to get any particular ear

21   witness identification to testify to an identification.

22           MR. HARDING:  Okay.  Thank you, Your Honor.  And of

23   course, the government recognizes the Bruton problem with trying

24   to get in Mr. Martin and Mr. Gardner's identification of

25   Mitchell's voice.

24

1          On the other Bruton issue that's been discussed this

2     morning, the statements that Mr. Gardner made to Mr. Montgomery,

3     we hope that when the Court hears from Mr. Montgomery the Court

4     will see how those statements were in furtherance of the

5     conspiracy.  And as you say, you left open the possibility of

6     revisiting that whole issue.

7          We think that what Mr. Gardner was trying to do was

8     reassure Mr. Montgomery about the viability of continuing to do

9     two planned robberies that they had planned to do with Mr.

10    Martin.  And he was attempting to assure Mr. Montgomery that they

11    would be able to do those robberies because both he and Mr.

12    Martin were not really in serious trouble.  They would be home

13    and ready to do those robberies.

14         So we think we have a good argument why those

15    statements are in furtherance.

16         Also, Your Honor, on the issue of the affidavit of

17    Judge Brown -- Ms. Rhodes can correct me if I'm wrong or Your

18    Honor can correct me if I'm wrong -- but if my memory serves me,

19    what happened was that after Haven Kodeck testified that day

20    about the practice over in state court, the government had Judge

21    Brown scheduled to testify.  And Your Honor said that you didn't

22    believe that would be necessary, that I should relieve Judge

23    Brown from having to testify and that you would consider the

24    affidavit instead.

25         THE COURT:  That's my recollection as well, Mr.

1    Harding.

2             MR. HARDING:  Thank you very much, Your Honor.

3             THE COURT:  While you're there, on the Stop Snitching.

4    Did I hear correctly that the person on the cell phone that was

5    being held to the camera named not just Mr. Montgomery, but two

6    or three other witnesses who were going to be called or who the

7    government intends to call in this case?

8             MR. HARDING:  Yes.  Total of three in this case, plus

9    some witnesses that already testified in the Lexington Terrace's

10   trial before Judge Blake a couple of years ago.  Aaron Butler and

11   Tavon Brown.  The ones before who have testified in the grand

12   jury, all three of them, in this case, are Darryl Bacon, William

13   Montgomery or Will Montgomery, and TM, as he is called on the

14   Stop Snitching video.  That's short for Tony Montana, which is

15   the street name of a guy named Mark Herbert, who testified in the

16   grand jury in this case.

17            THE COURT:  Okay.  Now, what is your evidence, very

18   briefly stated, that it was Mr. Harris speaking through that cell

19   phone?

20            MR. HARDING:  Well, we've played it to not only

21   Detective Benson, but to a cooperator who was very close to Mr.

22   Harris, and to Mr., and to other defendants here.  And he has

23   positively identified it without question as Mr. Harris.

24            There are two voices that come over the telephone,

25   actually.  The phone gets handed from one person to another in

1    the course of that brief snippet on the Stop Snitching video.

2    And the witness is completely without any doubt that it is Mr.

3    Harris.

4         He wasn't entirely sure about the other one.  But

5    again, we've only come across this evidence in the last few weeks

6    so we haven't played it to most of the possible witnesses who

7    might be able to identify the voices.  We've only played it to

8    one cooperator.

9         THE COURT:  All right.  And do you have any evidence

10   regarding Mr. Harris's likely access to his cell phone?

11        MR. HARDING:  Well, I can, I can assure the Court that

12   it would be a fairly simple matter to put on witnesses to testify

13   that cell phones are readily available in Supermax because --

14        THE COURT:  Does the voice say, did I hear the voice

15   say, "I'm at Supermax?"

16        MR. HARDING:  Yes.

17        THE COURT:  Does the voice actually say that or does

18   the guy holding the cell phone say that or both?

19        MR. HARDING:  My recollection is that the voice said

20   that.  The voice on the phone said that and then Shug repeats it.

21        THE COURT:  That was Shug holding the phone?

22        MR. HARDING:  Yeah.

23        THE COURT:  And he says, tell us where you are, or

24   something like that?

25        MR. HARDING:  Yes.  Yes.

1          THE COURT:  And then that question is answered.

2          MR. HARDING:  Yes.

3          THE COURT:  All right.  And do you know the date?  Are

4    you able to determine, I guess you're not, the date that that

5    piece of the recording was actually made?

