1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MARYLAND
2                   NORTHERN DIVISION

3


4
    UNITED STATES OF AMERICA
5
            v.                          CRIMINAL CASE NO.
6                                        AMD-04-029

    WILLIE MITCHELL,
7   SHELTON HARRIS,
    SHELLY WAYNE MARTIN,
8   SHAWN GARDNER,

9        Defendants
    _____/
10

11              (Motions Hearing)
             Friday, August 22, 2008
12           Baltimore, Maryland

13
    Before:  Honorable Andre M. Davis, Judge
14

15  Appearances:
          On Behalf of the Government:
16         Robert Harding, Esquire
          On Behalf of Defendant Mitchell:
17         Laura Kelsey Rhodes, Esquire
          On Behalf of Defendant Harris:
18         Gerard P. Martin, Esquire
           Paul Flannery, Esquire
19        On Behalf of Defendant Martin:
           Thomas L. Crowe, Esquire
20         James G. Pyne, Esquire
          On Behalf of Defendant Gardner:
21         Adam H. Kurland, Esquire
           Barry Coburn, Esquire
22

23  Reported by:
    Mary M. Zajac, RPR
24  Room 5515, U.S. Courthouse
    101 West Lombard Street
25  Baltimore, Maryland 21201

2

1          (Proceedings at 10:25 a.m.)

2          THE COURT:  Welcome, counsel.  I think we're in the

3    final stage of preparation and I'm prepared today to rule on

4    some, I think, a couple of open motions that have not yet been

5    finally determined.  I'm not sure whether the government has any

6    witnesses here today with respect to the Stop Snitching II video

7    and I'm not sure if there are any other matters that we need

8    final resolution on, but I'm prepared to hear counsel.  And then

9    I want to talk about final preparation for trial.

10         I think each of you has a copy of my memorandum to

11   counsel from yesterday, so I'll be glad to hear you on that, the

12   proposed schedule.  And I'm going to announce a few of the rules

13   that I intend to enforce during the trial, which will be embodied

14   in a future order and delivered to each of counsel.

15         So why don't I start with you, Mr. Harding?  Good

16   morning.  What is your personal agenda and what do you think we

17   need to accomplish today?

18         MR. HARDING:  Yes.  Thank you, Your Honor.  First of

19   all, let me apologize.  Mr. Hanlon is not here today.  He's in a

20   trial in another courtroom and although they aren't sitting

21   today, he's very pressed and needs to prepare witnesses this

22   morning.

23         THE COURT:  Indeed.

24         MR. HARDING:  With regard to the schedule which I

25   received this morning, I --

3

1          THE COURT:  I should mention -- I'm sorry.  I did

2    e-file it.  Some of you probably saw it.  But I wanted to be sure

3    that you had a copy because I understand, number one, that

4    counsel in these criminal cases probably aren't yet fully

5    acclimated to e-filing.  I know that's going to take a while.  So

6    you've had a chance to look it over, Mr. Harding?

7          MR. HARDING:  Yes.  In fact, Ms. Rhodes and I were just

8    discussing the fact that we did not receive the Court's e-filings

9    of yesterday, the paperless orders.  Apparently, other counsel

10   did.  We did not, for whatever reason.

11         THE COURT:  Are you registered in the CM/ECF system?

12         MR. HARDING:  You know --

13         THE COURT:  Probably not.

14         MR. HARDING:  May not have.

15         THE COURT:  If you're wondering about it, that would be

16   the answer.

17         MR. HARDING:  I took the training but I may have

18   forgotten to go back and get a password.

19         THE COURT:  Okay.  You can take care of that.

20         MR. HARDING:  In any event, on the issue of the

21   schedule, I do have one important issue.

22         THE COURT:  All right.

23         MR. HARDING:  As I told the Court last time, I don't,

24   I'm not as pessimistic as the Court is about how long this trial

25   is going to take.  I have obviously done a lot of preparation and

4

1    thinking about the witnesses and how long they would take.  And

2    although I was reminded as recently as this summer how difficult

3    it is to predict how long a trial is going to take when, of

4    course, I don't control the pace of the proceedings, I

5    nevertheless, based on my prior experience, decided that 12 trial

6    days would probably be enough to put on the government's case.

7            THE COURT:  In this case?

8            MR. HARDING:  Yes, Your Honor.

9            THE COURT:  Music to my ears, Mr. Harding.

10           MR. HARDING:  That would mean three typical weeks

11   except that, of course, we aren't sitting four days in every

12   week.  In fact, I wanted to ask the Court, are we going to sit on

13   September 18th?

14           THE COURT:  No.  If it's not listed there, we won't be

15   sitting.  Let me take a quick look and give you an explanation as

16   to why we're not sitting on any particular day that you're

17   wondering about.

18           MR. HARDING:  The schedule says we commence evidence on

19   September 17th.

20           THE COURT:  Right.

21           MR. HARDING:  And the next trial day indicated is

22   September 22nd.

23           THE COURT:  Yes.  I do not intend to sit on Thursday --

24           MR. HARDING:  Okay.  So we're only sitting on --

25           THE COURT:  I'm sorry.  Wait a minute.  I know there

5

1    was a reason, Mr. Harding, but I have to confess to you, sitting

2    here now looking at my calendar, it altogether escapes me.  I'm

3    trying to recall what it was about the 18th.  You know, that may

4    well have been an oversight on my part, Mr. Harding.  I think I

5    was probably looking at the 25th.

6          We will not be in session, as you can see from my

7    memorandum, on the 25th.  But in fact, I think we will be in

8    session on the 18th.  Thank you for highlighting that.  And I

9    will doublecheck that and confirm with counsel.

10          But yeah, please add the 18th for now to the proposed

11    schedule.

12          MR. HARDING:  Okay.  But that would mean we're taking

13    testimony for two days the first week.  And Your Honor has listed

14    three days the second week and three days the third week.

15          THE COURT:  Correct.  And by the way, the reason we're

16    not sitting on October 2nd is so that Ms. Arrington can be

17    retrained.  More specifically, that's a training day for court

18    staff, all court staff, as well as a day set aside for employee

19    recognition.  And the Clerk has asked us not to schedule court

20    proceedings on October 2nd.  And I've acquiesced to that request

21    in this case.  That's why we're not sitting on the 2nd of

22    October.

23          MR. HARDING:  Okay.  Well, in any event, if my

24    predictions have any accuracy, which I am not sure whether they

25    do or not, I would estimate that we would finish the government's

6

1    case sometime the week of October 14th.  And the reason I'm

2    emphasizing that is that, of course, if the defense has witnesses

3    they want to call, I don't want them to assume that they don't

4    have to worry about them until the second week in December.  We

5    may well be ready for the defense case in the second half of

6    October.  That's my prediction.

7         THE COURT:  I won't press you, at this point at least,

8    Mr. Harding, but obviously, and I don't know how defense counsel

9    feel about your disclosure, but the assertion, which I credit

10   unquestioningly, although I'm about to question it, that you can

11   put on this case in 12 trial days is surprising.

12        You haven't said anything about dismissing counts.

13   Obviously, the government has withdrawn the death notice and that

14   changes everything, of course.  But from what I understand the

15   government intends to do with four sets of lawyers conducting

16   cross examination of every witness, and leaving, even leaving

17   aside the fact that we still need to have hearings on

18   identification and perhaps other issues as the trial proceeds,

19   you really confident 12 trial days?

20        MR. HARDING:  No, I am not really confident at all,

21   Your Honor.

22        THE COURT:  Oh, okay.  That's your best --

23        MR. HARDING:  Yes.

24        THE COURT:  -- feel for it at this point?

25        MR. HARDING:  I had a trial just this summer with Mr.

1    Manley in which we put on 41 witnesses in about 2 and a half

2    days.  That was, the defendant, the last defendant then pleaded

3    guilty.  But there was only one defendant who actually went to

4    trial or was still around at the end of the trial.  It's nothing

5    like when you have four defense counsel.  Nevertheless, 41

6    witnesses in 2 and half days.  And it was a very similar type of

7    case with the same mix of civilian witnesses and police witnesses

8    and federal agents.

9             THE COURT:  Do you have some stipulations that I don't

10   know about?

11            MR. HARDING:  No.

12            THE COURT:  Okay.

13            MR. HARDING:  I haven't discussed stipulations.

14            THE COURT:  Of course.

15            MR. HARDING:  I think that's a very important topic

16   that we maybe should discuss.

17            THE COURT:  Certainly.

18            MR. HARDING:  It would speed things along.

19            THE COURT:  Certainly.  No.  I don't doubt that it can

20   happen.  41 in 3 days certainly is some kind of world record.

21   Records are made to be broken.  And I can easily imagine that.

22   And indeed, Mr. Hanlon and I have been involved in a couple of

23   trials, the one you alluded to earlier, this summer when frankly

24   he was a little embarrassed as Assistant U.S. Attorneys sometimes

25   are when they get to 3:20 on a trial day and run out of

8

1    witnesses.  So it does happen.  I understand that.  But I just

2    don't know of any reason reasonably to expect this particular 19

3    count indictment to get tried in 12 trial days.

4            I appreciate the heads up.  Counsel on the defense side

5    are alerted that they may well need to have witnesses available

6    at least the week of October the 14th if they intend to put on a

7    case.  So we'll see how it goes.

8            MR. HARDING:  Your Honor, I have, the government's

9    proposed jury instructions will be submitted next week, early

10   next week, I hope.

11           THE COURT:  Good.

12           MR. HARDING:  They're mostly done.  On the issue of the

13   Stop Snitching video and the voice mail, I'd like to proffer what

14   I can today, Your Honor, because I am still very, in the first

15   place, we haven't located all of our witnesses.  We still, we're

16   starting to look very hard for our witnesses but there are still

17   a number out there that we haven't located.

18           And in addition, some of our witnesses are, for one

19   reason or another, very much at risk.  Some of them are

20   incarcerated, and they're the ones who most at risk.  And I'm

21   simply very reluctant to bring anyone in here under those

22   circumstances unless I can be absolutely sure I can protect them.

23           Agent Benson is here and he can testify himself as to

24   the voice ID's he can make, as well as to the voice ID's made by

25   the one cooperator that we have played the Stop Snitching video

1    to.  And he would testify that both he and the cooperator clearly

2    recognize Mr. Harris's voice in the Stop Snitching video.

3    Agent -- I'm sorry -- TFO Benson also recognizes the voice of Mr.

4    Mitchell in the Stop Snitching video and seems confident of that.

5              But the cooperator that we, the one cooperator that

6    we've been able to play the Stop Snitching video to did not

7    identify Mr. Mitchell's voice.  He identified only Mr. Harris's

8    voice.

9              THE COURT:  Is it your proffer that Mr. Harris and Mr.

10   Mitchell each comes through that cell phone in that same part of

11   the video?

12             MR. HARDING:  Yes, Your Honor.

13             THE COURT:  I see.

14             MR. HARDING:  On the voice mail message, this is --

15             THE COURT:  By the way, in that connection, I take it

16   there's no evidence, external or extraneous evidence, as to Mr.

17   Mitchell or Mr. Harris's access to cell phones while detained.

18             MR. HARDING:  Not at this point, Your Honor.

19             THE COURT:  Okay.  All right.

20             MR. HARDING:  Of course, we may have testimony about

21   that.  We simply haven't had a chance to ask our cooperators

22   about that fact.  We can easily put on testimony that cell phones

23   are easily available in Supermax.

24             THE COURT:  Sure.

25             MR. HARDING:  And the other facilities here in

1    Baltimore.  It's something we hear about every day.

2              THE COURT:  Sure.

3              MR. HARDING:  As for the voice mail, the same

4    cooperator who I'm reluctant to bring in here and who we have

5    played the voice mail tape to clearly identifies both Mr. Harris

6    and Mr. Mitchell on the voice mail tape.  And his identifications

7    of who is talking when are about the same as TFO Benson's.  The

8    high voice at the beginning is Mr. Harris.  The guy who says you

9    should have checked their pockets or we should have checked their

10   pockets, whatever it is, that's Mr. Mitchell.

11             That particular sentence is actually corroborated by

12   Mr. Gardner, who told a witness in this case that it was Mitchell

13   that made that statement on the tape.  And so I feel that's a

14   particularly good voice ID.  We actually have, in a coconspirator

15   statement, Mr. Gardner verifying that that's Mitchell who made

16   that statement.

17             Now, as I said before, I would only put somebody on the

18   stand to make a voice ID if they had a very powerful, independent

19   basis for making the identification.  I haven't yet found all of

20   those people and I would like to reserve on the possibility of

21   asking one or two of them on the stand if they can make any voice

22   ID's, if the Court would permit me to do that.

23             The Court said something last time about permitting the

24   government to have the Wade hearing sort of outside the presence

25   of the jury prior to the witness testifying.  If I can do that, I

1    might want to take advantage of that.  But as I say, except for

2    this one cooperator, we don't really have the situation nailed

3    down.

