1

1

2                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF MARYLAND
3                            NORTHERN DIVISION

4

5       UNITED STATES OF AMERICA

6            v.                              CRIMINAL CASE NO.
                                             AMD-04-029
7       WILLIE MITCHELL,
        SHELTON HARRIS,
8       SHELLY WAYNE MARTIN,
        SHAWN GARDNER,
9
              Defendants
10      _____/

11            (Excerpt: Testimony of Darryl Bacon)
                  Thursday, September 18, 2008
12                  Baltimore, Maryland

13

     Before:  Honorable Andre M. Davis, Judge
14                    And a Jury

15   Appearances:
             On Behalf of the Government:
16            Robert Harding, Esquire
              Michael Hanlon, Esquire
17           On Behalf of Defendant Mitchell:
              Laura Kelsey Rhodes, Esquire
18            Michael E. Lawlor, Esquire
             On Behalf of Defendant Harris:
19            Gerard P. Martin, Esquire
              Paul Flannery, Esquire
20           On Behalf of Defendant Martin:
              Thomas L. Crowe, Esquire
21            James G. Pyne, Esquire
             On Behalf of Defendant Gardner:
22            Adam H. Kurland, Esquire
              Barry Coburn, Esquire
23
     Reported by:
24   Mary M. Zajac, RPR
     Room 5515, U.S. Courthouse
25   101 West Lombard Street
     Baltimore, Maryland 21201

1       (Excerpt: Testimony of Darryl Bacon)

2       MR. HARDING:  Yes, Your Honor.  The United States calls

3   Darryl Bacon.

4         DARRYL BACON, GOVERNMENT'S WITNESS, SWORN

5       THE WITNESS:  I do.

6       THE CLERK:  Be seated.  Scoot up.  Speak directly

7   toward the mike.  State your name and spell it for the record,

8   please.

9       THE WITNESS:  Darryl Bacon.

10      THE CLERK:  Spell your name for the record.

11      THE WITNESS:  D-A-R-R-Y-L.  B-A-C-O-N.

12      DIRECT EXAMINATION

13  BY MR. HARDING:

14  Q    Good morning, Mr. Bacon.

15  A    Good morning.

16  Q    Can you tell us how old you are, sir?

17  A    29.

18  Q    Where did you grow up, Mr. Bacon?

19  A    Randallstown.

20  Q    How far did you get in school?

21  A    Eleventh grade.

22  Q    What school was that that you were going to in the eleventh

23  grade?

24  A    Randallstown High.

25  Q    Okay.  Are you employed right now, Mr. Bacon?

1    A     Yes.

2    Q     Can you give us an idea of what kind of work you do, without

3    telling us the specific company you work for?

4    A     Sales rep.

5    Q     Okay.  Did you recently get out of jail after serving a

6    term?

7    A     Yes.

8    Q     How long ago did you get out?

9    A     About three months ago.

10   Q     And how long were you locked up for?

11   A     Four years.

12   Q     Okay.  Was that pursuant to a guilty plea that had a plea

13   agreement involved with it?

14   A     Yes.

15   Q     Okay.  Let me show you what's been marked as Government

16   Exhibit P-1 and ask you if you can identify that document.  I'll

17   call your attention to the last page.  Does that have your

18   signature on it?

19   A     Yes.

20   Q     And it also has a signature of an attorney, is that correct?

21   A     Yes.

22   Q     What's his name?

23   A     Michael Montemarano.

24   Q     Okay.  What charge or charges did you plead guilty to in

25   that plea agreement?

1    A    Possession of a handgun.

2    Q    Let me ask you.  By the way, I'm just going to put this on

3    the screen.  Can you read the date on the top of the plea

4    agreement?

5    A    I can't see it.

6    Q    Can you see it now?

7    A    No.  March 23rd.

8    Q    Is that better?

9    A    Yes.

10   Q    March 23rd of what year?

11   A    2005.

12   Q    Okay.  And is this a, is this a plea agreement with the

13   federal government rather than --

14           THE COURT:  I'm sorry, Mr. Harding.  I think you need

15   to adjust the iris, if you can find that button.  Mr. Hanlon to

16   the rescue once again.

17           MR. HANLON:  I don't know about, that Your Honor.

18           MR. HARDING:  Is that better?

19           THE COURT:  No.  That's worse.  That's better.  Okay.

20   Excellent.

21   BY MR. HARDING:

22   Q    Thank you, Your Honor.  Is this a plea agreement that you

23   made with the United States, Mr. Bacon?

24   A    Yes.

25   Q    Okay.  It's actually addressed to your lawyer, is that

1    correct?

2    A    Yes.

3    Q    Now, what did you promise to do in this plea agreement, Mr.

4    Bacon?

5    A    Testify in this case.

6    Q    Okay.  And specifically, are your commitments detailed,

7    first of all, in Paragraph Two, Subsection A and B?  Is that

8    correct?

9    A    Yes.

10    Q    Your client shall fully and truthfully respond to all

11    questions, and so on, and your client shall cooperate completely

12    with federal law enforcement authorities, those two

13    subparagraphs, is that right?

14    A    Yes.

15    Q    And then over on the next page, Subsection C, your client

16    shall testify fully and truthfully before grand juries and at all

17    trials of cases at which his testimony may be relevant.  Is that

18    right?

19    A    Yes.

20    Q    And also, it says, your client will not commit any offense

21    in violation of federal, state or local law between the date of

22    this agreement and his sentencing in this case.

23        What did you get in exchange for agreeing to testify

24    and to cooperate truthfully in this case?

25    A    Five years no parole.

1    Q    Five years no parole?

2    A    Yes.

3    Q    Okay.  Let me call your attention to some other provisions

4    in this plea agreement.  This is Paragraph 4-B.  In consideration

5    of the plea your client is entering in state court and in the

6    event that your client provides substantial assistance in the

7    investigation or prosecution of others who have committed an

8    offense, the government agrees not to prosecute him in federal

9    court for violations of federal criminal laws related to the

10   above stipulated facts about contraband and a firearm recovered

11   on August 17th, 2004.  Is that right?

12   A    That's correct.

13   Q    And then it says, your client understands that the Circuit

14   Court for Baltimore City is not bound by this agreement and will

15   determine the facts relevant to sentencing.  And then it goes on

16   to say something about how your criminal history could affect

17   your sentence and there's no understanding between you and the

18   government about what your criminal history is.  Is that right?

19   A    Yes.

20   Q    So in other words, you were permitted, pursuant to this plea

21   agreement, in exchange for agreeing to cooperate and testify

22   truthfully, you were allowed to plead guilty in state court, is

23   that right?

24   A    Yes.

25   Q    Specifically, Circuit Court of Baltimore City.  And you

1    agreed, did you not, that you would, that the government would

2    recommend a sentence of five years without parole, is that right?

3    A    Yes.

4    Q    And that's in Paragraph Five.  In return for the complete

5    fulfillment by your client of all of his obligations under this

6    agree, this office agrees as follows:  A, recommend the minimum

7    mandatory sentence of five years without parole for the offense

8    to which your client is pleading guilty and recommend that the

9    sentence be imposed concurrently with any time that your client

10   receives for pending VOP charges.  Does that mean violation of

11   probation charges?

12   A    Parole.

13   Q    Parole.  Okay.  Do you recall, under this agreement, what

14   would happen if you were to testify falsely or otherwise break

15   the plea agreement?

16   A    I could be charged with perjury.

17   Q    Okay.  Anything else?

18   A    Violate this plea agreement, this contract.

19   Q    It would, it would do what to the plea agreement?

20   A    Violate it.

21   Q    Okay.  And is that contained in Paragraph Six, Mr. Bacon?

22   A    Yes.

23   Q    It says, in fact, in the fourth line down of that paragraph,

24   that if you knowingly withheld evidence or otherwise not be

25   completely truthful in your testimony before grand juries or at

1    hearings and trials, then this office will be free to, one,

2    prosecute him for perjury, two, prosecute for other offenses that

3    he has committed, and so on.  Is that right?

4    A    Yes.

5    Q    And in fact, the fourth one is, recommend to the Circuit

6    Court of Baltimore City any sentence that this office considers

7    appropriate, up to and including the maximum possible sentence,

8    and five, prosecute your client in federal court for the crimes

9    your client committed on August 17th, 2004.  Do you see that?

10   A    Yes.

11   Q    Now, supposing there were a dispute over whether or not

12   you'd violated your plea agreement, do you know who it is that

13   would decide whether or not you had violated your plea agreement?

14   A    Yes.

15   Q    Okay.  Is that contained in Paragraph Seven?

16   A    Yes.

17   Q    So who would decide if you had violated the terms of your

18   plea agreement?

19   A    Circuit Court of Baltimore City.

20   Q    Okay.  Circuit Court of Baltimore City in an appropriate

21   proceeding.  And then it goes on to explain that all sorts of

22   disclosures and documents shall be admissible and this office

23   shall be required to establish your breach by a preponderance of

24   the evidence.  Do you see that?

25   A    Yes.

1  Q    Okay.  And then Paragraph Eight also goes on to explain that

2  nothing in the agreement protects you from perjury or false

3  statement charges, obstruction of justice charges.  Do you see

4  all that?

5  A    Yes.

6  Q    Okay.  Did you, in fact, get sentenced under that plea

7  agreement?

8  A    Yes.

9  Q    And that's when you got the five year no parole sentence?

10  A    Yes.

11  Q    And you served that entire sentence and got out of jail

12  already, is that right?

13  A    Yes.

14         MR. COBURN:  Objection, leading.

15         THE COURT:  Overruled.

16  Q    And in fact, you served a little less than five years

17  because you said you were locked up for four years, is that

18  right?

19  A    Yes.

20  Q    How come you got less than five years?

21  A    Under the state it's pretty much you're earning good days.

22  So --

23         THE COURT:  Keep your voice up, please, Mr. Bacon, and

24  get closer to the microphone.

25         THE WITNESS:  Under the state you get good days so the

1    good days put me out the door in four years.

2    BY MR. HARDING:

3    Q    How do you get good days?

4    A    Working.

5    Q    Working while you're locked up?

6    A    Yes.

7    Q    So you basically worked a year off your sentence that way?

8    A    Yes.

9    Q    Okay.  Now, is it fair to say, Mr. Bacon, that had you been

10   prosecuted federally, you could have gotten a lot more time than

11   five years no parole?

12   A    Yes.

13   Q    Did you and your lawyer talk about that back at the time

14   when you were deciding whether or not to take the plea agreement?

15   A    Yes.

16   Q    Do you have any idea now how much time you could have faced

17   if you, if you had been successfully prosecuted federally for the

18   offenses that you pled guilty to in state court?

19   A    No.

20   Q    You don't?

21   A    No.

22   Q    Okay.  Did you testify in the grand jury in this

23   investigation, Mr. Bacon?

24   A    Yes.

25   Q    Do you remember the date that you testified in the grand

1    jury?

2    A    No.

3    Q    Okay.  Would it refresh your recollection if I showed you

4    the first page of the transcript?

5             THE COURT:  You can put it on the DOAR, Mr. Harding.

6    Q    Is that the date, Mr. Bacon?

7    A    Yes.

8    Q    May 12th, 2004?

9    A    Yes.

10   Q    Okay.  So correct me if I'm wrong.  You testified in the

11   grand jury before you were even arrested in the case that you

12   pled guilty in, is that correct?

13   A    Yes.

14   Q    When you testified in the grand jury, you didn't have a

15   charge hanging over your head then, is that correct, Mr. Bacon?

16   A    No.

17   Q    You just got a subpoena to come and testify to court, is

18   that right?

19   A    Yes.

20   Q    And did you give details in your grand jury testimony about

21   everything that the government asked you about?

22   A    Yes.

23   Q    Okay.  Now, let me ask you about your other convictions in

24   the past.

25             Have you been convicted of other crimes, Mr. Bacon?

1    A    Yes.

2    Q    Can you give us an idea of what they are, as best you can?

3    A    Drug charges and gun charges.

4    Q    Okay.  Can you give us an idea of when these charges were

5    and, also, how many of them there were?

6    A    I caught four drug charges in '98, a handgun charge in '98,

7    '99 a drug charge.  2000, drug charge.  And 2004, drug charge,

8    gun charge.

9    Q    Okay.  The four drug charges in '98, were those all in a

10   single case or were some of them grouped into a single case?

11   A    It was a single case.

12   Q    It was a single case?

13   A    Yeah.

14   Q    Okay.  Were those undercover buys or some sort of

15   transactions that you did --

16            MR. LAWLOR:  Objection, Your Honor.  Leading.

17            THE COURT:  Overruled.

18   A    Yes.

19   Q    They were?  But then you were charged with them altogether,

20   is that correct?

21   A    Yes.

22   Q    Okay.  So you've got, you've got, is it two or three drug

23   convictions, then?

24   A    Two.

25   Q    Okay.  Have you also been convicted of making a false

1    statement to an officer?

2    A    Yes.

3    Q    Was that part of the, one of the drug convictions?

4    A    Yes.

5    Q    What was the false statement that you made?

6    A    I used an alias.

7    Q    Okay.  Do you remember what alias you used?

8    A    No.

9    Q    Why was it -- was this an alias that you gave when you were

10   arrested?

11   A    Yes.

12   Q    Why did you give an alias?

13   A    I had a warrant on me for a violation of probation.

14   Q    Okay.

15          THE COURT:  Would you like some water, Mr. Bacon?

16          THE WITNESS:  Yes.

17          MR. HARDING:  I can handle that.

18          THE COURT:  Ms. Arrington will get it.

19   BY MR. HARDING:

20   Q    Now, back for a minute to this past four years that you've

21   been locked up until three months ago.  Did you pick up a charge

22   while you were in jail?

23   A    Yes.

24   Q    What was that charge?

25   A    Possession of marijuana.

1   Q    You were caught with marijuana while you were in jail?

2   A    Yes.

3   Q    What jail were you in?

4   A    MCIJ.

5   Q    Okay.  Is that a state facility in Jessup, Maryland?

6   A    Yes.

7   Q    And so the charge was what?

8   A    Possession of marijuana.

9   Q    How much marijuana did you have?

10  A    A gram.

11  Q    A gram?

12  A    Yes.

13  Q    How did you get it in jail, anyway?

14  A    Just bought it through somebody.

15  Q    I'm sorry?

16  A    I bought it from a friend.

17  Q    Oh.  From another prisoner?

18  A    Yes.

19  Q    And is that case still pending in Anne Arundel state court?

20  A    Yes.

21  Q    When you got out of jail three months ago, did you express

22  an interest in moving yourself and your family because of this

23  case?

24           MR. LAWLOR:  Objection, Your Honor.

25           THE COURT:  Overruled.  You may answer.

1    A    Yes.

2    Q    And why was that?

3         MR. LAWLOR:  Objection.

4         THE COURT:  Overruled.  You may answer.

5    A    For safety reasons.

6    Q    And did the United States Attorney's Office, did the Victim

7    Witness Unit in the U.S. Attorney's Office provide you with funds

8    to help you move?

9    A    Yes.

10   Q    Do you have a recollection now as to how much money you got?

11   A    Around 3500.

12   Q    Okay.  And what was that to pay for, exactly?  Do you

13   remember?

14   A    Security deposit and first month's rent.

15   Q    Okay.  Now, you say you grew up in Randallstown and you went

16   to school there, is that correct?

17   A    Yes.

18   Q    While you were growing up, did you get to know somebody by

19   the name of Shawn Gardner?

20   A    Yes.

21   Q    Do you see him in the courtroom here today?

22   A    Yes.

23   Q    Could you point him out for us, please?

24   A    (Indicating.)

25   Q    Could you indicate, could you describe the person by the

1    type of clothing or other things about his appearance that would

2    help us to know who you're pointing to?

3    A    He has glasses on and a white shirt.

4    Q    Okay.  Can the record reflect that he's indicated the

5    defendant, Shawn Gardner, Your Honor?

6              THE COURT:  So noted.

7    Q    Do you remember how old you were when you met Shawn Gardner?

8    A    Around 12, 13.

9    Q    Is Mr. Gardner older than you or younger than you or the

10   same age or what?

11   A    He's older than me.

12   Q    How much?

13   A    By two years.

14   Q    Okay.  Did you also meet Willie Mitchell while you were in

15   Randallstown?

16   A    Yes.

17   Q    Do you see him in the courtroom?

18   A    Yes.

19   Q    Can you point him out?

20   A    (Indicating.)

21   Q    Can you describe what clothing he's wearing?

22   A    A sweater, gray.

23   Q    A gray sweater?

24   A    Yeah.

25   Q    Can the record reflect that the witness has identified the

1    defendant, Willie Mitchell, Your Honor?

2              THE COURT:  So noted.

3    Q    By the way, what's Mr. Mitchell's nickname, if you know?

4    A    Bo.

5    Q    And what's Mr. Gardner's nickname, if you know?

6    A    Goo.

7    Q    Goo?

8    A    Yes.

9    Q    Do you remember how you met Mr. Mitchell?

10   A    Through Goo.

11   Q    Through Goo?

12   A    Yes.

13   Q    Do you actually remember when you met Mr. Mitchell?

14   A    I think I met him in '93.

15   Q    Okay.  Do you remember how it was that you were introduced

16   to him?

17   A    We had cut out of, I think, Goo and I had cut out of school

18   and went over Willie, Bo's house.

19   Q    Okay.  Is that when you first met him?

20   A    Yes.

21   Q    Was he living in Randallstown, also, at the time?

22   A    Yes.

23   Q    And was Mr. Gardner living in Randallstown, also?

24   A    Yes.

25   Q    Okay.  Did you get to know, also, somebody by the name of

1    Shelly Martin?

2    A    Yes.

3    Q    Do you see him in the courtroom here today?

4    A    Yes.

5    Q    Could you point him out?

6    A    (Indicating.)

7    Q    What clothing is he wearing?

8    A    I can't tell.  White shirt.

9    Q    I'm sorry?  Did you say you can't tell?

10   A    No, I can't.  It's like a white shirt, I think, from over

11   here.

12   Q    Okay.  Tell us, tell us where he's --

13   A    He's sitting right there in the corner.

14   Q    In the corner?

15   A    Yes.

16   Q    Can the record reflect that the witness has identified Mr.

17   Martin, Your Honor?

18           THE COURT:  So noted.

19   Q    You said that Mr. Gardner was a couple of years older than

20   you.  What about Mr. Mitchell?  Is he older or younger than you?

21   A    He's older.

22   Q    How much older is he?

23   A    A couple years.

24   Q    And what about Mr. Martin?

25   A    A year older than me.

1    Q    He's older, also?

2    A    Yes.

3    Q    How much, do you know?

4    A    A year.

5    Q    One year?  Okay.  Does Mr. Martin have a nickname or a name

6    he usually goes by?

7    A    Wayne.

8    Q    Okay.  Is that also his middle name, do you know?

9    A    Yes.

10   Q    Okay.  Let me, back in the, a long time ago, around 1994,

11   did you get sent to the Charles Hickey School?

12   A    Yes.

13   Q    How long did you spend there?

14   A    A few months.

15   Q    Okay.  While you were there, did any of these three

16   defendants that you've just identified also arrive at the Hickey

17   School?

18   A    Yes.

19   Q    How many of them?

20   A    Two.

21   Q    Which two?

22   A    Wayne and Goo.

23   Q    Wayne and Goo?

24   A    Yes.

25   Q    Okay.  Did they tell you why they were there?

1    A    No, I can't remember.

2    Q    Okay.  Let me ask you another question.  Did you learn of a

3    robbery that Mr. Mitchell --

4              MR. LAWLOR:  Objection, Your Honor.

5              THE COURT:  Overruled.  Let him ask the question.

6    Q    -- that Mr. Mitchell was involved in back in, around that

7    time?

8              MR. LAWLOR:  Objection.

9              MR. CROWE:  Objection.

10             THE COURT:  Overruled.  You may answer.

11             THE WITNESS:  I can't remember.

12   BY MR. HARDING:

13   Q    Okay.  Let me, would it refresh your recollection if I

14   showed you a passage from your grand jury transcript?

15   A    Yes.

16             MR. HARDING:  This is Page Six.

17             MS. RHODES:  Could you use the system so we can see it?

18             MR. LAWLOR:  No.  No.  No.  No.

19             THE COURT:  I think counsel would rather you not show

20   the transcript on the DOAR.  So just read it yourself, Mr. Bacon,

21   whatever he points out to you.

22             (Pause in Proceedings.)

23   BY MR. HARDING:

24   Q    Does that refresh your recollection, Mr. Bacon?

25   A    Yes.

1   Q    What did -- well, who told you about it, first of all?

2   A    I can't remember who told me about it.

3   Q    Was it one of the three or all of the three or what?

4              MR. LAWLOR:  Objection, Your Honor.

5              MR. CROWE:  Objection.

6              MR. LAWLOR:  Asked and answered, Your Honor.

7              THE COURT:  Overruled.

8              THE WITNESS:  It was one of the three.

9              MR. HARDING:  Okay.  What did you, what did you learn?

10             MR. COBURN:  Objection.

11             MR. LAWLOR:  Objection.

12             THE COURT:  Overruled.

13             MR. LAWLOR:  Objection.  Can we approach, Your Honor?

14             THE COURT:  No.

15             THE WITNESS:  That a robbery happened.

16             MR. HARDING:  And was it an armed robbery or an unarmed

17  robbery --

18             MR. LAWLOR:  Objection.

19             MR. HARDING: -- did he tell you?

20             THE COURT:  Overruled.

21             THE WITNESS:  An armed robbery.

22  BY MR. HARDING:

23  Q    Okay.  Are you nervous today, Mr. Bacon?

24  A    No.

25  Q    Okay.  Did there come a time when you got involved in drug

1    trafficking, Mr. Bacon?

2    A    Yes.

3    Q    When was that?

4    A    '92, '93.

5    Q    How old were you then?

6    A    12, 13.

7    Q    Okay.  Let me just back up for one minute.  You told us

8    about how you met Mr. Mitchell when you cut out from school with

9    Mr. Gardner or Goo one day?

10   A    Yes.

11   Q    Was there somebody else there that you met at the same time?

12   A    I met Bo's cousin.

13   Q    Okay.  Who's Bo's cousin?

14   A    Donte.

15   Q    Donte?  Let me show you what's been marked as Government

16   Exhibit PH-54 and ask you if you can identify that?

17   A    That's Donte.

18   Q    Do you know Donte's last name?

19   A    No.

20   Q    And I'm putting PH-54 on the screen now.  He was there at

21   the same time when you met Mr. Mitchell, is that correct?

