```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE DISTRICT OF MARYLAND/NORTHERN DIVISION

 3       UNITED STATES OF AMERICA

 4                                        CRIMINAL NO.

 5       v.                               04-00029

 6

 7       WILLIE MITCHELL, ET AL.          May 10, 2007

 8                    Defendants

 9       _____/

10                    TRANSCRIPT OF MOTIONS HEARING

11              BEFORE THE HONORABLE ANDRE M. DAVIS,

12                  UNITED STATES DISTRICT JUDGE

13       APPEARANCES:

14       On behalf of the United States:

15       Michael Hanlon, AUSA
         Robert Harding, AUSA
16
17       On behalf of the defendants:

18       Laura K. Rhodes, Esquire
         Timothy Sullivan, Esquire
19       Gerard P. Martin, Esquire
         Joshua R. Treem, Esquire
20       James Pyne, Esquire
         Thomas L. Crowe, Esquire
21       Adam H. Kurland, Esquire
         Barry Coburn, Esquire
22
23       Reported By:

24       Jacqueline Sovich, RPR, CMR, FOCRR

25       Official Court Reporter

26
```

```
 1                    (PROCEEDINGS)

 2              THE COURT:  Please be seated.  Counsel, good morning.

 3              DEFENDANT HARRIS:  Does the record reflect that I

 4    Shelton Lee Harris Jr., a sentient moral being, since my

 5    initial plea for not guilty any and all motions filed on my

 6    behalf, signature and with the consent for cost, I made a

 7    mistake.  I repent on my debt.  I reserve all my rights with

 8    explicit reservations without prejudice.

 9              Also does the record reflect I have accepted Gerald

10    P. Martin, attorney at law, and Joshua Treem, attorney at law,

11    to be my private lawyers for value and return to their office

12    for value and request that they perform the following five

13    duties:

14              Do not argue the facts.

15              Request the Court issue me an appearance bond and

16    waive all public costs.

17              Request that the Court close the accounts, release

18    order to me.

19              Immediately request the Court set off and adjust all

20    public charges UCC 3-419, House Resolution 192, public law

21    7310.  Request immediate discharge.

22              THE COURT:  Thank you, Mr. Martin.  Does any of the

23    other defendants.

24              Excuse me, Mr. Harris.

25              Any other defendant wish to make a statement before
```

1    we begin?  Mr. Mitchell?

2         DEFENDANT MITCHELL:  First I'd like to thank the

3    Court.  I, Willie Edward Mitchell, scentient moral being, would

4    like the record to reflect I have accept Mrs. Attorney doing

5    business as Laura Rhodes also for value my private lawyer in

6    return for value, close settlement of account, I request the

7    five following duties:

8         Do not argue the facts.  Request the Court issue me

9    appearance bond.  Waive all public costs.  Request the courts

10   close -- excuse me, close all the accounts, and release the

11   order of the Court to me immediately.  Request the Court set

12   off and adjust all public charges, UCC 3-419 and House Joint

13   Resolution 192, Public Law 7810.  Request the Court immediate

14   discharge if she's not able to perform the five duties.

15        THE COURT:  Thank you, Mr. Mitchell.

16        Mr. Martin?

17        DEFENDANT MARTIN:  Let the record reflect I Shelly

18   Wayne Martin, sentient moral being, reserve all my rights with

19   explicit reservation.  And also let the record reflect I have

20   accepted James Pyne to be my private lawyer for value.  And I

21   also accepted Thomas Crowe offered to be my private lawyer and,

22   return to offer for, return their office to them for value of

23   settlement and closure.

24        I do not wish to argue the facts.  I request the

25   Court issue an appearance bond and waive all public costs.  I

1    Request the Court, I request the Court to close the account
2    release the order of court to me immediately and request the
3    Court to offset and adjust all public charges and report to the
4    Uniform Commercial Court Code 3-419, HR 192 and Public Law 7310
5    and request immediate discharge.
6          And if they do not perform the five following duties
7    they agree to, I will accept their dishonor.
8          THE COURT:  Thank you.  Mr. Gardner?
9          DEFENDANT GARDNER:  Let as the record show that I
10   Shawn Earl Gardner, scentient moral being, reserve my rights
11   with explicit reservations, and without prejudice, accept Adam
12   Kurland and Barry Coburn be my private attorney for value, and
13   offer to them for value the settlement and closure of the
14   account.
15         And I request them to perform following duties:  Do
16   not argue the facts, request the Judge issue me appearance
17   bond, waive all public costs, request that the Judge close the
18   account, release the order of the court me, request the Judge
19   release all public charges, UCC, 3-419, House Joint Resolution
20   192, public law 7810.  I request immediate discharge.
21         And if they're not able to perform my duties, I will
22   accept dishonor.
23         THE COURT:  Thank you, Mr. Gardner.  Now, gentlemen I
24   do not expect there to be any disruptions during the
25   proceedings.

1             Relating to Mr. Gardner, do any --

2             MR. COBURN:  If I may, Your Honor, just very briefly.

3             THE COURT:  Have we got the system to work?

4             DEFENDANT HARRIS:  May I speak one more time?

5             THE COURT:  No.

6             MR. COBURN:  There's nothing here, Your Honor, but I

7       can speak up.

8             THE COURT:  Try again, Mr. Coburn.

9             MR. COBURN:  With the Court permission, I'll check

10      the witness box to see whether that's live.

11            (Pause.)

12            THE COURT:  Counsel, I think what makes the most

13      sense is we should just stand in recess.  Brian thinks he can

14      rig it so that we can at least proceed.  Let's take a recess,

15      and I'll confer with the marshals, and if we can fit in to 5 B,

16      if we can't get it fixed down here, we'll reconvene in 5 B.

17      But Brian seems to think he can configure things so that we can

18      continue here.

19            All right.  We'll stand in recess for 15 minutes.

20            (Recess.)

21            THE COURT:  Mr. Kurland?

22            MR. KURLAND:  Yes.

23            THE COURT:  Excuse me.  Mr. Coburn, I meant to say.

24            MR. COBURN:  Thank you so much, Your Honor.

25            Just with the Court's permission, two very brief

1    administrative questions.  One is, we have a potential trial

2    witness here in the audience Dr. Neal Blumberg.  He's a

3    potential expert.  I just wanted to be make sure, I've talked

4    to the government they very kindly agreed to it, that he may

5    stay.

6            THE COURT:  Certainly.

7            MR. COBURN:  Thank you.  The only other -- I think

8    Your Honor's aware of this, I have a jury out in Federal Court

9    in D.C. and wanted to make sure Your Honor knows if anything

10   happens, they'll be calling chambers.

11           THE COURT:  I don't have any problem with your giving

12   them your cell phone number, Mr. Coburn, and putting yourself

13   on vibrate or something, would that be more --

14           MR. COBURN:  That's very kind of Your Honor.  I'll do

15   that.

16           THE COURT:  Okay.  Perhaps you can give Katina your

17   cell phone number, she can call Tony, and Tony will have it and

18   so forth.

19           MR. COBURN:  Much appreciated, Your Honor.

20           THE COURT:  All right.  Mr. Kurland?

21           MR. KURLAND:  Just a few preliminary matters.  The

22   first is with respect to the hearing with respect to the

23   show-up identification, we would ask that Mr. Gardner be not be

24   present in court during all that of testimony from all of the

25   witnesses.

1          THE COURT:  Certainly.

2          MR. KURLAND:  So, obviously, before the first witness

3     is called with respect to that.

4          Judge, also, a couple other things procedural

5     matters, and I'm not impugning any evil motive on the part of

6     the government, the government, though, sent a letter, and

7     we've been conversing back and forth, with respect to the

8     witnesses today and the government has informed me today,

9     contrary to what's in their letter, of two witnesses who we

10    were not made aware of who were going to take today, Andrea

11    Smith's mother and one officer.

12          I would ask the Court if we're okay with that, to the

13    extent we can do limited cross-examination today.  But I would

14    like to reserve the right to have those witnesses called for

15    tomorrow so I can go home and then look at earlier statements

16    with respect to those witnesses.

17          THE COURT:  Certainly.  I don't know of any reason

18    they couldn't be available on call, perhaps, tomorrow, and get

19    here in time for you to continue cross-examination if you need

20    to.

21          MR. KURLAND:  One other thing, Judge.  We anticipate

22    there's going to be a lot of -- there's might be some

23    controversy concerning the number of prior statements that were

24    made by witnesses with respect to identifications and

25    descriptions.  And I know it's a suppression hearing, and,

1    obviously, there's not a jury here, but rather than make

2    objections on hearsay grounds, I'm not intending to do that.

3    But I just wanted clarification with respect to the Court.

4         It's my position, and I think it would be the

5    government's position as well, that under the Neal versus

6    Biggars standards, the prior descriptions are relevant as they

7    go to one of the issues as to the accuracy of require

8    identifications.  So reserving all rights to argue hearsay

9    objections later, as to what the statement's going to be used

10   for, it's my intention not to object if any hearsay statements

11   are elicited, because for this purpose, they're relevant on the

12   issue of those prior statements.

13        And there might be some controversy, particularly

14   with respect to the nature of the alleged prior identifications

15   and the specific words used, there might be some controversy

16   that's going to be subject to oral argument with respect to

17   what particular statements may have to qualified under 801

18   (d)(1)(C), I don't want to keep jumping up making hearsay

19   objections, but I don't want to waive the right to argue those

20   are inadmissible statements for the truth of the matter

21   asserted under the rules.

22        THE COURT:  All right.  Mr. Kurland, I will give you

23   what I guess is a standing objection, continuing objection to

24   the matters you just described.  I confess, I'm not sure what

25   you just described.  My understanding is that this was

1    essentially a contemporaneous show-up.  I don't know how much

2    time elapsed between the event and the identification, but

3    without ruling, obviously, it seems pretty clear that any

4    statements of description or identification made within minutes

5    before the actual show-up certainly are not irrelevant, I'll

6    grant you that.  But their probative value or their importance

7    recedes to irrelevance.  Because if a person says I saw a guy

8    dressed this way, and the officer within minutes transports her

9    to a guy, and she says, oh, yes, that's the guy I saw five

10   minutes ago, or ten minutes ago, what she said in the ensuing

11   five or ten minutes isn't terribly important.

12          But having said that, I'll give you a continuing

13   objection.  I don't see much relevance to what was said five

14   minutes ago.

15          MR. KURLAND:  All right.

16          THE COURT:  If she got the color of the shirt wrong

17   or if she got the insignia on the hat wrong or whatever it was,

18   once she sees the individual and says that's him, that's the

19   identification.

20          MR. KURLAND:  No.  I understand Your Honor's

21   position.  I wanted to alert the Court there's going to be a

22   sequence of statements of various shades of different types of

23   quasi identifications, all right.  Thank you very much.

24          THE COURT:  All right.  Thank you.

25          Are there any other preliminary matters before we

1    proceed?

2                MR. HANLON:  One from the government.

3                THE COURT:  Mr. Hanlon?

4                MR. HANLON:  Just in terms of the order of witnesses,

5    the government will be presenting two, the identifying two

6    civilian witnesses today.  They'll be the first among the first

7    witnesses we'll be presenting Miss Kelly David.  She'll be the

8    first witness.  Our third witness will be Miss Andrea Smith,

9    who's the other identifier.

10               In between those witnesses, Your Honor, was the new

11   witness that I informed Mr. Kurland and Mr. Coburn about today,

12   or one of them, Patricia Maynard, who's the mother of Andrea

13   Smith.  She'll testify before Miss Smith strictly about the

14   interchange if any between Miss Smith and the police officer

15   during the show-up process.

16               THE COURT:  All right.

17               MR. HANLON:  I wanted to bring this up for this

18   witness, Miss Smith, who will be the third witness, is 17 years

19   old, and she was 13 at the time of the incident.  She asked me

20   --  and it's clear to me, if she could have her mother in the

21   courtroom while she's testifying, I would ask for permission to

22   do that.

23               My plan in witness order, again, I will put the

24   mother on the stand before Miss Smith, then let her go into the

25   gallery.  Then put Miss Smith on the stand so we'll preserve

1    the sequestration.  That is my proposal.

2              THE COURT:  Mr. Kurland?

3              MR. KURLAND:  Your Honor, we would object to that,

4    because it's not at all certain that Andrea Smith's mother

5    won't be a witness at trial.  And I think it would be

6    inappropriate for her, because the questioning is going to

7    concern against the specific nature of what exactly was said

8    with respect to the show-up identification, and even if the

9    government would today acknowledge or concede or stipulate not

10   to call her as a witness at trial, I still would feel very

11   uncomfortable with respect to that.  I would object to that.

12   Andrea Smith is 17 years old.

13             THE COURT: I appreciate your concern, Mr. Kurland,

14   and the rule on witnesses is a serious procedural device

15   intended to ensure fair and just and truthful outcomes.

16             But the fact of the matter is, you know as well as I

17   do, if she was 13 at the time, that they surely have talked

18   about this in such, for all I know, she is been in counseling

19   about it.  I mean, I don't know that.  But I mean the fact that

20   she was 13 at the time, she's now 17, and she did testify,

21   correct?

22             MR. KURLAND:  No, she did not.

23             THE COURT:  She did not testify.  But she was

24   interviewed, and probably prepped.  And my point, I think, is

25   obviously, it is unimaginable that Miss Smith could say

1    anything in this courtroom today, just unimaginable that she

2    can say anything in this courtroom today that her mother hasn't

3    heard 20 times.  That's a slight exaggeration, I guess.

4        But my point is they clearly have talked about this.

5    Mr. Hanlon has been very appropriate to say for purposes of

6    these proceedings we'll put the mother on first.  And so

7    there's no question that the mother's testimony will be such as

8    it is, unaffected by any taint from Miss Smith's actual 17-year

9    old testimony, but the mother's going to come in here and talk

10   about the last four years in one way or another.

11        MR. KURLAND:  Judge, Your Honor, that's probably

12   correct.  I would just say, Your Honor, that the written

13   statement that Andrea Smith gave after the show-up.

14        THE COURT:  After the show-up.

15        MR. KURLAND:  After the show-up, is a compendium

16   written both by the mother and by Andrea Smith.  She's a

17   critical witness.

18        I want to put on the record that we object to this,

19   and there's a potential big problem with respect to how this

20   could play out with respect to tainting her ability to testify.

21        THE COURT:  Okay.  I'll tell you what I'll do.  When

22   Miss Smith comes in, I will question her, because you're right.

23   If she just wants mom here for moral support, I mean, her

24   mother could stand outside.  That would be undignified, and I

25   wouldn't do that.

1          But I will explore with her why she thinks she needs

2     her mother in the courtroom.  I'll assess her maturity.  But if

3     I'm persuaded that, you know, it's appropriate, then I'll make

4     my ruling then.  Your objection is noted.

5          MR. KURLAND:  Thank you very much.

6          THE COURT:  All right.  Okay.  Now, Mr. Gardner, your

7     counsel have requested that, for purposes of this hearing,

8     since they're going to be witnesses who will be offered as

9     identification witnesses at the trial of this case, their

10    preference is that you not be present for this testimony.  And

11    the reason for that is, if they come in here and see you in

12    here, that may bolster their ability to identify you.  It may

13    not.

14         But in counsel's professional judgment, you will be

15    better off if you were simply not present in the courtroom when

16    these witnesses testify.

17         It's up to you.  Do you want to remain or do you want

18    to accede to your counsel's request and leave the courtroom for

19    purposes of these proceedings?

20         DEFENDANT GARDNER:  You making me a offer?

21         THE COURT:  No, Mr. Gardner.  I am not making you an

22    offer.

23         DEFENDANT GARDNER:  I accept the offer of value.

24         THE COURT:  You didn't stand up.  I take that as your

25    decision to remain seated, which is your decision to remain in

1    the courtroom.

2              The government may call its first witness.

3              MR. HANLON:  Thank you, Your Honor.  The government

4    will call Kelly David.

5              MR. KURLAND:  Objection.  Can we try to confer with

6    counsel?

7              THE COURT:  No, I think he's made his decision, Mr.

8    Kurland.  You may bring the witness in.

9              THE COURT:  Miss David, the clerk will place you

10   under oath right here, ma'am, and then make yourself

11   comfortable on the witness stand.

12             (The Witness is sworn.)

13             THE CLERK:  Thank you.  You may be seated.

14             Please speak directly into the microphone.  State

15   your name and spell your name for the record.

16             THE WITNESS:  My name is Kelly David.  K E L L Y,

17   David, D A V I D.

18                      DIRECT EXAMINATION

19   BY MR. HANLON:

20   Q.  Good morning, ma'am.

21   A.  Good morning.

22   Q.  Can you tell us what county town you live in?

23   A.  Baltimore County.

24   Q.  And directing your attention to 2002, were you living in a

25   part of Baltimore County at that time?

1    A.  Yes, sir.

2    Q.  Where were you living in 2002?

3    A.  Liberty Crossing Apartments.

4    Q.  And where's that located?

5    A.  It's located in Baltimore County in Randallstown.

6    Q.  Now, I'd like to ask you a couple specific questions about

7    a particular date, June 7th of 2002, is that a date you're

8    familiar with?

9    A.  Yes, sir.

10   Q.  And you spoke with various people over the years about that

11   date; is that right?

12   A.  Yes.

13   Q.  In the afternoon of that date, round about 4:30 or 5:00,

14   were you driving home?

15   A.  Yes, sir.

16   Q.  Where were you working at that time?

17   A.  I was working at the YMCA of Central Maryland in

18   Catonsville.

19   Q.  And just roughly, can you describe, Miss David, how you

20   typically went from work to home?

21   A.  I got off work, drive up South Rolling Road, make a left on

22   Frederick, and I go up North Rolling Road, I keep straight up

23   Rolling Road, and I make a left on Windsor Mills Road, and I

24   keep straight up Windsor Mills Road, make a right on Mayfield,

25   make a left on Carlson, go straight down Carlson, right on Old

1    Court, left on Gray Fox.

2    Q.  About how long the does it take to you take home at that

3    time?

4    A.  That particular day, it took me maybe 30 minutes.

5    Q.  Now, Miss Davis, on this instance, do you remember

6    receiving a phone call on your way home?

7    A.  Yes.

8    Q.  From whom was the call?

9    A.  The call was from my son.

10   Q.  And I gather this is on your cell phone?

11   A.  Yes, it was.

12   Q.  Where were you when you got this phone call, if you

13   remember?

14   A.  When I got this phone call, I was on Carlson Lane right at

15   Northwest Hospital.  So it's a small street just before you get

16   to Northwest Hospital.

17   Q.  And, again, was this an area that you passed every day on

18   your way home?

19   A.  Yes, sir.

20   Q.  You mentioned the call, I believe, was from your son?

21   A.  Yes.

22   Q.  What did he tell you, and what did you talk about during

23   this phone call?

24   A.  He informed me that our neighbor got shot.

25   Q.  Did you have any other conversation with your son during

1    this phone call?

2    A.  No, other than get in the house right now.

3    Q.  Now, at approximately the same period of time, did anything

4    else happened, Miss Davis, to call your attention?

5    A.  Yes, sir.

6    Q.  What happened?

7    A.  Two young men jetted out in front of my car coming -- it's

8    parking lot, and as you exit the parking lot, it's like you

9    come out of the parking lot.  And they just jetted right in

10   front of my car.

11   Q.  When you say they "jetted out," can you tell us what you

12   mean by that?

13   A.  Running just ran out, right in front of my car.

14   Q.  Now, was your car moving, or were you stopped at some

15   point?

16   A.  No, I was moving.

17   Q.  What --

18   A.  At that time, I had a accelerated in speed.

19   Q.  Why did you accelerate?

20   A.  Due to the phone call I received from my son.

21   Q.  And what happened as these two gentlemen came out in front

22   of your car?

23   A.  When they came out in front of my car, I immediately

24   stopped, slammed on brakes.  I'm looking at them.  They're

25   looking at me.

1                    I rolled down the window, asked if they're okay.  And

2      they just kept moving.  They kept moving.

3      Q.  Now, Miss Davis, let me ask you about this moment after you

4      stopped the car, do you remember if either of the men made

5      contact with your car, did your car make contact with them?

6      A.  Yes.  The second young man made contact with my car.

7      Q.  And when you say the second young man, am I correct one was

8      in the front and one was in the back?

9      A.  One came out first, and then the second one came out.

10     Q.  And what is it that he did to your car?

11     A.  He braced himself on the hood of my car.

12     Q.  Now, after this moment, what was -- let's kind of take it

13     step-by-step.  What happened immediately after that?  Did you

14     speak to them, look at them?

15     A.  Yes.  I asked them, I asked him, rather, rolled down my

16     window and said are you okay?  There was nothing said.  And

17     they just kept right on moving along in a very fast walking

18     pace.

19     Q.  And just to be clear, did either gentlemen say anything to

20     you in response to your question?

21     A.  No.

22     Q.  Now, as you were looking at them, did you have an

23     opportunity to see what they looked like?

24     A.  Yes.

25     Q.  Did you see their faces?

1    A.    Yes, I did.

2    Q.    If you can, starting with the first one, can you remember

3    sitting here today what the first one, the one that was in the

4    front looked like, his physical appearance?

5    A.    No, sir, just his height.

6    Q.    And what was his height, if you remember?

7    A.    His height was roughly about six three.  He was a tall

8    young man, taller than the second young man.

9    Q.    Do you remember what his -- I gather he was a male?

10    A.    Yes.

11    Q.    Do you remember what his racial background was?

12    A.    African American.

13    Q.    Now, in terms of his clothing, sitting here today, Miss

14    David, do you have a recollection as you testify what the first

15    gentleman was wearing?

16    A.    The first taller young man, he had a red hat, a light

17    colored shirt, very light colored shirt, faded jeans, and

18    butter Tims.

19    Q.    When you say he had butter Tims, what does butter Tims

20    mean?

21    A.    Butter Tims or the natural color Tims.

22    Q.    What is Tims?

23    A.    Timberland boots.

24    Q.    So tan Timberland boots?

25    A.    Yes.

1    Q.    And I apologize if you said this already, was the first

2    gentleman, did he have anything on his head?

3    A.    Just a red hat.

4    Q.    The hat, can you tell us what kind of hat it was?

5    A.    No, I cannot remember.

6    Q.    Do you remember if red was the only color of the hat?

7    A.    No, I cannot remember.

8    Q.    Now, did you remember anything distinctive about that first

9    gentleman's hairstyle?

10   A.    No.

11   Q.    Now, let's move onto the second man.    What did he look

12   like, beginning with his racial background?

13   A.    He was African American.    He was shorter than the first

14   young man.    He had very fine braids.

15   Q.    Tell us what you mean by very fine braids.    And assume I

16   don't know anything about hair.

17   A.    Right.    Okay.    His braids, he had braids going straight

18   back.    They were very, very neat, parted very straight.    They

19   looked really nice.

20   Q.    And there's a reason you noticed that?

21   A.    Yes, because I like braids, twists.

22   Q.    So that's his hairstyle.    How about his clothing, if you

23   remember?

24   A.    His clothes, he had also wore faded jeans and butter Tims

25   neutral colored Timberland boots.

1    Q.   Do you recall anything about the shirt he was wearing?

2    A.   His shirt was a little darker than the first young man's,

3    but no special anything.

4    Q.   Miss Davis when you saw these two gentlemen, could you --

5    do you remember anything about where they were looking, what

6    they were looking at?

7    A.   Well, once I asked them were they okay, then moved on.

8    Just out of concern, I'm looking out of my side-view mirror,

9    and I noticed they were looking back in the direction of where

10   I live.

11   Q.   And is there any particular reason you noticed, or is it

12   just something you noticed?

13   A.   It was just something I noticed because just being

14   concerned.

15   Q.   Now, at some point, the gentleman moved on; is that

16   correct?

17   A.   Yes.

18   Q.   Approximately, Miss Davis, how long did this whole

19   encounter last?

20   A.   A few seconds.

21   Q.   I gather you continued home?

22   A.   Yes.

23   Q.   Did you see what the two gentlemen did?

24   A.   As far as walking off?

25   Q.   Where they went, I should ask?

1    A.  Oh, yes, yes.

2    Q.  Where did they go?  First of all, I should ask you this,

3    how were you able to tell where they were going?

4    A.  Because along Carlson Lane, there's a day care center, and

5    there are woods just before you get to the day care center.

6    There's a pathway that you can cut through woods.

7    Q.  Now, are you familiar with that pathway?

8    A.  No.  I've never walked the pathway.  I just know that it's

9    there.  I've seen other people go through the pathway.

10   Q.  And would you pass this pathway when you were going up and

11   down Carlson Lane?

12   A.  Yes.

13   Q.  And so, again, you mentioned the pathway, where were the

14   two men going that you testified about?

15   A.  After passing me, they walked down and cut through the

16   pathway just before you get to the day care center.

17   Q.  And this is a wooded area; is that right?

18   A.  Yes.

19   Q.  Did you see where they went after they went into the woods?

20   A.  No.

21          MR. HANLON:  Your Honor, at this time, I have an

22   aerial photo of the area I'd like to put up on the easel, if

23   that's okay.

24          THE COURT:  All right.

25          MR. HANLON:  Unfortunately, I'm not sure if I can do

1  this so everyone can see.

2          THE COURT:  We can see it seriatim.

3          MR. HANLON:  Certainly.

4          THE COURT:  They can see it.  I can see it.

5          MR. HANLON:  With the Court's permission, may Miss

6  Davis approach?

7          THE COURT:  Do we have laser point, perhaps?  I know

8  we've got one in 5 B.

9          THE CLERK:  No, Your Honor.  I have a -- it's not a

10  laser, but --

11          THE COURT:  Okay.

12          Perhaps you can just stand on is this side, to the

13  side, so counsel can see where you're pointing.

14          THE WITNESS:  Okay.

15  BY MR. HANLON:

16  Q.  Miss Davis, let me begin by asking you, you mentioned

17  Carlson Lane you were taking home that day?

18  A.  Yes.

19  Q.  Indicate with your pointer, can you show the Judge what

20  direction you were driving at the time all this happened?

21  A.  This is Winfield.  You come straight up Carlson Lane.  This

22  is where I'm going to hit Old Court.  Am I speaking loud

23  enough?

24          THE COURT:  Yes.  Thank you, Miss Davis.

25  Q.  Now, at some point, you mentioned that you saw two people?

1    A.   Yes, sir.

2    Q.   Where was that, and just indicate with your pointer.

3    A.   Okay.   Right here, Stevenson, that's the name of the road.

4    This is Stevenson.   I'm right here because this is the entrance

5    to come out of the Northwest Hospital.   So I am right here, the

6    house at the corner.

7    Q.   And for the record, and counsel can correct me if I'm

8    wrong, you're indicating a house north of Stevenswood Road on

9    Carlson lane?

10   A.   Yes.

11   Q.   Now, you mentioned when you saw the gentlemen heading from

12   one side of the road, did have any sense, or could you tell

13   generally where they were coming from?

14   A.   They were coming, to come out of here, they were coming

15   from the direction of the hospital.   So where at the hospital,

16   no, I can't tell you.   But they came out right here.

17   Q.   And then after they completed crossing the road, you were

18   able to have a sense of where they went after that, can you

19   show us that with the pointer?

20   A.   Yes, sir.   They walked straight down here.   This is the day

21   care center that I was speaking about.   The entrance, the

22   cut-through or the pathway is right here.

23            MR. HANLON:   That's all I have for the easel, Your

24   Honor.

25            THE COURT:   All right.   You may resume your seat,

1    Miss Davis, thank you.

2              THE WITNESS:  Sure.

3              MR. HANLON:   Thank you, Your Honor.

4    BY MR. HANLON:

5    Q.  Miss Davis, let me ask you a general question, you don't

6    have any way of knowing where it is that these gentlemen were

7    originating from, or what they had been involved in, if

8    anything, prior to you seeing them; is that correct?

9    A.  Yes, sir.

10   Q.  Now, where did you go after the encounter you described?

11   A.  I went straight home.

12   Q.  Did you see your son when you got home?

13   A.  Yes, I did.

14   Q.  And at some point, did you end up speaking with a police

15   officer that day?

16   A.  Yes, I did.

17   Q.  Just ballpark, approximately, Miss Davis, how long after

18   you arrived home did you speak with the police officer for the

19   first time?

20   A.  Maybe three, four minutes.  It wasn't long at all.

21   Q.  Now, I gather that's an approximation?

22   A.  Yes.

23   Q.  While you were -- from the time you got home until the time

24   you spoke with the police, was there anyone outside of the

25   apartment complex?

 1          Can you tell us what was going on?

 2     A.   Yes.  There were other neighbors that came over from the

 3     circle.  On the other side of where I live at, it's an area we

 4     call a circle, so there were neighbors from that apartment

 5     complex over to where I live at in the last building.

 6     Q.   Were there any police vehicles or ambulances or anything

 7     like that?

 8     A.   No, not when I got there.

 9     Q.   At some point, did emergency vehicles arrive?

10     A.   Yes.

11     Q.   When you arrived home, did you see anyone receiving any

12     kind of medical care or attention, anybody who seemed to be

13     hurt, or anything like that?

14     A.   Yes.  I have a neighbor that lives next door to me, and

15     she's a paramedic.  She was tending to my other neighbor that

16     had just got shot and fell off the third floor.

17               MR. KURLAND:  Objection, Your Honor.

18               THE COURT:  Overruled.

19               MR. KURLAND:  Lack of firsthand knowledge of that.

20               THE COURT:  Overruled.

21     Q.   At some point, you spoke with the police prior to that.

22     Did you have any conversation -- I'm not asking you for content

23     of that conversation right now, did you have any conversation

24     with your neighbors about what you'd seen or what they had seen

25     prior to you arriving?

1    A.  No, I can't remember.

2    Q.  Did you have any conversation with them about what had gone

3    on, did you hear anything?

4    A.  No, no, no, I didn't.

5    Q.  Did you -- at some point, you did end up speaking with

6    police officers; is that right?

7    A.  Yes.

8    Q.  How did that come about that you got hooked up with the

9    police?

10   A.  I got hooked up with the police, one neighbor said there

11   are boys running over there.  And I said I just ran into two

12   boys over there.  That's the extent of that conversation.

13           As I'm about to go in the house, one of the officers,

14   one of the officers, one of the officers had already came, and

15   the neighbor said she saw two boys, and that's it.

16   Q.  And my question a few minutes ago about whether or not you

17   had any conversation with neighbors, I just want to draw back

18   on that.  Aside from what you just mentioned --

19   A.  Right.

20   Q.  -- was there any other information, descriptions?

21   A.  No, sir.

22   Q.  Clothing that you heard about, anything like that from your

23   other neighbors?

24   A.  No, sir.

25   Q.  You ended up speaking with the police officer?

1  A.  Yes, I did.

2  Q.  Again, without getting into what you told him specifically,

3  did you tell him about what you had seen on Carlson Lane?

4  A.  Yes, sir.

5  Q.  At some point, Miss Davis, did you get end up going with

6  the police officer to another location?

7  A.  Yes, sir.

8  Q.  Do you remember where you went?

9  A.  Yes, sir.  The first police officer, he wanted me to show

10  him where I encountered the two men that I almost hit.

11        Then we came back, and minutes later, a different

12  police officer said I just want you to see that these are the

13  two men that you saw.  That's it.

14  Q.  Let me ask about that second officer.  Where was it that

15  you were approached by the possibility to go look at somebody?

