```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE DISTRICT OF MARYLAND/NORTHERN DIVISION

 3     UNITED STATES OF AMERICA

 4                                    CRIMINAL NO.

 5     v.                            04-0029

 6

 7     WILLIE MITCHELL, ET AL.        July 27, 2007

 8                    Defendants

 9     _____/

10                    TRANSCRIPT OF MOTIONS HEARING

11            BEFORE THE HONORABLE ANDRE M. DAVIS,

12                  UNITED STATES DISTRICT JUDGE

13     APPEARANCES:

14     On behalf of the United States:

15     Michael Hanlon, AUSA
       Robert Harding, AUSA
16
17     On behalf of the defendants:

18     Laura K. Rhodes, Esquire
       Timothy Sullivan, Esquire
19     Gerard P. Martin, Esquire
       Joshua R. Treem, Esquire
20     James Pyne, Esquire
       Thomas L. Crowe, Esquire
21     Adam H. Kurland, Esquire
       Barry Coburn, Esquire
22
23     Reported By:

24     Jacqueline Sovich, RPR, CMR, FOCRR

25     Official Court Reporter

26
```

1                    (PROCEEDINGS)

2              THE COURT:  Good morning.  Please be seated.

3              Counsel, good morning.  It appears, counsel, that

4    regretably, this case ill start as it is has encountered

5    additional turbulence.

6              As counsel are aware, in the last several weeks,

7    there have emerged two instances of conflict of interest, one

8    involving counsel for Mr. Mitchell and one involving counsel

9    for Mr. Harris.

10              In connection with the matter involving Mr. Mitchell,

11    Mr. Sullivan brought this matter promptly to the attention of

12    the Court in consultation with Mr. Sullivan and Miss Shearer,

13    the Court-appointed counsel, to conduct an investigation into

14    the matter, and counsel has submitted to the Court a

15    confidential report.

16              And the Court thanks Mr. Paul Kemp for his work on

17    the matter.  Among other things, Mr. Kemp attempted to

18    interview Mr. Mitchell so as to explore the issues relating to

19    the apparent conflict, which arose quite unexpectedly in the

20    last couple of months as a result of an arrest that was, so far

21    as the Court is aware, entirely fortuitous and unconnected to

22    any of the matters in this case.

23              Mr. Mitchell declined to participate with Mr. Kemp in

24    a discussion of the matter, and Mr. Kemp has exercised his

25    professional judgment and made a recommendation to the Court

1   that Mr. Sullivan cannot continue in the case under the

2   circumstances.

3           That was a preliminary view that I had taken of the

4   matter early on, and under the circumstances, Mr. Kemp's

5   recommendation was not a surprise.

6           Indisputably, a more grave matter arose involving Mr.

7   Treem's successor counsel to Mr. Harris.  I believe all of

8   counsel have been privy to the exchange of correspondence

9   between Mr. Treem and the government, and in particular, I

10  believe all of counsel have received Mr. Martin's more recent

11  letter to the Court, Mr. Treem's co-counsel on behalf of Mr.

12  Harris.

13          It seems to me to be perfectly obvious,

14  notwithstanding the government's effort to cure the difficulty,

15  that Mr. Treem cannot continue as counsel to Mr. Harris.

16          Insofar as the government's response to this

17  conflict, it seems to me that Mr. Martin's letter really says

18  it all, and I can hardly add to what Mr. Martin has said.

19          I will make all of these letters a part of the Court

20  file to the extent they have not yet been made part of the

21  Court file.

22          So Mr. Harding and Mr. Hanlon, Mr. Hanlon's not

23  present, Mr. Harding, I'll be glad to hear from you in any

24  further response that you wish to make to these matters, but it

25  appears to me that what's going to have to happen is that the

1    Court's going to enter an order discharging Mr. Sullivan and

2    Mr. Treem from any further participation in the case and

3    continue these matters.

