1

1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MARYLAND
2                   NORTHERN DIVISION

3


4      UNITED STATES OF AMERICA

5           v.                        CRIMINAL CASE NO.
6                                      AMD-04-029

       WILLIE MITCHELL,
7      SHELTON HARRIS,
       SHELLY WAYNE MARTIN,
8      SHAWN GARDNER,

9           Defendants
       _____/
10
                 VOLUME III OF XXXVI
11               Wednesday, September 17, 2008
                 Baltimore, Maryland
12

13     Before:  Honorable Andre M. Davis, Judge
                     And a Jury
14
       Appearances:
15          On Behalf of the Government:
             Robert Harding, Esquire
16           Michael Hanlon, Esquire
            On Behalf of Defendant Mitchell:
17           Laura Kelsey Rhodes, Esquire
             Michael E. Lawlor, Esquire
18          On Behalf of Defendant Harris:
             Gerard P. Martin, Esquire
19           Paul Flannery, Esquire
            On Behalf of Defendant Martin:
20           Thomas L. Crowe, Esquire
             James G. Pyne, Esquire
21          On Behalf of Defendant Gardner:
             Adam H. Kurland, Esquire
22           Barry Coburn, Esquire

23     Reported by:
       Mary M. Zajac, RPR
24     Room 5515, U.S. Courthouse
       101 West Lombard Street
25     Baltimore, Maryland 21201

1                  (Proceedings at 10:45 a.m.)

2                  THE COURT:  We're ready to proceed?

3                  MS. RHODES:  Yes, Your Honor.

4                  THE COURT:  Last night, counsel, my wife said to me, so

5      did you get a jury?  And I said, yeah, took a little longer than

6      I'd hoped, but we got a jury, looks good, they seem to be really

7      good people.  And I said to her, but I'm predicting that tomorrow

8      Juror Number One's going to come in and tell us that he's not

9      being paid for jury service.

10                  And I'm advised by Ms. Arrington that, in fact, this

11     morning Juror Number One advised her that he learned yesterday

12     that he's not being paid for jury service.  So I'm going to bring

13     the juror out and try to get the actual facts.  But it would

14     appear that we are dipping into our alternates even on this

15     second day of the trial.

16                  Belinda, would you have Juror Number One step out,

17     please, with his belongings?

18                  You're all cued up, Ms. Rhodes?

19                  MS. RHODES:  Yes, Your Honor.

20                  (Juror Number One enters the courtroom.)

21                  THE COURT:  Good afternoon, sir.  Have a seat.  You are

22     Juror Number One in this proceeding?

23                  A JUROR:  Yes, sir.

24                  THE COURT:  Good morning.

25                  A JUROR:  Good morning.

3

1          THE COURT:  I've been advised by Ms. Arrington that you

2     advised her this morning that you have additional information to

3     give to us about your ability to serve on the jury?

4          A JUROR:  Yes, sir.

5          THE COURT:  Could you keep your voice up, please?

6          A JUROR:  I'm sorry.  I assumed that my employer was

7     going to pay for me to be here and I found out last night that

8     they are not going to.  They only were paying me for one day.

9     And unfortunately, I really can't afford to miss work and not

10    have a paycheck.

11         THE COURT:  Do you believe that if I called and spoke

12    to your supervisor or your Human Resources people that I might be

13    able to persuade them to make an exception in this instance?

14         A JUROR:  Unfortunately, I'd have to say probably not

15    because it's a small company.

16         THE COURT:  How large is your company?

17         A JUROR:  It's three of us.  Two other people and me.

18         THE COURT:  I see.  You own it?

19         A JUROR:  No.  The other two guys own it and operate

20    it.

21         THE COURT:  Are you going to own it one day?

22         A JUROR:  I don't know.  I don't know about owning it

23    but I'd like to hopefully run the business one day.

24         THE COURT:  Are you a computer science major?

25         A JUROR:  Yes, sir.

4

1          THE COURT:  Just graduated this year?

2          A JUROR:  Yes, sir.

3          THE COURT:  So this is your first job, sort of?

4          A JUROR:  Yes, sir.

5          THE COURT:  I don't want to embarrass you, but why did

6    you assume that you were going to be paid for ten weeks if the

7    company's only three people?

8          A JUROR:  Obviously, I'm salaried so I really didn't

9    put much thought into it.  I figured no matter what I was doing I

10   was going to make the same amount of money and I never thought

11   about asking.

12         THE COURT:  I see.  So you don't get paid hourly?

13         A JUROR:  No.

14         THE COURT:  And were you thinking perhaps that --

15   again, I'm not trying to embarrass you but I just, for my

16   edification -- were you thinking maybe you could work at night?

17   Is their work the kind of thing you can do almost from anywhere,

18   any time?

19         A JUROR:  Maybe some stuff.  But a lot of stuff we do,

20   we go to, we have several clients.

21         THE COURT:  Oh, I see.  You work in the field?

22         A JUROR:  Right.  Some stuff we do from the office but

23   a lot of times we're also going out and deal with support, at

24   their client locations.

25         THE COURT:  Is it maintaining web sites or exactly what

5

1    do they do?

2              A JUROR:  A lot, almost everything is --

3              THE COURT:  Network maintenance?

4              A JUROR:  Networking.  Any kind of software

5    applications.  We just installed some new servers for a couple

6    clients and we maintain all of their systems, stuff like that.

7              THE COURT:  I see.  All right.  Well, we deeply regret

8    this turn of events.  We know that you would have been a good

9    juror.  You, like the others, seems to me, were quite

10   conscientious in the way you approached the voir dire.  And I

11   suspect you're the youngest juror.

12             A JUROR:  I guess.

13             THE COURT:  So the average age of the jury's going to

14   go up, I suspect.  But that said, unless any of counsel wish to

15   be heard, I'm prepared to excuse the juror with our best wishes.

16             We wish you a good career, sir, and you are excused.

17             A JUROR:  All right.  Thank you.

18             THE COURT:  Thank you.  Good luck to you.

19             (Juror leaves the courtroom.)

20             MR. HARDING:  Judge, I just want to invoke the

21   sequestration.

22             THE COURT:  The microphone, please.

23             MR. HARDING:  I would like to invoke the sequestration

24   rule, Your Honor.

25             THE COURT:  I did that at the pretrial conference.  But

1     I'll remind everyone that there is a rule on witnesses.  Anyone

2     who might be a witness in this case should leave the courtroom at

3     this time.

4                 (Pause in proceedings.)

5                 (Jury enters the courtroom.)

6                 THE COURT:  Ladies and gentlemen of the jury, please be

7     seated.  Good morning.  We trust you had a pleasant evening.  As

8     I emphasized to you on yesterday, our alternate jurors are very

9     important to us and no greater proof is presented than just this

10    very moment.  It has become necessary for the Court to excuse our

11    former Juror Number One from any further service in this case.

12    Accordingly, if Alternate Number One will now step forward,

13    please, and bring your pad with you and take the seat of former

14    Juror Number One.  The others, if you wish, can move down.

15              So again, as you can see, although we're referring to

16    you as alternate jurors, as a practical matter, as I emphasized

17    on yesterday, on a moment's notice the alternate could be dropped

18    from the description of your service.  And so we again appreciate

19    the role that our alternates play for us.

20              So we're ready to continue.  The government concluded

21    its opening statements on yesterday.  We'll start now with the

22    defense open statements.  I believe Ms. Rhodes wishes to make an

23    opening statement.

24              MS. RHODES:  Good morning.  My name is Laura Kelsey

25    Rhodes and I represent Willie Mitchell, who is seated next to me,

1    along with Mike Lawlor.

2            A bunch of kids growing up poor in Baltimore and around

3    Baltimore.  A bunch of kids that met in junior high and high

4    school and later on and they hang out together and they go in and

5    out of each other's lives over a period of years, just like our

6    friends do in our lives.  In and out of each other's lives.

7            Their activities together may include having a beer,

8    they may include smoking pot, hanging out on the street, or going

9    to a movie.  But they still were just friends.

10           Eventually, one of them goes off to a juvenile

11   detention facility.  That's Willie Mitchell.  After getting in

12   trouble in high school, he gets sent there.  So his last year of

13   high school he spends at the Hickey School.

14           Fortunately, when he got there, he ran into Coach

15   Lynch, the football coach, who recognized that he had a couple of

16   skills, that he was smart and he was very fast on the football

17   field.  So he took him under his wing and at the Hickey School

18   Willie excelled in football.

19           And the coach thought so highly of him he decided to

20   see if he could get him into college, and he did.  He sent him to

21   a community college and got the funds together for him to go to a

22   community college in New Jersey.  Willie Mitchell went there to

23   play football.  He had to work full-time, too, or work almost

24   full-time, too, in addition to his studies.  And he did that and

25   he did well, again.  He didn't have a strong academic preparation

1    before he went there but he did the best he could.

2            He then went on to another school in Rhode Island,

3    Bryant College, to play there.  But when he was there, the

4    academics became tougher and he injured himself.  If you don't

5    have the grades, you can't play.  So after a couple of semesters

6    there, he couldn't play any more and he had to return to

7    Baltimore.  The silver lining there was that he could return to

8    his high school girlfriend and raise their child, which is

9    something he wanted to do.

10           His coach will tell you that it's not easy to prepare

11   kids that come out of Hickey to do well, whether it's on the

12   football field and academics or elsewhere.  Willie did the best

13   he could with that.

14           As the years went on, the four men occasionally saw

15   each other.  For a while it might be on a daily basis.  Another

16   time it might be a couple weeks.  Another time it could be months

17   and months before they see each other.  And yes, the prosecutor

18   said they were in jail sometimes, that's why they didn't see each

19   other.  That's true.  Sometimes they just didn't see each other

20   for months because they didn't hang out.

21           But remember, he says that this conspiracy supposedly

22   started in 1994.  Well, Willie was away in college and at Hickey

23   for about two and a half or three of those years.  Doesn't mean

24   he never spoke to his friends.  Well, some of them he didn't even

25   know yet.  Doesn't mean he didn't speak to them, but there

9

1    certainly wasn't, you won't find any conspiracy going on during

2    that time.

3         The testimony you're going to hear is that this group

4    was not organized.  It was not coherent.  It was not cohesive.

5    It was just their business of being friends.

6         I divided what I'm going to talk to you about into four

7    sections.  The first one is called the friend business, because

8    that's really what the government wants to kind of make it into

9    a, some kind of a business or an enterprise, an organization.

10   The fact that some of the things they may have done and you may

11   hear about were illegal doesn't mean it comes under the federal

12   conspiracy law.

13        There were no regular meetings that these four had.

14   There were no dues being paid.  There were no officers in this

15   organization.  There was no crime family.  In fact, the only

16   thing that was organized about what Mr. Mitchell did was the rap

17   business.  When he left college and came back to Baltimore he had

18   one dream besides football, and that was the rap business.  Not

19   as an artist, not as the rapper, but the business.  And that he

20   did work hard at.

21        So the second part I want to talk to you about after

22   the friend business is the rap business.  You're going to hear

23   from an expert in that field who's going to tell you how artists

24   get started.  It's actually not unlike how other artists get

25   started.  You decide, you have a friend who's good at something,

1    you get together with them, you're in somebody's basement, you're

2    in somebody's garage, and you start making music.

3          You're going to hear that, you've heard the term

4    "gangsta rap" already in the voir dire.  You're going to hear

5    more about that and you're going to hear the expert talk about

6    when that started to come about.  Really in the very late '80s

7    and early '90s it became big.

8          I'm going to play for you one of the songs that started

9    this movement called Straight Outta Compton.  It's a song by Ice

10   Cube, is the artist.  And when that started, think about the age

11   these men are.  As they were coming of age, that's what they were

12   listened to.  That's when gangsta rap became big.

13         And in gangsta rap, you're going to hear, you probably

14   heard about it, if you haven't heard a lot of it, you've heard it

15   talked about -- violence sells, sex sells, shootings.  And then

16   the bling, cars, clothes, cash.  That's what's big.  And when you

17   have something like that that's big, that's what your songs have

18   to be about, too.

19         So it is no surprise, and I'm going to play for you the

20   lyrics that Mr. Harding did yesterday, I'm going to play that

21   song for you, a portion of that song, because you need to hear it

22   in the context of these other gangsta rap lyrics and realize that

23   when you want to make it big, that's what you put in your music.

24   You need to have violence.  They have violence in them, also.

25   They have threats.  They have intimidation.  That's what the,

1    that's what the most popular gangsta rap artists have in their

2    songs.

3          The first one I'm going to play for you is the, is the

4    Straight Outta Compton.  Compton is a section of L.A., if you

5    don't know where that is.  It's the inner city, hard streets of

6    L.A., and that's where Ice Cube is from.

7          What you're going to hear is, not just in this song but

8    throughout this trial, you're going to hear a lot of bad

9    language, a lot of bad words over and over.  I'm not going to

10   apologize for it because it's part of this case.  And I just want

11   to put it out there so that none of us have to keep apologizing

12   for it when it comes up.  All right.

13          (Music played.)

14   MS. RHODES:  The government would have you believe that

15   when somebody uses those lyrics, it means they've done that, it

16   means that's what their history is.  But I want to show you, I

17   want to show you what Ice Cube is doing now.  Ice Cube is in

18   family comedy movies and he's making millions of dollars and he's

19   an actor.  That's part of what it's about.  It's show biz.  It's

20   acting.  It's making music.  He's made millions of dollars as an

21   entertainer because this is, the rap music is entertainment.

22   It's the entertainment business.

23          The next one we're going to play is Jay-Z, who you'll

24   hear is the, also, you heard about Kevin Lyles yesterday, he's

25   the former president of Def Jam.

1          (Music played.)

2          MS. RHODES:  That was done in the 2003 and it sold

3    three million copies in the U.S. alone.  Jay-Z sold 50 million

4    copies of songs and albums worldwide, half of them in the U.S.

5    And he's, according to MTV, one of the two best rappers of all

6    time.

7          The lyrics may not be pretty but you can see that's the

8    mainstream.  Those are the mainstream lyrics.  And what somebody

9    has to do in the rap business is make sure that's part of their,

10   that's part of their song, that's part of them.  And you'll even

11   hear that there are rumors that a bunch of people put stuff like

12   that in their lyrics when it's not their experience, and that

13   creates a little controversy.  And there are rumors that a couple

14   of rappers have tried to get shot to boost their street cred, to

15   boost their credibility.

16         So you'll see that what sells is what's inflammatory.

17   And to do well, you need to be there.

18         Now, I'm going to play for you the song, a song from

19   Shake Down Records, which is what Mr. Mitchell, Willie Mitchell,

20   and Shelton Harris were working on.  And it's a song where Mr.

21   Harris is the artist.  The album is called Pure Shit and so is

22   this track.

23         We're going to play about half of this.

24         (Music played.)

25         MS. RHODES:  So that is gangsta rap.  And the goal that

1    Willie Mitchell and Shelton Harris did have in common was to make

2    it big in that business.  And to do that you have to take, you

3    have to go out on a limb.  And if there's a rumor of something

4    you hear about, you do a song about it.  If there's a rumor about

5    something that's happening in your neighborhood, you do a song

6    about it if it's going to make it big.

7            So stuff that's happening in their neighborhood or in

8    their area that they know about, that's legitimate, that's

9    legitimate for a song.  They want to do what's going to sell.

10           As we're going through this trial, you'll want to

11   listen carefully to what the government's putting out there.  And

12   you'll remember that Mr. Harding said yesterday that there were a

13   couple of things that the government wasn't really sure about.

14   Doesn't know about how many shooters were there.  Maybe one,

15   maybe two.  Another situation with Mr. McCaffity, Mr. Harris,

16   maybe somebody else.  These were all possibilities.  And

17   possibilities aren't going to cut it when the standard of proof

18   is beyond a reasonable doubt.  So you'll need to keep that in

19   mind as you listen to the evidence.

20           Is the government proving its case against them,

21   because that's their job?  That's what the burden of proof is.

22   It's a job they have to do to prove their case to you.

23           Now, after the friend business and the rap business, I

24   want to talk to you about the blame business.  The blame business

25   is what I call what the snitches in this case do.  They're going

1    to come in.  Now, it's interesting.  Mr. Harding said you'll need

2    to decide, do they have an incentive to tell the truth or to tell

3    a lie?  Well, he left out a third possibility, which is that they

4    have an incentive to tell you what the government wants them to

5    say.

6              Why would that be?  Because you'll hear that it's the

7    government that pulls the strings in terms of their plea deals.

8    You'll see person after person come in here who is getting, like

9    snitches, they're either getting money, they're getting out, or

10   they're getting off.  Getting money because sometimes they get

11   actually paid for cooperating.  They're getting, they're getting

12   out because they might be doing a ten year sentence or a five

13   year sentence, and when they write a letter saying, I have some

14   information about something, the government can make a deal and

15   get them out of jail then.  And they did that over and over in

16   this case with some pretty bad people who went out and did more

17   crimes then.

18             And getting off, sometimes charges just get dropped if

19   you cooperate.

20             So the reason I call that the blame business is because

21   it's what incentive is for some of these snitches to come in and

22   blame somebody else.  And it's their own self-interest.  It's

23   what's going to get them where they want, where they want to be

24   or away from where they don't want to be.

25             I want to talk in particular about one, one person who

1    is, instead of a snitch may I should call him a cooperator,

2    because he's very cooperative with the government.  This is a man

3    named Dwayne Denham.  Now, it's interesting because at first when

4    you hear his testimony, you might think, well, this is kind of

5    ordinary testimony.  He was with Darryl Wyche the day, earlier in

6    the day when he got killed.  And comes in, he'll tell you about,

7    I was with him in DC, we did this and that.  Then we left and I

8    went home.  And it sounds pretty, sounds kind of boring.

9           But when you listen to it, when you listen to what's

10   behind what he's saying, it gets even more interesting.  Because

11   what Dwayne Denham does is he shifts blame.

12          If you think about it, he'll tell you that they went to

13   DC.  He and Darryl Wyche went into DC because he's kind of

14   protection for Darryl Wyche.  And he'll tell you that means he

15   does drug deals and I protect him.  He gets paid a couple hundred

16   bucks, 200 bucks, 300 bucks, for going with him, for things like

17   that.

18          Now, he'll also tell you that he didn't have a gun.

19   He's protection but he doesn't have a gun with him.

20          They go down to DC and he says Darryl's going to do

21   this deal and he's going to sell to somebody down there.  He's

22   got some, he's got some coke he's going to sell.

23          They go down to DC and he says that, I don't really

24   know that much about the stuff, I don't want to know too much.

25   He says, I don't want to know too much, it might make me a

1    suspect.  And he'll tell you that a couple of times.  He'll tell

2    you, I don't want to be a suspect.  He's very, very alert to

3    that, very aware of that, that he might look like a suspect.

4           Now, I'll tell you something else.  I mean, he's saying

5    that in general.  He's also known to have, to rob drug dealers.

6    Okay.  So that's his background.

7           So Dwayne Denham.  He goes by the nickname Deezo.

8    He'll tell you that he was with him and that he knows that Darryl

9    Wyche got some phone calls that day.  Doesn't really know exactly

10   who they were to or from.  He'll tell you he knows who Darryl

11   Wyche's supplier was.  It was a Dominican guy.  He doesn't know

12   his name.  But he'll also tell you that he knows that Darryl

13   Wyche owed the Dominican $50,000.  And he'll also tell you that

14   he needed to, Darryl needed to re-up.  Re-up, in case you don't

15   watch The Wire, re-up is when somebody has to get more drugs when

16   they're out.

17          So it will be, you'll see it's a kind of interesting

18   combination.  Owe your supplier $50,000 and still need to re-up.

19   And yet Deezo will tell you he had these drugs on him that he

20   took to DC, and he'll also tell you that he had a stash

21   somewhere.  You'll find out later where that is.  It's in the car

22   they were shot in.  But it's a confusing, it's a confusing

23   situation that Deezo tells you about when you start to look at it

24   carefully.

25          For example, he says the deal in DC didn't happen.

1   They went to DC.  Now, mind you, they're taking the risk of

2   driving on 95 down to DC.  That's why he's got an enforcer with

3   him.  And there's a risk of always being stopped by the police.

4   That's a huge risk.

5           So they go down to DC and he's not sure exactly why the

6   deal doesn't go through but he'll tell you he thinks it's because

7   they couldn't agree on a price.

8           So they come back up 95, which is inconvenient, because

9   they've still got the drugs on them, still facing the risk.  But

10  they come back up 95.  But he'll tell you Darryl was not

11  particularly upset about that.  That was okay with him.

12          You'll hear that that's not really how it works in the

13  drug business.  It's not okay if you drive down to DC, taking all

14  that risk, and you don't make a deal.  But he'll say Darryl was

15  okay with that.

16          Then he'll tell you that they all went to this place in

17  Randallstown.  There was a party at somebody named Randy's house.

18  They went there and they're hanging out there for a while.  And

19  then he says, and then we left.  Darryl, his brother, and Deezo,

20  all left at the same time.  And the other witnesses say that,

21  too, which means that Deezo was, in fact, the last person to see

22  them alive.

23          So it's very convenient when Deezo later says, I went,

24  I got in my own car then, I didn't go with them.  But the people

25  inside the house don't know that.  They'll tell you, we just saw

1    the three of them leave together.

2            And you've heard that the Wyche brothers were killed by

3    somebody sitting in there, in the back of their car.  So it had

4    to be somebody they knew and trusted.

5            Deezo will also tell you, I'm not sure of the exact

6    amount that Darryl had that day, that he was taking to DC.  And

7    he'll tell you there, I didn't want to make myself a suspect.

8    Okay.  Again, nothing, he's doing absolutely nothing wrong.

9    He'll consistently shift the blame off himself to somebody else.

10            He also will tell you he knew that Darryl had gotten,

11    had gotten kidnapped a couple of times.  But I don't know the

12    details about that.  I don't know if he did anything about that,

13    I just know he had gotten kidnapped a couple of times recently.

14    He also said the reason he doesn't know where Darryl's stash is,

15    is that he'll tell you it's because, if I didn't know where his

16    stash was, then you'd automatically have to eliminate me as a

17    suspect.  Well, nobody was initially saying he was a suspect but

18    he keeps talking about how he's not.  Anything that's coming

19    toward him, he is pushing off on somebody else.

20            The other things that don't add up about what Deezo

21    says is, there's a rumor that Willie Mitchell was mad at Darryl

22    Wyche.  So why would Darryl Wyche meet with him?  Is it more

23    likely that Willie Mitchell would be there or that Deezo, his

24    friend, would be there?  His friend who's a drug dealer and knows

25    how much money Deezo, Darryl has right then.

1          We also know from Darryl's wife that she had counted

2     out with him about $23,000 a couple of nights before this.  So of

3     the $50,000 he owed, presumably a chunk of it was available.  And

4     again, you have to ask yourselves whether it's more likely that

5     Deezo knew that or that Willie Mitchell knew that.

6          You also saw on this chart that the prosecutor put up

7     that Darryl Wyche was a supplier for Willie Mitchell.  So why is

8     he going to mess up his supply?  What's the advantage there?  And

9     you will also hear that the cocaine was left behind in the Wyche

10    brothers' car.  That sound more like somebody that was after the

11    money, who knew the big money was there.  And that would be

12    Deezo.

13         You're going to hear a lot of other snitches talk, too,

14    and you'll need to evaluate their motivation, motivation which is

15    usually just, get me out of jail.

16         The prosecutor would have you believe, I think, that

17    the killings, that the McCaffity killing and Wyche brothers, were

18    similar.  But even their own version shows you that there are

19    different, completely different motivations if their.  If their

20    versions are even correct about what the motivations were,

21    they're not similar.  They don't know, they don't know how many

22    shooters were in each one.  In McCaffity there's no direct

23    evidence that Willie Mitchell was involved at all in that

24    shooting.  None.  As far as Shelton Harris goes, there is the

25    print from his palm on that car.

1          The bottom line is that the snitches want to either get

2     off or get out or get money.  And those are the three motivators

3     that all of them have.  And none of those involve telling the

4     truth.

5          The fourth area I want to talk to you about is what I

6     call the free man business.  And it's a little complicated and

7     confusing.

8          You're going to hear from some attorneys who have

9     represented people in federal court in Maryland who have put

10    forth some arguments that the prosecutor talked about in certain

11    types of cases.  And the prosecutor has decided that those

12    arguments and those papers they filed with the Court are part of

13    their conspiracy.  So we have to address it and tell you what

14    those papers mean and what they're about.

15         One way we're going to do that is to have people, other

16    attorneys come in who have represented people in these situations

17    and discuss what their research has shown about these filings.

18    What they will say is that it's almost like a virus spreading in

19    the federal prisons; that people get word of an argument you can

20    make in a case and they latch on to that and believe that it will

21    get them off, that this defense they're going to use will get

22    them off.

23         And what it is basically is arguing that the federal

24    government has no jurisdiction over them.  "Jurisdiction" is a

25    legal term and jurisdiction has to do with what court has

1    authority or power over you.  For example, if you get a traffic

2    ticket out here on Pratt Street, Judge Davis can't do anything to

3    you.  Okay?  This court has no authority over that kind of

4    matter.  If you get a traffic ticket on a military base, you have

5    to go to a different court than you would go to if you'd gotten

6    that ticket right outside the military base.  So that's just what

7    court is going to have something.

8          The reason that's become an issue here is because these

9    crimes that are charged here, drug offenses, murders, are

10   normally in state court.  And when defendants who are normally in

11   state court get put into, get charged with something that is a

12   federal offense, and in this case charged with this RICO statute

13   you've heard about, which is a statute that was designed for

14   organized crime, for the Mafia.  And the federal government, when

15   they try to put something like this on these guys, it's bringing

16   about an enormous reaction that's spreading through the detention

17   centers and the prisons.

18         And what their reaction is, is we reject that you have

19   any authority over us.  We don't accept that authority.  And the

20   form it's taken here is a whole variety of pleadings.

21         They have filed pleadings that ask the Court to

22   discharge the case, a number of things like that.  And as I said,

23   they believe that if they come in here and assert this defense

24   and stick to it, come hell or high water, that they will win,

25   they will prevail in their case.

1        So when the, when the feds stepped in and took their

2   cases from state court to federal court, a kind of desperation

3   set in.  And that's when these pleading started.  To them it was

4   no longer a fair fight.

5        And you'll hear that, yes, they were at times rude in

6   court and that they were at times during hearings, they would

7   interrupt their attorneys or they would interrupt the judge.  And

8   that was, that that was annoying and irritating to those

9   participating.  But it was not obstruction of justice, which is

10  what the government would have you believe.

11        In fact, it did not stop the prosecution at all.  It

12  did not stop the hearings.  Generally, if there was disruptions,

13  Judge Davis would ask the marshals to escort them out and they

14  would escort them out calmly and the proceedings would continue.

15  So there was, in fact, no obstruction of justice.

16        In fact, Judge Davis at one point wrote an opinion

17  about their, what they had filed, to rule that there was no issue

18  with jurisdiction.  And in that opinion he said --

19        MR. HARDING:  Objection, Your Honor.

20        THE COURT:  Sustained.

21        MS. RHODES:  Judge Davis's ruling was that there, that

22  these behaviors were not going to, that they would not prove

23  effective in this case.  The point is, you will hear from our

24  witnesses that this was their way of, the defendants' way of

25  making their voices heard.  And that does not mean it's part of a

1    conspiracy.

2              I'm going to read to you part of what my client has

3    asked that I do in this case so that you understand their

4    position.

5              MR. HARDING:  Objection, Your Honor.

6              THE COURT:  Well --

7              MS. RHODES:  These have been filed with the Court, Your

8    Honor.

9              THE COURT:  Approach the bench, please.  Just Ms.

10   Rhodes and Mr. Harding, please.

11             (Bench conference with Ms. Rhodes and Mr. Harding.)

12             MS. RHODES:  It's the same thing.  It's the same thing

13   they filed.

14             THE COURT:  You going to put this in evidence?

15             MS. RHODES:  Well, I assume that, that that language is

16   in evidence.

17             THE COURT:  Are you going to put this sheet in?

18             MS. RHODES:  I wasn't going to.

19             THE COURT:  Do you object to it coming into evidence?

20             MR. HARDING:  Judge, I'm going to move a number of

21   these pleadings into evidence.  I can't say whether this is one

22   of them.

23             THE COURT:  Okay.  But generally, it's going to contain

24   the same kind of stuff?

25             MS. RHODES:  It's probably verbatim, if not very close.

24

1          THE COURT:  Looks largely the same.

2          MS. RHODES:  Yes.

3          MR. HARDING:  I'll withdraw my objection.

4          THE COURT:  Okay.

5          (End of bench conference.)

6          THE COURT:  The objection is withdrawn by the

7     government.

8          MR. HARDING:  Thank you, Your Honor.

9          MS. RHODES:  My instructions from Mr. Mitchell are:

10         Do not argue the facts, request the Court issue an

11    appearance bond and waive all public costs.  Request the Court

12    close the account and release the order of the court to him

13    immediately.  Request the Court set off and adjust all public

14    charges by the exemption in accord with Uniform Commercial Code

15    3-419, House Joint Resolution 192, and Public Law 7310.  Request

16    an immediate discharge.  We do not waive Mr. Mitchell's rights,

17    in fact, and we reserve all of his rights with explicit

18    reservations and without prejudice.  Mr. Mitchell accepts for

19    value Case Number AMD-04-0029, which is this case, for value, and

20    returns said case for closure and settlement of the account.

21         And that, we argue, is his right to express to this

22    jury, it's his right to express it in terms of what his defense

23    is.  And it is really more akin to an act of civil disobedience

24    than it is to any kind of obstruction of justice.

25         To summarize, we have four things I've talked about

1    here.  There's the friend business, which is where we believe

2    that you will find that there is no conspiracy, this is just a

3    very, very loose knit group of friends that sometimes do stuff

4    together.  If you think of it as four people, A, B, C and D.

5    Sometimes A and B do stuff.  Sometimes A and C.  Sometimes A and

6    D.  Sometimes B and C.  It's random.

7              As I said, there are no meetings.  There are no dues.

8    There are no officers.  There is no organization.  This is

9    disorganized, if anything.

10             The rap business.  Two of these defendants tried to

11   make it big in the rap business.  In fact, at Hammerjacks that

12   might, meeting Kevin Lyles, that was to be getting their word,

13   getting their music out there.  That was to be the night.

14             The blame business.  People pointing fingers at people

15   and trying to get something for their testimony that the

16   government needs and wants.

17             The free man business.  The only way they think they

18   can get their voices heard.

19             Because a bunch of kids who grew up poor in Baltimore

20   and around Baltimore that are friends that hang out from time to

21   time and later sometimes a couple years go past and later a

22   couple more years go past, that does not equal organized crime.

23   And therefore, it does not mean that there's a federal conspiracy

24   here.  Thank you.

25             THE COURT:  Thank you, Ms. Rhodes.  Mr. Martin, I

1    believe you wish to reserve your opening?

2         MR. MARTIN:  Yes, Your Honor.  At this time I'll

3    reserve my opening until the beginning of the defense case.

4         THE COURT:  Very well.  Mr. Crowe.

5         MR. CROWE:  Yes, Your Honor.

6         THE COURT:  You may proceed whenever you're ready.

7         MR. CROWE:  Good morning.  We met briefly on Monday

8    morning.  My name is Tom Crowe.  Jim Pyne and I represent Shelly

9    Martin in this criminal case.  Jim is the fellow who's seated

10   kind of at the end of, the corner at the right angle of the two

11   tables.  Mr. Martin is the individual immediately in front of

12   him, with the striped shirt.

13        Now, as I'll explain to you in some detail in a few

14   minutes, Mr. Martin is named in fewer counts of this fourth

15   superseding indictment than any of the other defendants.  And a

16   count is essentially a criminal charge.  And that means that he

17   has fewer criminal charges against him than any of his

18   codefendants.

19        As Judge Davis correctly told you on Monday, all of the

20   charges in this case are serious and that certainly goes for all

21   of the charges that have been filed against Mr. Martin.

22        Now, in a sense, Jim Pyne and I kind of stand between

23   Mr. Martin and the full weight of the federal government, the

24   state government, various law enforcement officers from Baltimore

25   City and Baltimore County.  Mr. Harding and Mr. Hanlon are here

1    today from the U.S. Attorney's Office.  I think Ms. Kelly was

2    here yesterday.  She will probably be here in other instances.

3    Mr. Keith Benson, who's a Baltimore County detective and on a

4    state/federal task force is here.  And yesterday there was what

5    they called the case agent, Special Agent Brian Klas from

6    Alcohol, Tobacco and Firearms.  These are all people that you're

7    going to be hearing about.

8              You may think that in some ways this is an unfair

9    fight.  I got to tell you in a lot of ways that I agree with you.

10   But Mr. Pyne and I have a little bit of company in a sense

11   because in a way each of you and Judge Davis also stand between

12   the government and Mr. Pyne (sic).  By that I don't mean to say

13   that you're partisans or, as the expression goes now, that you

14   have a dog in the fight.  You're something that, quite the

15   contrary.

16             You will be told before this case is over that jurors

17   are, in fact, judges of the facts.  Mr. Harding doesn't decide

18   the facts.  God knows I don't decide the facts.  Even Judge Davis

19   doesn't decide the facts.  It's up to you to listen to the

20   evidence, to decide the facts, and to then use your mature

21   judgment to determine what the verdict should be in this case,

22   and to go down defendant by defendant, count by count, and make

23   the determination whether or not the prosecution has proven its

24   case beyond a reasonable doubt.  Judge Davis gives you the law

25   but you decide in the end whether the government has proven any

1   of the charges beyond a reasonable doubt.

2          Now, yesterday Mr. Harding gave a pretty powerful

3   opening statement.  I think you realize that this is a matter in

4   which the government has devoted a fair amount of time.  But what

5   we need to do is to examine what he has laid out very carefully.

6          Now, stripped to its essentials, the government charges

7   that Mr. Martin was involved in three areas.  First, he was

8   involved, and I think that's actually the word that Mr. Harding

9   used, he was involved in the killings of Darryl and Anthony

10  Wyche.  He really doesn't tell us how.  He just said that he was

11  involved.

12         Secondly, he tells us that my client, Shelly Martin,

13  was a member of a criminal enterprise which went on from 1994

14  until August 18th of 2006.

15         Third, he says that my client was involved in a

16  continuing organization that dealt drugs between 1994 and 2004.

17  These drug, this so-called enterprise or RICO enterprise in this

18  drug thing overlapped to quite a good amount.  Those are the

19  essential allegations and they're spread out among seven counts

20  or criminal charges in this case against my client.

21         It's important that you recognize in the beginning that

22  this indictment, actually called the fourth superseding

23  indictment, does not allege that Mr. Martin is involved in some

24  very terrible things about which you're going to be hearing days,

25  if not weeks, of testimony.

1          First is the Hammerjacks brawl in February of 2002

2    where several people were apparently stabbed.  Secondly, he

3    wasn't involved in the robbery or death of Oliver McCaffity.

4    Third, he was not involved in the death of Lisa Brown.  Fourth,

5    the indictment does not charge that he was involved in any way,

6    even as a conspirator, in the attempted robbery and the

7    conspiracy to rob Darius Spence.  That would be in June of 2002.

8    And finally, he was not involved in the robbery and the very

9    tragic death of Tonya Jones-Spence in June of 2002.

10          When the evidence is in, we believe that you will

11    conclude that Mr. Martin was not involved in the killings of

12    Darryl and Anthony Wyche, that he wasn't involved in this grand

13    RICO enterprise which ran continuously for a period of more or

14    less 12 years, and that he was not involved in any drug

15    conspiracy that spanned a period of 11 or 12 years.

16          Let's get to the heart of the matter for Mr. Martin,

17    which is the matter involving the Wyche brothers.

18          Mr. Harding charactered Darryl Wyche and his brother,

19    Anthony Wyche, as big time drug dealers.  I think that's probably

20    clearly true of Darryl Wyche.  I'm not sure what the evidence is

21    going to be as to Anthony.  Whatever these men did in their

22    lives, whatever they were up to on March 24 and March 25 of 2002,

23    they certainly didn't deserve to die.  Their deaths are tragic.

24    And not only did they die, but they obviously left a big hole in

25    some of their relatives' lives.  Those lives are going to be

1    forever changed.

2          I expect some of those relatives are going to be

3    testifying for the government.  And I expect they are still very,

4    very sad, they are very, very stricken by this.  I expect a fair

5    amount of that is going to come out.

6          But the issue really with respect to Mr. Martin is what

7    did he have to do with these murders?  The road map that Mr.

8    Harding tried to lay out, I will tell you, is not really

9    specific, very specific about this.  In transitioning between the

10   murder of Mr. McCaffity and Lisa Brown in this matter, all he

11   said was that Willie Mitchell decided it wasn't sufficient to use

12   just Harris and Shawn Gardner, just Harris for the Wyche

13   brothers, so Shawn Gardner and Shelly Martin became part of the

14   scheme.

15         Now, Mr. Harding also told you at some point that we as

16   defense attorneys had seen all the papers in this case.  I'm not

17   sure if we've seen all but we've seen an awful lot.

18         I have to tell you that Mr. Pyne and I are basically

19   clueless about what Mr. Harding meant by that statement.  What is

20   the evidence going to be that Mr. Mitchell decided that it wasn't

21   sufficient for just Mr. Harris to be involved and that these

22   other two had to come into it?  We don't know.  Maybe we will

23   find out as the case goes on.

24         What I will tell you is that there is no evidence that

25   Mr. Martin was present at the killings himself.  No one will say

1    he is.  There is no forensic evidence to suggest that he was.

2    His fingerprints weren't recovered.  His palm print wasn't

3    recovered.  They did tests for DNA evidence and they didn't come

4    up with anything.

5         Mr. Harding suggested at different points that there

6    may be three things that tie Mr. Martin into this.  The first,

7    kind of surprisingly, is that Mr. Martin was some place else that

8    night.  Therefore, he says, what Martin had to be doing was to be

9    setting up an alibi because he knew that something was going to

10   go on.

11        Secondly, he tells you that there was some telephone

12   traffic that night between some telephone that Mr. Mitchell was

13   using and a telephone that Mr. Martin was using.

14        Third, he contends that the word "Wayne" appears in

15   that, remember that voice mail message, where he told you that

16   people pulled out the cell phone and pushed the wrong button, and

17   the message went into the cell phone of Irene Magginson, who was

18   the mother-in-law of Darryl Wyche.

19        Well, let's look at these matters.  First, the supposed

20   false alibi.  When Mr. Martin was arrested on April 17 of 2002,

21   he told law enforcement, and particularly he told the lead

22   investigator for the Baltimore City Police at that time, a

23   Detective Gary Niedermeyer, where he was that night.  He told him

24   what theater he was at, he told him where he was.  And eventually

25   Mr. Niedermeyer goes to the theater.  He sees Jason Walter, who

1    was the manager of the theater.  Mr. Walter pulls out some

2    papers, including a charge slip, which is signed Shelly Martin.

3    Pays 16 dollars for two tickets.  Indicates that the matter, that

4    the tickets were bought at 9:41 on the evening of Sunday, March

5    24th, and that the two, the show was, I think it was Blade Two,

6    whatever, whatever Mr. Harding told you.  And the theater also

7    provided some information on the run time.

8            Mr. Harding tells you, without elaboration, that a

9    woman by the name of Lakeisha McCoy, who Mr. Martin took to the

10   movie, was enlisted to provide a phony alibi.  I'm not exactly

11   sure what's so suspect about a person taking a girlfriend to a

12   movie on a Sunday night.  I'm particularly less sure why it

13   should be suspicious that he would take her there on Sunday,

14   March 24, when the girlfriend's birthday was March 24th.

15           As Mr. Harding indicated, I think, in an aside, this

16   wasn't a so-called perfect alibi because it would have been

17   possible to essentially leave the movie after it got out and get

18   to the murder scene.

19           But the truth of the matter is, and we believe you will

20   come to accept this, is that Mr. Martin wasn't setting up the

21   false alibi.  Mr. Martin was going to a movie.  And there's

22   nothing wrong about that.

23           The telephone traffic.  On the evening of March 24,

24   there are some phone calls between one of the cells that Willie

25   Mitchell maintained in somebody else's name and Martin's cell

33

1    phone.  There is no evidence that Mr. Martin answered any of the,

2    any of the calls to him.  Although we haven't pinned this down

3    completely, we're basically 99% sure that when the records come

4    in, you will be convinced that they all rang over into voice mail

5    and were not answered.

6           It is absolutely clear that Mr. Martin never called Mr.

7    Mitchell that evening.  Mr. Mitchell was calling him.  Mr.

8    Martin, they were going into voice mail, and Mr. Martin didn't

9    call him.

10          Finally, let me tell you something else about Mr.

11   Martin's cell phone.  We've heard that Mr. Mitchell had one phone

12   that was registered to a phony business.  He used another phone

13   that was in his girlfriend's name.  I'm pretty sure that was

14   Jaquetta Smith.  Mr. Martin was using a cell phone to which Mr.

15   Martin was a subscriber.  It was not one that was used whenever

16   anything -- it was not one that was, that he was worried about

17   people knowing that he was getting calls or making calls.  You

18   know, his use of that phone is absolutely, absolutely legitimate,

19   which may be, may be somewhat remarkable as some of this evidence

20   comes in in the case.

21          There was also just a brief mention that supposedly the

22   word "Wayne" appeared in the message that went into Irene

23   Magginson's thing.  I'm not quite sure what it is, whether it was

24   Wayne or Dwayne or man or main, which is sometimes sort of a

25   dialect that goes from man.  But whatever it is, from the tone of

1    the conversation, it isn't clear that whoever is speaking is

2    addressing anybody in the car or that anybody named Wayne or

3    Dwayne or anything else was there.

4            So the important thing that I want to emphasize is that

5    Mr. Martin is not charged with doing most of the serious stuff

6    that you're going to be hearing about and that he didn't have

7    anything to do with the Wyche brothers.

8            Let me just speak for a second, because Mr. Harding

9    yesterday indicated that Mr. Martin was somehow involved or had

10   had some conversations about a robbery of a man by the name of

11   Darius Spence, who's the husband of Tonya Jones-Spence, who was,

12   in fact, killed sometime in June.

13           Mr. Martin is out of the picture on April 17th.

14   Remember, that's the day that I told you that he was interviewed

15   by Detective Niedermeyer and he gave the statement.  He's

16   basically in jail from that point forward.

17           The indictment that we have here is called a fourth

18   superseding indictment.  What that means is that there were

19   original indictments and that there were four superseding

20   indictments.  This is essentially the fifth time that the

21   government gets its, gets its act together and put these charges

22   together.

23           At no place in this indictment does it say that Mr.

24   Martin was involved with respect to anything for Darius Spence or

25   for Tonya Jones-Spence.  There are passages in here that will

1    tell you that other people were involved in this conspiracy to

2    rob Darius Spence and possibly to kill him.  Mr. Martin, on the

3    fifth try, is not said to have been involved in that at all.

4         Now, somebody, and apparently a fellow by the name of

5    William Montgomery, is going to say something different.  This is

6    an individual that the prosecution likes to call a cooperator.

7    It's the type of person that Ms. Rhodes called a snitch.  I will

8    tell you what William Montgomery is.  William Montgomery is a

9    stone cold killer.  He is a gun for hire.  If you have somebody

10   that you don't like and would like to see out of the way and you

11   have $5,000, William Montgomery is your man.  Except now that he

12   is the prosecution's man.

13        I would hate to rely on anything that Mr. Montgomery

14   says.  However, I will tell you that if he says that my client

15   was in any way involved in any discussions with respect to Darius

16   Spence or had anything to do with the Tonya Jones-Spence murder,

17   I'm going to spend a lot of time referring Mr. Montgomery to his

18   prior sworn statements given to law enforcement officers and his

19   testimony in the grand jury and his testimony in at least one

20   other proceeding.  He never said that once before.

21        Now, I'm a lawyer and I've really gone through the most

22   important stuff, but it's sort of like I can't help myself.  I've

23   got to talk about some of the technical stuff, also.  So here it

24   is.

25        This fourth superseding indictment with 19 counts is,

1    as Judge Davis told you on Monday, extraordinarily complex.  And

2    let me just summarize what I think are some of the high points.

3         The murder charges against Mr. Martin and, indeed,

4    against all of the defendants require the prosecution not just to

5    prove that there was a murder, indeed not even to prove that one

6    of the defendants was involved in the murder.  They have to show

7    that those murders were part of this RICO enterprise, this 12

8    year continuing combination which is charged in the indictment.

9         Secondly, all of the firearms charges against Mr.

10   Martin require the government to prove either the RICO enterprise

11   and conspiracy or the very similar drug conspiracy.  What they

12   have to show is that, beyond a reasonable doubt, that those

13   matters existed and that Mr. Martin was a member of them.

14        Now, I'm not going to discuss the law, maybe to a

15   degree because I don't really understand it.  Judge Davis is

16   going to give you, at the end of this case, what are necessarily

17   very complex and detailed instructions.  That will be weeks from

18   now.  What I want to discuss is what the facts will show, and

19   more correctly maybe what they won't show.

20        The government, we submit, will not show that there was

21   some continuing, ongoing criminal enterprise which lasted between

22   1994 and April 16 of 2004.  My notes from Monday indicate that

23   what Judge Davis said was that the indictment charged this was an

24   ongoing organization in a continuing unit.  Whatever the evidence

25   does show, it's clearly not going to show that anything like this

1    existed for either the 12 year period or some period of time that

2    was reasonably related to that.

3          There essentially was no core.  There wasn't something

4    that continued throughout, throughout.

5          Again, there's going to be some evidence of drug

6    dealing.  Indeed, there's going to be some evidence of drug

7    dealing between my client and Mr. Gardner.  But there won't be

8    any evidence that anything continued for that period of time.

9          Now, surely, during this case you're going to learn, as

10   Ms. Rhodes told you, that some of the defendants' paths crossed

11   at various times.  And some of those times they crossed you may

12   be convinced they were doing things they really truly shouldn't

13   be doing.  But if their paths would cross, they would then

14   diverge, and then people would come together, and then people

15   would break off, and people, and then different people might come

16   together.

17         What the prosecution has to show in this case is that

18   there was some continuing core, there was something which

19   subsisted throughout that.  And that is not anything, that is not

20   anything that happened.

21         The evidence will show, as Ms. Rhodes explained, and

22   I'm not going into any detail, that there wasn't any structure.

23   There was no organization.  There was no bank account.  There was

24   no place where people kept their money.  There was none of the

25   stuff that you would expect out of this major drug organization.

1    In particular, I think you will be struck, as this case goes on,

2    there was none of the bling, none of the evidence that this was

3    any sort of a profitable enterprise at the various times when it

4    might have existed.

5         We are also told that Shake Down Enterprises was a

6    primary sort of organizational element of this thing.  Ms. Rhodes

7    is correct.  If there's anything that's organized in this, it's

8    Shake Down Enterprises.  You will not hear my client's name and,

9    in fact, you will not hear Mr. Gardner's name mentioned with

10   anything with respect to Shake Down Enterprises.  To the extent

11   that this was an organizational sort of pivot for this supposed

12   thing, it simply was not one that my person, that my client was

13   involved in.

14        On the technical stuff, what we are telling you, the

15   instructions, listen to the evidence and say, is this something

16   that really goes on that I can follow this for months, you know,

17   from week to week or even month to month or even year to year?

18   There are whole periods of time when I don't know anything about

19   it.  Is it really the core of these four people?  How often do we

20   see them together?  I would suggest to you that you don't often

21   see them together at all.

22        So again, the important thing is my client was not

23   involved in the murders of Darryl and Anthony Wyche.  He didn't

24   do most of the other stuff that was involved.  And on the

25   technical things, that this so-called enterprise that the

39

1    government has charged, and really, the way that this thing got

2    into federal court, just didn't exist.  And that's something they

3    have to prove beyond a reasonable doubt.

4         When the case is over or at least when the evidence is

5    finished, I'll be up weeks from now talking to you again.  At

6    that time I expect that I'm going to ask you to find Mr. Martin

7    not guilty of all the charges.  No person, and certainly not Mr.

8    Martin, should be convicted of the crimes that are being charged

9    on the evidence that the prosecution's going to present here.

10        Thank you very much for your attention.

11        THE COURT:  Thank you, Mr. Crowe.  Mr. Coburn, whenever

12   you're ready.

13        MR. COBURN:  Thank you so much, Your Honor.  I think

14   I'm required to wire up with the device.

15        I'm required to wear this thing, ladies and gentlemen,

16   because it's such a big courtroom and the court reporter is

17   sitting back there about a quarter of a mile away.  But I

18   guarantee you're not going to have any difficulty hearing me.

19        First, may it please the Court, counsel, good morning.

20   Ladies and gentlemen of the jury, good morning.  My name is Barry

21   Coburn, and together with that gentleman all the way on the

22   left-hand side over there, that's Adam Kurland, we have the

23   privilege and the honor of representing our clients, the

24   gentleman sitting immediately to his left, Shawn Gardner.

25        Now, ladies and gentlemen, we appreciate very much what

1    Judge Davis said during the course of jury selection in this case

2    about the critical role that defense lawyers play in the

3    adjudication of justice in the federal, and in fact, every

4    criminal justice system in the United States.  And of course we

5    agree.

6            The fact of the matter is that defense lawyers, as well

7    as prosecutors, play a critical role in doing what the system is

8    all about.  And that is, what this system is designed to do is to

9    find the truth.  The truth often times can be a very illusive

10   concept, ladies and gentlemen.  And that's the reason why this

11   system that we use, which you now are a critical and even more

12   critical, frankly, part of, is so ingenious.  Because what it's

13   designed to do is to create a clash.  It's designed to create

14   sort of an argument that occurs before you in which the

15   prosecutor advocates for one position, the defense lawyers

16   advocate for another position.  They do it aggressively and

17   zealously and with determination.  And through that process,

18   through that interaction, that clash, the truth is, it is hoped,

19   it is designed that the truth will emerge before you.

20           Now, you, ladies and gentlemen, actually have what is

21   typically, and I'm sure will be in this case, the hardest job in

22   this courtroom, because unlike virtually anybody else, any of the

23   other principal participants in this process, you are not allowed

24   to talk during the entire process until the very end when you

25   deliver your verdict, which, actually, the word "verdict" means

1     to speak.  It's a Latin term meaning to speak the truth.  That's

2     what you'll be doing at the end of this process when you return

3     your verdict.

4              And so what you ladies and gentlemen are going to be

5     doing is relying upon your eyes and, most importantly, your ears.

6     And that's what you have principally to work with during the

7     course of this case.  And that's what we're relying on.

8              You, ladies and gentlemen, will see how this process

9     will emerge over the course of time.  We're all going to get to

10    know each other very well.

11             We are particularly pleased and honored to appear

12    before you in this case because this case is one in which the

13    allegations and the underlying facts are going to be extremely

14    inflammatory.  They're going to be hard to take.  By their very

15    nature, they're going to be upsetting because what we're here to

16    talk about, aside from drug dealing and various other sorts of

17    things which you've heard a legal bit of a sketch about so far,

18    is murder.

19             Now, murder is something which most people have a lot

20    of difficulty even getting their minds around.  I mean, just the

21    idea of intentionally taking the life of another human being.

22             And I submit to you, ladies and gentlemen, and I mean

23    nothing personal about this because we have extremely wonderful

24    people prosecuting this case, very competent lawyers, I submit to

25    you, and we'll go into this in a little bit more detail a little

1    later, that part of what the United States, part of what the

2    government, the Department of Justice, relies upon when they

3    prosecute these kinds of cases in the way this case is being

4    prosecuted is the very inflammatory, and by its very nature, very

5    upsetting core, the very nature of the allegations in this case,

6    is just something which any normal human being would feel

7    inflamed and upset by.  And that's true with respect to each of

8    the five homicides of the five inherently valuable people whose

9    lives were snuffed out in this case.

10              Excuse me for one second.

11              There is sometimes, ladies and gentlemen, a perception.

12   And part of the reason perhaps, I'm speculating, that Judge Davis

13   thought it was important to make the point that he made about

14   defense lawyers in this case, there is sometimes a perception

15   that defense lawyers perceive it to be their job when they are

16   honored to stand before a jury just like you ladies and

17   gentlemen, to essentially try to confuse the facts, to throw up a

18   lot of smoke.  And I'm not suggesting that any of the other

19   lawyers in this case did that or that they intend to do it.

20              But there is this kind of perception that defense

21   lawyers, when they try a case, I'm not saying that even if a

22   lawyer were to do this it would be necessarily, you know, a bad

23   thing or an unethical thing because it's part of the process of

24   sort of testing the prosecution's allegations in the case,

25   testing the strength of them and their believability.  But there

1     is this perception that sometimes a defense lawyer would stand

2     before a jury and do that to try and confuse, to try to divert

3     and deflect, as opposed to trying to clarify the facts.

4            Ladies and gentlemen, I am here to tell you that Mr.

5     Kurland and I are not about that in this case.  What we are here

6     to do is to ask you ladies and gentlemen to focus like a laser

7     beam, focus like a laser on just a couple of key issues in this

8     case.  Because from our point of view, the harder your focus, the

9     better you listen.  The more tuned in you are to the detail, just

10    the wealth of detail that will be emerging before you in this

11    case, the more likely it is that you, ladies and gentlemen, are

12    going to come to the just and appropriate verdict in this case,

13    which we submit is going to be a verdict of not guilty with

14    respect to our client.

15           Now, what am I talking about?  Why do I say this?

16    There are just a couple of key issues, a couple of key things in

17    this case that we're going to ask you ladies and gentlemen to

18    think hard about.  And one of them, some of them have already

19    been alluded to a little bit during the course of what you heard

20    yesterday and today.  But one of them, I submit to you, ladies

21    and gentlemen, is best illustrated, it is just such a wonderful,

22    clear, elegant idea, that it is best illustrated with a

23    children's toy.  And I'm going to show it to you right now.

24           What's this?  This is a square peg.  What's that?  That

25    is a round hole.  That's what the government is trying to do in

1    this case.  They are trying to put a square peg -- you've heard

2    this expression before, square peg in a round hole?  They're

3    trying to put a square peg into a round hole.  It won't go.

4              You've heard a number of different concepts which

5    lawyers, I mean, these are words that lawyers use and they're

6    words that you, ladies and gentlemen, are going to become

7    intimately familiar with, just because you're going to understand

8    them at least as well as we do.

9              And I'm not going to actually presume to explain them,

10   you know, in any sort of conclusive way because that is Judge

11   Davis's role in this case.  At the end of this case, Judge Davis

12   is going to give you a set of instructions and those instructions

13   are going to tell you to faretheewell.  Those are the ones that

14   are going to be the bottom line in terms of how these various

15   concepts and ideas that you've heard the various lawyers in this

16   case talk about, how they are to be used, how they are to be

17   deployed in this case.

18             Now, you ladies and gentlemen have heard the

19   expression, Don't make a federal case out of it?"  Now, when I

20   say that, "Don't make a federal case out of it", I'm not for a

21   minute, not for one minute belittling the importance of what

22   happened out there in terms of the facts that are going to be

23   discussed during the course this trial because it's nothing that

24   could be more important or more egregious, more horrible, really,

25   than murder.  Nothing.

1          I'm not saying anything to the contrary about that.

2     But this is a special kind of a case.  Judge Davis alluded to it.

3     A number of the other lawyers have talked about it.  This is a

4     federal case.  This beautiful, enormous courtroom we sit in.

5     This trial is presided over by a judge who is appointed by the

6     President of the United States, confirmed by the United States

7     Senate.  This is a federal case.

8          And what that means is that the case is based on United

9     States law, law of the country as opposed to the law of the State

10    of Maryland.  You know, a lot of people don't really think that

11    much about this but everywhere in the United States, at least in

12    the 50 states, we're all subject to two separate sovereigns, two

13    separate bodies of law.  There are state laws and there are

14    federal laws.  This case is based on federal law.

15         And so when we talk about murder, murder is, as I think

16    one of the other lawyers already indicated, is typically

17    prosecuted under state law.  That's not to say it can't be

18    prosecuted federally.  Obviously, it can.  But when it is, when

19    it is prosecuted federally, as the prosecutors have decided to do

20    in this case, it is subject to certain very special requirements.

21         And these requirements are reflected in the indictment

22    in this case because what's indicted, what's charged against

23    these individuals, specifically against our client, Mr. Gardner,

24    is based on these federal laws.  And in order for the government

25    to succeed in carrying its burden to prove Mr. Gardner guilty

46

1    beyond a reasonable doubt of any of these offenses, as I expect

2    the judge will instruct you at the end of the case, the

3    government's got to prove beyond a reasonable doubt each of the

4    series of what are called elements or parts of each of these

5    offenses.  Okay?

6         And the one particular kind of offense that I'd like to

7    focus you on right now, and this is what I'm talking about when I

8    say focus like a laser beam, is this idea of a RICO conspiracy.

9    Now, the word "RICO" kind of has a little bit of a humorous

10   connotation because it's got this sort of, you know, the way it's

11   abbreviated, R-I-C-O.  But it's not humorous at all.  It's a very

12   serious and important federal law.  It stands for Racketeer

13   Influenced and Corrupt Organizations Act.  The law's been in

14   existence for decades.  There are, you know, it's been

15   interpreted in many, many cases and so on.

16        Some of what's been discussed before you today and even

17   yesterday kind of confuses a couple of different critical ideas.

18   And you, ladies and gentlemen, given the importance of the task

19   that you have in this case, you cannot afford to be confused.

20        Now, when we talk about a conspiracy, that's one thing.

21   And the government talks about, you know, conspiracies, you may

22   recall Mr. Harding say yesterday the conspiracy doesn't have to

23   be part of a written agreement, it doesn't even have to be an

24   oral agreement.  I think I'm virtually quoting him.  It can be

25   tacit.  Remember, he used that word?  Just kind of a bunch of

1    people doing things together, so on, so forth.  Suggesting that

2    that's all you need.  If you find that, you know, the people

3    involved were kind of doing some things together, that's enough,

4    the government suggests to you; then they've proven what they

5    need to prove.

6            I respectfully but emphatically agree.  And obviously

7    it will be the Judge's instructions that are going to ultimately

8    be the bottom line on this.

9            But I suggest to you that what the government has to

10   prove with respect to, certainly, the key allegations in this

11   case are what are called, what is called the existence of a RICO

12   enterprise.  Remember that term if you will.  RICO enterprise.

13           A RICO enterprise is not just a conspiracy.  It is not

14   just a conspiracy.  And this idea that it can be just a tacit

15   agreement of a bunch of people who do a few things together, I

16   respectfully suggest to you that's dead wrong.  A RICO, you can

17   see, actually, what's required by the language that is utilized

18   in the indictment, which you ladies and gentlemen will be able to

19   take back with you to the jury room.

20           Here's what's charged in the indictment with respect to

21   the RICO enterprise.  The four defendants, along with others

22   known and unknown to the grand jury, were members of a group

23   referred to herein as the Randallstown/Park Heights organization,

24   a criminal organization.

25           The Randallstown/Park Heights organization, including

1    its leadership members and associates, constituted -- and this is

2    in the indictment -- constituted a, quote-unquote, "enterprise as

3    defined by these sections:  1961, 1959.  That's RICO.  Okay?  Of

4    the U.S. code.

5          And this is the key language.  That is, a group of

6    individuals and an entity associated in fact which engaged in and

7    the activities of which affected interstate and foreign commerce;

8    the enterprise constituted an ongoing organization whose members

9    functioned as a continuing unit for a common purpose of achieving

10   the objectives of the enterprise.  And then it lists them.

11   Enriching the members.  Preserving and protecting the power,

12   territory, and profits of the enterprise.  Promoting and

13   enhancing the enterprise.  Maintaining and promoting the rap

14   music business in which the members were involved, including

15   Shake Down Entertainment Limited.  Preventing and obstructing the

16   arrest and prosecution of members through disruption of court

17   proceedings.

18         Says members of the enterprise -- and you may recall

19   the judge using this language -- made decisions, both by mutual

20   consent and by directions from its leaders.

21         So that, that is what has to be proven beyond a

22   reasonable doubt in this case.  And you're going to be hearing

23   lots more detail about just what constitutes a RICO enterprise

24   for purposes of this case.

25         And that, ladies and gentlemen, is something that the

1    government cannot prove.  They cannot prove it in this case.

2    That is putting a square peg in a round hole.

3            Ask yourselves, as the evidence comes in in the case,

4    where is the evidence of that RICO enterprise?  Where is their

5    infrastructure?  Is there, you know, I mean, you obviously don't

6    necessarily need to have a building or a headquarters, but is

7    there anything like that?  Is there a place where people go to

8    work every day?  Are there initiation procedures like, remember

9    in the Mafia, you know, the blood oath and that kind of thing?

10   Is there any kind of penalty for anybody who wants to pull out?

11   Are they engaged in other activities with other people, as

12   opposed to just the people that are alleged to be part of this

13   RICO enterprise?

14           Ask yourselves all of these questions as the evidence

15   comes in in this case.  And I submit to you, ladies and

16   gentlemen, that you'll find that there's no way the government

17   can prove the existence of this entity beyond a reasonable doubt.

18           And with respect to Mr. Gardner's alleged participation

19   in what they seek to define as a RICO enterprise in this case,

20   ask yourselves, where's the evidence of it?  Is Mr. Gardner a

21   rapper?  Does his voice appear on any rap song that you ladies

22   and gentlemen hear?  Is his name on any piece of paper associated

23   in any way with Shake Down Entertainment Limited?

24           Did he have anything to do with the Stop Snitching or

25   Stop Snitching Two video, according to the government's evidence

1    in this case?  Anything?

2              Excuse me for just one second, ladies and gentlemen.

3              Now, the government, ladies and gentlemen, is so

4    anxious to prove the existence of this coherent, coordinated,

5    established entity in this case, and to prove that each of the

6    homicides that's at issue was committed, and this is another key

7    term that I'll ask you ladies and gentlemen to focus on, again,

8    like a laser beam, in furtherance, in furtherance, in other

9    words, that the reason why, the government's position is that the

10   reason why the people who were horribly murdered in this case

11   were murdered was in order to promote this enterprise.

12             They are so anxious to prove that that they go so far

13   as to invoke, to try to prove to you that the tactics, the sort

14   of desperate things that these individuals did, after they were

15   made a part of this case and after they were incarcerated, these

16   tactics that were referred to and that Ms. Rhodes referred to and

17   some of the other lawyers, their position is that that is proof

18   of a RICO conspiracy in this case.

19             You, ladies and gentlemen, are going to be hearing a

20   lot of evidence about how, you know, these kinds of strange

21   tactics that, you know, people in their desperation use in these

22   kinds of cases are by no means restricted even to this case, that

23   there are lots of other cases in which the exact same tactics are

24   used.  So ask yourselves whether that is proof of some kind of an

25   integrated RICO conspiracy in this case.

1          Now, you are going to be hearing evidence, as has

2    already been stated, that Mr. Gardner was engaged in some

3    criminal conduct earlier on and that that conduct was addressed

4    in some cases by, you know, state law enforcement authorities.

5    And the question really is not whether, is not going to be

6    whether or not those things happened because the evidence is

7    going to show, in all likelihood, that they did.  The question is

8    going to be whether that is proof in any way, shape or form of

9    the existence of the RICO conspiracy that's charged in this case.

10   And it's not.

11         Now, there's one particular thing, one particular key

12   thing with respect to this question of a RICO enterprise that I'm

13   going to ask you ladies and gentlemen again to pay particular, if

14   you will, to pay particularly close attention to.  And that

15   relates in our case, with respect to our client, Mr. Gardner, to

16   the murder of Tonya Jones-Spence.  That's a name you've heard a

17   number of times.

18         Now, ladies and gentlemen, this was a horrible murder

19   and there is no excuse for it.  This was the murder that you've

20   already heard Mr. Harding talk about in which a young woman was,

21   they attempted to sort of bind and gag her in her apartment.  She

22   goes over a ledge.  She crawls under an overhang, and she's shot

23   by two individuals.

24         Now, there's going to be a lot of confusion in the

25   testimony in terms of identifications and physical descriptions

1    and that sort of thing, and who was wearing what color hat and

2    who did what and who was carrying which gun and all that sort of

3    thing.  I submit to you a lot of that is going to be grossly

4    unclear, as this trial develops.

5            One thing, I submit, that will be crystal clear, that

6    is going to be crystal clear, is that there is no way, there is

7    no way that this homicide could possibly have been in furtherance

8    of the hypothetical RICO conspiracy that the government alleges

9    existed in this case.  There are going to be just a host of

10   reasons as to why that cannot be.

11           Ask yourselves, ask yourselves, when all the evidence

12   is in in this case, what do you think, what do you believe were

13   the reasons why this homicide was committed?  Was it in pursuit

14   of some kind of a complex RICO enterprise as defined by the

15   government?  Or was it done for the pettiest of reasons?  The

16   pettiest and most common of reasons in terms of just seeking to

17   enrich, seeking to make some money, and having nothing whatsoever

18   to do with the kind of enterprise that's been alleged by the

19   government in this case?

20           And when you make this determination, think in

21   particular about the testimony.  And I know there have been a lot

22   of names, ladies and gentlemen, that have been thrown around

23   already and it's probably very hard to kind of track them all

24   since you haven't been living with them for months and years like

25   we have.  But one name in particular I'm just going to ask you,

1    ladies and gentlemen, to please focus hard on, and that name is,

2    I think he was referred to as Will, full name is William

3    Montgomery.  William Montgomery.

4          William Montgomery will be a critical or the critical

5    witness that the government is going to rely upon with respect to

6    the murder of Tonya Jones-Spence.  And that's the murder that Mr.

7    Gardner is alleged to be a direct and critical participant in.

8          Now, there's already been some language used.  The word

9    "snitch" was used during the course of this proceeding.  And, you

10   know, other people refer to these witnesses as cooperating

11   witnesses.

12         I know that you've been talked at for a while here, but

13   please just give me five or ten minutes more to talk about this

14   one critical thing.

15         A cooperating witness is probably in these kinds of

16   cases the thing that sort of occupies the most time and the most

17   energy on the part of all the lawyers who are involved in

18   prosecuting and defending these cases.  The government, as you

19   have already heard Mr. Harding tell you, the government takes the

20   position that cooperating witnesses, and I expect, by the way,

21   that you're ultimately going to be instructed to use this

22   testimony, kind of testimony with care because of its very

23   nature.  But cooperating witnesses, the government take the

24   position that they negotiate a deal.  You know, it's a plea

25   bargain.  You're going to be seeing the actual contracts that

54

1     exist between these witnesses and the government.  And you're

2     going to see that the contract, these letters of, you know, plea

3     letters or plea agreement letters, contain explicit language in

4     them to the effect that if you're not truthful, it says to the

5     defendant, if you're not truthful then the deal's off and you can

6     be prosecuted and lots of bad things are going to happen to you.

7           But it's going to be necessary, I submit to you, ladies

8     and gentlemen, to just dive a little deeper into the way the

9     system works in order to truly, to truly, to find the truth, to

10    appraise the testimony of these witnesses accurately.  Because

11    the truth, and the reason why we have this whole system with all

12    its complexity and the clash between the two sides and so on, is

13    because the truth often times is a very elusive concept and it

14    can be in the eye of the beholder.

15          You ladies and gentlemen are going to be finding out

16    how the system works.  And you're going to see that ultimately

17    the final arbiter with respect to who's telling the truth with

18    respect to these cooperation agreements is the government.  Only

19    the government is allowed to make the motion under what's called

20    the Federal Sentencing Guidelines to reduce the sentence that a

21    cooperating witness is facing based on their cooperation.  Only

22    the government.  It only counts what they think is the truth.

23    Sometimes even the government may not know precisely what the

24    truth is.

25          Basically, the way the system is designed is the

1    witness has an almost irresistible incentive to please the

2    government.  You may hear that these witnesses are referred to by

3    law enforcement, once they turn, as what's called playing on Team

4    USA.  They have to, they have to testify.  They have to present

5    their testimony in a way that the government deems truthful in

6    order to receive the kind of credit with respect to their

7    sentence that they are so desperately seeking.

8            Now, with respect to Mr. Montgomery, and this is where

9    this becomes just so extraordinarily important, particularly from

10   our point of view.  We are not, some defense lawyers spend a lot

11   of time on kind of picayune little details during the course of

12   trials.  You know, little teeny inconsistencies between a

13   witness' testimony at trial and what the witnesses said

14   beforehand, let's say, in the grand jury or to a police officer,

15   or so on.  Mr. Kurland and I, we're not going to do that.  We

16   know your time is valuable.  We don't think it's effective or

17   appropriate, anyway.  So when we focus on something like that, we

18   submit to you it's going to be significant.

19           With respect to Mr. Montgomery.  And this is where all

20   these things that we've just been talking about sort of come

21   together, ladies and gentlemen.  Remember, the government needs

22   to prove, the government needs to prove with respect to the Tonya

23   Jones homicide that that homicide was in furtherance, in

24   furtherance of the RICO enterprise, the RICO enterprise that they

25   allege existed in this case.

1          Listen carefully to what Mr. Montgomery, during the

2     course of his trial testimony, listen carefully to what he tries

3     to give them in that regard.  In other words, listen carefully to

4     the extent to which his testimony supports the idea that the

5     government is pushing in this case, that that homicide was in

6     furtherance of this RICO, this alleged RICO conspiracy.

7          Listen carefully, for example, to whether Mr.

8     Montgomery tells you that his understanding was that, you know,

9     money was needed in order to pay for Mr. Martin's lawyer so that,

10    you know, the enterprise, the RICO enterprise could continue.

11         And then, when the time comes for his cross

12    examination, listen carefully to the prior statements that he

13    made on this subject, on the reasons, what he says are the

14    reasons for the Tonya Jones-Spence homicide before he had an

15    incentive to provide that evidence, that in-furtherance evidence

16    to the United States government.  That, from our point of view,

17    is probably going to be the most critical issue in this case.

18    And so I am very grateful to have had the opportunity to give you

19    ladies and gentlemen a little preview of it and to ask you to

20    focus hard on it.

21         And with that, I think I've taken up enough of your

22    time.  I thank you very much.  When all is said and done and this

23    trial is completed, Mr. Kurland and I will have another

24    opportunity to talk to you.  We look forward to that very much.

25    Thank you again.

1          THE COURT:  Thank you, Mr. Coburn.

2          Seems to me, Mr. Harding, that rather than bring in a

3    witness at this time, we probably might better take a slightly

4    earlier lunch.  Is that acceptable?

5          MR. HARDING:  Fine, Your Honor.

6          THE COURT:  Ladies and gentlemen, it's 12:30.  We will

7    recess now for the luncheon break.  Please leave your note pads

8    on your chairs as you depart the courtroom.  Do not have any

9    discussion about the case.  Obviously, you have not heard any

10   evidence at this point.  You only heard the opening statements of

11   counsel.  Continue to keep an open mind about all issues.

12         Please be back in the jury room at 1:45 and we will

13   proceed at that time.  The jury is excused until 1:45.

14         (Jury exits the courtroom.)

15         THE COURT:  Were you approaching the lectern, Mr.

16   Harding?

17         MR. HARDING:  Yes, I guess I was.  Your Honor, just one

18   issue that I tried to raise with defense counsel this morning but

19   didn't get a clear response on is when these police officers

20   testify this afternoon about their prior cases involving these

21   defendants, there's going to be an issue over whether they can

22   testify that the case resulted in a conviction or whether it was

23   nol prossed or whatever.

24         Obviously, the government, well, the government was not

25   intending to introduce either one because it's hearsay.

1          THE COURT:  Of course.

2          MR. HARDING:  I imagine that if we do that and don't

3     elicit that so and so was convicted, defense counsel may attempt

4     to introduce the fact that the case was ultimately nol prossed or

5     stetted or some other resolution was reached that was short of a

6     conviction.

7          And so I think we need, we need a ruling on this or

8     we're going to have objections this afternoon to virtually all of

9     the cops who are testifying.  The government's position is that

10    it's hearsay and it shouldn't come in.

11         THE COURT:  Counsel, it seems to me -- you may

12    approach, Mr. Kurland, while I give you my preliminary view -- it

13    seems to me that it is unacceptably unfair to the government to

14    require the government not to ask the question on direct, only to

15    have it brought out on cross.  Furthermore, it seems quite clear

16    to me that it's even unfair, notwithstanding the Court's

17    instructions to the jury, it's even unfair to the government to

18    have the question asked, have the government object to the

19    question in front of the jury, and have the Court sustain the

20    objection.

21         Either way, the potential for unfairness in front of

22    the jury that arises from an inference either that the defendant

23    was acquitted when he wasn't or that the government didn't want

24    the jury to know that a particular defendant was acquitted.  So

25    it seems to me Mr. Harding's point is well taken.  And so I need

1    to -- and frankly, without delving into the hearsay question, I'm

2    agnostic on the question.  But I do believe that the Court needs

3    to get a binding undertaking from counsel as to whether you want

4    it out, that is an acquittal or a nol pros, whether you want it

5    out in front of the jury or your consent not to have the jury

6    learn of the outcome.

7              Now, there's already been representations to the jury

8    and concessions, indeed, on the defense side, that a number of,

9    if not all, of the defendants, have prior convictions.  The jury

10   clearly knows that.  So these are essentially your tactical

11   questions that you are entitled to make.  But I think you have to

12   make them in the context of fairness to the government.  Mr.

13   Kurland?

14             MR. KURLAND:  Your Honor, I agree that there's

15   significant fairness concerns that affect both sides, but also

16   with respect to the fairness and the potential unfairness of

17   whatever misleading impression the jury would be left with.  And

18   I want to put aside for a minute the issue with respect to my

19   client's, the murder conviction, because that raises, that's

20   obviously, that's the, kind of the steroidal concern to the same

21   issue that's been lurking for years.

22             But with respect to these, the drug issues and some of

23   the firearms issues that's going to come up today with respect to

24   the first slew of witnesses, a couple of things.  The first is

25   that this would be the time to renew a kind of a lurking 403

1    issue with respect to one of Mr. Gardner's arrests years ago,

2    which I believe did result in a conviction.  But that's the case

3    in which the gun is not present, a photograph of the gun is not

4    present, and the drugs are not present.

5           I was look at the transcript of that.  That's going to

6    come up, I think, through Detective Roseborough.  I would ask the

7    Court at this time, the Court kind of, "deferred" might be the

8    wrong word, but looking at the old transcripts of that from three

9    years ago, I think this would be the appropriate time to ask that

10   that event be excluded under 403 because there's no, the physical

11   evidence with respect to this 11 year old, I take that back, it

12   will be 10 years old next month, the decade old event, there's,

13   the government doesn't have the gun, the government didn't take a

14   photograph of the gun, the government doesn't have the drugs.  I

15   think that event should be excluded entirely.

16          THE COURT:  Well, let's back up.  I think you jumped

17   ahead.  It seems to me there ought to be, there ought to be a

18   uniform rule or ruling.  And that is, either the outcome of these

19   cases, whether nol pros, stet, conviction or acquittal, are

20   either going to be brought before the jury or they're not.  The

21   only way a conviction otherwise comes in is through the rules.

22   And I understand that there is no stipulations in this case.

23   Perhaps that's changed since I got Mr. Harding's letter.

24          But, for example, with respect to the one 922(g) count,

25   obviously, there's going to be proof of a prior conviction on the

1    part of, I believe, Mr. Martin.

2              So I don't want to get to the question of 403 and any

3    particular conviction before I hear from you and other counsel

4    who want to be heard as to whether you care about the jury's

5    learning of the outcome of these various cases.  And as I

6    understand it, some of them were acquittals maybe.  Some of them

7    were nol prosses.  Some were convictions.  It just seems to me

8    that if we're going to go down that path, it's preferable to go

9    down that path for all the defendants.

10             MR. KURLAND:  Absolutely.

11             THE COURT:  And all of the outcomes come out and the

12   government will be permitted to ask on direct.

13             MR. KURLAND:  Your Honor, here's my concern.  And this

14   is something that independent of whether Mr. Coburn and I have a

15   unified view on this that we obviously need to come to in a

16   minute or perhaps --

17             THE COURT:  Well, you own the mike now.

18             MR. KURLAND:  But this might be different from some of

19   the other defendants.  But my concern, particularly with respect

20   to my client, is that the jury is going to get, if they're not

21   told the outcome and they're going to hear these police officers

22   come in, my concern is the jury is going to come to the

23   conclusion, perhaps partly erroneous but perhaps somewhat

24   accurately, that the local court system here is a mess and the

25   feds have to swoop in and save the day.  And they are going to

1  assume incorrectly, for the gun charges as well as possibly the

2  homicide charge, that they were all acquittals.

3  THE COURT:  So your position is -- and you own the mike

4  now for Mr. Gardner -- your position is you want these outcomes

5  disclosed?

6  MR. KURLAND:  Well --

7  THE COURT:  I understand you're holding in reserve that

8  one, the one gun charge.

9  MR. KURLAND:  I would say yes only because --

10  THE COURT:  I don't really, I don't really, I don't

11  really need to know the because.

12  MR. KURLAND:  Well --

13  THE COURT:  You don't need to explain.

14  MR. KURLAND:  Your Honor, but partially if the

15  government in their opening, all right, made reference --

16  THE COURT:  Mr. Kurland, I don't need to know the

17  because.  It really was a yes or no question and you've answered

18  it yes, you want it out there.

19  MR. KURLAND:  And that would be because --

20  THE COURT:  And let me check with Ms. Rhodes.

21  MR. KURLAND:  Your Honor --

22  THE COURT:  Just one moment.  Just one moment.  It's a

23  survey.

24  MR. KURLAND:  I understand.

25  THE COURT:  Mr. Lawlor.

63

1          MR. LAWLOR:  Your Honor, I guess our preference is that

2    you, it depends on the facts and circumstances of each charge

3    pertaining to each defendant.  I don't know that the Court

4    should be --

5          THE COURT:  Well, but no, you're only there for Mr.

6    Mitchell.

7          MR. LAWLOR:  Correct.

8          THE COURT:  Forget other defendants.  What is your

9    answer as to Mr. Mitchell?

10         MR. LAWLOR:  My answer is it depends on what particular

11   case the government intends to introduce and how it intends to

12   introduce it.  For example --

13         THE COURT:  No.  Wait a second.  Wait a second.  Why on

14   earth would it make a difference, assuming Mr. Mitchell has some

15   convictions and some acquittals or some nol prosses, why does it

16   matter which was which?

17         MR. LAWLOR:  Your Honor, for example, there is, I

18   believe, a 1994 robbery case that Mr. Mitchell is alleged to have

19   been involved in that resulted in him spending some time at the

20   Hickey School.  I don't know --

21         THE COURT:  Well, we're not -- is that part of this

22   afternoon?

23         MR. HARDING:  No, Your Honor.

24         THE COURT:  No.  See.  So again --

25         MR. LAWLOR:  I don't think there's anything pertaining

64

1    to Mr. Mitchell this afternoon.  So I can sit down if we're only

2    talking about this afternoon.  But I'm just --

3            THE COURT:  But my question, really, Mr. Harding, was,

4    and perhaps you should approach the microphone and share it.

5    What I assumed was that, not just this afternoon but in general,

6    you were going to have, as we went through the motions hearings,

7    you're going to have a lot of law enforcement officers coming in

8    and testifying about arrests, searches, and questioning of a

9    number of defendants.

10           MR. HARDING:  Yes, Your Honor.

11           THE COURT:  Some of those cases were nol prossed.  Some

12   of those cases, arrests, resulted in acquittals, I assume.  Some

13   of those perhaps resulted in stets.  Some of those resulted in

14   convictions.

15           My point is I agree with you that it's not fair to the

16   government that you should be left with those acquittals being

17   brought out or those dismissals being brought out on cross

18   examination.  I understand your first position is that none of it

19   should come in, I think was your position, that neither the

20   convictions nor the acquittals nor the nol prosses should be

21   brought before the jury.  Am I right, that that's your first

22   position?

23           MR. HARDING:  That's right.  And part of the reason is

24   that some of these officers don't know the outcomes.

25           THE COURT:  Exactly.  Exactly.  So that's why I cut

1     immediately to the fairness issue.

2                 MR. LAWLOR:  Your Honor, can I jump in on that point?

3                 THE COURT:  Just one moment, Mr. Lawlor.  So apart from

4     what's hearsay and non-hearsay, even apart from whether the

5     officer remembers or not, if the defense intend to bring out

6     before the jury on some particular occasion, And by the way, he

7     was not convicted of that, was he?  Now the answer's either going

8     to be yes, he was, or no, he wasn't, or I don't remember.  And

9     I'm not, again, I'm trying to cut this short and, obviously, I'm

10    not succeeding at that.

11                My intent was to take a survey of defense counsel to

12    see if there was unanimity of opinion about, we don't want any of

13    it out.  They certainly are not going to be permitted to ask any

14    law enforcement officer a leading question such as, And my client

15    was acquitted of that, correct, without you first having an

16    opportunity to speak to the witness to see, one, whether they

17    remember, and frankly, in front of the jury to ask the question

18    yourself, not in a leading fashion.

19                But if they're going to bring out acquittals or nol

20    prosses, you should be entitled to ask all your witnesses to the

21    best of their recollection what was the outcome of the

22    prosecution after the arrest.

23                So now I understand Mr. Lawlor's position that he'd

24    like to do it on a case-by-case, arrest-by-arrest basis but I'm

25    not going to do it that way.

1          MR. LAWLOR:  Judge, can I say --

2          THE COURT:  You have the mike.  Move over, please, Mr.

3    Harding.

4          MR. LAWLOR:  Judge, in terms of the fairness issue, if

5    there were a case where we want to introduce the fact that a

6    charge was nol prossed and the Court's only concerned about

7    fairness, we would tell the government that and permit the

8    government --

9          THE COURT:  No. No.  Mr. Lawlor, a great offer.

10   Rejected like many great offers.  I'm not going to permit, the

11   fairness isn't resolved simply by permitting government to elicit

12   all the acquittals.  That's, that's not where we're going.

13         MR. LAWLOR:  Judge, you got to let me get my whole

14   answer out.

15         THE COURT:  Well, I saw your answer.

16         MR. LAWLOR:  You didn't, though.  You cut me off and I

17   had a lot more to my great offer and you cut it off halfway.

18         THE COURT:  What's the rest of it?

19         MR. LAWLOR:  If the Court is concerned about fairness,

20   then that is part of the resolution.  The other thing in terms of

21   the fairness issue is that it's already before this jury that

22   each and every one of these defendants has spent time in prison

23   on unrelated, on cases unrelated to one or at least not because

24   of these.  So they're going to be getting sort of part of that --

25   they have part of that information already.

1          THE COURT:  Not in the evidence.  We're talking about

2     witness testimony here.  Not talking about opening statements.

3          MR. LAWLOR:  But it will come in through evidence

4     because the government offered in opening, which they'll

5     necessarily be required to prove to the jury, that such and such

6     a defendant was out of the picture for X number of years because

7     he was in jail serving a sentence.

8          THE COURT:  That doesn't mean he was convicted of

9     something.  The government did not make clear whether someone was

10     being detained.  In fact, I've instructed this jury that the

11     defendants are, are detained pretrial.

12          MR. LAWLOR:  In this case.

13          THE COURT:  Look, Mr. Lawlor, I heard your offer.  It's

14     not going to be anything other than everything comes out or none

15     of it comes out.

16          MR. LAWLOR:  Judge, the final thing I want to say in

17     terms of Mr. Mitchell is that you're asking me at this point to

18     hit a moving target because I don't know what the government

19     intends to introduce as to Mr. Mitchell.  So I would like to --

20          THE COURT:  You know what Mr. Mitchell's records of

21     arrest --

22          MR. LAWLOR:  I know what his record of arrest is.  I

23     don't know what the government intends to introduce because some

24     of it, for example, what I discussed previously, is a robbery

25     when the man was a juvenile.  I may have something different to

1    say about that case, for example.

2              THE COURT:  Mr. Lawlor, Mr. Harding just said he's not

3    bringing that out.

4              MR. LAWLOR:  As an example of the fact that Your

5    Honor's asking me to hit a moving target.  I don't know what they

6    intend to introduce.

7              THE COURT:  Based on your answer, then, it seems to me

8    my ruling is going to be no witness will be permitted to ask

9    about the outcome of a prior arrest.  And I think that differs

10   from Mr. Kurland.

11             MR. LAWLOR:  That's not, that's not what we're asking.

12   So to the degree that that's the Court's ruling, we object to

13   that.

14             THE COURT:  Well, of course.  You want me to permit

15   you, permit the acquittals to come out.

16             MR. LAWLOR:  That's not true.

17             THE COURT:  And not the convictions.  That's clearly

18   what you want.  That's clearly what you want.

19             MR. LAWLOR:  That's not what I want.

20             THE COURT:  It's clearly what you want.  That's clearly

21   what you want.

22             MR. LAWLOR:  That's not what I want.

23             THE COURT:  Then you haven't expressed yourself very

24   well.

25             MR. LAWLOR:  That's not what I want.

69

1          THE COURT:  You keep talking about this juvenile

2     robbery instance.  Is there any basis for admitting that

3     evidence, Mr. Harding?

4          MR. HARDING:  Well, yes, Your Honor.

5          THE COURT:  And what's the basis?  What's the basis?

6          MR. HARDING:  It occurred within the time period of the

7     conspiracy and the enterprise, and it was an armed robbery which

8     is identified as one of the methods and means of this

9     organization.

10          THE COURT:  After 1994?

11          MR. HARDING:  Yes.  It is, it is an act that several of

12     these defendants took part in as well.

13          THE COURT:  Okay.  And who was convicted and who was

14     acquitted in that instance?

15          MR. HARDING:  I know that Mr. Martin and Mr. Mitchell

16     were convicted.  And I wasn't intending to call cops on this,

17     Your Honor.  But there's going to be an allusion to it when one

18     of our cooperators testifies.  That's the only reason I bring it

19     up.  In fact, Ms. Rhodes mentioned it in her opening.  She

20     mentioned that Mitchell was sent off to the Hickey School while

21     he was, while he was in high school.  That was the outcome of

22     that robbery case.

23          THE COURT:  All right.  Well, cooperators are different

24     from law enforcement officers who made an arrest.  Is the

25     cooperator someone who participated in the armed robbery?

1              MR. HARDING:  No.

2              THE COURT:  How does the cooperator know about it?

3              MR. HARDING:  The defendants told him about it.

4              THE COURT:  Which defendant?

5              MR. HARDING:  Mr. Mitchell and Mr. Martin, and I

6    believe also Mr. Gardner.

7              THE COURT:  So it's an admission as to the three of

8    them.

9              MR. HARDING:  Yes, Your Honor.

10             THE COURT:  I mean, how much detail are you talking

11   about getting into?

12             MR. HARDING:  Not any detail at all, really.  It's an

13   armed robbery.

14             THE COURT:  So they committed an armed robbery and Mr.

15   Mitchell ended up at Hickey School?

16             MR. HARDING:  Yes.

17             THE COURT:  See, I see that different from a law

18   enforcement officer testifying about an arrest and the processing

19   of a defendant and the seizure of some narcotics and what I

20   thought you and initially Mr. Kurland was addressing.

21             MR. HARDING:  I consider it different, too, Your Honor.

22   I'm just saying --

23             THE COURT:  It's clearly a difference.  So Mr. Lawlor,

24   with all respect, you weren't even addressing the issue that was

25   before me.

1          MR. LAWLOR:  Well, Your Honor, I think they're related

2    and I think this is the example of the government getting its

3    cake and eating it, too.

4          THE COURT:  Well, please.

5          MR. LAWLOR:  They want to introduce the fact that my

6    client purportedly told someone they did the robbery without

7    proving even the robbery ever occurred.

8          THE COURT:  It's an admission.  It's not hearsay.  When

9    Mr. Harding stood up, he started by saying he's concerned about

10   the hearsay.  It's not a hearsay if Mr., if Mr. Mitchell told a

11   cooperator that he committed a robbery and got sent to Hickey as

12   a result.  The government doesn't have to prove that an actual

13   robbery took place.

14         MR. LAWLOR:  Then I'll get a certified copy of the nol

15   pros for my client's arrest for narcotics offenses and there will

16   be no hearsay problem.

17         THE COURT:  How is that responsive to what I just said?

18         MR. LAWLOR:  Because Your Honor said you're concerned

19   about hearsay.

20         THE COURT:  I'm not concerned about hearsay.  What I

21   said was I don't want to talk about hearsay.  I started 20

22   minutes ago trying to survey counsel to see if there was

23   unanimity of opinion.

24         MR. LAWLOR:  There is not.

25         THE COURT:  About whether law enforcement officers who

1    had made arrests of the defendants over the last 16 years or

2    whatever it's been.  My understanding from the motions hearing is

3    that there were drug seizures, there were admissions, and that

4    the government intends to use those arrests as evidence of the

5    RICO conspiracy here.

6              MR. LAWLOR:  Right.

7              THE COURT:  So I don't care if a law enforcement

8    officer is saying, I think he was acquitted, or I think it was

9    nol prossed or, yes, he was convicted.  I don't care if you all

10   agree.  What I care about is the government being treated

11   unfairly.

12             My point was, and maybe I wasn't clear, if any of

13   counsel wish to bring out in cross examination of an arresting or

14   seizing officer what the outcome of the proceeding was --

15             MR. LAWLOR:  On behalf Mr. Mitchell.

16             THE COURT:  Just a moment.  My point is, if that's what

17   a lawyer wants to do, hearsay or not, I'm probably going to

18   permit the lawyer to do that, but the lawyer is going to have to

19   agree that the government can ask the same question.

20             MR. LAWLOR:  We're satisfied with that.

21             THE COURT:  That's all I was saying.

22             MR. LAWLOR:  Thank you.

23             THE COURT:  And I believe, Mr. Kurland, you're

24   satisfied with that.

25             MR. KURLAND:  Judge, with one, not side issue, but with

1    one kind of caveat to that.  With respect to Detective

2    Roseborough, I believe it's legitimate cross examination to ask,

3    to ask him IF it's true you don't have the gun to bring to court

4    today.

5             THE COURT:  Wait.  Wait.  Wait.  Wait.  Wait.  Wait.

6             MR. KURLAND:  That part --

7             THE COURT:  Wait.  Please wait.  Why do we care about

8    the gun, a photograph of the gun, or any such thing?  Why?

9             MR. KURLAND:  Because that's, that is part of the proof

10   of whether the event occurred.

11            THE COURT:  No, it is not.

12            MR. KURLAND:  Sure.

13            THE COURT:  It could be.  So would a videotape of it.

14   But we don't have a videotape of it, either.  We have a witness'

15   testimony that it occurred.

16            MR. KURLAND:  And commonly, there's going to be a

17   million, there's going to be several guns alluded to in this

18   case.  Many of the guns or photographs of the guns will be

19   introduced as evidence.  It's a legitimate cross examination

20   question to say, well, you took the gun, the gun went into police

21   custody?  Yes.  Do you have the gun?

22            THE COURT:  I'm not precluding that, I'm not precluding

23   that cross examination but I'm not going to exercise my

24   discretion under Rule 403, just because he doesn't have a

25   photograph of the gun, to prohibit the government from bringing

1    out the fact that a gun was seized.

2              MR. KURLAND:  By my concern is that with that type of

3    cross examination, the government then on redirect would say,

4    well, you don't have the gun, why not?  Well, because it was

5    destroyed after the conviction in state court.

6              THE COURT:  That's right.  It's part of some car

7    somewhere.  Right?

8              MR. KURLAND:  Might be.

9              THE COURT:  They don't put steel in cars any more, I

10   guess.  So what is --

11             MR. KURLAND:  But that relates to the larger issue

12   because I didn't want to be in a position where I asked a

13   question that somehow tripped up and fell into, opened the door

14   to a redirect by the government that would get into a prohibited

15   area with respect to finding out what happened with respect to

16   these charges.

17             The other issue that I'm concerned about independent of

18   this gun issue is that --

19             THE COURT:  Well, let's take them one at a time.

20             MR. KURLAND:  All right.

21             THE COURT:  Please.  Do you, on behalf Mr. Gardner, or

22   do you not agree with what Mr. Lawlor just agreed to with respect

23   to Mr. Mitchell?  That the government is permitted for every

24   arresting officer to inquire whether the officer recalls the

25   outcome of the arrest in respect to whether there was a

1    conviction, a nol pros, a stet, or an acquittal, or whether the

2    officer remembers at all?

3             MR. KURLAND:  I don't have a problem with the

4    government asking that question.

5             THE COURT:  I take that as a yes.

6             MR. KURLAND:  Yes.

7             THE COURT:  All right.  Would Mr. Crowe or Mr. Pyne or

8    Mr. Martin or Mr. Flannery approach the lectern, please, so that

9    we can --

10             MR. KURLAND:  Judge --

11             THE COURT:  Just step aside for one moment.  I'll come

12    back to you.

13             MR. KURLAND:  Thank you.

14             THE COURT:  Mr. Martin.

15             MR. MARTIN:  I'm not sure this even affects me.  I

16    don't have any acquittals that I would be worried about.

17             THE COURT:  Okay.

18             MR. MARTIN:  But I don't want Mr. Harding asking the

19    question of the arresting officer about what happened.  I want

20    him to have to prove what happened for the necessary convictions

21    on Mr. Harris's part.  There's two adult convictions.  I don't

22    want him to be able to ask the question of the arresting officer.

23             THE COURT:  And presumably --

24             MR. MARTIN:  Because I don't have any, there's no quid

25    pro quo in this for me.

1            THE COURT:  Right.  So you won't be asking --

2            MR. MARTIN:  No, sir, I will not.

3            THE COURT:  -- as to what the outcome was?

4            MR. MARTIN:  That's correct.

5            THE COURT:  So I think I can accept that as a

6    modification of my preliminary ruling.

7            MR. MARTIN:  Thank you, Your Honor.  Mr. Crowe.

8            MR. CROWE:  Your Honor, on behalf of Mr. Martin, we

9    don't object to the government's asking the question.

10           THE COURT:  Okay.  All right.  So Mr. Harding, here's

11   where we are.  With respect to any of the miscellaneous arrests

12   of any defendant, with the exception of Mr. Harris, you are free,

13   if you choose, to inquire of the officer, by the way, do you

14   recall how the case turned out, or what happened to the case?

15   Obviously, it's up to you whether you ask that question, but

16   you're not limited only to convictions.  You're not limited to

17   acquittals.  You can ask it when and as you choose to ask it.

18           MR. HARDING:  Thank you, Your Honor.

19           THE COURT:  With the exception of Mr. Harris.  All

20   right.  Mr. Kurland.

21           MR. KURLAND:  The related concern that I have with this

22   whole line, issue, is I'm concerned that the jury does not get a

23   misleading impression that everybody's acquitted with respect to

24   this.  Part of that concern, we submitted, Mr. Coburn and I

25   submitted a couple of days ago a proposed jury instruction

1    concerning dual sovereignty issues, which probably needs a little

2    refinement.  To the extent that there's a concern no matter how

3    this issue is resolved here, one of the ways the Court can handle

4    that is to give a type of a dual sovereignty instruction, to give

5    the jury just the legal framework as to how to evaluate or to not

6    make presumptions one way or another with respect to the other

7    charges.  That will go a long way toward resolving a lot of my

8    concerns regardless of how the evidence comes in with respect to

9    these things.  I take it that's still on the Court's --

10           THE COURT:  Absolutely.  It's in my instruction file.

11   While you have the lectern, Mr. Kurland, where do we stand now --

12   and Mr. Coburn, you may need to approach the lectern with your

13   co-counsel -- where do we stand, as you understand it, with

14   respect to Mr. Gardner's state conviction for the Tonya Jones

15   Spence?

16           I'm not asking you and Mr. Coburn to disclose anything

17   you can't disclose.  But I really need to, I need to try to come

18   to grips with that once and for all.

19           MR. KURLAND:  The current state of the rulings, as far

20   as I understand it, was that, that the Court was, had, the Court

21   had ruled that it couldn't come in even if we wanted to use it,

22   to deal with the government's motives in the case, and it

23   couldn't come in specifically as an issue with respect to

24   assessing Will Montgomery's credibility.  But it was an open

25   question as to whether or not the Court would permit it if the

78

1    way that the transcripts came in, whatever, that the jury might

2    be left with a misleading impression.

3                THE COURT:  Okay.  I think that's a very fair --

4                MR. KURLAND:  That there was an acquittal.  And Mr.

5    Coburn and I had not yet -- there are, Barry, we had not yet come

6    to the conclusion, because the Court hadn't required us yet, for

7    us to definitively say whether or not we were going to pursue it,

8    largely because the Court's ruling was such that we almost have

9    to see how the transcripts are dealt with, whatever.  And for us

10   then to make the argument as to what perception we think the

11   reasonable jury would be drawing at that time.

12               THE COURT:  Okay.  Now, having heard Mr. Coburn's

13   opening statement, it seems quite clear to me, or it seems clear

14   that very soon we're going to have to cross that bridge because,

15   as I understand Mr. Coburn's opening statement, essentially, it's

16   the kind of legal defense that I understand.

17               So let me hear from Mr. Coburn.  What do you intend to

18   do, Mr. Coburn, to shore up your argument to the jury that this

19   is not a federal matter whatsoever?

20               MR. COBURN:  Well, I have to tell Your Honor just very

21   candidly, I mean, this issue is one that Adam Kurland and I have

22   been debating for years.  We've had lunch and dinner, you know,

23   sat around and talked about it just ad nauseam.

24               Mr. Kurland sort of thinks outside the box and I think

25   his point in terms, I think his concern is entirely legitimate,

1    that if the jury doesn't know about the state conviction, that

2    they're going to think that he has to be convicted federally

3    because the state system, you know, quote-unquote, "didn't work."

4            THE COURT:  And if the jury doesn't know, it may well

5    undermine your legal defense here.

6            MR. COBURN:  Right.  But, of course, the other side of

7    the coin is if they do know, then they know they're dealing with

8    a convicted murderer and that can affect their judgment in a way

9    we're not really looking for, either.

10           Frankly, it's a real terrible conundrum in this case.

11   I don't want to tell Your Honor that we have a firm conclusion on

12   it when we really don't, but I know that's frustrating to the

13   Court because we do have to come to a conclusion.

14           THE COURT:  It's not so much frustrating.  I just don't

15   want to be surprised by anything.

16           MR. COBURN:  Absolutely.

17           THE COURT:  I assume we're not anywhere near that issue

18   evidentiary in terms of the witnesses today and tomorrow?

19           MR. COBURN:  We're not.

20           THE COURT:  Is that fair, Mr. Harding?

21           MR. HARDING:  We're not near the evidence --

22           THE COURT:  Move to the, move to the mike, please.

23           MR. HARDING:  We're not presenting any evidence

24   relating to that homicide today.

25           THE COURT:  This week.

1          MR. HARDING:  Or this week, yes.

2          THE COURT:  All right.  So as soon as you can, Mr.

3    Coburn, Mr. Kurland, have dinner again and hash it out.  And

4    let's figure out a way, consistent with the government's

5    objection, if that's going to come in, let's just get it out

6    there so I don't have to anticipate too much.

7          MR. COBURN:  Absolutely, Your Honor.

8          THE COURT:  All right.  Thank you.  We're in recess now

9    until 2 p.m.

10          (Recess at 1:03 p.m.)

11          THE COURT:  Please be seated.  Good afternoon.  Ms.

12   Rhodes, would you approach the microphone, please?  Apparently,

13   there's a juror who may be familiar with your Mr. Lynch.  What is

14   his first name again?

15          MS. RHODES:  I don't recall, Your Honor.

16          THE COURT:  Can you check with your client?

17          MS. RHODES:  I don't know, Your Honor.

18          THE COURT:  Do you know how old he is?

19          MS. RHODES:  I know that he was there in about '96,

20   '95, '96.

21          THE COURT:  Working at Hickey?

22          MS. RHODES:  Yes.  And I know he was still there, I

23   believe, a couple years later.  I'm not the person who had dealt

24   with him, though, so I don't --

25          THE COURT:  And you expect him to be a witness in the

1    case?

2            MS. RHODES:  Yes, Your Honor.

3            THE COURT:  All right.  Well, Juror Number Nine has

4    indicated that apparently his son has a personal trainer who

5    evidently this juror fairly immediately connected from your

6    opening statement, I guess to Hickey School, as the person who is

7    Herb Lynch, Herbert or Herb Lynch.

8            MS. RHODES:  Your Honor, we could find out, actually,

9    just in a few minutes, by contacting, making a couple of phone

10   calls.

11           THE COURT:  Okay.  Perhaps you can, you don't have to

12   do it right now.  And I won't take any action to make inquiry at

13   this point.  But if you could, during the overnight, look into

14   this and see if the person who is expected to be your witness is

15   operating a form of personal training business.

16           MS. RHODES:  In what area?  Geographically, I mean.

17           THE COURT:  I think here in Baltimore somewhere.

18   Actually had his business card because the juror had a business

19   card, and I seemed to have misplaced it even as I was coming out

20   here.  I think I stuck it in one of my papers.  I just had it.

21   Let's not worry about it any more.  But it was, I think, the

22   business card had an address of one of the local fitness centers.

23           MS. RHODES:  Very well.  We'll check into it.

24           THE COURT:  So you'll look into it and we'll see if it

25   could possibly be a different Mr. Lynch.  And if not, make

1   inquiry of the juror.

2           MS. RHODES:  Thank you, Your Honor.

3           THE COURT:  All right.  We'll have the jury out,

4   please.  Oh, here it is.  New Altitudes.  Does say altitudes, not

5   attitudes.  New altitudes, Herb Lynch, Certified Personal

6   Trainer, up in Bel Air.

7           MS. RHODES:  Thank you, Your Honor.

8           THE COURT:  I'll have Belinda give you a copy of the

9   card.

10          MS. RHODES:  Thank you.

11          THE COURT:  Okay.

12          You'll recall, as I read the list of witnesses, as now,

13  you didn't recall the first name of your witness, and I just

14  described him as Coach Lynch from the voir dire.

15          MS. RHODES:  Right.

16          (Jury enters the courtroom.)

17          THE COURT:  Please be seated, ladies and gentlemen.

18  The government may call its first witness.

19          MR. HANLON:  Thank you, Your Honor.  The United States

20  calls Officer Joseph Goldberg.

21      OFFICER JOSEPH GOLDBERG, GOVERNMENT'S WITNESS, SWORN

22          THE WITNESS:  I do.

23          THE CLERK:  Be seated.  Speak directly toward the mike.

24  State your name and spell it for the record, please.

25          THE WITNESS:  Joseph Goldberg.  J-O-S-E-P-H.

1    G-O-L-D-B-E-R-G.

2              DIRECT EXAMINATION

3    BY MR. HANLON:

4    Q    Sir good afternoon to you.

5    A    Good afternoon.

6    Q    Where do you work, sir?

7    A    I work in Baltimore City Police Department, Southern

8    District Operations Unit.

9    Q    How long have you been a Baltimore City Police officer?

10   A    I'm in my 33rd year.

11   Q    Now, you referred to something call the Southern District.

12   Can you tell us what the Southern District is?

13   A    Southern District is the portion of the city that goes from

14   Pratt Street, Inner Harbor, down to the county line, and it goes

15   over to Pulaski Street where it butts over to Southwest District.

16   Q    And is the entire city divided into districts by the city

17   police department?

18   A    Yes, it is.

19   Q    What kind of work have you done as a Baltimore City police

20   officer?

21   A    I've worked drugs, narcotics, patrol, juvenile initiative

22   and task force.  Just about everything.

23   Q    And directing your attention to the year 1997, a while back.

24   Were you working for the police department then?

25   A    Yes, I was.

DIRECT EXAMINATION OF JOSEPH GOLDBERG                84

1    Q    And what was your assignment?

2    A    I was a narcotics detective in the Southern District Drug

3    Unit.

4    Q    And how long did you work as a narcotics detective in the

5    Southern District, approximately?

6    A    The last time was '95 through 2000.  I did five years with

7    my last stint.  So I was like two years in the squad when this

8    incident occurred.

9    Q    Have you moved in and out of the drug enforcement work, into

10   other assignments from time to time as a police officer?

11   A    Yes, I have.

12   Q    Now, directing your attention, specifically asked you about

13   1997.  Let me ask you about September the 15th of 1997.  Do you

14   recall being on duty that day?

15   A    Yes, I do.

16   Q    And in preparation for your testimony, have you reviewed

17   your reports and other materials about the events we're going to

18   describe today?

19   A    Yes, I have.

20   Q    Although it's 11 years ago, do you feel comfortable

21   describing the event for us?

22   A    Yes, I do.

23   Q    What were you doing on duty on that particular day?

24   A    That particular day, I was with Zack Parker and Jesus Ortiz,

25   we called him J.  We were in plain clothes in an unmarked unit

Case 1:04-cr-00029-RDB     Document 673     Filed 06/08/09     Page 85 of 213

1    working narcotics in the southwest Baltimore area.

2    Q    And there's a particular event we're going to talk about.

3    What was the time frame of that event?

4    A    It was 1:40 in the afternoon in the 2000 block of McHenry

5    Street.

6    Q    Now, these other two men, individuals you described, they

7    also police officers?

8    A    Yes.  Well, one's had left the police department.  He's a

9    defense lawyer now.

10   Q    At the time they were police officers?

11   A    Yes, they were.

12   Q    So you weren't sitting in your car with a defense lawyer on

13   that day?

14   A    No.

15   Q    And I believe you may have already mentioned this, but your

16   car, was it marked or unmarked?

17   A    Unmarked.

18   Q    And were any of you in uniform?

19   A    No, plain clothes.

20   Q    And what were you out there doing on the, on McHenry?

21   A    We were working, doing some street rips, trying to work up

22   some cases.  Street rips meaning ride around, look for the

23   buyers, the dealers, the sellers, maybe try to set up on a point

24   of observation and see them going to the alley or to the car, to

25   their stashes and selling.  And we were just cruising around in

1    that mode, looking for street rips.

2    Q    Now, you mentioned something called street rips and you

3    talked about buyers and sellers and things.  Buyers and sellers

4    of what?

5    A    Narcotics.  Mainly heroin and cocaine.

6    Q    Now, you mentioned something called street rips and looking

7    for things, buying and selling.  What kinds of things did you

8    look for in terms of people's conduct on the streets that would

9    catch your attention?

10   A    Well, you could, well, I could, through my experience and

11   training, know the difference between the buyers.  They run

12   around, they got their money in their hand.  They're real

13   anxious.  They're sweating.  They need a fix.  And then you got

14   the dealers that stand out there, a lot of times it's two or

15   three of them.  You know, one has the drugs, one takes the money

16   and the other is a lookout and so forth.  So you get to know who

17   the players are and what role they play.

18        You take it from there and you just, a lot of times the

19   dealer, the buyers will take you to the dealers.  They'll go up

20   an alley, in a yard, behind a building, and they sort of lead you

21   to the dealers.

22   Q    So you sometimes follow people and then they encounter other

23   people and so forth?

24   A    That's correct.

25   Q    During the course of your work as a drug enforcement

1    officer, just ballpark, how many of these kinds of cases did you

2    work when you would watch the streets and look for, for street

3    level drug transactions?

4    A    Many.  Thousands.

5    Q    Now, on this particular day, did you, while you were

6    conducting your surveillance out on McHenry that day, did you see

7    something specific that caught your attention?

8    A    Yes, I did.

9    Q    What did you see?

10   A    I was riding with J Ortiz and Zack Parker.  It was their

11   car.  It was a black Cavalier.  And because it was their car and

12   they were partners, I was in the back seat.  I was riding with

13   them.  We were going westbound in the 2000 block of McHenry

14   Street.  We were going slow because we were looking.  The speed

15   limits on the side streets are I think 25 mile an hour, so we

16   were probably doing 15, 20 miles an hour, just cruising, looking

17   in the alleys and so forth.

18         Well, as we came westbound in the 2000 block of McHenry

19   Street, we could look down to the corner and we saw, it was later

20   identified as Shawn Gardner, with two other persons, a white

21   female and a white male.  I don't remember their names.  But they

22   were just local people that lived there.  They were drug users

23   that lived in that area.

24   Q    You saw an individual you identified as what name?

25   A    Shawn Gardner.

1    Q    Now, this is, again, several years ago, Detective.  If you

2    saw this individual again, do you feel you would be able to

3    identify him?

4    A    Yes, I would.

5    Q    And I've asked you to take an opportunity, and have you had

6    an opportunity to look around court and see if you see Shawn

7    Gardner here?

8    A    Yes, I did.

9    Q    If you do, please identify him by his location and his

10   clothing, if you would.

11   A    It's the gentleman at the very end of the table, white

12   shirt, wearing glasses.

13   Q    Your Honor, for the record, identifying the defendant, Mr.

14   Gardner.

15        THE COURT:  So noted.

16   Q    Now, Mr. Gardner was standing with two other people?

17   A    Yes, he was.

18   Q    Were these two individuals -- strike that.  Had you ever

19   seen Mr. Gardner prior to that day?

20   A    No, I have not.

21   Q    How about the two other individuals?  Had you ever seen them

22   prior to that date?

23   A    Yes.  Knew them from the area.  I think they live somewhere

24   on one of those blocks because we would always see them on the

25   corners and chase them off the corners and tell them to get away

1    from businesses and so forth.  They were drug users.

2    Q    What did you see on this particular day?  What did you do,

3    what did you see Mr. Gardner and those two other individuals

4    doing?

5    A    When we got about, we turned the corner off Monroe onto

6    westbound 2000 McHenry Street.  When we got about a third of the

7    way, block down, we looked cater-corner to the southeast corner

8    and I saw Mr. Gardner and these other two people standing there.

9    At that point, we couldn't see much.  It's just were huddled up.

10   Q    What distance were you from Mr. Gardner when you first

11   observed him and the two others?

12   A    Probably 90 to a hundred yards, most of that block length.

13   Q    So what happened next?

14   A    They were the only ones out there.  So we fixed, fixed on

15   them because the other two people, the buyers that we knew from

16   the area, was huddled up with him, next to him.  So we fixated on

17   them and we kept going down.  We stayed in our lane westbound.

18           When we got about halfway or two-thirds down the block,

19   I say we were, I don't know, 90 to a hundred feet, baseball

20   length.  Home plate to first base is 90 feet.  That's probably

21   about how far we were.

22           At that point, I could see Shawn Gardner had a plastic

23   sandwich bag in his hand.  And the white female -- now, he was

24   facing eastbound because we were coming west.  He wasn't facing

25   the crosswalk this way but he wasn't facing straight down the

1    sidewalk, either.  He was sort of facing cock-eyed out, you know,

2    just angled out like that.  As we were coming westbound, it

3    presented us a perfect view.

4         The female was on his left shoulder facing this way,

5    in.  The white male was on his right shoulder standing here,

6    facing in.  And as he had the bag in front of him, like this,

7    either looking out or getting ready to take something out, they

8    were both hunched over looking, very, very anxiously, very

9    excited, you know, what he had in that bag.

10   Q    Officer, let me stop you for a minute.  You mentioned it was

11   a sandwich bag, it looked like?

12   A    A plastic bag, yes.

13   Q    Was it clear?

14   A    Yes.

15   Q    From that distance, you just described at one point you were

16   about a first base length's away, were you able to see from that

17   distance the contents of the sandwich bag?

18   A    No, not really.

19   Q    You also mentioned that there were two other people around.

20   Is there any possibility, do you remember, might there, was there

21   anyone else near them on the block or anything like that?

22   A    No.  There was no one else around.  And from that, on the

23   south side of the street, when we first made contact with them,

24   three quarters of a block up, that that whole side of the block,

25   there were no cars parked there.  And there was just nothing

Case 1:04-cr-00029-RDB     Document 673     Filed 06/08/09     Page 91 of 213

1    there, nobody on the sidewalk.  And we could just see all the way

2    down.  It was just those three on the corner.

3    Q    And what were the conditions like that day?  Was it rainy,

4    sunny, cloudy?

5    A    Bright sunny, bright day.

6    Q    You mentioned at one point you had a clear view of Mr.

7    Gardner.  Was there anything obstructing your view, cars or

8    anything like that?

9    A    No, not at all.

10   Q    Based on what you've been able to see -- well, strike that.

11   You saw Mr. Gardner and we've described the sandwich bag.  What

12   action did you take?

13   A    As we got within 90 feet of the defendant and the other two

14   people, we saw the bag.  We knew it was a drug deal going down.

15   He was getting ready to serve these two people that we know to be

16   heroin users.

17          We crossed the yellow line and went right into the

18   parking lane, right to them.  As we crossed the yellow line and

19   hit the crossing lane, we cut that roughly 90 feet, if it was, in

20   half.  When we got about 30, 40 feet, I would say, as we got into

21   the parking lane, all three of them looked up at us.

22   Q    Did you actually make contact, you personally make contact

23   with Mr. Gardner and the two others?

24   A    Meaning?

25   Q    Did you actually, were you facing them or did you actually

1  make eye contact?

2  A    Yes.  I was, the point I'm talking about, I was meet in your

3  way.  They looked up at us.  I looked at them.  He's got the bag.

4  White female and male, both, they sort of came from looking in

5  and opened up and all three were facing us, look at us.

6  Q    What happened next?

7  A    Shawn Gardner just very casually just cupped the bag,

8  muffled it up, turned, put it down in front of his pants as he

9  turned to his right.  And I could see this, well, the frontal

10  part.  Then as he turned to go up the steps into the store, I

11  could see his left shoulder.  He put the bag in the front of his

12  pants, pulled his shirt over, and just very casually walked up

13  into the store.

14  Q    How about his two companions?

15  A    They took off at that point.  They took off running.

16  Q    Did you or your two police colleagues follow any of them?

17  A    No.  Well, I followed Shawn Gardner into the store.

18  Q    And did you catch up to Mr. Gardner?

19  A    Yes.  As soon as he went in the store, I was one step behind

20  him.  As he actually broke the threshold of the store, stepped

21  in, I ran behind him and grabbed him, and placed him under

22  arrest.

23  Q    Let me ask you something.  As you were approaching with your

24  vehicle, at some point you got out of your vehicle, is that

25  right?

1    A    That's correct.

2    Q    Was there anything on the vehicle or in any of your

3    clothing, you were in plain clothes, did any of you have badges

4    on or anything that identified you as police officers?

5    A    I don't remember.  But I will say as habit, we would have

6    our vest on and our badges displayed on a chain.  So I would say

7    yes, we probably were identifiable.

8    Q    When you caught up to Mr. Gardner, you mentioned you placed

9    him under arrest?

10   A    Yes.

11   Q    Did you identify yourself as a police officer at that time?

12   A    Yes.

13   Q    And was Mr. Gardner compliant with you?  Did he follow your

14   instructions?

15   A    Yes.  He was very cooperative.

16   Q    What did you do with Mr. Gardner?

17   A    As soon as I grabbed him, I said, I'm a police officer,

18   you're under arrest.  Put the cuffs on him.  Officers Parker and

19   Ortiz came running in the store behind me.  I turned him around,

20   sort of flipped up his shirt a little bit so I could see where

21   the dip area was, his belt line.  And the bag was partially

22   sticking out.  He didn't stuff it all the way down in his pants.

23   He just basically put it behind the belt line.  I just grabbed

24   the bag and pulled it out.

25   Q    When you grabbed that bag and pulled it out, describe what

1    you saw.

2    A    I -- excuse me one second.  I pulled the bag out.  There was

3    a plastic bag containing three blue gel caps of white powder

4    substance.

5    Q    Now, the gel caps inside the bag, if I understand you

6    correctly, was the powder substance inside the gel caps which

7    were in turn inside bag?

8    A    Yes.

9    Q    Had you ever seen powder like this on any other times as a

10   detective or as a police officer?

11   A    I don't recall you.  I don't exactly recall the content.

12   The blue capsules are odd.  I don't think I've ever gotten blue

13   capsules before.  They were always clear capsules to that point.

14   Q    Have you had any other cases where you recovered any type of

15   narcotics that were in a gel capsule?

16   A    Yes.

17   Q    And what type drug, in your experience, is typically sold or

18   used in that way?

19   A    Almost 100% of the time it was heroin.

20   Q    We described the sandwich bag.  Did you conduct any other

21   search of Mr. Gardner's person?

22   A    Yes.  He was searched incident to arrest, where $126

23   currency was seized from his person.

24   Q    Now, the gel capsules and the money, did you submit those

25   items into evidence?

1   A    No.  Officer Fred Roussey did.  He was my partner.

2   Q    You gave to another police officer.  He, in turn, submitted

3   it?

4   A    When we got into the station, he was there.  And he

5   submitted the drugs and money as I did the paperwork and booking

6   of Mr. Gardner.

7   Q    And you already indicated Mr. Gardner was booked and placed

8   under arrest, is that right?

9   A    Correct.

10  Q    May I approach the witness, Your Honor?

11        THE COURT:  You may.

12  Q    Officer, I'm showing you for identification here what's been

13  marked as Government's Exhibit L-2.  Do you see L-2?

14  A    Yes.

15  Q    Without getting into the specifics of the information on the

16  form, can you tell us what type of form Government's Exhibit L-2

17  is?

18  A    This is an evidence chain of custody, laboratory report,

19  which we fill out for all CDS cases, narcotics cases that we,

20  that we get.  Excuse me.  On this form, there are two

21  identifiable numbers on there.  One's the complaint number of the

22  case, which is 9-I-10141 for this incident.  And there's also a

23  property number assigned to that.  So those two numbers describe

24  and depict this case as being my case.  Those drugs were

25  recovered by me.

1    Q    If you would, for the record, could you please tell us what

2    the property number is for this particular item?

3    A    The property number is 97045345.

4    Q    And the particular item that you submitted to the lab for

5    analysis, can you just please tell us what the item was, not the

6    results, but what the item was?

7    A    We break it down to items.  Item one was a plastic bag and

8    item two would be the three blue gel caps containing white

9    powder.  Actually, on this, Fred Roussey wrote item one and item

10   three.  It should have been item two, with three gel caps.

11   Q    Thank you, Officer.

12        And I gather, Officer -- forgive me, Your Honor -- I

13   gather, Officer, that the procedure is that recovered drugs are

14   submitted by the officer to lab technicians then the lab analysis

15   figures out what they are, is that right?

16   A    Right.  The chemists do.  They test.

17        MR. HANLON:  Nothing further, Your Honor.

18        THE COURT:  Any questions, Ms. Rhodes or Mr. Lawlor?

19        CROSS EXAMINATION

20   BY MR. LAWLOR:

21   Q    Thank you, Your Honor.  Officer Goldberg?

22   A    Yes, sir.

23   Q    Did you say this was in the Southern District of the city,

24   where this arrest occurred?

25   A    It was right on the borderline.  The Southern District a few

Case 1:04-cr-00029-RDB   Document 673   Filed 06/08/09   Page 97 of 213

1    years back used to stop at Monroe Street and southwest would pick

2    up west of there.  But it switched later to Pulaski Street, at

3    the 2100 block is now the dividing line.

4    Q    Okay.  It's not -- sorry.  Go ahead.

5    A    So I don't remember if it changed at that time or not.  But

6    we were right on the line.

7    Q    It's not near Park Heights, though, is it?

8    A    No, no.  Nowhere near that.

9    Q    Far away?

10   A    Yeah, a whole half a city away, yeah.

11   Q    Okay.  Thank you very much.

12            THE COURT:  Any other counsel have questions?

13            CROSS EXAMINATION

14   BY MR. COBURN:

15   Q    Yes, Your Honor.  Thank you very much.  Officer Goldberg,

16   good afternoon, sir.

17   A    Good afternoon.

18   Q    You indicated that aside from -- thank you very much.

19   Sorry.  You indicated that aside from what you believed to be

20   illegal drugs that were seized from Mr. Gardner, there was also a

21   sum of money, right?

22   A    Correct.

23   Q    Did you say that the amount of money that was seized from

24   him was $126?

25   A    Yes.

1   Q    The date of this incident, again, would you tell us, just to

2   be sure?

3   A    September 15th, 1997.

4   Q    So that's more than ten years ago?

5   A    Correct.

6   Q    You indicated that when you encountered Mr. Gardner, when

7   you made the observations that you testified about in response to

8   the prosecutor's questions, that he was accompanied by a white

9   female and a white male, is that correct?

10  A    Yes.

11  Q    And you indicated that, based on your own experience in that

12  area, you knew those two individuals to be drug users, is that

13  right?

14  A    Yes.

15  Q    Okay.  So you didn't encounter anyone by the name of Willie

16  Mitchell at the time of this incident, right, sir?

17  A    No, I did not.

18  Q    Or Shelton Harris?

19  A    No, sir.

20  Q    Shelly Wayne Martin?  None of those people had anything to

21  do with what you're testifying about today, right, sir?

22  A    No, sir.

23  Q    Now, after you made this arrest, did you try to see that the

24  matter was, was prosecuted, was addressed in some way by some

25  prosecutive entity?

1    A    Did I try to see?  He was charged.

2    Q    That's what I'm getting at.  Sorry about that.  He was

3    charged, right?

4    A    He was booked and charged with the possession of heroin,

5    yes.

6    Q    Now, was he charged federally or was he charged in the state

7    court?

8    A    He was charged state court originally.

9    Q    And that would have been by, would have been handled by an

10   Assistant State's Attorney, right?

11   A    Yes, sir.

12   Q    Okay.  Nothing further.  Thank you, sir.

13          MR. HANLON:  Just a moment, Your Honor.

14          (Pause in proceedings.)

15          REDIRECT EXAMINATION

16   BY MR. HANLON:

17   Q    Officer, you were asked about whether the case was charged.

18   Do you know one way or the other what the disposition of this

19   case was in court?

20          MR. COBURN:  Objection, beyond the scope.

21          THE COURT:  Overruled.  You may answer.

22   A    No, I do not know the disposition.

23   Q    Thank you, Officer.  Thank you, Your Honor.

24          THE COURT:  Thank you very much, sir.  You're excused.

25   Next witness.

1          MR. HANLON:  Your Honor, the United States, the United

2   States calls David Phipps.

3          DAVID PHIPPS, GOVERNMENT'S WITNESS, SWORN

4          THE WITNESS:  I do.

5          THE CLERK:  Be seated.  I need you to speak directly

6   toward the mike.  State your name and spell it for the record,

7   please.

8          THE WITNESS:  David Phipps.  D-A-V-I-D.  P-H-I-P-P-S.

9          DIRECT EXAMINATION

10  BY MR. HANLON:

11  Q    Mr. Phipps, good afternoon to you.

12  A    Good afternoon.

13  Q    What do you do for a living, sir?

14  A    I am in the private security business and recreation

15  business.

16  Q    Now, you were formerly a member of the Baltimore City Police

17  Department, is that right?

18  A    That's correct.

19  Q    When were you a police officer?

20  A    From 1987 to 2006.

21  Q    And you left the department in 2006.  What for?

22  A    I was eligible for retirement so I left to pursue other

23  careers.

24  Q    And just briefly.  While you were a police officer, what

25  kind of work did you do?

1    A    I did a few years in uniformed patrol.  I worked roughly 12

2    years in drug enforcement at various levels.  And I spent five

3    years, my last five years in Internal Affairs.

4    Q    Now, directing your attention to a particular date in

5    October of 1996, specifically October the 18th of 1996, you were

6    a police officer at that time, is that right?

7    A    Yes.

8    Q    Where were you assigned?

9    A    I was assigned to the Southwestern District Drug Enforcement

10   Unit.

11   Q    Now, the Southwestern District is a part of Baltimore City,

12   is that right?

13   A    That's correct.

14   Q    And what did you do as a Drug Enforcement Unit officer?

15   A    We handled anything from small, nuisance, drug-related

16   nuisance complaints to mid-level drug dealing in the area.

17   Q    Now, on this particular date, directing your attention to

18   October the 18th of 1996, around 11, 12:00 a.m., were you

19   actually working at that time?

20   A    Yes, I was.

21   Q    Where were you doing?

22   A    I was conducting surveillance in the 2100 block of West

23   Pratt Street.

24   Q    What was the purpose -- let me ask you this.  The

25   surveillance you were doing, was it part of an ongoing case?

1    A    Yes.

2    Q    Did it have anything to do with the case you're coming here

3    to court to talk about?

4    A    No, not at all.

5    Q    Totally different thing?

6    A    Correct.

7    Q    Were you in uniform or plain clothes?

8    A    I was in plain clothes in an unmarked vehicle.

9    Q    And about how long were you out there that morning, if you

10   remember?

11   A    It wasn't long.  I was probably on Pratt Street maybe ten

12   minutes.

13   Q    Now, at some point, you're there for a particular case.  Did

14   you see something that caught your attention and diverted it?

15   A    Yes.  I was sitting in a vehicle and I observed an

16   individual later identified as Donte Mitchell open the trunk of a

17   red Chevy Corsica, held up a clear, large freezer-type bag of

18   leafy plan material, which I believed was marijuana.

19   Q    Now, let me ask you and try to set the scene a little bit.

20   You're by yourself in an unmarked car, is that right?

21   A    That's right.

22   Q    When you're on the street conducting surveillance, isn't it

23   possible for people walking by to look at you and notice you

24   sitting there?

25   A    Yes.

1    Q    What do you do to avoid that?

2    A    You usually try to get distance and, a combination of

3    distance and the ability to blend into the neighborhood is

4    usually good enough.

5    Q    In this instance, you saw an individual that you later

6    identified by the name Donte Mitchell.  About what distance were

7    you, from you was Donte Mitchell when you saw him approach this

8    red car?

9    A    The Corsica was on the opposite side of the street from

10   where I was sitting.  So 20 feet roughly.

11   Q    Did he at any point look in your direction or do anything to

12   cause you to think he knew you were there?

13   A    No.

14   Q    Now, I'm going to ask you about, you've indicated that

15   ultimately you identified this person as Donte Mitchell based on

16   some events that happened later on in the day, is that right?

17   A    Yes.

18   Q    Ultimately, ultimately, were you able to identify or has

19   Donte Mitchell been identified by another name?

20            MR. COBURN:  Objection, hearsay, foundation.

21            THE COURT:  Overruled.  You may answer.

22            THE WITNESS:  Yes, he was.

23   BY MR. HANLON:

24   Q    Approach the witness, Your Honor?

25            THE COURT:  Yes.  If you would, sir, just tell us how

1    ultimately Donte Mitchell was identified, by what name.

2    A    He was identified as Shawn Gardner.

3    Q    Now, you've described the bag.  Let's talk about the bag

4    that you saw Mr. Gardner, identified that day as Mr. Mitchell,

5    take out of the car.  Were you able to tell from where you were

6    how he was able to access the vehicle?  Was there a key or

7    anything like that that he used, from that point?

8    A    I don't recall if I actually saw the key.  But he approached

9    the back of the vehicle and the trunk lid went up.  But I don't

10   recall if I actually saw the key in his hand.

11   Q    And he took something out?

12   A    Yes.

13   Q    And describe that object.

14   A    It was the large, clear freezer bag.  And it had a leafy

15   plant material in it.  And he just looked at it for a brief, few

16   seconds, and it went back in the trunk.

17   Q    And this green plant or leafy material, had you seen

18   material like that as a narcotics officer?

19   A    Yes, I have.

20   Q    And I think you've already mentioned this, but what did it

21   look like to you from your distance?

22   A    It looked like marijuana.

23   Q    Having seen that, you're surveilling, you're doing

24   surveillance on something else.  Did you sort of shift your

25   attention and begin to look in that direction?

DIRECT EXAMINATION OF PHIPPS                    105

1    A    Yes.

2    Q    What happened?

3    A    Shawn Gardner immediately closed the drunk, walked away from

4    the vehicle south through an alley off of Pratt Street, which

5    would put him on McHenry Street, one block south.

6    Q    And did you change your position when you saw Mr. Gardner

7    take that route?

8    A    Yes.  After he walked out of view, I drove a block down

9    Pratt Street eastbound, south on Smallwood, and parked near the

10   intersection, I think it was Smallwood and McHenry, where I could

11   see Gardner and another individual further down the street.

12   Q    So you're on McHenry at this point?

13   A    Yes.

14   Q    Do you remember what block of McHenry you were on?

15   A    I believe it was the 2100 block of McHenry.

16   Q    If I understand correctly, does McHenry and Pratt run

17   parallel to one another?

18   A    Yes.  Parallel.

19   Q    So you saw Mr. Gardner again.  Did you see what he did?

20   A    Yeah.  When I saw him again, he was standing on a corner,

21   some mouth of an alley on McHenry Street, standing there with

22   another individual.

23   Q    And that other individual, did you have a view of the other

24   individual that Mr. Gardner was talking to?

25   A    Yes.

1    Q     And ultimately, did you obtain a name that day for that

2    individual?

3    A     Yes.  He gave the name of Gary Baire.

4    Q     And then ultimately, ultimately, was Gary Baire identified

5    by another name?

6    A     Yes.  Through finger --

7               MR. COBURN:  Same objection, Your Honor.

8               THE COURT:  Overruled.  You may answer.

9               THE WITNESS:  Through fingerprinting he was identified

10   as Shelly Wayne Martin.

11   BY MR. HANLON:

12   Q     So there's two individuals.  Now, is there anyone else when

13   you first saw them in the area?  Were they interacting with

14   anyone else or just the two of them?

15   A     Just the two of them at first.

16   Q     How long did you watch them?

17   A     I would say total time 10, 15 minutes.

18   Q     And during that 10 or 15 minute period, approximately, what

19   did you see them do?

20   A     I saw people approach Gary Baire or Shelly Wayne Martin and

21   hand him what I believe was currency.  After doing so, Donte

22   Mitchell would reach under a trash can that was on the opposite

23   side of the alley, retrieve items, and hand them to the person

24   that handed Martin currency.

25   Q     About how many times, sir, did you see this procedure you

1    just mentioned where someone else is handing Mr. Martin something

2    and then Mr. Gardner or Mitchell, as he was identified that day,

3    goes to a trash can and gives something to this first person?

4    How many times did you see that?

5    A    I believe it was three different times.

6    Q    Now, had you, at that you were working as a drug officer.

7    Part of your duties involves watching street leveling encounters

8    with people?

9    A    Yes.

10    Q    Had you seen transactions like this before where there's one

11    person approaching, two other people, in the manner you

12    described?

13    A    Yes.  Hundreds of times.

14    Q    And what, from your training, from your experience, what did

15    you understand this kind of encounter to be?

16    A    I believed they were selling drugs.

17    Q    And after the third transaction or so, what did you do?  Did

18    you take any action?

19    A    Yes.  I called via police radio for a marked unit that was

20    in the area to assist me.  And Officer Kathleen Jackson arrived

21    within minutes.  I explained to her what the situation was.  And

22    we drove down McHenry Street and placed the two under arrest.

23    Q    Did you have any difficulty arresting Mr. Gardner or Mr.

24    Martin?

25    A    No.

1    Q    Did you, after making that arrest, did you conduct a search

2    of Mr. Gardner's person, the person you identified that day as

3    Donte Mitchell?

4    A    Yes.  He was in possession of the keys to the red Corsica,

5    which was an Enterprise rental vehicle.

6    Q    And I'm going to ask you about the keys in that car in a

7    moment.  Did you conduct any search of Mr. Martin's person, who

8    was identified that day as Gary Baire?

9    A    Yes.  He had $120 US currency.

10   Q    Now, were the, were Mr. Martin and Mr. Gardner placed under

11   arrest and transported away?

12   A    Yes.

13   Q    Sitting here today, do you have any knowledge, or do you

14   know what, if anything, happened in court with that case?  Do you

15   know?

16   A    No, I have no idea.

17   Q    At some point, you had a car key.  Did you return to that

18   red Corsica?

19   A    Yes.  I returned to the Corsica, recovered the large

20   freezer, clear bag out of the trunk.  And it was found to contain

21   20 smaller bags of marijuana.

22   Q    Green plant-like substance?

23   A    Yes.

24   Q    Did you take the items you described, the key, the money,

25   and this bag of green plant-like substance and submit it into

1    evidence?

2    A    Yes.

3    Q    And if you did, did you note down the license plate for that

4    red Corsica?

5    A    I'd have to refer to the towing report.

6    Q    If it will refresh your recollection, go ahead.

7    A    Yes.  The tag was BMV-533, which is a Maryland registration.

8    Q    And you indicated, I believe, that it was a rental vehicle?

9    A    Yes.

10   Q    Your Honor, may I approach the witness?

11        THE COURT:  Yes.

12   Q    And sir, I'm showing you for identification what has been

13   marked as Government's Exhibit L-1.  Without getting into the

14   specific contents, can you tell me what L-1 is?

15   A    Yes.  It is a submission form for controlled dangerous

16   substances.

17   Q    In this case, is this the form you filled out for your

18   suspected marijuana that you just talked about?

19   A    Yes.

20   Q    Just by way of the form, again, it's marked for

21   identification.  It has your name on there as investigating

22   official?

23   A    Correct.

24   Q    And also has a complaint number.  Does that complaint number

25   on the lab form correspond to the complaint number that you did

1    for this case?

2    A    Yes.

3    Q    And for the record, what is that complaint number?

4    A    It is 8J as in John 13653.

5    Q    And there's also a property number labeled for this

6    submission of a clear plastic bag and 20 Ziploc bags of a leafy

7    plant material?

8    A    Yes.

9    Q    What's the property number?

10   A    The property number is 96045852.

11   Q    Just a moment, please, Your Honor.  Nothing further, Your

12   Honor.

13            THE COURT:  You may cross examine.

14            CROSS EXAMINATION

15   BY MR. LAWLOR:

16   Q    Mr. Phipps, good afternoon.

17   A    Good afternoon.

18   Q    Could you remind me of the intersection where you placed Mr.

19   Gardner and Mr. Martin under arrest?

20   A    Yes.  It was McHenry near Smallwood.

21   Q    Okay.  And is that in the southern part of the city?

22   A    It's officially part of the Southwestern District.

23   Q    Okay.  And it's nowhere near Park Heights or Randallstown,

24   is it?

25   A    No.

1    Q    Thank you.  No further questions, Your Honor.

2         CROSS EXAMINATION

3    BY MR. PYNE:

4    Q    Thank you, Your Honor.  Good afternoon, Mr. Phipps.  I'm Jim

5    Pyne.  I represent Shelly Wayne Martin.

6    A    Good afternoon.

7    Q    So even though these events occurred 12 years ago, it's your

8    testimony today that you have an accurate recollection of those

9    events as you sit here testifying from the witness stand?

10   A    Well, of course referred to my reports and notes, yes.

11   Q    Okay.  Well, I guess that's my question.  Are you just

12   reading into the record from your reports without an active

13   recollection or do you recall these events?

14   A    No, I recall them.

15   Q    Okay.  So you do have an active recollection?

16   A    Yes.

17   Q    Okay.  I'd ask you if you'd look around the courtroom here

18   today and see if you see the individuals you've talked about

19   today.

20   A    I couldn't identify either one.

21   Q    Okay.  So sitting there on the witness stand today, you

22   can't say if the person that's been identified as Shelly Wayne

23   Martin is here in the courtroom?

24   A    No, I can't.

25   Q    Okay.  Thank you.  Now, you were conducting surveillance

1    that day, is that correct?

2    A    Yes.

3    Q    And so you're trying to fit into the neighborhood, I believe

4    your testimony was?

5    A    Yeah.  That's the, usually the plan is to fit in where

6    you're not, your surveillance isn't compromised.

7    Q    If you were in a marked car with a police uniform on, it

8    would be tough to fit into the neighborhood?

9    A    Yes.

10   Q    So you didn't have anything on or about your person that

11   would have indicated you were a police officer, did you?

12   A    No.

13   Q    Okay.  And where exactly on Pratt Street were you stationing

14   yourself for surveillance?

15   A    I was in the 2100 block on the, it would be the north side

16   of Pratt Street, which the street runs east and west.

17   Q    Does it go both directions at that particular location?

18   A    I believe it's one way.

19   Q    Okay.  So it travels east or west?

20   A    It travels east only, I believe.

21   Q    Okay.  So your car, I take it, would have been facing

22   eastbound, is that correct?

23   A    Yes.

24   Q    All right.  And where exactly was this Corsica that you were

25   observing?

1    A    It was almost directly across the street.  I'd say a car

2    length ahead of me, but on the opposite, on the south side of the

3    street.

4    Q    Okay.  Do you recall how many lanes constitute Pratt Street

5    on that particular section?

6    A    I believe it's two parking lanes and two, two lanes to drive

7    through.

8    Q    Do you know if it's legal to park on both sides of Pratt

9    Street at that location?

10    A    I don't recall.  No.

11    Q    Okay.  And I believe you estimated that your distance away

12    from the car was approximately 20 feet.  Was that your testimony?

13    A    Yes.

14    Q    Now, do you recall that we had an earlier hearing in regards

15    to this case back almost three years ago now, in 2005, is that

16    correct?

17    A    Yes.

18    Q    And do you recall testifying on that occasion?

19    A    Yes.

20    Q    And do you recall at that time you testified that you were

21    approximately 40 feet away, isn't that correct?

22    A    I don't recall.

23    Q    Okay.  If I showed you a transcript of your testimony, would

24    that help refresh your recollection?

25    A    Yes.

1    Q    Going to have to break out my glasses here.  See if I can

2    try to use our high tech equipment here.

3              Question from the government.  You can read there.  How

4    far were you from the gentleman who was going into the trunk of

5    the Corsica when you first made the observation you described?  I

6    would say less than 40 feet.

7              Does that refresh your recollection?

8    A    I guess that's what I said, yes.

9    Q    Okay.  Well, as you sit here today, what is your

10   recollection?  Do you think 40 feet is correct?  Do you think 20

11   feet is correct?

12   A    I'd have to say between 20 and 40.

13   Q    Okay.  And what drew your attention to him was you saw him

14   going into the trunk of the car, is that correct?

15   A    Yes.

16   Q    And he pulled out a plastic freezer bag?

17   A    Yes.

18   Q    And what exactly did you see inside this freezer bag?

19   A    I could see a, a leafy plant material.

20   Q    Okay.  Was it just loose, leafy plant material?

21   A    I couldn't tell if it was loose, but it was clear.  It

22   filled the whole bottom of the bag.

23   Q    Well, you later recovered this, is that correct?

24   A    Yes.

25   Q    And what ultimately did you find when you recovered the bag?

1    A    That the leafy plant material was packaged in clear, smaller

2    Ziploc bags.

3    Q    And can you describe how big these Ziploc bags were?

4    A    I don't recall the size of them, no.

5    Q    Now, you worked in narcotics for a long period of time,

6    isn't that correct?

7    A    Yes.

8    Q    Isn't the normal smaller Ziploc baggies about one inch by

9    one inch?

10    A    It depends on the weight they're selling.  Some are, some

11    are the size of a, you know, a nickel, less than an inch.

12    There's various sizes that they're packaged in.

13    Q    Okay.  Is your testimony here today you don't even recall

14    how big the bags are that you recovered?

15    A    That's correct.

16    Q    But from a distance of 20 to 40 feet away, you could see

17    through the larger freezer bag, through the smaller Ziploc bags,

18    and see that it was a green, leafy substance in these small

19    Ziplocs?

20    A    Yes.

21    Q    Now, the individual who you described as Shelly Wayne Martin

22    or identified as Shelly Wayne Martin, did you ever see him go

23    near this Corsica?

24    A    No.

25    Q    What's the closest you ever saw Mr. Martin in regards to the

Case 1:04-cr-00029-RDB   Document 673   Filed 06/08/09   Page 116 of 213

1   Corsica?

2   A    I never saw him near it.  In fact, I never saw him until I

3   changed my location to McHenry Street, which was about a block

4   away.

5   Q    Okay.  So the closest you ever saw Shelly Wayne Martin to

6   this bag of green leafy material was a block away?

7   A    Yes.

8   Q    Did you ever see Mr. Martin go to this car?

9   A    No.

10  Q    Did you ever see him open the trunk of the car?

11  A    No.

12  Q    Did you ever see him touch that bag in any way?

13  A    No.

14  Q    At any time during this entire incident, did you ever see

15  Mr. Martin touch or possess any drugs?

16  A    No.

17  Q    What did you recover from the individual you've described as

18  Mr. Martin?

19  A    $120 US currency.

20  Q    Okay.  And can you describe how that, how you recovered

21  that, where it was on Mr. Martin?

22  A    It was in one of his front pants pocket.

23  Q    Okay.  Was there anything peculiar about the way in which

24  the bills were possessed?

25  A    Not that I recall, no.

1    Q    Okay.  Do you recall if they were rolled up or folded up and

2    just stuffed into his pocket or were they, was it a nice, crisp

3    one hundred dollar bill and a nice, crisp $20 bill?  Do you

4    recall anything about it?

5    A    No.

6    Q    Now, you testified that you have a clear recollection that

7    you observed three transactions, is that correct?

8    A    That's correct.

9    Q    Now, again, I'm going to refer to our earlier hearing.  Do

10   you recall what you testified to at that hearing?

11   A    No, I don't.

12   Q    If I showed you a transcript, would it refresh your

13   recollection?

14   A    Yes, it should.

15   Q    I have to try to do two different pages at this time.

16   Again, I believe this is me doing the questioning.  I can try to

17   get this under here.

18         You said there were a few transactions.  Can you

19   quantify that in any way?  Was it more than two, less than five?

20   You asked to refer to your notes, it was nine years ago, to see

21   if you could give an exact number.  And then continued on the

22   second page.

23         No, I don't recall the exact number.  I have been

24   working drugs for several years.  I know it would not have been

25   too many transactions for me to realize that I believed what was

1   going on.

2              Is that your testimony, do you recall?

3   A    Yes, I believe it is.

4   Q    So three years ago, you could not recall the exact number,

5   is that correct?

6   A    That's what I said then, yes.

7   Q    Okay.  But today you're sure that it was three transactions?

8   A    I believe it was three, yeah.

9   Q    Okay.  Now, you saw the individual that you indicated was

10  Mr. Gardner go to a trash can, is that correct?

11  A    Yes.

12  Q    And of course you searched that trash can, didn't you?

13  A    Yes, I did.

14  Q    And the immediate area thereabout?

15  A    Yes.

16  Q    And did you recover anything at all?

17  A    No.

18  Q    Did you have any idea what, in fact, they were doing out on

19  that street corner?

20  A    Yeah.  I believed they were selling drugs.

21  Q    What drugs?

22  A    I believe they were selling marijuana.

23  Q    Did you ever see the individual that was in the trunk of the

24  Corsica remove anything from that freezer bag?

25  A    No, I couldn't tell if anything was removed.

1   Q    You saw him left the freezer bag, look at it, and put it

2   back in the trunk?

3   A    Yes.

4   Q    And then you saw transactions that involved going underneath

5   the trash can, but there was nothing recovered from underneath

6   the trash can?

7   A    Correct.

8   Q    So they could have been selling any small object that they

9   were hiding underneath that trash can?

10  A    Yes, they could have.

11  Q    And other than believing it was drugs, you can't state with

12  any certainty here what exactly it was that they were selling?

13  A    No, I can't say exactly what they were selling.

14  Q    And you can't say with any certainty that they were, in

15  fact, selling anything, isn't that correct?

16  A    Well, I believe due to the money transactions they were

17  selling something.

18  Q    If I can have one second, Your Honor.  Nothing further.

19  Thank you very much, Mr. Phipps.

20           THE WITNESS:  You're welcome.

21           CROSS EXAMINATION

22  BY MR. COBURN:

23  Q    Good afternoon, Mr. Phipps.

24  A    Good afternoon.

25  Q    So you are testifying about an incident that occurred on

1    October 18th, 1996, right?

2    A    Yes.

3    Q    And based on your observations, your experience at that time

4    as a police officer, you believed that you were observing a

5    street sale of marijuana, is that correct?

6    A    That's correct.

7    Q    And when you, after the individuals in question were

8    arrested, $120 was recovered, is that right?

9    A    Yes.

10   Q    Now, the prosecutor asked you on direct examination whether

11   you knew how these cases were disposed of.  Do you remember that

12   question?

13   A    Yes.

14   Q    And you indicated that you did not, right?

15   A    That's correct.

16   Q    But you do know that they were handled in the state system,

17   right?

18   A    Yes.

19   Q    Thank you.  Nothing further.

20              REDIRECT EXAMINATION

21   BY MR. HANLON:

22   Q    Just briefly, Your Honor.  In your experience, sir, the

23   transactions that you were observing in which something was being

24   sold from underneath a trash can, what was that consistent with

25   in your experience?

1    A    That was consistent with street level drug distribution.

2    Q    Have you ever purchased anything yourself from underneath a

3    trash can or seen anything stored underneath a trash can for sale

4    other than narcotics at the street level?

5    A    No.

6    Q    Nothing further, Your Honor.

7             THE COURT:  Mr. Phipps, thank you very much.  You're

8    excused.  Next witness.

9             MR. HARDING:  Yes.  Your Honor, the United States calls

10   Peter Sullivan.

11            DET. PETER SULLIVAN, GOVERNMENT'S WITNESS, SWORN

12            THE WITNESS:  Yes, ma'am.

13            THE CLERK:  Speak directly toward the mike.  State your

14   name and spell it for the record, please.

15            THE WITNESS:  Detective Peter Sullivan.

16   S-U-L-L-I-V-A-N.

17            DIRECT EXAMINATION

18   BY MR. HARDING:

19   Q    Good afternoon, Detective Sullivan.

20   A    Good afternoon, sir.

21   Q    Can you tell us, Detective, how are you assigned now?

22   A    I'm assigned, I'm employed by the Baltimore Police

23   Department.  I'm assigned to the Office of the Police

24   Commissioner.

25   Q    Okay.  How long have you been a Baltimore City Police

1    Department officer or detective?

2    A    23 years, sir.

3    Q    And can you tell us, how were you employed, what was your

4    assignment back in 1997?

5    A    I was assigned to the Southwest District Flex Unit.

6    Q    Okay.  Let me call your attention to January 9th of 1997 at

7    around 9 p.m.  Were you on patrol that evening?

8    A    Yes, sir.

9    Q    Maybe you better tell the ladies and gentlemen of the jury

10    what the Flex Unit was, or is.

11    A    The Flex Unit is a group of officers or detectives that

12    generally work in plain clothes.  And they work at the discretion

13    of the district commander, which would be a major.  And at the

14    time we were tasked with going out into high crime areas and high

15    narcotics areas, where large amount of narcotics were sold on the

16    street level.

17          And we would try to, for lack of better term, arrest as

18    many violent offenders and street level drug dealers as possible.

19    Q    Okay.  When you were out at 9 p.m. on January 9th, 1997,

20    were you in plain clothes, as you say the Flex Unit usually was?

21    A    Yes, sir.

22    Q    And were you in a patrol car or on foot that evening?

23    A    I was in an unmarked patrol vehicle.

24    Q    Were you alone or were you with other officers?

25    A    I was with other officers.

DIRECT EXAMINATION OF SULLIVAN                    123

1    Q    Were they also in plain clothes or did some of them have

2    uniforms on?

3    A    No, sir.  We were all in plain clothes.

4    Q    Okay.  And were you doing what you told us the Flex Unit

5    usually does?  Namely, look for violent offenders and street

6    level drug traffickers?

7    A    Yes, sir.

8    Q    Okay.  Let me ask you, at around 9 p.m., did you make an

9    arrest of someone whose name you later learned was Shelly Wayne

10   Martin?

11   A    Yes, sir.

12   Q    Where was that arrest?

13   A    It was on Furrow Street.

14   Q    Okay.  I would like to show you a picture I have here, which

15   has been marked Government's Exhibit PH-10, and ask if you can

16   identify that?  May I approach the witness, Your Honor?

17          THE COURT:  Yes, of course.

18   A    Yes, sir, it's a picture of Furrow Street in the southwest

19   area of Baltimore City.

20   Q    Okay.  And does that depict the area of where this arrest

21   was made?

22   A    Yes, sir.

23   Q    Okay.  And while I'm here, I have a map right here, a

24   folding one.  I believe you've seen this.

25          It's already premarked.  Can you point it out to us?

1   A    Yes, sir.  It's --

2              THE COURT:  Just one moment.  Do we have a laser?  We

3   do.

4   Q    Great.

5   A    That would be Furrow Street right there.

6   Q    Okay.  You know what that area of town is called?

7   A    The general area, we kind of call it Pigtown.  But there's

8   also, I this the community association, I believe, is in Mill

9   Hill.

10  Q    That community association refers to a different name,

11  correct?

12             THE COURT:  Keep your voice up what while you're away

13  from the mike, Mr. Harding.

14  Q    I'm sorry.

15  A    The history --

16  Q    That community association refers to a different name,

17  doesn't it, Officer?

18  A    As far as Mill Hill or Pigtown?

19  Q    Yes.

20             THE COURT:  I'm sorry, Mr. Harding.  I think you're

21  obscuring Ms. Arrington's view.

22  Q    Oh, I'm sorry.

23  A    I would imagine.  But I believe the history of it is that

24  years ago that's where they had a lot of slaughter houses and

25  they had pigs in that area, and that's how it became known as

Case 1:04-cr-00029-RDB   Document 673   Filed 06/08/09   Page 125 of 213

1    Pigtown.

2    Q    Okay.  Why don't you tell us what happened when this arrest

3    occurred?  And I'll put this picture on the screen.  This is

4    PH-10, Your Honor, which the witness just identified.  Can you

5    see that picture?

6    A    Yes, sir.

7    Q    Would you describe for us what happened?

8    A    On, on that night, we were on what we called routine patrol.

9    We were riding around the area.  And as we were traveling up

10   Furrow Street, there was a car parked on, if I can, I guess, will

11   they see?

12         THE COURT:  Yeah.  I think if you touch that screen,

13   you can actually make marks on it.

14   A    Okay.  There were cars parked on, if you're looking at the

15   picture where the minivan is on the right-hand side of the

16   street --

17         THE COURT:  You can touch it.

18   A    Yes, sir.  Thank you.

19         THE COURT:  Did you touch it?

20   A    Yes, sir, I see it.

21         THE COURT:  Oh, I see.  It's working.

22         THE WITNESS:  There was a car parked on that side of

23   the street.  And there was a person sitting in the passenger side

24   of the car, who was later identified as the defendant, Shelly

25   Wayne Martin.  And there was a white male leaning into the

1    passenger side, and they appeared to be having a conversation.

2    BY MR. HARDING:

3    Q    Okay.  And so was Furrow Street one way at that time, the

4    way it appears to be in this picture?

5    A    Yes, sir.

6    Q    So you were coming up from behind and the vehicle was on

7    your right-hand side, is that right?

8    A    Yes, sir.

9    Q    Okay.  Tell us what happened after that.

10   A    After that, as the car that I was in pulled almost next to

11   the car, the white, the white male that was leaning in the car

12   noticed our presence and he quickly left his conversation and

13   started walking down Furrow Street.

14   Q    Okay.

15   A    And at that time you could look into the car that Mr. Martin

16   was sitting in.  And he made a motion with his hands as if he was

17   trying to conceal something in between the seats of the car.

18   Q    Okay.  Now, in this unmarked police vehicle that you were

19   in, where were you sitting in the vehicle?

20   A    I was sitting in the rear passenger seat.

21   Q    I see.  So you were on the right-hand side of your vehicle,

22   which would have been the side closest to the vehicle where Mr.

23   Martin was, is that right?

24   A    That's correct, sir.

25   Q    And you say you saw him make a movement with his hand that

1    made it look as though he was trying to conceal something?

2    A    Yes, sir.

3    Q    Could you tell where he was trying to conceal something?

4    A    It was, looked like he was going in between the seats of the

5    cars, of the car.

6    Q    Okay.  What happened after that?

7    A    Based on my experience and training and given the area, I

8    believed either Mr. Martin was, we had interrupted a drug

9    transaction and he was trying to conceal drugs or he was possibly

10   trying to conceal a weapon.  I got out of the car and used my

11   flashlight to light up the inside of the car that he was sitting

12   in, at which time I saw a plastic bag with numerous vials with a

13   white powder substance laying in the tray, it was like a tray,

14   the arm rest was up and it was like a tray in between the front

15   passenger seat and driver's seat.

16             At that time, Mr. Martin was taken out of the car and

17   placed under arrest and the drugs were recovered.

18   Q    Okay.  Now, this arm rest, you say it was between the front

19   driver's seat and the front passenger seat, is that right?

20   A    Yes, sir.

21   Q    And Mr. Martin was in the passenger seat.  So it would have

22   been on his left, is that correct?

23   A    That's correct.

24   Q    You say the arm rest was up and there was a sort of tray

25   there?

1    A    Yes.

2    Q    And that's where the bag was?

3    A    Yes.

4    Q    Okay.  Now, when you say you got out of the vehicle and Mr.

5    Martin was placed under arrest, you told us you got out of the

6    vehicle.  Did the other people in your police vehicle also get

7    out?

8    A    Yes.

9    Q    How many of you were there, if you recall?

10   A    To my recollection, there were three of us.

11   Q    Okay.  What was inside the plastic bag once you recovered

12   it?

13   A    There were 39 vials with a white substance.  And they were

14   bundled.  There were three bundles of 10 and one bundle of 9.

15   Q    Okay.  Did you know what the white substance was at that

16   time or not?  You said you thought it was a controlled substance.

17   A    Based on my experience, I believed it to be cocaine.

18   Q    Okay.  Did you recover anything else?

19   A    Yes, sir.  There was US currency recovered from the glove

20   box.

21   Q    Okay.  Would this have, if it was like most glove boxes, was

22   it on the passenger side dashboard?

23   A    Yes.  It was in front of where Mr. Martin was sitting.

24   Q    How much money was it?

25   A    If I could look at my notes, I can --

1    Q    Yes, you can.

2    A    It was $1618 of US currency, sir.

3    Q    Was anybody else in the car besides Mr. Martin?

4    A    No, sir.

5    Q    Do you know whether it was Mr. Martin's vehicle or not?

6    A    To my recollection, it was not Mr. Martin's vehicle.

7    Q    What makes you think that?

8    A    Because there were no keys to it.  Mr. Martin didn't have a

9    set of keys to the vehicle.

10   Q    Okay.  Did Mr. Martin give a name when you took him into

11   custody?

12   A    Yes, sir.

13   Q    What name did he give you?

14   A    He gave me the name Gary Baire.

15   Q    Okay.  And can you spell that for us?

16   A    Gary, G-A-R-Y.  Last name Baire, B-A-I-R-E.

17   Q    Okay.  When you, you say you found out later that his, his

18   name was Shelly Wayne Martin.  Is that after fingerprint

19   comparisons were made?

20   A    Yes, sir.  Actually, I didn't, I found out his name was

21   Shelly Wayne Martin when we prepped for the motions hearing.

22   Q    Okay.  Did you look over paperwork in your case file that

23   showed that?

24   A    Yes, sir.

25   Q    Okay.  Did you submit the 39 vials for drug analysis?

1    A    Detective Ring submitted them for me, yes.

2    Q    Okay.  Can you tell me the property number under which

3    Detective Ring submitted these 39 vials for analysis?

4    A    Yes, sir.  If I could look at my notes.

5    Q    By all means.

6    A    The property number is 97001748.

7    Q    And can you tell us the complaint number for this case?

8    A    The complaint number is 8A Adam 6214.

9    Q    I would like to show you what's been marked Government's

10   Exhibit L-3 and ask you if you can just tell us what that

11   document is.  I'm just asking what kind of document this is.

12   A    It's a lab report from our Crime Lab where they analyze the

13   suspected narcotics.

14   Q    And is that filled out for the 39 vials that you submitted

15   in this case?

16   A    Yes, sir.

17   Q    Does it bear the property number that you just gave to us?

18   A    Yes, sir.

19   Q    No further questions, Your Honor.

20        MR. LAWLOR:  No questions, Your Honor.

21        CROSS EXAMINATION

22   BY MR. PYNE:

23   Q    Thank you, Your Honor.  Good afternoon, Mr. Sullivan.

24   A    Good afternoon, sir.

25   Q    Officer Sullivan.  I'm Jim Pyne.  I represent Shelly Wayne

1    Martin.  Just a few questions for you.  So you did not know the

2    identity of Shelly Wayne Martin until 2005, is that correct?

3    A    That's correct, sir.

4    Q    Because we had the motions hearing in August of 2005?

5    A    That's correct.

6    Q    And so up until that point, you're familiar only with the

7    Gary Baire?

8    A    That's correct, sir.

9    Q    Now, that particular evening, you were not or -- let me

10   start with, you were not wearing anything that would indicate you

11   were a police officer?

12   A    I had a vest on, and probably my badge was around my neck.

13   Q    Okay.  But you were in plain clothes?

14   A    Yes, sir.

15   Q    I guess I don't understand the purpose of plain clothes.

16   Why were you wearing plain clothes if you are going to indicate

17   that you're a police officer?

18   A    We wear plain clothes so that we're not detected.  But if

19   we're going to engage with somebody, then it's nothing to take my

20   badge from under my vest that's on the chain and put it on the

21   outside of my vest.

22   Q    Okay.  But as you're driving around you don't want people to

23   immediately recognize that you're a police officer, is that

24   correct?

25   A    Sir, in a city, riding around in a Cavalier, three of us in

1    a car, the majority of the people know that we're police.  If I

2    were out walking around, I wouldn't have a vest on, I would just

3    walk around if I wanted to make street levels buys.  Then I dare

4    to say that not many people would have known I was the police.

5            But when I'm riding around in an unmarked Cavalier, for

6    us to be detected, it's not a big deal.

7    Q    When you say it's not a big deal, it's not unusual, you

8    mean, or --

9    A    No, sir.  I've ridden through the city and six-year-old

10   little boys called out "knockers."  That's kind of normal.

11   Q    Is that because of the type of vehicle or is that because

12   three individuals in the car?  Or why is it so apparent to

13   everyone?

14   A    I didn't stop to have a conversation with the six-year-old

15   to figure out why he figured out we were the knockers.  But we

16   work that area on a daily basis.  The people who live in that

17   area get to know us as we get to know them.  And we just do our

18   job the best way we can with what we have to do it with, sir.

19   Q    Okay.  So as you're pulling down this very narrow street,

20   the fact that a car is going by would not have been sufficient to

21   alert anyone to the fact you were police.  It had to be something

22   else, isn't that correct?

23   A    I don't know what was going through the minds of the

24   gentleman, what was going through Mr. Martin's mind or the

25   gentleman he was having a conversation with.  I can't answer

1    that.

2    Q    Okay.  I guess it's a poor question.  Looking at the picture

3    that's still on the screen here, there's just no way of going

4    down this street without passing by the parked cars very closely,

5    is that correct?

6    A    That's correct, yes.

7    Q    I mean, to get by either one of these, either this red van

8    over here or this car here, you have to pull up fairly closely to

9    them, isn't that correct?  It's a very narrow street.

10   A    It's not that narrow.  I mean, a car can fit through it.  A

11   trash truck can fit through it.  I mean, it's not like we were

12   scraping the side of the car with our car.

13   Q    Okay.  So you think it's just the fact that you pulled

14   alongside this car that alerted this person who you think was

15   about to buy drugs to scurry away?

16   A    Based on my experience and training, people who buy and sell

17   drugs live in a paranoid state and they're always on the constant

18   lookout for people who are police or people who may be trying to

19   rob them or do some harm to them.

20   Q    Okay.  And an individual sitting in a car selling drugs is

21   certainly going to be in a paranoid state, is he not?

22   A    He could be.  He may not be, sir.

23   Q    So the person standing on the street buying the drugs

24   probably is in a paranoid state, but the individual sitting in

25   the car may or may not be?

1      MR. HARDING:  Objection, Your Honor.

2  Q    Just trying to clarify the answer, Your Honor.

3      THE COURT:  Go ahead.  Clarify the answer.

4  Q    Is that what your testimony is?  The individual sitting in

5  the car selling drugs, who you suspect is selling drugs, may or

6  may not be in a paranoid state?

7  A    Any, anything is possible.  But I don't, I can't speak to

8  what Mr. Martin was thinking about that night.  And I can't speak

9  to, I can only go by the actions that happened.

10 Q    And the actions you observed, you were, again, sitting in

11 the back seat of the car, is that correct?

12 A    Yes, sir.

13 Q    Did you pull up even with the car that was parked?  Were you

14 slightly behind it?  Where exactly were you when you were making

15 these observations?

16 A    From my vantage point, I was slightly behind the car.  I

17 could look through the back window of the car and see Mr. Martin

18 and the white male.

19 Q    So you could see both?

20 A    Yes.

21 Q    All right.  And what observations did you make about the

22 person you're referring to as Mr. Martin?

23 A    I saw him.  He turned and he made a shoving motion in

24 between the seats, in between the front seats of the car.

25 Q    So he physically turned his body?

1    A    Yes.

2    Q    And did he use both hands to make this motion?

3    A    Yes.

4    Q    And it's your testimony that based on that, you then got out

5    of the car and went and flashed your light inside the car?

6    A    It's my testimony that based on the totality of the

7    circumstances, with the white male quickly leaving, the actions

8    of Mr. Martin, I believed that he was either hiding a gun or

9    drugs.  So then I got out of the car and I used my flashlight to

10   light up the inside of the car.

11   Q    And you observed a sandwich bag with vials, is that correct?

12   A    That's correct.

13   Q    Can you estimate how big the sandwich bag was?

14   A    It's a regular sandwich bag that you would, that I would

15   pack my daughter's sandwich in.

16   Q    Okay.  Can you estimate size-wise, inches-wise?  Two inches?

17   Three inches?  If you can.

18   A    I don't know if I could, I don't know.  I mean, it was, it

19   was a sandwich bag, sir.  It was a regular size.  It wasn't a

20   big, gallon-sized Ziploc bag or -- it was just a regular sandwich

21   bag.  The last time I made my daughter's sandwich I didn't look

22   at the measurements on the box, sir.

23   Q    And it was this sandwich bag that he picked up with both

24   hands and physically moved his shoulders to put between the

25   seats, is that correct?

1    A    I didn't say he picked it up.  I just said he moved, he

2    turned and he put, and he made a shoving motion between the

3    seats, sir.

4    Q    Your testimony was with both hands, though?

5    A    Yes.

6    Q    And he took both hands, physically moved his shoulders, and

7    tried to stuff it between the seats, is that correct?

8    A    I said he turned with both hands and he made a shoving

9    motion between the seats, yes, sir.

10   Q    And in fact, what he did was take this sandwich bag full of

11   vials and put it in a tray in plain view, is that correct?

12   A    I testified that when I looked in the car, that that is

13   where the bag was that I saw, where the bag that I recovered,

14   that's where it was.

15   Q    Did you have any problems seeing it at all?

16   A    No, sir.

17   Q    Now, he did not take the bag and stuff it underneath the

18   seat, did he?

19   A    No, sir.

20   Q    Did not stuff it down the front of his pants?

21   A    No, sir.  I recovered it from the tray that was under, that

22   the arm rest, where it was lifted up.  That's where I recovered

23   it from.

24   Q    He didn't take the sandwich bag and put it down the side of

25   the car by the door, where you wouldn't be able to see it?

1    A    Sir, I recovered the sandwich bag from the tray in between

2    the front passenger and driver's seat.  That was where the arm

3    rest was lifted, sir.

4    Q    Which is in plain view?

5    A    Yes, sir.

6    Q    Do you recall who the car was registered to?

7    A    No, sir, I don't.

8    Q    Do you recall what was done with the car?

9    A    It was parked legally so we locked it up and left it there.

10   Q    Did you do any further investigation into this incident?

11   A    No, sir.

12   Q    I have nothing further, Your Honor.  Thank you very much.

13                   REDIRECT EXAMINATION

14   BY MR. HARDING:

15   Q    In connection with the further investigation, Police Officer

16   Sullivan or Detective Sullivan, do you remember the disposition

17   of this case?

18              MR. PYNE:  Objection.

19              THE COURT:  Overruled.  You may answer.

20   A    Yes, sir.

21   Q    What was it?

22   A    Mr. Martin pled guilty.

23   Q    No further questions, Your Honor.

24              THE COURT:  Thank you very much, Detective Sullivan.

25   You are excused.

1           THE WITNESS:  You're welcome, sir.  Thank you.

2           THE COURT:  Next witness.  Perhaps we should take our

3      afternoon recess before the next witness.

4           Members of the jury, please leave your note pads on

5      your chairs.  Have no discussion about the case or any of the

6      evidence you've heard so far.  Continue to keep an open mind

7      about all issues.  Please remain in the jury room during this 15

8      minute recess.  The jury is excused for 15 minutes.

9           (Jury exits the courtroom.)

10          THE COURT:  We're in recess for 15 minutes.

11          (Brief recess.)

12          THE COURT:  Please be seated.  Good afternoon.  Ms.

13     Rhodes.

14          MS. RHODES:  Yes, Your Honor.  Herb Lynch is the

15     witness and we confirmed it's the same Herb Lynch, too.

16          THE COURT:  Okay.  I don't know that I've ever lost two

17     alternates or two jurors on the same day.

18          MS. RHODES:  Much less the first day.

19          THE COURT:  Yeah.  You sure he's going to testify?  I

20     mean, as sure as you can reasonably be?

21          MS. RHODES:  Yes.  Yes.

22          THE COURT:  Okay.  Would you ask Juror Number Nine to

23     come out, please, Belinda?

24          Just one moment.  Did you want to be heard first, Mr.

25     Harding?

1          MR. HARDING:  Yes.  It's evident to us from the opening

2    that Mr. Lynch is along the lines of a character witness, doesn't

3    really have testimony relevant to the issues in this case.  We

4    would ask the Court to conduct the voir dire, as I'm sure the

5    Court's going to do of this juror.  But we're very worried about

6    losing jurors so early in a long trial, and we hope the Court can

7    do whatever possible to keep that from happening.

8          THE COURT:  I think that's a fair observation, Mr.

9    Harding.  Would you agree, Ms. Rhodes, that obviously -- well, I

10   don't know what's obvious.  But from your description in the

11   opening statement, certainly Mr. Harding would seem to be

12   correct, that Mr. Lynch, in any traditional meaning of the term,

13   would be effectively a character witness.

14         MS. RHODES:  Your Honor, I'm not putting on any

15   character witnesses in this case.

16         THE COURT:  Okay.

17         MS. RHODES:  My intention on calling Mr. Lynch is that

18   it explains where Willie Mitchell was living and was during a

19   good part of this conspiracy.

20         THE COURT:  Okay.  Now --

21         MS. RHODES:  And it supports the idea --

22         THE COURT:  Can you make a proffer a little more

23   detailed than that?

24         MS. RHODES:  Well, he would discuss the dates.

25         THE COURT:  First of all, Mr. Lynch was, was he an

1    employee of Juvenile Services or was he an employee of the

2    private company that operated Hickey?  What do you know about

3    him?

4            MS. RHODES:  Well, I think when Willie, when Mr.

5    Mitchell was there, it was around the transition period.  Because

6    I know we got records from both places.  So I can't really say.

7    I mean, he may have been both.  He may have been initially a DJS

8    employee, State of Maryland, and then later --

9            THE COURT:  When was Mr. Mitchell at Hickey?

10           MS. RHODES:  I believe it was '95 to '96 or '96 to '97.

11   It was about a one year period ending in December.

12           THE COURT:  And was he released because he served his

13   period of detention or --

14           MS. RHODES:  Yes.  And he graduated.

15           THE COURT:  Okay.  Now, when you say he graduated --

16           MS. RHODES:  From high school.  From the school at

17   Hickey.

18           THE COURT:  From the school at Hickey.

19           MS. RHODES:  Yes.

20           THE COURT:  And I didn't know until you said so in

21   opening statement that Hickey ever had a football team.

22           MS. RHODES:  They did.  In fact, and there were games

23   with other, with regular schools.

24           THE COURT:  So this is how Mr. Lynch came to know Mr.

25   Mitchell?

1         MS. RHODES:  Right.  And then, also, Mr. Mitchell went

2    back shortly, within about a month after finishing, he was hired

3    as an employee.

4         THE COURT:  Right.  I got that.

5         MS. RHODES:  Well, there's two times, though.  That was

6    briefly.  That was, well, it was from roughly January until

7    August, when he went to college.  And then that was just as an

8    assistant in the, I think with Mr. Lynch, with Coach Lynch.

9         THE COURT:  Okay.  So just to get the time line, Mr.

10   Mitchell graduated high school while detained at Hickey.  And at

11   some point after graduation he was released.  And then at some

12   period of time shortly after that he was actually hired as a

13   contractor part-time or whatever to actually work with the boys

14   there?

15        MS. RHODES:  Well, initially, it was more like an

16   assistant to Mr. Lynch, in the gym, that sort of thing.

17        THE COURT:  I see.

18        MS. RHODES:  And then when he later came back after

19   college, he was more of a counselor or something.

20        THE COURT:  Oh, I see.  Okay.  So what was Mr. Lynch's

21   formal title?  He was a teacher and coach?

22        MS. RHODES:  I believe so.

23        THE COURT:  Is that how it worked?

24        MS. RHODES:  Yeah.

25        THE COURT:  And he was taken with Mr. Mitchell and he

1     worked with Mr. Mitchell's family to arrange these football

2     scholarships?

3          MS. RHODES:  No, not the family.  It was through some

4     foundation called Youth Opportunities or something like that.  I

5     think it's an organization in Maryland that has worked with other

6     Hickey students to, as they, when they finish.

7          THE COURT:  I see.

8          MS. RHODES:  I think whether for college or other

9     purposes, I'm not sure.  I'm sorry, Your Honor, I'm not so --

10     this was all really for mitigation.  So it's a little bit hazy

11     for me right now.

12          THE COURT:  So they were in pretty frequent contact

13     with each other over the course of, well, from the time the two

14     of them were together at Hickey through at least two or three or

15     maybe as many as four years.

16          MS. RHODES:  Correct.  Because while he was away at

17     college, Coach Lynch was in contact with the coaches and that

18     sort of thing.

19          THE COURT:  So you say you don't, you don't intend to

20     treat him as a character witness?

21          MS. RHODES:  No.

22          THE COURT:  So he's a fact witness intended to show

23     primarily where Mr. Mitchell was living, residing.

24          MS. RHODES:  And what he was doing, right.

25          THE COURT:  Now, of course, he doesn't know what he was

1   doing when he was away at school.  He knows he left to go to play

2   football but he doesn't know what he was doing.

3            MS. RHODES:  No.  He knows what he was doing at Hickey.

4            THE COURT:  Right.  And how long did he work at Hickey,

5   did Mr. Mitchell work at Hickey?

6            MS. RHODES:  The first time, as an assistant.

7            THE COURT:  I mean the second time.

8            MS. RHODES:  The second time, I think it was maybe --

9            THE COURT:  Mr. Harding seemed to suggest a couple of

10  months.

11           MS. RHODES:  Yeah.  I had thought it was, I think it

12  was maybe four months, something like that.  I think Mr. Harding

13  said two months.  I think it was maybe three or four.  Again --

14           THE COURT:  I presume, I infer that Mr. Lynch actually

15  was significantly involved in getting Mr. Mitchell hired.

16           MS. RHODES:  At least the first time he was.

17           THE COURT:  Well, I mean the second time.  Because he

18  didn't have a, did Mr. Mitchell actually earn a degree?

19           MS. RHODES:  No.

20           THE COURT:  No.  So didn't have any kind of

21  certification or anything.

22           MS. RHODES:  No.  No.

23           THE COURT:  So he would have been hired, I mean, how

24  did he get hired at Hickey?

25           MS. RHODES:  Well, I think there are a variety of

144

1    positions there.  Obviously, there are some people who are in the

2    dorms just to be, just to have adults in the dorms at night.

3    That sort of thing.  I referred to him as a counselor.  It was

4    probably something other than that officially.

5            THE COURT:  Okay.  Have they had any contact recently,

6    to your knowledge?

7            MS. RHODES:  I believe Coach Lynch saw Mr. Mitchell

8    after he was incarcerated in this case.  Mostly our mitigation

9    specialists had been dealing with him a lot.  But I believe he

10   did come and see Willie or he had talked to him.  I'm not sure

11   which it was.

12           THE COURT:  Okay.  All right.  Belinda, would you ask

13   the juror to step out, please?

14           MR. MARTIN:  Your Honor, Your Honor --

15           MS. RHODES:  Also, Your Honor, we don't, I mean, we

16   don't assume that because of this connection that the, that the

17   juror should be excused.

18           THE COURT:  Oh, of course.  Of course.  Yes, Mr.

19   Martin?

20           MR. MARTIN:  Your Honor, I just want to say, I don't,

21   I'm not sure I really understand.  He's not really a substantive

22   witness.  Mr. Harding doesn't want him excused.  I don't want him

23   excused.  You don't want him excused.

24           THE COURT:  No, I don't.

25           MR. MARTIN:  I guess you can ask him a couple

1    questions.  But I want it on the record that we do not want this

2    guy excused.

3                THE COURT:  That's what I'm going to do.  And perhaps I

4    jumped the gun by suggesting that I was, I had already prejudged

5    the issue and decided to let him go.  We'll see what he says.

6                MR. MARTIN:  Thank you, Your Honor.

7                MR. HARDING:  Judge, my position actually is that I'd

8    like to know what the voir dire is.  And I hope the Court will

9    give us an opportunity to be heard.  But my previous position was

10   not exactly that I didn't want him to go.  It was that --

11               THE COURT:  Understood.

12               MR. HARDING:  Okay.

13               THE COURT:  Thank you.

14               (Juror enters the courtroom.)

15               THE COURT:  Juror Number Nine, good afternoon.

16               A JUROR:  How are you doing, sir?

17               THE COURT:  Just fine.  If you would, please keep your

18   voice up.  You will recall, or perhaps you won't recall, and I

19   don't fault you if you don't recall, but during the voir dire on

20   Monday when I read that long list of names, one of the names in

21   quotes that I read was the name "Coach Lynch."  And the reason I

22   put it that way is because, frankly, at the time, I didn't know

23   and hadn't been advised of the first name of that potential

24   witness.

25               And based on your note, and we thank you very much for

1    alerting us to the information that you provided to us, as I

2    understand it, this Coach Lynch who's a gentleman that Ms. Rhodes

3    spoke of during her opening statement as someone who was formerly

4    associated with the Hickey School, is now apparently a person who

5    provides personal physical training services, as some do at these

6    various health clubs and gyms, and that, as I understand it, your

7    son is one of his clients.  Is that right?

8              A JUROR:  I see him regularly.

9              THE COURT:  You see your son regularly or you see Mr.

10   Lynch?

11             A JUROR:  I see Mr. Lynch regularly.  Every two days.

12             THE COURT:  Okay.  Now, how old is your son?

13             A JUROR:  He's 12.

14             THE COURT:  He's 12 years old.  And I gather from that

15   information that you and/or he believe that he has some athletic

16   potential?

17             A JUROR:  That's correct.

18             THE COURT:  And so can you just tell us briefly what is

19   the nature of the sports program and physical conditioning that

20   you have him involved in.

21             A JUROR:  I have him --

22             THE COURT:  Again, perhaps I should -- do we have the

23   hand mikes handy, or the lavaliere, just to help the juror out?

24   Thank you, Belinda.  This is just so we're sure that we can hear

25   you, sir.

1          A JUROR:  My son is --

2          THE COURT:  Hold that up near your mouth, please.

3          A JUROR:  My son runs track in Maryland.  He plays

4     football in Maryland.  He played basketball in Maryland.  He's a

5     pretty good athlete.  And Mr. Lynch has been training him for

6     probably about four months now.  And I didn't, when I heard

7     "Coach Lynch", it didn't stick.

8          THE COURT:  I see.

9          A JUROR:  When I heard "Hickey School", and through my

10    evaluation of who, of him and everything, that, that added up one

11    and one.

12         THE COURT:  I see.  So when you were, did you look

13    around to find someone who could work with your son and help him

14    develop his athletic abilities?

15         A JUROR:  No.  A friend that has a son running track

16    with him also is involved.

17         THE COURT:  I see.  And is that person the person who

18    recommended Mr. Lynch to you?

19         A JUROR:  Yes, sir.  He came to our track, our school,

20    our track team, and had a presentation.

21         THE COURT:  I see.  And so you investigated his

22    background somewhat, discussed it, discussed with Mr. Lynch his,

23    Mr. Lynch's background?

24         A JUROR:  Yes.  He talked to us, parents, everybody

25    about what he did, how he did.

148

1          THE COURT:  I see.  So it was in that connection that

2     he disclosed his earlier affiliation with Hickey School.

3          A JUROR:  That's correct.

4          THE COURT:  Is he still involved with Hickey School, to

5     your knowledge?

6          A JUROR:  No.  He's not.

7          THE COURT:  He's not?  So was this like a group

8     decision you and several other fathers and/or mothers for their

9     sons, and/or daughters?  Or how did it --

10          A JUROR:  Well, my son has, like I said, is a pretty

11     good track runner in Maryland.  And he, Mr. Lynch happened to

12     come to that track team and talked about him training kids to

13     participate in different activities.  And that's what I have him

14     in.

15          THE COURT:  I see.

16          A JUROR:  He does training.

17          THE COURT:  And so it's been since, I guess, the

18     beginning of the summer?

19          A JUROR:  That's correct.

20          THE COURT:  And your son is in what grade now?

21          A JUROR:  He's in the seventh grade.

22          THE COURT:  Seventh grade.  So you say you see Mr.

23     Lynch, you personally see Mr. Lynch a couple of times a week?

24          A JUROR:  I sit in on the practices, the meets outside,

25     inside, whatever.

149

1          THE COURT:  I see.  I see.  Now, is it practice or is

2     it physical conditioning and training or a combination of both?

3          A JUROR:  It's a combination of stretching and, and

4     training.

5          THE COURT:  I see.  And where does this take place?

6          A JUROR:  In Bel Air.

7          THE COURT:  Is it a school facility or a private

8     facility?  You don't have to give us the name of it.

9          A JUROR:  He goes to different, he goes to different

10    fields and he has his own office facility that he works at.

11         THE COURT:  I see.  And you're paying for this?

12         A JUROR:  That's correct.  My son was third in the

13    country at that age in track, in the 200 meters.

14         THE COURT:  Wow.  Wow.  Third in the country?

15         A JUROR:  Yes, sir.

16         THE COURT:  Wow.  Yeah.  So you haven't talked to Mr.

17    Lynch since you came in on Monday, I take it, or have you?

18         A JUROR:  No, I have not.

19         THE COURT:  When's his next scheduled appointment with

20    your son?

21         A JUROR:  As soon as I --

22         THE COURT:  This afternoon?

23         A JUROR:  As soon as our scheduling provides him to get

24    back in.  It's been between school and, and this --

25         THE COURT:  I see.  I see.  School started last week or

150

1    the week before?

2              A JUROR:  School started in September.  But I mean,

3    well, yes --

4              THE COURT:  No.  What I mean by that is, I would have

5    assumed that during the summer months it was a lot easier to

6    schedule.

7              A JUROR:  My son plays football so he's, he gets

8    between football practice and training and track.

9              THE COURT:  Busy young man.  So I assume his middle

10   school doesn't have a football team.

11             A JUROR:  No, it does not.

12             THE COURT:  But he's like --

13             A JUROR:  Recreational football.

14             THE COURT:  Recreational football.  Well, what, as best

15   you can tell us, what would be your reaction if Mr. Lynch came in

16   and testified as Ms. Rhodes has projected in her opening

17   statement?  Would it be difficult for you?

18             A JUROR:  No, it would not.  As long as there is no

19   conversation before, during.  I talk to Mr. Lynch on a regular

20   basis.  As long as no conversation about the scenario or court or

21   whatever.  I have no problem with it.

22             THE COURT:  So you would assure the Court that you

23   would not -- I mean, obviously you're going to see Mr. Lynch.

24             A JUROR:  Um-hum.

25             THE COURT:  A couple of times a week.

1          A JUROR:  Yes, sir.

2          THE COURT:  For the balance of this trial.  But you're

3     prepared to assure the Court that you would have no discussion

4     with him about the case or his proposed testimony or any

5     information about Mr. Mitchell?

6          A JUROR:  None whatsoever.

7          THE COURT:  How would you feel -- and I want you to

8     answer this honestly, and I know you will -- but how would you

9     feel if the Court were to say that it would not be appropriate

10    for you to have any contact with Mr. Lynch so long as you were on

11    the jury?  And so let me elaborate.

12         Would it be possible for your son to continue to work

13    with Mr. Lynch but for you to have absolutely no contact with Mr.

14    Lynch?  Or is that just not possible?

15         A JUROR:  Well, you know, I take my son.  I would not

16    have to take him to practice.  My wife would have to take him.  I

17    mean, that is not possible all the time.  I guess I could arrange

18    it.

19         THE COURT:  My guess is you wouldn't be very happy

20    about it.  You want to be involved with your son and his

21    training.

22         A JUROR:  Yes.  I do want to.

23         THE COURT:  Of course.  And you're to be commended for

24    that, celebrated for that.  What impact, if any, leaving aside

25    whether you would agree to do it or not, what impact, if any,

1    would there be if the Court were to say neither you, your son,

2    nor your wife may have contact with Mr. Lynch between now and the

3    time that he testifies in this case?  In other words, the Court

4    would say your son would have to find someone else to work out

5    with and choose as a trainer?  How much of a hardship would that

6    impose on you, even if you were willing to do it?

7            And I'm not asking you now whether you're willing to do

8    it.  But just, how much of a, how much of a hard --

9            A JUROR:  I have fees I paid Mr. Lynch.

10           THE COURT:  You've already paid?

11           A JUROR:  Yes.

12           THE COURT:  Do you have a contract, 6 month or 12 month

13   contract of any sort?

14           A JUROR:  It's not long.  A total of eight meetings

15   right now.

16           THE COURT:  I see.  Eight meetings.  So that's like

17   four weeks?

18           A JUROR:  Yes, sir.

19           THE COURT:  I see.  And if you were to suspend or

20   terminate that contract, either you would expect to be, have your

21   money refunded or you would expect that after this case was all

22   over and done with, then you would, you and your son would get

23   the benefit of those payments.

24           A JUROR:  That's correct.

25           THE COURT:  At some future time.

1          So is there anything you want to say to the court?

2          A JUROR:  Oh, I --

3          THE COURT:  And this is --

4          A JUROR:  I brought it up.

5          THE COURT:  No.  You were absolutely right to bring it

6     up.  And I don't fault you for one second.  I really, this is

7     very important for me personally.  I don't fault you for one

8     second, given the long list of names, to have missed the

9     significance of a Coach Lynch.  Frankly, there would have been,

10    there would have been no reason, frankly, for you to have alerted

11    to that.  Maybe some people would have, some people wouldn't

12    have.

13          Do you know him -- how do you refer to him, by the way?

14          A JUROR:  Coach, Mr. Lynch.

15          THE COURT:  Mr. Lynch?  You don't call him Herb or --

16          A JUROR:  No, I don't.

17          THE COURT:  You call him Coach sometimes?

18          A JUROR:  No, I just call him Mr. Lynch.

19          THE COURT:  Mr. Lynch?  Anything you want to say to the

20    Court before I confer with counsel?

21          A JUROR:  No.

22          THE COURT:  All right.  Have you told any of the other

23    jurors of your knowledge?

24          A JUROR:  No.

25          THE COURT:  All right.  Please return to the jury room,

1    sir.  And please do not disclose to any other jurors any aspect

2    of this conversation we've had out here.  Thank you very much.

3    You can leave your note pads on your chair.

4               (Juror exits the courtroom. )

5          MR. HARDING:  Judge, I'm afraid I completely changed my

6    mind.  First of all, he's not a character witness.  And secondly,

7    he clearly has a relationship with, his son has a relationship

8    with Herb Lynch very similar to the one Mr. Mitchell had.  And

9    that's, I think, the thing that makes me most nervous of all.  It

10   would be difficult for him not to identify with Mr. Mitchell, it

11   seems to me.

12          And we know, too, that he seems to have a very high

13   opinion of Mr. Lynch.  He speaks in very warm terms of him.  He's

14   obviously formed a trust relationship with him.  He's invested

15   his hard-earned money in Mr. Lynch.

16          So I think this goes well beyond -- I think we had

17   another juror in the voir dire panel who had simply heard of Mr.

18   Lynch or something, or Coach Lynch.  And I was assuming it was

19   just something like that.  I had no idea it was such a deep and

20   personal relationship.  And so I, I do think he should be struck,

21   Your Honor.  I'm sorry.

22          THE COURT:  Thank you, Mr. Harding.  Ms. Rhodes, and

23   then I'll hear from other counsel.

24          MS. RHODES:  Your Honor, I think that the nature of his

25   testimony, as I've explained in some detail, is not going to be

1    particularly at issue.  I mean, it's a matter of where Mr.

2    Mitchell was when he was at Hickey and what his obligations,

3    whether as a student or as an employee, were.  So I just think, I

4    don't think credibility is going to be a critical issue with Mr.

5    Lynch, which is the issue that you might be concerned about,

6    raising some bias in a juror.

7            MR. MARTIN:  Your Honor, I'll just reiterate what I

8    said earlier.  If I hadn't said I wanted him on the jury, I think

9    Mr. Harding would still want him.  I agree with Ms. Rhodes.  I

10   don't see where this testimony goes to any credibility or

11   anything.  It's kind of a background sort of thing.  It shouldn't

12   raise an issue at all like that with a juror.

13           MR. COBURN:  Your Honor, I think it's important to

14   focus on the fact that this is not a voir dire issue.  This is a

15   sitting juror.  He's obviously highly intelligent.  Just, I think

16   obviously to all of us, completely candid.

17           From our point of view, we would be very substantially

18   prejudiced by having this gentleman struck.  We are, first of

19   all, very concerned about, as I know Your Honor is, about losing

20   two jurors, two of five alternates this early in the trial.

21   Moreover, given that he is a sitting juror and given that it

22   sounds like the substance of the testimony that's at issue is not

23   going to be, doesn't sound to me like it's going to be subject

24   to, at least I'm not hearing that it's going to be subject to any

25   significant dispute, anyway.

1              I don't think the government's theory is inconsistent

2      with what's been proffered to be Mr. Lynch's testimony.  I don't

3      think there's any predicate to support Mr. Harding's conclusion

4      that this is some sort of a close, intimate relationship.  I

5      thought Your Honor asked a very probing question in terms of how

6      the juror refers to Mr. Lynch and he said, I call him Mr. Lynch.

7              I don't see any prejudice, any significant prejudice to

8      the government whatsoever, to retention of this juror.  And we

9      would just note our objection to his being excused.

10             THE COURT:  Thank you.  Well -- oh, Mr. Crowe.

11             MR. CROWE:  Yes, Your Honor.  Just to complete the

12     record, as Mr. Martin's counsel.  We think the juror should be

13     retained as well.  We don't see any reason that he should be

14     dismissed.  And quite honestly, nobody wants a mistrial.  And

15     losing two jurors in the first day is not good.

16             THE COURT:  I think I'm going to try to cut a baby in

17     half here, Mr. Harding.  And I hope it won't be perceived as

18     unfair to the juror.

19             But what I am inclined to do, because I am concerned

20     about losing two jurors so early in what is certain to be a

21     rather long trial.  That said, there, in all candor, can't be any

22     question that if the voir dire I just conducted with this juror

23     with knowledge of this witness' proposed role in this trial had

24     occurred on Monday rather than today, Wednesday, the juror would

25     have been excused on motion of the government.  The government

1   wouldn't even have needed to make a motion.  But here we are.

2          So Mr. Harding, what I am of a mind to do, frankly, is

3   to leave the juror in place and say this to Ms. Rhodes.  It seems

4   to me that while I recognize a live witness can never be

5   substituted -- well, almost never substituted for a stipulation,

6   as Mr. Coburn just pointed out, the subject matter of Mr. Lynch's

7   proposed testimony clearly is amenable to stipulation.

8          If he's not a character witness and if he's only being

9   called to tell the jury where Mr. Mitchell was at any given time,

10  as I said to Ms. Rhodes, the witness cannot tell anybody what Mr.

11  Mitchell was doing up in Rhode Island or in New Jersey or even at

12  Hickey.

13         It may be that Ms. Rhodes, wanting to hold on to this

14  juror, may decide not to call Mr. Lynch and instead offer a

15  stipulation to the government to cover the matters that are

16  intended to be covered.  And I leave to counsel for the time

17  being to have those discussions.

18         And I will admonish the juror that I haven't made a

19  final decision.  Well, no, I won't tell the juror that.  I'll

20  simply tell the juror not to discuss the case with anyone and do

21  not discuss this issue with anyone.  And we'll see where we end

22  up.

23         I am very, very inclined to agree with the government,

24  that this juror is disqualified.  But unless you want to press

25  the point now, Mr. Harding, in light of what I've described as a

1    proposed or potential compromise, we can go for a few more days

2    until you and Mr. Hanlon have had a chance to think it over and

3    to discuss it further with Ms. Rhodes.

4            MR. HARDING:  Well, I would propose that Ms. Rhodes and

5    Mr. Lawlor bring Mr. Lynch for a meeting and that we hammer out a

6    stipulation.

7            THE COURT:  That would probably be a good idea.  I

8    hadn't thought of your meeting Mr. Lynch.  But certainly,

9    absolutely.  I would think, in fact, as you say, that would need

10   to be a part of your decisionmaking process.

11           MR. HARDING:  Okay.

12           THE COURT:  So we can cross this bridge for the last

13   time, I hope, next week.  And hopefully everybody can get some of

14   what they want and we can hold on to this juror right through to

15   the end.  Yes, Ms. Rhodes.

16           MS. RHODES:  That's fine with us, Your Honor, except

17   that we probably, from our perspective, wouldn't make a decision

18   for a couple of weeks.  In other words, we're not planning to

19   getting to our part of the case until probably October 27th,

20   after the week we're gone.  So maybe in the, after we see how

21   things are going and the week before, so we'd probably make that

22   decision, if that's okay with the Court.

23           THE COURT:  Well, I have to tell you it's certainly

24   okay with me but I feel, I mean, morally, I have to tell you, I

25   feel that if I'm going to excuse this juror, I need to do it

1    sooner rather than later.  And in all honesty, it would be, it

2    would be, it would be wholly inappropriate, with all respect.

3    And I understand what you're saying.  For me to keep this juror

4    sitting here after what I've said, to keep this juror sitting

5    here even three or four weeks and then for you and Mr. Lawlor to

6    decide the stipulation's not possible and, you know, everybody's

7    made his or her record.  I want to make a decision on this juror

8    next week.

9         MS. RHODES:  All right.  Well, only reason I was

10   thinking of waiting, actually, because initially I thought that

11   would make sense, is the concern about the other, how many other

12   alternates we have.

13        THE COURT:  That is certainly a factor.  That is

14   certainly a factor.

15        MS. RHODES:  I would like to avoid a mistrial.  At the

16   last minute, we could scramble and call other people if we had

17   to.  But that's really the only reason to hold him longer than

18   next week.

19        THE COURT:  Well, I don't know if that's true or not.

20   I mean, you know, we could lose two jurors today and go ten weeks

21   and never lose another one.  We could lose four jurors over the

22   weekend, coming weekend.

23        No.  I just, I just feel a moral imperative, frankly,

24   in all honesty to tell this juror and therefore to have you all

25   tell me what decision I need to make certainly before the end of

1    next week.  It would be very unfair to drag him in here three or

2    four weeks and then, you know, you say, no, we really want Mr.

3    Lynch in here, and then I have to make a decision.

4              So I need to know on Monday.

5              MS. RHODES:  On Monday?

6              THE COURT:  I need to know on Monday.

7              MS. RHODES:  Your Honor, I can't, I can't --

8              THE COURT:  I'll give you till Tuesday.  I'll give you

9    till Tuesday.  Look, surely you must have Mr. Lynch's phone

10   number.  In fact, it's on his card.

11             MS. RHODES:  Can I explain, please?  We're going to

12   have to go to a number of other witnesses to see if we can use

13   them to replace Mr. Lynch?  It's not something we can do easily,

14   we can do over the weekend or in the next couple of days.  I

15   mean, we're here all the time.

16             THE COURT:  Of course you can.  Somebody knew where Mr.

17   Mitchell was during the period that you want to use --

18             MS. RHODES:  It's not a matter of talking to Mr. Lynch.

19   We have to get other witnesses to replace him and I'm not sure

20   that we can.

21             THE COURT:  But I'm sure you can.  If he was at college

22   for a semester in Rhode Island, you can subpoena somebody down

23   here from the college.  From the Bursar's Office or the Athletic

24   Department.  Look, I'm not saying it's easy.

25             MS. RHODES:  It's not easy.  I'm just concerned about

1    doing it by Monday.  I mean, that's --

2            THE COURT:  Well, I got to know by Monday.  I'm sorry.

3    You didn't give me the, the witness' full name.  I don't

4    particularly fault you for that.  But the witness list itself,

5    you put on there, or somebody did who typed it, question

6    mark/question mark/question mark, Coach Lynch.  And given --

7            MS. RHODES:  All right.  But Your Honor, the reason we

8    --

9            THE COURT:  I don't want to get into finger pointing.

10   You know, perhaps I should have pressed you, who is this Lynch?

11           MS. RHODES:  My understanding when we started this

12   discussion was that everybody was concerned about having lost two

13   witnesses, two jurors already today and the fact we only have

14   three more.

15           THE COURT:  Right.

16           MS. RHODES:  Alternates.

17           THE COURT:  Right.  None of us wants a mistrial.

18           MS. RHODES:  In light of that it seems premature to say

19   if we're going to kick him off, it's got to be by Monday.

20           THE COURT:  Because it's unfair to the juror, Ms.

21   Rhodes.

22           MS. RHODES:  I understand that.

23           THE COURT:  If he's off the jury, he ought to be off

24   the jury today.  I've even gone farther than I should, in all

25   honesty.

1          MS. RHODES:  I'm sorry, but this is not my fight.  None

2     of us want to be back here for a mistrial in a year.

3          THE COURT:  Of course not.  So if you really only need

4     Lynch as the source of information for Mr. Mitchell's physical

5     location from some time in 1994 or 5 to sometime in 1997, it

6     seems to me you could assemble very easily over the weekend, with

7     all respect, three or four phone numbers of people who Mr.

8     Harding and Mr. Hanlon can call, confirm what their testimony

9     might be, maybe get one or two of them in here so that the can

10    meet, and it can be done by Monday.  I'll give you until Tuesday.

11         But this is not something that we're going to sit and

12    see how the trial goes for three or four weeks and then you and

13    Mr. Lawlor decide whether you're going to call Mr. Lynch.  He's

14    not a character witness.  I don't know what he is, either.  What

15    is he?  You going to bring him in here and have him say to the

16    jury, well, Mr. Mitchell left, I put him on the bus to go to

17    Rhode Island on some date in 1998?

18         MS. RHODES:  Your Honor, he was with him on a daily

19    basis at the Hickey School for over a year.

20         THE COURT:  So the Hickey School records will reflect

21    that.  Mr. Harding probably is prepared to stipulate to that

22    right away.

23         MS. RHODES:  I'm sure --

24         THE COURT:  The government, the government has, was

25    very candid in its opening statement that for years one or the

1   other defendant was out of commission, not on the street.  So

2   that's not a big issue in this case.  It really isn't.  The

3   government will concede that there were periods when Mr.

4   Mitchell, Mr. Gardner, Mr. Martin, and Mr. Harris were

5   incarcerated.  We don't need a witness for that.

6          MS. RHODES:  Very well, Your Honor.

7          THE COURT:  So let me know first thing Tuesday morning,

8   and I'll be prepared to make a final ruling.

9          Have the juror come back out, please, Ms. Arrington.

10         (Juror Number Nine re-enters the courtroom.)

11         THE COURT:  Good afternoon once again, sir.  Please do

12  not discuss the case, any aspect of your interactions with the

13  Court out here in the courtroom by yourself, or the evidence

14  you've heard, of course, with anyone, as I've been instructing

15  you.

16         For now, you remain a part of the jury.  Needless to

17  say, but I need to say it, anyway, have no discussion whatsoever

18  with Mr. Lynch if you see him in the next several days, about

19  this trial, the fact that you are on jury duty, although I

20  realize it may be difficult to keep him from learning that

21  information.  I suspect your son may even say to him, or perhaps

22  your wife might say to him that you're on jury duty.  But beyond

23  that, have no discussion with Mr. Lynch whatsoever about any

24  aspect of this case.

25         A JUROR:  Yes, sir.

1          THE COURT:  This is especially important since it would

2     appear that Mr. Mitchell, that is Mr. Lynch is apparently aware

3     that Mr. Mitchell is on trial and he is apparently aware that it

4     is the intention that he testify at this trial.  And therefore,

5     knowing that and learning that you're on jury duty, Mr. Lynch may

6     well be curious or speculate and he might ask you something about

7     it.

8          But you are not to answer any questions that might be

9     asked of you and you are not to discuss in any way your

10    participation in this trial.

11         A JUROR:  Yes, sir.

12         THE COURT:  All right?  Thank you very much.  You may

13    step back into the jury room.

14         (Juror exits the courtroom.)

15         THE COURT:  Yes, Mr. Harding.

16         MR. HARDING:  Your Honor, my co-counsel makes the

17    excellent point that it would be good to advise the juror not to

18    have discussions about this with the other jurors, not to have

19    any discussions at all about --

20         THE COURT:  I did.

21         MR. HARDING:  -- about Mr. Lynch.

22         THE COURT:  I did.

23         MR. HARDING:  Did you?

24         THE COURT:  I think I did it both before he went in the

25    first time and when he just went in.

1          All right.  What do you have outside, Mr. Harding?

2    It's now 4:30.

3          MR. HARDING:  Two police officers, Your Honor.  Kevin

4    Roseborough is the next one.

5          THE COURT:  He's going to be rather lengthy?  Is that

6    the, is that the gun case that Mr. Kurland was concerned about?

7          MR. HARDING:  Yes.  I don't know that it's any more

8    lengthy than the other police officers we've heard.

9          THE COURT:  All right.  And who's the other one?

10          MR. HARDING:  Police Officer Herndon.

11          THE COURT:  What's that arrest?

12          MR. HARDING:  That's another arrest of Mr. Gardner with

13    a gun.

14          THE COURT:  Okay.  But you think they're both 10 or 15

15    minutes?

16          MR. HARDING:  No.  I wouldn't, I wouldn't be that

17    optimistic.  I think they've been going about a half hour,

18    including cross, up till now.  And I would say something like

19    that for these two.

20          THE COURT:  Okay.  Can you call in the shortest one

21    today?  The briefest one.  Call either one.  Call either one.

22          MR. HARDING:  Kevin Roseborough, then, Your Honor.

23          THE COURT:  All right.  Let's have the jury, please.

24          MR. HARDING:  May we release the other police officer?

25          THE COURT:  Yes.

1          (Jury enters the courtroom.)

2          THE COURT:  Please be seated, ladies and gentlemen.

3    Good afternoon.  Sorry for the delay.  We're ready to continue.

4          Last witness for the day, Mr. Harding?

5          MR. HARDING:  Yes.  Thank you, Your Honor.  The United

6    States calls Kevin Roseborough.

7        DETECTIVE KEVIN ROSEBOROUGH, GOVERNMENT'S WITNESS, SWORN

8          THE WITNESS:  I do.

9          THE CLERK:  Be seated.  Please scoot up toward the

10   mike.  State your name and spell it for the record, please.

11         THE WITNESS:  Kevin Roseborough.

12   R-O-S-E-B-O-R-O-U-G-H.

13         DIRECT EXAMINATION

14   BY MR. HARDING:

15   Q    Good afternoon, sir.  Can you tell us how you're employed?

16   A    Baltimore City Police Department.

17   Q    What's your assignment right now?

18   A    Assigned to the Violent Crime Impact Division.

19   Q    Okay.  Are you a detective or a police officer, or how

20   should I address you?

21   A    Detective, yes.

22   Q    Detective Roseborough, do you recall -- first let me ask

23   you, how long have you been employed by the Baltimore City Police

24   Department?

25   A    I'm working on my 15th year.

1    Q    And can you tell us what your assignment was back in October

2    of 1998?

3    A    Southwest District, Flex Unit.

4    Q    Okay.  Do you recall participating in an arrest on October

5    15th, 1998 at around 8:00 at night?

6    A    Yes, I do.

7    Q    At that time, were you alone or were you with other

8    officers?

9    A    Alone with members of the Flex Unit, yes.

10   Q    Okay.  Is that a plain clothes unit you were in?

11   A    Yes.  Plain clothes capacity.

12   Q    And so were you on foot or in a vehicle or what?

13   A    During the course of this incident, I was on foot.

14   Q    Okay.  Can you tell us where you were in the Southwest

15   District?

16   A    I was at the corner of Edmondson Avenue and Denison Street.

17   Q    Why don't you go ahead and just tell us what happened?

18   A    We was effecting an arrest at the intersection of Edmondson

19   Avenue and Denison, approximately 8:00 p.m., which was dark at

20   that particular time.  And that's a narrow street, one-way

21   street.

22          So about four or five cars started to line up because

23   we had stopped traffic for the incident that was occurring at the

24   intersection.  So I gradually walked down to each vehicle and

25   advised the driver that it's going to be a few moments, so please

1    be patient.

2              As I'm walking down is when I discovered Mr. Shawn

3    Gardner.

4    Q    Was he in a vehicle or on foot or what?

5    A    He was also in a vehicle, approximately five cars from the

6    intersection of Edmondson Avenue and Denison, along with another

7    individual later identified as Darryl Bacon.

8    Q    Okay.  And so these vehicles were just stopped there because

9    of your police activity up at the intersection?

10   A    That's correct.

11   Q    Okay.  Tell us what happened after you observed Mr. Gardner

12   in the vehicle with Darryl Bacon?

13   A    As I'm walking down to advise each, each vehicle of the

14   delay, I observed what I believed to be a handgun or silhouette

15   of a handgun through the window, through the windshield.  It was

16   up like this.

17             I then advised two of my partners by hand signal to

18   walk down with me down to like the fifth car, which would be a

19   Mitsubishi.  That's the vehicle which Mr. Shawn Gardner and

20   Darryl Bacon was inside of.

21   Q    Who was driving, do you remember?

22   A    Shawn Gardner was the driver, sitting in the driver's seat.

23   Q    And which one had the gun?

24   A    The individual that was sitting in the driver's seat was the

25   one flashing the gun across the windshield.

1    Q    And that was Mr. Gardner?

2    A    Yes.

3    Q    So what happened next?

4    A    As we proceeded down, I continued on the driver's side

5    walking down, and my two partners walked down the passenger side

6    of the vehicles, walking down towards Mr. Gardner's Mitsubishi.

7         We then had both individuals exit the vehicle, at which

8    time Mr. Gardner said, It's only a cell phone.  I looked at him

9    and said, Okay.  Both individuals got out of the vehicle, was

10   escorted to the rear of the vehicle by my other two partners, by

11   which time I then looked down and I could see a handgun that was

12   wedged between the driver's seat and the center console.

13   Q    Okay.  Was there anything unusual about the gun that you

14   noticed?

15   A    The gun had a laser, laser sights mounted to the bottom of

16   the barrel.  It was a laser, as well as light brights, which is

17   on the top of the barrel of the handgun.

18   Q    What are those things used for?

19   A    Well, the laser pretty much speaks for itself.  Whatever you

20   point at is where you're going to fire at.  And the light bright

21   is attached to the actual aiming devices on top of the barrel,

22   which is utilized to also focus on whatever, whomever you're

23   shooting at.

24   Q    What kind of gun was it?

25   A    It was a Glock 17 semiautomatic handgun.

1   Q    It's a Glock 17, is that what you said?

2   A    Yes.  That's the model number, Glock 17, which is a nine

3   millimeter.

4   Q    Was it loaded?

5   A    Yes.

6   Q    Fully loaded?

7   A    To full capacity?

8   Q    Yeah.

9   A    I don't recall if it was to full capacity.

10  Q    Okay.  Do you remember how many rounds were in it?

11  A    No.

12  Q    Would that be in your paperwork?

13  A    Not with a -- no.

14  Q    Okay.  Did you search the defendant, Mr. Gardner, and also

15  Mr. Bacon?  Did you search the car?  What did you do after you

16  took them out of the car?

17  A    Once the individual was taken out of the vehicle, escorted

18  to the rear of the vehicle by my other two partners, I then

19  observed the gun and then advised them they're both under arrest.

20       Search incident to the arrest, there was $1,397

21  recovered from Mr. Shawn Gardner's person and .4 grams of heroin

22  as well.

23  Q    Okay.  That was recovered from his person, also?

24  A    That was recovered from Shawn Gardner's person.

25  Q    Okay.  Are you able to identify Mr. Gardner in the courtroom

1   here today?

2   A    Yes.

3   Q    Could you point him out to us?

4   A    The guy with the white shirt on and the glasses.

5   Q    May the record reflect that the witness has identified Mr.

6   Gardner, Your Honor?

7          THE COURT:  So noted.

8   Q    Okay.  Now, you've testified that there was a quantity of

9   narcotics.  I would like to show you what's been marked

10  Government Exhibit L-4.  May I approach the witness, Your Honor?

11         THE COURT:  Yes.

12  Q    Can you tell us which kind of document that is?

13  A    This is the Baltimore City form, standard form, chain of

14  custody in evidence, laboratory sheet, which gives you the, the

15  laboratory results from anything that we seize that would be

16  tested.

17  Q    Okay.  Don't tell us what the laboratory results were.  But

18  tell us, if you remember, the property number that you submitted

19  the drugs under when you sent them down to the Evidence Control

20  Unit.

21  A    Yes.  It's written on here.

22  Q    Okay.  Tell us what it is.

23  A    98053630.

24  Q    Okay.  Did you, you said you charged both Mr. Gardner and

25  Mr. Bacon with the gun, is that correct, or do you remember?

1    A    I don't remember.

2    Q    Okay.  Obviously, you would have charged only Mr. Gardner

3    with the drugs, is that correct?

4    A    The driver being the one who had it in his hands, correct.

5    Q    Okay.  And you would have charged Mr. Gardner with the gun,

6    too, since you saw the gun in his hand, is that correct?

7    A    Mr. Gardner being the one that was occupying the driver's

8    seat, that's correct.

9    Q    You don't remember if you charged Mr. Bacon?

10   A    I don't believe I did.

11   Q    Okay.  Do you remember the outcome of the case in court or

12   not?

13   A    No.

14   Q    Okay.  Just one other question.  You said you were in the

15   Southwest District and that this stop occurred on Denison, is

16   that correct?

17   A    Yes.

18   Q    What part --

19          THE COURT:  Mr. Harding.

20   Q    What part of town is that in?

21   A    Beg your pardon?

22   Q    What part of town?

23   A    That's the Southwestern District, responsible for that

24   particular intersection.

25   Q    Okay.  So below Pratt Street, is that right?

1    A    Below Pratt Street?

2    Q    Yeah.  South of Pratt Street?

3    A    No.  It's above Pratt.

4    Q    It is?

5    A    Yes.

6    Q    Okay.  Is it still in the area called Pigtown?

7    A    Pigtown?

8    Q    Yeah.

9    A    No.  Pigtown is in the Western District.

10   Q    Okay.

11   A    This is more like Edmondson Avenue, Edmondson Village

12   community.

13   Q    So it's further west than Pigtown, is that correct?

14   A    Yes.  Yes.

15   Q    Okay.  All right.  Thank you.  I have no further questions.

16           THE WITNESS:  Okay.

17           MR. LAWLOR:  No questions.

18           CROSS EXAMINATION

19   BY MR. KURLAND:

20   Q    Good afternoon, Detective Roseborough.  Your Honor, may I

21   briefly go up and address the witness, see the document that he

22   was citing?

23           THE COURT:  Of course.

24   Q    Just take a moment.  Detective Roseborough, I just have a

25   few questions.  I'll be very brief.

1          The first one.  You testified on direct that the

2     substance you recovered, .4 grams of heroin.  At the time that

3     you made the arrest, you didn't know it was heroin?

4     A    At the time?

5     Q    Yeah.

6     A    No.  I could not be for certain it was heroin, no.

7     Q    Well, I mean, you didn't run any chemical analysis or

8     anything?

9     A    No, did not.

10    Q    So you got a substance which you at the time believed was

11    heroin?

12    A    That's correct.

13    Q    Next question.  The area that you described the event took

14    place, that's nowhere near the Randallstown/Park Heights area of

15    Baltimore, is that correct?

16    A    Randallstown/Park Heights?

17    Q    Yeah.

18    A    Randallstown is in Baltimore County.  Park Heights would be

19    in the city.

20    Q    I understand that.  But the area where the event took place

21    is nowhere near either of those locations, is that correct?

22    A    Would be closer to -- right.  Neither one.

23    Q    Okay.  All right.  I also notice that you brought a folder,

24    which probably has some notes in it.  But you didn't refer to any

25    of that during your direct examination, is that correct?  I was

1    sort of blocked over there.

2    A    That's correct.

3    Q    This event took place, it will be a decade next month?

4    A    October 15th.

5    Q    October 15th, 1990 --

6    A    Eight.

7    Q    Eight?  And you're able to, to the best of your

8    recollection, testify today without referring to notes concerning

9    what happened ten years ago?

10   A    At what point in time?  Since I've been on the stand?

11   Q    Well, yeah.  I notice on the stand today you did not refer

12   to any of the notes.  So is that just your recollection, your

13   testimony today, is that clear and no need to refer to notes

14   concerning what happened ten years ago?

15   A    There has been case preparation.  This did happen about ten

16   years ago, like you said.

17   Q    But there had been some case preparation in between?

18   A    Right.

19   Q    And just, do you recall, you testified September 29th, 2005

20   in a preliminary hearing on that matter in this case as well?

21   A    Yes, I did.

22   Q    Just a couple other questions.  With respect to the items

23   recovered, the gun, you described that, that's a fairly, I won't

24   say unusual, but that's not your normal gun that you'd find, I

25   take it, on the street?

1   A    No, it would be considered unusual.

2   Q    And that's an important piece of evidence?

3   A    Yes.

4   Q    And the substance that were narcotics, that's an important

5   piece of evidence as well?

6   A    That's correct.

7   Q    All right.  And that was, that was never turned back to the

8   defendants, is that correct?  You didn't give that back to Mr.

9   Gardner?

10  A    Which one?

11  Q    The gun?

12  A    No.  No.  We did not.  It was stolen.

13  Q    It was seized, and to your knowledge it was used in, in a

14  state court prosecution, is that correct?

15  A    Yes.

16  Q    All right.  Is it correct that that gun is no longer

17  available to be admitted as evidence here today?

18  A    No.  Because after the state case, it was destroyed.

19  Q    All right.  And do we have any photograph of the gun?

20  A    No, we do not.

21  Q    All right.  I have no further questions.  Thank you,

22  Officer, or Detective.

23              REDIRECT EXAMINATION

24  BY MR. HARDING:

25  Q    Sorry.  Did you say just now that the gun was stolen?

1    A    Yes.

2    Q    Okay.

3              MR. KURLAND:  I'm sorry.

4              THE COURT:  Mr. Harding owns the lectern right now.

5    BY MR. HARDING:

6    Q    Okay.  Was there a charge connected with the gun having been

7    stolen, do you recall?

8    A    No, it was not.

9    Q    Okay.  Thank you.  I have no further questions.

10             MR. KURLAND:  Brief redirect?

11             THE COURT:  Briefly.

12             RECROSS EXAMINATION

13   BY MR. KURLAND:

14   Q    Just for clarification.  The gun, it was in police custody

15   at the time it was stolen?

16   A    No.  When we recovered the handgun from the vehicle, we do,

17   we do what we call a gun check to verify whether or not, who is

18   the actual owner of the gun.  And at that time it was stolen.

19   Q    But that had nothing to do with Mr. Gardner?

20   A    Meaning what?  I don't understand your question.

21   Q    Well, I want to clear up.  There's no suggestion that Mr.

22   Gardner was involved in that?

23   A    He was not charged.

24   Q    Also, in the search of the car at the time, no evidence of,

25   of musical instruments?

RECROSS EXAMINATION OF ROSEBOROUGH BY KURLAND                178

1    A    Musical instruments?

2    Q    Any musical instruments in the car?

3    A    The vehicle was inventoried.  When we tow a vehicle, we have

4    inventory, make sure there's no items that might be stolen.  So

5    what we do, we secure those, put them in the trunk and so forth,

6    and then we tow.  This happened, again, ten years ago.  I do not

7    recall any type of instrument being inside the vehicle.

8    Q    Okay.  Your observation at the time you approached the car,

9    you saw no musical instruments?

10   A    I do not recall seeing no musical instruments.

11   Q    You saw no musical production machinery or equipment?

12   A    Once again, I do not recall seeing any musical instrument

13   inside the vehicle.

14   Q    All right.  Thank you, Detective.

15        THE COURT:  Thank you very much, Detective Roseborough.

16   You're excused.

17        Ladies and gentlemen of the jury, that will conclude

18   our court day.  I want to thank you.  I received a number of

19   notes from you, and so I appreciate your diligence in being

20   careful to bring to my attention any matter that may be of

21   concern to you.  And I encourage you to continue to do so.

22        I believe each of you has received a copy of my

23   memorandum to you setting out the dates.  As I say in the

24   memorandum, this right now is a firm schedule.  Changes are

25   possible, but I will let you know just as far in advance as I

1    possibly can when and if there are going to be changes.

2                We will be in session all day tomorrow, September 18th.

3    And then you will be free on Friday to go about your business.

4                Next week we'll be in session on the 22nd, which is

5    Monday, the 23rd, which is Tuesday, and the 24th, which is

6    Wednesday, but not on Thursday or Friday of next week.  Again,

7    this is all in the memorandum that I gave you.

8                And so you'll have not only a weekend, but a long

9    weekend, next week.  And then we'll see you again on Monday the

10   29th.

11               Now, on Monday the 29th, we will be breaking somewhat

12   early, no later than 3 p.m.  Then we won't be in session at all

13   on Tuesday the 30th.  We'll resume only on October 1st.

14               So the week of the 29th, we're only going to be in

15   session for three-quarters of a day on Monday and then not on

16   Tuesday, and then all day on Wednesday, and then not on Thursday.

17               Continue to adhere to all of my instructions.  Do not

18   discuss the case or any of the evidence you've heard so far.

19   Continue to keep an open mind about all issues.  Avoid any media

20   attention about the case, if any.  Do not discuss the case with

21   any family or friends during the overnight recess.  Do not

22   discuss the case among yourselves when you're waiting in the jury

23   room.  And conduct no investigation of any sort online, through

24   books, or in any other manner.

25               Please enjoy your evening.  The jury's excused until

180

1    9:30 tomorrow morning.  We'll resume at 9:30 Thursday morning.

2              (Jury exits the courtroom.)

3              THE COURT:  Counsel, I was alluding to the fact that

4    one juror sent a note inquiring about next weekend, whether she

5    could leave town for Saturday and Sunday.  So I answered that.

6              And another note indicates that one of the jurors may

7    be familiar with Officer Roussey, who is not going to be a

8    witness in the case.  That's correct, is it not?

9              MR. HANLON:  That's correct, Your Honor.

10             THE COURT:  I think he was the submitting officer on

11   one of those arrests.  So I don't see a need to respond to that.

12             Anything else for the good of the order?

13             MR. MARTIN:  Your Honor.

14             THE COURT:  Yes, Mr. Martin.

15             MR. MARTIN:  Your Honor, just two things that I would

16   like the Court to think about, issues that affect my client.  And

17   I don't say this to fault Mr. Harding because I know how busy

18   he's been.  But I have issues with those CD's that I wrote you

19   about, the tapes.

20             THE COURT:  Yes.

21             MR. MARTIN:  I would like to get a chance to have, A,

22   you have to approve my request to have the expert examine them

23   and enhance them.  I wrote you that letter last Friday or

24   Thursday.

25             THE COURT:  Have I not approved that?

1          MR. MARTIN:  I don't know that.  I haven't been in my

2    office all day.  But I didn't get anything yesterday.

3          THE COURT:  I think I signed it.

4          MR. MARTIN:  Then when that's done, I will need access

5    to the original.  And Mr. Harding and I need to work out how

6    we're going to do that.

7          The second thing, Your Honor, is we have an issue, I

8    have requested to see the original latent prints of the palm

9    print.  As Mr. Harding has pointed out to me several times now,

10   my request is very late.  And it was because I didn't really

11   think until I was starting to look at all the Jencks and

12   everything what I needed to do with it.  I hadn't really resolved

13   it in my own mind.

14         I'm told that I can't have access to that until the day

15   the guy shows up in court here to testify, which of course

16   doesn't give me much use of my expert to cross examine the

17   witness if he can only examine it that morning.  And I'm told

18   that because Mr. Harding says that the Baltimore City Police

19   require that he or someone from his office be present.

20         My expert has just been over there a couple weeks ago

21   and says that he doesn't know that to be a requirement.  Even if

22   it is, I would like to figure out with the Court's help when we

23   can arrange to do that, rather than have me wait until the day

24   that the fellow arrives in the courthouse here.

25         THE COURT:  Okay.

1          MR. MARTIN:  So those are two things I would like you

2     to think about.  I don't need an answer tonight, but I'm going to

3     need them pretty soon.

4          THE COURT:  Mr. Harding, can you approach the lectern,

5     please?  As I just mentioned to the jury, that week of September

6     29th we're only in session for part of the day on Monday and then

7     all day Wednesday.  I'm sorry.  All day Thursday.  No.  All day

8     Wednesday.  Are you going to get to the McCaffity proof before

9     then?

10         MR. HARDING:  Yes, Your Honor.

11         THE COURT:  All right.  Well, I don't see why Mr.

12    Martin's expert can't just go over there.  I don't know why a

13    lawyer has to be present for that.

14         MR. HARDING:  It's because of their internal rules.  I

15    understand they've had some bad experiences.

16         THE COURT:  Oh, we've read about lots of bad

17    experiences over there.

18         MR. HARDING:  Well, they have a rule now that they

19    can't allow the latents out of the lab except to go to court.

20    And if they're shown to a defense expert or to defense attorneys

21    for that matter, at the lab, the prosecutor has to be present

22    during the actual showing.  This is what they've explained to me.

23         So it's a considerable inconvenience for us.  And

24    considering that this came up at the last minute, I thought it

25    reasonable to simply tell Mr. Martin that when the expert comes

1    to court with the latent, then their expert can examine it that

2    day, perhaps before the expert takes the stand.

3            THE COURT:  Perhaps before.  No.  That's not

4    acceptable, Mr. Harding.

5            Look, you've got some really, really helpful, friendly

6    people in your office who are lawyers, who are assistant U.S.

7    attorneys, who like you and Mr. Hanlon a lot.  And I have no

8    doubt that if you can give Mr. Martin a firm appointment over at

9    the lab, they don't want you or Mr. Hanlon.  What they want is a

10   lawyer from the United States Attorney's Office.

11           So again, I don't see why this can't be done.  It's

12   going to take all of 30 minutes.  Just have somebody go over

13   there the same way you have people stand in for arraignments, and

14   let's just get it done.  Okay?  Do your best to get it done.

15           MR. HARDING:  All right, Your Honor.

16           THE COURT:  Thank you very much.  Yes, Mr. Crowe.

17           MR. CROWE:  Thank you, Your Honor.  I hesitate to

18   involve the Court in this.  But I have asked Mr. Harding if he

19   could provide one copy of the photographs and papers and document

20   exhibits, of the government exhibits for the defense counsel,

21   make copies and circulate them.  He's apparently expressed some

22   reluctance to do this.

23           One of the difficulties is when lab reports and things

24   of that nature are shown to witnesses, we don't necessarily have

25   them immediately at hand.  And it would be a great convenience if

1    we could have a copy of the government's exhibits.  And we

2    certainly don't want to interrupt the court proceedings so that

3    four of us can look at routine documents.

4            THE COURT:  Well, let me ask you a question.  Well,

5    what do you want to say about that, Mr. Harding?  Because I think

6    they ought to just be put on the DOAR and then everybody can look

7    at them at the same time.  Go ahead, Mr. Harding.

8            MR. HARDING:  Well, the documents, of course, have been

9    provided in the course of discovery.

10           THE COURT:  Right.  And Mr. Crowe didn't say anything

11   contrary to that.

12           MR. HARDING:  Actually, what I told Mr. Crowe was that

13   I would be, that we'd be happy to but we would, seven of the

14   eight defense counsel have told us they're willing to enter into

15   a sort of stipulation agreement designed to streamline this whole

16   proceeding.  We have only one defense attorney who's reluctant to

17   do that, and I encourage Mr. Crowe to try to talk to that person

18   and perhaps we can all reach a much more amicable understanding

19   about how we're going to proceed in this trial.  And that's the

20   effort I've been trying to --

21           THE COURT:  Well, I think -- I appreciate that.  I

22   appreciate Mr. Crowe's efforts, if any.  But I think there's an

23   even easier way.  What is the problem -- I haven't had any

24   evidentiary exhibits brought to my attention other than the ones

25   that we went over in the motions hearings.  So as far as I'm

1    concerned, everything's admissible.  So I don't understand why

2    every exhibit isn't simply put on the DOAR either for immediate

3    admission or on the basis of the government's representation that

4    you're going to connect up and satisfy the foundational

5    requirements.

6           I don't know why you have to approach a police officer

7    and show him a chemical report.  Maybe I'm missing something.

8           MR. HARDING:  No.  We didn't actually move the lab

9    reports into evidence.  We need to have the chemist come in.

10          THE COURT:  Right.  Okay.

11          MR. HARDING:  Just simply establishing that this lab

12   report is connected to the drugs the officer is testifying about

13   so when the chemists come in --

14          THE COURT:  So what's the -- I'm sorry to cut you off.

15   But what's the problem with the jury seeing it?  Why not just put

16   it on the DOAR?

17          MR. HARDING:  Fine with the government, Your Honor.

18          THE COURT:  I thought it would be.  Anybody got a

19   problem with that?

20          MR. COBURN:  No, Your Honor.

21          MR. MARTIN:  No, Your Honor.

22          THE COURT:  Of course not.  So just put it on the DOAR.

23   The whole point of having the DOAR is so you don't have to wear

24   out the carpet walking to the witness.

25          MR. HARDING:  I'm delighted.  I'll use the DOAR as much

1    as I possibly can.

2           THE COURT:  Excellent.  All right.  Problem solving

3    courts.  Mr. Pyne?

4           MR. PYNE:  Literally, Your Honor, I do have a

5    housekeeping matter.  I have pretty much worked my way completely

6    off the trial table there.  So I don't know what we can do in

7    terms of bringing in another table or whatever.  But today I was

8    essentially working off my lap.

9           If we could somehow get a little more trial space or

10   trial table space, it would be appreciated.

11          MR. COBURN:  From my point of view, I think that's a

12   completely reasonable request.  I mean, I'm just, Mr. Pyne's

13   chair kind of ended up getting turned around somewhere overnight

14   and so, you know, that's what accounts for the fact that he's not

15   at the end of the table any more.  But he is, he really does have

16   no space to work over there.

17          THE COURT:  Well, we will see what we can do for you,

18   Mr. Pyne.  I don't know that there's going to be much.  But we'll

19   take a look at it after tomorrow.

20          Anything else?  Thank you, counsel.  We're in recess

21   until 9:30 tomorrow.

22          (Conclusion of proceedings at 5 p.m.)

23

24

25

187

1                             INDEX

2

3                                                    PAGE

4    WITNESS: OFFICER JOSEPH GOLDBERG
     DIRECT EXAMINATION BY MR. HANLON          83
5    CROSS EXAMINATION BY MR. LAWLOR           96
     CROSS EXAMINATION BY MR. COBURN           97
6    REDIRECT EXAMINATION BY MR. HANLON        99

7    WITNESS: DAVID PHIPPS
     DIRECT EXAMINATION BY MR. HANLON          100
8    CROSS EXAMINATION BY MR. LAWLOR           110
     CROSS EXAMINATION BY MR. PYNE             111
9    CROSS EXAMINATION BY MR. COBURN           119
     REDIRECT EXAMINATION BY MR. HANLON        120
10
     WITNESS: DETECTIVE PETER SULLIVAN
11   DIRECT EXAMINATION BY MR. HARDING         121
     CROSS EXAMINATION BY MR. PYNE             130
12   REDIRECT EXAMINATION BY MR. HARDING       137

13   WITNESS: DETECTIVE KEVIN ROSEBOROUGH
     DIRECT EXAMINATION BY MR. HARDING         166
14   CROSS EXAMINATION BY MR. KURLAND          173
     REDIRECT EXAMINATION BY MR. HARDING       176
15   RECROSS EXAMINATION BY MR. KURLAND        177

16

17

18

19

20

21

22

23

24

25

188

1                    REPORTER'S CERTIFICATE

2


3          I, Mary M. Zajac, do hereby certify that I recorded

4   stenographically the proceedings in the matter of USA v. Willie

5   Mitchell, et al., Case Number(s) AMD-04-029, on September 17,

6   2008.

7          I further certify that the foregoing pages constitute

8   the official transcript of proceedings as transcribed by me to

9   the within matter in a complete and accurate manner.

10         In Witness Whereof, I have hereunto affixed my

11  signature this _____ day of _____, 2009.

12

13

14

15                         _____

                           Mary M. Zajac,
16                         Official Court Reporter

17

18

19

20

21

22

23

24

25

## $

**$1,397** [1] - 170:20
**$120** [3] - 108:9, 116:19, 120:8
**$126** [2] - 94:22, 97:24
**$1618** [1] - 129:2
**$20** [1] - 117:3
**$23,000** [1] - 19:2
**$5,000** [1] - 35:11
**$50,000** [3] - 16:13, 16:18, 19:3

## '

**'80s** [1] - 10:6
**'90s** [1] - 10:7
**'95** [3] - 80:20, 84:6, 140:10
**'96** [4] - 80:19, 80:20, 140:10
**'97** [1] - 140:10

## 1

**10** [5] - 60:12, 106:17, 106:18, 128:14, 165:14
**100** [1] - 187:7
**100%** [1] - 94:19
**101** [1] - 1:24
**10:45** [1] - 2:1
**11** [4] - 29:15, 60:11, 84:20, 101:18
**110** [1] - 187:8
**111** [1] - 187:8
**119** [1] - 187:9
**12** [9] - 29:14, 29:15, 36:7, 37:1, 101:1, 111:7, 146:13, 146:14, 152:12
**120** [1] - 187:9
**121** [1] - 187:11
**12:00** [1] - 101:18
**12:30** [1] - 57:6
**130** [1] - 187:11
**13653** [1] - 110:4
**137** [1] - 187:12
**15** [7] - 87:16, 106:17, 106:18, 138:7, 138:8, 138:10, 165:14
**15th** [6] - 84:13, 98:3, 166:25, 167:5, 175:4, 175:5
**16** [3] - 32:3, 36:22, 72:1
**166** [1] - 187:13
**17** [6] - 1:11, 31:20, 169:25, 170:1, 170:2,

188:5
**173** [1] - 187:14
**176** [1] - 187:14
**177** [1] - 187:15
**17th** [1] - 34:13
**18th** [5] - 28:14, 101:5, 101:18, 120:1, 179:2
**19** [1] - 35:25
**192** [1] - 24:15
**1959** [1] - 48:3
**1961** [1] - 48:3
**1987** [1] - 100:20
**1990** [1] - 175:5
**1994** [7] - 8:22, 28:13, 28:16, 36:22, 63:18, 69:10, 162:5
**1996** [2] - 101:5, 101:18, 120:1
**1997** [8] - 83:23, 84:13, 98:3, 122:4, 122:6, 122:19, 162:5
**1998** [3] - 162:17, 167:2, 167:5
**1:03** [1] - 80:10
**1:40** [1] - 85:4
**1:45** [2] - 57:12, 57:13
**1st** [1] - 179:13

## 2

**2** [1] - 80:9
**20** [9] - 71:21, 87:16, 103:10, 108:21, 110:6, 113:12, 114:10, 114:12, 115:16
**200** [2] - 15:16, 149:13
**2000** [5] - 84:6, 85:4, 87:13, 87:18, 89:6
**2002** [5] - 29:1, 29:7, 29:9, 29:22, 31:20
**2003** [1] - 12:2
**2004** [2] - 28:16, 36:22
**2005** [4] - 113:15, 131:2, 131:4, 175:19
**2006** [3] - 28:14, 100:20, 100:21
**2008** [2] - 1:11, 188:6
**2009** [1] - 188:11
**2100** [4] - 97:3, 101:22, 105:15, 112:15
**21201** [1] - 1:25
**22nd** [1] - 179:4
**23** [1] - 122:2
**23rd** [1] - 179:5
**24** [3] - 29:22, 32:14, 32:23
**24th** [3] - 32:5, 32:14, 179:5
**25** [2] - 29:22, 87:15

**27th** [1] - 158:19
**29th** [5] - 175:19, 179:10, 179:11, 179:14, 182:6

## 3

**3** [1] - 179:12
**3-419** [1] - 24:15
**30** [2] - 91:20, 183:12
**300** [1] - 15:16
**30th** [1] - 179:13
**33rd** [1] - 83:10
**39** [4] - 128:13, 129:25, 130:3, 130:14

## 4

**4** [2] - 170:21, 174:2
**40** [6] - 91:20, 113:21, 114:6, 114:10, 114:12, 115:16
**403** [4] - 59:25, 60:10, 61:2, 73:24
**4:30** [1] - 165:2

## 5

**5** [2] - 162:5, 186:22
**50** [2] - 12:3, 45:12
**5515** [1] - 1:24

## 6

**6** [1] - 152:12
**6214** [1] - 130:8

## 7

**7310** [1] - 24:15

## 8

**83** [1] - 187:4
**8:00** [2] - 167:5, 167:19
**8A** [1] - 130:8
**8J** [1] - 110:4

## 9

**9** [4] - 122:7, 122:19, 123:8, 128:14
**9-I-10141** [1] - 95:22
**90** [5] - 89:12, 89:19, 89:20, 91:13, 91:19

**922(g** [1] - 60:24
**95** [3] - 17:2, 17:8, 17:10
**96** [1] - 187:5
**96045852** [1] - 110:10
**97** [1] - 187:5
**97001748** [1] - 130:6
**97045345** [1] - 96:3
**98053630** [1] - 171:23
**99** [1] - 187:6
**99%** [1] - 33:3
**9:30** [3] - 180:1, 186:21
**9:41** [1] - 32:4
**9th** [2] - 122:6, 122:19

## A

**a.m** [2] - 2:1, 101:18
**abbreviated** [1] - 46:11
**abilities** [1] - 147:14
**ability** [2] - 3:3, 103:3
**able** [12] - 3:13, 47:18, 75:22, 88:2, 90:16, 91:10, 103:18, 104:5, 104:6, 136:25, 170:25, 175:7
**Absolutely** [4] - 61:10, 77:10, 79:16, 80:7
**absolutely** [7] - 18:8, 33:6, 33:18, 151:13, 153:5, 158:9
**academic** [1] - 7:25
**academics** [2] - 8:4, 8:12
**accept** [3] - 21:19, 32:20, 76:5
**acceptable** [2] - 57:4, 183:4
**accepts** [1] - 24:18
**access** [3] - 104:6, 181:4, 181:14
**accompanied** [1] - 98:8
**accord** [1] - 24:14
**according** [2] - 12:5, 49:25
**Accordingly** [1] - 6:12
**account** [3] - 24:12, 24:20, 37:23
**accounts** [1] - 186:14
**accurate** [2] - 111:8, 188:9
**accurately** [2] - 54:10, 61:24
**achieving** [1] - 48:9
**acquittal** [4] - 59:4, 60:19, 75:1, 78:4
**acquittals** [1] - 61:6, 62:2, 63:15, 64:12, 64:16, 64:20, 65:19,

66:12, 68:15, 75:16, 76:17
**acquitted** [6] - 58:23, 58:24, 65:15, 69:14, 72:8, 76:23
**Act** [1] - 46:13
**act** [3] - 24:23, 34:21, 69:11
**acting** [1] - 11:20
**action** [3] - 81:12, 91:12, 107:18
**actions** [1] - 134:9, 134:10, 135:7
**active** [2] - 111:12, 111:15
**activities** [4] - 7:7, 48:7, 49:11, 148:13
**activity** [1] - 168:9
**actor** [1] - 11:19
**actual** [6] - 2:13, 53:25, 71:12, 169:21, 177:18, 182:22
**ad** [1] - 78:23
**Adam** [4] - 1:21, 39:22, 78:21, 130:8
**add** [1] - 18:20
**added** [1] - 147:10
**addition** [1] - 7:24
**additional** [1] - 3:2
**address** [4] - 20:13, 81:22, 166:20, 173:21
**addressed** [2] - 51:3, 98:24
**addressing** [3] - 34:2, 70:20, 70:24
**adhere** [1] - 179:17
**adjudication** [1] - 40:3
**adjust** [1] - 24:13
**admissible** [1] - 185:1
**admission** [3] - 70:7, 71:8, 185:3
**admissions** [1] - 72:3
**admitted** [1] - 176:17
**admitting** [1] - 69:2
**admonish** [1] - 157:18
**adult** [1] - 75:21
**adults** [1] - 144:2
**advance** [1] - 178:25
**advantage** [1] - 19:8
**advise** [2] - 164:17, 168:13
**advised** [8] - 2:10, 2:11, 3:1, 3:2, 145:23, 167:25, 168:17, 170:19
**advocate** [1] - 40:16
**advocates** [1] - 40:15
**Affairs** [1] - 101:3
**affect** [2] - 59:15, 79:8, 180:16
**affected** [1] - 48:7

affects [1] - 75:15
affiliation [1] - 148:2
affixed [1] - 188:10
afford [2] - 3:9, 46:19
afraid [1] - 154:5
afternoon [33] - 2:21, 57:20, 58:8, 63:22, 64:1, 64:2, 64:5, 80:11, 83:4, 83:5, 85:4, 97:16, 97:17, 100:11, 100:12, 110:16, 110:17, 111:4, 111:6, 119:23, 119:24, 121:19, 121:20, 130:23, 130:24, 138:3, 138:12, 145:15, 149:22, 163:11, 166:3, 166:15, 173:20
age [4] - 5:13, 10:10, 10:11, 149:13
agent [1] - 27:5
Agent [1] - 27:5
aggressively [1] - 40:16
agnostic [1] - 59:2
ago [17] - 60:1, 60:9, 71:22, 76:25, 84:20, 88:1, 98:4, 111:7, 113:15, 117:20, 118:4, 124:24, 175:9, 175:14, 175:16, 178:6, 181:20
agree [1] - 17:7, 27:9, 40:5, 47:6, 59:14, 64:15, 72:10, 72:19, 74:22, 139:9, 151:25, 155:9, 157:23
agreed [1] - 74:22
agreement [5] - 46:23, 46:24, 47:15, 54:3, 184:15
agreements [1] - 54:18
ahead [7] - 60:17, 97:4, 109:6, 113:2, 134:3, 167:17, 184:7
aiming [1] - 169:21
Air [2] - 82:6, 149:6
akin [1] - 24:23
al [1] - 188:5
album [1] - 12:21
albums [1] - 12:4
Alcohol [1] - 27:6
alert [2] - 16:2, 132:21
alerted [2] - 133:14, 153:10
alerting [1] - 146:1
alibi [5] - 31:9, 31:20, 32:10, 32:16, 32:21
alive [1] - 17:22
allegations [5] - 28:19, 41:13, 42:5, 42:24, 47:10
allege [2] - 28:23, 55:25
alleged [6] - 49:12, 49:18, 52:18, 53:7, 56:6,

63:18
alleges [1] - 52:8
alley [5] - 85:24, 86:20, 105:4, 105:21, 106:23
alleys [1] - 87:17
allow [1] - 182:19
allowed [2] - 40:23, 54:19
alluded [3] - 43:19, 45:2, 73:17
alluding [1] - 180:3
allusion [1] - 69:17
almost [10] - 4:17, 5:2, 7:23, 20:18, 55:1, 78:8, 113:1, 113:15, 126:10, 157:5
Almost [1] - 94:19
alone [3] - 12:3, 122:24, 167:7
Alone [1] - 167:9
alongside [1] - 133:14
alternate [3] - 6:8, 6:16, 6:17
Alternate [1] - 6:12
Alternates [1] - 161:16
alternates [2] - 2:14, 6:19, 138:17, 155:20, 159:12
Altitudes [1] - 82:4
altitudes [2] - 82:4, 82:5
AMD-04-0029 [1] - 24:19
AMD-04-029 [2] - 1:6, 188:5
amenable [1] - 157:7
AMERICA [1] - 1:4
amicable [1] - 184:18
amount [7] - 4:10, 18:6, 28:4, 28:18, 30:5, 97:23, 122:15
analysis [5] - 96:5, 96:14, 129:25, 130:3, 174:7
analyze [1] - 130:12
Andre [1] - 1:13
angle [1] - 26:10
angled [1] - 90:2
annoying [1] - 22:8
answer [15] - 63:9, 63:10, 66:14, 66:15, 68:7, 99:21, 103:21, 106:8, 132:25, 134:2, 134:3, 137:19, 151:8, 164:8, 182:2
answer's [1] - 65:7
answered [4] - 33:1, 33:5, 62:17, 180:5
Anthony [5] - 28:9, 29:12, 29:19, 29:21, 38:23

anticipate [1] - 80:6
anxious [3] - 50:4, 50:12, 86:13
anxiously [1] - 90:8
anyway [3] - 55:17, 155:25, 163:17
apart [2] - 65:3, 65:4
apartment [1] - 51:21
apologize [1] - 11:10
apologizing [1] - 11:11
apparent [1] - 132:12
appear [4] - 2:14, 41:11, 49:21, 164:2
appearance [2] - 24:11
Appearances [1] - 1:14
appeared [2] - 33:22, 126:1
applications [1] - 5:5
appointed [1] - 45:5
appointment [2] - 149:19, 183:8
appraise [1] - 54:10
appreciate [5] - 6:18, 39:25, 178:19, 184:21, 184:22
appreciated [1] - 186:10
Approach [2] - 23:9, 103:24
approach [13] - 58:12, 64:4, 75:8, 77:12, 80:12, 95:10, 103:7, 106:20, 109:10, 123:16, 171:10, 182:4, 185:6
approached [3] - 5:10, 104:8, 178:8
approaching [3] - 57:15, 92:23, 107:11
appropriate [4] - 43:12, 55:17, 60:9, 151:9
approve [1] - 180:22
approved [1] - 180:25
April [3] - 31:20, 34:13, 36:22
arbiter [1] - 54:17
area [27] - 13:8, 20:5, 74:15, 81:16, 85:1, 87:23, 88:23, 89:16, 93:21, 98:12, 101:16, 106:13, 107:20, 118:14, 123:19, 123:20, 124:6, 124:7, 124:25, 125:9, 127:7, 132:16, 132:17, 173:6, 174:13, 174:14, 174:20
areas [3] - 28:7, 122:14, 122:15
argue [2] - 24:10, 24:21
arguing [1] - 20:23
argument [4] - 20:19,

40:14, 78:10, 78:18
arguments [2] - 20:10, 20:12
arises [1] - 58:22
arm [5] - 127:14, 127:18, 127:24, 136:22, 137:2
armed [4] - 69:7, 69:25, 70:13, 70:14
arraignments [1] - 183:13
arrange [3] - 142:1, 151:17, 181:23
arrest [36] - 48:16, 65:22, 65:24, 67:21, 67:22, 68:9, 69:24, 70:18, 71:15, 74:25, 92:22, 93:9, 93:18, 94:22, 95:8, 96:24, 98:23, 107:22, 108:1, 108:11, 110:19, 122:17, 123:9, 123:12, 123:20, 125:2, 127:17, 128:5, 165:11, 165:12, 167:4, 167:18, 170:19, 170:20, 174:3
arrest-by-arrest [1] - 65:24
arrested [3] - 31:20, 120:8
arresting [5] - 72:13, 74:24, 75:19, 75:22, 107:23
arrests [7] - 60:1, 64:8, 64:12, 72:1, 72:4, 76:11, 180:11
Arrington [3] - 2:10, 3:1, 163:9
Arrington's [1] - 124:21
arrived [1] - 107:20
arrives [1] - 181:24
artist [3] - 9:19, 10:10, 12:21
artists [3] - 9:23, 9:24, 11:1
aside [7] - 32:15, 41:16, 59:18, 75:11, 97:18, 97:19, 151:24
aspect [3] - 154:1, 163:12, 163:24
assemble [1] - 162:6
assert [1] - 21:23
assessing [1] - 77:24
assigned [7] - 95:23, 101:8, 101:9, 121:21, 121:22, 121:23, 122:5
Assigned [1] - 166:18
assignment [4] - 84:1, 122:4, 166:17, 167:1
assignments [1] -

84:10
assist [1] - 107:20
Assistant [1] - 99:10
assistant [4] - 141:8, 141:16, 143:6, 183:6
associated [3] - 48:6, 49:22, 146:4
associates [1] - 48:1
association [3] - 124:8, 124:10, 124:16
assume [7] - 4:6, 23:15, 62:1, 64:12, 79:17, 144:16, 150:9
assumed [3] - 3:6, 64:5, 150:5
assuming [2] - 63:14, 154:18
assure [2] - 150:22, 151:3
athlete [1] - 147:5
Athletic [1] - 160:23
athletic [2] - 146:15, 147:14
attached [1] - 169:21
attempt [1] - 58:3
attempted [2] - 29:6, 51:21
attention [15] - 39:10, 51:14, 83:23, 84:12, 86:9, 87:7, 101:4, 101:17, 102:14, 104:25, 114:13, 122:6, 178:20, 179:20, 184:24
attitudes [1] - 82:5
Attorney [1] - 99:10
attorney [1] - 184:16
Attorney's [2] - 27:1, 183:10
attorneys [6] - 20:8, 20:16, 22:7, 30:16, 182:20, 183:7
August [3] - 28:14, 131:4, 141:7
authorities [1] - 51:4
authority [4] - 21:1, 21:3, 21:19
automatically [1] - 18:16
available [2] - 19:3, 176:17
Avenue [4] - 167:16, 167:19, 168:6, 173:11
average [1] - 5:13
Avoid [1] - 179:19
avoid [2] - 103:1, 159:15
aware [3] - 16:3, 164:2, 164:3
awful [1] - 30:17

# B

**B-A-I-R-E** [1] - 129:16
**baby** [1] - 156:16
**background** [4] - 16:6, 147:22, 147:23, 155:11
**Bacon** [6] - 168:7, 168:12, 168:20, 170:15, 171:25, 172:9
**bad** [7] - 11:8, 11:9, 14:16, 42:22, 54:6, 182:15, 182:16
**badge** [2] - 131:12, 131:20
**badges** [2] - 93:3, 93:6
**bag** [52] - 89:23, 90:6, 90:9, 90:11, 90:12, 90:17, 91:11, 91:14, 92:3, 92:7, 92:11, 93:21, 93:24, 93:25, 94:2, 94:3, 94:5, 94:7, 94:20, 96:7, 102:17, 104:3, 104:14, 108:20, 108:25, 110:6, 114:16, 114:18, 114:22, 114:25, 115:17, 116:6, 116:12, 118:24, 119:1, 127:12, 128:2, 128:11, 135:11, 135:13, 135:14, 135:19, 135:20, 135:21, 135:23, 136:10, 136:13, 136:17, 136:24, 137:1
**baggies** [1] - 115:8
**bags** [6] - 108:21, 110:6, 115:2, 115:3, 115:14, 115:17
**Baire** [7] - 106:3, 106:4, 106:20, 108:8, 129:14, 129:16, 131:7
**balance** [1] - 151:2
**ballpark** [1] - 87:1
**Baltimore** [28] - 1:11, 1:25, 7:2, 7:3, 8:7, 9:17, 25:19, 25:20, 26:24, 26:25, 27:3, 31:22, 81:17, 83:7, 83:9, 83:19, 85:1, 100:16, 101:11, 121:22, 121:25, 123:19, 166:16, 166:23, 171:13, 174:15, 174:18, 181:18
**bank** [1] - 37:23
**bargain** [1] - 53:25
**barrel** [3] - 169:16, 169:17, 169:21
**Barry** [3] - 1:22, 39:20, 78:5
**base** [4] - 21:4, 21:6, 89:20, 90:16
**baseball** [1] - 89:19
**Based** [5] - 68:7, 91:10,

127:7, 128:17, 133:16
**based** [10] - 45:8, 45:14, 45:24, 54:21, 98:11, 103:15, 120:3, 135:4, 135:6, 145:25
**basement** [1] - 10:1
**basis** [9] - 8:15, 65:24, 69:2, 69:5, 132:16, 150:20, 162:19, 185:3
**basketball** [1] - 147:4
**beam** [3] - 43:7, 46:8, 50:8
**bear** [1] - 130:17
**beautiful** [1] - 45:4
**became** [5] - 8:4, 10:7, 10:12, 30:13, 124:25
**become** [6] - 6:10, 21:8, 44:6
**becomes** [1] - 55:9
**beer** [1] - 7:7
**beforehand** [1] - 55:14
**Beg** [1] - 172:21
**begin** [1] - 104:25
**beginning** [3] - 26:3, 28:21, 148:18
**Behalf** [5] - 1:15, 1:16, 1:18, 1:19, 1:21
**behalf** [3] - 72:15, 74:21, 76:8
**behaviors** [1] - 22:22
**behind** [10] - 15:10, 19:9, 86:20, 92:19, 92:21, 93:19, 93:23, 126:6, 134:14, 134:16
**beholder** [1] - 54:14
**Bel** [2] - 82:6, 149:6
**believability** [1] - 42:25
**Belinda** [5] - 2:16, 82:8, 138:23, 144:12, 146:24
**belittling** [1] - 44:21
**belongings** [1] - 2:17
**below** [1] - 172:25
**Below** [1] - 173:1
**belt** [2] - 93:21, 93:23
**bench** [2] - 23:9, 24:5
**Bench** [1] - 23:11
**benefit** [1] - 152:23
**Benson** [1] - 27:3
**best** [11] - 5:15, 8:1, 8:12, 12:5, 43:21, 43:22, 65:21, 132:18, 150:14, 175:7, 183:14
**better** [4] - 43:9, 57:3, 122:9, 122:17
**between** [29] - 26:22, 27:11, 28:16, 30:9, 31:12, 32:24, 36:21, 37:7, 54:1, 54:12, 55:12, 86:11, 114:12, 126:17, 127:4, 127:14, 127:18,

134:24, 135:24, 136:2, 136:7, 136:9, 137:1, 149:24, 150:8, 152:2, 169:12, 175:17
**beyond** [12] - 13:18, 27:24, 28:1, 36:12, 39:3, 46:1, 46:3, 48:21, 49:17, 99:20, 154:16, 163:22
**bias** [1] - 155:6
**big** [19] - 10:7, 10:12, 10:16, 10:17, 10:23, 13:2, 13:6, 19:11, 25:11, 29:19, 29:24, 39:16, 115:3, 115:14, 132:6, 132:7, 135:13, 135:20, 163:2
**bill** [2] - 117:3
**bills** [1] - 116:24
**bind** [1] - 51:21
**binding** [1] - 59:3
**birthday** [1] - 32:14
**bit** [8] - 27:10, 41:17, 41:25, 43:19, 46:9, 93:20, 102:19, 142:10
**biz** [1] - 11:19
**black** [1] - 87:11
**Blade** [1] - 32:5
**blame** [2] - 13:24, 14:20, 14:22, 15:11, 18:9, 25:14
**blend** [1] - 103:3
**bling** [2] - 10:16, 38:2
**block** [18] - 85:4, 87:13, 87:18, 89:7, 89:12, 89:18, 90:21, 90:24, 97:3, 101:22, 105:5, 105:8, 105:14, 105:15, 112:15, 116:3, 116:6
**blocked** [1] - 175:1
**blocks** [1] - 88:24
**blood** [1] - 49:9
**blue** [4] - 94:3, 94:12, 96:8
**BMV-533** [1] - 109:7
**bodies** [1] - 45:13
**body** [1] - 134:25
**bond** [1] - 24:11
**booked** [2] - 95:7, 99:4
**booking** [1] - 95:5
**books** [1] - 179:24
**boost** [2] - 12:14, 12:15
**borderline** [1] - 96:25
**boring** [1] - 15:8
**bottom** [5] - 20:1, 44:14, 47:8, 114:22, 169:15
**bought** [1] - 32:4
**box** [3] - 78:24, 128:20, 135:22
**boxes** [1] - 128:21

**boys** [2] - 132:10, 141:13
**brawl** [1] - 29:1
**break** [4] - 37:15, 57:7, 96:7, 114:1
**breaking** [1] - 179:11
**Brian** [1] - 27:5
**bridge** [2] - 78:14, 158:12
**Brief** [2] - 138:11, 177:10
**brief** [3] - 33:21, 104:15, 173:25
**briefest** [1] - 165:21
**Briefly** [1] - 177:11
**briefly** [6] - 26:7, 100:24, 120:22, 141:6, 146:18, 173:21
**Bright** [1] - 91:5
**bright** [2] - 91:5, 169:20
**brights** [1] - 169:16
**bring** [12] - 2:12, 6:13, 57:2, 65:5, 65:19, 69:18, 72:13, 73:3, 153:5, 158:5, 162:15, 178:20
**bringing** [4] - 21:15, 68:3, 73:25, 186:7
**broke** [1] - 92:20
**brother** [2] - 17:19, 29:18
**brothers** [5] - 18:2, 19:17, 29:17, 30:13, 34:7
**brothers'** [1] - 19:10
**brought** [8] - 58:15, 60:20, 64:17, 64:21, 153:4, 174:23, 184:24
**Brown** [2] - 29:4, 30:10
**Bryant** [1] - 8:3
**bucks** [3] - 15:16
**building** [2] - 49:6, 86:20
**bunch** [6] - 7:2, 7:3, 12:11, 25:19, 46:25, 47:15
**bundle** [1] - 128:14
**bundled** [1] - 128:14
**bundles** [1] - 128:14
**burden** [2] - 13:21, 45:25
**Bursar's** [1] - 160:23
**bus** [1] - 162:16
**business** [33] - 3:23, 9:5, 9:7, 9:9, 9:17, 9:18, 9:19, 9:22, 11:22, 12:9, 13:2, 13:23, 13:24, 14:20, 17:13, 20:6, 25:1, 25:10, 25:11, 25:14, 25:17, 33:12, 48:14, 81:15, 81:18, 81:22, 100:14, 100:15, 179:3

**businesses** [1] - 89:1
**Busy** [1] - 150:9
**busy** [1] - 180:17
**button** [1] - 31:16
**butts** [1] - 83:15
**buy** [2] - 133:15, 133:16
**buyers** [5] - 85:23, 86:3, 86:11, 86:19, 89:15
**Buyers** [1] - 86:3
**buying** [2] - 86:7, 133:23
**buys** [1] - 132:3
**BY** [36] - 83:3, 96:20, 97:14, 99:16, 100:10, 103:23, 106:11, 110:15, 111:3, 119:22, 120:21, 121:18, 126:2, 130:22, 137:14, 166:14, 173:19, 176:24, 177:5, 177:13, 187:4, 187:5, 187:5, 187:6, 187:7, 187:8, 187:8, 187:9, 187:9, 187:11, 187:11, 187:12, 187:13, 187:14, 187:14, 187:15

# C

**cake** [1] - 71:3
**calmly** [1] - 22:14
**candid** [2] - 155:16, 162:25
**candidly** [1] - 78:21
**candor** [1] - 156:21
**cannot** [5] - 46:19, 49:1, 52:10, 157:10
**capacity** [3] - 167:11, 170:7, 170:9
**caps** [5] - 94:3, 94:5, 94:6, 96:8, 96:10
**capsule** [1] - 94:15
**capsules** [4] - 94:12, 94:13, 94:24
**car** [68] - 16:21, 17:24, 18:3, 19:10, 19:25, 34:2, 74:6, 85:12, 85:16, 85:24, 87:11, 102:20, 103:8, 104:5, 108:6, 108:17, 112:7, 112:21, 113:1, 113:12, 114:14, 116:8, 116:10, 122:22, 125:10, 125:22, 125:24, 126:10, 126:11, 126:15, 126:17, 127:5, 127:10, 127:11, 127:16, 129:3, 132:1, 132:12, 132:20, 133:8, 133:10, 133:12, 133:14, 133:20, 133:25, 134:5, 134:11, 134:13,

134:16, 134:17, 134:24, 135:5, 135:9, 135:10, 136:12, 136:25, 137:6, 137:8, 168:18, 170:15, 170:16, 177:24, 178:2, 178:8
  **card** [5] - 81:18, 81:19, 81:22, 82:9, 160:10
  **care** [6] - 53:22, 61:4, 72:7, 72:9, 72:10, 73:7
  **career** [1] - 5:16
  **careers** [1] - 100:23
  **careful** [1] - 178:20
  **carefully** [8] - 13:11, 16:24, 28:5, 56:1, 56:2, 56:3, 56:7, 56:12
  **carpet** [1] - 185:24
  **carrying** [2] - 45:25, 52:2
  **cars** [9] - 10:16, 74:9, 90:25, 91:7, 125:14, 127:5, 133:4, 167:22, 168:5
  **case** [146] - 6:2, 6:11, 11:10, 13:20, 13:22, 13:25, 14:16, 16:14, 20:20, 21:12, 21:22, 21:25, 22:23, 23:3, 24:19, 24:20, 26:3, 26:9, 26:20, 27:5, 27:16, 27:21, 27:24, 28:20, 30:16, 30:23, 33:20, 36:16, 37:9, 37:17, 38:1, 39:4, 40:1, 40:21, 41:7, 41:12, 41:24, 42:3, 42:5, 42:9, 42:14, 42:19, 42:21, 42:24, 43:5, 43:8, 43:11, 43:12, 43:17, 44:1, 44:11, 44:16, 44:17, 44:19, 44:20, 45:2, 45:4, 45:7, 45:8, 45:14, 45:20, 45:22, 46:2, 46:19, 47:11, 48:22, 48:24, 49:1, 49:3, 49:15, 49:19, 50:1, 50:5, 50:10, 50:15, 50:18, 50:22, 50:25, 51:9, 51:15, 52:9, 52:12, 52:19, 55:25, 56:5, 56:17, 57:9, 57:22, 58:4, 60:2, 60:22, 63:11, 63:18, 65:24, 66:5, 67:12, 68:1, 69:22, 73:18, 76:14, 77:22, 79:10, 81:1, 95:22, 95:24, 99:17, 99:19, 101:25, 102:2, 102:13, 108:14, 109:17, 110:1, 113:15, 129:22, 130:7, 130:15, 137:17, 138:5,

139:3, 139:15, 144:8, 151:4, 152:3, 152:21, 157:20, 158:19, 163:2, 163:12, 163:24, 165:6, 172:11, 175:15, 175:17, 175:20, 176:18, 179:18, 179:20, 179:22, 180:8
  **Case** [2] - 24:19, 188:5
  **CASE** [1] - 1:5
  **case-by-case** [1] - 65:24
  **cases** [21] - 20:11, 22:2, 42:3, 46:15, 50:22, 50:23, 51:4, 53:16, 53:18, 57:20, 60:19, 61:5, 64:11, 64:12, 66:23, 85:22, 87:1, 94:14, 95:19, 120:11
  **cash** [1] - 10:16
  **casually** [2] - 92:7, 92:12
  **catch** [2] - 86:9, 92:18
  **cater** [1] - 89:7
  **cater-corner** [1] - 89:7
  **caught** [3] - 87:7, 93:8, 102:14
  **Cavalier** [3] - 87:11, 131:25, 132:5
  **caveat** [1] - 73:1
  **CD's** [1] - 180:18
  **CDS** [1] - 95:19
  **celebrated** [1] - 151:24
  **cell** [6] - 31:16, 31:17, 32:25, 33:11, 33:14, 169:8
  **cells** [1] - 32:24
  **center** [1] - 169:12
  **centers** [2] - 21:17, 81:22
  **certain** [4] - 20:10, 45:20, 156:20, 174:6
  **certainly** [14] - 9:1, 26:20, 29:23, 39:7, 47:10, 65:13, 133:21, 139:11, 158:8, 158:23, 159:13, 159:14, 159:25, 184:2
  **certainty** [2] - 119:12, 119:14
  **CERTIFICATE** [1] - 188:1
  **certification** [1] - 143:21
  **certified** [1] - 71:14
  **Certified** [1] - 82:5
  **certify** [2] - 188:3, 188:7
  **chain** [4] - 93:6, 95:18, 131:20, 171:13
  **chair** [2] - 154:3, 186:13
  **chairs** [2] - 57:8, 138:5

  **chance** [2] - 158:2, 180:21
  **change** [1] - 105:6
  **changed** [5] - 30:1, 60:23, 97:5, 116:3, 154:5
  **Changes** [1] - 178:24
  **changes** [1] - 179:1
  **character** [7] - 139:2, 139:13, 139:15, 142:20, 154:6, 157:8, 162:14
  **charactered** [1] - 29:18
  **charge** [8] - 26:16, 29:5, 32:2, 62:2, 62:8, 63:2, 66:6, 177:6
  **charged** [23] - 21:9, 21:11, 21:12, 34:5, 36:8, 36:23, 39:1, 39:8, 45:22, 47:20, 51:9, 99:1, 99:3, 99:4, 99:6, 99:8, 99:17, 171:24, 172:2, 172:5, 172:9, 177:23
  **charges** [15] - 14:18, 24:14, 26:17, 26:20, 26:21, 28:1, 28:6, 28:20, 34:21, 36:3, 36:9, 39:7, 62:1, 74:16, 77:7
  **chart** [1] - 19:6
  **chase** [1] - 88:25
  **check** [4] - 62:20, 80:16, 81:23, 177:17
  **chemical** [2] - 174:7, 185:7
  **chemist** [1] - 185:9
  **chemists** [2] - 96:16, 185:13
  **Chevy** [1] - 102:17
  **child** [1] - 8:8
  **children's** [1] - 43:23
  **choose** [3] - 76:13, 76:17, 152:5
  **chunk** [1] - 19:3
  **circulate** [1] - 183:21
  **circumstances** [2] - 63:2, 135:7
  **citing** [1] - 173:22
  **City** [13] - 26:25, 31:22, 83:7, 83:9, 83:19, 100:16, 101:11, 121:25, 123:19, 166:16, 166:23, 171:13, 181:18
  **city** [10] - 11:5, 83:13, 83:16, 96:23, 97:10, 110:21, 131:25, 132:9, 174:19
  **civil** [1] - 24:23
  **clarification** [1] - 177:14
  **Clarify** [1] - 134:3
  **clarify** [2] - 43:3, 134:2
  **clash** [3] - 40:13, 40:18,

54:12
  **clear** [23] - 33:6, 34:1, 43:22, 52:5, 52:6, 57:19, 58:15, 67:9, 72:12, 78:13, 90:13, 91:6, 94:13, 102:17, 104:14, 108:20, 110:6, 114:21, 115:1, 117:6, 175:13, 177:21
  **clearly** [10] - 29:20, 36:25, 59:10, 68:17, 68:18, 68:20, 70:23, 154:7, 157:7
  **CLERK** [4] - 82:23, 100:5, 121:13, 166:9
  **client** [17] - 4:24, 23:2, 28:12, 28:15, 28:20, 35:14, 37:7, 38:12, 38:22, 43:14, 45:23, 51:15, 61:20, 65:14, 71:6, 80:16, 180:16
  **client's** [3] - 38:8, 59:19, 71:15
  **clients** [4] - 4:20, 5:6, 39:23, 146:7
  **close** [4] - 23:25, 24:12, 51:14, 156:4
  **closed** [1] - 105:3
  **closely** [2] - 133:4, 133:8
  **closer** [1] - 174:22
  **closest** [3] - 115:25, 116:5, 126:22
  **closure** [1] - 24:20
  **clothes** [16] - 10:16, 84:25, 85:19, 93:3, 102:7, 102:8, 122:12, 122:20, 123:1, 123:3, 131:13, 131:15, 131:16, 131:18, 167:10, 167:11
  **clothing** [2] - 88:10, 93:3
  **cloudy** [1] - 91:4
  **clubs** [1] - 146:6
  **clueless** [1] - 30:19
  **co** [2] - 77:13, 164:16
  **co-counsel** [2] - 77:13, 164:16
  **Coach** [13] - 7:14, 82:14, 141:8, 142:17, 144:7, 145:21, 146:2, 147:7, 153:9, 153:14, 153:17, 154:18, 161:6
  **coach** [4] - 7:15, 7:19, 8:10, 141:21
  **coaches** [1] - 142:17
  **COBURN** [16] - 39:13, 78:20, 79:6, 79:16, 79:19, 80:7, 97:14, 99:20, 103:20, 106:7,

119:22, 155:13, 185:20, 186:11, 187:5, 187:9
  **Coburn** [13] - 1:22, 39:11, 39:21, 57:1, 61:14, 76:24, 77:12, 77:16, 78:5, 78:17, 78:18, 80:3, 157:6
  **Coburn's** [2] - 78:12, 78:15
  **cocaine** [3] - 19:9, 86:5, 128:17
  **cock** [1] - 90:1
  **cock-eyed** [1] - 90:1
  **code** [1] - 48:4
  **Code** [1] - 24:14
  **codefendants** [1] - 26:18
  **coherent** [2] - 9:4, 50:4
  **cohesive** [1] - 9:4
  **coin** [1] - 79:7
  **coke** [1] - 15:22
  **cold** [1] - 35:9
  **colleagues** [1] - 92:16
  **college** [11] - 7:20, 7:21, 7:22, 8:22, 9:17, 141:7, 141:19, 142:8, 142:17, 160:21, 160:23
  **College** [1] - 8:3
  **color** [1] - 52:1
  **combination** [5] - 16:18, 36:8, 103:2, 149:2, 149:3
  **comedy** [1] - 11:18
  **comfortable** [1] - 84:20
  **coming** [10] - 10:11, 18:18, 23:19, 64:7, 81:19, 89:24, 90:2, 102:2, 126:6, 159:22
  **commander** [1] - 122:13
  **commended** [1] - 151:23
  **commerce** [1] - 48:7
  **Commercial** [1] - 24:14
  **commission** [1] - 163:1
  **Commissioner** [1] - 121:24
  **committed** [4] - 50:6, 52:13, 70:14, 71:11
  **common** [3] - 13:1, 48:9, 52:16
  **commonly** [1] - 73:16
  **community** [6] - 7:21, 7:22, 124:8, 124:10, 124:16, 173:12
  **companions** [1] - 92:14
  **company** [4] - 3:15, 3:16, 27:10, 140:2
  **company's** [1] - 4:7
  **comparisons** [1] -

129:19
**competent** [1] - 41:24
**complaint** [7] - 95:21,
109:24, 109:25, 110:3,
130:7, 130:8
**complaints** [1] - 101:16
**complete** [2] - 156:11,
188:9
**completed** [1] - 56:23
**completely** [6] - 19:19,
33:3, 154:5, 155:16,
186:5, 186:12
**complex** [2] - 36:1,
36:17, 52:14
**complexity** [1] - 54:12
**compliant** [1] - 93:13
**complicated** [1] - 20:6
**compromise** [1] - 158:1
**compromised** [1] -
112:6
**Compton** [2] - 10:9,
11:4
**computer** [1] - 3:24
**conceal** [5] - 126:17,
127:1, 127:3, 127:9,
127:10
**concede** [1] - 163:3
**concept** [2] - 40:10,
54:13
**concepts** [2] - 44:4,
44:15
**concern** [11] - 59:20,
61:13, 61:19, 61:22,
74:2, 76:21, 76:24, 77:2,
78:25, 159:11, 178:21
**concerned** [14] - 66:6,
66:19, 71:9, 71:18,
71:20, 74:17, 76:22,
155:5, 155:19, 156:19,
160:25, 161:12, 165:6,
185:1
**concerning** [3] - 77:1,
175:8, 175:14
**concerns** [2] - 59:15,
77:8
**concessions** [1] - 59:8
**conclude** [2] - 29:11,
178:17
**concluded** [1] - 6:20
**conclusion** [5] - 61:23,
78:6, 79:11, 79:13, 156:3
**Conclusion** [1] - 186:22
**conclusive** [1] - 44:10
**conditioning** [2] -
146:19, 149:2
**conditions** [1] - 91:3
**conduct** [8] - 51:3,
86:8, 94:20, 108:1,
108:7, 139:4, 179:23
**conducted** [1] - 156:22

**conducting** [4] - 87:6,
101:22, 102:22, 111:25
**confer** [1] - 153:20
**conference** [3] - 5:25,
23:11, 24:5
**confirm** [1] - 162:8
**confirmed** [2] - 45:6,
138:15
**confuse** [2] - 42:17,
43:2
**confused** [1] - 46:19
**confuses** [1] - 46:17
**confusing** [3] - 16:22,
20:7
**confusion** [1] - 51:24
**connect** [1] - 185:4
**connected** [2] - 81:5,
177:6, 185:12
**connection** [3] -
137:15, 144:16, 148:1
**connotation** [1] - 46:10
**conscientious** [1] -
5:10
**consent** [2] - 48:20,
59:5
**consider** [1] - 70:21
**considerable** [1] -
182:23
**considered** [1] - 176:1
**considering** [1] -
182:24
**consistent** [1] - 80:4,
120:24, 121:1
**consistently** [1] - 18:9
**console** [1] - 169:12
**conspiracies** [1] -
46:21
**conspiracy** [25] - 8:21,
9:1, 9:12, 20:13, 23:1,
25:2, 25:23, 29:7, 29:15,
35:1, 36:11, 46:8, 46:20,
46:22, 47:13, 47:14,
50:18, 50:25, 51:9, 52:8,
56:6, 69:7, 72:5, 139:19
**conspirator** [1] - 29:6
**constant** [1] - 133:17
**constitute** [1] - 113:4,
188:7
**constituted** [3] - 48:1,
48:2, 48:8
**constitutes** [1] - 48:23
**contact** [10] - 90:23,
91:22, 92:1, 142:12,
142:17, 144:5, 151:10,
151:13, 152:2
**contacting** [1] - 81:9
**contain** [3] - 23:23,
54:3, 108:20
**containing** [2] - 94:3,
96:8

**contends** [1] - 31:14
**content** [1] - 94:11
**contents** [2] - 90:17,
109:14
**context** [2] - 10:22,
59:12
**Continue** [4] - 57:11,
138:6, 179:17, 179:19
**continue** [6] - 6:20,
22:14, 56:10, 151:12,
166:3, 178:21
**continued** [4] - 37:4,
37:8, 117:21, 169:4
**continuing** [4] - 28:16,
36:8, 36:21, 36:24,
37:18, 48:9
**continuously** [1] -
29:13
**contract** [4] - 54:2,
152:12, 152:13, 152:20
**contractor** [1] - 141:13
**contracts** [1] - 53:25
**contrary** [3] - 27:15,
45:1, 184:11
**Control** [1] - 171:19
**controlled** [2] - 109:15,
128:16
**controversy** [1] - 12:13
**conundrum** [1] - 79:10
**convenience** [1] -
183:25
**convenient** [1] - 17:23
**conversation** [8] - 34:1,
126:1, 126:12, 132:14,
132:25, 150:19, 150:20,
154:2
**conversations** [1] -
34:10
**convicted** [9] - 39:8,
58:3, 65:7, 67:8, 69:13,
69:16, 72:9, 79:2, 79:8
**conviction** [12] - 57:22,
58:6, 59:19, 60:2, 60:19,
60:21, 60:25, 61:3, 74:5,
75:1, 77:14, 79:1
**convictions** [9] - 59:9,
61:7, 63:15, 64:14,
64:20, 68:17, 75:20,
75:21, 76:16
**convinced** [2] - 33:4,
37:12
**cooperate** [1] - 14:19
**cooperating** [6] - 14:11,
53:10, 53:15, 53:20,
53:23, 54:21
**cooperation** [2] - 54:18,
54:21
**cooperative** [2] - 15:2,
93:15
**cooperator** [5] - 15:1,

35:6, 69:25, 70:2, 71:11
**cooperators** [2] - 69:18,
69:23
**coordinated** [1] - 50:4
**copies** [3] - 12:3, 12:4,
183:21
**cops** [2] - 58:9, 69:16
**copy** [5] - 71:14, 82:8,
178:22, 183:19, 184:1
**core** [4] - 37:3, 37:18,
38:19, 42:5
**corner** [9] - 26:10,
87:19, 89:5, 89:7, 91:2,
105:20, 118:19, 167:16
**corners** [1] - 88:25
**Correct** [8] - 63:7, 95:9,
97:22, 98:5, 102:6,
109:23, 119:7, 142:16
**correct** [71] - 19:20,
38:7, 65:15, 76:4, 86:24,
93:1, 98:9, 100:18,
101:13, 112:1, 112:22,
113:16, 113:21, 114:10,
114:11, 114:14, 114:23,
115:6, 115:15, 117:7,
117:8, 118:5, 118:10,
119:15, 120:5, 120:6,
120:15, 124:11, 126:24,
127:22, 127:23, 131:2,
131:3, 131:5, 131:8,
131:24, 132:22, 133:5,
133:6, 133:9, 134:11,
135:11, 135:12, 135:25,
136:7, 136:11, 139:12,
146:17, 148:3, 148:19,
149:12, 152:24, 168:10,
171:25, 172:3, 172:4,
172:6, 172:8, 172:16,
173:13, 174:12, 174:15,
174:21, 174:25, 175:2,
176:6, 176:8, 176:14,
176:16, 180:8, 180:9
**correctly** [4] - 26:19,
36:19, 94:6, 105:16
**correspond** [1] - 109:25
**Corrupt** [1] - 46:13
**Corsica** [11] - 102:17,
103:9, 108:4, 108:18,
108:19, 109:4, 112:24,
114:5, 115:23, 116:1,
118:24
**costs** [1] - 24:11
**counsel** [21] - 2:4, 5:14,
39:19, 57:11, 57:18,
58:3, 59:3, 61:3, 65:11,
71:22, 72:13, 77:13,
97:12, 153:20, 154:23,
156:12, 157:16, 164:16,
183:20, 184:14, 186:20
**Counsel** [2] - 58:11,

180:3
**counselor** [2] - 141:19,
144:3
**count** [4] - 26:16, 27:22,
60:24
**counted** [1] - 19:1
**country** [3] - 45:9,
149:13, 149:14
**counts** [4] - 26:14,
28:19, 35:25, 54:22
**county** [1] - 83:14
**County** [3] - 26:25,
27:3, 174:18
**couple** [29] - 5:5, 7:15,
8:5, 8:16, 12:13, 13:13,
15:15, 16:1, 18:11,
18:13, 19:2, 25:21,
25:22, 43:7, 43:16,
46:17, 59:24, 76:25,
80:23, 81:9, 143:9,
144:25, 148:23, 150:25,
158:18, 160:14, 175:22,
181:20
**course** [30] - 40:1, 40:4,
41:7, 41:9, 43:19, 44:23,
53:9, 55:11, 56:2, 58:1,
68:14, 79:6, 86:25,
111:10, 118:12, 123:17,
142:13, 142:25, 144:18,
151:23, 160:16, 162:3,
163:14, 167:13, 173:23,
181:15, 184:8, 184:9,
185:22
**COURT** [324] - 1:1, 2:2,
2:4, 2:21, 2:24, 3:1, 3:5,
3:11, 3:16, 3:18, 3:21,
3:24, 4:1, 4:3, 4:5, 4:12,
4:14, 4:21, 4:25, 5:3,
5:7, 5:13, 5:18, 5:22,
5:25, 6:6, 22:20, 23:6,
23:9, 23:14, 23:17,
23:19, 23:23, 24:1, 24:4,
24:6, 25:25, 26:4, 26:6,
39:11, 57:1, 57:6, 57:15,
58:1, 58:11, 60:16,
61:11, 61:17, 62:3, 62:7,
62:10, 62:13, 62:16,
62:20, 62:22, 62:25,
63:5, 63:8, 63:13, 63:21,
63:24, 64:3, 64:11,
64:25, 65:3, 66:2, 66:9,
66:15, 66:18, 67:1, 67:8,
67:13, 67:20, 68:2, 68:7,
68:14, 68:17, 68:20,
68:23, 69:1, 69:5, 69:10,
69:13, 69:23, 70:2, 70:4,
70:7, 70:10, 70:14,
70:17, 70:23, 71:4, 71:8,
71:17, 71:20, 71:25,
72:7, 72:16, 72:21,

72:23, 73:5, 73:7, 73:11, 73:13, 73:22, 74:6, 74:9, 74:19, 74:21, 75:5, 75:7, 75:11, 75:14, 75:17, 75:23, 76:1, 76:3, 76:5, 76:10, 76:19, 77:10, 78:3, 78:12, 79:4, 79:14, 79:17, 79:20, 79:22, 79:25, 80:2, 80:8, 80:11, 80:16, 80:18, 80:21, 80:25, 81:3, 81:11, 81:17, 81:24, 82:3, 82:8, 82:11, 82:17, 88:15, 95:11, 96:18, 97:12, 99:21, 99:24, 103:21, 103:25, 106:8, 109:11, 110:13, 121:7, 123:17, 124:2, 124:12, 124:20, 125:12, 125:17, 125:19, 125:21, 134:3, 137:19, 137:24, 138:2, 138:10, 138:12, 138:16, 138:19, 138:22, 139:8, 139:16, 139:20, 139:22, 139:25, 140:9, 140:12, 140:15, 140:18, 140:20, 140:24, 141:4, 141:9, 141:17, 141:20, 141:23, 141:25, 142:7, 142:12, 142:19, 142:22, 142:25, 143:4, 143:7, 143:9, 143:14, 143:17, 143:20, 143:23, 144:5, 144:12, 144:18, 144:24, 145:3, 145:11, 145:13, 145:15, 145:17, 146:9, 146:12, 146:14, 146:18, 146:22, 147:2, 147:8, 147:12, 147:17, 147:21, 148:1, 148:4, 148:7, 148:15, 148:17, 148:20, 148:22, 149:1, 149:5, 149:7, 149:11, 149:14, 149:16, 149:19, 149:22, 149:25, 150:4, 150:9, 150:12, 150:14, 150:22, 150:25, 151:2, 151:7, 151:19, 151:23, 152:10, 152:12, 152:16, 152:19, 152:25, 153:3, 153:5, 153:15, 153:17, 153:19, 153:22, 153:25, 154:22, 156:10, 156:16, 158:7, 158:12, 158:23, 159:13, 159:19, 160:6, 160:8, 160:16, 160:21, 161:2, 161:9, 161:15, 161:17, 161:20, 161:23, 162:3, 162:20, 162:24, 163:7, 163:11, 164:1, 164:12, 164:15, 164:20, 164:22, 164:24, 165:5,

165:9, 165:11, 165:14, 165:20, 165:23, 165:25, 166:2, 171:7, 171:11, 172:19, 173:23, 177:4, 177:11, 178:15, 180:3, 180:10, 180:14, 180:20, 180:25, 181:3, 181:25, 182:4, 182:11, 182:16, 183:3, 183:16, 184:4, 184:10, 184:21, 185:10, 185:14, 185:18, 185:22, 186:2, 186:17
**court** [32] - 20:9, 20:25, 21:3, 21:5, 21:7, 21:10, 21:11, 22:2, 22:6, 24:12, 39:2, 39:16, 48:16, 61:24, 73:3, 74:5, 88:6, 99:7, 99:8, 99:19, 102:3, 108:14, 150:20, 153:1, 172:11, 176:14, 178:18, 181:15, 182:19, 183:1, 184:2
**Court** [34] - 6:10, 20:12, 21:21, 23:7, 24:10, 24:11, 24:13, 39:19, 58:19, 59:2, 60:7, 63:3, 66:19, 77:3, 77:20, 77:25, 78:6, 79:13, 139:4, 139:6, 145:8, 150:22, 151:3, 151:9, 152:1, 152:3, 153:20, 158:22, 163:13, 180:16, 183:18, 188:16
**Court's** [7] - 58:16, 66:6, 68:12, 77:9, 78:8, 139:5, 181:22
**Courthouse** [1] - 1:24
**courthouse** [1] - 181:24
**courtroom** [21] - 2:20, 5:19, 6:2, 6:5, 39:16, 40:22, 45:4, 57:8, 57:14, 82:16, 111:17, 111:23, 138:9, 145:14, 154:4, 163:10, 163:13, 164:14, 166:1, 170:25, 180:2
**courts** [1] - 186:3
**cover** [1] - 157:15
**covered** [1] - 157:16
**crawls** [1] - 51:22
**create** [2] - 40:13
**creates** [1] - 12:13
**cred** [1] - 12:14
**credibility** [4] - 12:15, 77:24, 155:4, 155:10
**credit** [1] - 55:6
**Crime** [2] - 130:12, 166:18
**crime** [4] - 9:15, 21:14, 25:22, 122:14
**crimes** [3] - 14:17, 21:9,

39:8
**criminal** [9] - 26:9, 26:16, 26:17, 28:13, 28:20, 36:21, 40:4, 47:24, 51:3
**CRIMINAL** [1] - 1:5
**crisp** [2] - 117:2, 117:3
**critical** [11] - 40:2, 40:7, 40:11, 40:12, 46:17, 53:4, 53:7, 53:14, 56:17, 155:4
**CROSS** [14] - 96:19, 97:13, 110:14, 111:2, 119:21, 130:21, 173:18, 187:5, 187:5, 187:8, 187:8, 187:9, 187:11, 187:14
**cross** [14] - 37:13, 56:11, 58:15, 64:17, 72:13, 73:2, 73:19, 73:23, 74:3, 78:14, 110:13, 158:12, 165:18, 181:16
**crossed** [4] - 37:10, 37:11, 91:17, 91:18
**crossing** [1] - 91:19
**crosswalk** [1] - 89:25
**Crowe** [11] - 1:20, 26:4, 26:8, 39:11, 75:7, 76:7, 156:10, 183:16, 184:10, 184:12, 184:17
**CROWE** [5] - 26:5, 26:7, 76:8, 156:11, 183:17
**Crowe's** [1] - 184:22
**cruising** [2] - 85:25, 87:16
**crystal** [2] - 52:5, 52:6
**Cube** [4] - 10:10, 11:6, 11:17
**cued** [1] - 2:18
**cuffs** [1] - 93:18
**cupped** [1] - 92:7
**curious** [1] - 164:6
**currency** [7] - 94:23, 106:21, 106:24, 108:9, 116:19, 128:19, 129:2
**current** [1] - 77:19
**custody** [5] - 73:21, 95:18, 129:11, 171:14, 177:14
**cut** [8] - 13:17, 64:25, 65:9, 66:16, 66:17, 91:19, 156:16, 185:14

---

**D**

**D-A-V-I-D** [1] - 100:8
**daily** [3] - 8:15, 132:16,

162:18
**dangerous** [1] - 109:15
**dare** [1] - 132:3
**Darius** [5] - 29:7, 34:11, 34:24, 35:2, 35:15
**dark** [1] - 167:19
**Darryl** [25] - 15:5, 15:13, 15:14, 16:8, 16:10, 16:12, 16:14, 17:10, 17:14, 17:19, 18:6, 18:10, 18:21, 18:22, 18:25, 19:7, 28:9, 29:12, 29:18, 29:20, 31:18, 38:23, 168:7, 168:12, 168:20
**Darryl's** [3] - 15:20, 18:14, 19:1
**dashboard** [1] - 128:22
**date** [5] - 88:22, 98:1, 101:4, 101:17, 162:17
**dates** [2] - 139:24, 178:23
**daughter's** [2] - 135:15, 135:21
**daughters** [1] - 148:9
**David** [2] - 100:2, 100:8
**DAVID** [2] - 100:3, 187:7
**Davis** [15] - 1:13, 21:2, 22:13, 22:16, 26:19, 27:11, 27:18, 27:24, 36:1, 36:15, 36:23, 40:1, 42:12, 44:11, 45:2
**Davis's** [2] - 22:21, 44:11
**days** [6] - 28:24, 76:25, 146:11, 158:1, 160:14, 163:18
**DC** [12] - 15:7, 15:13, 15:20, 15:23, 16:20, 16:25, 17:1, 17:2, 17:5, 17:13, 18:6
**dead** [1] - 47:16
**deal** [11] - 4:23, 14:14, 15:21, 16:25, 17:6, 17:14, 53:24, 77:22, 91:14, 132:6, 132:7
**deal's** [1] - 54:5
**dealer** [2] - 18:24, 86:19
**dealers** [7] - 16:5, 29:19, 85:23, 86:14, 86:19, 86:21, 122:18
**dealing** [6] - 37:6, 37:7, 41:16, 79:7, 101:16, 144:9
**deals** [2] - 14:7, 15:15
**dealt** [3] - 28:16, 78:9, 80:23
**death** [3] - 29:3, 29:4, 29:9

**deaths** [1] - 29:23
**debating** [1] - 78:22
**decade** [2] - 60:12, 175:3
**decades** [1] - 46:14
**December** [1] - 140:11
**decide** [10] - 9:25, 14:2, 27:17, 27:18, 27:19, 27:20, 27:25, 157:14, 159:6, 162:13
**decided** [6] - 7:19, 20:11, 30:11, 30:20, 45:19, 145:5
**decision** [7] - 148:8, 157:19, 158:17, 158:22, 159:7, 159:25, 160:3
**decisionmaking** [1] - 158:10
**decisions** [1] - 48:19
**deems** [1] - 55:5
**deep** [1] - 154:19
**deeper** [1] - 54:8
**deeply** [1] - 5:7
**Deezo** [12] - 16:7, 16:19, 16:23, 17:19, 17:21, 17:23, 18:5, 18:20, 18:23, 18:25, 19:5, 19:12
**Def** [1] - 11:25
**defendant** [15] - 27:22, 54:5, 58:22, 58:24, 63:3, 67:6, 70:4, 70:19, 76:12, 88:13, 91:13, 125:24, 163:1, 170:14
**Defendant** [4] - 1:16, 1:18, 1:19, 1:21
**defendants** [18] - 21:10, 25:10, 26:15, 36:4, 36:6, 47:21, 57:21, 59:9, 61:9, 61:19, 63:8, 64:9, 66:22, 67:11, 69:12, 70:3, 72:1, 176:8
**Defendants** [1] - 1:9
**defendants'** [2] - 22:24, 37:10
**defending** [1] - 53:18
**defense** [28] - 6:22, 20:21, 21:23, 24:22, 26:3, 30:16, 40:2, 40:6, 40:15, 42:14, 42:15, 42:20, 43:1, 55:10, 57:18, 58:3, 59:8, 65:5, 65:11, 78:16, 79:5, 85:9, 85:12, 182:20, 183:20, 184:14, 184:16
**deferred** [1] - 60:7
**define** [1] - 49:19
**defined** [2] - 48:3, 52:14
**definitively** [1] - 78:7
**deflect** [1] - 43:3

**degree** [3] - 36:15, 68:12, 143:18
**delay** [2] - 166:3, 168:14
**delighted** [1] - 185:25
**deliver** [1] - 40:25
**delving** [1] - 59:1
**Denham** [3] - 15:3, 15:11, 16:7
**Denison** [4] - 167:16, 167:19, 168:6, 172:15
**depart** [1] - 57:8
**department** [4] - 83:17, 83:24, 85:8, 100:21
**Department** [8] - 42:2, 83:7, 100:17, 121:23, 122:1, 160:24, 166:16, 166:24
**depict** [2] - 95:24, 123:20
**deployed** [1] - 44:17
**describe** [7] - 84:18, 93:25, 95:23, 104:13, 115:3, 116:20, 125:7
**described** [14] - 82:14, 85:6, 90:15, 91:11, 94:20, 104:3, 107:12, 108:24, 114:5, 115:21, 116:17, 157:25, 174:13, 175:23
**describing** [1] - 84:21
**description** [2] - 6:18, 139:10
**descriptions** [1] - 51:25
**deserve** [1] - 29:23
**designed** [7] - 21:13, 40:8, 40:13, 40:19, 54:25, 184:15
**desperate** [1] - 50:14
**desperately** [1] - 55:7
**desperation** [2] - 22:2, 50:21
**destroyed** [2] - 74:5, 176:18
**DET** [1] - 121:11
**detail** [9] - 26:13, 37:22, 41:25, 43:9, 43:10, 48:23, 70:10, 70:12, 154:25
**detailed** [2] - 36:17, 139:23
**details** [2] - 18:12, 55:11
**detained** [3] - 67:10, 67:11, 141:10
**detected** [2] - 131:18, 132:6
**detective** [6] - 27:3, 84:2, 84:4, 94:10, 122:1, 166:19

**DETECTIVE** [3] - 166:7, 187:10, 187:13
**Detective** [19] - 31:23, 34:15, 60:6, 73:1, 88:1, 121:15, 121:19, 121:21, 130:1, 130:3, 137:16, 137:24, 166:21, 166:22, 173:20, 173:24, 176:22, 178:14, 178:15
**detectives** [1] - 122:11
**detention** [3] - 7:11, 21:16, 140:13
**determination** [3] - 27:23, 40:17, 52:20
**determine** [1] - 27:21
**develop** [1] - 147:14
**develops** [1] - 52:4
**device** [1] - 39:14
**devices** [1] - 169:21
**devoted** [1] - 28:4
**dialect** [1] - 33:25
**die** [2] - 29:23, 29:24
**difference** [2] - 63:14, 70:23, 86:11
**different** [22] - 19:19, 21:5, 31:5, 35:5, 37:15, 44:4, 46:17, 61:18, 67:25, 69:23, 70:17, 70:21, 81:25, 102:5, 107:5, 117:15, 124:10, 124:16, 148:13, 149:9
**differs** [1] - 68:9
**difficult** [3] - 150:17, 154:10, 163:20
**difficulties** [1] - 183:23
**difficulty** [3] - 39:18, 41:20, 107:23
**diligence** [1] - 178:19
**dinner** [2] - 78:22, 80:3
**dip** [1] - 93:21
**dipping** [1] - 2:14
**dire** [9] - 5:10, 10:4, 82:14, 139:4, 145:8, 145:19, 154:17, 155:14, 156:22
**DIRECT** [8] - 83:2, 100:9, 121:17, 166:13, 187:4, 187:7, 187:11, 187:13
**direct** [7] - 19:22, 53:7, 58:14, 61:12, 120:10, 174:1, 174:25
**directing** [4] - 83:23, 84:12, 101:4, 101:17
**direction** [2] - 103:11, 104:25
**directions** [2] - 48:20, 112:17
**directly** [4] - 82:23, 100:5, 113:1, 121:13

**discharge** [2] - 21:22, 24:16
**disclose** [2] - 77:16, 77:17, 154:1
**disclosed** [2] - 62:5, 148:2
**discovered** [1] - 168:2
**discovery** [1] - 184:9
**discretion** [2] - 73:24, 122:12
**discuss** [12] - 20:17, 36:14, 36:18, 139:24, 157:20, 157:21, 158:3, 163:12, 164:9, 179:18, 179:20, 179:22
**discussed** [5] - 44:23, 46:16, 67:24, 147:22
**discussion** [6] - 57:9, 138:5, 151:3, 161:12, 163:17, 163:23
**discussions** [4] - 35:15, 157:17, 164:18, 164:19
**dismissals** [1] - 156:14
**dismissed** [1] - 156:14
**disobedience** [1] - 24:23
**disorganized** [1] - 25:9
**displayed** [1] - 93:6
**disposed** [1] - 120:11
**disposition** [3] - 99:18, 99:22, 137:16
**dispute** [1] - 155:25
**disqualified** [1] - 157:24
**disruption** [1] - 48:16
**disruptions** [1] - 22:12
**distance** [9] - 89:10, 90:15, 90:17, 103:2, 103:3, 103:6, 104:21, 113:11, 115:16
**distribution** [1] - 121:1
**DISTRICT** [2] - 1:1, 1:1
**district** [1] - 122:13
**District** [8] - 83:8, 83:11, 83:12, 83:13, 83:15, 84:2, 84:5, 96:23, 96:25, 101:9, 101:11, 110:22, 122:5, 167:3, 167:15, 172:15, 172:23, 173:9
**districts** [1] - 83:16
**dive** [1] - 54:8
**diverge** [1] - 37:14
**divert** [1] - 43:2
**diverted** [1] - 102:14
**divided** [2] - 9:6, 83:16
**dividing** [1] - 97:3
**DIVISION** [1] - 1:2
**Division** [1] - 166:18
**DJS** [1] - 140:7

107:22
**Drug** [3] - 84:2, 101:9, 101:14
**drug** [33] - 15:15, 16:5, 17:13, 18:24, 21:9, 28:17, 28:18, 29:14, 29:19, 36:11, 37:5, 37:6, 37:25, 41:16, 59:22, 72:3, 84:9, 86:25, 87:3, 87:22, 89:1, 91:14, 94:17, 98:12, 101:2, 101:15, 101:16, 107:6, 121:1, 122:18, 123:6, 127:8, 129:25
**drug-related** [1] - 101:15
**drugs** [30] - 16:15, 16:19, 17:9, 28:16, 60:4, 60:14, 83:21, 86:15, 95:5, 95:24, 96:13, 97:20, 107:16, 116:15, 117:24, 118:20, 118:21, 119:11, 127:9, 127:17, 133:15, 133:17, 133:20, 133:23, 134:5, 135:9, 171:19, 172:3, 185:12
**drunk** [1] - 105:3
**dual** [2] - 77:1, 77:4
**due** [1] - 119:16
**dues** [2] - 9:14, 25:7
**During** [2] - 86:25, 167:13
**during** [22] - 9:1, 22:6, 37:9, 40:1, 40:24, 41:6, 43:19, 44:23, 53:9, 55:11, 56:1, 81:13, 106:18, 116:14, 138:7, 139:18, 145:19, 146:3, 150:5, 150:19, 160:17, 174:25, 179:21, 182:22
**duties** [1] - 107:7
**duty** [5] - 84:14, 84:23, 163:19, 163:22, 164:5
**Dwayne** [5] - 15:3, 15:11, 16:7, 33:24, 34:3

**DNA** [1] - 31:3
**DOAR** [6] - 184:6, 185:2, 185:16, 185:22, 185:23, 185:25
**document** [5] - 130:11, 171:12, 173:21, 183:19
**documents** [2] - 184:3, 184:8
**dog** [1] - 27:14
**dollar** [1] - 117:3
**dollars** [3] - 11:18, 11:20, 32:3
**Dominican** [2] - 16:11, 16:13
**done** [13] - 9:10, 11:15, 12:2, 52:15, 56:22, 83:19, 137:8, 152:22, 162:10, 181:4, 183:11, 183:14
**Donte** [8] - 102:16, 103:6, 103:7, 103:15, 103:19, 104:1, 106:21, 108:3
**door** [2] - 74:13, 136:25
**dorms** [2] - 144:2
**doubt** [10] - 13:18, 27:24, 28:1, 36:12, 39:3, 46:1, 46:3, 48:22, 49:17, 183:8
**down** [44] - 6:14, 15:20, 15:21, 15:23, 17:2, 17:5, 17:13, 27:22, 33:2, 61:8, 61:9, 64:1, 83:14, 87:19, 89:7, 89:17, 89:18, 89:25, 91:2, 91:14, 92:8, 93:22, 96:7, 105:8, 105:11, 107:22, 109:3, 126:13, 132:19, 133:4, 136:20, 136:24, 160:22, 167:24, 168:2, 168:13, 168:18, 169:4, 169:5, 169:6, 169:11, 171:19
**Down** [6] - 12:19, 38:5, 38:8, 38:10, 48:15, 49:23
**drag** [1] - 160:1
**drawing** [1] - 78:11
**dream** [1] - 9:18
**drew** [1] - 114:13
**drive** [2] - 17:13, 113:6
**driver** [3] - 167:25, 168:22, 172:4
**driver's** [8] - 127:15, 127:19, 137:2, 168:22, 168:24, 169:4, 169:12, 172:7
**driving** [3] - 17:2, 131:22, 168:21
**dropped** [2] - 6:17, 14:18
**drove** [2] - 105:8,

**E**

**early** [5] - 10:7, 139:6, 155:20, 156:20, 179:12
**earn** [1] - 143:18
**earned** [1] - 154:15
**ears** [1] - 41:5
**earth** [1] - 63:14
**easier** [2] - 150:5, 184:23
**easily** [2] - 160:13, 162:6
**east** [3] - 112:16,

112:19, 112:20
**eastbound** [3] - 89:24, 105:9, 112:22
**easy** [3] - 8:10, 160:24, 160:25
**eating** [1] - 71:3
**edification** [1] - 4:16
**Edmondson** [5] - 167:16, 167:18, 168:6, 173:11
**effect** [1] - 54:4
**effecting** [1] - 167:18
**effective** [2] - 22:23, 55:16
**effectively** [1] - 139:13
**effort** [1] - 184:20
**efforts** [1] - 184:22
**egregious** [1] - 44:24
**eight** [2] - 152:14, 184:14
**Eight** [3] - 152:16, 175:6, 175:7
**Either** [1] - 58:21
**either** [24] - 14:9, 20:1, 36:10, 37:1, 57:25, 58:22, 60:18, 60:20, 65:7, 73:14, 79:9, 90:1, 90:7, 111:20, 127:8, 133:7, 135:8, 152:20, 162:14, 165:21, 174:21, 185:2
**elaborate** [1] - 151:11
**elaboration** [1] - 32:8
**elegant** [1] - 43:22
**element** [1] - 38:6
**elements** [1] - 46:4
**elicit** [2] - 58:3, 66:11
**eligible** [1] - 100:22
**eliminate** [1] - 18:16
**elsewhere** [1] - 8:12
**elusive** [1] - 54:13
**embarrass** [2] - 4:5, 4:15
**emerge** [2] - 40:19, 41:9
**emerging** [1] - 43:10
**emphasize** [1] - 34:4
**emphasized** [2] - 6:8, 6:16
**emphatically** [1] - 47:6
**employed** [4] - 121:22, 122:3, 166:15, 166:23
**employee** [5] - 140:1, 140:8, 141:3, 155:3
**employer** [1] - 3:6
**encounter** [3] - 86:22, 98:15, 107:15
**encountered** [1] - 98:6
**encounters** [1] - 107:7
**encourage** [2] - 178:21, 184:17

**End** [1] - 24:5
**end** [12] - 26:10, 27:25, 36:16, 40:24, 41:2, 44:11, 46:2, 88:11, 157:21, 158:15, 159:25, 186:15
**ended** [2] - 70:15, 186:13
**ending** [1] - 140:11
**energy** [1] - 53:17
**Enforcement** [2] - 101:9, 101:14
**enforcement** [14] - 26:24, 31:21, 35:18, 51:4, 55:3, 64:7, 65:14, 69:24, 70:18, 71:25, 72:7, 84:9, 86:25, 101:2
**enforcer** [1] - 17:2
**engage** [1] - 131:19
**engaged** [3] - 48:6, 49:11, 51:2
**enhance** [1] - 180:23
**enhancing** [1] - 48:13
**enjoy** [1] - 179:25
**enlisted** [1] - 32:10
**enormous** [2] - 21:16, 45:4
**enrich** [1] - 52:17
**Enriching** [1] - 48:11
**enter** [1] - 184:14
**Enterprise** [1] - 108:5
**enterprise** [33] - 9:9, 28:13, 28:17, 29:13, 36:7, 36:10, 36:21, 38:3, 38:25, 47:12, 47:13, 47:21, 48:2, 48:8, 48:10, 48:12, 48:13, 48:18, 48:23, 49:4, 49:13, 49:19, 50:11, 51:12, 52:14, 52:18, 55:24, 56:10, 69:7
**Enterprises** [3] - 38:5, 38:8, 38:10
**enters** [6] - 2:20, 6:5, 82:16, 145:14, 163:10, 166:1
**entertainer** [1] - 11:21
**Entertainment** [2] - 48:15, 49:23
**entertainment** [2] - 11:21, 11:22
**entire** [3] - 40:24, 83:16, 116:14
**entirely** [2] - 60:15, 78:25
**entitled** [2] - 59:11, 65:20
**entity** [4] - 48:6, 49:17, 50:5, 98:25
**equal** [1] - 25:22

**equipment** [2] - 114:2, 178:11
**erroneous** [1] - 61:23
**escort** [2] - 22:13, 22:14
**escorted** [2] - 169:10, 170:17
**especially** [1] - 164:1
**Esquire** [10] - 1:15, 1:16, 1:17, 1:17, 1:18, 1:19, 1:20, 1:20, 1:21, 1:22
**essential** [1] - 28:19
**essentially** [8] - 26:16, 32:17, 34:20, 37:3, 42:17, 59:10, 78:15, 186:8
**essentials** [1] - 28:6
**established** [1] - 50:5
**establishing** [1] - 185:11
**estimate** [2] - 135:13, 135:16
**estimated** [1] - 113:11
**et** [1] - 188:5
**evaluate** [2] - 19:14, 77:5
**evaluation** [1] - 147:10
**evening** [8] - 6:7, 32:4, 32:23, 33:7, 122:7, 122:22, 131:9, 179:25
**event** [10] - 60:10, 60:12, 60:15, 73:10, 84:21, 85:2, 85:3, 174:13, 174:20, 175:3
**events** [6] - 5:8, 84:17, 103:16, 111:7, 111:9, 111:13
**Eventually** [1] - 7:10
**eventually** [1] - 31:24
**everywhere** [1] - 45:11
**Evidence** [1] - 171:19
**evidence** [57] - 13:19, 19:23, 23:14, 23:16, 23:19, 23:21, 27:20, 29:10, 29:20, 30:20, 30:24, 31:1, 31:3, 33:1, 33:19, 36:24, 37:5, 37:6, 37:8, 37:21, 38:2, 38:15, 39:4, 39:9, 49:3, 49:4, 49:14, 49:20, 49:25, 50:20, 51:1, 51:6, 52:11, 56:15, 57:10, 60:11, 67:1, 67:3, 69:3, 72:4, 73:19, 77:8, 79:21, 79:23, 94:25, 95:18, 109:1, 138:6, 163:13, 171:14, 176:2, 176:5, 176:17, 177:24, 179:18, 185:9
**evident** [1] - 139:1

**evidentiary** [2] - 79:18, 184:24
**evidently** [1] - 81:5
**exact** [5] - 18:5, 50:23, 117:21, 117:23, 118:4
**Exactly** [2] - 64:25
**exactly** [12] - 4:25, 16:9, 17:5, 32:10, 94:11, 112:13, 112:24, 114:18, 119:12, 119:13, 134:14, 145:10
**examination** [9] - 56:12, 64:18, 72:13, 73:2, 73:19, 73:23, 74:3, 120:10, 174:25
**EXAMINATION** [32] - 83:2, 96:19, 97:13, 99:15, 100:9, 110:14, 111:2, 119:21, 120:20, 121:17, 130:21, 137:13, 166:13, 173:18, 176:23, 177:12, 187:4, 187:5, 187:5, 187:6, 187:7, 187:8, 187:8, 187:9, 187:9, 187:11, 187:11, 187:12, 187:13, 187:14, 187:14, 187:15
**examine** [6] - 28:5, 110:13, 180:22, 181:16, 181:17, 183:1
**example** [10] - 16:25, 21:1, 56:7, 60:24, 63:12, 63:17, 67:24, 68:1, 68:4, 71:2
**excelled** [1] - 7:18
**excellent** [1] - 164:17
**Excellent** [1] - 186:2
**Except** [1] - 35:11
**except** [2] - 158:16, 182:19
**exception** [3] - 3:13, 76:12, 76:19
**excited** [1] - 90:9
**excluded** [2] - 60:10, 60:15
**excuse** [5] - 5:15, 6:10, 51:19, 94:2, 158:25
**Excuse** [3] - 42:10, 50:2, 95:20
**excused** [15] - 5:16, 57:13, 99:24, 121:8, 137:25, 138:8, 144:17, 144:22, 144:23, 145:2, 156:9, 156:25, 178:16, 179:25
**exemption** [1] - 24:14
**exercise** [1] - 73:23
**exhibit** [1] - 95:13
**Exhibit** [6] - 95:13, 95:16, 109:13, 123:15,

**evidentiary** continued ...

**evidently** ...

**evidentiary** [2] - 79:18, 184:24

130:10, 171:10
**exhibits** [4] - 183:20, 184:1, 184:24
**exist** [2] - 39:2, 54:1
**existed** [5] - 36:13, 37:1, 38:4, 52:9, 55:25
**existence** [5] - 46:14, 47:11, 49:17, 50:4, 51:9
**exit** [1] - 169:7
**exits** [5] - 57:14, 138:9, 154:4, 164:14, 180:2
**expect** [10] - 30:2, 30:3, 30:4, 37:25, 39:6, 46:1, 53:20, 80:25, 152:20, 152:21
**expected** [1] - 81:14
**experience** [11] - 12:12, 86:10, 94:17, 98:11, 107:14, 120:3, 120:22, 120:25, 127:7, 128:17, 133:16
**experiences** [2] - 182:15, 182:17
**expert** [9] - 9:23, 10:5, 180:22, 181:16, 181:20, 182:12, 182:20, 182:25, 183:1, 183:2
**explain** [4] - 26:13, 44:9, 62:13, 160:11
**explained** [4] - 37:21, 107:21, 154:25, 182:22
**explains** [1] - 139:18
**explicit** [2] - 24:17, 54:3
**express** [2] - 24:21, 24:22
**expressed** [2] - 68:23, 183:21
**expression** [3] - 27:13, 44:2, 44:19
**extent** [3] - 38:10, 56:4, 77:2
**extraordinarily** [2] - 36:1, 55:9
**extremely** [2] - 41:13, 41:23
**eye** [2] - 54:14, 92:1
**eyed** [1] - 90:1
**eyes** [1] - 41:5

---

**F**

**facility** [4] - 7:11, 149:7, 149:8, 149:10
**facing** [11] - 17:9, 54:21, 89:24, 89:25, 90:1, 90:4, 90:6, 91:25, 92:5, 112:21
**fact** [38] - 2:10, 9:10, 9:15, 17:21, 22:11,

22:15, 22:16, 24:17, 25:11, 27:17, 34:12, 38:9, 40:3, 40:6, 48:6, 58:4, 66:5, 67:10, 68:4, 69:19, 71:5, 74:1, 116:2, 118:18, 119:15, 132:20, 132:21, 133:13, 136:10, 140:22, 142:22, 155:14, 158:9, 160:10, 161:13, 163:19, 180:3, 186:14
**factor** [2] - 159:13, 159:14
**facts** [13] - 2:13, 24:10, 27:17, 27:18, 27:19, 27:20, 36:18, 41:13, 42:17, 43:3, 44:22, 63:2
**fair** [7] - 22:4, 28:4, 30:4, 64:15, 78:3, 79:20, 139:8
**fairly** [3] - 81:5, 133:8, 175:23
**fairness** [9] - 59:12, 59:15, 59:16, 65:1, 66:4, 66:7, 66:11, 66:19, 66:21
**false** [2] - 31:20, 32:21
**familiar** [4] - 44:7, 80:13, 131:6, 180:7
**family** [5] - 9:15, 11:18, 142:1, 142:3, 179:21
**Far** [1] - 97:9
**faretheewell** [1] - 44:13
**fashion** [1] - 65:18
**fast** [1] - 7:16
**fathers** [1] - 148:8
**fault** [5] - 145:19, 153:6, 153:7, 161:4, 180:17
**February** [1] - 29:1
**Federal** [1] - 54:20
**federal** [20] - 9:11, 20:9, 20:19, 20:23, 21:12, 21:14, 22:2, 25:23, 26:23, 39:2, 40:3, 44:19, 44:20, 45:4, 45:7, 45:14, 45:24, 46:12, 78:19
**federally** [4] - 45:18, 45:19, 79:2, 99:6
**feds** [2] - 22:1, 61:25
**fees** [1] - 152:9
**feet** [12] - 89:19, 89:20, 91:13, 91:19, 91:20, 103:10, 113:12, 113:21, 114:6, 114:10, 114:11, 115:16
**fell** [1] - 74:13
**fellow** [2] - 26:9, 35:4, 181:24

**female** [5] - 87:21, 89:23, 90:4, 92:4, 98:9
**few** [11] - 26:13, 47:15, 81:9, 96:25, 101:1, 104:15, 117:18, 131:1, 158:1, 167:25, 173:25
**fewer** [2] - 26:14, 26:17
**field** [4] - 4:21, 7:17, 8:12, 9:23
**fields** [1] - 149:10
**fifth** [3] - 34:20, 35:3, 168:18
**fight** [4] - 22:4, 27:9, 27:14, 162:1
**figure** [3] - 80:4, 132:15, 181:22
**figured** [2] - 4:9, 132:15
**figures** [1] - 96:15
**file** [2] - 77:10, 129:22
**filed** [6] - 20:12, 21:21, 22:17, 23:7, 23:13, 26:21
**filings** [1] - 20:17
**fill** [1] - 95:19
**filled** [3] - 109:17, 114:22, 130:14
**final** [4] - 54:17, 67:16, 157:19, 163:8
**Finally** [1] - 33:10
**finally** [1] - 29:8
**fine** [2] - 145:17, 158:16
**Fine** [2] - 57:5, 185:17
**finger** [2] - 106:6, 161:9
**fingerprint** [1] - 129:18
**fingerprinting** [1] - 106:9
**fingerprints** [1] - 31:2
**fingers** [1] - 25:14
**finish** [1] - 142:6
**finished** [1] - 39:5
**finishing** [1] - 141:2
**fire** [1] - 169:20
**Firearms** [1] - 27:6
**firearms** [2] - 36:9, 59:23
**firm** [3] - 79:11, 178:24, 183:8
**first** [32] - 4:3, 9:7, 11:3, 15:3, 31:6, 59:24, 64:18, 64:21, 65:15, 80:14, 82:13, 82:18, 89:10, 89:20, 90:16, 90:23, 106:13, 106:15, 107:3, 114:5, 138:18, 138:24, 143:6, 143:16, 145:23, 155:18, 156:15, 163:7, 164:25, 166:22, 174:1
**First** [6] - 28:7, 29:1, 31:19, 39:19, 139:25, 154:6
**fit** [5] - 112:3, 112:5,

112:8, 133:10, 133:11
**fitness** [1] - 81:22
**five** [11] - 14:12, 42:8, 53:13, 84:6, 101:2, 101:3, 117:19, 155:20, 167:22, 168:5
**fix** [1] - 86:13
**fixated** [1] - 89:16
**fixed** [2] - 89:14
**Flannery** [2] - 1:19, 75:8
**flashed** [1] - 135:5
**flashing** [1] - 168:25
**flashlight** [2] - 127:11, 135:9
**Flex** [7] - 122:5, 122:10, 122:11, 122:20, 123:4, 167:3, 167:9
**flipped** [1] - 93:20
**focus** [11] - 43:6, 43:7, 43:8, 46:7, 46:8, 50:7, 53:1, 55:17, 56:20, 155:14, 169:22
**folded** [1] - 117:1
**folder** [1] - 174:23
**folding** [1] - 123:24
**follow** [4] - 38:16, 86:22, 92:16, 93:13
**followed** [1] - 92:17
**foot** [4] - 122:22, 167:12, 167:13, 168:4
**football** [15] - 7:15, 7:16, 7:18, 7:23, 8:12, 9:18, 140:21, 142:1, 143:2, 147:4, 150:7, 150:8, 150:10, 150:13, 150:14
**FOR** [1] - 1:1
**force** [2] - 27:4, 83:22
**foregoing** [1] - 188:7
**foreign** [1] - 48:7
**forensic** [1] - 31:1
**forever** [1] - 30:1
**Forget** [1] - 63:8
**forgive** [1] - 96:12
**form** [12] - 21:20, 51:8, 81:15, 95:16, 95:20, 109:15, 109:17, 109:20, 109:25, 171:13
**formal** [1] - 141:21
**formed** [1] - 154:14
**former** [6] - 6:11, 6:13, 11:25
**formerly** [2] - 100:16, 146:3
**forth** [7] - 20:10, 47:1, 86:16, 86:23, 87:17, 89:1, 178:5
**Fortunately** [1] - 7:14
**forward** [3] - 6:12,

34:16, 56:24
**foundation** [2] - 103:20, 142:4
**foundational** [1] - 185:4
**four** [20] - 8:14, 9:6, 9:13, 24:25, 25:4, 34:19, 38:19, 47:21, 142:15, 143:12, 143:13, 147:6, 152:17, 159:5, 159:21, 160:2, 162:7, 162:12, 167:22, 184:3
**fourth** [5] - 20:5, 26:14, 28:22, 34:17, 35:25
**Fourth** [1] - 29:4
**frame** [1] - 85:3
**framework** [1] - 77:5
**frankly** [7] - 40:12, 59:1, 65:17, 145:22, 153:10, 157:2, 159:23
**Frankly** [2] - 79:10, 153:9
**Fred** [2] - 95:1, 96:9
**free** [4] - 20:6, 25:17, 76:12, 179:3
**freezer** [8] - 102:17, 104:14, 108:20, 114:16, 114:18, 115:17, 118:24, 119:1
**freezer-type** [1] - 102:17
**frequent** [1] - 142:12
**Friday** [3] - 179:3, 179:6, 180:23
**friend** [8] - 9:7, 9:22, 9:25, 13:23, 18:24, 25:1, 147:15
**friendly** [1] - 183:5
**friends** [7] - 7:6, 7:9, 8:24, 9:5, 25:3, 25:20, 179:21
**front** [16] - 26:11, 58:19, 58:21, 59:5, 65:17, 90:6, 92:8, 92:11, 116:22, 127:14, 127:18, 127:19, 128:23, 134:24, 136:20, 137:2
**frontal** [1] - 92:9
**frustrating** [2] - 79:12, 79:14
**full** [8] - 7:23, 7:24, 26:23, 53:2, 136:10, 161:3, 170:7, 170:9
**full-time** [2] - 7:23, 7:24
**Fully** [1] - 170:6
**functioned** [1] - 48:9
**funds** [1] - 7:21
**Furrow** [6] - 123:13, 123:18, 124:5, 125:10, 126:3, 126:13
**furtherance** [7] - 50:8,

52:7, 55:23, 55:24, 56:6, 56:15
**Furthermore** [1] - 58:15
**future** [1] - 152:25

## G

**G-A-R-Y** [1] - 129:16
**G-O-L-D-B-E-R-G** [1] - 83:1
**gag** [1] - 51:21
**gallon** [1] - 135:20
**gallon-sized** [1] - 135:20
**games** [1] - 140:22
**gangsta** [6] - 10:4, 10:12, 10:13, 10:22, 11:1, 12:25
**garage** [1] - 10:2
**GARDNER** [1] - 1:8
**Gardner** [67] - 1:21, 30:12, 30:13, 37:7, 39:24, 45:23, 45:25, 49:20, 51:2, 51:15, 53:7, 62:4, 70:6, 74:21, 87:20, 87:25, 88:7, 88:14, 88:16, 88:19, 89:3, 89:8, 89:10, 89:22, 91:7, 91:11, 91:23, 92:7, 92:17, 92:18, 93:8, 93:13, 93:16, 95:6, 95:7, 97:20, 98:6, 104:2, 104:4, 105:3, 105:6, 105:11, 105:19, 105:24, 107:2, 107:23, 108:10, 110:19, 118:10, 163:4, 165:12, 168:3, 168:11, 168:19, 168:22, 169:1, 169:8, 170:14, 170:25, 171:6, 171:24, 172:2, 172:5, 172:7, 176:9, 177:19, 177:22
**Gardner's** [9] - 38:9, 49:18, 60:1, 77:14, 94:21, 108:2, 169:6, 170:21, 170:24
**Gary** [8] - 31:23, 106:3, 106:4, 106:20, 108:8, 129:14, 129:16, 131:7
**gather** [2] - 96:12, 96:13, 146:14
**gel** [7] - 94:3, 94:5, 94:6, 94:15, 94:24, 96:8, 96:10
**general** [3] - 16:5, 64:5, 124:7
**Generally** [1] - 22:12
**generally** [2] - 23:23, 122:12

**gentleman** [8] - 39:21, 39:24, 88:11, 114:4, 132:24, 132:25, 146:2, 155:18

**gentlemen** [40] - 6:6, 39:15, 39:20, 39:25, 40:10, 40:20, 41:4, 41:8, 41:22, 42:11, 42:17, 43:4, 43:6, 43:11, 43:17, 43:21, 44:6, 44:18, 46:18, 47:18, 48:25, 49:16, 49:22, 50:2, 50:3, 50:7, 50:19, 51:13, 51:18, 52:22, 53:1, 54:8, 54:15, 55:21, 56:19, 57:6, 82:17, 122:9, 166:2, 178:17

**Geographically** [1] - 81:16

**Gerard** [1] - 1:18

**girlfriend** [2] - 8:8, 32:11

**girlfriend's** [2] - 32:14, 33:13

**given** [8] - 35:18, 46:18, 127:7, 153:8, 155:21, 157:9, 161:6

**glasses** [3] - 88:12, 114:1, 171:4

**Glock** [3] - 169:25, 170:1, 170:2

**glove** [2] - 128:19, 128:21

**goal** [1] - 12:25

**God** [1] - 27:18

**Goldberg** [4] - 82:20, 82:25, 96:21, 97:15

**GOLDBERG** [2] - 82:21, 187:4

**government** [96] - 6:20, 9:8, 11:14, 13:13, 13:20, 14:4, 14:7, 14:14, 15:2, 20:24, 21:14, 22:10, 24:7, 25:16, 26:23, 26:24, 27:12, 27:25, 28:4, 28:6, 30:3, 34:21, 36:10, 36:20, 39:1, 42:2, 43:25, 45:24, 46:21, 47:4, 47:9, 49:1, 49:16, 50:3, 52:8, 52:15, 52:19, 53:5, 53:18, 53:19, 53:23, 54:1, 54:18, 54:19, 54:22, 54:23, 55:2, 55:5, 55:21, 55:22, 56:5, 56:16, 57:24, 58:13, 58:14, 58:17, 58:18, 58:23, 59:12, 60:13, 60:14, 61:12, 62:15, 63:11, 64:16, 66:7, 66:8, 66:11, 67:4,

67:9, 67:18, 67:23, 71:2, 71:12, 72:4, 72:10, 72:19, 73:25, 74:3, 74:14, 74:23, 75:4, 82:18, 114:3, 156:8, 156:25, 157:15, 157:23, 162:24, 163:3, 183:20, 185:17

**Government** [2] - 1:15, 171:10

**government's** [11] - 13:11, 46:3, 49:25, 50:9, 58:9, 76:9, 77:22, 80:4, 156:1, 184:1, 185:3

**Government's** [5] - 95:13, 95:16, 109:13, 123:15, 130:9

**GOVERNMENT'S** [4] - 82:21, 100:3, 121:11, 166:7

**grabbed** [4] - 92:21, 93:17, 93:23, 93:25

**grade** [3] - 148:20, 148:21, 148:22

**grades** [1] - 8:5

**gradually** [1] - 167:24

**graduated** [4] - 4:1, 140:14, 140:15, 141:10

**graduation** [2] - 141:11

**grams** [2] - 170:21, 174:2

**grand** [4] - 29:12, 35:19, 47:22, 55:14

**grateful** [1] - 56:18

**Great** [1] - 124:4

**great** [4] - 66:9, 66:10, 66:17, 183:25

**greater** [1] - 6:9

**green** [4] - 104:17, 108:25, 115:18, 116:6

**Green** [1] - 108:22

**grew** [1] - 25:19

**grips** [1] - 77:18

**grossly** [1] - 52:3

**group** [6] - 9:3, 25:3, 47:22, 48:5, 122:11, 148:7

**growing** [1] - 7:2

**guarantee** [1] - 39:18

**guess** [14] - 5:12, 57:17, 63:1, 74:10, 81:6, 111:11, 114:8, 125:10, 131:15, 133:2, 144:25, 148:17, 151:17, 151:19

**Guidelines** [1] - 54:20

**guilty** [4] - 39:7, 43:13, 45:25, 137:22

**gun** [43] - 15:18, 15:19, 35:9, 52:2, 60:3, 60:13, 60:14, 62:1, 62:8, 73:3,

73:8, 73:20, 73:21, 73:25, 74:1, 74:4, 74:18, 135:8, 145:4, 165:6, 165:13, 168:23, 168:25, 169:13, 169:15, 169:24, 170:19, 171:25, 172:5, 172:6, 175:23, 175:24, 176:11, 176:16, 176:19, 176:25, 177:6, 177:14, 177:17, 177:18

**guns** [3] - 73:17, 73:18

**guy** [4] - 16:11, 145:2, 171:4, 181:15

**guys** [2] - 3:19, 21:15

**gym** [1] - 141:16

**gyms** [1] - 146:6

## H

**habit** [1] - 93:5

**half** [7] - 8:23, 12:4, 12:23, 91:20, 97:10, 156:17, 165:17

**halfway** [2] - 66:17, 89:18

**hammer** [1] - 158:5

**Hammerjacks** [2] - 25:11, 29:1

**hand** [14] - 39:22, 86:12, 89:23, 104:10, 106:21, 106:23, 125:15, 126:7, 126:21, 126:25, 146:23, 168:17, 172:6, 183:25

**handed** [1] - 106:24

**handgun** [6] - 168:14, 168:15, 169:11, 169:17, 169:25, 177:16

**handing** [1] - 107:1

**handle** [1] - 77:3

**handled** [3] - 99:9, 101:15, 120:16

**hands** [7] - 126:16, 135:2, 135:24, 136:4, 136:6, 136:8, 172:4

**handy** [1] - 146:23

**hang** [3] - 7:4, 8:20, 25:20

**hanging** [2] - 7:8, 17:18

**HANLON** [15] - 82:19, 83:3, 96:17, 99:13, 99:16, 100:1, 100:10, 103:23, 106:11, 120:21, 180:9, 187:4, 187:6, 187:7, 187:9

**Hanlon** [1] - 1:16, 26:25, 158:2, 162:8, 183:7, 183:9

**happy** [2] - 151:19,

184:13

**Harbor** [1] - 83:14

**hard** [9] - 9:20, 11:5, 41:14, 43:18, 52:23, 53:1, 56:20, 152:8, 154:15

**hard-earned** [1] - 154:15

**harder** [1] - 43:8

**hardest** [1] - 40:21

**HARDING** [67] - 5:20, 5:23, 22:19, 23:5, 23:20, 24:3, 24:8, 57:5, 57:17, 58:2, 63:23, 64:10, 64:23, 69:4, 69:6, 69:11, 69:15, 70:1, 70:3, 70:5, 70:9, 70:12, 70:16, 70:21, 76:18, 79:21, 79:23, 80:1, 121:9, 121:18, 126:2, 134:1, 137:14, 139:1, 145:7, 145:12, 154:5, 158:4, 158:1, 164:16, 164:21, 164:23, 165:3, 165:7, 165:10, 165:12, 165:16, 165:22, 165:24, 166:5, 166:14, 176:24, 177:5, 182:10, 182:14, 182:18, 183:15, 184:8, 184:12, 185:8, 185:11, 185:17, 185:25, 187:11, 187:12, 187:13, 187:14

**Harding** [61] - 1:15, 10:20, 13:12, 14:1, 23:10, 23:11, 26:25, 27:17, 28:2, 28:8, 29:18, 30:8, 30:15, 30:19, 31:5, 32:6, 32:8, 32:15, 34:8, 46:22, 51:20, 53:19, 57:2, 57:16, 64:3, 66:3, 68:2, 69:3, 71:9, 75:18, 76:10, 79:20, 124:13, 124:20, 138:25, 139:9, 139:11, 143:9, 143:12, 144:22, 154:22, 155:9, 156:17, 157:2, 157:25, 162:8, 162:21, 164:15, 165:1, 166:4, 172:19, 177:4, 180:17, 181:5, 181:9, 181:18, 182:4, 183:4, 183:18, 184:5, 184:7

**Harding's** [3] - 58:25, 60:23, 156:3

**hardship** [1] - 152:5

**harm** [1] - 133:19

**HARRIS** [1] - 1:7

**Harris** [1] - 1:18, 12:20, 12:21, 13:1, 13:15, 19:24, 30:12,

30:21, 76:12, 76:19, 98:18, 163:4

**Harris's** [1] - 75:21

**hash** [1] - 80:3

**hat** [1] - 52:1

**hate** [1] - 35:13

**hazy** [1] - 142:10

**headquarters** [1] - 49:6

**health** [1] - 146:6

**hear** [30] - 9:3, 9:11, 9:22, 10:3, 10:4, 10:5, 10:13, 10:21, 11:7, 11:8, 11:24, 12:11, 13:4, 14:6, 15:4, 17:12, 19:9, 19:13, 20:8, 22:5, 22:23, 38:8, 38:9, 49:22, 55:2, 61:3, 61:21, 78:17, 146:24, 154:23

**heard** [34] - 5:15, 10:3, 10:14, 11:24, 18:2, 21:13, 22:25, 25:18, 33:11, 41:17, 43:19, 44:1, 44:4, 44:15, 44:18, 51:16, 51:20, 53:19, 57:9, 57:10, 61:4, 67:13, 78:12, 138:6, 138:24, 145:9, 147:6, 147:9, 154:17, 163:14, 165:8, 179:18

**hearing** [15] - 27:7, 28:24, 34:6, 39:18, 48:22, 50:19, 51:1, 72:2, 113:14, 117:9, 117:10, 129:21, 131:4, 155:24, 175:20

**hearings** [4] - 22:6, 22:12, 64:6, 184:25

**hearsay** [4] - 57:25, 58:10, 59:1, 65:4, 71:8, 71:10, 71:16, 71:19, 71:20, 71:21, 72:17, 103:20

**heart** [1] - 29:16

**Heights** [7] - 47:23, 47:25, 97:7, 110:23, 174:14, 174:16, 174:18

**held** [1] - 102:17

**hell** [1] - 21:24

**help** [5] - 35:22, 113:24, 146:23, 147:13, 181:22

**helpful** [1] - 183:5

**Herb** [7] - 81:7, 82:5, 138:14, 138:15, 153:15, 154:8

**Herbert** [1] - 81:7

**hereby** [1] - 188:3

**herein** [1] - 47:23

**hereunto** [1] - 188:10

**Herndon** [1] - 165:10

**heroin** [9] - 86:5, 91:16,

94:19, 99:4, 170:21, 174:2, 174:3, 174:6, 174:11

**hesitate** [1] - 183:17
**Hickey** [30] - 7:13, 7:17, 8:11, 8:22, 63:20, 69:20, 70:15, 71:11, 80:21, 81:6, 140:2, 140:9, 140:17, 140:18, 140:21, 141:10, 142:6, 142:14, 143:3, 143:4, 143:5, 143:24, 146:4, 147:9, 148:2, 148:4, 155:2, 157:12, 162:19, 162:20
**hiding** [2] - 119:9, 135:8
**high** [14] - 7:3, 7:12, 7:13, 8:8, 21:24, 36:2, 69:21, 114:2, 122:14, 140:16, 141:10, 154:12
**highly** [2] - 7:19, 155:15
**Hill** [2] - 124:9, 124:18
**himself** [3] - 8:4, 18:9, 30:25
**hire** [1] - 35:9
**hired** [5] - 141:2, 141:12, 143:15, 143:23, 143:24
**history** [3] - 11:16, 124:15, 124:23
**hit** [3] - 67:18, 68:5, 91:19
**Hold** [1] - 147:2
**hold** [3] - 157:13, 158:14, 159:17
**holding** [1] - 62:7
**hole** [5] - 29:24, 43:25, 44:2, 44:3, 49:2
**home** [1] - 15:8
**Home** [1] - 89:20
**homicide** [8] - 52:7, 52:13, 55:23, 56:5, 56:14, 62:2, 79:24
**homicides** [2] - 42:8, 50:6
**honestly** [2] - 151:8, 156:14
**honesty** [3] - 159:1, 159:24, 161:25
**honor** [1] - 39:23
**Honor** [107] - 2:3, 2:19, 5:24, 22:19, 23:5, 23:8, 24:8, 26:2, 26:5, 39:13, 57:5, 57:17, 59:14, 61:13, 62:14, 62:21, 63:1, 63:17, 63:23, 64:10, 65:2, 69:4, 69:17, 70:9, 70:21, 71:1, 71:18, 76:7, 76:8, 76:18, 78:20, 79:11, 80:7, 80:15,

80:17, 81:2, 81:8, 82:2, 82:7, 82:19, 88:13, 95:10, 96:12, 96:17, 96:21, 97:15, 99:13, 99:23, 100:1, 103:24, 106:7, 109:10, 110:11, 110:12, 111:1, 111:4, 119:18, 120:22, 121:6, 121:9, 123:16, 125:4, 130:19, 130:20, 130:23, 134:1, 134:2, 137:12, 137:23, 138:14, 139:14, 142:9, 144:14, 144:15, 144:20, 145:6, 154:21, 154:24, 155:7, 155:13, 155:19, 156:5, 156:11, 158:16, 160:7, 161:7, 162:18, 163:6, 164:16, 165:3, 165:22, 166:5, 171:6, 171:10, 173:20, 180:9, 180:13, 180:15, 181:7, 182:10, 183:15, 183:17, 185:17, 185:20, 185:21, 186:4

**Honor's** [1] - 68:5
**Honorable** [1] - 1:13
**honored** [2] - 41:11, 42:16
**hope** [4] - 139:6, 145:8, 156:17, 158:13
**hoped** [2] - 2:6, 40:18
**hopefully** [2] - 3:23, 158:13
**horrible** [2] - 44:24, 51:18
**horribly** [1] - 50:10
**host** [1] - 52:9
**hour** [3] - 87:15, 87:16, 165:17
**hourly** [1] - 4:12
**house** [2] - 17:17, 17:25
**House** [1] - 24:15
**housekeeping** [1] - 186:5
**houses** [1] - 124:24
**huddled** [2] - 89:9, 89:16
**huge** [1] - 17:4
**hum** [1] - 150:24
**Human** [1] - 3:12
**human** [2] - 41:21, 42:6
**humorous** [2] - 46:9, 46:11
**hunched** [1] - 90:8
**hundred** [4] - 15:15, 89:12, 89:19, 117:3
**Hundreds** [1] - 107:13
**husband** [1] - 34:11
**hypothetical** [1] - 52:8

# I

**Ice** [4] - 10:9, 11:6, 11:17
**idea** [10] - 41:21, 43:22, 46:8, 47:14, 56:4, 108:16, 118:18, 139:21, 154:19, 158:7
**ideas** [2] - 44:15, 46:17
**identifiable** [1] - 93:7, 95:21
**identification** [3] - 95:12, 109:12, 109:21
**identifications** [1] - 51:25
**identified** [22] - 69:8, 87:20, 87:24, 93:4, 102:16, 103:6, 103:15, 103:19, 104:1, 104:2, 104:4, 106:4, 106:9, 107:2, 108:2, 108:8, 111:22, 115:22, 125:4, 125:24, 168:7, 171:5
**identify** [8] - 88:3, 88:9, 93:11, 103:18, 111:20, 123:16, 154:10, 170:25
**identifying** [1] - 88:13
**identity** [1] - 131:2
**IF** [1] - 73:3
**Ill** [1] - 1:10
**illegal** [2] - 9:11, 97:20
**illusive** [1] - 40:9
**illustrated** [2] - 43:21, 43:22
**imagine** [2] - 58:2, 124:23
**immediate** [3] - 24:16, 118:14, 185:2
**immediately** [8] - 24:13, 26:11, 39:24, 65:1, 81:5, 105:3, 131:23, 183:25
**Impact** [1] - 166:18
**impact** [2] - 151:24, 151:25
**imperative** [1] - 159:23
**importance** [2] - 44:21, 46:18
**important** [14] - 6:9, 28:21, 34:4, 35:22, 38:22, 42:13, 44:24, 46:12, 55:9, 153:7, 155:13, 164:1, 176:2, 176:4
**importantly** [1] - 41:5
**impose** [1] - 152:6
**impression** [3] - 59:17, 76:23, 78:2
**IN** [1] - 1:1
**in-furtherance** [1] -

56:15
**inappropriate** [1] - 159:2
**incarcerated** [3] - 50:15, 144:8, 163:5
**incentive** [5] - 14:2, 14:4, 14:21, 55:1, 56:15
**inch** [3] - 115:8, 115:9, 115:11
**inches** [3] - 135:16, 135:17
**inches-wise** [1] - 135:16
**incident** [11] - 84:8, 94:22, 95:22, 98:1, 98:16, 116:14, 119:25, 137:10, 167:13, 167:23, 170:20
**inclined** [2] - 156:19, 157:23
**include** [2] - 7:7, 7:8
**including** [4] - 32:2, 47:25, 48:14, 165:18
**inconsistencies** [1] - 55:12
**inconsistent** [1] - 156:1
**inconvenience** [1] - 182:23
**inconvenient** [1] - 17:8
**incorrectly** [1] - 62:1
**indeed** [3] - 36:3, 36:5, 59:8
**Indeed** [1] - 37:6
**independent** [2] - 61:14, 74:17
**INDEX** [1] - 187:1
**indicate** [3] - 36:22, 131:10, 131:16
**indicated** [14] - 32:15, 34:9, 45:16, 81:4, 95:7, 97:18, 97:19, 98:6, 98:11, 103:14, 109:8, 112:11, 118:9, 120:14
**indicates** [1] - 180:6
**Indicates** [1] - 32:3
**indicted** [1] - 45:22
**indictment** [14] - 26:15, 28:22, 28:23, 29:5, 34:17, 34:18, 34:23, 35:25, 36:8, 36:23, 45:21, 47:18, 47:20, 48:2
**indictments** [2] - 34:19, 34:20
**individual** [21] - 26:11, 35:6, 87:24, 88:2, 102:16, 103:5, 105:11, 105:22, 105:23, 105:24, 106:2, 115:21, 116:17, 118:9, 118:23, 133:20, 133:24, 134:4, 168:7,

168:24, 170:17
**individuals** [15] - 45:23, 48:6, 50:14, 51:23, 85:6, 88:18, 88:21, 89:3, 98:12, 106:12, 111:18, 120:7, 132:12, 169:7, 169:9
**infer** [1] - 143:14
**inference** [1] - 58:22
**inflamed** [1] - 42:7
**inflammatory** [3] - 12:16, 41:14, 42:4
**Influenced** [1] - 46:13
**information** [10] - 3:2, 14:14, 32:7, 66:25, 129:19, 146:1, 146:15, 151:5, 162:4, 163:21
**infrastructure** [1] - 49:5
**ingenious** [1] - 40:12
**inherently** [1] - 42:8
**initiation** [1] - 49:8
**initiative** [1] - 83:21
**injured** [1] - 8:4
**inner** [1] - 11:5
**Inner** [1] - 83:14
**inquire** [2] - 74:24, 76:13
**inquiring** [1] - 180:4
**inquiry** [2] - 81:12, 82:1
**inside** [13] - 17:25, 94:5, 94:6, 94:7, 114:18, 127:11, 128:11, 135:5, 135:10, 148:25, 168:20, 178:7, 178:13
**installed** [1] - 5:5
**instance** [4] - 3:13, 69:2, 69:14, 103:5
**instances** [1] - 27:2
**instead** [2] - 15:1, 157:14
**instruct** [1] - 46:2
**instructed** [2] - 53:21, 67:10
**instructing** [1] - 163:14
**instruction** [3] - 76:25, 77:4, 77:10
**instructions** [9] - 24:9, 36:17, 38:15, 44:12, 47:7, 58:17, 93:14, 179:17
**instrument** [2] - 178:7, 178:12
**instruments** [5] - 177:25, 178:1, 178:2, 178:9, 178:10
**integrated** [1] - 50:25
**intelligent** [1] - 155:15
**intend** [5] - 42:19, 65:5, 68:6, 78:17, 142:19
**intended** [2] - 142:22,

157:16
**intending** [2] - 57:25, 69:16
**intends** [5] - 63:11, 67:19, 67:23, 72:4
**intent** [1] - 65:11
**intention** [2] - 139:17, 164:4
**intentionally** [1] - 41:21
**interacting** [1] - 106:13
**interaction** [1] - 40:18
**interactions** [1] - 163:12
**interest** [1] - 14:22
**interesting** [4] - 14:1, 15:3, 15:10, 16:17
**internal** [1] - 182:14
**Internal** [1] - 101:3
**interpreted** [1] - 46:15
**interrupt** [2] - 22:7, 184:2
**interrupted** [1] - 127:8
**intersection** [7] - 105:10, 110:18, 167:18, 167:24, 168:6, 168:9, 172:24
**interstate** [1] - 48:7
**interviewed** [1] - 34:14
**intimate** [1] - 156:4
**intimately** [1] - 44:7
**intimidation** [1] - 10:25
**introduce** [9] - 57:25, 58:4, 63:11, 63:12, 66:5, 67:19, 67:23, 68:6, 71:5
**introduced** [1] - 73:19
**inventoried** [1] - 178:3
**inventory** [1] - 178:4
**invested** [1] - 154:14
**investigated** [1] - 147:21
**investigating** [1] - 109:21
**investigation** [3] - 137:10, 137:15, 179:23
**investigator** [1] - 31:22
**invoke** [3] - 5:20, 5:23, 50:13
**involve** [2] - 20:3, 183:18
**involved** [35] - 19:23, 28:7, 28:8, 28:9, 28:11, 28:15, 28:23, 29:3, 29:4, 29:5, 29:8, 29:11, 29:12, 29:14, 30:21, 34:9, 34:24, 35:1, 35:3, 35:15, 36:6, 38:13, 38:23, 38:24, 47:3, 48:14, 53:17, 63:19, 119:4, 143:15, 146:20, 147:16, 148:4, 151:20, 177:22

**involves** [1] - 107:7
**involving** [2] - 29:17, 57:20
**Irene** [2] - 31:17, 33:22
**irresistible** [1] - 55:1
**irritating** [1] - 22:8
**Island** [4] - 8:2, 157:11, 160:22, 162:17
**issue** [34] - 21:8, 22:17, 24:10, 30:6, 50:6, 56:17, 57:18, 57:21, 59:18, 59:21, 60:1, 65:1, 66:4, 66:21, 70:24, 72:25, 74:11, 74:17, 74:18, 76:22, 77:3, 77:23, 78:21, 79:17, 145:5, 155:1, 155:4, 155:5, 155:12, 155:14, 155:22, 157:21, 163:2, 181:7
**issues** [11] - 43:7, 43:16, 57:11, 59:22, 59:23, 77:1, 138:7, 139:3, 179:19, 180:16, 180:18
**item** [8] - 96:2, 96:4, 96:5, 96:6, 96:8, 96:9, 96:10
**Item** [1] - 96:7
**items** [6] - 94:25, 96:7, 106:23, 108:24, 175:22, 178:4
**itself** [2] - 161:4, 169:19

**J**

**J-O-S-E-P-H** [1] - 82:25
**Jackson** [1] - 107:20
**jail** [5] - 8:18, 14:15, 19:15, 34:16, 67:7
**Jam** [1] - 11:25
**James** [1] - 1:20
**January** [3] - 122:6, 122:19, 141:6
**Jaquetta** [1] - 33:14
**Jason** [1] - 31:25
**Jay** [2] - 11:23, 12:3
**Jay-Z** [2] - 11:23, 12:3
**Jencks** [1] - 181:11
**Jersey** [2] - 7:22, 157:11
**Jesus** [1] - 84:24
**Jim** [5] - 26:8, 26:9, 26:22, 111:4, 130:25
**job** [6] - 4:3, 13:21, 13:22, 40:21, 42:15, 132:18
**John** [1] - 110:4
**Joint** [1] - 24:15
**Jones** [6] - 29:9, 34:11,

34:25, 35:16, 51:16, 53:6, 55:23, 56:14, 77:14
**Jones-Spence** [7] - 29:9, 34:11, 34:25, 35:16, 51:16, 53:6, 56:14
**Joseph** [2] - 82:20, 82:25
**JOSEPH** [2] - 82:21, 187:4
**Judge** [27] - 1:13, 5:20, 21:2, 22:13, 22:16, 22:21, 23:20, 26:19, 27:11, 27:18, 27:24, 36:1, 36:15, 36:23, 40:1, 42:12, 44:10, 44:11, 45:2, 66:1, 66:4, 66:13, 67:16, 72:25, 75:10, 145:7, 154:5
**judge** [4] - 22:7, 45:5, 46:2, 48:19
**Judge's** [1] - 47:7
**judges** [1] - 27:17
**judgment** [2] - 27:21, 79:8
**jump** [1] - 65:2
**jumped** [2] - 60:16, 145:4
**June** [3] - 29:7, 29:9, 34:12
**junior** [1] - 7:3
**jurisdiction** [3] - 20:24, 20:25, 22:18
**Jurisdiction** [1] - 20:24
**JUROR** [70] - 2:23, 2:25, 3:4, 3:6, 3:14, 3:17, 3:19, 3:22, 3:25, 4:2, 4:4, 4:8, 4:13, 4:19, 4:22, 5:2, 5:4, 5:12, 5:17, 145:16, 146:8, 146:11, 146:13, 146:17, 146:21, 147:1, 147:3, 147:9, 147:15, 147:19, 147:24, 148:3, 148:6, 148:10, 148:16, 148:19, 148:21, 148:24, 149:3, 149:6, 149:9, 149:12, 149:15, 149:18, 149:21, 149:23, 150:2, 150:7, 150:11, 150:13, 150:18, 150:24, 151:1, 151:6, 151:15, 151:22, 152:9, 152:11, 152:14, 152:18, 152:24, 153:2, 153:4, 153:14, 153:16, 153:18, 153:21, 153:24, 163:25, 164:11
**Juror** [15] - 2:8, 2:11, 2:16, 2:20, 2:22, 5:19, 6:11, 6:14, 81:3, 138:22, 145:14, 145:15, 154:4,

163:10, 164:14
**juror** [39] - 2:13, 5:9, 5:11, 5:15, 80:13, 81:5, 81:18, 82:1, 139:5, 144:13, 144:17, 146:23, 154:17, 155:6, 155:12, 155:15, 155:21, 156:6, 156:8, 156:12, 156:18, 156:22, 156:24, 157:3, 157:14, 157:18, 157:19, 157:20, 157:24, 158:14, 158:25, 159:3, 159:4, 159:7, 159:24, 161:20, 163:9, 164:17, 180:4
**jurors** [15] - 6:8, 6:16, 27:16, 138:17, 139:6, 153:23, 154:1, 155:20, 156:15, 156:20, 159:20, 159:21, 161:13, 164:18, 180:6
**Jury** [7] - 1:13, 6:5, 57:14, 82:16, 138:9, 166:1, 180:2
**jury** [65] - 2:5, 2:6, 2:9, 2:12, 3:3, 6:6, 24:22, 35:19, 39:20, 40:1, 42:16, 43:2, 47:19, 47:22, 55:14, 57:12, 57:13, 58:17, 58:19, 58:22, 58:24, 59:5, 59:7, 59:9, 59:17, 60:20, 61:20, 61:22, 64:21, 65:6, 65:17, 66:21, 67:5, 67:10, 76:22, 76:25, 77:5, 78:1, 78:11, 78:18, 79:1, 79:4, 82:3, 122:9, 138:4, 138:7, 138:8, 151:11, 153:25, 155:8, 157:9, 161:23, 161:24, 162:16, 163:16, 163:19, 163:22, 164:5, 164:13, 165:23, 178:17, 179:22, 182:5, 185:15
**jury's** [3] - 5:13, 61:4, 179:25
**justice** [5] - 22:9, 22:15, 24:24, 40:3, 40:4
**Justice** [1] - 42:2
**Juvenile** [1] - 140:1
**juvenile** [4] - 7:10, 67:25, 69:1, 83:21

**K**

**Kathleen** [1] - 107:20
**Keep** [1] - 124:12
**keep** [12] - 3:5, 11:11, 13:18, 57:11, 69:1, 138:6, 139:7, 145:17, 159:3, 159:4, 163:20,

179:19
**keeps** [1] - 18:18
**Keith** [1] - 27:3
**Kelly** [1] - 27:1
**Kelsey** [2] - 1:17, 6:24
**kept** [2] - 37:24, 89:17
**KEVIN** [2] - 166:7, 187:13
**Kevin** [6] - 11:24, 25:12, 165:3, 165:22, 166:6, 166:11
**key** [12] - 43:7, 43:16, 47:10, 48:5, 50:6, 51:11, 104:6, 104:8, 104:10, 108:17, 108:24
**keys** [4] - 108:4, 108:6, 129:8, 129:9
**kick** [1] - 161:19
**kidnapped** [2] - 18:11, 18:13
**kids** [5] - 7:2, 7:3, 8:11, 25:19, 148:12
**kill** [1] - 35:2
**killed** [3] - 15:6, 18:2, 34:12
**killer** [1] - 35:9
**killing** [1] - 19:17
**killings** [4] - 19:17, 28:9, 29:11, 30:25
**kind** [47] - 4:17, 5:4, 9:8, 9:9, 15:4, 15:8, 15:13, 16:17, 21:3, 22:2, 23:24, 24:24, 26:10, 26:22, 31:7, 42:20, 45:2, 46:6, 46:9, 46:17, 46:25, 47:3, 49:9, 49:10, 50:24, 52:14, 52:18, 52:23, 53:22, 55:6, 55:11, 59:20, 59:25, 60:7, 73:1, 78:16, 83:19, 100:25, 107:15, 124:7, 130:11, 132:10, 143:20, 155:11, 169:24, 171:12, 186:13
**kinds** [6] - 42:3, 50:20, 50:22, 53:15, 86:7, 87:1
**Klas** [1] - 27:5
**knit** [1] - 25:3
**knockers** [2] - 132:10, 132:15
**knowing** [2] - 33:17, 164:5
**knowledge** [6] - 108:13, 144:6, 148:5, 153:23, 156:23, 176:13
**known** [4] - 16:5, 47:22, 124:25, 132:4
**knows** [6] - 16:8, 16:10, 16:12, 18:24, 27:18, 59:10, 143:1, 143:3
**KURLAND** [33] - 59:14,

61:10, 61:13, 61:18, 62:6, 62:9, 62:12, 62:14, 62:19, 62:21, 62:24, 72:25, 73:6, 73:9, 73:12, 73:16, 74:2, 74:8, 74:11, 74:20, 75:3, 75:6, 75:10, 75:13, 76:21, 77:19, 78:4, 173:19, 177:3, 177:10, 177:13, 187:14, 187:15

**Kurland** [17] - 1:21, 39:22, 43:5, 55:15, 56:23, 58:12, 59:13, 62:16, 68:10, 70:20, 72:23, 76:20, 77:11, 78:21, 78:24, 80:3, 165:6

# L

**L-1** [2] - 109:13, 109:14
**L-2** [3] - 95:13, 95:16
**L-3** [1] - 130:10
**L-4** [1] - 171:10
**L.A** [2] - 11:4, 11:6
**lab** [1] - 96:4, 96:14, 109:25, 130:12, 182:19, 182:21, 183:9, 183:23, 185:8, 185:11
**Lab** [1] - 130:12
**labeled** [1] - 110:5
**laboratory** [4] - 95:18, 171:14, 171:15, 171:17
**lack** [1] - 122:17
**Ladies** [5] - 6:6, 39:20, 43:4, 57:6, 178:17
**ladies** [35] - 39:15, 39:25, 40:10, 40:20, 41:4, 41:8, 41:22, 42:11, 42:16, 43:6, 43:11, 43:17, 43:20, 44:6, 44:18, 46:18, 47:18, 48:25, 49:15, 49:21, 50:2, 50:3, 50:7, 50:19, 51:13, 51:18, 52:22, 53:1, 54:7, 54:15, 55:21, 56:19, 82:17, 122:9, 166:2
**laid** [1] - 28:5
**Lakeisha** [1] - 32:9
**lane** [4] - 89:17, 91:18, 91:19, 91:21
**lanes** [3] - 113:4, 113:6
**language** [7] - 11:9, 23:15, 47:17, 48:5, 48:19, 53:8, 54:3
**lap** [1] - 186:8
**large** [5] - 3:16, 102:17, 104:14, 108:19, 122:15
**largely** [2] - 24:1, 78:8

**larger** [2] - 74:11, 115:17
**laser** [9] - 43:6, 43:7, 46:8, 50:8, 124:2, 169:15, 169:16, 169:19
**Last** [3] - 2:4, 129:16, 166:4
**last** [13] - 3:7, 7:12, 17:21, 72:1, 84:6, 84:7, 101:3, 135:21, 149:25, 158:12, 159:16, 180:23, 182:24
**lasted** [1] - 36:21
**latch** [1] - 20:20
**late** [2] - 10:6, 181:10
**latent** [2] - 181:8, 183:1
**latents** [1] - 182:19
**Latin** [1] - 41:1
**Laura** [2] - 1:17, 6:24
**lavaliere** [1] - 146:23
**law** [22] - 9:12, 26:24, 27:24, 31:18, 31:21, 35:18, 36:14, 45:9, 45:13, 45:14, 45:17, 46:12, 51:4, 55:3, 64:7, 65:14, 69:24, 70:17, 71:25, 72:7
**Law** [1] - 24:15
**law's** [1] - 46:13
**LAWLOR** [36] - 63:1, 63:7, 63:10, 63:17, 63:25, 65:2, 66:1, 66:4, 66:13, 66:16, 66:19, 67:3, 67:12, 67:16, 67:22, 68:4, 68:11, 68:16, 68:19, 68:22, 68:25, 71:1, 71:5, 71:14, 71:18, 71:24, 72:6, 72:15, 72:20, 72:22, 96:20, 110:15, 130:20, 173:17, 187:5, 187:8
**Lawlor** [13] - 1:17, 7:1, 62:25, 65:3, 66:9, 67:13, 68:2, 70:23, 74:22, 96:18, 158:5, 159:5, 162:13
**Lawlor's** [1] - 65:23
**laws** [3] - 45:13, 45:14, 45:24
**lawyer** [11] - 35:21, 42:22, 43:1, 56:9, 72:17, 72:18, 85:9, 85:12, 182:13, 183:10
**lawyers** [17] - 40:2, 40:6, 40:15, 41:24, 42:14, 42:15, 42:19, 42:21, 44:5, 44:15, 45:3, 45:16, 50:17, 53:17, 55:10, 183:6
**lay** [1] - 30:8

**laying** [1] - 127:13
**lead** [2] - 31:21, 86:20
**leaders** [1] - 48:20
**leadership** [1] - 48:1
**leading** [2] - 65:14, 65:18
**leafy** [9] - 102:18, 104:14, 104:17, 110:6, 114:19, 114:20, 115:1, 115:18, 116:6
**leaning** [2] - 125:25, 126:11
**learn** [2] - 37:9, 59:6
**learned** [2] - 2:11, 123:9
**learning** [3] - 61:5, 163:20, 164:5
**least** [8] - 35:19, 39:4, 44:8, 45:11, 66:23, 142:14, 143:16, 155:24
**leave** [9] - 6:2, 18:1, 32:17, 57:7, 138:4, 154:3, 157:3, 157:16, 180:5
**leaves** [1] - 5:19
**leaving** [2] - 135:7, 151:24
**lectern** [6] - 57:15, 75:8, 77:11, 77:12, 177:4, 182:4
**ledge** [1] - 51:22
**left** [23] - 9:17, 14:3, 15:7, 17:19, 17:20, 19:9, 29:24, 39:22, 39:24, 59:17, 64:16, 78:2, 85:8, 90:4, 92:11, 100:21, 100:22, 119:1, 126:12, 127:22, 137:9, 143:1, 162:16
**left-hand** [1] - 39:22
**legal** [6] - 20:25, 41:17, 77:5, 78:16, 79:5, 113:8
**legally** [1] - 137:9
**legitimate** [6] - 13:8, 13:9, 33:18, 73:2, 73:19, 78:25
**length** [3] - 89:12, 89:20, 113:2
**length's** [1] - 90:16
**lengthy** [2] - 165:5, 165:8
**less** [6] - 29:14, 32:12, 114:6, 115:11, 117:19, 138:18
**letter** [3] - 14:13, 60:23, 180:23
**letters** [3] - 54:2, 54:3
**level** [7] - 87:3, 101:16, 121:1, 121:4, 122:16, 122:18, 123:6
**leveling** [1] - 107:7

**levels** [2] - 101:2, 132:3
**license** [1] - 109:3
**lid** [1] - 104:9
**lie** [1] - 14:3
**life** [1] - 41:21
**lifted** [2] - 136:22, 137:3
**light** [7] - 127:11, 135:5, 135:10, 157:25, 161:18, 169:16, 169:20
**likelihood** [1] - 51:7
**likely** [3] - 18:23, 19:4, 43:11
**limb** [1] - 13:3
**limited** [2] - 76:16
**Limited** [2] - 48:15, 49:23
**limits** [1] - 87:15
**line** [13] - 20:1, 44:14, 47:8, 76:22, 83:14, 91:17, 91:18, 93:21, 93:23, 97:3, 97:6, 141:9, 167:22
**lines** [1] - 139:2
**lining** [1] - 8:7
**Lisa** [2] - 29:4, 30:10
**list** [4] - 82:12, 145:20, 153:8, 161:4
**listen** [10] - 13:11, 13:19, 15:9, 27:19, 38:15, 43:9, 56:2, 56:3, 56:12
**Listen** [2] - 56:1, 56:7
**listened** [1] - 10:12
**lists** [1] - 48:10
**Literally** [1] - 186:4
**live** [4] - 88:23, 132:16, 133:17, 157:4
**lived** [2] - 87:22, 87:23
**lives** [7] - 7:5, 7:6, 29:22, 29:25, 42:9
**living** [4] - 52:24, 100:13, 139:18, 142:23
**loaded** [2] - 170:4, 170:6
**local** [3] - 61:24, 81:22, 87:22
**location** [5] - 88:9, 112:17, 113:9, 116:3, 162:5
**locations** [2] - 4:24, 174:21
**locked** [1] - 137:9
**Lombard** [1] - 1:17
**look** [32] - 16:3, 16:23, 31:19, 56:24, 60:5, 81:13, 81:24, 85:22, 86:8, 87:2, 87:19, 88:6, 92:5, 102:23, 103:11, 104:21, 104:25, 111:17, 119:1, 123:5, 126:15,

127:1, 128:25, 129:22, 130:4, 134:17, 135:21, 147:12, 181:11, 184:3, 184:6, 186:19
**Look** [4] - 67:13, 160:9, 160:24, 183:5
**looked** [11] - 89:7, 90:11, 91:21, 92:3, 104:15, 104:22, 127:4, 136:12, 169:8, 169:11
**Looking** [1] - 133:2
**looking** [10] - 60:8, 79:9, 86:1, 86:6, 87:14, 87:16, 90:7, 90:8, 92:4, 125:14
**lookout** [2] - 86:16, 133:18
**looks** [1] - 2:6
**Looks** [1] - 24:1
**loose** [3] - 25:3, 114:20, 114:21
**lose** [3] - 159:20, 159:21
**losing** [4] - 139:6, 155:19, 156:15, 156:20
**lost** [2] - 138:16, 161:12
**luck** [1] - 5:18
**lunch** [2] - 57:4, 78:22
**luncheon** [1] - 57:7
**lurking** [2] - 59:21, 59:25
**Lyles** [2] - 11:24, 25:12
**Lynch** [68] - 7:15, 80:13, 81:7, 81:25, 82:5, 82:14, 138:14, 138:15, 139:2, 139:12, 139:17, 139:25, 140:24, 141:8, 141:16, 142:17, 143:14, 144:7, 145:21, 146:2, 146:10, 146:11, 147:5, 147:7, 147:18, 147:22, 148:11, 148:23, 149:17, 150:15, 150:19, 150:23, 151:10, 151:13, 151:14, 152:2, 152:9, 153:9, 153:14, 153:15, 153:18, 153:19, 154:8, 154:13, 154:15, 154:18, 155:5, 156:6, 157:14, 158:5, 158:8, 160:3, 160:13, 160:18, 161:6, 161:10, 162:4, 162:13, 163:18, 163:23, 164:2, 164:5, 164:21
**Lynch's** [5] - 141:20, 147:23, 156:2, 157:6, 160:9
**lyrics** [6] - 10:20, 10:22, 11:15, 12:7, 12:8, 12:12

# M

ma'am [1] - 121:12
machinery [1] - 178:11
mad [1] - 18:21
Mafia [2] - 21:14, 49:9
Magginson [1] - 31:17
Magginson's [1] -
33:23
mail [3] - 31:15, 33:4,
33:8
main [1] - 33:24
mainstream [2] - 12:8
maintain [1] - 5:6
maintained [1] - 32:25
Maintaining [1] - 48:13
maintaining [1] - 4:25
maintenance [1] - 5:3
major [3] - 3:24, 37:25,
122:13
majority [1] - 132:1
male [8] - 87:21, 90:5,
92:4, 98:9, 125:25,
126:11, 134:18, 135:7
man [10] - 15:2, 20:6,
25:17, 33:24, 33:25,
34:10, 35:11, 35:12,
67:25, 150:9
manager [1] - 32:1
manner [3] - 107:11,
179:24, 188:9
map [2] - 30:7, 123:23
March [6] - 29:22, 32:4,
32:14, 32:23
marijuana [6] - 102:18,
104:22, 108:21, 109:18,
118:22, 120:5
mark [1] - 161:6
mark/question [2] -
161:6
marked [9] - 85:16,
95:13, 107:19, 109:13,
109:20, 112:7, 123:15,
130:9, 171:9
marks [1] - 125:13
marshals [1] - 22:13
MARTIN [20] - 1:7, 26:2,
75:15, 75:18, 75:24,
76:2, 76:4, 76:7, 144:14,
144:20, 144:25, 145:6,
155:7, 180:13, 180:15,
180:21, 181:1, 181:4,
182:1, 185:21
Martin [91] - 1:18, 1:19,
25:25, 26:9, 26:11,
26:14, 26:21, 26:23,
28:7, 28:12, 28:23,
29:11, 29:16, 30:6,
30:13, 30:25, 31:6, 31:7,

31:8, 31:13, 31:20, 32:2,
32:9, 32:20, 32:21, 33:1,
33:6, 33:8, 33:14, 33:15,
34:5, 34:9, 34:13, 34:24,
35:2, 36:3, 36:10, 36:13,
39:6, 39:8, 61:1, 69:15,
70:5, 75:8, 75:14, 76:8,
98:20, 106:10, 106:20,
106:24, 107:1, 107:24,
108:10, 110:19, 111:5,
111:23, 115:21, 115:22,
115:25, 116:5, 116:8,
116:15, 116:18, 116:21,
123:10, 125:25, 126:15,
126:23, 127:8, 127:16,
127:21, 128:5, 128:23,
129:3, 129:8, 129:10,
129:18, 129:21, 131:1,
131:2, 134:8, 134:17,
134:22, 135:8, 137:22,
144:19, 163:4, 180:14,
182:25, 183:8
Martin's [9] - 32:25,
33:11, 56:9, 108:7,
129:5, 129:6, 132:24,
156:12, 182:12
Mary [3] - 1:23, 188:3,
188:15
MARYLAND [1] - 1:1
Maryland [11] - 1:11,
1:25, 20:9, 45:10, 109:7,
140:8, 142:5, 147:3,
147:4, 148:11
material [9] - 102:18,
104:15, 104:17, 104:18,
110:7, 114:19, 114:20,
115:1, 116:6
materials [1] - 84:17
matter [23] - 4:9, 6:16,
21:4, 28:3, 29:16, 29:17,
30:10, 32:3, 32:19, 40:6,
63:16, 77:2, 78:19,
98:24, 155:1, 157:6,
160:18, 175:20, 178:20,
182:21, 186:5, 188:4,
188:9
matters [3] - 31:19,
36:13, 157:15
mature [1] - 27:20
McCaffity [6] - 13:15,
19:17, 19:22, 29:3,
30:10, 182:8
McCoy [1] - 32:9
McHenry [16] - 85:4,
85:20, 87:6, 87:13,
87:18, 89:6, 105:5,
105:10, 105:12, 105:14,
105:15, 105:16, 105:21,
107:22, 110:20, 116:3
mean [38] - 8:23, 8:25,

9:11, 16:4, 20:14, 22:25,
25:23, 27:12, 41:20,
41:22, 44:5, 49:5, 67:8,
70:10, 78:21, 81:16,
132:8, 133:7, 133:10,
133:11, 135:18, 138:20,
140:7, 143:7, 143:17,
143:23, 144:15, 150:2,
150:4, 150:23, 151:17,
155:1, 158:24, 159:20,
160:15, 161:1, 174:7,
186:12
Meaning [2] - 91:24,
177:20
meaning [3] - 41:1,
85:22, 139:12
means [11] - 11:15,
11:16, 15:14, 17:21,
26:16, 34:18, 40:25,
45:8, 50:22, 69:8, 130:5
meant [1] - 30:19
measurements [1] -
135:22
media [1] - 179:19
meet [3] - 18:22, 92:2,
162:10
meeting [3] - 25:12,
158:5, 158:8
meetings [4] - 9:13,
25:7, 152:14, 152:16
meets [1] - 148:24
member [3] - 28:13,
36:13, 100:16
Members [1] - 138:4
members [8] - 47:22,
48:1, 48:8, 48:11, 48:14,
48:16, 48:18, 167:9
memorandum [3] -
178:23, 178:24, 179:7
men [4] - 8:14, 10:11,
29:21, 85:6
mention [1] - 33:21
mentioned [13] - 38:9,
69:19, 69:20, 85:15,
86:2, 86:6, 90:10, 90:19,
91:6, 93:8, 104:20,
107:1, 182:5
mess [2] - 19:8, 61:24
message [3] - 31:15,
31:17, 33:22
met [2] - 7:3, 26:7
meters [1] - 149:13
methods [1] - 69:8
Michael [2] - 1:16, 1:17
microphone [3] - 5:22,
64:4, 80:12
mid [1] - 101:16
mid-level [1] - 101:16
middle [1] - 150:9
Might [1] - 74:8

might [22] - 3:12, 6:2,
8:15, 8:16, 14:12, 15:4,
15:25, 16:3, 25:12,
37:15, 38:4, 57:3, 60:7,
61:18, 78:1, 90:20,
155:5, 162:9, 163:22,
164:6, 164:8, 178:4
Mike [1] - 7:1
mike [9] - 61:17, 62:3,
66:2, 79:22, 82:23,
100:6, 121:13, 124:13,
166:10
mikes [1] - 146:23
mile [2] - 39:17, 87:15
miles [1] - 87:16
military [2] - 21:4, 21:6
Mill [2] - 124:8, 124:18
millimeter [1] - 170:3
million [3] - 12:3, 73:17
millions [2] - 11:18,
11:20
mind [9] - 13:19, 17:1,
57:11, 132:24, 138:6,
154:6, 157:2, 179:19,
181:13
minds [2] - 41:20,
132:23
minivan [1] - 125:15
minute [9] - 44:21,
59:18, 61:16, 90:10,
106:18, 138:8, 159:16,
182:24
minutes [11] - 26:14,
53:13, 71:22, 81:9,
102:12, 106:17, 107:21,
138:8, 138:10, 165:15,
183:12
miscellaneous [1] -
76:11
misleading [3] - 59:17,
76:23, 78:2
misplaced [1] - 81:19
miss [1] - 3:9
missed [1] - 153:8
missing [1] - 185:7
mistrial [4] - 156:14,
159:15, 161:17, 162:2
MITCHELL [1] - 1:6
Mitchell [71] - 1:16,
6:25, 7:11, 7:22, 9:16,
12:19, 13:1, 18:21,
18:23, 19:5, 19:7, 19:23,
24:9, 24:18, 30:11,
30:20, 31:12, 32:25,
33:7, 33:11, 63:6, 63:9,
63:14, 63:18, 64:1,
67:17, 67:19, 69:15,
69:20, 70:5, 70:15,
71:10, 72:15, 74:23,
98:16, 102:16, 103:6,

103:7, 103:15, 103:19,
104:1, 104:4, 106:22,
107:2, 108:3, 139:18,
140:5, 140:9, 140:25,
141:1, 141:10, 141:25,
142:23, 143:5, 143:15,
143:18, 144:7, 151:5,
154:8, 154:10, 155:2,
157:9, 157:11, 160:17,
162:16, 163:4, 164:2,
164:3, 188:5
Mitchell's [4] - 24:16,
67:20, 142:1, 162:4
mitigation [2] - 142:10,
144:8
Mitsubishi [2] - 168:19,
169:6
mode [1] - 86:1
model [1] - 170:2
modification [1] - 76:6
moment [12] - 6:10,
62:22, 65:3, 72:16,
75:11, 99:13, 108:7,
110:11, 124:2, 138:24,
173:24
moment's [1] - 6:17
moments [1] - 167:25
Monday [19] - 26:7,
26:19, 36:1, 36:22,
145:20, 149:17, 156:24,
160:4, 160:5, 160:6,
161:1, 161:2, 161:19,
162:10, 179:5, 179:9,
179:11, 179:15, 182:6
money [21] - 4:10, 14:9,
14:10, 18:25, 19:11,
20:2, 37:24, 52:17, 56:9,
86:12, 86:15, 94:24,
95:5, 97:21, 97:23,
108:24, 119:16, 128:24,
152:21, 154:15
Monroe [2] - 89:5, 97:1
Montgomery [11] -
35:5, 35:8, 35:11, 35:13,
35:17, 53:3, 53:4, 55:8,
55:19, 56:1, 56:8
Montgomery's [1] -
77:24
month [7] - 38:17,
60:12, 141:2, 152:12,
175:3
months [10] - 8:16,
8:17, 8:20, 38:16, 52:24,
143:10, 143:12, 143:13,
147:6, 150:5
moral [1] - 159:23
morally [1] - 158:24
Moreover [1] - 155:21
morning [16] - 2:11,
2:24, 2:25, 3:2, 6:7,

6:24, 26:7, 26:8, 39:19, 39:20, 57:18, 102:9, 163:7, 180:1, 181:17
**most** [13] - 11:1, 34:5, 35:21, 38:24, 41:5, 41:19, 52:16, 53:16, 56:17, 89:12, 128:21, 154:9
**Mostly** [1] - 144:8
**mother** [1] - 31:18
**mother-in-law** [1] - 31:18
**mothers** [1] - 148:8
**motion** [8] - 54:19, 126:16, 134:23, 135:2, 136:2, 136:9, 156:25, 157:1
**motions** [5] - 64:6, 72:2, 129:21, 131:4, 184:25
**motivation** [2] - 19:14
**motivations** [2] - 19:19, 19:20
**motivators** [1] - 20:2
**motives** [1] - 77:22
**mounted** [1] - 169:15
**mouth** [2] - 105:21, 147:2
**move** [4] - 6:14, 23:20, 79:22, 185:8
**Move** [2] - 66:2, 79:22
**moved** [4] - 84:9, 135:24, 136:1, 136:6
**movement** [2] - 10:9, 126:25
**movie** [5] - 7:9, 32:10, 32:12, 32:17, 32:21
**movies** [1] - 11:18
**moving** [2] - 67:18, 68:5
**MR** [197] - 5:20, 5:23, 22:19, 23:5, 23:20, 24:3, 24:8, 26:2, 26:5, 26:7, 39:13, 57:5, 57:17, 58:2, 59:14, 61:10, 61:13, 61:18, 62:6, 62:9, 62:12, 62:14, 62:19, 62:21, 62:24, 63:1, 63:7, 63:10, 63:17, 63:23, 63:25, 64:10, 64:23, 65:2, 66:1, 66:4, 66:13, 66:16, 66:19, 67:3, 67:12, 67:16, 67:22, 68:4, 68:11, 68:16, 68:19, 68:22, 68:25, 69:4, 69:6, 69:11, 69:15, 70:1, 70:3, 70:5, 70:9, 70:12, 70:16, 70:21, 71:1, 71:5, 71:14, 71:18, 71:24, 72:6, 72:15, 72:20, 72:22, 72:25, 73:6, 73:9, 73:12,

73:16, 74:2, 74:8, 74:11, 74:20, 75:3, 75:6, 75:10, 75:13, 75:15, 75:18, 75:24, 76:2, 76:4, 76:7, 76:8, 76:18, 76:21, 77:19, 78:4, 78:20, 79:6, 79:16, 79:19, 79:21, 79:23, 80:1, 80:7, 82:19, 83:3, 96:17, 96:20, 97:14, 99:13, 99:16, 99:20, 100:1, 100:10, 103:20, 103:23, 106:7, 106:11, 110:15, 111:3, 119:22, 120:21, 121:9, 121:18, 126:2, 130:20, 130:22, 134:1, 137:14, 137:18, 139:1, 144:14, 144:20, 144:25, 145:6, 145:7, 145:12, 154:5, 155:7, 155:13, 156:11, 158:4, 158:11, 164:16, 164:21, 164:23, 165:3, 165:7, 165:10, 165:12, 165:16, 165:22, 165:24, 166:5, 166:14, 173:17, 173:19, 176:24, 177:3, 177:5, 177:10, 177:13, 180:9, 180:13, 180:15, 180:21, 181:1, 181:4, 182:1, 182:10, 182:14, 182:18, 183:15, 183:17, 184:8, 184:12, 185:8, 185:11, 185:17, 185:20, 185:21, 185:25, 186:4, 186:11, 187:4, 187:5, 187:5, 187:6, 187:7, 187:8, 187:8, 187:9, 187:9, 187:11, 187:11, 187:12, 187:13, 187:14, 187:14, 187:15
**MS** [78] - 2:3, 2:19, 6:24, 11:14, 12:2, 12:25, 22:21, 23:7, 23:12, 23:15, 23:18, 23:25, 24:2, 24:9, 80:15, 80:17, 80:19, 80:22, 81:2, 81:8, 81:16, 81:23, 82:2, 82:7, 82:10, 82:15, 138:14, 138:18, 138:21, 139:14, 139:17, 139:21, 139:24, 140:4, 140:10, 140:14, 140:16, 140:19, 140:22, 141:1, 141:5, 141:15, 141:18, 141:22, 141:24, 142:3, 142:8, 142:16, 142:21, 142:24, 143:3, 143:6, 143:8, 143:11, 143:16, 143:19, 143:22, 143:25, 144:7, 144:15, 154:24, 158:16, 159:9, 159:15, 160:5, 160:7,

160:11, 160:18, 160:25, 161:7, 161:11, 161:16, 161:18, 161:22, 162:1, 162:18, 162:23, 163:6
**MTV** [1] - 12:5
**muffled** [1] - 92:8
**murder** [17] - 30:10, 32:18, 35:16, 36:3, 36:5, 36:6, 41:18, 41:19, 44:25, 45:15, 51:16, 51:18, 51:19, 53:6, 59:19
**murdered** [2] - 50:10, 50:11
**murderer** [1] - 79:8
**murders** [4] - 21:9, 30:7, 36:7, 38:23
**music** [6] - 10:2, 10:23, 11:20, 11:21, 25:13, 48:14
**Music** [3] - 11:13, 12:1, 12:24
**musical** [6] - 177:25, 178:2, 178:9, 178:10, 178:11, 178:12
**Musical** [1] - 178:1
**must** [1] - 160:9
**mutual** [1] - 48:19

## N

**name** [44] - 6:24, 16:12, 26:8, 32:9, 32:25, 33:13, 34:10, 35:4, 38:8, 38:9, 39:20, 49:22, 51:16, 52:25, 53:1, 53:2, 80:14, 82:13, 82:24, 87:24, 98:15, 100:6, 103:6, 103:19, 104:1, 106:1, 106:3, 106:5, 109:21, 121:14, 123:9, 124:10, 124:16, 129:10, 129:13, 129:14, 129:16, 129:18, 129:20, 145:21, 145:23, 149:8, 161:3, 166:10
**named** [4] - 15:3, 17:17, 26:14, 34:2
**Namely** [1] - 123:5
**names** [5] - 52:22, 87:21, 145:20, 153:8
**narcotics** [16] - 70:19, 71:15, 83:21, 84:2, 84:4, 85:1, 94:15, 95:19, 104:18, 115:5, 121:4, 122:15, 130:13, 171:9, 176:4
**Narcotics** [1] - 86:5
**narrow** [4] - 132:19, 133:9, 133:10, 167:20
**nature** [7] - 41:15, 42:4,

42:5, 53:23, 146:19, 154:24, 183:24
**nauseam** [1] - 78:23
**near** [13] - 79:17, 79:21, 90:21, 97:7, 97:8, 105:9, 110:20, 110:23, 115:23, 116:2, 147:2, 174:14, 174:21
**necessarily** [5] - 36:16, 42:22, 49:6, 67:5, 183:24
**necessary** [3] - 6:10, 54:7, 57:20
**neck** [1] - 131:12
**need** [38] - 10:21, 10:24, 12:17, 13:18, 14:1, 16:18, 19:14, 28:5, 47:2, 47:5, 49:6, 58:7, 58:25, 61:15, 62:11, 62:13, 62:16, 77:12, 77:17, 86:13, 100:5, 158:9, 158:25, 159:25, 160:4, 160:6, 162:3, 163:5, 163:17, 175:13, 180:11, 181:4, 181:5, 182:2, 182:3, 185:9
**needed** [5] - 16:14, 56:9, 157:1, 181:12
**Needless** [1] - 163:16
**needs** [5] - 25:16, 55:21, 55:22, 59:2, 77:1
**negotiate** [1] - 53:24
**neighborhood** [5] - 13:5, 13:7, 103:3, 112:3, 112:8
**nervous** [1] - 154:9
**Network** [1] - 5:3
**Networking** [1] - 5:4
**never** [10] - 4:10, 8:24, 33:6, 35:20, 116:2, 157:4, 157:5, 159:21, 176:7
**New** [4] - 7:22, 82:4, 82:5, 157:11
**new** [1] - 5:5
**Next** [5] - 99:25, 121:8, 138:2, 174:13, 179:4
**next** [6] - 6:25, 11:23, 60:12, 89:13, 89:16, 92:6, 126:10, 138:3, 149:19, 158:13, 159:8, 159:18, 160:1, 160:14, 163:18, 165:4, 169:3, 175:3, 179:6, 179:9, 180:4
**nice** [2] - 117:2, 117:3
**nickel** [1] - 115:11
**nickname** [1] - 16:7
**Niedermeyer** [3] - 31:23, 31:25, 34:15
**night** [12] - 2:4, 3:7,

4:16, 25:13, 31:8, 31:12, 31:23, 32:12, 125:8, 134:8, 144:2, 167:5
**nights** [1] - 19:2
**Nine** [4] - 81:3, 138:22, 145:15, 163:10
**nine** [2] - 117:20, 170:2
**NO** [1] - 1:5
**nobody** [3] - 18:17, 91:1, 156:14
**nol** [1] - 57:23, 58:4, 59:4, 60:19, 61:7, 63:15, 64:11, 64:20, 65:19, 66:6, 71:14, 72:9, 75:1
**non** [1] - 65:4
**non-hearsay** [1] - 65:4
**none** [7] - 11:11, 20:3, 37:24, 38:2, 64:18, 67:14
**None** [5] - 19:24, 98:20, 151:6, 161:17, 162:1
**normal** [4] - 42:6, 115:8, 132:10, 175:24
**normally** [2] - 21:10
**north** [1] - 112:15
**NORTHERN** [1] - 1:2
**note** [6] - 57:7, 109:3, 138:4, 145:25, 154:3, 156:9, 180:4, 180:6
**noted** [2] - 88:15, 171:7
**notes** [10] - 36:22, 111:10, 117:20, 128:25, 130:4, 174:24, 175:8, 175:12, 175:13, 178:19
**Nothing** [7] - 44:25, 96:17, 99:12, 110:11, 119:18, 120:19, 121:6
**nothing** [11] - 18:8, 32:22, 41:23, 44:23, 52:17, 90:25, 119:5, 131:19, 137:12, 177:19
**notice** [6] - 6:17, 102:23, 174:23, 175:11
**noticed** [2] - 126:12, 169:14
**notwithstanding** [1] - 58:16
**nowhere** [3] - 110:23, 174:14, 174:21
**Nowhere** [1] - 97:8
**nuisance** [2] - 101:15, 101:16
**Number** [13] - 2:8, 2:11, 2:16, 2:20, 2:22, 6:11, 6:12, 6:14, 24:19, 81:3, 138:22, 145:15, 163:10
**number** [32] - 21:22, 23:20, 44:4, 45:3, 51:17, 59:8, 64:9, 67:6, 95:21, 95:23, 96:2, 96:3, 109:24, 109:25, 110:3,

110:5, 110:9, 110:10, 117:21, 117:23, 118:4, 130:2, 130:6, 130:7, 130:8, 130:17, 160:10, 160:12, 170:2, 171:18, 178:18
  **Number(s** [1] - 188:5
  **numbers** [3] - 95:21, 95:23, 162:7
  **numerous** [1] - 127:12

**O**

  **oath** [1] - 49:9
  **object** [6] - 23:19, 58:18, 68:12, 76:9, 104:13, 119:8
  **Objection** [6] - 22:19, 23:5, 99:20, 103:20, 134:1, 137:18
  **objection** [6] - 24:3, 24:6, 58:20, 80:5, 106:7, 156:9
  **objections** [1] - 58:8
  **objectives** [1] - 48:10
  **obligations** [1] - 155:2
  **obscuring** [1] - 124:21
  **observation** [4] - 85:24, 114:5, 139:8, 178:8
  **observations** [4] - 98:7, 120:3, 134:15, 134:21
  **observed** [8] - 89:11, 102:15, 117:7, 134:10, 135:11, 168:11, 168:14, 170:19
  **observing** [3] - 112:25, 120:4, 120:23
  **obstructing** [2] - 48:15, 91:7
  **obstruction** [3] - 22:9, 22:15, 24:24
  **obtain** [1] - 106:1
  **obvious** [1] - 139:10
  **Obviously** [7] - 4:8, 45:18, 57:9, 57:24, 76:15, 144:1, 172:2
  **obviously** [12] - 29:24, 47:6, 49:5, 59:20, 60:25, 61:15, 65:9, 139:9, 150:23, 154:14, 155:15, 155:16
  **occasion** [2] - 65:6, 113:18
  **occasionally** [1] - 8:14
  **occupies** [1] - 53:16
  **occupying** [1] - 172:7
  **occurred** [11] - 69:6, 71:7, 73:10, 73:15, 84:8, 96:24, 111:7, 119:25,

125:3, 156:24, 172:15
  **occurring** [1] - 167:23
  **occurs** [1] - 40:14
  **October** [10] - 101:5, 101:18, 120:1, 158:19, 167:1, 167:4, 175:4, 175:5, 179:13
  **odd** [1] - 94:12
  **OF** [3] - 1:1, 1:4, 1:10
  **offenders** [2] - 122:18, 123:5
  **offense** [2] - 21:12, 46:6
  **offenses** [4] - 21:9, 46:1, 46:5, 71:15
  **offer** [4] - 66:9, 66:17, 67:13, 157:14
  **offered** [1] - 67:4
  **offers** [1] - 66:10
  **Office** [5] - 27:1, 121:23, 160:23, 183:10
  **office** [5] - 4:22, 149:10, 181:2, 181:19, 183:6
  **officer** [38] - 55:14, 65:5, 65:14, 70:18, 72:8, 72:14, 74:24, 75:2, 75:19, 75:22, 76:13, 83:9, 83:20, 84:10, 87:1, 93:11, 93:17, 94:10, 95:2, 96:14, 100:19, 100:24, 101:6, 101:14, 104:18, 107:6, 112:11, 120:4, 122:1, 131:11, 131:17, 131:23, 165:24, 166:19, 180:10, 185:6, 185:12
  **Officer** [18] - 82:20, 90:10, 95:1, 95:12, 96:11, 96:12, 96:13, 96:21, 97:15, 99:17, 99:23, 107:20, 124:17, 130:25, 137:15, 165:10, 176:22, 180:7
  **OFFICER** [2] - 82:21, 187:4
  **Officers** [1] - 93:18
  **officers** [19] - 9:14, 25:8, 26:24, 35:18, 57:19, 61:21, 64:7, 64:24, 69:24, 71:25, 85:7, 85:10, 93:4, 122:11, 122:24, 122:25, 165:3, 165:8, 167:8
  **Official** [1] - 188:16
  **official** [2] - 109:22, 188:8
  **officially** [2] - 110:22, 144:4
  **often** [4] - 38:19, 38:20, 40:9, 54:13
  **old** [9] - 60:8, 60:11,

60:12, 80:18, 132:9, 132:14, 146:12, 146:14
  **Oliver** [1] - 29:3
  **Once** [2] - 170:17, 178:12
  **once** [5] - 35:20, 55:3, 77:18, 128:11, 163:11
  **One** [2] - 2:11, 2:16, 2:20, 2:22, 6:11, 6:12, 6:14, 20:15, 52:5, 183:23
  **one** [119] - 3:8, 3:21, 3:23, 7:10, 9:7, 9:18, 10:8, 11:3, 11:23, 12:5, 13:14, 14:25, 19:22, 22:16, 23:21, 30:25, 32:24, 33:11, 33:15, 33:16, 35:19, 36:5, 38:12, 40:15, 41:12, 42:10, 43:18, 43:20, 44:21, 45:16, 46:6, 46:20, 50:2, 51:11, 52:25, 53:14, 57:17, 57:25, 60:1, 60:24, 62:8, 62:22, 65:3, 65:16, 66:22, 66:23, 69:8, 69:17, 72:25, 73:1, 74:19, 75:11, 77:3, 77:6, 78:21, 81:20, 81:22, 86:15, 88:24, 90:15, 90:22, 91:6, 92:19, 94:2, 96:7, 96:9, 99:18, 105:5, 105:17, 107:10, 111:20, 112:18, 115:8, 115:9, 116:22, 117:3, 119:18, 123:24, 124:2, 126:3, 128:14, 133:7, 138:24, 140:11, 145:20, 146:7, 147:10, 147:11, 153:6, 153:7, 154:8, 159:21, 162:9, 162:25, 165:4, 165:9, 165:20, 165:21, 167:20, 168:23, 168:25, 172:4, 172:7, 172:14, 174:1, 174:22, 176:10, 180:4, 180:6, 180:11, 183:19, 184:16
  **one's** [1] - 85:8
  **One's** [2] - 2:8, 95:21
  **one-way** [1] - 167:20
  **ones** [3] - 44:13, 89:14, 184:24
  **ongoing** [4] - 36:21, 36:24, 48:8, 101:25
  **online** [1] - 179:23
  **open** [7] - 6:22, 57:11, 77:24, 102:16, 116:10, 138:6, 179:19
  **opened** [2] - 74:13, 92:5
  **opening** [19] - 6:21, 6:23, 26:1, 26:3, 28:3,

57:10, 62:15, 67:2, 67:4, 69:19, 78:13, 78:15, 81:6, 139:1, 139:11, 140:21, 146:3, 150:16, 162:25
  **operate** [1] - 3:19
  **operated** [1] - 140:2
  **operating** [1] - 81:15
  **Operations** [1] - 83:8
  **opinion** [5] - 22:16, 22:18, 65:12, 71:23, 154:13
  **Opportunities** [1] - 142:4
  **opportunity** [6] - 56:18, 56:24, 65:16, 88:5, 88:6, 145:9
  **opposed** [3] - 43:3, 45:9, 49:12
  **opposite** [3] - 103:9, 106:22, 113:2
  **optimistic** [1] - 165:17
  **oral** [1] - 46:24
  **order** [7] - 24:12, 45:24, 50:11, 54:9, 55:6, 56:9, 180:12
  **ordinary** [1] - 15:5
  **organization** [13] - 9:9, 9:15, 25:8, 28:16, 36:24, 37:23, 37:25, 47:23, 47:24, 47:25, 48:8, 69:9, 142:5
  **organizational** [2] - 38:6, 38:11
  **Organizations** [1] - 46:13
  **organized** [5] - 9:4, 9:16, 21:14, 25:22, 38:7
  **original** [3] - 34:19, 181:5, 181:8
  **originally** [1] - 99:8
  **Ortiz** [3] - 84:24, 87:10, 93:19
  **otherwise** [1] - 60:21
  **ought** [4] - 60:17, 161:23, 184:6
  **outcome** [1] - 59:6, 60:18, 61:5, 61:21, 65:21, 68:9, 69:21, 72:14, 74:25, 76:3, 172:11
  **outcomes** [3] - 61:11, 62:4, 64:24
  **outside** [1] - 21:6, 78:24, 131:21, 148:24, 165:1
  **Outta** [2] - 10:9, 11:4
  **overhang** [1] - 51:22
  **overlapped** [1] - 28:18
  **overnight** [3] - 81:13,

179:21, 186:13
  **Overruled** [4] - 99:21, 103:21, 106:8, 137:19
  **Owe** [1] - 16:18
  **owed** [2] - 16:13, 19:3
  **own** [11] - 3:18, 3:19, 3:21, 14:22, 17:24, 19:18, 61:17, 62:3, 98:11, 149:10, 181:13
  **owner** [1] - 177:18
  **owning** [1] - 3:22
  **owns** [1] - 177:4

**P**

  **P-H-I-P-P-S** [1] - 100:8
  **p.m** [8] - 80:9, 80:10, 122:7, 122:19, 123:8, 167:19, 179:12, 186:22
  **pack** [1] - 135:15
  **packaged** [2] - 115:1, 115:12
  **pad** [1] - 6:13
  **pads** [3] - 57:7, 138:4, 154:3
  **page** [1] - 117:22
  **PAGE** [1] - 187:3
  **pages** [2] - 117:15, 188:7
  **paid** [9] - 2:9, 2:12, 4:6, 4:12, 9:14, 14:11, 15:15, 152:9, 152:10
  **palm** [3] - 19:25, 31:2, 181:8
  **panel** [1] - 154:17
  **pants** [5] - 92:8, 92:12, 93:22, 116:22, 136:20
  **paper** [1] - 49:22
  **papers** [6] - 20:12, 20:14, 30:16, 32:2, 81:20, 183:19
  **paperwork** [3] - 95:5, 129:22, 170:12
  **parallel** [1] - 105:17
  **Parallel** [1] - 105:18
  **paranoid** [4] - 133:17, 133:21, 133:24, 134:6
  **pardon** [1] - 172:21
  **parents** [1] - 147:24
  **park** [1] - 113:8
  **Park** [3] - 97:7, 110:23, 174:18
  **parked** [8] - 90:25, 105:9, 125:10, 125:14, 125:22, 133:4, 134:13, 137:9
  **Parker** [3] - 84:24, 87:10, 93:18
  **parking** [3] - 91:18,

91:21, 113:6
**Part** [2] - 76:24, 107:7
**part** [45] - 9:21, 11:10, 11:19, 12:9, 12:10, 20:12, 22:25, 23:2, 30:13, 36:7, 40:12, 42:1, 42:12, 42:23, 46:23, 49:12, 50:15, 53:17, 61:1, 63:21, 64:23, 66:20, 66:24, 66:25, 69:12, 73:6, 73:9, 74:6, 75:21, 92:10, 101:11, 101:25, 110:21, 110:22, 139:19, 141:13, 158:10, 158:19, 163:16, 172:18, 172:20, 172:22, 182:6
**part-time** [1] - 141:13
**partially** [2] - 62:14, 93:21
**participant** [1] - 53:7
**participants** [1] - 40:23
**participate** [1] - 148:13
**participated** [1] - 69:25
**participating** [2] - 22:9, 167:4
**participation** [2] - 49:18, 164:10
**particular** [27] - 14:25, 38:1, 46:6, 51:11, 51:13, 52:21, 52:25, 58:24, 61:3, 63:10, 65:6, 84:23, 84:24, 85:2, 87:5, 89:2, 96:2, 96:4, 101:4, 101:17, 102:13, 112:17, 113:5, 131:9, 167:20, 172:24
**particularly** [9] - 17:11, 31:21, 32:12, 41:11, 51:14, 55:9, 61:19, 155:1, 161:4
**partisans** [1] - 27:13
**partly** [1] - 61:23
**partner** [1] - 95:1
**partners** [5] - 87:12, 168:17, 169:5, 169:10, 170:18
**parts** [1] - 46:4
**party** [1] - 17:17
**passages** [1] - 34:25
**passenger** [9] - 125:23, 126:1, 126:20, 127:15, 127:19, 127:21, 128:22, 137:2, 169:5
**passing** [1] - 133:4
**past** [2] - 25:21, 25:22
**path** [2] - 61:8, 61:9
**paths** [2] - 37:10, 37:13
**patient** [1] - 168:1
**patrol** [6] - 83:21, 101:1, 122:7, 122:22,

122:23, 125:8
**Paul** [1] - 1:19
**Pause** [2] - 6:4, 99:14
**pay** [4] - 3:7, 51:13, 51:14, 56:9
**paycheck** [1] - 3:10
**paying** [2] - 3:8, 149:11
**payments** [1] - 152:23
**Pays** [1] - 32:3
**peculiar** [1] - 116:23
**peg** [5] - 43:24, 44:1, 44:2, 44:3, 49:2
**penalty** [1] - 49:10
**people** [66] - 2:7, 3:12, 3:17, 4:7, 12:11, 14:16, 17:24, 20:9, 20:15, 20:16, 20:19, 25:4, 25:14, 27:6, 29:2, 31:16, 33:17, 35:1, 37:14, 37:15, 37:24, 38:19, 41:19, 41:24, 42:8, 45:10, 47:1, 47:2, 47:15, 49:7, 49:11, 49:12, 50:10, 50:21, 53:10, 86:22, 86:23, 87:22, 88:16, 89:8, 89:15, 90:19, 91:14, 91:15, 98:20, 102:23, 106:20, 107:8, 107:11, 128:6, 131:22, 132:1, 132:4, 132:16, 133:16, 133:18, 144:1, 153:11, 159:16, 162:7, 183:6, 183:13
**People** [1] - 25:14
**people's** [1] - 86:8
**perceive** [1] - 42:15
**perceived** [1] - 156:17
**perception** [5] - 42:11, 42:14, 42:20, 43:1, 78:10
**perfect** [2] - 32:16, 90:3
**perhaps** [14] - 4:14, 42:12, 61:16, 61:23, 64:4, 64:13, 145:3, 145:18, 146:22, 161:10, 163:21, 183:2, 184:18
**Perhaps** [4] - 60:23, 81:11, 138:2, 183:3
**period** [14] - 7:5, 29:13, 29:15, 37:1, 37:8, 69:6, 106:18, 115:5, 140:5, 140:11, 140:13, 141:12, 160:17
**periods** [2] - 38:18, 163:3
**permit** [6] - 66:7, 66:10, 68:14, 68:15, 72:18, 77:25
**permitted** [4] - 61:12, 65:13, 68:8, 74:23
**permitting** [1] - 66:11

**person** [33] - 14:8, 14:25, 17:21, 32:11, 35:7, 38:12, 39:7, 80:23, 81:6, 81:14, 94:21, 94:23, 103:15, 106:23, 107:3, 107:11, 108:2, 108:7, 111:22, 112:10, 125:23, 133:14, 133:23, 134:22, 146:4, 147:17, 170:21, 170:23, 170:24, 184:17
**Personal** [1] - 82:5
**personal** [5] - 41:23, 81:4, 81:15, 146:5, 154:20
**personally** [3] - 91:22, 148:23, 153:7
**persons** [1] - 87:20
**perspective** [1] - 158:17
**persuade** [1] - 3:13
**pertaining** [2] - 63:3, 63:25
**Peter** [2] - 121:10, 121:15
**PETER** [2] - 121:11, 187:10
**pettiest** [2] - 52:15, 52:16
**PH-10** [2] - 123:15, 125:4
**Phipps** [8] - 100:2, 100:8, 100:11, 110:16, 111:4, 119:19, 119:23, 121:7
**PHIPPS** [2] - 100:3, 187:7
**phone** [14] - 16:9, 31:16, 31:17, 32:24, 33:1, 33:11, 33:12, 33:14, 33:18, 81:9, 160:9, 162:7, 169:8
**phony** [2] - 32:10, 33:12
**photograph** [5] - 60:3, 60:14, 73:8, 73:25, 176:19
**photographs** [2] - 73:18, 183:19
**physical** [6] - 51:25, 60:10, 146:5, 146:19, 149:2, 162:4
**physically** [3] - 134:25, 135:24, 136:6
**picayune** [1] - 55:11
**pick** [1] - 97:1
**picked** [2] - 135:23, 136:1
**picture** [9] - 34:13, 67:6, 123:14, 123:18, 125:3, 125:5, 125:15,

126:4, 133:2
**piece** [3] - 49:22, 176:2, 176:5
**pigs** [1] - 124:25
**Pigtown** [7] - 124:7, 124:18, 125:1, 173:6, 173:7, 173:9, 173:13
**pinned** [1] - 33:2
**pivot** [1] - 38:11
**place** [11] - 17:16, 31:7, 34:23, 37:24, 49:7, 71:13, 149:5, 157:3, 174:14, 174:20, 175:3
**placed** [8] - 92:21, 93:8, 95:7, 107:22, 108:10, 110:18, 127:17, 128:5
**places** [1] - 140:6
**Plain** [1] - 167:11
**plain** [16] - 84:25, 85:19, 93:3, 102:7, 102:8, 122:12, 122:20, 123:1, 123:3, 131:13, 131:15, 131:16, 131:18, 136:11, 137:4, 167:10
**plan** [2] - 102:18, 112:5
**planning** [1] - 158:18
**plant** [8] - 104:15, 104:17, 108:22, 108:25, 110:7, 114:19, 114:20, 115:1
**plant-like** [2] - 108:22, 108:25
**plastic** [8] - 89:22, 90:12, 94:3, 96:7, 110:6, 114:16, 127:12, 128:11
**plate** [2] - 89:20, 109:3
**play** [16] - 6:19, 7:23, 8:3, 8:5, 8:6, 10:8, 10:19, 10:20, 11:3, 11:23, 12:18, 12:23, 40:2, 40:7, 86:17, 143:1
**played** [4] - 11:13, 12:1, 12:24, 147:4
**players** [1] - 86:17
**playing** [1] - 55:3
**plays** [2] - 147:3, 150:7
**plea** [4] - 14:7, 53:24, 54:2, 54:3
**pleading** [1] - 22:3
**pleadings** [3] - 21:20, 21:21, 23:21
**pleasant** [1] - 6:7
**pleased** [1] - 41:11
**pled** [1] - 137:22
**pocket** [2] - 116:22, 117:2
**point** [43] - 22:16, 22:23, 30:15, 34:16, 42:13, 43:8, 55:10, 56:16, 57:10, 58:25,

64:15, 65:2, 67:17, 72:12, 72:16, 78:25, 81:13, 85:23, 89:9, 89:22, 90:15, 91:6, 92:2, 92:15, 92:24, 94:13, 102:13, 103:11, 104:7, 105:12, 108:17, 123:25, 131:6, 134:16, 141:11, 155:17, 157:25, 164:17, 169:20, 171:3, 175:10, 185:23, 186:11
**pointed** [2] - 157:6, 181:9
**pointing** [2] - 25:14, 161:9
**points** [2] - 31:5, 36:2
**police** [41] - 17:3, 55:14, 57:19, 61:21, 73:20, 83:17, 83:19, 83:24, 84:10, 85:7, 85:8, 85:10, 92:16, 93:4, 93:11, 93:17, 94:10, 95:2, 100:19, 100:24, 101:6, 107:19, 112:7, 112:11, 120:4, 126:18, 128:6, 131:11, 131:17, 131:23, 132:1, 132:4, 132:21, 133:18, 165:3, 165:8, 165:24, 166:19, 168:9, 177:14, 185:6
**Police** [12] - 31:22, 83:7, 83:9, 100:16, 121:22, 121:23, 121:25, 137:15, 165:10, 166:16, 166:23, 181:18
**poor** [3] - 7:2, 25:19, 133:2
**popular** [1] - 11:1
**portion** [2] - 10:21, 83:13
**position** [18] - 23:4, 40:15, 40:16, 50:9, 50:17, 53:20, 53:24, 58:9, 62:3, 62:4, 64:18, 64:19, 64:22, 65:23, 74:12, 105:6, 145:7, 145:9
**positions** [1] - 144:1
**possess** [1] - 116:15
**possessed** [1] - 116:24
**possession** [2] - 99:4, 108:4
**possibilities** [2] - 13:16, 13:17
**possibility** [2] - 14:3, 90:20
**possible** [10] - 32:17, 102:23, 122:18, 134:7, 139:7, 151:12, 151:14, 151:17, 159:6, 178:25

**possibly** [7] - 35:2, 52:7, 62:1, 81:25, 127:9, 179:1, 186:1
**pot** [1] - 7:8
**potential** [5] - 58:21, 59:16, 145:23, 146:16, 158:1
**powder** [5] - 94:3, 94:6, 94:9, 96:9, 127:13
**power** [2] - 21:1, 48:11
**powerful** [1] - 28:2
**practical** - 6:16
**practice** [3] - 149:1, 150:8, 151:16
**practices** [1] - 148:24
**Pratt** [15] - 21:2, 83:14, 101:23, 102:11, 105:4, 105:9, 105:16, 112:13, 112:16, 113:4, 113:8, 172:25, 173:1, 173:2, 173:3
**precisely** [1] - 54:23
**precluding** [1] - 73:22
**predicate** [1] - 156:3
**predicting** [1] - 2:7
**preferable** [1] - 61:8
**preference** [1] - 63:1
**prejudged** [1] - 145:4
**prejudice** [3] - 24:18, 156:7
**prejudiced** [1] - 155:18
**preliminary** [3] - 58:12, 76:6, 175:20
**premarked** [1] - 123:25
**premature** [1] - 161:18
**preparation** [4] - 7:25, 84:16, 175:15, 175:17
**prepare** [1] - 8:10
**prepared** [4] - 5:15, 151:3, 162:21, 163:8
**prepped** [1] - 129:21
**presence** [1] - 126:12
**present** [9] - 30:25, 39:9, 55:4, 60:3, 60:4, 181:19, 182:13, 182:21
**presentation** [1] - 147:20
**presented** [2] - 6:9, 90:3
**presenting** [1] - 79:23
**Preserving** [1] - 48:11
**presided** [1] - 45:5
**president** [1] - 11:25
**President** [1] - 45:6
**press** [1] - 157:24
**pressed** [1] - 161:10
**presumably** [2] - 19:3, 75:23
**presume** [2] - 44:9, 143:14

**presumptions** [1] - 77:6
**pretrial** [2] - 5:25, 67:11
**pretty** [11] - 12:7, 14:16, 15:8, 28:2, 33:13, 142:12, 147:5, 148:10, 169:19, 182:3, 186:5
**prevail** [1] - 21:25
**Preventing** [1] - 48:15
**preview** [1] - 56:19
**previous** [1] - 145:9
**previously** [1] - 67:24
**price** [1] - 17:7
**primarily** [1] - 142:23
**primary** [1] - 38:6
**principal** [1] - 40:23
**principally** [1] - 41:6
**print** [3] - 19:25, 31:2, 181:9
**prints** [1] - 181:8
**prison** [1] - 66:22
**prisons** [2] - 20:19, 21:17
**private** [3] - 100:14, 140:2, 149:7
**privilege** [1] - 39:23
**pro** [1] - 75:25
**probing** [1] - 156:5
**problem** [6] - 71:16, 75:3, 150:21, 184:23, 185:15, 185:19
**Problem** [1] - 186:2
**problems** [1] - 136:15
**procedure** [2] - 96:13, 106:25
**procedures** [1] - 49:8
**proceed** [4] - 2:2, 26:6, 57:13, 184:19
**proceeded** [1] - 169:4
**proceeding** [5] - 2:22, 35:20, 53:9, 72:14, 184:16
**proceedings** [8] - 6:4, 22:14, 48:17, 99:14, 184:2, 186:22, 188:4, 188:8
**Proceedings** [1] - 2:1
**process** [7] - 40:17, 40:23, 40:24, 41:2, 41:8, 42:23, 158:10
**processing** [1] - 70:18
**production** [1] - 178:11
**proffer** [1] - 139:22
**proffered** [1] - 156:2
**profitable** [1] - 38:3
**profits** [1] - 48:12
**program** [1] - 146:19
**prohibit** [1] - 73:25
**prohibited** [1] - 74:14
**projected** [1] - 150:16

**promote** [1] - 50:11
**Promoting** [1] - 48:12
**promoting** [1] - 48:13
**proof** [9] - 6:9, 13:17, 13:21, 50:17, 50:24, 51:8, 60:25, 73:9, 182:8
**property** [10] - 95:23, 96:2, 96:3, 110:5, 110:9, 110:10, 130:2, 130:6, 130:17, 171:18
**propose** [1] - 158:4
**proposed** [5] - 76:25, 151:4, 156:23, 157:7, 158:1
**pros** [4] - 59:4, 60:19, 71:15, 75:1
**prosecute** [1] - 42:3
**prosecuted** [5] - 42:4, 45:17, 45:18, 45:19, 54:6, 98:24
**prosecuting** [1] - 41:24, 53:18
**prosecution** [8] - 22:11, 27:23, 35:6, 36:4, 37:17, 48:16, 65:22, 176:14
**prosecution's** [3] - 35:12, 39:9, 42:24
**prosecutive** [1] - 98:25
**prosecutor** [8] - 8:17, 19:6, 19:16, 20:10, 20:11, 40:15, 120:10, 182:21
**prosecutor's** [1] - 99:8
**prosecutors** [2] - 40:7, 45:19
**prossed** [5] - 57:23, 58:4, 64:11, 66:6, 72:9
**prosses** [4] - 61:7, 63:15, 64:20, 65:20
**protect** [1] - 15:15
**protecting** [1] - 48:11
**protection** [2] - 15:14, 15:19
**prove** [22] - 13:22, 22:22, 36:5, 36:10, 39:3, 45:25, 46:3, 47:5, 47:10, 49:1, 49:17, 50:4, 50:5, 50:12, 50:13, 55:22, 67:5, 71:12, 75:20
**proven** [4] - 27:23, 27:25, 47:4, 48:21
**provide** [3] - 32:10, 56:15, 183:19
**provided** [2] - 32:7, 146:1, 184:9
**provides** [2] - 146:5, 149:23
**proving** [2] - 13:20, 71:7
**public** [2] - 24:11, 24:13

**Public** [1] - 24:15
**Pulaski** [2] - 83:15, 97:2
**pull** [3] - 49:10, 133:8, 134:13
**pulled** [8] - 31:16, 92:12, 93:24, 93:25, 94:2, 114:16, 126:10, 133:13
**pulling** [1] - 132:19
**pulls** [2] - 14:7, 32:1
**purchased** [1] - 121:2
**Pure** [1] - 12:21
**purportedly** [1] - 71:6
**purpose** [3] - 48:9, 101:24, 131:15
**purposes** [2] - 48:24, 142:9
**pursue** [2] - 78:7, 100:22
**pursuit** [1] - 52:13
**pushed** [1] - 31:16
**pushing** [2] - 18:19, 56:5
**Put** [1] - 93:18
**put** [34] - 4:9, 10:23, 11:11, 12:11, 19:6, 20:9, 21:11, 21:15, 23:14, 23:17, 34:21, 44:1, 44:3, 59:18, 74:9, 92:8, 92:11, 93:23, 105:5, 119:1, 125:3, 131:20, 135:24, 136:2, 136:11, 136:24, 145:22, 161:5, 162:16, 178:5, 184:6, 185:2, 185:15, 185:22
**putting** [3] - 13:11, 49:2, 139:14
**Pyne** [11] - 1:20, 26:8, 26:22, 27:10, 27:12, 30:18, 75:7, 111:5, 130:25, 186:3, 186:18
**PYNE** [1] - 111:3, 130:22, 137:18, 186:4, 187:8, 187:11
**Pyne's** [1] - 186:12

## Q

**quantify** [1] - 117:19
**quantity** [1] - 171:8
**quarter** [1] - 39:17
**quarters** [2] - 90:24, 179:15
**questioning** [2] - 64:8, 117:16
**questions** [18] - 49:14, 59:11, 96:18, 97:12, 98:8, 111:1, 130:19, 130:20, 131:1, 137:23,

145:1, 164:8, 173:15, 173:17, 173:25, 175:22, 176:21, 177:9
**quickly** [2] - 126:12, 135:7
**quid** [1] - 75:24
**quite** [7] - 5:9, 27:14, 28:18, 33:23, 58:15, 78:13, 156:14
**quo** [1] - 75:25
**quote** [2] - 48:2, 79:3
**quote-unquote** [2] - 48:2, 79:3
**quotes** [1] - 145:21
**quoting** [1] - 46:24

## R

**R-I-C-O** [1] - 46:11
**R-O-S-E-B-O-R-O-U-G-H** [1] - 166:12
**Racketeer** [1] - 46:12
**radio** [1] - 107:19
**rainy** [1] - 91:3
**raise** [3] - 8:8, 57:18, 155:12
**raises** [1] - 59:19
**raising** [1] - 155:6
**ran** [3] - 7:14, 29:13, 92:21
**Randallstown** [3] - 17:17, 110:23, 174:18
**Randallstown/Park** [4] - 47:23, 47:25, 174:14, 174:16
**random** [1] - 25:6
**Randy's** [1] - 17:17
**rang** [1] - 33:4
**rap** [16] - 9:16, 9:18, 9:22, 10:4, 10:12, 10:13, 10:22, 11:1, 11:21, 12:9, 12:25, 13:23, 25:10, 25:11, 48:13, 49:21
**rapper** [2] - 9:19, 49:21
**rappers** [2] - 12:5, 12:14
**rather** [6] - 57:2, 156:21, 156:24, 159:1, 165:5, 181:23
**re** [4] - 16:14, 16:15, 16:18, 163:10
**Re** [1] - 16:14
**re-enters** [1] - 163:10
**re-up** [3] - 16:14, 16:15, 16:18
**Re-up** [1] - 16:14
**reach** [2] - 106:22, 184:18
**reached** [1] - 58:5

**reaction** [3] - 21:16, 21:18, 150:15
**read** [6] - 23:2, 82:12, 114:3, 145:20, 145:21, 182:16
**reading** [1] - 111:12
**ready** [7] - 2:2, 6:20, 26:6, 39:12, 90:7, 91:15, 166:3
**real** [2] - 79:10, 86:12
**realize** [4] - 10:22, 28:3, 117:25, 163:20
**really** [46] - 2:6, 3:9, 4:8, 9:8, 13:13, 15:23, 16:9, 17:12, 24:23, 28:10, 30:6, 30:8, 35:21, 36:15, 37:12, 38:16, 38:19, 39:1, 44:24, 45:10, 51:5, 62:10, 62:11, 62:17, 64:3, 70:12, 77:17, 79:9, 79:12, 90:18, 139:3, 140:6, 142:10, 144:21, 153:6, 159:17, 160:2, 162:3, 163:2, 181:10, 181:12, 183:5, 186:15
**Really** [1] - 10:6
**rear** [3] - 126:20, 169:10, 170:18
**reason** [16] - 14:20, 18:14, 21:8, 40:10, 42:12, 50:9, 50:10, 54:11, 64:23, 69:18, 145:21, 153:10, 156:13, 159:9, 159:17, 161:7
**reasonable** [12] - 13:18, 27:24, 28:1, 36:12, 39:3, 46:1, 46:3, 48:22, 49:17, 78:11, 182:25, 186:12
**reasonably** [2] - 37:2, 138:20
**reasons** [6] - 52:10, 52:13, 52:15, 52:16, 56:13, 56:14
**receive** [1] - 55:6
**received** [2] - 178:18, 178:22
**recently** [2] - 18:13, 144:5
**Recess** [1] - 80:10
**recess** [8] - 57:7, 80:8, 138:3, 138:8, 138:10, 138:11, 179:21, 186:20
**recognize** [3] - 28:21, 131:23, 157:4
**recognized** [1] - 7:15
**recollection** [14] - 65:21, 109:6, 111:8, 111:13, 111:15, 113:24, 114:7, 114:10, 117:6,

117:13, 128:10, 129:6, 175:8, 175:12
**recommended** [1] - 147:18
**record** [13] - 67:22, 82:24, 88:13, 96:1, 100:6, 110:3, 111:12, 121:14, 145:1, 156:12, 159:7, 166:10, 171:5
**recorded** [1] - 188:3
**Records** [1] - 12:19
**records** [4] - 33:3, 67:20, 140:6, 162:20
**recover** [1] - 116:17, 118:16, 128:18
**recovered** [25] - 31:2, 31:3, 94:14, 95:25, 96:13, 108:19, 114:23, 114:25, 115:14, 116:20, 119:5, 120:8, 127:17, 128:11, 128:19, 136:13, 136:21, 136:22, 137:1, 170:21, 170:23, 170:24, 174:2, 175:23, 177:16
**recreation** [1] - 100:14
**Recreational** [2] - 150:13, 150:14
**RECROSS** [2] - 177:12, 187:15
**red** [6] - 102:17, 103:8, 108:4, 108:18, 109:4, 133:7
**redirect** [3] - 74:3, 74:14, 177:10
**REDIRECT** [8] - 99:15, 120:20, 137:13, 176:23, 187:6, 187:9, 187:12, 187:14
**reduce** [1] - 54:20
**refer** [8] - 53:10, 109:5, 117:9, 117:20, 153:13, 174:24, 175:11, 175:13
**reference** [1] - 62:15
**referred** [8] - 47:23, 50:16, 53:2, 55:2, 83:11, 111:10, 144:3
**referring** [4] - 6:15, 35:17, 134:22, 175:8
**refers** [3] - 124:10, 124:16, 156:6
**refinement** [1] - 77:2
**reflect** [2] - 162:20, 171:5
**reflected** [1] - 45:21
**refresh** [4] - 109:6, 113:24, 114:7, 117:12
**refunded** [1] - 152:21
**regard** [1] - 56:3
**regardless** [1] - 77:8
**regards** [2] - 113:14,

115:25
**registered** [2] - 33:12, 137:6
**registration** [1] - 109:7
**regret** [1] - 5:7
**regular** [6] - 9:13, 135:14, 135:19, 135:20, 140:23, 150:19
**regularly** [2] - 146:8, 146:9, 146:11
**reiterate** [1] - 155:7
**reject** [1] - 21:18
**Rejected** [1] - 66:10
**related** [4] - 37:2, 71:1, 76:21, 101:15
**relates** [2] - 51:15, 74:11
**relating** [1] - 79:24
**relationship** [5] - 154:7, 154:14, 154:20, 156:4
**relatives** [1] - 30:2
**relatives'** [1] - 29:25
**release** [2] - 24:12, 165:24
**released** [2] - 140:12, 141:11
**relevant** [1] - 139:3
**relies** [1] - 42:2
**reluctance** [1] - 183:22
**reluctant** [1] - 184:16
**rely** [2] - 35:13, 53:5
**relying** [2] - 41:5, 41:7
**remain** [2] - 138:7, 163:16
**remarkable** [1] - 33:19
**remember** [21] - 8:21, 13:12, 31:15, 49:8, 65:8, 65:17, 87:21, 90:20, 93:5, 97:5, 102:10, 105:14, 120:11, 137:16, 168:21, 170:10, 171:18, 171:25, 172:1, 172:9, 172:11
**Remember** [4] - 34:14, 46:25, 47:12, 55:21
**remembers** [2] - 65:5, 75:2
**remind** [2] - 6:1, 110:18
**remove** [1] - 118:24
**removed** [1] - 118:25
**renew** [1] - 59:25
**rental** [2] - 108:5, 109:8
**replace** [2] - 160:13, 160:19
**report** [5] - 95:18, 109:5, 130:12, 185:7, 185:12
**Reported** [1] - 1:23
**Reporter** [1] - 188:16
**reporter** [1] - 39:16

**REPORTER'S** [1] - 188:1
**reports** [5] - 84:17, 111:10, 111:12, 183:23, 185:9
**represent** [4] - 6:25, 26:8, 111:5, 130:25
**representation** [1] - 185:3
**representations** [1] - 59:7
**represented** [2] - 20:9, 20:16
**representing** [1] - 39:23
**request** [4] - 24:10, 180:22, 181:10, 186:12
**Request** [3] - 24:11, 24:13, 24:15
**requested** [1] - 181:8
**require** [4] - 36:4, 36:10, 58:14, 181:19
**required** [5] - 39:14, 39:15, 47:17, 67:5, 78:6
**requirement** [1] - 181:21
**requirements** [3] - 45:20, 45:21, 185:5
**research** [1] - 20:17
**reservations** [1] - 24:18
**reserve** [4] - 24:17, 26:1, 26:3, 62:7
**residing** [1] - 142:23
**Resolution** [1] - 24:15
**resolution** [2] - 58:5, 66:20
**resolved** [3] - 66:11, 77:3, 181:12
**resolving** [1] - 77:7
**Resources** [1] - 3:12
**respect** [41] - 30:6, 34:24, 35:15, 38:10, 42:7, 43:14, 47:10, 47:20, 49:18, 51:12, 51:15, 53:5, 54:17, 54:18, 55:6, 55:8, 55:19, 55:22, 59:16, 59:18, 59:22, 59:23, 60:1, 60:11, 60:24, 61:19, 70:24, 73:1, 74:15, 74:22, 74:25, 76:11, 76:23, 77:6, 77:8, 77:14, 77:23, 159:2, 162:7, 175:22
**respectfully** [2] - 47:6, 47:16
**respond** [1] - 180:11
**response** [2] - 57:19, 98:7
**responsible** [1] - 172:23

**responsive** [1] - 71:17
**rest** [6] - 66:18, 127:14, 127:18, 127:24, 136:22, 137:3
**restricted** [1] - 50:22
**result** [2] - 60:2, 71:12
**resulted** [5] - 57:22, 63:19, 64:12, 64:13
**results** [3] - 96:6, 171:15, 171:17
**resume** [2] - 179:13, 180:1
**retained** [1] - 156:13
**retention** [1] - 156:8
**retirement** [1] - 100:22
**retrieve** [1] - 106:23
**return** [5] - 8:6, 8:7, 41:2, 108:17, 153:25
**returned** [1] - 108:19
**returns** [1] - 14:20
**reviewed** [1] - 84:16
**Rhode** [4] - 8:2, 157:11, 160:22, 162:17
**RHODES** [78] - 2:3, 2:19, 6:24, 11:14, 12:2, 12:25, 22:21, 23:7, 23:12, 23:15, 23:18, 23:25, 24:2, 24:9, 80:15, 80:17, 80:19, 80:22, 81:2, 81:8, 81:16, 81:23, 82:2, 82:7, 82:10, 82:15, 138:14, 138:18, 138:21, 139:14, 139:17, 139:21, 139:24, 140:4, 140:10, 140:14, 140:16, 140:19, 140:22, 141:1, 141:5, 141:15, 141:18, 141:22, 142:3, 142:4, 142:8, 142:16, 142:21, 142:24, 143:3, 143:6, 143:8, 143:11, 143:16, 143:19, 143:22, 143:25, 144:7, 144:15, 154:24, 158:16, 159:9, 159:15, 160:5, 160:7, 160:11, 160:18, 160:25, 161:7, 161:11, 161:16, 161:18, 161:22, 162:1, 162:18, 162:23, 163:6
**Rhodes** [29] - 1:17, 2:18, 6:22, 6:25, 23:10, 23:11, 25:25, 35:7, 37:10, 37:21, 38:6, 50:16, 62:20, 69:19, 80:12, 96:18, 138:13, 139:9, 146:2, 150:16, 154:22, 155:9, 157:3, 157:10, 157:13, 158:3, 158:4, 158:15, 161:21
**RICO** [29] - 21:12,

28:17, 29:13, 36:7, 36:10, 46:8, 46:9, 47:11, 47:12, 47:13, 47:16, 47:21, 48:3, 48:23, 49:4, 49:13, 49:19, 50:18, 50:25, 51:9, 51:12, 52:8, 52:14, 55:24, 56:6, 56:10, 72:5
  **ridden** [1] - 132:9
  **ride** [1] - 85:22
  **riding** [5] - 87:10, 87:12, 125:9, 131:25, 132:5
  **right-hand** [3] - 125:15, 126:7, 126:21
  **rights** [2] - 24:16, 24:17
  **Ring** [2] - 130:1, 130:3
  **rips** [5] - 85:21, 85:22, 86:1, 86:2, 86:6
  **risk** [5] - 17:1, 17:3, 17:4, 17:9, 17:14
  **road** [1] - 30:7
  **rob** [4] - 16:5, 29:7, 35:2, 133:19
  **robbery** [16] - 29:3, 29:6, 29:8, 34:10, 63:18, 67:24, 69:2, 69:7, 69:22, 69:25, 70:13, 70:14, 71:6, 71:7, 71:11, 71:13
  **Robert** [1] - 1:15
  **role** [6] - 6:19, 40:2, 40:7, 44:11, 86:17, 156:23
  **rolled** [1] - 117:1
  **room** [6] - 47:19, 57:12, 138:7, 153:25, 164:13, 179:23
  **Room** [1] - 1:24
  **Roseborough** [10] - 60:6, 73:2, 165:4, 165:22, 166:6, 166:11, 166:22, 173:20, 173:24, 178:15
  **ROSEBOROUGH** [2] - 166:7, 187:13
  **roughly** [4] - 91:19, 101:1, 103:10, 141:6
  **round** [4] - 43:25, 44:2, 44:3, 49:2
  **rounds** [1] - 170:10
  **Roussey** [3] - 95:1, 96:9, 180:7
  **route** [1] - 105:7
  **routine** [2] - 125:8, 184:3
  **RPR** [1] - 1:23
  **rude** [1] - 22:5
  **Rule** [1] - 73:24
  **rule** [5] - 5:24, 6:1, 22:17, 60:18, 182:18

  **ruled** [1] - 77:21
  **rules** [2] - 60:21, 182:14
  **ruling** [8] - 22:21, 58:7, 60:18, 68:8, 68:12, 76:6, 78:8, 163:8
  **rulings** [1] - 77:19
  **rumor** [3] - 13:3, 13:4, 18:21
  **rumors** [2] - 12:11, 12:13
  **run** [5] - 3:23, 32:7, 86:11, 105:16, 174:7
  **runner** [1] - 148:11
  **running** [3] - 92:15, 93:19, 147:15
  **runs** [2] - 112:16, 147:3

## S

  **S-U-L-L-I-V-A-N** [1] - 121:16
  **sad** [1] - 30:4
  **salaried** [1] - 4:8
  **sale** [2] - 120:5, 121:3
  **sandwich** [16] - 89:23, 90:11, 90:17, 91:11, 94:20, 135:11, 135:13, 135:14, 135:15, 135:19, 135:20, 135:21, 135:23, 136:10, 136:24, 137:1
  **sat** [1] - 78:23
  **satisfied** [2] - 72:20, 72:24
  **satisfy** [1] - 185:4
  **Saturday** [1] - 180:5
  **save** [1] - 61:25
  **saw** [37] - 8:14, 17:25, 19:6, 66:15, 87:19, 87:24, 88:2, 89:8, 91:11, 91:14, 94:1, 103:5, 103:7, 104:4, 104:8, 104:10, 105:6, 105:19, 105:20, 106:13, 106:20, 114:13, 115:25, 116:2, 116:5, 118:9, 119:1, 119:4, 126:25, 127:12, 134:23, 136:13, 144:7, 172:6, 178:9, 178:11
  **scenario** [1] - 150:20
  **scene** [2] - 32:18, 102:19
  **schedule** [2] - 150:6, 178:24
  **scheduled** [1] - 149:19
  **scheduling** [1] - 149:23
  **scheme** [1] - 30:14
  **scholarships** [1] - 142:2
  **school** [15] - 7:4, 7:12,

7:13, 8:2, 8:8, 69:21, 140:16, 140:18, 141:10, 143:1, 147:19, 149:7, 149:24, 150:10
  **School** [14] - 7:13, 7:17, 63:20, 69:20, 70:15, 81:6, 146:4, 147:9, 148:2, 148:4, 149:25, 150:2, 162:19, 162:20
  **schools** [1] - 140:23
  **science** [1] - 3:24
  **scoot** [1] - 166:9
  **scope** [1] - 99:20
  **scramble** [1] - 159:16
  **scraping** [1] - 133:12
  **screen** [3] - 125:3, 125:12, 133:3
  **scurry** [1] - 133:15
  **Search** [1] - 170:20
  **search** [6] - 94:21, 108:1, 108:7, 170:14, 170:15, 177:24
  **searched** [2] - 94:22, 118:12
  **searches** [1] - 64:8
  **seat** [16] - 2:21, 6:13, 87:12, 126:20, 127:15, 127:19, 127:21, 134:11, 136:18, 137:2, 168:22, 168:24, 169:12, 172:8
  **seated** [10] - 6:7, 6:25, 26:9, 80:11, 82:17, 82:23, 100:5, 138:12, 166:2, 166:9
  **seats** [8] - 126:17, 127:4, 134:24, 135:25, 136:3, 136:7, 136:9
  **second** [12] - 2:15, 9:21, 34:8, 42:10, 50:2, 63:13, 94:2, 117:22, 119:18, 143:7, 143:8, 143:17, 153:6, 153:8, 181:7
  **Secondly** [4] - 28:12, 29:2, 31:11, 36:9
  **secondly** [1] - 154:6
  **seconds** [1] - 104:16
  **section** [2] - 11:4, 113:5
  **sections** [2] - 9:7, 48:3
  **secure** [1] - 178:5
  **security** [1] - 100:14
  **See** [3] - 63:24, 70:17, 114:1
  **see** [116] - 3:18, 4:12, 4:21, 5:7, 6:15, 7:20, 8:17, 8:18, 8:19, 12:7, 12:16, 14:8, 16:17, 17:21, 35:10, 38:20, 38:21, 41:8, 47:17, 54:2, 54:16, 65:12, 65:16,

70:17, 71:22, 78:9, 81:14, 81:24, 85:24, 87:6, 87:9, 88:6, 88:24, 89:2, 89:3, 89:9, 89:22, 90:16, 91:1, 91:10, 92:9, 92:11, 93:20, 95:13, 98:23, 99:1, 102:14, 105:11, 105:19, 106:19, 106:25, 107:4, 111:18, 114:18, 114:19, 115:16, 115:18, 115:22, 116:8, 116:10, 116:12, 116:14, 117:20, 118:23, 125:5, 125:11, 125:20, 125:21, 126:21, 134:17, 134:19, 136:25, 141:17, 141:20, 142:7, 144:10, 145:5, 146:8, 146:9, 146:11, 147:8, 147:12, 147:17, 147:21, 148:1, 148:15, 148:22, 148:23, 149:1, 149:5, 149:11, 149:25, 150:23, 152:16, 152:19, 155:10, 156:7, 156:13, 157:21, 158:20, 160:12, 162:12, 163:18, 169:11, 173:21, 179:9, 180:11, 181:8, 182:11, 183:11, 186:17
  **seeing** [5] - 53:25, 136:15, 178:10, 178:12, 185:15
  **seek** [1] - 49:19
  **seeking** [3] - 52:16, 52:17, 55:7
  **seem** [2] - 2:6, 139:11
  **sees** [1] - 31:25
  **seize** [1] - 171:15
  **seized** [5] - 74:1, 94:23, 97:20, 97:23, 176:13
  **seizing** [1] - 72:14
  **seizure** [1] - 70:19
  **seizures** [1] - 72:3
  **selection** [1] - 40:1
  **self** [1] - 14:22
  **self-interest** [1] - 14:22
  **sell** [4] - 13:9, 15:21, 15:22, 133:16
  **sellers** [3] - 85:23, 86:3
  **selling** [14] - 85:25, 86:7, 107:16, 115:10, 118:20, 118:22, 119:8, 119:12, 119:13, 119:15, 119:17, 133:20, 134:5
  **sells** [3] - 10:15, 12:16
  **semester** [1] - 160:22
  **semesters** [1] - 8:5
  **semiautomatic** [1] - 169:25
  **Senate** [1] - 45:7

  **sense** [3] - 26:22, 27:10, 159:11
  **sent** [6] - 7:12, 7:20, 69:20, 71:11, 171:19, 180:4
  **sentence** [5] - 14:12, 14:13, 54:20, 55:7, 67:7
  **Sentencing** [1] - 54:20
  **separate** [2] - 45:12, 45:13
  **September** [8] - 1:11, 84:13, 98:3, 150:2, 175:19, 179:2, 182:5, 188:5
  **sequestration** [2] - 5:21, 5:23
  **series** [1] - 46:4
  **serious** [3] - 26:20, 34:5, 46:12
  **serve** [2] - 3:3, 91:15
  **served** [1] - 140:12
  **servers** [1] - 5:5
  **service** [4] - 2:9, 2:12, 6:11, 6:18
  **Services** [1] - 140:1
  **services** [1] - 146:5
  **serving** [1] - 67:7
  **session** [5] - 179:2, 179:4, 179:12, 179:15, 182:6
  **set** [6] - 22:3, 24:13, 44:12, 85:23, 102:19, 129:9
  **setting** [3] - 31:9, 32:20, 178:23
  **settlement** [1] - 24:20
  **seven** [2] - 28:19, 184:13
  **seventh** [1] - 148:21
  **Seventh** [1] - 148:22
  **several** [9] - 4:20, 29:2, 69:11, 73:17, 88:1, 117:24, 148:8, 163:18, 181:9
  **sex** [1] - 10:15
  **Shake** [6] - 12:19, 38:5, 38:8, 38:10, 48:15, 49:23
  **shape** [1] - 51:8
  **share** [1] - 64:4
  **SHAWN** [1] - 1:8
  **Shawn** [16] - 30:12, 30:13, 39:24, 87:20, 87:25, 88:6, 89:22, 92:7, 92:17, 104:2, 105:3, 168:2, 168:19, 168:22, 170:21, 170:24
  **sheet** [2] - 23:17, 171:14
  **Shelly** [18] - 26:8, 28:12, 30:13, 32:2,

98:20, 106:10, 106:20, 111:5, 111:22, 115:21, 115:22, 116:5, 123:9, 125:24, 129:18, 129:21, 130:25, 131:2
**SHELLY** [1] - 1:7
**Shelton** [4] - 12:20, 13:1, 19:24, 98:18
**SHELTON** [1] - 1:7
**shift** [2] - 18:9, 104:24
**shifts** [1] - 15:11
**shirt** [5] - 26:12, 88:12, 92:12, 93:20, 171:4
**Shit** [1] - 12:21
**shooters** [2] - 13:14, 19:22
**shooting** [2] - 19:24, 169:23
**shootings** [1] - 10:15
**shore** [1] - 78:18
**short** [2] - 58:5, 65:9
**shortest** [1] - 165:20
**shortly** [2] - 141:2, 141:12
**shot** [3] - 12:14, 16:22, 51:22
**shoulder** [1] - 90:4, 90:5, 92:11
**shoulders** [2] - 135:24, 136:6
**shoving** [3] - 134:23, 136:2, 136:8
**show** [20] - 11:16, 11:17, 11:19, 32:5, 36:6, 36:12, 36:18, 36:19, 36:20, 36:25, 37:17, 37:21, 43:23, 51:7, 123:14, 130:9, 142:22, 171:9, 185:7
**showed** [3] - 113:23, 117:12, 129:23
**showing** [3] - 95:12, 109:12, 182:22
**shown** [3] - 20:17, 182:20, 183:24
**shows** [2] - 19:18, 181:15
**sic)** [1] - 27:12
**side** [23] - 39:22, 59:8, 72:25, 79:6, 87:15, 90:23, 90:24, 103:9, 106:23, 112:15, 113:2, 125:15, 125:22, 125:23, 126:1, 126:7, 126:21, 126:22, 128:22, 133:12, 136:24, 169:4, 169:5
**sides** [3] - 54:12, 59:15, 113:8
**sidewalk** [2] - 90:1, 91:1

**sights** [1] - 169:15
**signal** [1] - 168:17
**signature** [1] - 188:11
**signed** [2] - 32:2, 181:3
**significance** [1] - 153:9
**significant** [4] - 55:18, 59:15, 155:25, 156:7
**significantly** [1] - 143:15
**silhouette** [1] - 168:14
**silver** [1] - 8:7
**similar** [4] - 19:18, 19:21, 36:11, 154:8
**simply** [7] - 38:12, 66:11, 154:17, 157:20, 182:25, 185:2, 185:11
**sit** [6] - 45:4, 64:1, 111:9, 114:9, 148:24, 162:11
**sites** [1] - 4:25
**Sitting** [1] - 108:13
**sitting** [24] - 18:3, 39:17, 39:24, 85:12, 102:15, 102:24, 103:10, 111:21, 125:23, 126:16, 126:19, 126:20, 127:11, 128:23, 133:20, 133:24, 134:4, 134:10, 155:15, 155:21, 159:4, 168:22, 168:24
**situation** [3] - 13:15, 16:23, 107:21
**situations** [1] - 20:16
**six** [2] - 132:9, 132:14
**six-year-old** [2] - 132:9, 132:14
**size** [4] - 115:4, 115:11, 135:16, 135:19
**size-wise** [1] - 135:16
**sized** [1] - 135:20
**sizes** [1] - 115:12
**sketch** [1] - 41:17
**skills** [1] - 7:16
**slaughter** [1] - 124:24
**slew** [1] - 59:24
**slightly** [3] - 57:3, 134:14, 134:16
**slip** [1] - 32:2
**slow** [1] - 87:14
**small** [4] - 3:15, 101:15, 115:18, 119:8
**smaller** [4] - 108:21, 115:1, 115:8, 115:17
**Smallwood** [3] - 105:9, 105:10, 110:20
**smart** [1] - 7:16
**Smith** [1] - 33:14
**smoke** [1] - 42:18
**smoking** [1] - 7:8
**snitch** [3] - 15:1, 35:7,

53:9
**snitches** [5] - 13:25, 14:9, 14:21, 19:13, 20:1
**Snitching** [2] - 49:24, 49:25
**snuffed** [1] - 42:9
**so-called** [3] - 28:17, 32:16, 38:25
**software** [1] - 5:4
**sold** [5] - 12:2, 12:3, 94:17, 120:24, 122:15
**solving** [1] - 186:2
**someone** [9] - 67:9, 69:25, 71:6, 107:1, 123:9, 146:3, 147:13, 152:4, 181:19
**sometime** [2] - 34:12, 162:5
**sometimes** [11] - 8:18, 14:10, 14:18, 25:3, 25:21, 33:24, 42:11, 42:14, 43:1, 86:22, 153:17
**Sometimes** [6] - 8:19, 25:5, 25:6, 54:23
**somewhat** [4] - 33:19, 61:23, 147:22, 179:11
**somewhere** [5] - 16:21, 74:7, 81:17, 88:23, 186:13
**son** [21] - 81:4, 146:7, 146:9, 146:12, 147:1, 147:3, 147:13, 147:15, 148:10, 148:20, 149:12, 149:20, 150:7, 151:12, 151:15, 151:20, 152:1, 152:4, 152:22, 154:7, 163:21
**song** [12] - 10:9, 10:21, 11:7, 12:10, 12:18, 12:20, 13:4, 13:5, 13:9, 49:21
**songs** [4] - 10:8, 10:17, 11:2, 12:4
**sons** [1] - 148:9
**soon** [7] - 78:14, 80:2, 92:19, 93:17, 149:21, 149:23, 182:3
**sooner** [1] - 159:1
**Sorry** [4] - 97:19, 99:2, 166:3, 176:25
**sorry** [12] - 3:6, 97:4, 124:14, 124:20, 124:22, 142:9, 154:21, 161:2, 162:1, 177:3, 182:7, 185:14
**sort** [33] - 4:3, 33:24, 35:22, 38:3, 38:6, 38:11, 40:14, 42:24, 44:10, 46:10, 50:13, 51:21,

52:1, 52:2, 53:16, 55:20, 66:24, 78:24, 86:20, 90:1, 92:4, 93:20, 104:24, 127:24, 141:16, 142:18, 144:3, 152:13, 155:11, 156:4, 175:1, 179:23, 184:15
**sorts** [1] - 41:16
**sound** [2] - 19:10, 155:23
**sounds** [3] - 15:8, 155:22
**source** [1] - 162:4
**South** [1] - 173:2
**south** [5] - 90:23, 105:4, 105:5, 105:9, 113:2
**southeast** [1] - 89:7
**southern** [1] - 110:21
**Southern** [8] - 83:7, 83:11, 83:12, 83:13, 84:2, 84:5, 96:23, 96:25
**Southwest** [5] - 83:15, 122:5, 167:3, 167:14, 172:15
**southwest** [3] - 85:1, 97:1, 123:18
**Southwestern** [4] - 101:9, 101:11, 110:22, 172:23
**sovereigns** [1] - 45:12
**sovereignty** [2] - 77:1, 77:4
**space** [3] - 186:9, 186:10, 186:16
**spanned** [1] - 29:15
**speaking** [1] - 34:1
**speaks** [2] - 154:13, 169:19
**special** [2] - 45:2, 45:20
**Special** [1] - 27:5
**specialists** [1] - 144:9
**specific** [4] - 30:9, 87:7, 109:14
**specifically** [4] - 45:23, 77:23, 84:12, 101:5
**specifics** [1] - 95:15
**speculate** [1] - 164:6
**speculating** [1] - 42:12
**speed** [1] - 87:14
**spell** [5] - 82:24, 100:6, 121:14, 129:15, 166:10
**Spence** [13] - 29:7, 29:9, 34:11, 34:24, 34:25, 35:2, 35:16, 51:16, 53:6, 56:14, 77:15
**spend** [2] - 35:17, 55:10
**spending** [1] - 63:19
**spends** [1] - 7:13
**spent** [2] - 66:22, 101:2
**sports** [1] - 146:19

**spread** [1] - 28:19
**spreading** [2] - 20:18, 21:16
**squad** [1] - 84:7
**square** [5] - 43:24, 44:1, 44:2, 44:3, 49:2
**stabbed** [1] - 29:2
**stand** [13] - 26:22, 27:11, 42:16, 43:1, 77:11, 77:13, 86:14, 111:9, 111:21, 175:10, 175:11, 183:2, 183:13
**standard** [2] - 13:17, 171:13
**standing** [6] - 88:16, 89:8, 90:5, 105:20, 105:21, 133:23
**stands** [1] - 46:12
**start** [4] - 6:21, 10:2, 16:23, 131:10
**started** [14] - 8:22, 9:24, 9:25, 10:6, 10:8, 10:10, 22:3, 71:9, 71:21, 126:13, 149:25, 150:2, 161:11, 167:22
**starting** [1] - 181:11
**stash** [3] - 16:20, 18:14, 18:16
**stashes** [1] - 85:25
**state** [22] - 21:10, 21:11, 22:2, 26:24, 45:13, 45:17, 51:4, 74:5, 77:14, 77:19, 79:1, 79:3, 99:6, 99:8, 119:11, 120:16, 133:17, 133:21, 133:24, 134:6, 176:14, 176:18
**State** [6] - 45:9, 82:24, 100:6, 121:13, 140:8, 166:10
**State's** [1] - 99:10
**state/federal** [1] - 27:4
**statement** [12] - 6:23, 28:3, 30:19, 34:15, 78:13, 78:15, 81:6, 139:11, 140:21, 146:3, 150:17, 162:25
**statements** [6] - 6:21, 6:22, 35:18, 56:12, 57:10, 67:2
**states** [1] - 45:12
**States** [13] - 40:4, 42:1, 45:6, 45:9, 45:11, 56:16, 82:19, 100:1, 100:2, 121:9, 166:6, 183:10
**STATES** [2] - 1:1, 1:4
**station** [1] - 95:4
**stationing** [1] - 112:13
**statute** [2] - 21:12, 21:13

**stayed** [1] - 89:17
**steel** [1] - 74:9
**stenographically** [1] - 188:4
**step** [6] - 2:16, 6:12, 75:11, 92:19, 144:13, 164:13
**stepped** [2] - 22:1, 92:20
**steps** [1] - 92:10
**steroidal** [1] - 59:20
**stet** [2] - 60:19, 75:1
**stets** [1] - 64:13
**stetted** [1] - 58:5
**stick** [2] - 21:24, 147:7
**sticking** [1] - 93:22
**still** [11] - 7:9, 16:18, 17:9, 30:3, 77:9, 80:22, 133:3, 148:4, 155:9, 173:6
**stint** [1] - 84:7
**stipulate** [1] - 162:21
**stipulation** [5] - 157:5, 157:7, 157:15, 158:6, 184:15
**stipulation's** [1] - 159:6
**stipulations** [1] - 60:22
**stolen** [6] - 176:12, 176:25, 177:7, 177:15, 177:18, 178:4
**stone** [1] - 35:9
**stood** [1] - 71:9
**stop** [6] - 22:11, 22:12, 90:10, 97:1, 132:14, 172:15
**Stop** [2] - 49:24, 49:25
**stopped** [3] - 17:3, 167:23, 168:8
**store** [6] - 92:10, 92:13, 92:17, 92:19, 92:20, 93:19
**stored** [1] - 121:3
**Straight** [2] - 10:9, 11:4
**straight** [1] - 89:25
**strange** [1] - 50:20
**streamline** [1] - 184:15
**street** [33] - 7:8, 12:14, 85:21, 86:1, 86:2, 86:6, 87:2, 90:23, 102:22, 103:9, 105:11, 107:7, 112:16, 113:1, 113:3, 118:19, 120:5, 121:1, 121:4, 122:16, 122:18, 123:5, 125:16, 125:23, 132:3, 132:19, 133:4, 133:9, 133:23, 163:1, 167:20, 167:21, 175:25
**Street** [3] - 1:24, 21:2, 83:14, 83:15, 85:5, 85:22, 87:14, 87:19,

89:6, 97:1, 97:2, 101:23, 102:11, 105:4, 105:5, 105:9, 105:21, 107:22, 112:13, 112:16, 113:4, 113:9, 116:3, 123:13, 123:18, 124:5, 125:10, 126:3, 126:13, 167:16, 172:25, 173:1, 173:2
**streets** [4] - 11:5, 86:8, 87:2, 87:15
**strength** [1] - 42:25
**stretching** [1] - 149:3
**stricken** [1] - 30:4
**strike** [2] - 88:18, 91:10
**strings** [1] - 14:7
**striped** [1] - 26:12
**stripped** [1] - 28:6
**strong** [1] - 7:25
**struck** [3] - 38:1, 154:20, 155:18
**structure** [1] - 37:22
**stuck** [1] - 81:20
**student** [1] - 155:3
**students** [1] - 142:6
**studies** [1] - 7:24
**stuff** [20] - 4:19, 4:22, 5:6, 12:11, 13:7, 15:24, 23:24, 25:3, 25:5, 34:5, 35:22, 35:23, 37:25, 38:14, 38:24, 93:22, 136:7, 136:17, 136:20
**stuffed** [1] - 117:2
**subject** [6] - 45:12, 45:20, 56:13, 155:23, 155:24, 157:6
**submission** [2] - 109:15, 110:6
**submit** [13] - 36:20, 41:22, 41:24, 43:13, 43:20, 49:15, 52:3, 52:5, 54:7, 55:18, 94:24, 108:25, 129:25
**submitted** [10] - 76:24, 76:25, 95:2, 95:5, 96:4, 96:14, 130:1, 130:3, 130:14, 171:18
**submitting** [1] - 180:10
**subpoena** [1] - 160:22
**subscriber** [1] - 33:15
**subsisted** [1] - 37:19
**substance** [13] - 94:4, 94:6, 108:22, 108:25, 115:18, 127:13, 128:13, 128:15, 128:16, 155:22, 174:2, 174:10, 176:4
**substances** [1] - 109:16
**substantially** [1] - 155:17
**substantive** [1] - 144:21

**substituted** [2] - 157:5
**succeed** [1] - 45:25
**succeeding** [1] - 65:10
**sufficient** [3] - 30:11, 30:21, 132:20
**suggest** [5] - 31:1, 38:20, 47:9, 47:16, 143:9
**suggested** [1] - 31:5
**suggesting** [2] - 42:18, 145:4
**Suggesting** [1] - 47:1
**suggestion** [1] - 177:21
**suggests** [1] - 47:4
**Sullivan** [8] - 121:10, 121:15, 121:19, 130:23, 130:25, 137:16, 137:24
**SULLIVAN** [2] - 121:11, 187:10
**sum** [1] - 97:21
**summarize** [2] - 24:25, 36:2
**summer** [2] - 148:18, 150:5
**Sunday** [4] - 32:4, 32:12, 32:13, 180:5
**sunny** [2] - 91:4, 91:5
**superseding** [5] - 26:15, 28:22, 34:18, 34:19, 35:25
**supervisor** [1] - 3:12
**supplier** [3] - 16:11, 16:18, 19:7
**supply** [1] - 19:8
**support** [2] - 4:23, 156:3
**supports** [2] - 56:4, 139:21
**supposed** [2] - 31:19, 38:11
**supposedly** [2] - 8:21, 33:21
**surely** [2] - 37:9, 160:9
**surprise** [1] - 10:19
**surprised** [1] - 79:15
**surprisingly** [1] - 31:7
**surveillance** [8] - 87:6, 101:22, 101:25, 102:22, 104:24, 111:25, 112:6, 112:14
**surveilling** [1] - 104:23
**survey** [3] - 62:23, 65:11, 71:22
**suspect** [11] - 5:11, 5:14, 16:1, 16:2, 16:3, 18:7, 18:17, 32:11, 134:5, 163:21
**suspected** [2] - 109:18, 130:13
**suspend** [1] - 152:19
**suspicious** [1] - 32:13

**sustain** [1] - 58:19
**Sustained** [1] - 22:20
**sweating** [1] - 86:13
**switched** [1] - 97:2
**swoop** [1] - 61:25
**SWORN** [4] - 82:21, 100:3, 121:11, 166:7
**sworn** [1] - 35:18
**system** [11] - 40:4, 40:7, 40:8, 40:11, 54:9, 54:11, 54:16, 54:25, 61:24, 79:3, 120:16
**systems** [1] - 5:6

# T

**table** [5] - 88:11, 186:6, 186:7, 186:10, 186:15
**tables** [1] - 26:11
**tacit** [2] - 46:25, 47:14
**tactical** [1] - 59:10
**tactics** [4] - 50:13, 50:16, 50:21, 50:23
**tag** [1] - 109:7
**talks** [1] - 46:21
**tapes** [1] - 180:19
**target** [2] - 67:18, 68:5
**task** [3] - 27:4, 46:18, 83:22
**tasked** [1] - 122:14
**teacher** [1] - 141:21
**Team** [1] - 55:3
**team** [4] - 140:21, 147:20, 148:12, 150:10
**tech** [1] - 114:2
**technical** [3] - 35:23, 38:14, 38:25
**technicians** [1] - 96:14
**teeny** [1] - 55:12
**telephone** [4] - 31:11, 31:12, 31:13, 32:23
**ten** [10] - 4:6, 14:12, 53:13, 98:4, 102:11, 159:20, 175:9, 175:14, 175:15, 178:6
**term** [7] - 10:3, 20:25, 41:1, 47:12, 50:7, 122:17, 139:12
**terminate** [1] - 152:20
**terms** [15] - 14:7, 24:22, 44:14, 44:22, 51:25, 52:16, 66:4, 66:20, 67:17, 78:25, 79:18, 86:8, 154:13, 156:5, 186:7
**terrible** [2] - 28:24, 79:10
**territory** [1] - 48:12
**test** [1] - 96:16

**tested** [1] - 171:16
**testified** [9] - 98:7, 113:20, 117:6, 117:10, 136:12, 150:16, 171:8, 174:1, 175:19
**testifies** [2] - 69:18, 152:3
**testify** [5] - 55:4, 57:20, 57:22, 138:19, 164:4, 175:8, 181:15
**testifying** [9] - 30:3, 58:9, 64:8, 70:18, 98:21, 111:9, 113:18, 119:25, 185:12
**testimony** [38] - 9:3, 15:4, 15:5, 25:15, 28:25, 35:19, 51:25, 52:21, 53:22, 54:10, 55:5, 55:13, 56:2, 56:4, 67:2, 73:15, 84:16, 111:8, 112:4, 113:12, 113:23, 115:13, 118:2, 134:4, 135:4, 135:6, 136:4, 139:3, 151:4, 154:25, 155:10, 155:22, 156:2, 157:7, 162:8, 175:13
**testing** [2] - 42:24, 42:25
**tests** [1] - 31:3
**THE** [343] - 1:1, 1:1, 2:2, 2:4, 2:21, 2:24, 3:1, 3:5, 3:11, 3:16, 3:18, 3:21, 3:24, 4:1, 4:3, 4:5, 4:12, 4:14, 4:21, 4:25, 5:3, 5:7, 5:13, 5:18, 5:22, 5:25, 6:6, 22:20, 23:6, 23:9, 23:14, 23:17, 23:19, 23:23, 24:1, 24:4, 24:6, 25:25, 26:4, 26:6, 39:11, 57:1, 57:6, 57:15, 58:1, 58:11, 60:16, 61:11, 61:17, 62:3, 62:7, 62:10, 62:13, 62:16, 62:20, 62:22, 62:25, 63:5, 63:8, 63:13, 63:21, 63:24, 64:3, 64:11, 64:25, 65:3, 66:2, 66:9, 66:15, 66:18, 67:1, 67:8, 67:13, 67:20, 68:2, 68:7, 68:14, 68:17, 68:20, 68:23, 69:1, 69:5, 69:10, 69:13, 69:23, 70:2, 70:4, 70:7, 70:10, 70:14, 70:17, 70:23, 71:4, 71:8, 71:17, 71:20, 71:25, 72:7, 72:16, 72:21, 72:23, 73:5, 73:7, 73:11, 73:13, 73:22, 74:6, 74:9, 74:19, 74:21, 75:5, 75:7, 75:11, 75:14, 75:17,

75:23, 76:1, 76:3, 76:5,
76:10, 76:19, 77:10,
78:3, 78:12, 79:4, 79:14,
79:17, 79:20, 79:22,
79:25, 80:2, 80:8, 80:11,
80:16, 80:18, 80:21,
80:25, 81:3, 81:11,
81:17, 81:24, 82:3, 82:8,
82:11, 82:17, 82:22,
82:23, 82:25, 88:15,
95:11, 96:18, 97:12,
99:21, 99:24, 100:4,
100:5, 100:8, 103:21,
103:22, 103:25, 106:8,
106:9, 109:11, 110:13,
119:20, 121:7, 121:12,
121:13, 121:15, 123:17,
124:2, 124:12, 124:20,
125:12, 125:17, 125:19,
125:21, 125:22, 134:3,
137:19, 137:24, 138:1,
138:2, 138:10, 138:12,
138:16, 138:19, 138:22,
139:8, 139:16, 139:20,
139:22, 139:25, 140:9,
140:12, 140:15, 140:18,
140:20, 140:24, 141:4,
141:9, 141:17, 141:20,
141:23, 141:25, 142:7,
142:12, 142:19, 142:22,
142:25, 143:4, 143:7,
143:9, 143:14, 143:17,
143:20, 143:23, 144:5,
144:12, 144:18, 144:24,
145:3, 145:11, 145:13,
145:15, 145:17, 146:9,
146:12, 146:14, 146:18,
146:22, 147:2, 147:8,
147:12, 147:17, 147:21,
148:1, 148:4, 148:7,
148:15, 148:17, 148:20,
148:22, 149:1, 149:5,
149:7, 149:11, 149:14,
149:16, 149:19, 149:22,
149:25, 150:4, 150:9,
150:12, 150:14, 150:22,
150:25, 151:2, 151:7,
151:19, 151:23, 152:10,
152:12, 152:16, 152:19,
152:25, 153:3, 153:5,
153:15, 153:17, 153:19,
153:22, 153:25, 154:22,
156:10, 156:16, 158:7,
158:12, 158:23, 159:13,
159:19, 160:6, 160:8,
160:16, 160:21, 161:2,
161:9, 161:15, 161:17,
161:20, 161:23, 162:3,
162:20, 162:24, 163:7,
163:11, 164:1, 164:12,
164:15, 164:20, 164:22,

164:24, 165:5, 165:9,
165:11, 165:14, 165:20,
165:23, 165:25, 166:2,
166:8, 166:9, 166:11,
171:7, 171:11, 172:19,
173:16, 173:23, 177:4,
177:11, 178:15, 180:3,
180:10, 180:14, 180:20,
180:25, 181:3, 181:25,
182:4, 182:11, 182:16,
183:3, 183:16, 184:4,
184:10, 184:21, 185:10,
185:14, 185:18, 185:22,
186:2, 186:17

**theater** [4] - 31:24,
31:25, 32:1, 32:6

**theory** [1] - 156:1

**thereabout** [1] - 118:14

**therefore** [3] - 25:23,
159:24, 164:4

**Therefore** [1] - 31:8

**they've** [6] - 11:15,
17:9, 47:4, 165:17,
182:15, 182:22

**thinking** [4] - 4:14,
4:16, 134:8, 159:10

**thinks** [2] - 17:6, 78:24

**Third** [4] - 28:15, 29:4,
31:14, 149:14

**third** [4] - 14:3, 89:6,
107:17, 149:12

**thirds** [1] - 89:18

**Thomas** [1] - 1:20

**Thousands** [1] - 87:4

**threats** [1] - 10:25

**three** [37] - 3:17, 4:7,
8:23, 12:3, 18:1, 20:2,
28:7, 31:6, 60:8, 70:7,
86:15, 90:24, 91:2,
91:21, 92:5, 94:3, 96:8,
96:10, 107:5, 113:15,
117:7, 118:4, 118:7,
118:8, 128:10, 128:14,
131:25, 132:12, 142:14,
143:13, 159:5, 160:1,
161:14, 162:7, 162:12,
179:15

**Three** [1] - 135:17

**three-quarters** [1] -
179:15

**threshold** [1] - 92:20

**throughout** [4] - 11:8,
37:4, 37:19

**throw** [1] - 42:17

**thrown** [1] - 52:22

**Thursday** [5] - 179:6,
179:16, 180:1, 180:24,
182:7

**ticket** [3] - 21:2, 21:4,
21:6

**tickets** [2] - 32:3, 32:4

**tie** [1] - 31:6

**title** [1] - 141:21

**Tobacco** [1] - 27:6

**today** [28] - 27:1, 43:20,
46:16, 59:23, 73:4,
79:18, 79:24, 84:18,
98:21, 108:13, 111:8,
111:18, 111:19, 111:21,
114:9, 115:13, 118:7,
156:24, 159:20, 161:13,
161:24, 165:21, 171:1,
175:8, 175:11, 175:13,
176:17, 186:7

**together** [18] - 7:4, 7:7,
7:21, 10:1, 18:1, 25:4,
34:21, 34:22, 37:14,
37:16, 38:20, 38:21,
39:21, 47:1, 47:3, 47:15,
55:21, 142:14

**Tom** [1] - 26:8

**tomorrow** [6] - 2:7,
79:18, 179:2, 180:1,
186:19, 186:21

**tone** [1] - 33:25

**tonight** [1] - 182:2

**Tonya** [9] - 29:9, 34:11,
34:25, 35:16, 51:16,
53:6, 55:22, 56:14, 77:14

**took** [17] - 2:5, 7:17,
16:20, 22:1, 32:9, 69:12,
71:13, 73:20, 92:15,
104:11, 129:10, 136:6,
170:16, 174:13, 174:20,
175:3

**top** [2] - 169:17, 169:21

**total** [2] - 106:17,
152:14

**totality** [1] - 135:6

**Totally** [1] - 102:5

**touch** [5] - 116:12,
116:15, 125:12, 125:17,
125:19

**tough** [1] - 112:8

**tougher** [1] - 8:4

**tow** [2] - 178:3, 178:6

**toward** [6] - 18:19,
77:7, 82:23, 100:6,
121:13, 166:9

**towards** [1] - 169:6

**towing** [1] - 109:5

**town** [4] - 124:6,
172:20, 172:22, 180:5

**toy** [1] - 43:23

**track** [10] - 12:22,
52:23, 147:3, 147:15,
147:19, 147:20, 148:11,
148:12, 149:13, 150:8

**traditional** [1] - 139:12

**traffic** [5] - 21:1, 21:4,

31:12, 32:23, 167:23

**traffickers** [1] - 123:6

**tragic** [2] - 29:9, 29:23

**trainer** [2] - 81:4, 152:5

**Trainer** [1] - 82:6

**training** [13] - 81:15,
86:11, 107:14, 127:7,
133:16, 146:5, 147:5,
148:12, 148:16, 149:2,
149:4, 150:8, 151:21

**transaction** [2] -
107:17, 127:9

**transactions** [9] - 87:3,
107:10, 117:7, 117:18,
117:25, 118:7, 119:4,
119:16, 120:23

**transcribed** [1] - 188:8

**transcript** [4] - 60:5,
113:23, 117:12, 188:8

**transcripts** [3] - 60:8,
78:1, 78:9

**transition** [1] - 140:5

**transitioning** [1] - 30:9

**transported** [1] -
108:11

**trash** [11] - 106:22,
107:3, 118:10, 118:12,
119:5, 119:6, 119:9,
120:24, 121:3, 133:11

**traveling** [1] - 125:9

**travels** [2] - 112:19,
112:20

**tray** [7] - 127:13,
127:14, 127:24, 136:11,
136:21, 137:1

**treat** [1] - 142:20

**treated** [1] - 72:10

**trial** [23] - 2:15, 11:8,
13:10, 44:23, 45:5, 52:4,
55:13, 56:2, 56:23,
139:6, 151:2, 155:20,
156:21, 156:23, 162:12,
163:19, 164:3, 164:4,
164:10, 184:19, 186:6,
186:9, 186:10

**trials** [1] - 55:12

**tried** [5] - 12:14, 25:10,
30:8, 57:18, 136:7

**tries** [1] - 56:2

**tripped** [1] - 74:13

**trouble** [1] - 7:12

**truck** [1] - 133:11

**true** [6] - 8:19, 29:20,
42:7, 68:16, 73:3, 159:19

**truly** [3] - 37:12, 54:9

**trunk** [10] - 102:16,
104:9, 104:16, 108:20,
114:4, 114:14, 116:10,
118:23, 119:2, 178:5

**trust** [2] - 6:7, 154:14

**trusted** [1] - 18:4

**truth** [14] - 14:2, 20:4,
32:19, 40:9, 40:18,
40:19, 41:1, 54:9, 54:11,
54:13, 54:17, 54:22,
54:24

**truthful** [3] - 54:4, 54:5,
55:5

**try** [20] - 2:13, 21:15,
35:3, 42:17, 42:21, 43:2,
50:13, 77:17, 85:23,
98:23, 99:1, 102:19,
103:2, 114:2, 117:15,
117:16, 122:17, 156:16,
184:17

**trying** [18] - 4:15, 25:15,
43:3, 43:25, 44:1, 44:3,
65:9, 71:22, 85:21,
112:3, 126:17, 127:1,
127:3, 127:9, 127:10,
133:18, 134:2, 184:20

**Tuesday** [7] - 160:8,
160:9, 162:10, 163:7,
179:5, 179:13, 179:16

**tuned** [1] - 43:9

**turn** [4] - 5:8, 55:3,
94:7, 95:2

**turned** [12] - 76:14,
89:5, 92:8, 92:9, 92:10,
93:19, 134:23, 134:25,
136:2, 136:8, 176:7,
186:13

**Two** [6] - 3:17, 25:10,
32:5, 49:25, 135:16,
165:3

**two** [68] - 3:19, 8:23,
12:5, 13:15, 26:10,
30:22, 32:3, 32:5, 45:12,
51:23, 54:12, 75:21,
84:7, 85:6, 86:14, 87:20,
88:16, 88:18, 88:21,
89:3, 89:8, 89:11, 89:15,
89:18, 90:19, 91:13,
91:15, 91:23, 92:14,
92:16, 95:20, 95:23,
96:8, 96:10, 98:12,
106:12, 106:14, 106:15,
107:11, 107:22, 113:6,
117:15, 117:19, 138:16,
138:17, 141:5, 142:13,
142:14, 143:13, 146:11,
155:20, 156:15, 156:20,
159:20, 161:12, 161:13,
162:9, 165:19, 168:17,
169:5, 169:10, 170:18,
180:15, 182:1

**two-thirds** [1] - 89:18

**type** [9] - 35:7, 74:2,
77:4, 94:14, 94:17,
95:16, 102:17, 132:11,

178:7
**typed** [1] - 161:5
**types** [1] - 20:11
**typically** [3] - 40:21, 45:16, 94:17

## U

**U.S** [6] - 1:24, 12:3, 12:4, 27:1, 48:4, 183:6
**ultimately** [11] - 47:7, 53:21, 54:16, 58:4, 103:15, 103:18, 104:1, 106:1, 106:4, 114:25
**Ultimately** [1] - 103:18
**Um-hum** [1] - 150:24
**unacceptably** [1] - 58:13
**unanimity** [2] - 65:12, 71:23
**unclear** [1] - 52:4
**under** [23] - 7:17, 9:11, 45:17, 51:22, 54:19, 60:10, 73:24, 92:21, 93:9, 93:18, 95:8, 106:22, 107:22, 108:10, 110:19, 117:17, 127:17, 128:5, 130:2, 131:20, 136:21, 170:19, 171:19
**underlying** [1] - 41:13
**undermine** [1] - 79:5
**underneath** [7] - 119:4, 119:5, 119:9, 120:24, 121:2, 121:3, 136:17
**Understood** [1] - 145:11
**undertaking** [1] - 59:3
**unethical** [1] - 42:23
**unfair** [7] - 27:8, 58:13, 58:16, 58:17, 156:18, 160:1, 161:20
**unfairly** [1] - 72:11
**unfairness** [2] - 58:21, 59:16
**unfortunately** [1] - 3:9
**Unfortunately** [1] - 3:14
**unified** [1] - 61:15
**Uniform** [1] - 24:14
**uniform** [4] - 60:18, 85:18, 102:7, 112:7
**uniformed** [1] - 101:1
**uniforms** [1] - 123:2
**Unit** [12] - 83:8, 84:3, 101:10, 101:14, 122:5, 122:10, 122:11, 122:20, 123:4, 167:3, 167:9, 171:20
**unit** [5] - 36:24, 48:9, 84:25, 107:19, 167:10

**UNITED** [2] - 1:1, 1:4
**United** [13] - 40:4, 42:1, 45:6, 45:8, 45:11, 56:16, 82:19, 100:1, 121:9, 166:5, 183:10
**unknown** [1] - 47:22
**unless** [2] - 5:14, 157:24
**unlike** [2] - 9:24, 40:22
**unmarked** [7] - 84:25, 85:16, 102:8, 102:20, 122:23, 126:18, 132:5
**Unmarked** [1] - 85:17
**unquote** [2] - 48:2, 79:3
**unrelated** [2] - 66:23
**unusual** [4] - 132:7, 169:13, 175:24, 176:1
**up** [86] - 2:18, 3:5, 5:14, 7:2, 11:12, 16:14, 16:15, 16:18, 17:8, 17:10, 18:20, 19:6, 19:8, 25:19, 27:19, 29:22, 31:4, 31:9, 32:20, 39:5, 39:14, 42:17, 56:21, 59:23, 60:6, 60:16, 69:19, 70:15, 71:9, 74:13, 76:15, 78:18, 82:6, 85:21, 85:23, 86:19, 89:9, 89:16, 90:24, 91:21, 92:3, 92:5, 92:8, 92:10, 92:12, 92:18, 93:8, 93:20, 97:2, 102:17, 104:9, 117:1, 124:12, 125:9, 126:6, 127:11, 127:14, 127:24, 131:6, 133:8, 134:13, 135:10, 135:23, 136:1, 136:22, 137:9, 145:18, 147:2, 147:10, 153:4, 153:6, 157:11, 157:22, 165:18, 166:9, 167:22, 168:9, 168:16, 173:21, 177:21, 181:15, 182:24, 185:4, 186:13
**upset** [2] - 17:11, 42:7
**upsetting** [2] - 41:15, 42:5
**US** [4] - 108:9, 116:19, 128:19, 129:2
**USA** [2] - 55:4, 188:4
**users** [4] - 87:22, 89:1, 91:16, 98:12
**uses** [1] - 11:15
**utilized** [2] - 47:17, 169:22

## V

**valuable** [2] - 42:8,

55:16
**value** [2] - 24:19
**van** [1] - 133:7
**vantage** [1] - 134:16
**variety** [2] - 21:20, 143:25
**various** [10] - 26:24, 37:11, 38:3, 41:16, 44:14, 44:15, 61:5, 101:2, 115:12, 146:6
**vehicle** [40] - 92:24, 93:2, 102:8, 102:15, 104:6, 104:9, 105:4, 108:5, 109:8, 122:23, 126:6, 126:18, 126:19, 126:21, 126:22, 128:4, 128:6, 129:5, 129:6, 129:9, 132:11, 167:12, 167:24, 168:4, 168:5, 168:12, 168:13, 168:19, 169:7, 169:9, 169:10, 170:17, 170:18, 177:16, 178:3, 178:7, 178:13
**vehicles** [2] - 168:8, 169:6
**verbatim** [1] - 23:25
**verdict** [6] - 27:21, 40:25, 41:3, 43:12, 43:13
**verify** [1] - 177:17
**version** [1] - 19:18
**versions** [1] - 19:20
**vest** [5] - 93:6, 131:12, 131:20, 131:21, 132:2
**via** [1] - 107:19
**vials** [7] - 127:12, 128:13, 129:25, 130:3, 130:14, 135:11, 136:11
**video** [1] - 49:25
**videotape** [2] - 73:13, 73:14
**view** [15] - 43:8, 55:10, 56:16, 58:12, 61:15, 90:3, 91:6, 91:7, 105:8, 105:23, 124:21, 136:11, 137:4, 155:17, 186:11
**Village** [1] - 173:11
**violence** [3] - 10:15, 10:24
**violent** [2] - 122:18, 123:5
**Violent** [1] - 166:18
**virtually** [3] - 40:22, 46:24, 58:8
**virus** [1] - 20:18
**voice** [7] - 3:5, 31:15, 33:4, 33:8, 49:21, 124:12, 145:18
**voices** [2] - 22:25, 25:18
**voir** [9] - 5:10, 10:4,

82:14, 139:4, 145:8, 145:19, 154:17, 155:14, 156:22
**VOLUME** [1] - 1:10

## W

**Wait** [9] - 63:13, 73:5, 73:7
**wait** [2] - 73:7, 181:23
**waiting** [2] - 159:10, 179:22
**waive** [2] - 24:11, 24:16
**walk** [2] - 132:3, 168:18
**walked** [5] - 92:12, 105:3, 105:8, 167:24, 169:5
**walking** [8] - 102:23, 126:13, 132:2, 168:2, 168:13, 169:5, 169:6, 185:24
**Walter** [2] - 31:25, 32:1
**wants** [7] - 9:8, 14:4, 25:16, 49:10, 72:17, 156:14, 161:17
**warm** [1] - 154:13
**watch** [3] - 16:15, 87:2, 106:16
**watching** [1] - 107:7
**water** [1] - 21:24
**WAYNE** [1] - 1:7
**Wayne** [18] - 31:14, 33:22, 33:24, 34:2, 98:20, 106:10, 106:20, 111:5, 111:22, 115:21, 115:22, 116:5, 123:9, 125:25, 129:18, 129:21, 130:25, 131:2
**ways** [3] - 27:8, 27:9, 77:3
**wealth** [1] - 43:10
**weapon** [1] - 127:10
**wear** [3] - 39:15, 131:18, 185:23
**wearing** [4] - 52:1, 88:12, 131:10, 131:16
**web** [1] - 4:25
**wedged** [1] - 169:12
**Wednesday** [6] - 1:11, 156:24, 179:6, 179:16, 182:7, 182:8
**week** [19] - 38:17, 79:25, 80:1, 148:23, 149:25, 150:1, 150:25, 158:13, 158:20, 158:21, 159:8, 159:18, 160:1, 179:4, 179:6, 179:9, 179:14, 182:5
**weekend** [7] - 159:22,

160:14, 162:6, 179:8, 179:9, 180:4
**weeks** [12] - 4:6, 8:16, 28:25, 36:17, 39:5, 152:17, 158:18, 159:5, 159:20, 160:2, 162:12, 181:20
**weight** [2] - 26:23, 115:10
**welcome** [2] - 119:20, 138:1
**West** [2] - 1:24, 101:22
**west** [5] - 89:24, 97:2, 112:16, 112:19, 173:13
**westbound** [5] - 87:13, 87:18, 89:6, 89:17, 90:2
**Western** [1] - 173:9
**whatsoever** [6] - 52:17, 78:19, 151:6, 156:8, 163:17, 163:23
**Whereof** [1] - 188:10
**White** [1] - 92:4
**white** [18] - 87:20, 87:21, 88:11, 89:23, 90:5, 94:3, 96:8, 98:8, 98:9, 125:25, 126:11, 127:13, 128:13, 128:15, 134:18, 135:7, 171:4
**whole** [10] - 21:20, 38:18, 54:11, 66:13, 76:22, 90:24, 97:10, 114:22, 184:15, 185:23
**wholly** [1] - 159:2
**wife** [5] - 2:4, 19:1, 151:16, 152:2, 163:22
**William** [7] - 35:5, 35:8, 35:11, 53:2, 53:3, 53:4
**Willie** [20] - 6:25, 7:11, 7:18, 7:22, 8:12, 8:22, 12:19, 13:1, 18:21, 18:23, 19:5, 19:7, 19:23, 30:11, 32:24, 98:15, 139:18, 140:4, 144:10, 188:4
**WILLIE** [1] - 1:6
**willing** [3] - 152:6, 152:7, 184:14
**win** [1] - 21:24
**window** [2] - 134:17, 168:15
**windshield** [2] - 168:15, 168:25
**wing** [1] - 7:17
**wire** [1] - 39:14
**Wire** [1] - 16:15
**wise** [1] - 135:16
**wish** [5] - 5:14, 5:16, 6:14, 26:1, 72:13
**wishes** [2] - 5:15, 6:22
**withdraw** [1] - 24:3

**withdrawn** [1] - 24:6
**witness** [45] - 6:2, 53:5, 53:15, 54:21, 55:1, 57:3, 65:16, 67:2, 68:8, 80:25, 81:14, 82:13, 82:18, 95:10, 99:25, 103:24, 109:10, 111:9, 111:21, 121:8, 123:16, 125:4, 138:2, 138:3, 138:15, 139:2, 139:13, 142:20, 142:22, 144:22, 145:24, 154:6, 157:4, 157:8, 157:10, 161:4, 162:14, 163:5, 166:4, 171:5, 171:10, 173:21, 180:8, 181:17, 185:24
**Witness** [1] - 188:10
**WITNESS** [22] - 82:21, 82:22, 82:25, 100:3, 100:4, 100:8, 103:22, 106:9, 119:20, 121:11, 121:12, 121:15, 125:22, 138:1, 166:7, 166:8, 166:11, 173:16, 187:4, 187:7, 187:10, 187:13
**witness'** [4] - 55:13, 73:14, 156:23, 161:3
**witnesses** [20] - 6:1, 17:20, 22:24, 53:10, 53:11, 53:20, 53:23, 54:1, 54:10, 55:2, 55:13, 59:24, 65:20, 79:18, 82:12, 139:15, 160:12, 160:19, 161:13, 183:24
**woman** [2] - 32:9, 51:20
**wonderful** [2] - 41:23, 43:21
**word** [10] - 20:19, 25:12, 28:8, 31:14, 33:22, 40:25, 46:9, 46:25, 53:8, 60:8
**words** [7] - 11:9, 44:5, 44:6, 50:9, 56:3, 152:3, 158:18
**works** [4] - 17:12, 54:9, 54:16, 149:10
**worldwide** [1] - 12:4
**worried** [3] - 33:16, 75:16, 139:5
**worry** [1] - 81:21
**Wow** [3] - 149:14, 149:16
**write** [1] - 14:13
**written** [2] - 46:23, 171:21
**wrote** [4] - 22:16, 96:9, 180:18, 180:23
**Wyche** [21] - 15:5, 15:13, 15:14, 16:9, 16:13, 18:2, 18:22, 19:7,

19:9, 19:17, 28:10, 29:12, 29:17, 29:18, 29:19, 29:20, 30:12, 31:18, 34:7, 38:23
**Wyche's** [1] - 16:11

## X

**XXXVI** [1] - 1:10

## Y

**yard** [1] - 86:20
**yards** [1] - 89:12
**year** [17] - 4:1, 7:12, 14:12, 14:13, 36:8, 37:1, 38:17, 60:11, 83:10, 83:23, 132:9, 132:14, 140:11, 162:2, 162:19, 166:25
**years** [40] - 7:5, 8:14, 8:23, 25:21, 25:22, 29:14, 29:15, 52:24, 59:21, 60:1, 60:9, 60:12, 67:6, 72:1, 78:22, 80:23, 84:6, 84:7, 84:20, 88:1, 97:1, 98:4, 101:1, 101:2, 101:3, 111:7, 113:15, 117:20, 117:24, 118:4, 122:2, 124:24, 142:15, 146:14, 162:25, 175:9, 175:14, 175:16, 178:6
**yellow** [2] - 91:17, 91:18
**yesterday** [15] - 2:11, 6:8, 6:17, 6:21, 10:20, 11:24, 13:12, 27:2, 27:4, 28:2, 34:9, 43:20, 46:17, 46:22, 181:2
**young** [2] - 51:20, 150:9
**youngest** [1] - 5:11
**yourself** [7] - 65:18, 68:23, 93:11, 102:20, 112:14, 121:2, 163:13
**yourselves** [8] - 19:4, 49:3, 49:14, 49:20, 50:24, 52:11, 179:22
**Youth** [1] - 142:4

## Z

**Zack** [2] - 84:24, 87:10
**Zajac** [3] - 1:23, 188:3, 188:15
**zealously** [1] - 40:17
**Ziploc** [6] - 110:6, 115:2, 115:3, 115:8, 115:17, 135:20

**Ziplocs** [1] - 115:19