1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION


UNITED STATES OF AMERICA

     v.                        CRIMINAL CASE NO.
                                    AMD-04-029

WILLIE MITCHELL,
SHELTON HARRIS,
SHELLY WAYNE MARTIN,
SHAWN GARDNER,

    Defendants
_____/

VOLUME V OF XXXVII
Monday, September 22, 2008
Baltimore, Maryland


Before:  Honorable Andre M. Davis, Judge
          And a Jury

Appearances:
     On Behalf of the Government:
      Robert Harding, Esquire
      Michael Hanlon, Esquire
     On Behalf of Defendant Mitchell:
      Laura Kelsey Rhodes, Esquire
      Michael E. Lawlor, Esquire
     On Behalf of Defendant Harris:
      Gerard P. Martin, Esquire
      Paul Flannery, Esquire
     On Behalf of Defendant Martin:
      Thomas L. Crowe, Esquire
      James G. Pyne, Esquire
     On Behalf of Defendant Gardner:
      Adam H. Kurland, Esquire
      Barry Coburn, Esquire

Reported by:
Mary M. Zajac, RPR
Room 5515, U.S. Courthouse
101 West Lombard Street
Baltimore, Maryland 21201

2

1                    (Proceedings at 10:10 a.m.)

2                    THE COURT:  We're ready to proceed?

3                    MR. HANLON:  Yes, Your Honor.

4                    THE COURT:  Does the easel have to sit there, Mr.

5          Hanlon?

6                    MR. HANLON:  No, Your Honor.  It's actually for a later

7          witness.  I can move it out.

8                    THE COURT:  Thanks.

9                    MR. HANLON:  I think, Your Honor, Ms. Arrington was

10         trying to anticipate.

11                   THE COURT:  Thank you.  All right.  We'll have the

12         jury.  Who is the next witness?

13                   MR. HANLON:  Your Honor, would be Mr. Travis Golder.

14                   THE COURT:  All right.  You can bring him in.

15                   (Jury enters the courtroom.)

16                   THE COURT:  Please be seated, ladies and gentlemen.

17         Good morning.

18                   Good morning, ladies and gentlemen.  I apologize for

19         the delay.  It appears some wayward gremlin got into our evidence

20         presentation system over the weekend.  So our technology people

21         were working on it.  I understand it's been repaired.

22                   Thank you for your patience.  We trust you had a

23         pleasant weekend.

24                   The government's next witness?

25                   MR. HANLON:  Your Honor, the United States calls Travis

1   Golder, who's on his way out.

2            THE COURT:  All right.

3            THE CLERK:  Raise your right hand, please.

4             TRAVIS GOLDER, GOVERNMENT'S WITNESS, SWORN

5            THE WITNESS:  Yes, ma'am.

6            THE CLERK:  Be seated.  Scoot up.  Speak directly

7   toward the mike.  State your name and spell it for the record,

8   please.

9            THE WITNESS:  Travis Golder.  T-R-A-V-I-S.

10  G-O-L-D-E-R.

11           THE COURT:  We need you a little closer to that mike,

12  Mr. Golder.  Thank you.

13           THE WITNESS:  Travis Golder.

14           THE COURT:  All right.

15           DIRECT EXAMINATION

16  BY MR. HANLON:

17  Q    Mr. Golder, good morning to you.  How old are you, sir?

18  A    28.

19  Q    And where were you born?

20  A    Where was --

21  Q    Where were you born?

22  A    Baltimore.

23  Q    Did you glow up in the Baltimore area?

24  A    Yes.

25  Q    How far did you go in school, sir?

4

1    A    Eleventh grade.

2    Q    And what school was that?  What high school?

3    A    Northwestern.

4    Q    Now, around about just approximately, I'm just asking by way

5    of background, when did you get out of school?  When did you

6    leave the eleventh grade?

7    A    What year or?

8    Q    What year?

9    A    I think it was '97.

10   Q    1997?

11   A    Yeah.

12   Q    Mr. Golder, at some point you were charged with a federal

13   crime relating to drug trafficking, is that correct?

14   A    Yes.

15   Q    And did you end up signing a plea agreement with the United

16   States Attorney's Office, with the government, and also with the

17   State's Attorney's Office in Baltimore City, to actually enter

18   into a plea of guilty in state court, to a state charge related

19   to your drug trafficking?

20   A    Yes.

21   Q    I'm going to show you, sir, a copy of your plea agreement.

22   I'm going to put it up.  And hopefully it will come up on the

23   screen in front of you there.  Do you see that, sir?  This is a

24   letter dated September the 28th of 2004.  It's been marked as

25   Government's Exhibit P-10.  And it's a letter to an individual

1    named J. David Ash.  Was that your attorney at the time, Mr.

2    Golder?

3    A    Yes, sir.

4    Q    And it references a case, United States versus Travis

5    Golder.  That was the name of your federal charge, is that right?

6    A    Yes.

7    Q    Now, as I understand it, and correct me if I'm wrong, Mr.

8    Golder, you were originally charged with a federal offense and

9    then you entered into a plea to enter a plea of guilty in state

10   court, in the Circuit Court for Baltimore City, Maryland, is that

11   right?

12   A    Yes.

13   Q    And the charge to which you pled guilty -- Your Honor, the

14   little control screen seems to have gone missing -- was

15   distribution, conspiracy to distribute cocaine and heroin, is

16   that right?

17   A    Yes.

18   Q    And this is Page Eight of your agreement.  You actually went

19   over this agreement with your attorney.  And you also signed your

20   name to the agreement, agreed to be bound by it, is that right,

21   Mr. Golder?

22   A    Yes.

23   Q    Now, part of this agreement included pleading guilty and

24   also cooperating, providing information to the state government

25   and to the federal government, is that right, Mr. Golder?

1    A    Yes.

2    Q    And you received some benefits as a result of that agreement

3    to provide information.  Is that right, Mr. Golder?

4    A    Yes.

5    Q    Those benefits included having your case moved over into

6    state court.  Is that correct?

7    A    Yes.

8    Q    And it also included, you're hoping that when you get

9    sentenced in state court, that you'll get a more lenient sentence

10   as a result of testifying or cooperating.  Is that fair to say?

11   A    Yes.

12   Q    Mr. Golder, have any promises been made to you by the U.S.

13   attorneys or by the State's Attorney's Office about what kind of

14   sentence you will get or what kind of reduction you will get?

15   A    No.

16   Q    Do you have an understanding of what could happen to you if

17   you were to provide information that was not truthful or that was

18   intended to get someone in trouble for something they hadn't

19   done, what could happen to you if you did something like that?

20   A    I guess my, the contract, whatever, would be, whatever I

21   signed will, it wouldn't work, it wouldn't work with me.

22   Q    Would it be void?

23   A    Yes, it would.

24   Q    Could you be charged for perjury and any other crimes you

25   may have committed?

1    A    Yes.

2    Q    Now, let me ask you briefly, Mr. Golder, about some of the

3    circumstances that led to your plea agreement in this case.  You

4    were arrested on this particular charge and you were charged with

5    a drug trafficking offense as a result of some activities you had

6    with an individual named Howard and Raeshio Rice, is that

7    correct?

8    A    Yes.

9    Q    Who are Howard and Raeshio Rice, just briefly?

10   A    They were some friends of mine.

11   Q    And these are people that you were involved in drug

12   trafficking with?

13   A    Yes.

14   Q    For about how long a period of time were you involved in

15   drug trafficking with Howard and Raeshio Rice?

16   A    Eight years.

17   Q    I'm sorry, sir?

18   A    Eight years.

19   Q    Were there other people involved besides you and Raeshio

20   Rice and Howard Rice?

21   A    Yes.

22   Q    Fair to say it was a group of people?

23   A    Yes.

24   Q    In those days you went by a nickname, is that correct?

25   A    Yes.

Case 1:04-cr-00029-RDB    Document 675    Filed 06/08/09    Page 8 of 239

1    Q    What was your nickname in those days, the eight years that

2    you worked with the Rice brothers?

3    A    Worm.

4    Q    And about what was the time frame that you were engaged in

5    drug activity with the Rice brothers?  Your plea is in 2004.

6    About what was the time frame that this eight years took place?

7    A    '92, '93.  Somewhere in that area.

8    Q    If you could, keep your voice --

9    A    '92, '93.  Something like that.

10   Q    So '92, '93, it began and then went on for eight years after

11   that, is that correct?

12   A    Yes.

13   Q    That's a yes?

14   A    Yes.

15   Q    And what was your role?  What did you do as part of your

16   activities with the Rice brothers?

17   A    My role was, I mean, we all hung together, we all did, we

18   hung together, saw the same people.  My role was --

19   Q    Did you ever sell drugs as part of your activity?

20   A    Yes, I did.

21   Q    Did you ever carry drugs as part of your activity?

22   A    Yes, I did.

23   Q    Did you ever package drugs?

24   A    Yes, I have.

25   Q    Did you sell drugs on the street or did you give drugs to

Case 1:04-cr-00029-RDB    Document 675    Filed 06/08/09    Page 9 of 239

1    other people to sell on the street?

2    A    Other people.

3    Q    Now, let me ask you about a particular event that took place

4    during that eight year period.  I'm directing your attention to

5    February of 2002.  Were you still spending time with the Rice

6    brothers at that time?

7    A    Yes.

8    Q    You remember going to a party at a night club called

9    Hammerjacks one night in February of '02?

10   A    Yes.

11   Q    Does February the 18th of 2002 sound correct, sir?

12   A    Yes.

13   Q    Do you remember what the purpose of this party was?  What

14   was it that was being celebrated?

15   A    Kevin Lyles's birthday party.

16   Q    I'm sorry?

17   A    Kevin Lyles birthday party.

18   Q    And who is Kevin Lyles?

19   A    Somebody that's in the music industry.

20   Q    At that time, did you or the Rice brothers have any, that

21   you knew of, have any interests in the music business?  Was there

22   any music activity going on?

23   A    It was something, it was something trying to go around with

24   it.

25   Q    Did it ever take off?

1   A    No.

2   Q    So you went to this party for Kevin Lyles.  Who did you go

3   with?

4   A    Me, Eric Clash, Raeshio Rice, Howard Rice, and probably ten

5   other people.

6   Q    And again, if you could keep your voice up just a little

7   bit, Mr. Golder, I'm sorry.  You mentioned the name "Eric Clash."

8   Was he another person who ran with the organization?

9   A    Yes.

10  Q    And did he have a nickname in those days?

11  A    Yes.

12  Q    What was his nickname?

13  A    White Boy.

14  Q    So you arrived at the party.  And for a while, was it a good

15  party?  Did you have a good time?

16  A    It was pretty cool, the hour or two I was there.

17  Q    That was going to be my next question.  About an hour or two

18  things were all right?

19  A    First hour everything was okay.

20  Q    At some point, Mr. Golder, did something happen at the

21  Hammerjacks party that was unexpected, that was not as much fun?

22  A    Yeah.  People started getting, fighting, and things like

23  that.

24  Q    Do you remember seeing, do you know, did you see who

25  initially got into the fight?

1    A    No.  It was just a big crowd of people fighting.

2    Q    Lot of people involved?

3    A    A lot of people involved.

4    Q    Did you personally find yourself in a struggle with anyone?

5    A    No.  I was just trying to figure out what was going on and

6    pushing people out of the way.

7    Q    Let me ask you about a couple of the people that you had

8    gone there with.  Was Raeshio Rice, that you could tell, in a

9    struggle with anyone?

10   A    Yes.

11   Q    Who was he struggling with?

12   A    He was struggling with a couple guys.

13   Q    Do you remember what these couple of guys looked like?

14   A    No, not at the time.  It was the big, a bunch of people just

15   fighting.

16   Q    Do you remember at the time having a recollection of who

17   they were?  Did you know who these guys were?

18   A    Not at that time.

19   Q    How about White Boy, Eric Clash?  Did you see him in a

20   struggle or interacting or fighting with anybody?

21   A    I saw him push people out the way, trying to get to whoever

22   was fighting.  It wasn't that many people who was fighting us.

23   It was like 15, probably 15 people with us and probably a couple

24   people with whoever they was fighting.

25   Q    And my next question is, do you have any specific

1    recollection of any particular person that Eric Clash was

2    fighting with?

3    A    No.

4    Q    Taking a look at the defendants in court today.  Do you have

5    a recollection of whether any of them were at the Hammerjacks

6    fight, involved with any of the people you just mentioned, if you

7    know?

8    A    I mean, after we heard about who, who was --

9    Q    Not what you heard.  But just for now, do you remember

10   seeing anybody there?  That's just my question.  We'll get to

11   whether things were heard in a few minutes.

12   A    Yes.

13   Q    You remember seeing someone?

14   A    Not, I haven't, I didn't see him fighting but I saw him

15   there, yeah.

16   Q    Okay.  Who did you see at the club?

17   A    Well, we called him Bo.  That's what we called him.

18   Q    Was this a person that you knew of as Bo at the time?

19   A    I really didn't know.  I heard of him.

20   Q    Do you see Bo in court today?

21   A    Yes.

22   Q    And could you please identify and tell me where he's sitting

23   relative to me and what he's wearing?

24   A    It's been a long time ago.  Bo, right there.

25   Q    How many people away from me is Bo?

1   A    One.

2   Q    Your Honor, for the record, identifying the defendant, Mr.

3   Mitchell.

4            THE COURT:  So noted.

5   Q    You didn't specifically see Bo fighting anyone, is that your

6   testimony?

7   A    No.

8   Q    But you saw him at the club?

9   A    Yes.

10  Q    Now, when this fight started happening, what action did you

11  take, Mr. Golder?  Did you try to get away?  Did you try to get

12  involved in the fight?

13  A    We tried to figure out what was going on and who was

14  involved that was with us.

15  Q    And did you take note of anybody in particular that was

16  involved from your group?

17  A    Yes.

18  Q    Who was involved?

19  A    Raeshio Rice, Hollywood, Eric Clash, and a couple other

20  guys.

21  Q    Hollywood is a new name.  Did Hollywood have another name?

22  A    Something like, something Alexander or something.

23  Q    And once you figured out who from your group was involved,

24  what did you do next?

25  A    We tried to figure out, like, what was going on, who was

1    involved.  And people was just fighting until, you know, I guess,

2    the security come, everything, and broke it up.

3    Q    So at some point things get broken up a little bit?

4    A    Yeah.  Things get broken up.  Mace and stuff like that.  And

5    it was basically everything, everybody went outside.

6    Q    Did you get hurt or injured in any way yourself?

7    A    No.

8    Q    Do you know if any of your associates, Raeshio Rice or Eric

9    Clash, if they got hurt?

10    A    Raeshio Rice, Eric Clash, and Hollywood.

11    Q    And how did they get injured?  How did Raeshio Rice get

12    injured?

13    A    They got stabbed.

14    Q    All three of them got stabbed?

15    A    Yes.

16    Q    At some point, were all of you able to get out of the club?

17    A    Yes.

18    Q    Did you go together or separately out of the club?

19    A    Separately.

20    Q    Do you have any knowledge, Mr. Golder, about whether any of

21    the three people you mentioned, Raeshio Rice, Eric Clash, or

22    Hollywood went to the hospital that evening?

23    A    Yes, they had.

24    Q    All of them?

25    A    Yes.

1    Q    Did you go with them or did you just see them taken?

2    A    I went there.

3    Q    And did they get treated?

4    A    Yes, they did.

5    Q    Now, later on -- well, strike that.  Were they released from

6    the hospital ultimately?

7    A    Yes.

8    Q    How long were they in the hospital, do you know?

9    A    A few hours.  Maybe one of them stayed overnight.  I think

10   one of them stayed overnight.

11   Q    Later on, was there any discussion within the group, among

12   you, Raeshio Rice, Eric Clash, Hollywood, Howard Rice, was there

13   any discussion about whether to do anything in response to what

14   had happened at Hammerjacks?

15   A    Yes.

16   Q    Who was involved in those discussions?

17            MS. RHODES:  Objection, Your Honor.

18            THE COURT:  Overruled.  You may answer.

19   A    Me, Raeshio Rice, Howard Rice, Hollywood, a few other guys.

20   Q    Did any of the people that you just mentioned express a

21   desire or intent to do something in response to what had happened

22   at Hammerjacks?

23   A    Yes.

24            MS. RHODES:  Objection, Your Honor.

25            THE COURT:  Overruled.

1          MS. RHODES:  May we have a continuing objection?

2          THE COURT:  Yes.

3     BY MR. HANLON:

4     Q     Who expressed -- that was a yes, sir?

5     A     Yes.

6     Q     Who expressed that intention?

7     A     It was basically all of us.

8     Q     And what was, what was said?  What was the desire among all

9     the people that you mentioned about what to do in response to

10    Hammerjacks?

11    A     Trying to find out exactly who this guy was and where he

12    located.

13    Q     Now, within that group was there any discussion about who

14    the guy was or who was responsible for what had happened?  Were

15    there any names put out?

16    A     A couple people.  I mean, they said the guy, they know him

17    from somewhere but they really didn't.  I mean, it was dark so, I

18    mean, this guy was fighting and this guy was fighting, so.

19    Q     Do you remember any of the names that were used during these

20    conversations?

21    A     No.  Because some of the guys that really knew who it was

22    wasn't there.  They was scattered all around the city at the

23    point.

24    Q     So there was some different names mentioned?

25    A     There was a lot of different names mentioned.

1    Q    Did the name 'Bo' come up during at any point in these

2    discussions?

3    A    The next day, yes.

4    Q    And who was involved in the discussions concerning Bo?

5    A    Me, Howard Rice, Raeshio Rice, Hollywood, Eric Clash.

6    Q    And who talked about Bo specifically?  All of them?

7    A    Raeshio Rice, basically.

8    Q    What did Raeshio Rice, during these conversations the next

9    day, say about Bo?

10   A    He said that he knew who he was and the young guy that was

11   with him.

12   Q    And Raeshio Rice knew Bo from where?  I mean, how did Bo

13   come up?  What was the relevance of Bo?

14   A    Say how did his name come up?

15   Q    Yes.

16   A    I guess somebody that knew Bo that was in the club must have

17   talked to Raeshio Rice the next day.

18   Q    Now, when Raeshio Rice talked about Bo, did Raeshio or any

19   of the other people in the group have any ideas about whether to

20   do anything to Bo or with Bo?

21   A    You said, did they -- say it again, please.

22   Q    Well, it was not a great question so let me try to make it

23   simpler.  During this conversation, did Raeshio or any of your

24   other friends talk about doing anything with Bo or about Bo?

25   A    With him or to him?

1    Q    To him.

2    A    Yes.

3    Q    And what was the idea?  What was discussed?

4    A    Get something done to him.

5    Q    Now, is that the word that was used, "get something done to

6    Bo?"

7    A    Something got to be done about the situation.

8    Q    Now, who said that?

9    A    Basically everybody.

10   Q    And what did you understand getting something done about the

11   situation to mean?  When you heard that, what did you understand

12   it to mean?

13   A    Getting him hit.

14   Q    I'm sorry?

15   A    Getting him hit.

16   Q    And that would mean what?

17   A    Getting him murdered.

18   Q    And did Raeshio talk about doing that?

19   A    Not personally his self.

20   Q    Who did talk about getting Bo, having something done about

21   him or having --

22   A    Everybody.  Everybody.  Everybody.

23   Q    But not the word "murder", I gather?

24   A    No, it wasn't.

25   Q    Do you know if any decision was reached about doing

1    anything, about getting something done or putting out a hit on

2    Bo?

3    A    Yeah.  We talked about it over a couple days.

4    Q    And were there people who thought it wasn't such a great

5    idea?

6    A    It wasn't a great idea.

7    Q    Why wasn't it a great idea?

8    A    We was being watched 24 hours a day by the feds, I mean, by

9    DEA, so it wasn't a great idea.

10   Q    Wouldn't be a great idea to do something like to somebody

11   and everybody would know you'd done it?

12   A    Everybody plus the DEA.  Yeah.

13   Q    As far as you know, was Bo -- let me ask you a dumb

14   question.  As far as you know, was Bo ever hit?

15   A    No.

16   Q    Do you know one way or the other about whether a contract

17   was ever put out on him?

18   A    It wasn't.

19   Q    It was not?

20   A    No.

21   Q    If it had been, your sense is that it would have been

22   carried out; is that fair to say?

23   A    If it had been, I would have knew first-hand.  I would have

24   knew.

25   Q    Just a moment, please, Your Honor.

Case 1:04-cr-00029-RDB   Document 675   Filed 06/08/09   Page 20 of 239

1          THE COURT:  Yes.

2     Q    Thank you, sir.  Nothing further, Your Honor.

3          MS. RHODES:  May I begin, Your Honor?

4          THE COURT:  Yes, please.

5          CROSS EXAMINATION

6     BY MS. RHODES:

7     Q    Mr. Golder, I'm going to ask you a few questions.  Okay?  I

8     represent Bo, Willie Mitchell.  And I just want to ask you some

9     questions about your role in the organization, the Rice brothers

10    organization.  You said it was about six years you worked with

11    them, right?

12    A    I worked with them, I say, about seven, eight years.

13    Q    Seven or eight years.  Okay.  And you did a variety of work

14    for them, right?

15    A    Yes.

16    Q    Different jobs?

17    A    We did a variety of work together, yes.

18    Q    Okay.  And the Rice brothers themselves, they were kind of

19    in charge?

20    A    Actually, it wasn't really -- no.

21    Q    Who was in charge?

22    A    Really wasn't nobody in charge.  Everybody worked together.

23    Q    They what?

24    A    Everybody worked together.

25    Q    Okay.  And so you kind of ran it like a democracy?

CROSS EXAMINATION OF GOLDER BY RHODES                    21

1    A    No.  We just, a bunch of friends just hanging together,

2    getting a couple dollars.

3    Q    Okay.  And your role was to sometimes package drugs?

4    A    Was my role to package drugs?

5    Q    Sometimes to package drugs?

6    A    No.  My role was to deliver drugs, but not for them, for me.

7    Q    Okay.  Well, a minute ago you told Mr. Hanlon you packaged

8    them.

9    A    Packaged in -- he asked me did I package them or did I

10   deliver them.

11   Q    He said, did you sell them?  You said yes, right?

12   A    Yes.

13   Q    He asked you, did you carry them?  And you said yes, right?

14   A    Yes.

15   Q    And he said, did you package them?  And you said yes, right?

16   A    Okay.  Yes.

17   Q    Okay.  So other people had different roles in the

18   organization, right?

19   A    Yes.

20   Q    Okay.  Did you ever, did you ever have to be an enforcer for

21   somebody?

22   A    Enforcer?  What you mean by that, ma'am?

23   Q    Well, what do you think "enforcer" means in the drug trade?

24   A    I'm asking you what, what do it mean.

25   Q    Well, I get to ask the questions, though.

1    A    Now ask me again, please.

2    Q    Okay.  What's an enforcer in the drug trade?

3    A    Enforcer is, I guess, the guy that's above everyone else

4    that is enforcing them regarding them to do things.

5    Q    Okay.  And that person is usually basically the one who

6    carries out stuff?  Like if there needs to be a hit, they do

7    that?

8    A    Yes.

9    Q    Okay.  Did you ever have that role?

10   A    No.

11   Q    Who had that role in the Rice organization?

12   A    It was, it was a lot of people that had that role.

13   Q    So the Rice organization had several enforcers?

14   A    Yes.

15   Q    Okay.  Who were some of them?

16   A    A guy named Eric.

17   Q    Eric Hall?

18   A    Yes.

19   Q    Who else?

20   A    It's a couple other guys.

21   Q    You remember any names or nicknames?

22   A    No.

23   Q    Well, you worked with them for a while.  Who else -- can you

24   just describe them if you don't know their names?

25   A    Describe them as what, how they look?

1    Q    Yeah.

2    A    Dark-skin guy, bald head, short.

3    Q    Short?

4    A    Yes.

5    Q    What kind of weight?

6    A    About 170.

7    Q    Okay.  And what was his name?

8    A    He had a nickname, by James.

9    Q    By James?  Okay.  Who else?

10   A    It was a couple guys.

11   Q    Okay.  How many, just in the time you worked with them, how

12   many different guys did enforcing for the organization, for the

13   Rice organization?

14   A    About, about two, but they have, they had other guys they

15   dealt with personally.

16   Q    Two, but what?

17   A    About two, but they have other guys that they dealt with

18   personally.

19   Q    Okay.  So two kind of regularly, but some others for special

20   occasions?

21   A    Yes.

22   Q    Okay.  And then apart from the enforcers, who else did you,

23   who else did you work with just kind of on your level?

24   A    I worked with me, Howard Rice, Eric Clash.

25   Q    Anthony Leonard?

1    A    Yeah, Anthony Leonard.

2    Q    What about the others?  Campbell, Jackson, Murphy?  Work

3    with them?

4    A    Yeah.  But they wasn't, they wasn't, they was outside the

5    bubble.

6    Q    They were outside the what?

7    A    Couple of them you just named, they wasn't, they was outside

8    of us.

9    Q    They weren't in the inner circle?

10   A    No, they wasn't in the inner circle.

11   Q    Okay.  When you got charged back in '04, you first got

12   charged in state court, right?

13   A    Yes.

14   Q    Okay.  And do you remember when you got charged, who else

15   got charged with you?

16   A    Yes.

17   Q    Who else got charged with you?

18   A    Me, my brother --

19   Q    What's your brother's name?

20   A    James Jones.

21   Q    Who else?

22   A    Me, James Jones, Stevenson.

23   Q    Shannon Gemison?

24   A    Yeah, Shannon Gemison.  But Shannon Gemison, he wasn't

25   locked up.  I guess they was looking for him, whatever.  But he

1    didn't --

2    Q    Okay.  Robert Hughes?

3    A    Yes.

4    Q    Donte Green?

5    A    Yes.

6    Q    Alan Foster?

7    A    Yes.

8    Q    Anthony Felder?

9    A    Yes.

10   Q    Sataio, El-Unto-El?

11   A    Yes.

12   Q    Keenan Dorsey?

13   A    Yes.

14   Q    Lawrence Chambers?

15   A    Yes.

16   Q    And then you said James Jones, right?

17   A    Yes.

18   Q    And Keith Jones?

19   A    Yes.  I mean, Keith Jones I didn't know but he had, after a

20   while I found out there was somebody named Keith Jones that was

21   involved, yes.

22   Q    Okay.  Kevin McNeill?  Christopher Monroe?

23   A    There's a lot of guys that was charged with that I didn't

24   really, I didn't even know, yeah.

25   Q    Okay.  So a pretty big, a pretty big group of guys that were

1    arrested?

2    A    That was a state case, yes.

3    Q    That was a state case.  And the prosecutor and you talked

4    about being in state court as opposed to being in federal court

5    when you were on direct examination, right?

6    A    Yes.

7    Q    Okay.  And in fact, that was the first thing he mentioned

8    when he said you got a deal and here's what the benefits were,

9    right?

10   A    Yes.

11   Q    Okay.  So what does that mean to you?  What's the difference

12   between state court and federal court?  Who cares?

13   A    But that case you talking about, my case got dropped down to

14   a level, when the federal case got dropped down to the state

15   court, they told us it's two separate cases.

16   Q    Okay.

17   A    They're not the same case.

18   Q    Okay.  So that was other people, that was a different drug

19   conspiracy?

20   A    I served my time for that case.

21   Q    Okay.  So back to this one.  What's the difference between

22   state court and federal court, as far as you're concerned?

23   A    Different time, different, different things.  More time

24   and --

25   Q    More time where?

CROSS EXAMINATION OF GOLDER BY RHODES                      27

1    A     More time in federal court than you get, I mean, depends on

2    what you get arrested for, yeah.

3    Q     Okay.  But generally, more time in the federal system?

4    A     Yes.

5    Q     More serious cases?

6    A     More serious cases.  They take it more seriously than the

7    state.

8    Q     Okay.  And no parole?

9    A     I really didn't know about, that was my first, my first

10   offense so I really didn't know about jail.

11   Q     Okay.  And what about -- now, you had an attorney, right?

12   Mr. Ash?

13   A     Yes.

14   Q     And what did he tell you about the kind of time you would be

15   facing in the federal system on these charges?

16            MR. HANLON:  Objection, Your Honor.

17            THE COURT:  Sustained.

18            MS. RHODES:  Did you have an understanding, after

19   talking to your attorney, about, about time that you'd be facing?

20            MR. HANLON:  Objection, Your Honor, as to the attorney.

21            THE COURT:  Why don't you rephrase the question, Ms.

22   Rhodes?  It's proper cross.  Just rephrase the question.

23   BY MS. RHODES:

24   Q     Mr. Golder, you had, you knew you'd be facing a lot of time,

25   serious time in federal court on this case, right?

1    A    Yes.

2    Q    Okay.  And that's why it was particularly appealing to you

3    to go into state court?

4    A    To go into state court?

5    Q    Yeah.  To have it in state court instead.

6    A    It was, it was just something I wanted to do.

7    Q    It was something that what?

8    A    That I wanted to do.

9    Q    Okay.  Well, you wanted to do it because it got you, you

10   know, half the sentence or something, right?

11   A    Yes.

12   Q    Okay.  So your focus at that time was on yourself?

13   A    Yes.

14   Q    Okay.  And doing the best you could do for yourself?

15   A    I was doing the best I could do for my family.

16   Q    And for your family, right.  And you were, you had to stay

17   focused on that, right?

18   A    Not really.  I wasn't super-focused on it but it was

19   something that I thought about.

20   Q    Well, 10 versus 20 years, you would be pretty focused on the

21   10, wouldn't you?

22   A    Yes.

23   Q    Okay.  And so your concern was not the other defendants or

24   anybody else at that time, right?

25   A    Yes.

1    Q    Okay.  Now you, you referred to these people as your

2    associates, the people, the business people you worked with,

3    right?  Okay.  And you said that you weren't somebody selling on

4    the street.  You were actually giving packages to people and they

5    would sell them, is that right?

6    A    Yes.

7    Q    Okay.  So you weren't kind of, you weren't at the bottom of

8    this organization, were you?

9    A    No.  I wasn't at the bottom.

10   Q    Okay.  In fact, there were people that you would give orders

11   to in terms of what they were going to be doing, selling and

12   stuff like that, right?

13   A    I had my own group of people outside the bubble, yes.

14   Q    You had your own people?

15   A    Outside.  Yes.

16   Q    So under you you had some people who sold for you?

17   A    Yes.

18   Q    Basically?  Okay.  And the way things operated, I mean, this

19   organization went on for a long time, didn't it, successfully?

20   A    Yes.

21   Q    And it was, it had some, some rules, right, about how things

22   operated?

23   A    It depends on what go down.  There were, certain situations

24   different.

25   Q    Okay.  And it was operating mostly in Park Heights, right?

1    A    Yes.

2    Q    And you guys didn't have a lot of serious competition there,

3    right?

4    A    Yeah, it was competition there.

5    Q    Was it serious competition for the Rice organization,

6    though, or just --

7    A    It was some people out there that was doing real, was doing

8    better.

9    Q    And so what did you do when there were people around who

10    were doing better?

11    A    Try to do better.

12    Q    Uh-huh.  And what else?

13    A    Try to do better.

14    Q    Well, to do better, what would the enforcers do?

15    A    The enforcers wouldn't do anything.  They ain't got nothing

16    to do with that.  If we see somebody else doing good, we going to

17    try to go do better.

18    Q    Okay.  Well, how would you do that?  What was your business

19    plan?

20    A    Make more money.

21    Q    But if they're on the corner and you want to be on that

22    corner and they've got the business, what do you do?

23    A    We don't do anything.  It wasn't like that.  We see somebody

24    out there making more money than us, we go out there, make a

25    deal, get something better and do, and try to do better.  It

1    wasn't no enforcer to do anything to the guys that was out there.

2    Q    As part of your plea agreement, you had to forfeit, you

3    agreed to forfeit any assets you had gotten from the drug

4    business, right?

5    A    Yes.

6    Q    Okay.  And that means that, you know, whatever, if you had a

7    car, if you had things you'd bought, jewelry, anything, you had

8    to give it back?  You had to give it to the government, right?

9    A    Yes.

10   Q    Okay.  And people in the Rice organization had some pretty

11   nice stuff, didn't they?

12   A    Yes.

13   Q    Like cars?

14   A    Yes.

15   Q    Jewelry?  Some real estate, too?  Condominium?

16   A    A couple things.

17   Q    Okay.  When you were -- and that was something that you all

18   wanted to protect, right?  Protect your business.

19   A    Protect it from what?

20   Q    From competition.

21   A    No.  We weren't protecting it because it wasn't nobody going

22   to come and take it, nothing from us.

23   Q    Okay.  Why wasn't anybody going to come and take anything

24   from you?

25   A    Why would they?

1    Q    So at this party at Hammerjacks, you said that you heard

2    later something about somebody had said that Bo had done

3    something, right?

4    A    Yes.

5    Q    Okay.  Now, you didn't -- did you know him before?

6    A    I heard about him.

7    Q    You'd heard of him.  Was Raeshio mad at him later because he

8    saw him as a rival drug dealer?

9    A    No.

10   Q    No.  It was because he thought he had been attacked by him,

11   right?

12   A    Yes.  He thought he had been attacked by him so that's why,

13   he wasn't actually mad about him, mad at him.  He wasn't mad at

14   the guy.  He was just, like this guy done something to me, I

15   can't believe this because, you know.

16   Q    So he needed to put him in his place?

17   A    Yes.

18   Q    Okay.  Can you read that on your screen?  I know it's not

19   really big.

20   A    Howard Rice, Raeshio --

21        THE COURT:  She means read it to yourself.

22   Q    Okay.  I just want to make sure this is, that you understand

23   that this is, that you agree that this is what you pled guilty

24   to, these facts.  That your agreement with them, with the

25   government was that you acknowledged having distributed, either

1    purchasing or redistributing 150 kilos of cocaine and at least 30

2    kilos of heroin?

3    A    Yes.

4    Q    In the course of the conspiracy, right?

5    A    Yes.

6    Q    Okay.  And that those quantities, whether directly by you or

7    other people in the conspiracy, were foreseeable to you and they

8    were in the scope of your agreement, they were part of your

9    agreement with them?

10   A    I had to plead guilty.  Yes.  I pleaded guilty to this so it

11   would be dropped down to state court.

12   Q    Okay.  And by admitting all that, they let you go into state

13   court?

14   A    I guess that's right.

15   Q    Okay.  And what they, and they also said the deal is, both

16   the prosecutors in state court and the prosecutors here, they're

17   going to agree not to recommend any more than ten years for you,

18   right?

19   A    My lawyer dealt with that.  So I'm not quite --

20   Q    Okay.  Well, you signed.  You see at the bottom where you

21   sign the agreement on that page?  It's on the screen.

22   A    Yes.

23   Q    Okay.  And so you had gone over it with your lawyer, right?

24   A    Yeah.  My lawyer, my lawyer talked to me but I was, he

25   talked to me about certain things.

1    Q    Okay.  Well, let me just show you.  This is where you signed

2    on the ending page, too.  Okay?  You see your signature there?

3    A    Yes.

4    Q    Right there?  Okay.  So if your lawyer, I mean, he would

5    have gone over the agreement with you, right?

6    A    He talked to me about it and said --

7    Q    Right.

8    A    -- certain things I should do, certain things I should not

9    do.

10   Q    Okay.  Do you remember going over this part with your

11   lawyer, that part that's in orange there, where it says at the

12   time of sentencing, the offices, that means prosecutors federal

13   and state, will recommend to the court that the defendant be

14   sentenced to no more than ten years' imprisment?

15   A    Yes, ma'am.

16   Q    Okay.  That must have been a pretty important part of the

17   deal, right?

18   A    Yes, ma'am.

19   Q    And it says, the exact recommendation of the offices will be

20   determined at the conclusion of the defendant's cooperation.

21   Right?

22   A    Yes.

23   Q    Okay.  So you can get less?

24   A    I mean --

25   Q    Right?

1    A    Yes.

2    Q    Okay.  I mean, they can recommend whatever.  They can

3    recommend probation.  They can recommend five years.  They can

4    recommend ten years.  Right?

5    A    I guess.  I mean --

6    Q    And it depends on your cooperation; it's based on your

7    cooperation, right?

8    A    Yes.

9    Q    Okay.  So depending on how you do, I mean, you haven't been

10   sentenced yet, or have you?

11   A    No.

12   Q    And that's -- do you know when that's going to happen?

13   A    No.  I'm not really concerned about it.

14   Q    But sometime after this case, right?

15   A    Yes.  I mean, it was before this case but I was working so

16   hard and I told them put it off.

17   Q    Oh, okay.  All right.  So, but it's coming up?

18   A    I mean, I haven't talked to my lawyer.

19   Q    Okay.  And you're facing anywhere from zero to ten years,

20   right?

21   A    Yes.

22   Q    Okay.  And it doesn't concern you at all?

23   A    At this moment?  I mean, not, not any more.

24   Q    Well, what you need to do in testifying here is say what

25   you've told the government you'll say, right?

1    A    Say it again, please.

2    Q    To, to perform your side of the deal, you've got to say what

3    you've told the government you're going to say?

4    A    I'm here just to tell the truth, what happened that night.

5    Q    And you've already told the government what you are going to

6    say today, right?

7    A    They asked me what happened and I told them what happened

8    that night.

9    Q    Right.  Well, I mean, you've met with them several times,

10   right?

11   A    Probably once, twice.

12   Q    Well, and there was another case, the Rice brothers, too,

13   right?  You met with the prosecutors then?

14   A    That ain't have nothing to do with this case right here,

15   either.

16   Q    No.  But I'm asking you, you met with federal prosecutors

17   for that case, too, right?

18   A    Yes.

19   Q    Okay.  So all told, it's been more than two times you met

20   with them?

21   A    Different prosecutors.

22   Q    Okay.  Different prosecutors.  So basically -- excuse me,

23   Your Honor.  Another thing about the Hammerjacks incident.  Do

24   you recall hearing why Bo was at the Hammerjacks that day?

25   A    Do I recall why he was there?

1    Q    Yeah.

2    A    No.  It was a party there, so --

3    Q    Right.  I mean, it was a party for Kevin Lyles, right?  It

4    was his birthday.

5    A    Yes.  It was Kevin Lyles's birthday party, so half the city

6    was there.

7    Q    Okay.  And do you know, and you know who Kevin Lyles is,

8    what his business is?

9    A    Yeah.

10   Q    Okay.  Which is, he's the president of Def Jam, at the time

11   he was the president of Def Jam records, right?

12   A    Yes.

13   Q    Okay.  And people generally have an interest in trying to

14   get close to him if they're in the rap business, right?

15   A    Yes.

16   Q    Okay.  And in fact, Bo was there that night to try and get

17   some of his music to Kevin Lyles, isn't that right?

18   A    I don't know.  You just told me that.

19   Q    You hadn't heard that?

20   A    No.

21   Q    Okay.  So to sum up, what you're doing in terms of your

22   cooperation is focusing on yourself and your family?

23   A    Yes.

24   Q    Okay.  And you're doing that to protect yourself, right?

25   A    Yes.

1    Q    And you're not focusing on anybody else, right?

2    A    No.  Why should I be focused on anybody else if I done this

3    and were found guilty?

4    Q    Okay.  So there's no need to focus on anybody else, right?

5    A    Focus on anybody else as far as like?

6    Q    Well, as far as what you're doing.  What you're doing.

7    You're just focusing on yourself.

8    A    I'm doing this for me.  I'm doing this for me, yes.

9    Q    Okay.  Okay.  Thank you.  Nothing further, Your Honor.

10              CROSS EXAMINATION

11   BY MR. MARTIN:

12   Q    Mr. Golder, my name is Gerry Martin.  I represent Mr.

13   Shelton Harris.  You don't know Mr. Harris, do you?

14   A    Mr. Who?

15   Q    Shelton Harris.

16   A    No.

17   Q    You've never seen him, have you?

18   A    You say Shelton Harris?  I don't know no Shelton Harris.

19   Q    And you didn't see a Shelton Harris at Hammerjacks that

20   night, did you?

21   A    I don't know no Shelton Harris.

22   Q    Mr. Golder, I just have one other question.  You talked

23   about, in your plea agreement there's a provision that says you

24   have to forfeit whatever you may have gained from this illegal

25   drug operation that you were part of.  Do you recall that?

1    A    Yes.

2    Q    Did you forfeit anything?

3    A    I didn't have anything to forfeit.

4    Q    Okay.  Others in the organization did, though, isn't that

5    correct?

6    A    They took a couple things.  They didn't take too much.

7    Q    And one last question.  What kind of car did Mr. Raeshio

8    Rice drive?

9    A    What kind of car did he drive?

10   Q    Yes.

11   A    He had a couple cars.  Which one you talking about?

12   Q    Did he have a blue Bentley?

13   A    Yes.

14   Q    Okay.  Thank you.

15        MR. PYNE:  No questions.

16        MR. COBURN:  No questions, Your Honor.

17        REDIRECT EXAMINATION

18   BY MR. HANLON:

19   Q    Just a couple questions Your Honor.  Mr. Golder, you, in

20   response to one of Ms. Rhodes's questions, the first defense

21   counsel that asked you, that cross examined you, you were asked

22   about the Rice organization.  I want to make sure I heard you

23   right.  You described it as a bunch of friends who just hung

24   together, getting a couple of dollars?

25   A    Yeah.

1   Q    During the time that you were involved with the Rice

2   brothers and some of the other people, were there times, Mr.

3   Golder, that you associated or did business with other people

4   outside the organization?

5   A    Of course.

6   Q    Is that pretty typical?

7   A    Everybody did their own thing.  I mean, we all run together.

8   We all got money together.  But we also had other things we did

9   outside of ourselves.

10  Q    Hanging together but then also sometimes doing your own

11  things; is that fair?

12  A    Yes.  Yes.

13          MR. HANLON:  Thank you, Your Honor.

14          THE COURT:  Thank you, Mr. Golder.

15          MS. RHODES:  Your Honor, if I could just briefly

16  inquire.

17          THE COURT:  Go ahead.

18          RECROSS EXAMINATION

19  BY MS. RHODES:

20  Q    Thank you.  Mr. Golder, when, where did you get your drugs?

21  A    When?

22  Q    Where?

23  A    Where did I get them from?

24  Q    Yeah.

25  A    Got them from a guy in California.

1    Q    Okay.  And did you ever go to California?

2    A    A couple times.

3    Q    And where did Raeshio get his drugs?

4    A    Got them from, got them in California.

5    Q    Okay.  Thanks.  Nothing further, Your Honor.

6         THE COURT:  Thank you, Mr. Golder.  You're excused.

7    Next witness.

8         MR. HARDING:  Yes, Your Honor.  The United States calls

9    Sergeant Russell Robar.

10        SGT. RUSSELL ROBAR, GOVERNMENT'S WITNESS, SWORN

11        THE WITNESS:  Yes.

12        THE CLERK:  Be seated.  Scoot up and speak directly

13   toward the mike.  State your name and spell it for the record,

14   please.

15        THE WITNESS:  Sergeant Russell Robar.  Last name is

16   spelled R-O-B-A-R.

17        DIRECT EXAMINATION

18   BY MR. HARDING:

19   Q    Good morning, Sergeant Robar.

20   A    Good morning.

21   Q    Can you tell us how you're employed, sir?

22   A    I'm employed as a sergeant with the Baltimore City Police

23   Department.

24   Q    And what's your assignment right now?

25   A    I'm assigned to the Northern District, Administrative

1   Sergeant.

2   Q    And how long have you been with the Baltimore City Police

3   Department?

4   A    Since July 22nd, 1998.

5   Q    Okay.  Let me call your attention to February of 2002.  Do

6   you recall what your assignment was at that time?

7   A    At the time I was a detective assigned to the Central

8   District, District Detective Unit.

9   Q    Okay.  So now you're in the Northern District but back then

10  you were in the Central District, being an investigator, a

11  detective, is that right?

12  A    Yes, sir.

13  Q    Okay.  Let me call your attention to the evening of February

14  18th, 2002, February 17th leading into the 18th of 2002.  Do you

15  remember, did you respond to a crime scene that night?

16  A    Yes, I did, on February 18th, in the morning hours.

17  Q    I see.  Do you recall about what time it was that you

18  responded?

19  A    About three in the morning was the time I arrived.  I was

20  called at home.  I was called in.

21  Q    Were you woken up?

22  A    Yes.

23  Q    Okay.  And where did you go, exactly?

24  A    I went to Hammerjacks, located at 320 North Guilford Avenue.

25  Q    All right.  Can you describe for the ladies and gentlemen of

1    the jury where that is?  What part of town it's in?

2    A    It's just basically in the center of town.  Just north of

3    north Baltimore.  Three blocks north of Baltimore Street.

4    Q    Okay.  Does it run near I-83?

5    A    Parallel.  Yes.

6    Q    Okay.  Okay.  You said you arrived there about 3:00 in the

7    morning.  Let me show you some photographs.

8    A    Okay.

9    Q    Tell us what you did after you arrived, first of all.

10   A    I met with, I believe, Sergeant Rhoden, who actually was

11   working overtime security outside of the bar.  And he was

12   actually my sergeant as a detective, also.  But he was working

13   secondary.  He told me that, that four people had been injured

14   inside, had been stabbed.  And I took control of the scene.

15            I met with Rob Heath, who is also a detective assigned

16   with my unit.  And we went through the crime scene.

17   Q    Okay.  So you were being assigned this case to investigate,

18   is that right?

19   A    Yeah.  At the time.  Yes.

20   Q    Okay.  Let me show you H-2.  Can you identify what that is?

21   A    That's the outside of Hammerjacks.

22   Q    Did you go into the dance floor area?

23   A    I went through pretty much the whole building, both upstairs

24   and downstairs.

25   Q    Let me show you H-3.  Can you tell us what that depicts?

1    A    That's the upstairs bar area.

2    Q    Okay.  Do you know where the fight was that broke out before

3    you got there?

4    A    All the evidence led to it being upstairs.  Just across from

5    the bar.

6    Q    In this general area that's on the screen right now?

7    A    Yes.  I think it was more, I mean, back a little bit from

8    there.  Like straight across from the bar.

9    Q    Okay.  And were there crime scene people there processing

10   the scene when you were, when you arrived and during the time you

11   were there?

12   A    Yes, sir.  The Crime Lab was on the scene.

13   Q    And what are these little yellow tags with letters on them

14   on the floor?

15   A    It marks for the Crime Lab technician possible evidence.

16   Could be physical evidence, blood.  Any kind of weapon.  Any kind

17   of evidence.  Clothing, anything.

18   Q    Okay.  This one is H-4.  Is this the same scene from the

19   opposite direction?

20   A    Yes, it is.

21   Q    And this one is H-5.  Can you tell us what that is?

22   A    It's hard to see on the screen.

23   Q    Let me show you, show it to you directly, then.

24   A    Yes.  It's just a longer angle of the bar heading towards

25   the downstairs.

DIRECT EXAMINATION OF SERGEANT ROBAR                    45

1    Q    Heading toward the downstairs.  So is there the bar back

2    here?

3    A    Yes.

4    Q    And this, this is the area in front of the bar that we were

5    talking about earlier, is that right?

6    A    Yes, I believe it is.  This screen, like I said, is really

7    dark.

8    Q    Okay.  I'm sorry about that.

9    A    No.  It's okay.

10   Q    And you say, but you said something about the downstairs.

11   Is that over here in this --

12   A    If I remember the layout correctly, yes, just off, it would

13   be the left side of that photograph.  The bottom left.

14   Q    This one is H-6.  That's obviously right in front of the

15   bar, right?

16   A    Yes.  Just a close-up of the other.

17   Q    And H-7.

18   A    Just evidence, it's the same thing as those photos, just up

19   close of blood and debris.

20   Q    Okay.  Now I've got H-9.  Can you tell us what that depicts?

21   A    Yes.  As you come down the steps, I believe that's the exit

22   and the bathrooms.

23   Q    So this is down on the first floor?

24   A    Yes.

25   Q    Why are there crime scene exhibit tags here?

1    A    I don't have the Crime Lab sheet so I can't speculate on

2    that.  Possible blood.

3    Q    Let me show you the next one, H-8.  Can you see what is on

4    the floor in that picture?

5    A    Yes.  It's blood, what appears to be blood.

6    Q    Just one moment.  You said that this was downstairs on the

7    first floor by the exit door, is that right?

8    A    That's right.

9    Q    Is this the exit door right here?

10   A    Yes, it is.

11   Q    You said there was also a bathroom down here?

12   A    Yes.  It looks just to the left.

13   Q    Right here?

14   A    Yes.

15   Q    Okay.  Do you recall, did the blood trail into the bathroom

16   or do you remember?

17   A    I don't remember.

18   Q    Okay.  This one is the one I just asked you about, H-8.  And

19   we see the same tag down here.

20   A    That's just facing the opposite way.

21   Q    Yeah.  Same, same area from the opposite direction?

22   A    That's correct.

23   Q    And you said that you could make out blood along the floor

24   down here, is that right?

25   A    That's right.

1    Q    Okay.  Were any of the victims of these stabbings still

2    there when you got there?

3    A    No, they were not.

4    Q    Did you speak to a Police Officer Murphy?

5    A    Yes, I did.

6    Q    And where was he?

7    A    He was in the 500 block of North Guilford.

8    Q    Okay.  Let me show you what's been marked Government Exhibit

9    PH-1.  Did you go to this area, the 500 block of North Guilford?

10   A    Yes, I did.

11   Q    This is PH-1.  Can you tell us what this is, Sergeant Robar?

12   A    Yeah.  It's the parking lot in which he found Willie

13   Mitchell at, up underneath -- that's 83 right up above that.

14   Q    Okay.  How far is this from Hammerjacks?

15   A    Two blocks.

16   Q    Is it north or south or east or west of Hammerjacks?

17   A    It would be straight north of Hammerjacks.

18   Q    Okay.  All right.  So Willie Mitchell was found in that

19   parking lot.  Do you know what condition he was in when he was

20   found?

21   A    I know he had been beaten up, according to Officer Murphy.

22   Q    And was there an arrest made there at the scene when the

23   police arrived?

24   A    Yes.

25   Q    Who was arrested?

1    A    Kendrick Kelly.

2    Q    And what was he doing when he was arrested?

3    A    From the reports, he was beating up and kicking Willie

4    Mitchell.

5    Q    Okay.  Was there any physical evidence recovered right there

6    at the scene where Willie Mitchell was on the ground?

7    A    Yes, there was.

8    Q    What was that?

9    A    A knife.

10   Q    Okay.  Let me show you what's been marked Government Exhibit

11   H-1.  Can you tell us what this is?  Take it out of the envelope.

12   A    It was the knife that was found at the scene.

13   Q    Where at the scene?

14   A    According to the police report, underneath of Willie

15   Mitchell.

16   Q    Okay.  Can you, holding that knife in your hand, can you

17   demonstrate how it opens?

18   A    Yeah.  You just flick it open.

19   Q    Okay.  Fine.  Do you know, did Kendrick Kelly, when he was

20   arrested, make statements about why it was he was attacking Mr.

21   Mitchell?

22   A    Yes.

23          MS. RHODES:  Objection.  Objection.

24          THE COURT:  Was this an objection?

25          MS. RHODES:  Yes, Your Honor.

1          THE COURT:  All right.  The objection is overruled.

2     The answer is yes?

3               THE WITNESS:  Yes, sir.

4               THE COURT:  He did make a statement?

5               THE WITNESS:  Yes, sir.

6     BY MR. HARDING:

7     Q    Okay.  But you were not there at the time he made those

8     statements, is that correct?

9     A    That's correct.

10    Q    All right.  What was the event there that night at

11    Hammerjacks?

12    A    I believe it was a birthday party.

13    Q    For whom?

14    A    Mr. Kevin Lyles.

15    Q    And do you know who Kevin Lyles is?

16    A    He's an executive with Def Jam Records.

17    Q    Okay.  Was there a videotape made of some of the activity at

18    the birthday party?

19    A    Yes, there was.

20    Q    Did you view the videotape?

21    A    Yes.

22    Q    Could you see Kevin Lyles in the videotape?

23    A    Yes.

24    Q    Did he mention, actually mention some of the, one or more of

25    the victims?

1    A    You can hear in the audio of the tape briefly he mentioned a

2    fellow by the name of Hollywood, who was Darryl Alexander.

3    Q    Okay.  Could you see dancing in the videotape?

4    A    Yes.

5    Q    And music?

6    A    Yes.

7    Q    Was it live music or not?

8    A    DJ.

9    Q    Okay.  Did you that evening try to interview the victims of

10   the stabbings?

11   A    Yes.  That morning, yes.  Or into the morning, now.

12   Q    That's what I mean, morning.  Where did you interview them?

13   A    At the hospital.

14   Q    Okay.  Can you tell us whom you, first of all, whom you

15   attempted to interview?

16   A    Well, it was myself and Detective Heath.  Detective Heath

17   just spoke to Eric Clash, Darryl Alexander and Raeshio Rice at

18   Johns Hopkins Hospital.  All of them, all they would give us was

19   they didn't see what happened, they just know there was a fight,

20   they were injured.  They didn't really want to talk to us.

21   Q    Did Detective Heath actually know Mr. Alexander?

22   A    Yes.  He recognized him.

23   Q    Would Mr. Alexander even give his name to the police

24   officers that night?

25   A    No.

1    Q    Were you surprised by their uncooperativeness?

2              MS. RHODES:  Objection.

3              THE COURT:  Overruled.  You can answer.  Were you

4    surprised?

5              THE WITNESS:  Not once I learned who they were.

6              MR. HARDING:  Who did you learn they were?

7              MS. RHODES:  Objection, Your Honor.

8              THE COURT:  Overruled.  You may answer.

9              THE WITNESS:  Darryl Alexander had just gotten released

10   from prison, as I say, for narcotics, serious narcotics offenses.

11   BY MR. HARDING:

12   Q    So why weren't you surprised?

13             MS. RHODES:  Objection.

14             THE COURT:  Overruled.

15   A    He had no reason to cooperate with us.  We had just put him

16   in jail and Detective Heath was familiar with the case.

17   Q    Okay.  Did you attempt to get any -- did you also interview

18   a fourth victim?

19   A    Yes.

20   Q    Or attempt to interview a fourth victim?

21   A    Yes.

22   Q    Who was that?

23   A    Batson, Lionel Batson.

24   Q    And was he at Johns Hopkins Hospital, also?

25   A    No, he was at Mercy Hospital.

DIRECT EXAMINATION OF SERGEANT ROBAR    52

1    Q    And did he speak to you?

2    A    He gave a brief statement.

3    Q    Okay.  Did you attempt to obtain blood samples from any of

4    these four individuals?

5    A    We were given blood samples from the hospital nurses.  I

6    can't remember, I know Darryl Alexander was one of them and I

7    can't remember the second one.

8    Q    Okay.

9    A    They were just drawing blood right there.  So the nurse

10   said, Would you like these, and we took them.

11   Q    I see.  But you didn't get them for two of them, then, I

12   take it, is that correct?

13   A    Just two of them.  I can't remember who the second person

14   was.  If I saw my notes, I would be able to tell you.

15   Q    Well, I have here a -- do you have the notes in front of

16   you?

17   A    No.  No.  This is just briefs.

18   Q    Do you want to look at your report?

19   A    Yeah.  I'm looking for a submission report.  I don't see

20   that in here.  Eric Clash.

21   Q    Could you repeat that?

22   A    I had received blood samples from Eric Clash.

23   Q    As well as Darryl Alexander?

24   A    That's correct.

25   Q    All right.  Now, did you attempt to interview the three

1    victims, Clash, Alexander, and Raeshio Rice on a later occasion,

2    around February 28th, 2002?

3    A    Yes, we did.

4    Q    Where did you interview them then?

5    A    At their attorney's office.

6    Q    Okay.  This would be about ten days later, is that right?

7    A    That's exactly right.

8    Q    So they all had one attorney?

9    A    I believe so.  I'm not, she acted like she was representing

10   all of them.

11   Q    Okay.  Did they agree to be interviewed by you on that

12   occasion?

13   A    No.

14   Q    They provided no information?

15   A    They wouldn't provide information, no.

16   Q    Okay.  Did you attempt to show photo arrays to any of those

17   three on that occasion?

18   A    Yes.

19   Q    Who did you try to show photo arrays to?

20   A    Eric Clash, Darryl Alexander and Raeshio Rice.

21   Q    All three of them?

22   A    Yes.

23   Q    Did they agree to anybody identify in the photo arrays?

24   A    No.

25            THE COURT:  Tell the ladies and gentlemen what a photo

1    array is, please.

2              THE WITNESS:  A photo array basically is, generally

3    speaking, we put six individuals similarly, similar in appearance

4    together on a piece of paper, and it may or may not include the

5    suspect or an individual that we're wanting to identify.  We then

6    present that to an individual, letting them know it may or may

7    not be the person we're looking for in this case.

8              The person will look at that and tell us if they

9    recognize anybody in that picture and why they recognize them.

10   BY MR. HARDING:

11   Q    Okay.  Let me call your attention now to a couple of weeks

12   later around mid March, March 14th or thereabouts.  Did you

13   interview another eyewitness who had been present at Hammerjacks

14   that night?

15   A    I believe it was March 15th, yes.

16   Q    March 15th.

17   A    Yes.

18   Q    What was that person's name?

19   A    His name was Patrick Joseph.

20   Q    And what was his job?

21   A    He was actually a bar back that worked at Hammerjacks.

22   Q    And was he working there on the night of the, the early

23   morning hours of the 18th of February?

24   A    Yes, he was.

25   Q    Did you, were you able to interview him?

1    A    Yes.

2    Q    And were you able to show him photo arrays?

3    A    Yes.

4    Q    Can you recall whose photographs were in the photo arrays

5    that you showed?  I mean the people you regarded as targets.

6    A    The target, I believe, was Mr. Willie Mitchell and Mr. Donte

7    Sands.

8    Q    Okay.

9    A    Two different arrays.

10   Q    Was Patrick Joseph able to make any identifications?

11            MS. RHODES:  Objection, Your Honor.

12            MR. HARDING:  Just yes or no, Your Honor.

13            THE COURT:  You can answer yes or no.

14            THE WITNESS:  Yes, he was.

15   BY MR. HARDING:

16   Q    After that, did you obtain an arrest warrant?

17   A    Yes.

18   Q    For whom?

19   A    Mr. Willie Mitchell.

20   Q    No further questions, Your Honor.

21            CROSS EXAMINATION

22   BY MS. RHODES:

23   Q    Hi, Detective Robar.  I just have a few questions for you.

24   A    Sure.

25   Q    When you interviewed Mr. Joseph, he described what he saw

1    that night, right?

2    A    Yes.

3    Q    And he described kind of a bigger guy, about five-ten, with

4    a bar stool over his head, coming at somebody else smaller?

5    A    Yes, I believe so.

6    Q    Okay.  And is that, and then after that, he thought he saw

7    Mr. Mitchell doing something, is that right?

8    A    He didn't think it.  He knew.  He was an independent witness

9    and was able to say for sure that he saw what, first he saw was a

10   silver object being put into somebody and then he saw that it was

11   actually a knife.

12   Q    Okay.  And then, that was as the other guy had the bar stool

13   over, was coming at him with a bar stool, right?

14   A    I think the bar stool had already been thrown.

15   Q    Do you want to check your notes on that?

16   A    Sure.  I don't have my folder, case folder.

17   Q    While we're doing that, let me ask you a couple other

18   questions.

19   A    Sure.

20   Q    When you went to the scene of the parking lot, you got some

21   reports from the other officers who'd already been there?

22   A    That's correct.

23   Q    And Officer Murphy was one of those?

24   A    Yes, ma'am.

25   Q    And you recall his saying that when they first approached, a

1   bunch of people ran?

2   A    Yes.

3   Q    Okay.  And those people were around where Willie Mitchell

4   was on the ground, right?

5   A    That's correct.

6   Q    Okay.  And after they ran, then one guy was still there and

7   he was jumping on, he was leaning against a car, supporting

8   himself, and jumping on Willie Mitchell's head, is that right?

9   A    That's correct.

10   Q    And after that, he was then taken to Shock Trauma for

11   treatment?

12   A    Yes, ma'am.

13   Q    Okay.  Do you recall whether or not it was reported that he

14   was unconscious at the time?

15   A    In this report it says he was unconscious.

16   Q    Okay.  And do you want to go ahead and look for the other

17   item about what Mr. Joseph told you?

18   A    This isn't my original case folder, so -- this is just a

19   copy of it.

20   Q    Okay.

21       THE COURT:  Once again, ladies and gentlemen of the

22   jury, as you well know, Mr. Mitchell is not charged in this case

23   with any offense arising out of the events at Hammerjacks.  This

24   evidence is solely admitted for your consideration as it may bear

25   on your determination of whether Mr. Mitchell learned of the

1    intention or the belief of certain other persons and whether, as

2    a result of learning of that belief or intention of other

3    persons, he was motivated to take certain acts and whether he, in

4    fact, took certain acts.

5            You may proceed, Ms. Rhodes.

6    BY MS. RHODES:

7    Q    Thank you.  Let me ask it this way.  Was it your

8    understanding from Mr. Joseph that the person who had the bar

9    stool over his head and eventually threw it at someone was the

10   one who got stabbed?

11   A    Mr. Joseph said after two men began fighting, the individual

12   came up to the one guy and began punching him in the side.  After

13   watching for several more seconds, I realized he was, wasn't

14   punching him but that he was stab (sic) him several times.  The

15   blood on the first guy began to increase --

16   Q    Okay.  You told us that before, but I'm asking about the bar

17   stool part.

18   A    According to picking out Willie Mitchell, that's exactly

19   what he said.  I noticed he was just punching.

20   Q    Okay.  Let me see if this refreshes your recollection.  Is

21   that document familiar to you?

22   A    Yes, it is.

23   Q    Okay.  What is that from?

24   A    This is from a meeting that he had with the state's -- this

25   is not with me.  He had this with my, not my initial interview

1    with him when he picked out Willie Mitchell.  This is a pretrial

2    meeting with State's Attorney Carrie Bauer.

3    Q    And you were there as well, right?

4    A    Yes.

5    Q    Okay.  And in that interview, he said that the person was

6    coming, a big guy, about five-ten or so, was coming at somebody

7    else, who was the person who eventually started hitting or

8    stabbing the big guy.  Coming at him with a bar stool and that he

9    threw the bar stool, and that's when somebody else started to go

10   after him, right?

11   A    Let me read it.  Got to read that.

12   Q    Okay.

13   A    That's correct.

14   Q    All right.  And the other thing, besides, and part of what

15   you recovered was a broken bar stool, a broken bar stool from the

16   trash?

17   A    That's correct.

18   Q    Okay.  And also --

19   A    Crime.

20   Q    And also some broken champagne bottles?

21   A    Glass bottles, yes, ma'am.

22   Q    Thank you.  Nothing further.

23        MR. MARTIN:  No questions, Judge.

24        MR. CROWE:  No questions, Your Honor.

25        MR. COBURN:  No questions, Your Honor.

1          REDIRECT EXAMINATION

2     BY MR. HARDING:

3     Q    Sergeant Robar, Ms. Rhodes just asked you about some

4     statements that were relayed to you by Police Officer Murphy at

5     the scene of the beating of Willie Mitchell.  Could you tell us

6     what Kendrick Kelly told Murphy?

7               MS. RHODES:  Objection.

8               THE COURT:  Overruled.  You may answer.

9     A    He stated that the guy just BEAT, just stabbed his friends

10    inside the club.

11    Q    The guy, what guy?

12    A    Willie, well, the victim, who was later identified as Willie

13    Mitchell.

14    Q    Okay.  Thank you.  I have no further questions, Your Honor.

15              THE COURT:  Thank you, Sergeant.  You're excused.

16              THE WITNESS:  Thank you, Your Honor.

17              THE COURT:  Do you want to retrieve your book, Mr.

18    Harding?

19              MR. HARDING:  Yes.

20              THE COURT:  Next witness.

21              MR. HARDING:  Your Honor, the United States calls Jason

22    Elder.

23              THE COURT:  Jason?

24              MR. HARDING:  Elder.  E-L-D-E-R.

25              THE COURT:  All right.

1          MR. HARDING:  Your Honor, the witness wasn't in the

2     witness room and the agent went to get him.  Would now be a good

3     time for a mid-morning break?

4          THE COURT:  All right.  We'll take our morning recess

5     at this time, ladies and gentlemen of the jury.  Please leave

6     your note pads on your chairs.  Have no discussion about any of

7     the evidence you've heard so far about any matters discussed.

8     Please remain in the jury room.  We're in recess for 15 minutes.

9          Jury's excused.

10         (Jury exits the courtroom.)

11         THE COURT:  We're in recess for 15 minutes.

12         (Recess at 11:23 a.m.)

13         (Defendants present in courtroom.)

14         THE COURT:  Have the jury, please.

15         MR. LAWLOR:  Judge, can I just put something on the

16    record real quick?

17         THE COURT:  Yes.  Mr. Lawlor.

18         MR. LAWLOR:  This is pertaining to our continuing

19    objection regarding various hearsay, really.  Pertaining to the

20    Hammerjacks incident.  Obviously, the first point is that we

21    continue to maintain our objection to the various hearsay that

22    implicates Mr. Mitchell.

23         Second of all, Your Honor, we object to the Court

24    giving, without the request of the defense, a limiting

25    instruction.  I understand the Court's ruling so I won't belabor

62

1    that.  But I would appreciate, and I think Mr. Martin mentioned

2    this on Friday, if the Court would give us an opportunity, it

3    would be a limiting instruction on the behalf of the defense,

4    that the Court has given sua sponte.

5         Our position is we really don't want it in the first

6    place because we think it highlights what we don't want in in the

7    first place.  Secondly, if the Court insists, we would like to

8    participate in the language that the Court gives to the jury.

9         THE COURT:  Well, as I said on Thursday, I'm happy to

10   consider anything anybody wants to submit.

11        MR. LAWLOR:  Thank you, Your Honor.

12        MR. MARTIN:  Your Honor, while we're here, can I just

13   say one thing?

14        THE COURT:  Mr. Martin.

15        MR. MARTIN:  On October 1st, Your Honor, if we could

16   start at 10:00 instead of 9:30.  I have a 9:30 trial in front of

17   Judge Grimm that's going to take five minutes.

18        THE COURT:  I can't imagine a problem, Mr. Martin.  And

19   I'll put it in for 10:00.

20        MR. MARTIN:  And on October 6th, Your Honor, I have, my

21   first board meeting at the St. Ignatius Loyola Academy For Boys

22   and it starts at 4:00.  So could I be out of here at a quarter of

23   four that day?

24        THE COURT:  Absolutely.

25        MR. MARTIN:  Thank you.  I'll make those changes now.

1    If you'll just remind me.

2              MR. MARTIN:  I will, Your Honor.

3              THE COURT:  Ma'am, please, follow the marshal's

4    instructions.

5                   (Jury enters the courtroom.)

6              THE COURT:  Please be seated, ladies and gentlemen.

7    Good morning.  Next witness.

8              MR. HARDING:  Yes, Your Honor.  The United States calls

9    Jason Elder.

10              JASON ELDER, GOVERNMENT'S WITNESS, SWORN

11             THE WITNESS:  I do.

12             THE CLERK:  Please be seated.  Scoot up, speak directly

13   toward the mike.  State your name and spell it for the record,

14   please.

15             THE WITNESS:  Jason Elder.  J-A-S-O-N.  E-L-D-E-R.

16             DIRECT EXAMINATION

17   BY MR. HARDING:

18   Q    Good morning, Mr. Elder.

19   A    Good morning.

20   Q    Can you tell us, sir, how are you employed?

21   A    Currently I am a crime analyst with the Cincinnati Police

22   Department.

23   Q    Cincinnati, Ohio?

24   A    Yes.

25   Q    And how long have you been doing that?

1    A    Since the beginning of August.

2    Q    You say you're a crime analyst?

3    A    Yes.

4    Q    Maybe you should tell us what a crime analyst is.

5    A    A crime analyst is someone who analyzes statistical stats

6    for crime for police departments.  Basically, we, it is used for

7    strategic and tactical analysis purposes, basically telling the

8    powers-that-be where the problems are.

9    Q    Okay.  Can you tell us what you were doing back in 2002?

10   A    I was employed by the University of Maryland, stationed at

11   Baltimore Police Department as an intelligence analyst.

12   Q    I see.  So you were actually employed by the University of

13   Maryland but you were stationed at the Baltimore Police

14   Department?

15   A    Yes.  It was part of the HIDTA program.

16   Q    And how long did you spend doing that job?

17   A    Seven years.

18   Q    And what kind of work was that?

19   A    It was a mixture of crime analysis and intelligence

20   analysis.  I did case support for narcotics investigations and I

21   also supported the COMSTAT process.

22   Q    Okay.  And so then you, did you leave that job to take the

23   job you now have in Cincinnati?

24   A    I had a job with a contractor for four months in Dayton in

25   between.

1  Q    Oh, I see.  Similar kind of job, crime analysis?

2  A    Yes.

3  Q    Well, thank you for coming here all this way to testify

4  today, Mr. Elder.  How far did you get in school?

5  A    I got a Masters Degree.

6  Q    In what, from where?

7  A    Criminal justice, from the University of Cincinnati.

8  Q    And so did you get a BA degree before that?

9  A    Yes.

10  Q    Okay.  Back in 2002, when you were working for University of

11  Maryland stationed at the Baltimore City Police Department, were

12  you asked to assist in an investigation, a narcotics

13  investigation by a detective named Giganti who was doing a drug

14  investigation?

15  A    Yes.

16  Q    Okay.  Did that involve the installation and analysis of a

17  GPS device?

18  A    Yes.

19  Q    And what does that kind of device do?

20  A    It's a device that connects with a satellite to display the

21  latitude/longitude coordinates.

22  Q    Okay.  And was there such a device, a GPS device attached to

23  an automobile operated by a guy named Oliver McCaffity?

24  A    Yes.

25  Q    And was that the GPS device that you were asked to help the

1    detectives analyze?

2    A    Yes.

3    Q    Okay.  At what point in all this were you brought into the,

4    into the case?

5    A    I was brought in a couple of days after the GPS was placed

6    on the vehicle.

7    Q    And was it placed on the vehicle by the police rather than

8    by Mr. McCaffity?

9    A    By the police, yes.

10   Q    So it was done by a court order, is that correct?

11   A    Yes.

12   Q    Okay.  Now, what is it exactly that you did in assisting the

13   detectives with the GPS work?

14   A    On a daily basis, I took the coordinates that were displayed

15   from the device and used a computerized mapping software to

16   display where the vehicle had traveled.

17   Q    Okay.  Can you tell us, did the device cease to operate at

18   some point before the termination of your court order that

19   permitted you to install and operate the device?

20   A    Yes.  On the ninth day, Mr. McCaffity was murdered inside

21   the vehicle.

22   Q    Okay.  How long was the court order for?

23   A    Sixty days.

24   Q    Okay.  Let me show you, this is Government Exhibit 36.  Can

25   you tell us what that is, Mr. Elder?

1   A     This is the printout of the GPS coordinates.

2   Q     For what time period?

3   A     February 28th -- I guess it goes backwards.  I'm sorry.

4   Looks like it goes from February 27th to February 28th.

5   Q     Okay.  Did you prepare a map showing the position of Mr.

6   McCaffity's car as time passed on the 27th and 28th, using the

7   coordinates information in Government Exhibit MB-36 that you got

8   off the GPS device on McCaffity's car?

9   A     Yes.

10  Q     Okay.  Let me show you Government Exhibit MB-37.  Is this a

11  map, is this the map that you prepared showing the location of

12  the car at various points in time?

13  A     Yes.

14  Q     What I'd like, Mr. Elder, is if -- I can move this easel

15  over here.

16        Could I ask you to step down from the witness stand

17  and, speaking into this microphone as best you can -- actually,

18  take this off.  I'm going to ask you to run through the

19  information that's on that map.

20        Did you also prepare an eight and a half by 11 version

21  of the same map that I have here marked as Government Exhibit

22  MB-37A?

23  A     Yes.

24  Q     Okay.  And I'm going to put this on the screen right now.

25  But I already know it doesn't come through particularly well.  So

Case 1:04-cr-00029-RDB   Document 675   Filed 06/08/09   Page 68 of 239

1    it will be better if you can use the chart that you have in front

2    of you there.

3           Okay.  Now, using the map, Mr. Elder, can you show us

4    the movement of the car, beginning at the earliest time depicted

5    on the map.  Let me ask you, first of all, by way of

6    clarification.  Does the GPS device send out transmissions every

7    second or every minute or every hour or what?

8    A    It's approximately every 20 seconds, three times a minute.

9    Q    Three times a minute.  Okay.  Starting, then, at the

10   earliest part in time, point in time, can you tell us where Mr.

11   McCaffity's car started out around 2215 hours on February 27th?

12   A    Yes.  At 2214, the vehicle leaves Arundel Mills, travels up

13   295, and makes a stop at 2239, at the 2300 block of Eutaw Place.

14          The device will go to sleep after about nine or ten

15   minutes of no activity, to save on the battery.  So the device

16   went to sleep at 2248 and didn't wake up again until 2315, when

17   the vehicle started to move again.

18          The vehicle got on 83 north.

19   Q    If I could just interrupt one second.  2339, of course,

20   means 11:39 at night, is that correct?

21   A    Yes.

22   Q    Okay.  You have no idea what was going on during this time

23   period when the car was stopped in the 2300 block of Eutaw Place,

24   is that correct?

25   A    Yes.

1    Q    Okay.  Tell us what happened, then, when the car started

2    back up again around 2315 or 11:15 in the evening?

3    A    Okay.  The vehicle made its way on to 83 north and it got

4    off on West Coldspring Lane.  At the top left of the map here

5    shows a blow-up of a satellite imagery of where the vehicle

6    traveled next.  2321 it arrived in the neighborhood.  It takes,

7    the vehicle takes a right turn on to Pall Mall, takes another

8    right on to Edgecombe Circle South, and then proceeds to go

9    around the block.  Takes a left on to Finney Avenue, a left on to

10   Edgecombe Circle North.

11   Q    What time are we at when it turns left on Edgecombe Circle

12   North?

13   A    2322.

14   Q    Okay.  And then what?

15   A    Okay.  It takes another left at Pall Mall and then goes,

16   goes around the round-about 2324, and makes its way back on to

17   Edgecombe Circle South.  At the corner of Edgecombe Circle South

18   and Finney, the vehicle arrives there at 2324.  It spends about

19   five minutes there.  And from that position, within 20 seconds or

20   so, the vehicle ends up down the hill where it, it crashed into a

21   tree.  It arrived at the crash of the tree at 2329.  And

22   approximately ten minutes later the device turns off and goes to

23   sleep due to no movement.

24   Q    Okay.  And how, can you explain to the ladies and gentlemen

25   of the jury how you know that it took less than 20 seconds for

1    the car to get from the corner of Edgecombe Circle South and

2    Finney Avenue down to where it crashed into the tree?

3    A    Well, each one of these points on the map are, as I said,

4    it's about three times a minute.  So it's about every 20 seconds

5    it's giving coordinates.

6    Q    So there's no coordinate on this map in between here and

7    here, so you know it had to be less than 20 seconds, is that

8    right?

9    A    Just about, yes.

10   Q    And then what happened?  After it hit the tree and stopped

11   around 2329, what happened next?

12   A    There's no movement for ten minutes and then the device goes

13   to sleep at 2338.

14   Q    Okay.  All right.  Let me just ask you a couple of follow-up

15   questions, Mr. Elder.  You said that the car came off of I-83 on

16   to Coldspring Lane going westbound?

17   A    Yes.

18   Q    And then turned right on to Pall Mall?

19   A    Yes.

20   Q    Is that correct?  And then it basically went to the stop at

21   Finney and Edgecombe Circle South but it didn't stop there the

22   first time, is that correct?

23   A    No.

24   Q    It just kept right on going up here to Edgecombe Circle

25   North and basically went around the block, is that correct?

1    A    Yes.

2    Q    And then it came back down here and went around this rotary

3    and retraced the steps that it had just taken a couple minutes

4    earlier, until it came to a stop at 2324.  In other words, 24

5    minutes past 11:00 it stopped right here for about five minutes,

6    is that right?

7    A    Yes.

8    Q    And then the next thing you know, five minutes later, at

9    2329, it's down here.  And there are a number -- what do these

10   red line, these red dots mean, those spots?

11   A    That's coordinates that the device is spitting out.  Since

12   there's no movement, there's a bunch of them right on top of one

13   another.

14   Q    Okay.  And so it stops here.  And then the GPS device goes

15   to sleep after a little less than ten minutes, is that right?

16   A    Yes.

17   Q    Okay.  You can resume the witness stand.  And I'm going to,

18   I don't know whether I should leave this up or take it down.  I

19   guess I should leave it up in case defense counsel have any

20   questions for you.  No further questions, Your Honor.

21            CROSS EXAMINATION

22   BY MR. LAWLOR:

23   Q    Mr. Elder, good afternoon.  How are you?

24   A    Good.  Yourself?

25   Q    Where were you employed at the time you were doing this

CROSS EXAMINATION OF ELDER BY LAWLOR                72

1   analysis?

2   A    The University of Maryland.

3   Q    And you were on loan from the University to the Baltimore

4   City Police Department?

5   A    Yes.

6   Q    To assist them?

7   A    Yes.  It's part --

8   Q    I'm sorry.  Go ahead.

9   A    It's part of the HIDTA program.  High Intensive Drug

10  Trafficking Area.  It's a program out of the White House.

11  Q    So you were requested to analyze the data pursuant to a

12  court-ordered GPS unit that had been placed on the vehicle?

13  A    Yes.

14  Q    And you met with the detectives involved in this

15  investigation?

16  A    Yes.

17  Q    And for how long were you undertaking this task?

18  A    It was, well, it had to be about a week because I came on a

19  couple days after the device was put on and the ninth day is when

20  the homicide occurred.

21  Q    Okay.  But you were prepared to spend two months full-time

22  analyzing this data?

23  A    Yes.

24  Q    And you were drawing a salary at that time, I assume?

25  A    Yes.

1   Q    Okay.  So just for your time, this amounted to a fairly

2   substantial allocation of manpower and monetary obligation to

3   this one task?

4   A    Yes.

5   Q    Okay.  And in order to obtain the GPS on this vehicle, you

6   needed the authorization of some court?

7   A    Yes.

8   Q    Okay.  And therefore, it's safe to assume that Mr. McCaffity

9   was being investigated for his criminal activities?

10  A    Yes.

11  Q    Were you told what his criminal activities were?

12  A    No.  Not exactly.

13  Q    It was at a minimum for his involvement in the drug

14  underworld, correct?

15  A    Yes.

16  Q    Okay.  Do you know who the car was registered to?

17  A    No, I do not.

18  Q    Okay.  Was it Mr. McCaffity's car?

19  A    I don't know.

20  Q    Did you have any, lend any assistance in the placement of

21  the unit on the vehicle?

22  A    No.

23  Q    Okay.  No further questions.

24          MR. MARTIN:  No questions, Your Honor.

25          MR. CROWE:  No questions, Your Honor.

1          MR. COBURN:  No questions, Your Honor.

2          THE COURT:  Thank you very much, Mr. Elder.  Have a

3    safe trip home.

4          THE WITNESS:  Thank you.

5          THE COURT:  Next witness.

6          MR. HARDING:  Your Honor, we have a witness available

7    but I'm afraid we need a minute or two to set up some equipment

8    for that witness.

9          THE COURT:  Okay.  Go ahead.

10          MR. HARDING:  Okay.

11          THE COURT:  Who is the witness, Mr. Hanlon?

12          MR. HANLON:  Your Honor, I believe it is, and I don't

13    want to speak for Mr. Harding.

14          THE COURT:  Okay.  That's all right.

15          MR. HANLON:  I don't want to get it wrong.  Rather say

16    nothing.

17          (Pause in Proceedings.)

18          THE COURT:  You may call your next witness.

19          MR. HARDING:  Yes, Your Honor.  The United States calls

20    Teri Labbe.

21          TERI LABBE, GOVERNMENT'S WITNESS, SWORN sworn

22          THE WITNESS:  I do.

23          THE CLERK:  Be seated.  Speak directly forward the

24    mike.  State your name and spell it for the record, please.

25          THE WITNESS:  My name is Teri Labbe.  That's T-E-R-I.

1   Last name L-A-B as in boy, B as in boy, E.

2                 DIRECT EXAMINATION

3   BY MR. HARDING:

4   Q    Good morning, Ms. Labbe.  Can you tell us where you're

5   employed?

6   A    I'm employed with the Baltimore City Police Department.  I

7   currently am assigned to the Serology Section in the Biology/DNA

8   Unit.

9   Q    Okay.  So you work in the Crime Lab, is that right?

10  A    That is correct.

11  Q    What is serology?

12  A    Serology is basically the study of and identification of

13  body fluids or any biological material, including hairs.  So

14  typically, blood, semen, saliva, urine, along that line.

15  Q    Okay.  And what exactly do you do with those bodily fluids?

16  A    What do I is, usually I get the evidence off the crime

17  scene.  And my job is to identify any potential biological fluid

18  or biological material on evidence by doing presumptive and

19  confirmatory tests.  And if it is of probative value, we would

20  forward it on to the DNA unit.

21  Q    Okay.  I'd like to show you what's been marked and received

22  into evidence as Government Exhibit H-1, and ask if you can

23  identify this.  I'm going to take this smaller envelope out of

24  the larger envelope.  Can you identify H-1?

25  A    I'm sorry.  Could you repeat that?

1    Q    Can you identify that exhibit, H-1?  The whole, whole thing

2    is call H-1.

3    A    Yes.  This is a knife that I analyzed on March 20th of '07.

4    Q    And what exactly do you mean by "analyzed?"

5    A    I received this knife and I believe previously it had

6    already been looked at or swabbed, the blade.  But in '07, we

7    have come up with a different technique to swab for possible skin

8    cells that might be on the handle of the knife.  And that was my

9    job with this piece of evidence.

10   Q    So you swabbed for skin cells on the handle, is that

11   correct?

12   A    That is correct.

13   Q    And did you retrieve any, anything?

14   A    We don't typically make a slide to verify the skin cells

15   because of it being what they call a touch DNA.  Very minimal

16   transfer.  So to preserve the sample for DNA and for further

17   analysis from defense, anything that was potentially handled in

18   that manner, we would go ahead and just forward it right to DNA,

19   and that's what I did in this case.

20   Q    You forwarded the sample that you took off the knife to DNA?

21   A    That's correct.  The swab.

22   Q    And who did you forward it to?

23   A    I forwarded it to our secure storage location.  But I

24   believe Ken Jones was the DNA analyst who actually performed the

25   DNA on the swab.

1    Q    Okay.  Those are all the questions I have for you, Ms.

2    Labbe.  Thank you.

3              CROSS EXAMINATION

4    BY MR. LAWLOR:

5    Q    Ma'am, good afternoon.  How are you?

6    A    Good afternoon.

7    Q    Prior to '07, had you analyzed H-1 in any manner whatsoever?

8    A    I had not, no.

9    Q    This is the first time you saw it?

10   A    That's correct.

11   Q    Okay.  Do you know, prior to that, whether any other

12   analysis of H-1 was done for blood that was on it?

13   A    I believe there was, yes.

14   Q    So there was analysis for blood that was on the knife and

15   then you went back and swabbed it for skin cells, is that right?

16   A    That is correct.

17   Q    All right.  But you didn't do any of the testing?

18   A    No, sir.

19   Q    Okay.  Thank you.  No further questions.

20             MR. MARTIN:  No questions, Your Honor.

21             MR. CROWE:  No questions.

22             MR. COBURN:  No questions.

23             THE COURT:  Thank you very much, Ms. Labbe.  Next

24   witness.

25             MR. HARDING:  Yes, Your Honor.  The United States calls

1    Kenneth Jones.

2              KENNETH JONES, GOVERNMENT'S WITNESS, SWORN

3              THE WITNESS:  I do.

4              THE CLERK:  Please be seated.  Speak directly toward

5    the mike.  State your name and spell it for the record, please.

6              THE WITNESS:  My name is Kenneth B. Jones.

7    K-E-N-N-E-T-H.

8              DIRECT EXAMINATION

9    BY MR. HARDING:

10   Q    Good morning, Mr. Jones.  Can you tell us how you're

11   employed, sir?

12   A    I am employed as a DNA analyst for the Baltimore City Police

13   Department's Crime Lab.

14   Q    Okay.  And can you tell us what that entails, I mean what

15   your job duties are?

16   A    My job duties as a DNA analyst is to receive evidence from

17   the Serology Unit of the Crime Lab, perform DNA analysis on those

18   samples, and do any comparisons to known standards.

19   Q    And how long have you held this position?

20   A    I've been a DNA analyst for three years.

21   Q    Can you tell us what your educational background is, what

22   degrees you've gotten?

23   A    I have a Bachelors of Science degree in biochemistry and I'm

24   also currently enrolled in a Masters of Forensic Science program

25   at Towson University.

1    Q    Okay.  Have you had other training outside of college, your

2    BS degree and your Masters program that you're in right now, that

3    relates to DNA analysis?

4    A    I have.

5    Q    Can you tell us what that training is?

6    A    I've had training specific to each of the instrumentation

7    that we use for the DNA analysis steps, as well as DNA testing

8    methods that we use.

9    Q    Can you tell us what some of those training programs were?

10   A    I'll have to reference my notes.

11   Q    Please do.

12   A    In July of 2005 I received the Applied Biosystems Advanced

13   Training for the 3100 Genetic Analyzer, as well as the

14   amplification kits.  In August of 2005, I received training in

15   the Quantifiler and Applied Biosystems Sequence Detection System

16   Training.

17          In January of 2006, I received realtime PCR and STR DNA

18   amplification for a human identification training.  In June of

19   2006, I received Applied Biosystems 3130 Genetic Analyzer and

20   Amplification Kit Training, as well as the 7500 Sequence

21   Detection System training.

22          And in August of this year, I received the FBI's DNA

23   auditor training.

24   Q    Okay.  Have you attended conferences and participated in

25   seminars relating to DNA analysis, Mr. Jones?

Case 1:04-cr-00029-RDB   Document 675   Filed 06/08/09   Page 80 of 239

1    A    I have.

2    Q    Can you give us an idea of some of those seminars and

3    conferences?

4    A    In September of 2004, I attended the Maryland DNA Technology

5    seminar.  In May of 2005, I attended the Mid Atlantic Association

6    of Forensic Scientists annual meeting and training conference.

7         In October of 2005, I attended the Capillary

8    Electrophoresis Users meeting of the Mid-Atlantic Association of

9    Forensic Scientists.  I attended that same meeting as well in

10   June of 2006, March, 2007, and April of this year.

11        And in May of 2007, I attended the Mid-Atlantic

12   Association of Forensic Scientists annual meeting and training

13   conference.

14   Q    Okay.  Can you tell us, Mr. Elder (sic), have you ever been

15   qualified as an expert in a court before on the subject area of

16   DNA analysis?

17   A    I have.

18   Q    Can you tell us how many times and in what courts?

19   A    I've been qualified eight times in the Baltimore City

20   Circuit Court.

21   Q    Okay.  Do you know what proficiency tests are?

22   A    I do.

23   Q    Can you tell the ladies and gentlemen of the jury what they

24   are?

25   A    A proficiency test is a test that is provided from an

1    outside agency outside the lab.  And it is treated just as a case

2    would be in our lab.  And when the results are obtained, it is

3    sent back to the company that freezes them, the results are

4    checked, and then the results are sent back to us.

5    Q    I see.  And have you had occasion to take such proficiency

6    tests?

7    A    I have.

8    Q    Is that a requirement for your job?

9    A    It is.

10   Q    How often do you have to a take proficiency tests?

11   A    As a DNA analyst, I'm required to take two yearly

12   proficiency tests.

13   Q    So have you taken two yearly proficiency tests each of the

14   three years that you've been a DNA analyst for the Baltimore City

15   Police Department?

16   A    I have.

17   Q    And have you passed those proficiency tests?

18   A    I received satisfy grades on each of those.

19   Q    Okay.  Can you tell us what a laboratory accreditation is?

20   A    A laboratory accreditation means that a laboratory has met a

21   set of standards or criteria presented to it by an outside

22   accrediting body.

23   Q    Like what would be an outside accrediting body?

24   A    Probably the most well-known one would be the American

25   Society of Crime Lab Directors Lab Accreditation Board.

1    Q    And is it a requirement for police labs, for example, that

2    they have this kind of outside accreditation periodically?

3    A    DNA labs need to be audited at least yearly.

4    Q    And is your lab, the Baltimore City Police Department,

5    audited yearly?

6    A    Yes.

7    Q    And is it accredited?

8    A    It is.

9    Q    By the same agency that you just gave us the name for?

10   A    It is accredited by the ASCLD Lab since December of 2006.

11   Q    Okay.  Your Honor, I would like to offer Mr. Jones as an

12   expert in DNA analysis.

13           THE COURT:  Any questions, counsel?

14           MR. LAWLOR:  No, Your Honor.

15           MR. MARTIN:  No, Your Honor.

16           MR. CROWE:  No, Your Honor.

17           MR. COBURN:  No, Your Honor.

18           THE COURT:  The witness is accepted as an expert in DNA

19   analysis.

20   BY MR. HARDING:

21   Q    Okay.  Let me ask you, first of all, let me get Exhibit H-1.

22   Here it is.  This exhibit right here in front of you, Exhibit

23   H-1, did there come a time when you were asked to perform an

24   analysis on DNA samples that were taken off of that exhibit by

25   one of your crime technicians named Teri Labbe?

1    A    Let me check the property number.  Yes, I did.

2    Q    Okay.  Can you tell us when and from whom you received that

3    exhibit?

4    A    I received that sample on April 5th of 2007 at 8 a.m.

5    Q    And who did you get it from or where did you get it from?

6    A    I obtained the evidence from our secure evidence vault.

7    Q    Can you tell us what you then did with the exhibit?

8    A    I then conducted DNA analysis on that sample.

9    Q    Okay.  Does this involve applying certain standard tests to

10    the exhibit, to the swabs of the exhibit?

11    A    There are standards that we use in the testing process, yes.

12    Q    Okay.  Are these tests new or novel tests that you performed

13    on the swabs?

14    A    No.  They've been around for quite sometime.

15    Q    Can you tell us, was that exhibit handled securely at all

16    times?

17    A    When I was performing DNA analysis, yes.

18    Q    Okay.  I'm going to ask you to tell the ladies and gentlemen

19    of the jury what DNA testing is, but I'd like to ask you if you

20    have a Power Point display that would assist you in explaining

21    what DNA analysis is to the jury?

22    A    I do have a Power Point I can display.

23    Q    Okay.  With the Court's permission, I would like to ask you

24    to lift up your laptop and run through with us what you've got,

25    in order to explain what DNA analysis consists of.

1    A    Certainly.  This Power Point is just going to be a brief

2    description of the type of testing that we use for DNA analysis

3    in the Baltimore City Police Department, as well as how we

4    interpret the data and ultimately base our conclusions.

5         To first start off, What is DNA?  DNA stands for

6    deoxyribonucleic acid.  It is the genetic blueprint for each

7    individual.  It is a chemical structure that contains the code

8    for everything in your body, from making cells, to your eye

9    color, to your hair color.

10        It is composed of these chemical components called

11   nucleotides.  There are four different types.  There's the A

12   type, the C type, the G type, and the T type.

13        And your DNA is contained in structures called

14   chromosomes.  There are 22 pairs of chromosomes, as well as a

15   pair of sex chromosomes, in each cell in your body.  What is key

16   about DNA, it is unique to individuals except for identical

17   twins, who have identical DNA.

18        DNA is found in any nucleated cell in the body.  So

19   that could be cells are found in your blood, in semen, saliva,

20   organs, tissues such as muscle tissue, bones.  And what's key to

21   understand is that all one's persons cells have the exact same

22   DNA.  So DNA is not going to differ in an individual from their

23   blood cells to, say, their bone cells.

24        95% of your DNA doesn't code for anything.  What that

25   means is there's a good deal of material in your DNA sequence

Case 1:04-cr-00029-RDB    Document 675    Filed 06/08/09    Page 85 of 239

1    that does not tell your body what color your eyes are going to be

2    or what color your hair is going to be, that sort of thing.

3    Those are the areas that we like to target when we're doing DNA

4    testing.

5          The non-coding DNA is full of what we call length

6    polymorphisms.  And those are variations in the physical length

7    of a sequence in the DNA molecule.

8          The key kind of polymorphism that we test in forensics

9    is what we call short tandem repeats.  These are found in all the

10    non-coating regions throughout the person's DNA.

11          So when we're testing a person's DNA, we're not testing

12    the entire genome or all their DNA.  We're only testing specific

13    locations.  And what we call those locations are loci.  It's just

14    a scientific term for where on the DNA that we're doing our

15    testing.

16          At those specific locations there will be a certain DNA

17    sequence that will be repeated over and over.  As you can see

18    here, the sequence ACTG is repeated five times.

19          The number of repeats at each of those locations is

20    what will vary between individuals.  And the number of repeats is

21    what we call an allele.  And that will give us a number.  So for

22    instance, at this location the allele will be five because

23    there's five repeats of that DNA sequence.

24          You inherit one copy of each of your chromosome from

25    your mom and your dad.  So your DNA's a combination of your

1    mother's DNA and your father's DNA.  As I said previously, your

2    DNA's stored in the form of chromosomes.  So you can on occasion

3    have a different number allele on each of your two chromosomes.

4         If we look at the example here, the first one, this

5    individual is homozygous, meaning that they obtained the same

6    numbers of alleles from their mother and their father.  If we

7    look at the second example, the individual obtained a different

8    number from the mother as opposed to the chromosome from their

9    father.  So you can have two different alleles at one location

10   based on that.

11        DNA can be found virtually any place bodily contact is

12   made if cells are left behind.  So that can be on clothing.  It

13   can be on cigarettes, drinking glasses, contact lenses, tooth

14   brushes, etc., or any place a body fluid has been left, such as a

15   blood stain or a saliva stain.

16        Only a very small amount of DNA is required for a

17   forensic DNA testing.  And then DNA at a crime scene can show if

18   a person was there or not.

19        These are the steps that we utilize in our Crime Lab

20   for DNA testing.  First is a serology screening, where a

21   serologist will test to see if a stain could be a bodily fluid or

22   there could be biological material there.  The second step is DNA

23   extraction, where we actually separate the DNA off of the

24   evidence.  So if it is a blood stain on a piece of clothing,

25   we'll separate the blood from the clothing and then in turn

1    separate the DNA from the blood.

2         DNA quantitation allows us to determine how much DNA

3    we're able to extract from our sample.  DNA amplification is

4    where we copy each of those specific locations that we're testing

5    over and over and over, and that gives us ample sample to go back

6    and do repeat testing, if necessary.

7         The fifth step is DNA electrophoresis, and that's where

8    the DNA fragments are sorted based on their size.

9         If at one location you have several repeats of a DNA

10   sequence, this instrument will separate those fragments based on

11   their size as opposed to smaller, or locations with smaller

12   repeats.

13        And the sixth step is the DNA data analysis where we

14   look at the data coming off the instrument.  We interpret it and

15   then we can, in turn, write our report, which is our seventh

16   step.

17        This is what the data looks like when it comes off the

18   instrument.  As you can see, there's a series of colored peaks.

19   And under each peak is a number.  The number under each peak is

20   indicating the number of repeats that were detected at that

21   location.

22        In this specific sample, this is what we call an

23   allelic ladder.  So this sample is showing us all the possible

24   repeat units that an individual could have at each of these

25   locations.  And this is what we look at when we're doing our data

1    analysis and interpretation.

2         Throughout the entire process of the DNA analysis, we

3    use a set of standards, what we call quality assurance controls.

4    We first use an extraction reagent blank, and that is a sample

5    that we treat just as an evidence sample.  However, there's no

6    DNA in it.  And that allows us to see if there's any

7    contamination occurring with reagents that we're using at each

8    step of the process.

9         Our blank, our negative PCR control.  So when we're

10   targeting those locations and copying them over and over, this

11   blank allows us to see if any foreign DNA's being introduced into

12   the reaction.

13        The 9947A is a positive PCR control.  And that's a

14   fragment of DNA that we already know the sequence of and that we

15   run with our samples to insure that the amplification process is

16   working correctly and that the instrument is making the allele

17   calls correctly as well.

18        And we have already spoken about accreditation, so I

19   will skip that part.

20        The objective of our data analysis is to evaluate the

21   quality of the data, determine the DNA profiles, determine if any

22   samples need to be rerun, and also compare evidence to items or

23   compare evidence items to any known standards that we may have

24   from individuals.

25        And samples may be needed to be rerun if they don't

1    reach an appropriate peak height or to verify alleles that may

2    not fall within the allele clatter, and to resolve any artifacts

3    that may be there.

4           On each of our reports we have a data table and it

5    lists all the alleles detected in the samples that we test, at

6    each of the locations that we tested.  We then make a comparison

7    to any known standards from individuals.  And we can make

8    statements of consistent with, excluded, or cannot be excluded.

9           If a consistent-with statement is made, we can then do

10   a statistical calculation to determine what are the chances that

11   a random person other than that individual could have contributed

12   to the DNA profile.  And each case and report goes through two

13   reviews prior to the case being closed, a technical review and an

14   administrative review.

15          The technical review allows another analyst to observe

16   my work, and they check and make sure I followed each of the

17   protocols, all the proper standards and protocols were used.  And

18   the administrative review is a second check.

19          So what you will see on the report is a chart that

20   looks similar to this, where in the sample column you have a list

21   with a combination of the letters and numbers.  Those are simply

22   the locations that we're testing on the DNA and it's the

23   scientific naming method that we're using.  So you can think of

24   it as an address on the DNA of where we're testing.

25          The second column, this sample is indicated Sample

1    Number 19.  Then you'll see a series of numbers underneath it.

2    Those are the alleles.  Those are the alleles that were detected

3    in that sample at each of those locations.

4         And this is what we use to compare against known

5    standards from other individuals.

6         When we do a statistical analysis, we are saying,

7    you're saying possibly that the DNA profile from the crime scene

8    equals the DNA profile from John Doe at each locus tested.  So

9    that means the numbers all match between the two.

10        So you have really two options if that's the case.

11   Number one, John Doe did actually leave the DNA at the crime

12   scene.  Or Option Two, someone else left the DNA at the crime

13   scene.  So what our statistics do is tell you what are the

14   chances that someone else other than John Doe could have left the

15   DNA there.  So it is what is the probability that a person other

16   than John Doe randomly selected from a population will have the

17   same profile as was detected.  This is what we call a random

18   match probability.

19        The smaller the probability, the greater the likelihood

20   that the two DNA samples came from the same person.  So when the

21   probability is very small, either the two samples came from the

22   same person or a very unlikely coincidence has occurred.

23        They will be displayed as a one in such and such

24   expected chance of selecting a random person when we see the

25   stats.  And it's like the lottery.  We're not saying that one in

1    so many people will have the DNA profile.  We're just saying that

2    one in so many people could have the chance of having the same

3    profile.

4         We primarily use three racial groups when we're testing

5    populations for the statistics.  We use the African-American

6    proposition, American Caucasian population, and the Southeast

7    Hispanic population.  And the reason we use those three

8    populations is because those are the largest population groups in

9    the Baltimore area or in the Eastern U.S. as well.

10        And key to understand is that a higher frequency in one

11   group does not mean an individual from that group was more likely

12   to have left the DNA at a scene.  That's it.

13   Q    Okay.  This last screen that you've got up here for a

14   minute, can I focus your attention on that for a moment?

15        When you were asked to perform the tests in this case,

16   did you have, first of all, a portion of Darryl Alexander's blood

17   card?

18   A    I did.

19   Q    And a portion of Eric Clash's blood card?

20   A    That's correct.

21   Q    And these were all, these were submitted to you as knowns,

22   is that what you called them before?

23   A    Yes.  Known standards.

24   Q    Okay.  And then there was a blood sample from knife.  Is

25   that Government Exhibit H-1 that we're talking about, that you

1   have there in front of you?  You can look at the property number

2   if you need to.

3   A    No.

4   Q    What is it?

5   A    H-1 is Sample Five on the list.

6   Q    Swab from handle of folding knife?

7   A    Yes.

8   Q    Okay.  What are blood sample, what are the two blood samples

9   from the knife?

10  A    Reference my notes here.  That's the only description I have

11  available to me, is blood samples from the knife.

12  Q    Okay.  Were those samples taken by a serologist back when

13  the knife was originally submitted as evidence in 2002, can you

14  tell?

15  A    I really can't tell.

16  Q    Okay.  All right.  You then also have number six down here,

17  blood standard from Willie Mitchell, is that correct?

18  A    Yes.

19  Q    Is that another known?

20  A    That's a known standard, yes.

21  Q    Okay.  Now, you mentioned during the course of your Power

22  Point demonstration that you had some quality control mechanisms.

23  One was a method to determine whether foreign DNA has been

24  introduced into the analysis at any point, is that correct?

25  A    That's correct.

1    Q    Was there any contamination in this case?

2    A    No.

3    Q    Okay.  Also, you mentioned during the course of your Power

4    Point that everybody has the same DNA in every portion of their

5    body.  In other words, the DNA in somebody's bones is the same as

6    the DNA in their blood, is the same as the DNA in their skin, is

7    that correct?

8    A    That's correct.

9    Q    But do two individuals ever have the same DNA?

10   A    Only in the case of identical twins.

11   Q    Okay.  So apart from that, everybody's DNA is different, is

12   that correct?

13   A    That's correct.

14   Q    Let me ask you, then, if you can tell the jury what the

15   result was of your tests in this case.

16   A    Certainly.  Actually, I have a slide prepared, if you would

17   like me to move to that.

18   Q    Excellent.

19   A    Would you like the statements or the actual allele table?

20   This is the allele table.

21   Q    At your discretion, because I'm not sure which is which.

22   A    Okay.  These are the statements that were made based on the

23   DNA analysis.  The first statement pertains to Sample Three and

24   Sample Five, which are the blood sample from the knife and the

25   swab from the handle of the folding knife.

1          Each of those samples yielded a DNA profile that was

2     consistent with the known standard from Willie Mitchell.  The

3     chances of selecting an unrelated individual from a random

4     population possessing the same profile as the evidence sample at

5     the tested loci are approximately one in one hundred quintillion

6     individuals in the American Caucasian population, one in 2.19

7     quintillion individuals in the African-American population, and

8     one in 82.9 quintillion individual in the Southeast Hispanic

9     population.

10         The second statement is for Sample Number Four, which

11    is the blood sample from the knife.  And that sample yielded a

12    DNA profile consistent with the known standard from Willie

13    Mitchell and additional minor alleles at the D3S1358 and CSF1PO

14    loci.  The chances of selecting an unrelated individual from a

15    random population as a possible contributor to the evidence

16    sample at the tested loci are approximately 1 in 76.8 trillion

17    individuals in the American Caucasian population, 1 in 2.20

18    trillion individuals in the African-American population, and 1 in

19    172 trillion individuals in the Southeast Hispanic population.

20    Q    Okay.  Am I correct, then, that, according to your tests,

21    both the skin samples off the handle of the knife and the blood

22    from the knife, although you didn't, you didn't have an

23    explanation where those two blood samples came from, they both

24    came back matched to Willie Mitchell, is that correct?

25    A    Yes.  They were consistent with the known standard of Willie

1    Mitchell.

2    Q     Just one moment, Your Honor.

3          THE COURT:  Yes.  Okay.

4    Q    Okay.  Can you, for the ladies and gentlemen of the jury,

5    could you determine and let me know who can provide information

6    about where those blood samples came from, since you weren't able

7    to testify about that?  You don't have to do it right now, but

8    can you let me know later if you can determine who that witness

9    would be?

10   A    Sure.

11   Q    Okay.  I have no further questions, Your Honor.

12          CROSS EXAMINATION

13   BY MR. LAWLOR:

14   Q    Mr. Jones, good afternoon.

15   A    Good afternoon.

16   Q    You're going to have to walk me through a couple things

17   pretty slowly.

18   A    Okay.

19   Q    When you're testing DNA in a sample, it's provided to you

20   and you take at face value that it is the known sample of X,

21   correct?

22   A    You're referring to a known standard?

23   Q    Known standard.

24   A    Known standards, yes.

25   Q    So if you get the known standard of the blood of Willie

1  Mitchell, you accept at face value that is what it purports to

2  be?

3  A    If it says known standard of Willie Mitchell, that's what I

4  record it as.

5  Q    Because you only analyze the data, you don't collect the

6  data?

7  A    That's correct.

8  Q    All right.  And in this case, you were provided with the

9  known standard of Mr. Alexander?  Yes?

10 A    Yes.

11 Q    Mr. Clash?

12 A    Yes.

13 Q    Mr. Mitchell?

14 A    Yes.

15 Q    And then H-1?

16 A    H-1, that's correct.

17 Q    Okay.

18 A    Well, it was a swab of H-1.

19 Q    Okay.  Various swabs you were provided?

20 A    Yes.

21 Q    All right.  And three, four, and five, three says a blood

22 sample, as does four, which you're presuming are blood samples

23 that were swabbed from H-1?

24 A    No.  I do not know where they are swabbed from.

25 Q    Okay.  You analyzed those?  You did analyze those?

1    A    Yes.

2    Q    All right.  But this is a chart that you created?

3    A    That's correct.

4    Q    And it says blood sample from knife?

5    A    That's correct.

6    Q    All right.  And so you're certainly attempting to relate to

7    the jury that three and four are blood that was swabbed off of

8    H-1, correct?

9    A    From a knife.  I'm not sure the knife described in samples

10    three or four is H-1.

11    Q    All right.  So part of your testimony could be that some

12    blood was taken from some knife in the known universe?

13    A    Yeah.

14    Q    That's not very helpful, right?

15    A    It doesn't appear so, no.

16    Q    Okay.  You were provided this information from law

17    enforcement personnel, correct?

18    A    The list the samples I have here that I tested were provided

19    to me by the serologist who had done the testing.

20    Q    What serologist was that?

21    A    Teri Labbe.

22    Q    Okay.  And you met with the prosecutors in anticipation of

23    your testimony here today?

24    A    Yes.

25    Q    And Item Five, that is a swab from the handle of the folding

1    knife, H-1?

2    A    That's correct.

3    Q    All right.  Did you deduce that three and four came from

4    H-1?

5    A    I did not deduce that, no.

6    Q    Did you deduce something to the alternative?

7    A    To the alternative?  I don't understand.

8    Q    That it came not from H-1 but affirmatively came from some

9    other knife?

10   A    It is not my job to determine where the evidence came from

11   or what probative value it has in the case.  My job is simply to

12   do the DNA testing on the samples that were requested for DNA

13   testing by the serologist.

14   Q    All right.  So notwithstanding that you've written blood

15   sample from knife for three and four, it appears that you have no

16   idea where that DNA came from?

17   A    The swab or the DNA?

18   Q    What you've listed as three and four.

19   A    I made the statement that three and four, the DNA profile

20   from that is consistent with Willie Mitchell.

21   Q    All right.  That's not the question I asked.  The question I

22   asked is, you wrote down that the blood three and four came from

23   a knife?

24   A    That's correct because that's the description that was given

25   to me of the swabs.

1    Q    All right.  But as you sit here today, it appears that

2    you're uncertain where that came from?

3    A    That's correct.

4    Q    All right.  Are you equally uncertain, then, that five came

5    from H-1?

6    A    I am quite certain of that.

7    Q    You are quite certain of that because you did the testing of

8    it or because someone told you that?

9    A    Because I'm looking at the property number and it matches

10   the property number on H-1.

11   Q    Okay.  Do you have the property number for three and four?

12   A    I do have it here, yes.

13   Q    Why don't you compare three and four property numbers so we

14   can see now if we're talking about the same knife.

15   A    For three and four, the property number, well, for Sample

16   Three the property number is 02010361.1A.  And Sample Four is

17   02010361.1B.

18   Q    All right.  I can't write that fast.  Are we talking about

19   the same item?

20   A    We're talking about two samples from the same item, yes.

21   Q    So three and four are from the same item?

22   A    Yes.

23   Q    Are three and four also from the same item that is five?

24   A    It does not appear so, no.

25   Q    Okay.  Could I approach the witness, Your Honor?

1       THE COURT:  Certainly.

2   Q    I'm going to have this marked in a minute as defendant's,

3   Defendant Mitchell's Exhibit Number One.  Is this a packet that

4   you prepared pursuant to your analysis of the data here?

5   A    It is.

6   Q    Okay.  And it is, for the ladies and gentlemen of the jury,

7   50 pages?

8   A    Yes.

9   Q    Okay.  And you prepared this?

10  A    Yes.

11  Q    Okay.  Prepared it as you analyzed the information?

12  A    That's correct.

13  Q    Your Honor, I need to use the DOAR.

14       THE COURT:  Look to Mr. Hanlon.  It should be a fairly

15  simple toggle to switch from the computer input to the DOAR

16  input.

17       MR. HANLON:  It used to be, Your Honor, but our control

18  panel has been taken away.  So I'm not sure.  It may have gotten

19  a little bit more complicated.

20       THE COURT:  Perhaps Ms. Arrington can -- thank you, Ms.

21  Arrington.

22  BY MR. LAWLOR:

23  Q    So I want to show you -- does that say Page Ten?

24  A    Can you move it to the left just a little?  Yes, it does.

25  Q    Okay.  And these are the same items that we're talking

1    about.  Mr. Alexander's blood card, Mr. Clash's blood card, blood

2    sample from the knife, blood sample from the knife, and the swab

3    from the handle of the folding knife?

4    A    That's correct.

5    Q    All right.  Read me that handwritten note right there?

6    A    The handwritten note says, compare to suspect's blood

7    sample, Willie Mitchell, previously analyzed, reference BO2-73.

8    Q    Is that your handwriting?

9    A    No, it is not.

10   Q    Whose handwriting is that?

11   A    I'm not sure.

12   Q    This is your report?

13   A    That's correct.

14   Q    You authored it, signed it, submitted it as fact?

15   A    I assume it's the serologist note since she sent me the

16   request.

17   Q    Does it indicate to you that there was a prior DNA test done

18   in this case?

19   A    Well, yes, because it says B02-73.

20   Q    Do you have the results from the prior DNA test in this

21   case?

22   A    Yes.

23   Q    Okay.  Your Honor, could we take the luncheon recess right

24   now?

25              THE COURT:  I would rather finish with the witness.

1    But that may not be possible.

2          MR. LAWLOR:  In light of last answer, Your Honor, I

3    don't think --

4          THE WITNESS:  It's included on the report.

5          THE COURT:  He says it's included in what you've got

6    there.

7          MR. LAWLOR:  Okay.  I'll move on, then.  I'll come back

8    to it.

9          THE COURT:  Perhaps he can direct you to it.

10   BY MR. LAWLOR:

11   Q    Okay.  I'll come back to that, Your Honor.  Let me ask you

12   this question.  You indicated that, in your Power Point, that DNA

13   is easily transferred, is that, am I summarizing that accurately?

14   A    Can be easily transferred, yes.

15   Q    Can be.  Okay.  And as part of your studies, in addition to

16   the comparison, the testing of DNA, you were educated on how DNA

17   comes to be at a certain place?

18   A    Can come to be, yes.

19   Q    Okay.  So my DNA could be here from --

20   A    Yes, it could be.

21   Q    Probably my skin cells could be right there, correct?

22   A    Yes, that's correct.

23   Q    Okay.  Now, if, if there was a knife lying on the ground --

24   you don't know what kind of DNA it is that you're analyzing, do

25   you?  You don't know, when you compared three and four to five

1    and six, other than the fact that someone says it's a known

2    standard of blood, you don't know if it's skin or saliva or if

3    it's blood, do you?

4    A    Well, it depends on the serological testing that was

5    performed.

6    Q    Okay.  But that is not performed by you?

7    A    That's correct.

8    Q    Okay.  So item five, the swab from handle of folding knife,

9    you know that as you test it, you discovered that that is, in

10   fact, DNA, first of all, correct?

11   A    That's correct.

12   Q    Okay.  But you don't know, other than perhaps what is

13   advised by someone else to you, the nature of that DNA, right?

14   A    As to whether it's from blood or -- that's correct.

15   Q    Correct.  Okay.  And when I test, when you test saliva

16   versus blood versus other bodily fluids, the DNA is the same,

17   right?

18   A    Within an individual, yes.

19   Q    Within an individual.  Correct.  Okay.  So if a knife was

20   lying on the ground, it would be possible for someone's DNA to

21   transfer on to that knife if someone else was jumping up and down

22   on their head, causing blood to then come out of their head,

23   right?

24   A    That is a possibility, yes.

25   Q    Okay.

1    A    Highly unlikely.

2    Q    Pardon me?

3    A    I would say that scenario is highly unlikely.  But yes, that

4    could occur.

5    Q    What part of what I just said is unlikely?

6    A    Somebody jumping up and down on their head.

7    Q    All right.  Well, let's say for the sake of discussion that

8    an individual had their head stomped.  Let's just take that as

9    fact.

10   A    Now I understand what you're saying.

11   Q    All right.  Assuming that fact we can agree on, the kicking

12   of my head or jumping up and down on my head would produce DNA to

13   come off of my head?

14   A    It could, yes.  Yes.

15   Q    Blood, right?  Might cause me to bleed, right?

16   A    Yes.

17   Q    And then that could cause, if a knife is sitting nearby,

18   blood to transfer on to that knife, right?

19   A    If the knife comes in contact with the blood, yes.

20   Q    Right.  Okay.  And if I were to stab you, and you seem like

21   a nice guy so I won't, but if I were to stab you, that would

22   likely produce your DNA on the knife, right?

23   A    Yes, that's correct.

24   Q    Okay.  Both in the form of blood and skin?  Yes?

25   A    Yes.

1    Q    Okay.  And although we don't know where Samples Three and

2    Four came from, your analysis of H-1, so you compared Mr.

3    Alexander's blood card, Mr. Clash's blood card, two samples of

4    blood from a knife, swab from the handle of the knife, and then a

5    known blood standard of Mr. Mitchell, correct?

6    A    That's correct.

7    Q    Compared all of those things to each other?

8    A    Yes.

9    Q    And what you're able to say is that Mr. Mitchell's blood was

10   on the knife, DNA was on the knife?

11   A    That's correct.

12   Q    And you are able to affirmatively say, correct, that both

13   Mr. Alexander and Mr. Clash's DNA are not on the knife, correct?

14   A    That's correct.

15   Q    Okay.  Court's indulgence, please.  That's all I have.

16   Thank you, sir.

17            MR. MARTIN:  No questions, Your Honor.

18            MR. COBURN:  I have a quick question, Your Honor.

19            MR. PYNE:  No questions.

20            CROSS EXAMINATION

21   BY MR. COBURN:

22   Q    Would it be a lot of trouble to switch back to the input we

23   had before?  Sorry, Ms. Arrington.

24            MR. HANLON:  I might be able to do it, Your Honor.

25   Q    Good afternoon, Mr. Jones.

1   A    Good afternoon.

2   Q    In that Power Point presentation, you can go, you can just

3   go to one particular slide, right?  You don't have to go through

4   the whole sequence again.

5   A    Okay.

6   Q    Do you remember you had one particular slide that had kind

7   of a large, like a cartoon of a detective with a magnifying glass

8   on top of a house?

9   A    I'm not sure which one that was.  Let me look for it here.

10  Q    Okay.  There you go.  I just wanted to ask you about this

11  one thing right at the bottom here.  See where it says, DNA at a

12  crime scene can show if a person was there or not?

13  A    Yes.

14  Q    That's accurate, right?

15  A    Yes.

16  Q    Nothing further.

17              REDIRECT EXAMINATION

18  BY MR. HARDING:

19  Q    Just a couple quick points, Mr. Jones.  You said that what

20  you did actually was test swabs of blood from the knife.  You

21  didn't actually handle the knife, is that correct?

22  A    That's correct.

23  Q    And one of those swabs was from the handle, is that correct?

24  A    In H-1, yes.

25  Q    Yes.  And then you had two, two blood samples, and you

1    didn't know where those came from except that on your report it

2    says it came from a knife, is that correct?

3    A    That's correct.

4    Q    So when you were testing those things, what you can say, I

5    assume, is that there was no DNA of Mr. Alexander on Mr. Clash on

6    the particular swabs that you tested, is that correct?

7    A    That's correct.

8    Q    Let me ask you this.  If a knife is used repeatedly and

9    gets, therefore, blood on it from a number of people, is it

10   likely that a swab taken at the, or swabs taken at the very end

11   are going to produce blood specimens from all those people?

12   A    That would be my assumption.  But it would depend on the

13   degree of how much blood from which person was donated to the

14   item.

15   Q    I see.  Let me ask you, also.  Your report that you've

16   referred to, I'm going to show you Government Exhibit H-15.  Is

17   this a copy of your two page report on this case?

18   A    It is.

19   Q    I'd like to move H-15 into evidence.

20        THE COURT:  It's admitted.

21   Q    Okay.  I have no further questions.

22        MR. LAWLOR:  Briefly, Your Honor.

23        THE COURT:  Briefly, Mr. Lawlor.

24        RECROSS EXAMINATION

25   BY MR. LAWLOR:

1    Q    Sir, what Mr. Harding just described to you of multiple DNA,

2    you'd be able to determine if it's a mixture, right?

3    A    That's correct.

4    Q    And you don't see that in this case, do you?

5    A    The only sample that indicates there could possibly be a

6    mixture was Sample Number Four, where there were two additional

7    minor alleles that weren't attributable to Willie Mitchell.

8    Q    Okay.  So that's sort of would indicate that the problem,

9    the hypothetical problem that Mr. Harding presented to you isn't

10   applicable here, right?

11   A    I'm sorry.  Could you rephrase your question?

12   Q    The hypothetical that Mr. Harding proposed to you of a

13   single knife being used on multiple occasions and gathering

14   multiple DNA from multiple sources, that doesn't appear to be the

15   case here, does it?

16   A    In this case, no, based on just having two minor alleles.

17   Q    Okay.  And you test what you asked to test?

18   A    That's correct.

19   Q    Presumably by the detectives in charge of the investigation?

20   A    Through the serologist, yes.

21   Q    Okay.  Thank you.

22           THE COURT:  Mr. Jones, thank you very much.

23           THE WITNESS:  You're welcome.

24           THE COURT:  Members the jury, we will take our luncheon

25   recess at this time.  Please leave your note pads on your chairs,

1    have no discussion about the case or any of the evidence you've

2    heard so far.  Continue to keep an open mind about all issues.

3            By the clock in the courtroom, it is 1:08.  So I'm

4    going to ask you to be back in the jury room, ready to proceed,

5    at 2:30.  Jury's excused for an 80 minute luncheon recess.

6            (Jury exits the courtroom.)

7            THE COURT:  Who do we have this afternoon, counsel?

8            MR. HARDING:  Yes.  Let me just say, Your Honor, that

9    we have, we've been having a problem today because one of our

10   witnesses didn't show up.  So we've been scrambling to get people

11   in here.

12           We have Paramedic Morsley and we have state, a state

13   trooper named Bond.  And I believe we will have Ron Berger here

14   at 3:00.  He's the homicide detective in the McCaffity/Jones,

15   McCaffity/Brown murder.

16           THE COURT:  He'll finish out the afternoon, you think?

17           MR. HARDING:  I believe so, Your Honor.  I'm not

18   actually entirely sure.  But we're doing the best we can since we

19   lost a witness we expected would take a considerable amount of

20   time.

21           THE COURT:  You have someone behind Berger?

22           MR. HARDING:  No.  No one else, Your Honor.  We've been

23   trying to get people in here today.

24           THE COURT:  All right.  We're in recess until 2:30.

25           (Luncheon recess at 1:10 p.m.)

1           THE COURT:  Ready to proceed?

2           MR. HANLON:  We are, Your Honor.  And our witness has

3      taken the stand.

4           THE COURT:  All right.  Counsel, in case you hadn't

5      been advised, in the mail today are additional copies of the,

6      quote, "non-negotiable notice of acceptance" from each of the

7      defendants.  I have what I presume are my copies, but it appears

8      that they were forwarded directly to the clerk.  So I expect

9      they'll be docketed in due course.

10          We'll have the jury, please.

11          MR. HANLON:  Your Honor, for the defense counsel's

12     information, the witness on the stand is the paramedic, Elwardo

13     Morsley.

14          THE COURT:  Morsley?

15          MR. HANLON:  Morsley.

16          (Jury enters the courtroom.)

17          THE COURT:  Please be seated, ladies and gentlemen.

18     Government may call its next witness.

19          MR. HANLON:  Thank you, Your Honor.  The United States

20     calls Mr. Elwardo Morsley to the stand.

21       ELWARDO MORSLEY, GOVERNMENT'S WITNESS, SWORN yes

22          THE CLERK:  Scoot up and speak directly toward the

23     mike.  State your name and spell it for the record.

24          THE WITNESS:  Elwardo Morsley.  E-L-W-A-R-D-O.

25     Morsley, M-O-R-S-L-E-Y.

1           DIRECT EXAMINATION

2    BY MR. HANLON:

3    Q    Mr. Morsley, good afternoon to you.

4    A    Good afternoon.

5    Q    Where do you work, sir?

6    A    Baltimore City Fire Department.

7    Q    And what do you do for the fire department?

8    A    I am a paramedic.

9    Q    How long have you been a fire department paramedic here in

10   Baltimore?

11   A    18 years, 3 months.

12   Q    And what was your work experience prior to joining the fire

13   department, sir?

14   A    Five years at St. Agnes Hospital and three years regular

15   army as a medic.

16   Q    You worked in the army as a medic?

17   A    Yes.

18   Q    Did you spend any time abroad?

19   A    Yes.

20   Q    What parts of the world?

21   A    In Germany.

22   Q    As a medic with the fire department, part of your duties

23   include responding to the scenes where people may need medical

24   help?

25   A    Correct.

1    Q    When you respond to a scene just in general, Mr. Morsley, do

2    you go by yourself in an ambulance or do you often have a partner

3    with you?

4    A    I have a partner.

5    Q    Let me direct your attention to the very early morning

6    hours, just after midnight, maybe 1:00 a.m., that approximate

7    time frame, on February the 28th, the early morning of the 28th

8    of February, 2002.  Were you on duty that day?

9    A    Yes.

10   Q    And when you're on duty, what do you do?  You just wait for

11   a call and then respond when a call comes in?

12   A    Yes.  Basically, stationed at fire houses around the city.

13   Q    Do you recall receiving a call for service on that morning?

14   A    Yes.

15   Q    What was the call for?

16   A    Unconscious and in a vehicle.

17   Q    When a call comes in, is it, in this instance, you know if

18   it was from a citizen who's calling in or law enforcement or

19   someone from the fire department?

20   A    Only if we ask Communications where the call originated

21   from.

22   Q    And in this instance, do you know one way or other?

23   A    No.  We didn't, we didn't ask.

24   Q    A call did come in and you responded to it, is that right?

25   A    Correct.

1    Q    What did the response comprise of?  Who went from the fire

2    department?

3    A    Based on the nature of the call, one medic unit and one

4    engine company, fire engine company.

5    Q    So a medic unit would be an ambulance?

6    A    Yes.

7    Q    Were you in the ambulance?

8    A    Yes.

9    Q    And I gather you had a partner with you?

10   A    Yes.

11   Q    And at the engine unit, is that what I might refer to as a

12   fire truck?

13   A    Yes.

14   Q    What would be the purpose of a fire truck going with you to

15   a call for an unconscious person?

16   A    They send extra personnel for assistance based on the nature

17   of the type of call.

18   Q    In this case, just in case you need the extra bodies?

19   A    Correct.

20   Q    What part of town did you go to?

21   A    Northwest section of the city.

22   Q    Baltimore City?

23   A    Yes.

24   Q    I gather it was still dark out when the call came in and

25   when you arrived at the scene?

1    A    Yes.

2    Q    If you know, Mrs. Morsley, who was the first from the fire

3    department to arrive at the location?

4    A    The medic unit was.

5    Q    Meaning your ambulance?

6    A    Meaning me and my partner.

7    Q    What did you do when you got there?

8    A    We immediately, we pulled ahead of the car that we suspected

9    was the one that was called in.  And we always basically, at

10   least I do, do just a quick survey of the scene for safety.

11   Q    Let me show you what's been, what's been marked as

12   Government's Exhibit M as in Michael, B as in bravo, MB-4.  Do

13   you see that on the screen in front of you?

14   A    Yes.

15   Q    And there's a little bit of a glare on the photograph, Mr.

16   Morsley.  It doesn't look like I'm making it much better.  But

17   what's shown in the photograph?

18   A    A vehicle.

19   Q    And is this the scene that you arrived at on, during the

20   incident we were just talking about?

21   A    Yes.

22   Q    We can obviously see part of it from the photograph.  What,

23   in general, was the scene?  Were there buildings around?  Were

24   there people around?

25   A    In the general area it's no, it's a residential area but in

1    this particular area it's, it's an unmarked parking lot, if you

2    will.

3    Q    Is it a somewhat remote area?

4    A    Yes.

5    Q    Now, we see that the vehicle in Government's Exhibit MB-4 is

6    partly damaged and it's fronted into a tree.  Do you see that?

7    A    Yes.

8    Q    Is that the condition that you actually found this car in?

9    A    Yes.

10   Q    When you got there, did you look for anything?

11   A    Yes.

12   Q    What did you look for?

13   A    We approached the car from the rear side towards the

14   driver's side and looked inside to see if anyone was inside the

15   vehicle.

16   Q    Now, directing your attention to the windows.  Obviously,

17   this is a nighttime photograph, but the windows are dark.  Was

18   there any tint on the windows at all?

19   A    Yes, dark tint.

20   Q    When you approached up close to the car, were you able to

21   look inside to see anything?

22   A    Yes.

23   Q    What did you see inside the vehicle?

24   A    We seen what appeared to be two people slumped over.

25   Q    From your point of view, could you tell whether they were

1    injured, alive, or what their condition was from outside the car?

2    A    No.  Not initially.

3    Q    Let me ask you about the car itself.  When you first

4    approached and saw the individuals inside, we're looking at an

5    image from the driver's side, the doors, were they closed as they

6    appear in the photograph?

7    A    Yes.

8    Q    And obviously, the two windows were intact, is that correct?

9    A    Yes.

10   Q    Did you try to access either of those two doors here on the

11   driver's side of the car?

12   A    Yes, we did.

13   Q    And were you able to get in?

14   A    No, we were not.

15   Q    Doors locked?

16   A    Yes.

17   Q    Showing you briefly Government's Exhibit MB-13.  Again,

18   there's a bit of a glare on the image, and I apologize for that.

19   Is this an image from the front of the car looking in through the

20   windshield?

21   A    Yes.

22   Q    And you indicated that there was one apparently, there was

23   one individual you could see inside slumped, is that right?

24   A    Correct.

25   Q    Was there another individual here in the passenger side that

1    can't be seen?

2    A    Correct.

3    Q    And is that person below where we see in this particular

4    image?

5    A    Yes.

6    Q    There was also, directing your attention to this part of

7    MB-13.  There appears to be some damage and some red splatter on

8    the windshield.  Do you see that?

9    A    Yes.

10   Q    And was that the condition of the car when you arrived?

11   A    Yes.

12   Q    Now, after attempting the driver's side parts of the car,

13   did you go around to the passenger side of the vehicle?

14   A    Yes, we did.

15   Q    And showing you what's been marked as Government's Exhibit

16   MB-7.  Is this an image from the driver's side?

17   A    Yes.

18   Q    Or from -- I'm sorry -- passenger?

19   A    Passenger side.

20   Q    Sorry about that, sir.  Now, in this instance, we see that

21   the two doors are open to the driver's side.  Is that how you

22   found the doors when you actually went around to the passenger

23   side, sir?

24   A    No.

25   Q    When was the condition of the car on the passenger side?

1    What was the situation with the two doors?

2    A    Both doors were locked and both windows were up.

3    Q    The windows on the passenger side were, in fact, intact?

4    A    Yes.

5    Q    What did you do?  You've got four locked doors now and four

6    closed windows.  What did you do to gain entry to the, into the

7    vehicle?

8    A    We broke out the passenger rear window.

9    Q    Showing you Government's Exhibit MB-15.  Is this an image of

10   the passenger side rear window after it was broken out?

11   A    Yes.

12   Q    Who actually did that?  Did you do that or did one of the

13   firefighters do that?

14   A    One of the firefighters did that.

15   Q    Let me ask you.  In terms of the choice to break this

16   particular window, why, why the rear window and why the passenger

17   side?

18   A    The rear window because it's furthest from the patient,

19   because you don't want to cause any further damage to someone

20   when you break a window because you're going to get glass.

21   Q    You're still assuming that the two people in the front part

22   of the car can possibly be treated, is that right?

23   A    Correct.

24   Q    And as far as the passenger side, is that because that's the

25   side of the car you ended up on?

Case 1:04-cr-00029-RDB    Document 675    Filed 06/08/09    Page 119 of 239

1    A    Correct.

2    Q    Once you broke the windows, did you make entry into the car?

3    A    Yes, we did.

4    Q    Showing you Government's Exhibit MB-12.  Does this show the

5    passenger side of the car after you were able to get into it?

6    A    Yes.

7    Q    Sir, there's some broken glass here on the back seat.  Where

8    does that broken glass come from, do you know?

9    A    The window that we broke and entered, get into the car.

10   Q    I'm not sure if I asked you this.  Do you remember if when

11   you first arrived at the car, first made entry into the car, do

12   you remember if the engine was running?

13   A    Yes, it was.

14   Q    And did anyone, either you or any of the other firefighters,

15   take any action with respect to the engine?

16   A    Yes.

17   Q    What did you do?

18   A    Once we gained entry, we reached in and turned off the

19   ignition.

20   Q    Once you got into the car, did you inspect the two

21   individuals in the front?

22   A    Yes.

23   Q    And what was, what did you see as you looked inside the

24   front of the car?

25   A    We seen two individuals that was bleeding and/or had been

1   bleeding, and they each had what appeared to be gunshot wounds to

2   the side of the head.

3   Q    Let me show you what's been marked as Government's Exhibit

4   MB-5.  Do you see MB-5 on the screen, sir?

5   A    Yes.

6   Q    What is shown in this photograph?

7   A    Male victim in the driver's seat slumped over, with blood on

8   his face.

9   Q    And this is the victim as you found him that night?

10  A    Yes.

11  Q    There's a bit of a glare on the photograph, sir, so I'll ask

12  you to identify a couple of things for the benefit of the jury.

13  There's an object here.  Is that an air bag from the, from the

14  driver's side wheel?

15  A    Yes.

16  Q    And is this the center, what is sometimes referred to as the

17  center console of car here that I'm indicating?

18  A    Yes.

19  Q    Now, our victim here, you mentioned a wound.  Is that the

20  wound right there?

21  A    Yes.

22  Q    Mr. Morsley, did you make any observations as you were

23  looking at this figure about the side of his body that the wound

24  was on?

25  A    Yes.

1   Q    What did you observe?

2   A    We observed that the entry wound from what appeared to be a

3   gunshot wound was to the right side of the head.

4   Q    The right side of the driver's head?

5   A    Yes.

6   Q    And that would be the side of his body that would be facing

7   the interior of the vehicle as opposed to the outer door of the

8   vehicle?

9   A    Correct.

10  Q    And you also, I believe, indicated that from your

11  observations, that appeared to be a gunshot entry wound?

12  A    Correct.

13  Q    Showing you Government's Exhibit MB-10, a close-up view of

14  the same male victim.  Is that right?

15  A    Yes.

16  Q    As I'm indicating with my pen, is that a closer view of the

17  same gunshot entry wound on the right side of the victim's head?

18  A    Yes.

19  Q    Where were you sitting as you made these initial

20  observations?

21  A    In the back seat.

22  Q    Being in the back seat, did that give you a clear view of

23  the driver, of the entry gunshot wound that we just observed

24  here?

25  A    Yes.

1    Q    Now, in addition to the driver, was there also a passenger

2    that you, that you examined?

3    A    Correct.

4    Q    Showing you Government's Exhibit MB-8.  Is this the driver

5    that we were just talking about here, that I'm indicating with my

6    pen?

7    A    Yes.

8    Q    I'm indicating the passenger here?

9    A    Yes.

10   Q    Obviously, we can't see the passenger's entire figure, but

11   what was her condition as you made your initial examination?

12   A    She was unconscious, without a pulse.

13   Q    Showing you Government's Exhibit MB-6.  Is this a close-up

14   view of the, part of the face of the passenger in this case?

15   A    Yes.

16   Q    And what observations did you make, looking at this portion

17   of the passenger's body?

18   A    She had blood on her face and also what appeared to be an

19   entrance gunshot wound to the left side of the head.

20   Q    The gunshot entrance wound that you're mentioning is what

21   I'm indicating with my pen here?

22   A    Correct.

23   Q    And the side of her head that you've indicated was the left

24   side of her head, is that correct?

25   A    Correct.

1    Q    And again, would that be for a passenger sitting in the car,

2    that would be the side of her head facing the interior of the

3    vehicle, is that correct?

4    A    Correct.

5    Q    And again, from your position in the back seat of the car,

6    did you have a clear view of the left side of the passenger's

7    body?

8    A    Clear view?  Basically, we had to kind of manipulate her a

9    little bit because she was --

10   Q    Slumped over?

11   A    -- slumped over much more than the driver.

12   Q    When you manipulated her and were able to position her to

13   look at her, from where you were sitting, was it the best place

14   to be able to see this gunshot wound on the left side of her

15   body?

16   A    Yes.

17   Q    Now, Mr. Morsley, as a paramedic at that time, did you make

18   any attempts to treat either of the two individuals, the two

19   victims that we've looked at in these photographs?

20   A    No.  Once we checked for pulses and any type of

21   responsiveness, we basically tried not to disturb the scene as

22   much as possible.

23   Q    At that time, in 2002, did you have any responsibilities

24   about whether to pronounce a person dead as part of your duties?

25   A    Restate your question.

1    Q    Sure.  Sure.  In 2002, did a paramedic ever have to make a

2    pronouncement of death?

3    A    Correct.

4    Q    In this instance, did you make such a pronouncement about

5    the driver and the passenger we've examined here?

6    A    Yes.

7    Q    Or did your partner make such a pronouncement?

8    A    Yes.

9    Q    And ultimately, the decision was made to preserve the scene

10   for crime scene investigation and not to do treatment?

11   A    Yes.

12   Q    What lead you to conclude -- it may seem an obvious

13   question, sir --  but what lead you to conclude that both the

14   passenger and the driver in this case were deceased?

15   A    The nature of the injuries and --

16   Q    And did either one of them have a pulse?

17   A    Right.  The nature of the injury, the lack of pulse, and

18   time also plays into it.

19   Q    From where you were sitting and from your observations about

20   the relative positions of the two gunshot wounds that you saw,

21   the left side of the passenger's head and the right side of the

22   driver's head, Mr. Morsley, in what, from what direction were

23   those two gunshot wounds facing?

24   A    They were facing each other.

25   Q    And from what position, if you could tell, would those

1    wounds have been sustained?  Where would the --

2    A    Basically, from the way they were positioned within the car,

3    the person would have had to be to the rear in the center.

4    Q    Sitting in the back seat?

5    A    Yes.

6    Q    Nothing further, Your Honor.  Thank you, sir.

7            THE WITNESS:  You're welcome.

8            THE COURT:  Would you like some water, Mr. Morsley?

9            THE WITNESS:  No, sir.  I'm good.  Thank you.

10           MR. LAWLOR:  No questions, Your Honor.

11           MR. MARTIN:  No questions, Your Honor.

12           MR. PYNE:  No questions, Your Honor.

13           MR. COBURN:  No questions.

14           THE COURT:  Thank you very much, Mr. Morsley.  You're

15   excused.

16           THE WITNESS:  Thank you, sir.

17           THE COURT:  Next witness.

18           MR. HARDING:  Judge, with the Court's permission, I

19   would like to recall Teri Labbe briefly to explain those two --

20           THE COURT:  Very well.  She's right outside?

21           MR. HARDING:  Yes.

22           TERI LEBBE, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

23           THE COURT:  Good afternoon, Ms. Labbe.  If you will

24   resume the witness stand.  You remain under oath, ma'am.  Would

25   you just state your name once again for record?

1          THE WITNESS:  Teri Labbe.

2          THE COURT:  Thank you.

3          DIRECT EXAMINATION

4    BY MR. HARDING:

5    Q    Good afternoon, Ms. Labbe.

6    A    Good afternoon.

7    Q    Let me apologize for not clearing up a couple of things this

8    morning and therefore having to ask you to come back to court to

9    testify.  Let me call your attention to an exhibit that's been

10   introduced into evidence as Government Exhibit H-15.  I'm

11   focusing here on the, on the top part of the report.  You're

12   familiar with this report, are you not?

13   A    I've seen it, yes.

14          THE COURT:  Mr. Harding, excuse me.  Perhaps you can

15   take it out of the sleeve and reduce the glare.

16   Q    Okay.  This morning, when you testified, I asked you about

17   the Item Number Five, the swab from the handle of the folding

18   knife.  Do you see that?

19   A    Yes.  That's correct.

20   Q    And you testified that you yourself swabbed the handle of

21   the folding knife that's been admitted into evidence as

22   Government Exhibit H-1, I believe it is.  Is that right?

23   A    That's correct.

24   Q    But what I didn't ask you about were these two blood

25   samples, Number Three and Number Four, blood sample from knife,

1    each with a property number that's the same except for the last

2    letter on the end.

3            Did I ask you to find out where those samples came

4    from?

5    A    Yes, you did.

6    Q    Can you explain to the ladies and gentlemen of the jury?

7    A    I'm looking in my folder.  Those two samples were retrieved

8    by myself from our secure storage location.  They were previously

9    analyzed by another serologist who no longer works with the

10   Baltimore City Police Department.  I myself used to be part of

11   the Mobile Crime Lab Unit which went out and responded to crime

12   scenes.  And essentially, what has happened with these two blood

13   samples from the knife is they were collected off of the knife by

14   the Mobile Crime Lab technician at that time.

15           Those swabs were submitted to the Evidence Control Unit

16   and given one property number, which is why you might see that

17   it's different from the actual knife itself.  The knife was then

18   also submitted as evidence under another property, another

19   property number.  And then the previous analyst actually did the

20   testing on those swabs to confirm whether or not there was human

21   blood indicated.  And at the time he stored them in the secure

22   storage location, since is he didn't have a victim standard or

23   victim standard at that time to compare it to.

24   Q    Okay.  Now, you say that they were taken off the knife.  Do

25   you mean the same knife that you swabbed later on in 2007, under

DIRECT EXAMINATION OF LABBE

128

1    Entry Number Five?

2    A    That is correct.  I went back and looked at the Mobile Crime

3    Lab technician's report and it was dated as such.

4    Q    Okay.  Except that these two blood samples were swabbed the

5    night the knife was recovered, is that correct, by the mobile

6    crime scene technician?

7    A    That is correct.

8    Q    And a mobile crime scene technician is somebody who actually

9    goes out to the crime screen where the item is recovered and does

10   work out there, is that correct?

11   A    That is correct.

12   Q    Also, Ms. Labbe, blood standard from Willie Mitchell, Number

13   Six.  Can you tell us how that was obtained and who submitted

14   that?

15   A    May I refer to my notes?

16        THE COURT:  You may.  Yes.

17   A    That blood sample was actually submitted under a different

18   complaint number.

19   Q    Okay.

20   A    Did you want that complaint number?

21   Q    Well, actually, I want the name of the detective, if you

22   could?

23   A    It was submitted by Detective Gary Niedermeier, and he

24   submitted that blood card on March 25th of '02.  On 11/04 -- I'm

25   sorry.  I'm sorry.  Take that back.  That was when he requested

1    the work to be done.  He originally submitted the blood card on

2    September 16th of '02.

3    Q    Okay.

4    A    That's not correct.  That can't be right.  I had called --

5    I'm sorry.  I had called back to the office to find this out.  It

6    was submitted by Gary Niedermeier in '02 and then Kim Mullings,

7    who is no longer with us, either, she worked in my section of the

8    laboratory, packaged those for DNA analysis on November 4th of

9    '02.  I think they had given me the wrong date that the detective

10   actually requested the work be done.

11   Q    Okay.  And so you used -- well, not you, but whoever

12   prepared this report, Kenneth Jones, received this exhibit on

13   April 5th of '07, as he says up at the top of his report, but it

14   was actually a blood standard that was obtained and submitted by

15   Detective Niedermeier back in 2002.  Is that your testimony?

16   A    That's correct.  And if you'll read the statement above

17   that, it refers to the DNA report number.

18   Q    Yes.

19   A    That that blood card was actually generated by a DNA

20   analyst.  I can't see that side of it.

21   Q    Can you see it now?

22   A    Nope.  The other way.  The biology number.  I can't see past

23   biology.  The biology number was B020073, which is different from

24   the biology number that this one was generated.  That is where

25   the original work was done on that blood card.

1    Q    I see.  All right.  Detective Niedermeier is going to

2    testify later on in this trial, Ms. Labbe, so I think those are

3    all the questions that I have for you.  Thank you very much for

4    clearing that up.

5                 CROSS EXAMINATION

6    BY MR. LAWLOR:

7    Q    Ma'am, just so the ladies and gentlemen of the jury are

8    clear.  At the time that Mr. Jones did his analysis of these

9    various samples, he had before him to compare Mr. Alexander's

10   known DNA, correct?

11   A    If it's listed on that report at the top that's what Ken

12   Jones had done.

13   Q    Okay.  Well, does Mr. Jones do his analysis pursuant to a

14   request that you make?

15   A    He does it based on a request that the serologist would

16   make, yes, sir.

17   Q    Is that you?

18   A    In this particular case for those items?

19   Q    Yes.

20   A    Yes.

21   Q    Okay.  So then since he did the request, since he did the

22   analysis at your request, you would know what he had to compare

23   and analyze, right?

24   A    Absolutely.

25   Q    All right.  Because you seem a little uncertain about what

1    was collected by whom when, is that fair?

2    A    No.  It's just the blood cards that were previously

3    generated under a different complaint number.  They were used to

4    compare to the evidence that I submitted for Mr. Jones.

5    Q    Okay.  In any event, at the time he did his analysis, Mr.

6    Jones had to compare Mr. Alexander's known DNA, Mr. Clash's known

7    DNA, two blood samples that came from H-1, a swab that came from

8    H-1, and Mr. Mitchell's known DNA, is that correct?

9    A    I'm not sure which H-1 is.  But if you're referring to --

10   Q    H-1 is the knife --

11   A    That's correct.

12   Q    -- that you said earlier today you swabbed.

13   A    Yes.  I just have them by property numbers.

14   Q    Okay.  Is what I said that Mr. Jones had available to

15   compare and analyze correct?

16   A    I believe -- you'd have to ask Mr. Jones, but typically,

17   when that blood card of Mr. Mitchell's was previously analyzed,

18   he doesn't actually reanalyze the blood card.  He uses that

19   information off the other DNA report as a comparison.

20   Q    Okay.  Have you had a chance to review what has been

21   submitted by the government as Exhibit H-15?

22   A    I know them by property numbers.  So what is H-15?

23   Q    May I approach, Your Honor?

24        THE COURT:  Yes.

25   Q    Have you seen that before?

1    A    I have seen this, yes.  This was the DNA report generated by

2    Mr. Jones.

3    Q    Okay.  You see where it says "sample?"  Do you see that?

4    A    Um-hum.  Yes.

5         THE COURT:  I'm sorry.  Say yes or no please, Ms.

6    Labbe.

7    A    Yes.

8    Q    And you see one through six?

9    A    Yes, sir.

10   Q    All right.  That one through six is designed to coordinate

11   with the one through six referenced immediately above that,

12   correct?

13   A    That is correct.

14   Q    All right.  So we can assume, can't we, that Mr. Jones

15   compared one through six, and that's the summary of his findings

16   right below there, right?

17   A    That is correct.

18   Q    No further questions.

19        MR. MARTIN:  No questions, Your Honor.

20        MR. CROWE:  No questions.

21        MR. COBURN:  No questions, Your Honor.

22        THE COURT:  Thank you very much, Ms. Labbe.  Thank you

23   for coming back.  Next witness.

24        MR. HANLON:  Your Honor, the United States calls

25   Raymond Bond.

1          RAYMON BOND, GOVERNMENT'S WITNESS, SWORN

2               THE WITNESS:  I do.

3               THE CLERK:  Be seated.  Speak directly toward the mike.

4     State your name and spell it for the record, please.

5               THE WITNESS:  Raymond Douglas Bond.  R-A-Y-M-O-N.

6     B-O-N-D.

7               DIRECT EXAMINATION

8     BY MR. HANLON:

9     Q    Mr. Bond, good afternoon to you.

10    A    Good afternoon.

11    Q    Where do you work, sir?

12    A    Maryland State Police.

13    Q    And what do you do for the Maryland State Police?

14    A    I'm a civilian employee background investigator.

15    Q    Prior to being an investigator with the Maryland State

16    Police, were you actually also a trooper?

17    A    I was.

18    Q    And how long were you a Maryland state trooper?

19    A    Nine and a half years.

20    Q    And during that time, what rank did you hold when you moved

21    from trooper to civilian investigator?

22    A    Trooper First Class.

23    Q    As a Maryland state trooper, did you receive standard

24    on-the-job and pre-job training to be a trooper?

25    A    Yes.

1    Q    What caused you to move from being in uniform to a civilian

2    position?

3    A    I was injured on a traffic stop effecting an arrest.

4    Q    And I apologize if I already asked you this.  But how long

5    have you been an investigator?

6    A    For three years now.

7    Q    And where are you currently posted?  Where's your office?

8    A    At Headquarters in Pikesville, Maryland.

9    Q    Now, while you were still a trooper with the Maryland State

10   Police Department, I'd like to ask you about a case you were

11   involved in on May the 7th of 1999.  Were you on duty that day?

12   A    Yes.

13   Q    What were you doing that day?

14   A    I was assigned the Harford County patrol area of Interstate

15   95.  I was in a marked car, in uniform.

16   Q    Flashing lights, the whole thing?

17   A    Yes, sir.

18   Q    You're on a patrol in a marked car.  What were you doing

19   that day?  What do you try to do when you're on patrol?

20   A    I enforce the motor vehicle laws, the criminal laws,

21   insuring the safety of life and property.

22   Q    Now, directing your attention to approximately 2:50 in the

23   afternoon.  Did you have, did you end up making a traffic stop

24   about that time?

25   A    Yes.

1    Q    Were you by yourself or were you with anyone else?

2    A    I was by myself.

3    Q    What did you see that caused you to make a traffic stop?

4    A    I observed a green Mazda two door traveling southbound in

5    directly my area.  I was parked stationery in an emergency

6    crossover, monitoring southbound traffic.  And I observed an

7    operator of a vehicle traveling without a seat belt on.

8    Q    From what you could tell when you saw that Mazda drive by,

9    you were able to actually see the driver from your position?

10   A    Clearly.  The window was down on the driver's side.

11   Q    Now, a part of your training as a trooper at that time,

12   depending on how fast the car is going, are you trained to be

13   able to identify a driver, what he's doing, whether he's seat

14   belted and things like that?

15   A    Yes.

16   Q    Could you tell, when you made that observation, whether

17   there was anyone else in the car with this particular driver?

18   A    At that moment I wasn't looking at the passenger area.  I

19   just had my eyes trained on the operator.

20   Q    You saw an operator without a seat belt.  Did you take any

21   action?

22   A    I did.

23   Q    What did you do?

24   A    I pulled my vehicle from the crossover without losing eye

25   contact of the Mazda.  I stopped the vehicle for the seat belt

1   violation southbound I-95 in the area of the 87 mile marker.

2   Q    Any trouble making a stop?

3   A    Not at all.

4   Q    Driver didn't try to get away or anything like that?

5   A    No.

6   Q    When you first made the stop, were you still by yourself?

7   A    Yes.

8   Q    Didn't call for backup or anything?

9   A    No.

10  Q    What did you do after making the traffic stop?

11  A    I made contact with the operator of the vehicle from the

12  passenger side of the violator's vehicle.

13  Q    You went around to the passenger side for safety purposes,

14  is that right?

15  A    Yes.

16  Q    You don't want to be on the side of the traffic?

17  A    Correct.

18  Q    Did you talk to the driver?

19  A    I did.

20  Q    And did you get a name or did you identify the driver?

21  A    When the operator provided a license, he provided a Virginia

22  driver's license, identifying him as Shelly Wayne Martin.

23  Q    Let me show you what's been marked as Government's Exhibit

24  Miscellaneous 11 for purposes of this case.  This is a photocopy

25  of a document.  Do you see it on the screen?

1   A    Yes.

2   Q    And what is this?  What is this a copy of?

3   A    That is a photocopy of the Virginia driver's license.  I

4   made a photocopy of it that day.

5   Q    Ultimately later on that day?

6   A    Yes.

7   Q    What did you talk to the driver about?

8   A    I first identified myself, stated the reason for the traffic

9   stop, and requested his driver's license and the vehicle

10  registration.

11  Q    And did Mr. Martin provide you those things?

12  A    He did.

13  Q    And what information did you get from the car information or

14  from Mr. Martin about whose car it was?

15  A    Martin provided a temporary registration that was just

16  issued the day prior to the traffic stop, indicating that the

17  owner was a Shawn Gardner.

18  Q    Let me show you on that subject a document that's been

19  marked as Government's Exhibit Miscellaneous Ten.  Is this a copy

20  of the temporary registration you just mentioned?

21  A    It looks like the same one.

22  Q    And the name of the identified owner of the vehicle, as I've

23  just circled, is that Shawn Earl Gardner?

24  A    Yes.  Yes.

25  Q    And there's a description of the vehicle.  A 1993 Mazda.  Is

1   that accurate?

2   A    Yes.

3   Q    Did you get any other information about the car from Mr.

4   Martin at that time?

5   A    At that time, no.

6   Q    What action -- did you make any observations at this point?

7   You're speaking with Mr. Martin.  He's providing this

8   documentation and his driver's license.  Did you make any

9   observations about the car?

10  A    I did.  Upon my initial contact, actually prior to me

11  stopping the vehicle, I noticed it had a temporary Delaware

12  license plate affixed to the back window of the vehicle.  As I

13  approached the vehicle, I looked in the passenger compartment of

14  the vehicle just a second before I made contact with Mr. Martin.

15  I observed an aerosol can of citrus air freshener.

16  Q    And why was that relevant to you as a state trooper?

17  A    Through my training, knowledge and experience, I know that

18  spray aerosol air fresheners are one of the commonly used known

19  masking agents for narcotics.

20  Q    Did you smell anything else?  You mentioned that you saw a

21  can of air freshener.  Did you smell anything at this point?

22  A    I did.  I had an overwhelming odor of citrus air freshener

23  when I was making contact with Martin during the traffic stop and

24  a faint odor of what I believed to be was burnt marijuana.

25  Q    Now, having, with all of that smell information, did you ask

1    Mr. Martin whether he'd be willing to step out of the vehicle?

2    A    Yes.

3    Q    And did he do so?

4    A    He did.

5    Q    Did you ask Mr. Martin whether he'd be willing to have his

6    person searched or patted down?

7    A    Only for the patdown for weapons for my safety and his.

8    Q    And he was okay with that?

9    A    Yes.  He raised his hands up and he said yes.

10   Q    And did you find any weapons or contraband?

11   A    No, I did not.

12   Q    As you were dealing a little bit more closely with Mr.

13   Martin's person, did you smell anything else?

14   A    The smell of the burnt marijuana was more pungent on his

15   clothing.

16   Q    Now, as Mr. Martin is stepping out of the vehicle, did you

17   observe anything in the ash tray of the Mazda?

18   A    I did.  The vehicle's ash tray was pulled open and there

19   were ashes inside of the ash tray.

20   Q    Now, at any point did you ask Mr. Martin at all about

21   whether he had any marijuana or whether there had been any

22   marijuana in the car?

23   A    I did.

24   Q    And what did he say?

25   A    As I said, when I was performing the patdown of Mr. Martin,

1    I could smell the odor of marijuana is more strong.  I asked him

2    if he had been smoking marijuana, if there's any marijuana in the

3    vehicle.  Martin stated there was not any marijuana in the

4    vehicle, that he had smoked some marijuana earlier in the day

5    with Gardner, who is the owner of the vehicle.

6    Q    Now, at some point did you talk to Mr. Martin about

7    conducting a search of the Mazda?

8    A    I did.

9    Q    And how did you discuss that with Mr. Martin?

10   A    I had provided Mr. Martin with an MSP Form 78, I believe it

11   is.  It's a Consent to Search form.

12   Q    This is a form that you used routinely as a state trooper?

13   A    That's correct.

14   Q    Does it advise a person about their rights concerning the

15   vehicle search?

16   A    Yes.

17   Q    Did you, does the form ask a person if they're willing to

18   consent to a search of their car?

19   A    Yes.

20   Q    Did you go over this form with Mr. Martin?

21   A    Yes.

22   Q    Did, at any point, Mr. Bond, did you tell Mr. Martin that he

23   was obligated to sign the form, that he could get in trouble if

24   he didn't?

25   A    No, not at all.

1    Q    Did Mr. Martin sign the form?

2    A    He did.

3    Q    Did Mr. Martin indicate he was willing to have you search

4    the Mazda?

5    A    Yes.

6    Q    At this point you've been dealing with Mr. Martin and you're

7    talking to him about possibly searching his car.  Had any other

8    troopers arrived by the car or at that point are you still by

9    yourself?

10   A    At that point I'm still by myself.

11   Q    After going over the consent issue with Mr. Martin, did you

12   do a search of the Mazda?

13   A    Once I had backup there, I did.

14   Q    At some point, there are backup troopers who arrived?

15   A    Yes.

16   Q    Why did you have additional troopers arriving at the scene?

17   A    Well, I didn't summons troopers there prior to me requesting

18   consent.  I didn't want it to be, I didn't want Martin to feel

19   intimidated by an overwhelming police presence.  So it is State

20   Police policy that if trooper is going to search a vehicle, he

21   has to have another backup officer there for the trooper's

22   safety.

23   Q    So the backup eventually arrived and you did a search of the

24   car?

25   A    Correct.

1    Q    How did you go about searching the Mazda?

2    A    I started in the passenger compartment.  At some point

3    during the search I observed the corner of a plastic baggie

4    underneath the center console where the emergency brake is.

5    There is an opening in the plastic there.  When I popped it up, I

6    observed a plastic baggie containing a white rock-like substance.

7    Q    The center console is this item in between a driver and

8    passenger seat where there's an arm rest that can flip up and

9    down and you can put items inside?

10    A    Yes.

11    Q    You saw a piece of plastic coming out of it, you said?

12    A    Yes.

13    Q    And when you flipped over the arm rest, if you could, you've

14    already described it in detail.  Could you tell us what you saw?

15    A    Yes.  When I popped the black plastic molding up, I observed

16    a white rock-like substance smaller than my fist, which I

17    believed through my training, knowledge and experience to be

18    crack cocaine.

19    Q    And it was inside some kind of plastic bag?

20    A    Yes, sir.

21    Q    The conclusion that it might be crack cocaine, what was that

22    based on?

23    A    Through my training, knowledge and experience.

24    Q    Color, the texture of the object, things like that?

25    A    Yes.

1    Q    What did you do with this suspected crack cocaine when you

2    found it?

3    A    At the time of the arrest?

4    Q    Right then and there.

5    A    Right then and there, I left it in the car and I placed

6    Martin under arrest.

7    Q    Did you find anything, if you recollect, at all in the ash

8    tray?

9    A    No.  It was just burnt ashes.

10   Q    Now, ultimately, some other troopers had arrived and you

11   found some, an item in the car, is that right?  Some other

12   troopers were there?

13   A    Yes.

14   Q    Do you recollect finding anything else of evidentiary value

15   during your search of the Mazda?

16   A    Just the spray air freshener and the crack cocaine, as far

17   as evidence in the Mazda.

18   Q    Did you make a decision to place Mr. Martin under arrest?

19   A    Yes.

20   Q    And what did you do when you arrested Mr. Martin?

21   A    I placed Martin under arrest.  I put him in handcuffs.  I

22   did a more thorough search of his person since I only did a

23   weapons patdown for my safety prior to the consent search of the

24   vehicle.  I then placed him in my patrol vehicle.  I retrieved a

25   three-by-five index card which has Miranda rights printed on it

1    that I received from the Maryland State Police academy.  And I

2    advised Martin of his Miranda rights.

3    Q    You did that inside the car?

4    A    Yes.  I was standing outside the car with the passenger door

5    open and he was seated inside the passenger seat.

6    Q    Now, this three-by-five card, is this something you carried

7    around routinely as a trooper?

8    A    Yes.

9    Q    And we talked about this before you came in court today, but

10   you don't have a copy of that card on you?

11   A    No, I don't.

12   Q    Do you recollect what the rights were?  Can you recite them

13   from memory?

14   A    You have the right to remain silent.  Anything that you say

15   can and will be used against you in a court of law.  You have the

16   right to consult a lawyer.  If you cannot hire one or afford one,

17   one will be afforded for you.  Do you understand these rights I

18   have explained to you?  And then there's a line for -- I'm sorry.

19   That's what was on the card.

20   Q    That's what was on the card?

21   A    Yes.

22   Q    Now, at that point, why were you going ahead and informing

23   Mr. Martin of his Miranda rights at that time?

24   A    In case Martin decided to make any type of statements

25   between the time, from the time of the arrest to the time I began

1    processing him.

2    Q    Did you put any questions to Mr. Martin at that time?

3    A    No, I did not.

4    Q    What did you do with Mr. Martin?

5    A    At that time, I transported Martin to the State Police

6    barrack in Perryville.

7    Q    Is this what is sometimes called, correct me if I'm wrong,

8    is this the JFK barracks?

9    A    Yes.

10   Q    As you were taking Mr. Martin back to the barracks, one of

11   the troopers that arrived, was there a Trooper Forrester who had

12   ultimately arrived at the scene before you left with Mr. Martin?

13   A    Yes.

14   Q    As you were taking Mr. Martin back to the barracks, did you

15   receive any radio traffic from Trooper Forrester?

16   A    I personally didn't.  But I overheard Trooper Forrester

17   calling the JFK barrack for a warrant and driver's license check.

18   Q    For what person?

19   A    For Shawn Gardner.

20   Q    So this wasn't directed at you but you hear it over the

21   radio?

22   A    Correct.

23   Q    Is that something you were interested in?

24   A    I was very interested in it because to my knowledge I don't

25   believe Trooper Forrester knew that Shawn Gardner was the owner

1    of the vehicle that I just found the crack in.  And since Martin

2    was by himself, I was suspicious on how Trooper Forrester came

3    into contact with Gardner.

4    Q    Now, you still had Mr. Martin in your car?

5    A    Yes.

6    Q    Did you turn right around or did you continue to the

7    barracks?

8    A    No.  What I did at that time when I heard Trooper Forrester

9    call for the warrant check and license check of Gardner, I called

10   Trooper Forrester over the radio and asked him to detain Gardner.

11   I was going to respond to the barrack, drop off Martin, secure

12   him in a cell, and I was going to respond back down to the scene,

13   wherever Trooper Forrester was at that time.

14   Q    So you went ahead, went back to the barracks, took care of

15   Mr. Martin, and submitted the suspected crack, is that right,

16   before going back to deal with Trooper Forrester?

17   A    Yeah.

18   Q    Did I get any part of that wrong?

19   A    Well, when you say process the crack.  All I did was I put

20   that in temporary --

21   Q    Submitted it?

22   A    -- temporary evidence locker until I had time to properly

23   weigh it and do the proper paperwork on it.

24   Q    So at some point you returned to Trooper Forrester's

25   location, is that right?

1    A    Yes.

2    Q    I'm not going to ask you for the exact time.  But did this

3    take hours, minutes?  What was the process?

4    A    No.  It was a matter of -- everything happened

5    chronologically.  I didn't waste any time at the barrack.  I

6    secured Martin in the cell.  As soon as I got his property, set

7    it to the side.  I secured the crack in a temporary locker.  And

8    I immediately went down to Trooper Forrester's location.

9    Q    And I gather you found Trooper Forrester?

10   A    Yes.

11   Q    And what was he doing when you arrived at his location?

12   A    He was pulled over on the right shoulder of Interstate 95,

13   approximately a quarter of a mile south of the turn-around that I

14   used to go northbound with Martin.  And he was behind a blue

15   Acura hatchback.

16   Q    And did he have anyone with him, any civilians?

17   A    Any civilians?  As far as civilians go, Earl Gardner or

18   Shawn Gardner was there, and I believe TFC Spinner was also

19   there, Trooper Spinner.

20   Q    At some point, did you, along with other troopers, see any

21   driver's license for Mr. Gardner?

22   A    Yes.

23   Q    And showing you what's been marked as Government's Exhibit

24   Miscellaneous 12.  Is this a copy of the driver's license?  The

25   photo is not particularly visible.  But is this a photocopy of

1    the driver's license for Shawn Gardner?

2    A    It is.  It is.

3    Q    What was done at what I'll call the Gardner scene?  Trooper

4    Forrester is there and you've arrived.  What happened?

5    A    Trooper Forrester advised me that he saw Gardner pulled over

6    on the side of the road and he thought it was a disabled vehicle

7    so he stopped to check on him.  And at some point during the

8    conversation with Gardner, Trooper Forrester asked for consent to

9    search Gardner's vehicle.  Prior to --

10              MR. COBURN:  Objection, hearsay.

11              THE COURT:  Overruled.  You may continue.

12              THE WITNESS:  Prior to --

13   BY MR. HANLON:

14   Q    Were you present for these events?

15   A    I was present for when TFC Forrester just began the search

16   of the vehicle.  From as best as I can remember.

17   Q    All right.  And did you see him actually undertaking the

18   search?

19   A    He began to search but he had also, prior to me arriving

20   there, like I said, had asked for the driver's license check for

21   Gardner.

22   Q    And at some point was that information received?

23   A    It was.

24   Q    And were you present when that information was received?

25   A    I was.

1    Q    And what was the status of Mr. Gardner's license check?

2    A    His privilege to drive in the State of Maryland was

3    suspended.

4    Q    Was Mr. Gardner then placed under arrest?

5    A    Yes.  I placed Mr. Gardner under arrest.

6    Q    And what was done at that point?  Mr. Gardner's been

7    arrested.  Was there any change with respect to the search of Mr.

8    Gardner's car?

9    A    I resumed search of the vehicle.  Trooper Forrester didn't

10   finish completing the search of the vehicle.  Myself and TFC

11   Spinner completed the search of the Acura.

12   Q    Was there anything of evidentiary value found inside the

13   Acura?

14   A    There was a small amount of marijuana found in between the

15   driver's seat and the center console, I believe, if I remember

16   right.

17   Q    Now, following the completion of the search of the Acura,

18   was Mr. Gardner taken back to the JFK barracks?

19   A    Yes, I transported Gardner to the JFK barrack.

20   Q    At this point, prior to leaving the scene or during the

21   transport, did you advise Mr. Gardner of his Miranda rights?

22   A    No.

23   Q    You just took him back to the barracks?

24   A    Yes.

25   Q    What was done with Mr. Gardner when you returned to the JFK

1  barracks?

2  A    I took Gardner back to one of the holding cells at JFK

3  barrack.  Supervisor watched me.  I did a standardized search of

4  Mr. Gardner.

5  Q    Do you recollect the approximate, just approximate time or

6  how long all of this stuff had been happening from the initial

7  part of the arrest just before 3:00 until when Mr. Gardner was

8  transported back to the barracks?  Do you recollect approximately

9  how long that was?

10 A    I believe I placed Martin under arrest approximately five

11 minutes after three in the afternoon.  I believe I got Gardner

12 back to the JFK barracks sometime between 4:10 and 4:15.

13 Q    When you got Mr. Gardner back to the barracks, did you put

14 him in the same cell with Mr. Martin or a different cell?

15 A    No.  A different cell.

16 Q    What was the reason for that?

17 A    It was Maryland State Police procedure that we would not

18 have two people in one cell at one time.

19 Q    Now, at any point, Mr. Bond, had you talked to either Mr.

20 Gardner or Mr. Martin or given them any advisories?

21 A    I did.

22 Q    And what did you -- who did talk to first?  Do you remember?

23 A    I don't recall which, Martin or Gardner, that I spoke to

24 first.  I know that I approached Gardner when I was doing his,

25 his search.  We have, Maryland State Police has a form that's

1    called a Prisoner Detention Log, Form 112, and we capture all of

2    the prisoner's vitals, height, weight, date of birth, social,

3    place of birth.  Also, any inventory, anything that the arrestee

4    or detainee may have on them, any type of jewelry, money, stuff

5    like that, we have them sign for it.

6             At the same time, when I was complete doing the

7    Prisoner Detention Log, the Form 112, I also presented Gardner

8    with his Advice of Rights, which is a standard form, 180, that we

9    have from the Maryland State Police.

10   Q    Let me show you another exhibit.  That has been marked as

11   Government's Exhibit -- bear with me, Mr. Bond -- Government's

12   Exhibit Miscellaneous 15.  I'll probably zoom in to part of it.

13   Can you tell me what this form is?

14   A    Yes.  That is a Maryland State Police Form 180, the Advice

15   of Rights form.

16   Q    This particular Form 180 is the form that you used with

17   respect to which defendant?

18   A    Shawn Earl Gardner.

19   Q    As part of the standard information you put out on the form,

20   do you indicate the date and the time that you go over the form?

21   A    The date, the time and location, the person explaining the

22   rights.

23   Q    In this case the date is May 7th of '99, the day we've been

24   talking about, is that right?

25   A    Yes.

1    Q    And the time is what?

2    A    It's 1625, 25 minutes after 4:00 in the afternoon.

3    Q    This form also goes over what are generally referred to as

4    the Miranda rights?

5    A    Yes.

6    Q    How did you review this form with Mr. Gardner?  What did you

7    do?

8    A    I had a copy for Mr. Gardner to look at while I read it to

9    him.  He appeared to be reading along.  And afterwards Gardner

10   signed it at the bottom.

11   Q    Is that his signature at the bottom there?

12   A    It is.

13   Q    And then you also put your signature as the witness?

14   A    Yes.

15   Q    There's an advisory here in the middle, Mr. Bond, beginning,

16   I have read or have had read to me this explanation of my rights.

17   I fully understand each of these rights and I am willing to

18   answer questions without consulting a lawyer or having a lawyer

19   present at this time.  My decision to answer questions is

20   entirely free and voluntary and I have not been promised

21   anything, nor have I been threatened or intimidated in any

22   manner.

23        Did you either go over that language or allow Mr.

24   Gardner to review it?

25   A    I did.  As I said, I presented the form to him for him to

DIRECT EXAMINATION OF BOND

153

1    read and then I also read it aloud to him.  He appeared to be

2    reading the form as I was reading along.

3    Q    Did Mr. Gardner have any questions for you about any of the

4    numbered rights, one through five, or about that language at the

5    bottom?

6    A    No.

7    Q    He obviously signed the form, as you indicated?

8    A    Yes.

9    Q    Did he tell you at any point that he wanted to be left alone

10   or that he wanted to talk to a lawyer?

11   A    No.

12   Q    Did he indicate that he didn't understand anything or that

13   he was confused?

14   A    No.

15   Q    Now, did you go ahead and interview Mr. Gardner after going

16   over this form with him?

17   A    No.

18   Q    Why not?

19   A    It was our policy at the barrack that if we, as in troopers,

20   made an arrest of a significant amount of drugs, we would have to

21   contact the Drug Enforcement Administration's task force officer,

22   which at that time was for the Maryland State Police, was a

23   trooper first class who would work as a liaison and work with the

24   DEA and the Maryland State Police.  It would be their

25   responsibility for the interrogation.

1    Q    So your intention was to Mirandize but then turn the

2    interview over to a fellow officer?

3    A    That's correct.

4    Q    Now, at some point, whether it was before or after this, you

5    also went ahead and had some additional conversation with Mr.

6    Martin, is that right?

7    A    Yes.

8    Q    Let me show you what's been marked as Government's Exhibit

9    Miscellaneous 14.  Did you also take an opportunity to go over a

10   written Miranda form MSP 180 with Mr. Martin?

11   A    Yes.

12   Q    Let me ask you about this particular form.  We noted that on

13   Mr. Gardner's form we had a time of 1625, 4:25 p.m.  On this

14   particular written form, we have a date and a time of May the 7th

15   of 1999 and a time of 1515.  That would be 3:15 p.m.?

16   A    Yes.

17   Q    Mr. Bond, is 1515 the time that you actually went over this

18   written form with Mr. Martin?

19   A    No.

20   Q    Why did you put 1515 on this form?

21   A    When I stated earlier, when I placed Martin under arrest for

22   the drug violation, I placed him in my car when he was

23   handcuffed, and I advised him of the Miranda rights from the

24   three-by-five card that was in my pocket.  At that time there was

25   no way for Martin to be able to sign an MSP Form 180, which is

Case 1:04-cr-00029-RDB   Document 675   Filed 06/08/09   Page 155 of 239

1    the Advice of Rights form to acknowledge.  So I just made note

2    either from my watch or I wrote it down on an index card.  I

3    don't recall.  But I remember that it was 1515 hours that I

4    advised him at the scene of the arrest of his rights.

5    Q    So 1515 oral advice, and then this form is done later, is

6    that correct?

7    A    That's correct.  Back at the barracks.

8    Q    You went over the two forms with the two defendants

9    separately, is that right?

10   A    That's correct.

11   Q    The form contains the same language, is that right?

12   A    Yes.

13   Q    Did you review it the same way?

14   A    I did.

15   Q    Once again, did Mr. Martin sign the form at the bottom?

16   A    He did.

17   Q    Did Mr. Martin have any questions or express any confusion

18   about this form?

19   A    No.

20   Q    Did he say he wanted to be left alone or that he wanted

21   counsel?

22   A    No.

23   Q    Did you interview him?

24   A    I'm sorry?

25   Q    Did you interview him?

1    A    No.

2    Q    Same thing, turned him over to other officers?

3    A    That's correct.

4    Q    Now, after going over these processes and from the time

5    that these two defendants arrived at the barracks and you were

6    with them, were you in or near their cells during the time they

7    were awaiting the arrival of this other trooper?

8    A    Yes.

9    Q    Did any other police officers, during the time that you were

10   there, go into the cells, converse with them, ask them any

11   questions or discuss anything with them before this other

12   trooper, the DEA TFO arrived?

13   A    No.

14   Q    With respect to the suspected crack that you found during

15   your initial search of the car that was driven by Mr. Martin, did

16   you, ultimately, I know it was put into a safe location when you

17   went out to help Trooper Forrester.  Ultimately, did you submit

18   this suspected crack for lab analysis?

19   A    Yes.

20   Q    I put up on the screen in front of you Government's Exhibit

21   L as in Lab 11.  Is this a copy of the laboratory submittal form

22   for that substance?

23   A    It is.

24   Q    And just showing you a couple of items.  The submitted item

25   is one plastic baggie containing an off-white rock substance, is

1    that right?

2    A    Yes.

3    Q    There's, there are some names down at the bottom.  Your name

4    appears here.  Does that mean that you're one of the people who

5    was involved in handling this substance?

6    A    Correct.

7    Q    And there's an agency case number, if I'm reading that

8    correctly.  Is it 99-62-07156?

9    A    Yes.

10   Q    And then there's a Crime Lab file number of, I might get

11   that wrong, is that a CC or CL?

12   A    I don't know.

13   Q    That's all right.  CC 0, I think that's an L, but it ends in

14   4230, is that right?

15   A    I can't see from where it is on my screen.  If it can be

16   moved over a little bit.

17   Q    Sure.  I'm sorry.

18   A    Yes.  4230.  Last four.

19   Q    My colleague's just reminded me.  I should have asked this.

20   And I can zoom in a little bit.  For the record, Mr. Bond, I'll

21   read this property number in for you.  Property number is

22   P-155715.  Do I have that correct?

23   A    Yes.

24   Q    And based on your initial assessment of the weight and the

25   size of this package, in your experience, Trooper, was this a

1    large seizure of crack cocaine?

2            MR. COBURN:  Objection to the characterization.

3            THE COURT:  Rephrase the question.

4    Q    How did this seizure of suspected crack cocaine compare to

5    other drug seizures that you've made, that you made during your

6    time as a trooper?

7            MR. COBURN:  Objection, irrelevant.

8            THE COURT:  Overruled.  You may answer.

9    A    Most of the drug arrests that I made while I was a trooper

10    were what I would consider personal use and not considered a

11    felony amount.  Knowing this cocaine over an ounce would be

12    considered a felony amount.

13            MR. COBURN:  Objection.  Motion to strike.

14            THE COURT:  Motion denied.  Objection overruled.

15    Q    And an ounce would be about 28 grams, is that right?

16    A    Approximately.

17    Q    Was this quantity in this case more or less?

18    A    It would be more.

19    Q    Thank you, sir.  Nothing further, Your Honor.

20            THE COURT:  Would you like some water, Mr. Bond?

21            THE WITNESS:  I'm good.  Thank you, Your Honor.

22            CROSS EXAMINATION

23    BY MR. PYNE:

24    Q    Good afternoon, Mr. Bond.

25    A    Good afternoon.

1   Q    I'm Jim Pyne.  I represent Mr. Martin.  I have just a few

2   questions for you.  What this all relates to, on May the 7th of

3   1999, is that correct?

4   A    Yes.

5   Q    And you have a clear recollection of the events of that day

6   even though it was almost nine years ago?

7   A    To the best of my knowledge.

8   Q    Okay.  Do you recall what shift you were working that day?

9   A    I was working early shift, which is considered 0700 to 1500

10  hours, seven in the morning to three in the afternoon.

11  Q    Until three in the afternoon?

12  A    Yes.

13  Q    So this would have been just about the time you were getting

14  off your shift?

15  A    Correct.

16  Q    Okay.  Do you recall what the traffic conditions were like

17  that day?

18  A    I would say medium.

19  Q    Okay.  Do you recall what the weather was like that day?

20  A    Cloudy.

21  Q    Cloudy?  You had no problem viewing the vehicles, though?

22  A    No.  Not at all.

23  Q    So you say that there was a medium amount of traffic.  And

24  was there anything in particular that drew your attention to this

25  particular car, this Mazda?

1    A    No.

2    Q    And you were on the side of the road or in the middle of the

3    road?

4    A    I was in the center of Interstate 95, parked perpendicular

5    to traffic flow.

6    Q    The traffic that was heading southbound?

7    A    Correct.

8    Q    Okay.  And you don't have any recollection as to whether or

9    not you saw anyone in the passenger seat?  Your attention was

10   directed towards the driver?  Was that your testimony?

11   A    That's correct.

12   Q    Do you recall if the driver's window was up or down?

13   A    It was down.

14   Q    And was this a two door or four door car?

15   A    Two door.

16   Q    Okay.  Do you recall if the passenger side window was down

17   or up?

18   A    At the time when Martin was passing me?  No.

19   Q    Okay.  When you ultimately stopped the car and approached

20   the vehicle, do you recall if the window was up or down?

21   A    It was down.

22   Q    Do you recall if he put it down or it was already down by

23   the time you got up there?

24   A    From the point of me being able to see the passenger side of

25   the vehicle when I came around the rear of my vehicle and

1    approached it, it was down.

2    Q    Okay.  Now, you said you never lost sight of the vehicle

3    after it passed you as you were pulling it over, is that correct?

4    A    That's correct.

5    Q    Did you keep your eyes on the driver to see if there was any

6    unusual movements that the driver was making?

7    A    Yes.

8    Q    Okay.  At any time did you see him spray an aerosol can

9    within the car?

10   A    I don't recall.

11   Q    Okay.  That's something you would have noticed, though?

12   A    At the time.

13   Q    Okay.  In fact, that would have been something you were

14   looking for by keeping your attention directed on the driver,

15   isn't that correct?

16   A    Um-hum.

17   Q    Okay.

18   A    Yes.

19   Q    And you did not note in your report that there was any

20   spraying of an aerosol can?

21   A    I did not write in my report that I observed Martin spray

22   anything in the vehicle.

23   Q    Okay.  So are we safe to assume that he didn't spray the

24   aerosol can while you were approaching the vehicle?

25   A    I can't assume that.

1   Q    Okay.  You didn't see those activities, did you?

2   A    I did not see that.

3   Q    Okay.  And you were, in fact, looking for those activities?

4   A    Yes.

5   Q    Weren't you?  Okay.  All right.  We'll move on.  Now, when

6   you approached Mr. Martin, he was polite and cooperative with

7   you, wasn't he?

8   A    Yes.

9   Q    And he provided his license to you?

10  A    Yes.

11  Q    And the vehicle's registration?

12  A    Yes.

13  Q    And I believe your testimony noted that the registration

14  indicated that Mr. Martin was, in fact, not the owner of the car,

15  is that correct?

16  A    Correct.

17  Q    That the car had just been purchased the day before by Mr.

18  Gardner?

19  A    Yes.

20  Q    Did you have any conversation with Mr. Martin about that?

21  A    Yes.

22  Q    And what did Mr. Martin tell you?

23  A    From what I recall, Martin told me that his friend, Shawn

24  Gardner, had purchased the vehicle the day prior at the Delaware

25  Auto Auction and that Gardner had gotten Martin to drive up to

1  Delaware that day to pick the car up to bring it back since

2  Gardner was by himself the day before when he purchased the

3  vehicle.  So he needed Martin's assistance to bring the vehicle

4  back to Maryland.

5  Q    Okay.  So Martin indicated to you that he had just gone up

6  that morning to get the car and they were in the process of

7  driving back?

8  A    Yes.

9  Q    And this was about 2:30 or so in the afternoon, is that

10 correct?

11 A    When I made the traffic stop, it was ten of three.

12 Q    Ten of three.  Okay.  Thank you.  And it was your testimony

13 that -- can you estimate how fast the car was traveling when it

14 passed you by, without Mr. Martin having his seat belt on?

15 A    I would guess he was going with the flow of traffic, which

16 out on Interstate 95 is anywhere between 65 and 75 miles an hour.

17 Q    Okay.  So he's traveling 70, 75 miles per hour.  His window,

18 at least, is open.  The passenger window may have been open?

19 A    May have been.

20 Q    Okay.  And when you approached the vehicle, there's still an

21 overwhelming odor of citrus within that vehicle?

22 A    Correct.

23 Q    And even over that overwhelming odor of citrus, you were

24 still able to pick up a slight odor of marijuana?

25 A    That's correct.

1    Q    Now, did you ever recover any marijuana from inside that

2    vehicle?

3    A    No.

4    Q    Now, you asked Mr. Martin to step from the car, is that

5    correct?

6    A    That's correct.

7    Q    And you asked his permission to pat him down?

8    A    That's correct.

9    Q    And he was polite and cooperative with you?

10   A    Yes.

11   Q    He had no problem with you patting him down?

12   A    No.  As a matter of fact, he even raised his hands up also

13   to give a physical indicator of giving me permission to pat him

14   down.

15   Q    You didn't find anything, did you?

16   A    No, I just did a quick patdown.  I didn't perform a search

17   of his person.

18   Q    Okay.  Did you issue him a citation for driving without a

19   seat belt?

20   A    I believe I did write him a citation.  I don't believe it

21   was a warning.

22   Q    Okay.  After you gave him the citation for driving without a

23   seat belt, did you explain to him that he was free to leave at

24   that time?

25   A    Yes.

1    Q    And why did you do that?

2    A    It was State Police policy to do that.

3    Q    Okay.  In fact, he wasn't free to leave, was he?

4    A    At that time, no.

5    Q    Why not?

6    A    Because he had the odor of burnt marijuana on his person in

7    the vehicle.

8    Q    And that slight odor of marijuana, in fact, is sufficient

9    probable cause for you to arrest him right there, isn't it?

10   A    Yes.

11   Q    So even though you're telling him he's free to leave and

12   you're telling him that you would like consent to search that

13   car, in fact, he's not free to leave and, in fact, you have

14   probable cause to search the car whether he gives you consent or

15   not, isn't that correct?

16   A    That's correct.

17   Q    But in spite of that, he agreed to allow you to search the

18   car, didn't he?

19   A    Yes, he did.

20   Q    Okay.  And you eventually found a plastic bag underneath the

21   center console?

22   A    Yes.

23   Q    Now, you had to remove some plastic housing around the stick

24   shift, is that correct?

25   A    Yes.

1    Q    So this is not an area that someone who's just getting into

2    the car to drive him back from Delaware would normally access, is

3    it?

4    A    It wasn't that difficult of a trim piece to pop up.  I don't

5    know if that's answering your question or not.

6    Q    Well, if -- normally, someone getting into the car to drive

7    it would not pop this trim piece out, is that correct?  Is that

8    safe to say?

9    A    I guess.

10   Q    Someone just getting into the car would not be readily

11   apparent to them that that baggie was there, is that correct?

12   A    Correct.

13   Q    And in fact, the case against Mr. Martin in this scenario

14   was ultimately dropped, was it not?

15   A    Not to my knowledge.

16   Q    I don't have anything further.  Thank you, Your Honor.

17   Thank you, Mr. Bond.

18             THE WITNESS:  You're welcome.

19             CROSS EXAMINATION

20   BY MR. COBURN:

21   Q    May I please borrow the government's exhibits?  Good

22   afternoon, Trooper Bond.

23   A    Good afternoon.

24   Q    If I understand correctly, prior to your making the stop of

25   the Mazda that's being driven by Mr. Martin, you're like sort of

Case 1:04-cr-00029-RDB    Document 675    Filed 06/08/09    Page 167 of 239

1    in the median strip of I-95.  I mean, we've all driven on I-95

2    and seen troopers there.  Right?  You're in the middle between

3    the northbound and southbound lanes.  Do I have that correct?

4    A    Yes.

5    Q    Are you facing the southbound lanes?

6    A    Yes.

7    Q    So whereabouts on -- excuse me -- on I-95 are you at this

8    point?

9    A    It's almost exactly at the 90 mile marker.

10   Q    What's that near?

11   A    That is in between the Exit 89, Havre de Grace exit, in

12   between Exit 89, which is for Havre de Grace, and the Millard

13   Tydings Bridge.

14   Q    Okay.  So you're somewhere near Havre de Grace, which is

15   well north of Baltimore, right?

16   A    Approximately 30 miles north of Baltimore, yes.

17   Q    About 30 miles.  Excuse me for stepping on your answer

18   there.  About 30 miles north of Baltimore?

19   A    Correct.

20   Q    So it's not a highly urbanized area, right?  Havre de Grace

21   is basically a small town, right?

22   A    I suppose.

23   Q    Okay.  So I mean, this isn't, you're not encountering any

24   sort of rush hour traffic on 95.  I think you indicated in

25   response to one of Mr. Pyne's questions that traffic was moving

1    at a normal rate of speed, right?

2    A    Correct.

3    Q    And I think you told us it was between 65 and 75 miles an

4    hour, right?

5    A    The flow of traffic, approximately.

6    Q    The Mazda, at the time that you first caught sight of it

7    from your stationery position on the median on I-95, is going

8    about how fast?  I'm sorry.  Strike that.  The Mazda, which lane

9    is the Mazda in?  Left, center, or right lane?

10   A    I don't recall.

11   Q    Okay.  You indicated that the driver's side window was down,

12   right?

13   A    Correct.

14   Q    And the car was traveling at approximately the rate of speed

15   that you've already described, correct?

16   A    Correct.

17   Q    So it's your testimony that the only reason that you decided

18   to effect a stop of this vehicle was because, from your

19   stationery position as this car passed you at between 65 and 75

20   miles an hour, you made an observation that the driver of the

21   Mazda was not wearing a seat belt, is that correct?

22   A    That's correct.

23   Q    Now, when you made the stop of the vehicle, you've described

24   already in some detail where you found the crack cocaine.  And

25   you indicated that's in the center console area, is that correct?

1    A    Correct.

2    Q    So that's, that's not in, anywhere near the front of the

3    car, right?  It's not in any of the vent areas?  It's like in a

4    part of the car that's kind of between the driver and the

5    passenger, is that correct?

6    A    It was right where the emergency brake was, except dividing

7    the passenger from the driver.

8    Q    Okay.  You've already told us a little bit about the

9    circumstances by which you became aware that Mr. Gardner was

10   stopped at around the same time period.  Now, that was done by a

11   different state trooper, right?

12   A    Yes.

13   Q    Trooper Forrester, I believe you told us?

14   A    Yes.

15   Q    Was Mr. Gardner going in the same direction of traffic or

16   the opposite direction of traffic when his car was encountered by

17   Trooper Forrester?

18   A    When I arrived at the scene, Gardner's vehicle was pointed

19   south.

20   Q    So that's the same direction?

21   A    That was the same direction.

22   Q    Okay.  How far was Gardner's car from the spot where you had

23   pulled over Martin's car or the car that Martin was driving,

24   rather?

25   A    Exactly?  I don't know.  When I cleared the scene with

1   Martin in my vehicle, where the traffic stop was, I don't recall

2   seeing the Acura.  I had to drive down approximately three-tenths

3   of a mile to get over into the fast lane and turn around at an

4   emergency crossover located at the 87 mile marker.

5         When I was making that turn, I saw Trooper Forrester

6   stop for a blue vehicle south of that location, approximately a

7   quarter of a mile, two tenths of a mile south of the emergency

8   crossover.

9   Q    So about how far were the two places where the cars stopped

10  from each other?

11  A    Roughly six-tenths of a mile maybe.

12  Q    Pretty close?  Okay.  Strike that.

13  A    Over half a mile.

14  Q    Let me show you what the government marked and introduced

15  into evidence as Government's Miscellaneous Exhibit Number Ten.

16  May I put it on the DOAR, Your Honor?

17        THE COURT:  Yes.

18  Q    That was the temporary registration that you've identified

19  during the course of your direct testimony, right, sir?

20  A    Correct.

21  Q    You never developed any evidence suggesting that the car was

22  not, in fact, purchased the day before by Mr. Gardner, did you?

23  A    I'm not sure I understand your question.

24  Q    Do you have any reason to believe he did not actually buy

25  the car on May 6th, 1999?

1    A    No.  The temporary registration provided me, I had no reason

2    to believe it was fraudulent, if that's what you're asking me.

3    Q    That's what I'm asking you.  Thank you very much.

4         Now, you indicated that Mr. Gardner consented to a

5    search of the car that he was driving, right?

6    A    Yes.

7    Q    Were you present at the time that he did that?

8    A    I don't recall.  As -- I'm sorry.  Are you asking me was I

9    present at the time that Gardner signed the consent form, giving

10   Trooper Forrester permission to search the vehicle?

11   Q    That's my question.

12   A    I don't recall.

13   Q    So it may be that when you testified about the fact that

14   that occurred, you were testifying about it based only on the

15   fact that Trooper Forrester had told you, right?

16   A    He had, Trooper Forrester had told me that Gardner had gave

17   him consent to search.  And I remember seeing the Form 78 present

18   at that time.  I don't recall if Trooper Spinner signed it as a

19   witness or if I signed it.  I don't recall.

20   Q    Now, it's your understanding, is it not, that at the time

21   Mr. Gardner consented to the search of the car he was driving, he

22   at least believed that he had a right to say no, right?

23   A    Sure.

24   Q    But he nonetheless consented to the trooper's search of the

25   vehicle?

1    A    To my knowledge, yes.

2    Q    And what was found in the vehicle was a quantity of

3    marijuana?

4    A    Yes.

5    Q    And that marijuana, I believe, if my notes are right, you

6    said, somewhere between the driver's seat and the center console,

7    right?

8    A    I believe.

9    Q    So we're talking about roughly the same area, right?

10   A    Same area as what, sir?

11   Q    As where the crack cocaine had been recovered from the

12   Mazda?  I mean, you indicated that was from near or in the center

13   console, right?

14   A    Yes.

15   Q    Okay.  So this is nowhere near the front vent area of the

16   car?

17   A    No.

18   Q    Right?  Okay.  And when Mr. Gardner -- sorry, Your Honor.

19   I'm referring to what the government's marked as Government

20   Miscellaneous Number 15.  May I put this on the DOAR as well?

21        THE COURT:  Yes.

22   Q    And when Mr. Gardner signed this form saying that he would

23   consent to speak to law enforcement officers on this occasion, it

24   was your understanding that he knew he didn't have to consent,

25   right?

1    A    Yes.

2    Q    I mean, the form says explicitly, in a number of different

3    ways, that the person signing it doesn't have to agree to speak

4    to law enforcement, right?

5    A    Correct.

6    Q    But nonetheless, that's Mr. Gardner's signature, I believe

7    you already told us, at the bottom of the form, right, sir?

8    A    That is Mr. Gardner's signature.

9    Q    And it was your understanding that by signing that, he, in

10   fact, did voluntarily consent to speak to law enforcement about

11   this incident, right?

12   A    Incorrect.  No.

13   Q    He --

14   A    That signature just acknowledges that he has been advised of

15   his rights.

16   Q    Okay.

17   A    That signature does not acknowledge that he is going to

18   actually talk to us.  That's just proof that he has been advised

19   of his rights.

20   Q    Okay.  Well, then, tell us, if you would, with respect to

21   this last sentence on the form, my decision to answer questions

22   is entirely free and voluntary and I have not been promised

23   anything nor have I been threatened or intimidated in any manner.

24   How do you interpret that language, then, with respect to whether

25   he has or has not agreed to speak to law enforcement?

1    A    I interpret that as if he is going to be asked questions, it

2    is entirely free and voluntary and he hasn't been promised

3    anything.  As I said before, that signature is only an

4    acknowledgment that he's been advised of his rights.

5    Q    Finally, let me direct your attention to what the

6    government's marked as Government Exhibit Number L-11.  Do you

7    remember being shown this form at the very end of your direct

8    examination?

9    A    Yes.

10   Q    Now, the form actually shows the results of the laboratory

11   analysis, right, sir?

12   A    Yes.

13   Q    It indicates that Item Number One was 41.3 grams of cocaine

14   base, 44%, that's a Schedule Two substance, right?

15   A    Yes.

16   Q    And Item Number Two, 11.8 grams cocaine base, also Schedule

17   Two substance, right?

18   A    Yes.

19   Q    Now, under that, under those results, there's a signature,

20   right, sir?

21   A    Yes.

22   Q    Do you know who that is?

23   A    Vonzella C. Johnson.

24   Q    Do you know that person?

25   A    Never met the person before in my life.

1    Q    Ever spoken to her?

2    A    No, sir.

3    Q    Now, you didn't do this analysis, right, sir?

4    A    No, I did not perform the drug analysis.

5    Q    As far as you know, the person who signed the analysis did

6    it, right, sir?

7    A    Yes.

8    Q    But nonetheless, the government showed you this form,

9    correct, and put it on the presenter?

10   A    Yes.

11   Q    Thank you.  Nothing further.

12            MR. HANLON:  No redirect, Your Honor.

13            THE COURT:  Thank you very much, Mr. Bond.  You're

14   excused.

15            THE WITNESS:  Thank you, Your Honor.

16            THE COURT:  How long is the next witness?

17            MR. HARDING:  We won't finish with the direct of this

18   witness today, Your Honor.

19            THE COURT:  Oh, you won't finish?  Okay.  So we'll take

20   a recess.

21            MR. HARDING:  Okay.  All right.

22            THE COURT:  He is here?

23            MR. HARDING:  Yes.

24            THE COURT:  All right.  We'll take a recess, ladies and

25   gentlemen.  Please leave your note pads on your chairs.  Have no

1  discussion about the case or any of the evidence you've heard so

2  far.  Continue to keep an open mind about all issues.  Jury's

3  excused for a 15 minute recess.

4              (Jury exits the courtroom.)

5              THE COURT:  Get the jury, please.  Do we have any

6  issues with this witness, counsel?

7              MR. HARDING:  Not from the government's standpoint,

8  Your Honor.

9              MR. MARTIN:  I am sure we have a lot of them, Your

10  Honor.

11             THE COURT:  Do you want to bring any to my attention

12  now?

13             MR. MARTIN:  I don't know what Mr. Harding's going to

14  do.  So it depends on what you allow him to do.

15             THE COURT:  Okay.

16             MR. MARTIN:  Stuff that we might object to.  And we'll

17  see how it goes.  Nothing that you have to deal with now.

18             (Jury enters the courtroom.)

19             THE COURT:  Please be seated.  Please announce your

20  next witness, Mr. Harding.

21             MR. HARDING:  Yes, Your Honor.  Your Honor, the United

22  States calls Detective Ron Berger.

23             THE COURT:  Detective Berger.

24        DETECTIVE RONALD BERGER, GOVERNMENT'S WITNESS, SWORN

25             THE WITNESS:  I do.

1        THE CLERK:  Be seated.  Speak directly toward the mike.

2   State your name and spell it for the record, please.

3        THE WITNESS:  Ronald Berger.  B-E-R-G-E-R.

4        DIRECT EXAMINATION

5   BY MR. HARDING:

6   Q    Good afternoon.

7   A    Good afternoon, sir.

8   Q    How are you employed right now?

9   A    I'm a retiree from the Baltimore City Police Department,

10  formerly assigned to the Homicide Unit.  I'm employed with the

11  Maryland Transportation Authority Police, and on a leave of

12  absence for purposes of military service.

13  Q    So you're on active duty right now?

14  A    Yes, sir.

15  Q    With the Army or the Navy or what?

16  A    The Army.  I mobilize with the Maryland National Guard and

17  assigned with the United States Army.

18  Q    Okay.  Can you tell us what your educational background is,

19  Mr. Berger?  How far did you get in college or school?

20  A    I have an Associate Degree in law enforcement from the, what

21  was then called the Community College of Baltimore, and a

22  Bachelor's Degree in criminal justice from the University of

23  Baltimore.

24  Q    Okay.  And you say you retired from the Baltimore Police

25  Department.  How long did you work for them?

1    A    I worked for them from August of 1982 until April of 2007,

2    approximately 24 and a half years.

3    Q    Okay.  Can I ask you, were you in the Homicide Division back

4    in February of 2002?

5    A    Yes, sir, I was.

6    Q    Let me call your attention to February 27th and 28th, the

7    night of the 27th and 28th of February of 2002.  Did you get a

8    call that lead you to respond to a crime scene that night?

9    A    Yes, sir.  That night at 2:25 a.m. on the 28th of February,

10   2002, a call was received at the Homicide Office to respond to

11   Edgecombe Circle South and Finney Avenue.  I responded there,

12   along with my partner, Detective Robert Cherry, arriving at 2:46

13   a.m.

14   Q    So your partner was Robert Cherry?

15   A    Yes, sir.

16   Q    Now, were you working the night shift that night or were you

17   brought in from home or what?

18   A    Working what we would call the midnight shift.  The shift

19   that works overnight.

20   Q    Do you recall what time you arrived at the scene on South

21   Edgecombe Circle on Finney Avenue?

22   A    2:46 a.m.

23   Q    What did you observe when you got there?

24   A    At that location, at the intersection of Edgecombe Circle

25   South and the rear alley east side, there is an extension of the

1    rear alley to the south.  That alley runs generally north and

2    south.  In a short extension to the south, there is a dead end

3    with a concrete wall, a tree growing out in the immediate

4    proximity of the wall.  There was a 1999 silver Infiniti that was

5    stopped against that tree, with front end damage.  And other

6    observations pertaining to that vehicle.

7    Q    Okay.  I have some photographs here that I'd like to show

8    you.  May I call you Detective, still, even though you're

9    retired?

10   A    You could, I suppose if you called me retired detective or,

11   at the moment, sergeant.

12   Q    Are you a Sergeant now?

13   A    I'm a master sergeant in the United States Army.

14   Q    Okay.  All right.  I have here an exhibit that's marked

15   Government Exhibit MB-48.  And I also have MB-49 and MB-47.  Can

16   you tell us generally what these three exhibits are?

17   A    Okay.  These three are aerial views showing the area of the

18   crime scene.  These photographs actual taken long after the

19   investigation at the scene.

20   Q    Right.  And they're obviously taken in the daytime, too, is

21   that correct?

22   A    Yes, sir.

23   Q    Let me show you, first off, Exhibit MB-48.  I'm going to put

24   this on the screen and hope that you can see it from where you

25   are.  And I will pass this around to the jury when we get done

1    talking about it.  But for the moment I want to ask you a few

2    questions.

3           If our system is working, you can actually touch the

4    point on the photograph where you saw the car that night and it

5    will actually highlight it on the screen for all of us.

6    A    It's not highlighting where I'm touching.

7           THE COURT:  It is on ours.  Showing up as a green dot.

8    A    Okay.  Well, where I'm intending to touch is immediately to

9    the right of where there's a person standing at the southward

10   extension of the alley.

11          THE COURT:  Perhaps you should do the touching again,

12   Mr. Harding.

13   Q    Okay.  I'll do the touching.  You see this, is this the

14   alleyway you're talking about?

15   A    Yes, sir.

16   Q    And you said where the person is standing.  Is this the

17   person you're talking about?

18   A    Yes, sir.  And immediately to the right of that is the

19   location where there is a concrete, concrete wall, barrier.  And

20   there's a tree growing out of the immediate proximity of that

21   barrier.

22   Q    Right here, is that correct?

23   A    Yes, sir.

24   Q    Okay.  And this alleyway looks like a sort of extension.  It

25   dog legs off from this road right here, is that correct?

1    A    Yes, sir.  The road you're now showing is Edgecombe Circle

2    South.  That is Finney.  What you're showing now is Finney

3    Avenue, which runs north and south.

4         The intersection, the closest intersection to the crime

5    scene is the intersection of Edgecombe Circle South and the rear

6    east side alley of the 4500 block of Finney Avenue.

7    Q    Okay.  And if I could just call your attention to the

8    physical surroundings around where this scene was.  What is this

9    area right in here?  Appears to be a vacant lot, is that correct?

10   A    It's a vacant area that's slightly wooded.

11   Q    And what is this up here?

12   A    That's a wooded area which also includes a small park and

13   tennis courts.

14   Q    Does it have a name?  Do you remember the name?

15   A    I can't recall the name of it.

16   Q    And over here are some more trees.  And here's a street down

17   here, is that correct?  It just dead ends?

18   A    That is, as I recall, that's a parking lot.

19   Q    A parking lot.  I'm sorry.  Okay.  Let me show you another

20   vantage point here.  This is MB-49.  And I'm having trouble

21   because my -- tell you what.  I'm not going to use this one

22   because it won't fit on the projection screen.  But I'll

23   circulate it to the jury, with the Court's permission, in a few

24   moments.

25         Here is another view of this area, a little closer up.

1    This is MB-47.  And is this the road that dog legs down into this

2    wooded area here, Detective?

3    A    Yes, sir, it is.

4    Q    And is this the tree that you were talking about?

5    A    Yes, sir.

6    Q    And where was the car in relation to the tree?

7    A    The car was facing toward the south, stopped against the

8    tree.  Obvious front end damage on the car.

9    Q    Your Honor, may I publish these to the jury?

10          THE COURT:  Sure, you can hand them out.  Take a look,

11   ladies and gentlemen.

12   Q    Okay.  Now, I also have some crime scene photographs.  First

13   of all, this is MB-4, Detective.  Can you tell us what this is?

14   A    This is a view of the vehicle stopped against the tree from

15   the left side of the vehicle.  The front end damage is obviously

16   apparent.  And that is a silver Infiniti.  And that tag number,

17   as I recall, was Maryland tag 045-BEK as in boy Edward king.

18   Q    Is that the way the car appeared when you got there that

19   night?

20   A    Yes, sir, from the left side that's how it appeared.

21   Q    Okay.  Let me show you MB-3.  What is this?

22   A    Same vehicle in the same position.  And this is the right

23   side of it, with obviously both front and rear right doors open.

24   Q    Were the doors open when you got there?

25   A    I believe they were at the time that I arrived, sir.

Case 1:04-cr-00029-RDB   Document 675   Filed 06/08/09   Page 183 of 239

1  Q    Okay.  Here's another shot.  Is that the same passenger side

2  of the car?

3  A    Yes, sir, it is.

4  Q    And --

5       MR. MARTIN:  What exhibit is that?

6  Q    This is MB-7.  And are there two guys back here?  Are those

7  police officers?

8  A    Yes, sir.  You can't see very well on this monitor but there

9  are, I know from having seen the photograph before that there are

10  two police officers to the far side of the vehicle.

11  Q    And did you later learn the names of the two people who were

12  inside the front seat of the car?

13  A    Yes, sir.  There is a male subject in the, the body of a

14  male subject in the driver's seat and he was subsequently

15  identified as Oliver McCaffity, date of birth May 11th, 1973.

16  And there was a female subject, body of a female subject in the

17  front passenger seat, identified as that of Lisa Brown, date of

18  birth 4 January 1974.

19  Q    Okay.  I hope you remembered those birth dates only because

20  you had a chance to review your paperwork and you don't actually

21  just remember them from back at that --

22  A    Well, I remembered that they were identified and I have

23  reviewed the paperwork to, as a reminder of what their dates of

24  birth were.

25  Q    Good.  That's reassuring.  There's another shot.  This is

1    MB-12.

2    A    That's a closer look at the rear seat of the same vehicle

3    from the right.

4    Q    Okay.  By the time you got there, was there all this broken

5    glass all over the rear seat of the vehicle?

6    A    Yes, sir, there was.

7    Q    Okay.  Did you learn how the window was broken?

8    A    From the firefighters and paramedics who had responded to

9    the scene, knew that there were bodies inside and they otherwise

10   couldn't make entry into the vehicle, so they broke the windows.

11   They broke at least the right rear vehicle, right rear window.

12   Q    Okay.  Here is MB-13.  Is that a front shot of the same

13   vehicle?

14   A    Yes, sir, it is.  That's a shot of the same vehicle seen

15   from the front.  I can't say for sure, but I'd say probably the

16   technician was standing to the south of that barrier and taking

17   the shot over the barrier.  This vehicle also shows the body of

18   Oliver McCaffity in the driver's seat.

19         There is damage to the windshield, to the front left of

20   Mr. McCaffity's head.  There is blood spatter and glass damage

21   there.

22   Q    Okay.  Could you tell, was that caused by a bullet fired

23   from inside the car?

24   A    It is consistent with a bullet fired from inside the car.

25   That is, that indication is enhanced by the fact that there's

1    blood spatter in the immediate proximity to where the structural

2    damage is.

3    Q    Based on your experience, what does that suggest to you?

4    A    It suggests that that is the result of an exit wound that

5    passed through human tissue or tissue, living tissue of some

6    kind, organic tissue of some kind, a bullet has passed through

7    there, impacted against the inside of the windshield, and also

8    generated, energy generated blood spatter into the same area.

9    Q    Okay.  Let me show you an exhibit that has been marked MB-2

10   and wrapped in a plastic bag, which I'm going to leave on here.

11   Can you tell us what this is?

12   A    This is the center console cover recovered from the vehicle.

13   And there is blood on the top of the cover.

14   Q    And where was that?

15   A    That is on the back seat, detached from its position at the

16   center console.

17   Q    Okay.  Let me show you now --

18   A    If you return to one of the prior photograph of the rear

19   seat, we may be able to see it in there.

20   Q    We'll get there in just a minute or two.  Let me show you,

21   I'm trying to go in order here or else I'll get mixed up.  This

22   is MB-9.  What does this show?

23   A    That's from the left side, driver's side.  That is a view of

24   the body of Oliver McCaffity in the driver's seat.

25   Q    Is that where he was when you got there or was he gone by

1   that time?

2   A    He was in the driver's seat.

3   Q    Okay.  The next one is MB-5.  Is this another shot of Mr.

4   McCaffity from the right-hand side?

5   A    Yes, sir.  That's a view of Mr. McCaffity seen from the

6   right, also, again in the driver's seat.

7   Q    Did Mr. McCaffity have a nickname?  Did you learn that he

8   had a nickname?

9   A    I learned his nickname to be Woody.

10  Q    Okay.  This thing right here, what is that?

11  A    That's the air bag, which has been blown, driver's side air

12  bag.

13  Q    Had the passenger's side air bag also been blown up?

14  A    Yes, sir, it was.

15  Q    And what is this thing right here to the right of Mr.

16  McCaffity?

17  A    That is the center console, which is a bit ajar from its

18  downward position.  It's been, it's dislocated from the downward

19  position.  And the console cover is missing in the photograph

20  here.  The console cover was recovered from the rear seat, that

21  being this.

22  Q    Okay.  Here's another shot of Mr. McCaffity.  Was this one

23  taken after he was taken out of the car and placed on a body bag?

24  A    I believe that was.  And I think that the white background

25  that we see behind his head there is actually the white plastic

1   of the body bag.

2   Q    Okay.  And then we have MB-8.  Can you tell us what this

3   shows?

4   A    That's a view from the right side of the vehicle, which

5   includes the position of the body of Lisa Brown, also showing the

6   passenger air bag having been blown.

7   Q    And I guess this is just a somewhat --

8   A    Yes, sir.  The same view, from slightly farther back.

9   Q    Okay.

10           MR. MARTIN:  What's that one?

11  Q    This is MB-11.  And then we have MB-6.  Does this depict Ms.

12  Brown after she'd been taken out of the car and placed on a body

13  bag outside the car?

14  A    Yes, sir.  And again, we can see in the background of the

15  photograph of the body is the white plastic of the body bag.

16  Q    Okay.  Can you tell us what MB-14 shows here?

17  A    That's a view of the center console missing the console top,

18  once the bodies had been removed.

19  Q    Okay.  This is MB-29.  Can you tell us what this shows?

20  A    That's a view of the driver's seat with the bodies having

21  been removed, and the keys have been removed from the ignition

22  and secured on the floor of the vehicle in front of the driver's

23  seat.  Also, it's difficult to tell what it is, but I know that

24  there's a phone there that's also, includes a jack running toward

25  the ignition.

1   Q    Is this the phone you're talking about?

2   A    Yes, sir.

3   Q    And are these the keys that you're talking about?

4   A    Yes, sir.  It's bundled, there's a lanyard bundled up around

5   the keys.

6   Q    Let me show you MB-1.  Can you tell us what MB-1 is?

7   A    Yes, sir.  This is the keys and also a door opener, an

8   electronic door opener.  And it includes the lanyard, which we

9   can see in the photograph bundled around the keys.

10  Q    Okay.  Now I have some shots of the surrounding area.  Can

11  you tell us what MB-18 is?  This was taken in the daytime, also,

12  so it's --

13  A    Yes, sir.  This is a daylight photograph taken on a

14  subsequent date.  And this is a view toward the south, standing

15  approximately where the intersection is, the intersection of

16  Edgecombe Circle South and the rear east side alley behind 54,

17  4500 Finney Avenue, looking toward the south.  That is the

18  concrete barrier and tree growing in the immediate proximity.

19  Q    Okay.  Now, you say this is the tree that the car was

20  crashed into, is that right?

21  A    Yes, sir.

22  Q    And when you say "concrete barrier", you're referring to

23  this low wall that looks like a sort of behind the tree?

24  A    Yes, sir.  It's difficult to tell from this photograph what

25  that is.  It does look generally horizontal.  But I know that

1   what it is is a concrete barrier.

2   Q    Okay.  What about this thing off to the left here?  What is

3   that?

4   A    That's a box, probably a transformer box or some other kind

5   of electrical fixture there.  That's a man-made object that

6   generally is, well, you're able to use in the photographs as a

7   land marker associating the crime scene and the park, the nearby

8   park.

9   Q    Okay.  That thing, that transformer, whatever it is, was

10  visible in the aerial photographs, also, was it not?

11  A    Yes, sir.

12  Q    Let me show you MB-17.  Is this just a closer up picture of

13  the same scene?

14  A    Yes, sir.

15  Q    And MB-19.  Does this, this is another perspective on the

16  same scene, correct?

17  A    That's, that would be the looking toward the east or maybe

18  even toward, canted a little bit toward the southeast.  It shows

19  the box.  Off the photograph, off the image we can see here to

20  the right would be where the crime scene was and the concrete

21  barrier.  And off the photograph to the left would be the park.

22       You can see an apartment development in the background

23  there.  And there's a vehicle that's shown, which is in the

24  parking lot that we're able to see from the aerial photographs.

25  Q    You're talking about this one right here?

DIRECT EXAMINATION OF DETECTIVE BERGER                    190

1    A    Yes, sir.

2    Q    Is this another shot of the same scene from further back?

3    A    Yes, sir.

4         MR. MARTIN:  Exhibit number?

5    Q    This being MB-20.  Were these police cars just out there

6    with you guys when you were taking these photographs?

7    A    Yes, sir.  Police vehicles.  I think one's probably a patrol

8    car and one is actually a Crime Lab vehicle.

9    Q    Okay.  Let me show you now MB-22.  Can you tell us what this

10   is?  Or maybe you need to hold it in your hand.  Tell me if you

11   can't make this out very well.

12   A    I believe that is the view of the same alley toward the

13   north, but I'd like to see, before I say for sure, I would like

14   to see the photograph.

15   Q    MB-22.

16   A    Yes.  This is a photograph, a view toward the north.  As

17   the, as the camera is looking, behind the camera would be where

18   the crime scene is, the tree in the barrier.  And this shows the

19   alley to the north.  To the right off of this photograph would be

20   the park and to the left would be Edgecombe Circle South.

21   Q    Okay.  This is MB-21.  Can you tell us what this shows?

22   A    That is a view toward the west along Edgecombe Circle South.

23   And we can see again the same two police vehicles.

24   Q    Okay.  Now I have several more photographs.  First of all,

25   this is MB-15.  Can you tell us what this shows?

1    A    That is the rear, the window of the rear right side door.

2    The glass is broken out.  And the console top is visible on the

3    back seat.

4    Q    Is that this thing right here?

5    A    Yes, sir.

6    Q    That's MB-2, the exhibit you testified about earlier?

7    A    That's this exhibit here.

8    Q    Okay.  And here's another shot, MB-16.  What does that show?

9    A    That is a view from the rear left side, through the left

10   side door having been opened, with the console on the seat.

11   Q    Okay.  Now, we saw a telephone on the floor of the driver's,

12   in front of the driver's seat a few minutes ago in one of the

13   photographs.  I want to show you now MB-30 and ask you what that

14   shows.

15   A    I can't see that very well, but I know from having seen the

16   photograph before that that is a, that is a view toward a phone

17   that is in the rear pocket of the driver's seat.

18   Q    Okay.  So there were two phones recovered, is that correct?

19   A    Yes, sir.

20   Q    And one was in the, on the floor in front of the driver's

21   seat and one was in the pocket right behind the driver's seat, is

22   that correct?

23   A    Yes, sir.

24   Q    Okay.  Now --

25   A    This photograph, by the way, is taken in a subsequent, at a

1    subsequent time, not during the processing of the crime scene.

2    Q    Yes.  Where was that photograph taken?

3    A    That's taken at the forensic bay at Police Headquarters,

4    where a search and seizure warrant was executed on the vehicle at

5    10:30 a.m. on that same day, the 28th of February.

6    Q    Are these latex gloves on the hands of whoever it is that's

7    opening up the pocket there?

8    A    Yes, sir.

9    Q    Do you know whose hands they are?

10   A    That would probably be Detective Laslett, Ray Laslett, who

11   assisted with the investigation by executing a search and seizure

12   warrant on the vehicle.

13   Q    Okay.  I now have an exhibit that's been marked MB-23.  Ask

14   you what that is.

15   A    This is a projectile that's recovered from the passenger

16   side door during the execution of the search and seizure warrant.

17   Q    When you say the "passenger side door", do you mean the

18   front passenger side door or the rear passenger side door?

19   A    Front passenger side door.

20   Q    So that would be the side that Lisa Brown was on?

21   A    Yes, sir.

22   Q    By the way, was the engine running when you got there,

23   Detective?

24   A    No, sir, it was not.

25   Q    Do you know, had it been turned off prior to your getting

1    there?

2    A    I've learned how it was turned off subsequently, which was

3    it was turned avenue off by the fire department personnel.

4    Q    Okay.  Did you learn to whom the car was registered?

5    A    It was registered to Hasim Rahman, who was very famous for

6    being a professional boxer.

7    Q    Okay.  Now I want to show you what's been marked Government

8    Exhibit MB-38 and MB-39.  Can you tell us first what MB-38 is?

9    A    MB-38 is a Panasonic cell phone with a charger jack that was

10   in the front seat.  This was positioned at the rear -- at the

11   front driver flooring area of the vehicle, with the jack extended

12   up toward the ignition.

13   Q    So that's the one that was on the floor in the picture we

14   saw earlier, is that correct?

15   A    Yes, sir.

16   Q    MB-39?

17   A    MB-39 is a Nextel phone.  There's also a jack with this

18   phone.  And this is, what's actually in this photograph that we

19   see here with the hands pulling the pocket open, that's the rear

20   pocket of the driver's seat.

21   Q    Okay.  Now, Detective, did you and your colleagues canvass

22   the area that night?

23   A    There was a canvass that was done.

24   Q    Can you tell the ladies and gentlemen of the jury what that

25   is?

1  A    That's officers or detectives go to neighboring houses,

2  knock on the doors, locate people that they can find, identify

3  those people and find out what those people might have seen or

4  heard unusual or somehow pertaining to the crime being

5  investigated.

6  Q    Okay.  Did you identify who the victims were that night or,

7  I should say, the next morning?

8  A    Well, during the course of the next day they were positively

9  identified as Oliver McCaffity and Lisa Brown.

10  Q    And how was that that done?

11  A    The ultimate identification was done with fingerprints,

12  fingerprint comparison.

13  Q    Did you inform the next of kin of what happened?

14  A    Yes, sir.  Myself and Detective Cherry and our supervisor,

15  Sergeant Steven Krouse, went to the home of Mr. McCaffity's

16  mother, Aida McCaffity, at 104 Diener Place, Apartment 302.  And

17  we notified her.  We also went to the home of Lisa Brown's

18  parents.  That's Reverend Melvin Williams and Mrs. Myrtle

19  Williams, at 11 Hard Spring Court in Baltimore County, and we

20  made a formal notification to the parents there in person.

21       However, I'd had already received three phone calls

22  from Reverend Williams, who was suspicious, having heard about

23  this incident, who was suspicious that the female victim involved

24  may have been his daughter.

25  Q    Okay.  Did you attend autopsies for the two victims?

1    A    Yes, sir, I did.

2    Q    And when were those conducted, if you remember?

3    A    Also on the 28th of February.  Later the same morning.

4    Q    Okay.  I just have one question about each autopsy for you.

5    First of all, the autopsy of Oliver McCaffity performed on the

6    28th of February, 2002.  This is a photograph that was taken at

7    the autopsy.  And what I want to show you is the wound right

8    here.  Do you see that?

9    A    Yes, sir, I do.  It's not very clear in this image but I can

10   make it out.

11   Q    Okay.  This is, by the way, Government Exhibit MB-27.  Can

12   you tell us, Detective, what that wound tells us?

13   A    Well, that's a wound surrounded by stippling.  And stippling

14   is an effect that occurs when a firearm is in such close

15   proximity to the wound that propellant charge from within the

16   actual fired cartridge is still burning and still being propelled

17   out of the barrel of the firearm.  And that causes actual burning

18   of the impact area on the victim's skin.

19           So this is an extreme close proximity wound.  However,

20   it is not indicative of a contact wound in which the firearm is

21   actually pressing against it.  I can tell that because there is

22   no starring.  There's no tearing away from the wound in the skin

23   which results from gas building up under the skin and actually

24   ripping it out from the center.

25           So this is an extreme close positioned firearm but not

1    a contact wound.

2    Q    Can you give us an idea in inches?  What do you mean by

3    extreme close proximity?

4    A    Within inches.  It's not -- I couldn't say.  I'm sure

5    there's a formula that can tell you in accordance with the, with

6    the type of firearm, the type of caliber and charge and so on.

7    But I'd say it's within a few inches.

8    Q    And by "stippling" are you referring to these little black

9    specks all the way around the actual wound?  Is that correct?

10   A    Yes, sir.  Those are small particles, those are

11   representative of small particles of the powder charge still

12   burning as they come out of the muzzle of the firearm.

13   Q    And if the gun were held further back, say a couple of feet

14   back, you wouldn't have stippling, is that correct?

15   A    That's correct.

16   Q    Same thing with MB-26.  Can you see stippling around this

17   wound to the left rear portion of Ms. Brown's head, right in

18   front of her ear?

19   A    I've seen that photograph before.  I know that's stippling.

20   From the image here, and I can say from our prior knowledge that

21   that's what we're seeing in the image.

22   Q    Okay.  So does that mean that she, too, suffered a very

23   close proximity wound?

24   A    Yes, sir.

25   Q    At the autopsy for Ms. Brown, did you recover any evidence?

1    A    Yes, sir.  I recovered evidence, including a projectile.

2    Q    Let me show you MB-24.  Ask you what this is.

3    A    This is a projectile recovered from the body of Lisa Brown.

4    Q    A projectile is the same thing as a bullet, is that correct?

5    A    Well, a bullet is a type of projectile and this one is a

6    bullet.

7    Q    What other types of projectiles are there?

8    A    Anything projected.

9    Q    Okay.

10   A    It could be an arrow.  It could be grape shot.

11   Q    I see.

12   A    Anything that's projected by energy.

13   Q    Are these the only two bullets you recovered from the scene,

14   the one from Ms. Brown and the one you've testified earlier came

15   from the passenger side door?

16   A    Yes, sir.  But these are not actually from the scene.  These

17   are from the -- the bullet from the door was recovered at

18   headquarters during the execution of the search and seizure

19   warrant.  And this is recovered not at the scene, but at the

20   autopsy.

21   Q    Okay.  Were there any other bullets recovered in connection

22   with this investigation?

23   A    No, sir.

24   Q    But you've told us about one bullet that you think hit the

25   front windshield, is that correct?

1    A    Yes, sir.  I think that a bullet impacted against the inside

2    of the front windshield, to the front left of where we see the

3    head positioned of Oliver McCaffity.

4    Q    And do you know what happened to that bullet?

5    A    I don't know.

6    Q    Okay.  Did you talk to friends and relatives of the victims

7    after this murder happened?

8    A    Yes, sir, I did.

9    Q    Do you have any recollection as to how many you found?

10   A    In total?  Maybe 10 to 20.

11   Q    Did you learn where they had been earlier that night?

12   A    I learned where some of them had been.

13   Q    No.  I mean where the victims were.

14   A    Where the victims had been?

15   Q    Yes.

16   A    Recovered along with Lisa Brown there was a, two movie

17   stubs, which are serial numbered in sequential order.  And they

18   are for a movie showing of the movie, as I recall, John Q, at the

19   Egyptian 24, which I recognized to be the movie theater at

20   Arundel Mills Mall.  And that was for 8 p.m. on the 27th, that

21   being the night before, the 27th of February, 2002.

22          There was also a Wendy's bag and Wendy's receipt that

23   was recovered from the vehicle.

24   Q    And did you travel to both those locations?

25   A    I visited the Wendy's and other detectives went to Arundel

1    Mills Mall.

2    Q    Did you speak to anyone who knew anything about this crime?

3    A    At those locations?

4    Q    Yes.

5    A    We spoke about getting tapes, the security tapes of, that

6    run at those locations.

7    Q    Okay.  Did you get anything that furthered your

8    investigation?

9    A    I got a security tape, security camera tape from the

10   Wendy's, and that is a Wendy's at Martin Luther King and McCulloh

11   Street.  Martin Luther King Boulevard and McCulloh Street in

12   Baltimore City.

13        A tape was also recovered from the movie theater at

14   Arundel Mills Mall.

15   Q    And did they further your investigation?

16   A    As I recall, there was some useful information in the tape

17   from the mall.

18   Q    What in the way of useful information?

19   A    Is that detectives that viewed that thought that they had

20   identified the two victims there earlier that night on camera at

21   the mall.

22   Q    Could they tell, was there anybody else there with them?

23   A    I don't recall that they could.

24   Q    Okay.  Now, you said you talked to Reverend Milton Williams.

25   In fact, you talked to him several times before you even went out

1    there to tell him about the death of his daughter, is that

2    correct?

3    A    Yes, sir.  Three times he called me at, during the conduct

4    of the autopsies at the Medical Examiner's Office.

5    Q    And he is the father of Lisa Brown?

6    A    Yes, sir.

7    Q    Did you talk to him in subsequent days as well?

8    A    Many times I've spoken to him since this.

9    Q    Okay.  As a result of your conversations with him, did you

10   attempt to investigate the nickname Goodie?

11   A    Yes, sir, I did.

12   Q    What did you do?

13   A    I ran a check of area crimes involving the nickname "Goodie"

14   or "Good" or similar sounding names.  And I found that there was

15   an incident at the Hammerjacks night club, a stabbing incident

16   where one of the victims had the nickname Good or Goodie.

17   Q    Okay.  Did you learn that there was an active police

18   investigation regarding that incident at Hammerjacks?

19   A    Yes, sir.  There was an active police investigation of a

20   stabbing incident there.

21   Q    And so did you, in the course of your investigation, learn

22   the names of two people who were involved in that stabbing

23   incident?

24            MR. LAWLOR:  Objection, Your Honor.  This is hearsay.

25            THE COURT:  Overruled.  You may answer.

1   A     I learned that there were two people who were persons of

2   interest in the investigation by the Central District detectives.

3   Q     And who were they?

4           MR. LAWLOR:  Objection.

5           THE COURT:  Overruled.  You may answer.

6   A     Those were an individual known to those detectives as Calvin

7   Wilson, also known as Bo, also known as Willie Mitchell, III.

8   And I think the other name was Donte Sands.

9   Q     Okay.  The next day after this murder did you and your

10  colleagues undertake to analyze two telephones that were

11  recovered from the car that Mr. McCaffity and Ms. Brown were

12  found in?

13  A     Yes, sir.  Primarily Detective Giganti worked the phones,

14  getting subpoenas for the records of the phones.  We also have

15  digital images of the actual phone displays from the phone

16  history, after the phone was recovered from the vehicle, the

17  victim vehicle in the execution of the search and seizure

18  warrant.

19          THE COURT:  Any good point you'd like to break, Mr.

20  Harding, would be fine.

21          MR. HARDING:  This is a perfect time, Your Honor.

22          THE COURT:  All right.  Members of the jury, we'll call

23  it a day at this time.  Please leave your note pads on your

24  chairs.  Have no discussion about the case or about any of the

25  evidence you've heard so far.  Continue to keep an open mind

1    about all issues.  Conduct no investigation.  Do not discuss the

2    case with anyone during this overnight recess.  Enjoy your

3    evening.

4          We'll see you tomorrow morning at 9:30 in the jury

5    room.  Jury is excused until 9:30 tomorrow morning.

6          You may step down, Detective.

7          (Jury exits the courtroom.)

8          THE COURT:  Ms. Rhodes.  Please be seated.

9          MS. RHODES:  You had asked to me to get back to you

10   today about the juror and the witness.

11         THE COURT:  Actually, I said first thing Tuesday

12   morning.

13         MS. RHODES:  Oh, shall we wait?  We had decided we do

14   need to call Coach lynch.  But our position is that this juror

15   can still, who has said he can be impartial and fair considering

16   the circumstances is perfectly appropriate to remain seated on

17   the jury.

18         THE COURT:  Mr. Harding?

19         MR. HARDING:  I thought that Your Honor had ruled on

20   this already, that we were, we were going to have a stipulation.

21   I talked to Ms. Rhodes last week about doing a stipulation and

22   she told me at that time that she wanted to call Mr. Lynch.  But

23   I, I was confused by that because I thought Your Honor had ruled

24   that we were going to have a stipulation on this issue.

25         I certainly do not believe that this alternate can --

1    I'm sorry -- this juror can remain on the jury if Mr. Lynch is

2    actually going to be called to testify.

3            It's the government's position that this witness is a

4    fact witness who knows basically when Mr. Mitchell went off to go

5    to college on a couple of occasions, can't even really testify on

6    the basis of first-hand knowledge, certainly, about when exactly

7    he was at the college or whatever.  And the government believes

8    that the solution of having a stipulation on this was a good one.

9            We don't want to lose the juror because we're all

10   afraid of what will happen if we get down to using up all our

11   alternates.  But on the other hand, the government cannot, the

12   government is firmly opposed to having this juror remain on the

13   jury if Mr. Lynch is actually going to be a witness in this case.

14   That's the government's position, Your Honor, for the reasons

15   that I've already stated on the record.

16           THE COURT:  Thank you, Mr. Harding.  Any of counsel who

17   wish to be heard should approach the lectern.

18           MR. COBURN:  Thank you, Your Honor.  Already on the

19   way.  Obviously, it's a somewhat awkward situation for me to be

20   disagreeing with one of the other codefendants in this case.  And

21   I'm uncomfortable about doing so.  But I will tell Your Honor

22   just as emphatically as I can, I mean, this is an issue of

23   extremely high priority to us.  You know, we think it would be,

24   we see no reason to lose this juror.  Retaining this particular

25   juror, from our point of view, is of critical importance, A, with

1    respect to precluding, doing what we can to preclude a mistrial,

2    and B, because the juror seems highly intelligent, very

3    interested in remaining, and for all the reasons I think Your

4    Honor very aptly observed last week, the last time this matter

5    was discussed.

6              My recollection, I'll tell Your Honor, is the same as

7    Mr. Harding's.  I thought that there was going to be a meeting

8    and discussion about a stipulation.  I know Ms. Rhodes and Mr.

9    Lawlor are fighting hard for their client, just like we are for

10   ours.  But I think Your Honor has got some significant discretion

11   here in terms of what witnesses are called and what they're

12   allowed to testify to and what Your Honor's appraisal is of the

13   probative value of their testimony.

14             I don't see a reason why this juror has to be excused.

15   I think there are a host of other options that Your Honor can

16   impose if the Court needs to.

17             THE COURT:  Thank you, Mr. Coburn.

18             MR. LAWLOR:  Judge, can we have an exception to the one

19   lawyer rule here?  I just have a very brief comment.

20             THE COURT:  Just let me check and make sure that other

21   counsel are content with what's been said.  Go ahead, Mr. Lawlor.

22             MR. LAWLOR:  I'm sorry, Judge.

23             THE COURT:  No.  That's all right.

24             MR. LAWLOR:  In fairness to what Mr. Coburn just said,

25   we're just not prepared to say affirmatively 100% right now that

1   we don't intend to call Coach lynch.  We may not.  And given, you

2   know, the concerns expressed by all the parties, what we don't

3   want is to get to that point in the trial and then decide that

4   either a stipulation is acceptable or the information has come

5   through other witnesses or other witnesses are available.  We're

6   just not prepared to make that determination now.

7         And I know Your Honor said previously, well, that's not

8   fair to the juror.  So we're trying to sort of find a middle

9   ground here.  And I guess the only thing we can affirmatively say

10  right now is we're just not sure of what we want to do at that

11  point in time in the trial.

12        THE COURT:  Mr. Lawlor, can you and/or Ms. Rhodes make

13  a truly detailed proffer now as to what you expect Mr. Lynch's

14  testimony to be?

15        MR. LAWLOR:  I'm going to let Ms. Rhodes handle that,

16  Your Honor.

17        THE COURT:  All right.

18        MS. RHODES:  Your Honor, I will make one but I want to

19  say first that I think that in a case like this where, among

20  other things, we don't have a lot of witnesses we're calling,

21  that it is our prerogative to call a live witness where in

22  another situation one might use a stipulation or one might use

23  certified records from some place.

24        In this situation, what Mr. Lynch is going to testify

25  to is less the fact that Willie Mitchell went to college and how

1    that happened.  It's the dates when he was at Hickey.  Mr. Lynch

2    knew him when he was at Hickey.  And those are also dates that

3    are part of the alleged conspiracy.

4         So that's, you know, in a sense, it's like an alibi

5    because he is somebody who worked with Mr. Mitchell on the field,

6    I mean the football field, every day.  So I think he has some

7    sense of was he, you know, was he doing what he was supposed to

8    be doing, that is going to school and playing football.

9         And I think that's not something that we can get from

10   records or we can do in a stipulation.  That's essentially what

11   his testimony will be.  It will be about the first, the period

12   where Mr. Mitchell was there for one year.  And I do have the

13   dates.  I'm not sure if I had them right the other day.  It was

14   from -- anyway, it was from December of '94 to December of '95.

15   That was the one year period when he was there, give or take five

16   days, and when he got his.

17        And then it was about eight to ten weeks after that

18   when he came back to work.  And he worked as an assistant in the

19   Athletic Department for Coach --

20        THE COURT:  So sometime in about March of '96?

21        MS. RHODES:  Right.  And he was there until August,

22   when he went to college.

23        THE COURT:  Of '96?

24        MS. RHODES:  Of '96, right.  And then when he came

25   back, it was -- excuse me -- 2000.  And he was then there from

1    October to December of 2000.  And that's when he was --

2              THE COURT:  I'm sorry?  From?

3              MS. RHODES:  October to December of 2000.

4              THE COURT:  Working at Hickey?

5              MS. RHODES:  Right.  Working at Hickey as a youth

6    counselor in a particular program.  It was a night shift position

7    he had from 10 a.m. to 6, 10 p.m. to 6 a.m.

8              And Coach Lynch was obviously in some contact with him

9    then and was also in contact with him when he was away, at the

10   other colleges he went to, at the colleges.  So that's

11   essentially what the testimony would be, including the

12   circumstances around his, Mr. Mitchell's going to college.

13             THE COURT:  All right.  Well, I certainly did not make

14   a final ruling last week.  What I indicated was that I thought,

15   it certainly appeared to me and continues to appear to me to be

16   the case that the information you just proffered, Ms. Rhodes, is

17   easily amenable to a stipulation and that that would solve

18   everybody's problem here, because nobody want to lose the juror.

19             And Mr. Coburn, on behalf of Mr. Gardner, is emphatic

20   about that.  And I believe other counsel who have not explicitly

21   addressed the issue almost certainly feel the same way.

22             The juror did impress me as thoughtful, articulate,

23   attentive, conscientious in every respect.

24             I also said last week that if I knew now what, if I

25   knew back during voir dire what I now know, I would not have

1    hesitated to strike the juror for cause.  And I don't think any

2    lawyer here would have objected.

3          So where we are is we have a situation in which the

4    proposed witness was inadequately identified during the voir

5    dire, and information comes to light after the jury's been seated

6    that discloses a truly intimate relationship between this juror

7    and this fact witness.  I use the term "intimate" advisedly, to

8    be sure.  But as we heard in my questioning of the juror last

9    week, in effect, the juror has turned over his 12-year-old son to

10    the supervision and, indeed, the custody of this particular

11    witness.  And it doesn't get much more intimate than that.

12          Now, I was very emphatic last week, Ms. Rhodes, that

13    you had to make your decision by, I said Monday, and then I said

14    first thing Tuesday morning, out of fairness to the juror.  There

15    is something that tells me that if you and Mr. Lawlor are given

16    just a little more time you are very likely to come to the

17    conclusion that you would rather have this juror than have that

18    witness under the circumstances of this case.

19          Obviously, it's entirely up to you and Mr. Lawlor.  I

20    don't know who would break the tie vote.  I'll be happy to do

21    that if you two want me to.

22          But I will back off my insistence that you let me know

23    by Tuesday a.m. and give you a little more time to observe the

24    juror, frankly, and to confer with Mr. Lawlor --

25          MS. RHODES:  Your Honor --

1        THE COURT:  -- so that you can make a final decision.

2   But what I am saying to you and to counsel is what I said on a

3   tentative basis last week.  And that is, I cannot imagine that

4   I'm going to permit that witness to come into this courtroom and

5   testify in front of that juror.

6        So the question for the Court is, in the absence of a

7   stipulation, who's going to go?  Is the juror going to go or is

8   the witness going to go?  Now, obviously, you've got a big thumb

9   on the scales of justice in that contest call the Sixth Amendment

10  right to subpoena witnesses.  But Mr. Gardner has a right, to say

11  nothing of the government's entitlement, to have a fair juror,

12  jury decide this case.

13       So it's pretty clear to me that I can't do both and I

14  shouldn't do both.  And frankly, it would be an abuse of my

15  discretion to do both.  But I'm going to give you a little more

16  time.

17       I have observed the juror, as we all have.  As I say,

18  he's conscientious.  In a long trial, you know, my voir dire of

19  the juror last week will be a faint memory four weeks from now.

20  So I'm not particularly anxious to remove the juror and I don't

21  want to remove the juror any more than I want to prohibit your

22  calling Mr. Lynch as a witness.  But I'm going to have to do one

23  or the other.  So we will confer again next Monday and I'll see

24  where you are.

25       So where I am today, contrary to my position last week,

1    while I thought it was extraordinarily unfair to the juror to

2    keep the juror hanging on, I think where I am now is I don't feel

3    quite as strongly about that because, frankly, my decision could

4    be that the juror stays and Mr. Lynch is precluded.  Now, that

5    puts me on some fairly thin ice, I recognize that, as to Mr.

6    Mitchell.  But we'll just have to see where we go.

7              MS. RHODES:  Thank you, Your Honor.

8              THE COURT:  Mr. Lynch is not going to testify in front

9    of his son's personal trainer in this trial.

10             MS. RHODES:  Very well.

11             THE COURT:  Okay?  Any other matters for the good of

12   the order?  Who do we have tomorrow, Mr. Harding?

13             MR. HARDING:  Well, we have the rest of Detective

14   Berger.

15             THE COURT:  Can I ask you?  How much more do you have

16   with him?  Ballpark.

17             MR. HARDING:  20 minutes or 25 minutes.

18             THE COURT:  And are there going to be some photo arrays

19   and what have you, or are you going to forego all that?

20             MR. HARDING:  No.  I should probably explain that

21   Detective Berger got called up into the National Guard and

22   therefore wasn't around for the later stages of this

23   investigation.

24             THE COURT:  Oh, I see.  So you're going to pick it up

25   with Niedermeier.

1           MR. HARDING:  Yeah.

2           THE COURT:  I see.  So his testimony will be similar to

3      what you've already covered basically, crime scene, autopsies.

4           MR. HARDING:  Yeah.  We get to some periods of weeks

5      after the actual murder.  But by 2003, this detective was in Iraq

6      or some similar place.

7           THE COURT:  Okay.  So you have no affirmative evidence

8      through this witness as to who committed these murders?

9           MR. HARDING:  Well, unless, the phone, telephone

10     analysis.

11          THE COURT:  Okay.  He's going to sponsor the telephone?

12          MR. HARDING:  He and Giganti are both going to sponsor

13     the telephone analysis.

14          THE COURT:  But other than that, no admissions, no --

15          MR. HARDING:  No.

16          THE COURT:  -- no statements against interest?  No

17     coconspirator statements?  None of that stuff?

18          MR. HARDING:  Certainly not coconspirators statements.

19          THE COURT:  From this witness.  All right.  Who do you

20     have after him?

21          MR. HARDING:  We're going to try to, we're going to

22     have Lorraine Lansey.

23          THE COURT:  Fingerprints?

24          MR. HARDING:  Yes.  That would be in the afternoon.  We

25     also have Niesha and Marquetta Duganne.

1               THE COURT:  Who are they?

2               MR. HARDING:  They are two people who distributed drugs

3     they obtained from Mr. Mitchell.

4               THE COURT:  Okay.  Oh, this is the Pennsylvania

5     connection?

6               MR. HARDING:  Yes.  And Sergeant Norman Young, also in

7     the Pennsylvania connection.

8               THE COURT:  All right.

9               MR. HARDING:  And we have Forrester.  Is he coming in

10    tomorrow?

11              MR. HANLON:  Yes.

12              MR. HARDING:  And Wooden?  Not Wooden.  Hold on one

13    second.

14              (Pause in Proceedings.)

15              MR. HARDING:  I might try to get Sergeant Richard

16    Willard here for tomorrow, also.  He is another police officer.

17              THE COURT:  All right.  Do we know what happened to the

18    control panel, Belinda?  Do we know what happened to the system

19    this morning, why they had to come and work on it?  Would you

20    check?  All right.  Thank you.

21              Thank you, counsel.  9:30 tomorrow.

22              (Conclusion of Proceedings at 5:17 p.m.)

23

24

25

```
 1                             INDEX

 2

 3                                                    PAGE

 4    WITNESS: TRAVIS GOLDER
      DIRECT EXAMINATION BY MR. HANLON                  3
 5    CROSS EXAMINATION BY MS. RHODES                  20
      CROSS EXAMINATION BY MR. MARTIN                  38
 6    REDIRECT EXAMINATION BY MR. HANLON               39
      RECROSS EXAMINATION BY MS. RHODES                40
 7
      WITNESS: SGT. RUSSELL ROBAR
 8    DIRECT EXAMINATION BY MR. HARDING                41
      CROSS EXAMINATION BY MS. RHODES                  55
 9    REDIRECT EXAMINATION BY MR. HARDING              60

10    WITNESS: JASON ELDER
      DIRECT EXAMINATION BY MR. HARDING                63
11    CROSS EXAMINATION BY MR. LAWLOR                  71

12    WITNESS: TERI LABBE
      DIRECT EXAMINATION BY MR. HARDING                75
13    CROSS EXAMINATION BY MR. LAWLOR                  77

14    WITNESS: KENNETH JONES
      DIRECT EXAMINATION BY MR. HARDING                78
15    CROSS EXAMINATION BY MR. LAWLOR                  95
      CROSS EXAMINATION BY MR. COBURN                 105
16    REDIRECT EXAMINATION BY MR. HARDING             106
      RECROSS EXAMINATION BY MR. LAWLOR               108
17
      WITNESS: ELWARDO MORSLEY
18    DIRECT EXAMINATION BY MR. HANLON                111

19    WITNESS: TERI LABBE
      DIRECT EXAMINATION BY MR. HARDING               125
20    CROSS EXAMINATION BY MR. LAWLOR                 130

21    WITNESS: RAYMOND BOND
      DIRECT EXAMINATION BY MR. HANLON                133
22    CROSS EXAMINATION BY MR. PYNE                   158
      CROSS EXAMINATION BY MR. COBURN                 166
23
      WITNESS: DET. RON BERGER
24    DIRECT EXAMINATION BY MR. HARDING               176

25
```

1                    REPORTER'S CERTIFICATE

2

3          I, Mary M. Zajac, do hereby certify that I recorded

4    stenographically the proceedings in the matter of USA v. Willie

5    Mitchell, et al., Case Number(s) AMD-04-029, on September 22,

6    2008.

7          I further certify that the foregoing pages constitute

8    the official transcript of proceedings as transcribed by me to

9    the within matter in a complete and accurate manner.

10         In Witness Whereof, I have hereunto affixed my

11   signature this _____ day of _____, 2009.

12

13

14

15                        _____

16                        Mary M. Zajac,
                           Official Court Reporter

17

18

19

20

21

22

23

24

25

**'**

**'02** [5] - 9:9, 128:24, 129:2, 129:6, 129:9
**'04** [1] - 24:11
**'07** [4] - 76:3, 76:6, 77:7, 129:13
**'92** [3] - 8:7, 8:9, 8:10
**'93** [3] - 8:7, 8:9, 8:10
**'94** [1] - 206:14
**'95** [1] - 206:14
**'96** [3] - 206:20, 206:23, 206:24
**'97** [1] - 4:9
**'99** [1] - 151:23
**'Bo'** [1] - 17:1

**0**

**0** [1] - 157:13
**02010361.1A** [1] - 99:16
**02010361.1B** [1] - 99:17
**045-BEK** [1] - 182:17
**0700** [1] - 159:9

**1**

**1** [3] - 94:16, 94:17, 94:18
**10** [5] - 28:20, 28:21, 198:10, 207:7
**100%** [1] - 204:25
**101** [1] - 1:25
**104** [1] - 194:16
**105** [1] - 213:15
**106** [1] - 213:16
**108** [1] - 213:16
**10:00** [2] - 62:16, 62:19
**10:10** [1] - 2:1
**10:30** [1] - 192:5
**11** [4] - 67:20, 136:24, 156:21, 194:19
**11.8** [1] - 174:16
**11/04** [1] - 128:24
**111** [1] - 213:18
**112** [2] - 151:1, 151:7
**11:00** [1] - 71:5
**11:15** [1] - 69:2
**11:23** [1] - 61:12
**11:39** [1] - 68:20
**11th** [1] - 183:15
**12** [1] - 147:24
**12-year-old** [1] - 208:9
**125** [1] - 213:19
**130** [1] - 213:20
**133** [1] - 213:21
**14** [1] - 154:9

**14th** [1] - 54:12
**15** [7] - 11:23, 61:8, 61:11, 151:12, 172:20, 176:3
**150** [1] - 33:1
**1500** [1] - 159:9
**1515** [5] - 154:15, 154:17, 154:20, 155:3, 155:5
**158** [1] - 213:22
**15th** [2] - 54:15, 54:16
**1625** [2] - 152:2, 154:13
**166** [1] - 213:22
**16th** [1] - 129:2
**170** [1] - 23:6
**172** [1] - 94:19
**176** [1] - 213:24
**17th** [1] - 42:14
**18** [1] - 111:11
**180** [5] - 151:8, 151:14, 151:16, 154:10, 154:25
**18th** [5] - 9:11, 42:14, 42:16, 54:23
**19** [1] - 90:1
**1973** [1] - 183:15
**1974** [1] - 183:18
**1982** [1] - 178:1
**1993** [1] - 137:25
**1997** [1] - 4:10
**1998** [1] - 42:4
**1999** [3] - 134:11, 154:15, 159:3, 170:25, 179:4
**1:00** [1] - 112:6
**1:08** [1] - 109:3
**1:10** [1] - 109:25
**1st** [1] - 62:15

**2**

**2.19** [1] - 94:6
**2.20** [1] - 94:17
**20** [9] - 28:20, 68:8, 69:19, 69:25, 70:4, 70:7, 198:10, 210:17, 213:5
**2000** [3] - 206:25, 207:1, 207:3
**2002** [18] - 9:5, 9:11, 42:5, 42:14, 53:2, 64:9, 65:10, 92:13, 112:8, 123:23, 124:1, 129:15, 178:4, 178:7, 178:10, 195:6, 198:21
**2003** [1] - 211:5
**2004** [3] - 4:24, 8:5, 80:4
**2005** [4] - 79:12, 79:14, 80:5, 80:7
**2006** [4] - 79:17, 79:19,

80:10, 82:10
**2007** [5] - 80:10, 80:11, 83:4, 127:25, 178:1
**2008** [2] - 1:11, 214:6
**2009** [1] - 214:11
**20th** [1] - 76:3
**21201** [1] - 1:25
**22** [3] - 1:11, 84:14, 214:5
**2214** [1] - 68:12
**2215** [1] - 68:13
**2239** [1] - 68:13
**2248** [1] - 68:16
**22nd** [1] - 42:4
**2300** [2] - 68:13, 68:23
**2315** [2] - 68:16, 69:2
**2321** [1] - 69:6
**2322** [1] - 69:13
**2324** [3] - 69:16, 69:18, 71:4
**2329** [3] - 69:21, 70:11, 71:9
**2338** [1] - 70:13
**2339** [1] - 68:19
**24** [1] - 19:8, 71:4, 178:2, 198:19
**25** [2] - 152:2, 210:17
**25th** [1] - 128:24
**27th** [7] - 67:4, 67:6, 68:11, 178:6, 178:7, 198:20, 198:21
**28** [2] - 3:18, 158:15
**28th** [13] - 4:24, 53:2, 67:3, 67:4, 67:6, 112:7, 178:6, 178:7, 178:9, 192:5, 195:3, 195:6
**295** [1] - 68:13
**2:25** [1] - 178:9
**2:30** [3] - 109:5, 109:24, 163:9
**2:46** [2] - 178:12, 178:22
**2:50** [1] - 134:22

**3**

**3** [2] - 111:11, 213:4
**30** [4] - 33:1, 167:16, 167:17, 167:18
**302** [1] - 194:16
**3100** [1] - 79:13
**3130** [1] - 79:19
**320** [1] - 42:24
**36** [1] - 66:24
**38** [1] - 213:5
**39** [1] - 213:6
**3:00** [3] - 43:6, 109:14, 150:7
**3:15** [2] - 154:15

**4**

**4** [1] - 183:18
**40** [1] - 213:6
**41** [1] - 213:8
**41.3** [1] - 174:13
**4230** [2] - 157:14, 157:18
**44%** [1] - 174:14
**4500** [2] - 181:6, 188:17
**4:00** [2] - 62:22, 152:2
**4:10** [1] - 150:12
**4:15** [1] - 150:12
**4:25** [1] - 154:13
**4th** [1] - 129:8

**5**

**50** [1] - 100:7
**500** [2] - 47:7, 47:9
**54** [1] - 188:16
**55** [1] - 213:8
**5515** [1] - 1:24
**5:17** [1] - 212:22
**5th** [2] - 83:4, 129:13

**6**

**6** [2] - 207:7
**60** [1] - 213:9
**63** [1] - 213:10
**65** [3] - 163:16, 168:3, 168:19
**6th** [2] - 62:20, 170:25

**7**

**70** [1] - 163:17
**71** [1] - 213:11
**75** [5] - 163:16, 163:17, 168:3, 168:19, 213:12
**7500** [1] - 79:20
**76.8** [1] - 94:16
**77** [1] - 213:13
**78** [3] - 140:10, 171:17, 213:14
**7th** [4] - 134:11, 151:23, 154:14, 159:2

**8**

**8** [2] - 83:4, 198:20
**80** [1] - 109:5
**82.9** [1] - 94:8
**83** [3] - 47:13, 68:18, 69:3

**87** [2] - 136:1, 170:4
**89** [2] - 167:11, 167:12

**9**

**90** [1] - 167:9
**95** [6] - 134:15, 147:12, 160:4, 163:16, 167:24, 213:15
**95%** [1] - 84:24
**99-62-07156** [1] - 157:8
**9947A** [1] - 88:13
**9:30** [5] - 62:16, 202:4, 202:5, 212:21

**A**

**a.m** [11] - 2:1, 61:12, 83:4, 112:6, 178:9, 178:13, 178:22, 192:5, 207:7, 208:23
**able** [25] - 14:16, 52:14, 54:25, 55:2, 55:10, 56:9, 87:3, 95:6, 105:9, 105:12, 105:24, 108:2, 115:20, 116:13, 119:5, 123:12, 123:14, 135:9, 135:13, 154:25, 160:24, 163:24, 185:19, 189:6, 189:24
**abroad** [1] - 111:18
**absence** [2] - 177:12, 209:6
**Absolutely** [2] - 62:24, 130:24
**abuse** [1] - 209:14
**academy** [1] - 144:1
**Academy** [1] - 62:21
**accept** [1] - 96:1
**acceptable** [1] - 205:4
**acceptance** [1] - 110:6
**accepted** [1] - 82:18
**access** [2] - 116:10, 166:2
**accordance** [1] - 196:5
**according** [2] - 47:21, 94:20
**According** [2] - 48:14, 58:18
**accreditation** [4] - 81:19, 81:20, 82:2, 88:18
**Accreditation** [1] - 81:25
**accredited** [2] - 82:7, 82:10
**accrediting** [2] - 81:22, 81:23
**accurate** [3] - 106:14,

138:1, 214:9
**accurately** [1] - 102:13
**acid** [1] - 84:6
**acknowledge** [2] - 155:1, 173:17
**acknowledged** [1] - 32:25
**acknowledges** [1] - 173:14
**acknowledgment** [1] - 174:4
**acted** [1] - 53:9
**ACTG** [1] - 85:18
**action** [4] - 13:10, 119:15, 135:21, 138:6
**active** [3] - 177:13, 200:17, 200:19
**activities** [6] - 7:5, 8:16, 73:9, 73:11, 162:1, 162:3
**activity** [6] - 8:5, 8:19, 8:21, 9:22, 49:17, 68:15
**acts** [2] - 58:3, 58:4
**actual** [8] - 93:19, 127:17, 179:18, 195:16, 195:17, 196:9, 201:15, 211:5
**Acura** [5] - 147:15, 149:11, 149:13, 149:17, 170:2
**Adam** [1] - 1:22
**addition** [2] - 102:15, 122:1
**additional** [5] - 94:13, 108:6, 110:5, 141:16, 154:5
**address** [1] - 89:24
**addressed** [1] - 207:21
**Administration's** [1] - 153:21
**administrative** [2] - 89:14, 89:18
**Administrative** [1] - 41:25
**admissions** [1] - 211:14
**admitted** [3] - 57:24, 107:20, 126:21
**admitting** [1] - 33:12
**Advanced** [1] - 79:12
**Advice** [3] - 151:8, 151:14, 155:1
**advice** [1] - 155:5
**advise** [2] - 140:14, 149:21
**advised** [9] - 103:13, 110:5, 144:2, 148:5, 154:23, 155:4, 173:14, 173:18, 174:4
**advisedly** [1] - 208:7
**advisories** [1] - 150:20
**advisory** [1] - 152:15

**aerial** [3] - 179:17, 189:10, 189:24
**aerosol** [5] - 138:15, 138:18, 161:8, 161:20, 161:24
**affirmatively** [4] - 98:8, 105:12, 204:25, 205:9
**affixed** [2] - 138:12, 214:10
**afford** [1] - 144:16
**afforded** [1] - 144:17
**afraid** [2] - 74:7, 203:10
**African** [3] - 91:5, 94:7, 94:18
**African-American** [3] - 91:5, 94:7, 94:18
**afternoon** [29] - 71:23, 77:5, 77:6, 95:14, 95:15, 105:25, 106:1, 109:7, 109:16, 111:3, 111:4, 125:23, 126:5, 126:6, 133:9, 133:10, 134:23, 150:11, 152:2, 158:24, 158:25, 159:10, 159:11, 163:9, 166:22, 166:23, 177:6, 177:7, 211:24
**afterwards** [1] - 152:9
**agency** [3] - 81:1, 82:9, 157:7
**agent** [1] - 61:2
**agents** [1] - 138:19
**Agnes** [1] - 111:14
**ago** [4] - 12:24, 21:7, 159:6, 191:12
**agree** [6] - 32:23, 33:17, 53:11, 53:23, 104:11, 173:3
**agreed** [4] - 5:20, 31:3, 165:17, 173:25
**agreement** [15] - 4:15, 4:21, 5:18, 5:19, 5:20, 5:23, 6:2, 7:3, 31:2, 32:24, 33:8, 33:9, 33:21, 34:5, 38:23
**ahead** [11] - 40:17, 57:16, 72:8, 74:9, 76:18, 114:8, 144:22, 146:14, 153:15, 154:5, 204:21
**Aida** [1] - 194:16
**ain't** [2] - 30:15, 36:14
**air** [10] - 120:13, 138:15, 138:18, 138:21, 138:22, 143:16, 186:11, 186:13, 187:6
**ajar** [1] - 186:17
**al** [1] - 214:5
**Alan** [1] - 25:6
**Alexander** [3] - 13:22, 50:2, 50:17, 50:21, 50:23, 51:9, 52:6, 52:23,

53:1, 53:20, 96:9, 105:13, 107:5
**Alexander's** [5] - 91:16, 101:1, 105:3, 130:9, 131:6
**alibi** [1] - 206:4
**alive** [1] - 116:1
**alleged** [1] - 206:3
**allele** [7] - 85:21, 85:22, 86:3, 88:16, 89:2, 93:19, 93:20
**alleles** [9] - 86:6, 86:9, 89:1, 89:5, 90:2, 94:13, 108:7, 108:16
**allelic** [1] - 87:23
**alley** [8] - 178:25, 179:1, 180:10, 181:6, 188:16, 190:12, 190:19
**alleyway** [2] - 180:14, 180:24
**allocation** [1] - 73:2
**allow** [3] - 152:23, 165:17, 176:14
**allowed** [1] - 204:12
**allows** [4] - 87:2, 88:6, 88:11, 89:15
**almost** [2] - 159:6, 167:9, 207:21
**alone** [2] - 153:9, 155:20
**aloud** [1] - 153:1
**alternate** [1] - 202:25
**alternates** [1] - 203:11
**alternative** [2] - 98:6, 98:7
**ambulance** [4] - 112:2, 113:5, 113:7, 114:5
**AMD-04-029** [2] - 1:6, 214:5
**amenable** [1] - 207:17
**Amendment** [1] - 209:9
**AMERICA** [1] - 1:5
**American** [7] - 81:24, 91:5, 91:6, 94:6, 94:7, 94:17, 94:18
**amount** [7] - 86:16, 109:19, 149:14, 153:20, 158:11, 158:12, 159:23
**amounted** [1] - 73:1
**ample** [1] - 87:5
**amplification** [4] - 79:14, 79:18, 87:3, 88:15
**Amplification** [1] - 79:20
**analysis** [43] - 64:7, 64:19, 64:20, 65:1, 65:16, 72:1, 76:17, 77:12, 77:14, 78:17, 79:3, 79:7, 79:25, 80:16, 82:12, 82:19, 82:24,

83:8, 83:17, 83:21, 83:25, 84:2, 87:13, 88:1, 88:2, 88:20, 90:6, 92:24, 93:23, 100:4, 105:2, 129:8, 130:8, 130:13, 130:22, 131:5, 156:18, 174:11, 175:3, 175:4, 175:5, 211:10, 211:13
**analyst** [14] - 63:21, 64:2, 64:4, 64:5, 64:11, 76:24, 78:12, 78:16, 78:20, 81:11, 81:14, 89:15, 127:19, 129:20
**analyze** [7] - 66:1, 72:11, 96:5, 96:25, 130:23, 131:15, 201:10
**analyzed** [8] - 76:3, 76:4, 77:7, 96:25, 100:11, 101:7, 127:9, 131:17
**Analyzer** [2] - 79:13, 79:19
**analyzes** [1] - 64:5
**analyzing** [2] - 72:22, 102:24
**Andre** [1] - 1:13
**angle** [1] - 44:24
**announce** [1] - 176:19
**annual** [2] - 80:6, 80:12
**answer** [14] - 15:18, 49:2, 51:3, 51:8, 55:13, 60:8, 102:2, 152:18, 152:19, 158:8, 167:17, 173:21, 200:25, 201:5
**answering** [1] - 166:5
**Anthony** [3] - 23:25, 24:1, 25:8
**anticipate** [1] - 2:10
**anticipation** [1] - 97:22
**anxious** [1] - 209:20
**anyway** [1] - 206:14
**apart** [2] - 23:22, 93:11
**Apartment** [1] - 194:16
**apartment** [1] - 189:22
**apologize** [4] - 2:18, 116:18, 126:7, 134:4
**apparent** [2] - 166:11, 182:16
**appealing** [1] - 28:2
**appear** [5] - 97:15, 99:24, 108:14, 116:6, 207:15
**appearance** [1] - 54:3
**Appearances** [1] - 1:15
**appeared** [10] - 115:24, 120:1, 121:2, 121:11, 122:18, 152:9, 153:1, 182:18, 182:20, 207:15
**applicable** [1] - 108:10
**Applied** [3] - 79:12,

79:15, 79:19
**applying** [1] - 83:9
**appraisal** [1] - 204:12
**appreciate** [1] - 52:21
**approach** [3] - 99:25, 131:23, 203:17
**approached** [10] - 56:25, 115:13, 115:20, 116:4, 138:13, 150:24, 160:19, 161:1, 162:6, 163:20
**approaching** [1] - 161:24
**appropriate** [2] - 89:1, 202:16
**approximate** [1] - 112:6, 150:5
**April** [4] - 80:10, 83:4, 129:13, 178:1
**aptly** [1] - 204:4
**Area** [1] - 72:10
**area** [36] - 3:23, 8:7, 43:22, 44:1, 44:6, 45:4, 46:21, 47:9, 80:15, 91:9, 114:25, 115:1, 115:3, 134:14, 135:5, 135:18, 136:1, 166:1, 167:20, 168:25, 172:9, 172:10, 172:15, 179:17, 181:9, 181:10, 181:12, 181:25, 182:2, 185:8, 188:10, 193:11, 193:22, 195:18, 200:13
**areas** [2] - 85:3, 169:3
**arising** [1] - 57:23
**arm** [2] - 142:8, 142:13
**army** [2] - 111:15, 111:16
**Army** [4] - 177:15, 177:16, 177:17, 179:13
**array** [2] - 54:1, 54:2
**arrays** [5] - 53:16, 53:19, 53:23, 55:2, 55:4, 55:9, 210:18
**arrest** [16] - 47:22, 55:16, 134:3, 143:3, 143:6, 143:18, 143:21, 144:25, 149:4, 149:5, 150:7, 150:10, 153:20, 154:21, 155:4, 165:9
**arrested** [8] - 7:4, 26:1, 27:2, 47:25, 48:2, 48:20, 143:20, 149:7
**arrestee** [1] - 151:3
**arrests** [1] - 158:9
**Arrington** [4] - 2:9, 100:20, 100:21, 105:23
**arrival** [1] - 156:7
**arrive** [1] - 114:3
**arrived** [25] - 10:14,

42:19, 43:6, 43:9, 44:10, 47:23, 69:6, 69:21, 113:25, 114:19, 117:10, 119:11, 141:8, 141:14, 141:23, 143:10, 145:11, 145:12, 147:11, 148:4, 156:5, 156:12, 169:18, 178:20, 182:25
**arrives** [1] - 69:18
**arriving** [3] - 141:16, 148:19, 178:12
**arrow** [1] - 197:10
**articulate** [1] - 207:22
**artifacts** [1] - 89:2
**Arundel** [4] - 68:12, 198:20, 198:25, 199:14
**ASCLD** [1] - 82:10
**ash** [4] - 139:17, 139:18, 139:19, 143:7
**Ash** [2] - 5:1, 27:12
**ashes** [2] - 139:19, 143:9
**assessment** [1] - 157:24
**assets** [1] - 31:3
**assigned** [8] - 41:25, 42:7, 43:15, 43:17, 75:7, 134:14, 177:10, 177:17
**assignment** [2] - 41:24, 42:6
**assist** [3] - 65:12, 72:6, 83:20
**assistance** [3] - 73:20, 113:16, 163:3
**assistant** [1] - 206:18
**assisted** [1] - 192:11
**assisting** [1] - 66:12
**Associate** [1] - 177:20
**associated** [1] - 40:3
**associates** [2] - 14:8, 29:2
**associating** [1] - 189:7
**Association** [3] - 80:5, 80:8, 80:12
**assume** [7] - 72:24, 73:8, 101:15, 107:5, 132:14, 161:23, 161:25
**Assuming** [1] - 104:11
**assuming** [1] - 118:21
**assumption** [1] - 107:12
**assurance** [1] - 88:3
**Athletic** [1] - 206:19
**Atlantic** [3] - 80:5, 80:8, 80:11
**attached** [1] - 65:22
**attacked** [2] - 32:10, 32:12
**attacking** [1] - 48:20
**attempt** [6] - 51:17,

51:20, 52:3, 52:25, 53:16, 200:10
**attempted** [1] - 50:15
**attempting** [2] - 97:6, 117:12
**attempts** [1] - 123:18
**attend** [1] - 194:25
**attended** [6] - 79:24, 80:4, 80:5, 80:7, 80:9, 80:11
**attention** [1] - 9:4, 42:5, 42:13, 54:11, 91:14, 112:5, 115:16, 117:6, 126:9, 134:22, 159:24, 160:9, 161:14, 174:5, 176:11, 178:6, 181:7
**attentive** [1] - 207:23
**Attorney** [1] - 59:2
**attorney** [6] - 5:1, 5:19, 27:11, 27:19, 27:20, 53:8
**attorney's** [1] - 53:5
**Attorney's** [3] - 4:16, 4:17, 6:13
**attorneys** [1] - 6:13
**attributable** [1] - 108:7
**Auction** [1] - 162:25
**audio** [1] - 50:1
**audited** [2] - 82:3, 82:5
**auditor** [1] - 79:23
**August** [5] - 64:1, 79:14, 79:22, 178:1, 206:21
**authored** [1] - 101:14
**Authority** [1] - 177:11
**authorization** [1] - 73:6
**Auto** [1] - 162:25
**automobile** [1] - 65:23
**autopsies** [1] - 194:25, 200:4, 211:3
**autopsy** [5] - 195:4, 195:5, 195:7, 196:25, 197:20
**available** [4] - 74:6, 92:11, 131:14, 205:5
**Avenue** [8] - 42:24, 69:9, 70:2, 178:11, 178:21, 181:3, 181:6, 188:17
**avenue** [1] - 193:3
**awaiting** [1] - 156:7
**aware** [1] - 169:9
**awkward** [1] - 203:19

---

**B**

**B-E-R-G-E-R** [1] - 177:3
**B-O-N-D** [1] - 133:6
**B02-73** [1] - 101:19

**B020073** [1] - 129:23
**BA** [1] - 65:8
**Bachelor's** [1] - 177:22
**Bachelors** [1] - 78:23
**background** [7] - 4:5, 78:21, 133:14, 177:18, 186:24, 187:14, 189:22
**backup** [5] - 136:8, 141:13, 141:14, 141:21, 141:23
**backwards** [1] - 67:3
**bag** [13] - 120:13, 142:19, 165:20, 185:10, 186:11, 186:12, 186:13, 186:23, 187:1, 187:6, 187:13, 187:15, 198:22
**baggie** [4] - 142:3, 142:6, 156:25, 166:11
**bald** [1] - 23:2
**Ballpark** [1] - 210:16
**Baltimore** [34] - 1:12, 1:25, 3:22, 3:23, 4:17, 5:10, 41:22, 42:2, 43:3, 64:11, 64:13, 65:11, 72:3, 75:6, 78:12, 80:19, 81:14, 82:4, 84:3, 91:9, 111:6, 111:10, 113:22, 127:10, 167:15, 167:16, 167:18, 177:9, 177:21, 177:23, 177:24, 194:19, 199:12
**bar** [19] - 43:11, 44:1, 44:5, 44:8, 44:24, 45:1, 45:4, 45:15, 54:21, 56:4, 56:12, 56:13, 56:14, 58:8, 58:16, 59:8, 59:9, 59:15
**barrack** [7] - 145:6, 145:17, 146:11, 147:5, 149:19, 150:3, 153:19
**barracks** [13] - 145:8, 145:10, 145:14, 146:7, 146:14, 149:18, 149:23, 150:1, 150:8, 150:12, 150:13, 155:7, 156:5
**barrel** [1] - 195:17
**barrier** [9] - 180:19, 180:21, 184:16, 184:17, 188:18, 188:22, 189:1, 189:21, 190:18
**Barry** [1] - 1:22
**base** [3] - 84:4, 174:14, 174:16
**based** [11] - 35:6, 86:10, 87:8, 87:10, 93:22, 108:16, 113:16, 130:15, 142:22, 157:24, 171:14
**Based** [2] - 113:3, 185:3
**basis** [3] - 66:14, 203:6,

209:3
**bathroom** [2] - 46:11, 46:15
**bathrooms** [1] - 45:22
**Batson** [2] - 51:23
**battery** [1] - 68:15
**Bauer** [1] - 59:2
**bay** [1] - 192:3
**bear** [2] - 57:24, 151:11
**BEAT** [1] - 60:9
**beaten** [1] - 47:21
**beating** [2] - 48:3, 60:5
**became** [1] - 169:9
**began** [7] - 8:10, 58:11, 58:12, 58:15, 144:25, 148:15, 148:19
**begin** [1] - 20:3
**beginning** [3] - 64:1, 68:4, 152:15
**behalf** [2] - 62:3, 207:19
**Behalf** [5] - 1:15, 1:17, 1:18, 1:20, 1:21
**behind** [8] - 86:12, 109:21, 147:14, 186:25, 188:16, 188:23, 190:17, 191:21
**belabor** [1] - 61:25
**belief** [2] - 58:1, 58:2
**believes** [1] - 203:7
**Belinda** [1] - 212:18
**below** [2] - 117:3, 132:16
**belt** [7] - 135:7, 135:20, 135:25, 163:14, 164:19, 164:23, 168:21
**belted** [1] - 135:12
**benefit** [1] - 120:12
**benefits** [3] - 6:2, 6:5, 26:8
**Bentley** [1] - 39:12
**BERGER** [2] - 176:24, 213:23
**Berger** [8] - 109:13, 109:21, 176:22, 176:23, 177:3, 177:19, 210:14, 210:21
**best** [7] - 28:14, 28:15, 67:17, 109:18, 123:13, 148:16, 159:7
**better** [10] - 30:8, 30:10, 30:11, 30:13, 30:14, 30:17, 30:25, 68:1, 114:16
**between** [19] - 26:12, 26:21, 64:25, 70:6, 85:20, 90:9, 142:7, 144:25, 149:14, 150:12, 163:16, 167:2, 167:11, 167:12, 168:3, 168:19, 169:4, 172:6, 208:6

**big** [8] - 11:1, 11:14, 25:25, 32:19, 59:6, 59:8, 209:8
**bigger** [1] - 56:3
**biochemistry** [1] - 78:23
**biological** [4] - 75:13, 75:17, 75:18, 86:22
**biology** [4] - 129:22, 129:23, 129:24
**Biology/DNA** [1] - 75:7
**Biosystems** [3] - 79:12, 79:15, 79:19
**birth** [6] - 151:2, 151:3, 183:15, 183:18, 183:19, 183:24
**birthday** [6] - 9:15, 9:17, 37:4, 37:5, 49:12, 49:18
**bit** [14] - 10:7, 14:3, 44:7, 100:19, 114:15, 116:18, 120:11, 123:9, 139:12, 157:16, 157:20, 169:8, 186:17, 189:18
**black** [2] - 142:15, 196:8
**blade** [1] - 76:6
**blank** [3] - 88:4, 88:9, 88:11
**bleed** [1] - 104:15
**bleeding** [2] - 119:25, 120:1
**block** [7] - 47:7, 47:9, 68:13, 68:23, 69:9, 70:25, 181:6
**blocks** [2] - 43:3, 47:15
**Blood** [1] - 104:15
**blood** [87] - 44:16, 45:19, 46:2, 46:5, 46:15, 46:23, 52:3, 52:5, 52:9, 52:22, 58:15, 75:14, 77:12, 77:14, 84:19, 84:23, 86:15, 86:24, 86:25, 87:1, 91:16, 91:19, 91:24, 92:8, 92:11, 92:17, 93:6, 93:24, 94:11, 94:21, 94:23, 95:6, 95:25, 96:21, 96:22, 97:4, 97:7, 97:12, 98:14, 98:22, 101:1, 101:2, 101:6, 103:2, 103:3, 103:14, 103:16, 103:22, 104:18, 104:19, 104:24, 105:3, 105:4, 105:5, 105:9, 106:20, 106:25, 107:9, 107:11, 107:13, 120:7, 122:18, 126:24, 126:25, 127:12, 127:21, 128:4, 128:12, 128:17, 128:24,

129:1, 129:14, 129:19, 129:25, 131:2, 131:7, 131:17, 131:18, 184:20, 185:1, 185:8, 185:13
**blow** [1] - 69:5
**blow-up** [1] - 69:5
**blown** [2] - 186:11, 186:13, 187:6
**blue** [3] - 39:12, 147:14, 170:6
**blueprint** [1] - 84:6
**Bo** [28] - 12:17, 12:18, 12:20, 12:24, 12:25, 13:5, 17:4, 17:6, 17:9, 17:12, 17:13, 17:16, 17:18, 17:20, 17:24, 18:6, 18:20, 19:2, 19:13, 19:14, 20:8, 32:2, 36:24, 37:16, 201:7
**BO2-73** [1] - 101:7
**board** [1] - 62:21
**Board** [1] - 81:25
**bodies** [4] - 113:18, 184:9, 187:18, 187:20
**bodily** [4] - 75:15, 86:11, 86:21, 103:16
**body** [25] - 75:13, 81:22, 81:23, 84:8, 84:15, 84:18, 85:1, 86:14, 93:5, 120:23, 121:6, 122:17, 123:7, 123:15, 183:13, 183:16, 184:17, 185:24, 186:23, 187:1, 187:5, 187:12, 187:15, 197:3
**BOND** [2] - 133:1, 213:21
**Bond** [15] - 109:13, 132:25, 133:5, 133:9, 140:22, 150:19, 151:11, 152:15, 154:17, 157:20, 158:20, 158:24, 166:17, 166:22, 175:13
**bone** [1] - 84:23
**bones** [2] - 84:20, 93:5
**book** [1] - 60:17
**born** [2] - 3:19, 3:21
**borrow** [1] - 166:21
**bottles** [2] - 59:20, 59:21
**bottom** [11] - 29:7, 29:9, 33:20, 45:13, 106:11, 152:10, 152:11, 153:5, 155:15, 157:3, 173:7
**bought** [1] - 31:7
**Boulevard** [1] - 199:11
**bound** [1] - 5:20
**box** [3] - 189:4, 189:19
**boxer** [1] - 193:6
**Boy** [2] - 10:13, 11:19

**boy** [3] - 75:1, 182:17
**Boys** [1] - 62:21
**brake** [2] - 142:4, 169:6
**bravo** [1] - 114:12
**break** [5] - 61:3, 118:15, 118:20, 201:19, 208:20
**Bridge** [1] - 167:13
**brief** [3] - 52:2, 84:1, 204:19
**Briefly** [2] - 107:22, 107:23
**briefly** [6] - 7:2, 7:9, 40:15, 50:1, 116:17, 125:19
**briefs** [1] - 52:17
**bring** [4] - 2:14, 163:1, 163:3, 176:11
**broke** [7] - 14:2, 44:2, 118:8, 119:2, 119:9, 184:10, 184:11
**broken** [11] - 14:3, 14:4, 59:15, 59:20, 118:10, 119:7, 119:8, 184:4, 184:7, 191:2
**brother** [1] - 24:18
**brother's** [1] - 24:19
**brothers** [9] - 8:2, 8:5, 8:16, 9:6, 9:20, 20:9, 20:18, 36:12, 40:2
**brought** [3] - 66:3, 66:5, 178:17
**Brown** [11] - 183:17, 187:5, 187:12, 192:20, 194:9, 196:25, 197:3, 197:14, 198:16, 200:5, 201:11
**Brown's** [2] - 194:17, 196:17
**brushes** [1] - 86:14
**BS** [1] - 79:2
**bubble** [2] - 24:5, 29:13
**building** [2] - 43:23, 195:23
**buildings** [1] - 114:23
**bullet** [10] - 184:22, 184:24, 185:6, 197:4, 197:5, 197:6, 197:17, 197:24, 198:1, 198:4
**bullets** [2] - 197:13, 197:21
**bunch** [5] - 11:14, 21:1, 39:23, 57:1, 71:12
**bundled** [3] - 188:4, 188:9
**burning** [3] - 195:16, 195:17, 196:12
**burnt** [4] - 138:24, 139:14, 143:9, 165:6
**business** [9] - 9:21, 29:2, 30:18, 30:22, 31:4,

31:18, 37:8, 37:14, 40:3
**buy** [1] - 170:24
**BY** [59] - 3:16, 16:3, 20:6, 27:23, 38:11, 39:18, 40:19, 41:18, 49:6, 51:11, 54:10, 55:15, 55:22, 58:6, 60:2, 63:17, 71:22, 75:3, 77:4, 78:9, 82:20, 95:13, 100:22, 102:10, 105:21, 106:18, 107:25, 111:2, 126:4, 130:6, 133:8, 148:13, 158:23, 166:20, 177:5, 213:4, 213:5, 213:5, 213:6, 213:6, 213:8, 213:8, 213:9, 213:10, 213:11, 213:12, 213:13, 213:14, 213:15, 213:15, 213:16, 213:16, 213:18, 213:19, 213:20, 213:21, 213:22, 213:22, 213:24

**C**

**calculation** [1] - 89:10
**caliber** [1] - 196:6
**California** [3] - 40:25, 41:1, 41:4
**Calvin** [1] - 201:6
**camera** [4] - 190:17, 199:9, 199:20
**Campbell** [1] - 24:2
**cannot** [4] - 89:8, 144:16, 203:11, 209:3
**canted** [1] - 189:18
**canvass** [2] - 193:21, 193:23
**Capillary** [1] - 80:7
**capture** [1] - 151:1
**car** [105] - 31:7, 39:7, 39:9, 57:7, 67:6, 67:8, 67:12, 68:4, 68:11, 68:23, 69:1, 70:1, 70:15, 73:16, 73:18, 114:8, 115:8, 115:13, 115:20, 116:1, 116:3, 116:11, 116:19, 117:10, 117:12, 117:25, 118:22, 118:25, 119:2, 119:5, 119:9, 119:11, 119:20, 119:24, 120:17, 123:1, 123:5, 125:2, 134:15, 134:18, 135:12, 135:17, 137:13, 137:14, 138:3, 138:9, 139:22, 140:18, 141:7, 141:8, 141:24, 143:5, 143:11, 144:3, 144:4, 146:4, 149:8, 154:22, 156:15, 159:25, 160:14,

160:19, 161:9, 162:14, 162:17, 163:1, 163:6, 163:13, 164:4, 165:13, 165:14, 165:18, 166:2, 166:6, 166:10, 168:14, 168:19, 169:3, 169:4, 169:16, 169:22, 169:23, 170:21, 170:25, 171:5, 171:21, 172:16, 180:4, 182:6, 182:7, 182:8, 182:18, 183:2, 183:12, 184:23, 184:24, 186:23, 187:12, 187:13, 188:19, 190:8, 193:4, 201:11
**card** [19] - 91:17, 91:19, 101:1, 105:3, 128:24, 129:1, 129:19, 129:25, 131:17, 131:18, 143:25, 144:6, 144:10, 144:19, 144:20, 154:24, 155:2
**cards** [1] - 131:2
**care** [1] - 146:14
**cares** [1] - 26:12
**Carrie** [1] - 59:2
**carried** [2] - 19:22, 144:6
**carries** [1] - 22:6
**carry** [2] - 8:21, 21:13
**cars** [4] - 31:13, 39:11, 170:9, 190:5
**cartoon** [1] - 106:7
**cartridge** [1] - 195:16
**case** [65] - 5:4, 6:5, 7:3, 26:2, 26:3, 26:13, 26:14, 26:17, 26:20, 27:25, 35:14, 35:15, 36:12, 36:14, 36:17, 43:17, 51:16, 54:7, 56:16, 57:18, 57:22, 64:20, 66:4, 71:19, 76:19, 81:1, 89:12, 89:13, 90:10, 91:15, 93:1, 93:10, 93:15, 96:8, 98:11, 101:18, 101:21, 107:17, 108:4, 108:15, 108:16, 109:1, 110:4, 113:18, 122:14, 124:14, 130:18, 134:10, 136:24, 144:24, 151:23, 157:7, 158:17, 166:13, 176:1, 201:24, 202:2, 203:13, 203:20, 205:19, 207:16, 208:18, 209:12
**CASE** [1] - 1:6
**Case** [1] - 214:5
**cases** [3] - 26:15, 27:5, 27:6
**Caucasian** [3] - 91:6, 94:6, 94:17
**caught** [1] - 168:6

**caused** [3] - 134:1, 135:3, 184:22
**causes** [1] - 195:17
**causing** [1] - 103:22
**CC** [2] - 157:11, 157:13
**cease** [1] - 66:17
**celebrated** [1] - 9:14
**cell** [9] - 84:15, 84:18, 146:12, 147:6, 150:14, 150:15, 150:18, 193:9
**cells** [14] - 76:8, 76:10, 76:14, 77:15, 84:8, 84:19, 84:21, 84:23, 86:12, 102:21, 150:2, 156:6, 156:10
**center** [3] - 43:2, 120:16, 120:17, 125:3, 142:4, 142:7, 149:15, 160:4, 165:21, 168:9, 168:25, 172:6, 172:12, 185:12, 185:16, 186:17, 187:17, 195:24
**Central** [3] - 42:7, 42:10, 201:2
**certain** [12] - 29:23, 33:25, 34:8, 58:1, 58:3, 58:4, 83:9, 85:16, 99:6, 99:7, 102:17
**certainly** [6] - 97:6, 202:25, 203:6, 207:13, 207:15, 207:21
**Certainly** [4] - 84:1, 93:16, 100:1, 211:18
**CERTIFICATE** [1] - 214:1
**certified** [1] - 205:23
**certify** [2] - 214:3, 214:7
**chairs** [4] - 61:6, 108:25, 175:25, 201:24
**Chambers** [1] - 25:14
**champagne** [1] - 59:20
**chance** [4] - 90:24, 91:2, 131:20, 183:20
**chances** [4] - 89:10, 90:14, 94:3, 94:14
**change** [1] - 149:7
**changes** [1] - 62:25
**characterization** [1] - 158:2
**charge** [11] - 4:18, 5:5, 5:13, 7:4, 20:19, 20:21, 20:22, 108:19, 195:15, 196:6, 196:11
**charged** [10] - 4:12, 5:8, 6:24, 7:4, 24:11, 24:12, 24:14, 24:15, 24:17, 25:23, 57:22
**charger** [1] - 195:15
**charges** [1] - 27:15
**chart** [3] - 68:1, 89:19,

97:2
  **check** [13] - 56:15, 83:1, 89:16, 89:18, 145:17, 146:9, 148:7, 148:20, 149:1, 200:13, 204:20, 212:20
  **checked** [2] - 81:4, 123:20
  **chemical** [2] - 84:7, 84:10
  **Cherry** [3] - 178:12, 178:14, 194:14
  **choice** [1] - 118:15
  **Christopher** [1] - 25:22
  **chromosome** [2] - 85:24, 86:8
  **chromosomes** [5] - 84:14, 84:15, 86:2, 86:3
  **chronologically** [1] - 147:5
  **cigarettes** [1] - 86:13
  **Cincinnati** [4] - 63:21, 63:23, 64:23, 65:7
  **Circle** [16] - 69:8, 69:10, 69:11, 69:17, 70:1, 70:21, 70:24, 178:11, 178:21, 178:24, 181:1, 181:5, 188:16, 190:20, 190:22
  **circle** [2] - 24:9, 24:10
  **circled** [1] - 137:23
  **Circuit** [2] - 5:10, 80:20
  **circulate** [1] - 181:23
  **circumstances** [5] - 7:3, 169:9, 202:16, 207:12, 208:18
  **citation** [3] - 164:18, 164:20, 164:22
  **citizen** [1] - 112:18
  **citrus** [4] - 138:15, 138:22, 163:21, 163:23
  **City** [17] - 4:17, 5:10, 41:22, 42:2, 65:11, 72:4, 75:6, 78:12, 80:19, 81:14, 82:4, 84:3, 111:6, 113:22, 127:10, 177:9, 199:12
  **city** [4] - 16:22, 37:5, 112:12, 113:21
  **civilian** [3] - 133:14, 133:21, 134:1
  **civilians** [3] - 147:16, 147:17
  **CL** [1] - 157:11
  **clarification** [1] - 68:6
  **Clash** [18] - 10:4, 10:7, 11:19, 12:1, 13:19, 14:9, 14:10, 14:21, 15:12, 17:5, 23:24, 50:17, 52:20, 52:22, 53:1,

53:20, 96:11, 107:5
  **Clash's** [5] - 91:19, 101:1, 105:3, 105:13, 131:6
  **class** [1] - 153:23
  **Class** [1] - 133:22
  **clatter** [1] - 89:2
  **clear** [6] - 121:22, 123:6, 130:8, 159:5, 195:9, 209:13
  **Clear** [1] - 123:8
  **cleared** [1] - 169:25
  **clearing** [2] - 126:7, 130:4
  **Clearly** [1] - 135:10
  **clerk** [1] - 110:8
  **CLERK** [9] - 3:3, 3:6, 41:12, 63:12, 74:23, 78:4, 110:22, 133:3, 177:1
  **client** [1] - 204:9
  **clock** [1] - 109:3
  **close** [12] - 37:14, 45:16, 45:19, 115:20, 121:13, 122:13, 170:12, 195:14, 195:19, 195:25, 196:3, 196:23
  **close-up** [3] - 45:16, 121:13, 122:13
  **closed** [3] - 89:13, 116:5, 118:6
  **closely** [1] - 139:12
  **closer** [5] - 3:11, 121:16, 181:25, 184:2, 189:12
  **closest** [1] - 181:4
  **clothing** [4] - 86:12, 86:24, 86:25, 139:15
  **Clothing** [1] - 44:17
  **Cloudy** [2] - 159:20, 159:21
  **club** [8] - 9:8, 12:16, 13:8, 14:16, 14:18, 17:16, 60:10, 200:15
  **Coach** [4] - 202:14, 205:1, 206:19, 207:8
  **coating** [1] - 85:10
  **COBURN** [17] - 39:16, 59:25, 74:1, 77:22, 82:17, 105:18, 105:21, 125:13, 132:21, 148:10, 158:2, 158:7, 158:13, 166:20, 203:18, 213:15, 213:22
  **Coburn** [4] - 1:22, 204:17, 204:24, 207:19
  **cocaine** [13] - 5:15, 33:1, 142:18, 142:21, 143:1, 143:16, 158:1, 158:4, 158:11, 168:24,

172:11, 174:13, 174:16
  **coconspirator** [1] - 211:17
  **coconspirators** [1] - 211:18
  **code** [2] - 84:7, 84:24
  **codefendants** [1] - 203:20
  **coding** [1] - 85:5
  **coincidence** [1] - 90:22
  **Coldspring** [2] - 69:4, 70:16
  **colleague's** [1] - 157:19
  **colleagues** [2] - 193:21, 201:10
  **collect** [1] - 96:5
  **collected** [2] - 127:13, 131:1
  **College** [1] - 177:21
  **college** [7] - 79:1, 177:19, 203:5, 203:7, 205:25, 206:22, 207:12
  **colleges** [2] - 207:10
  **Color** [1] - 142:24
  **color** [4] - 84:9, 85:1, 85:2
  **colored** [1] - 87:18
  **column** [2] - 89:20, 89:25
  **combination** [2] - 85:25, 89:21
  **Coming** [1] - 59:8
  **coming** [10] - 35:17, 56:4, 56:13, 59:6, 65:3, 87:14, 132:23, 142:11, 212:9
  **comment** [1] - 204:19
  **committed** [2] - 6:25, 211:8
  **commonly** [1] - 138:18
  **Communications** [1] - 112:20
  **Community** [1] - 177:21
  **company** [3] - 81:3, 113:4
  **compare** [12] - 88:22, 88:23, 90:4, 99:13, 101:6, 127:23, 130:9, 130:22, 131:4, 131:6, 131:15, 158:4
  **compared** [3] - 102:25, 105:2, 132:15
  **Compared** [1] - 105:7
  **comparison** [4] - 89:6, 102:16, 131:19, 194:12
  **comparisons** [1] - 78:18
  **compartment** [2] - 138:13, 142:2
  **competition** [4] - 30:2,

30:4, 30:5, 31:20
  **complaint** [3] - 128:18, 128:20, 131:3
  **complete** [2] - 151:6, 214:9
  **completed** [1] - 149:11
  **completing** [1] - 149:10
  **completion** [1] - 149:17
  **complicated** [1] - 100:19
  **components** [1] - 84:10
  **composed** [1] - 84:10
  **comprise** [1] - 113:1
  **computer** [1] - 100:15
  **computerized** [1] - 66:15
  **COMSTAT** [1] - 64:21
  **concern** [2] - 28:23, 35:22
  **concerned** [2] - 26:22, 35:13
  **concerning** [2] - 17:4, 140:14
  **concerns** [1] - 205:2
  **conclude** [2] - 124:12, 124:13
  **Conclusion** [1] - 212:22
  **conclusion** [3] - 34:20, 142:21, 208:17
  **conclusions** [1] - 84:4
  **concrete** [7] - 179:3, 180:19, 188:18, 188:22, 189:1, 189:20
  **condition** [6] - 47:19, 115:8, 116:1, 117:10, 117:25, 122:11
  **conditions** [1] - 159:16
  **Condominium** [1] - 31:15
  **conduct** [1] - 200:3
  **Conduct** [1] - 202:1
  **conducted** [2] - 83:8, 195:2
  **conducting** [1] - 140:7
  **confer** [2] - 208:24, 209:23
  **conference** [2] - 80:6, 80:13
  **conferences** [2] - 79:24, 80:3
  **confirm** [1] - 127:20
  **confirmatory** [1] - 75:19
  **confused** [2] - 153:13, 202:23
  **confusion** [1] - 155:17
  **connection** [3] - 197:21, 212:5, 212:7
  **connects** [1] - 65:20
  **conscientious** [2] -

207:23, 209:18
  **Consent** [1] - 140:11
  **consent** [12] - 140:18, 141:11, 141:18, 143:23, 148:8, 165:12, 165:14, 171:9, 171:17, 172:23, 172:24, 173:10
  **consented** [3] - 171:4, 171:21, 171:24
  **consider** [2] - 62:10, 158:10
  **considerable** [1] - 109:19
  **consideration** [1] - 57:24
  **considered** [3] - 158:10, 158:12, 159:9
  **considering** [1] - 202:15
  **consistent** [7] - 89:8, 89:9, 94:2, 94:12, 94:25, 98:20, 184:24
  **consistent-with** [1] - 89:9
  **consists** [1] - 83:25
  **console** [12] - 120:17, 142:4, 142:7, 149:15, 165:21, 168:25, 172:6, 172:13, 185:12, 185:16, 186:17, 186:19, 186:20, 187:17, 191:2, 191:10
  **conspiracy** [5] - 5:15, 26:19, 33:4, 33:7, 206:3
  **constitute** [1] - 214:7
  **consult** [1] - 144:16
  **consulting** [1] - 152:18
  **contact** [14] - 86:11, 86:13, 104:19, 135:25, 136:11, 138:10, 138:14, 138:23, 146:3, 153:21, 195:20, 196:1, 207:8, 207:9
  **contained** [1] - 84:13
  **containing** [2] - 142:6, 156:25
  **contains** [2] - 84:7, 155:11
  **contamination** [1] - 88:7, 93:1
  **content** [1] - 204:21
  **contest** [1] - 209:9
  **Continue** [3] - 109:2, 176:2, 201:25
  **continue** [3] - 61:21, 146:6, 148:11
  **continues** [1] - 207:15
  **continuing** [2] - 16:1, 61:18
  **contraband** [1] - 139:10
  **contract** [2] - 6:20,

19:16
**contractor** [1] - 64:24
**contrary** [1] - 209:25
**contributed** [1] - 89:11
**contributor** [1] - 94:15
**Control** [7] - 127:15
**control** [7] - 5:14, 43:14, 88:9, 88:13, 92:22, 100:17, 212:18
**controls** [1] - 88:3
**conversation** [4] - 17:23, 148:8, 154:5, 162:20
**conversations** [3] - 16:20, 17:8, 200:9
**converse** [1] - 156:10
**cool** [1] - 10:16
**cooperate** [1] - 51:15
**cooperating** [2] - 5:24, 6:10
**cooperation** [4] - 34:20, 35:6, 35:7, 37:22
**cooperative** [2] - 162:6, 164:9
**coordinate** [2] - 70:6, 132:10
**coordinates** [6] - 65:21, 66:14, 67:1, 67:7, 70:5, 71:11
**copies** [2] - 110:5, 110:7
**copy** [11] - 4:21, 57:19, 85:24, 87:4, 107:17, 137:2, 137:19, 144:10, 147:24, 152:8, 156:21
**copying** [1] - 88:10
**corner** [5] - 30:21, 30:22, 69:17, 70:1, 142:3
**correct** [141] - 4:13, 5:7, 6:6, 7:7, 7:24, 8:11, 9:11, 39:5, 46:22, 49:8, 49:9, 52:12, 52:24, 56:22, 57:5, 57:9, 59:13, 59:17, 66:10, 68:20, 70:25, 73:14, 75:10, 76:11, 76:12, 76:21, 77:10, 77:16, 91:20, 92:17, 92:24, 92:25, 93:7, 93:8, 93:12, 93:13, 94:20, 94:24, 95:21, 96:7, 96:16, 97:3, 97:5, 97:8, 97:17, 98:2, 98:24, 99:3, 100:12, 101:4, 101:13, 102:21, 102:22, 103:7, 103:10, 103:11, 103:14, 104:23, 105:5, 105:6, 105:11, 105:12, 105:13, 105:14, 106:21, 106:22, 106:23, 107:2,

107:3, 107:6, 107:7, 108:3, 108:18, 116:8, 122:24, 123:3, 126:19, 126:23, 128:2, 128:5, 128:7, 128:10, 128:11, 129:4, 129:16, 130:10, 131:8, 131:11, 131:15, 132:12, 132:13, 132:17, 140:13, 145:7, 154:3, 155:6, 155:7, 155:10, 156:3, 157:22, 159:3, 160:11, 161:3, 161:4, 161:15, 162:15, 163:10, 163:25, 164:5, 164:6, 164:8, 165:15, 165:16, 165:24, 166:7, 166:11, 167:3, 168:15, 168:21, 168:22, 168:25, 169:5, 175:9, 179:21, 180:22, 180:25, 181:9, 181:17, 189:16, 191:18, 191:22, 193:14, 196:9, 196:14, 196:15, 197:4, 197:25, 200:2
**Correct** [32] - 103:15, 103:19, 111:25, 112:25, 113:19, 116:24, 117:2, 118:23, 119:1, 121:9, 121:12, 122:3, 122:22, 122:25, 123:4, 124:3, 136:17, 141:25, 145:22, 157:6, 159:15, 160:7, 162:16, 163:22, 166:12, 167:19, 168:2, 168:13, 168:16, 169:1, 170:20, 173:5
**correctly** [5] - 45:12, 88:16, 88:17, 157:8, 166:24
**counsel** [11] - 39:21, 71:19, 82:13, 109:7, 155:21, 176:6, 203:16, 204:21, 207:20, 209:2, 212:21
**Counsel** [1] - 110:4
**counsel's** [1] - 110:11
**counselor** [1] - 207:6
**County** [2] - 134:14, 194:19
**Couple** [1] - 24:7
**couple** [29] - 11:7, 11:12, 11:13, 11:23, 13:19, 16:16, 19:3, 21:2, 22:20, 23:10, 31:16, 39:6, 39:11, 39:19, 39:24, 41:2, 54:11, 56:17, 66:5, 70:14, 71:3, 72:19, 95:16, 106:19, 120:12, 126:7, 156:24, 196:13, 203:5

**course** [9] - 33:4, 40:5, 68:19, 92:21, 93:3, 110:9, 170:19, 194:8, 200:21
**COURT** [141] - 1:1, 2:2, 2:4, 2:8, 2:11, 2:14, 2:16, 3:2, 3:11, 3:14, 13:4, 15:18, 15:25, 16:2, 20:1, 20:4, 27:17, 27:21, 41:6, 48:24, 49:1, 49:4, 51:3, 51:8, 51:14, 53:25, 55:13, 57:21, 60:8, 60:15, 60:17, 60:20, 60:23, 60:25, 61:4, 61:11, 61:14, 61:17, 62:9, 62:14, 62:18, 62:24, 63:3, 63:6, 74:2, 74:5, 74:9, 74:11, 74:14, 74:18, 77:23, 82:13, 82:18, 95:3, 100:1, 100:14, 100:20, 101:25, 102:5, 102:9, 107:20, 107:23, 108:22, 108:24, 109:7, 109:16, 109:21, 109:24, 110:1, 110:4, 110:14, 110:17, 125:8, 125:14, 125:17, 125:20, 125:23, 126:2, 126:14, 128:16, 131:24, 132:5, 132:22, 148:11, 158:3, 158:8, 158:14, 158:20, 170:17, 172:21, 175:13, 175:16, 175:19, 175:22, 175:24, 176:5, 176:11, 176:15, 176:19, 176:23, 180:7, 180:11, 182:10, 200:25, 201:5, 201:19, 201:22, 202:8, 202:11, 202:18, 203:16, 204:17, 204:20, 204:23, 205:12, 205:17, 206:20, 206:23, 207:2, 207:4, 207:13, 209:1, 210:8, 210:11, 210:15, 210:18, 210:24, 211:2, 211:7, 211:11, 211:14, 211:16, 211:19, 211:23, 212:1, 212:4, 212:8, 212:17
**Court** [11] - 5:10, 61:23, 62:2, 62:4, 62:7, 62:8, 80:20, 194:19, 204:16, 209:6, 214:16
**court** [32] - 4:18, 5:10, 6:6, 6:9, 12:4, 12:20, 24:12, 26:4, 26:12, 26:15, 26:22, 27:1, 27:25, 28:3, 28:4, 28:5, 33:11, 33:13, 33:16, 34:13, 66:10, 66:18, 66:22, 72:12, 73:6,

80:15, 126:8, 144:9, 144:15
**Court's** [5] - 61:25, 83:23, 105:15, 125:18, 181:23
**court-ordered** [1] - 72:12
**Courthouse** [1] - 1:24
**courtroom** [11] - 2:15, 61:10, 61:13, 63:5, 109:3, 109:6, 110:16, 176:4, 176:18, 202:7, 209:4
**courts** [2] - 80:18, 181:13
**cover** [4] - 185:12, 185:13, 186:19, 186:20
**covered** [1] - 211:3
**crack** [14] - 142:18, 142:21, 143:1, 143:16, 146:1, 146:15, 146:19, 147:7, 156:14, 156:18, 158:1, 158:4, 168:24, 172:11
**crash** [1] - 69:21
**crashed** [3] - 69:20, 70:2, 188:20
**created** [1] - 97:2
**crime** [35] - 4:13, 42:15, 43:16, 44:9, 45:25, 63:16, 64:2, 64:4, 64:5, 64:6, 64:19, 65:1, 75:16, 82:25, 86:17, 90:7, 90:11, 90:12, 106:12, 124:10, 127:11, 128:6, 128:8, 128:9, 178:8, 179:18, 181:4, 182:12, 189:7, 189:20, 190:18, 192:1, 194:4, 199:2, 211:3
**Crime** [14] - 44:12, 44:15, 46:1, 59:19, 75:9, 78:13, 78:17, 81:25, 86:19, 127:11, 127:14, 128:2, 157:10, 190:8
**crimes** [2] - 6:24, 200:13
**Criminal** [1] - 65:7
**criminal** [4] - 73:9, 73:11, 134:20, 177:22
**CRIMINAL** [1] - 1:6
**criteria** [1] - 81:21
**critical** [1] - 203:25
**cross** [2] - 27:22, 39:21
**CROSS** [20] - 20:5, 38:10, 55:21, 71:21, 77:3, 95:12, 105:20, 130:5, 158:22, 166:19, 213:5, 213:5, 213:8, 213:11, 213:13, 213:15,

213:15, 213:20, 213:22, 213:22
**crossover** [4] - 135:6, 135:24, 170:4, 170:8
**crowd** [1] - 11:1
**Crowe** [1] - 1:20
**CROWE** [5] - 59:24, 73:25, 77:21, 82:16, 132:20
**CSF1PO** [1] - 94:13
**custody** [1] - 208:10

**D**

**D3S1358** [1] - 94:13
**dad** [1] - 85:25
**daily** [1] - 66:14
**damage** [8] - 117:7, 118:19, 179:5, 182:8, 182:15, 184:19, 184:20, 185:2
**damaged** [1] - 115:6
**dance** [1] - 43:22
**dancing** [1] - 50:3
**Dark** [1] - 23:2
**dark** [5] - 16:17, 45:7, 113:24, 115:17, 115:19
**Dark-skin** [1] - 23:2
**Darryl** [7] - 50:2, 50:17, 51:9, 52:6, 52:23, 53:20, 91:16
**data** [13] - 72:11, 72:22, 84:4, 87:13, 87:14, 87:17, 87:25, 88:20, 88:21, 89:4, 96:5, 96:6, 100:4
**date** [9] - 129:9, 151:2, 151:20, 151:21, 151:23, 154:14, 183:15, 183:17, 188:14
**dated** [2] - 4:24, 128:3
**dates** [5] - 183:19, 183:23, 206:1, 206:2, 206:13
**daughter** [2] - 194:24, 200:1
**David** [1] - 5:1
**Davis** [1] - 1:13
**daylight** [1] - 188:13
**days** [10] - 7:24, 8:1, 10:10, 19:3, 53:6, 66:5, 66:23, 72:19, 200:7, 206:16
**daytime** [1] - 179:20, 188:11
**Dayton** [1] - 64:24
**de** [4] - 167:11, 167:12, 167:14, 167:20
**DEA** [4] - 19:9, 19:12,

153:24, 156:12
**dead** [3] - 123:24, 179:2, 181:17
**deal** [8] - 26:8, 30:25, 33:15, 34:17, 36:2, 84:25, 146:16, 176:17
**dealer** [1] - 32:8
**dealing** [2] - 139:12, 141:6
**dealt** [3] - 23:15, 23:17, 33:19
**death** [2] - 124:2, 200:1
**debris** [1] - 45:19
**deceased** [1] - 124:14
**December** [5] - 82:10, 206:14, 207:1, 207:3
**decide** [2] - 205:3, 209:12
**decided** [3] - 144:24, 168:17, 202:13
**decision** [8] - 18:25, 124:9, 143:18, 152:19, 173:21, 208:13, 209:1, 210:3
**deduce** [3] - 98:3, 98:5, 98:6
**Def** [3] - 37:10, 37:11, 49:16
**Defendant** [5] - 1:17, 1:18, 1:20, 1:21, 100:3
**defendant** [3] - 13:2, 34:13, 151:17
**defendant's** [2] - 34:20, 100:2
**defendants** [5] - 12:4, 28:23, 110:7, 155:8, 156:5
**Defendants** [2] - 1:9, 61:13
**defense** [6] - 39:20, 61:24, 62:3, 71:19, 76:17, 110:11
**Degree** [3] - 65:5, 177:20, 177:22
**degree** [4] - 65:8, 78:23, 79:2, 107:13
**degrees** [1] - 78:22
**Delaware** [4] - 138:11, 162:24, 163:1, 166:2
**delay** [1] - 2:19
**deliver** [2] - 21:6, 21:10
**democracy** [1] - 20:25
**demonstrate** [1] - 48:17
**demonstration** [1] - 92:22
**denied** [1] - 158:14
**deoxyribonucleic** [1] - 84:6
**Department** [17] - 41:23, 42:3, 63:22,

64:11, 64:14, 65:11, 72:4, 75:6, 81:15, 82:4, 84:3, 111:6, 127:10, 134:10, 177:9, 177:25, 206:19
**department** [8] - 111:7, 111:9, 111:13, 111:22, 112:19, 113:2, 114:3, 193:3
**Department's** [1] - 78:13
**departments** [1] - 64:6
**depict** [1] - 187:11
**depicted** [1] - 68:4
**depicts** [2] - 43:25, 45:20
**describe** [2] - 22:24, 42:25
**Describe** [1] - 22:25
**described** [8] - 39:23, 55:25, 56:3, 97:9, 108:1, 142:14, 168:15, 168:23
**description** [4] - 84:2, 92:10, 98:24, 137:25
**designed** [1] - 132:10
**desire** [2] - 15:21, 16:8
**DET** [1] - 213:23
**detached** [1] - 185:15
**detail** [2] - 142:14, 168:24
**detailed** [1] - 205:13
**detain** [1] - 146:10
**detainee** [1] - 151:4
**detected** [4] - 87:20, 89:5, 90:2, 90:17
**Detection** [2] - 79:15, 79:21
**DETECTIVE** [1] - 176:24
**detective** [11] - 42:7, 42:11, 43:12, 43:15, 65:13, 106:7, 109:14, 128:21, 129:9, 179:10, 211:5
**Detective** [24] - 42:8, 50:16, 50:21, 51:16, 55:23, 128:23, 129:15, 130:1, 176:22, 176:23, 178:12, 179:8, 182:2, 182:13, 192:10, 192:23, 193:21, 194:14, 195:12, 201:13, 202:6, 210:13, 210:21
**detectives** [9] - 66:1, 66:13, 72:14, 108:19, 194:1, 198:25, 199:19, 201:2, 201:6
**Detention** [2] - 151:1, 151:7
**determination** [2] -

57:25, 205:6
**determine** [9] - 87:2, 88:21, 89:10, 92:23, 95:5, 95:8, 98:10, 108:2
**determined** [1] - 34:20
**developed** [1] - 170:21
**development** [1] - 189:22
**device** [18] - 65:17, 65:19, 65:20, 65:22, 65:25, 66:15, 66:17, 66:19, 67:8, 68:6, 68:14, 68:15, 69:22, 70:12, 71:11, 71:14, 72:19
**Diener** [1] - 194:16
**differ** [1] - 84:22
**difference** [2] - 26:11, 26:21
**different** [23] - 16:24, 16:25, 21:17, 23:12, 26:18, 26:23, 29:24, 55:9, 76:7, 84:11, 86:3, 86:7, 86:9, 93:11, 127:17, 128:17, 129:23, 131:3, 150:14, 150:15, 169:11, 173:2
**Different** [2] - 20:16, 26:23, 36:21, 36:22
**difficult** [3] - 166:4, 187:23, 188:24
**digital** [1] - 201:15
**dire** [3] - 207:25, 208:5, 209:18
**direct** [7] - 26:5, 102:9, 112:5, 170:19, 174:5, 174:7, 175:17
**DIRECT** [18] - 3:15, 41:17, 63:16, 75:2, 78:8, 111:1, 126:3, 133:7, 177:4, 213:4, 213:8, 213:10, 213:12, 213:14, 213:18, 213:19, 213:21, 213:24
**directed** [3] - 145:20, 160:10, 161:14
**directing** [4] - 9:4, 115:16, 117:6, 134:22
**direction** [7] - 44:19, 46:21, 124:22, 169:15, 169:16, 169:20, 169:21
**directly** [12] - 3:6, 33:6, 41:12, 44:23, 63:12, 74:23, 78:4, 110:8, 110:22, 133:3, 135:5, 177:1
**Directors** [1] - 81:25
**disabled** [1] - 148:6
**disagreeing** [1] - 203:20
**discloses** [1] - 208:6

**discovered** [1] - 103:9
**discretion** [3] - 93:21, 204:10, 209:15
**discuss** [3] - 140:9, 156:11, 202:1
**discussed** [3] - 18:3, 61:7, 204:5
**discussion** [9] - 15:11, 15:13, 16:13, 61:6, 104:7, 109:1, 176:1, 201:24, 204:8
**discussions** [3] - 15:16, 17:2, 17:4
**dislocated** [1] - 186:18
**display** [4] - 65:20, 66:16, 83:20, 83:22
**displayed** [2] - 66:14, 90:23
**displays** [1] - 201:15
**distribute** [1] - 5:15
**distributed** [2] - 32:25, 212:2
**distribution** [1] - 5:15
**District** [6] - 41:25, 42:8, 42:9, 42:10, 201:2
**DISTRICT** [2] - 1:1, 1:2
**disturb** [1] - 123:21
**dividing** [1] - 169:6
**Division** [1] - 178:3
**DIVISION** [1] - 1:2
**DJ** [1] - 50:8
**DNA** [126] - 75:20, 76:15, 76:16, 76:18, 76:20, 76:24, 76:25, 78:12, 78:16, 78:17, 78:20, 79:3, 79:7, 79:17, 79:22, 79:25, 80:4, 80:16, 81:11, 81:14, 82:3, 82:12, 82:18, 82:24, 83:8, 83:17, 83:19, 83:21, 83:25, 84:2, 84:5, 84:13, 84:16, 84:17, 84:18, 84:22, 84:24, 84:25, 85:3, 85:5, 85:7, 85:10, 85:11, 85:12, 85:14, 85:16, 85:23, 86:1, 86:11, 86:16, 86:17, 86:20, 86:22, 86:23, 87:1, 87:2, 87:3, 87:7, 87:8, 87:9, 87:13, 88:2, 88:6, 88:14, 88:21, 89:12, 89:22, 89:24, 90:7, 90:8, 90:11, 90:12, 90:15, 90:20, 91:1, 91:12, 92:23, 93:4, 93:5, 93:6, 93:9, 93:11, 93:23, 94:1, 94:12, 95:19, 98:12, 98:16, 98:17, 98:19, 101:17, 101:20, 102:12, 102:16,

102:19, 102:24, 103:10, 103:13, 103:16, 103:20, 104:12, 104:22, 105:10, 105:13, 106:11, 107:5, 108:1, 108:14, 129:8, 129:17, 129:19, 130:10, 131:6, 131:7, 131:8, 131:19, 132:1
**DNA's** [3] - 85:25, 86:2, 88:11
**DOAR** [4] - 100:13, 100:15, 170:16, 172:20
**docketed** [1] - 110:9
**document** [3] - 58:21, 136:25, 137:18
**documentation** [1] - 138:8
**Doe** [4] - 90:8, 90:11, 90:14, 90:16
**dog** [2] - 180:25, 182:1
**dollars** [2] - 21:2, 39:24
**donated** [1] - 107:13
**done** [28] - 6:19, 18:4, 18:5, 18:7, 18:10, 18:20, 19:1, 19:11, 32:2, 32:14, 38:2, 66:10, 77:12, 97:19, 101:17, 129:1, 129:10, 129:25, 130:12, 148:3, 149:6, 149:25, 155:5, 169:10, 179:25, 193:23, 194:10, 194:11
**Donte** [5] - 25:4, 55:6, 201:8
**door** [19] - 46:7, 46:9, 121:7, 135:4, 144:4, 160:14, 160:15, 188:7, 188:8, 191:1, 191:10, 192:16, 192:17, 192:18, 192:19, 197:15, 197:17
**doors** [10] - 116:5, 116:10, 117:21, 117:22, 118:1, 118:2, 118:5, 182:23, 182:24, 194:2
**Doors** [1] - 116:15
**Dorsey** [1] - 25:12
**dot** [1] - 180:7
**dots** [1] - 71:10
**Douglas** [1] - 133:5
**down** [44] - 26:13, 26:14, 29:23, 33:11, 45:21, 45:23, 46:11, 46:19, 46:24, 67:16, 69:20, 70:2, 71:2, 71:9, 71:18, 92:16, 98:22, 103:21, 104:6, 104:12, 135:10, 139:6, 142:9, 146:12, 147:8, 155:2, 157:3, 160:12, 160:13, 160:16, 160:20, 160:21, 160:22, 161:1, 164:7,

164:11, 164:14, 168:11,
170:2, 181:16, 182:1,
202:6, 203:10
   **downstairs** [5] - 43:24,
44:25, 45:1, 45:10, 46:6
   **downward** [2] - 186:18
   **drawing** [2] - 52:9,
72:24
   **drew** [1] - 159:24
   **drinking** [1] - 86:13
   **drive** [8] - 39:8, 39:9,
135:8, 149:2, 162:25,
166:2, 166:6, 170:2
   **driven** [3] - 156:15,
166:25, 167:1
   **Driver** [1] - 136:4
   **driver** [21] - 121:23,
122:1, 122:4, 123:11,
124:5, 124:14, 135:9,
135:13, 135:17, 136:18,
136:20, 137:7, 142:7,
160:10, 161:5, 161:6,
161:14, 168:20, 169:4,
169:7, 193:11
   **driver's** [39] - 115:14,
116:5, 116:11, 117:12,
117:16, 117:21, 120:7,
120:14, 121:4, 124:22,
135:10, 136:22, 137:3,
137:9, 138:8, 145:17,
147:21, 147:24, 148:1,
148:20, 149:15, 160:12,
168:11, 172:6, 183:14,
184:18, 185:23, 185:24,
186:2, 186:6, 186:11,
187:20, 187:22, 191:11,
191:12, 191:17, 191:20,
191:21, 193:20
   **driving** [1] - 163:7,
164:18, 164:22, 169:23,
171:5, 171:21
   **drop** [1] - 146:11
   **dropped** [4] - 26:13,
26:14, 33:11, 166:14
   **drug** [18] - 4:13, 4:19,
7:5, 7:11, 7:15, 8:5,
21:23, 22:2, 26:18, 31:3,
32:8, 38:25, 65:13,
73:13, 154:22, 158:5,
158:9, 175:4
   **Drug** [2] - 72:9, 153:21
   **drugs** [13] - 8:19, 8:21,
8:23, 8:25, 21:3, 21:4,
21:5, 21:6, 40:20, 41:3,
153:20, 212:2
   **due** [2] - 69:23, 110:9
   **Duganne** [1] - 211:25
   **dumb** [1] - 19:13
   **during** [28] - 9:4, 16:19,
17:1, 17:8, 44:10, 68:22,

92:21, 93:3, 114:19,
133:20, 138:23, 142:3,
143:15, 148:7, 149:20,
156:6, 156:9, 156:14,
158:5, 170:19, 192:1,
192:16, 194:8, 197:18,
200:3, 202:2, 207:25,
208:4
   **During** [2] - 17:23, 40:1
   **duties** [4] - 78:15,
78:16, 111:22, 123:24
   **duty** [4] - 112:8, 112:10,
134:11, 177:13

---

## E

   **E-L-D-E-R** [2] - 60:24,
63:15
   **E-L-W-A-R-D-O** [1] -
110:24
   **ear** [1] - 196:18
   **Earl** [3] - 137:23,
147:17, 151:18
   **earliest** [2] - 68:4, 68:10
   **early** [4] - 54:22, 112:5,
112:7, 159:9
   **easel** [2] - 2:4, 67:14
   **easily** [3] - 102:13,
102:14, 207:17
   **east** [5] - 47:16, 178:25,
181:6, 188:16, 189:17
   **Eastern** [1] - 91:9
   **Edgecombe** [16] - 69:8,
69:10, 69:11, 69:17,
70:1, 70:21, 70:24,
178:11, 178:21, 178:24,
181:1, 181:5, 188:16,
190:20, 190:22
   **educated** [1] - 102:16
   **educational** [2] - 78:21,
177:18
   **Edward** [1] - 182:17
   **effect** [3] - 168:18,
195:14, 208:9
   **effecting** [1] - 134:3
   **Egyptian** [1] - 198:19
   **eight** [9] - 8:1, 8:6, 8:10,
9:4, 20:12, 20:13, 67:20,
80:19, 206:17
   **Eight** [3] - 5:18, 7:16,
7:18
   **either** [12] - 32:25,
36:15, 90:21, 116:10,
119:14, 123:18, 124:16,
129:7, 150:19, 152:23,
155:2, 205:4
   **El** [2] - 25:10
   **El-Unto-El** [1] - 25:10
   **Elder** [13] - 60:22,

60:24, 63:9, 63:15,
63:18, 65:4, 66:25,
67:14, 68:3, 70:15,
71:23, 74:2, 80:14
   **ELDER** [2] - 63:10,
213:10
   **electrical** [1] - 189:5
   **electronic** [1] - 188:8
   **electrophoresis** [1] -
87:7
   **Electrophoresis** [1] -
80:8
   **Eleventh** [1] - 4:1
   **eleventh** [1] - 4:6
   **Elwardo** [3] - 110:12,
110:20, 110:24
   **ELWARDO** [2] - 110:21,
213:17
   **emergency** [5] - 135:5,
142:4, 169:6, 170:4,
170:7
   **emphatic** [2] - 207:19,
208:12
   **emphatically** [1] -
203:22
   **employed** [12] - 41:21,
41:22, 63:20, 64:10,
64:12, 71:25, 75:5, 75:6,
78:11, 78:12, 177:8,
177:10
   **employee** [1] - 133:14
   **encountered** [1] -
169:16
   **encountering** [1] -
167:23
   **end** [9] - 4:15, 107:10,
127:2, 134:23, 174:7,
179:2, 179:5, 182:8,
182:15
   **ended** [1] - 118:25
   **ending** [1] - 34:2
   **ends** [3] - 69:20,
157:13, 181:17
   **energy** [2] - 185:8,
197:12
   **enforce** [1] - 134:20
   **Enforcement** [1] -
153:21
   **enforcement** [7] -
97:17, 112:18, 172:23,
173:4, 173:10, 173:25,
177:20
   **enforcer** [4] - 21:20,
21:23, 22:2, 31:1
   **Enforcer** [2] - 21:22,
22:3
   **enforcers** [4] - 22:13,
23:22, 30:14, 30:15
   **enforcing** [2] - 22:4,
23:12

   **engaged** [1] - 8:4
   **engine** [6] - 113:4,
113:11, 119:12, 119:15,
192:22
   **enhanced** [1] - 184:25
   **Enjoy** [1] - 202:2
   **enrolled** [1] - 78:24
   **entails** [1] - 78:14
   **enter** [2] - 4:17, 5:9
   **entered** [2] - 5:9, 119:9
   **enters** [4] - 2:15, 63:5,
110:16, 176:18
   **entire** [3] - 85:12, 88:2,
122:10
   **entirely** [5] - 109:18,
152:20, 173:22, 174:2,
208:19
   **entitlement** [1] - 209:11
   **entrance** [2] - 122:19,
122:20
   **entry** [9] - 118:6, 119:2,
119:11, 119:18, 121:2,
121:11, 121:17, 121:23,
184:10
   **Entry** [1] - 128:1
   **envelope** [3] - 48:11,
75:23, 75:24
   **equally** [1] - 99:4
   **equals** [1] - 90:8
   **equipment** [1] - 74:7
   **Eric** [18] - 10:4, 10:7,
11:19, 12:1, 13:19, 14:8,
14:10, 14:21, 15:12,
17:5, 22:16, 22:17,
23:24, 50:17, 52:20,
52:22, 53:20, 91:19
   **Esquire** [10] - 1:16,
1:16, 1:17, 1:18, 1:19,
1:19, 1:20, 1:21, 1:22,
1:22
   **essentially** [3] - 127:12,
206:10, 207:11
   **estate** [1] - 31:15
   **estimate** [1] - 163:13
   **et** [1] - 214:5
   **etc** [1] - 86:14
   **Eutaw** [2] - 68:13, 68:23
   **evaluate** [1] - 88:20
   **evening** [5] - 14:22,
42:13, 50:9, 69:2, 202:3
   **event** [3] - 9:3, 49:10,
131:5
   **events** [3] - 57:23,
148:14, 159:5
   **eventually** [4] - 58:9,
59:7, 141:23, 165:20
   **evidence** [39] - 2:19,
44:4, 44:15, 44:16,
44:17, 45:18, 48:5,
57:24, 61:7, 75:16,

75:18, 75:22, 76:9,
78:16, 83:6, 86:24, 88:5,
88:22, 88:23, 92:13,
94:4, 94:15, 98:10,
107:19, 109:1, 126:10,
126:21, 127:18, 131:4,
143:17, 146:22, 170:15,
170:21, 176:1, 196:25,
197:1, 201:25, 211:7
   **Evidence** [1] - 127:15
   **evidentiary** [2] -
143:14, 149:12
   **exact** [3] - 34:19, 84:21,
147:2
   **exactly** [10] - 16:11,
42:23, 53:7, 58:18,
66:12, 73:12, 75:15,
76:4, 167:9, 203:6
   **Exactly** [1] - 169:25
   **EXAMINATION** [48] -
3:15, 20:5, 38:10, 39:17,
40:18, 41:17, 55:21,
60:1, 63:16, 71:21, 75:2,
77:3, 78:8, 95:12,
105:20, 106:17, 107:24,
111:1, 126:3, 130:5,
133:7, 158:22, 166:19,
177:4, 213:4, 213:5,
213:5, 213:6, 213:6,
213:8, 213:8, 213:9,
213:10, 213:11, 213:12,
213:13, 213:14, 213:15,
213:15, 213:16, 213:16,
213:18, 213:19, 213:20,
213:21, 213:22, 213:22,
213:24
   **examination** [3] - 26:5,
122:11, 174:8
   **examined** [3] - 39:21,
122:2, 124:5
   **Examiner's** [1] - 200:4
   **example** [3] - 82:1,
86:4, 86:7
   **Excellent** [1] - 93:18
   **Except** [1] - 128:4
   **except** [4] - 84:16,
107:1, 127:1, 169:6
   **exception** [1] - 204:18
   **excluded** [2] - 89:8
   **Excuse** [1] - 167:17
   **excuse** [4] - 36:22,
126:14, 167:7, 206:25
   **excused** [2] - 41:6,
60:15, 61:9, 109:5,
125:15, 175:14, 176:3,
202:5, 204:14
   **executed** [1] - 192:4
   **executing** [1] - 192:11
   **execution** [2] - 192:16,
197:18, 201:17

**executive** [1] - 49:16
**exhibit** [18] - 45:25, 76:1, 82:22, 82:24, 83:3, 83:7, 83:10, 83:15, 126:9, 129:12, 151:10, 179:14, 183:5, 185:9, 191:6, 191:7, 192:13
**Exhibit** [40] - 4:25, 47:8, 48:10, 66:24, 67:7, 67:10, 67:21, 75:22, 82:21, 82:22, 91:25, 100:3, 107:16, 114:12, 115:5, 116:17, 117:15, 118:9, 119:4, 120:3, 121:13, 122:4, 122:13, 126:10, 126:22, 131:21, 136:23, 137:19, 147:23, 151:11, 151:12, 154:8, 156:20, 170:15, 174:6, 179:15, 179:23, 190:4, 193:8, 195:11
**exhibits** [2] - 166:21, 179:16
**exit** [5] - 45:21, 46:7, 46:9, 167:11, 185:4
**Exit** [2] - 167:11, 167:12
**exits** [4] - 61:10, 109:6, 176:4, 202:7
**expect** [2] - 110:8, 205:13
**expected** [2] - 90:24, 109:19
**experience** [6] - 111:12, 138:17, 142:17, 142:23, 157:25, 185:3
**expert** [2] - 80:15, 82:12, 82:18
**explain** [6] - 69:24, 83:25, 125:19, 127:6, 164:23, 210:20
**explained** [1] - 144:18
**explaining** [2] - 83:20, 151:21
**explanation** [2] - 94:23, 152:16
**explicitly** [2] - 173:2, 207:20
**express** [2] - 15:20, 155:17
**expressed** [3] - 16:4, 16:6, 205:2
**extended** [1] - 193:11
**extension** [4] - 178:25, 179:2, 180:10, 180:24
**extra** [2] - 113:16, 113:18
**extract** [1] - 87:3
**extraction** [2] - 86:23, 88:4
**extraordinarily** [1] -

210:1
**extreme** [3] - 195:19, 195:25, 196:3
**extremely** [1] - 203:23
**eye** [2] - 84:8, 135:24
**eyes** [2] - 85:1, 135:19, 161:5
**eyewitness** [1] - 54:11

**F**

**face** [5] - 95:20, 96:1, 120:8, 122:14, 122:18
**facing** [11] - 27:15, 27:19, 27:24, 35:19, 46:20, 121:6, 123:2, 124:23, 124:24, 167:5, 182:7
**fact** [28] - 26:7, 29:10, 37:16, 58:4, 101:14, 103:1, 103:10, 104:9, 104:11, 118:3, 161:13, 162:3, 162:14, 164:12, 165:3, 165:8, 165:13, 166:13, 170:22, 171:13, 171:15, 173:10, 184:25, 199:25, 203:4, 205:25, 208:7
**facts** [1] - 32:24
**faint** [2] - 138:24, 209:19
**fair** [7] - 6:10, 19:22, 40:11, 131:1, 202:15, 205:8, 209:11
**Fair** [1] - 7:22
**fairly** [3] - 73:1, 100:14, 210:5
**fairness** [2] - 204:24, 208:14
**fall** [1] - 89:2
**familiar** [3] - 51:16, 58:21, 126:12
**family** [3] - 28:15, 28:16, 37:22
**famous** [1] - 193:5
**far** [20] - 3:25, 19:13, 19:14, 26:22, 38:5, 38:6, 47:14, 61:7, 65:4, 109:2, 118:24, 143:16, 147:17, 169:22, 170:9, 175:5, 176:2, 177:19, 183:10, 201:25
**fast** [5] - 99:18, 135:12, 163:13, 168:8, 170:3
**father** [3] - 86:6, 86:9, 200:5
**father's** [1] - 86:1
**FBI's** [1] - 79:22
**February** [23] - 9:5, 9:9,

9:11, 42:5, 42:13, 42:14, 42:16, 53:2, 54:23, 67:3, 67:4, 68:11, 112:7, 112:8, 178:4, 178:6, 178:7, 178:9, 192:5, 195:3, 195:6, 198:21
**federal** [14] - 4:12, 5:5, 5:8, 5:25, 26:4, 26:12, 26:14, 26:22, 27:1, 27:3, 27:15, 27:25, 34:12, 36:16
**feds** [1] - 19:8
**feet** [1] - 196:13
**Felder** [1] - 25:8
**fellow** [2] - 50:2, 154:2
**felony** [2] - 158:11, 158:12
**female** [3] - 183:16, 194:23
**few** [10] - 12:11, 15:9, 15:19, 20:7, 55:23, 159:1, 180:1, 181:23, 191:12, 196:7
**field** [2] - 206:5, 206:6
**fifth** [1] - 87:7
**fight** [6] - 10:25, 12:6, 13:10, 13:12, 44:2, 50:19
**fighting** [15] - 10:22, 11:1, 11:15, 11:20, 11:22, 11:24, 12:2, 12:14, 13:5, 14:1, 16:18, 58:11, 204:9
**figure** [5] - 11:5, 13:13, 13:25, 120:23, 122:10
**figured** [1] - 13:23
**file** [1] - 157:10
**final** [2] - 207:14, 209:1
**Finally** [1] - 174:5
**findings** [1] - 132:15
**Fine** [1] - 48:19
**fine** [1] - 201:20
**fingerprint** [1] - 194:12
**Fingerprints** [1] - 211:23
**fingerprints** [1] - 194:11
**finish** [5] - 101:25, 109:16, 149:10, 175:17, 175:19
**Finney** [10] - 69:9, 69:18, 70:2, 70:21, 178:11, 178:21, 181:2, 181:6, 188:17
**Fire** [1] - 111:6
**fire** [12] - 111:7, 111:9, 111:12, 111:22, 112:12, 112:19, 113:1, 113:4, 113:12, 113:14, 114:2, 193:3
**firearm** [6] - 195:14,

195:17, 195:20, 195:25, 196:6, 196:12
**fired** [3] - 184:22, 184:24, 195:16
**firefighters** [4] - 118:13, 118:14, 119:14, 184:8
**firmly** [1] - 203:12
**first** [44] - 19:23, 24:11, 26:7, 27:9, 39:20, 43:9, 45:23, 46:7, 50:14, 56:9, 56:25, 58:15, 61:20, 62:5, 62:7, 62:21, 68:5, 70:22, 77:9, 82:21, 84:5, 86:4, 88:4, 91:16, 93:23, 103:10, 114:2, 116:3, 119:11, 136:6, 137:8, 150:22, 150:24, 153:23, 168:6, 179:23, 193:8, 202:11, 203:6, 205:19, 206:11, 208:14
**First** [6] - 10:19, 86:20, 133:22, 182:12, 190:24, 195:5
**first-hand** [2] - 19:23, 203:6
**fist** [1] - 142:16
**fit** [1] - 181:22
**five** [21] - 35:3, 56:3, 59:6, 62:17, 69:19, 71:5, 71:8, 85:18, 85:22, 85:23, 96:21, 99:4, 99:23, 102:25, 103:8, 143:25, 144:6, 150:10, 153:4, 154:24, 206:15
**Five** [6] - 92:5, 93:24, 97:25, 111:14, 126:17, 128:1
**five-ten** [2] - 56:3, 59:6
**fixture** [1] - 189:5
**Flannery** [1] - 1:19
**Flashing** [1] - 134:16
**flick** [1] - 48:18
**flip** [1] - 142:8
**flipped** [1] - 142:13
**floor** [10] - 43:22, 44:14, 45:23, 46:4, 46:7, 46:23, 187:22, 191:11, 191:20, 193:13
**flooring** [1] - 193:11
**flow** [3] - 160:5, 163:15, 168:5
**fluid** [3] - 75:17, 86:14, 86:21
**fluids** [3] - 75:13, 75:15, 103:16
**focus** [3] - 28:12, 38:4, 91:14
**Focus** [1] - 38:5
**focused** [3] - 28:17, 28:18, 28:20, 38:2

**focusing** [4] - 37:22, 38:1, 38:7, 126:11
**folder** [4] - 56:16, 57:18, 127:7
**folding** [7] - 92:6, 93:25, 97:25, 101:3, 103:8, 126:17, 126:21
**follow** [2] - 63:3, 70:14
**follow-up** [1] - 70:14
**followed** [1] - 89:16
**following** [1] - 149:17
**football** [2] - 206:6, 206:8
**FOR** [1] - 1:2
**force** [1] - 153:21
**forego** [1] - 210:19
**foregoing** [1] - 214:7
**foreign** [2] - 88:11, 92:23
**Forensic** [4] - 78:24, 80:6, 80:9, 80:12
**forensic** [2] - 86:17, 192:3
**forensics** [1] - 85:8
**foreseeable** [1] - 33:7
**forfeit** [5] - 31:2, 31:3, 38:24, 39:2, 39:3
**Form** [2] - 140:10, 151:1, 151:7, 151:14, 151:16, 154:25, 171:17
**form** [41] - 86:2, 104:24, 140:11, 140:12, 140:17, 140:20, 140:23, 141:1, 150:25, 151:8, 151:13, 151:15, 151:16, 151:19, 151:23, 152:3, 152:6, 152:25, 153:2, 153:7, 153:16, 154:10, 154:12, 154:13, 154:14, 154:18, 154:20, 155:1, 155:5, 155:11, 155:15, 155:18, 156:21, 171:9, 172:22, 173:2, 173:7, 173:21, 174:7, 174:10, 175:8
**formal** [1] - 194:20
**formerly** [1] - 177:10
**forms** [1] - 155:8
**formula** [1] - 196:5
**Forrester** [23] - 145:11, 145:15, 145:16, 145:25, 146:2, 146:8, 146:10, 146:13, 146:16, 147:9, 148:4, 148:5, 148:8, 148:15, 149:9, 156:17, 169:13, 169:17, 170:5, 171:10, 171:15, 171:16, 212:9
**Forrester's** [2] - 146:24, 147:8
**forward** [4] - 74:23,

75:20, 76:18, 76:22
**forwarded** [3] - 76:20, 76:23, 110:8
**Foster** [1] - 25:6
**four** [25] - 43:13, 52:4, 62:23, 64:24, 84:11, 96:21, 96:22, 97:7, 97:10, 98:3, 98:15, 98:18, 98:19, 98:22, 99:11, 99:13, 99:15, 99:21, 99:23, 102:25, 118:5, 157:18, 160:14, 209:19
**Four** [5] - 94:10, 99:16, 105:2, 108:6, 126:25
**fourth** [2] - 51:18, 51:20
**fragment** [1] - 88:14
**fragments** [2] - 87:8, 87:10
**frame** [3] - 8:4, 8:6, 112:7
**frankly** [3] - 208:24, 209:14, 210:3
**fraudulent** [1] - 171:2
**free** [7] - 152:20, 164:23, 165:3, 165:11, 165:13, 173:22, 174:2
**freezes** [1] - 81:3
**frequency** [1] - 91:10
**freshener** [4] - 138:15, 138:21, 138:22, 143:16
**fresheners** [1] - 138:18
**Friday** [1] - 62:2
**friend** [1] - 162:23
**friends** [6] - 7:10, 17:24, 21:1, 39:23, 60:9, 198:6
**Front** [1] - 192:19
**front** [37] - 4:23, 45:4, 45:14, 52:15, 62:16, 68:1, 82:22, 92:1, 114:13, 116:19, 118:21, 119:21, 119:24, 156:20, 169:2, 172:15, 179:5, 182:8, 182:15, 182:23, 183:12, 183:17, 184:12, 184:15, 184:19, 187:22, 191:12, 191:20, 192:18, 193:10, 193:11, 196:18, 197:25, 198:2, 209:5, 210:8
**fronted** [1] - 115:6
**full** [2] - 72:21, 85:5
**full-time** [1] - 72:21
**fully** [1] - 152:17
**fun** [1] - 10:21
**furthered** [1] - 199:7
**furthest** [1] - 118:18

# G

**G-O-L-D-E-R** [1] - 3:10
**gain** [1] - 118:6
**gained** [2] - 38:24, 119:18
**GARDNER** [1] - 1:8
**Gardner** [54] - 1:21, 137:17, 137:23, 140:5, 145:19, 145:25, 146:3, 146:9, 146:10, 147:17, 147:18, 147:21, 148:1, 148:3, 148:5, 148:8, 148:21, 149:4, 149:5, 149:18, 149:19, 149:21, 149:25, 150:2, 150:4, 150:7, 150:11, 150:13, 150:20, 150:23, 150:24, 151:7, 151:18, 152:6, 152:8, 152:9, 152:24, 153:3, 153:15, 162:18, 162:24, 162:25, 163:2, 169:9, 169:15, 170:22, 171:4, 171:9, 171:16, 171:21, 172:18, 172:22, 207:19, 209:10
**Gardner's** [2] - 148:9, 149:1, 149:6, 149:8, 154:13, 169:18, 169:22, 173:6, 173:8
**Gary** [2] - 128:23, 129:6
**gas** [1] - 195:23
**gather** [4] - 18:23, 113:9, 113:24, 147:9
**gathering** [1] - 108:13
**Gemison** [3] - 24:23, 24:24
**general** [4] - 44:6, 112:1, 114:23, 114:25
**generally** [8] - 27:3, 37:13, 54:2, 152:3, 179:1, 179:16, 188:25, 189:6
**generated** [6] - 129:19, 129:24, 131:3, 132:1, 185:8
**genetic** [1] - 84:6
**Genetic** [2] - 79:13, 79:19
**genome** [1] - 85:12
**gentlemen** [18] - 2:16, 2:18, 42:25, 53:25, 57:21, 61:5, 63:6, 69:24, 80:23, 83:18, 95:4, 100:6, 110:17, 127:6, 130:7, 175:25, 182:11, 193:24
**Gerard** [1] - 1:19
**Germany** [1] - 111:21

**Gerry** [1] - 38:12
**Giganti** [3] - 65:13, 201:13, 211:12
**given** [8] - 52:5, 62:4, 98:24, 127:16, 129:9, 150:20, 205:1, 208:15
**glare** [4] - 114:15, 116:18, 120:11, 126:15
**Glass** [1] - 59:21
**glass** [7] - 106:7, 118:20, 119:7, 119:8, 184:5, 184:20, 191:2
**glasses** [1] - 86:13
**gloves** [1] - 192:6
**glow** [1] - 3:23
**Golder** [28] - 2:13, 3:1, 3:9, 3:12, 3:13, 3:17, 4:12, 5:2, 5:5, 5:8, 5:21, 5:25, 6:3, 6:12, 7:2, 10:7, 10:20, 13:11, 14:20, 20:7, 27:24, 38:12, 38:22, 39:19, 40:3, 40:14, 40:20, 41:6
**GOLDER** [2] - 3:4, 213:4
**Goodie** [3] - 200:10, 200:13, 200:16
**Government** [18] - 1:15, 47:8, 48:10, 66:24, 67:7, 67:10, 67:21, 75:22, 91:25, 107:16, 110:18, 126:10, 126:22, 172:19, 174:6, 179:15, 193:7, 195:11
**government** [14] - 4:16, 5:24, 5:25, 31:8, 32:25, 35:25, 36:3, 36:5, 131:21, 170:14, 175:8, 203:7, 203:11, 203:12
**government's** [8] - 2:24, 166:21, 172:19, 174:6, 176:7, 203:3, 203:14, 209:11
**GOVERNMENT'S** [9] - 3:4, 41:10, 63:10, 74:21, 78:2, 110:21, 125:22, 133:1, 176:24
**Government's** [19] - 4:25, 114:12, 115:5, 116:17, 117:15, 118:9, 119:4, 120:3, 121:13, 122:4, 122:13, 136:23, 137:19, 147:23, 151:11, 154:8, 156:20, 170:15
**GPS** [11] - 65:17, 65:22, 65:25, 66:5, 66:13, 67:1, 67:8, 68:6, 71:14, 72:12, 73:5
**Grace** [4] - 167:11, 167:12, 167:14, 167:20

**grade** [2] - 4:1, 4:6
**grades** [1] - 81:18
**grams** [3] - 158:15, 174:13, 174:16
**grape** [1] - 197:10
**great** [6] - 17:22, 19:4, 19:6, 19:7, 19:9, 19:10
**greater** [1] - 90:19
**green** [2] - 135:4, 180:7
**Green** [1] - 25:4
**gremlin** [1] - 2:19
**Grimm** [1] - 62:17
**ground** [5] - 48:6, 57:4, 102:23, 103:20, 205:9
**group** [10] - 7:22, 13:16, 13:23, 15:11, 16:13, 17:19, 25:25, 29:13, 91:11
**groups** [2] - 91:4, 91:8
**growing** [3] - 179:3, 180:20, 188:18
**Guard** [2] - 177:16, 210:21
**guess** [13] - 6:20, 14:1, 17:16, 22:3, 24:25, 33:14, 35:5, 67:3, 71:19, 163:15, 166:9, 187:7, 205:9
**Guilford** [3] - 42:24, 47:7, 47:9
**guilty** [6] - 4:18, 5:9, 5:13, 5:23, 32:23, 33:10, 38:3
**gun** [1] - 196:13
**gunshot** [10] - 120:1, 121:3, 121:11, 121:17, 121:23, 122:19, 122:20, 123:14, 124:20, 124:23
**guy** [24] - 16:11, 16:14, 16:16, 16:18, 17:10, 22:3, 22:16, 23:2, 32:14, 40:25, 56:3, 56:12, 57:6, 58:12, 58:15, 59:6, 59:8, 60:9, 60:11, 65:23, 104:21
**guys** [17] - 11:12, 11:13, 11:17, 13:20, 15:19, 16:21, 22:20, 23:10, 23:12, 23:14, 23:17, 25:23, 25:25, 30:2, 31:1, 183:6, 190:6

# H

**H-1** [29] - 48:11, 75:22, 75:24, 76:1, 76:2, 77:7, 77:12, 82:21, 82:23, 91:25, 92:5, 96:15, 96:16, 96:18, 96:23,

97:8, 97:10, 98:1, 98:4, 98:8, 99:5, 99:10, 105:2, 106:24, 126:22, 131:7, 131:8, 131:9, 131:10, 131:22
**H-15** [5] - 107:16, 107:19, 126:10, 131:21, 131:22
**H-2** [1] - 43:20
**H-3** [1] - 43:25
**H-4** [1] - 44:18
**H-5** [1] - 44:21
**H-6** [1] - 45:14
**H-7** [1] - 45:17
**H-8** [2] - 46:3, 46:18
**H-9** [1] - 45:20
**hair** [2] - 84:9, 85:2
**hairs** [1] - 75:13
**half** [6] - 28:10, 37:5, 67:20, 133:19, 170:13, 178:2
**Hall** [1] - 22:17
**Hammerjacks** [22] - 9:9, 10:21, 12:5, 15:14, 15:22, 16:10, 32:1, 36:23, 36:24, 38:19, 42:24, 43:21, 47:14, 47:16, 47:17, 49:11, 54:13, 54:21, 57:23, 61:20, 200:15, 200:18
**hand** [8] - 3:3, 19:23, 48:16, 182:10, 186:4, 190:10, 203:6, 203:11
**handcuffed** [1] - 154:23
**handcuffs** [1] - 143:21
**handle** [14] - 76:8, 76:10, 92:6, 93:25, 94:21, 97:25, 101:3, 103:8, 105:4, 106:21, 106:23, 126:17, 126:20, 205:15
**handled** [2] - 76:17, 83:15
**handling** [1] - 157:5
**hands** [5] - 139:9, 164:12, 192:6, 192:9, 193:19
**handwriting** [2] - 101:8, 101:10
**handwritten** [2] - 101:5, 101:6
**hanging** [2] - 21:1, 210:2
**Hanging** [1] - 40:10
**HANLON** [29] - 2:3, 2:6, 2:9, 2:13, 2:25, 3:16, 16:3, 27:16, 27:20, 39:18, 40:13, 74:12, 74:15, 100:17, 105:24, 110:2, 110:11, 110:15, 110:19, 111:2, 132:24,

133:8, 148:13, 175:12, 212:11, 213:4, 213:6, 213:18, 213:21

**Hanlon** [5] - 1:16, 2:5, 21:7, 74:11, 100:14
**happy** [2] - 62:9, 208:20
**Hard** [1] - 194:19
**hard** [3] - 35:16, 44:22, 204:9
**Harding** [13] - 1:16, 60:18, 74:13, 108:1, 108:9, 108:12, 126:14, 176:20, 180:12, 201:20, 202:18, 203:16, 210:12
**HARDING** [61] - 41:8, 41:18, 49:6, 51:6, 51:11, 54:10, 55:12, 55:15, 60:2, 60:19, 60:21, 60:24, 61:1, 63:8, 63:17, 74:6, 74:10, 74:19, 75:3, 77:25, 78:9, 82:20, 106:18, 109:8, 109:17, 109:22, 125:18, 125:21, 126:4, 175:17, 175:21, 175:23, 176:7, 176:21, 177:5, 201:21, 202:19, 210:13, 210:17, 210:20, 211:1, 211:4, 211:9, 211:12, 211:15, 211:18, 211:21, 211:24, 212:2, 212:6, 212:9, 212:12, 212:15, 213:8, 213:9, 213:10, 213:12, 213:14, 213:16, 213:19, 213:24
**Harding's** [2] - 176:13, 204:7
**Harford** [1] - 134:14
**HARRIS** [1] - 1:7
**Harris** [8] - 1:18, 38:13, 38:15, 38:18, 38:19, 38:21
**Hasim** [1] - 193:5
**hatchback** [1] - 147:15
**Havre** [4] - 167:11, 167:12, 167:14, 167:20
**head** [25] - 23:2, 56:4, 57:8, 58:9, 103:22, 104:6, 104:8, 104:12, 104:13, 120:2, 121:3, 121:4, 121:17, 122:19, 122:23, 122:24, 123:2, 124:21, 124:22, 184:20, 186:25, 196:17, 198:3
**heading** [2] - 44:24, 160:6
**Heading** [1] - 45:1
**Headquarters** [2] - 134:8, 192:3
**headquarters** [1] - 197:18

**hear** [2] - 50:1, 145:20
**heard** [19] - 12:8, 12:9, 12:11, 12:19, 18:11, 32:1, 32:6, 32:7, 37:19, 39:22, 61:7, 109:2, 146:8, 176:1, 194:4, 194:22, 201:25, 203:17, 208:8
**hearing** [1] - 36:24
**hearsay** [4] - 61:19, 61:21, 148:10, 200:24
**Heath** [5] - 43:15, 50:16, 50:21, 51:16
**height** [2] - 89:1, 151:2
**Heights** [1] - 29:25
**held** [2] - 78:19, 196:13
**help** [3] - 65:25, 111:24, 156:17
**helpful** [1] - 97:14
**hereby** [1] - 214:3
**hereunto** [1] - 214:10
**heroin** [2] - 5:15, 33:2
**hesitated** [1] - 208:1
**Hi** [1] - 55:23
**Hickey** [4] - 206:1, 206:2, 207:4, 207:5
**HIDTA** [2] - 64:15, 72:9
**High** [1] - 72:9
**high** [2] - 4:2, 203:23
**higher** [1] - 91:10
**highlight** [1] - 180:5
**highlighting** [1] - 180:6
**highlights** [1] - 62:6
**Highly** [1] - 104:1
**highly** [3] - 104:3, 167:20, 204:2
**hill** [1] - 69:20
**himself** [3] - 57:8, 146:2, 163:2
**hire** [1] - 144:16
**Hispanic** [3] - 91:7, 94:8, 94:19
**history** [1] - 201:16
**hit** [7] - 18:13, 18:15, 19:1, 19:14, 22:6, 70:10, 197:24
**hitting** [1] - 59:7
**hold** [2] - 133:20, 190:10
**Hold** [1] - 212:12
**holding** [2] - 48:16, 150:2
**Hollywood** [9] - 13:19, 13:21, 14:10, 14:22, 15:12, 15:19, 17:5, 50:2
**home** [5] - 42:20, 74:3, 178:17, 194:15, 194:17
**homicide** [2] - 72:20, 109:14
**Homicide** [3] - 177:10,

178:3, 178:10
**homozygous** [1] - 86:5
**Honor** [109] - 2:3, 2:6, 2:9, 2:13, 2:25, 5:13, 13:2, 15:17, 15:24, 19:25, 20:2, 20:3, 27:16, 27:20, 36:23, 38:9, 39:16, 39:19, 40:13, 40:15, 41:5, 41:8, 48:25, 51:7, 55:11, 55:12, 55:20, 59:24, 59:25, 60:14, 60:16, 60:21, 61:1, 61:23, 62:11, 62:12, 62:15, 62:20, 63:2, 63:8, 71:20, 73:24, 73:25, 74:1, 74:6, 74:12, 74:19, 77:20, 77:25, 82:11, 82:14, 82:15, 82:16, 82:17, 95:2, 95:11, 99:25, 100:13, 100:17, 101:23, 102:2, 102:11, 105:17, 105:18, 105:24, 107:22, 109:8, 109:17, 109:22, 110:2, 110:11, 110:19, 125:6, 125:10, 125:11, 125:12, 131:23, 132:19, 132:21, 132:24, 158:19, 158:21, 166:16, 170:16, 172:18, 175:12, 175:15, 175:18, 176:8, 176:10, 176:21, 182:9, 200:24, 201:21, 202:19, 202:23, 203:14, 203:18, 203:21, 204:4, 204:6, 204:10, 204:15, 205:7, 205:16, 205:18, 208:25, 210:7
**Honor's** [1] - 204:12
**Honorable** [1] - 1:13
**hope** [2] - 179:24, 183:19
**hopefully** [1] - 4:22
**hoping** [1] - 6:8
**Hopkins** [2] - 50:18, 51:24
**horizontal** [1] - 188:25
**hospital** [5] - 14:22, 15:6, 15:8, 50:13, 52:5
**Hospital** [5] - 50:18, 51:24, 51:25, 111:14
**host** [1] - 204:15
**hour** [9] - 10:16, 10:17, 10:19, 68:7, 163:16, 163:17, 167:24, 168:4, 168:20
**hours** [9] - 15:9, 19:8, 42:16, 54:23, 68:11, 112:6, 147:3, 155:3, 159:10
**house** [1] - 106:8

**House** [1] - 72:10
**houses** [2] - 112:12, 194:1
**housing** [1] - 165:23
**Howard** [10] - 7:6, 7:9, 7:15, 7:20, 10:4, 15:12, 15:19, 17:5, 23:24, 32:20
**Hughes** [1] - 25:2
**hum** [2] - 132:4, 161:16
**human** [3] - 79:18, 127:20, 185:5
**hundred** [1] - 94:5
**hung** [3] - 8:17, 8:18, 39:23
**hurt** [2] - 14:6, 14:9
**hypothetical** [2] - 108:9, 108:12

**I**

**I-83** [2] - 43:4, 70:15
**I-95** [5] - 136:1, 167:1, 167:7, 168:7
**ice** [1] - 210:5
**idea** [10] - 18:3, 19:5, 19:6, 19:7, 19:9, 19:10, 68:22, 80:2, 98:16, 196:2
**ideas** [1] - 17:19
**identical** [3] - 84:16, 84:17, 93:10
**identification** [3] - 75:12, 79:18, 194:11
**identifications** [1] - 55:10
**identified** [10] - 60:12, 137:8, 137:22, 170:18, 183:15, 183:17, 183:22, 194:9, 199:20, 208:4
**identify** [13] - 12:22, 43:20, 53:23, 54:5, 75:17, 75:23, 75:24, 76:1, 120:12, 135:13, 136:20, 194:2, 194:6
**identifying** [2] - 13:2, 136:22
**Ignatius** [1] - 62:21
**ignition** [4] - 119:19, 187:21, 187:25, 193:12
**III** [1] - 201:7
**illegal** [1] - 38:24
**image** [10] - 116:5, 116:18, 116:19, 117:4, 117:16, 118:9, 189:19, 195:9, 196:20, 196:21
**imagery** [1] - 69:5
**images** [1] - 201:15
**imagine** [2] - 62:18, 209:3
**immediate** [4] - 179:3,

180:20, 185:1, 188:18
**immediately** [5] - 114:8, 132:11, 147:8, 180:8, 180:18
**impact** [1] - 195:18
**impacted** [2] - 185:7, 198:1
**impartial** [1] - 202:15
**implicates** [1] - 61:22
**importance** [1] - 203:25
**important** [1] - 34:16
**impose** [1] - 204:16
**impress** [1] - 207:22
**imprisonment** [1] - 34:14
**IN** [1] - 1:1
**inadequately** [1] - 208:4
**inches** [3] - 196:2, 196:4, 196:7
**incident** [10] - 36:23, 61:20, 114:20, 173:11, 194:23, 200:15, 200:18, 200:20, 200:23
**include** [2] - 54:4, 111:23
**included** [5] - 5:23, 6:5, 6:8, 102:4, 102:5
**includes** [4] - 181:12, 187:5, 187:24, 188:8
**including** [3] - 75:13, 197:1, 207:11
**Incorrect** [1] - 173:12
**increase** [1] - 58:15
**indeed** [1] - 208:10
**independent** [1] - 56:8
**index** [2] - 143:25, 155:2
**INDEX** [1] - 213:1
**indicate** [5] - 101:17, 108:8, 141:3, 151:20, 153:12
**indicated** [15] - 89:25, 102:12, 116:22, 121:10, 122:23, 127:21, 153:7, 162:14, 163:5, 167:24, 168:11, 168:25, 171:4, 172:12, 207:14
**indicates** [1] - 108:5, 174:13
**indicating** [7] - 87:20, 120:17, 121:16, 122:5, 122:8, 122:21, 137:16
**indication** [1] - 184:25
**indicative** [4] - 195:20
**indicator** [1] - 164:13
**individual** [8] - 4:25, 7:6, 54:5, 54:6, 58:11, 84:7, 84:22, 86:5, 86:7, 87:24, 89:11, 91:11,

94:3, 94:8, 94:14,
103:18, 103:19, 104:8,
116:23, 116:25, 201:6
  **individuals** [17] - 52:4,
54:3, 84:16, 85:20,
88:24, 89:7, 90:5, 93:9,
94:6, 94:7, 94:17, 94:18,
94:19, 116:4, 119:21,
119:25, 123:18
  **indulgence** [1] - 105:15
  **industry** [1] - 9:19
  **Infiniti** [2] - 179:4,
182:16
  **inform** [1] - 194:13
  **information** [24] - 5:24,
6:3, 6:17, 53:14, 53:15,
67:7, 67:19, 95:5, 97:16,
100:11, 110:12, 131:19,
137:13, 138:3, 138:25,
148:22, 148:24, 151:19,
199:16, 199:18, 205:4,
207:16, 208:5
  **informing** [1] - 144:22
  **inherit** [1] - 85:24
  **initial** [7] - 58:25,
121:19, 122:11, 138:10,
150:6, 156:15, 157:24
  **injured** [7] - 14:6,
14:11, 14:12, 43:13,
50:20, 116:1, 134:3
  **injuries** [1] - 124:15
  **injury** [1] - 124:17
  **inner** [2] - 24:9, 24:10
  **input** [3] - 100:15,
100:16, 105:22
  **inquire** [1] - 40:16
  **inside** [23] - 43:14,
60:10, 66:20, 115:14,
115:21, 115:23, 116:4,
116:23, 119:23, 139:19,
142:9, 142:19, 144:3,
144:5, 149:12, 164:1,
183:12, 184:9, 184:23,
184:24, 185:7, 198:1
  **insistence** [1] - 208:22
  **insists** [1] - 62:7
  **inspect** [1] - 119:20
  **install** [1] - 66:19
  **installation** [1] - 65:16
  **instance** [5] - 85:22,
112:17, 112:22, 117:20,
124:4
  **instead** [2] - 28:5, 62:16
  **instruction** [1] - 61:25,
62:3
  **instructions** [1] - 63:4
  **instrument** [4] - 87:10,
87:14, 87:18, 88:16
  **instrumentation** [1] -
79:6

  **insure** [1] - 88:15
  **insuring** [1] - 134:21
  **intact** [2] - 116:8, 118:3
  **intelligence** [2] - 64:11,
64:19
  **intelligent** [1] - 204:2
  **intend** [1] - 205:1
  **intended** [1] - 6:18
  **intending** [1] - 180:8
  **intensive** [1] - 72:9
  **intent** [1] - 15:21
  **intention** [4] - 16:6,
58:1, 58:2, 154:1
  **interacting** [1] - 11:20
  **interest** [3] - 37:13,
201:2, 211:16
  **interested** [3] - 145:23,
145:24, 204:3
  **interests** [1] - 9:21
  **interior** [2] - 121:7,
123:2
  **interpret** [4] - 84:4,
87:14, 173:24, 174:1
  **interpretation** [1] - 88:1
  **interrogation** [1] -
153:25
  **interrupt** [1] - 68:19
  **intersection** [6] -
178:24, 181:4, 181:5,
188:15
  **Interstate** [4] - 134:14,
147:12, 160:4, 163:16
  **interview** [15] - 50:9,
50:12, 50:15, 51:17,
51:20, 52:25, 53:4,
54:13, 54:25, 58:25,
59:5, 153:15, 154:2,
155:23, 155:25
  **interviewed** [2] - 53:11,
55:25
  **intimate** [3] - 208:6,
208:7, 208:11
  **intimidated** [3] -
141:19, 152:21, 173:23
  **introduced** [4] - 88:11,
92:24, 126:10, 170:14
  **inventory** [1] - 151:3
  **investigate** [2] - 43:17,
200:10
  **investigated** [2] - 73:9,
194:5
  **investigation** [17] -
65:12, 65:13, 65:14,
72:15, 108:19, 124:10,
179:19, 192:11, 197:22,
199:8, 199:15, 200:18,
200:19, 200:21, 201:2,
202:1, 210:23
  **investigations** [1] -
64:20

  **investigator** [5] - 42:10,
133:14, 133:15, 133:21,
134:5
  **involve** [2] - 65:16, 83:9
  **involved** [21] - 7:11,
7:14, 7:19, 11:2, 11:3,
12:6, 13:12, 13:14,
13:16, 13:18, 13:23,
14:1, 15:16, 17:4, 25:21,
40:1, 72:14, 134:11,
157:5, 194:23, 200:22
  **involvement** [1] - 73:13
  **involving** [1] - 200:13
  **Iraq** [1] - 211:5
  **irrelevant** [1] - 158:7
  **issue** [5] - 141:11,
164:18, 202:24, 203:22,
207:21
  **issued** [1] - 137:16
  **issues** [4] - 109:2,
176:2, 176:6, 202:1
  **Item** [4] - 97:25, 126:17,
174:13, 174:16
  **item** [11] - 57:17, 99:19,
99:20, 99:21, 99:23,
103:8, 107:14, 128:9,
142:7, 143:11, 156:24
  **items** [6] - 88:22, 88:23,
100:25, 130:18, 142:9,
156:24
  **itself** [2] - 116:3, 127:17

## J

  **J-A-S-O-N** [1] - 63:15
  **jack** [4] - 187:24, 193:9,
193:11, 193:17
  **Jackson** [1] - 24:2
  **jail** [2] - 27:10, 51:16
  **Jam** [3] - 37:10, 37:11,
49:16
  **James** [6] - 1:21, 23:8,
23:9, 24:20, 24:22, 25:16
  **January** [2] - 79:17,
183:18
  **JASON** [2] - 63:10,
213:10
  **Jason** [4] - 60:21,
60:23, 63:9, 63:15
  **jewelry** [2] - 31:7, 151:4
  **Jewelry** [1] - 31:15
  **JFK** [7] - 145:8, 145:17,
149:18, 149:19, 149:25,
150:2, 150:12
  **Jim** [1] - 159:1
  **job** [15] - 54:20, 64:16,
64:22, 64:23, 64:24,
65:1, 75:17, 76:9, 78:15,
78:16, 81:8, 98:10,

98:11, 133:24
  **jobs** [1] - 20:16
  **John** [5] - 90:8, 90:11,
90:14, 90:16, 198:18
  **Johns** [2] - 50:18, 51:24
  **Johnson** [1] - 174:23
  **joining** [1] - 111:12
  **JONES** [2] - 78:2,
213:14
  **Jones** [26] - 24:20,
24:22, 25:16, 25:18,
25:19, 25:20, 76:24,
78:1, 78:6, 78:10, 79:25,
82:11, 95:14, 105:25,
106:19, 108:22, 129:12,
130:8, 130:12, 130:13,
131:4, 131:6, 131:14,
131:16, 132:2, 132:14
  **Joseph** [6] - 54:19,
55:10, 55:25, 57:17,
58:8, 58:11
  **Judge** [7] - 1:13, 59:23,
61:15, 62:17, 125:18,
204:18, 204:22
  **July** [2] - 42:4, 79:12
  **jumping** [5] - 57:7,
57:8, 103:21, 104:6,
104:12
  **June** [2] - 79:18, 80:10
  **juror** [29] - 202:10,
202:14, 203:1, 203:9,
203:12, 203:24, 203:25,
204:2, 204:14, 205:8,
207:18, 207:22, 208:1,
208:6, 208:8, 208:9,
208:14, 208:17, 208:24,
209:5, 209:7, 209:11,
209:17, 209:19, 209:20,
209:21, 210:1, 210:2,
210:4
  **jury** [32] - 2:12, 43:1,
57:22, 61:5, 61:8, 61:14,
62:8, 69:25, 80:23,
83:19, 83:21, 93:14,
95:4, 97:7, 100:6,
108:24, 109:4, 110:10,
120:12, 127:6, 130:7,
176:5, 179:25, 181:23,
182:9, 193:24, 201:22,
202:4, 202:17, 203:1,
203:13, 209:12
  **Jury** [10] - 1:14, 2:15,
61:10, 63:5, 109:6,
110:16, 176:4, 176:18,
202:5, 202:7
  **Jury's** [3] - 61:9, 109:5,
176:2
  **jury's** [1] - 208:5
  **justice** [3] - 65:7,
177:22, 209:9

## K

  **K-E-N-N-E-T-H** [1] -
78:7
  **Keenan** [1] - 25:12
  **keep** [7] - 8:8, 10:6,
109:2, 161:5, 176:2,
201:25, 210:2
  **keeping** [1] - 161:14
  **Keith** [3] - 25:18, 25:19,
25:20
  **Kelly** [3] - 48:1, 48:19,
60:6
  **Kelsey** [1] - 1:17
  **Ken** [2] - 76:24, 130:11
  **Kendrick** [3] - 48:1,
48:19, 60:6
  **Kenneth** [3] - 78:1,
78:6, 129:12
  **KENNETH** [2] - 78:2,
213:14
  **kept** [1] - 70:24
  **Kevin** [9] - 9:15, 9:17,
9:18, 10:2, 25:22, 37:3,
37:5, 37:7, 37:17, 49:14,
49:15, 49:22
  **key** [4] - 84:15, 84:20,
85:8, 91:10
  **keys** [5] - 187:21,
188:3, 188:5, 188:7,
188:9
  **kicking** [2] - 48:3,
104:11
  **kilos** [2] - 33:1, 33:2
  **Kim** [1] - 129:6
  **kin** [1] - 194:13
  **kind** [23] - 6:13, 6:14,
20:18, 20:25, 23:5,
23:19, 23:23, 27:14,
29:7, 39:7, 39:9, 44:16,
56:3, 64:18, 65:1, 65:19,
82:2, 85:8, 102:24,
106:6, 123:8, 142:19,
169:4, 185:6, 189:4
  **King** [2] - 199:10,
199:11
  **king** [1] - 182:17
  **Kit** [1] - 79:20
  **kits** [1] - 79:14
  **knife** [60] - 48:9, 48:12,
48:16, 56:11, 76:3, 76:5,
76:8, 76:20, 77:14,
91:24, 92:6, 92:9, 92:11,
92:13, 93:24, 93:25,
94:11, 94:21, 94:22,
97:4, 97:9, 97:12, 98:1,
98:9, 98:15, 98:23,
99:14, 101:2, 101:3,
102:23, 103:8, 103:19,

103:21, 104:17, 104:18, 104:19, 104:22, 105:4, 105:10, 105:13, 106:20, 106:21, 107:2, 107:8, 108:13, 126:18, 126:21, 126:25, 127:13, 127:17, 127:24, 127:25, 128:5, 131:10
**knock** [1] - 194:2
**Knowing** [1] - 158:11
**knowledge** [10] - 14:20, 138:17, 142:17, 142:23, 145:24, 159:7, 166:15, 172:1, 196:20, 203:6
**Known** [3] - 91:23, 95:23, 95:24
**known** [26] - 78:18, 81:24, 88:23, 89:7, 90:4, 92:19, 92:20, 94:2, 94:12, 94:25, 95:20, 95:22, 95:25, 96:3, 96:9, 97:12, 103:1, 105:5, 130:10, 131:6, 131:8, 138:18, 201:6, 201:7
**knowns** [1] - 91:21
**knows** [1] - 203:4
**Krouse** [1] - 194:15
**Kurland** [1] - 1:22

**L**

**L-11** [1] - 174:6
**LAB** [1] - 75:1
**lab** [4] - 81:1, 81:2, 82:4, 156:18
**Lab** [16] - 44:12, 44:15, 46:1, 75:9, 78:13, 78:17, 81:25, 82:10, 86:19, 127:11, 127:14, 128:3, 156:21, 157:10, 190:8
**Labbe** [15] - 74:20, 74:25, 75:4, 77:2, 77:23, 82:25, 97:21, 125:19, 125:23, 126:1, 126:5, 128:12, 130:2, 132:6, 132:22
**LABBE** [3] - 74:21, 213:12, 213:19
**laboratory** [6] - 81:19, 81:20, 129:8, 156:21, 174:10
**labs** [2] - 82:1, 82:3
**lack** [1] - 124:17
**ladder** [1] - 87:23
**ladies** [18] - 2:16, 2:18, 42:25, 53:25, 57:21, 61:5, 63:6, 69:24, 80:23, 83:18, 95:4, 100:6, 110:17, 127:6, 130:7,

175:24, 182:11, 193:24
**land** [1] - 189:7
**lane** [3] - 168:8, 168:9, 170:3
**Lane** [2] - 69:4, 70:16
**lanes** [2] - 167:3, 167:5
**language** [5] - 62:8, 152:23, 153:4, 155:11, 173:24
**Lansey** [1] - 211:22
**lanyard** [2] - 188:4, 188:8
**laptop** [1] - 83:24
**large** [2] - 106:7, 158:1
**larger** [1] - 75:24
**largest** [1] - 91:8
**Laslett** [2] - 192:10
**last** [15] - 39:7, 91:13, 102:2, 127:1, 173:21, 202:21, 204:4, 207:14, 207:24, 208:8, 208:12, 209:3, 209:19, 209:25
**Last** [3] - 41:15, 75:1, 157:18
**latex** [1] - 192:6
**latitude/longitude** [1] - 65:21
**Laura** [1] - 1:17
**law** [8] - 97:16, 112:18, 144:15, 172:23, 173:4, 173:10, 173:25, 177:20
**LAWLOR** [26] - 61:15, 61:18, 62:11, 71:22, 77:4, 82:14, 95:13, 100:22, 102:2, 102:7, 102:10, 107:22, 107:25, 125:10, 130:6, 200:24, 201:4, 204:18, 204:22, 204:24, 205:15, 213:11, 213:13, 213:15, 213:16, 213:20
**Lawlor** [9] - 1:18, 61:17, 107:23, 204:9, 204:21, 205:12, 208:15, 208:19, 208:24
**Lawrence** [1] - 25:14
**laws** [2] - 134:20
**lawyer** [13] - 33:19, 33:23, 33:24, 34:4, 34:11, 35:18, 144:16, 152:18, 153:10, 204:19, 208:2
**layout** [1] - 45:12
**lead** [3] - 124:12, 124:13, 178:8
**leading** [1] - 42:14
**leaning** [1] - 57:7
**learn** [8] - 51:6, 183:11, 184:7, 186:7, 193:4, 198:11, 200:17, 200:21

**learned** [6] - 51:5, 57:25, 186:9, 193:2, 198:12, 201:1
**learning** [1] - 58:2
**least** [6] - 33:1, 82:3, 114:10, 163:18, 171:22, 184:11
**leave** [15] - 4:6, 61:5, 64:22, 71:18, 71:19, 90:11, 108:25, 164:23, 165:3, 165:11, 165:13, 175:25, 177:11, 185:10, 201:23
**leaves** [1] - 68:12
**leaving** [1] - 149:20
**LEBBE** [1] - 125:22
**lectern** [1] - 203:17
**led** [2] - 7:3, 44:4
**Left** [1] - 168:9
**left** [34] - 45:13, 46:12, 69:4, 69:9, 69:11, 69:15, 86:12, 86:14, 90:12, 90:14, 91:12, 100:24, 122:19, 122:23, 123:6, 123:14, 124:21, 143:5, 145:12, 153:9, 155:20, 182:15, 182:20, 184:19, 185:23, 189:2, 189:21, 190:20, 191:9, 196:17, 198:2
**legs** [2] - 180:25, 182:1
**lend** [1] - 73:20
**length** [2] - 85:5, 85:6
**lenient** [1] - 6:9
**lenses** [1] - 86:13
**Leonard** [2] - 23:25, 24:1
**less** [6] - 34:23, 69:25, 70:7, 71:15, 158:17, 205:25
**letter** [3] - 4:24, 4:25, 127:2
**letters** [2] - 44:13, 89:21
**letting** [1] - 54:6
**level** [2] - 23:23, 26:14
**liaison** [1] - 153:23
**license** [14] - 136:21, 136:22, 137:3, 137:9, 138:8, 138:12, 145:17, 146:9, 147:21, 147:24, 148:1, 148:20, 149:1, 162:9
**life** [2] - 134:21, 174:25
**lift** [1] - 83:24
**light** [2] - 102:2, 208:5
**lights** [1] - 134:16
**likelihood** [1] - 90:19
**likely** [4] - 91:11, 104:22, 107:10, 208:16
**limiting** [1] - 61:24,

62:3
**line** [3] - 71:10, 75:14, 144:18
**Lionel** [1] - 51:23
**Lisa** [8] - 183:17, 187:5, 192:20, 194:9, 194:17, 197:3, 198:16, 200:5
**list** [3] - 89:20, 92:5, 97:18
**listed** [2] - 98:18, 130:11
**lists** [1] - 89:5
**live** [2] - 50:7, 205:21
**living** [1] - 185:5
**loan** [1] - 72:3
**locate** [1] - 194:2
**located** [3] - 16:12, 42:24, 170:4
**location** [17] - 67:11, 76:23, 85:22, 86:9, 87:9, 87:21, 114:3, 127:8, 127:22, 146:25, 147:8, 147:11, 151:21, 156:16, 170:6, 178:24, 180:19
**locations** [14] - 85:13, 85:16, 85:19, 87:4, 87:11, 87:25, 88:10, 89:6, 89:22, 90:3, 198:24, 199:3, 199:6
**loci** [4] - 85:13, 94:5, 94:14, 94:16
**locked** [4] - 24:25, 116:15, 118:2, 118:5
**locker** [2] - 146:22, 147:7
**locus** [1] - 90:8
**Log** [2] - 151:1, 151:7
**Lombard** [1] - 1:25
**Look** [1] - 100:14
**look** [20] - 12:4, 22:25, 52:18, 54:8, 57:16, 86:4, 86:7, 87:14, 87:25, 92:1, 106:9, 114:16, 115:10, 115:12, 115:21, 123:13, 152:8, 182:10, 184:2, 188:25
**looked** [7] - 11:13, 76:6, 115:14, 119:23, 123:19, 128:2, 138:13
**looking** [15] - 24:25, 52:19, 54:7, 99:9, 116:4, 116:19, 120:23, 122:16, 127:7, 135:18, 161:14, 162:3, 188:17, 189:17, 190:17
**Looks** [1] - 67:4
**looks** [6] - 46:12, 87:17, 89:20, 137:21, 180:24, 188:23
**Lorraine** [1] - 211:22

**lose** [3] - 203:9, 203:24, 207:18
**losing** [1] - 135:24
**lost** [2] - 109:19, 161:2
**lottery** [1] - 90:25
**low** [1] - 188:23
**Loyola** [1] - 62:21
**luncheon** [3] - 101:23, 108:24, 109:5
**Luncheon** [1] - 109:25
**Luther** [2] - 199:10, 199:11
**lying** [2] - 102:23, 103:20
**Lyles** [9] - 9:17, 9:18, 10:2, 37:3, 37:7, 37:17, 49:14, 49:15, 49:22
**Lyles's** [2] - 9:15, 37:5
**lynch** [2] - 202:14, 205:1
**Lynch** [9] - 202:22, 203:1, 203:13, 205:24, 206:1, 207:8, 209:22, 210:4, 210:8
**Lynch's** [1] - 205:13

**M**

**M-O-R-S-L-E-Y** [1] - 110:25
**ma'am** [8] - 3:5, 21:22, 34:15, 34:18, 56:24, 57:12, 59:21, 125:24
**Ma'am** [3] - 63:3, 77:5, 130:7
**Mace** [1] - 14:4
**mad** [4] - 32:7, 32:13
**magnifying** [1] - 106:7
**mail** [1] - 110:5
**maintain** [1] - 61:21
**Male** [1] - 120:7
**male** [3] - 121:14, 183:13, 183:14
**mall** [2] - 199:17, 199:21
**Mall** [6] - 69:7, 69:15, 70:18, 198:20, 199:1, 199:14
**man** [1] - 189:5
**man-made** [1] - 189:5
**manipulate** [1] - 123:8
**manipulated** [1] - 123:12
**manner** [5] - 76:18, 77:7, 152:22, 173:23, 214:9
**manpower** [1] - 73:2
**map** [10] - 67:5, 67:11, 67:19, 67:21, 68:3, 68:5,

69:4, 70:3, 70:6
  **mapping** [1] - 66:15
  **March** [8] - 54:12,
54:15, 54:16, 76:3,
80:10, 128:24, 206:20
  **marijuana** [16] - 138:24,
139:14, 139:21, 139:22,
140:1, 140:2, 140:3,
140:4, 149:14, 163:24,
164:1, 165:6, 165:8,
172:3, 172:5
  **marked** [23] - 4:24,
47:8, 48:10, 67:21,
75:21, 100:2, 114:11,
117:15, 120:3, 134:15,
134:18, 136:23, 137:19,
147:23, 151:10, 154:8,
170:14, 172:19, 174:6,
179:14, 185:9, 192:13,
193:7
  **marker** [4] - 136:1,
167:9, 170:4, 189:7
  **marks** [1] - 44:15
  **Marquetta** [1] - 211:25
  **marshal's** [1] - 63:3
  **MARTIN** [21] - 1:8,
38:11, 59:23, 62:12,
62:15, 62:20, 62:25,
63:2, 73:24, 77:20,
82:15, 105:17, 125:11,
132:19, 176:9, 176:13,
176:16, 183:5, 187:10,
190:4, 213:5
  **Martin** [79] - 1:19, 1:20,
38:12, 62:1, 62:14,
62:18, 136:22, 137:11,
137:14, 137:15, 138:4,
138:7, 138:14, 138:23,
139:1, 139:5, 139:16,
139:20, 139:25, 140:3,
140:6, 140:9, 140:10,
140:20, 140:22, 141:1,
141:3, 141:6, 141:11,
141:18, 143:6, 143:18,
143:20, 143:21, 144:2,
144:23, 144:24, 145:2,
145:4, 145:5, 145:10,
145:12, 145:14, 146:1,
146:4, 146:11, 146:15,
147:6, 147:14, 150:10,
150:14, 150:20, 150:23,
154:6, 154:10, 154:18,
154:21, 154:25, 155:15,
155:17, 156:15, 159:1,
160:18, 161:21, 162:6,
162:14, 162:20, 162:22,
162:23, 162:25, 163:5,
163:14, 164:4, 166:13,
166:25, 169:23, 170:1,
199:10, 199:11

  **Martin's** [3] - 139:13,
163:3, 169:23
  **Mary** [3] - 1:24, 214:3,
214:15
  **MARYLAND** [1] - 1:2
  **Maryland** [27] - 1:12,
1:25, 5:10, 64:10, 64:13,
65:11, 72:2, 80:4,
133:12, 133:13, 133:15,
133:18, 133:23, 134:8,
134:9, 144:1, 149:2,
150:17, 150:25, 151:9,
151:14, 153:22, 153:24,
163:4, 177:11, 177:16,
182:17
  **masking** [1] - 138:19
  **master** [1] - 179:13
  **Masters** [3] - 65:5,
78:24, 79:2
  **match** [2] - 90:9, 90:18
  **matched** [1] - 94:24
  **matches** [1] - 99:9
  **material** [4] - 75:13,
75:18, 84:25, 86:22
  **matter** [5] - 147:4,
164:12, 204:4, 214:4,
214:9
  **matters** [2] - 61:7,
210:11
  **Mazda** [18] - 135:4,
135:8, 135:25, 137:25,
139:17, 140:7, 141:4,
141:12, 142:1, 143:15,
143:17, 159:25, 166:25,
168:6, 168:8, 168:9,
168:21, 172:12
  **MB-1** [2] - 188:6
  **MB-10** [1] - 121:13
  **MB-11** [1] - 187:11
  **MB-12** [2] - 119:4, 184:1
  **MB-13** [1] - 116:17,
117:7, 184:12
  **MB-14** [1] - 187:16
  **MB-15** [2] - 118:9,
190:25
  **MB-16** [1] - 191:8
  **MB-17** [1] - 189:12
  **MB-18** [1] - 188:11
  **MB-19** [1] - 189:15
  **MB-2** [2] - 185:9, 191:6
  **MB-20** [1] - 190:5
  **MB-21** [1] - 190:21
  **MB-22** [2] - 190:9,
190:15
  **MB-23** [1] - 192:13
  **MB-24** [1] - 197:2
  **MB-26** [1] - 196:16
  **MB-27** [1] - 195:11
  **MB-29** [1] - 187:19
  **MB-3** [1] - 182:21

  **MB-30** [1] - 191:13
  **MB-36** [1] - 67:7
  **MB-37** [1] - 67:10
  **MB-37A** [1] - 67:22
  **MB-38** [3] - 193:8, 193:9
  **MB-39** [3] - 193:8,
193:16, 193:17
  **MB-4** [3] - 114:12,
115:5, 182:13
  **MB-47** [2] - 179:15,
182:1
  **MB-48** [2] - 179:15,
179:23
  **MB-49** [2] - 179:15,
181:20
  **MB-5** [3] - 120:4, 186:3
  **MB-6** [2] - 122:13,
187:11
  **MB-7** [2] - 117:16, 183:6
  **MB-8** [2] - 122:4, 187:2
  **MB-9** [1] - 185:22
  **McCaffity** [17] - 65:23,
66:8, 66:20, 73:8,
183:15, 184:18, 185:24,
186:4, 186:5, 186:7,
186:16, 186:22, 194:9,
194:16, 195:5, 198:3,
201:11
  **McCaffity's** [6] - 67:6,
67:8, 68:11, 73:18,
184:20, 194:15
  **McCaffity/Brown** [1] -
109:15
  **McCaffity/Jones** [1] -
109:14
  **McCulloh** [2] - 199:10,
199:11
  **McNeill** [1] - 25:22
  **mean** [46] - 8:17, 12:8,
16:16, 16:17, 16:18,
17:12, 18:11, 18:12,
18:16, 19:8, 21:22,
21:24, 25:19, 26:11,
27:1, 29:18, 34:4, 34:24,
35:2, 35:5, 35:9, 35:15,
35:18, 35:23, 36:9, 37:3,
40:7, 44:7, 50:12, 55:5,
71:10, 76:4, 78:14,
91:11, 127:25, 157:4,
167:1, 167:23, 172:12,
173:2, 192:17, 196:2,
196:22, 198:13, 203:22,
206:6
  **meaning** [1] - 86:5
  **Meaning** [2] - 114:5,
114:6
  **means** [8] - 21:23, 31:6,
32:21, 34:12, 68:20,
81:20, 84:25, 90:9
  **mechanisms** [1] - 92:22

  **median** [2] - 167:1,
168:7
  **medic** [6] - 111:15,
111:16, 111:22, 113:3,
113:5, 114:4
  **Medical** [1] - 200:4
  **medical** [1] - 111:23
  **medium** [2] - 159:18,
159:23
  **meeting** [8] - 58:24,
59:2, 62:21, 80:6, 80:8,
80:9, 80:12, 204:7
  **Melvin** [1] - 194:18
  **Members** [2] - 108:24,
201:22
  **memory** [2] - 144:13,
209:19
  **men** [1] - 58:11
  **mention** [2] - 49:24
  **mentioned** [15] - 10:7,
12:6, 14:21, 15:20, 16:9,
16:24, 16:25, 26:7, 50:1,
62:1, 92:21, 93:3,
120:19, 137:20, 138:20
  **mentioning** [1] - 122:20
  **Mercy** [1] - 51:25
  **met** [10] - 36:9, 36:13,
36:16, 36:19, 43:10,
43:15, 72:14, 81:20,
97:22, 174:25
  **method** [2] - 89:23,
92:23
  **methods** [1] - 79:8
  **Michael** [3] - 1:16, 1:18,
114:12
  **microphone** [1] - 67:17
  **Mid** [3] - 80:5, 80:8,
80:11
  **mid** [2] - 54:12, 61:3
  **Mid-Atlantic** [2] - 80:8,
80:11
  **mid-morning** [1] - 61:3
  **middle** [4] - 152:15,
160:2, 167:2, 205:8
  **midnight** [2] - 112:6,
178:18
  **Might** [1] - 104:15
  **might** [11] - 76:8,
105:24, 113:11, 127:16,
142:21, 157:10, 176:16,
194:3, 205:22, 212:15
  **mike** [9] - 3:7, 3:11,
41:13, 63:13, 74:24,
78:5, 110:23, 133:3,
177:1
  **mile** [9] - 136:1, 147:13,
167:9, 170:3, 170:4,
170:7, 170:11, 170:13
  **miles** [7] - 163:16,
163:17, 167:16, 167:17,

  167:18, 168:3, 168:20
  **military** [1] - 177:12
  **Millard** [1] - 167:12
  **Mills** [4] - 68:12,
198:20, 199:1, 199:14
  **Milton** [1] - 199:24
  **mind** [3] - 109:2, 176:2,
201:25
  **mine** [1] - 7:10
  **minimal** [1] - 76:15
  **minimum** [1] - 73:13
  **minor** [3] - 94:13,
108:7, 108:16
  **minute** [11] - 21:7, 68:7,
68:8, 68:9, 70:4, 74:7,
91:14, 100:2, 109:5,
176:3, 185:20
  **minutes** [19] - 12:11,
61:8, 61:11, 62:17,
68:15, 69:19, 69:22,
70:12, 71:3, 71:5, 71:8,
71:15, 147:3, 150:11,
152:2, 191:12, 210:17
  **Miranda** [7] - 143:25,
144:2, 144:23, 149:21,
152:4, 154:10, 154:23
  **Mirandize** [1] - 154:1
  **Miscellaneous** [7] -
136:24, 137:19, 147:24,
151:12, 154:9, 170:15,
172:20
  **missing** [3] - 5:14,
186:19, 187:17
  **mistrial** [1] - 204:1
  **MITCHELL** [1] - 1:7
  **Mitchell** [41] - 1:17,
13:3, 20:8, 47:13, 47:18,
48:4, 48:6, 48:15, 48:21,
55:6, 55:19, 56:7, 57:3,
57:22, 57:25, 58:18,
59:1, 60:5, 60:13, 61:22,
92:17, 94:2, 94:13,
94:24, 95:1, 96:1, 96:3,
96:13, 98:20, 101:7,
105:5, 108:7, 128:12,
201:7, 203:4, 205:25,
206:5, 206:12, 210:6,
212:3, 214:5
  **Mitchell's** [6] - 57:8,
100:3, 105:9, 131:8,
131:17, 207:12
  **mixed** [1] - 185:21
  **mixture** [3] - 64:19,
108:2, 108:6
  **Mobile** [3] - 127:11,
127:14, 128:2
  **mobile** [2] - 128:5,
128:8
  **mobilize** [1] - 177:16
  **molding** [1] - 142:15

**molecule** [1] - 85:7
**mom** [1] - 85:25
**moment** [8] - 19:25, 35:23, 46:6, 91:14, 95:2, 135:18, 179:11, 180:1
**moments** [1] - 181:24
**Monday** [3] - 1:11, 208:13, 209:23
**monetary** [1] - 73:2
**money** [4] - 30:20, 30:24, 40:8, 151:4
**monitor** [1] - 183:8
**monitoring** [1] - 135:6
**Monroe** [1] - 25:22
**months** [3] - 64:24, 72:21, 111:11
**morning** [33] - 2:17, 2:18, 3:17, 41:19, 41:20, 42:16, 42:19, 43:7, 50:11, 50:12, 54:23, 61:3, 61:4, 63:7, 63:18, 63:19, 75:4, 78:10, 112:5, 112:7, 112:13, 126:8, 126:16, 159:10, 163:6, 194:7, 195:3, 202:4, 202:5, 202:12, 208:14, 212:19
**Morsley** [16] - 109:12, 110:13, 110:14, 110:15, 110:20, 110:24, 110:25, 111:3, 112:1, 114:2, 114:16, 120:22, 123:17, 124:22, 125:8, 125:14
**MORSLEY** [2] - 110:21, 213:17
**most** [1] - 81:24
**Most** [1] - 158:9
**mostly** [1] - 29:25
**mother** [3] - 86:6, 86:8, 194:16
**mother's** [1] - 86:1
**Motion** [2] - 158:13, 158:14
**motivated** [1] - 58:3
**motor** [1] - 134:20
**move** [9] - 2:7, 67:14, 68:17, 93:17, 100:24, 102:7, 107:19, 134:1, 162:5
**moved** [3] - 6:5, 133:20, 157:16
**movement** [4] - 68:4, 69:23, 70:12, 71:12
**movements** [1] - 161:6
**movie** [5] - 198:16, 198:18, 198:19, 199:13
**moving** [1] - 167:25
**MR** [663] - 2:3, 2:6, 2:9, 2:13, 2:25, 3:16, 16:3, 27:16, 27:20, 38:11,

39:15, 39:16, 39:18, 40:13, 41:8, 41:18, 49:6, 51:6, 51:11, 54:10, 55:12, 55:15, 59:23, 59:24, 59:25, 60:2, 60:19, 60:21, 60:24, 61:1, 61:15, 61:18, 62:11, 62:12, 62:15, 62:20, 62:25, 63:2, 63:8, 63:17, 71:22, 73:24, 73:25, 74:1, 74:6, 74:10, 74:12, 74:15, 74:19, 75:3, 77:4, 77:20, 77:21, 77:22, 77:25, 78:9, 82:14, 82:15, 82:16, 82:17, 82:20, 95:13, 100:17, 100:22, 102:2, 102:7, 102:10, 105:17, 105:18, 105:19, 105:21, 105:24, 106:18, 107:22, 107:25, 109:8, 109:17, 109:22, 110:2, 110:11, 110:15, 110:19, 111:2, 125:10, 125:11, 125:12, 125:13, 125:18, 125:21, 126:4, 130:6, 132:19, 132:20, 132:21, 132:24, 133:8, 148:10, 148:13, 158:2, 158:7, 158:13, 158:23, 166:20, 175:12, 175:17, 175:21, 175:23, 176:7, 176:9, 176:13, 176:16, 176:21, 177:5, 183:5, 187:10, 190:4, 200:24, 201:4, 201:21, 202:19, 203:18, 204:18, 204:22, 204:24, 205:15, 210:13, 210:17, 210:20, 211:1, 211:4, 211:9, 211:12, 211:15, 211:18, 211:21, 211:24, 212:2, 212:6, 212:9, 212:11, 212:12, 212:15, 213:4, 213:5, 213:6, 213:8, 213:9, 213:10, 213:11, 213:12, 213:13, 213:14, 213:15, 213:15, 213:16, 213:16, 213:18, 213:19, 213:20, 213:21, 213:22, 213:22, 213:24
**MS** [31] - 15:17, 15:24, 16:1, 20:3, 20:6, 27:18, 27:23, 40:15, 40:19, 48:23, 48:25, 51:2, 51:7, 51:13, 55:11, 55:22, 58:6, 60:7, 202:9, 202:13, 205:18, 206:21, 206:24, 207:3, 207:5, 208:25, 210:7, 210:10, 213:5, 213:6, 213:8
**MSP** [3] - 140:10,

154:10, 154:25
**Mullings** [1] - 129:6
**multiple** [4] - 108:1, 108:13, 108:14
**murder** [5] - 18:23, 109:15, 198:7, 201:9, 211:5
**murdered** [2] - 18:17, 66:20
**murders** [1] - 211:8
**Murphy** [6] - 24:2, 47:4, 47:21, 56:23, 60:4, 60:6
**muscle** [1] - 84:20
**music** [6] - 9:19, 9:21, 9:22, 37:17, 50:5, 50:7
**must** [2] - 17:16, 34:16
**muzzle** [1] - 196:12
**Myrtle** [1] - 194:18

# N

**name** [36] - 3:7, 5:5, 5:20, 10:7, 13:21, 17:1, 17:14, 23:7, 24:19, 38:12, 41:13, 41:15, 50:2, 50:23, 54:18, 54:19, 63:13, 74:24, 74:25, 75:1, 78:5, 78:6, 82:9, 110:23, 125:25, 128:21, 133:4, 136:20, 137:22, 157:3, 177:2, 181:14, 181:15, 201:8
**named** [9] - 5:1, 7:6, 22:16, 24:7, 25:20, 65:13, 65:23, 82:25, 109:13
**names** [10] - 16:15, 16:19, 16:24, 16:25, 22:21, 22:24, 157:3, 183:11, 200:14, 200:22
**naming** [1] - 89:23
**narcotics** [5] - 51:10, 64:20, 65:12, 138:19
**National** [2] - 177:16, 210:21
**nature** [5] - 103:13, 113:3, 113:16, 124:15, 124:17
**Navy** [1] - 177:15
**near** [7] - 43:4, 156:6, 167:10, 167:14, 169:2, 172:12, 172:15
**nearby** [2] - 104:17, 189:7
**necessary** [1] - 87:6
**need** [12] - 3:11, 35:24, 38:4, 74:7, 82:3, 88:22, 92:2, 100:13, 111:23, 113:18, 190:10, 202:14

**needed** [4] - 32:16, 73:6, 88:25, 163:3
**needs** [2] - 22:6, 204:16
**negative** [1] - 88:9
**negotiable** [1] - 110:6
**neighborhood** [1] - 69:6
**neighboring** [1] - 194:1
**never** [3] - 38:17, 161:2, 170:21
**Never** [1] - 174:25
**new** [2] - 13:21, 83:12
**Next** [7] - 41:7, 60:20, 63:7, 74:5, 77:23, 125:17, 132:23
**next** [22] - 2:12, 2:24, 10:17, 11:25, 13:24, 17:3, 17:8, 17:17, 46:3, 69:6, 70:11, 71:8, 74:18, 110:18, 175:16, 176:20, 186:3, 194:7, 194:8, 194:13, 201:9, 209:23
**Nextel** [1] - 193:17
**nice** [2] - 31:11, 104:21
**nickname** [11] - 7:24, 8:1, 10:10, 10:12, 23:8, 186:7, 186:8, 186:9, 200:10, 200:13, 200:16
**nicknames** [1] - 22:21
**Niedermeier** [5] - 128:23, 129:6, 129:15, 130:1, 210:25
**Niesha** [1] - 211:25
**night** [29] - 9:8, 9:9, 36:4, 36:8, 37:16, 38:20, 42:15, 49:10, 50:24, 54:14, 54:22, 56:1, 68:20, 120:9, 128:5, 178:7, 178:8, 178:9, 178:16, 180:4, 182:19, 193:22, 194:6, 198:11, 198:21, 199:20, 200:15, 207:6
**nighttime** [1] - 115:17
**nine** [2] - 68:14, 159:6
**Nine** [1] - 133:19
**ninth** [2] - 66:20, 72:19
**NO** [1] - 1:6
**nobody** [3] - 20:22, 31:21, 207:18
**non** [3] - 85:5, 85:10, 110:6
**non-coating** [1] - 85:10
**non-coding** [1] - 85:5
**non-negotiable** [1] - 110:6
**None** [1] - 211:17
**nonetheless** [3] - 171:24, 173:6, 175:8
**normal** [1] - 168:1

**normally** [2] - 166:2, 166:6
**Norman** [1] - 212:6
**North** [6] - 42:24, 47:7, 47:9, 69:10, 69:12, 70:25
**north** [15] - 43:2, 43:3, 47:16, 47:17, 68:18, 69:3, 167:15, 167:16, 167:18, 179:1, 181:3, 190:13, 190:16, 190:19
**northbound** [2] - 147:14, 167:3
**NORTHERN** [1] - 1:2
**Northern** [2] - 41:25, 42:9
**Northwest** [1] - 113:21
**Northwestern** [1] - 4:3
**note** [10] - 13:15, 61:6, 101:5, 101:6, 101:15, 108:25, 155:1, 161:19, 175:25, 201:23
**noted** [2] - 13:4, 154:12, 162:13
**notes** [7] - 52:14, 52:15, 56:15, 79:10, 92:10, 128:15, 172:5
**nothing** [5] - 30:15, 31:22, 36:14, 74:16, 209:11
**Nothing** [9] - 20:2, 38:9, 41:5, 59:22, 106:16, 125:6, 158:19, 175:11, 176:17
**notice** [1] - 110:6
**noticed** [3] - 58:19, 138:11, 161:11
**notification** [1] - 194:20
**notified** [1] - 194:17
**notwithstanding** [1] - 98:14
**novel** [1] - 83:12
**November** [1] - 129:8
**nowhere** [1] - 172:15
**nucleated** [1] - 84:18
**nucleotides** [1] - 84:11
**Number** [15] - 90:1, 90:11, 94:10, 100:3, 108:6, 126:17, 126:25, 128:1, 128:12, 170:15, 172:20, 174:6, 174:13, 174:16
**number** [35] - 71:9, 83:1, 85:19, 85:20, 85:21, 86:3, 86:8, 87:19, 87:20, 92:1, 92:16, 99:9, 99:10, 99:11, 99:15, 99:16, 107:9, 127:1, 127:16, 127:19, 128:18, 128:20, 129:17, 129:22, 129:23, 129:24, 131:3,

157:7, 157:10, 157:21,
173:2, 182:16, 190:4
  **Number(s** [1] - 214:5
  **numbered** [2] - 153:4,
198:17
  **numbers** [7] - 86:6,
89:21, 90:1, 90:9, 99:13,
131:13, 131:22
  **nurse** [1] - 52:9
  **nurses** [1] - 52:5

**O**

  **oath** [1] - 125:24
  **object** [6] - 56:10,
61:23, 120:13, 142:24,
176:16, 189:5
  **objected** [1] - 208:2
  **Objection** [18] - 15:17,
15:24, 27:16, 27:20,
48:23, 51:2, 51:7, 51:13,
55:11, 60:7, 148:10,
158:2, 158:7, 158:13,
158:14, 200:24, 201:4
  **objection** [5] - 16:1,
48:24, 49:1, 61:19, 61:21
  **objective** [1] - 88:20
  **obligated** [1] - 140:23
  **obligation** [1] - 73:2
  **observation** [2] -
135:16, 168:20
  **observations** [8] -
120:22, 121:11, 121:20,
122:16, 124:19, 138:6,
138:9, 179:6
  **observe** [5] - 89:15,
121:1, 139:17, 178:23,
208:23
  **observed** [11] - 121:2,
121:23, 135:4, 135:6,
138:15, 142:3, 142:6,
142:15, 161:21, 204:4,
209:17
  **obtain** [3] - 52:3, 55:16,
73:5
  **obtained** [7] - 81:2,
83:6, 86:5, 86:7, 128:13,
129:14, 212:3
  **Obvious** [1] - 182:8
  **obvious** [1] - 124:12
  **obviously** [9] - 45:14,
114:22, 116:8, 153:7,
179:20, 182:15, 182:23,
207:8, 209:8
  **Obviously** [5] - 61:20,
115:16, 122:10, 203:19,
208:19
  **occasion** [6] - 53:1,
53:12, 53:17, 81:5, 86:2,

172:23
  **occasions** [3] - 23:20,
108:13, 203:5
  **occur** [1] - 104:4
  **occurred** [3] - 72:20,
90:22, 171:14
  **occurring** [1] - 88:7
  **occurs** [1] - 195:14
  **October** [5] - 62:15,
62:20, 80:7, 207:1, 207:3
  **odor** [8] - 138:22,
138:24, 140:1, 163:21,
163:23, 163:24, 165:6,
165:8
    **OF** [3] - 1:2, 1:5, 1:11
  **off-white** [1] - 156:25
  **offense** [4] - 5:8, 7:5,
27:10, 57:23
  **offenses** [1] - 51:10
  **offer** [1] - 82:11
  **Office** [5] - 4:16, 4:17,
6:13, 178:10, 200:4
  **office** [1] - 53:5, 129:5,
134:7
  **officer** [4] - 141:21,
153:21, 154:2, 212:16
  **Officer** [4] - 47:4, 47:21,
56:23, 60:4
  **officers** [5] - 50:24,
56:21, 156:2, 156:9,
172:23, 183:7, 183:10,
194:1
  **offices** [2] - 34:12,
34:19
  **official** [1] - 214:8
  **Official** [1] - 214:23
  **often** [2] - 81:10, 112:2
  **Ohio** [1] - 63:23
  **old** [1] - 3:17
  **Oliver** [7] - 65:23,
183:15, 184:18, 185:24,
194:9, 195:5, 198:3
  **on-the-job** [1] - 133:24
  **Once** [7] - 57:21, 119:2,
119:18, 119:20, 123:20,
141:13, 155:15
  **once** [5] - 13:23, 36:11,
51:5, 125:25, 187:18
  **one** [107] - 9:9, 15:9,
15:10, 19:16, 22:5,
26:21, 38:22, 39:7,
39:11, 39:20, 44:18,
44:21, 45:14, 46:3, 46:6,
46:18, 49:24, 52:6, 52:7,
53:8, 56:23, 57:6, 58:10,
58:12, 62:13, 68:19,
70:3, 71:12, 73:3, 81:24,
82:25, 85:24, 86:4, 86:9,
87:9, 90:11, 90:23,
90:25, 91:2, 91:10, 94:5,

94:6, 94:8, 95:2, 106:3,
106:6, 106:9, 106:11,
106:23, 109:9, 109:22,
112:22, 113:3, 114:9,
116:22, 116:23, 118:12,
124:16, 127:16, 129:24,
132:8, 132:10, 132:11,
132:15, 137:21, 138:18,
144:16, 144:17, 145:10,
150:2, 150:18, 153:4,
156:25, 157:4, 167:25,
181:21, 185:18, 186:3,
186:22, 187:10, 189:25,
190:8, 191:12, 191:20,
191:21, 193:13, 195:4,
197:5, 197:14, 197:24,
200:16, 203:8, 203:20,
204:18, 205:18, 205:22,
206:12, 206:15, 209:22,
212:12
  **One** [5] - 13:1, 92:23,
100:3, 118:14, 174:13
  **one's** [2] - 84:21, 190:7
  **open** [12] - 48:18,
109:2, 117:21, 139:18,
144:5, 163:18, 176:2,
182:23, 182:24, 193:19,
201:25
  **opened** [1] - 191:10
  **opener** [2] - 188:7,
188:8
  **opening** [2] - 142:5,
192:7
  **opens** [1] - 48:17
  **operate** [2] - 66:17,
66:19
  **operated** [3] - 29:18,
29:22, 65:23
  **operating** [1] - 29:25
  **operation** [1] - 38:25
  **operator** [5] - 135:7,
135:19, 135:20, 136:11,
136:21
  **opportunity** [2] - 62:2,
154:9
  **opposed** [5] - 26:4,
86:8, 87:11, 121:7,
203:12
  **opposite** [4] - 44:19,
46:20, 46:21, 169:16
  **Option** [1] - 90:12
  **options** [2] - 90:10,
204:15
  **oral** [1] - 155:5
  **orange** [1] - 34:11
  **order** [8] - 66:10, 66:18,
66:22, 73:5, 83:25,
185:21, 198:17, 210:12
  **ordered** [1] - 72:12
  **orders** [1] - 29:10

  **organic** [1] - 185:6
  **organization** [15] -
10:8, 20:9, 20:10, 21:18,
22:11, 22:13, 23:12,
23:13, 29:8, 29:19, 30:5,
31:10, 39:4, 39:22, 40:4
  **organs** [1] - 84:20
  **original** [2] - 57:18,
129:25
  **originally** [3] - 5:8,
92:13, 129:1
  **originated** [1] - 112:20
  **otherwise** [2] - 184:9
  **ounce** [2] - 158:11,
158:15
  **ourselves** [1] - 40:9
  **outer** [1] - 121:7
  **outside** [19] - 14:5,
24:4, 24:6, 24:7, 29:13,
40:4, 40:9, 43:11, 43:21,
79:1, 81:1, 81:21, 81:23,
82:2, 116:1, 125:20,
144:4, 187:13
  **Outside** [1] - 29:15
  **overheard** [1] - 145:16
  **overnight** [4] - 15:9,
15:10, 178:19, 202:2
  **overruled** [2] - 49:1,
158:14
  **Overruled** [10] - 15:18,
15:25, 51:3, 51:8, 51:14,
60:8, 148:11, 158:8,
200:25, 201:5
  **overtime** [1] - 43:11
  **overwhelming** [4] -
138:22, 141:19, 163:21,
163:23
  **own** [4] - 29:13, 29:14,
40:7, 40:10
  **owner** [5] - 137:17,
137:22, 140:5, 145:25,
162:14

**P**

  **P-10** [1] - 4:25
  **P-155715** [1] - 157:22
  **p.m** [6] - 109:25,
154:13, 154:15, 198:20,
207:7, 212:22
  **package** [7] - 8:23,
21:3, 21:4, 21:5, 21:9,
21:15, 157:25
  **packaged** [2] - 21:7,
129:8
  **Packaged** [1] - 21:9
  **packages** [1] - 21:9
  **packet** [1] - 100:3
  **pads** [4] - 61:6, 108:25,

175:25, 201:23
  **page** [3] - 33:21, 34:2,
107:17
  **PAGE** [1] - 213:3
  **Page** [2] - 5:18, 100:23
  **pages** [2] - 100:7, 214:7
  **pair** [1] - 84:15
  **pairs** [1] - 84:14
  **Pall** [3] - 69:7, 69:15,
70:18
  **Panasonic** [1] - 193:9
  **panel** [2] - 100:18,
212:18
  **paper** [1] - 54:4
  **paperwork** [3] - 146:23,
183:20, 183:23
  **Parallel** [1] - 43:5
  **Paramedic** [1] - 109:12
  **paramedic** [5] - 110:12,
111:8, 111:9, 123:17,
124:1
  **paramedics** [1] - 184:8
  **Pardon** [1] - 104:2
  **parents** [2] - 194:18,
194:20
  **park** [5] - 181:12, 189:7,
189:8, 189:21, 190:20
  **Park** [1] - 29:25
  **parked** [2] - 135:5,
160:4
  **parking** [7] - 47:12,
47:19, 56:20, 115:1,
181:18, 181:19, 189:24
  **parole** [1] - 27:8
  **part** [37] - 5:23, 8:15,
8:19, 8:21, 33:2, 33:8,
34:10, 34:11, 34:16,
38:25, 43:1, 58:17,
59:14, 64:15, 68:10,
72:7, 72:9, 88:19, 97:11,
102:15, 104:5, 111:22,
113:20, 114:22, 117:6,
118:21, 122:14, 123:24,
126:11, 127:10, 135:11,
146:18, 150:7, 151:12,
151:19, 169:4, 206:3
  **participate** [1] - 62:8
  **participated** [1] - 79:24
  **particles** [2] - 196:10,
196:11
  **particular** [20] - 7:4,
9:3, 12:1, 13:15, 106:3,
106:6, 107:6, 115:1,
117:3, 118:16, 130:18,
135:17, 151:16, 154:12,
154:14, 159:24, 159:25,
203:24, 207:6, 208:10
  **particularly** [4] - 28:2,
67:25, 147:25, 209:20
  **parties** [1] - 205:2

**partly** [1] - 115:6
**partner** [7] - 112:2, 112:4, 113:9, 114:6, 124:7, 178:12, 178:14
**parts** [2] - 111:20, 117:12
**party** [14] - 9:8, 9:13, 9:15, 9:17, 10:2, 10:14, 10:15, 10:21, 32:1, 37:2, 37:3, 37:5, 49:12, 49:18
**pass** [1] - 179:25
**passed** [7] - 67:6, 81:17, 161:3, 163:14, 168:19, 185:5, 186:6
**passenger** [40] - 116:25, 117:13, 117:18, 117:22, 117:25, 118:3, 118:8, 118:10, 118:16, 118:24, 119:5, 122:1, 122:8, 122:14, 123:1, 124:5, 124:14, 135:18, 136:12, 136:13, 138:13, 142:2, 142:8, 144:4, 144:5, 160:9, 160:16, 160:24, 163:18, 169:5, 169:7, 183:1, 183:17, 187:6, 192:15, 192:17, 192:18, 192:19, 197:15
**Passenger** [1] - 117:19
**passenger's** [5] - 122:10, 122:17, 123:6, 124:21, 186:13
**passing** [1] - 160:18
**past** [2] - 71:5, 129:22
**pat** [2] - 164:7, 164:13
**patdown** [4] - 139:7, 139:25, 143:23, 164:16
**patience** [1] - 82:2
**patient** [1] - 118:18
**Patrick** [2] - 54:19, 55:10
**patrol** [5] - 134:14, 134:18, 134:19, 143:24, 190:7
**patted** [1] - 139:6
**patting** [1] - 164:11
**Paul** [1] - 1:19
**Pause** [2] - 74:17, 212:14
**PCR** [3] - 79:17, 88:9, 88:13
**peak** [2] - 87:19, 89:1
**peaks** [1] - 87:18
**pen** [3] - 121:16, 122:6, 122:21
**Pennsylvania** [2] - 212:4, 212:7
**people** [69] - 2:20, 7:11, 7:19, 7:22, 8:18, 9:1, 9:2, 10:5, 11:1, 11:2,

11:3, 11:6, 11:7, 11:14, 11:21, 11:22, 11:23, 11:24, 12:6, 12:25, 14:1, 14:21, 15:20, 16:9, 16:16, 17:19, 19:4, 21:17, 22:12, 26:18, 29:1, 29:2, 29:4, 29:10, 29:13, 29:14, 29:16, 30:7, 30:9, 31:10, 33:7, 37:13, 40:2, 40:3, 43:13, 44:9, 55:5, 57:1, 57:3, 91:1, 91:2, 107:9, 107:11, 109:10, 109:23, 111:23, 114:24, 115:24, 118:21, 150:18, 157:4, 183:11, 194:2, 194:3, 200:22, 201:1, 212:2
**People** [1] - 10:22
**per** [1] - 163:17
**perfect** [1] - 201:21
**perfectly** [1] - 202:16
**perform** [6] - 36:2, 78:17, 82:23, 91:15, 164:16, 175:4
**performed** [5] - 76:24, 83:12, 103:5, 103:6, 195:5
**performing** [2] - 83:17, 139:25
**perhaps** [1] - 103:12
**Perhaps** [4] - 100:20, 102:9, 126:14, 180:11
**period** [7] - 7:14, 9:4, 67:2, 68:23, 169:10, 206:11, 206:15
**periodically** [1] - 82:2
**periods** [1] - 211:4
**perjury** [1] - 6:24
**permission** [6] - 83:23, 125:18, 164:7, 164:13, 171:10, 181:23
**permit** [1] - 209:4
**permitted** [1] - 66:19
**perpendicular** [1] - 160:4
**Perryville** [1] - 145:6
**person** [39] - 10:8, 12:1, 12:18, 22:5, 52:13, 54:7, 54:8, 58:8, 59:5, 59:7, 86:18, 89:11, 90:15, 90:20, 90:22, 90:24, 106:12, 107:13, 113:15, 117:3, 123:24, 125:3, 139:6, 139:13, 140:14, 140:17, 143:22, 145:18, 151:21, 164:17, 165:6, 173:3, 174:24, 174:25, 175:5, 180:9, 180:16, 180:17, 194:20
**person's** [3] - 54:18,

85:10, 85:11
**personal** [2] - 158:10, 210:9
**personally** [5] - 11:4, 18:19, 23:15, 23:18, 145:16
**personnel** [3] - 97:17, 113:16, 193:3
**persons** [4] - 58:1, 58:3, 84:21, 201:1
**perspective** [1] - 189:15
**pertaining** [3] - 61:18, 179:6, 194:4
**Pertaining** [1] - 61:19
**pertains** [1] - 93:23
**PH-1** [2] - 47:9, 47:11
**phone** [11] - 187:24, 188:1, 191:16, 193:9, 193:17, 193:18, 194:21, 201:15, 201:16, 211:9
**phones** [3] - 191:18, 201:13, 201:14
**photo** [9] - 53:16, 53:19, 53:23, 53:25, 54:2, 55:2, 55:4, 147:25, 210:18
**photocopy** [4] - 136:24, 137:3, 137:4, 147:25
**photograph** [27] - 45:13, 114:15, 114:17, 114:22, 115:17, 116:6, 120:6, 120:11, 180:4, 183:9, 185:18, 186:19, 187:15, 188:9, 188:13, 188:24, 189:19, 189:21, 190:14, 190:16, 190:19, 191:16, 191:25, 192:2, 193:18, 195:6, 196:19
**photographs** [12] - 43:7, 55:4, 123:19, 179:7, 179:18, 182:12, 189:6, 189:10, 189:24, 190:6, 190:24, 191:13
**photos** [1] - 45:18
**physical** [5] - 44:16, 48:5, 85:6, 164:13, 181:8
**pick** [5] - 163:1, 163:24, 210:24
**picked** [1] - 59:1
**picking** [1] - 58:18
**picture** [4] - 46:4, 54:9, 189:12, 193:13
**piece** [6] - 54:4, 76:9, 86:24, 142:11, 166:4, 166:7
**Pikesville** [1] - 134:8
**place** [13] - 8:6, 9:3, 32:16, 62:6, 62:7, 86:11, 86:14, 102:17, 123:13,

143:18, 151:3, 205:23, 211:6
**Place** [3] - 68:13, 68:23, 194:16
**placed** [13] - 66:5, 66:7, 72:12, 143:5, 143:21, 143:24, 149:4, 149:5, 150:10, 154:21, 154:22, 186:23, 187:12
**placement** [1] - 73:20
**places** [1] - 170:9
**plan** [1] - 30:19
**plastic** [7] - 142:3, 142:5, 142:6, 142:11, 142:15, 142:19, 156:25, 165:20, 165:23, 185:10, 186:25, 187:15
**plate** [1] - 138:12
**playing** [1] - 206:8
**plays** [1] - 124:18
**plea** [9] - 4:15, 4:18, 4:21, 5:9, 7:3, 8:5, 31:2, 38:23
**plead** [1] - 33:10
**pleaded** [1] - 33:10
**pleading** [1] - 5:23
**pleasant** [1] - 2:23
**pled** [2] - 5:13, 32:23
**plus** [1] - 19:12
**pocket** [6] - 154:24, 191:17, 191:21, 192:7, 193:19, 193:20
**Point** [7] - 83:20, 83:22, 84:1, 92:22, 93:4, 102:12, 106:2
**point** [40] - 4:12, 10:20, 14:3, 14:16, 16:23, 17:1, 61:20, 66:3, 66:18, 68:10, 92:24, 115:25, 138:6, 138:21, 139:20, 140:6, 140:22, 141:6, 141:8, 141:10, 141:14, 142:2, 144:22, 146:24, 147:20, 148:7, 148:22, 149:6, 149:20, 150:19, 153:9, 154:4, 160:24, 167:8, 180:4, 181:20, 201:19, 203:25, 205:3, 205:11
**pointed** [1] - 169:18
**points** [3] - 67:12, 70:3, 106:19
**pole** [1] - 47:23, 48:14, 50:23, 64:6, 66:7, 66:9, 82:1, 141:19, 156:9, 183:7, 183:10, 190:5, 190:23, 200:17, 200:19, 212:16
**Police** [34] - 41:22, 42:2, 47:4, 60:4, 63:21,

64:11, 64:13, 65:11, 72:4, 75:6, 78:12, 81:15, 82:4, 84:3, 127:10, 133:12, 133:13, 133:16, 134:10, 141:20, 144:1, 145:5, 150:17, 150:25, 151:9, 151:14, 153:22, 153:24, 165:2, 177:9, 177:11, 177:24, 190:7, 192:3
**policy** [3] - 141:20, 153:19, 165:2
**polite** [2] - 162:6, 164:9
**polymorphism** [1] - 85:8
**polymorphisms** [1] - 85:6
**pop** [2] - 166:4, 166:7
**popped** [2] - 142:5, 142:15
**population** [12] - 90:16, 91:6, 91:7, 91:8, 94:4, 94:6, 94:7, 94:9, 94:15, 94:17, 94:18, 94:19
**populations** [2] - 91:5, 91:8
**portion** [5] - 91:16, 91:19, 93:4, 122:16, 196:17
**position** [21] - 62:5, 67:5, 69:19, 78:19, 123:5, 123:12, 124:25, 134:2, 135:9, 168:7, 168:19, 182:22, 185:15, 186:18, 186:19, 187:5, 202:14, 203:3, 203:14, 207:6, 209:25
**positioned** [4] - 125:2, 193:10, 195:25, 198:3
**positions** [1] - 124:20
**positive** [1] - 88:13
**positively** [1] - 194:8
**possessing** [1] - 94:4
**possibility** [1] - 103:24
**possible** [7] - 44:15, 76:7, 87:23, 94:15, 102:1, 103:20, 123:22
**Possible** [1] - 46:2
**possibly** [4] - 90:7, 108:5, 118:22, 141:7
**posted** [1] - 134:7
**potential** [1] - 75:17
**potentially** [1] - 76:17
**powder** [1] - 196:11
**Power** [7] - 83:20, 83:22, 84:1, 92:22, 93:3, 102:12, 106:2
**powers** [1] - 64:8
**powers-that-be** [1] - 64:8

**pre** [1] - 133:24
**pre-job** [1] - 133:24
**preclude** [1] - 204:1
**precluded** [1] - 210:4
**precluding** [1] - 204:1
**prepare** [2] - 67:5, 67:20
**Prepared** [1] - 100:11
**prepared** [8] - 67:11, 72:21, 93:16, 100:4, 100:9, 129:12, 204:25, 205:6
**prerogative** [1] - 205:21
**presence** [1] - 141:19
**present** [10] - 54:6, 54:13, 61:13, 148:14, 148:15, 148:24, 152:19, 171:7, 171:9, 171:17
**presentation** [2] - 2:20, 106:2
**presented** [4] - 81:21, 108:9, 151:7, 152:25
**presenter** [1] - 175:9
**preserve** [2] - 76:16, 124:9
**president** [2] - 37:10, 37:11
**pressing** [1] - 195:21
**Presumably** [1] - 108:19
**presume** [1] - 110:7
**presuming** [1] - 96:22
**presumptive** [1] - 75:18
**pretrial** [1] - 59:1
**Pretty** [1] - 170:12
**pretty** [10] - 10:16, 25:25, 28:20, 31:10, 34:16, 40:6, 43:23, 95:17, 209:13
**previous** [1] - 127:19
**PREVIOUSLY** [1] - 125:22
**previously** [7] - 76:5, 86:1, 101:7, 127:8, 131:2, 131:17, 205:7
**primarily** [1] - 91:4
**Primarily** [1] - 201:13
**printed** [1] - 143:25
**printout** [1] - 67:1
**priority** [1] - 203:23
**prison** [1] - 51:10
**Prisoner** [2] - 151:1, 151:7
**prisoner's** [1] - 151:2
**privilege** [1] - 149:2
**probability** [4] - 90:15, 90:18, 90:19, 90:21
**probable** [2] - 165:9, 165:14
**probation** [1] - 35:3

**probative** [3] - 75:19, 98:11, 204:13
**problem** [7] - 62:18, 108:8, 108:9, 109:9, 159:21, 164:11, 207:18
**problems** [1] - 64:8
**procedure** [1] - 150:17
**proceed** [4] - 2:2, 58:5, 109:4, 110:1
**proceedings** [2] - 214:4, 214:8
**Proceedings** [4] - 2:1, 74:17, 212:14, 212:22
**proceeds** [1] - 69:8
**process** [8] - 64:21, 83:11, 88:2, 88:8, 88:15, 146:19, 147:3, 163:6
**processes** [1] - 156:4
**processing** [3] - 44:9, 145:1, 192:1
**produce** [3] - 104:12, 104:22, 107:11
**professional** [1] - 193:6
**proffer** [1] - 205:13
**proffered** [1] - 207:16
**proficiency** [7] - 80:21, 80:25, 81:5, 81:10, 81:12, 81:13, 81:17
**profile** [10] - 89:12, 90:7, 90:8, 90:17, 91:1, 91:3, 94:1, 94:4, 94:12, 98:19
**profiles** [1] - 88:21
**program** [6] - 64:15, 72:9, 72:10, 78:24, 79:2, 207:6
**programs** [1] - 79:9
**prohibit** [1] - 209:21
**projected** [2] - 197:8, 197:12
**projectile** [5] - 192:15, 197:1, 197:3, 197:4, 197:5
**projectiles** [1] - 197:7
**projection** [1] - 181:22
**promised** [3] - 152:20, 173:22, 174:2
**promises** [1] - 6:12
**pronounce** [1] - 123:24
**pronouncement** [3] - 124:2, 124:4, 124:7
**proof** [1] - 173:18
**propellant** [1] - 195:15
**propelled** [1] - 195:16
**proper** [3] - 27:22, 89:17, 146:23
**properly** [1] - 146:22
**property** [17] - 83:1, 92:1, 99:9, 99:10, 99:11, 99:13, 99:15, 99:16,

127:1, 127:16, 127:18, 127:19, 131:13, 131:22, 134:21, 147:6, 157:21
**Property** [1] - 157:21
**proposed** [2] - 108:12, 208:4
**proposition** [1] - 91:6
**prosecutor** [1] - 26:3
**prosecutors** [8] - 33:16, 34:12, 36:13, 36:16, 36:21, 36:22, 97:22
**protect** [2] - 31:18, 37:24
**Protect** [2] - 31:18, 31:19
**protecting** [1] - 31:21
**protocols** [2] - 89:17
**provide** [5] - 6:3, 6:17, 53:15, 95:5, 137:11
**provided** [13] - 53:14, 80:25, 95:19, 96:8, 96:19, 97:16, 97:18, 136:21, 137:15, 140:10, 162:9, 171:1
**providing** [2] - 5:24, 138:7
**provision** [1] - 38:23
**proximity** [6] - 179:4, 180:20, 185:1, 188:18, 195:15, 195:19, 196:3, 196:23
**publish** [1] - 182:9
**pulled** [6] - 114:8, 135:24, 139:18, 147:12, 148:5, 169:23
**pulling** [2] - 161:3, 193:19
**pulse** [3] - 122:12, 124:16, 124:17
**pulses** [1] - 123:20
**punching** [3] - 58:12, 58:14, 58:19
**pungent** [1] - 139:14
**purchased** [4] - 162:17, 162:24, 163:2, 170:22
**purchasing** [1] - 33:1
**purports** [1] - 96:1
**purpose** [2] - 9:13, 113:14
**purposes** [4] - 64:7, 136:13, 136:24, 177:12
**pursuant** [2] - 72:11, 100:4, 130:13
**push** [1] - 11:21
**pushing** [1] - 11:6
**put** [27] - 4:22, 16:15, 19:17, 32:16, 35:16, 51:15, 54:3, 56:10, 61:15, 62:19, 67:24, 72:19, 142:9, 143:21,

145:2, 146:19, 150:13, 151:19, 152:13, 154:20, 156:16, 156:20, 160:22, 170:16, 172:20, 175:9, 179:23
**puts** [1] - 210:5
**putting** [1] - 19:1
**Pyne** [2] - 1:21, 159:1
**PYNE** [5] - 39:15, 105:19, 125:12, 158:23, 213:22
**Pyne's** [1] - 167:25

## Q

**qualified** [2] - 80:15, 80:19
**quality** [3] - 88:3, 88:21, 92:22
**Quantifiler** [1] - 79:15
**quantitation** [1] - 87:2
**quantities** [1] - 33:6
**quantity** [2] - 158:17, 172:2
**quarter** [3] - 62:22, 147:13, 170:7
**questioning** [1] - 208:8
**questions** [51] - 20:7, 20:9, 21:25, 39:15, 39:16, 39:19, 39:20, 55:20, 55:23, 56:18, 59:23, 59:24, 59:25, 60:14, 70:15, 71:20, 73:3, 73:24, 73:25, 74:1, 77:1, 77:19, 77:20, 77:21, 77:22, 82:13, 95:11, 105:17, 105:19, 107:21, 125:10, 125:11, 125:12, 125:13, 130:3, 132:18, 132:19, 132:20, 132:21, 145:2, 152:18, 152:19, 153:3, 155:17, 156:11, 159:2, 167:25, 173:21, 174:1, 180:2
**quick** [5] - 61:16, 105:18, 106:19, 114:10, 164:16
**quintillion** [3] - 94:5, 94:7, 94:8
**quite** [5] - 33:19, 83:14, 99:6, 99:7, 210:3
**quote** [1] - 110:6

## R

**R-A-Y-M-O-N** [1] - 133:5
**R-O-B-A-R** [1] - 41:16
**racial** [1] - 91:4
**radio** [3] - 145:15,

145:2, 146:19, 150:13, 151:19, 152:13, 154:20, 156:16, 156:20, 160:22, 170:16, 172:20, 175:9, 179:23
**Raeshio** [29] - 7:6, 7:9, 7:15, 7:19, 10:4, 11:8, 13:19, 14:8, 14:10, 14:11, 14:21, 15:12, 15:19, 17:5, 17:7, 17:8, 17:12, 17:17, 17:18, 17:23, 18:18, 32:7, 32:20, 39:7, 41:3, 50:17, 53:1, 53:20
**Rahman** [1] - 193:5
**Raise** [1] - 3:3
**raised** [2] - 139:9, 164:12
**ran** [5] - 10:8, 20:25, 57:1, 57:6, 200:13
**random** [5] - 89:11, 90:17, 90:24, 94:3, 94:15
**randomly** [1] - 90:16
**rank** [1] - 133:20
**rap** [1] - 37:14
**rate** [2] - 168:1, 168:14
**rather** [4] - 66:7, 101:25, 169:24, 208:17
**Rather** [1] - 74:15
**Ray** [1] - 192:10
**RAYMON** [1] - 133:1
**RAYMOND** [1] - 213:21
**Raymond** [2] - 132:25, 133:5
**reach** [1] - 89:1
**reached** [2] - 18:25, 119:18
**reaction** [1] - 88:12
**read** [11] - 32:18, 32:21, 59:11, 129:16, 152:8, 152:16, 153:1, 157:21
**Read** [1] - 101:5
**readily** [1] - 166:10
**reading** [4] - 152:9, 153:2, 157:7
**Ready** [1] - 110:1
**ready** [2] - 2:2, 109:4
**reagent** [1] - 88:4
**reagents** [1] - 88:7
**real** [3] - 30:7, 31:15, 61:16
**realized** [1] - 58:13
**Really** [1] - 20:22
**really** [17] - 12:19, 16:17, 16:21, 20:20, 25:24, 27:9, 27:10, 28:18, 32:19, 35:13, 45:6, 50:20, 61:19, 62:5, 90:10, 92:15, 203:5
**realtime** [1] - 79:17
**reanalyze** [1] - 131:18
**rear** [26] - 115:13, 118:8, 118:10, 118:16, 118:18, 125:3, 160:25,

178:25, 179:1, 181:5,
182:23, 184:2, 184:5,
184:11, 185:18, 186:20,
188:16, 191:1, 191:9,
191:17, 192:18, 193:10,
193:19, 196:17
    **reason** [9] - 51:15, 91:7,
137:8, 150:16, 168:17,
170:24, 171:1, 203:24,
204:14
    **reasons** [2] - 203:14,
204:3
    **reassuring** [1] - 183:25
    **receipt** [1] - 198:22
    **receive** [3] - 78:16,
133:23, 145:15
    **received** [18] - 6:2,
52:22, 75:21, 76:5,
79:12, 79:14, 79:17,
79:19, 79:22, 81:18,
83:2, 83:4, 129:12,
144:1, 148:22, 148:24,
178:10, 194:21
    **receiving** [1] - 112:13
    **recess** [12] - 61:4, 61:8,
61:11, 101:23, 108:25,
109:5, 109:24, 109:25,
175:20, 175:24, 176:3,
202:2
    **Recess** [1] - 61:12
    **recite** [1] - 144:12
    **recognize** [3] - 54:9,
210:5
    **recognized** [2] - 50:22,
198:19
    **recollect** [5] - 143:7,
143:14, 144:12, 150:5,
150:8
    **recollection** [8] - 11:16,
12:1, 12:5, 58:20, 159:5,
160:8, 198:9, 204:6
    **recommend** [6] - 33:17,
34:13, 35:2, 35:3, 35:4
    **recommendation** [1] -
34:19
    **record** [14] - 3:7, 13:2,
41:13, 61:16, 63:13,
74:24, 78:5, 96:4,
110:23, 125:25, 133:4,
157:20, 177:2, 203:15
    **recorded** [1] - 214:3
    **records** [4] - 37:11,
201:14, 205:23, 206:10
    **Records** [1] - 49:16
    **recover** [2] - 164:1,
196:25
    **Recovered** [1] - 198:16
    **recovered** [19] - 48:5,
59:15, 128:5, 128:9,
172:11, 185:12, 186:20,

191:18, 192:15, 197:1,
197:3, 197:13, 197:17,
197:19, 197:21, 198:23,
199:13, 201:11, 201:16
    **RECROSS** [4] - 40:18,
107:24, 213:6, 213:16
    **red** [3] - 71:10, 117:7
    **redirect** [1] - 175:12
    **REDIRECT** [6] - 39:17,
60:1, 106:17, 213:6,
213:9, 213:16
    **redistributing** [1] - 33:1
    **reduce** [1] - 126:15
    **reduction** [1] - 6:14
    **refer** [2] - 113:11,
128:15
    **reference** [2] - 79:10,
101:7
    **Reference** [1] - 92:10
    **referenced** [1] - 132:11
    **references** [1] - 5:4
    **referred** [4] - 29:1,
107:16, 120:16, 152:3
    **referring** [5] - 95:22,
131:9, 172:19, 188:22,
196:8
    **refers** [1] - 129:17
    **refreshes** [1] - 58:20
    **regarded** [1] - 55:5
    **regarding** [3] - 22:4,
61:19, 200:18
    **regions** [1] - 85:10
    **registered** [3] - 73:16,
193:4, 193:5
    **registration** [7] -
137:10, 137:15, 137:20,
162:11, 162:13, 170:18,
171:1
    **regular** [1] - 111:14
    **regularly** [1] - 23:19
    **relate** [1] - 97:6
    **related** [1] - 4:18
    **relates** [2] - 79:3, 159:2
    **relating** [2] - 4:13,
79:25
    **relation** [1] - 182:6
    **relationship** [1] - 208:6
    **relative** [2] - 12:23,
124:20
    **relatives** [1] - 198:6
    **relayed** [1] - 60:4
    **released** [2] - 15:5, 51:9
    **relevance** [1] - 17:13
    **relevant** [1] - 138:16
    **remain** [6] - 61:8,
125:24, 144:14, 202:16,
203:1, 203:12
    **remaining** [1] - 204:3
    **remember** [30] - 9:8,
9:13, 10:24, 11:13,

11:16, 12:9, 12:13,
16:19, 22:21, 24:14,
34:10, 42:15, 45:12,
46:16, 46:17, 52:6, 52:7,
52:13, 106:6, 119:10,
119:12, 148:16, 149:15,
150:22, 155:3, 171:17,
174:7, 181:14, 183:21,
195:2
    **remembered** [2] -
183:19, 183:22
    **remind** [1] - 63:1
    **reminded** [1] - 157:19
    **reminder** [1] - 183:23
    **remote** [1] - 115:3
    **remove** [3] - 165:23,
209:20, 209:21
    **removed** [3] - 187:18,
187:21
    **repaired** [1] - 2:21
    **repeat** [4] - 52:21,
75:25, 87:6, 87:24
    **repeated** [2] - 85:17,
85:18
    **repeatedly** [1] - 107:8
    **repeats** [7] - 85:9,
85:19, 85:20, 85:23,
87:9, 87:12, 87:20
    **rephrase** [3] - 27:21,
27:22, 108:11
    **Rephrase** [1] - 158:3
    **report** [23] - 48:14,
52:18, 52:19, 57:15,
87:15, 89:12, 89:19,
101:12, 102:4, 107:1,
107:15, 107:17, 126:11,
126:12, 128:3, 129:12,
129:13, 129:17, 130:11,
131:19, 132:1, 161:19,
161:21
    **reported** [1] - 57:13
    **Reported** [1] - 1:23
    **Reporter** [1] - 214:16
    **REPORTER'S** [1] -
214:1
    **reports** [1] - 48:3,
56:21, 89:4
    **represent** [3] - 20:8,
38:12, 159:1
    **representative** [1] -
196:11
    **representing** [1] - 53:9
    **request** [6] - 61:24,
101:16, 130:14, 130:15,
130:21, 130:22
    **requested** [5] - 72:11,
98:12, 128:25, 129:10,
137:9
    **requesting** [1] - 141:17
    **required** [1] - 81:11,

86:16
    **requirement** [2] - 81:8,
82:1
    **rerun** [2] - 88:22, 88:25
    **residential** [1] - 114:25
    **resolve** [1] - 89:2
    **respect** [8] - 119:15,
149:7, 151:17, 156:14,
173:20, 173:24, 204:1,
207:23
    **respond** [7] - 42:15,
112:1, 112:11, 146:11,
146:12, 178:8, 178:10
    **responded** [5] - 42:18,
112:24, 127:11, 178:11,
184:8
    **responding** [1] - 111:23
    **response** [6] - 15:13,
15:21, 16:9, 39:20,
113:1, 167:25
    **responsibilities** [1] -
123:23
    **responsibility** [1] -
153:25
    **responsible** [1] - 16:14
    **responsiveness** [1] -
123:21
    **rest** [2] - 142:8, 142:13,
210:13
    **Restate** [1] - 123:25
    **result** [7] - 6:2, 6:10,
7:5, 58:2, 93:15, 185:4,
200:9
    **results** [7] - 81:2, 81:3,
81:4, 101:20, 174:10,
174:19, 195:23
    **resume** [2] - 71:17,
125:24
    **resumed** [1] - 149:9
    **Retaining** [1] - 203:24
    **retired** [3] - 177:24,
179:9, 179:10
    **retiree** [1] - 177:9
    **retraced** [1] - 71:3
    **retrieve** [2] - 60:17,
76:13
    **retrieved** [2] - 127:7,
143:24
    **return** [1] - 185:18
    **returned** [2] - 146:24,
149:25
    **Reverend** [3] - 194:18,
194:22, 199:24
    **review** [9] - 89:13,
89:14, 89:15, 89:18,
131:20, 152:6, 152:24,
155:13, 183:20
    **reviewed** [1] - 183:23
    **reviews** [1] - 89:13
    **Rhoden** [1] - 43:10

    **Rhodes** [11] - 1:17,
27:22, 58:5, 60:3, 202:8,
202:21, 204:8, 205:12,
205:15, 207:16, 208:12
    **RHODES** [31] - 15:17,
15:24, 16:1, 20:3, 20:6,
27:18, 27:23, 40:15,
40:19, 48:23, 48:25,
51:2, 51:7, 51:13, 55:11,
55:22, 58:6, 60:7, 202:9,
202:13, 205:18, 206:21,
206:24, 207:3, 207:5,
208:25, 210:7, 210:10,
213:5, 213:6, 213:8
    **Rhodes's** [1] - 39:20
    **Rice** [45] - 7:6, 7:9,
7:15, 7:20, 8:2, 8:5,
8:16, 9:5, 9:20, 10:4,
11:8, 13:19, 14:8, 14:10,
14:11, 14:21, 15:12,
15:19, 17:5, 17:7, 17:8,
17:12, 17:17, 17:18,
20:9, 20:18, 22:11,
22:13, 23:13, 23:24,
30:5, 31:10, 32:20,
36:12, 39:8, 39:22, 40:1,
50:17, 53:1, 53:20
    **Richard** [1] - 212:15
    **right-hand** [1] - 186:4
    **rights** [17] - 140:14,
143:25, 144:2, 144:12,
144:17, 144:23, 149:21,
151:22, 152:4, 152:16,
152:17, 153:4, 154:23,
155:4, 173:15, 173:19,
174:4
    **Rights** [3] - 151:8,
151:15, 155:1
    **ripping** [1] - 195:24
    **rival** [1] - 32:8
    **road** [6] - 148:6, 160:2,
160:3, 180:25, 181:1,
182:1
    **Rob** [1] - 43:15
    **Robar** [6] - 41:9, 41:15,
41:19, 47:11, 55:23, 60:3
    **ROBAR** [1] - 41:10,
213:7
    **Robert** [4] - 1:16, 25:2,
178:12, 178:14
    **rock** [3] - 142:6, 142:16,
156:25
    **rock-like** [1] - 142:6,
142:16
    **role** [10] - 8:15, 8:17,
8:18, 20:9, 21:3, 21:4,
21:6, 22:9, 22:11, 22:12
    **roles** [1] - 21:17
    **RON** [1] - 213:23
    **Ron** [2] - 109:13,

176:22
**RONALD** [1] - 176:24
**Ronald** [1] - 177:3
**Room** [1] - 1:24
**room** [4] - 61:2, 61:8, 109:4, 202:5
**rotary** [1] - 71:2
**Roughly** [1] - 170:11
**roughly** [1] - 172:9
**round** [1] - 69:16
**round-about** [1] - 69:16
**routinely** [2] - 140:12, 144:7
**RPR** [1] - 1:24
**rule** [1] - 204:19
**ruled** [2] - 202:19, 202:23
**rules** [1] - 29:21
**ruling** [2] - 61:25, 207:14
**run** [6] - 40:7, 43:4, 67:18, 83:24, 88:15, 199:6
**running** [3] - 119:12, 187:24, 192:22
**runs** [2] - 179:1, 181:3
**rush** [1] - 167:24
**Russell** [2] - 41:9, 41:15
**RUSSELL** [2] - 41:10, 213:7

**S**

**safe** [5] - 73:8, 74:3, 156:16, 161:23, 166:8
**safety** [6] - 114:10, 134:21, 136:13, 139:7, 141:22, 143:23
**sake** [1] - 104:7
**salary** [1] - 72:24
**saliva** [5] - 75:14, 84:19, 86:15, 103:2, 103:15
**Sample** [8] - 89:25, 92:5, 93:23, 93:24, 94:10, 99:15, 99:16, 108:6
**sample** [32] - 76:16, 76:20, 83:4, 83:8, 87:3, 87:5, 87:22, 87:23, 88:4, 88:5, 89:20, 89:25, 90:3, 91:24, 92:8, 93:24, 94:4, 94:11, 94:16, 95:19, 95:20, 96:22, 97:4, 98:15, 101:2, 101:7, 108:5, 126:25, 128:17, 132:3
**samples** [32] - 52:3, 52:5, 52:22, 78:18,

82:24, 88:15, 88:22, 88:25, 89:5, 90:20, 90:21, 92:8, 92:11, 92:12, 94:1, 94:21, 94:23, 95:6, 96:22, 97:9, 97:18, 98:12, 99:20, 105:3, 106:25, 126:25, 127:3, 127:7, 127:13, 128:4, 130:9, 131:7
**Samples** [1] - 105:1
**Sands** [2] - 55:7, 201:8
**Sataio** [1] - 25:10
**satellite** [2] - 65:20, 69:5
**satisfy** [1] - 81:18
**save** [1] - 68:15
**saw** [25] - 8:18, 11:21, 12:14, 13:8, 32:8, 52:14, 55:25, 56:6, 56:9, 56:10, 77:9, 116:4, 124:20, 135:8, 135:20, 138:20, 142:11, 142:14, 148:5, 160:9, 170:5, 180:4, 191:11, 193:14
**scales** [1] - 209:9
**scattered** [1] - 16:22
**scenario** [2] - 104:3, 166:13
**scene** [58] - 42:15, 43:14, 43:16, 44:9, 44:10, 44:12, 44:18, 45:25, 47:22, 48:6, 48:12, 48:13, 56:20, 60:5, 75:17, 86:17, 90:7, 90:12, 90:13, 91:12, 106:12, 112:1, 113:25, 114:10, 114:19, 114:23, 123:21, 124:9, 124:10, 128:6, 128:8, 141:16, 145:12, 146:12, 148:3, 149:20, 155:4, 169:18, 169:25, 178:8, 178:20, 179:18, 179:19, 181:5, 181:8, 182:12, 184:9, 189:7, 189:13, 189:16, 189:20, 190:2, 190:18, 192:1, 197:13, 197:16, 197:19, 211:3
**scenes** [2] - 111:23, 127:12
**Schedule** [2] - 174:14, 174:16
**school** [7] - 3:25, 4:2, 4:5, 65:4, 177:19, 206:8
**Science** [2] - 78:23, 78:24
**scientific** [2] - 85:14, 89:23
**Scientists** [3] - 80:6, 80:9, 80:12

**Scoot** [4] - 3:6, 41:12, 63:12, 110:22
**scope** [1] - 33:8
**scrambling** [1] - 109:10
**screen** [18] - 4:23, 5:14, 32:18, 33:21, 44:6, 44:22, 45:6, 67:24, 91:13, 114:13, 120:4, 128:9, 136:25, 156:20, 157:15, 179:24, 180:5, 181:22
**screening** [1] - 86:20
**search** [37] - 140:7, 140:15, 140:18, 141:3, 141:12, 141:20, 141:23, 142:3, 143:15, 143:22, 143:23, 148:9, 148:15, 148:18, 148:19, 149:7, 149:9, 149:10, 149:11, 149:17, 150:3, 150:25, 156:15, 164:16, 165:12, 165:14, 165:17, 171:5, 171:10, 171:17, 171:21, 171:24, 192:4, 192:11, 192:16, 197:18, 201:17
**Search** [1] - 140:11
**searched** [1] - 139:6
**searching** [2] - 141:7, 142:1
**seat** [41] - 119:7, 120:7, 121:21, 121:22, 123:5, 125:4, 135:7, 135:13, 135:20, 135:25, 142:8, 144:5, 149:15, 160:9, 163:14, 164:19, 164:23, 168:21, 172:6, 183:12, 183:14, 183:17, 184:2, 184:5, 184:18, 185:15, 185:19, 185:24, 186:2, 186:6, 186:20, 187:20, 187:23, 191:3, 191:10, 191:12, 191:17, 191:21, 193:10, 193:20
**seated** [15] - 2:16, 3:6, 41:12, 63:6, 63:12, 74:23, 78:4, 110:17, 133:3, 144:5, 176:19, 177:1, 202:8, 202:16, 208:5
**second** [11] - 52:7, 52:13, 68:7, 86:19, 86:7, 86:22, 89:18, 89:25, 94:10, 138:14, 212:13
**Second** [1] - 61:23
**secondary** [1] - 43:13
**Secondly** [1] - 62:7
**seconds** [6] - 58:13, 68:8, 69:19, 69:25, 70:4, 70:7
**Section** [1] - 75:7

**section** [2] - 113:21, 129:7
**secure** [5] - 76:23, 83:6, 127:8, 127:21, 146:11
**secured** [3] - 147:6, 147:7, 187:22
**securely** [1] - 83:15
**security** [5] - 14:2, 43:11, 199:5, 199:9
**See** [1] - 106:11
**see** [99] - 4:23, 10:24, 11:19, 12:14, 12:16, 12:20, 13:5, 15:1, 30:16, 30:23, 33:20, 34:2, 38:19, 42:17, 44:22, 46:3, 46:19, 49:22, 50:3, 50:19, 52:11, 52:19, 58:20, 64:12, 65:1, 81:5, 85:17, 86:21, 87:18, 88:6, 88:11, 89:19, 90:1, 90:24, 99:14, 107:15, 108:4, 114:13, 114:22, 115:5, 115:6, 115:14, 115:21, 115:23, 116:23, 117:3, 117:8, 117:20, 119:23, 120:4, 122:10, 123:14, 126:18, 127:16, 129:20, 129:21, 129:22, 130:1, 132:3, 132:8, 135:3, 135:9, 136:25, 147:20, 148:17, 157:15, 160:24, 161:5, 161:8, 162:1, 162:2, 176:17, 179:24, 180:13, 183:8, 185:19, 186:25, 187:14, 188:9, 189:19, 189:22, 189:24, 190:13, 190:14, 190:23, 191:15, 193:19, 195:8, 196:16, 197:11, 198:2, 202:4, 203:24, 204:14, 209:23, 210:6, 210:24, 211:2
**seeing** [6] - 10:24, 12:10, 12:13, 170:2, 171:17, 196:21
**seem** [3] - 104:20, 124:12, 130:25
**seizure** [7] - 158:1, 158:4, 192:4, 192:11, 192:16, 197:18, 201:17
**seizures** [1] - 158:5
**selected** [1] - 90:16
**selecting** [1] - 90:24, 94:3, 94:14
**self** [1] - 18:19
**sell** [5] - 8:19, 8:25, 9:1, 21:11, 29:5
**selling** [2] - 29:3, 29:11
**semen** [2] - 75:14, 84:19

**seminar** [1] - 80:5
**seminars** [2] - 79:25, 80:2
**send** [2] - 68:6, 113:16
**sense** [3] - 19:21, 206:4, 206:7
**sent** [3] - 81:3, 81:4, 101:15
**sentence** [4] - 6:9, 6:14, 28:10, 173:21
**sentenced** [3] - 6:9, 34:14, 35:10
**sentencing** [1] - 34:12
**separate** [5] - 26:15, 86:23, 86:25, 87:1, 87:10
**separately** [2] - 14:18, 155:9
**Separately** [1] - 14:19
**September** [5] - 1:11, 4:24, 80:4, 129:2, 214:5
**sequence** [8] - 84:25, 85:7, 85:17, 85:18, 85:23, 87:10, 88:14, 106:4
**Sequence** [2] - 79:15, 79:20
**sequential** [1] - 198:17
**Sergeant** [12] - 41:9, 41:15, 41:19, 42:1, 43:10, 47:11, 60:3, 60:15, 179:12, 194:15, 212:6, 212:15
**sergeant** [4] - 41:22, 43:12, 179:11, 179:13
**serial** [1] - 198:17
**series** [2] - 87:18, 90:1
**serious** [6] - 27:5, 27:6, 27:25, 30:2, 30:5, 51:10
**seriously** [1] - 27:6
**serological** [1] - 103:4
**serologist** [9] - 86:21, 92:12, 97:19, 97:20, 98:13, 101:15, 108:20, 127:9, 130:15
**Serology** [3] - 75:7, 75:12, 78:17
**serology** [2] - 75:11, 86:20
**served** [1] - 26:20
**service** [2] - 112:13, 177:12
**set** [4] - 74:7, 81:21, 88:3, 147:6
**seven** [2] - 20:12, 159:10
**Seven** [2] - 20:13, 64:17
**seventh** [1] - 87:15
**several** [7] - 22:13, 36:9, 58:13, 58:14, 87:9, 190:24, 199:25

**sex** [1] - 84:15
**SGT** [2] - 41:10, 213:7
**shall** [1] - 202:13
**Shannon** [3] - 24:23, 24:24
**SHAWN** [1] - 1:8
**Shawn** [8] - 137:17, 137:23, 145:19, 145:25, 147:18, 148:1, 151:18, 162:23
**sheet** [1] - 46:1
**SHELLY** [1] - 1:8
**Shelly** [1] - 136:22
**SHELTON** [1] - 1:7
**Shelton** [6] - 38:13, 38:15, 38:18, 38:19, 38:21
**shift** [8] - 159:8, 159:9, 159:14, 165:24, 178:16, 178:18, 207:6
**Shock** [1] - 57:10
**short** [3] - 23:2, 85:9, 179:2
**Short** [1] - 23:3
**shot** [10] - 183:1, 183:25, 184:12, 184:14, 184:17, 186:3, 186:22, 190:2, 191:8, 197:10
**shots** [1] - 188:10
**shoulder** [1] - 147:12
**show** [46] - 4:21, 34:1, 43:7, 43:20, 43:25, 44:23, 46:3, 47:8, 48:10, 53:16, 53:19, 55:2, 66:24, 67:10, 68:3, 75:21, 86:17, 100:23, 106:12, 107:16, 109:10, 114:11, 119:4, 120:3, 136:23, 137:18, 151:10, 154:8, 170:14, 179:7, 179:23, 181:19, 182:21, 185:9, 185:17, 185:20, 185:22, 188:6, 189:12, 190:9, 191:8, 191:13, 193:7, 195:7, 197:2
**showed** [2] - 55:5, 175:8
**showing** [11] - 67:5, 67:11, 87:23, 117:15, 147:23, 156:24, 179:17, 181:1, 181:2, 187:5, 198:18
**Showing** [7] - 116:17, 118:9, 119:4, 121:13, 122:4, 122:13, 180:7
**shown** [4] - 114:17, 120:6, 174:7, 189:23
**shows** [11] - 69:5, 174:10, 184:17, 187:3, 187:16, 187:19, 189:18,

190:18, 190:21, 190:25, 191:14
**sic** [2] - 58:14, 80:14
**side** [71] - 36:2, 45:13, 58:12, 115:13, 115:14, 116:5, 116:11, 116:25, 117:12, 117:13, 117:16, 117:19, 117:21, 117:23, 117:25, 118:3, 118:10, 118:17, 118:24, 118:25, 119:5, 120:2, 120:14, 120:23, 121:3, 121:4, 121:6, 121:17, 122:19, 122:23, 122:24, 123:2, 123:6, 123:14, 124:21, 129:20, 135:10, 136:12, 136:13, 136:16, 147:7, 148:6, 160:2, 160:16, 160:24, 168:11, 178:25, 181:6, 182:15, 182:20, 182:23, 183:1, 183:10, 185:23, 186:4, 186:11, 186:13, 187:4, 188:16, 191:1, 191:9, 191:10, 192:16, 192:17, 192:18, 192:19, 192:20, 197:15
**sight** [2] - 161:2, 168:6
**sign** [6] - 33:21, 140:23, 141:1, 151:5, 154:25, 155:15
**signature** [10] - 34:2, 152:11, 152:13, 173:6, 173:8, 173:14, 173:17, 174:3, 174:19, 214:11
**signed** [12] - 5:19, 6:21, 33:20, 34:1, 101:14, 152:10, 153:7, 171:9, 171:18, 171:19, 172:22, 175:5
**significant** [2] - 153:20, 204:10
**signing** [3] - 4:15, 173:3, 173:9
**silent** [1] - 144:14
**silver** [3] - 56:10, 179:4, 182:16
**Similar** [1] - 65:1
**similar** [5] - 54:3, 89:20, 200:14, 211:2, 211:6
**similarly** [1] - 54:3
**simple** [1] - 100:15
**simpler** [1] - 17:23
**simply** [2] - 89:21, 98:11
**single** [1] - 108:13
**sit** [2] - 2:4, 99:1
**sitting** [6] - 12:22, 104:17, 121:19, 123:1, 123:13, 124:19
**Sitting** [1] - 125:4

**situation** [7] - 18:7, 18:11, 118:1, 203:19, 205:22, 205:24, 208:3
**situations** [1] - 29:23
**Six** [1] - 128:13
**six** [9] - 20:10, 54:3, 92:16, 103:1, 132:8, 132:10, 132:11, 132:15, 170:11
**six-tenths** [1] - 170:11
**sixth** [1] - 87:13
**Sixth** [1] - 209:9
**Sixty** [1] - 66:22
**size** [3] - 87:8, 87:11, 157:25
**skin** [13] - 23:2, 76:7, 76:10, 76:14, 77:15, 93:6, 94:21, 102:21, 103:2, 104:24, 195:18, 195:22, 195:23
**skip** [1] - 88:19
**sleep** [5] - 68:14, 68:16, 69:23, 70:13, 71:15
**sleeve** [1] - 126:15
**slide** [4] - 76:14, 93:16, 106:3, 106:6
**slight** [2] - 163:24, 165:8
**slightly** [2] - 181:10, 187:8
**slowly** [1] - 95:17
**Slumped** [1] - 123:10
**slumped** [4] - 115:24, 116:23, 120:7, 123:11
**small** [7] - 86:16, 90:21, 149:14, 167:21, 181:12, 196:10, 196:11
**smaller** [6] - 56:4, 75:23, 87:11, 90:19, 142:16
**smell** [6] - 138:20, 138:21, 138:25, 139:13, 139:14, 140:1
**smoked** [1] - 140:4
**smoking** [1] - 140:2
**social** [1] - 151:2
**Society** [1] - 81:25
**software** [1] - 66:15
**sold** [1] - 29:16
**solely** [1] - 57:24
**solution** [1] - 203:8
**solve** [1] - 207:17
**Someone** [1] - 166:10
**someone** [15] - 6:18, 12:13, 58:9, 64:5, 90:12, 90:14, 99:8, 103:1, 103:13, 103:21, 109:21, 112:19, 118:19, 166:1, 166:6
**sometime** [4] - 35:14,

83:14, 150:12, 206:20
**sometimes** [4] - 21:3, 40:10, 120:16, 145:7
**Sometimes** [1] - 21:5
**somewhat** [3] - 115:3, 187:7, 203:19
**Somewhere** [1] - 8:7
**somewhere** [3] - 16:17, 167:14, 172:6
**son** [1] - 208:9
**son's** [1] - 210:9
**soon** [1] - 147:6
**Sorry** [2] - 105:23, 117:20
**sorry** [24] - 7:17, 9:16, 10:7, 18:14, 45:8, 67:3, 72:8, 75:25, 108:11, 117:18, 128:25, 129:5, 132:5, 144:18, 155:24, 157:17, 168:8, 171:8, 172:18, 181:19, 203:1, 204:22, 207:2
**sort** [7] - 85:2, 108:8, 166:25, 167:24, 180:24, 188:23, 205:8
**sorted** [1] - 87:8
**sound** [1] - 9:11
**sounding** [1] - 200:14
**sources** [1] - 108:14
**south** [13] - 47:16, 147:13, 169:19, 170:6, 170:7, 179:1, 179:2, 181:3, 182:7, 184:16, 188:14, 188:17
**South** [13] - 69:8, 69:17, 70:1, 70:21, 178:11, 178:20, 178:25, 181:2, 181:5, 188:16, 190:20, 190:22
**southbound** [6] - 135:4, 135:6, 136:1, 160:6, 167:3, 167:5
**southeast** [1] - 189:18
**Southeast** [3] - 91:6, 94:8, 94:19
**southward** [1] - 180:9
**spatter** [3] - 184:20, 185:1, 185:8
**speaking** [3] - 54:3, 67:17, 138:7
**special** [1] - 23:19
**specific** [6] - 11:25, 79:6, 85:12, 85:16, 87:4, 87:22
**specifically** [2] - 13:5, 17:6
**specimens** [1] - 107:11
**specks** [1] - 196:9
**speculate** [1] - 46:1
**speed** [2] - 168:1,

168:14
**spell** [8] - 3:7, 41:13, 63:13, 74:24, 78:5, 110:23, 133:4, 177:2
**spelled** [1] - 41:16
**spend** [2] - 64:16, 72:21, 111:18
**spending** [1] - 9:5
**spends** [1] - 69:18
**Spinner** [4] - 147:18, 147:19, 149:11, 171:18
**spite** [1] - 165:17
**spitting** [1] - 71:11
**splatter** [1] - 117:7
**spoken** [3] - 88:18, 175:1, 200:8
**sponsor** [2] - 211:11, 211:12
**sponte** [1] - 62:4
**spot** [1] - 169:22
**spots** [1] - 71:10
**spray** [5] - 138:18, 143:16, 161:8, 161:21, 161:23
**spraying** [1] - 161:20
**Spring** [1] - 194:19
**St** [2] - 62:21, 111:14
**stab** [3] - 58:14, 104:20, 104:21
**stabbed** [5] - 14:13, 14:14, 43:14, 58:10, 60:9
**stabbing** [5] - 59:8, 200:15, 200:20, 200:22
**stabbings** [2] - 47:1, 50:10
**stages** [1] - 210:22
**stain** [4] - 86:15, 86:21, 86:24
**stand** [6] - 67:16, 71:17, 110:3, 110:12, 110:20, 125:24
**standard** [20] - 83:9, 92:17, 92:20, 94:2, 94:12, 94:25, 95:22, 95:23, 95:25, 96:3, 96:9, 103:2, 105:5, 127:22, 127:23, 128:12, 129:14, 133:23, 151:8, 151:19
**standardized** [1] - 150:3
**standards** [10] - 78:18, 81:21, 83:11, 88:3, 88:23, 89:7, 89:17, 90:5, 91:23, 95:24
**standing** [5] - 144:4, 180:9, 180:16, 184:16, 188:14
**standpoint** [1] - 176:7
**stands** [1] - 84:5
**starring** [1] - 195:22

**start** [2] - 62:16, 84:5
**started** [8] - 10:22, 13:10, 59:7, 59:9, 68:11, 68:17, 69:1, 142:2
**Starting** [1] - 68:9
**starts** [1] - 62:22
**State** [23] - 3:7, 41:13, 63:13, 74:24, 78:5, 110:23, 133:4, 133:12, 133:13, 133:15, 134:9, 141:19, 144:1, 145:5, 149:2, 150:17, 150:25, 151:9, 151:14, 153:22, 153:24, 165:2, 177:2
**state** [29] - 4:18, 5:9, 5:24, 6:6, 6:9, 24:12, 26:2, 26:3, 26:4, 26:12, 26:14, 26:22, 27:7, 28:3, 28:4, 28:5, 33:11, 33:12, 33:16, 34:13, 109:12, 125:25, 133:18, 133:23, 138:16, 140:12, 169:11
**state's** [1] - 58:24
**State's** [3] - 4:17, 6:13, 59:2
**statement** [7] - 49:4, 52:2, 89:9, 93:23, 94:10, 98:19, 129:16
**statements** [10] - 48:20, 49:8, 60:4, 89:8, 93:19, 93:22, 144:24, 211:16, 211:17, 211:18
**States** [13] - 2:25, 4:16, 5:4, 41:8, 60:21, 63:8, 74:19, 77:25, 110:19, 132:24, 176:22, 177:17, 179:13
**STATES** [2] - 1:1, 1:5
**stationed** [4] - 64:10, 64:13, 65:11, 112:12
**stationery** [3] - 135:5, 168:7, 168:19
**statistical** [3] - 64:5, 89:10, 90:6
**statistics** [2] - 90:13, 91:5
**stats** [2] - 64:5, 90:25
**status** [1] - 149:1
**stay** [1] - 28:16
**stayed** [2] - 15:9, 15:10
**stays** [1] - 210:4
**stenographically** [1] - 214:4
**step** [9] - 67:16, 86:22, 87:7, 87:13, 87:16, 88:8, 139:1, 164:4, 202:6
**stepping** [2] - 139:16, 167:17
**steps** [4] - 45:21, 71:3, 79:7, 86:19

**Steven** [1] - 194:15
**Stevenson** [1] - 24:22
**stick** [1] - 165:23
**still** [17] - 9:5, 47:1, 57:6, 113:24, 118:21, 134:9, 136:6, 141:8, 141:10, 146:4, 163:20, 163:24, 179:8, 195:16, 196:11, 202:15
**stippling** [6] - 195:13, 196:8, 196:14, 196:16, 196:19
**stipulation** [10] - 202:20, 202:21, 202:24, 203:8, 204:8, 205:4, 205:22, 206:10, 207:17, 209:7
**stomped** [1] - 104:8
**stool** [10] - 56:4, 56:12, 56:13, 56:14, 58:9, 58:17, 59:8, 59:9, 59:15
**stop** [19] - 68:13, 70:20, 70:21, 71:4, 134:3, 134:23, 135:3, 136:2, 136:6, 136:10, 137:9, 137:16, 138:23, 163:11, 166:24, 168:18, 168:23, 170:1, 170:6
**stopped** [11] - 68:23, 70:10, 71:5, 135:25, 148:7, 160:19, 169:10, 170:9, 179:5, 182:7, 182:14
**stopping** [1] - 138:11
**stops** [1] - 71:14
**storage** [3] - 76:23, 127:8, 127:22
**stored** [2] - 86:2, 127:21
**STR** [1] - 79:17
**straight** [2] - 44:8, 47:17
**strategic** [1] - 64:7
**street** [4] - 8:25, 9:1, 29:4, 181:16
**Street** [4] - 1:25, 43:3, 199:11
**Strike** [2] - 168:8, 170:12
**strike** [3] - 15:5, 158:13, 208:1
**strip** [1] - 167:1
**strong** [1] - 140:1
**strongly** [1] - 210:3
**structural** [1] - 185:1
**structure** [1] - 84:7
**structures** [1] - 84:13
**struggle** [3] - 11:4, 11:9, 11:20
**struggling** [2] - 11:11,

11:12
**stubs** [1] - 198:17
**studies** [1] - 102:15
**study** [1] - 75:12
**stuff** [7] - 14:4, 22:6, 29:12, 31:11, 150:6, 151:4, 211:17
**Stuff** [1] - 176:16
**sua** [1] - 62:4
**subject** [6] - 80:15, 137:18, 183:13, 183:14, 183:16
**submission** [1] - 52:19
**submit** [2] - 62:10, 156:17
**submittal** [1] - 156:21
**submitted** [16] - 91:21, 92:13, 101:14, 127:15, 127:18, 128:13, 128:17, 128:23, 128:24, 129:1, 129:6, 129:14, 131:4, 131:21, 146:15, 156:24
**Submitted** [1] - 146:21
**subpoena** [1] - 209:10
**subpoenas** [1] - 201:14
**subsequent** [4] - 188:14, 191:25, 192:1, 200:7
**subsequently** [2] - 183:14, 193:2
**substance** [7] - 142:6, 142:16, 156:22, 156:25, 157:5, 174:14, 174:17
**substantial** [1] - 73:2
**successfully** [1] - 29:19
**suffered** [1] - 196:22
**sufficient** [1] - 165:8
**suggest** [1] - 185:3
**suggesting** [1] - 170:21
**suggests** [1] - 185:4
**sum** [1] - 37:21
**summarizing** [1] - 102:13
**summary** [1] - 132:15
**summons** [1] - 141:17
**super** [1] - 28:18
**super-focused** [1] - 28:18
**supervision** [1] - 208:10
**Supervisor** [1] - 150:3
**supervisor** [1] - 194:14
**support** [1] - 64:20
**supported** [1] - 64:21
**supporting** [1] - 57:7
**suppose** [2] - 167:22, 179:10
**supposed** [1] - 206:7
**surprised** [3] - 51:1, 51:4, 51:12

**surrounded** [1] - 195:13
**surrounding** [1] - 188:10
**surroundings** [1] - 181:8
**survey** [1] - 114:10
**suspect** [1] - 54:5
**suspect's** [1] - 101:6
**suspected** [6] - 114:8, 143:1, 146:15, 156:14, 156:18, 158:4
**suspended** [1] - 149:3
**suspicious** [3] - 146:2, 194:22, 194:23
**Sustained** [1] - 27:17
**sustained** [1] - 125:1
**Swab** [1] - 92:6
**swab** [13] - 76:7, 76:21, 76:25, 93:25, 96:18, 97:25, 98:17, 101:2, 103:8, 105:4, 107:10, 126:17, 131:7
**swabbed** [4] - 76:6, 76:10, 77:15, 96:23, 96:24, 97:7, 126:20, 127:25, 128:4, 131:12
**swabs** [10] - 83:10, 83:13, 96:19, 98:25, 106:20, 106:23, 107:6, 107:10, 127:15, 127:20
**switch** [2] - 100:15, 105:22
**sworn** [1] - 74:21
**SWORN** [9] - 3:4, 41:10, 63:10, 74:21, 78:2, 110:21, 125:22, 133:1, 176:24
**system** [5] - 2:20, 27:3, 27:15, 180:3, 212:18
**System** [2] - 79:15, 79:21

# T

**T-E-R-I** [1] - 74:25
**T-R-A-V-I-S** [1] - 3:9
**table** [3] - 89:4, 93:19, 93:20
**tactical** [1] - 64:7
**tag** [3] - 46:19, 182:16, 182:17
**tags** [2] - 44:13, 45:25
**tandem** [1] - 85:9
**tape** [5] - 50:1, 199:9, 199:13, 199:16
**tapes** [1] - 199:5
**target** [2] - 55:6, 85:3
**targeting** [1] - 88:10

**targets** [1] - 55:5
**task** [3] - 72:17, 73:3, 153:21
**tearing** [1] - 195:22
**technical** [2] - 89:13, 89:15
**technician** [5] - 44:15, 127:14, 128:6, 128:8, 184:16
**technician's** [1] - 128:3
**technicians** [1] - 82:25
**technique** [1] - 76:7
**technology** [1] - 2:20
**Technology** [1] - 80:4
**telephone** [4] - 191:11, 211:9, 211:11, 211:13
**telephones** [1] - 201:10
**temporary** [8] - 137:15, 137:20, 138:11, 146:20, 146:22, 147:7, 170:18, 171:1
**ten** [14] - 10:4, 33:17, 34:14, 35:4, 35:19, 53:6, 56:3, 59:6, 68:14, 69:22, 70:12, 71:15, 163:11, 206:17
**Ten** [4] - 100:23, 137:19, 163:12, 170:15
**tennis** [1] - 181:13
**tentative** [1] - 209:3
**tenths** [3] - 170:2, 170:7, 170:11
**Teri** [6] - 74:20, 74:25, 82:25, 97:21, 125:19, 126:1
**TERI** [4] - 74:21, 125:22, 213:12, 213:19
**term** [2] - 85:14, 208:7
**termination** [1] - 66:18
**terms** [4] - 29:11, 37:21, 118:15, 204:11
**test** [10] - 80:25, 85:8, 86:21, 89:5, 101:17, 101:20, 103:9, 103:15, 106:20, 108:17
**tested** [8] - 89:6, 90:8, 94:5, 94:16, 97:18, 107:6
**testified** [5] - 126:16, 126:20, 171:13, 191:6, 197:14
**testify** [10] - 65:3, 95:7, 126:9, 130:2, 203:2, 203:5, 204:12, 205:24, 209:5, 210:8
**testifying** [3] - 6:10, 35:24, 171:14
**testimony** [14] - 13:6, 97:11, 97:23, 129:15, 160:10, 162:13, 163:12, 168:17, 170:19, 204:13,

205:14, 206:11, 207:11,
211:2

**testing** [26] - 77:17,
79:7, 83:11, 83:19, 84:2,
85:4, 85:11, 85:12,
85:15, 86:17, 86:20,
87:4, 87:6, 89:22, 89:24,
91:4, 95:19, 97:19,
98:12, 98:13, 99:7,
102:16, 103:4, 107:4,
127:20

**tests** [13] - 75:19,
80:21, 81:6, 81:10,
81:12, 81:13, 81:17,
83:9, 83:12, 91:15,
93:15, 94:20

**texture** [1] - 142:24

**TFC** [3] - 147:18,
148:15, 149:10

**TFO** [1] - 156:12

**THE** [185] - 1:1, 1:2, 2:2,
2:4, 2:8, 2:11, 2:14,
2:16, 3:2, 3:3, 3:5, 3:6,
3:9, 3:11, 3:13, 3:14,
13:4, 15:18, 15:25, 16:2,
20:1, 20:4, 27:17, 27:21,
32:21, 40:14, 40:17,
41:6, 41:11, 41:12,
41:15, 48:24, 49:1, 49:3,
49:4, 49:5, 51:3, 51:5,
51:8, 51:9, 51:14, 53:25,
54:2, 55:13, 55:14,
57:21, 60:8, 60:15,
60:16, 60:17, 60:20,
60:23, 60:25, 61:4,
61:11, 61:14, 61:17,
62:9, 62:14, 62:18,
62:24, 63:3, 63:6, 63:11,
63:12, 63:15, 74:2, 74:4,
74:5, 74:9, 74:11, 74:14,
74:18, 74:22, 74:23,
74:25, 77:23, 78:3, 78:4,
78:6, 82:13, 82:18, 95:3,
100:1, 100:14, 100:20,
101:25, 102:4, 102:5,
102:9, 107:20, 107:23,
108:22, 108:23, 108:24,
109:7, 109:16, 109:21,
109:24, 110:1, 110:4,
110:14, 110:17, 110:22,
110:24, 125:7, 125:8,
125:9, 125:14, 125:16,
125:17, 125:20, 125:23,
126:1, 126:2, 126:14,
128:16, 131:24, 132:5,
132:22, 133:2, 133:3,
133:5, 148:11, 148:12,
158:3, 158:8, 158:14,
158:20, 158:21, 166:18,
170:17, 172:21, 175:13,

175:15, 175:16, 175:19,
175:22, 175:24, 176:5,
176:11, 176:15, 176:19,
176:23, 176:25, 177:1,
177:3, 180:7, 180:11,
182:10, 200:25, 201:5,
201:19, 201:22, 202:8,
202:11, 202:18, 203:16,
204:17, 204:20, 204:23,
205:12, 205:17, 206:20,
206:23, 207:2, 207:4,
207:13, 209:1, 210:8,
210:11, 210:15, 210:18,
210:24, 211:2, 211:7,
211:11, 211:14, 211:16,
211:19, 211:23, 212:1,
212:4, 212:8, 212:17

**theater** [2] - 198:19,
199:13

**themselves** [1] - 20:18

**thereabouts** [1] - 54:12

**therefore** [4] - 73:8,
107:9, 126:8, 210:22

**they've** [1] - 30:22

**They've** [1] - 83:14

**thin** [1] - 210:5

**Thomas** [1] - 1:20

**thorough** [1] - 143:22

**thoughtful** [1] - 207:22

**threatened** [2] - 152:21,
173:23

**three** [41] - 14:14,
14:21, 42:19, 52:25,
53:17, 53:21, 68:8, 70:4,
78:20, 81:14, 91:4, 91:7,
96:21, 97:7, 97:10, 98:3,
98:15, 98:18, 98:19,
98:22, 99:11, 99:13,
99:15, 99:21, 99:23,
102:25, 111:14, 134:6,
143:25, 144:6, 150:11,
154:24, 159:10, 159:11,
163:11, 163:12, 170:2,
179:16, 179:17, 194:21

**Three** [7] - 43:3, 68:9,
93:23, 99:16, 105:1,
126:25, 200:3

**three-by-five** [3] -
143:25, 144:6, 154:24

**three-tenths** [1] - 170:2

**threw** [2] - 58:9, 59:9

**Throughout** [1] - 88:2

**throughout** [1] - 85:10

**thrown** [1] - 56:14

**thumb** [1] - 209:8

**Thursday** [1] - 62:9

**tie** [1] - 208:20

**tint** [2] - 115:18, 115:19

**tissue** [5] - 84:20,
185:5, 185:6

**tissues** [1] - 84:20

**today** [14] - 12:4, 12:20,
36:6, 65:4, 97:23, 99:1,
109:9, 109:23, 110:5,
131:12, 144:9, 175:18,
202:10, 209:25

**together** [12] - 8:17,
8:18, 14:18, 20:17,
20:22, 20:24, 21:1,
39:24, 40:7, 40:8, 40:10,
54:4

**toggle** [1] - 100:15

**tomorrow** [6] - 202:4,
202:5, 210:12, 212:10,
212:16, 212:21

**took** [12] - 8:6, 9:3,
39:6, 43:14, 52:10, 58:4,
66:14, 69:25, 76:20,
146:14, 149:23, 150:2

**tooth** [1] - 86:13

**top** [9] - 69:4, 71:12,
106:8, 126:11, 129:13,
130:11, 185:13, 187:17,
191:2

**total** [1] - 198:10

**touch** [3] - 76:15, 180:3,
180:8

**touching** [3] - 180:6,
180:11, 180:13

**toward** [20] - 3:7, 41:13,
45:1, 63:13, 78:4,
110:22, 133:3, 177:1,
182:7, 187:24, 188:14,
188:17, 189:17, 189:18,
190:12, 190:16, 190:22,
191:16, 193:12

**towards** [1] - 44:24,
115:13, 160:10

**town** [1] - 43:1, 43:2,
113:20, 167:21

**Towson** [1] - 78:25

**trade** [2] - 21:23, 22:2

**traffic** [22] - 134:3,
134:23, 135:3, 135:6,
136:10, 136:16, 137:8,
137:16, 138:23, 145:15,
159:16, 159:23, 160:5,
160:6, 163:11, 163:15,
167:24, 167:25, 168:5,
169:15, 169:16, 170:1

**trafficking** [5] - 4:13,
4:19, 7:5, 7:12, 7:15

**Trafficking** [1] - 72:10

**trail** [1] - 46:15

**trained** [2] - 135:12,
135:19

**trainer** [1] - 210:9

**training** [15] - 79:1,
79:5, 79:6, 79:9, 79:14,
79:18, 79:21, 79:23,

80:6, 80:12, 133:24,
135:11, 138:17, 142:17,
142:23

**Training** [3] - 79:13,
79:16, 79:20

**transcribed** [1] - 214:8

**transcript** [1] - 214:8

**transfer** [3] - 76:16,
103:21, 104:18

**transferred** [2] -
102:13, 102:14

**transformer** [2] - 189:4,
189:9

**transmissions** [1] -
68:6

**transport** [1] - 149:21

**Transportation** [1] -
177:11

**transported** [3] - 145:5,
149:19, 150:8

**trash** [1] - 59:16

**Trauma** [1] - 57:10

**travel** [1] - 198:24

**traveled** [2] - 66:16,
69:6

**traveling** [5] - 135:4,
135:7, 163:13, 163:17,
168:14

**travels** [1] - 68:12

**Travis** [5] - 2:13, 2:25,
3:9, 3:13, 5:4

**TRAVIS** [2] - 3:4, 213:4

**tray** [4] - 139:17,
139:18, 139:19, 143:8

**treat** [2] - 88:5, 123:18

**treated** [3] - 15:3, 81:1,
118:22

**treatment** [2] - 57:11,
124:10

**tree** [16] - 69:21, 70:2,
70:10, 115:6, 179:3,
179:5, 180:20, 182:4,
182:6, 182:8, 182:14,
188:18, 188:19, 188:23,
190:18

**trees** [1] - 181:16

**trial** [6] - 62:16, 130:2,
205:3, 205:11, 209:18,
210:9

**tried** [3] - 13:13, 13:25,
123:21

**trillion** [3] - 94:16,
94:18, 94:19

**trim** [2] - 166:4, 166:7

**trip** [1] - 74:3

**trooper** [18] - 109:13,
133:16, 133:18, 133:21,
133:23, 133:24, 134:9,
135:11, 138:16, 140:12,
141:20, 144:7, 153:23,

156:7, 156:12, 158:6,
158:9, 169:11

**Trooper** [28] - 133:22,
145:11, 145:15, 145:16,
145:25, 146:2, 146:8,
146:10, 146:13, 146:16,
146:24, 147:8, 147:9,
147:19, 148:3, 148:5,
148:8, 149:9, 156:17,
157:25, 166:22, 169:13,
169:17, 170:5, 171:10,
171:15, 171:16, 171:18

**trooper's** [2] - 141:21,
171:24

**troopers** [10] - 141:8,
141:14, 141:16, 141:17,
143:10, 143:12, 145:11,
147:20, 153:19, 167:2

**trouble** [5] - 6:18,
105:22, 136:2, 140:23,
181:20

**truck** [2] - 113:12,
113:14

**truly** [2] - 205:13, 208:6

**trust** [1] - 2:22

**truth** [1] - 36:4

**truthful** [1] - 6:17

**try** [13] - 13:11, 17:22,
30:17, 30:25, 37:16,
50:9, 53:19, 116:10,
134:19, 136:4, 211:21,
212:15

**Try** [2] - 30:11, 30:13

**trying** [8] - 2:10, 9:23,
11:5, 11:21, 37:13,
109:23, 185:21, 205:8

**Trying** [1] - 16:11

**Tuesday** [2] - 202:11,
208:14, 208:23

**turn** [8] - 69:7, 86:25,
87:15, 146:6, 147:13,
154:1, 170:3, 170:5

**turn-around** [1] -
147:13

**turned** [7] - 70:18,
119:18, 156:2, 192:25,
193:2, 193:3, 208:9

**turns** [2] - 69:11, 69:22

**twice** [1] - 36:11

**twins** [2] - 84:17, 93:10

**Two** [8] - 23:16, 47:15,
55:9, 90:12, 160:15,
174:14, 174:16, 174:17

**two** [72] - 10:16, 10:17,
23:14, 23:17, 23:19,
26:15, 36:19, 52:11,
52:13, 58:11, 72:21,
74:7, 81:11, 81:13, 86:3,
86:9, 89:12, 90:9, 90:10,
90:20, 90:21, 92:8, 93:9,

94:23, 99:20, 105:3, 106:25, 107:17, 108:6, 108:16, 115:24, 116:8, 116:10, 117:21, 118:1, 118:21, 119:20, 119:25, 123:18, 124:20, 124:23, 125:19, 126:24, 127:7, 127:12, 128:4, 131:7, 135:4, 150:18, 155:8, 156:5, 160:14, 170:7, 170:9, 183:6, 183:10, 183:11, 185:20, 190:23, 191:18, 194:25, 197:13, 198:16, 199:20, 200:22, 201:1, 201:10, 208:21, 212:2

**Tydings** [1] - 167:13
**type** [12] - 84:2, 84:12, 113:17, 123:20, 144:24, 151:4, 196:6, 197:5
**types** [2] - 84:11, 197:7
**typical** [1] - 40:6
**typically** [3] - 75:14, 76:14, 131:16

## U

**U.S** [3] - 1:24, 6:12, 91:9
  **ultimate** [1] - 194:11
  **ultimately** [8] - 15:6, 84:4, 124:9, 143:10, 145:12, 156:16, 160:19, 166:14
  **Ultimately** [2] - 137:5, 156:17
  **Um-hum** [2] - 132:4, 161:16
  **uncertain** [3] - 99:2, 99:4, 130:25
  **uncomfortable** [1] - 203:21
  **Unconscious** [1] - 112:16
  **unconscious** [4] - 57:14, 57:15, 113:15, 122:12
  **uncooperativeness** [1] - 51:1
  **under** [19] - 29:16, 87:19, 125:24, 127:18, 127:25, 128:17, 131:3, 143:6, 143:18, 143:21, 149:4, 149:5, 150:10, 154:21, 174:19, 195:23, 208:18
  **underneath** [5] - 47:13, 48:14, 90:1, 142:4, 165:20

**undertake** [1] - 201:10
**undertaking** [2] - 72:17, 148:17
**underworld** [1] - 73:14
**unexpected** [1] - 10:21
**unfair** [1] - 210:1
**uniform** [2] - 134:1, 134:15
**unique** [1] - 84:16
**Unit** [6] - 42:8, 75:8, 78:17, 127:11, 127:15, 177:10
**unit** [8] - 43:16, 72:12, 73:21, 75:20, 113:3, 113:5, 113:11, 114:4
**UNITED** [2] - 1:1, 1:5
**United** [13] - 2:25, 4:15, 5:4, 41:8, 60:21, 63:8, 74:19, 77:25, 110:19, 132:24, 176:21, 177:17, 179:13
**units** [1] - 87:24
**universe** [1] - 97:12
**University** [8] - 64:10, 64:12, 65:7, 65:10, 72:2, 72:3, 78:25, 177:22
**unless** [1] - 211:9
**unlikely** [4] - 90:22, 104:1, 104:3, 104:5
**unmarked** [1] - 115:1
**unrelated** [2] - 94:3, 94:14
**Unto** [1] - 25:10
**unusual** [2] - 161:6, 194:4
**up** [81] - 3:6, 3:23, 4:15, 4:22, 10:6, 14:2, 14:3, 14:4, 17:1, 17:13, 17:14, 24:25, 35:17, 37:21, 41:12, 42:21, 45:16, 45:18, 47:13, 47:21, 48:3, 58:12, 63:12, 68:12, 68:16, 69:2, 69:5, 69:20, 70:14, 70:24, 71:18, 71:19, 74:7, 76:7, 83:24, 91:13, 103:21, 104:6, 104:12, 109:10, 110:22, 115:20, 118:2, 118:25, 121:13, 122:13, 126:7, 129:13, 130:4, 134:23, 139:9, 142:5, 142:8, 142:15, 156:20, 160:12, 160:17, 160:20, 160:23, 162:25, 163:1, 163:5, 163:24, 164:12, 166:4, 180:7, 181:11, 181:25, 185:21, 186:13, 188:4, 189:12, 192:7, 193:12, 195:23, 203:10, 208:19, 210:21, 210:24

**upstairs** [3] - 43:23, 44:1, 44:4
**urbanized** [1] - 167:20
**urine** [1] - 75:14
**USA** [1] - 214:4
**useful** [2] - 199:16, 199:18
**Users** [1] - 80:8
**uses** [1] - 131:18
**utilize** [1] - 86:19

## V

**vacant** [2] - 181:9, 181:10
**value** [7] - 75:19, 95:20, 96:1, 98:11, 143:14, 149:12, 204:13
**vantage** [1] - 181:20
**variations** [1] - 85:6
**variety** [2] - 20:13, 20:17
**various** [4] - 61:19, 61:21, 67:12, 130:9
**Various** [1] - 96:19
**vary** [1] - 85:20
**vault** [1] - 83:6
**vehicle** [97] - 66:6, 66:7, 66:16, 66:21, 68:12, 68:17, 68:18, 69:3, 69:5, 69:7, 69:18, 69:20, 72:12, 73:5, 73:21, 112:16, 114:18, 115:5, 115:15, 115:23, 117:13, 118:7, 121:7, 121:8, 123:3, 134:20, 135:7, 135:24, 135:25, 136:11, 136:12, 137:9, 137:22, 137:25, 138:11, 138:12, 138:13, 138:14, 139:1, 139:16, 140:3, 140:4, 140:5, 140:15, 141:20, 143:24, 146:1, 146:6, 148:9, 148:16, 149:9, 149:10, 160:20, 160:25, 161:2, 161:22, 161:24, 162:24, 163:3, 163:20, 163:21, 164:2, 165:7, 168:18, 168:23, 169:18, 170:1, 170:6, 171:10, 171:25, 172:2, 179:6, 182:14, 182:15, 182:22, 183:10, 184:2, 184:5, 184:10, 184:11, 184:13, 184:14, 184:17, 185:12, 187:4, 187:22, 189:23, 190:8, 192:4, 192:12, 193:11, 198:23, 201:16, 201:17

**vehicle's** [2] - 139:18, 162:11
**vehicles** [3] - 159:21, 190:7, 190:23
**vent** [2] - 169:3, 172:15
**verify** [2] - 76:14, 89:1
**version** [1] - 67:20
**versus** [4] - 5:4, 28:20, 103:16
**victim** [11] - 51:18, 51:20, 60:12, 120:7, 120:9, 120:19, 121:14, 127:22, 127:23, 194:23, 201:17
**victim's** [2] - 121:17, 195:18
**victims** [12] - 47:1, 49:25, 50:9, 53:1, 123:19, 194:6, 194:25, 198:6, 198:13, 198:14, 199:20, 200:16
**videotape** [4] - 49:17, 49:20, 49:22, 50:3
**view** [23] - 49:20, 115:25, 121:13, 121:16, 121:22, 122:14, 123:6, 123:8, 181:25, 182:14, 185:23, 186:5, 187:4, 187:8, 187:17, 187:20, 188:14, 190:12, 190:16, 190:22, 191:9, 191:16, 203:25
**viewed** [1] - 199:19
**viewing** [1] - 159:21
**views** [1] - 179:17
**violation** [2] - 136:1, 154:22
**violator's** [1] - 136:12
**Virginia** [2] - 136:21, 137:3
**virtually** [1] - 86:11
**visible** [3] - 147:25, 189:10, 191:2
**visited** [1] - 198:25
**vitals** [1] - 151:2
**voice** [2] - 8:8, 10:6
**void** [1] - 6:22
**voir** [3] - 207:25, 208:4, 209:18
**VOLUME** [1] - 1:11
**voluntarily** [1] - 173:10
**voluntary** [3] - 152:20, 173:22, 174:2
**Vonzella** [1] - 174:23
**vote** [1] - 208:20

## W

**wait** [2] - 112:10,

202:13
  **wake** [1] - 68:16
  **walk** [1] - 95:16
  **wall** [4] - 179:3, 179:4, 180:19, 188:23
  **wants** [1] - 62:10
  **warning** [1] - 164:21
  **warrant** [8] - 55:16, 145:17, 146:9, 192:4, 192:12, 192:16, 197:19, 201:18
  **waste** [1] - 147:5
  **watch** [1] - 155:2
  **watched** [2] - 19:8, 150:3
  **watching** [1] - 58:13
  **water** [2] - 125:8, 158:20
  **Wayne** [1] - 136:22
  **WAYNE** [1] - 1:8
  **ways** [1] - 173:3
  **wayward** [1] - 2:19
  **weapon** [1] - 44:16
  **weapons** [3] - 139:7, 139:10, 143:23
  **wearing** [2] - 12:23, 168:21
  **weather** [1] - 159:19
  **week** [10] - 72:18, 202:21, 204:4, 207:14, 207:24, 208:9, 208:12, 209:3, 209:19, 209:25
  **weekend** [2] - 2:20, 2:23
  **weeks** [4] - 54:11, 206:17, 209:19, 211:4
  **weigh** [1] - 146:23
  **weight** [3] - 23:5, 151:2, 157:24
  **welcome** [3] - 108:23, 125:7, 166:18
  **well-known** [1] - 81:24
  **Wendy's** [2] - 198:22, 198:25, 199:10
  **West** [2] - 1:25, 69:4
  **west** [2] - 47:16, 190:22
  **westbound** [1] - 70:16
  **whatsoever** [1] - 77:7
  **wheel** [1] - 120:14
  **whereabouts** [1] - 167:7
  **Whereof** [1] - 214:10
  **white** [6] - 142:6, 142:16, 156:25, 186:24, 186:25, 187:15
  **White** [3] - 10:13, 11:19, 72:10
  **who'd** [1] - 56:21
  **whole** [5] - 43:23, 76:1, 106:4, 134:16

**Willard** [1] - 212:16
**Williams** [4] - 194:18, 194:19, 194:22, 199:24
**Willie** [29] - 20:8, 47:12, 47:18, 48:3, 48:6, 48:14, 55:6, 55:19, 57:3, 57:8, 58:18, 59:1, 60:5, 60:12, 92:17, 94:2, 94:12, 94:24, 94:25, 95:25, 96:3, 98:20, 101:7, 108:7, 128:12, 201:7, 205:25, 214:4
**WILLIE** [1] - 1:7
**willing** [5] - 139:1, 139:5, 140:17, 141:3, 152:17
**Wilson** [1] - 201:7
**window** [18] - 118:8, 118:10, 118:16, 118:18, 118:20, 119:9, 135:10, 138:12, 160:12, 160:16, 160:20, 163:17, 163:18, 168:11, 184:7, 184:11, 191:1
**windows** [9] - 115:16, 115:17, 115:18, 116:8, 118:2, 118:3, 118:6, 119:2, 184:10
**windshield** [6] - 116:20, 117:8, 184:19, 185:7, 197:25, 198:2
**wish** [1] - 203:17
**Witness** [1] - 214:10
**witness** [48] - 2:7, 2:12, 2:24, 41:7, 56:8, 60:20, 61:1, 61:2, 63:7, 67:16, 71:17, 74:5, 74:6, 74:8, 74:11, 74:18, 77:24, 82:18, 95:8, 99:25, 101:25, 109:19, 110:2, 110:12, 110:18, 125:17, 125:24, 132:23, 152:13, 171:19, 175:16, 175:18, 176:6, 176:20, 202:10, 203:3, 203:4, 203:13, 205:21, 208:4, 208:7, 208:11, 208:18, 209:4, 209:8, 209:22, 211:8, 211:19
**WITNESS** [52] - 3:4, 3:5, 3:9, 3:13, 41:10, 41:11, 41:15, 49:3, 49:5, 51:5, 51:9, 54:2, 55:14, 60:16, 63:10, 63:11, 63:15, 74:4, 74:21, 74:22, 74:25, 78:2, 78:3, 78:6, 102:4, 108:23, 110:21, 110:24, 125:7, 125:9, 125:16, 125:22, 126:1, 133:1, 133:2,

133:5, 148:12, 158:21, 166:18, 175:15, 176:24, 176:25, 177:3, 213:4, 213:7, 213:10, 213:12, 213:14, 213:17, 213:19, 213:21, 213:23
**witnesses** [6] - 109:10, 204:11, 205:5, 205:20, 209:10
**woken** [1] - 42:21
**wooded** [3] - 181:10, 181:12, 182:2
**Wooden** [2] - 212:12
**Woody** [1] - 186:9
**word** [2] - 18:5, 18:23
**words** [2] - 71:4, 93:5
**works** [2] - 127:9, 178:19
**world** [1] - 111:20
**Worm** [1] - 8:3
**wound** [23] - 120:19, 120:20, 120:23, 121:2, 121:3, 121:11, 121:17, 121:23, 122:19, 122:20, 123:14, 185:4, 195:7, 195:12, 195:13, 195:15, 195:19, 195:20, 195:22, 196:1, 196:9, 196:17, 196:23
**wounds** [4] - 120:1, 124:20, 124:23, 125:1
**wrapped** [1] - 185:10
**write** [4] - 87:15, 99:18, 161:21, 164:20
**written** [4] - 98:14, 154:10, 154:14, 154:18
**wrote** [2] - 98:22, 155:2

# X

**XXXVII** [1] - 1:11

# Y

**year** [7] - 4:7, 4:8, 9:4, 79:22, 80:10, 206:12, 206:15
**yearly** [4] - 81:11, 81:13, 82:3, 82:5
**years** [23] - 7:16, 7:18, 8:1, 8:6, 8:10, 20:10, 20:12, 20:13, 28:20, 33:17, 35:3, 35:4, 35:19, 64:17, 78:20, 81:14, 111:11, 111:14, 133:19, 134:6, 159:6, 178:2
**years'** [1] - 34:14
**yellow** [1] - 44:13
**yielded** [2] - 94:1, 94:11

**Young** [1] - 212:6
**young** [1] - 17:10
**yourself** [13] - 11:4, 14:6, 28:12, 28:14, 32:21, 37:22, 37:24, 38:7, 112:2, 126:20, 135:1, 136:6, 141:9
**Yourself** [1] - 71:24
**youth** [1] - 207:5

# Z

**Zajac** [3] - 1:24, 214:3, 214:15
**zero** [1] - 35:19
**zoom** [2] - 151:12, 157:20