1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION



UNITED STATES OF AMERICA

     v.                            CRIMINAL CASE NO.
                                     AMD-04-029

WILLIE MITCHELL,
SHELTON HARRIS,
SHELLY WAYNE MARTIN,
SHAWN GARDNER,

     Defendants
_____/

VOLUME VII OF XXXVII
Wednesday, September 24, 2008
Baltimore, Maryland


Before:  Honorable Andre M. Davis, Judge
          And a Jury

Appearances:
     On Behalf of the Government:
      Robert Harding, Esquire
      Michael Hanlon, Esquire
     On Behalf of Defendant Mitchell:
      Laura Kelsey Rhodes, Esquire
      Michael E. Lawlor, Esquire
     On Behalf of Defendant Harris:
      Gerard P. Martin, Esquire
      Paul Flannery, Esquire
     On Behalf of Defendant Martin:
      Thomas L. Crowe, Esquire
      James G. Pyne, Esquire
     On Behalf of Defendant Gardner:
      Adam H. Kurland, Esquire
      Barry Coburn, Esquire

Reported by:
Mary M. Zajac, RPR
Room 5515, U.S. Courthouse
101 West Lombard Street
Baltimore, Maryland 21201

2

1             (Defendants present in courtroom.  Jury not present.)

2             THE COURT:  I understand there's some issue, counsel.

3    We're waiting for a juror, apparently.  Good morning, Mr.

4    Flannery.

5             MR. FLANNERY:  Good morning, Your Honor.  Your Honor,

6    we have an initial issue.  The government plans on calling, as I

7    mentioned yesterday, a Chris O'Ree.  He was an arresting officer

8    in a 1998 drug charge of Mr. Harris.  The government did provide

9    404(b) notice to Mr. Martin and I.  To be honest, Your Honor, we

10   just didn't concentrate on it until recently.

11            So we would like to offer some argument on why we feel

12   that this evidence should not be admitted today.

13            THE COURT:  Let me hear from the government, what the

14   government intends to do.

15            MR. HANLON:  Good morning, Your Honor.

16            THE COURT:  Good morning, Mr. Hanlon.

17            MR. HANLON:  The anticipated testimony would be that

18   Detective Chris O'Ree of the Baltimore City Police Department

19   would testify that on December 1st, 1998, he was involved in the

20   execution of a search warrant on Woodland, I believe, Avenue in

21   Baltimore City, which is in the Park Heights section of Baltimore

22   City.  As he and his raid team were approaching the house, they

23   saw a male, later identified as our defendant, Shelton Harris, on

24   the front porch.

25            I'm paraphrasing the detective's testimony, Your Honor.

1    But the detective observed Mr. Harris take what appeared to be a

2    bag and attempt to secrete the bag near a trash can near the

3    front of the residence.

4         Detective O'Ree's job was to secure anyone on the

5    porch.  So he secured Mr. Harris, recovered that bag, and found

6    inside the bag approximately 60 gel caps of what appeared to be a

7    controlled substance.  There were a few other gel caps near the

8    trash can that appeared to have fallen out, for a total of, I

9    think, 63 gel caps.

10        They were all tested and they were confirmed to be a

11   controlled substance.  And if I could have a moment.  They tested

12   positive for cocaine base.  And for the Court's information,

13   Detective O'Ree testified about this in a suppression hearing

14   sometime ago.

15        The individual arrested, again, who had been seen

16   putting that item near the garbage can, was our defendant,

17   Shelton Harris.  This takes place in December, 1998 in the Park

18   Heights neighborhood.

19        THE COURT:  Why is it 404(b)?

20        MR. HANLON:  It goes, Your Honor, this is a case in

21   which the government, as part of the drug trafficking charge, the

22   conspiracy to distribute narcotics, obviously has to prove an

23   intent on the part of these defendants to engage in such a

24   conspiracy and to actually not only possess narcotics, but also

25   possess them in a distribution quantity.

4

1          Prior drug trafficking conduct --

2          THE COURT:  Wait.  Wait.  Wait.  I'm missing something.

3  Why is it 404(b)?  Why isn't it intrinsic to the charge, several

4  of the charges here?

5          MR. HANLON:  I think it could be made an argument that

6  it is, Your Honor.  However, we provided 404(b) for this reason.

7          THE COURT:  I see.  You were just being cautious.

8          MR. HANLON:  We were.  I would also anticipate the

9  defense might make this argument.  This is 1998.  Mr. Harris has

10 his first sort of conduct with Mr. Mitchell during the 2000 time

11 frame, when they began sort of embarking on the music business

12 and other things.

13         So we provided 404(b) notice because, and the defense

14 I'm sure would argue, that this is arguably before Mr. Harris's

15 entry into this RICO enterprise or the conspiracy.

16         THE COURT:  I see.  All right.  What's the, what's the

17 date of the drug conspiracy charged in the indictment?

18         MR. HANLON:  1994 through 2002.

19         THE COURT:  Okay.  So Mr. Harris is named in the drug

20 conspiracy covering that period, but the government is conceding

21 that it has no evidence other than this incident from '99 that

22 shows Mr. Harris dealing drugs?  I guess I'm just trying to put

23 it all together.  What's the earliest evidence of Mr. Harris's

24 involvement in drug distribution?

25         MR. HANLON:  I believe this arrest.

1          THE COURT:  This arrest.

2          MR. HANLON:  December 1st, '98.

3          THE COURT:  I see.  But then you don't have any

4     affirmative evidence of any connection between Mr. Harris and the

5     alleged drug conspiracy charged in the indictment or the RICO

6     conspiracy until 2000?

7          MR. HANLON:  Either that or we have weaker evidence

8     than with respect to the other defendants.  I wouldn't want to

9     miss something that will come up.

10          THE COURT:  Okay.  All right.  Mr. Flannery, I'll be

11     glad to hear from you.

12          MR. FLANNERY:  Thank you, Your Honor.  Your Honor, with

13     all respect to Mr. Hanlon --

14          THE COURT:  By the way, Mr. Flannery, was Mr. Harris

15     charged in this instance?

16          MR. FLANNERY:  He was, Your Honor.

17          THE COURT:  And do you know the outcome of the

18     proceedings?

19          MR. FLANNERY:  I do, Your Honor.  He admitted to the

20     possession with intent charge and the possession charge was

21     dismissed and he was placed on probation through the Drug Court

22     treatment program.

23          THE COURT:  Okay.  All right.

24          MR. FLANNERY:  Your Honor, the government provided the

25     404(b) notice because they, in this case, were required to

6

1    provide the 404(b) notice because these acts were certainly not

2    intrinsic.  This is, at this time Mr. Harris had not even reached

3    his 16th birthday and this is over two years --

4            THE COURT:  How old was he?

5            MR. FLANNERY:  He was 15, Your Honor.

6            THE COURT:  15.

7            MR. FLANNERY:  And this is over two years before he

8    admittedly ever met any of these defendants.  This certainly was

9    not part of the conspiracy that's charged in this indictment and,

10   quite frankly, was not in furtherance of any conspiracy.

11           THE COURT:  I agree.  I think it's properly 404(b).

12           MR. FLANNERY:  I would agree, Your Honor.  Beyond that,

13   within 404(b), you know, the government's trying to make a

14   classic argument that this is, that they're going to bootstrap

15   these prior bad acts as evidence that Mr. Harris had some sort of

16   intent and knowledge that, when it came time that he subsequently

17   did meet these defendants, that therefore, you know, he was a

18   knowing member of this drug conspiracy based on something that he

19   did two years ago.

20           THE COURT:  Well, are there others?  You said prior bad

21   acts.

22           MR. FLANNERY:  I'm sorry, Your Honor?

23           THE COURT:  Are there others other than this 1999, 63

24   vials that you're aware of?

25           MR. FLANNERY:  That the government is intending on

1    using?

2              THE COURT:  Yes.

3              MR. FLANNERY:  They did provide notice of other bad

4    acts, Your Honor.  And quite frankly, they did provide notice

5    within the time frame of this alleged conspiracy that was as late

6    as 2002.  And, you know --

7              THE COURT:  Well, that's clearly not 404(b), if it's

8    2002.

9              MR. FLANNERY:  Well, I think in this, in this case,

10   Your Honor --

11             THE COURT:  I'm sorry.  I don't mean to confuse you,

12   Mr. Flannery.  What I focused on, you used the plural, "prior bad

13   acts."  And it just seems to me we can deal with this, all of

14   them now rather than just one at a time.

15             MR. FLANNERY:  Understood.

16             THE COURT:  So other than the 1999, 63 gel caps, are

17   there others of which you are aware?  Maybe I should ask Mr.

18   Hanlon.

19             MR. FLANNERY:  Yes, Your Honor.  The government

20   provided notice concerning a 2000 second degree assault against

21   Mr. Harris's girlfriend.

22             THE COURT:  That's not coming in.

23             MR. HANLON:  We're not using that.

24             THE COURT:  No.  They're not using that.  Is that it,

25   Mr. Hanlon?

1      MR. HANLON:  For 404(b) as to Mr. Harris, yes, Your

2  Honor.

3      THE COURT:  Okay.  All right.  Go ahead, Mr. Flannery.

4      MR. FLANNERY:  Your Honor, what I would say concerning

5  this particular conviction is 1998.  The government, under

6  404(b), they certainly have to satisfy that this is somehow

7  relevant, necessary, reliable.

8      THE COURT:  All right.  Is this '98 or '99?

9      MR. FLANNERY:  This is '98, Your Honor.

10      THE COURT:  '98.

11      MR. FLANNERY:  And in this particular case, we would

12  argue that there really is certainly no relevance to this case

13  under this conspiracy charged to what Mr. Harris did in 1998

14  other than the fact what the government would like to show is

15  that Mr. Harris was in Park Heights at that time and they would

16  like the jury to consider that as substantive evidence of Mr.

17  Harris's guilt, that he was engaged in some sort of Park Heights

18  drug organization.

19      Beyond that, there's no necessity for this evidence;

20  that the government is going to try to use a prior conviction of

21  Mr. Harris to bootstrap on to evidence that you still haven't

22  heard in this case as to the tenuous relationship to Park Heights

23  as to these defendants.

24      THE COURT:  What was the point of the suppression

25  hearing?  Why did I hear this evidence previously?  Whose motion

9

1    was it?

2              MR. FLANNERY:  One second, Your Honor.

3              MR. MARTIN:  Your Honor, perhaps, perhaps this is my

4    fault.  I don't remember ever discussing this issue with anybody

5    at any time.  And there may have been, Your Honor, you may

6    recall, there was one or two hearings that I didn't attend

7    because of my surgery.

8              THE COURT:  Right.

9              MR. MARTIN:  And I think that may be when this came up.

10   Because the only, the only thing I remember raising is the 2002

11   arrest at Mr. Harris's mother's house on Amity Avenue.  That's

12   the only thing I remember.  So if it came up, I don't remember it

13   at all.

14             THE COURT:  Mr. Hanlon, were you in the case at that

15   point?  Do we have to turn to Mr. Harding?

16             MR. HANLON:  I hate to pass the buck, Your Honor --

17             THE COURT:  I thought so.  Mr. Harding, why would I

18   have conducted a Motion to Suppress hearing on this particular

19   incident?

20             MR. HARDING:  Because each of the defense attorneys

21   filed suppression motions relating, sort of boilerplate

22   suppression motions that related to all of the drug evidence we

23   were intending to introduce.

24             THE COURT:  So it was actually Mr. Harris's motion?

25             MR. HARDING:  Yes.

1          THE COURT:  Technically speaking?

2          MR. HARDING:  Yes, it was, Your Honor.

3          THE COURT:  Okay.

4          MR. HARDING:  We responded to all of the defense

5    suppression motions sort of seriatim by calling in all of the

6    arresting officers.

7          THE COURT:  Okay.  I get it.

8          MR. HARDING:  It was two or three years ago.

9          THE COURT:  Right.  Okay.  Mr. Martin?

10          MR. MARTIN:  Yes.  Your Honor, I think back then, it

11   may have been more than two or three years ago.  It was Mr.

12   Kanwisher and I do doing the case.  I'm pretty sure that, while

13   we may have raised it, we didn't put on any evidence at that

14   hearing.

15          THE COURT:  Sure.

16          MR. MARTIN:  I don't even know whether we raised it or

17   whether Mr. Harding just decided to bring the officers, all of

18   them, in.  Because that happened on a couple of occasions.

19          THE COURT:  Sure.  It sounds like Mr. Harding just

20   corralled all of the seizing, arresting officer for all of them

21   and brought them in.

22          MR. MARTIN:  In any event, I know we didn't challenge

23   the search there.  I don't think I would have, having read the

24   documents last night, I don't think I would have.

25          THE COURT:  Okay.  All right, Mr. Flannery.

1          MR. FLANNERY:  Final point, Your Honor, again, like I

2     mentioned, this was certainly a juvenile crime.  From my

3     understanding what appears the law --

4          THE COURT:  Did he get adjudicated or was he convicted?

5          MR. FLANNERY:  He pled guilty, Your Honor.

6          THE COURT:  So it was an adult conviction.

7          MR. FLANNERY:  No, Your Honor.

8          THE COURT:  So when you say he pled guilty, the proper

9     term is he admitted an act of delinquency.

10          MR. FLANNERY:  Yes, Your Honor.

11          THE COURT:  All right.  Mr. Hanlon, why should I admit

12     this?  I mean, I understand the connection between Park Heights

13     but the mere fact that Mr. Harris was dealing drugs in Park

14     Heights several years before he took up with this group would

15     seem to be scant reason to admit the evidence.  What do you,

16     you're relying on intent?

17          MR. HANLON:  Intent, knowledge, and also, Your Honor,

18     and I think that this really is a 404(b) factor that's certainly

19     encompassed within the notions of intent and knowledge, but the

20     Fourth Circuit cases approving of prior drug conduct in a drug

21     case, and of course there's legions of cases, generally stand for

22     the proposition that a drug conspiracy or drug trafficking

23     defendant's experience, awareness of drugs, awareness of

24     trafficking techniques, awareness of the neighborhoods, awareness

25     of where to go and so forth is always relevant in a drug

1    trafficking case.

2            In this case, the defense theory, which has been

3    pursued by all four defendants, has been to minimize the

4    experience of the defendants, minimize the connections of the

5    defendants, not just between one another, but between them and

6    this particular neighborhood.  I mean, we've heard over and over

7    again in cross examination, that's not Park Heights, is it?

8    That's not Randallstown, is it?

9            Here we have a couple of years before Mr. Harris's

10   clear entry into the conspiracy a situation where he's engaging

11   in the distribution of cocaine base, one of our charged crimes,

12   in the neighborhood on Woodland, in Park Heights, the center,

13   geographically, of the primary location where the conspiracy took

14   place.  And certainly that experience, that awareness of drugs,

15   the connection to the neighborhood, would have been the sort of

16   thing, Your Honor, that would have made it a natural fit for Mr.

17   Harris to have moved into this RICO and drug conspiracy a couple

18   of years later.

19           THE COURT:  And in the grand scheme of things, it is a

20   lot of drugs.

21           MR. HANLON:  Yes, Your Honor.  This is a fairly

22   substantial, 63 vials is a fairly substantial hit.

23           THE COURT:  We just heard yesterday about the sale of

24   only two eight balls, which weren't really eight balls.  Okay.

25   Thank you, Mr. Hanlon.

1          Mr. Flannery, I think the law is strongly against you

2     on this.  Having just been reversed by the Fourth Circuit, I

3     think the Fourth Circuit is as expansive in its approach to

4     404(b) as any circuit in the country.  And it does seem to me to

5     be probative of Mr. Harris's intent, his knowledge of drug

6     dealing.  When you consider the quantity of drugs, it supports an

7     inference that he was more than just a small-time operator.  And

8     the government would be entitled to argue that that's

9     circumstantial evidence of his stature in the trade that might

10    make him attractive to a RICO conspiracy, etc., etc., etc.

11         Now, in your favor, it is a juvenile, although I'm not

12    aware of any law that differentiates.  And it's difficult to

13    discern undue prejudice here given, frankly, the nature of the

14    evidence in this case.

15         MR. FLANNERY:  Your Honor, speaking in the context of

16    juvenile crimes, I believe that the cases that generally look to

17    admitting juvenile acts under 404(b) are generally in cases where

18    a juvenile engages in some sort of continuing conspiracy beyond

19    the age of majority.  And that's certainly not the case here,

20    Your Honor, at least not with respect to this particular

21    conviction that they're trying to show as evidence of an ongoing

22    conspiracy, that then somehow morphed into the one that's now

23    charged in the indictment.  That's just simply not the case here.

24         Beyond that, Your Honor, I just, I do not see how the

25    government can even begin to argue that they've satisfied the

1    necessity prong of 404(b), that somehow this evidence is

2    necessary for them to be able to prove their case.  And it's

3    simply not.  They have inside the time frame charged in the

4    indictment evidence that they are going to attempt to admit, and

5    they will be able to admit against Mr. Harris, concerning, you

6    know, his knowledge or his relationship to the drug trade.

7         They don't need a 1990 conviction.  You all but heard

8    Mr. Hanlon admit that it's because of the defense's approach that

9    Park Heights, that the Randallstown/Park Heights organization

10   doesn't exist that they need now to go into juvenile crimes to

11   try to show that certain individuals charged in this indictment

12   were operating in Park Heights.

13        THE COURT:  Well, I agree with you to the extent that,

14   and it's a slippery concept, to call it a Randallstown/Park

15   Heights organization doesn't mean, and I shouldn't interpret it

16   to mean, that everybody who was dealing drugs in Park Heights was

17   associated with this alleged enterprise.

18        On the other hand, that's what the indictment says.

19   The government's entitled to try to prove it.  I don't know how

20   much more the jury will learn about the insularity, if any, of

21   Park Heights.  But I know that the government has got several

22   other witnesses who are going to come in and talk about Park

23   Heights and how easy or difficult it was to deal drugs in Park

24   Heights and who was in control and who wasn't in control.

25        On balance, I think that the probative value does

1    indeed outweigh the undue prejudice, focusing on that element of

2    the 404(b) balancing process.  And though it's a juvenile

3    conviction, the Court is satisfied that the amount of the drugs

4    and the circumstances of their seizure support the government's

5    contention that this is properly admitted for purposes of proof

6    of knowledge, proof of intent, proof of motivation even.  And the

7    Court will admit the evidence.

8            Thank you.  Your motion is denied.  Mr. Crowe.

9            MR. CROWE:  Yes, Your Honor.  I understand the Court

10   has already ruled but I think the codefendants have an argument

11   in this case that I would like to address.

12           THE COURT:  All right.

13           MR. CROWE:  This Rule 404(b) evidence is always a

14   problem in multi-defendant trials, even in fairly simple trials,

15   and I think in particular it's going to be a difficulty in this

16   one.

17           I know that the Court has a fair deal of confidence in

18   limiting instructions, as the Fourth Circuit does as well.  But I

19   question just how many limiting instructions this jury is going

20   to be able to juggle.

21           Our position, my position on behalf of Mr. Martin is

22   that this evidence is extremely prejudicial because it's one

23   other instance of drug dealing by somebody who was supposed to be

24   a member of this conspiracy.  And for that reason, we would ask,

25   we would ask that it not be admitted.  We think the presence of

1    the codefendants is something which is important and which tips

2    the balance the other way.

3         If I could perhaps expand a bit on the argument Mr.

4    Flannery made and made very effectively.

5         THE COURT:  Well, I can't hear you on behalf of Mr.

6    Harris.

7         MR. CROWE:  Well, if we say that it isn't even

8    admissible as 404(b) evidence, I think that's part of our

9    argument as well.

10        THE COURT:  Well, but it's not admissible as 404(b)

11   evidence against your client.  And I will, I will give the jury

12   an instruction, even before the witness testifies, and make it

13   clear that this goes only to Mr. Harris and it goes only to his

14   motivation, knowledge, and intent later on, and that's what their

15   consideration of this is limited to.

16        MR. CROWE:  Your Honor, I didn't think that I was going

17   to dissuade you on it, but my point was that if it isn't even

18   admissible as 404(b) evidence --

19        THE COURT:  But it is.  I just --

20        MR. CROWE:  -- against Mr. Harris, that's a point in

21   which the other defendants -- and I would be happy to complete

22   the record.  But if you want me to sit down.

23        THE COURT:  No.  Go ahead.  Go ahead.  It is 404(b)

24   evidence against Mr. Harris.

25        MR. CROWE:  The difficulty in these cases is the

1    government always comes up in cases where there is no issue of

2    knowledge or where there is no issue of intent, to say that

3    404(b) evidence has to be admitted on issues of knowledge or

4    intent.  I may be mistaken, but I would be shocked if any of the

5    defense attorneys stood up in this case and said, well, you know,

6    these people weren't really, weren't really dealing drugs, they

7    thought they were dealing with sugar or talcum powder or salt.

8         With respect to the intent to distribute, I don't

9    believe that there's any real issue about intent to distribute in

10   any of these matters.

11        In examination we have heard of officers, both during

12   the pretrial motions and during the trial itself, nobody has

13   tried to advance an argument that what we were talking about was

14   simply a matter of people having drugs on their possession for

15   personal use.  If we'd made the argument, we would have been

16   laughed out of court.  And I would expect that with the state of

17   the evidence the Court would be precluded from giving a lesser

18   included offense instruction on simple possession.

19        What I am saying is that where evidence, where evidence

20   is sought to be admitted for some of the exceptions of Rule

21   404(b) on a matter which is not truly at issue, it simply should

22   not be admitted.  And from the standpoint of the codefendants, it

23   clearly should not be admitted because it's going to confuse

24   what's already a pretty complicated trial and going to give the

25   jurors some difficulty in segregating evidence in this case.

1          THE COURT:  Thank you, Mr. Crowe.  Mr. Kurland, good

2    morning.

3          MR. KURLAND:  Good morning, Your Honor.  Your Honor,

4    very briefly.  If this were simply a single defendant case, the

5    404(b) evidence against one particular defendant, to the extent

6    that the Court articulated a theory of admissibility, that would

7    probably be okay.  But with respect to the conspiracy charge that

8    then affects all the defendants, a 404(b) piece of evidence that

9    comes in for motive or intent, as the government is articulating,

10   spills over to the point where it's essentially evidence against,

11   to some extent, of all the defendants, once it's part of the

12   conspiracy charged.

13         The problem with the government's argument is that they

14   are using 404(b) evidence on something that they admit is not

15   part of the conspiracy to establish the intent into the

16   conspiracy.  And that does kind of spill, that's an improper use

17   of the evidence under 404(b).  It's the classic kind of

18   bootstrapping that goes beyond the rational inference of the

19   evidence.

20         The other thing that I would point out, Your Honor, in

21   the context of the posture of the case, the Court obviously isn't

22   concerned about reversal on this particular issue because the way

23   the ruling would come up would be, you know, unappealable.  So

24   that's not going to, there's not going to be any reversal on

25   this.

1          But as Mr. Crowe has pointed out, it is sort of an

2     illegitimate and improper use of the evidence as 404(b) because

3     the government's conceding that his knowledge of drug dealing in

4     this particular area.  And simply because the defendants are

5     arguing that in the context of the conspiracy which charges the

6     Randallstown/Park Heights organization, to the extent that the

7     defendants to some degree or another have all argued or suggested

8     that there's all sorts of drug dealing going on that has nothing

9     to do with Randallstown/Park Heights, to use an event that the

10    government concedes is not related to the conspiracy to kind of

11    prove some sort of, regardless of what instruction the Court

12    gives, limiting instruction, that's just not a use of 404(b)

13    evidence.  And despite all the cases that Mr. Hanlon alluded to,

14    I would doubt that any reach this particular situation.

15          THE COURT:  All right.  Thank you, Mr. Kurland.

16          MR. KURLAND:  I don't have my eyeglasses with me.  But

17    Mr. Coburn has a cite that I think is relevant on the juvenile

18    issue.

19          MR. COBURN:  I won't argue, Your Honor.  I just wanted

20    to make Your Honor aware I'm just doing a little bit of quick

21    research on the issue of use of juvenile convictions in the

22    404(b) context.  And it looks like the Fourth Circuit has some

23    law on this suggesting that -- I haven't read the cases that well

24    yet -- suggesting that they might not be typically usable.

25          And I'm looking at U.S. versus Spoone, 741 F.2d 680,

1    Page 687.  That is a Fourth Circuit case from 1984.

2              THE COURT:  Just one moment.  Mr. Kurland, can you give

3    me the, not the Westlaw cite, but the Fourth Circuit case number?

4    Should be --

5              MR. COBURN:  Absolutely, Your Honor.

6              THE COURT:  Oh something dash something something.

7              MR. COBURN:  Absolutely.  Also, just to let Your Honor

8    know, I'm looking at a case that cites this case.  I'm not saying

9    you can never use juvenile convictions in the --

10             THE COURT:  I'm happy to look at it.  Obviously, I

11   raised that issue myself.

12             MR. COBURN:  Absolutely, Your Honor.  Hopefully, this

13   is going to pop right up here.

14             THE COURT:  I haven't had them load --

15             MR. COBURN:  I think I have it.

16             THE COURT:  -- Westlaw on this computer.  I should

17   have.  I will.

18             MR. COBURN:  I think I have it.  I can see it's a case

19   coming out of South Carolina in the Fourth Circuit.  Let's see.

20   Just have to get under the headnotes.

21             THE COURT:  What's the name?  Maybe I can do it by

22   name.

23             MR. COBURN:  It's U.S. v. Spoone, Your Honor.

24             THE COURT:  Spoon as in fork and?

25             MR. COBURN:  It's got an E at the end.  S-P-O-O-N-E.  I

1    haven't actually read this in any detail yet.  It looks like

2    there's some cautionary language in here about the use of

3    juvenile adjudications.  They're not really convictions.

4    Juvenile adjudications for 404(b) purposes.  I don't think it

5    says the Fourth Circuit case number in here, strangely enough.

6          THE COURT:  Okay.  That's all right.  U.S. v. Spoone.

7    What's the year?

8          MR. COBURN:  1984.

9          THE COURT:  '84?

10          MR. COBURN:  Sure.

11          THE COURT:  This one doesn't go back that far.

12          MR. COBURN:  I could bring my computer up and Your

13    Honor could read it on this if you wanted to.

14          THE COURT:  If I can get Westlaw.

15          MR. HANLON:  Your Honor, it's Number 81-5260.

16          THE COURT:  Okay.  I can't go back that far into the

17    Fourth Circuit's web site.  Just a moment.

18          Okay.  I got it.  What's the citation, Mr. Kurland

19    (sic)?

20          MR. COBURN:  Looks like 741 F.2d. 680, Page 687.  I'm

21    actually just relying on actually a cite to this case from a

22    later case.

23          THE COURT:  Okay.  You made the proper disclaimer.

24          Okay.  It appears the issue is one defendant assigned

25    as error the admission of evidence pertaining to his activities

1    before his 18th birthday, among other issues.  He was only 17.

2    And this was a situation where apparently there was a single

3    conspiracy in which the defendant's participation pre-dated his

4    18th birthday and continued past his 18th birthday.

5           MR. HANLON:  Which, Your Honor, as the Court is aware,

6    is also the case here.  Mr. Harris, although he wasn't in the

7    conspiracy in 1998, enters it in 2000.  And it would have been

8    before he turned 18.  In fact, his time at Hickey School leads

9    him to his relationship with Mr. Mitchell.

10          THE COURT:  When did he turn 18?

11          MR. HANLON:  I don't want to give the defendant's

12   birthday, of course, but it was late 2000.

13          THE COURT:  Late 2000.

14          MR. HANLON:  Yes.  It was while at the Hickey School

15   that Mr. Harris met Mr. Mitchell.

16          THE COURT:  So what would be different from Spoone, I

17   take it, is whereas, I'm just looking at it very quickly, in

18   Spoone it was one defendant, the prior act was a part of the

19   conspiracy, which the defendant joined before his 18th birthday

20   and in which he remained a member past his 18th birthday.

21          Here, under 404(b), you're seeking to use acts pre-18th

22   birthday not a part of the conspiracy, but very much like the

23   acts which were committed as a part of the conspiracy.  I see

24   your point.

25          MR. HARDING:  Your Honor, could I make one more point

1    that precedes Mr. Hanlon's entry into the case?

2              THE COURT:  Yes.

3              MR. HARDING:  We actually litigated this issue.  Mr.

4    Martin filed a motion having to do with juvenile conduct and when

5    it can be used and when it can't be.  And the government

6    responded.  And I remember dealing with the Spoone case at that

7    time.  The government has already filed a pleading on this and so

8    has Mr. Martin.

9              THE COURT:  Okay.  I think Spoone is supportive of the

10   government's position here.

11             (Pause in proceedings.)

12             THE COURT:  I'm looking at an unreported opinion, U.S.

13   v. Coleman, which discusses Spoone.  That's at 2001 Westlaw

14   417669, Fourth Circuit, April 24th, 2001.  The Court says, quote:

15             "Because the government presented evidence linking

16   Coleman, the defendant, to a conspiracy as an adult, the jury was

17   entitled to assess such testimony in light of other evidence

18   indicating the level and nature of Coleman's involvement in that

19   conspiracy."  Citing to Spoone.  "Consequently, testimony at

20   trial by coconspirators and witnesses of Coleman's participation

21   in the Williams conspiracy as a juvenile was properly admitted

22   for that purpose."

23             I think the upshot of this, again, it's an unpublished

24   opinion and therefore not precedential -- oh, here's another part

25   of it.  "The gravamen of Coleman's claims rests with the fact

1    that much of the evidence educed at trial addressed acts of

2    juvenile delinquency which could not serve as the basis for his

3    conviction as an adult."  Citing to Spoone and Section 5031-42 of

4    the United States Code, Title 18.

5            "Coleman claims that the evidence presented at trial

6    indicated he withdrew from the conspiracy as a minor and that any

7    evidence of his continued distribution of cocaine base could only

8    show participation in a separate subsequent conspiracy.  While

9    the evidence presented at trial demonstrated that there may have

10   been two separate successive conspiracies, the first of which,

11   organized by Jeffrey Williams, ended shortly after Coleman's 18th

12   birthday, there was sufficient evidence to implicate Coleman as a

13   participant in the former conspiracy.

14           "A member of the Williams conspiracy indicated that

15   Coleman made at least one purchase of cocaine base from that

16   distribution ring after his 18th birthday."

17           Okay.  So what I'm gathering from Spoone and Coleman is

18   fairly self-evident.  And I assume in light of Mr. Harding's

19   statement a few moments ago that we did spend sometime looking at

20   this.  Obviously, acts committed as a juvenile under the

21   juvenile, Federal Juvenile Justice Act cannot form the basis by

22   themselves of conviction in an adult, on an adult charge.

23           What the argument is in Spoone is that because only one

24   overt act in that alleged conspiracy occurred after his 18th

25   birthday, the charge was that the government was using juvenile

1   acts to prove guilt of an adult offense.  But where the

2   defendant's participation in a conspiracy continues past his 18th

3   birthday, acts committed prior to his 18th birthday, which would

4   not otherwise be admissible to prove guilt of an adult conviction

5   on an adult charge is admissible under 404(b) for all the normal

6   purposes.

7          And that's really what we have here, with the one

8   exception that here the particular act of drug distribution or

9   possession with the intent to distribute was a part of a separate

10  conspiracy that may or may not have continued past the

11  defendant's 18th birthday.  But the defendant, Mr. Harris, is not

12  charged in this case with that conspiracy.  He's charged in the

13  present conspiracy, which clearly began, according to the

14  indictment and the proof so far, began while he was a juvenile,

15  that continued past his 18th birthday.

16         So the only difference here that I perceive is that

17  there are two conspiracies.  But 404(b) evidence has long been

18  used against a defendant to show his participation in conspiracy

19  one, which is not charged in the indictment on trial, to show his

20  knowing and intentional participation in conspiracy number two,

21  which is charged in the indictment on trial.

22         So I don't find anything here that prohibits or even,

23  frankly, calls into question the propriety, if the other

24  requirements of 404(b) are satisfied, from admitting acts of

25  juvenile delinquency where the defendant simply switches

1    membership in a drug conspiracy.

2            Do you have other citations you want me to look at, Mr.

3    Flannery?

4            MR. FLANNERY:  Your Honor, what I was going to say

5    briefly is that in Spoone, as I mentioned before, these cases in

6    the Fourth Circuit where they're using juvenile acts, they're

7    generally looking at some sort of continuation, to use the

8    juvenile acts to show, like 404(b) would be generally admissible

9    to put some further later conspiracy into context, that it's used

10   to show some sort of knowing continuation, where maybe a prior

11   one was before the age of majority and the second, in the Spoone

12   case, was after the age of majority.  That's simply not the case

13   here at all.

14           In this case, you're looking at a difference of over

15   two years before defendant Harris even met any of the other

16   defendants.  So I'm not really sure how Spoone isn't, quite

17   frankly, exactly in the defendant's behavior, that this is not a

18   case where there was a short time distance, even one year,

19   between a minor act that provides context to a very similar later

20   act.  And that's not the case here really at all.

21           There really is no, you know, there is no evidence that

22   there is even a first conspiracy.

23           THE COURT:  Well, he pled guilty.  He may not have pled

24   guilty to a conspiracy charge, but clearly if he's sitting on a

25   porch at a house where law enforcement have probable cause to

1    believe narcotics transactions are, that the residence is the

2    center of narcotics activity such that a judge issued a search

3    warrant, and he's encountered at the time of the execution of the

4    search warrant hiding 63 vials of crack, clearly that's evidence

5    of a conspiracy.  He didn't grow the crack in the back yard by

6    himself.  He clearly got the crack from somebody.  And it's a

7    significant amount of drugs.  So clearly, prima facie, there's

8    evidence there of a conspiracy.

9            Now, I assume the government's not going to get into,

10   doesn't even want to get into all the details of that

11   investigation.  I assume this testimony is going to take all of

12   five or ten minutes at the most, Mr. Hanlon.

13           MR. HANLON:  Much less time than this legal argument's

14   taking.

15           THE COURT:  Exactly.  Exactly.  So clearly he's

16   involved, Mr. Harris is involved in a drug conspiracy of some

17   significance.  It's in Park Heights.  And it's not specious for

18   the government to argue that while there may be no affirmative

19   evidence that Mr. Harris knew Mr. Mitchell or Mr. Gardner or Mr.

20   Martin in the 1998/1999 period, it's not a specious inference to

21   suggest to the jury that if you were dealing drugs at this level

22   in Park Heights in 1998, '99, people knew people, and it may well

23   be that Mr. Harris, though he was a youngster at the time,

24   demonstrated his capacity for serious business if he's got 63

25   vials.

1          So I don't think that's a specious inference and I

2     don't think the government has to have affirmative evidence that

3     there was only one conspiracy.  And I don't want to stretch it

4     too far.  But you get my drift.  Not that Park Heights is, you

5     know, it's not one square block of area where everybody knows

6     everybody.

7          I think I'm satisfied, again, that the probative value

8     of the evidence on intent, motivation, knowledge substantially

9     outweighs any undue prejudice to Mr. Harris and to the other

10    defendants, because I'm going to instruct the jury that this

11    evidence is not to be considered against any of the other

12    defendants.

13         MR. FLANNERY:  Your Honor --

14         THE COURT:  Yes, Mr. Flannery.

15         MR. FLANNERY:  Co-counsel, one more point, has alerted

16    me, too, that in cases where in jurisdictions, in state

17    jurisdictions in this case, where juvenile records are sealed,

18    referring me to cites that that evidence is not to be admissible

19    under 404(b).

20         THE COURT:  Well, I don't think the government intended

21    to elicit the conviction.

22         MR. HANLON:  As with other cases, Your Honor, I was

23    going to ask the detective if he knew.  He tells me he does not

24    know.  That's how we were going to handle that.

25         THE COURT:  Perhaps on this one we should make an

1    exception and not have you ask.  I'm sure Mr. Flannery's not

2    going to ask or Mr. Martin's not going to ask.  So perhaps on

3    this, we just leave it at, I arrested him because he hid a bag

4    and I went to retrieve the bag and it had 63 vials of crack

5    cocaine.

6         MR. HANLON:  That would be fine with me, Your Honor.

7    If it would be all right, I would like to instruct the witness

8    when he takes the stand.

9         THE COURT:  Of course, of course.

10        MR. FLANNERY:  Your Honor, it's not simply the

11   disposition.  It's the entire record.  It's not simply the

12   disposition.

13        THE COURT:  And we're not going into the record.  What

14   we're going into is the facts of what happened out on the street.

15   As far as the jury is concerned, the jury won't even know whether

16   he was charged.  What the jury will know on the instructions that

17   Mr. Hanlon will give the officer is that he was arrested in

18   possession of 63 vials of crack cocaine at a location where a

19   judge had issued a search warrant in pursuit of a drug

20   investigation.  Leave it at that point.

21        MR. FLANNERY:  Very well, Your Honor.

22        THE COURT:  Thank you, Mr. Flannery.  Final word, Mr.

23   Kurland.

24        MR. KURLAND:  One quick legal point with respect to

25   404(b).  I even listened to the way the Court articulated, trying

1    to summarize the government's position.

2         That comes suspiciously close to improper uses

3    propensity evidence, not so much with respect to his intent of

4    knowing how to distribute, but with respect to, Well, if he dealt

5    drugs in Park Heights on X date, at an event which the government

6    concedes is not part of the conspiracy, well, if he dealt drugs

7    in Park Heights, we want to use that under the rubric of intent

8    motive to prove that he dealt drugs in Park Heights, you know, as

9    part of the conspiracy.

10        That's classic propensity evidence, which is

11   impermissible.  And to the extent now the government feels a

12   heightened need to try to prove drug dealing within Park Heights,

13   that shouldn't wipe out the prohibition as to the improper use.

14   And to call it motive intent, I mean, we see this all the time.

15   Those are the classic kind of fallback, you know, umbrella

16   positions, that when you really break it down, as I've listened

17   to the argument and I've listened to what the government is

18   actually acknowledging what they really want out of the evidence,

19   is not his knowledge that he knows how to deal drugs but that

20   it's a drug deal in Park Heights.

21        On that line, Your Honor, that's a clearly

22   impermissible propensity use of the evidence.

23        THE COURT:  I think what you just said, Mr. Kurland,

24   can be said in every 404(b) argument.  You're absolutely right.

25   That's the nature of 404(b).  The issue here is, did he become a

1    member of this racketeering conspiracy and did he become a

2    knowing member of this drug conspiracy?  That's the question.

3    Not whether he knows how to deal drugs, not whether his dealing

4    drugs was an accident.  But the question is, did he have the

5    intent to join up with this group to deal drugs?

6            And what the government is saying is that this group

7    was significant, it provided protection, it provided aid and

8    comfort, it provided sources of supply, etc., etc.

9            And so the question on Mr. Harris is, did he become a

10   member of this particular conspiracy?  Because, frankly, what all

11   of you are going to argue, I'm almost certain I'm going to have

12   to give a multiple conspiracy instruction in this case, and what

13   I'm going to hear is that there were four conspiracies.  First of

14   all, there was no conspiracy.  That everybody was a solo

15   practitioner, so to speak, and everybody was doing his own thing.

16   And I'm sure I'm going to have to give a multiple conspiracy

17   instruction.

18           So the government is going to have to meet that

19   argument with evidence, direct and circumstantial, that, oh, no,

20   this was not four conspiracies.  This was, in fact, an

21   association, in fact, of an enterprise, centered geographically,

22   centered culturally, rooted in childhood relationships, and that

23   Mr. Harris, not a member of that childhood from Randallstown,

24   joined in because he was impressed with their abilities and they

25   accepted him because, after all, he had 63 grams of crack dealing

32

1       in Park Heights.  So he knew Park Heights.  He could help them.

2              MR. KURLAND:  You've given a good closing argument for

3       the government.  Do you want to give one for the defense?

4              THE COURT:  I will in due course.  I will.

5              MR. KURLAND:  Your Honor, there's also the last point.

6       There's been testimony from the government sort of witnesses,

7       though, that there's a lot of drug dealing in Park Heights from

8       people that are clearly not members of this charged conspiracy.

9              THE COURT:  Absolutely.  And I'm going to hear a lot

10      about that.  That's when I'll give the defense closing argument.

11      Everybody deals drugs in Park Heights.

12             MR. KURLAND:  Thank you, Your Honor.

13             THE COURT:  All right.  Thank you very much, counsel.

14             All right.  The juror has arrived.  We'll have the

15      jury.  Who do we have coming in?

16             MR. HANLON:  Our first witness was going to be

17      Detective O'Ree, Your Honor.

18             THE COURT:  And then after him?

19             MR. HANLON:  Trooper Douglas Forrester, who was

20      involved in the I-95 incident.  And then Marquetta Duganne, who

21      was another --

22             THE COURT:  Would you have the trooper come in, the

23      officer come in, please?

24             MR. HANLON:  For that third witness, she's in custody.

25             THE COURT:  All right.  We'll take a recess before her.

1           (Jury enters the courtroom.)

2           THE COURT:  Please be seated, ladies and gentlemen.

3   Good morning.  Once again, thank you for your patience.  We're

4   ready to continue.  You may call your next witness.

5           MR. HANLON:  Thank you, Your Honor.  United States

6   calls Detective Christopher O'Ree, who is on his way out as we

7   speak.

8           THE COURT:  All right.

9       DETECTIVE CHRISTOPHER O'REE, GOVERNMENT'S WITNESS, SWORN

10          THE WITNESS:  Yes, ma'am, I do.

11          THE CLERK:  Be seated.  Scoot up and speak directly

12  toward the mike.  State your name and spell it for the record.

13          THE WITNESS:  Sergeant Chris O'Ree, Baltimore City

14  Police Department, Violent Crimes Impact Division.

15          C-H-R-I-S-T-O-P-H-E-R.  O apostrophe R-E-E.

16          THE COURT:  Ladies and gentlemen, before Mr. Hanlon

17  commences his interrogation of this witness, let me advise you

18  now that this incident that this witness will describe is to be

19  considered by you as evidence only against Mr. Harris.  It is not

20  to be considered as evidence against Mr. Mitchell, Mr. Martin or

21  Mr. Gardner.

22          Furthermore, it is to be considered by you only as you

23  may find it relevant to the question of whether Mr. Harris became

24  a member of the conspiracies which are charged in this

25  indictment.  The event that this witness will describe to you is

1    not a charge in this case and you are not to consider it as

2    affirmative evidence of Mr. Harris's alleged involvement in the

3    conspiracies in this indictment.

4              You may proceed, Mr. Hanlon.

5              DIRECT EXAMINATION

6    BY MR. HANLON:

7    Q    Thank you, Your Honor.  Sergeant O'Ree, good morning to you.

8    A    Good morning, sir.

9    Q    You've already said how you're employed.  With the Baltimore

10   City Police Department?

11   A    Yes, sir.

12   Q    Your current posting I think you mentioned.  What was that

13   again?

14   A    The Violent Crimes Impact Division.

15   Q    What does the Violent Crimes Impact Division do?

16   A    It focuses on reduction of violent crimes and targeting, and

17   targeting individuals that are responsible for the violence in

18   and throughout the Baltimore City area.

19   Q    Now, in addition to -- how long have you been a police

20   officer?

21   A    I'm in my 13th year.

22   Q    And during the course of your time as an officer, I gather

23   you spent some time in patrol?

24   A    Yes, sir.

25   Q    How long have you been doing narcotics investigations or

1   related investigations?

2   A     Over ten years.

3   Q     Directing your attention to December of 1998.  You were a

4   police officer at that time, is that right?

5   A     Yes, sir.

6   Q     What was your post?

7   A     I was assigned as an investigator in the Northwest District

8   Drug Enforcement Unit.

9   Q     And Drug Enforcement Unit does drug enforcement work, I

10  gather?

11  A     Yes, sir.  We investigate street level to mid level drug

12  crimes within the district of the northwest.

13  Q     How can did you hold that position, approximately?

14  A     Around five years.

15  Q     Now, let me ask you about a particular investigation.

16  Directing your attention to December 1st of 1998.  Were you on

17  duty that day?

18  A     Yes, sir, I was.

19  Q     And were you involved with other officers in an operation?

20  A     Yes, sir, I was.

21  Q     What did you do with these other officers?

22  A     We executed a search and seizure warrant at 3516 Woodland

23  Avenue.

24  Q     Is that in Baltimore City?

25  A     Yes, sir, it is.

1    Q    Sergeant, 3516 Woodland Avenue, what neighborhood of

2    Baltimore City is that located in?

3    A    It's the Park Heights community.

4    Q    Was this a community that you were familiar with as a

5    detective?

6    A    Yes, sir, I was.

7    Q    How did you come to be involved in this particular search

8    warrant operation?  Did you have any role in the investigation

9    leading up to it?

10   A    Yes, sir, I did.

11   Q    In this instance, as part of executing a warrant, is that

12   something that one police officer does by himself or did you have

13   other officers with you?

14   A    Yes, sir.  Other officers.  Something that we do as a team.

15   Q    Prior to going out to do a search warrant, do you get

16   together and do an operations plan?

17   A    Yes, sir, we do.

18   Q    Where did that take place?

19   A    On the parking lot of the Northwest District police station.

20   Q    The individual officers who were going to be involved in

21   this search warrant, do they each have particular tasks they're

22   going to do?

23   A    Yes, sir, they do.

24   Q    What was your assigned task?

25   A    My assigned task was what we call the hands person, which is

1    the individual responsible for detaining individuals that are

2    inside the location and placing handcuffs on them.

3    Q    Now, at some point the group of officers get together and

4    you go out to the search warrant location on Woodland Avenue?

5    A    Yes, we did.

6    Q    How were you all dressed?

7    A    We were dressed in plain clothes but we wear an outer

8    garment that they refer to as a raid coat, which is clearly

9    marked Baltimore City Police on the front and back.

10   Q    So you go out to 3516 Woodland Avenue.  About approximately

11   what time of day did you go out there?

12   A    Approximately 1600 hours.  That's 4:00 in the afternoon.

13   Q    Now, when you got to the, nearby the location, Woodland

14   Avenue, as you were, as you were approaching the house, did you

15   see anything out front of the house?

16   A    Yes, sir, I did.

17   Q    What did you see?

18   A    I saw a black male later identified as Shelton Harris

19   standing on the front porch of 3516 Woodland Avenue.

20   Q    When you first saw this individual, Mr. Harris, he was

21   standing on the porch, did you see him doing anything as you

22   approached?

23   A    Yes, sir, I did.  I made eye contact with him and he

24   immediately discarded a brown paper bag off the porch and into

25   the top of an open garbage can.

1    Q    When you say that Mr. Harris discarded a brown paper bag,

2    did he pick it up from some place?  When did you first see the

3    brown paper bag?

4    A    I first saw it in his hand, and he dropped it.

5    Q    When you first saw the bag, about how far were you from Mr.

6    Harris?

7    A    About 16 to 18 feet.

8    Q    Had you gotten out of your car at this point?  Were you on

9    foot?  Or were you still in your vehicle?

10   A    I was getting out.

11   Q    From that distance on the front porch of the house you were

12   about to do a search warrant, how focused would you have been on

13   that front area of the house and on this activity by Mr. Harris?

14   A    That is exact, my exact focal point.  Not looking at

15   anything else, I'm paying attention to the house and any threats

16   that may or may not be on the front porch and the front door,

17   locations of the windows and our avenue of approach.

18   Q    And between the porch and your own vehicle, things like

19   that, was there anything blocking your view of Mr. Harris and

20   this brown paper bag?

21   A    No, sir.

22   Q    You see, and I believe you already testified about this,

23   what did you ultimately see Mr. Harris do with the brown paper

24   bag as you're approaching?

25   A    He dropped it off of the porch and into an open metal

1    garbage can that was sitting next to the steps of the porch.

2    Q    Were you able to see that open garbage can?

3    A    Yes, I did.

4    Q    What did you do?

5    A    I immediately exited the vehicle.  I went up on the porch,

6    placed Mr. Harris on the ground and placed handcuffs on him.

7    Q    And what was the purpose of securing and detaining Mr.

8    Harris at that point?

9    A    It was twofold.  One, I thought he just discarded evidence.

10   And two, I was clearing the area of the front door of the

11   dwelling so as not to impede the rest of the raid team members

12   from making entry.

13   Q    Now, after securing Mr. Harris, did you go back to that

14   trash can and investigate that?

15   A    Yes, sir, I did.

16   Q    What did you find inside the trash can?

17   A    I found a paper bag.  Inside that paper bag was a plastic

18   bag that contained 60 vials that had a white rock-like substance,

19   we suspected to be crack cocaine.  It also had a small plastic

20   bag knotted with some white substance in it that we believed to

21   be crack cocaine.

22   Q    What lead you to believe that the item inside that knotted

23   plastic bag and inside the vials from the brown paper bag might

24   be crack cocaine in particular?

25   A    Well, based on, based on my training and experience, and

1  examining the shape and the consistency and the color of the

2  item, I believed it to be cocaine.

3  Q    Powder cocaine or crack cocaine?

4  A    Crack cocaine.

5  Q    Now, when you pulled the brown paper bag out of the trash,

6  the bag that you recovered, how did it compare with the bag that

7  you'd seen Mr. Harris put in the trash?

8  A    It was identical.  It was the same one.

9  Q    Were there any other brown paper bags that you noticed?

10 A    No, sir.

11 Q    Did you go immediately to this particular one?

12 A    Yes, I did.

13 Q    Let me show you what's been marked as Government's Exhibit

14 Miscellaneous 20.  I'm going to put it up on the screen in front

15 of you.  It's not a great image.  Let me see if I can -- that's a

16 bit better.  It is a black and white image.  Sergeant, can you

17 see that?

18 A    Yes, I do.

19 Q    All right.  Taking one item at a time, the item marked one,

20 which I'm circling, what is that?

21 A    That is the brown paper bag.

22 Q    And then there are two items marked two and three.  Can you

23 tell me what they are?

24 A    Yes.  Item Two is the plastic bag that contained the 60

25 vials, which is Exhibit Four.  And Number Three is the plastic

DIRECT EXAMINATION OF O'REE

1   bag that con, the knotted plastic bag that contained the white

2   substance believed to be cocaine, crack cocaine.

3   Q    Is that the cocaine you're referencing?

4   A    Yes, sir.

5   Q    And then finally you mentioned that this bag over here

6   contained something.  Is that what's marked as Number Four?

7   A    That's correct.  Yes, sir.

8   Q    Let me ask you about Item Number Four.  How many capsules

9   did you find inside the plastic bag?

10  A    Inside the bag were 60.

11  Q    And if I've counted them right, Sergeant, do you have them

12  grouped up into groups of ten here?

13  A    Yes, sir.

14  Q    Before I mess up my screen too much.  Let me ask you about

15  near the bottom there.  Is that three additional vials?

16  A    Yes, sir, it is.

17  Q    In addition to the 60 inside the plastic bag, did you find

18  any additional vials in the area?

19  A    Yes, I did.

20  Q    Where were they, approximately?

21  A    On the ground next to the garbage can, the front yard area.

22  Within about eight to nine inches from the garbage can on the

23  ground were those vials.

24  Q    The vials, and we can see something in the photo here but

25  it's in black and white.  How did the vials on the ground compare

DIRECT EXAMINATION OF O'REE

1  with the 60 from the bag?

2  A    They were identical to size, shape, color and consistency of

3  the ones in the bag.

4  Q    Now, all of these items, did you secure them and ultimately

5  make arrangements, either yourself or with another officer, to

6  submit them into evidence?

7  A    Yes, I did.

8  Q    And in your experience, Detective, you've been doing drug

9  investigation for a while at that time and you've done it since,

10  is that correct?

11  A    That's correct.

12  Q    63 vials of suspected crack cocaine, in your experience is

13  that personal use quantity or is that a distribution quantity?

14  A    That's a distribution quantity.

15  Q    What makes you say that?

16  A    A user of crack cocaine normally doesn't buy in quantity

17  like that because their main objective is to get high and to use

18  the product.  It's very seldom that they would have enough money

19  to purchase that amount and/or to carry it around.

20  Q    Now, ultimately, one of your fellow officers, did you make

21  arrangements to have a fellow officer submit this item into

22  evidence?

23  A    Yes, sir, I did.

24  Q    Did you do, you don't do the chemical analysis or lab

25  analysis yourself, is that right?  You send it to the lab?

1   A    That's correct.  No, I do not.

2   Q    Just by way of explaining that process.  I'll put on the

3   screen what's been marked as Government's Exhibit L-5.

4   Submitting officer is identified as a Michael Carney.  Is that

5   the individual you were working with that day?

6   A    Yes, sir, it was.

7   Q    One of them, I should say?

8   A    Yes.

9   Q    The items submitted included paper bag, a plastic bag,

10  plastic bag containing a white rock-like substance, and then 63

11  vials.  Is what we were just looking at?

12  A    Yes, sir, it was.

13  Q    And the complaint number is a little bit cut off here, but

14  does that look like a 6L507, with the 7 a little cut off?

15  A    Yes, sir, that was.

16  Q    And is that the CC number for this case?

17  A    That is correct.

18  Q    And then, finally, the property number is 98062021, is that

19  correct?

20  A    That's correct.

21  Q    And in terms of the manner in which the defendant was

22  identified, Mr. Harris, for this case, that would have been, how

23  did you go about identifying him then?

24  A    I did the processing.  He advised me that his name was

25  Shelton Harris and gave me his date of birth.

1    Q    Ultimately, would Mr. Harris have been fingerprinted and

2    identified as such?

3    A    Yes, sir.

4    Q    Nothing further, Your Honor.

5         THE COURT:  Questions from the defense?  Mr. Flannery.

6         CROSS EXAMINATION

7    BY MR. FLANNERY:

8    Q    Good morning, Detective.

9    A    Good morning, sir.

10   Q    My name's Paul Flannery.  I represent the defendant, Shelton

11   Harry.  Detective, you said when you approached the, you

12   approached the house, how far, again, were you?

13   A    About 16 to 18 feet.  We were directly in front of the

14   house.

15   Q    And you were exiting the car at the time?

16   A    Yes, sir.

17   Q    And you identified that there was a black male on the front

18   porch?

19   A    That's correct.

20   Q    And when you approached the house, were you coming from the

21   east, from the west?

22   A    We were, our vehicles were traveling in a westerly direction

23   on Woodland Avenue.  And I was in the front passenger seat, which

24   put me directly to the house.

25   Q    Okay.  So that put you directly facing the house.  Was the

1    house to your right, then?  To your left when you're exiting?

2    A    Facing the house.  When I exited the vehicle, the house was

3    right in front of me.

4    Q    Okay.  When you, at that point, you exited the car, you

5    began to run directly up towards the porch?

6    A    Yes, sir.

7    Q    And could you describe, at that point Mr. Harris, he turned

8    away from you?

9    A    Yes, he did.

10   Q    And so his back was facing you at that time?

11   A    Well, I was yelling "police, search warrant, get on the

12   ground" and he complied.  He turned around and he got on the

13   ground, he laid on the ground.

14   Q    Okay.  But you didn't, in fact, see him at that time raise

15   his arms or anything of that manner?

16   A    Not that I recall.  I might have told him to put his hands

17   up at first.  Ultimately, I told him to turn around and get on

18   the ground and he did it.

19   Q    And how far away from the trash can was he at the time?

20   A    About three or four feet.

21   Q    So he first made eye contact with you, correct?

22   A    When he first made eye contact with me, I was still in the

23   vehicle.  So about 16, 16 feet away.

24   Q    And your testimony is then that he motioned towards the

25   trash can?

1    A    Yeah.  He's standing on top of the porch.  The porch

2    probably had four, five steps going up to it.  And he took the

3    paper bag and dropped it right into the top of the garbage can.

4    Q    You then approached up on to the porch?

5    A    That's correct.

6    Q    At that point?  And Mr. Harris at that point had moved

7    farther from the trash can?

8    A    No, he was standing in the general direction.  He didn't

9    really move much at all.

10    Q    At that point, then, was your back facing the trash can or

11    was your -- at that point was your back facing the trash can when

12    you were apprehending him?

13    A    Yes, it was.  I was placing the handcuffs on him.  I'm

14    concentrating on him.  He's laying on the porch.

15    Q    Do you recall how many people were in the house at that

16    time?

17    A    I believe there were somewhere in excess of ten people.

18    Q    So there were several other people in the house?

19    A    That is correct.

20    Q    And the rest of your raid team, they entered the front door?

21    A    Yes, sir.

22    Q    How many members of the raid team -- were you the only

23    member of the raid team that stayed out front?

24    A    Yes, I was.

25    Q    So you're the only member of the raid team at that point,

1    and you are out front on the porch with your back facing the

2    trash can, concentrating on Mr. Harris at that point.

3    A    For approximately ten, the ten seconds that it took me to

4    put the handcuffs on him, yes.

5    Q    Okay.  And so at that point you're not viewing the trash

6    can, you're not viewing the front of the house, you're not

7    viewing anything like that.  You're concentrating on Mr. Harris.

8    The rest of the raid team has at that point enter the vehicle --

9    entered the house?

10   A    That's correct.

11   Q    Okay.  You found near the trash can other drugs in and

12   around the trash can area?

13   A    Yes, sir.

14   Q    Okay.  You found three vials of crack cocaine very similar

15   to the vials of crack cocaine that you testified were found in

16   the trash can.  Those were in front of the trash can?

17   A    Yes, sir.

18   Q    In the general vicinity?

19   A    Several inches away from the trash can.

20   Q    Okay.  And how long was it before you turned around after

21   apprehending Mr. Harris that you then went back to the trash can

22   to retrieve it?

23   A    I would say about four to five seconds.

24   Q    But didn't you just testify that you were concentrating on

25   him for about ten seconds?

1    A    Yes.  Placing the handcuffs on him.  Once he was secure,

2    there was, it took me the time to walk down the steps, grab the

3    brown paper bag, and walk back up.

4    Q    I see.  So you didn't turn around four or five seconds after

5    engaging Mr. Harris.  It would be more like 14 to 15 seconds, by

6    the time you apprehended him, by the time you had turned your

7    concentration away from him, by the time you moved back to the

8    trash can?

9    A    Thereabouts.

10   Q    Okay.  And inside the trash can, the trash can is full of

11   trash?

12   A    The trash can is -- yes, there were, there were empty beer

13   bottles and various other trash.  I don't recall exactly what.

14   Q    Various other trash bags?

15   A    Yeah.  Like the white plastic kind.

16   Q    Okay.

17   A    Like kitchen trash bag type stuff.

18   Q    Inside the trash can, there are other trash bags?

19   A    Yes, there was.

20   Q    Okay.  And outside the trash can, again, you found drugs

21   that were very similar in nature to the ones that were found

22   inside the trash can?

23   A    That's correct.

24   Q    Detective, in your experience as a narcotics investigator in

25   Park Heights, is it your understanding that drug dealers in that

1    area secrete or use trash cans, in and around trash cans as

2    storage facilities essentially for their drugs?

3    A    Sometimes they do.

4    Q    So it's not uncommon in your experience to come up upon a

5    scene and have drugs found essentially in a trash can?  It's a

6    storage bin that's often times used in neighborhoods?

7    A    Sometimes it is, yes, sir.

8    Q    Detective, did BCPD surveil this house before you decided to

9    raid it?

10   A    I believe there was a drive-by conducted of the house prior

11   to the raid.

12   Q    Understood.  And Mr. Harris was never identified at that

13   time as someone that was in and around that house?

14   A    No, sir, he wasn't.

15   Q    Okay.  And in your experience in Park Heights, you at that

16   point couldn't identify Mr. Harris when you saw him?

17   A    Right.  We didn't know who Mr. Harris was prior to that, no,

18   sir.  Or at least I didn't.

19   Q    No further questions.

20              CROSS EXAMINATION

21   BY MR. CROWE:

22   Q    Good morning, Officer.

23   A    Good morning, sir.

24   Q    Is it common when search warrants are executed that one of

25   the officers will make a list of people who are present at the

1    site?

2    A    Yes, sir, it is.

3    Q    And does this, in fact, appear to be the list of the person

4    sheet which was made that day?

5    A    Yes, sir, it is.

6    Q    Are the persons listed as present, and I'll just read middle

7    names, a Lisa Carroll, C-A-R-R-O-L-L?

8    A    Yes, sir.

9    Q    A Lishel, L-I-S-H-E-L, Holmes?

10   A    Yes, sir.

11   Q    A Madalyn Carroll?

12   A    Yes, sir.

13   Q    What appears to be the name Calvin Smith?

14   A    Yes, sir.

15   Q    Cornell Stamper, S-T-A-M-P-E-R?

16   A    Yes.

17   Q    Lashone, L-A-S-H-O-N-E, Stamper?

18   A    Yes.

19   Q    A Robert Hostler, H-O-S-T-L-E-R?

20   A    Yes.

21   Q    A Rhonda Preston?

22   A    Yes.

23   Q    Charlene Hurd, H-U-R-D?

24   A    Yes.

25   Q    A Gregory Artis, A-R-T-I-S?

1    A    Yes, sir.

2    Q    A Chanel, C-H-A-N-E-L, Stamper?

3    A    Yes.

4    Q    And finally, a Shelton Lee Harris?

5    A    That's correct.  Yes, sir.

6    Q    And did the officers endeavor to make sure they get the

7    names of everybody they can in the area?

8    A    Everyone that's in and around the dwelling that we're

9    raiding, yes, sir.

10            MR. CROWE:  Thank you very much.

11            CROSS EXAMINATION

12   BY MR. COBURN:

13   Q    Good morning, sir.

14   A    Good morning, sir.

15   Q    Just one question.  Is it correct that Shelton Harris was 15

16   years old at the time of this arrest?

17   A    That is correct.  Yes, sir.

18   Q    Thank you.

19            THE COURT:  Sergeant, thank you very much.  You're

20   excused.

21            THE WITNESS:  Thank you, Your Honor.

22            THE COURT:  Again, ladies and gentlemen, I emphasize to

23   you that this evidence was admitted solely against Mr. Harris,

24   may not be considered by you as any evidence against any of the

25   other three defendants.  As I will instruct you in greater detail

1    later in the trial, this evidence may be considered by you only

2    for your use in determining whether the government has proven

3    beyond a reasonable doubt that Mr. Harris knowingly and

4    intentionally joined the conspiracy that is charged in this case.

5    Mr. Harris is not charged in connection with the events about

6    which you've just heard from December 1st, 1998.

7            Next witness.

8            MR. HANLON:  Your Honor, the United States calls

9    Trooper Douglas Forrester.

10          TROOPER DOUGLAS FORRESTER, GOVERNMENT'S WITNESS, SWORN

11           THE WITNESS:  Yes, I do.

12           THE CLERK:  Be seated.

13           Would you speak into the mike?  State your name and

14   spell it for the record.

15           THE WITNESS:  Yes, ma'am.  My name is Douglas

16   Forrester.  D-O-U-G-L-A-S.  Forrester, F-O-R-R-E-S-T-E-R.

17           DIRECT EXAMINATION

18   BY MR. HANLON:

19   Q    Sir, good morning to you.

20   A    Good morning, sir.

21   Q    Where do you work?

22   A    The Golden Ring Barracks in Baltimore County, for the State

23   Police.

24   Q    Maryland State Police?

25   A    Yes, sir.

1    Q    And what rank do you hold?

2    A    I'm a sergeant.

3    Q    Sergeant, how long have you been a Maryland State trooper?

4    A    July will make 15 years.

5    Q    And during the course of your time as a trooper, what

6    generally have you done in terms of your duties?

7    A    Uniformed patrol.

8    Q    Does that include traffic patrol, helping motorists, things

9    like that?

10   A    Yes, sir.

11   Q    From time to time in uniformed patrol you work highways in

12   the state, is that right?

13   A    Yes, sir.

14   Q    Do you sometimes become involved in investigations of

15   criminal activity on the highways?

16   A    Yes, sir.

17   Q    Let me direct your attention to May 7th of 1999.  Were you

18   on duty that day?

19   A    Yes, I was.

20   Q    And what were you doing that day?

21   A    That day, I was working a special assignment in Southern

22   Maryland.  And on this particular day, I was on my way home from

23   my special assignment, my detail.

24   Q    On that special assignment, nothing to do with this case, is

25   that correct?

1    A    No, sir.

2    Q    Now, as you were on your way back to your barracks that day,

3    did you receive a call that another trooper was involved in

4    something and might need some backup?

5    A    I was monitoring the local channels in the area and heard a

6    trooper that I'm friends with call out a traffic stop, and was

7    hearing the traffic stop unfold as I was traveling.

8    Q    The trooper who put that call out, was that Trooper Raymond

9    Bond?

10   A    Yes, sir.

11   Q    And the time frame of this, around about 2:50, 3:00 in the

12   afternoon sound right?

13   A    Yes, sir.

14   Q    When you received this information, where did you go?

15   A    I was traveling north on 95, and I just continued north up

16   to his location.

17   Q    Your Honor, if it's all right, I'm just going to bring a

18   copy of the trooper's report up to him, just in case.

19        THE COURT:  Certainly.

20   A    Thank you.

21   Q    Trooper, where did you, did you end up meeting up with some

22   other members of your department?

23   A    Yes, sir.

24   Q    Approximately where was that?

25   A    It was southbound on 95 around mile marker 87, which is in

1    Harford County, Maryland, north of Baltimore.

2    Q    When you arrived there, did you see some other troopers?

3    A    Yes, sir.

4    Q    What were they doing?

5    A    At that particular time, they were assisting Trooper Bond on

6    his traffic stop.  They were backing him up.

7    Q    Now, Sergeant, just to move things ahead a little bit.  Were

8    you personally involved in recovering any evidence from this

9    particular vehicle at mile marker 87 in Harford County?

10   A    No, sir.

11   Q    You didn't personally search that car or recover any

12   evidence, is that right?

13   A    No, sir.

14   Q    By the time you got there, had something, to your knowledge,

15   been recovered?

16   A    Yes, sir.  By the time I got there, I was trying to get

17   there as quickly as I could because, as I stated, I heard the

18   traffic stop start to unfold and I heard the events that were

19   going on on the roadside.  So I tried to respond for officer's

20   safety measures, to assist Trooper Bond.

21           When I got there I was informed, Trooper Bond explained

22   what was going on and told me about the drugs they found in the

23   car.

24   Q    Things were sort of done by the time you got there?

25   A    Yes, sir.

1    Q    Was there a particular individual who was in custody or

2    about to be taken into custody by the time you got there?

3    A    Yes, sir.

4    Q    Who was that?

5    A    Martin.

6    Q    Specifically, was it a Mr. Shelly Wayne Martin?

7    A    Yes, sir.

8    Q    About how long did you stay at that scene and what did you

9    do to help out?

10   A    At that time, I just stood by to assist Trooper Bond, helped

11   them watch his prisoner.  Just helped them keep the scene safe

12   while he was conducting his business.

13   Q    Did there come a time when you departed the location?

14   A    Yes, sir.

15   Q    How about the other troopers?  Did they as well?

16   A    Yes, they did.  One of the troopers drove the vehicle that

17   was, that Trooper Bond stopped back to the barracks.  And they

18   also transported Martin back to the barracks.  And I left,

19   continued south on 95.

20   Q    Now, as you were getting to leave yourself, you mentioned

21   that one vehicle had been taken away and Mr. Martin had been

22   taken back to the barracks.  You're getting ready to leave.  As

23   you were leaving the area, did you see anything?

24   A    Yes, sir.  I saw another passenger car parked on the same

25   side of the highway, about, I think about a quarter of a mile

1    south of our location.  It was pulled off on the shoulder.

2    Q    Do you remember what the car looked like, the second car a

3    quarter of a mile south or so?

4    A    I just remember it being a small passenger car.  I think it

5    was an Acura.

6    Q    Now, the fact that this car was pulled over, is that

7    something you sometimes look for as a trooper?

8    A    Yes, sir.  It's part of our duties, we have to stop and

9    check for vehicles that are parked on the side of the highway.

10   Q    So you thought this person might need help?

11   A    Yes, sir.

12   Q    Did you pull over?

13   A    Yes, I did.

14   Q    As you were pulling up to this Acura, what did you, or did

15   you see anything?

16   A    I noticed that the vehicle was parked on the shoulder and

17   that Mr. Gardner was seated in the driver's seat alone in the

18   vehicle.  As I exited the patrol car, I saw him reach up, turn

19   the ignition off, and jump out of the car pretty quickly.

20   Q    I'm sorry.  Turn what off?

21   A    The ignition.  Turned the key.

22   Q    The individual that you saw, you identified as a Mr.

23   Gardner, was that a Mr. Shawn Gardner ultimately identified?

24   A    Yes, sir.  He identified his self with his Maryland license.

25   Q    A few minutes later?

1    A    Yes, sir.

2    Q    When you got there, which side of the car did Mr. Gardner

3    get out of?  Driver or passenger?

4    A    Driver's side.

5    Q    Was there anyone else with him?

6    A    No, sir, he was alone.

7    Q    So you indicated that you could tell he was turning off the

8    ignition?

9    A    Yes, sir.

10   Q    How did you know that?  Did you actually see him turn the

11   key?

12   A    I saw the motion.  It was just obvious to me that, you know,

13   because I was paying attention to his hands and his movements in

14   the vehicle as I approached, I could just tell what was going on.

15   Q    So Mr. Gardner turns off the ignition.  What did he do next?

16   A    Jumped out of the vehicle pretty quickly.

17   Q    Did you see what he did after that?

18   A    He immediately went to the front of the vehicle and popped

19   the hood.

20   Q    And you observed all of that?

21   A    Yes, sir.

22   Q    Did you approach Mr. Gardner and talk to him?

23   A    Yes, I did.  I approached him, check on his welfare, find

24   out what was going on, ask him what was happening.

25   Q    Did Mr. Gardner explain anything to you?

1    A    He told me that his vehicle kept cutting off and he was

2    having problems with the vehicle.

3    Q    Did that strike you as odd?

4    A    Yes, sir.

5    Q    Why?

6    A    I figured if the vehicle was cutting off, the last thing you

7    want to do it shut it off once it was running.  So I didn't see

8    anything like a radiator fluid or flat tires or anything that

9    showed me that there was anything obviously wrong with the

10   vehicle.

11   Q    Now, did you talk with Mr. Gardner at all about where he was

12   coming from or what he was doing or anything like that?

13   A    Yes, sir, I did.

14   Q    What did he tell you?

15   A    He told me that he was coming from Delaware, he was going to

16   Essex.  And I asked him, I said, Were you waiting for your

17   friend, and I motioned to where the traffic stop was behind us.

18   Q    The one involving Mr. Martin?

19   A    Yes, sir.

20   Q    And what did Mr. Martin say to that?

21   A    He said he was, he was waiting.  He didn't know what was

22   going on, what the hold-up was with his friend or what he was

23   doing, what was going on.

24   Q    Now, is that something that was significant to you?

25   A    Yes, sir, it was.

1    Q    Why was that?

2    A    I remembered what Trooper Bond had explained to me on his

3    traffic stop, and the circumstances that the fellow that he

4    arrested was traveling with another companion.

5    Q    And without getting into the details, did the name "Gardner"

6    come up?

7    A    Yes, sir.

8    Q    Did you radio this information back to your barracks or back

9    to your fellow officers?

10   A    Yes, sir, I did.

11   Q    And what was the purpose of you sending out a radio message,

12   excuse me, concerning Shawn Gardner?

13   A    Well, immediately, even before I learned of the name of the

14   driver I was out with, I became suspicious.  And as part of our

15   routine, we call the barrack and let them know what the vehicle

16   is we're out with, the tag number.  We also let them know the

17   name and date of birth of the driver.

18           So we run a routine license and registration and wanted

19   checks on them to let the barracks know who we're with.

20   Q    At some point, did you talk to Mr. Gardner about taking a

21   look at his car?

22   A    Yes, I did.

23   Q    And tell us about that.

24   A    Well, I immediately, after radioing the information in and

25   becoming suspicious of the driver's activities, Trooper Bond

1    radioed to me to detain Mr. Gardner because he was involved in

2    his arrest, the drug arrest that he had.  He was actually the

3    owner of the car that Martin was driving.

4              So I had it in the back of my mind that he wasn't free

5    to leave but I didn't tell him that because I was by myself, on

6    the road side with him, so I didn't want to alert him to

7    anything.

8    Q    Was that for your own safety?

9    A    Yes, sir.

10   Q    What did you tell Mr. Gardner?

11   A    I told him that I would need to check his information out

12   and asked him if he had anything illegal at all in the vehicle,

13   and asked if I could do a consent search on the vehicle.

14   Q    What did Mr. Gardner say to that?

15   A    He agreed.  I read a form to him, a Consent to Search form,

16   and he signed it, agreeing to allow me, consent to search the

17   car.

18   Q    Now, at any point, Sergeant, did any of your fellow troopers

19   begin to arrive on hand?

20   A    Yes, sir, Trooper Bond.  Trooper Bond came back, and Trooper

21   Spinner.

22   Q    And did you begin to undertake a search of Mr. Gardner's

23   Acura?

24   A    Yes, I did.

25   Q    While you were doing that, did you eventually get some

1  information back about the license check that you'd asked for?

2  A    Yes, sir.  I received a radio transmission from the

3  dispatcher that there was information starting to come back.  So

4  I went back to the patrol vehicle so I could hear a little

5  better.  And I was advised that he was actually suspended, his

6  driver's license through Maryland was suspended.

7  Q    So you'd begun a search of Mr. Gardner's Acura.  Did you

8  find anything of evidentiary value during your part search that

9  you remember?

10  A    There was actually, from what I remember there was some

11  marijuana in the vehicle.  I didn't seize it or remove it.  It

12  was part of the way I conduct a search of the vehicle.  If I find

13  evidence in the vehicle, I don't immediately seize it, especially

14  if I know that another trooper's going to handle the arrest.

15  That way things aren't mixed up as far as where what was found in

16  the vehicle.  I usually let the trooper handling the arrest

17  retrieve the evidence.

18  Q    So you had begun a search and you'd seen some things?

19  A    Um-hum.

20  Q    And you received information that your license check was

21  done?

22  A    Yes, sir.

23  Q    You go back to your car?

24  A    Yes, sir.

25  Q    And then you found out it was suspended?

1    A    Yes, sir.

2    Q    What did you do then?

3    A    At that time, Trooper Bond arrested Gardner just simply

4    based on his license being suspended.  It's an arrestable

5    offense.  So he immediately arrested Gardner.  And I stood guard

6    of Gardner on the roadside while Trooper Bond and Spinner

7    conducted the rest of the search of the vehicle.

8    Q    That was going to be my next question.  You didn't finish

9    off the search?  The other troopers did?

10   A    No, sir.  I turned it over to Trooper Bond.

11   Q    Why was that?

12   A    Because it was already his investigation.

13   Q    As far as you know, was Mr. Gardner transported away?

14   A    Yes, sir, he was taken back to the barrack.

15   Q    Did you do that or was there another trooper?

16   A    Another trooper did it.

17   Q    Did that more or less conclude your involvement in this

18   case?

19   A    Yes, sir.

20   Q    Nothing further.  Thank you, Sergeant.

21   A    Yes, sir.

22            CROSS EXAMINATION

23   BY MR. PYNE:

24   Q    Good morning, Trooper Forrester.  I'm Jim Pyne.  I represent

25   Mr. Martin.

1    A    Yes, sir.

2    Q    Now, the events of this day happened quite sometime ago, is

3    that correct?

4    A    Yes, sir.

5    Q    Do you today, from the witness stand, have an accurate

6    recollection of what happened that day?

7    A    I can picture it, yes, sir.

8    Q    Okay.  Before today, did you meet with the prosecuting

9    attorneys in this case and review all the facts involved in this

10   case?

11   A    Yes, I did.

12   Q    Okay.  And are you aware that the charges against Mr. Martin

13   were dropped in this case?

14   A    No, sir.

15   Q    Okay.  Thank you.  Nothing further, Your Honor.

16              CROSS EXAMINATION

17   BY MR. COBURN:

18   Q    Sergeant Forrester, good morning, sir.

19   A    Good afternoon.  How are you?

20   Q    Whatever.  If I understand you correctly, when you

21   approached the Acura that was stopped on the side of I-95, so far

22   as you knew at that time, before you made contact with the driver

23   or ran the license check, so far as you knew the driver had done

24   nothing illegal at that point, is that correct?

25   A    That's correct.  Yes, sir.

1    Q    If I understood you correctly, then, in response to a

2    question that Mr. Hanlon posed to you, the reason you approached

3    the vehicle was because you wanted to offer assistance.  You

4    thought the car might be disabled, is that right?  Is it

5    accurate, then, again if I understood you right, you could see

6    this vehicle about a quarter of a mile down the road south on

7    I-95 from when you first left the other vehicle from where

8    Trooper Bond initially was?

9    A    Actually, you know, I don't remember seeing it because I

10   think if, if I would have seen it, we would have addressed it a

11   lot quicker.  So I don't think that I actually saw from Trooper

12   Bond's traffic stop, traffic stop.

13   Q    Your testimony, then, is you left Trooper Bond's traffic

14   stop, got on to I-95, and at some point thereafter you saw the

15   second vehicle that Mr. Gardner was in, right?

16   A    Yes, sir.

17   Q    Mr. Gardner gave you what you understood and still

18   understand to be his true, correct name of Shawn Gardner, right?

19   A    His driver's license, yes, sir.

20   Q    Okay.  And when you asked him for consent to search the

21   vehicle, he gave it to you, right?

22   A    He did.

23   Q    He didn't have any reason to believe at that time that -- I

24   mean, as far as he knew, he could refuse, right?

25   A    Well, the form explained it very easily in detail, that he

1    had an opportunity to refuse, yes, sir.

2    Q     But he didn't refuse.  He consented and allowed you to

3    search the vehicle, correct?

4    A     Yes, he did.

5    Q     Thank you.  Nothing further.

6              THE WITNESS:  Yes, sir.

7              REDIRECT EXAMINATION

8    BY MR. HANLON:

9    Q     Just one question, Your Honor.  Sergeant, as far as you

10   know, at the conclusion of your investigation at the Gardner

11   scene, did one of the state troopers drive that Acura back to the

12   barracks?

13   A     Yes, sir.

14   Q     Any trouble getting the Acura back?  Was the engine cutting

15   out on him?

16   A     No, sir.  Started good.

17             MR. HANLON:  Thank you.

18             THE COURT:  Sergeant, thank you very much.  You're

19   excused.  Members of the jury, we'll take a brief morning recess

20   at this time.  Please leave your note pads on your chairs.  Have

21   no discussion about the case or any of the evidence you've heard

22   so far.  You're excused for a 15 minute recess.

23             We'll stand in recess for 15 minutes.

24             (Recess.)

25             THE COURT:  We'll have the jury, please.

1          (Jury enters the courtroom.)

2          THE COURT:  Please be seated, ladies and gentlemen.

3    You may call your next witness.

4          MR. HANLON:  Thank you, Your Honor.  The United States

5    calls Marquetta Duganne.

6          MARQUETTA DUGANNE, GOVERNMENT'S WITNESS, SWORN

7          THE WITNESS:  Yes.

8          THE CLERK:  Be seated.  Scoot up and speak directly

9    toward the mike.  State your name and spell it for the record,

10   please.

11         THE WITNESS:  Marquetta Duganne.  M-A-R-Q-U-E-T-T-A.

12   Last name D-U-G-A-N-N-E.

13         DIRECT EXAMINATION

14   BY MR. HANLON:

15   Q    Good morning or good afternoon, Ms. Duganne.  How old are

16   you, ma'am?

17   A    Thirty.

18   Q    And where were you born?

19   A    Altoona, Pennsylvania.

20   Q    Altoona is a town two or three hours from here in central

21   Pennsylvania, is that right?

22   A    Right.

23   Q    Did you grow up in Altoona?

24   A    Yes.

25   Q    How far did you go in school in Altoona?

DIRECT EXAMINATION OF MARQUETTA DUGANNE                68

1    A    I have my GED.  I'm actually in college right now.

2    Q    You have gotten your GED and you're getting some college

3    classes now, is that right?

4    A    Correct.

5    Q    And you're actually doing that while you're serving a

6    sentence up in Pennsylvania, is that right?

7    A    Right.

8    Q    I'm probably going to talk to you about that in a few

9    minutes.  But prior to that, there was a time when you were in

10   high school in Altoona, correct?

11   A    Correct.

12   Q    And how far did you go in high school before leaving school

13   for a time?

14   A    Eleventh grade was the last grade completed.

15   Q    And just approximately, when was it that you left school?

16   A    1996.

17   Q    Now, during the time that you were in high school or before

18   and after, did there come a time when you began selling drugs to

19   make money, Ms. Duganne?

20   A    Um-hum, yes.

21   Q    And how did you get into that business?  Just tell us about

22   it.

23   A    By robbing people, robbing things.  Made money, started

24   buying drugs and selling them.

25   Q    You made money by engaging in various types of criminal

1    activity?

2    A    Right.

3    Q    Now, you talked about robbing people and robbing things.

4    When you talk about robbing, tell us exactly what you mean by

5    that.  How would you go about doing that?

6    A    Like robbing cars, selling systems out of cars.  Like petty

7    thefts.

8    Q    Breaking into cars?

9    A    Right.

10   Q    Did you sometimes break into garages and places like that?

11   A    Yeah.

12   Q    When you talk about robbery, have you ever, you know, done a

13   stick-up or threatened any person to get money or property from

14   them?

15   A    No.

16   Q    And if you talk about robbing a car, you're talking about

17   breaking into a car, not a carjacking or anything like that?

18   A    Right.

19   Q    Now, you come from a family in Altoona, is that right, your

20   mother, your father, you have some siblings up there?

21   A    Yes.

22   Q    Have your parents, any of your siblings ever been engaged in

23   any drug activity?

24   A    Yes.

25   Q    Basically the whole family?

1    A    Correct.

2    Q    Did you learn something of the drug trade through your

3    family?

4    A    I guess I would say so, yeah.

5    Q    Now, there does come a time, you've discussed thefts and

6    breaking in and stuff like that.  Did there come a time that you

7    also began selling drugs in Altoona?

8    A    Yes.

9    Q    About how long did you sell drugs up in Altoona?

10   A    I sold drugs for about 15 years.

11   Q    Before you got out of school?

12   A    Um-hum.

13   Q    That's a yes?

14   A    Yes.

15   Q    And miss Ms. Duganne, if you could, try to keep your voice

16   up a little bit if you would.  You can move the microphone closer

17   to you if you need to.

18        What kind of drugs did you sell in Altoona?

19   A    Weed, powder cocaine, crack cocaine, heroin, Ecstasy.

20   Q    And was it around the Altoona area that you sold?

21   A    Yes.

22   Q    Now, at some point you, at various points of time you've

23   gotten in some trouble doing that, is that correct?

24   A    Several occasions.

25   Q    And as I think we've already discussed, you're currently

1    serving a sentence in a Pennsylvania state prison, is that right?

2    A    Correct.

3    Q    What charge are you serving a sentence for right now?

4    A    Possession with intent to deliver and firearm.

5    Q    And when was it that you committed that offense and got

6    convicted of it?

7    A    This offense occurred September 13th of last year.

8    Q    Of 2007?

9    A    Correct.

10   Q    And how long do you expect to be in jail for that offense?

11   A    Four and a half years.

12   Q    Do you have any kind of a possible release date?  Are you

13   hoping for parole or anything like that?

14   A    Parole gave me until, I was actually serving parole time for

15   a previous drug indictment and I'm currently awaiting to start my

16   new sentence for my new charge.

17   Q    Is that going to be the four and a half year sentence?

18   A    Well, it's actually two and a half.

19   Q    So all told, how long do you anticipate you're going to be

20   in jail, just approximately?

21   A    About two more years.

22   Q    So there's a charge that, there's a couple of different

23   charges.  There's some earlier arrests, also, in 2002 or

24   thereabouts?

25   A    2000 -- yes.  2003, I believe.

1    Q    What was that for?

2    A    A drug indictment involving my husband and I.

3    Q    And what was your husband's name?

4    A    Rashid Meyers.

5    Q    Now, your husband, Mr. Meyers, is he also in jail right now?

6    A    Yes.

7    Q    And he's serving a period of incarceration as well, is that

8    correct?

9    A    Yes.  20 to 40 years.

10   Q    Now, Ms. Duganne, you and I met a couple of times to go over

11   your testimony and to review some of the information you'd be

12   testifying about today, is that right?

13   A    Correct.

14   Q    And during that time we talked about, you know, the basis of

15   your testimony and we talked about whether or not you had any

16   expectations or wanted the government, the U.S. Attorney's

17   office, to do anything, or whether you hoped we could do anything

18   as part of your ongoing cases, is that right?

19   A    Correct.

20   Q    Both for your testimony today and also for your grand jury

21   testimony that you gave back in -- and I want to get the year

22   right -- 2004, you've been told by me and by other prosecutors

23   that nothing that you say in court, the grand jury or in this

24   proceeding, is going to be turned around and used against you in

25   building any new federal criminal case, is that correct?

1    A    Correct.

2    Q    And that's your understanding of the basis of your testimony

3    today, is that right?

4    A    Yes.

5    Q    We also told you that if you wanted us to, we would notify

6    any prosecuting authority in Pennsylvania or wherever, including

7    the ones handling your case, about the fact that you were

8    testifying and providing information in a criminal case here in

9    Baltimore.  We told you we were willing to do that if you wanted

10   us to, is that right?

11   A    Yes.

12   Q    And so far, you haven't indicated you care one way or the

13   other whether we do that, is that correct?

14   A    Correct.

15   Q    And then finally, Ms. Duganne, you inquired with us about

16   whether there was anything we could possibly do with respect to

17   your husband's current case.  And we explained to you, again,

18   we'd be happy to tell anybody, any prosecuting authority about

19   the fact that you're testifying but we weren't really in a

20   position to make any promises or to do anything with respect to

21   your husband's sentence.  Is that fair to say?

22   A    Correct.

23   Q    And have any promises been made to you, ma'am, one way or

24   the other about your case, your husband's case, or anything like

25   that?

1   A    No.

2   Q    As far as you know, are we really doing anything for you

3   other than not prosecuting you for your testimony today?

4   A    No.

5   Q    Let me talk a little bit, then, about some specific things.

6   We talked about the fact that you were selling drugs in Altoona.

7   Back in Altoona, before you got into trouble in some of the cases

8   we've already talked about, 1999, 2000, or thereabouts, did you

9   know a person named Carlos?

10  A    Yeah.

11  Q    Did he go by the name Los, L-O-S?

12  A    Yes.

13  Q    Who was Carlos?

14  A    Some, some dude from Baltimore.  I don't know his full name.

15  Q    You knew him by Carlos or Los, is that right?

16  A    Correct.

17  Q    Did you ever buy drugs from Carlos in '99 or 2000?

18  A    Several times.

19  Q    Was he a somewhat or semi-regular supplier for you, someone

20  you could buy from from time to time?

21  A    For the most part.

22  Q    Not your only one, though, is that correct?

23  A    Right.

24  Q    Other people you bought from?  What did you buy from him?

25  What kind of drug?

1    A    Crack cocaine.

2    Q    And what kind of arrangement did you have?  You mentioned

3    that Carlos was from Baltimore.  What kind of an arrangement in

4    terms of prices did you have with Carlos?  If you gave him an

5    amount of money, how much crack cocaine would you expect in

6    return?

7    A    It was basically double-ups.  Whatever I bought he would

8    give me double.

9    Q    So double-up, you pay a hundred dollars, and you get $200

10   worth back?

11   A    Right.

12   Q    Generally speaking, when you would buy from Carlos, about

13   how much crack cocaine would you get each time?

14   A    Maybe four vials, eight.  Depending on what I was working

15   with.  It varied.

16   Q    Vials?

17   A    Vials.

18   Q    And you mentioned that it depended on who you were working

19   with.  Let me ask you a couple of questions.  A vial is a

20   container, a small container that might contain some crack, is

21   that right?

22   A    Correct.

23   Q    When you think of four or five vials, about how much crack

24   would you expect to be in each vial during your dealings with

25   Carlos?

1    A    Like .5 grams, considered a 50 rock.

2    Q    About a half gram?

3    A    Um-hum.

4    Q    That's a yes?

5    A    Yes.

6    Q    And you mentioned that's called a 50 rock.  What do you mean

7    by a 50 rock?

8    A    Weight-wise it weighs .5 grams on a scale.

9    Q    And how much would you be able to sell that for?

10   A    $50.

11   Q    How much would you have to pay Carlos to get a 50 rock?

12   A    25.  I never got a 50 rock, though.

13   Q    Okay.  Fair enough.  Fair enough.  But you would get vials,

14   correct?

15   A    Correct.

16   Q    And each vial, I want to make sure I understand, contains

17   about a half gram?

18   A    Right.

19   Q    And how much does that cost you, that half gram?

20   A    What do you mean how much does it cost me?

21   Q    How much would you have to pay per vial for a vial

22   containing a half gram of crack?

23   A    I never bought it per vial.

24   Q    Well, how many vials would you buy at a time?

25   A    Like four.

1    Q    How much would it cost you for four vials?

2    A    A hundred dollars.

3    Q    And how much could you turn around and sell those four vials

4    for?  If you paid a hundred dollars, how much would you sell them

5    for?

6    A    200.

7    Q    Now, about how long was it that you bought from Carlos,

8    however frequently you did?

9    A    A couple times a week.

10   Q    And for what period of time, approximately?

11   A    A month or two.

12   Q    Now, at some point -- you mentioned that Carlos was from

13   where?

14   A    Baltimore.

15   Q    Did you ever meet anyone else that Carlos knew from

16   Baltimore?

17   A    Yeah.

18   Q    Did you ever meet a Sharmeka Fletcher?

19   A    Yes.

20   Q    Who was Sharmika Sharmeka?

21   A    Some girl from Baltimore.

22   Q    Did she have any kind of relationship with Carlos?  Did she

23   know Carlos or anything like that?

24   A    I guess they hung out together.  They knew each other.

25   Q    You'd see them together sometimes?

1    A    Yeah.

2    Q    Now, at some point did Carlos introduce you to a guy that he

3    knew from Baltimore?

4    A    Yes.

5    Q    How long had you been buying from, or how long had you known

6    Carlos when he introduced you to this guy from Baltimore?  A

7    couple months?  More than that?

8    A    I had, actually, I knew Carlos for a while prior to that.

9    Q    Was it a shorter period of time you were buying from Carlos?

10   A    Yes.

11   Q    Couple months or so?

12   A    Um-hum.

13   Q    That's a yes?

14   A    Yes.

15   Q    So he introduces you to someone.  Who did he introduce you

16   to?

17   A    A man named Bo.

18   Q    And how did Carlos describe Bo?  Did he say, This is Bo, or

19   did he describe Bo in another way?

20   A    He just said, This is my boy, Bo, from Baltimore.

21   Q    Did he say Baltimore:  Or did he say "The B?"

22   A    The B.

23   Q    What did you understand "The B" to mean?

24   A    Baltimore.

25   Q    Now, you remember meeting Bo personally?

1    A    Yes.

2    Q    Do you see Bo in court today?

3    A    Yes.

4    Q    Could you please identify him?  Tell me how far he's sitting

5    from me and what he's wearing.

6    A    He's to the right side of you in a gray top.

7    Q    To my right?

8    A    Yes.

9    Q    Your Honor, for the record, identifying Mr. Mitchell, the

10   defendant.

11          THE COURT:  So noted.

12   Q    Now, did Carlos ever refer to Mr. Mitchell or Bo as "My

13   Boy?"

14   A    Yes.

15   Q    What would you understand the term, my boy --

16          MS. RHODES:  Objection, Your Honor.

17          THE COURT:  Overruled.  You may answer or complete your

18   question.

19   Q    What would you understand the term "my boy" in this context

20   to mean, if Carlos introduced Mr. Mitchell to you that way?

21   A    His, his dude, his homey, his main, you know what I'm

22   saying?  Like his people.  I mean, it's different words to saying

23   stuff on the street.  There's different ways of taking words.

24   Q    Did you ever buy anything from Bo, from Mr. Mitchell?  After

25   you met him?

1    A    A few different times.

2    Q    About how long after you met Mr. Mitchell for the first time

3    did you begin buying anything from him?

4    A    I really can't remember.

5    Q    Matter of days?  Weeks?

6    A    It would have probably been within some weeks.

7    Q    And how did it come about that you began buying from Mr.

8    Mitchell?  How did you know that this was someone you could buy

9    something from?

10    A    From the boy Los.

11    Q    Los told you that?

12    A    Yes.

13    Q    What did Los tell you about being able to buy something from

14    Mr. Mitchell?

15            MS. RHODES:  Overruled.

16            THE COURT:  Overruled.  You may answer.

17    A    Just that since I was bringing in a couple dollars or

18    whatever, I could just go to his dude.

19    Q    Los told you that since you were bringing a couple dollars,

20    you could go to Los's dude?

21    A    Right.

22    Q    You bringing in a couple dollars means you're able to sell

23    drugs quickly, is that right?

24    A    Basically.

25    Q    And if Los is telling you that you can just go to his

1    dude --

2              MS. RHODES:  Objection, Your Honor.

3              THE COURT:  Overruled.

4    Q    If Los is telling you you can go to Los's dude, what did you

5    understand that to mean in this context?

6    A    That I could go to Bo myself.

7    Q    To do what?

8    A    To cop whatever I needed.

9    Q    Cop what?

10   A    The drugs, the crack.

11   Q    And that's what you started buying from Mr. Mitchell, is

12   that correct?

13   A    Correct.

14   Q    Now, what period of time, how many months, if you remember,

15   did you buy from Mr. Mitchell, did you buy crack from Mr.

16   Mitchell?

17   A    It wasn't long.  About a month or two.

18   Q    A month or two.  During the period of that time, about how

19   frequently during that month or two did you contact Mr. Mitchell

20   to buy crack?

21   A    Probably about the same amount of time as I was contacting

22   Los.

23   Q    How much was that?

24   A    A few times a week.

25   Q    Now, when you would buy drugs from Mr. Mitchell, what would

1    you immediately do with those drugs?  Did you resell them?

2    A    Yeah.

3    Q    Were there ever times, ma'am, that you would buy drugs from

4    a supplier, sell them to someone else, and then take some time

5    off?  Was there ever a time that you just let it go or would you

6    immediately go back to re-up, to resupply?

7    A    I would usually go right back and re-up.

8    Q    And a few times a week you've indicated you would buy from

9    Mr. Mitchell?

10    A    Correct.

11    Q    When you would contact him to buy crack cocaine from him,

12    how would you get a hold of him?

13    A    Pager.

14    Q    You had a pager number for him?

15    A    Um-hum.

16    Q    That's a yes?

17    A    Yes.

18    Q    So you would page him and then what would happen?  Would he

19    call you back or did that mean you were supposed to meet?

20    A    I really don't remember how it went.

21    Q    But you remember there was a pager involved?

22    A    Yes.

23    Q    Each time you purchased from Mr. Mitchell, did you go meet

24    in any particular place or were there different places that you

25    went?

1   A    I really don't recall the specifics on that.

2   Q    That's all right.  Did you ever go to an apartment to buy

3   drugs from him there?

4   A    Yes.

5   Q    What apartment did you go to?

6   A    An apartment he shared with a couple other people.

7   Q    Did he share that apartment with Sharmeka Fletcher?

8   A    I believe so.

9   Q    Was there a girl named -- I'm sorry -- was there a lady

10  named Dionne?

11  A    Yes.

12  Q    Do you know if Dionne had any kind of relationship,

13  friendship or otherwise, with Sharmeka Fletcher or Mr. Mitchell

14  during this period of time?

15  A    Can you specify that?

16  Q    Was she friends with them?

17  A    Yeah.  Yes.

18  Q    Did she hang out with them?

19  A    As far as to my knowledge, yeah.

20  Q    Was Dionne ever present when you went to the apartment to

21  buy drugs from Bo, that you remember?

22  A    I believe so.

23  Q    But you're not sure about, is that fair to say?

24  A    Right.

25  Q    Each time you would visit Mr. Mitchell to buy drugs, whether

1    it was at an apartment or elsewhere, how much crack cocaine would

2    you get?  How many vials of crack cocaine would you get?

3    A    Anywhere from maybe four to eight.

4    Q    And each one of these vials, was it the same type of vial

5    that you previously got from Carlos or Los?

6    A    Right.

7    Q    So you expected each vial would have about a half gram of

8    crack cocaine?

9    A    If that, yeah.

10    Q    And how much would you spend for -- you mentioned four to

11    eight vials.  How much would you spend for eight vials?

12    A    400.

13    Q    And how much would you be able to turn that money around?

14    A    I'm sorry.  You said how much would I spend for eight?

15    Q    Spend for eight vials?

16    A    $200.

17    Q    And then how much could you turn that around?

18    A    Four.

19    Q    So this, was this this double-up process again?

20    A    Right.

21    Q    And were you able to turn this crack around pretty quickly,

22    sell it pretty quickly?

23    A    Yeah.

24    Q    Did you have any understanding about why Mr. Mitchell and,

25    before him, Los, were able to give you such a good price for

1    crack cocaine, this double-up system?

2            MS. RHODES:  Objection, Your Honor.

3            THE COURT:  Overruled.  You may answer.

4    A    Can you repeat that?

5    Q    Let me ask you a different way.  Los and Mr. Mitchell came

6    from what town, to your understanding?

7    A    From Baltimore.

8    Q    And to your understanding, was there any advantage to

9    someone from Baltimore getting drugs in Baltimore and then

10   selling them in a town like Altoona?

11           MS. RHODES:  Objection.

12           THE COURT:  Overruled.  You may answer.

13   A    Of course.  Anybody who brings drugs from the city can

14   usually sell them at a better price in a town like Altoona, can

15   make more profit out of it.

16   Q    Is that what made the double-up possible?

17   A    Yeah.

18   Q    Now, did there ever come a time that you saw Mr. Mitchell or

19   Sharmeka Fletcher or anyone else packaging drugs?

20   A    I was at the house before.  There were drugs in a punch bowl

21   on a table but I can't directly say who was actually packaging

22   them.

23   Q    That's fine.  Let me ask you about the scene, then.  There

24   was a punch bowl on the table?

25   A    Um-hum.

1    Q    That's a yes?

2    A    Yes.

3    Q    And there was something inside the punch bowl.  What did you

4    see inside the punch bowl?

5    A    Vials.

6    Q    Did any of the vials, were they empty or did they have

7    anything inside them?

8    A    I don't remember.

9    Q    Did you see anything that you knew to be drugs?

10   A    Yes.

11   Q    Where were they?

12   A    Kind of like sitting off on the side.

13   Q    Now, was there anybody near this table or at this table?

14   A    Yeah.  We were all sitting around the table.

15   Q    When you say "we all", that means you?

16   A    Yes.

17   Q    Who else?

18   A    Sharmeka, Dionne, my sister Nieshia.  And I want to recall

19   Bo was kind of like running around the house, different areas,

20   but he was also present.

21   Q    And you mentioned that there was some drugs and they were

22   not in packaged form at that time, is that correct?

23   A    Right.

24   Q    Could you tell what kind of drug it was?

25   A    Cocaine.

1    Q    Crack cocaine or powder cocaine?

2    A    Crack cocaine.

3    Q    You were able to tell the difference?

4    A    Yes.

5    Q    And I think you've already answered this.  But was anybody

6    involved in packaging the drugs there at that time or did you

7    just see the vials and the crack and they were just sitting

8    there?

9    A    To the best of my knowledge, I don't remember.

10   Q    That's fine.  And did you, when you saw this, these

11   narcotics sort of lying out, did you have any thoughts about what

12   you might have been able to do if you had an opportunity?

13   A    As in?

14   Q    Did you think about stealing the stuff?

15   A    Oh, yeah.

16   Q    If you'd had an opportunity, that would have been something

17   you would have considered doing, is that fair to say?

18   A    Yeah.

19   Q    Did you have such an opportunity?

20   A    No.

21   Q    So I gather you didn't steal anything?

22   A    No.

23   Q    Now, there came a time when you learned that Mr. Mitchell

24   had been arrested, is that right?

25   A    Correct.

1  Q    Let me ask you about that evening.  Had you spent any time

2  with Mr. Mitchell prior to that arrest?

3  A    Yes.

4  Q    During this period of time we've been discussing, you bought

5  drugs from Mr. Mitchell but there was also, you occasionally were

6  intimate with Mr. Mitchell, is that correct?

7  A    We were -- yeah.

8  Q    And on this particular evening you were spending time with

9  him socially, is that fair to say?

10  A    Correct.

11  Q    How about, just ballpark, if you remember, how long were you

12  with him that night?

13  A    Maybe about a half hour, 45 minutes.

14  Q    And at some point did he ask you to go get anything?  Did

15  Mr. Mitchell ask you to go get anything?

16  A    I'm not sure it was asked.  But I remember leaving and going

17  to my grandfather's bar to get beer.

18  Q    You're not sure if you were asked to go get beer?

19  A    Right.

20  Q    But somebody either asked you or told you to go get some

21  beer?

22  A    Right.

23  Q    And you went to this bar.  Where was the bar located?

24  A    Maybe three blocks away.

25  Q    It was a family bar?

1    A    Yes.

2    Q    And you, did you pick up some beer?

3    A    Yes.

4    Q    And did you take it back?  Where was it that you were

5    hanging out with Mr. Mitchell that evening?  Whose place?

6    A    The apartment.

7    Q    This apartment that Mr. Mitchell used and that Sharmeka

8    Fletcher also used?

9    A    Yes.  I don't know whose apartment it was.

10   Q    When you got back to the apartment, did you see anything

11   happening?

12   A    Yeah.  There were police everywhere.

13   Q    Including inside the apartment?

14   A    I wasn't sure if they were inside of the apartment yet.

15   Q    But they were around?

16   A    Right.

17   Q    Were there flashing lights?

18   A    Yes.

19   Q    What did you do?

20   A    Tried to page their pager.

21   Q    Whose pager?

22   A    Bo's.

23   Q    And did Mr. Mitchell answer?

24   A    No.

25   Q    What did you end up doing that night?  Did you walk up to

1    the police and say, What's going on, or did you walk away?

2    A    No, I kept driving past.

3    Q    You didn't want to get in trouble, is that fair?

4    A    Yeah.

5    Q    Now, there comes a time later on, and I won't get into what

6    you heard, but did you receive information that your sister,

7    Nieshia, had been involved in some way in the events leading to

8    that arrest?

9    A    Correct.

10   Q    And I just want to try to put a little bit of background

11   here.  Do you have any idea, did you ever see your sister,

12   Nieshia, on that particular evening before leaving the apartment

13   to go pick up some beer?

14   A    No.

15   Q    Do you know whether or not she came before you arrived in

16   Mr. Mitchell's that night or while you were at the bar, anything

17   like that?  Do you know one way or the other?

18   A    No.

19   Q    During this time that you were occasionally buying from Mr.

20   Mitchell in Altoona, did you ever see any guns in that apartment?

21   A    Yes.

22   Q    When did you see a gun in the apartment?

23   A    Laying on the table.

24   Q    Was this the same table you talked about with the punch

25   bowl?

1    A    Um-hum.

2    Q    That's a yes?

3    A    Yes.

4    Q    Was it the same time that we just discussed, where there was

5    a punch bowl, or was this a different time that you saw a gun in

6    the apartment?

7    A    This is the same time.

8    Q    And what kind of a gun was it?  Did you know anything about

9    what type of a gun it might have been?

10   A    Could have been a .357.  It had a long barrel.  I don't

11   really -- I didn't pick it up and examine it or anything, so --

12   Q    Do you remember what color it was?

13   A    I want to believe it was black.

14   Q    You remember if it was a -- you mentioned it was a .357.  Do

15   you remember if it was a revolver or a semiautomatic, if you know

16   the difference?

17   A    No, I don't.

18   Q    Where was the gun?

19   A    Laying on the table.

20   Q    Near the drugs?  Far from the drugs?

21   A    Actually, it was about where Dionne was sitting at.

22   Q    That was going to be my next question.  Were there people

23   sitting at the table?

24   A    Yes.

25   Q    And Dionne was one of them?

1   A    Um-hum.

2   Q    That's a yes?

3   A    Yes.

4   Q    The gun was closest to her?

5   A    Yes.

6   Q    How about Sharmeka?  Was she sitting at the table?

7   A    Everybody was kind of bunched together.  It was a small

8   table.

9   Q    And this is the same instance where I think you indicated

10  Mr. Mitchell was there, but he was moving around a lot?

11  A    Correct.

12  Q    Was your sister in the area as well?

13  A    Yes, she was.  She was getting her hair done.

14  Q    Now, sometime after the arrest that we talked about, and

15  that arrest that we talked about, or the police activity we

16  talked about, does January of 2000 sound accurate?

17  A    Could be.  It's been a while.

18  Q    That's fine.  Couple years after that, during the 2002 time

19  frame, did there come a time when you saw Mr. Mitchell again?

20  A    In Baltimore.

21  Q    How did you come to be in Baltimore during this 2002, early

22  2002 time frame?

23  A    I took somebody else I know from Baltimore, I brought them

24  down to see their parents.

25  Q    Just a friend who needed a ride and you just drove them?

1    A    Basically, yeah.

2    Q    Driving this friend down to Baltimore, did you, did you have

3    any idea that you might just hang out in Baltimore yourself or

4    was this purely to give your friend a ride?

5    A    No.  Purely to give him a ride.

6    Q    Now, you end up bumping into some people that you knew while

7    you were here, is that right?

8    A    Right.

9    Q    How did that happen?

10   A    Because the dude I took down there jumped out the truck.  I

11   guess we were in his neighborhood.  He jumped out the truck to

12   say hi to some people.  And the time I was sitting there, I had

13   seen a few people I knew, recognized.

14   Q    So your friend is seeing some friends.  While he's talking

15   to them, you see some people you recognize.  Who did you see?

16   A    First Chris Byrd.

17   Q    Who is Chris Byrd, while we're on that subject?

18   A    Some dude that I knew, that used to come up to Altoona from

19   Baltimore.

20   Q    What did he come up to Altoona for?

21   A    Sell drugs.

22   Q    Did you ever buy drugs from Chris Byrd?

23   A    Yeah, I believe so.  I really don't remember, honestly.

24   Q    Do you know if Chris Byrd knew Carlos, if you know?

25   A    Do I know if he knew Carlos?

1    Q    Yes.

2    A    I believe he did.

3    Q    And did you know Chris Byrd before or after you knew Mr.

4    Mitchell during the time that we discussed in 2000?

5    A    Before.

6    Q    So Chris Byrd was one of the guys that you saw in Baltimore,

7    and you went up and talked to him?

8    A    He came up to my truck and spoke to me.

9    Q    While you were talking to Mr. Byrd, did you see anyone else

10   you knew?

11   A    Afterwards, yeah.

12   Q    And who was that?

13   A    Bo.

14   Q    Mr. Mitchell?

15   A    Yes.

16   Q    When did you see Mr. Mitchell?  Was it on the street or did

17   you go some place with Mr. Byrd and then you saw Mr. Mitchell?

18   A    No.  It was on the street.

19   Q    Now, you talked to Mr. Mitchell that day?

20   A    Yeah.

21   Q    What did you guys talk about?

22   A    Nothing really.  At first I didn't want to talk to him

23   because I thought he thought I had something to do with my sister

24   setting him up.  So it had been a while since I seen him.  He

25   came up and said, What's up.  I asked him, you know what I'm

1    saying, how he been or whatever.  He said he just got done doing

2    a bit for a body.  And basically that was it.

3          MR. LAWLOR:  Objection, Your Honor, move to strike.

4          THE COURT:  The jury will disregard the last portion of

5    the witness's answer.  Go ahead, Mr. Harding (sic).

6    Q    Well, let me ask you this, Ms. Duganne.  If the defense

7    objects.  Did Mr. Mitchell tell you anything specifically about

8    what he had been doing in the recent past?

9          MR. LAWLOR:  Objection, Your Honor.  Can we approach?

10         THE COURT:  Answer yes or no first.

11         MR. HANLON:  Yes or no?

12         THE WITNESS:  You have to specify that question.

13         MR. HANLON:  Sure.

14         THE COURT:  Go ahead, Mr. Harding.

15         MR. HANLON:  I'll ask this in a yes or no.  Did Mr.

16   Mitchell talk to you about just finishing something, yes or no?

17   Did he say anything about just finishing something?

18         MS. RHODES:  Objection, Your Honor.

19         THE COURT:  Well, the witness said he did a bit.  Is

20   that what you said?

21         THE WITNESS:  Yes.

22         THE COURT:  And what did you mean by that?

23         THE WITNESS:  He just got done doing prison time.

24         THE COURT:  Okay.  Go ahead, Mr. Harding.

25         MR. HANLON:  And did Mr. Mitchell tell you what he did

1    a bit for?

2              MR. LAWLOR:  Objection, Your Honor.

3              THE COURT:  Overruled.  The answer is yes or no.  Did

4    he tell you what he did the time for?

5              THE WITNESS:  Yes.

6              THE COURT:  All right.  Go ahead, Mr. Harding.

7              MR. HANLON:  And what did Mr. Mitchell tell you about

8    what he had done that time for?

9              MR. LAWLOR:  Objection, Your Honor.

10              THE COURT:  The objection's overruled.  You may answer.

11              MR. LAWLOR:  Approach?  Your Honor, can we approach?

12              THE COURT:  No.  You may answer.

13              THE WITNESS:  I'm not sure the exact words of, I got a

14    body or I had a body.  In those forms.

15              MR. LAWLOR:  Your Honor, objection, move to strike.

16              THE COURT:  The objection's overruled.  The motion is

17    denied.

18              MR. LAWLOR:  Motion for a mistrial, Your Honor.

19              THE COURT:  Motion for mistrial is denied.  Go ahead,

20    Mr. Harding.

21              MR. HANLON:  And what did you, what did you understand

22    Mr. Mitchell to mean when he said he had just, when he made this

23    reference to a body?  What did you understand him to mean?

24              MR. LAWLOR:  Continuing objection, please, Your Honor.

25              THE COURT:  The objection's overruled.

1          MR. LAWLOR:  May we have a continuing objection, Your

2     Honor?

3          THE COURT:  On this particular point?

4          MR. LAWLOR:  Yes, sir.

5          THE COURT:  Yes.  You may answer.

6          THE WITNESS:  I'm sorry.  Can you repeat that again?

7          MR. HANLON:  Yes.  When Mr. Mitchell made a reference

8     to a body, what did you understand that to mean?

9          THE WITNESS:  That he killed somebody.

10         THE COURT:  Now, ladies and gentlemen, you just heard

11    this witness testify that Mr. Mitchell told her that he had

12    killed someone.  That is not proof that Mr. Mitchell had killed

13    someone.  But you are entitled to consider this evidence of what

14    this witness says Mr. Mitchell told her.  Go ahead, Mr. Harding.

15         THE WITNESS:  Excuse me?  Can I --

16         THE COURT:  No, just wait for the next question.

17         THE WITNESS:  Because I didn't say that he said he

18    killed somebody.  I said he got a body.

19         MR. LAWLOR:  Objection, move to strike.

20         THE COURT:  Right.  You told the jury that you

21    understood --

22         THE WITNESS:  That was my --

23         THE COURT:  --that what he was saying to you --

24         THE WITNESS:  Right.

25         THE COURT:  -- was that he had killed somebody.

1          THE WITNESS:  That was my understanding.

2          THE COURT:  Right.  You didn't say that that's what he

3   said to you.

4          THE WITNESS:  Right.

5          THE COURT:  Go ahead, Mr. Harding.

6          MR. HANLON:  It's actually Mr. Hanlon, Your Honor.

7          THE COURT:  I'm sorry.  Mr. Hanlon.

8   BY MR. HANLON:

9   Q    At any point, did you talk to Mr. Mitchell about any CD's

10  that day or any music?

11  A    No.  He had told me that he was doing good.  He was

12  producing music.  And basically, that's it.

13  Q    Did he have any names for, did he mention the name for a

14  music label or anything like that?

15  A    He had a CD on him.  He put it in my CD player.  And I

16  listened to it.  He gave me a CD.

17  Q    Do you remember seeing any of the words on the CD in terms

18  of the label or anything like that?

19  A    No.

20  Q    Hold on, ma'am.  Just a moment, please, Your Honor.  Nothing

21  further, Your Honor.

22               CROSS EXAMINATION

23  BY MS. RHODES:

24  Q    Good afternoon, Ms. Duganne.

25  A    Good afternoon.

1    Q    I'm Laura Kelsey Rhodes.  I'm representing Mr. Mitchell.

2    You were selling drugs in Altoona on the street, is that right?

3    A    Correct.

4    Q    And you were selling vials one at a time?

5    A    Correct.

6    Q    And this rock that was in those vials, about how long would

7    that last somebody who's an addict?

8    A    Depends on how much they smoke at one time.

9    Q    Okay.  So the people you were selling to, how long did it

10   usually last them?

11   A    Depended.  I didn't sit there and watch them.

12   Q    Well, you know how often they came back to you.

13   A    Would depend on when they get more money.

14   Q    Okay.  So how long would it take somebody to smoke, put that

15   rock in a pipe and smoke it and get high off of it?  What's that,

16   how long does that high last?

17   A    I don't get high.  I don't know.

18   Q    You don't know what your users are doing?

19   A    I don't know how long their high lasts.  That's what you

20   just asked me.

21   Q    Okay.  So how long would they smoke it for, then?

22   A    If it took them five minutes to smoke it, it took them five

23   minutes.  If it took them a half hour, if they spread it out, it

24   took them a half hour.  I'm not sure exactly how long it took

25   them to smoke it.

1    Q    So it wouldn't last necessarily all day for them?

2    A    No.

3    Q    And you were selling about ten vials every three days or so,

4    is that right?

5    A    Around about.

6    Q    Okay.  And that was considered pretty good turnover in

7    Altoona, is that right?

8    A    Right.

9    Q    And when Los, Carlos introduced you to Bo, you understood

10   that Bo was going to be the one staying in Altoona then?

11   A    It wasn't directed that he was going to be staying in

12   Altoona.  He just introduced me to him at that particular point

13   in time.

14   Q    And Bo was there more than Los was after that, right?

15   A    Well, no.  Los actually lived in Altoona, also.  I seen Bo

16   on occasions.

17   Q    Okay.  Los didn't tell you when he introduced him that he

18   was going back to Baltimore?

19   A    He may have.  I know he was, he was in and out a lot.  But

20   he resided in Altoona.

21   Q    Okay.  And he, well, he told you when you met he was going

22   to be going back to Baltimore, didn't he?

23   A    It's possible.  It's been a while.

24   Q    Okay.  So you may have said that in front of the grand jury?

25   A    I may have.

1    Q    Okay.  Now, when you went to the house and -- let's talk

2    about the time you were buying from Bo.  You would also sometimes

3    buy from some other people during that time, right?

4    A    Right.

5    Q    Even at the house, that same house where he was, right?

6    A    No, I would go to different drug dealers.

7    Q    Okay.

8    A    Whoever.

9    Q    But sometimes at that house, you would buy from Sharmeka or

10   Dionne, right?

11   A    I can't recall if I purchased off Sharmeka or Dionne.

12   Q    Well, if you said that in front of the grand jury, would

13   that refresh your recollection?

14   A    If it's in the transcript, then it would refresh my

15   recollection.

16   Q    Okay.  Do you recall now saying that?

17   A    No, I don't.

18   Q    Okay.  Now, when -- your impression of Bo back then was that

19   he wanted to kind of make a name for himself in Altoona, right?

20   A    My impression was he was trying to come up like everybody

21   else.

22   Q    Okay.  Well, you thought he was acting like Mr. Big Stuff,

23   right?

24   A    Not necessarily Mr. Big Stuff.

25   Q    Okay.  You remember when you testified in front of the grand

1    jury, right?

2    A    Somewhat.

3    Q    It was in July of 2004.

4    A    Okay.

5    Q    Well, do you remember that?  Does that sound right?

6    A    Yes.

7    Q    Okay.  And do you remember saying that he wanted to, when

8    asked about Bo's drug business, you said he wanted to basically

9    be Mr. Big Stuff?

10             MR. HANLON:  Your Honor --

11             THE COURT:  Page, please.

12   Q    Page 20.  Do you remember saying he wanted to be basically

13   Mr. Big Stuff?  Let me --

14   A    I don't remember that.

15   Q    Put this on the screen.  Let me put this on the screen so

16   you can say it.  Okay.  Looking at Line 14.  Can you read that?

17   Can you read it?  Can you see it on the screen?

18   A    I can see it.

19   Q    Can you read it out loud, starting on Line 14, the first two

20   sentences?

21   A    He wanted to basically be Mr. Big --

22             THE COURT:  Slowly, please.

23   A    He wanted to basically be Mr. Big Stuff who everybody had to

24   come to to buy their drugs.  If it's there, I must have said it

25   but it doesn't, it doesn't ring a bell.  But, I mean, it's there.

1    Q    So it must be true, then, that you said it, huh?

2    A    I must have, yes.

3    Q    Because you were telling the truth back then, right?

4    A    If it's there, yeah.

5    Q    I mean, you can independently recall now, you were telling

6    the truth then, right?

7    A    Apparently.

8    Q    Okay.  And then Line 21, you were asked if he achieved that

9    goal.  And you said, or actually starting at 20, you said he

10    never achieved that goal, right?  And you agreed with that?

11    A    That line's not completed.  I don't know what I was saying

12    there.

13    Q    Well, Line 19.  You say, And with him getting busted he

14    never, and the prosecutor finishes, Achieved that goal, and you

15    said right.

16    A    Okay.  Right.

17    Q    Is it hard to remember what you said at the grand jury?

18    A    To some point, yes, it is.

19    Q    Okay.  And that was about four years after these incidents

20    you're talking about, right?

21    A    Correct.

22    Q    Okay.  So it must be especially hard to remember what

23    happened back then?

24    A    Correct.

25    Q    Okay.  In terms of the rap music, you heard the CD that he

1    gave you, right?

2    A    Yes.

3    Q    You listened to it?

4    A    Yes.

5    Q    And it was, the lyrics were about the drug game and the

6    lifestyle?

7    A    I don't really remember what the words said.

8    Q    Okay.  Do you remember saying that at the grand jury?

9    A    No.  You probably have to show it to me again.

10   Q    Okay.  Page 18.  Okay.  You were asked, Did he say anything

11   about the CD business he was involved in?  And you said yes.  And

12   you were asked what he said.  And you answer, after we talked

13   about him just getting out of jail, he said that he was chilling

14   now, that he was producing music, he was making money doing CD's,

15   he had a CD out.  Does this ring a bell?

16   A    Yes.

17   Q    Okay.  And I'm going to turn the page.  And I was like, no,

18   you don't, you thought he was joking, right?

19   A    Yes.

20   Q    Okay.  And then you told him that, or you told the grand

21   jury that you listened to the CD, right?

22   A    Correct.

23   Q    And you were asked, do you remember the kind of songs that

24   were on the CD, right?  You said, like basically about his

25   lifestyle, the game, being the drug game, you know, just

1    basically whatever, I mean common rappers rap about, I guess?

2    A    Yeah.

3    Q    Does that ring a bell now?

4    A    Yeah.

5    Q    I mean, do you remember listening to the CD?

6    A    Yeah, I listened to it.  I listen to a lot of music.

7    Q    And it was pretty good, wasn't it?

8    A    It wasn't like I listen to it every day.  I listened to it

9    on my ride back home.  I listened to it a couple times with a

10   couple family members back home, you know, let them know he came

11   out with a CD.  But other than that, it's not like anything I

12   seen on BET every day, where I memorize the words or anything.

13   Q    Okay.  But the lyrics were basically stuff that you hear

14   commonly in that kind of music, right?

15   A    Right.

16   Q    Okay.  Now, when you went down to Baltimore, that trip, when

17   was it?

18   A    '04.

19   Q    It was '04?

20   A    I'm not exactly sure of the year.

21   Q    Okay.  Well, what time of year was it?

22   A    Had to be --

23   Q    I mean, hot out?  Cold out?

24   A    It was nice out.

25   Q    It was nice out.  Okay.  And how do you remember that?  What

1   do you remember about it?

2   A    I just know it was decent out because everybody was out,

3   chilling outside.

4   Q    Okay.

5   A    Usually during wintertime, you know, everybody's bundled up.

6   It wasn't that time of the year.

7   Q    Okay.  And do you remember what you were wearing in terms of

8   clothes?  Like summer clothes?  Or do you remember?

9   A    I don't remember.

10  Q    Okay.  Did you drive -- is there air conditioning in your

11  car?

12  A    I would hope I had air conditioning in there.  I don't

13  really recall, though.

14  Q    Do you remember if you had the windows up or down?

15  A    No, i don't.  I smoke so they more than likely probably

16  would have been down than up.

17  Q    All right.  Now, your family business.  It's drugs, right?

18  A    Yes.

19  Q    That came, you know, your sister's involved, your mom, your

20  grandfather --

21  A    Not my grandfather.  My sister and my mom and I.  My father.

22  Q    Okay.  Well, didn't you testify at the grand jury that it

23  came through your grandfather, too, and his business, the bar?

24  A    I've never known my grandfather to directly sell drugs.

25  Drugs have been transferred and everything else in his bar.

1   Q    I see.  Okay.  In addition to that, part of the family

2   business is cooperating with the government, too, isn't it?

3   A    I can't say with myself, no.

4   Q    Well, you've done it, right?

5   A    When?

6   Q    Right now.

7   A    I'm only being asked about somebody that I've known years

8   ago.

9   Q    Okay.  Well, you heard Mr. Hanlon say that they've said to

10  you they'll talk to other prosecutors about your cooperation.

11  That doesn't mean anything to you?  You thought he was just

12  joking?

13  A    That was asked by me to him after the fact of the matter.

14  Q    Okay.  So you would say you're not cooperating right now?

15  A    I mean, I'm cooperating as far as sitting here and going

16  over the transcript from the grand jury.  As far as doing

17  anything for anything in return, no.

18  Q    Have you ever heard the term "snitch?"

19  A    Yes.

20  Q    Okay.  Would you say you're a snitch?

21       MR. HANLON:  Objection, Your Honor.

22       THE COURT:  Overruled.  You may answer.

23  A    That depends on what you consider a snitch is.

24  Q    What do you consider a snitch, Ms. Duganne?

25  A    I consider a snitch somebody that sets somebody up.

1    Q    Okay.  So that's, is that your term, your definition of

2    cooperator, too?

3    A    No.  That's my term of "snitch."

4    Q    Okay.  So what does "cooperator" mean to you?

5    A    Cooperating is answering any questions that I'm asked

6    truthfully.

7    Q    Okay.  Let me say this, then.  Is snitching part of your

8    family business, too?

9    A    I would have to say snitching has occurred.  As far as

10   family business, there is no family business.  Individuals have

11   sold drugs separately on their own occasions.

12   Q    Okay.  And you've snitched, right?

13   A    No.

14   Q    You --

15   A    I never snitched.

16   Q    Your sister has snitched?

17   A    Yes, my sister has.

18   Q    And your mom has snitched?

19   A    Yes, she has.

20   Q    Okay.  And your father?

21   A    To my knowledge, no.

22   Q    Okay.  So only some of the family snitches, then, right?

23   A    Right.

24   Q    Okay.  And have you ever, has your sister ever received

25   money that you know of for her cooperation with the government?

1    A    I don't know anything about her dealings with them.

2    Q    Now, when you've, you say you're never actually set somebody

3    up, right?

4    A    Never.

5    Q    Okay.  Have you ever ratted on anyone?

6    A    What's your term of ratted?

7    Q    Well, what do you think it means, because you're the one in

8    the business.

9              MR. HANLON:  Objection, Your Honor.

10             THE COURT:  Overruled.  Put your question, please.

11   Q    What do you think "ratting" means, given your experience in

12   the business?

13   A    Ratting to me is snitching, the same definition of a snitch.

14   Q    Okay.  Let me ask you this, then.  Have you ever talked to

15   the police after you were arrested to help them get other people

16   and to help yourself get a better deal?

17   A    Never.

18   Q    Never?

19   A    Never.

20   Q    Okay.  So you are doing this right now today just out of the

21   goodness of your heart?

22   A    I am doing this today because I was pulled into a grand jury

23   back in 2003, 4, whenever it was, and asked questions about an

24   individual that I had knew.  Now today this is a trial and I've

25   been pulled in as a witness to testify as to what I spoke on at

1    that grand jury.

2    Q    Okay.  Did you ask Mr. Hanlon recently about whether he

3    could help your husband and his sentence?

4    A    I asked him that just recently.  I just recently met him.

5    Q    Okay.  And why did you ask him that?  Why did you think that

6    this strange man you've never met before might be able to help

7    you with something like that?

8    A    I told them, basically, I have no involvement in this case.

9    Okay.  There's really nothing that I know about that individual

10   sitting over there that I know of as Bo.  And if it was that

11   important for me to have to come in here and say something, as

12   where I really don't know anything, then somebody's going to do

13   something in turn for me.

14   Q    Okay.  Okay.

15   A    That's what I said.

16   Q    So they owe you, basically?

17   A    They already told me they're not going to do nothing.  So I

18   mean, what am I going to do?  My statement's on the paper.

19   Q    Well, let me ask you this.  You said they told you they

20   wouldn't do anything?

21   A    Correct.

22   Q    Didn't they tell you they would talk to other prosecutors,

23   that they couldn't necessarily help -- let's talk about your

24   husband first.  They couldn't necessarily help his case but they

25   could call the prosecutors or communicate with the prosecutors

1    there?

2    A    Actually, he had told me that he could write a letter to the

3    Board of Parole stating that I had cooperated and came in here

4    and did what I had to do.  And I told him that that was not

5    necessary, I didn't want anything in return.

6    Q    For your husband, I mean.

7    A    No.  I'm talking in terms of my self.

8    Q    Okay.  And why don't you want that on your record?

9    A    Because I'm not doing this for anything in return.

10   Q    Okay.  Because you're afraid of being labeled a snitch?

11   A    No.  A snitch is setting somebody up.

12   Q    Okay.  Well, let me ask you this, then.  Why was it that you

13   were, that after this bust happened that Dionne was going around

14   Altoona telling people that you were a snitch?

15            MR. HANLON:  Objection, Your Honor.

16            THE COURT:  Sustained.  That means don't answer.

17   Q    You've said before that Dionne, after this bust, was going

18   around Altoona telling people that you were a snitch, right?

19   A    That's possible.

20   Q    Okay.  You possibly said that in front of the grand jury,

21   right?

22   A    That's possible.

23   Q    Okay.  Court's indulgence.

24            THE COURT:  Yes.  Ms. Rhodes, how much more do you

25   think you have?

1   Q    15 minutes.

2              THE COURT:  Okay.  We should probably take the luncheon

3   recess.  That's okay.

4              MS. RHODES:  Fine.  Sure.

5              THE COURT:  Ladies and gentlemen, we will take our

6   luncheon recess at this time.  You are to have no discussion

7   about the case or any of the evidence you've heard so far.

8   Please continue to keep an open mind about all issues.  Please

9   leave your note pads on your chairs.  The jury is excused until,

10  I think that clock that I've been looking at for a couple of

11  weeks, ladies and gentlemen, is incorrect.  So I hope you don't

12  feel cheated out of lunch time.

13             I think it's actually 1:10 now, not just four minutes

14  after one.  So I'm going to ask you to be back by 2:30 in the

15  jury room.  The real 2:30, not by the clock in the courtroom.

16             The jury is excused until 2:30 p.m.

17             (Jury exits the courtroom.)

18             THE COURT:  Ms. Duganne is excused until 2:30.

19             (Witness exits the courtroom.)

20             THE COURT:  Now, be seated for a moment, please.  I'm

21  not going to comment in commenting on the fact that it was Mr.

22  Lawlor who I thought objected during this witness' direct.  So I

23  was somewhat surprised to see you stand up to do the examination,

24  Ms. Rhodes, because that runs afoul of the one witness rule, or

25  the one attorney rule, I guess.  But maybe I didn't hear you

1    object, Ms. Rhodes.  But you don't have to answer that.  You

2    don't have to answer that.

3           In any event, I invite you and/or Mr. Lawlor to make

4    whatever record you think is necessary.  Mr. Lawlor seems to be

5    taking the laboring oar on this.

6           MR. LAWLOR:  I'm just more combative in general, Your

7    Honor, so that's why I tend to shout out objections even when

8    it's not my witness.

9           THE COURT:  I'm sorry.  NO. I didn't hear that.  You're

10   more combative?

11          MR. LAWLOR:  In general.

12          THE COURT:  In general than Ms. Rhodes?

13          MR. LAWLOR:  Probably more than most people, yes.

14   Probably all defense counsel.

15          THE COURT:  That's fine.

16          MR. LAWLOR:  Yes, Your Honor.  We renew our motion for

17   a mistrial.

18          THE COURT:  On what basis?

19          MR. LAWLOR:  On the basis that a witness giving vague

20   testimony that our client admitted to some unknown murder is not

21   relevant, is certainly more prejudicial than probative, given

22   that there's no probative value whatsoever to that, and violates

23   Rule 404.  I just, and then, Your Honor --

24          THE COURT:  Well, it's demonstrably false.

25          MR. LAWLOR:  You may know that and I may know that, but

1   those 12 people just heard the witness say that my client

2   willy-nilly admitted to the some murder.

3           THE COURT:  The jury knows full well, full well, even

4   now on, what, the fifth day of the trial, that Mr. Mitchell was

5   not serving any sentence for any homicide when he was back on the

6   street in 2002.  To the contrary.  Just a moment, just a moment.

7   The jury knows full well that in February of 2002, Mr. Mitchell

8   was partying at Hammerjacks.  And Mr. Hanlon didn't have the

9   witness specify what part of 2002.  But the jury either knows now

10  or will soon learn, get crystal clear, that Mr. Mitchell, in

11  fact, the jury does know, just from yesterday, that Mr. Mitchell

12  has been in custody from in or about April of 2002 continuously

13  until today.  And they know that he was at Hammerjacks in

14  February of 2002.

15          So the jury knows full well that if this witness saw

16  Mr. Mitchell on the street, it was before April of 2004.  And the

17  jury clearly knows it was, it was a false statement.

18          The government is entitled to elicit admissions that

19  contain false assertions of fact under many circumstances.  And

20  in fact, this witness' own testimony around the same time that

21  Mr. Hanlon was questioning her made it clear to the jury, if they

22  were paying attention, and I'm sure they were, that this witness

23  was a little concerned about Mr. Mitchell running into him in

24  Baltimore because she was afraid that Mr. Mitchell might suspect

25  that she, this witness, had something to do with him getting

1   busted in Altoona.

2          MR. LAWLOR:  That was nothing that Mr. Mitchell did.

3          THE COURT:  Just a moment.  Let me finish.  So it makes

4   perfect sense, assuming the witness is telling the truth, and

5   that's for the jury, makes perfect sense for Mr. Mitchell, if

6   he's on the same page as this witness, to have said to her, I've

7   committed a murder, as a way of communicating to her, You mess

8   with me and you end up dead.

9          Now, I'm not making any of this up.  You may not like

10  these inferences but they're inferences that are available to the

11  jury.

12         Interestingly, while all the other counsel join in your

13  objection, in fact, none of them objected that I could hear.  And

14  they'll correct me if I'm wrong.  But it doesn't matter whether I

15  heard it.  They join in your objection.

16         But the point is, it was an admission by Mr. Mitchell

17  to this witness.  She heard it.  There wasn't even an objection

18  to the "he just did a bit."  You moved to strike that and I

19  granted the motion because Mr. Hanlon hadn't laid a proper

20  foundation.  So I sustained your objection, ordered the jury to

21  disregard that statement about "I just done a bit for a body."

22         But then Mr. Hanlon came back, made it clear that she

23  was talking to Mr. Mitchell, that this was Mr. Mitchell speaking.

24  And so I overruled your objection and I denied the motion for a

25  mistrial.  And then I gave what the Court regards as a proper

1    instruction, which, again, I'm happy to elaborate on.  I won't if

2    you don't ask me to.  But I would tell the jury that just because

3    somebody says something doesn't make it true.

4         And again, the jury has no question in its mind that

5    Mr. Mitchell in 2002 was not being just released from

6    incarceration for a body, meaning because of a murder.  The jury

7    knows that.  But the government's entitled to argue what Mr.

8    Mitchell was apparently intending to communicate by telling that

9    kind of lie to this witness who was, after all, a coconspirator

10   of Mr. Mitchell, even two years later.

11        There's no evidence that anybody withdrew from the

12   Altoona conspiracy.  To the contrary, the evidence in the case

13   seems to be that Mr. Mitchell didn't go back to Altoona because

14   he was released on bail after this arrest.

15        So for all it appears, this Altoona conspiracy had

16   continued in existence, and she was one of his coconspirators.

17   And a false statement that, I have just committed a murder, is

18   quintessentially a statement in furtherance of a conspiracy,

19   certainly to an underling.

20        So those are the Court's reasons.  If there's more

21   record you need to make Mr. Lawlor, go ahead and do it.

22        MR. LAWLOR:  Well, Your Honor, first of all, that there

23   was an ongoing conspiracy in Altoona, I disagree with you,

24   because typically a conspiracy's terminated by the arrest of one

25   of the participants.

1          THE COURT:  Absolutely not.  This case is the

2   paradigmatic example of that.  Every one of these gentlemen got

3   locked up during the course of this conspiracy.

4          MR. LAWLOR:  For a different conspiracy.

5          THE COURT:  What do you mean "a different conspiracy?"

6          MR. LAWLOR:  You're talking about a conspiracy that the

7   witness and Mr. Mitchell were involved in that you were calling

8   the Altoona conspiracy.

9          THE COURT:  There is no record in this record that that

10  conspiracy ever ended.  Just because Mr. Mitchell and the young

11  women got busted doesn't mean the conspiracy ended.  There's no

12  such rule of law.

13         MR. LAWLOR:  Well, that's where I disagree with you.  I

14  think Mr. Mitchell's arrest by operation of law would terminate

15  that conspiracy.

16         THE COURT:  Well, there's not many things I'm

17  absolutely certain you're wrong about, Mr. Lawlor, but that's one

18  of them.

19         MR. LAWLOR:  Well, I think you usually think I'm wrong

20  about most things.

21         THE COURT:  That's not true.  That's not true.  You're

22  right about a lot more than you're wrong about, but on that

23  you're absolutely wrong.

24         MR. LAWLOR:  That's not going to slow me down any.

25         THE COURT:  I hope it doesn't.  I don't want it to.

1    Anything else?

2              MR. LAWLOR:  Can I make my record, please?

3              THE COURT:  I think you made it.

4              MR. LAWLOR:  I haven't.

5              THE COURT:  What more is there to say?

6              MR. LAWLOR:  Your Honor, you're not going to let me

7    speak uninterrupted, I'm never going to be able to finish this

8    record.  Please.

9              THE COURT:  Maybe we should wait until after lunch.

10   Maybe our sugar is low.

11             MR. LAWLOR:  All right.  I'll defer to you on that.

12             THE COURT:  What more is there to say?  You objected.

13   You made your motion for a mistrial.  You said because it was,

14   what?  Inadmissible hearsay?  You didn't say hearsay.

15             MR. LAWLOR:  Not a hearsay objection, Your Honor.

16             THE COURT:  You said it's a violation of --

17             MR. LAWLOR:  401, 403 and 404.  Your Honor, I wanted to

18   respond to what Your Honor just said.

19             THE COURT:  No. You don't get to respond to the Court's

20   ruling.  You get to make your record.  Go ahead.  Make your

21   record.

22             MR. LAWLOR:  Your Honor, Your Honor said that the jury,

23   you know, they don't believe this, they know this is false.  And

24   I disagree with the Court there.  And Your Honor discussed the

25   fact of a limiting instruction.  And Your Honor, we object to the

1    Court sua sponte giving limiting instructions.  If we want to,

2    this is evidence that we would seek to limit, harmful evidence

3    against Mr. Mitchell that we object to coming in at all.  To the

4    degree that we want to have the Court limit its admission, that's

5    something that we should be permitted to ask for.

6              THE COURT:  The Court has an independent obligation

7    under the Sixth Amendment, Mr. Lawlor, as you well know, to

8    insure as best as humanly possible that these four men get a fair

9    trial.  And if I think a limiting instruction is necessary to

10   carry out that responsibility, I expect to do that.

11             And I've said now, what, nine times, if you want to

12   submit some limiting instructions, I'm happy to elaborate on

13   anything I've said.  If you think I've given an incorrect

14   limiting instruction, apart from you don't want limiting

15   instructions, I understand you don't want them because you want

16   reversible error.  I don't fault you for that.

17             MR. LAWLOR:  That's not it.

18             THE COURT:  I don't fault you for that.  But I'm going

19   to continue to give limiting instructions based on my

20   understanding of the law and the fairness, the kind of fair trial

21   that these defendants are entitled to.

22             I don't know if you finished making your record.  Go

23   ahead.

24             MR. LAWLOR:  Your Honor, no, to the degree I have

25   anything else to say, I'll submit it in a limiting instruction or

1    written objection after lunch.

2            THE COURT:  One of the reasons, by the way, I was happy

3    to see, hear Ms. Rhodes say that she had another 15 minutes, was

4    because I wanted to be able to take a recess and give you and her

5    a chance to discuss this witness and for her to decide how she

6    wants to conclude her cross examination.  Obviously, there's a

7    lot she can do along the lines of our colloquy just now to bring

8    home to the jury that Mr. Mitchell was puffing.  As the witness

9    said in her grand jury testimony, trying to be a big guy.  And

10   it's perfectly consistent with the whole gangsta rap defense that

11   is a part of this case.

12           MR. LAWLOR:  Your Honor, I'll give you two to one odds

13   that the government in closing argument will say that what Mr.

14   Mitchell said to that witness is a confession.

15           THE COURT:  No.

16           MR. LAWLOR:  And not puffing.

17           THE COURT:  No, they aren't.  No, they aren't.  Let's

18   hear it from, let's hear it right now.  Does the government have

19   any evidence whatsoever that if Mr. Mitchell was on the street on

20   bail or having completed a sentence in 2002, that he completed a

21   sentence for a homicide?

22           MR. HANLON:  No, Your Honor.

23           THE COURT:  So you're not going to say it was true that

24   Mr. Mitchell had just done a bit in 2002 and been released for a

25   homicide?

```
 1            MR. HANLON:  We can't say that that's true because it's

 2    not.

 3            THE COURT:  It's not.

 4            MR. HANLON:  But we do agree, Your Honor, that it was

 5    certainly an intended threat to this witness.

 6            THE COURT:  I think that's a fair inference.

 7            MR. HANLON:  Fair argument.

 8            THE COURT:  It's absolutely fair argument.  It's

 9    absolutely fair argument.

10            MR. LAWLOR:  Your Honor, if that's the case, I'd ask

11    the Court, at a minimum, one of the things that I'm going to ask

12    for, for you to instruct the jury that what Mr. Mitchell

13    purportedly said is demonstrably false.

14            THE COURT:  I might do something like that.

15            MR. LAWLOR:  All right.

16            THE COURT:  Thank you.  We're in recess until 2:30.

17            (Luncheon recess.)

18            (Defendants present.  Jury not present. Witness not

19    present.)

20            THE COURT:  Can we had get Ms. Duganne back?

21            MR. LAWLOR:  Your Honor, before she comes out, can I

22    just get a quick word about the limiting instruction we're going

23    to request?  If the Court is willing to give one.

24            THE COURT:  I was going to give one but I'm happy to --

25            MR. LAWLOR:  Here's the language that we had in mind.
```

1    You have heard evidence from this witness regarding statements

2    attributable to Mr. Mitchell.  Previously instructed you about

3    the limited basis on which you could consider this evidence.  I

4    further instruct you that these statements are demonstrably

5    false.

6              THE COURT:  I'm going to elaborate just a little bit

7    more and be more specific.  And it's not true that I told the

8    jury what the evidence could be considered for, and I intend to

9    do that.  But I hadn't done that before.  All I said to the jury

10   before was that just because somebody says something doesn't make

11   it true.

12             MR. LAWLOR:  Okay.

13             THE COURT:  Okay.  But certainly, your request is

14   perfectly well taken and I'm going to cover everything that

15   you've asked me to cover as a part of a more general credibility

16   determination instruction.  You know, the way I will at the end

17   of the case.  And tell the jury that they will determine who,

18   what is true and what is not in terms of the testimony, that they

19   can believe all, part or none of the testimony of any given

20   witness.  But in this instance it is not true that in 2002 Mr.

21   Mitchell served time for killing anyone.  Because that's what's

22   not true.

23             MR. LAWLOR:  Okay.

24             THE COURT:  Okay?  And I'm going to.

25             MR. LAWLOR:  You just said --

1      THE COURT:  Let me finish.  I'm going to go further and

2  say, it's for you to determine what, if any, part of this

3  witness' testimony to believe, it is for you to determine what,

4  if anything, Mr. Mitchell said to this witness.  It is for you to

5  determine what, if anything, Mr. Mitchell intended to communicate

6  by what he said to the witness.  But you may consider that

7  evidence from the witness about Mr. Mitchell having served a bit

8  for a body only in consideration of the effect that it may likely

9  have had on the witness, or words to that effect.

10      MR. LAWLOR:  Your Honor, could you, rather than

11  instruct them, if I could make a request --

12      THE COURT:  Yes.

13      MR. LAWLOR: -- that Mr. Mitchell had never served time

14  in 2002 for a body or however you want to characterize it, could

15  you instruct them that he has never served a sentence for

16  anything of that kind?

17      THE COURT:  No.  I'm not going to go outside the

18  evidence that far.

19      MR. LAWLOR:  Well, could you tell them, then, that he

20  has, prior to his incarceration on this case on April 1st, 2002,

21  never been incarcerated as an adult?

22      THE COURT:  I don't know that to be true.

23      MR. LAWLOR:  It is true.

24      THE COURT:  Well, I don't know that.

25      MR. LAWLOR:  I have one other unrelated request, Your

1    Honor.

2              THE COURT:  If you'd just step back.

3              MR. LAWLOR:  This will take five seconds.  I'm under

4    the weather.  And I was wondering, there are going to be a couple

5    witnesses related to Mr. Mitchell.  I was wondering if the Court

6    would excuse me after those witnesses are completed.

7              THE COURT:  Absolutely.  And Mr. Lawlor, I will say

8    something to the jury about your absence, if that's, you weren't

9    feeling well and I've excused you.

10             MR. LAWLOR:  That will be great.

11             THE COURT:  All right.  Mr. Hanlon.

12             MR. HANLON:  Your Honor, I think that the Court's

13   instructions that the Court's drafted probably encompasses this.

14   The government's obviously very sensitive to not having a

15   situation where any instruction from the Court leads the jury to

16   infer that the witness' testimony is demonstrably false.

17             THE COURT:  No.  Right.  Of course, I have to be

18   careful about that.

19             MR. HANLON:  Or that the Court is telling the jury to

20   say that it is false that in 2002 Mr. Mitchell had a body on him,

21   since it is the government's theory that he, in fact, did have a

22   body on him.  What is untrue about this is that he had done time

23   for such a thing.

24             THE COURT:  Fully understood.

25             MR. HANLON:  I think that the Court's instruction has

125

1    that intent.

2             THE COURT:  Absolutely.  Absolutely.  Mr. Martin.

3             MR. MARTIN:  Your Honor, I can clarify.  You going to

4    give that instruction now or are we going to wait till the end?

5             THE COURT:  I was going to ask Ms. Rhodes what her

6    preference was, whether she wanted me to wait until the cross is

7    concluded or the entire examination is concluded, or you want me

8    to give it right away?

9             MS. RHODES:  I would prefer that you wait until

10   everything is concluded with this witness.

11            THE COURT:  Okay.  Sure.  Mr. Martin?

12            MR. MARTIN; Your Honor, one other thing I want to make

13   clear is that the, you are not, I can't follow everything you

14   said you were going to say.  My brain's too old to remember all

15   those things.

16            THE COURT:  I doubt that, Mr. Martin.

17            MR. MARTIN:  You're going to give me an option, also,

18   in this instruction of determining that, it's a possibility that

19   they could determine that Mr. Mitchell never said this at all.

20            THE COURT:  Exactly.  Exactly.  Absolutely.  In other

21   words, what, if any, part of the witness' testimony to credit is

22   up to them.

23            MR. MARTIN:  Thank you, Your Honor.

24            MR. HANLON:  Your Honor, may I put one more thing on

25   the record?

1          THE COURT:  Yes.

2          MR. HANLON:  The language that Mr. Martin asked about,

3    which I think would be standard language that would be included

4    in a witness credibility instruction at the conclusion of trial,

5    the concern we have about that being read right now, since it's

6    obviously going to be part of a standard instruction at the end,

7    I think the jury would take note of the fact that the Court is

8    specifically advising them after a particular witness' testimony,

9    and I think they would infer that the Court has doubts or

10   concerns about the witness' credibility.  It's an unusual

11   instruction to give right after a particular witness.

12         THE COURT:  I appreciate that, Mr. Hanlon, but I

13   disagree.  I don't think the jury, and as you well know, I will

14   instruct the jury, and in fact, I will include in this limiting

15   instruction what the Court, that they are the judges of the

16   facts, a term used by one of counsel earlier in the trial.  And

17   whatever the Court may say about a witness relating to any

18   factual matters, they are to ignore.  So I'll clean it up that

19   way.

20         MR. HANLON:  Thank you, Your Honor.

21         MR. LAWLOR:  I'm sorry, Judge.  I don't mean to belabor

22   this.  But did the Court indicate that it was going to limit it

23   to the effect on the hearer?  Limit the language used, may be

24   only considered in conjunction with the effect it had on the

25   hearer?

1        THE COURT:  Well, what I intend to say is, they are

2    entitled to consider, I'm going to tell them it is not true, but

3    they are entitled to consider within the context of all the

4    evidence, if they find that Mr. Mitchell made the statement, why

5    he would have made the statement.  And in particular they may

6    consider it as it may or may not have had an effect on the

7    witness herself, who says she heard the statement.

8        MR. LAWLOR:  Okay.

9        THE COURT:  Okay?  All right.  Thank you.

10        MR. LAWLOR:  Thank you, Judge.

11        (Witness enters the courtroom.)

12        (Jury enters the courtroom.)

13        THE COURT:  Good afternoon, ladies and gentlemen.

14    Thank you for your patience.  Ms. Duganne, you may be seated.

15    You remain under oath, ma'am.  And continue to speak into the

16    microphone, please.

17        THE WITNESS:  Yes, sir.

18        THE COURT:  Whenever you're ready, Ms. Rhodes.

19        CONT'D CROSS EXAMINATION

20    BY MS. RHODES:

21    Q    Thank you, Your Honor.  Good afternoon, Ms. Duganne.

22    A    Good afternoon.

23    Q    We were talking before we broke about whether or not Dionne

24    was telling people in Altoona you were a snitch, right?

25    A    Correct.

1    Q    Okay.  And did you, do you recall that now, that you had

2    testified to that before in the grand jury?

3    A    It's familiar.  A lot of people were saying it after my

4    sister had, you know, did what she did.  So several people said

5    it.  But yeah, it's familiar.

6    Q    And Dionne, too?

7    A    Yes.

8    Q    Okay.  And that, do you know why she was saying it?

9            MR. HANLON:  Objection, Your Honor.

10           THE COURT:  Overruled.  You may answer.

11   A    Of course.  My sister had set somebody up.  She set up

12   several people.  So I mean, who wouldn't think that I was

13   involved?

14   Q    Okay.  And that was a concern that you had, right, that

15   people --

16   A    Right.

17   Q    -- would think you were involved?  Okay.  In fact, that was

18   a concern you had when you met up with Mr. Mitchell a couple

19   years later in Baltimore, right?

20   A    Right.

21   Q    Okay.  And then you saw him.  You started talking to him?

22   A    Yes.

23   Q    Right?  Okay.  And you told him, you know, sorry, I had

24   nothing to do with that, right?

25   A    To some extent.  It was discussed briefly.  He basically

1    said he, you know, he had later found out I didn't have anything

2    to do with it.

3    Q    Okay.  So you were reassured at that point?

4    A    Right.

5    Q    And then you guys got along okay.  I mean, you went to his

6    place to get the CD, right?

7    A    Some place, yeah.

8    Q    And then he gave you the CD?

9    A    Right.

10   Q    Did you listen to some of it right then?

11   A    Yes.

12   Q    Okay.  So you weren't concerned that he was still mad at you

13   or anything?

14   A    No.

15   Q    Okay.  So the day of the drug bust, you're at the apartment

16   that afternoon, is that right?

17   A    It was afternoon, early evening.  I can't remember exactly

18   when.  But yeah, I was there.

19   Q    Okay.  And you're saying that you went over that day.  How

20   long were you there, would you say, altogether?

21   A    I want to say like a half hour, 45 minutes.  To the best of

22   my knowledge, I don't recall being there longer than that.  It

23   could have been but I don't believe that it was.

24   Q    Okay.  And who was there when you got there?

25   A    Bo was there, and I want to believe Sharmeka and Dionne were

1    there.

2    Q    Okay.  So when you first got there, just the four of you?

3    A    Right.

4    Q    Okay.  Now, you're kind of smiling now.  What's that about?

5    A    Because I'm just making sure that that's who was there, I'm

6    right.  Because somebody was upstairs.  Dionne or Sharmeka, one

7    of the two were upstairs and then they came downstairs.  So yeah.

8    That's who was there.

9    Q    Well, this is kind of hard to remember back that far?

10   A    Well, it is when you've -- yeah.  That's who was there.

11   Q    How many times have you testified in other trials?

12   A    Zero.

13   Q    This is your first trial?

14   A    Yes.

15   Q    Was that your first grand jury appearance?

16   A    Yes.

17   Q    Okay.  And do you like being in prison?

18   A    Do I like it?

19   Q    Yeah.

20   A    No.

21   Q    Would you rather be out?

22   A    I can accept my prison time.

23   Q    What's that?

24   A    It's not about would I rather be out.  If I do a crime, I

25   have to do my time.

1   Q    Well, I'm asking, would you rather be out?

2   A    Anybody would, yes.

3   Q    Okay.  So you get there and the three of them are there,

4   right?  And what do you do then?

5   A    We're just chilling.  I don't know.  We might have smoked

6   some weed.  I don't know.  We were all chilling.  We were messing

7   with puppies.  He had pit puppies.

8   Q    Were you buying crack that particular time?

9   A    I don't, I don't believe.  So I think I went over there just

10  to kick.  I don't believe I was going over there to re-up.  No.

11  I don't think I was that time.

12  Q    You're not 100% sure but you don't think so?

13  A    I don't believe I was.

14  Q    Okay.  And what else did you guys do then?

15  A    Nothing.  We were chilling.  We were laying around on a

16  mattress or something that was on the floor.

17  Q    Who is we?

18  A    Me and Bo.

19  Q    Okay.  And this is upstairs or where?

20  A    Downstairs in the living room.

21  Q    In the living room?

22  A    Yeah.

23  Q    Okay.  And what happened then?

24  A    Nothing.  Some, somebody mentioned about drinking or

25  whatever.  That's whenever I left.  I went down to the bar.

1    Q    Okay.  So first you're there for about 45 minutes?

2    A    If it was that, yes.

3    Q    Okay.  And then you leave to get some beer?

4    A    Right.

5    Q    Somebody mentioned getting beer?

6    A    Right.

7    Q    Okay.  You remember saying in the grand jury that it was Bo,

8    Bo asked you to go get some beer?

9    A    Okay.  Then that's who it was.

10   Q    Is that correct?

11   A    Correct.

12   Q    Okay.  And do you remember what time this was?  What time of

13   the afternoon or early evening?

14   A    No.

15   Q    Okay.  And you had a car there, right?

16   A    I had somebody's car, yes.

17   Q    Okay.  So --

18   A    I was driving.

19   Q    You get in the car, right?

20   A    Um-hum.  Yes.

21   Q    You drive to your grandfather's bar?

22   A    Correct.

23   Q    And that's about three blocks?

24   A    Right.

25   Q    So it's a real quick ride?

1    A    Right.

2    Q    So you get the beer?

3    A    Yes.

4    Q    And you come back?

5    A    I didn't make it back.  But yes.

6    Q    Okay.  So by the time you drive back to the house or past

7    the house, that probably took 15, 20 minutes, max?

8    A    If that.

9    Q    Okay.  And did you have the beer?

10   A    Yes.

11   Q    With you?  Okay.  And that's when you see the swarm of

12   police cars outside?

13   A    I seen the lights out of my peripheral before I even got to

14   the block.

15   Q    Okay.  Okay.  And you hadn't seen your sister earlier that

16   day?

17   A    I don't --

18   Q    Or had you?

19   A    I'm not sure.

20   Q    Was that the first time you'd been to the house that day?

21   A    I'm not sure.  I don't remember.

22   Q    Okay.  And your not sure.  You might have talked to her, you

23   might not have?

24   A    I'm sure I spoke to her.  I'm not sure if I had seen her.

25   Q    Okay.  Was she there when you were at the house?

1    A    That evening?

2    Q    Yeah.

3    A    No.

4    Q    You didn't see her at all?

5    A    Not that evening when I was there, no.

6    Q    When you were there, were you in the -- is it two floors or

7    just one floor?

8    A    Two.  I believe it was two.  I was never upstairs.

9    Q    So you were downstairs the whole time when that, that day?

10   A    Correct.

11   Q    And you never saw her come in?

12   A    No.

13   Q    And you never saw her leave?

14   A    No.

15   Q    Okay.  And that day, you also saw a gun on the table, right?

16   A    Yes.

17   Q    Okay.  Now, when the police or prosecutors or anybody asked

18   you about this case, did you tell them you had seen a gun on the

19   table?

20   A    Yes.

21   Q    Okay.  And you mentioned that Nieshia was getting her hair

22   cut?

23   A    She was getting it braided, I believe.  One of the girls

24   were braiding her hair.  I don't remember which one.  But she had

25   came over to get her hair braided.

1    Q    So she was getting her hair breaded there at the house?

2    A    Right.

3    Q    Well, so you did see her that day, then?

4    A    Yes.  It was that day, then.

5    Q    Okay.  So she must have been there for a while, I guess, if

6    she's getting her hair braided?

7    A    Yeah.  I can't remember what kind of style or braids it was.

8    But it takes time to get your hair braided.

9    Q    And she was already there when you got there?

10   A    I don't remember if we went there together or if she was

11   already there.  It wasn't at the same time that evening that she

12   was getting her hair done.  That had been earlier.

13   Q    Okay.  Are you having trouble remembering?

14   A    I may be.

15   Q    Okay.  Did you know at the time, on that day, that your

16   sister had ever set anybody up before?

17   A    No.

18   Q    Did you know that your mother had?

19   A    No.

20   Q    So this was new to you?

21   A    Right.

22   Q    Okay.  And you're sure that your sister didn't tell you

23   anything about what she was going to do, right?

24   A    No.

25   Q    Okay.  So when you went to get beer and you came back and

1    there were the police, you didn't get caught with anything,

2    right?

3    A    No.

4    Q    You didn't get charged with anything, right?

5    A    No.

6    Q    You didn't get arrested?

7    A    I didn't go directly back to the house.

8    Q    Right.  And so you didn't get arrested?

9    A    At all.  No.

10   Q    Okay.  And this was the bust that your sister had set up,

11   right?

12   A    And which I found out she had her involvement with

13   afterwards, yes.

14   Q    Yeah.  Okay.  So that was a pretty lucky day for you, wasn't

15   it?

16   A    Yeah.

17   Q    Okay.  Nothing further, Your Honor.

18            CROSS EXAMINATION

19   BY MR. KURLAND:

20   Q    Good afternoon.

21   A    Good afternoon.

22   Q    My name is Adam Kurland.  I represent Shawn Gardner.  I just

23   have a couple of questions.

24            First off, did you get an opportunity to visit with

25   your sister yesterday?

1    A    Briefly.

2    Q    Just want to clear that up.  Also, you had indicated before

3    that you're serving time for various offenses, including a

4    firearms violation?  Did I understand that correctly?

5    A    Correct.

6    Q    Just out of curiosity, what type of firearms charge is that?

7    A    What do you mean, what type?

8    Q    Is it possession of an illegal firearm?  Is it sale of an

9    illegal firearm?

10   A    A felon not to possess a firearm.

11   Q    Pardon me?

12   A    A felon not to possess a firearm.  And actually, my

13   daughter's father had took that charge so it kind of was merged

14   off of my sentence.

15   Q    All right.  I take it that given your, the family history

16   that you described on some of the questions from the government,

17   that you're familiar with, you've been basically raised around

18   firearms and drugs?

19   A    Correct.

20   Q    Long time?  Are most of the guns, you don't go out to

21   Wal-Mart to buy the guns?  The guns are usually possessed or

22   purchased in an illegal manner?

23   A    Right.

24   Q    And when you possess a gun or you purchase a gun, well, I

25   guess with respect to the drugs, I take it that the use, to have

1    a gun around drugs is for protection?

2    A    Basically.

3    Q    And there might be some other reasons as well.  When you

4    purchase the firearm, then, and then use it to protect the drugs,

5    the person who sold you the gun has no idea what you're doing

6    with the gun later on, is that correct?

7             MR. HANLON:  Objection, Your Honor.

8             THE COURT:  Sustained.

9    Q    The guns that you possessed, you know that, or whatever you

10   were doing with the gun, the person who you got that gun from

11   didn't know what you were doing?

12            MR. HANLON:  Objection, Your Honor.

13            THE COURT:  Can you answer that?

14   A    No.

15   Q    No?  Is that responsive to my question or your question?

16            THE COURT:  It's responsive to my question, she can't

17   answer it.

18            THE WITNESS:  No, I was actually answering the

19   question.

20            THE COURT:  Okay.  So you can answer his question?

21            THE WITNESS:  Right.  I told him no.  They didn't know.

22   BY MR. KURLAND:

23   Q    Just for clarification so the jury understands.  That the

24   gun that you were possessing, the person who you purchased it

25   from or obtained it from had no idea what you were doing with it

1    at the time when you were arrested?

2    A    Probably not.

3    Q    All right.  Because they weren't there?

4    A    Right.

5    Q    That clarifies that.  Okay.  I want to just ask you a couple

6    of other things with respect to the guys from Baltimore that came

7    up to Altoona to sell drugs.  You had mentioned there's Bo from

8    Baltimore?

9    A    Right.

10   Q    There's Los, Carlos?  Same person?

11   A    Right.

12   Q    From Baltimore?

13   A    Right.

14   Q    And let me just take a look at your grand jury testimony.

15   Elroy Wise, another guy from Baltimore involved in drugs?

16   A    Right.

17   Q    And they had a nickname or a name for their, for their crew

18   up in Altoona.  The Bull Dog City or BDC?  Is that what they

19   called themselves?

20   A    That was a phrase that Elroy had used.

21   Q    All right.  That was a phrase he had used to describe the

22   Baltimore guys who were involved in drugs in Altoona?

23   A    It wasn't described as people that were involved with drugs.

24   That's what he just used to always say, Bull Dog City.  He never

25   said it as a group of people or anything like that.

1    Q    Well, do you recall testifying concerning this manner before

2    the grand jury?

3    A    No, I don't.

4    Q    I'm going to have to use this.  I'm going to put the page up

5    on the machine here.

6              THE COURT:  Give counsel the page, please.

7    Q    It's Page 22.  Let me just cross off some markings I had

8    made.  I'm sorry.  I direct your attention to line --

9    A    Can you slide it over a little bit, please?  I can't see it

10   the other way.

11   Q    Sure.  This way?

12   A    No, to the right.

13   Q    It's on my screen.  Is it on your screen?

14   A    Almost.  It's on there.  You're good.

15   Q    All right.  I direct your attention to line -- apologize for

16   the cross out.  If you look down, there's a question from the

17   government.  And do you know whether or not he had any

18   relationship, drug relationship with Bo?  And your answer:  I

19   would assume that he did.  I mean, all, all the Baltimore guys

20   stuck together.  They all knew what each other was doing.  It was

21   kind of like they all stuck together.

22              If you go to the bottom.  The B-more crew, that's what,

23   you know, they called themselves, BDC, Bull Dog City.

24   A    Okay.  Well, the way it's put together, it's a little, I

25   don't know, that was George's words.

REDIRECT EXAMINATION OF DUGANNE                    141

1    Q    Okay.  But this was your testimony?

2    A    You're right.  You're right.

3    Q    At the grand jury.

4    A    You're right.

5    Q    Let me just briefly talk with counsel for just one moment.

6              (Pause in proceedings.)

7              MR. KURLAND:  I have no further questions.

8              REDIRECT EXAMINATION

9    BY MR. HANLON:

10   Q    Just briefly, Your Honor.  You were asked a number of

11   questions by Ms. Rhodes about, you know, the relative dates and

12   times of when you were at the apartment, when your sister was at

13   the apartment.  And I just want to, to avoid any confusion.

14   Sitting here today, your memory in terms of days and things like

15   that, are you certain of what days things were taking place on

16   some of these points?  Whether your sister was at the apartment

17   on this day or some other day, Ms. Duganne?

18   A    As far as day wise, in Tuesday or Wednesday, or do you mean

19   --

20   Q    No. No. No.  In terms of --

21   A    -- particularly that day?

22   Q    That day.  The day of the arrest, for example.

23   A    No.  The day of the arrest, her being there earlier getting

24   her hair done and me being there that evening happened the same

25   day.

1    Q    Nieshia is there earlier in the day, you're there later in

2    the day?  Is my understanding correct on that point?

3    A    Right.  We were both there earlier that day.

4    Q    All right.

5    A    And then later that evening I had went back myself.

6    Q    And in terms of later that evening, do you have any idea if

7    later that evening Nieshia came back while you were at the bar

8    getting the beer or before you arrived that evening?  Do you know

9    one way or the other?

10   A    She apparently did.  She busted them with drugs.

11   Q    I understand that.  But did you see her that evening?  Do

12   you know one way --

13   A    No.

14   Q    And Ms. Rhodes asked you a couple of questions about at some

15   point talking to the police and talking to prosecutors and things

16   like that.  I don't think she intended it this way.  But just so

17   I'm clear.  You didn't talk to any police or prosecutors that

18   night or the night of the arrest or immediately thereafter, is

19   that correct?

20   A    No.

21   Q    Thank you, Your Honor.

22              RECROSS EXAMINATION

23   BY MS. RHODES:

24   Q    Briefly, Your Honor.  I also have one question I forgot to

25   ask on cross, if I might, Your Honor.  You did not talk to the

1    police that night, right?

2    A    No, I had no involvement in what happened.

3    Q    You have, however, talked to your sister since that arrest

4    that night, right?

5    A    Correct.

6    Q    And you've talked about what happened, too, right?

7    A    About what happened that evening?

8    Q    Right.  The night of the bust.  Yeah.

9    A    No.  I stopped talking to her for like three months after it

10   happened.

11   Q    Okay.  Did you ever discuss with her the fact that you had

12   seen a gun and she had seen a gun on the table that day?

13   A    No.

14   Q    Okay.  In terms of what you're serving a sentence for now,

15   you also have a conviction from 2004, don't you?

16   A    Yes.

17   Q    March of 2004?

18   A    Um-hum.

19        MR. HANLON:  Your Honor, scope.  Objection.

20   Q    This is the matter I said I have another question to ask on.

21        THE COURT:  Okay.  Go ahead.

22   Q    And that was for two counts of criminal use of a

23   communication facility?  That's what the statute's called?

24   A    It was a lot more.  I was indicted on a multi-million dollar

25   drug ring.

1    Q    Okay.  So what you were convicted of was those two counts

2    and then one count of being part of a corrupt organization?

3    A    Correct.

4    Q    And then a count of prescription fraud, a felony?

5    A    I don't know nothing about that charge.  But okay.

6    Q    What was the other conviction for, then?

7    A    They were manufacturing, possession with intent,

8    communications, conspiracy, corrupt organization.  There was a

9    few different charges.

10   Q    And how much time did you get on that?

11   A    Two and a half to six.  I pled out.

12   Q    Okay.  And then one other conviction you have is from

13   October of 2002.  And that's for false reports to a law

14   enforcement officer, right?

15   A    Right.

16   Q    Okay.  Thank you.  Nothing further, Your Honor.

17             THE COURT:  Thank you.  Ms. Duganne is concluded.

18   Watch your step.  Who's the next witness?

19             MR. HARDING:  Your Honor, the United States calls

20   Detective David Jones.

21             THE COURT:  All right.  While Detective Jones is coming

22   in, ladies and gentlemen, this is a good time for me to give you

23   a more expansive instruction on certain matters.

24             I will instruct you in considerable detail at the end

25   of the case about a lot of matters, but in particular I will

1    instruct you on how you are to evaluate the testimony of each

2    witness.  I will give you a rather lengthy list of factors that

3    you may take into account.

4           The bottom line of that instruction will be that you as

5    the jury are the judges of the facts.  I believe that's a term

6    that one of the lawyers used earlier in this case.  I as the

7    judge am the judge of the law and my instructions to you, of

8    course, are binding on you.

9           Would you be seated, please, for a moment?  Thank you,

10   Detective.

11          My instructions on the law are binding on you.  And I

12   as the judge am in charge of the law.  You as the jury have as

13   your responsibility to be the judge of the facts.  So as I say,

14   the bottom line of my instructions on how you should approach

15   witness testimony in this case will be that you are free,

16   considering all of the factors that I mentioned, to believe all

17   of the testimony of a particular witness, none of the testimony

18   of a particular witness, or some of the testimony of a particular

19   witness.  It's entirely up to you.

20          Now, the witness who just left the stand testified

21   earlier today that Mr. Mitchell, when she encountered him in

22   Baltimore in 2002, told her that he had just been released from a

23   bit for a body.  And the witness told you what she understood

24   that communication from Mr. Mitchell to mean.

25          I instruct you now that Mr. Mitchell did not serve any

1    sentence for a homicide in 2002.  So it is false that Mr.

2    Mitchell was released from prison on a sentence for a homicide in

3    2002.

4            It will be for you, as you evaluate all of the

5    testimony and evidence in this case, to decide first whether Mr.

6    Mitchell made the statement that was attributable, attributed to

7    him by this witness; second, whether this witness' understanding

8    of that statement is one that you accept, and if you do accept

9    the witness' description of her understanding of the statement

10   and that Mr. Mitchell indeed made the statement, you may consider

11   that statement for or as evidence as it may have a bearing on Mr.

12   Mitchell's intent in making the statement, and you may consider

13   it as it may bear on your determination of what, if any, effect

14   Mr. Mitchell intended to have or did have on the witness who

15   heard the statement that was attributed to him.

16           All right.  You may proceed.  Would you stand, please,

17   Detective?

18           THE WITNESS:  Yes, Judge.

19       DETECTIVE DAVID JONES, GOVERNMENT'S WITNESS, SWORN

20           THE WITNESS:  I do.

21           THE CLERK:  Be seated.  Speak directly toward the mike

22   and state your name and spell it for the record, please.  State

23   your name.

24           THE WITNESS:  Yes, ma'am.  Detective David Jones.

25   Baltimore Police Department.  Currently assigned to the Central

1    District Drug Enforcement Unit.

2              DIRECT EXAMINATION

3    BY MR. HARDING:

4    Q    Okay.  How long have you been working for the police

5    department, Detective Jones?

6    A    For the past 24 yours.

7    Q    And you told us what your assignment is now.  What was your

8    assignment back in April of 2000?

9    A    The same as it is today.  Central District Drug Enforcement

10   Unit.

11   Q    Okay.  Do you recall on April 28th of 2000, did you

12   participate in making an arrest that day?

13   A    Yes, I did.

14   Q    Do you recall, were you in a vehicle or on foot?

15   A    I was in an unmarked police vehicle, working plain clothes

16   that evening.

17   Q    Okay.  Were you alone or with someone else?

18   A    That evening, I was with Detective John Calpin.

19   Q    And so were the both of you in that unmarked patrol car that

20   night?

21   A    That is correct.

22   Q    And calling your attention to around, it was actually around

23   seven p.m., is that correct?

24   A    That is correct.

25   Q    Was it light out still or was it dark or do you remember?

1    A    Yeah.  It was still light.

2    Q    Okay.  Can you tell us how it came about that you made an

3    arrest that night?

4    A    Yes.  During that evening, myself and Detective Calpin were

5    working in a plain clothes capacity in an unmarked vehicle when

6    traveling northbound in the 2000 block of McCullogh Street in

7    Baltimore City, approaching the intersection of Bloom Street.

8    That particular location is one of our drug locations, where

9    narcotic trafficking normally occurs.

10        As we approached that intersection, our attention was

11   drawn to six individuals that were on the northwest corner of

12   McCulloh and Bloom.  And then initially suspecting suspected

13   narcotic activity, we stopped at the corner and got out of the

14   vehicle.  And two individuals that were in the six broke away

15   from the group and started to walk northbound on McCullogh

16   Street.

17        Then myself and Detective Calpin went to talk to the

18   other four individuals to conduct a field interview, to get their

19   information and names and to see what they were doing in the

20   area.

21        As we were getting their information, I got a telephone

22   call on my cell phone.  And based on the information that I got

23   from that call, I directed Detective Calpin to go to the 500

24   block of Bloom Street and there should be a ground stash in the

25   gutter.  And from that point, Detective Calpin went down about 25

1    feet approximately on Bloom Street from the corner of McCulloh.

2    And in the gutter he recovered a popcorn bag.  And in that

3    popcorn bag was a plastic bag that had 37 capsules of suspected

4    heroin.

5           And then, also based on the information that I

6    received, we placed Mr. Calvin Wilson under arrest.  And he was

7    one of the six persons that were initially on the corner.

8    Q    Okay.  Let me back you up just a little bit.  You say you

9    were in the 2000 block of McCullogh Street and you came up to the

10   intersection with Bloom, is that correct?

11   A    That is correct.

12   Q    What part of town is that in, Detective?

13   A    That's within the Central District.

14   Q    Okay.  Could you tell us what the neighborhood is?

15   A    Yeah.  That would be Madison Park.  Borderlines of Madison

16   Park and Druid Heights would be the two communities.

17   Q    Okay.  Do we have our map?  I'm not sure everybody

18   understands what those neighborhoods are and I'm pretty sure

19   people won't know what Central District is.  Let's see if you can

20   point that out on the map for us.

21          THE COURT:  I'm sorry, Detective.  You need to speak

22   into the microphone.

23          THE WITNESS:  Yes, sir.  Okay.  It would be in the

24   lower right-hand corner of the map.

25          THE COURT:  See, we can't hear you when you do that.

1          I think you have a laser pointer there that you can

2     use.

3          THE WITNESS:  Got you.  Okay.  Okay.  In the lower

4     right-hand corner of the map, where it says 2000 McCulloh Street,

5     would be the location where this offense occurred.

6     BY MR. HARDING:

7     Q    Okay.  Thank you.  I also have a picture that's been marked

8     as Government Exhibit PH-50, which I'm going to put on the screen

9     and which you can see on the screen in front of you.  Can you

10    tell us what this shows, Detective?

11    A    Yes.  This would be the intersection of McCulloh and Bloom.

12    And this corner accurately reflects the location where we

13    initially observed the six individuals standing on the corner on

14    the day in question.

15    Q    And you said that when you approached the six individuals,

16    that was before you got this radio call or -- was it a radio call

17    or a cell phone call?

18    A    It was a cell phone call that I received.  Yes.

19    Q    Okay.  So why did you approach the six individuals?

20    A    Initially, as we were traveling northbound on McCullogh

21    Street, myself and Detective Calpin being familiar with that area

22    and assignment being drug enforcement, suspected that those six

23    initial, six individuals were involved in suspected narcotic

24    activity, and went to investigate that further.

25    Q    Did you notice, did any of the six individuals have US

1    currency in his or her hand?

2    A    Yes.  When the two individuals broke off from the six and

3    continued northbound on McCulloh, the four remaining, one of

4    those four individuals did have currency in his hand.

5    Q    Okay.  And then you approached the four remaining people, is

6    that correct?

7    A    That is correct.

8    Q    Did you make any effort to stop the two who walked away?

9    A    No, sir.

10   Q    You said they walked northbound on McCullogh Street, is that

11   correct?

12   A    That is correct.

13   Q    So that would be up this sidewalk here, is that right?

14   A    Correct.  Going toward North Avenue.  Would be the next

15   major intersecting street.

16   Q    Okay.  And then you talked to the other four gentlemen.

17   What were you asking them about?

18   A    Their names, addresses, date of birth, and inquiring what

19   they were doing at that particular location.

20   Q    And it was then that you got the cell phone call, is that

21   correct?

22   A    That is correct.

23   Q    Okay.  Now, was it just you and Calpin still at this point?

24   A    Yes.

25   Q    Then after you got done talking on the telephone, you say

1    you directed Calpin to go get a bag that was in the gutter, is

2    that correct?

3    A    Yeah.  Indicated to Detective Calpin, based on the

4    information that I received, that there should be a narcotic

5    ground stash in the gutter in the 500 block of Bloom Street.

6    Q    How far from where you were standing with the four gentlemen

7    would it have been that the stash was discovered?

8    A    Approximately 25 feet.

9    Q    Okay.  So maybe you can help me out here.  Where was it that

10   you were talking to the four remaining individuals on Bloom and

11   McCulloh?

12   A    Where the person is standing, just maybe a couple feet back

13   where the group was standing initially.

14   Q    So right on the corner?

15   A    Yes.  Right on the corner.

16   Q    And you say that the stash was 20 feet further down Bloom

17   Street in this direction?

18   A    Right.  In the gutter, correct.

19   Q    Would it be on this picture at all or would it be --

20   A    Yes.  General area, yes.

21   Q    Right about where I'm pointing right now?

22   A    Yes, sir.

23   Q    Okay.  I'm going to make, I'm going to attempt to make a, I

24   might need Mr. Hanlon again.  There it is.  Okay.  Right about

25   there where I marked?

1    A    Approximately, yes, sir.

2            THE COURT:  I think the left side of the image is

3    coming off some monitors, Mr. Hanlon.  Mr. Harding.  If you could

4    move it to your left a bit, I think might -- no, the other way, I

5    think.  No.  Maybe you had it right the first time.

6    Q    Is that better?

7    A    Yes, sir.

8            THE COURT:  Can jury see that image satisfactorily?

9    Okay.  Thank you.

10   BY MR. HARDING:

11   Q    Okay.  And then you say you placed under arrest a gentleman

12   named Calvin Wilson, is that correct?

13   A    That is correct.

14   Q    And he was one of the four individuals that you were talking

15   to on the corner?

16   A    That's correct.

17   Q    And you say his name was Calvin Wilson.  Is that the name

18   that he gave you?

19   A    Yes.  On, on this particular day, at the time of arrest,

20   that's the name that he provided to us, was Calvin Wilson.

21   Q    Did you later learn another name for him?

22   A    Yes.

23   Q    What was that?

24   A    That would be Willie Mitchell.

25   Q    Okay.  Did there come a time when other police officers

1    arrived?

2    A    That is correct.

3    Q    When did that happen?

4    A    Just after Detective Calpin had recovered the popcorn bag

5    from the gutter, several marked patrol units arrived to that

6    intersection and received information from the responding

7    officers that they had just received a call to that location, to

8    McCulloh and Bloom, for a black male wearing all black

9    distributing drugs.

10            MR. LAWLOR:  Objection, Your Honor.

11            THE COURT:  Overruled.

12   Q    Okay.  So do you have any way of knowing, were they

13   responding to a radio run from same person that called you on a

14   cell phone or was it somebody different, or do you just have no

15   idea?

16   A    I have no idea.  All I know, it was a generated call to the

17   Baltimore City Police Department Communications Center, making a

18   drug complaint for that location.  So who the complainant was for

19   that particular call, I don't know.

20   Q    And what kind of clothing was Calvin Wilson or Willie

21   Mitchell wearing that night?

22   A    Black shirt and black pants.

23   Q    Okay.  Was there anybody else wearing all black?

24   A    No, sir.

25   Q    Okay.  Did the gentleman who identified himself to you as

1   Calvin Wilson, did he also give you an address?

2   A    Yes.  He identified his residence as being 1205 Etting

3   Street in Baltimore City.

4   Q    Etting, is that E-T-T-I-N-G?

5   A    Yes, sir.

6   Q    Do you know what part of town that's in?

7   A    Yes.  That's still within the Central District.

8   Approximately two miles from McCulloh and Bloom, approximately.

9   Q    Okay.  Now, you say that Calpin recovered 30-some vials.  Do

10  you know what drug was involved?

11  A    Yes.  The capsules that we recovered on the day in question

12  were submitted to the Baltimore City Police Department for

13  analysis and tested positive for Schedule One, heroin.

14  Q    Heroin?

15  A    Yes, sir.

16  Q    Can you give us the property number?  Oh, actually, first

17  let me ask you, was it you or Detective Calpin who submitted the

18  drugs?

19  A    Detective Calpin submitted the drugs.

20  Q    Okay.  I think that those are all the questions I have for

21  you because detective, is Detective Calpin outside?

22  A    Yes, he is.

23  Q    Okay.  Those are the only questions I have, Your Honor.

24  Thank you.

25          THE COURT:  Remove the exhibit, Mr. Harding.

1          MR. HARDING:  Yes.

2          CROSS EXAMINATION

3    BY MR. LAWLOR:

4    Q    Detective, good afternoon.

5    A    Good afternoon, sir.

6    Q    As you approached these individuals, you were in an unmarked

7    vehicle?

8    A    That is correct.

9    Q    And six individuals are standing on this corner?

10   A    That is correct, sir.

11   Q    And you didn't observe any illicit activity in the time that

12   you approached them?

13   A    No, sir.

14   Q    Okay.  Now, how close were you to them when two of the

15   individuals broke off and walked away?

16   A    Well, just as the car was pulling up to the corner, they

17   started to walk northbound before the vehicle came to a complete

18   stop.

19   Q    All right.  But presumably, they observed you or, is it safe

20   to assume that they observed you pulling up?

21   A    That would be my assumption, yes.

22   Q    So your appearance induced two of the six individuals to

23   walk away?

24   A    Yes.

25   Q    Okay.  And the person who identified himself as Calvin

1    Wilson, Mr. Mitchell, did not walk away.  He stayed there,

2    correct?

3    A    That is correct.  He was one of the four that stayed.

4    Q    He stayed.

5    A    Yes.

6    Q    And he had no money in his hands or his pockets or anywhere

7    else?

8    A    No.  Mr. Mitchell was the individual with no money in his

9    hands.

10   Q    So you arrested him and searched him?

11   A    Yes.

12   Q    All right.  And not only did he not have money on his hands,

13   he had no money on his person?

14   A    That's correct.

15   Q    Okay.  How much money did the other fellow have?

16   A    I don't recall.  It was a dollar, there was a bill, currency

17   in bill form but I don't recall --

18   Q    Was he placed under arrest?

19   A    No, he was not.

20   Q    Okay.  What about the other two individuals?  Were they

21   placed under arrest?

22   A    No, sir.

23   Q    What about the two folks that walked away?  Did you go after

24   them to inquire what they were doing?

25   A    No, sir.

1  Q    All right.  And this is a high drug trafficking area?

2  A    Yes, sir.

3  Q    What does that mean in lay terms?

4  A    It's a common place where narcotic trafficking normally

5  occurs within the Central District and a location that normally

6  gets a lot of drug complaints from area residents.

7  Q    Okay.  So a lot of people standing on the corners selling

8  drugs?

9  A    Yes.

10 Q    And a lot of drug dealers tend to put their stash here or

11 there, right?

12 A    Depending on the organization, yes.

13 Q    Behind a stairwell, behind a trash can, etc., etc.?

14 A    Only limited to the drug dealer's imagination.

15 Q    All right.  So Mr. Mitchell was placed under arrest, at

16 which time you discovered that on his person he possessed no

17 drugs nor possessed any money, right?

18 A    That is correct.

19 Q    Okay.  And he was 25 feet away from the drugs that you

20 discovered that he was standing --

21 A    Approximately, sir, yes.

22 Q    No further questions.

23            REDIRECT EXAMINATION

24 BY MR. HARDING:

25 Q    Just one very brief question.  Based on your experience in

1    doing narcotics law enforcement for many years, is it common for

2    drug traffickers to keep a stash of drugs away from their person

3    somewhere else?

4    A    Yes.  That's a common practice, to show that there's no

5    nexus between the drugs and the individuals that are dealing

6    drugs.  So it's a common practice.

7    Q    Thank you.  I have no other questions.

8            MR. LAWLOR:  One brief.

9            THE COURT:  Thank you.  Thank you, Detective Jones.

10   You're excused.  Next witness.

11           MR. HARDING:  Yes.  The government calls Detective John

12   Calpin.

13           THE CLERK:  Raise your right hand, please.

14        DETECTIVE JOHN CALPIN, GOVERNMENT'S WITNESS, SWORN

15           THE WITNESS:  I do.

16           THE CLERK:  Be seated.  Speak directly toward the mike.

17   State your name and spell it for the record, please.

18           THE WITNESS:  Detective John Calpin.  C as in Charles,

19   A as in Adam, L as in Lincoln, P as in Paul, I as in Ida, N as in

20   Nancy.

21           DIRECT EXAMINATION

22   BY MR. HARDING:

23   Q    Good afternoon, Detective.

24   A    Good afternoon.

25   Q    Can you tell us how you're employed, sir?

1    A    As a police detective in the Baltimore City Police

2    Department.

3    Q    Can you tell us what your assignment is right now?

4    A    Violent Crimes Impact Division.

5    Q    Okay.  So you're at headquarters now?

6    A    Yes.

7    Q    Can I call your attention back to the spring of 2000, April

8    of 2000.  Do you remember what your assignment was back then?

9    A    Yes.  Central District Drug Enforcement Unit.

10   Q    Did you participate in an arrest -- let me ask you, also.

11   How long have you been a police officer in Baltimore City?

12   A    Next week will be 23 years.

13   Q    Okay.  Calling your attention back to April of 2000, April

14   28th of 2000.  Did you participate in an arrest around 7:00 in

15   the evening that day?

16   A    Yes.

17   Q    Can you tell us who you were with at that time, any other

18   police officers?

19   A    Detective David Jones.

20   Q    Okay.  Were you in uniform or plain clothes?

21   A    Regular clothes, plain.

22   Q    Okay.  And were you in a vehicle or on foot?

23   A    In an unmarked vehicle.

24   Q    Okay.  Tell us about how the arrest happened.

25   A    As we drove north on McCullogh Street, we got to the

1    intersection with Bloom and observed approximately six people on

2    the corner, six males.  One of them had money in his hand, which

3    we thought to be odd and could be a possible narcotic

4    transaction, in the, as it was going on.  So we stopped to

5    investigate it.

6    Q    And so what did you do to investigate it?

7    A    We stopped, I believe, some of the males.  A couple of them

8    left, walked away.  The other ones we stopped to get their names

9    and find out what they're doing in the area and do what's called

10   a field interview.

11   Q    Okay.  What happened then?

12   A    While doing that, Detective Jones got a call from, I thought

13   it was confidential informant.

14              MR. LAWLOR:  Objection, Your Honor.

15              THE COURT:  Overruled.  Go ahead, Detective.

16   A    Okay.

17              THE COURT:  Without saying --

18   A    Excuse me?

19              THE COURT:  -- what he said the call was about, go

20   ahead.  He got a call.

21   A    He got a call and then he told me to, he motioned to the man

22   that was wearing all black and then he told me to check in a

23   gutter down Bloom Street for a stash.

24   Q    Okay.

25   A    Drug stash, which was narcotics hidden in the gutter.

1    Q    Did you find anything?

2    A    Yes, I did.

3    Q    What did you find?

4    A    Found a popcorn bag with a plastic bag with 37 gelatin

5    capsules with white powder, suspected heroin.

6    Q    Okay.  And while you were getting that stash, what was Jones

7    doing?

8    A    He was standing with the males, especially the one in black.

9    Q    Okay.  Did he place anyone under arrest?

10   A    Yes.  The man in the black, and wearing all black.

11   Q    Did you learn his name?

12   A    At the time he gave us Calvin Wilson.

13   Q    Excuse me?

14   A    Calvin Wilson.

15   Q    Okay.  And did you eventually learn another name for him

16   after he was booked?

17   A    Yes.  Mr. Mitchell.

18   Q    Okay.  Were you, did you have the drugs in your custody that

19   evening after you retrieved the stash from the gutter?

20   A    Yes, I did.

21   Q    Did you submit them to the lab for analysis?

22   A    Yes, I did.

23   Q    Let me show you -- just one moment, Your Honor.

24        THE COURT:  Yes.

25   Q    I'm going to -- sorry.  I've got on the screen here a

CROSS EXAMINATION OF CALPIN BY LAWLOR

163

1    document that I'm going to mark for identification as L-12.  Is

2    this form the request for lab analysis that you filled out that

3    night?

4    A    Yes, it is.

5    Q    Can you read us the property number that appears on there?

6    A    Property number is 00023557.

7    Q    Okay.  And that's the 37 gel caps of suspected heroin that

8    you retrieved from the gutter at Bloom Street near the corner

9    with McCulloh on the evening of April 28th, 2000, is that

10   correct?

11   A    Yes.

12   Q    Okay.  I have no further questions.

13              CROSS EXAMINATION

14   BY MR. LAWLOR:

15   Q    Detective, did I hear you correctly to say that the fact

16   that one of these individuals had money in his hands was odd and

17   indicative of narcotics distribution?

18   A    Could have been.

19   Q    I don't want to say what it could have been.  Did I hear you

20   correctly to say that it was odd and was indicative of drug

21   distribution.  Did I hear you say that?

22   A    Yes.  Yes.

23   Q    You did say that.  Okay.  These six individuals were young

24   African-American males?

25   A    Yes.

1    Q    All right.  If you were driving in Roland Park and saw six

2    young white men wearing NFL jerseys and one of them had money in

3    his hands, would you think he was a drug dealer?

4              MR. HARDING:  Objection.

5              THE COURT:  Sustained.

6    Q    Okay.  You arrested the person that you identified as Mr.

7    Mitchell, right?

8    A    Yes.

9    Q    And on his person you uncovered no money and no drugs,

10   correct?

11   A    Correct.

12   Q    25 feet away you uncovered some drugs, right?

13   A    20 to 25, yes.

14   Q    Okay.  I have no money on my person nor do I have any drugs

15   on my person.  You going to arrest me?

16             MR. HARDING:  Objection.

17             THE COURT:  Sustained.

18             MR. LAWLOR:  No further questions.

19             MR. HARDING:  No further questions, Your Honor.

20             THE COURT:  Thank you very much, Detective.  You're

21   excused.

22             THE WITNESS:  Thank you, Your Honor.

23             THE COURT:  Next witness.

24             MR. HARDING:  Yes.  The government calls Detective

25   Richard Willard.

1          Well, Your Honor, after waiting all day the witness

2    isn't in the witness room.  We think he may have just left for a

3    short time, but we're looking for him.

4               THE COURT:  Okay.  Do you have a backup?

5               MR. HARDING:  No.

6               THE COURT:  Is he the last witness?

7               MR. HARDING:  Yes.

8               THE COURT:  He's the last witness for the day?

9               MR. HARDING:  Yes.

10              THE COURT:  Has he been found?

11              MR. HARDING:  Yes.  Apparently, he has been.

12         SERGEANT RICHARD WILLARD, GOVERNMENT'S WITNESS, SWORN

13              THE WITNESS:  Yes, ma'am, I do.

14              THE CLERK:  Be seated.  State your name and spell it

15   for the record, please.

16              THE WITNESS:  Sergeant Richard Willard, W-I-L-L-A-R-D.

17              DIRECT EXAMINATION

18   BY MR. HARDING:

19   Q    Good afternoon, Sergeant.  How are you employed?

20   A    I'm a sergeant in the Baltimore City Police Department.

21   Q    Okay.  What's your assignment now?

22   A    I'm in charge of the Gun Trace Task Force under VCID.

23   Q    Okay.  VCID is the Violent Crime Impact Division or

24   something?

25   A    Yes, sir.

1    Q    And what's the Gun Trace Unit?

2    A    We work different aspects tracking illegal straw purchases

3    of handguns, parole and probation violations, sex offenders.

4    Q    Okay.  How long have you worked for the Baltimore City

5    Police Department?

6    A    Over 16 years.

7    Q    Can you tell us what your assignment was back in June of

8    1999?

9    A    I was an officer assigned to the Flex Unit in the Southwest

10   District.

11   Q    Do you recall participating in an arrest around 1:30 p.m. on

12   June 18th, 1999?

13   A    Yes, sir, I do.

14   Q    How was it that this arrest was initiated?

15   A    We went up to the area based on information.

16   Q    Based on information from what?

17          MR. CROWE:  Objection.

18          THE COURT:  Just the source of the information, sir.

19          THE WITNESS:  A complaint that initiated information

20   about a person selling drugs in the area.

21          MR. CROWE:  Objection.

22          THE COURT:  Overruled.

23   BY MR. HARDING:

24   Q    Okay.  So tell us, after you -- did you speak to this

25   complainant yourself?

1    A    I'm not sure if I did.  It was nine years ago, sir.

2    Q    Okay.  What did you do in response to the information that

3    you got?

4    A    We responded to the area of the 300 block of South Pulaski

5    Street.

6    Q    And what were you looking for?

7    A    A gold Ford Taurus station wagon.

8    Q    Doing what?

9    A    Dropping off drugs in the area.

10        MR. CROWE:  Objection, move to strike.

11        THE COURT:  The Motion to Strike is denied.  The

12   objection is overruled.  Now, what you're hearing, ladies and

13   gentlemen of the jury, is the background for what prompted this

14   officer to do what he's about to tell you he did.  Go ahead, Mr.

15   Harding.

16   BY MR. HARDING:

17   Q    Yes.  Why don't you just tell us what you did after you

18   responded to the 300 block of Pulaski Street looking for this

19   gold Taurus dropping off drugs?

20   A    We set up surveillance in the block and observed the

21   defendant driving northbound on Pulaski Street.  We were, he was

22   coming from, from Wilkens Avenue.  We were facing south.  He made

23   a left-hand turn on Ashton Street.

24        As he was coming up the street and making the turn,

25   sort of smoking what looked to be from my experience and training

1    a re-rolled cigar that commonly people put marijuana in, they

2    call it a blunt sometimes.  When we observed him make the turn,

3    we pulled in, followed him.

4            He turned again onto northbound, the 200 block of

5    Smallwood Street.  We stopped him.

6            As we approached the car we could smell the smell of

7    burnt marijuana and observed him placing down by his feet and

8    next to the console what later was discovered was the marijuana.

9    Q    Okay.  Let me back up for a minute.  You say that you saw

10   the defendant making this turn off of Pulaski Street?

11   A    Correct.

12   Q    On to Smallwood, is that correct?

13   A    No.  From Pulaski, he turned and went westbound on Ashton

14   and then made another right northbound on Smallwood.

15   Q    Okay.  First question, what kind of car was this that you

16   observed?

17   A    It was a gold Ford Taurus station wagon.

18   Q    Okay.  Was that why you were interested in this, because it

19   matched with the description you got?

20   A    That's the reason we, our attention was drawn to the car.

21   Q    Okay.

22   A    And then what led with the re-rolled cigar in his hand.

23   Q    I see.  Now, let me show you what's been marked as

24   Government Exhibit PH-13.  Do you recognize that?

25            THE COURT:  I'm sorry.  Mr. Harding, can you clean up

1    the screen?

2    Q    I sure can.  I think I can.  Mr. Hanlon can.

3         THE COURT:  Excellent.  Thank you.  Thank you, Ms.

4    Rhodes.

5    Q    That's the area of Smallwood Street, is that correct?

6    A    Yes, sir, it looks to be, facing southbound.

7    Q    That's facing southbound.  But you were going northbound, is

8    that right?

9    A    Right.

10   Q    Can you see on there roughly where it was that you stopped

11   the gold Taurus that afternoon?

12   A    It was down near the Stop sign facing, facing north in that

13   direction.  He had just turned up from Ashton.

14   Q    So you pointed to the screen.  And you see those black

15   arrows appeared on the screen.  Do you see that?

16   A    No, I don't see any arrows.

17   Q    Do you now?

18   A    No.  My screen, everything's to the right.  I can't see the

19   arrows.  From her screen, it looks like it will be on your

20   left-hand side.

21        THE COURT:  Wait.  Wait.  You can put the marks, I

22   think if you trace over the marks he just made.  Apparently,

23   what's happening is the monitor, the witness monitor will record

24   the witness' marks but not for the witness.  So we'll see if we

25   can't take care of that over the weekend.

1    Q    Why don't you just point on the screen again for our benefit

2    where it was that --

3    A    Where I'm pointing, it keeps pushing to go left.  I mean to

4    the right.  I would have to go probably -- nope.  Right in this

5    area.

6    Q    Okay.  So pretty far down in the picture, it looks like?

7    A    Correct.

8    Q    All right.  So you pulled the gold Taurus over and that's

9    because you saw the driver was smoking what you believed to be a

10   marijuana blunt?  Is that your testimony?

11   A    Yes, sir.

12   Q    What happened then?

13   A    We removed him from the vehicle and placed him under arrest.

14   We recovered the blunt.  And while we were going down under, at

15   the seat, on the floorboard where he put it, we observed a

16   handgun underneath the seat.

17   Q    Okay.  Did you get the name of the driver?

18   A    Yes.  Shelly Wayne Martin.

19   Q    And did you recover the gun from the car, I assume?

20   A    Yes, sir.

21   Q    Let me show you what's been marked as -- just one moment,

22   Your Honor.  You brought this gun over with you today, is that

23   correct?

24   A    Yes, sir.

25   Q    I'm going to show you what's been marked Government Exhibit,

1    Government Miscellaneous 21.  And I'm not going to bring it up to

2    you.  I'm just going to put it on this camera again.  And it has

3    a tag on it.  Can you identify this, Detective?

4    A    That's a property tag that's placed on smaller items with

5    the police department.

6    Q    Okay.  Did you fill this out or someone else?

7    A    No.  I didn't fill that out.

8    Q    Okay.  Was the gun loaded?

9    A    Yes, it was.

10   Q    And so did you put the 9 millimeter Luger cartridges in a

11   separate brown envelope?

12   A    Yes, sir.

13   Q    Okay.  Who is Hollingsworth?

14   A    Officer Chris Hollingsworth.  He was in the unit with us.

15   Q    What was his role in connection with submitting this gun?

16   A    We would make up on average 10 to 15 arrests during the day

17   in the Flex Unit.  It was mostly street level arrests.  And one

18   person each day on the calendar day would be tasked to do

19   submissions.  So that was his job, to write up all the

20   submissions and submit any evidence recovered.

21   Q    Okay.  But you recognize this as the gun you recovered from

22   Shelly Wayne Martin that afternoon, is that correct?

23   A    Yes, sir.

24   Q    And let me show you something else.  Each of these

25   documents, several of them, have an address from Shelly Wayne

1    Martin of 106 Summar Court, Apartment 1-C.  Do you see that?

2    A    Yes, sir.

3    Q    Is that also on this property tag that's attached to the

4    gun?

5    A    Yes, sir.

6    Q    Do you know where that is?

7    A    I believe in Baltimore County.

8    Q    Okay.  Do you know where in Baltimore County?

9    A    Off the top of my head, I don't remember.

10   Q    Okay.  Did you charge Mr. Martin with illegal possession of

11   the firearm?

12   A    Yes, sir.

13   Q    By the way, what kind of gun is this, if you remember?

14   A    It's a High Point 9 millimeter.

15   Q    Is that a semiautomatic?

16   A    Yes, sir.

17   Q    What happened in the case?

18   A    It was pled.  He pled guilty in court.

19   Q    Okay.  Was Shelly Wayne Martin a name that he gave you

20   himself or did he give you another name?

21   A    That's the name he gave us.

22   Q    Okay.  Thank you.  I have no further questions.

23             CROSS EXAMINATION

24   BY MR. CROWE:

25   Q    Good afternoon, Detective.  You're the last witness of the

1    week and I'm sure the jury wants me to go fairly quickly.

2                My understanding is that you stopped the defendant and

3    he was driving a Ford Taurus, is that correct?

4    A    Yes, sir.

5    Q    Do you recall the year of the Taurus?

6    A    I don't recall the year, sir.

7    Q    Okay.  Let me show you.  Do you remember writing a crime

8    incident report on this?

9    A    Yes.  And a Statement of Charges.

10   Q    Okay.  Does this look like the crime incident report that

11   you wrote?

12   A    Yes, sir, it does.

13   Q    And does that indicate that it was a 1993 Ford Taurus?

14   A    Yes, sir.

15   Q    And would you expect that if you wrote that on the report,

16   that that's the way it really happened?

17   A    That would depend on what we were told by KGA and Dispatch.

18   Q    Okay.  Now, your testimony is that you saw this person, and

19   this is a person who gave his name as Shelly Wayne Martin, is

20   that correct?

21   A    Correct.

22   Q    You saw him smoking a blunt, is that right?

23   A    Yes, sir.

24   Q    In some, just riding normal speed down, down the road,

25   smoking a blunt?

1    A    Correct.

2    Q    And a blunt is, you've described, either a re-rolled or

3    hollowed-out cigar with marijuana stuffed in it?

4    A    Yes, sir.

5    Q    And I think you've testified at a previous time that you've

6    probably seen thousands of those in your career, is that right?

7    A    Yes, sir, I have.

8    Q    Were you in a marked or an unmarked car?

9    A    An unmarked car.

10    Q    And how was Mr. Martin directed to pull over?

11    A    We have dash lights that we put into the unmarked cars.

12    Q    Okay.  And so you activated the dash lights?

13    A    Yes, sir.

14    Q    And did he pull over fairly quickly?

15    A    Yes, sir.

16    Q    Okay.  No resistance, no attempt at escape, nothing of that

17    nature, correct?

18    A    Not that I recall.

19    Q    Now, you further indicated that at some point you saw him

20    making motions towards the floorboard of the car?

21    A    As we pulled him over.

22    Q    And he had the blunt in his hand, is that right?

23    A    When he made the corner, he had the blunt in his hand.  I

24    couldn't see where the blunt was when we were behind him.

25    Q    But you saw him making motions towards the floorboard, is

1    that right?

2    A    Right.  He was leaning.  You could see his right shoulder

3    dipping down toward his foot area.

4    Q    Okay.  I'm not sure that everybody could see that.  But when

5    you made that gesture, you made it on the right side of your

6    right leg, is that correct?

7    A    Correct.

8    Q    And was Mr. Martin then asked to get out of the car?

9    A    Yes, he was.

10   Q    And did he get out of the car?

11   A    Yes, he did.

12   Q    Again, was there, there was no resistance, no mouthing off,

13   no problem?

14   A    I don't recall any.  It was nine years ago.

15   Q    Okay.  And you certainly, you certainly reviewed your report

16   since then, haven't you?

17   A    Yes.  I didn't make any note of any --

18   Q    And indeed, did you find a, what you've described as a half

19   burnt re-rolled cigar down by the console, about where the

20   person's right leg would be?

21   A    Yes, sir.

22   Q    And when you say half burnt, by that did you mean, was that

23   half smoked?

24   A    It looked to be.

25   Q    Okay.  And was there also a very strong odor of marijuana at

1    the time?

2    A     Yes, sir.

3    Q     And am I also correct that when you, it was not until you or

4    somebody else actually looked into the driver's compartment that

5    you could see the butt of the gun sticking out from under the

6    seat?

7    A     When we were recovering the marijuana, yes, sir.

8    Q     Okay.  And there is certainly no indication that he was

9    reaching for the gun or anything of that matter, is that correct?

10   A     No indication of that at all.

11   Q     Now, other than this half-smoked cigar which you believe is

12   stuffed with marijuana, was there any other drugs discovered?

13   A     No, sir.

14   Q     Was Mr. Martin with anyone that day?

15   A     No, sir.

16   Q     Thank you.  That's all that I have.

17              MR. HARDING:  No further questions, Your Honor.

18              THE COURT:  Detective, thank you very much.

19              THE WITNESS:  Thank you, sir.

20              THE COURT:  You are excused.  Well, ladies and

21   gentlemen, this will conclude our second week of trial.  I am

22   advised by counsel that despite the delays that we've

23   encountered, and there have been far more than I would have liked

24   and I'm sure you would have liked, we are moving along at a good

25   pace.

1          The Court continues to believe that this will be a ten

2     week trial, but there is reason to think that it won't take as

3     many as ten weeks.

4          In any event, you are now free tomorrow and Friday.  We

5     will not be in session.  Enjoy your weekend.  We will resume on

6     Monday morning at 9:00.  I'm sorry.  9:30.  And I'll confer again

7     with counsel.  Have a good breakfast because, as I told you

8     yesterday, we will either, we will break early on Monday, no

9     later than three.  And it may be that we'll simply have a longer

10    mid-morning recess of about 20 or 25 minutes and then a second

11    recess and you'll be excused sometime between 1:30 and 2:30 or

12    something like that.

13         We will not be in session on Tuesday next week at all.

14    And on Wednesday, we will be in session for a full day from

15    about, from actually 10:00.  We're going to start at 10:00 next

16    Wednesday.  Again, I'll remind you of this on Monday.  And then

17    we won't be in session again until Monday, October 6th.

18         That week will be three days only, Monday, Tuesday, and

19    Wednesday, the 6th, the 7th and the 8th, pretty much all day.

20    And then the following week, October 13th, the 13th is a federal

21    holiday, Columbus day.  So we won't be in session that day.  But

22    we will be in session on the 14th, the 15th, and the 16th.  And I

23    think we're making good progress.

24         Continue to adhere carefully to all of my instructions.

25    Avoid any media accounts of this case.  I myself have not

1    encountered any media accounts of this case.  That doesn't mean

2    there haven't been any out of there.  And it certainly doesn't

3    mean there won't be any tomorrow or the next day or over the

4    weekend.

5         So be on the alert to avoid any exposure by broadcast

6    media or print media concerning this case.  Don't listen to the

7    channel, change the station.  Have your family save any articles

8    that might come out about this case.

9         Do not permit anyone to discuss the case with you and

10   do not discuss the case with anyone yourself.  If there should be

11   an inadvertent or other violation of any of these instructions,

12   please, as I remind you, send me a note in private.  Do not

13   discuss any such incident or occurrence with any of your fellow

14   jurors.  Just let me know so that I can take appropriate steps.

15        Leave your note pads on your chairs.  And again,

16   conduct no investigation during this extended recess.  Don't look

17   up any words.  Don't go online to conduct any investigation.

18   Don't visit the scene of any locations that you may have heard

19   discussed in the testimony.

20        Have a pleasant extended weekend, ladies and gentlemen.

21   We'll see you Monday morning at 9:30.  Jury's excused.

22        (Jury exits the courtroom.)

23        THE COURT:  Counsel, as you may or may not know, we

24   have a large contingent of students in the courtroom tomorrow for

25   a program that I'm involved in.  So I will need you to clear out

1    everything and get it locked up, take it with you.

2            Mr. Harding, I'm so proud of you.  I saw you start

3    towards the witness with that firearm and you caught yourself and

4    you went back and you used the DOAR.  And this is a great

5    development.

6            MR. HARDING:  Thank you, Your Honor.

7            THE COURT:  Mr. Lawlor, I hope you feel better.  I'm

8    sorry you're feeling so under the weather.  Are there any matters

9    for the good of the order?  Ms. Rhodes.

10           MS. RHODES:  Very briefly, Your Honor.  In the

11   corrective instruction you gave, I noticed that you said that the

12   witness said that the conversation was in 2002.  The witness

13   actually said 2004, and that was not corrected by the government.

14   So -- I know.  Believe me, I heard it.

15           THE COURT:  Okay.  Just a moment.

16           MS. RHODES:  So I don't want them to then -- obviously,

17   they're going to take your word for it and fix their notes, if

18   that's what it is.  But she did say 2004.

19           THE COURT:  We're going to fix this right now.  What

20   did you hear, Mr. Hanlon?

21           MR. HANLON:  Your Honor, I asked the witness about a

22   series of-- I directed her to a timeframe in 2002.

23           THE COURT:  Right.

24           MR. HANLON:  And then I asked her about taking a train

25   to Baltimore and she had a friend, and did you bump into anybody.

1    And then she explained what she explained.  Now, I don't know

2    whether or not 2004 came in at once.  But I don't think that it's

3    uncontested, by any stretch of the imagination, that the witness

4    said 2004.  I directed her to a period in 2002.  That's what we

5    were talking about.  Her grand jury testimony was in 2004.

6            MS. RHODES:  I mean, I think the record will show.

7    When I asked her on cross, when was this?  And she said 2004.

8            THE COURT:  She couldn't have run into Mr. Mitchell on

9    the street in 2004.

10           MS. RHODES:  I know.  I know.  Makes her statement even

11   more unlikely.

12           THE COURT:  She didn't say 2004.  My recollection --

13   that's all right.  I don't think we need it.  I'll listen to it

14   during the recess.

15           But Mr. Hanlon is absolutely correct, Ms. Rhodes.  He

16   directed her to 2002.  It was a couple of years later.  And my

17   recollection of that is just as clear as it could be.  Now --

18           MS. RHODES:  I'm not disputing that.  I'm not disputing

19   that.

20           THE COURT:  Okay.  She may have misspoken and said 2004

21   or you may have said 2004.

22           MS. RHODES:  I didn't suggest the date.  She said 2004

23   on cross.  So she's given two dates.  I asked an open-ended

24   question.

25           THE COURT:  What was the question?

181

1          MS. RHODES:  We were talking about the incident.  I

2     said, when was this, because I wanted to get, my understanding is

3     she's got the wrong season.  And so that's why I was asking her

4     what time of year was it, that sort of thing.  I'd also asked her

5     in that series, when was this, and she said 2004.

6          THE COURT:  And what was the "this?"

7          MS. RHODES:  We were already talking about the

8     conversation when she went down to Baltimore.

9          THE COURT:  I think she thought you were talking about

10     her grand jury appearance.

11          MS. RHODES:  Okay.

12          THE COURT:  I'll listen to it.  If you want me to

13     supplement the jury, the limiting instruction, I'll be happy to

14     do that.  But I'll listen to it.

15          MR. HANLON:  Your Honor, I'm assuming that the Court --

16     two things.  Number one, any supplementation isn't going to

17     suggest that it's somehow uncontested or that it was the witness'

18     intent.

19          THE COURT:  No.

20          MR. HANLON:  Additionally, this is the kind of thing,

21     if it had been brought up at the time, it might have been a

22     little bit easier to deal with than it is a couple hours later.

23          THE COURT:  I don't expect to give a supplemental, but

24     I don't want to rule out Ms. Rhodes's opportunity to suggest

25     same.  But I will listen to the audio recording of that part of

1    the testimony, of both parts of the testimony.  Mr. Crowe.

2          MR. CROWE:  Very briefly.  On behalf of Mr. Martin I

3    would like to make a motion for mistrial based on the admission

4    of evidence through the last witness.  The witness was permitted

5    to testify both over an objection and a Motion to Strike as to

6    the contents of the informant's tip, which was that my client,

7    that somebody was driving a gold Taurus down there for the

8    purpose of distributing drugs.

9          The contents, the only way evidence of that nature

10   comes in is if the informant or somebody saw it happen.  My

11   understanding is that the proper way that that evidence comes in

12   is that the officer is asked, did you get a phone call?  Yes.

13   Did you do something as a result of that phone call?

14         Instead, we have had gratuitously injected into this

15   case an informant's tip that my client was dealing drugs.  And in

16   the case where there is a drug distribution conspiracy, that's

17   not a small matter.  I think that that was textbook inadmissible

18   and we move for a mistrial.

19         THE COURT:  All right.  Thank you, Mr. Crowe.  The

20   motion for a mistrial is denied.  Certainly, it would have been

21   nicer form if the question had been, Did you get some information

22   that caused you to do something?  Yes.  What did you do?  I was

23   on the lookout for a gold Taurus.  I think whatever, whatever

24   problem may have arisen, I cured it by telling the jury that this

25   was all for background.  And I appreciate your concern.  The

183

1    motion for a mistrial is denied.

2         MR. KURLAND:  Your Honor, just a couple of quick

3    points.  One, with respect to some of the comments the Court made

4    concerning the scope and duration of the conspiracy.  I just want

5    to bring up the fact that it's our position, the Court's

6    obviously correct that an arrest does not as a matter of law

7    terminate a conspiracy.  But the obverse or the inverse or

8    whatever is also not correct, that the law does not imply that

9    the conspiracy lasts forever until there's, until there's a

10   specific act of termination.  I mean, in fact, the law is

11   actually the opposite.  The law disfavors continuing conspiracies

12   forever.

13        Now, that's only going to be important because it's

14   conceivable that later on it might affect the reshaping of other

15   instructions.  But I just wanted the Court to think about that

16   over the long break; that the law, again, the continuation of

17   conspiracies, you know, forever, interminable, is not the

18   presumption that the law operates under.

19        THE COURT:  Well, what is presumed is a defendant's

20   continuing membership in a conspiracy.  And the conspiracies in

21   this case are bracketed by the dates in the indictment.  And so

22   we weren't anywhere near the terminus in that earlier discussion.

23   We weren't anywhere near the terminus of either of these

24   conspiracies as alleged in the indictment in respect to that

25   discussion.

1          MR. KURLAND:  That's correct, Judge.  But just the

2     general proposition that the law presumes conspiracies to go on

3     forever is not, that's not necessarily impacted here.

4          THE COURT:  I don't know that I disagree with that.

5          MR. KURLAND:  One other point that's going to come up

6     with respect to other witnesses, I just wanted a clarification.

7     That when a witness, when we show grand jury testimony and a

8     witness acknowledges the grand jury testimony, that's sufficient,

9     it's in the record, and there needs to be no additional marking

10    of the exhibit.

11         THE COURT:  No, I'm glad you brought that up.  We

12    probably should clarify that.

13         Ordinarily in a trial, of course, you don't show the

14    jury the grand jury transcript.

15         MR. KURLAND:  That's true.

16         THE COURT:  Now, I don't see any problem with it.  I

17    think just about everybody has done it.  There hasn't been any

18    objection.  And certainly I will tell the jury, and I'll count on

19    you, Mr. Kurland, to remind me to include it in my instructions,

20    that the grand jury transcripts, though they saw them and though

21    there was lots of discussion about them, and I would assume I'll

22    do this when I give my prior inconsistent statement

23    instruction --

24         MR. KURLAND:  Yes.

25         THE COURT:  -- that the grand jury transcripts are not

1    in evidence.  But I don't see any problem, unless somebody really

2    has a problem with it.  You were good to scratch off your notes.

3    It just helps move things along.

4              MR. KURLAND:  Absolutely.  But my concern is, and I'm

5    not sure, I think it's okay at least with respect to I think most

6    of the witnesses.  Maybe this is the evidence professor in me

7    coming out.  If they acknowledge the testimony, then the evidence

8    is in the record and you don't need it.  But there might well be

9    a situation in which under 801 the grand jury testimony actually

10   has to be admitted into evidence if it comes in as a prior

11   inconsistent statement, as substantive evidence that they are

12   denying making.

13             My recollection is most witnesses, in the manner in

14   which it is done here, whether or not that's absolutely chapter

15   and verse with respect to the rules, hasn't been a problem

16   because every witness has at least acknowledged that, yes, I said

17   that, or the transcript is what it is and I said that.

18             So I don't think it's a problem here.  But a carte

19   blanche instruction that the grand jury transcripts aren't

20   evidence might not necessarily apply to all circumstances,

21   depending on the nature of the testimony.

22             THE COURT:  Sure.  If somebody wants, either through

23   the residual exception or some other exception, to actually put

24   in a witness' grand jury testimony as substantive evidence, then

25   obviously the transcript needs to be marked.

1          MR. KURLAND:  Right.  Because that's what I intended to

2     do with the brief cross examination, but she acknowledged the

3     subject so at that point it was in.

4          THE COURT:  Yeah.  I don't think anybody has said, no,

5     I didn't say that.

6          MR. KURLAND:  That's my recollection as well.  They

7     essentially acknowledged.  And I guess now we're free to argue,

8     if it's inconsistent with something that they said two minutes

9     before, the inconsistency of their testimony is in the record and

10    it's fair game.

11         THE COURT:  Sure.

12         MR. KURLAND:  Your Honor, when you get off the bench,

13    just a curiosity, what is the thing going on tomorrow?  I'm

14    interested in the students thing.

15         THE COURT:  It's the Just the Beginning Foundation's

16    bi-annual meeting.  It's mainly in Washington.  Which is federal

17    judges of color every two years.  It's a multi-racial

18    organization headquartered in Chicago.  I'm sorry you didn't know

19    about it.  I'll send you an e-mail.

20         But there's a program on Saturday all day over in DC.

21    And this is the first.  It's called Robes in School.

22         MR. KURLAND:  There's a lot of stuff at Howard with

23    respect to that.

24         THE COURT:  In fact, Howard is one of the locations.

25         MR. KURLAND:  I'm in my own cocoon here so I'm a little

1    bit disconnected.  Thank you, Your Honor.

2           THE COURT:  Sure.  Judge Williams, Judge Ann Williams

3    of the Seventh Circuit has just been fantastic in shepherding

4    this organization for the last dozen years.  She and Judge Keith

5    from the Sixth Circuit.  Mr. Martin.

6           MR. MARTIN:  Yes, Your Honor.  Two thing.  The witness

7    we spoke about yesterday is going to testify next Wednesday, Mr.

8    Dobropolski.  I think I got it right.  We have found there are

9    some other things that we think we didn't get, and Mr. Hanlon's

10   looking for them.

11          I just wanted the Court to be aware.  I don't want to

12   find out on Monday, I get some other tapes handed to me.  So

13   that's number one.

14          Number two.  When we get to him and other witnesses

15   like him, I'm going to ask the Court to make sure everybody's

16   more aware of the nonleading with that kind of witness.  I don't

17   care if they lead a police officer in this kind of stuff.  But

18   when we get there, it's very crucial.

19          The third thing, Your Honor, is when you're showing

20   these transcripts, I saw a couple things today that didn't affect

21   my client so I didn't say anything about them.  But there were a

22   couple of things that were not being highlighted on the

23   transcript that I wouldn't want the jury to see.

24          I think everybody's got to be a little careful.  I'll

25   be looking for that.  But we don't always know until they put it

1    on the book, we don't always know what it's going to be.

2           THE COURT:  Words of wisdom, Mr. Martin.  I couldn't

3    agree with you more.  It's not just Lines 19 through 22 showing

4    up on the monitor.  It's Lines 25, 26 and 27.  So counsel do need

5    to be very keenly aware of that.

6           The answer may be to use the focus on the camera or

7    perhaps not put the transcript on the DOAR.  Because you don't

8    have.  If it's just a Q and A, you just read to it the witness

9    and see if it refreshes the witness' recollection.

10          MR. MARTIN:  That's fine, Your Honor.  One other thing

11   just for my -- I'm from the dinosaur age in trying cases.  What

12   happens to these exhibits that get put on here and I don't see

13   them again?  Do they have them or does Ms. Arrington have them?

14          THE COURT:  I think Ms. Arrington's got everything.

15          MR. MARTIN:  Because I want to at some point check my

16   exhibits against the list.

17          THE COURT:  No.  Ms. Arrington's, busy as she is, she's

18   got them.

19          MR. MARTIN:  Thank you, Your Honor.

20          THE COURT:  The point Mr. Martin made, Mr. Hanlon and

21   Mr. Harding, is very well taken.  When we get to people like

22   Dobro -- the witness on Wednesday -- and Mr. Montgomery and

23   people of that category, the Court will expect there to be no

24   leading questions.  And let's do it by the book and not run into

25   problems in that regard.

1           Anything else?  All right.  Thank you, counsel.

2           MR. KURLAND:  The order of the government's witnesses?

3           MS. RHODES:  Yes, the witnesses.

4           THE COURT:  Can you tell us who's here on Monday?

5           MR. HARDING:  Yes, Your Honor.

6           THE COURT:  By the way, it seems to me to make sense,

7    assuming we get started at 9:30 on Monday, we take a healthy

8    recess, say, at 11:15 till about 11:45, then come back and go

9    from about 11:45 until 1:30, 1:45, call it a day, rather than

10   take a break for lunch and come back at two and only stay for an

11   hour.  So that's what I'd like to do.

12          MR. HARDING:  Okay.  11:15 to 11:45 for a break.

13          THE COURT:  Yeah.  Roughly, roughly.

14          MR. HARDING:  Judge.  I'm going to give six names

15   without pretending that we're going to actually get to all six of

16   these people.  But the fact is we haven't contacted these people

17   yet and we don't know for sure.  Some of them may have

18   difficulty.  So here they are.  Giganti, Wagster, Lansey, Tanara

19   Williams, Damita Green, Gary Niedermeier.

20          THE COURT:  And then on Wednesday is likely to be, have

21   only one witness on Wednesday, pretty much?  Is he going to be on

22   for the whole day?

23          MR. HARDING:  Dobropolski is likely to take a long

24   time.  Probably not all day, I wouldn't think.  We are breaking

25   early that day.  But I think we probably should get --

1          THE COURT:  Not Wednesday.  We're breaking early on

2    Monday.

3          MR. HARDING:  Oh, we're --

4          THE COURT:  We have a full day on Wednesday.

5          MR. HARDING:  Then we'll have other witnesses.  I mean,

6    obviously, we'll know how many of these six we get through on

7    Monday.  So it's likely that we'll continue with some of those

8    six names on Wednesday.

9          THE COURT:  Good.  Thank you, counsel.  Have a safe

10   weekend.  I hope you feel better, Mr. Lawlor.

11          (Conclusion of Proceedings at 4:11 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           INDEX

2

3                                                          PAGE
   WITNESS: DET. CHRISTOPHER O'REE
4  DIRECT EXAMINATION BY MR. HANLON                        34
   CROSS EXAMINATION BY MR. FLANNERY                       44
5  CROSS EXAMINATION BY MR. CROWE                          49
   CROSS EXAMINATION BY MR. COBURN                         51
6
   WITNESS: TROOPER DOUGLAS FORRESTER
7  DIRECT EXAMINATION BY MR. HANLON                        52
   CROSS EXAMINATION BY MR. PYNE                           63
8  CROSS EXAMINATION BY MR. COBURN                         64
   REDIRECT EXAMINATION BY MR. HANLON                      66
9
   WITNESS: MARQUETTA DUGANNE
10 DIRECT EXAMINATION BY MR. HANLON                        67
   CROSS EXAMINATION BY MS. RHODES                         98
11 CROSS EXAMINATION BY MR. KURLAND                        136
   REDIRECT EXAMINATION BY MR. HANLON                      141
12 RECROSS EXAMINATION BY MS. RHODES                       142

13 WITNESS: DET. DAVID JONES
   DIRECT EXAMINATION BY MR. HARDING                       147
14 CROSS EXAMINATION BY MR. LAWLOR                         156
   REDIRECT EXAMINATION BY MR. HARDING                     158
15
   WITNESS: DET. JOHN CALPIN
16 DIRECT EXAMINATION BY MR. HARDING                       159
   CROSS EXAMINATION BY MR. LAWLOR                         163
17
   WITNESS: SGT. RICHARD WILLARD
18 DIRECT EXAMINATION BY MR. HARDING                       165
   CROSS EXAMINATION BY MR. CROWE                          172

19

20

21

22

23

24

25

REPORTER'S CERTIFICATE

1

2

3       I, Mary M. Zajac, do hereby certify that I recorded

4   stenographically the proceedings in the matter of USA v. Willie

5   Mitchell, et al., Case Number(s) AMD-04-029, on September 24,

6   2008.

7       I further certify that the foregoing pages constitute

8   the official transcript of proceedings as transcribed by me to

9   the within matter in a complete and accurate manner.

10       In Witness Whereof, I have hereunto affixed my

11   signature this _____ day of _____, 2009.

12

13

14

15                          _____

                             Mary M. Zajac,
16                           Official Court Reporter

17

18

19

20

21

22

23

24

25

## $

**$200** [2] - 75:9, 84:16
**$50** [1] - 76:10

## '

**'04** [2] - 105:18, 105:19
**'84** [1] - 21:9
**'98** [4] - 5:2, 8:8, 8:9, 8:10
**'99** [4] - 4:21, 8:8, 27:22, 74:17

## 0

**00023557** [1] - 163:6

## 1

**1-C** [1] - 172:1
**10** [1] - 171:16
**100%** [1] - 131:12
**101** [1] - 1:25
**106** [1] - 172:1
**10:00** [2] - 177:15
**11:15** [2] - 189:8, 189:12
**11:45** [3] - 189:8, 189:9, 189:12
**12** [1] - 114:1
**1205** [1] - 155:2
**136** [1] - 191:11
**13th** [4] - 34:21, 71:7, 177:20
**14** [3] - 48:5, 102:16, 102:19
**141** [1] - 191:11
**142** [1] - 191:12
**147** [1] - 191:13
**14th** [1] - 177:22
**15** [12] - 6:5, 6:6, 48:5, 51:15, 53:4, 66:22, 66:23, 70:10, 112:1, 120:3, 133:7, 171:16
**156** [1] - 191:14
**158** [1] - 191:14
**159** [1] - 191:16
**15th** [1] - 177:22
**16** [5] - 38:7, 44:13, 45:23, 166:6
**1600** [1] - 37:12
**163** [1] - 191:16
**165** [1] - 191:18
**16th** [2] - 6:3, 177:22
**17** [1] - 22:1
**172** [1] - 191:18

**18** [6] - 22:8, 22:10, 24:4, 38:7, 44:13, 104:10
**18th** [13] - 22:1, 22:4, 22:19, 22:20, 24:11, 24:16, 24:24, 25:2, 25:3, 25:11, 25:15, 166:12
**19** [2] - 103:13, 188:3
**1984** [2] - 20:1, 21:8
**1990** [1] - 14:7
**1993** [1] - 173:13
**1994** [1] - 4:18
**1996** [1] - 68:16
**1998** [11] - 2:8, 2:19, 3:17, 4:9, 8:5, 8:13, 22:7, 27:22, 35:3, 35:16, 52:6
**1998/1999** [1] - 27:20
**1999** [6] - 6:23, 7:16, 53:17, 74:8, 166:8, 166:12
**1:10** [1] - 112:13
**1:30** [3] - 166:11, 177:11, 189:9
**1:45** [1] - 189:9
**1st** [5] - 2:19, 5:2, 35:16, 52:6, 123:20

## 2

**20** [8] - 40:14, 72:9, 102:12, 103:9, 133:7, 152:16, 164:13, 177:10
**200** [2] - 77:6, 168:4
**2000** [21] - 4:10, 5:6, 7:20, 22:7, 22:12, 22:13, 71:25, 74:8, 74:17, 92:16, 94:4, 147:8, 147:11, 148:6, 149:9, 150:4, 160:7, 160:8, 160:13, 160:14, 163:9
**2001** [2] - 23:13, 23:14
**2002** [28] - 4:18, 7:6, 7:8, 9:10, 71:23, 92:18, 92:21, 92:22, 114:6, 114:7, 114:9, 114:12, 114:14, 116:5, 120:20, 120:24, 122:20, 123:14, 123:20, 124:20, 144:13, 145:22, 146:1, 146:3, 179:12, 179:22, 180:4, 180:16
**2003** [2] - 71:25, 109:23
**2004** [17] - 72:22, 102:3, 114:16, 143:15, 143:17, 179:13, 179:18, 180:2, 180:4, 180:5, 180:7, 180:9, 180:12, 180:20, 180:21, 180:22, 181:5
**2007** [1] - 71:8

**2008** [2] - 1:11, 192:6
**2009** [1] - 192:11
**21** [2] - 103:8, 171:1
**21201** [1] - 1:25
**22** [2] - 140:7, 188:3
**23** [1] - 160:12
**24** [3] - 1:11, 147:6, 192:5
**24th** [1] - 23:14
**25** [8] - 76:12, 148:25, 152:8, 158:19, 164:12, 164:13, 177:10, 188:4
**26** [1] - 188:4
**27** [1] - 188:4
**28th** [3] - 147:11, 160:14, 163:9
**2:30** [6] - 112:14, 112:15, 112:16, 112:18, 121:16, 177:11
**2:50** [1] - 54:11

## 3

**30-some** [1] - 155:9
**300** [2] - 167:4, 167:18
**34** [1] - 191:4
**3516** [4] - 35:22, 36:1, 37:10, 37:19
**357** [2] - 91:10, 91:14
**37** [3] - 149:3, 162:4, 163:7
**3:00** [1] - 54:11

## 4

**4** [1] - 109:23
**40** [1] - 72:9
**400** [1] - 84:12
**401** [1] - 118:17
**403** [1] - 118:17
**404** [2] - 113:23, 118:17
**404(b** [36] - 2:9, 3:19, 4:3, 4:6, 4:13, 5:25, 6:1, 6:13, 7:7, 8:1, 8:6, 11:18, 13:4, 13:17, 14:1, 15:2, 15:13, 16:8, 16:10, 16:18, 16:23, 17:3, 17:21, 18:5, 18:8, 18:14, 19:2, 19:12, 19:22, 21:4, 22:21, 25:5, 25:17, 25:24, 26:8, 30:24
**404(b)** [5] - 6:11, 18:17, 28:19, 29:25, 30:25
**417669** [1] - 23:14
**44** [1] - 191:4
**45** [3] - 88:13, 129:21, 132:1
**49** [1] - 191:5

**4:00** [1] - 37:12
**4:11** [1] - 190:11

## 5

**5** [2] - 76:1, 76:8
**50** [5] - 76:1, 76:6, 76:7, 76:11, 76:12
**500** [2] - 148:23, 152:5
**5031-42** [1] - 24:3
**51** [1] - 191:5
**52** [1] - 191:7
**5515** [1] - 1:24

## 6

**60** [6] - 3:6, 39:18, 40:24, 41:10, 41:17, 42:1
**63** [12] - 3:9, 6:23, 7:16, 12:22, 27:4, 27:24, 29:4, 29:18, 31:25, 42:12, 43:10, 191:7
**64** [1] - 191:8
**66** [1] - 191:8
**67** [1] - 191:10
**680** [2] - 19:25, 21:20
**687** [2] - 20:1, 21:20
**6L507** [1] - 43:14
**6th** [2] - 177:17, 177:19

## 7

**7** [1] - 43:14
**741** [2] - 19:25, 21:20
**7:00** [1] - 160:14
**7th** [2] - 53:17, 177:19

## 8

**801** [1] - 185:9
**81-5260** [1] - 21:15
**87** [2] - 54:25, 55:9
**8th** [1] - 177:19

## 9

**9** [2] - 171:10, 172:14
**95** [3] - 54:15, 54:25, 56:19
**98** [1] - 191:10
**98062021** [1] - 43:18
**9:00** [1] - 177:6
**9:30** [3] - 177:6, 178:21, 189:7

## A

**abilities** [1] - 31:24
**able** [15] - 14:2, 14:5, 15:20, 39:2, 76:9, 80:13, 80:22, 84:13, 84:21, 84:25, 87:3, 87:12, 110:6, 118:7, 120:4
**absence** [1] - 124:8
**absolutely** [7] - 30:24, 117:17, 117:23, 121:8, 121:9, 180:15, 185:14
**Absolutely** [10] - 20:5, 20:7, 20:12, 32:9, 117:1, 124:7, 125:2, 125:20, 185:4
**accept** [3] - 130:22, 146:8
**accepted** [1] - 31:25
**accident** [1] - 31:4
**according** [1] - 25:13
**account** [1] - 145:3
**accounts** [2] - 177:25, 178:1
**accurate** [4] - 64:5, 65:5, 92:16, 192:9
**accurately** [1] - 150:12
**achieved** [2] - 103:8, 103:10
**Achieved** [1] - 103:14
**acknowledge** [1] - 185:7
**acknowledged** [3] - 185:16, 186:2, 186:7
**acknowledges** [1] - 184:8
**acknowledging** [1] - 30:18
**Act** [1] - 24:21
**act** [7] - 11:9, 22:18, 24:24, 25:8, 26:19, 26:20, 183:10
**acting** [1] - 101:22
**activated** [1] - 174:12
**activities** [2] - 21:25, 60:25
**activity** [9] - 27:2, 38:13, 53:15, 69:1, 69:23, 92:15, 148:13, 150:24, 156:11
**acts** [15] - 6:1, 6:15, 6:21, 7:4, 7:13, 13:17, 22:21, 22:23, 24:1, 24:20, 25:1, 25:3, 25:24, 26:6, 26:8
**Acura** [7] - 57:5, 57:14, 61:23, 62:7, 64:21, 66:11, 66:14
**Adam** [3] - 1:22,

136:22, 159:19
**addict** [1] - 99:7
**addition** [3] - 34:19,
41:17, 107:1
**additional** [3] - 41:15,
41:18, 184:9
**Additionally** [1] -
181:20
**address** [3] - 15:11,
155:1, 171:25
**addressed** [2] - 24:1,
65:10
**addresses** [1] - 151:18
**adhere** [1] - 177:24
**adjudicated** [1] - 11:4
**adjudications** [2] -
21:3, 21:4
**admissibility** [1] - 18:6
**admissible** [7] - 16:8,
16:10, 16:18, 25:4, 25:5,
26:8, 28:18
**admission** [4] - 21:25,
115:16, 119:4, 182:3
**admissions** [1] - 114:18
**admit** [7] - 11:11, 11:15,
14:4, 14:5, 14:8, 15:7,
18:14
**admitted** [14] - 2:12,
5:19, 11:9, 15:5, 15:25,
17:3, 17:20, 17:22,
17:23, 23:21, 51:23,
113:20, 114:2, 185:10
**admittedly** [1] - 6:8
**admitting** [2] - 13:17,
25:24
**adult** [9] - 11:6, 23:16,
24:3, 24:22, 25:1, 25:4,
25:5, 123:21
**advance** [1] - 17:13
**advantage** [1] - 85:8
**advise** [1] - 33:17
**advised** [3] - 43:24,
62:5, 176:22
**advising** [1] - 126:8
**affect** [2] - 183:14,
187:20
**affects** [1] - 18:8
**affixed** [1] - 192:10
**afoul** [1] - 112:24
**afraid** [2] - 111:10,
114:24
**African** [1] - 163:24
**African-American** [1] -
163:24
**afternoon** [22] - 37:12,
54:12, 64:19, 67:15,
98:24, 98:25, 127:13,
127:21, 127:22, 129:16,
129:17, 132:13, 136:20,
136:21, 156:4, 156:5,

159:23, 159:24, 165:19,
169:11, 171:22, 172:25
**Afterwards** [1] - 94:11
**afterwards** [1] - 136:13
**age** [4] - 13:19, 26:11,
26:12, 188:11
**ago** [9] - 3:14, 6:19,
10:8, 10:11, 24:19, 64:2,
107:8, 167:1, 175:14
**agree** [5] - 6:11, 6:12,
14:13, 121:4, 188:3
**agreed** [2] - 61:15,
103:10
**agreeing** [1] - 61:16
**ahead** [18] - 8:3, 16:23,
55:7, 95:5, 95:14, 95:24,
96:6, 96:19, 97:14, 98:5,
116:21, 118:20, 119:23,
143:21, 161:15, 161:20,
167:14
**aid** [1] - 31:7
**air** [2] - 106:10, 106:12
**al** [1] - 192:5
**alert** [2] - 61:6, 178:5
**alerted** [1] - 28:15
**alleged** [6] - 5:5, 7:5,
14:17, 24:24, 34:2,
183:24
**allow** [1] - 61:16
**allowed** [1] - 66:2
**alluded** [1] - 19:13
**Almost** [1] - 140:14
**almost** [1] - 31:11
**alone** [3] - 57:17, 58:6,
147:17
**altogether** [1] - 129:20
**Altoona** [36] - 67:19,
67:20, 67:23, 67:25,
68:10, 69:19, 70:7, 70:9,
70:18, 70:20, 74:6, 74:7,
85:10, 85:14, 90:20,
93:18, 93:20, 99:2,
100:7, 100:10, 100:12,
100:15, 100:20, 101:19,
111:14, 111:18, 115:1,
116:12, 116:13, 116:15,
116:23, 117:8, 127:24,
139:7, 139:18, 139:22
**AMD-04-029** [2] - 1:6,
192:5
**Amendment** [1] - 119:7
**AMERICA** [1] - 1:5
**American** [1] - 163:24
**Amity** [1] - 9:11
**amount** [5] - 15:3, 27:7,
42:19, 75:5, 81:21
**analysis** [5] - 42:24,
42:25, 155:13, 162:21,
163:2
**Andre** [1] - 1:13

**Ann** [1] - 187:2
**annual** [1] - 186:16
**Answer** [1] - 95:10
**answer** [21] - 79:17,
80:16, 85:3, 85:12,
89:23, 95:5, 96:3, 96:10,
96:12, 97:5, 104:12,
107:22, 111:16, 113:1,
113:2, 128:10, 138:13,
138:17, 138:20, 140:18,
188:6
**answered** [1] - 87:5
**answering** [2] - 108:5,
138:18
**anticipate** [2] - 4:8,
71:19
**anticipated** [1] - 2:17
**apart** [1] - 119:14
**apartment** [20] - 83:2,
83:5, 83:6, 83:7, 83:20,
84:1, 89:6, 89:7, 89:9,
89:10, 89:13, 89:14,
90:12, 90:20, 90:22,
91:6, 129:15, 141:12,
141:13, 141:16
**Apartment** [1] - 172:1
**apologize** [1] - 140:15
**apostrophe** [1] - 33:15
**appear** [1] - 50:3
**appearance** [3] -
130:15, 156:22, 181:10
**Appearances** [1] - 1:15
**appeared** [4] - 3:1, 3:6,
3:8, 169:15
**apply** [1] - 185:20
**appreciate** [2] - 126:12,
182:25
**apprehended** [1] - 48:6
**apprehending** [2] -
46:12, 47:21
**Approach** [1] - 96:11
**approach** [8] - 13:3,
14:8, 38:17, 58:22, 95:9,
96:11, 145:14, 150:19
**approached** [15] -
37:22, 44:11, 44:12,
44:20, 46:4, 58:14,
58:23, 64:21, 65:2,
148:10, 150:15, 151:5,
156:6, 156:12, 168:6
**approaching** [4] - 2:22,
37:14, 38:24, 148:7
**appropriate** [1] - 178:14
**approving** [1] - 11:20
**April** [10] - 23:14,
114:12, 114:16, 123:20,
147:8, 147:11, 160:7,
160:13, 163:9
**area** [27] - 19:4, 28:5,
34:18, 38:13, 39:10,

41:18, 41:21, 47:12,
49:1, 51:7, 54:5, 56:23,
70:20, 92:12, 148:20,
150:21, 152:20, 158:1,
158:6, 161:9, 166:15,
166:20, 167:4, 167:9,
169:5, 170:5, 175:3
**areas** [1] - 86:19
**arguably** [1] - 4:14
**argue** [9] - 4:14, 8:12,
13:8, 13:25, 19:19,
27:18, 31:11, 116:7,
186:7
**argued** [1] - 19:7
**arguing** [1] - 19:5
**argument** [22] - 2:11,
4:5, 4:9, 6:14, 15:10,
16:3, 16:9, 17:13, 17:15,
18:13, 24:23, 30:17,
30:24, 31:19, 32:2,
32:10, 120:13, 121:7,
121:8, 121:9
**argument's** [1] - 27:13
**arisen** [1] - 182:24
**arms** [1] - 45:15
**arrangement** [2] - 75:2,
75:3
**arrangements** [2] -
42:5, 42:21
**arrest** [36] - 4:25, 5:1,
9:11, 51:16, 61:2, 62:14,
62:16, 88:2, 90:8, 92:14,
92:15, 116:14, 116:24,
117:14, 141:22, 141:23,
142:18, 143:3, 147:12,
148:3, 149:6, 153:11,
153:19, 157:18, 157:21,
158:15, 160:10, 160:14,
160:24, 162:9, 164:15,
166:11, 166:14, 170:13,
183:6
**arrestable** [1] - 63:4
**arrested** [13] - 3:15,
29:3, 29:17, 60:4, 63:3,
63:5, 87:24, 109:15,
136:6, 136:8, 139:1,
157:10, 164:6
**arresting** [3] - 2:7, 10:6,
10:20
**arrests** [3] - 71:23,
171:16, 171:17
**Arrington** [1] - 188:13
**Arrington's** [2] -
188:14, 188:17
**arrive** [1] - 61:19
**arrived** [6] - 32:14,
55:2, 90:15, 142:8,
154:1, 154:5
**arrows** [3] - 169:15,
169:16, 169:19

**articles** [1] - 178:7
**articulated** [2] - 18:6,
29:25
**articulating** [1] - 18:9
**Artis** [1] - 50:25
**ARTIS** [1] - 50:25
**Ashton** [3] - 167:23,
168:13, 169:13
**aspects** [1] - 166:2
**assault** [1] - 7:20
**assertions** [1] - 114:19
**assess** [1] - 23:17
**assigned** [6] - 21:24,
35:7, 36:24, 36:25,
146:25, 166:9
**assignment** [10] -
53:21, 53:23, 53:24,
147:7, 147:8, 150:22,
160:3, 160:8, 165:21,
166:7
**assist** [2] - 55:20, 56:10
**assistance** [1] - 65:3
**assisting** [1] - 55:5
**associated** [1] - 14:17
**association** [1] - 31:21
**assume** [7] - 24:18,
27:9, 27:11, 140:19,
156:20, 170:19, 184:21
**assuming** [3] - 115:4,
181:15, 189:7
**assumption** [1] -
156:21
**attached** [1] - 172:3
**attempt** [4] - 3:2, 14:4,
152:23, 174:16
**attend** [1] - 9:6
**attention** [13] - 35:3,
35:16, 38:15, 53:17,
58:13, 114:22, 140:8,
140:15, 147:22, 148:10,
160:7, 160:13, 168:20
**attorney** [1] - 112:25
**Attorney's** [1] - 72:16
**attorneys** [3] - 9:20,
17:5, 64:9
**attractive** [1] - 13:10
**attributable** [2] - 122:2,
146:6
**attributed** [2] - 146:6,
146:15
**audio** [1] - 181:25
**authority** [2] - 73:6,
73:18
**available** [1] - 115:10
**avenue** [1] - 38:17
**Avenue** [12] - 2:20,
9:11, 35:23, 36:1, 37:4,
37:10, 37:14, 37:19,
44:23, 151:14, 167:22
**average** [1] - 171:16

**Avoid** [1] - 177:25
**avoid** [2] - 141:13, 178:5
**awaiting** [1] - 71:15
**aware** [9] - 6:24, 7:17, 13:12, 19:20, 22:5, 64:12, 187:11, 187:16, 188:5
**awareness** [5] - 11:23, 11:24, 12:14

## B

**B-more** [1] - 140:22
**background** [3] - 90:10, 167:13, 182:25
**backing** [1] - 55:6
**backup** [2] - 54:4, 165:4
**bad** [4] - 6:15, 6:20, 7:3, 7:12
**bag** [44] - 3:2, 3:5, 3:6, 29:3, 29:4, 37:24, 38:1, 38:3, 38:5, 38:20, 38:24, 39:17, 39:18, 39:20, 39:23, 40:5, 40:6, 40:21, 40:24, 41:1, 41:5, 41:9, 41:10, 41:17, 42:1, 42:3, 43:9, 43:10, 46:3, 48:3, 48:17, 149:2, 149:3, 152:1, 154:4, 162:4
**bags** [3] - 40:9, 48:14, 48:18
**bail** [2] - 116:14, 120:20
**balance** [2] - 14:25, 16:2
**balancing** [1] - 15:2
**ballpark** [1] - 88:11
**balls** [2] - 12:24
**Baltimore** [59] - 1:12, 1:25, 2:18, 2:21, 33:13, 34:9, 34:18, 35:24, 36:2, 37:9, 52:22, 55:1, 73:9, 74:14, 75:3, 77:14, 77:16, 77:21, 78:3, 78:6, 78:20, 78:21, 78:24, 85:7, 85:9, 92:20, 92:21, 92:23, 93:2, 93:3, 93:19, 94:6, 100:18, 100:22, 105:16, 114:24, 128:19, 139:6, 139:8, 139:12, 139:15, 139:22, 140:19, 145:22, 146:25, 148:7, 154:17, 155:3, 155:12, 160:1, 160:11, 165:20, 166:4, 172:7, 172:8, 179:25, 181:8
**bar** [10] - 88:17, 88:23, 88:25, 90:16, 106:23, 106:25, 131:25, 132:21,

142:7
**barrack** [2] - 60:15, 63:14
**barracks** [7] - 54:2, 56:17, 56:18, 56:22, 60:8, 60:19, 66:12
**Barracks** [1] - 52:22
**barrel** [1] - 91:10
**Barry** [1] - 1:22
**base** [4] - 3:12, 12:11, 24:7, 24:15
**Based** [2] - 158:25, 166:16
**based** [10] - 6:18, 39:25, 63:4, 119:19, 148:22, 149:5, 152:3, 166:15, 182:3
**basis** [7] - 24:2, 24:21, 72:14, 73:2, 113:18, 113:19, 122:3
**BCPD** [1] - 49:8
**BDC** [2] - 139:18, 140:23
**bear** [1] - 146:13
**bearing** [1] - 146:11
**became** [2] - 33:23, 60:14
**become** [4] - 30:25, 31:1, 31:9, 53:14
**becoming** [1] - 60:25
**beer** [13] - 48:12, 88:17, 88:18, 88:21, 89:2, 90:13, 132:3, 132:5, 132:8, 133:2, 133:9, 135:25, 142:8
**began** [7] - 4:11, 25:13, 25:14, 45:5, 68:18, 70:7, 80:7
**begin** [4] - 13:25, 61:19, 61:22, 80:3
**Beginning** [1] - 186:15
**begun** [2] - 62:7, 62:18
**behalf** [3] - 15:21, 16:5, 182:2
**Behalf** [5] - 1:15, 1:17, 1:18, 1:20, 1:21
**behavior** [1] - 26:17
**behind** [3] - 59:17, 158:13, 174:24
**Behind** [1] - 158:13
**belabor** [1] - 126:21
**bell** [3] - 102:25, 104:15, 105:3
**bench** [1] - 186:12
**benefit** [1] - 170:1
**best** [3] - 87:9, 119:8, 129:21
**BET** [1] - 105:12
**better** [7] - 40:16, 62:5, 85:14, 109:16, 153:6,

179:7, 190:10
**between** [8] - 5:4, 11:12, 12:5, 26:19, 38:18, 159:5, 177:11
**beyond** [3] - 13:18, 18:18, 52:3
**Beyond** [3] - 6:12, 8:19, 13:24
**bi** [1] - 186:16
**bi-annual** [1] - 186:16
**big** [1] - 120:9
**Big** [6] - 101:22, 101:24, 102:9, 102:13, 102:21, 102:23
**bill** [2] - 157:16, 157:17
**bin** [1] - 49:6
**binding** [2] - 145:8, 145:11
**birth** [3] - 43:25, 60:17, 151:18
**birthday** [15] - 6:3, 22:1, 22:4, 22:12, 22:19, 22:20, 22:22, 24:12, 24:16, 24:25, 25:3, 25:11, 25:15
**bit** [22] - 16:3, 19:20, 40:16, 43:13, 55:7, 70:16, 74:5, 90:10, 95:2, 95:19, 96:1, 115:18, 115:21, 120:24, 122:6, 123:7, 140:9, 145:23, 149:8, 153:4, 181:22, 187:1
**black** [14] - 37:18, 40:16, 41:25, 44:17, 91:13, 154:8, 154:22, 154:23, 161:22, 162:8, 162:10, 169:14
**Black** [1] - 154:22
**blanche** [1] - 185:19
**block** [10] - 28:5, 133:14, 148:6, 148:24, 149:9, 152:5, 167:4, 167:18, 167:20, 168:4
**blocking** [1] - 38:19
**blocks** [2] - 88:24, 132:23
**Bloom** [14] - 148:7, 148:12, 148:24, 149:1, 149:10, 150:11, 152:5, 152:10, 152:16, 154:8, 155:8, 161:1, 161:23, 163:8
**blunt** [9] - 168:2, 170:10, 170:14, 173:22, 173:25, 174:2, 174:22, 174:23, 174:24
**Bo** [26] - 78:17, 78:18, 78:19, 78:20, 78:25, 79:2, 79:12, 79:24, 81:6,

83:21, 86:19, 94:13, 100:9, 100:10, 100:14, 100:15, 101:2, 101:18, 110:10, 129:25, 131:18, 132:7, 132:8, 139:7, 140:18
**Bo's** [2] - 89:22, 102:8
**Board** [1] - 111:3
**body** [13] - 95:2, 96:14, 96:23, 97:8, 97:18, 115:21, 116:6, 123:8, 123:14, 124:20, 124:22, 145:23
**boilerplate** [1] - 9:21
**Bond** [14] - 54:9, 55:5, 55:20, 55:21, 56:10, 56:17, 60:2, 60:25, 61:20, 63:3, 63:6, 63:10, 65:8
**Bond's** [2] - 65:12, 65:13
**book** [2] - 188:1, 188:24
**booked** [1] - 162:16
**bootstrap** [2] - 6:14, 8:21
**bootstrapping** [1] - 18:18
**Borderlines** [1] - 149:15
**born** [1] - 67:18
**bottles** [1] - 97:19
**bottom** [4] - 41:15, 140:22, 145:4, 145:14
**bought** [5] - 74:24, 75:7, 76:23, 77:7, 88:4
**bowl** [6] - 85:20, 85:24, 86:3, 86:4, 90:25, 91:5
**boy** [4] - 78:20, 79:15, 79:19, 80:10
**Boy** [1] - 79:13
**bracketed** [1] - 183:21
**braided** [4] - 134:23, 134:25, 135:6, 135:8
**braiding** [1] - 134:24
**braids** [1] - 135:7
**brain's** [1] - 125:14
**breaded** [1] - 135:1
**break** [6] - 30:16, 69:10, 177:8, 183:16, 189:10, 189:12
**breakfast** [1] - 177:7
**Breaking** [1] - 69:8
**breaking** [4] - 69:17, 70:6, 189:24, 190:1
**brief** [4] - 66:19, 158:25, 159:8, 186:2
**briefly** [7] - 18:4, 26:5, 128:25, 141:5, 141:10, 179:10, 182:2
**Briefly** [2] - 137:1,

142:24
**bring** [6] - 10:17, 21:12, 54:17, 120:7, 171:1, 184:11
**bringing** [3] - 80:17, 80:19, 80:22
**brings** [1] - 85:13
**broadcast** [1] - 178:5
**broke** [4] - 127:23, 148:14, 151:2, 156:15
**brought** [5] - 10:21, 92:23, 170:22, 181:21, 184:11
**brown** [11] - 37:24, 38:1, 38:3, 38:20, 38:23, 39:23, 40:5, 40:9, 40:21, 48:3, 171:11
**buck** [1] - 9:16
**building** [1] - 72:25
**Bull** [3] - 139:18, 139:24, 140:23
**bump** [1] - 179:25
**bumping** [1] - 93:6
**bunched** [1] - 92:7
**bundled** [1] - 106:5
**burnt** [3] - 168:7, 175:19, 175:22
**business** [14] - 4:11, 27:24, 56:12, 68:21, 102:8, 104:11, 106:17, 106:23, 107:2, 108:8, 108:10, 109:8, 109:12
**bust** [5] - 111:13, 111:17, 129:15, 136:10, 143:8
**busted** [4] - 103:13, 115:1, 117:11, 142:10
**busy** [1] - 188:17
**butt** [1] - 176:5
**buy** [24] - 42:16, 74:17, 74:20, 74:24, 75:12, 76:24, 79:24, 80:8, 80:13, 81:15, 81:20, 81:25, 82:3, 82:8, 82:11, 83:2, 83:21, 83:25, 93:22, 101:3, 101:9, 102:24, 137:21
**buying** [9] - 68:24, 78:5, 78:9, 80:3, 80:7, 81:11, 90:19, 101:2, 131:8
**BY** [47] - 34:6, 44:7, 49:21, 51:12, 52:18, 63:23, 64:17, 66:8, 67:14, 98:8, 98:23, 127:20, 136:19, 138:22, 141:9, 142:23, 147:3, 150:6, 153:10, 156:3, 158:24, 159:22, 163:14, 165:18, 166:23, 167:16, 172:24, 191:4, 191:4,

191:5, 191:5, 191:7, 191:7, 191:8, 191:8, 191:10, 191:10, 191:11, 191:11, 191:12, 191:13, 191:14, 191:14, 191:16, 191:16, 191:18, 191:18
**Byrd** [8] - 93:16, 93:17, 93:22, 93:24, 94:3, 94:6, 94:9, 94:17

**C**

C-H-R-I-S-T-O-P-H-E-R [1] - 33:15
**calendar** [1] - 171:18
**CALPIN** [2] - 159:14, 191:15
**Calpin** [16] - 147:18, 148:4, 148:17, 148:23, 148:25, 150:21, 151:23, 152:1, 152:3, 154:4, 155:9, 155:17, 155:19, 155:21, 159:12, 159:18
**Calvin** [10] - 50:13, 149:6, 153:12, 153:17, 153:20, 154:20, 155:1, 156:25, 162:12, 162:14
**camera** [2] - 171:2, 188:6
**cannot** [1] - 24:21
**cans** [2] - 49:1
**capacity** [2] - 27:24, 148:5
**caps** [5] - 3:6, 3:7, 3:9, 7:16, 163:7
**capsules** [4] - 41:8, 149:3, 155:11, 162:5
**car** [35] - 38:8, 44:15, 45:4, 55:11, 55:23, 56:24, 57:2, 57:4, 57:6, 57:18, 57:19, 58:2, 60:21, 61:3, 61:17, 62:23, 65:4, 69:16, 69:17, 106:11, 132:15, 132:16, 132:19, 147:19, 156:16, 168:6, 168:15, 168:20, 170:19, 174:8, 174:9, 174:20, 175:8, 175:10
**care** [3] - 73:12, 169:25, 187:17
**career** [1] - 174:6
**careful** [2] - 124:18, 187:24
**carefully** [1] - 177:24
**carjacking** [1] - 69:17
**Carlos** [26] - 74:9, 74:13, 74:15, 74:17, 75:3, 75:4, 75:12, 75:25,

76:11, 77:7, 77:12, 77:15, 77:22, 77:23, 78:2, 78:6, 78:8, 78:9, 78:18, 79:12, 79:20, 84:5, 93:24, 93:25, 100:9, 139:10
**Carney** [1] - 43:4
**Carolina** [1] - 20:19
**Carroll** [2] - 50:7, 50:11
**CARROLL** [1] - 50:7
**carry** [2] - 42:19, 119:10
**cars** [5] - 69:6, 69:8, 133:12, 174:11
**carte** [1] - 185:18
**cartridges** [1] - 171:10
**CASE** [1] - 1:6
**Case** [1] - 192:5
**case** [80] - 3:20, 5:25, 7:9, 8:11, 8:12, 8:22, 9:14, 10:12, 11:21, 12:1, 12:2, 13:14, 13:19, 13:23, 14:2, 15:11, 17:5, 17:25, 18:4, 18:21, 20:1, 20:3, 20:8, 20:18, 21:5, 21:21, 21:22, 22:6, 23:1, 23:6, 25:12, 26:12, 26:14, 26:18, 26:20, 28:17, 31:12, 34:1, 43:16, 43:22, 52:4, 53:24, 54:18, 63:18, 64:9, 64:10, 64:13, 66:21, 72:25, 73:7, 73:8, 73:17, 73:24, 110:8, 110:24, 112:7, 116:12, 117:1, 120:11, 121:10, 122:17, 123:20, 134:18, 144:25, 145:6, 145:15, 146:5, 172:17, 177:25, 178:1, 178:6, 178:8, 178:9, 178:10, 182:15, 182:16, 183:21
**cases** [14] - 11:20, 11:21, 13:16, 13:17, 16:25, 17:1, 19:13, 19:23, 26:5, 28:16, 28:22, 72:18, 74:7, 188:11
**category** [1] - 188:23
**caught** [2] - 136:1, 179:3
**caused** [1] - 182:22
**cautionary** [1] - 21:2
**cautious** [1] - 4:7
**CC** [1] - 43:16
**CD** [13] - 98:15, 98:16, 98:17, 103:25, 104:11, 104:15, 104:21, 104:24, 105:5, 105:11, 129:6, 129:8
**CD's** [2] - 98:9, 104:14

cell [5] - 148:22, 150:17, 150:18, 151:20, 154:14
**center** [2] - 12:12, 27:2
**Center** [1] - 154:17
**centered** [2] - 31:21, 31:22
**central** [1] - 67:20
**Central** [7] - 146:25, 147:9, 149:13, 149:19, 155:7, 158:5, 160:9
**certain** [5] - 14:11, 31:11, 117:17, 141:15, 144:23
**certainly** [17] - 6:1, 6:8, 8:6, 8:12, 11:2, 11:18, 12:14, 13:19, 113:21, 116:19, 121:5, 122:13, 175:15, 176:8, 178:2, 184:18
**Certainly** [2] - 54:19, 182:20
**CERTIFICATE** [1] - 192:1
**certify** [2] - 192:3, 192:7
**chairs** [3] - 66:20, 112:9, 178:15
**challenge** [1] - 10:22
**chance** [1] - 120:5
**Chanel** [1] - 51:2
**CHANEL** [1] - 51:2
**change** [1] - 178:7
**channel** [1] - 178:7
**channels** [1] - 54:5
**chapter** [1] - 185:14
**characterize** [1] - 123:14
**charge** [20] - 2:8, 3:21, 4:3, 5:20, 18:7, 24:22, 24:25, 25:5, 26:24, 34:1, 71:3, 71:16, 71:22, 137:6, 137:13, 144:5, 145:12, 165:22, 172:10
**charged** [4] - 4:17, 5:5, 5:15, 6:9, 8:13, 12:11, 13:23, 14:3, 14:11, 18:12, 25:12, 25:19, 25:21, 29:16, 32:8, 33:24, 52:4, 52:5, 136:4
**Charges** [1] - 173:9
**charges** [5] - 4:4, 19:5, 64:12, 71:23, 144:9
**Charlene** [1] - 50:23
**Charles** [1] - 159:18
**cheated** [1] - 112:12
**check** [6] - 57:9, 58:23, 61:11, 62:1, 62:20, 64:23, 161:22, 188:15
**checks** [1] - 60:19
**chemical** [1] - 42:24

Chicago [1] - 186:18
**childhood** [2] - 31:22, 31:23
**chilling** [5] - 104:13, 106:3, 131:5, 131:6, 131:15
**Chris** [10] - 2:7, 2:18, 33:13, 93:16, 93:17, 93:22, 93:24, 94:3, 94:6, 171:14
**Christopher** [1] - 33:6
**CHRISTOPHER** [2] - 33:9, 191:3
**cigar** [5] - 168:1, 168:22, 174:3, 175:19, 176:11
**circling** [1] - 40:20
**circuit** [1] - 13:4
**Circuit** [13] - 11:20, 13:2, 13:3, 15:18, 19:22, 20:1, 20:3, 20:19, 21:5, 23:14, 26:6, 187:3, 187:5
**Circuit's** [1] - 21:17
**circumstances** [4] - 15:4, 60:3, 114:19, 185:20
**circumstantial** [2] - 13:9, 31:19
**citation** [1] - 21:18
**citations** [1] - 26:2
**cite** [3] - 19:17, 20:3, 21:21
**cites** [2] - 20:8, 28:18
**Citing** [2] - 23:19, 24:3
**City** [20] - 2:18, 2:21, 2:22, 33:13, 34:10, 34:18, 35:24, 36:2, 37:9, 139:18, 139:24, 140:23, 148:7, 154:17, 155:3, 155:12, 160:1, 160:11, 165:20, 166:4
**city** [1] - 85:13
**claims** [2] - 23:25, 24:5
**clarification** [2] - 138:23, 184:6
**clarifies** [1] - 139:5
**clarify** [2] - 125:3, 184:12
**classes** [1] - 68:3
**classic** [4] - 6:14, 18:17, 30:10, 30:15
**clean** [2] - 126:18, 168:25
**clear** [10] - 12:10, 16:13, 114:10, 114:21, 115:22, 125:13, 137:2, 142:17, 178:25, 180:17
**clearing** [1] - 39:10
**clearly** [12] - 7:7, 17:23, 25:13, 26:24, 27:4, 27:6,

27:7, 27:15, 30:21, 32:8, 37:8, 114:17
**CLERK** [3] - 33:11, 52:12, 67:8, 146:21, 159:13, 159:16, 165:14
**client** [6] - 16:11, 113:20, 114:1, 182:6, 182:15, 187:21
**clock** [2] - 112:10, 112:15
**close** [2] - 30:2, 156:14
**closer** [1] - 70:16
**closest** [1] - 92:4
**closing** [3] - 32:2, 32:10, 120:13
**clothes** [7] - 37:7, 106:8, 147:15, 148:5, 160:20, 160:21
**clothing** [1] - 154:20
**Co** [1] - 28:15
**Co-counsel** [1] - 28:15
**coat** [1] - 37:8
**Coburn** [2] - 1:22, 19:17
**COBURN** [16] - 19:19, 20:5, 20:7, 20:12, 20:15, 20:18, 20:23, 20:25, 21:8, 21:10, 21:12, 21:20, 51:12, 64:17, 191:5, 191:8
**cocaine** [33] - 3:12, 12:11, 24:7, 24:15, 29:5, 29:18, 39:19, 39:21, 39:24, 40:2, 40:3, 40:4, 41:2, 41:3, 42:12, 42:16, 47:14, 47:15, 70:19, 75:1, 75:5, 75:13, 82:11, 84:1, 84:2, 84:8, 85:1, 87:1, 87:2
**Cocaine** [1] - 86:25
**coconspirator** [1] - 116:9
**coconspirators** [2] - 23:20, 116:16
**cocoon** [1] - 186:25
**Code** [1] - 24:4
**codefendants** [3] - 15:10, 16:1, 17:22
**Cold** [1] - 105:23
**Coleman** [6] - 23:13, 23:16, 24:5, 24:12, 24:15, 24:17
**Coleman's** [4] - 23:18, 23:20, 23:25, 24:11
**college** [2] - 68:1, 68:2
**colloquy** [1] - 120:7
**color** [4] - 40:1, 42:2, 91:12, 186:17
**Columbus** [1] - 177:21
**combative** [2] - 113:6, 113:10

**comfort** [1] - 31:8
**coming** [12] - 7:22, 20:19, 32:15, 44:20, 59:12, 59:15, 119:3, 144:21, 153:3, 167:22, 167:24, 185:7
**commences** [1] - 33:17
**comment** [1] - 112:21
**commenting** [1] - 112:21
**comments** [1] - 183:3
**committed** [6] - 22:23, 24:20, 25:3, 71:5, 115:7, 116:17
**common** [6] - 49:24, 105:1, 158:4, 159:1, 159:4, 159:6
**commonly** [2] - 105:14, 168:1
**communicate** [3] - 110:25, 116:8, 123:5
**communicating** [1] - 115:7
**communication** [2] - 143:23, 145:24
**Communications** [1] - 154:17
**communications** [1] - 144:8
**communities** [1] - 149:16
**community** [2] - 36:3, 36:4
**companion** [1] - 60:4
**compare** [2] - 40:6, 41:25
**compartment** [1] - 176:4
**complainant** [2] - 154:18, 166:25
**complaint** [3] - 43:13, 154:18, 166:19
**complaints** [1] - 158:6
**complete** [4] - 16:21, 79:17, 156:17, 192:9
**completed** [5] - 68:14, 103:11, 120:20, 124:6
**complicated** [1] - 17:24
**complied** [1] - 45:12
**computer** [2] - 20:16, 21:12
**con** [1] - 41:1
**concedes** [2] - 19:10, 30:6
**conceding** [2] - 4:20, 19:3
**conceivable** [1] - 183:14
**concentrate** [1] - 2:10
**concentrating** [4] -

46:14, 47:2, 47:7, 47:24
**concentration** [1] - 48:7
**concept** [1] - 14:14
**concern** [2] - 126:5, 128:14, 128:18, 182:25, 185:4
**concerned** [4] - 18:22, 29:15, 114:23, 129:12
**concerning** [7] - 7:20, 8:4, 14:5, 60:12, 140:1, 178:6, 183:4
**concerns** [1] - 126:10
**conclude** [2] - 63:17, 120:6, 176:21
**concluded** [4] - 125:7, 125:10, 144:17
**conclusion** [2] - 66:10, 126:4
**Conclusion** [1] - 190:11
**conditioning** [2] - 106:10, 106:12
**conduct** [8] - 4:1, 4:10, 11:20, 23:4, 62:12, 148:18, 178:16, 178:17
**conducted** [3] - 9:18, 49:10, 63:7
**conducting** [1] - 56:12
**confer** [1] - 177:6
**confession** [1] - 120:14
**confidence** [1] - 15:17
**confidential** [1] - 161:13
**confirmed** [1] - 3:10
**confuse** [2] - 7:11, 17:23
**confusion** [1] - 141:13
**conjunction** [1] - 126:24
**connection** [5] - 5:4, 11:12, 12:15, 52:5, 171:15
**connections** [1] - 12:4
**consent** [3] - 61:13, 61:16, 65:20
**Consent** [1] - 61:15
**consented** [1] - 66:2
**Consequently** [1] - 23:19
**consider** [14] - 8:16, 13:6, 34:1, 97:13, 107:23, 107:24, 107:25, 122:3, 123:6, 127:2, 127:3, 127:6, 146:10, 146:12
**considerable** [1] - 144:24
**consideration** [2] - 16:15, 123:8
**considered** [11] - 28:11, 33:19, 33:20, 33:22,

51:24, 52:1, 76:1, 87:17, 100:6, 122:8, 126:24
**considering** [1] - 145:16
**consistency** [2] - 40:1, 42:2
**consistent** [1] - 120:10
**console** [2] - 168:8, 175:19
**conspiracies** [11] - 24:10, 25:17, 31:13, 31:20, 33:24, 34:3, 183:11, 183:17, 183:20, 183:24, 184:2
**conspiracy** [81] - 3:22, 3:24, 4:15, 4:17, 4:20, 5:5, 5:6, 6:9, 6:10, 6:18, 7:5, 8:13, 11:22, 12:10, 12:13, 12:17, 13:10, 13:18, 13:22, 15:24, 18:7, 18:12, 18:15, 18:16, 19:5, 19:10, 22:3, 22:7, 22:19, 22:22, 22:23, 23:16, 23:19, 23:21, 24:6, 24:8, 24:13, 24:14, 24:24, 25:2, 25:10, 25:12, 25:13, 25:18, 25:20, 26:1, 26:9, 26:22, 26:24, 27:5, 27:8, 27:16, 28:3, 30:6, 30:9, 31:1, 31:2, 31:10, 31:12, 31:14, 31:16, 32:8, 52:4, 116:12, 116:15, 116:18, 116:23, 117:3, 117:4, 117:5, 117:6, 117:8, 117:10, 117:11, 117:15, 144:8, 182:16, 183:4, 183:7, 183:9, 183:20
**conspiracy's** [1] - 116:24
**constitute** [1] - 192:7
**CONT'D** [1] - 127:19
**contact** [6] - 37:23, 45:21, 45:22, 64:22, 81:19, 82:11
**contacted** [1] - 189:16
**contacting** [1] - 81:21
**contain** [2] - 75:20, 114:19
**contained** [4] - 39:18, 40:24, 41:1, 41:6
**container** [2] - 75:20
**containing** [2] - 43:10, 76:22
**contains** [1] - 76:16
**contention** [1] - 15:5
**contents** [2] - 182:6, 182:9
**context** [9] - 13:15, 18:21, 19:5, 19:22, 26:9,

26:19, 79:19, 81:5, 127:3
**contingent** [1] - 178:24
**continuation** [3] - 26:7, 26:10, 183:16
**continue** [5] - 33:4, 112:8, 119:19, 127:15, 190:7
**Continue** [1] - 177:24
**continued** [8] - 22:4, 24:7, 25:10, 25:15, 54:15, 56:19, 116:16, 151:3
**continues** [1] - 25:2, 177:1
**Continuing** [1] - 96:24
**continuing** [4] - 13:18, 97:1, 183:11, 183:20
**continuously** [1] - 114:12
**contrary** [2] - 114:6, 116:12
**control** [2] - 14:24
**controlled** [2] - 3:7, 3:11
**conversation** [2] - 179:12, 181:8
**convicted** [2] - 11:4, 71:6, 144:1
**conviction** [13] - 8:5, 8:20, 11:6, 13:21, 14:7, 15:3, 24:3, 24:22, 25:4, 28:21, 143:15, 146:6, 144:12
**convictions** [3] - 19:21, 20:9, 21:3
**cooperated** [1] - 111:3
**cooperating** [3] - 107:2, 107:14, 107:15
**Cooperating** [1] - 108:5
**cooperation** [2] - 107:10, 108:25
**cooperator** [2] - 108:2, 108:4
**cop** [1] - 81:8
**Cop** [1] - 81:9
**copy** [1] - 54:18
**Cornell** [1] - 50:15
**corner** [16] - 148:11, 148:13, 149:1, 149:7, 149:24, 150:4, 150:12, 150:13, 152:14, 152:15, 153:15, 156:9, 156:16, 161:2, 163:8, 174:23
**corners** [1] - 158:7
**corralled** [1] - 10:20
**Correct** [40] - 68:4, 68:11, 70:1, 71:2, 71:9, 72:13, 72:19, 73:1, 73:14, 73:22, 74:16, 75:22, 76:15, 81:13,

82:10, 87:25, 88:10, 90:9, 92:11, 99:3, 99:5, 103:21, 103:24, 104:22, 110:21, 127:25, 132:11, 132:22, 134:10, 137:5, 137:19, 143:5, 144:3, 151:14, 164:11, 168:11, 170:7, 173:21, 174:1, 175:7
**correct** [76] - 41:7, 42:10, 42:11, 43:1, 43:17, 43:19, 43:20, 44:19, 45:21, 46:5, 46:19, 47:10, 48:23, 51:5, 51:15, 51:17, 53:25, 64:3, 64:24, 64:25, 65:18, 66:3, 68:10, 70:23, 72:8, 72:25, 73:13, 74:22, 76:14, 81:12, 86:22, 88:6, 115:14, 132:10, 138:6, 142:2, 142:19, 147:21, 147:23, 147:24, 149:10, 149:11, 151:6, 151:7, 151:11, 151:12, 151:21, 151:22, 152:2, 152:18, 153:12, 153:13, 153:16, 154:2, 156:8, 156:10, 157:2, 157:3, 157:14, 158:18, 163:10, 164:10, 168:12, 169:5, 170:23, 171:22, 173:3, 173:20, 174:17, 175:6, 176:3, 176:9, 180:15, 183:6, 183:8, 184:1
**corrected** [1] - 179:13
**corrective** [1] - 179:11
**correctly** [5] - 64:20, 65:1, 137:4, 163:15, 163:20
**corrupt** [2] - 144:2, 144:8
**cost** [3] - 76:19, 76:20, 77:1
**counsel** [13] - 2:2, 28:15, 32:13, 113:14, 115:12, 126:16, 140:6, 141:5, 176:22, 177:7, 188:4, 189:1, 190:9
**Counsel** [1] - 178:23
**count** [3] - 144:2, 144:4, 184:18
**counted** [1] - 41:11
**country** [1] - 13:4
**counts** [2] - 143:22, 144:1
**County** [5] - 52:22, 55:1, 55:9, 172:17, 172:8
**Couple** [2] - 78:11, 92:18

**couple** [27] - 10:18, 12:9, 12:17, 71:22, 72:10, 75:19, 77:9, 78:7, 80:17, 80:19, 80:22, 83:6, 105:9, 105:10, 112:10, 124:4, 128:18, 136:23, 139:5, 142:14, 152:12, 161:7, 180:16, 181:22, 183:2, 187:20, 187:22
**course** [13] - 11:21, 22:12, 29:9, 32:4, 34:22, 53:5, 85:13, 117:3, 124:17, 128:11, 145:8, 184:13
**Court** [36] - 5:21, 15:3, 15:7, 15:9, 15:17, 17:17, 18:6, 18:21, 19:11, 22:5, 23:14, 29:25, 115:25, 118:24, 119:1, 119:4, 119:6, 121:11, 121:23, 124:5, 124:15, 124:19, 126:7, 126:9, 126:15, 126:17, 126:22, 172:1, 177:1, 181:15, 183:3, 183:15, 187:11, 187:15, 188:23, 192:16
**court** [4] - 17:16, 72:23, 79:2, 172:18
**COURT** [267] - 1:1, 2:2, 2:13, 2:16, 3:19, 4:2, 4:7, 4:16, 4:19, 5:1, 5:3, 5:10, 5:14, 5:17, 5:23, 6:4, 6:6, 6:11, 6:20, 6:23, 7:2, 7:7, 7:11, 7:16, 7:22, 7:24, 8:3, 8:8, 8:10, 8:24, 9:8, 9:14, 9:17, 9:24, 10:1, 10:3, 10:7, 10:9, 10:15, 10:19, 10:25, 11:4, 11:6, 11:8, 11:11, 12:19, 12:23, 14:13, 15:12, 16:5, 16:10, 16:19, 16:23, 18:1, 19:15, 20:2, 20:6, 20:10, 20:14, 20:16, 20:21, 20:24, 21:6, 21:9, 21:11, 21:14, 21:16, 21:23, 22:10, 22:13, 22:16, 23:2, 23:9, 23:12, 26:23, 27:15, 28:14, 28:20, 28:25, 29:9, 29:13, 29:22, 30:23, 32:4, 32:9, 32:13, 32:18, 32:22, 32:25, 33:2, 33:8, 33:16, 44:5, 51:19, 51:22, 54:19, 66:18, 66:25, 67:2, 79:11, 79:17, 80:16, 81:3, 85:3, 85:12, 95:4, 95:10, 95:14, 95:19,

95:22, 95:24, 96:3, 96:6, 96:10, 96:12, 96:16, 96:19, 96:25, 97:3, 97:5, 97:10, 97:16, 97:20, 97:23, 97:25, 98:2, 98:5, 98:7, 102:11, 102:22, 107:22, 109:10, 111:16, 111:24, 112:2, 112:5, 112:18, 112:20, 113:9, 113:12, 113:15, 113:18, 113:24, 114:3, 115:3, 117:1, 117:5, 117:9, 117:16, 117:21, 117:25, 118:3, 118:5, 118:9, 118:12, 118:16, 118:19, 119:6, 119:18, 120:2, 120:15, 120:17, 120:23, 121:3, 121:6, 121:8, 121:14, 121:16, 121:20, 121:24, 122:6, 122:13, 122:24, 123:1, 123:12, 123:17, 123:22, 123:24, 124:2, 124:7, 124:11, 124:17, 124:24, 125:2, 125:5, 125:11, 125:16, 125:20, 126:1, 126:12, 127:1, 127:9, 127:13, 127:18, 128:10, 138:8, 138:13, 138:16, 138:20, 140:6, 143:21, 144:17, 144:21, 149:21, 149:25, 153:2, 153:8, 154:11, 155:25, 159:9, 161:15, 161:17, 161:19, 162:24, 164:5, 164:17, 164:20, 164:23, 165:4, 165:6, 165:8, 165:10, 166:18, 166:22, 167:11, 168:25, 169:3, 169:21, 176:18, 176:20, 178:23, 179:7, 179:15, 179:19, 179:23, 180:8, 180:12, 180:20, 180:25, 181:6, 181:9, 181:12, 181:19, 181:23, 182:19, 183:19, 184:4, 184:11, 184:16, 184:25, 185:22, 186:4, 186:11, 186:15, 186:24, 187:2, 188:2, 188:14, 188:17, 188:20, 189:4, 189:6, 189:13, 189:20, 190:1, 190:4, 190:9
**Court's** [8] - 3:12, 111:23, 116:20, 118:19, 124:12, 124:13, 124:25, 183:5
**Courthouse** [1] - 1:24
**courtroom** [10] - 2:1, 33:1, 67:1, 112:15, 112:17, 112:19, 127:11, 127:12, 178:22, 178:24

**cover** [2] - 122:14, 122:15
**covering** [1] - 4:20
**Crack** [4] - 40:4, 75:1, 87:1, 87:2
**crack** [32] - 27:4, 27:5, 27:6, 29:4, 29:18, 31:25, 39:19, 39:21, 39:24, 40:3, 41:2, 42:12, 42:16, 47:14, 47:15, 70:19, 75:5, 75:13, 75:20, 75:23, 76:22, 81:10, 81:15, 81:20, 82:11, 84:1, 84:2, 84:8, 84:21, 85:1, 87:7, 131:8
**credibility** [3] - 122:15, 126:4, 126:10
**credit** [1] - 125:21
**crew** [2] - 139:17, 140:22
**Crime** [1] - 165:23
**crime** [4] - 11:2, 130:24, 173:7, 173:10
**crimes** [5] - 12:11, 13:16, 14:10, 34:16, 35:12
**Crimes** [4] - 33:14, 34:14, 34:15, 160:4
**criminal** [5] - 53:15, 68:25, 72:25, 73:8, 143:22
**CRIMINAL** [1] - 1:6
**cross** [9] - 12:7, 120:6, 125:6, 140:7, 140:16, 142:25, 180:7, 180:23, 186:2
**CROSS** [21] - 44:6, 49:20, 51:11, 63:22, 64:16, 98:22, 127:19, 136:18, 156:2, 163:13, 172:23, 191:4, 191:5, 191:5, 191:7, 191:8, 191:10, 191:11, 191:14, 191:16, 191:18
**CROWE** [15] - 15:9, 15:13, 16:7, 16:16, 16:20, 16:25, 49:21, 51:10, 166:17, 166:21, 167:10, 172:24, 182:2, 191:5, 191:18
**Crowe** [6] - 1:20, 15:8, 18:1, 19:1, 182:1, 182:19
**crucial** [1] - 187:18
**crystal** [1] - 114:10
**culturally** [1] - 31:22
**cured** [1] - 182:24
**curiosity** [2] - 137:6, 186:13
**currency** [3] - 151:1, 151:4, 157:16

**current** [2] - 34:12, 73:17
**custody** [5] - 32:24, 56:1, 56:2, 114:12, 162:18
**cut** [3] - 43:13, 43:14, 134:22
**cutting** [3] - 59:1, 59:6, 66:14

**D**

**D-O-U-G-L-A-S** [1] - 52:16
**D-U-G-A-N-N-E** [1] - 67:12
**Damita** [1] - 189:19
**dark** [1] - 147:25
**dash** [3] - 20:6, 174:11, 174:12
**date** [7] - 4:17, 30:5, 43:25, 60:17, 71:12, 151:18, 180:22
**dated** [1] - 22:3
**dates** [3] - 141:11, 180:23, 183:21
**daughter's** [1] - 137:13
**David** [3] - 144:20, 146:24, 160:19
**DAVID** [2] - 146:19, 191:13
**Davis** [1] - 1:13
**days** [5] - 80:5, 100:3, 141:14, 141:15, 177:18
**DC** [1] - 186:20
**dead** [1] - 115:8
**deal** [9] - 7:13, 14:23, 15:17, 30:19, 30:20, 31:3, 31:5, 109:16, 181:22
**dealer** [1] - 164:3
**dealer's** [1] - 158:14
**dealers** [3] - 48:25, 101:6, 158:10
**dealing** [17] - 4:22, 11:13, 13:6, 14:16, 15:23, 17:6, 17:7, 19:3, 19:8, 23:6, 27:21, 30:12, 31:3, 31:25, 32:7, 159:5, 182:15
**dealings** [2] - 75:24, 109:1
**deals** [1] - 32:11
**dealt** [3] - 30:4, 30:6, 30:8
**December** [6] - 2:19, 3:17, 5:2, 35:3, 35:16, 52:6
**decent** [1] - 106:2

**decide** [2] - 120:5, 146:5
**decided** [2] - 10:17, 49:8
**Defendant** [4] - 1:17, 1:18, 1:20, 1:21
**defendant** [19] - 2:23, 3:16, 15:14, 18:4, 18:5, 21:24, 22:18, 22:19, 23:16, 25:11, 25:18, 25:25, 26:15, 43:21, 44:10, 79:10, 167:21, 168:10, 173:2
**defendant's** [7] - 11:23, 22:3, 22:11, 25:2, 25:11, 26:17, 183:19
**defendants** [18] - 3:23, 5:8, 6:8, 6:17, 8:23, 12:3, 12:4, 12:5, 16:21, 18:8, 18:11, 19:4, 19:7, 26:16, 28:10, 28:12, 51:25, 119:21
**Defendants** [3] - 1:9, 2:1, 121:18
**defense** [12] - 4:9, 4:13, 9:20, 10:4, 12:2, 17:5, 32:3, 32:10, 44:5, 95:6, 113:14, 120:10
**defense's** [1] - 14:8
**defer** [1] - 118:11
**definition** [2] - 108:1, 109:13
**degree** [4] - 7:20, 19:7, 119:4, 119:24
**Delaware** [1] - 59:15
**delays** [1] - 176:22
**delinquency** [3] - 11:9, 24:2, 25:25
**deliver** [1] - 71:4
**demonstrably** [4] - 113:24, 121:13, 122:4, 124:16
**demonstrated** [2] - 24:9, 27:24
**denied** [7] - 15:8, 96:17, 96:19, 115:24, 167:11, 182:20, 183:1
**denying** [1] - 185:12
**departed** [1] - 56:13
**Department** [9] - 2:18, 33:14, 34:10, 146:25, 154:17, 155:12, 160:2, 165:20, 166:5
**department** [3] - 54:22, 147:5, 171:5
**depended** [1] - 75:18
**Depended** [1] - 99:11
**describe** [5] - 33:18, 33:25, 45:7, 78:18, 78:19, 139:21

**described** [4] - 137:16, 139:23, 174:2, 175:18
**description** [2] - 146:9, 168:19
**despite** [2] - 19:13, 176:22
**DET** [3] - 191:3, 191:13, 191:15
**detail** [5] - 21:1, 51:25, 53:23, 65:25, 144:24
**details** [2] - 27:10, 60:5
**detain** [1] - 61:1
**detaining** [2] - 37:1, 39:7
**detective** [5] - 3:1, 28:23, 36:5, 155:21, 160:1
**DETECTIVE** [3] - 33:9, 146:19, 159:14
**Detective** [44] - 2:18, 3:4, 3:13, 32:17, 33:6, 42:8, 44:8, 44:11, 48:24, 49:8, 144:20, 144:21, 145:10, 146:17, 146:24, 147:5, 147:18, 148:4, 148:17, 148:23, 148:25, 149:12, 149:21, 150:10, 150:21, 152:3, 154:4, 155:17, 155:19, 155:21, 156:4, 159:9, 159:11, 159:18, 159:23, 160:19, 161:12, 161:15, 163:15, 164:20, 164:24, 171:3, 172:25, 176:18
**detective's** [1] - 2:25
**determination** [2] - 122:16, 146:13
**determine** [5] - 122:17, 123:2, 123:3, 123:5, 125:19
**determining** [2] - 52:2, 125:18
**development** [1] - 179:5
**difference** [4] - 25:16, 26:14, 87:3, 91:16
**different** [15] - 22:16, 71:22, 79:22, 79:23, 80:1, 82:24, 85:5, 86:19, 91:5, 101:6, 117:4, 117:5, 144:9, 154:14, 166:2
**differentiates** [1] - 13:12
**difficult** [2] - 13:12, 14:23
**difficulty** [4] - 15:15, 16:25, 17:25, 189:18
**dinosaur** [1] - 188:11
**Dionne** [14] - 83:10,

83:12, 83:20, 86:18, 91:21, 91:25, 101:10, 101:11, 111:13, 111:17, 127:23, 128:6, 129:25, 130:6
**dipping** [1] - 175:3
**direct** [5] - 31:19, 53:17, 112:22, 140:8, 140:15
**DIRECT** [12] - 34:5, 52:17, 67:13, 147:2, 159:21, 165:17, 191:4, 191:7, 191:10, 191:13, 191:16, 191:18
**directed** [7] - 100:11, 148:23, 152:1, 174:10, 179:22, 180:4, 180:16
**Directing** [2] - 35:3, 35:16
**direction** [4] - 44:22, 46:8, 152:17, 169:13
**directly** [1] - 33:11, 44:13, 44:24, 44:25, 45:5, 67:8, 85:21, 106:24, 136:7, 146:21, 159:16
**disabled** [1] - 65:4
**disagree** [6] - 116:23, 117:13, 118:24, 126:13, 184:4
**discarded** [3] - 37:24, 38:1, 39:9
**discern** [1] - 13:13
**disclaimer** [1] - 21:23
**disconnected** [1] - 187:1
**discovered** [5] - 152:7, 158:16, 158:20, 168:8, 176:12
**discuss** [5] - 120:5, 143:11, 178:9, 178:10, 178:13
**discussed** [7] - 70:5, 70:25, 91:4, 94:4, 118:24, 128:25, 178:19
**discusses** [1] - 23:13
**discussing** [2] - 9:4, 88:4
**discussion** [5] - 66:21, 112:6, 183:22, 183:25, 184:21
**disfavors** [1] - 183:11
**dismissed** [1] - 5:21
**Dispatch** [1] - 173:17
**dispatcher** [1] - 62:3
**disposition** [2] - 29:11, 29:12
**disputing** [1] - 180:18
**disregard** [2] - 95:4, 115:21
**dissuade** [1] - 16:17

**distance** [2] - 26:18, 38:11
**distribute** [5] - 3:22, 17:8, 17:9, 25:9, 30:4
**distributing** [2] - 154:9, 182:8
**distribution** [11] - 3:25, 4:24, 12:11, 24:7, 24:16, 25:8, 42:13, 42:14, 163:17, 163:21, 182:16
**District** [10] - 35:7, 36:19, 147:1, 147:9, 149:13, 149:19, 155:7, 158:5, 160:9, 166:10
**DISTRICT** [2] - 1:1, 1:2
**district** [1] - 35:12
**Division** [5] - 33:14, 34:14, 34:15, 160:4, 165:23
**DIVISION** [1] - 1:2
**DOAR** [2] - 179:4, 188:7
**Dobro** [1] - 188:22
**Dobropolski** [2] - 187:8, 189:23
**document** [1] - 163:1
**documents** [2] - 10:24, 171:25
**Dog** [3] - 139:18, 139:24, 140:23
**dollar** [2] - 143:24, 157:16
**dollars** [6] - 75:9, 77:2, 77:4, 80:17, 80:19, 80:22
**done** [20] - 42:9, 53:6, 55:24, 62:21, 64:23, 69:12, 92:13, 95:1, 95:23, 96:8, 107:4, 115:21, 120:24, 122:9, 124:22, 135:12, 141:24, 151:25, 184:17, 185:14
**door** [3] - 38:16, 39:10, 46:20
**double** [6] - 75:7, 75:8, 75:9, 84:19, 85:1, 85:16
**double-up** [4] - 75:9, 84:19, 85:1, 85:16
**double-ups** [1] - 75:7
**doubt** [3] - 19:14, 52:3, 125:16
**doubts** [1] - 126:9
**DOUGLAS** [2] - 52:10, 191:6
**Douglas** [3] - 32:19, 52:9, 52:15
**down** [26] - 16:22, 30:16, 48:2, 65:6, 92:24, 93:2, 93:10, 105:16, 106:14, 106:16, 117:24, 131:25, 140:16, 148:25, 152:16, 161:23, 168:7,

169:12, 170:6, 170:14, 173:24, 175:3, 175:19, 181:8, 182:7
**downstairs** [2] - 130:7, 134:9
**Downstairs** [1] - 131:20
**dozen** [1] - 187:4
**drafted** [1] - 124:13
**drawn** [2] - 148:11, 168:20
**dressed** [2] - 37:6, 37:7
**drift** [1] - 28:4
**drinking** [1] - 131:24
**drive** [5] - 49:10, 66:11, 106:10, 132:21, 133:6
**drive-by** [1] - 49:10
**Driver** [1] - 58:3
**driver** [6] - 60:14, 60:17, 64:22, 64:23, 170:9, 170:17
**driver's** [5] - 57:17, 60:25, 62:6, 65:19, 176:4
**Driver's** [1] - 58:4
**Driving** [1] - 93:2
**driving** [7] - 61:3, 90:2, 132:18, 164:1, 167:21, 173:3, 182:7
**dropped** [4] - 38:4, 38:25, 46:3, 64:13
**Dropping** [1] - 167:9
**dropping** [1] - 167:19
**drove** [3] - 56:16, 92:25, 160:25
**drug** [59] - 2:8, 3:21, 4:1, 4:17, 4:19, 4:24, 5:5, 6:18, 8:18, 9:22, 11:20, 11:22, 11:25, 12:17, 13:5, 14:6, 15:23, 19:3, 19:8, 25:8, 26:1, 27:16, 29:19, 30:12, 30:20, 31:2, 32:7, 35:9, 35:11, 42:8, 48:25, 61:2, 69:23, 70:2, 71:15, 72:2, 74:25, 86:24, 101:6, 102:8, 104:5, 104:25, 129:15, 140:18, 143:25, 148:8, 150:22, 154:18, 155:10, 158:1, 158:6, 158:10, 158:14, 159:2, 163:20, 164:3, 182:16
**Drug** [7] - 5:21, 35:8, 35:9, 147:1, 147:9, 160:9, 161:25
**Drugs** [1] - 106:25
**drugs** [87] - 4:22, 11:13, 11:23, 12:14, 12:20, 13:6, 14:16, 14:23, 15:3, 17:6, 17:14, 27:7, 27:21, 30:5, 30:6, 30:8, 30:19, 31:3, 31:4, 31:5, 32:11,

47:11, 48:20, 49:2, 49:5, 55:22, 68:18, 68:24, 70:7, 70:9, 70:10, 70:18, 74:6, 74:17, 80:23, 81:10, 81:25, 82:1, 82:3, 83:3, 83:21, 83:25, 85:9, 85:13, 85:19, 85:20, 86:9, 86:21, 87:6, 88:5, 91:20, 93:21, 93:22, 99:2, 102:24, 106:17, 106:24, 108:11, 137:18, 137:25, 138:1, 138:4, 139:7, 139:15, 139:22, 139:23, 142:10, 154:9, 155:18, 155:19, 158:8, 158:17, 158:19, 159:2, 159:5, 159:6, 162:18, 164:9, 164:12, 164:14, 166:20, 167:9, 167:19, 176:12, 182:8, 182:15
**Druid** [1] - 149:16
**dude** [8] - 74:14, 79:21, 80:18, 80:20, 81:1, 81:4, 93:10, 93:18
**due** [1] - 32:4
**Duganne** [17] - 32:20, 67:5, 67:11, 67:15, 68:19, 70:15, 72:10, 73:15, 95:6, 98:24, 107:24, 112:18, 121:20, 127:14, 127:21, 141:17, 144:17
**DUGANNE** [2] - 67:6, 191:9
**duration** [1] - 183:4
**During** [4] - 81:18, 88:4, 90:19, 148:4
**during** [21] - 4:10, 17:11, 17:12, 34:22, 53:5, 62:8, 68:17, 72:14, 75:24, 81:19, 83:14, 92:18, 92:21, 94:4, 101:3, 106:5, 112:22, 117:3, 171:16, 178:16, 180:14
**duties** [2] - 53:6, 57:8
**duty** [2] - 35:17, 53:18
**dwelling** [2] - 39:11, 51:8

**E**

**e-mail** [1] - 186:19
**earliest** [1] - 4:23
**early** [6] - 92:21, 129:17, 132:13, 177:8, 189:25, 190:1
**easier** [1] - 181:22
**easily** [1] - 65:25

east [1] - 44:21
easy [1] - 14:23
Ecstasy [1] - 70:19
educed [1] - 24:1
effect [6] - 123:8, 123:9, 126:23, 126:24, 127:6, 146:13
effectively [1] - 16:4
effort [1] - 151:8
eight [9] - 12:24, 41:22, 75:14, 84:3, 84:11, 84:14, 84:15
Either [1] - 5:7
either [7] - 42:5, 88:20, 114:9, 174:2, 177:8, 183:23, 185:22
elaborate [3] - 116:1, 119:12, 122:6
element [1] - 15:1
Eleventh [1] - 68:14
elicit [2] - 28:21, 114:18
Elroy [2] - 139:15, 139:20
elsewhere [1] - 84:1
embarking [1] - 4:11
emphasize [1] - 51:22
employed [3] - 34:9, 159:25, 165:19
empty [2] - 48:12, 86:6
encompassed [1] - 11:19
encompasses [1] - 124:13
encountered [4] - 27:3, 145:21, 176:23, 178:1
end [9] - 20:25, 54:21, 89:25, 93:6, 115:8, 122:16, 125:4, 126:6, 144:24
endeavor [1] - 51:6
ended [4] - 24:11, 117:10, 117:11, 180:23
Enforcement [5] - 35:8, 35:9, 147:1, 147:9, 160:9
enforcement [5] - 26:25, 35:9, 144:14, 150:22, 159:1
engage [1] - 3:23
engaged [2] - 8:17, 69:22
engages [1] - 13:18
engaging [3] - 12:10, 48:5, 68:25
engine [1] - 66:14
Enjoy [1] - 177:5
enter [1] - 47:8
entered [2] - 46:20, 47:9
enterprise [3] - 4:15, 14:17, 31:21

enters [5] - 22:7, 33:1, 67:1, 127:11, 127:12
entire [2] - 29:11, 125:7
entirely [1] - 145:19
entitled [9] - 13:8, 14:19, 23:17, 97:13, 114:18, 116:7, 119:21, 127:2, 127:3
entry [4] - 4:15, 12:10, 23:1, 39:12
envelope [1] - 171:11
error [2] - 21:25, 119:16
escape [1] - 174:16
especially [3] - 62:13, 103:22, 162:8
Esquire [1] - 1:16, 1:16, 1:17, 1:18, 1:19, 1:19, 1:20, 1:21, 1:22, 1:22
essentially [4] - 18:10, 49:2, 49:5, 186:7
Essex [1] - 59:16
establish [1] - 18:15
et [1] - 192:5
etc [7] - 13:10, 31:8, 158:13
ETTING [1] - 155:4
Etting [2] - 155:2, 155:4
evaluate [2] - 145:1, 146:4
evening [22] - 88:1, 88:8, 89:5, 90:12, 129:17, 132:13, 134:1, 134:5, 135:11, 141:24, 142:5, 142:6, 142:7, 142:8, 142:11, 143:7, 147:16, 147:18, 148:4, 160:15, 162:19, 163:9
event [10] - 10:22, 19:9, 30:5, 33:25, 113:3, 177:4
events [4] - 52:5, 55:18, 64:2, 90:7
eventually [2] - 61:25, 162:15
everywhere [1] - 89:12
evidence [100] - 2:12, 4:21, 4:23, 5:4, 5:7, 6:15, 8:16, 8:19, 8:21, 8:25, 9:22, 10:13, 11:15, 13:9, 13:14, 13:21, 14:1, 14:4, 15:7, 15:13, 15:22, 16:8, 16:11, 16:18, 16:24, 17:3, 17:17, 17:19, 17:25, 18:5, 18:8, 18:10, 18:14, 18:17, 18:19, 19:2, 19:13, 21:25, 23:15, 23:17, 24:1, 24:5, 24:7, 24:9, 24:12, 25:17, 26:21, 27:4, 27:8, 27:19, 28:2,

28:8, 28:11, 28:18, 30:3, 30:10, 30:18, 30:22, 31:19, 33:19, 33:20, 34:2, 39:9, 42:6, 42:22, 51:23, 51:24, 52:1, 55:8, 55:12, 62:13, 62:17, 66:21, 97:13, 112:7, 116:11, 116:12, 119:2, 120:19, 122:1, 122:3, 122:8, 123:7, 123:18, 127:4, 146:5, 146:11, 171:20, 182:4, 182:9, 182:11, 185:1, 185:6, 185:7, 185:10, 185:11, 185:20, 185:24
evident [1] - 24:18
evidentiary [1] - 62:8
exact [3] - 38:14, 96:13
exactly [6] - 26:17, 48:13, 69:4, 99:24, 105:20, 129:17
Exactly [4] - 27:15, 125:20
EXAMINATION [41] - 34:5, 44:6, 49:20, 51:11, 52:17, 63:22, 64:16, 66:7, 67:13, 98:22, 127:19, 136:18, 141:8, 142:22, 147:2, 156:2, 158:23, 159:21, 163:13, 165:17, 172:23, 191:4, 191:4, 191:5, 191:5, 191:7, 191:7, 191:8, 191:8, 191:10, 191:10, 191:11, 191:11, 191:12, 191:13, 191:14, 191:14, 191:16, 191:16, 191:18, 191:18
examination [6] - 12:7, 17:11, 112:23, 120:6, 125:7, 186:2
examine [1] - 91:11
examining [1] - 40:1
example [2] - 117:2, 141:22
Excellent [1] - 169:3
exception [4] - 25:8, 29:1, 185:23
exceptions [1] - 17:20
excess [1] - 46:17
Excuse [3] - 97:15, 161:18, 162:13
excuse [2] - 60:12, 124:6
excused [12] - 51:20, 66:19, 66:22, 112:9, 112:16, 112:18, 124:9, 159:10, 164:21, 176:20, 177:11, 178:21
executed [2] - 35:22,

49:24
executing [1] - 36:11
execution [2] - 2:20, 27:3
exhibit [2] - 155:25, 184:10
Exhibit [6] - 40:13, 40:25, 43:3, 150:8, 168:24, 170:25
exhibits [2] - 188:12, 188:16
exist [1] - 14:10
existence [1] - 116:16
exited [4] - 39:5, 45:2, 45:4, 57:18
exiting [2] - 44:15, 45:1
exits [3] - 112:17, 112:19, 178:22
expand [1] - 16:3
expansive [2] - 13:3, 144:23
expect [8] - 17:16, 71:10, 75:5, 75:24, 119:10, 173:15, 181:23, 188:23
expectations [1] - 72:16
expected [1] - 84:7
experience [12] - 11:23, 12:4, 12:14, 39:25, 42:8, 42:12, 48:24, 49:4, 49:15, 109:11, 158:25, 167:25
explain [1] - 58:25
explained [6] - 55:21, 60:2, 65:25, 73:17, 180:1
explaining [1] - 43:2
exposure [1] - 178:5
extended [2] - 178:16, 178:20
extent [6] - 14:13, 18:5, 18:11, 19:6, 30:11, 128:25
extremely [1] - 15:22
eye [3] - 37:23, 45:21, 45:22
eyeglasses [1] - 19:16

## F

F-O-R-R-E-S-T-E-R [1] - 52:16
F.2d [2] - 19:25, 21:20
facie [1] - 27:7
facilities [1] - 49:2
facility [1] - 143:23
facing [10] - 44:25, 45:10, 46:10, 46:11, 47:1, 167:22, 169:6,

169:7, 169:12
Facing [1] - 45:2
fact [29] - 8:14, 11:13, 22:8, 23:25, 31:20, 31:21, 45:14, 50:3, 57:6, 73:7, 73:19, 74:6, 107:13, 112:21, 114:11, 114:19, 114:20, 115:13, 118:25, 124:21, 126:7, 126:14, 128:17, 143:11, 163:15, 183:5, 183:10, 186:24, 189:16
factor [1] - 113:19
factors [2] - 145:2, 145:16
facts [5] - 29:14, 64:9, 126:16, 145:5, 145:13
factual [1] - 126:18
Fair [1] - 76:13, 121:7
fair [12] - 15:17, 73:21, 83:23, 87:17, 88:9, 90:3, 119:8, 119:20, 121:6, 121:8, 121:9, 186:10
fairly [6] - 12:21, 12:22, 15:14, 24:18, 173:1, 174:14
fairness [1] - 119:20
fallback [1] - 30:15
fallen [1] - 3:8
false [11] - 113:24, 114:17, 114:19, 116:17, 118:23, 121:13, 122:5, 124:16, 124:20, 144:13, 146:1
familiar [5] - 36:4, 128:3, 128:5, 137:17, 150:21
family [1] - 69:19, 69:25, 70:3, 88:25, 105:10, 106:17, 107:1, 108:8, 108:10, 108:22, 137:15, 178:7
fantastic [1] - 187:3
far [31] - 21:11, 21:16, 25:14, 28:4, 29:15, 38:5, 44:12, 45:19, 62:15, 63:13, 64:21, 64:23, 65:24, 66:9, 66:22, 67:25, 68:12, 73:12, 74:2, 79:4, 83:19, 107:15, 107:16, 108:9, 112:7, 123:18, 130:9, 141:18, 152:6, 170:6, 176:23
Far [1] - 91:20
father [4] - 69:20, 106:21, 108:20, 137:13
fault [3] - 9:4, 119:16, 119:18
favor [1] - 13:11

**February** [2] - 114:7, 114:14
**Federal** [1] - 24:21
**federal** [3] - 72:25, 177:20, 186:16
**feet** [11] - 38:7, 44:13, 45:20, 45:23, 149:1, 152:8, 152:12, 152:16, 158:19, 164:12, 168:7
**fellow** [7] - 42:20, 42:21, 60:3, 60:9, 61:18, 157:15, 178:13
**felon** [2] - 137:10, 137:12
**felony** [1] - 144:4
**few** [9] - 3:7, 24:19, 57:25, 68:8, 80:1, 81:24, 82:8, 93:13, 144:9
**field** [2] - 148:18, 161:10
**fifth** [1] - 114:4
**figured** [1] - 59:6
**filed** [3] - 9:21, 23:4, 23:7
**fill** [2] - 171:6, 171:7
**filled** [1] - 163:2
**Final** [2] - 11:1, 29:22
**finally** [4] - 41:5, 43:18, 51:4, 73:15
**Fine** [1] - 112:4
**fine** [6] - 29:6, 85:23, 87:10, 92:18, 113:15, 188:10
**fingerprinted** [1] - 44:1
**finish** [4] - 63:8, 115:3, 118:7, 123:1
**finished** [1] - 119:22
**finishes** [1] - 103:14
**finishing** [2] - 95:16, 95:17
**firearm** [8] - 71:4, 137:8, 137:9, 137:10, 137:12, 138:4, 172:11, 179:3
**firearms** [3] - 137:4, 137:6, 137:18
**first** [27] - 4:10, 24:10, 26:22, 32:16, 37:20, 38:2, 38:4, 38:5, 45:17, 45:21, 45:22, 65:7, 80:2, 94:22, 95:10, 102:19, 110:24, 116:22, 130:2, 130:13, 130:15, 132:1, 133:20, 146:5, 153:5, 155:16, 186:21
**First** [4] - 31:13, 93:16, 136:24, 168:15
**fit** [1] - 117:8
**five** [9] - 27:12, 35:14, 46:2, 47:23, 48:4, 75:23,

99:22, 124:3
**fix** [2] - 179:17, 179:19
**Flannery** [14] - 1:19, 2:4, 5:10, 5:14, 7:12, 8:3, 10:25, 13:1, 16:4, 26:3, 28:14, 29:22, 44:5, 44:10
**FLANNERY** [30] - 2:5, 5:12, 5:16, 5:19, 5:24, 6:5, 6:7, 6:12, 6:22, 6:25, 7:3, 7:9, 7:15, 7:19, 8:4, 8:9, 8:11, 9:2, 11:1, 11:5, 11:7, 11:10, 13:15, 26:4, 28:13, 28:15, 29:10, 29:21, 44:7, 191:4
**Flannery's** [1] - 29:1
**flashing** [1] - 89:17
**flat** [1] - 59:8
**Fletcher** [5] - 77:18, 83:7, 83:13, 85:19, 89:8
**Flex** [2] - 166:9, 171:17
**floor** [2] - 131:16, 134:7
**floorboard** [3] - 170:15, 174:20, 174:25
**floors** [1] - 134:6
**fluid** [1] - 59:8
**focal** [1] - 38:14
**focus** [1] - 188:6
**focused** [2] - 7:12, 38:12
**focuses** [1] - 34:16
**focusing** [1] - 15:1
**folks** [1] - 157:23
**follow** [1] - 125:13
**followed** [1] - 168:3
**following** [1] - 177:20
**foot** [3] - 38:9, 147:14, 160:22, 175:3
**FOR** [1] - 1:2
**Force** [1] - 165:22
**Ford** [4] - 167:7, 168:17, 173:3, 173:13
**foregoing** [1] - 192:7
**forever** [4] - 183:9, 183:12, 183:17, 184:3
**forgot** [1] - 142:24
**fork** [1] - 29:8
**form** [8] - 24:21, 61:15, 65:25, 86:22, 157:17, 163:2, 182:21
**former** [1] - 24:13
**forms** [1] - 96:14
**Forrester** [6] - 32:19, 52:9, 52:16, 63:24, 64:18
**FORRESTER** [2] - 52:10, 191:6
**forth** [1] - 11:25
**foundation** [1] - 115:20
**Foundation's** [1] -

186:15
**four** [28] - 12:3, 31:13, 31:20, 45:20, 46:2, 47:23, 48:4, 71:17, 75:14, 75:23, 76:25, 77:1, 77:3, 84:3, 84:10, 103:19, 112:13, 119:8, 130:2, 148:18, 151:3, 151:4, 151:5, 151:16, 152:6, 152:10, 153:14, 157:3
**Four** [5] - 40:25, 41:6, 41:8, 71:11, 84:18
**Fourth** [12] - 11:20, 13:2, 13:3, 15:18, 19:22, 20:1, 20:3, 20:9, 21:5, 21:17, 23:14, 26:6
**frame** [6] - 4:11, 7:5, 14:3, 54:11, 92:19, 92:22
**frankly** [6] - 6:10, 7:4, 13:13, 25:23, 26:17, 31:10
**fraud** [1] - 144:4
**free** [4] - 61:4, 145:15, 177:4, 186:7
**frequently** [2] - 77:8, 81:19
**Friday** [1] - 177:4
**friend** [7] - 59:17, 59:22, 92:25, 93:2, 93:4, 93:14, 179:25
**friends** [3] - 54:6, 83:16, 93:14
**friendship** [1] - 83:13
**front** [27] - 2:24, 3:3, 37:9, 37:15, 37:19, 38:11, 38:13, 38:16, 39:10, 40:14, 41:21, 44:13, 44:17, 44:23, 45:3, 46:20, 46:23, 47:1, 47:6, 47:16, 58:18, 100:24, 101:12, 101:25, 111:20, 150:9
**full** [8] - 48:10, 74:14, 114:3, 114:7, 114:15, 177:14, 190:4
**Fully** [1] - 124:24
**furtherance** [2] - 6:10, 116:18
**Furthermore** [1] - 33:22

## G

**game** [4] - 104:5, 104:25, 186:10
**gangsta** [1] - 120:10
**garages** [1] - 69:10
**garbage** [7] - 3:16, 37:25, 39:1, 39:2, 41:21,

41:22, 46:3
**GARDNER** [1] - 1:8
**Gardner** [26] - 1:21, 27:19, 33:21, 57:17, 57:23, 58:2, 58:15, 58:22, 58:25, 59:11, 60:5, 60:12, 60:20, 61:1, 61:10, 61:14, 63:3, 63:5, 63:6, 63:13, 65:15, 65:17, 65:18, 66:10, 136:22
**Gardner's** [2] - 61:22, 62:7
**garment** [1] - 37:8
**Gary** [1] - 189:19
**gather** [3] - 34:22, 35:10, 87:21
**gathering** [1] - 24:17
**GED** [2] - 68:1, 68:2
**gel** [5] - 3:6, 3:7, 3:9, 7:16, 163:7
**gelatin** [1] - 162:4
**general** [7] - 46:8, 47:18, 113:6, 113:11, 113:12, 122:15, 184:2
**General** [1] - 152:20
**generally** [6] - 11:21, 13:16, 13:17, 26:7, 26:8, 53:6
**Generally** [1] - 75:12
**generated** [1] - 154:16
**gentleman** [2] - 153:11, 154:25
**gentlemen** [15] - 33:2, 33:16, 51:22, 67:2, 97:10, 112:5, 112:11, 117:2, 127:13, 144:22, 151:16, 152:6, 167:13, 176:21, 178:20
**geographically** [2] - 12:13, 31:21
**George's** [1] - 140:25
**Gerard** [1] - 1:19
**gesture** [1] - 175:5
**Giganti** [1] - 189:18
**girl** [2] - 77:21, 83:9
**girlfriend** [1] - 7:21
**girls** [1] - 134:23
**given** [8] - 13:13, 32:2, 109:11, 113:21, 119:13, 122:19, 137:15, 180:23
**glad** [2] - 5:11, 184:11
**goal** [2] - 103:9, 103:10, 103:14
**gold** [7] - 167:7, 167:19, 168:17, 169:11, 170:8, 182:7, 182:23
**Golden** [1] - 52:22
**goodness** [1] - 109:21
**government** [44] - 2:6,

2:8, 2:13, 2:14, 3:21, 4:20, 5:24, 6:25, 7:19, 8:5, 8:14, 8:20, 13:8, 13:25, 14:21, 17:1, 18:9, 19:10, 23:5, 23:7, 23:15, 24:25, 27:18, 28:2, 28:20, 30:5, 30:11, 30:17, 31:6, 31:18, 32:3, 32:6, 52:2, 72:16, 107:2, 108:25, 114:18, 120:13, 120:18, 137:16, 140:17, 159:11, 164:24, 179:13
**Government** [5] - 1:15, 150:8, 168:24, 170:25, 171:1
**GOVERNMENT'S** [6] - 33:9, 52:10, 67:6, 146:19, 159:14, 165:12
**government's** [12] - 6:13, 14:19, 15:4, 18:13, 19:3, 23:10, 27:9, 30:1, 116:7, 124:14, 124:21, 189:2
**Government's** [2] - 40:13, 43:3
**grab** [1] - 48:2
**grade** [2] - 68:14
**gram** [5] - 76:2, 76:17, 76:19, 76:22, 84:7
**grams** [3] - 31:25, 76:1, 76:8
**grand** [31] - 12:19, 72:20, 72:23, 100:24, 101:12, 101:25, 103:17, 104:8, 104:20, 106:22, 107:16, 109:22, 110:1, 111:20, 120:9, 128:2, 130:15, 132:7, 139:14, 140:2, 141:3, 180:5, 181:10, 184:7, 184:8, 184:14, 184:20, 184:25, 185:9, 185:19, 185:24
**grandfather** [4] - 106:20, 106:21, 106:23, 106:24
**grandfather's** [2] - 88:17, 132:21
**granted** [1] - 115:19
**gratuitously** [1] - 182:14
**gravamen** [1] - 23:25
**gray** [1] - 79:6
**great** [3] - 40:15, 124:10, 179:4
**greater** [1] - 51:25
**Green** [1] - 189:19
**Gregory** [1] - 50:25
**ground** [10] - 39:6, 41:21, 41:23, 41:25, 45:12, 45:13, 45:18,

148:24, 152:5
**group** [7] - 11:14, 31:5, 31:6, 37:3, 139:25, 148:15, 152:13
**grouped** [1] - 41:12
**groups** [1] - 41:12
**grow** [2] - 27:5, 67:23
**guard** [1] - 63:5
**guess** [9] - 4:22, 70:4, 77:24, 93:11, 105:1, 112:25, 135:5, 137:25, 186:7
**guilt** [3] - 8:17, 25:1, 25:4
**guilty** [5] - 11:5, 11:8, 26:23, 26:24, 172:18
**gun** [27] - 90:22, 91:5, 91:8, 91:9, 91:18, 92:4, 134:15, 134:18, 137:24, 138:1, 138:5, 138:6, 138:10, 138:24, 143:12, 170:19, 170:22, 171:8, 171:15, 171:21, 172:4, 172:13, 176:5, 176:9
**Gun** [2] - 165:22, 166:1
**guns** [5] - 90:20, 137:20, 137:21, 138:9
**gutter** [10] - 148:25, 149:2, 152:1, 152:5, 152:18, 154:5, 161:23, 161:25, 162:19, 163:8
**guy** [4] - 78:2, 78:6, 120:9, 139:15
**guys** [7] - 94:6, 94:21, 129:5, 131:14, 139:6, 139:22, 140:19

## H

**hair** [9] - 92:13, 134:21, 134:24, 134:25, 135:1, 135:6, 135:8, 135:12, 141:24
**half** [17] - 71:11, 71:17, 71:18, 76:2, 76:17, 76:19, 76:22, 84:7, 88:13, 99:23, 99:24, 129:21, 144:11, 175:18, 175:22, 175:23, 176:11
**half-smoked** [1] - 176:11
**Hammerjacks** [2] - 114:8, 114:13
**hand** [14] - 14:18, 38:4, 61:19, 149:24, 150:4, 151:1, 151:4, 159:13, 161:2, 167:23, 168:22, 169:20, 174:22, 174:23
**handcuffs** [5] - 37:2,

39:6, 46:13, 47:4, 48:1
**handed** [1] - 187:12
**handgun** [1] - 170:16
**handguns** [1] - 166:3
**handle** [2] - 28:24, 62:14
**handling** [2] - 62:16, 73:7
**hands** [8] - 36:25, 45:16, 58:13, 157:6, 157:9, 157:12, 163:16, 164:3
**hang** [2] - 83:18, 93:3
**hanging** [1] - 89:5
**Hanlon** [31] - 1:16, 2:16, 5:13, 7:18, 7:25, 9:14, 11:11, 12:25, 14:8, 19:13, 27:12, 29:17, 33:16, 34:4, 65:2, 98:6, 98:7, 107:9, 110:2, 114:8, 114:21, 115:19, 115:22, 124:11, 126:12, 152:24, 153:3, 169:2, 179:20, 180:15, 188:20
**HANLON** [69] - 2:15, 2:17, 3:20, 4:5, 4:8, 4:18, 4:25, 5:2, 5:7, 7:23, 8:1, 9:16, 11:17, 12:21, 21:15, 22:5, 22:11, 22:14, 27:13, 28:22, 29:6, 32:16, 32:19, 32:24, 33:5, 34:6, 52:8, 52:18, 66:8, 66:17, 67:4, 67:14, 95:11, 95:13, 95:15, 95:25, 96:7, 96:21, 97:7, 98:6, 98:8, 102:10, 107:21, 109:9, 111:15, 120:22, 121:1, 121:4, 121:7, 124:12, 124:19, 124:25, 125:24, 126:2, 126:20, 128:9, 138:7, 138:12, 141:9, 143:19, 179:21, 179:24, 181:15, 181:20, 191:4, 191:7, 191:8, 191:10, 191:11
**Hanlon's** [2] - 23:1, 187:9
**happy** [8] - 16:21, 20:10, 73:18, 116:1, 119:12, 120:2, 121:24, 181:13
**hard** [3] - 103:17, 103:22, 130:9
**HARDING** [38] - 9:20, 9:25, 10:2, 10:4, 10:8, 22:25, 23:3, 144:19, 147:3, 150:6, 153:10, 156:1, 158:24, 159:11, 159:22, 164:4, 164:16,

164:19, 164:24, 165:5, 165:7, 165:9, 165:11, 165:18, 166:23, 167:16, 176:17, 179:6, 189:5, 189:12, 189:14, 189:23, 190:3, 190:5, 191:13, 191:14, 191:16, 191:18
**Harding** [18] - 1:16, 9:15, 9:17, 10:17, 10:19, 95:5, 95:14, 95:24, 96:6, 96:20, 97:14, 98:5, 153:3, 155:25, 167:15, 168:25, 179:2, 188:21
**Harding's** [1] - 24:18
**Harford** [2] - 55:1, 55:9
**harmful** [1] - 119:2
**HARRIS** [1] - 1:7
**Harris** [64] - 1:18, 2:8, 2:23, 3:1, 3:5, 3:17, 4:9, 4:19, 4:22, 5:4, 5:14, 6:2, 6:15, 8:1, 8:13, 8:15, 8:21, 11:13, 12:17, 14:5, 16:6, 16:13, 16:20, 16:24, 22:6, 22:15, 25:11, 26:15, 27:16, 27:19, 27:23, 28:9, 31:9, 31:23, 33:19, 33:23, 37:18, 37:20, 38:1, 38:6, 38:13, 38:19, 38:23, 39:6, 39:8, 39:13, 40:7, 43:22, 43:25, 44:1, 45:7, 46:6, 47:2, 47:7, 47:21, 48:5, 49:12, 49:16, 49:17, 51:4, 51:15, 51:23, 52:3, 52:5
**Harris's** [9] - 4:14, 4:23, 7:21, 8:17, 9:11, 9:24, 12:9, 13:5, 34:2
**Harry** [1] - 44:11
**hate** [1] - 9:16
**head** [1] - 172:9
**headnotes** [1] - 20:20
**headquartered** [1] - 186:18
**headquarters** [1] - 160:5
**healthy** [1] - 189:7
**hear** [19] - 2:13, 5:11, 8:25, 16:5, 31:13, 32:9, 62:4, 105:13, 112:25, 113:9, 115:13, 120:3, 120:18, 149:25, 163:15, 163:19, 163:21, 179:20
**heard** [24] - 8:22, 12:6, 12:23, 14:7, 17:11, 52:6, 54:5, 55:17, 55:18, 66:21, 90:6, 97:10, 103:25, 107:9, 107:18, 112:7, 114:1, 115:15, 115:17, 122:1, 127:7,

146:15, 178:18, 179:14
**hearer** [2] - 126:23, 126:25
**hearing** [6] - 3:13, 8:25, 9:18, 10:14, 54:7, 167:12
**hearings** [1] - 9:6
**hearsay** [3] - 118:14, 118:15
**heart** [1] - 109:21
**heightened** [1] - 30:12
**Heights** [35] - 2:21, 3:18, 8:15, 8:17, 8:22, 11:12, 11:14, 12:7, 12:12, 14:9, 14:12, 14:15, 14:16, 14:21, 14:23, 14:24, 19:6, 19:9, 27:17, 27:22, 28:4, 30:5, 30:7, 30:8, 30:12, 30:20, 32:1, 32:7, 32:11, 36:3, 48:25, 49:15, 149:16
**help** [10] - 32:1, 56:9, 57:10, 109:15, 109:16, 110:3, 110:6, 110:23, 110:24, 152:9
**helped** [2] - 56:10, 56:11
**helping** [1] - 53:8
**helps** [1] - 185:3
**hereby** [1] - 192:3
**hereunto** [1] - 192:10
**heroin** [5] - 70:19, 149:4, 155:13, 162:5, 163:7
**Heroin** [1] - 155:14
**herself** [1] - 127:7
**hi** [1] - 93:12
**Hickey** [2] - 22:8, 22:14
**hid** [1] - 29:3
**hidden** [1] - 161:25
**hiding** [1] - 27:4
**High** [1] - 172:14
**high** [9] - 42:17, 68:10, 68:12, 68:17, 99:15, 99:16, 99:17, 99:19, 158:1
**highlighted** [1] - 187:22
**highway** [2] - 56:25, 57:9
**highways** [2] - 53:11, 53:15
**himself** [6] - 27:6, 36:12, 101:19, 154:25, 156:25, 172:20
**history** [1] - 137:15
**hit** [1] - 12:22
**Hold** [1] - 98:20
**hold** [4] - 35:13, 53:1, 59:22, 82:12
**hold-up** [1] - 59:22
**holiday** [1] - 177:21

**Hollingsworth** [2] - 171:13, 171:14
**hollowed** [1] - 174:3
**hollowed-out** [1] - 174:3
**Holmes** [1] - 50:9
**home** [4] - 53:22, 105:9, 105:10, 120:8
**homey** [1] - 79:21
**homicide** [5] - 114:5, 120:21, 120:25, 146:1, 146:2
**honest** [1] - 2:9
**honestly** [1] - 93:23
**Honor** [151] - 2:5, 2:9, 2:15, 2:25, 3:20, 4:6, 5:12, 5:16, 5:19, 5:24, 6:5, 6:12, 6:22, 7:4, 7:10, 7:19, 8:2, 8:4, 8:9, 9:2, 9:3, 9:5, 9:16, 10:2, 10:10, 11:1, 11:5, 11:7, 11:10, 11:17, 12:16, 12:21, 13:15, 13:20, 13:24, 15:9, 16:16, 18:3, 18:20, 19:19, 19:20, 20:5, 20:7, 21:02, 20:23, 21:13, 21:15, 22:5, 22:25, 26:4, 28:13, 28:22, 29:6, 29:10, 29:21, 30:21, 32:5, 32:12, 32:17, 33:5, 34:7, 44:4, 51:21, 52:8, 54:17, 64:15, 66:9, 67:4, 79:9, 79:16, 81:2, 85:2, 95:3, 95:9, 95:18, 96:2, 96:9, 96:11, 96:15, 96:18, 96:24, 97:2, 98:6, 98:20, 98:21, 102:10, 107:21, 109:9, 111:15, 113:7, 113:16, 113:23, 116:22, 118:6, 118:15, 118:17, 118:18, 118:22, 118:24, 118:25, 119:24, 120:12, 120:22, 121:4, 121:10, 121:21, 123:10, 124:1, 124:12, 125:3, 125:12, 125:23, 125:24, 126:20, 127:21, 128:9, 136:17, 138:7, 138:12, 141:10, 142:21, 142:24, 142:25, 143:19, 144:16, 144:19, 154:10, 155:23, 161:14, 162:23, 164:19, 164:22, 165:1, 170:22, 176:17, 179:6, 179:10, 179:21, 181:15, 183:2, 186:12, 187:1, 187:6, 187:19, 188:10, 188:19, 189:5
**Honorable** [1] - 1:13
**hood** [1] - 58:19

**hope** [5] - 106:12, 112:11, 117:25, 179:7, 190:10
**hoped** [1] - 72:17
**Hopefully** [1] - 20:12
**hoping** [1] - 71:13
**Hostler** [1] - 50:19
**HOSTLER** [1] - 50:19
**hot** [1] - 105:23
**hour** [5] - 88:13, 99:23, 99:24, 129:21, 189:11
**hours** [3] - 37:12, 67:20, 181:22
**house** [35] - 2:22, 9:11, 26:25, 37:14, 37:15, 38:11, 38:13, 38:15, 44:12, 44:14, 44:20, 44:24, 44:25, 45:1, 45:2, 46:15, 46:18, 47:6, 47:9, 49:8, 49:10, 49:13, 85:20, 86:19, 101:1, 101:5, 101:9, 133:6, 133:7, 133:20, 133:25, 135:1, 136:7
**Howard** [2] - 186:22, 186:24
**hum** [11] - 62:19, 68:20, 70:12, 76:3, 78:12, 82:15, 85:25, 91:1, 92:1, 132:20, 143:18
**humanly** [1] - 119:8
**hundred** [3] - 75:9, 77:2, 77:4
**hung** [1] - 77:24
**Hurd** [1] - 50:23
**HURD** [1] - 50:23
**husband** [5] - 72:2, 72:5, 110:3, 110:24, 111:6
**husband's** [4] - 72:3, 73:17, 73:21, 73:24

**I**

**I-95** [4] - 32:20, 64:21, 65:7, 65:14
**Ida** [1] - 159:19
**idea** [7] - 90:11, 93:3, 138:5, 138:25, 142:6, 154:15, 154:16
**identical** [2] - 40:8, 42:2
**identification** [1] - 163:1
**identified** [14] - 2:23, 37:18, 43:4, 43:22, 44:2, 44:17, 49:12, 57:22, 57:23, 57:24, 154:25, 155:2, 156:25, 164:6
**identify** [3] - 49:16,

79:4, 171:3
**identifying** [2] - 43:23, 79:9
**ignition** [4] - 57:19, 57:21, 58:8, 58:15
**ignore** [1] - 126:18
**illegal** [7] - 61:12, 64:24, 137:8, 137:9, 137:22, 166:2, 172:10
**illegitimate** [1] - 19:2
**illicit** [1] - 156:11
**image** [4] - 40:15, 40:16, 153:2, 153:8
**imagination** [2] - 158:14, 180:3
**immediately** [11] - 37:24, 39:5, 40:11, 58:18, 60:13, 60:24, 62:13, 63:5, 82:1, 82:6, 142:18
**Impact** [5] - 33:14, 34:14, 34:15, 160:4, 165:23
**impacted** [1] - 184:3
**impede** [1] - 39:11
**impermissible** [2] - 30:11, 30:22
**implicate** [1] - 24:12
**imply** [1] - 183:8
**important** [3] - 16:1, 110:11, 183:13
**impressed** [1] - 31:24
**impression** [2] - 101:18, 101:20
**improper** [4] - 18:16, 19:2, 30:2, 30:13
**IN** [1] - 1:1
**Inadmissible** [1] - 118:14
**inadmissible** [1] - 182:17
**inadvertent** [1] - 178:11
**incarcerated** [1] - 123:21
**incarceration** [3] - 72:7, 116:6, 123:20
**inches** [2] - 41:22, 47:19
**incident** [8] - 4:21, 9:19, 32:20, 33:18, 173:8, 173:10, 178:13, 181:1
**incidents** [1] - 103:19
**include** [2] - 53:8, 126:14, 184:19
**included** [3] - 17:18, 43:9, 126:3
**Including** [1] - 89:13
**including** [2] - 73:6, 137:3

**inconsistency** [1] - 186:9
**inconsistent** [3] - 184:22, 185:11, 186:8
**incorrect** [2] - 112:11, 119:13
**indeed** [3] - 15:1, 146:10, 175:18
**independent** [1] - 119:6
**independently** [1] - 103:5
**INDEX** [1] - 191:1
**indicate** [2] - 126:22, 173:13
**indicated** [8] - 24:6, 24:14, 58:7, 73:12, 82:8, 92:9, 137:2, 174:19
**Indicated** [1] - 152:3
**indicating** [1] - 23:18
**indication** [2] - 176:8, 176:10
**indicative** [2] - 163:17, 163:20
**indicted** [1] - 143:24
**indictment** [16] - 4:17, 5:5, 6:9, 13:23, 14:4, 14:11, 14:18, 25:14, 25:19, 25:21, 33:25, 34:3, 71:15, 72:2, 183:21, 183:24
**individual** [10] - 3:15, 36:20, 37:1, 37:20, 43:5, 56:1, 57:22, 109:24, 110:9, 157:8
**individuals** [23] - 14:11, 34:17, 37:1, 148:11, 148:14, 148:18, 150:13, 150:15, 150:19, 150:23, 150:25, 151:2, 151:4, 152:10, 153:14, 156:6, 156:9, 156:15, 156:22, 157:20, 159:5, 163:16, 163:23
**Individuals** [1] - 108:10
**induced** [1] - 156:22
**indulgence** [1] - 111:23
**infer** [2] - 124:16, 126:9
**inference** [5] - 13:7, 18:18, 27:20, 28:1, 121:6
**inferences** [2] - 115:10
**informant** [2] - 161:13, 182:10
**informant's** [2] - 182:6, 182:15
**information** [23] - 3:12, 54:14, 60:8, 60:24, 61:11, 62:1, 62:3, 62:20, 72:11, 73:8, 90:6, 148:19, 148:21, 148:22, 149:5, 152:4, 154:6,

166:15, 166:16, 166:18, 166:19, 167:2, 182:21
**informed** [1] - 55:21
**initial** [2] - 2:6, 150:23
**initiated** [2] - 166:14, 166:19
**injected** [1] - 182:14
**inquire** [1] - 157:24
**inquired** [1] - 73:15
**inquiring** [1] - 151:18
**Inside** [3] - 39:17, 41:10, 48:18
**inside** [15] - 3:6, 14:3, 37:2, 39:16, 39:22, 39:23, 41:9, 41:17, 48:10, 48:22, 86:3, 86:4, 86:7, 89:13, 89:14
**instance** [5] - 5:15, 15:23, 36:11, 92:9, 122:20
**Instead** [1] - 182:14
**instruct** [11] - 28:10, 29:7, 51:25, 121:12, 122:4, 123:11, 123:15, 126:14, 144:24, 145:1, 145:25
**instructed** [1] - 122:2
**instruction** [27] - 16:12, 17:18, 19:11, 19:12, 31:12, 31:17, 116:1, 118:25, 119:9, 119:14, 119:25, 121:22, 122:16, 124:15, 124:25, 125:4, 125:18, 126:4, 126:6, 126:11, 126:15, 144:23, 145:4, 179:11, 181:13, 184:23, 185:19
**instructions** [15] - 15:18, 15:19, 29:16, 119:1, 119:12, 119:15, 119:19, 124:13, 145:7, 145:11, 145:14, 177:24, 178:11, 183:15, 184:19
**insularity** [1] - 14:20
**insure** [1] - 119:8
**intend** [2] - 122:8, 127:1
**intended** [6] - 28:20, 121:5, 123:5, 142:16, 146:14, 186:1
**intending** [3] - 6:25, 9:23, 116:8
**intends** [1] - 2:14
**intent** [25] - 3:23, 5:20, 6:16, 11:16, 11:19, 13:5, 15:6, 16:14, 17:2, 17:4, 17:8, 17:9, 18:9, 18:15, 25:9, 28:8, 30:3, 30:7, 30:14, 31:5, 71:4, 125:1, 144:7, 146:12, 181:18
**Intent** [1] - 11:17

**intentional** [1] - 25:20
**intentionally** [1] - 52:4
**interested** [2] - 168:18, 186:14
**Interestingly** [1] - 115:12
**interminable** [1] - 183:17
**interpret** [1] - 14:15
**interrogation** [1] - 33:17
**intersecting** [1] - 151:15
**intersection** [6] - 148:7, 148:10, 149:10, 150:11, 154:6, 161:1
**interview** [2] - 148:18, 161:10
**intimate** [1] - 88:6
**intrinsic** [2] - 4:3, 6:2
**introduce** [3] - 9:23, 78:2, 78:15
**introduced** [5] - 78:6, 79:20, 100:9, 100:12, 100:17
**introduces** [1] - 78:15
**inverse** [1] - 183:7
**investigate** [5] - 35:11, 39:14, 150:24, 161:5, 161:6
**investigation** [9] - 27:11, 29:20, 35:15, 36:8, 42:9, 63:12, 66:10, 178:16, 178:17
**investigations** [3] - 34:25, 35:1, 53:14
**investigator** [2] - 35:7, 48:24
**invite** [1] - 113:3
**involved** [26] - 2:19, 27:16, 32:20, 35:19, 36:7, 36:20, 53:14, 54:3, 55:8, 61:1, 64:9, 82:21, 87:6, 90:7, 104:11, 106:19, 117:7, 128:13, 128:17, 139:15, 139:22, 139:23, 150:23, 155:10, 178:25
**involvement** [7] - 4:24, 23:18, 34:2, 63:17, 110:8, 136:12, 143:2
**involving** [2] - 59:18, 72:2
**issue** [14] - 2:2, 2:6, 9:4, 17:1, 17:2, 17:9, 17:21, 18:22, 19:18, 19:21, 20:11, 21:24, 23:3, 30:25
**issued** [2] - 27:2, 29:19
**issues** [3] - 17:3, 22:1, 112:8

**Item** [2] - 40:24, 41:8
**item** [6] - 3:16, 39:22, 40:2, 40:19, 42:21
**items** [4] - 40:22, 42:4, 43:9, 171:4
**itself** [1] - 17:12

**J**

**jail** [4] - 71:10, 71:20, 72:5, 104:13
**James** [1] - 1:21
**January** [1] - 92:16
**Jeffrey** [1] - 24:11
**jerseys** [1] - 164:2
**Jim** [1] - 63:24
**job** [2] - 3:4, 171:19
**John** [2] - 147:18, 159:11, 159:18
**JOHN** [2] - 159:14, 191:15
**join** [3] - 31:5, 115:12, 115:15
**joined** [2] - 22:19, 31:24, 52:4
**joking** [2] - 104:18, 107:12
**Jones** [8] - 144:20, 144:21, 146:24, 147:5, 159:9, 160:19, 161:12, 162:6
**JONES** [2] - 146:19, 191:13
**judge** [6] - 27:2, 29:19, 145:7, 145:12, 145:13
**Judge** [9] - 1:13, 126:21, 127:10, 146:18, 184:1, 187:2, 187:4, 189:14
**judges** [3] - 126:15, 145:5, 186:17
**juggle** [1] - 15:20
**July** [2] - 53:4, 102:3
**jump** [1] - 57:19
**jumped** [2] - 93:10, 93:11
**Jumped** [1] - 58:16
**June** [2] - 166:7, 166:12
**jurisdictions** [2] - 28:16, 28:17
**juror** [2] - 2:3, 32:14
**jurors** [2] - 17:25, 178:14
**jury** [84] - 8:16, 14:20, 15:19, 16:11, 23:16, 27:21, 28:10, 29:15, 29:16, 32:15, 66:19, 66:25, 72:20, 72:23, 95:4, 97:20, 100:24,

101:12, 102:1, 103:17, 104:8, 104:21, 106:22, 107:16, 109:22, 110:1, 111:20, 112:9, 112:15, 112:16, 114:3, 114:7, 114:9, 114:11, 114:15, 114:17, 114:21, 115:5, 115:11, 115:20, 116:2, 116:4, 116:6, 118:22, 120:8, 120:9, 121:12, 122:8, 122:9, 122:17, 124:8, 124:15, 124:19, 126:7, 126:13, 126:14, 128:2, 130:15, 132:7, 138:23, 139:14, 140:2, 141:3, 145:5, 145:12, 153:8, 167:13, 173:1, 180:5, 181:10, 181:13, 182:24, 184:7, 184:8, 184:14, 184:18, 184:20, 184:25, 185:9, 185:19, 185:24, 187:23
**Jury** [8] - 1:14, 2:1, 33:1, 67:1, 112:17, 121:18, 127:12, 178:22
**Jury's** [1] - 178:21
**Justice** [1] - 24:21
**juvenile** [2] - 11:2, 13:11, 13:16, 13:17, 13:18, 14:10, 15:2, 19:17, 19:21, 20:9, 21:3, 23:4, 23:21, 24:2, 24:20, 24:21, 24:25, 25:14, 25:25, 26:6, 26:8, 28:17
**Juvenile** [2] - 21:4, 24:21

**K**

**Kanwisher** [1] - 10:12
**keenly** [1] - 188:5
**keep** [4] - 56:11, 70:15, 112:8, 159:2
**keeps** [1] - 170:3
**Keith** [1] - 187:4
**Kelsey** [2] - 1:17, 99:1
**kept** [2] - 59:1, 90:2
**key** [2] - 57:21, 58:11
**KGA** [1] - 173:17
**kick** [1] - 131:10
**killed** [5] - 97:9, 97:12, 97:18, 97:25
**killing** [1] - 122:21
**kind** [33] - 18:16, 18:17, 19:10, 30:15, 48:15, 70:18, 71:12, 74:25, 75:2, 75:3, 77:22, 83:12, 86:19, 86:24, 91:8, 92:7, 101:19, 104:23, 105:14,

116:9, 119:20, 123:16, 130:4, 130:9, 135:7, 137:13, 140:21, 154:20, 168:15, 172:13, 181:20, 187:16, 187:17
**Kind** [1] - 86:12
**kitchen** [1] - 48:17
**knotted** [1] - 39:20, 39:22, 41:1
**knowing** [6] - 6:18, 25:20, 26:10, 30:4, 31:2, 154:12
**knowingly** [1] - 52:3
**knowledge** [17] - 6:16, 11:17, 11:19, 13:5, 14:6, 15:6, 16:14, 17:2, 17:3, 19:3, 28:8, 30:19, 55:14, 83:19, 87:9, 108:21, 129:22
**known** [3] - 78:5, 106:24, 107:7
**knows** [9] - 28:5, 30:19, 31:3, 114:3, 114:7, 114:9, 114:15, 114:17, 116:7
**Kurland** [9] - 1:22, 18:1, 19:15, 20:2, 21:18, 29:23, 30:23, 136:22, 184:19
**KURLAND** [22] - 18:3, 19:16, 29:24, 32:2, 32:5, 32:12, 136:19, 138:22, 141:7, 183:2, 184:1, 184:5, 184:15, 184:24, 185:4, 186:1, 186:6, 186:12, 186:22, 186:25, 189:2, 191:11

**L**

**L-12** [1] - 163:1
**L-5** [1] - 43:3
**lab** [4] - 42:24, 42:25, 162:21, 163:2
**label** [2] - 98:14, 98:18
**labeled** [1] - 111:10
**laboring** [1] - 113:5
**ladies** [10] - 33:2, 51:22, 67:2, 97:10, 112:11, 127:13, 144:22, 167:12, 176:20, 178:20
**Ladies** [2] - 33:16, 112:5
**lady** [1] - 83:9
**laid** [2] - 45:13, 115:19
**language** [5] - 21:2, 121:25, 126:2, 126:3, 126:23
**Lansey** [1] - 189:18

**large** [1] - 178:24
**laser** [1] - 150:1
**Lashone** [1] - 50:17
**LASHONE** [1] - 50:17
**Last** [1] - 67:12
**last** [15] - 14:20, 32:5, 59:6, 68:14, 71:7, 95:4, 99:7, 99:10, 99:16, 100:1, 165:6, 165:8, 172:25, 182:4, 187:4
**lasts** [2] - 99:19, 183:9
**Late** [1] - 22:13
**late** [2] - 7:5, 22:12
**laughed** [1] - 17:16
**Laura** [2] - 1:17, 99:1
**law** [20] - 11:3, 13:1, 13:12, 19:23, 26:25, 117:12, 117:14, 119:20, 144:13, 145:7, 145:11, 145:12, 159:1, 183:6, 183:8, 183:10, 183:11, 183:16, 183:18, 184:2
**LAWLOR** [60] - 95:3, 95:9, 96:2, 96:9, 96:11, 96:15, 96:18, 96:24, 97:1, 97:4, 97:19, 113:6, 113:11, 113:13, 113:16, 113:19, 113:25, 115:2, 116:22, 117:4, 117:6, 117:13, 117:19, 117:24, 118:2, 118:4, 118:6, 118:11, 118:15, 118:17, 118:22, 119:17, 119:24, 120:12, 120:16, 121:10, 121:15, 121:21, 121:25, 122:12, 122:23, 122:25, 123:10, 123:13, 123:19, 123:23, 123:25, 124:3, 124:10, 126:21, 127:8, 127:10, 154:10, 156:3, 159:8, 161:14, 163:14, 164:18, 191:14, 191:16
**Lawlor** [10] - 1:18, 112:22, 113:3, 113:4, 116:21, 117:17, 119:7, 124:7, 179:7, 190:10
**lawyers** [1] - 145:6
**lay** [1] - 158:3
**laying** [2] - 46:14, 131:15
**Laying** [2] - 90:23, 91:19
**lead** [2] - 39:22, 187:17
**leading** [3] - 36:9, 90:7, 188:24
**leads** [2] - 22:8, 124:15
**leaning** [1] - 175:2
**learn** [6] - 14:20, 70:2, 114:10, 153:21, 162:11, 162:15

**learned** [2] - 60:13, 87:23
**least** [5] - 13:20, 24:15, 49:18, 185:5, 185:16
**leave** [8] - 29:3, 56:20, 56:22, 61:5, 66:20, 112:9, 132:3, 134:13
**Leave** [2] - 29:20, 178:15
**leaving** [4] - 56:23, 68:12, 88:16, 90:12
**led** [1] - 168:22
**Lee** [1] - 51:4
**left** [12] - 45:1, 56:18, 65:7, 65:13, 68:15, 131:25, 145:20, 153:2, 153:4, 161:8, 165:2, 167:23, 169:20, 170:3
**left-hand** [2] - 167:23, 169:20
**leg** [2] - 175:6, 175:20
**legal** [2] - 27:13, 29:24
**legions** [1] - 11:21
**lengthy** [1] - 145:2
**less** [2] - 27:13, 63:17
**lesser** [1] - 17:17
**letter** [1] - 111:2
**level** [5] - 23:18, 27:21, 35:11, 171:17
**license** [8] - 57:24, 60:18, 62:1, 62:6, 62:20, 63:4, 64:23, 65:19
**lie** [1] - 116:9
**lifestyle** [2] - 104:6, 104:25
**light** [4] - 23:17, 24:18, 147:25, 148:1
**lights** [4] - 89:17, 133:13, 174:11, 174:12
**likely** [5] - 106:15, 123:8, 189:20, 189:23, 190:7
**Limit** [1] - 126:23
**limit** [3] - 119:2, 119:4, 126:22
**limited** [3] - 16:15, 122:3, 158:14
**limiting** [14] - 15:18, 15:19, 19:12, 18:25, 119:1, 119:9, 119:12, 119:14, 119:19, 119:25, 121:22, 126:14, 181:13
**Lincoln** [1] - 159:19
**line** [5] - 30:21, 140:8, 140:15, 145:4, 145:14
**Line** [4] - 102:16, 102:19, 103:8, 103:13
**line's** [1] - 103:11
**Lines** [2] - 188:3, 188:4
**lines** [1] - 120:7

linking [1] - 23:15
Lisa [1] - 50:7
Lishel [1] - 50:9
LISHEL [1] - 50:9
list [4] - 49:25, 50:3, 145:2, 188:16
listed [1] - 50:6
listen [8] - 105:6, 105:8, 129:10, 178:6, 180:13, 181:12, 181:14, 181:25
listened [9] - 29:25, 30:16, 30:17, 98:16, 104:3, 104:21, 105:6, 105:8, 105:9
listening [1] - 105:5
litigated [1] - 23:3
lived [1] - 100:15
living [2] - 131:20, 131:21
load [1] - 20:14
loaded [1] - 171:8
local [1] - 54:5
located [2] - 36:2, 88:23
location [15] - 12:13, 29:18, 37:2, 37:4, 37:13, 54:16, 56:13, 57:1, 148:8, 150:5, 150:12, 151:19, 154:7, 154:18, 158:5
locations [4] - 38:17, 148:8, 178:18, 186:24
locked [2] - 117:3, 179:1
Lombard [1] - 1:25
look [10] - 13:16, 20:10, 26:2, 43:14, 57:7, 60:21, 139:14, 140:16, 173:10, 178:16
looked [4] - 57:2, 167:25, 175:24, 176:4
Looking [1] - 102:16
looking [15] - 19:25, 20:8, 22:17, 23:12, 24:19, 26:7, 26:14, 38:14, 43:11, 112:10, 165:3, 167:6, 167:18, 187:10, 187:25
lookout [1] - 182:23
Looks [1] - 21:20
looks [5] - 19:22, 21:1, 169:6, 169:19, 170:6
Los [17] - 74:11, 74:15, 80:10, 80:11, 80:13, 80:19, 80:25, 81:4, 81:22, 84:5, 84:25, 85:5, 100:9, 100:14, 100:15, 100:17, 139:10
LOS [1] - 74:11
Los's [2] - 80:20, 81:4
loud [1] - 102:19

low [1] - 118:10
lower [2] - 149:24, 150:3
lucky [1] - 136:14
Luger [1] - 171:10
lunch [2] - 112:12, 118:9, 120:1, 189:10
Luncheon [1] - 121:17
luncheon [2] - 112:2, 112:6
lying [1] - 87:11
lyrics [2] - 104:5, 105:13

# M

M-A-R-Q-U-E-T-T-A [1] - 67:11
ma'am [9] - 33:10, 52:15, 67:16, 73:23, 82:3, 98:20, 127:15, 146:24, 165:13
machine [1] - 140:5
mad [1] - 129:12
Madalyn [1] - 50:11
Madison [2] - 149:15
mail [1] - 186:19
main [2] - 42:17, 79:21
major [1] - 151:15
majority [3] - 13:19, 26:11, 26:12
male [4] - 2:23, 37:18, 44:17, 154:8
males [4] - 161:2, 161:7, 162:8, 163:24
man [4] - 78:17, 110:6, 161:21, 162:10
manner [6] - 43:21, 45:15, 137:22, 140:1, 185:13, 192:9
manufacturing [1] - 144:7
map [4] - 149:17, 149:20, 149:24, 150:4
March [1] - 143:17
marijuana [9] - 62:11, 168:1, 168:7, 168:8, 170:10, 174:3, 175:25, 176:7, 176:12
mark [1] - 163:1
marked [14] - 37:9, 40:13, 40:19, 40:22, 41:6, 43:3, 150:7, 152:25, 154:5, 168:23, 170:21, 170:25, 174:8, 185:25
marker [2] - 54:25, 55:9
marking [1] - 184:9
markings [1] - 140:7

marks [3] - 169:21, 169:22, 169:24
MARQUETTA [2] - 67:6, 191:9
Marquetta [3] - 32:20, 67:5, 67:11
Mart [1] - 137:21
MARTIN [14] - 1:8, 9:3, 9:9, 10:10, 10:16, 10:22, 125:3, 125:12, 125:17, 125:23, 187:6, 188:10, 188:15, 188:19
Martin [35] - 1:19, 1:20, 2:9, 10:9, 15:21, 23:4, 23:8, 27:20, 33:20, 56:5, 56:6, 56:18, 56:21, 59:18, 59:20, 61:3, 63:25, 64:12, 125:2, 125:11, 125:16, 126:2, 170:18, 171:22, 172:1, 172:10, 172:19, 173:19, 174:10, 175:8, 176:14, 182:2, 187:5, 188:2, 188:20
Martin's [1] - 29:2
Mary [3] - 1:24, 192:3, 192:15
MARYLAND [1] - 1:2
Maryland [8] - 1:12, 1:25, 52:24, 53:3, 53:22, 55:1, 57:24, 62:6
matched [1] - 168:19
matter [11] - 17:14, 17:21, 107:13, 115:14, 143:20, 176:9, 182:17, 183:6, 192:4, 192:9
Matter [1] - 80:5
matters [5] - 17:10, 126:18, 144:23, 144:25, 179:8
mattress [1] - 131:16
max [1] - 133:7
McCullogh [6] - 148:6, 148:15, 149:9, 150:20, 151:10, 160:25
McCulloh [9] - 148:12, 149:1, 150:4, 150:11, 151:3, 152:11, 154:8, 155:8, 163:9
mean [46] - 7:11, 11:12, 12:6, 14:15, 14:16, 30:14, 65:24, 69:4, 76:6, 76:20, 78:23, 79:20, 79:22, 81:5, 82:19, 95:22, 96:2, 96:23, 97:8, 102:25, 103:5, 105:1, 105:5, 105:23, 107:11, 107:15, 108:4, 110:18, 111:6, 117:5, 117:11, 126:21, 128:12,

129:5, 137:7, 140:19, 141:18, 145:24, 158:3, 170:3, 175:22, 178:1, 178:3, 180:6, 183:10, 190:5
meaning [1] - 116:6
means [5] - 80:22, 86:15, 109:7, 109:11, 111:16
measures [1] - 55:20
media [4] - 177:25, 178:1, 178:6
meet [7] - 6:17, 31:18, 64:8, 77:15, 77:18, 82:19, 82:23
meeting [3] - 54:21, 78:25, 186:16
member [11] - 6:18, 15:24, 22:20, 24:14, 31:1, 31:2, 31:10, 31:23, 33:24, 46:23, 46:25
members [5] - 32:8, 39:11, 46:22, 54:22, 105:10
Members [1] - 66:19
membership [2] - 26:1, 183:20
memorize [1] - 105:12
memory [1] - 141:14
men [1] - 119:8, 164:2
mention [1] - 98:13
mentioned [18] - 2:7, 11:2, 26:5, 34:12, 41:5, 56:20, 75:2, 75:18, 76:6, 77:12, 84:10, 86:21, 91:14, 131:24, 132:5, 134:21, 139:7, 145:16
mere [1] - 11:13
merged [1] - 137:13
mess [2] - 41:14, 115:7
message [1] - 60:11
messing [1] - 131:6
met [10] - 6:8, 22:15, 26:15, 72:10, 79:25, 80:2, 100:21, 110:4, 110:6, 128:18
metal [1] - 38:25
Meyers [2] - 72:4, 72:5
Michael [3] - 1:16, 1:18, 43:4
microphone [3] - 70:16, 127:16, 149:22
mid [2] - 35:11, 177:10
mid-morning [1] - 177:10
middle [1] - 50:6
might [27] - 4:9, 13:9, 19:24, 39:23, 45:16, 54:4, 57:10, 65:4, 75:20, 87:12, 91:9, 93:3, 110:6,

114:24, 121:14, 131:5, 133:22, 133:23, 138:3, 142:25, 152:24, 153:4, 178:8, 181:21, 183:14, 185:8, 185:20
mike [5] - 33:12, 52:13, 67:9, 146:21, 159:16
mile [5] - 54:25, 55:9, 56:25, 57:3, 65:6
miles [1] - 155:8
millimeter [2] - 171:10, 172:14
million [1] - 143:24
mind [4] - 61:4, 112:8, 116:4, 121:25
minimize [2] - 12:3, 12:4
minimum [1] - 121:11
minor [2] - 24:6, 26:19
minute [2] - 66:22, 168:9
minutes [15] - 27:12, 57:25, 66:23, 68:9, 88:13, 99:22, 99:23, 112:1, 112:13, 120:3, 129:21, 132:1, 133:7, 177:10, 186:8
Miscellaneous [2] - 40:14, 171:1
miss [2] - 5:9, 70:15
missing [1] - 4:2
misspoken [1] - 180:20
mistaken [1] - 17:4
mistrial [9] - 96:18, 96:19, 113:17, 115:25, 118:13, 182:3, 182:18, 182:20, 183:1
MITCHELL [1] - 1:7
Mitchell [103] - 1:17, 4:10, 22:9, 22:15, 27:19, 33:20, 79:9, 79:12, 79:20, 79:24, 80:2, 80:8, 80:14, 81:11, 81:15, 81:16, 81:19, 81:25, 82:9, 82:23, 83:13, 83:25, 84:24, 85:5, 85:18, 87:23, 88:2, 88:5, 88:6, 88:15, 89:5, 89:7, 89:23, 90:20, 92:10, 92:19, 94:4, 94:14, 94:16, 94:17, 94:19, 95:7, 95:16, 95:25, 96:7, 96:22, 97:7, 97:11, 97:12, 97:14, 98:9, 99:1, 114:4, 114:7, 114:10, 114:11, 114:16, 114:23, 114:24, 115:2, 115:5, 115:16, 115:23, 116:5, 116:8, 116:10, 116:13, 117:7, 117:10, 119:3,

120:8, 120:14, 120:19, 120:24, 121:12, 122:2, 122:21, 123:4, 123:5, 123:7, 123:13, 124:5, 124:20, 125:19, 127:4, 128:18, 145:21, 145:24, 145:25, 146:2, 146:6, 146:10, 146:14, 153:24, 154:21, 157:1, 157:8, 158:15, 162:17, 164:7, 180:8, 192:5

**Mitchell's** [3] - 90:16, 117:14, 146:12

**mixed** [1] - 62:15

**mom** [3] - 106:19, 106:21, 108:18

**moment** [13] - 3:11, 20:2, 21:17, 98:20, 112:20, 114:6, 115:3, 141:5, 145:9, 162:23, 170:21, 179:15

**moments** [1] - 24:19

**Monday** [11] - 177:6, 177:8, 177:16, 177:17, 177:18, 178:21, 187:12, 189:4, 189:7, 190:2, 190:7

**money** [21] - 42:18, 68:19, 68:23, 68:25, 69:13, 75:5, 84:13, 99:13, 104:14, 108:25, 157:6, 157:8, 157:12, 157:13, 157:15, 158:17, 161:2, 163:16, 164:2, 164:9, 164:14

**monitor** [3] - 169:23, 188:4

**monitoring** [1] - 54:5

**monitors** [1] - 153:3

**Montgomery** [1] - 188:22

**month** [4] - 77:11, 81:17, 81:18, 81:19

**months** [4] - 78:7, 78:11, 81:14, 143:9

**morning** [24] - 2:3, 2:5, 2:15, 2:16, 18:2, 18:3, 33:3, 34:7, 34:8, 44:8, 44:9, 49:22, 49:23, 51:13, 51:14, 52:19, 52:20, 63:24, 64:18, 66:19, 67:15, 177:6, 177:10, 178:21

**morphed** [1] - 13:22

**most** [7] - 27:12, 74:21, 113:13, 117:20, 137:20, 185:5, 185:13

**mostly** [1] - 171:17

**mother** [2] - 69:20, 135:18

**mother's** [1] - 9:11

**motion** [13] - 8:25, 9:24, 15:8, 23:4, 58:12, 96:16, 113:16, 115:19, 115:24, 118:13, 182:3, 182:20, 183:1

**Motion** [5] - 9:18, 96:18, 96:19, 167:11, 182:5

**motioned** [1] - 45:24, 59:17, 161:21

**motions** [6] - 9:21, 9:22, 10:5, 17:12, 174:20, 174:25

**motivation** [3] - 15:6, 16:14, 28:8

**motive** [3] - 18:9, 30:8, 30:14

**motorists** [1] - 53:8

**mouthing** [1] - 175:12

**move** [10] - 46:9, 55:7, 70:16, 95:3, 96:15, 97:19, 153:4, 167:10, 182:18, 185:3

**moved** [4] - 12:17, 46:6, 48:7, 115:18

**movements** [1] - 58:13

**moving** [2] - 92:10, 176:24

**MR** [265] - 2:5, 2:15, 2:17, 3:20, 4:5, 4:8, 4:18, 4:25, 5:2, 5:7, 5:12, 5:16, 5:19, 5:24, 6:5, 6:7, 6:12, 6:22, 6:25, 7:3, 7:9, 7:15, 7:19, 7:23, 8:1, 8:4, 8:9, 8:11, 9:2, 9:3, 9:9, 9:16, 9:20, 9:25, 10:2, 10:4, 10:8, 10:10, 10:16, 10:22, 11:1, 11:5, 11:7, 11:10, 11:17, 12:21, 13:15, 15:9, 15:13, 16:7, 16:16, 16:20, 16:25, 18:3, 19:16, 19:19, 20:5, 20:7, 20:12, 20:15, 20:18, 20:23, 20:25, 21:8, 21:10, 21:12, 21:15, 21:20, 22:5, 22:11, 22:14, 22:25, 23:3, 26:4, 27:13, 28:13, 28:15, 28:22, 29:6, 29:10, 29:21, 29:24, 32:2, 32:5, 32:12, 32:16, 32:19, 32:24, 33:5, 34:6, 44:7, 49:21, 51:10, 51:12, 52:8, 52:18, 63:23, 64:17, 66:8, 66:17, 67:4, 67:14, 95:3, 95:9, 95:11, 95:13, 95:15, 95:25, 96:2, 96:7, 96:9, 96:11, 96:15,

96:18, 96:21, 96:24, 97:1, 97:4, 97:7, 97:19, 98:6, 98:8, 102:10, 107:21, 109:9, 111:15, 113:6, 113:11, 113:13, 113:16, 113:19, 113:25, 115:2, 116:22, 117:4, 117:6, 117:13, 117:19, 117:24, 118:2, 118:4, 118:6, 118:11, 118:15, 118:17, 118:22, 119:17, 119:24, 120:12, 120:16, 120:22, 121:1, 121:4, 121:7, 121:10, 121:15, 121:21, 121:25, 122:12, 122:23, 122:25, 123:10, 123:13, 123:19, 123:23, 123:25, 124:3, 124:10, 124:12, 124:19, 124:25, 125:3, 125:12, 125:17, 125:23, 125:24, 126:2, 126:20, 126:21, 127:8, 127:10, 128:9, 136:19, 138:7, 138:12, 138:22, 141:7, 141:9, 143:19, 144:19, 147:3, 150:6, 153:10, 154:10, 156:1, 156:3, 158:24, 159:8, 159:11, 159:22, 161:14, 163:14, 164:4, 164:16, 164:18, 164:19, 164:24, 165:5, 165:7, 165:9, 165:11, 165:18, 166:17, 166:21, 166:23, 167:10, 167:16, 172:24, 176:17, 179:6, 179:21, 179:24, 181:15, 181:20, 182:2, 183:2, 184:1, 184:5, 184:15, 184:24, 185:4, 186:1, 186:6, 186:12, 186:22, 186:25, 187:6, 188:10, 188:15, 188:19, 189:2, 189:5, 189:12, 189:14, 189:23, 190:3, 190:5, 191:4, 191:4, 191:5, 191:5, 191:7, 191:7, 191:8, 191:8, 191:10, 191:11, 191:11, 191:13, 191:14, 191:14, 191:16, 191:16, 191:18, 191:18

**MS** [23] - 79:16, 80:15, 81:2, 85:2, 85:11, 95:18, 98:23, 112:4, 125:9, 127:20, 142:23, 179:10, 179:16, 180:6, 180:10, 180:18, 180:22, 181:1, 181:7, 181:11, 189:3, 191:10, 191:12

**multi** [3] - 15:14, 143:24, 186:17

**multi-defendant** [1] - 15:14

**multi-million** [1] - 143:24

**multi-racial** [1] - 186:17

**multiple** [2] - 31:12, 31:16

**murder** [2] - 113:20, 114:2, 115:7, 116:6, 116:17

**music** [8] - 4:11, 98:10, 98:12, 98:14, 103:25, 104:14, 105:6, 105:14

**must** [5] - 102:24, 103:1, 103:2, 103:22, 135:5

## N

**name** [35] - 20:21, 20:22, 33:12, 43:24, 50:13, 52:13, 52:15, 60:5, 60:13, 60:17, 65:18, 67:9, 67:12, 72:3, 74:11, 74:14, 98:13, 101:19, 136:22, 139:17, 146:22, 146:23, 153:17, 153:20, 153:21, 159:17, 162:11, 162:15, 165:14, 170:17, 172:19, 172:20, 172:21, 173:19

**name's** [1] - 44:10

**named** [6] - 4:19, 74:9, 78:17, 83:9, 83:10, 153:12

**names** [8] - 50:7, 51:7, 98:13, 148:19, 151:18, 161:8, 189:14, 190:8

**Nancy** [1] - 159:20

**narcotic** [6] - 148:9, 148:13, 150:23, 152:4, 158:4, 161:3

**narcotics** [10] - 3:22, 3:24, 27:1, 27:2, 34:25, 48:24, 87:11, 159:1, 161:25, 163:17

**natural** [1] - 12:16

**nature** [7] - 13:13, 23:18, 30:25, 48:21, 174:17, 182:9, 185:21

**Near** [1] - 91:20

**near** [11] - 3:2, 3:7, 3:16, 41:15, 47:11, 86:13, 163:8, 169:12, 183:22, 183:23

**nearby** [1] - 37:13

**necessarily** [6] - 100:1, 101:24, 110:23, 110:24, 184:3, 185:20

**necessary** [5] - 8:7, 14:2, 111:5, 113:4, 119:9

**necessity** [2] - 8:19, 14:1

**need** [14] - 14:7, 14:10, 30:12, 54:4, 57:10, 61:11, 70:17, 116:21, 149:21, 152:24, 178:25, 180:13, 185:8, 188:4

**needed** [2] - 81:8, 92:25

**needs** [2] - 184:9, 185:25

**neighborhood** [7] - 3:18, 12:6, 12:12, 12:15, 36:1, 93:11, 149:14

**neighborhoods** [3] - 11:24, 49:6, 149:18

**Never** [1] - 109:4, 109:17, 109:18, 109:19

**never** [19] - 20:9, 49:12, 76:12, 76:23, 103:10, 103:14, 106:24, 108:15, 109:2, 110:6, 118:7, 123:13, 123:15, 123:21, 125:19, 134:8, 134:11, 134:13, 139:24

**new** [4] - 71:16, 72:25, 135:20

**Next** [4] - 52:7, 159:10, 160:12, 164:23

**next** [15] - 33:4, 39:1, 41:21, 58:15, 63:8, 67:3, 91:22, 97:16, 144:18, 151:14, 168:8, 177:13, 177:15, 178:3, 187:7

**nexus** [1] - 159:5

**NFL** [1] - 164:2

**nice** [2] - 105:24, 105:25

**nicer** [1] - 182:21

**nickname** [1] - 139:17

**Niedermeier** [1] - 189:19

**Nieshia** [6] - 86:18, 90:7, 90:12, 134:21, 142:1, 142:7

**night** [13] - 10:24, 88:12, 89:25, 90:16, 142:18, 143:1, 143:4, 143:8, 147:20, 148:3, 154:21, 163:3

**nilly** [1] - 114:2

**nine** [4] - 41:22, 119:11, 167:1, 175:14

**NO** [2] - 1:6, 113:9

**nobody** [1] - 17:12

**none** [3] - 115:13, 122:19, 145:17

**nonleading** [1] - 187:16

**normal** [2] - 25:5,

173:24
**normally** [4] - 42:16, 148:9, 158:4, 158:5
**north** [5] - 54:15, 55:1, 160:25, 169:12
**North** [1] - 151:14
**northbound** [10] - 148:6, 148:15, 150:20, 151:3, 151:10, 156:17, 167:21, 168:4, 168:14, 169:7
**NORTHERN** [1] - 1:2
**Northwest** [2] - 35:7, 36:19
**northwest** [2] - 35:12, 148:11
**note** [6] - 66:20, 112:9, 126:7, 175:17, 178:12, 178:15
**noted** [1] - 79:11
**notes** [2] - 179:17, 185:2
**Nothing** [10] - 44:4, 63:20, 64:15, 66:5, 94:22, 98:20, 131:15, 131:24, 136:17, 144:16
**nothing** [19] - 19:8, 53:24, 64:24, 72:23, 110:9, 110:17, 115:2, 128:24, 144:5, 174:16
**notice** [8] - 2:9, 4:13, 5:25, 6:1, 7:3, 7:4, 7:20, 150:25
**noticed** [3] - 40:9, 57:16, 179:11
**notify** [1] - 73:5
**notions** [1] - 11:19
**Number** [2] - 21:15, 40:25, 41:6, 41:8, 181:16, 187:14
**number** [13] - 20:3, 21:5, 25:20, 43:13, 43:16, 43:18, 60:16, 82:14, 141:10, 155:16, 163:5, 163:6, 187:13
**Number(s** [1] - 192:5

## O

**O'REE** [2] - 33:9, 191:3
**O'Ree** [7] - 2:7, 2:18, 3:13, 32:17, 33:6, 33:13, 34:7
**O'Ree's** [1] - 3:4
**oar** [1] - 113:5
**oath** [1] - 127:15
**object** [3] - 113:1, 118:25, 119:3
**objected** [3] - 112:22,

115:13, 118:12
**Objection** [24] - 79:16, 81:2, 85:2, 85:11, 95:3, 95:9, 95:18, 96:2, 96:9, 97:19, 107:21, 109:9, 111:15, 128:9, 138:7, 138:12, 143:19, 154:10, 161:14, 164:4, 164:16, 166:17, 166:21, 167:10
**objection** [13] - 96:15, 96:24, 97:1, 115:13, 115:15, 115:17, 115:20, 115:24, 118:15, 120:1, 167:12, 182:5, 184:18
**objection's** [3] - 96:10, 96:16, 96:25
**objections** [1] - 113:7
**objective** [1] - 42:17
**objects** [1] - 95:7
**obligation** [1] - 119:6
**observe** [1] - 156:11
**observed** [11] - 3:1, 58:20, 150:13, 156:19, 156:20, 161:1, 167:20, 168:2, 168:7, 168:16, 170:15
**obtained** [1] - 138:25
**obverse** [1] - 183:7
**obvious** [1] - 58:12
**obviously** [9] - 3:22, 18:21, 59:9, 124:14, 126:6, 179:16, 183:6, 185:25, 190:6
**Obviously** [3] - 20:10, 24:20, 120:6
**occasionally** [2] - 88:5, 90:19
**occasions** [4] - 10:18, 70:24, 100:16, 108:11
**occurred** [4] - 24:24, 71:7, 108:9, 150:5
**occurrence** [1] - 178:13
**occurs** [2] - 148:9, 158:5
**October** [3] - 144:13, 177:17, 177:20
**odd** [4] - 59:3, 161:3, 163:16, 163:20
**odds** [1] - 120:12
**odor** [1] - 175:25
**OF** [3] - 1:2, 1:5, 1:11
**offenders** [1] - 166:3
**offense** [7] - 17:18, 25:1, 63:5, 71:5, 71:7, 71:10, 150:5
**offenses** [1] - 137:3
**offer** [2] - 2:11, 65:3
**office** [1] - 72:17
**Officer** [2] - 49:22, 171:14

**officer** [17] - 2:7, 10:20, 29:17, 32:23, 34:20, 34:22, 35:4, 36:12, 42:5, 42:21, 43:4, 144:14, 160:11, 166:9, 167:14, 182:12, 187:17
**officer's** [1] - 55:19
**officers** [16] - 10:6, 10:17, 17:11, 35:19, 35:21, 36:13, 36:14, 36:20, 37:3, 42:20, 49:25, 51:6, 60:9, 153:25, 154:7, 160:18
**official** [1] - 192:8
**Official** [1] - 192:16
**often** [2] - 49:6, 99:12
**old** [4] - 6:4, 51:16, 67:15, 125:14
**once** [3] - 18:11, 59:7, 180:2
**Once** [2] - 33:3, 48:1
**one** [89] - 7:14, 9:6, 12:5, 12:11, 13:22, 15:16, 15:22, 18:5, 20:2, 21:11, 21:24, 22:18, 22:25, 24:15, 24:23, 25:7, 25:19, 26:11, 26:18, 28:3, 28:5, 28:15, 28:25, 32:3, 36:12, 40:8, 40:11, 40:19, 42:20, 49:24, 51:15, 56:21, 59:18, 66:9, 66:11, 73:12, 73:23, 74:22, 84:4, 90:17, 91:25, 94:6, 99:4, 99:8, 100:10, 109:7, 112:14, 112:24, 112:25, 116:16, 116:24, 117:2, 117:17, 120:12, 121:11, 121:23, 121:24, 123:25, 125:12, 125:24, 126:16, 130:6, 134:7, 134:24, 141:5, 142:9, 142:12, 142:24, 144:2, 144:12, 145:6, 146:8, 148:8, 149:7, 151:3, 153:14, 157:3, 158:25, 162:8, 162:23, 163:16, 164:2, 170:21, 171:17, 181:16, 186:24, 187:13, 189:21
**One** [13] - 9:2, 29:24, 39:9, 43:7, 56:16, 120:2, 134:23, 155:13, 159:8, 161:2, 183:3, 184:5, 188:10
**ones** [4] - 42:3, 48:21, 73:7, 161:8
**ongoing** [3] - 13:21, 72:18, 116:23
**online** [1] - 178:17

**open** [5] - 37:25, 38:25, 39:2, 112:8, 180:23
**open-ended** [1] - 180:23
**operates** [1] - 183:18
**operating** [1] - 14:12
**operation** [2] - 35:19, 36:8, 117:14
**operations** [1] - 36:16
**operator** [1] - 13:7
**opinion** [2] - 23:12, 23:24
**opportunity** [6] - 66:1, 87:12, 87:16, 87:19, 136:24, 181:24
**opposite** [1] - 183:11
**option** [1] - 125:17
**order** [2] - 179:9, 189:2
**ordered** [1] - 115:20
**Ordinarily** [1] - 184:13
**organization** [9] - 8:18, 14:9, 14:15, 19:6, 144:2, 144:8, 158:12, 186:18, 187:4
**organized** [1] - 24:11
**otherwise** [2] - 25:4, 83:13
**outcome** [1] - 5:17
**outer** [1] - 37:7
**outside** [5] - 48:20, 106:3, 123:17, 133:12, 155:21
**outweigh** [1] - 15:1
**outweighs** [1] - 28:9
**overruled** [5] - 96:10, 96:16, 96:25, 115:24, 167:12
**Overruled** [13] - 79:17, 80:15, 80:16, 81:3, 85:3, 85:12, 96:3, 107:22, 109:10, 128:10, 154:11, 161:15, 166:22
**overt** [1] - 24:24
**owe** [1] - 110:16
**own** [6] - 31:15, 38:18, 61:8, 108:11, 114:20, 186:25
**owner** [1] - 61:3

## P

**p.m** [4] - 112:16, 147:23, 166:11, 190:11
**pace** [1] - 176:25
**packaged** [1] - 86:22
**packaging** [3] - 85:19, 85:21, 87:6
**pads** [3] - 66:20, 112:9, 178:15

**Page** [6] - 20:1, 21:20, 102:11, 102:12, 104:10, 140:7
**page** [6] - 82:18, 89:20, 104:17, 115:6, 140:4, 140:6
**PAGE** [1] - 191:3
**Pager** [1] - 82:13
**pager** [4] - 82:14, 82:21, 89:20, 89:21
**pages** [1] - 192:7
**paid** [1] - 77:4
**pants** [1] - 154:22
**paper** [15] - 37:24, 38:1, 38:3, 38:20, 38:23, 39:17, 39:23, 40:5, 40:9, 40:21, 43:9, 46:3, 48:3, 110:18
**paradigmatic** [1] - 117:2
**paraphrasing** [1] - 2:25
**Pardon** [1] - 137:11
**parents** [2] - 69:22, 92:24
**Park** [33] - 2:21, 3:17, 8:15, 8:17, 8:22, 11:12, 11:13, 12:7, 12:12, 14:9, 14:12, 14:16, 14:21, 14:22, 14:23, 27:17, 27:22, 28:4, 30:5, 30:7, 30:8, 30:12, 30:20, 32:1, 32:7, 32:11, 36:3, 48:25, 49:15, 149:15, 149:16, 164:1
**parked** [3] - 56:24, 57:9, 57:16
**parking** [1] - 36:19
**parole** [3] - 71:13, 71:14, 166:3
**Parole** [2] - 71:14, 111:3
**part** [33] - 3:21, 3:23, 6:9, 16:8, 18:11, 18:15, 22:18, 22:22, 22:23, 23:24, 25:9, 30:6, 30:9, 36:11, 57:8, 60:14, 62:8, 62:12, 72:18, 74:21, 107:1, 108:7, 114:9, 120:11, 122:15, 122:19, 123:2, 125:21, 126:6, 144:2, 149:12, 155:6, 181:25
**participant** [1] - 24:13
**participants** [1] - 116:25
**participate** [3] - 147:12, 160:10, 160:14
**participating** [1] - 166:11
**participation** [6] - 22:3,

23:20, 24:8, 25:2, 25:18, 25:20
**particular** [38] - 8:5, 8:11, 9:18, 12:6, 13:20, 15:15, 18:5, 18:22, 19:4, 19:14, 25:8, 31:10, 35:15, 36:7, 36:21, 39:24, 40:11, 53:22, 55:5, 55:9, 56:1, 82:24, 88:8, 90:12, 97:3, 100:12, 126:8, 126:11, 127:5, 131:8, 144:25, 145:17, 145:18, 148:8, 151:19, 153:19, 154:19
**particularly** [1] - 141:21
**parts** [1] - 182:1
**partying** [1] - 114:8
**pass** [1] - 9:16
**passenger** [4] - 44:23, 56:24, 57:4, 58:3
**past** [9] - 22:4, 22:20, 25:2, 25:10, 25:15, 90:2, 95:8, 133:6, 147:6
**patience** [2] - 33:3, 127:14
**patrol** [8] - 34:23, 53:7, 53:8, 53:11, 57:18, 62:4, 147:19, 154:5
**Paul** [3] - 1:19, 44:10, 159:19
**Pause** [2] - 23:11, 141:6
**pay** [3] - 75:9, 76:11, 76:21
**paying** [3] - 38:15, 58:13, 114:22
**Pennsylvania** [5] - 67:19, 67:21, 68:6, 71:1, 73:6
**people** [42] - 17:6, 17:14, 27:22, 32:8, 46:15, 46:17, 46:18, 49:25, 68:23, 69:3, 74:24, 79:22, 83:6, 91:22, 93:6, 93:12, 93:13, 93:15, 99:9, 101:3, 109:15, 111:14, 111:18, 113:13, 114:1, 127:24, 128:3, 128:4, 128:12, 128:15, 139:23, 139:25, 149:19, 151:5, 158:7, 161:1, 168:1, 188:21, 188:23, 189:16
**per** [2] - 76:21, 76:23
**perceive** [1] - 25:16
**perfect** [2] - 115:4, 115:5
**perfectly** [2] - 120:10, 122:14
**Perhaps** [1] - 28:25
**perhaps** [5] - 9:3, 16:3,

29:2, 188:7
**period** [10] - 4:20, 27:20, 72:7, 77:10, 78:9, 81:14, 81:18, 83:14, 88:4, 180:4
**peripheral** [1] - 133:13
**permit** [1] - 178:9
**permitted** [2] - 119:5, 182:4
**person** [23] - 36:25, 50:3, 57:10, 69:13, 74:9, 138:5, 138:10, 138:24, 139:10, 152:12, 154:13, 156:25, 157:13, 158:16, 159:2, 164:6, 164:9, 164:14, 164:15, 166:20, 171:18, 173:18, 173:19
**person's** [1] - 175:20
**personal** [2] - 17:15, 42:13
**personally** [3] - 55:8, 55:11, 78:25
**persons** [2] - 50:6, 149:7
**pertaining** [1] - 21:25
**petty** [1] - 69:6
**PH-13** [1] - 168:24
**PH-50** [1] - 150:8
**phone** [2] - 148:22, 150:17, 150:18, 151:20, 154:14, 182:12, 182:13
**photo** [1] - 41:24
**phrase** [2] - 139:20, 139:21
**pick** [4] - 38:2, 89:2, 90:13, 91:11
**picture** [1] - 64:7, 150:7, 152:19, 170:6
**piece** [1] - 18:8
**pipe** [1] - 99:15
**pit** [1] - 131:7
**place** [12] - 3:17, 12:14, 36:18, 38:2, 82:24, 89:5, 94:17, 129:6, 129:7, 141:15, 158:4, 162:9
**placed** [1] - 5:21, 39:6, 149:6, 153:11, 157:18, 157:21, 158:15, 170:13, 171:4
**places** [2] - 69:10, 82:24
**Placing** [1] - 48:1
**placing** [1] - 37:2, 46:13, 168:7
**plain** [5] - 37:7, 147:15, 148:5, 160:20, 160:21
**plan** [1] - 36:16
**plans** [1] - 2:6
**plastic** [1] - 39:17, 39:19, 39:23, 40:24,

40:25, 41:1, 41:9, 41:17, 43:9, 43:10, 48:15, 149:3, 162:4
**player** [1] - 98:15
**pleading** [1] - 23:7
**pleasant** [1] - 178:20
**pled** [7] - 11:5, 11:8, 26:23, 144:11, 172:18
**plural** [1] - 7:12
**pockets** [1] - 157:6
**Point** [1] - 172:14
**point** [53] - 8:24, 9:15, 11:1, 16:17, 16:20, 18:10, 18:20, 22:24, 22:25, 28:15, 29:20, 29:24, 32:5, 37:3, 38:8, 38:14, 39:8, 45:4, 45:7, 46:6, 46:10, 46:11, 46:25, 47:2, 47:5, 47:8, 49:16, 60:20, 61:18, 64:24, 65:14, 70:22, 77:12, 78:2, 88:14, 97:3, 98:9, 100:12, 103:18, 115:16, 129:3, 142:2, 142:15, 148:25, 149:20, 151:23, 170:1, 174:19, 184:5, 186:3, 188:15, 188:20
**pointed** [2] - 19:1, 169:14
**pointer** [1] - 150:1
**pointing** [2] - 152:21, 170:3
**points** [3] - 70:22, 141:16, 183:3
**Police** [12] - 2:18, 33:14, 34:10, 37:9, 52:23, 52:24, 146:25, 154:17, 155:12, 160:1, 165:20, 166:5
**police** [23] - 34:19, 35:4, 36:12, 36:19, 45:11, 89:12, 90:1, 92:15, 109:15, 133:12, 134:17, 136:1, 142:15, 142:17, 143:1, 147:4, 147:15, 153:25, 160:1, 160:11, 160:18, 171:5, 187:17
**pop** [1] - 20:13
**popcorn** [4] - 149:2, 149:3, 154:4, 162:4
**popped** [1] - 58:18
**porch** [19] - 2:24, 3:5, 26:25, 37:19, 37:21, 37:24, 38:11, 38:16, 38:18, 38:25, 39:1, 39:5, 44:18, 45:5, 46:1, 46:4, 46:14, 47:1
**portion** [1] - 95:4

**posed** [1] - 65:2
**position** [7] - 15:21, 23:10, 30:1, 35:13, 73:20, 183:5
**positions** [1] - 30:16
**positive** [2] - 3:12, 155:13
**possess** [5] - 3:24, 3:25, 137:10, 137:12, 137:24
**possessed** [4] - 137:21, 138:9, 158:16, 158:17
**possessing** [1] - 138:24
**Possession** [1] - 71:4
**possession** [9] - 5:20, 17:14, 17:18, 25:9, 29:18, 137:8, 144:7, 172:10
**possibility** [1] - 125:18
**possible** [7] - 71:12, 85:16, 100:23, 111:19, 111:22, 119:8, 161:3
**possibly** [2] - 73:16, 111:20
**post** [1] - 35:6
**posting** [1] - 34:12
**posture** [1] - 18:21
**powder** [4] - 17:7, 70:19, 87:1, 162:5
**Powder** [1] - 40:3
**practice** [2] - 159:4, 159:6
**practitioner** [1] - 31:15
**pre** [1] - 22:3
**pre-18th** [1] - 22:21
**pre-dated** [1] - 22:3
**precedential** [1] - 23:24
**precedes** [1] - 23:1
**precluded** [1] - 17:17
**prefer** [1] - 125:9
**preference** [1] - 125:6
**prejudice** [3] - 13:13, 15:1, 28:9
**prejudicial** [2] - 15:22, 113:21
**prescription** [1] - 144:4
**presence** [1] - 15:25
**present** [10] - 2:1, 25:13, 49:25, 50:6, 83:20, 86:20, 121:18, 121:19
**presented** [3] - 23:15, 24:5, 24:9
**Preston** [1] - 50:21
**presumably** [1] - 156:19
**presumed** [1] - 183:19
**presumes** [1] - 184:2
**presumption** [1] - 183:18

**pretending** [1] - 189:15
**pretrial** [1] - 17:12
**pretty** [13] - 10:12, 17:24, 57:19, 58:16, 84:21, 84:22, 100:6, 105:7, 136:14, 149:18, 170:6, 177:19, 189:21
**previous** [2] - 71:15, 174:5
**previously** [2] - 8:25, 84:5
**Previously** [1] - 122:2
**price** [2] - 84:25, 85:14
**prices** [1] - 75:4
**prima** [1] - 27:7
**primary** [1] - 12:13
**print** [1] - 178:6
**prison** [5] - 71:1, 95:23, 130:17, 130:22, 146:2
**prisoner** [1] - 56:11
**private** [1] - 178:12
**probable** [1] - 26:25
**probation** [2] - 5:21, 166:3
**probative** [5] - 13:5, 14:25, 28:7, 113:21, 113:22
**problem** [9] - 15:14, 18:13, 175:13, 182:24, 184:16, 185:1, 185:2, 185:15, 185:18
**problems** [1] - 59:2, 188:25
**proceed** [2] - 34:4, 146:16
**proceeding** [1] - 72:24
**proceedings** [5] - 5:18, 23:11, 141:6, 192:4, 192:8
**Proceedings** [1] - 190:11
**process** [3] - 15:2, 43:2, 84:19
**processing** [1] - 43:24
**producing** [2] - 98:12, 104:14
**product** [1] - 42:18
**professor** [1] - 185:6
**profit** [1] - 85:15
**program** [3] - 5:22, 178:25, 186:20
**progress** [1] - 177:23
**prohibition** [1] - 30:13
**prohibits** [1] - 25:22
**promises** [2] - 73:20, 73:23
**prompted** [1] - 167:13
**prong** [1] - 14:1
**proof** [5] - 15:5, 15:6, 25:14, 97:12

**propensity** [3] - 30:3, 30:10, 30:22
**proper** [5] - 11:8, 21:23, 115:19, 115:25, 182:11
**properly** [3] - 6:11, 15:5, 23:21
**property** [6] - 43:18, 69:13, 155:16, 163:5, 171:4, 172:3
**Property** [1] - 163:6
**proposition** [2] - 11:22, 184:2
**propriety** [1] - 25:23
**prosecuting** [4] - 64:8, 73:6, 73:18, 74:3
**prosecutor** [1] - 103:14
**prosecutors** [8] - 72:22, 107:10, 110:22, 110:25, 134:17, 142:15, 142:17
**protect** [1] - 138:4
**protection** [2] - 31:7, 138:1
**proud** [1] - 179:2
**prove** [8] - 3:22, 14:2, 14:19, 19:11, 25:1, 25:4, 30:8, 30:12
**proven** [1] - 52:2
**provide** [2] - 2:8, 6:1, 7:3, 7:4
**provided** [8] - 4:6, 4:13, 5:24, 7:20, 31:7, 31:8, 153:20
**provides** [1] - 26:19
**providing** [1] - 73:8
**puffing** [2] - 120:8, 120:16
**Pulaski** [5] - 167:4, 167:18, 167:21, 168:10, 168:13
**pull** [1] - 57:12, 174:10, 174:14
**pulled** [8] - 40:5, 57:1, 57:6, 109:22, 109:25, 168:3, 170:8, 174:21
**pulling** [3] - 57:14, 156:16, 156:20
**punch** [6] - 85:20, 85:24, 86:3, 86:4, 90:24, 91:5
**puppies** [2] - 131:7
**purchase** [4] - 24:15, 42:19, 137:24, 138:4
**purchased** [4] - 82:23, 101:11, 137:22, 138:24
**purchases** [1] - 166:2
**purely** [1] - 93:4
**Purely** [1] - 93:5
**purportedly** [1] - 121:13
**purpose** [4] - 23:22,

39:7, 60:11, 182:8
**purposes** [3] - 15:5, 21:4, 25:6
**pursued** [1] - 12:3
**pursuit** [1] - 29:19
**pushing** [1] - 170:3
**put** [30] - 4:22, 10:13, 26:9, 40:7, 40:14, 43:2, 44:24, 44:25, 45:16, 47:4, 54:8, 90:10, 98:15, 99:14, 102:15, 125:24, 140:4, 140:24, 150:8, 158:10, 168:1, 169:21, 170:15, 171:2, 171:10, 174:11, 185:23, 187:25, 188:7, 188:12
**Put** [1] - 102:15, 109:10
**putting** [1] - 3:16
**PYNE** [2] - 63:23, 191:7
**Pyne** [1] - 1:21, 63:24

## Q

**quantity** [6] - 3:25, 13:6, 42:13, 42:14, 42:16
**quarter** [3] - 56:25, 57:3, 65:6
**questioning** [1] - 114:21
**Questions** [1] - 44:5
**questions** [19] - 49:19, 75:19, 108:5, 109:23, 136:23, 137:16, 141:7, 141:11, 142:14, 155:20, 155:23, 158:22, 159:7, 163:12, 164:18, 164:19, 172:22, 176:17, 188:24
**quick** [5] - 19:20, 29:24, 121:22, 132:25, 183:2
**quicker** [1] - 65:11
**quickly** [9] - 22:17, 55:17, 57:19, 58:16, 80:23, 84:21, 84:22, 173:1, 174:14
**quintessentially** [1] - 116:18
**quite** [4] - 6:10, 7:4, 26:16, 64:2
**quote** [1] - 23:14

## R

**R-E-E** [1] - 33:15
**racial** [1] - 186:17
**racketeering** [1] - 31:1
**radiator** [1] - 59:8
**radio** [6] - 60:8, 60:11, 62:2, 150:16, 154:13
**radioed** [1] - 61:1

**radioing** [1] - 60:24
**raid** [10] - 2:22, 37:8, 39:11, 46:20, 46:22, 46:23, 46:25, 47:8, 49:9, 49:11
**raiding** [1] - 51:9
**Raise** [1] - 159:13
**raise** [1] - 45:14
**raised** [4] - 10:13, 10:16, 20:11, 137:17
**raising** [1] - 9:10
**ran** [1] - 64:23
**Randallstown** [2] - 12:8, 31:23
**Randallstown/Park** [4] - 14:9, 14:14, 19:6, 19:9
**rank** [1] - 53:1
**rap** [3] - 103:25, 105:1, 120:10
**rappers** [1] - 105:1
**Rashid** [1] - 72:4
**rather** [7] - 7:14, 123:10, 130:21, 130:24, 131:1, 145:2, 189:9
**rational** [1] - 18:18
**ratted** [2] - 109:5, 109:6
**ratting** [1] - 109:11
**Ratting** [1] - 109:13
**Raymond** [1] - 54:8
**re** [7] - 82:6, 82:7, 131:10, 168:1, 168:22, 174:2, 175:19
**re-rolled** [4] - 168:1, 168:22, 174:2, 175:19
**re-up** [3] - 82:6, 82:7, 131:10
**reach** [2] - 19:14, 57:18
**reached** [1] - 6:2
**reaching** [1] - 176:9
**read** [12] - 10:23, 19:23, 21:1, 21:13, 50:6, 61:15, 102:16, 102:17, 102:19, 126:5, 163:5, 188:8
**ready** [3] - 33:4, 56:22, 127:18
**real** [3] - 17:9, 112:15, 132:25
**really** [27] - 8:12, 11:18, 12:24, 17:6, 21:3, 25:7, 26:16, 26:20, 26:21, 30:16, 30:18, 46:9, 73:19, 74:2, 80:4, 82:20, 83:1, 91:11, 93:23, 94:22, 104:7, 106:13, 110:9, 110:12, 173:16, 185:1
**reason** [7] - 4:6, 11:15, 15:24, 65:2, 65:23, 168:20, 177:2
**reasonable** [1] - 52:3

**reasons** [3] - 116:20, 120:2, 138:3
**reassured** [1] - 129:3
**receive** [2] - 54:3, 90:6
**received** [9] - 54:14, 62:2, 62:20, 108:24, 149:6, 150:18, 152:4, 154:6, 154:7
**recent** [1] - 95:8
**recently** [4] - 2:10, 110:2, 110:4
**recess** [4] - 32:25, 66:19, 66:22, 66:23, 112:3, 112:6, 120:4, 121:16, 121:17, 177:10, 177:11, 178:16, 180:14, 189:8
**Recess** [1] - 66:24
**recognize** [3] - 93:15, 168:24, 171:21
**recognized** [1] - 93:13
**recollection** [8] - 64:6, 101:13, 101:15, 180:12, 180:17, 185:13, 186:6, 188:9
**record** [26] - 16:22, 29:11, 29:13, 33:12, 52:14, 67:9, 79:9, 111:8, 113:4, 116:21, 117:9, 118:2, 118:8, 118:20, 118:21, 119:22, 125:25, 146:22, 159:17, 165:15, 169:23, 180:6, 184:9, 185:8, 186:9
**recorded** [1] - 192:3
**recording** [1] - 181:25
**records** [1] - 28:17
**recover** [2] - 55:11, 170:19
**recovered** [10] - 3:5, 40:6, 55:15, 149:2, 154:4, 155:9, 155:11, 170:14, 171:20, 171:21
**recovering** [2] - 55:8, 176:7
**RECROSS** [2] - 142:22, 191:12
**REDIRECT** [6] - 66:7, 141:8, 158:23, 191:8, 191:11, 191:14
**reduction** [1] - 34:16
**refer** [2] - 37:8, 79:12
**reference** [2] - 96:23, 97:7
**referencing** [1] - 41:3
**referring** [1] - 150:12
**reflects** [1] - 150:12
**refresh** [2] - 101:13, 101:14
**refreshes** [1] - 188:9

**refuse** [3] - 65:24, 66:1, 66:2
**regard** [1] - 188:25
**regarding** [1] - 122:1
**regardless** [1] - 19:11
**regards** [1] - 115:25
**registration** [1] - 60:18
**Regular** [1] - 160:21
**regular** [1] - 74:19
**related** [4] - 9:22, 19:10, 35:1, 124:5
**relating** [2] - 9:21, 126:17
**relationship** [7] - 8:22, 14:6, 22:9, 77:22, 83:12, 140:18
**relationships** [1] - 31:22
**relative** [1] - 141:11
**release** [1] - 71:12
**released** [5] - 116:5, 116:14, 120:24, 145:22, 146:2
**relevance** [1] - 8:12
**relevant** [5] - 8:7, 11:25, 19:17, 33:23, 113:21
**reliable** [1] - 8:7
**relying** [2] - 11:16, 21:21
**remain** [1] - 127:15
**remained** [1] - 22:20
**remaining** [3] - 151:3, 151:5, 152:10
**remember** [56] - 9:4, 9:10, 9:12, 23:6, 57:2, 57:4, 62:9, 62:10, 65:9, 78:25, 80:4, 81:14, 82:20, 82:21, 83:21, 86:8, 87:9, 88:11, 88:16, 91:12, 91:14, 91:15, 93:23, 98:17, 101:25, 102:5, 102:7, 102:12, 102:14, 103:17, 103:22, 104:7, 104:8, 104:23, 105:5, 105:25, 106:1, 106:7, 106:8, 106:9, 106:14, 125:14, 129:17, 130:9, 132:7, 132:12, 133:21, 134:24, 135:7, 135:10, 147:25, 160:8, 172:9, 172:13, 173:7
**remembered** [1] - 60:2
**remembering** [1] - 135:13
**remind** [3] - 177:16, 178:12, 184:19
**remove** [1] - 62:11
**Remove** [1] - 155:25
**removed** [1] - 170:13
**renew** [1] - 113:16

**repeat** [2] - 85:4, 97:6
**report** [5] - 54:18, 173:8, 173:10, 173:15, 175:15
**Reported** [1] - 1:23
**Reporter** [1] - 192:16
**REPORTER'S** [1] - 192:1
**reports** [1] - 144:13
**represent** [3] - 44:10, 63:24, 136:22
**representing** [1] - 99:1
**request** [5] - 121:23, 122:13, 123:11, 123:25, 163:2
**required** [1] - 5:25
**requirements** [1] - 25:24
**research** [1] - 19:21
**resell** [1] - 82:1
**reshaping** [1] - 183:14
**resided** [1] - 100:20
**residence** [3] - 3:3, 27:1, 155:2
**residents** [1] - 158:6
**residual** [1] - 185:23
**resistance** [2] - 174:16, 175:12
**respect** [18] - 5:8, 5:13, 13:20, 17:8, 18:7, 29:24, 30:3, 30:4, 73:16, 73:20, 137:25, 139:6, 183:3, 183:24, 184:6, 185:5, 185:15, 186:23
**respond** [3] - 55:19, 118:18, 118:19
**responded** [4] - 10:4, 23:6, 167:4, 167:18
**responding** [2] - 154:6, 154:13
**response** [2] - 65:1, 167:2
**responsibility** [2] - 119:10, 145:13
**responsible** [2] - 34:17, 37:1
**responsive** [2] - 138:15, 138:16
**rest** [4] - 39:11, 46:20, 47:8, 63:7
**rests** [1] - 23:25
**result** [1] - 182:13
**resume** [1] - 177:5
**resupply** [1] - 82:6
**retrieve** [3] - 29:4, 47:22, 62:17
**retrieved** [2] - 162:19, 163:8
**return** [4] - 75:6, 107:17, 111:5, 111:9

**reversal** [2] - 18:22, 18:24
**reversed** [1] - 13:2
**reversible** [1] - 119:16
**review** [2] - 64:9, 72:11
**reviewed** [1] - 175:15
**revolver** [1] - 91:15
**RHODES** [23] - 79:16, 80:15, 81:2, 85:2, 85:11, 95:18, 98:23, 112:4, 125:9, 127:20, 142:23, 179:10, 179:16, 180:6, 180:10, 180:18, 180:22, 181:1, 181:7, 181:11, 189:3, 191:10, 191:12
**Rhodes** [14] - 1:17, 99:1, 111:24, 112:24, 113:1, 113:12, 120:3, 125:5, 127:18, 141:11, 142:14, 169:4, 179:9, 180:15
**Rhodes's** [1] - 181:24
**Rhonda** [1] - 50:21
**Richard** [2] - 164:25, 165:16
**RICHARD** [2] - 165:12, 191:17
**RICO** [4] - 4:15, 5:5, 12:17, 13:10
**ride** [5] - 92:25, 93:4, 93:5, 105:9, 132:25
**riding** [1] - 173:24
**right-hand** [2] - 149:24, 150:4
**Ring** [1] - 52:22
**ring** [5] - 24:16, 102:25, 104:15, 105:3, 143:25
**road** [3] - 61:6, 65:6, 173:24
**roadside** [1] - 55:19, 63:6
**robbery** [1] - 69:12
**robbing** [7] - 68:23, 69:3, 69:4, 69:6, 69:16
**Robert** [2] - 1:16, 50:19
**Robes** [1] - 186:21
**rock** [9] - 39:18, 43:10, 76:1, 76:6, 76:7, 76:11, 76:12, 99:6, 99:15
**rock-like** [2] - 39:18, 43:10
**Roland** [1] - 164:1
**role** [2] - 36:8, 171:15
**rolled** [4] - 168:1, 168:22, 174:2, 175:19
**Room** [1] - 1:24
**room** [4] - 112:15, 131:20, 131:21, 165:2
**rooted** [1] - 31:22
**Roughly** [1] - 189:13

**roughly** [2] - 169:10, 189:13
**routine** [2] - 60:15, 60:18
**RPR** [1] - 1:24
**rubric** [1] - 30:7
**Rule** [3] - 15:13, 17:20, 113:23
**rule** [4] - 112:24, 112:25, 117:12, 181:24
**ruled** [1] - 15:10
**rules** [1] - 185:15
**ruling** [2] - 18:23, 118:20
**run** [5] - 45:5, 60:18, 154:13, 180:8, 188:24
**running** [2] - 59:7, 86:19, 114:23
**runs** [1] - 112:24

---

**S**

**S-P-O-O-N-E** [1] - 20:25
**safe** [3] - 56:11, 156:19, 190:9
**safety** [2] - 55:20, 61:8
**sale** [2] - 12:23, 137:8
**salt** [1] - 17:7
**satisfactorily** [1] - 153:8
**satisfied** [4] - 13:25, 15:3, 25:24, 28:7
**satisfy** [1] - 8:6
**Saturday** [1] - 186:20
**save** [1] - 178:7
**saw** [34] - 2:23, 37:18, 37:20, 38:4, 38:5, 49:16, 56:24, 57:18, 57:22, 58:12, 65:11, 65:14, 85:18, 87:10, 91:5, 92:19, 94:6, 94:17, 114:15, 128:21, 134:11, 134:13, 134:15, 164:1, 168:9, 170:9, 173:18, 173:22, 174:19, 174:25, 179:2, 182:10, 184:20, 187:20
**scale** [1] - 76:8
**scant** [1] - 11:15
**scene** [6] - 49:5, 56:8, 56:11, 66:11, 85:23, 178:18
**Schedule** [1] - 155:13
**scheme** [1] - 12:19
**School** [3] - 22:8, 22:14, 186:21
**school** [7] - 67:25, 68:10, 68:12, 68:15, 68:17, 70:11

**Scoot** [2] - 33:11, 67:8
**scope** [2] - 143:19, 183:4
**scratch** [1] - 185:2
**screen** [17] - 40:14, 41:14, 43:3, 102:15, 102:17, 140:13, 150:8, 150:9, 162:25, 169:1, 169:14, 169:15, 169:18, 169:19, 170:1
**sealed** [1] - 28:17
**Search** [1] - 61:15
**search** [2] - 2:20, 10:23, 27:2, 27:4, 29:19, 35:22, 36:7, 36:15, 36:21, 37:4, 38:12, 45:11, 49:24, 55:11, 61:13, 61:16, 61:22, 62:7, 62:8, 62:12, 62:18, 63:7, 63:9, 65:20, 66:3
**searched** [1] - 157:10
**season** [1] - 181:3
**seat** [5] - 44:23, 57:17, 170:15, 170:16, 176:6
**seated** [12] - 33:2, 33:11, 52:12, 57:17, 67:2, 67:8, 112:20, 127:14, 145:9, 146:21, 159:16, 165:14
**second** [8] - 7:20, 9:2, 26:11, 57:2, 65:15, 146:7, 176:21, 177:10
**seconds** [6] - 47:3, 47:23, 47:25, 48:4, 48:5, 124:3
**secrete** [2] - 3:2, 49:1
**Section** [1] - 24:3
**section** [1] - 2:21
**secure** [3] - 3:4, 42:4, 48:1
**secured** [1] - 3:5
**securing** [2] - 39:7, 39:13
**see** [73] - 4:7, 4:16, 5:3, 13:24, 20:18, 20:19, 22:23, 30:14, 37:15, 37:17, 37:21, 38:2, 38:22, 38:23, 39:2, 40:15, 40:17, 41:24, 45:14, 48:4, 55:2, 56:23, 57:15, 58:10, 58:17, 59:7, 65:5, 77:25, 79:2, 82:6, 86:9, 87:7, 89:10, 90:11, 90:20, 90:22, 92:24, 93:15, 94:9, 94:16, 102:17, 102:18, 107:1, 112:23, 120:3, 133:11, 134:4, 135:3, 140:9, 142:11, 148:19, 149:19, 150:9, 153:8,

**168:23, 169:10, 169:14,**
169:15, 169:16, 169:18, 169:24, 172:1, 174:24, 175:2, 175:4, 176:5, 178:21, 184:16, 185:1, 187:23, 188:9, 188:12
**See** [1] - 149:25
**seeing** [3] - 65:9, 93:14, 98:17
**seek** [1] - 119:2
**seeking** [1] - 22:21
**seem** [2] - 11:15, 13:4
**segregating** [1] - 17:25
**seize** [2] - 62:11, 62:13
**seizing** [1] - 10:20
**seizure** [2] - 15:4, 35:22
**seldom** [1] - 42:18
**self** [3] - 24:18, 57:24, 111:7
**self-evident** [1] - 24:18
**sell** [11] - 70:9, 70:18, 76:9, 77:3, 77:4, 80:22, 82:4, 84:22, 85:14, 106:24, 139:7
**Sell** [1] - 93:21
**selling** [12] - 68:18, 68:24, 69:6, 70:7, 74:6, 85:10, 99:2, 99:4, 99:9, 100:3, 158:7, 166:20
**semi** [1] - 74:19
**semi-regular** [1] - 74:19
**semiautomatic** [2] - 91:15, 172:15
**send** [3] - 42:25, 178:12, 186:19
**sending** [1] - 60:11
**sense** [3] - 115:4, 115:5, 189:6
**sensitive** [1] - 124:14
**sentence** [15] - 68:6, 71:1, 71:3, 71:16, 71:17, 73:21, 110:3, 114:5, 120:20, 120:21, 123:15, 137:14, 143:14, 146:1, 146:2
**sentences** [1] - 102:20
**separate** [4] - 24:8, 24:10, 25:9, 171:11
**separately** [1] - 108:11
**September** [3] - 1:11, 71:7, 192:5
**Sergeant** [15] - 33:13, 34:7, 36:1, 40:16, 41:11, 51:19, 53:3, 55:7, 61:18, 63:20, 64:18, 66:9, 66:18, 165:16, 165:19
**SERGEANT** [1] - 165:12
**sergeant** [2] - 53:2, 165:20
**seriatim** [1] - 10:5

**series** [2] - 179:22, 181:5
**serious** [1] - 27:24
**serve** [2] - 24:2, 145:25
**served** [4] - 122:21, 123:7, 123:13, 123:15
**serving** [8] - 68:5, 71:1, 71:3, 71:14, 72:7, 114:5, 137:3, 143:14
**session** [6] - 177:5, 177:13, 177:14, 177:17, 177:21, 177:22
**set** [6] - 109:2, 128:11, 135:16, 136:10, 167:20
**sets** [1] - 107:25
**setting** [2] - 94:24, 111:11
**seven** [1] - 147:23
**Seventh** [1] - 187:3
**Several** [3] - 47:19, 70:24, 74:18
**several** [8] - 4:3, 11:14, 14:21, 46:18, 128:4, 128:12, 154:5, 171:25
**sex** [1] - 166:3
**SGT** [1] - 191:17
**shape** [2] - 40:1, 42:2
**share** [1] - 83:7
**shared** [1] - 83:6
**Sharmeka** [12] - 77:18, 77:20, 83:7, 83:13, 85:19, 86:18, 89:7, 92:6, 101:9, 101:11, 129:25, 130:6
**Sharmika** [1] - 77:20
**SHAWN** [1] - 1:8
**Shawn** [4] - 57:23, 60:12, 65:18, 136:22
**sheet** [1] - 50:4
**Shelly** [6] - 56:6, 170:18, 171:22, 171:25, 172:19, 173:19
**SHELLY** [1] - 1:8
**Shelton** [7] - 2:23, 3:17, 37:18, 43:25, 44:10, 51:4, 51:15
**SHELTON** [1] - 1:7
**shepherding** [1] - 187:3
**shirt** [1] - 154:22
**shocked** [1] - 17:4
**short** [2] - 26:18, 165:3
**shorter** [1] - 78:9
**shortly** [1] - 24:11
**shoulder** [3] - 57:1, 57:16, 175:2
**shout** [1] - 113:7
**show** [20] - 8:14, 13:21, 14:11, 24:8, 25:18, 25:19, 26:8, 26:10, 40:13, 104:9, 159:4,

162:23, 168:23, 170:21, 170:25, 171:24, 173:7, 180:6, 184:7, 184:13
**showed** [1] - 59:9
**showing** [2] - 187:19, 188:3
**shows** [2] - 4:22, 150:10
**shut** [1] - 59:7
**siblings** [2] - 69:20, 69:22
**sic** [1] - 21:19
**sic)** [1] - 95:5
**side** [11] - 56:25, 57:9, 58:2, 58:4, 61:6, 64:21, 79:6, 86:12, 153:2, 169:20, 175:5
**sidewalk** [1] - 151:13
**sign** [1] - 169:12
**signature** [1] - 192:11
**signed** [1] - 61:16
**significance** [1] - 27:17
**significant** [3] - 27:7, 31:7, 59:24
**similar** [3] - 26:19, 47:14, 48:21
**simple** [2] - 15:14, 17:18
**simply** [12] - 13:23, 14:3, 17:14, 17:21, 18:4, 19:4, 25:25, 26:12, 29:10, 29:11, 63:3, 177:9
**single** [2] - 18:4, 22:2
**sister** [19] - 86:18, 90:6, 90:11, 92:12, 94:23, 106:21, 108:16, 108:17, 108:24, 128:4, 128:11, 133:15, 135:16, 135:22, 136:10, 136:25, 141:12, 141:16, 143:3
**sister's** [1] - 106:19
**sit** [2] - 16:22, 99:11
**site** [2] - 21:17, 50:1
**Sitting** [1] - 141:14
**sitting** [12] - 26:24, 39:1, 79:4, 86:12, 86:14, 87:7, 91:21, 91:23, 92:6, 93:12, 107:15, 110:10
**situation** [5] - 12:10, 19:14, 22:2, 124:15, 185:9
**six** [21] - 144:11, 148:11, 148:14, 149:7, 150:13, 150:15, 150:19, 150:22, 150:23, 150:25, 151:2, 156:9, 156:22, 161:1, 161:2, 163:23, 164:1, 189:14, 189:15, 190:6, 190:8
**Sixth** [2] - 119:7, 187:5

**size** [1] - 42:2
**slide** [1] - 140:9
**slippery** [1] - 14:14
**slow** [1] - 117:24
**Slowly** [1] - 102:22
**small** [6] - 13:7, 39:19, 57:4, 75:20, 92:7, 182:17
**small-time** [1] - 13:7
**smaller** [1] - 171:4
**Smallwood** [4] - 168:5, 168:12, 168:14, 169:5
**smell** [2] - 168:6
**smiling** [1] - 130:4
**Smith** [1] - 50:13
**smoke** [7] - 99:8, 99:14, 99:15, 99:21, 99:22, 99:25, 106:15
**smoked** [3] - 131:5, 175:23, 176:11
**smoking** [4] - 167:25, 170:9, 173:22, 173:25
**snitch** [12] - 107:18, 107:20, 107:23, 107:24, 107:25, 108:3, 109:13, 111:10, 111:11, 111:14, 111:18, 127:24
**snitched** [4] - 108:12, 108:15, 108:16, 108:18
**snitches** [1] - 108:22
**snitching** [3] - 108:7, 108:9, 109:13
**socially** [1] - 88:9
**sold** [4] - 70:10, 70:20, 108:11, 138:5
**solely** [1] - 51:23
**solo** [1] - 31:14
**someone** [10] - 49:13, 74:19, 78:15, 80:8, 82:4, 85:9, 97:12, 97:13, 147:17, 171:6
**sometime** [5] - 3:14, 24:19, 64:2, 92:14, 177:11
**sometimes** [7] - 53:14, 57:7, 69:10, 77:25, 101:2, 101:9, 168:2
**Sometimes** [2] - 49:3, 49:7
**Somewhat** [1] - 102:2
**somewhat** [2] - 74:19, 112:23
**somewhere** [2] - 46:17, 159:3
**songs** [1] - 104:23
**soon** [1] - 114:10
**sorry** [17] - 6:22, 7:11, 57:20, 83:9, 84:14, 97:6, 98:7, 113:9, 126:21, 128:23, 140:8, 149:21, 162:25, 168:25, 177:6,

179:8, 186:18
**sort** [17] - 4:10, 4:11, 6:15, 8:17, 9:21, 10:5, 12:15, 13:18, 19:1, 19:11, 26:7, 26:10, 32:6, 55:24, 87:11, 167:25, 181:4
**sorts** [1] - 19:8
**sought** [1] - 17:20
**sound** [3] - 54:12, 92:16, 102:5
**sounds** [1] - 10:19
**source** [1] - 166:18
**sources** [1] - 31:8
**south** [5] - 56:19, 57:1, 57:3, 65:6, 167:22
**South** [2] - 20:19, 167:4
**southbound** [1] - 54:25, 169:6, 169:7
**Southern** [1] - 53:21
**Southwest** [1] - 166:9
**speaking** [4] - 10:1, 13:15, 75:12, 115:23
**special** [3] - 53:21, 53:23, 53:24
**specific** [3] - 74:5, 122:7, 183:10
**Specifically** [1] - 56:6
**specifically** [2] - 95:7, 126:8
**specifics** [1] - 83:1
**specify** [3] - 83:15, 95:12, 114:9
**specious** [3] - 27:17, 27:20, 28:1
**speed** [1] - 173:24
**spell** [6] - 33:12, 52:14, 67:9, 146:22, 159:17, 165:14
**Spend** [1] - 84:15
**spend** [4] - 24:19, 84:10, 84:11, 84:14
**spending** [1] - 88:8
**spent** [2] - 34:23, 88:1
**spill** [1] - 18:16
**spills** [1] - 18:10
**Spinner** [2] - 61:21, 63:6
**sponte** [1] - 119:1
**Spoon** [1] - 20:24
**Spoone** [15] - 19:25, 20:23, 21:6, 22:16, 22:18, 23:6, 23:9, 23:13, 23:19, 24:3, 24:17, 24:23, 26:5, 26:11, 26:16
**spread** [1] - 99:23
**spring** [1] - 160:7
**square** [1] - 28:5
**stairwell** [1] - 158:13
**Stamper** [3] - 50:15,

50:17, 51:2
**STAMPER** [1] - 50:15
**stand** [7] - 11:21, 29:8, 64:5, 66:23, 112:23, 145:20, 146:16
**standard** [2] - 126:3, 126:6
**standing** [12] - 37:19, 37:21, 46:1, 46:8, 150:13, 152:6, 152:12, 152:13, 156:9, 158:7, 158:20, 162:8
**standpoint** [1] - 17:22
**start** [4] - 55:18, 71:15, 177:15, 179:2
**Started** [1] - 66:16
**started** [6] - 68:23, 81:11, 128:21, 148:15, 156:17, 189:7
**starting** [3] - 62:3, 102:19, 103:9
**stash** [1] - 148:24, 152:5, 152:7, 152:16, 158:10, 159:2, 161:23, 161:25, 162:6, 162:19
**State** [9] - 33:12, 52:13, 52:22, 52:24, 53:3, 67:9, 146:22, 159:17, 165:14
**state** [6] - 17:16, 28:16, 53:12, 66:11, 71:1, 146:22
**statement** [18] - 24:19, 114:17, 115:21, 116:17, 116:18, 127:4, 127:5, 127:7, 146:6, 146:8, 146:9, 146:10, 146:11, 146:12, 146:15, 180:10, 184:22, 185:11
**Statement** [1] - 173:9
**statement's** [1] - 110:18
**statements** [2] - 122:1, 122:4
**STATES** [2] - 1:1, 1:5
**States** [5] - 24:4, 33:5, 52:8, 67:4, 144:19
**stating** [1] - 111:3
**station** [4] - 36:19, 167:7, 168:17, 178:7
**stature** [1] - 13:9
**statute's** [1] - 143:23
**stay** [2] - 56:8, 189:10
**stayed** [4] - 46:23, 157:1, 157:3, 157:4
**staying** [2] - 100:10, 100:11
**steal** [1] - 87:21
**stealing** [1] - 87:14
**stenographically** [1] - 192:4
**step** [2] - 124:2, 144:18

**steps** [4] - 39:1, 46:2, 48:2, 178:14
**stick** [1] - 69:13
**stick-up** [1] - 69:13
**sticking** [1] - 176:5
**still** [9] - 8:21, 38:9, 45:22, 65:17, 129:12, 147:25, 148:1, 151:23, 155:7
**stood** [3] - 17:5, 56:10, 63:5
**stop** [12] - 54:6, 54:7, 55:6, 55:18, 57:8, 59:17, 60:3, 65:12, 65:14, 151:8, 156:18
**Stop** [1] - 169:12
**stopped** [10] - 56:17, 64:21, 143:9, 148:13, 161:4, 161:7, 161:8, 168:5, 169:10, 173:2
**storage** [2] - 49:2, 49:6
**strange** [1] - 110:6
**strangely** [1] - 21:5
**straw** [1] - 166:2
**street** [13] - 29:14, 35:11, 79:23, 94:16, 94:18, 99:2, 114:6, 114:16, 120:19, 151:15, 167:24, 171:17, 180:9
**Street** [23] - 1:25, 148:6, 148:7, 148:16, 148:24, 149:1, 149:9, 150:4, 150:21, 151:10, 152:5, 152:17, 155:3, 160:25, 161:23, 163:8, 167:5, 167:18, 167:21, 167:23, 168:5, 168:10, 169:5
**stretch** [2] - 28:3, 180:3
**Strike** [2] - 167:11, 182:5
**strike** [6] - 59:3, 95:3, 96:15, 97:19, 115:18, 167:10
**strong** [1] - 175:25
**strongly** [1] - 13:1
**stuck** [2] - 140:20, 140:21
**students** [2] - 178:24, 186:14
**stuff** [7] - 48:17, 70:6, 79:23, 87:14, 105:13, 186:22, 187:17
**Stuff** [5] - 101:22, 101:24, 102:9, 102:13, 102:23
**stuffed** [2] - 174:3, 176:12
**style** [1] - 135:7
**sua** [1] - 119:1
**subject** [2] - 93:17,

186:3
**submissions** [2] - 171:19, 171:20
**submit** [6] - 42:6, 42:21, 119:12, 119:25, 162:21, 171:20
**submitted** [4] - 43:9, 155:12, 155:17, 155:19
**submitting** [1] - 171:15
**Submitting** [1] - 43:4
**subsequent** [1] - 24:8
**subsequently** [1] - 6:16
**substance** [6] - 3:7, 3:11, 39:18, 39:20, 41:2, 43:10
**substantial** [2] - 12:22
**substantially** [1] - 28:8
**substantive** [3] - 8:16, 185:11, 185:24
**successive** [1] - 24:10
**sufficient** [2] - 24:12, 184:8
**sugar** [2] - 17:7, 118:10
**suggest** [4] - 27:21, 180:22, 181:17, 181:24
**suggested** [1] - 19:7
**suggesting** [2] - 19:23, 19:24
**Summar** [1] - 172:1
**summarize** [1] - 30:1
**summer** [1] - 106:8
**supplement** [1] - 181:13
**supplemental** [1] - 181:23
**supplementation** [1] - 181:16
**supplier** [2] - 74:19, 82:4
**supply** [1] - 31:8
**support** [1] - 15:4
**supportive** [1] - 23:9
**supports** [1] - 13:6
**supposed** [2] - 15:23, 82:19
**Suppress** [1] - 9:18
**suppression** [5] - 3:13, 8:24, 9:21, 9:22, 10:5
**surgery** [1] - 9:7
**surprised** [1] - 112:23
**surveil** [1] - 49:8
**surveillance** [1] - 167:20
**suspect** [1] - 114:24
**suspected** [8] - 39:19, 42:12, 148:12, 149:3, 150:22, 150:23, 162:5, 163:7
**suspecting** [1] - 148:12
**suspended** [4] - 62:5,

62:6, 62:25, 63:4
**suspicious** [2] - 60:14, 60:25
**suspiciously** [1] - 30:2
**Sustained** [4] - 111:16, 138:8, 164:5, 164:17
**sustained** [1] - 115:20
**swarm** [1] - 133:11
**switches** [1] - 25:25
**SWORN** [6] - 33:9, 52:10, 67:6, 146:19, 159:14, 165:12
**system** [1] - 85:1
**systems** [1] - 69:6

## T

**table** [14] - 85:21, 85:24, 86:13, 86:14, 90:23, 90:24, 91:19, 91:23, 92:6, 92:8, 134:15, 134:19, 143:12
**tag** [4] - 60:16, 171:3, 171:4, 172:3
**talcum** [1] - 17:7
**Tanara** [1] - 189:18
**tapes** [1] - 187:12
**targeting** [2] - 34:16, 34:17
**task** [2] - 36:24, 36:25
**Task** [1] - 165:22
**tasked** [1] - 171:18
**tasks** [1] - 36:21
**Taurus** [10] - 167:7, 167:19, 168:17, 169:11, 170:8, 173:3, 173:5, 173:13, 182:7, 182:23
**team** [8] - 2:22, 36:14, 39:11, 46:20, 46:22, 46:23, 46:25, 47:8
**Technically** [1] - 10:1
**techniques** [1] - 11:24
**telephone** [2] - 148:21, 151:25
**ten** [10] - 27:12, 35:2, 41:12, 46:17, 47:3, 47:25, 100:3, 177:1, 177:3
**tend** [2] - 113:7, 158:10
**tenuous** [1] - 8:22
**term** [9] - 11:9, 79:15, 79:19, 107:18, 108:1, 108:3, 109:6, 126:16, 145:5
**terminate** [2] - 117:14, 183:7
**terminated** [1] - 116:24
**termination** [1] - 183:10
**terminus** [1] - 183:22,

183:23
**terms** [13] - 43:21, 53:6, 75:4, 98:17, 103:25, 106:7, 111:7, 122:18, 141:14, 141:20, 142:6, 143:14, 158:3
**tested** [3] - 3:10, 3:11, 155:13
**testified** [8] - 3:13, 38:22, 47:15, 101:25, 128:2, 130:11, 145:20, 174:5
**testifies** [1] - 16:12
**testify** [7] - 2:19, 47:24, 97:11, 106:22, 109:25, 182:5, 187:7
**testifying** [4] - 72:12, 73:8, 73:19, 140:1
**testimony** [44] - 2:17, 2:25, 23:17, 23:19, 27:11, 32:6, 45:24, 65:13, 72:11, 72:15, 72:20, 72:21, 73:2, 74:3, 113:20, 114:20, 120:9, 122:18, 122:19, 123:3, 124:16, 125:21, 126:8, 139:14, 141:1, 145:1, 145:15, 145:17, 145:18, 146:5, 170:10, 173:18, 178:19, 180:5, 182:1, 184:7, 184:8, 185:7, 185:9, 185:21, 185:24, 186:9
**textbook** [1] - 182:17
**THE** [311] - 1:1, 1:2, 2:2, 2:13, 2:16, 3:19, 4:2, 4:7, 4:16, 4:19, 5:1, 5:3, 5:10, 5:14, 5:17, 5:23, 6:4, 6:6, 6:11, 6:20, 6:23, 7:2, 7:7, 7:11, 7:16, 7:22, 7:24, 8:3, 8:8, 8:10, 8:24, 9:8, 9:14, 9:17, 9:24, 10:1, 10:3, 10:7, 10:9, 10:15, 10:19, 10:25, 11:4, 11:6, 11:8, 11:11, 12:19, 12:23, 14:13, 15:12, 16:5, 16:10, 16:19, 16:23, 18:1, 19:15, 20:2, 20:6, 20:10, 20:14, 20:16, 20:21, 20:24, 21:6, 21:9, 21:11, 21:14, 21:16, 21:23, 22:10, 22:13, 22:16, 23:2, 23:9, 23:12, 26:23, 27:15, 28:14, 28:20, 28:25, 29:9, 29:13, 29:22, 30:23, 32:4, 32:9, 32:13, 32:18, 32:22, 32:25, 33:2, 33:8, 33:10, 33:11,

33:13, 33:16, 44:5, 51:19, 51:21, 51:22, 52:11, 52:12, 52:15, 54:19, 66:6, 66:18, 66:25, 67:2, 67:7, 67:8, 67:11, 79:11, 79:17, 80:16, 81:3, 85:3, 85:12, 95:4, 95:10, 95:12, 95:14, 95:19, 95:21, 95:22, 95:23, 95:24, 96:3, 96:5, 96:6, 96:10, 96:12, 96:13, 96:16, 96:19, 96:25, 97:3, 97:5, 97:6, 97:9, 97:10, 97:15, 97:16, 97:17, 97:20, 97:22, 97:23, 97:24, 97:25, 98:1, 98:2, 98:4, 98:5, 98:7, 102:11, 102:22, 107:22, 109:10, 111:16, 111:24, 112:2, 112:5, 112:18, 112:20, 113:9, 113:12, 113:15, 113:18, 113:24, 114:3, 115:3, 117:1, 117:5, 117:9, 117:16, 117:21, 117:25, 118:3, 118:5, 118:9, 118:12, 118:16, 118:19, 119:6, 119:18, 120:2, 120:15, 120:17, 120:23, 121:3, 121:6, 121:8, 121:14, 121:16, 121:20, 121:24, 122:6, 122:13, 122:24, 123:1, 123:12, 123:17, 123:22, 123:24, 124:2, 124:7, 124:11, 124:17, 124:24, 125:2, 125:5, 125:11, 125:16, 125:20, 126:1, 126:12, 127:1, 127:9, 127:13, 127:17, 127:18, 128:10, 138:8, 138:13, 138:16, 138:18, 138:20, 138:21, 140:6, 143:21, 144:17, 144:21, 146:18, 146:20, 146:21, 146:24, 149:21, 149:23, 149:25, 150:3, 153:2, 153:8, 154:11, 155:25, 159:9, 159:13, 159:15, 159:16, 159:18, 161:15, 161:17, 161:19, 162:24, 164:5, 164:17, 164:20, 164:22, 164:23, 165:4, 165:6, 165:8, 165:10, 165:13, 165:14, 165:16, 166:18, 166:19, 166:22, 167:11, 168:25, 169:3, 169:21, 176:18, 176:19, 176:20, 178:23, 179:7, 179:15, 179:19, 179:23, 180:8, 180:12, 180:20, 180:25,

181:6, 181:9, 181:12, 181:19, 181:23, 182:19, 183:19, 184:4, 184:11, 184:16, 184:25, 185:22, 186:4, 186:11, 186:15, 186:24, 187:2, 188:2, 188:14, 188:17, 188:20, 189:4, 189:6, 189:13, 189:20, 190:1, 190:4, 190:9

**thefts** [2] - 69:7, 70:5

**themselves** [3] - 24:22, 139:19, 140:23

**theory** [3] - 12:2, 18:6, 124:21

**thereabouts** [2] - 71:24, 74:8

**Thereabouts** [1] - 48:9

**thereafter** [2] - 65:14, 142:18

**therefore** [2] - 6:17, 23:24

**they've** [2] - 13:25, 107:9

**third** [2] - 32:24, 187:19

**Thirty** [1] - 67:17

**Thomas** [1] - 1:20

**thoughts** [1] - 87:11

**thousands** [1] - 174:6

**threat** [1] - 121:5

**threatened** [1] - 69:13

**threats** [1] - 38:15

**three** [15] - 10:8, 10:11, 40:22, 41:15, 45:20, 47:14, 51:25, 67:20, 88:24, 100:3, 131:3, 132:23, 143:9, 177:9, 177:18

**Three** [1] - 40:25

**throughout** [1] - 34:18

**timeframe** [1] - 179:22

**tip** [2] - 182:6, 182:15

**tips** [1] - 16:1

**tires** [1] - 59:8

**Title** [1] - 24:4

**today** [17] - 2:12, 64:5, 64:8, 72:12, 72:20, 73:3, 74:3, 79:2, 109:20, 109:22, 109:24, 114:13, 141:14, 145:21, 147:9, 170:22, 187:20

**together** [10] - 4:23, 36:16, 37:3, 77:24, 77:25, 92:7, 135:10, 140:20, 140:21, 140:24

**tomorrow** [4] - 177:4, 178:3, 178:24, 186:13

**took** [14] - 11:14, 12:13, 46:2, 47:3, 48:2, 92:23, 93:10, 99:22, 99:23,

99:24, 133:7, 137:13

**top** [5] - 37:25, 46:1, 46:3, 79:6, 172:9

**total** [1] - 3:8

**toward** [6] - 33:12, 67:9, 146:21, 151:14, 159:16, 175:3

**towards** [5] - 45:5, 45:24, 174:20, 174:25, 179:3

**town** [6] - 67:20, 85:6, 85:10, 85:14, 149:12, 155:6

**Trace** [2] - 165:22, 166:1

**trace** [1] - 169:22

**tracking** [1] - 166:2

**trade** [3] - 13:9, 14:6, 70:2

**traffic** [10] - 53:8, 54:6, 54:7, 55:6, 55:18, 59:17, 60:3, 65:12, 65:13

**traffickers** [1] - 159:2

**trafficking** [8] - 3:21, 4:1, 11:22, 11:24, 12:1, 148:9, 158:1, 158:4

**train** [1] - 179:24

**training** [2] - 39:25, 167:25

**transaction** [1] - 161:4

**transactions** [1] - 27:1

**transcribed** [1] - 192:8

**transcript** [8] - 101:14, 107:16, 184:14, 185:17, 185:25, 187:23, 188:7, 192:8

**transcripts** [4] - 184:20, 184:25, 185:19, 187:20

**transferred** [1] - 106:25

**transmission** [1] - 62:2

**transported** [2] - 56:18, 63:13

**trash** [35] - 3:2, 3:8, 39:14, 39:16, 40:5, 40:7, 45:19, 45:25, 46:7, 46:10, 46:11, 47:2, 47:5, 47:11, 47:12, 47:16, 47:19, 47:21, 48:8, 48:10, 48:11, 48:12, 48:13, 48:14, 48:17, 48:18, 48:20, 48:22, 49:1, 49:5, 158:13

**traveling** [6] - 44:22, 54:7, 54:15, 60:4, 148:6, 150:20

**treatment** [1] - 5:22

**trial** [19] - 17:12, 17:24, 23:20, 24:1, 24:5, 24:9, 25:19, 25:21, 52:1, 109:24, 114:4, 119:9,

119:20, 126:4, 126:16, 130:13, 176:21, 177:2, 184:13

**trials** [3] - 15:14, 130:11

**tried** [2] - 17:13, 55:19

**Tried** [1] - 89:20

**trip** [1] - 105:16

**trooper** [10] - 32:22, 53:3, 53:5, 54:3, 54:6, 54:8, 57:7, 62:16, 63:15, 63:16

**Trooper** [21] - 32:19, 52:9, 54:8, 54:21, 55:5, 55:20, 55:21, 56:10, 56:17, 60:2, 60:25, 61:20, 63:3, 63:6, 63:10, 63:24, 65:8, 65:11, 65:13

**TROOPER** [2] - 52:10, 191:6

**trooper's** [2] - 54:18, 62:14

**troopers** [6] - 55:2, 56:15, 56:16, 61:18, 63:9, 66:11

**trouble** [5] - 66:14, 70:23, 74:7, 90:3, 135:13

**truck** [3] - 93:10, 93:11, 94:8

**true** [16] - 65:18, 103:1, 116:3, 117:21, 120:23, 121:1, 122:7, 122:11, 122:18, 122:20, 122:22, 123:22, 123:23, 127:2, 184:15

**truly** [1] - 17:21

**truth** [3] - 103:3, 103:6, 115:4

**truthfully** [1] - 108:6

**try** [6] - 8:20, 14:11, 14:19, 30:12, 70:15, 90:10

**trying** [8] - 4:22, 6:13, 13:21, 29:25, 55:16, 101:20, 120:9, 188:11

**Tuesday** [3] - 141:18, 177:13, 177:18

**Turn** [1] - 57:20

**turn** [16] - 9:15, 22:10, 45:17, 48:4, 57:18, 58:10, 77:3, 84:13, 84:17, 84:21, 104:17, 110:13, 167:23, 167:24, 168:2, 168:10

**turned** [10] - 22:8, 45:7, 45:12, 47:20, 48:6, 63:10, 72:24, 168:4, 168:13, 169:13

**Turned** [1] - 57:21

**turning** [1] - 58:7

**turnover** [1] - 100:6

turns [1] - 58:15

**two** [44] - 6:3, 6:7, 6:19, 9:6, 10:8, 10:11, 12:24, 24:10, 25:17, 25:20, 26:15, 39:10, 40:22, 67:20, 71:18, 71:21, 77:11, 81:17, 81:18, 81:19, 102:19, 116:10, 120:12, 130:7, 134:6, 134:8, 143:22, 144:1, 148:14, 149:16, 151:2, 151:8, 155:8, 156:14, 156:22, 157:20, 157:23, 180:23, 181:16, 186:8, 186:17, 187:14, 189:10

**Two** [4] - 40:24, 134:8, 144:11, 187:6

**twofold** [1] - 39:9

**type** [5] - 48:17, 84:4, 91:9, 137:6, 137:7

**types** [1] - 68:25

**typically** [2] - 19:24, 116:24

## U

**U.S** [6] - 1:24, 19:25, 20:23, 21:6, 23:12, 72:16

**Ultimately** [2] - 44:1, 45:17

**ultimately** [4] - 38:23, 42:4, 42:20, 57:23

**Um-hum** [11] - 62:19, 68:20, 70:12, 76:3, 78:12, 82:15, 85:25, 91:1, 92:1, 132:20, 143:18

**umbrella** [1] - 30:15

**unappealable** [1] - 18:23

**uncommon** [1] - 49:4

**uncontested** [2] - 180:3, 181:17

**uncovered** [2] - 164:9, 164:12

**under** [27] - 8:5, 8:13, 13:17, 18:17, 20:20, 22:21, 24:20, 25:5, 28:19, 30:7, 114:19, 119:7, 124:3, 127:15, 149:6, 153:11, 157:18, 157:21, 158:15, 162:9, 165:22, 170:13, 170:14, 176:5, 179:8, 183:18, 185:9

**underling** [1] - 116:19

**underneath** [1] - 170:16

**Understood** [2] - 7:15, 49:12

**understood** [7] - 65:1, 65:5, 65:17, 97:21, 100:9, 124:24, 145:23

**undertake** [1] - 61:22

**undue** [3] - 13:13, 15:1, 28:9

**unfold** [2] - 54:7, 55:18

**uniform** [1] - 160:20

**Uniformed** [1] - 53:7

**uniformed** [1] - 53:11

**uninterrupted** [1] - 118:7

**Unit** [8] - 35:8, 35:9, 147:1, 147:10, 160:9, 166:1, 166:9, 171:17

**unit** [1] - 171:14

**UNITED** [2] - 1:1, 1:5

**United** [5] - 24:4, 33:5, 52:8, 67:4, 144:19

**units** [1] - 154:5

**unknown** [1] - 113:20

**unless** [1] - 185:1

**unlikely** [1] - 180:11

**unmarked** [8] - 147:15, 147:19, 148:5, 156:6, 160:23, 174:8, 174:9, 174:11

**unpublished** [1] - 23:23

**unrelated** [1] - 123:25

**unreported** [1] - 23:12

**untrue** [1] - 124:22

**unusual** [1] - 126:10

**up** [104] - 5:9, 9:9, 9:12, 11:14, 17:1, 17:5, 18:23, 20:13, 21:12, 31:5, 33:11, 36:9, 38:2, 39:5, 40:14, 41:12, 41:14, 45:5, 45:17, 46:2, 46:4, 48:3, 49:4, 54:15, 54:18, 54:21, 55:6, 57:14, 57:18, 59:22, 60:6, 62:15, 67:8, 67:23, 68:6, 69:13, 69:20, 70:9, 70:16, 75:9, 82:6, 82:7, 84:19, 85:1, 85:16, 89:2, 89:25, 90:13, 91:11, 93:6, 93:18, 93:20, 94:7, 94:8, 94:24, 94:25, 101:20, 106:5, 106:14, 106:16, 107:25, 109:3, 111:11, 112:23, 115:8, 115:9, 117:3, 125:22, 126:18, 128:11, 128:18, 131:10, 135:16, 136:10, 137:2, 139:7, 139:18, 140:4, 145:19, 149:8, 149:9, 151:13, 156:16, 156:20, 166:15, 167:20, 167:24, 168:9, 168:25, 169:13, 171:1, 171:16,

171:19, 178:17, 179:1, 181:21, 183:5, 184:5, 184:11, 188:4
**ups** [1] - 75:7
**upshot** [1] - 23:23
**upstairs** [4] - 130:6, 130:7, 131:19, 134:8
**US** [1] - 150:25
**USA** [1] - 192:4
**usable** [1] - 19:24
**user** [1] - 42:16
**users** [1] - 99:18
**uses** [1] - 30:2

## V

**vague** [1] - 113:19
**value** [4] - 14:25, 28:7, 62:8, 113:22
**varied** [1] - 75:15
**various** [4] - 48:13, 68:25, 70:22, 137:3
**Various** [1] - 48:14
**VCID** [2] - 165:22, 165:23
**vehicle** [42] - 38:9, 38:18, 39:5, 45:2, 45:23, 47:8, 55:9, 56:16, 56:21, 57:16, 57:18, 58:14, 58:16, 58:18, 59:1, 59:2, 59:6, 59:10, 60:15, 61:12, 61:13, 62:4, 62:11, 62:12, 62:13, 62:16, 63:7, 65:3, 65:6, 65:7, 65:15, 65:21, 66:3, 147:14, 147:15, 148:5, 148:14, 156:7, 156:17, 160:22, 160:23, 170:13
**vehicles** [2] - 44:22, 57:9
**verse** [1] - 185:15
**versus** [1] - 19:25
**vial** [8] - 75:19, 75:24, 76:16, 76:21, 76:23, 84:4, 84:7
**vials** [35] - 6:24, 12:22, 27:4, 27:25, 29:4, 29:18, 39:18, 39:23, 40:25, 41:15, 41:18, 41:23, 41:24, 41:25, 42:12, 43:11, 47:14, 47:15, 75:14, 75:23, 76:13, 76:24, 77:1, 77:3, 84:2, 84:4, 84:11, 84:15, 86:6, 87:7, 99:4, 99:6, 100:3, 155:9
**Vials** [3] - 75:16, 75:17, 86:5
**vicinity** [1] - 47:18

**view** [1] - 38:19
**viewing** [3] - 47:5, 47:6, 47:7
**VII** [1] - 1:11
**violates** [1] - 113:22
**violation** [3] - 118:16, 137:4, 178:11
**violations** [1] - 166:3
**violence** [1] - 34:17
**Violent** [5] - 33:14, 34:14, 34:15, 160:4, 165:23
**violent** [1] - 34:16
**visit** [3] - 83:25, 136:24, 178:18
**voice** [1] - 70:15
**VOLUME** [1] - 1:11

## W

**W-I-L-L-A-R-D** [1] - 165:16
**wagon** [2] - 167:7, 168:17
**Wagster** [1] - 189:18
**Wait** [5] - 4:2, 169:21
**wait** [5] - 97:16, 118:9, 125:4, 125:6, 125:9
**waiting** [4] - 2:3, 59:16, 59:21, 165:1
**Wal** [1] - 137:21
**Wal-Mart** [1] - 137:21
**walk** [4] - 48:2, 48:3, 89:25, 90:1, 148:15, 156:17, 156:23, 157:1
**walked** [5] - 151:8, 151:10, 156:15, 157:23, 161:8
**wants** [3] - 120:6, 173:1, 185:22
**warrant** [12] - 2:20, 27:3, 27:4, 29:19, 35:22, 36:8, 36:11, 36:15, 36:21, 37:4, 38:12, 45:11
**warrants** [1] - 49:24
**Washington** [1] - 186:16
**Watch** [1] - 144:18
**watch** [2] - 56:11, 99:11
**WAYNE** [1] - 1:8
**Wayne** [6] - 56:6, 170:18, 171:22, 171:25, 172:19, 173:19
**ways** [1] - 79:23
**weaker** [1] - 5:7
**wear** [1] - 37:7
**wearing** [8] - 79:5, 106:7, 154:8, 154:21, 154:23, 161:22, 162:10,

164:2
**weather** [2] - 124:4, 179:8
**web** [1] - 21:17
**Wednesday** [12] - 1:11, 141:18, 177:14, 177:16, 177:19, 187:7, 188:22, 189:20, 189:21, 190:1, 190:4, 190:8
**Weed** [1] - 70:19
**weed** [1] - 131:6
**week** [10] - 77:9, 81:24, 82:8, 160:12, 173:1, 176:21, 177:2, 177:13, 177:18, 177:20
**weekend** [5] - 169:25, 177:5, 178:4, 178:20, 190:10
**Weeks** [1] - 80:5
**weeks** [3] - 80:6, 112:11, 177:3
**weighs** [1] - 76:8
**Weight** [1] - 76:8
**Weight-wise** [1] - 76:8
**welfare** [1] - 58:23
**west** [1] - 44:21
**West** [1] - 1:25
**westbound** [1] - 168:13
**westerly** [1] - 44:22
**Westlaw** [4] - 20:3, 20:16, 21:14, 23:13
**whatsoever** [2] - 113:22, 120:19
**whereas** [1] - 22:17
**Whereof** [1] - 192:10
**white** [9] - 39:18, 39:20, 40:16, 41:1, 41:25, 43:10, 48:15, 162:5, 164:2
**whole** [4] - 69:25, 120:10, 134:9, 189:22
**Wilkens** [1] - 167:22
**Willard** [2] - 164:25, 165:16
**WILLARD** [2] - 165:12, 191:17
**Williams** [6] - 23:21, 24:11, 24:14, 187:2, 189:19
**Willie** [3] - 153:24, 154:20, 192:4
**WILLIE** [1] - 1:7
**willing** [2] - 73:9, 121:23
**willy** [1] - 114:2
**willy-nilly** [1] - 114:2
**Wilson** [9] - 149:6, 153:12, 153:17, 153:20, 154:20, 155:1, 157:1, 162:12, 162:14

**windows** [2] - 38:17, 106:14
**wintertime** [1] - 106:5
**wipe** [1] - 30:13
**wisdom** [1] - 188:2
**wise** [2] - 76:8, 141:18
**Wise** [1] - 139:15
**withdrew** [2] - 24:6, 116:11
**Witness** [4] - 112:19, 121:18, 127:11, 192:10
**witness** [77] - 16:12, 29:7, 32:16, 32:24, 33:4, 33:17, 33:18, 33:25, 52:7, 64:5, 67:3, 95:19, 97:11, 97:14, 109:25, 112:24, 113:8, 113:19, 114:1, 114:9, 114:15, 114:22, 114:25, 115:4, 115:6, 115:17, 116:9, 117:7, 120:5, 120:8, 120:14, 121:5, 122:1, 122:20, 123:4, 123:6, 123:7, 123:9, 125:10, 126:4, 126:11, 126:17, 127:7, 144:18, 145:2, 145:15, 145:17, 145:18, 145:19, 145:20, 145:23, 146:7, 146:14, 159:10, 164:23, 165:1, 165:2, 165:6, 165:8, 169:23, 169:24, 172:25, 179:3, 179:12, 179:21, 180:3, 182:4, 184:7, 184:8, 185:16, 187:6, 187:16, 188:8, 188:22, 189:21
**WITNESS** [48] - 33:9, 33:10, 33:13, 51:21, 52:10, 52:11, 52:15, 66:6, 67:6, 67:7, 67:11, 95:12, 95:21, 95:23, 96:5, 96:13, 97:6, 97:9, 97:15, 97:17, 97:22, 97:24, 98:1, 98:4, 127:17, 138:18, 138:21, 146:18, 146:19, 146:20, 146:24, 149:23, 150:3, 159:14, 159:15, 159:18, 164:22, 165:12, 165:13, 165:16, 166:19, 176:19, 191:3, 191:6, 191:9, 191:13, 191:15, 191:17
**witness'** [3] - 112:22, 114:20, 123:3, 124:16, 125:21, 126:8, 126:10, 146:7, 146:9, 169:24, 181:17, 185:24, 188:9
**witness's** [1] - 95:5
**witnesses** [12] - 14:22, 23:20, 32:6, 124:5,

124:6, 184:6, 185:6, 185:13, 187:14, 189:2, 189:3, 190:5
**women** [1] - 117:11
**wondering** [2] - 124:4, 124:5
**Woodland** [9] - 2:20, 12:12, 35:22, 36:1, 37:4, 37:10, 37:13, 37:19, 44:23
**word** [3] - 29:22, 121:22, 179:17
**Words** [1] - 188:2
**words** [10] - 79:22, 79:23, 96:13, 98:17, 104:7, 105:12, 123:9, 125:21, 140:25, 178:17
**worth** [1] - 75:10
**write** [2] - 111:2, 171:19
**writing** [1] - 173:7
**written** [1] - 120:1
**wrote** [2] - 173:11, 173:15

## X

**XXXVII** [1] - 1:11

## Y

**yard** [2] - 27:5, 41:21
**year** [12] - 21:7, 26:18, 34:21, 71:7, 71:17, 72:21, 105:20, 105:21, 106:6, 173:5, 173:6, 181:4
**years** [30] - 6:3, 6:7, 6:19, 10:8, 10:11, 11:14, 12:9, 12:18, 26:15, 35:2, 35:14, 51:16, 53:4, 70:10, 71:11, 71:21, 72:9, 92:18, 103:19, 107:7, 116:10, 128:19, 159:1, 160:12, 166:6, 167:1, 175:14, 180:16, 186:17, 187:4
**yelling** [1] - 45:11
**yesterday** [6] - 2:7, 12:23, 114:11, 136:25, 177:8, 187:7
**young** [3] - 117:10, 163:23, 164:2
**youngster** [1] - 27:23
**yourself** [8] - 42:5, 42:25, 56:20, 93:3, 109:16, 166:25, 178:10, 179:3

## Z

**Zajac** [3] - 1:24, 192:3, 192:15
**Zero** [1] - 130:12