1

1                    IN THE UNITED STATES DISTRICT COURT
2                      FOR THE DISTRICT OF MARYLAND
                            NORTHERN DIVISION
3


4


5       UNITED STATES OF AMERICA

6            v.                              CRIMINAL CASE NO.
                                               AMD-04-029
7       WILLIE MITCHELL,
        SHELTON HARRIS,
8       SHELLY WAYNE MARTIN,
        SHAWN GARDNER,
9
             Defendants
10      _____/

11                      VOLUME X OF XXXVII
                        Monday, October 6, 2008
12                      Baltimore, Maryland

13

        Before:  Honorable Andre M. Davis, Judge
14                      And a Jury

15      Appearances:
                On Behalf of the Government:
16               Robert Harding, Esquire
                 Michael Hanlon, Esquire
17              On Behalf of Defendant Mitchell:
                 Laura Kelsey Rhodes, Esquire
18               Michael E. Lawlor, Esquire
                On Behalf of Defendant Harris:
19               Gerard P. Martin, Esquire
                 Paul Flannery, Esquire
20              On Behalf of Defendant Martin:
                 Thomas L. Crowe, Esquire
21               James G. Pyne, Esquire
                On Behalf of Defendant Gardner:
22               Adam H. Kurland, Esquire
                 Barry Coburn, Esquire
23
        Reported by:
24      Mary M. Zajac, RPR
        Room 5515, U.S. Courthouse
25      101 West Lombard Street
        Baltimore, Maryland 21201

2

1             (Proceedings at 9:45 a.m.)

2             THE COURT:  Good morning.  We ready to proceed?

3             MR. HARDING:  Yes, Your Honor.

4             THE COURT:  Who do we have on tap, Mr. Harding?

5             MR. HARDING:  Mr. Dobropolski.

6             THE COURT:  All right.  So we should take up Mr.

7    Martin's motion?

8             MR. MARTIN:  It's actually Mr. Harding's motion.  It's

9    sort of my motion but Mr. Harding is the one who filed it.  The

10   motion in limine.  But I'm the one who should be arguing it.

11            THE COURT:  Good morning.

12            MR. MARTIN:  Your Honor, I understood from your

13   comments last week that, you know, you were, it would be a tough

14   sell to convince you that this was not a conspiracy.  I don't

15   concede that, Your Honor.  I don't think that these statements

16   were made in the course of a conspiracy involving -- forgetting

17   the two defendants at the end of this table who have nothing to

18   do with this -- but involving the other two defendants, my client

19   and Mr. Mitchell.

20            But I would argue, Your Honor, that in addition to a

21   that, even if you did find that there was a conspiracy, these

22   statements that they want to introduce here were not made in

23   furtherance of the conspiracy.  I think the Court is aware, the

24   government has to prove by a preponderance of the evidence that

25   the statements were made during the course of a conspiracy that

1    both Harris and Mitchell were part of.

2           Here, Your Honor, as you know, although Harris had been

3    arrested, although Harris had been arrested for something

4    different but he was nevertheless in jail at the time.  The other

5    two defendants were also incarcerated at the time.

6           Other than Mr. Dobropolski's statements, which I tell

7    you, Your Honor, are I believed stretched to the maximum by the

8    government for purposes of this motion, there is no evidence that

9    there was a knock and rob drug dealer's conspiracy that existed

10   in September of 2003.  Furthermore, there's no evidence that Mr.

11   Harris would have committed or did commit any overt act in

12   furtherance of any such conspiracy involving Mr. Mitchell.

13          And any of the later statements that we just learned

14   about two weeks ago, the statements that were in these tapes and

15   in the DEA 6's, the meetings after Mr. Harris was released from

16   jail, those aren't in furtherance of the conspiracy because

17   Dobropolski at that time was an informant and United States v.

18   Chase says that those statements of that nature cannot be in the

19   nature of statements in furtherance of a conspiracy.

20          The test, I think, Your Honor, is that there must be

21   substantial independent evidence, I think that's what Shores

22   said, in order to prove the conspiracy.  In Shores, you'll

23   remember, Your Honor, they had polygraph examination which the

24   witness had passed, and the witness had given him very, extremely

25   detailed accountings of each of future events that were going to

4

1    take place and they all came true.  And here the witness'

2    accounts are vague about what was supposed to happen and what was

3    going to happen.  And I think, I'm paraphrasing, but I think he

4    said, I think they wanted me to be sort of an enforcer for them,

5    maybe.  That's one of the statements, that's my best paraphrase

6    of that statement, Your Honor.

7            In addition, Your Honor, you have Mr. Dobropolski

8    trying by Sergeant Giganti, Detective Giganti's own testimony, a

9    dozen times or so to get corroboration, and failed.  So you don't

10   have that, that comfort that Shores had as to the reliability of

11   these statements and as to the reliability as to why there was a

12   conspiracy that existed.

13           And this latter information, the information about the

14   tapes and all that was, was withheld from us until a point in

15   time in which I would argue it was too late for us to do anything

16   about.  I could explain a little bit of that to the Court.  But I

17   think that plays into your decision here as well.

18           You know, our tape enhancer says he can do no more

19   because he doesn't have time.  He's the only one we could find

20   and it would take him, we would be into November before he could

21   enhance the last tape that we wanted enhanced, which was actually

22   the first tape they tried to make with Mr. Harris on October

23   27th.  So we're not going to be able to get that enhanced.

24           I think that that delay has inured to our detriment,

25   greatly to our detriment given what I believe we were able to do

1    with one of the other tapes, Your Honor.

2         We didn't get them in the order that they were made for

3    some reason.  I don't know why.  We didn't.  So the first one we

4    got, we sent to get enhanced, and that's the one we were able to

5    get enhanced.  We can't get the others done.

6         Even if you were to find, Your Honor, that there was

7    this conspiracy that existed between Mr. Harris and Mr. Mitchell

8    in September of 2003 when they were locked up with Mr.

9    Dobropolski at different places, but in that same one month

10   period in September, last August of '03, September of '03, the

11   statements that Mr. Dobropolski, that they're going to ask him

12   about were not in furtherance of the conspiracy.

13        And this prong of the test in this circuit is not to be

14   broadly construed.  The Urbanik case says you must narrowly

15   construe that prong as to whether they are in furtherance.

16   Urbanik went to say, Idle chatter or banter is not in furtherance

17   of the conspiracy.

18        The government says Mr. Harris was trying to recruit

19   Mr. Dobropolski.  So his bragging about his past, his past, I

20   guess, they used the term "work", quote-unquote, you may have

21   seen that, Mr. Dobropolski uses the term "work" to mean murders,

22   that Mr. Harris was bragging about his work in an effort to

23   impress and recruit Mr. Dobropolski.  That I think is the

24   government's theory as to why this is a conspiracy that

25   continued.

6

1          THE COURT:  Mr. Martin, can you tell me precisely, and

2     I know it's in the record somewhere, but I need you to tell me,

3     or Mr. Harding, what statements are we talking about, actually?

4          MR. MARTIN:  Well, I can tell you what I think they

5     are, Your Honor.

6          THE COURT:  Okay.  All right.

7          MR. MARTIN:  They are that, Mr. Harris told me that he

8     put some work in for Bo before.  He asked me if I knew the former

9     heavyweight champion.

10          THE COURT:  I'm sorry.  Harris told Dobropolski --

11          MR. MARTIN:  Right.

12          THE COURT:  That he, Harris, had put some work in for

13     Mitchell.

14          MR. MARTIN:  Yes.

15          THE COURT:  Okay.  That's statement number one.

16          MR. MARTIN:  And he tied that to, ask him if he knew

17     who the heavy weight champion was.  And Dobropolski said he knew

18     who he was but he didn't know much about him.  And then he said

19     his friends began to disappear.

20          THE COURT:  Harris said?

21          MR. MARTIN:  Yes.  This is what Dobropolski says Harris

22     said.

23          THE COURT:  Okay.

24          MR. MARTIN:  His friends began to disappear.  People

25     started dying around him.  His friends started to get killed.

7

1   And he told me people, around this boxer started dying and he was

2   the one that killed them.  That's what Dobropolski says over this

3   two or three week period he got out of Mr. Harris.

4            THE COURT:  All right.  Now, they are clearly

5   admissible against Mr. Harris.

6            MR. MARTIN:  Absolutely, Your Honor.

7            THE COURT:  Okay.

8            MR. MARTIN:  And if this information has been known to

9   us when we were filing his motions for severance, this would have

10  been something that we would have been arguing with you.

11  Unfortunately, you're put in the position now of us having

12  invested three weeks in a trial and here we are.

13           THE COURT:  I'm still missing something.  You are

14  arguing to exclude statements that are admissions as to Mr.

15  Harris?

16           MR. MARTIN:  I'm arguing that when you consider, I'm

17  arguing, I guess I supposedly, the argument is theirs because the

18  statements are more -- but there's also a statement from Mr.

19  Mitchell that Mr. Dobropolski wants to enter, in which he says

20  that Mr. Mitchell --

21           THE COURT:  Okay.  We'll get to that.  I'm just trying

22  to take them one at a time.

23           MR. MARTIN:  Well, I took it upon myself to respond to

24  the motion because I didn't see anybody else doing this.

25           MR. LAWLOR:  Can I jump in, Your Honor?

8

1          THE COURT:  Mr. Lawlor, please.  You'll get a chance.
2     You'll get a chance.  Let me just hear from Mr. Martin.
3          MR. MARTIN:  I'm trying to present the argument that
4     they would present as well.  We're kind to doing this as a
5     unified front.
6          THE COURT:  That's fine.  I just want to make sure --
7          MR. MARTIN:  I understand.  I'm not trying to confuse
8     you.
9          THE COURT:  No.  It's not confusing at all.
10          MR. MARTIN:  There is a later statement by Mr.
11     Mitchell.
12          THE COURT:  All right.  Let's go to that one, then.
13          MR. MARTIN:  There's a statement that Mr. Mitchell made
14     in the jail.
15          THE COURT:  What time period?  Still '02?
16          MR. MARTIN:  '03.
17          THE COURT:  '03.  Mr. Harding is shaking his head, but
18     go ahead.
19          MR. MARTIN:  Well, the statements were made in '03.
20     You disagree with that?  When were they made?  '02?  I'm sorry,
21     Your Honor.
22          THE COURT:  All right.  So Mitchell, Mitchell says --
23          MR. MARTIN:  Yes.  That's right.  The statements were
24     made in '02.  I'm a year off.
25          THE COURT:  All right.  So Mitchell said to the witness

1    in '02, what?

2              MR. MARTIN:  That Mr. Harris had, quote, "put some work

3    in for him."  And then the witness says that meant that Mr.

4    Harris had killed somebody for him.

5              THE COURT:  So Harris told the witness that he put in

6    some work for Mitchell and Mitchell told the witness that Harris

7    had put --

8              MR. MARTIN:  The use of the word "work" is Mr.

9    Dobropolski's word.

10             THE COURT:  Right.  I got that.  Okay.

11             MR. MARTIN:  That's what the government, that's the, I

12   guess, the universe of the statements that the government wants

13   to get in during this period.  And the issue becomes, were they

14   in furtherance of a conspiracy?

15             THE COURT:  Okay.

16             MR. MARTIN:  In other words, what we're saying is that

17   these statements are idle chatter that took place during the

18   course of conversations where Mr. Dobropolski admits, in

19   statements to the police that we have, that he was extracting

20   this information.  Mr. Dobropolski was on a mission to get

21   himself out of jail.  And --

22             THE COURT:  In '02?

23             MR. MARTIN:  Yes, Your Honor.  When he went into jail,

24   he had filed a motion to get out.  He'd filed a motion with Judge

25   Byrnes.  As they often do in state court, as you know, Judge

1    Byrnes said, I'll hear it in a year, the motion's sitting here

2    now, you go off to prison and I'll hear the motion in a year.

3    Common practice in the state court system.

4                    THE COURT:  Right.

5                    MR. MARTIN:  So Mr. Dobropolski goes to jail.  And my

6    argument is, he's on a mission at that point.  He needs to find

7    out something to help himself.  And he, he admits that he spent

8    two weeks or more, quote, his word, he uses the word "distract",

9    but if you read the transcript it's extract, he was extracting

10   statements from these people.  And the theory is he was trying to

11   gain their trust so they would tell him things.

12                   The government's theory is that Mr. Harris just started

13   telling him these things.

14                   THE COURT:  Well, I think the government says in order

15   to recruit him.

16                   MR. MARTIN:  That's what they say.  But Mr. Dobropolski

17   says, I had to gain his trust, and it took a two week period.  So

18   you have to weigh this testimony at this stage.

19                   THE COURT:  Okay.  And there's no Sixth Amendment issue

20   floating around here, right?  You don't claim that Mr.

21   Dobropolski violated any of Mr. Harris's Sixth Amendment rights

22   because --

23                   MR. MARTIN:  No.

24                   THE COURT:  Right.  These charges, I mean, this

25   indictment hadn't even been filed.

1          MR. MARTIN:  That's not a claim, Your Honor.  We're

2     talking strictly in the parameters of whether or not this

3     statement was in furtherance of a conspiracy.  They want to

4     introduce these confessions without Mr. Harris being permitted

5     through cross examination to elicit -- in other words, let's just

6     focus on the statements that Mr. Mitchell is going to make, that

7     they're going to put in for Mr. Mitchell.

8          They want to put in a statement to Mr. Mitchell that he

9     did some work for him and, you know, they want to do this without

10    us being able to have the ability to bring in the whole of what

11    the conversations were between the three of them.  I just think,

12    we've talked about that.

13         THE COURT:  Why wouldn't you be able to bring in the

14    whole?

15         MR. MARTIN:  Well, because, because the statements are

16    incriminatory to my client that he supposedly made.  So I'm in a

17    joint trial.  For instance, if you allowed them to just, Mr.

18    Harris to just say, just say that some work was put in for him,

19    then I wouldn't be getting the benefit of the argument that Mr.

20    Mitchell was the one who was up to all this.  It's a difficult

21    concept for me to explain to the Court right here.

22         Perhaps I can get back to what I'm really talking about

23    here, which is that these statements on both sides are not in

24    furtherance of a conspiracy, Your Honor.  It's idle speculation.

25         The witness says, and he will say, Your Honor, that

1    they are were BS'ing over a period of weeks.  He was trying to

2    gain Mr. Harris's trust.  And in a clear import, when you read

3    what he has to say, is that after he gained his trust is when Mr.

4    Harris told him about these things.  It would be, stretch

5    credibility, Your Honor, to assume that Mr. Harris just started

6    spouting to a guy he didn't even know, especially when you see

7    this guy, Your Honor, a skinhead white guy with tattoos all over

8    him, that you're going to wonder would Mr. Harris just start

9    spouting that, I committed these murders?  That doesn't make any

10   sense, Your Honor.  Mr. Dobropolski himself says, Before he told

11   me anything I had to get his trust.

12           So these are idle conversations at that point.  And not

13   made in furtherance of any conspiracy.

14           It were BS'ing.  He was bragging about what he knew.

15   He, Dobropolski, was bragging about who he knew and what he knew

16   in his past to Harris and Harris was saying to him, Hell, I can

17   fight real good, too.  He said it took days and weeks to get the

18   witness to gain his trust and only then did he, quote, "sort of

19   describe the double murder."

20           I'm arguing, Your Honor, that these conversations were

21   casual asides to them.  They were casual asides to their talks

22   about Park Heights, which is what Mr. Dobropolski's going to say

23   they were doing.  The Eubanks case says that casual admissions of

24   culpability to someone he individually trusted are not statements

25   in furtherance of a conspiracy.

1          So even if there were some later entrance of Mr.

2     Dobropolski into a conspiracy with Mr. Harris and Mr. Mitchell,

3     that would not convert these prior statements into statements in

4     furtherance of a conspiracy.  The <u>Shores</u> case, Your Honor, which

5     the government heavily relies on, in fact totally relies on, said

6     in that case the facts were overwhelmingly strong and the Court

7     still said that the issue of in furtherance of conspiracy was a

8     close question.

9          Here, unlike <u>Shores</u>, the Harris statements were not

10    made in the course of conversations where Harris was seeking to

11    get Dobropolski to work for them, but were cobbled together over

12    a period of weeks, Your Honor, during which Dobropolski admits

13    that he was extracting information from Harris.  It's a trust

14    issue, Your Honor, and common sense would tell you, as I think I

15    just said a few minutes ago, that Mr. Harris is not going to just

16    suddenly invite Mr. Dobropolski into some conspiracy with him.

17         And Mr. Mitchell isn't even involved in this at this

18    time.  It's not going to happen, Your Honor.  Common sense tells

19    you that that kind of conversation just doesn't occur, that Mr.

20    Harris is just not going to suddenly open up to some guy,

21    especially when the guy admits that he was mining information

22    from him, he was extracting information from him.

23         THE COURT:  Why does it matter?  It's reasonably clear

24    that, accepting the government's theory at face value, that these

25    statements were intended to induce Mr. Dobropolski to do the work

1   of the alleged conspiracy and, therefore, were in furtherance of

2   the conspiracy.

3            MR. MARTIN:  Your Honor, they're all in jail.

4            THE COURT:  Why --

5            MR. MARTIN:  They're all in jail at the time.

6            THE COURT:  I understand that.  I understand that.  Let

7   me ask my question.

8            MR. MARTIN:  I'm sorry.

9            THE COURT:  Why does it matter that Dobropolski took a

10  couple of weeks to earn the trust and confidence of the

11  coconspirators?  That would almost be an absolute necessity

12  because, as you say, a coconspirator's not going to talk to just

13  anybody.  So I don't understand the connection between

14  Dobropolski's working as an informant and earning the trust of

15  the declarant.  That doesn't seem to me to vitiate the character

16  of the later statements if, in fact, they were made in

17  furtherance of the conspiracy.

18           MR. MARTIN:  Your Honor, if he's an informant, which he

19  wasn't at that time.  If he's an informant, they're not.  The

20  Fourth Circuit law says it's not a statement in furtherance of a

21  conspiracy if he's an informant.  If he's put there by the

22  government to do that.  But as I told you, he wasn't at that

23  point.  He was working on his own at that point.

24           The issue is whether or not --

25           THE COURT:  Wait.  Wait.  You're saying the Fourth

1    Circuit rule is that --

2              MR. MARTIN:  There's a Fourth Circuit case, Your Honor,

3    that --

4              THE COURT:  I understand you can't conspire with an

5    informant, obviously.  But why can't you make a statement to an

6    informant, just as you can make a statement to anybody, that is

7    in furtherance of a conspiracy?  You can make a statement to law

8    enforcement that's in furtherance of the conspiracy.

9              MR. MARTIN:  Your Honor, United States, United States

10   v. Chase, which is the case that I cited to Your Honor somewhere

11   in my brief.  I can't tell you exactly where.

12             THE COURT:  All right.

13             MR. MARTIN:  United States v. Chase, Page Three of our

14   brief, is the case, somewhere in United States v. Chase it says,

15   it's well established that one who acts as a government agent and

16   enters into a purported conspiracy, in his secret role as an

17   informer cannot be a conspirator.

18             THE COURT:  Right.

19             MR. MARTIN:  How can a statement to him be made in

20   furtherance of a conspiracy?

21             THE COURT:  No.  Because a statement in furtherance of

22   a conspiracy has that quality quite apart from the listener or

23   the target of the statement.  You can make a statement in

24   furtherance of a conspiracy on television to a camera.  You have

25   no idea who's listening or watching.

1          MR. MARTIN:  That's true.

2          THE COURT:  Yeah.  So if Dobropolski either with prior

3    agreement with the government or in hopes of striking an

4    agreement with the government, induced trust from Mr. Mitchell

5    and Mr. Harris, it seems to me that that's not at all material to

6    the question of whether their later statements to him, he having

7    earned their trust, in fact, were made in furtherance of a

8    conspiracy.

9          MR. MARTIN:  I appreciate Your Honor's argument, but

10   that's not my argument.

11         THE COURT:  Okay.

12         MR. MARTIN:  Whether he was an informant or not is

13   really aside from what I'm saying.

14         THE COURT:  Okay.

15         MR. MARTIN:  I am saying that these particular

16   statements, if you listen to the witness, were casual, idle

17   chatter, conversation, all part of them getting to know one

18   another.  They were not part of any conspiracy.  They were just

19   casual, idle conversation.  That's what Mr., that's the gist of

20   what I read and everything Mr. Dobropolski said.

21         And the cases in the Fourth Circuit say that if that's

22   the case, then they are not statements in furtherance of the

23   conspiracy.  And they say, the Urbanik case says that case has to

24   be strictly construed.  We're not going to be loosey-goosey about

25   this.  You have to be pretty sure.

1          Your Honor, I think at a minimum, you'll have to hold a

2     hearing and listen to Mr. Dobropolski before you decide that.  I

3     know you don't want to do that.

4          THE COURT:  I don't think I do.  Again, taking your

5     presentation at face value, you said that there was a period of

6     time during which Mr. Harris and Mr. Mitchell did not make

7     statements that the government intends to use.

8          MR. MARTIN:  I said they were extracted over a period,

9     over a period of time.  That's what I said.

10         THE COURT:  Okay.  But I think you were very clear, and

11    that's what prompted my --

12         MR. MARTIN:  If I was clear, then I misstated.  My

13    argument is, they were extracted by Mr. Dobropolski over a two or

14    three week period when they were incarcerated as he got Mr.

15    Harris to trust him.

16         THE COURT:  Well, that's my point.  Even if I were to

17    say that during the first week, just to use round numbers, the

18    first seven days, let's say, I were to say, All right, everything

19    that's said to each other in the first seven days is idle

20    chatter.  All right?  But now at some point trust ripens.  And

21    now Mr. Mitchell and/or Mr. Harris are making statements,

22    according to the government's theory, with the aim of inducing

23    Mr. Dobropolski to become a member of the conspiracy, to do work

24    for them, to whatever.

25         I don't think just because there's idle chatter in the

1    first two or three or four or five days, that what's said on Days

2    14, 15, 16 and 17 necessarily constitutes idle chatter.

3            MR. MARTIN:  Your Honor, again, it's a nice theory.

4    But you don't know and I don't know, until we hear Mr.

5    Dobropolski, whether it was the first two, three, or four or five

6    days.  His grand jury testimony is, as you are aware, most grand

7    jury testimony is pretty vague.  It's clear that he was

8    extracting information from him over a period of time.  And we

9    don't know exactly when in that course of events these statements

10   were made.

11           But accepting at face value what you said, if they were

12   made in the first seven days, then they're not in furtherance of

13   the conspiracy and they shouldn't come in.

14           THE COURT:  In which case I would instruct the jury to

15   disregard them as I'm going to instruct -- but I can't try the

16   case.  You know, that's what the Fifth Circuit used to require.

17   You had a trial on coconspirator statements and then you had a

18   real trial.

19           MR. MARTIN:  I understand.  And we all used to file

20   that motion in this court and it was denied routinely.  And I

21   understand all that, Your Honor.

22           But this is the seminal, most important witness in this

23   case.

24           THE COURT:  I doubt that.

25           MR. MARTIN:  This is a witness about which, the

1    government's known this stuff forever.  Everybody would have had

2    a more serious, more pointed motion for severance back when you

3    were considering these issues.  You even at one point said at

4    some point during one of these hearings, is there anything else

5    that we should know about that bears on severance?  None of us

6    knew about it.

7              THE COURT:  In fact, I severed the trials.

8              MR. MARTIN:  Well, you did, but not for this reason.

9              THE COURT:  Well, not for this reason.  But I severed

10   the trials.

11             MR. MARTIN:  But a trial like this necessarily has

12   problems like this, Your Honor.  And unfortunately, we're now

13   stuck here.  After three weeks, nobody wants this thing to go

14   haywire and have to do it over again.  And I suggest to Your

15   Honor that this is a very, very important issue in this case.

16             And the government even chooses, Your Honor, to use

17   these later statements that were obtained by Mr. Dobropolski

18   after he was released from prison.  After they got him out of

19   jail and they went and sat with Mr. Harris and taped them, they

20   want to use those statements as further evidence of this

21   conspiracy they say existed.  And that's just not fair.  They

22   didn't even give us that information, Your Honor.  There has to

23   be, ought to be some sanction for that.

24             There ought to be, you ought to be not considering that

25   evidence with respect to whether or not there wa a conspiracy or

1    whether these statements were made in furtherance of that

2    conspiracy.  It's just not right.  And no matter how many times I

3    say it, Your Honor, I'm going to say it again, every one of these

4    DEA 6's has a line on the bottom of it that says "prosecutor."

5    They were made four years ago and we didn't get them.  We only

6    got some of them ten days ago.

7           And now the government files its motion in limine, and

8    what do they rely on?  Well, this conspiracy existed and these

9    statements that were made by Mr. Harris after they were released

10   from prison are proof of that conspiracy.

11          THE COURT:  By the way, when did you learn that Mr.

12   Dobropolski was a government witness?

13          MR. MARTIN:  When I got Mr. Coburn's, whenever you

14   ordered Mr. Coburn to turn over that stuff to us, the grand jury

15   stuff.  I got some of it.  But I didn't get any of the DEA-6's

16   and I didn't get any of the tapes.  All I got, I got the grand

17   jury and the statement he made to the police.  And I suppose I

18   got his handwritten letter to Judge Byrnes when he first came up

19   with this information and wrote to Judge Byrnes.

20          I think that's what I got.  I may have gotten his

21   second letter to Judge Byrnes, but I didn't get the later

22   information.  And I'm not claiming that I did.  I read the grand

23   jury testimony when Mr. Coburn made it available to me.  And I

24   didn't read it the way the government reads it now.  I still

25   don't.  That's part of my argument, is I don't think these are

1    statements in furtherance of the conspiracy.  I think this is

2    idle chatter, casual conversations.

3            Now, in the middle of trial, we're presented with this

4    motion in limine, and on top of it presented with an argument

5    that says that these later conversations about which we were

6    never told are support for that.  And I just don't think that's

7    right, Your Honor.

8            I think this is such a seminal and important issue that

9    this is one of those things, with all those hearings we had, that

10   we tried to ferret out.  You didn't want to have any of these

11   arguments during the course of the trial.  That's why we had so

12   many hearings.  But here we are, because of something that we

13   didn't know about.

14           And I suggest to Your Honor that, in the Fourth

15   Circuit, this issue of whether they're in furtherance of the

16   conspiracy -- you know, you and I could argue forever about

17   whether this really was a continuing conspiracy.  You'll always

18   win that argument.

19           I'm going to the second part, which is, even if it was,

20   Your Honor, these statements weren't made in furtherance of it.

21   And you should not allow the government to do this in this case,

22   Your Honor.  I suppose, as you said, I'm making Mr. Mitchell's

23   argument to some extent because there's more statements made by

24   my client than there are by him.  But nevertheless, I'm making

25   it.  And it counts for everybody, I think.

1          THE COURT:  All right.  It's very odd that Mr. Martin

2     and Mr. Gardner don't seem to be weighing in, although I suspect

3     they may have something to say in a moment.

4          Let me hear from Mr. Lawlor and then I'll hear from Mr.

5     Harding.

6          MR. MARTIN:  Thank you, Your Honor.

7          THE COURT:  Thank you, Mr. Martin.

8          MR. LAWLOR:  Your Honor, I apologize.  I didn't mean to

9     interrupt Mr. Martin.  I just wanted to alert the Court that Mr.

10    Martin was, as he said, sort of arguing for both Mr. Mitchell and

11    Mr. Harris, Mr. Mitchell as to Mr. Harris's statements and Mr.

12    Harris as to Mr. Mitchell's statement.

13         I will not repeat, obviously, what Mr. Martin just

14    said.  I would rather just adopt the lion's share of his

15    argument.  Our objection, obviously, is to the statements that

16    Mr. Harris made to the witness, whose name I cannot pronounce.

17    And it is a Bruton issue because Mr. Harris said, in essence,

18    narrowing it down to its essence, I killed these two people on

19    behalf of Bo or at Bo's behest.  Hence the Bruton issue, because

20    he doesn't just say, I killed these two people.

21         And I think the government's motion was made to

22    introduce the statements both as to what Mr. Harris said

23    concerning what he did and the fact that he did it at Bo's

24    behest, which is the confrontation problem for Mr. Mitchell.

25         I agree with Mr. Martin that, number one, the Court

1    ought to have a hearing outside of the presence of the jury.

2    Now, I understand --

3              THE COURT:  I'm sorry.  Mr. Martin represents that

4    separate from Mr. Harris's statement that he did it for Mr.

5    Mitchell, we have Mr. Mitchell's statement that Mr. Harris did it

6    for Mr. Mitchell or at Mr. Mitchell's direction.

7              MR. LAWLOR:  I think, I think, and you know, the

8    statements will speak for themselves, the government can correct

9    me if I'm understating this, but we would submit to the Court

10   that Mr. Harris's statements are more explicit than are Mr.

11   Mitchell's.  Given that --

12             THE COURT:  But they both used the word "work."

13             MR. LAWLOR:  They both do use the word 'work.'  And Mr.

14   Harris, I think, goes into some greater detail about what he did

15   and then says he did it at Bo's behest.  And then Mr. Mitchell --

16             THE COURT:  Confirms that.

17             MR. LAWLOR:  -- for lack of a better term.  I wouldn't

18   characterize it like that, but I won't quarrel with the Court's

19   word.

20             THE COURT:  Okay.

21             MR. LAWLOR:  Your Honor, I agree with Mr. Martin's

22   submission to the Court that given the nature of the evidence and

23   the nature of this witness, that the Court ought to consider a

24   hearing outside of the presence of the jury, both to consider the

25   factors that the Court needs to find under 801(d)(2)(e), but also

1    I think it's important given the gravity of this evidence and its

2    importance, to assess the credibility of Mr. Dobropolski, because

3    I think the Court could be satisfied that, given a credible

4    witness, I find that the five, if there are five, factors under

5    801(d)(2)(e) are present hypothetically, but that the witness is

6    so incredible that I won't permit the evidence.

7         We would ask the Court to hold a hearing on this issue

8    outside of the presence of the jury, not just to assess the

9    witness' credibility, but also to determine, based on the entire

10   context of the lead up to the statements, the statements

11   themselves, whether or not they were, for example, in furtherance

12   of the conspiracy.

13        And on that point, Your Honor, just to clarify.  And I

14   think Mr. Martin made this point.  But he's using the word "idle

15   chatter."  And I thought, and I hope I didn't misconstrue this,

16   but the Court was thinking of the idle chatter as the two weeks

17   of conversation leading up to Mr. Harris's critical comment, I

18   killed, and again I'm paraphrasing, but if Mr. Harris said, I

19   killed these two people at Bo's behest.  Our submission is that

20   that statement, even that statement is not in furtherance of the

21   conspiracy.  It is boasting about past criminal acts and, you

22   know, we reject it.

23        It seems to us that the government sort of reaches into

24   a bag of rationale as to why a statement given to a

25   non-conspirator well after the fact is in furtherance of the

1  conspiracy.  And they reached into the bag and came up with the

2  theory that, well, they were recruiting Mr. Dobropolski.

3       The problem with that, Your Honor, is other than the

4  government's submission that that's what was going on here,

5  there's no evidence to support that theory, which is why we

6  submit to the Court that these weren't in furtherance of the

7  conspiracy.  But the critical statement itself, again,

8  paraphrasing, Mr. Harris's statement, I killed these two people

9  at Bo's behest, is not a statement in furtherance of the

10  conspiracy but rather just boasting, idle chatter, as Mr. Martin

11  would say, boasting about past criminal acts, but certainly not

12  in furtherance of the conspiracy.

13       And in light of that, we feel that the admission of the

14  statement would violate Mr. Mitchell's confrontation rights.

15  It's not admissible under 801(d)(2)(e) and we would ask the Court

16  to exclude it.

17       THE COURT:  Thank you, Mr. Lawlor.  Unless you have

18  more to add, Mr. Crowe, I'll deem you to have adopted all of the

19  arguments.

20       MR. CROWE:  Your Honor, just very briefly.  The Court

21  had wondered why we had not weighed in.  And the reason that Mr.

22  Pyne and I have not weighed in as Mr. Martin's counsel is that

23  Mr. Martin is not mentioned either by his name, by street name,

24  or by description as being involved in this matter at all.

25       THE COURT:  Of course, it's still evidence against Mr.

1    Martin if the jury finds that he's a member of the conspiracy.

2            MR. CROWE:  It would still be evidence against Mr.

3    Martin, but Mr. Martin's name is not mentioned.  And indeed, the

4    fact that his name is not mentioned might be something that we

5    would argue to the jury.

6            Again, this is the McCaffity/Brown killing that they're

7    speaking about, and this is, this is not a matter which Mr., my

8    client has been alleged to be involved in.

9            The only other quick point --

10           THE COURT:  But let's talk about that for just a

11   second.  It's the McCaffity/Brown murders but that murder is said

12   to be an act, those murders are said to be acts of racketeering.

13           MR. CROWE:  Indeed they are.  But we feel, but I mean,

14   I don't want to go into my theories of the case at great length.

15   But it's our feeling that the fact that this matter is restricted

16   to two of the people and it does not involve our client is a

17   matter which reflects more favorably on him than unfavorably.

18           THE COURT:  All right.  I'm just concerned -- well, I

19   guess I'm not concerned.

20           MR. CROWE:  Your Honor, in that case I'll object to it.

21   I'll object to it, also.

22           THE COURT:  No, really.  If, if the government is able

23   to prove two acts of racketeering activity by any defendant and

24   if the jury finds the conspiracy otherwise established, aren't

25   you concerned about that?

1          MR. CROWE:  I am concerned about it but my primary

2     concern is their proof that my client was involved.

3          THE COURT:  Was a member of the conspiracy.

4          MR. CROWE:  Was a member of the conspiracy.  The only

5     other point I would make, Your Honor, is that I think perhaps the

6     leading Fourth Circuit case on statements in furtherance of is

7     the Shores case, which has been cited many times by counsel on

8     both sides.  I would point out that in that decision, Judge

9     Phillips very pointedly notes that the district judge in that

10    case had a hearing out of the presence of the jury to make a

11    determination of whether the statement was made in furtherance of

12    the conspiracy.

13          We think that's one reason that such hearings are going

14    to be necessary for this witness and for Mr. Montgomery, who's

15    coming on later.

16          THE COURT:  Thank you, Mr. Crowe.

17          MR. KURLAND:  Good morning, Your Honor.

18          THE COURT:  Good morning.

19          MR. KURLAND:  Your Honor, I'll be careful not to repeat

20    anything that some of the other defense counsel said.  But a

21    couple of things that specifically relate to Mr. Gardner's

22    position here.

23          If these statements come in simply as, as admissions,

24    if they're not found in furtherance of the conspiracy, that will

25    obviously lead to a severance motion with Mr. Gardner.

1          We are concerned about the point that the Court made.

2     Even though Mr. Gardner is not charged and it's not the

3     government's theory that he was in any way personally involved in

4     the, in the McCaffity/Brown killings, and there's no evidence of

5     that, he's not charged in those separate counts, it is, though,

6     part of the racketeering charge.  So the coconspirator aspect of

7     it certainly affects Mr. Gardner.

8          And just to amplify, to put a little bit different

9     focus on the way that the other defense counsel have argued the

10    issue.  And that is the Court -- and I think this kind of lends

11    itself to at least a hearing outside the presence of the jury --

12    the finding that the Court has to make with respect to whether

13    the statements are in furtherance of the conspiracy, under

14    Bourjaily the Court has to make a finding by the preponderance of

15    the evidence.  That isn't simply just, well, could a reasonable

16    jury find, and kind of punt it as a jury question.  That's a

17    significant finding.

18         THE COURT:  Well, but I have -- I'm sorry to cut you

19    off.

20         MR. KURLAND:  That's all right.

21         THE COURT:  But nothing's been proffered to me from the

22    defense side apart from legal argument.

23         MR. KURLAND:  Well, Your Honor --

24         THE COURT:  So I mean, in other words, the argument is,

25    Judge, this was idle chatter, they were locked up together.  All

1    you, all you have, as I understand it, you, the defense, in terms

2    of the need to make a finding by a preponderance, are the

3    undisputed facts that Mr. Dobropolski was locked up with them,

4    they had conversations.  And the defense argument is that all of

5    it was idle chatter.

6            So in terms of facts, what I have before me are those

7    undisputed facts and the government's particular spin on those

8    facts, and the proffer of what Dobropolski is going to say.

9            MR. KURLAND:  Well, Judge, I would, I think that's

10   slightly --

11           THE COURT:  What else is there?

12           MR. KURLAND:  -- incomplete.  The government is the one

13   that has to establish by a preponderance of the evidence, has to

14   convince the Court by a preponderance --

15           THE COURT:  Of course.

16           MR. KURLAND:  -- that the statements are part of the

17   conspiracy.  With respect to the thing that probably needs to be

18   dealt with outside the presence of the jury.

19           THE COURT:  What is that?

20           MR. KURLAND:  Is the fact that this is not a

21   situation -- I understand the recruiting theory.  I understand a

22   bunch of cases and I understand the theory, that if you're trying

23   to recruit someone into the conspiracy, even if they aren't a

24   member, even if they're a government agent, even if they never

25   joined the conspiracy, that the Court is in a position like that

1    to make a finding that the statements are a prong to the evidence

2    in furtherance of the conspiracy.

3            But here, with respect to what I believe Mr. Martin set

4    forth, given the fact that Dobropolski -- and I'll make sure I

5    pronounce his name correctly in front of the jury -- he is going

6    to say that, I was in a bad way here.  My goal here was to coax

7    stuff out of these guys.  Okay?

8            And so with respect to whether or not the Court's going

9    to make the finding by a preponderance that a particular

10   statement is in furtherance of the conspiracy, the Court has more

11   than simply our argument, but a substantial proffer that the

12   context of how these statements were made.

13           It isn't like somebody recruiting somebody clearly.

14   It's this bizarre give and take where the person's going to say,

15   My goal was to try to get these guys' confidence and to say

16   certain things.  And how that comes out from the witness stand,

17   it is our position, and I suspect it's the codefendants'

18   positions as well, is going to color the Court's determination as

19   to whether or not the Court is convinced by a preponderance that

20   a statement was in furtherance of the conspiracy or was, suggest,

21   I call it idle chatter, but that sort of minimizes what's going

22   on.  But not every statement of culpability is a statement in

23   furtherance of the conspiracy.

24           And I believe that we have established that there's

25   enough --

1          THE COURT:  But I don't need to, I don't need a

2    hearing.  Mr. Harding shook his head when you described just now

3    what you believe Mr. Dobropolski's testimony is.

4          MR. KURLAND:  Shake it up and down or sideways?

5          THE COURT:  Sideways.  All right?  So even accepting

6    that at face value, I don't need a hearing in order to make a

7    determination whether, even assuming Dobropolski wanted to induce

8    statements in furtherance of the conspiracy, whether by a

9    preponderance of the evidence those statements are still in

10   furtherance of the conspiracy.

11         Again, if I can be clear, I understand the dichotomy

12   that the defense wants me to adopt.  The defense wants me to

13   adopt a dichotomy that says a statement is either voluntary in

14   the constitutional sense, number one, and is, number two, not

15   idle chatter, or the defense theory seems to be they're

16   statements in furtherance of the conspiracy.  And I just don't

17   buy that.  And I don't need an evidentiary hearing to tell you

18   that.  I don't buy that.

19         If Dobropolski intended to induce incriminating

20   statements, I would be prepared to say, So what?  If Dobropolski

21   intended to generate trust in him by the declarants, I would be

22   prepared to say, So what?  The question is, given the

23   non-evidentiary record from the defense perspective, why would

24   Mitchell and/or Harris simply brag to Dobropolski or anybody else

25   about a murder they had committed?

1          MR. KURLAND:  Judge, we have heard some bizarre

2     evidence as to what these defendants purportedly say to one

3     another, to people on visits, and to other prisoners, that might

4     seem somewhat incredulous or illogical.  But if we had a

5     situation here, where, let's say there is a defendant allegedly

6     is making a statement to another prisoner who's a quadriplegic,

7     okay, instead of being some big strapping guy who apparently was

8     allegedly possibly being recruited to provide muscle.  All right?

9     There are cases in which defendants, prisoners --

10          THE COURT:  You change the facts, you change the

11     analysis.

12          MR. KURLAND:  No, I understand that, Your Honor.  But

13     even if a defendant or somebody in prison bragged or confessed

14     about a crime they allegedly committed to somebody who, say, was

15     physically infirmed and could not under any stretch of the

16     imagination be helpful, I don't think in that situation the Court

17     would have, would be, I don't think the Court would have

18     difficulty in saying that is just idle chatter, that is not a

19     statement in furtherance.

20          THE COURT:  But that's not this case.

21          MR. KURLAND:  I understand that's not this case, Your

22     Honor.  But the fact is it proves the proposition that not every

23     statement made that is inculpatory to somebody else is in

24     furtherance of the conspiracy.

25          THE COURT:  And you don't have to convince me of that.

1    You're absolutely right.

2                MR. KURLAND:  So therefore, here, and if the Court

3    feels on the proffer such as it is, then that, I guess, is going

4    to be the Court's finding of preponderance.  But again, if the

5    testimony comes out a little bit different, if we don't have a

6    hearing, it's going to lead to heightened mistrial motions.  And

7    I think that's just, you know, if the Court's, if the Court is

8    satisfied on the record --

9                THE COURT:  I haven't heard from Mr. Harding yet but I

10   think I'm satisfied.

11               MR. KURLAND:  Okay.  Hopefully, it will be a weaker

12   position after Mr. Harding speaks.

13               THE COURT:  All right.  Thank you, Mr. Kurland.

14               MR. LAWLOR:  Judge, could I get a word before Mr.

15   Harding goes?

16               THE COURT:  No.  I think I've given the defense a full

17   opportunity.  Mr. Harding.

18               MR. HARDING:  Judge, just to put things in perspective.

19   Over 99% of the statements that Dobropolski is going to report

20   about are going to come in as admissions because --

21               THE COURT:  Well, they're going to come in against

22   admission, they're going to come in as admissions against the

23   declarant.

24               MR. HARDING:  Yes.

25               THE COURT:  That's understood.  So that's why I asked

1      Mr. Martin, why isn't Mr. Kurland up here, why isn't Mr. Crowe up

2      here?  So I appreciate that.  I'm really focused on, really,

3      Gardner and Martin more than Harris and Mitchell, although I

4      appreciate Mr. Martin, Esquire, taking the lead on this issue.

5              MR. HARDING:  Okay.  Well, did the Court get the

6      pleading that I filed?

7              THE COURT:  I did.

8              MR. HARDING:  Okay.  I want to briefly address Mr.

9      Martin's statements about being surprised by all this and not

10     having notice about it until recently.

11             The statements that we're talking about --

12             THE COURT:  Could you tell us precisely, as precisely

13     as you can, what the statements are and when they were made?

14             MR. HARDING:  Yes.

15             THE COURT:  And by whom.

16             MR. HARDING:  In April of '02, Mr. Dobropolski was

17     locked up with Shelton Harris, who was his cell mate, and also

18     Mr. Mitchell, who was not his cell mate, but nevertheless talked

19     to both Mr. Harris and Mr. Dobropolski during this time period.

20             THE COURT:  This is at Central Booking?

21             MR. HARDING:  Yes.  The statements were not at all

22     extracted by Mr. Dobropolski.  Mr. Harris had already heard of

23     Dobropolski.  Mr. Dobropolski had a reputation.  He was a tough

24     guy from the streets of Park Heights.  And Mr. Harris immediately

25     took an interest in recruiting this guy.

1          So in the course of conversation --

2          THE COURT:  And by the way, how do you know, what is

3   the source of your information that Mr. Harris took an immediate

4   interest in recruiting Dobropolski?

5          MR. HARDING:  It's Mr. Dobropolski.

6          THE COURT:  Okay.  And I assume he's not going to use

7   that particular language.

8          MR. HARDING:  No.

9          THE COURT:  As best as you can tell me, what is

10  Dobropolski going to say?  How does he say, Yeah, Harris tried to

11  recruit me?

12         MR. HARDING:  He's going to say that they talked first

13  about some of their mutual friends from Park Heights, some guys

14  they knew in common and stuff they'd done in the past.  They got

15  to know one another.

16         Mr. Harris had heard about Mr. Dobropolski from other

17  prisoners before they became cell mates.  And so --

18         THE COURT:  You mean, again, I don't want to put words

19  in anybody's mouth, but I'm just trying to understand the factual

20  basis because, as counsel say, I have to make a finding by a

21  preponderance.

22         Are you saying that Dobropolski shows up at Central

23  Booking when Harris is already there, and before Dobropolski is

24  assigned as Mr. Harris's cell mate other detainees are talking

25  about the fact, hey, guess who's here?

1              MR. HARDING:  Yes.

2              THE COURT:  Dobropolski?  Is that what you mean when

3    you say Harris found out about --

4              MR. HARDING:  Yes.

5              THE COURT:  -- Dobropolski before Dobropolski became

6    Harris's cell mate?

7              MR. HARDING:  Yes.

8              THE COURT:  Okay.  So Dobropolski is sort of a guy with

9    a reputation?

10             MR. HARDING:  Yes.

11             THE COURT:  And some street cred?

12             MR. HARDING:  Yes.

13             THE COURT:  And in Park Heights?

14             MR. HARDING:  Yes.  And they knew a number of people in

15   common, whom Mr. Dobropolski will name.

16             THE COURT:  All right.  Now, let me, you know, I

17   alluded to this the other day.  And the record needs to reflect.

18   I think it's even a matter of judicial notice.  But basically, in

19   the context of Baltimore City, when people talk about Park

20   Heights, certainly in the last 15 to 20 years, people are talking

21   about an African-American community.  Fine people who bought

22   their homes and take care of their homes and are beleaguered by

23   the criminal activity, including the drug dealing, that goes on

24   in Park Heights.  I mean, really, everybody knows that.

25             It is a place where many federal dollars have been

1    devoted to try to increase the housing stock, to improve the

2    housing stock, improve the streets, improve the safety of the

3    community.

4            And so what hasn't been said yet on the record and what

5    we need to, I think, make a part of this is I'm told that

6    Dobropolski is Caucasian.  Is that right?

7            MR. HARDING:  Yes, he is.

8            THE COURT:  So is that part of his reputation?  I mean,

9    if you know.

10           MR. HARDING:  I'm not sure, Your Honor.  I never

11   discussed that particular aspect of it with him.

12           THE COURT:  All right.  Again, I'm talking from serving

13   21 years as a judge in Baltimore City, state and federal, having

14   heard more drug, assault, murder, traffic cases coming out of

15   what is commonly understood to be Park Heights during all that

16   time.  And most people, most judges would be surprised to know

17   that there were Caucasian drug dealers in Park Heights.  Okay.

18           MR. HARDING:  Yes, Your Honor.

19           THE COURT:  But to your knowledge, that's not a part of

20   Dobropolski's milieu or his environment, his reputation?

21           MR. HARDING:  Well, I see why the Court is speculating

22   about that.  But I'm afraid I just don't have any information on

23   that.

24           THE COURT:  That's fine.  That's fine.  I'm trying to

25   understand why, when Dobropolski shows up at Central Booking, he

1    would be a topic of conversation among the detained population

2    there.  Do you know anything else about that?  I mean, there are,

3    what?  I don't know.  275 people a day go into Central Booking

4    during the 2002/2004 period.  Why would people be particularly

5    interested in him?  Or knowledgeable about him?

6              MR. HARDING:  I don't know, Your Honor.

7              THE COURT:  Okay.  That's fine.  Go ahead.

8              MR. HARDING:  Well, Mr. Harris, the way this will come

9    out and the way it's always come out to me is that Mr. Harris

10   volunteered the whole story of this double homicide in Rahman's

11   car.  It wasn't anything that Mr. Dobropolski extracted.  Even,

12   the Court has already made it clear that it doesn't really matter

13   whether Dobropolski was trying to extract it or not.  But, in

14   fact, he was not.

15             In fact, it was not until May of 2003 that Dobropolski

16   bothered to write the state court judge about all this.  It was

17   eight or nine months later, after these August of '02 statements.

18             THE COURT:  So the statements are in August, '02?

19             MR. HARDING:  Yes.

20             THE COURT:  So when did they become cell mates, Mr.

21   Harris and Mr. Dobropolski?

22             MR. HARDING:  In August of '02.  Remember, Mr. Harris

23   was locked up from June of '02 for that drug raid on his mother's

24   house and also on an assault charge.  I'm not sure exactly when

25   Dobropolski was locked up.

1          THE COURT:  Okay.  So the April date is not correct?

2          MR. HARDING:  April?

3          MR. MARTIN:  He was wrong, Your Honor.  He got it

4     wrong.  It's late August, early September.

5          THE COURT:  Somebody earlier said that --

6          MR. MARTIN:  You did when you were talking to the

7     judge.

8          THE COURT:  You said April, '02?

9          MR. HARDING:  I meant to say August.  The statements

10    are in August of '02.

11         THE COURT:  All right.  The statements are in August,

12    '02.  Okay.  Mr. Harris having been arrested in June of '02.

13         MR. HARDING:  That's right.

14         THE COURT:  And Mr. Dobropolski having been arrested

15    and having become his cell mate at some point after that.

16         MR. HARDING:  Yes.

17         THE COURT:  Because Mr. Harris was already there.

18         MR. HARDING:  Well, actually, I'm not sure when

19    Dobropolski arrived there.  But they didn't have contact really

20    until they became cell mates.  They may have both been in CBIF

21    for a while.

22         THE COURT:  Okay.  And Mr. Mitchell had been there

23    since late April?

24         MR. HARDING:  Around April 1st.

25         THE COURT:  Early April.  All right.  All right.  So

1    your proffer is that Mr. Dobropolski, whatever he said in the

2    grand jury or whatever may appear in the DEA, he's going to deny

3    having elicited or --

4                 MR. HARDING:  Yes.

5                 THE COURT:  -- induced.

6                 MR. HARDING:  That's right.  He did report it to a

7    judge in May of '03, but that's many months later.  And so that

8    tends to suggest that when he was having these discussions with

9    Shelton Harris and Mitchell, he wasn't just trying to extract

10   information from them that he could exploit to his advantage.  He

11   was, in fact, involved in serious negotiations with them about

12   participating in their criminal activities.  That's my

13   understanding.

14                THE COURT:  During the August and post August period,

15   you mean?

16                MR. HARDING:  Yes.

17                THE COURT:  All right.

18                MR. HARDING:  Now, just to go back to the surprise

19   issue, if I may, Your Honor.  Mr. Martin acknowledges that he got

20   the grand jury testimony back when the Court, several years ago,

21   maybe two years or more ago, the Court ordered Mr. Coburn to turn

22   over all the Jencks material.

23                THE COURT:  Right.

24                MR. HARDING:  The grand jury is, as far as I know, the

25   only statement that I have, the only presentation of these

1    statements.  There is no DEA-6 that I'm aware of on this issue.

2    So, in fact, Mr. Martin and other counsel have had all this

3    information not simply for months, but for years.  And so to say

4    now that they're being surprised by this strikes me as very

5    farfetched.

6          The statements that were turned over late, because I

7    didn't know about them, were these statements in '03 that

8    Dobropolski made when he was out on the street with Harris.  They

9    had a series of conversations that wound up being in some cases

10   tape recorded, although poorly.

11         None of that stuff involves coconspirator statements

12   that I have to try to get in. They are arguably coconspirators

13   statements, but they're also admissions.  The stuff will all come

14   in as admissions.

15         THE COURT:  Against Mr. Harris only?

16         MR. HARDING:  Yeah.  He didn't have any conversations

17   with Mr. Mitchell in that period.

18         THE COURT:  All right.  What's the character of those

19   statements?

20         MR. HARDING:  Well, they're talking about new crimes

21   that they are going to be involved in.  And there's also one

22   conversation about the murder in Rahman's car because Mr.

23   Dobropolski did try to extract information from Harris about that

24   murder.

25         THE COURT:  And what's that statement, if you recall?

1    The gist of it.

2              MR. HARDING:  Yes.  Mr. Dobropolski will testify that

3    in December of '03 he asked Shelton Harris if the guy he killed

4    in Rahman's car was named Woody and Rahman responds, he shakes

5    his head.

6              THE COURT:  Harris responds.

7              MR. HARDING:  Yes.  Sorry.  Harris responds yes.  Mr.

8    Dobropolski then, in an attempt to elicit more information, he is

9    trying to elicit information at this point.

10             THE COURT:  Right.

11             MR. HARDING:  Says that he was locked up with some guy

12   who was trying to take credit for that homicide.

13             THE COURT:  He says this to Harris.

14             MR. HARDING:  Yes.  And Harris responds, He's trying to

15   take credit for my, my murder.

16             THE COURT:  I see.  All right.

17             MR. HARDING:  He's sort of indignant about the whole

18   thing.

19             THE COURT:  All right.

20             MR. HARDING:  And then there's a little bit more

21   discussion, and that's basically the end of it.  In fact, some of

22   that discussion comes across on the tape.  And so I'm actually

23   going to play, when Mr. Dobropolski testifies, just a few minutes

24   of the tape of that, because you can hear Mr. Harris say, He's

25   trying to take credit for my shit, words to that effect.

1          THE COURT:  All right.  Okay.  Is this account included

2     in those narratives that Dobropolski prepared after the --

3          MR. HARDING:  Yes.

4          THE COURT:  -- encounters?

5          MR. HARDING:  Yes.

6          THE COURT:  And you turned those over some weeks ago?

7          MR. HARDING:  Well, the reports were turned over a

8     couple of week ago before trial, I believe.  Some of them were

9     turned over during trial.  Some of them were turned over before

10    trial.  And the handwritten statement, I didn't know about until

11    last week, and we turned it over then.

12         THE COURT:  All right.

13         MR. HARDING:  Okay.  I might add that Mr. Martin made

14    some statements to suggest that Mr. Dobropolski isn't really sure

15    about all this, that there's some aura of uncertainty about these

16    statements.  In fact, quite the opposite is true.  He's very

17    definite and clear and he provides specific details that add

18    credibility to this whole account because nobody could have known

19    about this except Shelton Harris.

20         Dobropolski knows, for example, that when Shelton

21    Harris committed the crime, he then got out of the car and the

22    car proceeded to roll down the hill, because Harris tells him

23    this.  I submit, Your Honor, that the only other person in

24    Baltimore who could have known that's the way the murder happened

25    was the guy, the technician who came in here and testified about

1    the GPS results on McCaffity's car.  The car stopped for a few

2    minutes and then rolled down the hill and crashed into the tree.

3              THE COURT:  All right.

4              MR. HARDING:  This is something that Dobropolski knew

5    about.  He knew where the victims were shot.  He knew there was a

6    man and a woman.  He knew the man was shot first.  He knew the

7    woman was shot only because she happened to be there.  He knew

8    that the whole thing arose over a dispute about some rap music

9    incident that Mr. Mitchell got involved in.

10             THE COURT:  All right.  Who does he say was present?

11             MR. HARDING:  At the murder?

12             THE COURT:  Yes.

13             MR. HARDING:  He only talks about Mr. Harris's role

14   because that's what Harris talks about.

15             THE COURT:  All right.

16             MR. HARDING:  But he, Mr. Harris tells Dobropolski that

17   Mitchell is the guy who had him do this.

18             THE COURT:  And Mitchell --

19             MR. HARDING:  Mitchell acknowledges that later on in

20   this fashion that they use of saying, He put in work for me.

21             THE COURT:  And when did that conversation take place?

22             MR. HARDING:  It was also in this August, 2002 time

23   period, when they were all locked up together.

24             THE COURT:  All right.

25             MR. HARDING:  Mr. Dobropolski had some separate

1    conversations with Mitchell.

2             THE COURT:  All right.

3             MR. HARDING:  If I may, Your Honor, in my pleading that

4    Your Honor has read, I pointed out the very narrow reading that

5    the Fourth Circuit has given to this idle chatter issue.  In

6    fact, the Howard case and the Lewis case show that the Court does

7    not want the idle chatter kind of argument to prevent evidence

8    from coming in.  They have a very narrow interpretation of that.

9             This case here, the case of Mr. Dobropolski, is clearly

10   one where Mr. Harris and Mr. Mitchell, too, are both interested

11   in impressing Dobropolski because they want him to join up with

12   their crew.  And that is clearly a coconspirator situation.

13            It wouldn't even matter under Shores if Dobropolski

14   never became a member of the conspiracy.  Even if he said no to

15   them, under Shores, statements made by a coconspirator to a third

16   party who is not then a member of the conspiracy are considered

17   to be in furtherance of the conspiracy if they are designed to

18   induce that party to either join the conspiracy or to act in a

19   way that will assist in accomplishing its objectives.

20            So in fact, Mr. Dobropolski did agree to become a

21   member of the conspiracy.  That was the upshot of their

22   discussions while they were in jail.

23            THE COURT:  And what is your basis for saying that?

24            MR. HARDING:  Several things, Your Honor.  First of

25   all --

46

1          THE COURT:  I really only need one.

2          MR. HARDING:  Well, Dobropolski is going to testify

3     that he agreed to join their crew.

4          THE COURT:  All right.  Okay.

5          MR. HARDING:  Another is that Mr. Harris wrote rap

6     songs about Mr. Dobropolski.  Wrote some lines in rap songs about

7     him.

8          THE COURT:  He write lines about Dobropolski?

9          MR. HARDING:  Yes.

10          THE COURT:  What lines?  I mean, what did he have to

11     say about Dobropolski?  You don't have to quote it.

12          MR. HARDING:  For cracking backs or something like

13     that.

14          THE COURT:  Cracking backs?

15          MR. HARDING:  Yes.

16          THE COURT:  What does that mean?

17          MR. HARDING:  He was praising his ability to inflict

18     physical violence on his fellow man.

19          THE COURT:  And how do you know it's about Dobropolski?

20          MR. HARDING:  He uses the name "Chris" and Dobropolski

21     says --

22          THE COURT:  Is that Dobropolski's first name?

23          MR. HARDING:  Yes.  And Dobropolski remembers him

24     writing the rap and singing it when they were locked up together.

25     The rap was recovered from Dobropolski's house in 2004, along

1    with all the other rap lyrics that he had written.

2              THE COURT:  You mean Harris's house.

3              MR. HARDING:  Harris's house, yes.

4              THE COURT:  Are you suggesting that the lyrics were

5    actually written in Central Booking?

6              MR. HARDING:  Yes.

7              THE COURT:  Okay.  All right.

8              MR. HARDING:  Because Dobropolski remembers him writing

9    this stuff.

10             THE COURT:  Okay.  And singing it, you say?

11             MR. HARDING:  Yes.

12             THE COURT:  In Central Booking?

13             MR. HARDING:  Yes.

14             THE COURT:  Sort of rehearsing?

15             MR. HARDING:  Yes.

16             THE COURT:  All right.

17             MR. HARDING:  And there are little slips of paper with

18   Dobropolski's name and phone numbers all over it.

19             THE COURT:  In Harris's stuff?

20             MR. HARDING:  In Harris's stuff, yes.

21             THE COURT:  All right.

22             MR. HARDING:  Also, of course, they meet up in 2003 and

23   engage in a number of meetings and phone conversations where

24   they're planning new criminal activity.  It's clearly no --

25             THE COURT:  Which is evidence of Dobropolski's

48

1    agreement to be involved?

2              MR. HARDING:  Yes.

3              THE COURT:  Although by then he's actually working for

4    the government?

5              MR. HARDING:  Yes.

6              THE COURT:  All right.

7              MR. HARDING:  Harris, remember, was not in 2002 locked

8    up for murder.  He was just doing what he thought was a short bit

9    of time for this drug charge he picked up.

10             THE COURT:  The drugs from Amity Street.

11             MR. HARDING:  Yes.  In fact, he got out in 2003.  Okay.

12   I think those are the only points that I need to emphasize.

13   Thank you, Your Honor.

14             THE COURT:  All right.  I've looked at yours -- I'm not

15   going to hear any more argument on this.

16             MR. KURLAND:  Can I just preserve our severance motion

17   on this?

18             THE COURT:  Of course.  Everybody preserves a severance

19   motion.

20             MR. LAWLOR:  Your Honor, can I say something?

21             THE COURT:  No, Mr. Lawlor.  I'm ready to rule.

22             MR. LAWLOR:  Judge --

23             THE COURT:  Mr. Lawlor, I said no.  I don't see a need

24   for an evidentiary hearing.  The Court is entitled, certainly in

25   the absence of any factual proffer calling for express

1    fact-finding from the defense, the Court is entitled to accept

2    the government's proffer, obviously assures itself, makes clear,

3    and as the rules make clear, the strict rules of evidence don't

4    apply to the Court's preliminary determination.

5         And the Court has no hesitation in finding

6    preliminarily, by a preponderance, that these various statements

7    by Mr. Harris primarily, and by Mr. Mitchell, to Mr. Dobropolski

8    in the late summer, early fall, whatever it was, of 2002 were

9    prima facie and by a preponderance of the evidence made in

10   furtherance of the conspiracy.

11        The government has refuted, through its proffer,

12   suggestions from the defense that statements were purposely

13   induced.  The Court finds no indicia of idle chatter based on the

14   proffer of evidence before the Court.

15        The Court finds that, indeed, based on the government's

16   proffer, that Dobropolski was a recruit, was intended to be,

17   talked to as a potential recruit, and according to the

18   government's representation, actually agreed to join in certain

19   activities with one or more of the defendants.  And again, the

20   Court is entitled to take Mr. Dobropolski's testimony, and thus

21   his proffered testimony, into account in ruling on this issue.

22        With respect to the purported Bruton issue regarding

23   Mr. Mitchell and Mr. Harris's assertion that it was Mr. Mitchell

24   who put him up to the McCaffity/Brown murders, the proffer is

25   that Mr. Mitchell ratified that statement.  And so in that sense

1    Mr. Harris's assertion that Mr. Mitchell put him up to it is

2    actually cumulative and is not unduly prejudicial.

3          In fact, I don't believe there is a Bruton problem

4    where Defendant A effectively confesses and Defendant B's

5    confession includes incriminating statements about Defendant A,

6    at least when all we're talking about is a single murder or, as

7    here, a double murder.

8          So for all these reasons, the Court will not conduct an

9    evidentiary hearing and finds preliminarily that Mr.

10   Dobropolski's proposed testimony is admissible against all the

11   defendants.  The defendants' exceptions and objections are noted

12   for the record.

13         Of course, the Court reserves the prerogative to modify

14   this ruling as such needs may arise.  And of course the Court

15   will instruct the jury carefully with respect to admission of

16   coconspirators statements at the appropriate time.

17         Are there any other issues before we bring the jury

18   out?

19         MR. HARDING:  Not from the government.

20         MR. MARTIN:  I'm not taking exception to your ruling.

21         THE COURT:  Well, you have the exception.

22         MR. MARTIN:  Right.

23         THE COURT:  Your record is made and preserved.

24         MR. MARTIN:  Just something you said that I want to

25   point out and make sure the record shows it, because I'm not sure

1    whether it's been filed.  Our response to the motion in limine

2    contains at least four very specific statements Dobropolski made

3    which read as idle chatter.  I don't know whether the Court is

4    aware of that.  But you've ruled.  But it's there and I wanted to

5    make sure the record shows that.  Those are the reasons why we

6    think the court should grant our motion.

7                THE COURT:  I just don't believe you can make a

8    determination from a statement on a piece of paper whether it's

9    idle chatter.

10               MR. MARTIN:  But you're making determination that it

11   isn't from a statement on a paper.

12               THE COURT:  The statements that I've heard.  I asked

13   you this morning, what statements are we talking about?

14               MR. MARTIN:  They were in my motion, Your Honor.  Four

15   or five they have.

16               THE COURT:  I'm asking you now, what statements?  If I

17   haven't heard all the statements --

18               MR. MARTIN:  I think he sort of wanted me to do

19   something with him.  After several weeks he opened up to me.

20               THE COURT:  Well, that's not a statement.  No.  I think

21   he sort of wanted me to do something is not a statement by

22   anybody.  Look, we're past this issue.  I'm finished.  Is there

23   anything else, Mr. Kurland?

24               MR. KURLAND:  Your Honor, I just wanted a

25   clarification.  The last thing that Mr. Harding said concerning

1   something on the tape about somebody taking credit for the --

2           THE COURT:  Right.

3           MR. KURLAND:  It's my --

4           THE COURT:  That's admissible only against Mr. Harris.

5           MR. KURLAND:  Okay.  It's on that ground we ask for

6   severance and at a minimum that the Court give a specific

7   limiting instruction.

8           THE COURT:  Of course I will.  Of course I will.  All

9   right.  Let's bring the jury out, please.  Can we have Mr.

10  Dobropolski brought down?

11          MR. LAWLOR:  Judge, real quick.  Your Honor, just on

12  this issue procedurally.  Mr. Martin is going to take the lead

13  and then we were going to go second.

14          THE COURT:  Yeah.  That was agreed last week.  Mr.

15  Dobropolski, when the jury is seated you'll be asked to stand and

16  the clerk will place you under oath.  She'll also offer you

17  water.

18          (Jury enters the courtroom.)

19          THE COURT:  Please be seated, ladies and gentlemen.  A

20  belated good morning to each of you.  We trust you had a pleasant

21  weekend.  I again apologize and regret the delay that was

22  occasioned this morning.  We're ready to continue.

23          You will recall, of course, that when we broke on

24  Wednesday last week, there was a witness on the stand whose

25  testimony had not been completed.  But as I told you earlier

1    during the trial, there will be occasions when we will interrupt

2    a particular witness' testimony so as to better manage the trial

3    and the appearance of certain witnesses.  So we're going to do

4    that this morning.

5             The witness who was on the stand last Wednesday, of

6    course, will be back, I think probably later this week, to

7    complete his testimony.  I think you will be able to follow

8    along.

9             The government may call its next witness.

10            MR. HARDING:  Yes, Your Honor.  The United States calls

11   Christopher Dobropolski.  Mr. Dobropolski, would you stand and

12   face the clerk, please, and be sworn?

13        CHRISTOPHER DOBROPOLSKI, GOVERNMENT'S WITNESS, SWORN.

14            THE CLERK:  Speak directly toward the mike and state

15   your name and spell it for the record.

16            THE WITNESS:  Christopher Dobropolski.

17            THE COURT:  Spell that, please.

18            THE WITNESS:  D-O-B-R-O-P-O-L-S-K-I.

19            DIRECT EXAMINATION

20   BY MR. HARDING:

21   Q    Good morning, Mr. Dobropolski.

22   A    Good morning.

23   Q    Can you tell us how old you are, sir?

24   A    37.

25   Q    Okay.  Where did you grow up?

1   A    Northwest Baltimore.

2   Q    How far did you get in school?

3   A    GED.

4   Q    Okay.  Have you ever been convicted of any crimes, Mr.

5   Dobropolski?

6   A    Yes, I have.

7   Q    Can you tell us what crimes you've been convicted of?

8   A    Auto thefts, assaults, batteries, domestic violence.

9   Q    Okay.  Several, several different crimes.  Did you say

10  assaults in the plural or singular?

11  A    Plural.

12  Q    How many assault convictions do you have, if you remember?

13  A    I don't know.  A handful.

14  Q    Are these including domestic assault type crimes?

15  A    Yeah.

16  Q    Okay.  Are they all domestic assault type?

17  A    No.

18  Q    No?  Okay.  What about resisting arrest?  Were you ever

19  convicted of resisting arrest?

20  A    Sure.

21  Q    Can you tell us what time period you acquired these

22  convictions?  Beginning when and ending when?  Does it go back to

23  the 1990's?

24  A    It goes back to the '80s.

25  Q    To the '80s.  How old are you now again, did you say?

Case 1:04-cr-00029-RDB    Document 680    Filed 06/08/09    Page 55 of 273

1    A    37.

2    Q    Okay.  Can I focus your attention on the period 2001, 2002?

3    Can you tell us how you were earning a living back at that time?

4    A    2001, 2002?  I was in a rehabilitation center in 2001.

5    2002, I was released.  Selling drugs.

6    Q    Okay.

7    A    Construction.

8    Q    And shuffling?

9    A    Construction.  I was doing construction work, too.

10   Q    Where were you selling drugs?

11   A    South Baltimore.

12   Q    And you said you were in a rehab program, is that right?

13   A    Yeah.  Right before that, yeah.

14   Q    What, is that a drug rehab program you're talking about?

15   A    Second Genesis.

16   Q    Second Genesis?

17   A    That's right.

18   Q    So you in the past have been addicted to drugs?

19   A    Sure.

20   Q    Okay.  Have you used drugs recently?

21   A    No.

22   Q    In fact, you've been locked up for a while, is that correct?

23   A    17 months.

24   Q    Okay.  What are you locked up for right now?

25   A    The remainder of an eight year sentence, violation of

1    parole.

2    Q    I see.

3    A    Domestic violence.

4    Q    Okay.  You got paroled in a domestic violence case?

5    A    Um-hum.

6    Q    And you violated that and you got sent back to do the rest

7    of your sentence?

8    A    Yeah.

9    Q    Okay.  How did you violate it?

10   A    Picked up an auto theft charge.  Was arrested for an auto

11   theft.  Pled guilty to an auto theft charge.

12   Q    So that's your auto theft conviction, then, is that correct?

13   Because you said before you got convicted of an auto theft, I

14   believe.

15   A    Yeah.  But I had auto thefts back in the early, I mean the

16   late '80s.

17   Q    How many auto theft convictions do you have?

18   A    Probably three, four.

19   Q    Okay.  Let me call your attention to August of 2002.  Did

20   you get locked up at that time?

21   A    Yes, I did.

22   Q    And what were you locked up for then?

23   A    Assault, and also violation of court order.

24   Q    Okay.  How long did you remain locked up for then?

25   A    Probably 14, 15 months.

1   Q    Okay.  Were you housed at Central Booking here in Baltimore

2   at the beginning of that time period, beginning August of 2002?

3   A    Yes, I was.

4   Q    Okay.  Who was your cell mate when you were there?

5   A    Shelton Harris.

6   Q    How long was he your cell mate for?

7   A    Probably about two weeks.

8   Q    Do you see him here in the courtroom today?

9   A    Yep.

10  Q    Can you point him out to us, please?

11  A    (Indicating.)

12  Q    What kind of clothing is he wearing?

13  A    Mr. Harris is wearing, it looks similar, Mr. Harris is

14  wearing a black shirt, I think.  It's the bald head.  Oh, the

15  striped shirt.  I'm saying they look similar because they both

16  have bald heads.  I haven't seen him in like five or six years.

17  Q    Okay.  What kind of shirt do you think Mr. Harris is

18  wearing?

19  A    The one in the white striped shirt.

20  Q    Okay.  May the record reflect that the witness has

21  identified Shelton Harris, Your Honor?

22           THE COURT:  So noted.

23  Q    When you met him, did he already know who, know about you?

24  A    Sure.  There were people on the tier talking about me.

25  Q    What was your reputation?

1        MR. MARTIN:  Objection.

2        THE COURT:  Overruled.  You may answer.

3   Q    You may answer.

4   A    Oh.  For being an enforcer.

5   Q    Being an enforcer.  What does that mean?

6   A    Collecting money for other drug dealers.

7   Q    Okay.  So did Mr. Harris speak to you and talk to you about

8   your reputation?

9        MR. MARTIN:  Objection, Your Honor, leading.

10       THE COURT:  Overruled.  You may answer.

11  A    Did he speak with me about that?

12  Q    Yes.

13  A    Sure.

14  Q    Can you tell us what kind of conversations you had with Mr.

15  Harris when he became your cell mate?

16  A    Just talking about some of the work that I did in the past

17  as far as collecting money, muscling people.  Doing things of

18  that nature, things he was interested in.

19  Q    Did, did you talk about anybody that you knew in common?

20  A    Sure.  Julius Collins, Cookie Man Lexus, Lex Stove, Stover

21  Stockman.

22  Q    Okay.  You mentioned Julius Collins.  Who is that?

23  A    Jules.  I kind of grew up with Jules.

24  Q    Jules Collins?

25  A    Yeah.  Julius is his name.

DIRECT EXAMINATION OF DOBROPOLSKI                    59

1    Q    Is he a drug trafficker?

2    A    Yeah.  He's got a reputation of being a serious individual.

3    Q    What does "serious" mean exactly?

4    A    He can get you touched.  Jules, he can handle his business.

5    He can fight.  If he wants to shoot you, he'll shoot you, do

6    whatever.  Jules is a serious individual.

7    Q    What about Stover Stockton?  You mentioned him.

8    A    Yeah.  They're just names I was familiar with from being

9    around the area.

10   Q    Being around what area are you talking about?

11   A    Park Heights.

12   Q    Okay.  And you mentioned someone named Lex?

13   A    Yeah.

14   Q    Would you say all these guys are serious individuals?

15   A    Yeah.

16   Q    Did you mention a guy named Cookie Man?

17   A    Yep.

18   Q    Is he another serious individual?

19   A    Yes, he is.

20   Q    And were these all guys that you and Mr. Harris knew in

21   common?

22   A    Sure.

23   Q    At that time, did Mr. Harris expect to be locked up for a

24   long time or not?

25   A    I don't know but he had a pending case.  But he wasn't sure.

DIRECT EXAMINATION OF DOBROPOLSKI                          60

1    Q    He wasn't sure?

2    A    Yeah.  He didn't think it would be that long.

3    Q    Sorry.  Could you repeat that?

4    A    He didn't think it would be too long.

5              THE COURT:  Would you want some water, Mr. Dobropolski?

6              THE WITNESS:  No, I'm fine.

7    BY MR. HARDING:

8    Q    Do you remember what he was locked up for at that time?

9    A    I think attempted murder, first degree assault, deadly

10   weapon.

11   Q    Okay.

12   A    And I think he had a pending drug charge.

13   Q    Okay.  Let me ask you about the assault.  Do you remember

14   anything unusual about that assault charge that -- did he tell

15   you anything about it?

16   A    Yeah.  He said he stabbed somebody.  In the process he lost

17   his finger, the knife closed on his finger.

18   Q    Okay.  So he cut his own finger off?

19   A    Um-hum.  Yes.

20   Q    What about the drug charge?  What did he tell you about the

21   drug charge?

22   A    His mother's house got raided.

23   Q    Okay.  Did he, did he mention anything more about his

24   mother?

25   A    She wasn't talking to him.

1  Q    Did anything happen to her, did he tell you?  Did she get

2  arrested?

3  A    I think she might have.

4  Q    Okay.  Do you know, was she still living at that house that

5  got raided?

6  A    I think she had to move.  I'm not sure.

7  Q    Okay.  Did Mr. Harris recruit you to do anything?

8  A    Did he recruit me?

9  Q    Yeah.

10 A    No, he didn't recruit me.  He wanted to hook up when I got

11 out.

12 Q    Okay.  He wanted to hook up with you when you got out?

13 A    Yeah.

14 Q    To do what?

15 A    Oh, rob drug dealers, sell drugs.

16 Q    Rob drug dealers and sell drugs?

17 A    Yep.

18 Q    What drug?

19 A    Crack.  Whatever kind of drugs.  Ecstasy.

20 Q    Was Mr. Harris already dealing drugs at that time, before he

21 got locked up?

22 A    I believe so, yes.

23 Q    Whereabouts?

24 A    In Park Heights, the Woodland area, Woodland Avenue area.

25 Q    Woodland Avenue?

DIRECT EXAMINATION OF DOBROPOLSKI                    62

1    A    Um-hum.

2    Q    Is that what he told you?

3    A    Yep.

4    Q    Okay.  So when you, the idea was that when you got out, you

5    and he would get together and rob drug dealers?

6                MR. KURLAND:  Objection, leading.

7                THE COURT:  Sustained.  Rephrase the question.

8    BY MR. HARDING:

9    Q    I just was recapitulating what you said.  I'll move on to

10   something else.  Did you agree to hook up with him when you got

11   out?

12   A    Yes.

13   Q    Did you engage in any discussions about music?

14   A    Yeah.

15   Q    What?

16   A    His music.  Sheistyville I think was the record label, or

17   was name of that crew, anyway.

18   Q    Sheistyville?

19   A    Um-hum.

20   Q    Okay.  Did he tell you anything more about his record label

21   or his crew, as you put it?

22   A    Basically just gangsta rap, had his producer named Bo, had

23   his dude named LB, a couple other guys named Twin.  Their kind of

24   rap.

25   Q    And it did rap music, is that right?

1    A    Yeah.  Hip hop.

2    Q    You said he had had a producer named Bo?

3    A    Yeah.

4    Q    Okay.  And did Mr. Dobropolski sing in this rap group?

5         MR. MARTIN:  Objection.

6         THE COURT:  Sustained.

7    Q    What was Mr. -- I'm sorry.  What was Mr. Harris's role in

8    the group?

9    A    He was a performer.

10   Q    Okay.  Did he also write rap music?

11   A    Yes, he did.

12   Q    Do you recall, did he mention you in one of his rap songs?

13   A    Yes.

14   Q    Okay.  Your Honor, I have here an exhibit, which is marked

15   Government Exhibit SE-13.  SE-13.

16        MR. MARTIN:  Objection, Your Honor.  There's no

17   foundation for this.

18        THE COURT:  He's about to lay a foundation, I think.

19        MR. MARTIN:  I don't think he can with this witness,

20   Your Honor.

21        THE COURT:  Well, go ahead, Mr. Harding.

22   BY MR. HARDING:

23   Q    You said that you were aware that he wrote, he mentioned you

24   in some rap lyrics, is that correct?

25   A    Yes, he did.

Case 1:04-cr-00029-RDB   Document 680   Filed 06/08/09   Page 64 of 273

1    Q    Okay.  Sorry we have a brief technical issue here, Your

2    Honor.

3         Did you ever see him writing rap lyrics, Mr.

4    Dobropolski?

5    A    Yes.

6    Q    Okay.  I'm holding now under the screen what's been marked

7    as Government Exhibit SE-13?

8         THE COURT:  I think you're going to need to take it out

9    of the envelope, Mr. Harding.

10   Q    I'm not going to read this whole thing, but I'll just read

11   the last stanza down here.  Know the downs back on Rock yeah we,

12   back to doing black on black crime, back in the streets busting

13   black on black nines with crack in those, these streets to the

14   friends, don't worry --

15        THE COURT:  Just one moment.  Apparently, the jurors'

16   monitors aren't --

17        MR. HANLON:  We've got one working, Your Honor, but the

18   other two are not.

19        THE COURT:  You think they maybe just need to be warmed

20   up?  Looking for an unplugged cable?

21        MR. HANLON:  Try moving this monitor over to the jury.

22        THE COURT:  No.  Let's get it fixed.

23        MR. HARDING:  With the Court's permission I could

24   proceed and we could come back to this later.

25        THE COURT:  That's a good idea.  If you can proceed

DIRECT EXAMINATION OF DOBROPOLSKI                65

1    without the exhibit.

2    BY MR. HARDING:

3    Q    Oh, without the exhibit?  Okay.  Let me show you Government

4    Exhibit SE-20, Mr. Dobropolski.

5            THE COURT:  Well, I was suggesting that if you had

6    additional questions that didn't require an exhibit while we're

7    waiting for IT to come.  I'm sure it's just some unplugged cable

8    or something that can be fixed reasonably quickly.  At least

9    that's my hope.

10   Q    Did Shelton Harris tell you who he worked with on the

11   outside in robbing drug dealers and dealing drugs?

12           MR. MARTIN:  Objection, Your Honor.

13           THE COURT:  Overruled.  You may answer.

14   A    Bo, among other people.  But essentially Bo.

15   Q    Okay.  Who is Bo?

16   A    His producer.

17   Q    His producer.  Did you meet Bo?

18   A    Sure.

19   Q    How did you meet him?

20   A    Through Shelton the first time.  Second time I met him by

21   myself.

22   Q    Okay.  Was he at CBIF, also, Central Booking, also?

23   A    Yes, he was.

24   Q    Okay.  And so Shelton Harris introduced you to Bo, is that

25   correct?

1    A    Yes.

2    Q    Did Mr., did this guy, Bo, also know of you before you met

3    him?

4    A    I think through Shelton talking about me before to him.

5         MR. MARTIN:  Objection, move to strike.

6         THE COURT:  Overruled.  Motion denied.

7    Q    Do you see Bo here in the courtroom right now, today?

8    A    Sure.  Yeah.

9    Q    Tell us what kind of clothing he's wearing.

10   A    Gray shirt, white T-shirt underneath.

11   Q    Okay.  Can the record reflect that the witness has

12   identified Mr. Mitchell, Your Honor?

13        THE COURT:  So noted.

14   Q    Did you talk to him as well as to Shelton Harris about your

15   plans for when you got out of jail?

16        MR. MARTIN:  Objection.

17        THE COURT:  Overruled.  You may answer.

18   A    I spoke more to Shelton about that.  But I mentioned it.  It

19   was mentioned.

20   Q    Okay.

21   A    Brief conversations.  Wasn't really --

22   Q    In the course of your conversations, did Shelton Harris tell

23   you about a job that he had done?

24   A    Yes.

25        MR. MARTIN:  Objection.

Case 1:04-cr-00029-RDB   Document 680   Filed 06/08/09   Page 67 of 273

1          THE COURT:  Overruled.

2    Q    Sorry.  You should answer again, I guess.

3    A    Yes.

4    Q    Okay.  What did he tell you?

5          MR. LAWLOR:  Objection, Your Honor.

6          THE COURT:  Overruled.  You may answer.

7    A    He told me, he asked me if I knew who Hasim Rahman was.  And

8    I told him, yeah, of course I knew who he is.  I was into boxing

9    a little bit.  And he asked me if I remember after he won his

10   title, that a handful of his friends started getting killed.  And

11   I wasn't aware of that because at the time I was in a

12   rehabilitation center and certain kinds of news and things like

13   that we didn't watch, like violence or, you know, it was kind of,

14   it was monitored a little bit.

15         THE COURT:  Excuse me, Mr. Harding, one second.

16   Carlos, thank you for coming down.  Apparently, these two

17   monitors seem to be unplugged or otherwise inoperative.

18             Thanks, Donna.

19             We just needed your presence.  Thank you.  All right.

20   Sorry, Mr. Harding.

21   BY MR. HARDING:

22   Q    Sorry.  Did they fix them?

23         THE COURT:  They didn't fix them.  They just stood next

24   to them.

25   Q    Okay.  Yes.  They're working now.  Is that correct, ladies

1    and gentlemen?

2                THE JURORS:  Yes.

3                THE COURT:  All right.

4    BY MR. HARDING:

5    Q    Okay.  Let's go back to these exhibits.  If I can interrupt

6    you.  We'll get back to what Mr. Harris told you in a few

7    minutes.  Okay, Mr. Dobropolski?

8    A    Yeah.

9    Q    Just wanted to finish this rap lyric.  Know the downs back

10   on track.  Yeah, we back to doing black on black crime, back in

11   the streets bustin' black on black nines with crack in these

12   streets.  To the friends, don't worry, the crack's fine.  If

13   those who don't know, I cop all my weed sucks live or sacks live.

14   One love to my nigga Chris D.  He crack spines.  I'll go to war

15   for my nigga Ock.  Hopefully he got five.

16               Can you read what it says there at the end?  He got

17   five something?

18   A    Who, me?

19   Q    Yeah.

20   A    I can't see it.  Hopefully, he got five --

21   Q    You can't understand it, either?

22   A    No.

23   Q    Okay.  Who's Chris D?

24   A    Me.

25   Q    What does it mean to say that you crack spines?

1   A    I fight, I enforce.

2   Q    Okay.  Let me show you some other slips of paper from

3   Government Exhibit SE-20.

4            Is that you, also, Mr. Dobropolski, Chris D?

5   A    Yes, it is.

6   Q    Did you write that yourself?

7   A    Yes, I did.

8   Q    Is that your handwriting?

9   A    Yes, it is.

10  Q    And what does Eric, what does that note mean?

11  A    Eric's a friend of mine.  He's in the hip hop business, too.

12  Q    Okay.  So why did you write that out for Mr. Harris?

13  A    Because maybe they could do something in the studio

14  together.

15  Q    I see.  What does 30 milligrams mean?

16  A    It's really 80 milligrams.

17  Q    80 milligrams.

18  A    Yeah.

19  Q    What does that mean?

20  A    It's a hip hop group.

21  Q    I see.  So you were giving him a reference in the rap music

22  business?

23  A    Yes, I was.

24  Q    And down here?

25  A    That's my address, my old address.

1    Q    Did you write that one, also?

2    A    Yes, I did.

3    Q    And so Mr. Harris took it with him when he left CBIF, as far

4    as you know?

5    A    Yep.

6    Q    Let me show you another rap lyric here.  This is SE-19.

7         I went hard to the point that I lost my fuckin' finger

8    and I don't mind losing another one day or my life.  One love to

9    the heights for life.  What does that refer to, Mr. Dobropolski?

10   A    Losing his finger.

11   Q    Okay.  Now, you were telling us about a conversation that

12   you had with Mr. Harris where he started talking about Hasim

13   Rahman, the boxer?

14   A    Um-hum.

15   Q    And you explained that you didn't know about his friends

16   dying after he won the championship, is that right?

17   A    That's right.

18   Q    Okay.  So go on and tell us what Mr. Harris told you.

19   A    He told me a couple of the murders he committed, the ones

20   that were in his car.  It was a dude, a dude named Woody and a

21   girl that he was with.  He said that they'd been having problems

22   with Woody about money or maybe something with the industry, the

23   business they're involving themselves in.  And supposedly Woody

24   was to give, was to get a gun from Bo but then turned around and

25   used it on Bo.  So when he showed up to get the gun, Bo sent Mr.

1    Harris with the gun.  Instead of giving it to him, killed him.

2    And when he got back to the car, he killed him and the female

3    that was in the car.

4    Q    So he was doing what Bo told him to do?

5    A    Yes, he was.

6    Q    Where was Bo at this time, do you know?

7    A    I'm not sure.

8    Q    Okay.  So what does this have to do with Mr. Rahman,

9    exactly?

10   A    Absolutely nothing other than it was in his vehicle.

11   Q    Okay.  So let me see, let me back up.  You said that this

12   thing grew out of some dispute over money, you say, or the rap

13   music business?

14   A    Yeah.  It was general description.  It was nothing really

15   pinpointed.  They were just having words.

16   Q    And Mr. Harris told you that he committed the murder of the

17   two people in Rahman's car?

18              MS. RHODES:  Objection, Your Honor.

19              MR. LAWLOR:  Objection, leading.

20              THE COURT:  Sustained.

21   BY MR. HARDING:

22   Q    Okay.  What did Mr. Harris say he did specifically in

23   connection with this?

24              MR. MARTIN:  Objection.  Asked and answered already.

25              THE COURT:  Sustained.  He's answered it.

DIRECT EXAMINATION OF DOBROPOLSKI                    72

1    BY MR. HARDING:

2    Q    Okay.  Did he tell you anything more about the manner in

3    which the two victims died?

4    A    Yes, he did.  He said he shot both of them in the head.

5    Q    Did he tell you anything more about what happened to them

6    right after the shots hit their head?

7    A    He said their heads went down very slowly, something that he

8    kind of, he kind of remembered because he just didn't think it

9    would happen like that.  It's like mechanically, sort of.

10   Dropped down.

11   Q    Did he tell you which one he shot first?

12   A    The male.

13   Q    And why was the -- you say there was a female there, too?

14   A    That's right.

15   Q    Did he tell you why he shot the female?

16   A    Because she just happened to be there.

17   Q    She just happened to be there?

18   A    That's right.

19   Q    Okay.  Let me see.  You said something about how the guy was

20   coming to get a gun from Bo, is that correct?

21   A    That's right.

22   Q    And so what did Bo tell Mr. Harris?

23   A    He gave him the gun and he told him, when you get there --

24            MS. RHODES:  Objection, Your Honor.

25   A    -- kill him.

DIRECT EXAMINATION OF DOBROPOLSKI          73

1        THE COURT:  Overruled.  Go ahead.

2   Q    You can repeat it.

3   A    He gave him the gun and told him, well, when you go to give

4   it to him, kill him.

5   Q    Okay.  Did he tell you what happened when he got out of the

6   car?

7   A    Yeah.  He said he got out of the car, was walking up the

8   street and looked back, the car was drifting down the street.

9   Q    Okay.  Did he say where he went at that time?

10  A    Nah.

11  Q    Okay.

12  A    Not that I recall.

13  Q    Did he mention to you any other shootings he'd been involved

14  in?

15  A    Said one Woodland Avenue, he said he shot somebody.  But I

16  really don't have any details about it.

17  Q    Did you talk to Bo alone without Mr. Harris being present?

18  A    Yes, I did.

19  Q    Okay.  Can you tell us, did you discuss with him your plans

20  for when you got out of jail at all?

21  A    Yeah.  Talking about doing, doing like stick-ups and stuff

22  like that.  You know, Mr. Harris and I planned on doing.  And you

23  know, explained to him that, you know, Shelton put me down, the

24  nature of some of the crimes he, you know, committed.  Things

25  like that.

DIRECT EXAMINATION OF DOBROPOLSKI                    74

1   Q    Okay.  Did you mention this story that Mr. Harris had just

2   told you, had told you already about --

3            MR. LAWLOR:  Objection Your Honor, leading.

4            THE COURT:  Rephrase.

5   BY MR. HARDING:

6   Q    Did you tell him anything about any of the crimes that Mr.

7   Harris had told you about?

8            MR. MARTIN:  Objection.

9            MR. LAWLOR:  Objection, Your Honor, leading.

10           THE COURT:  Overruled.  You may answer.

11  A    Yeah.  I explained to him that I knew about Rahman's car,

12  Woody, the girl getting killed, and stuff like that.

13  Q    What did Mr. Mitchell say?  I mean Bo.  What did Bo say?

14  A    He said he, he put work in, too.

15  Q    What did you understand by that?

16           MR. LAWLOR:  Objection.

17           THE COURT:  Overruled.  You may answer.

18  A    He's killed people as well.

19  Q    Okay.  Did Mr., did this guy, Bo, talk to you about the

20  charge that he was locked up for at that time?

21  A    Not, not details of the crime.  He let me know he was

22  arrested for murder, he was being charged with murder and he had

23  a codefendant.

24  Q    What did he say about it?

25  A    He said that his codefendant ended up telling his girlfriend

1    that --

2              MR. CROWE:  Objection, Your Honor.

3              THE COURT:  You're quoting Mr. Mitchell now?  Is that

4    it?  You're telling the jury what Mr. Mitchell told you?

5              THE WITNESS:  Sure.

6              THE COURT:  About what his codefendant said?

7              THE WITNESS:  Yeah.

8              THE COURT:  Okay.  Sustain the objection.

9              MR. HARDING:  Actually, Your Honor --

10             THE COURT:  You can do it.  Go ahead.  Rephrase the

11   question.

12   BY MR. HARDING:

13   Q    I'm not interested in what the codefendant said to Mr.

14   Mitchell.  I'm just asking you what Mr. Mitchell said about the

15   codefendant in connection with that charge.

16             MR. CROWE:  Same objection, Your Honor.

17             MR. LAWLOR:  Objection, Your Honor, likewise.

18             THE COURT:  Overruled.  You may answer.

19             THE WITNESS:  All right.  Mr. Mitchell explained to me

20   that supposedly his codefendant went and blabbed.

21             MR. LAWLOR:  Objection.

22             THE COURT:  Okay.  Don't tell the jury what Mr.

23   Mitchell believed his codefendant had done.  The question is,

24   what did Mr. Mitchell tell you about the codefendant?

25             THE WITNESS:  He told me that his codefendant bragged

1    to his girlfriend --

2              MR. CROWE:  Objection.

3              THE COURT:  Can you get, jump over that part, Mr.

4    Harding, to get to the point?

5              MR. HARDING:  Is the Court asking me to lead the

6    witness?

7              THE COURT:  Well, if you can do so to get to the point.

8    Apparently, the answer to the question is the codefendant said

9    something to somebody.  If that's what you're asking, the

10   objection is sustained.

11             MR. LAWLOR:  Your Honor --

12             THE COURT:  Go ahead, Mr. Harding.

13             MR. LAWLOR:  We have a separate objection.  Can we

14   approach?

15             THE COURT:  The objection is sustained.  Go ahead, Mr.

16   Harding.

17             MR. HARDING:  Did Mr. Mitchell tell you who he thought

18   should take the charge?

19             MR. CROWE:  Objection.

20             MR. LAWLOR:  Objection.

21             THE COURT:  Sustained.  That means don't answer, Mr.

22   Dobropolski.

23             MR. HARDING:  Can I ask the witness, Your Honor --

24             THE COURT:  You can ask and I'll rule on any objection

25   that's made.

Case 1:04 cr 00029 RDB    Document 680    Filed 06/08/09    Page 77 of 273

1          MR. HARDING:  What did Mr. Mitchell say about his

2     codefendant who was charged in that offense?

3          MR. LAWLOR:  Objection, Your Honor.

4          MR. CROWE:  Objection.

5          THE COURT:  Sustained.  Let's move on.

6     BY MR. HARDING:

7     Q    How long you were in Central Booking for, Mr. Dobropolski?

8     A    Probably about 30 days.

9     Q    When you left, did Shelton Harris or Bo go with you?

10    A    No.  Shelton was, he was in the part of the jail on a

11    different floor.  I was in the JI building.

12    Q    What's the JI building?

13    A    The old part of City Jail.  You have City Jail, JI, and you

14    have Central Booking.

15    Q    Okay.  So in other words, got split up from both Mr.

16    Mitchell and Mr. Harris, is that right?

17    A    That's right.

18    Q    Did you ever see them again until today?

19    A    Yeah.

20    Q    When?

21    A    I saw Shelton the day I was going to DOC in '02.  He was

22    coming back from court and I was going to Division of Corrections

23    backing my years.  Actually, I had to go to Baltimore County.  I

24    just beat my charges in Baltimore City.  They were just

25    dismissed.

DIRECT EXAMINATION OF DOBROPOLSKI                78

1   Q    Okay.  And so you ran into him in a bullpen or something

2   like that?

3   A    He was coming back from court.  He was on the other side.

4   He was in the hallway.  I was in the bullpen area.

5   Q    Did you speak?

6   A    Yeah.  I told him I'd be back in a few years.

7   Q    Is that the last time you saw him?

8   A    No.  I saw him at Parole and Probation a couple times.

9   Q    Okay.  We'll get to that eventually.  Did you ever see Mr.

10  Mitchell again?

11  A    No.  Not until today.

12  Q    Okay.  Did you subsequently report to anyone what you had

13  learned about these two murders in Rahman's car?

14  A    Yes, I did.

15  Q    How did you report it?

16  A    I wrote a letter to my judge and asked him to pass

17  information to a homicide detective.

18  Q    Okay.  Let me show you what's been marked as Government

19  Exhibit MB-38.  And if you can, Mr. Dobropolski, I'm just going

20  to ask you to read this letter aloud since your, this is your

21  handwriting, right?

22  A    Yeah.  Yeah.

23        THE COURT:  Mr. Harding, may I suggest?  Do you have

24  another copy of it?

25        MR. HARDING:  Yes.

1          THE COURT:  This is an instance where I think it would

2     make more sense if you could give the witness a hard copy and

3     leave a copy on the monitor for the jury to follow along.

4          MR. HARDING:  I completely agree, Your Honor.

5          THE COURT:  All right.  Mr. Dobropolski, I'm going to

6     ask you to read it very slowly, much more slowly than you would

7     normally talk.  All right?

8          THE WITNESS:  All right.

9     BY MR. HARDING:

10    Q    What's the date at the top, Mr. Dobropolski?

11    A    5/23/03.

12    Q    Okay.  So that's about eight or nine months after you had

13    these conversations with Mr. Harris in CBIF, is that correct?

14    A    Yes, it is.

15    Q    Any particular reason why you waited so long before you

16    reported it to anybody?

17    A    Yeah.  Several reasons.  I was a criminal for a long time,

18    and it's just something you really don't do.  Just the nature of

19    it.

20    Q    You were reluctant to report it?

21    A    Sure.  It's a hard thing for me to sit right here.  I'm

22    usually on other side where they are.  You know what?  It's a

23    hard thing if you've been into criminal activity for a long time

24    and like kind of grew up around that stuff.  But like I said, the

25    nature of the crimes and, you know, what Mr. Harris told me about

1    basically killing people for, someone asked him to was kind of, I

2    didn't want that stuff on my conscience, if he continued, you

3    know, to kill people.  I would feel a little bit responsible for

4    it.  So it kind of put me in a, in a bad situation, like

5    position.

6    Q    Do you remember the name of your judge that you wrote this

7    letter to?

8    A    Judge Byrnes.  J. Norris Byrnes.

9    Q    Is he a Circuit Court judge in Baltimore County?

10   A    Yes, he is.

11   Q    Okay.  Go ahead and read the letter.

12   A    Dear sir:  I would like to ask if you could arrange a

13   private hearing or maybe a meeting in your chambers between

14   myself and a narcotics officer from Baltimore's Southern District

15   named Tommy Mallin.  This is the only officer that I'm willing to

16   talk to.  I believe that I came across vital information

17   concerning a double murder in Northwest Baltimore.  However, and

18   I'm firm about this, I will not and cannot work or speak with

19   officers while I'm incarcerated nor am I willing to speak with

20   any detectives or investigators that may attempt to interview me

21   at this, at this prison.

22           Please don't think it's my intention to be

23   disrespectful.  The information that I've acquired could get me

24   killed.  And I have another offer that I would like to speak with

25   you and Officer Mallin about.  And please, if the information

1    that I have along with the offer I make is deemed relevant and

2    valid, would you consider modifying my sentence?  That way --

3    that's the only way that I will be able to work with law

4    enforcement.  And sir, please don't send anyone to attempt to

5    interview me.  I won't talk.  You would seriously put me at risk.

6    Just trust me and set up a meeting.  Sincerely, Mr. Dobropolski.

7          The information I have is about a double murder that

8    took place in Northwest Baltimore in the Park Heights area.  A

9    male and a female were shot multiple times while sitting in their

10    vehicle.  After they were shot, the car drifted down the street,

11    came to a stop, and that's where the bodies were found.  The

12    cause of death, gunshot wounds to the head.  I have no

13    involvement in the crime.  I believe I was incarcerated when it

14    took place.  A person claiming to be the shooter confided in me.

15    Q    Okay.  Who's this Tommy Mallins guy that you say is the only

16    guy you're willing to talk to about it?

17    A    He was a narcotics officer in Southern District that I'm

18    pretty, pretty tight with.  And he ended up being a homicide

19    detective when I wrote this letter.

20    Q    Did he, in fact, come to talk to you?

21    A    Yes, he did.  Yes.  Yes, he did.

22    Q    Did he come with another homicide detective?

23    A    Gary Niedner, detective.

24    Q    Okay.  Did you agree to talk to them even though you were

25    still locked up?

1    A    Yes.

2    Q    Okay.  Did they show you photo arrays when you came to talk

3    to them?

4    A    Yes, they did.

5    Q    Okay.  I'm going to show you, first of all, what's been

6    marked as Government Exhibit MB-40.  Let me show you, is that

7    your signature at the top there, Mr. Dobropolski?  I guess you

8    can't see it very well.

9    A    Yeah.

10   Q    Okay?

11   A    Yes.

12   Q    Sorry?

13   A    Yes.

14   Q    Did Detective Mallins and Gary Niedermeyer also sign their

15   names to it?

16   A    Yeah, I think, yeah.  It's something underneath of it.

17   Sure.

18   Q    And is there a date and time on there?  Can you read the

19   date and time?

20   A    I think it's 10/2/03, or something.

21   Q    Okay.

22   A    The time is 1:00 p.m.

23   Q    Okay.  And then on the back, did you make this statement

24   that's written on the back here?

25   A    Yes, I did.

1    Q    Can you read it?

2    A    Yes.  You have to slide it over some.

3    Q    Is that better?

4    A    Yeah.  That's good.  This is Shelton Harris, the person --

5    this is Shelton Harris, a person that confessed to a double

6    homicide that took place in Northwest Baltimore.  The person he

7    said that he killed was a male and a female.  Shelton stated to

8    me that he committed these murders for a friend.  The friend's

9    AKA is Bo.

10   Q    Okay.  Is that your signature right after it?

11   A    Yes, it is.

12   Q    And of course, the date and time appear immediately above

13   it, once again, is that correct?

14   A    10/2/03, 1:00 p.m.

15   Q    Now I'm going to show you MB-39.  Is that your signature on

16   that?

17   A    Yes, it is.

18   Q    And again, it has the date and time, and the detectives'

19   signatures, is that correct?

20   A    Yes.

21   Q    And now I want you to read what's on the back of this one.

22   A    All right.  This is a person that introduced himself to me

23   as Bo.  Bo stated to me that he and Shelton Harris handled some

24   business for him concerning homicides.

25   Q    Sorry.  Could you read that last sentence one more time?

1    A    Bo stated to me that he had Shelton Harris handle some

2    business for him concerning homicides.

3    Q    Okay.  Is "handle some business" a phrase, you put it in

4    quotation marks, is that a phrase that you and people in your

5    community use?

6    A    Yeah.  Yes.

7    Q    What does it mean?

8    A    Depending on the conversation.  The conversation that we

9    were having, it was concerning homicides.

10   Q    Okay.  Now, at that time, when you were locked up and

11   Detective Mallins and Detective Niedermeyer came to talk to you

12   in October of 2003, what were you locked up for?

13   A    Assault charge, it was domestic violence.

14   Q    Okay.

15   A    A violation.  Violation of parole.

16   Q    Okay.  What did you do to violate your parole?

17   A    I left Second Genesis, violated a court order.

18   Q    You left Second Genesis?

19   A    Yes.  And I violated a court order.

20   Q    I see.  What is Second Genesis?  Can you tell us what Second

21   Genesis is, Mr. Dobropolski?

22   A    Oh, substance abuse rehabilitation center.

23   Q    So you were in a substance abuse rehab center and you left

24   it, is that your testimony?

25   A    Yes.

1  Q    And that violated the Court's order?

2  A    Yes, it did.

3  Q    Because a judge had paroled you on a domestic violence

4  offense?

5  A    Yes, he did.

6  Q    But since you violated the court order, you had to go back

7  to jail.  Is that it?

8  A    Yeah.  I left the rehabilitation center.  I wasn't supposed

9  to.

10 Q    Right.  I understand.  Okay.  So did the detectives talk to

11 you about doing some work for them on the street once you got

12 out?

13         MR. MARTIN:  Objection.

14         THE COURT:  Overruled.  You may answer.

15 A    Yes, they did.

16 Q    What did they want you to do?

17 A    To set Mr. Harris up.

18 Q    Set him up how?

19 A    With wires, digital and analog recorders, and things like

20 that.

21 Q    So they wanted you to wear a recording device?

22 A    Yes, they did.

23 Q    And they wanted you to go talk to Mr. Harris?

24 A    Yeah.

25 Q    Was he out of jail by that time?

1    A    Yes, he was.

2    Q    And did you agree to do that?

3    A    Yeah.

4    Q    What kind of conversations did they want you to have with

5    Mr. Harris?

6    A    To see if he would talk about anything concerning a

7    homicide.  See if I can get him to bite on anything.

8    Q    Okay.  Did you agree to do that?

9    A    Yes, I did.

10   Q    Did they then go before Judge Byrnes with a city prosecutor

11   and a county prosecutor and apply to have your, your sentence

12   modified so that you could get back out on to the street?

13   A    Yes, they did.

14   Q    And so did you go before Judge Byrnes, the same one to whom

15   you'd written the letter?

16   A    Yes.

17   Q    Do you remember the name of the city homicide Assistant

18   State's Attorney who went with you?

19   A    Say it again.

20   Q    Do you remember the name of the city prosecutor or the

21   county prosecutor who went with you to court that day?

22   A    County pros -- I'm not sure.

23   Q    What about the detectives?  What detectives went with you,

24   if you remember?

25   A    Tommy Mallin.  I think Niedermeyer was there.  I think Keith

1    was there.  Keith Benson, I think, was there.  There was, it was

2    a handful of people.  I really --

3    Q    Okay.

4    A    John was there.

5    Q    John?

6    A    Yeah.

7    Q    What's his last name?

8    A    Detective -- I can't remember his last name.  Giganti.  John

9    Giganti, I think, was there.

10   Q    Okay.  This was before there was any kind of federal

11   investigation in place, is that correct?

12   A    Right.

13              MR. KURLAND:  Objection.

14              THE COURT:  Overruled.  Well, the witness may not know

15   whether there was a federal investigation or not.

16   BY MR. HARDING:

17   Q    Okay.  Did the judge, Judge Byrnes, agree to modify your

18   sentence?

19   A    Yes, he did.

20   Q    And so did you get back out on to the street?

21   A    Yup.  With the stipulation that I help law enforcement, the

22   homicide detectives.

23   Q    Do you know when the, when the detectives spoke to the judge

24   and the state prosecutors talked to the judge, did they check

25   with the victim of the domestic assault case that you were locked

DIRECT EXAMINATION OF DOBROPOLSKI                    88

1    up on at this time?

2             MR. LAWLOR:  Objection.

3             THE COURT:  Do you know whether they did?

4             THE WITNESS:  Yeah.

5             THE COURT:  Okay.  And this actually happened in front

6    of a judge?  In a courtroom?

7             THE WITNESS:  No.  Well, I'm still in contact with her.

8    She let me know that --

9             MR. LAWLOR:  Objection.

10            THE COURT:  No.  My question is Mr. Harding's been

11   asking you who went with you in front of the judge.  My question

12   is, did all of you actually go in front of a judge in connection

13   with your release?

14            THE WITNESS:  Except for, except for the victim in my

15   case.

16            THE COURT:  Okay.  So all of you did go except for the

17   victim?

18            THE WITNESS:  Except for the victim.

19            THE COURT:  Okay.  Go ahead, Mr. Harding.

20   BY MR. HARDING:

21   Q    And did people check with the victim to put, so that her

22   views could be represented to the Court, also?

23   A    That's right.

24            MR. LAWLOR:  Objection.

25            THE COURT:  The objection's overruled.  You may answer.

1    A    Yes.

2    Q    And what was her attitude toward you getting out?

3    A    Yeah.  Immediately.

4    Q    It was okay with her?

5    A    Um-hum.

6    Q    Okay.  So --

7             THE COURT:  That's a yes?

8             THE WITNESS:  Yes.

9    Q    Can you tell us how much time you think got cut off your

10   sentence because of that?  Or how much time you got out, how much

11   time you wound up not having to spend in jail that you would have

12   had to spend in jail if that hadn't happened?

13   A    About eight months, seven or eight months.  Something like

14   that.

15   Q    Okay.  Did you, in fact, go to work trying to record a

16   conversation with Mr. Harris as the detectives wanted you to?

17   A    Yes.

18   Q    And did you sometime after that testify in a federal grand

19   jury?

20   A    Yes, I did.

21   Q    You don't remember the date of that, do you, Mr.

22   Dobropolski?

23   A    Not right offhand.

24   Q    Would it refresh your recollection to look at the transcript

25   of your grand jury testimony?

1    A    It might.

2    Q    Okay.  Just, does that refresh your recollection as to what

3    the date was when you testified?

4    A    Yes.

5    Q    What was it?

6    A    November 19th, 2003.

7    Q    Thank you.

8    A    You're welcome.

9    Q    Now, these meetings that you were going to have with Mr.

10   Harris to try to record a conversation with him, how were you

11   going to meet up with him?

12   A    Bump into him.

13   Q    I'm sorry?

14   A    Just like something casual.  Like act, I mean, bump into him

15   but, of course, it would be set up, happen at Parole and

16   Probation while he was seeing his parole officer.  I was taken

17   with other detectives.

18   Q    I see.

19   A    I was wearing recording devices.

20   Q    Okay.  So you're both out of jail.  You're both on

21   probation.  So you were going to run into him at the probation

22   office?

23   A    Yes.

24   Q    Do you recall how many times you tried to record a

25   conversation with Mr. Harris at the probation office?

1   A     Twice.

2   Q     Okay.  Was there, I guess there were other people there at

3   the probation office, is that correct?

4   A     Yes.

5   Q     Was there a lot of noise?

6   A     Yeah.  It's a pretty loud place.  It's a lot, it's a lot of

7   people in there.  One of the bigger probation offices.

8   Q     And where was this wire that you were wearing?  Where was it

9   on your body?

10  A     On my side.

11  Q     Was it underneath clothing?

12  A     Yes, it was.

13  Q     Okay.  I want to call your attention, first of all, to

14  December 1st of 2003 and to a meeting that occurred on that day.

15  Do you remember writing out in handwritten form an account of

16  what happened at that particular meeting you had with Mr. Harris?

17  A     Yes.

18  Q     Okay.  I've got here Government Exhibit MB --

19         MR. MARTIN:  Objection, Your Honor.

20         THE COURT:  Members of the jury, I realize you've been

21  out here for, I guess, barely an hour, but we've been out here a

22  little longer than you have.  So we're going to take our

23  mid-morning recess at this time.

24         Please leave your note pads on your chairs.  Have no

25  discussion about the evidence.  Continue to keep an open mind

1    about all issues.  The jury is excused for a 15 minute recess.

2                (Jury exits the courtroom.)

3                THE COURT:  Mr. Dobropolski is excused for 15 minutes.

4                (Witness exits the courtroom.)

5                THE COURT:  Mr. Harding, the objection seems to be well

6    taken.  How do you propose to proceed with this?  Are you going

7    to ask the witness, are you going to use it as past recollection

8    refreshed or past recollection recorded or --

9                MR. HARDING:  I am going to ask him to account in his

10   own terms what happened.  And then I'm going to ask him if he

11   needs to refresh his recollection by looking at his statement.

12               THE COURT:  Okay.  So you don't really need to show him

13   any of the statements until after you've questioned him.

14               MR. HARDING:  I will move it into evidence as past

15   recollection recorded if it doesn't refresh his recollection.

16               THE COURT:  All right.

17               MR. KURLAND:  Your Honor, objection.  Past recollection

18   recorded --

19               THE COURT:  Just, please.  Please, please.

20               MR. KURLAND:  Sorry.

21               THE COURT:  So you're not going to show it to him until

22   after you've questioned him about what happened?

23               MR. HARDING:  Yeah.  I then propose to play the actual

24   section of the tape, which is a very poor quality tape, as the

25   Court has heard.  But you can actually hear fragments of --

1          THE COURT:  Okay.  How long is the tape?  The first

2     one.

3          MR. HARDING:  We're going to play about seven or eight

4     minutes of it.

5          THE COURT:  We got to sit here and listen to a lot of

6     stuff we can't hear or understand for seven minutes?  Okay.

7          MR. HARDING:  I'm afraid so, Your Honor.

8          THE COURT:  I understand.  I understand.

9          MR. HARDING:  I also have one phone conversation I'm

10     going to play, which you can hear well.

11          THE COURT:  Okay.  And did anybody check to see whether

12     it's possible -- these are CD's?

13          MR. HARDING:  Yes.

14          THE COURT:  And do we have a CD player built into the

15     system?  I'm looking at Mr. Hanlon.

16          MS. RHODES:  Yes.  There is, that's what I used to play

17     those.

18          THE COURT:  So it worked for you, Ms. Rhodes?

19          MS. RHODES:  Yes.

20          THE COURT:  Well, then, I think it should work for the

21     government.

22          MR. HARDING:  I think it should, too.  I just don't

23     know how to do it.  Mr. Hanlon and others can help.

24          THE COURT:  Mr. Hanlon and Ms. Rhodes together, and

25     with Ms. Arrington's supervision, can figure out how to do it.

1    Mr. Flannery seems to be volunteering.

2              MR. FLANNERY:  I went through this in preparation for

3    this this Friday with IT.  And the best system is these speakers.

4    When you put it through the court system, the poor quality, the

5    level, the volume that you have to have it at to hear anything,

6    it creates interference.

7              THE COURT:  If other words, Straight Out of Compton is

8    fine in the DOAR.

9              MR. FLANNERY:  Because the quality is sufficient that

10   you can have the volume low enough that it won't create

11   interference.  That starts buzzing in the courtroom.  I've tried

12   it.

13             THE COURT:  All right.

14             MR. FLANNERY:  You can take my word at it or you can

15   try it.

16             THE COURT:  I believe Mr. Flannery.  We'll see how it

17   goes.  Maybe --

18             MR. HARDING:  Judge, could I be heard briefly about the

19   statement that the Court did not allow the witness to say?

20             THE COURT:  Yeah.  What was that all about?

21             MR. HARDING:  Okay.

22             THE COURT:  First of all, who's the codefendant?

23   Martin?

24             MR. HARDING:  Yeah.

25             THE COURT:  So what was that all about?  You didn't

Case 1:04-cr-00029-RDB   Document 680   Filed 06/08/09   Page 95 of 273

1    alert me to that.  Or at least I missed it if you did.

2           MR. HARDING:  Well, I think it was in the grand jury

3    testimony so the, it's not as if defense counsel were unaware of

4    it.

5           THE COURT:  Clearly, they're aware of it.  They

6    objected.

7           MR. HARDING:  Bo, Mr. Mitchell and Mr. Dobropolski are

8    having this discussion about all the stuff they're going to do

9    together.  And Bo mentions that his codefendant should take the

10   charge that he, Bo, is locked up for because his codefendant had

11   blabbed to his girlfriend about what had happened.  Therefore,

12   the codefendant should take the charge.  That means Bo's going to

13   get out.  Bo's going to be out of jail pretty soon and will be

14   able to pursue these ventures with Mr. Dobropolski and Mr.

15   Harris.

16          THE COURT:  All right.  I'm pretty sure that's not a

17   statement in furtherance of the conspiracy, certainly not the way

18   you set it up with the witness.

19          Now, first of all, who's the codefendant and who's the

20   girlfriend?

21          MR. HARDING:  Well, the codefendant would be Mr.

22   Martin.  He was locked up on April 17th for the murder, along

23   with Mr. Mitchell.

24          THE COURT:  Of Mr. McCaffity and Ms. Brown?

25          MR. HARDING:  No.  This is the Wyche brothers murder.

Case 1:04-cr-00029-RDB   Document 680   Filed 06/08/09   Page 96 of 273

1          THE COURT:  See, that's why I was lost.  So who's the

2     girlfriend?  And what's that all about?

3          MR. HARDING:  Okay.  Mr. Martin had a girlfriend named

4     Lakeisha McCoy.

5          THE COURT:  Right.

6          MR. HARDING:  And you may be aware that Lakeisha McCoy

7     became Martin's alibi witness.

8          THE COURT:  Right.

9          MR. HARDING:  So --

10         THE COURT:  The whole, the movie thing?

11         MR. HARDING:  Yeah.

12         THE COURT:  Right.

13         MR. HARDING:  Okay.  So that's by way of background,

14    because Bo doesn't explain this to Mr. Dobropolski.  All he says

15    is that his codefendant should take the charge because he blabbed

16    to his girlfriend about what had happened, suggesting --

17         THE COURT:  And I hadn't heard that before.  I had not

18    heard that Mr. Martin made an incriminating admission to Ms.

19    McCoy.  Do you mean that they didn't really go to the movies?  Is

20    that what you're getting at?

21         MR. HARDING:  No.  The whole alibi is a hoax, Your

22    Honor.

23         THE COURT:  I understand.

24         MR. HARDING:  I said that in my opening.

25         THE COURT:  I understand that.  But you see my problem

1    now?  What did, what did Martin allegedly Blab to McCoy?  You

2    seem to be saying he didn't blab anything.

3              MR. HARDING:  He blabbed his, that he committed the

4    offense.  He blabbed that he committed the Wyche brothers murder.

5              THE COURT:  When did he do that?

6              MR. HARDING:  Well, we only know what Bo said to

7    Dobropolski.

8              THE COURT:  Okay.  So McCoy denies that Martin

9    confessed to the Wyche brothers' murders?  Is that right?

10             MR. HARDING:  Well, McCoy became the alibi witness.  So

11   I guess you could say that sort of indirectly.  But I think

12   that's all rather beside the point.

13             THE COURT:  It's not beside the point, Mr. Harding, if

14   I'm trying to understand what you're talking about.  So what

15   you're saying is, if, just tell me if I have it right.  Martin

16   didn't say anything to McCoy about any murder, etc.  In fact,

17   McCoy is his alibi witness.  So what Bo, what, if I understand

18   it, you want the witness to tell the jury that Bo essentially

19   lied to Dobropolski or --

20             MR. HARDING:  No.

21             THE COURT:  Expressed the unadorned opinion to

22   Dobropolski that Martin should take the charge on the Wyche

23   murders because Martin made an admission to his girlfriend,

24   McCoy, and therefore if he hadn't done that, neither he, Bo, nor

25   Mr. Martin would have been arrested.  Now, that's what makes

Case 1:04-cr-00029-RDB   Document 680   Filed 06/08/09   Page 98 of 273

1    sense.  I'm not saying that's true.  But that's the only sense

2    that any of this makes.  So now you clarify for me.

3              MR. HARDING:  Well, I don't know what Mr. Martin said

4    to his girlfriend.

5              THE COURT:  Of course.  Right.  Okay.

6              MR. HARDING:  All we know is --

7              THE COURT:  And we don't know if Bo knows what Mr.

8    Martin said to his girlfriend, if anything.

9              MR. HARDING:  We know that Bo claimed that Mr.

10   Dobropolski --

11             THE COURT:  That Martin should take the charge.

12             MR. HARDING:  That Martin should take the charge

13   because --

14             THE COURT:  And he attached the reason for that

15   opinion.

16             MR. HARDING:  Because Martin had blabbed to his

17   girlfriend.

18             THE COURT:  Well, that's not in furtherance of the

19   conspiracy.

20             MR. HARDING:  I suggest that it is, Your Honor.

21             THE COURT:  Well, I'm ruling that it's not.  Okay.

22   We've moved past it.  The jury's forgotten it.  It wasn't

23   critical to anything.  All right.

24             I think Mr. Kurland had first dibs, Mr. Crowe.

25             MR. KURLAND:  Well, I will allow --

1          THE COURT:  Mr. Crowe, the gentleman yields back the

2   balance of his time.

3          MR. CROWE:  Thank you, Your Honor.

4          MR. KURLAND:  Not the entire balance.

5          MR. CROWE:  Your Honor, today is the first time that I

6   have heard or seen anything concerning the topic of Mr. Martin

7   supposedly making a statement for anything.

8          THE COURT:  It's out.  It's out.  It's out.  We're not

9   going back there.

10          MR. CROWE:  If, in fact, it is in the grand jury, I

11   would ask that the prosecutor tell me where it is.  If, in fact,

12   it is in anything that is written, I would ask him to do that as

13   well.

14          THE COURT:  It's ruled out.

15          MR. CROWE:  It may be ruled out but the jury has heard

16   that a codefendant made a statement to his girlfriend and --

17          THE COURT:  And the jury has no idea, absolutely no

18   idea, any more idea than I do who he was talking about.

19          MR. CROWE:  Well, Your Honor, Your Honor indicated that

20   he knew very well who they were talking about.  And I assume that

21   the jury --

22          THE COURT:  No.

23          MR. CROWE:  Before this case is over, the jury is going

24   to want --

25          THE COURT:  Wait a minute.  Let me be very clear.  Part

1    of the reason I sustained the objection, and there were several,

2    I had no idea who he was talking about.  When he said Bo talked

3    about a codefendant, I have no idea that Martin, I mean, I'm sure

4    the government will make this clear in closing argument, but I

5    don't remember that Martin and Mitchell got arrested for the

6    Wyche brothers in April of 2002.  I mean, I wish I had that kind

7    of brain.

8              MR. CROWE:  Your Honor, there's been considerable

9    testimony both in pretrial hearings and here that Mr. Mitchell

10   was arrested on April 1, Mr. Martin was arrested on April 17th.

11             THE COURT:  Right.

12             MR. CROWE:  That the other defendants were not

13   arrested, were not arrested or charged with this until years

14   later.

15             There's going to be, I expect, another witness who is

16   going to testify about going to the state court proceeding that

17   had to do with the Wyche brothers charges, where Mr. Mitchell and

18   my client were the only people in there.

19             THE COURT:  I'm sorry.  Why, I mean, I understand Mr.

20   Kurland and Mr. Coburn's point regarding Mr. Gardner and the

21   Jones-Spence murder, but why would we ever get into state court

22   proceedings regarding the Wyche brothers' murders?  I haven't

23   heard any evidence.

24             MR. CROWE:  Maybe I could just ask the prosecution if

25   we're going to hear a witness talk about that.

1          MR. HARDING:  Sorry.  Talk about?

2          THE COURT:  The state court proceedings related to the

3     Wyche brothers' murders.

4          MR. HARDING:  Not exactly the state court proceedings,

5     no.

6          THE COURT:  Right.  Right.

7          MR. CROWE:  We have gotten grand jury testimony.

8          MR. HARDING:  That I'm aware of at the moment.

9          MR. CROWE:  In any event, Your Honor, the jury is

10    certainly going to become aware that the only codefendant at that

11    time was Mr. Martin.  We had absolutely no, we had absolutely no

12    indication that the government was going to try to get any sort

13    of a statement of this in, of this sort in.  If it had, it would

14    have been something that we would have taken up before the

15    witness testified.

16          The jury has heard a statement about, about the fact

17    that a girlfriend, about the fact that a codefendant, and that

18    was only Mr. Martin at the time, for the charge that Mr. Mitchell

19    was locked up on, had made a statement.  And the jury is clearly

20    going to conclude after it hears all the evidence that this had

21    something to do with the alibi, which is a matter that the

22    government is going to try to disparage.

23          I won't do it now, but we've got a couple of points

24    that we'd like to talk about in terms of a mistrial.  We'll do

25    that at an appropriate time.  I just don't understand how the

DIRECT EXAMINATION OF DOBROPOLSKI                102

1        government tried to get this in with no notice to us at all.

2                And if they can show that we had notice, I'll

3        apologize.

4                THE COURT:  Well, they didn't get it in.  And I'm sorry

5        to disappoint counsel, I'm telling you my best guess is that the

6        jury, like the Court, thought Mr. Mitchell was in as a result of

7        getting arrested with that handgun.  Nobody, nobody, I'm

8        confident that nobody on this jury has consciousness now, they

9        will, I'm sure, but at the time of that examination, nobody on

10       this jury had consciousness that Mr. Mitchell had been arrested

11       and charged with the Wyche brothers' murders.

12               We haven't even gone over those murders yet.  I mean,

13       we haven't.  You know, we haven't gone over them.

14               So the thing that, if anything, the jury remembers is

15       what I remember, and that is that Mr. Mitchell got arrested in a

16       car and there was a firearm in an ankle holster.  That's what the

17       jury's thinking.  If anything.  Anyway, Mr. Kurland.

18               MR. KURLAND:  Judge, just two quick points.

19               THE COURT:  You want to talk about past recollection?

20               MR. KURLAND:  From my vantage point, I can't see

21       exactly what Mr. Harding was referring to.  But past

22       recollection, if it qualifies, doesn't come in.  So we would

23       object to any effort to get it actually physically before the

24       jury.

25               The second thing is, a little bit perspectively, I

1    don't know what time we're going to get to Mr. Montgomery, but at

2    the time Mr. Montgomery is called, there are going to be a few

3    things that Mr. Coburn and I need to address outside the presence

4    of the jury.  So hopefully it could be at break in which it

5    wouldn't be --

6              THE COURT:  Actually, I would like to do that now.  How

7    much more do you have with Mr. Dobropolski, roughly, Mr. Harding?

8              MR. HARDING:  Ten or fifteen minutes.

9              THE COURT:  Ten to fifteen minutes.  And then Mr.

10   Montgomery is next?

11             MR. HARDING:  I've got to play the disk.

12             THE COURT:  Right.  Is Montgomery next?

13             MR. HARDING:  Yeah, Mr. Montgomery is next.

14             THE COURT:  All right.  Let me ask you, Mr. Kurland,

15   have you and Mr. Coburn had a chance to discuss your motion with

16   Mr. Gardner?

17             MR. KURLAND:  Yes.

18             THE COURT:  And are you and Mr. Coburn satisfied that

19   you've had a full exchange with Mr. Gardner regarding that issue?

20   Referring, of course, to the admissibility of Mr. Gardner's

21   conviction and/or sentence in state court.

22             MR. KURLAND:  I think Mr. Coburn could factually speak

23   to that, to that particular issue.

24             THE COURT:  It's a fairly straightforward question, Mr.

25   Coburn.  Are you satisfied that you've had a chance to discuss

1    this fully with Mr. Gardner?

2              MR. COBURN:  You know, Your Honor, as I hear Your Honor

3    pose the question, I'm not 100% sure that I am completely

4    satisfied.  I can tell Your Honor that it's been explored.

5              THE COURT:  All right.

6              MR. COBURN:  But I don't know that it's been explored

7    as fully as it could be.

8              THE COURT:  All right.  Mr. Gardner, your lawyers have

9    proposed that the Court permit them to introduce in this trial

10   evidence that you have already been tried and convicted for the

11   murder of Tonya Jones-Spence in state court.  In their judgment,

12   as potentially prejudicial as that evidence might be to you, in

13   their judgment, in their professional judgment, considering what

14   the government's burden is here, what the evidence is, what the

15   evidence is likely to be going forward, they believe that you

16   will be better off if they introduce that evidence or otherwise

17   acquiesces in its introduction than if the jury is kept from

18   learning that you have been previously convicted.  And they have

19   tried to discuss this with you.

20             It's a very, very important decision that they have

21   thought about tirelessly for a long time.  And they've made their

22   decision.

23             Do you have any questions of the Court about this or

24   for your attorneys, Mr. Gardner?

25             DEFENDANT GARDNER:  You making me an offer, sir?

1          THE COURT:  All right.  Let the record reflect that Mr.

2    Gardner responded to the Court's question, "are you making me an

3    offer, sir?"  Mr. Gardner, the court is of a mind, subject to

4    hearing from government counsel and from your codefendants'

5    counsel, to permit the lawyers who represent you to have the jury

6    learn this information.  And I'm giving you this opportunity now

7    and after the recess to speak either to the Court about it, if

8    you choose to, or to your attorneys if you choose to.  Do you

9    understand what I have said, sir?

10         DEFENDANT GARDNER:  I accept your offer for value,

11   return your offer for value.

12         THE COURT:  Let the record reflect that Mr. Gardner

13   said something about accepting an offer for value and returning

14   an offer for value.  The Court can't make any sense of it.

15         All right.  Briefly, Mr. Kurland.  Anything you want to

16   say in that light?

17         MR. KURLAND:  Your Honor, we would ask that the

18   evidence be admitted of Mr. Gardner's prior conviction and actual

19   sentence of life without possibility of parole.

20         THE COURT:  All right.  When we come back, I'll here

21   from the government, I'll hear from other counsel, either after

22   lunch or before lunch.  It's now afternoon.

23         Obviously, those are separate questions.  I mean, the

24   question breaks, the question breaks down into several subparts.

25   For example, the principal question:  Will the Court permit the

1    jury to learn that Mr. Gardner has been convicted?  If yes, how

2    much, if any, detail and additional facts concerning the

3    conviction will the Court permit the jury to learn?  One.

4         Will the Court permit or insist that the jury learn

5    that it's a jury conviction?  Will the Court permit or insist

6    that Mr. Gardner's sentence be disclosed to the jury?

7         And third, will the Court permit the government to

8    elicit the evidence?  Will the Court prohibit the government and

9    permit you to elicit the evidence?  Or will the Court require a

10   stipulation which the Court can advise the jury of?

11        So those are the subsidiary questions that don't, the

12   answer to which don't automatically follow from a ruling that the

13   evidence should be permitted.

14        I also need to hear from other counsel because they

15   have an interest in this question, at least that entitles them to

16   be heard.

17        MR. KURLAND:  Your Honor, as the Court knows, this is

18   something that Mr. Coburn and I have struggled with for several

19   years.

20        THE COURT:  Right.

21        MR. KURLAND:  But to us, it isn't, it isn't uncoupled,

22   that the issue with respect to the prior conviction and the

23   actual sentence is very much integral to our defense.  And if the

24   Court is only of a mind to --

25        THE COURT:  Well, I said, we'll cover that.  I'm just

1    saying it's not automatic.  I understand you don't want the, I

2    assume you don't want the conviction in without the sentence

3    because you don't want to leave the impression to the jury that

4    he got acquitted or that he got a five year sentence.

5             MR. KURLAND:  Yes, that's right.

6             THE COURT:  I understand that.

7             MR. KURLAND:  And we briefed that and the Court is well

8    aware of the misleading impression issues, particularly in light

9    of everything else that's gone on, as to what appears to be some

10   sort of revolving door, you know, trial.

11            THE COURT:  All right.  I got it.  All right.  Let's

12   stand in recess for 15 minutes.

13            MR. KURLAND:  All right.  Thank you, Your Honor.

14            (Recess.)

15            THE COURT:  We'll have the jury, please.

16            MR. MARTIN:  Your Honor, just as a reminder, I have a

17   board meeting this afternoon.  So I should be out of here to get

18   up Downtown, there's a complication with the students, I have to

19   be there by four, so I should have 20 minutes once I leave here.

20   So if we could leave at 3:40.

21            THE COURT:  All right.  Fine.

22            MR. MARTIN:  I suspect I'm going to be in the middle of

23   my cross when that happens.

24            (Jury enters the courtroom.)

25            THE COURT:  Please be seated, ladies and gentlemen.

1    Whenever you're ready, Mr. Harding.

2    BY MR. HARDING:

3    Q    Thank you, Your Honor.  Mr. Dobropolski, when we broke we

4    were talking about an occasion in December of '03 when you went

5    to Parole and Probation to meet with, to try to met with Mr.

6    Harris.  Do you recall that?

7    A    Yes.

8    Q    Okay.  Now, do you recall what you first started talking to

9    him about when you ran into him there?

10   A    When I first started talking to him about?  He brought up,

11   he brought up robbing drug dealers, Ecstasy dealer out in

12   Delaware.

13   Q    Okay.  Let me ask you if -- you testified that you wrote out

14   a written statement about your meeting that day.  Would it

15   refresh your recollection to refer to your notes on that?

16        MR. MARTIN:  Objection, Your Honor.  He didn't say he

17   didn't have any recollection.

18        THE COURT:  Right.  Let's see what he remembers.  Go

19   ahead, Mr. Harding.

20   Q    Okay.  Did you have, did you have a discussion about having

21   trouble getting a hold of him?

22   A    Yes.

23   Q    Okay.  Had you changed home addresses?

24   A    Yes, I did.

25   Q    Did you explain that to him?

1    A    Yes.

2    Q    Did you explain to him why you had -- were you afraid you

3    were going to be violated on your probation?

4              MR. MARTIN:  Objection, Your Honor.

5              THE COURT:  Overruled.  You may answer.

6    A    Not really, but that's what I said.

7    Q    Okay.  What did you tell Mr. Harris?

8    A    I can't remember precisely what, I can't remember exactly

9    what I told him.

10   Q    Would it refresh your recollection to look at your

11   handwritten statement?

12   A    Maybe.  Let me see it, please.

13             THE COURT:  Mr. Harding, you can have him tell the jury

14   when he made the statement and so forth.

15   Q    Mr. Dobropolski, can I ask you to turn to the second page of

16   this and then I'll ask you, did you write the date at the bottom

17   of this statement?

18   A    Did I write the date?

19   Q    Yeah.

20   A    No.  Write a statement for -- no, that's not my handwriting.

21   Q    Somebody else wrote that?  Okay.

22   A    Underneath my name, yeah.

23   Q    Did you sign your name to it?

24   A    Yeah, I signed my name at the bottom.  I think Detective

25   John Giganti who signed and dated, 12/11/03.

1    Q     Okay.  Is that when you wrote out, did you write out this

2    statement yourself?  Is this your handwriting?

3    A     Yes, it is.

4    Q     Do you recall, when you wrote it out, was it the same day

5    that you had this conversation with Mr. Harris or later?

6                MR. KURLAND:  Objection, Your Honor.

7                THE COURT:  Overruled.  You may answer.

8    A     Yes, it is.

9    Q     It was the same day?

10   A     Yep.

11   Q     Okay.  Have you had a chance to refresh your recollection

12   about this conversation you had about being afraid of, being

13   violated on your probation?

14   A     Yeah.  I just said that.  I don't think I was really worried

15   about violating my probation.

16   Q     What did you tell Mr. Harris?

17   A     That I was scared I would get violated.  That's why I

18   changed home addresses.

19   Q     And did you speculate as to why you were going to be

20   violated?

21   A     A couple dirty urines.

22   Q     Okay.  Are you saying that wasn't true, that you were just

23   saying that to Mr. Harris?

24   A     Yeah.  Actually, well, I was violated for dirty urines but

25   not at the time, no.  I was --

1    Q    Okay.

2    A    I was just saying that to say that.

3    Q    At that point in the conversation, what happened?

4    A    On my thing is I walked outside, smoked a cigarette, waited

5    for Shelton.  Yeah, actually, I did.  I left before Shelton.  He

6    went up and talked to his parole officer.  I think it was a

7    supervisor, supervising parole officer.  But while I was waiting

8    for him, I went outside and smoked a cigarette.

9    Q    Okay.  Did there come a time when Mr. Harris came down out

10   of his appointment with his probation officer?

11   A    Yes.

12   Q    What happened then?

13   A    He came outside, reached in the garbage can, grabbed a box

14   cutter.  And I lit up another cigarette.

15   Q    What did he say when he was grabbing his box cutter out of

16   the garbage can?

17   A    I have to get my shit.

18   Q    And what did you take that to mean?

19   A    A weapon.  That's usually where people keep them at.  Parole

20   and Probation right there.

21   Q    Okay.  What did you talk about then?

22   A    Oh, plans we had made before to stick up, take drug dealers

23   off.

24   Q    Did you, what did you say about that?

25   A    I said there was an Ecstasy dealer.  Well, I told Mr. Harris

1    when we were at Central Booking there was an Ecstasy dealer in

2    Delaware that we could probably take off for about 80 grand.  I

3    was talking to Mr. Harris that day, I explained to him that we

4    can probably go get it but we might have to kill some people in

5    the house and it didn't really bother me too much.

6    Q    Okay.  Did you then have a discussion about something you

7    had heard at CBIF, Central Booking?

8    A    No.  Actually, when I was in Cumberland.

9             MR. KURLAND:  Your Honor, objection.  Is the witness

10   supposed to be reading from the paper?

11            THE COURT:  I believe the witness has demonstrated that

12   he doesn't recall the specifics.  So Mr. Harding, if you want him

13   to read it, apparently there's an objection to the jury seeing

14   it.  But if you want to read it to him and have him verify your

15   reading or have him read it, I'll permit that.

16            MR. HARDING:  Okay.  Well, on Page Two, Mr. Harris, I'm

17   going to read the second to the last paragraph.

18            MR. KURLAND:  Objection.  The foundation for --

19            THE COURT:  Overruled.  Go ahead.

20   BY MR. HARDING:

21   Q    Can I put it on the screen, Your Honor?

22            THE COURT:  No.  Don't show it.  They don't want the

23   jury to see it but you can read it.

24   Q    I also told Shelton that when I was in prison I heard about

25   his work, which he told me about over CBIF, and I told him the

1    alias name of the person he killed, Woody.  He smiled and shook

2    his head as if to let me know that I was correct.  I also told

3    Shelton that I had argued with the guy Woody, and a friend of

4    his, Eric, back in 1996.  Woody and Eric sold drugs and guns in

5    the South Baltimore area back then.  The final thing that I said

6    to Shelton was that the person in prison that was talking about

7    the murders he committed tried to claim his work, meaning that

8    Shelton didn't do it.  Shelton got a strange look, angry look on

9    his face and stated, he tried to claim my work?  Exclamation

10   point.  I then told Shelton not to get mad, it was good when

11   people did that, and I ended the conversation.  Shelton left and

12   so did I.

13           Is that what you wrote, Mr. Dobropolski?

14   A    Yes.

15   Q    Let me ask you a couple questions.  You testified before

16   that the detectives wanted you to try to engage in a conversation

17   with Mr. Harris about this double murder involving Woody, is that

18   correct?

19   A    That's right.

20   Q    So did that have anything to do with your bringing up the

21   name "Woody" then?

22   A    Yeah.  I was trying to get him to talk about it a little

23   bit.

24   Q    Okay.  And you say that he shook his head and smiled when

25   you asked him about the alias name of the person he killed,

1   Woody.  And you, and you wrote here, as if to let me know that I

2   was correct?

3   A    That's right.

4        MR. MARTIN:  Objection, Your Honor.  This is all asked

5   and answered.

6        THE COURT:  Overruled.

7   A    That's right.

8   Q    And then you start explaining that you had had an argument

9   with Woody back in 1996.  Was that true or untrue?

10  A    It is true, and I believe that they're the same people.  I

11  think, I mean, Woody's not a really common name, whatever.  But I

12  know that I was arguing with somebody in my neighborhood that

13  sold drugs and weapons.  I got in an argument with a dude named

14  Woody and a guy named Eric.  They were from Park Heights.  So I

15  kind of, I was assuming that they were probably one and the same.

16  Q    Okay.  And then you mentioned that some guy in prison had

17  taken, had tried to claim credit for that murder, those murders.

18  Was that true?

19  A    Yes.  No one ever said that.  I was just trying to engage

20  him in a consideration.  He can talk about it a little bit more.

21  Q    So that was a device you made up to get him to talk about

22  it?

23  A    That's right.

24  Q    Did it work?

25  A    To a certain degree.  I mean, yeah.  I mean, he was kind of

1    upset that someone was taking his work, claiming his work.  At

2    that time I told him, well, that's a good thing, because, you

3    know what I mean, it kind of gets the heat off you a little bit.

4    I remember the conversation.

5    Q    Okay.  Now, at this time, Your Honor, I'd like to play a

6    section, a few minutes from a tape recorded version of this

7    meeting.

8              THE COURT:  Very well.

9              MR. HARDING:  And if I could explain, we're playing it

10   over these speakers here on our table.  We can't hook it up to

11   the courtroom system because we can't fast forward, if we do

12   that, to the spot I want to play.  And I'm sure no one wants to

13   listen to all the preliminary stuff before we get to it.

14             THE COURT:  All right.

15             (Tape playing.)

16   BY MR. HARDING:

17   Q    So that's not a very good recording, is it, Mr. Dobropolski?

18   A    No, it's not.

19   Q    You can make out some of the phrases along the way, however?

20   A    Yeah, a little bit.

21   Q    Okay.  I wanted to ask you about a couple of phrases that I,

22   I heard, and see if you heard them, too.  At a couple of points

23   Mr. Harris appears to talk about a beeper and he gives you a

24   beeper number, is that correct?

25   A    Right.

1              MR. MARTIN:  Objection, Your Honor.

2              THE COURT:  Overruled.

3              MR. MARTIN:  The jury can determine that.

4              THE COURT:  Overruled.

5    BY MR. HARDING:

6    Q    Did he actually give you his beeper number that day?

7    A    Yes, he did.

8    Q    Okay.  And at another point a little later on he says, oh,

9    he's trying to claim that.  Do you remember that phrase?

10   A    Yes, I do.

11   Q    What's he talking about there?

12   A    About his two murders in Rahman's car.

13   Q    Okay.  Is this the segment of the conversation, then, that

14   you were talking about when you say that you raised this issue of

15   Woody and made up this story about how someone was claiming

16   credit for it?

17             MR. MARTIN:  Objection, Your Honor.

18             THE COURT:  Overruled.  You may answer.

19   A    That's right.

20   Q    Okay.  And then there's a mention of, I'm about to get to my

21   man on North Avenue, my man on North Avenue?

22   A    Um-hum.

23   Q    What is he talking about there, do you know?

24             MR. MARTIN:  Objection.

25             THE COURT:  Overruled.

1    A    He's talking about, I think, a studio or something.

2              MR. MARTIN:  Objection.

3              THE COURT:  Go ahead.  Overruled.

4    A    I believe he was talking about a studio where he was working

5    on some CD's or something, something of that nature.

6    Q    Okay.  Do you know who "my man" is, when he refers to my man

7    in here?

8    A    No, I don't.

9    Q    Okay.  And then near the end of what we listened to, you

10   hear, what's up with you, Shorty?  Do you recall that?

11   A    Yeah.  I think that was just somebody passing by.

12   Q    So he wasn't talking to you?

13             MR. MARTIN:  Objection.  He didn't say who was talking.

14             THE COURT:  Overruled.  You may answer.

15   A    I don't think so.

16   Q    Okay.  All right.  Did you have another similar meeting with

17   Mr. Harris on January 8th of 2000 and -- sorry.  January 8th of

18   2004, I think this would be.

19   A    Yeah.

20   Q    And did you try to record another conversation that day?

21   A    Yes, I did.

22   Q    And did you prepare another handwritten statement regarding

23   that meeting?

24   A    Yes.

25   Q    Do you recall what you talked about at that meeting?

1    A    I think I was trying to hook up with him to go try to rob

2    these drug dealers, trying to get him to meet me.

3    Q    Anything else?

4    A    Not right offhand, no.

5    Q    Would it refresh your recollection to look at your

6    handwritten statement?

7    A    It might.

8              THE COURT:  Just take your time and review that, Mr.

9    Dobropolski.

10             (Pause in proceedings.)

11   A    I remember this.  But the meeting didn't actually take

12   place.

13   Q    It didn't take place?

14   A    No.  It didn't take place.

15   Q    So what are your handwritten notes referring to?

16   A    A phone conversation.

17   Q    Oh, I see.  So what did you talk about in the phone

18   conversation?

19   A    Trying to hook up with him.  Trying to meet with him so that

20   we could go ahead and set some drug dealers up to rob.

21   Q    Okay.  So you didn't actually meet with him on January 8th?

22   A    No.

23   Q    How about on January 6th?  Did you have a meeting with him

24   on January 6th?  I guess you would have no way of remembering

25   that date, would you?  Let me ask you a different question.  I

1    have here -- may I approach the witness, Your Honor?

2              THE COURT:  Yes.

3    Q    I have here an exhibit that actually isn't marked, but what

4    should be MB-50, I believe.  You recognize that?

5    A    Yeah.

6    Q    What is it?

7    A    It's Shelton's numbers.  I'm not sure -- yeah, I think page

8    number and his cell number.

9    Q    Did he write that out?  Is that his writing or your writing?

10   A    I think this is his writing.  It's not mine.

11   Q    Did you turn that over to the detectives after he gave it to

12   you?

13   A    Yes, I did.

14   Q    I'm going to put this on the screen.  Okay.  Does that say

15   Roc, 410-888 -- 880-1749.  Do you see that?

16   A    Right.

17   Q    Is that the same beeper number that he gave to you in the

18   recorded conversation we just heard or do you recall?

19   A    I think it is.

20   Q    Okay.

21   A    I know this number was given in the recording.

22   Q    And then there's another number listed there as home, is

23   that correct?

24   A    Right.

25   Q    Okay.  Did Mr. Harris get arrested, were you aware that he

1    got arrested later on in January on federal charges?

2    A    Yes.

3    Q    Okay.  I'm going to show you part of an exhibit called HA-1,

4    which isn't in evidence yet.  But I'm going to ask you about this

5    particular slip.  Did you write that out?

6    A    Yes, I did.

7    Q    Okay.  Now, after Mr. Harris got locked up on these federal

8    charges in 2004, did you have another probation violation hearing

9    in front of Judge Byrnes in May of 2004?

10   A    Yes, I did.

11   Q    And why was that?

12   A    Dirty urines and failing to report.

13   Q    Okay.  So you had been out on the street and you were

14   charged with violating your probation, is that correct?

15   A    Yes.

16   Q    And you had a hearing in front of the same judge?

17   A    Um-hum.

18   Q    On that occasion, did I go out there to the courtroom, along

19   with a state prosecutor?

20   A    Yes.

21   Q    Okay.  And do you recall, did I explain to the judge that

22   you were trying to cooperate with a federal investigation?

23   A    Yes.

24   Q    Did the judge agree to reinstate you on your probation?

25   A    Yes, he did.

DIRECT EXAMINATION OF DOBROPOLSKI

121

1    Q    Did you, some months later, at the end of 2004, get

2    rearrested again?

3    A    Yes, I did.

4    Q    What did you get arrested for on that occasion?

5    A    Domestic violence and unauthorized use.

6    Q    And did you eventually get sent back to jail for that by the

7    judge?

8    A    Right.

9    Q    And so did you get out of jail eventually after you did the

10   time remaining on your probation?

11   A    Yes.

12   Q    Okay.  And then did you get arrested more recently?

13   A    Yes.  Auto theft.

14   Q    That's the auto theft charge you told us about at the

15   beginning, is that correct?

16   A    Right.

17   Q    You said you've been locked up now for 17 months, is that

18   right?

19   A    Um-hum.  Yes.

20   Q    Okay.  Did you serve your whole sentence for, the whole rest

21   of your probation time because of the violation you committed

22   when you picked up that car theft charge?

23   A    Yeah.

24   Q    Okay.  So you didn't get any reduction in your sentence for

25   the fact that you had cooperated?

1    A    No.  Eight years.  Eight years.

2    Q    Okay.  That was the time remaining from your eight years

3    year sentence, is that what you're saying?

4    A    Yeah.  The rest of the time.

5    Q    Okay.  One minute.  No further questions, Your Honor.

6         THE COURT:  Mr. Martin, why don't you go ahead and get

7    started?  We'll go a few minutes and then we'll break for lunch.

8         MR. MARTIN:  All right, Your Honor.  Thank you.

9         THE COURT:  And you can complete your examination after

10   lunch.

11        CROSS EXAMINATION

12   BY MR. MARTIN:

13   Q    Mr. Dobropolski, good afternoon.

14   A    Good afternoon.

15   Q    My name's Gerry Martin and I represent Mr. Harris.  I want

16   to ask you a few questions.  Probably more than a few.  That

17   won't surprise you, will it?

18   A    No.

19   Q    You just testified one minute ago that you didn't get any

20   reduction in your sentence because of your cooperation.  Do you

21   recall that was the last question Mr. Harding asked you?

22   A    Right.

23   Q    But in 2003, two state prosecutors went to Judge Byrnes and

24   got you out of jail, didn't they?

25   A    Yes.

1    Q    You got out early, didn't you?

2    A    Sure.

3    Q    And I think your testimony was seven to nine months early?

4    A    Seven to eight.

5    Q    Did you have a release date at that point in time or was

6    that just your guess as to when the State would release you?

7    A    More than likely.

8    Q    It was more than likely?

9    A    Yeah.  About seven, eight months.

10   Q    But you could have served the rest of that sentence, the

11   whole four years, couldn't you?

12   A    No.

13   Q    Why not?

14   A    Well, there's only so much good time with loss, if I would

15   have went on lock-up or anything.  There's a certain amount they

16   couldn't have taken so I wouldn't have done the whole four years.

17   Q    Okay.  And you know the system pretty well, don't you?

18   A    A little bit.

19   Q    Well, you've been in a jail most of your adult life, isn't

20   that right?

21   A    That's right.

22   Q    Do you know how many months in your, let's take it since you

23   were born in, what, 1972?

24   A    '70.

25   Q    1970.  So you were 18 in 1988, right?

1    A    Right.

2    Q    Do you know how many months you have been out of jail

3    between 1988 and today?

4    A    How many months or years?

5    Q    How many years?  How many years do you think total?

6    A    Maybe, maybe five.

7    Q    All right.  Five or less, isn't that right?

8    A    Maybe five.  Yeah, maybe less.  I'm not sure.

9    Q    Well, I have a record here that I'll show you in a few

10   minute and we can talk about it.

11   A    All right.

12   Q    So you got out seven or eight months early because the

13   police and prosecutors went to bat for you with Judge Byrnes in

14   October of 2003, correct?

15   A    In fact, I didn't even want them to do that.

16   Q    You didn't want them to do that?

17   A    No.  I wanted to finish my sentence before I even attempted

18   to do any of this stuff.

19   Q    But they wanted you out so they could put you together with

20   Mr. Harris?

21   A    Yeah.  That's right.

22   Q    And that wasn't your idea?

23   A    No.  That wasn't my idea.  They showed up the second time

24   without even telling me they were coming.

25   Q    And the second time being what?  When was the first time?

1    A    First time is when I talked to Detective Niedermeyer, the

2    initial meeting I had with Tommy Mallin and Detective

3    Niedermeyer, two homicide detectives.  The second time they

4    showed up a few weeks later, two to three weeks later.  And I

5    asked them what they were doing.  They said they were taking me

6    to court because we need you to work for us.

7    Q    So the first time was the meeting you described with

8    Detective Mallin, who you said you were pretty tight with?

9    A    Yep, that's right.

10   Q    He was a South Baltimore narcotics detective, right?

11   A    He was.

12   Q    And you pretty much lived in South Baltimore and did a lot

13   of crimes in South Baltimore, isn't that right?

14   A    From time to time, yes.

15   Q    From time to time?

16   A    Um-hum.

17   Q    And from 1996 on you were in South Baltimore, isn't that

18   true?

19   A    From 1988 on.

20   Q    Okay.  From the 1988 on you were in South Baltimore?

21   A    Right.

22   Q    And that's where you were committing your crimes?

23   A    Um-hum.

24   Q    And --

25             THE COURT:  Mr. Dobropolski, please say yes or no.

1    A    Yes.

2    Q    And Detective Mallin got to know you during that time,

3    didn't he?

4    A    Yes, he did.

5    Q    So you felt you could trust him and that's why you wanted

6    him to be at any meeting?

7    A    Yes.

8    Q    And if he hadn't been there, you wouldn't have talked, would

9    you?

10   A    Probably not.

11   Q    Okay.  So he and Detective Niedermeyer show up.  Where were

12   you housed at the time?  Is it Western Correctional Facility?

13   A    WCI.

14   Q    And where's that?

15   A    Cumberland.

16   Q    So they drove up to Cumberland, picked you up?

17   A    Um-hum.

18   Q    Took you where?

19   A    State Police barracks.

20   Q    In Cumberland?

21   A    Yes.

22   Q    What time?  Do you remember what time they picked you up?

23   A    Maybe around, maybe around noon sometime, I'm assuming.  I

24   can't really remember.

25   Q    Around noon.  Did they tell you why they were there or did

1   you know?

2   A    I knew.

3   Q    Did you know they were coming?

4   A    No, I didn't.

5   Q    All right.  So they took you and they took you from the

6   Western Correctional Facility to the State Police barracks in

7   Cumberland?

8   A    Yes, they did.

9   Q    Is that about a ten minute ride?

10  A    Maybe a little bit longer.

11  Q    Okay.  15?  20?

12  A    Yeah.  I'd go with that.  15, 20.

13  Q    And on the ride, did you talk to them?

14  A    Excuse me?

15  Q    Did you talk to them on the ride?

16  A    No.  But they were just explaining that they got, got a

17  whole another, judge sent them my letter, that they wanted to

18  talk to me about it.  Nothing really to say.

19  Q    And did they ask you any questions in the car about what you

20  knew?

21  A    Nope.

22  Q    So you got to Cumberland and they showed you these photo

23  ID's --

24  A    That's right.

25  Q    -- that Mr. Harding put in.  And you identified each, Mr.

CROSS EXAMINATION OF DOBROPOLSKI BY MARTIN

128

1    Mitchell and Mr. Harris, right?

2    A    That's right.

3    Q    And on the back you wrote those little things that you wrote

4    that we saw today?

5    A    Yeah, that's right.

6    Q    Did you actually write that or did the detectives write it?

7    A    I wrote it.

8    Q    And while you were doing that, you were talking to them,

9    isn't that right?  Describing what you knew?

10   A    No.  They just pretty much asked me to pick the people out.

11   Q    Pick what people out?

12   A    That I came into contact with concerning this case.

13   Q    How did they know what --

14   A    That I had information about.

15   Q    Without talking to you, how did they know what photos to

16   show you?

17   A    Well, they gave me a photo array of six pictures and asked,

18   if I hadn't seen the people --

19   Q    If these two people, these two individuals in the courtroom

20   here were among that photo array of six people?

21   A    Yes, they were.

22   Q    So they already had Mr. Harris's name before you gave it to

23   them?

24   A    I wouldn't know that.  I had no idea.

25   Q    Well, you identified him as one of -- I assume -- strike

1    that.  I assume they didn't bring a hundred pictures with them up

2    to Cumberland to question you, did they?  They brought six,

3    right?

4    A    Yeah.  Six for each person, yes, that's correct.

5    Q    And among the six was Mr. Harris?

6    A    Yes.

7    Q    So somehow or another they knew about Mr. Harris before they

8    came to see you, isn't that right?

9              MR. HARDING:  Objection.

10             THE COURT:  Overruled.  You may answer.

11   Q    You can answer.

12   A    I guess.

13   Q    Okay.  And then when you identified these pictures, and I

14   think you identified Mr. Harris at 1:05, if I remember the

15   exhibit.  And you identified Mr. Mitchell at 1:15.  Correct?

16   A    I don't know.

17   Q    You don't remember?  All right.  Well, it's in evidence.

18   We'll let the jury decide that.  The photos.  That's what they

19   say.

20             This is, I believe, your identification of Mr.

21   Mitchell, is that correct?  Handled some business for him.  Do

22   you see that, sir?

23   A    No, I really can't see.  I see half of it.

24   Q    You can't see?  See it now?

25   A    Yeah.

1  Q    That's Mr. Mitchell, right?

2  A    Can I see the front and I'll tell you?  Yup.  That's Mr.

3  Mitchell.

4  Q    And it says that you identified him at 1:15.  Can you read

5  that up there or do you want me to turn it over?

6  A    I don't know what you're talking about, 1:15.

7  Q    Okay.  Let's look at the back again.  What does it say

8  there?

9  A    Oh, 1:15 p.m.  Okay.  You're talking about the time.  All

10  right.

11  Q    Okay.  And show you -- do you recognize that as the

12  photograph you identified of Mr. Harris?

13  A    Yeah.

14  Q    And that --

15  A    Yes.

16  Q    -- says one p.m., does it not?  Can you see that?

17  A    Yes.

18  Q    Where it says time?  All right.  So by 1:15, you had

19  identified both of them.  And then the detectives spoke to you,

20  did they not, about what you knew?

21  A    I think that's right.

22  Q    And they were taking notes, weren't they?

23  A    I really can't remember.  It's been like six years.

24  Q    You can't remember whether they took notes?

25  A    No.  I had to write some stuff down.

1   Q    You had to write some.  What did you have to write down?

2   A    What Mr. Harris told me.

3   Q    So you wrote that down that day?

4   A    I think I wrote something down concerning that.  It might

5   have been the back of this.  Like I said, it's been like six

6   years.

7   Q    So what you wrote may have been what I just showed you?

8   A    May have been.

9   Q    Well, you're not sure.  That's Government's Exhibit MB-39

10  and MB-40.  Did you write anything else down?

11  A    I'm not sure.  It's been six years.

12  Q    Did they write anything down?

13  A    I'm not sure.

14  Q    At some point after you identified these people and after

15  you had some conversations with them, they turned on a recorder,

16  isn't that right?

17  A    Yes, they did.

18  Q    And then they asked you questions again about what you knew,

19  right?

20  A    Um-hum.

21  Q    Yes?  Is that a yes?

22  A    Yes.

23  Q    Okay.  Your Honor, I might suggest this is a good time --

24            THE COURT:  All right.

25            MR. MARTIN:  -- to break.

1          THE COURT:  Members of the jury, we'll break for lunch

2     at this time.  Please leave your note pads on your chairs.  Have

3     no discussion about the case during this recess.

4          It's approximately ten after one.  I'm going to ask you

5     to be back in the jury room no later than 2:30 p.m. this

6     afternoon.

7          We will be breaking a little earlier this afternoon so

8     we probably will not have an afternoon recess, ladies and

9     gentlemen.  But we'll break a little early.

10         Jury is excused until 2:30.  We're in recess until

11    2:30.

12         (Luncheon recess at 1:05 p.m.)

13         (Jury not present in courtroom.)

14         THE COURT:  Could I have the jury, please?

15         MR. HARDING:  Judge, could I ask, Your Honor said

16    before the break you told the jury we were going to break early

17    today.

18         THE COURT:  Yeah.  I didn't realize that Mr. Martin

19    needed to leave by 20 of 4?

20         MR. MARTIN:  That's correct, Your Honor.

21         MR. HARDING:  There was some discussion --

22         MR. MARTIN:  I think I said a quarter to four the other

23    day.

24         THE COURT:  Quarter to four.  I thought it was on the

25    other side of 4:00.

1        MR. HARDING:  Okay.  There was some discussion last

2   weak of Mr. Martin leaving but us not suspending the proceedings

3   because of that, because Mr. Harris --

4        THE COURT:  There was that discussion.  And I take it,

5   Mr. Martin, if you've concluded your cross -- well, he wants to

6   be here for the other cross.

7        MR. MARTIN:  I would prefer to be here for the other

8   cross, Your Honor.

9        THE COURT:  All right.  Well, we may make it.  Let's

10  see how it goes.

11       MR. HARDING:  Should we let our other witness go for

12  the evening?

13       THE COURT:  No.  Hold on to him for now.  I will say,

14  for the record, obviously, I haven't heard the cross examinations

15  yet.  But nothing that I heard during the direct examination

16  calls into question the Court's earlier ruling with respect to

17  Rule 801.  And I'll be alert to any need to modify that ruling as

18  we go forward.

19       MR. HARDING:  Judge, I will, before the jury gets here,

20  I will object to simply displaying something that's not in

21  evidence, which is quite clearly not even an official document.

22       THE COURT:  Okay.  Mr. Martin, you can just read those

23  dates to the witness.

24       MR. MARTIN:  Your Honor, there's s lot of them.  I will

25  read them that way.  I will suggest to the Court, tell the Court

1    that I have, if I have to subpoena everybody for the backup for

2    this sheet that I have, I will do that if I have to.  They are

3    official records we obtained by subpoena pretrial, or we got them

4    off the Internet.  They're records of Mr. Dobropolski's

5    institutional movement since he's been incarcerated, for the

6    first time on February 7th, 1989.

7              THE COURT:  Okay.  Well, don't show the document to the

8    witness, just read the dates.

9              (Jury enters the courtroom.)

10             THE COURT:  Good afternoon, ladies and gentlemen.

11   Whenever you're ready, Mr. Martin.

12   BY MR. MARTIN:

13   Q    Thank you, Your Honor.  Good afternoon, Mr. Dobropolski.

14   A    Good afternoon.

15   Q    Mr. Dobropolski, is it fair to say that your first adult

16   conviction occurred in 1989?

17   A    '89 or '88.

18   Q    '89 or '88.  What was that for, do you remember?

19   A    Auto theft.

20   Q    Pardon me?

21   A    Auto theft.

22   Q    Okay.  And were you locked up for that?

23   A    I was released on bail and given probation before judgment.

24   Q    So if you were locked up, it was only for a few days?

25   A    A few hours.

1   Q    A few hours.  All right.  And then, do you remember what

2   your second conviction was?

3   A    Auto theft, I think.

4   Q    And that was in December of '89?

5   A    I think so.  I believe so.

6   Q    And you were sent to Volunteers of America?

7   A    No.

8   Q    It's a halfway house, isn't it?

9   A    The first sentence was for auto theft.

10  Q    Pardon me?

11       THE COURT:  Please keep your voice up, Mr. Dobropolski.

12  A    First sentence was for auto theft.

13  Q    The first sentence.  And were you placed at the Volunteers

14  of America to serve your sentence, a work release type sentence?

15  A    No.  I was being detained there.  Not --

16  Q    So you were detained pending trial?

17  A    Right.  And it wasn't for auto theft.  That was for a charge

18  that was dismissed.

19  Q    Okay.  But you were detained there and you escaped from

20  there, did you not?

21  A    Yeah, I left.

22  Q    You left?

23  A    Yes.

24  Q    They called it an escape, though, didn't they?

25  A    Yeah.  They do that now.

CROSS EXAMINATION OF DOBROPOLSKI BY MARTIN          136

1    Q    You don't think they should be doing that?

2    A    If you can walk out, it shouldn't be an escape.

3    Q    Even if you're not authorized to walk out?

4    A    I'm not going to get into semantics.  That's how it fits.

5    Q    And after you walked out, you were incarcerated again in the

6    Baltimore City Detention Center, right?

7    A    Right.

8    Q    And then that charge was then dismissed about a month later?

9    A    Um-hum.  Yes.

10   Q    Okay.  And then in June of 1990, you were again in the

11   Baltimore City Detention Center.  Do you remember that?

12   A    No, but I take your word for it.

13   Q    And what was that for?

14   A    I have no idea.

15        MR. HARDING:  Judge, I object.

16        THE COURT:  Sustained.

17   BY MR. MARTIN:

18   Q    Were you convicted of a crime -- what was the second crime

19   you were convicted of, Mr. Dobropolski?

20   A    I don't know.

21   Q    What are our choices?

22   A    I have no idea.

23   Q    Carjacking?

24   A    Carjacking?  Where do you get that from?  That's not on my

25   record.

1    Q    Auto theft?

2    A    Is that what's on my record?  I mean, you have it in front

3    of you, right?

4    Q    I have your detention institutional movement record in front

5    of me.  Someone else has those other records and they'll go

6    through them with you.  But do you recall?

7    A    No, I don't.

8    Q    Okay.  You told me this morning, did you not, that, I guess

9    it was probably this afternoon, even, that you probably haven't

10   been out of jail more than a total of five years?

11   A    Yeah.  Yes.

12   Q    Since 1989 or '88?

13   A    '88, that's right.

14   Q    And when you were out of jail, you were on the street in

15   South Baltimore committing crimes, is that right?

16   A    I didn't say I was out there committing crimes.  I was in

17   South Baltimore.  Some of them happened in South Baltimore, some

18   of them didn't.

19   Q    Where did the other ones happen?

20   A    Wherever.

21   Q    Wherever?

22   A    Yeah.

23   Q    You were living in South Baltimore at the time, weren't you?

24   A    Yeah.  More than likely, yeah.

25   Q    More than likely from '88 until now, when you were out on

CROSS EXAMINATION OF DOBROPOLSKI BY MARTIN                    138

1    the street, you were living in South Baltimore?

2    A    Right.

3    Q    Okay.  You heard the rap song that, I guess it was not the

4    song, but the rap lyrics that were read to you this morning by

5    Mr. Harding?

6    A    Yes.

7    Q    And you told the jury, I think, that Mr. Harris was the one

8    who wrote those rap lyrics while he was in prison with you?

9    A    In Central Booking.

10   Q    In Central Booking.  All right.  So you actually saw him

11   writing these things?

12   A    Yes.

13   Q    And as he wrote them, he sang them to you, serenaded you

14   with them?

15   A    He wasn't serenading me with them.  But yeah, he was letting

16   me hear what he was writing, that's right.

17   Q    Did he sing you to sleep with them?

18   A    No.  He usually went to sleep before I did.

19   Q    So this was during your waking hours?

20   A    That's right.

21   Q    Did he perform for you?

22   A    No.  He used to rap on the tier and stuff for other inmates.

23   Q    But he didn't perform for you in the cell?

24   A    He would let me hear what he wrote.  No, but it wasn't like

25   an all out performance.

1   Q    And in particular, you remember the one that you read this

2   morning about cracking or busting spines, was it?

3   A    That's right.

4   Q    And is that actually what you did, you told him you did?

5   A    No.  That was his idea.  That's what he came up with.

6   Q    You told him you beat people up?

7   A    Oh.  That's what he heard about me, yeah.  And I'm sure I

8   told him I beat people up, too, yeah.

9   Q    And you did beat people up, didn't you?

10  A    I had.  I have an extensive assault record.

11  Q    And you did that when you were in South Baltimore, didn't

12  you?

13  A    South Baltimore, yeah.

14  Q    Now, you mentioned some names that Mr. Harris gave to you

15  when you were having these conversations with him in, I believe,

16  is it September of 2002 when you were both locked up together,

17  roommates for two weeks?

18  A    August, 2002.  August or September, yeah.

19  Q    So it was the end of August and into September, correct?

20  A    Probably.

21  Q    Okay.  And you mentioned the name Jules Collins?

22  A    Yeah.  Julius.

23  Q    Who is Julius Collins?

24  A    Dude I sort of grew up with, in prison with.  Got a serious

25  reputation of being a killer.

1    Q    A dude you grew up with, in prison with?

2    A    Yep.

3    Q    So you met Julius Collins, Jules Collins in -- is it Jules

4    or Julius?

5    A    Julius.

6    Q    You met Julius Collins in prison?

7    A    That's right.

8    Q    So you grew up with him in prison?

9    A    Yeah.

10   Q    Because that's pretty much where you grew up, isn't it, in

11   prison?

12   A    No, not really.

13   Q    Well, since you were 18?

14   A    Yeah.

15   Q    Now, Julius Collins, how old is he?

16   A    Mid thirties.

17   Q    Mid thirties?

18   A    Yeah.

19   Q    And where was he from?

20   A    Northwest Baltimore.

21   Q    Northwest Baltimore.  Where in Northwest Baltimore?

22   A    Woodland Avenue.

23   Q    Woodland Avenue.  Okay.  How about Stover Stockton?  Who is

24   he?

25   A    Just names I heard in general out in the Park Heights area.

1    I don't know him.

2    Q    Somebody you didn't know?

3    A    No.

4    Q    You don't have any idea how old he is or anything else, do

5    you?

6    A    Nope, wouldn't be able to tell you.

7    Q    Pardon me?

8    A    Nope.

9    Q    This person Lex, who is that?

10   A    I think one of Stover's codefendants.

11   Q    Do you know him?

12   A    Nope.

13   Q    Just somebody you heard of?

14   A    That's right.  All related to the Park Heights area.

15   Q    And as you would call it, a serious dude?

16   A    Serious dude.

17   Q    Okay.  But you don't know him?  You never met him?

18   A    Nope.

19   Q    Don't have any idea how old he is, do you?

20   A    Nope.

21   Q    And you told us this morning that when Mr. Harris spoke with

22   you, he told you that the murder in Mr. Rahman's car, that it was

23   about, a rap music dispute over money?  Isn't that what you told

24   us this morning?

25   A    Yeah.  It was like in general.  It was never really

1    pinpointed.  He was telling me about, more or less about the

2    murders that he committed.

3    Q    And he was telling you that this particular murder was about

4    a rap music dispute over money, isn't that right?  Yes or no?

5    A    Yes.

6    Q    Let me ask you about the letter that you wrote to Judge

7    Byrnes in April of '03, the one that you read this morning.

8    A    Sure.

9    Q    Do you recall that?

10   A    Yes.

11   Q    It's true, isn't it, Mr. Dobropolski, that what you were

12   doing was dangling this information that you had about this

13   double murder and saying you won't speak with the police while

14   incarcerated, right?

15   A    That's right.

16   Q    So your purpose in writing the letter was to let whoever was

17   going to read it know, I got this information, but unless I get

18   out I am not going to tell anybody what it is, isn't that right?

19   A    No.  That's not correct.

20   Q    That's not?

21   A    Because I didn't even want to talk to him until I was

22   released.

23   Q    But that's what you wrote, isn't it?

24   A    That's right.  Now I deal with the rest of the stuff when I

25   get released from prison.  I didn't ask them to take me to court.

1    Q    But you did write that to Judge Byrnes, saying, unless I get

2    out, I'm not going to give anybody this information, didn't you?

3    A    I don't think I put it like that, unless you see it written

4    like that, word for word.

5    Q    Let me show you.

6    A    Unless I get out --

7         THE COURT:  Just wait, wait for the question, Mr.

8    Dobropolski.

9    Q    And do you see that sentence that begins "however?"  It's

10   highlighted.

11   A    Yep.

12   Q    However, and I am firm about this, I will not and cannot

13   work with or speak with officers while I am incarcerated,

14   correct?

15   A    That's right.

16   Q    So a condition of your telling them anything was that you

17   had to get out of jail, right?

18   A    That was their idea.  It wasn't mine.

19   Q    Well, you wrote this letter before anybody knew about you,

20   didn't you?

21   A    Yeah.  But that was the detective's idea.  It wasn't mine.

22   I don't want to deal with this while I was incarcerated.

23   Expected to wait eight months and come home --

24   Q    When you wrote this letter --

25   A    I mean, how many I got in.

1    Q    Let me put it in front of you again, please.  When you wrote

2    this letter, the detectives didn't even know about you, did they?

3    A    No, they didn't.

4    Q    And you wrote, I will not and cannot work with or speak with

5    officers while I am incarcerated, didn't you?

6    A    Um-hum.  Yeah.  But then -- all right.

7    Q    You want me to leave it up there?  I'm sorry.

8    A    Yeah.  If you come down a little bit further, I said,

9    because it will actually put me in some kind of danger.  I put

10   that there.  Could get me killed.

11   Q    I understand.  But you said, I'm not going to tell you

12   anything unless I get out of jail?

13   A    You can probably highlight whatever you want and say what

14   you want, but if you read the whole letter you'll understand what

15   I was talking about.

16   Q    We've seen the whole letter.

17   A    Yeah, I've seen it.  I wrote it.

18   Q    And you asked the judge if he would consider modifying your

19   sentence, didn't you?

20   A    Modify my sentence?

21   Q    And you say, that way, didn't you, at the end of that

22   sentence?  Modify my sentence, that way?

23   A    That's the only way I will be able to -- can you turn this

24   over?  There's another page, right?

25   Q    Sure.  Go ahead.  I'll put it up for you.  That way to work

1    with law enforcement.  Correct?

2    A    That's it.

3    Q    But you say -- let me put it back up again just so we get

4    the whole thing.  Would you consider modifying my sentence that

5    way?  That's the only way I'll be able to work with law

6    enforcement.  Correct?

7    A    That's right.

8    Q    In other words, I can't work with law enforcement unless I

9    get out?

10   A    Yeah, I can't do it from my prison cell, that's right.

11   Q    All right.  And you said this morning, did you not, that you

12   didn't want to get out?  You wanted to serve the rest of your

13   sentence?  Didn't you?

14   A    Finish the last eight months, that's correct.  I wanted to

15   finish the last eight months.  I would have did this when I got

16   released.

17   Q    So you didn't want Judge Byrnes to let you out.  You wanted

18   to wait and then work with law enforcement after you got out?

19   A    That's right.

20   Q    You wanted Judge Byrnes, you say in this letter, modifying

21   my sentence.

22   A    He wouldn't have had to modify my sentence.  I still would

23   have did it.  They still would be sitting right over there.

24   Q    Well, you did modify your sentence to the point where you

25   got out, as you said this morning, at least eight months earlier,

1    right?

2    A    Yeah.

3    Q    And at the end of this letter you have what I guess we could

4    call a postscript.  You say, the information I have?  See that?

5    It's about a double murder that took place in Northwest Baltimore

6    in the Park Heights area, correct?

7    A    Yup.

8    Q    All right.  So you told the police that it was in Park

9    Heights.  You told the police that it was a male and female that

10   were shot in the head?

11   A    That's right.

12   Q    You told the police that the car drifted?

13   A    Um-hum.

14   Q    Correct?

15   A    That's right.

16   Q    Now, at that point in time you didn't name the victim, did

17   you?

18   A    No, I didn't.

19   Q    You didn't know the victim's name at that point, did you?

20   A    No, I didn't.  That's right.

21   Q    Now, Mr. Harding didn't show you, but I want to show you

22   this letter.  You wrote a second letter to Judge Byrnes, didn't

23   you?

24   A    That's right.

25   Q    Because you didn't get any response to your first letter,

1    huh?

2    A    That's right.

3    Q    Now, before you began your prison sentence or about the same

4    time you began this prison sentence of Judge Byrnes, was that a

5    violation of probation that put you back in jail in '02?

6    A    Violation of court order.  It wasn't a violation of

7    probation.

8    Q    Right.  The court order was that you go to Second Genesis,

9    right?

10   A    Right.  And I left.

11   Q    And you walked away from Second Genesis?

12   A    Yes.

13   Q    And when your probation officer and Judge Byrnes found out

14   about it, they called you in and he gave you a sentence, right?

15   A    I didn't have a probation officer at the time.  I was

16   released from prison to Second Genesis, violated the court order,

17   went back in front of Judge Byrnes.  I didn't have a probation

18   officer.

19   Q    All right.  So you were back in front of Judge Byrnes and he

20   incarcerated you?

21   A    That's right.

22   Q    And what was the sentence that he gave you?

23   A    The original sentence was eight years.

24   Q    Eight years?

25   A    That's right.

1   Q    So in '02, in September or August of '02 you go back in to

2   serve that eight year sentence, correct?

3   A    Go back to finish it, yes.

4   Q    To finish it.  How much time had you served on that

5   sentence?

6   A    I started '99.  I started in July of '99.

7   Q    Okay.  And at some point you served a certain amount of

8   time, then you went to Second Genesis?

9   A    Yes.

10  Q    When you walked away from Second Genesis, Judge Byrnes

11  called you in and he then sentenced you to the remainder of your

12  sentence?

13  A    Yes.

14  Q    Which was a total of 8 years, less whatever you had served,

15  right?

16  A    Yes.

17  Q    And so you're in front of Judge Byrnes.  He sentences you.

18  And you had a lawyer at the time, right?

19  A    I don't know.  I don't know if I had a lawyer.  I think I

20  had a Public Defender.

21  Q    All right.  And that lawyer filed a motion to reduce your

22  sentence, right?

23  A    I did have a lawyer.  Timothy Knepp.

24  Q    And he filed a motion with Judge Byrnes to reduce that

25  sentence that he just sent you away on, isn't that right?

1   A    He might have.  I'm not sure.

2   Q    And do you recall if Judge Byrnes agreed, you agreed with

3   the Court that he would wait one year to rule on that motion?

4   A    I don't know.

5   Q    Let me -- do you recall a letter that you wrote to Judge

6   Byrnes?  Your Honor, would you prefer I showed this to the

7   witness rather than put it on the screen?

8        THE COURT:  I don't think there's going to be any

9   objection.

10  Q    Do you recall that letter that you wrote to Judge Byrnes on

11  September 7th, 2003?  I can put that on the screen.  Is that your

12  handwriting?

13  A    Yes, it is.

14  Q    What's the first sentence there after "dear sir?"  What does

15  it say?

16  A    Dear Sir:  Concerning the motion for --

17       THE COURT:  Slowly.  Slowly, please, Mr. Dobropolski.

18       THE WITNESS:  Dear Sir:  Concerning the motion for

19  modification and/or reduction of sentence which was agreed to be

20  held sub curia for a period of one year, September, 2002 through

21  September, 2003, in advance I would like to respectfully submit

22  several issues for your consideration, as well as the prosecutors

23  in my case.

24  BY MR. MARTIN:

25  Q    Does that refresh your recollection as to whether you had

1    filed a motion for reduction of sentence and that the judge had

2    decided that they would wait one year before he ruled on it?

3    A    Yeah.  I had Mr. Knepp representing me, but I also had a

4    Public Defender, too.  I was getting confused.

5    Q    That's okay.  But that does refresh your recollection now,

6    correct?

7    A    Right.  And I wrote this letter, too.

8    Q    So in the beginning of September, 2002, you knew that you

9    had one year before Judge Byrnes would even consider letting you

10   out, right?

11   A    Right.

12   Q    Okay.  Now, you went to prison and you were put in the same

13   cell.  You went to, I guess it wasn't prison.  Was it the

14   Baltimore City Jail?  Where did you go when Judge Byrnes sent you

15   away that time?  Where did you meet Mr. Harris?

16   A    Central Booking.

17   Q    Okay.  So you went to Central Booking.  Mr. Harris was there

18   in Central Booking, right?

19   A    That's right.

20   Q    You guys became cell mates?

21   A    Yes.

22   Q    And at that point in time, as we have just seen, you knew

23   that you had one year to come up with something for the judge to

24   consider letting you out, didn't you?

25   A    Nope.

1    Q    You didn't?

2    A    Nope.

3    Q    You did know you had a year before the judge would consider

4    your motion, though, didn't you?

5    A    At that time I wasn't even going out to Baltimore County.  I

6    never even appeared in front of the judge yet.

7    Q    Doesn't the letter say, concerning the motion for

8    modification that you agreed to hold sub curia for a period of

9    one year?

10   A    Um-hum.

11   Q    Isn't that what it says?

12   A    Yeah.  But if you look at the date that I went to court,

13   you'll see that was after I met Shelton.

14   Q    What's the date you went to court on there?

15   A    I don't know.  It was after I got out of City Jail.

16   Q    You wrote the letter on 9/7/03?

17   A    That's right.  And I met Shelton in '02.

18   Q    It's 9/7.  And at one point, you wrote an earlier letter in

19   May of '03?

20   A    I met Shelton in '02.

21   Q    You wrote a letter in May of '03 and another letter in

22   September of '03, correct?

23   A    Right.  I met Shelton in '02.

24   Q    When you went to jail a year earlier, you knew that the

25   judge was going to wait one year to rule?

1    A    No, I didn't.

2    Q    That's what you wrote in your letter here, didn't you?

3    A    Listen to me.  I had yet, I didn't go up in front of this

4    judge until September of '03.

5    Q    I understand.

6    A    I met Shelton in August of, of '02.

7    Q    We all understand that.

8    A    So I wouldn't have known that.

9    Q    You met Mr. Harris at the end of August in '02?

10            MR. HARDING:  Could I ask that Mr. Martin let the

11   witness finish answering his questions?  He's being interrupted.

12            THE COURT:  Mr. Dobropolski, if you need to finish your

13   answer, you'll be permitted to finish your answer.  Go ahead, Mr.

14   Martin.

15            THE WITNESS:  All right.

16   BY MR. MARTIN:

17   Q    You met Mr. Harris at the end of August in '02.  That's what

18   you just told us, correct?

19   A    That's right.

20   Q    And in this letter, you write in September of '03, one year

21   later, that the judge had agreed, you agreed that he would hold

22   it sub curia for one year?

23   A    That's right.

24   Q    And you knew that when you went to jail in '02, in

25   September -- August, late August, early September of '02, you

1    knew, didn't you?

2    A    No, I didn't, and I'll explain why.  Because I met Shelton.

3    I got my charges taken care of in Baltimore City.  And then they

4    transferred me to Baltimore County the following month when I

5    went in front of the judge.  And then he said the stipulation for

6    the one year sub curia.  I didn't know about that in advance to

7    meeting Mr. Shelton.

8    Q    Okay.  And in '03, September of '03, first in May of '03 and

9    then September of '03, you knew that your time for going back

10   before Judge Byrnes was coming up, didn't you?

11   A    I mean, it's not a definite thing he's going to bring me

12   back up.

13   Q    Well, you knew that it agreed to be held in abeyance for one

14   year, correct?

15   A    Doesn't mean he has to bring me back to court.

16   Q    I understand that.  But you knew that the time period of one

17   year was going to expire a year from when you were in front of

18   Judge Byrnes, didn't you?

19   A    Wouldn't expire.  He can hold it up to 18 months, five

20   years.  I can go out the door --

21   Q    But you knew you could -- I'm sorry.  Did I interrupt you?

22   Did you finish your answer?

23   A    No, go ahead.

24   Q    You knew that he wasn't going to hear you before at least

25   one year was gone, correct?

1    A    Okay.

2    Q    You agree with that?  Say yes or no.

3    A    Yeah.

4    Q    Okay.  Now, this morning you testified as to why you held on

5    to this information for a period of eight months, I think Mr.

6    Harding said.  Is that right?

7    A    Right.

8    Q    So you learned of it in the fall of 2002 and you didn't do

9    anything until May of 2003, right?

10   A    Right.

11   Q    And you said that you, I think you told the grand jury, you

12   recall saying you wanted to, quote, "do something right", close

13   quote?

14   A    Exactly.

15   Q    And you didn't want to have it on your conscience if

16   anything happened because you hadn't brought the information

17   forward, correct?

18   A    That's right.

19   Q    And, of course, that's why you waited eight months to tell

20   everybody about it, isn't it?

21   A    No.  It was the taller thing to do.

22   Q    You waited eight months to tell everybody about it because

23   you were a criminal at heart and you didn't want to report on

24   other criminals?

25        MR. HARDING:  Your Honor, again, the witness was

1    interrupted.

2    A     Yeah, if that's what you want to say.

3              MR. MARTIN:  I thought he'd finished, Your Honor.

4              THE COURT:  Go ahead, Mr. Martin.

5    BY MR. MARTIN:

6    Q     You waited eight months, I think you said this morning,

7    because of this code of criminals?  You didn't want to talk about

8    another criminal, is that right?

9    A     That's right.

10   Q     So despite your feelings that you wanted to do something

11   right, and despite your feelings that you didn't want to have it

12   on your conscience, you thought it was okay to wait eight months?

13   A     Took me a long time to figure out what I was going to do

14   with that.

15   Q     All right.  And what you were going to do with it is go to

16   Judge Byrnes and get your sentence cut, isn't that right?

17   A     I mean, that's what you want to say.  I already told you why

18   I did it.  I mean, I didn't gain anything from this, and I damn

19   sure didn't feel like doing this.

20   Q     When you went before Judge Byrnes in October, 2003, he let

21   you out that day, didn't he?

22   A     Yeah.  So I can work with homicide detectives.  You think

23   it's easy?

24   Q     Well, that's what you said you wanted to do, isn't it?

25   A     Yeah.  I didn't know what I was getting into, trust me.

1    Q    Well, that's what you said you wanted to do, isn't it?

2    A    Yeah.

3    Q    I mean, isn't that this letter?

4    A    Um-hum.

5    Q    Because of the serious nature, one of my primary goals,

6    which is to offer my assistance to law enforcement as an

7    informant?

8    A    That's right.

9    Q    That was your, that was one of your primary goals when you

10   wrote this letter in September of '03 to Judge Byrnes, wasn't it?

11   A    That's correct.

12   Q    Okay.  Now, you were offering to be an informant in a number

13   of areas.  Do you remember that?

14   A    Yes, I was.

15   Q    And one of them was illegal firearms?

16   A    Illegal firearms?

17   Q    Yeah.  Did you offer to be an informant in illegal firearms?

18   You did, didn't you?

19   A    Yeah, exactly.

20   Q    So you knew about illegal firearms, didn't you?

21   A    Sure do.

22   Q    And you offered to be an informant on drug matters?

23   A    That's right.

24   Q    And out of state narcotics contributions to Maryland?

25   A    That's right.

1    Q    And local and state narcotics distribution, correct?

2    A    That's correct.

3    Q    And high-powered illegal firearms?

4    A    Yep.

5    Q    Which you knew about?

6    A    Um-hum.

7    Q    Because of your career in crime, correct?

8    A    Right.

9    Q    And because of your time in prison, correct?

10   A    Right.

11   Q    Okay.  Illegal gambling something else you knew about?

12   A    A little bit.

13   Q    And you offered your help to authorities with illegal

14   gambling, didn't you?

15   A    That's right.

16   Q    And businesses used to filter illegal money?

17   A    Yup.

18   Q    And you knew about that from your career in crime, is that

19   right?

20   A    Sure.

21   Q    And possible information about homicides, correct?

22   A    That's correct.

23   Q    And you told Judge Byrnes again in this second letter,

24   didn't you, that under any circumstances you will not be

25   interviewed by law enforcement while you're incarcerated,

1    correct?

2    A    That's right.

3    Q    But you said you would sign an agreement with the court as a

4    condition of your release to work with and supply information

5    regarding these above areas, the illegal firearms to gambling and

6    all of that.  Do you recall that?

7    A    Right.

8    Q    So you were asking Judge Byrnes to let me out of jail and

9    I'll work with the police on all these things, correct?

10   A    Yup.

11   Q    You also said that Officer Mallin was the only one you would

12   talk to or at least he had to be there when you talked?

13   A    Yup.

14   Q    Because you trusted him, right?

15   A    Still do.

16   Q    So again, for the second time, you've told Judge Byrnes no

17   interview while still incarcerated, correct?

18   A    That's right.

19   Q    Okay.  And do you recall telling Judge Byrnes that your

20   problem in life has been what Judge Byrnes had earlier identified

21   as your failure to take responsibility for your own actions?

22   A    Yup.

23   Q    But you said you told Judge Byrnes you had changed, isn't

24   that right?

25   A    Exactly.

CROSS EXAMINATION OF DOBROPOLSKI BY MARTIN                     159

1    Q    And you said you were now ready to be responsible for what

2    you do, correct?

3    A    That's it.

4    Q    And that was in September of '03, correct?

5    A    Okay.

6    Q    And do you recall telling Judge Byrnes that one of the

7    things for you on the responsibility issue was that you, you

8    weren't, you were going to do more than just stop committing

9    crimes and moving away from your friends who were getting you in

10   trouble, but you were going to offer to law enforcement your

11   complete cooperation and give them information about the strong

12   incidence of criminal element in a section of Baltimore City,

13   South Baltimore, to assist law enforcement in increasing the

14   quality of life in that community.  Do you remember writing that?

15   A    Yup.

16   Q    So what you were saying was, I know a lot about crime in

17   South Baltimore and I'm willing to help everybody out so we can

18   clean that community up, isn't that right?

19   A    I was saying I was done with crime.  I was done seeing it

20   tearing my neighborhood up.  You can put it how you want to put

21   it.

22   Q    Well, I'm putting it the way you put it.  Am I not?

23   A    No, you're putting it you --

24   Q    Let me show you the letter.

25   A    I've already seen it.  I wrote it.

1    Q    You see this?  Means using a 20 year criminal background.

2    A    That's right.

3    Q    Information ties and a strong influence of the criminal

4    element in a section of Baltimore City, South Baltimore, to

5    assist law enforcement in increasing the quality of life in that

6    community, in a community that desperately needs it, correct?

7    A    Yep.

8    Q    So that's what you were offering when you wrote Judge Byrnes

9    on September 7th, correct?

10   A    Yes, I was.

11   Q    And at that time the detectives, Detective Mallin and

12   Detective Niedermeyer, hadn't yet come to see you, correct?

13   A    No.  I don't think so.

14   Q    Well, they came to see you in October.  You wrote this

15   letter on September 7th.

16   A    Right.

17   Q    Is that right?  I mean, if you think -- I'm not trying to

18   trick you.  Trust me.  But if you think I am, just say so and

19   we'll show you the documents.  All right?

20         Now, even when you went to court on October, was it

21   October 15th?  Is that what you recall?  Somewhere around there?

22   They came and got you and said, we're going to court, right?

23   A    Second time.

24   Q    Right.  And you didn't know about it?

25   A    You're right.

1    Q    And they took you to Judge Byrnes.  And Judge Byrnes agreed,

2    after the prosecutors talked to him, to let you out, correct?

3    A    Yep.

4    Q    And the condition that he put on letting you out was that

5    you had to cooperate with the police?

6    A    That's right.

7    Q    And did you tell the jury this morning that you didn't want

8    to do that at that point?

9    A    I didn't want to do it beforehand.

10   Q    Now, when you were interviewed by Detective Mallin and

11   Detective Niedermeyer, the date of that interview was October

12   2nd, 2003.  Do you see that at the top here?

13   A    Um-hum.

14   Q    By the time of that interview you had already written two

15   letters describing what you wanted to do and briefly describing

16   the information that you had, is that right?

17   A    Right.

18   Q    But you didn't tell them any names because you didn't know

19   any names at that point, did you?

20   A    That's right.

21   Q    I mean, you knew who you spoke to in prison but you didn't

22   know the names of the victims, did you?

23   A    No.

24   Q    Okay.  Now, and on October 3rd, you spoke for a period of

25   time with Detectives Niedermeyer and Mallin, correct?

1    A    Right.

2    Q    And at that point, you testified already this morning you

3    identified these photo spreads?  You picked out Mr. Harris and

4    Mr. Mitchell, correct?

5    A    Right.

6    Q    And did you say they had six other spreads that they showed

7    you, or four other?

8    A    It was six on each page.

9    Q    But there were only two pages?

10   A    Photo arrays, yeah.

11   Q    All right.  So there were six on one page and six on

12   another?

13   A    Um-hum.

14   Q    So the only two photo arrays they showed you were of Mr.

15   Harris and Mr. Mitchell on that day?

16   A    Yeah.  I mean, it was 12 photos.

17   Q    Right.  Is that correct?  Is that true, then?  The only

18   photo arrays they showed you were the ones that Mr. Harding put

19   into evidence this morning?

20   A    Right.

21   Q    Okay.  And you hadn't talked to them yet at that point, had

22   you?

23   A    No.

24   Q    Now, when you talked to them, you'd told them all the

25   details that you had, didn't you?

1    A    Yup.

2    Q    And did you tell them that Mr. Harris and Mr. Mitchell had

3    tried to recruit you to do crimes?

4    A    Yup.

5    Q    And you told them that on October 2nd?

6    A    I don't know if I told them on October 2nd.  I think I

7    discussed that with Mr. Harding, too.

8    Q    Well, we'll get do that.  But you don't know whether you

9    told them on October 2nd, correct?  Now, you know there's a

10   transcript of that?

11        MR. HARDING:  Objection, Your Honor.  The witness never

12   answered the previous question.

13   Q    I'm sorry.

14        THE COURT:  Go ahead, Mr. Martin.  There's no question

15   right now.  Go ahead, Mr. Martin.

16   BY MR. MARTIN:

17   Q    You gave them the details that you had, correct?

18   A    Right.

19   Q    And at that point in time, do you recall if you told them

20   that Mr. Mitchell and Mr. Harris tried to recruit you to do

21   crimes with them?

22   A    I may have.

23   Q    The record would reflect best what you did; do you agree

24   with that?

25   A    If that's what I did, that's what I did.  If you got it on

1    record, yeah, I'll go with that.

2    Q    And your interview with them was taped, correct?

3    A    Yeah.

4    Q    But everything you said to them that day wasn't taped, was

5    it?

6    A    Like what?

7    Q    There was nothing taped when they showed the photo spreads

8    of the two individuals, was there?

9    A    I don't know.  I don't know really when they turned it on

10   and when they turned it off.

11   Q    There was a time -- so you don't know when they turned it on

12   and when they turned it off?

13   A    Nope.

14   Q    Speaking of turning it on and turning it off, the device

15   that Detective Giganti fitted you with when you taped Mr.

16   Harris --

17   A    That's right.

18   Q    -- had an off and on button on it, didn't it?

19   A    I don't know.

20   Q    You don't know?

21   A    Nope.

22   Q    Now, you had conversations with Mr. Harris while you were

23   cell mates together for a period of about two weeks?

24   A    That's right.

25   Q    And it was a process of you getting to know him and him

1    getting to know you, right?

2    A    Yep.

3    Q    And during that time period, do you recall describing what

4    you were doing was extracting information from Mr. Harris?

5    A    Not really.  We were just talking in general.

6    Q    Let me -- bear with me a second, Your Honor.

7          THE COURT:  Yes.

8    Q    Do you remember telling Mr. Harding this morning about you

9    testifying in the grand jury on November 19th, 2003?

10   A    Yes.

11   Q    Do you remember being asked at Page 13, Mr. Harding, Line

12   23:  Question:  So what was it -- Your Honor, would you prefer I

13   show this to him or just read it?

14         THE COURT:  I don't think there will be any objection.

15   But you can put it on --

16   Q    I would just as soon read it and I can put it up here.

17         THE COURT:  All right.

18   Q    That way everybody can see it.

19         Line 23.  So what was it you talked about when you met

20   Bo and how did you meet him?  And your answer was:  I met him

21   through Shelvin.  Shelvin introduced him to me.  Things we would

22   talk about were criminal activity we would probably do when we

23   got out, as far as setting up drug dealers, robbing drug dealers,

24   selling drugs.  They wanted, I think they wanted me to be sort of

25   an enforcer for them maybe, for protection, things of that

1    nature.  Do you recall that?

2    A    Yep.

3    Q    Now, do you recall when you were interviewed by Detectives

4    Mallin and Niedermeyer that you told them, and again, Your Honor,

5    I'll put this on the screen.  First full paragraph.

6            Like I said this went, information I got was like sort

7    of distracted over like probably a two week period.  You meant to

8    say extracted, didn't you?

9            MR. HARDING:  Objection.

10            THE COURT:  Overruled.  You may answer.

11    A    I guess.

12    Q    And you said it was like probably over a two week period.

13    It was just like me and him BS'ing, right?  That's what you said,

14    right?

15    A    Where's it at?

16    Q    Same paragraph, right below it.  Just like me and him

17    BS'ing.  It's B-S-I-N-G.  See it, fourth line down?  Left-hand

18    side.  There.

19    A    Oh, I got it.

20    Q    So you guys were just chatting, right?

21    A    Um-hum.

22    Q    And then shooting the bull and passing the time of day

23    yourself, correct?

24    A    That's it.

25    Q    Okay.  So that's what you describe as BS'ing, correct?

1  A    Yep.

2  Q    And you were in the process of extracting this information

3  from Mr. Harris, correct?

4  A    No, he kind of came out with it.

5  Q    He kind of came out with it?

6  A    Um-hum.

7  Q    Okay.

8           THE COURT:  Please say yes or no, Mr. Dobropolski.

9  Q    Your answer was he kind of came out with it?

10  A    Yes.

11  Q    And your answer is yes, correct?

12  A    Yes.

13  Q    Okay.  And what you had to do with Mr. Harris in order to

14  get this information was establish, if you will, your street

15  credentials with him?

16  A    No.  I wasn't trying to get information.  He just came out

17  with it.

18  Q    Well, he just came out with it.  So what were you trying to

19  do, then?

20  A    I wasn't trying to do anything.  I thought he was a pretty

21  decent dude, to be honest with you.

22  Q    So he just came out with it then?

23  A    Yep.

24  Q    And were you surprised when he came out with it?

25  A    Yeah, I was a little surprised.

1   Q    And you testified, did you not, that the reason he came out

2   with it was that you had gained his confidence?

3   A    Excuse me?

4   Q    You testified, did you not, that the reason you believe he

5   came out with it was that you had gained his confidence?

6            MR. HARDING:  Objection.

7            THE COURT:  Overruled.  You may answer.

8   A    I'm not sure.

9   Q    You're not sure if you testified that way or you're not sure

10  that's what happened?

11  A    That's how I meant -- go ahead.  Did I say that?  That's my

12  testimony?  I gained his confidence?

13  Q    I thought that's what you said but if you don't remember it,

14  that's fine.

15  A    I'm not sure.

16  Q    Did you gain his confidence, do you think?

17  A    I wasn't trying to gain his confidence.  We were talking

18  about criminal activities.

19  Q    And you talked about, did you not, where we, you and he,

20  grew up?

21  A    Right.

22  Q    Now, when he was in Park Heights, you weren't even there any

23  more, were you?

24  A    No.  I'm a little bit older than that.

25  Q    And we talked already about these similar acquaintances you

1   had?

2   A    Right.

3   Q    Only you've testified that you didn't know three of those

4   people, correct?

5   A    Yeah.  Neither did he, I don't think.

6   Q    Neither did he?

7   A    Just knew the names, yeah.

8   Q    Okay.  And your reputation?

9   A    My reputation?

10  Q    Right.  You said he knew about it when you got to prison, he

11  already knew about your reputation?

12  A    Yeah.  There were people on the tier that were talking about

13  me.

14  Q    People on the tier.  And how did the people on the tier know

15  about your reputation?

16  A    Friends.

17  Q    Do you know?

18  A    Friends.  South Baltimore people.

19  Q    So your reputation was a South Baltimore tough guy?

20  A    Right.

21  Q    Okay.  And you testified, actually, in the statement you

22  gave the detectives, you said that, quote, "they believed that

23  you were an enforcer for drug dealers?"

24  A    Right.

25  Q    Who is "they"?  The people on the tier?

1   A    I don't know.  I don't know who we're referring to when I

2   was talking to the detectives.  I have no clue.

3   Q    I'm sorry.  I didn't catch that last part of your answer.

4   A    I don't know.

5   Q    What did you do to make them, whoever they are, believe that

6   you were an enforcer for drug dealers?

7   A    Who is they?

8   Q    I asked you who they is because that was your statement,

9   they.

10  A    I can't remember what the conversation --

11  Q    Let me try.

12  A    What we're talking about, yeah.

13  Q    Let me try to pin it down.  Were you referring to Mr. Harris

14  and Mr. Mitchell?

15  A    I don't know.  We're talking to detectives.  So I might have

16  been talking about them.

17  Q    Might have been talking about who?  Mr. Harris and Mr.

18  Mitchell?

19  A    Maybe.

20  Q    Well, Mr. Mitchell never said anything to you about whether

21  he knew you were an enforcer for drug dealers, did he?

22  A    No.  I think Mr. Harris talked to him about that.  I believe

23  he did.

24  Q    You think Mr. Harris talked to you about that?

25  A    Talked to Bo about that, Mr. Mitchell.

1   Q    You think he did.  You don't know that, though, do you?

2   A    Yeah.  He said he told him all about me.

3   Q    Well, did you and Mr. Harris talk about you being an

4   enforcer for drug dealers?

5   A    Yeah.

6   Q    Okay.  And you told him that you were?

7   A    Yes.

8   Q    And these are drug dealers in South Baltimore?

9   A    Some of them.

10  Q    Where are the others?

11  A    Um-um.

12  Q    Um-um is not an answer.  Where were the others?

13  A    South Baltimore, surroundings, surrounding part of South

14  Baltimore, Glen Burnie.

15  Q    South Baltimore meaning south of here and down towards Glen

16  Burnie?

17  A    That's right.

18  Q    That's where you hung out, right?

19  A    Um-hum.

20  Q    Okay.  Now, prior to your being thrown in the same cell with

21  Mr. Harris, you'd never met him before, correct?

22  A    Nope.

23  Q    And he didn't come right out when you got thrown in the cell

24  and make these statements to you, did he, about the double murder

25  that you've testified about?

1    A    No, he didn't.

2    Q    It took quite a while for you to get that information,

3    didn't it?

4    A    Maybe about a week.

5    Q    And it was because he trusted you that he did that, correct?

6    A    That's right.

7    Q    All right.  And at that time he wasn't recruiting you to do

8    any work for him, was he?

9    A    Say that again.

10   Q    At that time he wasn't recruiting you to do any work for

11   him, was he?

12   A    No.

13   Q    Okay.  Now, when you had your conversation with Bo, which

14   was sometime right after you had these conversations with Mr.

15   Harris, is that correct?

16   A    Right.

17   Q    You met Bo through Mr. Harris?

18   A    Yup.

19   Q    So were you all on the same tier or something?

20   A    Nah.

21   Q    So how did you happen to meet?

22   A    In the courtyard.

23   Q    So when you were out, your outdoor time, whatever?

24   A    Right.

25   Q    All right.  And Mr. Harris introduced you to Bo?

CROSS EXAMINATION OF DOBROPOLSKI BY MARTIN 173

1    A    Right.

2    Q    And the only thing Bo ever told you about what you testified

3    here today is that Mr. Harris, quote, "handled some business for

4    him", correct?

5    A    Yup.

6    Q    And your interpretation of what Mr. Harris, what Mr.

7    Mitchell was saying was that he'd done some murders for him?

8    A    Yes.

9    Q    He didn't say that, though, did he?

10   A    No.  He said Shelton put some work in for him.

11   Q    Put some work in for him?

12   A    And some business.

13   Q    And you say Mr. Harris told you that these murders in Hasim

14   Rahman's car took place right after Rahman had won the title?

15   A    Yeah.  That's what he told me.

16   Q    You don't know when that was, though, because you were

17   locked up somewhere, right?

18   A    Yeah.  I was in a rehabilitation center.  Yeah.  Locked in a

19   rehabilitation center.

20   Q    And you said in your interviews with Detective Mallin and

21   Niedermeyer, and again here today, that the murder took place

22   because of a money dispute between Bo and the victim related to

23   the rap music business, correct?

24   A    That's what I said.

25   Q    And that's, you said that because that's what Mr. Harris,

1    you say, told you, correct?

2    A    Eh, pretty much.

3    Q    Somebody else state that?

4    A    Do you want me to answer that?  No.  No.  Shelton said that.

5    Q    And you said, did you not, that this man who was killed --

6    at this point in time when you're talking to the police officer

7    you don't know the victim's name, do you?

8    A    No.

9    Q    Okay.  And you've said that he, this man, victim, had put a

10    contract or taken a contract on Bo's life, that Mr. Harris told

11    you that?

12    A    Yeah, something like that.

13    Q    Did he say that or not?

14    A    I believe it was something like that.  No.  He said that he

15    was coming to get a gun from Bo but in reality he was going to

16    use that gun on Bo.

17    Q    So a man who had a contract to kill Bo, and who Bo knew had

18    a contract to kill him, asked Bo to get him a gun?

19    A    I didn't say anything like he had a contract.  What I said

20    is this guy wanted to kill Bo was going to purchase a gun from

21    Bo, get a gun from him and turn around and use it on him.  That's

22    what Shelton told me was the reason why Bo asked him to go kill

23    that person.

24    Q    Now, on October 14th, 2003, this is the hearing in front of

25    Judge Byrnes where the detectives came and took you out of the,

1    is it the Western Correctional Institution?

2    A    Yes.

3    Q    And drove you to Baltimore, to Baltimore County?

4    A    Yes.

5    Q    And they took you in before Judge Byrnes, correct?

6    A    Yes, they did.

7    Q    And the State's Attorney showed up and told Judge Byrnes

8    that you needed to be released so you could work with the State

9    on this double homicide, correct?

10   A    That's right.

11   Q    You didn't say to Judge Byrnes that day, I don't want to get

12   out, Judge, did you?

13   A    No.

14   Q    Because you did want to get out, didn't you?

15   A    Of course.  Everybody wants to get out of jail.

16   Q    And so they asked for probation with a condition that you

17   cooperate with them, right?

18   A    Right.

19   Q    And do you remember the Court being concerned with doing

20   that because you'd already walked away from Second Genesis?

21   A    I'm not sure.  I wasn't even really talking to the judge.

22   Q    At the time you were in front of Judge Byrnes, he wasn't

23   very happy with you, was he?

24   A    Never was.

25   Q    And do you recall when you were in the grand jury, a grand

1   juror, not Mr. Harding, but a grand juror asked you a question

2   about whether you had been in rehab?

3   A    Right.

4   Q    And you told the grand juror that you had been in rehab but

5   you were now out, correct?

6   A    That's right.

7   Q    You didn't tell them that you walked away from rehab, did

8   you?

9   A    No.  I was talking about, this is even before that started.

10  That was '01.  Talking about '03.

11  Q    You did not --

12  A    That was in the past.

13  Q    You did not tell the grand juror that you had walked away

14  from rehab, did you?

15  A    They didn't ask.

16  Q    Let me show you Page 21, Line 8.  A juror.  See that?

17  A    Yup.

18  Q    Has anything particularly happened in your life in the past

19  year or so that sort of brought forth this convergence of this or

20  is it a convergence of sorts?  That is, you said you were sort of

21  an enforcer, so are you giving up that life?  The witness:  Yes.

22        A juror:  As far as an enforcer?  Yes, I am.

23        Then a juror:  Yes, sir.  You mentioned, were you in

24  rehab before?  Yes, ma'am.

25        May I ask for what?  Substance abuse.

1          A juror:  Substance abuse.  Witness:  Yes, Second

2     Genesis.

3          A juror:  How are you doing?

4          THE COURT:  Mr. Martin, that part of it is not being

5     displayed.

6     Q    I'm sorry, Your Honor.  I'm reading it and not looking at

7     the screen.  I should be reading and looking at the screen.

8          A juror:  How are you doing?  And you say, actually,

9     I'm out now but I did the program in 2001, I think it was 2002.

10    See that?

11    A    Right.

12    Q    You didn't tell that juror that you had walked away from the

13    program, did you?

14    A    Didn't ask.

15    Q    You didn't tell him that, did you?  All you said is you were

16    out.

17    A    That's right.  They didn't ask.

18    Q    And you didn't tell them you were out because you walked

19    away, did you?

20    A    No.  If they would have asked, I would have told them.

21    Q    Now, the intention that the prosecutors had that day in

22    court in front of Judge Byrnes in getting you out was so you

23    could tape conversations with Mr. Harris, isn't that right?

24    A    Right.

25    Q    And would it be fair to say that while Judge Byrnes went

CROSS EXAMINATION OF DOBROPOLSKI BY MARTIN                178

1    along with that, he was reluctant to do so?

2    A    I don't know.

3    Q    And when he let you out that day, he told you that if you

4    used drugs again you were going right back to jail, isn't that

5    right?

6    A    That's right.

7    Q    And in 2003, you used drugs again, didn't you?

8    A    Yep.

9    Q    In fact, you got out in October of 2003.  You missed your

10   first two appointments with your probation officer, didn't you?

11   A    I don't think so.  I'm not sure.

12   Q    You were violated for missing those appointments, weren't

13   you?

14   A    I don't think the first two.

15   Q    Were you violated for missing an appointment in the

16   beginning of November, 2003?

17   A    I don't know.  Do you have the violation papers?

18   Q    We'll go through that.

19   A    All right.

20   Q    And do you recall that in May of 2004, you had a probation

21   violation hearing in front of Judge Byrnes in Baltimore County?

22   A    I think it was.

23   Q    So there's no question, let me show you the page.  I'm not

24   sure how to make this clearer, Your Honor.  If I can't do it, Mr.

25   Flannery will help me, I'm sure.  See that date?  May, 2004.

1   A    I see it.

2   Q    I can zoom more.

3   A    That's good.

4   Q    See that date?

5   A    Yup.

6   Q    And the title of that case was State of Maryland versus

7   Christopher Dobropolski, correct?

8   A    Yep.

9   Q    So you believe that that's your probation violation in front

10  of Judge Byrnes?

11  A    Yep.

12  Q    Pardon me?

13  A    Yes.

14  Q    Okay.  And the allegations against you --

15          MR. HARDING:  Objection.

16          THE COURT:  Yeah.  Why don't you just do it without the

17  transcript, Mr. Martin.

18          MR. MARTIN:  I'm sorry, Your Honor.  What?

19          THE COURT:  Do it without the transcript if you want to

20  bring out the --

21  BY MR. MARTIN:

22  Q    The allegations against you were failure to report from

23  December 3rd, 2003, correct?

24  A    Yes.

25  Q    All right.  I said November.  I apologize for that.

1    Condition two is a failure to produce documentation that you were

2    working.  And I believe you actually did have some documentation

3    but you hadn't produced it yet, correct?

4    A    Right.

5    Q    And they were unable to verify your address, correct,

6    because you didn't give them one?

7    A    I did give them an address.

8    Q    Well, they said in court you didn't have it, didn't they?

9    A    No.  It was -- I forgot how they do that.

10   Q    Pardon me?  Could you move your hand away from your mouth?

11   A    I think, because if you don't report, then they can't verify

12   your address, what it was.  But I gave them the address.  They

13   knew the address because they showed up.

14   Q    How did you give them the address if you didn't report?

15   A    You give them the address before you're released.  I had to

16   because I was leaving for prison.

17   Q    And when they showed up, you weren't there, correct?

18   A    They never showed up.

19   Q    And you were also violated, were you not, for violating your

20   special condition about urine samples between November 7th, 2003

21   and January 30th, 2004, correct?

22   A    That's right.

23   Q    You hadn't given any urine samples, had you?

24   A    I don't think so.  I think I'm just, yeah, like 20 of them.

25   Q    And at the time you said to Judge Byrnes that you weren't

1     using drugs, even though you hadn't given urine samples, correct?

2     A     Say it again.

3     Q     You told Judge Byrnes that you weren't using drugs, correct?

4     A     No.  I told Judge Byrnes that I was using drugs even though

5     I wasn't violated for it.

6     Q     Did you tell Mr. Reilly, who was your probation officer,

7     that you weren't using drugs?

8     A     I wasn't reporting so I didn't tell him.

9     Q     Because you didn't report, you never told him that?

10    A     That's right.  That's correct.

11    Q     Okay.  And when you said, you said in court, did you not, to

12    Judge Byrnes that you weren't using drugs?

13    A     I told him I was using drugs.

14    Q     Well, let's take a look at page --

15    A     Even though I wasn't violated for it.

16    Q     Page Seven.  See below that note?  That thing that says

17    "defendant:  I wasn't using drugs?"

18    A     I said I was using drugs.  I don't know why it came out like

19    this.  Because he made a statement after that.  He said, then,

20    I'm going to find you guilty for that, too, for that violation,

21    too, or something.

22    Q     Well, the transcript says, does it not, I wasn't using

23    drugs.  And the Court says, sure you were.  Guilty.  Right?

24    A     I said I was.

25    Q     Well, the judge said, sure you were.  Why would he say that

CROSS EXAMINATION OF DOBROPOLSKI BY MARTIN

182

1  if you said you weren't using them?

2  A    I don't know.  I specifically remember telling him I was.

3  Q    So your testimony here is that the transcript, the official

4  transcript is wrong, correct?

5  A    Yeah.  That's what I'm saying.

6  Q    And that you didn't lie to Judge Byrnes that day?

7  A    I didn't lie to him because I told him I was.

8  Q    And he found that you were using drugs, didn't he?

9  A    Because I told him.

10  Q    And were you using drugs when you didn't give the urinalysis

11  in the beginning of November of 2003?

12  A    Well, this is how he found out I was using drugs, because I

13  told him.  Because I was never violated for not, for giving dirty

14  urines.  I was violated for not producing urines at all.

15  Q    But you told him that you were using drugs?

16  A    That's right.

17  Q    And the reason you didn't give the urines was because you

18  were using drugs, is that right?

19  A    Yep.

20  Q    Okay.  So in November of 2003, you had your first, one of

21  your first meetings with the probation officer.  You didn't give

22  a urine sample in November of 2003 because you were using drugs,

23  correct, and you didn't want to get caught?

24  A    I don't know if I started using in November or December.

25  Q    You didn't give a urine sample in November, did you?

1    A    I might have just been not reporting.

2    Q    In fact, you didn't give any urine samples prior to being in

3    front of Judge Byrnes, did you?

4    A    That's right.

5    Q    Because you didn't want to get caught using drugs, right?

6    A    No.  Yeah.  I was using drugs again.

7    Q    Because you knew that as soon as he found out about that,

8    you were going back to jail, isn't that right?

9    A    Yeah.  That's how it works.

10   Q    You didn't want to go back to jail, did you?

11   A    No.

12   Q    And so there you were in May of 2004 and you're in front of

13   Judge Byrnes, correct?

14   A    Yes.

15   Q    And he's on the verge of sending you back to jail, isn't he?

16   A    Yes, he was.

17   Q    And Mr. Harding shows up, doesn't he?

18   A    Yep.

19   Q    And Mr. Harding convinced Judge Byrnes not to put you back

20   in jail, didn't he?

21   A    Yep.

22   Q    So you were still cooperating and the government kept you

23   out of jail?

24   A    That's right.

25   Q    Even though you had violated your probation, right?

1    A    Yup.  Yes.

2    Q    And even though, as you admitted here today, you were in

3    violation of your probation as early as November of 2003, before

4    you testified in front of the federal grand jury, isn't that

5    right?

6    A    I don't think the violation came.

7    Q    You hadn't given a urine sample, did you?

8    A    No.  But I wasn't violated.

9    Q    And you had been using drugs, weren't you?

10   A    I don't know if I was using then or not.  I know I wasn't

11   reporting.

12   Q    You were accused in your probation violation hearing of not

13   giving urine samples in, between November 7th, 2003 and January

14   30th, 2004, correct?

15   A    Right.

16   Q    And you testified here today that the reason you didn't give

17   them was because, if you gave them, you knew you'd be caught?

18   A    Or because I wasn't showing up, either.

19   Q    You weren't showing what?

20   A    I wasn't showing up.  I wasn't reporting.  So it could have

21   been that I just didn't report.  I'm not sure if started using

22   drugs in November or December or something.  I'm not sure.

23   Q    All right.  So today you're not sure?  And in November or in

24   May of 2004, even though the transcript says you denied using

25   drugs, you say you said you were using drugs?

1   A    I told him I was using drugs, that I was --

2   Q    Was Mr. Harding there when you said that?

3            MR. HARDING:  Objection.

4            THE COURT:  Were you finished your answer?

5            MR. MARTIN:  I'm sorry, Your Honor.  I did it again.

6   You said you were using drugs.

7            THE WITNESS:  I just don't know when I started using

8   them.

9   BY MR. MARTIN:

10  Q    But you say you told the Court that you were using them and

11  that this transcript is wrong?

12  A    I was using drugs.  I told him that.  I just don't know when

13  I started.  I don't know if I started November or December.

14  Q    Was Mr. Harding there when you said that, when you admitted

15  to Judge Byrnes that you were using drugs?

16  A    I'm not sure if he -- I was standing at a table.

17  Q    He was actually there for the hearing, though, wasn't he?

18  A    Yeah.

19  Q    And he actually had a conversation with Judge Byrnes, didn't

20  he?

21  A    Right.

22  Q    But it wasn't on the record, was it?

23  A    I don't know.  I don't know.

24  Q    You don't know?

25  A    I don't know.  I don't know when they turn the recorder on

1    and off.

2    Q    He didn't stand up in open court and talk about it, did he?

3    A    No.

4    Q    He went up to the bench, right?

5    A    That's right.

6    Q    And had a conversation with Judge Byrnes at the bench?

7    A    I was standing right there.

8    Q    And it wouldn't surprise you that that conversation doesn't

9    appear in this transcript, would it?

10   A    I didn't look.

11   Q    So at some point that day there was a promise made to you

12   about what you needed to do if they were going to let you out.

13   Do you agree with that?

14   A    Yes.

15   Q    And just let me read this to you.  Page Six, Mr. Harding.

16   The judge told you you were waiving your rights to all, your

17   rights to contest the probation violation.  Do you recall that?

18   A    That's right.

19   Q    And he said to you that you waive all those rights.  And he

20   said, there's been one promise made to you which we will not put

21   on the record but the one we discussed at the bench.  Other than

22   that, have any promises been made to you to get you to proceed in

23   this fashion?  Defendant:  No.  Are you doing this of your own

24   free will?  I am.  What was that promise made to you at the

25   bench?

1    A    Promise?  I have no idea.

2    Q    Someone made you a promise to get you to plead guilty to the

3    probation violation, didn't they?

4    A    I'm not sure.

5    Q    Well, let me ask it this way.  Was the promise that was made

6    to you at the bench a promise that if you continued cooperating,

7    he would let you out again, even though you violated your

8    probation?

9    A    It could be.

10   Q    But you don't recall?

11   A    Not specifically.

12   Q    It's not on the record so we don't know, right?

13         MR. HARDING:  Objection.

14   A    I have no idea.

15         THE COURT:  Yeah.  The witness hadn't completed his

16   answer.  Go ahead, Mr. Dobropolski.

17   A    I'm not 100% sure.  Things went so fast and we were at the

18   bench talking.  I mean, it was six years ago, something like

19   that.  Four years ago.  Whatever.

20   Q    If it had been on the record, though, we would all have been

21   able to see what happened, didn't we?

22   A    But I think the reason they didn't have it on the record was

23   because of the work that I was doing.  That's what I think.  I'm

24   not 100% sure about that, obviously.

25   Q    And so once again he let you out that day, correct?

1   A    Yes.

2   Q    So up to that point in May of 2004, you had used your

3   information to get released from jail after serving less than

4   half of your sentence, correct?

5   A    Okay.

6   Q    So that's a yes, right?

7   A    Yes.

8   Q    And you were in jail for beating up your girlfriend?

9   A    Yes.

10  Q    And have you since had another altercation with either that

11  girlfriend or another girlfriend?

12  A    Another girlfriend.  Different one.

13  Q    You beat a different one up?

14  A    Yes.

15  Q    Okay.  And did you, you were found guilty of that?

16  A    Yes, I was.  I pled guilty to it.

17  Q    Is that what you're in prison for now?

18  A    No.  This is from the original one.  I received an eight

19  year sentence and I'm finishing it now.

20  Q    So you're finishing the eight year sentence that started

21  this odyssey, correct?

22  A    Yeah.

23  Q    So you've beaten up two girlfriends in the last eight years?

24  A    Yes.

25  Q    Now, we talked about this a little bit and you talked about

1   it this morning.  Judge Byrnes let you out of jail when, at least

2   in theory, you still had four years to serve on your sentence,

3   correct?

4   A    Right.

5   Q    But you expected that you would get out in eight months?

6   A    Yup.

7   Q    Okay.

8          MR. HARDING:  Sorry.  Are we talking about -- which

9   hearing before Judge Byrnes?

10  Q    We're talking about the first one when he first let him out

11  of jail, October 15th, 2003.  And it's because the police and the

12  prosecutors asked him to let you out, right?

13  A    Yes.

14  Q    And pretty clear to you, wasn't it, that if it hadn't been

15  for the urging of the police and the prosecutors that day, that

16  Judge Byrnes would not have let you out?

17  A    I don't know what Judge Byrnes was thinking.  He might have.

18  Q    Now, it's also clear to you, isn't it, Mr. Dobropolski, that

19  but for the story that you're telling here today and that you

20  told to the police and to the prosecutors and to the grand jury,

21  that nobody on the law enforcement side would have gone to bat

22  for you, correct?

23  A    I don't know.

24  Q    You think they might have gone to bat for you without you

25  dangling this story in front of them?

1          MR. HARDING:  Objection.

2          THE COURT:  Overruled.  You may answer.

3    A    I don't know.

4    Q    You wrote the letter specifically to get them to go to bat

5    for you, didn't you?

6    A    I think there's certain officers on the force that would

7    have helped me out, yeah.

8    Q    What about the people you're dealing with now?  Mr. Harding

9    and the others.

10   A    Oh, now, I doubt it, because --

11   Q    Mr. Harding.  I'm sorry.  I interrupted you again.  I'm

12   sorry.

13   A    Go ahead.

14   Q    Mr. Harding wouldn't have been in that courtroom in 2004 in

15   front of Judge Byrnes if you weren't telling the story that

16   you're telling now, would he?

17   A    He wouldn't have known who I was.  That's right.

18   Q    Now, at the time -- strike that.  You met Mr. Harris in

19   September, 2002.  It took you several weeks to get the

20   information that he gave you.  And then you waited eight month to

21   report it, correct?

22   A    That's right.

23   Q    And you actually didn't report it for a whole year?  You

24   wrote a letter but you didn't report, you didn't name Mr. Harris,

25   you didn't give anybody any details, right?

1    A    Yes.

2    Q    And so this, this story that you told here today and that

3    you're telling me, you used that as sort of a currency that you

4    could trade for your freedom, didn't you?

5    A    No, not really.

6    Q    You didn't use the story as a currency you could trade for

7    your freedom?

8    A    No.  That's how you put it.

9    Q    What do you think you did?

10   A    Did the right thing.

11   Q    Did the right thing?

12   A    Exactly.

13   Q    And you didn't really want out of jail?  You just wanted to

14   do the right thing?

15   A    I would have waited until I got out of jail.  I told you, I

16   still would have did this.

17   Q    You would have waited until you got out of jail?

18   A    Yeah.

19   Q    Despite what you wrote Judge Byrnes about having to get out

20   of jail?

21   A    Speaking, if I would have had to wait, I would have waited.

22   I still would have did this.  You'd still be sitting there.  I'd

23   still be sitting here.

24   Q    You didn't tell Judge Byrnes on October 15th that you really

25   didn't really want out yet, did you?

CROSS EXAMINATION OF DOBROPOLSKI BY MARTIN                    192

1    A    And I told Gary Niedermeyer I really didn't want to do this

2    while I was incarcerated, let me finish my sentence.  And I

3    expressed this to Mr. Harding, too.

4    Q    You told Niedermeyer, Mr. Niedermeyer that?

5    A    I sure did.

6    Q    Did he write it down?

7    A    I doubt it because he wanted me to go ahead and started with

8    him right then and there.

9    Q    But you didn't tell Judge Byrnes on either of the two

10   occasions that you wrote him that you didn't want to get out of

11   jail, did you?

12   A    No.

13   Q    Now, you agree that, without your story, the prosecutors

14   never would have gone to bat with you to get you out of jail,

15   would they?

16   A    That's probably true, yes.

17   Q    And so part of the bargain that you offered was that when

18   you left jail, when you got out, that you would go out and try to

19   seek out Mr. Harris?  You would wear a wire and you would see if

20   you could get him to confirm on tape what you told the police?

21   A    Yes.

22   Q    So that was your whole task for law enforcement, was to get

23   Mr. Harris to admit that he committed these murders, correct?

24   A    Yes.

25   Q    Your Honor, I have a whole series now on these tapes.  I

1    think this would be a good time to do the break.

2            THE COURT:  All right.  Due to a scheduling issue,

3    members of the jury, we'll recess a little early today.

4            Please leave your note pads on your chairs.  Have no

5    discussion about the case or about the evidence you've heard so

6    far.  Continue to keep an open mind about all issues.

7            I'm going to be working with counsel this afternoon

8    after you depart to see if we can't really start tomorrow morning

9    exactly at 9:30.  So that's going to be our goal.

10           Please be back in the jury room tomorrow morning no

11   late than 9:30.  We'll resume at that time.  The jury's excused

12   until 9:30 tomorrow.

13           (Jury exits the courtroom.)

14           THE COURT:  You're excused, Mr. Dobropolski.

15           (Witness exits the courtroom.)

16           THE COURT:  Mr. Martin is excused.  I want to spend

17   time now this afternoon seeing if we can't finalize a ruling on

18   this whole question relating to Mr. Gardner.  Mr. Flannery, I

19   presume you're prepared to address that if you need to.

20           Mr. Harding, I know that the government's original

21   position was to oppose, I guess, on two or three, perhaps more,

22   different grounds.  But having read the motion filed by counsel

23   for Mr. Gardner and thought about it now, what's the government's

24   position?  Mr. Hanlon, are you going to handle that?

25           MR. HANLON:  Yes, Your Honor.

1          THE COURT:  Certainly.  Certainly.

2          MR. HANLON:  Your Honor, the government does continue

3     to oppose the admission of the fact of the state jury verdict in

4     this case.  Essentially, for many of the same reasons that we've

5     always opposed it.  The government simply feels that it's not

6     relevant to this jury's determination.

7          Having reviewed the brief that was filed by Mr. Coburn

8     and Mr. Kurland about these issues, the government's position is

9     not changed.  And if the Court wishes me to be heard with respect

10    to points in that brief, I'm happy to address them now.

11         The brief --

12         THE COURT:  Let me try to do it this way.  The defense

13    here, among other things, is that there was no enterprise, that,

14    for the sake of discussion, we'll say, let's assume from time to

15    time Defendant A got together with Defendant B to sell some

16    drugs.  Defendant A got together with Defendant D to buy a gun,

17    sell a gun.  Defendant B and C got together and committed a

18    murder.  But the defense here is that the jury will not be able

19    to conclude beyond a reasonable doubt that there was an

20    enterprise of sufficient continuity, that none of the defendants

21    were motivated to commit any acts or omissions by their desire to

22    further or improve their standing in the enterprise.

23         Why doesn't, why aren't counsel for Mr. Gardner

24    entitled to bolster that argument with an argument along the

25    lines of, my client's been convicted, Montgomery is lying or has

1   made up this business about the reason for the Jones-Spence

2   murder had anything to do with Mr. Mitchell or Mr. Martin or Mr.

3   Harris, and finally, this isn't specifically mentioned in the

4   defendant's brief but it seems to me there's no question that if

5   Mr. Gardner were to testify in this case, the government would

6   not be opposed.

7           In other words, Mr. Gardner could himself, through his

8   testimony, could provide exactly the same evidence that his

9   counsel are suggesting should be admissible through some other

10  source.  So that being the case, I'm hard-pressed to see how I

11  can prohibit evidence of, I'll grant you tenuous relevance, but

12  relevance nonetheless, and leave for the jury under proper

13  instructions what the jury makes of evidence that Mr. Gardner has

14  been convicted in state court.

15          So that's my take on it.

16          MR. HANLON:  I believe that that's the theory of the

17  defense as articulated in their brief.  With respect to counsel,

18  the government feels that there's actually another strategic

19  purpose that --

20          THE COURT:  Oh, of course.  As we discussed during the

21  motions hearing, one of the things the introduction of this

22  evidence would be aimed at, whether counsel admitted or not, and

23  I'm not calling on them to admit it, but they want to suggest to

24  the jury that Mr. Gardner should be entitled to some sympathy or

25  they should ignore Mr. Gardner, that Mr. Gardner has been

1    convicted, has a sentence of life without parole, and to impugn

2    the government's motivation for including him in this indictment.

3        And I'm not going to let them do that, as I made clear

4    in the motions hearing.  And I'll craft some instructions that

5    makes it clear that the jury may not use the evidence for that

6    purpose.

7        But the fact that evidence might be used for an

8    improper purpose has never been a reason to exclude it.

9        MR. HANLON:  Absolutely, Your Honor.

10        THE COURT:  Particularly evidence from a defendant in a

11    criminal case.

12        MR. HANLON:  And certainly usually the government is

13    making that kind of an argument.  Here's the government's take on

14    this particular evidence.

15        The defense theory as articulated is that the verdict

16    is --

17        THE COURT:  By the way, I'm sorry to cut you off.  And

18    then I won't again.  Do you agree with the Court that if Mr.

19    Gardner were to take the stand, he could tell the jury that he's

20    been convicted and serving a life sentence?

21        MR. HANLON:  I believe that if Mr. Gardner took the

22    stand, he could tell the jury that he had aid and abetted and

23    committed the murder.

24        THE COURT:  You don't think he could answer the

25    question, Where are you residing?  He could say, I'm residing in

1   the Division of Correction, serving a life without parole

2   sentence?

3              MR. HANLON:  In that kind of situation --

4              THE COURT:  Of course he would.  There would be no

5   basis --

6              MR. HANLON:  I'll grant that for purpose of argument,

7   Your Honor.

8              THE COURT:  All right.

9              MR. HANLON:  Of course, we're not in that situation.  I

10  would also point out, Your Honor, that if the defense were

11  offering to us a stipulation that Mr. Gardner had committed the

12  crime, we'd be in a different kind of situation.

13             THE COURT:  Again, as I said earlier, the question

14  before the Court first is whether the Court will permit, and it's

15  actually more, probably more appropriate to phrase it, whether

16  the Court will prohibit the induction of this evidence.  How this

17  evidence gets before the jury is a separate question.

18             MR. HANLON:  Yes.

19             THE COURT:  And how much of it.  Meaning the

20  conviction, how the conviction was obtained, and the sentence,

21  and all parts of the sentence.  All of those are subsidiary

22  questions that I'm not dealing with now.  Right now I'm focused

23  on is Mr. Gardner entitled, in view of the Sixth Amendment, to

24  put this evidence before the jury of the fact that he's been

25  convicted of the Jones Spence murder?

1          MR. HANLON:  No, in the government's opinion because

2     the verdict is not relevant to any of the issues in this case.

3     And I'll explain.

4          THE COURT:  Well, see, I'm sorry to cut you off again.

5     Forget the verdict.  Forget the verdict.  Forget the verdict,

6     forget the sentence, forget whether the verdict is a jury verdict

7     or a verdict by a judge.  Forget whether Mr. Gardner pled guilty

8     under an Alford plea or no contest.  Leave all of that to one

9     side.  Focus first on the fundamental question of whether the

10    evidence of the conviction for that murder in state court is

11    admissible.

12         MR. HANLON:  It's not admissible, Your Honor, because

13    the fact of that conviction, to murder under state law does not

14    reach any of the RICO or conspiracy theories that are before the

15    Court in this case.  The State, whether it was the jury or a

16    judge or whatever, would not have been required as part of that

17    conviction to find any of the elements that the defense believes

18    the state conviction is relevant to.

19         THE COURT:  Of course not.  Of course not.

20         MR. HANLON:  Hence, it's irrelevant for the issues that

21    the defense claims it's relevant for.

22         THE COURT:  Well, but that's not true because if

23    Montgomery -- am I correct that Montgomery is the only source of

24    evidence you have, apart from reasonable inferences, am I correct

25    that Montgomery's the only source of evidence you have to tie

1    that murder to the charges in this case?  To the RICO conspiracy?

2              MR. HANLON:  No, it's not, Your Honor.

3              THE COURT:  What else is there?  What else is there?

4              MR. HANLON:  On the broader, my expertise is sort of

5    the Spence murder.  Can I ask Mr. Harding?

6              THE COURT:  Sure, you can confer.

7              (Pause while government counsel confer.)

8              MR. HANLON:  Your Honor, we have another witness,

9    Ernest Reynolds, who will testify.

10             THE COURT:  Who is Reynolds?

11             MR. HANLON:  He's another cooperating witness.  He's an

12    individual who has engaged in drug trafficking during the time

13    frame of the 1990s with people he knew of as Goo and Wayne.  He

14    purchased from Card on various, at various points in time.

15             THE COURT:  Okay.  What does Reynolds say and what has

16    he said in the grand jury or in a 302 or DEA-6 that ties the

17    Jones Spence murder to a RICO conspiracy?

18             MR. HANLON:  Mr. Reynolds will testify that he was told

19    by defendants in this case --

20             THE COURT:  Who?

21             MR. HANLON:  By Mr. Gardner in this case that the

22    reason that the Spence murder was committed was in order to get

23    money in order to pay for Mr. Martin's attorney.  He'll also

24    testify about some of the initial planning of the crime and how

25    it was initially conceived as a robbery, to take money from

1    Darius Spence, a drug dealer.  And this was a plan that was put

2    together by Mr. Gardner and Mr. Martin before Mr. Martin got

3    locked up and then needed money for his attorney's fees.

4            THE COURT:  And was that evidence introduced in the

5    state trial of Mr. Gardner?

6            MR. HANLON:  I don't believe Ernest Reynolds' testimony

7    was introduced in the state trial.  And I'm not sure that the

8    state trial went into as much detail about the relationship of

9    Mr. Gardner --

10           THE COURT:  What was the evidence of motivation in the

11   state trial?

12           MR. HANLON:  I believe that the state trial was simply

13   a theory of robbery motivation, that there was believed to be

14   drugs and/or money in the apartment and this was the motivation

15   of the robbery.  Whether or not there was a particular intent to

16   get money and drugs to help Mr. Martin or anyone else, I'm not

17   sure that that was presented in the case and I'm not sure that

18   the state would have needed to.

19           THE COURT:  I'm having a difficult time appreciating

20   that if A is going to commit a theft or a robbery, the immediate

21   motivation, of course, is to get the money.  Now, if A achieves

22   that purpose of committing the robbery, A's got the money.  Now,

23   A is free to do whatever he wants with that money.

24           And so what the government is saying here is because

25   Mr. Gardner was motivated in part, because you're not suggesting

1   that all of the money was going to Mitchell's attorney.

2           MR. HANLON:  Actually, I believe that will be the

3   testimony, Your Honor.  That this was originally put together --

4   to Mr. Martin.  The government --

5           THE COURT:  You're contending that if they had walked

6   out of there with $100,000, that they were going to give all of

7   that money to some lawyer to represent Mr. Mitchell?  You have

8   evidence of that?

9           MR. HANLON:  Well, Your Honor, I should say that they

10  were going to use whatever they needed to get to get money to pay

11  for Mr. Martin's attorney, not Mr. Mitchell's attorney but Mr.

12  Martin.

13          THE COURT:  I'm sorry.  Mr. Martin's attorney.

14          MR. HANLON:  I suppose if there had been excess, sure,

15  they could have used it for some other purpose.

16          THE COURT:  There's always excess.

17          MR. HANLON:  By that logic, Your Honor, any robbery,

18  and any taking of money or drugs could theoretically be excluded

19  from a RICO or drug conspiracy on the logic that there could

20  conceivably be an excess which is going to be used for other

21  purposes.

22          THE COURT:  We're not talking about excluding evidence.

23  We're talking about admitting evidence.  That's exactly the

24  point.  That's exactly the point.  You don't worry about this in

25  the RICO cases that I've seen, most of them, certainly.  This

1    seems to be sui generis.  Mr. Harding is shaking his head.

2            Give me one other example in the State and District of

3    Maryland of a person convicted of first degree murder in state

4    court who is then charged in a RICO conspiracy.  In this

5    district, Mr. Harding.  Or just cite me a case where that's been

6    done.

7            MR. HARDING:  Of a person who's charged with murder

8    who's then charged in a RICO conspiracy?

9            THE COURT:  No.  Who is charged with having committed

10   an act of racketeering murder where that person has already been

11   convicted in state court after a jury trial of first degree

12   murder.

13           MR. HARDING:  Well, no, I can't give you another

14   example of that, Your Honor.  But what I was shaking me head

15   about is that there was actually copious case law on how

16   connected a particular event has to be to a racketeering

17   enterprise in order to make it in furtherance of the enterprise.

18           THE COURT:  Of course.

19           MR. HARDING:  It's actually very, it's stunningly

20   slight.

21           THE COURT:  I don't have a problem with that.  Really.

22   You two are missing the point here.  We're not talking about

23   excluding evidence.  We're talking about whether evidence should

24   be admitted.

25           MR. HANLON:  Yes, Your Honor.

1          THE COURT:  I'm not suggesting that this murder is

2    somehow improperly included in the indictment.  Of course it is.

3          MR. HANLON:  That may have been my confusion, Your

4    Honor.  I thought the Court was asking some question about that.

5          THE COURT:  No.  Of course it's proper.  Of course it's

6    proper.  The jury's got to decide what were the various

7    motivations for this murder because you got, you got to prove a

8    specific motivation.

9          MR. HANLON:  Yes, Your Honor.

10         THE COURT:  Right?  The State didn't have to prove a

11   specific motivation.

12         MR. HANLON:  Correct.

13         THE COURT:  Motivation is irrelevant in the state case.

14         Now, the defense argument is that the context and the

15   facts of this case make is it less likely, make it less likely

16   that a reasonable fact finder will conclude that the motivation

17   was the one you have to prove by evidence that he's already been

18   convicted in state court of what appears to be simply a classic

19   felony murder, as well as a first degree murder.

20         MR. HANLON:  In other words, Your Honor, the defense

21   wants to use the fact of the existing state convictions to prove

22   the reverse inference.  Something that is not an element of the

23   state conviction must therefore not be true.

24         THE COURT:  Not the fact of the state conviction.  How

25   do they, how do they impeach Montgomery if Montgomery -- and

1    correct me if I'm wrong.  And I understand your point, that it

2    would not have been necessary or perhaps even, perhaps

3    appropriate although, frankly, motivation is always admissible,

4    state and federal court.  If Montgomery didn't say anything about

5    raising money to pay Martin's lawyer, did he?  The state, in the

6    state testimony?

7         MR. HANLON:  I don't believe so.  Not in the state

8    testimony.

9         THE COURT:  Okay.  So how do they impeach Montgomery

10   who now comes in to federal court and says, oh, the reason, the

11   motivation, the objective of this robbery was to steal money, not

12   because anybody wants money, but specifically to steal money to

13   pay Martin's lawyer, without showing the circumstances

14   surrounding the state prosecution?  Most of which I'm not, I'm

15   still not even aware of.

16        MR. HANLON:  The way I would do it, Your Honor, and

17   frankly, it sounds better without pointing out that it was a

18   prosecution in the state court.

19        THE COURT:  Sounds better for you.

20        MR. HANLON:  No.  Sounds better for the defense.

21        THE COURT:  Well, that's their call, Mr. Hanlon.  Look,

22   let's be very clear.  You don't get to decide what's best for the

23   defense, obviously.

24        MR. HANLON:  Yes, Your Honor.

25        THE COURT:  And I don't get to decide what's best for

1    the defense.  Of course it's crazy.  Let's be up front about

2    this.  It's absolutely crazy for a defense lawyer to stand up in

3    front of a jury and say to the jury, yes, my guy committed this

4    murder but not for the reason the government said he committed

5    it.  I absolutely agree with you.  That's insane.

6         No reasonable lawyer would do it except these two

7    reasonable lawyers, who don't have some abstract case, you know,

8    who don't have some hypothetical case.  They have a real case

9    here.

10        Now, I confess, for the life of me, you know, RICO is

11   just one of those things that catches everybody's attention.  And

12   I've tried to sort of think about this.  And I'm not sure the

13   RICO count is the most important count in this indictment.  It's

14   the first count.  It probably leverages a lot of evidence into

15   the record that perhaps wouldn't come in.  I don't know.  But as

16   I think about it and think about it, and as I listen to the

17   evidence, I'm not sure it's the most critical count, but that's

18   what they've decided to attack.

19        Now, there are other 1959 counts as well.

20        MR. HANLON:  Yes, Your Honor.

21        THE COURT:  Which are closely overlapping.  But there's

22   a lot more in this indictment.

23        Anyway, my point is, I don't get to decide, the

24   government doesn't get to decide how counsel for Mr. Gardner

25   present his defense.  My focus here is on admissibility of

1    evidence.  And while I absolutely appreciate the improper purpose

2    to which that evidence can be put, that can be said about an

3    awful lot of defense evidence.

4            Jury nullification floats around every criminal trial

5    in America.  And part of my responsibility is to, in appropriate

6    ways, combat the prospect of jury nullification.  But I don't see

7    why I should preclude the defense from supporting arguments

8    related to Mr. Gardner's motivation, particularly in light of the

9    fact that the government, I think, has to agree that if Mr.

10   Gardner testifies, we don't have this discussion.  We spend this

11   time talking about jury instructions.

12           And so it may be the government wants to say, well,

13   Judge, he's not going to testify, or he's unlikely to testify, so

14   let's not cross that bridge.  But if it's admissible, it's

15   admissible.  It's admissible.

16           Now, the government gets the benefit of Rule 403 just

17   as the defendant gets the benefit of Rule 403.  And there is the

18   potential for prejudice to the government.  There is the

19   potential for confusion of the issues.  But I'm hard-pressed to

20   exclude defense evidence under 403 of this sort.

21           So let me be quiet for a moment, Mr. Hanlon, and let

22   you present an argument that I haven't permitted you to present

23   up until now.

24           MR. HANLON:  That's all right, Your Honor.  I'll see

25   how I do.  And I'll try to be brief.

1          The government, and I don't want to repeat everything

2     the Court's already gone over.  But with respect to the relevancy

3     of this, in some respects the government has to kind of reach how

4     the defense wants to present their case because that's the

5     defense argument.

6          THE COURT:  Of course.

7          MR. HANLON:  We need this to do this and this and this.

8     And part of my response is the defense doesn't really need this

9     to do this and this and this.  You can do a very effective cross

10    examination of Will Montgomery by pointing out that in prior

11    court proceedings he never opened his mouth or said one word

12    about the fact that there was this Martin connection to the

13    money.  And frankly, that cross examination would be just as

14    persuasive and just as powerful without getting into the niceties

15    of the fact that there was a state trial with different

16    jurisdictional elements.

17         The notion that Mr. Montgomery had any understanding of

18    those differing elements is a little bit preposterous, but I

19    suppose the defense could launch that kind of cross examination

20    simply by pointing out that it was a different hearing with

21    different issues.  We don't necessarily have to reach the fact

22    that there was a disposition or conviction in the prior

23    proceeding in which Mr. Montgomery testified, only that he was

24    testifying, it was a prior proceeding, and this is what you were

25    trying to accomplish then and it's different from what you are

1    trying to accomplish now, isn't that right, Mr. Montgomery?  I

2    think the cross examination is still possible.

3            The fact of the matter is is that we're sort of trying

4    to construct the sort of relevancy theory here.  And the Court

5    has articulated one, while also pointing out that it's sort of a

6    wacky theory which 99 out of 100 cases we'd think no one would

7    try to pursue.

8            THE COURT:  Actually, Mr. Lawlor did it in a recent

9    case in front of me.

10           MR. HANLON:  And I'm sure --

11           THE COURT:  The stakes weren't quite as high.

12           MR. LAWLOR:  Little different, Your Honor.

13           THE COURT:  Well, the principle is the same.  It is not

14   infrequent that a defense lawyer stands up in opening statement

15   or closing argument in the course of cross examination,

16   essentially concedes his or her client's guilt to something or

17   other for the purpose of defeating or combatting guilt on some

18   other count.

19           MR. HANLON:  Except, Your Honor, and I keep coming back

20   to this, that's not what the defense is trying to do here.  Mr.

21   Gardner is not getting up and conceding guilt.  Mr. Gardner wants

22   to get up and says, Well, this is already over, we're wasting our

23   time here.

24           THE COURT:  Well, they're not going to be permitted to

25   do that.  You see, I agree with you.  It bleeds over into issues

1    of instructions and what arguments are permitted.

2            MR. HANLON:  And I won't touch on that any more, Your

3    Honor, except to point out that a substantial portion of the

4    defense argument on this point is also based on the fact that the

5    jury's going to be confused and the jury needs to be made to

6    understand this, and the jury is going to infer from the federal

7    prosecution that there's something defective about the state

8    court system.  And we need to put in Mr. Gardner's conviction to

9    cure that.  That could just as easily, and I would argue more

10   easily, be cured through a Court instruction than if we get into

11   the fact that there's been another court which has disposed of

12   this conviction, which then has to be instructed away.  And we've

13   got the possibility for jury instructions both sides.

14           The problem the government sees is really twofold.

15   Number one is a standard 401, 403 analysis.  We've got a very

16   attenuated, very abstract, very theoretical kind of analysis.

17   The government argues no relevance.  The Court has articulated

18   some relevance.

19           And then we have a very large, substantial 403 problem.

20   Yes, it can be addressed through instructions.  But the

21   government would argue that the defense's concerns could far more

22   easily be cured through instructions.

23           It's unusual.  It's odd.  And I think it's going to be

24   extremely confusing for that jury to be told that there's been a

25   state conviction on one of these cases and then have to consider

1   the merits of the federal prosecution.  Frankly, the jury's going

2   to infer we've been wasting their time for six weeks.

3           THE COURT:  Actually, the jury already knows, as Mr.

4   Coburn and Mr. Kurland have pointed out, that these defendants

5   have been convicted of a number of offenses and found not guilty

6   of a number of offenses and some charges have been nol prossed.

7           I mean, that's a very important piece of their

8   argument.

9           MR. HANLON:  That is true, and the government did

10  resist the admission of that.  We got into it because the State,

11  because the defense teams wanted it.  The jury's heard about some

12  old gun cases, some old drug cases during the 1990's, not a

13  murder, which is one of the predicate racketeering acts in the

14  case.  There is, respectfully, a difference.

15          There's one lingering concern the government has here,

16  Your Honor.

17          THE COURT:  Okay.

18          MR. HANLON:  The Court, I think properly, voir dired

19  Mr. Gardner earlier today about whether or not he was consenting

20  to this strategy.  I think defense counsel have almost certainly

21  addressed it with him.

22          Mr. Coburn, I think, in candor indicated he had some

23  discussion, hadn't gotten what he would necessarily expect to get

24  from a client in a normal position, but they talked about it.

25          When the Court attempted to voir dire Mr. Gardner about

1    this, he gave the flesh and blood speech.  The government's

2    concern here is that this is the type of thing, telling a jury

3    that I've been convicted of a murder is the kind of thing that

4    normally we would want an extensive voir dire from the defendant

5    about, to the point of consent.

6          And the problem that the government foresees, if it's

7    six months, a year from now, after he's been sitting in jail for

8    a while, Mr. Gardner checks out of the flesh and blood theory and

9    decides, you know what, that was a bad strategy, he's going to be

10   able to file a 2255, and there's not going to be a record here

11   that he consented to it.

12          THE COURT:  Believe me, the least thing I'm worried

13   about in this case is a 2255 claiming ineffective assistance of

14   counsel.  That's all I'll say about that.

15          By the way, Mr. Hanlon, thank you for your

16   presentation.  Address the fact -- and this will be very

17   challenging for you, but you always rise to the challenge --

18   address the fact that I don't even know who the defense witnesses

19   are for Mr. Gardner.  How do I even know that they're not going

20   to bring in a witness who's going to say that Montgomery is

21   absolutely lying through his teeth about everything he says?

22          MR. HANLON:  I guess the Court doesn't know that.

23          THE COURT:  And don't I have to allow, in my ruling, I

24   mean, obviously, the 403 analysis, you know, is not symmetrical

25   because, you know, I know everything about the government's case

1    that I want to know.  And I have this lengthy proffer from the

2    government, of course, that Mr. Harding submitted under seal, I

3    think even before you got in the case.

4            MR. HANLON:  I'm sure it was, Your Honor.

5            THE COURT:  But maybe it was shortly afterwards.  So I

6    know an awful lot of what's, or I used to know an awful lot of

7    what the government thinks the evidence is going to be.  I have

8    no idea what the defense evidence is going to be.  And I don't

9    see how I can defer my ruling until the defense case because

10   Montgomery's going to be in here testifying in front of the jury

11   in the next 24, 48 hours.

12           What do you say about that?  The fact that I don't have

13   a window into the defense evidence?  I have a window into the

14   defense theory.  I've heard the opening statements and I've heard

15   the cross examination, but I don't know what their witnesses are.

16   I don't know what their evidence is.

17           MR. HANLON:  To the extent that that would be

18   determinative in the Court helping to do a rule 401, 402, Rule

19   403 analysis, it seems to me it would be unfair for the

20   government in assessing the admissibility of defense evidence to

21   entertain the assumption that the defense is going to present

22   evidence the government witnesses are lying and, therefore, I

23   need to be, I need to apply a more generous standard with respect

24   to whether defense evidence is going to come in.

25           If that's a determinative point of view, Mr. Gardner

1    should proffer through his counsel what his evidence is going to

2    be and how it's going to change the relevancy considerations

3    here.  And then the Court could take that proffer into

4    consideration, just as you considered our proffer of Will

5    Montgomery's testimony.

6              THE COURT:  Thank you.  And maybe you need to confer

7    with Mr. Harding on this.  When was the first time, to the

8    knowledge of the government prosecutors, that Mr. Montgomery made

9    a statement that the money from the Spence robbery was going to

10   be used to pay Mr. Martin's lawyer?

11             MR. HANLON:  I will have to defer.

12             THE COURT:  First time anybody heard that.  Month and

13   year would be great.

14             (Pause in Proceedings.)

15             MR. HARDING:  Well, I was checking the earliest

16   proffers that Mr. Montgomery gave because he talked a great deal

17   about, I'm talking now about the earliest proffers he gave in

18   2002, in August and September of 2002.  I'll just read to you, if

19   I may.

20             THE COURT:  Somebody's notes of what he said?

21             MR. HARDING:  Yeah.

22             THE COURT:  Is it your note?

23             MR. HARDING:  No.  This is --

24             THE COURT:  Agent's notes?

25             MR. HARDING:  Detective's notes.

1          MR. KURLAND:  For the record, Your Honor, we've asked

2     for years for this and the government has not given it to us.

3          MR. HARDING:  I told Mr. Kurland this morning, Your

4     Honor, that we will turn these over to him and I have had copies

5     made and we're going to hand them out at the end of the day.

6     They're not witness statements.  So they aren't Jencks material.

7     We're just turning them over in an abundance of caution.

8          THE COURT:  Good.  So these --

9          MR. HARDING:  There's no Brady and there's no Giglio in

10    them.

11         THE COURT:  So are these handwritten notes that have

12    been reduced to typewritten form?

13         MR. HARDING:  Yes.  They are reports done by the

14    original detectives who interviewed Mr. Montgomery right after he

15    got arrested.

16         And he told all about Martin, Mitchell, Darryl Bacon,

17    and Mr. Gardner and his activities over the years with these

18    particular defendants.  Montgomery advised that they had east

19    side and west side connections.  They would go to New York and go

20    down --

21         THE COURT:  Slow down, please.

22         MR. HARDING:  They would go to New York in Gardner's

23    Honda Accord station wagon or Mitchell's black truck.

24         THE COURT:  No.  Mr. Harding, please, focus in on the

25    Spence Jones murder.

1            MR. HARDING:  He doesn't --

2            THE COURT:  My question is when in connection with the

3    Spence Jones murder, the Jones Spence murder, did Mr. Montgomery

4    first tell anybody that the proceeds from that robbery were

5    intended to be used to pay for a lawyer for Mr. Martin or anybody

6    else, for that matter?

7            MR. HARDING:  Well, he has told me that from the

8    earliest proffers that I had with him.  But I don't have, I can't

9    tell you whether it was in 2003 or 2004.

10           THE COURT:  And when was Mr. Gardner convicted?

11           MR. HARDING:  In state court?

12           THE COURT:  Yes.  Anybody have the date at their

13   fingertips?

14           MR. COBURN:  It was 2004, Your Honor.

15           THE COURT:  When?

16           MR. COBURN:  I think September, September, October.

17           THE COURT:  September of 2004.

18           MR. HARDING:  Your Honor, there's another --

19           THE COURT:  So they proceeded with the murder trial

20   after this indictment?

21           MR. HARDING:  Yes.  They, the County refused to drop

22   their case.  We tried to, we were in touch --

23           THE COURT:  I'm sure you did.

24           MR. HARDING:  In any case --

25           THE COURT:  So much for state/federal cooperation.

1    That's the craziest thing I've ever heard in my life.  That was,

2    I guess, Ms. O'Connor's swan song, so to speak.

3              MR. HARDING:  Judge, there's one other important --

4              THE COURT:  And was it a death case?

5              MR. COBURN:  It was not, Your Honor.

6              THE COURT:  It was not?

7              MR. COBURN:  No one really knows why.

8              THE COURT:  No one knows why?

9              MR. COBURN:  Baltimore County, you would think it would

10    be death penalty.

11              THE COURT:  Well, Ms. O'Connor has been very candid in

12    saying that one of the important factors her office took into

13    account is what the victims thought.  And I don't know.  That's

14    one of the factors.  But certainly, they had a policy of seeking

15    it in every case.  And there's no question, this qualified.

16              MR. HARDING:  I just wanted to point out one other

17    thing, Your Honor.

18              THE COURT:  Yes.

19              MR. HARDING:  Mr. Martin, Mr. Gardner and Will

20    Montgomery and Aaron Holly were all involved in robbery schemes

21    in April of 2002.  And specifically, they were going to rob this

22    drug dealer by the name of Goose, whom I know I've mentioned to

23    the Court before.

24              THE COURT:  Right.

25              MR. HARDING:  They also were considering the Darius

1    Spence robbery.

2              THE COURT:  Right.

3              MR. HARDING:  It was Mr. Martin's arrest that thwarted

4    the plan to do Goose because it was Mr. Martin who had the

5    connection to Goose.

6              THE COURT:  Right.  I remember that.

7              MR. HARDING:  So they focused more on the Darius Spence

8    murder and with greater urgency.

9              THE COURT:  So you see how that really, I think,

10   redounds to the benefit of Mr. Gardner, because if Martin and

11   Montgomery and Gardner were going to commit a robbery of a drug

12   dealer before Martin got arrested, and I assume there's going to

13   be testimony about that because it's certainly consistent with

14   the defense position, nothing changed.

15             So Martin gets arrested, so yeah, we'll use some of the

16   money to help out Martin.  Okay.  Let me, first of all --

17             MR. HARDING:  No.  Something did change.  Montgomery's

18   going to make it very clear that Gardner had a much greater sense

19   of urgency about this once Martin got arrested, because he needed

20   to get money to help Martin.  That's Montgomery's understanding

21   of what the situation was.  Not that Gardner said that in so many

22   words.  But Gardner was much more hepped up about getting this

23   robbery done.  And eventually, when they did do the robbery, it

24   was because Gardner insisted it was time to move.  So it did have

25   an impact.

1          And there was, the fact that they needed money for

2     Martin was an important motivation, not only according to Mr.

3     Montgomery --

4          THE COURT:  I'm sorry.

5          MR. HARDING:  According to Mr. Reynolds, who heard

6     about all this from Mr. Gardner.

7          THE COURT:  And what was the motivation for robbing

8     Goose before Martin got arrested?

9          MR. HARDING:  That was just to make money.

10         THE COURT:  Well, you see, that's kind of my point.

11    Okay.  Ms. Rhodes -- before I hear from you, Mr. Kurland -- do

12    you have any view you wish to express on this question?

13         MR. LAWLOR:  Your Honor, I mean, we would object.  And

14    part of the issue is, you know, and I guess my objection is a

15    little bit unknown because I don't know, and the government hit

16    on this, whether they intend to, whether Mr. Gardner intends to

17    seek to introduce only the fact of the conviction or whether he's

18    conceding his factual involvement in that crime.

19         Either way, we object on the basis that they're

20    essentially conceding a portion of the government's theory.  And

21    some of that stain is going to leak on to us.

22         THE COURT:  Now, what would be your position if Mr.

23    Gardner were to testify to these facts?  Would you have a ground

24    of objection?

25         MR. LAWLOR:  I don't think even if he were to testify,

1    Your Honor, "I have been convicted in state court" would be a

2    relevant question or answer.  I'm trying to think of what, what

3    issue that would support that's relevant to this trial.

4              THE COURT:  It tends to make, if Mr. Gardner, again,

5    and I'm just talking hypothetically here, if Mr. Gardner were to

6    take the stand and say, Yes, I did the murder, yes, I intended to

7    commit the robbery, I wanted to take a vacation to the Bahamas,

8    and that was the only reason I went in that apartment with Mr.

9    Holly, and --

10             MR. LAWLOR:  I did it but it wasn't in furtherance of

11   the enterprise.

12             THE COURT:  Exactly.  There is no enterprise.  I was

13   never a part of any enterprise.  I wasn't trying to get a

14   promotion.  I was just doing a robbery.  I've done them before.

15   I intended to do them some more if I had been acquitted.

16             MR. LAWLOR:  Right.

17             THE COURT:  And this, I don't even know why I'm here.

18             MR. LAWLOR:  Yeah, I agree.  I think you're right.  I

19   think that would be admissible.  I agree.

20             THE COURT:  All right.  So you would have no objection?

21             MR. LAWLOR:  No.

22             THE COURT:  I mean, you would have no objection --

23             MR. LAWLOR:  No, I don't think I would have a basis.

24             THE COURT:  -- that could be sustained.

25             MR. LAWLOR:  Correct.  I agree.  And I think Mr.

1    Kurland just clarified that they don't intend to concede his

2    involvement in that which, candidly, I think takes away from our

3    position, in all candor.

4            THE COURT:  Well, I'm going to have to hear from Mr.

5    Kurland.  I don't know how in the world you tell the jury, I've

6    been convicted of first degree murder but I'm not conceding my

7    involvement in that offense.  I mean, that's part of the

8    complication here that, frankly, is causing me to put the brakes

9    on.  That's why I tried to leave those subsidiary questions to

10   one side because, frankly, those are the tougher issues than this

11   one, although this one is tough, too.  All right.

12           But for the record, Mr. Mitchell objects?

13           MR. LAWLOR:  Correct, Your Honor.  I guess maybe the

14   better way would be to double back.  But if the Court is going to

15   permit this, we would like to be heard separately on the issue of

16   limiting instructions.

17           THE COURT:  Of course.  Mr. Kurland, Mr. Pyne.  I'm

18   sorry.  Mr. Flannery.

19           MR. FLANNERY:  Mr. Martin and I would follow Mr.

20   Lawlor's objection as well.

21           THE COURT:  So you object.

22           MR. FLANNERY:  We object on the same ground, the

23   spillover effect.

24           THE COURT:  Because of the spillover effect this could

25   have on Mr. Martin -- Mr. Harris.  Mr. Crowe?

1          MR. CROWE:  Your Honor, I've been over this question

2     quite a few times in the last two years and a number of times

3     just today.  And I'm afraid I have to take the coward's way out

4     on this.  I don't know what my position will be and I don't know

5     that I should be asked to state what the position would be until

6     the government's case is concluded.

7          It seems to me that this is evidence that could be

8     presented in Mr. Gardner's case.

9          THE COURT:  All right.  Okay.  So I guess, I appreciate

10    that.  But my point is, are you now objecting on behalf of Mr. --

11    I mean, this is one of those instances when I'm not, I've got to

12    hear individually from everybody as to whether they're objecting

13    or not.

14          MR. CROWE:  Yes.

15          THE COURT:  You are objecting?

16          MR. CROWE:  But I may not be in two weeks.

17          THE COURT:  Okay.  All right.  Mr. Kurland?  If you

18    would, Mr. Kurland, start with, as I realize it's 4:25, start

19    with the most coherent explication of the relevance that you can

20    muster.

21          MR. KURLAND:  All right, Your Honor.  This is three

22    years' worth of work.  First of all, at the outset, our position

23    is we want admitted into evidence the fact of Mr. Gardner's

24    conviction and the fact he is serving a life sentence.

25          THE COURT:  Do you want evidence that it's a jury

1   verdict?

2        MR. KURLAND:  Well, that's going to come out because,

3   contrary to Mr. Hanlon's antiseptic manner in which he would

4   cross examine the witness if he were a hypothetical defense

5   counsel, it is going to be unavoidable.  And the Court has

6   alluded to it, with respect to any competent cross examination of

7   Mr. Montgomery, that Mr. Montgomery testified, not at a

8   proceeding, in a state trial, received a substantial benefit from

9   delivering the goods in that first trial, and he expects a

10  substantial benefit in addition to delivering the goods here,

11  which is the manufacturing of the federal jurisdiction.

12       THE COURT:  So your point is, and I think I get it,

13  your point is that Montgomery's motivation was, shall we say,

14  heightened because he wasn't just sitting in front of some judge

15  on some Motion to Suppress or something but, in fact, he was

16  doing exactly what he's going to do in this courtroom, and that

17  is, sit in front of 12 people, look them in the eye, actually or

18  figuratively, and essentially sell his credibility to that group

19  of 12 citizens?

20       MR. KURLAND:  Yes, Your Honor.  And in addition to

21  that --

22       THE COURT:  So in other words, you want this jury to

23  know that Mr. Montgomery testified in front of a jury?

24       MR. KURLAND:  Absolutely.

25       THE COURT:  And that that jury bought his testimony?

1          MR. KURLAND:  Yes.  Yes.

2          THE COURT:  And thus a guilty verdict?

3          MR. KURLAND:  Largely because the story that he is

4    going to tell today is flatly -- I take that back.  The story

5    that he is going to tell in this trial, and this is consistent

6    with all the representations of the government, is, it isn't just

7    a matter of him testifying to details that weren't important in

8    the state trial, his testimony in this trial is going to be

9    flatly inconsistent in several respects with his testimony in the

10   state trial.

11         THE COURT:  And your source of that is to compare what?

12   His trial testimony and his grand jury testimony, or his trial

13   testimony, DEA-6?  What is it?

14         MR. KURLAND:  Okay.  The sources of that, of the

15   inconsistency is his grand jury transcripts, which the Court has

16   already looked at, at least in part with respect to some earlier

17   issue.

18         THE COURT:  I don't remember what it was, frankly.

19         MR. KURLAND:  His grand jury testimony, his trial, his

20   state court trial testimony, and one recorded proffer that we,

21   that the government has given us, that was done not on the dates

22   that Mr. Harding is going to give us, these earlier things that

23   are non-Jencks according to the government, but on January 22nd,

24   2003, there was a recorded proffer.  We have the actual tape

25   recording of it.

1          And on this particular issue of the motivation, he

2     says -- the government's had this for years -- a totally

3     different motivation as to why Mr. Gardner got involved that has

4     nothing to do with money for, for lawyers.

5          So we have written documentation which we filed our 807

6     motion on that we want this admitted for the truth of the matter

7     asserted; that according to Mr. Montgomery, Mr. Gardner has

8     already offered to the government several years ago an entirely

9     different version as to why Mr. Gardner wanted the money that had

10    nothing to do with legal fees.

11         Now, before I get into the other point -- I'll read it.

12    Okay.  Fine.  Okay.  It says --

13         THE COURT:  Slowly, slow.

14         MR. KURLAND:  DS, which I guess is Stocksdale, who's

15    the state prosecutor.  Was there a particular reason --

16         THE COURT:  I'm sorry.  What are you reading from?

17         MR. KURLAND:  I'm reading from a transcript which has

18    already been provided to the government when we argued the

19    coconspirator issue.  I'm sorry.  Already provided to the Court.

20    This is January 22nd, 2003.  It's a recorded, transcribed, it's a

21    transcript.

22         THE COURT:  A proffered session.

23         MR. KURLAND:  Of a proffer session.

24         THE COURT:  And there's an assistant state's attorney

25    present?

1          MR. KURLAND:  And I believe Mr. Harding is present as

2    well because --

3          THE COURT:  He says he's not.

4          MR. KURLAND:  I'm sorry.  It says, We're at the U.S.

5    Attorney's office.  Present is Montgomery, his attorney,

6    Detective Tincher, and myself and Dean Stocksdale.  So there's a

7    U.S. attorney present.

8          MR. HARDING:  There is no U.S. attorney present.  He

9    was brought over to this office because Montgomery was a federal

10   prisoner and it was just more convenient.  The only people

11   present were the Baltimore County.

12         THE COURT:  All right.

13         MR. KURLAND:  DS, which I assume is State's Attorney

14   Stocksdale.  Was there a particular reason that Gardner was or

15   was part of this plan, the robbery of Darius Spence?  E told him

16   about it.

17         THE COURT:  I'm sorry?

18         MR. KURLAND:  Your Honor, E, which is Holly, told him,

19   Gardner, about it, that he had taken a nice fall around this

20   time.  Stocksdale:  And when you say he took a nice fall, who are

21   you referring to?  Montgomery, Goo, which is Mr. Gardner.  And

22   what do you mean, he took a nice fall?  He lost a couple of

23   thousand.

24         So the testimony that we have which we argue under 807

25   should come in, not simply to impeach but as the truth of the

1    matter asserted.

2              THE COURT:  And what's the date of that proffer?

3              MR. KURLAND:  January 22nd, 2003.  And it's going to be

4    our position, I feel a little bit uncomfortable revealing too

5    much of the defense strategy, if it's necessary, it's necessary,

6    and some of this has already come out in the copious pleadings

7    over the past several years, and that is is that Mr. Montgomery

8    is not a stupid man.  He shapes it.  He understands what's going

9    on.  All of these guys have testified, they fear federal

10   prosecution because the fed sentences are way harder.

11             We heard Bacon testify that he pled in state court

12   because he didn't want to deal with federal court.  These guys

13   aren't stupid.  Montgomery's not stupid.  He's willing to shape

14   the testimony on time, on dates, on motivations, whatever,

15   because he wants, he said, I think it's in Giganti's affidavit,

16   he fully expects to get more credit by delivering the goods once

17   again in this different form.

18             So with respect to the specific question the Court

19   answered, it is vitally necessary in any competent cross

20   examination of Mr. Montgomery for all of this to come out,

21   including the fact that he testified at his state trial and the

22   fact that Mr. Gardner was convicted.

23             So that's separate, that's one substantial relevancy

24   issue as well.  There's no way in any limitation, with all due

25   respect, any limitation on Mr. Montgomery's cross examination, to

1    artificially constrain it to prior proceedings, so on and so

2    forth.

3            I got one of my research assistants up there.  I'll

4    have him go get the cases.  It adversely and unconstitutionally

5    impacts our right to a full and effective cross examination.  So

6    that's reason alone that this is necessary.

7            Now, the second thing is, it's solely Mr. Montgomery's

8    shaped testimony about this connection for, for lawyers.  I have

9    looked at Mr. Reynolds' grand jury testimony.  Mr. Benson's a

10   good guy here.  But this testimony or the proffer that Mr.

11   Harding asserted here is the summary testimony of Detective

12   Benson.  The actual testimony of Mr. Reynolds does not say that.

13   That connection is fictitious.  It does not exist.  It's the

14   heart of our defense.

15           The sole witness, the sole witness that is going to tie

16   up the loose ends and make the Gardner, and make the Spence plan

17   robbery which, after all, there's also this other derivation

18   which Mr. Montgomery has testified to.  This was some sort of

19   revenge stuff because Momma was sleeping with, with Tonya Spence.

20   And according to Montgomery, Montgomery comes up with this idea

21   by himself.  It isn't just, Hey, we're going to rob Goose, maybe

22   we'll rob Darius.  Wait a minute, Martin's arrested, so now the

23   Goose plan can't work because he's working at the sporting store,

24   he wasn't going to get close, so let's shift to plan B.

25           Mr. Montgomery has testified under oath several times,

1    there's a totally different derivation, and that isn't what

2    happened.  What happened according to Montgomery under oath at

3    the state court trial is that he's approached by Darius Spence to

4    go beat up Mama and then he decides to play one against the

5    other.  Finds out that Mama is sleeping with, sleeping with Tonya

6    Spence.  So he decides, Hey, you know what?  Since somebody's

7    going to shoot somebody, might as well hire me to kill Darius.

8    Because I've checked out Mama and Mama's cool, I'm not going to

9    kill Mama.

10         So Darius Spence, that's how he gets involved.  And

11   according to his under-oath testimony, he recruits Holly, who

12   then recruits Gardner.  And Gardner gets involved because,

13   according to this proffer that he couldn't lie about, he's lost a

14   couple of thousand.  So that needs to come out.  That's going to

15   come out.

16         So the way that the government has presented it here,

17   that's their spin and that's what it is.  They're allowed to make

18   the arguments or the inferences, but so are we.  But on this,

19   with respect to Mr. Reynolds saying that the money is for

20   lawyers, that isn't what he testified in the grand jury.  That is

21   what, what Sergeant Benson says as a summary witness.  But he's

22   not going to testify to that at this trial.

23         That's why Mr. Harding, I'm not going to say that's why

24   Mr. Harding resisted giving us the summary transcripts, but as a

25   former Assistant U.S. attorney, I understand prosecutors don't

1    like to give summary witness transcripts, particularly when

2    there's been succeeding grand juries, because there's all sorts

3    of mistakes.  We saw one with Giganti.  Or an alleged mistake

4    with regard to where the palm print is.

5            I understand that.  I'm not impugning anybody's

6    credibility.  But believe me, Mr. Coburn and myself, we've read

7    this a million times over.  And on this particular detail, we're

8    sort of idiot savants with respect to this.

9            THE COURT:  Give me a preview, very, very short preview

10   of your closing argument.  I'm not going to ask you about any

11   evidence.  But what are you going to do with this?  That's the

12   question.

13           MR. KURLAND:  Right.  Okay.  First all, Your Honor, we

14   submitted with our motion some proposed jury instructions.  And I

15   understand the Court's discussion.  But we have no intention of

16   making any sort of improper, unconstitutional or unlawful

17   arguments concerning the misuse of the evidence.

18           THE COURT:  You're not going to make a jury

19   nullification argument.

20           MR. KURLAND:  Absolutely not.

21           THE COURT:  I understand that.

22           MR. KURLAND:  Absolutely not.

23           THE COURT:  What are you going to argue?

24           MR. KURLAND:  A couple of things.  One is that the

25   government has made a big deal about the incarceration status of

1    these defendants and the fact that it is, according to them, it

2    is, I won't say insignificant, but apparently people are in jail,

3    and then they come out of jail and the thing continues for a long

4    period of time.

5            And it's true that the government initially objected to

6    the, to the testimony of the results of those, of those many drug

7    charges and many gun charges.  Now, they sort of pooh-pah it by

8    saying, That's drugs and guns, it's not murder.  But the fact is

9    those are still predicate acts in the RICO count, just like the

10   murders are.

11           So while the murder is different at least in a

12   quantitative sense, in a qualitative sense all of those earlier

13   drug cases and gun cases are part and parcel of the charged

14   conspiracy and the scope of the enterprise.

15           Now, with respect to the incarceration status, we are

16   entitled to argue that Shawn Gardner has been incarcerated in a

17   state prison since X date.  Again, the jury can take that for

18   what it's worth.  That is some evidence.  The Court cannot direct

19   a verdict saying just because they're in prison, that means

20   they're out of the conspiracy.  That's a factual issue for the

21   jury to decide.

22           The way that the government has indicted the case,

23   they've chosen to extend the period to 2006, which is three or

24   four years after he has been incarcerated and two years after he

25   was convicted and serving a life without possibility of parole

1    state court sentence.

2         He had nothing to do with the stuff happening with

3    Supermax and Stop Snitching One, Two, you know, Roman numeral 50,

4    whatever.  He had nothing to do with that.  We're entitled to

5    make that argument.  We're entitled to say that he is in a

6    separate institution from the other defendants.  And that is a

7    factual issue that goes to the core of what's going on.

8         Now, in addition to that, it is legitimate to argue --

9    and this is not a jury nullification argument -- the Court has

10   already given an instruction, I think we attached that to the

11   motion, the early instruction you gave when the jury first heard

12   evidence of the, of the evidence concerning some of the drug

13   charges and some of the gun charges, and sometimes the police

14   officers knew the resolution or not.

15        It's a legitimate argument to make, consistent with a

16   proposed dual sovereignty instruction which we submitted and,

17   again, it's a rough draft, obviously, the government's going to

18   have their input and I suspect that will take a long time in kind

19   of hashing out what's going on, but it's a legitimate argument to

20   make that the defendants, or at least Mr. Gardner, has been dealt

21   with, in the 11 year period of this alleged RICO conspiracy.

22   He's been arrested a lot.  He's been caught by the police with

23   drugs and guns.  And he has gone to jail for various amounts of

24   time for state crimes, including the murder.

25        And with respect to whether or not there is a, this

1    particular murder was part of a federal RICO enterprise, it's a

2    fair argument to say, consistent with a proper jury instruction

3    that accurately states the law, that these are state crimes that

4    have been dealt with in state court.

5            And there was one other thing -- let me just take a

6    look at my notes.  There was one other thing that I wanted to

7    say.

8            Oh, also, Mr. Gardner's, fact that he was convicted in

9    state court was presented by these prosecutors, not Mr. Hanlon

10   personally, but by their office, that was presented to the grand

11   jury.  For the government to come in here now --

12           THE COURT:  Presented to the grand jury?

13           MR. KURLAND:  Yes, it was.

14           THE COURT:  In what context?

15           MR. KURLAND:  Officer Niedermeier testified to it.  So

16   for them to argue that it's irrelevant, along those lines,

17   suggested we're 2555 (sic) waiting to happen, I would ask, then,

18   that the indictment be dismissed as to Mr. Gardner.  Because they

19   presented -- if it's improper, they presented it to the grand

20   jury.

21           THE COURT:  How are you going to, if you are going to,

22   not concede his guilt?

23           MR. KURLAND:  Well, Your Honor, again, I feel

24   uncomfortable --

25           THE COURT:  Okay.  If you can't answer it.

233

1              MR. KURLAND:  No, no.  Put it this way.  The way that

2      we plan to do it is to elicit evidence that Mr. Gardner was

3      convicted in state court and is serving a life without

4      possibility of parole sentence.  Obviously, just like

5      inconsistent defenses, and I know what Justice Scalia says about

6      that, so on, so forth, obviously, that puts a responsibility on

7      Mr. Coburn and myself not to be totally self-defeating in the

8      manner in which we examine and cross examine some witnesses.

9              We are mindful of that issue but we do not have to

10     stand up here and concede or stipulate that he did it.  We

11     understand --

12             THE COURT:  What's the status of his appeal?

13             MR. KURLAND:  His direct appeal has been denied.

14             THE COURT:  Well, it's not denied.  You mean the

15     judgment was affirmed?

16             MR. KURLAND:  Yeah.  The conviction was affirmed and

17     the, the writ of certiorari to the highest court of Maryland was

18     not granted.  So that is a final conviction on direct appeal.

19             THE COURT:  Is there a petition for cert being filed by

20     the Public Defender's Office with the Supreme Court?

21             MR. KURLAND:  With the U.S. Supreme Court?

22             THE COURT:  Yes.

23             MR. KURLAND:  No.

24             THE COURT:  You sure?

25             MR. KURLAND:  Positive.

234

1          THE COURT:  Has the time expired?

2          MR. KURLAND:  I believe so.  Yes.

3          MR. COBURN:  I think it has, Your Honor.  They wouldn't

4     even, they refused to go the Maryland Court of Appeals.

5          THE COURT:  Excuse me?

6          MR. COBURN:  The PD even refused to go to the Maryland

7     Court of Appeals.

8          THE COURT:  It was a pro se petition?

9          MR. COBURN:  Yes.

10         MR. KURLAND:  Yes.

11         THE COURT:  So what happens if, and you told me

12    earlier, in fact, concerned about Mr. Gardner's papers back in

13    the DOC, he's going to file or he has filed a post-conviction.

14         MR. KURLAND:  Yes.

15         THE COURT:  So now what happens if two weeks from now,

16    you know, Baltimore County schedules a hearing on the

17    post-conviction?  Does the government then get to present to the

18    jury, Oh, and by way -- or even apart from scheduling the post

19    conviction, does the government now get to show the jury that it

20    may be a quote-unquote "final conviction" but, in fact, under

21    Maryland law there are post-conviction proceedings, to say

22    nothing of a 2254 in Federal Court somewhere down the line?

23         MR. KURLAND:  Well, one, factually, I mean, if that

24    happens, I would have to talk about this it to Mr. Coburn.  But

25    factually, if that would happen, I wouldn't have a problem with

235

1    the government going through that.  I think that would be 403

2    and --

3              THE COURT:  But see, now I'm in the grips of 403 in a

4    way that I can't breathe any more.

5              MR. KURLAND:  It's not going to happen.  The petition

6    hasn't even been filed yet.  But see, we're just, look, all of

7    the other prior state court results have been in.  All we, not

8    all we want because separate and apart from the clearing up the

9    misleading impression, that the jury's going to think this is a

10   revolving justice system that just spits out state court

11   defendants, Montgomery's credibility issue alone requires us to

12   inquire into this.  And that makes it sui generis.

13             These complaints from my esteemed colleagues here as

14   codefendants, I mean, they're concerned about evidentiary

15   spillover.  That's just a canard.  There's no discussion as to

16   what that really means.  That's what everybody says.  Mr. Gardner

17   is different.

18             Mr. Gardner has, in fact, been convicted of a charge

19   which, in this count or in this indictment, he's the only one

20   charged.  So I don't understand their evidentiary spillover.

21             To the extent that the jury might think that they were

22   all convicted of the other murders, that actually helps them in

23   my view.  But that isn't their concern.

24             THE COURT:  But this is a racketeering act in Count

25   One.

1           MR. KURLAND:  Yes.

2           THE COURT:  And so if the jury finds beyond a

3    reasonable doubt that Mr. Gardner committed this murder and that

4    it was an act of racketeering, then, then these three defendants

5    are 50% home because the government's got to prove two --

6           MR. KURLAND:  But our defense is that, Your Honor,

7    one -- two things.  One, Mr. Gardner's, I understand the

8    racketeering charge.  He's the only defendant charged in the

9    substantive counts.  And two, our defense is, whatever his

10   involvement was, it had nothing to do with furthering his

11   position in this enterprise that we're going to argue doesn't

12   exist.

13          THE COURT:  All right.

14          MR. KURLAND:  So the fact of Mr. Gardner's conviction

15   does not, does not automatically redound to the detriment of any

16   of these defendants.

17          THE COURT:  I think it does.  I absolutely believe it

18   does, Mr. Kurland.

19          MR. KURLAND:  Well, then, I guess, then we should be

20   severed, then.

21          THE COURT:  You know, how many times am I going to say

22   this?  I did sever.

23          MR. KURLAND:  Yes.

24          THE COURT:  I did sever.  And Mr. Gardner and his

25   codefendants absolutely spit in the Court's face, to use a

1    graphic term, in granting them that benefit.  Now, that's not

2    your fault.  That's not Mr. Coburn's fault.  It's nobody's fault

3    but the defendants.

4            Mr. Gardner was scheduled for a trial by himself in the

5    fall of 2006.

6            MR. KURLAND:  That's correct, Your Honor.

7            THE COURT:  And you know, and Mr. Coburn knows more

8    than any other defendant, I absolutely broke my back trying to

9    get Mr. Gardner to see the serious mistake he was making.  And I

10   ended up virtually getting cussed out by his family because I had

11   the temerity to bring them in to the courtroom ex parte to try to

12   make sense to Mr. Gardner, what he was doing to himself.

13           MR. KURLAND:  Judge, the Court has gone above and

14   beyond --

15           THE COURT:  I know, I don't need you to --

16           MR. KURLAND:  Your Honor, one other thing.  I think

17   this, my whole purpose, everything I say before the podium, I

18   want to make sure my argument is stronger than it was before I

19   got up.

20           THE COURT:  All right.  I'll let you strengthen it up,

21   but briefly.

22           MR. KURLAND:  Well, the one last thing is that, is that

23   there's no question, as the Court has pointed out, that if Mr.

24   Gardner were to testify, he would be able to say, I'm now

25   currently living at the state correctional facility in Jessup,

1    Maryland and that's where I'm under a life sentence.  That

2    clearly is admissible evidence and there are --

3              THE COURT:  He didn't testify in the state trial.

4              MR. KURLAND:  He did not testify in the state court

5    trial.  And again, there are a legion of cases which say that a

6    defendant cannot be punished for exercising his Fifth Amendment

7    right.  If the evidence could come in if he testifies, then it's

8    admissible.

9              THE COURT:  No, that's not true.  I set up that red

10   herring under my colloquy --

11             MR. KURLAND:  Judge, I'll get to, I'll get to the

12   cases.  There can be no requirement that a defendant could only

13   put on a defense if he testifies.

14             THE COURT:  No.  It's not a question of putting on a

15   defense.  It's a question of the relevance and the probative

16   value of the evidence.

17             MR. KURLAND:  Again, Montgomery's credibility,

18   Montgomery's credibility has to be cross examined in this manner.

19             THE COURT:  I'm going to think about Montgomery some

20   more overnight.  I'm not sure you can't achieve what you need to

21   achieve in front of this jury with Mr. Montgomery without

22   presenting evidence that Mr. Gardner has been convicted.

23             I will even allow you, because I think you're

24   absolutely entitled, to have this jury know that Mr. Montgomery,

25   if you choose to do so, Mr. Montgomery testified in front of a

1    prior jury.

2           Now, I appreciate there's a risk that if this jury, the

3    federal jury doesn't learn the outcome of that case, there could

4    be some residual prejudice if a juror were to believe that Mr.

5    Gardner has been tried in state court and acquitted or a mistrial

6    or something.  But again, as I said to the government, I think

7    juries follow the Court's instructions.  It's quite clear in this

8    case.  The Court's instructions are going to be more than a

9    hundred pages.  And each juror will have his or her own separate

10   copy, etc.

11          So just like I can cure prejudice or unnecessary

12   confusion of the issues through instructions, if I admit the

13   evidence, I think the government's got a good argument that you

14   can pretty much get what you want as well in cross examining Mr.

15   Montgomery.  And I don't think it's burdening Mr. Gardner's right

16   to testify at all.  But under the circumstances, Mr. Gardner

17   would be free to make that decision when and if the time comes.

18          MR. KURLAND:  Well, Judge, let me say his.  I hate

19   lawyers -- I do mostly appeals.  I hate lawyers who say they got

20   a great issue on appeal.  This is a great one here.

21          THE COURT:  And I don't try cases to harmless error,

22   either.  So you and I are on the same page on that.

23          MR. KURLAND:  Exactly.  But the other thing, Judge, and

24   this is the last thing I'll say, is that, I had some profound

25   point on this.  That --

1          THE COURT:  Mr. Coburn -- maybe it will come back to

2     you in a second.  Why don't you let Mr. Coburn pick up?

3          MR. COBURN:  Thank you so much, Your Honor.  I don't

4     mean to gang up on the government but they both spoke to this.

5     So I appreciate Your Honor allowing me just a minute.

6          The one scenario that I'm most scared of in this case

7     is the one that Your Honor just referred to, which is when I

8     cross examine Montgomery, I've got to establish the fact that

9     he's testifying before a jury on guilt/innocence, you know, with

10    respect to the Tonya Spence homicide.  Otherwise, I can't get at

11    his motive or the possible benefit that would inure to him and so

12    on.

13         So then the jury finds out that there's already been a

14    trial on guilt/innocence with respect to Tonya Spence, with Shawn

15    Gardner as a defendant, but they don't find out what happens.

16         I know, I mean, I know Your Honor will fashion the best

17    possible instruction with respect to that and give it in the best

18    possible way.  But we've got a very intelligent, sophisticated

19    jury here and they know, at least there are going to be some

20    people on that jury that are going to know that there is a

21    history, I mean, it happens.

22             Particularly like in the civil rights context.  Your

23    Honor might remember Lemerick Nelson up in Brooklyn, you know,

24    got acquitted in state court.  Then there's a following federal

25    prosecution.  I think the same thing happened with Kuhn in

1    California.

2              THE COURT:  I'm surprising you didn't mention OJ.

3              MR. COBURN:  OJ, you know, a perfect example.  The

4    federal government kind of leaps into the breach when the state

5    system doesn't work.

6              THE COURT:  Well, OJ is obviously not the state/federal

7    thing.  I take your point, Mr. Coburn.

8              MR. KURLAND:  Your Honor, I remembered the last thing.

9              THE COURT:  Yes.

10             MR. KURLAND:  That is, again, the cat's already out of

11   the bag with respect -- and they are serious charges.  The drug

12   charges and gun charges which make up predicate acts are serious

13   charges.  The jury has already heard that these things are

14   handled by the state court and they're able to hear whether or

15   not it was nol prossed or convicted.  So to artificially isolate

16   out this particular conviction.

17             And again, the other defendants are in a different

18   situation because they weren't tried in state court.  Just

19   amplifying what Mr. Coburn said.  If they hear about, that even

20   if you say, You are not to consider so on, so forth, we filed an

21   earlier brief on this particular issue.  And the default position

22   is, not the default position, but the general presumption is, is

23   that juries, even with instructions, are often bound to assume

24   that, that the earlier prosecution, you hear about it and don't

25   know the results, resulted in either an acquittal or mistrial and

1    that's what he's doing here.

2              So I think on the balance, on the 403 balance, not just

3    the government's 403 balance, but the other co-defendants, I

4    think the balance has to come down on permitting the evidence to

5    come in.

6              THE COURT:  All right.  Thank you, Mr. Kurland.  Did

7    you want to have a final word, Mr. Hanlon?

8              MR. HANLON:  Only to say, Your Honor, I'll leave the

9    Court with this.  We agree that it's an intelligent jury.  We

10   agree that it's a jury that's going to follow instructions.  Our

11   solution is, let the defense do their cross examination.  Their

12   cross examination, defense raises issues that they're concerned

13   about.  Instruct the jury that the disposition of the state case

14   has no relevance.  And that solves the problem.

15             THE COURT:  All right.  Thank you, Mr. Hanlon.

16             I'm going to think about this some more overnight and

17   take another look at the record.  And I'm going to give counsel

18   literally no more than 90 seconds tomorrow morning before we

19   start to add anything that you wish you'd said this afternoon.

20             And I would prefer if something comes to you, if you're

21   able to do so, to just submit something through ECF.

22             As I sit here, I am leaning somewhat strongly in the

23   direction of prohibiting this evidence.  While I have a keen

24   respect for Mr. Gardner's Sixth Amendment right to put on a

25   defense, putting on a defense doesn't necessarily mean

1    introducing all evidence and it doesn't even mean necessarily

2    introducing all relevant evidence or all evidence in a particular

3    form.

4              I am concerned about the effect of that evidence on the

5    other defendants.  I am concerned about the traditional Rule 403

6    factors, confusion of the issues, waste of time.  I don't really

7    perceive much in the way of unfairness to the government, but I

8    do perceive the potential for significant unfairness to the

9    co-defendants.

10             I'm concerned about the bootstrapping quality of the

11   argument.  And I don't use that term pejoratively, but Mr.

12   Kurland, Mr. Coburn, I think are very clear, they don't want the

13   conviction solely in.  That would hurt more than it would help

14   even Mr. Gardner.  So they have to have both, I mean, it seems to

15   me, they have to have both the conviction and the sentence in

16   before the jury.  And once we go there, it is beyond me how in

17   any coherent way you can maintain innocence through a

18   non-concession of guilt when you've told the jury or had the

19   Court tell the jury or conceded in front of the jury that there

20   has been a trial, Montgomery testified, a jury listened to that

21   evidence as well as other evidence, and found beyond a reasonable

22   doubt that Mr. Gardner had committed this murder or, and/or aided

23   and abetted in the commission of this murder and/or conspired to

24   commit this murder.

25             And I believe stipulations can be fashioned and a

244

course of cross examination can be fashioned so that Mr. Gardner

can get whatever he needs in the way of impeaching evidence as to

Mr. Montgomery in front of this jury without walking out on this

plank, because whatever else I may say or think about 2255, or

anything else for that matter, it is a plank.  And we shouldn't

walk planks other than when there's an absolute, absolute need to

do so.

So that's my preliminary view.  As I say, I'll give

counsel 90 seconds tomorrow morning.  Or if you want to submit

something tonight, I will read it.

But I'm going to prohibit it, understanding -- I am

likely to prohibit it, understanding full well that if Mr.

Gardner were to take the stand, that still doesn't open the door

to anything Mr. Gardner wants to say.  But as I suggested to Mr.

Hanlon, it would be, it seems to me, pretty extraordinary for me

to prohibit Mr. Gardner from bringing this information before the

jury if he chose to do so either on direct or cross examination.

And of course, that would afford his codefendants the opportunity

to cross examine him, and that cures that problem.

So Mr. Coburn, Mr. Kurland, thank you very much.  It's

an absolutely fascinating issue, certainly not one that I've ever

encountered, certainly not in this way at this time in this

context.  But that's the Court's preliminary view.

All right.  Thank you all very much.  See you 9:30

tomorrow.

245

1           (Conclusion of Proceedings at 4:53 p.m.)

2

3

4

5    WITNESS:  CHRISTOPHER DOBROPOLSKI

6    DIRECT EXAMINATION BY MR. HARDING              53

7    CROSS EXAMINATION BY MR. MARTIN               122

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        REPORTER'S CERTIFICATE

2

3            I, Mary M. Zajac, do hereby certify that I recorded

4   stenographically the proceedings in the matter of USA v. Willie

5   Mitchell, et al., Case Number(s) AMD-04-029, on October 6, 2008.

6            I further certify that the foregoing pages constitute

7   the official transcript of proceedings as transcribed by me to

8   the within matter in a complete and accurate manner.

9            In Witness Whereof, I have hereunto affixed my

10  signature this _____ day of _____, 2009.

11

12

13

14            _____

                Mary M. Zajac,
15              Official Court Reporter

16

17

18

19

20

21

22

23

24

25

**$**

$100,000 [1] - 201:6

**'**

'01 [1] - 176:10
'02 [26] - 8:15, 8:20, 8:24, 9:1, 9:22, 34:16, 38:17, 38:18, 38:22, 38:23, 39:8, 39:10, 39:12, 77:21, 147:5, 148:1, 151:17, 151:20, 151:23, 152:6, 152:9, 152:17, 152:24, 152:25
'03 [22] - 5:10, 8:16, 8:17, 8:19, 40:7, 41:7, 42:3, 108:4, 142:7, 151:19, 151:21, 151:22, 152:4, 152:20, 153:8, 153:9, 156:10, 159:4, 176:10
'70 [1] - 123:24
'80s [3] - 54:24, 54:25, 56:16
'88 [5] - 134:17, 134:18, 137:12, 137:13, 137:25
'89 [3] - 134:17, 134:18, 135:4
'99 [2] - 148:6
'work [1] - 23:13

**1**

1 [1] - 100:10
10/2/03 [2] - 82:20, 83:14
100 [1] - 208:6
100% [3] - 104:3, 187:17, 187:24
101 [1] - 1:25
11 [1] - 231:21
12 [3] - 162:16, 222:17, 222:19
12/11/03 [1] - 109:25
122 [1] - 245:7
13 [1] - 165:11
14 [2] - 18:2, 56:25
14th [1] - 174:24
15 [8] - 18:2, 36:20, 56:25, 92:1, 92:3, 107:12, 127:11, 127:12
15th [3] - 160:21, 189:11, 191:24
16 [1] - 18:2
17 [3] - 18:2, 55:23, 121:17
17th [2] - 95:22, 100:10
18 [3] - 123:25, 140:13, 153:19
1959 [1] - 205:19

1970 [1] - 123:25
1972 [1] - 123:23
1988 [4] - 123:25, 124:3, 125:19, 125:20
1989 [3] - 134:6, 134:16, 137:12
1990 [1] - 136:10
1990's [2] - 54:23, 210:12
1990s [1] - 199:13
1996 [3] - 113:4, 114:9, 125:17
19th [1] - 90:6, 165:9
1:00 [2] - 82:22, 83:14
1:05 [2] - 129:14, 132:12
1:15 [5] - 129:15, 130:4, 130:6, 130:9, 130:18
1st [2] - 39:24, 91:14

**2**

20 [7] - 36:20, 107:19, 127:11, 127:12, 132:19, 160:1, 180:24
2000 [1] - 117:17
2001 [4] - 55:2, 55:4, 177:9
2002 [19] - 44:22, 48:7, 49:8, 55:2, 55:4, 55:5, 56:19, 57:2, 100:6, 139:16, 139:18, 149:20, 150:8, 154:8, 177:9, 190:19, 213:18, 216:21
2002/2004 [1] - 38:4
2003 [32] - 3:10, 5:8, 38:15, 47:22, 48:11, 84:12, 90:6, 91:14, 122:23, 124:14, 149:11, 149:21, 154:9, 155:20, 161:12, 165:9, 174:24, 178:7, 178:9, 178:16, 179:23, 180:20, 182:11, 182:20, 182:22, 184:3, 184:13, 189:11, 215:9, 223:24, 224:20, 226:3
2004 [16] - 46:25, 117:18, 120:8, 120:9, 121:1, 178:20, 178:25, 180:21, 183:12, 184:14, 184:24, 188:2, 190:14, 215:9, 215:14, 215:17
2006 [2] - 230:23, 237:5
2008 [2] - 1:11, 246:5
2009 [1] - 246:10
21 [2] - 37:13, 176:16
21201 [1] - 1:25
2254 [1] - 234:22
2255 [3] - 211:10, 211:13, 244:4

22nd [3] - 223:23, 224:20, 226:3
23 [2] - 165:12, 165:19
24 [1] - 212:11
2555 [1] - 232:17
275 [1] - 38:3
27th [1] - 4:23
2:30 [3] - 132:5, 132:10, 132:11
2nd [4] - 161:12, 163:5, 163:6, 163:9

**3**

30 [2] - 69:15, 77:8
302 [1] - 199:16
30th [2] - 180:21, 184:14
37 [1] - 53:24, 55:1
3:40 [1] - 107:20
3rd [2] - 161:24, 179:23

**4**

4 [1] - 132:19
401 [2] - 209:15, 212:18
402 [1] - 212:18
403 [12] - 206:16, 206:17, 206:20, 209:15, 209:19, 211:24, 212:19, 235:1, 235:3, 242:2, 242:3, 243:5
410-888 [1] - 119:15
48 [1] - 212:11
4:00 [1] - 132:25
4:25 [1] - 221:18
4:53 [1] - 245:1

**5**

5/23/03 [1] - 79:11
50 [1] - 231:3
50% [1] - 236:5
53 [1] - 245:6
5515 [1] - 1:24

**6**

6 [2] - 1:11, 246:5
6's [2] - 3:15, 20:4
6th [2] - 118:23, 118:24

**7**

7th [6] - 134:6, 149:11, 160:9, 160:15, 180:20, 184:13

**8**

8 [2] - 148:14, 176:16
80 [3] - 69:16, 69:17, 112:2

801 [1] - 133:17
801(d)(2)(e [3] - 23:25, 24:5, 25:15
807 [2] - 224:5, 225:24
880-1749 [1] - 119:15
8th [3] - 117:17, 118:21

**9**

9/7 [1] - 151:18
9/7/03 [1] - 151:16
90 [2] - 242:18, 244:9
99 [1] - 208:6
99% [1] - 33:19
9:30 [4] - 193:9, 193:11, 193:12, 244:24
9:45 [1] - 2:1

**A**

A's [1] - 200:22
a.m [1] - 2:1
Aaron [1] - 216:20
abetted [2] - 196:22, 243:23
abeyance [1] - 153:13
ability [2] - 11:10, 46:17
able [18] - 4:23, 4:25, 5:4, 11:10, 11:13, 26:22, 53:7, 81:3, 95:14, 141:6, 144:23, 145:5, 187:21, 194:18, 211:10, 237:24, 241:14, 242:21
absence [1] - 48:25
absolute [3] - 14:11, 244:6
Absolutely [6] - 7:6, 71:10, 196:9, 222:24, 229:20, 229:22
absolutely [13] - 33:1, 99:17, 101:11, 205:2, 205:5, 206:1, 211:21, 236:17, 236:25, 237:8, 238:24, 244:21
abstract [2] - 205:7, 209:16
abundance [1] - 214:7
abuse [4] - 84:22, 84:23, 176:25, 177:1
accept [2] - 49:1, 105:10
accepting [4] - 13:24, 18:11, 31:5, 105:13
accomplish [2] - 207:25, 208:1
accomplishing [1] - 45:19
Accord [1] - 214:23
according [10] - 17:22, 49:17, 218:2, 223:23, 224:7, 227:20, 228:2,

228:11, 228:13, 230:1
According [1] - 218:5
account [6] - 43:1, 43:18, 49:21, 91:15, 92:9, 216:13
accountings [1] - 3:25
accounts [1] - 4:2
accurate [2] - 246:8
accurately [1] - 232:3
accused [1] - 184:12
achieve [2] - 238:20, 238:21
achieves [1] - 200:21
acknowledges [2] - 40:19, 44:19
acquaintances [1] - 168:25
acquiesces [1] - 104:17
acquired [2] - 54:21, 80:23
acquittal [2] - 241:25
acquitted [4] - 107:4, 219:15, 239:5, 240:24
act [7] - 3:11, 26:12, 45:18, 90:14, 202:10, 235:24, 236:4
actions [1] - 158:21
activities [4] - 40:12, 40:19, 168:18, 214:17
activity [5] - 26:23, 36:23, 47:24, 79:23, 165:22
acts [9] - 15:15, 24:21, 25:11, 26:12, 26:23, 194:21, 210:13, 230:9, 241:12
actual [5] - 92:23, 105:18, 106:23, 223:24, 227:12
Adam [1] - 1:22
add [4] - 25:18, 43:13, 43:17, 242:19
addicted [1] - 55:18
addition [5] - 2:20, 4:7, 222:10, 222:20, 231:8
additional [2] - 65:6, 106:2
address [4] - 34:8, 69:25, 103:3, 180:5, 180:7, 180:12, 180:13, 180:14, 180:15, 193:19, 194:10, 211:18
Address [1] - 211:16
addressed [2] - 209:20, 210:21
addresses [2] - 108:23, 110:18
admissibility [3] - 103:20, 205:25, 212:20
admissible [14] - 7:5,

25:15, 50:10, 52:4, 195:9, 198:11, 198:12, 204:3, 206:14, 206:15, 219:19, 238:2, 238:8
**admission** [7] - 25:13, 33:22, 50:15, 96:18, 97:23, 194:3, 210:10
**admissions** [7] - 7:14, 12:23, 27:23, 33:20, 33:22, 41:13, 41:14
**admit** [3] - 192:23, 195:23, 239:12
**admits** [4] - 9:18, 10:7, 13:12, 13:21
**admitted** [7] - 105:18, 184:2, 185:14, 195:22, 202:24, 221:23, 224:6
**admitting** [1] - 201:23
**adopt** [3] - 22:14, 31:12, 31:13
**adopted** [1] - 25:18
**adult** [2] - 123:19, 134:15
**advance** [1] - 149:21, 153:6
**advantage** [1] - 40:10
**adversely** [1] - 227:4
**advise** [1] - 106:10
**advised** [1] - 214:18
**affects** [1] - 28:7
**affidavit** [1] - 226:15
**affirmed** [2] - 233:15, 233:16
**affixed** [1] - 246:9
**afford** [1] - 244:18
**afraid** [5] - 37:22, 93:7, 109:2, 110:12, 221:3
**African** [1] - 36:21
**African-American** [1] - 36:21
**afternoon** [14] - 105:22, 107:17, 122:13, 122:14, 132:6, 132:7, 132:8, 134:10, 134:13, 134:14, 137:9, 193:7, 193:17, 242:19
**afterwards** [1] - 212:5
**agent** [2] - 15:15, 29:24
**Agent's** [1] - 213:24
**ago** [12] - 3:14, 13:15, 20:5, 20:6, 40:20, 40:21, 43:6, 43:8, 122:19, 187:18, 187:19, 224:8
**agree** [2] - 22:25, 23:21, 45:20, 62:10, 79:4, 81:24, 86:2, 86:8, 87:17, 120:24, 154:2, 163:23, 186:13, 192:13, 196:18, 205:5, 206:9, 208:25, 219:18, 219:19,

219:25, 242:9, 242:10
**agreed** [11] - 46:3, 49:18, 52:14, 149:2, 149:19, 151:8, 152:21, 153:13, 161:1
**agreement** [4] - 16:3, 16:4, 48:1, 158:3
**ahead** [24] - 8:18, 38:7, 63:21, 73:1, 75:10, 76:12, 76:15, 80:11, 88:19, 108:19, 112:19, 117:3, 118:20, 122:6, 144:25, 152:13, 153:23, 155:4, 163:14, 163:15, 168:11, 187:16, 190:13, 192:7
**aid** [1] - 196:22
**aided** [1] - 243:22
**aim** [1] - 17:22
**aimed** [1] - 195:22
**AKA** [1] - 83:9
**al** [2] - 246:5
**alert** [3] - 22:9, 95:1, 133:17
**Alford** [1] - 198:8
**alias** [2] - 113:1, 113:25
**alibi** [5] - 96:7, 96:21, 97:10, 97:17, 101:21
**allegations** [2] - 179:14, 179:22
**alleged** [4] - 14:1, 26:8, 229:3, 231:21
**allegedly** [4] - 32:5, 32:8, 32:14, 97:1
**allow** [5] - 21:21, 94:19, 98:25, 211:23, 238:23
**allowed** [2] - 11:17, 228:17
**allowing** [1] - 240:5
**alluded** [2] - 36:17, 222:6
**almost** [2] - 14:11, 210:20
**alone** [3] - 73:17, 227:6, 235:11
**aloud** [1] - 78:20
**altercation** [1] - 188:10
**AMD-04-029** [2] - 1:6, 246:5
**Amendment** [5] - 10:19, 10:21, 197:23, 238:6, 242:24
**America** [2] - 135:6, 135:14, 206:5
**AMERICA** [1] - 1:5
**American** [1] - 36:21
**Amity** [1] - 48:10
**amount** [2] - 123:15, 148:7
**amounts** [1] - 231:23

**amplify** [1] - 28:8
**amplifying** [1] - 241:19
**analog** [1] - 85:19
**analysis** [5] - 32:11, 209:15, 209:16, 211:24, 212:19
**Andre** [1] - 1:13
**angry** [1] - 113:8
**ankle** [1] - 102:16
**answer** [38] - 58:2, 58:3, 58:10, 65:13, 66:17, 67:2, 67:6, 74:10, 74:17, 75:18, 76:8, 76:21, 85:14, 88:25, 106:12, 109:5, 110:7, 116:18, 117:14, 129:10, 129:11, 152:13, 153:22, 165:20, 166:10, 167:9, 167:11, 168:7, 170:3, 171:12, 174:4, 185:4, 187:16, 190:2, 196:24, 219:2, 232:25
**answered** [5] - 71:24, 71:25, 114:5, 163:12, 226:19
**answering** [1] - 152:11
**antiseptic** [1] - 222:3
**anyway** [1] - 62:17
**Anyway** [2] - 102:17, 205:23
**apart** [5] - 15:22, 28:22, 198:24, 234:18, 235:8
**apartment** [2] - 200:14, 219:8
**apologize** [4] - 22:8, 52:21, 102:3, 179:25
**appeal** [4] - 233:12, 233:13, 233:18, 239:20
**appeals** [1] - 239:19
**Appeals** [2] - 234:4, 234:7
**appear** [3] - 40:2, 83:12, 186:9
**appearance** [1] - 53:3
**Appearances** [1] - 1:15
**appeared** [1] - 151:6
**apply** [3] - 49:4, 86:11, 212:23
**appointment** [2] - 111:10, 178:15
**appointments** [2] - 178:10, 178:12
**appreciate** [7] - 16:9, 34:2, 34:4, 206:1, 221:9, 239:2, 240:5
**appreciating** [1] - 200:19
**approach** [2] - 76:14, 119:1
**approached** [1] - 228:3

**appropriate** [5] - 50:16, 101:25, 197:15, 204:3, 206:5
**April** [13] - 34:16, 39:1, 39:2, 39:8, 39:23, 39:24, 39:25, 95:22, 100:6, 100:10, 142:7, 216:21
**area** [10] - 59:9, 59:10, 61:24, 78:4, 81:8, 113:5, 140:25, 141:14, 146:6
**areas** [2] - 156:13, 158:5
**arguably** [1] - 41:12
**argue** [12] - 2:20, 4:15, 21:16, 26:5, 209:9, 209:21, 225:24, 229:23, 230:16, 231:8, 232:16, 236:11
**argued** [2] - 28:9, 113:3, 224:18
**argues** [1] - 209:17
**arguing** [8] - 2:10, 7:10, 7:14, 7:16, 7:17, 12:20, 22:10, 114:12
**argument** [41] - 7:17, 8:3, 10:6, 11:19, 16:9, 16:10, 17:13, 20:25, 21:4, 21:18, 21:23, 22:15, 28:22, 28:24, 29:4, 30:11, 45:7, 48:15, 100:4, 114:8, 114:13, 194:24, 196:13, 197:6, 203:14, 206:22, 207:5, 208:15, 209:4, 210:8, 229:10, 229:19, 231:5, 231:9, 231:15, 231:19, 232:2, 237:18, 239:13, 243:11
**arguments** [6] - 21:11, 25:19, 206:7, 209:1, 228:18, 229:17
**arise** [1] - 50:14
**arose** [1] - 44:8
**arrange** [1] - 80:12
**array** [2] - 128:17, 128:20
**arrays** [4] - 82:2, 162:10, 162:14, 162:18
**arrest** [2] - 54:18, 54:19, 217:3
**arrested** [27] - 3:3, 39:12, 39:14, 56:10, 61:2, 74:22, 97:25, 100:5, 100:10, 100:13, 102:7, 102:10, 102:15, 119:25, 120:1, 121:4, 121:12, 214:15, 217:12, 217:15, 217:19, 218:8, 227:22, 231:22
**Arrington's** [1] - 93:25

**arrived** [1] - 39:19
**articulated** [4] - 195:17, 196:15, 208:5, 209:17
**artificially** [2] - 227:1, 241:15
**aside** [1] - 16:13
**asides** [2] - 12:21
**aspect** [2] - 28:6, 37:11
**assault** [10] - 37:14, 38:24, 54:12, 54:14, 54:16, 60:9, 60:13, 60:14, 87:25, 139:10
**Assault** [2] - 56:23, 84:13
**assaults** [2] - 54:8, 54:10
**asserted** [3] - 224:7, 226:1, 227:11
**assertion** [2] - 49:23, 50:1
**assess** [2] - 24:2, 24:8
**assessing** [1] - 212:20
**assigned** [1] - 35:24
**assist** [3] - 45:19, 159:13, 160:5
**assistance** [2] - 156:6, 211:13
**Assistant** [2] - 86:17, 228:25
**assistant** [1] - 224:24
**assistants** [1] - 227:3
**assume** [10] - 12:5, 35:6, 99:20, 107:2, 128:25, 129:1, 194:14, 217:12, 225:13, 241:23
**assuming** [3] - 31:7, 114:15, 126:23
**assumption** [1] - 212:21
**assures** [1] - 49:2
**attached** [2] - 98:14, 231:10
**attack** [1] - 205:18
**attempt** [3] - 42:8, 80:20, 81:4
**attempted** [3] - 60:9, 124:17, 210:25
**attention** [4] - 55:2, 56:19, 91:13, 205:11
**attenuated** [1] - 209:16
**attitude** [1] - 89:2
**attorney** [10] - 199:23, 201:1, 201:11, 201:13, 224:24, 225:5, 225:7, 225:8, 228:25
**Attorney** [3] - 86:18, 175:7, 225:13
**Attorney's** [1] - 225:5
**attorney's** [1] - 200:3
**attorneys** [2] - 104:24,

105:8
**August** [23] - 5:10, 38:17, 38:18, 38:22, 39:4, 39:9, 39:10, 39:11, 40:14, 44:22, 56:19, 57:2, 139:18, 139:19, 148:1, 152:6, 152:9, 152:17, 152:25, 213:18
**aura** [1] - 43:15
**authorities** [1] - 157:13
**authorized** [1] - 136:3
**Auto** [6] - 54:8, 121:13, 134:19, 134:21, 135:3, 137:1
**auto** [1] - 56:10, 56:11, 56:12, 56:13, 56:15, 56:17, 121:14, 135:9, 135:12, 135:17
**automatic** [1] - 107:1
**automatically** [2] - 106:12, 236:15
**available** [1] - 20:23
**Avenue** [7] - 61:24, 61:25, 73:15, 116:21, 140:22, 140:23
**aware** [13] - 2:23, 18:6, 41:1, 51:4, 63:23, 67:11, 95:5, 96:6, 101:8, 101:10, 107:8, 119:25, 204:15
**awful** [3] - 206:3, 212:6

# B

**B's** [1] - 50:4
**B-S-I-N-G** [1] - 166:17
**background** [2] - 96:13, 160:1
**backing** [1] - 77:23
**backs** [2] - 46:12, 46:14
**backup** [1] - 134:1
**Bacon** [2] - 214:16, 226:11
**bad** [3] - 30:6, 80:4, 211:9
**bag** [3] - 24:24, 25:1, 241:11
**Bahamas** [1] - 219:7
**bail** [1] - 134:23
**balance** [6] - 99:2, 99:4, 242:2, 242:3, 242:4
**bald** [2] - 57:14, 57:16
**Baltimore** [54] - 1:12, 1:25, 36:19, 37:13, 43:24, 54:1, 55:11, 57:1, 77:23, 77:24, 80:9, 80:17, 81:8, 83:6, 113:5, 125:10, 125:12, 125:13, 125:17, 125:20, 136:6, 136:11, 137:15, 137:17, 137:23, 138:1, 139:11,

139:13, 140:20, 140:21, 146:5, 150:14, 151:5, 153:3, 153:4, 159:12, 159:13, 159:17, 160:4, 169:18, 169:19, 171:8, 171:13, 171:14, 171:15, 175:3, 178:21, 216:9, 225:11, 234:16
**Baltimore's** [1] - 80:14
**banter** [1] - 5:16
**barely** [1] - 91:21
**bargain** [1] - 192:17
**barracks** [2] - 126:19, 127:6
**Barry** [1] - 1:22
**based** [4] - 24:9, 49:13, 49:15, 209:4
**basis** [5] - 35:20, 45:23, 197:5, 218:19, 219:23
**bat** [5] - 124:13, 189:21, 189:24, 190:4, 192:14
**batteries** [1] - 54:8
**bear** [1] - 165:6
**bears** [1] - 19:5
**beat** [6] - 77:24, 139:6, 139:8, 139:9, 188:13, 228:4
**beaten** [1] - 188:23
**beating** [1] - 188:8
**became** [8] - 35:17, 36:5, 39:20, 45:14, 58:15, 96:7, 97:10, 150:20
**become** [5] - 17:23, 38:20, 39:15, 45:20, 101:10
**becomes** [1] - 9:13
**beeper** [4] - 115:22, 115:24, 116:6, 119:17
**beforehand** [1] - 161:9
**began** [4] - 6:19, 6:24, 147:3, 147:4
**Beginning** [1] - 54:22
**beginning** [6] - 57:2, 121:15, 150:8, 178:16, 182:11
**begins** [1] - 143:9
**behalf** [2] - 22:19, 221:10
**Behalf** [5] - 1:15, 1:17, 1:18, 1:20, 1:21
**behest** [1] - 52:20
**belated** [1] - 52:20
**beleaguered** [1] - 36:22
**believes** [1] - 198:17
**below** [2] - 166:16, 181:16
**bench** [6] - 186:4, 186:6, 186:21, 186:25,

187:6, 187:18
**benefit** [8] - 11:19, 206:16, 206:17, 217:10, 222:8, 222:10, 237:1, 240:11
**Benson** [3] - 87:1, 227:12, 228:21
**Benson's** [1] - 227:9
**beside** [2] - 97:12, 97:13
**best** [9] - 4:5, 35:9, 94:3, 102:5, 163:23, 204:22, 204:25, 240:16, 240:17
**better** [8] - 23:17, 53:2, 83:3, 104:16, 204:17, 204:19, 204:20, 220:14
**between** [8] - 5:7, 11:11, 14:13, 80:13, 124:3, 173:22, 180:20, 184:13
**beyond** [5] - 194:19, 236:2, 237:14, 243:16, 243:21
**big** [2] - 32:7, 229:25
**bigger** [1] - 91:7
**bit** [22] - 4:16, 28:8, 33:5, 42:20, 48:8, 67:9, 67:14, 80:3, 102:25, 113:23, 114:20, 115:3, 115:20, 123:18, 127:10, 144:8, 157:12, 168:24, 188:25, 207:18, 218:15, 226:4
**bite** [1] - 86:7
**bizarre** [2] - 30:14, 32:1
**Blab** [1] - 97:1
**blab** [1] - 97:2
**blabbed** [6] - 75:20, 95:11, 96:15, 97:3, 97:4, 98:16
**black** [10] - 57:14, 64:12, 64:13, 68:10, 68:11, 214:23
**bleeds** [1] - 208:25
**blood** [2] - 211:1, 211:8
**Bo** [53] - 6:8, 22:19, 62:22, 63:2, 65:14, 65:15, 65:17, 65:24, 66:2, 66:7, 70:24, 70:25, 71:4, 71:6, 72:20, 72:22, 73:17, 74:13, 74:19, 77:9, 83:9, 83:23, 84:1, 95:7, 95:9, 95:10, 96:14, 97:6, 97:17, 97:18, 97:24, 98:7, 98:9, 100:2, 165:20, 170:25, 172:13, 172:17, 172:25, 173:2, 173:22, 174:15, 174:16, 174:17, 174:18, 174:20,

174:21, 174:22
**Bo's** [8] - 22:19, 22:23, 23:15, 24:19, 25:9, 95:12, 95:13, 174:10
**board** [1] - 107:17
**boasting** [3] - 24:21, 25:10, 25:11
**bodies** [1] - 81:11
**body** [1] - 91:9
**bolster** [1] - 194:24
**Booking** [17] - 34:20, 35:23, 37:25, 38:3, 47:5, 47:12, 57:1, 65:22, 77:7, 77:14, 112:1, 112:7, 138:9, 138:10, 150:16, 150:17, 150:18
**bootstrapping** [1] - 243:10
**born** [1] - 123:23
**bother** [1] - 112:5
**bothered** [1] - 38:16
**bottom** [3] - 20:4, 109:16, 109:24
**bought** [2] - 36:21, 222:25
**bound** [1] - 241:23
**Bourjaily** [1] - 28:14
**box** [2] - 111:13, 111:15
**boxer** [2] - 7:1, 70:13
**boxing** [1] - 67:8
**Brady** [1] - 214:9
**brag** [1] - 31:24
**bragged** [2] - 32:13, 75:25
**bragging** [4] - 5:19, 5:22, 12:14, 12:15
**brain** [1] - 100:7
**brakes** [1] - 220:8
**breach** [1] - 241:4
**break** [8] - 103:4, 122:7, 131:25, 132:1, 132:9, 132:16, 193:1
**breaking** [1] - 132:7
**breaks** [1] - 105:24
**breathe** [1] - 235:4
**bridge** [1] - 206:14
**Brief** [1] - 66:21
**brief** [10] - 15:11, 15:14, 64:1, 194:7, 194:10, 194:11, 195:4, 195:17, 206:25, 241:21
**briefed** [1] - 107:7
**Briefly** [1] - 105:15
**briefly** [5] - 25:20, 34:8, 94:18, 161:15, 237:21
**bring** [1] - 11:10, 11:13, 50:17, 52:9, 129:1, 153:11, 153:15, 179:20, 211:20, 237:11
**bringing** [2] - 113:20,

244:16
**broader** [1] - 199:4
**broadly** [1] - 5:14
**broke** [3] - 52:23, 108:3, 237:8
**Brooklyn** [1] - 240:23
**brothers** [4] - 95:25, 97:4, 100:6, 100:17
**brothers'** [4] - 97:9, 100:22, 101:3, 102:11
**brought** [7] - 52:10, 108:10, 108:11, 129:2, 154:16, 176:19, 225:9
**Brown** [1] - 95:24
**Bruton** [4] - 22:17, 22:19, 49:22, 50:3
**BS'ing** [5] - 12:1, 12:14, 166:13, 166:17, 166:25
**building** [2] - 77:11, 77:12
**built** [1] - 93:14
**bull** [1] - 166:22
**bullpen** [2] - 78:1, 78:4
**Bump** [1] - 90:12
**bump** [1] - 90:14
**bunch** [1] - 29:22
**burden** [1] - 104:14
**burdening** [1] - 239:15
**Burnie** [2] - 171:14, 171:16
**business** [13] - 59:4, 69:11, 69:22, 70:23, 71:13, 83:24, 84:2, 84:3, 129:21, 173:3, 173:12, 173:23, 195:1
**businesses** [1] - 157:16
**bustin'** [1] - 68:11
**busting** [2] - 64:12, 139:2
**button** [1] - 164:18
**buy** [3] - 31:17, 31:18, 194:16
**buzzing** [1] - 94:11
**BY** [30] - 53:20, 60:7, 62:8, 63:22, 65:2, 67:21, 68:4, 71:21, 72:1, 74:5, 75:12, 77:6, 79:9, 87:16, 88:20, 108:2, 112:20, 115:16, 116:5, 122:12, 134:12, 136:17, 149:24, 152:16, 155:5, 163:16, 179:21, 185:9, 245:6, 245:7
**Byrnes** [73] - 9:25, 10:1, 20:18, 20:19, 20:21, 80:8, 86:10, 86:14, 87:17, 120:9, 122:23, 124:13, 142:7, 143:1, 145:17, 145:20, 146:22, 147:4, 147:13, 147:17,

147:19, 148:10, 148:17,
148:24, 149:2, 149:6,
149:10, 150:9, 150:14,
153:10, 153:18, 155:16,
155:20, 156:10, 157:23,
158:8, 158:16, 158:19,
158:20, 158:23, 159:6,
160:8, 161:1, 174:25,
175:5, 175:7, 175:11,
175:22, 177:22, 177:25,
178:21, 179:10, 180:25,
181:3, 181:4, 181:12,
182:6, 183:3, 183:13,
183:19, 185:15, 185:19,
186:6, 189:1, 189:9,
189:16, 189:17, 190:15,
191:19, 191:24, 192:9

## C

**cable** [2] - 64:20, 65:7
**California** [1] - 241:1
**camera** [1] - 15:24
**canard** [1] - 235:15
**candid** [1] - 216:11
**candidly** [1] - 220:2
**candor** [2] - 210:22,
220:3
**cannot** [8] - 3:18, 15:17,
22:16, 80:18, 143:12,
144:4, 230:18, 238:6
**car** [24] - 38:11, 41:22,
42:4, 43:21, 43:22, 44:1,
70:20, 71:2, 71:3, 71:17,
73:6, 73:7, 73:8, 74:11,
78:13, 81:10, 102:16,
116:12, 121:22, 127:19,
141:22, 146:12, 173:14
**Card** [1] - 199:14
**care** [2] - 36:22, 153:3
**career** [2] - 157:7,
157:18
**careful** [1] - 27:19
**carefully** [1] - 50:15
**Carjacking** [2] - 136:23,
136:24
**Carlos** [1] - 67:16
**case** [71] - 5:14, 12:23,
13:4, 13:6, 15:2, 15:10,
15:14, 16:22, 16:23,
18:14, 18:16, 18:23,
19:15, 21:21, 26:14,
26:20, 27:6, 27:7, 27:10,
32:20, 32:21, 45:6, 45:9,
56:4, 59:25, 87:25,
88:15, 99:23, 128:12,
132:3, 149:23, 179:6,
193:5, 194:4, 195:5,
195:10, 196:11, 198:2,
198:15, 199:1, 199:19,
199:21, 200:17, 202:5,

202:15, 203:13, 203:15,
205:7, 205:8, 207:4,
208:9, 210:14, 211:13,
211:25, 212:3, 212:9,
215:22, 215:24, 216:4,
216:15, 221:6, 221:8,
230:22, 239:3, 239:8,
240:6, 242:13
**Case** [1] - 246:5
**CASE** [1] - 1:6
**cases** [16] - 16:21,
29:22, 32:9, 37:14, 41:9,
201:25, 208:6, 209:25,
210:12, 227:4, 230:13,
238:5, 238:12, 239:21
**casual** [7] - 12:21,
12:23, 16:16, 16:19,
21:2, 90:14
**cat's** [1] - 241:10
**catch** [1] - 170:3
**catches** [1] - 205:11
**Caucasian** [2] - 37:6,
37:17
**caught** [4] - 182:23,
183:5, 184:17, 231:22
**causing** [1] - 220:8
**caution** [1] - 214:7
**CBIF** [6] - 39:20, 65:22,
70:3, 79:13, 112:7,
112:25
**CD** [1] - 93:14
**CD's** [2] - 93:12, 117:5
**cell** [19] - 34:17, 34:18,
35:17, 35:24, 36:6,
38:20, 39:15, 39:20,
57:4, 57:6, 58:15, 119:8,
138:23, 145:10, 150:13,
150:20, 164:23, 171:20,
171:23
**Center** [2] - 136:6,
136:11
**center** [7] - 55:4, 67:12,
84:22, 84:23, 85:8,
173:18, 173:19
**Central** [17] - 34:20,
35:22, 37:25, 38:3, 47:5,
47:12, 57:1, 65:22, 77:7,
77:14, 112:1, 112:7,
138:9, 138:10, 150:16,
150:17, 150:18
**cert** [1] - 233:19
**certain** [8] - 30:16,
49:18, 53:3, 67:12,
114:25, 123:15, 148:7,
190:6
**certainly** [13] - 25:11,
28:7, 36:20, 48:24,
95:17, 101:10, 196:12,
201:25, 210:20, 216:14,
217:13, 244:21, 244:22

**Certainly** [2] - 194:1
**CERTIFICATE** [1] -
246:1
**certify** [2] - 246:3, 246:6
**certiorari** [1] - 233:17
**chairs** [3] - 91:24,
132:2, 193:4
**challenge** [1] - 211:17
**challenging** [1] -
211:17
**chambers** [1] - 80:13
**champion** [2] - 6:9,
6:17
**championship** [1] -
70:16
**chance** [5] - 8:1, 8:2,
103:15, 103:25, 110:11
**change** [4] - 32:10,
213:2, 217:17
**changed** [2] - 108:23,
110:18, 158:23, 194:9,
217:14
**character** [2] - 14:15,
41:18
**characterize** [1] - 23:18
**charge** [26] - 28:6,
38:24, 48:9, 56:10,
56:11, 60:12, 60:14,
60:20, 60:21, 74:20,
75:15, 76:18, 84:13,
95:10, 95:12, 96:15,
97:22, 98:11, 98:12,
101:18, 121:14, 121:22,
135:17, 136:8, 235:18,
236:8
**charged** [14] - 28:2,
28:5, 74:22, 77:2,
100:13, 102:11, 120:14,
202:4, 202:7, 202:8,
202:9, 230:13, 235:20,
236:8
**charges** [16] - 10:24,
77:24, 100:17, 120:1,
120:8, 153:3, 199:1,
210:6, 230:7, 231:13,
241:11, 241:12, 241:13
**Chase** [4] - 3:18, 15:10,
15:13, 15:14
**chatter** [20] - 5:16, 9:17,
16:17, 17:20, 17:25,
18:2, 21:2, 24:15, 24:16,
25:10, 28:25, 29:5,
30:21, 31:15, 32:18,
45:5, 45:7, 49:13, 51:3,
51:9
**chatting** [1] - 166:20
**check** [3] - 87:24,
88:21, 93:11
**checked** [1] - 228:8
**checking** [1] - 213:15

**checks** [1] - 211:8
**choices** [1] - 136:21
**choose** [3] - 105:8,
238:25
**chooses** [1] - 19:16
**chose** [1] - 244:17
**chosen** [1] - 230:23
**Chris** [4] - 46:20, 68:14,
68:23, 69:4
**Christopher** [3] - 53:11,
53:16, 179:7
**CHRISTOPHER** [2] -
53:13, 245:5
**cigarette** [3] - 111:4,
111:8, 111:14
**circuit** [1] - 5:13
**Circuit** [9] - 14:20, 15:1,
15:2, 16:21, 18:16,
21:15, 27:6, 45:5, 80:9
**circumstances** [3] -
157:24, 204:13, 239:16
**cite** [1] - 202:5
**cited** [2] - 15:10, 27:7
**citizens** [1] - 222:19
**City** [12] - 36:19, 37:13,
77:13, 77:24, 136:6,
136:11, 150:14, 151:15,
153:3, 159:12, 160:4
**city** [3] - 86:10, 86:17,
86:20
**civil** [1] - 240:22
**claim** [6] - 10:20, 11:1,
113:7, 113:9, 114:17,
116:9
**claimed** [1] - 98:9
**claiming** [5] - 20:22,
81:14, 115:1, 116:15,
211:13
**claims** [1] - 198:21
**clarification** [1] - 51:25
**clarified** [1] - 220:1
**clarify** [2] - 24:13, 98:2
**classic** [1] - 203:18
**clean** [1] - 159:18
**clear** [20] - 12:2, 13:23,
17:10, 17:12, 18:7,
31:11, 38:12, 43:17,
49:2, 49:3, 99:25, 100:4,
189:14, 189:18, 196:3,
196:5, 204:22, 217:18,
239:7, 243:12
**clearer** [1] - 178:24
**clearing** [1] - 53:19
**Clearly** [1] - 95:5
**clearly** [8] - 7:4, 30:13,
45:9, 45:12, 47:24,
101:19, 133:21, 238:2
**clerk** [2] - 52:16, 53:12
**CLERK** [1] - 53:14
**client** [8] - 2:18, 11:16,

21:24, 26:8, 26:16, 27:2,
100:18, 210:24
**client's** [2] - 194:25,
208:16
**close** [3] - 13:8, 154:12,
227:24
**closed** [1] - 60:17
**closely** [1] - 205:21
**closing** [3] - 100:4,
208:15, 229:10
**clothing** [3] - 57:12,
66:9, 91:11
**clue** [1] - 170:2
**co** [2] - 242:3, 243:9
**co-defendants** [2] -
242:3, 243:9
**coax** [1] - 30:6
**cobbled** [1] - 13:11
**COBURN** [12] - 104:2,
104:6, 215:14, 215:16,
216:5, 216:7, 216:9,
234:3, 234:6, 234:9,
240:3, 241:3
**Coburn** [23] - 1:22,
20:14, 20:23, 40:21,
103:3, 103:15, 103:18,
103:22, 103:25, 106:18,
194:7, 210:4, 210:22,
229:6, 233:7, 234:24,
237:7, 240:1, 240:2,
241:7, 241:19, 243:12,
244:20
**Coburn's** [3] - 20:13,
100:20, 237:2
**coconspirator** [6] -
18:17, 28:6, 41:11,
45:12, 45:15, 224:19
**coconspirator's** [1] -
14:12
**coconspirators** [3] -
14:11, 41:12, 50:16
**code** [1] - 155:7
**codefendant** [22] -
74:23, 74:25, 75:6,
75:13, 75:15, 75:20,
75:23, 75:24, 75:25,
76:8, 77:2, 94:22, 95:9,
95:10, 95:12, 95:19,
95:21, 96:15, 99:16,
100:3, 101:10, 101:17
**codefendants** [4] -
141:10, 235:14, 236:25,
244:18
**codefendants'** [2] -
30:17, 105:4
**coherent** [2] - 221:19,
243:17
**colleagues** [1] - 235:13
**Collecting** [1] - 58:6
**collecting** [1] - 58:17

**Collins** [9] - 58:20,
58:22, 58:24, 139:21,
139:23, 140:3, 140:6,
140:15
**colloquy** [1] - 238:10
**color** [1] - 30:18
**combat** [1] - 206:6
**combatting** [1] - 208:17
**comfort** [1] - 4:10
**coming** [12] - 27:15,
37:14, 45:8, 67:16,
72:20, 77:22, 78:3,
124:24, 127:3, 153:10,
174:15, 208:19
**comment** [1] - 24:17
**comments** [1] - 2:13
**commission** [1] -
243:23
**commit** [6] - 3:11,
194:21, 200:20, 217:11,
219:7, 243:24
**committed** [24] - 3:11,
12:9, 31:25, 32:14,
43:21, 70:19, 71:16,
73:24, 83:8, 97:3, 97:4,
113:7, 121:21, 142:2,
192:23, 194:17, 196:23,
197:11, 199:22, 202:9,
205:3, 205:4, 236:3,
243:22
**committing** [5] -
125:22, 137:15, 137:16,
159:8, 200:22
**Common** [1] - 10:3,
13:18
**common** [6] - 13:14,
35:14, 36:15, 58:19,
59:21, 114:11
**commonly** [1] - 37:15
**community** [7] - 36:21,
37:3, 84:5, 159:14,
159:18, 160:6
**compare** [1] - 223:11
**competent** [2] - 222:6,
226:19
**complaints** [1] - 235:13
**complete** [4] - 53:7,
122:9, 159:11, 246:8
**completed** [2] - 52:25,
187:15
**completely** [2] - 79:4,
104:3
**complication** [2] -
107:18, 220:8
**Compton** [1] - 94:7
**concede** [4] - 2:15,
220:1, 232:22, 233:10
**conceded** [1] - 243:19
**concedes** [1] - 208:16
**conceding** [4] - 208:21,

218:18, 218:20, 220:6
**conceivably** [1] -
201:20
**conceived** [1] - 199:25
**concept** [1] - 11:21
**concern** [4] - 27:2,
210:15, 211:2, 235:23
**concerned** [12] - 26:18,
26:19, 26:25, 27:1, 28:1,
175:19, 234:12, 235:14,
242:12, 243:4, 243:5,
243:10
**Concerning** [2] -
149:16, 149:18
**concerning** [14] -
22:23, 51:25, 80:17,
83:24, 84:2, 84:9, 86:6,
99:6, 106:2, 128:12,
131:4, 151:7, 229:17,
231:12
**concerns** [1] - 209:21
**concession** [1] - 243:18
**conclude** [3] - 101:20,
194:19, 203:16
**concluded** [2] - 133:5,
221:6
**Conclusion** [1] - 245:1
**Condition** [1] - 180:1
**condition** [5] - 143:16,
158:4, 161:4, 175:16,
180:20
**conduct** [1] - 50:8
**confer** [3] - 199:6,
199:7, 213:6
**confess** [1] - 205:10
**confessed** [3] - 32:13,
83:5, 97:9
**confesses** [1] - 50:4
**confession** [1] - 50:5
**confessions** [1] - 11:4
**confided** [1] - 81:14
**confidence** [7] - 14:10,
30:15, 168:2, 168:5,
168:12, 168:16, 168:17
**confident** [1] - 102:8
**confirm** [1] - 192:20
**Confirms** [1] - 23:16
**confrontation** [2] -
22:24, 25:14
**confuse** [1] - 8:7
**confused** [2] - 150:4,
209:5
**confusing** [1] - 8:9,
209:24
**confusion** [4] - 203:3,
206:19, 239:12, 243:6
**connected** [1] - 202:16
**connection** [9] - 14:13,
71:23, 75:15, 88:12,
207:12, 215:2, 217:5,

227:8, 227:13
**connections** [1] -
214:19
**conscience** [3] - 80:2,
154:15, 155:12
**consciousness** [2] -
102:8, 102:10
**consent** [1] - 211:5
**consented** [1] - 211:11
**consenting** [1] - 210:19
**consider** [11] - 7:16,
23:23, 23:24, 81:2,
144:18, 145:4, 150:9,
150:24, 151:3, 209:25,
241:20
**considerable** [1] -
100:8
**consideration** [3] -
114:20, 149:22, 213:4
**considerations** [1] -
213:2
**considered** [2] - 45:16,
213:4
**considering** [4] - 19:3,
19:24, 104:13, 216:25
**consistent** [4] - 217:13,
223:5, 231:15, 232:2
**conspiracy** [88] - 2:14,
2:16, 2:21, 2:23, 2:25,
3:9, 3:12, 3:16, 3:19,
3:22, 4:12, 5:7, 5:12,
5:17, 5:24, 9:14, 11:3,
11:24, 12:13, 12:25,
13:2, 13:4, 13:7, 13:16,
14:1, 14:2, 14:17, 14:21,
15:7, 15:8, 15:16, 15:20,
15:22, 15:24, 16:8,
16:18, 16:23, 17:23,
18:13, 19:21, 19:25,
20:2, 20:8, 20:10, 21:1,
21:16, 21:17, 24:12,
24:21, 25:1, 25:7, 25:10,
25:12, 26:1, 26:24, 27:3,
27:4, 27:12, 27:24,
28:13, 29:17, 29:23,
29:25, 30:2, 30:10,
30:20, 30:23, 31:8,
31:10, 31:16, 32:24,
45:14, 45:16, 45:17,
45:18, 45:21, 49:10,
95:17, 98:19, 198:14,
199:1, 199:17, 201:19,
202:4, 202:8, 230:14,
230:20, 231:21
**conspirator** [2] - 15:17,
24:25
**conspire** [1] - 15:4
**conspired** [1] - 243:23
**constitute** [1] - 246:6
**constitutes** [1] - 18:2

**constitutional** [1] -
31:14
**constrain** [1] - 227:1
**construct** [1] - 208:4
**Construction** [2] - 55:7,
55:9
**construction** [1] - 55:9
**construe** [1] - 5:15
**construed** [2] - 5:14,
16:24
**contact** [3] - 39:19,
88:7, 128:12
**contains** [1] - 51:2
**contending** [1] - 201:5
**contest** [2] - 186:17,
198:8
**context** [7] - 24:10,
30:12, 36:19, 203:14,
232:14, 240:22, 244:23
**continue** [2] - 52:22,
194:2
**Continue** [2] - 91:25,
193:6
**continued** [3] - 5:25,
80:2, 187:6
**continues** [1] - 230:3
**continuing** [1] - 21:17
**continuity** [1] - 194:20
**contract** [5] - 174:10,
174:17, 174:18, 174:19
**contrary** [1] - 222:3
**contributions** [1] -
156:24
**convenient** [1] - 225:10
**convergence** [2] -
176:19, 176:20
**conversation** [31] -
13:19, 16:17, 16:19,
24:17, 35:1, 38:1, 41:22,
44:21, 70:11, 84:8,
89:16, 90:10, 90:25,
93:9, 110:5, 110:12,
111:3, 113:11, 113:16,
115:4, 116:13, 117:20,
118:16, 118:18, 119:18,
170:10, 172:13, 185:19,
186:6, 186:8
**conversations** [22] -
9:18, 11:11, 12:12,
12:20, 13:10, 21:2, 21:5,
24:19, 41:9, 41:16, 45:1,
47:23, 58:14, 66:21,
66:22, 79:13, 86:4,
131:15, 139:15, 164:22,
172:14, 177:23
**convert** [1] - 13:3
**convicted** [30] - 54:4,
54:7, 54:19, 56:13,
104:10, 104:18, 106:1,
136:18, 136:19, 194:25,

195:14, 196:1, 196:20,
197:25, 202:3, 202:11,
203:18, 210:5, 211:3,
215:10, 219:1, 220:6,
226:22, 230:25, 232:8,
233:3, 235:18, 235:22,
238:22, 241:15
**conviction** [34] - 56:12,
103:21, 105:18, 106:3,
106:5, 106:22, 107:2,
134:16, 135:2, 197:20,
198:10, 198:13, 198:17,
198:18, 203:23, 203:24,
207:22, 209:8, 209:12,
209:25, 218:17, 221:24,
233:16, 233:18, 234:13,
234:17, 234:19, 234:20,
234:21, 236:14, 241:16,
243:13, 243:15
**convictions** [4] - 54:12,
54:22, 56:17, 203:21
**convince** [3] - 2:14,
29:14, 32:25
**convinced** [2] - 30:19,
183:19
**Cookie** [2] - 58:20,
59:16
**cool** [1] - 228:8
**cooperate** [3] - 120:22,
161:5, 175:17
**cooperated** [1] - 121:25
**cooperating** [3] -
183:22, 187:6, 199:11
**cooperation** [3] -
122:20, 159:11, 215:25
**cop** [1] - 68:13
**copies** [1] - 214:4
**copious** [2] - 202:15,
226:6
**copy** [4] - 78:24, 79:2,
79:3, 239:10
**core** [1] - 231:7
**correct** [96] - 23:8, 39:1,
55:22, 56:12, 63:24,
65:25, 67:25, 72:20,
79:13, 83:13, 83:19,
87:11, 91:3, 113:2,
113:18, 114:2, 115:24,
119:23, 120:14, 121:15,
124:14, 129:4, 129:21,
132:20, 139:19, 142:19,
143:14, 145:14, 146:6,
148:2, 150:6, 151:22,
152:18, 153:14, 153:25,
154:17, 156:11, 157:1,
157:2, 157:7, 157:9,
157:21, 157:22, 158:1,
158:9, 158:17, 159:2,
159:4, 160:6, 160:9,
160:12, 161:2, 161:25,

162:4, 162:17, 163:9,
163:17, 164:2, 166:23,
166:25, 167:3, 167:11,
169:4, 171:21, 172:5,
172:15, 173:4, 173:23,
174:1, 175:5, 175:9,
176:5, 179:7, 179:23,
180:3, 180:5, 180:17,
180:21, 181:1, 181:3,
181:10, 182:4, 182:23,
183:13, 184:14, 187:25,
188:4, 188:21, 189:3,
189:22, 190:21, 192:23,
198:23, 198:24, 204:1,
237:6

**Correct** [7] - 129:15,
145:1, 145:6, 146:14,
203:12, 219:25, 220:13

**Correction** [1] - 197:1

**correctional** [1] -
237:25

**Correctional** [3] -
126:12, 127:6, 175:1

**Corrections** [1] - 77:22

**correctly** [1] - 30:5

**corroboration** [1] - 4:9

**counsel** [26] - 25:22,
27:7, 27:20, 28:9, 35:20,
41:2, 95:3, 102:5, 105:4,
105:5, 105:21, 106:14,
193:7, 193:22, 194:23,
195:9, 195:17, 195:22,
199:7, 205:24, 210:20,
211:14, 213:1, 222:5,
242:17, 244:9

**count** [7] - 205:13,
205:14, 205:17, 208:18,
230:9, 235:19

**Count** [1] - 235:24

**counts** [4] - 21:25, 28:5,
205:19, 236:9

**county** [2] - 86:11,
86:21

**County** [11] - 77:23,
80:9, 86:22, 151:5,
153:4, 175:3, 178:21,
215:21, 216:9, 225:11,
234:16

**couple** [14] - 14:10,
27:21, 43:8, 62:23,
70:19, 78:8, 101:23,
110:21, 113:15, 115:21,
115:22, 225:22, 228:14,
229:24

**course** [42] - 2:16, 2:25,
9:18, 13:10, 18:9, 21:11,
25:25, 29:15, 35:1,
47:22, 48:18, 50:13,
50:14, 52:8, 52:23, 53:6,
66:22, 67:8, 83:12,

90:15, 98:5, 103:20,
154:19, 175:15, 195:20,
197:4, 197:9, 198:19,
200:21, 202:18, 203:2,
203:5, 205:1, 207:6,
208:15, 212:2, 220:17,
244:1, 244:18

**COURT** [501] - 1:1, 2:2,
2:4, 2:6, 2:11, 6:1, 6:6,
6:10, 6:12, 6:15, 6:20,
6:23, 7:4, 7:7, 7:13,
7:21, 8:1, 8:6, 8:9, 8:12,
8:15, 8:17, 8:22, 8:25,
9:5, 9:10, 9:15, 9:22,
10:4, 10:14, 10:19,
10:24, 11:13, 13:23,
14:4, 14:6, 14:9, 14:25,
15:4, 15:12, 15:18,
15:21, 16:2, 16:11,
16:14, 17:4, 17:10,
17:16, 18:14, 18:24,
19:7, 19:9, 20:11, 22:1,
22:7, 23:3, 23:12, 23:16,
23:20, 25:17, 25:25,
26:10, 26:18, 26:22,
27:3, 27:16, 27:18,
28:18, 28:21, 28:24,
29:11, 29:15, 29:19,
31:1, 31:5, 32:10, 32:20,
32:25, 33:9, 33:13,
33:16, 33:21, 33:25,
34:7, 34:12, 34:15,
34:20, 35:2, 35:6, 35:9,
35:18, 36:2, 36:5, 36:8,
36:11, 36:13, 36:16,
37:8, 37:12, 37:19,
37:24, 38:7, 38:18,
38:20, 39:1, 39:5, 39:8,
39:11, 39:14, 39:17,
39:22, 39:25, 40:5,
40:14, 40:17, 40:23,
41:15, 41:18, 41:25,
42:6, 42:10, 42:13,
42:16, 42:19, 43:1, 43:4,
43:6, 43:12, 44:3, 44:10,
44:12, 44:15, 44:18,
44:21, 44:24, 45:2,
45:23, 46:1, 46:4, 46:8,
46:10, 46:14, 46:16,
46:19, 46:22, 47:2, 47:4,
47:7, 47:10, 47:12,
47:14, 47:16, 47:19,
47:21, 47:25, 48:3, 48:6,
48:10, 48:14, 48:18,
48:21, 48:23, 50:21,
50:23, 51:7, 51:12,
51:16, 51:20, 52:2, 52:4,
52:8, 52:14, 52:19,
53:17, 57:22, 58:2,
58:10, 60:5, 62:7, 63:6,
63:18, 63:21, 64:8,

64:15, 64:19, 64:22,
64:25, 65:5, 65:13, 66:6,
66:13, 66:17, 67:1, 67:6,
67:15, 67:23, 68:3,
71:20, 71:25, 73:1, 74:4,
74:10, 74:17, 75:3, 75:6,
75:8, 75:10, 75:18,
75:22, 76:3, 76:7, 76:12,
76:15, 76:21, 76:24,
77:5, 78:23, 79:1, 79:5,
85:14, 87:14, 88:3, 88:5,
88:10, 88:16, 88:19,
88:25, 89:7, 91:20, 92:3,
92:5, 92:12, 92:16,
92:19, 92:21, 93:1, 93:5,
93:8, 93:11, 93:14,
93:18, 93:20, 93:24,
94:7, 94:13, 94:16,
94:20, 94:22, 94:25,
95:5, 95:16, 95:24, 96:1,
96:5, 96:8, 96:10, 96:12,
96:17, 96:23, 96:25,
97:5, 97:8, 97:13, 97:21,
98:5, 98:7, 98:11, 98:14,
98:18, 98:21, 99:1, 99:8,
99:14, 99:17, 99:22,
99:25, 100:11, 100:19,
101:2, 101:6, 102:4,
102:19, 103:6, 103:9,
103:12, 103:14, 103:18,
103:24, 104:5, 104:8,
105:1, 105:12, 105:20,
106:20, 106:25, 107:6,
107:11, 107:15, 107:21,
107:25, 108:18, 109:5,
109:13, 110:7, 112:11,
112:19, 112:22, 114:6,
115:8, 115:14, 116:2,
116:4, 116:18, 116:25,
117:3, 117:14, 118:8,
119:2, 122:6, 122:9,
125:25, 129:10, 131:24,
132:1, 132:14, 132:18,
132:24, 133:4, 133:9,
133:13, 133:22, 134:7,
134:10, 135:11, 136:16,
143:7, 149:8, 149:17,
152:12, 155:4, 163:14,
165:7, 165:14, 165:17,
166:10, 167:8, 168:7,
177:4, 179:16, 179:19,
185:4, 187:15, 190:2,
193:2, 193:14, 193:16,
194:1, 194:12, 195:20,
196:10, 196:17, 196:24,
197:4, 197:8, 197:13,
197:19, 198:4, 198:19,
198:22, 199:3, 199:6,
199:10, 199:15, 199:20,
200:4, 200:10, 200:19,
201:5, 201:13, 201:16,

201:22, 202:9, 202:18,
202:21, 203:1, 203:5,
203:10, 203:13, 203:24,
204:9, 204:19, 204:21,
204:25, 205:21, 207:6,
208:8, 208:11, 208:13,
208:24, 210:3, 210:17,
211:12, 211:23, 212:5,
213:6, 213:12, 213:20,
213:22, 213:24, 214:8,
214:11, 214:21, 214:24,
215:2, 215:10, 215:12,
215:15, 215:17, 215:19,
215:23, 215:25, 216:4,
216:6, 216:8, 216:11,
216:18, 216:24, 217:2,
217:6, 217:9, 218:4,
218:7, 218:10, 218:22,
219:4, 219:12, 219:17,
219:20, 219:22, 219:24,
220:4, 220:17, 220:21,
220:24, 221:9, 221:15,
221:17, 221:25, 222:12,
222:22, 222:25, 223:2,
223:11, 223:18, 224:13,
224:16, 224:22, 224:24,
225:3, 225:12, 225:17,
226:2, 229:9, 229:18,
229:21, 229:23, 232:12,
232:14, 232:21, 232:25,
233:12, 233:14, 233:19,
233:22, 233:24, 234:1,
234:5, 234:8, 234:11,
234:15, 235:3, 235:24,
236:2, 236:13, 236:17,
236:21, 236:24, 237:7,
237:15, 237:20, 238:3,
238:9, 238:14, 238:19,
239:21, 240:1, 241:2,
241:6, 241:9, 242:6,
242:15

**court** [64] - 9:25, 10:3,
18:20, 38:16, 51:6,
56:23, 77:22, 78:3,
84:17, 84:19, 85:6,
86:21, 94:4, 100:16,
100:21, 101:2, 101:4,
103:21, 104:11, 105:3,
125:6, 142:25, 147:6,
147:8, 147:16, 151:12,
151:14, 153:15, 158:3,
160:20, 160:22, 177:22,
180:8, 181:11, 186:2,
195:14, 198:10, 202:4,
202:11, 203:18, 204:4,
204:10, 204:18, 207:11,
209:8, 209:11, 215:11,
219:1, 223:20, 226:11,
226:12, 228:3, 231:1,
232:4, 232:9, 233:3,
233:17, 235:7, 235:10,

238:4, 239:5, 240:24,
241:14, 241:18

**Court** [106] - 2:23, 4:16,
11:21, 13:6, 22:9, 22:25,
23:9, 23:22, 23:23,
23:25, 24:3, 24:7, 24:16,
25:6, 25:15, 25:20, 28:1,
28:10, 28:12, 28:14,
29:14, 29:25, 30:10,
30:19, 32:16, 32:17,
33:2, 33:7, 34:5, 37:21,
38:12, 40:20, 40:21,
45:6, 48:24, 49:1, 49:5,
49:13, 49:14, 49:15,
49:20, 50:8, 50:13,
50:14, 51:3, 52:6, 76:5,
80:9, 88:22, 92:25,
94:19, 102:6, 104:9,
104:23, 105:7, 105:14,
105:25, 106:3, 106:4,
106:5, 106:7, 106:8,
106:9, 106:10, 106:17,
106:24, 107:7, 133:25,
149:3, 175:19, 181:23,
185:10, 194:9, 196:18,
197:14, 197:16, 198:15,
203:4, 208:4, 209:10,
209:17, 210:18, 210:25,
211:22, 212:18, 213:3,
216:23, 220:14, 222:5,
223:15, 224:19, 226:18,
230:18, 231:9, 233:20,
233:21, 234:4, 234:7,
234:22, 237:13, 237:23,
242:9, 243:19, 246:15

**Court's** [16] - 23:18,
30:8, 30:18, 33:4, 33:7,
49:4, 64:23, 85:1, 105:2,
133:16, 207:2, 229:15,
236:25, 239:7, 239:8,
244:23

**Courthouse** [1] - 1:24

**courtroom** [18] - 52:18,
57:8, 66:7, 88:6, 92:2,
92:4, 94:11, 107:24,
115:11, 120:18, 128:19,
132:13, 134:9, 190:14,
193:13, 193:15, 222:16,
237:11

**courtyard** [1] - 172:22

**cover** [1] - 106:25

**coward's** [1] - 221:3

**crack** [4] - 64:13, 68:11,
68:14, 68:25

**Crack** [1] - 61:19

**crack's** [1] - 68:12

**cracking** [2] - 46:12,
139:2

**Cracking** [1] - 46:14

**craft** [1] - 196:4

**crashed** [1] - 44:2
**craziest** [1] - 216:1
**crazy** [2] - 205:1, 205:2
**create** [1] - 94:10
**creates** [1] - 94:6
**cred** [1] - 36:11
**credentials** [1] - 167:15
**credibility** [9] - 12:5, 24:2, 24:9, 43:18, 222:18, 229:6, 235:11, 238:17, 238:18
**credible** [1] - 24:3
**credit** [7] - 42:12, 42:15, 42:25, 52:1, 114:17, 116:16, 226:16
**crew** [4] - 45:12, 46:3, 62:17, 62:21
**crime** [15] - 32:14, 43:21, 64:12, 68:10, 74:21, 81:13, 136:18, 157:7, 157:18, 159:16, 159:19, 197:12, 199:24, 218:18
**crimes** [17] - 41:20, 54:4, 54:7, 54:9, 54:14, 73:24, 74:6, 79:25, 125:13, 125:22, 137:15, 137:16, 159:9, 163:3, 163:21, 231:24, 232:3
**CRIMINAL** [1] - 1:6
**criminal** [16] - 24:21, 25:11, 36:23, 40:12, 47:24, 79:17, 79:23, 154:23, 155:8, 159:12, 160:1, 160:3, 165:22, 168:18, 196:11, 206:4
**criminals** [2] - 154:24, 155:7
**critical** [4] - 24:17, 25:7, 98:23, 205:17
**CROSS** [2] - 122:11, 245:7
**cross** [21] - 11:5, 107:23, 133:5, 133:6, 133:8, 133:14, 206:14, 207:9, 207:13, 207:19, 208:2, 208:15, 212:15, 222:4, 222:6, 226:19, 226:25, 227:5, 233:8, 238:18, 239:14, 240:8, 242:11, 242:12, 244:1, 244:17, 244:19
**Crowe** [7] - 1:20, 25:18, 27:16, 34:1, 98:24, 99:1, 220:25
**CROWE** [25] - 25:20, 26:2, 26:13, 26:20, 27:1, 27:4, 75:2, 75:16, 76:2, 76:19, 77:4, 99:3, 99:5, 99:10, 99:15, 99:19,

99:23, 100:8, 100:12, 100:24, 101:7, 101:9, 221:1, 221:14, 221:16
**culpability** [1] - 12:24, 30:22
**Cumberland** [7] - 112:8, 126:15, 126:16, 126:20, 127:7, 127:22, 129:2
**cumulative** [1] - 50:2
**cure** [2] - 209:9, 239:11
**cured** [2] - 209:10, 209:22
**cures** [1] - 244:19
**curia** [4] - 149:20, 151:8, 152:22, 153:6
**currency** [2] - 191:3, 191:6
**cussed** [1] - 237:10
**cut** [6] - 28:18, 60:18, 89:9, 155:16, 196:17, 198:4
**cutter** [2] - 111:14, 111:15

# D

**D-O-B-R-O-P-O-L-S-K -I** [1] - 53:18
**damn** [1] - 155:18
**danger** [1] - 144:9
**dangling** [2] - 142:12, 189:25
**Darius** [8] - 200:1, 216:25, 217:7, 225:15, 227:22, 228:3, 228:7, 228:10
**Darryl** [1] - 214:16
**date** [20] - 39:1, 79:10, 82:18, 82:19, 83:12, 83:18, 89:21, 90:3, 109:16, 109:18, 118:25, 123:5, 151:12, 151:14, 161:11, 178:25, 179:4, 215:12, 226:2, 230:17
**dated** [1] - 109:25
**dates** [4] - 133:23, 134:8, 223:21, 226:14
**Davis** [1] - 1:13
**days** [9] - 12:17, 17:18, 17:19, 18:1, 18:6, 18:12, 20:6, 77:8, 134:24
**Days** [1] - 18:1
**DEA** [3] - 3:15, 20:4, 40:2
**DEA-6** [3] - 41:1, 199:16, 223:13
**DEA-6's** [1] - 20:15
**deadly** [1] - 60:9
**deal** [5] - 142:24,

143:22, 213:16, 226:12, 229:25
**dealer** [1] - 108:11, 111:25, 112:1, 200:1, 216:22, 217:12
**dealer's** [1] - 3:9
**dealers** [17] - 37:17, 58:6, 61:15, 61:16, 62:5, 65:11, 108:11, 111:22, 118:2, 118:20, 165:23, 169:23, 170:6, 170:21, 171:4, 171:8
**dealing** [5] - 36:23, 61:20, 65:11, 190:8, 197:22
**dealt** [3] - 29:18, 231:20, 232:4
**Dean** [1] - 225:6
**dear** [1] - 149:14
**Dear** [3] - 80:12, 149:16, 149:18
**death** [3] - 81:12, 216:4, 216:10
**December** [8] - 42:3, 91:14, 108:4, 135:4, 182:3, 182:24, 184:22, 185:13
**decent** [1] - 167:21
**decide** [8] - 17:2, 129:18, 203:6, 204:22, 204:25, 205:23, 205:24, 230:21
**decided** [2] - 150:2, 205:18
**decides** [3] - 211:9, 228:4, 228:6
**decision** [5] - 4:17, 27:8, 104:20, 104:22, 239:17
**declarant** [2] - 14:15, 33:23
**declarants** [1] - 31:21
**deem** [1] - 25:18
**deemed** [1] - 81:1
**default** [2] - 241:21, 241:22
**defeating** [2] - 208:17, 233:7
**defective** [1] - 209:7
**Defendant** [13] - 1:17, 1:18, 1:20, 1:21, 50:4, 50:5, 186:23, 194:15, 194:16, 194:17
**defendant** [12] - 26:23, 32:5, 32:13, 181:17, 196:10, 206:17, 211:4, 236:8, 237:8, 238:6, 238:12, 240:15
**DEFENDANT** [2] - 104:25, 105:10

**defendant's** [1] - 195:4
**Defendants** [1] - 1:9
**defendants** [23] - 2:17, 2:18, 3:5, 32:2, 32:9, 49:19, 50:11, 100:12, 194:20, 199:19, 210:4, 214:18, 230:1, 231:6, 231:20, 235:11, 236:4, 236:16, 237:3, 241:17, 242:3, 243:5, 243:9
**defendants'** [1] - 50:11
**Defender** [2] - 148:20, 150:4
**Defender's** [1] - 233:20
**defense** [60] - 27:20, 28:9, 28:22, 29:1, 29:4, 31:12, 31:15, 31:23, 33:16, 49:1, 49:12, 95:3, 106:23, 194:12, 194:18, 195:17, 196:15, 197:10, 198:17, 198:21, 203:14, 203:20, 204:20, 204:23, 205:1, 205:2, 205:25, 206:3, 206:7, 206:20, 207:19, 208:14, 208:20, 209:4, 210:11, 210:20, 211:18, 212:8, 212:9, 212:13, 212:14, 212:20, 212:21, 212:24, 217:14, 222:4, 226:5, 227:14, 236:6, 236:9, 238:13, 238:15, 242:11, 242:12, 242:25
**defense's** [2] - 208:17
**defenses** [1] - 233:5
**defer** [2] - 212:9, 213:11
**definite** [2] - 43:17, 153:11
**degree** [6] - 60:9, 114:25, 202:3, 202:11, 203:19, 220:6
**Delaware** [2] - 108:12, 112:2
**delay** [2] - 4:24, 52:21
**delivering** [3] - 222:9, 222:10, 226:16
**demonstrated** [1] - 112:11
**denied** [5] - 18:20, 66:6, 184:24, 233:13, 233:14
**denies** [1] - 97:8
**deny** [1] - 40:2
**depart** [1] - 193:8
**derivation** [2] - 227:17, 228:1
**describe** [2] - 12:19, 166:25
**described** [2] - 31:2, 125:7

**describing** [3] - 161:15, 165:3
**Describing** [1] - 128:9
**description** [2] - 25:24, 71:14
**designed** [1] - 45:17
**desire** [1] - 194:21
**desperately** [1] - 160:6
**despite** [2] - 155:10, 155:11
**Despite** [1] - 191:19
**detail** [4] - 23:14, 106:2, 200:8, 229:7
**detailed** [1] - 3:25
**details** [7] - 43:17, 73:16, 74:21, 162:25, 163:17, 190:25, 223:7
**detained** [4] - 38:1, 135:15, 135:16, 135:19
**detainees** [1] - 35:24
**detective** [5] - 78:17, 81:19, 81:22, 81:23, 125:10
**Detective** [19] - 4:8, 82:14, 84:11, 87:8, 109:24, 125:1, 125:2, 125:8, 126:2, 126:11, 160:11, 160:12, 161:10, 161:11, 164:15, 173:20, 225:6, 227:11
**Detective's** [1] - 213:25
**detective's** [1] - 143:21
**Detectives** [2] - 161:25, 166:3
**detectives** [21] - 80:20, 85:10, 86:23, 87:22, 87:23, 89:16, 90:17, 113:16, 119:11, 125:3, 128:6, 130:19, 144:2, 155:22, 160:11, 169:22, 170:2, 170:15, 174:25, 214:14
**detectives'** [1] - 83:18
**Detention** [2] - 136:6, 136:11
**detention** [1] - 137:4
**determination** [7] - 27:11, 30:18, 31:7, 49:4, 51:8, 51:10, 194:6
**determinative** [2] - 212:18, 212:25
**determine** [2] - 24:9, 116:3
**detriment** [3] - 4:24, 4:25, 236:15
**device** [3] - 85:21, 114:21, 164:14
**devices** [1] - 90:19
**devoted** [1] - 37:1
**dibs** [1] - 98:24

**dichotomy** [2] - 31:11, 31:13
**died** [1] - 72:3
**difference** [1] - 210:14
**Different** [1] - 188:12
**different** [22] - 3:4, 5:9, 28:8, 33:5, 54:9, 77:11, 118:25, 188:13, 193:22, 197:12, 207:15, 207:20, 207:21, 207:25, 208:12, 224:3, 224:9, 226:17, 228:1, 230:11, 235:17, 241:17
**differing** [1] - 207:18
**difficult** [2] - 11:20, 200:19
**difficulty** [1] - 32:18
**digital** [1] - 85:19
**dire** [2] - 210:25, 211:4
**direct** [5] - 133:15, 230:18, 233:13, 233:18, 244:17
**DIRECT** [2] - 53:19, 245:6
**direction** [2] - 23:6, 242:23
**directly** [1] - 53:14
**dired** [1] - 210:18
**Dirty** [1] - 120:12
**dirty** [3] - 110:21, 110:24, 182:13
**disagree** [1] - 8:20
**disappear** [2] - 6:19, 6:24
**disappoint** [1] - 102:5
**disclosed** [1] - 106:6
**discuss** [4] - 73:19, 103:15, 103:25, 104:19
**discussed** [4] - 37:11, 163:7, 186:21, 195:20
**discussion** [16] - 42:21, 42:22, 91:25, 95:8, 108:20, 112:6, 132:3, 132:21, 133:1, 133:4, 193:5, 194:14, 206:10, 210:23, 229:15, 235:15
**discussions** [3] - 40:8, 45:22, 62:13
**disk** [1] - 103:11
**dismissed** [4] - 77:25, 135:18, 136:8, 232:18
**disparage** [1] - 101:22
**displayed** [1] - 177:5
**displaying** [1] - 133:20
**disposed** [1] - 209:11
**disposition** [2] - 207:22, 242:13
**dispute** [5] - 44:8, 71:12, 141:23, 142:4, 173:22

**disregard** [1] - 18:15
**disrespectful** [1] - 80:23
**distract** [1] - 10:8
**distracted** [1] - 166:7
**distribution** [1] - 157:1
**DISTRICT** [2] - 1:1, 1:2
**district** [2] - 27:9, 202:5
**District** [3] - 80:14, 81:17, 202:2
**Division** [2] - 77:22, 197:1
**DIVISION** [1] - 1:2
**DOAR** [1] - 94:8
**DOBROPOLSKI** [2] - 53:13, 245:5
**Dobropolski** [148] - 2:5, 3:17, 4:7, 5:9, 5:11, 5:19, 5:21, 5:23, 6:10, 6:17, 6:21, 7:2, 7:19, 9:18, 9:20, 10:5, 10:16, 10:21, 12:10, 12:15, 13:2, 13:11, 13:12, 13:16, 13:25, 14:9, 16:2, 16:20, 17:2, 17:13, 17:23, 18:5, 19:17, 20:12, 24:2, 25:2, 29:3, 29:8, 30:4, 31:7, 31:19, 31:20, 31:24, 33:19, 34:16, 34:19, 34:22, 34:23, 35:4, 35:5, 35:10, 35:16, 35:22, 35:23, 36:2, 36:5, 36:8, 36:15, 37:6, 37:25, 38:11, 38:13, 38:15, 38:21, 38:25, 39:14, 39:19, 40:1, 41:8, 41:23, 42:2, 42:8, 42:23, 43:2, 43:14, 43:20, 44:4, 44:16, 44:25, 45:9, 45:11, 45:13, 45:20, 46:2, 46:6, 46:8, 46:11, 46:19, 46:20, 46:23, 47:8, 49:7, 49:16, 51:2, 52:10, 52:15, 53:11, 53:16, 53:21, 54:5, 60:5, 63:4, 64:4, 65:4, 68:7, 69:4, 70:9, 76:22, 77:7, 78:19, 79:5, 79:10, 81:6, 82:7, 84:21, 89:22, 92:3, 95:7, 95:14, 96:14, 97:7, 97:19, 97:22, 98:10, 103:7, 108:3, 109:15, 113:13, 115:17, 118:9, 122:13, 125:25, 134:13, 134:15, 135:11, 136:19, 142:11, 143:8, 149:17, 152:12, 167:8, 179:7, 187:16, 189:18, 193:14
**Dobropolski's** [13] -

3:6, 9:9, 12:22, 14:14, 31:3, 37:20, 46:22, 46:25, 47:18, 47:25, 49:20, 50:10, 134:4
**DOC** [2] - 77:21, 234:13
**document** [2] - 133:21, 134:7
**documentation** [3] - 180:1, 180:2, 224:5
**documents** [1] - 160:19
**dollars** [1] - 36:25
**domestic** [7] - 54:8, 54:14, 54:16, 56:4, 84:13, 85:3, 87:25
**Domestic** [2] - 56:3, 121:5
**done** [14] - 5:5, 35:14, 66:23, 75:23, 97:24, 123:16, 159:19, 173:7, 202:6, 214:13, 217:23, 219:14, 223:21
**Donna** [1] - 67:18
**door** [3] - 107:10, 153:20, 244:13
**double** [12] - 12:19, 38:10, 50:7, 80:17, 81:7, 83:5, 113:17, 142:13, 146:5, 171:24, 175:9, 220:14
**doubt** [6] - 18:24, 190:10, 192:7, 194:19, 236:3, 243:22
**down** [30] - 22:18, 31:4, 43:22, 44:2, 52:10, 64:11, 67:16, 69:24, 72:7, 72:10, 73:8, 73:23, 81:10, 105:24, 111:9, 130:25, 131:1, 131:3, 131:4, 131:10, 131:12, 144:8, 166:17, 170:13, 171:15, 192:6, 214:20, 214:21, 234:22, 242:4
**downs** [2] - 64:11, 68:9
**Downtown** [1] - 107:18
**dozen** [1] - 4:9
**draft** [1] - 231:17
**drifted** [2] - 81:10, 146:12
**drifting** [1] - 73:8
**drop** [1] - 215:21
**Dropped** [1] - 72:10
**drove** [2] - 126:16, 175:3
**drug** [39] - 3:9, 36:23, 37:14, 37:17, 38:23, 48:9, 55:14, 58:6, 59:1, 60:12, 60:20, 60:21, 61:15, 61:16, 61:18, 62:5, 65:11, 108:11, 111:22, 118:2, 118:20,

156:22, 165:23, 169:23, 170:6, 170:21, 171:4, 171:8, 199:12, 200:1, 201:19, 210:12, 216:22, 217:11, 230:6, 230:13, 231:12, 241:11
**drugs** [46] - 48:10, 55:5, 55:10, 55:18, 55:20, 61:15, 61:16, 61:19, 61:20, 65:11, 113:4, 114:13, 165:24, 178:4, 178:7, 181:1, 181:3, 181:4, 181:7, 181:12, 181:13, 181:17, 181:18, 181:23, 182:8, 182:10, 182:12, 182:15, 182:18, 182:22, 183:5, 183:6, 184:9, 184:22, 184:25, 185:1, 185:6, 185:12, 185:15, 194:16, 200:14, 200:16, 201:18, 230:8, 231:23
**DS** [2] - 224:14, 225:13
**dual** [1] - 231:16
**dude** [8] - 62:23, 70:20, 114:13, 140:1, 141:15, 141:16, 167:21
**Dude** [1] - 139:24
**Due** [1] - 193:2
**due** [1] - 226:24
**During** [21] - 2:25, 9:13, 9:17, 13:12, 17:6, 17:17, 19:4, 21:11, 34:19, 37:15, 38:4, 43:9, 53:1, 126:2, 132:3, 133:15, 138:19, 165:3, 195:20, 199:12, 210:12
**dying** [3] - 6:25, 7:1, 70:16

# E

**earliest** [3] - 213:15, 213:17, 215:8
**early** [12] - 39:4, 49:8, 56:15, 123:1, 123:3, 124:12, 132:9, 132:16, 152:25, 184:3, 193:3, 231:11
**Early** [1] - 39:25
**earn** [1] - 14:10
**earned** [1] - 16:7
**earning** [2] - 14:14, 55:3
**easily** [3] - 209:9, 209:10, 209:22
**east** [1] - 214:18
**easy** [1] - 155:23
**ECF** [1] - 242:21
**Ecstasy** [4] - 61:19,

108:11, 111:25, 112:1
**effect** [4] - 42:25, 220:23, 220:24, 243:4
**effective** [2] - 207:9, 227:5
**effectively** [1] - 50:4
**effort** [2] - 5:22, 102:23
**eight** [26] - 38:17, 55:25, 79:12, 89:13, 93:3, 122:2, 123:4, 123:9, 124:12, 143:23, 145:14, 145:15, 145:25, 147:23, 148:2, 154:5, 154:19, 154:22, 155:6, 155:12, 188:18, 188:20, 188:23, 189:5, 190:20
**Eight** [2] - 122:1, 147:24
**Either** [1] - 218:19
**either** [13] - 16:2, 25:23, 31:13, 45:18, 68:21, 105:7, 105:21, 184:18, 188:10, 192:9, 239:22, 241:25, 244:17
**element** [3] - 159:12, 160:4, 203:22
**elements** [3] - 198:17, 207:16, 207:18
**elicit** [1] - 11:5, 42:8, 42:9, 106:8, 106:9, 233:2
**elicited** [1] - 40:3
**emphasize** [1] - 48:12
**encountered** [1] - 244:22
**encounters** [1] - 43:4
**end** [12] - 2:17, 42:21, 68:16, 117:9, 121:1, 139:19, 144:21, 146:3, 152:9, 152:17, 214:5
**ended** [4] - 74:25, 81:18, 113:11, 237:10
**ending** [1] - 54:22
**ends** [1] - 227:16
**enforce** [1] - 69:1
**enforcement** [14] - 15:8, 81:4, 87:21, 145:1, 145:6, 145:8, 145:18, 156:6, 157:25, 159:10, 159:13, 160:5, 189:21, 192:22
**enforcer** [10] - 4:4, 58:4, 58:5, 165:25, 169:23, 170:6, 170:21, 171:4, 176:21, 176:22
**engage** [1] - 47:23, 62:13, 113:16, 114:19
**engaged** [1] - 199:12
**enhance** [1] - 4:21
**enhanced** [4] - 4:21, 4:23, 5:4, 5:5

**enhancer** [1] - 4:18
**enter** [1] - 7:19
**enterprise** [11] - 194:13, 194:20, 194:22, 202:17, 219:11, 219:12, 219:13, 230:14, 232:1, 236:11
**enters** [4] - 15:16, 52:18, 107:24, 134:9
**entertain** [1] - 212:21
**entire** [2] - 24:9, 99:4
**entirely** [1] - 224:8
**entitled** [10] - 48:24, 49:1, 49:20, 194:24, 195:24, 197:23, 230:16, 231:4, 231:5, 238:24
**entitles** [1] - 106:15
**entrance** [1] - 13:1
**envelope** [1] - 64:9
**environment** [1] - 37:20
**Eric** [4] - 69:10, 113:4, 114:14
**Eric's** [1] - 69:11
**Ernest** [2] - 199:9, 200:6
**error** [1] - 239:21
**escape** [2] - 135:24, 136:2
**escaped** [1] - 135:19
**especially** [2] - 12:6, 13:21
**Esquire** [11] - 1:16, 1:16, 1:17, 1:18, 1:19, 1:19, 1:20, 1:21, 1:22, 1:22, 34:4
**essence** [2] - 22:17, 22:18
**Essentially** [1] - 194:4
**essentially** [5] - 64:14, 97:18, 208:16, 218:20, 222:18
**establish** [3] - 29:13, 167:14, 240:8
**established** [3] - 15:15, 26:24, 30:24
**esteemed** [1] - 235:13
**et** [1] - 246:5
**etc** [2] - 97:16, 239:10
**Eubanks** [1] - 12:23
**evening** [1] - 133:12
**event** [2] - 101:9, 202:16
**events** [2] - 3:25, 18:9
**eventually** [4] - 78:9, 121:6, 121:9, 217:23
**evidence** [100] - 2:24, 3:8, 3:10, 3:21, 19:20, 19:25, 23:22, 24:1, 24:6, 25:5, 25:25, 26:2, 28:4, 28:15, 29:13, 30:1, 31:9, 32:2, 45:7, 47:25, 49:3,

49:9, 49:14, 91:25, 92:14, 100:23, 101:20, 104:10, 104:12, 104:14, 104:15, 104:16, 105:18, 106:8, 106:9, 106:13, 120:4, 129:17, 133:21, 162:19, 193:5, 195:8, 195:11, 195:13, 195:22, 196:5, 196:7, 196:10, 196:14, 197:16, 197:17, 197:24, 198:10, 198:24, 198:25, 200:4, 200:10, 201:8, 201:22, 201:23, 202:23, 203:17, 205:14, 205:17, 206:1, 206:2, 206:3, 206:20, 212:7, 212:8, 212:13, 212:16, 212:20, 212:22, 212:24, 213:1, 221:7, 221:23, 221:25, 229:11, 229:17, 230:18, 231:12, 233:2, 238:2, 238:7, 238:16, 238:22, 239:13, 242:4, 242:23, 243:1, 243:2, 243:4, 243:21, 244:2
**evidentiary** [6] - 31:17, 31:23, 48:24, 50:9, 235:14, 235:20
**ex** [1] - 237:11
**Exactly** [5] - 154:14, 158:25, 191:12, 219:12, 239:23
**exactly** [14] - 15:11, 18:9, 38:24, 59:3, 71:9, 101:4, 102:21, 109:8, 156:19, 193:9, 195:8, 201:23, 201:24, 222:16
**EXAMINATION** [4] - 53:19, 122:11, 245:6, 245:7
**examination** [19] - 3:23, 11:5, 102:9, 122:9, 133:15, 207:10, 207:13, 207:19, 208:2, 208:15, 212:15, 222:6, 226:20, 226:25, 227:5, 242:11, 242:12, 244:1, 244:17
**examinations** [1] - 133:14
**examine** [5] - 222:4, 233:8, 240:8, 244:19
**examined** [1] - 238:18
**examining** [1] - 239:14
**example** [6] - 24:11, 43:20, 105:25, 202:2, 202:14, 241:3
**Except** [3] - 88:14, 88:18, 208:19
**except** [5] - 43:19, 88:14, 88:16, 205:6,

209:3
**exception** [2] - 50:20, 50:21
**exceptions** [1] - 50:11
**excess** [3] - 201:14, 201:16, 201:20
**exchange** [1] - 103:19
**Exclamation** [1] - 113:9
**exclude** [4] - 7:14, 25:16, 196:8, 206:20
**excluded** [1] - 201:18
**excluding** [2] - 201:22, 202:23
**Excuse** [4] - 67:15, 127:14, 168:3, 234:5
**excused** [6] - 92:1, 92:3, 132:10, 193:11, 193:14, 193:16
**exercising** [1] - 238:6
**exhibit** [7] - 63:14, 65:1, 65:3, 65:6, 119:3, 120:3, 129:15
**Exhibit** [8] - 63:15, 64:7, 65:4, 69:3, 78:19, 82:6, 91:18, 131:9
**exhibits** [1] - 68:5
**exist** [2] - 227:13, 236:12
**existed** [5] - 3:9, 4:12, 5:7, 19:21, 20:8
**existing** [1] - 203:21
**exits** [4] - 92:2, 92:4, 193:13, 193:15
**expect** [3] - 59:23, 100:15, 210:23
**Expected** [1] - 143:23
**expected** [1] - 189:5
**expects** [2] - 222:9, 226:16
**expertise** [1] - 199:4
**expire** [2] - 153:17, 153:19
**expired** [1] - 234:1
**explain** [9] - 4:16, 11:21, 96:14, 108:25, 109:2, 115:9, 120:21, 153:2, 198:3
**explained** [2] - 70:15, 73:23, 74:11, 75:19, 112:3
**explaining** [2] - 114:8, 127:16
**explication** [1] - 221:19
**explicit** [1] - 23:10
**exploit** [1] - 40:10
**explored** [2] - 104:4, 104:6
**express** [2] - 48:25, 218:12
**Expressed** [1] - 97:21

**expressed** [1] - 192:3
**extend** [1] - 230:23
**extensive** [2] - 139:10, 211:4
**extent** [3] - 21:23, 212:17, 235:21
**extract** [4] - 10:9, 38:13, 40:9, 41:23
**extracted** [5] - 17:8, 17:13, 34:22, 38:11, 166:8
**extracting** [7] - 9:19, 10:9, 13:13, 13:22, 18:8, 165:4, 167:2
**extraordinary** [1] - 244:15
**extremely** [2] - 3:24, 209:24
**eye** [1] - 222:17

## F

**face** [7] - 13:24, 17:5, 18:11, 31:6, 53:12, 113:9, 236:25
**facie** [1] - 49:9
**facility** [1] - 237:25
**Facility** [2] - 126:12, 127:6
**fact** [67] - 13:5, 14:16, 16:7, 19:7, 22:23, 24:25, 26:4, 26:15, 29:20, 30:4, 32:22, 35:25, 38:14, 38:15, 40:11, 41:2, 42:21, 43:16, 45:6, 45:20, 48:11, 49:1, 50:3, 55:22, 81:20, 89:15, 97:16, 99:10, 99:11, 101:16, 101:17, 121:25, 124:15, 178:9, 183:2, 194:3, 196:7, 197:24, 198:13, 203:16, 203:21, 203:24, 206:9, 207:12, 207:15, 207:21, 208:3, 209:4, 209:11, 211:16, 211:18, 212:12, 218:1, 218:17, 221:23, 221:24, 222:15, 226:21, 226:22, 230:1, 230:8, 232:8, 234:12, 234:20, 235:18, 236:14, 240:8
**fact-finding** [1] - 49:1
**factors** [5] - 23:25, 24:4, 216:12, 216:14, 243:6
**facts** [9] - 13:6, 29:3, 29:6, 29:7, 38:2, 32:10, 106:2, 203:15, 218:23
**factual** [5] - 35:19, 48:25, 218:18, 230:20, 231:7

**factually** [3] - 103:22, 234:23, 234:25
**failed** [1] - 4:9
**failing** [1] - 120:12
**failure** [3] - 158:21, 179:22, 180:1
**fair** [4] - 19:21, 134:15, 177:25, 232:2
**fairly** [1] - 103:24
**fall** [6] - 49:8, 154:8, 225:19, 225:20, 225:22, 237:5
**familiar** [1] - 59:8
**family** [1] - 237:10
**far** [8] - 40:24, 54:2, 58:17, 70:3, 165:23, 176:22, 193:6, 209:21
**farfetched** [1] - 41:5
**fascinating** [1] - 244:21
**fashion** [3] - 44:20, 186:23, 240:16
**fashioned** [2] - 243:25, 244:1
**fast** [2] - 115:11, 187:17
**fault** [3] - 237:2
**favorably** [1] - 26:17
**fear** [1] - 226:9
**February** [1] - 134:6
**fed** [1] - 226:10
**Federal** [1] - 234:22
**federal** [21] - 36:25, 37:13, 87:10, 87:15, 89:18, 120:1, 120:7, 120:22, 184:4, 204:4, 204:10, 209:6, 210:1, 222:11, 225:9, 226:9, 226:12, 232:1, 239:3, 240:24, 241:4
**feelings** [2] - 155:10, 155:11
**fees** [2] - 200:3, 224:10
**fellow** [1] - 46:18
**felony** [1] - 203:19
**felt** [1] - 126:5
**female** [6] - 71:2, 72:13, 72:15, 81:9, 83:7, 146:9
**ferret** [1] - 21:10
**few** [16] - 13:15, 42:23, 44:1, 68:6, 78:6, 103:2, 115:6, 122:7, 122:16, 124:9, 125:4, 134:24, 134:25, 135:1, 221:2
**fictitious** [1] - 227:13
**fifteen** [2] - 103:8, 103:9
**Fifth** [2] - 18:16, 238:6
**fight** [3] - 12:17, 59:5, 69:11
**figuratively** [1] - 222:18
**figure** [2] - 93:25, 155:13

**file** [3] - 18:19, 211:10, 234:13
**filed** [16] - 2:9, 9:24, 10:25, 34:6, 51:1, 148:21, 148:24, 150:1, 193:22, 194:7, 224:5, 233:19, 234:13, 235:6, 241:20
**files** [1] - 20:7
**filing** [1] - 7:9
**filter** [1] - 157:16
**final** [4] - 113:5, 233:18, 234:20, 242:7
**finalize** [1] - 193:17
**finally** [1] - 195:3
**finder** [1] - 203:16
**Fine** [3] - 36:21, 107:21, 224:12
**fine** [8] - 8:6, 37:24, 38:7, 60:6, 68:12, 94:8, 168:14
**finger** [5] - 60:17, 60:18, 70:7, 70:10
**fingertips** [1] - 215:13
**Finish** [1] - 145:14
**finish** [10] - 68:9, 124:17, 145:15, 148:3, 148:4, 152:11, 152:12, 152:13, 153:22, 192:2
**finished** [3] - 51:22, 155:3, 185:4
**finishing** [2] - 188:19, 188:20
**firearm** [1] - 102:16
**firearms** [6] - 156:15, 156:16, 156:17, 156:20, 157:3, 158:5
**firm** [2] - 80:18, 143:12
**first** [50] - 4:22, 5:3, 17:17, 17:18, 17:19, 18:1, 18:5, 18:12, 20:18, 35:12, 44:6, 46:22, 60:9, 65:20, 72:11, 82:5, 91:13, 93:1, 95:19, 98:24, 99:5, 108:8, 108:10, 124:25, 125:7, 134:6, 134:15, 135:9, 135:13, 146:25, 149:14, 153:8, 178:10, 178:14, 182:20, 182:21, 189:10, 197:14, 198:9, 202:3, 202:11, 203:19, 205:14, 213:7, 215:4, 217:16, 220:6, 222:9, 231:11
**First** [8] - 45:24, 94:22, 125:1, 135:12, 166:5, 213:12, 221:22, 229:13
**fits** [1] - 136:4
**fitted** [1] - 164:15
**Five** [1] - 124:7

**five** [14] - 18:1, 18:5, 24:4, 51:15, 57:16, 68:15, 68:17, 68:20, 107:4, 124:6, 124:8, 137:10, 153:19
**fix** [2] - 67:22, 67:23
**fixed** [2] - 64:22, 65:8
**Flannery** [1] - 1:19, 94:1, 94:16, 178:25, 193:18, 220:18
**FLANNERY** [5] - 94:2, 94:9, 94:14, 220:19, 220:22
**flatly** [2] - 223:4, 223:9
**flesh** [2] - 211:1, 211:8
**floating** [1] - 10:20
**floats** [1] - 206:4
**floor** [1] - 77:11
**focus** [5] - 11:6, 28:9, 55:2, 205:25, 214:24
**Focus** [1] - 198:9
**focused** [3] - 34:2, 197:22, 217:7
**follow** [6] - 53:7, 79:3, 106:12, 220:19, 239:7, 242:10
**following** [2] - 153:4, 240:24
**FOR** [1] - 1:2
**force** [1] - 190:6
**foregoing** [1] - 246:6
**foresees** [1] - 211:6
**forever** [2] - 19:1, 21:16
**Forget** [4] - 198:5, 198:7
**forget** [2] - 198:6
**forgetting** [1] - 2:16
**forgot** [1] - 180:9
**forgotten** [1] - 98:22
**form** [4] - 91:15, 214:12, 226:17, 243:3
**former** [2] - 6:8, 228:25
**forth** [6] - 30:4, 109:14, 176:19, 227:2, 233:6, 241:20
**forward** [4] - 104:15, 115:11, 133:18, 154:17
**foundation** [3] - 63:17, 63:18, 112:18
**Four** [2] - 51:14, 187:19
**four** [13] - 18:1, 18:5, 20:5, 51:2, 56:18, 107:19, 123:11, 123:16, 132:22, 132:24, 162:7, 189:2, 230:24
**Fourth** [7] - 14:20, 14:25, 15:2, 16:21, 21:14, 27:6, 45:5
**fourth** [1] - 166:17
**fragments** [1] - 92:25

**frame** [1] - 199:13
**frankly** [6] - 204:3, 204:17, 207:13, 220:8, 220:10, 223:18
**Frankly** [1] - 210:1
**free** [3] - 186:24, 200:23, 239:17
**freedom** [2] - 191:4, 191:7
**Friday** [1] - 94:3
**friend** [3] - 69:11, 83:8, 113:3
**friend's** [1] - 83:8
**friends** [9] - 6:19, 6:24, 6:25, 35:13, 64:14, 67:10, 68:12, 70:15, 159:9
**Friends** [2] - 169:16, 169:18
**front** [39] - 8:5, 30:5, 88:5, 88:11, 88:12, 120:9, 120:16, 130:2, 137:2, 137:4, 144:1, 147:17, 147:19, 148:17, 151:6, 152:3, 153:5, 153:17, 174:24, 175:22, 177:22, 178:21, 179:9, 183:3, 183:12, 184:4, 189:25, 190:15, 205:1, 205:3, 208:9, 212:10, 222:14, 222:17, 222:23, 238:21, 238:25, 243:19, 244:3
**fuckin'** [1] - 70:7
**full** [5] - 33:16, 103:19, 166:5, 227:5, 244:12
**fully** [3] - 104:1, 104:7, 226:16
**fundamental** [1] - 198:9
**furtherance** [54] - 2:23, 3:12, 3:16, 3:19, 5:12, 5:15, 5:16, 9:14, 11:3, 11:24, 12:13, 12:25, 13:4, 13:7, 14:1, 14:17, 14:20, 15:7, 15:8, 15:20, 15:21, 15:24, 16:7, 16:22, 18:12, 20:1, 21:1, 21:15, 21:20, 24:11, 24:20, 24:25, 25:6, 25:9, 25:12, 27:6, 27:11, 27:24, 28:13, 30:2, 30:10, 30:20, 30:23, 31:8, 31:10, 31:16, 32:19, 32:24, 45:17, 49:10, 95:17, 98:18, 202:17, 219:10
**furthering** [1] - 236:10
**Furthermore** [1] - 3:10
**future** [1] - 3:25

**G**

**gain** [7] - 10:11, 10:17, 12:2, 12:18, 155:18, 168:16, 168:17
**gained** [4] - 12:3, 168:2, 168:5, 168:12
**gambling** [3] - 157:11, 157:14, 158:5
**gang** [1] - 240:4
**gangsta** [1] - 62:22
**garbage** [2] - 111:13, 111:16
**GARDNER** [3] - 1:8, 104:25, 105:10
**Gardner** [90] - 1:21, 22:2, 27:25, 28:2, 28:7, 34:3, 100:20, 103:16, 103:19, 104:1, 104:8, 104:24, 105:2, 105:3, 105:12, 106:1, 193:18, 193:23, 194:23, 195:5, 195:7, 195:13, 195:24, 195:25, 196:19, 196:21, 197:11, 197:23, 198:7, 199:21, 200:2, 200:5, 200:9, 200:25, 205:24, 206:10, 208:21, 210:19, 210:25, 211:8, 211:19, 212:25, 214:17, 215:10, 216:19, 217:10, 217:11, 217:18, 217:21, 217:22, 217:24, 218:6, 218:16, 218:23, 219:4, 219:5, 224:3, 224:7, 224:9, 225:14, 225:19, 225:21, 226:22, 227:16, 228:12, 230:16, 231:20, 232:18, 233:2, 235:16, 235:18, 236:3, 236:24, 237:4, 237:9, 237:12, 237:24, 238:22, 239:5, 239:16, 240:15, 243:14, 243:22, 244:1, 244:13, 244:14, 244:16
**Gardner's** [15] - 27:21, 103:20, 105:18, 106:6, 206:8, 209:8, 214:22, 221:8, 221:23, 232:8, 234:12, 236:7, 236:14, 239:15, 242:24
**Gary** [3] - 81:23, 82:14, 192:1
**GED** [1] - 54:3
**general** [5] - 71:14, 140:25, 141:25, 165:5, 241:22
**generate** [1] - 31:21
**generis** [2] - 202:1, 235:12
**generous** [1] - 212:23

**Genesis** [13] - 55:15, 55:16, 84:17, 84:18, 84:20, 84:21, 147:8, 147:11, 147:16, 148:8, 148:10, 175:20, 177:2
**gentleman** [1] - 99:1
**gentlemen** [5] - 52:19, 68:1, 107:25, 132:9, 134:10
**Gerard** [1] - 1:19
**Gerry** [1] - 122:15
**Giganti** [6] - 4:8, 87:8, 87:9, 109:25, 164:15, 229:3
**Giganti's** [2] - 4:8, 226:15
**Giglio** [1] - 214:9
**girl** [2] - 70:21, 74:12
**girlfriend** [17] - 74:25, 76:1, 95:11, 95:20, 96:2, 96:3, 96:16, 97:23, 98:4, 98:8, 98:17, 99:16, 101:17, 188:8, 188:11, 188:12
**girlfriends** [1] - 188:23
**gist** [2] - 16:19, 42:1
**Given** [1] - 23:11
**given** [18] - 3:24, 4:25, 23:22, 24:1, 24:3, 24:24, 30:4, 31:22, 33:16, 45:5, 119:21, 134:23, 180:23, 181:1, 184:7, 214:2, 223:21, 231:10
**Glen** [2] - 171:14, 171:15
**goal** [3] - 30:6, 30:15, 193:9
**goals** [2] - 156:5, 156:9
**Goo** [2] - 199:13, 225:21
**goods** [3] - 222:9, 222:10, 226:16
**Goose** [6] - 216:22, 217:4, 217:5, 218:8, 227:21, 227:23
**goosey** [1] - 16:24
**government** [82] - 2:24, 3:8, 5:18, 9:11, 9:12, 10:14, 13:5, 14:22, 15:15, 16:3, 16:4, 17:7, 19:16, 20:7, 20:12, 20:24, 21:21, 23:8, 24:23, 26:22, 29:12, 29:24, 48:4, 49:11, 50:19, 53:9, 93:21, 100:4, 101:12, 101:22, 102:1, 105:4, 105:21, 106:7, 106:8, 183:22, 194:2, 194:5, 195:5, 195:18, 196:12, 199:7,

200:24, 201:4, 205:4, 205:24, 206:9, 206:12, 206:16, 206:18, 207:1, 207:3, 209:14, 209:17, 209:21, 210:9, 210:15, 211:6, 212:2, 212:7, 212:20, 212:22, 213:8, 214:2, 218:15, 223:6, 223:21, 223:23, 224:8, 224:18, 228:16, 229:25, 230:5, 230:22, 232:11, 234:17, 234:19, 235:1, 239:6, 240:4, 241:4, 243:7

**Government** [8] - 1:15, 63:15, 64:7, 65:3, 69:3, 78:18, 82:6, 91:18

**Government's** [1] - 131:9

**GOVERNMENT'S** [1] - 53:13

**government's** [28] - 5:24, 10:12, 13:24, 17:22, 19:1, 22:21, 25:4, 28:3, 29:7, 49:2, 49:15, 49:18, 104:14, 193:20, 193:23, 194:8, 196:2, 196:13, 198:1, 211:1, 211:25, 218:20, 221:6, 224:2, 231:17, 236:5, 239:13, 242:3

**GPS** [1] - 44:1

**grabbed** [1] - 111:13

**grabbing** [1] - 111:15

**grand** [33] - 18:6, 20:14, 20:16, 20:22, 40:2, 40:20, 40:24, 89:18, 89:25, 95:2, 99:10, 101:7, 112:2, 154:11, 165:9, 175:25, 176:1, 176:4, 176:13, 184:4, 189:20, 199:16, 223:12, 223:15, 223:19, 227:9, 228:20, 229:2, 232:10, 232:12, 232:19

**grant** [3] - 51:6, 195:11, 197:6

**granted** [1] - 233:18

**granting** [1] - 237:1

**graphic** [1] - 237:1

**gravity** [1] - 24:1

**Gray** [1] - 66:10

**great** [5] - 26:14, 213:13, 213:16, 239:20

**greater** [3] - 23:14, 217:8, 217:18

**greatly** [1] - 4:25

**grew** [8] - 58:23, 71:12, 79:24, 139:24, 140:1, 140:8, 140:10, 168:20

**grips** [1] - 235:3

**ground** [3] - 52:5, 218:23, 220:22

**grounds** [1] - 193:22

**group** [4] - 63:4, 63:8, 69:20, 222:18

**grow** [1] - 53:25

**guess** [28] - 5:20, 7:17, 9:12, 26:19, 33:3, 35:25, 67:2, 82:7, 91:2, 91:21, 97:11, 102:5, 118:24, 123:6, 129:12, 137:8, 138:3, 146:3, 150:13, 166:11, 193:21, 211:22, 216:2, 218:14, 220:13, 221:9, 224:14, 236:19

**guilt** [5] - 208:16, 208:17, 208:21, 232:22, 243:18

**guilt/innocence** [2] - 240:9, 240:14

**guilty** [8] - 56:11, 181:20, 187:2, 188:15, 188:16, 198:7, 210:5, 223:2

**Guilty** [1] - 181:23

**gun** [18] - 70:24, 70:25, 71:1, 72:20, 72:23, 73:3, 174:15, 174:16, 174:18, 174:20, 174:21, 194:16, 194:17, 210:12, 230:7, 230:13, 231:13, 241:12

**guns** [3] - 113:4, 230:8, 231:23

**gunshot** [1] - 81:12

**guy** [26] - 12:6, 12:7, 13:20, 13:21, 32:7, 34:24, 34:25, 36:8, 42:3, 42:11, 43:25, 44:17, 59:16, 66:2, 72:19, 74:19, 81:15, 81:16, 113:3, 114:14, 114:16, 169:19, 174:20, 205:3, 227:10

**guys** [9] - 30:7, 35:13, 59:14, 59:20, 62:23, 150:20, 166:20, 226:9, 226:12

**guys'** [1] - 30:15

## H

**HA-1** [1] - 120:3

**half** [2] - 129:23, 188:4

**halfway** [1] - 135:8

**hallway** [1] - 78:4

**hand** [3] - 166:17, 180:10, 214:5

**handful** [3] - 54:13, 67:10, 87:2

**handgun** [1] - 102:7

**handle** [4] - 59:4, 84:1, 84:3, 193:24

**handled** [3] - 83:23, 173:3, 241:14

**Handled** [1] - 129:21

**handwriting** [5] - 69:8, 78:21, 109:20, 110:2, 149:12

**handwritten** [8] - 20:18, 43:10, 91:15, 109:11, 117:22, 118:6, 118:15, 214:11

**Hanlon** [12] - 1:16, 93:15, 93:23, 93:24, 193:24, 204:21, 206:21, 211:15, 232:9, 242:7, 242:15, 244:15

**HANLON** [49] - 64:17, 64:21, 193:25, 194:2, 195:16, 196:9, 196:12, 196:21, 197:3, 197:6, 197:9, 197:18, 198:1, 198:12, 198:20, 199:2, 199:4, 199:8, 199:11, 199:18, 199:21, 200:6, 200:12, 201:2, 201:9, 201:14, 201:17, 202:25, 203:3, 203:9, 203:12, 203:20, 204:7, 204:16, 204:20, 204:24, 205:20, 206:24, 207:7, 208:10, 208:19, 209:2, 210:9, 210:18, 211:22, 212:4, 212:17, 213:11, 242:8

**Hanlon's** [1] - 222:3

**happy** [2] - 175:23, 194:10

**hard** [6] - 70:7, 79:2, 79:21, 79:23, 195:10, 206:19

**hard-pressed** [2] - 195:10, 206:19

**harder** [1] - 226:10

**Harding** [60] - 1:16, 2:4, 2:9, 6:3, 8:17, 22:5, 31:2, 33:9, 33:12, 33:15, 33:17, 51:25, 63:21, 64:9, 67:15, 67:20, 76:4, 76:12, 76:16, 78:23, 88:19, 92:5, 97:13, 102:21, 103:7, 108:1, 108:19, 109:13, 112:12, 122:21, 127:25, 138:5, 146:21, 154:6, 162:18, 163:7, 165:8, 165:11, 176:1, 183:17, 183:19, 185:2, 185:14, 186:15, 190:8, 190:11, 190:14, 192:3, 193:20, 199:5, 202:1, 202:5, 212:2,

213:7, 214:24, 223:22, 225:1, 227:11, 228:23, 228:24

**HARDING** [193] - 2:3, 2:5, 33:18, 33:24, 34:5, 34:8, 34:14, 34:16, 34:21, 35:5, 35:8, 35:12, 36:1, 36:4, 36:7, 36:10, 36:12, 36:14, 37:7, 37:10, 37:18, 37:21, 38:6, 38:8, 38:19, 38:22, 39:2, 39:9, 39:13, 39:16, 39:18, 39:24, 40:4, 40:6, 40:16, 40:18, 40:24, 41:16, 41:20, 42:2, 42:7, 42:11, 42:14, 42:17, 42:20, 43:3, 43:5, 43:7, 43:13, 44:4, 44:11, 44:13, 44:16, 44:19, 44:22, 44:25, 45:3, 45:24, 46:2, 46:5, 46:9, 46:12, 46:15, 46:17, 46:20, 46:23, 47:3, 47:6, 47:8, 47:11, 47:13, 47:15, 47:17, 47:20, 47:22, 48:2, 48:5, 48:7, 48:11, 50:19, 53:10, 53:20, 60:7, 62:8, 63:22, 64:23, 65:2, 67:21, 68:4, 71:21, 72:1, 74:5, 75:9, 75:12, 76:5, 76:17, 76:23, 77:1, 77:6, 78:25, 79:4, 79:9, 87:16, 88:20, 92:9, 92:14, 92:23, 93:3, 93:7, 93:9, 93:13, 93:22, 94:18, 94:21, 94:24, 95:2, 95:7, 95:21, 95:25, 96:3, 96:6, 96:9, 96:11, 96:13, 96:21, 96:24, 97:3, 97:6, 97:10, 97:20, 98:3, 98:6, 98:9, 98:12, 98:16, 98:20, 101:1, 101:4, 101:8, 103:8, 103:11, 103:13, 108:2, 112:16, 112:20, 115:9, 115:16, 116:5, 129:9, 132:15, 132:21, 133:1, 133:11, 133:19, 136:15, 152:10, 154:25, 163:11, 166:9, 168:6, 179:15, 185:3, 187:13, 189:8, 190:1, 202:7, 202:13, 202:19, 213:15, 213:21, 213:23, 213:25, 214:3, 214:9, 214:13, 214:22, 215:1, 215:7, 215:11, 215:18, 215:21, 216:24, 216:3, 216:16, 216:19, 216:25, 217:3, 217:7, 217:17, 218:5, 218:9, 225:8, 245:6

**Harding's** [2] - 2:8, 88:10

**harmless** [1] - 239:21

**HARRIS** [1] - 1:7

**Harris** [191] - 1:18, 3:1, 3:2, 3:3, 3:11, 3:15, 4:22, 5:7, 5:18, 5:22, 6:7, 6:10, 6:12, 6:20, 6:21, 7:3, 7:5, 7:15, 9:2, 9:4, 9:5, 9:6, 10:12, 11:4, 11:18, 12:4, 12:5, 12:8, 12:16, 13:2, 13:9, 13:10, 13:13, 13:15, 13:20, 16:5, 17:6, 17:15, 17:21, 19:19, 20:9, 22:11, 22:12, 22:16, 22:17, 22:22, 23:5, 23:14, 24:18, 31:24, 34:3, 34:17, 34:19, 34:22, 34:24, 35:3, 35:10, 35:16, 35:23, 36:3, 38:8, 38:9, 38:21, 38:22, 39:12, 39:17, 40:9, 41:8, 41:15, 41:23, 42:3, 42:6, 42:7, 42:13, 42:14, 42:24, 43:19, 43:21, 43:22, 44:14, 44:16, 45:10, 46:5, 48:7, 49:7, 52:4, 57:5, 57:13, 57:17, 57:21, 58:7, 58:15, 59:20, 59:23, 61:7, 61:20, 65:10, 65:24, 66:14, 66:22, 68:6, 69:12, 70:3, 70:12, 70:18, 71:1, 71:16, 71:22, 72:22, 73:17, 73:22, 74:1, 74:7, 77:9, 77:16, 79:13, 79:25, 83:4, 83:5, 83:23, 84:1, 85:17, 85:23, 86:5, 89:16, 90:10, 90:25, 91:16, 95:15, 108:6, 109:7, 110:5, 110:16, 110:23, 111:9, 111:25, 112:3, 112:16, 113:17, 115:23, 117:17, 119:25, 120:7, 122:15, 124:20, 128:1, 129:5, 129:7, 129:14, 130:12, 131:2, 133:3, 138:7, 139:14, 141:21, 150:15, 150:17, 152:9, 152:17, 162:3, 162:15, 163:2, 163:20, 164:16, 164:22, 165:4, 167:3, 167:13, 170:13, 170:17, 170:22, 170:24, 171:3, 171:21, 172:15, 172:17, 172:25, 173:3, 173:6, 173:13, 173:25, 174:10, 177:23, 190:18, 190:24, 192:19, 192:23,

195:3, 220:25
**Harris's** [18] - 10:21, 12:2, 22:11, 23:4, 23:10, 24:17, 25:8, 35:24, 36:6, 44:13, 47:2, 47:3, 47:19, 47:20, 49:23, 50:1, 63:7, 128:22
**hashing** [1] - 231:19
**Hasim** [3] - 67:7, 70:12, 173:13
**hate** [2] - 239:18, 239:19
**haywire** [1] - 19:14
**head** [12] - 8:17, 31:2, 42:5, 57:14, 72:4, 72:6, 81:12, 113:2, 113:24, 146:10, 202:1, 202:14
**heads** [2] - 57:16, 72:7
**hear** [26] - 8:2, 10:1, 10:2, 18:4, 22:4, 42:24, 48:15, 92:25, 93:6, 93:10, 94:5, 100:25, 104:2, 105:21, 106:14, 117:10, 138:16, 138:24, 153:24, 218:11, 220:4, 221:12, 241:14, 241:19, 241:24
**heard** [39] - 32:1, 33:9, 34:22, 35:16, 37:14, 51:12, 51:17, 92:25, 94:18, 96:17, 96:18, 99:6, 99:15, 100:23, 101:16, 106:16, 112:7, 112:24, 115:22, 119:18, 133:14, 133:15, 138:3, 139:7, 140:25, 141:13, 193:5, 194:9, 210:11, 212:14, 213:12, 216:1, 218:5, 220:15, 226:11, 231:11, 241:13
**hearing** [25] - 17:2, 23:1, 23:24, 24:7, 27:10, 28:11, 31:2, 31:6, 31:17, 33:6, 48:24, 50:9, 80:13, 105:4, 120:8, 120:16, 174:24, 178:21, 184:12, 185:17, 189:9, 195:21, 196:4, 207:20, 234:16
**hearings** [5] - 19:4, 21:9, 21:12, 27:13, 100:9
**hears** [1] - 101:20
**heart** [2] - 154:23, 227:14
**heat** [1] - 115:3
**heavily** [1] - 13:5
**heavy** [1] - 6:17
**heavyweight** [1] - 6:9
**heightened** [2] - 33:6, 222:14
**heights** [1] - 70:9

**Heights** [17] - 12:22, 34:24, 35:13, 36:13, 36:20, 36:24, 37:15, 37:17, 59:11, 61:24, 81:8, 114:14, 140:25, 141:14, 146:6, 146:9, 168:22
**held** [3] - 149:20, 153:13, 154:4
**Hell** [1] - 12:16
**help** [10] - 10:7, 87:21, 93:23, 157:13, 159:17, 178:25, 200:16, 217:16, 217:20, 243:13
**helped** [1] - 190:7
**helpful** [1] - 32:16
**helping** [1] - 212:18
**helps** [1] - 235:22
**Hence** [2] - 22:19, 198:20
**hepped** [1] - 217:22
**hereby** [1] - 246:3
**hereunto** [1] - 246:9
**herring** [1] - 238:10
**hesitation** [1] - 49:5
**high** [2] - 157:3, 208:11
**high-powered** [1] - 157:3
**highest** [1] - 233:17
**highlight** [1] - 144:13
**highlighted** [1] - 143:10
**hill** [2] - 43:22, 44:2
**himself** [8] - 9:21, 10:7, 12:10, 83:22, 195:7, 227:21, 237:4, 237:12
**Hip** [1] - 63:1
**hip** [2] - 69:11, 69:20
**hire** [1] - 228:7
**history** [1] - 240:21
**hit** [2] - 72:6, 218:15
**hoax** [1] - 96:21
**Hold** [1] - 133:13
**hold** [6] - 17:1, 24:7, 108:21, 151:8, 152:21, 153:19
**holding** [1] - 64:6
**Holly** [4] - 216:20, 219:9, 225:18, 228:11
**holster** [1] - 102:16
**home** [5] - 108:23, 110:18, 119:22, 143:23, 236:5
**homes** [1] - 36:22
**homicide** [3] - 38:10, 42:12, 78:17, 81:18, 81:22, 83:6, 86:7, 86:17, 87:22, 125:3, 155:22, 175:9, 240:10
**homicides** [4] - 83:24, 84:2, 84:9, 157:21

**Honda** [1] - 214:23
**honest** [1] - 167:21
**Honor** [195] - 2:3, 2:12, 2:15, 2:20, 3:2, 3:7, 3:20, 3:23, 4:6, 4:7, 5:1, 5:6, 6:5, 7:6, 7:25, 8:21, 9:23, 11:1, 11:24, 11:25, 12:5, 12:7, 12:10, 12:20, 13:4, 13:12, 13:14, 13:18, 14:3, 14:18, 15:2, 15:9, 15:10, 17:1, 18:3, 18:21, 19:12, 19:15, 19:16, 19:22, 20:3, 21:7, 21:14, 21:20, 21:22, 22:6, 22:8, 23:21, 24:13, 25:3, 25:20, 26:20, 27:5, 27:17, 27:19, 28:23, 32:12, 32:22, 37:10, 37:18, 38:6, 39:3, 40:19, 43:23, 45:3, 45:4, 45:24, 48:13, 48:20, 51:14, 51:24, 52:11, 53:10, 57:21, 58:9, 63:14, 63:16, 63:20, 64:2, 64:17, 65:12, 66:12, 67:5, 71:18, 72:24, 74:3, 74:9, 75:2, 75:9, 75:16, 75:17, 76:11, 76:23, 77:3, 79:4, 91:19, 92:17, 93:7, 96:22, 98:20, 99:3, 99:5, 99:19, 100:8, 101:9, 104:2, 104:4, 105:17, 106:17, 107:13, 107:16, 108:3, 108:16, 109:4, 110:6, 112:9, 112:21, 114:4, 115:5, 116:1, 116:17, 119:1, 122:5, 122:8, 131:23, 132:15, 132:20, 133:8, 133:24, 134:13, 149:6, 154:25, 155:3, 163:11, 165:6, 165:12, 166:4, 177:6, 178:24, 179:18, 185:5, 192:25, 193:25, 194:2, 196:9, 197:7, 197:10, 198:12, 199:2, 199:8, 201:3, 201:9, 201:17, 202:14, 202:25, 203:4, 203:9, 203:20, 204:16, 204:24, 205:20, 206:24, 208:12, 208:19, 209:3, 210:16, 212:4, 214:1, 214:4, 215:14, 215:18, 216:5, 216:17, 218:13, 219:1, 220:13, 221:1, 221:21, 222:20, 225:18, 229:13, 232:23, 234:3, 236:6, 237:6, 237:16, 240:3, 240:5, 240:7, 240:16, 240:23, 241:8, 242:8

**Honor's** [1] - 16:9
**Honorable** [1] - 1:13
**hook** [6] - 61:10, 61:12, 62:10, 115:10, 118:1, 118:19
**hop** [3] - 63:1, 69:11, 69:20
**hope** [2] - 24:15, 65:9
**Hopefully** [3] - 33:11, 68:15, 68:20
**hopefully** [1] - 103:4
**hopes** [1] - 16:3
**hour** [1] - 91:21
**hours** [4] - 134:25, 135:1, 138:19, 212:11
**house** [8] - 38:24, 46:25, 47:2, 47:3, 60:22, 61:4, 112:5, 135:8
**housed** [1] - 57:1, 126:12
**housing** [2] - 37:1, 37:2
**Howard** [1] - 45:6
**hum** [24] - 56:5, 60:19, 62:1, 62:19, 70:14, 89:5, 116:22, 120:17, 121:19, 125:16, 125:23, 126:17, 131:20, 136:9, 144:6, 146:13, 151:10, 156:4, 157:6, 161:13, 162:13, 166:21, 167:6, 171:19
**hundred** [2] - 129:1, 239:9
**hung** [1] - 171:18
**hurt** [1] - 243:13
**hypothetical** [2] - 205:8, 222:4
**hypothetically** [2] - 24:5, 219:5

**I**

**ID's** [1] - 127:23
**idea** [22] - 15:25, 62:4, 64:25, 99:17, 99:18, 100:2, 100:3, 124:22, 124:23, 128:24, 136:14, 136:22, 139:5, 141:4, 141:19, 143:18, 143:21, 187:1, 187:14, 212:8, 227:20
**identification** [1] - 129:20
**identified** [13] - 57:21, 66:12, 127:25, 128:25, 129:13, 129:14, 129:15, 130:4, 130:12, 130:19, 131:14, 158:20, 162:3
**idiot** [1] - 229:8
**idle** [22] - 9:17, 11:24, 12:12, 16:16, 16:19, 17:19, 17:25, 18:2, 21:2,

24:14, 24:16, 25:10, 28:25, 29:5, 30:21, 31:15, 32:18, 45:5, 45:7, 49:13, 51:3, 51:9
**Idle** [1] - 5:16
**ignore** [1] - 195:25
**illegal** [7] - 156:15, 156:17, 156:20, 157:3, 157:13, 157:16, 158:5
**Illegal** [2] - 156:16, 157:11
**illogical** [1] - 32:4
**imagination** [1] - 32:16
**immediate** [2] - 35:3, 200:20
**Immediately** [1] - 89:3
**immediately** [2] - 34:24, 83:12
**impact** [1] - 217:25
**impacts** [1] - 227:5
**impeach** [2] - 203:25, 204:9, 225:25
**impeaching** [1] - 244:2
**import** [1] - 12:2
**importance** [1] - 24:2
**important** [11] - 18:22, 19:15, 21:8, 24:1, 104:20, 205:13, 210:7, 216:3, 216:12, 218:2, 223:7
**impress** [1] - 5:23
**impressing** [1] - 45:11
**impression** [3] - 107:3, 107:8, 235:9
**improper** [4] - 196:8, 206:1, 229:16, 232:19
**improperly** [1] - 203:2
**improve** [4] - 37:1, 37:2, 194:22
**impugn** [1] - 196:1
**impugning** [1] - 229:5
**IN** [1] - 1:1
**incarcerated** [14] - 3:5, 17:14, 80:19, 81:13, 134:5, 136:5, 142:14, 143:13, 143:22, 144:5, 147:20, 157:25, 158:17, 192:2, 230:16, 230:24
**incarceration** [2] - 229:25, 230:15
**incidence** [1] - 159:12
**incident** [1] - 44:9
**included** [2] - 43:1, 203:2
**includes** [1] - 50:5
**including** [5] - 36:23, 54:14, 196:2, 226:21, 231:24
**incomplete** [1] - 29:12
**inconsistency** [1] -

223:15
**inconsistent** [2] - 223:9, 233:5
**increase** [1] - 37:1
**increasing** [2] - 159:13, 160:5
**incredible** [1] - 24:6
**incredulous** [1] - 32:4
**incriminating** [3] - 31:19, 50:5, 96:18
**incriminatory** [1] - 11:16
**inculpatory** [1] - 32:23
**indeed** [2] - 26:3, 49:15
**Indeed** [1] - 26:13
**independent** [1] - 3:21
**indicated** [2] - 99:19, 210:22
**Indicating** [1] - 57:11
**indication** [1] - 101:12
**indicia** [1] - 49:13
**indicted** [1] - 230:22
**indictment** [8] - 10:25, 196:2, 203:2, 205:13, 205:22, 215:20, 232:18, 235:19
**indignant** [1] - 42:17
**indirectly** [1] - 97:11
**individual** [4] - 59:2, 59:6, 59:18, 199:12
**individually** [2] - 12:24, 221:12
**individuals** [3] - 59:14, 128:19, 164:8
**induce** [4] - 13:25, 31:7, 31:19, 45:18
**induced** [3] - 16:4, 40:5, 49:13
**inducing** [1] - 17:22
**induction** [1] - 197:16
**industry** [1] - 70:22
**ineffective** [1] - 211:13
**infer** [2] - 209:6, 210:2
**inference** [1] - 203:22
**inferences** [2] - 198:24, 228:18
**infirmed** [1] - 32:15
**inflict** [1] - 46:17
**influence** [1] - 160:3
**informant** [12] - 3:17, 14:14, 14:18, 14:19, 14:21, 15:5, 15:6, 16:12, 156:7, 156:12, 156:17, 156:22
**information** [44] - 4:13, 7:8, 9:20, 13:13, 13:21, 13:22, 18:8, 19:22, 20:19, 20:22, 35:3, 37:22, 40:10, 41:3, 41:23, 42:8, 42:9, 78:17,

80:16, 80:23, 80:25, 81:7, 105:6, 128:14, 142:12, 142:17, 143:2, 146:4, 154:5, 154:16, 157:21, 158:4, 159:11, 161:16, 165:4, 166:6, 167:2, 167:14, 167:16, 172:2, 188:3, 190:20, 244:16
**Information** [1] - 160:3
**informer** [1] - 15:17
**infrequent** [1] - 208:14
**initial** [1] - 125:2, 199:24
**inmates** [1] - 138:22
**innocence** [1] - 243:17
**inoperative** [1] - 67:17
**input** [1] - 231:18
**inquire** [1] - 235:12
**insane** [1] - 205:5
**insignificant** [1] - 230:2
**insist** [2] - 106:4, 106:5
**insisted** [1] - 217:24
**instance** [2] - 11:17, 79:1
**instances** [1] - 221:11
**Instead** [1] - 71:1
**instead** [1] - 32:7
**Institution** [1] - 175:1
**institution** [1] - 231:6
**institutional** [2] - 134:5, 137:4
**instruct** [3] - 18:14, 18:15, 50:15
**Instruct** [1] - 242:13
**instructed** [1] - 209:12
**instruction** [7] - 52:7, 209:10, 231:10, 231:11, 231:16, 232:2, 240:17
**instructions** [14] - 195:13, 196:4, 206:11, 209:1, 209:13, 209:20, 209:22, 220:16, 229:14, 239:7, 239:8, 239:12, 241:23, 242:10
**integral** [1] - 106:23
**intelligent** [2] - 240:18, 242:9
**intend** [2] - 218:16, 220:1
**intended** [7] - 13:25, 31:19, 31:21, 49:16, 215:5, 219:6, 219:15
**intends** [2] - 17:7, 218:16
**intent** [1] - 200:15
**intention** [3] - 80:22, 177:21, 229:15
**interest** [3] - 34:25, 35:4, 106:15

**interested** [4] - 38:5, 45:10, 58:18, 75:13
**interference** [2] - 94:6, 94:11
**Internet** [1] - 134:4
**interpretation** [2] - 45:8, 173:6
**interrupt** [4] - 22:9, 53:1, 68:5, 153:21
**interrupted** [3] - 152:11, 155:1, 190:11
**interview** [6] - 80:20, 81:5, 158:17, 161:11, 161:14, 164:2
**interviewed** [4] - 157:25, 161:10, 166:3, 214:14
**interviews** [1] - 173:20
**introduce** [6] - 2:22, 11:4, 22:22, 104:9, 104:16, 218:17
**introduced** [6] - 65:24, 83:22, 165:21, 172:25, 200:4, 200:7
**introducing** [2] - 243:1, 243:2
**introduction** [2] - 104:17, 195:21
**inure** [1] - 240:11
**inured** [1] - 4:24
**invested** [1] - 7:12
**investigation** [3] - 87:11, 87:15, 120:22
**investigators** [1] - 80:20
**invite** [1] - 13:16
**involve** [1] - 26:16
**involved** [14] - 13:17, 25:24, 26:8, 27:2, 28:3, 40:11, 41:21, 44:9, 48:1, 73:13, 216:20, 224:3, 228:10, 228:12
**involvement** [5] - 81:13, 218:18, 220:2, 220:7, 236:10
**involves** [1] - 41:11
**involving** [5] - 2:16, 2:18, 3:12, 70:23, 113:17
**irrelevant** [3] - 198:20, 203:13, 232:16
**isolate** [1] - 241:15
**issue** [41] - 9:13, 10:19, 13:7, 13:14, 14:24, 19:15, 21:8, 21:15, 22:17, 22:19, 24:7, 28:10, 34:4, 40:19, 41:1, 45:5, 49:21, 49:22, 51:22, 52:12, 64:1, 103:19, 103:23, 106:22, 116:14, 159:7, 193:2,

218:14, 219:3, 220:15, 223:17, 224:1, 224:19, 226:24, 230:20, 231:7, 233:9, 235:11, 239:20, 241:21, 244:21
**issues** [16] - 19:3, 50:17, 92:1, 107:8, 149:22, 193:6, 194:8, 198:2, 198:20, 206:19, 207:21, 208:25, 220:10, 239:12, 242:12, 243:6
**IT** [2] - 65:7, 94:3
**itself** [3] - 25:7, 28:11, 49:2

## J

**jail** [54] - 3:4, 3:16, 8:14, 9:21, 9:23, 10:5, 14:3, 14:5, 19:19, 45:22, 66:15, 73:20, 77:10, 85:7, 85:25, 89:11, 89:12, 90:20, 95:13, 121:6, 121:9, 122:24, 123:19, 124:2, 137:10, 137:14, 143:17, 144:12, 147:5, 151:24, 152:24, 158:8, 175:15, 178:4, 183:8, 183:10, 183:15, 183:20, 183:23, 188:3, 188:8, 189:1, 189:11, 191:13, 191:15, 191:17, 191:20, 192:11, 192:14, 192:18, 211:7, 230:2, 230:3, 231:23
**Jail** [4] - 77:13, 150:14, 151:15
**James** [1] - 1:21
**January** [1] - 117:17, 118:21, 118:23, 118:24, 120:1, 180:21, 184:13, 223:23, 224:20, 226:3
**Jencks** [3] - 40:22, 214:6, 223:23
**Jessup** [1] - 237:25
**JI** [3] - 77:11, 77:12, 77:13
**job** [1] - 66:23
**John** [4] - 87:4, 87:5, 87:8, 109:25
**join** [4] - 45:11, 45:18, 46:3, 49:18
**joined** [1] - 29:25
**joint** [1] - 11:17
**Jones** [8] - 100:21, 104:11, 195:1, 197:25, 199:17, 214:25, 215:3
**Jones-Spence** [3] - 100:21, 104:11, 195:1
**judge** [35] - 27:9, 37:13, 38:16, 39:7, 40:7, 78:16,

80:6, 80:9, 85:3, 87:17, 87:23, 87:24, 88:6, 88:11, 88:12, 120:16, 120:21, 120:24, 121:7, 127:17, 144:18, 150:1, 150:23, 151:3, 151:6, 151:25, 152:4, 152:21, 153:5, 175:21, 181:25, 186:16, 198:7, 198:16, 222:14
**Judge** [93] - 1:13, 9:24, 9:25, 20:18, 20:19, 20:21, 27:8, 28:25, 29:9, 32:1, 33:14, 33:18, 48:22, 52:11, 80:8, 86:10, 86:14, 87:17, 94:18, 102:18, 120:9, 122:23, 124:13, 132:15, 133:19, 136:15, 142:6, 143:1, 145:17, 145:20, 146:22, 147:4, 147:13, 147:17, 147:19, 148:10, 148:17, 148:24, 149:2, 149:5, 149:10, 150:9, 150:14, 153:10, 153:18, 155:16, 155:20, 156:10, 157:23, 158:8, 158:16, 158:19, 158:20, 158:23, 159:6, 160:8, 161:1, 174:25, 175:5, 175:7, 175:11, 175:12, 175:22, 177:22, 177:25, 178:21, 179:10, 180:25, 181:3, 181:4, 181:12, 182:6, 183:3, 183:13, 183:19, 185:15, 185:19, 186:6, 189:1, 189:9, 189:16, 189:17, 190:15, 191:19, 191:24, 192:9, 206:13, 216:3, 237:13, 238:11, 239:18, 239:23
**judges** [1] - 37:16
**judgment** [5] - 104:11, 104:13, 134:23, 233:15
**judicial** [1] - 36:18
**Jules** [8] - 58:23, 58:24, 59:4, 59:6, 139:21, 140:3
**Julius** [10] - 58:20, 58:22, 58:25, 139:22, 139:23, 140:3, 140:4, 140:5, 140:6, 140:15
**July** [1] - 148:6
**jump** [2] - 7:25, 76:3
**June** [3] - 38:23, 39:12, 136:10
**juries** [3] - 229:2, 239:7, 241:23
**jurisdiction** [1] - 222:11
**jurisdictional** [1] - 207:16

**juror** [13] - 176:1, 176:4, 176:13, 176:16, 176:22, 176:23, 177:1, 177:3, 177:8, 177:12, 239:4, 239:9

**JURORS** [1] - 68:2
**jurors'** [1] - 64:15
**Jury** [9] - 1:14, 52:18, 92:2, 107:24, 132:10, 132:13, 134:9, 193:13, 206:4

**jury** [148] - 18:6, 18:7, 18:14, 20:14, 20:17, 20:23, 23:1, 23:24, 24:8, 26:1, 26:5, 26:24, 27:10, 28:11, 28:16, 29:18, 30:5, 40:2, 40:20, 40:24, 50:15, 50:17, 52:9, 52:15, 64:21, 75:4, 75:22, 79:3, 89:19, 89:25, 91:20, 92:1, 95:2, 97:18, 99:10, 99:15, 99:17, 99:21, 99:23, 101:7, 101:9, 101:16, 101:19, 102:6, 102:8, 102:10, 102:14, 102:24, 103:4, 104:17, 105:5, 106:1, 106:3, 106:4, 106:5, 106:6, 106:10, 107:3, 107:15, 109:13, 112:13, 112:23, 116:3, 129:18, 132:1, 132:5, 132:14, 132:16, 133:19, 138:7, 154:11, 161:7, 165:9, 175:25, 184:4, 189:20, 193:3, 193:10, 194:3, 194:18, 195:12, 195:13, 195:24, 196:5, 196:19, 196:22, 197:17, 197:24, 198:6, 198:15, 199:16, 202:11, 205:3, 206:6, 206:11, 209:5, 209:6, 209:13, 209:24, 210:3, 211:2, 212:10, 220:5, 221:25, 222:22, 222:23, 222:25, 223:12, 223:15, 223:19, 227:9, 228:20, 229:14, 229:18, 230:17, 230:21, 231:9, 231:11, 232:2, 232:11, 232:12, 232:20, 234:18, 234:19, 235:21, 236:2, 238:21, 238:24, 239:1, 239:2, 239:3, 240:9, 240:13, 240:19, 240:20, 241:13, 242:9, 242:10, 242:13, 243:16, 243:18, 243:19, 243:20, 244:3, 244:17

**jury's** [9] - 98:22,

102:17, 193:11, 194:6, 203:6, 209:5, 210:1, 210:11, 235:9
**Justice** [1] - 233:5
**justice** [1] - 235:10

## K

**keen** [1] - 242:23
**keep** [5] - 91:25, 111:19, 135:11, 193:6, 208:19
**Keith** [1] - 86:25, 87:1
**Kelsey** [1] - 1:17
**kept** [2] - 104:17, 183:22
**kill** [10] - 72:25, 73:4, 80:3, 112:4, 174:17, 174:18, 174:20, 174:22, 228:7, 228:9
**killed** [20] - 6:25, 7:2, 9:4, 22:18, 22:20, 24:18, 24:19, 25:8, 42:3, 67:10, 71:1, 71:2, 74:12, 74:18, 80:24, 83:7, 113:1, 113:25, 144:10, 174:5
**killer** [1] - 139:25
**killing** [2] - 26:6, 80:1
**killings** [1] - 28:4
**kind** [38] - 8:4, 13:19, 28:10, 28:16, 45:7, 57:12, 57:17, 58:14, 58:23, 61:19, 62:23, 66:9, 67:13, 72:8, 79:24, 80:1, 80:4, 86:4, 87:10, 100:6, 114:15, 114:25, 115:3, 144:9, 167:4, 167:5, 167:9, 196:13, 197:3, 197:12, 207:3, 207:19, 209:16, 211:3, 218:10, 231:18, 241:4
**kinds** [1] - 67:12
**Knepp** [2] - 148:23, 150:3
**knife** [1] - 60:17
**knock** [1] - 3:9
**knowledge** [2] - 37:19, 213:8
**knowledgeable** [1] - 38:5
**known** [6] - 7:8, 19:1, 43:18, 43:24, 152:8, 190:17
**knows** [8] - 36:24, 43:20, 98:7, 106:17, 210:3, 216:7, 216:8, 237:7
**Kuhn** [1] - 240:25
**Kurland** [22] - 1:22, 33:13, 34:1, 51:23, 98:24, 100:20, 102:17,

103:14, 105:15, 194:8, 210:4, 214:3, 218:11, 220:1, 220:5, 220:17, 221:17, 221:18, 236:18, 242:6, 243:12, 244:20
**KURLAND** [88] - 27:17, 27:19, 28:20, 28:23, 29:9, 29:12, 29:16, 29:20, 31:4, 32:1, 32:12, 32:21, 33:2, 33:11, 48:16, 51:24, 52:5, 52:5, 62:6, 87:13, 92:17, 92:20, 98:25, 99:4, 102:18, 102:20, 103:17, 103:22, 105:17, 106:17, 106:21, 107:5, 107:7, 107:13, 110:6, 112:9, 112:18, 214:1, 221:21, 222:2, 222:20, 222:24, 223:1, 223:3, 223:14, 223:19, 224:14, 224:17, 224:23, 225:1, 225:4, 225:13, 225:18, 226:3, 229:13, 229:20, 229:22, 229:24, 232:13, 232:15, 232:23, 233:1, 233:13, 233:16, 233:21, 233:23, 233:25, 234:2, 234:10, 234:14, 234:23, 235:5, 236:1, 236:6, 236:14, 236:19, 236:23, 237:6, 237:13, 237:16, 237:22, 238:4, 238:11, 238:17, 239:18, 239:23, 241:8, 241:10

## L

**label** [2] - 62:16, 62:20
**lack** [1] - 23:17
**ladies** [5] - 52:19, 67:25, 107:25, 132:8, 134:10
**Lakeisha** [2] - 96:4, 96:6
**language** [1] - 35:7
**large** [1] - 209:19
**Largely** [1] - 223:3
**last** [25] - 2:13, 4:21, 5:10, 36:20, 43:11, 51:25, 52:14, 52:24, 53:5, 64:11, 78:7, 83:25, 87:7, 87:8, 112:17, 122:21, 133:1, 145:14, 145:15, 170:3, 188:23, 221:2, 237:22, 239:24, 241:8
**late** [8] - 4:15, 39:4, 39:23, 41:6, 49:8, 56:16, 152:25, 193:11
**latter** [1] - 4:13

**launch** [1] - 207:19
**Laura** [1] - 1:17
**law** [19] - 14:20, 15:7, 81:3, 87:21, 145:1, 145:5, 145:8, 145:18, 156:6, 157:25, 159:10, 159:13, 160:5, 189:21, 192:22, 198:13, 202:15, 232:3, 234:21
**LAWLOR** [34] - 7:25, 22:8, 23:7, 23:13, 23:17, 23:21, 33:14, 48:20, 48:22, 52:11, 67:5, 71:19, 74:3, 74:9, 74:16, 75:17, 75:21, 76:11, 76:13, 76:20, 77:3, 88:2, 88:9, 88:24, 208:12, 218:13, 218:25, 219:10, 219:16, 219:18, 219:21, 219:23, 219:25, 220:13
**Lawlor** [7] - 1:18, 8:1, 22:4, 25:17, 48:21, 48:23, 208:8
**Lawlor's** [1] - 220:20
**lawyer** [12] - 148:18, 148:19, 148:21, 148:23, 201:7, 204:5, 204:13, 205:2, 205:6, 208:14, 213:10, 215:5
**lawyers** [8] - 104:8, 105:5, 205:7, 224:4, 227:8, 228:20, 239:19
**lay** [1] - 63:18
**LB** [1] - 62:23
**lead** [6] - 24:10, 27:25, 33:6, 34:4, 52:12, 76:5
**leading** [7] - 24:17, 27:6, 58:9, 62:6, 71:19, 74:3, 74:9
**leak** [1] - 218:21
**leaning** [1] - 242:22
**leaps** [1] - 241:4
**learn** [6] - 20:11, 105:6, 106:1, 106:3, 106:4, 239:3
**learned** [3] - 3:13, 78:13, 154:8
**learning** [1] - 104:18
**least** [15] - 28:11, 50:6, 51:2, 65:8, 95:1, 106:15, 145:25, 153:24, 158:12, 189:1, 211:12, 223:16, 230:11, 231:20, 240:19
**Leave** [1] - 198:8
**leave** [12] - 79:3, 91:24, 107:3, 107:19, 107:20, 132:2, 132:19, 144:7, 193:4, 195:12, 220:9, 242:8
**leaving** [2] - 133:2,

180:16
**left** [12] - 70:3, 77:9, 84:17, 84:18, 84:23, 85:8, 111:5, 113:11, 135:21, 135:22, 147:10, 192:18
**Left** [1] - 166:17
**Left-hand** [1] - 166:17
**legal** [2] - 28:22, 224:10
**legion** [1] - 238:5
**legitimate** [3] - 231:8, 231:15, 231:19
**Lemerick** [1] - 240:23
**lends** [1] - 28:10
**length** [1] - 26:14
**lengthy** [1] - 212:1
**less** [7] - 124:7, 124:8, 142:1, 148:14, 188:3, 203:15
**letter** [38] - 20:18, 20:21, 78:16, 78:20, 80:7, 80:11, 81:19, 86:15, 127:17, 142:6, 142:16, 143:19, 143:24, 144:2, 144:14, 144:16, 145:20, 146:3, 146:22, 146:25, 149:5, 149:10, 150:7, 151:7, 151:16, 151:18, 151:21, 152:2, 152:20, 156:3, 156:10, 157:23, 159:24, 160:15, 190:4, 190:24
**letters** [1] - 161:15
**letting** [4] - 138:15, 150:9, 150:24, 161:4
**level** [1] - 94:5
**leverages** [1] - 205:14
**Lewis** [1] - 45:6
**Lex** [3] - 58:20, 59:12, 141:9
**Lexus** [1] - 58:20
**lie** [3] - 182:6, 182:7, 228:13
**lied** [1] - 97:19
**life** [19] - 70:8, 70:9, 105:19, 123:19, 158:20, 159:14, 160:5, 174:10, 176:18, 176:21, 196:1, 196:20, 197:1, 205:10, 216:1, 221:24, 230:25, 233:3, 238:1
**light** [4] - 25:13, 105:16, 107:8, 206:8
**likely** [8] - 104:15, 123:7, 123:8, 137:24, 137:25, 203:15, 244:12
**likewise** [1] - 75:17
**limine** [4] - 2:10, 20:7, 21:4, 51:1
**limitation** [2] - 226:24,

226:25
  **limiting** [2] - 52:7, 220:16
  **line** [3] - 20:4, 166:17, 234:22
  **Line** [3] - 165:11, 165:19, 176:16
  **lines** [5] - 46:6, 46:8, 46:10, 194:25, 232:16
  **lingering** [1] - 210:15
  **lion's** [1] - 22:14
  **listed** [1] - 119:22
  **Listen** [1] - 152:3
  **listen** [5] - 16:16, 17:2, 93:5, 115:13, 205:16
  **listened** [2] - 117:9, 243:20
  **listener** [1] - 15:22
  **listening** [1] - 15:25
  **lit** [1] - 111:14
  **literally** [1] - 242:18
  **live** [2] - 68:13
  **lived** [1] - 125:12
  **living** [5] - 55:3, 61:4, 137:23, 138:1, 237:25
  **local** [1] - 157:1
  **lock** [1] - 123:15
  **lock-up** [1] - 123:15
  **locked** [33] - 5:8, 28:25, 29:3, 34:17, 38:23, 38:25, 42:11, 44:23, 46:24, 48:7, 55:22, 55:24, 56:20, 56:22, 56:24, 59:23, 60:8, 61:21, 74:20, 81:25, 84:10, 84:12, 87:25, 95:10, 95:22, 101:19, 120:7, 121:17, 134:22, 134:24, 139:16, 173:17, 200:3
  **Locked** [1] - 173:18
  **logic** [2] - 201:17, 201:19
  **Lombard** [1] - 1:25
  **look** [14] - 57:15, 89:24, 109:10, 113:8, 118:5, 130:7, 151:12, 181:14, 186:10, 222:17, 232:6, 235:6, 242:17
  **Look** [2] - 51:22, 204:21
  **looked** [4] - 48:14, 73:8, 223:16, 227:9
  **Looking** [1] - 64:20
  **looking** [4] - 92:11, 93:15, 177:6, 177:7
  **looks** [1] - 57:13
  **loose** [1] - 227:16
  **loosey** [1] - 16:24
  **loosey-goosey** [1] - 16:24

  **losing** [1] - 70:8
  **Losing** [1] - 70:10
  **loss** [1] - 123:14
  **lost** [5] - 60:16, 70:7, 96:1, 225:22, 228:13
  **loud** [1] - 91:6
  **love** [2] - 68:14, 70:8
  **low** [1] - 94:10
  **lunch** [5] - 105:22, 122:7, 122:10, 132:1
  **Luncheon** [1] - 132:12
  **lying** [3] - 194:25, 211:21, 212:22
  **lyric** [2] - 68:9, 70:6
  **lyrics** [6] - 47:1, 47:4, 63:24, 64:3, 138:4, 138:8

**M**

  **ma'am** [1] - 176:24
  **mad** [1] - 113:10
  **maintain** [1] - 243:17
  **male** [4] - 72:12, 81:9, 83:7, 146:9
  **Mallin** [12] - 80:15, 80:25, 86:25, 125:2, 125:8, 126:2, 158:11, 160:11, 161:10, 161:25, 166:4, 173:20
  **Mallins** [3] - 81:15, 82:14, 84:11
  **Mama** [4] - 228:4, 228:5, 228:8, 228:9
  **Mama's** [1] - 228:8
  **man** [11] - 44:6, 46:18, 116:21, 117:6, 174:5, 174:9, 174:17, 226:8
  **Man** [2] - 58:20, 59:16
  **manage** [1] - 53:2
  **manner** [5] - 72:2, 222:3, 233:8, 238:18, 246:8
  **manufacturing** [1] - 222:11
  **marked** [5] - 63:14, 64:6, 78:18, 82:6, 119:3
  **marks** [1] - 84:4
  **MARTIN** [103] - 1:8, 2:8, 2:12, 6:4, 6:7, 6:11, 6:14, 6:16, 6:21, 6:24, 7:6, 7:8, 7:16, 7:23, 8:3, 8:7, 8:10, 8:13, 8:16, 8:19, 8:23, 9:2, 9:8, 9:11, 9:16, 9:23, 10:5, 10:16, 10:23, 11:1, 11:15, 14:3, 14:5, 14:8, 14:18, 15:2, 15:9, 15:13, 15:19, 16:1, 16:9, 16:12, 16:15, 17:8, 17:12, 18:3, 18:19, 18:25, 19:8,

19:11, 20:13, 22:6, 39:3, 39:6, 50:20, 50:22, 50:24, 51:10, 51:14, 51:18, 58:1, 58:9, 63:5, 63:16, 63:19, 65:12, 66:5, 66:16, 66:25, 71:24, 74:8, 85:13, 91:19, 107:16, 107:22, 108:16, 109:4, 114:4, 116:1, 116:3, 116:17, 116:24, 117:2, 117:13, 122:8, 122:12, 131:25, 132:20, 132:22, 133:7, 133:24, 134:12, 136:17, 149:24, 152:16, 155:3, 155:5, 163:16, 179:18, 179:21, 185:5, 185:9, 245:7
  **Martin** [81] - 1:19, 1:20, 6:1, 8:2, 22:1, 22:7, 22:9, 22:10, 22:13, 22:25, 23:3, 24:14, 25:10, 25:23, 26:1, 26:3, 30:3, 34:1, 34:3, 34:4, 40:19, 41:2, 43:13, 52:12, 94:23, 95:22, 96:3, 96:18, 97:1, 97:8, 97:15, 97:22, 97:23, 97:25, 98:3, 98:8, 98:11, 98:12, 98:16, 99:6, 100:3, 100:5, 100:10, 101:11, 101:18, 122:6, 122:15, 132:18, 133:2, 133:5, 133:22, 134:11, 152:10, 152:14, 155:4, 163:14, 163:15, 177:4, 179:17, 193:16, 195:2, 200:2, 200:16, 201:4, 201:12, 207:12, 214:16, 215:5, 216:19, 217:4, 217:10, 217:12, 217:15, 217:16, 217:19, 217:20, 218:2, 218:8, 220:19, 220:25
  **Martin's** [14] - 2:7, 23:21, 25:22, 26:3, 34:9, 96:7, 199:23, 201:11, 201:13, 204:5, 204:13, 213:10, 217:3, 227:22
  **Mary** [3] - 1:24, 246:3, 246:14
  **MARYLAND** [1] - 1:2
  **Maryland** [10] - 1:12, 1:25, 156:24, 179:6, 202:3, 233:17, 234:4, 234:6, 234:21, 238:1
  **mate** [8] - 34:17, 34:18, 35:24, 36:6, 39:15, 57:4, 57:6, 58:15
  **material** [3] - 16:5,

40:22, 214:6
  **mates** [5] - 35:17, 38:20, 39:20, 150:20, 164:23
  **matter** [19] - 13:23, 14:9, 20:2, 25:24, 26:7, 26:15, 26:17, 36:18, 38:12, 45:13, 101:21, 208:3, 215:6, 223:7, 224:6, 226:1, 244:5, 246:4, 246:8
  **matters** [1] - 156:22
  **maximum** [1] - 3:7
  **MB** [1] - 91:18
  **MB-38** [1] - 78:19
  **MB-39** [2] - 83:15, 131:9
  **MB-40** [2] - 82:6, 131:10
  **MB-50** [1] - 119:4
  **McCaffity** [1] - 95:24
  **McCaffity's** [1] - 44:1
  **McCaffity/Brown** [4] - 26:6, 26:11, 28:4, 49:24
  **McCoy** [9] - 96:4, 96:6, 96:19, 97:1, 97:8, 97:10, 97:16, 97:17, 97:24
  **mean** [62] - 5:21, 10:24, 22:8, 26:13, 28:24, 35:18, 36:2, 36:24, 37:8, 38:2, 40:15, 46:10, 46:16, 47:2, 56:15, 58:5, 59:3, 68:25, 69:10, 69:15, 69:19, 74:13, 84:7, 90:14, 96:19, 100:3, 100:6, 100:19, 102:12, 105:23, 111:18, 114:11, 114:25, 115:3, 137:2, 143:25, 153:11, 153:15, 155:17, 155:18, 156:3, 160:17, 161:21, 162:16, 187:18, 210:7, 211:24, 218:13, 219:22, 220:7, 221:11, 225:22, 233:14, 234:23, 235:14, 240:4, 240:16, 240:21, 242:25, 243:1, 243:14
  **meaning** [2] - 113:7, 171:15
  **Meaning** [1] - 197:19
  **Means** [1] - 160:1
  **means** [4] - 76:21, 95:12, 230:19, 235:16
  **meant** [4] - 9:3, 39:9, 166:7, 168:11
  **mechanically** [1] - 72:9
  **meet** [11] - 47:22, 65:17, 65:19, 90:11, 108:5, 118:2, 118:19, 118:21, 150:15, 165:20, 172:21
  **meeting** [16] - 80:13,

81:6, 91:14, 91:16, 107:17, 108:14, 115:7, 117:16, 117:23, 117:25, 118:11, 118:23, 125:2, 125:7, 126:6, 153:7
  **meetings** [4] - 3:15, 47:23, 90:9, 182:21
  **member** [8] - 17:23, 26:1, 27:3, 27:4, 29:24, 45:14, 45:16, 45:21
  **members** [1] - 193:3
  **Members** [2] - 91:20, 132:1
  **mention** [7] - 59:16, 60:23, 63:12, 73:13, 74:1, 116:20, 241:2
  **mentioned** [15] - 25:23, 26:3, 26:4, 58:22, 59:7, 59:12, 63:23, 66:18, 66:19, 114:16, 139:14, 139:21, 176:23, 195:3, 216:22
  **mentions** [1] - 95:9
  **merits** [1] - 210:1
  **met** [20] - 57:23, 65:20, 66:2, 108:5, 140:3, 140:6, 141:17, 151:13, 151:17, 151:20, 151:23, 152:6, 152:9, 152:17, 153:2, 165:19, 165:20, 171:21, 172:17, 190:18
  **Michael** [2] - 1:16, 1:18
  **mid** [1] - 91:23
  **Mid** [2] - 140:16, 140:17
  **mid-morning** [1] - 91:23
  **middle** [2] - 21:3, 107:22
  **might** [19] - 26:4, 32:3, 43:13, 61:3, 90:1, 104:12, 112:4, 118:7, 131:4, 131:23, 149:1, 170:15, 183:1, 189:17, 189:24, 196:7, 228:7, 235:21, 240:23
  **Might** [1] - 170:17
  **mike** [1] - 53:14
  **milieu** [1] - 37:20
  **milligrams** [3] - 69:15, 69:16, 69:17
  **million** [1] - 229:7
  **mind** [5] - 70:8, 91:25, 105:3, 106:24, 193:6
  **mindful** [1] - 233:9
  **mine** [4] - 69:11, 119:10, 143:18, 143:21
  **minimizes** [1] - 30:21
  **minimum** [2] - 17:1, 52:6
  **mining** [1] - 13:21

**minute** [8] - 92:1, 99:25, 122:5, 122:19, 124:10, 127:9, 227:22, 240:5

**minutes** [13] - 13:15, 42:23, 44:2, 68:7, 92:3, 93:4, 93:6, 103:8, 103:9, 107:12, 107:19, 115:6, 122:7

**misconstrue** [1] - 24:15

**misleading** [2] - 107:8, 235:9

**missed** [2] - 95:1, 178:9

**missing** [4] - 7:13, 178:12, 178:15, 202:22

**mission** [2] - 9:20, 10:6

**misstated** [1] - 17:12

**mistake** [2] - 229:3, 237:9

**mistakes** [1] - 229:3

**mistrial** [4] - 33:6, 101:24, 239:5, 241:25

**misuse** [1] - 229:17

**MITCHELL** [1] - 1:7

**Mitchell** [88] - 1:17, 2:19, 3:1, 3:12, 5:7, 6:13, 7:19, 7:20, 8:11, 8:13, 8:22, 8:25, 9:6, 11:6, 11:7, 11:8, 11:20, 13:2, 13:17, 16:4, 17:6, 17:21, 22:10, 22:11, 22:24, 23:5, 23:6, 23:15, 31:24, 34:3, 34:18, 39:22, 40:9, 41:17, 44:9, 44:17, 44:18, 44:19, 45:1, 45:10, 49:7, 49:23, 49:25, 50:1, 66:12, 74:13, 75:3, 75:4, 75:14, 75:19, 75:23, 75:24, 76:17, 77:1, 77:16, 78:10, 95:7, 95:23, 100:5, 100:9, 100:17, 101:18, 102:6, 102:10, 102:15, 128:1, 129:15, 129:21, 130:1, 130:3, 162:4, 162:15, 163:2, 163:20, 170:14, 170:18, 170:20, 170:25, 173:7, 195:2, 201:7, 214:16, 220:12, 246:5

**Mitchell's** [9] - 21:22, 22:12, 23:5, 23:6, 23:11, 25:14, 201:1, 201:11, 214:23

**modification** [2] - 149:19, 151:8

**modified** [1] - 86:12

**Modify** [2] - 144:20, 144:22

**modify** [5] - 50:13, 87:17, 133:17, 145:22,

145:24

**modifying** [4] - 81:2, 144:18, 145:4, 145:20

**moment** [4] - 22:3, 64:15, 101:8, 206:21

**Momma** [1] - 227:19

**Monday** [1] - 1:11

**money** [33] - 58:6, 58:17, 70:22, 71:12, 141:23, 142:4, 157:16, 173:22, 199:23, 199:25, 200:3, 200:14, 200:16, 200:21, 200:22, 200:23, 201:1, 201:7, 201:10, 201:18, 204:5, 204:11, 204:12, 207:13, 213:9, 217:16, 217:20, 218:1, 218:9, 224:4, 224:9, 228:19

**monitor** [2] - 64:21, 79:3

**monitored** [1] - 67:14

**monitors** [2] - 64:16, 67:17

**Montgomery** [48] - 27:14, 103:1, 103:2, 103:10, 103:12, 103:13, 194:25, 198:23, 203:25, 204:4, 204:9, 207:10, 207:17, 207:23, 208:1, 211:20, 213:8, 213:16, 214:14, 214:18, 215:3, 216:20, 217:11, 218:3, 222:7, 222:23, 224:7, 225:5, 225:9, 225:21, 226:7, 226:20, 227:18, 227:20, 227:25, 228:2, 238:19, 238:21, 238:24, 238:25, 239:15, 240:8, 243:20, 244:3

**Montgomery's** [12] - 198:25, 212:10, 213:5, 217:17, 217:20, 222:13, 226:13, 226:25, 227:7, 235:11, 238:17, 238:18

**Month** [1] - 213:12

**month** [4] - 5:9, 136:8, 153:4, 190:20

**months** [28] - 38:17, 40:7, 41:3, 55:23, 56:25, 79:12, 89:13, 121:1, 121:17, 123:3, 123:9, 123:22, 124:2, 124:4, 124:12, 143:23, 145:14, 145:15, 145:25, 153:19, 154:5, 154:19, 154:22, 155:6, 155:12, 189:5, 211:7

**morning** [31] - 2:2, 2:11, 27:17, 27:18,

51:13, 52:20, 52:22, 53:4, 53:21, 53:22, 91:23, 137:8, 138:4, 139:2, 141:21, 141:24, 142:7, 145:11, 145:25, 154:4, 155:6, 161:7, 162:2, 162:19, 165:8, 189:1, 193:8, 193:10, 214:3, 242:18, 244:9

**Most** [1] - 204:14

**most** [10] - 18:6, 18:22, 37:16, 123:19, 201:25, 205:13, 205:17, 221:19, 240:6

**mostly** [1] - 239:19

**mother** [1] - 60:24

**mother's** [2] - 38:23, 60:22

**motion** [33] - 2:7, 2:8, 2:9, 2:10, 3:8, 7:24, 9:24, 10:2, 18:20, 19:2, 20:7, 21:4, 22:21, 27:25, 48:16, 48:19, 51:1, 51:6, 51:14, 103:15, 148:21, 148:24, 149:3, 149:16, 149:18, 150:1, 151:4, 151:7, 193:22, 224:6, 229:14, 231:11

**Motion** [2] - 66:6, 222:15

**motion's** [1] - 10:1

**motions** [4] - 7:9, 33:6, 195:21, 196:4

**motivated** [2] - 194:21, 200:25

**Motivation** [1] - 203:13

**motivation** [16] - 196:2, 200:10, 200:13, 200:14, 200:21, 203:8, 203:11, 203:16, 204:3, 204:11, 206:8, 218:2, 218:7, 222:13, 224:1, 224:3

**motivations** [2] - 203:7, 226:14

**motive** [1] - 240:11

**mouth** [3] - 35:19, 180:10, 207:11

**move** [7] - 61:6, 62:9, 66:5, 77:5, 92:14, 180:10, 217:24

**moved** [1] - 98:22

**movement** [2] - 134:5, 137:4

**movie** [1] - 96:10

**movies** [1] - 96:19

**moving** [4] - 64:21, 159:9

**MR** [508] - 2:3, 2:5, 2:8, 2:12, 6:4, 6:7, 6:11, 6:14, 6:16, 6:21, 6:24,

7:6, 7:8, 7:16, 7:23, 7:25, 8:3, 8:7, 8:10, 8:13, 8:16, 8:19, 8:23, 9:2, 9:8, 9:11, 9:16, 9:23, 10:5, 10:16, 10:23, 11:1, 11:15, 14:3, 14:5, 14:8, 14:18, 15:2, 15:9, 15:13, 15:19, 16:1, 16:9, 16:12, 16:15, 17:8, 17:12, 18:3, 18:19, 18:25, 19:8, 19:11, 20:13, 22:6, 22:8, 23:7, 23:13, 23:17, 23:21, 25:20, 26:2, 26:13, 26:20, 27:1, 27:4, 27:17, 27:19, 28:20, 28:23, 29:9, 29:12, 29:16, 29:20, 31:4, 32:1, 32:12, 32:21, 33:2, 33:11, 33:14, 33:18, 33:24, 34:5, 34:8, 34:14, 34:16, 34:21, 35:5, 35:8, 35:12, 36:1, 36:4, 36:7, 36:10, 36:12, 36:14, 37:7, 37:10, 37:18, 37:21, 38:6, 38:8, 38:19, 38:22, 39:2, 39:3, 39:6, 39:9, 39:13, 39:16, 39:18, 39:24, 40:4, 40:6, 40:16, 40:18, 40:24, 41:16, 41:20, 42:2, 42:7, 42:11, 42:14, 42:17, 42:20, 43:3, 43:5, 43:7, 43:13, 44:4, 44:11, 44:13, 44:16, 44:19, 44:22, 44:25, 45:3, 45:24, 46:2, 46:5, 46:9, 46:12, 46:15, 46:17, 46:20, 46:23, 47:3, 47:6, 47:8, 47:11, 47:13, 47:15, 47:17, 47:20, 47:22, 48:2, 48:5, 48:7, 48:11, 48:16, 48:20, 48:22, 50:19, 50:20, 50:22, 50:24, 51:10, 51:14, 51:18, 51:24, 52:3, 52:5, 52:11, 53:10, 53:20, 58:1, 58:9, 60:7, 62:6, 62:8, 63:5, 63:16, 63:19, 63:22, 64:17, 64:21, 64:23, 65:2, 65:12, 66:5, 66:16, 66:25, 67:5, 67:21, 68:4, 71:19, 71:21, 71:24, 72:1, 74:3, 74:5, 74:8, 74:9, 74:16, 75:2, 75:9, 75:12, 75:16, 75:17, 75:21, 76:2, 76:5, 76:11, 76:13, 76:17, 76:19, 76:20, 76:23, 77:1, 77:3, 77:4, 77:6, 78:25, 79:4, 79:9, 85:13, 87:13,

87:16, 88:2, 88:9, 88:20, 88:24, 91:19, 92:9, 92:14, 92:17, 92:20, 92:23, 93:3, 93:7, 93:9, 93:13, 93:22, 94:2, 94:9, 94:14, 94:18, 94:21, 94:24, 95:2, 95:7, 95:21, 95:25, 96:3, 96:6, 96:9, 96:11, 96:13, 96:21, 96:24, 97:3, 97:6, 97:10, 97:20, 98:3, 98:6, 98:9, 98:12, 98:16, 98:20, 98:25, 99:3, 99:4, 99:5, 99:10, 99:15, 99:19, 99:23, 100:8, 100:12, 100:24, 101:1, 101:4, 101:7, 101:8, 101:9, 102:18, 102:20, 103:8, 103:11, 103:13, 103:17, 103:22, 104:2, 104:6, 105:17, 106:17, 106:21, 107:5, 107:7, 107:13, 107:16, 107:22, 108:2, 108:16, 109:4, 110:6, 112:9, 112:16, 112:18, 112:20, 114:4, 115:9, 115:16, 116:1, 116:3, 116:5, 116:17, 116:24, 117:2, 117:13, 122:8, 122:12, 129:9, 131:25, 132:15, 132:20, 132:21, 132:22, 133:1, 133:7, 133:11, 133:19, 133:24, 134:12, 136:15, 136:17, 149:24, 152:10, 152:16, 154:25, 155:3, 155:5, 163:11, 163:16, 166:9, 168:6, 179:15, 179:18, 179:21, 185:3, 185:5, 185:9, 187:13, 189:8, 190:1, 193:25, 194:2, 195:16, 196:9, 196:12, 196:21, 197:3, 197:6, 197:9, 197:18, 198:1, 198:12, 198:20, 199:2, 199:4, 199:8, 199:11, 199:18, 199:21, 200:6, 200:12, 201:2, 201:9, 201:14, 201:17, 202:7, 202:13, 202:19, 202:25, 203:3, 203:9, 203:12, 203:20, 204:7, 204:16, 204:20, 204:24, 205:20, 206:24, 207:7, 208:10, 208:12, 208:19, 209:2, 210:9, 210:18, 211:22, 212:4, 212:17, 213:11, 213:15, 213:21, 213:23, 213:25, 214:1, 214:3, 214:9, 214:13, 214:22, 215:1, 215:7, 215:11,

215:14, 215:16, 215:18, 215:21, 215:24, 216:3, 216:5, 216:7, 216:9, 216:16, 216:19, 216:25, 217:3, 217:7, 217:17, 218:5, 218:9, 218:13, 218:25, 219:10, 219:16, 219:18, 219:21, 219:23, 219:25, 220:13, 220:19, 220:22, 221:1, 221:14, 221:16, 221:21, 222:2, 222:20, 222:24, 223:1, 223:3, 223:14, 223:19, 224:14, 224:17, 224:23, 225:1, 225:4, 225:8, 225:13, 225:18, 226:3, 229:13, 229:20, 229:22, 229:24, 232:13, 232:15, 232:23, 233:1, 233:13, 233:16, 233:21, 233:23, 233:25, 234:2, 234:3, 234:6, 234:9, 234:10, 234:14, 234:23, 235:5, 236:1, 236:6, 236:14, 236:19, 236:23, 237:6, 237:13, 237:16, 237:22, 238:4, 238:11, 238:17, 239:18, 239:23, 240:3, 241:3, 241:8, 241:10, 242:8, 245:6, 245:7

**MS** [4] - 71:18, 72:24, 93:16, 93:19

**multiple** [1] - 81:9

**murder** [68] - 12:19, 26:11, 31:25, 37:14, 41:22, 41:24, 42:15, 43:24, 44:11, 48:8, 50:6, 50:7, 60:9, 71:16, 74:22, 80:17, 81:7, 95:22, 95:25, 97:4, 97:16, 100:21, 104:11, 113:17, 114:17, 141:22, 142:3, 142:13, 146:5, 171:24, 173:21, 194:18, 195:2, 196:23, 197:25, 198:10, 198:13, 199:1, 199:5, 199:17, 199:22, 202:3, 202:7, 202:10, 202:12, 203:1, 203:7, 203:19, 205:4, 210:13, 211:3, 214:25, 215:3, 215:19, 217:8, 219:6, 220:6, 230:8, 230:11, 231:24, 232:1, 236:3, 243:22, 243:23, 243:24

**murders** [23] - 5:21, 12:9, 26:11, 26:12, 49:24, 70:19, 78:13, 83:8, 97:9, 97:23, 100:22, 101:3, 102:11, 102:12, 113:7, 114:17,

116:12, 142:2, 173:7, 173:13, 192:23, 230:10, 235:22

**muscle** [1] - 32:8

**muscling** [1] - 58:17

**music** [10] - 44:8, 62:13, 62:16, 62:25, 63:10, 69:21, 71:13, 141:23, 142:4, 173:23

**must** [3] - 3:20, 5:14, 203:23

**muster** [1] - 221:20

**mutual** [1] - 35:13

## N

**Nah** [2] - 73:10, 172:20

**name** [32] - 22:16, 25:23, 26:3, 26:4, 30:5, 36:15, 46:20, 46:22, 47:18, 53:15, 58:25, 62:17, 80:6, 86:17, 86:20, 87:7, 87:8, 109:22, 109:23, 109:24, 113:1, 113:21, 113:25, 114:11, 128:22, 139:21, 146:16, 146:19, 174:7, 190:24, 216:22

**name's** [1] - 122:15

**named** [12] - 42:4, 59:12, 59:16, 62:22, 62:23, 63:2, 70:20, 80:15, 96:3, 114:13, 114:14

**names** [8] - 59:8, 82:15, 139:14, 140:25, 161:18, 161:19, 161:22, 169:7

**narcotics** [5] - 80:14, 81:17, 125:10, 156:24, 157:1

**narratives** [1] - 43:2

**narrow** [2] - 45:4, 45:8

**narrowing** [1] - 22:18

**narrowly** [1] - 5:14

**nature** [11] - 3:18, 3:19, 23:22, 23:23, 58:18, 73:24, 79:18, 79:25, 117:5, 156:5, 166:1

**near** [1] - 117:9

**necessarily** [6] - 18:2, 19:11, 207:21, 210:23, 242:25, 243:1

**necessary** [6] - 27:14, 204:2, 226:5, 226:19, 227:6

**necessity** [1] - 14:11

**need** [28] - 6:2, 29:2, 31:1, 31:6, 31:17, 37:5, 46:1, 48:12, 48:23, 64:8, 64:19, 92:12, 103:3, 106:14, 125:6, 133:17,

152:12, 193:19, 207:7, 207:8, 209:8, 212:23, 213:6, 237:15, 238:20, 244:6

**needed** [9] - 67:19, 132:19, 175:8, 186:12, 200:3, 200:18, 201:10, 217:19, 218:1

**needs** [10] - 10:6, 23:25, 29:17, 36:17, 50:14, 92:11, 160:6, 209:5, 228:14, 244:2

**negotiations** [1] - 40:11

**neighborhood** [2] - 114:12, 159:20

**Nelson** [1] - 240:23

**Never** [1] - 175:24

**never** [17] - 21:6, 29:24, 37:10, 45:14, 141:17, 141:25, 151:6, 163:11, 170:20, 171:21, 180:18, 181:9, 182:13, 192:14, 196:8, 207:11, 219:13

**nevertheless** [3] - 3:4, 21:24, 34:18

**New** [2] - 214:19, 214:22

**new** [2] - 41:20, 47:24

**news** [1] - 67:12

**next** [6] - 53:9, 67:23, 103:10, 103:12, 103:13, 212:11

**nice** [4] - 18:3, 225:19, 225:20, 225:22

**niceties** [1] - 207:14

**Niedermeier** [1] - 232:15

**Niedermeyer** [14] - 82:14, 84:11, 86:25, 125:1, 125:3, 126:11, 160:12, 161:11, 161:25, 166:4, 173:21, 192:1, 192:4

**Niedner** [1] - 81:23

**nigga** [2] - 68:14, 68:15

**nine** [3] - 38:17, 79:12, 123:3

**nines** [2] - 64:13, 68:11

**NO** [1] - 1:6

**nobody** [6] - 19:13, 43:18, 102:7, 102:8, 102:9, 189:21

**Nobody** [1] - 102:7

**nobody's** [1] - 237:2

**noise** [1] - 91:5

**nol** [2] - 210:6, 241:15

**non** [4] - 24:25, 31:23, 223:23, 243:18

**non-concession** [1] - 243:18

**non-conspirator** [1] - 24:25

**non-evidentiary** [1] - 31:23

**non-Jencks** [1] - 223:23

**none** [1] - 194:20

**None** [2] - 19:5, 41:11

**nonetheless** [1] - 195:12

**noon** [2] - 126:23, 126:25

**normal** [1] - 210:24

**normally** [2] - 79:7, 211:4

**Norris** [1] - 80:8

**North** [2] - 116:21

**NORTHERN** [1] - 1:2

**Northwest** [8] - 54:1, 80:17, 81:8, 83:6, 140:20, 140:21, 146:5

**note** [6] - 69:10, 91:24, 132:2, 181:16, 193:4, 213:22

**noted** [3] - 50:11, 57:22, 66:13

**notes** [10] - 27:9, 108:15, 118:15, 130:22, 130:24, 213:20, 213:24, 213:25, 214:11, 232:6

**nothing** [12] - 2:17, 71:10, 71:14, 133:15, 164:7, 217:14, 224:4, 224:10, 231:2, 231:4, 234:22, 236:10

**Nothing** [1] - 127:18

**nothing's** [1] - 28:21

**notice** [4] - 34:10, 36:18, 102:1, 102:2

**notion** [1] - 207:17

**November** [16] - 4:20, 90:6, 165:9, 178:16, 179:25, 180:20, 182:11, 182:20, 182:22, 182:24, 182:25, 184:3, 184:13, 184:22, 184:23, 185:13

**nullification** [4] - 206:4, 206:6, 229:19, 231:9

**number** [17] - 6:15, 22:25, 31:14, 36:14, 47:23, 115:24, 116:6, 119:8, 119:17, 119:21, 119:22, 156:12, 210:5, 210:6, 221:2

**Number** [1] - 209:15

**Number(s** [1] - 246:5

**numbers** [3] - 17:17, 47:18, 119:7

**numeral** [1] - 231:3

**non-conspirator** [1] - 24:25

**non-evidentiary** [1] - 31:23

**non-Jencks** [1] - 223:23

## O

**O'Connor** [1] - 216:11

**O'Connor's** [1] - 216:2

**oath** [4] - 52:16, 227:25, 228:2, 228:11

**object** [9] - 26:20, 26:21, 102:23, 133:20, 136:15, 218:13, 218:19, 220:21, 220:22

**objected** [2] - 95:6, 230:5

**objecting** [3] - 221:10, 221:12, 221:15

**Objection** [50] - 58:1, 58:9, 62:6, 63:5, 63:16, 65:12, 66:5, 66:16, 66:25, 67:5, 71:18, 71:19, 71:24, 72:24, 74:3, 74:8, 74:9, 74:16, 75:2, 75:17, 75:21, 76:2, 76:19, 76:20, 77:3, 77:4, 85:13, 87:13, 88:2, 88:9, 88:24, 91:19, 108:16, 109:4, 110:6, 112:18, 114:4, 116:1, 116:17, 116:24, 117:2, 117:13, 129:9, 163:11, 166:9, 168:6, 179:15, 185:3, 187:13, 190:1

**objection** [19] - 22:15, 75:8, 75:16, 76:10, 76:13, 76:15, 76:24, 92:5, 92:17, 100:1, 112:9, 112:13, 149:9, 165:14, 218:14, 218:24, 219:20, 219:22, 220:20

**objection's** [1] - 88:25

**objections** [1] - 50:11

**objective** [1] - 204:11

**objectives** [1] - 45:19

**objects** [1] - 220:12

**obtained** [3] - 19:17, 134:3, 197:20

**Obviously** [2] - 105:23, 233:4

**obviously** [12] - 15:5, 22:13, 22:15, 27:25, 49:2, 133:14, 187:24, 204:23, 211:24, 231:17, 233:6, 241:6

**occasion** [3] - 108:4, 120:18, 121:4

**occasioned** [1] - 52:22

**occasions** [2] - 53:1, 192:10

**occur** [1] - 13:19

**occurred** [2] - 91:14, 134:16

**Ock** [1] - 68:15

**October** [19] - 1:11, 4:22, 84:12, 124:14, 155:20, 160:14, 160:20, 160:21, 161:11, 161:24, 163:5, 163:6, 163:9, 174:24, 178:9, 189:11, 191:24, 215:16, 246:5
**odd** [2] - 22:1, 209:23
**odyssey** [1] - 188:21
**OF** [3] - 1:2, 1:5, 1:11
**offense** [4] - 77:2, 85:4, 97:4, 220:7
**offenses** [2] - 210:5, 210:6
**offer** [12] - 52:16, 80:24, 81:1, 104:25, 105:3, 105:10, 105:11, 105:13, 105:14, 156:6, 156:17, 159:10
**offered** [4] - 156:22, 157:13, 192:17, 224:8
**offering** [3] - 156:12, 160:8, 197:11
**offhand** [2] - 89:23, 118:4
**Office** [1] - 233:20
**office** [7] - 90:22, 90:25, 91:3, 216:12, 225:5, 225:9, 232:10
**officer** [14] - 80:14, 80:15, 81:17, 90:16, 111:6, 111:7, 111:10, 147:13, 147:15, 147:18, 174:6, 178:10, 181:6, 182:21
**Officer** [3] - 80:25, 158:11, 232:15
**officers** [5] - 80:19, 143:13, 144:5, 190:6, 231:14
**offices** [1] - 91:7
**official** [4] - 133:21, 134:3, 182:3, 246:7
**Official** [1] - 246:15
**often** [2] - 9:25, 241:23
**OJ** [3] - 241:2, 241:3, 241:6
**old** [9] - 53:23, 54:25, 69:25, 77:13, 140:15, 141:4, 141:19, 210:12
**older** [1] - 168:24
**omissions** [1] - 194:21
**once** [7] - 83:13, 85:11, 107:19, 187:25, 217:19, 226:16, 243:16
**One** [9] - 68:14, 70:8, 91:7, 106:3, 122:5, 229:24, 231:3, 235:25, 236:7
**one** [120] - 2:9, 2:10,

4:5, 4:19, 5:1, 5:3, 5:4, 5:9, 6:15, 7:2, 7:22, 8:12, 11:20, 15:15, 16:17, 19:3, 19:4, 20:3, 21:9, 22:25, 27:13, 29:12, 31:14, 32:2, 35:15, 41:21, 45:10, 46:1, 49:19, 57:19, 63:12, 64:15, 64:17, 67:15, 70:1, 70:8, 72:11, 73:15, 83:21, 83:25, 86:14, 93:2, 93:9, 114:15, 114:19, 115:12, 122:19, 128:25, 130:16, 132:4, 138:7, 139:1, 141:10, 142:7, 149:3, 149:20, 150:2, 150:9, 150:23, 151:9, 151:18, 151:25, 152:20, 152:22, 153:6, 153:13, 153:16, 153:25, 156:5, 156:9, 156:15, 158:11, 159:6, 162:11, 180:6, 182:20, 186:20, 186:21, 188:12, 188:13, 188:18, 189:10, 195:21, 198:8, 202:2, 203:17, 205:11, 207:11, 208:5, 208:6, 209:15, 209:25, 210:13, 210:15, 216:3, 216:7, 216:8, 216:12, 216:14, 216:16, 220:10, 220:11, 221:11, 223:20, 226:23, 227:3, 228:4, 229:3, 232:5, 232:6, 234:23, 235:19, 236:7, 237:16, 237:22, 239:20, 240:6, 240:7, 244:21
**ones** [3] - 70:19, 137:19, 162:18
**open** [5] - 13:20, 91:25, 186:2, 193:6, 244:13
**opened** [2] - 51:19, 207:11
**opening** [3] - 96:24, 208:14, 212:14
**opinion** [3] - 97:21, 98:15, 198:1
**opportunity** [3] - 33:17, 105:6, 244:18
**oppose** [2] - 193:21, 194:3
**opposed** [2] - 194:5, 195:6
**opposite** [1] - 43:16
**order** [16] - 3:22, 5:2, 10:14, 31:6, 56:23, 84:17, 84:19, 85:1, 85:6, 147:6, 147:8, 147:16, 167:13, 199:22, 199:23,

202:17
**ordered** [2] - 20:14, 40:21
**original** [4] - 147:23, 188:18, 193:20, 214:14
**originally** [1] - 201:3
**otherwise** [3] - 26:24, 67:17, 104:16
**Otherwise** [1] - 240:10
**ought** [5] - 19:23, 19:24, 23:1, 23:23
**outcome** [1] - 239:3
**outdoor** [1] - 172:23
**outset** [1] - 221:22
**outside** [10] - 23:1, 23:24, 24:8, 28:11, 29:18, 65:11, 103:3, 111:4, 111:8, 111:13
**overlapping** [1] - 205:21
**overnight** [2] - 238:20, 242:16
**overruled** [1] - 88:25
**Overruled** [27] - 58:2, 58:10, 65:13, 66:6, 66:17, 67:1, 67:6, 73:1, 74:10, 74:17, 75:18, 85:14, 87:14, 109:5, 110:7, 112:19, 114:6, 116:2, 116:4, 116:18, 116:25, 117:3, 117:14, 129:10, 166:10, 168:7, 190:2
**overt** [1] - 3:11
**overwhelmingly** [1] - 13:6
**own** [7] - 4:8, 14:23, 60:18, 92:10, 158:21, 186:23, 239:9

## P

**p.m** [7] - 82:22, 83:14, 130:9, 130:16, 132:5, 132:12, 245:1
**pads** [3] - 91:24, 132:2, 193:4
**page** [8] - 109:15, 119:7, 144:24, 162:8, 162:11, 178:23, 181:14, 239:22
**Page** [6] - 15:13, 112:16, 165:11, 176:16, 181:16, 186:15
**pages** [3] - 162:9, 239:9, 246:6
**palm** [1] - 229:4
**paper** [5] - 47:17, 51:8, 51:11, 69:2, 112:10
**papers** [1] - 178:17, 234:12

**paragraph** [3] - 112:17, 166:5, 166:16
**parameters** [1] - 11:2
**paraphrase** [1] - 4:5
**paraphrasing** [3] - 4:3, 24:18, 25:8
**parcel** [1] - 230:13
**Pardon** [5] - 134:20, 135:10, 141:7, 179:12, 180:10
**Park** [17] - 12:22, 34:24, 35:13, 36:13, 36:19, 36:24, 37:15, 37:17, 59:11, 61:24, 81:8, 114:14, 140:25, 141:14, 146:6, 146:8, 168:22
**Parole** [4] - 78:8, 90:15, 108:5, 111:19
**parole** [1] - 56:1, 84:15, 84:16, 90:16, 105:19, 111:6, 111:7, 196:1, 197:1, 230:25, 233:4
**paroled** [2] - 56:4, 85:3
**part** [29] - 3:1, 16:17, 16:18, 20:25, 21:19, 28:6, 29:16, 37:5, 37:8, 37:19, 76:3, 77:10, 77:13, 120:3, 170:3, 171:13, 177:4, 192:17, 198:16, 200:25, 206:5, 207:8, 218:14, 219:13, 220:7, 223:16, 225:15, 230:13, 232:1
**Part** [1] - 99:25
**parte** [1] - 237:11
**participating** [1] - 40:12
**particular** [24] - 16:15, 29:7, 30:9, 35:7, 37:11, 53:2, 79:15, 91:16, 103:23, 120:5, 139:1, 142:3, 196:14, 200:15, 202:16, 214:18, 224:1, 224:15, 225:14, 229:7, 232:1, 241:16, 241:21, 243:2
**particularly** [5] - 38:4, 107:8, 176:18, 206:8, 229:1
**Particularly** [2] - 196:10, 240:22
**parts** [1] - 197:21
**party** [2] - 45:16, 45:18
**pass** [1] - 78:16
**passed** [1] - 3:24
**passing** [2] - 117:11, 166:22
**Past** [1] - 92:17
**past** [18] - 5:19, 12:16, 24:21, 25:11, 35:14,

51:22, 55:18, 58:16, 92:7, 92:8, 92:14, 98:22, 102:19, 102:21, 176:12, 176:18, 226:7
**Paul** [1] - 1:19
**Pause** [3] - 118:10, 199:7, 213:14
**pay** [6] - 199:23, 201:10, 204:5, 204:13, 213:10, 215:5
**PD** [1] - 234:6
**pejoratively** [1] - 243:11
**penalty** [1] - 216:10
**pending** [3] - 59:25, 60:12, 135:16
**People** [2] - 6:24, 169:14
**people** [52] - 7:1, 10:10, 22:18, 22:20, 24:19, 25:8, 26:16, 32:3, 36:14, 36:19, 36:20, 36:21, 37:16, 38:3, 38:4, 57:24, 58:17, 65:14, 71:17, 74:18, 80:1, 80:3, 84:4, 87:2, 88:21, 91:2, 91:7, 100:18, 111:19, 112:4, 113:11, 114:10, 128:10, 128:11, 128:18, 128:19, 128:20, 131:14, 139:6, 139:8, 139:9, 169:4, 169:12, 169:14, 169:18, 169:25, 190:8, 199:13, 222:17, 225:10, 230:2, 240:20
**perceive** [2] - 243:7, 243:8
**perfect** [1] - 241:3
**perform** [2] - 138:21, 138:23
**performance** [1] - 138:25
**performer** [1] - 63:9
**perhaps** [5] - 27:5, 193:21, 204:2, 205:15
**Perhaps** [1] - 11:22
**period** [32] - 5:10, 7:3, 8:15, 9:13, 10:17, 12:1, 13:12, 17:5, 17:8, 17:9, 17:14, 18:8, 34:19, 38:4, 40:14, 41:17, 44:23, 54:21, 55:2, 57:2, 149:20, 151:8, 153:16, 154:5, 161:24, 164:23, 165:3, 166:7, 166:12, 230:4, 230:23, 231:21
**permission** [1] - 64:23
**permit** [12] - 24:6, 104:9, 105:15, 105:25, 106:3, 106:4, 106:5, 106:7, 106:9, 112:15,

197:14, 220:15
**permitted** [6] - 11:4,
106:13, 152:13, 206:22,
208:24, 209:1
**permitting** [1] - 242:4
**person** [15] - 43:23,
81:14, 83:4, 83:5, 83:6,
83:22, 113:1, 113:6,
113:25, 129:4, 141:9,
174:23, 202:3, 202:7,
202:10
**person's** [1] - 30:14
**personally** [2] - 28:3,
232:10
**perspective** [2] - 31:23,
33:18
**perspectively** [1] -
102:25
**persuasive** [1] - 207:14
**petition** [3] - 233:19,
234:8, 235:5
**Phillips** [1] - 27:9
**phone** [5] - 47:18,
47:23, 93:9, 118:16,
118:17
**photo** [8] - 82:2,
127:22, 128:17, 128:20,
162:3, 162:14, 162:18,
164:7
**Photo** [1] - 162:10
**photograph** [1] -
130:12
**photos** [3] - 128:15,
129:18, 162:16
**phrase** [4] - 84:3, 84:4,
116:9, 197:15
**phrases** [2] - 115:19,
115:21
**physical** [1] - 46:18
**physically** [2] - 32:15,
102:23
**pick** [2] - 128:10, 240:2
**Pick** [1] - 128:11
**Picked** [1] - 56:10
**picked** [5] - 48:9,
121:22, 126:16, 126:22,
162:3
**pictures** [3] - 128:17,
129:1, 129:13
**piece** [2] - 51:8, 210:7
**pin** [1] - 170:13
**pinpointed** [2] - 71:15,
142:1
**place** [16] - 4:1, 9:17,
36:25, 44:21, 52:16,
81:8, 81:14, 83:6, 87:11,
91:6, 118:12, 118:13,
118:14, 146:5, 173:14,
173:21
**placed** [1] - 135:13

**places** [1] - 5:9
**plan** [7] - 200:1, 217:4,
225:15, 227:16, 227:23,
227:24, 233:2
**plank** [2] - 244:4, 244:5
**planks** [1] - 244:6
**planned** [1] - 73:22
**planning** [2] - 47:24,
199:24
**plans** [3] - 66:15, 73:19,
111:22
**play** [9] - 42:23, 92:23,
93:3, 93:10, 93:16,
103:11, 115:5, 115:12,
228:4
**player** [1] - 93:14
**playing** [2] - 115:9,
115:15
**plays** [1] - 4:17
**plea** [1] - 198:8
**plead** [1] - 187:2
**pleading** [2] - 34:6,
45:3
**pleadings** [1] - 226:6
**pleasant** [1] - 52:20
**Pled** [1] - 56:11
**pled** [3] - 188:16, 198:7,
226:11
**plural** [1] - 54:10
**Plural** [1] - 54:11
**podium** [1] - 237:17
**point** [63] - 4:14, 10:6,
12:12, 14:23, 17:16,
17:20, 19:3, 19:4, 24:13,
24:14, 26:9, 27:5, 27:8,
28:1, 39:15, 42:9, 50:25,
57:10, 70:7, 76:4, 76:7,
97:12, 97:13, 100:20,
102:20, 111:3, 113:10,
116:8, 123:5, 131:14,
145:24, 146:16, 146:19,
148:7, 150:22, 151:18,
161:8, 161:19, 162:2,
162:21, 163:19, 174:6,
186:11, 188:2, 197:10,
201:24, 202:22, 204:1,
205:23, 209:3, 209:4,
211:5, 212:25, 216:16,
218:10, 221:10, 222:12,
222:13, 224:11, 239:25,
241:7
**pointed** [4] - 19:2, 45:4,
210:4, 237:23
**pointedly** [1] - 27:9
**pointing** [4] - 204:17,
207:10, 207:20, 208:5
**points** [6] - 48:12,
101:23, 102:18, 115:22,
194:10, 199:14
**Police** [2] - 126:19,

127:6
**police** [16] - 9:19,
20:17, 124:13, 142:13,
146:8, 146:9, 146:12,
158:9, 161:5, 174:6,
189:11, 189:15, 189:20,
192:20, 231:13, 231:22
**policy** [1] - 216:14
**polygraph** [1] - 3:23
**pooh** [1] - 230:7
**pooh-pah** [1] - 230:7
**poor** [2] - 92:24, 94:4
**poorly** [1] - 41:10
**population** [1] - 38:1
**portion** [2] - 209:3,
218:20
**pose** [1] - 104:3
**position** [7] - 7:11,
27:22, 29:25, 30:17,
33:12, 80:5, 193:21,
193:24, 194:8, 210:24,
217:14, 218:22, 220:3,
221:4, 221:5, 221:22,
226:4, 236:11, 241:21,
241:22
**positions** [1] - 30:18
**Positive** [1] - 233:25
**possibility** [4] - 105:19,
209:13, 230:25, 233:4
**possible** [6] - 93:12,
157:21, 208:2, 240:11,
240:17, 240:18
**possibly** [1] - 32:8
**post** [5] - 40:14, 234:13,
234:17, 234:18, 234:21
**post-conviction** [3] -
234:13, 234:17, 234:21
**postscript** [1] - 46:4
**potential** [4] - 49:17,
206:18, 206:19, 243:8
**potentially** [1] - 104:12
**powered** [1] - 157:3
**powerful** [1] - 207:14
**practice** [1] - 10:3
**praising** [1] - 46:17
**precisely** [4] - 6:1,
34:12, 109:8
**preclude** [1] - 206:7
**predicate** [3] - 210:13,
230:9, 241:12
**prefer** [4] - 133:7,
149:6, 165:12, 242:20
**prejudice** [3] - 206:18,
239:4, 239:11
**prejudicial** [2] - 50:2,
104:12
**preliminarily** [1] - 49:6,
50:9
**preliminary** [4] - 49:4,
115:13, 244:8, 244:23

**preparation** [1] - 94:2
**prepare** [1] - 117:22
**prepared** [4] - 31:20,
31:22, 43:2, 193:19
**preponderance** [12] -
2:24, 28:14, 29:2, 29:13,
29:14, 30:9, 30:19, 31:9,
33:4, 35:21, 49:6, 49:9
**preposterous** [1] -
207:18
**prerogative** [1] - 50:13
**presence** [8] - 23:1,
23:24, 24:8, 27:10,
28:11, 29:18, 67:19,
103:3
**present** [17] - 8:3, 8:4,
24:5, 44:10, 73:17,
132:13, 205:25, 206:22,
207:4, 212:21, 224:25,
225:1, 225:7, 225:8,
225:11, 234:17
**Present** [1] - 225:5
**presentation** [3] - 17:5,
40:25, 211:16
**Presented** [1] - 232:12
**presented** [9] - 21:3,
21:4, 200:17, 221:8,
228:16, 232:9, 232:10,
232:19
**presenting** [1] - 238:22
**preserve** [1] - 48:16
**preserved** [1] - 50:23
**preserves** [1] - 48:18
**pressed** [1] - 195:10,
206:19
**presume** [1] - 193:19
**presumption** [1] -
241:22
**pretrial** [1] - 100:9,
134:3
**pretty** [7] - 16:25, 18:7,
81:18, 91:6, 95:13,
95:16, 123:17, 125:8,
125:12, 128:10, 140:10,
167:20, 174:2, 189:14,
239:14, 244:15
**prevent** [1] - 45:7
**preview** [2] - 229:9
**previous** [1] - 163:12
**previously** [1] - 104:18
**prima** [1] - 49:9
**primarily** [1] - 49:7
**primary** [3] - 27:1,
156:5, 156:9
**principal** [1] - 105:25
**principle** [1] - 208:13
**print** [1] - 229:4
**prison** [28] - 10:2,
19:18, 20:10, 32:13,
80:21, 112:24, 113:6,

114:16, 138:8, 139:24,
140:1, 140:6, 140:8,
140:11, 142:25, 145:10,
147:3, 147:4, 147:16,
150:12, 150:13, 157:9,
161:21, 169:10, 180:16,
188:17, 230:17, 230:19
**prisoner** [2] - 32:6,
225:10
**prisoners** [3] - 32:3,
32:9, 35:17
**private** [1] - 80:13
**pro** [1] - 234:8
**Probation** [4] - 78:8,
90:16, 108:5, 111:20
**probation** [32] - 90:21,
90:25, 91:3, 91:7, 109:3,
110:13, 110:15, 111:10,
120:8, 120:14, 120:24,
121:10, 121:21, 134:23,
147:5, 147:7, 147:13,
147:15, 147:17, 175:16,
178:10, 178:20, 179:9,
181:6, 182:21, 183:25,
184:3, 184:12, 186:17,
187:3, 187:8
**probative** [1] - 238:15
**problem** [6] - 22:24,
25:3, 50:3, 96:25,
158:20, 202:21, 209:14,
209:19, 211:6, 234:25,
242:14, 244:19
**problems** [2] - 19:12,
70:21
**procedurally** [1] - 52:12
**proceed** [5] - 2:2,
64:24, 64:25, 92:6,
186:22
**proceeded** [2] - 43:22,
215:19
**proceeding** [4] -
100:16, 207:23, 207:24,
222:8
**Proceedings** [3] - 2:1,
213:14, 245:1
**proceedings** [10] -
100:22, 101:2, 101:4,
118:10, 133:2, 207:11,
227:1, 234:21, 246:4,
246:7
**proceeds** [1] - 215:4
**process** [3] - 60:16,
164:25, 167:2
**produce** [1] - 180:1
**produced** [1] - 180:3
**producer** [2] - 62:22,
63:2, 65:16, 65:17
**producing** [1] - 182:14
**professional** [1] -
104:13

**proffer** [20] - 29:8, 30:11, 33:3, 40:1, 48:25, 49:2, 49:11, 49:14, 49:16, 49:24, 212:1, 213:1, 213:3, 213:4, 223:20, 223:24, 224:23, 226:2, 227:10, 228:13
**proffered** [3] - 28:21, 49:21, 224:22
**proffers** [3] - 213:16, 213:17, 215:8
**profound** [1] - 239:24
**program** [4] - 55:12, 55:14, 177:9, 177:13
**prohibit** [6] - 106:8, 195:11, 197:16, 244:11, 244:12, 244:16
**prohibiting** [1] - 242:23
**promise** [6] - 186:11, 186:20, 186:24, 187:2, 187:5, 187:6
**Promise** [1] - 187:1
**promises** [1] - 186:22
**promotion** [1] - 219:14
**prompted** [1] - 17:11
**prong** [3] - 5:13, 5:15, 30:1
**pronounce** [2] - 22:16, 30:5
**proof** [2] - 20:10, 27:2
**proper** [4] - 195:12, 203:5, 203:6, 232:2
**properly** [1] - 210:18
**propose** [2] - 92:6, 92:23
**proposed** [4] - 50:10, 104:9, 229:14, 231:16
**proposition** [1] - 32:22
**pros** [1] - 86:22
**prosecution** [8] - 100:24, 204:14, 204:18, 209:7, 210:1, 226:10, 240:25, 241:24
**prosecutor** [8] - 20:4, 86:10, 86:11, 86:20, 86:21, 99:11, 120:19, 224:15
**prosecutors** [13] - 87:24, 122:23, 124:13, 149:22, 161:2, 177:21, 189:12, 189:15, 189:20, 192:13, 213:8, 228:25, 232:9
**prospect** [1] - 206:6
**prossed** [2] - 210:6, 241:15
**protection** [1] - 165:25
**prove** [5] - 2:24, 3:22, 26:23, 203:7, 203:10, 203:17, 203:21, 236:5

**proves** [1] - 32:22
**provide** [2] - 32:8, 195:8
**provided** [2] - 224:18, 224:19
**provides** [1] - 43:17
**Public** [3] - 148:20, 150:4, 233:20
**punished** [1] - 238:6
**punt** [1] - 28:16
**purchase** [1] - 174:20
**purchased** [1] - 199:14
**purported** [2] - 15:16, 49:22
**purportedly** [1] - 32:2
**purpose** [10] - 142:16, 195:19, 196:6, 196:8, 197:6, 200:22, 201:15, 206:1, 208:17, 237:17
**purposely** [1] - 49:12
**purposes** [2] - 3:8, 201:21
**pursue** [2] - 95:14, 208:7
**Put** [2] - 173:11, 233:1
**put** [59] - 6:8, 6:12, 7:11, 9:2, 9:5, 9:7, 11:7, 11:8, 11:18, 14:21, 28:8, 33:18, 35:18, 44:20, 49:24, 50:1, 62:21, 73:23, 74:14, 80:4, 81:5, 84:3, 88:21, 94:4, 112:21, 119:14, 124:19, 127:25, 143:3, 144:1, 144:9, 144:25, 145:3, 147:5, 149:7, 149:11, 150:12, 159:20, 159:22, 161:4, 162:18, 165:15, 165:16, 166:5, 173:10, 174:9, 183:19, 186:20, 191:8, 197:24, 200:1, 201:3, 206:2, 209:8, 220:8, 238:13, 242:24
**puts** [1] - 233:6
**putting** [4] - 159:22, 159:23, 238:14, 242:25
**Pyne** [3] - 1:21, 25:22, 220:17

## Q

**quadriplegic** [1] - 32:6
**qualified** [1] - 216:15
**qualifies** [1] - 102:22
**qualitative** [1] - 230:12
**quality** [7] - 15:22, 92:24, 94:4, 94:9, 159:14, 160:5, 243:10
**quantitative** [1] - 230:12

**quarrel** [1] - 23:18
**quarter** [1] - 132:22
**Quarter** [1] - 132:24
**questioned** [2] - 92:13, 92:22
**questions** [12] - 65:6, 104:23, 105:23, 106:11, 113:15, 122:5, 122:16, 127:19, 131:18, 152:11, 197:22, 220:9
**quick** [3] - 26:9, 52:11, 102:18
**quickly** [1] - 65:8
**quiet** [1] - 206:21
**quite** [7] - 15:22, 43:16, 133:21, 172:2, 208:11, 221:2, 239:7
**quotation** [1] - 84:4
**quote** [10] - 5:20, 9:2, 10:8, 12:18, 46:11, 154:12, 154:13, 169:22, 173:3, 234:20
**quote-unquote** [2] - 5:20, 234:20
**quoting** [1] - 75:3

## R

**racketeering** [9] - 26:12, 26:23, 28:6, 202:10, 202:16, 210:13, 235:24, 236:4, 236:8
**Rahman** [5] - 42:4, 67:7, 70:13, 71:8, 173:14
**Rahman's** [9] - 38:10, 41:22, 42:4, 71:17, 74:11, 78:13, 116:12, 141:22, 173:14
**raid** [1] - 38:23
**raided** [2] - 60:22, 61:5
**raised** [1] - 116:14
**raises** [1] - 242:12
**raising** [1] - 204:5
**ran** [2] - 78:1, 108:9
**rap** [25] - 44:8, 46:5, 46:6, 46:24, 46:25, 47:1, 62:22, 62:24, 62:25, 63:4, 63:10, 63:12, 63:24, 64:3, 68:9, 69:21, 70:6, 71:12, 138:3, 138:4, 138:8, 138:22, 141:23, 142:4, 173:23
**rather** [4] - 22:14, 25:10, 97:12, 149:7
**ratified** [1] - 49:25
**rationale** [1] - 24:24
**reach** [3] - 198:14, 207:3, 207:21
**reached** [2] - 25:1, 111:13

**reaches** [1] - 24:23
**read** [39] - 10:9, 12:2, 16:20, 20:22, 20:24, 45:4, 51:3, 64:10, 68:16, 78:20, 79:6, 80:11, 82:18, 83:1, 83:21, 83:25, 112:13, 112:14, 112:15, 112:17, 112:23, 130:4, 133:22, 133:25, 134:8, 138:4, 139:1, 142:7, 142:17, 144:14, 165:13, 165:16, 186:15, 193:22, 213:18, 224:11, 229:6, 244:10
**reading** [7] - 45:4, 112:10, 112:15, 177:6, 177:7, 224:16, 224:17
**reads** [1] - 20:24
**ready** [6] - 2:2, 48:21, 52:22, 108:1, 134:11, 159:1
**real** [4] - 12:17, 18:18, 52:11, 205:8
**reality** [1] - 174:15
**realize** [3] - 91:20, 132:18, 221:18
**Really** [1] - 202:21
**really** [44] - 11:22, 16:13, 21:17, 26:22, 34:2, 36:24, 38:12, 39:19, 43:14, 46:1, 66:21, 69:16, 71:14, 73:16, 79:18, 87:2, 92:12, 96:19, 109:6, 110:14, 112:5, 114:11, 126:24, 127:18, 129:23, 130:23, 140:12, 141:25, 164:9, 165:5, 175:21, 191:5, 191:13, 191:24, 191:25, 192:1, 193:8, 207:8, 209:14, 216:7, 217:9, 235:16, 243:6
**rearrested** [1] - 121:2
**reason** [23] - 5:3, 19:8, 19:9, 25:21, 27:13, 79:15, 98:14, 100:1, 168:1, 168:4, 174:22, 182:17, 184:16, 187:22, 195:1, 196:8, 199:22, 204:10, 205:4, 219:8, 224:15, 225:14, 227:6
**reasonable** [8] - 28:15, 194:19, 198:24, 203:16, 205:6, 205:7, 236:3, 243:21
**reasonably** [2] - 13:23, 65:8
**reasons** [4] - 50:8, 51:5, 79:17, 194:4
**recapitulating** [1] - 62:9

**received** [2] - 188:18, 222:8
**recent** [1] - 208:8
**recently** [3] - 34:10, 55:20, 121:12
**recess** [5] - 91:23, 92:1, 105:7, 107:12, 132:3, 132:8, 132:10, 132:12, 193:3
**Recess** [1] - 107:14
**recognize** [2] - 119:4, 130:11
**recollection** [9] - 89:24, 90:2, 92:7, 92:8, 92:11, 92:15, 92:17, 102:19, 102:22, 108:15, 108:17, 109:10, 110:11, 118:5, 149:25, 150:5
**record** [38] - 6:2, 31:23, 33:8, 36:17, 37:4, 50:12, 50:23, 50:25, 51:5, 53:15, 57:20, 62:16, 62:20, 66:11, 89:15, 90:10, 90:24, 105:1, 105:12, 117:20, 124:9, 133:14, 136:25, 137:2, 137:4, 139:10, 163:23, 164:1, 185:22, 186:21, 187:12, 187:20, 187:22, 205:15, 211:10, 214:1, 220:12, 242:17
**recorded** [10] - 41:10, 92:8, 92:15, 92:18, 115:6, 119:18, 223:20, 223:24, 224:20, 246:3
**recorder** [2] - 131:15, 185:25
**recorders** [1] - 85:19
**recording** [5] - 85:21, 90:19, 115:17, 119:21, 223:25
**records** [3] - 134:3, 134:4, 137:5
**recovered** [1] - 46:25
**recruit** [12] - 5:18, 5:23, 10:15, 29:23, 35:11, 49:16, 49:17, 61:7, 61:8, 61:10, 163:3, 163:20
**recruited** [1] - 32:8
**recruiting** [12] - 25:2, 29:21, 30:13, 34:25, 35:4, 172:7, 172:10
**recruits** [2] - 228:11, 228:12
**red** [1] - 238:9
**redound** [1] - 236:15
**redounds** [1] - 217:10
**reduce** [2] - 148:21, 148:24
**reduced** [1] - 214:12

reduction [4] - 121:24, 122:20, 149:19, 150:1
refer [2] - 70:9, 108:15
reference [1] - 69:21
referred [1] - 240:7
referring [5] - 102:21, 118:15, 170:1, 170:13, 225:21
Referring [1] - 103:20
refers [1] - 117:6
reflect [6] - 36:17, 57:20, 66:11, 105:1, 105:12, 163:23
reflects [1] - 26:17
refresh [10] - 89:24, 90:2, 92:11, 92:15, 108:15, 109:10, 110:11, 118:5, 149:25, 150:5
refreshed [1] - 92:8
refused [3] - 215:21, 234:4, 234:6
refuted [1] - 49:11
regard [1] - 229:4
regarding [6] - 49:22, 100:20, 100:22, 103:19, 117:22, 158:5
regret [1] - 52:21
rehab [6] - 55:12, 55:14, 84:23, 176:2, 176:4, 176:7, 176:14, 176:24
rehabilitation [6] - 55:4, 67:12, 84:22, 85:8, 173:18, 173:19
rehearsing [1] - 47:14
Reilly [1] - 181:6
reinstate [1] - 120:24
reject [1] - 24:22
relate [1] - 27:21
related [4] - 101:2, 141:14, 173:22, 206:8
relating [1] - 193:18
relationship [1] - 200:8
release [5] - 88:13, 123:5, 123:6, 135:14, 158:4
released [12] - 3:15, 19:18, 20:9, 55:5, 134:23, 142:22, 142:25, 145:16, 147:16, 175:8, 180:15, 188:3
relevance [7] - 195:11, 195:12, 209:17, 209:18, 221:19, 238:15, 242:14
relevancy [4] - 207:2, 208:4, 213:2, 226:23
relevant [8] - 81:1, 194:6, 198:2, 198:18, 198:21, 219:2, 219:3, 243:2
reliability [2] - 4:10,

4:11
relies [2] - 13:5
reluctant [2] - 79:20, 178:1
rely [1] - 20:8
remain [1] - 56:24
remainder [5] - 55:25, 148:11
remaining [2] - 121:10, 122:2
Remember [1] - 38:22
remember [41] - 3:23, 48:7, 54:12, 60:8, 60:13, 67:9, 80:6, 86:17, 86:20, 86:24, 87:8, 89:21, 91:15, 100:5, 102:15, 109:8, 115:4, 116:9, 118:11, 126:22, 126:24, 129:14, 129:17, 130:23, 130:24, 134:18, 135:1, 136:11, 139:1, 156:13, 159:14, 165:8, 165:11, 168:13, 170:10, 175:19, 182:2, 217:6, 223:18, 240:23
remembered [2] - 72:8, 241:8
remembering [1] - 118:24
remembers [4] - 46:23, 47:8, 102:14, 108:18
reminder [1] - 107:16
repeat [5] - 22:13, 27:19, 60:3, 73:2, 207:1
Rephrase [3] - 62:7, 74:4, 75:10
report [15] - 33:19, 40:6, 78:12, 78:15, 79:20, 120:12, 154:23, 179:22, 180:11, 180:14, 181:9, 184:21, 190:21, 190:23, 190:24
reported [1] - 79:16
Reported [1] - 1:23
Reporter [1] - 246:15
REPORTER'S [1] - 246:1
reporting [4] - 181:8, 183:1, 184:11, 184:20
reports [2] - 43:7, 214:13
represent [3] - 105:5, 122:15, 201:7
representation [1] - 49:18
representations [1] - 223:6
represented [1] - 88:22
representing [1] - 150:3
represents [1] - 23:3

reputation [13] - 34:23, 36:9, 37:8, 37:20, 57:25, 58:8, 59:2, 139:25, 169:8, 169:9, 169:11, 169:15, 169:19
require [3] - 18:16, 65:6, 106:9
required [1] - 198:16
requirement [1] - 238:12
requires [1] - 235:11
research [1] - 227:3
reserves [1] - 50:13
residing [2] - 196:25
residual [1] - 239:4
resist [1] - 210:10
resisted [1] - 228:24
resisting [2] - 54:18, 54:19
resolution [1] - 231:14
respect [26] - 19:25, 28:12, 29:17, 30:3, 30:8, 49:22, 50:15, 106:22, 133:16, 194:9, 195:17, 207:2, 212:23, 222:6, 223:16, 226:18, 226:25, 228:19, 229:8, 230:15, 231:25, 240:10, 240:14, 240:17, 241:11, 242:24
respectfully [2] - 149:21, 210:14
respects [2] - 207:3, 223:9
respond [1] - 7:23
responded [1] - 105:2
responds [4] - 42:4, 42:6, 42:7, 42:14
response [3] - 51:1, 146:25, 207:8
responsibility [4] - 158:21, 159:7, 206:5, 233:6
responsible [2] - 80:3, 159:1
rest [6] - 56:6, 121:20, 122:4, 123:10, 142:24, 145:12
restricted [1] - 26:15
result [1] - 102:6
resulted [1] - 241:25
results [4] - 44:1, 230:6, 235:7, 241:25
resume [1] - 193:11
return [1] - 105:11
returning [1] - 105:13
revealing [1] - 226:4
revenge [1] - 227:19
reverse [1] - 203:22
review [1] - 118:8
reviewed [1] - 194:7

revolving [2] - 107:10, 235:10
Reynolds [7] - 199:9, 199:10, 199:15, 199:18, 218:5, 227:12, 228:19
Reynolds' [2] - 200:6, 227:9
Rhodes [1] - 1:17, 93:18, 93:24, 218:11
RHODES [4] - 71:18, 72:24, 93:16, 93:19
RICO [12] - 198:14, 199:1, 199:17, 201:19, 201:25, 202:4, 202:8, 205:10, 205:13, 230:9, 231:21, 232:1
ride [3] - 127:9, 127:13, 127:15
rights [6] - 10:21, 25:14, 186:16, 186:17, 186:19, 240:22
ripens [1] - 17:20
rise [1] - 211:17
risk [2] - 81:5, 239:2
Rob [1] - 61:16
rob [8] - 3:9, 61:15, 62:5, 118:1, 118:20, 216:21, 227:21, 227:22
robbery [18] - 199:25, 200:13, 200:15, 200:20, 200:22, 201:17, 204:11, 213:9, 215:4, 216:20, 217:1, 217:11, 217:23, 219:7, 219:14, 225:15, 227:17
robbing [4] - 65:11, 108:11, 165:23, 218:7
Robert [1] - 1:16
Roc [1] - 119:15
Rock [1] - 64:11
role [3] - 15:16, 44:13, 63:7
roll [1] - 43:22
rolled [1] - 44:2
Roman [1] - 231:3
Room [1] - 1:24
room [2] - 132:5, 193:10
roommates [1] - 139:17
rough [1] - 231:17
roughly [1] - 103:7
round [1] - 17:17
routinely [1] - 18:20
RPR [1] - 1:24
Rule [5] - 133:17, 206:16, 206:17, 212:18, 243:5
rule [6] - 15:1, 48:21, 76:24, 149:3, 151:25, 212:18

ruled [4] - 51:4, 99:14, 99:15, 150:2
rules [2] - 49:3
ruling [9] - 49:21, 50:14, 50:20, 98:21, 106:12, 133:16, 133:17, 193:17, 211:23, 212:9
run [1] - 90:21

## S

sacks [1] - 68:13
safety [1] - 37:2
sake [1] - 194:14
sample [3] - 182:22, 182:25, 184:7
samples [5] - 180:20, 180:23, 181:1, 183:2, 184:13
sanction [1] - 19:23
sang [1] - 138:13
sat [1] - 19:19
satisfied [6] - 24:3, 33:8, 33:10, 103:18, 103:25, 104:4
savants [1] - 229:8
saw [6] - 77:21, 78:7, 78:8, 128:4, 138:10, 229:3
Scalia [1] - 233:5
scared [2] - 110:17, 240:6
scenario [1] - 240:6
scheduled [1] - 237:4
schedules [1] - 234:16
scheduling [2] - 193:2, 234:18
schemes [1] - 216:20
school [1] - 54:2
scope [1] - 230:14
screen [8] - 64:6, 112:21, 119:14, 149:7, 149:11, 166:5, 177:7
se [1] - 234:8
SE-13 [3] - 63:15, 64:7
SE-19 [1] - 70:6
SE-20 [2] - 65:4, 69:3
seal [1] - 212:2
seated [3] - 52:15, 52:19, 107:25
Second [5] - 55:15, 55:16, 65:20, 84:17, 84:18, 84:20, 147:8, 147:11, 147:16, 148:8, 148:10, 160:23, 175:20, 177:1
second [19] - 20:21, 21:19, 26:11, 52:13, 67:15, 102:25, 109:15, 112:17, 124:23, 124:25,

125:3, 135:2, 136:18, 146:22, 157:23, 158:16, 165:6, 227:7, 240:2
**seconds** [2] - 242:18, 244:9
**secret** [1] - 15:16
**section** [4] - 92:24, 115:6, 159:12, 160:4
**See** [11] - 86:7, 96:1, 129:24, 146:4, 166:17, 176:16, 177:10, 178:25, 179:4, 181:16, 244:24
**see** [61] - 7:24, 12:6, 37:21, 42:16, 48:23, 56:2, 57:8, 64:3, 66:7, 68:20, 69:15, 69:21, 71:11, 72:19, 77:18, 78:9, 82:8, 84:20, 86:6, 90:18, 93:11, 94:16, 96:25, 102:20, 108:18, 109:12, 112:23, 115:22, 118:17, 119:15, 129:8, 129:22, 129:23, 129:24, 130:2, 130:16, 133:10, 143:3, 143:9, 151:13, 160:1, 160:12, 160:14, 161:12, 165:18, 179:1, 187:21, 192:19, 193:8, 195:10, 198:4, 206:6, 206:24, 208:25, 212:9, 217:9, 218:10, 235:3, 235:6, 237:9
**seeing** [4] - 90:16, 112:13, 159:19, 193:17
**seek** [2] - 192:19, 218:17
**seeking** [2] - 13:10, 216:14
**seem** [5] - 14:15, 22:2, 32:4, 67:17, 97:2
**sees** [1] - 209:14
**segment** [1] - 116:13
**self** [1] - 233:7
**self-defeating** [1] - 233:7
**sell** [6] - 2:14, 61:15, 61:16, 194:15, 194:17, 222:18
**Selling** [1] - 55:5
**selling** [2] - 55:10, 165:24
**semantics** [1] - 136:4
**seminal** [2] - 18:22, 21:8
**send** [1] - 81:4
**sending** [1] - 183:15
**sense** [13] - 12:10, 13:14, 13:18, 31:14, 49:25, 79:2, 98:1, 105:14, 217:18, 230:12,

237:12
**sent** [8] - 5:4, 56:6, 70:25, 121:6, 127:17, 135:6, 148:25, 150:14
**sentence** [64] - 55:25, 56:7, 81:2, 83:25, 86:11, 87:18, 89:10, 103:21, 105:19, 106:6, 106:23, 107:2, 107:4, 121:20, 121:24, 122:3, 122:20, 123:10, 124:17, 135:9, 135:12, 135:13, 135:14, 143:9, 144:19, 144:20, 144:22, 145:4, 145:13, 145:21, 145:22, 145:24, 147:3, 147:4, 147:14, 147:22, 147:23, 148:2, 148:5, 148:12, 148:22, 148:25, 149:14, 149:19, 150:1, 155:16, 188:4, 188:19, 188:20, 189:2, 192:2, 196:1, 196:20, 197:2, 197:20, 197:21, 198:6, 221:24, 231:1, 233:4, 238:1, 243:15
**sentenced** [1] - 148:11
**sentences** [2] - 148:17, 226:10
**separate** [10] - 23:4, 28:5, 44:25, 76:13, 105:23, 197:17, 226:23, 231:6, 235:8, 239:9
**separately** [1] - 220:15
**September** [29] - 3:10, 5:8, 5:10, 39:4, 139:16, 139:18, 139:19, 148:1, 149:11, 149:20, 149:21, 150:8, 151:22, 152:4, 152:20, 152:25, 153:8, 153:9, 156:10, 159:4, 160:9, 160:15, 190:19, 213:18, 215:16, 215:17
**serenaded** [1] - 138:13
**serenading** [1] - 138:15
**Sergeant** [2] - 4:8, 228:21
**series** [2] - 41:9, 192:25
**serious** [13] - 19:2, 40:11, 59:2, 59:3, 59:6, 59:14, 59:18, 139:24, 141:15, 156:5, 237:9, 241:11, 241:12
**Serious** [1] - 141:16
**seriously** [1] - 81:5
**serve** [5] - 121:20, 135:14, 145:12, 148:2, 189:2
**served** [4] - 123:10, 148:4, 148:7, 148:14
**serving** [7] - 37:12,

188:3, 196:20, 197:1, 221:24, 230:25, 233:3
**session** [2] - 224:22, 224:23
**set** [7] - 30:3, 81:6, 85:17, 90:15, 95:18, 118:20, 238:9
**Set** [1] - 85:18
**setting** [1] - 165:23
**Seven** [2] - 123:4, 181:16
**seven** [9] - 17:18, 17:19, 18:12, 89:13, 93:3, 93:6, 123:3, 123:9, 124:12
**sever** [2] - 236:22, 236:24
**several** [12] - 40:20, 51:19, 54:9, 100:1, 105:24, 106:18, 149:22, 190:19, 223:9, 224:8, 226:7, 227:25
**Several** [3] - 45:24, 54:9, 79:17
**severance** [7] - 7:9, 19:2, 19:5, 27:25, 48:16, 48:18, 52:6
**severed** [3] - 19:7, 19:9, 236:20
**Shake** [1] - 31:4
**shakes** [1] - 42:4
**shaking** [3] - 8:17, 202:1, 202:14
**shall** [1] - 222:13
**shape** [1] - 226:13
**shaped** [1] - 227:8
**shapes** [1] - 226:8
**share** [1] - 22:14
**Shawn** [2] - 230:16, 240:14
**SHAWN** [1] - 1:8
**sheet** [1] - 134:2
**Sheistyville** [2] - 62:16, 62:18
**SHELLY** [1] - 1:8
**Shelton** [42] - 34:17, 40:9, 42:3, 43:19, 43:20, 57:5, 57:21, 65:10, 65:20, 65:24, 66:4, 66:14, 66:18, 66:22, 73:23, 77:9, 77:10, 77:21, 83:4, 83:5, 83:7, 83:23, 84:1, 111:5, 112:24, 113:3, 113:6, 113:8, 113:10, 113:11, 151:13, 151:17, 151:20, 151:23, 152:6, 153:2, 153:7, 173:10, 174:4, 174:22
**SHELTON** [1] - 1:7

**Shelton's** [1] - 119:7
**Shelvin** [2] - 165:21
**shift** [1] - 227:24
**shirt** [6] - 57:14, 57:15, 57:17, 57:19, 66:10
**shit** [2] - 42:25, 111:17
**shook** [3] - 31:2, 113:1, 113:24
**shoot** [3] - 59:5, 228:7
**shooter** [1] - 81:14
**shooting** [1] - 166:22
**shootings** [1] - 73:13
**Shores** [8] - 3:21, 3:22, 4:10, 13:4, 13:9, 27:7, 45:13, 45:15
**short** [2] - 48:8, 229:9
**shortly** [1] - 212:5
**Shorty** [1] - 117:10
**shot** [10] - 44:5, 44:6, 44:7, 72:4, 72:11, 72:15, 73:15, 81:9, 81:10, 146:10
**shots** [1] - 72:6
**show** [28] - 45:6, 65:3, 69:2, 70:6, 78:18, 82:2, 82:5, 82:6, 83:15, 92:12, 92:21, 102:2, 112:22, 120:3, 124:9, 126:11, 128:16, 130:11, 134:7, 143:5, 146:21, 159:24, 160:19, 165:13, 176:16, 178:23, 234:19
**showed** [14] - 70:25, 124:23, 125:4, 127:22, 131:7, 149:6, 162:6, 162:14, 162:18, 164:7, 175:7, 180:13, 180:17, 180:18
**showing** [4] - 184:18, 184:19, 184:20, 204:13
**shows** [5] - 35:22, 37:25, 50:25, 51:5, 183:17
**shuffling** [1] - 55:8
**sic** [1] - 232:17
**side** [10] - 28:22, 78:3, 79:22, 91:10, 132:25, 166:18, 189:21, 198:9, 214:19, 220:10
**sides** [3] - 11:23, 27:8, 209:13
**sideways** [1] - 31:4
**Sideways** [1] - 31:5
**sign** [3] - 82:14, 109:23, 158:3
**signature** [4] - 82:7, 83:10, 83:15, 246:10
**signatures** [1] - 83:19
**signed** [2] - 109:24, 109:25

**significant** [2] - 28:17, 243:8
**similar** [4] - 57:13, 57:15, 117:16, 168:25
**simply** [11] - 27:23, 28:15, 30:11, 31:24, 41:3, 133:20, 194:5, 200:12, 203:18, 207:20, 225:25
**Sincerely** [1] - 81:6
**sing** [2] - 63:4, 138:17
**singing** [2] - 46:24, 47:10
**single** [1] - 50:6
**singular** [1] - 54:10
**sit** [4] - 79:21, 93:5, 222:17, 242:22
**sitting** [7] - 10:1, 81:9, 145:23, 191:22, 191:23, 211:7, 222:14
**situation** [10] - 29:21, 32:5, 32:16, 45:12, 80:4, 197:3, 197:9, 197:12, 217:21, 241:18
**six** [15] - 57:16, 128:17, 128:20, 129:2, 129:5, 130:23, 131:5, 131:11, 162:6, 162:8, 162:11, 187:18, 210:2, 211:7
**Six** [2] - 129:4, 186:15
**Sixth** [4] - 10:19, 10:21, 197:23, 242:24
**skinhead** [1] - 12:7
**sleep** [2] - 138:17, 138:18
**sleeping** [3] - 227:19, 228:5
**slide** [1] - 83:2
**slight** [1] - 202:20
**slightly** [1] - 29:10
**slip** [1] - 120:5
**slips** [2] - 47:17, 69:2
**slow** [1] - 224:13
**Slow** [1] - 214:21
**Slowly** [3] - 149:17, 224:13
**slowly** [2] - 72:7, 79:6
**smiled** [2] - 113:1, 113:24
**smoked** [2] - 111:4, 111:8
**Snitching** [1] - 231:3
**sold** [2] - 113:4, 114:13
**sole** [2] - 227:15
**solely** [2] - 227:7, 243:13
**solution** [1] - 242:11
**solves** [1] - 242:14
**Someone** [2] - 137:5, 187:2

**someone** [6] - 12:24, 29:23, 59:12, 80:1, 115:1, 116:15

**sometime** [3] - 89:18, 126:23, 172:14

**sometimes** [1] - 231:13

**somewhat** [2] - 32:4, 242:22

**somewhere** [5] - 6:2, 15:10, 15:14, 173:17, 234:22

**Somewhere** [1] - 160:21

**song** [3] - 138:3, 138:4, 216:2

**songs** [3] - 46:6, 63:12

**soon** [3] - 95:13, 165:16, 183:7

**sophisticated** [1] - 240:18

**Sorry** [11] - 42:7, 60:3, 64:1, 67:2, 67:20, 67:22, 82:12, 83:25, 92:20, 101:1, 189:8

**sorry** [28] - 6:10, 8:20, 14:8, 23:3, 28:18, 63:7, 90:13, 100:19, 102:4, 117:17, 144:7, 153:21, 163:13, 170:3, 177:6, 179:18, 185:5, 190:11, 190:12, 196:17, 198:4, 201:13, 218:4, 220:18, 224:16, 224:19, 225:4, 225:17

**sort** [31] - 2:9, 4:4, 12:18, 22:10, 24:23, 30:21, 36:8, 42:17, 51:18, 51:21, 72:9, 97:11, 101:12, 101:13, 107:10, 139:24, 165:24, 166:6, 176:19, 176:20, 191:3, 199:4, 205:12, 206:20, 208:3, 208:4, 208:5, 227:18, 229:8, 229:16, 230:7

**Sort** [1] - 47:14

**sorts** [2] - 176:20, 229:2

**sounds** [1] - 204:17

**Sounds** [2] - 204:19, 204:20

**source** [5] - 35:3, 195:10, 198:23, 198:25, 223:11

**sources** [1] - 223:14

**south** [1] - 171:15

**South** [23] - 55:11, 113:5, 125:10, 125:12, 125:13, 125:17, 125:20, 137:15, 137:17, 137:23, 138:1, 139:11, 139:13,

159:13, 159:17, 160:4, 169:18, 169:19, 171:8, 171:13, 171:15

**Southern** [2] - 80:14, 81:17

**sovereignty** [1] - 231:16

**speakers** [2] - 94:3, 115:10

**Speaking** [2] - 164:14, 191:21

**speaking** [1] - 26:7

**speaks** [1] - 33:12

**special** [1] - 180:20

**specific** [6] - 43:17, 51:2, 52:6, 203:8, 203:11, 226:18

**specifically** [8] - 27:21, 71:22, 182:2, 187:11, 190:4, 195:3, 204:12, 216:21

**specifics** [1] - 112:12

**speculate** [1] - 110:19

**speculating** [1] - 37:21

**speculation** [1] - 11:24

**speech** [1] - 211:1

**spell** [1] - 53:15

**Spell** [1] - 53:17

**Spence** [22] - 100:21, 104:11, 195:1, 197:25, 199:5, 199:17, 199:22, 200:1, 213:9, 214:25, 215:3, 217:1, 217:7, 225:15, 227:16, 227:19, 228:3, 228:6, 228:10, 240:10, 240:14

**spend** [4] - 89:11, 89:12, 193:16, 206:10

**spent** [1] - 10:7

**spillover** [4] - 220:23, 220:24, 235:15, 235:20

**spin** [2] - 29:7, 228:17

**spines** [3] - 68:14, 68:25, 139:2

**spit** [1] - 236:25

**spits** [1] - 235:10

**split** [1] - 77:15

**sporting** [1] - 227:23

**spot** [1] - 115:12

**spouting** [2] - 12:6, 12:9

**spreads** [3] - 162:3, 162:6, 164:7

**stabbed** [1] - 60:16

**stage** [1] - 10:18

**stain** [1] - 218:21

**stakes** [1] - 208:11

**stand** [13] - 30:16, 52:15, 52:24, 53:5, 53:11, 107:12, 186:2,

196:19, 196:22, 205:2, 219:6, 233:10, 244:13

**standard** [2] - 209:15, 212:23

**standing** [3] - 185:16, 186:7, 194:22

**stands** [1] - 208:14

**stanza** [1] - 64:11

**start** [6] - 12:8, 114:8, 193:8, 221:18, 242:19

**started** [20] - 6:25, 7:1, 10:12, 12:5, 67:10, 70:12, 108:8, 108:10, 122:7, 148:6, 176:9, 182:24, 184:21, 185:7, 185:13, 188:20, 192:7

**starts** [1] - 94:11

**state** [73] - 9:25, 10:3, 37:13, 38:16, 53:14, 87:24, 100:16, 100:21, 101:2, 101:4, 103:21, 104:11, 120:19, 122:23, 156:24, 157:1, 174:3, 194:3, 195:14, 198:10, 198:13, 198:18, 200:5, 200:7, 200:8, 200:11, 200:12, 200:18, 202:3, 202:11, 203:13, 203:18, 203:21, 203:23, 203:24, 204:4, 204:5, 204:6, 204:7, 204:14, 204:18, 207:15, 209:7, 209:25, 215:11, 219:1, 221:5, 222:8, 223:8, 223:10, 223:20, 224:15, 226:11, 226:21, 228:3, 230:17, 231:1, 231:24, 232:3, 232:4, 232:9, 233:3, 235:7, 235:10, 237:25, 238:3, 238:4, 239:5, 240:24, 241:4, 241:14, 241:18, 242:13

**State** [9] - 123:6, 126:19, 127:6, 175:8, 179:6, 198:15, 202:2, 203:10, 210:10

**state's** [1] - 224:24

**State's** [3] - 86:18, 175:7, 225:13

**state/federal** [2] - 215:25, 241:6

**statement** [65] - 4:6, 6:15, 7:18, 8:10, 8:13, 11:3, 11:8, 14:20, 15:5, 15:6, 15:7, 15:19, 15:21, 15:23, 20:17, 22:12, 23:4, 23:5, 24:20, 24:24, 25:7, 25:8, 25:9, 25:14, 27:11, 30:10, 30:20, 30:22, 31:13, 32:6,

32:19, 32:23, 40:25, 41:25, 43:10, 49:25, 51:8, 51:11, 51:20, 51:21, 82:23, 92:11, 94:19, 95:17, 99:7, 99:16, 101:13, 101:16, 101:19, 108:14, 109:11, 109:14, 109:17, 109:20, 110:2, 117:22, 118:6, 169:21, 170:8, 181:19, 208:14, 213:9

**statements** [91] - 2:15, 2:22, 2:25, 3:6, 3:13, 3:14, 3:18, 3:19, 4:5, 4:11, 5:11, 6:3, 7:14, 7:18, 8:19, 8:23, 9:12, 9:17, 9:19, 10:10, 11:6, 11:15, 11:23, 12:24, 13:3, 13:9, 13:25, 14:16, 16:6, 16:16, 16:22, 17:7, 17:21, 18:9, 18:17, 19:17, 19:20, 20:1, 20:9, 21:1, 21:20, 21:23, 22:11, 22:15, 22:22, 23:8, 23:10, 24:10, 27:6, 27:23, 28:13, 29:16, 30:1, 30:12, 31:8, 31:9, 31:16, 31:20, 33:19, 34:9, 34:11, 34:13, 34:21, 38:17, 38:18, 39:9, 39:11, 41:1, 41:6, 41:7, 41:11, 41:13, 41:19, 43:14, 43:16, 45:15, 49:6, 49:12, 50:5, 50:16, 51:2, 51:12, 51:13, 51:16, 51:17, 92:13, 171:24, 212:14, 214:6

**States** [6] - 3:17, 15:9, 15:13, 15:14, 53:10

**states** [1] - 232:3

**STATES** [2] - 1:1, 1:5

**station** [1] - 214:23

**status** [3] - 229:25, 230:15, 233:12

**steal** [2] - 204:11, 204:12

**stenographically** [1] - 246:4

**stick** [2] - 73:21, 111:22

**stick-ups** [1] - 73:21

**still** [22] - 7:13, 13:7, 20:24, 25:25, 26:2, 31:9, 61:4, 81:25, 88:7, 145:22, 145:23, 158:17, 183:22, 189:2, 191:16, 191:22, 191:23, 204:15, 208:2, 230:9, 244:13

**Still** [2] - 8:15, 158:15

**stipulate** [1] - 233:10

**stipulation** [4] - 87:21, 106:10, 153:5, 197:11

**stipulations** [1] - 243:25

**stock** [2] - 37:1, 37:2

**Stockman** [1] - 58:21

**Stocksdale** [4] - 224:14, 225:6, 225:14, 225:20

**Stockton** [2] - 59:7, 140:23

**stood** [1] - 67:23

**Stop** [1] - 231:3

**stop** [2] - 81:11, 159:8

**stopped** [1] - 44:1

**store** [1] - 227:23

**story** [14] - 38:10, 74:1, 116:15, 189:19, 189:25, 190:15, 191:2, 191:6, 192:13, 223:3, 223:4

**Stove** [1] - 58:20

**Stover** [2] - 58:20, 59:7, 140:23

**Stover's** [1] - 141:10

**Straight** [1] - 94:7

**straightforward** [1] - 103:24

**strange** [1] - 113:8

**strapping** [1] - 32:7

**strategic** [1] - 195:18

**strategy** [3] - 210:20, 211:9, 226:5

**street** [13] - 25:23, 36:11, 41:8, 73:8, 81:10, 85:11, 86:12, 87:20, 120:13, 137:14, 138:1, 167:14

**Street** [2] - 1:25, 48:10

**streets** [6] - 34:24, 37:2, 64:12, 64:13, 68:11, 68:12

**strengthen** [1] - 237:20

**stretch** [2] - 12:4, 32:15

**stretched** [1] - 3:7

**strict** [1] - 49:3

**strictly** [2] - 11:2, 16:24

**strike** [3] - 66:5, 128:25, 190:18

**strikes** [1] - 41:4

**striking** [1] - 16:3

**striped** [2] - 57:15, 57:19

**strong** [3] - 13:6, 159:11, 160:3

**stronger** [1] - 237:18

**strongly** [1] - 242:22

**struggled** [1] - 106:18

**stuck** [1] - 19:13

**students** [1] - 107:18

**studio** [3] - 69:13,

**stuff** [23] - 19:1, 20:14, 20:15, 30:7, 35:14, 41:11, 41:13, 47:9, 47:19, 47:20, 73:21, 74:12, 79:24, 80:2, 93:6, 95:8, 115:13, 124:18, 130:25, 138:22, 142:24, 227:19, 231:2

117:1, 117:4

**stunningly** [1] - 202:19
**stupid** [3] - 226:8, 226:13
**sub** [4] - 149:20, 151:8, 152:22, 153:6
**subject** [1] - 105:3
**submission** [3] - 23:22, 24:19, 25:4
**submit** [6] - 23:9, 25:6, 43:23, 149:21, 242:21, 244:9
**submitted** [3] - 212:2, 229:14, 231:16
**subparts** [1] - 105:24
**subpoena** [2] - 134:1, 134:3
**subsequently** [1] - 78:12
**subsidiary** [3] - 106:11, 197:21, 220:9
**substance** [2] - 84:22, 84:23
**Substance** [2] - 176:25, 177:1
**substantial** [7] - 3:21, 30:11, 209:3, 209:19, 222:8, 222:10, 226:23
**substantive** [1] - 236:9
**succeeding** [1] - 229:2
**sucks** [1] - 68:13
**suddenly** [2] - 13:16, 13:20
**sufficient** [1] - 94:9, 194:20
**suggest** [10] - 19:14, 21:14, 30:20, 40:8, 43:14, 78:23, 98:20, 131:23, 133:25, 195:23
**suggested** [2] - 232:17, 244:14
**suggesting** [6] - 47:4, 65:5, 96:16, 195:9, 200:25, 203:1
**suggestions** [1] - 49:12
**sui** [2] - 202:1, 235:12
**summary** [4] - 227:11, 228:21, 228:24, 229:1
**summer** [1] - 49:8
**Supermax** [1] - 231:3
**supervising** [1] - 111:7
**supervision** [1] - 93:25

**supervisor** [1] - 111:7
**supply** [1] - 158:4
**support** [3] - 21:6, 25:5, 219:3
**supporting** [1] - 206:7
**suppose** [4] - 20:17, 21:22, 201:14, 207:19
**supposed** [3] - 4:2, 85:8, 112:10
**supposedly** [5] - 7:17, 11:16, 70:23, 75:20, 99:7
**Suppress** [1] - 222:15
**Supreme** [2] - 233:20, 233:21
**surprise** [3] - 40:18, 122:17, 186:8
**surprised** [5] - 34:9, 37:16, 41:4, 167:24, 167:25
**surprising** [1] - 241:2
**surrounding** [2] - 171:13, 204:14
**surroundings** [1] - 171:13
**suspect** [4] - 22:2, 30:17, 107:22, 231:18
**suspending** [1] - 133:2
**Sustain** [1] - 75:8
**Sustained** [7] - 62:7, 63:6, 71:20, 71:25, 76:21, 77:5, 136:16
**sustained** [4] - 76:10, 76:15, 100:1, 219:24
**swan** [1] - 216:2
**sworn** [1] - 53:12
**SWORN** [1] - 53:13
**symmetrical** [1] - 211:24
**sympathy** [1] - 195:24
**system** [9] - 10:3, 93:15, 94:3, 94:4, 115:11, 123:17, 209:8, 235:10, 241:5

**T**

**T-shirt** [1] - 66:10
**table** [3] - 2:17, 115:10, 185:16
**talks** [3] - 12:21, 44:13, 44:14
**taller** [1] - 154:21
**tap** [1] - 2:4
**Tape** [1] - 115:15
**tape** [14] - 4:18, 4:21, 4:22, 41:10, 42:22, 42:24, 52:1, 92:24, 93:1, 115:6, 177:23, 192:20, 223:24
**taped** [5] - 19:19, 164:2,

164:4, 164:7, 164:15
**tapes** [5] - 3:14, 4:14, 5:1, 20:16, 192:25
**target** [1] - 15:23
**task** [1] - 192:22
**tattoos** [1] - 12:7
**teams** [1] - 210:11
**tearing** [1] - 159:20
**technical** [1] - 64:1
**technician** [1] - 43:25
**teeth** [1] - 211:21
**television** [1] - 15:24
**temerity** [1] - 237:11
**Ten** [2] - 103:8, 103:9
**ten** [3] - 20:6, 127:9, 132:4
**tends** [2] - 40:8, 219:4
**tenuous** [1] - 195:11
**term** [5] - 5:20, 5:21, 23:17, 237:1, 243:11
**terms** [4] - 29:1, 29:6, 92:10, 101:24
**test** [2] - 3:20, 5:13
**testified** [28] - 43:25, 90:3, 101:15, 108:13, 113:15, 122:19, 154:4, 162:2, 168:1, 168:4, 168:9, 169:3, 169:21, 171:25, 173:2, 184:4, 184:16, 207:23, 222:7, 222:23, 226:9, 226:21, 227:18, 227:25, 228:20, 232:15, 238:25, 243:20
**testifies** [4] - 42:23, 206:10, 238:7, 238:13
**testify** [18] - 42:2, 46:2, 89:18, 100:16, 195:5, 199:9, 199:18, 199:24, 206:13, 218:23, 218:25, 226:11, 228:22, 237:24, 238:3, 238:4, 239:16
**testifying** [5] - 165:9, 207:24, 212:10, 223:7, 240:9
**testimony** [46] - 4:8, 10:18, 18:16, 18:7, 20:23, 31:3, 33:5, 40:20, 49:20, 49:21, 50:10, 52:25, 53:2, 53:7, 84:24, 89:25, 95:3, 100:9, 101:7, 123:3, 168:12, 182:3, 195:8, 200:6, 201:3, 204:6, 204:8, 213:5, 217:13, 222:25, 223:8, 223:9, 223:12, 223:13, 223:19, 223:20, 225:24, 226:14, 227:8, 227:9, 227:10, 227:11, 227:12, 228:11, 230:6
**THE** [520] - 1:1, 1:2, 2:2,

2:4, 2:6, 2:11, 6:1, 6:6, 6:10, 6:12, 6:15, 6:20, 6:23, 7:4, 7:7, 7:13, 7:21, 8:1, 8:6, 8:9, 8:12, 8:15, 8:17, 8:22, 8:25, 9:5, 9:10, 9:15, 9:22, 10:4, 10:14, 10:19, 10:24, 11:13, 13:23, 14:4, 14:6, 14:9, 14:25, 15:4, 15:12, 15:18, 15:21, 16:2, 16:11, 16:14, 17:4, 17:10, 17:16, 18:14, 18:24, 19:7, 19:9, 20:11, 22:1, 22:7, 23:3, 23:12, 23:16, 23:20, 25:17, 25:25, 26:10, 26:18, 26:22, 27:3, 27:16, 27:18, 28:18, 28:21, 28:24, 29:11, 29:15, 29:19, 31:1, 31:5, 32:10, 32:20, 32:25, 33:9, 33:13, 33:16, 33:21, 33:25, 34:7, 34:12, 34:15, 34:20, 35:2, 35:6, 35:9, 35:18, 36:2, 36:5, 36:8, 36:11, 36:13, 36:16, 37:8, 37:12, 37:19, 37:24, 38:7, 38:18, 38:20, 39:1, 39:5, 39:8, 39:11, 39:14, 39:17, 39:22, 39:25, 40:5, 40:14, 40:17, 40:23, 41:15, 41:18, 41:25, 42:6, 42:10, 42:13, 42:16, 42:19, 43:1, 43:4, 43:6, 43:12, 44:3, 44:10, 44:12, 44:15, 44:18, 44:21, 44:24, 45:2, 45:23, 46:1, 46:4, 46:8, 46:10, 46:14, 46:16, 46:19, 46:22, 47:2, 47:4, 47:7, 47:10, 47:12, 47:14, 47:16, 47:19, 47:21, 47:25, 48:3, 48:6, 48:10, 48:14, 48:18, 48:21, 48:23, 50:21, 50:23, 51:7, 51:12, 51:16, 51:20, 52:2, 52:4, 52:8, 52:14, 52:19, 53:14, 53:16, 53:17, 53:18, 57:22, 58:2, 58:10, 60:5, 60:6, 62:7, 63:6, 63:18, 63:21, 64:8, 64:15, 64:19, 64:22, 64:25, 65:5, 65:13, 66:6, 66:13, 66:17, 67:1, 67:6, 67:15, 67:23, 68:2, 68:3, 71:20, 71:25, 73:1, 74:4, 74:10, 74:17, 75:3, 75:5, 75:6, 75:7, 75:8, 75:10,

75:18, 75:19, 75:22, 75:25, 76:3, 76:7, 76:12, 76:15, 76:21, 76:24, 77:5, 78:23, 79:1, 79:5, 79:8, 85:14, 87:14, 88:3, 88:4, 88:5, 88:7, 88:10, 88:14, 88:16, 88:18, 88:19, 88:25, 89:7, 89:8, 91:20, 92:3, 92:5, 92:12, 92:16, 92:19, 92:21, 93:1, 93:5, 93:8, 93:11, 93:14, 93:18, 93:20, 93:24, 94:7, 94:13, 94:16, 94:20, 94:22, 94:25, 95:5, 95:16, 95:24, 96:1, 96:5, 96:8, 96:10, 96:12, 96:17, 96:23, 96:25, 97:5, 97:8, 97:13, 97:21, 98:5, 98:7, 98:11, 98:14, 98:18, 98:21, 99:1, 99:8, 99:14, 99:17, 99:22, 99:25, 100:11, 100:19, 101:2, 101:6, 102:4, 102:19, 103:6, 103:9, 103:12, 103:14, 103:18, 103:24, 104:5, 104:8, 105:1, 105:12, 105:20, 106:20, 106:25, 107:6, 107:11, 107:15, 107:21, 107:25, 108:18, 109:5, 109:13, 110:7, 112:11, 112:19, 112:22, 114:6, 115:8, 115:14, 116:2, 116:4, 116:18, 116:25, 117:3, 117:14, 118:8, 119:2, 122:6, 122:9, 125:25, 129:10, 131:24, 132:1, 132:14, 132:18, 132:24, 133:4, 133:9, 133:13, 133:22, 134:7, 134:10, 135:11, 136:16, 143:7, 149:8, 149:17, 149:18, 152:12, 152:15, 155:4, 163:14, 165:7, 165:14, 165:17, 166:10, 167:8, 168:7, 177:4, 179:16, 179:19, 185:4, 185:7, 187:15, 190:2, 193:2, 193:14, 193:16, 194:1, 194:12, 195:20, 196:10, 196:17, 196:24, 197:4, 197:8, 197:13, 197:19, 198:4, 198:19, 198:22, 199:3, 199:6, 199:10, 199:15, 199:20, 200:4, 200:10, 200:19, 201:5, 201:13, 201:16, 201:22, 202:9, 202:18, 202:21, 203:1, 203:5, 203:10, 203:13, 203:24, 204:9,

204:19, 204:21, 204:25, 205:21, 207:6, 208:8, 208:11, 208:13, 208:24, 210:3, 210:17, 211:12, 211:23, 212:5, 213:6, 213:12, 213:20, 213:22, 213:24, 214:8, 214:11, 214:21, 214:24, 215:2, 215:10, 215:12, 215:15, 215:17, 215:19, 215:23, 215:25, 216:4, 216:6, 216:8, 216:11, 216:18, 216:24, 217:2, 217:6, 217:9, 218:4, 218:7, 218:10, 218:22, 219:4, 219:12, 219:17, 219:20, 219:22, 219:24, 220:4, 220:17, 220:21, 220:24, 221:9, 221:15, 221:17, 221:25, 222:12, 222:22, 222:25, 223:2, 223:11, 223:18, 224:13, 224:16, 224:22, 224:24, 225:3, 225:12, 225:17, 226:2, 229:9, 229:18, 229:21, 229:23, 232:12, 232:14, 232:21, 232:25, 233:12, 233:14, 233:19, 233:22, 233:24, 234:1, 234:5, 234:8, 234:11, 234:15, 235:3, 235:24, 236:2, 236:13, 236:17, 236:21, 236:24, 237:7, 237:15, 237:20, 238:3, 238:9, 238:14, 238:19, 239:21, 240:1, 241:2, 241:6, 241:9, 242:6, 242:15
   **theft** [17] - 56:10, 56:11, 56:12, 56:13, 56:17, 121:13, 121:14, 121:22, 134:19, 134:21, 135:3, 135:9, 135:12, 135:17, 137:1, 200:20
   **thefts** [2] - 54:8, 56:15
   **theirs** [1] - 7:17
   **themselves** [3] - 23:8, 24:11, 70:23
   **theoretical** [1] - 209:16
   **theoretically** [1] - 201:18
   **theories** [2] - 26:14, 198:14
   **theory** [21] - 5:24, 10:10, 10:12, 13:24, 17:22, 18:3, 25:2, 25:5, 28:3, 29:21, 29:22, 31:15, 189:2, 195:16, 196:15, 200:13, 208:4, 208:6, 211:8, 212:14, 218:20

**Therefore** [1] - 95:11
**therefore** [5] - 14:1, 33:2, 97:24, 203:23, 212:22
**they've** [3] - 104:21, 205:18, 230:23
**thinking** [3] - 24:16, 102:17, 189:17
**thinks** [1] - 212:7
**third** [2] - 45:15, 106:7
**thirties** [2] - 140:16, 140:17
**Thomas** [1] - 1:20
**thousand** [2] - 225:23, 228:14
**three** [14] - 7:3, 7:12, 11:11, 17:14, 18:1, 18:5, 19:13, 56:18, 125:4, 169:3, 193:21, 221:21, 230:23, 236:4
   **Three** [1] - 15:13
**thrown** [2] - 171:20, 171:23
**thwarted** [1] - 217:3
**tie** [2] - 198:25, 227:15
**tied** [1] - 6:16
**tier** [7] - 57:24, 138:22, 169:12, 169:14, 169:25, 172:19
**ties** [2] - 160:3, 199:16
**tight** [2] - 81:18, 125:8
**Timothy** [1] - 148:23
**Tincher** [1] - 225:6
**tirelessly** [1] - 104:21
**title** [3] - 67:10, 173:14, 179:6
**today** [19] - 57:8, 66:7, 77:18, 78:11, 99:5, 124:3, 128:4, 132:17, 173:3, 173:21, 184:2, 184:16, 184:23, 189:19, 191:2, 193:3, 210:19, 221:3, 223:4
**together** [16] - 13:11, 28:25, 44:23, 46:24, 62:5, 69:14, 93:24, 95:9, 124:19, 139:16, 164:23, 194:15, 194:16, 194:17, 200:2, 201:3
**Tommy** [4] - 80:15, 81:15, 86:25, 125:2
**tomorrow** [6] - 193:8, 193:10, 193:12, 242:18, 244:9, 244:25
**tonight** [1] - 244:10
**Tonya** [5] - 104:11, 227:19, 228:5, 240:10, 240:14
**Took** [2] - 126:18, 155:13

**took** [26] - 7:23, 9:17, 10:17, 12:17, 14:9, 34:25, 35:3, 70:3, 81:8, 81:14, 83:6, 127:5, 130:24, 146:5, 161:1, 172:2, 173:14, 173:21, 174:25, 175:5, 190:19, 196:21, 216:12, 225:20, 225:22
**top** [4] - 21:4, 79:10, 82:7, 161:12
**topic** [2] - 38:1, 99:6
**total** [3] - 124:5, 137:10, 148:14
**totally** [4] - 13:5, 224:2, 228:1, 233:7
**touch** [2] - 209:2, 215:22
**touched** [1] - 59:4
**tough** [4] - 2:13, 34:23, 169:19, 220:11
**tougher** [1] - 220:10
**toward** [2] - 53:14, 89:2
**towards** [1] - 171:15
**track** [1] - 68:10
**trade** [2] - 191:4, 191:6
**traditional** [1] - 243:5
**traffic** [1] - 37:14
**trafficker** [1] - 59:1
**trafficking** [1] - 199:12
**transcribed** [2] - 224:20, 246:7
**transcript** [14] - 10:9, 89:24, 163:10, 179:17, 179:19, 181:22, 182:3, 182:4, 184:24, 185:11, 186:9, 224:17, 224:21, 246:7
**transcripts** [3] - 223:15, 228:24, 229:1
**transferred** [1] - 153:4
**tree** [1] - 44:2
**trial** [43] - 7:12, 11:17, 18:17, 18:18, 19:11, 21:3, 21:11, 43:8, 43:9, 43:10, 53:1, 53:2, 104:9, 107:10, 135:16, 200:5, 200:7, 200:8, 200:11, 200:12, 202:11, 206:4, 207:15, 215:19, 219:3, 222:8, 222:9, 223:5, 223:8, 223:10, 223:12, 223:19, 223:20, 226:21, 228:3, 228:22, 237:4, 238:3, 238:5, 240:14, 243:20
**trials** [2] - 19:7, 19:10
**trick** [1] - 160:18
**tried** [18] - 4:22, 21:10, 35:10, 90:24, 94:11,

102:1, 104:10, 104:19, 113:7, 113:9, 114:17, 163:3, 163:20, 205:12, 215:22, 220:9, 239:5, 241:18
**trouble** [2] - 108:21, 159:10
**truck** [1] - 214:23
**true** [17] - 4:1, 16:1, 43:16, 98:1, 110:22, 114:9, 114:10, 114:18, 125:18, 142:11, 162:17, 192:16, 198:22, 203:23, 210:9, 230:5, 238:9
**trust** [18] - 10:11, 10:17, 12:2, 12:3, 12:11, 12:18, 13:13, 14:10, 14:14, 16:4, 16:7, 17:15, 17:20, 31:21, 52:20, 81:6, 126:5, 155:25
   **Trust** [1] - 160:18
**trusted** [2] - 12:24, 158:14, 172:5
**truth** [2] - 224:6, 225:25
**try** [21] - 18:15, 30:15, 37:1, 41:12, 41:23, 90:10, 94:15, 101:12, 101:22, 108:5, 113:16, 117:20, 118:1, 170:11, 170:13, 192:18, 194:12, 206:25, 208:7, 237:11, 239:21
   **Try** [1] - 64:21
**Trying** [2] - 118:19
**trying** [36] - 4:8, 5:18, 7:21, 8:3, 8:7, 10:10, 12:1, 29:22, 35:19, 37:24, 38:13, 40:9, 42:9, 42:12, 42:14, 42:25, 89:15, 97:14, 113:22, 114:19, 116:9, 118:1, 118:2, 120:22, 160:17, 167:16, 167:18, 167:20, 168:17, 207:25, 208:1, 208:3, 208:20, 219:2, 219:13, 237:8
**turn** [9] - 20:14, 40:21, 109:15, 119:11, 130:5, 144:23, 174:21, 185:25, 214:4
**turned** [12] - 41:6, 43:6, 43:7, 43:9, 43:11, 70:24, 131:15, 164:9, 164:10, 164:11, 164:12
**turning** [3] - 164:14, 214:7
   **Twice** [1] - 91:1
   **Twin** [1] - 62:23
**two** [55] - 2:17, 2:18, 3:5, 3:14, 7:3, 10:8,

10:17, 17:13, 18:1, 18:5, 22:18, 22:20, 24:16, 24:19, 25:8, 26:16, 26:23, 31:14, 40:21, 57:7, 64:18, 67:16, 71:17, 72:3, 78:13, 102:18, 116:12, 122:23, 125:3, 125:4, 128:19, 139:17, 161:14, 162:9, 162:14, 164:8, 164:23, 166:7, 166:12, 178:10, 178:14, 180:1, 188:23, 192:9, 193:21, 202:22, 205:6, 221:2, 221:16, 230:24, 234:15, 236:5, 236:7, 236:9
   **Two** [2] - 112:16, 231:3
**twofold** [1] - 209:14
**type** [4] - 54:14, 54:16, 135:14, 211:2
**typewritten** [1] - 214:12

**U**

**U.S** [6] - 1:24, 225:4, 225:7, 225:8, 228:25, 233:21
**Um-hum** [24] - 56:5, 60:19, 62:1, 62:19, 70:14, 89:5, 116:22, 120:17, 121:19, 125:16, 125:23, 126:17, 131:20, 136:9, 144:6, 146:13, 151:10, 156:4, 157:6, 161:13, 162:13, 166:21, 167:6, 171:19
**Um-um** [2] - 171:11, 171:12
**unable** [1] - 180:5
**unadorned** [1] - 97:21
**unauthorized** [1] - 121:5
**unavoidable** [1] - 222:5
**unaware** [1] - 95:3
**uncertainty** [1] - 43:15
**uncomfortable** [2] - 226:4, 232:24
**unconstitutional** [1] - 229:16
**unconstitutionally** [1] - 227:4
**uncoupled** [1] - 106:21
**under** [23] - 23:25, 24:4, 25:15, 28:13, 32:15, 45:13, 45:15, 52:16, 64:6, 157:24, 195:12, 198:8, 198:13, 206:20, 212:2, 225:24, 227:25, 228:2, 228:11, 234:20, 238:1, 238:10, 239:16
**under-oath** [1] - 228:11

**Underneath** [1] - 109:22
**underneath** [3] - 66:10, 82:16, 91:11
**understating** [1] - 23:9
**understood** [2] - 2:12, 33:25, 37:15
**undisputed** [2] - 29:3, 29:7
**unduly** [1] - 50:2
**unfair** [1] - 212:19
**unfairness** [2] - 243:7, 243:8
**unfavorably** [1] - 26:17
**Unfortunately** [1] - 7:11
**unfortunately** [1] - 19:12
**unified** [1] - 8:5
**UNITED** [2] - 1:1, 1:5
**United** [6] - 3:17, 15:9, 15:13, 15:14, 53:10
**universe** [1] - 9:12
**unknown** [1] - 218:15
**unlawful** [1] - 229:16
**unless** [5] - 142:17, 143:1, 143:3, 144:12, 145:8
**Unless** [2] - 25:17, 143:6
**unlike** [1] - 13:9
**unlikely** [1] - 206:13
**unnecessary** [1] - 239:11
**unplugged** [3] - 64:20, 65:7, 67:17
**unquote** [2] - 5:20, 234:20
**untrue** [1] - 114:9
**unusual** [2] - 60:14, 209:23
**up** [156] - 2:6, 5:8, 11:20, 13:20, 20:18, 24:10, 24:17, 25:1, 28:25, 29:3, 31:4, 34:1, 34:17, 35:22, 37:25, 38:23, 38:25, 41:9, 42:11, 44:23, 45:11, 46:24, 47:22, 48:8, 48:9, 49:24, 50:1, 51:19, 53:25, 55:22, 55:24, 56:10, 56:20, 56:22, 56:24, 58:23, 59:23, 60:8, 61:10, 61:12, 61:21, 62:10, 64:20, 70:25, 71:11, 73:7, 74:20, 74:25, 77:15, 79:24, 81:6, 81:18, 81:25, 84:10, 84:12, 85:17, 85:18, 88:1, 89:11, 90:11, 90:15,

95:10, 95:18, 95:22, 101:14, 101:19, 107:18, 108:10, 108:11, 111:6, 111:14, 111:22, 113:20, 114:21, 115:10, 116:15, 117:10, 118:1, 118:19, 118:20, 120:7, 121:17, 121:22, 123:15, 124:23, 125:4, 126:11, 126:16, 126:22, 129:1, 130:5, 134:22, 134:24, 135:11, 139:5, 139:6, 139:8, 139:9, 139:16, 139:24, 140:1, 140:8, 140:10, 144:7, 144:25, 145:3, 150:23, 152:3, 153:10, 153:12, 153:19, 159:18, 159:20, 165:16, 165:23, 168:20, 173:17, 175:7, 176:21, 180:13, 180:17, 180:18, 183:17, 184:18, 184:20, 186:2, 186:4, 188:2, 188:8, 188:13, 188:23, 195:1, 200:3, 205:1, 205:2, 206:23, 208:14, 208:21, 208:22, 217:22, 227:3, 227:16, 227:20, 228:4, 233:10, 235:8, 237:10, 237:19, 237:20, 238:9, 240:2, 240:4, 240:23, 241:12
**ups** [1] - 73:21
**upset** [1] - 115:1
**upshot** [1] - 45:21
**Urbanik** [3] - 5:14, 5:16, 16:23
**urgency** [2] - 217:8, 217:19
**urging** [1] - 189:15
**urinalysis** [1] - 182:10
**urine** [8] - 180:20, 180:23, 181:1, 182:22, 182:25, 183:2, 184:7, 184:13
**urines** [6] - 110:21, 110:24, 120:12, 182:14, 182:17
**USA** [1] - 246:4
**uses** [3] - 5:21, 10:8, 46:20

## V

**vacation** [1] - 219:7
**vague** [2] - 4:2, 18:7
**valid** [1] - 81:2
**value** [9] - 13:24, 17:5, 18:11, 31:6, 105:10, 105:11, 105:13, 105:14, 238:16
**vantage** [1] - 102:20

**various** [5] - 49:6, 199:14, 203:6, 231:23
**vehicle** [2] - 71:10, 81:10
**ventures** [1] - 95:14
**verdict** [12] - 194:3, 196:15, 198:2, 198:5, 198:6, 198:7, 222:1, 223:2, 230:19
**verge** [1] - 183:15
**verify** [2] - 112:14, 180:5, 180:11
**version** [2] - 115:6, 224:9
**versus** [1] - 179:6
**victim** [8] - 87:25, 88:14, 88:17, 88:18, 88:21, 146:16, 173:22, 174:9
**victim's** [2] - 146:19, 174:7
**victims** [4] - 44:5, 72:3, 161:22, 216:13
**view** [6] - 197:23, 212:25, 218:12, 235:23, 244:8, 244:23
**views** [1] - 88:22
**violate** [3] - 25:14, 56:9, 84:16
**violated** [22] - 10:21, 56:6, 84:17, 84:19, 85:1, 85:6, 109:3, 110:13, 110:17, 110:20, 110:24, 147:16, 178:12, 178:15, 180:19, 181:5, 181:15, 182:13, 182:14, 183:25, 184:8, 187:7
**violating** [3] - 110:15, 120:14, 180:19
**violation** [16] - 55:25, 56:23, 84:15, 120:8, 121:21, 147:5, 147:6, 178:17, 178:21, 179:9, 181:20, 184:3, 184:6, 184:12, 186:17, 187:3
**Violation** [2] - 84:15, 147:6
**violence** [8] - 46:18, 54:8, 56:3, 56:4, 67:13, 84:13, 85:3, 121:5
**virtually** [1] - 237:10
**visits** [1] - 32:3
**vital** [1] - 80:16
**vitally** [1] - 226:19
**vitiate** [1] - 14:15
**voice** [1] - 135:11
**voir** [3] - 210:18, 210:25, 211:4
**volume** [2] - 94:5, 94:10
**VOLUME** [1] - 1:11

**voluntary** [1] - 31:13
**volunteered** [1] - 38:10
**volunteering** [1] - 94:1
**Volunteers** [2] - 135:6, 135:13

## W

**wacky** [1] - 208:6
**wagon** [1] - 214:23
**Wait** [4] - 14:25, 99:25, 227:22
**wait** [9] - 143:7, 143:23, 145:18, 149:3, 150:2, 151:25, 155:12, 191:21
**waited** [9] - 79:15, 111:4, 154:19, 154:22, 155:6, 190:20, 191:15, 191:17, 191:21
**waiting** [3] - 65:7, 111:7, 232:17
**waive** [1] - 186:19
**waiving** [1] - 186:16
**waking** [1] - 138:19
**walk** [3] - 136:2, 136:3, 244:6
**walked** [10] - 111:4, 136:5, 147:11, 148:10, 175:20, 176:7, 176:13, 177:12, 177:18, 201:5
**walking** [2] - 73:7, 243:3
**wants** [17] - 7:19, 9:12, 19:13, 31:12, 59:5, 115:12, 133:5, 175:15, 200:23, 203:21, 204:12, 206:12, 207:4, 208:21, 226:15, 244:14
**war** [1] - 68:14
**warmed** [1] - 64:19
**waste** [1] - 243:6
**wasting** [2] - 208:22, 210:2
**watch** [1] - 67:13
**watching** [1] - 15:25
**water** [2] - 52:17, 60:5
**WAYNE** [1] - 1:8
**Wayne** [1] - 199:13
**ways** [1] - 206:6
**WCI** [1] - 126:13
**weak** [1] - 133:2
**weaker** [1] - 33:11
**weapon** [2] - 60:10, 111:19
**weapons** [1] - 114:13
**wear** [2] - 85:21, 192:19
**wearing** [7] - 57:12, 57:13, 57:14, 57:18, 66:9, 90:19, 91:8
**Wednesday** [2] - 52:24,

53:5
**weed** [1] - 68:13
**week** [15] - 2:13, 7:3, 10:17, 17:14, 17:17, 43:8, 43:11, 52:14, 52:24, 53:6, 166:7, 166:12, 172:4
**weekend** [1] - 52:21
**weeks** [20] - 3:14, 7:12, 10:8, 12:1, 12:17, 13:12, 14:10, 19:13, 24:16, 43:6, 51:19, 57:7, 125:4, 139:17, 164:23, 190:19, 210:2, 221:16, 234:15
**weigh** [1] - 10:18
**weighed** [2] - 25:21, 25:22
**weighing** [1] - 22:2
**weight** [1] - 6:17
**welcome** [1] - 90:8
**west** [1] - 214:19
**West** [1] - 1:25
**Western** [3] - 126:12, 127:6, 175:1
**Whereabouts** [1] - 61:23
**Whereof** [1] - 246:9
**white** [3] - 12:7, 57:19, 66:10
**whole** [22] - 11:10, 11:14, 38:10, 42:17, 43:18, 44:8, 64:10, 96:10, 96:21, 112:20, 123:11, 123:16, 127:17, 144:14, 144:16, 145:4, 190:23, 192:22, 192:25, 193:18, 237:17
**WILLIE** [1] - 1:7
**Willie** [1] - 246:4
**willing** [5] - 80:15, 80:19, 81:16, 159:17, 226:13
**win** [1] - 21:18
**window** [2] - 212:13
**wire** [2] - 91:8, 192:19
**wires** [1] - 85:19
**wish** [3] - 100:6, 218:12, 242:19
**wishes** [1] - 194:9
**withheld** [1] - 4:14
**Witness** [4] - 92:4, 177:1, 193:15, 246:9
**witness** [59] - 3:24, 8:25, 9:3, 9:5, 9:6, 11:25, 12:18, 16:16, 18:22, 18:25, 20:12, 22:16, 23:23, 24:4, 24:5, 27:14, 30:16, 52:24, 53:5, 53:9, 57:20, 63:19, 66:11, 76:6, 76:23, 79:2,

87:14, 92:7, 94:19,
95:18, 96:7, 97:10,
97:17, 97:18, 100:15,
100:25, 101:15, 112:9,
112:11, 119:1, 133:11,
133:23, 134:8, 149:7,
152:11, 154:25, 163:11,
176:21, 187:15, 199:8,
199:11, 211:20, 214:6,
222:4, 227:15, 228:21,
229:1

**WITNESS** [18] - 53:13,
53:16, 53:18, 60:6, 75:5,
75:7, 75:19, 75:25, 79:8,
88:4, 88:7, 88:14, 88:18,
89:8, 149:18, 152:15,
185:7, 245:5

**witness'** [3] - 4:1, 24:9,
53:2

**witnesses** [5] - 53:3,
211:18, 212:15, 212:22,
233:8

**woman** [2] - 44:6, 44:7

**won** [3] - 67:9, 70:16,
173:14

**wonder** [1] - 12:8

**wondered** [1] - 25:21

**Woodland** [6] - 61:24,
61:25, 73:15, 140:22,
140:23

**Woody** [14] - 42:4,
70:20, 70:22, 70:23,
74:12, 113:1, 113:3,
113:4, 113:17, 113:21,
114:1, 114:9, 114:14,
116:15

**Woody's** [1] - 114:11

**word** [15] - 9:8, 9:9,
10:8, 23:12, 23:13,
23:19, 24:14, 33:14,
94:14, 136:12, 143:4,
207:11, 242:7

**words** [13] - 9:16, 11:5,
28:24, 35:18, 42:25,
71:15, 77:15, 94:7,
145:8, 195:7, 203:20,
217:22, 222:22

**works** [1] - 183:9

**world** [1] - 220:5

**worried** [2] - 110:14,
211:12

**worry** [3] - 64:14, 68:12,
201:24

**worth** [2] - 221:22,
230:18

**wound** [2] - 41:9, 89:11

**wounds** [1] - 81:12

**writ** [1] - 233:17

**write** [21] - 38:16, 46:8,
63:10, 69:6, 69:12, 70:1,

109:16, 109:18, 110:1,
119:9, 120:5, 128:6,
130:25, 131:1, 131:10,
131:12, 143:1, 152:20,
192:6

**Write** [1] - 109:20

**writing** [11] - 46:24,
47:8, 64:3, 91:15, 119:9,
119:10, 138:11, 138:16,
142:16, 159:14

**written** [9] - 47:1, 47:5,
82:24, 86:15, 99:12,
108:14, 143:3, 161:14,
224:5

**Wrote** [1] - 46:6

**wrote** [44] - 20:19, 46:5,
63:23, 78:16, 80:6,
81:19, 108:13, 109:21,
110:1, 110:4, 113:13,
114:1, 128:3, 128:7,
131:3, 131:4, 131:7,
138:8, 138:13, 138:24,
142:6, 142:23, 143:19,
143:24, 144:1, 144:4,
144:17, 146:22, 149:5,
149:10, 150:7, 151:16,
151:18, 151:21, 152:2,
156:10, 159:25, 160:8,
160:14, 190:4, 190:24,
191:19, 192:10

**Wyche** [9] - 95:25, 97:4,
97:9, 97:22, 100:6,
100:17, 100:22, 101:3,
102:11

# X

**XXXVII** [1] - 1:11

# Y

**year** [31] - 8:24, 10:1,
10:2, 55:25, 107:4,
122:3, 148:2, 149:3,
149:20, 150:2, 150:9,
150:23, 151:3, 151:9,
151:24, 151:25, 152:20,
152:22, 153:6, 153:14,
153:17, 153:25, 160:1,
176:19, 188:19, 188:20,
190:23, 211:7, 213:13,
231:21

**years** [39] - 20:5, 36:20,
37:13, 40:20, 40:21,
41:3, 57:16, 77:23, 78:6,
100:13, 106:19, 122:1,
122:2, 123:11, 123:16,
124:4, 124:5, 130:23,
131:6, 131:11, 137:10,
147:23, 147:24, 148:14,
153:20, 187:18, 187:19,
188:23, 189:2, 214:2,

214:17, 221:2, 224:2,
224:8, 226:7, 230:24

**years'** [1] - 221:22

**yields** [1] - 99:1

**York** [2] - 214:19,
214:22

**yourself** [3] - 69:6,
110:2, 166:23

**Yup** [16] - 87:21, 130:2,
146:7, 157:17, 158:10,
158:13, 158:22, 159:15,
163:1, 163:4, 172:18,
173:5, 176:17, 179:5,
184:1, 189:6

# Z

**Zajac** [3] - 1:24, 246:3,
246:14

**zoom** [1] - 179:2