1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION


UNITED STATES OF AMERICA

        v.                          CRIMINAL CASE NO.
                                    AMD-04-029
WILLIE MITCHELL,
SHELTON HARRIS,
SHELLY WAYNE MARTIN,
SHAWN GARDNER,

        Defendants
_____/

            VOLUME XII OF XXXVII
            Wednesday, October 8, 2008
            Baltimore, Maryland


Before:  Honorable Andre M. Davis, Judge
            And a Jury

Appearances:
        On Behalf of the Government:
         Robert Harding, Esquire
         Michael Hanlon, Esquire
        On Behalf of Defendant Mitchell:
         Laura Kelsey Rhodes, Esquire
         Michael E. Lawlor, Esquire
        On Behalf of Defendant Harris:
         Gerard P. Martin, Esquire
         Paul Flannery, Esquire
        On Behalf of Defendant Martin:
         Thomas L. Crowe, Esquire
         James G. Pyne, Esquire
        On Behalf of Defendant Gardner:
         Adam H. Kurland, Esquire
         Barry Coburn, Esquire

Reported by:
Mary M. Zajac, RPR
Room 5515, U.S. Courthouse
101 West Lombard Street
Baltimore, Maryland 21201

1          (Proceedings at 9:35 a.m.)

2          THE COURT:  We ready to proceed?

3          MR. HARDING:  Yes, Your Honor.

4          THE COURT:  Who are you calling, Mr. Hanlon?

5          MR. HARDING:  Kelly David, Your Honor.

6          THE COURT:  Kelly David and then Ms. Smith?

7          MR. HARDING:  Yes.

8          THE COURT:  All right.  We'll have the jury, please.

9    Counsel, I received a letter from one of the jurors, which I will

10   share with you this morning.  Mainly the concern is about the

11   weekend of November 14th, 15th and 16th, which we're not

12   scheduled to sit.  So it's no concern.

13         MR. HANLON:  Your Honor, would the Court like us to

14   bring out the witness?

15         THE COURT:  Yes.  If you could just bring her in, sure.

16         MR. HANLON:  It will be Kelly David.

17         THE COURT:  Why don't we wait until the jury comes?

18         MR. HANLON:  Certainly.

19         (Jury enters the courtroom.)

20         THE COURT:  Ladies and gentlemen, good morning.  We're

21   ready to proceed.  Once again, we will interrupt a witness so

22   that we can accommodate the needs and schedules of a couple of

23   other witnesses.  Mr. Montgomery will be back with us this

24   morning.  But for now we're going to have two additional

25   witnesses.  Mr. Hanlon, your next witness.

1          MR. HANLON:  Thank you, Your Honor.  The United States

2     calls Kelly David to the stand.

3          THE COURT:  All right.

4          MR. HANLON:  And the witness is on the way out.

5          KELLY DAVID, GOVERNMENT'S WITNESS, SWORN

6          THE WITNESS:  I do.

7          THE CLERK:  Be seated.  Speak directly toward the mike.

8     State your name and spell it for the record, please.

9          THE WITNESS:  My name is Kelly David.  K-E-L-L-Y.

10     D-A-V-I-D.

11          DIRECT EXAMINATION

12     BY MR. HANLON:

13     Q    Ms. David, good morning to you.

14     A    Good morning.

15     Q    How old are you, ma'am?

16     A    35.

17     Q    And do you currently live in Baltimore County, Maryland?

18     A    No, I don't.

19     Q    Where do you live?  What locality do you live in?

20     A    Baltimore City.

21     Q    And did you grow up in the Baltimore area?

22     A    Yes.

23     Q    What do you do for a living?

24     A    Safety and security.

25     Q    And how long have you been out of school?  Just a ballpark.

DIRECT EXAMINATION OF KELLY DAVID                                    4

1    A    A really long time.

2    Q    I shouldn't have asked that, Ms. David.  I'm sorry.  How far

3    did you go in school?

4    A    Twelfth grade.

5    Q    I won't ask you when you were in 12th grade.  We've moved

6    past that now.

7            Let me direct your attention.  Do you have any

8    children?

9    A    Yes.

10   Q    And how many children do you have?

11   A    Two.

12   Q    And boys, girls?

13   A    Boy and a girl.

14   Q    And how old are they?

15   A    18 and 16.

16   Q    Now, let me direct your attention to a few years back, June

17   7th of 2002.  Do you remember that particular day?

18   A    Yes, sir.

19   Q    Where were you living at that time?

20   A    Baltimore County, Bramble Lane.

21   Q    Specifically, were you living at 8618 Bramble Lane?

22   A    Yes, Apartment 102.

23   Q    And that's an apartment building, then?

24   A    Yes.

25   Q    How long did you live at 8618 Bramble Lane?

1    A    Eleven years.

2    Q    So quite a while?

3    A    Yes.

4    Q    And since June 7th of 2002, you've since moved on to another

5    home, is that right?

6    A    Yes.

7    Q    On June 7th of 2002, in the afternoon, did you work that

8    day?

9    A    Yes.

10    Q    Where were you working at that time?

11    A    The YMCA of Central Maryland in Catonsville.

12    Q    And what kind of work did you do for the YMCA?

13    A    I was Assistant Family Center Director.

14    Q    And directing your attention just approximately to around

15    4:30, 5:00 or thereabouts, is that about when you returned home,

16    typically?

17    A    Yes.

18    Q    When you would go home from the YMCA, so you're going from

19    your office to Bramble Lane, what general route would you take?

20    A    I would take South Rolling Road up to Frederick Road.  Then

21    take North Rolling Road all the way up to Windsor Mills Road, up

22    to Mayfield, and then Carlson Lane, Old Court Road, and then turn

23    into Bramble Lane.

24    Q    There were a number of streets that you mentioned there.

25    But shortly before you arrived home typically, you would be on

1    something called Carlson Lane?

2    A    Yes.

3    Q    And Carlson, for our court reporter, is C-A-R-L-S-O-N, is

4    that right?

5    A    Yes.

6    Q    Is this a route you took home pretty much every day?

7    A    Yes.

8    Q    Were you fairly familiar with it?

9    A    Yes.

10   Q    On this particular day, June 7th of 2002, as you were on

11   your way home, did you receive a phone call while you were on

12   Carlson Lane?

13   A    Yes.

14   Q    I gather this would have been on your cell phone?

15   A    Yes.

16   Q    Who was the phone call from?

17   A    My son.

18   Q    And you and your son had a brief conversation that day?

19   A    Yes.

20   Q    Without getting into what your son told you that day, did

21   you give any instructions to your son after that phone call?

22   A    Yes.

23   Q    What did you tell your son to do?

24   A    Get your tail in the house right now.

25   Q    So there was a reason you wanted your son to get into the

1    house quickly?

2    A    Yes.

3    Q    And again, after that phone call, did you sort of speed up

4    to try to get home quicker?

5    A    Yes.

6    Q    Again, without getting into details, did you receive

7    information that you were worried about over the phone?

8    A    Yes.

9    Q    Now, you're on Carlson Lane at that point?

10   A    Yes, I am.

11   Q    As you're heading up Carlson Lane in the direction you took

12   to go home, did something happen to you?

13   A    Yes.

14   Q    What happened?

15   A    Two young men ran out in front of my car.

16   Q    If you remember, these two young men, at that time had you

17   ever seen them before?  Did you have any idea who they were?

18   A    No.

19   Q    Was it only two men?

20   A    Yes.

21   Q    You mentioned that they ran out in front of your car.  Were

22   those your words?

23   A    Yes.

24   Q    From what direction were they coming, if you could tell?

25   A    They came out of the parking lot of Northwest Hospital.

1    Q    Your Honor, may I approach witness and put something on the

2    easel at this point?

3              THE COURT:  Yes.

4              MR. HANLON:  Try not to trip myself.

5              THE COURT:  Yeah.  Can we perhaps move that laptop

6    until it's needed, Mr. Harding?  Thank you.  So that the cable

7    isn't -- if you could just put it on your table.

8              MR. HARDING:  Could I put the speakers over here to

9    accomplish the same thing in moving the wires?

10             THE COURT:  Okay.  All right.  Thank you.

11   BY MR. HANLON:

12   Q    Is this in an all right position for the easel?  I'm

13   assuming the jury can see it.  Now, Ms. David, I've put a big

14   overhead map up on the easel.  For your information, I've put a

15   few post-it notes on to redact it a little bit for things we'll

16   use with other witnesses.  So you don't need to worry about that

17   stuff.  But this map is marked as Government's Exhibit S-1.

18             Could you tell us, basically, what this area is that's

19   shown in this photograph?

20   A    This --

21             THE COURT:  Ms. David, I'm sorry.  But because of the

22   setup of the courtroom, I'm going to need you to speak into the

23   microphone.  And then when you're looking at the map, if you

24   could just turn back when you need to speak.

25             THE WITNESS:  Sure.

1          THE COURT:  Thank you.

2          THE WITNESS:  The area is the Randallstown area, close

3    to where I live.

4          MR. HANLON:  Your Honor, the mike is working.

5          THE COURT:  Okay.  Great.

6    BY MR. HANLON:

7    Q    Ms. David, would you be comfortable using this?

8    A    Sure.  That would be fine.

9    Q    Why don't you take the mike?  Now you're going to be in a

10   night club singer mode for a few minutes.  So this is the, this

11   area includes your neighborhood and some of the surroundings, is

12   that right?

13   A    Yes, that's correct.

14   Q    If you could, it may be obscured by post-its.  Could you

15   circle with your hand where your apartment building was in 2002,

16   in June?

17   A    My apartment building, this is Bramble Lane.  The post-its

18   are kind of sort of in the way.  I'm like right over here.  Right

19   over in this area.  Actually right over here, where the other

20   post-it is.

21   Q    So it's under one of the post-its?

22   A    Yes.

23   Q    Now, if you would, if you could indicate with your finger,

24   what would typically be the route that you would take home to get

25   home from work?

1    A    Okay.  I went just kind of straight up Carlson Lane because

2    where it cuts off at, I would turn from Windsor Mill Road on to

3    Mayfield, then turn from Mayfield on to Carson Lane.  Then come

4    up straight up Carlson Lane, make the right on Old Court, go up

5    to Gray Fox, which is pretty much Bramble Lane where the main

6    entrance is.  Go down, go around and go to the back.

7    Q    And if you would, again, focusing on Carlson Lane, which

8    runs up through the middle of the map, would you tell us

9    approximately wherever you were when you saw these two men run

10   out in front of your car?

11   A    Okay.  This is Northwest Hospital right here.  This is

12   Stevenswood.  Right here it's the house and then this is the

13   drive, well, the exit from the hospital.  So I'm like right here,

14   right about here in between the house and where the black steel

15   fence is that they have separating the hospital from the

16   residences.

17   Q    And for the record, you're indicating with your finger

18   Carlson Lane just a few, a little bit south of the complex that

19   you're indicating is Northwest Hospital?

20   A    Yes.

21   Q    And last question.  The direction that you saw these two men

22   coming from, if you could tell the jury where you saw them coming

23   from?

24   A    Yes.  They came from the driveway part out of this way and

25   came across and cut right in front of my car, because at this

1    point this is where I am.

2    Q    All right.  I think at this point you can give me the mike

3    back.  You may be seated.  We may use it again.  Thank you.

4         Now, understanding that you saw right where the men

5    were coming from, would you have had any way of knowing, Ms.

6    David, where they'd been prior to that or where they were

7    ultimately originating from?

8    A    No.

9    Q    Is that mike not on?

10   A    No.

11   Q    Now, when the men ran out in front of your car, what

12   happened?

13   A    As soon as they ran out in front of my car, because I had

14   accelerated due to the phone call that I got from my son, I like

15   hit one of them.

16   Q    When you say that you hit one of them, tell us exactly what

17   you mean.

18   A    The first one, I didn't.  The second young man who was

19   shorter in height, that's the one I hit.  Once I did that, I was

20   like, Oh, my God, I'm getting ready to go to jail.  I'm like, Are

21   you okay?  And he just looked and kind of nudged his head and

22   continued on past me.

23   Q    And that was the individual that you feel like you hit a

24   little bit?

25   A    Yes.

1    Q    He continued he past you.  How about the other one who you

2    did not hit?

3    A    The other young man stopped, which was a taller gentleman.

4    Just stopped and watched, I guess to make sure if the other

5    person was okay, and then they both just continued on down

6    Carlson Lane.

7    Q    I'm going to ask you in a moment where, what direction they

8    took as they continued down Carlson Lane.  But let me ask you

9    about the encounter a little bit.  You've already touched on this

10   a little bit.  It was two men, is that right?

11   A    Yes.

12   Q    Could you tell what their racial or ethnic backgrounds were?

13   A    African-American.

14   Q    You've indicated that one of them was shorter than the

15   other?

16   A    Yes.

17   Q    And was it the shorter or the taller individual that you

18   feel like you made contact with your vehicle?

19   A    The shorter individual.

20   Q    And he was the second one?

21   A    Yes.

22   Q    Now, the taller individual, the other one, never made

23   contact with your vehicle that you're aware of?

24   A    No.

25   Q    If you could, describe the contact that the shorter man made

1    with your car.  What was the contact?

2    A    More of a hands-on bumper type contact.

3    Q    So the shorter gentleman actually touched your car with his

4    hands?

5    A    Yes.

6    Q    Now, after this, you were surprised by this?

7    A    Yes, I was.

8    Q    Had you seen these two men coming prior to seeing them in

9    front of your car?

10   A    No.

11   Q    You asked them if they were okay?

12   A    Yes.  The shorter young man, I asked him was he okay.

13   Q    Did either the shorter man or the other one say anything in

14   response?

15   A    No.

16   Q    Did you say anything else to them?

17   A    No.

18   Q    Did, did you notice anything about the kind of look that

19   either of these two men had on their face as you were asking them

20   if they were okay or as you were looking in their direction?

21   A    The shorter young man, which my focus was more on him, he

22   had a, of course, a surprising look, startled look, pretty much

23   the same that I had.  More like a deer in headlights type look.

24   Q    And then they moved on, is that correct?

25   A    Yes.

1    Q    When they moved on down Carlson Lane, what speed were they

2    taking?  Were they walking, running, trotting?

3    A    A very fast, speedy walk.

4    Q    And did either of them say anything to you at all prior to

5    leaving?

6    A    No.

7    Q    Let me ask you about what they looked like, more or less.

8    We've talked about their racial background and we've talked about

9    the fact that they were both men, is that correct?

10   A    Yes.

11   Q    Let me ask you about the first one who you've described as

12   the taller individual.  Do you have any recollection about what

13   he was wearing, what his clothing looked like?

14   A    Just the light colored shirt, the Tims, the jeans.

15   Q    You mentioned a light colored shirt, Tims and jeans?

16   A    Yes, Timberland boots.  I'm sorry.

17   Q    That's fine.  That was going to be my question.  What does

18   "Tims" mean?

19   A    Timberland boots.  Timberland boots.

20   Q    Do you remember what the color of the taller man's boots

21   were?

22   A    The butter color.  Like the neutral, natural color of Tims,

23   the tan color.

24   Q    Do you remember if the taller man was wearing anything on

25   his head?

1    A    No, I can't remember.

2    Q    Do you have a recollection of anything that the shorter man,

3    the second one, was wearing at that time?

4    A    Jeans as well, butter Tims, Timberland boots.  His braids,

5    he had very fine braids.

6    Q    The shorter man had very fine braids?

7    A    Yes.

8    Q    If you would, and I'm not a hairdresser so I want to make

9    sure that we're clear for the record.  What do you money by

10   braids?

11   A    They're braids that go straight back, straight back braids.

12   I noticed them because at the time I got my hair braided a lot.

13   I was like, wow, his hair looks really nice.  I wonder who did

14   his hair.

15   Q    And that's something that you've noticed from time to time,

16   is that right?

17   A    Yes.

18   Q    In fact, you and I have talked about this case and gone over

19   these facts a number of times, is that correct?

20   A    Yes.

21   Q    These braids, Ms. David, is this something that you've often

22   remembered, a particular detail you remember about this case?

23   A    Yes.

24   Q    Is that because you liked the braids?

25   A    Yes.  Because I liked the braids a lot.

1    Q    Now, Ms. David, you, at approximately this time, ultimately

2    there came a time when you had to actually talked to the police

3    about this encounter on Carlson Lane, is that right?

4    A    Yes.

5    Q    And just for the record, it's not because you were being

6    investigated for hitting anybody, is that right?

7    A    Yes.

8    Q    And you did a written statement for the police that day, is

9    that correct?

10   A    Yes.

11   Q    Your Honor, may I approach?

12        THE COURT:  Yes.

13   Q    Ms. David, if this is okay, I'd like you to take at that for

14   a minute.  And just read to it yourself and tell me if it

15   refreshes your recollection about whether the taller of men was

16   wearing anything on his hat, on his head.  I'm sorry.

17   A    Yes.

18   Q    It does refresh your recollection?

19   A    Yes.

20   Q    With your recollection refreshed, what, if anything, was the

21   taller man wearing on his head?

22   A    A red hat.

23   Q    And sitting here today, do you remember seeing the red hat?

24   A    Yes.

25   Q    Now, after this encounter, about how long are we talking

1    about here?  Seconds?  Minutes?

2    A    Encounter from?

3    Q    The time that the men were in front of your car.

4    A    From when I wrote this statement?

5    Q    No.  No.  I'm sorry.  Let me step back.  How long were the

6    two guys in front of your car?  How long did you have to look at

7    them?

8    A    Oh, maybe about a good 15 to 30 seconds.

9    Q    And during that time, what was the weather like that day?

10   A    It was a nice, sunny day.  Bright.  Clear.

11   Q    No rain on your windshield or anything?

12   A    No.  No rain.

13   Q    Do you wear glasses or anything like that?

14   A    Yes.

15   Q    I see you're wearing glasses today.

16   A    Yes.  Yes.

17   Q    Were you wearing them at the time?

18   A    Yes.

19   Q    Was there anything obstructing your view of the two men?

20   Anything obstructing your view of their faces or what they were

21   wearing?

22   A    No.

23   Q    Did you get a clear look at them?

24   A    Yes.

25   Q    After that 15 or 30 seconds or so, the men moved on as

1    you've already testified?

2    A    Yes.

3    Q    If you would, describe to the jury the direction they took

4    and where they seemed to be going, from what you could observe?

5    A    Okay.  As you guys can see on the map, Carlson Lane, I was

6    going towards Old Court.  They were going down Carlson Lane

7    towards Winfield Elementary School, as well as a day care center

8    that would be on left-hand side of the street.

9              Just before you hit the day care center, it's a little

10   cut pathway that they beared off into the woods.

11   Q    And if it's all right with the Court, I'm going to ask you

12   to take the microphone again and show us where the day care

13   center and woods are.

14   A    Okay.  Okay.  As you come down Carlson Lane, right here's

15   the day care center.  And it's little cut path just, just before

16   you hit the day care center to go off into, further off into the

17   woods.  So this is the day care center.

18   Q    Ms. David, did you, were you able to tell if the men -- did

19   you actually see them walk into the wooded path or did you just

20   see them heading in that direction?

21   A    No, I saw them walk off into the wooded path.

22   Q    Now, this would have been behind you at that point, is that

23   correct?

24   A    Yes.

25   Q    Because you've moved up Carlson Lane?

1    A    Yes.

2    Q    Were still looking at them, trying to gauge where they were

3    going?

4    A    Yes, in my side view mirror and only because I was so

5    concerned that I hit someone.

6    Q    Were you a little nervous about this whole encounter?

7    A    Yes.

8    Q    After the men went in the woods, did you see them, where

9    they went after they went into the woods?  Did you follow them or

10   anything like that?

11   A    No.

12   Q    Where did you go after that?

13   A    Home.

14   Q    And again, that's Bramble Lane?

15   A    Yes.

16   Q    When you got home, was there any police activity around your

17   house?

18   A    Not just as I pulled up.

19   Q    Did you see anything when you got home to Bramble Lane?

20   A    Yes.

21   Q    What did you see on Bramble Lane when you got home?

22   A    My neighbor.

23   Q    And just to be clear, not what you were told by anyone else,

24   just what you observed with your own eyes.

25   A    Yes.  My neighbor under the deck of my other neighbor's

DIRECT EXAMINATION OF KELLY DAVID                    20

1    apartment.

2    Q    I'm going to show you a photograph which, if it's working,

3    will come up on your screen.  Do you see this photograph in front

4    of you?

5    A    Yes.

6    Q    This has been marked as Government's Exhibit S-56.  What is

7    this that we see on the screen?

8    A    This is the apartment building where I live.

9    Q    And it's not quite super easy to see.  But does that say

10   8618 there?

11   A    Yes.

12   Q    Is your personal apartment shown in this photograph, the one

13   that you lived in at that time?

14   A    No.

15   Q    Where was, approximately where was your apartment relative

16   to this photo?

17   A    My apartment is in the back.

18   Q    Now, you mentioned that you saw a neighbor under another

19   neighbor's balcony?

20   A    Yes.

21   Q    Let me direct your attention to this part that I'm circling

22   with my hand there.  What is that part of the photograph, S-56,

23   that I've circled?

24   A    That's where I saw my neighbor laying.

25   Q    Was there anyone with her, anybody attending to her, giving

1    her any kind of help?

2    A    Yes.  The young lady that lives in the apartment right

3    above, right where the deck is, she was trying to assist her,

4    trying to help her.

5    Q    What was her name?

6    A    Serena -- I don't remember Serena's last name.

7    Q    Now, could you tell whether or not your neighbor -- first of

8    all, did you know this neighbor's name, the one who was under the

9    balcony?

10   A    No, I didn't know her name.  She hadn't been living in the

11   apartment long.

12   Q    But you recognized her as a neighbor?

13   A    Yes.

14   Q    Did she appear to be injured?

15   A    Yes.

16   Q    And did you, what did you see in terms of injuries that you

17   could see?

18   A    A lot of blood.

19   Q    At some point, Ms. David, did you, did the police or

20   paramedics arrive?

21   A    Yes.  The police did.

22   Q    And did they do their thing, provide assistance to the lady

23   under the balcony?

24   A    Yes.

25   Q    And did the police officers arrive and look around?  Did the

1   police officers arrive and look around the lawn and the

2   apartment?

3   A    Yes.  Asked questions.

4   Q    Did there come a time when you spoke with a member of the

5   police department?

6   A    Yes.

7   Q    And this would have been a member of the Baltimore County

8   Police Department?

9   A    Yes.

10  Q    And did you describe for him the encounter, that's the word

11  I keep using, but did you describe with him the encounter you had

12  on Carlson Lane with the two men?

13  A    Yes, I did.

14  Q    At some point did you go any place with any police officers?

15  A    Yes.

16  Q    Where did you go?

17  A    The first officer, I went to Carlson Lane to show him

18  exactly where I was and what happened.  And the second officer,

19  he took me to see if these were the two men that I saw on Carlson

20  Lane.

21  Q    So if I understand you correctly, Ms. David, were there two

22  trips you took with the police?

23  A    Yes.

24  Q    And the first one was with an officer over to Carlson Lane

25  and the woods and things like that?

1    A    Yes.

2    Q    And did you show him the wooded area and things?

3    A    Yes, I did.

4    Q    About how long after you got home to Bramble Lane did you

5    take this first trip with the police officer?  Just

6    approximately.

7    A    It couldn't have been five minutes.  Five, ten minutes.

8    Q    After going back to Carlson Lane with that officer, did that

9    first officer take you back to Bramble?

10   A    Yes.

11   Q    And at some point there came a time with when you took

12   another car ride with a second police officer?

13   A    Yes.

14   Q    Again, just approximately, how much time passed before you

15   took that second car ride?

16   A    Maybe another ten, about ten minutes, ten to fifteen

17   minutes.

18   Q    When you took that second car ride with the second officer,

19   did he explain to you what the purpose of the trip was or what he

20   would be asking you to do?

21   A    Yes.

22   Q    And what did he tell you?  What information did the officer

23   give you?

24   A    All he said was, I just want you to see if these are the two

25   guys that you saw on Carlson Lane.

1    Q    And then he drove you from Bramble Lane some place?

2    A    Yes.

3    Q    Do you know where he took you?

4    A    He took me on the other side of Carlson Lane, like further

5    down Old Court Road, past a nursing home.  And all the streets

6    over there like end with the same name almost.  It's not far from

7    where I live at.

8    Q    I'm going to approach this map again with the Court's

9    permission.  Ms. David, I'm just going to ask you if, to show me,

10   there's a neighborhood right here.  I'm sort of indicating

11   broadly and circling with my hand on the left side, left lower

12   side of Government's Exhibit S-1.  Is this the neighborhood you

13   were just mentioning on the reverse side of Carlson Lane woods?

14   A    Yes, it is.

15   Q    And you've indicated that all the streets had green

16   something, Greens Lane, Green Mead, South Green, Green Knoll,

17   Green Brush.  Does that sound right?

18   A    Yes.  They all end or begin with the same name.

19   Q    How long did it take to get from Bramble Lane down to that

20   green neighborhood?

21   A    Maybe about six minutes driving.

22   Q    During the car trip, you've testified about what the officer

23   asked you, told you about what you were going to do.  Did he give

24   you any information about the people you were going to look at or

25   whether they'd been arrested or whether anything had been found

1    on them or what they were wearing or anything like that?

2    A    No.

3    Q    Did you know anything from the officer, from any police

4    officers, other than that you were being driven out to this

5    neighborhood to take a look at a couple guys?

6    A    No.

7    Q    At some point did you turn into this neighborhood and did

8    the officer stop some place and allow you to look at something?

9    A    He didn't quite stop.  He more so slowed down.  Because

10   before he came to a stop, I said, Those are the two guys right

11   there.

12   Q    Let me ask you about that.  You pulled into the neighborhood

13   with the officer?

14   A    Yes.

15   Q    Was there anyone else in the car with you, by the way?

16   Other than you and the officer?

17   A    No.  No.

18   Q    You pull in and at some point you see two men, is that

19   right?

20   A    Yes.

21   Q    Were there officers around these two individuals?  Were

22   there police cars or police officers in the area?

23   A    Yes.

24   Q    And the two guys or the two gentlemen that you looked at, I

25   assume, were not in uniform, they were not police officer or

1   anything like that?

2   A    Yes.  The two that I identified.  They just had on regular

3   clothes.  But it was one officer that I saw standing.

4   Q    When you first saw these men, when you first glimpsed them,

5   what kind of a look were you able to get at them at that point?

6   A    They didn't see me.  The two young men didn't see me.

7   Q    What kind of look were you able to get at them?

8   A    Oh, a good look.  A nice clear look.

9   Q    Do you remember if they were standing or sitting when you

10  first saw them?

11  A    One was sitting.  The one that was sitting on the curb was

12  the one with the fine braids.  And that's the first one I

13  noticed.

14  Q    And when you saw these men and you had a chance to look at

15  them, did you tell anything to the officer you were with?

16  A    Yes.  I said, Officer, those are the two young men that I

17  saw on Carlson Lane.

18  Q    And again, you've already anticipated this, but the two men

19  that you saw on the street with the police officer, were these

20  the two men you'd seen earlier on Carlson Lane?

21  A    Yes.

22  Q    Were you 100% certain about that at the time?

23  A    Yes.

24  Q    What was it about these two men that caused you to believe

25  and caused you to conclude that they were the same ones you had

DIRECT EXAMINATION OF KELLY DAVID                    27

1  seen on Carlson Lane?

2  A    The braids, of course.  And the fact that I was afraid

3  because I knew I had ran into the smaller one, or the shorter

4  one, rather.

5  Q    Being afraid, why did that cause you to have a stronger

6  sense of what they looked like?

7  A    Just, A, I know, I know this guy right here, I know I ran

8  into this guy, the braids, the jeans, the butter Tims.  This is

9  the young man.

10 Q    Did it cause you to look at him more closely?

11 A    From the first time, yes.

12 Q    Was one of the two men that you saw with the police, was one

13 taller than the other one?

14 A    The shorter one was sitting down.  So yes.

15 Q    And which of the ones had the braids that you noticed?

16 A    The shorter young man.

17 Q    When you told the police officer that these were the men

18 you'd seen, what was his reaction?

19 A    He said, Are you sure?  And I said yes.  He said, Are you

20 certain?  I said yes.  He said, Okay, thank you, and then took me

21 back to Bramble Lane.

22 Q    And were you sure and were you certain?

23 A    Yes.

24 Q    Police officer took you back to Bramble Lane.  Did he give

25 you any other information about the two men or the case or

1    anything like that?

2    A    No.

3    Q    Ms. David, up to that time, had you had any contact or had

4    you had any chance to talk to an neighbor of yours named Andrea

5    Smith, by any chance?

6    A    Yes.

7    Q    And again, prior to going out with the police officers to

8    the scene and things like that, did you know one way or the other

9    whether Ms. Smith had, had a chance to look at these two men or

10   to, to identify or not identify these men?  Did you have any

11   sense of whether or not she had done that or whether or not she

12   had seen anything or what she'd seen?

13   A    No.

14   Q    Now, we've talked about the two men that you identified out

15   in the green neighborhood at about, and that process.  Let me ask

16   you this.  This is back in 2002, is that right?

17   A    Yes.

18   Q    If you saw these two men again, either the shorter one with

19   the braids or the taller one, would you know if you saw them

20   again, would you recognize them?

21   A    No.

22   Q    Because of the time that's passed?

23   A    Right.  No, I wouldn't.

24   Q    Looking around the courtroom today, do you know one way or

25   the other whether either of those two men are in court today?

1    A    No, sir.

2    Q    They could be, they might not be?  You're not sure?

3    A    Right.  I'm not sure.

4    Q    You mentioned the fact that one of the men during the

5    Carlson Lane encounter actually touched his hands to your bumper,

6    is that right?

7    A    Yes.

8    Q    At any point, is that something that you told the police

9    about or informed the police, by the way, one of them touched my

10   car?

11   A    No, I didn't.

12   Q    Did not occur to you?

13   A    No.

14   Q    Thank you, Ms. David.  Nothing further, Your Honor.

15        THE COURT:  Would you like some water, Ms. David?

16        THE WITNESS:  No.  It's cold in here.

17        THE COURT:  Feels great to me.  Sorry.

18        CROSS EXAMINATION

19   BY MR. KURLAND:

20   Q    Judge, just give me a moment.  I just need to look at one

21   thing.

22        THE COURT:  Certainly.  I can't offer you hot tea, Ms.

23   David.

24        THE WITNESS:  How are you doing today?

25        THE COURT:  I'm fine, thank you.

1          THE WITNESS:  Good.

2     BY MR. KURLAND:

3     Q     Good morning, Ms. David.

4     A     Good morning.  How are you?

5     Q     I'm pretty good.  I just have a couple of questions, just to

6     clarify a few things that you said a few moments ago with Mr.

7     Hanlon.  I take it that at the time that you were driving up

8     Carlson Lane and first saw the two, the two men, when you

9     thought, when you hit one, you obviously were nervous and scared?

10    A     Yes.

11    Q     Okay.  And I think you actually testified that you thought,

12    Oh, my God, I was going to jail?

13    A     Yes.

14    Q     So your heart must have been pounding very quickly?

15    A     Yes.

16    Q     I take it that's obviously not the most ideal time to, you

17    know, clear headed make decisions and stuff?  Would you agree

18    with that?

19    A     No, I wouldn't.

20    Q     Okay.  So you're saying that you're pretty clear headed when

21    you hit somebody and you think you're going to go to jail?

22    A     Yes.

23    Q     Okay.  All right.  Was your heart bracing?

24    A     Yes.

25    Q     And you've decided to speed up a little bit and kind of

1    speed home?

2    A    Yes, after the phone call.

3    Q    Sure.

4    A    Right.

5    Q    Just wanted to get that clear.  Okay.  Just a couple other

6    things.  We're now after Mr. Hanlon showed you your earlier

7    statement.  You're now, you're pretty clear, you are certain that

8    the taller one was wearing a red hat, is that correct?

9    A    Yes.

10   Q    So you said a few minutes ago, with respect to Mr. Hanlon,

11   that you didn't tell the police at the time that one of the

12   suspects actually touched your car?

13   A    Yes.

14   Q    And so I take it, then, that your car was never, the police

15   officers or nobody took your car to get dusted for prints or

16   anything?

17   A    No.

18   Q    All right.  If I may, Your Honor, I would like to approach

19   the witness and have her look at the same earlier statement that

20   I believe Mr. Hanlon showed her.

21             THE COURT:  Certainly.  She may have a copy of it.

22   Q    Is that up there?

23   A    Yes.

24   Q    Anyway, without actually reading it aloud, if you could take

25   a look at the second page of the document, which is denominated

1    Page Two.  And if you look up at the last four lines that are

2    written.  Just for clarification.  Without saying what's on the

3    document, this is the police statement that was given on June

4    7th, 2002, that you wrote down, with police officers?

5    A    Yes.

6    Q    Okay.  That was obviously much closer in time then than we

7    are today with respect to the event?

8    A    Yes.

9    Q    Now, is there anything on that document that refreshes your

10   memory as to whether or not you told the police officers about

11   whether or not any of the suspects had any type of contact with

12   your car?

13   A    Yes, I did.

14   Q    Okay.  Just for clarification.  You say, Yes, you did.  So

15   now is it your recollection that you did, in fact, tell the

16   police officers that one of the, one of the men you saw actually

17   did touch your car?

18   A    Hit the bumper but not with his hands.

19   Q    I understand that.  But, so you did tell them that you had,

20   one of the guys you saw actually did come into physical contact

21   with your car?

22   A    Yes.

23   Q    And that information was given to the police officers that

24   day?

25   A    Yes.

1    Q    And, but, as you said before, the police never took your car

2    away and had it dusted for fingerprints or palm prints or

3    anything?

4    A    No.

5    Q    That's all with respect that.  I just have a couple more

6    questions.  Okay.  I know that, you know, your heart was racing a

7    little bit but you were pretty clear-eyed, as you testified to,

8    you know, that you pushed open, in pretty good shape as to be

9    clear-headed.

10        When you saw the two men run out, did you have any

11   chance to see whether or not there was any writing on their

12   shirts?

13   A    I don't remember.

14   Q    You don't remember?

15   A    I mean, I can look at my statement.

16   Q    Okay.  Please look at your statement, see if your statement

17   refreshes your memory as to whether or not you saw any words or

18   writings on the shirts.

19   A    No.

20   Q    Okay.  When you say no, meaning what?

21   A    No, I didn't see any writings or statements, logos on the

22   shirts.

23   Q    Okay.  And at the time you saw the two men, you were able to

24   observe, I would assume, both the men's hands, correct?

25   A    Yes.

Case 1:04-cr-00029-RDB    Document 682    Filed 06/08/09    Page 34 of 193

1    Q    And there was nothing in their hands?

2    A    No.  I didn't see anything in their hands.

3    Q    Okay.  And when they were, you said they walked fast,

4    correct?

5    A    Once away from my car, yes.

6    Q    They walked fast.  And that was even after you hit one?

7    A    Yes.

8    Q    So as they walked away and walked fast, they didn't appear

9    to be impeded or hurt in any way?

10   A    Right.

11   Q    Didn't appear to have anything, you know, you know, stuck

12   down their shorts in such a way that would make them walk with a

13   limp or anything?

14   A    No.

15   Q    Okay.  And I just have a few more questions.  Let me just

16   kind of doublecheck my notes on a few things.

17          Oh, at the time that -- Mr. Hanlon asked you a series

18   of questions concerning what you observed when the police brought

19   you back that second time.  The first time you went out to look,

20   to show the police officers where on Carlson Lane you had the

21   contact?

22   A    Yes.

23   Q    The first time.  And then you went to that area in that

24   other neighborhood where, where you observed the two men that you

25   said were the two you saw on the street?

1    A    Yes.

2    Q    I want to just ask you a couple of questions about what they

3    were wearing at the time.

4         Is it your testimony that they were wearing the same

5    type of clothes at the time you saw them with, when the police

6    officers were standing around them than when they were in the,

7    than when you hit, when you saw them on Carlson Lane?

8    A    When I saw them on Carlson Lane, I noticed the shorter,

9    young man with the fine braids.  That goes without saying.

10   Q    Sure.

11   A    The butter Tims, which are Timberland boots, and the jeans,

12   right off the bat.  I was like, oh, those are the two guys right

13   there.

14   Q    Okay.  So based on the fact that one had that, the braids

15   you liked and the Timberland jeans.  That wasn't my question.  My

16   question was, were the two men wearing the same articles of

17   clothing at the time you saw them when the police took you out to

18   that other neighborhood as compared to when you saw them just a

19   couple of minutes before on Carlson Lane?

20   A    I can't remember.

21   Q    You can't remember.  Okay.  Let me just ask you one other

22   thing, and I don't mean to be, you know, nitpicking or anything.

23   But I take it my eyes are bad.  What's the color of your, of the

24   outfit you're wearing?  Is that blue or --

25   A    Yes.  It's blue jean.

1   Q    Okay.  Isn't it correct to say that the first time that you

2   described the taller man you saw who was wearing the red hat,

3   that he was wearing black jeans?

4   A    Yes, if it's in my statement, yes.

5   Q    Why don't you just doublecheck and just have that refresh

6   your memory.  Then the question is, the first time, your first

7   description of the taller man with the red hat, that you say he

8   was wearing black jeans?

9   A    Yes.

10  Q    Can I just have a moment with co-counsel?

11           THE COURT:  Certainly.

12           (Pause in proceedings.)

13           MR. KURLAND:  I have no further questions, Your Honor.

14  Thank you, Ms. David.

15           THE WITNESS: Okay.

16           THE COURT:  Any redirect?

17           REDIRECT EXAMINATION

18  BY MR. HANLON:

19  Q    Just briefly, Your Honor, I think.  Ms. David, you still

20  have that statement in front of you?

21  A    Yes.

22  Q    If you would, Mr. Kurland asked you a couple of questions

23  about whether or not you told the police about any contact either

24  of these men had had with the car.  I believe during direct I

25  asked you a similar question in relation to whether or not you

1    talked to the police about whether the men touched their hands to

2    the car.  Did you tell any of the police officers whether the

3    men, either of them, had touched their hands to any part of your

4    car?

5    A    No.

6    Q    And if you would, if you wouldn't mind, can you read that

7    last part of your statement, the question and answer, the very

8    end of your statement, that Mr. Kurland ask you about, about what

9    it is you articulated for the police that day in your statement?

10   A    Yes.  The one in the gray shirt hit the bumper and gave

11   eye-to-eye contact.

12   Q    So you told the police about a hit on the bumper?

13   A    Yes.

14   Q    But there was no discussion about touching his hands to the

15   car?

16   A    No.

17   Q    You were asked some questions about whether or not there was

18   any writing on any of the men's shirts when you saw them on

19   Carlson Lane.  If I understood you correctly, you don't remember

20   seeing any writing, is that correct?

21   A    Right.

22   Q    Do you remember anything about the type of shirts the men

23   were wearing?  The color or anything like that?

24   A    Both, both young men had on shirts in light color.

25   Q    Whether they were gray or white?

1    A    Right.  Gray, light gray, white.  They were both light in

2    color.

3    Q    And you talked about Tims during direct.  And I apologize if

4    I didn't ask you this.  Was it just one of the men wearing Tims,

5    Timberland boots, or were both of the mean wearing Timberland

6    boots?

7    A    Both of the men were wearing Timberland boots.

8    Q    And you do not remember one way or the other whether the men

9    were clothed exactly the same way when you saw them on Carlson

10   Lane versus when you made the identification in the green

11   neighborhood, is that right?

12   A    That's right.

13   Q    Your Honor, I believe that is all I have.

14            MR. KURLAND:  Court's indulgence for just one quick

15   moment, Your Honor.

16            THE COURT:  Yes, Mr. Kurland.

17            MR. KURLAND:  I just might have one question.  Nothing,

18   Your Honor.

19            THE COURT:  Thank you.  Thank you very much, Ms. David.

20   You are excused.

21            THE WITNESS:  Thank you.

22            THE COURT:  Next witness.

23            MR. HANLON:  Your Honor, the United States calls Andrea

24   Smith.

25            ANDREA SMITH, GOVERNMENT'S WITNESS, SWORN

```
 1                THE WITNESS:  I do.

 2                THE CLERK:  Be seated.  Scoot up and speak directly

 3    toward the mike.  State your name and spell it for the record.

 4                THE WITNESS:  Andrea Smith.

 5                THE COURT:  Spell your first and last name, please, Ms.

 6    Smith.

 7                THE WITNESS:  A-N --

 8                THE COURT:  Get close, get closer to the microphone,

 9    please.

10                THE WITNESS:  A-N-D-R-E-A.  S-M-I-T-H.

11                DIRECT EXAMINATION

12    BY MR. HANLON:

13    Q    Thank you, Your Honor.  Ms. Smith, good morning to you.  How

14    are you today?

15    A    Fine.

16    Q    Do you need any water or anything like that before I begin?

17    A    No.

18    Q    How old are you, Ms. Smith?

19    A    19.

20    Q    And you currently live in Baltimore City or Baltimore

21    County, this area, is that correct?

22    A    My family lives in Baltimore County.

23    Q    Do you live, your family lives in Baltimore County but I

24    think you're in school, is that correct?

25    A    Um-hum.
```

1    Q    That's a yes?

2    A    Yes.

3    Q    And --

4         THE COURT:  I'm sorry.  Ms. Smith, get a little closer

5    to the microphone, please.  Thank you.

6    Q    And Ms. Smith, if you could maybe raise your voice a little

7    bit for me, I'd appreciate it.  Did you grow up in the Baltimore

8    area?

9    A    Yes.

10   Q    You grew up with your family in Baltimore County?

11   A    Yes.

12   Q    Back in June of 2002, were you living with your mom in

13   Baltimore County at that time?

14   A    Yes.

15   Q    And your address at that time, was it 8618 Bramble Lane?

16   A    Yes.

17   Q    And that's in Baltimore County, is that right?

18   A    Yes.

19   Q    And back in 2002, I don't want to do the math and get it

20   wrong, but were you 12 or 13 at that time?

21   A    I think 13 or 12.  One of them.

22   Q    And you were obviously living with your mom and going to

23   school and things like that at the time, is that right?

24   A    Yes.

25   Q    I guess it's possible June might have been during the summer

1    break.  But you were in school, is that correct?

2    A    Yes.

3    Q    Now, on June 7th of 2002, during the afternoon, did

4    something happen that day that you've had to testify about and

5    that you've talked to the police about a few times?  You've

6    talked to me about as well?

7    A    Yes.

8    Q    And on that particular afternoon, around about 4:30, 5:00 or

9    so, were you outside near your house?

10   A    Yes.

11   Q    What were you doing outside your house?

12   A    Talking.

13   Q    Who were you talking to?

14   A    The people that live in my building.

15   Q    Neighbors and things like that?

16   A    Yes.

17   Q    Was your mom home at that time, do you remember?

18   A    No.

19   Q    Was she working or maybe coming home from work pretty soon?

20   Or was she out running an errand?

21   A    She was at the store.

22   Q    She was at the store?  That's a yes?

23   A    Yes.

24   Q    And what was she doing at the store?

25   A    Shopping.

1    Q    Shopping.  Were you planning on having a cookout or anything

2    like that that day, if you remember?

3    A    As far as I can remember.

4    Q    I know it's a while back.  Now, while you were outside, Ms.

5    Smith, I'm going to show you a picture.  It's going to come up on

6    your screen in front of you.  This is called Government's Exhibit

7    S-56.  And I'm going to zoom in on part of it, if that's okay.

8    Do you see the number right there next to the door?

9    A    Yes.

10   Q    Is this, is that 8618 Bramble Lane?

11   A    Yes.

12   Q    Is this the front entrance to your apartment building that

13   you were living at back in June of 2002?

14   A    Yes.

15   Q    Yes?

16   A    Yes.

17   Q    While you were outside that day, were you near or close to

18   this front entrance?

19   A    Yes.

20   Q    Were you in this area?

21   A    Yes.

22   Q    While you were outside that afternoon, again, 4:30 or 5:00

23   or so, did something happen to one of your neighbors, Ms. Smith?

24   A    Yes.

25   Q    What did you see happen?

1   A    She fell.

2   Q    All right.  Your neighbor fell.  She fell from one place to

3   the other?

4   A    Yes.

5   Q    If you can, describe it on the screen and then I'll circle

6   it.  From where did your neighbor fall?

7   A    From the top porch.

8   Q    Top porch on the left or on the right?

9   A    On the left, my left.

10  Q    So she fell from this porch here?

11  A    Yes.

12  Q    And is this a neighbor that you have recognized as a

13  neighbor?  Did you know her?

14  A    I seen her.

15  Q    Did you know her name at that time?

16  A    No.

17  Q    But you knew she was a neighbor?

18  A    Yes.

19  Q    Do you know if she lived in that apartment?

20  A    Yes.

21  Q    And your neighbor fell.  And did she fall down to the

22  ground?

23  A    Yes.

24  Q    What happened to your neighbor after she fell from that

25  third floor porch down to the ground below?

1    A    She was hurt.

2    Q    And when you say she was hurt, how was she hurt?

3    A    She hurt herself from falling.

4    Q    Where did your neighbor go after she fell from the third

5    floor porch?

6    A    She crawled under the porch.

7    Q    When you say she crawled under the porch, did she crawl

8    under this space here?

9    A    Yes.

10   Q    And she seemed to be hurt, you testified?

11   A    Yes.

12   Q    Did she ask anybody for help or anything like that?

13   A    She told me to call the police.

14   Q    Now, as your neighbor was under the porch, did she, did

15   anyone else come outside?  Did you see anyone else?

16   A    The lady that was on the porch, right there.

17   Q    Um-hum.

18   A    The porch she crawled under, came outside.

19   Q    So there was another lady that came out to check?

20   A    Yeah.

21   Q    And did you see anyone else approach your neighbor who had

22   fallen from the porch and hurt herself?

23   A    After she fell?

24   Q    Yes.

25   A    When?  When the lady came out on her porch?

1    Q    After the lady.

2    A    Yes.

3    Q    All right.  At some point, who else did you see walk up

4    towards your neighbor who was hurt under the porch?

5    A    Two men.

6    Q    Where did these two men come from, Ms. Smith?  Did you see

7    where they came from?

8    A    Upstairs.

9    Q    Upstairs inside the apartment building?

10   A    Yes.

11   Q    And you're still sort of nearby while this is happening, is

12   that right?

13   A    Yes.

14   Q    The two men walked out, and where did the two men go?

15   A    Towards her.

16   Q    Towards your neighbor who was under the porch who was hurt?

17   A    Hmm?

18   Q    They went towards your neighbor who was under the porch

19   hurt?

20   A    Yeah.

21   Q    And when these two men walked up, what did they do?

22   A    They were standing in front of her.

23   Q    The two men?

24   A    Yeah.

25   Q    Were standing in front of your neighbor.  And did they do

1    anything?

2    A    They shoot at her.

3    Q    They shot at her?

4    A    Um-hum.

5    Q    That's a yes?

6    A    Yes.

7    Q    Could you tell if it was both of the men that shot at your

8    neighbor or one of the men that shot at your neighbor?

9    A    One of them.

10   Q    Now, Ms. Smith, do you remember anything, sitting here

11   today, about what these two men were wearing or what they looked

12   like?

13   A    I don't know.

14   Q    They were both men, is that correct?

15   A    Yes.

16   Q    Do you remember what their, what their race or their

17   ethnicity were?

18   A    Yes.

19   Q    And what was their, what was their racial or ethnic

20   background?

21   A    They were colored.

22   Q    African-American?

23   A    Yes.

24   Q    Now, do you remember if one or the other was taller or

25   shorter than the other?

Case 1:04-cr-00029-RDB     Document 682     Filed 06/08/09     Page 47 of 193

1    A    I don't remember.

2    Q    And you don't remember which one of them shot the lady, is

3    that correct?

4    A    Don't remember.

5    Q    Do you remember seeing a gun?

6    A    Yes.

7    Q    And was the gun in one of the two men's hands?

8    A    I don't remember.

9    Q    You remember hearing a bang?

10   A    A bang?

11   Q    Yeah, like a gunshot.

12   A    Yeah.

13   Q    And they shot your neighbor, is that correct?

14   A    Yes.

15   Q    Do you remember if it was more than one shot or just one

16   shot that you heard, or do you remember?

17   A    I don't remember.

18   Q    Now, after one of these two men shot your neighbor, did they

19   do anything else to her?  Did they take anything from her or did

20   they go any place?

21   A    They didn't touch her.

22   Q    Did the two men go any place?

23   A    They ran.

24   Q    And did you see them run?

25   A    Yeah.

1   Q     And in what direction did you see the men run?

2   A     Towards the circle.

3   Q     And when you say "towards the circle", what do you mean by

4   the circle?  Is the circle something near your house?

5   A     Yeah.

6   Q     Is it like a little circle where people can go?

7   A     Um-hum.

8   Q     Your Honor, may I approach the easel?

9         THE COURT:  Yes.

10  Q     Ms. Smith, this big blow-up poster I have is called

11  Government's Exhibit S-1.  And it's sort of like an aerial

12  photographic map.  Does this show some of the area around your

13  neighborhood, including Bramble Lane up around here, where you

14  were living in 2002?

15  A     Yeah.

16  Q     And there's a little red star here.  And is this

17  approximately close to one of the apartment buildings, 8618,

18  where you and your mom were living that we were talking about

19  today?

20  A     What's the question?

21  Q     The red star, is that sort of close, more or less close to

22  8618, to the building that you and your mom were living in in

23  June of 2002?

24  A     Yes.

25  Q     Now, you mentioned that there was a circle and that the men

1    ran in the direction of the circle, is that right?

2    A    Yes.

3    Q    Is this the circle here?

4    A    Yes.

5    Q    Now, past on down the circle from the direction the men were

6    running towards the circle, is the next road down south Old Court

7    Road?

8    A    Yes.

9    Q    And is that the direction that the men were running in?

10   A    Yes.

11   Q    Your Honor, if I may approach one more time.  Ms. Smith,

12   there came a time after you saw what you saw that you actually

13   talked to the police and gave the police a statement about what

14   you had seen that day, is that right?

15   A    Yes.

16   Q    And you actually wrote or something, you actually wrote it

17   yourself or something may have been written for you, that you had

18   a chance to read and sign if it was correct, is that right?  Is

19   that correct?

20   A    Yes.

21   Q    The piece of paper I've just put in front of you, is that

22   the statement that you looked over and signed the day that you

23   saw everything you just described?

24   A    Yes.

25   Q    I'm going to ask you if you can, Ms. Smith, just to read it

1    over to yourself.  Take all the time you need.  And I want, I

2    want you to take a look at it and tell me if it refreshes your

3    recollection about what the men were wearing that day.  And let

4    me know when you're through.

5              (Pause in Proceedings.)

6    A    I read it.

7    Q    Having read your statement, Ms. Smith, does that refresh

8    your recollection, does it help you remember what it was that the

9    men were wearing that day?

10   A    What's the question?

11   Q    Sure.  I'll try to give it to you simpler.  Does reading

12   your statement help you to remember what the men were wearing

13   that day, the ones that you saw shoot your neighbor?  Does it put

14   a picture in your head of what they were wearing?

15   A    Yeah.

16   Q    It does help you remember?

17   A    A little.  Not really.

18   Q    Doesn't really help you remember?

19   A    No, not really.

20   Q    Now, this statement that you read, let me just ask you a

21   couple of questions about the statement itself, Ms. Smith.  This

22   is a statement that you filled out, or not that you filled out,

23   but it was written out and you signed it on June 7th of 2002, is

24   that right?

25   A    Yes.

1    Q    And that was the same day that you witnessed everything that

2    you saw that you just described, is that right?

3    A    Yes.

4    Q    And I think the time on the statement, it's in police

5    military time.  It says 1830.  If my math is right, I think that

6    would have been 6:30 p.m. that you had an opportunity to have the

7    statement written and then you read it and signed it.  Does that

8    sound about right?  About 6:30 p.m.?

9    A    I don't remember what time it was.

10   Q    But it was, does the same day sound right?

11   A    Yeah.

12   Q    When this statement was written out, if I'm looking at it,

13   it looks like part of it was written in one type of handwriting

14   and then there's one line at the end of the second page that's

15   got a different handwriting.  That different handwriting on the

16   second page, is that something that you added in your own hand?

17   A    Yes.

18   Q    The rest of it, was it written down by your mom or by a

19   police officer, somebody for you, to take a look at it and read?

20   A    Yeah.

21   Q    And did you have a chance to read it and did you sign it?

22   A    I signed it.

23   Q    And did, at the time that you filled out the statement or

24   that you signed it, you had a chance to think about everything

25   that had happened and you signed basically what you remembered

1    seeing that day, is that fair?

2    A    Yes.

3    Q    Your Honor, the government would propose to read a segment

4    of this written statement at this time.

5              THE COURT:  You may proceed.

6              MR. KURLAND:  Your Honor, we might need a sidebar on

7    this.

8              THE COURT:  Well, you're only going to read a portion

9    of it, correct?

10              MR. HANLON:  Going to read a portion relating to --

11    well, yes, only a portion under Rule 802(5).

12              MR. KURLAND:  Your Honor, I would like to at least be

13    able to speak with Mr. Hanlon to see what portion.

14              THE COURT:  All right.  You can confer.

15              MR. HANLON:  Certainly, Your Honor.

16              (Pause in Proceedings.)

17    BY MR. HANLON:

18    Q    Thank you, your Honor.  Sorry about that, Ms. Smith.  You

19    still have your written statement in front of you, is that right?

20    A    Yes.

21    Q    Okay.  I'm going to read part of it.  And in fact, from

22    right there.  From where I indicated, I'm going to read this and

23    you tell me if I get any part of it wrong.  Okay?

24              The statement reads:  One man had on a white top and

25    blue pants.  The other one had on a gray top and blue pants.  The

1   one with the gray top had corn rows in his hair.  The other one

2   had a red scarf in his front pocket right.  The one that shot the

3   girl had on a red hat.

4              Did I read that correctly?

5   A    No.  Yes.

6   Q    I did read it correctly?

7   A    Um-hum.

8   Q    Okay.  That's a yes?

9   A    Yes.

10  Q    Now, after the men ran off towards the circle, Ms. Smith,

11  your neighbor was hurt and she'd been shot.  At some point did

12  police and paramedics show up to try to help her?

13  A    Yeah.

14  Q    And did there come a time when you actually talked to a

15  police officer about what you'd seen and gave them the

16  information that you've given today?

17  A    Yes.

18  Q    Did a police officer at some point take you some place to

19  look at someone?

20  A    Yes.

21  Q    And did your mom go with you in the car?

22  A    Yes.

23  Q    The police officer, was he wearing a police uniform?

24  A    I don't remember what he was wearing.

25  Q    And you drove some place with him, is that right?

1    A    Yes.

2    Q    Was it far from your house?  Did it take a long time to get

3    there or did it take a few minutes?

4    A    A few minutes.

5    Q    And was it still light out when you went out with the

6    officer?

7    A    I don't remember.

8    Q    At some point, the officer pulled into a neighborhood with

9    you.  And you drove up and there were some, there were some,

10   well, there were two gentlemen, two guys that you looked at, is

11   that correct?

12   A    Yes.

13   Q    And did the officer, as he was taking you from Bramble Lane

14   to this other neighborhood where you were going to look at these

15   two men, did he tell you that he was taking you out to see if

16   these were the guys you'd seen?

17   A    He didn't say nothing.

18   Q    He didn't say anything?  Did he give you any information or

19   tell you anything about the guys you were coming to look at?

20   A    No.

21   Q    Did you understand that you were going to look at some guys

22   to see if they were the ones you'd seen shoot your neighbor?

23   A    Yes.

24   Q    And when you got out to this other neighborhood and you saw

25   two men, did you tell the police officer anything?

Case 1:04-cr-00029-RDB   Document 682   Filed 06/08/09   Page 55 of 193

1    A    Yes.

2    Q    And what did you tell the officer?  Did you tell him if the

3    men you saw on the street, that the officer showed you, were the

4    men that you'd seen shoot your neighbor?

5    A    Yes.

6    Q    And were you sure about that at the time?

7    A    I think so.

8    Q    This was several years ago, is that right, Ms. Smith?

9    A    Yes.

10   Q    If you saw these men again, would you have any idea if you

11   recognized them, would you know one way or the other if you saw

12   them again?

13   A    No.

14   Q    Looking around the courtroom today, do you know one way or

15   the other whether or not any of the people in this courtroom are

16   the men that you saw do the shooting or that you saw with the

17   police officer?

18   A    I don't know.

19   Q    Thank you, Ms. Smith.  Nothing further, Your Honor.

20        MR. KURLAND:  I just need a moment, Your Honor.

21        THE COURT:  Ms. Rhodes has taken a little ill, ladies

22   and gentlemen.  I've excused her from remaining in the courtroom.

23   Hopefully, she'll be able to rejoin us today.

24        CROSS EXAMINATION

25   BY MR. KURLAND:

1    Q    Good morning, Ms. Smith.

2    A    Hello.

3    Q    Would you like me to call you Andrea or Ms. Smith or do you

4    care?

5    A    I don't care.

6    Q    Okay.  I'll call you Ms. Smith, then.  I'm going to place up

7    on the machine Government's S-56.  Is that in the right direction

8    on your screen?

9    A    Yes.

10   Q    Ms. Smith, I'm just going to ask you a couple of questions.

11   When Mr. Hanlon showed you your statement, just so it's clear,

12   it's your testimony now that it was the, that the man in the red

13   hat was the one that shot?

14   A    Hmm?

15   Q    It was the man in the red hat that, that shot?

16   A    Yeah.  That's what's on the paper.

17   Q    Well, I know it's on the paper, but, I mean, is that your

18   testimony today?

19   A    Yes.

20   Q    All right.  I want you to just take a look at, at S-56, the

21   picture of your, of the apartment building.

22   A    Um-hum.

23   Q    Could you just kind of indicate, and I think if you touch

24   the screen it will make a mark.

25             THE COURT:  I think, Mr. Kurland, it might be more --

1    Q    Should I do it?

2         THE COURT:  Yeah.  If you would do it.

3    Q    Ms. Smith, I want to place a mark on the picture that will

4    show roughly where you were when your neighbor fell off the

5    balcony.

6         THE COURT:  You can approach the witness and have her

7    actually point it out to you.

8    Q    Okay.  And then I'll come back and --

9         THE COURT:  Yes.

10   Q    Ms. Smith, can you kind of, just kind of touch the screen to

11   show where you were when your neighbor fell off the balcony?

12   A    Right here (indicating).

13   Q    You were underneath the balcony?

14   A    I was standing right there.  Right there, right there.

15   Q    Okay.  All right.  I will -- okay.  Let me go back there and

16   I'll try to -- I know it's hard to sometimes put marks on these

17   things.  And I'm not sure I can erase this.  I might need the

18   government's assistance there for the delete button.  All right.

19        Ms. Smith, there's a red marker of some sort on the

20   grass.  Do you see that in the picture?

21   A    Yes.

22   Q    All right.  I'm trying to just get a gauge as to where you

23   were standing in the grass area.  Were you in the grass area or

24   were you up on that first balcony?

25   A    I was in the grass.

1    Q    Okay.  So sort of -- proud of myself -- sort of where I've

2    placed that, the pink mark?  Is that in the same general area

3    where you were?

4    A    I was on that part of the grass.

5    Q    All right.  So I just want to make it clear that that's,

6    that the mark that I placed is roughly in the same general area

7    where you were when you saw what you testified about?

8    A    Yeah.  That's where, where exactly where was, yeah.

9    Q    Okay.  That's what I wanted from that.  I know it's

10   difficult to think back several years and I know it's

11   particularly difficult to think back about this event.  So I'm

12   just going to ask you a couple more questions.  I would like to,

13   I'm going to put up here what's already been admitted into

14   evidence as Government's PH-58.  Okay.

15        Ms. Smith, does the picture of the man that I just put

16   up there, can you see that on your screen?

17   A    A little.

18   Q    A little?  Is it clear on everybody's screen?

19        THE COURT:  Perhaps if you zoom back just a bit, Mr.

20   Kurland, the witness may be able to see it a little.

21   Q    I'm learning.

22        THE COURT:  Good.  Can you see it now, Ms. Smith?

23        THE WITNESS:  Yes.

24        THE COURT:  All right.

25   BY MR. KURLAND:

1    Q    Ms. Smith, do you have any recollection of seeing that man

2    out there on or near the grass on June 7th, 2002?

3    A    I don't know.

4    Q    You don't know?

5    A    I don't know.

6    Q    So it could have been, you just don't know?

7    A    I don't know if that's him.

8    Q    All right.  You don't know if that's him.  So you don't

9    know, you're saying you don't know if it's one of the two men

10   that came down?

11   A    I don't remember what they looked like.

12   Q    Okay.  All right.  It was your testimony that two men came

13   down the stairs, correct?

14   A    Yes.

15   Q    Was there any, did you see any other adult African-American

16   man in that area when you were outside playing with your other

17   friends?

18   A    No.

19   Q    Ms. Smith, again, you indicated a moment ago when Mr. Hanlon

20   was asking you questions, when the police took you out there and

21   asked you to look at the two men, I believe it was your testimony

22   just a few minutes ago that you, you weren't sure if those were

23   the men that you saw at the apartment?

24          MR. HANLON:  Objection, Your Honor.

25          THE WITNESS:  What's the question?

1          THE COURT:  What's the question?

2     BY MR. KURLAND:

3     Q    I guess, was it your testimony that when the police officers

4     took you out to look at the two men, that you weren't 100% sure

5     they were the same guys you saw in front of your apartment?

6     A    I don't remember what they looked like.

7     Q    You don't remember?  Okay.  Just one moment, Your Honor.

8          (Pause in Proceedings.)

9          MR. KURLAND:  I have no further questions, Your Honor.

10    Ms. Smith, I'm finished.

11         THE COURT:  Thank you, Mr. Kurland.

12         MR. HANLON:  Unless there's other cross examination,

13    Your Honor.

14              REDIRECT EXAMINATION

15    BY MR. HANLON:

16    Q    Ms. Smith, just a couple of questions.  When the officer

17    took you out there that day to look at the two men, and you did

18    have a chance to look at them that day, is that right?

19    A    Yes.

20    Q    And when you looked at them, did you tell the police officer

21    that day whether those were the men that you'd seen do the

22    shooting?

23    A    Yes.

24    Q    And did you tell the police officer that they were the men

25    who had done the shooting?  Let me rephrase.

1    A    What are you asking?

2    Q    Is it correct that you told the officer the day that he took

3    you out, when you saw those two men, that those were the men that

4    had done the shooting, is that correct?

5    A    It's possible.

6    Q    When I asked you a few minutes ago during direct examination

7    if the men that you saw out on the street were the men that you'd

8    seen do the shooting, if I recollect your testimony correctly I

9    believe you testified that you thought so.  Am I remembering your

10   testimony right?

11   A    Yes.

12   Q    Thank you, Your Honor.

13          THE COURT:  Ms. Smith, thank you very much.  You're

14   excused.  You can leave that paper there.

15          THE WITNESS:  This here?

16          THE COURT:  Yes.  Thank you.

17          Ladies and gentlemen, we'll take a morning recess at

18   this time.  I'm advised that your snacks have been replenished

19   and I'm glad to hear that.

20          I do expect we're going to have a more abbreviated

21   luncheon recess today and we will be breaking earlier in the

22   afternoon.  So enjoy your snacks.

23          Please leave your note pads on your chairs.  Have no

24   discussion about any of the evidence.  Keep an open mind about

25   all issues.  Jury's excused for a 15 minute recess.  We're in

1   recess for 15 minutes.

2                (Recess at 10:54 p.m.)

3                THE COURT:  Ready for Mr. Montgomery?

4                MR. HARDING:  Yes.

5                THE COURT:  Bring him out, please.  Please be seated.

6                MR. COBURN:  Your Honor, I do need the Court's

7   permission to bring my laptop up to the podium when I cross

8   examine.  It's just for one particular purpose in terms --

9                THE COURT:  I mean, I mean, if those are your notes, I

10  don't have any problem with it.  Is that what you mean?

11               MR. COBURN:  No, Your Honor.  There's actually a

12  demonstrative on it which I wouldn't show the jury until after

13  the witness recites the, what's already on there.

14               THE COURT:  Okay.  Can you tell us?

15               MR. COBURN:  It's --

16               THE COURT:  In other words, is it going to need to be

17  hooked up to the system?

18               MR. COBURN:  It will take two seconds, Your Honor.  I

19  already know how to do it.

20               THE COURT:  All right.  Okay.

21               MR. COBURN:  Just like Mr. Harding's is hooked up right

22  now.

23               THE COURT:  All right.  And what is the demonstrative?

24               MR. COBURN: Just a list of his prior statement.

25               THE COURT:  A list of his prior statements.  That

63

1    you're going to show him?

2            MR. COBURN:  One at a time, with the Court's

3    permission.

4            THE COURT:  Well, is there an objection?

5            MR. HARDING:  Yes.

6            MR. COBURN:  I'm not going to show the statements.

7    It's just a list of what they are.

8            MR. HARDING:  I object to that, Your Honor.

9            MR. COBURN:  I mean, without even knowing, you know,

10   what the purpose of it is in the context of my cross, I'm not

11   sure why he's objecting.

12           THE COURT:  I'm not sure why you get to show -- if it's

13   not in evidence, why would the jury get to see it?

14           MR. COBURN:  I would just propose to use this little

15   list of each statement that he gave just with place, date and

16   time, as a demonstrative.

17           THE COURT:  But if it's a prior inconsistent statement,

18   if that's what you mean, then you can confront him with the

19   statement, not a list of the statement.

20           MR. COBURN:  Okay.  It's probably a little hard for me

21   to address it right now, without Your Honor seeing how it would

22   work in.  So I won't bring it up at this point.  Just if Your

23   Honor would allow me to address it again later, I'm sure there

24   will be a lunch break in the interim.  That would be much

25   appreciated.

1          THE COURT:  All right.  I'll try to find some time to

2     hear you on it.  But if it's not evidence, it's not evidence.

3     And if it's a prior inconsistent statement, it's not evidence.

4          MR. COBURN:  I understand.

5          THE COURT:  All right.

6          MR. MARTIN:  Your Honor, as you may have noticed, I

7     really don't have a dog in this fight with this witness.  There

8     are some things I may want to ask him.  I would like to do it

9     last after all the other defense lawyers are done.  Would that be

10    okay?  I may decide when they're done that I don't have to do it.

11    That's why I'd like to wait.

12         THE COURT:  What is the order that you all have agreed

13    to with this witness?  I know that Mr. Coburn goes first.

14         MR. LAWLOR:  Yeah.  Other than that, it was going to go

15    normal order.  So I guess if this witness, if the Court will

16    permit it, would be Mr. Coburn, myself, Mr. Crowe.

17         THE COURT:  Okay.  I don't have any problem with that.

18         MR. MARTIN:  Thank you, Your Honor.

19         THE COURT:  We'll have the jury, please.

20         Now, Mr. Harding, is there any issue about the Stop

21    Snitching?  Is there no objection?

22         MR. HARDING:  I haven't heard one.

23         THE COURT:  Okay.  I haven't, either.  All right.

24         MR. COBURN:  Well -- okay.

25         THE COURT:  I wasn't inviting one, Mr. Coburn.  Well,

1   the jury's coming out now.

2              MR. COBURN:  I'll say it in three seconds.  We do

3   object to it, Your Honor, on the ground that it's just

4   inflammatory and doesn't relate to Mr. Gardner.

5              THE COURT:  Well, you don't object to it on

6   authentication grounds.  Oh, okay.

7              (Jury enters the courtroom.)

8              THE COURT:  Mr. Montgomery, you remain under oath, of

9   course.

10             Mr. Harding, you may proceed whenever you're ready.

11             CONTINUED DIRECT EXAMINATION

12  BY MR. HARDING:

13  Q    Yes.  Thank you.  Good morning, Mr. Montgomery.

14  A    Good morning.

15  Q    Mr. Montgomery, just to go back to something we did

16  yesterday.  This is your plea agreement in the state, for the

17  state charge, P-3.  And I just want to call your attention.  It

18  says William Montgomery, AKA Michael Rowe.  Did you ever use

19  aliases, Mr. Montgomery?

20  A    Yes.

21  Q    And was Michael Rowe one of your aliases?

22  A    Yes.

23  Q    Is there a real Michael Rowe?

24  A    Yes.

25  Q    Who is it?

1    A    My brother.

2    Q    Okay.  And did you give that name to the police when you got

3    locked up?

4    A    Yes.

5    Q    Okay.  Did you realize that they would fingerprint you and

6    find out who you really were?

7    A    Yes.

8    Q    Okay.  Let me go back to where we were yesterday.  We were

9    talking about these surveillances that you conducted on Darius

10   Spence's apartment during a month and a half period in 2002.  Let

11   me ask you first.  You said that Darius knew you for a long time,

12   that you had known him since childhood basically, is that

13   correct?

14   A    Yes.

15   Q    So he obviously knew what you looked like, is that a safe

16   statement?

17   A    Yes.

18   Q    How about Tonya Jones-Spence?  Did she know what you looked

19   like?  Did you know her?

20   A    She knew of me, yes.

21   Q    Okay.  Do you know, did Darius know what Goo looked like,

22   Mr. Gardner?

23   A    I'm not sure.

24   Q    What about Tonya?

25   A    No.

DIRECT EXAMINATION OF MONTGOMERY                    67

1    Q    Tonya did not know what Goo looked like?

2    A    No.

3    Q    What about E?  Did either Darius or Tonya know what E looked

4    like?

5    A    Darius might have seen E with me before.

6    Q    Okay.  But not Tonya?

7    A    No.

8    Q    So Tonya didn't know either Goo or E, Aaron Holly?

9    A    No.

10   Q    Okay.  Now, we were talking about the stuff that you took

11   out there with you when you did those surveillances.  And you

12   mentioned that you took duct tape out there.  What did you take

13   duct tape for?

14   A    The plan was for Tonya to be duct taped up.

15   Q    Why?

16   A    So I could come in.

17   Q    So who was going to duct tape her up?

18   A    Goo and E.

19   Q    Okay.  And did that include blindfolding or just --

20   A    Yes.

21   Q    -- tying her up?  It did?

22   A    Yes.

23   Q    What about the latex gloves?  You said you took latex gloves

24   out there.  What were those for?

25   A    So we wouldn't leave no fingerprints.

1    Q    And what about the walkie-talkies?

2    A    So we can communicate.

3    Q    Okay.  Where were you -- were you going to be separated?

4    A    For a while, yes.

5    Q    How so?

6    A    Like I was in the car on the day, on any day, I'm normally

7    in the car for a while.  On the day that that took place, I was

8    in the car when she pulled up.  So I called over the

9    walkie-talkie and let them know that she was coming into the

10   building.

11   Q    Okay.  So was the plan all along that they would go into the

12   building and you would stay in the car?

13   A    No.  I was going to come in after they duct taped her up.

14   Q    Oh, I see, yes.  But until she came, were you going to stay

15   in the car?

16   A    Yes.

17   Q    Is that because she could recognize you?

18   A    Yes.

19   Q    And we talked about, just as we broke yesterday afternoon,

20   we were talking about the two guns, the .357 and the .40 caliber.

21   You said that Goo provided both of those guns but he carried only

22   the .357, is that correct?

23   A    Yes.

24   Q    And so E carried the .40 caliber?

25   A    Yes.

1    Q    Was the .40 caliber dirty, Mr. Montgomery?

2    A    Yes.

3    Q    What does "dirty" mean?

4    A    Had a body on it.

5    Q    How did you know that?

6    A    Goo said it.

7    Q    Okay.  You said yesterday that you didn't know whether it

8    was the same .40 caliber that Wayne had mentioned having

9    possession of that had three bodies on it, is that correct?

10   A    Right.

11   Q    But you knew it had at least one body because Goo said it

12   was dirty, is that correct?

13   A    Right.

14   Q    Now, when you were riding in the car, going out there, where

15   did you keep the guns each time you went out there?

16   A    Sometimes we carried them in a black bag.  Sometimes they

17   had them in their dip.

18   Q    What about if they got out to go in the building?  Where

19   would they keep them?

20   A    In their dips.

21   Q    Can you explain exactly what that means, their dips?

22   A    Put the gun in your pants.

23   Q    Okay.  Would that conceal them?

24   A    Yes.

25   Q    So would their shirts be untucked or tucked or what?

1    A    Untucked.

2    Q    I see.  Did you have a gun, Mr. Montgomery, when you would

3    go out there for surveillances?

4    A    No.

5    Q    Did you have a gun at home?

6    A    Yes.

7    Q    Any particular reason why you didn't take it out there when

8    you did these surveillances?

9    A    The gun I was carrying at the time was too big.

10   Q    What kind of gun was it?

11   A    It was a 9 millimeter.

12   Q    Okay.  How many rounds did it have, did it carry in it?

13   A    30.

14   Q    It could carry 30 rounds?

15   A    Yes.

16   Q    Okay.  Is that the one that you later got locked up for, the

17   federal gun charge on?

18   A    Yes.

19   Q    What would happen to the, since you carried the guns out

20   there each day when you were doing these surveillances, five or

21   six days a week, is that correct?

22   A    Yes, something like that, yes.

23   Q    What would you do with, at the end of each day?

24   A    Take them back to E girlfriend house.

25   Q    And where was E's girlfriend's house?

1    A    Town and Country Apartments.

2    Q    And where are they located?

3    A    Across street from Security Mall.

4    Q    Okay.  Do you know where E, Aaron Holly, kept them inside

5    his girlfriend's apartment?

6    A    Inside the stove.

7    Q    Okay.  Were you there sometimes when E went to retrieve the

8    guns or something?

9    A    Yes.

10   Q    What about the duct tape and the walkie-talkies and the

11   latex gloves?  What happened to that stuff each time you returned

12   from doing a surveillance on Tonya and Darius's apartment?

13   A    It was mostly kept in the car.

14   Q    Goo's car?

15   A    Yes.

16   Q    Who got all that stuff, anyway?

17   A    Goo.

18   Q    Where did he get the walkie-talkies from?

19   A    CVS.

20   Q    CVS Pharmacy?

21   A    Yes.

22   Q    Were you with him when he got them?

23   A    Yes.

24   Q    Which pharmacy did he go to?

25   A    One out Randallstown.

1    Q    Okay.  Was that specifically for this project you were

2    doing?

3    A    Yes.

4    Q    What about the latex gloves?  Did Goo get those, too?

5    A    Yes.

6    Q    Do you know where he got those?

7    A    Same spot.

8    Q    Okay.  And then the duct tape?  Do you know, did he get

9    that, also?

10   A    I don't remember.

11   Q    Okay.  Anyway, that stuff got left in Goo's car each time

12   you returned, is that correct?

13   A    Yes.

14   Q    Now, you said before that Mr. Gardner, Goo, was a couple of

15   years older than you, is that correct?

16   A    Yes.

17   Q    What about Aaron Holly?  Was he older than you or younger

18   than you?

19   A    Younger.

20   Q    Okay.  Was he, in fact, at this time, in 2002, was he a

21   juvenile, under 18 years old?

22   A    I think so.

23   Q    Okay.  Who was taller?  Mr. Gardner or Aaron Holly?

24   A    Aaron.

25   Q    Okay.  Was he taller than you, too?

1    A    Yes.

2    Q    Okay.  Now let me call your attention to early May, 2002, in

3    the midst of these surveillances that you were conducting on

4    Darius and Tonya's apartment.  Did you commit another murder in

5    Baltimore City?

6    A    Yes.

7    Q    And who, who did you kill?

8    A    Terry Cheeks.

9    Q    Did anyone pay you to do that?

10   A    Yes.

11   Q    Who?

12   A    Tyree Stewart.

13   Q    Why did Mr. Stewart want Terry Cheeks killed?

14   A    He killed his cousin.

15   Q    Terry Cheeks killed Tyree Stewart's cousin?

16   A    Yes.

17   Q    So did Tyree Stewart hire you to do it?

18   A    Yes.  You can say that, yes.

19   Q    How much did he pay you?

20   A    The original price was 15,000 but I was given 10.

21   Q    Okay.  You got paid but you didn't get paid in full, is that

22   correct?

23   A    Right.

24   Q    Can you tell us where this murder occurred in Baltimore

25   City?

Case 1:04-cr-00029-RDB    Document 602    Filed 06/08/09    Page 74 of 193

1    A    Lanvale and McKean.

2    Q    You say you did this for Tyree Stewart.  Was this the same

3    Tyree Stewart that you had been beefing with ever since 1999, you

4    told us yesterday?

5    A    Yes.

6    Q    Did the beef come to an end?

7    A    No.

8    Q    Does that mean that you were still planning on killing Tyree

9    Stewart some day?

10   A    Yes.

11   Q    But in the meantime you were going to do a hit for him; is

12   that your testimony?

13   A    Yes.

14   Q    You told us yesterday that you were living on Main Avenue,

15   is that correct?

16   A    Yes.

17   Q    And you told us that Aaron Holly had a girlfriend who lived

18   in the Town and Country Apartments across the street from

19   Security Mall.  Was he living there or just, or was that just his

20   girlfriend's place?

21   A    He was staying there.

22   Q    Okay.  Did you know where Mr. Gardner was living at that

23   particular point in time?

24   A    No.

25   Q    How would you get in touch with him each day or how would he

1    get in touch with you?

2    A    I called him or he'll call me.

3    Q    Okay.  After the murder of Terry Cheeks, did you resume your

4    surveillances of Darius and Tonya's apartment every day with Mr.

5    Gardner and Aaron Holly?

6    A    Yes.

7    Q    You'd still go out there in Mr. Gardner's car?

8    A    Sometimes, yes.

9    Q    Well, was there another car you used to go out there in

10   sometimes?

11   A    Sometimes I used to get a rental.

12   Q    Okay.  And sometimes you'd use that car, then?

13   A    Right.

14   Q    Let me ask you.  You said that you would carry the duct tape

15   and the latex gloves and the walkie-talkies out there when you

16   were doing surveillances.  Were you, were you ready to do this

17   home invasion robbery on any of these days if the opportunity

18   arose?

19   A    Yes.

20   Q    Okay.  And yet things dragged on for a month and a half?

21   A    Right.

22   Q    Can you tell us why the opportunity never arose during all

23   those times?

24   A    Because we was mainly trying to get Darius and really

25   couldn't get on his schedule.

1    Q    You couldn't get on his schedule?

2    A    Right.

3    Q    You wanted Darius there because you were going to kill him,

4    is that correct?

5    A    Right.

6    Q    And you told us before that you thought there would be money

7    in the apartment, is that correct?

8    A    Right.

9    Q    Can you give us an idea how much money you thought would be

10   there?

11   A    Momma, Momma told me that Darius wife told him that she seen

12   him counting something like a hundred thousand.  So I had it

13   being a little under.

14   Q    A little under that?

15   A    Yeah.

16   Q    What about drugs?  Did you expect any drugs to be in the

17   apartment?

18   A    Yes.

19   Q    What kind of drugs?

20   A    Marijuana and heroin.

21   Q    Why did you expect those two kinds of drugs to be in the

22   apartment?

23   A    Because I know him to sell marijuana and heroin.

24   Q    You knew Darius to sell those two kinds of drugs?

25   A    Yes.

1    Q    Okay.  Now, you also told us before that you weren't

2    planning on splitting the proceeds of the robbery with Momma, is

3    that correct?

4    A    Right.

5    Q    What about the three of you who were doing all these

6    surveillances and planning to do the robbery together?  Did you

7    have an understanding as to how the proceeds would be split up?

8    A    It was never said, but it was going to be an even split.

9    Q    Okay.  You think that you all just assumed that?

10   A    Yes.

11   Q    Okay.  And did everyone know that Darius was going to be

12   killed?

13   A    Yes.

14   Q    What was the plan for Tonya?

15   A    She wasn't supposed to get hurt.

16   Q    What if something happened?

17   A    Then something happened.

18   Q    What if there was a problem, for example?

19   A    If there was a problem then she, which it was a problem, I

20   guess, so she got killed.

21   Q    Okay.  Did you know, what did you think was going to happen

22   to Tonya prior to the day you actually went out there to do the

23   robbery?

24   A    I had an idea that she probably would be killed.

25   Q    Why was that?

1    A    Because of who I was with.

2    Q    Because of who you were with?

3    A    Right.

4    Q    Mr. Gardner and E?

5    A    Yes.

6    Q    Why was being with them a reason why you would think that

7    Tonya Jones-Spence would be killed?

8                 MR. COBURN:  Objection.

9                 THE COURT:  Overruled.  You may answer.

10   A    E was young and wild, Goo too smart to leave a witness.

11   Q    I see.  Let's go to the day of the robbery itself, Mr.

12   Montgomery.  Did Mr. Gardner pick you up that day in his car?

13   A    Yes.

14   Q    And where did he pick you up at?

15   A    Main Avenue.

16   Q    Was it the same car you told us about before, the Intrepid?

17   A    Yes.

18   Q    Let me show you Government Exhibit S-58.  Does that look

19   like the car?

20   A    Yes.

21   Q    And what color does that look like to you, Mr. Montgomery?

22   A    Green.

23   Q    Okay.  What did you do after Mr. Gardner picked you up?

24   A    We went to E girlfriend house.

25   Q    And what happened then?

1    A    We got the guns and E.  Got out and went out Tonya and them

2    house.

3    Q    Okay.  Now, did Mr. Holly bring the two guns out the way you

4    say he always did in the surveillances?

5    A    Yes.

6    Q    Was Goo's attitude any different that day?

7    A    Yes.

8    Q    How so?

9    A    He was impatient.

10   Q    What led you to conclude he was impatient?

11   A    He said, we going to get the bitch today.

12   Q    We're going to get the bitch today?

13   A    Yes.

14   Q    And who did you understand him to mean by that?

15   A    Going to grab Tonya.

16   Q    Well, what did you say in response to that?

17   A    Fuck it.

18   Q    Is that an agreement or a disagreement?

19   A    Agreement.

20   Q    And so, but what if Darius wasn't there?

21   A    I kill him on the streets later.

22   Q    I see.  So the plan was modified.  You weren't necessarily

23   going to wait for Darius to get home, is that it?

24   A    Right.

25   Q    And that was okay with you?

1    A    Yes.

2    Q    What about Aaron Holly?  Did he agree?

3    A    Yes.

4    Q    Did you have all the other stuff that you've told us about,

5    the rubber gloves and the walkie-talkies and the duct tape?

6    A    Yes.

7    Q    Let me show you S-36.  Does that resemble one of the

8    walkie-talkies that you guys were using at that time?

9    A    Yes.

10   Q    And you said Goo purchased this at a CVS Pharmacy especially

11   for this operation?

12   A    Yes.

13   Q    I'm going to show you S-2.  Does this resemble the duct tape

14   you guys took out there?

15   A    Yes.

16   Q    And this is S-53.  Okay.  Does this resemble the latex

17   gloves that you guys were using at that time?

18   A    Yes.

19   Q    Did it have that black powder on it at the time?

20   A    No.

21   Q    Okay.  Do you know what that black powder is, from your

22   experience?

23   A    The stuff they use to fingerprint you.

24   Q    Okay.  What time of day was it when you guys drove out there

25   to Tonya and Darius's apartment?

1    A    Afternoon.

2    Q    Do you have any more precise idea, just estimating, but

3    early afternoon, late afternoon, what?

4    A    Maybe around like 3:30.

5    Q    Okay.  Was Mr. Gardner driving?

6    A    Yes.

7    Q    What did you do when you got to Tonya and Darius's building?

8    A    I called Momma.

9    Q    Where were you sitting in the car?

10   A    In the back seat.

11   Q    Did you call him from the car?

12   A    Yes.

13   Q    Why did you call him?

14   A    Goo told me to call him and see where Tonya was at.

15   Q    I see.  Did you reach Momma?

16   A    Yes.

17   Q    And did he give you information?

18   A    Yes.

19   Q    About where Tonya was at that point?

20   A    Momma said she was on her way home.

21   Q    Okay.  So what did you do then?

22   A    Goo and E got out the car and went to their normal spot.  I

23   got --

24   Q    Okay.  Just one moment.  Did Momma happen to say why he knew

25   that she was on her way home?

1    A    I think he said he just got off the phone with her.

2    Q    Do you know, was he still having this affair with her at the

3    time?

4    A    Yes.

5    Q    Okay.  Then you said Goo and E got out of the car, is that

6    correct?

7    A    Yes.

8    Q    Do you remember anything about the clothing they had on that

9    day?

10   A    Everybody had hats on.  E had a red hat on.

11   Q    Okay.  You had a hat on, too?

12   A    Yes.

13   Q    Who had the, did you have -- did they take their two guns

14   with them?

15   A    Yes.

16   Q    Who took the .357 magnum?

17   A    Goo.

18   Q    Was that the gun he always carried?

19   A    Yes.

20   Q    And who took the .40 caliber semiautomatic?

21   A    E.

22   Q    That's the one you said was dirty, is that correct?

23   A    Yes.

24   Q    Do you know, was the reason why Goo didn't want to carry the

25   .40 caliber, was that because it was dirty?

1          MR. COBURN:  Objection.

2          THE COURT:  Overruled.  If you know.

3    A    I don't know.

4    Q    Did you see where they put their guns when they left the

5    car?

6    A    They put them in their dips.

7    Q    Okay.  Where did they go?  Let me ask you first, where was

8    your understanding of where they were going to go?

9    A    Into the little basement part of the apartment building.

10   Q    Okay.  I have a map over here that I'm going to pull out, if

11   I may.  Actually, it's not a map.  It's a photograph.

12          You ever used one of these laser pointers, Mr.

13   Montgomery?  You just press the button, a little red dot appears

14   on the map.  Have you had a chance to look at this photograph

15   before?

16   A    Yes.

17   Q    Okay.  Could you take this, then, and indicate where on that

18   photograph you parked or Goo parked the Intrepid that day?

19   A    (Indicating.)

20   Q    Okay.  In that parking lot?

21   A    Yes.

22   Q    And did you tell us where Goo and E were headed, where they

23   were going to go when they got out of the car?

24   A    They were going into the apartment building.

25   Q    Any particular place in the apartment building?

1    A    In the basement.

2    Q    Why in the basement?

3    A    It had a little storage room or something in there.

4    Q    Okay.  What were they going to do when Tonya came home?

5    A    Follow her up the stairs and grab her.

6    Q    And did there come a time when Tonya did, in fact, show up?

7    A    Yes.

8    Q    Where were you when that happened?

9    A    I was still in the parking lot.

10   Q    In the car?

11   A    Yes.

12   Q    And so did you see her drive up?

13   A    Yes.

14   Q    What did you do when you saw that?

15   A    I called Goo or E on the walkie-talkie, let them know that

16   she was coming in the building.

17   Q    Did you reach them?

18   A    Yes.

19   Q    What happened then?

20   A    Then I moved the car.

21   Q    Then you moved the car.  Why did you move the car?

22   A    I always move the car.

23   Q    Did you move it even when you did surveillances out there?

24   A    Some days, yes.

25   Q    Can you show us by using that pointer again where you moved

1    the car to?

2    A    (Indicating.)

3    Q    Okay.  For the record, you moved it to a parking lot above,

4    north of the one where you originally parked.  And it's marked

5    Grey Fox Road on the, on the photograph, is that correct?

6    A    Yes.

7    Q    Let me show you, also, another photograph, which I'm going

8    to put on the screen.  You remember being shown this photograph

9    once before, Mr. Montgomery?

10   A    Yes.

11   Q    And did you sign it on the back?

12   A    Yes.

13   Q    Approximate location of Dodge Intrepid as indicated by

14   William Montgomery?

15   A    Yes.

16   Q    And it says X equals that, right?  Did you make this X right

17   here on the parking lot?

18   A    I don't know.

19   Q    You don't know whether you or someone else did?

20   A    Right.

21   Q    But was that the approximate location of where you parked

22   first when you got to the location?

23   A    Right.

24   Q    And then when you moved it, is this the Grey Fox Road

25   parking lot where you moved to a little further north?

1    A    Over there.

2    Q    You can actually point at the screen and it will actually

3    record where it is you're pointing, if you want to point for us

4    where you parked the second time.  Okay.

5              Now, why was it that you moved?

6    A    I moved in case something went down, nobody get a look at

7    the car.

8    Q    Did you just stay in the car, then, for a little while on

9    Grey Fox Road?

10   A    Yes.

11   Q    What happened then?

12   A    I called back to them, didn't get no answer.

13   Q    You called back on the walkie-talkie?

14   A    Yes.

15   Q    By the way, when you called Momma from the, from the car to

16   find out where Tonya was, you didn't use your walkie-talkie, did

17   you?

18   A    No.

19   Q    Because he didn't have a walkie-talkie?

20   A    No.

21   Q    Whose phone did you use?

22   A    Goo's.

23   Q    Goo had a cell phone?

24   A    Yes.

25   Q    Okay.  When you got out of the car to go up to the building,

1    can you tell us where you went?

2    A    When I got out?

3    Q    Yeah.

4    A    I went inside the building, almost up the first flight of

5    the steps, stopped because somebody on the second floor apartment

6    door was wide open.  So I started coming back down.  Coming out

7    the building, I started hearing shots.

8    Q    Okay.  I've got on the screen right now Government Exhibit

9    S-56.  Do you recognize that?

10   A    Yes.

11   Q    What is it?

12   A    That look like Tonya building.

13   Q    Is that the door you went into?

14   A    Yes.

15   Q    You say you went up, you started to go up the first flight

16   of stairs, is that correct?

17   A    Yes.

18   Q    And you can actually see the stairs in the picture, is that

19   correct?

20   A    Right.

21   Q    Which one was Tonya's apartment?  Was it on the first floor

22   or the second floor or what?

23   A    It was the third floor.

24   Q    Third floor.  Is there another apartment down here below,

25   below here, like a garden apartment?

1    A    I believe so.

2    Q    Okay.  So this is actually a second floor apartment and this

3    is the third floor?

4    A    Yes.

5    Q    So you say you started to go up this first set of stairs,

6    correct?

7    A    Correct.

8    Q    And then what happened?

9    A    Somebody door was wide open.  So I turned around.

10   Q    Somebody on the second floor?

11   A    Yes.

12   Q    So it wasn't the door to Tonya's apartment?

13   A    No.

14   Q    Why did you turn around?

15   A    Didn't want to be recognized.

16   Q    Okay.  What happened then?

17   A    As I was coming out, shots were being fired, she was coming

18   over the balcony.

19   Q    Okay.  So let me see if I have this right.  You came back

20   out this door, is that right?

21   A    Right.

22   Q    Did you look around to see if you could see anything?

23   A    Yes.

24   Q    Where did you look?

25   A    Everywhere.

1    Q    Were there other people around on the yard at that time?

2    A    Yes.

3    Q    Were there any kids, did you notice?

4    A    Yes, it was kids out.

5    Q    Okay.  Now, you say that you heard shots and Tonya was

6    coming over the balcony.  Is that what you said?

7    A    Yes.

8    Q    Which balcony was her balcony?

9    A    This.

10   Q    This one right here?

11   A    Yes.

12   Q    Was she at this end of the balcony or this end of the

13   balcony?

14   A    The other end.

15   Q    This end right here?

16   A    Yes.

17   Q    And you're talking about when you were coming out the door,

18   she was coming over the balcony here?

19   A    Right.

20   Q    Did you make eye contact with her?

21   A    When she hit the ground.

22   Q    Oh.  Before she hit the ground, you did not make eye contact

23   with her?

24   A    No.

25   Q    Was she saying anything when she was coming over the

1    balcony?

2    A    Not that I remember.

3    Q    Did it appear to you that she jumped over the balcony or

4    fell over the balcony?

5    A    It looked like she was jumping but tried to catch herself.

6    Q    And you say there were shots being fired at that time,

7    correct?

8    A    Yes.

9    Q    Could you see who was doing the shooting?

10   A    No.

11   Q    And then she fell, is that correct?

12   A    Right.

13   Q    All the way to the ground?

14   A    Right.

15   Q    And then you made eye contact with her?

16   A    Right.

17   Q    Did she say anything to you?

18   A    No.

19   Q    Did you say anything to her?

20   A    No.

21   Q    What did you do?

22   A    Kept walking.

23   Q    You kept walking?

24   A    Yes.

25   Q    Which direction?

1    A    Back towards the car.

2    Q    Did you come down this walkway or did you cut across the

3    lawn or what?

4    A    I came down the walkway.

5    Q    Right down here?

6    A    Right.

7    Q    Did you turn around?  Could see what happened after that?

8    A    No.

9    Q    So where exactly did you go?

10   A    To the car.

11   Q    Which was parked still in that parking lot marked Grey Fox

12   Road on the photograph behind you, is that correct?

13   A    Yes.

14   Q    Did there come a time when you heard something more?

15   A    I heard more shots.

16   Q    How many more shots, do you remember?

17   A    No.

18   Q    And did you turn around?

19   A    No.

20   Q    If you had turned around, were you in a position where you

21   could have seen what was going on?

22   A    No.

23   Q    Why?

24   A    I was almost at the car.

25   Q    You were almost at the car.  And was there a building

1    between you and where Tonya's place was at that point?

2    A    Yes.

3    Q    Did there come a time when you spoke to or saw Mr. Gardner

4    or Mr. Holly again?

5    A    Yes.  I saw them.

6    Q    You saw them?  Sorry?

7    A    I saw them first.

8    Q    Okay.  What were they doing when you saw them?

9    A    They was running across the parking lot.

10   Q    Which parking lot?  The one where you were parked or the one

11   where you first parked?

12   A    The one where Goo first parked.

13   Q    The one where Goo first parked.  I see.  So what did you do?

14   A    I was trying to call them on the walkie-talkies to let them

15   know that I moved the car.

16   Q    Did you get through to them?

17   A    Not at that time, no.

18   Q    Okay.  So what did they do?

19   A    Kept running.

20   Q    Kept running where?  Could you see where they were running

21   toward?

22   A    No.  I started moving the car.

23   Q    Okay.  Were you in your car already by the time you were

24   trying to talk to them on the walkie-talkie?

25   A    Yes.

1    Q    So you started to move the car.  Where were you going to go?

2    A    I was trying to come around to catch them.

3    Q    Okay.  What happened then?

4    A    I couldn't find them.

5    Q    Did you try to communicate with them by walkie-talkie again?

6    A    Yeah.  I tried to communicate but we was out of contact for

7    a while.  Then we came back in contact.

8    Q    When you made contact with them, where were they?

9    A    They said they was in some woods behind a hospital.

10   Q    Did they say anything else?

11   A    Come get them.

12   Q    Did you?

13   A    Yeah, I was trying.

14   Q    You were driving around on the streets looking for them?

15   A    Right.

16   Q    Okay.  But you weren't able to find them, is that correct?

17   A    Found them too late.

18   Q    You found them too late?

19   A    Yes.

20   Q    Why?

21   A    By the time I found them, there was a police car sitting

22   outside the woods and one behind me.

23   Q    There was a police car behind you?

24   A    Yes.

25   Q    Following you?

1    A    Yes.

2    Q    What did you do when a police car started following you?

3    A    I told them get out the woods.  I told them it was a car

4    behind them, get out the woods.  Then I threw the walkie-talkie

5    out the window.

6    Q    Why did you throw the walkie-talkie out the window?

7    A    Didn't want to be caught with it.

8    Q    Okay.  What happened then?

9    A    I kept driving, turned into some parking complex, parked,

10   jumped out, went into a building.  Police kept going.

11   Q    Why did you pull into some parking complex and get out?

12   A    I tried to act like I was going somewhere.

13   Q    Oh, so were you afraid the police were watching you?

14   A    Yeah, I thought they was going to pull me over.

15   Q    So what did you do when you got out in the parking lot?

16   A    Went into a building.

17   Q    Was this, was this the building where the shooting had taken

18   place or some other building?

19   A    Some other place.

20   Q    Was it in the vicinity?

21   A    Yes.

22   Q    Does it appear on that aerial photograph or is it off the

23   photograph?

24   A    It's off.

25   Q    Okay.  How long did you spend in that parking lot?

1    A    Not long.  I walked around the area.

2    Q    You walked around the area.  Okay.  And then what did you

3    do?

4    A    I waited about an hour, jumped back in the car, went home.

5    Q    You waited an hour?

6    A    Yeah, about an hour.

7    Q    How come so long?

8    A    Just to make sure.

9    Q    Okay.  And then you went home, you say?

10   A    Right.

11   Q    Back to Main Avenue?

12   A    No.

13   Q    Where?

14   A    To my girlfriend house.

15   Q    Okay.  Where was that located?

16   A    Normandy Avenue.

17   Q    And can you tell us the name of your girlfriend?

18   A    Brittany.

19   Q    Where is Normandy Avenue located?

20   A    Edmondson Village.

21   Q    So down in Southwest Baltimore?

22   A    Right.

23   Q    Did you speak to Brittany when you got back there?

24   A    Yes.

25   Q    Did you tell her what happened?

1    A    Didn't have to.

2    Q    You didn't have to?

3    A    No.

4    Q    Why not?

5    A    She seen it on the news.

6    Q    So what did you do when you got home?

7    A    Chilled for a minute.  Then I left and went to Main Avenue.

8    Q    What did you do when you got to Main Avenue?

9    A    Called Momma.

10   Q    Called Momma.  Did you reach him?

11   A    Yes.

12   Q    And why did you call him?

13   A    To let him know what happened, which I did, and tell him

14   come meet me so we can talk.

15   Q    Did you want to meet him right away?

16   A    Yes.

17   Q    Did he agree to meet you?

18   A    Yes.

19   Q    What happened then?

20   A    He met me.  By the time he met me, Tonya had died.  He told

21   me that.  He asked me was I still going to get Darius.  I told

22   him yeah.  I told him give me, give me some crack so I can, while

23   I'm laying low, something to sell.

24   Q    Well, what did he say when you asked him for some crack to

25   sell?

1   A    He was cool with it.

2   Q    He was supposed to pay you some money, too, wasn't he,

3   for -- oh, that was for killing Darius, which you hadn't done

4   yet?

5   A    Right.

6   Q    So did he agree to give you some crack?

7   A    Yes.

8   Q    Any other discussion with him at that first meeting?

9   A    Not that I recall.

10  Q    Where did you meet him, anyway?

11  A    Up Liberty Heights.

12  Q    Some particular spot?

13  A    It's a little shopping center, up there near Garrison.

14  Q    Liberty Heights near Garrison.  Okay.  Well, did he, in

15  fact, get you some crack?

16  A    Yes.

17  Q    How long did it take him to get the crack to you?

18  A    A couple hours maybe.

19  Q    Where did you meet him when a couple of hours passed?

20  A    In the same shopping center.

21  Q    And how much crack did he have for you?

22  A    He brought me a half ounce.

23  Q    Did you have any discussion about Mr. Gardner and Mr. Holly?

24  A    Yes.  He asked me what was up with them.  I told him don't

25  worry about them, they soldiers.

1    Q    You told him, don't worry about them, they're soldiers.

2    What does that mean?

3    A    He was worried would they tell.

4    Q    And what does "soldier" mean?  That they're not going to

5    tell?

6    A    Right.

7    Q    Okay.  Now, you were in Mr. Gardner's car this whole time,

8    is that correct?

9    A    Yes.

10   Q    What did you do with the car?

11   A    I parked it out back of the apartment I was staying at on

12   Main.

13   Q    Was that the one on Normandy or the one on Main Avenue?

14   A    On Main.

15   Q    Okay.  How long did you keep possession of the car?

16   A    I think I had it for about a week before his brother came

17   and got it.

18   Q    How did his brother find you to get the car back?

19   A    Goo told him.

20   Q    Who's his brother?  Do you know his name?

21   A    No.

22   Q    Had you known him before?

23   A    I met him one time before.

24   Q    Okay.  So he just came over to Main Avenue and picked up the

25   car one day?

1   A    Yes.

2   Q    By the way, let me just back up one minute.  You remember

3   signing a photograph and saying that's E shirt, Mr. Montgomery?

4   A    Yes.

5        MR. MARTIN:  What is that exhibit number?

6   Q    This is S-56.  Does that look like the shirt that Aaron

7   Holly had on that day?

8   A    Yes.

9   Q    Did there come a time when you got arrested?

10  A    Yes.

11  Q    Do you remember the day you got arrested?

12  A    July 2nd, 2002.

13  Q    So that would be three, three weeks or so after this murder

14  and robbery, is that correct?

15  A    Yes.

16  Q    Excuse me.  Sorry, Your Honor.  This should be S-67, not

17  S-56.

18       THE COURT:  The photograph of the shirt, T-shirt?

19       MR. HARDING:  Yes.

20       THE COURT:  All right.

21  BY MR. HARDING:

22  Q    And I'm going to re-label S-57, the photograph of the

23  parking lot, as S-68?

24       THE COURT:  So noted.

25  Q    So you got arrested on July 2nd.  What were you arrested

1    for?

2    A    Violation of probation.

3    Q    And then I believe you told us yesterday about how, after

4    you were picked up for that, did they discover your 9 millimeter

5    gun in one of your apartments?

6    A    Yes.

7    Q    Where was it, anyway?  Main Avenue or Normandy or what?

8    A    Normandy.

9    Q    And so you picked up a federal gun charge at that point, is

10   that correct?

11   A    Yes.

12   Q    And sometime after that, you were also charged with murder

13   of Terry Cheeks, am I right?

14   A    Yes.

15   Q    But within about 15 days, you signed this letter called P-17

16   and started to cooperate with the authorities, is that correct?

17   A    Yes.

18   Q    So were you interviewed by detectives?

19   A    Yes.

20   Q    Let me call your attention to the first interview.  What did

21   you tell them about in the first interview you did with them?

22   A    The first interview?

23   Q    Yeah.

24   A    They was asking me about Tyree Stewart.

25   Q    And the Terry Cheeks murder?

1    A    Yes.

2    Q    Did you tell them what you knew about it?

3    A    Yes.

4    Q    Did you have subsequent interviews in the days that followed

5    and the weeks that followed?

6    A    Yes.

7    Q    Did you tell them about this murder of Tonya Jones-Spence?

8    A    Yes.

9    Q    How did it come up?

10   A    I told them.

11   Q    They didn't ask you about it?

12   A    No.

13   Q    Did they have any idea that you were involved in it?

14   A    No.

15        MR. COBURN:  Objection, no foundation.

16        THE COURT:  Overruled.

17   Q    Did you also disclose in those early interviews your whole

18   history with Mr. Mitchell and Mr. Gardner and Mr. Martin?

19   A    Yes.

20   Q    Did you disclose what Mr. Gardner told you about Boo pushing

21   the wrong button on a telephone or the victim pushing the wrong

22   button, one or the other?

23        MR. CROWE:  Objection, Your Honor.

24        THE COURT:  Rephrase the question, please.

25   Q    Did you disclose in your initial interviews the information

1   you had learned from Mr. Gardner about the murder charge that was

2   then pending against --

3           MR. CROWE:  Objection.

4   Q    -- Mr. Martin and Mr. Mitchell?

5           THE COURT:  The objection's overruled.  You may answer.

6           THE WITNESS:  Yes.

7   Q    Did you tell them about the fake alibi?

8           MR. CROWE:  Objection.

9   A    Yes.

10          THE COURT:  Objection's overruled.

11  Q    Did you tell them about what Mr. Gardner had told you about

12  the Bo's voice being on the recording, talking about not checking

13  their pockets?

14          MR. LAWLOR:  Objection.

15          THE COURT:  Overruled.

16  A    Yes.

17  Q    Did you tell them what Mr. Gardner had told you about not

18  believing what the police said about their leaving drugs in the

19  car after that murder?

20  A    Yes.

21  Q    Did you run into Mr. Gardner after you were locked up?

22  A    Yes.

23  Q    Where?

24  A    DOC.

25  Q    DOC?

1    A    Yes.

2    Q    Department of Corrections?

3    A    Yes.

4    Q    Did he tell you, did he talk to you about the charge against

5    him?

6    A    A little bit, yes.

7    Q    What did he say?

8    A    Said it was looking good.

9    Q    It was looking good?

10   A    Yes.

11   Q    What did you understand that to mean?

12   A    That he had a chance of beating it.

13   Q    Okay.  Did you have a later meeting with some detectives

14   where they showed you some photo arrays?

15   A    Yes.

16   Q    Let me show you Government Exhibit S-62.  Is that your

17   signature in the top left-hand corner, next, right above a

18   photograph?

19   A    Yes.

20   Q    Actually, it's sort of fuzzy.  You see the date there, Mr.

21   Montgomery?

22   A    Yes.

23   Q    What is it?

24   A    December 17th, '03.

25   Q    And on the back, is this your writing?

1    A    Yes.

2    Q    I saw Wayne, William Montgomery, is that correct?

3    A    Yes.

4    Q    This is S-63.  Is that your signature above another

5    photograph?

6    A    Yes.

7    Q    Did you write, Goo, William Montgomery?

8    A    Yes.

9    Q    And here's one, S-64.  And your signature doesn't appear

10   anywhere on those particular photographs, does it, Mr.

11   Montgomery?

12   A    No.

13   Q    Did you write no ID?

14   A    Right.

15   Q    This is S-65.  Is that your signature at the top right-hand

16   corner, Mr. Montgomery?

17   A    Yes.

18   Q    These are all the same date, 12/17/03, correct?

19   A    Yes.

20   Q    And did you write, I think it is Bo, William Montgomery?

21   A    Yes.

22   Q    And then here's S-66.  Is that your signature in the lower

23   right, Mr. Montgomery?

24   A    Yes.

25   Q    And did you write, it looks like Bo, William Montgomery?

1    A    Yes.

2    Q    Did you recently have an opportunity to look at the Stop

3    Snitching video, Stop Snitching II video, Mr. Montgomery, or a

4    portion of it?

5    A    Yes.

6    Q    What I'm going to do, Mr. Montgomery, is play just the

7    beginning of the video and then skip, I think, 10 or 15 minutes

8    into the video and play a particular segment of it.  Okay?

9    A    Um-hum.

10            MR. MARTIN:  Just for the record, objection.

11            THE COURT:  Objection is noted.  Overruled.  We're not

12    getting the video.  My law clerk will try to give you some

13    assistance, Mr. Harding.  Function five.

14            MR. COBURN:  Or 8.

15            THE COURT:  Or 10 or 8.  Okay.  Think we got it now.

16            MR. HARDING:  I can't wait to tell my son that I did

17    this, Your Honor.

18            THE COURT:  He won't believe you.

19            MR. HARDING:  Now there's no sound.

20            (Tape playing.)

21            THE COURT:  Is it broadcasting through the speakers?

22            MR. HARDING:  Can you hear it?

23            THE COURT:  Can you pull the mike down a bit?

24            (Video playing.)

25            MR. HARDING:  Okay.  Now I'm going to go to a

1    particular segment, Mr. Montgomery.

2              (Video playing.)

3              MR. HARDING:  I'm trying to back it up a little bit,

4    Your Honor.

5              (Video playing again.)

6    BY MR. HARDING:

7    Q    Do you know this guy who's holding up the cell phone right

8    there, Mr. Montgomery?

9    A    Yes.

10   Q    Who is he?

11   A    Tall Vials.

12   Q    Tall Vials?

13   A    Yes.

14   Q    That sounds like a street name rather than a birth name, is

15   that correct?

16   A    Right.

17   Q    How do you know him?

18   A    From the neighborhood.

19   Q    Which neighborhood are you talking about?

20   A    Edmondson Avenue.

21   Q    Did you ever do crimes with that guy?

22   A    Yes.

23   Q    What crimes?

24   A    We did some little robberies.

25   Q    Little robberies?

1   A    Yes.

2   Q    Did you recognize the, or can you identify the voice on the

3   cell phone?

4   A    No.

5   Q    What does the phrase "put a name out there" or "put that

6   name out there", what does that mean?

7   A    Let it be known.

8   Q    Let it be known.  And can you tell us why people want to put

9   a name out there?

10            MR. MARTIN:  Objection.

11            MR. LAWLOR:  Objection, Your Honor.

12            THE COURT:  Overruled.  You may answer.

13  A    I guess so it wouldn't be safe for us on the streets no

14  more.

15  Q    Okay.  Of the names that he mentioned, do you know who TM

16  is?

17  A    No.

18  Q    Do you know who Darryl Bacon is?

19  A    Yes.

20  Q    And it said Little Will from around Lauretta and Monroe.  Is

21  that where you used to live?

22  A    Yes.

23  Q    That's where your grandmother's house was, as I recall, is

24  that correct?

25  A    Yes.

1    Q    And then they mentioned a couple of other names.  Aaron

2    Brown and -- I'm sorry -- Aaron Butler and Tavon Brown.  Do you

3    know either of those guys?

4    A    Tavon Brown.

5    Q    Where do you know him from?

6    A    He my cell buddy.

7    Q    He's your cell buddy?

8    A    Yes.

9    Q    Is he a federal cooperator, also?

10   A    Yes.

11        MR. MARTIN:  Your Honor, can we take this off the

12   screen?

13        THE COURT:  You done with the exhibit, Mr. Harding?

14        MR. HARDING:  Yes, I am, Your Honor.  I'm going to get

15   it off the screen.  And I am done with my direct of Mr.

16   Montgomery.

17        THE COURT:  Thank you.  Members of the jury, we'll take

18   our luncheon recess at this time.  I'm going to ask you to be

19   back in the jury room, it's now 12:31, I'm going to ask you to be

20   back in the jury room in 60 minutes, by 1:30 this afternoon.

21   Have no discussion about the case.  Please leave your note pads

22   on your chairs.

23        Jury is excused for 60 minutes.

24        (Jury exits the courtroom.)

25        THE COURT:  All right.  Counsel, we will resume

1    hopefully right at 1:30 and go until about 2:45, 2:50.  But I

2    guarantee counsel we will not sit past 3:00.  Yes, Mr. Kurland.

3            MR. KURLAND:  Your Honor, this is Mr. Coburn's witness.

4    But there's a legal issue.  We sent a memo saying that I'm going

5    to argue some of the legal issues with respect to this.  I can do

6    it right now.

7            THE COURT:  Go ahead.

8            MR. KURLAND:  In the government's direct, they elicited

9    from Mr. Montgomery a statement concerning Mr. Gardner being a

10   part --

11           THE COURT:  Can you speak into the microphone?

12           MR. KURLAND:  Oh, sure.  I'm sorry.  On the

13   government's direct of Mr. Montgomery, they elicited from Mr.

14   Montgomery concerning Mr. Gardner's arrest on the Spence homicide

15   and they, and Mr. Montgomery said that Mr. Gardner responded that

16   that case was looking good, he had a chance to beat it.

17           That is highly inflammatory.  The jury is now left with

18   the impression --

19           THE COURT:  I didn't hear an objection.  I specifically

20   did not hear an objection to --

21           MR. KURLAND:  I did not understand that that, that that

22   testimony is nowhere -- I did not expect that.

23           THE COURT:  I didn't, either.  But I didn't hear an

24   objection.

25           MR. KURLAND:  Well, but the fact is they elicited,

1    they've opened the door.  And I believe that now gives us the

2    right to put in the evidence that the Court has earlier ruled

3    wasn't going to come in.  This jury needs to know --

4              THE COURT:  Oh, I see.  You're going back to the

5    question of Mr. Gardner's conviction.

6              MR. KURLAND:  Or the alternative, Your Honor.  This is

7    something Mr. Coburn and I would have to think about, is that in

8    addition to a very specific limiting or, quote, "curative

9    instruction", this is also going to have to be dealt with, if the

10   Court's not going to allow us to get in the prior conviction

11   status.  Because the jury's now obviously misled.  He's going to

12   beat it.  Now he's sitting in court several years later.  The

13   connection as to, well, he must have beaten it or he certainly

14   wasn't convicted of it is now firmly in the jury's mind.

15             If the Court is not going to revisit the prior

16   conviction issue, then I think Mr. Coburn and I have to try to

17   come up with, for the Court's consideration, a combination of

18   both curative instructions now and also some very, very, very

19   detailed both dual sovereignty and limiting instructions with

20   respect to that.

21             THE COURT:  Okay.  Obviously, I suspect that Mr.

22   Coburn's probably not even going to finish his cross of Mr.

23   Montgomery this week, meaning today.  So we will have time to

24   consider that.

25             I'm loath to revisit my decision on the admissibility

1      of Mr. Gardner's conviction and sentence simply on the basis of

2      an un-objected to statement attributed to Mr. Gardner by Mr.

3      Montgomery.  Frankly, I would have sustained the objection.  But

4      I'll consider whatever you want to submit.  But certainly, it

5      doesn't open the door this afternoon for Mr. Coburn in his cross

6      examination to elicit --

7              MR. KURLAND:  We'll submit something in writing.  I

8      will also talk to Mr. Coburn during the break.  I will say, Your

9      Honor, just so the record is very clear on this, the government

10     who, again, was vociferously arguing that the prior conviction

11     should be inadmissible because it was irrelevant, they elicited

12     this on direct.

13              I mean, again, the status, this is clear testimony, a

14     surprise to us, that the government clearly elicited on direct

15     with respect to Mr. Gardner's, the status of the state court

16     conviction.  So --

17              THE COURT:  Well, in fact, of course the jury doesn't

18     have this level of sophistication.  But the question was, did you

19     encounter Mr. Gardner in the Division of Correction?  Now, the

20     only way a person goes to the Division of Correction is if he's

21     been convicted of a crime and sentenced, generally speaking.  So

22     again, I'm not suggesting that the jury has that level of

23     sophistication.

24              So, I mean, on that basis, you're wrong to suggest that

25     the jury would necessarily infer that he, quote-unquote, "beat

1    the charge" because, in fact, he was in the Division of

2    Correction.  Now, I understand he may have been in the Division

3    of Correction for any number of different charges, indictments,

4    convictions, and so forth.

5              But the question was, you encountered him in the

6    Division of Correction.

7              MR. KURLAND:  Your Honor, we're more concerned with

8    looking good, he had a chance to beat it.  And again, here we are

9    six years later --

10             THE COURT:  No.  But from all that appears, he'd

11   already been convicted.

12             MR. KURLAND:  No, Your Honor.

13             THE COURT:  Mr. Gardner may be sitting there right now

14   thinking he's going to beat the charge, I mean, even though the

15   Supreme Court has denied cert or no cert petition was sought.  I

16   take --

17             MR. KURLAND:  Your Honor, that wasn't before --

18             THE COURT:  I take your point.  I take your point.

19   There was no date put on it.  It was the Division of Correction,

20   and there was no objection.

21             So I will consider anything and everything you want to

22   submit.  But for purposes of Mr. Coburn's cross examination this

23   afternoon, the Court has not modified its ruling.

24             MR. COBURN:  Your Honor --

25             THE COURT:  Yes, Mr. Coburn.

1          MR. COBURN:  Thank you so much, Your Honor.  I just

2     want to proffer a couple of things about this.  First of all --

3          THE COURT:  Why are you proffering?  Why aren't we all

4     going off to get a quick lunch?

5          MR. COBURN:  Can Your Honor give me 30 seconds?

6          THE COURT:  Okay.  Go ahead.

7          MR. COBURN:  I apologize for delaying it.  First of

8     all, it would have been my job to object, not Mr. Kurland.  This

9     is my witness.

10          THE COURT:  Well, I'm not getting into that.  All I'm

11     saying, there was no objection.

12          MR. COBURN:  Sure, there wasn't.  From my point of

13     view, the question was calling for an admission from a party

14     opponent.  What he testified to was nowhere in any prior

15     statement.  It was a surprise to me.  As a tactical matter, I was

16     not going to call attention to the jury, the jury's, adding

17     attention to it after the cat was out of the bag.  But I do move

18     to strike it now.

19          THE COURT:  All right.

20          MR. LAWLOR:  Can I just have ten seconds?

21          THE COURT:  Yes, Mr. Lawlor.

22          MR. LAWLOR:  Mr. Martin made an objection to the

23     admission of the Stop Snitching video.  I believe we took it up

24     prior to trial.

25          THE COURT:  We did.  And I specifically asked everybody

1    during the last recess, was there an objection to the

2    authentication of the exhibit, and nobody said yes.

3            MR. LAWLOR:  I think I --

4            THE COURT:  There was an objection, I believe, from Mr.

5    Pyne or Mr., and Mr. Coburn having to do with 403, inflammatory

6    and so forth.  And I overruled that objection.  Mr. Martin

7    objected.

8            MR. LAWLOR:  My question is, the rule has been, and I

9    just want to confirm this, because I might have dozed off for a

10   minute, but Mr. Martin's objection, like all objections, apply to

11   all defendants?

12           THE COURT:  Yes.  Absolutely.  Absolutely.

13           MR. LAWLOR:  That's it.

14           THE COURT:  Okay.  We're in recess until 1:30.

15           (Luncheon recess.)

16           THE COURT:  Can we get the witness back, please?  Mr.

17   Coburn, thank you for your letter.  I very much enjoy getting

18   letters from you.  Please, don't, I mean it.  Don't ever

19   apologize for writing to the Court.  The government still

20   objects?

21           MR. HARDING:  Yes, Your Honor.

22           THE COURT:  Yeah.  The objection's sustained, Mr.

23   Coburn.  You know what it reminds me of?  When I was on the

24   Circuit Court, there was this old sort of taxicab lawyer who, who

25   used to, what he would do is he would use the easel and in effect

1    try to create his own transcript.  Have you ever seen that

2    technique?

3            MR. COBURN:  I'm tried it.

4            THE COURT:  You tried it?  Yeah, that's what you're

5    trying to do here, kind of.  You know, ask the witness a question

6    and he'd put the answer up on the easel.

7            MR. COBURN:  I have.

8            THE COURT:  You know, you know.  Look, the list is not

9    relevant and material.  It's what the witness said during any

10   interview.  And the list itself is not impeaching.  Doesn't

11   matter how many statements he gave.  What's impeaching is if he

12   was inconsistent in any of his statements.

13           MR. COBURN:  Understood, Your Honor.  I do have, I

14   should let Your Honor know.  I've got a little bit of an

15   audiotape of one of his prior statements, which if he's

16   inconsistent, I would propose to use just like a transcript.  I'm

17   assuming it doesn't raise an issue.  It's just like using a

18   transcript.

19           THE COURT:  One of the taped -- I don't see any problem

20   with that.

21           MR. COBURN:  Thank you, Your Honor.

22           THE COURT:  Are you all plugged in and ready to go?

23           MR. COBURN:  Plugged in and ready to go.

24           THE COURT:  All right.  Ms. Rhodes, are you okay?

25           MS. RHODES:  I'm feeling better.  Make it till three.

1          THE COURT:  I said you could leave if you weren't up to

2    sitting here for another hour.

3          MS. RHODES:  Thank you.  No, I would rather --

4          MR. LAWLOR:  She doesn't trust me, judge.

5          THE COURT:  One can see why, Mr. Lawlor, sometimes.

6          MR. LAWLOR:  I was waiting for that.

7          THE COURT:  I hope you feel better.  And I told the

8    jury you weren't feeling well.  If you need to leave, feel free.

9    While we're waiting, Mr. Harding?  What's it look like for next

10   week?

11         MR. HARDING:  Actually --

12         THE COURT:  How are we doing, in other words?

13         MR. HARDING:  Oh, well, we're still behind schedule but

14   we're, I think, more than halfway done.

15         THE COURT:  More than halfway?

16         MR. HARDING:  Yes, Your Honor.  Mr. Hanlon and I

17   haven't worked out witness list for next week so I was hoping to

18   e-mail that information to defense counsel.

19         THE COURT:  Sure.  Please do that before the end of the

20   day tomorrow.

21         MR. HARDING:  Okay.

22         THE COURT:  But you think more than halfway?

23         MR. HARDING:  I do, yes, Your Honor.

24         (Witness enters the courtroom.)

25         THE COURT:  Okay.  All right.  Jury, please.  Ms.

1    Rhodes, I don't remember whether I gave you and Mr. Lawlor a

2    deadline or not, but I've been expecting the formal written

3    proffer.  So if you could work on that over the weekend.

4              MS. RHODES:  Certainly, Your Honor.

5              THE COURT:  You know what I'm referring to?

6              MS. RHODES:  Yes.  Yes.

7              (Jury enters the courtroom.)

8              THE COURT:  Good afternoon, ladies and gentlemen.  Mr.

9    Coburn, I believe you're first up.

10             MR. COBURN:  Thank you so much, Your Honor.

11             THE COURT:  Whenever you're ready.

12             CROSS EXAMINATION

13   BY MR. COBURN:

14   Q    Mr. Montgomery, good afternoon, sir.

15   A    Good afternoon.

16   Q    In your direct examination by the government, you mentioned

17   that sometime after the homicide of Ms. Spence that you

18   described, you met Mr. Gardner in, I think you said the DOC, is

19   that right?

20   A    Yes.

21   Q    And you had a conversation, which the government asked you

22   about, which you told the jury about, right?

23   A    Yes.

24   Q    Now, when you talk about the DOC, that stands for the

25   Department of Corrections, right, sir?

1    A    Yes.

2    Q    Is that in Jessup, Maryland?

3    A    No.

4    Q    Okay.  That's somewhere else?

5    A    In Baltimore.

6    Q    In Baltimore.  Right after the government asked you that

7    series of questions about your conversation where you testified

8    about what was your conversation with Mr. Gardner, the government

9    then played what they referred to as the Stop Snitching II video

10   or a portion of it, correct, sir?

11   A    Right.

12   Q    They played the part of the video in which there's an

13   individual who you said you know, right?

14   A    Right.

15   Q    And what's that person's name again?

16   A    Tall Vials.

17   Q    Tall Vials.  Now, is Mr. Tall Vials sitting in this

18   courtroom anywhere?

19   A    No.

20   Q    You indicated that he's shown on the video.  And we all saw

21   him holding up a cell phone in which he's having a conversation

22   with somebody who says they're in Supermax, is that correct, sir?

23   A    Right.

24   Q    You told the jury that you have no idea who that person is

25   in Supermax who's talking through the cell phone on to the video,

1    is that correct?

2    A    Right.

3    Q    Okay.  And you testified about that right after the

4    government asked you about a conversation you've told us about

5    with Mr. Gardner in which you said Mr. Gardner said that he

6    thought that it was looking good, that he might be able to beat

7    this, right, sir?

8    A    Right.

9    Q    And your interpretation of the Stop Snitching II video in

10   which your name is explicitly mentioned is that this is a threat

11   to your physical safety, is that correct, sir?

12   A    Right.

13   Q    And I believe the government asked you at the very beginning

14   of your testimony, I guess it was yesterday, whether you were in

15   the Federal Witness Protection Program, right, sir?

16   A    Right.

17   Q    And you told us that yes, you were?

18   A    Right.

19   Q    And that is a program that is administered by the U.S.

20   Marshal Service in the United States, right, sir?

21   A    Right.

22   Q    For witnesses who are at risk, right?

23   A    Right.

24   Q    And there have been movies about it, right?

25   A    Right.

Case 1:04-cr-00029-RDB    Document 682    Filed 06/08/09    Page 120 of 193

1    Q    I mean, this is a situation in which people change their

2    names and move to different locations, right?

3    A    Right.

4    Q    Okay.  Now, you have provided testimony about what you've

5    told the jury is criminal conduct by several of the people in

6    this room, right, sir?

7    A    Right.

8    Q    But they are not the only ones that you have cooperated

9    against, are they?

10   A    No.

11   Q    Can you tell the ladies and gentlemen of the jury, those

12   people sitting immediately to your right, Mr. Montgomery, how

13   many times you spoke to either state or federal prosecutors as

14   part of your cooperation that was called for by the plea

15   agreement that Mr. Harding showed you?

16   A    I don't know.

17   Q    Okay.  Well, let me just ask you if you remember the

18   following.  Is it correct that you gave a taped statement to

19   Baltimore City Homicide on July 2nd, 2002?

20   A    Yes.

21   Q    That was the very day of your arrest, right, sir?

22   A    Right.

23   Q    And is it correct that you then gave another taped

24   statement, which is referred to as the second taped statement, to

25   Baltimore City Homicide on July 3rd, 2002, the next day, although

1    perhaps it's more technically the same day because it's at 12:32

2    a.m., just after midnight, is that right?

3    A    Right.

4    Q    And is it correct that you then gave another statement

5    referred to as the third taped statement to Baltimore City

6    Homicide on July 3rd, 2002, this time after the sun came up, at

7    11:08 a.m., is that right?

8    A    I believe so.

9    Q    Is it also correct, Mr. Montgomery, that you engaged in a

10   series, I believe it would be five, consecutive proffer

11   sessions -- you know what the word "proffer" means?

12   A    No.

13   Q    Okay.  Well, this is not a quiz or anything like that.  The

14   only reason I ask is because during the course of your direct

15   testimony the government showed you as an exhibit early in your

16   testimony what they referred to as proffer letter.  Do you

17   remember that?

18   A    Right.

19   Q    Okay.  So you had a series meetings with the U.S. Attorney's

20   office, right?

21   A    Right.

22   Q    And the first one, you can just tell us if this is correct,

23   was on August 13th, 2002, right?

24   A    I don't know the dates.

25   Q    Was there another one, then, on August 23rd, 2002 at 9:30

1    a.m.?

2    A    I wouldn't remember the dates.

3    Q    Okay.  Well, how about, do you remember when, the same day,

4    September 23rd, '02, at 10:45 a.m.?

5    A    I one remember the dates.

6    Q    How about September 26th, '02, at 11:10 a.m.?

7    A    I wouldn't remember the dates.

8    Q    Well, do you remember one three hours later, September 26th,

9    '02, at 2:05 p.m.?

10   A    No.

11   Q    Do you recall giving a recorded statement -- do you remember

12   an individual, Mr. Montgomery, by the name of Dean Stocksdale?

13   A    Yes.

14   Q    Does that name sound familiar?

15   A    Yes.

16   Q    Okay.  Well, do you remember giving him and others a

17   recorded statement on January 23rd -- and this was a detailed

18   recorded statement relating to the Tonya Jones-Spence homicide --

19   do you remember giving that on January 22nd, 2003?

20   A    I remember giving a taped statement but not the date.

21   Q    Okay.  And that was in the U.S. Attorney's office you gave

22   that, right, sir?

23   A    Right.

24   Q    All right.  Do you remember testifying, then, even after

25   that, before a federal grand jury on January 14th, 2004?

1    A    I remember testifying in the grand jury, yes.

2    Q    And do you recall giving testimony in a prior proceeding, a

3    prior proceeding on September 29th, 2004 relating to the Tonya

4    Jones-Spence homicide?  Do you remember that?

5    A    Yes.

6    Q    All right.  Now, during the course of this, this series of

7    conversations that you had first with Baltimore City Homicide,

8    then with the U.S. Attorney's office, plus the recorded statement

9    with Dean Stocksdale that you told us about, tell me whether or

10   not you provided information about what you said was criminal

11   conduct by the following people.  Okay?

12        Tyree Stewart.  Did you say that he had engaged in

13   criminal conduct?

14   A    Yes.

15   Q    I mean, you told law enforcement that it was Tyree Stewart

16   that hired you to murder Terry Cheeks, right?

17   A    Yes.

18   Q    So that would be criminal conduct, correct?

19   A    Right.

20   Q    Do you remember telling law enforcement during the course of

21   your cooperation that we've just talked about, about criminal

22   conduct by someone by the name of Corey Smith?

23   A    Right.

24   Q    Is that correct?

25   A    Yes.

1    Q    Corey Smith was somebody who you described to law

2    enforcement during your cooperation as a self-proclaimed

3    gangster, is that right?

4    A    I don't remember making that statement.

5    Q    Are you telling us that you did not?

6    A    I don't remember.  I don't remember making it.

7    Q    Okay.  Well, then, let me just sharpen this a little bit so

8    we have the record clear.  Is it a fact that during the course of

9    a proffer session with the U.S. Attorney's office on August 23rd,

10   2002 at 10:45, starting at 10:45 a.m., you stated that Corey

11   Smith is a self-proclaimed gangster?

12   A    I don't remember making that statement.

13   Q    So it's false, is that right?

14   A    I'm not saying that.

15   Q    You're just telling us you don't know one way or the other,

16   is that right?

17   A    Right.

18   Q    Did you tell law enforcement about criminal conduct by Corey

19   Smith?

20   A    Yes.

21   Q    Did you tell law enforcement that it was Corey Smith who was

22   basically like the person in the middle?  The intermediary who

23   talked to you and made the arrangements for you to get paid

24   $10,000 for killing Terry Cheeks?  Is that right?

25   A    No.

1    Q    Okay.  Did you tell law enforcement that he was involved in

2    any way in the murder of Terry Cheeks?

3    A    Yes.

4    Q    All right.  So you described criminal conduct by him, too,

5    right?

6    A    Yes.

7    Q    Now, I believe you mentioned, just kind of in passing,

8    during the course of your direct examination where Mr. Harding

9    was asking you questions, someone by the name of Dirty, right?

10   A    Yes.

11   Q    You know who Dirty is, right?

12   A    Yes.

13   Q    I think you told Mr. Harding that Dirty is a friend of

14   yours, is that correct?

15   A    Yes.

16   Q    His real name is Davon Watson, right?

17   A    Yes.

18   Q    Did you tell law enforcement about criminal conduct that he

19   had committed?

20   A    Yes.

21   Q    In fact, you told law enforcement that he had been involved

22   in a murder, right?

23   A    Yes.

24   Q    Did you also tell law enforcement about criminal conduct,

25   and I'm just going to ask you about a number of names here, by

1    someone --

2              MR. HARDING:  Objection, Your Honor.

3              THE COURT:  Overruled.  Go ahead.

4    Q    -- by someone that you knew or know as Dicky, criminal

5    conduct by Dicky?

6    A    Dicky?

7    Q    Dicky.

8    A    I don't know no Dicky.

9    Q    You don't know no Dicky?

10   A    No.

11   Q    Is that your testimony?

12   A    Yes.

13   Q    Okay.  How about someone by the name of Marvin?  These are

14   just nicknames that I'm just, I'm just, you know, you can tell us

15   if you don't know who I'm talking about.  Do you know someone by

16   the name of Marvin from the streets?

17   A    Yes.

18   Q    Did you tell law enforcement about criminal conduct by

19   Marvin?

20   A    Yes.

21   Q    Did you tell law enforcement about criminal conduct by the

22   person that you've referred to and described for the ladies and

23   gentlemen of the jury to your right there, someone by the name of

24   Momma?

25   A    Yes.

1   Q    I mean, you told us just over the last couple of days that

2   it was an arrangement you made with Momma about Momma showing you

3   where Darius Spence lived so you could kill him, right?

4   A    Yes.

5   Q    So that's criminal conduct, right?

6   A    Yes.

7   Q    You also told law enforcement about criminal conduct by

8   Aaron Holly, right?

9   A    Yes.

10  Q    That's the person whose nickname is E, correct?

11  A    Yes.

12  Q    Did you also tell law enforcement about criminal conduct by

13  someone by the name of Kelly?

14  A    Kelly?

15  Q    Kelly.  Does that sound familiar?

16  A    No.

17  Q    So your answer is no, is that correct?

18  A    Right.

19  Q    Did you also tell law enforcement about criminal conduct by

20  someone by the name of Poe, P-O-E?

21  A    Yes.

22  Q    You did?  You told law enforcement that Poe and, I'm going

23  to just ask you, Kelly were involved in the murder of someone by

24  the name of Apple, is that correct?

25  A    No.

1    Q    It's incorrect?

2    A    Right.

3    Q    Did you tell law enforcement about criminal --

4              THE COURT:  I'm sorry.  Is it incorrect that he told

5    them or is it incorrect, that it's not truthful?  Or more

6    accurate?

7              THE WITNESS:  I didn't tell them that.

8    BY MR. COBURN:

9    Q    You didn't say a word about Kelly, is that right?

10   A    No.

11   Q    Is that correct?

12   A    Right.

13   Q    Okay.  And you didn't say anything about Kelly or Poe being

14   involved in the murder of someone by the name of Apple, is that

15   right?

16   A    No.

17   Q    Is that right?

18   A    Right.

19   Q    Okay.  Did you ever hear of somebody by the name of Rog,

20   R-O-G?

21   A    Yes.

22   Q    Did you tell law enforcement about criminal conduct by him?

23   A    Yes.

24   Q    How about Halfie, someone who you know as Halfie.  Did you

25   tell law enforcement about criminal conduct by Halfie?

1    A    Yes.

2    Q    Do you know someone by the name of Angelo Clary, who's known

3    as Pooh?

4    A    Yes.

5    Q    Did you tell law enforcement about criminal conduct by him?

6    A    Yes.

7    Q    How about Antoine Wingo?  Does that name sound familiar?

8    A    No.

9    Q    Never heard of him?

10   A    No.

11   Q    So it's your testimony it, then, as you sit here, that you

12   did not tell law enforcement about any criminal conduct by

13   someone by the name of Antoine Wingo, right?

14   A    No.

15   Q    Is that correct?

16   A    Right.

17   Q    How about someone by the name of Mackie?  Does that name

18   sound familiar?

19   A    Yes.

20   Q    You told them about criminal conduct by him?

21   A    Yes.

22   Q    Dezzy?

23   A    Yes.

24   Q    Did you tell them about criminal conduct by Dezzy?

25   A    Yes.

1   Q    How about someone you know as Smith?  Did you tell law

2   enforcement about criminal conduct by Smith?

3   A    I don't know no Smith.

4   Q    You don't know any Smith?

5   A    No.

6   Q    So you did not, it's your testimony you did not tell law

7   enforcement about criminal conduct by him, right?

8   A    Right.

9   Q    How about Smoky?  Do you know that nickname?

10  A    Yes.

11  Q    Did you tell law enforcement about criminal conduct by him?

12  A    Yes.

13  Q    How about Stink?  Do you know that name?

14  A    Yes.

15  Q    Did you talk to law enforcement about criminal conduct by

16  Stink?

17  A    Yes.

18  Q    Do you know the name Sharif?

19  A    Yes.

20  Q    Did you talk to law enforcement about criminal conduct by

21  him?

22  A    Yes.

23  Q    Do you know someone by the name of Pistol?

24  A    Yes.

25  Q    Did you talk to law enforcement about criminal conduct by

1    him?

2    A    Yes.

3    Q    How about Fruit?

4    A    Yes.

5    Q    Did you talk to law enforcement about criminal conduct by

6    him?

7    A    Yes.

8    Q    Stokes?  Do you know him?

9    A    No.

10   Q    Never heard of anyone by the name of Stokes, is that

11   correct?

12   A    Right.

13   Q    How about Boopie?  Does that name sound familiar?

14   A    Yes.

15   Q    Did you talk to law enforcement about criminal conduct by

16   him?

17   A    Yes.

18   Q    How about Fatty Pooh?  Does that sound familiar?

19   A    Yes.

20   Q    Did you talk to law enforcement about criminal conduct by

21   him?

22   A    Yes.

23   Q    What about Duck?

24   A    Yes.

25   Q    Does that nickname sound familiar?

1    A    Yes.

2    Q    And did you talk to law enforcement about criminal conduct

3    by him?

4    A    Yes.

5    Q    Rough House?

6    A    Yes.

7    Q    Criminal conduct by him?

8    A    Yes.

9    Q    Elkie?

10   A    Yes.

11   Q    Criminal conduct by him?

12   A    Yes.

13   Q    And just two more.  Do you know someone by the name of

14   Vernon Yellowday?

15   A    No.

16   Q    Never heard of him?

17   A    No.

18   Q    How about just Vernon?  Ever heard of him?

19   A    Yes.

20   Q    Did you talk to law enforcement about criminal conduct by

21   him?

22   A    Yes.

23   Q    Now let's talk about one last person, sir.  Do you know

24   someone by the name of Bunk?

25   A    Yes.

1    Q    Did you happen to talk to law enforcement, Mr. Montgomery,

2    about criminal conduct by Bunk?

3    A    Yes.

4    Q    Did you also happen to mention to law enforcement that Bunk

5    had tried to have you killed in jail?

6    A    Yes.

7    Q    You did?

8    A    Yes.

9    Q    Did you say anything about that on your direct examination?

10   A    I don't know.

11   Q    You told law enforcement that someone by the name of Mike J,

12   who was working with Bunk, hired someone by the name of Real to

13   kill you when you were incarcerated, right, sir?

14   A    No.

15   Q    That's wrong?

16   A    Yes.

17   Q    Okay.  Was Mike J involved in any way?

18   A    Yes.

19   Q    Was Real involved in any way?

20   A    No.

21   Q    He was not?

22   A    Right.

23   Q    So there was no one by the name of Real who was supposed to

24   be involved in this scheme by Bunk to kill you, right, sir?

25   A    Right.

1    Q    Okay.  You, Mr. Montgomery, are a hit man, is that correct?

2    A    You could say that, yes.

3    Q    You know a detective by the name of John Giganti, right,

4    sir?

5    A    No.

6    Q    Never met him?

7    A    I probably did.

8    Q    Okay.  Do you know whether anyone by that name was present

9    for any of this series of meetings that you had with law

10   enforcement?

11   A    He probably was.

12   Q    Let me ask you a little bit about the murder of Terry

13   Cheeks.  You've already indicated that Tyree Stewart was involved

14   in this, right, sir?

15   A    Yes.

16   Q    Now, is Tyree Stewart in the courtroom today?

17   A    No.

18   Q    Did Tyree Stewart work with a group of people?

19   A    Yes.

20   Q    Was one of those people Corey Smith?

21   A    Yes.

22   Q    Is Corey Smith in the courtroom today?

23   A    No.

24   Q    Pardon?

25   A    No.

1    Q    Tyree Stewart and Corey Smith were both involved in causing

2    or participating in the events leading to the murder of Terry

3    Cheeks, is that right?

4    A    Yes.

5    Q    Terry Cheeks had a nickname, right, sir?

6    A    Yes.

7    Q    What was that?

8    A    T-Rock.

9    Q    T-Rock.  Did you tell Mr. Harding, I think you may have,

10   during your direct examination, that the reason Terry Cheeks had

11   to die was because he had been involved in the murder of somebody

12   else a couple of weeks earlier, is that correct?

13   A    Yes.

14   Q    And this related in some way to Dirty, right, sir?

15   A    Yes.

16   Q    Okay.  Now, Terry Cheeks or K-Rock, he was a friend of

17   yours, is that correct?

18   A    Yes.

19   Q    He trusted you, is that right?

20   A    Yes.

21   Q    And so what happened, after you made this arrangement to get

22   paid $15,000 for his murder, was that you and he were standing on

23   a street corner one day, is that correct?

24   A    Yes.

25   Q    And he peeked around the corner, is that right, sir?

1   A     Yes.

2   Q     And then you dropped back a little bit.  Right, Mr.

3   Montgomery?

4   A     Yes.

5   Q     And when you dropped back, you pulled out a 9 millimeter

6   semi-automatic handgun, is that correct?

7   A     Yes.

8   Q     You had it in your dip, right, sir?

9   A     Yes.  No.

10  Q     No?

11  A     I had it in my back pocket.

12  Q     Okay.  You pulled it out of your back pocket while Mr.

13  Cheeks, your friend, was peering around the corner.  Right, sir?

14  A     Yes.

15  Q     And you pointed that handgun at the back of his head, is

16  that correct?

17  A     Yes.

18  Q     And you pulled the trigger, right?

19  A     Yes.

20  Q     So you sent a bullet through your friend, Mr. Cheeks's,

21  head, through the back of his head.  I believe, I don't know if

22  you noticed this at the time, but you can tell us, the bullet

23  exited through his left eye, is that correct?  Did you happen to

24  notice that after he fell to the ground after you shot him?

25  A     Yes.

1   Q    But despite the fact that you had just shot your friend,

2   Terry Cheeks, in the back of the head and he fell to the ground,

3   you had the presence of mind before running away to take the gun

4   that he was holding out of his hand first, right, sir?

5   A    I tried to.

6   Q    You didn't succeed?

7   A    No.

8   Q    So you left it there, is that your testimony?

9   A    No.

10  Q    It's not your testimony?

11  A    No.

12  Q    Did you take it with you?

13  A    I didn't, no.

14  Q    Someone you were with took it with them?

15  A    Yes.

16  Q    Okay.  You pulled it out of his hand, is that correct?

17  A    I tried to.

18  Q    Now, have you heard of the Randallstown/Park Heights

19  organization?

20  A    No.

21  Q    Never heard of it?

22  A    No.

23  Q    Did that murder of Terry Cheeks that you committed with your

24  own hands, sir, have anything to do with something called the

25  Randallstown/Park Heights organization?

1    A    No.

2    Q    It is correct, is it not, and I believe you told Mr. Harding

3    this, that prior to your doing this murder for Tyree Stewart, you

4    were beefing with Tyree Stewart, right?

5    A    Yes.

6    Q    That means that you had a dispute with him, is that correct?

7    A    Right.

8    Q    Okay.  And it's correct, is it not, that Tyree Stewart and

9    the people around him nonetheless, despite the fact you committed

10   this murder, put out a contract on you, right, sir?

11   A    Right.

12   Q    And that contract was for a lot bigger amount of money than

13   the 10,000 you were paid for murdering Terry Cheeks or the 15,000

14   you say you were owed for it, correct?

15   A    Right.

16   Q    It was for $50,000 for your murder, right, sir?

17   A    Right.

18   Q    And I think you've already told us that Mr. Cheeks isn't in

19   this court -- I'm sorry -- Mr. Stewart isn't in this courtroom,

20   is he?

21   A    No.

22   Q    Okay.  Now, tell me whether this is correct.  Is it correct

23   that Tyree Stewart and the people around you wanted you dead so

24   badly because you terrorized their stripes, they can't make no

25   money, and you want their money.  They ain't got nobody that can

1   handle you right now.  They're just scared because they know what

2   you are capable of doing when you want to do.  Certain people

3   you've got get them.  That's why all of them --

4            MR. HARDING:  Objection.

5   Q    -- are scared.  Is that right?

6            THE COURT:  The objection is sustained.

7   Q    I believe you told Mr. Harding, in response to one of his

8   questions, that you use a lot of aliases, correct?

9   A    Yes.

10  Q    One of them was your brother's name.  Is that right?

11  A    Right.

12  Q    Michael Rowe, R-O-W-E?

13  A    Right.

14  Q    In fact, that was the name that you actually went through,

15  when you pled guilty to the murder of Terry Cheeks, you actually

16  went through the whole plea proceeding using that name, is that

17  right?

18  A    No.

19  Q    Okay.  Is it correct that you have lied to the police every

20  single time you have been arrested?  Is that accurate?

21  A    Yes.

22  Q    And sometimes they appear to believe you, didn't they?

23  A    Yes.

24  Q    It's correct, is it not, Mr. Montgomery, that the intention

25  or the attempt to rob and murder Darius Spence was your idea,

1    right, sir?

2    A    Right.

3    Q    The reason you came up with the idea of robbing and

4    murdering Darius Spence was because it was worth some money, is

5    that right?

6    A    Right.

7    Q    You have told us, you have testified in response to

8    questions from Mr. Harding that -- let me have the Court's

9    indulgence, if I may, just for a moment.

10            THE COURT:   Yes.

11   Q    You've told us about what you have testified under oath were

12   Goo, that's Shawn Gardner's, reasons for becoming involved in

13   this scheme, is that correct, sir?

14   A    Yes.

15   Q    And you have told this jury under oath that his reason for

16   becoming involved was because he needed money to pay for a lawyer

17   for Shelly Wayne Martin, is that right?

18   A    Right.

19   Q    And you've told this jury that that's what he told you at

20   the time, right, sir?

21   A    Right.

22   Q    Okay.  Now, in any of the prior times that you have talked

23   to law enforcement or testified, any of those times, any of those

24   proffer sessions, any of those taped interviews, the recorded

25   statement with Dean Stocksdale, the testimony before the grand

Case 1:04-cr-00029-RDB   Document 682   Filed 06/08/09   Page 141 of 193

1    jury, or the testimony in the prior proceeding, any of those

2    times when you referred to the Tonya Jones-Spence homicide did

3    you ever, ever before say that, that Mr. Gardner had said that he

4    needed money for Shelly Wayne Martin's lawyer?  Ever once say it?

5    A    Yes.

6    Q    Which one?

7    A    I don't know.

8    Q    But you're sure you said it in one of them, right, sir?

9    A    Right.

10   Q    Did you say it in more than one?

11   A    Probably.

12   Q    Probably.  At least one.  That is your testimony, right,

13   sir?

14   A    Yes.

15   Q    Okay.  During the course of your conversations with the

16   prosecutors and as you prepared for your testimony yesterday and

17   today, have any of the prosecutors in this case talked to you

18   about what this case is about?  In other words, what the

19   allegations are, what's, you know, in the indictment in this

20   case.  Have they talked to you about that at all?

21   A    No.

22   Q    That's your testimony, they never told you anything about

23   that, is that right?

24   A    No.

25   Q    Okay.  Now, you testified yesterday that you and the

1    individuals in this courtroom who you referred to, including Mr.

2    Gardner, you said that you were a family.  You used the word

3    "family", is that right, sir?

4    A    Yes.

5    Q    In any of your prior statements, those ones we were just

6    talking about, any of them, did you ever before today use that

7    word to describe your relationship with these people?

8    A    I believe so, yes.

9    Q    Which one?

10   A    I don't know.

11   Q    But you're sure it's one of them?

12   A    I believe so, yes.

13   Q    How sure are you?  Are you certain?

14   A    Yes.

15   Q    Okay.  I'm referring now to what I called your taped

16   statement.  This occurred on January 22nd, 2003, the conversation

17   with Mr. Stocksdale that we just referred to.  Okay?  Page 10 of

18   the transcript.  Actually, I should tell Your Honor there are a

19   couple of different transcripts of this, one of which we have,

20   the other we don't.  I'm hoping the government has the same one

21   we're looking at.  It's not the official court reporter

22   transcript.

23           Page 10, right around the middle of the page.  And

24   you've told us, and this is just a little bit of repetition, I

25   apologize, you've told us you have previously referred to your

1   relationship Mr. Gardner and others in this courtroom as a

2   family.  Right, sir?

3   A    Yes.

4   Q    Well, then, tell us, Mr. Montgomery, whether on that date I

5   just referred to, January 22nd, 2003, you were asked the

6   following questions and gave the following answers?  And tell us

7   whether the voice that you're hearing on this tape I'm about to

8   play for you, whether that's your voice.  Okay, sir?

9   A    Yes.

10  Q    Apologize, Your Honor.  We have a cassette tape so we've got

11  to use this little --

12           THE COURT:  Old style.

13           MR. COBURN:  Exactly.  Old style.

14           (Tape playing.)

15  Q    Was that your voice?

16  A    That sounds like me, yes.

17  Q    Was that a part of the recorded statement that you gave on

18  January 22nd, 2003?

19  A    I believe so.

20  Q    So you stated, when you gave that statement, that your

21  relationship with Mr. Gardner ain't no serious relationship to

22  have to honor each other, is that correct?

23  A    Correct.

24  Q    And that's true, right, sir?

25  A    Right.

1    Q    And you said you used to associate with him on a regular

2    basis but it wasn't nothing like you met every day or he called

3    you when he got in trouble, right?

4    A    Right.

5    Q    That was true, right, sir?

6    A    Right.

7    Q    The relationship wasn't like what you and Dirty had, right?

8    A    No.

9    Q    Is that right?

10   A    No.

11   Q    It's not right?

12   A    It wasn't like what me and Dirty had.

13   Q    Okay.  You and Dirty were a lot closer, right, sir?

14   A    No.

15   Q    You weren't closer; is that your testimony?

16   A    Right.

17   Q    Okay.  The murder of Mr. Cheeks that we just talked about,

18   that related to Dirty, right, sir?

19   A    Right.

20   Q    Part of the reason you felt you had to do it was because

21   dirty was in danger, right, sir?

22   A    Yes.

23   Q    All right.  Now, you have told this jury that Mr. Gardner

24   was, told you that he needed to be part of this plan, the robbery

25   and murder of Darius Spence, because he needed money for Shelly

1    Wayne Martin's lawyer, right, sir?

2    A    Right.

3    Q    So tell us, then, sir, whether back on January 22nd, 2003,

4    you were asked the following questions about that and gave the

5    following answers?  It's the same page, Page 10 of the

6    transcript, just the very next section.

7              (Tape playing.)

8    Q    Was that your voice?

9    A    Yes.

10   Q    Back on January 22nd, 2003?

11   A    I believe so.

12   Q    So at that time you were asked the question:  Um, was there

13   a particular reason that Gardner was or was part of this plan,

14   right?

15   A    Right.

16   Q    And you responded that he had taken a nice fall, right?

17   A    Right.

18   Q    That he lost a couple of thousand, right, sir?

19   A    Right.

20   Q    And where in that answer, then, did you tell the person who

21   was interviewing you about the need to pay Shelly Wayne Martin's

22   lawyer?

23   A    In that interview?  I guess nowhere in there.

24   Q    Okay.  You were also asked, just a few lines down in the

25   same interview, about your relationship with Aaron Holly.  That's

Case 1:04-cr-00029-RDB    Document 682    Filed 06/08/09    Page 146 of 193

1    a person that you know by the nickname of E, is that correct?

2    A    Yes.

3    Q    And now I'm on Page 11 of the same transcript.  And you

4    stated, he cool, right?

5    A    Probably.

6    Q    Okay.  And then you were asked, and when you say, again, he

7    cool, what do you mean by that?  We can play this.  Just requires

8    us to go a little farther on the tape.  But I'll just ask you.

9         You said, did you not:  Ain't no, I don't know, I

10   don't, I don't trust him like that.  I use him for certain

11   things.  Did you say that?

12   A    Probably so, yes.

13   Q    So you didn't trust him like that, right, sir?

14   A    Right.

15   Q    Is it correct, Mr. Montgomery, that Goo, that's my client,

16   Shawn Gardner, and E had no connection with Darius Spence or

17   Tonya Spence, none, before you got them involved in this plan, is

18   that correct?

19   A    Right.

20   Q    Now, you testified, again, this is yesterday when Mr.

21   Harding was asking you questions about someone by the name of

22   Goose, is that correct?

23   A    Yes.

24   Q    And you testified about there being some planning before,

25   the planning about the murder and robbery of Darius Spence, that

1    there was some planning about a robbery of Goose, is that right?

2    A    Yes.

3    Q    And you told us, did you not, that the people, this is

4    yesterday, when you were on the witness stand here in this

5    courtroom, that people involved in planning the robbery of Goose

6    were Mr. Gardner and Mr. Martin and others, is that right?

7    A    I don't remember.

8    Q    Pardon?

9    A    I don't remember.

10   Q    You don't remember?

11   A    Right.

12   Q    Is it your testimony that Mr. Gardner was involved in the

13   planning of the robbery of Goose?

14   A    Yes.

15   Q    He was?

16   A    Yes.

17   Q    You're sure?

18   A    Yes.

19   Q    Okay.  In any of your prior statements relating to the Tonya

20   Jones-Spence homicide, any of them, did you say -- strike that.

21   Did you say anything about Mr. Gardner being involved in the

22   planning of the robbery of Goose, ever, before today?

23   A    I don't know.

24   Q    Let's take a look now, if we could, at your plea agreement,

25   the one that you executed in connection with your killing of

1    Terry Cheeks.  This is a document that was shown to you by the

2    government.  And if I could impose on Mr. Harding for the

3    government's exhibits, that would be much appreciated.  P-3, is

4    it?  If not, I have another copy of it right here, if it would be

5    easier.  Okay.  That's okay.  I've got it right here.

6              Mr. Montgomery, do you remember being shown a copy of

7    this document during the course of Mr. Harding's questioning of

8    you?

9    A    Yes.

10   Q    All right.  At the title, at the top, it says State of

11   Maryland versus William Montgomery, AKA Michael Rowe, right, sir?

12   A    Yes.

13   Q    Okay.  Then if we move down the page it says, this is right

14   on the first page, under the terms of this agreement are as

15   follows.  It says, does it not, the defendant agrees to cooperate

16   with the State on the following terms and conditions, right?

17   A    Right.

18   Q    It says, and this is just the first sentence there right

19   underneath, the defendant represents that he has fully and

20   truthfully responded to all questions put to him by federal,

21   state, and local law enforcement authorities during all prior

22   proffer sessions.  Right?

23   A    Yes.

24   Q    Now, this document has your signature on it, I believe

25   you've already told us, right, sir?  That's your signature at the

1    back?

2    A    Yes.

3    Q    Just to review a couple of the conditions, the things that

4    you promised when you signed this agreement and that the

5    government promised.  Well, it looks like these pages aren't

6    numbered.  But this, I think, is Page Three of the agreement.  At

7    the very top.  Says, does it not, the United States Attorney's

8    Office for the District of Maryland has represented that the

9    defendant will not be prosecuted by the federal government for

10   his participation in the homicide of Terry Cheeks.  See where it

11   says that at the very top?  Did I read that right?

12   A    Right.

13   Q    Now, it's your understanding that you could have been

14   prosecuted in Federal Court for the murder of Terry Cheeks that

15   you admit you committed, right, sir?

16   A    Yes.

17   Q    But it was one of the conditions of this agreement, in

18   exchange for your willingness to cooperate, that the U.S.

19   Attorney's office, the federal prosecutors in this jurisdiction,

20   agreed that you wouldn't be prosecuted at all for the murder of

21   that person, right, sir?

22   A    At all?

23   Q    Well, that's what it says, right?  That they're not going to

24   prosecute you?

25   A    Right.

1    Q    By the federal government for its participation in the

2    homicide of Terry Cheeks, right, sir?

3    A    Right.

4    Q    Now, you've told us, have you not, that you were also, I

5    mean, deeply involved in what ended up being the murder of Tonya

6    Jones-Spence, right, sir?

7    A    Yes.

8    Q    You drove the car -- I mean, aside from this all being your

9    idea, you drove the car to the scene, right?

10   A    No.

11   Q    Okay.  Well, then, after the car got to the scene, you were

12   driving it, right, sir?

13   A    Right.

14   Q    You waited in the car while the two individuals you said

15   committed this homicide, or committed this attempted robbery and

16   the other events you described were in the apartment building,

17   right, sir?

18   A    Right.

19   Q    It was your intention to, you've told us, to pick them up

20   afterwards, right, sir?

21   A    Right.

22   Q    You were talking to them, you've told us, on a walkie-talkie

23   the whole time, right, sir?

24   A    Right.

25   Q    But you have not been prosecuted at all for this murder,

1    have you, or attempted robbery?

2    A    No.

3    Q    And it is your expectation, is it not, that as part of your

4    cooperation you will never be prosecuted for your role in the

5    death of that young woman, isn't that right?

6    A    Right.

7    Q    Let's continue to go on down this agreement.

8         Subparagraph C there starts with:  At the defendant's

9    sentencing, the State will make a recommendation.  Do you see

10   that?

11   A    Yes.

12   Q    Then the next sentence says:  If the defendant completes all

13   of the terms and conditions set forth in this agreement to the

14   satisfaction of the State, the State will recommend that the

15   defendant receive a maximum sentence of life imprisonment -- and

16   here we get into some legal language, which maybe you can

17   interpret for us -- with all but a cap of 40 years suspended,

18   followed by 5 years supervised probation upon his release.  You

19   understand exactly what that means, right, Mr. Montgomery?

20   A    Right.

21   Q    Now, you understood, did you not, sir, that you could have

22   been facing the death penalty for this murder, right?

23   A    Right.

24   Q    Even if the prosecutors hadn't sought the death penalty, you

25   certainly could have been facing life imprisonment without

1    parole, so you're in jail, in prison, I should say, for the rest

2    of your natural life, correct?

3    A    Right.

4    Q    But instead what's being agreed to here is that the State

5    will recommend that you receive, and again, it says a maximum

6    sentence of life imprisonment with all but a cap of 40 years

7    suspended, right?

8    A    Right.

9    Q    So that means, does it not, Mr. Montgomery, that assuming

10   the State's recommendation is accepted by the Court, you cannot

11   receive more than 40 years for that murder, right, sir?

12   A    Right.

13   Q    But you could receive less, right, sir?

14   A    Right.

15   Q    You're hoping you will, right, Mr. Montgomery?

16   A    Right.

17   Q    And if I understand correctly, sir, you have not been

18   sentenced yet, have you?

19   A    No.

20   Q    But this murder occurred a long time ago, didn't it?

21   A    Right.

22   Q    Back in '02?

23   A    Right.

24   Q    And today it's, right now it's 2008.  So that's about a

25   little more than six years later, right, sir?

1    A    Right.

2    Q    And is it your understanding, then, that the Court is

3    basically kind of waiting, has the matter stayed pending your

4    cooperation?

5    A    Right.

6    Q    So that prosecutors then can make kind of a full,

7    comprehensive representation about how good your cooperation was?

8    A    Right.

9    Q    Then it says, does it not, Subparagraph D:  The State will

10   recommend that the sentence imposed for Indictment Number 10311,

11   and it's got a bunch of numbers, be made to run concurrently with

12   any sentence the defendant may receive for violation of probation

13   under another case number.  See where it says that?

14   A    Yes.

15   Q    Now, do you remember Mr. Harding, when he was asking you

16   questions yesterday and today, I believe he established that when

17   you got arrested after the Cheeks homicide, what you got arrested

18   for was a violation of probation?

19   A    Yes.

20   Q    And so the way probation works, you've been on probation a

21   lot, right, Mr. Montgomery?

22   A    Yes.

23   Q    I mean, how many times have you had a judge sentence you to

24   a period of probation?

25            MR. HARDING:  Objection.

1      THE COURT:  If you know.

2    A    I don't.

3    Q    When you get sentenced to probation, typically, the judge

4    essentially is asking you for a promise that you'll engage in

5    lawful conduct and stay out of trouble, and in exchange, during

6    your period of probation, you won't be incarcerated, right, sir?

7    A    Right.

8    Q    Have you ever actually followed through on a promise like

9    that that you made to a judge?

10   A    No.

11   Q    So each time you made that promise to a judge, you were

12   lying, right?

13   A    Right.

14   Q    This paragraph here, this Subparagraph D, what this is

15   saying, and the key word is right over here, concurrently, you

16   know exactly what that word means, right, Mr. Montgomery?

17   A    Right.

18   Q    Concurrent means that the two sentences are going to run

19   together, right?

20   A    Yes.

21   Q    So in other words, when you serve a day on one, it counts as

22   a day on the other, right?

23   A    Right.

24   Q    So when the two sentences run concurrently, you're really

25   only serving one of them, the longer one, right?

1    A    Right.

2    Q    The other one doesn't really count because those days are

3    elapsing just like, at the same time the sentence, the days on

4    the longer one are going, right, sir?

5    A    It don't count to me, right.

6    Q    Okay.  And so part of the promise that's being made to you

7    in exchange for your cooperation is that basically you're not

8    doing any additional time on this violation of probation, right?

9    A    Right.

10   Q    And that charge, by the way, that you were on probation for,

11   was that a gun charge?

12   A    Right.

13   Q    Then, and I believe Mr. Harding asked you about this,

14   Subparagraph E says that what you say when you cooperate can't be

15   used against you in any proceeding, right?

16   A    Right.

17   Q    And then, in Paragraph Four, moving on down this page, it

18   says, does it not, it is understood that should the defendant

19   commit any further crimes or should it be determined that he has

20   knowingly withheld information, given false, incomplete or

21   misleading testimony or information, or should he otherwise fail

22   in any way to fulfill completely each and every one of his

23   obligations under this agreement, then the State will be

24   completely released from any obligations under this agreement.

25   Did I read that right?

1    A    Right.

2    Q    And then it says, in such event, a series of bad things will

3    happen, right?

4    A    Right.

5    Q    The State may recommend any sentence, the defendant shall be

6    subject to prosecution by state or federal authorities for

7    anything about which they have knowledge, right, sir?

8    A    Right.

9    Q    And it says, in any such prosecution this office may use as

10   evidence in any criminal proceeding all statements made by you to

11   the office or other designated law enforcement agents, is that

12   correct?

13   A    Right.

14   Q    Okay.  Now, there's just one other paragraph here that I

15   wanted to direct your attention to, Mr. Montgomery.  And just so

16   we're clear about this.  This agreement was executed, in other

17   word, you signed it on May 13th, 2003, is that right, sir?

18   A    Yes.

19   Q    Paragraph Six says, does it not, and this is a condition,

20   it's a provision of this agreement, is it not, the defendant

21   shall not be permitted to withdraw a guilty plea entered pursuant

22   to this agreement under any circumstances.  Does it say that?

23   A    Right.

24   Q    Marking an item, Your Honor, as, I think we are up to

25   Defendant Gardner's Exhibit Number Four.  Strike that, Your

1    Honor.  It should be Number Three.  And before I put this on the

2    presenter, Your Honor, I'm going to show it to Mr. Harding.

3              THE COURT:  All right.

4    Q    Marked the wrong one.  I'm sorry.

5              MR. COBURN:  Just so the government can note an

6    objection if they seek to, Your Honor, before I put it on the

7    presenter.

8              (Pause in proceedings.)

9              MR. COBURN:  Also mark, just to save a little time,

10   Your Honor, mark another item as Gardner Exhibit Number Four,

11   which I'll show to Mr. Harding as well.

12             (Pause in proceedings.)

13             MR. COBURN:  Your Honor, there does seem to be an

14   objection to it.  I don't know if Your Honor wants to have a side

15   bar on this.

16             THE COURT:  Can you just hand it to the clerk, please,

17   the exhibits?

18             MR. COBURN:  Absolutely.  I'll hand both of them to the

19   clerk, Your Honor.

20             THE COURT:  Is there an objection to both?

21             MR. HARDING:  I don't object to Mr. Coburn asking him

22   about the document.

23             THE COURT:  You want to put them in, Mr. Coburn?

24             MR. COBURN:  If Your Honor would allow me to do so.

25             THE COURT:  All right.  Let me see them, please.

1        MR. COBURN:  The first page on the first one, Your

2   Honor, I don't need.  It's really the remainder of it.

3        MR. HARDING:  Judge, if Mr. Coburn's willing to include

4   the first page, I'll withdraw the objection.

5        MR. COBURN:  I'll include the first page.

6        THE COURT:  Okay.  So they're both in?  All right.

7   Gardner Three and Four are admitted.

8        MR. COBURN:  Thank you, Your Honor.  Other counsel are

9   looking at it right now, Your Honor.

10        THE COURT:  All right.

11        (Pause in proceedings.)

12        MR. LAWLOR:  We have no objection, Your Honor.

13        MR. MARTIN:  No objection.

14        MR. CROWE:  No objection.

15   BY MR. COBURN:

16   Q    Putting Gardner Three, then, on the DOAR presenter so that

17   the jury can see it.  Tell me whether you recognize this letter,

18   whether you've ever seen that before.

19   A    No, I haven't seen this letter.

20   Q    First time?

21   A    Yes.

22   Q    Okay.  Let me direct your attention just to one part of

23   this.  Do you see where it says at the bottom of the second

24   paragraph, obviously, these discussions were private and are

25   covered under attorney/client privilege?

1    A    Yes.

2    Q    And what's being referred to there are discussions involving

3    a number of people, including your lawyers and the prosecutor,

4    right?

5    A    I believe so.

6    Q    Do you believe that all those people, you have some kind of

7    an attorney/client privilege with all those people?

8    A    Not all.

9    Q    Okay.  Turning to the second page, tell us if you recognize

10   this.  This is a legal document, correct?

11   A    Right.

12   Q    And the title of it is Motion to Withdraw Guilty Plea,

13   right?

14   A    Right.

15   Q    And it's in your case, right?

16   A    Right.

17   Q    See where it says, on April 7th, 2004, your lawyer received

18   a telephone message from you saying that you wanted to withdraw

19   your guilty plea?

20   A    Yes.

21   Q    And then this is the motion that your lawyer filed seeking

22   to withdraw your guilty plea, right?

23   A    Right.

24   Q    And the motion got ruled on, right, sir?

25   A    Yes.

1    Q    Referring now to Gardner Exhibit Four.  This is an order

2    from the judge saying that your motion seeking leave to withdraw

3    your guilty plea with respect to the murder of Terry Cheeks is

4    denied, right?

5    A    Right.

6    Q    So when you filed that motion, you violated your plea

7    agreement, right?

8    A    I don't think so.

9    Q    Do you remember the language in the plea agreement we looked

10   at just a second ago saying the defendant shall not be permitted

11   to withdraw guilty plea entered pursuant to this agreement under

12   any circumstances?

13   A    Yes.

14   Q    So you violated it, correct?

15   A    I guess I did.

16   Q    So then given that you violated your cooperation plea

17   agreement, I'm assuming that the government did all these things,

18   that they said they were going to do, right?  Because it says

19   should you violate it, then the State's released from its

20   obligations, going to recommend any sentence, you'll be subject

21   to prosecution for any criminal violation, and the other language

22   we looked at.  That happened, right?  Did any of that happen?

23   A    No.

24   Q    None of that happened, did it?

25   A    No.

1    Q    Let's look now at another document that the prosecution

2    showed you.

3           THE COURT:  Roughly ten more minutes, Mr. Coburn,

4    before we break?

5           MR. COBURN:  Absolutely.  Any time that's convenient

6    for the Court is good for me, Your Honor.

7           THE COURT:  Five minutes or so.

8    BY MR. COBURN:

9    Q    Perfect.  This was marked by the government as Government's

10   Exhibit P-2.  Recognize that?

11   A    Yes.

12   Q    Do you remember Mr. Sakellaris, the government asked you

13   about him?

14   A    Yes.

15   Q    He was your lawyer, one of your two lawyers, right?

16   A    Right.

17   Q    The other one was Joan Fraser, you told us?

18   A    Right.

19   Q    So this document is your plea agreement in your federal case

20   that ran, that was around the same time as the other plea

21   agreement that we looked at, right, sir?

22   A    Right.

23   Q    Let me show you a page of this agreement which I'm not sure

24   the government asked you about.  You can tell us.  I'm referring

25   to, actually starts at the very bottom of Page Six of the plea

1   letter and goes over to Page Seven.  See where it says the title,

2   Obligations of the United States Attorney's Office?

3   A    Yes.

4   Q    And the first one is, at the time of your sentencing on your

5   federal charge -- and that's a gun charge, right?

6   A    Yes.

7   Q    That's a different gun charge, another gun charge from the

8   one for which you were previously on probation, right, sir?

9   A    Right.

10  Q    It says at the time of sentencing this office will move to

11  dismiss all remaining counts of the indictment pending against

12  the defendant other than the count to which he has agreed to

13  plead guilty.  Right?

14  A    Right.

15  Q    And it says they're going to bring all relevant information

16  to the Court's attention, right?

17  A    Right.

18  Q    And then it says, does it not, at the time of sentencing if

19  the defendant has fully complied with all of his obligations

20  under his plea agreement, with the Office of the State's Attorney

21  for Baltimore City dated May 13th, 2003, which is incorporated by

22  reference herein -- means it's made part of this document, right,

23  sir?

24  A    Right.

25  Q    This office will recommend that any sentence imposed in this

1   matter be ordered to run concurrently with the sentence imposed

2   in State of Maryland versus William Montgomery, AKA Michael Rowe,

3   right?

4   A    Right.

5   Q    Now, there's that word "concurrently" again.  If I

6   understand correctly, this gun charge is the 9 millimeter, right?

7   A    Right.

8   Q    Is it the same 9 millimeter that you used to put a bullet

9   into the back of Mr. Cheeks's head?

10  A    No.

11  Q    A different one?

12  A    Right.

13  Q    So you have used a couple of them during that period, right,

14  sir?

15  A    Yes.

16  Q    And so what the prosecutor is saying here is that the

17  sentence that you get for your federal gun charge is going to run

18  concurrently with any sentence that you get for the murder of Mr.

19  Cheeks, right?

20  A    Right.

21  Q    So you're not going to have to do any extra time on the

22  federal charge at all, right, sir?

23  A    Right.

24  Q    Your Honor, with the Court's permission, this would be a

25  great time to break.

1          THE COURT:  All right.  Thank you, Mr. Coburn.  Mr.

2     Montgomery is excused.

3          Mr. Montgomery will be back with us on Tuesday, ladies

4     and gentlemen.

5          So ladies and gentlemen, that will conclude our court

6     day and our court week.  Let me take just a couple of minutes to

7     review things with you.

8          I'm sure you're not counting, but this is actually the

9     tenth day of evidence, it's the twelfth day that we've actually

10    been in session.  Of course, several of those days, like today,

11    have been not full days.  I am assured by the government that,

12    despite the delays and late starts on several occasions which

13    were necessitated, I assure you, by the need for the Court to

14    confer with counsel on certain legal matters outside of your

15    presence, has absolutely nothing to do with anybody being late or

16    not attentive.  I assure you everybody's been very attentive.

17         And we've tried to plan the trial as best we could.

18    But as I've told you several times, a trial is not a Broadway

19    play or a TV script where everything goes exactly as we hope.  We

20    have to deal with matters as they come up.  And I appreciate your

21    understanding and your patience as we deal with issues as they

22    come up.

23         So this is the tenth day of evidence.  I'm assured by

24    the government that we are more than halfway through the

25    government's presentation.  So we're really making, I think, good

165

1    time.

2           Let me project for you very quickly what we expect in

3    the next several weeks.  Monday, of course, is a holiday,

4    Columbus day.  I used to work for a judge who would bring people

5    in to work even on federal holidays, but I'm not that kind of

6    judge.  But we do work hard.

7           So we'll resume on Tuesday, the 14th.  And we'll be in

8    session Tuesday, the 14th, Wednesday the 15th, and Thursday, the

9    16th, next week.  So we hope to have pretty close to full days,

10   three days, next week.

11          And then we're off for a week, and you'll be off to do

12   your own business, to go to work, take care of your personal

13   matters the week of October 20th.  So we won't be in session at

14   all during that week.

15          Then we come back on the 27th of October, two weeks

16   from Monday, and we will have three days that week, the 27th, the

17   28th, and the 29th, which I expect will be full days.

18          And then the following week we'll be in session all day

19   on Monday, the 3rd of November.  The 4th, of course, is Election

20   Day so we'll start a little bit late to give those of you who

21   wish to vote early in the morning a chance to do so and we'll

22   break a little bit early for those of you who want to vote later

23   in the day.

24          Then we'll be in session on November 5th, 6th, and 7th.

25   Now, the 7th of November will be the first Friday that we'll be

1   in session.  And what I anticipate is that we'll probably be in

2   session until about 1 or 1:30 that day.  We won't have a full day

3   on Friday, the 7th.

4           That could very easily bring us very, very near the

5   very end of the evidentiary portion of the trial.  I'm not making

6   a prediction now.  But my sense is that with an additional seven

7   or eight days or nine or ten days, we could very easily be at the

8   end of the evidentiary portion of the trial.

9           Now, as I've told you, as I will instruct you, in a

10  criminal case no defendant ever has any burden, is not required

11  to produce any evidence, but is of course entitled to do so if he

12  or she chooses.  So whether the defendants in this case choose to

13  call any witnesses or put on any evidence is a question that

14  their attorneys and they will decide at the appropriate time and

15  we'll abide their decisions.

16          But right now, it appears very likely that sometime

17  around the second or maybe the third week of November, quite

18  possibly the second week of November, you may begin your

19  deliberations.

20          Now, as I've said to you before, there is no way for

21  anybody ever to predict how deliberations will go, how long it

22  might take.  What's important is that each of you who is

23  committed to deliberate fairly and impartially do so.

24          As you can probably surmise, my instructions in this

25  case at the very end are going to be quite long.  And indeed, I

1    might say now, not to hold us up, but you've already, I think,

2    gotten a sense that several of the crimes in this case charged in

3    the indictment are rather complex.  And indeed, we use the term

4    sometimes compound-complex crimes.  They involve a number of

5    elements that you the jury will have to consider in light of the

6    evidence.  And indeed in this case, the state law becomes a part

7    of federal law in this case.  And again, I will instruct you on

8    all of this very carefully.

9         And I assure that the jurors who deliberate a verdict

10   in this case will have, each one will have his or her own copy of

11   my instructions that you will be able to take into the jury room,

12   together with the exhibits, and look at and refer to as much as

13   you need to to try to understand them.  And of course, I can say

14   this now, even during your deliberations, while you're not

15   permitted to ask questions during the trial, should you have any

16   questions during your deliberations about any matter, including

17   matters related to my instructions, I am available, we are

18   available to answer any questions that you may have during your

19   deliberations.

20        What I can assure you of is that absolutely no one will

21   be inconvenienced in terms of any plans you may have made.  And

22   we will not be in session on any days that I have not included in

23   that letter that I gave you the first, the first week of trial.

24   So you can plan your life around the days that you've been told

25   we'll be in session.

1          Right now, frankly, it appears that the case won't go

2     into December, after Thanksgiving, but there's still that

3     possibility.  But right now it does not appear to me that the

4     case is going to go into Thanksgiving week.  But we will not be

5     in session on any day that is not listed in that letter that I

6     gave you the first day.

7          With that, I will wish you goodbye for the week.

8     Remember, no session on Monday, federal holiday.  And do enjoy

9     your weekend.

10          Let me emphasize, as you've grown accustomed to me

11     having emphasized to you, conduct no investigation whatsoever,

12     don't go online, don't look up any words, don't visit any

13     locations.  Do not discuss the case with family and friends.

14     Avoid any media attention about the case.  And do not discuss the

15     case among yourselves.

16          Please leave your note pads on your chairs and have a

17     pleasant weekend.  We'll see you Tuesday morning, 9:30, to begin

18     at that time.

19          Thank you, ladies and gentlemen.  You are excused.

20          (Jury exits at 2:40 p.m.)

21          THE COURT:  Mr. Harding, you and Mr. Hanlon will see to

22     it that you get the lineup of witnesses to counsel as promptly as

23     possible before end of the day tomorrow.

24          MR. HARDING:  Yes, Your Honor.

25          THE COURT:  Ms. Rhodes?

1        MS. RHODES:  Yes, Your Honor, I have a scheduling

2   request.

3        THE COURT:  Please be seated, counsel.

4        MS. RHODES:  I have an out-of-town witness coming and I

5   would like to be able to schedule him for the 29th of October.

6   Initially, we thought we would be beginning our witnesses the

7   27th.  He could come that day but I think the safer day probably

8   is the 29th.  But he'll need to know pretty soon.  I said I would

9   try to get back to him today about whether we could firm up that

10  date.  So that be would be the 29th, Wednesday.

11       And if for some reason the government is not finished,

12  I would like to ask the permission to call him out of turn.

13       THE COURT:  Mr. Harding, who will be the identification

14  witness on the Stop Snitching?  Is that Reynolds or who is that?

15       MR. HARDING:  Rodney Hayes, Your Honor.

16       THE COURT:  Hayes?  And who's your next two longest

17  witnesses, apart from the medical examiner and the ballistics?

18  Do you have any more long witnesses?  Lay witnesses?

19       MR. HARDING:  I think that both the homicide detective

20  for the Wyche brothers murder and for the Tonya Jones-Spence

21  murder will be fairly lengthy witnesses.  And we may get to both

22  of those next week.

23       THE COURT:  Okay.  And then, so we have Niedermeyer and

24  the Baltimore County detective?

25       MR. HARDING:  Yes.

1          THE COURT:  And then the medical examiner, the

2     ballistics on the two gun thing.

3          MR. HARDING:  We have a number of officers in the Tonya

4     Jones-Spence murder yet.

5          THE COURT:  Right.  But they'll be pretty, like the

6     ID's and so forth.

7          MR. HARDING:  We have some more civilian witnesses as

8     well, Your Honor.

9          THE COURT:  On the Tonya Jones-Spence?

10         MR. HARDING:  Yeah.  And just looking at the, I don't

11    know why Ms. Rhodes has picked October 29th as the day when she

12    thinks she'll be able to call this witness.  That would only give

13    us five more days to complete our case.  And even though I

14    predicted that we were more than half done, it's taken us ten

15    trial days to get halfway done.  So I think Ms. Rhodes may be --

16         THE COURT:  Too optimistic?

17         MR. HARDING:  Yes.

18         THE COURT:  Ms. Rhodes, is that week written in stone

19    or are you trying to figure out which day that week you should

20    have your witness come in?  Because it does sound like it would

21    probably --

22         MS. RHODES:  I think the latest day that week.  But the

23    only, the problem my witness has is that the following week he is

24    not available until Thursday, the 6th of November.

25         THE COURT:  I think that makes much more sense.

1        MS. RHODES:  Okay.  That's fine.

2        THE COURT:  Yeah.  Schedule him on the 6th.  What I

3   think my intention is, that to the extent, I mean, we'll have a

4   better sense of when the government's going to rest, obviously,

5   after next week.  By the time we break for that week long recess,

6   I think we should have, you agree, Mr. Harding, we should have a

7   pretty good idea of how many additional days we're going to need?

8        MR. HARDING:  I think we'll have a much better idea

9   than we do right now.

10       THE COURT:  Right.  So it's my hope that before we

11  break on the 16th next week we'll be able to map out something

12  that's reasonably, reasonably clear to us going forward.  And so

13  I think November 6th is probably a very good bet for you.

14  Clearly, to the extent that any defendant intends to call

15  witnesses, again, assuming there's no objection once we get past

16  the government's case in chief, we can sort of, you know,

17  hopefully mix and match and people can call witnesses as they may

18  be available, as we may be able to accommodate them, and lessen

19  the inconvenience to them.

20       To the extent that the government rests and we have,

21  say, a day, you know, with no witnesses, I won't have any

22  problem, and I'm sure the jury won't any problem, taking a day

23  off while defense witnesses are lined up and so forth.

24       I don't know how much, if any, argument will be

25  necessary and/or appropriate on a Rule 29 motion, but my

1    suspicion is counsel are going to want to be heard.  And so it

2    may well be that we're going to have a full half day of argument

3    on a Rule 29 motion.

4           So I think we've got some flexibility built in.  And I

5    think that the November 6th date, Ms. Rhodes, is pretty good for

6    you, notwithstanding our somewhat strong disagreement on

7    yesterday.  I certainly hesitate to put a defense witness in

8    before the government has rested because that creates all kinds

9    of additional complications.  But I won't say I'd never do it.

10   But it would be pretty extraordinary.

11          So I'm hoping you can get your witness scheduled for

12   the 6th.  We'll get to him or her on the 6th.

13          Yes, Mr. Lawlor.

14          MR. LAWLOR:  Judge, I think I know the answer to this.

15   But is the Court committed to sitting on the 7th?  The only

16   reason I ask is that I was scheduled, without consultation, to

17   argue a case in the DC Circuit that day.  And I could move it but

18   I just think that, speaking for some of my older colleagues, five

19   days in a week seems a little long.

20          THE COURT:  Well, I'm committing to half a day that

21   day.

22          MR. LAWLOR:  I can move it.  But I just didn't know if

23   the Court is, or are we definitely sitting that day?

24          THE COURT:  I am definitely sitting that day, except,

25   except as I just said, if, let's say, the government were to rest

1    on the 5th or the 6th, then I would not see any reason why I

2    should bring the jury in on Friday the 7th.  But --

3              MR. LAWLOR:  Can I ask you --

4              THE COURT:  But if, you know, otherwise, if we're into

5    the defense case and defense has some witnesses and if we're

6    still in the government's case in chief, yes, I'm committed to

7    sitting on Friday the 7th for a half a day.

8              MR. LAWLOR:  I'll work it out then.  Thanks, Judge.

9              MR. KURLAND:  Judge, I just have a question on Election

10   Day.

11             THE COURT:  Certainly.

12             MR. KURLAND:  This can probably wait for a definitive

13   answer until next Tuesday.  But if the Court would have an idea

14   whether the Court's going to go either, start in the morning,

15   what time would it be in morning?  I'm just trying to figure out

16   logistically if I need to be in Baltimore for that night.  On

17   Election day, what time would the Court start in the morning?

18             THE COURT:  Oh, I have it in the calendar for 10:00.  I

19   could make it, I can make it --

20             MR. KURLAND:  Let me doublecheck.  I don't want to take

21   too much of the Court's time.

22             THE COURT:  I can make it 10:30 to 2:30 or something,

23   or 10:30 to 3.

24             MR. KURLAND:  I'll try to get that firmed up.  Thank

25   you, Your Honor.

1          THE COURT:  All right.  Thank you very much, counsel.

2    We're in recess until Tuesday morning, 9:30.

3              (Conclusion of Excerpt.)

175

```
1                              INDEX

2

3                                              PAGE

4   WITNESS: KELLY DAVID

5   DIRECT EXAMINATION BY MR. HANLON             3

6   CROSS EXAMINATION BY MR. KURLAND            29

7   REDIRECT EXAMINATION BY MR. HANLON          36

8

9   WITNESS: ANDREA SMITH

10  DIRECT EXAMINATION BY MR. HANLON            39

11  CROSS EXAMINATION BY MR. KURLAND            55

12  REDIRECT EXAMINATION BY MR. HANLON          60

13

14  WITNESS: WILLIAM MONTGOMERY

15  CONT'D DIRECT EXAMINATION BY MR. HARDING    65

16  CROSS EXAMINATION BY MR. COBURN            117

17

18

19

20

21

22

23

24

25
```

REPORTER'S CERTIFICATE

1

2

3          I, Mary M. Zajac, do hereby certify that I recorded

4    stenographically the proceedings in the matter of USA v. Willie

5    Mitchell, et al., Case Number(s) AMD-04-029, on October 8, 2009.

6          I further certify that the foregoing pages constitute

7    the official transcript of proceedings as transcribed by me to

8    the within matter in a complete and accurate manner.

9          In Witness Whereof, I have hereunto affixed my

10   signature this _____ day of _____, 2009.

11

12

13

14          _____

15                Mary M. Zajac,
                  Official Court Reporter

16

17

18

19

20

21

22

23

24

25

## $

**$10,000** [1] - 124:24
**$15,000** [1] - 135:22
**$50,000** [1] - 138:16

## '

**'02** [4] - 122:4, 122:6, 122:9, 152:22
**'03** [1] - 103:24

## 1

**1** [1] - 166:2
**10** [6] - 73:20, 105:7, 105:15, 142:17, 142:23, 145:5
**10,000** [1] - 138:13
**100%** [2] - 26:22, 60:4
**101** [1] - 1:25
**102** [1] - 4:22
**10311** [1] - 153:10
**10:00** [1] - 173:18
**10:30** [2] - 173:22, 173:23
**10:45** [3] - 122:4, 124:10
**10:54** [1] - 62:2
**11** [1] - 146:3
**117** [1] - 175:16
**11:08** [1] - 121:7
**11:10** [1] - 122:6
**12** [2] - 40:20, 40:21
**12/17/03** [1] - 104:18
**12:31** [1] - 108:19
**12:32** [1] - 121:1
**12th** [1] - 4:5
**13** [2] - 40:20, 40:21
**13th** [2] - 121:23, 156:17, 162:21
**14th** [4] - 2:11, 122:25, 165:7, 165:8
**15** [6] - 17:8, 17:25, 61:25, 62:1, 100:15, 105:7
**15,000** [2] - 73:20, 138:13
**15th** [2] - 2:11, 165:8
**16** [1] - 4:15
**16th** [3] - 2:11, 165:9, 171:11
**17th** [1] - 103:24
**18** [2] - 4:15, 72:21
**1830** [1] - 51:5
**19** [1] - 39:19
**1999** [1] - 74:3

## 1:30

**1:30** [4] - 108:20, 109:1, 114:14, 166:2

## 2

**2002** [25] - 4:17, 5:4, 5:7, 6:10, 9:15, 28:16, 32:4, 40:12, 40:19, 41:3, 42:13, 48:14, 48:23, 50:23, 59:2, 66:10, 72:20, 73:2, 99:12, 120:19, 120:25, 121:6, 121:23, 121:25, 124:10
**2003** [8] - 122:19, 142:16, 143:5, 143:18, 145:3, 145:10, 156:17, 162:21
**2004** [3] - 122:25, 123:3, 159:17
**2008** [2] - 1:11, 152:24
**2009** [2] - 176:5, 176:10
**20th** [1] - 165:13
**21201** [1] - 1:25
**22nd** [6] - 122:19, 142:16, 143:5, 143:18, 145:3, 145:10
**23rd** [4] - 121:25, 122:4, 122:17, 124:9
**26th** [2] - 122:6, 122:8
**27th** [3] - 165:15, 165:16, 169:7
**28th** [1] - 165:17
**29** [3] - 171:25, 172:3, 175:6
**29th** [6] - 123:3, 165:17, 169:5, 169:8, 169:10, 170:11
**2:05** [1] - 122:9
**2:30** [1] - 173:22
**2:40** [1] - 168:20
**2:45** [1] - 109:1
**2:50** [1] - 109:1
**2nd** [2] - 99:12, 99:25, 120:19

## 3

**3** [2] - 173:23, 175:5
**30** [5] - 17:8, 17:25, 70:13, 70:14, 113:5
**35** [1] - 3:16
**357** [3] - 68:20, 68:22, 82:16
**36** [1] - 175:7
**39** [1] - 175:10
**3:00** [1] - 109:2
**3:30** [1] - 81:4
**3rd** [3] - 120:25, 121:6,

165:19

## 4

**40** [9] - 68:20, 68:24, 69:1, 69:8, 82:20, 82:25, 151:17, 152:6, 152:11
**403** [1] - 114:5
**4:30** [3] - 5:15, 41:8, 42:22
**4th** [1] - 165:19

## 5

**5** [1] - 151:18
**55** [1] - 175:11
**5515** [1] - 1:24
**5:00** [3] - 5:15, 41:8, 42:22
**5th** [2] - 165:24, 173:1

## 6

**60** [3] - 108:20, 108:23, 175:12
**65** [1] - 175:15
**6:30** [2] - 51:6, 51:8
**6th** [8] - 165:24, 170:24, 171:2, 171:13, 172:5, 172:12, 173:1

## 7

**7th** [15] - 4:17, 5:4, 5:7, 6:10, 32:4, 41:3, 50:23, 59:2, 159:17, 165:24, 165:25, 166:3, 172:15, 173:2, 173:7

## 8

**8** [4] - 1:11, 105:14, 105:15, 176:5
**802(5)** [1] - 52:11
**8618** [7] - 4:21, 4:25, 20:10, 40:15, 42:10, 48:17, 48:22

## 9

**9** [5] - 70:11, 100:4, 136:5, 163:6, 163:8
**9:30** [3] - 121:25, 168:17, 174:2
**9:35** [1] - 2:1

## A

**A-N-D-R-E-A** [1] - 39:10
**a.m** [7] - 2:1, 121:2, 121:7, 122:1, 122:4, 122:6, 124:10
**Aaron** [13] - 67:8, 71:4, 72:17, 72:23, 72:24, 74:17, 75:5, 80:2, 99:6, 108:1, 108:2, 127:8, 145:25
**abbreviated** [1] - 61:20
**abide** [1] - 166:15
**able** [14] - 18:18, 26:5, 26:7, 33:23, 52:13, 55:23, 58:20, 93:16, 119:6, 167:11, 169:5, 170:12, 171:11, 171:18
**absolutely** [2] - 164:15, 167:20
**Absolutely** [4] - 114:12, 157:18, 161:5
**accelerated** [1] - 11:14
**accepted** [1] - 152:10
**accommodate** [2] - 2:22, 171:18
**accomplish** [1] - 8:9
**accurate** [3] - 128:6, 139:20, 176:8
**accustomed** [1] - 168:10
**act** [1] - 94:12
**activity** [1] - 19:16
**Adam** [1] - 1:22
**added** [1] - 51:16
**adding** [1] - 113:16
**addition** [1] - 110:8
**additional** [2] - 2:24, 155:8, 166:6, 171:7, 172:9
**address** [2] - 40:15, 63:21, 63:23
**administered** [1] - 119:19
**admissibility** [1] - 110:25
**admission** [2] - 113:13, 113:23
**admit** [1] - 149:15
**admitted** [2] - 58:13, 158:7
**adult** [1] - 59:15
**advised** [1] - 61:18
**aerial** [2] - 41:8, 94:22
**affair** [1] - 82:2
**affixed** [1] - 176:9
**afraid** [3] - 27:2, 27:5, 94:13
**African** [3] - 12:13,

46:22, 59:15
**African-American** [3] - 12:13, 46:22, 59:15
**afternoon** [14] - 5:7, 41:3, 41:8, 42:22, 61:22, 68:19, 81:3, 108:20, 111:5, 112:23, 117:8, 117:14, 117:15
**Afternoon** [1] - 81:1
**afterwards** [1] - 150:20
**agents** [1] - 156:11
**ago** [8] - 30:6, 31:10, 55:8, 59:19, 59:22, 61:6, 152:20, 160:10
**agree** [5] - 30:17, 80:2, 96:17, 97:6, 171:6
**agreed** [2] - 64:12, 149:20, 152:4, 162:12
**Agreement** [1] - 79:19
**agreement** [23] - 65:16, 79:18, 120:15, 147:24, 148:14, 149:4, 149:6, 149:17, 151:7, 151:13, 155:23, 155:24, 156:16, 156:20, 156:22, 160:7, 160:9, 160:11, 160:17, 161:19, 161:21, 161:23, 162:20
**agrees** [1] - 148:15
**ahead** [3] - 109:7, 113:6, 126:3
**ain't** [2] - 138:25, 143:21
**Ain't** [1] - 146:9
**AKA** [3] - 65:18, 148:11, 163:2
**al** [1] - 176:5
**aliases** [3] - 65:19, 65:21, 139:8
**alibi** [1] - 102:7
**allegations** [1] - 141:19
**allow** [4] - 25:8, 63:23, 110:10, 157:24
**almost** [3] - 24:6, 87:4, 91:24, 91:25
**aloud** [1] - 31:24
**alternative** [1] - 110:6
**AMD-04-029** [2] - 1:6, 176:5
**AMERICA** [1] - 1:5
**American** [3] - 12:13, 46:22, 59:15
**amount** [1] - 138:12
**AN** [1] - 39:7
**Andre** [1] - 1:13
**Andrea** [2] - 28:4, 38:23, 39:4, 56:3
**ANDREA** [2] - 38:25, 175:9
**Angelo** [1] - 129:2

**answer** [11] - 37:7, 78:9, 86:12, 102:5, 107:12, 115:6, 127:17, 145:20, 167:18, 172:14, 173:13
**answers** [2] - 143:6, 145:5
**anticipate** [1] - 166:1
**anticipated** [1] - 26:18
**Antoine** [2] - 129:7, 129:13
**Anyway** [2] - 31:24, 72:11
**anyway** [3] - 71:16, 97:10, 100:7
**apart** [1] - 169:17
**Apartment** [1] - 4:22
**apartment** [38] - 4:23, 9:15, 9:17, 20:1, 20:8, 20:12, 20:15, 20:17, 21:2, 21:11, 22:2, 42:12, 43:19, 45:9, 48:17, 56:21, 59:23, 60:5, 66:10, 71:5, 71:12, 73:4, 75:4, 76:7, 76:17, 76:22, 80:25, 83:9, 83:24, 83:25, 87:5, 87:21, 87:24, 87:25, 88:2, 88:12, 98:11, 150:16
**Apartments** [2] - 71:1, 74:18
**apartments** [1] - 100:5
**apologize** [4] - 38:3, 113:7, 114:19, 142:25
**Apologize** [1] - 143:10
**appear** [8] - 21:14, 34:8, 34:11, 90:3, 94:22, 104:9, 139:22, 168:3
**Appearances** [1] - 1:15
**Apple** [2] - 127:24, 128:14
**apply** [1] - 114:10
**appreciate** [2] - 40:7, 164:20
**appreciated** [2] - 63:25, 148:3
**approach** [8] - 8:1, 16:11, 24:8, 31:18, 44:21, 48:8, 49:11, 57:6
**appropriate** [2] - 166:14, 171:25
**approximate** [1] - 85:21
**Approximate** [1] - 85:13
**April** [1] - 159:17
**area** [20] - 3:21, 8:18, 9:2, 9:11, 9:19, 23:2, 25:22, 34:23, 39:21, 40:8, 42:20, 48:12, 57:23, 58:2, 58:6, 59:16,

95:1, 95:2
**argue** [2] - 109:5, 172:17
**arguing** [1] - 111:10
**argument** [2] - 171:24, 172:2
**arose** [2] - 75:18, 75:22
**arrangement** [2] - 127:2, 135:21
**arrangements** [1] - 124:23
**arrays** [1] - 103:14
**arrest** [2] - 109:14, 120:21
**arrested** [8] - 24:25, 99:9, 99:11, 99:25, 139:20, 153:17
**arrive** [3] - 21:20, 21:25, 22:1
**arrived** [1] - 5:25
**articles** [1] - 35:16
**articulated** [1] - 37:9
**aside** [1] - 150:8
**assist** [1] - 21:3
**assistance** [3] - 21:22, 57:18, 105:13
**Assistant** [1] - 5:13
**associate** [1] - 144:1
**assume** [2] - 25:25, 33:24
**assumed** [1] - 77:9
**assuming** [5] - 8:13, 115:17, 152:9, 160:17, 171:15
**assure** [4] - 164:13, 164:16, 167:9, 167:20
**assured** [2] - 164:11, 164:23
**attempt** [1] - 139:25
**attempted** [2] - 150:15, 151:1
**attending** [1] - 20:25
**attention** [13] - 4:7, 4:16, 5:14, 20:21, 65:17, 73:2, 100:20, 113:16, 113:17, 156:15, 158:22, 162:16, 168:14
**attentive** [2] - 164:16
**attitude** [1] - 79:6
**Attorney** [1] - 162:20
**Attorney's** [7] - 121:19, 122:21, 123:8, 124:9, 149:7, 149:19, 162:2
**attorney/client** [2] - 158:25, 159:7
**attorneys** [1] - 166:14
**attributed** [1] - 111:2
**audiotape** [1] - 115:15
**August** [3] - 121:23, 121:25, 124:9

**authentication** [2] - 65:6, 114:2
**authorities** [3] - 100:16, 148:21, 156:6
**automatic** [1] - 136:6
**available** [4] - 167:17, 167:18, 170:24, 171:18
**Avenue** [11] - 74:14, 78:15, 95:11, 95:16, 95:19, 96:7, 96:8, 98:13, 98:24, 100:7, 106:20
**Avoid** [1] - 168:14
**aware** [1] - 12:23

## B

**background** [2] - 14:8, 46:20
**backgrounds** [1] - 12:12
**Bacon** [1] - 107:18
**bad** [2] - 35:23, 156:2
**badly** [1] - 138:24
**bag** [2] - 69:16, 113:17
**balcony** [17] - 20:19, 21:9, 21:23, 57:5, 57:11, 57:13, 57:24, 88:18, 89:6, 89:8, 89:12, 89:13, 89:18, 90:1, 90:3, 90:4
**ballistics** [2] - 169:17, 170:2
**ballpark** [1] - 3:25
**Baltimore** [27] - 1:12, 1:25, 3:17, 3:20, 3:21, 4:20, 22:7, 39:20, 39:22, 39:23, 40:7, 40:10, 40:13, 40:17, 73:5, 73:24, 95:21, 118:5, 118:6, 120:19, 120:25, 121:5, 123:7, 162:21, 169:24, 173:16
**bang** [2] - 47:9, 47:10
**bar** [1] - 157:15
**Barry** [1] - 1:22
**based** [1] - 35:14
**basement** [3] - 83:9, 84:1, 84:2
**basis** [3] - 111:1, 111:24, 144:2
**bat** [1] - 35:12
**beared** [1] - 18:10
**beat** [6] - 109:16, 110:12, 111:25, 112:8, 112:14, 119:6
**beaten** [1] - 110:13
**beating** [1] - 103:12
**becomes** [1] - 167:6
**becoming** [2] - 140:12, 140:16

**beef** [1] - 74:6
**beefing** [2] - 74:3, 138:4
**begin** [4] - 24:18, 39:16, 166:18, 168:17
**beginning** [3] - 105:7, 119:13, 169:6
**Behalf** [5] - 1:15, 1:17, 1:18, 1:20, 1:21
**behind** [7] - 18:22, 91:12, 93:9, 93:22, 93:23, 94:4, 116:13
**below** [3] - 43:25, 87:24, 87:25
**best** [1] - 164:17
**bet** [1] - 171:13
**better** [4] - 115:25, 116:7, 171:4, 171:8
**between** [2] - 10:14, 92:1
**big** [3] - 8:13, 48:10, 70:9
**bigger** [1] - 138:12
**birth** [1] - 106:14
**bit** [19] - 8:15, 10:18, 11:24, 12:9, 12:10, 30:25, 33:7, 40:7, 58:19, 103:6, 105:23, 106:3, 115:14, 124:7, 134:12, 136:2, 142:24, 165:20, 165:22
**bitch** [2] - 79:11, 79:12
**black** [6] - 10:14, 36:3, 36:8, 69:16, 80:19, 80:21
**blindfolding** [1] - 67:19
**blood** [1] - 21:18
**blow** [1] - 48:10
**blow-up** [1] - 48:10
**blue** [4] - 35:24, 35:25, 52:25
**Bo** [2] - 104:20, 104:25
**Bo's** [1] - 102:12
**bodies** [1] - 69:9
**body** [2] - 69:4, 69:11
**Boo** [1] - 101:20
**Boopie** [1] - 131:13
**boots** [9] - 14:16, 14:19, 14:20, 15:4, 35:11, 38:5, 38:6, 38:7
**bottom** [2] - 158:23, 161:25
**Boy** [1] - 4:13
**boys** [1] - 4:12
**bracing** [1] - 30:23
**braided** [1] - 15:12
**braids** [16] - 15:4, 15:5, 15:6, 15:10, 15:11, 15:21, 15:24, 15:25, 26:12, 27:2, 27:8, 27:15, 28:19, 35:9, 35:14
**Bramble** [20] - 4:20,

4:21, 4:25, 5:19, 5:23, 9:17, 10:5, 19:14, 19:19, 19:21, 23:4, 23:9, 24:1, 24:19, 27:21, 27:24, 40:15, 42:10, 48:13, 54:13
**break** [8] - 41:1, 63:24, 111:8, 161:4, 163:25, 165:22, 171:5, 171:11
**breaking** [1] - 61:21
**brief** [1] - 6:18
**briefly** [1] - 36:19
**Bright** [1] - 17:10
**Bring** [1] - 62:5
**bring** [9] - 2:14, 2:15, 62:7, 63:22, 79:3, 162:15, 165:4, 166:4, 173:2
**Brittany** [1] - 95:18, 95:23
**broadcasting** [1] - 105:21
**broadly** [1] - 24:11
**Broadway** [1] - 164:18
**broke** [1] - 68:19
**brother** [4] - 66:1, 98:16, 98:18, 98:20
**brother's** [1] - 139:10
**brothers** [1] - 169:20
**brought** [2] - 34:18, 97:22
**Brown** [2] - 108:2, 108:4
**Brush** [1] - 24:17
**buddy** [2] - 108:6, 108:7
**building** [27] - 4:23, 9:15, 9:17, 20:8, 41:14, 42:12, 45:9, 48:22, 56:21, 68:10, 68:12, 69:18, 81:7, 83:9, 83:24, 83:25, 84:16, 86:25, 87:4, 87:7, 87:12, 91:25, 94:10, 94:16, 94:17, 94:18, 150:16
**buildings** [1] - 48:17
**built** [1] - 172:4
**bullet** [2] - 136:20, 136:22, 163:8
**bumper** [5] - 13:2, 29:5, 32:18, 37:10, 37:12
**bunch** [1] - 156:14
**Bunk** [5] - 132:24, 133:2, 133:4, 133:12, 133:24
**burden** [1] - 166:10
**business** [1] - 165:12
**Butler** [1] - 108:2
**butter** [4] - 14:22, 15:4, 27:8, 35:11
**button** [4] - 57:18,

83:13, 101:21, 101:22
  **BY** [27] - 3:12, 8:11, 9:6,
29:19, 30:2, 36:18,
39:12, 52:17, 55:25,
58:25, 60:2, 60:15,
65:12, 99:21, 106:6,
117:13, 128:8, 158:15,
161:8, 175:5, 175:6,
175:7, 175:10, 175:11,
175:12, 175:15, 175:16

---

**C**

---

**cable** [1] - 8:6
**calendar** [1] - 173:18
**caliber** [6] - 68:20,
68:24, 69:1, 69:8, 82:20,
82:25
**cannot** [1] - 152:10
**cap** [2] - 151:17, 152:6
**capable** [1] - 139:2
**car** [84] - 7:15, 7:21,
10:10, 10:25, 11:11,
11:13, 13:1, 13:3, 13:9,
17:3, 17:6, 23:12, 23:15,
23:18, 24:22, 25:15,
29:10, 31:12, 31:14,
31:15, 32:12, 32:17,
32:21, 33:1, 34:5, 36:24,
37:2, 37:4, 37:15, 53:21,
68:6, 68:7, 68:8, 68:12,
68:15, 69:14, 71:13,
71:14, 72:11, 75:7, 75:9,
75:12, 78:12, 78:16,
78:19, 81:9, 81:11,
81:22, 82:5, 83:5, 83:23,
84:10, 84:20, 84:21,
84:22, 85:1, 86:7, 86:8,
86:15, 86:25, 91:1,
91:10, 91:24, 91:25,
92:15, 92:22, 92:23,
93:1, 93:21, 93:23, 94:2,
94:3, 95:4, 98:7, 98:10,
98:15, 98:18, 98:25,
102:19, 150:8, 150:9,
150:11, 150:14
**care** [9] - 18:7, 18:9,
18:12, 18:15, 18:16,
18:17, 56:4, 56:5, 165:12
**carefully** [1] - 167:8
**Carlson** [37] - 5:22, 6:1,
6:3, 6:12, 7:9, 7:11,
10:1, 10:4, 10:7, 10:18,
12:6, 12:8, 14:1, 16:3,
18:5, 18:6, 18:14, 18:25,
22:12, 22:17, 22:19,
22:24, 23:8, 23:25, 24:4,
24:13, 26:17, 26:20,
27:1, 29:5, 30:8, 34:20,
35:7, 35:8, 35:19, 37:19,

38:9
  **CARLSON** [1] - 6:3
**carried** [1] - 68:21,
68:24, 69:16, 70:19,
82:18
**carry** [4] - 70:12, 70:14,
75:14, 82:24
**carrying** [1] - 70:9
**cars** [1] - 25:22
**Carson** [1] - 10:3
**case** [29] - 15:18, 15:22,
27:25, 86:6, 108:21,
109:16, 141:17, 141:18,
141:20, 153:13, 159:15,
161:19, 166:10, 166:12,
166:25, 167:2, 167:6,
167:7, 167:10, 168:1,
168:4, 168:13, 168:14,
168:15, 170:13, 171:16,
172:17, 173:5, 173:6
**Case** [1] - 176:5
**CASE** [1] - 1:6
**cassette** [1] - 143:10
**cat** [1] - 113:17
**catch** [2] - 90:5, 93:2
**Catonsville** [1] - 5:11
**caught** [1] - 94:7
**caused** [2] - 26:24,
26:25
**causing** [1] - 135:1
**cell** [8] - 6:14, 86:23,
106:7, 107:3, 108:6,
108:7, 118:21, 118:25
**center** [8] - 18:7, 18:9,
18:13, 18:15, 18:16,
18:17, 97:13, 97:20
**Center** [1] - 5:13
**Central** [1] - 5:11
**cert** [1] - 112:15
**Certain** [1] - 139:2
**certain** [7] - 26:22,
27:20, 27:22, 31:7,
142:13, 146:10, 164:14
**certainly** [4] - 110:13,
111:4, 151:25, 172:7
**Certainly** [7] - 2:18,
29:22, 31:21, 36:11,
52:15, 117:4, 173:11
**CERTIFICATE** [1] -
176:1
**certify** [2] - 176:3, 176:6
**chairs** [3] - 61:23,
108:22, 168:16
**chance** [14] - 26:14,
28:4, 28:5, 28:9, 33:11,
49:18, 51:21, 51:24,
60:18, 83:14, 103:12,
109:16, 112:8, 165:21
**change** [1] - 120:1
**charge** [16] - 65:17,

70:17, 100:9, 102:1,
103:4, 112:1, 112:14,
115:10, 155:11, 162:5,
162:7, 163:6, 163:17,
163:22
**charged** [2] - 100:12,
167:2
**charges** [1] - 112:3
**check** [1] - 44:19
**checking** [1] - 102:12
**Cheeks** [26] - 73:8,
73:13, 73:15, 75:3,
100:13, 100:25, 123:16,
124:24, 125:2, 134:13,
135:3, 135:5, 135:10,
135:16, 136:13, 137:2,
137:23, 138:13, 138:18,
139:15, 144:17, 148:1,
149:10, 149:14, 150:2,
153:17, 160:3, 163:19
**Cheeks's** [2] - 136:20,
163:9
**chief** [2] - 171:16, 173:6
**childhood** [1] - 66:12
**children** [2] - 4:8, 4:10
**Chilled** [1] - 96:7
**choose** [1] - 166:12
**chooses** [1] - 166:12
**circle** [13] - 9:15, 43:5,
48:2, 48:3, 48:4, 48:6,
48:25, 49:1, 49:3, 49:5,
49:6, 53:10
**circled** [1] - 20:23
**circling** [2] - 20:21,
24:11
**Circuit** [2] - 114:24,
172:17
**circumstances** [2] -
156:22, 160:12
**City** [9] - 3:20, 39:20,
73:5, 73:25, 120:19,
120:25, 121:5, 123:7,
162:21
**civilian** [1] - 170:7
**clarification** [2] - 32:2,
32:14
**clarify** [1] - 30:6
**Clary** [1] - 129:2
**clear** [18] - 15:9, 17:23,
19:23, 26:8, 30:17,
30:20, 31:5, 31:7, 33:7,
33:9, 56:11, 58:5, 58:18,
111:9, 111:13, 124:8,
156:16, 171:12
**Clear** [1] - 17:10
**clear-eyed** [1] - 33:7
**clear-headed** [1] - 33:9
**Clearly** [1] - 171:14
**clearly** [1] - 111:14
**CLERK** [2] - 3:7, 39:2

**clerk** [3] - 105:12,
157:16, 157:19
**client** [1] - 146:15
**close** [7] - 9:2, 39:8,
42:17, 48:17, 48:21,
165:9
**closely** [1] - 27:10
**closer** [5] - 32:6, 39:8,
40:4, 144:13, 144:15
**clothed** [1] - 38:9
**clothes** [2] - 26:3, 35:5
**clothing** [3] - 14:13,
35:17, 82:8
**club** [1] - 9:10
**co** [1] - 36:10
**co-counsel** [1] - 36:10
**COBURN** [44] - 62:6,
62:11, 62:15, 62:18,
62:21, 62:24, 63:2, 63:6,
63:9, 63:14, 63:20, 64:4,
64:24, 65:2, 78:8, 83:1,
101:15, 105:14, 112:24,
113:1, 113:5, 113:7,
113:12, 115:3, 115:7,
115:13, 115:21, 115:23,
117:10, 117:13, 128:8,
143:13, 157:5, 157:9,
157:13, 157:18, 157:24,
158:1, 158:5, 158:8,
158:15, 161:5, 161:8,
175:16
**Coburn** [17] - 1:22,
64:13, 64:16, 64:25,
110:7, 110:16, 111:5,
111:8, 112:25, 114:5,
114:17, 114:23, 117:9,
157:21, 157:23, 161:3,
164:1
**Coburn's** [4] - 109:3,
110:22, 112:22, 158:3
**cold** [1] - 29:16
**colleagues** [1] - 172:18
**color** [9] - 14:20, 14:22,
14:23, 35:23, 37:23,
37:24, 38:2, 78:21
**colored** [3] - 14:14,
14:15, 46:21
**Columbus** [1] - 165:4
**combination** [1] -
110:17
**comfortable** [1] - 9:7
**Coming** [1] - 87:6
**coming** [9] - 7:24,
10:22, 11:5, 13:8, 41:19,
54:19, 65:1, 68:9, 84:16,
87:6, 88:17, 89:6, 89:17,
89:18, 89:25, 169:4
**commit** [2] - 73:4,
155:19
**committed** [9] - 125:19,

137:23, 138:9, 149:15,
150:15, 166:23, 172:15,
173:6
  **committing** [1] - 172:20
  **communicate** [3] -
68:2, 93:5, 93:6
  **compared** [1] - 35:18
  **complete** [2] - 170:13,
176:8
  **completely** [2] - 155:22,
155:24
  **completes** [1] - 151:12
  **complex** [5] - 10:18,
94:9, 94:11, 167:3, 167:4
  **complications** [1] -
172:9
  **complied** [1] - 162:19
  **compound** [1] - 167:4
  **compound-complex**
[1] - 167:4
  **comprehensive** [1] -
153:7
  **conceal** [1] - 69:23
  **concern** [2] - 2:10, 2:12
  **concerned** [2] - 19:5,
112:7
  **concerning** [3] - 34:18,
109:9, 109:14
  **conclude** [2] - 26:25,
79:10, 164:5
  **Conclusion** [1] - 174:3
  **Concurrent** [1] - 154:18
  **concurrently** [6] -
153:11, 154:15, 154:24,
163:1, 163:5, 163:18
  **condition** [1] - 156:19
  **conditions** [4] - 148:16,
149:3, 149:17, 151:13
  **conduct** [38] - 120:5,
123:11, 123:13, 123:18,
123:22, 124:18, 125:4,
125:18, 125:24, 126:5,
126:18, 126:21, 127:5,
127:7, 127:12, 127:19,
128:22, 128:25, 129:5,
129:12, 129:20, 129:24,
130:2, 130:7, 130:11,
130:15, 130:20, 130:25,
131:5, 131:15, 131:20,
132:2, 132:7, 132:11,
132:20, 133:2, 154:5,
168:11
  **conducted** [1] - 66:9
  **conducting** [1] - 73:3
  **confer** [2] - 52:14,
164:14
  **confirm** [1] - 114:9
  **confront** [1] - 63:18
  **connection** [3] -
110:13, 146:16, 147:25

**consecutive** [1] - 121:10

**consider** [4] - 110:24, 111:4, 112:21, 167:5

**consideration** [1] - 110:17

**constitute** [1] - 176:6

**consultation** [1] - 172:16

**CONT'D** [1] - 175:15

**contact** [17] - 12:18, 12:23, 12:25, 13:1, 13:2, 28:3, 32:11, 32:20, 34:21, 36:23, 37:11, 89:20, 89:22, 90:15, 93:6, 93:7, 93:8

**context** [1] - 63:10

**continue** [1] - 151:7

**CONTINUED** [1] - 65:11

**continued** [4] - 11:22, 12:1, 12:5, 12:8

**contract** [2] - 138:10, 138:12

**convenient** [1] - 161:5

**conversation** [7] - 6:18, 117:21, 118:7, 118:8, 118:21, 119:4, 142:16

**conversations** [2] - 123:7, 141:15

**convicted** [3] - 110:14, 111:21, 112:11

**conviction** [6] - 110:5, 110:10, 110:16, 111:1, 111:10, 111:16

**convictions** [1] - 112:4

**cookout** [1] - 42:1

**cool** [3] - 97:1, 146:4, 146:7

**cooperate** [4] - 100:16, 148:15, 149:18, 155:14

**cooperated** [1] - 120:8

**cooperation** [8] - 120:14, 123:21, 124:2, 151:4, 153:4, 153:7, 155:7, 160:16

**cooperator** [1] - 108:9

**copy** [4] - 31:21, 148:4, 148:6, 167:10

**Corey** [8] - 123:22, 124:1, 124:10, 124:18, 124:21, 134:20, 134:22, 135:1

**corn** [1] - 53:1

**corner** [5] - 103:17, 104:16, 135:23, 135:25, 136:13

**correct** [99] - 9:13, 13:24, 14:9, 15:19, 16:9, 18:23, 31:8, 33:24, 34:4, 36:1, 37:20, 39:21,

39:24, 41:1, 46:14, 47:3, 47:13, 49:18, 49:19, 52:9, 54:11, 59:13, 61:2, 61:4, 66:13, 68:22, 69:9, 69:12, 70:21, 72:12, 72:15, 73:22, 74:15, 76:4, 76:7, 77:3, 82:6, 82:22, 85:5, 87:16, 87:19, 88:6, 90:7, 90:11, 91:12, 93:16, 98:8, 99:14, 100:10, 100:16, 104:2, 104:18, 106:15, 107:24, 118:10, 118:22, 119:1, 119:11, 120:18, 120:23, 121:4, 121:9, 121:22, 123:18, 123:24, 125:14, 127:10, 127:17, 127:24, 128:11, 129:15, 131:11, 134:1, 135:12, 135:17, 135:23, 136:6, 136:16, 136:23, 137:16, 138:2, 138:6, 138:8, 138:14, 138:22, 139:8, 139:19, 139:24, 140:13, 143:22, 146:1, 146:15, 146:18, 146:22, 152:2, 156:12, 159:10, 160:14

**Correct** [2] - 88:7, 143:23

**Correction** [6] - 111:19, 111:20, 112:2, 112:3, 112:6, 112:19

**Corrections** [2] - 103:2, 117:25

**correctly** [7] - 22:21, 37:19, 53:4, 53:6, 61:8, 152:17, 163:6

**counsel** [9] - 36:10, 109:2, 116:18, 158:8, 164:14, 168:22, 169:3, 172:1, 174:1

**Counsel** [2] - 2:9, 108:25

**count** [3] - 155:2, 155:5, 162:12

**counting** [2] - 76:12, 164:8

**Country** [2] - 71:1, 74:18

**counts** [2] - 154:21, 162:11

**County** [10] - 3:17, 4:20, 22:7, 39:21, 39:22, 39:23, 40:10, 40:13, 40:17, 169:24

**couple** [24] - 2:22, 25:5, 30:5, 31:5, 33:5, 35:2, 35:19, 36:22, 50:21, 56:10, 58:12, 60:16, 72:14, 97:18, 97:19,

108:1, 113:2, 127:1, 135:12, 142:19, 145:18, 149:3, 163:13, 164:6

**course** [16] - 13:22, 27:2, 65:9, 111:17, 121:14, 123:6, 123:20, 124:8, 125:8, 141:15, 148:7, 164:10, 165:3, 165:19, 166:11, 167:13

**COURT** [159] - 1:1, 2:2, 2:4, 2:6, 2:8, 2:15, 2:17, 2:20, 3:3, 8:3, 8:5, 8:10, 8:21, 9:1, 9:5, 16:12, 29:15, 29:17, 29:22, 29:25, 31:21, 36:11, 36:16, 38:16, 38:19, 38:22, 39:5, 39:8, 40:4, 48:9, 52:5, 52:8, 52:14, 55:21, 56:25, 57:2, 57:6, 57:9, 58:19, 58:22, 58:24, 60:1, 60:11, 61:13, 61:16, 62:3, 62:5, 62:9, 62:14, 62:16, 62:20, 62:23, 62:25, 63:4, 63:12, 63:17, 64:1, 64:5, 64:12, 64:17, 64:19, 64:23, 64:25, 65:5, 65:8, 78:9, 83:2, 99:18, 99:20, 99:24, 101:16, 101:24, 102:5, 102:10, 102:15, 105:11, 105:15, 105:18, 105:21, 105:23, 107:12, 108:13, 108:17, 108:25, 109:7, 109:11, 109:19, 109:23, 110:4, 110:21, 111:17, 112:10, 112:13, 112:18, 112:25, 113:3, 113:6, 113:10, 113:19, 113:21, 113:25, 114:4, 114:12, 114:14, 114:16, 114:22, 115:4, 115:8, 115:19, 115:22, 115:24, 116:1, 116:5, 116:7, 116:12, 116:15, 116:19, 116:22, 116:25, 117:5, 117:8, 117:11, 126:3, 128:4, 139:6, 140:10, 143:12, 154:1, 157:3, 157:16, 157:20, 157:23, 157:25, 158:6, 158:10, 161:3, 161:7, 164:1, 168:21, 168:25, 169:3, 169:13, 169:16, 169:23, 170:1, 170:5, 170:9, 170:16, 170:18, 170:25, 171:2, 171:10, 172:20, 172:24, 173:4, 173:11, 173:18, 173:22, 174:1

**Court** [24] - 2:13, 5:22, 10:4, 18:6, 18:11, 24:5,

49:6, 64:15, 110:2, 110:15, 112:15, 112:23, 114:19, 114:24, 149:14, 152:10, 153:2, 161:6, 164:13, 172:15, 172:23, 173:13, 173:17, 176:15

**court** [8] - 6:3, 28:25, 110:12, 111:15, 138:19, 142:21, 164:5, 164:6

**Court's** [11] - 24:8, 38:14, 62:6, 63:2, 110:10, 110:17, 140:8, 162:16, 163:24, 173:14, 173:21

**Courthouse** [1] - 1:24

**courtroom** [7] - 2:19, 8:22, 28:24, 55:14, 55:15, 55:22, 65:7, 108:24, 116:24, 117:7, 118:18, 134:16, 134:22, 138:19, 142:1, 143:1, 147:5

**cousin** [2] - 73:14, 73:15

**covered** [1] - 158:25

**crack** [6] - 96:22, 96:24, 97:6, 97:15, 97:17, 97:21

**crawl** [1] - 44:18

**crawled** [3] - 44:6, 44:7, 44:18

**create** [1] - 115:1

**creates** [1] - 172:8

**crime** [1] - 111:21

**crimes** [5] - 106:21, 106:23, 155:19, 167:2, 167:4

**criminal** [38] - 120:5, 123:10, 123:13, 123:18, 123:21, 124:18, 125:4, 125:18, 125:24, 126:4, 126:18, 126:21, 127:5, 127:7, 127:12, 127:19, 128:3, 128:22, 128:25, 129:5, 129:12, 129:20, 129:24, 130:2, 130:7, 130:11, 130:15, 130:20, 130:25, 131:5, 131:15, 131:20, 132:2, 132:20, 133:2, 156:10, 160:21, 166:10

**CRIMINAL** [1] - 1:6

**Criminal** [2] - 132:7, 132:11

**CROSS** [6] - 29:18, 55:24, 117:12, 175:6, 175:11, 175:16

**cross** [6] - 60:12, 62:7, 63:10, 110:22, 111:5, 112:22

**CROWE** [4] - 101:23,

102:3, 102:8, 158:14

**Crowe** [2] - 1:20, 64:16

**curative** [2] - 110:8, 110:18

**curb** [1] - 26:11

**cut** [4] - 10:25, 18:10, 18:15, 91:2

**cuts** [1] - 10:2

**CVS** [3] - 71:19, 71:20, 80:10

---

**D**

**D-A-V-I-D** [1] - 3:10

**danger** [1] - 144:21

**Darius** [22] - 66:9, 66:11, 66:21, 67:3, 67:5, 73:4, 75:4, 75:24, 76:3, 76:11, 76:24, 77:11, 79:20, 79:23, 96:21, 97:3, 127:3, 139:25, 140:4, 144:25, 146:16, 146:25

**Darius's** [3] - 71:12, 80:25, 81:7

**Darryl** [1] - 107:18

**date** [8] - 63:15, 103:20, 104:18, 112:19, 122:20, 143:4, 169:10, 172:5

**dated** [1] - 162:21

**dates** [4] - 121:24, 122:2, 122:5, 122:7

**David** [26] - 2:5, 2:6, 2:16, 3:2, 3:9, 3:13, 4:2, 8:13, 8:21, 9:7, 11:6, 15:21, 16:1, 16:13, 18:18, 21:19, 22:21, 24:9, 28:3, 29:14, 29:15, 29:23, 30:3, 36:14, 36:19, 38:19

**DAVID** [2] - 3:5, 175:4

**Davis** [1] - 1:13

**Davon** [1] - 125:16

**days** [22] - 70:21, 75:17, 84:24, 100:15, 101:4, 127:1, 155:2, 155:3, 164:10, 164:11, 165:9, 165:10, 165:16, 165:17, 166:7, 167:22, 167:24, 170:13, 170:15, 171:7, 172:19

**DC** [1] - 172:17

**dead** [1] - 138:23

**deadline** [1] - 117:2

**deal** [2] - 164:20, 164:21

**dealt** [1] - 110:9

**Dean** [3] - 122:12, 123:9, 140:25

**death** [3] - 151:5, 151:22, 151:24
**December** [2] - 103:24, 168:2
**decide** [2] - 64:10, 166:14
**decided** [1] - 30:25
**decision** [1] - 110:25
**decisions** [2] - 30:17, 166:15
**deck** [2] - 19:25, 21:3
**deeply** [1] - 150:5
**deer** [1] - 13:23
**Defendant** [5] - 1:17, 1:18, 1:20, 1:21, 156:25
**defendant** [14] - 148:15, 148:19, 149:9, 151:12, 151:15, 153:12, 155:18, 156:5, 156:20, 160:10, 162:12, 162:19, 166:10, 171:14
**defendant's** [1] - 151:8
**defendants** [2] - 114:11, 166:12
**Defendants** [1] - 1:9
**defense** [6] - 64:9, 116:18, 171:23, 172:7, 173:5
**definitely** [2] - 172:23, 172:24
**definitive** [1] - 173:12
**delaying** [1] - 113:7
**delays** [1] - 164:12
**delete** [1] - 57:18
**deliberate** [2] - 166:23, 167:9
**deliberations** [5] - 166:19, 166:21, 167:14, 167:16, 167:19
**demonstrative** [3] - 62:12, 62:23, 63:16
**denied** [2] - 112:15, 160:4
**denominated** [1] - 31:25
**department** [1] - 22:5
**Department** [3] - 22:8, 103:2, 117:25
**describe** [6] - 12:25, 18:3, 22:10, 22:11, 43:5, 142:7
**described** [9] - 14:11, 36:2, 49:23, 51:2, 117:18, 124:1, 125:4, 126:22, 150:16
**description** [1] - 36:7
**designated** [1] - 156:11
**despite** [3] - 137:1, 138:9, 164:12
**detail** [1] - 15:22

**detailed** [2] - 110:19, 122:17
**details** [1] - 7:6
**detective** [3] - 134:3, 169:19, 169:24
**detectives** [2] - 100:18, 103:13
**determined** [1] - 155:19
**Dezzy** [2] - 129:22, 129:24
**Dicky** [6] - 126:4, 126:5, 126:6, 126:7, 126:8, 126:9
**die** [1] - 135:11
**died** [1] - 96:20
**different** [8] - 51:15, 79:6, 112:3, 120:2, 142:19, 162:7, 163:11
**difficult** [2] - 58:10, 58:11
**dip** [2] - 69:17, 136:8
**dips** [3] - 69:20, 69:21, 83:6
**DIRECT** [6] - 3:11, 39:11, 65:11, 175:5, 175:10, 175:15
**direct** [18] - 4:7, 4:16, 20:21, 36:24, 38:3, 61:6, 108:15, 109:8, 109:13, 111:12, 111:14, 117:16, 121:14, 125:8, 133:9, 135:10, 156:15, 158:22
**directing** [1] - 5:14
**direction** [13] - 7:11, 7:24, 10:21, 12:7, 13:20, 18:3, 18:20, 48:1, 49:1, 49:5, 49:9, 56:7, 90:25
**directly** [2] - 3:7, 39:2
**Director** [1] - 5:13
**dirty** [6] - 69:1, 69:3, 69:12, 82:22, 82:25, 144:21
**Dirty** [8] - 125:9, 125:11, 125:13, 135:14, 144:7, 144:12, 144:13, 144:18
**disagreement** [2] - 79:18, 172:6
**disclose** [3] - 101:17, 101:20, 101:25
**discover** [1] - 100:4
**discuss** [2] - 168:13, 168:14
**discussion** [5] - 37:14, 61:24, 97:8, 97:23, 108:21
**discussions** [2] - 158:24, 159:2
**dismiss** [1] - 162:11
**dispute** [1] - 138:6

**District** [1] - 149:8
**DISTRICT** [2] - 1:1, 1:2
**Division** [6] - 111:19, 111:20, 112:1, 112:2, 112:6, 112:19
**DIVISION** [1] - 1:2
**DOAR** [1] - 158:16
**DOC** [4] - 102:24, 102:25, 117:18, 117:24
**document** [11] - 31:25, 32:3, 32:9, 148:1, 148:7, 148:24, 157:22, 159:10, 161:1, 161:19, 162:22
**Dodge** [1] - 85:13
**dog** [1] - 64:7
**done** [11] - 28:11, 60:25, 61:4, 64:9, 64:10, 97:3, 108:13, 108:15, 116:14, 170:14, 170:15
**door** [9] - 42:8, 87:6, 87:13, 88:9, 88:12, 88:20, 89:17, 110:1, 111:5
**dot** [1] - 83:13
**doublecheck** [3] - 34:16, 36:5, 173:20
**down** [10] - 10:6, 12:5, 12:8, 14:1, 18:6, 18:14, 24:5, 24:19, 25:9, 27:14, 32:4, 34:12, 43:21, 43:25, 49:5, 49:6, 51:18, 59:10, 59:13, 86:6, 87:6, 87:24, 91:2, 91:4, 91:5, 95:21, 105:23, 145:24, 148:13, 151:7, 155:17
**dozed** [1] - 114:9
**dragged** [1] - 75:20
**drive** [2] - 10:13, 84:12
**driven** [1] - 25:4
**driveway** [1] - 10:24
**driving** [6] - 24:21, 30:7, 81:5, 93:14, 94:9, 150:12
**dropped** [2] - 136:2, 136:5
**drove** [6] - 24:1, 53:25, 54:9, 80:24, 150:8, 150:9
**drugs** [6] - 76:16, 76:19, 76:21, 76:24, 102:18
**dual** [1] - 110:19
**Duck** [1] - 131:23
**duct** [10] - 67:12, 67:13, 67:14, 67:17, 68:13, 71:10, 72:8, 75:14, 80:5, 80:13
**due** [1] - 11:14
**during** [28] - 17:9, 29:4, 36:24, 38:3, 40:25, 41:3, 61:6, 66:10, 75:22,

111:8, 114:1, 115:9, 121:14, 123:6, 123:20, 124:2, 124:8, 125:8, 135:10, 148:7, 148:21, 154:5, 163:13, 165:14, 167:14, 167:15, 167:16, 167:18
**During** [2] - 24:22, 141:15
**dusted** [2] - 31:15, 33:2

## E

**E's** [1] - 70:25
**e-mail** [1] - 116:18
**early** [6] - 73:2, 81:3, 101:17, 121:15, 165:21, 165:22
**easel** [6] - 8:2, 8:12, 8:14, 48:8, 114:25, 115:6
**easier** [1] - 148:5
**easily** [2] - 166:4, 166:7
**easy** [1] - 20:9
**Edmondson** [2] - 95:20, 106:20
**effect** [1] - 114:25
**eight** [1] - 166:7
**either** [14] - 13:13, 13:19, 14:4, 28:18, 28:25, 36:23, 37:3, 64:23, 67:3, 67:8, 108:3, 109:23, 120:13, 173:14
**elapsing** [1] - 155:3
**Election** [3] - 165:19, 173:9, 173:17
**Elementary** [1] - 18:7
**elements** [1] - 167:5
**Eleven** [1] - 5:1
**elicit** [1] - 111:6
**elicited** [5] - 109:8, 109:13, 109:25, 111:11, 111:14
**Elkie** [1] - 132:9
**emphasize** [1] - 168:10
**emphasized** [1] - 168:11
**Encounter** [1] - 17:2
**encounter** [8] - 12:9, 16:3, 16:25, 19:6, 22:10, 22:11, 29:5, 111:19
**encountered** [1] - 112:5
**end** [15] - 24:6, 24:18, 37:8, 51:14, 70:23, 74:6, 89:12, 89:14, 89:15, 116:19, 166:5, 166:8, 166:25, 168:23
**ended** [1] - 150:5
**enforcement** [38] - 123:15, 123:20, 124:2,

124:18, 124:21, 125:1, 125:18, 125:21, 125:24, 126:18, 126:21, 127:7, 127:12, 127:19, 127:22, 128:3, 128:22, 128:25, 129:5, 129:12, 130:2, 130:7, 130:11, 130:15, 130:20, 130:25, 131:5, 131:15, 131:20, 132:2, 132:20, 133:1, 133:4, 133:14, 134:10, 140:23, 148:21, 156:11
**engage** [1] - 154:4
**engaged** [2] - 121:9, 123:12
**enjoy** [3] - 61:22, 114:17, 168:8
**entered** [2] - 156:21, 160:11
**enters** [4] - 2:19, 65:7, 116:24, 117:7
**entitled** [1] - 166:11
**entrance** [3] - 10:6, 42:12, 42:18
**equals** [1] - 85:16
**erase** [1] - 57:17
**errand** [1] - 41:20
**especially** [2] - 80:10, 156:2
**Esquire** [10] - 1:16, 1:16, 1:17, 1:18, 1:19, 1:19, 1:20, 1:21, 1:22, 1:22
**essentially** [1] - 154:4
**established** [1] - 153:16
**estimating** [1] - 81:2
**et** [1] - 176:5
**ethnic** [2] - 12:12, 46:19
**ethnicity** [1] - 46:17
**event** [2] - 32:7, 58:11, 156:2
**events** [2] - 135:2, 150:16
**Everywhere** [1] - 88:25
**evidence** [13] - 58:14, 61:24, 63:13, 64:2, 64:3, 110:2, 156:10, 164:9, 164:23, 166:11, 166:13, 167:6
**evidentiary** [2] - 166:5, 166:8
**Exactly** [1] - 143:13
**exactly** [9] - 11:16, 22:18, 38:9, 58:8, 69:21, 91:9, 151:19, 154:16, 164:19
**EXAMINATION** [16] - 3:11, 29:18, 36:17, 39:11, 55:24, 60:14, 65:11, 117:12, 175:5, 175:6, 175:7, 175:10,

175:11, 175:12, 175:15, 175:16
**examination** [8] - 60:12, 61:6, 111:6, 112:22, 117:16, 125:8, 133:9, 135:10
**examine** [1] - 62:8
**examiner** [2] - 169:17, 170:1
**example** [1] - 77:18
**except** [2] - 172:24, 172:25
**Excerpt** [1] - 174:3
**exchange** [3] - 149:18, 154:5, 155:7
**Excuse** [1] - 99:16
**excused** [7] - 38:20, 55:22, 61:14, 61:25, 108:23, 164:2, 168:19
**executed** [2] - 147:25, 156:16
**exhibit** [4] - 99:5, 108:13, 114:2, 121:15
**Exhibit** [12] - 8:17, 20:6, 24:12, 42:6, 48:11, 78:18, 87:8, 103:16, 156:25, 157:10, 160:1, 161:10
**exhibits** [3] - 148:3, 157:17, 167:12
**exit** [1] - 10:13
**exited** [1] - 136:23
**exits** [2] - 108:24, 168:20
**expect** [6] - 61:20, 76:16, 76:21, 109:22, 165:2, 165:17
**expectation** [1] - 151:3
**expecting** [1] - 117:2
**experience** [1] - 80:22
**explain** [2] - 23:19, 69:21
**explicitly** [1] - 119:10
**extent** [3] - 171:3, 171:14, 171:20
**extra** [1] - 163:21
**extraordinary** [1] - 172:10
**eye** [6] - 37:11, 89:20, 89:22, 90:15, 136:23
**eye-to-eye** [1] - 37:11
**eyed** [1] - 33:7
**eyes** [2] - 19:24, 35:23

**F**

**face** [1] - 13:19
**faces** [1] - 17:20
**facing** [2] - 151:22,

151:25
**fact** [18] - 14:9, 15:18, 27:2, 29:4, 32:15, 35:14, 52:21, 72:20, 84:6, 97:15, 109:25, 111:17, 112:1, 124:8, 125:21, 137:1, 138:9, 139:14
**facts** [1] - 15:19
**fail** [1] - 155:21
**fair** [1] - 52:1
**fairly** [3] - 6:8, 166:23, 169:21
**fake** [1] - 102:7
**fall** [3] - 43:6, 43:21, 145:16
**fallen** [1] - 44:22
**falling** [1] - 44:3
**false** [2] - 124:13, 155:20
**familiar** [8] - 6:8, 122:14, 127:15, 129:7, 129:18, 131:13, 131:18, 131:25
**family** [7] - 39:22, 39:23, 40:10, 142:2, 142:3, 143:2, 168:13
**Family** [1] - 5:13
**far** [4] - 4:2, 24:6, 42:3, 54:2
**fast** [4] - 14:3, 34:3, 34:6, 34:8
**Fatty** [1] - 131:18
**Federal** [2] - 119:15, 149:14
**federal** [17] - 70:17, 100:9, 108:9, 120:13, 122:25, 148:20, 149:9, 149:19, 150:1, 156:6, 161:19, 162:5, 163:17, 163:22, 165:5, 167:7, 168:8
**fell** [14] - 43:1, 43:2, 43:10, 43:21, 43:24, 44:4, 44:23, 57:4, 57:11, 90:4, 90:11, 136:24, 137:2
**felt** [1] - 144:20
**fence** [1] - 10:15
**few** [15] - 4:16, 8:15, 9:10, 10:18, 30:6, 31:10, 34:15, 34:16, 41:5, 54:3, 54:4, 59:22, 61:6, 145:24
**fifteen** [1] - 23:16
**fight** [1] - 64:7
**figure** [2] - 170:19, 173:15
**filed** [2] - 159:21, 160:6
**filled** [3] - 50:22, 51:23
**Fine** [1] - 39:15
**fine** [8] - 9:8, 14:17,

15:5, 15:6, 26:12, 29:25, 35:9, 171:1
**finger** [1] - 9:23, 10:17
**fingerprint** [2] - 66:5, 80:23
**fingerprints** [1] - 33:2, 67:25
**finish** [1] - 110:22
**finished** [2] - 60:10, 169:11
**fire** [2] - 88:17, 90:6
**firm** [1] - 169:9
**firmed** [1] - 173:24
**firmly** [1] - 110:14
**First** [3] - 113:2, 113:7, 158:20
**first** [51] - 11:18, 14:11, 21:7, 22:17, 22:24, 23:5, 23:9, 26:4, 26:10, 26:12, 27:11, 30:8, 34:19, 34:23, 36:1, 36:6, 39:5, 57:24, 64:13, 66:11, 83:7, 85:22, 87:4, 87:15, 87:21, 88:5, 92:7, 92:11, 92:12, 92:13, 97:8, 100:20, 100:21, 100:22, 117:9, 121:22, 123:7, 137:4, 148:14, 148:18, 158:1, 158:4, 158:5, 162:4, 165:25, 167:23, 168:6
**five** [6] - 23:7, 70:20, 105:13, 121:10, 170:13, 172:18
**Five** [2] - 23:7, 161:7
**Flannery** [1] - 1:19
**flexibility** [1] - 172:4
**flight** [2] - 87:4, 87:15
**floor** [10] - 43:25, 44:5, 87:5, 87:21, 87:22, 87:23, 87:24, 88:2, 88:3, 88:10
**focus** [1] - 13:21
**focusing** [1] - 10:7
**follow** [1] - 19:9
**Follow** [1] - 84:5
**followed** [4] - 101:4, 101:5, 151:18, 154:8
**Following** [1] - 93:25
**following** [10] - 94:2, 120:18, 123:11, 143:6, 145:4, 145:5, 148:16, 165:18, 170:23
**follows** [1] - 148:15
**FOR** [1] - 1:2
**foregoing** [1] - 176:6
**formal** [1] - 117:2
**forth** [5] - 112:4, 114:6, 151:13, 170:6, 171:23
**forward** [1] - 171:12

**foundation** [1] - 101:15
**four** [1] - 32:1
**Four** [5] - 155:17, 156:25, 157:10, 158:7, 160:1
**Fox** [5] - 10:5, 85:5, 85:24, 86:9, 91:11
**Frankly** [1] - 111:3
**frankly** [1] - 168:1
**Fraser** [1] - 161:17
**Frederick** [1] - 5:20
**free** [1] - 116:8
**Friday** [4] - 165:25, 166:3, 173:2, 173:7
**friend** [5] - 125:13, 135:16, 136:13, 136:20, 137:1
**friends** [2] - 59:17, 168:13
**front** [20] - 7:15, 7:21, 10:10, 10:25, 11:11, 11:13, 13:9, 17:3, 17:6, 20:3, 36:20, 42:6, 42:12, 42:18, 45:22, 45:25, 49:21, 52:19, 53:2, 60:5
**Fruit** [1] - 131:3
**Fuck** [1] - 79:17
**fulfill** [1] - 155:22
**full** [7] - 73:21, 153:6, 164:11, 165:9, 165:17, 166:2, 172:2
**fully** [2] - 148:19, 162:19
**Function** [1] - 105:13
**fuzzy** [1] - 103:20

**G**

**gangster** [2] - 124:3, 124:11
**garden** [1] - 87:25
**GARDNER** [1] - 1:8
**Gardner** [42] - 1:21, 65:4, 66:22, 72:14, 72:23, 74:22, 75:5, 78:4, 78:12, 78:23, 81:5, 92:3, 97:23, 101:18, 101:20, 102:1, 102:11, 102:17, 102:21, 109:9, 109:15, 111:2, 111:19, 112:13, 117:18, 118:8, 119:5, 141:3, 142:2, 143:1, 143:21, 144:23, 145:13, 146:16, 147:6, 147:12, 147:21, 157:10, 158:7, 158:16, 160:1
**Gardner's** [8] - 75:7, 98:7, 109:14, 110:5, 111:1, 111:15, 140:12,

156:25
**Garrison** [2] - 97:13, 97:14
**gather** [1] - 6:14
**gauge** [2] - 19:2, 57:22
**general** [3] - 5:19, 58:2, 58:6
**generally** [1] - 111:21
**gentleman** [2] - 12:3, 13:3
**gentlemen** [11] - 2:20, 25:24, 54:10, 55:22, 61:17, 117:8, 120:11, 126:23, 164:4, 164:5, 168:19
**Gerard** [1] - 1:19
**Giganti** [1] - 134:3
**girl** [2] - 4:13, 53:3
**girlfriend** [5] - 70:24, 74:17, 78:24, 95:14, 95:17
**girlfriend's** [3] - 70:25, 71:5, 74:20
**girls** [1] - 4:12
**given** [6] - 32:3, 32:23, 53:16, 73:20, 155:20, 160:16
**glad** [1] - 61:19
**glasses** [2] - 17:13, 17:15
**glimpsed** [1] - 26:4
**gloves** [7] - 67:23, 71:11, 72:4, 75:15, 80:5, 80:17
**God** [2] - 11:20, 30:12
**Goo** [27] - 66:21, 67:1, 67:8, 67:18, 68:21, 69:6, 69:11, 71:17, 72:4, 72:14, 78:10, 80:10, 81:14, 81:22, 82:5, 82:17, 82:24, 83:18, 83:22, 84:15, 86:23, 92:12, 92:13, 98:19, 104:7, 140:12, 146:15
**Goo's** [4] - 71:14, 72:11, 79:6, 86:22
**goodbye** [1] - 168:7
**Goose** [5] - 146:22, 147:1, 147:5, 147:13, 147:22
**government** [27] - 52:3, 111:9, 111:14, 114:19, 117:16, 117:21, 118:6, 118:8, 119:4, 119:13, 121:15, 142:20, 148:2, 149:5, 149:9, 150:1, 157:5, 160:17, 161:9, 161:12, 161:24, 164:1, 164:24, 169:11, 171:20, 172:8, 172:25

**Government** [4] - 1:15, 78:18, 87:8, 103:16
**GOVERNMENT'S** [2] - 3:5, 38:25
**government's** [8] - 57:18, 109:8, 109:13, 148:3, 164:25, 171:4, 171:16, 173:6
**Government's** [8] - 8:17, 20:6, 24:12, 42:6, 48:11, 56:7, 58:14, 161:9
**grab** [2] - 79:15, 84:5
**grade** [2] - 4:4, 4:5
**grand** [3] - 122:25, 123:1, 140:25
**grandmother's** [1] - 107:23
**grass** [6] - 57:20, 57:23, 57:25, 58:4, 59:2
**gray** [5] - 37:10, 37:25, 38:1, 52:25, 53:1
**Gray** [2] - 10:5, 38:1
**great** [2] - 29:17, 163:25
**Great** [1] - 9:5
**green** [4] - 24:15, 24:20, 28:15, 38:10
**Green** [5] - 24:16, 24:17, 78:22
**Greens** [1] - 24:16
**grew** [1] - 40:10
**Grey** [4] - 85:5, 85:24, 86:9, 91:11
**ground** [8] - 43:22, 43:25, 65:3, 89:21, 89:22, 90:13, 136:24, 137:2
**grounds** [1] - 65:6
**group** [1] - 134:18
**grow** [2] - 3:21, 40:7
**grown** [1] - 168:10
**guarantee** [1] - 109:2
**guess** [9] - 12:4, 40:25, 60:3, 64:15, 77:20, 107:13, 119:14, 145:23, 160:15
**Guilty** [1] - 159:12
**guilty** [7] - 139:15, 156:21, 159:19, 159:22, 160:3, 160:11, 162:13
**gun** [19] - 47:5, 47:7, 69:22, 70:2, 70:5, 70:9, 70:10, 70:17, 82:18, 100:5, 100:9, 137:3, 155:11, 162:5, 162:7, 163:6, 163:17, 170:2
**guns** [8] - 68:20, 68:21, 69:15, 70:19, 71:8, 79:1, 79:3, 82:13, 83:4
**gunshot** [1] - 47:11
**guy** [4] - 27:7, 27:8,

106:7, 106:21
**guys** [18] - 17:6, 18:5, 23:25, 25:5, 25:10, 25:24, 32:20, 35:12, 54:10, 54:16, 54:19, 54:21, 60:5, 80:8, 80:14, 80:17, 80:24, 108:3

### H

**hair** [4] - 15:12, 15:13, 15:14, 53:1
**hairdresser** [1] - 15:8
**half** [7] - 66:10, 75:20, 97:22, 170:14, 172:2, 172:20, 173:7
**Halfie** [3] - 128:24, 128:25
**halfway** [5] - 116:14, 116:15, 116:22, 164:24, 170:15
**hand** [11] - 9:15, 18:8, 20:22, 24:11, 51:16, 103:17, 104:15, 137:4, 137:16, 157:16, 157:18
**handgun** [2] - 136:6, 136:15
**handle** [1] - 139:1
**hands** [12] - 13:2, 13:4, 29:5, 32:18, 33:24, 34:1, 34:2, 37:1, 37:3, 37:14, 47:7, 137:24
**hands-on** [1] - 13:2
**handwriting** [3] - 51:13, 51:15
**Hanlon** [13] - 1:16, 2:4, 2:25, 30:7, 31:6, 31:10, 31:20, 34:17, 52:13, 56:11, 59:19, 116:16, 168:21
**HANLON** [2] - 2:13, 2:16, 2:18, 3:1, 3:4, 3:12, 8:4, 8:11, 9:4, 9:6, 36:18, 38:23, 39:12, 52:10, 52:15, 52:17, 59:24, 60:12, 60:15, 175:5, 175:7, 175:10, 175:12
**hard** [3] - 57:16, 63:20, 165:6
**HARDING** [39] - 2:3, 2:5, 2:7, 8:8, 62:4, 63:5, 63:8, 64:22, 65:12, 99:19, 99:21, 105:16, 105:19, 105:22, 105:25, 106:3, 106:6, 108:14, 114:21, 116:11, 116:13, 116:16, 116:21, 116:23, 126:2, 139:4, 153:25, 157:21, 158:3, 168:24,

169:15, 169:19, 169:25, 170:3, 170:7, 170:10, 170:17, 171:8, 175:15
**Harding** [23] - 1:16, 8:6, 64:20, 65:10, 105:13, 108:13, 116:9, 120:15, 125:8, 125:13, 135:9, 138:2, 139:7, 140:8, 146:21, 148:2, 153:15, 155:13, 157:2, 157:11, 168:21, 169:13, 171:6
**Harding's** [2] - 62:21, 148:7
**HARRIS** [1] - 1:7
**Harris** [1] - 1:18
**hat** [11] - 16:16, 16:22, 16:23, 31:8, 36:2, 36:7, 53:3, 56:13, 56:15, 82:10, 82:11
**hats** [1] - 82:10
**Hayes** [2] - 169:15, 169:16
**head** [10] - 11:21, 14:25, 16:16, 16:21, 50:14, 136:15, 136:21, 137:2, 163:9
**headed** [4] - 30:17, 30:20, 33:9, 83:22
**heading** [2] - 7:11, 18:20
**headlights** [1] - 13:23
**hear** [7] - 61:19, 64:2, 105:22, 109:19, 109:20, 109:23, 128:19
**heard** [12] - 47:16, 64:22, 89:5, 91:14, 91:15, 129:9, 131:10, 132:16, 132:18, 137:18, 137:21, 172:1
**hearing** [3] - 47:9, 87:7, 143:7
**heart** [3] - 30:14, 30:23, 33:6
**height** [1] - 11:19
**Heights** [4] - 97:11, 97:14, 137:18, 137:25
**Hello** [1] - 56:2
**help** [8] - 21:1, 21:4, 44:12, 50:8, 50:12, 50:16, 50:18, 53:12
**hereby** [1] - 176:3
**herein** [1] - 162:22
**hereunto** [1] - 176:9
**heroin** [2] - 76:20, 76:23
**herself** [3] - 44:3, 44:22, 90:5
**hesitate** [1] - 172:7
**highly** [1] - 109:17
**hire** [1] - 73:17

**hired** [2] - 123:16, 133:12
**history** [1] - 101:18
**Hit** [1] - 32:18
**hit** [18] - 11:15, 11:16, 11:19, 11:23, 12:2, 18:9, 18:16, 19:5, 30:9, 30:21, 34:6, 35:7, 37:10, 37:12, 74:11, 89:21, 89:22, 134:1
**hitting** [1] - 16:6
**Hmm** [2] - 45:17, 56:14
**hold** [1] - 167:1
**holding** [3] - 106:7, 118:21, 137:4
**holiday** [2] - 165:3, 168:8
**holidays** [1] - 165:5
**Holly** [13] - 67:8, 71:4, 72:17, 72:23, 74:17, 75:5, 79:3, 80:2, 92:4, 97:23, 99:7, 127:8, 145:25
**home** [27] - 5:5, 5:15, 5:18, 5:25, 6:6, 6:11, 7:4, 7:12, 9:24, 9:25, 19:16, 19:19, 19:21, 23:4, 24:5, 31:1, 41:17, 41:19, 70:5, 75:17, 79:23, 81:20, 81:25, 84:4, 95:4, 95:9, 96:6
**Home** [1] - 19:13
**homicide** [11] - 109:14, 117:17, 122:18, 123:4, 141:2, 147:20, 149:10, 150:2, 150:15, 153:17, 169:19
**Homicide** [4] - 120:19, 120:25, 121:6, 123:7
**honor** [1] - 143:22
**Honor** [86] - 2:3, 2:5, 2:13, 3:1, 8:1, 9:4, 16:11, 29:14, 31:18, 36:13, 36:19, 38:13, 38:15, 38:18, 38:23, 39:13, 48:8, 49:11, 52:3, 52:6, 52:12, 52:15, 52:18, 55:19, 55:20, 59:24, 60:7, 60:9, 60:13, 61:12, 62:6, 62:11, 62:18, 63:8, 63:21, 63:23, 64:6, 64:18, 65:3, 99:16, 101:23, 105:17, 106:4, 107:11, 108:11, 108:14, 109:3, 110:6, 111:9, 112:7, 112:12, 112:17, 112:24, 113:1, 113:5, 114:21, 115:13, 115:14, 115:21, 116:16, 116:23, 117:4, 117:10,

126:2, 142:18, 143:10, 156:24, 157:1, 157:2, 157:6, 157:10, 157:13, 157:14, 157:19, 157:24, 158:2, 158:8, 158:9, 158:12, 161:6, 163:24, 168:24, 169:1, 169:15, 170:8, 173:25
**Honorable** [1] - 1:13
**hooked** [2] - 62:17, 62:21
**hope** [4] - 116:7, 164:19, 165:9, 171:10
**Hopefully** [1] - 55:23
**hopefully** [2] - 109:1, 171:17
**hoping** [4] - 116:17, 142:20, 152:15, 172:11
**Hospital** [2] - 7:25, 10:11, 10:19
**hospital** [3] - 10:13, 10:15, 93:9
**hot** [1] - 29:22
**hour** [4] - 95:4, 95:5, 95:6, 116:2
**hours** [3] - 97:18, 97:19, 122:8
**house** [15] - 6:24, 7:1, 10:12, 10:14, 19:17, 41:9, 41:11, 48:4, 54:2, 70:24, 70:25, 78:24, 79:2, 95:14, 107:23
**House** [1] - 132:5
**hum** [7] - 39:25, 44:17, 46:4, 48:7, 53:7, 56:22, 105:9
**hundred** [1] - 76:12
**hurt** [12] - 34:9, 44:1, 44:2, 44:3, 44:10, 44:22, 45:4, 45:16, 45:19, 53:11, 77:15

### I

**ID** [1] - 104:13
**ID's** [1] - 170:6
**idea** [13] - 7:17, 55:10, 76:9, 77:24, 81:2, 101:13, 118:24, 139:25, 140:3, 150:9, 171:7, 171:8, 173:13
**ideal** [1] - 30:16
**identification** [2] - 38:10, 169:13
**identified** [2] - 26:2, 28:14
**identify** [3] - 28:10, 107:2
**II** [3] - 105:3, 118:9,

119:9
**ill** [1] - 55:21
**immediately** [1] -
120:12
**impartially** [1] - 166:23
**impatient** [2] - 79:9,
79:10
**impeaching** [2] -
115:10, 115:11
**impeded** [1] - 34:9
**important** [1] - 166:22
**impose** [1] - 148:2
**imposed** [3] - 153:10,
162:25, 163:1
**impression** [1] - 109:18
**imprisonment** [3] -
151:15, 151:25, 152:6
**IN** [1] - 1:1
**inadmissible** [1] -
111:11
**incarcerated** [2] -
133:13, 154:6
**include** [3] - 67:19,
158:3, 158:5
**included** [1] - 167:22
**includes** [1] - 9:11
**including** [4] - 48:13,
142:1, 159:3, 167:16
**incomplete** [1] - 155:20
**inconsistent** [4] -
63:17, 64:3, 115:12,
115:16
**inconvenience** [1] -
171:19
**inconvenienced** [1] -
167:21
**incorporated** [1] -
162:21
**incorrect** [3] - 128:1,
128:4, 128:5
**indeed** [3] - 166:25,
167:3, 167:6
**INDEX** [1] - 175:1
**indicate** [3] - 9:23,
56:23, 83:17
**indicated** [7] - 12:14,
24:15, 52:22, 59:19,
85:13, 118:20, 134:13
**Indicating** [2] - 83:19,
85:2
**indicating** [3] - 10:17,
10:19, 24:10
**indicating)** [1] - 57:12
**Indictment** [1] - 153:10
**indictment** [3] - 141:19,
162:11, 167:3
**indictments** [1] - 112:3
**individual** [7] - 11:23,
12:17, 12:19, 12:22,
14:12, 118:13, 122:12

**individuals** [3] - 25:21,
142:1, 150:14
**indulgence** [2] - 38:14,
140:9
**infer** [1] - 111:25
**inflammatory** [3] - 65:4,
109:17, 114:5
**information** [15] - 7:7,
8:14, 23:22, 24:24,
27:25, 32:23, 53:16,
54:18, 81:17, 101:25,
116:18, 123:10, 155:20,
155:21, 162:15
**informed** [1] - 29:9
**initial** [1] - 101:25
**injured** [1] - 21:14
**injuries** [1] - 21:16
**inside** [3] - 45:9, 71:4,
87:4
**Inside** [1] - 71:6
**instead** [1] - 71:4
**instruct** [2] - 166:9,
167:7
**instruction** [1] - 110:9
**instructions** [6] - 6:21,
110:18, 110:19, 166:24,
167:11, 167:17
**intends** [1] - 171:14
**intention** [3] - 139:24,
150:19, 171:3
**interim** [1] - 63:24
**intermediary** [1] -
124:22
**interpret** [1] - 151:17
**interpretation** [1] -
119:9
**interrupt** [1] - 2:21
**interview** [6] - 100:20,
100:21, 100:22, 115:10,
145:23, 145:25
**interviewed** [1] - 100:18
**interviewing** [1] -
145:21
**interviews** [4] - 101:4,
101:17, 101:25, 140:24
**Intrepid** [3] - 78:16,
83:18, 85:13
**invasion** [1] - 75:17
**investigated** [1] - 16:6
**investigation** [1] -
168:11
**inviting** [1] - 64:25
**involve** [1] - 154:7
**involved** [18] - 101:13,
125:1, 125:21, 127:23,
128:14, 133:17, 133:19,
133:24, 134:13, 135:1,
135:11, 140:12, 140:16,
146:17, 147:5, 147:12,
147:21, 150:5

**involving** [1] - 159:2
**irrelevant** [1] - 111:11
**issue** [4] - 64:20, 109:4,
110:16, 115:17
**issues** [3] - 61:25,
109:5, 164:21
**item** [2] - 156:24,
157:10
**itself** [3] - 50:21, 78:11,
115:10

## J

**jail** [5] - 11:20, 30:12,
30:21, 133:5, 152:1
**James** [1] - 1:21
**January** [8] - 122:17,
122:19, 122:25, 142:16,
143:5, 143:18, 145:3,
145:10
**jean** [1] - 35:25
**jeans** [7] - 14:14, 14:15,
27:8, 35:11, 35:15, 36:3,
36:8
**Jeans** [1] - 15:4
**Jessup** [1] - 118:2
**Joan** [1] - 161:17
**job** [1] - 113:8
**John** [1] - 134:3
**Jones** [11] - 66:18,
78:7, 101:7, 122:18,
123:4, 141:2, 147:20,
150:6, 169:20, 170:4,
170:9
**Jones-Spence** [11] -
66:18, 78:7, 101:7,
122:18, 123:4, 141:2,
147:20, 150:6, 169:20,
170:4, 170:9
**Judge** [6] - 1:13, 29:20,
158:3, 172:14, 173:8,
173:9
**judge** [8] - 116:4,
153:23, 154:3, 154:9,
154:11, 160:2, 165:4,
165:6
**July** [5] - 99:12, 99:25,
120:19, 120:25, 121:6
**jumped** [3] - 90:3,
94:10, 95:4
**jumping** [1] - 90:5
**June** [13] - 4:16, 5:4,
5:7, 6:10, 9:16, 32:3,
40:12, 40:25, 41:3,
42:13, 48:23, 50:23, 59:2
**jurisdiction** [1] - 149:19
**jurors** [2] - 2:9, 167:9
**Jury** [8] - 1:14, 2:19,
65:7, 108:23, 108:24,

116:25, 117:7, 168:20
**jury** [34] - 2:8, 2:17,
8:13, 10:22, 18:3, 62:12,
63:13, 64:19, 108:17,
108:19, 108:20, 109:17,
110:3, 111:17, 111:22,
111:25, 113:16, 116:8,
117:22, 118:24, 120:5,
120:11, 122:25, 123:1,
126:23, 140:15, 140:19,
141:1, 144:23, 158:17,
167:5, 167:11, 171:22,
173:2
**Jury's** [1] - 61:25
**jury's** [4] - 65:1, 110:11,
110:14, 113:16
**juvenile** [1] - 72:21

## K

**K-E-L-L-Y** [1] - 3:9
**K-Rock** [1] - 135:16
**keep** [4] - 22:11, 69:15,
69:19, 98:15
**Keep** [1] - 61:24
**KELLY** [2] - 3:5, 175:4
**Kelly** [11] - 2:5, 2:6,
2:16, 3:2, 3:9, 127:13,
127:14, 127:15, 127:23,
128:9, 128:13
**Kelsey** [1] - 1:17
**Kept** [3] - 90:22, 92:19,
92:20
**kept** [5] - 71:4, 71:13,
90:23, 94:9, 94:10
**key** [1] - 154:15
**kids** [2] - 89:3, 89:4
**kill** [6] - 73:7, 76:3,
79:21, 127:3, 133:13,
133:24
**killed** [8] - 73:13, 73:14,
73:15, 77:12, 77:20,
77:24, 78:7, 133:5
**killing** [4] - 74:8, 97:3,
124:24, 147:25
**kind** [5] - 5:12, 9:18,
10:1, 11:21, 13:18, 21:1,
26:5, 26:7, 30:25, 34:16,
56:23, 57:10, 70:10,
76:19, 115:5, 125:7,
153:3, 153:6, 159:6,
165:5
**kinds** [3] - 76:21, 76:24,
172:8
**Knoll** [1] - 24:16
**knowing** [2] - 11:5, 63:9
**knowingly** [1] - 155:20
**knowledge** [1] - 156:7
**known** [5] - 66:12,

98:22, 107:7, 107:8,
129:2
**KURLAND** [28] - 29:19,
30:2, 36:13, 38:14,
38:17, 52:6, 52:12,
55:20, 55:25, 58:25,
60:2, 60:9, 109:3, 109:8,
109:12, 109:21, 109:25,
110:6, 111:7, 112:7,
112:12, 112:17, 173:9,
173:12, 173:20, 173:24,
175:6, 175:11
**Kurland** [9] - 1:22,
36:22, 37:8, 38:16,
56:25, 58:20, 60:11,
109:2, 113:8

## L

**label** [1] - 99:22
**ladies** [7] - 55:21,
117:8, 120:11, 126:22,
164:3, 164:5, 168:19
**Ladies** [2] - 2:20, 61:17
**lady** [7] - 21:2, 21:22,
44:16, 44:19, 44:25,
45:1, 47:2
**Lane** [57] - 4:20, 4:21,
4:25, 5:19, 5:22, 5:23,
6:1, 6:12, 7:9, 7:11,
9:17, 10:1, 10:3, 10:4,
10:5, 10:7, 10:18, 12:6,
12:8, 14:1, 16:3, 18:5,
18:6, 18:14, 18:25,
19:14, 19:19, 19:21,
22:12, 22:17, 22:20,
22:24, 23:4, 23:8, 23:25,
24:1, 24:4, 24:13, 24:16,
24:19, 26:17, 26:20,
27:1, 27:21, 27:24, 29:5,
30:8, 34:20, 35:7, 35:8,
35:19, 37:19, 38:10,
40:15, 42:10, 48:13,
54:13
**language** [3] - 151:16,
160:9, 160:21
**Lanvale** [1] - 74:1
**laptop** [2] - 8:5, 62:7
**laser** [1] - 83:12
**last** [9] - 10:21, 21:6,
32:1, 37:7, 39:5, 64:9,
114:1, 127:1, 132:23
**late** [6] - 81:3, 93:17,
93:18, 164:12, 164:15,
165:20
**latest** [1] - 170:22
**latex** [6] - 67:23, 71:11,
72:4, 75:15, 80:16
**Laura** [1] - 1:17

**Lauretta** [1] - 107:20
**law** [41] - 105:12, 123:15, 123:20, 124:1, 124:18, 124:21, 125:1, 125:18, 125:21, 125:24, 126:18, 126:21, 127:7, 127:12, 127:19, 127:22, 128:3, 128:22, 128:25, 129:5, 129:12, 130:1, 130:6, 130:11, 130:15, 130:20, 130:25, 131:5, 131:15, 131:20, 132:2, 132:20, 133:1, 133:4, 133:11, 134:9, 140:23, 148:21, 156:11, 167:6, 167:7
**lawful** [1] - 154:5
**LAWLOR** [15] - 64:14, 102:14, 107:11, 113:20, 113:22, 114:3, 114:8, 114:13, 116:4, 116:6, 158:12, 172:14, 172:22, 173:3, 173:8
**Lawlor** [5] - 1:18, 113:21, 116:5, 117:1, 172:13
**lawn** [2] - 22:1, 91:3
**lawyer** [8] - 114:24, 140:16, 141:4, 145:1, 145:22, 159:17, 159:21, 161:15
**lawyers** [3] - 64:9, 159:3, 161:15
**Lay** [1] - 169:18
**laying** [2] - 20:24, 96:23
**leading** [1] - 135:2
**learned** [1] - 102:1
**learning** [1] - 58:21
**least** [3] - 52:12, 69:11, 141:12
**leave** [9] - 61:14, 61:23, 67:25, 78:10, 108:21, 116:1, 116:8, 160:2, 168:16
**leaving** [2] - 14:5, 102:18
**led** [1] - 79:10
**left** [13] - 18:8, 24:11, 43:8, 43:9, 72:11, 83:4, 96:7, 103:17, 109:17, 136:23, 137:8
**left-hand** [2] - 18:8, 103:17
**legal** [5] - 109:4, 109:5, 151:16, 159:10, 164:14
**lengthy** [1] - 169:21
**less** [3] - 14:7, 48:21, 152:13
**lessen** [1] - 171:18
**letter** [9] - 2:9, 100:15,

114:17, 121:16, 158:17, 158:19, 162:1, 167:23, 168:5
**letters** [1] - 114:18
**level** [2] - 111:18, 111:22
**Liberty** [2] - 97:11, 97:14
**lied** [1] - 139:19
**life** [5] - 151:15, 151:25, 152:2, 152:6, 167:24
**light** [7] - 14:14, 14:15, 37:24, 38:1, 54:5, 167:5
**likely** [1] - 166:16
**limiting** [2] - 110:8, 110:19
**limp** [1] - 34:13
**line** [1] - 51:14
**lined** [1] - 171:23
**lines** [2] - 32:1, 145:24
**lineup** [1] - 168:22
**list** [8] - 62:24, 62:25, 63:7, 63:15, 63:19, 115:8, 115:10, 116:17
**listed** [1] - 168:5
**live** [11] - 3:17, 3:19, 4:25, 9:3, 20:8, 24:7, 39:20, 39:23, 41:14, 107:21
**lived** [4] - 20:13, 43:19, 74:17, 127:3
**lives** [3] - 21:2, 39:22, 39:23
**living** [13] - 3:23, 4:19, 4:21, 21:10, 40:12, 40:22, 42:13, 48:14, 48:18, 48:22, 74:14, 74:19, 74:22
**loath** [1] - 110:25
**local** [1] - 148:21
**locality** [1] - 3:19
**located** [3] - 71:2, 95:15, 95:19
**location** [3] - 85:13, 85:21, 85:22
**locations** [2] - 120:2, 168:13
**locked** [3] - 66:3, 70:16, 102:21
**logistically** [1] - 173:16
**logos** [1] - 33:21
**Lombard** [1] - 1:25
**longest** [1] - 169:16
**Look** [1] - 115:8
**look** [50] - 13:18, 13:22, 13:23, 17:6, 17:23, 21:25, 22:1, 24:24, 25:5, 25:8, 26:5, 26:7, 26:8, 26:14, 27:10, 28:9, 29:20, 31:19, 31:25,

32:1, 33:15, 33:16, 34:19, 50:2, 51:19, 53:19, 54:14, 54:19, 54:21, 56:20, 59:21, 60:4, 60:17, 60:18, 78:18, 78:21, 83:14, 86:6, 87:12, 88:22, 88:24, 99:6, 105:2, 116:9, 147:24, 161:1, 167:12, 168:12
**looked** [20] - 11:21, 14:7, 14:13, 25:24, 27:6, 46:11, 49:22, 54:10, 59:11, 60:6, 60:20, 66:15, 66:18, 66:21, 67:1, 67:3, 90:5, 160:9, 160:22, 161:21
**looking** [13] - 8:23, 13:20, 19:2, 51:12, 93:14, 103:8, 103:9, 109:16, 112:8, 119:6, 142:21, 158:9, 170:10
**Looking** [2] - 28:24, 55:14
**looks** [4] - 15:13, 51:13, 104:25, 149:5
**lost** [1] - 145:18
**low** [1] - 96:23
**lower** [2] - 24:11, 104:22
**lunch** [2] - 63:24, 113:4
**Luncheon** [1] - 114:15
**luncheon** [2] - 61:21, 108:18
**lying** [1] - 154:12

**M**

**ma'am** [1] - 3:15
**machine** [1] - 56:7
**Mackie** [1] - 129:17
**magnum** [1] - 82:16
**mail** [1] - 116:18
**Main** [10] - 74:14, 78:15, 95:11, 96:7, 96:8, 98:12, 98:13, 98:14, 98:24, 100:7
**main** [1] - 10:5
**Mall** [2] - 71:3, 74:19
**man** [22] - 11:18, 12:3, 12:25, 13:12, 13:13, 13:21, 14:24, 15:2, 15:6, 16:21, 27:9, 27:16, 35:9, 36:2, 36:7, 52:24, 56:12, 56:15, 58:15, 59:1, 59:16, 134:1
**man's** [1] - 14:20
**manner** [1] - 176:8
**map** [11] - 8:14, 8:17,

8:23, 10:8, 18:5, 24:8, 48:12, 83:10, 83:11, 83:14, 171:11
**marijuana** [1] - 76:23
**Marijuana** [1] - 76:20
**mark** [6] - 56:24, 57:3, 58:2, 58:6, 157:9, 157:10
**Marked** [1] - 157:4
**marked** [5] - 8:17, 20:6, 85:4, 91:11, 161:9
**marker** [1] - 57:19
**Marking** [1] - 156:24
**marks** [1] - 57:16
**Marshal** [1] - 119:20
**MARTIN** [8] - 1:8, 64:6, 64:18, 99:5, 105:10, 107:10, 108:11, 158:13
**Martin** [8] - 1:19, 1:20, 101:18, 102:4, 113:22, 114:6, 140:17, 147:6
**Martin's** [4] - 114:10, 141:4, 145:1, 145:21
**Marvin** [3] - 126:13, 126:16, 126:19
**Mary** [3] - 1:24, 176:3, 176:14
**MARYLAND** [1] - 1:2
**Maryland** [8] - 1:12, 1:25, 3:17, 5:11, 118:2, 148:11, 149:8, 163:2
**match** [1] - 171:17
**material** [1] - 115:9
**math** [2] - 40:19, 51:5
**matter** [7] - 113:15, 115:11, 153:3, 163:1, 167:16, 176:4, 176:8
**matters** [4] - 164:14, 164:20, 165:13, 167:17
**maximum** [2] - 151:15, 152:5
**Mayfield** [3] - 5:22, 10:3
**McKean** [1] - 74:1
**Mead** [1] - 24:16
**mean** [31] - 11:17, 14:18, 33:15, 35:22, 38:5, 48:3, 56:17, 62:9, 62:10, 63:9, 63:18, 69:3, 74:8, 79:14, 98:2, 98:4, 103:11, 107:6, 111:13, 111:24, 112:14, 114:18, 120:1, 123:15, 127:1, 146:7, 150:5, 150:8, 153:23, 171:3
**meaning** [2] - 33:20, 110:23
**means** [8] - 69:21, 121:11, 138:6, 151:19, 152:9, 154:16, 154:18, 162:22
**meantime** [1] - 74:11

**media** [1] - 168:14
**medical** [2] - 169:17, 170:1
**meet** [5] - 96:14, 96:15, 96:17, 97:10, 97:19
**meeting** [2] - 97:8, 103:13
**meetings** [2] - 121:19, 134:9
**member** [2] - 22:4, 22:7
**Members** [1] - 108:17
**memo** [1] - 109:4
**memory** [3] - 32:10, 33:17, 36:6
**men** [88] - 7:15, 7:16, 7:19, 10:9, 10:21, 11:4, 11:11, 12:10, 13:8, 13:19, 14:9, 16:15, 17:3, 17:19, 17:25, 18:18, 19:8, 22:12, 22:19, 25:18, 26:4, 26:6, 26:14, 26:16, 26:18, 26:20, 26:24, 27:12, 27:17, 27:25, 28:9, 28:10, 28:14, 28:18, 28:25, 29:4, 30:8, 32:16, 33:10, 33:23, 34:24, 35:16, 36:24, 37:1, 37:3, 37:22, 37:24, 38:4, 38:7, 38:8, 45:5, 45:6, 45:14, 45:21, 45:23, 46:7, 46:8, 46:11, 46:14, 47:18, 47:22, 48:1, 48:25, 49:5, 49:9, 50:3, 50:9, 50:12, 53:10, 54:15, 54:25, 55:3, 55:4, 55:10, 55:16, 59:9, 59:12, 59:21, 59:23, 60:4, 60:17, 60:21, 60:24, 61:3, 61:7
**men's** [2] - 33:24, 37:18, 47:7
**mention** [1] - 133:4
**mentioned** [11] - 5:24, 7:21, 14:15, 20:18, 29:4, 48:25, 67:12, 69:8, 107:15, 108:1, 117:16, 119:10, 125:7
**mentioning** [1] - 24:13
**message** [1] - 159:18
**met** [6] - 96:20, 98:23, 117:18, 134:6, 144:2
**Michael** [8] - 1:16, 1:18, 65:18, 65:21, 65:23, 139:12, 148:11, 163:2
**microphone** [5] - 8:23, 18:12, 39:8, 40:5, 109:11
**middle** [3] - 10:8, 124:22, 142:23
**midnight** [1] - 121:2
**midst** [1] - 73:3

**might** [11] - 29:2, 38:17, 40:25, 52:6, 56:25, 57:17, 67:5, 114:9, 119:6, 166:22, 167:1
**mike** [7] - 3:7, 9:4, 9:9, 11:2, 11:9, 39:3, 105:23
**Mike** [2] - 133:11, 133:17
**military** [1] - 51:5
**Mill** [1] - 10:2
**millimeter** [5] - 70:11, 100:4, 136:5, 163:6, 163:8
**Mills** [1] - 5:21
**mind** [4] - 37:6, 61:24, 110:14, 137:3
**minute** [5] - 16:14, 61:25, 96:7, 99:2, 114:10
**minutes** [19] - 9:10, 23:7, 23:16, 23:17, 24:21, 31:10, 35:19, 54:3, 54:4, 59:22, 61:6, 62:1, 105:7, 108:20, 108:23, 161:3, 161:7, 164:6
**Minutes** [1] - 17:1
**mirror** [1] - 19:4
**misleading** [1] - 155:21
**misled** [1] - 110:11
**MITCHELL** [1] - 1:7
**Mitchell** [4] - 1:17, 101:18, 102:4, 176:5
**mix** [1] - 171:17
**mode** [1] - 9:10
**modified** [2] - 79:22, 112:23
**mom** [7] - 40:12, 40:22, 41:17, 48:18, 48:22, 51:18, 53:21
**moment** [9] - 12:7, 29:20, 36:10, 38:15, 55:20, 59:19, 60:7, 81:24, 140:9
**moments** [1] - 30:6
**Momma** [13] - 76:11, 77:2, 81:8, 81:15, 81:20, 81:24, 86:15, 96:9, 96:10, 126:24, 127:2
**Monday** [4] - 165:3, 165:16, 165:19, 168:8
**money** [11] - 15:9, 76:6, 76:9, 97:2, 138:12, 138:25, 140:4, 140:16, 141:4, 144:25
**Monroe** [1] - 107:20
**Montgomery** [55] - 2:23, 62:3, 65:8, 65:13, 65:15, 65:18, 65:19, 69:1, 70:2, 78:12, 78:21, 83:13, 85:9, 85:14, 99:3,

103:21, 104:2, 104:7, 104:11, 104:16, 104:20, 104:23, 104:25, 105:3, 105:6, 106:1, 106:8, 108:16, 108:9, 109:13, 109:14, 109:15, 110:23, 111:3, 117:14, 120:12, 121:9, 122:12, 133:1, 134:1, 136:3, 139:24, 143:4, 146:15, 148:6, 148:11, 151:19, 152:9, 152:15, 153:21, 154:16, 156:15, 163:2, 164:2, 164:3
**MONTGOMERY** [1] - 175:14
**month** [2] - 66:10, 75:20
**morning** [18] - 2:10, 2:20, 2:24, 3:13, 3:14, 30:3, 30:4, 39:13, 56:1, 61:17, 65:13, 65:14, 165:21, 168:17, 173:14, 173:15, 173:17, 174:2
**most** [1] - 30:16
**mostly** [1] - 71:13
**Motion** [1] - 159:12
**motion** [6] - 159:21, 159:24, 160:2, 160:6, 171:25, 172:3
**move** [11] - 8:5, 84:21, 84:22, 84:23, 93:1, 113:17, 120:2, 148:13, 162:10, 172:17, 172:22
**moved** [15] - 4:5, 5:4, 13:24, 14:1, 17:25, 18:25, 84:20, 84:21, 84:25, 85:3, 85:24, 85:25, 86:5, 86:6, 92:15
**movies** [1] - 119:24
**moving** [3] - 8:9, 92:22, 155:17
**MR** [160] - 2:3, 2:5, 2:7, 2:13, 2:16, 2:18, 3:1, 3:4, 3:12, 8:4, 8:8, 8:11, 9:4, 9:6, 29:19, 30:2, 36:13, 36:18, 38:14, 38:17, 38:23, 39:12, 52:6, 52:10, 52:12, 52:15, 52:17, 55:20, 55:25, 58:25, 59:24, 60:2, 60:9, 60:12, 60:15, 62:4, 62:6, 62:11, 62:15, 62:18, 62:21, 62:24, 63:2, 63:5, 63:6, 63:8, 63:9, 63:14, 63:20, 64:4, 64:6, 64:14, 64:18, 64:22, 64:24, 65:2, 65:12, 78:8, 83:1, 99:5, 99:19, 99:21, 101:15,

101:23, 102:3, 102:8, 102:14, 105:10, 105:14, 105:16, 105:19, 105:22, 105:25, 106:3, 106:6, 107:10, 107:11, 108:11, 108:14, 109:3, 109:8, 109:12, 109:21, 109:25, 110:6, 111:7, 112:7, 112:12, 112:17, 112:24, 113:1, 113:5, 113:7, 113:12, 113:20, 113:22, 114:3, 114:8, 114:13, 114:21, 115:3, 115:7, 115:13, 115:21, 115:23, 116:4, 116:6, 116:11, 116:13, 116:16, 116:21, 116:23, 117:10, 117:13, 126:2, 128:8, 139:4, 143:13, 153:25, 157:5, 157:9, 157:13, 157:18, 157:21, 157:24, 158:1, 158:3, 158:5, 158:8, 158:12, 158:13, 158:14, 158:15, 161:5, 161:8, 168:24, 169:15, 169:19, 169:25, 170:3, 170:7, 170:10, 170:17, 171:8, 172:14, 172:22, 173:3, 173:8, 173:9, 173:12, 173:20, 173:24, 175:5, 175:6, 175:7, 175:10, 175:11, 175:12, 175:15, 175:16
**MS** [8] - 115:25, 116:3, 117:4, 117:6, 169:1, 169:4, 170:22, 171:1
**murder** [39] - 73:4, 73:24, 75:3, 99:13, 100:12, 100:25, 101:7, 102:1, 102:19, 123:16, 125:2, 125:22, 127:23, 128:14, 134:12, 135:2, 135:11, 135:22, 137:23, 138:3, 138:10, 138:16, 139:15, 139:25, 144:17, 144:25, 146:25, 149:14, 149:20, 150:5, 150:25, 151:22, 152:11, 152:20, 160:3, 163:18, 169:20, 169:21, 170:4
**murdering** [2] - 138:13, 140:4
**must** [2] - 30:14, 110:13

---

# N

**name** [55] - 3:8, 3:9, 21:5, 21:6, 21:8, 21:10, 24:6, 24:18, 39:3, 39:5, 43:15, 66:2, 95:17,

98:20, 106:14, 107:5, 107:6, 107:9, 118:15, 119:10, 122:12, 122:14, 123:22, 125:9, 125:16, 126:13, 126:16, 126:23, 127:13, 127:20, 127:24, 128:14, 128:19, 129:2, 129:7, 129:13, 129:17, 130:13, 130:18, 130:23, 131:10, 131:13, 132:13, 132:24, 133:11, 133:12, 133:23, 134:3, 134:8, 139:10, 139:14, 139:16, 146:21
**named** [1] - 28:4
**names** [4] - 107:15, 108:1, 120:2, 125:25
**natural** [2] - 14:22, 152:2
**near** [7] - 41:9, 42:17, 48:4, 59:2, 97:13, 97:14, 166:4
**nearby** [1] - 45:11
**necessarily** [2] - 79:22, 111:25
**necessary** [1] - 171:25
**necessitated** [1] - 164:13
**need** [19] - 8:16, 8:22, 8:24, 29:20, 39:16, 50:1, 52:6, 55:20, 57:17, 62:6, 62:16, 116:8, 145:21, 158:2, 164:13, 167:13, 169:8, 171:7, 173:16
**needed** [6] - 8:4, 140:16, 141:4, 144:24, 144:25
**needs** [2] - 2:22, 110:3
**neighbor** [31] - 19:22, 19:25, 20:18, 20:24, 21:7, 21:12, 28:4, 43:2, 43:6, 43:12, 43:13, 43:17, 43:21, 43:24, 44:4, 44:14, 44:21, 45:4, 45:16, 45:18, 45:25, 46:8, 47:13, 47:18, 50:13, 53:11, 54:22, 55:4, 57:4, 57:11
**neighbor's** [3] - 19:25, 20:19, 21:8
**neighborhood** [17] - 9:11, 24:10, 24:12, 24:20, 25:5, 25:7, 25:12, 28:15, 34:24, 35:18, 38:11, 48:13, 54:8, 54:14, 54:24, 106:18, 106:19
**Neighbors** [1] - 41:15
**neighbors** [1] - 42:23
**nervous** [2] - 19:6, 30:9

**neutral** [1] - 14:22
**Never** [5] - 129:9, 131:10, 132:16, 134:6, 137:21
**never** [8] - 12:22, 31:14, 33:1, 75:22, 77:8, 141:22, 151:4, 172:9
**news** [1] - 96:5
**next** [17] - 2:25, 42:8, 49:6, 103:17, 116:9, 116:17, 120:25, 145:6, 151:12, 165:3, 165:9, 165:10, 169:16, 169:22, 171:5, 171:11, 173:13
**Next** [1] - 38:22
**nice** [5] - 15:13, 17:10, 26:8, 145:16
**nickname** [5] - 127:10, 130:9, 131:25, 135:5, 146:1
**nicknames** [1] - 126:14
**Niedermeyer** [1] - 169:23
**night** [5] - 9:10, 173:16
**nine** [1] - 166:7
**nitpicking** [1] - 35:22
**NO** [1] - 1:6
**nobody** [4] - 31:15, 86:6, 114:2, 138:25
**None** [1] - 160:24
**none** [1] - 146:17
**nonetheless** [1] - 138:9
**normal** [2] - 64:15, 81:22
**normally** [1] - 68:6
**Normandy** [5] - 95:16, 95:19, 98:13, 100:7, 100:8
**North** [1] - 5:21
**north** [2] - 85:4, 85:25
**NORTHERN** [1] - 1:2
**Northwest** [3] - 7:25, 10:11, 10:19
**note** [4] - 61:23, 108:21, 157:5, 168:16
**noted** [2] - 99:24, 105:11
**notes** [3] - 8:15, 34:16, 62:9
**nothing** [4] - 34:1, 54:17, 144:2, 164:15
**Nothing** [3] - 29:14, 38:17, 55:19
**notice** [3] - 13:18, 89:3, 136:24
**noticed** [7] - 15:12, 15:15, 26:13, 27:15, 35:8, 64:6, 136:22
**notwithstanding** [1] - 172:6

**November** [9] - 2:11, 165:19, 165:24, 165:25, 166:17, 166:18, 170:24, 171:13, 172:5
**nowhere** [3] - 109:22, 113:14, 145:23
**nudged** [1] - 11:21
**Number** [4] - 153:10, 156:25, 157:1, 157:10
**number** [10] - 5:24, 15:19, 42:8, 99:5, 112:3, 125:25, 153:13, 159:3, 167:4, 170:3
**Number(s** [1] - 176:5
**numbered** [1] - 149:6
**numbers** [1] - 153:11
**nursing** [1] - 24:5

## O

**oath** [3] - 65:8, 140:11, 140:15
**object** [5] - 63:8, 65:3, 65:5, 113:8, 157:21
**objected** [2] - 111:2, 114:7
**objecting** [1] - 63:11
**Objection** [14] - 59:24, 78:8, 83:1, 101:15, 101:23, 102:3, 102:8, 102:14, 105:11, 107:10, 107:11, 126:2, 139:4, 153:25
**objection** [23] - 63:4, 64:21, 105:10, 109:19, 109:20, 109:24, 111:3, 112:20, 113:11, 113:22, 114:1, 114:4, 114:6, 114:10, 139:6, 157:6, 157:14, 157:20, 158:4, 158:12, 158:13, 158:14, 171:15
**objection's** [2] - 102:5, 114:22
**Objection's** [1] - 102:10
**objections** [1] - 114:10
**objects** [1] - 114:20
**obligations** [4] - 155:23, 155:24, 160:20, 162:19
**Obligations** [1] - 162:2
**obscured** [1] - 9:14
**observe** [2] - 18:4, 33:24
**observed** [3] - 19:24, 34:18, 34:24
**obstructing** [2] - 17:19, 17:20
**obviously** [8] - 30:9,

30:16, 32:6, 40:22, 66:15, 110:11, 158:24, 171:4
**Obviously** [1] - 110:21
**occasions** [1] - 164:12
**occur** [1] - 29:12
**occurred** [2] - 73:24, 142:16, 152:20
**October** [6] - 1:11, 165:13, 165:15, 169:5, 170:11, 176:5
**OF** [3] - 1:2, 1:5, 1:11
**offer** [1] - 29:22
**office** [10] - 5:19, 121:20, 122:21, 123:8, 124:9, 149:19, 156:9, 156:11, 162:10, 162:25
**Office** [3] - 149:8, 162:2, 162:20
**officer** [35] - 22:17, 22:18, 22:24, 23:5, 23:8, 23:9, 23:12, 23:18, 23:22, 24:22, 25:3, 25:8, 25:13, 25:16, 25:25, 26:3, 26:15, 26:19, 27:17, 27:24, 51:19, 53:15, 53:18, 53:23, 54:6, 54:8, 54:13, 54:25, 55:2, 55:3, 55:17, 60:16, 60:20, 60:24, 61:2
**Officer** [1] - 26:16
**officers** [17] - 21:25, 22:1, 22:14, 25:4, 25:21, 25:22, 28:7, 31:15, 32:4, 32:10, 32:16, 32:23, 34:20, 35:6, 37:2, 60:3, 170:3
**Official** [1] - 176:15
**official** [2] - 142:21, 176:7
**often** [1] - 15:21
**old** [5] - 3:15, 4:14, 39:18, 72:21, 114:24
**Old** [7] - 5:22, 10:4, 18:6, 24:5, 49:6, 143:12, 143:13
**older** [3] - 72:15, 72:17, 172:18
**once** [3] - 85:9, 141:4, 171:15
**Once** [3] - 2:21, 11:19, 34:5
**One** [9] - 26:11, 40:21, 46:9, 52:24, 63:2, 71:25, 115:19, 116:5, 139:10
**one** [133] - 2:9, 9:21, 11:15, 11:16, 11:18, 11:19, 12:1, 12:14, 12:20, 12:22, 13:13, 14:11, 15:3, 20:12, 21:8,

22:24, 26:3, 26:11, 26:12, 27:3, 27:4, 27:12, 27:13, 27:14, 28:8, 28:18, 28:19, 28:24, 29:4, 29:9, 29:20, 30:9, 31:8, 31:11, 32:16, 32:20, 34:6, 35:14, 35:21, 37:10, 38:4, 38:8, 38:14, 38:17, 42:23, 43:2, 46:8, 46:24, 47:2, 47:7, 47:15, 47:18, 48:17, 49:11, 51:13, 51:14, 52:25, 53:1, 53:2, 55:11, 55:14, 56:13, 59:9, 60:7, 62:8, 64:22, 64:25, 65:21, 69:11, 70:16, 80:7, 81:24, 82:22, 83:12, 85:4, 87:21, 89:10, 92:10, 92:12, 92:13, 93:22, 98:13, 98:23, 98:25, 99:2, 100:5, 101:22, 104:9, 115:15, 121:22, 121:25, 122:5, 122:8, 124:15, 132:23, 133:23, 134:20, 135:23, 139:7, 141:6, 141:8, 141:10, 141:12, 142:9, 142:11, 142:19, 142:20, 147:25, 149:17, 154:21, 154:25, 155:2, 155:4, 155:22, 156:14, 157:4, 158:1, 158:22, 161:15, 161:17, 162:4, 162:8, 163:11, 167:10, 167:20
**ones** [6] - 26:25, 27:15, 50:13, 54:22, 120:8, 142:5
**online** [1] - 168:12
**open** [5] - 33:8, 61:24, 87:6, 88:9, 111:5
**opened** [1] - 110:1
**operation** [1] - 80:11
**opponent** [1] - 113:14
**opportunity** [4] - 51:6, 75:17, 75:22, 105:2
**optimistic** [1] - 170:16
**order** [3] - 64:12, 64:15, 160:1
**ordered** [1] - 163:1
**organization** [2] - 137:19, 137:25
**original** [1] - 73:20
**originally** [1] - 85:4
**originating** [1] - 11:7
**otherwise** [2] - 155:21, 173:4
**ounce** [1] - 97:22
**out-of-town** [1] - 169:4
**outfit** [1] - 35:24

**outside** [10] - 41:9, 41:11, 42:4, 42:17, 42:22, 44:15, 44:18, 59:16, 93:22, 164:14
**overhead** [1] - 8:14
**Overruled** [7] - 78:9, 83:2, 101:16, 102:15, 105:11, 107:12, 126:3
**overruled** [3] - 102:5, 102:10, 114:6
**owed** [1] - 138:14
**own** [6] - 19:24, 51:16, 115:1, 137:24, 165:12, 167:10

## P

**P-17** [1] - 100:15
**P-2** [1] - 161:10
**P-3** [2] - 65:17, 148:3
**p.m** [5] - 51:6, 51:8, 62:2, 122:9, 168:20
**pads** [3] - 61:23, 108:21, 168:16
**page** [13] - 31:25, 51:14, 51:16, 142:23, 145:5, 148:13, 148:14, 155:17, 158:1, 158:4, 158:5, 159:9, 161:23
**PAGE** [1] - 175:3
**Page** [8] - 32:1, 142:17, 142:23, 145:5, 146:3, 149:6, 161:25, 162:1
**pages** [2] - 149:5, 176:6
**paid** [5] - 73:21, 124:23, 135:22, 138:13
**palm** [1] - 33:2
**pants** [3] - 52:25, 69:22
**paper** [4] - 49:21, 56:16, 56:17, 61:14
**Paragraph** [2] - 155:17, 156:19
**paragraph** [3] - 154:14, 156:14, 158:24
**paramedics** [2] - 21:20, 53:12
**Pardon** [2] - 134:24, 147:8
**parked** [12] - 83:18, 85:4, 85:21, 86:4, 91:11, 92:10, 92:11, 92:12, 92:13, 94:9, 98:11
**parking** [14] - 7:25, 83:20, 84:9, 85:3, 85:17, 85:25, 91:11, 92:9, 92:10, 94:9, 94:11, 94:15, 94:25, 99:23
**parole** [1] - 152:1
**Part** [1] - 144:20

**part** [22] - 10:24, 20:21, 20:22, 37:3, 37:7, 42:7, 51:13, 52:21, 52:23, 58:4, 83:9, 109:10, 118:12, 120:14, 143:17, 144:24, 145:13, 151:3, 155:6, 158:22, 162:22, 167:6
**participating** [1] - 135:2
**participation** [2] - 149:10, 150:1
**particular** [13] - 4:17, 6:10, 15:22, 41:8, 62:8, 70:7, 74:23, 83:25, 97:12, 104:10, 105:8, 106:1, 145:13
**particularly** [1] - 58:11
**party** [1] - 113:13
**passed** [3] - 23:14, 28:22, 97:19
**passing** [1] - 125:7
**past** [7] - 4:6, 11:22, 12:1, 24:5, 49:5, 109:2, 171:15
**path** [3] - 18:15, 18:19, 18:21
**pathway** [1] - 18:10
**patience** [1] - 164:21
**Paul** [1] - 1:19
**Pause** [7] - 36:12, 50:5, 52:16, 60:8, 157:8, 157:12, 158:11
**pay** [5] - 73:9, 73:19, 97:2, 140:16, 145:21
**peeked** [1] - 135:25
**peering** [1] - 136:13
**penalty** [2] - 151:22, 151:24
**pending** [3] - 102:2, 153:3, 162:11
**people** [23] - 24:24, 41:14, 48:6, 55:15, 89:1, 107:8, 120:1, 120:5, 120:12, 123:11, 134:18, 134:20, 138:9, 138:23, 139:2, 142:7, 147:3, 147:5, 159:3, 159:6, 159:7, 165:4, 171:17
**Perfect** [1] - 161:9
**perhaps** [2] - 8:5, 121:1
**Perhaps** [1] - 58:19
**period** [4] - 66:10, 153:24, 154:6, 163:13
**permission** [5] - 24:9, 62:7, 63:3, 163:24, 169:12
**permit** [1] - 64:16
**permitted** [2] - 156:21, 160:10, 167:15
**person** [10] - 12:5,

111:20, 118:24, 124:22, 126:22, 127:10, 132:23, 145:20, 146:1, 149:21
**person's** [1] - 118:15
**personal** [2] - 20:12, 165:12
**petition** [1] - 112:15
**PH-58** [1] - 58:14
**Pharmacy** [2] - 71:20, 80:10
**pharmacy** [1] - 71:24
**phone** [15] - 6:11, 6:14, 6:16, 6:21, 7:3, 7:7, 11:14, 31:2, 82:1, 86:21, 86:23, 106:7, 107:3, 118:21, 118:25
**photo** [2] - 20:16, 103:14
**photograph** [19] - 8:19, 20:2, 20:3, 20:12, 20:22, 83:11, 83:14, 83:18, 85:5, 85:7, 85:8, 91:12, 94:22, 94:23, 99:3, 99:18, 99:22, 103:18, 104:5
**photographic** [1] - 48:12
**photographs** [1] - 104:10
**phrase** [1] - 107:5
**physical** [2] - 32:20, 119:11
**pick** [3] - 78:12, 78:14, 150:19
**picked** [5] - 78:23, 98:24, 100:4, 100:9, 170:11
**picture** [7] - 42:5, 50:14, 56:21, 57:3, 57:20, 58:15, 87:18
**piece** [1] - 49:21
**pink** [1] - 58:2
**Pistol** [1] - 130:23
**place** [17] - 22:14, 24:1, 25:8, 43:2, 47:20, 47:22, 53:18, 53:25, 56:6, 57:3, 63:15, 68:7, 74:20, 83:25, 92:1, 94:18, 94:19
**placed** [2] - 58:2, 58:6
**plan** [9] - 67:14, 68:11, 77:14, 79:22, 144:24, 145:13, 146:17, 164:17, 167:24
**planning** [10] - 42:1, 74:8, 77:2, 77:6, 146:24, 146:25, 147:1, 147:5, 147:13, 147:22
**plans** [1] - 167:21
**play** [5] - 105:6, 105:8, 143:8, 146:7, 164:19

**played** [2] - 118:9, 118:12
**playing** [7] - 59:16, 105:20, 105:24, 106:2, 106:5, 143:14, 145:7
**Plea** [1] - 159:12
**plea** [16] - 65:16, 120:14, 139:16, 147:24, 156:21, 159:19, 159:22, 160:3, 160:6, 160:9, 160:11, 160:16, 161:19, 161:20, 161:25, 162:20
**plead** [1] - 162:13
**pleasant** [1] - 168:17
**pled** [1] - 139:15
**plugged** [1] - 115:22
**Plugged** [1] - 115:23
**plus** [1] - 123:8
**pocket** [2] - 53:2, 136:11, 136:12
**pockets** [1] - 102:13
**podium** [1] - 62:7
**Poe** [3] - 127:20, 127:22, 128:13
**POE** [1] - 127:20
**point** [27] - 7:9, 8:2, 11:1, 11:2, 18:22, 21:19, 22:14, 23:11, 25:7, 25:18, 26:5, 29:8, 45:3, 53:11, 53:18, 54:8, 57:7, 63:22, 74:23, 81:19, 86:2, 86:3, 92:1, 100:9, 112:18, 113:12
**pointed** [1] - 136:15
**pointer** [1] - 84:25
**pointers** [1] - 83:12
**pointing** [1] - 86:3
**Police** [3] - 22:8, 27:24, 94:10
**police** [63] - 16:2, 16:8, 19:16, 21:19, 21:21, 21:25, 22:1, 22:5, 22:14, 22:22, 23:5, 23:12, 25:3, 25:22, 25:25, 26:19, 27:12, 27:17, 28:7, 29:8, 29:9, 31:11, 31:14, 32:3, 32:4, 32:10, 32:16, 32:23, 33:1, 34:18, 34:20, 35:5, 35:17, 36:23, 37:1, 37:2, 37:9, 37:12, 41:5, 44:13, 49:13, 51:4, 51:19, 53:12, 53:15, 53:18, 53:23, 54:25, 55:17, 59:20, 60:3, 60:20, 60:24, 66:2, 93:21, 93:23, 94:2, 94:13, 102:18, 139:19
**Pooh** [2] - 129:3, 131:18

**porch** [5] - 43:7, 43:8, 43:10, 43:25, 44:5, 44:6, 44:7, 44:14, 44:16, 44:18, 44:22, 44:25, 45:4, 45:16, 45:18
**portion** [8] - 52:8, 52:10, 52:11, 52:13, 105:4, 118:10, 166:5, 166:8
**position** [2] - 8:12, 91:20
**possession** [2] - 69:9, 98:15
**possibility** [1] - 168:3
**possible** [3] - 40:25, 61:5, 168:23
**possibly** [1] - 166:18
**post** [5] - 8:15, 9:14, 9:17, 9:20, 9:21
**post-it** [2] - 8:15, 9:20
**post-its** [3] - 9:14, 9:17, 9:21
**poster** [1] - 48:10
**pounding** [1] - 30:14
**powder** [2] - 80:19, 80:21
**precise** [1] - 81:2
**predict** [1] - 166:21
**predicted** [1] - 170:14
**prediction** [1] - 166:6
**prepared** [1] - 141:16
**presence** [2] - 137:3, 164:15
**present** [1] - 134:8
**presentation** [1] - 164:25
**presenter** [3] - 157:2, 157:7, 158:16
**press** [1] - 83:13
**pretty** [15] - 6:6, 10:5, 13:22, 30:5, 30:20, 31:7, 33:7, 33:8, 41:19, 165:9, 169:8, 170:5, 171:7, 172:5, 172:10
**previously** [2] - 142:25, 162:8
**price** [1] - 73:20
**prints** [2] - 31:15, 33:2
**prison** [1] - 152:1
**private** [1] - 158:24
**privilege** [2] - 158:25, 159:7
**probation** [12] - 100:2, 151:18, 153:12, 153:18, 153:20, 153:24, 154:3, 154:6, 155:8, 155:10, 162:8
**problem** [6] - 62:10, 64:17, 77:18, 77:19, 115:19, 170:23, 171:22

**proceed** [4] - 2:2, 2:21, 52:5, 65:10
**proceeding** [6] - 123:2, 123:3, 139:16, 141:1, 155:15, 156:10
**proceedings** [6] - 36:12, 157:8, 157:12, 158:11, 176:4, 176:7
**Proceedings** [2] - 2:1, 50:5, 52:16, 60:8
**proceeds** [2] - 77:2, 77:7
**process** [1] - 28:15
**proclaimed** [2] - 124:2, 124:11
**produce** [1] - 166:11
**proffer** [8] - 113:2, 117:3, 121:10, 121:11, 121:16, 124:9, 140:24, 148:22
**proffering** [1] - 113:3
**Program** [1] - 119:15
**program** [1] - 119:19
**project** [2] - 72:1, 165:2
**promise** [4] - 154:4, 154:8, 154:11, 155:6
**promised** [2] - 149:4, 149:5
**promptly** [1] - 168:22
**propose** [3] - 52:3, 63:14, 115:16
**prosecute** [1] - 149:24
**prosecuted** [5] - 149:9, 149:14, 149:20, 150:25, 151:4
**prosecution** [4] - 156:6, 156:9, 160:21, 161:1
**prosecutor** [2] - 159:3, 163:16
**prosecutors** [6] - 120:13, 141:16, 141:17, 149:19, 151:24, 153:6
**Protection** [1] - 119:15
**proud** [1] - 58:1
**provide** [1] - 21:22
**provided** [3] - 68:21, 120:4, 123:10
**provision** [1] - 156:20
**pull** [5] - 25:18, 83:10, 94:11, 94:14, 105:23
**pulled** [8] - 19:18, 25:12, 54:8, 68:8, 136:5, 136:12, 136:18, 137:16
**purchased** [1] - 80:10
**purpose** [3] - 23:19, 62:8, 63:10
**purposes** [1] - 112:22
**pursuant** [2] - 156:21, 160:11
**pushed** [1] - 33:8

**pushing** [2] - 101:20, 101:21
**Put** [1] - 69:22
**put** [27] - 8:1, 8:7, 8:8, 8:13, 8:14, 49:21, 50:13, 57:16, 58:13, 58:15, 83:4, 83:6, 85:8, 107:5, 107:8, 110:2, 112:19, 115:6, 138:10, 148:20, 157:1, 157:6, 157:23, 163:8, 166:13, 172:7
**Putting** [1] - 158:16
**Pyne** [1] - 1:21, 114:5

## Q

**questioning** [1] - 148:7
**questions** [27] - 22:3, 30:5, 33:6, 34:15, 34:18, 35:2, 36:13, 36:22, 37:17, 50:21, 56:10, 58:12, 59:20, 60:9, 60:16, 118:7, 125:9, 139:8, 140:8, 143:6, 145:4, 146:21, 148:20, 153:16, 167:15, 167:16, 167:18
**quick** [2] - 38:14, 113:4
**quicker** [1] - 7:4
**quickly** [3] - 7:1, 30:14, 165:2
**quite** [5] - 5:2, 20:9, 25:9, 166:17, 166:25
**quiz** [1] - 121:13
**quote** [2] - 110:8, 111:25
**quote-unquote** [1] - 111:25

## R

**race** [1] - 46:16
**racial** [3] - 12:12, 14:8, 46:19
**racing** [1] - 33:6
**rain** [2] - 17:11, 17:12
**raise** [2] - 40:6, 115:17
**ran** [7] - 7:15, 7:21, 11:11, 11:13, 27:3, 27:7, 47:23, 49:1, 53:10, 161:20
**Randallstown** [2] - 9:2, 71:25
**Randallstown/Park** [2] - 137:18, 137:25
**rather** [4] - 27:4, 106:14, 116:3, 167:3
**re** [1] - 99:22
**re-label** [1] - 99:22

**reach** [3] - 81:15, 84:17, 96:10

**reaction** [1] - 27:18

**read** [19] - 16:14, 37:6, 49:18, 49:25, 50:6, 50:7, 50:20, 51:7, 51:19, 51:21, 52:3, 52:8, 52:10, 52:21, 52:22, 53:4, 53:6, 149:11, 155:25

**reading** [2] - 31:24, 50:11

**reads** [1] - 52:24

**ready** [8] - 2:2, 2:21, 11:20, 65:10, 75:16, 115:22, 115:23, 117:11

**Ready** [1] - 62:3

**Real** [3] - 133:12, 133:19, 133:23

**real** [2] - 65:23, 125:16

**realize** [1] - 66:5

**really** [12] - 4:1, 15:13, 50:17, 50:18, 50:19, 64:7, 66:6, 75:24, 154:24, 155:2, 158:2, 164:25

**reason** [13] - 6:25, 70:7, 78:6, 82:24, 121:14, 135:10, 140:3, 140:15, 144:20, 145:13, 169:11, 172:16, 173:1

**reasonably** [2] - 171:12

**reasons** [1] - 140:12

**receive** [7] - 6:11, 7:6, 151:15, 152:5, 152:11, 152:13, 153:12

**received** [2] - 2:9, 159:17

**recently** [1] - 105:2

**recess** [10] - 61:17, 61:21, 61:25, 62:1, 108:18, 114:1, 114:14, 114:15, 171:5, 174:2

**Recess** [1] - 62:2

**recites** [1] - 62:13

**recognize** [6] - 28:20, 68:17, 87:9, 107:2, 158:17, 159:9

**Recognize** [1] - 161:10

**recognized** [4] - 21:12, 43:12, 55:11, 88:15

**recollect** [1] - 61:8

**recollection** [9] - 14:12, 15:2, 16:15, 16:18, 16:20, 32:15, 50:3, 50:8, 59:1

**recommend** [6] - 151:14, 152:5, 153:10, 156:5, 160:20, 162:25

**recommendation** [2] - 151:9, 152:10

**record** [10] - 3:8, 10:17, 15:9, 16:5, 39:3, 85:3, 86:3, 105:10, 111:9, 124:8

**recorded** [7] - 122:11, 122:17, 122:18, 123:8, 140:24, 143:17, 176:3

**recording** [1] - 102:12

**red** [14] - 16:22, 16:23, 31:8, 36:2, 36:7, 48:16, 48:21, 53:2, 53:3, 56:12, 56:15, 57:19, 82:10, 83:13

**redact** [1] - 8:15

**redirect** [1] - 36:16

**REDIRECT** [4] - 36:17, 60:14, 175:7, 175:12

**refer** [1] - 167:12

**reference** [1] - 162:22

**referred** [11] - 118:9, 120:24, 121:5, 121:16, 126:22, 141:2, 142:1, 142:17, 142:25, 143:5, 159:2

**Referring** [1] - 160:1

**referring** [3] - 117:5, 142:15, 161:24

**refresh** [3] - 16:18, 36:5, 50:7

**refreshed** [1] - 16:20

**refreshes** [4] - 16:15, 32:9, 33:17, 50:2

**regular** [2] - 26:2, 144:1

**rejoin** [1] - 55:23

**relate** [1] - 65:4

**related** [3] - 135:14, 144:18, 167:17

**relating** [4] - 52:10, 122:18, 123:3, 147:19

**relation** [1] - 36:25

**relationship** [6] - 142:7, 143:1, 143:21, 144:7, 145:25

**relative** [1] - 20:15

**release** [1] - 151:18

**released** [2] - 155:24, 160:19

**relevant** [2] - 115:9, 162:15

**remain** [1] - 65:8

**remainder** [1] - 158:2

**remaining** [2] - 55:22, 162:11

**Remember** [1] - 168:8

**remember** [75] - 4:17, 7:16, 14:20, 14:24, 15:1, 15:22, 16:23, 21:6, 26:9, 33:13, 33:14, 35:20, 35:21, 37:19, 37:22, 38:8, 41:17, 42:2, 42:3,

46:10, 46:16, 46:24, 47:1, 47:2, 47:4, 47:5, 47:8, 47:9, 47:15, 47:16, 47:17, 50:8, 50:12, 50:16, 50:18, 51:9, 53:24, 54:7, 59:11, 60:6, 60:7, 72:10, 82:8, 85:8, 90:2, 91:16, 99:2, 99:11, 117:1, 120:17, 121:17, 122:2, 122:3, 122:5, 122:7, 122:8, 122:11, 122:16, 122:19, 122:20, 122:24, 123:1, 123:4, 123:20, 124:4, 124:6, 124:12, 147:7, 147:9, 147:10, 148:6, 153:15, 160:9, 161:12

**remembered** [2] - 15:22, 51:25

**remembering** [1] - 61:9

**reminds** [1] - 114:23

**rental** [1] - 75:11

**repetition** [1] - 142:24

**rephrase** [1] - 60:25

**Rephrase** [1] - 101:24

**replenished** [1] - 61:18

**Reported** [1] - 1:23

**reporter** [2] - 6:3, 142:21

**Reporter** [1] - 176:15

**REPORTER'S** [1] - 176:1

**representation** [1] - 153:7

**represented** [1] - 149:8

**represents** [1] - 148:19

**request** [1] - 169:2

**required** [1] - 166:10

**requires** [1] - 146:7

**resemble** [3] - 80:7, 80:13, 80:16

**residences** [1] - 10:16

**respect** [7] - 31:10, 32:7, 33:5, 109:5, 110:20, 111:15, 160:3

**responded** [2] - 109:15, 145:16, 148:20

**response** [4] - 13:14, 79:16, 139:7, 140:7

**rest** [4] - 51:18, 152:1, 171:4, 172:25

**rested** [1] - 172:8

**rests** [1] - 171:20

**resume** [3] - 75:3, 108:25, 165:7

**retrieve** [1] - 71:7

**returned** [3] - 5:15, 71:11, 72:12

**reverse** [1] - 24:13

**review** [2] - 149:3,

164:7

**revisit** [2] - 110:15, 110:25

**Reynolds** [1] - 169:14

**Rhodes** [9] - 1:17, 55:21, 115:24, 117:1, 168:25, 170:11, 170:15, 170:18, 172:5

**RHODES** [8] - 115:25, 116:3, 117:4, 117:6, 169:1, 169:4, 170:22, 171:1

**ride** [3] - 23:12, 23:15, 23:18

**riding** [1] - 69:14

**right-hand** [1] - 104:15

**risk** [1] - 119:22

**Road** [12] - 5:20, 5:21, 5:22, 10:2, 24:5, 49:7, 85:5, 85:24, 86:9, 91:12

**road** [1] - 49:6

**rob** [1] - 139:25

**robberies** [2] - 106:24, 106:25

**robbery** [14] - 75:17, 77:2, 77:6, 77:23, 78:11, 99:14, 144:24, 146:25, 147:1, 147:5, 147:13, 147:22, 150:15, 151:1

**robbing** [1] - 140:3

**Robert** [1] - 1:16

**Rock** [3] - 135:8, 135:9, 135:16

**Rodney** [1] - 169:15

**Rog** [1] - 128:19

**ROG** [1] - 128:20

**role** [1] - 151:4

**Rolling** [2] - 5:20, 5:21

**room** [5] - 84:3, 108:19, 108:20, 120:6, 167:11

**Room** [1] - 1:24

**Rough** [1] - 132:5

**roughly** [2] - 57:4, 58:6

**Roughly** [1] - 161:3

**rounds** [2] - 70:12, 70:14

**route** [3] - 5:19, 6:6, 9:24

**ROWE** [1] - 139:12

**Rowe** [6] - 65:18, 65:21, 65:23, 139:12, 148:11, 163:2

**rows** [1] - 53:1

**RPR** [1] - 1:24

**rubber** [1] - 80:5

**rule** [1] - 114:8

**Rule** [3] - 52:11, 171:25, 172:3

**ruled** [2] - 110:2, 159:24

**ruling** [1] - 112:23

**run** [10] - 10:9, 33:10, 47:24, 48:1, 102:21, 153:11, 154:18, 154:24, 163:1, 163:17

**running** [9] - 14:2, 41:20, 49:6, 49:9, 49:9, 92:19, 92:20, 137:3

**runs** [1] - 10:8

# S

**S-1** [3] - 8:17, 24:12, 48:11

**S-2** [1] - 80:13

**S-36** [1] - 80:7

**S-53** [1] - 80:16

**S-56** [8] - 20:6, 20:22, 42:7, 56:7, 56:20, 87:9, 99:6, 99:17

**S-57** [1] - 99:22

**S-58** [1] - 78:18

**S-62** [1] - 103:16

**S-63** [1] - 104:4

**S-64** [1] - 104:9

**S-65** [1] - 104:15

**S-66** [1] - 104:22

**S-67** [1] - 99:16

**S-68** [1] - 99:23

**S-M-I-T-H** [1] - 39:10

**safe** [2] - 66:15, 107:13

**safer** [1] - 169:7

**safety** [1] - 119:11

**Safety** [1] - 3:24

**Sakellaris** [1] - 161:12

**satisfaction** [1] - 151:14

**save** [1] - 157:9

**saw** [57] - 10:9, 10:21, 10:22, 11:4, 18:21, 20:18, 20:24, 22:19, 23:25, 26:3, 26:4, 26:10, 26:14, 26:17, 26:19, 27:12, 28:18, 28:19, 30:8, 32:16, 32:20, 33:10, 33:17, 33:23, 34:25, 35:5, 35:7, 35:8, 35:17, 35:18, 36:2, 37:18, 38:9, 49:12, 49:23, 50:13, 51:2, 54:24, 55:3, 55:10, 55:11, 55:16, 58:7, 59:23, 60:5, 61:3, 61:7, 84:14, 92:3, 92:5, 92:6, 92:7, 92:8, 104:2, 118:20

**scared** [3] - 30:9, 139:1, 139:5

**scarf** [1] - 53:2

**scene** [3] - 28:8, 150:9, 150:11

**Schedule** [1] - 171:2
**schedule** [4] - 75:25,
76:1, 116:13, 169:5
**scheduled** [3] - 2:12,
172:11, 172:16
**schedules** [1] - 2:22
**scheduling** [1] - 169:1
**scheme** [2] - 133:24,
140:13
**school** [5] - 3:25, 4:3,
39:24, 40:23, 41:1
**School** [1] - 18:7
**Scoot** [1] - 39:2
**screen** [14] - 20:3, 20:7,
42:6, 43:5, 56:8, 56:24,
57:10, 58:16, 58:18,
85:8, 86:2, 87:8, 108:12,
108:15
**script** [1] - 164:19
**seat** [1] - 81:10
**seated** [5] - 3:7, 11:3,
39:2, 62:5, 169:3
**second** [23] - 11:18,
12:20, 15:3, 22:18,
23:12, 23:15, 23:18,
31:25, 34:19, 51:14,
51:16, 86:4, 87:5, 87:22,
88:2, 88:10, 120:24,
158:23, 159:9, 160:10,
166:17, 166:18
**Seconds** [1] - 17:1
**seconds** [6] - 17:8,
17:25, 62:18, 65:2,
113:5, 113:20
**section** [1] - 145:6
**security** [1] - 3:24
**Security** [2] - 71:3,
74:19
**see** [66] - 8:13, 17:15,
18:5, 18:19, 18:20, 19:8,
19:19, 19:21, 20:3, 20:7,
20:9, 21:16, 21:17,
22:19, 23:24, 25:18,
26:6, 33:11, 33:16,
33:21, 34:2, 42:8, 42:25,
44:15, 44:21, 45:3, 45:6,
47:24, 48:1, 52:13,
54:15, 54:22, 57:20,
58:16, 58:20, 58:22,
59:15, 63:13, 68:14,
70:2, 78:11, 79:22,
81:14, 81:15, 83:4,
84:12, 87:18, 88:19,
88:22, 90:9, 91:7, 92:13,
92:20, 103:20, 110:4,
115:19, 116:5, 151:9,
157:25, 158:17, 158:23,
168:17, 168:21, 173:1
**See** [4] - 149:10,
153:13, 159:17, 162:1

**seeing** [7] - 13:8, 16:23,
37:20, 47:5, 52:1, 59:1,
63:21
**seek** [1] - 157:6
**seeking** [2] - 159:21,
160:2
**seem** [1] - 157:13
**segment** [3] - 52:3,
105:8, 106:1
**self** [2] - 124:2, 124:11
**self-proclaimed** [2] -
124:2, 124:11
**self** [4] - 76:23, 76:24,
96:23, 96:25
**semi** [1] - 136:6
**semi-automatic** [1] -
136:6
**semiautomatic** [1] -
82:20
**sense** [6] - 27:6, 28:11,
166:6, 167:2, 170:25,
171:4
**sent** [2] - 109:4, 136:20
**sentence** [15] - 111:1,
148:18, 151:12, 151:15,
152:6, 153:10, 153:12,
153:23, 155:3, 156:5,
160:20, 162:25, 163:1,
163:17, 163:18
**sentenced** [3] - 111:21,
152:18, 154:3
**sentences** [2] - 154:18,
154:24
**sentencing** [4] - 151:9,
162:4, 162:10, 162:18
**separated** [1] - 68:3
**separating** [1] - 10:15
**September** [4] - 122:4,
122:6, 122:8, 123:3
**Serena** [1] - 21:6
**Serena's** [1] - 21:6
**series** [7] - 34:17,
118:7, 121:10, 121:19,
123:6, 134:9, 156:2
**serious** [1] - 143:21
**serve** [1] - 154:21
**Service** [1] - 119:20
**serving** [1] - 154:25
**session** [12] - 124:9,
164:10, 165:8, 165:13,
165:18, 165:24, 166:1,
166:2, 167:22, 167:25,
168:5, 168:8
**sessions** [3] - 121:11,
140:24, 148:22
**set** [2] - 88:5, 151:13
**setup** [1] - 8:22
**Seven** [1] - 162:1
**seven** [1] - 166:6
**several** [9] - 55:8,

58:10, 110:12, 120:5,
164:10, 164:12, 164:18,
165:3, 167:2
**shall** [3] - 156:5,
156:21, 160:10
**shape** [1] - 33:8
**share** [1] - 2:10
**Sharif** [1] - 130:18
**sharpen** [1] - 124:7
**Shawn** [3] - 140:12,
146:16
**SHAWN** [1] - 1:8
**Shelly** [4] - 140:17,
141:4, 144:25, 145:21
**SHELLY** [1] - 1:8
**SHELTON** [1] - 1:7
**shirt** [7] - 14:14, 14:15,
37:10, 99:3, 99:6, 99:18
**shirts** [7] - 33:12, 33:18,
33:22, 37:18, 37:22,
37:24, 69:25
**shoot** [4] - 46:2, 50:13,
54:22, 55:4
**shooting** [7] - 55:16,
60:22, 60:25, 61:4, 61:8,
90:9, 94:17
**shopping** [2] - 97:13,
97:20
**Shopping** [2] - 41:25,
42:1
**shorter** [17] - 11:19,
12:14, 12:17, 12:19,
12:25, 13:3, 13:12,
13:13, 13:21, 15:2, 15:6,
27:3, 27:14, 27:16,
28:18, 35:8, 46:25
**shortly** [1] - 5:25
**shorts** [1] - 34:12
**shot** [14] - 46:3, 46:7,
46:8, 47:2, 47:13, 47:15,
47:16, 47:18, 53:2,
53:11, 56:13, 56:15,
136:24, 137:1
**shots** [6] - 87:7, 88:17,
89:5, 90:6, 91:15, 91:16
**show** [25] - 18:12, 20:2,
22:17, 23:2, 24:9, 34:20,
42:5, 48:12, 53:12, 57:4,
57:11, 62:12, 63:1, 63:6,
63:12, 78:18, 80:7,
80:13, 84:6, 84:25, 85:7,
103:16, 157:2, 157:11,
161:23
**showed** [8] - 31:6,
31:20, 55:3, 56:11,
103:14, 120:15, 121:15,
161:2
**showing** [1] - 127:2
**shown** [6] - 8:19, 20:12,
85:8, 118:20, 148:1,

148:6
**side** [7] - 18:8, 19:4,
24:4, 24:11, 24:12,
24:13, 157:14
**sidebar** [1] - 52:6
**sign** [3] - 49:18, 51:21,
85:11
**signature** [8] - 103:17,
104:4, 104:9, 104:15,
104:22, 148:24, 148:25,
176:10
**signed** [9] - 49:22,
50:23, 51:7, 51:22,
51:24, 51:25, 100:15,
149:4, 156:17
**signing** [1] - 99:3
**similar** [1] - 36:25
**simpler** [1] - 50:11
**simply** [1] - 111:1
**singer** [1] - 9:10
**single** [1] - 139:20
**sit** [3] - 2:12, 109:2,
129:11
**sitting** [7] - 16:23,
26:9, 26:11, 27:14,
46:10, 81:9, 93:21,
110:12, 112:13, 116:2,
118:17, 120:12, 172:15,
172:23, 172:24, 173:7
**situation** [1] - 120:1
**Six** [2] - 156:19, 161:25
**six** [4] - 24:21, 70:21,
112:9, 152:25
**skip** [1] - 105:7
**slowed** [1] - 25:9
**smaller** [1] - 27:3
**smart** [1] - 78:10
**SMITH** [2] - 38:25,
175:9
**Smith** [49] - 2:6, 28:5,
28:9, 38:24, 39:4, 39:6,
39:13, 39:18, 40:4, 40:6,
42:5, 42:23, 45:6, 46:10,
48:10, 49:11, 49:25,
50:7, 50:21, 52:18,
53:10, 55:8, 55:19, 56:1,
56:3, 56:6, 56:10, 57:3,
57:10, 57:19, 58:15,
58:22, 59:1, 59:19,
60:10, 60:16, 61:13,
123:22, 124:1, 124:11,
124:19, 124:21, 130:1,
130:2, 130:3, 130:4,
134:20, 134:22, 135:1
**Smoky** [1] - 130:9
**snacks** [2] - 61:18,
61:22
**Snitching** [7] - 64:21,
105:3, 113:23, 118:9,
119:9, 169:14

**soldier** [1] - 98:4
**soldiers** [2] - 97:25,
98:1
**someone** [25] - 19:5,
53:19, 85:19, 123:22,
125:9, 126:1, 126:4,
126:13, 126:15, 126:23,
127:13, 127:20, 127:23,
128:14, 128:24, 129:2,
129:13, 129:17, 130:1,
130:23, 132:13, 132:24,
133:11, 133:12, 146:21
**Someone** [1] - 137:14
**sometime** [3] - 100:12,
117:17, 166:16
**Sometimes** [4] - 69:16,
75:8, 75:11
**sometimes** [7] - 57:16,
71:7, 75:10, 75:12,
116:5, 139:22, 167:4
**somewhat** [1] - 172:6
**somewhere** [2] - 94:12,
118:4
**son** [8] - 6:17, 6:18,
6:20, 6:21, 6:23, 6:25,
11:14, 105:16
**soon** [3] - 11:13, 41:19,
169:8
**sophistication** [2] -
111:18, 111:23
**Sorry** [4] - 29:17, 52:18,
92:6, 99:16
**sorry** [11] - 4:2, 8:21,
14:16, 16:16, 17:5, 40:4,
108:2, 109:12, 128:4,
138:19, 157:4
**sort** [12] - 7:3, 9:18,
24:10, 45:11, 48:11,
48:21, 57:19, 58:1,
103:20, 114:24, 171:16
**sought** [2] - 112:15,
151:24
**sound** [2] - 24:17,
51:8, 51:10, 105:19,
122:14, 127:15, 129:7,
129:18, 131:13, 131:18,
131:25, 170:20
**sounds** [2] - 106:14,
143:16
**south** [2] - 10:18, 49:6
**South** [2] - 5:20, 24:16
**Southwest** [1] - 95:21
**sovereignty** [1] -
110:19
**space** [1] - 44:8
**speakers** [2] - 8:8,
105:21
**speaking** [2] - 111:21,
172:18
**specific** [1] - 110:8

**specifically** [3] - 72:1, 109:19, 113:25
**Specifically** [1] - 4:21
**speed** [4] - 7:3, 14:1, 30:25, 31:1
**speedy** [1] - 14:3
**spell** [2] - 3:8, 39:3
**Spell** [1] - 39:5
**Spence** [20] - 66:18, 78:7, 101:7, 109:14, 117:17, 122:18, 123:4, 127:3, 139:25, 140:4, 141:2, 144:25, 146:16, 146:17, 146:25, 147:20, 150:6, 169:20, 170:4, 170:9
**Spence's** [1] - 66:10
**spend** [1] - 94:25
**split** [2] - 77:7, 77:8
**splitting** [1] - 77:2
**spot** [3] - 72:7, 81:22, 97:12
**stairs** [5] - 59:13, 84:5, 87:16, 87:18, 88:5
**stand** [2] - 3:2, 147:4
**standing** [8] - 26:3, 26:9, 35:6, 45:22, 45:25, 57:14, 57:23, 135:22
**stands** [1] - 117:24
**star** [2] - 48:16, 48:21
**start** [3] - 165:20, 173:14, 173:17
**started** [8] - 87:6, 87:7, 87:15, 88:5, 92:22, 93:1, 94:2, 100:16
**starting** [1] - 124:10
**startled** [1] - 13:22
**starts** [3] - 151:8, 161:25, 164:12
**State** [12] - 3:8, 39:3, 148:10, 148:16, 151:9, 151:14, 152:4, 153:9, 155:23, 156:5, 163:2
**state** [7] - 65:16, 65:17, 111:15, 120:13, 148:21, 156:6, 167:6
**State's** [3] - 152:10, 160:19, 162:20
**statement** [54] - 16:8, 17:4, 31:7, 31:19, 32:3, 33:15, 33:16, 36:4, 36:20, 37:7, 37:8, 37:9, 49:13, 49:22, 50:7, 50:12, 50:20, 50:21, 50:22, 51:4, 51:7, 51:12, 51:23, 52:4, 52:19, 52:24, 56:11, 62:24, 63:15, 63:17, 63:19, 64:3, 66:16, 109:9, 111:2, 113:15, 120:18,

120:24, 121:4, 121:5, 122:11, 122:17, 122:18, 122:20, 123:8, 124:4, 124:12, 140:25, 142:16, 143:17, 143:20
**statements** [10] - 33:21, 62:25, 63:6, 115:11, 115:12, 115:15, 142:5, 147:19, 156:10
**STATES** [2] - 1:1, 1:5
**States** [5] - 3:1, 38:23, 119:20, 149:7, 162:2
**status** [2] - 110:11, 111:13, 111:15
**stay** [4] - 68:12, 68:14, 86:8, 154:5
**stayed** [1] - 153:3
**staying** [2] - 74:21, 98:11
**steel** [1] - 10:14
**stenographically** [1] - 176:4
**step** [1] - 17:5
**steps** [1] - 87:5
**Stevenswood** [1] - 10:12
**Stewart** [18] - 73:12, 73:13, 73:17, 74:2, 74:3, 74:9, 100:24, 123:12, 123:15, 134:13, 134:16, 134:18, 135:1, 138:3, 138:4, 138:8, 138:19, 138:23
**Stewart's** [1] - 73:15
**still** [15] - 19:2, 36:19, 45:11, 52:19, 54:5, 74:8, 75:7, 82:2, 84:9, 91:11, 96:21, 114:19, 116:13, 168:2, 173:6
**Stink** [2] - 130:13, 130:16
**Stocksdale** [4] - 122:12, 123:9, 140:25, 142:17
**Stokes** [2] - 131:8, 131:10
**stone** [1] - 170:18
**Stop** [7] - 64:20, 105:2, 105:3, 113:23, 118:9, 119:9, 169:14
**stop** [3] - 25:8, 25:9, 25:10
**stopped** [2] - 12:3, 12:4, 87:5
**storage** [1] - 84:3
**store** [3] - 41:21, 41:22, 41:24
**stove** [1] - 71:6
**straight** [4] - 10:1, 10:4, 15:11

**Street** [1] - 1:25
**street** [9] - 18:8, 26:19, 34:25, 55:3, 61:7, 71:3, 74:18, 106:14, 135:23
**streets** [7] - 5:24, 24:5, 24:15, 79:21, 93:14, 107:13, 126:16
**strike** [2] - 113:18, 147:20
**Strike** [1] - 156:25
**stripes** [1] - 138:24
**strong** [1] - 172:6
**stronger** [1] - 27:5
**stuck** [1] - 34:11
**stuff** [8] - 8:17, 30:17, 67:10, 71:11, 71:16, 72:11, 80:4, 80:23
**style** [2] - 143:12, 143:13
**subject** [2] - 156:6, 160:20
**submit** [3] - 111:4, 111:7, 112:22
**Subparagraph** [4] - 151:8, 153:9, 154:14, 155:14
**subsequent** [1] - 101:4
**succeed** [1] - 137:6
**suggest** [1] - 111:24
**suggesting** [1] - 111:22
**summer** [1] - 40:25
**sun** [1] - 121:6
**sunny** [1] - 17:10
**super** [1] - 20:9
**Supermax** [2] - 118:22, 118:25
**supervised** [1] - 151:18
**supposed** [3] - 77:15, 97:2, 133:23
**Supreme** [1] - 112:15
**surmise** [1] - 166:24
**surprise** [2] - 111:14, 113:15
**surprised** [1] - 13:6
**surprising** [1] - 13:22
**surroundings** [1] - 9:11
**surveillance** [1] - 71:12
**surveillances** [11] - 66:9, 67:11, 70:3, 70:8, 70:20, 73:3, 75:4, 75:16, 77:6, 79:4, 84:23
**suspect** [1] - 110:21
**suspects** [2] - 31:12, 32:11
**suspended** [2] - 151:17, 152:7
**suspicion** [1] - 172:1
**sustained** [3] - 111:3, 114:22, 139:6
**SWORN** [2] - 3:5, 38:25

**system** [1] - 62:17

# T

**T-Rock** [2] - 135:8, 135:9
**T-shirt** [1] - 99:18
**table** [1] - 8:7
**tactical** [1] - 113:15
**tail** [1] - 6:24
**talkie** [10] - 68:9, 84:15, 86:13, 86:16, 86:19, 92:24, 93:5, 94:4, 94:6, 150:22
**talkies** [7] - 68:1, 71:10, 71:18, 75:15, 80:5, 80:8, 92:14
**Tall** [5] - 106:11, 106:12, 118:16, 118:17
**taller** [16] - 12:3, 12:17, 12:22, 14:12, 14:20, 14:24, 16:15, 16:21, 27:13, 28:19, 31:8, 36:2, 36:7, 46:24, 72:23, 72:25
**tan** [1] - 14:23
**tape** [11] - 67:12, 67:13, 67:17, 71:10, 72:8, 75:14, 80:5, 80:13, 143:7, 143:10, 146:8
**Tape** [1] - 105:20, 143:14, 145:7
**taped** [10] - 67:14, 68:13, 115:19, 120:18, 120:23, 120:24, 121:5, 122:20, 140:24, 142:15
**Tavon** [2] - 108:2, 108:4
**taxicab** [1] - 114:24
**tea** [1] - 29:22
**technically** [1] - 121:1
**technique** [1] - 115:2
**telephone** [2] - 101:21, 159:18
**ten** [8] - 23:7, 23:16, 113:20, 161:3, 166:7, 170:14
**tenth** [2] - 164:9, 164:23
**term** [1] - 167:3
**terms** [6] - 21:16, 62:8, 148:14, 148:16, 151:13, 167:21
**terrorized** [1] - 138:24
**Terry** [23] - 73:8, 73:13, 73:15, 75:3, 100:13, 100:25, 123:16, 124:24, 125:2, 134:12, 135:2, 135:5, 135:10, 135:16, 137:2, 137:23, 138:13, 139:15, 148:1, 149:10, 149:14, 150:2, 160:3

**testified** [16] - 18:1, 24:22, 30:11, 33:7, 44:10, 58:7, 61:9, 113:14, 118:7, 119:3, 140:7, 140:11, 140:23, 141:25, 146:20, 146:24
**testify** [1] - 41:4
**testifying** [2] - 122:24, 123:1
**testimony** [29] - 35:4, 56:12, 56:18, 59:12, 59:21, 60:3, 61:8, 61:10, 74:12, 109:22, 111:13, 119:14, 120:4, 121:15, 121:16, 123:2, 126:11, 129:11, 130:6, 137:8, 137:10, 140:25, 141:1, 141:12, 141:16, 141:22, 144:15, 147:12, 155:21
**Thanksgiving** [2] - 168:2, 168:4
**THE** [180] - 1:1, 1:2, 2:2, 2:4, 2:6, 2:8, 2:15, 2:17, 2:20, 3:3, 3:6, 3:7, 3:9, 8:3, 8:5, 8:10, 8:21, 8:25, 9:1, 9:2, 9:5, 16:12, 29:15, 29:16, 29:17, 29:22, 29:24, 29:25, 30:1, 31:21, 36:11, 36:15, 36:16, 38:16, 38:19, 38:21, 38:22, 39:1, 39:2, 39:4, 39:5, 39:7, 39:8, 39:10, 40:4, 48:9, 52:5, 52:8, 52:14, 55:21, 56:25, 57:2, 57:6, 57:9, 58:19, 58:22, 58:23, 58:24, 59:25, 60:1, 60:11, 61:13, 61:15, 61:16, 62:3, 62:5, 62:9, 62:14, 62:16, 62:20, 62:23, 62:25, 63:4, 63:12, 63:17, 64:1, 64:5, 64:12, 64:17, 64:19, 64:23, 64:25, 65:5, 65:8, 78:9, 83:2, 99:18, 99:20, 99:24, 101:16, 101:24, 102:5, 102:6, 102:10, 102:15, 105:11, 105:15, 105:18, 105:21, 105:23, 107:12, 108:13, 108:17, 108:25, 109:7, 109:11, 109:19, 109:23, 110:4, 110:21, 111:17, 112:10, 112:13, 112:18, 112:25, 113:3, 113:6, 113:10, 113:19, 113:21, 113:25, 114:4, 114:12, 114:14, 114:16, 114:22, 115:4, 115:8, 115:19, 115:22,

115:24, 116:1, 116:5, 116:7, 116:12, 116:15, 116:19, 116:22, 116:25, 117:5, 117:8, 117:11, 126:3, 128:4, 128:7, 139:6, 140:10, 143:12, 154:1, 157:3, 157:16, 157:20, 157:23, 157:25, 158:6, 158:10, 161:3, 161:7, 164:1, 168:21, 168:25, 169:3, 169:13, 169:16, 169:23, 170:1, 170:5, 170:9, 170:16, 170:18, 170:25, 171:2, 171:10, 172:20, 172:24, 173:4, 173:11, 173:18, 173:22, 174:1

**thereabouts** [1] - 5:15
**they've** [1] - 110:1
**thinking** [1] - 112:14
**thinks** [1] - 170:12
**Third** [1] - 87:24
**third** [8] - 43:25, 44:4, 87:23, 88:3, 121:5, 166:17
**Thomas** [1] - 1:20
**thousand** [2] - 76:12, 145:18
**threat** [1] - 119:10
**Three** [4] - 149:6, 157:1, 158:7, 158:16
**three** [9] - 65:2, 69:9, 77:5, 99:13, 115:25, 122:8, 165:10, 165:16
**threw** [1] - 94:4
**throw** [1] - 94:6
**Thursday** [2] - 165:8, 170:24
**Timberland** [9] - 14:16, 14:19, 15:4, 35:11, 35:15, 38:5, 38:7
**Tims** [9] - 14:14, 14:15, 14:18, 14:22, 15:4, 27:8, 35:11, 38:3, 38:4
**title** [3] - 148:10, 159:12, 162:1
**TM** [1] - 107:15
**today** [26] - 16:23, 17:15, 28:24, 28:25, 29:24, 32:7, 39:14, 46:11, 48:19, 53:16, 55:14, 55:23, 56:18, 61:21, 79:11, 79:12, 110:23, 134:16, 134:22, 141:17, 142:6, 147:22, 152:24, 153:16, 164:10, 169:9
**together** [3] - 77:6, 154:19, 167:12
**tomorrow** [2] - 116:20,

168:23
**Tonya** [33] - 66:18, 66:24, 67:1, 67:3, 67:6, 67:8, 67:14, 71:12, 77:14, 77:22, 78:7, 79:1, 79:15, 80:25, 81:7, 81:14, 81:19, 84:4, 84:6, 86:16, 87:12, 89:5, 96:20, 101:7, 122:18, 123:3, 141:2, 146:17, 147:19, 150:5, 169:20, 170:3, 170:9
**Tonya's** [5] - 73:4, 75:4, 87:21, 88:12, 92:1
**took** [29] - 6:6, 7:11, 12:8, 18:3, 22:19, 22:22, 23:11, 23:15, 23:18, 24:3, 24:4, 27:20, 27:24, 31:15, 33:1, 35:17, 59:20, 60:4, 60:17, 61:2, 67:10, 67:12, 67:23, 68:7, 80:14, 82:16, 82:20, 113:23, 137:14
**top** [9] - 43:7, 52:24, 52:25, 53:1, 103:17, 104:15, 148:10, 149:7, 149:11
**Top** [1] - 43:8
**touch** [6] - 32:17, 47:21, 56:23, 57:10, 74:25, 75:1
**touched** [7] - 12:9, 13:3, 29:5, 29:9, 31:12, 37:1, 37:3
**touching** [1] - 37:14
**toward** [3] - 3:7, 39:3, 92:21
**Towards** [3] - 45:15, 45:16, 48:2
**towards** [8] - 18:6, 18:7, 45:4, 45:18, 48:3, 49:6, 53:10, 91:1
**Town** [2] - 71:1, 74:18
**town** [1] - 169:4
**transcribed** [1] - 176:7
**transcript** [8] - 115:1, 115:16, 115:18, 142:18, 142:22, 145:6, 146:3, 176:7
**transcripts** [1] - 142:19
**trial** [8] - 113:24, 164:17, 164:18, 166:5, 166:8, 167:15, 167:23, 170:15
**tried** [9] - 90:5, 93:6, 94:12, 115:3, 115:4, 133:5, 137:5, 137:17, 164:17
**trigger** [1] - 136:18
**trip** [4] - 8:4, 23:5, 23:19, 24:22

**trips** [1] - 22:22
**trotting** [1] - 14:2
**trouble** [2] - 144:3, 154:5
**true** [2] - 143:24, 144:5
**trust** [3] - 116:4, 146:10, 146:13
**trusted** [1] - 135:19
**truthful** [1] - 128:5
**truthfully** [1] - 148:20
**try** [12] - 7:4, 50:11, 53:12, 57:16, 64:1, 93:5, 105:12, 110:16, 115:1, 167:13, 169:9, 173:24
**Try** [1] - 8:4
**trying** [13] - 19:2, 21:3, 21:4, 57:22, 57:24, 92:14, 92:24, 93:2, 93:13, 106:3, 115:5, 170:19, 173:15
**tucked** [1] - 69:25
**Tuesday** [6] - 164:3, 165:7, 165:8, 168:17, 173:13, 174:2
**turn** [9] - 5:22, 8:24, 10:2, 10:3, 25:7, 88:14, 91:7, 91:18, 169:12
**turned** [2] - 88:9, 91:20, 94:9
**Turning** [1] - 159:9
**TV** [1] - 164:19
**Twelfth** [1] - 4:4
**twelfth** [1] - 164:9
**two** [72] - 2:24, 7:16, 7:19, 10:9, 10:21, 12:10, 13:8, 13:19, 17:6, 17:19, 22:12, 22:19, 22:21, 23:24, 25:10, 25:18, 25:21, 25:24, 26:2, 26:6, 26:16, 26:18, 26:20, 26:24, 27:12, 27:25, 28:9, 28:14, 28:18, 28:25, 30:8, 33:10, 33:23, 34:24, 34:25, 35:12, 35:16, 45:6, 45:14, 45:21, 45:23, 46:11, 47:7, 47:18, 47:22, 54:10, 54:19, 54:25, 59:9, 59:12, 59:21, 60:4, 60:17, 61:3, 62:18, 68:20, 76:21, 76:24, 79:3, 82:13, 132:13, 150:14, 154:18, 154:24, 161:15, 165:15, 169:16, 170:2
**Two** [4] - 4:11, 7:15, 32:1, 45:5
**tying** [1] - 67:21
**type** [6] - 13:2, 13:23, 32:11, 35:5, 37:22, 51:13

**typically** [4] - 5:16, 5:25, 9:24, 154:3
**Tyree** [17] - 73:12, 73:15, 73:17, 74:2, 74:3, 74:8, 100:24, 123:12, 123:15, 134:13, 134:16, 134:18, 135:1, 138:3, 138:4, 138:8, 138:23

## U

**U.S** [7] - 1:24, 119:19, 121:19, 122:21, 123:8, 124:9, 149:18
**ultimately** [2] - 11:7, 16:1
**Um-hum** [7] - 39:25, 44:17, 46:4, 48:7, 53:7, 56:22, 105:9
**un-objected** [1] - 111:2
**under** [28] - 9:21, 19:25, 20:18, 21:8, 21:23, 44:6, 44:7, 44:8, 44:14, 44:18, 45:4, 45:16, 45:18, 52:11, 65:8, 72:21, 76:13, 76:14, 140:11, 140:15, 148:14, 153:13, 155:23, 155:24, 156:22, 158:25, 160:11, 162:20
**underneath** [2] - 57:13, 148:19
**Understood** [1] - 115:13
**understood** [3] - 37:19, 151:21, 155:18
**uniform** [2] - 25:25, 53:23
**UNITED** [2] - 1:1, 1:5
**United** [5] - 3:1, 38:23, 119:20, 149:7, 162:2
**Unless** [1] - 60:12
**unquote** [1] - 111:25
**untucked** [1] - 69:25
**Untucked** [1] - 70:1
**Up** [1] - 97:11
**up** [85] - 3:21, 5:20, 5:21, 7:3, 7:11, 8:14, 10:1, 10:4, 10:8, 18:25, 19:18, 20:3, 28:3, 30:7, 30:25, 31:22, 32:1, 39:2, 40:7, 40:10, 42:5, 45:3, 45:21, 48:10, 48:13, 53:12, 54:9, 56:6, 57:24, 58:13, 58:16, 62:7, 62:17, 62:21, 63:22, 66:3, 67:14, 67:17, 67:21, 68:8, 68:13, 70:16, 77:7, 78:12, 78:14, 78:23, 84:5, 84:6,

84:12, 86:25, 87:4, 87:15, 88:5, 97:13, 97:24, 98:24, 99:2, 100:4, 100:9, 101:9, 102:21, 106:3, 106:7, 110:17, 113:23, 115:6, 116:1, 117:9, 118:21, 121:6, 140:3, 150:5, 150:19, 156:24, 164:20, 164:22, 167:1, 168:12, 169:9, 171:23, 173:24
**Upstairs** [2] - 45:8, 45:9
**USA** [1] - 176:4

## V

**vehicle** [2] - 12:18, 12:23
**verdict** [1] - 167:9
**Vernon** [2] - 132:14, 132:18
**versus** [3] - 38:10, 148:11, 163:2
**Vials** [5] - 106:11, 106:12, 118:16, 118:17
**vicinity** [1] - 94:20
**victim** [1] - 101:21
**video** [11] - 105:3, 105:7, 105:8, 105:12, 113:23, 118:9, 118:12, 118:20, 118:25, 119:9
**Video** [3] - 105:24, 106:2, 106:5
**view** [4] - 17:19, 17:20, 19:4, 113:13
**Village** [1] - 95:20
**violate** [1] - 160:19
**violated** [3] - 160:6, 160:14, 160:16
**violation** [4] - 153:12, 153:18, 155:8, 160:21
**Violation** [1] - 100:2
**visit** [1] - 168:12
**vociferously** [1] - 111:10
**voice** [7] - 40:6, 102:12, 107:2, 143:7, 143:8, 143:15, 145:8
**VOLUME** [1] - 1:11
**vote** [2] - 165:21, 165:22

## W

**wait** [5] - 2:17, 64:11, 79:23, 105:16, 173:12
**waited** [3] - 95:4, 95:5, 150:14
**waiting** [3] - 116:6,

116:9, 153:3
**walk** [5] - 14:3, 18:19, 18:21, 34:12, 45:3
**walked** [8] - 34:3, 34:6, 34:8, 45:14, 45:21, 95:1, 95:2
**walkie** [17] - 68:1, 68:9, 71:10, 71:18, 75:15, 80:5, 80:8, 84:15, 86:13, 86:16, 86:19, 92:14, 92:24, 93:5, 94:4, 94:6, 150:22
**walkie-talkie** [10] - 68:9, 84:15, 86:13, 86:16, 86:19, 92:24, 93:5, 94:4, 94:6, 150:22
**walkie-talkies** [7] - 68:1, 71:10, 71:18, 75:15, 80:5, 80:8, 92:14
**walking** [3] - 14:2, 90:22, 90:23
**walkway** [2] - 91:2, 91:4
**wants** [1] - 157:14
**watched** [1] - 12:4
**watching** [1] - 94:13
**water** [2] - 29:15, 39:16
**Watson** [1] - 125:16
**WAYNE** [1] - 1:8
**Wayne** [6] - 69:8, 104:2, 140:17, 141:4, 145:1, 145:21
**wear** [1] - 17:13
**wearing** [28] - 14:13, 14:24, 15:3, 16:16, 16:21, 17:15, 17:17, 17:21, 25:1, 31:8, 35:3, 35:4, 35:16, 35:24, 36:2, 36:3, 36:8, 37:23, 38:4, 38:5, 38:7, 46:11, 50:3, 50:9, 50:12, 50:14, 53:23, 53:24
**weather** [1] - 17:9
**Wednesday** [3] - 1:11, 165:8, 169:10
**week** [27] - 70:21, 98:16, 110:23, 116:10, 116:17, 164:6, 165:9, 165:10, 165:11, 165:13, 165:14, 165:16, 165:18, 166:17, 166:18, 167:23, 168:4, 168:7, 169:22, 170:18, 170:19, 170:22, 170:23, 171:5, 171:11, 172:19
**weekend** [4] - 2:11, 117:3, 168:9, 168:17
**weeks** [5] - 99:13, 101:5, 135:12, 165:3, 165:15
**West** [1] - 1:25

**whatsoever** [1] - 168:11
**Whereof** [1] - 176:9
**white** [3] - 37:25, 38:1, 52:24
**whole** [5] - 19:6, 98:7, 101:17, 139:16, 150:23
**wide** [2] - 87:6, 88:9
**wife** [1] - 76:11
**wild** [1] - 78:10
**WILLIAM** [1] - 175:14
**William** [8] - 65:18, 85:14, 104:2, 104:7, 104:20, 104:25, 148:11, 163:2
**Willie** [1] - 176:4
**WILLIE** [1] - 1:7
**willing** [1] - 158:3
**willingness** [1] - 149:18
**window** [2] - 94:5, 94:6
**windshield** [1] - 17:11
**Windsor** [2] - 5:21, 10:2
**Winfield** [1] - 18:7
**Wingo** [2] - 129:7, 129:13
**wires** [1] - 8:9
**wish** [2] - 165:21, 168:7
**withdraw** [5] - 156:21, 158:4, 159:18, 159:22, 160:2, 160:11
**Withdraw** [1] - 159:12
**withheld** [1] - 155:20
**WITNESS** [23] - 3:5, 3:6, 3:9, 8:25, 9:2, 29:16, 29:24, 30:1, 36:15, 38:21, 38:25, 39:1, 39:4, 39:7, 39:10, 58:23, 59:25, 61:15, 102:6, 128:7, 175:4, 175:9, 175:14
**Witness** [3] - 116:24, 119:15, 176:9
**witness** [28] - 2:14, 2:21, 2:25, 3:4, 8:1, 31:19, 38:22, 57:6, 58:20, 62:13, 64:7, 64:13, 64:15, 78:10, 109:3, 113:9, 114:16, 115:5, 115:9, 116:17, 147:4, 169:4, 169:14, 170:12, 170:20, 170:23, 172:7, 172:11
**witnessed** [1] - 51:1
**witnesses** [17] - 2:23, 2:25, 8:16, 119:22, 166:13, 168:22, 169:6, 169:17, 169:18, 169:21, 170:7, 171:15, 171:17, 171:21, 171:23, 173:5
**woman** [1] - 151:5
**wonder** [1] - 15:13

**wooded** [3] - 18:19, 18:21, 23:2
**woods** [11] - 18:10, 18:13, 18:17, 19:8, 19:9, 22:25, 24:13, 93:9, 93:22, 94:3, 94:4
**word** [9] - 22:10, 121:11, 128:9, 142:2, 142:7, 154:15, 154:16, 156:17, 163:5
**words** [7] - 7:22, 33:17, 62:16, 116:12, 141:18, 154:21, 168:12
**works** [1] - 153:20
**worried** [2] - 7:7, 98:3
**worry** [3] - 8:16, 97:25, 98:1
**worth** [1] - 140:4
**wow** [1] - 15:13
**write** [4] - 104:7, 104:13, 104:20, 104:25
**writing** [6] - 33:11, 37:18, 37:20, 103:25, 111:7, 114:19
**writings** [2] - 33:18, 33:21
**written** [12] - 16:8, 32:2, 49:17, 50:23, 51:7, 51:12, 51:13, 51:18, 52:4, 52:19, 117:2, 170:18
**wrote** [4] - 17:4, 32:4, 49:16
**Wyche** [1] - 169:20

## X

**XII** [1] - 1:11
**XXXVII** [1] - 1:11

## Y

**yard** [1] - 89:1
**years** [13] - 4:16, 5:1, 55:8, 58:10, 72:15, 72:21, 110:12, 112:9, 151:17, 151:18, 152:6, 152:11, 152:25
**Yellowday** [1] - 132:14
**yesterday** [14] - 65:16, 66:8, 68:19, 69:7, 74:4, 74:14, 100:3, 119:14, 141:16, 141:25, 146:20, 147:4, 153:16, 172:7
**YMCA** [3] - 5:11, 5:12, 5:18
**young** [15] - 7:15, 7:16, 11:18, 12:3, 13:12, 13:21, 21:2, 26:6, 26:16,

27:9, 27:16, 35:9, 37:24, 78:10, 151:5
**younger** [1] - 72:17
**Younger** [1] - 72:19
**yourself** [3] - 16:14, 49:17, 50:1
**yourselves** [1] - 168:15

## Z

**Zajac** [3] - 1:24, 176:3, 176:14
**zoom** [2] - 42:7, 58:19