6          MR. HARDING:  You know, I've never actually, it's such

7    a long tape that we might, by analyzing the references in it, we

8    might be able to pinpoint the date.  There are a number of

9    references to particular events in the tape itself that would

10   help us to pinpoint the date.  If we set our minds to it, we

11   might well be able to pinpoint when the tape was made.

12         THE COURT:  But not particularly when that portion of

13   it was --

14         MR. HARDING:  That's correct.

15         THE COURT:  -- recorded.

16         MR. HARDING:  That's correct.

17         THE COURT:  Okay.  I think that would be helpful.

18   Okay.  And is it your position that that evidence would be

19   admissible against all four defendants?

20         MR. HARDING:  Yes, Your Honor.

21         THE COURT:  On what theory?

22         MR. HARDING:  On the coconspirator statement theory,

23   Your Honor, that, first of all, there may well have been two

24   defendants involved in the conversation.  But the point was to

25   encourage retaliation against government cooperators in this

1    case.  It is a continuation of the same activity that the rap

2    songs were attempting to do, intimidate, scare off witnesses,

3    escape these charges.  That's what, that's what we think was

4    going on in the Stop Snitching video.

5         THE COURT:  All right.  Thank you, Mr. Harding.  Well,

6    I'm inclined to admit the Stop Snitching video on the basis of

7    the government's proffer that Mr. Harris's voice will be

8    identified and that the government can establish by way of

9    foundation that access to phones, whether cell phones or some

10   other phone, in a place of detention such as Supermax would not

11   be an extraordinary occurrence.

12        I don't perceive any prejudice, undue prejudice to the

13   defendants from the jury's knowledge that the defendants are

14   being detained.  And of course, if I'm requested to do so during

15   voir dire, I would be more than happy to explain to the jury that

16   the fact that a defendant is detained in no way vitiates the

17   presumption of innocence, and emphasize to the jury that the jury

18   is not to draw any adverse inference from the fact that the

19   defendants have been detained in custody.

20        So my inclination is to permit the government to use

21   that evidence.

22        Now, again, whether it's coconspirators' statement is

23   not obvious to me.  But it's clearly tied up on a question that

24   we haven't even gotten to yet, and that is the inclusion in the

25   superseding indictments following the defendant's resort to

1    flesh, the flesh and blood defense, to what extent the Court will

2    permit the government to argue, as the indictment charges, that

3    the conspiracy has continued right up through the pendency of the

4    case.  But that's another one of those issues we'll have to

5    confront, hopefully on August 23rd, and certainly throughout that

6    period.

7          So I think that those preliminary rulings are what I

8    want counsel to be aware of.  And now I'll hear from counsel on

9    any of those and any additional issues before I think we can

10   break for the day and for the week.

11         Ms. Rhodes.

12         MS. RHODES:  Yes, Your Honor.  Thank you.  Just on this

13   issue of the Stop Snitching.  It would be helpful to me if I

14   could get from the government any other voices that they're

15   identifying as being on that tape.  I have information that other

16   people in Mr. Harding's office have concluded, have identified

17   they think some other voices on that tape, in that particular

18   conversation.

19         And the reason, I need that for a couple reasons.  But

20   one of them is to rule out any potential conflict that I need to

21   evaluate.

22         THE COURT:  I'm sorry.  When you say "voices on the

23   tape", do you mean -- Mr. Harding says he thinks there are two

24   people speaking through the cell phone.  And then there's some

25   voices.  Is it Shug?

1          MS. RHODES:  Well, I think there's about --

2          THE COURT:  The guy holding cell phone to the camera is

3     Shug.

4          MS. RHODES:  It sounds to me as if there's a background

5     voice and then there are --

6          THE COURT:  You mean a background voice in the room

7     with Shug?

8          MS. RHODES:  No.

9          THE COURT:  Okay.  What do you mean?

10         MS. RHODES:  In the background of the cell phone.  In

11    other words, there's Shug in one place.  And then it seems to me

12    that there are three other voices that one can hear.  One is not

13    really audible, it's the background voice.

14         THE COURT:  Okay.

15         MS. RHODES:  And then two, or possibly even three

16    others.  And so my understanding is from, there's another person

17    in Mr. Harding's office related to another case, where Stop

18    Snitching Two has been, has been relevant, that they have made

19    other assumptions, not ruling out Mr. Harris.  But I'm just

20    saying other assumptions about other voices.

21         So I need that information because of a potential

22    conflict.  It's a very slight chance but I just want to rule it

23    out.