4         I don't mean to say that the other people -- Mr. Crowe

5    put in his pleading that a lot of civilians have made voice ID's

6    with respect to the voice mail, not with respect to the Stop

7    Snitching video, but with respect to the voice mail.  So they

8    made voice ID's on the day that Irene Magginson got the voice

9    mail message and played it to people in her house or else the

10   police played the tape for some people at some point.

11        So they have heard the tape before and some of them

12   have made ID's before.  But we aren't prepared to -- we certainly

13   aren't going to use all of those people.  We won't use most of

14   them.  There may be one or two of them that we would like to use

15   if the Court permits us.

16        That's the situation with respect to the voice ID

17   issue.

18        I know that we still have an issue remaining about the

19   statement that Mr. Mitchell made when he was arrested for the, he

20   was arrested on April 1st, 2002 on a couple of open warrants.

21        THE COURT:  Correct.  And I'm prepared to hear Ms.

22   Rhodes, if she wishes to be heard on that, and you, if necessary.

23   I'm prepared to rule on that today.

24        MR. HARDING:  Okay.  Good.  I hope we're going to try

25   to resolve that issue today.

1       THE COURT:  I think it's important that we resolve it

2  today, yes.

3       MR. HARDING:  Okay.  As far as I'm aware, those are the

4  outstanding issues.  There are other, there are other motions

5  that have not been ruled on but I don't know that there's any

6  argument that remains to be done or any evidence that remains to

7  be put on.

8       THE COURT:  The two that I had in mind, Mr. Harding,

9  were, one, in one of my paperless orders last evening, denied the

10  Motion to Dismiss Count 19, which is the obstruction count

11  against Mr. Harris, which, as you, of course, will recall is also

12  the matter in a separate case and in, I believe, the third

13  superseding indictment, the government included that obstruction

14  charge arising from the events in the marshal's lockup as Count

15  19 in the third superseding indictment.  Then, of course, there's

16  a fourth superseding indictment.  Likewise, Count 19 of that

17  indictment.

18       So I denied it in my paperless order last night only in

19  a sense that it's in the third superseding indictment and the

20  third superseding indictment has been superseded.  But I presume

21  that Mr. Harris wishes to have a court rule on that today.  And I

22  think I'm prepared to rule on it today if counsel wanted to be

23  heard or not.

24       And then the second was, I thought I hadn't ruled on

25  the Motion to Dismiss Count One on the ground that the enterprise

1    element was insufficiently pled in the indictments.

2         So those are the two motions that I thought were

3    outstanding, in addition to the Mitchell statement motion.

4         MR. HARDING:  Okay.  I know that the government has

5    responded on paper to both of those.

6         THE COURT:  Correct.

7         MR. HARDING:  I didn't know we were going to have oral

8    argument on it today.  But I don't know that I have anything to

9    add to what's on the papers in that, in either of those matters.

10        THE COURT:  All right.  Ms. Rhodes, good morning.

11        MS. RHODES:  Good morning, Your Honor.

12        THE COURT:  I see you are not accompanied this morning.

13        MS. RHODES:  I am accompanied by Mr. Mitchell only.

14        THE COURT:  Yes.  Indeed.

15        MS. RHODES:  Mr. Lawlor is, was not able to be here.

16   He's working on a federal habeas capital case and had to attend

17   to business out of town for that.

18        THE COURT:  All right.  He's excused.

19        MS. RHODES:  Thank you, Your Honor.  I wanted to just

20   briefly review some of the testimony that we had on this issue

21   before from Detective Niedermeyer and Detective Townsend.

22        THE COURT:  Referring now to Mr. Mitchell's statement?

23        MS. RHODES:  Right.  This is the suppression hearing

24   that we continued from around November of 2005.

25        THE COURT:  Yes.  Before you get into that, if you can,

14

1    just preview for me, do you have any other issues, whether

2    related to motions or housekeeping matters or anything, just so I

3    have it sort of in the back of my mind?

4           MS. RHODES:  The only other one, Your Honor, relates to

5    the remaining, the portion of the fourth superseding indictment

6    that includes the live flesh and blood conspiracy issues.

7           THE COURT:  Right.  Right.  That was something that we

8    needed to take up.

9           MS. RHODES:  Yeah.  And I think that we would, I don't

10    know at what point the Court's going to deal with that.  Mr.

11    Lawlor was preparing some issues on that.  So I don't know if we

12    can deal with that right before trial or how do you want to

13    handle that?

14           THE COURT:  Well, I think I'm prepared, at least on a

15    preliminary basis, to give some rulings on those issues today.

16    But certainly, I won't rule finally until Mr. Lawlor and anybody

17    else who wants to be heard on that have been heard.

18           MS. RHODES:  Okay.  Just the thrust of our argument

19    there is that there are a number of problems that arise if those

20    are, if those facts are to be included in the trial, in the

21    indictment, in the trial; namely, that we all are witnesses.  And

22    if not some of us specifically, then we'd have to call, we may

23    have to call court personnel because all we have is a transcript.

24    But there exists tapes and there exists eyewitnesses to the

25    behavior.  And depending on how it's characterized, our position

1    is that we can't, we can't not call witnesses if we think it's

2    mischaracterized to the jury.

3              THE COURT:  Okay.  Let's wait and see if Mr. Harding's

4    prepared today to sort of project for us the extent to which the

5    government intends to make hay out of those facts.

6              MS. RHODES:  Okay.  All right.  So back to October of

7    2005, which was dealing with Mr. Mitchell's transportation on

8    April 17th, 2002.

9              As the Court recalls, he was arrested April 1st and

10   charged with possession of a handgun.  And that's what put him in

11   custody to begin with.

12             On April 17th, then, first Detective Townsend, Darryl

13   Townsend, went to get him at Central Booking.  And as the Court

14   probably recalls, the interesting way they do this routinely, and

15   he said, Detective Townsend's testimony was on a weekly basis,

16   and he had done hundreds of these in his career, would be to get

17   a writ and take it to Central Booking.  And the writ was simply

18   signed by, was prepared by the State's Attorney's Office and

19   signed by a judge, but did not say in the writ that it was a writ

20   for questioning about a homicide case or questioning.  It

21   appeared to be a writ for, a writ for a court appearance or

22   something akin to that.

23             The writ would then be taken to Central Booking.  It

24   would be showed, along with the photograph, to them.  And they

25   would then turn over the prisoner and issue a receipt for having

1    received the writ.

2           Detective Townsend testified that he had never had

3    somebody say, "No, you can't take this prisoner."  He also

4    testified that people didn't routinely ask him, "Is this okay

5    with my lawyer?"  There was no discussion.

6           Needless to say, the essential part of our argument is

7    the intimidation factor that's going on.  These people are taken,

8    Detective Townsend said, in leg irons and a waist cuff as well.

9    And there is no discussion.

10          In fact, he said if he's asked where he's taking them,

11   he indicates he's taking them, he says either he doesn't know or

12   he said, we'll let you know when we get there.  He said, that's

13   for his safety.  He doesn't feel comfortable saying, we're taking

14   you to Homicide for questioning, understandably.

15          He does say, if he's asked, though, or if he's asked

16   where he's going, where they're going, he'll say, "I have a writ

17   for you."  So the person clearly is meant to understand that

18   there is a court order for him to comply with this

19   transportation.  Not that they would feel anything else when the

20   officers come to get them, but that's what they're told.

21          In terms of witnesses today, Your Honor, last time I

22   had mentioned that we might be calling witnesses.  I've discussed

23   this with Mr. Mitchell and we have decided he's not going to

24   testify today.

25          In terms of evidentiary issues, I do want to still

1    object strenuously to the affidavit by Judge Brown.  Our position

2    is that we are not able to cross examine him, obviously, and that

3    it's highly unusual in a contested case like this for the

4    government to be able to use an affidavit, whatever the reason

5    is.  As Mr. Harding pointed out, it was the Court's suggestion,

6    the Court's idea, last time.

7            Our concern is that, because the detective's testimony

8    was so consistent about, we do this all the time and no one ever

9    challenges it, and it seems okay to us, that to have anything to

10   the contrary about the correctness of the procedure from somebody

11   else really needs to be subjected to cross examination.

12           Okay.  I think one portion of Detective Townsend's

13   testimony that's particularly interesting is when the Court asked

14   a question regarding how the person, how the officer transporting

15   would respond to an assertion of right to counsel.  And what

16   Detective Townsend said was, "I'd wait until we got down to

17   Homicide Office to explain."  This is Page 39 of the transcript

18   from October 17th of '05.

19           "I would wait until we got down to the Homicide Office

20   to explain, I have you here to talk to you about this."

21           The Court:  "It's obvious, of course, but nobody's ever

22   given their Miranda warnings before they leave Central Booking?"

23           The Witness:  "No."

24           The Court:  "That would never be done?"

25           The Witness:  "No."

1          The Court:  "So even if a person were to invoke his

2     right to a lawyer before you leave Central Booking, he's still

3     going to Homicide?"

4          The Witness:  "I've never had that happen, Your Honor.

5     In my personal opinion, I would transport the individual to

6     Homicide, read him his Miranda rights if it was my case, on

7     Baltimore City Police Form 69, have him initial those and write

8     at the bottom, I want a lawyer."

9          Aside from the fact that that's an interesting way of

10    giving somebody their Miranda rights after they've asked for a

11    lawyer, would be to take them somewhere else, tell them to fill

12    out this form, and then to write what they want on the bottom of

13    that form, the bottom line is that there's just no question that

14    this particular transport officer and this particular procedure

15    accommodates in any way, shape, or form somebody's previous

16    assertion of their right to counsel on their initial arrest.

17         The next question the Court asked at that point was,

18    "Okay.  Now, again, I think this is fairly obvious, but surely I

19    think you would agree that several or maybe many or maybe even

20    most of the people that you transport under these circumstances

21    do have a lawyer because they're at Central Booking, right?"

22         The Witness:  "That's correct."

23         The Court:  "So it's a very good chance that most of

24    the people you transport out of there have a lawyer or an

25    existing charge, either a Public Defender, or their family has

1  hired a lawyer?"

2          The Witness: "Yes, I would agree with that."

3          And then interestingly, the next question that the

4  Court asked was, "And sometimes that charge relates to the thing

5  that you are transporting them to Homicide about?"  And the

6  witness said, "No, I don't agree with that, Your Honor," which is

7  interesting because that's not, that's not the situation here.

8          Mr. Mitchell was detained on something else, had been

9  appointed a Public Defender, and at this point was being taken

10  out somewhere else for the, for the homicide investigation.  But

11  by having, by virtue of having had a Public Defender was, didn't

12  need to reassert his right to counsel at that point with them.

13          And later, the witness says that he essentially would,

14  with the writ, bring the person to Homicide, advise him of his

15  rights.  And the Court says, "And then question him if he waived

16  his rights?"  And the witness says, "Yes."

17          Now, I understand the government's position is that Mr.

18  Mitchell here waived his rights, waived his right to counsel at

19  that point.  Our position is that the situation was so tainted by

20  having a writ that was basically not a valid writ, in our

21  opinion, because it was signed by a judge who didn't know what

22  the purpose of the writ was for, so it wasn't obtained in a valid

23  way.  And that if this, if this procedure is, I mean, the

24  procedure can't be honored because if it's honored, there's no

25  reason for any officer ever to stop it.  There's no reason for

1    the system to, to adhere more closely to a defendant's or

2    suspect's constitutional rights.

3         So what happens here is people are in a, in an

4    intimidating fashion transported somewhere, not told where

5    they're going, not told why they're going, and taken somewhere

6    and then questioned about a new case without any prior, without

7    any warning, without any due process on the part of the system in

8    terms of what's going on.

9         In this situation, Mr. Mitchell certainly didn't have

10   any opportunity to object.  There's no, it's clear from the

11   officer's testimony, the transporting officer's testimony, that

12   that was not, that's not routine, although he did say he did not

13   recall this particular case, this particular transport.  But his

14   practice was never to discuss the situation with the person being

15   transported, never to ask them whether they already had counsel,

16   never to ask them whether they had waived counsel previously or

17   not.

18        Our position is that, as a result of these procedures

19   and the taint that they bring into this, the whole system, that

20   this, this statement should be suppressed and should not be

21   accessible to the government in their case in chief.  Thank you.

22        THE COURT:  Thank you very much, Ms. Rhodes.  I don't

23   think I need to hear much from you, if anything, Mr. Harding.  I

24   do want to make sure that Mr. Mitchell's record on this point is

25   secure.

1          What I'm going through my papers looking for is my copy

2     of Judge Brown's affidavit.  And I just want to make sure that

3     that's a part of the official court file.  Did you file it, Mr.

4     Harding?  Or was it --

5          MR. HARDING:  I think I --

6          THE COURT:  -- handed up?

7          MR. HARDING:  -- supplied copies to the Court and

8     counsel.  But I have another copy here, if the Court wants a

9     copy.  That's my only copy.