22   A    Yes.

23   Q    Okay.  When you got involved in drug trafficking, Mr. Bacon,

24   did you get involved with some of the defendants that you've just

25   identified here today?

1    A    Yes.

2    Q    Okay.  Can you tell us, did you get involved, for example,

3    with Goo?

4              MR. COBURN:  Objection, Your Honor, leading.

5              THE COURT: Overruled.

6    A    Yes.

7    Q    Where was it that you were selling drugs, Mr. Bacon?

8    A    Catonsville.

9    Q    Okay.  What part of Catonsville?

10   A    Winters Lane.

11   Q    Winters Lane?

12   A    Yes.

13   Q    And what about Goo?  Do you know where he was selling?

14             MR. COBURN:  Objection, no foundation.

15             THE COURT:  Overruled.

16   Q    I'm sorry?

17   A    No.

18   Q    Okay.  Did you eventually learn places where he sold his

19   drugs?

20             MR. COBURN:  Same objection, Your Honor.

21             THE COURT:  Overruled.

22   A    Yes.

23   Q    Where?

24   A    Randallstown.

25   Q    Where about in Randallstown?

1    A    Savoy.

2         MR. COBURN:  Same objection.

3         THE COURT:  Overruled.

4    Q    Savoy.  What's that?

5    A    Apartment complex.

6    Q    Okay.  Did you sell there?

7    A    Yes.

8    Q    So you did, you sold both there and in Catonsville?

9    A    Yes.

10   Q    And are the Savoy Apartments still standing, Mr. Bacon?

11   A    No.

12   Q    What happened to them?

13   A    Tore them down.

14   Q    Okay.  What about Mr. Martin?  You said you met him in

15   Randallstown, also, is that correct?

16   A    Yes.

17   Q    Did there come a time when his family moved somewhere?

18   A    Yes.

19   Q    Where did they move to?

20   A    South Baltimore.

21   Q    What part of South Baltimore, do you remember?

22   A    Southwest.

23   Q    Okay.  Did they stay there or did they move back at some

24   point?

25   A    I don't know.  I guess they stayed there.

1    Q    Okay.  Do you know, where did Mr. Martin sell drugs, or did

2    he sell drugs, first of all?

3    A    Yes.

4    Q    Where did he sell drugs?

5    A    South Baltimore.

6    Q    Okay.  Can you tell us what drugs you sold?

7    A    Cocaine.

8    Q    Any others?

9    A    Heroin.

10   Q    Any others?

11   A    And marijuana.

12   Q    Okay.  What about Goo?

13          MR. COBURN:  Same objection, Your Honor.

14          THE COURT:  Overruled.

15   Q    What drugs did he sell?

16   A    Cocaine.

17   Q    What about marijuana?

18   A    Marijuana.

19   Q    Okay.  And you said he was selling in Randallstown.  Did

20   there come a time when he sold somewhere in Baltimore City, also?

21   A    Yes.

22          MR. COBURN:  Same objection, Your Honor.

23          THE COURT:  Overruled.

24   Q    Where?

25   A    South Baltimore.

1    Q    Okay.  Did he also sell to somebody in Park Heights, do you

2    know?

3              MR. MARTIN:  Objection.

4              THE COURT:  Overruled.

5    A    No.

6    Q    Okay.  Did he have another dealer that he distributed to who

7    then dealt in Park Heights?

8              MR. COBURN:  Objection, Your Honor.

9              MR. MARTIN:  Objection.

10             THE COURT:  Overruled.

11   A    I can't remember.

12   Q    Okay.  Do you remember the name Avon?

13             MR. MARTIN:  Objection.

14             THE WITNESS:  Yes.

15             THE COURT:  Overruled.

16   Q    Who is Avon?

17   A    That's Goo's cousin.

18   Q    Where did -- to your knowledge, did Mr. Gardner sell drugs

19   to Avon?

20   A    I'm not sure.

21   Q    Okay.  Let me, let me call your attention to Page 12 of your

22   grand jury testimony, Mr. Gardner.  Specifically, to Line 15 and

23   the passages that follow.  Can you take a look at that?  Does

24   that refresh your recollection, Mr. Gardner?

25             MR. COBURN:  Objection.

1                THE COURT:  Overruled.

2    A    Yes.

3    Q    Where did, where did Avon distribute drugs?

4                MR. COBURN:  Objection.

5                MR. MARTIN:  Objection.

6                THE COURT:  Overruled.

7    A    Park Heights.

8    Q    Okay.  And did Goo or Mr. Gardner distribute to Avon?

9                MR. COBURN:  Objection.

10               THE COURT:  Overruled.

11   A    Yes.

12   Q    Okay.  And he was Mr. Gardner's cousin, is that right?

13   A    Yes.

14   Q    And you've met him, I assume, is that correct?

15   A    Yes.

16   Q    In fact, have you gotten drugs from him yourself?

17   A    Yes.

18   Q    Okay.  We'll, I think we'll come to that later.  Let me go

19   back to Mr. Martin.  You said he dealt in South Baltimore, is

20   that correct?

21   A    Yes.

22   Q    Do you remember the streets?

23   A    Smallwood and Ramsay.

24   Q    Smallwood and Ramsay?

25   A    Yes.

1   Q    Any others?

2   A    Not that I'm familiar with.

3   Q    Okay.  Did you deal down there in South Baltimore to some

4   extent, Mr. Bacon?

5   A    No.  I probably been down there for a month or two.

6   Q    A month or two?

7   A    Yes.

8   Q    Selling drugs?

9   A    Yes.

10  Q    What streets did you sell on?

11  A    Wilhelm and Smallwood.

12  Q    Okay.  Wilhelm and Smallwood.  Is that a good area to go to

13  sell drugs?

14  A    Yes.

15  Q    Because it's not near your house, is it?

16  A    No.

17  Q    So was it just because it was a good market that you went

18  down there?

19  A    Yes.

20  Q    Okay.  Let me show you a couple of other photographs now.

21       THE COURT:  Why don't you put them on the DOAR, Mr.

22  Harding?

23  Q    I'm now going to show you Government Exhibit PH-56.  Can you

24  see that picture, Mr. Bacon?

25  A    Yes.

1    Q    Who is that guy?

2    A    Darryl Wyche.

3    Q    Okay.  Did he grow up with you in Randallstown, also?

4    A    Yes.

5    Q    Was he older than you or younger than you?

6    A    Older.

7    Q    Do you remember how much?

8    A    No.

9    Q    And now I'm going to show you Government Exhibit PH-55.  Do

10   you recognize who that is?

11   A    Yes.

12   Q    Who is it?

13   A    Anthony Wyche.

14   Q    And is he related to Darryl Wyche?

15   A    Yes.

16   Q    How so?

17   A    Brothers.

18   Q    Is Anthony older or younger than Darryl?

19   A    Younger.

20   Q    Is he younger than you?

21   A    No.

22   Q    Is he older or the same age?

23   A    Older.

24   Q    How much older?

25   A    Don't know.

1    Q    Okay.  Did you grow up with those guys, both of them, in

2    Randallstown?

3    A    Yes.

4    Q    Did they go to school with you?

5    A    Anthony Wyche did.

6    Q    Randallstown High School?

7    A    Yes.

8    Q    And Darryl, did he go there before you or what?

9    A    I don't know.

10   Q    Okay.  Did these two brothers, to your knowledge, get

11   involved in drug trafficking, also?

12   A    Yes.

13   Q    What kind of drugs did they sell?

14   A    Cocaine.

15   Q    Did there come a time when you got drugs from Darryl Wyche

16   through someone else?

17   A    Yes.

18   Q    Okay.  Who did you go through to get drugs from Darryl

19   Wyche?

20   A    Willie Mitchell.

21   Q    Okay.  Is that Bo?

22   A    Yes.

23   Q    Why didn't you just buy drugs directly from Darryl?

24   A    I ain't deal with Darryl like that.

25   Q    You didn't deal with Darryl like that?

1    A    No.

2    Q    Okay.  But Mr. Mitchell did?

3    A    Yes.

4    Q    Let me just try to get some chronological perspective here,

5    Mr. Bacon.  Did you get locked up in 2000?

6    A    Yes.

7    Q    And did you wind up doing about three years in jail at that

8    time?

9    A    Yes.

10    Q    So you were locked up from 2000 to 2003?

11    A    Yes.

12    Q    So it was before 2000 that you were getting drugs from

13    Darryl Wyche through Mr. Mitchell, is that right?

14    A    Yes.

15    Q    Do you remember what years you were doing that in?

16    A    '99.

17    Q    '99?

18    A    Yeah.

19    Q    Into 2000?

20    A    Yes.

21    Q    And after you got locked up in 2000, did you later learn

22    from Mr. Mitchell that he was still being supplied by Darryl

23    Wyche?

24            MR. LAWLOR:  Objection, Your Honor, leading.

25            THE COURT:  Overruled.  You may answer.

1          THE WITNESS:  Yes.

2    BY MR. HARDING:

3    Q    I want to ask, I want to show you a couple more pictures

4    now.  This is Government Exhibit PH-68.  Do you recognize who

5    that person is?

6    A    Yes.

7    Q    Who is that?

8    A    Claudus Lassiter.

9    Q    Claudus Lassiter.  Who is he?

10   A    A guy who grew up out Randallstown.

11   Q    Another guy who grew up in Randallstown?

12   A    Yes.

13   Q    Do you know, did he work with the Wyche brothers in the drug

14   business?

15   A    Yes.

16          MR. LAWLOR:  Again, Your Honor, objection.

17          THE COURT:  Overruled.

18   A    Yes.

19   Q    Okay.  What did he do, if you remember?

20   A    Pretty much sold drugs.

21   Q    For the Wyche brothers?

22   A    Yes.

23   Q    What kind of drugs did the Wyche brothers sell?

24   A    Cocaine.

25   Q    Is that powder cocaine as opposed to crack?

1   A   Yes.

2   Q   Okay.  And I'm showing you now PH-71.  Do you recognize who

3   that person is?

4   A   Yes.

5   Q   Who is that?

6   A   Deezo.

7   Q   Deezo?

8   A   Yes.

9   Q   I assume that's a nickname?

10  A   Yes.

11  Q   What's his real name, do you know?

12  A   No.

13  Q   Okay.  Who is he?

14  A   Some guy from out Randallstown.

15  Q   Okay.  So did you grow up with him, also?

16  A   No.

17  Q   You didn't?

18  A   No.

19  Q   Was he involved with the Wyche brothers, also?

20  A   Yes.

21  Q   What did he do?

22  A   Sell drugs.

23  Q   He sold drugs?

24  A   Yes.

25  Q   Okay.  If I may back up for a minute.  Was there a time back

1    in the '90s when Bo or Mr. Mitchell got drugs from Wayne or Mr.

2    Martin?

3    A    Yes.

4             MR. PYNE:  Objection.

5             THE COURT:  Overruled.

6    Q    What drugs?

7    A    Cocaine.

8    Q    Did you get drugs from Wayne on occasion?

9    A    No.

10   Q    Did he sell you drugs?

11            MR. PYNE:  Objection.

12   A    No.

13            THE COURT:  Overruled.

14   Q    Did he front you drugs?  I mean, did he give you drugs on

15   the understanding that you would pay him back after you sold

16   them?

17   A    No.

18   Q    Okay.  Let me ask you about some of the people -- well, let

19   me ask you about some names.  Do you know the name Polo?

20   A    Yes.

21   Q    Who is Polo?

22   A    Polo was a guy from out Columbia that sold drugs.

23   Q    Okay.  Columbia, Maryland or Columbia, South America?

24   A    Columbia, Maryland.

25   Q    Okay.  And did you get drugs from Polo?

1    A    Yes.

2    Q    What kind of drugs?

3    A    Cocaine.

4    Q    Where did you used to go to get drugs from Polo?

5    A    Up Irvington, Baltimore, Maryland.

6         THE COURT:  Closer to the mike, close.

7    A    Up Irvington, Baltimore, Maryland.

8    Q    Okay.  So you didn't go all the way down to Columbia to meet

9    with him?

10   A    No.

11   Q    Did Mr. Martin and Mr. Gardner, that is to say, Wayne and

12   Goo, also get drugs from Polo?

13        MR. COBURN:  Objection.

14        THE COURT:  Overruled.  You may answer.

15   A    Yes.

16        THE COURT:  What was your answer?

17   A    Yes.

18   Q    Did you sometimes all go together to get drugs from Polo?

19   A    Yes.

20   Q    What kind of quantities did you get?

21   A    Like a kilo.

22   Q    A kilo at a time?

23   A    It was only one time.

24   Q    Only one time that you went with them to buy a package, is

25   that right?

1    A    Yes.

2    Q    Did you go separately on other occasions?

3    A    No.

4    Q    You only went once to get drugs from Polo?

5    A    Yes.

6    Q    What about Polo's cousin?  Did he have a cousin?

7    A    I don't know.

8    Q    Do you know the name Tim?

9    A    Yes.

10   Q    Who is Tim?

11   A    A friend of Polo's.

12   Q    A friend of Polo's?

13   A    Yes.

14   Q    Did you also get drugs from Tim?

15   A    Yes.

16   Q    Do you know, did Mr. Gardner and Mr. Martin also get drugs

17   from Tim?

18          MR. COBURN:  Objection.

19          THE COURT:  Overruled.

20   A    I don't know about Mr. Martin.  I know about Mr. Gardner.

21   Yes.

22   Q    Okay.  What kind of quantities?

23   A    I'm not for sure.

24   Q    Was it cocaine, also, or some other drug?

25   A    Cocaine.

1    Q    You know the name Poppi?

2    A    Yes.

3    Q    Who is Poppi?

4    A    Dominican from New York.

5    Q    Okay.  A Dominican from up in New York.  What kind, did he

6    deal drugs, also?

7    A    Yes.

8    Q    Did you get drugs from Poppi?

9    A    Yes.

10   Q    What kind of drugs?

11   A    Heroin.

12   Q    Heroin?

13   A    Yes.

14   Q    Any other drugs?

15   A    That's it to my recollection.

16   Q    How about Mr. Martin and Mr. Gardner?  Did they get drugs

17   from Poppi, also?

18            MR. COBURN:  Objection.

19            THE COURT:  Overruled.

20   A    Heroin.

21   Q    Heroin?

22   A    Yes.

23   Q    Okay.  Did you travel up there together sometimes?

24   A    Yes.

25   Q    How often did you go up there?

1    A    Went there about once or twice.

2    Q    Once or twice in what time period?

3    A    Twice in one month.

4    Q    Twice in a month?

5    A    Yes.

6    Q    Was this also in the 90's that you were going up to New York

7    to see Poppi?

8    A    Yes.

9    Q    What kind of quantities did you get when you were up there?

10   A    25, 50 grams of heroin.

11   Q    25 or 50 grams of heroin?

12   A    Yes.

13   Q    Was that your share or was that what all of you got?

14   A    That's, we all split it.

15   Q    You all would split it?

16   A    Yes.

17   Q    Did you pull your money to get packages of heroin from

18   Poppi?

19   A    Yes.

20   Q    Okay.  When you went up to New York, did you go with other

21   people usually?

22   A    No.

23   Q    Well, I mean, did Mr. Gardner and Mr. Martin go with you?

24             MR. COBURN:  Objection.

25             THE COURT:  Overruled.

1    A    Yes.

2    Q    Okay.  And you're saying there weren't other people in

3    addition to them?

4    A    I went up there one other time with Will Montgomery.

5    Q    Will Montgomery.  Who's Will Montgomery?

6    A    A guy that grew up out Catonsville, Maryland.

7    Q    Okay.  Let me show you Government Exhibit 58.  Can you

8    identify that?

9    A    William Montgomery.

10   Q    Okay.  Did you, did you guys, meaning you and Mr. Martin and

11   Mr. Gardner and Will Montgomery, for that matter, did you buy

12   from other dealers in New York or just from this guy, Poppi?

13   A    No.  Will and I had bought from somebody else.

14   Q    Okay.  Who was that?  You don't remember his name?

15   A    No.

16   Q    Okay.  Let me ask you.  When you went up there to buy drugs

17   with Mr. Martin and Mr. Gardner, how did you get the drugs back

18   to Baltimore?

19   A    Drove.

20   Q    You drove?

21   A    Drove back or had somebody bring it back for us.

22   Q    Okay.  You had somebody who brought it back for you?

23   A    Yes.

24   Q    Was that a male or a female?

25   A    Female.

1   Q    What was her name?

2   A    Devin.

3   Q    Devin?

4   A    Yes.

5   Q    Did Mr. Martin have somebody who brought it back for him?

6   A    I'm not sure.

7   Q    You're not sure?

8   A    No.  I use, I use my friend for the majority everything.

9   Her name is Devin.

10  Q    Okay.  Did Mr. Martin also have a female that brought back

11  drugs for him?

12           MR. COBURN:  Objection.  Asked and answered.

13           THE COURT:  Overruled.

14  A    I don't remember her name but it was a female.

15  Q    There was a female but you don't remember her name?

16  A    No.

17  Q    Okay.  How did they bring it back, Devin and this other

18  female, do you know?

19  A    I don't know how they would bring it back but they would

20  just, I mean, they would put it on their person and bring it back

21  on a bus.

22  Q    Okay.  Do you know how they put it on their person?

23  A    I don't know.  They might have put it inside of them.

24  Q    Okay.  Would this have been heroin, then, that you were

25  getting from this guy Poppi?

Case 1:04-cr-00029-RDB   Document 470   Filed 10/03/08   Page 41 of 176

1    A    Yes.

2    Q    Okay.

3         THE COURT:  Want more water, Mr. Bacon?

4         THE WITNESS:  Yes.

5         THE COURT:  Okay.  You can have some but you've got to

6    get closer to the microphone.

7         THE WITNESS:  All right.

8         THE COURT:  Give the witness more water, please, Ms.

9    Arrington.  You can pull that microphone a little closer to

10   yourself.  That's good.

11   BY MR. HARDING:

12   Q    You said you got 50 grams or something every time,

13   typically, when you went up to New York, the three of you, or 25

14   grams?  What was it?

15   A    25 to 50 grams.

16   Q    25 to 50 grams?

17   A    Yes.

18   Q    How much did you pay for 50 grams of heroin?  Just give us a

19   ballpark?

20   A    A couple thousand.

21   Q    A couple thousand dollars?

22   A    Yes.

23   Q    Okay.  And then you told us how you got it back here to

24   Baltimore.  What did you do with it when you got it back here to

25   Baltimore?

1    A    Distributed it.

2    Q    Okay.  That meant you packaged it up, is that right?

3    A    Yes.

4    Q    Did you do that together with the other guys that you went

5    up to New York with?

6    A    No.

7    Q    Just did it by yourself?

8    A    Yes.

9    Q    Okay.  Did there come a time when Poppi started coming down

10   to this area to distribute drugs to you guys?

11   A    Not to me personally, no.

12   Q    To Mr. Gardner and Mr. Martin?

13        MR. COBURN:  Objection.

14        THE COURT:  Overruled.

15   A    I'm not for sure which one.

16   Q    Okay.  Do you know, did they or either of them meet Mr.,

17   this guy Poppi somewhere north of Baltimore to do drug

18   transactions?

19        MR. COBURN:  Objection.

20        THE COURT:  Overruled.

21   A    North of Baltimore?  Not to my recollection.

22        THE COURT:  Mr. Bacon, when a question is asked and one

23   of the attorneys objects, I need you to wait until the Court has

24   ruled on the objection before you answer.

25        THE WITNESS:  Okay.

1          THE COURT:  If I say "overruled", that means you may

2    answer.  If I say "sustained", that means you shouldn't answer

3    that question and just wait for the next question.

4          THE WITNESS:  Okay.

5          THE COURT:  All right.  Go ahead, Mr. Harding.

6    BY MR. HARDING:

7    Q    I'm trying to remember what my question was at this point,

8    Your Honor.

9          THE COURT:  I think he answered it.

10   Q    Okay.  Did you know a guy by the name of Black?

11   A    Yes.

12   Q    Was he another guy you got drugs from?

13   A    No.

14   Q    You didn't?

15   A    No.

16   Q    Do you know, did Mr. Gardner get drugs from him?

17         MR. COBURN:  Objection.

18   A    I don't know.  I'm sorry.

19         THE COURT:  Overruled.

20   Q    You don't know?

21   A    No.

22   Q    Well, who was Black?  Where did he live and what did he do?

23   A    Black was from South Baltimore.

24   Q    Did he deal drugs?

25   A    Yeah.  Yes.

1  Q   Do you know anybody he dealt to?

2  A   No.

3  Q   You don't?  Do you know a guy named Card?

4  A   Yes.

5  Q   And was he another drug dealer?

6  A   Yes.

7  Q   Do you know his real name?

8  A   No.

9  Q   Okay.  Where did he used to deal drugs?

10 A   In Baltimore.

11 Q   What part of Baltimore?

12 A   South Baltimore.

13 Q   Okay.  Do you know, did Mr. Gardner or Mr. Martin get drugs

14 from him?

15        MR. COBURN:  Objection.

16        THE COURT:  Overruled.

17 A   Yes.

18 Q   They did?  And how do you know that?

19 A   We used to hang together back then.

20 Q   You and Mr. Gardner and Mr. Martin?

21 A   Me and Mr. Gardner.

22 Q   You and Mr. Gardner?

23 A   Yes.

24 Q   Did you know that Mr. Martin also got drugs from Card?

25 A   Not to my recollection.

1    Q    Not to your recollection.  What about Darryl Wyche?  Did he

2    used to get drugs from Card?

3    A    Yes.

4    Q    He did?  Let me ask you about another guy.  In fact, I'll

5    just put a picture on the screen here.  This is Government

6    Exhibit 69.  Can you see that, Mr. Bacon?

7    A    Yes.

8    Q    Who is that?

9    A    Goose.

10   Q    Goose?

11   A    Yes.

12   Q    You know Goose's real name?

13   A    No.

14   Q    Did you -- well, tell us, did you meet Goose at some time?

15   A    Yes.

16   Q    Who introduced you to him?

17   A    I met him through, hanging out from down South Baltimore.

18   Q    Yeah.  But I mean who specifically introduced you to him?

19   A    Shawn Gardner.

20   Q    Shawn Gardner?

21   A    Yes.

22   Q    Was he another drug dealer?

23   A    Yes.

24   Q    Was Mr. Gardner getting supplied by him?

25        MR. COBURN:  Objection.

1          THE COURT:  Overruled.

2   A    I don't know.

3   Q    You don't know?

4   A    No.

5   Q    What about Mr. Martin?  Was he getting from Goose?

6   A    No.

7   Q    Did you get from Goose?

8   A    Yes.

9   Q    What quantities did you get from Goose?

10  A    Six ounces.

11  Q    Is that why Mr. Gardner introduced you to Goose, so that you

12  could buy drugs from him?