16  Were you at home?

17  A.  Yes, I was home.

18  Q.  And you've already touched on this, but if you can, to the

19  extent you remember, what exactly were you told about where you

20  were going to go or what you were going to be asked to do?

21  A.  All the officer said I want you to go and see if these are

22  the two men that you encountered on Carlson Lane.

23  Q.  Did you go with the officer?

24  A.  Yes, I did.

25  Q.  Other than you and the officer, was there anybody else in

1    the car with you?

2    A.  No, sir.

3    Q.  About how long -- do you know where you went?

4    A.  The street, no.  But it's -- it's like, it's a turn like

5    literally down the street around the corner from where I live

6    at.

7    Q.  About how long did it take for you and the officer to get

8    there?

9    A.  Maybe five minutes.

10   Q.  When you arrived, or during the car trip, did the officer

11   tell you anything else about what you were going to do or who

12   you were going to see?

13   A.  No, sir.

14   Q.  Did you ever receive any information, Miss Davis, about who

15   these men were that you were going to see, where they'd come

16   from, if they had anything, or what they looked like?

17   A.  No, sir.

18   Q.  At some point, you arrived at a location, there was some

19   other people; is that correct?

20   A.  Yes, sir.

21   Q.  Describe what happened when you arrived.

22   A.  As the officer that took me as we were driving up before we

23   even stopped, I said, those are the two young men right there.

24   And the officer said are you sure?  I say, yes, sir.  He said

25   are you sure?  I say yes because the one with fine braids, I

1    noticed him.

2    Q.  Now, you mentioned, was this before or after the vehicle

3    you were in actually came to a stop?

4    A.  It was before the vehicle came to a stop.

5    Q.  The men that you saw, were there other police officers with

6    them, around them?

7    A.  Yes, sir.  How many, I'm not certain.

8    Q.  Were there -- I'm just asking you for, you know, a general

9    description to paint the picture.  Were there any patrol cars

10   other than the one you were in?

11   A.  No, sir.

12   Q.  When you arrived in this area, and you made the comment

13   that you mentioned, did the officer have a chance to tell you

14   take a look at those guys, or anything like that?

15   A.  No, sir.

16   Q.  After you told the officer what -- well, actually, let me

17   step back.

18         When you first saw the two men, if you remember, were

19   they sitting or standing?

20   A.  I don't remember.

21   Q.  Do you remember if there were handcuffed?

22   A.  No, sir, I don't remember.

23   Q.  Do you remember if they had to be taken out of a patrol

24   car, or a police vehicle, or anything like that, for you to see

25   them?

```
 1    A.  No, they were not.

 2    Q.  Were they together when you saw them?

 3    A.  Yes, sir.

 4    Q.  At the time that you saw them that time, can you tell us,

 5    I've already touched on this, but can you tell us what they

 6    looked like at that point, if you remember?

 7    A.  No, sir.  I just remember the one with the really fine

 8    braids.

 9    Q.  Was either of them wearing a red hat?

10    A.  I can't remember.

11    Q.  After you told the officer what you told them, did the

12    officer say anything to you in response?

13    A.  No.  Not after he said are you sure?  And I confirmed to

14    him no.

15    Q.  Did he communicate anything to any other officers, get on

16    his radio or roll down his window or anything like that, that

17    you can remember?

18    A.  No, sir.

19    Q.  Looking back at that point, you've already testified to

20    what it is you told the officer, but looking back to that time,

21    Miss Davis, the two people that you saw with that police

22    officer, were they the gentlemen that you'd seen on Carlson?

23    A.  Yes, sir.

24    Q.  Do you lack certainty about that?

25    A.  No, sir.
```

1    Q.   After this procedure was done, where did you and the

2    officer go?

3    A.   Back to my apartment.

4    Q.   Approximately how long did you stay in the -- at this place

5    looking at these men before you left, if you remember?

6    A.   Only a few minutes.  An actual time I can't tell you, but

7    it was only a few minutes.

8    Q.   Did you and the officer have any further conversation on

9    the way home?

10   A.   No, sir.

11   Q.   Did he ever say anything to you like "good job" or "you got

12   him," or anything that suggested that sounded like he picked

13   the right guys?

14   A.   No, sir.

15   Q.   When you got home, I gather he let you go?

16   A.   Yes, sir.

17   Q.   Prior to going out to the scene, Miss Davis, did you have

18   any conversation with a young lady named Andrea Smith?

19   A.   No, sir.  That's my son's friend.

20   Q.   She was a young lady at the time?

21   A.   Yeah.

22   Q.   Do you have any awareness at some point she was eventually

23   taken to see someone with a police officer?

24   A.   No, sir, I don't remember.

25   Q.   Do you remember talking to her or comparing with her or

 1    learning from her what you'd seen or telling her what you had

 2    seen that day?

 3    A.  No, sir.

 4            THE COURT:  I'm sorry.  I missed the part about your

 5    son and Andrea Smith, what was it you said about that?

 6            THE WITNESS:  Oh.  That's my son's friend.  They were

 7    friends.

 8            THE COURT:  Andrea Smith is a friend of your son's?

 9            THE WITNESS:  Yes, sir.

10            THE COURT:  I see.

11    BY MR. HANLON:

12    Q.  They both were 12 or 13 years old?

13    A.  Yeah, 12 years old, neighbors, we lived upstairs,

14    downstairs.

15            THE COURT:  Okay.  Thank you.

16    Q.  Can I just approach the witness briefly?

17            Miss Davis, I'm going to show you a document, is this

18    something you wrote?

19    A.  Yes, sir.

20    Q.  What is it?

21    A.  It's the statement that I was asked to write by an officer.

22    Q.  And was this on the same day as everything you testified

23    about?

24    A.  Yes, sir.

25    Q.  If you remember, did you write this before or after you

1    took your ride with the officer?

2    A.  It was after.

3    Q.  I just have a couple very quick questions for you, Miss

4    Davis.  On the first page of your statement, there's a two-page

5    statement.  There is a Q and a circle, which I gather means

6    question beginning of the first asks, it asks can you give a

7    description of the two subjects in line.  There's an A, and

8    under A, there's a 1 and a 2.  I gather that refers to the

9    first and the second gentlemen?

10   A.  Yes, sir.

11   Q.  Under the description for number 1, you have the phrase

12   "white shirt," right before the phrase "red hat"?

13   A.  Yes.

14   Q.  The reference to white shirt, I want to ask you, sitting

15   here today, do you remember what the color of the first male's

16   shirt was?

17   A.  No, sir.  I know it was just a lighter colored shirt.

18   Q.  Couple references, the term white shirt appears one more

19   time?

20   A.  Yes.

21   Q.  I guess you just wrote it twice by accident.  Then there's

22   a reference to black jeans.  My question for you is, can you

23   tell us what you men by black jeans?

24   A.  Black in color, darker in color.  Pretty much.  They were

25   both faded jeans.  The first young man's jeans were darker in

1    fade than the second young man in jeans.

2                MR. HANLON:  Just a moment, please, Your Honor.

3                (Pause.)

4                MR. HANLON:  Nothing further, Your Honor.

5                Thank you, Miss Davis.

6                 Your Honor, for the record, I neglected to do this,

7    and Mr. Kurland is reminding me I will mark this for

8    identification purposes as government's exhibit I believe it

9    would be 5 for this hearing.

10               THE COURT:  Very well.

11               (Marked for identification.)

12                        CROSS-EXAMINATION

13   BY MR. KURLAND:

14   Q.  It's almost good afternoon, Miss Davis, how are you?

15   A.  Good afternoon.  Fine.  And yourself?

16   Q.  Fine.  I just have a couple questions.

17               Going back to when you arrived back at your house,

18   after you had had the contact with the two men on the street, I

19   want to focus in for a few minutes on when you spoke to an

20   officer.

21   A.  Yes, sir.

22   Q.  At that time when you spoke to the officer, did you -- you

23   gave a description as to the man that you saw; isn't that

24   correct?

25   A.  Yes, sir.

1    Q.  All right.  Now, a few minutes ago, you testified to your

2    current recollection as to what those men looked like, but you

3    were recalled, as you just said, you gave a description to the

4    officer on June 7th, 2002?

5    A.  Yes, sir.

6    Q.  Okay.  Do you remember today exactly the description you

7    gave the officer five years ago?

8    A.  No, sir, not without looking at my notes.

9    Q.  All right.  And prior to your testimony here today, you've

10   talked with the prosecutors, haven't you?

11   A.  Yes.

12   Q.  All right.  Did you use any documents or receive any

13   documents in preparation for your testimony today?

14   A.  Yes, sir.

15   Q.  Can you -- what documents have you had a chance to look at?

16   A.  Just my statement and the prior trials that I've been in.

17   Q.  All right.  Now, you testified -- my understanding is that

18   you testified, in addition to the prior statement that the

19   government showed you, you've testified in the state court

20   trial on at least two separate occasions?

21   A.  Yes, sir.

22   Q.  Once at a preliminary hearing I believe in February 24,

23   2003.  I don't know that you know the date.  You testified at a

24   preliminary hearing?

25   A.  Yes, sir.

1    Q.  And then you also testified at the trial where there was an

2    actual jury there?

3    A.  Yes, sir.

4    Q.  And it's your testimony that you reviewed that testimony as

5    well prior to your appearance here today?

6    A.  Yes, sir.

7    Q.  Okay.  Did you have an opportunity to look at the police

8    officer's police report that he took down at the time you spoke

9    to him at your house?

10   A.  No, sir.

11   Q.  All right.  Your Honor, for the record, I'd like to just

12   make sure that she has it.  Can I approach the witness?

13            THE COURT:  Of course.

14            (Pause.)

15   Q.  Just wanted to you take a look at that and ask if you have

16   ever seen that report before?

17   A.  No, sir.

18   Q.  Okay.  I'll give it back.

19            Now, I am going to direct your attention to your

20   preliminary hearing testimony on February 24th, 2003.  I have a

21   copy of that.  I'm also going to provide a second copy to you

22   in just a moment.

23            (Pause.)

24            THE COURT:  Maybe she won't need it, Mr. Kurland.

25   Q.  All right.  I'll ask the question, then.

1          THE COURT:  If you want a copy, Miss Davis, please

2     say so.  But I'm not sure you'll need it to answer his

3     question.

4     A.  No, sir, thank you.

5     Q.  Do you recall at the preliminary hearing testifying under

6     oath on February 24, 2003 when asked about the description of

7     the men you saw, you testified under oath, "Okay.  The taller

8     one was six foot three.  He had on a gray shirt, faded jeans,

9     butter Tims, baseball cap."

10    A.  Yes, sir.

11    Q.  So the testimony there was it was a gray shirt?

12    A.  Yes.

13    Q.  And that was February 24, 2003, and that was much closer in

14    time than today?

15    A.  Yes.

16    Q.  Okay.  So would your recollection as to what you observed

17    be better then as opposed to today?

18    A.  Yes, sir.

19    Q.  Okay.  And, in addition, did you also testify, with respect

20    to the second person, the second one had on -- he was shorter,

21    five foot six, five seven.  He had on fade jeans as well, same

22    Timberland boots, butter Tims, gray shirt, real fine braids,

23    really nice and neat?

24    A.  Yes, sir.

25    Q.  And, again, this testimony was much closer in time to the

1     events.  And I take it that this testimony would be more

2     accurate with respect to the description?

3     A.  Yes, sir.

4     Q.  Good.  All right.  Thank you.

5              Would -- is it also true, you did speak to a police

6     officer, as you said, at the scene, correct?

7     A.  Yes.

8     Q.  And you gave a description?

9     A.  Yes.

10    Q.  All right.  Isn't it true that at that time when you gave a

11    description of the suspects, you described them exactly as your

12    testimony was on February 24, that it was the taller one had on

13    a red and white baseball hat, gray shirt, light blue jeans.

14    And the second one was shorter, real fine braids, wearing a

15    gray shirt.

16             Wasn't that the description you gave to the officer

17    at the scene?

18    A.  Yes, sir.

19             MR. KURLAND:  May I have a moment, Your Honor?

20             THE COURT:  Yes.

21    Q.  Okay.  And your testimony on direct was that you really

22    couldn't recall what the men were wearing when you saw them

23    after the police officer took you, took you in the car, you

24    were asked questions from the prosecutor about the descriptions

25    of what they were wearing.  Do you recall what they were

1    wearing when you saw them?

2    A.  Do I recall what they were wearing then when I saw them?

3    Q.  Yes.

4    A.  Yes, sir.

5    Q.  What color shirt, do you recall what color shirts they were

6    wearing when you saw them when the officer brought you over to

7    see if they were the same people you saw running?

8    A.  I'm not sure I understand your question.

9    Q.  All right.  That's my fault.

10          Do you have any recollection today as to the clothing

11   that the two men were wearing at the time you saw them, not on

12   the street, but after the police officer had brought you --

13   down the block and around the corner?

14   A.  Yes.  I described both of the men to the officer.  I said

15   those are the guys right there.

16   Q.  Okay.  Do you recall what color shirts they were wearing at

17   that time?

18   A.  At that time, yes, sir.

19   Q.  And what color shirts were they wearing?

20   A.  What did I write in my statement?  I cannot remember, you

21   know, from then.  I know one shirt was lighter than the other

22   shirt.  The taller guy's shirt was lighter than the shorter

23   guy's shirt.

24          MR. KURLAND:  Okay.  I have no further questions.

25          MR. HANLON:  No redirect, Your Honor.

```
 1              THE COURT:  Any other counsel have any questions?
 2    All right.  Thank you, Miss Davis, very much, you're excused.
 3              THE WITNESS:  Okay.  Thank you.
 4              MR. HANLON:  Your Honor, I assume that the witness
 5    can be excused for today?
 6              THE COURT:  Yes, she's excused.
 7              THE WITNESS:  Thank you.
 8              MR. HANLON:  Your Honor, the United States will call
 9    Patricia Maynard.
10              THE COURT:  All right.  Miss Maynard, the clerk will
11    place you under oath over here, and then you can make yourself
12    comfortable on the witness stand.
13              THE CLERK:  Please remain standing and raise your
14    right hand.
15              (The Witness is sworn.)
16              THE CLERK:  Thank you.  May be seated.  Please speak
17    directly into the microphone.  Please state your name and spell
18    your name for the record.
19              THE WITNESS:  Patricia Maynard, P A T R I C I A,
20    Maynard, M A Y N A R D.
21                        DIRECT EXAMINATION
22    BY MR. HANLON:
23    Q.  Miss Maynard, good morning.
24    A.  Good morning.
25    Q.  Do you have any children?
```

1  A.  Yes.

2  Q.  How many?

3  A.  Three.

4  Q.  You have one 17-year old daughter; is that right?

5  A.  Yes.

6  Q.  What is her name?

7  A.  Andrea Smith.

8  Q.  Miss Maynard, I'm going to direct your attention to a

9  particular date.  You may not remember the day, but it's in

10  June of 2002.

11        Do you remember a day when you accompanied your

12  daughter Andrea Smith with a police officer on a ride someplace

13  and returned home?

14  A.  Yes.

15  Q.  I'm going to ask you very specifically about that day,

16  about how that came to pass that you did that.

17        You arrived home that day, spoke with your daughter

18  and learned that something happened near home; is that correct?

19  A.  Outside, yes.

20  Q.  Did you witness what happened outside your home or anything

21  like that?

22  A.  No.  I didn't witness the actual event.

23  Q.  You spoke with people about it?

24  A.  After the fact, yes.

25  Q.  At some point, on that same day, did a police officer ask

1    to talk to your daughter, or talk to your daughter and you

2    became aware of that?

3    A.   Yes.

4    Q.   About how long after you returned home and learned that

5    things had happened in outside your house did you see the

6    police with your daughter?

7    A.   About 15, 20 minutes, not -- not long.

8    Q.   And how did you become aware police were interested in

9    talking to Andrea?

10   A.   They knocked on the door.

11   Q.   Did you allow Andrea to speak with the police?

12   A.   In my presence, yes.

13   Q.   That was going to be my next question.

14          Did you allow her any time that day that you can

15   remember to talk with any police officers when you were not

16   present?

17   A.   Two minutes.  Because when they knocked on the door, she

18   answered the door, but I was directly behind her, so it really

19   wasn't long, if two minutes.  He may have asked her something

20   that I wasn't there.

21   Q.   From then on, were you present all the time?

22   A.   Yes.

23   Q.   And at some point, did you learn that police were

24   interested in driving your daughter someplace to do something?

25   A.   Yes.

1    Q.  Can you tell us what it is the police asked your daughter

2    that you heard?

3    A.  They asked her if she could go ride with them to identify

4    two people who had done the crime.

5    Q.  Do you remember the particular words or language that the

6    officers used?

7    A.  Not word-for-word.  That was five years ago.

8    Q.  I completely understand.  It's perfectly all right if you

9    don't remember.

10          Did Andrea and you agree to go with the police?

11   A.  Yes.

12   Q.  The officer that you rode with, was it the same officer

13   that asked you to do this, or was it another officer driving

14   the car, if you remember?

15   A.  I'm not sure.  It may have been another officer than the

16   one I spoke to.

17   Q.  Was there any conversation between your daughter and the

18   officer or between you and the officer during that car ride?

19   A.  No, not really.

20   Q.  At any time did the officer in the car tell you or Andrea

21   anything about who the men were that she was going to be

22   seeing, or what they had done, or what they looked like, or

23   anything about them?

24   A.  No.

25   Q.  Did you -- did the officer in your presence give Andrea any

1    information about where these men had been coming from, if

2    anything had been taken from him, or anything like that?

3    A.  No.

4    Q.  How about the first officer that first approached Andrea

5    about this, did he say anything about who the men were, or what

6    they looked like or where they'd been seen or anything like

7    that?

8    A.  No.

9    Q.  When you arrived at the location, can you tell us what

10   happened?

11   A.  She looked through the window, and he just asked if you can

12   identify, do you see anybody that you can identify.  And she

13   said yes.  He didn't question her and say is that them or

14   anything like that.

15   Q.  Other than saying yes, did Andrea say anything else that

16   you can remember?

17   A.  I want to go home.

18   Q.  And about how long were you at this location before Andrea

19   said yes with respect to the identification?

20   A.  Just a few minutes.  We weren't there too long.

21   Q.  Did Andrea or you ever have to get out of the car?

22   A.  No.

23   Q.  After, do you remember if an officer said anything to the

24   other officers over the radio or through the window or anything

25   like that?

```
1    A.   I think he said something in his radio.  I don't know
2    exactly what it was.
3    Q.   Did you return home after that?
4    A.   Yes.
5    Q.   About how long did it take to you get to this location?
6    A.   A few minutes.
7              MR. HANLON:  One moment, please, Your Honor.
8              Nothing further, Your Honor.  Thank you, Miss Smith.
9              MR. KURLAND:  May I have a moment, Judge?
10             THE COURT:  Yes.  Help yourself to some water there,
11   Miss Maynard, if you'd like.
12             THE WITNESS:  Thank you.
13             MR. KURLAND:  I have just a few question, Your Honor.
14                       CROSS-EXAMINATION
15   BY MR. KURLAND:
16   Q.   I'm showing the government a document that I'm going to --
17   Your Honor, may I approach the witness?
18             THE COURT:  Yes.
19   Q.   I placed before you a document that is Baltimore County
20   Police Department witness statement form.  And the top says
21   "Andrea Smith;" is that correct?
22   A.   Correct.
23   Q.   All right.  After the police officers took you and your
24   daughter to the scene, you returned back to your house?
25   A.   Yes.
```

1    Q.   At that time, did your daughter write out a statement?

2    A.   No.   We wrote the statement before we left, I do believe.

3    Q.   Pardon?

4    A.   I wrote the statement for her before we went to go identify

5    anybody, because when he first came to come talk to her, he

6    gave us these papers, and we started writing this statement in

7    before he came to ask her to go out and identify, if I'm not

8    mistaken.

9    Q.   Okay.   No, that's your testimony.

10             And is this statement written in your writing?   Is

11   this your -- excuse me.   Is this your writing?

12   A.   Most of it.   The last line is hers.

13   Q.   When you say the last line, starting with "the one that

14   shot"?

15   A.   Right.   That's her handwriting.

16   Q.   Right.

17   A.   And she signed it.

18             MR. KURLAND:   Yes.   Your Honor, may I have a moment

19   with co-counsel?

20             THE COURT:   Certainly.

21             (Pause.)

22             MR. KURLAND:   No further questions, Your Honor.   Can

23   that be marked for identification defense 1?

24             THE COURT:   Gardner 1.   Okay.

25             Miss Maynard, thank you very much.   You're excused.

1          Next witness.

2          MR. HANLON:  Your Honor, the next witness will be

3    Andrea Smith.  We're now at the issue with --

4          THE COURT:  All right.  Miss Maynard, would you just

5    step outside the courtroom, please?  I've been told that your

6    daughter would like you to be in the courtroom when she

7    testifies.  I need to speak to her outside of your presence

8    before I make a decision whether you can remain here.

9          So if you would just step outside and remain outside.

10          It appears, Mr. Kurland, that my speculation was

11    quite on the mark.  I mean, the witness testified that she

12    actually prepared the statement, and is that Andrea only added

13    one sentence to the statement.  So I really don't see any harm

14    in her being in here, but I'll just question Andrea a bit, Miss

15    Smith.

16          MR. HANLON:  She's on her way in, Your Honor.

17    They're all over in this witness room.

18          (Pause.)

19          THE CLERK:  Good afternoon.  Please remain standing

20    and raise your right hand.

21          (The Witness is sworn.)

22          THE CLERK:  Thank you.  Please be seated.  Please

23    speak directly into the microphone.  Please state your name and

24    spell your name for the record.

25          THE WITNESS:  Andrea Smith.

```
 1                    THE COURT:  Miss Smith, you pull that microphone a
 2          little closer to you, please.  Good afternoon.  I'm Judge
 3          Davis.
 4                    THE WITNESS:  How are you doing?
 5                    THE COURT:  I've been told that you would very much
 6          like to have your mother sit in the courtroom when you testify;
 7          is that right?
 8                    THE WITNESS:  Yeah.
 9                    THE COURT:  Can you tell me why you want her in here?
10                    THE WITNESS:  I just wanted her with me.
11                    THE COURT:  Okay.  You'd feel better about it that
12          way?
13                    THE WITNESS:  Yes.
14                    THE COURT:  How much, if at all, have you and your
15          mom talked about these incidents that you're here to testify
16          about?
17                    THE WITNESS:  We didn't talk about them until
18          yesterday when they brought back up.
19                    THE COURT:  Prior to yesterday going all the way back
20          to 2002, when you were 13 years old, have you talked about it
21          since then from time to time?
22                    THE WITNESS:  Not since the first year came up.
23                    THE COURT:  The first year?  You have to say yes or
24          no.
25                    THE WITNESS:  Yes.
```

```
 1                 THE COURT:  Okay.  And have you told her everything
 2      that you know about the incident?
 3                 THE WITNESS:  Yes.
 4                 THE COURT:  As far as you know?
 5                 THE WITNESS:  Yes.
 6                 THE COURT:  Did she question you about it?
 7                 THE WITNESS:  No.
 8                 THE COURT:  No?  Were you scared?
 9                 THE WITNESS:  Yes.
10                 THE COURT:  Did your mom try to help you not be
11      scared about it?
12                 THE WITNESS:  Yes.
13                 THE COURT:  Okay.  All right.  I'm satisfied, Mr.
14      Kurland, that there will be no prejudice whatsoever to your
15      client to have Miss Maynard sit in the courtroom.
16                 By the way you're 17 now?  When is your birthday.
17                 THE WITNESS:  July 26.
18                 THE COURT:  So you'll be 18 this year?
19                 THE WITNESS:  Yes.
20                 THE COURT:  Okay.  All right.
21                 MR. HANLON:  Thank you, Your Honor.
22                 THE COURT:  Try to keep your voice up, please, Miss
23      Smith.
24                      DIRECT EXAMINATION
25      BY MR. HANLON:
```

1    Q.  Miss Smith, good morning.

2    A.  How are you doing?

3    Q.  Fine.  We talked before a couple times; is that right?

4    A.  Yes.

5            THE COURT:  Miss Smith, I'm sorry.  You need to get

6    as closer as you can to that microphone.  Thank you.  That's

7    good.

8    Q.  Miss Smith, I know it's hard, but I'm almost going to ask

9    to you raise your voice almost to where you think you might be

10   talking too loud.  It's not rude, just so everybody in the room

11   can hear.  If I ask you to speak up once or twice, don't be

12   offended, okay?

13   A.  Yes.

14   Q.  Now, you've testified you're 17 years old; is that right?

15   A.  Yes.

16   Q.  Back in a few years ago, back in June of 2002, do you

17   remember that there was a day when you saw something happen

18   outside your home?

19   A.  Yes.

20   Q.  And you and I have talked about that day, you've talked to

21   the police officers and things about that day; is that right?

22   A.  Yes.

23   Q.  On that day, you came home from school; is that right?

24   A.  Uh-huh.

25           THE COURT:  You have to say yes or no.

```
 1   A.  Yes.

 2   Q.  Okay.  When you got home from school, what did you do?

 3   A.  I went in the house.

 4   Q.  You went out?

 5   A.  I went in the house.

 6   Q.  In the house.  I'm sorry.

 7            What did you do in your house?

 8   A.  I was with my little sister and my older sister.  We were

 9   -- we were having a cookout.

10   Q.  At some point, Miss Smith, did you go outside your house?

11   A.  Yes.

12   Q.  And what were you doing outside the house?

13   A.  Standing out front.

14   Q.  Playing, talking to other kids?

15   A.  Talking to the girl under me.

16   Q.  Can you give me that once more, Miss Smith?

17   A.  Talking to the girl and the under me on the porch.

18   Q.  The girl under you?

19   A.  Uh-huh.  And I know she lives in my building.

20   Q.  You were just chatting, right?

21   A.  Uh-huh.

22            THE COURT:  You have to say yes or no.

23   A.  Yes.

24   Q.  Where was your mom on that day?

25   A.  She went to the store.
```

1    Q.   What was she getting at the store?

2    A.   Hamburger and hot dog rolls.

3    Q.   Were you planning on having barbeque outside?

4    A.   A cookout.

5    Q.   Now, while you're outside, do you remember the street name

6    that you lived on, Miss Smith, at that time?

7    A.   Bramble Lane.

8    Q.   You don't remember the name number offhand, do you? It is

9    okay.

10   A.   8618.

11   Q.   While you will were outside, did you see something strange

12   happen?

13   A.   Yes.

14   Q.   What did you see happen?

15   A.   A lady fell off the porch.

16   Q.   A lady --

17           THE COURT:  Take a few deep breaths, Miss Smith, and

18   take your time.

19   Q.   Are you okay?

20   A.   Yes.

21   Q.   Lady fell off her porch.  Can you tell us what happened,

22   how she fell off the porch?

23   A.   She was trying to get down.

24   Q.   She fell off the porch, and where did she fall to?

25   A.   To the ground off the third level.

1  Q.  Did you know who this lady -- have you ever seen her

2  before?

3  A.  She was my next door neighbor.

4  Q.  You'd seen her around the house from time to time?

5  A.  Uh-huh.

6  Q.  That's a yes?

7  A.  Yes.

8  Q.  Did you -- were you able to see what made the lady fall off

9  the porch?

10  A.  Somebody in her window.

11  Q.  Somebody in her window.  You were able to see through the

12  windows to her apartment?

13  A.  The porch window.

14  Q.  She fell off the porch, when she fell down, what did she do

15  after she fell?

16  A.  She crawled under the porch.

17  Q.  There was space under the porch?

18  A.  Uh-huh.

19  Q.  Is that a yes?

20  A.  Yes.

21  Q.  Could you tell what the person in her window did after she

22  fell?  Did they stay in the window, or did they go somewhere

23  else?

24  A.  I wasn't paying attention to it.  I don't know where they

25  --

1    Q.  The last thing you said, Miss Smith?

2    A.  I said I wasn't paying attention to what happened in her

3    window after she fell.

4    Q.  Were you focused on the lady?

5    A.  Yes.

6    Q.  Now, she goes under the porch.  What happened next?  Was

7    there anyone else there?

8    A.  It was my sisters went outside.  And the lady under her,

9    that lived in the apartment under her, came out there and asked

10   me what was that.  And I told her the lady fell.

11   Q.  Did the lady who fell, did she say anything, or gesture in

12   any way?

13   A.  Told me to call the police.

14   Q.  Was there anyone else there that you saw, did anyone come

15   by?

16   A.  The man came out of her house.

17   Q.  A man came out of her house.  Can you tell us how many men

18   it was?  Was it one or more?

19   A.  Two.

20   Q.  Two men.

21           Where did they go after they came out of her house?

22   A.  They ran down the steps.

23   Q.  And where did they go when they came down the steps?

24   A.  Out the door.

25   Q.  There's a front door at the bottom of the steps?

1    A.   Yes.

2    Q.   As they came out the door, what did they do after that,

3    Miss Smith?

4    A.   They were standing in front of her, and they shot her.

5    Q.   Did they both shoot her, or did one of them shoot her?

6    A.   One of them.

7    Q.   Miss Smith, when you saw this --  it's okay to give a

8    ballpark, about how far away were you when you saw these men

9    near the lady?

10   A.   I was standing in front of them.

11   Q.   Was it -- was it a matter of feet or a matter of yards?

12   A.   A couple foot steps from the lady.

13   Q.   Can you tell us what the men looked like?

14   A.   I don't remember.

15   Q.   Do you remember what they were wearing?

16   A.   Not exactly.

17   Q.   Not exactly.  You at some point, Miss Smith, did you write

18   out, or did your mom help you write out a statement for a

19   police officer?

20   A.   Yes.

21   Q.   This was a little later; is that right?

22   A.   Yes.

23   Q.   If I showed you that and if would you have a chance to read

24   it, is there any chance that would help you remember what the

25   men were wearing?

1    A.   Maybe.

2              MR. HANLON:  Your Honor, may I approach?

3              THE COURT: Yes.

4    Q.   Miss Smith, does this look like the thing that your mom had

5    helped you write?

6    A.   Yes.

7    Q.   And is that your signature at the bottom of this first page

8    here?

9    A.   Yes.

10   Q.   I'm going to ask you to take a look at a particular part of

11   it.  The third line from the bottom on the first page begins

12   with "one man," and then it goes to the end of that page, and

13   there's a little bit written on the next page as well.  Do you

14   see that?

15             Take a look at that for me and tell me when you've

16   had a chance to read that.

17             (Pause.)

18   A.   I read it.

19   Q.   Does that help you remember what the men looked like or

20   what they were wearing or anything like that?

21   A.   No.

22   Q.   Okay.  Do you remember if either one of them, anything

23   about their hairstyles, or if they were wearing hats, or

24   anything like that?

25   A.   One of them had corn rows, and the other one had a red hat

 1    on.

 2    Q.   One had corn rows, and one had a red hat on; is that right?

 3    A.   Yes.

 4    Q.   You mentioned that one of them shot the lady.  Can you tell

 5    us who shot the lady, the one with the red hat or the one with

 6    the corn rows?

 7    A.   The one with the red hat.

 8    Q.   Do you remember, Miss Smith, if either of these two men was

 9    taller than the other one?