4         I have considered under the circumstances whether it

5    would be appropriate, advisable, and just to continue the trial

6    of Mr. Mitchell and Mr. Harris only and to proceed in September

7    in the case of Mr. Martin and Mr. Gardner.  As I said in my

8    memorandum to counsel several weeks ago, there was a time when

9    I was fully prepared for severance and to try this case more

10   than once.  But for reasons I think the record clearly shows,

11   the Court is not remotely interested in doing that.  The Court

12   wants to try this case once, and only once.

13        So, under the circumstances, it seems to me not

14   advisable to proceed with the trial of Mr. Gardner and Mr.

15   March 10 in September as presently calendared, and it appears

16   to me that what's going to have to happen, the case is going to

17   have to be continued.

18        I have already conferred with Miss Shearer, who is,

19   as always, hard at work trying to find successor counsel.  It

20   appears that she's going to have to go some distance from this

21   city, if not from this district, in order to achieve that.

22        The difficulty is redoubled, of course, because, as I

23   said in my memorandum to counsel, Mr. Kurland has really bent

24   over backwards to make himself available to us and to Mr.

25   Gardner as co-counsel, and I certainly want very much for Mr.

1    Kurland to stay with the case, and I will hope that he would do

2    everything that's humanly possible to make that happen.

3              But at the same time, I have to recognize that we've

4    already asked an awful lot of him and of his employer, Howard

5    University School of Law, and so if it is to be that Miss

6    Shearer has to find three counsel to come into the case, then

7    all three and a half years into the prosecution, since the

8    filing of the indictment, then that's what justice is likely to

9    require.

10             So I'll hear from you, Mr. Harding.  I can only say

11   that if now 20 years into the Sentencing Reform Act and the

12   application of the guidelines, substantial assistance has

13   become the coin of the realm, it seems to me that the banker

14   has a special duty to tend to the market.

15             And without finding fault, and I don't find fault

16   here, I don't think it's necessary, or appropriate, if

17   substantial assistance is what it is, then the banker owes a

18   special responsibility to the market to keep the market true.

19             And Mr. Treem never should have been brought into

20   this case.  Never should have been brought into this case.

21   Never should have been asked to step into this case.

22             And I regret very much that we have hit this stone

23   wall.

24             So Mr. Harding?

25             MR. HARDING:  Well, I'm sorry the Court has gotten so

1      far along the road to a decision in this matter, but Mr.

2      Martin's letter is in fact based on a completely erroneous

3      assumption about the government's position with respect to

4      these two witnesses.

5              Mr. Martin says, quote, "There is no doubt that Mr.

6      Harding would, absent Mr. Treem, call them to the stand in this

7      case.  By deciding not to call them, Mr. Harding denies them

8      significant benefits negotiated by Mr. Treem's partner."

9              That statement is 100 percent incorrect, Your Honor.

10     What appears to have happened here is that Mr. Treem obtained

11     materials from Mr. Gardner's attorney that were turned over a

12     year and a half ago to Mr. Gardner's attorneys.

13             THE COURT: On the Court's instruction, of course.

14             MR. HARDING:  Yes.  And this material included Jencks

15     material and Giglio material at the same time.

16             Giglio material, including information that bears

17     negatively on government witnesses, or that may contain

18     information inconsistent with what government witnesses

19     intended to say.

20             The two witnesses cited by Mr. Treem were a guy named

21     Tyree Stewart and a guy named Jermaine Johnson.  Tyree Stewart

22     was not going to be called as a witness in this case.  He

23     doesn't have information about these defendants pertinent

24     enough to make him worth calling as a witness.

25             Tyree Stewart had information, though, about

1    government witnesses, and we turned over -- neither of these

2    witnesses testified in the federal grand jury in this case.

3    Neither of them has ever been identified as a government

4    witness in this case.  But Tyree Stewart gave proffers and

5    reports to the government in interviews that the government

6    turned over, and a plea agreement with a statement of facts

7    that the government turned over to Mr. Coburn and to Mr.

8    Kurland in an abundance of caution, because he had statements

9    about other government witnesses that bore negatively on them.