24         THE COURT:  And it's Brady, frankly.

25         MS. RHODES:  Well, that's true.  To the extent it's not

1    defendants.  For a variety of reasons.

2         THE COURT:  Right.  The government has more than a

3    scintilla of evidence both of the number of people or of,

4    certainly of the identity of the people speaking through that

5    cell phone, then you're entitled to know that.

6         MS. RHODES:  Certainly.  Because presumably, other

7    people in his office have shopped this around to other

8    cooperators in the chance that they might identify other voices

9    on it.

10        THE COURT:  All right.

11        MS. RHODES:  Thank you.

12        THE COURT:  Mr. Pyne?  Mr. Crowe?

13        MR. CROWE:  Your Honor, the only question I have is

14   whether the Court is contemplating that there's going to be

15   evidence taken on any issue when we convene in August.

16        THE COURT:  Well, first, there's Ms. Rhodes's possible

17   issue on Mr. Mitchell's statement at Homicide.  Whether the

18   government will find and bring in identification witnesses at

19   that time I don't know yet.  I hope they do.  So, yes, I'm hoping

20   that we'll have at least a couple of identification witnesses on

21   August 23rd.

22        MR. CROWE:  Thank you.

23        THE COURT:  Mr. Martin?

24        MR. MARTIN:  Your Honor, just so I'm clear.  You

25   haven't yet ruled that you will or will not allow the jury to see

1    the transcript of the --

2           THE COURT:  Oh, thank you for reminding me.  I will

3    allow the government to use the transcript.  I appreciate Mr.

4    Kurland's suggestion.  But I don't find the transcript as a whole

5    to be so, I do not find that the transcript overwhelms the tape.

6           Now, if there are changes to the transcript that the

7    defense would like the Court to consider, I certainly will

8    consider that.  Frankly, there are certain parts of the tape

9    where I couldn't even hear what was being said.  I mean, I barely

10   could tell that it was a human voice.  And I think there may have

11   been one or two points on the transcript where words were

12   appearing.  And I remember thinking, well, you know, who prepared

13   this transcript and how can they say that that's what's being

14   said?

15          So I agree, there may be one or two lines on the

16   transcript that may need to be just deleted.  And what should be

17   replaced is "inaudible" or "indecipherable."  But there are other

18   parts of the transcript, clearly, the voice is closer to the cell

19   phone, or for whatever other reason, it's very clear.  The use of

20   the name "Wayne", the use of the term "Shorty", you know, this

21   business about why didn't I search their pockets, that comes

22   through pretty clearly.

23          MR. MARTIN:  Actually, Your Honor, the government has

24   versions where it says "why didn't I", and then they have

25   versions that say "why I didn't."  And I heard it as "why I

1    didn't."

2              THE COURT:  Yeah.

3              MR. MARTIN:  But my point, Your Honor, is, and I don't

4    want to, I don't quite know how to say this.  I don't want to

5    insult you or anything.

6              THE COURT:  No, you can't do that.

7              MR. MARTIN:  I wish maybe you would wait to rule

8    finally on that and think about it for a week or so, and then go

9    back and just listen to the tape, don't put the transcript in

10   front of you.  You can't, other than "Wayne", you can't

11   understand it.

12             THE COURT:  But that doesn't make any sense.  No.  No.

13   It doesn't make any sense to listen to the tape without the

14   transcript.  Now, I understand the point.  At some point

15   somebody, some investigator or some clerical support, somebody

16   listened to it the first time without a transcript.  I agree,

17   clearly.  And somebody did some work to try to translate what

18   they were hearing on that tape to paper.

19             All I'm saying is, in some respects they did a pretty

20   good job.  Shorty is Shorty.  You can't --

21             MR. MARTIN:  You don't need a transcript to say it's

22   Shorty.

23             THE COURT:  Don't need a transcript.

24             MR. MARTIN:  You do need a transcript to tell you

25   whether he's saying "I'm calling your house, Shorty" or "I'm

1    coming to your house, Shorty."  Originally, the government said

2    it was, "I'm coming to your house, Shorty."  Now it's, "I'm

3    calling your house, Shorty."

4            I think those transcripts are very suggestive and I

5    think it's dangerous to let a jury look at a suggestive

6    transcript in a case where, you know, I don't know how many

7    iterations of the transcript the government has.  And I wonder if

8    the Court would tell the government to give us every iteration

9    that they've had.

10           I let somebody in my office listen to it for an hour

11   the other day and had her make up a transcript, and it looks,

12   Shorty, and the other ones we could obviously hear.  There are

13   other things she just couldn't hear and didn't pick up.  I didn't

14   let her see the transcript before she did it.