10         THE COURT:  Yeah.  Again, I don't so much need a copy

11    because I know I have a copy.  I just want to make sure it's in

12    the record.  So maybe you can hand it to the clerk, if that's an

13    extra copy you have, to make sure it's in the record.

14         Let's mark that as Mitchell Motion Exhibit, or

15    Government's Exhibit on Mr. Mitchell's Motion to Suppress

16    Evidence.  It's probably already in the record but I think it's

17    important to make sure that it is indeed in the record.

18         I'm prepared to deny the motion.  The evidentiary

19    record is closed.  Ms. Rhodes has indicated that the defense does

20    not have any evidentiary material to offer on this motion.  Mr.

21    Mitchell has elected not to testify, which is fine.  And that's

22    really what we, primarily, that's what we held the record open

23    for.  Mr. Sullivan, who was taking the laboring oar on this

24    before he withdrew, had indicated that he wished to keep the

25    record open in the event that the defense wished to offer some

22

1    evidence.  But I'm prepared to rule on this.

2              As I say, the motion is denied.  As is clear in the

3    record, and I don't think anybody was in the dark about my own

4    feelings about this, I think it's dangerous, it's a dangerous

5    practice.  I think that it poses very substantial risk to Sixth

6    Amendment rights and, relatedly, Fifth Amendment rights of

7    detained individuals in Baltimore City to be transported for

8    questioning from the detention facility on the basis of a writ

9    issued by a Circuit Court judge, lacking any information

10   whatsoever about the reason for the writ or what the intentions

11   of the law enforcement officers seeking the writ through the

12   State's Attorney's Office are.

13             But hypotheticals aside, on the evidence in this case,

14   the Court is satisfied, one, that Mr. Mitchell knowingly,

15   intelligently, and voluntarily waived his rights through an

16   effective administration of the Miranda warnings.  There's simply

17   no question and no doubt about that.

18             The Court further finds that there is not a scintilla

19   of evidence to support any suggestion that Mr. Mitchell's waiver

20   of his rights or, more generally, that the statements he made

21   were involuntary in the constitutional sense or in any sense, for

22   that matter.

23             So that the focus of the hearing became, I think what

24   surprisingly, certainly to me and perhaps to Mr. Sullivan, was

25   this whole procedural aspect of how Baltimore City law

1    enforcement officers obtain the custody of individuals from

2    Central Intake and Booking in order to conduct custodial

3    interrogations.

4           On the question of Judge Brown's affidavit, obviously,

5    the rules permit the Court, in considering preliminary issues of

6    admissibility, to rely on reliable hearsay.  Certainly, Judge

7    Brown's affidavit by any measure satisfies that criterion.  The

8    Court didn't perceive the need to subject Judge Brown to cross

9    examination given the nature of the issues presented.

10          The defense argument that perhaps other officers, other

11   judges, other State's Attorneys, may take a different view of

12   this is interesting but, in my view, not material to the actual

13   issues presented in this case.

14          Mr. Mitchell was taken from Central Booking, not by his

15   own request, certainly, and most importantly of all, without

16   notice to counsel.  However, as the government argued, among

17   other things, he was not questioned about the particular offense

18   for which he was then being held and as to which the Sixth

19   Amendment right to counsel had attached, the handgun charge.

20          Clearly, the officers were interested in the homicides

21   of a couple of weeks earlier.  And the questioning of Mr.

22   Mitchell was generally limited to subjects other than the handgun

23   charge as to which the Sixth Amendment right to counsel had

24   attached.

25          Again, while I think it's a dangerous practice and I

1    think, in the appropriate case, I think the prosecutors are going

2    to get an unwelcome surprise because I think some judge is going

3    to find a problem eventually with the coercive aspect of

4    transportation from Central Booking without notice to counsel,

5    but that's not this case.  And whatever my feelings about it may

6    be, what the Court's being called upon in this case to do is to

7    rule on a specific Motion to Suppress Evidence that is before the

8    Court.

9           Coincidentally, Ms. Rhodes, a very similar occasion

10   presented itself to me in the last year or so in which the U.S.

11   Attorney's Office made use of what again they refer to as a writ

12   to transport a defendant who had pled guilty before me, but not

13   yet sentenced, and was being detained in one of this

14   distribution's far flung detention centers, to transport that

15   individual, without notice to counsel, from, I believe, Ohio into

16   District of Columbia, or perhaps it was Alexandria, for the

17   purpose of a similar type of interview in which pressure was

18   brought to bear to get this individual to cooperate with the

19   government.  And the Assistant U.S. Attorney will tell you that I

20   absolutely blew my stack when I learned that this had happened.

21          There is in federal law a provision that permits the

22   attorney general and through, the attorney general acting through

23   the offices of the United States Attorneys, to take custody of a

24   Bureau of Prisons inmate for the purpose of law enforcement, and

25   transport such an inmate to a location.  But the statute is very

1    clear on its face that this applies to Bureau of Prisons inmates,

2    i.e., people who have been sentenced, or perhaps people on parole

3    retake warrants.  But there's nothing in the statute that talks

4    about a pretrial detainee, which a person still is even after he

5    or she has pled guilty but not yet been sentenced.

6         Furthermore, the inappropriate use of the term "writ"

7    for this piece of paper was quite surprising to the Court in this

8    instance that I'm describing.  It's not a writ.  It's essentially

9    an order by the Attorney General to the Bureau of Prisons which,

10   of course, as we know, reports to the Attorney General up the

11   chain of command, and to the U.S. Marshal, which likewise reports

12   to the Attorney General up through the chain of command,

13   essentially to transport an individual who's in executive

14   custody.  But a person in pretrial detention is in judicial

15   custody, not executive custody, although the U.S. Marshal is

16   responsible.

17        So I was very shocked at that.  And as I say, I really

18   blew my top and was very unhappy about what had happened because,

19   in that instance, not so much a risk to Sixth Amendment rights,

20   although there was no notice to counsel, it actually risked

21   personal injury to the individual who was left exposed to the

22   belief by those who were detained with him that he was

23   cooperating with the government.  And he'd made it very clear

24   that he didn't want to cooperate with the government.  And that

25   was the reason that they used this subterfuge, if you will,

1   that's a strong word, to transport him to Alexandria to be

2   interviewed and, as I say, for pressure to be brought to bear to

3   see if he would cooperate.  Again, this was all without notice to

4   counsel.

5           So it's not just in the state system that these kinds

6   of things take place.  And I don't think they're any more

7   defensible in the state system or the federal system.

8           Now, the Assistant U.S. Attorney in that instance

9   apologized, frankly, and I didn't find any bad faith whatsoever.

10          The problem with these kinds of things, as you argue,

11  is that it becomes so routine that respect for constitutional

12  protections is corroded and thus constitutional protections are

13  corroded.  All that said, the Court finds no basis here for

14  suppression.

15          The recent Supreme Court case on the Fourth Amendment

16  contacts which makes clear, I think it's Franklin, Virginia v.

17  Franklin, it's probably not the correct name, made it clear that

18  violations of state law by themselves do not give rise to the

19  suppression remedy under the Fourth Amendment.  And by analogy,

20  even if under Maryland law this is an abuse of the writ or some

21  derogation of responsibility by the State's Attorney for

22  Baltimore City, and I'm not finding that it is, to say nothing of

23  some cutting of corners that in some sense might be inappropriate

24  for a Circuit Court judge, and I'm not saying that it is, those

25  facts by themselves would not give rise to a suppression remedy.

1          So in the absence of any evidence that Mr. Mitchell was

2     actually coerced into making a statement, notwithstanding that he

3     was transported other than by his own request or that of his

4     attorney, and in light of the fact that he was not questioned

5     about any pending charge as to which the Sixth Amendment right to

6     counsel had attached, and in light of the fact that his

7     statements were taken only after a knowing, intelligent, and

8     voluntary waiver of his Miranda rights, the Court denies the

9     Motion to Suppress.

10          MR. HARDING:  Thank you.  May I make a couple points,

11    just for the record?

12          THE COURT:  Of course.  Of course.  Of course, Mr.

13    Harding.  I might also mention, as Mr. Harding approaches the

14    lectern, Ms. Rhodes, I would also ask you to make sure that Mr.

15    Sullivan's letter, actually, it's the letter from you and Mr.

16    Sullivan on this issue, which I only have a fax copy of, dated

17    October 12, 2005, is made a part of the record so that your

18    record is complete.

19          MS. RHODES:  Thank you.

20          THE COURT:  It contains additional arguments that you

21    all made in support of the Motion to Suppress.  Yes, Mr. Harding.

22          MR. HARDING:  Judge, with respect to Judge Brown's

23    affidavit, I just want to emphasize that before the Court

24    exempted Judge Brown from testifying, Haven Kodeck had testified

25    on October 14th, 2005, nearly three years ago now.  And he had

1    testified, he's a Deputy State's Attorney in Baltimore City, he

2    testified about how writs like the one in this case for Mr.

3    Mitchell are typical of ones that are issued every day in state

4    court, every single day, he said on Page 91 of the transcript.

5    And he said that the system was in place when he started in the

6    office in 1970.  It was created by the judges themselves.

7         And he testified that he undertook to verify this by

8    consulting with two of the judges, one of whom was Judge Brown.

9    He also said he went and discussed the whole matter with Judge

10   Stewart.  And he said that both of those judges agreed with his

11   analysis that this was a routine procedure in the Circuit Court

12   of Baltimore City.  In other words, the Court had before it the

13   substance of what Judge Brown was going to testify to in hearsay

14   form from Haven Kodeck before the Court announced that it wasn't

15   going to be necessary to have Judge Brown testify.

16        Also, Your Honor, the government's position is that, I

17   don't know that we touched on this, and Your Honor may have just

18   touched on this, also, but the Court, the Court's concerns about

19   the way the writs are used in this case, or used in Baltimore

20   City Circuit Court to bring prisoners in for questioning,

21   regardless of the merits or demerits of that system, regardless

22   even of whether that's constitutional or unconstitutional, we

23   know from United States v. Leon that the exclusionary rule is not

24   available to punish mistakes by judges or correct systemic errors

25   in criminal justice procedures.  It's available as a sanction

1    against cops and agents who violate the law in what they do in

2    handling defendants.

3          In this case, and this is the law in this area, I

4    believe that Detective Niedermeyer and Detective Hastings

5    operated in complete good faith.  They operated according to what

6    they understood to be the routine procedure in Baltimore City.

7    And therefore, the exclusionary rule should not be available as a

8    sanction against anything they did, regardless of what the Court

9    feels about the way the system of writs operates in Baltimore

10   City.

11         THE COURT:  I think that's a very fair point, Mr.

12   Harding.  And I think you're absolutely correct to rely on Leon

13   by analogy here as an additional reason why the Court should not

14   suppress this evidence.

15         I will say, in case something more comes of this, my

16   comments have been heartfelt and sincere, but reasonable judges

17   and reasonable lawyers can disagree about what constitutional

18   imperatives entail.  Frankly, I think it would be a good idea if

19   some member of the bar brought a mandamus action to see whether,

20   in fact, the Maryland Court of Appeals would approve of this

21   practice.  I think it would be a very good idea to remove some of

22   the uncertainty.  Not that my view of it creates uncertainty, but

23   I just think that it's something that needs to be looked at.

24         MR. HARDING:  Finally, Your Honor, Your Honor

25   mentioned that --

1          THE COURT:  And again, just to be clear -- I'm sorry,

2     Mr. Harding -- it is the practice of doing it without notice to

3     counsel.  That's what bothers me.  Even recognizing that, as in

4     this instance, a defendant will not be questioned about the

5     charge to which the Sixth Amendment right to counsel has

6     attached, it just seems to me that as a matter of constitutional

7     good housekeeping and recognizing that it's difficult to conduct

8     an interview of a person at Central Booking, it just strikes me

9     as inappropriate and probably constitutionally inappropriate to

10    move people around for the purpose of questioning on other

11    charges without notice to counsel.  And that's really what it

12    comes down to.

13          And I have to say, frankly, if, I have to believe that

14    any judge on the Circuit Court of Baltimore City who is presented

15    one of these requests, who somehow has before him or her that

16    detainee's lawyer who says to the judge, Judge, he doesn't want

17    to go to Central, he doesn't want to go to Homicide, he doesn't

18    want to talk to these officers, he has nothing to say, I have no

19    doubt honestly that any Circuit Court judge, any judge in America

20    would say, okay, well, you can't take him.  You know, it's as

21    simple as that.

22          So the problem is that you're leaving out of the

23    equation, not you, of course, but the system, the practice leaves

24    out of the equation, as it all too often does, notice to counsel,

25    which is what we say make our system, you know, the best in the

1    world.

2            Anyway, go ahead.

3            MR. HARDING:  Well, Your Honor, the Court noted that we

4    have no evidence at all that Mr. Mitchell invoked any rights

5    because the defense has never put on any evidence in this case.