13  A    No.

14  Q    Why did he introduce you to him?

15          MR. COBURN:  Objection.

16          THE COURT:  Overruled.

17  A    He was a, he was a cool guy.

18  Q    How much drugs -- you got six ounces from Goose, is that

19  correct?

20  A    Yes.

21  Q    For how much money?

22  A    5500.

23  Q    5500.  Okay.  So would this be cocaine we're talking about?

24  A    Yes.

25  Q    When you, you testified about this guy, Will Montgomery, and

DIRECT EXAMINATION OF BACON                                    47

1    you said you went up to New York with him on occasion, did Wayne

2    and Goo ever go also with you and Will Montgomery to New York?

3    A    No, just Goo and I, Goo and Wayne.  Sorry about that.  Just

4    Goo and, and Will.

5    Q    Will and Goo and you, all three went?

6    A    Yes.

7    Q    And that's when I believe you said Will Montgomery

8    introduced you to another dealer?

9    A    Yes.

10   Q    And Goo was there, too?

11   A    Yes.

12   Q    Okay.  What kind of drug did you get?

13   A    Weed.

14   Q    Weed, is that marijuana?

15   A    Yes.

16   Q    Do you remember what kind of quantities of weed you got from

17   this guy whose name you don't remember in New York?

18   A    A couple ounces.

19   Q    A couple of ounces at a time?

20   A    We only went one time.

21   Q    You just went one time?

22   A    Yes.

23   Q    Where did you find him?

24   A    In Manhattan, New York.

25   Q    Do you know where in Manhattan?

1    A    Like 142nd Street.

2    Q    142nd Street?

3    A    Yes.

4    Q    Did Mr. Montgomery ever hook you up with somebody to sell

5    drugs to?

6    A    Yes.

7    Q    Who was that?

8    A    I don't know the guy's name.

9    Q    Where was it that you sold him drugs?

10   A    Monroe and Lauretta.

11   Q    And that was somebody Will Montgomery introduced you to?

12   A    Yes.

13   Q    For purposes of selling these drugs?

14   A    Yes.

15   Q    What kind of drug was that?

16   A    Cocaine.

17   Q    Where is Lauretta and Monroe?

18   A    West Baltimore.

19   Q    Did Mr. Montgomery also distribute drugs in that area?

20   A    Yes.

21   Q    Did he distribute drugs in Catonsville?

22   A    I don't know.

23   Q    Okay.  Let me ask you this.  When you distributed drugs in

24   Catonsville, did you have somebody you used to give the drugs to

25   in order to sell for you?

DIRECT EXAMINATION OF BACON 49

1   A   Yes.

2   Q   Who was that?

3   A   A few people.

4   Q   Tell us their names.

5   A   Mike, Scott, Alex.

6   Q   Mike, Scott, and Alex?

7   A   Yes.

8   Q   I guess you don't know their last names?

9   A   No.

10  Q   Do you know a guy named Aaron Holly?

11  A   Yes.

12  Q   Did you give drugs to him to sell in Catonsville?

13  A   Yes.

14  Q   Is he, is he related to you?

15  A   Yes.

16  Q   What's your relationship to him?

17  A   First cousins.

18  Q   First cousins?

19  A   Yes.

20  Q   Okay.  Let me show you Government Exhibit PH-59.  Do you

21  recognize that?

22  A   Yes.

23  Q   Who is it?

24  A   Aaron Holly.

25  Q   Does he have a nickname?

1   A    Aaron.

2   Q    Aaron?

3   A    Yes.

4   Q    Any other nickname?

5   A    No.

6   Q    Okay.  Let me show you Government Exhibit PH-22.  Do you

7   recognize that street?

8   A    Yes.

9   Q    What is it?

10  A    Winters Lane.

11  Q    That's Winters Lane in Catonsville?

12  A    Yes.

13  Q    Is that where Mr. Holly used to distribute drugs that you

14  gave to him?

15  A    Yes.

16  Q    Did Goo also give drugs to Mr. Holly to distribute in

17  Catonsville?

18          MR. COBURN:  Objection.

19          THE COURT:  Overruled.  You may answer.

20  A    Yes.

21  Q    And did he give them to Aaron Holly specifically?

22          MR. COBURN:  Objection.

23          THE COURT:  Overruled.  You may answer.

24  A    Yes.

25  Q    Did Will Montgomery give drugs to Aaron Holly to distribute

1    in Catonsville, also?

2    A    Not that I'm aware of.

3    Q    Not that you're aware of?

4    A    Um-um.

5    Q    Okay.  Did there come a time when you stopped selling to

6    drug users on the street and started selling mostly weight?

7    A    Yes.

8    Q    Can you tell the ladies and gentlemen of the jury what that

9    means, what it means to sell weight?

10   A    Instead of selling pills, basically you're selling like

11   quarter ounces, half ounces, ounces, stuff like that.

12   Q    Okay.  Is it sort of like wholesale quantities?

13   A    Yes.

14   Q    That you'd give, that you'd sell to other dealers, is that

15   correct?

16   A    Yes.

17   Q    When was it, if you recall, about when was it that you

18   started selling weight?

19   A    '98.

20   Q    '98?

21   A    Yes.

22   Q    Did Mr. Gardner and Mr. Martin also start selling weight

23   rather than selling directly to customers?

24   A    I'm not for sure.  I know Mr. Gardner was selling weight.  I

25   don't know about Mr. Martin.

1   Q    You know Mr. Gardner was selling weight but you don't know

2   about Mr. Martin?

3   A    Yes.

4   Q    Can you give us an idea, when you were selling weight in

5   Catonsville, can you give us an idea how much money you could

6   make in an evening there?

7   A    About 3 to $500.

8   Q    Three to $500?

9   A    Yes.

10  Q    Okay.  Is that just your share or is that also what the

11  people you were, like Mr. Holly, does that include what he made

12  or is that just what you made?

13           MR. LAWLOR:  Objection, Your Honor.

14           THE COURT:  Overruled.

15  A    That's an overall total what you can make probably at the

16  end of the day.

17  Q    That you could make or that all of you could make together?

18  A    That we could make together.

19  Q    Okay.  Do you remember being asked about that when you

20  testified in the grand jury back in 2004, Mr. Bacon?

21           MR. LAWLOR:  Objection, Your Honor.  Lack of

22  foundation.

23           THE COURT:  Overruled.

24  A    No.

25  Q    Let me show you what has been --

1        MR. LAWLOR:  Objection, Your Honor.

2        THE COURT:  There's no question.

3        MR. LAWLOR:  It's an improper foundation.

4        THE COURT:  You object to questions, not to counsel

5   walking across the floor.

6   BY MR. HARDING:

7   Q   Would it refresh your recollection if I showed you your

8   grand jury testimony from 2004, Mr. Bacon?

9   A   Yes.

10       MR. LAWLOR:  Objection, Your Honor, asked and answered.

11       THE COURT:  Overruled.

12  Q   Okay.  Let me call your attention to Page 29, Line 8.  Could

13  you read those few lines and tell me, does that refresh your

14  recollection?

15  A   Okay.  Okay.  How much money were you making back --

16       THE COURT:  No.  Read it yourself.

17       THE WITNESS:  Okay.  Yes.

18  BY MR. HARDING:

19  Q   How much money were you making in Catonsville on a good

20  night?

21  A   A thousand dollars.

22  Q   Okay.  Do you remember what you said in the grand jury?

23  A   Yes.

24  Q   What did you say in the grand jury?

25  A   A thousand, 1500, 2000.  I exaggerated a little bit on that.

1    Q    You did?

2    A    Yes.

3    Q    What about sales of, sales in East Baltimore?  Were you also

4    dealing in East Baltimore?

5    A    Yes.

6    Q    How much money could you make selling in East Baltimore?

7    A    Anywhere from 500 to a thousand dollars.

8    Q    Okay.

9            THE COURT:  This seems to be a good point, Mr. Harding,

10   for a break.

11           MR. HARDING:  Sure.  Thank you, Your Honor.

12           THE COURT:  You can step down, Mr. Bacon.  You're

13   excused for a few minutes.

14           Ladies and gentlemen of the jury, we'll take our

15   morning recess at this time.  Please leave your note pads in your

16   chairs.  Have no discussion about the case or about any of the

17   evidence you've heard so far.  Continue to keep an open mind

18   about all issues.  The jury is excused for a 15 minute recess.

19           (Jury exits the courtroom.)

20           THE COURT:  Counsel, I'll be happy to give you a

21   standing objection to a discrete area of examination but I'm not

22   going to turn this 10 week trial into a 20 week trial by trying

23   to do textbook examinations.  Now, when areas are fundamentally

24   not in dispute, I'm going to permit not just the government, but

25   the defense, to lead all you want to, even your own witnesses, to

1    get through this.

2           And I don't know what you benefit yourself by

3    continuing to object.  But I think I've made it clear in my

4    rulings that non-controversial, leading questions are a good

5    thing, not a bad thing.  But you can continue to object all you

6    want and the Court will continue to rule on them, as you've seen

7    me do.  We've got to move on.

8           We're in recess for 15 minutes.

9           (Recess.)

10           (Defendants present in courtroom.  Jury not present.)

11           THE COURT:  Please be seated.  Yes, Mr. Coburn.

12           MR. COBURN:  Thank you so much, Your Honor.  First, I

13    appreciate Your Honor's offer very much of the continuing

14    objection.  I would request it.

15           THE COURT:  What is the continuing objection to?

16           MR. COBURN:  My understanding is during the course of

17    the examination that the questions are being asked, which just

18    from my point of view, Your Honor, I don't think the government's

19    eliciting a foundation and they seem to be hearsay to me.  So

20    it's really --

21           THE COURT:  I'm sorry.  What is hearsay?

22           MR. COBURN:  In other words, like when Mr. Harding asks

23    a question of the witness to the effect of, was Goo buying drugs

24    from Poppi up in New York, he's not eliciting any foundation.  We

25    have no idea how he would know that.

Case 1:04-cr-00029-RDB   Document 470   Filed 10/03/08   Page 56 of 176

1          THE COURT:  That's what cross examination is for.

2   Prima facie, the government has established that Mr. Bacon

3   conspired with various individuals to distribute drugs.  I mean,

4   prima facie, there's a clear foundation.

5          MR. COBURN:  I understand Your Honor's ruling and I

6   appreciate the continuing objection very much.

7          THE COURT:  I'm not giving you one.  I'm not giving you

8   one because I still don't understand what the objection is to.

9   If it's to foundation, then the objection is overruled.  So what

10  is it?

11         MR. COBURN:  It's to, it's to --

12         THE COURT:  Lack of foundation?

13         MR. COBURN:  When those questions are asked in that

14  way.

15         THE COURT:  Okay.  It's overruled.  It's overruled.  Is

16  there anything else?

17         MR. COBURN:  So it's not continuing, then, Your Honor?

18         THE COURT:  No, it's not continuing.

19         MR. COBURN:  Okay.  There was actually one other issue

20  which I was hoping I might raise.

21         THE COURT:  Go ahead.

22         MR. COBURN:  Very, very briefly.

23         THE COURT:  Go ahead.

24         MR. COBURN:  During the break, Mr. Harding was

25  consulting with the witness, which he tells me is allowed under

1   the local rules as long as the direct isn't completed.  I just

2   wanted to bring that to Your Honor's attention, because you are

3   going to know the answer to that much better than I will.

4              THE COURT:  All right.  Anything else?

5              MR. COBURN:  No.

6              THE COURT:  Okay.  Thank you.  Now, this is going to be

7   pretty much the only time I'm going to issue this warning.  One

8   or more defendants are making faces at the witness and, indeed,

9   mouthing obscenities at the witness.  And I'm not going to put up

10  with that.  I'm reasonably sure the jury can observe that so I

11  don't know why any defendant would believe that it's helpful to

12  do that.

13             Glaring at a witness is one thing and anybody is free

14  to glare at a witness.  But mouthing obscenities at a witness is

15  not acceptable and is not going to be tolerated.  Okay.

16             Let's have the jury.  Can we get Mr. Bacon back in,

17  please?  Before, before we bring the jury in, Belinda, let the

18  agent retrieve the witness.

19             Again, Mr. Harding, as I said yesterday, of course, I

20  understand counsel don't want the grand jury transcripts, the

21  actual testimony placed on the DOAR.  But it's difficult for me

22  to imagine that you would ever need to approach the witness or

23  any witness very often to show an exhibit before you place it on

24  the DOAR.

25             MR. HARDING:  Does that include grand jury transcripts?

1           THE COURT:  Okay.  Except for the grand jury

2    transcripts.

3           MR. HARDING:  Except for the grand jury transcripts.

4           THE COURT:  I mean, the cover was fine.  But counsel,

5    some of counsel would rather not have the actual testimony

6    displayed to the jury.

7           MR. HARDING:  That's fine, Your Honor.

8           (Witness Bacon enters the courtroom.)

9           THE COURT:  Mr. Bacon, please remember to stay as close

10   as you can to the microphone and speak directly into the

11   microphone.

12          (Jury enters the courtroom.)

13          THE COURT:  Please be seated, ladies and gentlemen.

14   You may proceed whenever you're ready, Mr. Harding.

15   BY MR. HARDING:

16   Q    Yes.  Thank you, Your Honor.

17          Mr. Bacon, let me call your attention to earlier this

18   year while you were still locked up.  Did you become aware of the

19   Stop Snitching Two video at that time?

20   A    Yes.

21   Q    Did you learn that your name was actually broadcast in that?

22   A    Yes.

23   Q    How did you find out?

24   A    Through my brother.

25   Q    What's your understanding of the purpose of putting your

1    name out there in the Stop Snitching Two video?

2    A    I don't know if it was --

3         MR. MARTIN:  Objection.

4         THE COURT:  The objection is overruled.  You may state

5    your understanding.

6    A    My understanding was probably to tarnish my name, let

7    everybody know I was snitching.

8    Q    Okay.  Did that cause you concern?

9         MR. MARTIN:  Objection.

10        THE COURT:  Overruled.

11   A    I'm saying somewhat.

12   Q    Okay.  How was it that you found out about this?  Who told

13   you about it?

14   A    My brother.

15   Q    Your brother?

16   A    Yes.

17   Q    Did you speak to him by telephone or did you, did he come

18   out to see you at the facility where you were being held or what?

19   A    I spoke with him through the telephone.

20   Q    Okay.  Is it different testifying here in this courtroom

21   than it is to testify in the grand jury?

22   A    Yes.

23   Q    Are you less comfortable or more comfortable testifying here

24   in this courtroom?

25        MR. LAWLOR:  Objection.

1          THE COURT:  Overruled.  You may answer.

2    A    I'm comfortable.

3    Q    You're comfortable?

4    A    Yes.

5    Q    Were you more comfortable in the grand jury?

6    A    Yes.

7    Q    During your testimony, have you noticed the defendants from

8    time to time during your, while you've been testifying?

9    A    Yes.

10   Q    Have they made any gestures or seemed to mouth words to you

11   while you were testifying?

12        MR. COBURN:  Objection to "they."

13        THE COURT:  The objection is sustained.  Rephrase the

14   question.

15   BY MR. HARDING:

16   Q    Has any one of the defendants done that?

17   A    No.

18   Q    You haven't noticed that?

19   A    No.

20   Q    Do you know anybody in the audience here today?

21   A    No.

22        MR. LAWLOR:  Objection.

23        THE COURT:  Overruled.  The answer was no.

24   Q    You don't know any of those people?

25   A    No.

1    Q    Okay.  Let me go back to the time period of the 1990's, up

2    until you went to jail in 2000.  Did you used to carry a gun, Mr.

3    Bacon?

4    A    Yes.

5    Q    Why was that?

6    A    For protection.

7    Q    Protection from what?

8    A    From, from the streets, anything, like if somebody would try

9    to come rob you, if I was beefing with anybody.

10   Q    Okay.  To your knowledge, did Mr. Martin carry a gun?

11   A    No.

12   Q    Did he own a gun?

13   A    No.

14   Q    Do you remember a .44 caliber with a laser site on it that

15   he had?

16            MR. MARTIN:  Objection.

17            THE COURT:  The objection is overruled.  You may

18   answer.

19   A    Yes, I remember the handgun, but I remember it being a guy

20   name Wiley's.

21   Q    Wiley's?

22   A    Yes.

23   Q    Did Mr. Gardner carry a gun?

24   A    Yes.

25   Q    What kind of gun?

1    A    9 millimeter.

2    Q    Okay.  Did you ever trade guns with Mr. Gardner?

3    A    Yes.

4    Q    What gun did you trade for?  What gun did you give to Mr.

5    Gardner.

6    A    .32 revolver.

7    Q    What kind of gun did he give you?

8    A    A .380.

9    Q    .380?

10   A    Yes.

11   Q    Did you ever loan guns to one another, you and these

12   defendants?

13            MR. LAWLOR:  Objection, Your Honor.

14            THE COURT:  Rephrase the question.

15   Q    Did you ever loan a gun to any one of these three defendants

16   that you've testified about here today?

17            MR. LAWLOR:  Objection, Your Honor.

18            THE COURT:  Overruled.  You may answer.

19   A    Yes.

20   Q    Who?

21   A    Shawn Gardner.

22   Q    What kind of gun did you loan to him?

23   A    A .40 Taurus.

24   Q    Do you recall about when it was that you loaned him a .40

25   caliber Taurus?

1   A    '98.

2   Q    Okay.  Did you loan it to him or did you sell it to him?

3   A    Loaned it to him.

4   Q    Let me call your attention to your drug business in

5   Catonsville.  Do you remember being involved in a turf war at

6   some point in Catonsville?

7   A    Yes.

8   Q    What's a turf war?

9   A    It's when, pretty much when one side, one side of the people

10  is dealing drugs out in one area, if you don't deal with them,

11  they dealing through somebody else.  So it pretty much starts an

12  animosity between both the people that's out there.

13  Q    Who were the guys that you got into a turf war with?

14  A    A guy named Bubbles and Tuffy.

15  Q    Okay.  What did you decide to do about it?

16  A    I decided to call my friends up and see what I was going to

17  do about it.

18  Q    What friends did you call up?

19  A    I called Wayne and Goo up.

20  Q    Did they come to help you?

21  A    Yes.

22  Q    Did they bring their guns with them?

23  A    Yes.

24  Q    And did you have a gun?

25  A    Yes.

1    Q    Did you go looking for Tuffy and Bubbles?

2    A    Yes.

3    Q    Did you locate them?

4    A    No.

5    Q    You've testified a good deal about heroin and cocaine and

6    marijuana.  Did you ever distribute crack, Mr. Bacon?

7    A    Yes.

8    Q    Did you cook it up?

9    A    Yes.

10   Q    Where did you cook it up?

11   A    I cooked it up in apartment buildings, out Winchester and

12   out Catonsville.

13   Q    Okay.  Where is the Winchester apartment building?

14   A    In West Baltimore.

15   Q    And where was it in Catonsville that you used to go to cook

16   up your cocaine into crack?

17   A    Johnnycake Road.

18   Q    Johnnycake Road?

19   A    Yes.

20   Q    Was it a friend's house or a stash house or what?

21   A    It was a stash house.

22   Q    Okay.  Can you explain to the ladies and gentlemen of the

23   jury what it means to cook up cocaine into crack?

24   A    It's just taking the powder form of cocaine, putting it in a

25   pot and bringing it back with baking soda and turning it into

1    crack.

2    Q    Okay.  Did Goo also cook up cocaine into crack?

3    A    Yes.

4    Q    Where did he do that?

5    A    Out Catonsville.

6    Q    Same place you did?

7    A    Yes.

8    Q    Any place else?

9    A    I don't know.

10   Q    Okay.  What about Mr. Martin?  Did he do that or did he just

11   distribute powdered cocaine?

12   A    To my recollection, he never messed with crack.

13   Q    Okay.

14   A    Just powder cocaine.

15   Q    What about Mr. Mitchell?  Did he cook up cocaine into crack?

16   A    Yes.

17   Q    Where did he used to do that?

18   A    Belmar.  Bell -- I don't know, I'm not for sure the

19   apartment name.  In Randallstown.

20   Q    Belmar.  Is that what you were saying?

21   A    Yes.

22   Q    Something like that?

23   A    Yes.

24   Q    Do you know, did he have anybody else he used to cook up the

25   cocaine with him?

1    A    Not that I'm aware of.

2    Q    Did you ever transport drugs in cars and other kinds of

3    vehicles?

4    A    Yes.

5    Q    Did you have some special kind of place where you used to

6    conceal your drugs?

7    A    Depends on the car.  Some cars you could take arm rest, I

8    mean, the arm rest out or the doors and you could stash, or the

9    vents, and you could stash drugs in there.

10   Q    Okay.  Let me call your attention to Mr. Gardner, Goo.  Did

11   he have an Acura at one point in time?

12   A    Yes.

13   Q    Did he have a stash location in the Acura?

14   A    Yes.

15   Q    For his drugs?

16   A    Yes.

17   Q    What -- is the answer yes?

18   A    Yes.

19   Q    Where was it?

20   A    In the vent.

21   Q    The vent?

22   A    Yes.  The vent, like where the air conditioner comes out at

23   in the front.

24   Q    Okay.

25   A    On the dashboard.

1    Q    Let me call your attention to October 15th, 1998.  Did you

2    get arrested around that date with Shawn Gardner?

3    A    Yes.

4    Q    Do you recall where it was that you got arrested?

5    A    No.

6    Q    Okay.  What were you doing when you got arrested?

7    A    I was, we was driving.  We got arrested twice like back to

8    back.  I don't know which date we got arrested first for two, a

9    handgun, another handgun.

10   Q    Okay.  Do you remember, was one of those times, were you

11   arrested in a Mitsubishi?