10         THE WITNESS:  I don't know which one.

11    Q.   One was a little taller than the other?

12    Q.   But you're not sure if red hat was taller than the man with

13    the corn rows?

14    A.   I don't remember.

15    Q.   Do you remember how many shots you heard?

16    A.   Two.

17    Q.   And did you -- can you tell us what happened after that,

18    after the shots were fired?

19    A.   They ran.

20    Q.   Did you see, Miss Smith, where they ran?  What general

21    direction they were running toward?

22    A.   Old Court Road near Northwest Hospital.

23    Q.   Old Court Road and Old Northwest Hospital?

24    A.   Yes.

25    Q.   And after they ran off, what did you do?

1    A.   I went in the house.

2    Q.   Did you stay in your house?

3    A.   No.

4    Q.   At some point, did you speak to a police officer or get

5    interviewed or something like that?

6    A.   Yes.

7    Q.   Was your mom with you then?

8    A.   Not at first.

9    Q.   Not at first?  But did she come over?

10   A.   Yes.

11   Q.   Now, at some point, Miss Smith, did a police officer come

12   to you and ask you to go someplace with him?

13   A.   Yes.

14   Q.   And about how long after you had seen this event were you

15   asked to go someplace with an officer, was it a matter of

16   minutes, or was it longer?

17   A.   It was minutes.

18   Q.   Did you go someplace with the officer?

19   A.   Yes.

20   Q.   You drove someplace?

21   A.   Uh-huh, yes.

22   Q.   Was your mom with you?

23   A.   Yes.

24   Q.   Do you remember what the officer told you about where you

25   were going or what he was going to ask you to do?

1    A.  He just say he wanted me to identify the people.

2    Q.  And did he tell you anything in the car ride about where

3    they'd been found or what they were doing, or if they had

4    anything, or anything like that?

5    A.  No.

6    Q.  Aside from that you were going to look at them, did you

7    know anything about these two guys?

8    A.  Did I know anything about them?

9    Q.  Did the officer tell you anything about them, about what

10   the officer thought about them, or anything like that?

11   A.  No.

12   Q.  And you went, you drove with the officer, eventually, you

13   arrived someplace; is that right?

14   A.  Yes.

15   Q.  And did you have a chance to look at two gentlemen?

16   A.  Yes.

17   Q.  And when you saw these gentlemen, what did you say?

18   A.  That's them.

19   Q.  Did the officer say anything to you after that?

20   A.  No.  I said I want to go home.

21   Q.  And did he take you home?

22   A.  Yes.

23   Q.  Do you remember feeling that these were the guys that you'd

24   seen a little while before outside your house?

25   A.  Yes.

1    Q.  Do you still feel that way?

2    A.  I don't know.

3    Q.  Did the officers say anything to you on the way back, Miss

4    Smith?

5    A.  Not that I can remember.

6    Q.  And you got home and the officer dropped you off?

7    A.  I don't remember him doing --

8    Q.  The officer dropped you off at home, you and your mom?

9    A.  Uh-huh.

10    Q.  That's a yes?

11    A.  Yes.

12          MR. HANLON:  Your Honor, just one moment.

13          Miss Smith, thank you.

14          Your Honor, I don't have anything further.

15          MR. KURLAND:  Just a moment, Your Honor.

16          (Pause.)

17                CROSS-EXAMINATION

18    BY MR. KURLAND:

19    Q.  Good afternoon, Miss Smith.  How are you?

20    A.  Fine.

21    Q.  Would you prefer if I call you Andrea or Miss Smith?  What

22    are you more comfortable with?

23    A.  Shay.

24          MR. KURLAND:  Your Honor, is it okay if I address her

25    as Shay?

1              THE COURT:  That is okay.

2  Q.  All right.  Shay, I'm just a lawyer in the case.  We've

3  never talked before.  You've never met me before?

4  A.  No.

5  Q.  I'm just going to ask you a couple questions, and I know

6  that it's difficult.

7              Shay, going back to the time when -- from the first

8  officer arrived at the scene --

9  A.  Yes.

10  Q.  -- do you recall that officer asking you if you could give

11  a description as to the two guys that you saw?  I know it was a

12  long time ago.

13  A.  I don't remember.

14  Q.  So you don't remember giving any description to the police

15  officer?

16  A.  Only description I remember giving is the one I saw on this

17  paper.

18  Q.  Okay.  Okay.  If I -- I'm going to -- well, is it possible,

19  though, that at that time that you did give a description to

20  the police officer, you just don't remember?

21  A.  It's possible.

22  Q.  Okay.  I only have a couple other questions I want to ask

23  you.

24              When the police officer drove you and your mom to

25  take a look at those two other, the other two men or the two

1   men, at the time you saw the two men, you testified a couple

2   minutes ago that you were in the police car?

3   A.  Yes.

4   Q.  You never got out of the police car?

5   A.  No.

6   Q.  The two guys, they were handcuffed, weren't they, were you

7   able to see that?

8   A.  I don't remember if they were handcuffed.

9            MR. KURLAND:  Okay.  Your Honor, may I have a minute?

10           THE COURT: Yes.

11  BY MR. KURLAND:

12  Q.  Shay, I just want to ask you one last question concerning

13  that statement that's in front of you.  Can you turn to that

14  page, the second page?  The last three lines there you can see

15  from this statement there's two different writings, there's the

16  first page is written in somebody's handwriting, and then

17  there's the last three lines that are printed?

18  A.  Uh-huh.

19  Q.  Are the last three lines your writing?

20  A.  Yes.

21  Q.  Is the rest of the writing your mom's writing?

22  A.  Yes.

23           MR. KURLAND:  Okay.  I have nothing further, Your

24  Honor.

25           THE COURT:  Very well.

1                MR. HANLON:  No redirect, Your Honor.

2                THE COURT:  All right.  Miss Smith, thank you very

3      much.  You are excused.

4                Go ahead.

5                MR. HANLON:  I assume Miss Smith and Miss Maynard may

6      be excused go to home.

7                THE COURT:  That's exactly right.  By the way, what

8      grade are you in?

9                THE WITNESS:  10th.

10               THE COURT:  10th?

11               MR. KURLAND:  Your Honor, after the witness gets out,

12     I need to --

13               THE COURT:  Okay.

14               MR. HANLON:  Your Honor, I'm sorry.

15               MR. KURLAND:  Your Honor, I was just talking with the

16     prosecutor here.  Depending on the nature of what the police

17     officers testify to, I've asked the prosecutor that they're

18     subject to recall if there's something substantially different.

19               THE COURT:  Sure.

20               MR. KURLAND:  Thank you very much.

21               MR. HANLON:  Your Honor, the next government's next

22     witness, again he's being ushered in as we speak, will be

23     Officer Keith Ketterman of the Baltimore County.

24               THE COURT:  I was going to take a break.  Which one

25     was he?

1          MR. HANLON:  Officer Ketterman was one of the two

2    police officers actually involved in the stop of the defendant,

3    Mr. Gardner.  I don't think there's any Fourth Amendment issues

4    being litigated today, but he was present with the defendant at

5    the time of the show-up procedures.  He's also one of the

6    officers that I think counsel had asked me to procure for

7    today, him and another officer Tony, who's not available.

8          THE COURT:  You didn't plan to call him.  He's only

9    here because Mr. Kurland wanted him?

10         MR. HANLON:  Since I was asked to procure him, I was

11   going to call him and put him on and let defense counsel do

12   some cross.  I don't think it's going to be lengthy.

13         THE COURT:  We'll go ahead and see if we can't get

14   him back to work.

15         MR. HANLON:  Actually, I'll ask counsel if there are

16   no Fourth Amendment issues being litigated today, if I simply

17   go straight to where the show-up is being done?

18         THE COURT:  There's no evidence that was seized, was

19   there?  You can come in, officer.

20         MR. HANLON:  I just want to make sure.  I think it's

21   just show-up.

22         MR. KURLAND:  No.  There's no probable cause argument

23   that's being litigated.

24         THE COURT:  Very good.  You can approach the witness

25   stand, officer.  Thank you.

```
 1                  THE WITNESS:  Good morning, Your Honor.
 2                  THE COURT:  Good morning.
 3                  THE CLERK:  Please remain standing and raise your
 4       right hand.
 5                  (The Witness is sworn.)
 6                  THE CLERK:  Thank you.  Please seated.  Please state
 7       your name and spell your last name for the record.
 8                  THE WITNESS:  Officer Keith Ketterman, K E T T E R M
 9       A N.
10                        DIRECT EXAMINATION
11       BY MR. HANLON:
12       Q.  Officer, good morning, or good afternoon I suppose it is.
13            How are you employed, sir?
14       A.  Excuse me?
15       Q.  How are you employed?
16       A.  Through the Baltimore County Police Department.
17       Q.  And how long have you been a Baltimore County Police
18       Officer?
19       A.  Approximately 11 and a half years.
20       Q.  Directing your attention to June 7th, 2002, were you a
21       County officer at that time?
22       A.  Yes, I was.
23       Q.  What precinct were you assigned to in 2003?
24       A.  The Garrison precinct.
25       Q.  I'm going to lead through a couple things, officer, to try
```

1    focus you on something else.  At some point on that date, were

2    you asked by some other officers to respond to a neighboring

3    precinct to assist in something?

4    A.  Yes.

5    Q.  What is it that you were asked to do?

6    A.  We proceeded to the Woodlawn precinct, that area for a

7    shooting that just occurred.

8    Q.  And at some point, and again I'm going to direct you

9    through a couple things, at some point, you actually came into

10   the company of two men that you detained along with another

11   officer name Michael Tony; is that right?

12   A.  Yes.

13   Q.  So some events passed, and you actually did a report on

14   that; is that correct?

15   A.  Yes.

16   Q.  Your Honor, may I approach the witness?

17          THE COURT:  Yes.

18   Q.  Officer, for the record and just for the officer's

19   reference, and I've alerted Mr. Kurland, I've just provided

20   Officer Ketterman with his own report and handwritten notes,

21   both of which the defense have.

22          Officer Ketterman, the two gentlemen you were in the

23   company of, do you remember getting any identification from

24   them?

25   A.  Yes.  One of them had ID, and the other one didn't.

1   Q.   The gentleman who had ID, what was his name?

2   A.   Shawn Gardner.

3   Q.   The gentleman who did not, what did you understand his name

4   to be?

5   A.   He gave us Tevon Brown.

6   Q.   At some point did you learn, maybe from other officers or

7   that Tevon Brown had a different identity?

8   A.   Yes.

9   Q.   What was that identity?

10  A.   Aaron Holly.

11  Q.   While you were in the company of these men, can you tell us

12  where you were in terms of what neighborhood you were in?

13  A.   It's -- I guess I'm not sure what it's's called, but it's

14  Green Brush and Green Knoll, called the Greens, possibly.

15  Q.   Do you recall approximately what intersection you were at

16  when you had the men in your company?

17  A.   Green Brush.  When I first spotted the suspects it was

18  Green Brush Court and South Green Road.

19  Q.   When you ended up, without getting into all the details,

20  you followed them around for a few minutes and ultimately sort

21  of stopped them; is that correct?

22  A.   Yes.

23  Q.   Do you recall where they were when they were detained?

24  A.   If may I refer to my notes?

25  Q.   Sure.

1    A.   Green Knoll Road and Green, Green Brush, or South Green

2    Road and Green Knoll Road.

3    Q.   Too many greens.

4    A.   Yes.

5    Q.   Now, at some point, these men are in your company, did you

6    receive word that a show-up, one-on-one identification process,

7    was going to be done?

8    A.   Yes.

9    Q.   Did you have any awareness of what it is that these men

10    were being detained for, what you were there investigating?

11    A.   Possible suspects in a shooting.

12    Q.   And the purpose of the show-up was to allow witnesses to

13    see the men that you had in your company?

14    A.   Yes.

15    Q.   Ball park, officer, how long after you detained these

16    gentlemen did the first witness arrive for purposes of a

17    show-up identification process?

18    A.   Five, ten minutes approximately.

19    Q.   Now, at the time of the first witness who came in, did they

20    come in on foot, or was it in a vehicle?

21    A.   In a vehicle.

22    Q.   Did you ever see the witness or know anything about that

23    witness?

24    A.   No.

25    Q.   Did you know anything about the officer who was driving

1    that witness?

2    A.   No.

3    Q.   If I told you that the witness was a man or woman or

4    whatever, would you know if I was right or wrong?

5    A.   No.

6    Q.   When that first witness arrived, they never got out of the

7    car I gather?

8    A.   No.

9    Q.   What was the condition of the two men that you had in

10    detention at the time of the first witness arrived, were they

11    handcuffed?

12    A.   No.

13    Q.   Were they sitting together, or were they separate?

14    A.   They were sitting on the curb.

15    Q.   You've anticipated my next question.  They were sitting on

16    a curb.  They had not been placed in a police car, I gather?

17    A.   No.

18    Q.   Were you the only -- were you and Officer Tony the only

19    uniforms present?

20    A.   No.

21    Q.   There were other uniformed officers?

22    A.   Yes.

23    Q.   Were there other squad cars?

24    A.   Yes.

25    Q.   When the first witness arrived, at any point, did you

1    receive an instruction, or do you remember the two men standing

2    up for that witness?

3    A.   Yes.  We had him standing.

4    Q.   Do you remember if you had to help pull them up or gesture

5    them up or order them up?

6    A.   I don't recall.

7    Q.   But they did stand up?

8    A.   Yes.

9    Q.   About how long were they standing?

10   A.   I'm not sure of the exact time.

11   Q.   Moments?

12   A.   Yeah.

13   Q.   At some point, did you or one of your other officers

14   receive word with respect to whether the witness in the car had

15   identified these two men?

16   A.   I remember we had a positive identification.

17   Q.   Do you recall how that information was relayed?

18   A.   No, I don't.

19   Q.   Did the vehicle the witness was in leave at that point?

20   A.   Yes, I believe so.

21   Q.   What did you or your other officers do with the two

22   gentlemen who had detained after receiving word that it was a

23   positive ID?

24   A.   I don't recall from we had placed handcuffs on them then or

25   after the second show-up.

1    Q.  You're not sure?

2    A.  Yeah, I don't recall.

3    Q.  Do you recall whether or not they were placed in a patrol

4    car after that first identification?

5    A.  I don't recall.

6    Q.  At some point, officer, did a second witness arrive on the

7    scene?

8    A.  Yes.

9    Q.  About how long passed between the departure of the first

10   and the arrival of the second?

11   A.  I can just say approximately probably five, ten minutes,

12   something like that.

13   Q.  Same questions I asked you before, do you have any

14   recollection of having to stand the men up, or asked them to

15   stand, or take them out of a police car, or anything that would

16   help you recollect the scene?

17   A.  I don't recall.

18   Q.  Do you remember if they were handcuffed at the time of the

19   arrival of the second witness?

20   A.  No, I don't.

21   Q.  How long was the second witness there?

22   A.  Moments.  Minutes.

23   Q.  Did the second witness get out of the car?  Did you ever

24   see the second witness?

25   A.  No.

1    Q.   At some point, did you receive word about whether this was

2    a positive or negative?

3    A.   I believe it was positive, also.

4    Q.   And what action did you or your other officers take at that

5    time, if you remember?

6    A.   I don't recall who actually placed them, I know Officer

7    Tony had one in his car, suspect, and Officer Jess, I believe,

8    transported them from the scene to the precinct.

9    Q.   You were not involved in the transport to the precinct?

10   A.   No.

11   Q.   If I just may approach the witness briefly, Your Honor?

12             Officer, I just want to ask you a question about the

13   last line of your report.  I'll refer to your report as

14   government's exhibit -- I think we're at 6.

15             At the very last line of your report, and this

16   photocopying, photocopy of your handwritten notes and then a

17   typed version the report you prepared; is that right?

18   A.   Yes.

19   Q.   The very last line of your report reads, quote, "Both were

20   positively identified as the subjects responsible for shooting

21   Mrs. Joan Spence;" do you see that?

22   A.   Yes.

23   Q.   I'm asking you here today, officer, by that language, did

24   you know, or did you hear, or did you believe that these

25   witnesses specifically identified the two men you had in your

1    company as shooters, or just that they made positive

2    identifications?

3    A.   Just positive identification.

4    Q.   In terms of reference to responsibility for the shooting?

5    A.   For the shooting.

6    Q.   Is it fair to say that's just an assumption?

7    A.   Yes.

8              MR. HANLON:  Your Honor, just a moment, please.

9              Nothing further, Your Honor.  Thank you, officer.

10                  CROSS-EXAMINATION

11   BY MR. KURLAND:

12   Q.   It should have been this morning, but now it's afternoon.

13   Good afternoon, officer.

14   A.   Yes.

15   Q.   I just have a couple of questions.

16             You've testified concerning this matter at some prior

17   state proceedings?

18   A.   Yes.

19   Q.   And it's my understanding -- well, I have the transcripts.

20   You testified at both a preliminary hearing on February 12th,

21   2003, and then you also testified I believe in court --

22   A.   Yes.

23   Q.   -- before an actual trial?

24             All right.  I'm going to ask you a couple questions.

25   I will get to the transcript in just a minute.

```
 1              On the date of the incident that we're talking about,
 2   June 7th, 2002, did you receive a transmission that gave a
 3   description of the suspects?
 4   A.  Yes.
 5   Q.  And do you recall today -- well, let me go back.
 6              Did you look or review any notes?
 7   A.  Yes, I did.
 8   Q.  Or transcripts prior to your testimony here today?
 9   A.  Yes.
10   Q.  What documents or notes did you take a look at?
11   A.  These here and my transcripts.
12   Q.  Both, of both proceedings?
13   A.  Yes.
14   Q.  Okay.  I am going to -- well, okay.
15              Direct your attention to your preliminary hearing.
16              Actually, before we get there, do you recall today,
17   based on your current recollection today, can you recall with
18   specificity the descriptions of the persons that you were
19   looking for that were broadcast over the radio?
20   A.  Yes.
21   Q.  You do based on -- you can recall today what that
22   description was?
23   A.  (The witness nodded affirmatively.)
24   Q.  All right.  Can you tell me what that description was?
25   A.  It was a black male over six feet, and also one about five
```

1    seven, much shorter.  One had a red and white baseball cap,

2    blue jeans and gray shirts.

3    Q.  Okay.  And with respect, was that the one with the baseball

4    cap, the gray shirt?

5    A.  They both, they both had gray shirts on.

6    Q.  Both had gray shirts on?

7            And that was the description that was broadcast over

8    the radio?

9    A.  Yes.

10   Q.  At the time that you observed the suspects, did their

11   descriptions at that time, did their clothing match the

12   descriptions that you'd received over the radio?

13   A.  Not the exact description.

14   Q.  And is it true, isn't it true that neither of them were

15   wearing any hats?

16   A.  No.

17   Q.  That you saw?

18   A.  No hats.

19   Q.  No hats.

20           And at that time were they both wearing gray shirts,

21   or one was wearing a white shirt and one gray shirt?

22   A.  I know one was wearing a white shirt, and I believe one was

23   wearing a gray shirt.

24   Q.  So at the time of the show-up when the witnesses came, one

25   was wearing a white shirt, one was wearing a gray shirt?

1    A.  Yes.

2    Q.  Even though the description that you received on the air

3    waves were both suspects were wearing gray shirts?

4    A.  Yes.

5              MR. KURLAND:  Can I have a moment, Your Honor?

6              (Pause.)

7              MR. KURLAND:  Your Honor, I have no further

8    questions.

9              THE COURT:  All right.  Officer, thank you very much.

10   You are excused.

11             THE WITNESS:  Thank you, Your Honor.

12             MR. HANLON:  Your Honor, I assume Officer Ketterman

13   can be excused as well?

14             THE COURT:  Yes.

15             MR. HANLON:  Does the Court wish to take a break now?

16             THE COURT:  We're going to take a break.  A couple of

17   quick things, though.  I don't know if there's agreement or

18   not.  Counsel had some concerns about the mental health order

19   that I issued, and there's been some subsequent filings on

20   that.  What's the status?  The government has submitted a more

21   refined -- or maybe it's the same order that I just missed.

22             Are the defense satisfied of the government's

23   proposed order, Mr. Sullivan?

24             MR. SULLIVAN:  No, Your Honor.  The first 17

25   paragraphs, yes.  The last paragraph, no.

1          THE COURT:  Okay.  Let me get the order in front of

2    me.

3          So, Mr. Sullivan, apart from the last paragraph, does

4    the government's proposed order address all your concerns?

5          MR. SULLIVAN:  Yes, Your Honor.  The first 15

6    paragraphs deal with methodology for 12.2 procedures.  No

7    objection from Mitchell on that.

8          THE COURT:  Okay.  Let me see if I can find that.

9          (Pause.)

10         THE COURT:  Okay.  So how would you amend that

11   paragraph?

12         MR. SULLIVAN:  By deletion.

13         THE COURT:  Okay.  Short of deletion, how would you

14   amend it?

15         MR. SULLIVAN:  Your Honor, I wasn't being sarcastic.

16   The mental health order deals with precisely that, what under

17   12.2 what mental health evidence that the defense proposed to

18   use at the penalty phase.

19         Paragraph 16 has nothing to do with mental health

20   experts.  In fact, the government carves that out and says

21   except for mental health experts, they want every penalty phase

22   expert we intend to offer.  It's not 12.2 linked.  It's a

23   general expert designation.  And that's what we're objecting

24   to, because there's no basis at this point in time for the

25   government to have an unencumbered view of all of our penalty

1    phase experts.

2              THE COURT:  Okay.  Let me --

3              MR. SULLIVAN:  It says --

4              THE COURT:  I see.  So where it says any expert

5    witness, you believe it should say any expert witness relating

6    to mental health or psychiatric?

7              MR. SULLIVAN:  Your Honor, if you keep reading down,

8    see they have a disclaimer here.  If the Court keeps reading,

9    it says --

10             THE COURT:  I see other than an expert testifying

11   about the mental health of the defendant.

12             MR. SULLIVAN:  Right.

13             THE COURT:  Okay.  Mr. Harding, Mr. Hanlon, do you

14   want to address this issue?

15             MR. HARDING:  Yes, Your Honor.  Mr. Sullivan's motion

16   suggested that I was trying to pull a fast one or something by

17   inserting that into the proposed order, but I explained in the

18   accompanying motion on page 15 that the first 15 paragraphs

19   were derived from and similar to the ones, in fact, I almost

20   identical to the ones that Judge Chasanow and Judge Messitte

21   had used in the Irby and Lighty cases respectfully.

22             Paragraph 16 provides discovery pertaining to people

23   like social scientists and social workers who are often called

24   in penalty phase proceedings.  And the reason why that's

25   important, Your Honor, is that Rule 12.2 actually relates to a

1    kind of evidence rather than to a kind of witness.  It

2    requires, at the beginning of subparagraph B, that if a

3    defendant intends to introduce expert evidence relating to a

4    mental disease or defect, or any other mental condition of the

5    defendant bearing on either the issue of guilt or the issue of

6    punishment in a capital case, the defendant must within a time

7    provided for filing a pretrial motion or at any later time the

8    Court sets notifying attorney for the government in writing of

9    his intention.

10        As I explained in my motion, the Court has plenty of

11   authority outside Rule 12.2 to regulate discovery in a capital

12   case.  12.2, before it existed, it hasn't existed that long,

13   but courts were accustomed to using their inherent authority or

14   Rule 57 to regulate discovery in a capital proceeding.

15        So the Court certainly has authority to issue an

16   order relating to the discovery.

17        What happens in penalty phase proceedings often is,

18   Your Honor, that social scientists and social workers are

19   called to testify to provide background history about a

20   defendant.  An attempt is then made to elicit from them expert

21   opinions that bear on the issue of their mental condition at

22   the time of the offense or now, and so they in fact become

23   witnesses that are within the ambit of Rule 12.2(b), because

24   they're offering evidence relating to a mental condition of the

25   defendant.

1          The government then characteristically objects,

2    because no notice was given pursuant the Court's pretrial order

3    about the mental health condition.

4          I can tell you that Judge Messitte, in the Lighty

5    trial, precluded the social scientist.

6          THE COURT:  I would do exactly the same thing.  I

7    think any judge would do the same thing.

8          MR. HARDING:  Well, in a way, I'm giving notice that

9    if the defense attempts to use social workers or social

10   scientists to offer mental condition evidence at the trial, I

11   will object unless they provide notice pursuant to the mental

12   health order that Court enters in this case.

13         THE COURT:  Okay.  I think the defense is on notice

14   of the government's intention, and of the Court's awareness of

15   the issue.  You're perfectly -- you acted perfectly

16   appropriately to try to be proactive to guard against surprise,

17   and the disguised entry -- introduction of 12.2 evidence

18   through some other means.

19         But I think we can cross those bridges when we get to

20   them, if we get to them.

21         MR. HARDING:  I can tell the Court that Judge

22   Chasanow and Judge Messitte did not include a paragraph similar

23   to the one in paragraph 16 in the government's proposed order.

24   They did, nevertheless, provide for discovery after the verdict

25   came in.  The defense was required immediately to turn over

1    exactly the kind of evidence called for in paragraph 16.

2            THE COURT:  I would think that's the appropriate way

3    to do it, yeah.

4            MR. HARDING:  So the government will consent to

5    deleting paragraph 16 provided, and but with the notice that

6    the government will expect to object to any attempt to elicit

7    mental condition type testimony from these kind of witnesses.

8            THE COURT:  Okay.  Mr. Sullivan, anything further?

9            MR. SULLIVAN:  Your Honor, the only thing I would say

10    is that 12.2 requires the defense to reaffirm their intent the

11    at the conclusion of the trial and before the penalty phase.

12    So I think that I thank the government for the tutorial, but I

13    think all of us understand what our obligations are under 12.2

14    and the consequences that run if we run afoul of them.  But

15    deleting that paragraph is fine.

16            THE COURT:  Very good.  I have deleted the paragraph,

17    initialed the deletion in the margin and dated it, and

18    otherwise I will go ahead and enter this order.  I thank

19    counsel for helping me to get through that.

20            We'll stand in recess until 2:00.

21            (Luncheon recess.)

22            THE COURT:  Please seated, good afternoon noon.  Mr.

23    Martin, approach the bench.

24            MR. MARTIN:  I think I discussed this with Mr.

25    Harding.  We're probably not going to get to Harris' motion, if

1    it's okay with I need blood work taken.  I can be gone.  Josh

2    will be here and --

3              THE COURT:  Hopefully, we won't need a session

4    tomorrow, but we'll see.

5              MR. MARTIN:  That's right, Mr. Harding said he wants

6    to argue Harris's motions next time up.  Thank you.

7              THE COURT:  All right.  Mr. Harding?

8              MR. HARDING:  Yes.  Thank you, Your Honor.

9              THE COURT:  Just to fresh my recollection, if you

10   would, please, this relates, I take it, to the arrest and

11   transport of Mr. Mitchell from Central Booking over to

12   homicide.

13             MR. HARDING:  No, Your Honor.

14             THE COURT:  No.  Because that issue's still hanging

15   out there, right?

16             MR. HARDING:  Well, Your Honor's never actually ruled

17   on that.

18             THE COURT:  Right.  That's what I mean by hanging out

19   there.

20             MR. HARDING:  Because do you remember I put on

21   Detective Kramer about two weeks ago to testify about the

22   arrest of Willie Mitchell, which actually occurred on April 1,

23   2002, because he was arrested for a Pennsylvania warrant for

24   the Hammerjack's stabbings, and then when he was arrested, he

25   also had a gun on him.  So they locked him up for that as well.

```
 1                    THE COURT:  Right.

 2                    MR. HARDING:  But he wasn't questioned about the

 3     murder for another two and a half weeks.

 4                    THE COURT:  That was at the time of the transport.

 5                    MR. HARDING:  Yeah.

 6                    THE COURT:  Okay.  So what's this?

 7                    MR. HARDING:  This relates to the arrest of Willy

 8     Mitchell back on April first.  And the reason is that --

 9                    THE COURT:  The reason we need this witness is?

10                    MR. HARDING:  Okay.  Your Honor, Your Honor raised an

11     issue.  We discussed first of all, a Sixth Amendment issue,

12     which had do with whether his Sixth Amendment rights were

13     violated when he was brought over on the 17th.

14                    THE COURT:  So you want to establish no advisement of

15     the Miranda?

16                    MR. HARDING:  Yes.  On the April first arrest,

17     because Your Honor raised a Fifth Amendment issue having to do

18     whether there was an Edwards violation.

19                    THE COURT:  Okay.

20                    MR. HARDING:  Based on Arizona versus Robers, and

21     that's what Kramer testified to that last time.

22                    THE COURT:  Right.  This is essentially --

23                    MR. HARDING:  The same thing.

24                    THE COURT:  -- the same thing.  Okay.  Thank you.

25                    MR. SULLIVAN:  Your Honor, just as an aside, this
```

1    motion's been pending for about 11 months.

2                THE COURT:  Only 11 months?  I think it is more than

3    11 months.

4                MR. SULLIVAN:  Benefit of the doubt.  And we're not

5    even into the defense case yet.  I want it understood this is

6    not rebuttal.  This is still the government's case.

7                THE COURT:  Absolutely.

8                MR. SULLIVAN:  All right.

9                THE COURT:  Absolutely.  Absolutely.

10               THE CLERK:  Please remain standing and raise your

11   right hand.

12               (The Witness is sworn.)

13               THE CLERK:  Thank you.  You may be seated.  Please

14   state your name and spell your name for the record.

15               THE WITNESS:  Sergeant Russell Steven Robar, R O B A

16   R.

17                          DIRECT EXAMINATION

18   BY MR. HARDING:

19   Q.  Good afternoon, Sergeant Robar.

20               Can you tell us how you're employed right now?

21   A.  I'm employed with the Baltimore City Police Department as a

22   sergeant.

23   Q.  Okay.  And what's your assignment right now, sergeant?

24   A.  I'm assigned to the Northern District.

25   Q.  Okay.  And what's your position there?

1    A.  I'm a patrol sergeant as well as the field training

2    coordinator.

3    Q.  Okay.  What was your assignment back on -- well, first let

4    me ask you, what's your -- how far did you get in college?

5    A.  Four years without graduating.

6    Q.  Okay.  And let me call your attention now back to February,

7    January and February of 2002, were you involved in the

8    investigation of a series of stabbings that occurred at

9    Hammerjack's nightclub?

10    A.  Yes, I was.  It was all one incident.

11    Q.  One incident?

12    A.  Uh-huh.

13    Q.  Not there were several stabbings?

14    A.  Yes, multiple victims.

15    Q.  Did you as a result of that investigation obtain an arrest

16    warrant for Willie Mitchell?

17    A.  Yes.

18    Q.  Do you recall approximately when that was?

19    A.  It would have been either late March, middle of March,

20    April, sometime that year.

21    Q.  Okay.  Were you involved in executing the arrest warrant?

22    A.  No, I was not.

23    Q.  Let me call your attention to April first of 2002, can you

24    tell us what hours you were working that day?