10          The same is true of Jermaine Johnson, as is

11   completely obvious from the report that the government turned

12   over, he had statements that were inconsistent with an

13   important government witness.

14          Jermaine Johnson is a little bit different, because

15   he's not even a government cooperator.  He has never been a

16   government cooperator.  He's never had a plea agreement with

17   the government.

18          In other words, it's completely untrue that he would

19   be denied significant benefits if the government failed to call

20   him as a witness.

21          He has no pending case that the government is aware

22   of.  The government believes he's out on the street somewhere.

23   He was represented by an associate of Mr. Treem's firm, not by

24   Mr. Ravenell directly, but by an associate who worked

25   underneath Mr. Ravenell in a state case some years ago.

1          And, yes, he was represented by this guy.

2          However, the government can refrain from calling him

3     as a witness, and he will not be denied any benefits, because

4     he doesn't have a pending case.  He doesn't have any agreement

5     with the government whatsoever.

6          He was called as a witness in the state case against

7     Mr. Gardner in the state murder trial because they needed

8     testimony about a single phone conversation that he had made

9     with the government witness back at the time prior to the

10     murder of Tania Jones Spence.  He was on the stand for

11     approximately a minute in relevant testimony.  There was also

12     some cross-examination by the defense attorney.

13          The defense attorney -- and there were some

14     preliminaries, but all he basically testified to was a single

15     phone conversation.  And the point was to identify who was

16     using the phone at that point in time.

17          The government can eschew calling him from, refrain

18     from calling him for that purpose without any damage whatsoever

19     to the government's case.  And it's completely incorrect to

20     say, by deciding not to call him, Mr. Harding denies him

21     significant benefits negotiated by Mr. Treem's partner.

22          In other words, Your Honor, there is no conflict of

23     interest with either of these witnesses.

24          I should add that the other reason for turning over

25     Jermaine Johnson's statements, his reports, again, there was no

1    grand jury testimony, no plea agreement with the government of

2    any sort, no indication that he was a government witness, but

3    the reason for turning over his reports was also that he gave a

4    version of the events leading up to the Tania Jones Spence

5    murder that were different from important government witnesses.

6    And so it was Giglio material.  That's the primary reason for

7    turning over his --

8              THE COURT:  Was it labeled as such?

9              MR. HARDING:  It was -- if I may, we don't go through

10   and label our information.

11             THE COURT: Of course you don't.  I knew the answer to

12   the question before I asked it.  You see where I'm going, if

13   you deliver a stack of 6's and 302's and grand jury testimony

14   and police statements and unsworn statements, how is defense

15   counsel supposed to know?  And maybe there's a clear answer to

16   this.  How is defense counsel supposed to know who's a

17   government witness?  I just -- how is defense counsel supposed

18   to know it was merely Giglio, even assuming, and I do assume

19   and I do accept absolutely your representations as to the

20   characterization of all of this, how --

21             MR. HARDING:  I think it was obvious to anyone who

22   read the report.  It says in the --

23             THE COURT:  I'm sorry.  What report?

24             MR. HARDING:  This is the report that was turned over

25   as Giglio material to Mr. Coburn and Mr. Kurland a year and a

1    half ago, and which Mr. Treem apparently got a copy of and

2    assumed that this guy was going to be a government witness.

3              THE COURT:  And what is the report from whom, by

4    whom, dated what?

5              MR. HARDING:  It's a Baltimore County Police report

6    by a Detective Phil Marl, and it's dated and September 6th,

7    2002.  The first sentence of the first full paragraph says Mr.

8    Johnson was asked if he was familiar with subjects named Goo

9    and E, and he said no.

10             And then it goes on to detail what he said.  And the

11   final sentence is "It should be noted in William Montgomery's

12   proffer, Johnson does in fact know Gardner and Holly, and he

13   was an active participant in the planning of the robbery of

14   Tania Jones Spence."

15             THE COURT:  Who's the he?

16             MR. HARDING:  Mr. Johnson.

17             THE COURT:  Mr. Montgomery is telling the detective

18   or somebody that Johnson was the active participant?