15           I think that kind of exercise is helpful when we're

16   talking about a tape that is so important, as important as this

17   one is.  And when we're talking, Your Honor, Mr. Harding isn't

18   prepared to tell you, he has a theory, I think he said, that all

19   four were there?  You know, I don't know.  But he wasn't prepared

20   to tell you who was there, only who's on the tape.

21           You know, it's very important.  This is really crucial

22   to this case.

23           THE COURT:  I appreciate that, Mr. Martin.

24           MR. MARTIN:  I just don't think juries ought to be

25   allowed to speculate about all of that.

1          THE COURT:  I'm sure what I would be willing to do,

2     absolutely, and this is how I will take the defense request, I

3     will first have the jury listen to it without the transcript,

4     maybe even more than once, if that's what the defense want to do.

5     I mean, I'm talking about, of course, in the government's direct

6     case.  And then give the jury the transcript.

7          So that would give the defense, I think, pretty much

8     exactly what the defense wants.

9          MR. MARTIN:  Would you let me give them one of mine,

10    depending on --

11         THE COURT:  If you have a completed transcript, I'll be

12    glad to compare transcripts.  I'm not going to require the

13    government to give you its earlier versions.  But I certainly

14    would be willing, more than happy, and I assure counsel, I will

15    listen to this many more times before August 23rd.  And if you

16    want to send me your transcript, I'll be glad to compare and

17    contrast and listen to it without and listen to it with the

18    government's and listen to it with yours, and see if we can't

19    reach some consensus on what should be there, what shouldn't be

20    there, what's inaudible, what's not, and what's indecipherable

21    and what's not.  I appreciate that, I really do.

22         I had a case, I had a sentencing the other day.  Drug

23    conspiracy, people coming up from Virgin Islands.  And the

24    indictment said first name, last name, AKA Cheap Head, C-H-E-A-P,

25    H-E-A-D. And so at sentencing, you all know me, I said to the

1   defendant, I said, "Where did you get this nickname, Cheap Head?"

2   And the defendant said to me, "That's not my nickname."  I said,

3   "What's your nickname?"  He said, "Sheep Head."  S-H-E-E-P,

4   H-E-A-D.

5          And it's pretty clear, it was a Title Three case, and

6   it's pretty clear to me that some agent or some investigator

7   listened to the tape and now the guy for the rest of his life is

8   going to have the nickname "Cheap Head" because that's how he's

9   been convicted.  He'd never had been known as Cheap Head.

10          MR. MARTIN:  In a lot of ways it might be better than

11   Sheep Head.

12          THE COURT:  So I share that with you just to say, Mr.

13   Martin, I have always been skeptical of transcripts and I'm not

14   foreclosing any further argument, any competing transcripts.  But

15   I'm not going to require the jury not to look, I'm not going to

16   forbid the government from providing the transcript.  But I will

17   require the government to play the tape without the transcript

18   one or two times.

19          MR. MARTIN:  And the next issue, Your Honor, do we

20   still, did I understand you to say that it's still somewhat of an

21   open issue on tying in this continuing conspiracy with the flesh

22   and blood issues that we have here?

23          THE COURT:  Absolutely.  I think somebody projected at

24   our least hearing, might have been you, that motions in limine of

25   some sort are likely to be filed.  And we'll see where that goes.

1          Obviously, if the government's going to be permitted to

2    proceed on the theory espoused in what is now, what, the fourth

3    superseding indictment, then clearly the conspiracy continued up

4    through 2006 or 7.  So yeah.

5          MR. MARTIN:  You mean if they can establish that it

6    did?

7          THE COURT:  If they can establish that.

8          MR. MARTIN:  I mean, I just see all kinds of issues

9    here because, Your Honor, there's three other cases in this

10   district, at least, where the guys were doing the same thing.

11   Are they part of this conspiracy?  You know, those are issues

12   that I think we need to think about before we let this happen.

13   We'll be doing that in our motions in limine.

14          Finally, Your Honor, you will, you are going to

15   consider and rule on the RICO issue?

16          THE COURT:  Yes.

17          MR. MARTIN:  And the only comment I would make about

18   that issue, I frankly can't even remember what I wrote any more

19   when I wrote it, but it was the enterprise issue.

20          THE COURT:  Okay.

21          MR. MARTIN:  And the only thing I would say to the

22   Court with some caution is, and I'm not sure I understand why

23   this happens, but if this was a civil case, that thing wouldn't

24   be here, the RICO would be thrown out.  I see that in every

25   criminal RICO case I have, every civil RICO case I have.