6    We also, and Ms. Rhodes will correct me if I'm wrong about this,

7    we have no evidence that Mr. Mitchell had an attorney in those

8    other matters for which he was arrested on April 1st of 2002.

9    There's never been any evidence that he ever had an attorney in

10   those matters.

11           THE COURT:  I think that's a good point.  There's no

12   question that the Sixth Amendment right to counsel had attached

13   whether or not he actually had an identified attorney.  He was

14   clearly, under Maryland law, entitled to a Public Defender at a

15   minimum.

16           MR. HARDING:  Finally, Your Honor, on Pages 26 and 27

17   of the transcript of October 17th, 2005, those are the pages that

18   I think the Court alluded to earlier when you noted that Mr.

19   Sullivan had simply suggested that there had been some kind of

20   invocation of rights by Mr. Mitchell.  And he asked, Your Honor

21   asked Mr. Sullivan if Mitchell was going to testify.  And Mr.

22   Sullivan said that he had consulted with Mr. Mitchell on that

23   point and would get back to the Court.  This is three years ago.

24           And then the Court went on to note that even Mr.

25   Sullivan's representation, even in his representation it wasn't

1    clear whether it was a Sixth Amendment right to counsel or a

2    Fifth Amendment right that Mr. Mitchell claims to have invoked.

3    And Your Honor noted on the next page that, under McNeil v.

4    Wisconsin and Texas v. Cobb, the Sixth Amendment right to counsel

5    invocation would have no impact on what happened on April 17th

6    because, as Your Honor noted, the Sixth Amendment right to

7    counsel is offense-specific.

8         And we still, to this day, don't have any suggestion

9    from the defense about this hypothetical invocation of rights by

10   Mr. Mitchell, whether it was a Sixth Amendment or Fifth Amendment

11   right that he was invoking.  So those are just the points that I

12   wanted to put on the record.

13        THE COURT:  Thank you very much, Mr. Harding.  Very

14   well taken.  Before you sit down and while you have the podium,

15   can we go to that issue that Ms. Rhodes raised, because it's of

16   obvious, of great relevance to all the defendants?  And that is

17   the fourth superseding indictment.  And if you can say so, I'm

18   not sure we can finally resolve this today, I'm sure we can't,

19   but if you can say so, to the extent you can, what is the

20   government's intentions regarding the fourth superseding

21   indictment's expansion of the conspiracy here to include

22   disruption of court proceedings?

23        Now, let me say this.  One obvious effect of that, I

24   think it's obvious, is that you broaden the base of admissibility

25   for coconspirator's statements perhaps.  Not perhaps, clearly you

1    do.  If you add another couple of years to a conspiracy, then

2    statements made during that post-indictment period becomes a part

3    of the conspiracy and, therefore, statements made during that

4    period may well be admissible against defendants where they might

5    otherwise not have been admissible.

6            So beyond that, what strikes me as obvious, what is the

7    government's intention here?

8            MR. HARDING:  Your Honor, the only clear plan the

9    government has at this point is to call TFO Benson to the stand

10   and have him not only recite from his own notes and his own

11   memory what happened in the courtroom, but also perhaps read

12   selected passages from the transcripts of those proceedings, and

13   also introduce into evidence some of the, at least some of the

14   pro se pleadings that the defendants filed because it shows their

15   concert of action, it shows their willingness to continue to

16   cooperate to try to thwart this prosecution and these court

17   proceedings.

18           So that's the government's only plan at this point.  If

19   I develop another idea, I will certainly let the Court know very

20   quickly.  But that's all I happen to have in mind at the moment.

21           THE COURT:  Okay.  You're talking about maybe at the

22   most an hour of trial time, and probably less than that?

23           MR. HARDING:  Yes.

24           THE COURT:  All right.  Thank you.  With that

25   preliminary explanation, Ms. Rhodes, is there anything you want

1   to say about that at this time?  And I will say, given Mr.

2   Harding's proffer, the Court would be very much inclined to

3   permit such evidence and related argument.

4          MS. RHODES:  Well, Your Honor, I think it presents a

5   lot of problems for us because we have, I mean, it's almost the

6   worst case scenario for us because what they're going to do is

7   have a witness who is in the courtroom testify about it.  And I

8   imagine that other people, I mean, we're all precluded from being

9   witnesses or we need other counsel.  And the Court personnel were

10  the other witnesses.  I think that's very --

11         THE COURT:  Well, you've got Mr. Sullivan, Mr. Treem,

12  for one.

13         MS. RHODES:  I'm not sure if Mr. Treem was here during

14  that, that period.

15         THE COURT:  I think he was.  And we've got the

16  transcripts, which speak for themselves.  And we've got the pro

17  se pleadings that clearly speak for themselves.  And we probably

18  have an audiotape.  In fact, I know we have an audiotape of some

19  of it.

20         So I don't know that you or any of the other defense

21  counsel would need to become witnesses.  In fact, I can't imagine

22  why you would need to.

23         MS. RHODES:  Well, I guess it depends on what stages

24  Mr. Harding's going to be talking about, have Mr. Benson talk

25  about.

1          For example, if the Court is going to admit this, then

2     I would think that the fair thing would be for the government to

3     be limited to what we're limited to, which is essentially, would

4     be transcripts or audio recordings, and not have somebody else

5     talk about their observations.  But beyond that, I still think

6     that there are other issues that we will want to get into in

7     response.

8          For example, there was one time I think the Court

9     characterized something as some motions that the defendants were

10    making as they were leaving.  I think there were two different

11    times when that happened.  And it's possible we would want to

12    call people to say what our interpretations of those things were.

13         THE COURT:  Well, I can tell you now, I would not,

14    certainly, I would permit the government, again, preliminarily,

15    to read into the record before the jury certain of my comments.

16    But I can assure you there's certain other comments that I would

17    never permit the government to read into the record.  So I want

18    to give you a level of comfort about that.

19         As far as my characterizing anything, that would not be

20    admitted.  Anything I "characterized", quote-unquote, would not

21    be admitted.  At most, to the extent the government wanted to use

22    the Court's own statements, it would be limited to purely factual

23    statements such as, for example, let the record reflect that Mr.

24    X has interrupted the Court for the third time, or something of

25    that sort.

1          I don't know if I would permit the government to show

2     the jury that the defendants were actually excluded from the

3     courtroom as a result of their behavior.  That probably goes too

4     far.  So it will be appropriate -- well, I can't say it will be

5     appropriately limited because I'm sure you're going to disagree

6     with any of it, and I respect that.  But it will certainly be

7     limited to purely factual, undisputed statements, pleadings, and

8     activities.

9          And I think Mr. Harding, I can't read Mr. Harding's

10    mind, but when he referred to Agent Benson's notes, I don't think

11    he intended to suggest that Agent Benson would get on the stand

12    and purport to characterize what he saw in the courtroom.  We're

13    talking about factual matters that are, frankly, undisputed in

14    the record.

15         MS. RHODES:  Well, I guess our other concern about it

16    is whether or not the government will be characterizing their

17    behavior, and how the disruptions will be characterized.  In

18    other words, are they going to be -- because my concern is that

19    the taint will be that they were quasi-violent disruptions.  In

20    other words --

21         THE COURT:  No.  No.

22         MS. RHODES:  -- disrespectful, whereas we see them more

23    as a civil disobedience, and by pleadings, the pleadings

24    themselves are kind of civil disobedience and not anything more.

25    So that's really the main concern that I have, is by not having

1    witnesses from our side able to say they sat, they sat politely

2    through the hearings, they, at the end, asked to be heard, the

3    Court recognized them, and that which was often the case, in

4    addition to the other, to objecting or something in the middle of

5    somebody else speaking.

6              THE COURT:  That's fair.  And you will be able to show

7    that through appropriate means.  And no, we're not going to get

8    into violence or, I mean, disrespectful is sort of a slippery

9    concept in this context.  I'm aware of your concern and I'll be

10   alert to it.  But I think, I think we're largely on the same page

11   here.

12             MS. RHODES:  Very well.

13             THE COURT:  And I'm not finally ruling.

14             MS. RHODES:  Thank you, Your Honor.

15             THE COURT:  All right.  Again, the indictment and the

16   government's theory, as I understand it, is that the conspiracy

17   continued beyond the indictments as evidenced by the concert of

18   action by the defendants in the courtroom.  And that is most

19   clearly shown, if at all, by the pro se pleadings and the

20   recitations, when they occurred, of the defendants in the

21   courtroom, of the prepared soliloquys, shall we say.

22             All right.  Mr. Pyne?  Mr. Crowe?  Good morning.

23             MR. CROWE:  Good morning, Your Honor.  The matter I

24   wish to address may not even be pending because the Court may

25   have ruled or at least preliminarily ruled on it.  But I'd just

1    like to speak for a couple of minutes about the voice ID matter.

2            THE COURT:  Yeah.  Let me, because I didn't do it, Mr.

3    Crowe, before you -- I'll be glad to hear you.  Here is where I

4    am on voice ID, both the Stop Snitching II, as well as the voice

5    mail on Ms. Magginson's home system.

6            I believe the record's pretty clear, but if it's not I

7    make it clear now, that I do not find that the voice mail or the

8    video are so incoherent, so garbled, so audio damaged that it is

9    as a matter of law impossible for a person who is familiar with

10   the voices of certain individuals to be able to pick out one or

11   more voices.  So that the general thresh, the government has

12   gotten over that general threshold as of today.

13           I am acceding to the government's request that we hold

14   off until trial so that the government doesn't have to bring in

15   witnesses, particularly those they haven't found yet, in order to

16   conduct the final suppression or admissibility hearing.  So what

17   I intend to do with some of these 36 trial days is to set aside

18   some time so that, outside of the presence of the jury, the

19   proposed voice identification witnesses can be voir dired by

20   counsel so as to scare out any infirmities in the ability of

21   those witnesses to identify those voices.

22           Ultimately, where I am now is I'm reasonably clear that

23   it goes to weight and not admissibility as to what the

24   government's proffered so far.  Not a final ruling.  You will

25   have a chance to argue in support of suppression before they're

1    finally admitted.  Obviously, again, we don't know who or which

2    witnesses the government will ask to make the identifications.

3    But I assure all of counsel that you will have an opportunity to

4    explore both the ability of the witness, whoever he or she may

5    be, to make an identification, and the reliability of any

6    identification that the witness purports to make.  Okay.

7            With that background, I'll be glad to hear you.

8            MR. CROWE:  As I grow older, I find often that when I

9    go back and check the transcript, what I recalled was not, in

10   fact, what happened in the courtroom.  Be that as it may, my

11   recollection was that the Court had originally indicated a

12   preliminary ruling that the audio quality of the voice mail was

13   so poor that it doubted that it would allow any witness to say

14   that a particular individual was speaking on the voice mail.

15           If I'm wrong or if --

16           THE COURT:  I may well have said that.

17           MR. CROWE:  -- if the Court's changed its preliminary

18   ruling, be that as it may.  I'm not quite sure how the Court

19   intends to hold the hearing.

20           One of the difficulties that I have pointed to before

21   is that there was apparently this large meeting of probably very

22   agitated, very distraught family members and friends at Ms.

23   Magginson's house, and that there was a lot of cross talk back

24   and forth as to who might have been on the tape.

25           Mr. Harding indicated in one instance that we didn't

1    have any evidence of this.  Going back over part of the record in

2    this case, I have been able to find a supplemental disclosure

3    that was provided by the State's Attorney's Office to Mr.

4    Martin's lawyer at the time when this was still, case was still

5    in state court.  And I'd like to submit that as an exhibit at

6    this time, if I might.

7            THE COURT:  All right.  That will be Martin Exhibit

8    One.

9            MR. CROWE:  Your Honor, I apologize.  I don't have any

10    exhibit tags on it right now.

11            THE COURT:  That's quite all right.

12            MR. CROWE:  Your Honor, I'd just like to read into the

13    record this disclosure which was made, apparently by Joseph

14    Spicer, who's an Assistant State's Attorney for Baltimore City.

15    It's a document marked State's Supplemental Disclosure.  And it

16    has a court received date on it of apparently April 17, 2003.

17            There's really one significant paragraph.  It's

18    numbered number one.  Like a lot of things I file, it has a

19    couple of grammatical mistakes.  Let me just read it into the

20    record the way it is.

21            "Originally, when Anthony Magginson heard the taped

22    voice mail message at Mrs. Magginson's house, he believed that he

23    heard Shawn Gardner's brother's, ("Plum"), on the voice mail

24    message.  A discussion occurred between he and some family

25    members and then Mr. Magginson concluded or came to believe that

1    he heard Willie Mitchell, Shelley Wayne Martin, and Shawn

2    Gardner's", I think the word "voice" is omitted, "on the voice

3    mail."

4           We think that this is, I don't know the background of

5    this.  I don't know the background information that the state had

6    when it felt that it was compelled, as I believe it was

7    compelled, to make this disclosure.  But it certainly indicates

8    that the sort of things that we've proffered or have said must

9    have happened did, in fact, happen, at least with this one

10   witness.