12   A    Yes.

13   Q    Tell us about that time.

14   A    We was coming through, we was coming through a known drug

15   area on our way, on our way to our store.  We was coming through

16   the drug area.  The knockers were standing outside and they

17   stopped the car and pulled us out of the car and found a gun

18   inside the car.

19   Q    Okay.  When you say "the knockers", who are you talking

20   about?

21   A    Undercover police.

22   Q    Okay.  Do you remember what kind of gun it was?

23   A    A Glock, 9 millimeter.

24   Q    Okay.  Had you purchased that gun?

25   A    Yes.

1    Q    From who?

2    A    Claudus Lassiter.

3    Q    Do you remember how much you paid for it?

4    A    No.

5    Q    Did you then sell it to Mr. Gardner?

6    A    No.

7    Q    Was it still your gun when it was recovered that day?

8    A    Yes.

9    Q    This was in a Mitsubishi.  Where were you coming from?

10   A    We was coming from Irvington, West Baltimore.

11   Q    What were you doing in Irvington?

12   A    Looking for somebody that owe Shawn some money.

13   Q    I'm sorry?

14   A    We was looking for somebody that owe Shawn Gardner some

15   money.

16   Q    Okay.  Did you find the person?

17   A    Yes.

18   Q    What did you do?

19   A    Nothing.  Just got out, checked his pockets, asked him where

20   the money was at.  He ain't had nothing so we just let him go.

21   Q    Who checked his pockets?

22   A    Shawn and us -- Shawn and I.

23   Q    You mean you both checked his pockets?

24   A    Yes.

25   Q    Who had the gun at that point?

1    A    I had the gun.

2    Q    And did you keep it in your, did you keep it somewhere or

3    were you holding it in your hand?

4    A    I kept it in my dip.

5    Q    In your dip?

6    A    Yes.

7    Q    Did you ever take it out?

8    A    No.

9    Q    Who did this person owe money to?

10   A    Shawn Gardner.

11   Q    So you were helping him out by trying to recover the money

12   for him?

13   A    Yes.

14   Q    This was somebody that had purchased drugs from Mr. Gardner

15   and hadn't paid him back?

16          MR. COBURN:  Objection.

17          THE COURT:  Overruled.  You may answer.

18   A    Yes.

19   Q    But you say you didn't get any money off him, is that

20   correct?

21   A    Yes.

22   Q    So what did you do?

23   A    Nothing.  We just slapped him up a little bit and got back

24   in the car and left.

25   Q    Who slapped him up a little bit?

1    A    Shawn and I.

2    Q    Does that mean that he struck this guy?

3    A    Yes.

4    Q    What, what was his name?

5    A    J-Rock.

6    Q    J-Rock?

7    A    J-Rock.

8    Q    J-Rock?

9    A    Yes.

10   Q    And he distributes in Irvington, is that correct?

11   A    Yes.

12   Q    And that's over in Southwest Baltimore, correct?

13   A    Correct.

14   Q    And then you say you were driving back from that and that's

15   when you were stopped by the police, is that correct?

16   A    Yes.

17   Q    Or actually, were you stopped at an intersection and then

18   the police walked up on the car?  Is that what happened?

19   A    Yeah.  We was pulling up the street in a known drug area and

20   the undercover police were standing on the corner.  And they,

21   when we got to the stop sign, they told us to put the car in

22   park.  And they came, told us to get out the car and they

23   proceeded to search the car and search us.

24   Q    Where was the gun?

25   A    In the middle of the, between the driver's seat and the

1    middle console.

2    Q    Who put it there?

3    A    Shawn.

4    Q    So did he have it when the police arrived and put it in that

5    location?

6    A    No.

7    Q    To conceal it?

8    A    It was already right there when we got there.

9    Q    Okay.  Did you go some place, did you say you went some

10   place after you slapped up J-Rock or after Mr. Gardner slapped up

11   J-Rock, before the gun was seized by the police?

12   A    No.  We went, as soon as we left from around that area, we

13   was going on our way back down towards the McKean and Westwood

14   and we was stopped by the police.

15   Q    Okay.  What's at McKean and Westwood?

16   A    Corner store that we had together.

17   Q    You and who?

18   A    Shawn Gardner.

19   Q    Let me show you Government Exhibit PH-49.  Does that look

20   familiar?

21   A    Yes.

22   Q    What is it?

23   A    That's the corner store that was on McKean and Westwood.

24   Q    Is this some location that you rented with Mr. Gardner, is

25   that correct?

DIRECT EXAMINATION OF BACON                    72

1    A    Yes.

2    Q    What was the purpose of having a store at McKean and

3    Westwood in West Baltimore?

4    A    To sell a variety of, variety of stuff, like food, tobacco

5    products.  And pretty much that's it.

6    Q    So you operated a business besides also selling drugs, is

7    that correct?

8    A    Yes.

9    Q    Did you sell drugs out of the store?

10   A    No.  I might have sold some weed out of the store but I

11   ain't, I haven't sold drugs out of the store.  No cocaine or

12   heroin out of the store.

13   Q    All right.  When I say drugs, I include weed, okay?

14   A    Okay.

15   Q    So you sold weed out of the store?

16   A    Yes.

17   Q    How about Mr. Gardner?

18   A    No.

19   Q    He didn't?

20   A    No.

21   Q    Just you?

22   A    Yes.

23   Q    You said that when you went through J-Rock's pockets, you

24   didn't find any money.  Did Shawn Gardner find some other things?

25   A    He had a couple like game on him.  I think it was like some

1    Play Station games or something.  Can't remember.

2    Q    Did Mr. Gardner take them?

3    A    Yes.

4    Q    Do you remember, did you ever do something like that with

5    Wayne, Mr. Martin?  That is, jump out on a drug debtor like that?

6    A    No.  One time I was in my car, Wayne was in the car with me,

7    I jumped out on somebody.

8    Q    Who was that?

9    A    Some, a guy that used to work for me down South Baltimore.

10   Q    Do you remember his name?

11   A    No.

12   Q    When you say he worked for you, does that mean that you

13   fronted him drugs that he would pay you back for later?

14   A    Yes.

15   Q    And did he owe you money then?

16   A    Yes.

17   Q    Is that why you jumped out on him?

18   A    Yes.

19   Q    Did Mr. Martin also help?

20   A    No.  He stayed in the car.

21   Q    He stayed in the car.  Did you have a gun on that occasion?

22   A    Yes.

23   Q    Did you use it?  Did you pull it out, or did you just keep

24   it on you?

25   A    I pulled it out.

1    Q    Did you get anything back from him?

2    A    Yeah.  I got something back from him later.  He didn't give

3    me nothing right there on the spot but he called me later on and

4    gave me the money.

5    Q    How much money?

6    A    I can't remember.

7    Q    Do you remember what street that happened on?

8    A    Wilhelm, Wilhelm and Pulaski, South Baltimore.

9    Q    Okay.  You said there were two occasions when you got

10   caught, you and Mr. Gardner got caught with a gun, is that

11   correct?

12   A    Yes.

13   Q    Okay.  Let me call your attention to November 6th, 1998.

14   Were you in an Acura that night?

15   A    Yes.

16   Q    Was that Mr. Gardner's Acura that you just talked about a

17   few minutes ago?

18   A    Yes.

19   Q    The one where he used the vent as a stash location?

20   A    Yes.

21   Q    Okay.  Tell us what happened that night.

22   A    That night, we was over East Baltimore.  I don't know where

23   we were going at.  But we was coming through that area.  And it

24   was a stop sign.  And the police said we had ran the stop sign

25   and they had pulled us over.  And by us just getting locked up

Case 1:04-cr-00029-RDB   Document 470   Filed 10/03/08   Page 75 of 176
DIRECT EXAMINATION OF BACON                                    75

1    together like a couple weeks before, they had like a high alert
2    out on us, on the car, and on his name, period.  And they
3    searched the car and found a handgun in the car.
4    Q    And what kind of gun was that?
5    A    A 9 millimeter.
6    Q    Do you know what kind of 9 millimeter?
7    A    Taurus.
8    Q    Do you know where that gun had been acquired?  Do you know
9    how you guys got it?
10             MR. COBURN:  Objection, hearsay.
11             THE COURT:  Overruled.  Do you know?
12   A    No, I can't remember.
13   Q    Is that the 9 millimeter Taurus that you said a few minutes
14   ago you loaned to Mr. Gardner?
15   A    No.
16   Q    A different one?
17   A    That was, the one you just talking about was a Glock, 9
18   millimeter Glock.
19   Q    But I talked to you also about loaning guns.  Didn't you say
20   that you loaned a Taurus to Mr. Gardner?
21   A    That was a .40 caliber Taurus.
22   Q    .40 caliber.  Okay.  Whose gun was that, the 9 millimeter
23   Taurus that the police recovered from the Acura?
24   A    That was Shawn.
25   Q    That was Shawn's?

1    A    Yes.

2    Q    Where was it in the car?

3    A    It was somewhere in the back, like on the passenger side

4    back seat somewhere.  I'm not for sure where the exact spot.

5    Q    Who put it back there?

6    A    Shawn.

7    Q    Did he put it back there after the police stopped him or

8    before?

9    A    It was, it was already back there before we got stopped.

10   Q    Okay.  Do you remember, did Mr. Gardner say anything to the

11   police when he was leaving the car?

12   A    I can't remember.

13   Q    Do you remember where you were coming from that night?

14   A    No.

15   Q    Do you remember where you were going to?

16   A    No.

17   Q    Had you been in your store with Mr. Gardner before that

18   incident that night?

19   A    Yes.

20   Q    Did you have the gun with you in the store?

21   A    Yes.

22   Q    It was Mr. Gardner's gun, is that correct?

23   A    Yes.

24   Q    Did he use, did he keep it in the store usually, or what?

25   A    We both kept, we both kept guns in the store.

1   Q    Okay.  Let me call your attention to another occasion when

2   you got stopped in the car.  Did you get stopped on I-95?

3   A    Yes.

4   Q    When you were driving?

5   A    Yes.

6   Q    And who was with you in the car?

7   A    Me, Bo, and Goo.

8   Q    And were you stopped in Maryland on I-95 or in another

9   state?

10  A    We were stopped in Maryland, in Harford County.

11  Q    And did you pick up a charge for that?

12  A    Yes.

13  Q    What kind of -- was it a drug charge?

14  A    Yes.  Possession of marijuana.

15  Q    Okay.  And Mr. Gardner and Mr. Mitchell, were they charged

16  with anything?

17  A    No.

18  Q    Did you, as a result of that, stop going to New York around

19  that time?

20  A    Yes.

21  Q    Did Mr. Gardner and Mr. Martin stop going to New York or

22  just you?

23       MR. COBURN:  Objection.

24       THE COURT:  Rephrase the question.

25  Q    Do you know, did Mr. Gardner and Mr. Martin stop going to

1    New York?

2            MR. COBURN:  Objection.

3    A    I don't know.

4    Q    Do you know, did they talk to their source of supply about

5    meeting them closer to Maryland?

6            MR. PYNE:  Objection.

7            THE COURT:  Do you know when they did or not?

8            THE WITNESS:  Not, not to my recollection.

9    BY MR. HARDING:

10   Q    Was there an occasion when they got arrested on I-95

11   themselves?

12   A    Yes.

13           MR. COBURN:  Objection.  Hearsay.

14           THE COURT:  Overruled.

15   Q    Did they tell you about it?

16   A    Yes.

17   Q    What did they tell you?

18           MR. PYNE:  Objection.

19           THE COURT:  Overruled.

20   A    Goo had told me that he was going, he needed somebody to go

21   pick up his car with him, the car he just bought.  So he took

22   Wayne up there with him and Wayne went to go pick the car up.

23   And he was driving, following each other down, back down the

24   highway.  And Wayne had got pulled over and they had found drugs

25   in the car.  And Goo had came back and admitted that the drugs

1   was his, that Wayne didn't know anything about it.

2   Q    Okay.  So did that mean that only one of them was charged?

3   A    Yes.

4   Q    Or do you know?

5   A    As I know of, yes.

6   Q    As you know, yes?

7   A    Yes.

8   Q    Who was it?

9   A    Shawn Gardner.

10  Q    And that's because he went up and took responsibility for

11  the drugs, is that it?

12  A    Yes.

13  Q    Do you know what kind of drugs there were in that car?

14  A    Cocaine.

15  Q    Was it cocaine base or cocaine powder, do you know?

16  A    I don't know.

17  Q    You don't know.  Okay.  Did Mr. Gardner wind up serving a

18  substantial amount of time in jail as a result of that?

19  A    I don't know how much time he served.  I know he wasn't in

20  jail for a long time.

21  Q    He was or was not?

22  A    Wasn't.  He was not in jail for a long time.  Probably like

23  a year or longer.

24  Q    A year or what?

25  A    A year or a couple months.

1    Q    What about Mr. Martin?  Did he also get arrested shortly

2    after that?

3    A    Yes.

4    Q    And what was that for?

5    A    Handgun.

6    Q    Did he get a substantial amount of jail time for that?

7    A    Three years.

8    Q    Three years?

9    A    Yes.

10   Q    Okay.  Okay.  Let me call your attention back to this same

11   time period, 1998 and '99, before you got locked up on those

12   charges in 2000.  Do you remember, did Boo and -- I'm sorry -- Bo

13   and Goo open up drug trafficking operations in Pennsylvania?

14   A    Yes.

15   Q    Where did Goo open his shop?

16   A    Hanover, Pennsylvania.

17   Q    Did you ever go up there and look at the people, look at the

18   town and meet some of the people that he knew up there?

19   A    Yes.  I went there a couple times.

20   Q    And who was it that he had working for him up there?

21   A    A lady and a man.

22   Q    Do you remember their names?

23   A    I just remember the guy's name was Darryl.  I don't remember

24   his wife's name.

25   Q    Okay.  Did they distribute drugs for Goo up there in

1    Hanover, Pennsylvania?

2    A    Yes.

3    Q    What kind of drug?

4    A    Cocaine base.

5    Q    Cocaine base.  That's crack, right?

6    A    Yes.

7    Q    And you were up there a couple times?

8    A    Yes.

9    Q    So did Mr. Gardner take crack up with him when he went up

10   there?

11   A    Yes.

12   Q    How much did he take?

13   A    I don't know.

14   Q    Did you see it?

15   A    Yes.

16   Q    You just can't, you didn't ever learn how much it weighed,

17   is that your testimony?

18   A    Yes.  It was already, I guess it was already put together.

19   Q    Already put together?

20   A    Yes.

21   Q    Into pills?  Into vials or pills, is that what you mean?

22   A    Yes.

23   Q    How many of them were there?  Can you estimate?

24   A    It was a bag.  I don't know how much was in the bag.

25   Q    Okay.  Did he have a bag of pills with him each time he went

1    up there with you?

2    A    Yes.

3    Q    How many times did you go up there with him?

4    A    Three times.

5    Q    Three times.  Did Goo cook up that crack himself from

6    cocaine?

7    A    Yes.

8    Q    And where did he used to do that?

9    A    Out --

10    Q    I'm sorry?

11    A    Out -- I don't know where he used to do it at that point in

12    time, where he was cooking at.

13    Q    Okay.  You named some places where he did it in general.

14    A    Yes.  Catonsville, Johnnycake Road.

15    Q    Okay.  That's a stash house you told us about?

16    A    Yes.

17    Q    What about the Winchester apartments?

18    A    Winchester as well.

19    Q    Okay.  What about Bo?  You said he opened up a shop in

20    Pennsylvania, also.

21    A    Yes.

22    Q    Do you know where in Pennsylvania?

23    A    York.

24    Q    York?  Did you ever go up there with him?

25    A    No.

1    Q    How do you know about it?  Did he tell you about it?

2    A    Yes.

3    Q    Why was it that they opened up shops in Pennsylvania,

4    anyway?

5              MR. COBURN:  Objection.

6              THE COURT:  Overruled.  You may answer.

7    A    It's more profit than Baltimore.

8    Q    How much more profit?

9    A    Probably quadruple your money.

10   Q    Quadruple your money?

11   A    Yes.

12   Q    Okay.  Did there come a time when Mr. Mitchell got arrested

13   up there in Pennsylvania?

14   A    Yes.

15   Q    Did he tell you about it?

16   A    Yes.

17   Q    What did he tell you?

18   A    It was a house raid and the girl snitched on him and they

19   came, raided the house and locked him up.  Everybody in the

20   house.

21   Q    Did he get out of jail?

22   A    Yes.

23   Q    Did he ever go back to Pennsylvania?

24   A    I don't know.

25   Q    Did Goo continue to sell in Pennsylvania after that?

1   A    After what?

2   Q    After Bo had his problem in Pennsylvania, his house raid?

3   A    Yes.

4   Q    He did?  Did he have, did Goo have a girlfriend up there, do

5   you know?

6   A    Not that I know of.

7   Q    Okay.  Let me call your attention to 2000.  You got arrested

8   again in that year, is that correct?

9   A    Yes.

10  Q    What were you doing when you got arrested?

11  A    I was getting ready to buy some marijuana up on Reisterstown

12  and Borman.

13  Q    Reisterstown Road and Balmore?

14  A    No, Borman Avenue.

15  Q    Borman Avenue?

16  A    Yes.

17  Q    Who were you going to buy the marijuana from?

18  A    Avon.

19  Q    Avon.  This guy who was a cousin of Goo's, is that correct?

20  A    Yes.

21  Q    How much marijuana were you going to buy?

22  A    A couple bags.  Dime bags.  Ten dollar bags.

23  Q    Okay.  Were you with anybody else?

24  A    Yes.

25  Q    Who?

1    A    Eric Stokes.

2    Q    Anybody else?

3    A    No.

4    Q    What happened?

5    A    We was standing, we were standing behind, me and Avon were

6    standing behind the car getting ready to make the transaction and

7    the police rolled down the street and jumped out on us.  And they

8    searched us, they didn't find anything.  They was like, they went

9    to the car that we was leaning on and looked inside the car, seen

10   Eric Stokes in the car.  He was wanted for attempted murder.  So

11   they automatically pulled him out of the car and they searched

12   the car and found drugs and locked him and I up because I was

13   driving the car.

14   Q    And whose drugs were those?

15   A    Mine.

16   Q    What kind of drug was it?

17   A    Crack.

18   Q    Do you remember how much it was?

19   A    It was like 40, 50 pills.

20   Q    Okay.  Did you cook that crack up yourself?

21   A    Yes.

22   Q    Where did you get the powder cocaine from?

23   A    Darryl Wyche.

24   Q    And who got it for you from Darryl Wyche?

25   A    Willie Mitchell.

1    Q    Where did you pick it up from Mr. Mitchell?

2    A    Out Catonsville, Route 40, Darryl's cell phone store.

3    Q    Darryl Wyche had a cell phone store?

4    A    Yes.

5    Q    On Route 40?

6    A    Yes.

7    Q    But you got it from Mr. Mitchell at that location, is that

8    correct?

9    A    Yes.  Me, me and Mr. Mitchell rode out there together and he

10   went and took care of it for me because me and Darryl wasn't on

11   good terms.

12   Q    You weren't on good terms?

13   A    No.

14   Q    Okay.  Well, how much did you, how much money did you give

15   Mr. Mitchell to buy this cocaine for?

16   A    A thousand dollars.

17   Q    Do you remember how much cocaine you got in weight?

18   A    An ounce.

19   Q    An ounce?

20   A    Yes.

21   Q    And then you took it and cooked it up, is that correct?

22   A    Yes.

23   Q    Where did you go to cook it up?

24   A    My house.

25   Q    Where was your house at that time?

1   A    Owings Mills.

2   Q    And then you had it with you when you were going to buy

3   marijuana from this guy Avon, is that correct?

4   A    Yes.

5   Q    And Avon's the guy who testified earlier who used to get

6   supplied by Goo to sell in Park Heights, is that correct?

7   A    Yes.

8   Q    Okay.  Now you said you wound up doing a substantial amount

9   of time in jail around that time.  From 2000 to 2003, is that

10  correct?

11  A    Yes.

12  Q    Did you get visited while you were in jail?  Did Mr.

13  Mitchell, first of all, come to visit you?

14  A    Yes.

15  Q    Where were you when he came to visit you?

16  A    Pikesville, Maryland.  State trooper had caught us.

17  Q    What were you doing there?

18  A    Working on a detail from, I was incarcerated in boot camp,

19  and we had a detail out there.

20  Q    I see.  Did Mr. Mitchell bring you anything when he came to

21  visit you?

22  A    He brought me some long johns and socks.

23  Q    Okay.  And did he tell you anything about Darryl Wyche?

24  A    No.

25  Q    Did he mention that he was still getting from Darryl Wyche?

1          MR. LAWLOR:  Objection, Your Honor.  Asked and

2   answered.

3          THE COURT:  Overruled.  You may answer.

4   A    Yes.

5   Q    Okay.  Do you remember what year this was?

6   A    Two thousand and -- 2001.

7   Q    Okay.  Did he mention anything about his music business?

8   A    Yes.

9   Q    What did he say?

10  A    He was producing.

11  Q    He was producing music?

12  A    Yes.

13  Q    Is that all he said?

14  A    Yes.

15  Q    Did he mention Donte Sands?

16  A    No.

17  Q    He didn't?

18  A    No.

19  Q    Okay.  Did you speak to Mr. Mitchell on later occasions on

20  the telephone?

21  A    Yes.

22  Q    Okay.  Let me ask you, in 2002, did you get a visit from Mr.

23  Martin and Mr. Gardner?

24  A    Yes.

25  Q    Where were you when they came to visit you?

1  A    I graduated from boot camp in Jessup and they came to the

2  Jessup Brockbridge facility.

3  Q    Okay.  Let me ask you about, did they ever come to visit you

4  in Pikesville?

5  A    Yes.

6  Q    Okay.  And do you recall, is this around February of 2002?

7  Does that sound about right?

8  A    Yes.

9  Q    Okay.  Did they tell you about anything involving Bo on that

10  occasion?

11  A    They told me he had gotten into something, he had stabbed a

12  couple guys out there --

13        MR. LAWLOR:  Objection, Your Honor.

14        THE COURT:  Overruled.

15  A    They had told me, they had told me that he had stabbed a

16  couple guys up down Hammerjacks and he got beat up real bad, and

17  the guys who had he stabbed up had put a hit out on him.