25    A.  I was working the evening, but I don't know exactly the

1    hours, like if it was three to eleven or five to one.  I
2    remember generally speaking the detectives worked the five to
3    one, but I'm not sure that's exactly what I was working that
4    day.
5    Q.  Where were you assigned?
6    A.  I was a detective in Central District, District
7    Investigative Services, DEU.
8    Q.  Was there on the evening of April first of 2002, was there
9    anyone else there who had been involved in the investigation of
10   a Hammerjack's stabbings with you?
11   A.  No, sir.
12   Q.  Okay.  Was it your intention after the warrant was
13   executed, to question Mr. Mitchell?
14   A.  No.
15   Q.  And is there any particular reason why you did not intend
16   to question him?
17   A.  Yes.  I was asked by a homicide detective if it wasn't
18   pertinent to my case if I would not interview him.  And when I
19   agreed it wasn't pertinent to my case, to do that.  So I agreed
20   not to question him.
21   Q.  And who was the homicide detective?
22   A.  Detective Niedermyer.
23   Q.  And did he say why he didn't want you to?
24   A.  He didn't really go into specifics.  I didn't really ask
25   about his case.  He said he had a case that he was working.  He

1  didn't want to alert any information, to give any information
2  to the Willie Mitchell at the time.  So he just said if it was
3  possible and I said I didn't need it in my case, so it was not
4  a problem.
5  Q.  Okay.  Did there come a time that evening when you heard
6  about an arrest --
7  A.  Yes.
8  Q.  -- of Willie Mitchell?
9  A.  Yes.
10  Q.  And do you recall how you heard about him?
11  A.  I believe John Giganti, Detective John Giganti of our
12  apartment called.
13  Q.  Would that have been telephone or radio or what?
14  A.  Telephone.
15  Q.  Okay.  So what did you do after you got this phone call
16  from Giganti?
17  A.  From what I remember, I went over and picked up the
18  warrant, because the way our district is situated right next to
19  headquarters, it's a walkway.  We can go right to the hot desk
20  and pick up the actual hard copy of the warrant so it could be
21  served.
22  Q.  Okay.  So did you do that?
23  A.  Yes.
24  Q.  So what happened after that?
25  A.  Detective Benson brought Willie Mitchell to our office.

1    Q.   Okay.  The Central District you're talking about?

2    A.   Central District, yes, up on the third floor to our office.

3    Q.   Why was he brought to your office?

4    A.   To serve the warrant.

5    Q.   Okay.  You say Detective Benson brought him, was he alone,

6    or was there someone else with him, or do you remember?

7    A.   I don't remember.  I'm sure he had somebody else with him,

8    but that part I don't remember.

9    Q.   What floor were you on, where's the detective?

10   A.   It's on the third floor.

11   Q.   So what did they do when they brought Mr. Mitchell into the

12   detective bureau?

13   A.   We sat him in a chair.

14   Q.   Okay.  Do you recall, was he handcuffed?

15   A.   Yeah, he was handcuffed.

16   Q.   Okay.  Did you have any conversation with him?

17   A.   I don't remember.  Like it was definitely no questioning or

18   anything.  It might have been how you doing, like that kind of,

19   but nothing, no questions or anything like that.

20   Q.   Okay.  Did you have a warrant by that time?

21   A.   Yes.

22   Q.   So what did you do when you showed up there?

23   A.   What happens is, normally, if there's going to be no other

24   charges, just the warrant, we would call for a wagon.  And we

25   did call for a wagon.  The wagon will take it over and certify

1    the warrant over at Central Booking with the individual that's

2    under arrest.

3              In this case, we had to get a van.  There were

4    additional charges with a handgun.  They have to get a band and

5    toe tags that gives the information about the arrest that made

6    the arrest, suspect's name, the band number that's going to go

7    on the suspect, and also the charge, the primary charge,

8    whether, whatever that is, goes on there, and the date and time

9    of the arrest and the location of arrest.

10             And that's so when you get to Central Booking they

11    can -- if he gets there where we start processing, the

12    correctional officer at the window can enter that information

13    into the computer.

14    Q.  Okay.

15    A.  And the wagon men are the individuals that carry those

16    bands and the toe tags.

17    Q.  Did you at any time give Miranda warnings to Mr. Mitchell?

18    A.  No, sir.

19    Q.  If you had intended to interview him that evening, what

20    would you have done when you showed up there?

21    A.  He would have been taken to --

22             MR. SULLIVAN:  Objection.

23    A.  He would been taken to an interview room and placed in the

24    secured in the room.  I would have had another detective with

25    me.  We'd have went in and we would have gone over all the

1    Miranda advice of rights form and the Miranda and probably

2    brought a tape player in and took a taped statement from him.

3    Q.  Okay.  Would you have gone from an advice of rights form?

4    A.  Yes, absolutely.

5    Q.  Did you do an advice of rights form?

6    A.  No.

7    Q.  If he had given a statement, would you also have written a

8    report about it?

9    A.  Absolutely.

10   Q.  And did you do a report in this case?

11   A.  No, sir.

12   Q.  Did there come a time when the wagon showed up?

13   A.  Yes.

14   Q.  Okay.  What happened at that point?

15   A.  Well, I -- we gave them to the wagon man, and he took them

16   over to Central Booking, obviously.

17   Q.  Okay.  What did Benson do after dropping him off there?

18   A.  I can't answer that.  I don't know.  I have no clue.

19   Q.  Okay.  Did Giganti show up at any time during the time you

20   were at Central, at the Central District?

21   A.  I don't recall.  I mean, it wasn't a big deal.  And then I

22   don't recall at all.

23   Q.  Okay.  All right.

24   A.  I'm sure that it was a time when he did.

25              MR. SULLIVAN:  Objection.  No question.

```
 1              THE COURT:  Sustained.
 2  Q.  Did you have any conversation with Giganti that evening
 3  after the phone call that you already told him about?
 4  A.  I don't know if it was that evening.
 5  Q.  You don't remember, is that your testimony?
 6  A.  I've talked to Giganti since, you know, but I don't know if
 7  it was that evening.
 8  Q.  Okay.  All right.  I think those are all my questions for
 9  you, Sergeant Robar.
10  A.  Thank you.
11                    CROSS-EXAMINATION
12  BY MR. KURLAND:
13  Q.  Good afternoon, sergeant.
14  A.  Good afternoon.
15  Q.  Sergeant, let me just start by asking you this question,
16  Central Booking does the processing of people that you arrest,
17  correct?
18  A.  I don't understand.  You're going to have to explain what
19  you mean by process.
20  Q.  Sure.  You arrest somebody, okay, let's say I'm arrested
21  for driving while suspended or something, and you take me to
22  Central Booking so I can appear in front of a commissioner,
23  right?
24  A.  Correct.  Well, not necessarily, you do criminals, criminal
25  not traffic, evidence.
```

1    Q.  I'm -- I have a handgun on me.

2    A.  Okay.

3    Q.  And I'm taken to Central Booking to be processed?

4    A.  Okay.

5    Q.  Is that correct?

6    A.  Yes.

7    Q.  Okay.  And while I'm being processed, in the course of

8    being processed as a criminal defendant, I appear in front of a

9    commissioner at Central Booking, correct?

10   A.  I'm sure, yes.  I don't go through that procedure.

11   Q.  I don't think Mr. Harding asked you this, how many years

12   have you been on the job?

13   A.  Eight, over eight.

14   Q.  So you know what a commissioner does in the State of

15   Maryland?

16   A.  Absolutely.

17   Q.  What does he do?

18   A.  Reviews the statement of charges and also sets bail, among

19   other things.

20   Q.  Among the other things is to advise somebody they have a

21   right to an attorney?

22   A.  I am sure they do.  It's on the statement of charges on the

23   thing.

24   Q.  Well, could you answer for me then while the -- strike

25   that.

1          You had nothing to do with Redrum in 2002, did you?

2     A.  No.

3     Q.  Okay.  And could you tell why, when you were told that Mr.

4     Mitchell was arrested on your outstanding warrant, that he was

5     brought to the detective bureau?

6     A.  Because he was -- it was a matter of convenience, actually.

7     I was the one with the hard copy of the warrant.  You have to

8     take the body over with the warrant.  Central Booking's not

9     going to accept them without our warrant being there, unless

10    it's out of our jurisdiction in which they Fax a copy over,

11    C-fire over to them so I have a hard copy.  The wagon's there.

12    That's why he's brought to us.

13    Q.  I thought you called for a wagon, right?

14    A.  Yes.  He works in our district.  Like I work in a district.

15    When I say detective bureau, we're assigned to the district

16    level, and I work directly for the district.  So --

17    Q.  So would it be a fair statement that -- well, strike that.

18    How long was Mr. Mitchell there?

19    A.  Less than an hour.  Probably less than an hour, less than

20    an hour probably.

21    Q.  Do you have any paperwork on this?  Did you write a report?

22    A.  No other than the warrant being served.

23    Q.  Right.  Did you write a report about Mr. Mitchell's being

24    in custody in the detective bureau?

25    A.  No.  That would have been done by Detective Benson with the

1    handgun charge and all of that.

2    Q.   Okay.  Now, so we established that you have nothing to do

3    with the execution of the arrest of Mr. Mitchell on April 1,

4    2002, right?

5    A.   Yes.

6    Q.   Now, when you --

7    A.   Physical arrest.

8    Q.   He was brought to you for a matter of convenience because

9    you had the hard copy of the arrest warrant, did I understand

10   you correctly, sir, to say that getting the statement from Mr.

11   Mitchell would not be pertinent to your case?

12   A.   It wasn't absolutely necessary.  We had -- we had an

13   independent witness that's not affiliated with either defendant

14   or the victims in this case.

15          So for the matter of a bigger investigation and the

16   matter of integrity of that investigation, that's why it wasn't

17   pertinent to the statement.

18   Q.   What was the big investigation?

19   A.   I didn't get involved in it.

20   Q.   How do you even know there was one.

21   A.   Because I talked to Detective Niedermyer.

22   Q.   What did he tell you?

23   A.   They were working on a homicide of --

24   Q.   What, of whom?

25   A.   I didn't ask.

1  Q.  Okay.  So Detective Niedermyer, he was your supervisor?

2  A.  No.

3  Q.  Superior?

4  A.  No.

5  Q.  So you just took what he said weren't, didn't pursue

6  anything else in your case?

7  A.  Absolutely.

8  Q.  Okay.  Now, do you have any reports that say --

9  A.  Well, let me rephrase that.  Not pursue anything in my

10  case, I don't know, relative to questioning the defendant, yes.

11  But following up with the case, we still continued the case.

12  We didn't drop our case against him.  The matter -- the only

13  thing we didn't do was interview the defendant.

14  Q.  Okay.  Now, as a detective, and now as a sergeant, in the

15  panoply of the arsenal of police getting a statement from

16  somebody who you suspect of being doing a crime is an important

17  piece of evidence, isn't it?

18  A.  Oh, absolutely unless it's going to affect our

19  investigation.

20  Q.  So is there a general order somewhere that you're familiar

21  with that says don't interview someone if there's another

22  investigation ongoing?

23  A.  No.  There's not a general order that says to do

24  investigate them, either.

25  Q.  Now, Mr. Harding asked you a series of questions about what

1    if you were going to do a statement for Mr. Mitchell; do you

2    remember those?

3    A.  Uh-huh.

4    Q.  And I think you said something about a tape recording,

5    right?  You had a tape recorder?

6    A.  Yeah.  If we were going to take a taped statement,

7    absolutely.

8    Q.  Now, do you do a pre-tape interview and then do the taped

9    interview?

10    A.  Depends on the situation.  And it also depends we might not

11    even have a statement.  He could waive his rights there before

12    we even get to that point.  At that time, I'd keep a hard copy

13    of the advice of rights statement saying he wanted a lawyer.

14    Q.  You didn't go to the commissioner, right?

15    A.  No.

16    Q.  So you wouldn't be privy to -- strike that.  You wouldn't

17    be privy to anything that Mr. Mitchell said to the

18    commissioner, correct?

19    A.  I wouldn't have anything from the time he left our custody

20    to today.

21    Q.  And I guess likewise you wouldn't have any -- you wouldn't

22    be privy to saying that was said in Baltimore County when he

23    was arrested till the time that he was transported to the third

24    floor of your office?

25    A.  No, sir.

1    Q.  Now, is it usual and customary that if somebody gets picked

2    up that you have an arrest warrant for that they automatically

3    get brought to your office, because you have the hard copy the

4    warrant?

5    A.  Well, generally speaking, if they're -- if we're involved

6    in a case, yes.  If I'm a detective and I have a case because I

7    would interview him.

8           But this case was different because we knew we

9    weren't -- being I'm essential and right next to Central

10   District, it was a matter of convenience.

11   Q.  And Detective Benson was there, correct?

12   A.  I believe so, yes.

13   Q.  And who was the other detective?

14   A.  I don't remember.

15   Q.  Do you remember -- did you have to sign a body release to

16   Detective Benson?

17   A.  No.

18   Q.  Whose custody was Mr. Mitchell in when he was in your

19   office?

20   A.  Just mine.  He would have been in mine.

21   Q.  So you didn't transfer, sign any forms or anything?

22   A.  No, we don't do any.

23   Q.  You don't sign any?

24   A.  No.

25   Q.  All this discussion we had heard you say about toe tags and

1    bands?

2    A.  You're talking about if they're going to be charged.

3    That's not -- that has nothing to do with custody.  That has to

4    do with merely the booking process, so that the booking window

5    when he gets there, they can move along and he's -- they have

6    the basic information needed to do the fingerprints and

7    photographs, basic charges.  That has nothing to do with

8    custody.

9    Q.  Okay.  Thank you, sir.

10   A.  Thank you.

11              THE COURT:  Thank you very much, sergeant, you're

12   excused.

13              THE WITNESS:  Thank you, sir.

14              MR. HANLON:  Your Honor, the United States will call

15   Sergeant Craig Mitchell.

16              (The Witness is sworn.)

17              THE CLERK:  Thank you.  You may be seated.  Please

18   state your name and spell your last name for the record.

19              THE WITNESS:  Sergeant Craig Mitchell, M I T C H E L

20   L.

21                        DIRECT EXAMINATION

22   BY MR. HANLON:

23   Q.  Sergeant Mitchell, good afternoon.  How are you employed?

24   A.  I'm employed with the Baltimore County Police Department.

25   Q.  How long have you been a County policeman?

1  A.  It will be 14 years in August.

2  Q.  And directing your attention -- what is your current rank?

3  A.  Sergeant.

4  Q.  What is your current assignment?

5  A.  I'm at Woodlawn Precinct Investigative Services Team.

6  Q.  Direct your attention to couple years back June of 2002,

7  you were with the County police at that time?

8  A.  Yes.

9  Q.  What was your rank then?

10 A.  Corporal.

11 Q.  As a corporal, directing your attention to June 7, 2002, do

12 you recall being involved in assisting an investigation that

13 day?

14 A.  Yes, sir.

15 Q.  How did you come know this investigation, what is it that

16 you learned in terms of the initial information?

17 A.  Initial information was that a shooting call came out that

18 8618 Bramble Lane.

19 Q.  When you received that, what did you do?

20 A.  Responded to the scene.

21 Q.  When you arrived, sergeant, what did you see in the area?

22 A.  My initial response when I arrived, I observed the medics

23 on the scene, several subjects outside of the department.  I

24 also observed medic bandages and wraps at the scene of 8618

25 Bramble Lane apparently where the subject had been worked on.

1    And I met up with officer, meeting with several other officers.

2    Q.  You were not the first police officer to respond; is that

3    right?

4    A.  I was not.

5    Q.  Were you in uniform that day?

6    A.  Yes, I was.

7    Q.  How about your car, was it a marked patrol car?

8    A.  Marked patrol unit.

9    Q.  And when you arrived there, you mentioned you spoke with an

10   Officer Mead, without getting into the content of what he told

11   you, what was the subject matter of what you talked about?

12   A.  When I arrived, initially I spoke to the medic who was

13   standing outside the ambulance, inquiring of the condition of

14   the victim.

15          Once I discussed the condition of the victim with

16   him, I was approached by Officer Mead.  He advised that he had

17   a subject who witnessed several subjects were right in front of

18   her vehicle in crossing the lane.

19   Q.  Did the officer introduce you to anyone?

20   A.  He introduced me to Kelly David.

21   Q.  At some point, did you have any conversation with Miss

22   Davis at that time about what it is she'd seen or description

23   of the people she'd seen on anything like, anything beyond what

24   you mentioned hearing from Officer Mead?

25   A.  No.  I was just advised she witnessed subjects running down

1  crossing the lane, and we had several subjects detained, and I

2  was asked to do a one-on-one identification.

3  Q.  That was my next question, Sergeant.  At some point, did

4  you have occasion to drive Miss Davis to another location?

5  A.  Yes, sir.

6  Q.  About how long after you arrived at the scene and you see

7  --  how long after that did you and Miss Davis drive together

8  to this other location to do a one-on-one?

9  A.  It was just a matter of minutes.

10  Q.  And did anyone go with you and Miss Davis?

11  A.  No, sir.

12  Q.  Just you and the lady?

13  A.  Yes, sir.

14  Q.  Where did you go?

15  A.  We went to the information of South Green and Green Knoll.

16  Q.  Now, sergeant, when you first encountered Miss Davis, did

17  you or did Officer Mead tell her what it is you were going to

18  take her to do, or anything like that?

19  A.  She was advised that I would be taking her to do the

20  one-on-one identification to see if the subjects detained were

21  the ones that ran in front of her vehicle on Carlson Lane.

22  Q.  Beyond that, did you tell Miss Davis anything else about

23  the two subjects who were detained?

24  A.  No, sir.

25  Q.  Did you know anything else --

1    A.  No, sir.

2    Q.  -- about the subjects that were detained?

3           And I'll just ask a couple questions.  Did you know

4    anything or where they'd be been coming from when they were

5    detained.

6    A.  At the time?

7    Q.  Yes.

8    A.  No, sir.

9    Q.  Did you know anything about what they were wearing when

10   they were detained at the time?

11   A.  No, sir.

12   Q.  Do you know whether or not anything had been taken off of

13   them, or what they'd been doing when they were detained?

14   A.  No, sir.

15   Q.  Any conversation at all with Miss Davis between Bramble

16   Lane the location of this identification process was going to

17   take place?

18   A.  No, sir.

19   Q.  Directing your attention to this chart I have up here,

20   which I've used before, I'll mark as government's number 1,

21   Your Honor.  If it's okay, I'm just going to walk it over, look

22   for a way to do it that.

23           THE COURT:  We actually have the laser now point now.

24   Judge Garbis's law clerk located it.

25           THE WITNESS:  Thank you very much.

1  Q.  If you can, sergeant, just signal on government's exhibit 1
2  where Bramble Lane was?
3  A.  Bramble Lane?
4  Q.  Yes.
5  A.  Let's see.
6          THE COURT:  You may need to get a little closer.
7          THE WITNESS:  I'm sorry.
8  Q.  I apologize.
9  A.  There it is right there (indicating).
10 Q.  I'm going back up a little bit so the judge can see it.
11         THE COURT:  Okay.
12 Q.  Thank you.  And I will move in.  Can you tell us where it
13 is that you took Miss David, where was --
14 A.  I can see that.  It's Green Knoll, South Green Way here at
15 the intersection.  Right there.
16 Q.  Again, I'll back up for the Judge.
17 A.  Right there.
18         THE COURT:  Okay.
19 Q.  I'll put this away.
20         About how long did it take to you get from Bramble to
21 the intersection you described?
22 A.  No more than a minute or two.  It's a very short distance.
23 Q.  When you got to the area, did there come a time when you
24 saw some additional officers with some other people?
25 A.  Yes, sir.

1    Q.  What is it that you saw as you approached the area?

2    A.  There were several officers.  The patrol vehicles were

3    there.  Two subjects were sitting on the curb.

4    Q.  Were there other and uniformed police officers around?

5    A.  Yes.

6    Q.  Other marked cars?

7    A.  Yes, sir.

8    Q.  The two subjects were on -- were sitting on a curb?

9    A.  Yes, sir.

10   Q.  When you pulled in, at any point, did Miss Davis say

11   anything to you as you approached the area, or approach the men

12   I should say?

13   A.  It was me -- I'm not sure if it was the subjects stood up

14   or while they were still sitting down, I can't remember.  She

15   did say those were the subjects she saw run in front of her, on

16   -- across the lane.

17   Q.  Did Miss Davis express any hesitation or uncertainty about

18   that?

19   A.  It was immediate.

20   Q.  Did Miss Davis tell you if she was certain or not certain?

21   A.  She said thaw those were definitely the subjects.

22   Q.  Do you remember at the time Miss Davis was brought in with

23   the two men that she was being asked to look at?

24   A.  Two subjects I believe is what I said.

25   Q.  Were they two males?

1    A.   They were two males.

2    Q.   Do you remember sitting hearing today what they looked like

3    or how they were attired at the time?

4    A.   At the time we approached him?

5    Q.   Yes.

6    A.   One subject was taller than the other.  One subject had a

7    white shirt on and the other had a white shirt.

8    Q.   Either of them wearing a hat?

9    A.   No, sir.

10   Q.   Do you remember if they were handcuffed or not?

11   A.   At that time, no.

12   Q.   Do you remember seeing anything -- if any of the officers

13   that the two subjects were with, did the officers have to

14   motion the subjects to stand up?

15            Did they have to help the subjects up?

16            Do you remember anything about that one way or the

17   other?

18   A.   I'm not sure how they stood up, if they were assisted or

19   just asked to stand up.

20   Q.   Approximately, sergeant, how close were you able to get

21   your vehicle to the subjects at the time Miss Davis, how close

22   did you get with Miss Davis?

23   A.   When the subjects stood up and were brought out off the

24   curb, it was a 15 to 20 feet, I'm guessing.

25   Q.   We've talked about this before in a prior hearing in  one

1    of the state proceedings in this case you testified about this

2    incident before; is that correct?

3    A.   Correct.

4    Q.   And one of your testimony I believe may have been the

5    motions hearing you testified it was ballpark about 30 feet?

6    A.   I believe I said 20 to 30, maybe.

7    Q.   Between the time that that testimony and your latter

8    appearance, I believe, at the state trial, did you actually

9    have an opportunity go to this location?

10   A.   I did.

11   Q.   And approximate a measurement?

12   A.   Yes.

13   Q.   Based on that measurement, the estimate is what you said a

14   few minutes ago?

15   A.   Yes, sir.  I positioned my vehicle as I felt I had

16   positioned it that day, and I remember thinking to myself it

17   was a little different closer than what I initially stated, not

18   much difference, maybe five or ten.

19   Q.   After Miss Davis made her identification, did you relay

20   that information any way to the officers at the scene?

21   A.   After she made her identification?

22   Q.   Yes.

23   A.   Yes, sir.

24   Q.   Do you remember how did you that?

25   A.   No, I did not.

1    Q.  When you relayed the information, can you tell what under

2    the circumstances, whether it was by radio or any other means?

3    A.  I informed them it was a positive identification.  I'm not

4    sure how I did it, if it was by radio, or said out the window,

5    or how I did it.

6    Q.  To be very clear, that was after Miss Davis made her

7    identification; is that right?

8    A.  That's correct.

9    Q.  How long did you stay with Miss Davis at the place?

10   A.  It was only a matter of minutes.

11   Q.  And you went, where did you go after that?

12   A.  We drove to Carlson Lane where I had Miss Davis show me

13   where the subjects ran to the woods.

14   Q.  And you took a mental note about an hour?

15   A.  I took a mental note.

16   Q.  Yes.

17   A.  I actually request an officer to respond to where she

18   pointed out where the subjects ran into the woods so he could

19   wait there for K-9 to respond as well.

20   Q.  That was for possible search of the area for --

21   A.  Correct.

22   Q.  -- evidence and things like that?

23   A.  Yes.

24   Q.  Where did you take Miss Davis after that?

25   A.  Back to Bramble Lane.

1    Q.  Did you have any further conversation with her on the way

2    back?

3    A.  No, sir.

4    Q.  You dropped her at off at Bramble lane, I gather?

5    A.  Yes.

6    Q.  Do you know, after you dropped her offer off, sergeant,

7    where Miss Davis went?

8    A.  I don't know.

9    Q.  You didn't pay attention?

10   A.  No, sir.

11   Q.  At any point were you introduced to anyone else at Bramble

12   Lane?

13   A.  Yes.

14   Q.  And who was that?

15   A.  That was Miss Smith.  That was Andrea Smith and her mother

16   Patricia Maynard.

17   Q.  Miss Smith was the younger person; is that right?

18   A.  Yes.

19   Q.  How were you introduced to them?

20   A.  By Officer Mead.

21   Q.  How soon after arriving back at Bramble Lane did you meet,

22   or was Andrea Smith brought over to you by Officer Mead?

23   A.  It was shortly after like within a minute or so.

24   Q.  Did you ever see, did you have an occasion to see whether

25   Miss Davis had any opportunity to speak with Miss Smith,

1    whether they exchanged any kind of information?

2    A.  I did not observe any.

3    Q.  Given the relationship of dropping off Miss Davis and then

4    being reintroduced to Miss Smith, would you have been in a

5    position to see if the two of them talked to one another?

6    A.  Well, I did not see where Miss Davis went, but Miss Smith

7    and her mother were brought to my attention by Officer Mead

8    shortly thereafter, and I did not see Miss Davis around.

9    Q.  You were introduced to Miss Smith.  Did you have any

10   conversation with Miss Smith about whether she'd seen anything

11   or what she saw or a description or anything?

12   A.  I was advised that Miss Smith witnessed the actual

13   shooting.

14   Q.  Did Officer Mead give you that information?

15   A.  Yes.

16   Q.  Did you take Miss Smith to the South Green location you

17   described a minute ago?

18   A.  I took her and her mother.

19   Q.  Same couple of questions I asked before, what did you tell

20   Andrea Smith or her mother about what you were going to do with

21   Miss Smith, or what Miss Smith was going to be asked to do?

22   A.  I asked Miss Smith, just questioning her, I said if she did

23   get a good look at what happened.  And that's when she said

24   yes, she did.  So --

25   Q.  Anything beyond that?

1    A.  No, sir.

2    Q.  You drive her to the scene, to South Green, I should say,

3    did you have any conversation with either lady?

4    A.  Miss -- her mother, Miss Maynard, was questioning as to her

5    safety.  She was worried about her and her daughter's safety.

6    And I just reiterated they had to stay in the vehicle, they

7    would be okay.

8    Q.  Any conversation, again, about what Miss Smith had seen or

9    about the men she was going to look at?

10   A.  No, sir.

11   Q.  Did you have any information to give Miss Smith about who

12   these men were or what they looked like or anything like that?

13   A.  No, sir.

14   Q.  Did you relay your own observations of these men from the

15   previous show?

16   A.  No, sir.

17   Q.  You arrived at the location, what happened when you got

18   there?

19   A.  I arrived at the location with -- if my recollection's

20   correct, I believe the subjects were in the police cars at this

21   time, and they were removed from the police vehicles.  I

22   believe they were cuffed at this time.  And they were brought

23   out.

24          So Miss Smith could get a good look at them.

25   Q.  And did she have an opportunity to look at them?

1    A.  Yes, sir.

2    Q.  Did she ever get out of the car?

3    A.  No, sir.

4    Q.  About, again, ballpark, how close to the men was Miss Smith

5    when she made her observations?

6    A.  I would say about same distance.

7    Q.  And what did Miss Smith say?

8    A.  She gave a positive identification those were the subjects

9    she saw at the shooting scene, and she stated to me that the

10   subject was very sure that it was that of the shooter.

11   Q.  Did she say anything, quoting the actual shooter's

12   hairstyle?

13   A.  That I don't recall.

14   Q.  About how long after arriving at South Green did Miss Smith

15   make her positive identification?  How long did she have to

16   look at them?

17   A.  I don't know the exact time.  It was an immediate

18   identification once she saw the subjects.

19   Q.  Did she say anything else that you can recall?

20   A.  No, sir.

21   Q.  Did you relay that information to your fellow officers?

22   A.  About it being positive?

23   Q.  Yes.

24   A.  Yes, sir.

25   Q.  Again, any information relayed, was that before or after

1    Miss Smith made her identification?

2    A.  It was after the identification was made.

3    Q.  What did you do with Miss Smith and the mother after that?

4    A.  Took them back to Bramble Lane.

5    Q.  Any conversation on the way back?

6    A.  Just say thank you.

7    Q.  And you dropped Miss Smith off, I gather.  Did you see

8    where she went?

9    A.  No, sir.

10   Q.  Any further contact with Miss Smith, Miss Maynard or Miss

11   Davis that day?

12   A.  No, sir.

13   Q.  Just a moment, please, Your Honor.

14            (Pause.)

15   Q.  Your Honor, again, the color of the shirt that Miss Smith

16   mentioned, the actual shooter was wearing, what was that color?

17   A.  Gray.

18            MR. HANLON:  Nothing further, Your Honor.  Thank you.

19            THE COURT:  Help yourself to some water, sergeant, if

20   you'd like.

21            THE WITNESS:  Oh, yes, sir.

22                    CROSS-EXAMINATION

23   BY MR. KURLAND:

24   Q.  Is it Captain Mitchell?

25   A.  Sergeant, sir.

1    Q.   Sergeant Mitchell.

2              I'm just going to ask you a couple questions.

3              Okay.   Sergeant Mitchell, on the date in question,

4    did you hear any -- any police traffic over the radio of a

5    description of the --

6    A.   There were several descriptions that were broadcast, yes.

7    Q.   Do you remember any of those today, yes or no?

8    A.   No, sir, I don't.

9    Q.   Okay.   You have before you your report?

10   A.   Yes, sir, a copy of it.

11   Q.   This is a typed report that is dated 6-7-02.   I take it

12   were there original notes taken at the scene?

13   A.   No, not by me, sir.

14   Q.   How did this report get to be made?

15   A.   I made that report after the incident was ended at the end

16   of the day.

17   Q.   As you simply typed it up at the end of the day?

18   A.   Yes.

19   Q.   You have no contemporaneous notes that you relied on to --

20   A.   No, sir.

21   Q.   -- make this report?

22             Okay.   You indicate I believe in your testimony, I'll

23   get back to it in a second, but you indicated that Miss Smith

24   made a positive ID of the gray shirt was the actual shooter,

25   and you said actual.

```
 1              Did you really think she used those exact terms
 2    actual shooter?
 3    A.  I'm not sure if she used that or not.
 4    Q.  Okay.  Now, with respect to the identifications, were you
 5    aware that, in some of the descriptions that earlier had gone
 6    out over the radio, that both persons were described as wearing
 7    gray shirts; were you aware of that?
 8    A.  I'm not aware of that, unless you say it happened.  I'd
 9    have to look at the call to see if that's exactly what
10    happened.  I'm not sure what the description was that day.
11    Q.  Okay.  With respect to the two subjects, with their
12    relative heights, do you recall their relative heights?
13    A.  I know one was taller than the other.
14    Q.  All right.  Do you know anything with respect to the
15    hairstyles of the two?
16    A.  No, I don't.
17    Q.  No recollection?
18    A.  No recollection, sir.
19    Q.  So okay.
20              Do you know -- let's go back to the identification.
21              Now, with respect to the report that's before you,
22    when -- how many years have you been on the force?
23    A.  It will be 14 in August.
24    Q.  Okay.  How many show of identifications have you done?
25    A.  Oh, numerous, a lot.  I don't know the exact number.
```

1    Q.  Okay.  Now, you would agree in making up a report, the

2    manner in which somebody specifically identifies someone and

3    the actual words they use would be important?

4    A.  I agree.

5    Q.  All right.  And with respect to an identification, if

6    somebody is -- if there are -- say if somebody is taller than

7    somebody else, it would be common for somebody to identify as

8    between two people the taller one the shorter one, is it

9    common?