19             MR. HARDING:  Yes.  In the planning, not in the

20   actual execution.

21             THE COURT:  Okay.

22             MR. HARDING:  But Johnson is in fact the one who

23   identified where the Spences lived.  That was his role in all

24   of this.  And he denies this.  He denied it in his police

25   report.

1    Therefore, he gave a story inconsistent with Will

2    Montgomery's story.   Therefore, his statements to the police

3    are Giglio material as to Will Montgomery.

4         That's the primary reason for turning over that

5    report to Mr. Kurland and Mr. Coburn a year and a half ago.

6         So the government's position is, Your Honor, that Mr.

7    Treem does not have a conflict of interest by any stretch of

8    the imagination.

9         THE COURT:  Did you want to any anything more about

10   Stewart?

11        MR. HARDING:  I'm sorry, about Stewart?

12        THE COURT: Yeah.   Stewart has a plea agreement with

13   your office, correct?

14        MR. HARDING:  Yes.

15        THE COURT:  To cooperate for substantial assistance?

16        MR. HARDING:  Yes.  He gave information in those

17   reports that were turned over also about several government

18   witnesses, Darius Spence and Will Montgomery and others.

19        THE COURT:  Did not testify in the grand jury?

20        MR. HARDING:  He did not testify in the grand jury.

21   There should have been no reason to assume that he was going to

22   be called as a government witness, but Mr. Treem appears to

23   have assumed so.

24        The government made it clear in its letter that Mr.

25   Treem did not have a conflict of interest in this matter.

1          THE COURT:  I'm sorry.  I have to disagree with you

2     on that, Mr. Harding, if we're talking about the same letter.

3     Which letter are you referring to?

4          MR. HARDING:  I'm referring to my letter, Your Honor,

5     of July 17th, 2007.  I'm sorry, that's the wrong one.

6          July, I'm sorry, June 28th, 2007.  We received Mr.

7     Treem's letter of June 25, 2007.

8          THE COURT:  I'm sorry, Mr. Harding.  You call that

9     making something clear?  These three sentences?  Excuse me.

10     Five sentences.  One paragraph.

11          MR. HARDING:  Well, Your Honor, if --

12          THE COURT:  I mean, you didn't say any of what you

13     just said at any time before just now.

14          MR. HARDING:  We clearly identified, we said that,

15     quote, "Mr. Treem will not have a conflict of interest in the

16     above-captioned case."

17          THE COURT:  And that's what you mean by making it

18     clear?

19          MR. HARDING:  We will not call one of the witnesses.

20          THE COURT:  That's what you mean by making clear?

21          MR. HARDING:  Yes, Your Honor.

22          THE COURT:  Okay.  You should complete that sentence,

23     quote, "The government will not call one of the witnesses Mr.

24     Treem is concerned about, and we are exploring whether he has a

25     conflict with respect to the other."

1          MR. HARDING:  Yes.

2          THE COURT:  I didn't know the name of the witness

3    that you were referring to in that sentence.  I didn't know why

4    you thought not calling the witness would cure the problem.

5    The government never told me that Mr. Treem was incorrect in

6    identifying these two individuals as likely government

7    witnesses or at a minimum government cooperators.

8          MR. HARDING:  Judge, it wasn't the government's

9    intent, in writing this letter, to fully brief the Court on

10   facts underlying this whole issue.  It was simply to alert the

11   Court that the government took a different position from Mr.

12   Treem's.

13         We had no idea that the Court was proposing to reach

14   a decision on this matter before hearing from the government.

15         THE COURT:  Well, this was hearing from the

16   government, the June 28th letter.  I mean, trial was scheduled

17   for September 17th.  When was I going to hear from the

18   government?