1          The law mainly comes from the civil cases.  It says you

2   can't have the enterprise be the same as the person.  You know,

3   we're not going to do that.  Mostly because the courts don't want

4   to hear these crazy RICO civil cases.  And yet in the criminal

5   cases, it's the same statute.  It seems to get a different

6   connotation.  I ask the Court to keep that in mind when you're

7   ruling.

8          THE COURT:  All right.

9          MR. MARTIN:  Thank you, Your Honor.

10          THE COURT:  Thank you very much, Mr. Martin.  Mr.

11   Kurland.

12          MR. KURLAND:  Your Honor, two quick things.  One, a

13   point of clarification with respect to the transcripts.  Did I

14   hear the Court say that you also leave open the option, as I

15   think is done in some cases, that potentially competing

16   transcript the jury would be able to --

17          THE COURT:  What I really was saying was, for purposes

18   of settling on a transcript, that I would consider defense

19   suggestions of amendments, modifications, or an entirely

20   competing transcript.  But no, I don't expect, I'm not ruling it

21   out but I don't expect to give the jury two transcripts.

22          MR. KURLAND:  Also, I take it, Your Honor, with respect

23   to the procedure that you sort of tentatively set forth, if the

24   jury listens to it first and then gets either a transcript or

25   whatever transcript, at that point I take it the Court would also

1  give a very clear, firm instruction to the jury, instructing them

2  as to the use of the transcripts.

3          THE COURT:  Absolutely.  Absolutely.

4          MR. KURLAND:  The second thing, Judge, is with respect

5  to the kind of open issue concerning the scope of the conspiracy,

6  whether it extends, with respect to the flesh and blood issue, I

7  would suggest or submit to the Court that on Brady principles,

8  all of the evidence that the government has concerning flesh and

9  blood defenses, as they come up throughout the federal prison

10  system, is Brady evidence that we should have because, just along

11  the lines of, you know, other conspiracies, other drug

12  conspiracies, are they part of these conspiracies, an allegation

13  by the government that part of the continuing nature of this

14  conspiracy is the in-concert activity, it's fair game to then get

15  all the information as to, you know, we have some tax protester

16  in Idaho is, you know, is putting on a flesh and blood defense,

17  we're entitled to that evidence from the government and to be

18  able to argue to the jury that the scope of the conspiracy

19  doesn't include that because there's, you know, thousands or

20  hundreds of other defendants who are doing the same thing.  And

21  it goes more to a kind of a frustration with the federal criminal

22  court system as opposed to being a specific incident of this

23  conspiracy.

24          So I'll file a formal motion.  But I think though, that

25  if the government is going to go down that path, and I understand

1    the Court hasn't specifically ruled on that, but if that's the

2    government's intention, I believe it's Brady material, we're

3    entitled to whatever the government knows concerning flesh and

4    blood jurisdictional defenses in federal criminal cases

5    throughout the United States.

6            THE COURT:  I seriously doubt that, but you can file

7    your motion.  We'll see what you say about that.

8            MR. KURLAND:  Thank you, Your Honor.

9            THE COURT:  All right.  When I use the term "flesh and

10   blood defense", you understood, Mr. Kurland, it was in quotes.  I

11   didn't do this (motioning), but you understood.

12           MR. KURLAND:  I understand.  But it's my understanding,

13   though, that that's a, that's a term of art that turns up.  And

14   same thing with UCC recitations.  That's not unique to this

15   courtroom.

16           THE COURT:  Oh, sure.  Sure.  Okay.  Anything else

17   anybody has?  Thank you all very much.  Look forward to seeing

18   you on August 23rd.  We're in recess.

19           (Conclusion of Proceedings at 11:03 a.m.)

20

21

22

23

24

25

1                          REPORTER'S CERTIFICATE

2

3              I, Mary M. Zajac, do hereby certify that I recorded

4      stenographically the proceedings in the matter of USA v. Willie

5      Mitchell, et al., Case Number(s) AMD-04-029, on June 12, 2008.

6              I further certify that the foregoing pages constitute

7      the official transcript of proceedings as transcribed by me to

8      the within matter in a complete and accurate manner.

9              In Witness Whereof, I have hereunto affixed my

10     signature this _____ day of _____, 2008.

11

12

13

14     _____

           Mary M. Zajac,
15         Official Court Reporter

16

17

18

19

20

21

22

23

24

25