11          I would also note that in the memorandum which Mr.

12   Harding filed on June 9th of 2008, he indicated that Anthony

13   Magginson was one of the people that he was, that he expected to

14   locate and call to present that sort of voice identification

15   testimony.

16          The difficulty that I see that we face is if we do this

17   on some sort of a witness-by-witness basis during the course of

18   trial, the witness may well be on the stand and may say something

19   that, oh, yes, this person was there, that person was there, or

20   something else was said.  And the defense is going to be

21   essentially hearing that for the first time and not going to be

22   in much of a position to run out and scramble and to find

23   witnesses.

24          Mr. Harding, and Mr. Martin's counsel, I will tell you,

25   have been having a great deal of trouble locating witnesses even

1    with months leave time in this.  It's not any small matter.

2             It's for that reason that we think that there should be

3    a single hearing where people have the opportunity to get in as

4    many witnesses as they can possibly, as they can possibly locate

5    and bring to the court.  And indeed, I think the Court had

6    indicated during the course of these protracted pretrial

7    proceedings that there would indeed be such a pretrial hearing.

8             This difficulty, the problem we find is going to be

9    quite difficult.

10             I also just want to clarify one thing that I thought I

11    understood in the proffer which Mr. Harding gave.  And that was

12    that both Task Force Officer Benson and whatever cooperator it

13    was that listened to this voice mail identified Mr. Mitchell's

14    voice and Mr. Harris's voice.  I assume that neither of them

15    would be in a position to identify Mr. Martin's voice.

16             THE COURT:  Thank you, Mr. Crowe.  Let me just say, one

17    of the keys here will be, in my mind, evidence of the timing of

18    the identifications.  And my understanding of the factual

19    scenario is as follows.

20             There may or may not be evidence that, when this group

21    of people apparently gathered at Ms. Magginson's home on the

22    morning after the murders and listened repeatedly, I take it, to

23    this tape, there may or may not be evidence that one or more

24    persons who were in that group was aware that the Wyches had an

25    appointment either with or had been set up by Mr. Mitchell.

1          So one of the things I'll be particularly interested in

2    in ruling on the reliability is the extent to which with, on the

3    one hand, or without, on the other hand, persons listening to

4    this tape, without knowledge of what the Wyches were up to the

5    night before, listened to the tape and said, I think that's Bo's

6    voice.  Acknowledging the potential for taint from having two or

7    more people listening to the tape over and over again and the

8    possibility of, don't you think that's Bo's voice, no, I don't

9    think that's Bo's voice, listen to it again, don't you think -- I

10   appreciate that kind of thing needs to be scrutinized carefully.

11   But if someone, without knowledge of what the Wyches were up to

12   the night before, comes in to Ms. Magginson's, hears that tape

13   and says, I think that's Bo's voice, and is able to answer

14   questions on cross examination as to when and why they came to

15   that conclusion, then that's going to drive the Court's

16   determination very significantly, in contrast to a situation

17   where three days later, four days later, you know, two days after

18   the funeral, investigators are sitting down with people who claim

19   to be able to identify any particular defendant's voice, who then

20   listens to the tape with the investigator, with knowledge of the

21   murder, with knowledge of the rumors and the discussions in the

22   community at large.

23          You see the kind of, you know, dichotomy that I'm just

24   sketching out here hypothetically?  So one's view, I think, of

25   the former situation is likely to be quite different from one's

1    view, and thus the admissibility, the reliability, and thus the

2    admissibility of an identification made days after the murder and

3    everybody knows that this was a phone call apparently made from

4    Mr. Wyche's phone by people who were responsible for their

5    murder.

6            So we're not going to be able to do a consolidated, you

7    know, two day suppression hearing where all 19 people who may

8    have listened to this tape can come in and testify on direct and

9    cross as to who was present, who said what, and why they think

10   they know who said what on the tape.  But we'll do the best we

11   can on a more limited basis, witness by witness.  But I

12   appreciate your comments, Mr. Crowe.

13           All right.  Mr. Martin.  And Mr. Flannery, welcome.

14   I'm not sure if this is the first time you've appeared.

15           MR. FLANNERY:  No, Your Honor, but thank you.

16           THE COURT:  Okay.  Welcome, anyway.

17           MR. MARTIN:  Well, I can't help but give away my age

18   when I stand here this morning and I say to Your Honor, as

19   regards the writ procedure we talked about earlier, what would

20   Judge Kaufman have done with that?  We would be here for months.

21           THE COURT:  He'd have all 33 judges on the Circuit

22   Court of Baltimore City testify.

23           MR. MARTIN:  Absolutely.  It's amazing.  And the other

24   thing that I'm, I'm hopeful that this trial can be as quick as

25   Mr. Harding says it can be.  But if he keeps arguing to you the

1    points he's already won, we'll be here forever.  I mean, you

2    know, Judge Harvey used to tell me, you've already won that one,

3    move on.  So just an observation.

4           You want to talk to me, I guess, Your Honor, about the

5    RICO motion and you've also mentioned --

6           THE COURT:  Only if you want to talk to me about it.

7           MR. MARTIN:  Just briefly.  Count 19, I'm a little

8    confused about what you said about Count 19.  You had indicated

9    you would deny our Motion to Dismiss Count 19, but that motion

10   was filed when it was the third superseding indictment.

11          THE COURT:  Right.  I denied it because it was in the

12   third superseding indictment.  It's now in the fourth superseding

13   indictment.  I guess as a matter of form, I just want you to

14   renew the motion.

15          MR. MARTIN:  I renew the motion.  It's the same

16   argument.  And you're going to deny it.

17          THE COURT:  I'll deny it.  It is denied.  It is

18   relevant, material.  Any prejudice to the defendant is de

19   minimis.  And it is probative of the defendant's intent relevant

20   to the issues in this case.  So the Motion to Dismiss Count 19 is

21   denied.

22          MR. MARTIN:  Your Honor, I also want to make one other

23   comment before I talk about the RICO.

24          As I understood what Mr. Harding said, he's got a

25   cooperator and he's got TFC Benson, and they're going to ID my

1    client on both the Stop Snitching and the cell phone recording.

2    Whether there are any others who will do that, we won't know

3    until Mr. Harding decides to call them.  Is that the way you see

4    it?

5              THE COURT:  Well, no.  When I get to the housekeeping

6    for the trial, one of the things I'm going to direct the

7    government to provide to all of us is a running 48 hour

8    projection of the identity of the witnesses.

9              MR. MARTIN:  That covers another point I was going to

10   raise.  So we will have that available.  So we will know two days

11   in advance, hopefully.

12             THE COURT:  Absolutely.

13             MR. MARTIN:  As best we can.

14             THE COURT:  At least two days in advance, yes.

15             MR. MARTIN:  Okay.  The problem that you've mentioned,

16   this is moving on to another issue now, which is this question of

17   the continuing conspiracy, the flesh and blood issues.

18             I can't figure out how this is going to play out in

19   court.  But I can imagine a scenario where if, if Detective

20   Benson is permitted to testify about what he observed that, as

21   you said, I might want to call Mr. Treem or Mr. Sullivan.  But I

22   might have a differing recollection of what happened from one of

23   these lawyers, in which case I would want to call them, depending

24   on what that differing recollection was.

25             I guess what I'm saying, this is kind of a tar baby

1    here.  We're heading down the road, and the only reason we're

2    heading down that road is because, because of this notion that

3    somehow this defense, as bizarre as it might be, shows that these

4    people are all conspiring.

5         It may show that they are conspiring to defend

6    themselves in a way that they think is appropriate.  And I must

7    say, regardless of how you want, if you look at the results so

8    far, they've done pretty good.  The death notice has been

9    dismissed.  I mean, if you think about it, you know, who's to say

10   that they've done the wrong thing?

11        I disagree with it legally but it seems to have had

12   some effect.  And so I don't know how that becomes part of a

13   conspiracy.  I'm still, I know you already ruled on it and I'm

14   discussing something you've already ruled on.  I just think we

15   head down a slope when you do that because, as a result of that

16   ruling, you then say that these ID's that are going to be made on

17   the Stop Snitching video are admissible because the conspiracy

18   still continues, with no proof whatsoever that, other than this

19   so-called continuation because of the flesh and blood issue.

20   With no proof whatsoever, for instance, that Mr. Gardner, who's

21   in a different institution, had anything to do with that, that

22   cell phone, that call to stop, the Stop Snitching call.

23        So I am, I'm concerned that we get all through this,

24   and God forbid we're in the wrong, say something like this, but

25   the Fourth Circuit would turn around and say, you can't do that.

1   You shouldn't have admitted that tape and you shouldn't have

2   allowed all this stuff in.  Then we come back and try the case

3   all over again.  I don't think it's wise to go there.  That's my

4   comment on it.

5          And I understand that this thing's been around a long

6   time and we want to move on.  But I think if we move on, we ought

7   to be moving on in the right way.  And I don't think that's the

8   right way.  That's my personal view.  I've argued it before you

9   before and you have ruled.  I just want to state that.

10          THE COURT:  I appreciate that, Mr. Martin.  I assure

11  you I'm going to try to make it as gentle a slope as possible.

12          MR. MARTIN:  I don't know how that's going to work out.

13  As to the RICO, Your Honor, the only thing I want to say, I think

14  I've said everything in the pleadings that I can possibly say.

15  And I said the last time here that if this was a civil case, it

16  wouldn't get much past the courtroom door.  It would get filed

17  and it would be dismissed, because that's a ground that the

18  Fourth Circuit has routinely, and this Court has routinely

19  dismissed civil RICO cases on.

20          I read all the pleadings.  I read my own again.  I read

21  Mr. Harding's response, and I read our reply.  And I still think

22  this sits four square within Computer Sciences in the Fourth

23  Circuit.  And I think as a practical matter, Your Honor, I can't

24  imagine, in trying to put together instructions for Your Honor, I

25  don't know how a jury's ever going to understand the instructions

1   that you're going to have to give on Count One.

2           I just don't -- I put them together, and I'm pretty

3   familiar with this area of the law, anyway.  And I've tried a

4   number of RICO cases.  Instructions are always difficult.  But

5   this one is even more difficult.

6           I think we're right on the law and I don't think you

7   would ever be reversed if you dismissed the RICO count.  And I

8   think that we are absolutely right-on on that RICO count and I'd

9   ask the Court to consider it.

10          THE COURT:  Why is it the -- what's the defect in the

11  government's allegation of the, quote-unquote, "Randallstown/Park

12  Heights organization?"

13          MR. MARTIN:  Because the organization consists of, it

14  wouldn't be a defect if it was, if it was 1962(a) or (b).  But

15  for (c), you cannot have people who are, defendants who are also

16  members of the enterprise.  Because the enterprise minus one of

17  these defendants isn't the same enterprise any more.  It's a

18  different one.  The enterprise --

19          THE COURT:  See, I don't think that's true.

20          MR. MARTIN:  Well, that's the teaching in Computer

21  Sciences, Your Honor.  That's clearly the teaching in Computer

22  Sciences.  The corporation that was the enterprise was owned by

23  one of the defendant corporations.  And the Court said, you can't

24  do that because then, because then you have a member of the

25  enterprise who is also a defendant, and that can't be.  You're

1    not allowed to have that.

2           And the government says, well, we're more, because

3    people are individuals here, it's different.  But it's not.  Mr.

4    Harris is just like CFC was in <u>Computer Sciences</u>.  Mr. Harris is

5    CFC for purposes of that analysis.

6           And if you read <u>Computer Sciences</u> carefully and you

7    read our brief, I think you will agree with us.  I just don't see

8    this as the government being able to permissibly charge it.  They

9    could have charged somebody under Subsection A or Subsection B,

10   but for Subsection C, you cannot do it.  The Fourth Circuit has

11   been clear on that.

12          And in every civil case that gets filed where that

13   issue comes up, the courts routinely dismiss the RICO counts and

14   the Fourth Circuit approves those dismissals.

15          THE COURT:  All right.  I'll look at it again, but I've

16   looked at it already and I don't see --

17          MR. MARTIN:  It would make all our lives a lot easier.

18   Thank you, Your Honor.

19          THE COURT:  Thank you, Mr. Martin.  Mr. Coburn, good

20   morning.

21          MR. COBURN:  Good morning, Your Honor.  Your Honor, I

22   think I heard the Court say that we were going to be discussing

23   housekeeping issues later in this proceeding.  So there are a few

24   issues I have related to that, which maybe I should just defer to

25   that time.

1                    THE COURT:  Yeah.  If that's okay.

2                    MR. COBURN:  Absolutely, Your Honor.  There's actually

3      one, which whenever is convenient for Your Honor, Mr. Kurland and

4      I were hoping we might talk briefly ex parte about.  It is

5      purely, it is a properly CJA ex parte matter.

6                    THE COURT:  Would it better be done in writing?

7                    MR. COBURN:  We could do it in writing.  But Your

8      Honor, it would take also about a minute and a half to present it

9      to Your Honor orally if Your Honor had time.