18  Q    Okay.  Do you remember how Wayne and Goo got out there to

19  Pikesville to tell you about this?

20  A    Wayne had a Plymouth.

21  Q    Okay.

22  A    He drove out.

23  Q    All right.  Let me call your attention now to March 4th of

24  2002.  I'm going to show you an exhibit.  I'm just going to put

25  it on the screen, with the Court's permission.

1           THE COURT:  Yes.

2    Q    This is Government Exhibit W-5-I.  Do you recognize this,

3    Mr. Bacon?

4    A    Yes.

5    Q    What is it?

6    A    A letter I wrote Wayne.

7    Q    All right.  Can you read it for us or do you want to hold it

8    in your hands while you read it?  Is this clear enough on the

9    screen?

10   A    If you can just slide it over some on the screen.

11   Q    Like this?

12   A    Yeah.  A little bit more.  All right.  What's --

13          THE COURT:  I'm sorry, Mr. Bacon.  Read it very slowly

14   because when you read you talk faster than normally.  So just try

15   to concentrate on reading it slowly.

16   A    What's poppin, playboy?  How are the streets treating you

17   out there?  I know you only been home for a minute but I hope

18   you're getting back into the swing of things.

19          I know it's hard out there to start over from scratch

20   ain't cutting it.  Kicking in doors and shit to us.  Hold on.

21   Kicking in doors and shit to us.  I know you're out there

22   plotting.  Just be careful, dog.  When I get out I hope I can

23   come to my dogs and get an eighth with no problem.  It's a risky

24   business but a nigga like me lives on the edge.  I don't have no

25   problem with ski masking it up.  You know we don't have any

1    picks.  I have a few niggas in mind, especially black.  Fuck all

2    that playing around.  We have families out there and we don't

3    have it in us coming back here.  You know how we carry it, dog.

4    Yo, if you do strike rich, make sure you holler at your dog real

5    loud.

6            I do need some help on this lawyer money.  I sent

7    Carolyn $400 -- move it over some.  Slide it over.  All right.

8            I sent Carolyn $400 from road crew and selling

9    cigarettes.  Ernie gave her 200 for me but I need 400 more.

10   Needleman wants that dough up front.  Yo, whatever you can do I

11   would appreciate.  A nigga's trying to get back on them streets

12   so I can support my family and make things happen.  Yo, I know

13   y'all niggas are in my corner.  I just want y'all to be safe out

14   there, out that bitch.  Goo supposed to come through and holler

15   at me Friday up MSP, bring a nigga a can and some drink so I can

16   fell that shit before I go down tight as BCCC.  I'm about to

17   shoot some dice.

18           I just smoked some hydro yesterday.  Yo, you know a

19   nigga was high as a bitch.  When I get out I can't afford to fuck

20   with that shit, you know.  All right, dog.  Be safe and send the

21   family my love.

22   Q    Okay.  You signed it?

23   A    My love, Darryl.  Little Darryl.

24   Q    Okay.  Let me ask you a couple of questions.  When, when you

25   say kicking in doors ain't shit to us, I know you're out there

1    plotting and I hope I can come home to my dogs, what are you

2    talking about there?

3    A    I was talking about pretty much if shit, if the drugs not

4    going right, that we got to do whatever we got to do to get

5    money.

6    Q    Okay.  Specifically kicking in doors, is that correct?

7    A    Yes.  That was just a line I used from a song.  So I mean,

8    just any means necessary, if the drug game ain't going as well as

9    planned.

10   Q    Okay.  And speaking of that, you also say, I don't have no

11   problem with ski masking it up.  What does that mean?

12   A    Putting on a ski mask and going, get, going to rob somebody.

13   Q    Okay.  You also say, when I get out I hope I can come home

14   to my dogs and get an eighth with no problem.  What are you

15   talking about?

16   A    Cocaine.

17   Q    Okay.  What does a eighth mean?

18   A    Four and a half ounces of cocaine.

19   Q    That's an eighth of a kilo?

20   A    Yes.

21   Q    Okay.  And you're hoping that Wayne, Mr. Martin, will supply

22   you with an eighth as soon as you get home?

23   A    Yes.

24   Q    Okay.  Who's this guy Black?  You say, we don't have any

25   picks.  I have a few niggas in mind, especially Black.  Who are

DIRECT EXAMINATION OF BACON                                    93

1    you talking about there?

2    A    That was a guy I told you about earlier that I jumped out on

3    down South Baltimore who owed me some money.

4    Q    Oh, is that the time that Mr. Martin was in the car with

5    you?

6    A    Yes.

7    Q    Okay.  And why would he be a good person for you to rob?

8    A    Because he, at the time he was doing good and now he

9    already, he still owed me some more money.  So I still have

10   animosity towards that.

11   Q    Okay.  He would have a lot of money because he was doing

12   good in the drug business?  Is that what you mean?

13   A    Yes.

14   Q    And then you say, fuck all that playing around.  We have

15   families out there and we don't have it in us coming back here.

16   What do you mean by that?

17   A    Coming back to jail.

18   Q    You talk about needing money and you mention, you mention

19   how you sent money to someone named Carolyn, is that correct?

20   A    Yes.

21   Q    And also, this is money you made selling cigarettes and

22   working on a road crew, is that correct?

23   A    Yes.

24   Q    That's selling contraband cigarettes in the boot camp where

25   you were?

DIRECT EXAMINATION OF BACON                                    94

1    A    Yes.

2    Q    And then Ernie gave her $200 for me but I need 400 more

3    because Needleman wants that dough up front.  Who's Needleman?

4    A    Stanley Needleman's a lawyer.

5    Q    What did, what did you need to have a lawyer for at that

6    point?  You were already locked up.

7    A    I had a pending case.  No.  No.  No.  No.  No.  I was trying

8    to get an appeal.

9    Q    Trying to get an appeal?

10   A    Yes.

11   Q    I see.  So you want Mr. Martin to send you some money so

12   that you can pay your lawyer, is that it?

13   A    Yes.

14   Q    Did he send you money for your lawyer?

15   A    Yes.  He sent me a couple hundred.

16   Q    And then you say, Goo supposed to come through and holler at

17   me Friday up MSP.  Is that Maryland State Police?

18   A    That's Maryland State Police Headquarters in Pikesville.

19   Q    I see.  Did he come?  Did Goo come?

20   A    Yes.

21   Q    Okay.  Do you remember what he talked about when he came to

22   see you?

23   A    No.  We just had some small talk about what was going on,

24   how he was doing.  Pretty much when I was leaving from up there

25   and going down B triple C.

1    Q    Okay.  You talk about you smoked some hydro yesterday.  What

2    is that?

3    A    Marijuana.

4    Q    Hydro is a kind of marijuana?

5    A    Yes.  Hydro planted.  I think it's like the seeds that grow

6    in the water.

7    Q    I see.  So that would be contraband marijuana in the jail,

8    also?

9    A    Yes.

10   Q    That's what you got locked up for later at Jessup, correct?

11   A    Yes.

12   Q    Okay.  Let me call your attention to March of 2002, the same

13   month.  Did you graduate from boot camp around that time?

14   A    Yes.

15   Q    Did anybody come to your graduation?

16   A    Yeah.  My mother, my son mother, and my son, and Wayne and

17   Goo came through for me.

18   Q    Okay.  Were Darryl and Anthony Wyche still alive at that

19   time when you graduated?

20   A    Yes.

21   Q    Okay.  Let me call your attention to the next month, up at,

22   were you at BCCC at that time?

23   A    Yes.

24   Q    That's a facility here in Baltimore that you mentioned in

25   your letter, is that correct?

1    A    Yes.

2    Q    Okay.  Did Wayne and Goo come and visit you there?

3    A    Yes.

4    Q    Did they mention the Wyche brothers' murder?

5    A    Yes.

6    Q    Murders?  Okay.  Did they tell you how the Wyche brothers

7    died?

8    A    They just told me somebody had shot them, both of them in

9    the back of the heads, and that guy, Claudus Lassiter, a friend

10   of Darryl and Tony's, had put their names in it from a voice

11   recording.

12   Q    Anybody else put their names in it?

13   A    Deezo, Tyrone, Wally.

14   Q    Okay.  These are all guys that you knew?

15   A    Yes.

16   Q    You've told us about Deezo already.  What about Tyrone and

17   the other one?

18   A    Tyrone has supposed to have said something as well about

19   their, that it sounded like them on the voice recording.  And

20   Wally.

21   Q    Sounded like their voice recording what?

22   A    Sounded like their voices on a recording.

23   Q    Okay.  What did Wayne and Goo tell you about a recording?

24   A    They said they tried to say it was them on there.

25   Q    I'm sorry?

1    THE COURT:  Just one moment, please.

2    (Loud outside siren.)

3    THE COURT:  Okay.  You can go ahead, Mr. Bacon.

4  A    All right.  No.  They was just telling me that Darryl home

5  boys, Claudus and Tyrone and them, tried to implicate them,

6  saying it was their voices on the voice recording message.

7  Q    Okay.  Did Wayne and Goo tell you anything about, anything

8  more about the voice recording?

9  A    No.

10    THE COURT:  About five minutes, Mr. Harding?

11  Q    Yes, Your Honor.  You told us back at the beginning of the

12  testimony that you got a grand jury subpoena.  And you testified

13  in the grand jury on May 12th of 2004.  Is that correct?

14  A    Yes.

15  Q    Did you let Wayne know that you had gotten a grand jury

16  subpoena?

17  A    Yes.

18  Q    And what did he tell you to do?

19  A    Talk to a lawyer before I come down there, before I come to

20  the grand jury.

21  Q    Did you?

22  A    Yes.

23  Q    What lawyer?

24  A    Lawrence Rosenberg.

25  Q    But you obviously testified, is that correct?

1    A    Yes.

2    Q    Afterwards, did you talk to Wayne and Goo some more by

3    telephone?

4    A    Yes.

5    Q    In fact, did you often speak to these guys by telephone?

6              MR. LAWLOR:  Objection, Your Honor.  These guys.

7              THE COURT:  Rephrase the question.

8    Q    Did you speak to -- well, you've already told us you spoke

9    to Mr. Mitchell by telephone from jail, is that correct?

10   A    Yes.

11   Q    Did you speak to Goo by telephone from jail from time to

12   time?

13   A    Yes.

14   Q    And what about Wayne, Mr. Martin?

15   A    Yes.

16   Q    Yes.  Okay.  Did you speak to Wayne after you testified in

17   the grand jury?

18   A    Yes.

19   Q    What did he tell you?

20   A    He was asking me what kind of questions was they asking and

21   stuff like that.

22   Q    Okay.  Did he tell you anything about Mr. Mitchell or Bo?

23   A    Not to my recollection.

24   Q    Did he tell you anything about getting mixed up in

25   something?

1          MR. LAWLOR:  Objection, Your Honor.  Asked and

2    answered.

3          THE COURT:  Overruled.  You may answer.

4    A    Yes.  He said that he got, all the stuff that was going on

5    with the Darryl and Tony stuff, that Bo had got him caught up in

6    it.

7    Q    Okay.  When you got out of jail in 2003, did you go and

8    visit Goo?

9    A    Yes.

10   Q    Because he was locked up at that time, is that correct?

11   A    Yes.

12   Q    Where was he?

13   A    Jessup, Maryland.

14   Q    Was that the last time you visited Goo before today?

15   A    Yes.

16   Q    But you spoke to him by telephone, is that correct?

17   A    Yes.

18   Q    When you spoke to him by telephone, did he ask you for

19   money?

20   A    Yes.

21   Q    Did you send him money?

22   A    Yes.

23   Q    How much did you send him?

24   A    A hundred dollars.

25          MR. HARDING:  No further questions, Your Honor.

1          THE COURT:  Members of the jury, we will take our

2     afternoon recess at this time.  Please leave your note pads in

3     your chairs.  Have no discussion about the case.  Let me correct

4     myself.  It's not the afternoon recess, it's the lunch recess.

5     Please be back in the jury room no later than two p.m. this

6     afternoon so that we may continue at that time.  Continue to keep

7     an open mind about all issues.  The jury is excused.

8               (Jury exits the courtroom.)

9          THE COURT:  Mr. Bacon is excused.

10              MR. HARDING:  May I have a word with the agent, Your

11    Honor?

12              THE COURT:  Yes.

13              (Pause in proceedings.)

14              THE COURT:  Mr. Harding, I trust that you realize I

15    wasn't saying, I'm sure you understood I wasn't saying you only

16    had five more minutes with the witness.  I was simply saying five

17    more minutes before the recess.

18              MR. HARDING:  Coincidentally, I only had five more

19    minutes to go, Your Honor.

20              THE COURT:  It's perfect.  Once again, a note from the

21    jury.  He's going to be away, one of the jurors, the weekend

22    after Thanksgiving.  We don't have to worry about that, do we?

23              MR. HARDING:  I sure hope not, Your Honor.

24              THE COURT:  Okay.  We're in recess until two p.m.

25              (Recess at 12:45 p.m.)

1          THE COURT:  Ready to go, Mr. Lawlor?

2          MR. LAWLOR:  Yes, Your Honor.

3          THE COURT:  May we have the witness, please?

4          Please resume your seat, Mr. Bacon.  And thank you.

5    Continue to keep your voice up and speak directly into the

6    microphone.  We'll have the jury.

7          (Jury enters the courtroom.)

8          THE COURT:  Please be seated, ladies and gentlemen.

9    Good afternoon.  Whenever you're ready, Mr. Lawlor.

10          CROSS EXAMINATION

11   BY MR. LAWLOR:

12   Q    Thank you, Your Honor.  Mr. Bacon, good afternoon.

13   A    Good afternoon.

14   Q    How are you?

15   A    All right.

16   Q    I would like to take you back, if I could, to when you first

17   met some of the gentlemen seated in court today.  You said that

18   you grew up in Randallstown?

19   A    Yes.

20   Q    And you started dealing drugs at a very young age?

21   A    Yes.

22   Q    Okay.  And did that owe in part to the conditions in which

23   you grew up?  Did you grow up in a sort of rough and tumble

24   neighborhood?

25   A    No.

1  Q    You did not?  Okay.  This just happened by happenstance that

2  you started dealing drugs at such a young age?

3  A    Yes.

4  Q    Okay.  And ultimately related to that is something else, you

5  went away into the Hickey School?

6  A    Yes.

7  Q    Was this in 1994?

8  A    The first time I went to Hickey School was '93.

9  Q    '93 was the first time.  What was the time or how old were

10  you or what year was it when you were there with Mr. Mitchell,

11  Mr. Gardner, and Mr. Martin?

12  A    '94.

13  Q    '94.  Okay.  So you are 29 years old now?

14  A    Yes.

15  Q    How old were you in 1994?

16  A    15.

17  Q    15.  And Mr. Mitchell is a year or so older than you?

18  A    Yes.

19  Q    So he was 16, is that correct?

20  A    I'm not for sure.

21  Q    Well, if you were 15 in 1994 and he's a year older than you,

22  that would make him 16, is that fair?

23  A    That's fair.

24  Q    Okay.  So you were at Hickey.  Mr. Mitchell was at Hickey.

25  And he was 16 years old.  Is that correct?

1   A    That's fair.

2   Q    Okay.  And you alluded on questioning from Mr. Harding to

3   the fact that you heard something about a robbery.  Is that

4   right?

5   A    Yes.

6   Q    And you heard it from a person, is that right?

7   A    Yes.

8   Q    Okay.  And today, as you sit here today, it's 2008, is that

9   right?

10  A    Yes.

11  Q    So that was 14 years ago?

12  A    Yes.

13  Q    And not just regarding that conversation but regarding a lot

14  of the events, a lot of the conversations you've had with people,

15  a lot of the things you've done and a lot of things that you've

16  heard, you don't remember all of it, right?

17  A    No.

18  Q    All right.  Certainly a conversation that you had in 1994

19  you might not remember the particulars of that.  Is that fair?

20  A    Yeah, that's fair.

21  Q    Okay.  So do you remember who you even had this conversation

22  with?

23  A    No.

24  Q    Okay.  You don't?  But you recall that you had a

25  conversation about the fact that they were there because of a

1    robbery?

2    A    Yes.

3    Q    All right.  You don't know that they committed a robbery.

4    You just know that they were there because of a robbery?

5    A    Yes.

6    Q    All right.  Have you ever been arrested for something you

7    didn't do?

8    A    Yes.

9    Q    Okay.  So you don't know that they did any robbery

10   whatsoever; is that fair?

11   A    I don't know if they committed a crime.

12   Q    You don't know if they committed any crime that resulted in

13   them being incarcerated at Hickey School at 16 years old, do you?

14   A    No.  I know they committed a crime to get there.  But I

15   don't know if they got found guilty of the crime or not.

16   Q    Okay.  Now, do you know what each of them were there for or

17   is this discussion, this robbery between one person perhaps had

18   to do with what one of them was doing there?

19   A    I don't know what each one of them was there for.

20   Q    Okay.  All right.  So in any event, you and the gentlemen

21   here today obviously left the Hickey School at some point and

22   were back on the streets?

23   A    Yes.

24   Q    Okay.  And you've been incarcerated from '04 to '08, right?

25   '04 till just recently?

1   A    Yes.

2   Q    All right.  Prior to your incarceration, other than when you

3   were in jail, you basically spent your time selling drugs almost

4   throughout your whole life, from 12 years old until 2004?

5   A    Yes.

6   Q    Okay.  And that was what you did?  You didn't work?  You

7   didn't go to school?  You were by occupation, by profession, a

8   drug seller?

9   A    Yes.

10  Q    Okay.  And so you know the game, right?

11  A    Yes.

12  Q    Inside and out, correct?

13  A    Okay.

14  Q    You know how the game works?

15  A    Yes.

16  Q    All right.  Inside and out, right?

17  A    Yes.

18  Q    All right.  And at various points in time you've discussed

19  the fact that you had different dealings with the different

20  gentlemen here today or, I should say, with Mr. Mitchell, with

21  Mr. Martin, and with Mr. Gardner, is that fair?

22  A    Yes.

23  Q    Okay.  And it sounds like, and I'm not trying to put words

24  in your mouth, so forgive me, correct me if I say something

25  that's not right, but it sounds to me like you were more friendly

1    with Mr. Gardner and Mr. Martin than you were with Mr. Mitchell,

2    is that fair?

3    A    No.

4    Q    You were equal friends with all three of them?

5    A    I had a better relationship with Mr. Martin and Mr. Gardner.

6    Q    You had a better relationship?

7    A    Yes.

8    Q    And you had more dealings with them?

9    A    Yes.

10   Q    And you spent more time with them?

11   A    Yes.

12   Q    You got arrested with them?

13   A    Yes.

14   Q    You talked to them more often?

15   A    Yes.

16   Q    Okay.  And you've discussed the fact, you testified on

17   direct to a lot of different things over a lot of different

18   years.  Is that right?

19   A    Yes.

20   Q    All right.  So let me see if I can just sort of summarize

21   and then we'll get into some of the details.  Is it fair to say

22   that Mr. Mitchell, to the degree that you say he dealt drugs, did

23   that in a different part of the city than where Mr. Gardner did

24   or where Mr. Martin did?

25   A    Yes.

1    Q    He plied his trade in a different location than where Mr.

2    Gardner did and Mr. Martin did, right?

3    A    Yes.

4    Q    And is it fair to say that you, like many drug dealers, you

5    go where the money is, right?

6    A    Yes.

7    Q    And you're looking out for number one, right?

8    A    Yes.

9    Q    All right.  So when you're selling drugs, your goal is to

10   make as much profit as possible, is that fair?

11   A    Yes.

12   Q    All right.  So, and you don't care, for example -- who did

13   you deal drugs with?  Give me a name of someone you dealt drugs

14   with that's not in this courtroom today?

15   A    Aaron Holly.

16   Q    All right.  So you dealt, in various times in your life you

17   worked with Mr. Holly, you dealt drugs with him?

18   A    Yes.

19   Q    All right.  Now, if Mr. Holly dealt drugs on corner X and

20   you thought you could make more money on corner Y, then you would

21   make that decision on your own?  You would go to corner Y to make

22   more money, right?

23   A    Yes.

24   Q    All right.  And so at various points in time it behooved

25   you, it benefited you to do something with Mr. Gardner and so you

1   would do it with Mr. Gardner, right?

2   A    Yes.

3   Q    And other times it made no sense to do something with Mr.

4   Gardner, so you might do it with Mr. Holly?  Is that fair?

5   A    No.

6   Q    Well, at certain points in time you did work with only Mr.

7   Holly, is that right?

8   A    No.

9   Q    Didn't you just say five minutes ago that you dealt drugs

10  with Mr. Holly?

11  A    I did deal drugs with him.  Not only with him, though.

12  Q    Okay.  All right.  Well, we won't use Mr. Holly.  But

13  someone other than Mr. Gardner or Mr. Martin.  If it behooved

14  you, if money could be made by dealing drugs with someone other

15  than the two of them, if the opportunity presented itself, you

16  would seize upon that opportunity.  Is that fair?

17  A    No.

18  Q    It's not fair?

19  A    No, it's not fair.

20  Q    You're saying you would only do anything in your life if Mr.

21  Gardner or Mr. Martin were present?

22  A    No.  I'm not saying that.

23  Q    I'm -- you've confused me.

24  A    I'm just saying that you saying, you can't trust everybody

25  so why would you just go ahead and start selling drugs with

1   everybody?

2   Q    All right.  Fair enough.  There were certain people that you

3   knew that you dealt with?

4   A    Yes.

5   Q    In terms of selling to them, correct?

6   A    Correct.

7   Q    Buying from them, correct?

8   A    Correct.

9   Q    And selling with them?

10  A    Correct.

11  Q    But you knew a lot of people, right?

12  A    Yes.

13  Q    Because you dealt drugs in East Baltimore?

14  A    Yes.

15  Q    Catonsville?

16  A    Yes.

17  Q    South Baltimore?

18  A    Yes.

19  Q    Where else?

20  A    Pretty much all through Baltimore City.

21  Q    Okay.  So, and you dealt, I assume, with a lot of different

22  people in those various geographic areas?

23  A    Yes.

24  Q    All right.  So again, back to my original question.  Of

25  these many people that you've dealt with in these many years and

1    these many geographical regions, you would associate with someone

2    from time to time and someone else from time to time and you

3    would come in and out of people's lives.  Is that fair?

4    A    No.

5    Q    What is it I've said that's incorrect?

6    A    I mean, coming in and out of people's lives.  I only deal

7    with, you mean, people like, I mean, the people that I dealt with

8    like my associates, that was something different.  But friends,

9    we dealt with each other every day.