10   A.  Possibly.

11   Q.  Possibly?

12   A.  Possibly.

13   Q.  Well, if a person's six foot five and a person is five foot

14   two?

15   A.  Okay.

16   Q.  And you are asking somebody to identify say one particular

17   person, would it be possible, I mean, is it your testimony that

18   it would only be possible that if somebody were to identify the

19   taller one, they wouldn't say the taller one?

20   A.  That's very possible, yes.

21   Q.  They wouldn't say that?

22   A.  That's very possibly they will say that.

23   Q.  That they would say that?  Okay.

24        You would agree, then, these reports are correct?

25   A.  Yes.

1    Q.  You would agree with respect to the identification of

2    somebody that it's important to be as precise as possible in

3    putting in all of the descriptions that somebody would use with

4    respect to an identification?

5    A.  That's why I put what she said about the gray shirt.

6    Q.  So that's correct.  So if somebody would indicate taller or

7    shorter, you would put that in your report?

8    A.  I wish I would have.  If that's what was said, I would hope

9    so.

10   Q.  That's my question.  If it were said, that the relative

11   height taller or shorter, that would have made its way into the

12   report?

13   A.  I would think so.

14   Q.  You would think so?  It's a yes or no question.

15   A.  I would think so, yes. I would hope so.  I don't

16   understand.

17   Q.  You're writing the report.  So it's not a matter of hope.

18   A.  I don't understand the question.  Would you rephrase or

19   repeat it?

20   Q.  If someone identified -- there are two people at a show-up?

21   A.  Yes, sir.

22   Q.  And someone were to identify let's say the taller person --

23   A.  Okay.

24   Q.  -- and they will say the taller person, that indication

25   with respect to height, that is important enough that you would

1    put it in the report?

2    A.  That should have been put in the report, then, if that's

3    what was told to me, yes.

4    Q.  If someone was let's say heavier as opposed to thinner, and

5    then the identification was made on that basis, that, too, that

6    kind of information would be in the report?

7    A.  Yes.

8    Q.  If someone had a particular distinctive hairstyle, and that

9    were the mode of identification, that would be put into the

10   report?

11   A.  If that's what was told to me, I would have put it in the

12   report.

13   Q.  If someone has a distinctive physical feature, like a very

14   visible tattoo, and the person says it's the guy with the

15   tattoo, that would be put in the record?

16   A.  If that's what was told to me, I would have put it in the

17   report.

18   Q.  None of those things are in the report, other than the gray

19   shirt?

20   A.  Yes, that's what we mentioned.

21   Q.  Thank you.

22          Okay.  At the time of the show-up, neither subject

23   was wearing a hat; is that correct?

24   A.  Correct.

25   Q.  And both subjects were handcuffed?

1    A.  Not during the original, sir.

2    Q.  I'm sorry, with respect to the second?

3    A.  The second, yes, sir, I believe they were.

4    Q.  Now, you indicated that with respect to the second

5    identification, that you indicated that a positive ID was made

6    as to both subjects?

7    A.  Yes.

8    Q.  Now, could you -- can you remember in as specific language

9    as possible what exactly Miss Smith said?

10    A.  Exactly?  No, sir, I can't.

11    Q.  I would be surprised if she used the words "I am making a

12    positive ID."

13    A.  I'd be surprised, too, sir.  I don't think she said that.

14    Q.  Give us a general idea as to what she said with respect to

15    that.

16    A.  I'm afraid I can't.  I have no idea.

17            MR. KURLAND:  May I have a moment, Your Honor?

18            THE COURT:  Yes.

19            (Pause.)

20            MR. KURLAND:  I have no further questions.

21            MR. HANLON:  No redirect.

22            THE COURT:  Sergeant, thank you very much.  You're

23    excused.  Sorry we couldn't reach you this morning.

24            MR. HANLON:  Your Honor, the United States calls

25    Corporal Greg Mead.

1              Your Honor, I don't believe I've marked this.  This

2      is government's exhibit number 7.

3              THE COURT:  All right.  So noted.

4              THE CLERK:  Please remain standing and raise your

5      right hand.

6              (The Witness is sworn.)

7              THE CLERK:  Thank you.  You may be seated.  Please

8      state your name and spell your name for the record.

9              THE WITNESS:  Corporal Gregory Mead, M E A D.  First

10     name is spelled G R E G O R Y.

11             I work at Precinct 12, Dundalk North Point, which is

12     for Baltimore County Police.

13                         DIRECT EXAMINATION

14     BY MR. HANLON:

15     Q.  Corporal, good afternoon.

16     A.  Good afternoon, sir.

17     Q.  You anticipated my first question was going to be where do

18     you work?  How long have you been a police officer?

19     A.  A little over 11 years.

20     Q.  Corporal, I put in front of you a report on I believe

21     offered by which I referred as Exhibit 8.  With the Court's

22     permission, if you need to fresh, you can look at that report

23     if you need to.

24     A.  Thank you.

25     Q.  Directing your attention to June of 2002, were you involved

1    in an investigation on that day?

2    A.  Yes, I was.

3    Q.  June 7th, 2002?

4    A.  Yes, I was.

5    Q.  What was your rank, officer?

6    A.  I was an officer, patrol.

7    Q.  Still with Baltimore County?

8    A.  Yes, sir, Woodlawn.

9    Q.  Directing your attention to the afternoon of that date,

10   June 7th, prior to the call in this case, were you involved in

11   some other investigation?

12   A.  Yes, I was.

13   Q.  What were you doing?

14   A.  I was handling a call for suspicious subject is the

15   Salvation Army on Red Brook Drive.

16   Q.  At some point while you were handling that call or

17   preparing to close that call, did you receive word over your

18   radio or hear something that caught your attention?

19   A.  I heard what appeared to be two gunshots coming from the

20   apartment complex to my left.

21   Q.  And this is an area that you're familiar with from patrol?

22   A.  Yes.  We get a number of calls in that area.

23   Q.  And when did you receive any information over your radio

24   that caused you to go to the location?

25   A.  Well, I went out to the call.  It got dispatched over the

1    radio.

2    Q.  So your answering one call, did you close out that other

3    call?

4    A.  Yes.

5    Q.  There's no relationship between that and this case?

6    A.  Not at all.

7    Q.  And where did you go after closing out that call?

8    A.  I started heading in the direction of the Village of

9    Huntington, Gray Fox, Bramble Lane.  That's the area I heard

10   the shots coming from.

11   Q.  Did you end up in a particular location?

12   A.  In route, it came out it was 8618 Bramble Lane was the call

13   for service that a 12-year old had been shot.

14   Q.  Just ballpark, corporal, how long did it take to you get

15   there?

16   A.  One to two minutes, approximately.

17   Q.  When you arrived, what did you see?

18   A.  There was approximately ten people out in front of the

19   location.  It was -- looked like a female attending to what

20   appeared to be a child laying underneath of a overhang, which

21   was a balcony on the first floor.  And I probably would say

22   between five to six subjects to the right of where those two

23   were.

24   Q.  Your Honor, I have handed out copies of some photographs

25   that I might use in this proceeding.  I trust everyone has

1    them.  I believe I can provide one to the Court.

2              THE COURT:  Thank you.

3    Q.  May I approach the witness?

4              Showing you what's been marked as government's

5    exhibit 4 A for this hearing, corporal, do you see that in

6    front of you?

7    A.  Yes, I do.

8    Q.  What is government's exhibit 4 A, what is this a photograph

9    of?

10   A.  It's the front of 8618 Bramble Lane.

11   Q.  Now, you mentioned I think you used the word overhang?

12   A.  Uh-huh.

13   Q.  Just making reference to this photo, can you tell us what

14   you mean by overhang?

15   A.  It's the first floor balcony to the left.  It's got the

16   blue face on the front it.  I considered it an overhang.  She

17   was underneath of it, and it was over top of her.  That's why I

18   said overhand.  It was actually a balcony.

19   Q.  What did you do when you arrived?

20   A.  Made out to where the adult female and the small child

21   laying underneath the balcony, and started rendering, she was

22   already doing first aid trying to stop bleeding from the chest.

23   I pushed on the towel and started asking the victim some

24   questions.

25   Q.  What did the victim tell you?

1    A.  First I asked her if she knew who had done that to her.

2    She said she's never seen them.  I asked her how old she was,

3    and she said she was 29.

4           The third question I asked her if she had any ID on

5    her because I didn't have her date of birth and everything

6    else.  She pointed to a gold Honda Accord in the parking lot.

7    Q.  And as were you doing all of this, were there any other

8    officers arriving or paramedics or anything like that?

9    A.  Not at that time, no.

10   Q.  Ultimately, were you able to identify this lady?

11   A.  Yes, I was.

12   Q.  What was her name?

13   A.  Tanya, I think it was Tanya Jones Spence.

14   Q.  And was that identification you recovered from her vehicle?

15   A.  Yes, sir.

16   Q.  Now, at some point, officer, or corporal, I'm sorry --

17   A.  That's okay.

18   Q.  -- were you introduced or did you have brought to your

19   attention any possible witnesses in this case?

20   A.  Yeah.  Once the medic arrived, I turned around to the crowd

21   that was outside and asked who had seen what had occurred, and

22   they identified Andrea Smith as being the best witness.

23   Q.  And that phrase is something you heard from other people in

24   the area?

25   A.  Yes.

1    Q.   Did you speak with this lady, Miss Smith?

2    A.   Yes, sir.

3    Q.   And just in terms of her description, she was a girl?

4    A.   Yes, sir.

5    Q.   How old was she about?

6    A.   12 years old at the time.  11 or 12.

7    Q.   And did you speak with Miss Smith?

8    A.   Yes, I did.

9    Q.   Was her mother near by?

10   A.   No, she wasn't.

11   Q.   At some point did you speak with Miss Smith in her mother's

12   presence?

13   A.   Yes, sir, I did.

14   Q.   About how long after your arrival at the scene were you

15   able to speak with Miss Smith and her mother?

16   A.   Two to five minutes, approximately, at the most.

17   Q.   What did Miss Smith tell you about what she Miss Smith had

18   seen?

19   A.   Oh.  Repeat that question.  You said --

20   Q.   Sure.  What did Miss Smith tell you, before that, Miss

21   Smith and her mother --

22   A.   How long till I spoke with them?

23   Q.   Yes, I'm sorry.

24   A.   Oh, I can't recall.  It was quite a while afterwards that I

25   spoke to her and her mother both.

1  Q.  About how long after your arrival did you speak with Miss

2  Smith for the first time in substance about what she had seen?

3  A.  I'd say that's the two to five minutes.

4  Q.  And what did Miss Smith tell you?

5  A.  She said she was out front playing with her friends when

6  she saw on the third floor balcony a female come out the door

7  saying, no, no she put one foot over the top of the balcony,

8  slips and falls down to the ground in front of them in the

9  grass.  She's trying to catch her breath, motions to the

10  children to run.  Then she sees two black males exit the top

11  floor.

12  Q.  I'm sorry.  Miss Smith told that you Miss Smith saw this

13  the two black males exiting?

14  A.  Miss Smith, are you talking about the mother?

15  Q.  Andrea Smith told you she had seen these two black males?

16  A.  Yes, sir.

17       THE COURT:  The mother is Miss Maynard.

18  A.  Okay.

19  Q.  Yes, I'm sorry.  I apologize, corporal.  I should have told

20  you.

21  A.  Okay.

22  Q.  This is all information received from Andrea Smith?

23  A.  Yes, sir.

24  Q.  And she mentioned two black males.  According to Miss

25  Smith, what happened?

1    A.   They exited the apartment, they come running down the

2    steps.   They run up to where the victim is approximately three

3    to four feet away, pulled out a handgun and fired two shoots

4    into the victim.

5    Q.   At the time you were speaking with Andrea Smith, the young

6    girl, did she provide you any physical description of these two

7    people?

8    A.   Yes, she did.

9    Q.   You can use your report if you need to.   What was the

10   description?

11   A.   The first subject she describes as a black male, six three,

12   170 pounds wearing a red and white baseball hat, gray T-shirt

13   light blue jeans.

14          Second one she described is five eight, 145 pounds,

15   gray shirt, light blue jeans.   And she described him as having

16   tight braids.

17   Q.   And in terms of did she give you any information at that

18   time about whether or not both of them had actually fired shots

19   or one of them fired shots?

20   A.   She told me the one with the red baseball hat fired the

21   shots.

22   Q.   Now, you're receiving this information, corporal, did you

23   relay this information to other officers at dispatch?

24   A.   Yes.   As she's giving it, it's getting relayed out.

25   Q.   Now, at any time during the course of your involvement in

1    this investigation, did you hear through the radio or through

2    other means there were any descriptions going out of anyone

3    else that might have been involved in the shooting?

4    A.   I heard over the radio, yes, other descriptions were coming

5    out.

6    Q.   Do you remember a reference to a blue do rag?

7    A.   Yes, I do.

8    Q.   Were you involved in any of these other investigations at

9    any of these other leads?  Do you know about whether or not

10   anything transpired?

11   A.   No, sir.

12   Q.   Did you pursue any other leads other than what was brought

13   to your attention at Bramble?

14   A.   No, sir.

15   Q.   Now, Miss Smith provides you that information.  Now, at

16   some point, did you receive any other information that led you

17   to talk to another witness?

18   A.   Yes.  Kelly Michelle David was the other witness that we

19   had, and I can't recall how it was brought to my attention, but

20   that she had seen two similar subjects to the ones we had

21   broadcast a description to.

22   Q.   And you spoke with Miss Davis directly?

23   A.   Yes, sir.

24   Q.   What did Miss Davis tell you about what she'd seen?

25   A.   Miss Davis advised she was heading I guess it would be

1    westbound on Carlson Lane, which is across from where we were

2    standing in front of a day care when two subjects ran in front

3    of her car.

4    Q.  And did she give a description as to what these subjects

5    were doing, other than running across the road?

6    A.  Runs across the road.  They were heading into a wooded area

7    in front of the day care where a path --

8    Q.  Did Miss Davis give you a physical description of these two

9    people?

10   A.  Yes, she did.

11   Q.  Again, referring to your report, what did she tell you

12   about the first time?

13   A.  She described him black male, six three, thin, wearing red

14   and white baseball hat, gray T-shirt, light blue jeans.

15           The second subject she described as a black male,

16   short, about five seven with real tight fine braids gray shirt

17   and light blue jeans.

18   Q.  Now, at any time did you -- were you involved in any

19   arrangements to have either the first witness, Miss Smith, or

20   the second witness, Miss Davis, go to do a one-on-one

21   identification process?

22   A.  No, sir.

23   Q.  Were you aware that such a one-on-one being arranged?

24   A.  Yes, I was aware of that.

25   Q.  You're not the one that drove?

1    A.  No, sir, I was not.

2    Q.  Aside from these two interviews you were involved in, did

3    you at some point obtain written statements from these two

4    witnesses?

5    A.  I know I did one.  I'm not sure of the second one, yes.

6            MR. HANLON:  Just a moment, please, Your Honor.

7            Nothing further, Your Honor.

8            THE COURT:  Help yourself to water, if you'd like.

9            THE WITNESS:  Fine.

10            MR. HANLON:  Thank you, corporal.

11            THE WITNESS:  No problem, sir.

12            MR. KURLAND:  Could I just have a minute, Your Honor?

13            THE COURT:  Sure.

14            (Pause.)

15                        CROSS-EXAMINATION

16    BY MR. KURLAND:

17    Q.  Good afternoon, Officer Mead.

18    A.  Good afternoon, sir.

19    Q.  You have your typed report --

20    A.  Yes, sir.

21    Q.  -- in front of you, that the prosecutor had directed your

22    attention to?

23            You earlier testified when first asked a question as

24    to what Andrea Smith told you, you indicated something about

25    they fired two shots?

1    A.  Yes, sir.

2    Q.  Okay.  But in looking at your notes, though, your report

3    clearly says that Andrea Smith told that you only one person

4    fired the shots --

5    A.  Correct.

6    Q.  -- is that correct?

7              And that's your testimony today?

8    A.  Yes, sir.

9    Q.  Okay.  And you testified that the original description that

10   Andrea Smith gave you has six three, black male, wearing red

11   and white baseball hat, gray shirt.

12             And then there was another black male, five eight,

13   145 tight braids and gray shirt.  That's your testimony and

14   based on what's in the report?

15   A.  Yes, sir.

16   Q.  And Miss Davis's description with respect to the height and

17   weight and the color of the shirt and hat is exactly the same?

18   A.  Yes, sir.

19   Q.  You transmitted this information over the radio?

20   A.  Yes, sir.

21   Q.  And I would also include a description of both suspects

22   wearing gray shirts.

23   A.  Yes, sir.

24   Q.  When Miss Smith returned back from the show-up, that's when

25   she made -- she made you a draft of the report?

1    A.  It was after that that we took the report.  I don't know

2    the exact time.

3    Q.  Well, the time on the report, in your writing, do you have

4    this report in front of you?

5    A.  No, sir.

6    Q.  This is defendant's 1.  I'm going put this in front of you

7    until I find my other copy.

8              Just a minute, Your Honor.  I always seem to lose

9    track of documents.

10             (Pause.)

11             MR. KURLAND:  I apologize, Judge.

12             MR. COBURN:  Here it is.  Got it.

13   BY MR. KURLAND:

14   Q.  Okay.

15             Okay.  The notation on both papers and near your

16   signature has 1830?

17   A.  Yes, sir.

18   Q.  That would indicate 6:30 in the evening?

19   A.  Yes, sir.

20   Q.  Okay.  If I can have a moment, Your Honor?

21             (Pause.)

22             MR. KURLAND:  Judge, I have no further questions.

23             THE COURT:  Very well.

24             MR. HANLON:  No redirect, Your Honor.

25             THE COURT:  Thank you very much, Officer Mead.

1          THE WITNESS:  Thank you, sir.

2          MR. HANLON:  United States will call Detective Philip

3    more realm I'll just check outside.

4          MR. HARDING:  I'll get him.

5          THE CLERK:  Please remain standing and raise your

6    right hand.

7          (The Witness is sworn.)

8          THE WITNESS:  Clerk come in contact you may be seated

9    please state your name and spell your name for the record.

10          THE WITNESS:  Detective Philip Marll, that's M A R L

11    L, Baltimore County Police Department homicide unit.

12                    DIRECT EXAMINATION

13    BY MR. HANLON:

14    Q.  Detective Marll, good afternoon.

15    A.  Good afternoon.

16    Q.  You mentioned where you work.  How long have you been a

17    detective?

18    A.  And I've been homicide unit for going on 21 years.

19    Q.  How long have you been a police officer?

20    A.  33.

21    Q.  Directing your attention to June 7th, 2002, did you become

22    involved in a homicide investigation on that day?

23    A.  Yes, sir, I did.

24    Q.  What was the name of the victim?

25    A.  Tanya Joan Spence.

1    Q.  Did you end up becoming the lead detective for the County

2    on that case?

3    A.  I was one of the two.  My partner was actually the lead

4    detective.  He's retired right now.

5    Q.  That's Detective Tinsure?

6    A.  That's correct.

7    Q.  Among the various thing you did, in your portion of the

8    investigation, Detective Marll, on various occasions you

9    returned to a wooded area between Carlson Lane and South Green

10   Road in Baltimore County; is that correct?

11   A.  Yes, sir, it is.

12   Q.  It's a bit far away from you, but if I show you this map

13   over here, which is called government's exhibit 1, if I can get

14   away without moving it all, in gesturing here with my finger to

15   a wood area to the bottom middle of this exhibit, is that

16   basically the area we're talking about?

17   A.  Yes, sir, that's correct.

18   Q.  Specifically, there were a number of occasions, I'm not

19   going to ask you about every single one, Detective, but there

20   were a number of occasions where you and other and officers

21   returned to this area looking for evidence related to this

22   case; is that right?

23   A.  Yes, sir, that's correct.

24   Q.  Let me direct your attention to June 9, 2002, which I guess

25   would have been two days after the homicide; is that correct?

1  A.  That's correct.

2  Q.  I have a couple exhibits that I put in front of you there.

3  First one is called government's exhibit 4 B as in bravo.  Do

4  you see that in front of you?

5  A.  Yes, sir, I do.

6  Q.  What is government's exhibit 4 B a photo of?

7  A.  This a photograph of the path leading from Carlson Lane

8  over to the area of Green Brush Court.

9          THE COURT:  We all have copies.

10 Q.  I'm sorry.  Everybody's got copies of that.  So this is a

11 pathway that cuts through the woods?

12 A.  Yes, sir, that's correct.

13 Q.  Now, on June 9th of 2002, were there particular items that

14 you found with respect to clothing?

15 A.  Yes, sir, that's correct.

16 Q.  What is it that was discovered?

17 A.  Behind 3 Green Brush Court, we found a gray shirt, sweat

18 shirt, with Rocker Wear red and black letters, large letters,

19 and a red hat, and a baseball style hat with the New York

20 Yankee logo on the front of it.

21 Q.  And government's exhibit 4 C, which you may already be

22 looking at, is that a photograph of the two items as they lay

23 at the time of their discovery?

24 A.  Yes, sir, that's correct.

25 Q.  Detective, were you the one that actually came across these

1    items, or was your attention drawn to them by another officer?

2    A.   My attention was drawn there by one of the K-9 officers,

3    Officer Gardner, who had found the evidence with his dog.

4    Q.   And they were -- I gather they were picked up and put into

5    evidence?

6    A.   Yes, sir, that's correct.

7    Q.   Let's move one more to government's exhibit 4 D, what is

8    government's exhibit 4 D a photo of?

9    A.   Government's exhibit 4 D is a photograph of the shirt, the

10   T shirt, with the logo Rocker Wear on the front of it.  That's

11   an extra, extra large shirt.

12   Q.   Is that the same shirt that was found on the ground as seen

13   in 4 C?

14   A.   Yes, sir, it is.

15   Q.   And this photo, I gather, was taken back at the station?

16   A.   I'm sorry?

17   Q.   This photo was taken back at the station?

18   A.   Yes, sir, that's correct.

19   Q.   Finally, government's 4 E as in echo, what is this a

20   photograph of?

21   A.   This is a photograph of the red baseball hat with the New

22   York Yankee logo on it and white lettering.

23   Q.   Again, is this the same hat we saw previously in

24   government's exhibit 4 C?

25   A.   Yes, sir, it is.

1            MR. HANLON:  Your Honor, nothing further for the

2      detective.  Thank you, Detective.

3            MR. KURLAND:  Your Honor, just a moment.

4            (Pause.)

5            MR. KURLAND:  I have no questions, Your Honor.

6            THE COURT:  Thank you very much, detective.  Sorry we

7      couldn't get to you this morning.

8            THE WITNESS:  That's fine, Your Honor.  Thank you

9      very much.

10           MR. HANLON:  That concludes the government's evidence

11     on the show-up identification issue, Your Honor.

12           THE COURT:  All right.  Anything from the defense?

13           MR. KURLAND:  Yes.  Your Honor just a couple things

14     that I believe that we've worked out.  If the government's

15     willing to stipulate to one thing and another thing we'd

16     proffer on, I don't know if the government's going to stipulate

17     to.  Detective Marll just testified that the head detective was

18     Detective Tinsure, who is retired.  There is a statement of

19     probable cause report that has the height and weight of both

20     Mr. Gardner and Mr. Holly indicating that Mr. Gardner is five

21     seven, 170.  Mr. Holly back here, Holly, six one, 160.

22           And, in addition, there is a report by Detective

23     Tinsure in the statement of probable cause that is written on

24     6-8-02 the day after, and we'll just submit that.

25           But the germane fact as well indicates both suspects

1    were positively identified, and it summarizes the investigation

2    took place the day before.  There is no mention in the report

3    of any identification by Miss Smith of a particular person as

4    the shooter.

5              THE COURT:  Very well.

6              MR. KURLAND:  We'll I guess have that marked as

7    defendant's number 2.

8              THE COURT:  Very well.

9              MR. KURLAND:  And the next thing, your Honor, is that

10   we would like to proffer a portion of Mr. Montgomery's grand

11   jury testimony, and in it Mr. Montgomery, who is alleged to

12   have been involved in the incident, indicates in his grand jury

13   testimony that Aaron Holly's nickname is E, and that on the

14   date in question, I think prosecutor asked do you remember

15   which one was wearing the red hat.

16             THE COURT:  Slow down, please.

17             MR. KURLAND:  I'm sorry.  On the testimony by the

18   government at the grand jury in this proceeding --

19             THE COURT:  Testimony by Mr. Montgomery?

20             MR. KURLAND:  No, by Mr. Montgomery.

21             THE COURT:  Under questioning by?

22             MR. KURLAND:  Under questioning by the Assistant U.S.

23   Attorney, talks about Aaron Holly's nickname E, and then asked

24   about the event.

25             "Was either of them wearing a red hat?"

1          Answer, "Yes."

2          "Do you remember which one was wearing the red hat?"

3          Answer, "E." Which is Mr. Holly.

4          THE COURT:  All right.

5          MR. KURLAND:  We would proffer that evidence as for

6    purposes of this hearing as well.

7          MR. HANLON:  I'll argue weight and all that stuff.  I

8    don't have probable with admissibility.

9          THE COURT:  Very well.

10         MR. KURLAND:  We'll mark that as defense 3.

11         THE COURT:  All right.

12         MR. KURLAND:  We'd ask for those to be admitted.

13         THE COURT:  All right.  It's admitted.  Do you want

14   to be heard?

15         MR. KURLAND:  Can I have a moment?

16         THE COURT:  Certainly.

17         MR. KURLAND:  In the light for final argument with

18   respect to this issue?

19         THE COURT:  We can could do it today or put it off if

20   you prefer.

21         MR. KURLAND:  I am prepared to argue today, but I'd

22   like a couple minutes to kind of gather my thoughts because the

23   testimony came in a little bit different than --

24         THE COURT:  Okay.  Does Mr. Harding have one or two

25   more witnesses?

```
1                 MR. HARDING:  Just one today.

2                 THE COURT:  Why don't we do that witness?  We'll take

3     a break, and then I'll hear argument on the identification.

4                 MR. KURLAND:  Thank you very much.

5                 Your Honor, can I leave the table here and go back?

6                 THE COURT:  Sure.

7                 MR. KURLAND:  Thank you very much.

8                 MR. HARDING:  Your Honor, the United States calls

9     Detective Keith Benson.

10                (The Witness is sworn.)

11                THE CLERK:  Thank you.  You may be seated.  Please

12    speak directly into the microphone.  Please state your name for

13    the record.

14                THE WITNESS:  Detective Keith Benson, B E N S O N.

15                      DIRECT EXAMINATION

16    BY MR. HARDING:

17    Q.  Good afternoon, Detective Benson.

18    A.  Good afternoon.

19    Q.  Can you tell us how you're employed right now?

20    A.  I'm employed with the Baltimore City Police Department and

21    detailed to Drug Enforcement Administration Task Force.

22    Q.  What's the name that of task force?

23    A.  They call it the Redrum Task Force.

24    Q.  What does that task force do?

25    A.  Focus on organizations that are responsible for murders and
```

1    violence.

2    Q.   Okay.  How long have you been in Redrum?

3    A.   Coming up on and five years, six years now.

4    Q.   Okay.  Let me call your attention to April first of 2002,

5    were you in Redrum at that time?

6    A.   Yes, I was.

7    Q.   And, by the way, did you tell us how long you'd been in the

8    Baltimore City Police Department?

9    A.   In two weeks, it will be 13 years complete.

10   Q.   Okay.  Back to April 1, 2002, let me first ask you,

11   however, were you here, were you in the courtroom when

12   detective or Sergeant Robar testified earlier today?

13   A.   No, sir, I wasn't.

14   Q.   Were you in the courtroom when Detective Kramer testified

15   back I believe on April 26th about two weeks ago?

16   A.   No, sir.

17   Q.   Okay.  Let me ask you about the event of April 1, 2002.

18   Did you participate in an arrest that day?

19   A.   Yes, I did.

20   Q.   And was that arrest pursuant to a warrant?

21   A.   Yes.  It was actually in reference to two open warrants for

22   Willie Edward Mitchell.

23   Q.   Did you have, prior to that day, anything to do with the

24   investigation of Willie Edward Mitchell for any crimes?

25   A.   No, sir.

1    Q.  So when you were detailed that day, it was just to

2    participate in the arrest?

3    A.  Yes, sir.

4    Q.  Can you tell us where you were that day?

5    A.  I was at my office, the Federal Building 200 Saint Paul.

6    There were several people from my unit, investigators that were

7    putting together a plan of action to go out, locate and arrest

8    Willie Mitchell for two outstanding warrants, one for series of

9    stabbings that occurred resulting from a fight at a

10   Hammerjack's Club in downtown Baltimore.

11            The second was I believe an outstanding drug warrant

12   from Altoona, Pennsylvania, or somewhere in Pennsylvania.

13   Q.  Okay.  So where did you go after this meeting 200 St. Paul

14   Place?

15   A.  We coordinated a few spots we believed we might locate him,

16   one an apartment in Randallstown and one was his girl friend or

17   wife, I'm not sure which it is, her place of employment on a

18   place called Global Payments on Red Run Boulevard, also

19   Randallstown I believe it is.

20            So we sent individuals out to different locations in

21   hopes that we'd be able to locate Mr. Mitchell.

22            After a short time, units that were at the Global

23   Payments location observed Mr. Mitchell pull up in a black, I

24   believe it was an Altima pulled up in front of the Global

25   Payments, got out of the driver's seat, sat in the passenger

1    seat like he was waiting.  Eventually the individual later

2    identified as Jaquetta Smith got outside, got into the driver's

3    seat, then left the area.

4              We were given the direction of travel of the vehicle,

5    and myself and my partner at that time Detective Kramer, who's

6    now Sergeant Kramer, responded out to that area.

7              We also had an individual, a detective from Baltimore

8    County, who had Baltimore County police radio, so we would have

9    communications with both City and County since we were out in

10   Baltimore County at the time.

11             We were able to eventually intercept the vehicle, get

12   behind it on and Reisterstown Road heading south, but right at

13   the City/County line heading south toward the city.

14             The Baltimore County Detective with us was able to

15   radio for marked units to effect a car stop, and so we could he

16   place Mr. Mitchell under arrest.

17             And after the car was stopped, we approached the

18   vehicle, got Mr. Mitchell out from the passenger side, and upon

19   placing him under arrest, recovered a 9 millimeter Lorcin

20   loaded semiautomatic handgun from the sock of his right pant

21   leg area.

22   Q.   Okay.  Who was actually doing the arrest, then?

23   A.   Myself and Detective Kramer approached the vehicle at the

24   same time he was just in front of me.  So he actually was hands

25   on first, and as he's pulled him out of the vehicle, I believe

1    may have prone him out face down on the ground, put handcuffs

2    on him, he recovered the handgun as he was patting him down,

3    handed it to me, and we -- so we basically together Kramer

4    actually put the handcuffs on him.

5    Q.  Did you give him Miranda warnings?

6    A.  No, I didn't.

7    Q.  Why not?

8    A.  I had no intention of asking him any questions or talking

9    to him.  I just was there to effect his arrest.