19         I heard from the government in the June 28, 2007

20   letter, and having received what I received, in consultation

21   with Miss Shearer --

22         MR. HARDING:  I had no idea that the Court was going

23   to consider Mr. Treem's claimed conflict so seriously that it

24   would guide this Court's decision-making on whether to have a

25   trial this fall or not, and Mr. Sullivan's conflict or Ms.

1    Rhodes's conflict, I'm not sure which one has a conflict, the
2    Court has never disclosed to the government at all.
3              THE COURT:  All I can say is Mr. Treem's response to
4    your letter says that Mr. Ravenell represented both Mr. Stewart
5    and Mr. Johnson quote "Stewart has extensive information about
6    Mr. Montgomery, and Johnson testified at Gardner's state trial.
7    Mr. Stewart has yet to be sentenced."
8              I don't know what else I was supposed to do.
9              MR. HARDING:  Judge, there was one other thing that I
10   needed to clarify, and which I have still not have clarified
11   it, which is whether or not we needed to call Jermaine Johnson
12   as to that one phone conversation or not.  Whether the
13   testimony on that limited tiny issue would have constituted a
14   conflict of interest as to Mr. Treem who represented a
15   defendant against whom that testimony was completely
16   irrelevant, because Mr. Treem's client had nothing to do with
17   this particular incident.  So I was interested in pursuing some
18   legal research on that issue.
19             But, in any event, he's not -- he cannot -- it is
20   completely inaccurate to say that the government would deny him
21   significant benefits by not calling him as a witness because he
22   doesn't have a plea agreement.  He's not a cooperator.
23             THE COURT:  Referring to Mr. Johnson?
24             MR. HARDING:  Yes.
25             THE COURT:  Okay.  Well, Mr. Harding, I don't want to

1    put too fine a point on it, but there is no tiny issue in a

2    capital case.  There is no tiny issue.  And this discussion

3    that we've had for the last 10 minutes or so really is the best

4    evidence yet in a capital case of why we've heard over and over

5    again death is different and the T's have to be crossed, and

6    the I's have to be dotted.  And I regret if you were waiting

7    for some indication from the Court that I wanted and needed

8    more from you, from the government, but I thought the matter

9    was grave.

10            Mr. Treem is not one taken to hysterical claims.  He

11    is a distinguished, as are all our counsel, member of the bar

12    of this Court, who takes his professional responsibilities

13    seriously, and I accepted the written submissions that I got.

14    And, again, it just wasn't time for careful legal research on a

15    question where, from what I could tell from the record, it was

16    a pretty clear and blatant conflict for Mr. Ravenell to be

17    representing a person such as Mr. Stewart with a plea agreement

18    with the government awaiting sentencing.

19            And I couldn't agree more that there is no cure that

20    says deprive Mr. Stewart of the benefits of his cooperation

21    agreement in order to cure the conflict that is manifest in the

22    record.

23            MR. HARDING:  Judge --

24            THE COURT:  I don't agree, either, again, I couldn't

25    disagree more strongly with your suggestion that just because

1    one witness gave short what you call unimportant testimony in

2    Mr. Gardner's state murder trial that that's of no moment here.

3    It is.  This is a racketeering conspiracy.  As we have spent

4    hours in the course of these hearings, evidence against one

5    defendant is evidence against all of the defendants.

6            That's the foundation.  That's why this case is

7    structured the way it is.  It's exactly the government's theory

8    of the case.

9            And a witness in Mr. Gardner's state murder trial,

10   who testified for two minutes about who made a phone call or

11   who was present when a phone call is made is evidence against

12   Mr. Mitchell, Mr. Martin, and Mr. Harris.  And there is no

13   unimportant evidence in a capital case.

14           I just can't be any more clear than that.

15           Any defense counsel want to be heard?

16           MR. COBURN:  Yes, Your Honor.

17           THE COURT: Mr. Coburn, you may approach the podium.

18           MR. COBURN:  Thank you so much.

19           Your Honor, with respect to Tyree Stewart, I'm not as

20   conversant with exactly how he would fit into this case as I

21   probably should be at this moment.