10                   THE COURT:  Okay.  If it's really only 90 seconds,

11     we'll do it.

12                   MR. COBURN:  Appreciate it very much.

13                   In terms of the issues that have already been

14     discussed, I just wanted to make sure I'm clear on one thing.  At

15     an earlier proceeding, it's my recollection, it may or may not be

16     Mr. Harding's or anybody else's, but I am pretty sure I heard Mr.

17     Harding say that he was not going to attempt to demonstrate that

18     Shawn Gardner's voice is anywhere on that voice mail message.

19                   I mean, Mr. Crowe earlier was referring to kind of an

20     older statement by a witness and so on.  I just wanted to make

21     sure that that's my understanding of that position.

22                   THE COURT:  That's my recollection as well.

23                   MR. COBURN:  I just wanted to make my record that we're

24     relying on that.

25                   THE COURT:  Certainly.

1        MR. COBURN:  With respect to the issue of utilizing

2  what's been referred to as the flesh and blood defense as part of

3  the conspiracy, and with Your Honor's permission Mr. Kurland may

4  have some things to say about this as well, but I just wanted to

5  tell Your Honor, I think I have a clear understanding of what the

6  government's theory is about this and why Your Honor's inclined

7  the way that you are about it.

8        But I would join what Mr. Martin said and just note my

9  own fairly strenuous objection to it being included as part of

10  the trial.  I know it's in the latest incarnation of the

11  indictment, at least sort of by kind of relatively brief

12  reference.

13        You know, I think about some of the white collar

14  criminal cases that I've been involved in.  And I'm trying in my

15  own mind to figure out, well, obviously, what we're calling the

16  flesh and blood defense is, you know, it's highly unusual.  I

17  mean, it's got all kinds of legal problems with it.  I guess

18  we've all got our own personal opinions about its usefulness or

19  viability.

20        But I'm not sure, like sort of analytically, where the

21  distinction is between these defendants doing what they're doing,

22  even though, I mean, I acknowledge it's obstreperous conduct or

23  was, versus, you know, a group of white collar defendants, sort

24  of the group is headed, as Your Honor has seen probably hundreds

25  of times, headed by a lawyer representing the corporation.  You

1    know, there's a joint defense arrangement and the defense lawyers

2    are typically meeting periodically and so on.

3          I mean, why would it be okay to make as part of the

4    conspiracy in this case the fact that the defendants were doing

5    what they were doing after they were indicted and locked up in

6    this case, but it would be clearly impermissible for the

7    government in a white collar case to say, well, you know, to

8    stand up in front of the jury and say, well, ladies and

9    gentlemen, you know, these defendants are still conspiring

10   because, I mean, they have a joint defense arrangement, and these

11   lawyers that you're seeing right in front of you right now are

12   meeting with each other periodically, you know, even during the

13   course of the trial.  So the conspiracy's ongoing.  The lawyers

14   themselves are conspirators.

15         I'm just not sure analytically I see the distinction.

16   I think there is a prejudice versus probative value problem with

17   it.  And I just wanted to note my own sense that I think it

18   should be excluded.

19         THE COURT:  Well, it's pretty obvious to me the

20   distinctions.  You mentioned yourself, Mr. Coburn.  What lawyers

21   do never becomes part of the proof at trial.  And what makes this

22   unique is that these defendants, these, as to Mr. Gardner, housed

23   in separate institutions, somehow managed to get prepared and to

24   sign individually identical pleadings.  And then they came to

25   court and each one of them gave, with very minor variations,

54

1    identical soliloquys that were disruptive of the court.

2            So that's a clear distinction between any joint defense

3    agreement, between what you refer to as white collar defendants

4    who are never detained before trial and who are acting through

5    their counsel.  I mean, there are all kinds of differences.

6            By the way, I can't imagine that I'm going to permit

7    anybody, well, certainly not on the government's side, to refer

8    to a, quote-unquote, "flesh and blood" defense.  That's not a

9    part of what Mr. Harding had in mind.  Again, I'm going to keep

10   the slope gentle and it's going to be factual statements that are

11   beyond dispute in the record.

12           I appreciate your objection.  Your objection is noted.

13   And we'll see where we go with this.  It may be that the

14   government rethinks this and backs away from it.  As Mr. Martin

15   himself mentioned, you know, it really opens up, you know, all

16   kinds of issues relating to the withdrawal of the death notice.

17           MR. COBURN:  It does.  I think it opens up a host of

18   issues.  I think it's really uncharted territory.  I'm hoping

19   they are going to rethink it.  I don't want to sort of quibble

20   with anything that Your Honor said.

21           I have a submission in terms of what lawyers do as

22   agents of their clients not being a real distinction and so on.

23   But as Your Honor indicated, I'm sure we'll revisit the issue

24   later.  And so I'll save some of that.

25           THE COURT:  Again, but the gravamen here is the

1    disruption of the court proceedings.  That's what the indictment

2    says.  That the conspiracy continued insofar as it attempted to

3    obstruct the court proceedings.  And no joint defense agreement

4    has that as a purpose.

5             MR. COBURN:  Again, I don't want to, I know Your Honor

6    wants to defer this and move on.  But I guess I would submit to

7    Your Honor that, you know, sort of the definition of, I don't

8    think that really is the charged conspiracy in the indictment.  I

9    mean, the definition of the conspiracy is, you know, it's a

10   racketeering conspiracy, a drug conspiracy.

11            THE COURT:  Yeah.  With several purposes -- rob, kill,

12   deal drugs, obstruct court proceedings.

13            MR. COBURN:  But I guess one question, then, Your

14   Honor, would be, is the disruption of the court proceedings, is

15   it criminal in the same sense?  In other words, you can be held

16   in contempt for it, I guess.  But that's not a criminal act in

17   the same sense as, you know, committing a murder in furtherance

18   of a federal RICO conspiracy.

19            THE COURT:  Well, making a phone call is an overt act

20   in furtherance of a conspiracy, is not a criminal act.

21            MR. COBURN:  That's true.  If the phone call is made so

22   as to engineer that murder, then, no question about it, that's

23   admissible evidence.  But here --

24            THE COURT:  But it doesn't have to be made to engineer

25   a murder.  It can be made just to say hello, how are you doing

56

1    today?

2              MR. COBURN:  I don't know that that --

3              THE COURT:  Do you need more ammunition?

4              MR. COBURN:  That would be.

5              THE COURT:  Do you want to go to the movies?  If you're

6    calling a coconspirator.  Anyway, I take your point.

7              MR. COBURN:  I understand.  I'm just checking my list

8    to see if there's anything else.  Everything else falls into the

9    category of housekeeping.

10             THE COURT:  I'm very loath to hear from Mr. Kurland,

11   not because I don't want to hear from Mr. Kurland.  I'd love to

12   hear from Mr. Kurland.  But as you've seen, we're quickly

13   establishing a pattern of one lawyer makes a presentation.

14             MR. KURLAND:  I don't want any prejudice by my last

15   seat over here.

16             THE COURT:  Absolutely not.

17             MR. COBURN:  Okay.  I guess, just because Your Honor

18   covered it already, I probably should just mention, and this will

19   just be two seconds.  But I have a proceeding that was just set

20   yesterday morning for November 7th, just because I thought we

21   weren't going to be sitting on Fridays, before I saw Your Honor's

22   order about it.  But this case obviously is a jury trial, it's

23   going to take priority.  So the other one is in the Eastern

24   District of Virginia and that will have to be kicked over.

25             THE COURT:  Mr. Harding says we're going to have a

1   verdict by November 7th.

2           MR. COBURN:  That would be great.

3           THE COURT:  Okay.

4           MR. COBURN:  Thank you, Your Honor.

5           THE COURT:  All right.  Mr. Harding.

6           MR. KURLAND:  Wait.

7           THE COURT:  I said I wouldn't hear from you, Mr.

8   Kurland.  I'll hear you on housekeeping matters later.

9           MR. KURLAND:  Judge, there's a few substantive --

10          THE COURT:  Well, why can't Mr. Coburn handle it?

11  Please, I don't want to hear from two counsel, Mr. Kurland.  You

12  know, the pattern in the trial is, as you well know, I think, one

13  lawyer per witness.  And I'd like to establish that pattern now.

14          MR. KURLAND:  Could I then have a moment to confer with

15  Mr. Coburn so we can --

16          THE COURT:  Of course.  Of course.

17          (Pause in proceedings.)

18          MR. COBURN:  Thank you very much, Your Honor.  Just a

19  couple of brief matters.

20          First, during one of Mr. Harding's presentations here

21  this morning he referred, at least I think it was Mr. Harding,

22  who referred at one point to a statement that Mr. Gardner

23  allegedly made to someone who might testify in this trial, to the

24  effect that one of the other defendant's voices, I believe Mr.

25  Mitchell's voice, was on the voice mail on the tape.  And our

58

1    recollection is that Your Honor already ruled that that was not a

2    coconspirator's statement.  So I just wanted to note that and ask

3    if that's the Court's recollection as well.  In other words, that

4    --

5          THE COURT:  Yeah.  My recollection is that there were

6    further discussions about that and that Mr. Harding made a fuller

7    proffer, that this was a discussion while the two of them were

8    locked up.  And I seem to recall that I was more inclined to view

9    it as a coconspirator's statement.  Now, I mean, we'll have to

10   comb the transcripts, as I know we will, to get a better sense of

11   that.  But that's my recollection.

12         MR. COBURN:  I have to confess to the Court that my own

13   recollection's kind of failing me on this point.  But I'm getting

14   a violent head shake from Mr. Kurland --

15         MR. KURLAND:  Not violent.

16         MR. COBURN:  -- that that's not his recollection.  I

17   just want to let Your Honor know.  Also, we just wanted to

18   proffer to the Court that with respect to the proposition of

19   extending the conspiracy into pro se pleadings of the defendants

20   filed in support of the defense that they were presenting, with

21   the Court's permission we would be filing something, just noting

22   our objection to that and explaining why.

23         Also, the very last thing Mr. Kurland had in mind was

24   just to, and I don't know whether Your Honor's inclined to rule

25   on this now, but just to give Your Honor a preview, we might ask

1    the Court to at some point take judicial notice of the fact that

2    pleadings like this have been filed in various other cases and in

3    various other jurisdictions, just to make the point to the jury

4    that, to the extent this comes into evidence, it's not peculiar

5    to this case, but it extends to other cases as well.

6             THE COURT:  I think you can do that by cross

7    examination of Agent Benson or -- I mean, I'm not ruling on it

8    now.  But you'll be given an opportunity for fair response to

9    denude whatever inference the government's going after.

10            MR. COBURN:  Thank you very much, Your Honor.

11            THE COURT:  Okay.  All right.  Mr. Harding, any

12   response to anything we've heard so far?

13            MR. HARDING:  No, Your Honor.

14            THE COURT:  Okay.  How are we doing -- we're moving now

15   to housekeeping.  How are we doing on discovery?  No complaints?

16   Well, I shouldn't put it that way.  No legitimate complaints?

17   Okay.

18            I hope Mr. Harding is close to spot on with regard to

19   his undertaking to complete the case in just 12 or so trial days.

20   So I join in his admonishment to defense counsel that, to the

21   extent you want to have witnesses available, please plan to do

22   so, if you issue subpoenas, please use the date, I guess, of

23   October 14th, and we can continue the subpoenas beyond that date

24   as necessary.  But please don't issue a subpoena for somebody in

25   late November.

1          MR. KURLAND:  Your Honor, I have a calendar issue that

2     relates to that, if this is an appropriate time.

3          THE COURT:  After I finish, I'll hear from counsel.

4     We'll start generally at 9:30 and conclude generally around 5.

5          I have found it really useful for the jury, I think the

6     human mind seeks out order as a general proposition, and so as I

7     think I may have mentioned before, but I'll make clear now, the

8     order of cross examination will be exactly the same starting with

9     the first witness.

10          Now, Mr. Mitchell is listed first in the indictment.

11     Ms. Rhodes, you're somewhat in the catbird seat.  And unless I'm

12     advised to the contrary by counsel in agreement, that the order

13     of examination by the defense will be in the order that you all

14     are seated here today.  So that if, for example, Ms. Rhodes has

15     no particular questions for a particular witness, she and Mr.

16     Lawlor will expressly pass the witness to Mr. Pyne and Mr. Crowe,

17     and so on down the line.  No variations from that because, again,

18     as I say, the jury finds a certain amount of comfort in the

19     predictability and the stability of trial procedures in that way.

20          As I mentioned a moment ago, of course as you all know

21     under the local rules, one witness, one lawyer per witness in

22     examination.

23          Remember, under local rules you only have to ask for

24     the Court's permission to approach the witness once per witness.

25     So the first time you do it, the Court says yes, you don't have

1    to ask permission again.