10   Q    All right.  So you would see -- how many people did you deal

11   drugs with over the course of, you started when you were twelve

12   in, say, '94 and '95.  You get arrested in 2004.  Over those ten,

13   roughly ten years, how many different people did you associate

14   with in the drug game?

15   A    I mean, I can't count.  Probably like 50.

16   Q    More than 50?

17   A    Yeah, more than 50.

18   Q    More than a hundred?

19   A    Probably around like in between that.

20   Q    So these are a hundred people that you bought from, sold to,

21   sold with?

22   A    Yes.

23   Q    All right.  And you did not see those people every day?

24   A    No.

25   Q    And I'm sure of those hundred people, some of them you might

1    see for a month and then not see for six months, right?

2    A    Yes.

3    Q    And that's common, right?

4    A    Yes.

5    Q    Okay.  And you said that you bought drugs.  You would go to

6    New York yourself occasionally with Mr. Gardner and with Mr.

7    Martin, is that right?

8    A    Yes.

9    Q    But not with Mr. Mitchell?

10   A    No.

11   Q    Okay.  In fact, this one time that you got arrested and you

12   were in the car with Mr. Mitchell, you got arrested on I-95 for

13   possession of marijuana?

14   A    Yes.

15   Q    That was just some weed that you had on your person, right?

16   A    No.  It was just some weed in the car that was traces.

17   Q    It was just trace weed.  So this was no big time operation

18   that you were involved in with Mr. Mitchell?  This was just --

19   A    Some seeds.

20   Q    Some seeds.  It really had nothing to do with nothing?

21   A    Yes.

22   Q    Okay.  All right.  And in fact, so you bought from someone

23   named Polo, right?

24   A    Yes.

25   Q    And then you also bought from someone named Poppi, right?

1    A    Yes.

2    Q    And Polo is local?  He's Columbia, Maryland?

3    A    Yes.

4    Q    And Poppi is New York?

5    A    Yes.

6    Q    And you'd never went to New York with Bo, right?

7    A    I went to New York with Bo.

8    Q    You went to New York to see Bo.  You didn't travel there

9    with him, did you?

10   A    We traveled together, went to a club.

11   Q    You traveled together to a club because Bo was in college up

12   there, right?

13   A    Yes.

14   Q    All right.  So how old are you now?

15   A    29.

16   Q    All right.  So Mr. Mitchell is 30 or 31.  We're going back

17   about ten years when he was in college, right?

18   A    Yes.

19   Q    Late '90s?

20   A    Late 90's.

21   Q    So you were out of jail, still plying your trade, correct?

22   A    Yes.

23   Q    And Mr. Mitchell was in college for a couple years there,

24   right?

25   A    Yes.

1    Q    And you would go to visit him?

2    A    Yes.

3    Q    Okay.  So when you say you went to New York with him, you

4    went with him to socialize, not to engage in any illicit activity

5    together with him, right?

6    A    Correct.

7    Q    Okay.  And he was at a couple different colleges during that

8    time, right?

9    A    Yes.

10   Q    All right.  And you mentioned, though, that Bo came back to

11   the Baltimore region.  And you, Mr. Gardner, and Mr. Martin were

12   buying from, from Polo and Poppi and Bo was buying from, from Mr.

13   Wyche, right?

14   A    Yes.

15   Q    All right.  And you said that you knew where you cut up

16   your, cooked your crack, where Mr. Gardner cooked crack, where

17   Mr. Martin cooked his crack, but Bo did that somewhere else,

18   right?

19   A    Yes.

20            MR. PYNE:  Objection.

21   Q    And he worked with his cousin, right?  He worked with Donte?

22   A    I'm not for sure.

23   Q    You don't know who he worked with?

24   A    I don't know who he worked with.

25   Q    He was doing his own thing, more or less?

1    A    Yes.

2    Q    All right.  In addition to the fact that Mr. Mitchell was

3    away at college for some period of time, prior to that he was

4    also, he did another stint at the Hickey School, is that right?

5    A    Yes.

6    Q    For about a year prior to the time that he went to college,

7    right?

8    A    Yes.

9    Q    And then he graduated from the high school at Hickey, went

10   off to college?

11   A    Yes.

12   Q    All right.  So you were separated from him by and large for

13   some several years?

14   A    Yes.

15   Q    Okay.  And in addition to that, the other gentlemen, Mr.

16   Martin and Mr. Gardner, they would be gone for some periods of

17   time.  They might get a year or two in jail and they would be off

18   the streets and sort of just out of the game, right?

19   A    Yes.

20   Q    Okay.  Just like you, when you've been away, you went away

21   from 2000 to 2003, right?

22   A    Yes.

23   Q    And that shut you down, you're out of the game, right?

24   A    Yes.

25   Q    You're not conspiring with anyone.  You're just biding your

1    time.  Is that fair?

2    A    Yes.

3    Q    All right.  And I mentioned that Mr. Mitchell was doing his

4    own thing.  That includes when he was in Pennsylvania, right?

5    Goo was in one place and he was in an entirely different place,

6    right?

7    A    Yes.

8    Q    Unrelated, right?

9    A    Unrelated, yes.

10   Q    Okay.  Now, let me talk to you a little bit about, about

11   everyday activity if you're in the game.  In addition to the fact

12   that you sold drugs all these years, you carried a gun all of

13   those years, right, by and large?

14   A    Yes.

15   Q    All right.  And that was by force of necessity?

16   A    Yes.

17   Q    And you were, do you, is it your desire to have to use that

18   gun?

19   A    No.

20   Q    Are you a killer?

21   A    No.

22   Q    Why do you carry a gun?

23   A    For protection and when people play games with your money.

24   Q    What kind of games?

25   A    Like ducking out when he owe you money and stuff like that.

1    When he --

2    Q    Someone owes you money, you need to have a gun to get your

3    money back?

4    A    Yeah.

5    Q    And you do understand, as you sit here today, for the rest

6    of us, for the ladies and gentlemen of the jury, for the lawyers

7    and for the judge, that this is not how normal, everyday life

8    works?  You do understand that, right?

9    A    Yes.

10   Q    That the fact that you need a gun to collect a debt is

11   unusual?

12   A    Yes.

13   Q    Okay.  But in the world that you lived in, and I say this

14   not to criticize but for clarification, the world in which you

15   lived, you needed to have the gun to get the money, right?

16   A    Yes.

17   Q    And you needed the gun to keep your own money, right?

18   A    Yes.

19   Q    Why do you need a gun to keep your own money?

20   A    Because somebody will try to come take it from you.

21   Q    And if you don't have a gun, what's going to happen?

22   A    It's going to be easier for them to get it.

23   Q    How will they get it if you don't have a gun?

24   A    How will they get it?  I don't know how they will get it.

25   Q    They will have a gun, right?

1    A    Pretty much.

2    Q    And they will show you their gun and you will not have a

3    gun.  And therefore, you will be disposing of your money to them,

4    right?

5    A    Yes.

6    Q    Because part of this game is robberies, right?

7    A    Yes.

8    Q    Everyone is robbing everyone, right?

9    A    Yes.

10   Q    There's no faith and there's no trust, right, outside of

11   your own circle?

12   A    Yes.

13   Q    It's the dog-eat-dog world, right?  And so you have, and you

14   have, have you been robbed personally?

15   A    Yes.

16   Q    All right.  How many times?

17   A    Twice.

18   Q    Okay.  Of drug proceeds?

19   A    Yes.

20   Q    Presumably by other dealers who knew that you were a drug

21   dealer?

22   A    Yes.

23   Q    Have you participated in robbing other people?

24   A    Yes.

25   Q    Okay.  You robbed other drug dealers?

1    A    Yes.

2    Q    And that was something you would do with no, no qualms?

3    A    Yes.

4    Q    Their money was there to be had, you were going to take it?

5    A    Yes.

6    Q    And that's part of, essentially, that's part of the code.

7    That's fair game, right?

8    A    Yes.

9    Q    Okay.  And that's why you said you have these hundred people

10   and you're going to socialize with some of them on some

11   occasions, right?

12   A    Yes.

13   Q    All right.  But if you're in a different part of town from

14   somebody, then you're not worried about -- if you're in South

15   Baltimore and someone else is in Park Heights, they're not

16   protecting you, right?

17   A    No.

18   Q    They got to be with you?

19   A    Yes.

20   Q    Okay.  Now, in addition to robberies, kidnappings, is that a

21   common phenomenon in the world, in the drug world?

22   A    You could say so.

23   Q    All right.  Well, I don't want to say so.  I want you to say

24   so if it's true?

25   A    I don't know.

1  Q    Have you ever heard of people being kidnapped, drug dealers

2  being kidnapped and basically held for ransom?

3  A    Yes.

4  Q    Okay.  Have you heard of people being murdered?

5  A    Yes.

6  Q    A lot of people?

7  A    Yes.

8  Q    Is that an all too common thing in this city, in this game,

9  for lack of a better word?

10  A    Yes.

11  Q    You know a lot of people been killed?

12  A    Yes.

13  Q    People that were close to you, that you cared about?

14  A    Yes.

15  Q    All right.  And people get killed for every reason and for

16  no reason, right?

17  A    Yes.

18  Q    All right.  So if I think you robbed me, right or wrong, I

19  might kill you, right?

20  A    Yes.

21  Q    If you looked at my girl the wrong way, I might kill you,

22  right?

23  A    Yes.

24  Q    Okay.  If you got a corner that I want, I might kill you,

25  right?

1    A    Yes.

2    Q    All right.  If you've got drugs on your person and I want

3    them, I might kill you, right?

4    A    Yes.

5    Q    These are, as I said, for every reason and no reason people

6    kill others and get killed, right?

7    A    Yes.

8    Q    Okay.  And you said, you testified before the grand jury,

9    right?

10   A    Yes.

11   Q    All right.  And in that you reference, I think there was

12   some questioning about sort of the size and scope of your own

13   operation.  And you were kind of small time, right?

14   A    Yes.

15   Q    You were small time; Bo was small time, right?

16   A    Yes.

17   Q    Bo was kind of really an abject failure at the game, wasn't

18   he?  He failed out of the drug game, didn't he?

19   A    I don't know.

20   Q    Well, did you say that to the grand jury?

21   A    I didn't say he failed out of the drug game.

22   Q    All right.  Well, did you say that he was not successful?

23   A    I don't know.  I didn't see it.

24   Q    All right.  Well, let me come back to that.  You agree,

25   though, that you were small time?

1    A    Yes.

2    Q    Bo was small time?

3    A    Yes.

4    Q    Mr. Gardner was small time?

5    A    Yes.

6    Q    Mr. Martin was small time?

7    A    Yes.

8    Q    All right.  And there are, as part of this culture, you

9    become aware of the other players, right?  Is that fair?

10   A    Yes.

11   Q    Okay.  So you've heard of, for example, the Rice

12   organization, have you?

13   A    No.

14   Q    Okay.  You've heard of the Wyche organization?

15   A    Yes.

16   Q    Okay.  And they were bigger?  They're a big organization,

17   right?

18   A    I don't know.

19   Q    You don't know?  Okay.  Well, they were dealing -- were they

20   moving weight?

21   A    Yes.

22   Q    All right.  And you mentioned to that end that they had a

23   couple of fellows working for them, Deezo and Lassiter?

24   A    Yes.

25   Q    Were they muscle for the Wyche brothers?  Is that what they

1    were?

2    A    I don't know.

3    Q    All right.  Well, someone who's moving weight like the Wyche

4    brothers, do they need muscle?

5    A    I mean, they pretty they probably could have used some.

6    Q    They could use some?

7    A    Yeah.

8    Q    And they probably would use some, right?

9    A    Yes.

10   Q    Okay.  Let me back up to something.  You, you talked about

11   robberies and being in the game and knowing what the game's all

12   about.  And you mentioned, and I don't recall the particulars of

13   whose car it was, but that the car had sort of a stash, right?

14   A    Yes.

15   Q    A hidden compartment?

16   A    Yes.

17   Q    Is that a common phenomenon, that drug dealers who have

18   automobiles, that drive those automobiles with illicit substances

19   in the automobiles, will have a secret compartment?

20   A    Yes.

21   Q    That's common.  Why do you need that?

22   A    If you get pulled over from the police, it ain't in plain

23   view.

24   Q    Because you care not to have them find your drugs, right?

25   So if you're going to rob someone in a car, you're going to know,

1    if you're going to rob a drug dealer in a car you're going to

2    know that they likely have a stash, right?

3    A    Yes.

4    Q    So the point of the robbery, right, is to take what they

5    have to improve your situation in the world, right?

6    A    Yes.

7    Q    All right.  So what they have you want, right?

8    A    Yes.

9    Q    And you want all of what they have, right?

10   A    Yes.

11   Q    So you're going to look through the car and take it all,

12   right?

13   A    Yes.

14   Q    Okay.  Now, you also said that, in the same vein, that there

15   was a turf war that you were involved in?

16   A    Yes.

17   Q    All right.  And where was that?

18   A    Catonsville.

19   Q    All right.  And am I summarizing a turf war correctly by

20   saying that someone is coming into your territory or even that,

21   just that they have territory that you want?

22   A    It could be anything.  It could be, a turf war could be

23   somebody coming into your area selling drugs or somebody coming

24   in there, or somebody that's already in your area that's selling

25   drugs.

CROSS EXAMINATION OF BACON BY LAWLOR

1  Q    All right.  And so these would be people that you're
2  unfriendly with?
3  A    Yes.
4  Q    And you settle that border dispute with violence, right?
5  A    Yes.
6  Q    All right.  Because there's no other way to settle things,
7  is there?
8  A    Well, you could talk it out.
9  Q    All right.  If you can't talk it out, though, you're going
10 basically out with guns to enforce your will, right?
11 A    Yes.
12 Q    And you've done that, right?
13 A    Yes.
14 Q    I mean, you've done that not just, you reference going out
15 trying to find someone and you couldn't find them, gun in hand,
16 right?
17 A    Yes.
18 Q    What was your plan had you located these individuals?
19 A    Meaning?  You shoot them.
20 Q    You were going to shoot them.  Okay.  I assume shoot them to
21 kill them?
22 A    Yes.
23 Q    Okay.  And that's, I mean, that's a pretty powerful
24 statement, sir.  I mean, you're saying now that you are an
25 individual who would, in order to promote your own bottom line,

1    kill someone.  Is that what you're saying?

2    A    Yes.

3    Q    All right.  I mean, you have no qualms about that, right?

4    A    No.

5    Q    All right.  And you're not unique in that respect, are you?

6    A    No.

7    Q    All right.  As I said, it's all too common that one

8    individual who sells drugs might kill another individual for

9    something as silly as a couple blocks, right?

10   A    Yes.

11   Q    Because you want those blocks because you want to sell the

12   drugs on those blocks because you want to make more money?

13   A    Yes.

14   Q    And the other person's existence harms your effort, right?

15   A    Yes.

16   Q    Okay.  Now, you talked about some things that you heard and

17   some things that were told to you over the years on direct when

18   Mr. Harding asked you.  So what I want to know is, there's a lot

19   of chatter out there, right?

20   A    Yes.

21   Q    And notwithstanding the fact that you are personally, and

22   many of the people you associate with, very tough, and you carry

23   guns, you also gossip like women?  And I don't mean that to be

24   rude.  But is that fair?

25   A    Yes.

1   Q    There's a lot of chatter going on out there, right?  Who's

2   selling who, who did who dirty, and who's sleeping with whose

3   girlfriend, yada, yada, yada, right?

4   A    Yes.

5   Q    And it's not all true, is it?

6   A    No.

7   Q    All right.  Because someone would act upon information

8   that's true or false, right?

9   A    Yes.

10  Q    All right.  So things that you've heard over the years and

11  things that you've said in court today, a lot of that's based on

12  just things that you heard that were in the air, right?

13  A    No.

14  Q    Everything you said in here is stone cold fact, you have

15  first-hand knowledge about?

16  A    No.

17  Q    All right.  Well, which is it?

18  A    First hand, first-hand facts.

19  Q    Everything -- all right.  Let me ask you this, then.  You

20  said that Wayne and Goo said that there was a fight at

21  Hammerjacks, right?  Did they tell you that?

22  A    Yes.

23  Q    And you testified about that fact when Mr. Harding

24  questioned you about it, right?

25  A    Yes.

1   Q    All right.  So that is something you don't have first-hand

2   knowledge about.  You heard from other people that there was a

3   fight at Hammerjacks and that Bo did whatever someone told you he

4   did and that Bo got beaten up, is that correct?

5   A    Yes.

6   Q    All right.  Now, you heard this information from Mr. Martin

7   and Mr. Gardner, right?

8   A    Yes.

9   Q    Were they in Hammerjacks the night that this all purportedly

10  happened?

11  A    Yes.

12  Q    You're sure about that?

13  A    Yes.

14  Q    Okay.  You're sure about that because they told you that

15  they were there?

16  A    Yes.

17  Q    All right.  You know that this was in 2002, right?  That the

18  incident at Hammerjacks occurred in 2002.  Are you aware of that

19  fact?

20  A    Yes.

21  Q    All right.  And so I assume that your conversation with Mr.

22  Gardner and Mr. Martin occurred in 2002?

23  A    Yes.

24  Q    And so you're saying six years later, you know that they

25  said that they were there?

1    A    Yes.

2    Q    You're sure about that?

3    A    Yes.

4    Q    And you're sure that they were there?

5    A    Yes.

6    Q    Okay.  All right.  And they also told you that they heard,

7    right, they're telling you some things they heard on the street,

8    right?

9    A    Yes.

10    Q    That Lassiter and Deezo and another gentleman said that they

11    heard that Goo's voice and Wayne's voice was on the voice mail,

12    right?

13    A    Yes.

14    Q    They said that they heard that?

15    A    Yes.

16    Q    Because it was in the air, it was in the wind.  You don't

17    know that to be true or not true, right?

18    A    Right.

19    Q    You don't even know whether Lassiter knew that, right, using

20    him as an example?  You don't know that Mr. Lassiter knew that,

21    right?

22    A    Right.

23    Q    You were hearing what the rumor on the street was, right?

24    A    Right.

25    Q    And that's a common thing, right, that there's a rumor on

1    the street, right?

2    A    Yes.

3    Q    And B, when your friends come to see you, they share with

4    you what the rumor is on the street, right?

5    A    Yes.

6    Q    And it's, is it even mostly not true?  Is that fair to say?

7    That most of this information is either completely false or

8    completely unreliable?

9    A    Sometimes.

10   Q    Okay.  And you also heard that Bo got caught up in some

11   homicide, right?  Is that right?  Did you say that?

12   A    Yes.

13   Q    And you just -- but that's what you heard, that he was

14   caught up in it, right?

15   A    Yes.

16   Q    Okay.  And again, that's just what the rumor mill is

17   spitting out at that given time, right?

18   A    Correct.

19   Q    All right.  And so you testified before the grand jury and

20   you're testifying here today, and going back to my original

21   question, some of the things that you said here today are not

22   based on first-hand knowledge, right?  They're based on things

23   that you heard that were going through the rumor mill, right?

24   A    Yeah, some of them are.

25   Q    All right.  Some of them are.  All right.  And you're here

1    today pursuant to an agreement with the government, right?

2    A    Correct.

3    Q    All right.  Now, I don't care to go through each and every

4    criminal event that has occurred in your lie.  Again, I say this

5    not to embarrass you or criticize you, but we've established that

6    your entire life up to this point that you've been on the street

7    has been involving attempted murder, robbery, sale of drugs,

8    carrying of weapons, right?

9    A    Correct.

10   Q    And we're past the point of deciding or concerning ourselves

11   with what you got convicted for and what you didn't, right?

12   A    Correct.

13   Q    You served your time, you paid your debt, and here you are

14   today, right?

15   A    Correct.

16   Q    But at some point in time the situation was different,

17   right?  You had charges pending, right?

18   A    Yes.

19   Q    All right.  Because you have been convicted many times,

20   right?

21   A    Yes.

22   Q    And you were on probation, right?

23   A    Parole.

24   Q    All right.  In 2004, the last time that you got arrested,

25   you were on parole, right?

1  A    Yes.

2  Q    And so the jury understands what that means, that means if,

3  for example, you got a ten year sentence and they released you

4  after three, you owe them seven years, right?

5  A    Yes.

6  Q    All right.  And you owe them that time with the condition

7  that I will behave myself on the street or I will go back to

8  prison to serve out the remainder of that ten years, right?

9  A    Correct.

10  Q    All right.  And so notwithstanding the fact that in 2004

11  you're on parole, you were still involved in the game, right?

12  A    Correct.

13  Q    And you got arrested again, right?

14  A    Correct.

15  Q    All right.  And you were arrested in possession of a large

16  quantity of drugs?

17  A    Correct.

18  Q    And a weapon?

19  A    Correct.

20  Q    And you knew that you were looking at new charges, right?

21  A    Correct.

22  Q    And you were looking at federal charges, right?

23  A    Correct.

24  Q    And you understand, without getting into the specifics, that

25  a sentence in federal court is likely to be much worse than

1   anything you're going to see over in the city court, right?

2   A    Correct.

3   Q    And you wanted no part of that, right?

4   A    Correct.

5   Q    And that was what induced you to enter into this agreement

6   with the government, right?

7   A    I mean, I already had made the statement to the grand jury

8   before I caught the charge.

9   Q    All right.  Well, was your agreement with the government

10  made for no reason or for some reason?

11  A    For some reason.

12  Q    The reason being that you would get less time?

13  A    Correct.

14  Q    Okay.  And that was what interested you, interested you,

15  correct?

16  A    Correct.

17  Q    All right.  And as opposed to getting a lengthy term in this

18  court, you got a five year sentence in the state court, right?

19  A    Correct.

20  Q    And not only did you only get a five year sentence over in

21  state court, you also didn't get extra time for the violation of

22  your parole, did you?

23  A    Yes, I did.

24  Q    Did they run those two sentences concurrent?

25  A    No.

1    Q    They did not?

2    A    No.

3    Q    Wasn't that part of your agreement?

4    A    It was part of it but it didn't come through.

5    Q    Okay.  It didn't come through, so the judge rejected that

6    part of the agreement?

7    A    Yes.

8    Q    All right.  But you had an agreement with the government

9    that you would at least serve the sentence for the gun and the

10   drugs.  You wouldn't be prosecuted over here at all, right?