10   Q.  Where did you take him?

11   A.  He was placed in -- we were just out.  I believe we were --

12   I don't know if we were outside the County line or inside the

13   City, but we had the Baltimore County, one of the vehicles that

14   made the car stop was a cage car.  I asked them if they could

15   do a transport, or at least have him sit in the vehicle until

16   we could figure out how to transport him down to downtown

17   Baltimore.

18          So we placed him in the rear of one of their cage

19   cars.  Once we explained everything that was going on to Miss

20   Smith, I believe we let her take the vehicle from the scene, we

21   drove to Valdivia Court, which is the apartment we already had

22   a search warrant in place to execute at Valdivia Court.

23          We drove to Valdivia Court to coordinate and see who

24   was going to take him downtown to be charged.  And once we got

25   to that location, some of the individuals executed the search

 1    warrant, and I followed the Baltimore County vehicle with Mr.

 2    Mitchell down, or they actually followed me because the County

 3    officer wasn't that familiar with downtown, where to go.

 4          So he followed me down to the Central District.

 5    Q.  When you say that Mr. Mitchell was in sort of a cage car --

 6    A.  Yeah.  It's a -- yeah.  They call it a cage car.  It's just

 7    a marked patrol vehicle with like a screen between the front

 8    and back seat.

 9    Q.  Okay.  What did you do?  Where did you take Mr. Mitchell

10    that day?

11    A.  The County officer followed me down to Central District.  I

12    brought -- took Mr. Mitchell out of the vehicle and brought him

13    up to the detective that was handling the stabbing at

14    Hammerjack's.

15          Detective Russell Robar brought him up to their

16    office.  He was the one that actually had the physical warrant

17    that he would need to take him over to Central Booking to

18    charge him.  I brought him there to get that warrant.  And I

19    let the Baltimore County officer go back into service.  He had

20    done me a favor by bringing him down, so we were going to

21    coordinate to have a Baltimore City wagon take him over to

22    Central Booking.

23    Q.  Was there anything else you had to do down there at Central

24    Booking?

25    A.  I had to -- he was being charged on the two open warrants,

1    but I also -- possession of the handgun, he had a small bag of

2    marijuana, and a pocket knife on him.  So the new charges had

3    to be booked in.  I could do that at the Central District as

4    well from a remote booking station.

5    Q.  What does that involve?

6    A.  It involves getting a -- they get a tag on their arm that

7    has a bar code that, once they get to Central Booking, it can

8    be scanned in with a scanner gun.

9         And whatever information I type in, the remote

10   booking station would show up at Central Booking as if I was

11   there doing the processing.

12        But basically processing from an off site.  So I

13   retrieved one of those tags, the wagons that do the transports

14   to Central Booking carry those.

15        I obtained one of those, put on Mr. Mitchell so he

16   could be sent over, and I kept that number and went in and did

17   the processing for the new charges.

18   Q.  And then did you actually put a band on Mr. Mitchell?

19   A.  Yes, sir.

20   Q.  A wrist band?

21   A.  Yeah.  It's a plastic wrist band that has a small clasp,

22   and that holds it in place.

23   Q.  And was there something else that you put on him?  Did you

24   mention a toe tag?

25   A.  They call it a toe tag.  It's --

1    Q.   Is that the same thing?

2    A.   It's the same thing.  It's just an identification bracelet

3    with a bar code.

4    Q.   Okay.  And if there hadn't been a new charge, if there

5    hadn't been a gun that you wanted to charge Mr. Mitchell with,

6    would you have taken him to Central Booking just to get the

7    warrant?

8    A.   No.  The actual physical warrant was in Detective Robar's

9    possession, so either way I had to take him there to get the

10   warrant.  And he could have simply -- the warrant could be

11   certified and sent over with the wagon man to Central Booking.

12   There's no need for anybody to actually physically accompany

13   him over there.

14   Q.   Okay.  Was someone helping you when you took Mr. Mitchell

15   up to where Robar was at the Central District?

16   A.   No.  I walked him up.  I don't recall if the Baltimore

17   County officer might have walked him up to the second floor and

18   left.  I think I walked him up alone, he got in his car and

19   left.  It's only 50 feet inside the building and up one flight

20   of stairs.

21   Q.   Did you speak to Mr. Mitchell at any time when you --

22   A.   No, sir.

23   Q.   -- either, either at the scene of the arrest, or while

24   transporting him, or at the Central District, did you speak to

25   him?

1    A.   No, sir.

2    Q.   Did you speak to Robar?

3    A.   I did.

4    Q.   What did you say to Robar?

5    A.   I told him that obviously we had arrested him, gave him the

6    circumstances, told him that we got him in a car stop in

7    County, and that he had a handgun, and we would be placing new

8    additional charges on him.

9         Then we discussed whether or not it would be a good

10   idea to even interview him, because he was -- the basis for

11   getting him arrested on those warrants was he was also a

12   suspect in a double murder in the city.

13        And to not taint anything that was done in that

14   murder investigation, the stabbing was already done.  The drug

15   investigation warrants were already done.  We got him with a

16   handgun.  We didn't feel there was any need to ask him any

17   questions about anything.  So I didn't, I didn't question him.

18   Q.   Okay.  Did Robar are question him while you were there?

19   A.   Not in my presence, no.

20   Q.   What did Robar say in response to your comments about not

21   needing to interrogate him?

22   A.   He thought it was a good idea.  He also said his stabbing

23   case was good, and he had witnesses and he had a lot of

24   evidence.  If it was going to cause any jeopardy to the double

25   murder investigation, he would just as soon not do any sort of

1    interview.

2    Q.   How would it cause jeopardy to the double murder

3    investigation?

4    A.   For one, I don't believe at the time that Mr. Mitchell knew

5    that he was a suspect in that double murder.  So if he was

6    picked up on just this stabbing warrant and the drug warrant,

7    the investigation, they weren't ready to charge the double

8    murder at that moment.  The idea was get him off the street,

9    they could complete their investigation of the double murder,

10   that could alert him if he knew that he was a suspect in it.

11   He could make phone calls and have evidence destroyed.  There's

12   ways it could muck up the investigation.

13   Q.   Who was the homicide detective on the double murder you're

14   referring to?

15   A.   Gary Niedermyer and Kirk Hastings was the secondary.

16   Q.   Were either of them present for the arrest of Mr. Mitchell?

17   A.   No, sir.

18   Q.   Were they present at the Central District?

19   A.   No, sir.

20   Q.   Do you know if they were even working that night?

21   A.   I don't know if they were working.  I believe I talked to

22   Gary.  I think he knew that we were -- that was our -- we were

23   going out to make the arrest of Mitchell.  And but I don't know

24   if he was working or not working that night.  I didn't see him

25   at all during that night.

1    Q.  Did -- you said that you didn't talk to Mr. Mitchell that

2    night.  Did Mr. Mitchell say anything?

3    A.  I think the only -- he was very subdued, very calm.  I

4    think the only thing he said you know why am I here.  And we

5    just kind of said we'll explain things to you and left it at

6    that.

7              But he didn't really say too much.  He was very

8    subdued.

9    Q.  If you had given him Miranda warnings, would you have

10   filled out a form and put it in a report?

11   A.  Most definitely.

12   Q.  Now, what happened after you got done filling out your --

13   you described doing this wrist band for Mr. Mitchell and

14   putting that on, what happened after that?

15   A.  To my knowledge, the wagon man took possession of him, took

16   custody of him, with the processing, there's a processing

17   sheet, and that has a number that matches the wrist band sheet.

18   And that's taken over to Central Booking.

19             He was dropped off and I went into the remote booking

20   room and did the processing for the new charges.

21   Q.  I see.  But you had already put the wrist band on at that

22   time?

23   A.  Yes.

24   Q.  So did you not transport him to Central Booking?

25   A.  I did not.

1    Q.  Was there a sort of summary report of all the events that

2    occurred that day including searches and the arrest and

3    everything?

4    A.  There were different reports written by different people,

5    and I don't think there was one overall summary report that I'm

6    aware of.

7    Q.  Did you review a report that was prepared by Detective

8    Giganti?

9    A.  Yes, I did.

10    Q.  And did Giganti have any contact with Mitchell that day, as

11    far as you know?

12    A.  None whatsoever that I know of.

13    Q.  Was he present at the scene of the arrest?

14    A.  No.  I was present at the scene of the arrest.  The

15    transport down, and then ultimately turning custody over to the

16    wagon man, who took him to Central Booking, and Giganti was

17    never present for that.

18    Q.  Okay.  Did Giganti indicated Mitchell did get Miranda

19    warnings and declined to give a statement?

20    A.  He did.

21    Q.  Was that statement correct?

22    A.  I don't believe so.  Like I said, I was present with him

23    through the entire process.  I think Detective Giganti just

24    misspoke in his report possibly assumed that it had been

25    Sunday.

1          MR. SULLIVAN:  Objection.

2          THE COURT:  Overruled.  Go ahead.

3   A.  He possibly assumed that it had been done, because it is

4   common when someone's arrested for any crime of violence or

5   stabbing that they're going to be interviewed by the detective

6   down there.

7          But due to the mitigating circumstances with this

8   situation, that would be if there was no other investigation

9   going on with the suspect.

10          But based on this situation, it wasn't done.  And he

11   may have just assumed, and that's why he may have put in the

12   report, but that's my guess.

13   Q.  Okay.  Thank you.  I have no further questions.

14          THE COURT:  Rather than proceed, Mr. Sullivan, I

15   think we'll break now and then you'll have your cross, and then

16   I'll have argument.

17          Do any counsel believe we need or want to have a

18   session tomorrow or believe one is needed or desirable?  You

19   seem to be make good time.

20          MR. COBURN:  I think so, Your Honor.

21          THE COURT:  Mr. Harding, Mr. Hanlon?

22          MR. HARDING:  We don't have a need for one.

23          MR. HANLON:  I don't believe there's a need.

24          THE COURT:  Let's not have one, then.  All right.

25   We'll stand in recess for 15 minutes, and then I'll have

1    cross-examination by Mr. Sullivan, and we'll hear argument on

2    the identification.

3              (Recess.)

4              THE COURT:  Please be seated, you may proceed, Mr.

5    Mitchell.  Excuse me, Mr. Sullivan.

6              MR. SULLIVAN:  Thank you, Your Honor.

7              THE COURT:  Not now, Mr. Gardner.  You'll get a

8    chance before we conclude today.

9              MR. GARDNER:  Thank you.

10                   CROSS-EXAMINATION

11   BY MR. SULLIVAN:

12   Q.  Detective, let's start where Mr. Harding finished.  You

13   have no reason to know one way or the other why Detective

14   Giganti said that he administered Miranda warnings to Mr.

15   Mitchell?

16   A.  No, I don't.

17   Q.  All right.  So what you just told Mr. Harding is what you

18   told the Court?

19              MR. HARDING:  Objection.  I think that's a

20   mischaracterization of Giganti's report.

21              THE COURT:  I haven't seen it, so anybody can say

22   anything they want about it, because I haven't seen it.

23              MR. SULLIVAN:  I assume the government's calling

24   Detective Giganti at some point.

25              THE COURT:  At some point.

1    Q.  It's just an assumption you're making and guesswork on your

2    part, would that be a fair statement?

3    A.  Based on my involvement with it and knowing that he had no

4    involvement with it, that's my assumption.

5    Q.  Well, your involvement began on April first, 2002, right?

6    A.  That's correct.

7    Q.  And your involvement concluded on April 1, 2002?

8    A.  It hasn't concluded yet.

9    Q.  In regard to the -- we're talking about the arrest of Mr.

10   Mitchell?

11   A.  Yes.

12   Q.  Okay.  So if I understand your testimony, detective, you

13   have nothing, as a Redrum task force officer, you had nothing

14   to do with Willie Mitchell in until April 1, 2002?

15   A.  That's correct.

16   Q.  And apparently, you were part of some kind of planning

17   meeting at some federal building on St. Paul Street to develop

18   a plan of action to arrest Mr. Mitchell; would that be a fair

19   statement?

20   A.  Correct.

21   Q.  Okay.  And was Detective Giganti present at that meeting?

22   A.  I don't recall if he was there or if he was already out on

23   the street at one of the locations conducting surveillance.

24   Q.  Well --

25   A.  He was privy to the information from the --

1    Q.  Let me give you some names, and you can tell me if these

2    people were part of this planning meeting, showed up at some

3    point, or had no involvement, okay?

4    A.  All right.

5    Q.  Detective Sergeant James Hagan?

6    A.  He was there.

7    Q.  Special Agent Douglas Ellington?

8    A.  He was there.

9    Q.  Detective Chris Kraul?

10   A.  He was.

11   Q.  Detective Keith Benson?

12   A.  That's me.  I was there.

13   Q.  Donald Kramer?

14   A.  He was there.

15   Q.  He's your partner?

16   A.  Yes.

17   Q.  Detective John Giganti?

18   A.  He was there at some point, but I don't recall if he was

19   there at the initial meet.

20   Q.  Sergeant Barry Blevins?

21   A.  He was out in the County.  He wasn't present at the initial

22   meet.

23   Q.  Okay.  Detective Brendon Brannon?

24   A.  I believe that may be the county officer that was riding

25   with us.  He was out in the County.

1    Q.   Detective Tim Biden?

2    A.   I think he's also a County officer or Detective.

3    Q.   Detective Ryan Cooper?

4    A.   I am assuming based on me, not knowing the names, I'm

5    assuming the are.

6    Q.   Detective, if you don't know who he is, just say I don't

7    know, I will accept that.

8              Detective Ryan Cooper?

9    A.   I don't know him.

10   Q.   Detective Tom Seabolt?

11   A.   I know Tom, he was there, also.

12   Q.   Okay.  Now, the names that I just read out to you, were

13   these either detectives or police officers present on Valdavia

14   Court during the execution of the search warrant?

15   A.   Yes.

16   Q.   Now, just so I understand this, you placed Mr. Mitchell

17   under arrest, you and Detective Kramer, in Baltimore County,

18   correct?

19   A.   I don't recall if it was -- it was right at the City/County

20   line, 60 something hundred block of Reisterstown Road.

21   Q.   What was the exact location of the arrest?

22   A.   I'd have to refer, I believe it was the 6200 block of

23   Reisterstown Road, which I don't know the County/City line, but

24   I think it may be, it's irrelevant if it's County or City

25   because I'm a task force officer.  I have arrest powers

1    throughout the country.

2    Q.  That's great.  But I'm asking, was he in the County or the

3    City?

4    A.  I believe it was in the City.  I mean in the County.

5    Q.  And even though you're a Redrum task force officer,

6    identified probably as a DEA Agent Special Agent or Marshal,

7    one of the two, you're still a Baltimore City Police Officer,

8    correct?

9    A.  Correct.

10   Q.  Okay.  And you didn't run to a federal magistrate judge on

11   April first, did you, to present a complaint, an arrest warrant

12   for Willie Mitchell based on your Redrum task force capacity,

13   did you?

14   A.  No, I was --

15   Q.  Okay.

16   A.  I was out there based on two outstanding warrants.

17   Q.  Okay.  Now, you had looked over to the government table.

18   Do you have a report that would help refresh your recollection

19   as to exactly where Mr. Mitchell was arrested?

20   A.  I don't have it with me.  But I'm fairly confident it's the

21   6200 block of Reisterstown Road in Baltimore County.

22   Q.  And what time was this arrest effectuated?

23   A.  Some time around 9 p.m.  I don't know exactly.

24   Q.  You got something that would refresh your recollection as

25   to the time?

1   A.  I don't have it with me, no, sir.

2   Q.  What is it?

3   A.  It would be my charging papers arrest, charging papers of

4   Willie Mitchell that outlined exactly what they did.

5              MR. SULLIVAN:  Your Honor, I'm going to suspend my

6   cross with the Court's permission to revisit at another point.

7   I don't have this document.  I'd like to look at it.  I don't

8   believe it's been provided in the course of discovery, and the

9   timing and the location are critical to cross, and I don't see

10  how anybody would be prejudiced.  I could keep going, but

11  instead of recalling him at later time, you know.

12             THE COURT: You don't --

13             MR. SULLIVAN:  I guess --

14             THE COURT:  You don't have the papers on the gun

15  charge?

16             MR. SULLIVAN:  Not his, no.  I have the application

17  of charges from the commissioner.

18             THE COURT:  That's what I'm referring to.

19             But they're not yours?  That's what he's referring?

20             THE WITNESS:  Pertaining to the gun charges, yes.

21  BY MR. SULLIVAN:

22  Q.  You didn't write those?

23  A.  For the charge with the Lorcin 9 mm handgun were written by

24  me.

25  Q.  Do you have those?

1    A.  I don't have them with me, no.

2    Q.  Okay.

3             THE COURT:  Do you have them, Mr. Sullivan?  Has the

4    government provided them?  Mr. Harding?

5             MR. HARDING:  I believe we have, Your Honor.  But --

6             THE COURT:  Okay.

7             MR. HARDING:  Mr. --

8             MR. SULLIVAN:  I'm not saying the government has not

9    provided them.

10            THE COURT:  Oh, sure.  We're just trying to make sure

11   it's in hand.

12            MR. SULLIVAN:  Your Honor, I don't have them.

13            THE COURT:  Okay.

14            MR. SULLIVAN:  I can, let me just continue and we if

15   I can recall him in my case if I need to recall him.

16            THE COURT:  Sure.

17            MR. SULLIVAN:  That would be fine.

18   BY MR. SULLIVAN:

19   Q.  So the time of the arrest was 9 p.m.?

20   A.  Somewhere around there.  I'd have to refer to the notes to

21   see exactly.

22            MR. SULLIVAN:  Your Honor, I'll call him later as my

23   witness.  There's no need -- I need to know the details, I

24   can't --

25            THE COURT:  Okay.  Kramer didn't testify to any of

1      that?

2                 MR. HARDING:  I believe he did, Your Honor.

3                 MR. SULLIVAN:  Your Honor, my recollection is that

4      Detective Kramer didn't go into the details.

5                 THE COURT:  Okay.

6                 MR. SULLIVAN:  Or the specifics.

7                 THE COURT:  Okay.  All right.  You may step down.

8      Thank you.  All right.  So we'll keep the record open.

9                 Of course, as you said, Mr. Sullivan, we still

10     haven't gotten to the defense case on that issue.

11                MR. SULLIVAN:  Thank you.

12                THE COURT:  All right.  I believe the last item on

13     the agenda for today is argument on the motion to suppress

14     out-of-court identifications.

15                Mr. Kurland, I'll be glad to hear from you.  We all

16     know that the law is fairly settled.  Your burden is to show

17     unnecessary suggestiveness giving rise to a substantial

18     likelihood of irreparable misidentification, and if you show

19     unnecessary suggestiveness, then the burden shifts to the

20     government to establish reliability.

21                MR. KURLAND:  Yes, Your Honor.

22                Judge, the way that I see this, and plus the way it's

23     structured and the way the evidence came in, there appears to

24     be three different aspects of the show-up that are at issue

25     here, or three different show-up identifications.

1              There's the show-up identification of Kelly David.

2     These were the two guys that she saw running into her car.   And

3     then with respect to Andrea Smith, there's the show-up

4     identification that these are the two guys that were involved

5     in the incident, and then the separate alleged identification

6     of somebody as the shooter.

7              So the way that I see the evidence, there are three

8     separate --

9              THE COURT:   I don't see it that way.   I'll try to

10    follow you.

11             MR. KURLAND:   All right.   Okay.   I want to first

12    start out with respect to the argument of the show-up

13    identification, the alleged show-up identification as to a

14    particular person, presumably Mr. Gardner as the shooter.

15             THE COURT:   You see, I wish you wouldn't start there,

16    because I don't see that as a separate identification.   It is a

17    part of the identification of Mr. Gardner by Miss Smith.

18             MR. KURLAND:   Well, she allegedly made -- well, she

19    allegedly made two separate statements, and I think the

20    arguments with respect to whether or not they're suppressible

21    are not necessarily the same.

22             And I think that it's fair to characterize her, not

23    her testimony, but the testimony in the record, and I'll start

24    with Miss Smith, then.

25             Part one is her testimony at the show-up that those

1    were the two guys that she saw at the scene.

2            And a second separate alleged statement that the guy

3    in the gray shirt was the shooter.

4            THE COURT:  All right.  Wait.  Wait.  Let's slow down

5    a bit.  You keep talking about statements.

6            MR. KURLAND:  Yes.

7            THE COURT:  Obviously, that's important evidence.

8    But the motion is to suppress the identification.

9            MR. KURLAND:  Yes, Your Honor.  No.  But there's two

10   aspects to the identification.  This is clear in the pleadings.

11   The identification has two dimensions to it, and they're

12   separate.

13           The first dimension is her identification is that

14   these are the two guys that -- the two guys did the show-up

15   were the same two persons she saw at the scene

16           THE COURT:  Okay.  But the detective or the sergeant

17   couldn't even remember what Miss Smith said in the car.  Now,

18   she says she said that's them.  That's how she testified.

19           MR. KURLAND:  That's correct.

20           THE COURT:  He couldn't even remember what she said.

21   So, for example, if he were to testify in support of her

22   identification, the testimony would be I don't remember what

23   she said, but it was a positive identification.

24           Now, that has nothing to do with statements, at least

25   in so far as his testimony would be concerned.  So I don't --

1    I'm not going -- I'm not overly concerned with your focus on

2    statements.

3              I understand what you were doing, what you need to

4    do.  But I don't want to give it too much emphasis.

5              MR. KURLAND:  Well --

6              THE COURT:  The real question is the identification.

7              MR. KURLAND:  Your Honor, again, I don't mean to

8    sound dense or whatever.  It's critically important with

9    respect to how I proceed here that there are -- and I

10   understand this to be the government's case as well, there are

11   two pieces of evidence with respect to Andrea Smith's

12   identification they want in or at least is in play and that is

13   her identification the show-up that those two were the guys.

14             THE COURT:  Right.

15             MR. KURLAND:  And that --

16             THE COURT:  The taller of the two was the shooter.

17             MR. KURLAND:  I would love it.  The point is

18   Gardner's the shorter.  I think there's no evidence in the

19   record that Gardner's the shooter.

20             THE COURT:  I don't know what the government's

21   evidence is to prove that Mr. Gardner was the shooter.  What I

22   know I heard here today is testimony by the two young women

23   that they identified two people.  And one of them, according to

24   Miss Smith, she said the taller of the two was the shooter.

25   But I think she also said the one wearing the red baseball cap.

```
1    You know, I don't know how that fits together.  That's not my
2    job.
3              MR. KURLAND:  Well, but it's my job, then.
4              THE COURT:  Right.
5              MR. KURLAND:  Okay.  Let me back up a second.
6              Andrea Smith's testimony on the stand today with
7    respect to when the government elicited from her on direct
8    examination what did she observe, and she testified that the
9    taller of the two wearing the red hat was the shooter.
10             THE COURT:  Right.
11             MR. KURLAND:  That testimony will be admissible at
12   trial, if she testifies the same way, and that has nothing to
13   do with the show-up.
14             THE COURT:  Well, sure it does.
15             MR. KURLAND:  No, no.
16             THE COURT:  Because she saw -- she saw somebody shoot
17   somebody, and then a few minutes later --
18             MR. KURLAND:  No, Your Honor, that's correct.  Though
19   but the aspect of the --
20             THE COURT:  She couldn't have made the identification
21   if she didn't see what she says she saw.
22             MR. KURLAND:  Judge, I got to start over again,
23   because for some reason, it's just not -- we're mixing up a
24   couple of things.
25             THE COURT:  I know, because you won't go down the
```

1    path that I'm asking to you lead me down.  You're insisting on

2    me going down your path, and I can't go down that path, because

3    I don't -- I'm not going to play it that way.

4                MR. KURLAND:  Well, okay.

5                THE COURT:  We have two identifications.

6                MR. KURLAND:  Your Honor, her testimony in court

7    today as to what she observed at the scene --

8                THE COURT:  Is the foundation for her show-up

9    identification.  Okay.

10                MR. KURLAND:  Yes.

11                THE COURT:  We agree on that.

12                MR. KURLAND:  But whether or not the show-up

13    identification is admissible, her testimony at the scene isn't

14    a Neal versus Biggars question.

15                THE COURT:  She didn't testify at the scene.  She

16    testified here in court as to what she observed at the scene.

17    And it was what she observed at the scene that enabled her to

18    make an identification a few minutes later.  So we're in

19    agreement on that.

20                MR. KURLAND:  Okay.

21                THE COURT:  Now tell me why the show-up --

22                MR. KURLAND:  Okay.

23                THE COURT:  -- was unnecessarily suggestive.

24                MR. KURLAND:  Again, there are two aspects of her --

25    Your Honor, unless the government is going to concede that

1    there's no evidence in the record that she identified Gardner

2    as the shooter, which they should be, because there's no

3    evidence.

4            THE COURT:  The government's not conceding anything.

5    Please, Mr. Kurland, make your argument as to why the show-up

6    identification by Miss Smith and/or either are both are

7    unnecessarily suggestive shifting the burden to the government.

8            MR. KURLAND:  The starting point is the show-ups are

9    inherently suggestive to begin with.

10           THE COURT:  Absolutely.  So make your argument why

11   it's unnecessarily suggestive.

12           MR. KURLAND:  In addition to that, Andrea Smith's

13   mother testified that, in the transfer over to the scene, that

14   the police officer told her that, and I have the testimony,

15   that she was going to be taken to see two people to identify

16   that they had done the crime, so that is sort of -- the

17   testimony is that that was her testimony in the car, along with

18   Andrea Smith so that's sort of kind of adding to the snowball

19   effect of the procedure that's inherently suggestive or

20   suggestive to begin with.

21           THE COURT:  Okay.

22           MR. KURLAND:  Now, in addition to that, Andrea

23   Smith's testimony and in all of the other testimony in the case

24   was that the two people involved, there was a taller one

25   wearing a red hat, a shorter one, and they were both wearing

1    gray shirts.

2              At the scene, when the show-up is made, the testimony

3    is nobody is wearing a hat.  There is no -- there is testimony

4    that one is wearing a white shirt.  One is wearing a gray

5    shirt.  But there is no testimony as to which one is wearing

6    which shirt.

7              And there is no testimony as to the relative height

8    of the two.  There's just testimony in the record that at the

9    time of the show-up, one is wearing a white shirt.  One is

10   wearing a gray shirt.

11             THE COURT:  Okay.

12             MR. KURLAND:  The alleged identification that Andrea

13   Smith said she didn't say, but Officer Mitchell said she said

14   was that the one in the gray shirt was the shooter.  The only

15   constant between her initial description and every other

16   description in the case is the gray shirt.

17             So her identification of the one in the gray shirt as

18   the shooter is totally devoid of any evidence against Mr.

19   Gardner.  There is no evidence in the record that Mr. Gardner

20   was wearing a gray shirt at the time of the ID, at the time of

21   the show-up.

22             But, in addition to that, the identification, it

23   wasn't accompanied by a pointing.  It wasn't accompanied by the

24   shorter guy or the taller guy.  So the record on its face is

25   totally devoid of any connection between that gray shirt

1    shooter as being to Mr. Gardner.

2          So for the government to try to argue that there is

3    evidence in the record that Andrea Smith identified the person

4    in the gray shirt as the shooter who is Gardner, the record

5    simply doesn't support that at all.

6          Zero.  There's no evidence at all.

7          Now, furthermore, with respect to the focusing back

8    on the Neal versus Biggars issues, the two factors that I want

9    to focus in are, one, the accuracy of the prior description of

10   the criminal.

11         Again, her testimony is clear that the shooter at the

12   scene was the taller one wearing the red hat.

13         Even if we assume that Gardner was wearing a gray

14   shirt, again, there's no evidence in the record to support

15   that, that the prior identification that then at the scene

16   would be totally inconsistent, diametrically inconsistent with

17   this tepid identification of the gray shirt.

18         Again, when Andrea Smith goes back and writes her

19   statement down, that kind of hybrid statement that is both, you

20   know, 75 percent written by her mother, and then she writes the

21   last couple of lines, the only lines that she writes are that

22   the one that shot was the one with the gray and blue and he had

23   on a red hat.

24         So Andrea Smith is consistent throughout the whole

25   thing that it's gray hat shooter.  Her testimony that was

1    supported also by Officer Mead when he took down the additional

2    report was that her initial description was the taller guy with

3    the gray shirt and the red hat is the shooter.

4            So with respect to the aspect of the identification,

5    that when she said the guy in the gray shirt is the shooter.  I

6    emphasized, there was no evidence in the record that she was

7    identifying Gardner.  If, at best, all that evidence does is

8    buttress all of her other testimony that she had also said that

9    the taller guy with the gray shirt and a red hat was the

10   shooter on this record.

11           There is nothing in this record to show if she made

12   that statement.  And this again goes above and beyond the issue

13   with respect to just a credibility issue.

14           There's nothing in the record that that statement, if

15   it were made, is identification of Gardner.  That's why I asked

16   the questions I did of Officer Mitchell concerning was there

17   any other -- any identification made, did she point, did she

18   say taller, did she stay shorter, braided hair, or curly hair.

19   Absolutely nothing.

20           So we have this disembodied statement that simply

21   refers to an article of clothing, which is the only constant

22   when she saw those two guys there, the only constant between

23   her initial description and her alleged identification is the

24   gray shirt.

25           In my initial pleadings I filed, there's a series of

1    case law that says that when identification is largely based on

2    an article of clothing devoid of any other characteristics at a

3    show-up, that it kind of tips it over the scales of being not

4    just inherently suggestive to begin with, but inherently

5    suggestive and subject to irreparable misidentification.

6        And I think it's clear, from all other records, even

7    the stipulated evidence that came in, that if Mr. Gardner were

8    involved, and we're not conceding that, but as to Holly and

9    Gardner, Holly is the taller one, and based on Montgomery's

10   grand jury testimony, Holly's the one wearing the red hat, and

11   that's consistent with everything else.

12       If we factor that back to the evidence, Biggars

13   factors, the accuracy of the prior description of the criminal,

14   the initial accuracy of the description of the taller person in

15   the red hat is very clear.

16       THE COURT:  See, I think you're arguing reliability

17   now.  I don't think --

18       MR. KURLAND:  Well --

19       THE COURT:  I don't think you're arguing

20   suggestiveness.

21       MR. KURLAND:  The factor, though, with regard to the

22   Neal versus Biggars factors is accuracy of the prior

23   description.  We have the prior description of the taller

24   person with the red hat.  Then we have gray shirt.  Those

25   descriptions are diametrically opposed, and that's one of the

1    and factors that goes in the Neal versus Biggars analysis.

2              The other factor is the level of certainty

3    demonstrated at the confrontation.

4              I will put aside for a moment her level of certainty

5    with respect to where those the two guys involved.  I'll

6    acknowledge that her level of certainty on that issue was far

7    different than her level of certainty with respect to who is

8    the shooter.  But with respect to her level of certainty who is

9    the shooter, her alleged identification was simply identifying

10   an article of clothing on an unclear record as to who she was

11   identifying, and therefore if you take all of that into account

12   under the Neal versus Biggars factors, there is absolutely

13   nothing in this record that would support the admissibility of

14   her statement that the guy in the gray shirt was an

15   identification of Gardner as the shooter.

16             THE COURT:  See, you're doing it again.  You keep

17   talking about the statement.  And I really I understand why.  I

18   understand why you're doing it.  But it doesn't fit in the law

19   that you're relying on.