22           Mr. Kurland may actually know more detail about than

23   I do right now.

24           With respect to Jermaine Johnson, I can tell Your

25   Honor he plays a critical role with respect to Tania Spence

1     murder.

2              And without getting into necessary a lot of detail

3     about it, I'm looking at his state testimony in Mr. Garner's

4     trial right now.  His testimony was not just about cell phone

5     conversation with a young woman.  He also testified about an

6     in-person conversation with Willie Montgomery, who's the person

7     who actually planned the Spence murder.

8              THE COURT:  That's the cross-examination Mr. Harding

9     alluded to.

10              MR. COBURN:  That's the direct examination, and it's

11     also covered under cross-examination.  His testimony goes

12     approximately 22 or 23 transcript pages, and he is, in my view,

13     a very substantial and significant witness with respect to that

14     murder and was in the state trial.  I just wanted to let Your

15     Honor know that.

16              THE COURT:  Thank you, Mr. Coburn.

17              Mr. Kurland?

18              MR. KURLAND:  Judge, just to briefly add a couple

19     things, Tyree Stewart more problematic, but one of the things

20     with Jermaine Johnson, without going into the full details as

21     to the nature of our defense, that will be a witness that would

22     be -- it's critical to the defense, so a government position

23     not to call him on direct would obviously not eliminate the

24     issue of him being a witness in the case.

25              THE COURT:  Obviously.  Obviously, that's true about

 1    Mr. Johnson and Mr. Stewart.  And any other potential, or

 2    government witness for anybody else in the whole world.

 3                    MR. KURLAND:  True.

 4                    THE COURT: Thank you, Mr. Kurland.

 5                    MR. KURLAND:  Thank you, Judge.

 6                    THE COURT:  Mr. Treem, anything to add?

 7                    MR. TREEM:  No, Your Honor.  I think the record

 8    speaks for itself in this matter.

 9                    THE COURT:  Anything from other counsel, Mr.

10    Sullivan?

11                    MR. SULLIVAN:  No, Your Honor.

12                    THE COURT:  All right.  Thank you very much, counsel.

13    The case is continued, generally, the pretrial conference is

14    canceled.

15                    The Court will enter an order striking the appearance

16    of Mr. Sullivan and Mr. Treem.

17                    Miss Shearer, as I say, is already hard at work to

18    identify successor counsel.

19                    I should have asked you, Mr. Kurland, when you were

20    at the lectern, are you able to please --

21                    DEFENDANT MITCHELL: May I speak, Your Honor?

22                    THE COURT:  No, Mr. Mitchell.

23                    Mr. Kurland, I know that it's all but impossible for

24    you, I assume it's all but impossible, but in the case, what is

25    your situation?

1          MR. KURLAND:  Well, Judge, I will, apropos to your
2     comments here, I will do whatever I possibly can to remain in
3     the case.  I believe that that's in the best interest of my
4     client.
5          Obviously, when the case would be scheduled again
6     would be -- I obviously would need to know that.  Obviously, I
7     have to talk to the Dean and if it -- I don't know what other
8     kind of communications are appropriate from the Court, but the
9     law school's been fairly flexible.
10          I -- it's close.
11          THE COURT:  I don't want to lose Dean Schmoke's
12     friendship over this.
13          MR. KURLAND:  No, but Dean Schmoke, within the bounds
14     of what can be done, Dean Schmoke recognizes, you know, the
15     importance or whatever.
16          So I think, from my standpoint, I would need to know
17     when the case is going to be rescheduled for, and to the extent
18     -- I mean, obviously, it's low on the totem pole of hierarchy
19     of importance, but with respect to a case that is probably
20     going to go several months, from my, the scheduling standpoint,
21     it only impacts on one semester, it's a better chance that I
22     can get the Dean and Associate Dean to work with it.
23          At this point, I'm not going no tell the Court or
24     Miss Shearer that I want to get out.  But with respect to how
25     the scheduling is going to proceed and when a date's going to

1  be picked --

2          THE COURT: All right.  Well, I have no idea, of

3  course, how successful -- well, I know she'll be successful,

4  but I don't have any idea about is how long it will take her to

5  be successful, under the circumstances, to obtain successor

6  counsel to Mr. Mitchell and Mr. Harris.