2          The provisions of Local Rule 107(1)(b) will be fully in

3    effect during the trial.  Thus, when a document or other exhibit

4    is displayed to a witness, that document is deemed admitted in

5    the absence of objection.  And I will expect the government to

6    produce to defense counsel, if it hasn't already, an exhibit list

7    so that you can anticipate well in advance what you have a

8    problem with.  And I will expect counsel to bring objections to

9    my attention before we bring the jury in.

10          Obviously, all pretrial rulings, to the extent we all

11   have some failure of recollection about what some of them were,

12   but with respect to the Motions to Suppress and so forth, the

13   pretrial rulings are of record and you need not make objections

14   during trial to the denials of Motions to Suppress.  You don't

15   need to preserve those.  They are all preserved.

16          As I've indicated, I will deem every defendant to have

17   joined in an objection made by any defendant.  So if you hear an

18   objection, you need not also object.  Any objection to any

19   question or proffer of evidence by any counsel is deemed joined

20   in by all counsel.

21          Obviously, I don't expect to hear anybody speak, apart

22   from just "Objection, Your Honor", other than at the lectern.

23   Absolutely, you must be at the lectern when addressing the Court

24   or conducting an examination.

25          Those of you who tried cases in front of me know that,

1    with respect to bench conferences, I generally grant about 10% of

2    the requests, slightly higher on the government's side.  So I

3    don't expect to have many bench conferences.  We'll take up

4    matters outside the presence of the jury in the morning, at

5    lunch, and at the end of the day.

6         We will have available, I expect to have available the

7    listening devices so that your clients will be able to listen in

8    on all bench conferences and will not need to approach the bench

9    when we do have those rare bench conferences, or for the

10   individual voir dire.

11        I'm going to direct the government, as I mentioned

12   earlier, to provide to us on a daily basis a rolling projection

13   covering 48 hours of the upcoming witnesses.  It won't be written

14   in stone.  And to the extent that changes have to be made,

15   certainly, the government will be permitted to do that.  But

16   again, 48 hours in advance counsel for the defense will know who

17   the government expects to call.

18        I will ask the government, to the maximum extent

19   possible, to arrange for any and all incarcerated witnesses to

20   start the day.  I realize this may not be possible all the time

21   and, indeed, it may be that on some days you have more than one

22   incarcerated witness.  But to the extent that the government can

23   start the day or start the afternoon session after lunch with an

24   incarcerated witness, I think that will smooth things

25   appreciably.

63

1        In this connection, Mr. Harding, I would have no

2    difficulty, and I don't believe jurors generally have a

3    difficulty, if, for example, at the end of the morning session

4    you haven't concluded a witness either on direct or cross and you

5    plan to bring in an incarcerated witness immediately after lunch,

6    I don't see any problem with interrupting the testimony of a

7    witness, if it can be done without prejudice to the defense or to

8    the government, to interrupt a witness who's on the stand but not

9    completed at the end of the morning session and go to an

10   incarcerated witness at the beginning of the afternoon session.

11       My point is, I think, pretty obvious.  I'd like to get

12   incarcerated witnesses in custody in and out as expeditiously as

13   possible.  And I know that the government has that goal as well.

14       So to the extent that they can come in in the morning

15   and be finished by lunch or finished after lunch, they will be

16   done, they will be gone.  And to the extent you have to break up

17   the testimony of other witnesses in order to achieve that, you

18   will be permitted to do so.  And again, I will advise the jury

19   carefully as to why that's being done, and it's being done at the

20   request of the Court.

21       There is, of course, a rule on witnesses in the case.

22       The Court will reserve the first three rows of the

23   gallery for victims and the survivors of victims so that

24   spectators, general spectators other than the members of the

25   media will be limited to the rows behind the first three rows in

1    the gallery.

2              I am concerned about excessive movement in the

3    courtroom in a way that I'm normally not.  And so it may be that

4    I will issue an order providing that once a spectator leaves the

5    courtroom during a session, he or she will not be permitted to

6    reenter the courtroom until there's been a recess in the

7    proceedings.

8              So someone who's here at 9:30, like the rest of us,

9    will be required to remain in the courtroom in his or her seat

10   until we take a mid-morning recess.  If he or she gets up to

11   leave before the recess, he or she will not be permitted to

12   reenter the courtroom until after the recess.

13             I will not permit spectators any mobile communication

14   devices during this trial.  No cell phones, no pagers, no

15   Blackberrys.  And I will be in communication with the marshals

16   and the court security officers to insure that people who wish to

17   attend the trial understand that they need to leave their

18   communication devices in their cars because they will not be

19   permitted into this courtroom.

20             We'll take four alternates.  And I am aware that

21   there's been a request for extra peremptory strikes from the

22   defense.  I expect to afford the defense and the government

23   additional peremptory strikes.  I have a very significant panel

24   coming in on the 15th of September.

25             As I told you I would do, when the Jury Section sent

1    out the initial notice to the prospective jurors, we included in

2    that notice in highlight that this was expected to be an 8 to 10

3    week trial.  And it's my hope that before September 15th, any

4    prospective juror who would find that a hardship, as we've asked

5    them, will notify the Court.  And I will rule on requests to be

6    excused as they come in.  And so I'm hoping that we will start on

7    September 15th with a robust group of about 130 to 150 jurors.

8    As you've seen, I'm intending to devote the entire day of the

9    15th to jury selection.

10         As some, if not all, of you are aware, there was one

11   recent prominent magazine, front page magazine article in The

12   Washington Monthly about this case.  And so for that and other

13   reasons, I can anticipate, we can anticipate that there will be

14   more than the normal number of jurors who will have read or heard

15   something about this case.  Obviously, simply having read or

16   heard something about the case will not by itself disqualify a

17   juror.  But I do anticipate that there will be jurors who will

18   have to be excused on account of exposure to media reports about

19   the case.

20         I remind counsel, of course, that for the voir dire

21   process you will receive two separate lists, one with the

22   demographic information about the jurors and one that contains

23   only the juror's name and number.  And at the conclusion of the

24   voir dire the list that contains the information about the jurors

25   will be collected by Ms. Arrington, and so you will want to be

1   sure to make notes on your legal pads and on the blank sheets

2   with the jurors' names and numbers for your use during the trial.

3          I expect to have the evidence presentation system

4   that's presently in Courtroom 5-B relocated to this courtroom in

5   the next week or so.  If any of counsel need a refresher on the

6   use of that equipment, that can be arranged quite easily.  So

7   please be reasonably competent in the use of that equipment by

8   the time the trial commences.

9          All right.  I think that concludes my particular

10  concerns.  I'm happy to hear from counsel now regarding any and

11  all other housekeeping or trial management issues.

12         Remember that the marshals will need plenty of notice

13  and arrangements have to be made if the defendants' families wish

14  to bring clothing for them to wear during the trial.  Please make

15  sure that they're aware that they need to be brought in early,

16  have to be examined.  And I trust counsel will take care of that.

17         Let me just say as emphatically as I can that the

18  Court's tolerance for any lack of dignity or disruption in these

19  proceedings is long past exhausted and the Court will act

20  promptly and definitively to maintain the dignity of these

21  proceedings and to maintain an orderly process throughout this

22  trial.

23         Mr. Harding?

24         MR. HARDING:  Nothing from the government, Your Honor.

25         THE COURT:  Ms. Rhodes?

1          MS. RHODES:  Nothing further.

2          THE COURT:  Mr. Pyne, Mr. Crowe?

3          MR. CROWE:  Just one thing, Your Honor.  In the

4    indictment, Mr. Martin was actually listed as the third

5    defendant, and we would request that the order of cross

6    examination be in the order of the indictment.  We'd be more than

7    happy to switch seats.

8          THE COURT:  How did you happen to get seated there?

9          MR. CROWE:  We just sat there the first day.  He's also

10   involved in more counts than we are.  We think it would be

11   appropriate for us to go third.

12         THE COURT:  All right.  Mr. Martin, any problem with

13   that?

14         MR. MARTIN:  No, sir.

15         THE COURT:  All right.  You'll change seats with Mr.

16   Crowe, but not defendants.  Anything else, Mr. Martin?

17         MR. MARTIN:  No, Your Honor.

18         THE COURT:  Mr. Kurland?

19         MR. KURLAND:  Thank you, Your Honor.

20         THE COURT:  By the way, anybody interested or concerned

21   at all about daily copy?

22         MR. COBURN:  We would love to have daily copy if

23   possible.

24         THE COURT:  Why did I know that you would stand you and

25   say that, Mr. Coburn?  You can talk to Ms. Zajac.  I raise it.

1    She probably regrets that I even raised it.  But I don't know

2    that it's necessary or advisable.  You've got a heavy burden to

3    convince me that it's going to be necessary.  In fact, don't

4    speak to Ms. Zajac.  Submit whatever you want to submit to me and

5    we'll take that up in advance of the trial.

6            Yes, Mr. Kurland.  Good morning.  Good afternoon.

7            MR. KURLAND:  Good afternoon, Your Honor.  Your Honor,

8    a couple of scheduling matters which I think might push the

9    government's optimistic October 14th until the 20th, when you

10   factor in the religious holidays, in which case --

11           THE COURT:  Yes.  Can you remind me what those are

12   again, Mr. Kurland?  If you can't, that's all right.

13           MR. KURLAND:  No, I can.  I can.  I have that.  Yom

14   Kippur, which starts, you know, the Jewish holidays start on the

15   evening.  Rosh Hashanah actually, Rosh Hashanah begins on the

16   evening of September 29th.

17           THE COURT:  Okay.

18           MR. KURLAND:  Let me just doublecheck that.  Rosh

19   Hashanah begins at sundown.  So that Monday, I would ask that

20   court be dismissed early that day.

21           THE COURT:  We'll break around three probably.

22           MR. KURLAND:  At three?  Then Rosh Hashanah, and this

23   is where it gets a little dicey.  On Tuesday the 30th is, Rosh

24   Hashanah's observed by all Jews on the 30th.  Many Jews observe

25   two days, though.  Now, that wouldn't affect me but it might

1    affect the jury pool.

2              THE COURT:  Right.

3              MR. KURLAND:  So if that were the case, there should be

4    no court on Tuesday, September 30th.  And if you wanted to be on

5    the safe side and not incur the wrath of whoever, the Almighty,

6    perhaps, that might rule out the Wednesday, the 1st, as well.

7    Again, my personal practice has been to observe only one day but

8    I know that many observe both days.

9              THE COURT:  All right.

10             MR. KURLAND:  If you take that into account, there's

11   one and a half days or two days and a half days.  That might push

12   the optimistic government date from -- what do they have it down

13   as -- October 14th.  That would push it to the end of that week,

14   the 20th.  Which would then mean that there's that week off, the

15   20th to the 27th.  Perhaps it might be more prudent to simply

16   just say that the defense would be expected to start their case

17   on that Monday, the 27th.

18             THE COURT:  Sure.  Sure.  Thanks for that information.

19   This may also --

20             MR. KURLAND:  Yom Kippur, too, that I have to add as

21   well.  Sorry.

22             THE COURT:  Yes.  This may prompt me, I'll confer with

23   Ms. Cannon, I'm not sure Ms. Arrington needs retraining.  We may

24   be in session on the 2nd, in that light.  Or we may not.  But

25   we'll see how it goes.

1          Okay.  When do we have Yom Kippur?

2          MR. KURLAND:  With respect to Rosh Hashanah, though,

3    what's the Court's ruling on the --

4          THE COURT:  We will not be in session on the 30th and

5    we'll break early on the 29th.  I'll see what the jury's make-up

6    is as to the 1st.

7          MR. KURLAND:  Okay.  Again, that's just my, I don't

8    want to, I don't dare speak for other persons.

9          THE COURT:  No.  I appreciate that.  No.  Sure.

10         MR. KURLAND:  With respect to Yom Kippur, which is the

11   holiest of all holy days, that begins on sundown on Wednesday the

12   8th.  So that would have to be another day in which -- I don't

13   have my lunar map here as to when sundown actually is -- but that

14   would have to be another day that would have to be a half day.

15         THE COURT:  3:00 or maybe even -- in fact, what I will

16   probably do is not break for lunch until 1:30 or something, or 2

17   maybe, but 2 morning recesses, and then excuse the jury for the

18   day.

19         MR. KURLAND:  That would be excellent because that

20   makes it easier to get down with the traffic.

21         THE COURT:  Exactly.

22         MR. KURLAND:  Thank you, Your Honor.  So that would be

23   Wednesday, the afternoon of the 8th.  And then Yom Kippur is

24   observed, then, on Thursday, the 9th.  So there couldn't be court

25   on the 9th.

1          THE COURT:  All right.  So we will not be in session on

2   October 9.

3          MR. KURLAND:  And I hope I have, I'm fairly certain

4   that those are the correct dates.

5          THE COURT:  All right.

6          MR. KURLAND:  All right.  That was the one major

7   schedule matter that I had.  A couple other just minor, minor

8   housekeeping matters.

9          The first is, perhaps might be premature to ask this

10  now, but the Court's preference in closing argument with respect

11  to blow-up of jury instructions.  Does the Court generally permit

12  that?  If it's instructions that the Court is going to give?