11   A    Correct.

12   Q    You would get five years for the gun.  Not only did they not

13   prosecute you here, they didn't prosecute you for the drugs at

14   all, correct?

15   A    Correct.

16   Q    You got a free ride on that and you just had to take five

17   years on the gun, right?

18   A    Right.

19   Q    And they at least offered an inducement that they would ask

20   for the violation of parole be run concurrent?

21   A    Correct.

22   Q    And that was an inducement for you to enter into this

23   agreement, right?

24   A    Correct.

25   Q    All right.  And since, on top of those things that you've

1    been given by the government, now that you've been released,

2    they've also given you money, right?

3    A    Correct.

4    Q    $3500, is that right?

5    A    Correct.

6    Q    Okay.  Now, is it part of your plea agreement, which was

7    entered May, March 23rd, 2005, right?

8    A    Correct.

9    Q    All right.  Part of the agreement was that you would do

10   certain things and they wouldn't prosecute you over here, right?

11   Was that part of the agreement?

12   A    Correct.

13   Q    All right.  And one of the things that you agreed to do was

14   to refrain from violating state law and federal law, right?

15   A    Correct.

16   Q    All right.  But you haven't done that, right?

17   A    Correct.

18   Q    All right.  You continue to smoke weed at a minimum, right?

19   A    I don't smoke weed no more.

20   Q    All right.  Well, while you were incarcerated, at least, you

21   were still --

22   A    I was still smoking.

23   Q    All right.  You were still smoking weed.  And has the

24   government notified you of the fact that, notwithstanding the

25   fact that you violated the terms of the agreement, that they

1   intend on prosecuting you?

2   A    Correct.

3   Q    My question is, have they notified you?

4   A    Correct.

5   Q    They have notified you that they intend to or they don't

6   intend to?

7   A    They notified me that I had violated the agreement.

8   Q    Are they going to prosecute you over here?

9   A    I don't know.

10   Q    I assume you hope not?

11   A    Correct.

12   Q    Okay.  I mean, you really hope not, right?

13   A    Correct.

14   Q    Now, one final thing.  Mr. Harding asked you about the money

15   that you were making on the street when you were selling drugs.

16   A    Correct.

17   Q    Right?  And you said, he asked you two separate questions.

18   How much money you made on a day selling coke and how much money

19   you made on a day selling heroin, right?

20   A    Correct.

21   Q    And he asked you if you pulled it up or if it was your own

22   money.  He asked you that, right?

23   A    Correct.

24   Q    And you said, that the answer you gave, which was like a

25   thousand dollars a day, was for your whole group, right?

1    A    Correct.

2    Q    All right.  And when he showed you your grand jury, though,

3    that revealed, your grand jury testimony is over four years ago,

4    right?

5    A    Correct.

6    Q    Closer in time to the events which you were testifying

7    about, right?

8    A    Correct.

9    Q    And at that time you said that you made a lot more than

10   three or $500 a day.  It was thousands of dollars a day, right?

11   A    Correct.

12   Q    3,000.  For heroin, it was like you could make 7000 a day on

13   a good day, right?

14   A    Correct.

15   Q    That's what you said then.  And you told Mr. Harding that

16   you exaggerated in the grand jury about how much money you made?

17   A    Correct.

18   Q    All right.  Why would you exaggerate -- I got to tell you,

19   this makes no sense to me whatsoever.  Why would you exaggerate

20   and say you made more money than you really did, that you were a

21   bigger dealer than you really were?

22   A    Because that's what drug dealers do.

23   Q    Exaggerate?

24   A    Yes.

25   Q    All right.  It's that or you would like to minimize your

1   activities now here today?

2   A    No.  That's what drug dealers do.  I mean, if you worth

3   20,000, they might think you worth 50,000 or so.

4   Q    All right.  Did you understand when you were testifying

5   before the grand jury that you were under oath?

6   A    Yes.

7   Q    In front of a federal grand jury?

8   A    Correct.

9   Q    You didn't think you were out on the corner with your

10  friends?

11  A    Correct.

12  Q    So you weren't really exaggerating, you were lying?  I mean,

13  it's the other side of the same coin, isn't it?

14  A    I mean, I exaggerated a little but I didn't lie.  I just

15  exaggerate on the figures.

16  Q    What's the difference?

17  A    I don't know.

18  Q    All right.  All right.  Well, we established, though, that

19  you would rob someone to help yourself, that you would kill

20  someone to help yourself.  You exaggerated in the grand jury.

21  When you went to your, when you got sentenced previously and when

22  you were on probation or parole, you told some authority figure

23  that you would stay out of trouble, right?

24  A    Correct.

25  Q    And you didn't do that?

1    A    Correct.

2    Q    And you didn't intend on doing that?

3    A    Correct.

4    Q    All right.  Because we saw that letter in 2002, while

5    incarcerated you had every intention of going out of jail, on to

6    the street, back selling and back robbing, right?

7    A    Correct.

8    Q    So the bottom line is, when the situation, when you're

9    confronted with a given situation, you will say whatever you have

10   to say at that time to better yourself, right?

11   A    No.

12   Q    No?

13   A    No.

14   Q    Just recently or through your whole life?

15   A    My whole life.

16   Q    All right.  I have no further questions.

17        MR. MARTIN:  No questions, Your Honor.

18        CROSS EXAMINATION

19   BY MR. PYNE:

20   Q    Good afternoon, Mr. Bacon?

21   A    Hello.

22   Q    All right.  My name's Jim Pyne.  I represent Mr. Martin.

23   Just a few questions for you, if I could.

24        Mr. Harding went through your plea agreement this

25   morning in great detail and emphasized that you're required under

1    your plea agreement to tell the truth, is that correct?

2    A    Correct.

3    Q    Now, who makes the determination of whether or not you're

4    telling the truth here today?

5    A    The jurors.

6    Q    Oh, so you only get the benefit of your plea bargain if they

7    come back guilty?

8    A    No.

9    Q    Well, how is the jury going to then determine what the truth

10   is in terms of the enforcement of your plea agreement?

11   A    I don't know.

12   Q    Isn't it true that, in fact, Mr. Harding and Mr. Hanlon will

13   be the ones who decide whether or not to, that you told the truth

14   here today?  Because isn't it, in fact, that according to your

15   plea agreement, they have to agree that you told the truth here

16   in court before you get the benefit of your plea agreement?

17   A    I don't know.

18   Q    Well, let me put it this way.  If they decide you weren't

19   truthful, then you violated your plea agreement?

20   A    Correct.

21   Q    And in fact, they could bring federal charges against you?

22   A    Correct.

23   Q    And in fact, if they brought federal charges against you,

24   not only could you be charged with the drugs that you weren't

25   charged with and the gun that you hadn't been charged with yet

1    federally, but everything you've told them up to now can be used

2    against you?

3    A    Correct.

4    Q    And this decision is totally in the hands of the government,

5    isn't that correct?

6    A    I don't know.

7    Q    Well, didn't, when Mr. Lawlor was asking you questions,

8    didn't the government already decide to notify you that you

9    violated your plea agreement?

10   A    Correct.

11   Q    And you're waiting to find out whether or not they're going

12   to prosecute you?

13   A    Correct.

14   Q    So it's very important for you to impress upon them that

15   you're being truthful?

16   A    Correct.

17   Q    And in that sense, you want to testify in a way that Mr.

18   Hanlon and Mr. Harding are happy with, is that accurate?

19   A    I'm just going to testify to my best of knowledge.

20   Q    Okay.  Now, also, in terms of the pending case you have,

21   you're hoping that your testimony here today will provide you a

22   benefit in that case as well.  Isn't that true?

23   A    No.

24   Q    You're not expecting anything at all in that case?

25   A    No.

1    Q    Now, I believe you testified earlier that you knew the Wyche

2    brothers, is that correct?

3    A    Correct.

4    Q    And you, in fact, were very good friends with Anthony Wyche,

5    isn't that true?

6    A    Correct.

7    Q    And it was your earlier testimony that you did not get any

8    drugs from Mr. Martin, is that correct?

9    A    Correct.

10   Q    You never were supplied by Mr. Martin?

11   A    Correct.

12   Q    And in spite of Mr. Lawlor's earlier testimony, I believe it

13   was your testimony, in fact, that Mr. Martin did not make crack,

14   isn't that correct?

15   A    Correct.

16   Q    You never knew Mr. Martin to cook crack?

17   A    No, sir.

18   Q    And even though you were getting drugs from Tim, who was a

19   friend of Polo's, you did not know if Mr. Martin ever got drugs

20   from Tim, isn't that correct?

21   A    Correct.

22   Q    And in terms of this Dominican, Poppi, in New York, I

23   believe it was your testimony that Mr. Martin went with you once

24   or twice, is that correct?

25   A    Correct.

1    Q    And during those trips, you got 25 to 50 grams of heroin and

2    you split the amounts of heroin, is that correct?

3    A    Correct.

4    Q    And another source of drugs for you was an individual you

5    identified as Card.  And in fact, you have no knowledge if Mr.

6    Martin ever got drugs from Mr. Card, is that correct?

7    A    Correct.

8    Q    And another source of yours was an individual who you knew

9    as Goose.  And it was your earlier testimony that Mr. Martin was

10   not getting any drugs from Goose?

11   A    Correct.

12   Q    And at a certain point in time you began selling weight but

13   it's your testimony that you don't know if Mr. Martin ever came

14   to the point where he was selling weight?

15   A    Correct.

16   Q    And again, referring to Mr. Lawlor's earlier testimony, he

17   left the impression that everyone was carrying guns.  In fact,

18   wasn't it your testimony that Mr. Martin did not carry a gun?

19   A    Correct.

20   Q    And wasn't it your testimony that Mr. Martin did not own a

21   gun, to your knowledge?

22   A    Correct.

23   Q    And so, in fact, not everyone was carrying guns, isn't that

24   true?

25   A    Correct.

1    Q    Now, when you were testifying about jumping out on this

2    individual who you described as J-Rock, several times you

3    testified that you were driving through a known drug area.

4    A    Correct.

5    Q    Where did you get that phrase, "known drug area", from?

6    A    It's like, I got that phrase from wherever drug corner is

7    like a known drug area.  There's drugs on that corner.  That's

8    like a drug area, known drug area.

9    Q    Did you get that phrase from reading police reports?

10   A    No.

11   Q    Did, in fact, you review police reports from your prior

12   arrest before you testified?

13   A    No.

14   Q    You never did?  Did you prepare for your testimony here

15   today with the U.S. attorneys?

16   A    No.

17   Q    They never prepared you for your testimony here today?

18   A    They asked me about my grand jury testimony.  That's about,

19   that was it.

20   Q    When did they do that?

21   A    A couple weeks ago.

22   Q    Okay.  How many times have you met with the U.S. attorneys

23   before today?

24   A    About three or four times.

25   Q    Okay.  And was your attorney present during those meetings?

1    A    Yes.  The first couple ones.

2    Q    And how long did those meetings last?

3    A    About an hour.

4    Q    And at no point did you review any police reports?

5    A    No.

6    Q    So that's your own nomenclature?  You drove through a known

7    drug area?

8    A    Yes.

9    Q    Okay.  Now, you've testified that you only jumped out on one

10   person when Mr. Martin was with you, is that correct?

11   A    Correct.

12   Q    And in fact, when that occurred, Mr. Martin didn't even get

13   out of the car?  He, in fact, remained in the car?

14   A    Correct.

15   Q    Now, you also told of several visits that Mr. Martin made to

16   see you while you were incarcerated.  And he spoke to you about

17   things that were occurring back in Baltimore?

18   A    Yes.

19   Q    Okay.  And he told you that, I believe it was your

20   testimony, that some home boys, some of Darryl's home boys were

21   trying to implicate him in a homicide?

22   A    Yes.

23   Q    Obviously, from your letter to Mr. Martin, you had no

24   problem sharing criminal type information back and forth, is that

25   correct?

1  A    Correct.

2  Q    Now, did Mr. Martin indicate to you that he was involved in

3  that homicide in any way?

4  A    No.

5  Q    Now, you also spoke to Mr. Martin on the phone several

6  times?

7  A    Correct.

8  Q    Probably numerous times over the time that you've known him.

9  Did you have any problem recognizing his voice?

10  A    No.

11  Q    Did there come a time when you had an opportunity to listen

12  to this voice mail that was involved in the Wyche murders?

13  A    Yes.

14  Q    Do you know if Mr. Martin's voice is on that tape?

15  A    No.

16  Q    No, you don't know or, no, his voice is not on that tape?

17  A    No, his voice is not on that tape from what I heard.

18  Q    Okay.  Some of your earlier testimony, I believe it was in

19  regards to the letter that you wrote to Mr. Martin, you said you

20  included a line from a song?

21  A    Yeah.

22  Q    Would that have been a rap song?

23  A    Yes.

24  Q    Are you familiar with rap music in general?

25  A    Yes.

CROSS EXAMINATION OF BACON BY COBURN                    146

1   Q    Are you familiar with the artist Jay-Z?

2   A    Yes.

3   Q    Have you ever heard the phrase in a rap song "shit main?"

4   A    Yes.

5   Q    Has Jay-Z used that term, "shit main", in songs before?

6   A    Yes.

7   Q    Have you ever heard it in other rap songs?

8   A    Yes.

9   Q    Were you ever arrested with Mr. Martin?

10  A    No.

11       MR. PYNE:  I don't think I have anything further.

12  Thank you.  Thank you, Mr. Bacon.

13       THE WITNESS:  Thank you.

14       CROSS EXAMINATION

15  BY MR. COBURN:

16  Q    Good afternoon, Mr. Bacon.

17  A    Good afternoon.

18  Q    You responded to one of Mr. Pyne, that's the gentleman who

19  was right before me, the tall gentleman, you responded to one of

20  his questions, did you not, by saying that you had met with the

21  prosecutors on a number of occasions before your testimony?

22  Right?

23  A    Correct.

24  Q    And -- excuse me, Your Honor, I'm sorry -- the purpose of

25  those meetings was in order to, I'm not suggesting there's

1    anything inappropriate about it, was to get you ready for your

2    testimony here today, right, sir?

3    A    And to go over my grand jury testimony with them.

4    Q    To go over your grand jury testimony and get you prepared to

5    testify before the ladies and gentlemen of the jury today, right,

6    sir?

7    A    Correct.

8    Q    And it's, again, not suggesting there's anything against the

9    rules about it, but you also had a conversation with the

10   prosecutor in the midst of your direct testimony, right, when we

11   were on a break, is that correct?

12   A    Correct.

13   Q    Today, this morning?

14   A    This morning, correct.

15   Q    Okay.  Now, you mentioned an individual during the course of

16   your testimony, Mr. Bacon, by the name of Aaron Holly, right?

17   A    Correct.

18   Q    Is Aaron Holly older or younger than you?

19   A    Younger.

20   Q    And you're younger than Mr. Gardner, right, sir?

21   A    Correct.

22   Q    How tall is Aaron Holly?

23   A    About six, probably about six-three.

24   Q    He's taller than you, right?

25   A    Right.

1    Q     And he's also, he's significantly taller than Mr. Gardner,

2    right, sir?

3    A     Right.

4    Q     You told Mr. Harding during the course of your, when he was

5    asking you questions, that's your direct testimony, you told him,

6    did you not, that among the various prior criminal offenses that

7    you've been convicted of, that one of them was a false statement

8    that you made to a police officer, right, sir?

9    A     Correct.

10   Q     And you told him that the reason you made the false

11   statement was because you knew there was a warrant that was out

12   for you at the time and you didn't want to be charged with a

13   violation of your probation, right, sir?

14   A     Correct.

15   Q     So because you thought that using a false name would help

16   you on that occasion, that's why you told the police officer that

17   you were somebody that you were not, right?

18   A     Correct.

19   Q     Now, in the year 2000, I believe you told us that you were

20   locked up, you were picked up for a criminal offense, a drug

21   offense, and you were locked up for approximately three years,

22   right?

23   A     Correct.

24   Q     If I understand correctly, when you got arrested in 2000,

25   this was in Park Heights, Maryland, right?

1    A    Correct.

2    Q    Park Heights is to the north, right?

3    A    Northwest.

4    Q    When you got caught in Park Heights on that occasion, was

5    that in April of 2000?

6    A    Yes.

7    Q    That was what you referred to as a jump-out, right?

8    A    Yes.

9    Q    Could you tell the ladies and gentlemen of the jury to your

10   right there just what a jump-out is?

11   A    A jump-out, it's certain days in the city that Baltimore

12   City Police jump out and just pretty much want to know whether

13   you got ID or check to see if you got any warrants.  On Tuesdays

14   and Thursdays they jumped out, they jumped out on me and Avon and

15   searched us and they didn't find anything.  But they went to the

16   car that I was in and pretty much they just like jump out, they

17   check for ID, check for paraphernalia, any drugs, anything like

18   that.

19   Q    Now, when you were just describing that incident to the

20   ladies and gentlemen of the jury, you said that they jumped out

21   on you and Avon, right?

22   A    Yes.

23   Q    But there was a third person there, too, right?

24   A    Yes.

25   Q    And who was that?

1    A    Eric Stokes.

2    Q    Now, Eric Stoltz is not in this courtroom, is he?

3    A    No.

4    Q    And he's not charged in this case so far as you know, right?

5    A    Correct.

6    Q    Now, Avon, who you've identified as a relative of Mr.

7    Gardner's, Avon was not charged in April of 2000, is that right?

8    A    Correct.

9    Q    But you and Mr. Stoltz were, right?

10   A    Correct.

11   Q    So you and Mr. Stoltz were out there selling drugs at the

12   street level in April of 2000, right?

13   A    Correct.

14   Q    And you did three years on that one, from April of 2000

15   until June of 2003, right?

16   A    Correct.

17   Q    Just to kind of continue in chronological order then.  You

18   got released from jail, or from prison -- actually, let's be

19   specific about that.

20         When you did that time, did you do it at Jessup, from

21   2000 to 2003, after the jump-out arrest in Park Heights?  Where

22   were you locked up during that time period?

23   A    Hagerstown and, Hagerstown, Maryland, and Jessup, Maryland,

24   and Baltimore, Maryland.

25   Q    Now, when you say Jessup, Maryland, we're talking about a

1    large facility that's a little bit to the south of here.  It's

2    right in Jessup, Maryland, right?

3    A    Correct.

4    Q    And that's not, you understand the difference between a jail

5    and a prison?

6    A    Correct.

7    Q    Jessup is a prison, right?

8    A    Correct.

9    Q    That's where people are actually serving time after they get

10   convicted of a crime?

11   A    Correct.

12   Q    And that's why you were there?

13   A    Yes.

14   Q    Okay.  And you were in Jessup, again -- we'll get to this in

15   a second -- you were in Jessup again later on, after 2003, right?

16   A    Yes.

17   Q    Okay.  So you're released in June of 2003.  And then pretty

18   shortly after that, if I understand correctly, Mr. Bacon, you

19   testified in the grand jury, is that right?

20   A    Correct.

21   Q    Now, this is a federal grand jury.  And it's relating to

22   this case that we're here talking about here today, right?

23   A    Correct.

24   Q    Your testimony, and you may remember the date because Mr.

25   Harding on a couple of points showed you the transcript, was on

1    May the 12th, 2004, right?

2    A    Correct.

3    Q    Now, do you remember during your direct testimony, when Mr.

4    Harding was asking you questions, he made the point that your

5    plea agreement in this case came after your testimony in the

6    grand jury, right?

7    A    Correct.

8    Q    He pointed out that your plea agreement was on March 23rd,

9    2005.  Is that correct?

10   A    Correct.

11   Q    But before you got made all those promises and, you know,

12   you entered into the contract with the prosecutors, that's in

13   your plea agreement, you testified in the grand jury before that,

14   right?

15   A    Correct.

16   Q    And Mr. Harding indicated, during one of his questions on

17   direct examination, did he not, that at that time that was, you

18   just came in, I think his words were you just came in and

19   testified, right?

20   A    I got summonsed.

21   Q    Pardon?

22   A    I had got summonsed into the grand jury.

23   Q    But he was suggesting to you that you came in and testified

24   with no promises, right?  No concessions, no promises?  You just

25   came in and testified before the grand jury when you got your

1    summons, is that right?

2    A    Correct.

3    Q    Is that true?

4    A    Correct.

5    Q    Okay.  Well, I have an item, Your Honor, which I've marked,

6    with the Court's permission, as Defendant Gardner's Exhibit

7    Number One.  I'll show it to Mr. Harding before I put it on the

8    DOAR?  May I go ahead and put it on the device, Your Honor?

9         THE COURT:  Certainly.

10   Q    This document, which I've marked as Defendant Gardner's

11   Exhibit Number One, it doesn't actually have the date at the top

12   so we're just going to flip over and take a look at the date

13   that's on the second page.  You see it's on U.S. Department of

14   Justice stationery?

15   A    Yes.

16   Q    And it says United States Attorney, District of Maryland,

17   Northern Division?

18   A    Correct.

19   Q    Okay.  If we look at the second page, we can see the date.

20   Do you see the date down there in the lower left-hand corner?

21   A    Correct.

22   Q    And that date is May 12th, 2004, right?

23   A    Correct.

24   Q    So that's the date of your, it's the date you actually

25   testified in the grand jury, right, sir?

1    A    Correct.

2    Q    You familiar with the term "proffer letter?"  You ever hear

3    that one before?

4    A    Sort of.

5    Q    Okay.  Well, the terminology's really not important.  I'm

6    sorry to keep flipping this back and forth.  I mean, on the

7    second page of this document, that's your signature, right?

8    A    Correct.

9    Q    Right above your name, Darryl Bacon, on the lower left-hand

10   corner?

11   A    Correct.

12   Q    And it's also signed by a prosecutor by the name of

13   Christine Manuelian, who was involved in this matter before,

14   right?

15   A    Correct.

16   Q    And it's also signed by one of the detectives who's been

17   involved in this investigation, John Giganti, right?

18   A    Correct.

19   Q    Okay.  Now, this letter says, does it not, and I'm

20   referring, in the first paragraph, talks about you've been

21   subpoenaed to appear before a federal grand jury, right?

22   A    Correct.

23   Q    And then a couple of sentences down, I'll just put my finger

24   in there, it says, by way of this letter, this office agrees that

25   any of the information or statements provided or made by you with

1    regards to this matter will not be used against you in any

2    criminal case.  Right?