20             She saw two guys come out of the apartment, one of

21   whom fired two shoots into the victim.  She says the one fired

22   the shots was wearing a red baseball cap and was the taller of

23   the two.

24             Okay?  Minutes later, she says that's them.

25             MR. KURLAND:  Right.  I'll address that now if you

1    want.

2              THE COURT:  I don't know based on this record as you

3    put it who "them" were.  For purposes of this record, I don't

4    know who "them" were.  I presume one of them was Mr. Gardner,

5    or otherwise you wouldn't be arguing the motion, all right?

6              But based on this record, I don't know, other than

7    what you just said, whether Mr. Gardner assuming he was there

8    and arrested on that day and was sitting on a curb, and sitting

9    in a police car.  I don't know if he's the braided shorter one,

10   or the taller one wearing the red cap.  And for purposes of

11   this motion, I don't need to know.  The government didn't have

12   to prove who was actually there, who got arrested, who was

13   identified.

14             The government didn't have to prove this, prove that

15   for purposes of this motion.

16             I take it that Mr. Gardner was one of the two men.

17   So the question, seems to me, is, have you demonstrated on

18   behalf of Mr. Gardner that the identification by Ms. David and

19   by Miss Smith was unnecessarily suggestive?

20             MR. KURLAND:  Well --

21             THE COURT:  And that has nothing to do with what

22   statements she made and has nothing particularly do with her

23   further identification of one of the two as the shooter.

24             MR. KURLAND:  Judge, let me get my rule book for a

25   second.

 1          THE COURT:  You're not going to find an answer to

 2     what I just said.

 3          MR. KURLAND:  You know what, I will address the issue

 4     of the general idea that those are the two guys.  But I'm going

 5     to reserve my right to argue in rebuttal.  I have a hunch that

 6     --

 7          THE COURT:  You automatically get rebuttal, because I

 8     will have the government address reliability, and then you'll

 9     get the last word --

10          MR. KURLAND:  I understand.

11          THE COURT:  -- on why it's unnecessarily suggestive

12     and why it's not reliable.

13          MR. KURLAND:  I'm still -- I still have a problem.  I

14     won't say that.  I won't characterize it that way.

15          I still don't --

16          THE COURT:  Think we're on the same page.

17          MR. KURLAND:  With respect to show-up identification,

18     I think that the structure of how I have set it up is

19     consistent with the law, not to get hung up on identifications

20     or statements, I don't want to get hung up on that, but I'm

21     fairly certain that the government is also going to identify

22     those three discrete aspects.

23          THE COURT:  Let's see what the government does.  We

24     don't have to speculate.

25          MR. KURLAND:  But let me --

1          THE COURT:  They're sitting right here.

2          MR. KURLAND:  Let me reach though putting aside the

3   identification of the shooter aspect, with regard to the

4   general comments concerning both Kelly David and Andrea Smith.

5          THE COURT:  All right.

6          MR. KURLAND:  We have a starting point, again

7   inherently suggestive show-up to begin with, and we still have

8   to show with regard to the identifications with respect to the

9   reliability, we have descriptions with respect to the clothing

10  that are different from --

11         THE COURT:  Gray and white.

12         MR. KURLAND:  Now, with regard to Miss Davis, it's a

13  little bit different.  But certainly with respect to Andrea

14  Smith, with respect to Neal versus Biggars, even her comment

15  these are the two guys, given that it's been I would say

16  tainted and polluted by the testimony that while they were

17  being driven over there, one of the officers said we're going

18  to take you over to where the two guys did the crime, I think

19  that that kind of tips the balance that all aspects of Andrea

20  Smith's identification, not just the gray shirt, is the

21  shooter, but also the issue with respect to those are the guys

22  would fall under the Neal versus Biggars.

23         THE COURT:  What's unnecessarily suggestive about

24  Miss Davis's procedure?

25         MR. KURLAND:  That would be, I acknowledge, that's

1    obviously a closer call.  I think it would be that you've got

2    the people dressed just differently with respect to the

3    clothing, and you've got you know the black pants, blue pants,

4    and they're surrounded by five different officers.  I think the

5    testimony is they weren't handcuffed at the time.  They were

6    handcuffed when Andrea Smith came by there.

7        THE COURT:  All right.  Now, I assume that the

8    government will have arrest photos of the two detainees?

9        MR. KURLAND:  I assume.

10        THE COURT:  I mean you haven't seen them.

11        MR. KURLAND:  There are some.

12        THE COURT:  Okay.  But, in other words, the two

13    distinctive features of the two people seen by Miss Davis seem

14    to be -- one was considerably taller than the other.  And, two,

15    one had finally braided hair.

16        MR. KURLAND:  Yes.

17        THE COURT:  I assume that the arrest photos of those

18    two people, one of whom apparently was Mr. Gardner, will depict

19    that, correct?

20        MR. KURLAND:  It --

21        THE COURT:  No?

22        MR. KURLAND:  It might.  Put it this way, on this

23    record, the height's in the record that came in, in exhibit D

24    2.  It's -- it might not be crystal clear from the arrest

25    photos.

 1        THE COURT:  Whose hair's braided and whose is not?

 2   Maybe they were both braided and Miss Davis didn't notice the

 3   other one.

 4        MR. KURLAND:  I mean, well, I think those questions

 5   are probably more directed toward the government, because it's

 6   the government evidence.

 7        THE COURT:  Let me hear from the government.  Mr.

 8   Hanlon, seems to me that the defense has not established,

 9   frankly, I don't think it's come close to show unnecessary

10   suggestiveness as to Miss Davis.  As Mr. Kurland I think

11   correctly says, it's a lot closer question on Miss Smith as to

12   suggestiveness.

13        Actually, Mr. Kurland said it the opposite way.

14   But assuming for the sake of argument that the defense has

15   satisfied its burden, you can certainly address suggestiveness,

16   but I mainly want to hear you on the liability.

17        MR. HANLON:  Certainly.  First of all, the various

18   factors the Court should consider, well known is the Biggars

19   factors.  I'm not sure I have to go the witness's opportunity

20   to view, first of all.  Both of these witnesses had an

21   excellent opportunity to view the two men respective times.

22   The only factor that militates against the government on that

23   point is time.  It was couple of seconds.  But they were

24   obviously concentrated seconds.

25        The two witnesses are absolutely focused on those two

1    men in sharp situations, very close, basically the hood of the

2    car in Miss Davis's case, within a few feet in Miss Smith's

3    case.  The opportunity to view is very good, and the witnesses

4    certainly never testified otherwise.  The witness's degree of

5    attention is second kind of duplicative with the first one, but

6    again their attention was riveted by these two respective

7    situations, clear from the testimony.

8            Accuracy of the witness's prior description of the

9    perpetrators, to use the case law, I should say alleged

10   perpetrators.  I have to be candid, I probably should have put

11   in more about what they were wearing at the time of the

12   show-up.  It didn't occur.  I have clothing.

13           THE COURT:  You have arrest photos?

14           MR. HANLON:  We do have arrest photos.

15           THE COURT:  Are the braids clearly perceptible in the

16   --

17           MR. HANLON:  Yes.  One has braids, and one does not.

18           THE COURT:  By the way, I don't know what you want to

19   say about is this, but Officer Mead, it seems pretty clear to

20   me I'd like to know what you think when he read from his report

21   that young Miss Smith had said six three, 180.  She didn't say

22   any of that.

23           MR. HANLON:  She may not have articulated it that

24   way.

25           THE COURT:  She didn't say that.

1          MR. HANLON:  I'm sure the officer probably gave her

2     numbers and ranges and things like that and summarized them.  I

3     don't think the report misstates what she said.  I'm sure she

4     didn't say in that --

5          THE COURT:  Of course, she didn't.  What I suspect is

6     he wrote the report after, obviously, after they'd been

7     arrested.  He may well have written the report after they found

8     the hat and the shirt.

9          MR. HANLON:  I'm --

10         THE COURT:  In fact, as I recall, what's the date on

11    the report?  Refresh my recollection.

12         MR. HANLON:  Hold on.

13         (Pause.)

14         THE COURT:  Now, of course, there would have been

15    drafts perhaps before the date on the report, but --

16         MR. HANLON:  Date submitted is 6-21-02.

17         THE COURT:  6-21.  The murder was what, June second?

18         MR. HANLON:  June 7th.

19         THE COURT:  Two weeks later.  So it seems pretty

20    clear that this an incidence of, insofar as I can tell, a well

21    intended law enforcement officer sitting down to do his report

22    and incorporating all the stuff he's learned in the two weeks

23    since his involvement.

24         There's no way that young girl, you know, when she

25    walked in here, when I saw her come through the gate, I knew I

1    was going to let her mother sit in here.  She could barely

2    walk.  I think you saw her mother hug her when she got in

3    there.

4              MR. HANLON:  That's why the government went to the

5    steps that it did.

6              THE COURT:  She's terrified.  She's absolutely

7    terrified.  There's no way she said six three, 190.

8              MR. HANLON:  I'm sure she didn't articulated it that

9    way.  By the same token, I'm not taking the Court's comments --

10             THE COURT:  Not at all, not at all.  Not one bit.

11             As I suggested to Mr. Kurland earlier, yes, prior

12   descriptions mean a lot.  But when you're talking about a

13   show-up, 10, 15, 20 minutes later, I don't know that the prior

14   description in the Biggars analysis carries much weight.

15             MR. HANLON:  I agree, Your Honor.  I put some in some

16   evidence that I thought it was some relevance come up in cross,

17   but it's never been the government's position this was anything

18   other than a description of taller man and shorter man.  One,

19   two in a gray shirt initially, so forth.

20             In terms of the accuracy of the witness's prior

21   descriptions, I should have frankly put more in, clothing and

22   photographs and stuff like that.  We were moving along, and it

23   just --

24             THE COURT:  In another case, it might mean something.

25   I'm not sure it does here.  I'm going to hear from Mr. Kurland.

1           MR. HANLON:  I will point out this, with respect to

2   the two witnesses, and I think that certainly, you know, the

3   Court can take Officer Mead's specific 6 3 so forth description

4   with a grain of salt.  But I think it's the essence here the

5   initial descriptions taller and shorter, two gray shirts,

6   jeans, the red hat, things like that, which are remarkable

7   about the initial police descriptions about these two

8   witnesses, they're very similar to one another, very clear that

9   these witnesses see the same two men.  Of course, that's why

10  the officers responded the way they did.

11          Now, the Court does see, I'm sure, noted a change in

12  terms of the two gray shirts become a white shirt and gray

13  shirt.  Later on, of course, the red hat disappears.  The

14  reason for that is, of course, Mr. Holland cleverly decided to

15  disrobe himself in part in those woods and so the red hat and

16  the gray shirt are found later.

17          But the fact of the matter is that the witnesses were

18  on in terms of the head wear and roughly in terms of the

19  initial descriptions of the clothing.  I think it's possible

20  that they see somebody with a white shirt later on, and I think

21  it's natural human instinct to think I must have been talking

22  about a light-colored shirt, which was the language Miss Davis

23  used.  I think the witnesses are remarkably accurate in terms

24  of this.

25          And Miss Smith is obviously a child.  So I think we

1    need to take her testimony with a different level of analysis.

2    Miss Davis is very sharp and very clear and very specific with

3    what she said.  Obviously, she's been refreshed and had an

4    opportunity go over this with me, but she's very sharp and I

5    think clearly knows what she saw.

6           With respect to the witness's level of certainty,

7    there was a high level certainty from both witnesses.  Miss

8    Davis I think goes without saying.  Miss Smith is a more

9    interesting call.  She's obviously scared.  She obviously

10   doesn't want to be here.  I say that with nothing but respect.

11   I wouldn't want be here, either.  She obviously doesn't want to

12   be involved in this, but none of that detracts from her level

13   of certainty at the time of this identification.  I think her

14   level of certainty became clear from her own testimony, from

15   her mother's testimony, and also from then Corporal now

16   Sergeant Mitchell's testimony in terms of how all of this was

17   carried off.  She was very sure.  She didn't have to linger.

18   She didn't have to watch.  She didn't have these guys turn

19   around or come back to the scene.

20          She knew when she saw them she was in a position to

21   know.  I think on a level of certainty there's a great deal of

22   accuracy there.

23          Finally, in some respects, most important, the length

24   of time from the incident to the confrontation.

25          THE COURT:  What do you say that was, Mr. Hanlon?

1                MR. HANLON:  How much time?

2                THE COURT:  Yeah.

3                MR. HANLON:  I acknowledge a little bit of variance

4                THE COURT:  What's the ballpark?

5                MR. HANLON:  I think it was probably five to ten

6     minutes from crime to first interviews with the police to maybe

7     another five to ten minutes to the identification process.  So

8     we're talking about maybe 20 minutes or something like that.

9     That's a ballpark figure, obviously.

10                THE COURT:  I don't want to go outside the evidence,

11     but what is the government's theory or evidence or explanation?

12     Was there a getaway driver who was supposed to be there?

13     Because it just strikes one as passing strange that a couple of

14     guys would go into an apartment complex in the middle of the

15     afternoon, with kids playing outside, and have some woman jump

16     over the balcony.  I shouldn't say some woman.  Have a human

17     being jump her off balcony to get away and then come downstairs

18     in front of school kids playing outside and pump two rounds

19     into her.

20                MR. HANLON:  That is a very -- there's a complicated

21     back story to that, Your Honor, told by the government's

22     cooperating witness, Mr. Will Montgomery, who was the driver.

23                THE COURT:  He's the driver.  He got out of there.

24                MR. HANLON:  Well, part of it.  It's complicated.

25                THE COURT:  Or they didn't connect?

1          MR. HANLON:  They didn't connect.  He was parked in a

2     space.  He waited they moved.  He moved to the wrong place.

3     There's a great deal of back and forth there.  That was a

4     getaway.  There was confusion.  That's how basically how the

5     investigation unraveled, how the crime unraveled, I should say.

6          So considering all of the five Biggars factors, Your

7     Honor, the government believes it prevails on every one

8     assuming we get to the reliability stage, which, with all due

9     respect, I don't believe we get to either way because there's

10    no suggestivity here.

11         I can comment on suggestivity as to both witnesses,

12    if the Court wishes to hear it.  Miss Davis is clear.  In the

13    government's submission, there's just no evidence from either a

14    civilian or law enforcement side.

15         With respect to Miss Smith's testimony, Mr. Kurland's

16    placed great emphasis on this one comment from Miss Smith's

17    mother about in terms of what exactly they were told.

18         Now I should note the sergeant's testimony was

19    nothing of the kind.  Sergeant Mitchell was specific as to what

20    he did, and this is someone who does these procedures as part

21    of his job.  He's not going say to a witness, you know, I'm

22    going to take you over immediately.  And if these are the guy

23    who saw it, you need to say so.

24         I think Miss Maynard --

25         THE COURT:  Well, not even Mr. Kurland goes so far.

1            MR. HANLON:  No, he didn't.  But I don't think we're

2    going to even get that far.

3            Miss Maynard, I think she was speaking sort of, you

4    know, mental shorthand in terms of what was going on.

5            THE COURT:  I think that's fair.

6            MR. HANLON:  She knew the purpose.  And I would urge

7    the Court to consider, in terms of assessing the officer's

8    conduct here and how Sergeant Mitchell did this, is to consider

9    the testimony of Miss Davis, who was adamant that at no time

10   was she told anything or given any information whatsoever.

11           Of course, Sergeant Mitchell doesn't even have any

12   information to give, even if he want to.  He didn't arrest

13   these guys, didn't stop them, didn't detain them, and didn't

14   know anything about them.

15           So, for all of those reasons, I submit that there is

16   no suggestivity.  We don't even get to reliability.  But even

17   if we get to reliability, the identification process is still

18   entirely admissible in this case.

19           THE COURT:  Okay.  Thank you.

20           What do you want to say about Mr. Kurland's focus on

21   what we might call the sub identification, or the secondary

22   identification?

23           MR. HANLON:  I'm assuming what Mr. Kurland's talking

24   to is the component of Miss Smith's statement, identification

25   with Sergeant Mitchell to the effect of the guy in the gray is

1    the shooter.

2              Am I correct?

3              THE COURT:  I think that's what he's saying.

4              MR. KURLAND:  You're correct.

5              MR. HANLON:  And, Your Honor, the government's

6    position is that that is part of the identification.  It should

7    come in just under the identification rule.

8              Mr. Kurland and Mr. Coburn are well aware of what I'm

9    sure they would take the position are inconsistencies with

10   other statements.  It's fine impeachment.  It's a fine jury

11   question.

12             THE COURT:  Who does Montgomery say, if anybody had

13   the gun?

14             MR. HANLON:  My understanding, Your Honor --

15             THE COURT:  By the way, did you ever recover the

16   weapon?

17             MR. HANLON:  Yes, Your Honor.

18             THE COURT:  Where was the weapon?

19             MR. HANLON:  It was in the woods.

20             THE COURT:  In the woods?  Okay.  I like it when you

21   leave out a lot of evidence.

22             MR. HANLON:  Your Honor, I should --

23             THE COURT:  No, no, no criticism.

24             MR. HANLON:  I wanted to surprise the Court and make

25   the trial interesting.  But I was trying to avoid trying the

1    entire case.

2              THE COURT:  I think I've had enough surprises for one

3    trial.

4              MR. HANLON:  Two weapons are found in the woods.

5              THE COURT:  Two weapons.

6              MR. HANLON:  Both individuals weapons.  One was a

7    357, and that was the murder weapon.

8              THE COURT:  No prints?

9              MR. HANLON:  No prints or anything like that.

10             THE COURT:  And two entry wounds to Miss --

11             MR. HANLON:  I believe.

12             THE COURT:  -- Joan Spence?

13             MR. COBURN:  There are two wounds, Your Honor.

14             THE COURT:  Okay.  Same weapon, though?

15             MR. COBURN:  Right.

16             MR. HANLON:  Yes, Your Honor.

17             THE COURT:  Okay.  I mean, this is all irrelevant.  I

18   don't fault you for not putting it in, but, obviously, on the

19   issue of reliability, it clearly bolsters young Miss Smith's

20   testimony.

21             MR. HANLON:  You're correct.

22             In the future, maybe I'll spend a little more time.

23   The murder weapon, according to Mr. Will Montgomery, when he

24   left the company of Mr. Gardner and Mr. Holly before the crime,

25   it was Mr. Gardner that had the 357 in his hand.

1                   Mr. Holly I think was wearing the baseball cap.

2      These are all matters that are appropriate for the jury, but I

3      do not believe that they implicate the identification where it

4      requires a suppression either on suggestivity or on

5      reliability.

6                   THE COURT:  So, in other words, your evidence is

7      going to be that the murder weapon is in the hand, to Mr.

8      Montgomery's recollection, of Mr. Gardner?

9                   MR. HANLON:  Yes, Your Honor.

10                  THE COURT:  And Mr. Gardner, was Mr. Gardner the

11     taller or shorter?

12                  MR. HANLON:  He was the shorter.

13                  THE COURT:  He was the shorter with the corn rows?

14                  MR. HANLON:  He had corn rows.

15                  THE COURT:  Okay.  All right.  Okay.  Thank you, Mr.

16     Hanlon.

17                  Mr. Kurland?

18                  MR. KURLAND:  Judge, as long as we're going on

19     information that's outside the record, the record, trial record

20     will also show, again, this is irrefutable from the State court

21     trial record, that with respect to gunpowder residue, it's

22     inclusive as to the evidence is going to show.  It's

23     inconclusive as to Mr. Gardner and positive as to Mr. Holly.

24                  Now, I'm going to submit on the my earlier argument

25     with respect to the general identifications that these are the

1    two guys.  I'm going to make a couple other comments with

2    respect to the sub issue.

3              Under 801(d)(1)(C), statements which are not hearsay,

4    prior statements of witness, 801(d)(1)(C)(1) of identification

5    of a person made after proceeding the person, a show-up

6    identification is a statement, and that is why I was using that

7    vernacular.

8              Now, perhaps while I think it's a red lighted issue,

9    perhaps more specifically this sub identification of the

10   shooter based on the record presented here doesn't qualify as

11   such a statement under 801(d)(1)(C).

12             Now, and the reason I know this is, this is stuck in

13   a footnote, but just to the extent we've heard the testimony on

14   it, a couple of things.

15             First, it's the predicate to get in the prior

16   identification.  The government will concede that, for the

17   show-up identification to come in, Andrea Smith has to testify

18   at trial.  That's a predicate under 801 (d)(1)(C). 801(d)(1)

19   prior statement of witnesses, the declarant testifies at the

20   trial or hearing and is subject to cross-examination concerning

21   the statement.

22             When Andrea Smith testified on direct examination,

23   Your Honor, with respect to the identification, her testimony

24   was that's them.  I want to go home.

25             THE COURT:  Right.

1          MR. KURLAND:  She was never asked a followup question

2     by the prosecutor as to whether or not she made any additional

3     statements as to which one was the shooter.

4          When Captain Mitchell or Officer Mitchell testified

5     that she said something to that effect, and that also added the

6     one in the gray shirt was the shooter, the prerequisites with

7     respect to the rule having been satisfied, because she hasn't

8     been cross-examined concerning that statement.

9          And if the Court, then the second thing, Your Honor,

10    is that on this record, her comment, which is a statement,

11    that's just the way the rule was written, her statement as part

12    of the identification that the person in the gray hat is the

13    shooter, on --

14          THE COURT:  Red hat.

15          MR. KURLAND:  No, no, no, Judge, that's -- that might

16    be the source of the confusion.

17          I have no problem for the sake of this hearing, for

18    the sake of this argument, with her statement that the guy in

19    the red hat.

20          THE COURT:  But I didn't hear any testimony about a

21    gray hat.

22          MR. KURLAND:  I'm sorry.  Gray shirt.  Officer

23    Mitchell or Corporal Mitchell, what's his rank, Sergeant

24    Mitchell?  I'm sorry.  Sergeant Mitchell testified that, in

25    addition to Andrea Smith saying those are the guys, he further

1    testified that she made the further cryptic statement that the
2    guy in the gray shirt was the shooter.
3           THE COURT:  Yeah.  You asked him about actually the
4    shooter, was is that --
5           MR. KURLAND:  No, that's --
6           THE COURT:  That was back at the scene?
7           MR. KURLAND:  That was back at the scene.  But what I
8    asked him, though, was did she make any other gestures with
9    respect to pointing, and he said no.  And he said that he had
10    if he had it would have been in the report.
11           So we've got two.  Again, I'm now focusing on what
12    the Court is calling, you know --
13           THE COURT:  Well, sounds like you're just focusing on
14    Sergeant Mitchell's testimony.
15           MR. KURLAND:  I want to keep that out.  I don't think
16    there's any evidentiary basis that their alleged identification
17    was of Gardner.  Because my understanding, the government wants
18    that evidence as proof that Gardner was the shooter.
19           THE COURT:  Okay.  So let me see if I can unpack that
20    briefly.
21           What were they wearing at the show-up?
22           MR. KURLAND:  Well, two things, Your Honor.  One,
23    there is no evidence in the record.  Now, that's the
24    government's problem, not mine.
25           I can tell you, based on other testimony, but I'll

1    assume, you know, I will assume --

2              THE COURT:  I'm just trying to understand your

3    obsession over the gray T shirt.

4              MR. KURLAND:  Okay.  That's fair enough.  That's fair

5    enough.

6              Here's my obsession, and it is an obsession.

7              THE COURT:  Really, clearly.

8              MR. KURLAND:  But it's a good obsession since I've

9    gone over all the trial --

10             THE COURT:  Lay it out for me.

11             MR. KURLAND:  Okay.  The critical obsession is that

12   the testimony is critically clear that all sources are

13   uncontroverted that all of the witnesses say that the people at

14   the scene both had gray shirts on.

15             THE COURT:  But I'm asking you --

16             MR. KURLAND:  I understand.

17             THE COURT: Okay.  Go ahead.  I'll be quiet.

18             MR. KURLAND:  No, that's all right.  So what happens,

19   Judge, is with respect to the show-up, is that at the show-up,

20   only one of two has on a gray shirt.

21             THE COURT:  What does the other have on?

22             MR. KURLAND:  The other one has on a white shirt.

23             THE COURT:  How much difference is there generally or

24   in this particular instance between a quote unquote gray T

25   shirt and a quote up quote white?

1          MR. KURLAND:  Oh, it's significant, Your Honor,

2     because --

3          THE COURT:  First of all, are you saying that on the

4     basis of photographs, color photographs?

5          MR. KURLAND:  I am saying that, on the basis of one

6     color photographs, two, on the basis of the descriptions of the

7     witnesses because Your Honor --

8          THE COURT:  You're not going to convince me as an

9     abstract matter ever, Mr. Kurland, when you're talking to a

10    person who is not color blind, but who is color challenged.

11    All right.

12          Okay.  I'm just trying to be honest with you.

13          MR. KURLAND:  I understand that.

14          THE COURT:  So I have no problem whatsoever with

15    people calling what people with perfect color vision would call

16    gray white, and people calling what is clearly white gray.  I

17    don't have a problem with that.

18          MR. KURLAND:  Your Honor, I understand that.

19          THE COURT:  That's why I --

20          MR. KURLAND:  Here's my obsession so --

21          THE COURT:  Go ahead.

22          MR. KURLAND:  The original statements, I understand,

23    I appreciate the colloquy you had with counsel perhaps

24    reshaping of Officer Mead's testimony, but in Officer Mead's

25    original statement and the original descriptions given by both

1    Kelly David and by Andrea Smith, they describe at the scene

2    both persons wearing a gray shirt.  At the show-up, you know,

3    please let me finish --

4            THE COURT:  That's not the testimony I heard from

5    Miss Davis.

6            MR. KURLAND:  That is the testimony.

7            THE COURT:  I don't think it is.  Go ahead.  I'll

8    assume it was the testimony.

9            MR. KURLAND:  It is.

10            THE COURT:  I thought she said a lighter shirt.

11            MR. KURLAND:  But then I asked her on

12    cross-examination, I showed her the her testimony.  I pointed

13    out her testimony at the preliminary hearing on February 12th,

14    2002, and she acknowledged her initial description was that

15    they were wearing gray shirts.  That is significant.

16            THE COURT:  So they're both right?

17            MR. KURLAND:  At the show-up, one is wearing a gray

18    shirt, one a wearing a white shirt even taking into account the

19    Court's comments concerning color challenged, it is only after

20    the show-up where one is wearing gray and one is wearing white

21    when Kelly David and Andrea Smith helped by her mother write

22    their statements, which have now been influenced by what they

23    saw in the show-up, they now, consistent with what they saw at

24    the show-up, now the shirts in their descriptions are gray and

25    white.

1          So these people aren't making kind of vague judgments

2     as to, you know, is the Miami Dolphins uniform teal or green or

3     aqua.  They clearly identify two gray shirts at the outset, and

4     then after seeing the show-up, one is wearing gray.  One is

5     wearing, white is that then becomes the locked into their mind.

6     The difference they now when they write about it's now gray and

7     white in the substantive reports.

8          But, Judge, the point is, yeah, I've submitted with

9     respect to the general ID's.  There is insufficient evidence in

10    this record to support any findings Andrea Smith's -- and this

11    just isn't a credibility issue, that Andrea Smith's alleged

12    statement, because she denies making it, her alleged statement

13    to Officer Mitchell that the guy in the gray shirt was the

14    shooter.

15         There, A, is no evidence in this record that that was

16    identification of Gardner. And even one could argue and

17    establish through other photographs that at the show-up Gardner

18    was wearing a gray shirt.

19              THE COURT:  Was he?

20              MR. KURLAND:  As an officer of the court, I believe

21    the answer is yes.

22              THE COURT:  Okay.  And so -- and so there are two

23    gray shirts, gray T-shirts?

24              MR. KURLAND:  The other one is found.

25              THE COURT:  Right.  So that would appear to --

1              MR. KURLAND:  No.

2              THE COURT:  To suggest, that would appear to suggest

3       that the earlier descriptions, if in fact the description were

4       two gray T-shirts, were right on.

5              MR. KURLAND:  That is correct, Your Honor.  However

6       --

7              THE COURT:  I'm actually trying to help you here.  I

8       don't think you're arguing this, but this is the argument that

9       I see here that, if there are two gray T-shirts and the shooter

10      is wearing a gray T shirt, and then at the show-up, one of the

11      suspects has discarded his gray T shirt is now wearing a white

12      T shirt, that's suggestive that the sole person wearing a gray

13      T shirt was the shooter when in fact at the time of the

14      shooting both were wearing gray T-shirts.

15             MR. KURLAND:  Yes.

16             THE COURT:  Is that what you're saying?

17             MR. KURLAND:  Yes.

18             THE COURT:  Why didn't you say so?

19             MR. KURLAND:  That's what I tried to start out

20      saying, Judge, but obviously the poverty of my language was

21      insufficient.

22             THE COURT:  Okay.

23             MR. KURLAND:  Yes, that is why for her alleged

24      identification of the shooter aspect --

25             THE COURT:  Coming from Mitchell.

1          MR. KURLAND:  -- is unnecessarily suggestive because,

2     one, Andrea Smith doesn't even acknowledge making that

3     statement.

4          THE COURT:  I don't know that she denies making it,

5     but I take your point.

6          MR. KURLAND:  That goes back.  I apologize.  We're

7     here 45 minutes.  That goes back to my original comment that,

8     with regard to the only thing that was constant from her

9     initial description, and now I'm conceding for the sake of

10    argument that her general comments would come in, those are the

11    two guys, I'm not, but to get to step two, the constant, hat,

12    nobody's wearing a hat, okay, that was an accurate part of the

13    description.

14         The height aspect, one significantly taller than the

15    other, that isn't the basis of her identification.  The only

16    constant she sees, and the police did this through no fault of

17    their own, because the gray, other gray shirt, wasn't recovered

18    until a couple days later, but at the time of the show-up, the

19    only constant from her initial description, which she says is

20    guy in the gray shirt is the shooter is only one of the two

21    guys who were wearing the gray shirt.

22         She doesn't even point out when she says the guy in

23    the gray shirt is the shooter, which she allegedly says that,

24    that is unnecessarily suggestive under the totality of the

25    circumstances is likely irreparable misidentification because

1    now only one guy is wearing the gray shirt.

2            THE COURT:  And it is shorter guy?

3            MR. KURLAND:  Yes.

4            THE COURT:  Okay.  So let me hear from the government

5    on that.  I don't mean to suggest you made it unduly

6    complicated, but it's pretty apparent to me what your argument

7    is now.  Okay.

8            So, Mr. Hanlon, if I understand the defense argument,

9    both men are wearing gray T-shirts.  The most reliable evidence

10   of the identity of the shooter seems to me to be the taller of

11   the two.

12           We know from Miss Davis that if the same two people

13   -- if the same two people are seen by Ms. Smith are the two

14   people observed by Miss Davis, we know that the taller of the

15   two -- and I haven't seen the arrest photos -- did not have

16   braided hair, or at least finely braided hair, and the short of

17   the two had finely braided hair was wearing gray T-shirts, that

18   it was the taller of the two who do not have braids, who was

19   wearing the red Yankee cap, who was the shooter.

20           Okay?

21           MR. HANLON:  Yes, Your Honor.

22           THE COURT:  And Mr. Kurland is saying by the time of

23   the show-up, one gray T shirt is now gone, the hat is now gone,

24   and to the extent Sergeant Mitchell attributes to Miss Smith

25   the identification of the shooter as the person wearing the

1    gray T shirt, that that should not come in as manifestly

2    unreliable under the circumstances.  That's my understanding of

3    the argument.