7          But I suppose I can hope against hope that say by

8  Halloween we could actually have two people identified who will

9  have agreed to take up this representation, and further hope

10 against hope that their calendars would be clear for a

11 four-month trial starting in September of '08.  Because I know

12 that September would work best for you, correct, in terms of

13 trying to get it all done in one academic semester?

14         MR. KURLAND:  It would be helpful, because when I go

15 back and talk, I mean, my personal schedule is sort of again

16 it's relatively unimportant like everything else, but if I can

17 go back and talk to the Dean's office with a ballpark, that the

18 tentative plan is for basically a year from now.

19         I could let -- I mean, I could -- when does the Court

20 want me to let you or Miss Shearer know?

21         THE COURT: We've got to hear from Miss Shearer first.

22 I would ask counsel, please, hold harmless September, 2008.  I

23 just can't in good conscience ask you to hold open any time

24 before that.

25         My guess is that most of you already are booked

1    through spring and early summer next year so it would be an

2    academic request, in any event.  But please starting the date

3    after Labor Day next year, please don't calendar anything

4    without conferring with me first, if you can get away with

5    that, among my state and federal colleagues, because that's

6    what I'm hoping we're able to do, because I just don't have any

7    realistic possibility of thinking we can get somebody in here

8    and start this trial say in April or May of next year.

9           And I dare say the government, likewise, is committed

10   throughout that period.  So I think we're talking about 12

11   months out.

12          All right.  So we'll be in touch, Mr. Kurland, of

13   course, and give you the best information we can give you.

14          MR. KURLAND:  I thank the Court for the Court's

15   consideration as well.

16          THE COURT:  Miss Rhodes?

17          MS. RHODES:  Thank you, Your Honor.

18          Regarding that date, I have a four-month trial

19   starting January death penalty case before Judge Chasanow.

20          THE COURT:  '08?

21          MS. RHODES:  So I would not be able to go

22   back-to-back four months or eight months.

23          THE COURT: How likely is that case to go, Miss

24   Rhodes?  I mean you don't know.

25          MS. RHODES:  It was noticed.  It's with a

1    co-defendant, one co-defendant, and it's a series of I think

2    five, well, actually with the non death case, about six or

3    seven trials, we're the next to the last one going, and I think

4    it's -- you know, beyond that, I can't really say, other than

5    it has been noticed.

6            THE COURT: All right.  Yes, Mr. Harding?

7            MR. HARDING:  If the Court is going to appoint new

8    counsel or have Miss Shearer look for new counsel, I would urge

9    the Court to ask her to consult with me with a view toward

10   avoiding any conflicts of interest.

11           THE COURT:  Yeah, I think that's an excellent

12   suggestion, Mr. Harding, and one I was going to make.

13   Actually, what I would like from you, which I will share with

14   Miss Shearer, is as complete an order of proof and witness list

15   and exhibit list as you can must some time before the middle of

16   September.

17           Would you be willing to do that?

18           MR. HARDING:  The exhibit list is a problem.

19           THE COURT:  It's nothing that you're ever going to be

20   held to, nothing that anybody else other than myself and Miss

21   Shearer will ever look at.  I'm not going to share it with

22   counsel.

23           MR. HARDING:  I can provide Miss Shearer with a list

24   of every possible government witness that I'm aware of.

25           THE COURT:  I want you to give it to me.  And I will

1    share it with Miss Shearer.

2            MR. HARDING:  Okay.  I'm happy to do that.  I don't

3    know about the order of proof and the exhibit list because I'm

4    not sure those would help Ms. Shearer in the first place.

5            And, secondly, those would -- the exhibit lists in

6    particular would be difficult to whip up.  The witness list is

7    what she really needs.