13         THE COURT:  Sure.  I don't have a problem with

14  blow-ups.  Let me just say, my practice is, first of all, of

15  course, I always send in copies of the instructions.  And while I

16  read the instructions, what I found works really well is to

17  actually project the instructions to the jury so they will,

18  assuming I instruct first in this case, and I'm not sure if I'll

19  instruct first or after argument, but assuming I instruct first,

20  which I know is what counsel's preference always is, I will read

21  them the instructions.  They will have the opportunity to read

22  along with me through the video monitors.  And then I will send

23  in copies.  So if you want to make enlargements to highlight --

24         MR. KURLAND:  Yeah.  For particular emphasis during

25  closing argument.  The Court generally has no objection to that?

1           THE COURT:  Certainly.  Certainly.  In that regard, by

2    the way, I'm glad you mentioned that, Mr. Kurland.  For opening

3    statements and closing argument, if you intend to use an exhibit,

4    this is true for everybody, be sure to share it with other

5    counsel.  And only if there's a problem do you need to bring it

6    to my attention.  But share any argument exhibits with counsel

7    before you use them.

8           MR. KURLAND:  All right, Your Honor.  Thank you.  Two

9    other quick things.  One is with respect to your comment, the

10   Court's comment concerning Local Rule 107(1)(b) and when you show

11   a document to a witness, it's deemed admitted absent objection?

12          THE COURT:  Yes.

13          MR. KURLAND:  I'll take a look at that rule as soon as

14   I leave the courtroom.  But with respect to certain documents

15   that are used only for refreshment of memory only, that are not

16   intended to be admissible as evidence and, in fact, are not

17   admissible under the rules, I take it that doesn't apply to

18   those.

19          THE COURT:  Of course.  Of course.

20          MR. KURLAND:  The last point is that, as I got up here,

21   we were trying to use proper decorum.  Mr. Coburn wrote down a

22   couple notes that he wanted me to address to you, to the Court

23   concerning voir dire.  But could Mr. Coburn simply just stand?  I

24   can't read it clearly.

25          MR. COBURN:  Don't worry about it.  Don't worry about

1   it.

2           MR. KURLAND:  Are you sure?

3           MR. COBURN:  Yes.

4           MR. KURLAND:  All right.

5           THE COURT:  I have pretty much a standard voir dire.  I

6   can tell counsel that I will rely very heavily on the

7   questionnaire that we put together last year.  And then the sort

8   of standard voir dire questions, you know.  Would you treat the

9   testimony of a law enforcement officer any differently?  But if

10  anybody has any particular requests, simply file them

11  electronically and we'll do it.

12          MR. KURLAND:  Your Honor, let me just have a

13  clarification.  Maybe I just missed something.  But we didn't

14  send out that questionnaire for this coming in, because it was a

15  capital case.

16          THE COURT:  No.

17          MR. KURLAND:  Okay.

18          THE COURT:  No.  I was simply suggesting that, I think

19  virtually anything that would need to be covered in voir dire is

20  covered in that questionnaire.

21          MR. KURLAND:  Would there be any circumstance where any

22  part of voir dire would take place in chambers?

23          THE COURT:  No.  No.  What I will do, I think we can

24  fit 120 in here in seats.  And as I say, I'm anticipating between

25  130 and 150 people showing up.  Notwithstanding what I said about

1    the dignity of the court, what I plan to do is to bring everybody

2    in, and some will have to stand for the initial few minutes of

3    the voir dire.  But I'm hopeful that fairly quickly, in the first

4    two or three questions, we will identify, you know, people who

5    didn't realize it was an eight week trial or people who have, you

6    know, medical procedures recently scheduled or something.  And

7    they're going to be out of here.  So I'm hoping that we'll get

8    seats for all the jurors fairly quickly.

9         And then I conduct a general voir dire where I ask the

10   question, people stand, they give their number only.  And I ask

11   follow-up questions.  And then I will excuse them if it's fairly

12   obvious that they can't serve.  And then at the end of the

13   general voir dire, we have the individual voir dire here at the

14   bench.  It's going to take all day, no question about it.

15        By the way, my law clerks will each have hand

16   microphones so that as jurors respond to the general voir dire,

17   they will be running back and forth, like Price is Right, to be

18   sure that we can hear the juror.

19        MR. KURLAND:  I was going to say Monty Hall and Let's

20   Make a Deal.  But Price is Right is the same idea as well.

21        Your Honor, one last thing.  With regard to the fact we

22   have the religious holidays, is it safe to, when we deal with the

23   defense witnesses, is October 27th --

24        THE COURT:  Yes.  Yes.

25        MR. KURLAND:  And that week of the 20th to the 27th,

1    under no circumstances --

2            THE COURT:  Well, you know, Mr. Harding threw a real, a

3    long steel bolt into the works.  If Mr. Harding is anywhere near

4    accurate --

5            MR. KURLAND:  We've already added a week for the Jewish

6    holidays.  So he's already a week off.

7            THE COURT:  Yeah.  You're right.  You took away what

8    Mr. Harding gave.  That's good.  So yeah, I think the 27th is

9    perfectly okay.

10           MR. KURLAND:  Thank you very much.

11           THE COURT:  So we will not be in session the week of

12   October 20th.

13           MR. KURLAND:  Thank you, Your Honor.

14           THE COURT:  Thank you, Mr. Kurland.  Anything else?

15   Counsel, thank you.  Yes, Ms. Rhodes.

16           MS. RHODES:  I mentioned this before.  But I was

17   thinking in terms of the Court's position on how we're going in

18   order, there will be witnesses where we may agree that somebody's

19   going to take the lead on that witness and so I would not

20   necessarily have a cross exam of them once I have heard the lead

21   person's cross of them.  So I would hate to sort of do one that I

22   wouldn't really have to do just to keep the order going.

23           So with the Court's permission, if we know that, I

24   could certainly be the person to stand up and say Mr. Coburn is

25   doing that.

1          THE COURT:  No.  No.  The way we do that is this.  You

2     will say, "No questions, Your Honor."  Mr. Martin, who will then

3     be seated next to you, will say, "No questions, Your Honor."  We

4     get to Mr. Pyne, who's the lead lawyer.  Then he will question

5     the witness.  So he will take the first cross examination.  And

6     then we'll move to Mr. Coburn, Mr. Kurland.  And then we'll go

7     back to the government for redirect.  And then we'll come back to

8     you for recross if there's anything you want to do.  Do you

9     follow me?

10          MS. RHODES:  Yes.

11          THE COURT:  So the order will be the same.  You don't

12    have to say, "Your Honor, Mr. Martin's going to take the lead in

13    examining this witness."  You just say, "I don't have any

14    questions."

15          MS. RHODES:  Well, all right.  But my cross, what I do

16    have, the very brief cross I might have in that circumstance,

17    might not be for recross.  It might be for --

18          THE COURT:  Well, then, you're going to have to

19    question the witness.

20          MS. RHODES:  But I won't know until the lead person is

21    finished.

22          THE COURT:  Then it's recross.

23          MS. RHODES:  All right.

24          THE COURT:  I mean it's cross.

25          MS. RHODES:  But it's not going to be -- okay.  But

1    it's not going to be based on what the government, it doesn't

2    have to be based on what the government has done then?

3            THE COURT:  Okay.  Maybe I'm missing the point.  Start

4    over.  There might be witnesses --

5            MS. RHODES:  Well, let's say Mr. Pyne does a terrible

6    job.

7            THE COURT:  Why would you assume such a counter-factual

8    thing as that?

9            MS. RHODES:  I'm just saying.  There might be some

10   angle of it that I think needs to be included that wasn't.

11   Perhaps it wasn't as useful or relevant to their client.  So

12   there may be two questions I need to ask, but they're not really

13   going to be based on what Mr. Harding says.

14           THE COURT:  No.  No.  You don't get to cross just on

15   what Mr. Harding does.  You get to cross on whatever any lawyer

16   asks.  I see your point.

17           MS. RHODES:  Okay.

18           THE COURT:  Either way, it's going to be cross

19   examination.

20           MS. RHODES:  Okay.  That's fine.

21           THE COURT:  So whether Mr. Pyne does a wonderful job or

22   a lousy job, you still get to conduct a cross examination.  But

23   first you have to say --

24           MS. RHODES:  No questions.

25           THE COURT:  -- no questions.  And it will be

1    appropriately limited, then, to matters that have arisen either

2    on the direct or on the cross by other counsel.

3          MS. RHODES:  Oh, well, then, that's not what I was,

4    what I thought you were saying.

5          THE COURT:  Then you'll need to go ahead and conduct

6    your examination.

7          MS. RHODES:  Okay.  But what I'm saying is I'll have to

8    do a full cross on that witness, then.  In other words, if

9    there's a 1 through 10 that needs to be covered in the cross

10   examination, I would rather let the other person do it and

11   presumably they'll hit 1 through 10, because it's their witness

12   more than my witness.

13         THE COURT:  Okay.

14         MS. RHODES:  But if --

15         THE COURT:  And so Mr. Pyne does 1 through 7 and 9, but

16   not 8 and 10.

17         MS. RHODES:  Um-hum.

18         THE COURT:  Then you get to do 8 and 10.

19         MS. RHODES:  All right.

20         THE COURT:  And re-explore 1 through 7 if you believe

21   that he's been lousy with 1 through 7.

22         MS. RHODES:  Okay.

23         THE COURT:  Okay?

24         MS. RHODES:  All right.

25         THE COURT:  Now, having said all of that, I'm glad you

1    mention it.  Throughout my career I've been far too generous with

2    recross examination.  Of late, I'm trying to change those old

3    habits.

4              MS. RHODES:  Could you start after Thanksgiving?

5              THE COURT:  I'll continue to be generous, just not as

6    generous as before.  I understand the difficulty of four

7    defendants and all that.  So you'll have the time you need.  And

8    I know, I respect all of you, you know that.  And you all will do

9    the best you can to avoid redundancies and repetition.

10             You'll have the leeway to do what you need.  I just

11   need you to stand up and say, "No questions, Your Honor, at this

12   time."

13             MS. RHODES:  All right.

14             THE COURT:  That way the jury says, okay, one, two,

15   three, four, one, two, three, four.  They like that rhythm.

16   Okay?

17             MS. RHODES:  Thank you, Your Honor.

18             THE COURT:  All right?  Mr. Martin.

19             MR. MARTIN:  Your Honor, one last issue, that I want to

20   clarify something.  As you are aware, at various points during

21   the pendency of this trial I have obtained orders from you about

22   pretrial subpoenas that were sealed.  And so I haven't, I think I

23   need the Court to permit me now to make that stuff available to

24   everybody else.  I just want to make sure I'm not violating an

25   order, because you sealed the subpoena and the fact of the

1   subpoena, so nobody except you and I know that I did this, other

2   than the recipients of the subpoenas.

3          And there are some of those records that I probably

4   will use.  Most of it was mitigation related.  So I won't be

5   using those.  But there are some of those records, and I'll make

6   them available, as I think the order says, in the order that I

7   got them, to the government whenever they wish to come look at

8   them.

9          THE COURT:  Absolutely.

10          MR. MARTIN:  There's not a whole lot of them but they

11   are there.

12          THE COURT:  All of counsel who have received Rule 17

13   subpoenas by order of the Court are now free to make disclosures

14   as necessary consistent with your obligations.

15          MR. MARTIN:  Thank you, Your Honor.

16          THE COURT:  Counsel, thank you very much.  Yes, Mr.

17   Harding.

18          MR. HARDING:  If they're going to make disclosures --

19          THE COURT:  Approach the lectern.

20          MR. HARDING:  If they're going to make disclosures

21   about documents they obtained through Rule 17 subpoenas, the

22   government would request that they simply make copies of the

23   material, and not invite us to come to their offices and look at

24   the materials, since that's what we did with all of our

25   materials.

1          THE COURT:  I'm sure they'll be courteous.  Thank you,

2     counsel.  We're in recess.  See you all on September 15th.

3          MR. COBURN:  Your Honor, should we come around to

4     chambers on our ex parte now?

5          THE COURT:  Why don't you come on up?  Do we need to be

6     on the record?

7          MR. COBURN:  Not at all.

8          (Conclusion of Proceedings at 12:40 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

82

1                           REPORTER'S CERTIFICATE

2

3            I, Mary M. Zajac, do hereby certify that I recorded

4    stenographically the proceedings in the matter of USA v. Willie

5    Mitchell, et al., Case Number(s) AMD-04-029, on August 22, 2008.

6            I further certify that the foregoing pages constitute

7    the official transcript of proceedings as transcribed by me to

8    the within matter in a complete and accurate manner.

9            In Witness Whereof, I have hereunto affixed my

10   signature this _____ day of _____, 2008.

11

12

13

14                   _____

                     Mary M. Zajac,
15                   Official Court Reporter

16

17

18

19

20

21

22

23

24

25