3    A    Correct.

4    Q    So that promise was, in fact, made to you before you

5    testified in the grand jury, right, sir?

6    A    Correct.

7    Q    Now, did you understand that to be a form of immunity that

8    you were receiving?

9    A    No.

10   Q    Okay.  Well, do you still have a copy of your grand jury

11   testimony up there with you?

12   A    No, I don't.

13   Q    Your Honor, could I come around and just get a second copy

14   from Mr. Kurland and then give it to the witness?

15        THE COURT:  Certainly.  Certainly.

16   Q    May I approach the witness, Your Honor?

17        THE COURT:  Yes.

18   Q    Let me direct your attention, sir, to Page 4 of the

19   transcript of your testimony.  This is right at the beginning,

20   before you actually get into the substance of what you were

21   talking about, when you were before the grand jury, right?

22   A    Okay.

23   Q    Directing you to Line 7 on Page 4.  Is it correct that the

24   prosecutor told you, right at the beginning of your testimony,

25   okay, did I, when we met earlier, did I give you something called

1    a proffer letter addressed to you and signed by me and Ms.

2    Manuelian, or actually it's just signed by Ms. Manuelian, it's

3    not signed by me?  Did I give you that letter?  And you said,

4    yes, sir?

5    A    Yes, sir.

6    Q    And then did the prosecutor say, and isn't your

7    understanding that you will not be prosecuted on the basis of

8    anything you say here today so long as it's truthful?

9    A    Correct.

10   Q    And you said yes, right?

11   A    Correct.

12   Q    And then the prosecutor said, did he not, okay, Mr. Bacon,

13   do you understand that you have a right under the Fifth Amendment

14   not to answer questions that might incriminate you?  However,

15   this immunity letter assures you that you're not going to be

16   prosecuted for anything you say here today.  Right?

17   A    Correct.

18   Q    And in response to that you said yes, right?

19   A    Correct.

20   Q    So that agreement existed when you testified before the

21   grand jury, right, sir?

22   A    Correct.

23   Q    Now, on the occasion when you entered the disposition, the

24   guilty plea, to the state offense that's -- this gets a little

25   complicated.  Sorry, Your Honor.  Let me pull this off the DOAR.

1    Your Honor, I've marked an item as Defendant's Exhibit Number

2    Two.  This is the plea agreement letter.  And the only reason I

3    marked it separately is because the government's version redacts

4    the statement of facts and I wanted to use it without, without

5    the statement redacted.

6              THE COURT:  Very well.

7    Q    Thank you, Your Honor.  What you're looking at now, sir,

8    Defendant Gardner's Exhibit Number Two.  This is your, this is

9    your plea agreement with the federal government, with the

10   prosecutors here today, right, sir?

11   A    Correct.

12   Q    Okay.  Now, you understood that, and here we're talking

13   about a separate incident, not the one that you got locked up for

14   in 2000.  We're talking about something you got locked up for

15   subsequently, afterwards, right?

16   A    Yes.  In '04.

17   Q    In '04.  Now, is it, that was a drug and a gun offense,

18   right?

19   A    Correct.

20   Q    And the nature of the offense, what you did for which you

21   got prosecuted, is actually described in this, in this letter?

22   A    Correct.

23   Q    In this agreement with the government, right?

24   A    Correct.

25   Q    And it's described in this part of the letter agreement that

1   has the title Stipulation on it, right?

2   A    Correct.

3   Q    On Page Two?  It talks about how you got locked up for

4   having a hundred vials of crack as well as a Llama .45 caliber

5   semiautomatic handgun, right?

6   A    Correct.

7   Q    On this occasion, it was just you who got locked up.  You

8   didn't have any codefendants, right?

9   A    Correct.

10  Q    What happened, if I understand correctly, is that you

11  entered into an agreement with the federal government that you

12  would not be prosecuted federally at all for that conduct, even

13  though you could have been, right?  You could have been

14  prosecuted, you could have gotten federal charge because of that,

15  is that right?

16  A    I didn't get federal charges.

17  Q    Yeah.  But my question is, you could have gotten federal

18  charges, is that right?

19       MR. HARDING:  Sorry.  Are we talking about in the plea

20  agreement or the proffer letter?

21  Q    Well, we're onto the plea agreement and we're talking about

22  the incident that occurred on August 17th, 2004, after the

23  proffer letter and after the -- at least I think that's right.

24  Right?  The testimony in the grand jury is May 12th, 2004.  And

25  when you got locked up in Baltimore City for the offense that's

CROSS EXAMINATION OF BACON BY COBURN                     159

1    covered in your plea agreement with the government, that's

2    several months later, August 17th, 2004, right?

3    A    Correct.

4    Q    Okay.  And I believe you told Mr. Lawlor already, I may be

5    wrong, but you understood you could have been prosecuted, you

6    could have gotten federal charges because of that conduct, right?

7    A    Correct.

8    Q    But you didn't?

9    A    Correct.

10   Q    It was part of the agreement with the government that you

11   wouldn't, right?

12   A    Correct.

13   Q    Okay.  And you also got, you weren't prosecuted by the state

14   for the drugs.  They just let, I think you told Mr. Lawlor they

15   just let that go.  And you were prosecuted just for the gun,

16   right?

17   A    Yeah.

18   Q    Okay.  Just taking a look at the plea agreement that you

19   have with the government itself.  Turning to Page Three.  The

20   agreement in, I think, three separate places says that it's a

21   condition of your agreement with the government, with the federal

22   government, that you will not commit any other state or local

23   offense, right?

24   A    Correct.

25   Q    I mean, right at the top here it says, in the event that

1    your client fails to accept personal responsibility and then

2    commits any offense in violation of federal, state or local law,

3    then the office will be relieved of its obligations to you.

4    Right?

5    A     Correct.

6    Q     Moving on down the page, Paragraph Six.  If your client

7    fails to fulfill completely each and every one of his

8    obligations, the office will be released from its commitment to

9    honor its obligations.  Right?

10   A     Correct.

11   Q     Thus, for example, if he should commit any crime, right?

12   A     Correct.

13   Q     Then the U.S. Attorney's Office, the federal prosecutors in

14   this case, are relieved from their obligations under the

15   agreement and they can prosecute you federally for the conduct

16   that you committed on August 17th, 2004, right?

17   A     Correct.

18   Q     Now, the charge that you picked up afterwards, do you

19   remember you told us about a marijuana charge that you picked up

20   while you were locked up in Jessup, correct?

21   A     Correct.

22   Q     That happened sometime after you signed this plea agreement

23   with the government, right?

24   A     Right.

25   Q     Now, the date of the plea agreement is March 23rd, 2005.

1    When did you pick up that charge for the possession of marijuana

2    in the state prison in Jessup?

3    A    November.  I mean September, '07.

4    Q    I'm sorry?

5    A    September, '07.

6    Q    September, '07.  So that, that is about a year ago, right?

7    A    Correct.

8    Q    So during the course of the last year, has the federal

9    government, in fact, charged you with any federal offense

10   relating to the conduct you committed on August 17th, 2004?  Have

11   you been indicted?

12   A    No.

13   Q    Finally, you indicated that when you were talking about the

14   amounts of money that were made on the street, that you

15   exaggerated a little bit.  Is that correct?

16   A    Yes.

17   Q    What you actually testified to, and I'm referring to your

18   grand jury testimony.  You can feel free to look at it if you

19   like, on Page 29.  Starts from Line Eight on down, just for a few

20   lines.  It says, question is:  Okay.  How much money were you

21   making?

22            THE COURT:  Just one moment, Mr. Coburn.

23   Q    I'm sorry, Your Honor.  Thank you.

24   A    Okay.

25   Q    It says:  Okay.  How much money were you making back when

1    you were on Winters Lane in Catonsville selling cocaine?  How

2    much did you make there on a good night?  And you answered:

3    Anywhere from like 1,500, 1,200, to 2000, right?  Correct?

4    A    Correct.

5    Q    And then you were asked by the prosecutor:  And what about

6    from your sales in East Baltimore of cocaine and heroin, too?

7    And you answered:  That was a little bit more money.  Heroin was

8    like 3,500 on a slow day and 7,000 on a good day, right?

9    A    Correct.

10   Q    Now, those amounts of money are substantially greater than

11   the ones you told Mr. Harding about today, correct?

12   A    Correct.

13   Q    Now, you understood, did you not, sir, that when you

14   testified in the grand jury you swore the same oath to tell the

15   truth, the whole truth, and nothing but the truth that you swore

16   in this courtroom today, correct, sir?

17   A    Correct.

18   Q    Thank you, Your Honor.  Nothing further.

19              MR. HARDING:  May I have one moment, Your Honor?

20              THE COURT:  Yes.

21              REDIRECT EXAMINATION

22   BY MR. HARDING:

23   Q    Let me ask you first about the proffer letter that you got

24   when you got subpoenaed to the grand jury, Mr. Bacon.  Do you

25   remember you had an attorney on that occasion?

1   A    Correct.

2   Q    Lawrence Rosenberg?

3   A    Correct.

4   Q    And you knew, and I'm sure he explained to you, that you

5   have a Fifth Amendment right, correct?

6   A    Correct.

7   Q    You don't have to say anything that might incriminate you,

8   is that correct?

9   A    Correct.

10  Q    And what the proffer letter was designed to do was to assure

11  you that the government would not take your words and turn around

12  and prosecute you based on your words.  Was that your

13  understanding?

14  A    Correct.

15  Q    And do you understand the difference between that so-called

16  use immunity and a different kind of immunity that assures you

17  you won't be prosecuted at all?

18  A    Correct.  Yes.

19  Q    Was it your understanding that the government was promising

20  simply not to take your testimony in the grand jury and use it to

21  prosecute you, but that the government could still prosecute you

22  using other kinds of evidence?  Was that your understanding from

23  talking to Mr. Rosenberg?

24  A    Yes.

25  Q    And let me just call your attention to this language.  I'm

1    sure that Mr. Rosenberg went over it with you or that you had it

2    explained to you.  Let me call your attention to Paragraph Number

3    2.  It says your complete truthfulness and candor are express

4    material conditions to the undertakings of the government set

5    forth in this letter; therefore, in the event that you offer

6    testimony materially different from any statements made or other

7    information provided by you, the attorney for the government or

8    other opposing party may cross examine you concerning statements

9    made or other information provided by you regarding this matter.

10           Did you understand that you got the benefit of this use

11    immunity only if you were completely truthful?

12    A    Correct.

13    Q    And were you completely truthful and candid in the grand

14    jury, Mr. Bacon?

15    A    Yes.

16    Q    And am I correct that you have no charge pending against you

17    at all when you came in for the grand jury?

18    A    Correct.

19    Q    So the only thing you got was this guarantee that the

20    government supplied your attorney that you wouldn't be prosecuted

21    based on what you said in the grand jury, is that correct?

22    A    Yes, sir.

23    Q    Mr. Lawlor was asking you about when you were visiting Bo in

24    New York.  Do you recall that?

25    A    Yes.

1   Q    And he was up there in college on a couple of separate

2   occasions in 1997 and '98 or thereabouts, is that correct?

3   A    Yes.

4   Q    And that was during a time period that you were also going

5   up to New York on your trips with Wayne and Goo to purchase drugs

6   from Poppi, is that correct?

7   A    Correct.

8   Q    And you told us, also, that in 1998 and '99, Mitchell, Mr.

9   Mitchell, or Bo, got back into drug trafficking up in

10  Pennsylvania, is that correct?  Is that when he opened his shop

11  in Pennsylvania?

12  A    Correct.

13  Q    He was getting his cocaine from Darryl Wyche at that time,

14  is that correct?

15  A    Correct.

16  Q    And Mr. Lawlor also made the point that you guys would get

17  locked up periodically and you'd lose, you would be separated by,

18  literally by bars, is that correct?

19  A    Correct.

20  Q    But you stayed in touch when you were locked up, didn't you?

21  A    Correct.

22  Q    We've seen many examples already during your testimony here

23  today of visits that you made to one another, is that correct?

24  A    Correct.

25  Q    Did you give money to one another while you were locked up?

166

1    A    Yes.

2    Q    Did you help pay for lawyers and pay for bails and thing

3    like that?

4    A    Yes.

5    Q    Did you write letters like the one we saw in evidence

6    earlier today, in which you talked about future plans when you

7    got out of jail?

8    A    Yes.

9    Q    Even planning future crimes, is that correct?

10   A    Correct.

11   Q    So in fact, even though you were locked up from time to

12   time, it didn't in any way impede you from keeping in contact

13   with these guys in your inner circle, is that correct?

14   A    Correct.

15   Q    In fact, "inner circle" is a phrase that came up when Mr.

16   Lawlor was talking to you.  He said that robbery was common

17   amongst drug dealers because there's no faith outside your

18   circle, is that correct?

19   A    Correct.

20   Q    And is it fair to say that Mr. Gardner and Mr. Mitchell and

21   Mr. Martin were inside your circle?

22   A    Correct.

23   Q    You trusted them, didn't you?

24   A    Correct.

25   Q    So that even if you were locked up, you would still support

1    one another, still do what was necessary to help one another?

2    And if one or more of you was out on the street, you would make

3    phone calls to them and stay in touch with them, is that correct?

4    A    Correct.

5    Q    And it's very important to have that kind of support system

6    when you're locked up, isn't it?

7    A    Correct.

8    Q    Mr. Lawlor questioned you about Bo's activity as a drug

9    dealer.  And he tried to get you to say that Bo was a failure or,

10   actually, he said that you said that in the grand jury, and you

11   denied it, is that correct?

12   A    Correct.

13   Q    And then he said, well, did you say that he was not

14   successful?  And you denied that, too, is that correct?

15   A    Correct.

16   Q    And then he said he'd get back to you about that and he

17   didn't, in fact, get back to you about that, did he?

18   A    No.

19   Q    Okay.  Let me show you your grand jury.

20        THE COURT:  I think he's got a copy.

21   Q    Okay.  Do you have the concordance at the end where it lists

22   the words that appear in the course of the grand jury testimony?

23   I want you to look up the word "successful" or "successfully."

24   Do you see that the word "successful" does not appear at all and

25   the word "successfully" appears only one time?

1   A    Correct.

2   Q    And that word appears on Page 29, Line 6.  And that word was

3   actually used in connection with whether the contract that was

4   put out on Bo after the Hammerjacks stabbings was successful or

5   not.  I asked you, at least nobody did successfully, did they?

6   And you answered no, is that correct?

7   A    Correct.

8   Q    So is it fair to say that you never used the words

9   "successful" or "successfully" in connection with Bo's drug

10  dealing activities?

11  A    Correct.

12  Q    Mr. Lawlor also was making a point to you about whether your

13  testimony was first-hand, factual information.  And you said that

14  it was.  And then he brought up the example of what Mr. Martin

15  and Mr. Gardner told you about those Hammerjacks stabbings, is

16  that correct?

17  A    Correct.

18  Q    They told you that Bo stabbed some people and a contract was

19  put out on Bo as a result of those stabbings, is that correct?

20  A    Correct.

21  Q    Okay.  And what you reported to the grand jury and here in

22  court today was what you were told by Mr. Gardner and Mr. Martin,

23  is that correct?

24  A    Correct.

25  Q    And that's first-hand in the sense that what you're

1    reporting is what they told you, is that correct?

2    A    Correct.

3    Q    And it's important what they thought, isn't it?

4    A    Yes.

5    Q    For example, even if there never was a contract put out on

6    Bo, it was still very important that Mr. Gardner and Mr. Martin

7    thought there was a contract put out on him?

8              MR. LAWLOR:  Objection, Your Honor.

9              THE COURT:  Rephrase the question.

10   Q    Is it fair to say that it's important all by itself that Mr.

11   Gardner and Mr. Martin thought there was a contract out on Bo?

12             MR. LAWLOR:  Objection, Your Honor.

13             THE COURT:  Overruled.  You may answer.

14   A    Correct.

15   Q    And they wanted you to know about that, isn't that correct?

16   A    Correct.

17   Q    Mr. Pyne asked you a number of questions about your plea

18   agreement.  And he said that, isn't it true that it's the

19   prosecutors who totally decide whether you're being truthful here

20   today?  Do you recall that line --

21   A    Yes.

22   Q    -- of questioning?  And you said you didn't know.  Is that

23   correct?

24   A    Yes.

25   Q    Let's go back over your plea agreement.  I'll call your

1    attention to Paragraph Seven.  Doesn't it say that whether or not

2    your client has violated the terms of this agreement shall be

3    determined by the Circuit Court of Baltimore City in an

4    appropriate proceeding at which his disclosures, you, your

5    disclosures, and documents shall be admissible and at which this

6    office shall be required to establish his breach by a

7    preponderance of the evidence.  Do you see that?

8    A    Yes.

9    Q    So is it your understanding that if the government thought

10   you were being untruthful, you would have the right to have the

11   whole matter decided in the Circuit Court of Baltimore City and

12   that the burden would be on the government by a preponderance of

13   the evidence to persuade the judge that you had violated your

14   plea agreement?  Isn't that your understanding, Mr. Bacon?

15   A    Correct.

16   Q    Just returning to this passage one more time about the

17   amount of money you were making when you were in Catonsville.

18   Mr. Coburn referred to that again.  And he actually read the

19   passage aloud.  The question was actually:  How much did you make

20   on a good night?  And the figures you gave were responsive to

21   that question, is that correct?

22   A    Correct.

23   Q    Did you have bad nights when you were in Catonsville?

24   A    Correct.

25   Q    How much would you make on bad nights?

1    A    A couple hundred.

2    Q    When you wrote this letter that's been admitted into

3    evidence, Government Exhibit W5-I, you talked with, you talked to

4    Wayne about going out and ski masking it up.  That meant

5    basically committing robberies, including home invasion

6    robberies, is that correct?

7    A    Correct.

8    Q    And you knew that Wayne might be interested in doing that,

9    is that correct?

10   A    I wasn't for sure but if it was, I mean, I asked him, I

11   don't know if he was going to do it.  But if he was, if he was,

12   that was up to him.

13   Q    Okay.  Mr. Coburn asked you about a conversation that you

14   and I had during the time you were on direct examination this

15   morning.  Do you recall that?

16   A    Correct.

17   Q    And do you remember that you brought up two things with me

18   when we were talking outside the courtroom?  Do you remember the

19   Stop Snitching video?

20   A    Yes.

21   Q    And do you remember, also, your talking to me about how

22   difficult it was for you to testify in this courtroom with the

23   defendants here?

24   A    Yes.

25   Q    It's not easy, is it?

REDIRECT EXAMINATION OF BACON                                    172

1    A    No.

2    Q    It's not easy for a couple of reasons, isn't it?  I mean,

3    for one thing --

4              THE COURT:  Don't lead the witness.

5    Q    What are the reasons that made it difficult, Mr. Bacon?

6              MR. LAWLOR:  Objection, Your Honor.

7              THE COURT:  Overruled.  You may answer.

8    A    I mean, these guys, we basically brothers.  We grew up

9    together so it's real hard.

10   Q    You've had a hard time because of that, haven't you?

11   A    Yes.

12   Q    Are there other reasons?

13   A    No.

14   Q    What about the Stop Snitching video?

15   A    I mean --

16   Q    Do you have worries about the consequences of your

17   testifying here today?

18   A    I mean, I have worries but that's what comes with it.  It

19   comes with the game.

20   Q    Okay.  You've been worried before, is that what you're

21   saying?

22   A    Correct.

23   Q    Just one moment, Your Honor.  No further questions, Your

24   Honor.

25             MR. LAWLOR:  Your Honor, very brief recross?

1          THE COURT:  Briefly, Mr. Lawlor.

2          RECROSS EXAMINATION

3    BY MR. LAWLOR:

4    Q    Mr. Bacon, I did forget to show you one thing and I used the

5    wrong phrase, so I apologize.  I used the word "successful" when

6    I referenced your characterization of Mr. Mitchell's drug sales.

7    Let me show you what you said.

8             You were asked how much money you made, right?  See

9    that?  You were asked how much money made?

10   A    What line was that?

11   Q    Looking at 14 and 15.  Mr. Harding asked you in the grand

12   jury how many you were making, right?

13   A    Correct.

14   Q    And then he asked you whether Wayne and Goo were doing well

15   and you said they weren't doing that well, right?

16   A    What line is that?

17   Q    20.  Does it say right there, what about Wayne and Goo?

18   Your answer is:  They wasn't doing that well but they was doing

19   about the same.  Right?

20   A    Yes.

21   Q    Correct.  Is that what it says?

22   A    Correct.

23   Q    Is that what you testified to?

24   A    Correct.

25   Q    And then it said:  What about Bo?  On Line 24.  And you

1  said:  No.  Right?  Correct?

2  A    Correct.

3  Q    And then on the next page it says, not as much, right?

4  A    It says no underneath that.

5  Q    No.  Right.  So you said Bo -- I used the word "successful."

6  Wasn't certainly doing as well as you, right?

7  A    I mean, he was doing good for his self.  He wasn't doing

8  bad.

9  Q    He wasn't doing as well as you, right?

10  A    No.

11  Q    All right.  And you were small change, right?

12  A    Correct.

13  Q    All right.  No further questions.

14         THE COURT:  Mr. Bacon is excused.

15         (Conclusion of Excerpt.)

16

17

18

19

20

21

22

23

24

25

175

```
1                          INDEX

2

3                                              PAGE

4    WITNESS: DARRYL BACON

5    DIRECT EXAMINATION BY MR. HARDING              2

6    CROSS EXAMINATION BY MR. LAWLOR              101

7    CROSS EXAMINATION BY MR. PYNE               138

8    CROSS EXAMINATION BY MR. COBURN             146

9    REDIRECT EXAMINATION BY MR. HARDING         162

10   RECROSS EXAMINATION BY MR. LAWLOR           173

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

176

REPORTER'S CERTIFICATE

1

2

3       I, Mary M. Zajac, do hereby certify that I recorded

4  stenographically the proceedings in the matter of USA v.

5  Mitchell, et al., Case Number(s) AMD-04-029, on September 18,

6  2008.

7       I further certify that the foregoing pages constitute

8  the official excerpt transcript of proceedings as transcribed by

9  me to the within matter in a complete and accurate manner.

10      In Witness Whereof, I have hereunto affixed my

11  signature this _____ day of _____, 2008.

12

13

14

15                        _____

16                        Mary M. Zajac,
                          Official Court Reporter

17

18

19

20

21

22

23

24

25