4              MR. HANLON:  I believe that that's an accurate

5    statement of the argument, Your Honor.

6              THE COURT:  Okay.  All right.  What do you say to

7    that?

8              MR. HANLON:  Well, first of all, we have to get part

9    of the suggestivity issue on that issue.

10             THE COURT:  Well, it's clearly suggestive.  Whether

11   it's unnecessarily suggestive, I agree with you.  If you know,

12   if two guys dress identically, let's call them Laurel and

13   Hardy, commit a crime, flee, and then one of them discards his

14   outfit, the other unwisely doesn't, and then at the show-up,

15   the people show up and say, yeah, one's fatter than the other

16   one, but it's the one who's wearing a derby who committed the

17   crime.  I don't know that that's unnecessarily suggestive.

18             I don't know that that's state action.

19             MR. HANLON:  Exactly my point.

20             THE COURT:  Exactly.  Exactly.

21             MR. HANLON:  So suggestivity is a question of due

22   process.  And if a co-conspirator chooses to confuse witnesses

23   by disrobing and creates a situation where officers were

24   setting up a show-up process can't do any better than they do

25   --

 1              THE COURT:  On the other hand, due process wouldn't

 2     permit the conviction of an innocent person through the

 3     machinations of co-conspirators, because it doesn't matter.  I

 4     mean, if you're not guilty, you're not guilty.  If you're not

 5     liable, you're not liable.  And nothing, I mean, short of

 6     perjured testimony not known to the government, you see my

 7     point?

 8              MR. HANLON:  I do, Your Honor.  In this case the due

 9     process is going to come from the fact that if there's been

10     statements, you know, if Miss Smith testifies when she has to,

11     for any of this to come in, and if she testifies --

12              THE COURT:  Well, she's testified now.  She's been

13     subject to cross-examination.

14              MR. HANLON:  Correct.  So if the government presents

15     evidence of the gray shirt shooter, then presumably the defense

16     is going to be allowed to present whatever inconsistencies that

17     they feel and make sure that the jury hears that in weighing

18     whether or not maybe it was the guy with the red hat and all

19     these other circumstances.

20              THE COURT:  I'm sorry to cut you off.  Are you going

21     --  I guess I need to ask you, what is the government's not

22     belief but theory about who is the shooter?

23              MR. HANLON:  Based on Mr. Montgomery's testimony,

24     Your Honor, I think the best evidence we have is that the

25     shooter was Mr. Gardner, because he's the one who had the

1    murder weapon as they parted company.

2              THE COURT:  Okay.  How can you be sure they didn't

3    exchange murder weapons?

4              MR. HANLON:  That's --

5              THE COURT:  Or weapons?

6              MR. HANLON:  How can I sure that that didn't happen?

7              THE COURT:  How can you be sure that, what was the

8    other weapon?

9              MR. HANLON:  The other weapon was a 40 caliber

10   handgun.

11             THE COURT:  Both semiautomatics?

12             MR. HANLON:  Yes, Your Honor, no.  Your Honor.

13             THE COURT:  One's a revolver?

14             MR. HANLON:  One was a resolver.

15             THE COURT:  Okay.  Mr. Montgomery puts the

16   semiautomatic in Mr. Gardner?

17             MR. HANLON:  No Mr. Montgomery puts the 357 there.

18             THE COURT:  The revolver?

19             MR. HANLON:  Correct.

20             THE COURT:  And it's the revolver that's the murder

21   weapon.

22             MR. HANLON:  Yes, Your Honor.

23             THE COURT:  So what do you do about the fact that

24   Miss Smith says it was the taller who fired?

25             MR. KURLAND:  With the red hat?

1          THE COURT:  With the red hat and with the fact that

2     Mr. Gardner has the braids?

3          MR. HANLON:  I think it is for the jury to assess

4     whether or not --

5          THE COURT:  I'm sorry, no.  The government's got to

6     make some of these choices.

7          MR. HANLON:  Your Honor --

8          THE COURT:  You don't just throw it all on the wall

9     and ask the jury to measure how much comes off.

10         MR. HANLON:  This isn't a situation -- we're not

11    suggesting everything ought to be put in there.

12         THE COURT:  It doesn't matter under the federal

13    statute, does it?  Who the shooter is?

14         MR. HANLON:  No, Your Honor, no.

15         THE COURT:  Mr. Kurland, it doesn't matter?

16         MR. KURLAND:  Judge, let me address that with respect

17    to the guilt phase, and I think Mr. Coburn might have some

18    issues with the penalty phase.

19         Your Honor, with regard to the nature of all the

20    charges together, it does matter with respect to how we intend

21    or want to present the case with respect to both substantive

22    evidence of Mr. Gardner's involvement, if at all, and some

23    other obviously some related issues that go toward -- that

24    would go toward the penalty phase, if there is one.

25         But, Your Honor, in addition to -- it's important to

1    understand that this is still -- regardless of whether or not

2    it's a technical defense or not a defense to the charge,

3    there's two things.  There's a threshold level of reliability

4    for this highly prejudicial evidence to come in, which is

5    demonstrably false.

6         Your Honor, I'm not going to play this card.  I was a

7    former prosecutor.  To present this evidence and to say that

8    the strongest evidence is Mr. Montgomery is the most highly

9    compromised witness I've ever dealt with.

10        THE COURT:  Please, let's --

11        MR. KURLAND:  Judge, the most direct evidence is the

12   clear testimony from the only eyewitness who says that the

13   tall, very clear, very reliable, according to the government

14   with respect to -- she was absolutely certain, and she's been

15   consistent in all of her statements, even in her own written

16   hand, that the taller one with the red hat was the shooter?

17        Now, there's two different ways that that can be kept

18   out here.  One is that --

19        THE COURT:  I'm asking you why it matters.

20        MR. KURLAND:  It matters with respect to --

21        THE COURT:  It clearly doesn't matter for guilt or

22   innocence.

23        MR. KURLAND:  Well --

24        THE COURT:  Clearly.

25        MR. KURLAND:  It matters with respect to the overall

1    nature, when the jury is hearing all this evidence, as to what

2    Mr. Gardner allegedly did and did not do?

3          It matters with respect to whether there's evidence

4    presented that he was the shooter because also, Your Honor,

5    we're not conceding --

6          THE COURT:  What was the state's theory?

7          MR. KURLAND:  Your Honor, as I've submitted in papers

8    months, or a year ago, the state's theory is that they chose

9    not to that offer this evidence at all.

10          THE COURT:  No, no.  I mean, what does did the state

11    argue to the jury?

12          MR. KURLAND:  Neither.  In fact, the Judge made a

13    specific finding at the close of the case during sentencing

14    that a two-week trial did not establish who was the shooter.

15    They chose not to -- they chose not to even try to admit the

16    evidence of --

17          THE COURT:  And what happened to Holly, by the way?

18          MR. KURLAND:  Holly was convicted and is serving

19    life.  He was a minor at the time.  And he is serving I believe

20    a life without possibility of parole sentence.

21          THE COURT:  He was waived up?

22          MR. COBURN:  Yes, Your Honor, he was waived up.

23          THE COURT:  Okay.

24          MR. KURLAND:  One other thing, another way to resolve

25    this is that even if, and I think --

1          THE COURT:  I haven't heard, Mr. Hanlon, on your

2     other point yet, which is if Smith doesn't adopt that

3     statement, gray shirt statement, does it still come in?

4          MR. KURLAND:  Your Honor, that's not quite the law.

5     She doesn't have to adopt it.  But she has to be asked about

6     it, which she wasn't.

7          THE COURT:  Because you didn't ask her about it?

8          MR. KURLAND:  She wasn't asked on direct.

9          THE COURT:  Well, you cross-examined her.

10         MR. KURLAND:  No, Your Honor, that's correct.  But

11    the state of the record was that she only made a statement

12    concerning those are the two guys.  I want to go away.

13         THE COURT:  Okay.  Sergeant Mitchell has a better

14    recollection argument.

15         MR. KURLAND:  But that's not the rule, though.  The

16    rule has to do with the witness, doesn't say did I have an

17    opportunity, it's they have to be examined upon it.  And they

18    weren't.

19         Your Honor, a couple other things before the

20    government gets back up, and that is, that with respect to

21    couple other ways this issue can be looked at is on the due

22    process issue, it isn't solely a matter of did the government,

23    you know, fool around with a lineup and only put one person in

24    so on and so forth.

25         As the Court correctly points out with the Laurel and

1    Hardy analogy, due process goes under the totality of the

2    circumstance was this unnecessarily suggestive.

3            While the government did not necessarily do this on

4    purpose, the end result was the only constant in the show-up,

5    and it turns out she didn't say the guy with the braids.  She

6    didn't say the taller.

7            Her identification, if she made it, wasn't even

8    pointing, maybe she was simply reciting the guy in the gray

9    shirt was the shooter, which is not necessarily that the guy in

10    the gray shirt standing before me is the shooter, because there

11    is no testimony that she pointed to the guy in the gray shirt.

12            Now, the second thing is, Judge, if this evidence

13    were to come in, and I think now finally properly framed, I

14    apologize to finally get to the point so the Court could

15    understand what I was saying, is that even assuming is that the

16    Court doesn't find a constitutional violation, which I believe

17    the record reflects, that it should still be kept out under

18    403.

19            Because to permit this in, if you look at the last

20    pleadings we filed on this, if this evidence comes in, five or

21    six separate statements by Miss Smith and by the officer

22    including his seriatim testimony from prior proceedings, are

23    going to have to come in for impeachment and for non hearsay

24    purposes.

25            There's a lot of case law that says if the Judge --

```
 1    and I'll just give you the quote -- that I cited in the last --
 2              THE COURT:  You don't need to do that, Mr. Kurland.
 3              MR. KURLAND:  All right, bottom line.
 4              THE COURT:  I'll hear you.
 5              MR. KURLAND:  It requires --
 6              THE COURT:  I'm getting it.  Now, here's a problem we
 7    haven't addressed yet.
 8              MR. KURLAND:  Okay.
 9              THE COURT:  I haven't seen any photographs.
10              MR. KURLAND:  Okay.
11              THE COURT:  Really I don't need to say any more than
12    that.  I can't finally resolve this until I see some
13    photographs of the manner in which Mr. Gardner and Mr. Holly
14    appear at the time of the show-up.  I just can't.  I don't
15    know, assuming she said the guy in the gray T shirt, I need to
16    see, I need to see the photographs, because I don't know.
17              MR. HANLON:  Your Honor --
18              MR. COBURN:  Give us one second.
19              (Pause.)
20              THE COURT:  I still don't see why it matters.
21              MR. KURLAND:  Do you want to address it?
22              THE COURT:  I don't want to go to the penalty phase.
23              MR. COBURN:  No.
24              THE COURT:  Why does it matter?
25              MR. COBURN:  Just with respect to the guilt phase in
```

1    terms of who the shooter is.

2         THE COURT:  Yes, yes.

3         MR. COBURN:  I can't think of a reason why it's

4    particularly probative in the guilt phase.

5         What I can tell Your Honor, I realize you don't want

6    to get to the penalty the way it operates, of course, all the

7    evidence of the guilt phase gets imported into the penalty

8    phase.  And so even if it's not directly probative of guilt, I

9    think Your Honor's right that it isn't -- it's still -- all

10   that evidence still goes directly into the penalty phase, gets

11   incorporated automatically into the penalty phase.  It's very,

12   very important in the penalty phase as to who the shooter is.

13        THE COURT:  It's hard to imagine how a reasonable

14   juror could conclude beyond a reasonable doubt, and I realize,

15   you know, I'm just talking about two witnesses here, but it

16   seems pretty clear to mow that if you have Miss Smith and her

17   testimony that I've now been exposed to, and you have Mr.

18   Montgomery, and the inference from Mr. Montgomery's assertion

19   that Mr. Gardner had the revolver when they got out of the car,

20   I don't see how a reasonable juror could find beyond a

21   reasonable doubt that Mr. Gardner was the shooter.

22        MR. COBURN:  I think Your Honor's absolutely right,

23   but these two brilliant lawyers to my right here are going to

24   point out when the time comes --

25        THE COURT:  But the problem is, they don't have to

1    prove beyond a reasonable doubt that Mr. Gardner was the

2    shooter.

3            MR. COBURN:  They may very well make an argument

4    that, you know, since all that evidence goes, like I said, gets

5    imported directly into the penalty phase, they don't

6    necessarily have to prove that beyond a reasonable doubt in the

7    penalty phase.

8            THE COURT:  Well --

9            MR. COBURN:  Your Honor, depending on how the death

10   notice works and so on, whether it's a specific aggravator and

11   so on, I'm not really sure it is.  But they're going to say

12   that that's something they can argue regardless of whether a

13   reasonable juror could find that beyond a reasonable doubt.

14           And, regardless, Your Honor, what my suggestion to

15   the Court is, I think you know I think --

16           THE COURT:  How old was Holly at the time?

17           MR. COBURN:  I think he was like 16.

18           THE COURT:  16?

19           MR. KURLAND:  17.

20           THE COURT:  17?

21           MR. COBURN:  I think Your Honor's absolutely right to

22   look at the arrest photos.  What I would propose, if it's okay,

23   particularly given the lateness of the hour, we can submit

24   those to Your Honor.  And if it becomes important to the

25   Court's analysis, just to give a little additional authority on

1    this state action question, because I think the government is

2    dead wrong on that.

3         THE COURT:  I don't think that's critical here.  I

4    mean I agree with -- I mean the state action plays a role here,

5    as you heard me say, to follow up with Mr. Hanlon, we're not

6    going to be able to convict somebody because his co-conspirator

7    screwed him up.  I mean, you know, anyway.  All right.  See,

8    okay.

9         So, Mr. Kurland, you know, I just don't see this

10   fundamentally as a Sixth Amendment identification issue.  I

11   just don't see it that way.

12        MR. KURLAND:  Then I'll just hope I don't have to

13   deal with this on appeal, but the fact is the identification,

14   somebody is a shooter is an identification issue.  But on the

15   403 issue, even if it's not a Sixth Amendment issue, on 403

16   issue, because if this comes in, the inquiry, it's tepid at

17   best.

18        THE COURT:  I understand, I hear what you're --

19        MR. KURLAND:  The quote is it would require the trier

20   of fact to engage in intricate, extraordinarily or impossible

21   mental gymnastics in order to comprehend the impacts of the

22   evidence to assess its weight.  And that is because if this

23   testimony comes in, this tepid ambiguous testimony of gray

24   shirt, it's going to require admission of seven or eight

25   additional statements by the witnesses, and the jury's going to

1    have a very difficult time.

2            I think on that ground, even if it's relevant to the

3    government's case, it should be kept out under 403.

4            THE COURT:  I understand what you're saying.

5            Briefly, Mr. Hanlon, assuming Miss Smith says, no, I

6    didn't say it was the guy in the gray shirt, at the time of the

7    show-up, is it the government's position that sergeant, that

8    the sergeant's testimony that she did say that still comes in

9    for the truth of the matter?

10           MR. HANLON:  Your Honor, I suspect the Court's not

11   going to like my answer, but a plain reading of Rule 801 is

12   yes.

13           THE COURT:  The opportunity of cross-examination, not

14   --

15           MR. HANLON:  Exactly.  The opportunity to ask the

16   witness, did you ever say that?  No, I didn't.  Did you ever

17   tell the police that?  No, I didn't.

18           There is your opportunity for cross-examination right

19   in front of the jury, and of course the weight of the whatever

20   the other.

21           THE COURT:  We have both Miss Smith and Miss Maynard

22   --

23           MR. HANLON:  Yes, Your Honor.

24           THE COURT:  -- who don't put those words in Miss

25   Smith's mouth.

1          MR. HANLON:  That's correct, Your Honor.  That's

2    correct.

3          THE COURT:  And in light of what I said about Mr.

4    Mead's two week old report, not two week old, but report

5    prepared two weeks later, that's some indication, and it's not

6    a criticism, natural human reaction, and we've all seen it

7    before, but when people sit down to write their reports, all

8    kinds of stuff ends up in reports that they learned two days

9    ago, but they're putting in a report that purports to be a

10   contemporaneous account of what happened two weeks ago.

11         MR. HANLON:  Yes, except I don't think these

12   officers, back in 2002 when they wrote the reports, I don't

13   think they ever imagined the significance of Mr. Gardner as the

14   shooter was going to come up in the case later on.

15         If they had, either consciously or --

16         THE COURT:  Is that in the report?

17         MR. HANLON:  No.

18         THE COURT:  Exactly.

19         MR. HANLON:  Exactly.

20         THE COURT:  He didn't even write a report.  How does

21   he even remember?

22         MR. HANLON:  Officer Mead?

23         THE COURT:  No.  I'm jumping around on you.  I

24   apologize.  It was Sergeant Mitchell, now Sergeant Mitchell,

25   then Corporal Mitchell, he's the one who took Miss Maynard and

1    Miss Smith to the show-up, right?

2              MR. HANLON:  That's correct, Your Honor.

3              THE COURT:  He didn't do a report.

4              MR. HANLON:  He did do a report.

5              THE COURT:  He did do a report?

6              MR. HANLON:  And I believe that the comment that

7    we've been talking about --

8              THE COURT:  Yeah, read that comment, please.

9              MR. HANLON:  Give me a moment, please.

10             (Pause.)

11             THE COURT:  And I believe, if my recollection is

12   correct, he wrote in his report that night, right?

13             MR. HANLON:  That is correct, Your Honor.

14             Officer, then Corporal Mitchell's report is dated

15   submitted 6-7-02 and the second to the last sentence "Witness

16   Smith advised me the subject with the gray shirt was the

17   shooter.  And that's basically what he testified to today.

18             THE COURT:  Now, how clear is it in that report, if

19   at all, I realize he disavowed any further conversation.  But

20   how clear is it, if at all, in the report that the statement

21   was made as she observed the two suspects as opposed to during

22   the drive back to Bramble, or even after she and her mom had

23   gotten out of the car, because the way that sentence reads --

24             MR. HANLON:  On the four corners of the report, Your

25   Honor, it reads "Witness Smith advised me the subject with gray

1    shirt was the shooter.  I then transported witness Smith and

2    her mother back to Bramble Lane."

3              THE COURT:  What's the sentence before that?

4              MR. HANLON:  Sentence before that is "After arriving

5    in South Green, witness Smith got a good look at the two

6    suspects being detained and she stated --"

7              THE COURT:  Go ahead.

8              MR. HANLON:  "And she stated without hesitation they

9    were the subjects who shot the victim on Bramble Lane."

10             THE COURT:  Now, I never pick on police officers or

11   law enforcement officer's grammar.  But the way that should

12   have been written was comma, or maybe semi colon, she stated

13   that the guy in the gray shirt was the shooter.  You don't say

14   period.  And then the capital S, she advised me that the guy in

15   the gray shirt was the shooter.

16             Again, I'm not picking on the grammar.  I'm really

17   not.  But it's troublesome.  It's very troublesome to say the

18   least.  It's very troublesome.

19             I can't rule out that this was overheard

20   conversation, and I'm not making this up.  I'm not going out on

21   a very thin limb here.  Miss Smith could have been saying that

22   to her mother in the back seat as they were driving back.  And

23   that's not criticism of the officer.  He clearly believes he

24   heard that.  But this she advised she didn't.

25             MR. HANLON:  She advised me, meaning the writer.

1          THE COURT:  She advised me.

2          MR. HANLON:  She advised me the writer then goes on

3   to report I then transported.

4          THE COURT:  I then transported, that looks an awful

5   lot like she said he was six three, 190 pounds.

6          MR. HANLON:  Your Honor, I suppose if he wanted to

7   write that, first of all, this is the day, of course, if he

8   wanted to try to consciously or unconsciously that --

9          THE COURT:  Not conscious, not conscious.

10          MR. HANLON:  But even if he unconsciously seems to me

11   he would have unconsciously made it a little bit stronger.  I

12   mean the only --

13          THE COURT:  I don't think so, no.  We're not talking

14   about misbehavior here.

15          MR. HANLON:  Right.

16          THE COURT:  We're talking about a law enforcement

17   officer doing the best he possibly can do.

18          Frankly, you know, just as my heart went out to her

19   here, five years later, I mean that officer looked like a real

20   human being to me.  It would be passing strange for him not to

21   have said something like that.  I mean he's got a 13-year old

22   witness to a homicide in the back seat, probably crying into

23   her mother's shoulder.  He wouldn't say something like it must

24   be awful for you.  I'm sorry you had to do this.  I mean, that

25   will be just a human reaction to a human situation.

```
 1              Listen, I'm not talking about any misbehavior.  It's
 2    just very curious.  Just very curious.  And you don't have
 3    Montgomery saying I saw the shooting, they never caught up in
 4    Montgomery, so there are no admissions as to Montgomery.
 5    Okay.
 6              MR. HANLON:  The only other comment I will make, Your
 7    Honor, for Your Honor's information been asking about arrest
 8    photos, Your Honor, we do have the clothes.  We have various
 9    pieces of clothing.
10              THE COURT:  Got them here.
11              MR. HANLON:  If we could have a stipulation or
12    something as to who came from what defendant.
13              THE COURT:  It's late.  We'll have a chance in June.
14    Bring them back.
15              MR. KURLAND:  Your Honor --
16              MR. COBURN:  Chance in June.
17              MR. KURLAND:  I just want to that respond with
18    respect to Officer Mitchell's statement, Officer Mitchell
19    testified that he did not contemporaneously take any notes
20    whatsoever.  So even if it was written down later on, it's
21    typed up much later.
22              THE COURT:  I understand.
23              MR. KURLAND:  And, again, with respect to the issue,
24    it's -- again, I just want to emphasize it for the last time
25    that the report does not clearly indicate that there was no
```

1    pointing.  There was no reference.

2            THE COURT:  I understand.  I have all of that.  I

3    have all of that.

4            MR. KURLAND:  All right, Judge.  Thank you.  Thanks.

5            THE COURT:  Okay.  Preliminarily, it seems pretty

6    clear to me certainly with Miss Davis there's no unnecessarily

7    suggestive evidence whatsoever.  It was fortuity.  She almost

8    ran him over.  One of them put his hand on her car.  She had

9    just gotten a call from her son of a shooting.  She didn't

10   immediately connect these two men with that report, but she did

11   note them.  She clearly took note of nicely braided hair and of

12   the clothing.

13           I acknowledge that she reviewed her prior testimony

14   before testifying here today.  But the Court has no hesitation

15   in finding that the show-up in fact, and as the procedures that

16   were followed as to Miss Davis are untainted by any improper

17   police conduct, and that there is no unnecessarily

18   suggestiveness inherently in that show-up despite the inherent

19   suggestiveness in a show-up at all.

20           But the Court has no hesitation in finding that Miss

21   Davis's identification of the two people sitting on the curb

22   and apparently standing up when she was taken to the location

23   where they were being detained is a reliable identification,

24   that they were the two people that she had seen minutes before

25   on her way home from work.

1          As to Miss Smith, while it's a closer call, I don't
2    find any unnecessary suggestiveness.

3          Yes, it would have been better had the officer not
4    said what the mother Miss Maynard said he said.  Frankly, I
5    have a doubt, a serious doubt, that Miss Maynard actually
6    reported to us accurately what the officer said.  But in any
7    event, it would have been perfectly clear to Miss Maynard and
8    to Miss Smith that the reason they were being asked to get in
9    the police car and accompany the officers some short distance
10   away is because the police who clearly converged on the area
11   immediately, Mead, Officer Mead heard the gunshots and was
12   there in a minute or two.  It would have been clear to any even
13   13-year old, let alone her mother, that they were being taken
14   to a location to observe suspects in what had just happened to
15   this little girl.

16         And so it's difficult to imagine, frankly, what any
17   officer might have said that would have tainted the subsequent
18   show-up.

19         Frankly, young Miss Smith was either going to say
20   yes, that's them.  No, that's not them.  Or I'm not sure.

21         But the evidence could not be more clear that even
22   before the show-up, procedure was fully engaged as they
23   approached the vehicle.  She immediately blurted out that's
24   them.  She expressed her acknowledgment of two African American
25   males.  She's an African American teenager.  She was standing

1    right there when they came out the door.  Her attention had

2    already been directed to the victim falling from the third

3    floor.  She was paying attention clearly.  It even appears as

4    if the shooter had to walk past Miss Smith in order to commit

5    the murder.

6           And so the Court has no difficulty in finding that

7    the identification's reliable of the two men as being "that's

8    them," the same two men she saw come out of the apartment

9    building.

10          So even if there is unnecessary suggestiveness, which

11    the Court does not find, in the procedures that were followed,

12    the Court applying the Biggars factors has no hesitation in

13    concluding that the identification by Miss Smith of those two

14    persons as the two persons who came out of the apartment and

15    who were involved in the homicide was reliable.

16          I'm reserving on the whole question on the gray T

17    shirt.  I'm very bothered by the prospect of the government

18    effectively impeaching its own witnesses in a matter of this

19    seriousness.  And I say that with all respect.  It's not a

20    description of any poor behavior or misbehavior or any improper

21    behavior on the part the government, the government's got

22    witnesses who are telling divergent versions of what happened.

23          The government wasn't there.  The defense attorneys

24    weren't there.  The Court wasn't there.  The government 99

25    percent of the time is entitled to choose the witnesses that it

1    believes in the totality of the evidence is more likely than

2    not giving the jury the full truth.

3              But whether I'm going to permit the government in

4    this case, whether it's on a due process basis or whatever it

5    is, 403, whether I'm going to permit the government to put

6    witnesses on the stand, one of whom who says directly and

7    indirectly it was Mr. Gardner who fired the shot, and then

8    bring in another witness who says directly or indirectly it was

9    Mr. Holly who fired the shots, I don't know if I'm going to

10   permit the government to do that.

11             As I said, Mr. Kurland, and I don't fault you for

12   addressing this issue in terms of identification testimony, but

13   I don't think it's identification testimony.  It clearly is --

14   you're right, but it goes deeper than that.

15             MR. KURLAND:  Yes, it --

16             THE COURT:  It goes to an issue of fundamental

17   fairness.  The government can't have it both ways.

18             Now, surely the government can impeach its witnesses.

19   I'm not saying that.  But the government can't give the jury

20   two diametrically opposite versions of a homicide and just say

21   to the jury you decide and choose to argue whatever it chooses

22   to argue.

23             But that's not a ruling, just some observations.

24   It's very troublesome.

25             MR. KURLAND:  Does the Court want further briefing on

1    that?

2          THE COURT:  I don't need any further briefing.

3    Perhaps some further argument at a future hearing date.  I may

4    not be able to and probably won't be able to resolve it until

5    we get to trial.  I don't know what the government's order of

6    proof is.

7          Obviously, I'm going to want to hear from Mr.

8    Montgomery.  I've seen Miss Smith.  I'm going to want to see

9    arrest photos.  I'm going to want to see the guns.  I'm going

10   to want to see it all.

11         I'll want to know if Mr. Montgomery knows the

12   difference between a revolver and a semiautomatic.  Maybe he

13   does, maybe he doesn't.  I don't know.

14         I don't know how long the plan to do the shooting was

15   underway.  Did Mr. Montgomery see?  I mean, it was I who

16   actually said in colloquy with Mr. Hanlon that Montgomery saw

17   the gun in Mr. Gardner's hand as he got out of the car.  But I

18   don't think Mr. Hanlon said that.  For all I know, Mr.

19   Montgomery said Mr. Gardner had the revolver the night before.

20         So there's a lot more evidence that I've got to hear

21   in order to assess the due process propriety of what the

22   government proposes to do.

23         And, again, I'm not faulting the government.  The

24   government wasn't there.  The government's making reasonable

25   inferences from what it knows about this case, which is likely

1    as more than not, but I've got to hear more before I did can

2    finally resolve this issue of whether Detective Mitchell's sort

3    of solitary statement right there, you know, sort of jumping

4    out of that report, out of nowhere, no notes, no verification

5    by Miss Smith, no verification corroboration by Miss Maynard,

6    nothing, just Detective Mitchell says, yeah, gray T shirt.

7    And your point is very well taken.  I'm going to see the

8    T-shirts.  Okay.  All right.  So --

9              MR. KURLAND:  I'm sorry.  Housekeeping matter?

10             THE COURT:  So that's the Court's ruling granted in

11    part, reserved in part, denied in part.

12             The motion to suppress the identification, evidence,

13    is denied in part, and the Court reserves in part.  Okay.

14             Housekeeping?

15             MR. KURLAND:  Housekeeping, with regard to a trailer

16    issue of the last hearing, because counsel have been preparing

17    for this hearing, we would like to, co-conspirator statement

18    thing.  The Court said two or three weeks.  I think we've

19    talked with co-counsel as well, two weeks we'll get something

20    together that will be in two weeks.

21             THE COURT:  Next hearing is June 7th.

22             MR. KURLAND:  So it would be the 25th.

23             THE COURT:  Be sure to give the government time to

24    file a response.

25             MR. KURLAND:  The other thing is are we meeting

1    tomorrow?

2         THE COURT:  No, we're not meeting tomorrow.  I guess

3    you were out of the room when I conferred with counsel.  We

4    don't have any more business we need to take care of this week.

5         MR. KURLAND:  Okay.

6         THE COURT:  June 7th.

7         Yes, Mr. Harding?

8         MR. HANLON:  Your Honor, I just want to briefly

9    address what we're doing on the 7th.

10        THE COURT:  You can do that now or perhaps you've

11   been very kind to send us these letters, could you do that,

12   that would be very useful.

13        MR. HARDING:  I'll send a letter right away, but what

14   I'm most eager about, Your Honor --

15        THE COURT: Okay.

16        MR. HARDING:  -- the issue of the Mitchell statement

17   and the fact that Mr. Sullivan today suggested they might have

18   witnesses on this, I would hope that we are moving close to

19   resolving this issue and that Mr. Sullivan would be prepared to

20   put on any witnesses next time.

21        THE COURT:  That's very fair.  What do you say, Mr.

22   Sullivan?

23        MR. SULLIVAN:  Ready to go.

24        THE COURT:  June 7th.

25        MR. SULLIVAN:  If I'd like to call anybody, they'll

1    be here.

2              THE COURT:  June 7th, they'll be here, if anyone.

3              MR. HARDING:  We'll also prepare a letter for Your

4    Honor.

5              THE COURT:  That would be great, Mr. Harding.  Thank

6    you.

7              Mr. Gardner, I know I promised you, it's too late.

8    I'll give you a little extra time on June 7th at the beginning

9    to make your speech.

10             For now, we're in recess.

11             Mr. Hanlon, I need to see you right away about a

12   separate matter.

13                  (Proceedings adjourned)

14

15             I, Jacqueline Sovich, RPR, CM, do hereby certify
     that the foregoing is a correct transcript from the
16   stenographic record of proceedings in the above-entitled
     matter.

17

18   _____

19   Jacqueline Sovich                        DATE
     Official Court Reporter
20

21

22

23

24

25

```
 1
 2                    I N D E X
 3    WITNESS            DIRECT    CROSS    REDIRECT    RECROSS
 4    Kelly David            14       35
 5    Patricia Maynard       41       46
 6    Keith Ketterman        66       74
 7    Gregory Mead          120      130
 8    Philip Marll          133      153
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```