8            THE COURT:  Well, yeah, but I want exhibits, too.

9    Miss Shearer is a fountain of unbelievable information.  She,

10   as you well know, she's our CJA coordinator, and she in the

11   back of her mind knows who represents whom, who, I mean, she

12   goes back years.

13           So I want information that she can look at and maybe

14   something will be triggered, maybe it won't.  So I'm not asking

15   you to do work.  I'm really not asking you to do work.  All I'm

16   asking, and I'm not asking you to do it tomorrow.  I said by

17   mid September at the latest, I would like to get from you total

18   list of witnesses, a list of possible exhibits, I'm not asking

19   for a summary of testimony or anything like that.  Just order

20   of proof.  I mean, which murders, in what order?  Just so that

21   I can sit down with Miss Shearer and see if anything triggers

22   her memory.

23           I don't want this to happen again.  You don't want it

24   to happen again.  None of us want it to happen again.  So more

25   is better, is all I'm saying.

1            MR. HARDING:  And I guess --

2            THE COURT:  And it will not -- it will be absolutely

3     in camera, I assure you.  I assure you.

4            MR. HARDING:  Okay.  Does -- by order of proof, do

5     you mean exact order in which the government intends to call

6     witnesses?

7            THE COURT:  No, no.  I just mean you know are you

8     going to prove it up chronologically, are you going to prove,

9     I'm using the term very loosely.  I'm using it more loosely

10    than you've ever heard it used, that's all.  I don't want

11    anything exact.  Okay.

12           MR. HARDING:  Also --

13           THE COURT:  I just what I want is some representation

14    of the government's case.  That's really all I'm asking for by

15    way of witnesses, exhibits, and a timeline, that's really what

16    I mean by order of proof.  Just basically a timeline.

17           And all these twists and turns and how they relate to

18    each other, in outline fashion, that's all.  I've never gotten

19    that.  I've never asked for it.  You didn't fail by not giving

20    it to me, but I really need to understand this case, as I've

21    said, you know, two years ago, what this case is is like 22

22    prosecutions.  That's what this case is.  It's five murders,

23    and then, you know, possession of this, and distribution of

24    this, and possession of this handgun, and it's absolutely all

25    over the place.

1          I mean, I sat through the motions hearing.  We had
2     suppression hearings on traffic stops from 1999.  That's what
3     this case is.
4          MR. HARDING:  Okay.  I'm happy to provide that to
5     Your Honor.
6          THE COURT:  All right.
7          MR. HARDING:  I have one other concern, which is the
8     conflict that Mr. Mitchell's attorneys had.  I have no notion
9     of what that might be.  And I wonder if that is something,
10    first of all, I assume the Court does not choose to disclose
11    that to government or you would have done so already.
12         THE COURT:  Exactly.
13         MR. HARDING:  But I want to alert the Court of the
14    possibility that could give rise to conflicts in the future and
15    I would have no knowledge.
16         THE COURT:  Frankly, I can tell you this, you had no
17    control over this.  There is nothing, absolutely nothing you
18    could have done to have anticipated or prevented that conflict.
19    Zero.
20         Am I right, Mr. Sullivan?
21         MR. SULLIVAN:  Correct, Your Honor.
22         THE COURT:  Absolutely nothing.  It was a fortuity.
23    And, frankly, I will tell you that in a different case, or
24    under different circumstances, Mr. Mitchell, Mr. Sullivan
25    wouldn't have to be disqualified.  So that's it.

```
1              MR. HARDING:  Thank you, Your Honor.

2              THE COURT:  Thank you all.  We're in recess.

3                  (PROCEEDINGS ADJOURNED)

4

5

6              I, Jacqueline Sovich, RPR, CM, do hereby certify
   that the foregoing is a correct transcript from the
7  stenographic record of proceedings in the above-entitled
   matter.

8

9  _____

10 Jacqueline Sovich                        DATE
   Official Court Reporter
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```