1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION


UNITED STATES OF AMERICA

        v.                              CRIMINAL CASE NO.
                                         AMD-04-029
WILLIE MITCHELL,
SHELTON HARRIS,
SHELLY WAYNE MARTIN,
SHAWN GARDNER,

        Defendants
_____/

                VOLUME XVII OF XXXVII
                Tuesday, October 28, 2008
                Baltimore, Maryland


Before:  Honorable Andre M. Davis, Judge
                And a Jury

Appearances:
        On Behalf of the Government:
         Robert Harding, Esquire
         Michael Hanlon, Esquire
        On Behalf of Defendant Mitchell:
         Laura Kelsey Rhodes, Esquire
         Michael E. Lawlor, Esquire
        On Behalf of Defendant Harris:
         Gerard P. Martin, Esquire
         Paul Flannery, Esquire
        On Behalf of Defendant Martin:
         Thomas L. Crowe, Esquire
         James G. Pyne, Esquire
        On Behalf of Defendant Gardner:
         Adam H. Kurland, Esquire
         Barry Coburn, Esquire

Reported by:
Mary M. Zajac, RPR
Room 5515, U.S. Courthouse
101 West Lombard Street
Baltimore, Maryland 21201

2

1          (Proceedings at 9:50 a.m.)

2          THE COURT:  We ready to proceed?

3          MR. HARDING:  Yes, Your Honor.

4          THE COURT:  Ms. Rhodes?

5          MS. RHODES:  I believe your clerk has had a chance to

6    show you the article that we're concerned about.  This is from, I

7    just learned of it this morning, although I had heard yesterday

8    on NPR a similar story about the lack of solution in Baltimore's

9    homicide rate and that Stop Snitching culture or the Stop

10   Snitching videos were, in part, to blame.

11          The concern I have in particular now is that on Sunday

12   the lead story in the Baltimore Sun was about, it was called

13   "Murders, Cold Trail", about the lack of solutions of homicides

14   in the city.  We're concerned that there may have been jurors who

15   read this because this does not directly have to do with our

16   case.  It's in theory a general article although, in fact, it has

17   a lot to do with our case.

18          Just for the record, it is the lead article in the

19   Sunday Sun.  It takes up, apart from the masthead, about

20   three-quarters of the first page with a picture, a graphic, a

21   graph indicating the rate and indicating the national rate

22   compared to the Baltimore rate.  It also has a picture of the, of

23   Kenneth Harris, who, a prominent politician in the city, who was

24   killed a few week ago, and whose homicide has not been solved.

25          Of particular concern is, in terms of the content, is

3

1    the frequent reference to the Stop Snitching issues.  And our

2    concern is if the jurors have read any of this, that they will be

3    influenced by it and be concerned about the, even more concerned

4    about the testimony they may be hearing about the Stop Snitching

5    video.

6              In particular, there's a quote from a professor at the

7    John Jay College of Criminal Justice in New York indicating that

8    one of the, two of the problems that exist right now regarding

9    the lack of solving these homicides, is the, quote, "exodus of

10   veteran talent in the mid nine 1990s in the Homicide Division",

11   and these, quote, "subsequent growth of a Stop Snitching

12   culture."

13             And then there are a couple more paragraphs that

14   discuss the Stop Snitching momentum.  And the other quote from

15   Kennedy is that the Stop Snitching momentum which stands in

16   opposition to law enforcement's ability to investigate and

17   prosecute crimes is swamping the beneficial impact of a lower

18   homicide rate.

19             This is something that, I mean, it goes on to say, you

20   still need witnesses, you still need juries that will convict.

21   And if any of the jurors have read this, we're very concerned

22   about the impact that would have.

23             It also quotes from somebody who's also a witness in

24   the case, Detective Cherry, Bob Cherry, who's apparently the

25   incoming president of the Baltimore's Police Union.  And he

4

1    indicates that apart from the issues of their staffing and things

2    like that, there's a separate issue regarding the Stop Snitching

3    problem.  His quote is, "but if witnesses in the community aren't

4    willing to come forward and say that's the person in the photo

5    array", which, as you recall, is an issue in this case, "and they

6    aren't willing to tell that to a jury, then we just can't seal a

7    deal."

8            Then further it talks about the fact that sometimes

9    they have to work with federal, their federal counterparts in

10   order to get convictions which, again, is an issue that arises in

11   this case.  It quotes, it says, the article says that Cherry and

12   McLarney said police are working around the Stop Snitching

13   culture by arresting homicide suspects on gun or drug charges.

14           They then discuss somebody who was arrested by city

15   detectives and federal drug agents in September and they say that

16   he's both, Butler played a role in at least three homicides,

17   which is something that they're saying it's a drug organization,

18   but there were several homicides involved which, again, is

19   something that sounds a lot like the situation in this case.  And

20   he says, you're going to have evidentiary issues in a lot of

21   them.  That's why we use our drug squads and federal partners and

22   we target people.

23           So our concern is that, again, that if people have read

24   this, they're going to be, their impressions of what they need to

25   do as jurors are going to be pretty well set forth for them in

1    this article.

2             In light of that we're asking for a mistrial because we

3    think this pool may well be irreparably tainted.  I don't even

4    know what the other media outlets carried.  I haven't had time to

5    research that because I didn't seen this article until this

6    morning.  But I would ask the Court for a chance to do that and

7    see what the television coverage was, because I know simply that

8    from what I've, the only other outlet I listened to was NPR

9    yesterday morning and that did carry the story.  I don't know if

10   it carried it as a national story or local story.

11            So in addition to, in the alternative, if the Court is

12   not inclined to grant a mistrial, we would ask that the jury,

13   either way, that the jury be polled to ask which of them, if any

14   of them, have read this article or heard the story on the news

15   and that the Court issue a curative instruction or an instruction

16   to ask them to set aside what they have heard, if they can, to

17   the extent they can, and to consider only the facts of this case

18   and remind them that they are sitting only on this case, and

19   what's happening outside of here is not supposed to influence

20   their decision.

21            THE COURT:  The motion for a mistrial is denied.  And

22   I'll hear from the government in a moment.  Would you be

23   satisfied, Ms. Rhodes, if I were to simply ask, once the jury is

24   seated, any juror who read the lead article in the Sunpapers on

25   Sunday to raise his or her hand, so that you all would have a

6

1   chance to know exactly which jurors read the article.  And then I

2   would give an instruction along the lines of reminding the jury

3   that they are not to consider anything that occurs or that they

4   learned outside this courtroom as evidence and to disregard.  And

5   I would also mention to the jury, of course, that if they read

6   the article, it was not a violation of my instruction because

7   there's nothing in the article that would lead one to believe it

8   had anything to do with this case.  It really was just a general

9   article.

10          MS. RHODES:  Right.

11          THE COURT:  Routine crime-type article.  And just

12   remind them that they're to disregard what they read.  And that

13   any juror who hadn't read the article should not read it, simply

14   have their family save it if they want to see it after the trial.

15   Would you be satisfied with that?

16          MS. RHODES:  No, Your Honor.  We would ask that those

17   jurors who did read it be individually voir dired.  Particularly

18   because the Stop Snitching issue was such a hot button during the

19   jury selection and so many people had heard of it and had

20   opinions on it.  I think that we just need to make sure that that

21   didn't push some people over the edge.

22          THE COURT:  I'm sorry.  So in other words, you would be

23   okay with me generally asking any juror who read the article to

24   raise his or her hand, and then you want an individual voir dire

25   of each of those jurors who had read the article?

7

1          MS. RHODES:  Correct.

2          THE COURT:  Okay.

3          MS. RHODES:  And we're not withdrawing the mistrial

4     motion.

5          THE COURT:  I understand.  I understand.

6          MS. RHODES:  Thank you.

7          THE COURT:  All right.  Mr. Coburn.

8          MR. COBURN:  Thank you so much, Your Honor.  I just

9     wanted to make sure it was clear that we join in the motion for a

10    mistrial.

11         THE COURT:  I'm assuming everybody joins in the motion.

12    Yes.  Mr. Harding?

13         MR. HARDING:  Judge, the article doesn't have anything

14    to do with this case.  Detective Cherry is not a witness in this

15    case.  There are articles every day in the paper that raise

16    issues that sound like issues in this case, but that's not enough

17    to create a taint on this jury.

18             The government's belief is that if the Court

19    individually voir dires the jury, as has been suggested, that it

20    will only call attention to this issue and create a risk of taint

21    that doesn't now exist.  I think the best course of action for

22    the Court would be to do nothing at all, frankly.  And the Court

23    is not obligated to do anything because there has been nothing

24    raised today that should lead the Court to feel it has to make an

25    inquiry of the jury.

1          THE COURT:  I will tell you, Mr. Harding, that I

2     absolutely agree with everything you said.  The difficulty that

3     the Court faces in this context, however, is that if the Court

4     fails to inquire and then later on something pops up, not that

5     Ms. Rhodes or any other counsel would ever do it, they're going

6     to be standing down in a courtroom in Richmond, if there's a

7     conviction, saying, See, we told the, as they say, learned

8     district judge to at least ask questions.  And you're going to

9     have a panel down there saying, Why didn't the judge just take a

10    few minutes and inquire.

11          So I'm going to do it, although I agree with you.  But

12    it's a risk that the defense gets to, gets to take.  And I would

13    be loathe to prohibit the defense from taking that risk.  I think

14    you're absolutely right -- to call attention to it may well

15    increase the risk.  But I think I should at least take a poll of

16    the jury and see who read it.  Hopefully, there won't be more

17    than three or four of them and I'll bring them out one at a time

18    to inquire.  So would you bring the jury out, please?

19          MS. RHODES:  If I could have this exhibit marked?

20          THE COURT:  Yes.  We used to have a fine newspaper in

21    this town.

22          MR. MARTIN:  Seems like a long time ago, doesn't it?

23          THE COURT:  Did you see the Los Angeles Times is going

24    to lay off 75 more?  It's just, I guess we're only going to have

25    about five newspapers in the whole country in another few years.

1          MR. COBURN:  If they survive.

2          THE COURT:  Yeah.  Mr. Harding, Mr. Hanlon, I want to

3    express the Court's appreciation to you.  When you got back to

4    your office yesterday and realized that there may be some changes

5    in the witness lineup, that you told had us about, you promptly

6    by e-mail notified counsel of those possible changes.  And I

7    appreciate that.

8          MR. HARDING:  Thank you.

9          (Jury enters the courtroom at 10 a.m.)

10          THE COURT:  Members of the jury, good morning, and

11    thank you for your patience.  The Court needs to take a moment

12    this morning to make inquiry of you as to certain matters.

13          There was a lead article in the Sunday Sun two days

14    ago, the Baltimore Sun, that was a crime related article on the

15    front page.  It got some rather prominent exposure on the front

16    page of the Sun.  The article did not deal with this case.  So if

17    anybody read the article, it would not in any way have been a

18    violation of the Court's instructions to avoid media reports

19    about this case.

20          But I need to ask you, and I would ask you to just

21    raise your hand and keep it raised for a moment, if, as I've

22    described it to you now, the lead article in the Baltimore

23    Sunpapers on Sunday, if you read that article, please raise your

24    right hand.

25          (No response.)

1          THE COURT:  The record will reflect that not a single

2     juror has raised his or her right hand.  My suspicion is that

3     some of you may have noticed the article and thought it might

4     have had something to do with this trial and, in accordance with

5     my instructions, you did not read the article.  And I thank you

6     for that.  And it simply confirms for me my strong belief and

7     conviction that you are conscientiously adhering to all of my

8     instructions.  And indeed, it would appear that you're erring on

9     the side of caution to be as certain as you possibly can to avoid

10    any inadvertent violation of the Court's instructions.

11         I will remind you, as I have repeatedly, that you are

12    to have no discussion about the case or about the evidence.  You

13    should keep an open mind about all issues until we come to the

14    very end of the case when you've been instructed as to the law

15    and told you may begin your deliberations.

16         You should continue to avoid, as you have, any exposure

17    to media reports by printed media or over the air or broadcast

18    media that you think might have anything to do with this case or

19    any of the issues related to this case.  And again, I thank you

20    for your conscientious service as jurors in this case.

21         All right.  We're ready to continue.  Government may

22    call its next witness.

23         MR. HANLON:  Your Honor, the United States calls

24    Detective Brian Edwards to the stand.

25         DETECTIVE BRIAN EDWARDS, GOVERNMENT'S WITNESS, SWORN

1          THE WITNESS:  Yes.

2          THE CLERK:  Be seated.  Speak directly toward the mike.

3    State your name and spell it for the record, please.

4          THE WITNESS:  Detective Brian Edwards.  E-D-W-A-R-D-S.

5          DIRECT EXAMINATION

6    BY MR. HANLON:

7    Q    Detective, good morning to you.

8          THE COURT:  Thank you for coming back, Detective

9    Edwards.  We couldn't reach you yesterday.

10   Q    Where do you work, sir?

11   A    I work for the Baltimore County Police Department.  I'm now

12   assigned to the Homicide Unit.

13   Q    And how long have you been working homicide?

14   A    Almost four years.  December will be four years.

15   Q    Now, back in -- how long have you been a police officer?

16   A    Thirteen years.

17   Q    Back in June of 2002, were you a police officer then?

18   A    I was.

19   Q    If my math is correct, that would have been before your

20   current position with the Homicide Unit, is that right?

21   A    Yes, I was assigned to the Robbery Unit in the Criminal

22   Investigation Division.

23   Q    And you were a detective at that time?

24   A    Yes, that's correct.

25   Q    Directing your attention to June 7th of 2002, in the late

1   afternoon and evening, did you become involved in providing

2   assistance with two recent arrests?

3   A    I was involved, yes.

4   Q    And did these arrests arise or relate to the shooting that

5   day of a lady named Tonya Jones Spence?

6   A    That's correct.

7   Q    Who were the two individuals you interacted with that day?

8   A    There were two subjects that were identified as Shawn

9   Gardner and Aaron Holly.  Aaron Holly had given a different name

10  but was later identified as Aaron Wayne Holly.

11  Q    Mr. Holly originally identified himself by Tavon Brown, is

12  that correct?

13  A    That's correct.

14  Q    Now, Detective Edwards, this case you're testifying about

15  today is about six years ago.  If you saw either of these

16  individuals again, would you recognize them?

17  A    I'd say it's possible, and most likely have to refer to the

18  arrest or processing photos from that day.

19  Q    There would be better looking at a photograph?

20  A    There would be.

21  Q    Let me show you what's been marked as Government's Exhibit

22  100-A.  Do you recognize that individual?

23  A    That is the subject, Shawn Gardner.

24  Q    And let me ask you a couple --  did he more or less appear

25  that way on June 7th of '02?

1    A    Yes.

2    Q    Showing you Government's Exhibit 100-B as in boy.  Is that a

3    profile shot of Mr. Gardner?

4    A    It is.

5    Q    Government's Exhibit S-100C as in Charlie.  Is that a

6    reverse profile shot of Mr. Gardner?

7    A    It is.

8    Q    And then finally, Government's Exhibit S-59.  Who is this

9    individual?

10   A    That is Aaron Holly.

11   Q    Now, what interaction did you have with Mr. Gardner and Mr.

12   Holly that day?  What was your role?

13   A    I was supporting Detective Ruby.  Initially that day, the

14   Robbery Unit was called out to handle the incident.  Once we

15   lettered that the victim was deceased, then Homicide took over.

16         Detective Ruby and I had already responded to the

17   precinct where there were two subjects in custody.  Detective

18   Ruby and I went in to the interview rooms with each subject

19   individually and attempted interviews, Detective Ruby being the

20   lead and I was in as a support or witness.

21   Q    Now, at some point, Detective, you were involved in actually

22   getting some property from the defendants and later from the

23   lockers, is that right?

24   A    That's correct.

25   Q    Let me ask you about, first of all, your interaction in

1    terms of getting things from Mr. Gardner.  You took a couple of

2    items, including clothing items, from Mr. Gardner's person, is

3    that right?

4    A    That's correct.

5    Q    Let me show you a couple of items.  Showing you he's been

6    marked as Government's Exhibit S-11.  Can I approach the witness,

7    Your Honor?

8                THE COURT:  Yes.

9    Q    Detective, understanding it may be apparent, can you tell us

10   what S-11 is?

11   A    I'm sorry.  Could you repeat that?

12   Q    Government's Exhibit S-11, can you tell me what is the item

13   I just handed you?

14   A    That is an item that is labeled with a Baltimore County

15   inventory number of Item 3901-002.  My identification number with

16   Baltimore County Police is 3901.  Anything that I would seize

17   would be inventoried under my ID number with this incident

18   number, and then sequentially numbered.  So this is the second

19   item I seized.

20              It is a pair of blue jeans belonging to Shawn Earl

21   Gardner.

22   Q    You collected these jeans from Mr. Gardner and then

23   inventoried them as you described, is that correct?

24   A    That's correct.

25   Q    I've handed you what's been marked as Government's Exhibit

1    S-12.  Can you tell us what S-12 is?

2    A    This is an item inventoried with the number 3901-1.  And it

3    is a gray T-shirt, which I seized from Mr. Gardner.

4    Q    Also placed it into evidence, the same procedure?

5    A    That's correct.

6    Q    Now, staying on Mr. Gardner for a moment, Detective.  You

7    also inventoried some items that were stored in a locker

8    referenced to Mr. Gardner, is that right?

9    A    That's correct.

10   Q    Tell us about that procedure.  Tell us about how the lockers

11   operate at the precinct and how you went about doing that?

12   A    At Precinct 2, there is a set of lockers near where the

13   prisoners come in and out of the back door.  It's in the prisoner

14   processing area.  Desk officers would normally, as part of

15   procedure, take certain property off of the prisoners before

16   they're placed in a holding cell.  That property is typically put

17   in a bag, labeled, and put in a locker.  The key from that

18   locker, which is numbered, is then passed through to an

19   administrative area of the precinct and then held, held there

20   under that prisoner's name.

21   Q    And you went through the locker for Mr. Gardner?

22   A    I did.

23   Q    Let me ask you about some items there.  Beginning with

24   Government's Exhibit S-13.  Detective, what is S-13?

25   A    S-13 is Item Number 3901-006.  And they're brown Timberland

1    boots that belonged to Shawn Gardner.

2    Q    Now, just to be clear.  There were a couple of items of

3    clothing that you took from Mr. Gardner's person --

4    A    That's correct.

5    Q    -- that day.  But these boots had been placed in his locker

6    before you arrived there?

7    A    That's correct.  The previous two items on the table there I

8    actually received from his person.  These were received from the

9    prisoner property locker.  The packaging inside of the outer

10   packaging would have been the original, the bag.  And I have a

11   personal, or my handwriting here, a note, that says from prisoner

12   locker 2034, meaning 8:34 p.m. on that date of June 7th of 2002.

13   And in other writing, presumably the desk officer's writing, is

14   the name "Gardner."

15   Q    So this second bag that you're looking at was the original

16   bag that all of the items in the locker were in?

17   A    That's correct.  When I went to the locker and was given the

18   key, I opened it up.  I took this bag out.  This bag contained a

19   few items, including the boots.  I removed the other items from

20   the bag and packaged them individually, kept the boots in the

21   original bag here.

22        The tag on this bag is my handwriting and then the tag

23   on the outside of this bag is someone else's handwriting, most

24   likely re-packaging the evidence after this packaging had become

25   torn and tattered.

1    Q    Thank you.  Your Honor, for the record, I've also unfolded

2    the gray shirt, which is Government's Exhibit S-12, so it's

3    little bit more visible to the jury.

4              Continuing to go through the locker items, Detective,

5    I'm going to use our overhead projector device for some of these

6    things.  Marked as Government's Exhibit S-14.  I'm going to put

7    the item on the overhead projector and then I'm going to show you

8    the envelope, Detective, for your purposes.

9    A    This is Item 3901-7.  I labeled it as a hat, a black nylon

10   hat with strings.  Than would have come from the, the bag that I

11   just mentioned, the prisoner property inventory of Shawn Gardner.

12   Q    And again, Detective, you're indicating that this is a hat.

13   For the record, it's a black item?

14   A    Black nylon type material, yes.

15   Q    It's knotted in the rear of the hat, is that correct?

16   A    Yes, that's correct.

17   Q    And then there are, I'm not sure if they're draw strings or

18   strings going down from the bottom of the item?

19   A    That's correct.

20   Q    Now, I'm now showing the jury and I've handed you a bag

21   relating to Government's Exhibit S-15.  Could you tell us what

22   S-15 is?

23   A    S-15 is an item labeled 3901-10, a knife, which I made note

24   of black and red handled knife.  This came from the property

25   inventory bag of Shawn Gardner.

1    Q    I've handed you what I will call S-14A for this case, at

2    least the envelope for it.  And placing this item on our screen.

3    Can you tell us what S-14A is, Detective?

4    A    That is an item inventoried as 3901-8, a cell phone and a

5    Nokia model 5165, with an electronic serial number of

6    09410804943, and an extra battery.  And this, again, came from

7    the inventory of Shawn Gardner.

8    Q    Finally, on this topic, Government's Exhibit S-16, I'm

9    placing on the overhead device and I'm giving you the envelope in

10   which it was contained.  Detective, can you tell us what S-16 is?

11   A    S-16 an item inventoried as Item 3901-11, an ID in the name

12   of Shawn Gardner.  It's a Maryland driver's license.

13   Q    You've indicated the ID is in the name of Shawn Earl

14   Gardner.  Can you read the address on the ID into the record,

15   please?

16   A    82 Ambo Circle, Baltimore, Maryland, 21220.

17   Q    If I can have a moment, Your Honor, just to clear out the

18   table.

19             THE COURT:  Yes.  Would you like some water, Detective?

20             THE WITNESS:  I'm fine.  Thank you, sir.

21   Q    After dealing with Mr. Gardner, his person, his property

22   locker, you also met with Mr. Holly, then identified as Mr.

23   Brown, is that correct?

24   A    That's correct.

25   Q    Let me talk to you about some items taken from Mr. Holly's

1    person, again.  First of all, Government's Exhibit S-23.  Can you

2    tell us what S-23 is, Detective?

3    A    S-23 is an item labeled 3901-16.  It is a pair of blue

4    jeans.  And that is, the bag is labeled Brown, in my handwriting,

5    Brown's blue jeans.  Then it's crossed out with the corrected

6    name of Holly.

7    Q    So initially identified as Brown's blue jeans, later

8    corrected to read Holly?

9    A    That's correct.

10   Q    Government's S-22.

11   A    This is an item labeled 3901-15, a white T-shirt.  Again,

12   labeled Brown's T-shirt and then crossed out, with the corrected

13   name of Holly.

14   Q    There's a couple of pieces of handwriting on this T-shirt,

15   Detective, dated 8/16/02, it looks like.  Just for clarity, and

16   so the jury's not wondering, that appears to be police officer's

17   evidence handwriting, is that?

18   A    That's correct.  That was not on there at the time I seized

19   the T-shirt.

20   Q    Government's Exhibit S-24.

21   A    This is an item labeled 3901-19, bandanna, red.  My

22   handwritten note on the packaging is bandanna on the left side of

23   the pants waistband, with the name of Brown crossed out and

24   corrected to be Holly.

25   Q    Your Honor, may I show this to the jury just briefly?

Case 1:04-cr-00029-RDB    Document 687    Filed 06/12/09    Page 20 of 215

1        THE COURT:  Yes.

2             (Mr. Hanlon exhibits to the jury the bandanna.)

3    BY MR. HANLON:

4    Q    You also went through a property locker associated with Mr.

5    Holly, Detective?

6    A    I did.

7    Q    First of all, Detective, was the locker containing Mr.

8    Holly's personal items organized and separated out the same way

9    that the Gardner locker was?

10   A    It was.

11   Q    You indicated with Mr. Gardner's locker that there was an

12   original bag that contained all of the property and that you sort

13   of re-cataloged it separately?

14   A    That's correct.  And that was the case with Mr. Holly's

15   stuff as well.

16   Q    Mr. Holly's sort of original bag, if I can call it that, was

17   it labeled in the name Holly or was it labeled in the name Brown?

18   A    It was labeled in the name Brown.  And this item you can see

19   right here in the marker, it's the name Brown, which I then

20   crossed out and corrected with Holly.

21   Q    And this particular item that I've put in front of you,

22   which is Government's Exhibit S-25, what is S-25?

23   A    Item 3901-20.  And it's a pair of Timberland boots.

24   Q    Again, from Holly's locker?

25   A    From Holly's locker, that's correct.

1   Q    Finally, Government's Exhibit S-21.  What is Exhibit S-21,

2   Detective?

3   A    That is Item 3901-22, a knife, which I noted to have a red

4   and black handle.  And it was also received from Holly's

5   inventory bag.

6   Q    Now, Detective, did you note any comparison between this

7   knife, which is S-21, and an item taken from Mr. Gardner's

8   locker, which has been previously marked as Government's Exhibit

9   S-15?

10  A    I noted that they appeared to be the same brand, model, make

11  knife as each other.

12  Q    One was in Mr. Gardner's locker, the other one in Mr.

13  Holly's?

14  A    That's correct.

15  Q    Detective Edwards, I believe I have no further questions for

16  you.  Thank you.  Thank you, Your Honor.

17              CROSS EXAMINATION

18  BY MR. KURLAND:

19  Q    Good morning, Officer.  Is it Officer or Detective?

20  A    Detective.

21  Q    Detective.

22  A    Good morning, sir.

23  Q    Don't want to demote you.  I just have a couple of

24  questions.  Just so it's clear.  On the items that you testified

25  to concerning the property inventory bag that was segregated, one

1    for Mr. Gardner, one for Mr. Holly.

2    A    Yes.

3    Q    You did not personally put those items in the bag?

4    A    No.  The state that I received them in, they were already in

5    a bag labeled with each person's name and then in a secured

6    locker.  That's how I received them.

7    Q    Okay.  So you don't, you actually weren't the one that took

8    those items from --

9    A    No.

10   Q    -- the suspects?  All right.  In addition to that, it's

11   correct that from Mr. Gardner, in either the property inventory

12   bag or the items you actually took from him, no set of car keys?

13   A    I made a note of Item 3901-12, keys.  And in the description

14   I made various keys.  Unless I saw them, I couldn't remember

15   whether there were car keys on that ring or not.

16   Q    And the last question.  With respect to the red bandanna

17   that you were shown, may I approach, Your Honor?

18              THE COURT:  Yes.

19   Q    This was from, in Mr. Holly's property inventory bag, is

20   that correct?

21   A    That was actually recovered off of his blue jeans waistband.

22   Q    Okay.  So it was tied to his waistband?

23   A    Yes.

24   Q    In your experience as an officer, does that signify some

25   sort of gang affiliation?

1    A    It does.

2    Q    I have no further questions.

3              REDIRECT EXAMINATION

4    BY MR. HANLON:

5    Q    Just a quick follow-up, Your Honor.  Detective, I've shown

6    you what I'll mark as Government's Exhibit 14-B as in Bravo.

7    Could you tell us what this item is?

8    A    That is item numbered 3901-12, the keys I made mention to.

9    They were recovered from Shawn Gardner's prisoner inventory bag.

10   Q    And I think you alluded to this on cross examination.  Would

11   you have any way offhand of knowing whether there are any car

12   keys or house keys or what these various keys would activate?

13   A    There are some keys that are marked with car manufacturer

14   logos that sometimes you can tell are car keys.  Others, it's

15   unclear.  I'd have to see these or have them in my hand to be

16   able to tell you whether I can make any determination with these

17   particular keys.

18   Q    A moment please, Your Honor.  That's all right, Detective.

19   Thank you.

20             THE COURT:  Thank you very much, Detective.

21             MR. KURLAND:  Your Honor, briefly, one question.  I

22   need to take a quick look at that.  Could I approach the witness?

23             THE COURT:  Yes.

24             RECROSS EXAMINATION

25   BY MR. KURLAND:

1    Q    Officer, it's a good thing I didn't bring my car keys with

2    me today because they would have the risk of being turned into an

3    exhibit.  But in your professional experience or both as a police

4    officer and just as a person who has driven cars, nothing there

5    are car keys, are there?

6    A    It doesn't appear that any of these are car keys.

7    Q    Thank you.  That's all, Your Honor.

8              THE COURT:  All right.  Thank you very much, Detective.

9              THE WITNESS:  Thank you, sir.

10             THE COURT:  You're excused.

11             MR. KURLAND:  Your Honor, with respect to, I believe,

12   the government's next witness, I need a brief side bar on one

13   issue that will take about one minute.

14             THE COURT:  All right.  Come on up.

15             (Bench conference on the record:)

16             MR. KURLAND:  Your Honor, the government's next witness

17   is Deandre Wesley.

18             THE COURT:  Say the name again.

19             MR. KURLAND:  Deandre Wesley.  Kelly David's son.  In

20   the state trial, he didn't cooperate at all with the police and

21   gave no statement.  At the state trial, the state prosecutor

22   elicited that the reason why he didn't cooperate is he was afraid

23   he was going to be killed, the same thing would happen to them.

24   I forgot to ask Mr. Hanlon if he was going to elicit that.

25             MR. HANLON:  Unless he's asked on cross examination why

Case 1:04-cr-00029-RDB   Document 687   Filed 06/12/09   Page 25 of 215

1    he didn't cooperate with police, I won't go into it.

2              MR. KURLAND:  Okay.  Thank you, Judge.

3              (End of bench conference.)

4              MR. HANLON:  Your Honor, the United States calls

5    Deandre Wesley to the stand.  I believe he's on his way out.

6              DEANDRE WESLEY, GOVERNMENT'S WITNESS, SWORN

7              THE WITNESS:  Yes, ma'am.

8              THE CLERK:  Be seated.  Scoot up and speak directly

9    toward the mike.  State your name and spell it for the record,

10   please.

11             THE WITNESS:  Deandre Wesley.  D-E-A-N-D-R-E.

12   W-E-S-L-E-Y.

13             DIRECT EXAMINATION

14   BY MR. HANLON:

15   Q    Mr. Wesley, good morning to you.

16   A    Good morning.

17   Q    How old are you, sir?

18   A    Eighteen.

19   Q    And your mom is Kelly David, is that right?

20   A    Yes, sir.

21   Q    Where did you grow up?

22   A    In Randallstown.

23   Q    Now, directing your attention, Mr. Wesley, back to June of

24   2002, in fact, June 7th of 2002.  Where were you living at that

25   time?

1    A    8618 Bramble Lane, Apartment 102.

2    Q    And that's also in Randallstown in Baltimore County?

3    A    Yes, sir.

4    Q    Did you live with your mom, Kelly David, at that time?

5    A    Yes, sir.

6    Q    On the late afternoon, 4:50 or so, p.m., on June 7th of

7    2002, were you near your home outside?

8    A    Yes, sir.

9    Q    What were you doing that day?

10   A    Outside chilling, talking to my friends.

11   Q    Just hanging out?

12   A    Yes, sir.

13   Q    Now, at some point did something unusual happen?

14   A    Yes.  We heard a loud noise outside.

15   Q    Now, where were you and your friends when you heard this

16   loud noise?

17   A    We was inside the complex building.

18   Q    And the complex building, this would be like the front area

19   where you would go to get into your apartment?

20   A    Yes, sir.

21   Q    And I gather there's like a stairwell?

22   A    Um-hum.

23   Q    Between the apartments?  That's a yes?

24   A    Yes, sir.

25   Q    And you heard a loud bang.  And how many bangs did you hear,

Case 1:04-cr-00029-RDB   Document 687   Filed 06/12/09   Page 27 of 215

1    if you remember?

2    A    Just one.

3    Q    What did you and your friends do after you heard that loud

4    bang?

5    A    We looked around.  We didn't notice nothing so we just kept

6    on talking.  And then we saw two guys run down the steps and we

7    ran right behind them.

8    Q    Give me just a moment.  Mr. Wesley, this is a photograph

9    that's been marked as Government's Exhibit S-56.  I'm going to

10   zoom it in a little bit.  Can you see it on your screen?

11   A    Yes, sir.

12   Q    Is this the front entrance to the apartment building where

13   you lived with your mom back in June of '02?

14   A    Yes, sir.

15   Q    How old were you then?

16   A    Seven, I think seven.  12.  I'm sorry.

17   Q    That's all right.  You were young at that time, correct?

18   A    Very young.

19   Q    All starts to blend together, doesn't it?

20   A    Um-hum.

21   Q    So you're 12 years old at that time.  Now, you mentioned

22   that there was this sort of inner complex and a stairwell in

23   between the apartments.  Is that what you were talking about?

24   A    Yes, sir.

25   Q    And when this event happened, that you heard a loud bang and

1    there were two guys, you were inside that area, that is right?

2    A    Yes, sir.

3    Q    Now, let me ask you about the two men that you and your

4    friends sort of followed out.  They just happened to be there at

5    the same time, is that right?

6    A    Yes, sir.

7    Q    Now, when the two men came outside, did you see what they

8    did or where they went?

9    A    Yes.  They came right out into the front, right up under the

10   first porch.

11   Q    Right here?

12   A    Yes, sir.  And we was, we was still on the sidewalk and we

13   just looked at them.  I didn't picture them.  I didn't see their

14   faces or anything.  But what they did, one of the guys pulled out

15   a gun, and they had on latex gloves, shot the lady.  I wasn't

16   paying attention to how many shots were shot.  I just saw, I was

17   just paying attention on the gun and the gloves because the first

18   thing that was going through my head was, I'm in a movie.

19   Q    That's how it felt?

20   A    Yes, sir.

21   Q    Did you recognize the lady that was getting shot?

22   A    Yes, sir.

23   Q    And who was she?

24   A    My next door neighbor.

25   Q    Did you know her name at the time?

1   A    No.  I just, we just say hi and bye to each other.

2   Q    You recognized her as your next door neighbor?

3   A    Yes, sir.

4   Q    Do you remember which apartment she lived in?

5   A    Yes, the top floor.

6   Q    Right here?

7   A    Yes, sir.

8   Q    Now, let me ask you about these two, these two individuals.

9        First of all, you've already mentioned that you saw

10  something on the hands of one of them?

11  A    Yes, sir.

12  Q    And what was it that you saw on the hands?

13  A    Latex gloves, as doctors would wear if they was doing an

14  operation or something.

15  Q    And which one of the two men was wearing latex gloves?  Was

16  it one of them that you noticed or both of them that you noticed?

17  A    I just noticed one because I was just focused on the gun.

18  Q    And that kind of brings me to the next question.  The one

19  you knew had latex gloves also had something in his hand?

20  A    Yes, sir.

21  Q    And that was what?

22  A    A gun.

23  Q    Do you know one way or the other, Mr. Wesley, whether or not

24  it was just one of them with latex gloves and a gun?  Do you know

25  whether the other man had latex gloves and a gun?

1    A    To be honest, I wasn't paying attention.  I was just focused

2    on the gun and the gloves.

3    Q    You were focused just on the one?

4    A    Yes, sir.

5    Q    And you've also mentioned that you didn't get a look at the

6    faces of either of these two men, is that right?

7    A    No, sir.

8    Q    Do you remember, they were both guys, is that correct?

9    A    Yes, sir.

10   Q    Do you remember what their racial background was?

11   A    They was black.

12   Q    And would you have any way of knowing, Mr. Wesley, if you

13   saw either of these two men again?

14   A    No, sir.

15   Q    Would you have any way of knowing if either of them is in

16   court today?

17   A    No, sir.

18   Q    Now, after you saw this, I gather you were frightened, is

19   that right?

20   A    Yes, sir.

21   Q    Did you notice what the two men did after one of them shot

22   the lady?

23   A    They ran towards Northwest Hospital direction, and towards

24   Northwest Hospital.

25   Q    Your Honor, may I get the overhead?

DIRECT EXAMINATION OF WESLEY                    31

1          THE COURT:  Yes.

2    Q    Okay, Mr. Wesley.  Hopefully the jury can all see our map.

3    This is Government's Exhibit S-1.  And over near here, near this

4    red star, near the upper part of the exhibit is where your

5    apartment building was at that time, is that right?

6    A    Yes, sir.

7          THE COURT:  Mr. Wesley, I'm sorry.  I need you to speak

8    into the microphone.

9    A    Yes, sir.

10   Q    I know it's awkward, Mr. Wesley.  This will be the last

11   couple of questions.  If you would, show us with your finger

12   where you saw, what direction you saw the men running in on S-1?

13   A    Straight down here.  Just --

14         THE COURT:  Mr. Wesley.  Okay.  Go ahead.

15   A    It's like a little path right here.  We call this right here

16   the circle.  And this path leads straight to Northwest Hospital.

17   Q    Thank you, sir.  And Mr. Wesley, was that the last you saw

18   the men?

19   A    Yes, sir.  Yes, sir.

20   Q    Thank you, Mr. Wesley.

21         THE WITNESS:  No problem.

22         THE COURT:  Thank you, Your Honor.

23         MR. KURLAND:  Court's indulgence for just one minute.

24         (Pause in proceedings.)

25         MR. KURLAND:  No questions, Your Honor.

1          THE COURT:  Thank you, Mr. Wesley.  You are excused.

2          MR. HANLON:  Your Honor, the government's next witness

3    will be Darius Spence.

4          THE COURT:  All right.

5          MR. HANLON:  Your Honor, for the Court's information,

6    this witness is in custody.  Agents will be bringing him up.

7          THE COURT:  Perhaps you should move the easel.

8          MR. HANLON:  Absolutely, Your Honor.

9          THE COURT:  Turn and face the clerk, sir.  Raise your

10   right hand.  Your right hand.

11          DARIUS SPENCE, GOVERNMENT'S WITNESS, SWORN

12          THE WITNESS:  Yes.

13          THE CLERK:  Be seated.  Speak directly toward the mike

14   and state your name and spell it for the record, please.

15          THE WITNESS:  Darius Spence.

16          THE COURT:  Mr. Spence, can you get closer to the

17   microphone, please?  You can pull it down.

18          THE WITNESS:  Darius Spence.

19          THE COURT:  Spell that for the record, please.

20          THE WITNESS:  D-A-R-I-U-S.  Spence, S-P-E-N-C-E.

21          DIRECT EXAMINATION

22   BY MR. HANLON:

23   Q    Mr. Spence, good morning to you, sir.

24   A    Um-hum.

25   Q    How old are you?

DIRECT EXAMINATION OF SPENCE                    33

1   A    37.

2   Q    And where did you grow up, Mr. Spence?

3   A    West Baltimore.

4   Q    Any particular neighborhoods in West Baltimore?

5   A    Lanvale, Lanvale Street.

6   Q    How far did you go in school, sir?

7   A    To the eleventh grade.

8   Q    And what caused you to leave school?

9   A    Got caught up in the street life.

10  Q    Let me ask you about that.  In terms of getting caught up in

11  the street life, can you tell us what you mean by that?

12  A    I was selling drugs, getting locked up.

13  Q    About how old were your -- actually, scratch that.  About

14  how long ago did you first start selling drugs, Mr. Spence?  Just

15  approximately.

16  A    Like 20 years ago.

17  Q    So quite a long time, big part of your life?

18  A    Yeah, yeah.

19  Q    Ultimately, that life has sort of led you to have a criminal

20  record, is that correct?

21  A    Yeah.

22  Q    Let me show you what's been marked as Government Exhibit

23  P-15.  Do you recognize this piece of paper, Mr. Spence?

24  A    Yes.

25  Q    And if it's all right, Your Honor, may I approach the

1    witness and use the microphone?

2              THE COURT:  I think he can see it.

3    Q    Do you recognize this as your plea agreement, Mr. Spence?

4    A    Yes.

5    Q    This is a plea that you entered into with my office, the US

6    Attorney's Office.  The prosecutor on your case was Mr. George

7    Russell, is that right?

8    A    Yes.

9    Q    And in this plea you agreed to plead guilty to conspiracy to

10   possess with the intent to distribute heroin in Federal Court, is

11   that right?

12   A    Yes.

13   Q    And you admitted as part of your plea in this case that you

14   were guilty of distributing heroin, that you'd been a drug

15   dealer; is that fair to say?

16   A    Yes.

17   Q    As part of your plea in this case, you agreed to cooperate

18   with the government, that is to testify if called upon to, to

19   provide information about other criminal activity you had

20   knowledge of, including your own, is that correct?

21   A    Yes.

22   Q    And you also agreed that if you needed to, you would testify

23   in the grand jury or in trials like this one if called upon by

24   the government, is that correct?

25   A    Yes.

1    Q    And you've met with, have you met with prosecutors like me

2    and law enforcement agents on some prior occasions and talked to

3    them about various things pursuant to this agreement, Mr. Spence?

4    A    Yes.

5    Q    And is it fair to say, Mr. Spence, that you had hope and

6    continue to have a hope that if you cooperate, that maybe you'll

7    get a lower sentence when you ultimately -- or scratch that.

8    You'll ultimately get a sentencing reduction in your own case, is

9    that correct?

10   A    Yes.

11   Q    You've actually already been sentenced on this particular

12   case that arose from this plea agreement, is that correct, sir?

13   A    Yes.

14   Q    Let me ask you or show you Paragraph 12 of your plea

15   agreement.  In this plea, the government, my office, agreed that

16   if you provided substantial assistance in the investigation or

17   prosecution of other people that they would, the office would, in

18   its discretion, make a request to basically reduce your sentence

19   under something called Section 5K1.1, is that right?

20   A    Yes, sir.

21   Q    And although you've already been sentenced on this case, Mr.

22   Spence, you're aware, and in fact I've told you that your

23   sentence could still be reduced under what is called a Rule 35,

24   is that right?

25   A    Yes.

1   Q    Could you tell us what your sentence is right now?

2   A    11 years and 10 months.

3   Q    Be fair to say, Mr. Spence, that you wouldn't mind getting a

4   reduction in your sentence, is that right?

5   A    Yeah.

6   Q    Have any promises been made to you?  Have I told you

7   definitely whether you're getting a reduction or how much or

8   anything like that?

9   A    No.

10  Q    What's your understanding of what you would have to do if

11  you wanted to get a sentencing reduction?

12  A    Tell the truth.

13  Q    Do you have an understanding, Mr. Spence, of what could

14  happen to you in your case if you were to not tell the truth?

15  A    Yeah.

16  Q    And what is that?  What would happen?

17  A    Nothing.

18  Q    In fact, could you be prosecuted for additional crimes?

19  A    Yeah.  For perjury.

20  Q    And you and I talked about that?

21  A    Yeah.

22  Q    Now, Mr. Spence, understanding the plea agreement here --

23  actually getting ahead of myself.  At the very end of the plea,

24  Mr. Russell, the prosecutor in your case, signed the plea, is

25  that right?

1    A    Yes.

2    Q    And you also signed the plea and agreed to its terms, is

3    that correct?

4    A    Yes.

5    Q    And then you had assistance of an attorney, Mr. Gerald

6    Ruter, who provided you advice and was with you when you pled

7    guilty, is that right?

8    A    Yes.

9    Q    Let me ask you about the drug dealing that you've talked

10   about already that sort of ultimately brought you to court today.

11   During the 20 years or so that you worked as a drug dealer, were

12   there other times, sir, that you got arrested and charged with

13   drug-related conduct?

14   A    Yes.

15   Q    Do you have any other conviction for drug-related conduct,

16   other than the federal case we have here?

17   A    Yes.

18   Q    What convictions do you have?

19   A    Possession with the intent to distribute, this, a lot of

20   drug convictions.

21   Q    Various drug-related?

22   A    Yeah.  Various.

23   Q    Mr. Spence, during that period of time, what kinds of drugs

24   did you distribute?  What did you deal?

25   A    Marijuana, heroin, cocaine.

1    Q    And what part of town did you generally work in?

2    A    West Baltimore.

3    Q    Any particular streets or intersections?

4    A    Lanvale and Payson, Edmondson Avenue, Monroe and Mosher.

5    Q    Let me sort of bring you up to 2002.  2002 was the year that

6    you got arrested and charged in your case, is that right?

7    A    No.

8    Q    Was it later than that?  I apologize.

9    A    Yeah.  It was in '05.

10   Q    So it was a few years later.  Apologize.  In 2002, you were

11   dealing drugs at that time, is that right?

12   A    Yes.

13   Q    Did you do anything else to make money during that time

14   frame?

15   A    Well, I have, I had a few jobs that I had worked.  But for

16   the most part, I was selling drugs.

17   Q    In 2002, were you married?

18   A    Yes.

19   Q    And what was the name of your wife?

20   A    Tonya Jones Spence.

21   Q    When did you and Tonya Jones Spence get married?

22   A    September the 7th of 2000.

23   Q    And in 2002, you were still married?

24   A    Yes.

25   Q    Were you living with your wife?

1    A    Yes.

2    Q    What part of town, what area were you living in?

3    A    In Baltimore County.

4    Q    Your address at that time, was it 8618 Bramble Lane?

5    A    Yes.

6    Q    And how long had you lived in Bramble Lane as of June of

7    '02?  About how long did you live there with your wife?

8    A    Since March of '02.

9    Q    And in June of, on June 7th of 2002, something happened to

10   your wife, is that right?

11   A    Yes.

12   Q    What happened to her?

13   A    She was murdered.

14   Q    We're going to talk for a few minutes about sort of the

15   events leading up to that.  And I'll start by asking you some

16   questions about specifically what you were up to in 2002.

17            At that time, what part of town, Baltimore, Baltimore

18   County, what neighborhoods were you really dealing in the most?

19   A    In Baltimore County?

20   Q    Anywhere.

21   A    As far as my drug activity?

22   Q    Yes, sir.

23   A    West Baltimore, Edmondson Avenue, Lanvale Street, Payson

24   Street.

25   Q    Did it vary a little bit?

1    A    Huh?

2    Q    Did it vary a little bit?  You sometimes worked in different

3    areas?

4    A    Yeah, sometimes.

5    Q    Did you, tell me about some of the people you were working

6    with at that time.  Did you have a regular person that you bought

7    from or had a regular relationship with?

8    A    I was dealing with some people from California.

9    Q    So there was some people in California?

10   A    Yeah.

11   Q    Let me ask you about a name.  Do you know a name Jamane

12   Johnson?

13   A    Yes.

14   Q    Who is Jamane Johnson?

15   A    He's from the neighborhood.  He was the one having an affair

16   with my wife.

17   Q    Let me ask you about Mr. Johnson.  Did he go by any

18   nicknames?

19   A    Mama.

20   Q    And what kind of relationship did you have with Mama, Jamane

21   Johnson.  You mentioned the fact that there was something going

22   on with your wife.  But aside from that, before learning of that,

23   what was your relationship with him?

24   A    We was, we was friends, we was cool.  And then when I found

25   that out, you know, it went to another level.

1   Q      How did you find out that there was something going on

2   between Jamane Johnson and your wife, Tonya?

3   A      A friend of mine told me.

4   Q      You came to have a suspicion and a belief that there was

5   something going on?

6   A      Yeah.

7   Q      Was there any tension, did anything ever happen between you

8   and Jamane Johnson over your belief that he was having an affair

9   with your wife?

10  A      Yeah.  We got into an altercation and I stabbed him.  And,

11  you know, one thing led to another.

12  Q      Did you ever have any verbal altercations?

13  A      Yeah.

14  Q      With Jamane Johnson?

15  A      Yeah.

16  Q      So there was some bad blood there?

17  A      Yeah.

18  Q      Do you know an individual, Mr. Spence, named will, William

19  Montgomery or Will Montgomery?

20  A      Yes.

21  Q      Who is Will Montgomery?

22  A      He was from the neighborhood.

23  Q      And how did you know him?

24  A      I knew him since, since he was a kid.

25  Q      And in 2002, in the months leading up to June of '02, what

1    kind of relationship did you have with Will Montgomery?

2    A    We was, we was cool.  And he had came to me.  He found out

3    about the situation with me and Jamane Johnson.  And he asked me

4    did I, did he, you know, could he take care of that for me.  And

5    I was like, I was like, yeah.  And then I changed my mind.  I

6    told him I'll handle it myself.

7    Q    Now, when you told -- let me ask you about a couple of those

8    things.  Mr. Montgomery asks you if you're interested in having

9    him take care of Jamane Johnson.  And you told him you would

10   handle it yourself.  What did you understand Mr. Montgomery to

11   mean about taking care of Jamane Johnson?

12   A    Taking care of him mean kill him.

13   Q    Did you have knowledge at that time of how Will Montgomery

14   made a living?

15   A    Yeah.

16   Q    What did he do?

17   A    Hit man.

18   Q    I'm sorry, sir.  What was that?

19   A    He was a hit man.  And he was out there robbing and, you

20   know, doing whatever.

21   Q    Now, you were initially interested in this, is that fair to

22   say?

23   A    Yes.

24   Q    And you told that to Mr. Montgomery?

25   A    Yeah.

1    Q    At some point did you have sort of a follow-up discussion

2    with Mr. Montgomery?

3    A    Yeah.

4    Q    And what was that?

5    A    I told him, don't worry about it, I'll deal with it on my

6    own, I'll handle it on my own.

7    Q    And what did you mean by handling it on your own?

8    A    I would just, you know, deal with the situation like, you

9    know, I didn't, I didn't want it to go that far so I just changed

10   my mind.  I just, it's like I just handle it another way.  And,

11   you know, that.

12   Q    Did you -- I'm sorry, sir.

13   A    Because it wasn't worth it, you know, me getting something

14   done to him.

15   Q    Did you have any ideas, Mr. Spence, about what you might

16   specifically do to handle things on your end?

17   A    I mean, I was just going to, I was just going to really,

18   just leave it alone, you know.  I was just going to leave it

19   alone.

20   Q    Why would you want to leave something like this alone, Mr.

21   Spence?  Didn't it bother you that this was going on?

22   A    I mean, it did, but I knew if I did something to him, by him

23   being in tight with her family, that it was going to get back to

24   me, anyway.  So it wasn't even worth the effort.  So I was, I

25   was, you know, I was just leaving it alone.

1    Q    You mentioned he was tight with her family?

2    A    Yes.

3    Q    Jamane Johnson had a good relationship?

4    A    Yeah.  With her family, a good relationship.

5    Q    Let me show you a few photographs, Mr. Spence, if I could.

6    This is Government's Exhibit S-56.  Do you recognize this front

7    entrance to this building?

8    A    Yeah.  That's my apartment building.

9    Q    And was this your apartment up here?

10   A    Yeah.  Upper balcony.

11   Q    You and your, and your wife lived in that apartment at the

12   time, is that right?

13   A    Yeah.

14   Q    And by the time, I'm talking about June 7th of 2002?

15   A    Yeah.

16   Q    Did you have any children?

17   A    No.  She had two, she had two kids, though.

18   Q    And what were their ages at that time?

19   A    Ten and twelve.

20   Q    Did your wife's children also live in the apartment with

21   you?

22   A    Yes.  Yes.

23   Q    You were making your living as a drug dealer at that time,

24   Mr. Spence.  Did you ever keep any items in your house,

25   drug-related items, anything like that?

1   A    A little marijuana here and there.  And I kept, I kept a

2   weapon in there.  And money from time to time.

3   Q    Sometimes there would be some money in the house?

4   A    Yeah.

5   Q    Why would you keep a weapon in the house that you shared

6   with your wife?

7   A    Because the life I was leading, living.

8   Q    Just to protect yourself, protect your money, things like

9   that?

10  A    Yeah.

11  Q    As a person --

12  A    Her, too.

13  Q    Her, too?

14  A    Yeah.

15  Q    And the children, I guess?

16  A    Yeah.

17  Q    As a person who was living the life you mentioned, was it

18  common for you to keep a gun and have access to one?

19  A    Yes.

20  Q    Showing you a photograph, Mr. Spence, that's been marked as

21  Government's Exhibit S-113.  Is that the weapon that you

22  mentioned?

23  A    Yes.

24  Q    Another view of it is Government's Exhibit S-121.  Is that

25  another photograph of the gun?

1    A    Yes.

2    Q    Mr. Spence, the specifics on the gun.  Am I correct, was it

3    a .40 caliber Taurus semiautomatic?

4              MR. COBURN:  Objection, leading.

5              THE COURT:  Overruled, you may answer.

6              THE WITNESS:  It was a .40 caliber Millenium.  I don't

7    really know the make, the name of it.  Said Millenium on it.

8    BY MR. HANLON:

9    Q    Understood.  Let me ask you about June the 7th of 2002.

10   That's obviously a date that you do remember, sir, is that right?

11   A    Yeah.

12   Q    Do you recollect having any conversation with your wife that

13   afternoon?

14   A    Yeah.  We was, we was supposed to go to the movies after she

15   got off of work.

16   Q    What time would your wife, Tonya, normally get off of work?

17   A    At 4:30.

18   Q    And what did she do for a living at that time?

19   A    She worked for ROHOS (phonetic).  I think it's a part of

20   Social Security on Dogwood and Rolling Road.

21   Q    Now, you had some conversation with your wife.  Was it by

22   phone or in person?

23   A    By phone.

24   Q    And where were you that day?

25   A    I was, I was down on Lanvale Street.

1    Q    Doing what?

2    A    Just waiting for her to get off.

3    Q    And if you remember, approximately, when was the last time

4    that you talked to your wife by phone?

5    A    Like, like, I guess like 10, 10 or 15 minutes before she got

6    killed.  She was on her way home when I called her.  She said

7    she, I was trying to get her to come down where I was at.  She

8    was, like, I'm only five minutes away from the house.  So she was

9    like, she going to go to the house.  So when she got to the

10   house, I waited and I called the phone back.  I didn't get no

11   answer.  So I call the house phone and didn't get no answer.  So

12   I started getting worried.  So I went to drive out there.  When I

13   got out there, the police was out there.

14   Q    That conversation by phone was, before all that happened,

15   was the last you ever talked to your wife?

16   A    Yeah.

17   Q    Where were the children that day?

18   A    They was with their grandfather.

19   Q    To your knowledge, Mr. Spence, did you ever keep latex

20   gloves or duct tape in your apartment?

21   A    No.  Not that I remember, no.

22   Q    The day or so after Tonya's death, do you remember there was

23   a police investigation, is that right?

24   A    Say that again?

25   Q    Do you remember there was a police investigation for a while

1   after Tonya's death?

2   A    Yeah.

3   Q    And for certainly the first day, there were detectives in

4   your house and sort of all over the place?

5   A    Yeah.

6   Q    You gave a statement to the police very shortly after

7   Tonya's death, is that correct?

8   A    Yeah.

9   Q    Is it fair to say, Mr. Spence, that you were not honest with

10  the police in terms of answering their questions?

11  A    Yeah, you could say that.

12  Q    You didn't mention to them that you were a drug dealer or

13  anything like that?

14  A    No.  No.

15  Q    And you didn't mention to them anything about your lifestyle

16  that may have had something to do with your wife's murder, is

17  that correct?

18  A    That's correct.

19  Q    Why were you not honest with the police that day, Mr.

20  Spence?

21  A    Because I felt, I felt that at the time that it didn't, you

22  know, matter what, what I was doing.  I wasn't thinking, you

23  know.  I just, I just felt like, you know, what I was out there

24  doing, you know, didn't matter, why she got killed, you know.

25  Q    Ultimately, you did make the decision to talk to law

1    enforcement about all of this, is that correct?

2    A    Yeah.

3    Q    Was that in the context of your own criminal case a couple

4    years later?

5    A    Yeah.

6    Q    Be fair to say, also, that one of the agreements, one of the

7    benefits you get under your plea agreement, Mr. Spence, that you

8    enjoy use immunity, meaning your testimony today will not be used

9    against you in building any criminal case against you as, for

10   drug trafficking or anything else, provided you're truthful, is

11   that correct?

12   A    Yes.

13   Q    Now, during that initial sort of police work, while they

14   were searching for evidence and things like that, do you

15   recollect getting a call from one of the police detectives who

16   asked you to make a phone call for him?

17   A    Yes.

18   Q    What did the police detective -- do you remember his name,

19   by any chance?

20   A    I think his name was Marll, Phil Marll or something like

21   that.

22   Q    This detective calls you and asks you to do something.  What

23   did he ask you to do?

24   A    To call, call her phone, call my wife phone.

25   Q    Now, your wife had her own cell phone at that time, is that

1    right?

2    A    Yeah.

3    Q    And if you remember, was this a cell phone that was in your

4    name?

5    A    Yeah.  It was in my name.

6    Q    Do you remember offhand the telephone number for that cell

7    phone?

8    A    No, I can't remember that.

9    Q    After receiving this call from Detective Marll, what did you

10   do?

11   A    I called, I dialed the number back and he was like okay

12   after that.  I guess he had the phone, whatever, he had found the

13   phone or something.  Got me to call the number.

14   Q    And you called for him.  Did the call connect?

15   A    Yeah.

16   Q    Did you get a voice mail?  Did you recognize it as your

17   wife's?

18   A    Yeah.

19   Q    Mr. Spence, did you ever give any thought, and going back to

20   the discussions you had with Will Montgomery, about doing

21   something with Jamane, with Mama, was there ever any discussion

22   or did you ever have a thought about maybe having Will Montgomery

23   beat him up, do something short of killing him?

24   A    Yeah, I did.  I did that, too.  But I was just, I had, I had

25   to sit back and rethink, rethink the whole situation.  It just

1    wasn't, it just wasn't worth it, you know.  It just wasn't worth

2    it.  I knew if something would happen to him, I was the one end

3    up taking the fall for it, anyway.  And, you know, you can't stop

4    somebody.  If they want to do what they want to do, you can't,

5    you can't stop them, you know, as far as in a relationship.  You

6    know, she choose to deal with him, then, you know, that's what it

7    was.

8    Q    Thank you, Mr. Spence.  Nothing further, Your Honor.

9                CROSS EXAMINATION

10   BY MR. COBURN:

11   Q    Mr. Spence, good morning, sir.  If I understood you

12   correctly, Mr. Spence, you indicated that you and Mama -- and his

13   real name is Jamane Johnson, right?

14   A    Yeah.

15   Q    You and he, initially you and he were cool, right?

16   A    Yeah.

17   Q    And then you learned of the fact that he was having an

18   affair with your wife, right?

19   A    Yeah.

20   Q    And then did you tell the jury, in response to one of Mr.

21   Hanlon's questions, that things, after you found out, things went

22   to another level?  Was that the words you used, went to another

23   level between you and Jamane Johnson?

24   A    Yeah.  Yeah.

25   Q    Okay.  And after you found out that he and your wife were

1    having an affair, you and he had, did you say that you had an

2    altercation?

3    A    Yeah, had an altercation with him.

4    Q    And during the altercation, you stabbed him?

5    A    Yeah.  He got stabbed, yeah.

6    Q    By you?

7    A    Yeah.

8    Q    And when was that?

9    A    That was, it was about six months before my wife got killed.

10   Q    Where was it?

11   A    Down on Lanvale Street.

12   Q    Do you know where on Lanvale Street?

13   A    Lanvale and Hamilton.

14   Q    Was anyone else around or was it just you and him?

15   A    Just me and him.  My wife's sister was around.

16   Q    What's her name?

17   A    Katrina Jones.

18   Q    Where on Jamane Johnson's body did you stab him?

19   A    In his shoulder.

20   Q    How many times did you stab him?

21   A    One time.

22   Q    Were the police called, do you know?

23   A    No.

24   Q    Do you know whether he went to the hospital or whether an

25   ambulance took him anywhere?

Case 1:04-cr-00029-RDB   Document 687   Filed 06/12/09   Page 53 of 215

1    A    I think he drove his self to the hospital.

2    Q    Do you know what hospital he went to?

3    A    No, I don't.

4    Q    As far as you know, the police were never involved, is that

5    your testimony, sir?

6    A    Yes.

7    Q    Now, was it sometime after that incident, sometime after you

8    stabbed Mama, that you talked to Mr. Montgomery, had the

9    conversations that you were just talking about with Mr. Hanlon?

10   A    Repeat it again.

11   Q    Was it before you stabbed Mama or after you stabbed Mama

12   that you talked to Mr. Montgomery?

13   A    It was after.

14   Q    After?

15   A    Yeah.

16   Q    Okay.  And was it your testimony that Mr. Montgomery came to

17   you, as opposed to your going to him?

18   A    He came to me.

19   Q    You didn't go to him?

20   A    No.  I didn't go to him.

21   Q    You're sure about that?

22   A    Yeah.

23   Q    It was your testimony that he came to you and offered to

24   take care of Mama, is that right?

25   A    Yes.

1    Q    And you understood, you understood those words "take care of

2    him" to mean that he was offering to kill him?

3    A    Yeah.

4    Q    And that wasn't a surprise to you because, as you've already

5    told the jury, Mr. Montgomery was a hit man, right?

6    A    Yeah.

7    Q    And that's what he did for a living?

8    A    Yeah.

9    Q    Okay.  So did you and he have a discussion about price,

10   about how much it might cost for Mr. Montgomery to kill Mama?

11   A    No.

12   Q    Never talked about money at all?

13   A    No, because I told him, I told him hold up.  And then I just

14   changed my mind.

15   Q    You talked to him, you've told the jury that you talked to

16   him on two occasions, right?

17   A    Yeah.

18   Q    And the second time you told him hold up, right?

19   A    Yeah.

20   Q    And there was never any discussion about any particular

21   amount of money, right?

22   A    No.

23   Q    And you never told him that Mama owed you money, right?

24   A    No.

25   Q    You didn't tell him that that was why you all were having

1    this conversation, because Mama owed you money, right?

2    A    No.

3    Q    Now, you've already indicated, in response to Mr. Hanlon's

4    questions, that you had been a drug dealer for about 20 years, is

5    that right?

6    A    Yeah.

7    Q    Is that 20 years from now, 20 years ago until now?

8    A    Yeah.

9    Q    So you're dealing drugs pretty much continuously over the

10   last 20 years?

11   A    Yeah.

12   Q    And is that mostly how you were making your living?

13   A    Yes.

14   Q    Okay.  Now, Mr. Hanlon was asking you about a statement that

15   you had given to the police.  And I think he said it was shortly

16   after your wife was murdered, right, sir?

17   A    Yeah.

18   Q    Was it the very next day?

19   A    Repeat it again.

20   Q    When you talked to the police about whether or not you were

21   a drug dealer, was that the next day, the day after she was

22   killed?

23   A    Well, they, they, you know, I didn't, I didn't tell them

24   until later like, you know, what I was doing, you know.  They

25   asked me, you know, but I didn't never admit that I was, you

1    know, a drug dealer at that time.

2    Q    I mean, it wasn't just that you didn't offer it.  They

3    specifically asked you, right?

4    A    Not necessarily.  They didn't specifically ask me.

5    Q    Okay.  Well, let me ask you this.  Is it correct that when

6    you were asked -- and this would have been in an interview with

7    Detectives Tincher and Phillip Marll.  Do you remember them?

8    A    Yeah.

9    Q    Do you remember Detective Marll?

10   A    Um-hum.

11   Q    Okay.  And is it correct that on June 8th, 2002, the day

12   after the murder, when you were asked about a possible drug

13   connection, you stated that you were no longer involved in

14   dealing drugs and that you did not feel that the murder of your

15   wife had anything whatsoever to do with drugs?

16   A    Yes.

17   Q    Is that what you said?

18   A    Yes.

19   Q    And that was false?

20   A    That's what I told them, yeah.

21   Q    And it was false?

22   A    Yeah.

23   Q    Okay.  Is it correct that you were sometimes counting money

24   in the apartment?

25   A    Yes.

1    Q    Showing you what you referred to during your testimony on

2    direct examination with Mr. Hanlon.  This is Government's Exhibit

3    S-113.  Do you remember when Mr. Hanlon was asking you about

4    that?

5    A    Yes.

6    Q    That's the gun that was in your apartment, right?

7    A    Yes.

8    Q    And what kind of gun was it?

9    A    It was a .40 caliber Millenium.  I don't know the make or

10   nothing like that.

11   Q    So when Mr. Hanlon asked you about whether it was a Glock

12   and you said yes, you don't actually know that it was a Glock,

13   right?  I may have the make wrong.  You don't know the make?

14   A    I know it's a .40 caliber.

15   Q    Okay.  Where did you get it?

16   A    I bought it off the street.

17   Q    That's a fairly common occurrence, right, for people to,

18   particularly people involved in the drug trade, to just buy

19   drugs, buy guns off the street?

20   A    Yeah.

21   Q    And guns change hands frequently, right?

22   A    Yeah.

23   Q    That's because guns, as you've indicated, are kind of a

24   fairly common feature of the drug trade, right?

25   A    Yes.

1    Q    I mean, the gun's not registered.  You didn't buy it --

2    A    No.

3    Q    -- from a dealer or something like that?

4    A    No.  Bought it off the street.

5    Q    Let me show you now a copy of another document that you

6    referred to during your direct examination with Mr. Hanlon.  This

7    is your plea agreement.  Okay?  And Mr. Hanlon asked you about

8    this, too, right?

9    A    Yes.

10   Q    This is a letter dated July 7th, 2005, correct?

11   A    Yes.

12   Q    It's correct, is it not, that with respect to the falsehood

13   that you told the police about, whether you were still involved

14   in dealing drugs, you didn't correct that until after you got

15   arrested on this case, in 2005, right?  I can put the question

16   another way.  I mean, you corrected it as part of your

17   cooperation after you signed the plea agreement in this case,

18   right?

19   A    Yes.

20   Q    In your pending case.  Actually, it's not pending any more

21   because you indicated you'd already been sentenced.  But you're

22   hoping for a further reduction in your sentence?

23   A    Yeah.

24   Q    Okay.  Now, in this case, Mr. Spence, you pleaded guilty to

25   a drug conspiracy, right?

1    A    Yes.

2    Q    Just directing your attention to page, looks like the pages

3    are not actually numbered on this thing.  One, two, three, fourth

4    page in, at the bottom.  This agreement has a little description

5    of the conspiracy that you were part of, right?

6    A    Yes.

7    Q    At the bottom, under Factual Stipulation it says, between

8    January, 2004 and December, 2004, you agreed when you signed this

9    document that you were conspiring with Tahlil Yasin, Carl Locke,

10   Bolondolay Banks and others to possess with intent to distribute

11   at least a hundred grams of heroin, right?

12   A    Yes.

13   Q    It talks about travel to New York, is that right?

14   A    Yes.

15   Q    None of these people are here in the courtroom today, right,

16   sir?

17   A    No.

18   Q    You made a statement during your direct examination, when

19   Mr. Hanlon was asking you questions about, you decided to just

20   let it go, let the affair go because, if I heard you right,

21   Jamane had a good relationship with her family and it was going

22   to come back to me, anyway, is that right?

23   A    Yeah.  I mean, I, I, I was, when I, when I, when I first

24   discussed the matter with, with Will Montgomery, I was, I was

25   angry, you know.  That's what anybody, their wife is cheating on

1    them or, you know, you're not going to be thinking clearly.  So I

2    had to take some time back and rethink the whole thing.  You

3    know, is it worth it?

4    Q    Okay.  But what I was actually asking you about was that

5    statement you made before, when Mr. Hanlon was asking you

6    questions on direct examination, when you said that, and am I

7    saying this right, you said that Jamane had a good relationship

8    with her family and it was going to come back to me, anyway?

9    A    Yeah.

10   Q    Right?

11   A    Yeah, I said that.

12   Q    So what that meant was that if you did something to Jamane,

13   that something might then happen to you?

14   A    To me, yeah.

15   Q    Right?

16   A    Yeah.

17   Q    Okay.  Court's indulgence, Your Honor?

18            THE COURT:  Yes.

19            MR. COBURN:  Thank you.

20            (Pause in proceedings.)

21            MR. COBURN:  Thank you very much, Your Honor.  No

22   further questions.

23            MR. HANLON:  No redirect, Your Honor.

24            THE COURT:  Thank you, Mr. Spence.  You're excused.

25   Next witness.

1          MR. HANLON:  Your Honor, the United States will call

2     Ms. Maureen Bottrell.  I'll get her.

3          MAUREEN BOTTRELL, GOVERNMENT'S WITNESS, SWORN

4          THE WITNESS:  I do.

5          THE CLERK:  Be seated.  Speak directly toward the mike.

6     State your name and spell it for the record.

7          THE WITNESS:  I'm Maureen Bottrell.  Last name is B as

8     in boy, O-T-T-R-E-L-L.

9          DIRECT EXAMINATION

10    BY MR. HANLON:

11    Q    Sorry about that, Your Honor.  Has the witness been sworn,

12    Your Honor?

13         THE COURT:  She has.

14         MR. HANLON:  I apologize.

15         THE COURT:  That's quite all right, Mr. Hanlon.

16    BY MR. HANLON:

17    Q    Ms. Bottrell, good morning.  How are you employed?

18    A    I'm a geologist forensic examiner with the Federal Bureau of

19    Investigation laboratory in Quantico, Virginia.

20    Q    A geologist forensic examiner?

21    A    Yes, sir.

22    Q    Can you tell us what that means?

23    A    As a geologist forensic examiner, I examine things like

24    soils, glass, building materials, gem stones, any sort of

25    geologic material or materials which are derived from those which

1    are like artificial rocks, things like concrete and glass.

2    Q    And let me ask you a little bit about the purpose of that

3    kind of examination.  And I'm going to ask you about your

4    background.  What is it you're trying to figure out when you look

5    at these various geological sources and samples?

6    A    Well, typically there are two types of questions that we are

7    called upon to answer.  One is identification of a particular

8    material.  Somebody finds something, they're not sure what it is

9    or how it might relate to their investigation, and we're asked to

10   do that, an identification.

11          The other type of examination, which is what we do more

12   frequently, is a comparison of a material that is recovered from

13   some location, compared to a known source.

14   Q    Now, tell us a little bit about your educational background.

15   A    I have a Bachelor of Science in geology and a Master of

16   Science in geochemistry, both from the University of Georgia.

17   I've also taken numerous training classes in various types of

18   analysis and in the analysis of particular types of materials, as

19   well as in instrumentation.

20   Q    You're working for the FBI Quantico lab now, is that right?

21   A    Yes, sir.

22   Q    Tell us, before coming to the FBI, what was your work

23   experience?

24   A    Prior to coming to the FBI, I worked in private industry for

25   approximately eight years.  I worked as a laboratory examiner

Case 1:04-cr-00029-RDB   Document 687   Filed 06/12/09   Page 63 of 215

1    for, for, mostly for litigation support in law suits.  So I was

2    looking at things like building materials, to attempt to discover

3    whether or not they had asbestos in them and who was the

4    manufacturer.

5              I also worked in a number of environmental

6    laboratories, looking at things like lead in paint or various

7    other airborne contaminants.  And my last position, prior to

8    coming to the FBI laboratory, was the manager of a small

9    laboratory.

10   Q    Now, since working at the FBI, have you held the position

11   you hold now the entire time?

12   A    I have.

13   Q    And what is your total, how long have you been at the FBI?

14   And I'm sorry if I asked you that already, Ms. Bottrell.

15   A    I've been with the FBI laboratory for 13 years.

16   Q    And during that time, about how frequently do you have

17   occasion to compare one soil sample to another?

18   A    Probably doing soil analysis is about half the work that I

19   do.  So it's quite a number of soil samples that I've looked at.

20   Q    Hundreds?  Thousands?

21   A    Thousands, easily.

22   Q    Among the samples that you receive, they include items that

23   are picked up by FBI agents in their work, is that correct?

24   A    Yes.

25   Q    In addition to that, the FBI lab receives requests to do

1    soil analysis from other agencies and from local police

2    departments, is that right?

3    A    Yes, we do.

4    Q    If you know, what do you do more frequently?  An FBI task or

5    soil you receive from other agencies?

6    A    I actually would look at more soil from local agencies than

7    I do with FBI work.

8    Q    Your Honor, at this time I would tender Ms. Bottrell as an

9    expert in the area of forensic geological analysis.

10            MR. COBURN:  May I voir dire very briefly, Your Honor?

11            THE COURT:  Certainly.  Would you like some water, Ms.

12   Bottrell?

13            THE WITNESS:  No.  I'm fine, thank you.

14            CROSS EXAMINATION (On Qualifications)

15   BY MR. COBURN:

16   Q    Ms. Bottrell, good morning.

17   A    Good morning.

18   Q    It's not Agent, right?  You're a civilian?

19   A    I am a civilian.

20   Q    All right.  You've qualified as an expert before, is that

21   right?

22   A    Yes, I have.

23   Q    In both federal and local courts, right?

24   A    That's correct.

25   Q    Can you tell the ladies and gentlemen of the jury about how

1   many times?

2   A    I'd have, I quit counting quite a while ago, but I'm

3   somewhere probably in the forties.

4   Q    Thank you.  Nothing further.  Thank you, Your Honor.  No

5   objection.

6         THE COURT:  The witness will be accepted as an expert

7   as tendered.

8         CONTINUED DIRECT EXAMINATION

9   BY MR. HANLON:

10  Q    Your Honor, I should have tendered the witness specifically

11  as an expert in the area of soil comparison and forensic

12  analysis.  I'm assuming the defense has no objection to that?

13        MR. COBURN:  No objection.

14        THE COURT:  No objection.

15  Q    Ms. Bottrell, you and I have talked before, is that correct?

16  A    Yes, we have.

17  Q    You received a request back in, well, several years ago from

18  the Baltimore County Police Department to do an analysis on a

19  number of soil samples that that agency had obtained, is that

20  right?

21  A    That's correct.

22  Q    Now, you would not have had a role in actually collecting

23  these soil samples, is that correct?

24  A    No, I didn't.

25  Q    They just get sent to you?

1    A    That's correct.

2    Q    How were they sent to you?  In what form?

3    A    These were, we received these the normal course of business,

4    through the, I believe this was a Federal Express package.  I can

5    check my notes to make sure of that if you'd like.

6    Q    I don't think it's necessary.  You recollect it being a

7    Federal Express package?

8    A    The known samples were received in paint canisters.  And the

9    samples that they had collected from some individuals were

10   actually in paper bags sealed with tape.

11   Q    I'm going to, you had no role in the collection of these

12   items.  But for the jury's reference, Your Honor, I'm going to

13   put a photograph up on the screen, which is already in evidence

14   as Government's Exhibit S-160.

15            Understanding you weren't the collecting person, Ms.

16   Bottrell, based on the information you received from Baltimore

17   County, you had some understanding of what these various samples

18   were, is that right?

19   A    That's correct.

20   Q    You made a reference to known samples and then there were

21   some samples collected from people.  Are they sometimes referred

22   to as questioned samples?

23   A    That's correct.

24   Q    In your work, what does it mean, a known sample versus a

25   questioned example?

1   A   With a known sample, we're looking at something that we

2   collected from a known source.  We know where we got it, where it

3   came from.  In the case of soil samples, they were dug up from

4   the ground and we know the location where we dug them up.

5         For a questioned item, we don't know the source of the,

6   of the ultimate source of that particular item of evidence.  So

7   while it might be, it might be something that we've collected off

8   of somebody's clothing, but we don't know for sure where that,

9   where that piece of evidence was transferred from.

10   Q   In this case, the known soil samples that you received,

11   based on your information, these were soil samples, five of them

12   total, is that right?

13   A   Yes.

14   Q   And they were collected from various spots in and around a

15   spot where, according to your information, county officers had

16   recovered a couple of firearms in a wooded area, is that right?

17   A   That's correct.

18   Q   Let me ask you about some of these.  You got all of these

19   various samples and you labeled the known soil samples K-1, K-2,

20   K-3, K-4 and K-5, is that right?

21   A   That's right.

22   Q   What was K-1?

23   A   K-1 was a soil sample from location where the guns were

24   recovered.

25   Q   And what was K-2?

Case 1:04-cr-00029-RDB    Document 687    Filed 06/12/09    Page 68 of 215

1    A    K-2 was a soil sample that was taken east of, about

2    approximately ten feet east of where the gun was recovered.

3    Q    And K-3?

4    A    K-3 was another soil sample that was taken approximately ten

5    feet west of where the gun was recovered.

6    Q    I think everyone knows where we're going now.  How about

7    K-4?

8    A    K-4 was taken approximately ten feet north of where the gun

9    was recovered.

10   Q    And would I be correct that K-5 was taken also ten feet

11   away?

12   A    Yes, it was.

13   Q    In what direction?

14   A    South.

15   Q    So you have 5 K samples, 5 K-soil samples.  And you also

16   received a couple of Q items, questioned items?

17   A    That's correct.

18   Q    And what did you label as Q-1 and Q-2?

19   A    Q-1 and Q-2 were a pair of shoes that were, I was told that

20   they were collected from Shawn Gardner.

21   Q    And these shoes had possible soil samples on them, is that

22   right?

23   A    That's correct.

24   Q    And how about Q-3 and Q-4?

25   A    Q-3 and Q-4 were a pair of shoes that were collected from

1    Aaron Holly.

2    Q    And then, finally, there was a Q-3.1, is that right?

3    A    That's correct.

4    Q    What was that?

5    A    Packaged in with the pair of shoes from Aaron Holly was a

6    small envelope which contained some soil which had been recovered

7    by the Baltimore police that was packaged with the shoes that it

8    had fallen off of.

9    Q    So you did an analysis after receiving these items, Ms.

10   Bottrell, to see whether or not any of the soil or soil scrapings

11   from the boots and from the debris, the Q items, could be matched

12   up against the soil samples, the known items from the gun and the

13   area surrounding the gun?

14   A    That's correct.

15   Q    Tell us about your lab.  What kind of safeguards do you have

16   in place to make sure that everything is done properly?

17   A    Well, we have is entire quality assurance system with our

18   standard operating procedures, which require a certain, a certain

19   type of analysis.  So I can't just go in and make it up as I go

20   along.  I am actually following a set procedure.

21        We are also, we also have been collecting samples.  I

22   am collecting them in a room which I have cleaned myself.  And we

23   have wiped down all of the surfaces and vacuumed them as well to

24   make sure that there's no contamination from other potential

25   sources.

1          We take a clean sheet of brown paper and put it down on

2     a table.  Each item of evidence is placed on a fresh sheet of

3     brown paper.  And then we use various tools to collect the

4     evidence off the items.

5          In this case, since I was processing shoes, I was

6     actually using small tools that look a little like dental picks

7     to pick the soil out from between the treads in the shoes.  And

8     in between each of these, in between the pairs of shoes, since

9     they were packaged together, I'm changing the paper, wiping down

10    the table, cleaning all the tools, to make sure that there's no

11    cross contamination.

12         We have only one item open at a time.  That also is to

13    prevent any possible cross-contamination.

14    Q    Once you have your space set up and you have your items, Ms.

15    Bottrell, what procedure do you go through in actually conducting

16    a soil comparisons between the K items and the Q items?

17    A    After I have collected the soil, it's placed in a small

18    plastic box.  And we are using that soil material for

19    comparisons.  The shoes are repackaged and I'm not going to be

20    look at those any more.  I'm going to be looking at the soil that

21    I've recovered.

22         And the first thing that I will do is take an arm's

23    length look at what I have to see whether or not there are any

24    obvious differences.  If they are obviously different at that

25    point, there's no point in continuing the examination because

1    soil from the same location is going to look the same.

2           If they look the same at this arm's length difference,

3    then we start taking a closer look at the samples themselves.

4           The next actual test that we do is a color comparison.

5    So I'm comparing the color of the soil that I recovered to a set

6    of known standards of color.  And this will allow me to get a

7    numerical value of the color of the soil, plus a standardized

8    name.  This is, the standard that we're using is the Munsell soil

9    color charts.

10          If the, if the soils are the same in color, then,

11   again, it's the same logic.  If they are different in color, they

12   wouldn't have come from the same source.  If they're the same in

13   color, we go on to our next test, which is an analysis of the

14   texture of the soils.

15          Are they approximately the same grain sizes?  Are the

16   individual grains themselves the same sort of rounding or do they

17   have squared-off edges?  Do they have any sort of other, maybe,

18   small crystals included inside of them?  All of those sort of

19   things are part of our textural analysis that we're comparing.

20          Again, if those are the same, then we go on to the next

21   step, which is actually an identification of the components of

22   the soil.  So we'll look at all the minerals that are in there.

23   We'll identify them and give an approximate percentage for each

24   of the samples.

25   Q    Ms. Bottrell, one of the things that allows you to determine

DIRECT EXAMINATION OF BOTTRELL                    72

1    whether soil from one spot is a match to soil from another is

2    that soil can vary sometimes from place to place, is that right?

3    A    That's right.  Soil can, soil can vary quite a bit.  The

4    soil in any one location is dependent on a number of factors.

5    The first one is the type of bedrock material that the soil is

6    derived from or any other material that might have been swept in

7    like, say, during a flooding event.  So you're looking at the

8    geologic materials that it's composed of.

9          We're also looking at any sort of biological material.

10   So is there leaf litter or any other material that might have

11   gotten incorporated into that soil?

12         The geography of the area is also very important.

13   You'll get different types of soil developing on different types

14   of terrain.  So you'll see something different in a mountainous

15   area than you would in something that's flat lying.  But that's

16   also true on a very micro level as well.  So I may see a

17   different type of soil in my front yard than I do in my back yard

18   because there's very slight differences in, like, elevation or

19   sloping, things like that.

20         And all this is happening under the context of time.

21   So the longer this, the longer this soil production goes on, the

22   more it will change.  And this will give you soil that's

23   different from place to place and with depth, below the surface.

24         So it can, it can change very abruptly, if you're

25   getting one of these things, one of these factors that are

1    different.  Or it can be the same over a fairly long area.  So

2    for instance, if you have like a beach environment, looks like a

3    nice, white sandy breach for quite a while, that doesn't change a

4    whole lot.  But in other areas you may see that the bedrock will

5    suddenly differ from one place to another and you will get

6    completely different soils.  That can happen within inches.

7    Q    Ms. Bottrell, what conclusions, what opinions did you arrive

8    at with respect to your comparison of the boots and the known

9    items in this case with the questioned soil samples from the

10   woods?  I'm sorry.  I got that all wrong.

11          What conclusions did you draw with respect to the

12   questioned items in this case, which were the boots, with the

13   known samples from the woods?  I'm sorry.

14   A    The soils that I recovered from the boots were different

15   than the soil samples from where the guns were recovered and from

16   those locations nearby.  So I can make no association between the

17   soil that was recovered from the boots to those locations.

18   Q    And Ms. Bottrell, can we conclude from that that there's no

19   way the boots ever went through that area where the guns were

20   recovered?

21   A    No, we can't, we can't make that conclusion.  There's any

22   number of reasons why you would get soil that was different.  You

23   can, the first one, of course, is that the soil from, the boots

24   were genuinely not in that location.  They may never have been

25   there.  That's a possibility.

DIRECT EXAMINATION OF BOTTRELL                    74

1          Second possibility is that you can walk through an area

2     and not get soil transferred on your shoes.  So if the, if the,

3     if it's been dry lately and the soil is not muddy, it might not

4     sick to your shoes.  Or if you're walking through leaf litter or

5     grass, there might be no time when you actually contact the soil

6     and get that transferred to your shoes.

7          Another possibility is that you walked through an area,

8     you get soil transferred on to your shoes.  You continue walking

9     some place else and it falls off. And certainly, anybody who has

10    children knows that soil will fall off their shoes.

11         The other possibility is that you have, you either had

12    soil on your shoes beforehand, go to the location and get more

13    soil on them.  Or you had no soil on them, you go to that

14    location, get soil at that place, and then keep walking and get

15    soil from some place else, you know have two or more soils on

16    your shoes.  And unless we can separate those apart in the

17    laboratory, which is typically not an easy thing to do, then we

18    can't say for sure which location they came from.  They will be

19    mixed.  And I wouldn't be able to identify either location.

20    Q    Let me ask you about that last point, Ms. Bottrell, the fact

21    that sometimes soils can be mixed even within a particular

22    sample.  Did you note anything along those lines in terms of the

23    items you examined in this case?

24    A    On both the pairs of boots that were submitted with this

25    case, there were at least two types of soil on the bottoms of the

1    shoes.  There were two distinct colors of soil on the shoes.  But

2    I cannot separate them from one another.

3    Q    And in the absence of being able to separate those two types

4    of soil, there would be no way for you to discern whether either

5    of those two mixed types came from one of the known areas you

6    tested here?

7    A    That's correct.

8    Q    Let me ask you about the various -- you mentioned there were

9    five known soil samples from the woods, one where the guns were

10   recovered and then points north, east, south and west.  Did you

11   note any variances or differences between or among the five known

12   soil samples?

13   A    There is some variation among the soil samples that were

14   submitted as the known samples.

15   Q    You mentioned a few moments ago that sometimes there can be

16   variance in soil, even over a matter of inches or feet.  Is that

17   correct?

18   A    That's correct.

19   Q    So is that something that you noticed in this case or at

20   least something approaching that with respect to the known

21   samples?

22   A    Yes.  Because I see soil that I can tell apart from these

23   distances, I know that the soil is changing fairly rapidly in

24   this area, at the most over the course of about ten feet.

25   Q    And again, just to make sure I'm clear on something.  Is it

1   possible, Ms. Bottrell, for a person to walk through an area and

2   not pick up soil that you would be able to match to that area?

3   A    Yes.

4   Q    Thank you, ma'am.  Nothing further, Your Honor.

5                CROSS EXAMINATION

6   BY MR. COBURN:

7   Q    Good morning again, Ms. Bottrell.

8   A    Good morning.

9   Q    It sounds, then, from your description of the methodology

10  that you and your colleagues use in the FBI lab that you use a

11  great deal of care in doing these examinations, right?

12  A    We certainly take every effort, yes.

13  Q    You do everything that you know of that's possible to avoid

14  contamination or avoid mixing different samples from different

15  sources, right?

16  A    Yes.

17  Q    Now, in this case, if I understand correctly and, you know,

18  there's a certain jargon here which we're sort of used to but

19  others might not be, when we're talking about known samples,

20  we're talking about bits of soil that, based on your

21  understanding, were taken by police officers from the area right

22  around where the guns were found, right?

23  A    Yes, sir.

24  Q    And there were five of them, correct?

25  A    Yes.

1    Q    And I think you indicated in response to one of Mr. Hanlon's

2    questions that there was some variation between the five samples

3    that were taken?

4    A    There is some variation between the samples, yes.

5    Q    And you looked carefully at each one of those five, right?

6    A    I did.

7    Q    And then, like on the other side of the coin, there are what

8    are called the questioned samples, right?

9    A    Yes.

10   Q    And those samples, if I understand correctly, there are two

11   that come off Shawn Gardner's boots, based on your understanding,

12   two that come off Aaron Holly's boots.  Then there's a little

13   envelope of a fifth thing which appeared to have come off Aaron

14   Holly's boots before they were all packaged up, is that right?

15   A    Yes.  That's what was reported to me, that it was a package

16   of debris that had come off the boots prior to them sending it

17   in.

18   Q    And when you did was, using all this sort of painstaking

19   care that you just described for the jury, you looked at each one

20   of those samples.  You looked at the five that you knew were

21   taken from where the guns were seized.  You looked at the five

22   that were, two from one pair of boots, two from the other pair of

23   boots, and then the fifth one that seemed to have fallen off

24   Holly's boots.  You gave each of these a very careful, individual

25   look, right?

1    A    Well, with the pairs of boots, the boots were packaged as

2    pairs.  So they were in each, each pair was in a single bag.

3    Because we can't say for sure when they're packaged together

4    which shoe it came from, those two were, the two shoes from a

5    single pair were actually analyzed collectively.

6              So I took the soil off of one pair of shoes and that

7    was placed in one container for analysis.  So there actually is

8    just three that we are comparing for the questioned samples.

9    Q    Okay.  And that's standard operating procedure, right?

10   A    It is.

11   Q    You didn't vary anything in this case?

12   A    No.

13   Q    That's the way it's always done, right?

14   A    That's correct.

15   Q    And after, after giving these samples the painstaking

16   examination that you just described, you were not able to

17   associate the soil that came off the boots with any of the five

18   samples that were taken from around where the guns were found,

19   right?

20   A    That's correct.  The soil that I recovered from the boots is

21   different from the soil from the known locations.

22   Q    And so based on that, the boots might have been there and

23   they might not have been there, and you don't have an opinion one

24   way or the other, right?

25   A    That's correct.

1    Q    Thank you.  Nothing further.

2                 REDIRECT EXAMINATION

3    BY MR. HANLON:

4    Q    Your Honor, if I may, I neglected to get into an area with

5    the witness on direct.  Slightly different test.  Certainly, if

6    defense is --

7                 THE COURT:  Permission granted, Mr. Hanlon.

8    Q    Thank you, Your Honor.  Ms. Bottrell, one thing I forgot to

9    ask you.  You are aware that the lab received a request from

10   Baltimore County to inquire as to whether or not latex gloves

11   could be compared against one another, is that right?

12   A    That's correct.

13   Q    And was the FBI lab able to do such an analysis?

14   A    No.  We do not analyze latex gloves.

15   Q    Is that because latex gloves are kind of generic and common

16   on the market?

17   A    Latex gloves are very generic.  They cannot be easily told

18   from one manufacturer to another.

19   Q    Thank you, ma'am.  Thank you, Your Honor.

20                 RECROSS EXAMINATION

21   BY MR. COBURN:

22   Q    I just have a quick question, if I may.  So when you say

23   they're generic, latex gloves, that is, I mean, that means that

24   they're, you mean, they're basically kind of, if they're not all

25   the same, I mean, they're, they're sort of a stock item, is that

1    right.  They don't differ like one to the other?

2    A    That's correct.

3    Q    Okay.  And they're widely available, right?

4    A    Yes.

5    Q    In all kinds of different stores?

6    A    Yes.

7    Q    Thank you.

8            THE COURT:  Thank you very much, Ms. Bottrell.  You are

9    excused.

10           Members of the jury, we'll take our morning recess at

11   this time.  Please leave your note pads on your chairs.  Have no

12   discussion about the case or any of the evidence you've heard so

13   far.  Continue to keep an open mind about all issues.

14           You are excused for A 15 minutes recess.  We'll stand

15   in recess for 15 minutes.

16           (Recess.)

17           (Jury not in THE courtroom. )

18           MR. HARDING:  Your Honor, could I say something briefly

19   about scheduling before the jury comes back?

20           THE COURT:  Absolutely.

21           MR. HARDING:  The next witness we have is a fairly

22   brief witness.  I don't expect him to be on the stand for more

23   than 15 or 20 minutes.  After that, we don't have another witness

24   until after lunch.  And we only have two witnesses for after

25   lunch, one of whom is reasonably substantial.  That's Police

1   Officer Alvin Barnes.  The other one will be another brief

2   witness.  And we have over the break and last night used our

3   efforts to try to get other witnesses in here but we haven't

4   succeeded.

5           Our most important witness for today is on the lam.  We

6   can't locate the most important witness.  So I am alerting the

7   Court to a possible problem with our schedule for the afternoon.

8           THE COURT:  Is the -- I'm sorry.  Is the problem with

9   the afternoon -- I'm just trying to put together what you said.

10  You have, if I was counting correctly, you have four witnesses

11  left for today?

12          MR. HARDING:  No.

13          THE COURT:  Who are present.

14          MR. HARDING:  Three, Your Honor.

15          THE COURT:  Three?  Two very short ones and Officer

16  Barnes.

17          MR. HARDING:  Yeah.

18          THE COURT:  Who's a little longer.

19          MR. HARDING:  Yeah.

20          THE COURT:  And what's he going to talk about, by the

21  way?

22          MR. HARDING:  The search of 205 Amity Street.

23          THE COURT:  Oh, okay.  So just really a sponsoring

24  witness?

25          MR. HARDING:  No.  He has statements from Mr. --

1          THE COURT:  Oh, that's right.  That's right.  We had

2     the hearing.  We had the hearing.  Who's on the lam, if you care

3     to say?

4          MR. HARDING:  Damita Green, Your Honor.

5          THE COURT:  Oh, Green.  All right.

6          MR. HARDING:  She's afraid to testify.  She's terrified

7     to testify.  So we may well be seeking a warrant from Your Honor

8     this afternoon.

9          THE COURT:  Okay.  So I guess the question, then,

10    really becomes who was going to be next?

11         MR. HARDING:  After lunch, you mean?

12         THE COURT:  No.  I mean who was going to be right now?

13         MR. HARDING:  Police Officer Timothy Rutherford.  He's

14    available now.  We can put him on.

15         THE COURT:  Well, I'm just wondering if we shouldn't

16    break for lunch now.

17         MR. HARDING:  Well, whatever the Court wants to do is

18    fine.

19         THE COURT:  What's his area?  Rutherford?

20         MR. HARDING:  He's involved, he was part of the

21    perimeter team in the Tonya Jones Spence murder.

22         THE COURT:  And what does he contribute?

23         MR. HARDING:  He contributes that no one entered or

24    exited the woods after the defendants went into the woods.

25         THE COURT:  I see.  Okay.  So I guess we ought to get

1    him on and off so he can get back to work.

2            MR. HARDING:  Okay.

3            THE COURT:  Then we'll break for lunch.  And we'll

4    take, we'll take the normal lunch until two and see what you

5    have.

6            MR. HARDING:  Okay.  Thank you very much.

7            THE COURT:  All right.  We'll have the jury, please.

8            MS. RHODES:  May I address the Court very briefly, Your

9    Honor?  Scheduling matter for tomorrow morning.  With the Court's

10   permission, I would like to be on a phone call with my daughter's

11   doctor between about 9:30 and 10 tomorrow.  She has an

12   appointment that her father's taking her to, but I want to be

13   able to be by phone, and I think Mr. Lawlor can just sit in for

14   me.

15           The only witness I have this week, I think, is Damita

16   Green.  So if she is here tomorrow morning, if we could just wait

17   maybe until 11 or so to call her, that would be helpful.

18           THE COURT:  Sure.  I'm wondering, frankly, under the

19   circumstances whether we are even going to be in session

20   tomorrow.  Perhaps Mr. Harding, Mr. Hanlon, you can help me out

21   here.  So if we can just run through it pretty quickly.  We have

22   Barnes this afternoon for sure.

23           MR. HANLON:  Yes, Your Honor.

24           THE COURT:  Sounds like he's at most an hour?

25           MR. HANLON:  That would be my estimate, Your Honor.

1          THE COURT:  Direct and cross.  And then we've got

2     Rutherford.  And we've got one other witness this afternoon, very

3     short?

4          MR. HANLON:  Yes, Your Honor.

5          THE COURT:  Who is that?

6          MR. HANLON:  Erin Wisnieski, Your Honor.  The resident

7     from the Greens.

8          THE COURT:  The knock on the door.

9          MR. HANLON:  Right.

10          THE COURT:  And that's it for today.

11          MR. HANLON:  That's it for today.

12          THE COURT:  Then who do we have tomorrow?

13          MR. HANLON:  Your Honor, I have Ernest Reynolds lined

14     up for tomorrow.  He's an individual, we're going to be stepping

15     out of the Spence murder, going back to some of the drug

16     trafficking, the historical stuff.  And he'll testify about that

17     stuff.

18          THE COURT:  And this is, this is the conversation while

19     he was a cell mate of Mr. Gardner's?

20          MR. HANLON:  That is correct, Your Honor.

21          THE COURT:  And he's the subject of one of the motions.

22          MR. HANLON:  In fact, Your Honor, one of the things Mr.

23     Harding and I are noting is that a number of our next witnesses

24     have briefed motions sort of as a, as a barrier.  The firearms

25     examiner witnesses, for example.  Some of the people from the Lee

1    shooting, the witnesses we would present on that.  The Ernest

2    Reynolds and those statements as they relate to some of the

3    defendants.  There are sort of some outstanding motions that are

4    going to impact on how those witnesses testify.  So that's kind

5    of where we're getting to right now.

6              THE COURT:  So you were going to do ballistics

7    tomorrow?

8              MR. HANLON:  I'm sorry, Your Honor?

9              THE COURT:  You were going to do ballistics tomorrow?

10             MR. HANLON:  Well, it was an area we could get into.

11   Right now, Your Honor, here are the witness we have today.

12   Ballistics was an area we were going to do told but we held it

13   off.  Mr. Harding has Roy Jones set up, Ken Welsh, Shamier

14   Delvison, Shannon Harris, and Arlene Williams.

15             THE COURT:  And who are they?

16             MR. HANLON:  They are -- I should probably let Mr.

17   Harding say.

18             THE COURT:  They are all civilians?

19             MR. HARDING:  Yes.  Roy Jones is just a fingerprint guy

20   related to the Wyche brothers murder.  Kenny Welsh is the, the

21   lead investigator of the Eric Lee murder, the guy who supervised

22   the collection of the shell casings and the bullets that are at

23   issue in one of these motions.

24             THE COURT:  So he's just foundation for the shell

25   casings and --

1          MR. HARDING:  Yes.

2          THE COURT:  Okay.

3          MR. HARDING:  Shamier Delvison, Shannon Harris, and

4     Arlene Williams were all present at 205 North Amity Street when

5     the search was conducted and will testify basically that the

6     stuff found there was not theirs.

7          THE COURT:  Okay.

8          MR. HARDING:  Do you have any other witnesses for

9     tomorrow?

10         MR. HANLON:  Just Mr. Reynolds.  He's lined up for

11    tomorrow.

12         THE COURT:  Is he in custody?

13         MR. HANLON:  No, Your Honor.

14         THE COURT:  No?

15         MR. KURLAND:  Judge, we have some 403 issues with

16    respect to the Lee and the guns.

17         THE COURT:  Okay.  Well, it sounds like we're going to

18    have some time this afternoon to deal with some of these legal

19    issues.  And so why don't we do this?  Why don't we break for

20    lunch now?  I'll excuse the jury until 1:30.  No.  No.  Let's get

21    Rutherford on and off.  And then see where we go.  Okay?  Since

22    he's here.  We'll have the jury.

23         In any event, Ms. Rhodes, that won't be a problem at

24    all.  Just a question of whether we even start at 10 or 10:30 or

25    something.  But you'll be excused.

1              (Jury enters the courtroom.)

2              THE COURT:  Good afternoon, ladies and gentlemen.  Mr.

3     Harding, you may call the next witness.

4              MR. HARDING:  Yes, Your Honor.  The United States calls

5     Police Officer Timothy Rutherford.

6        OFFICER TIMOTHY RUTHERFORD, GOVERNMENT'S WITNESS, SWORN

7              THE WITNESS:  I do.

8              THE CLERK:  Be seated.  Speak directly toward the mike.

9     State your name and spell it for the record, please.

10             THE WITNESS:  Officer Timothy Rutherford.

11    R-U-T-H-E-R-F-O-R-D.

12             DIRECT EXAMINATION

13    BY MR. HARDING:

14    Q    Good morning, Officer.  Can you tell us how you're employed,

15    sir?

16    A    I'm a Baltimore County Police officer.

17    Q    And how long have you been employed by the Baltimore County

18    Police Department?

19    A    Approximately eight and a half years.

20    Q    Where were you assigned back in June of 2002?

21    A    The Woodlawn precinct.

22    Q    Let me draw your attention to June 7th of 2002, in the late

23    afternoon hours, about 5:00.  Were you summoned to participate in

24    an investigation around that time?

25    A    Yes.

1    Q    Can you tell us where you went and what you did?

2    A    I responded to the area of a shooting complaint.  Then I

3    assisted with a perimeter with regards to trying to apprehend

4    suspects.  And then after the perimeter was shut down, I

5    responded back to the scene for scene security.

6    Q    Okay.  Let me call your attention first to the perimeter you

7    say you helped to establish.  Is that the first thing you did?

8    A    That was the first coordinated effort, yes, besides

9    responding to the area.

10   Q    When you responded to the area, did you speak to other

11   officers or to another officer?

12   A    There was an officer that gave a broadcast of a possible

13   suspect description and area of which they may have fled.

14   Q    Okay.  Let me call your attention to the aerial photograph

15   that's on the easel behind you.  Does that look familiar?

16   A    Yes.

17   Q    Okay.  Let me ask, where it was -- were you told where the

18   suspects were last seen?

19   A    Approximate area, a wooded area off of Carlson Lane.

20   Q    Okay.  Do you see that on the aerial photograph behind you?

21   A    Yes.

22   Q    Could you get up out of your seat?  And I'll hand you a

23   microphone.  Could you, using that, point to where you were

24   stationed near where the suspects had last been seen running?

25   A    I was stationed on Carlson Lane between Stevenswood and

1    Kenjac, approximately in this area here.

2    Q    Okay.  I'm using this pointer here.  Is this where you're

3    pointing to?

4    A    Yes, sir.

5    Q    Now, were you in uniform that day?

6    A    Yes, sir.

7    Q    And were you in a vehicle or on foot?

8    A    I was in a marked patrol vehicle.

9    Q    And correct me if I'm wrong.  This street right here is

10   Carlson Lane, is that correct?

11   A    That's correct.

12   Q    And this street is the street you called Stevenswood, is

13   that right?

14   A    That's correct.

15   Q    And this street down here is Kenjac?

16   A    Yes, sir.

17   Q    And you say you were positioned here as part of a perimeter,

18   is that correct?

19   A    Yes, sir.

20   Q    Okay.  Now, you can resume the witness stand.  What was the

21   point of having a perimeter there?

22   A    To deter any suspects from, you know, we had a possible area

23   that they may have went to, to encircle that area so they did not

24   enter or exit that area from another area.

25   Q    Without you seeing them?

1    A    Correct.

2    Q    And did you have other people also involved in this effort?

3    A    Yes.

4    Q    Was there anybody near where you were?

5    A    There was another officer stationed down the street from

6    where I was, facing towards my patrol vehicle.

7    Q    And do you remember the name of that officer?

8    A    I believe it was Officer Gill.

9    Q    And where was he stationed?

10   A    He was stationed below, I believe it was below Kenjac Road,

11   towards Kenjac, below me.

12   Q    Okay.  So he would have been --

13   A    Approximately in that area, yes.

14   Q    Okay.  And you're further up the road in here, is that

15   right?

16   A    Yes.

17   Q    And you say you could see him from your patrol car?

18   A    I remember seeing his patrol vehicle, yes.

19   Q    Was he stationed in his patrol vehicle?

20   A    Yes.

21   Q    Was he facing you or --

22   A    His vehicle was facing towards my vehicle.

23   Q    So was he on the other side of the road or on the same side

24   as you?

25   A    I believe he was on the opposite side of the road.

1  Q    Was he doing the same thing you were, perimeter work?

2  A    I believe so, yes.

3  Q    Okay.  So after you set up this perimeter, did you get word

4  that a couple of suspects had been apprehended on the other side

5  of the woods?

6  A    Yes.

7  Q    Okay.  Did you nevertheless maintain your perimeter there

8  for a while?

9  A    Yes.

10  Q    Can you tell us about how long it was or tell us about what

11  time it was that you discontinued your perimeter?

12  A    I believe it was around 1800 hours, which would be 6:00.

13  Q    During that time, did anybody, did you see anybody come in

14  or out of the woods?

15  A    No.

16  Q    Okay.  And you say that after you ended your perimeter work,

17  you went back to the scene of the shooting, is that correct?

18  A    Yes.

19  Q    And what did you do there?

20  A    I guarded the front door to note who made entry and exit

21  from the building and deterred people that weren't allowed to be

22  there.

23  Q    Okay.  Thank you.  I have no further questions, Your Honor.

24  Your.

25           CROSS EXAMINATION

1    BY MR. KURLAND:

2    Q    Good afternoon, Officer Rutherford.  How are you?

3    A    Good afternoon, sir.

4    Q    I just have a couple of questions.  Your Honor, may I

5    approach the --

6              THE COURT:  Yes.

7    Q    I don't have a pointer.

8              MR. HARDING:  You can use this one, counselor.

9    Q    If I need it, thank you.  All right.  Officer, you indicated

10   again that your -- actually, maybe I will use the pointer.  I

11   just have a few questions.  You indicated, Officer, that your car

12   was about here, a little bit below Stevenswood?

13             THE COURT:  I think you're blocking the view of a

14   couple of jurors, Mr. Kurland.

15   Q    I just want to get -- your vehicle was about here or was it

16   above Stevenswood?

17   A    No, it was below Stevenswood.

18   Q    Below Stevenswood.  And you indicated that another officer's

19   vehicle was down about here?

20   A    Approximately.

21   Q    Okay.  And you indicated that you left the perimeter around

22   6:00?

23   A    I believe it was around 6:00, yes.

24   Q    So you were there for a little less than an hour?

25   A    I don't know a time frame on how long I was there.

1    Q    All right.  It was still light, though?

2    A    Yes.

3    Q    And do you recall the other officer's vehicle, was that,

4    were you able to observe it during the entire time that you were

5    stationed?

6    A    I believe so, yes.

7    Q    Do you recall, did it leave at approximately the same time

8    you did?

9    A    I do not recall.

10    Q    Could have left before?

11    A    Probably would have left the same time I would have, when

12    the perimeter was broken.  But I can't testify as to when it

13    left.

14    Q    And I don't want you to speculate.  So you, it could have

15    left before, you just don't know?

16    A    Yes.

17    Q    Just one other thing.  The woods area that we've had a lot

18    of testimony about, actually is a fairly large area.  It's

19    contiguous.  It goes up Carlson on to the parking lot, and all

20    the way out to Old Court, correct?

21    A    Correct.

22    Q    And then also goes down, I don't know if South Green

23    continues all here.  But the woods stretches from Old Court down

24    to off the photograph here, is that correct?

25    A    Correct.

```
1   Q    You're aware that there's more than one entry way into this

2   wooded area?

3   A    Correct.

4   Q    All right.  And there are a lot of the areas with respect to

5   entry ways which were outside of your line of vision?

6   A    Correct.

7   Q    All right.  And whether or not the entire perimeter was

8   covered, you don't know?

9   A    No, I do not know.

10  Q    No further questions.  Thank you, Officer.

11       THE COURT:  Officer Rutherford, thank you very much.

12  You're excused.

13       THE WITNESS:  Thank you, Your Honor.

14       THE COURT:  Members of the jury, we will break now for

15  lunch.  There are some issues regarding certain witnesses, timing

16  and so forth.  So we may have a slight adjustment in our schedule

17  in the coming days.

18       Let me just take this opportunity to remind you that

19  right now the plan is we will be in session this afternoon and

20  tomorrow.  We will not be in session on Thursday or Friday of

21  this week.  We will resume on Monday of next week.  And we will

22  be in session every day next week, if you recall.  That's the

23  first week when we'll have a session each of the five work days.

24       Tuesday being Election Day, I anticipate that we will

25  start later than normal and end earlier than normal.  And then
```

1    we'll have a full day, I hope, on Wednesday and Thursday of next

2    week.  And then Friday of next week, November 7th, I expect we'll

3    be in session from about 9:30 until about 12:30, 1:00, only a

4    half a day.  But we will be in session on Friday of next week.

5         I'll have more detailed information about our schedule

6    going forward with you in the next day or so.

7         For now, enjoy your lunch.  Please leave your note pads

8    on your chairs.  Have no discussion about any of the evidence

9    you've heard or about the case.  Continue to keep an open mind

10   about all issues.

11        The jury is excused until 2 p.m.  We'll resume at 2:00.

12        (Jury exits the courtroom.)

13   THE COURT:  So Mr. Hanlon, Mr. Harding, I think if we

14   can excuse the jury early, I think that's fine.  That's a good

15   thing.  If you've got somebody who is available this afternoon

16   but who wouldn't be terribly inconvenienced by coming back

17   tomorrow, we can sort of, you know, end load tomorrow if you want

18   and just perhaps do Barnes this afternoon at two, and then break

19   sometime before three.  What do you think makes sense?

20        Or if you got witnesses here that you really want to

21   get on and off this afternoon, we can do that as well.

22        MR. HARDING:  Well, Wisnieski's on her way down here

23   and I do think it would be --

24        THE COURT:  Okay.

25        MR. HARDING:  She's very brief.  So I would like to do

1    her as well as Barnes.  I tried to get another witness in here

2    already for this afternoon and failed.  So I don't think we can

3    get any more witnesses in here.

4            THE COURT:  Okay.  So we're going to have Barnes and

5    Wisnieski this afternoon.

6            MR. HARDING:  Yes.

7            THE COURT:  Which together sounds like probably an

8    hour.

9            MR. HARDING:  An hour to an hour and a quarter,

10   something.

11           THE COURT:  To an hour and a quarter.  All right.  I

12   don't think the jury will be annoyed by being excused early.  I

13   think they will be annoyed if the case, we've sort of hit a

14   couple of slow patches here.

15           Perhaps you can, again, off the top of your head, Mr.

16   Harding, sketch out for us the next five or six trial days.

17           MR. HARDING:  We're going to close next week, Your

18   Honor.  We're going to rest the government's case next week.

19           THE COURT:  Might that be Monday or you think more like

20   Thursday?

21           MR. HARDING:  No.  More like Thursday.  But we may well

22   be done before Friday is what I'm saying.  The Court was planning

23   on sitting this coming Friday.

24           THE COURT:  Right.

25           MR. HARDING:  I think, I think we certainly have enough

1  to fill up several days of next week, three or four days.  But

2  we're close to completing our case.

3          THE COURT:  All right.  Well, certainly I can tell

4  everybody if, if you should, in fact, rest by the end of the day

5  on Thursday, obviously, I will not bring the jury back on Friday.

6  And I suspect they'll be pleased to hear that.

7          We'll devote Friday morning to argument on Rule 29, and

8  if we have the time talk about jury instructions and any other

9  matters that we need to talk about.  But that's good.  So we'll

10  have, we'll have the morning available to us to take care of a

11  number of housekeeping/evidentiary/jury charge matters.

12          Did you decide to do all the medical examiner in one

13  fell swoop, which is fine?

14          MR. HARDING:  Well, I don't believe that the medical

15  examiner is going to take more than a couple of hours, Your

16  Honor.

17          THE COURT:  Okay.

18          MR. HARDING:  The reason is that --

19          THE COURT:  Well, the reason is is gunshots.  So I get

20  it.  You don't even need, you don't even need a medical examiner.

21          MR. HARDING:  There's some mild importance to some of

22  the trajectories of some of the bullets because they help

23  establish that the shooter was in the back seat of the car.

24          THE COURT:  Right.  I think the photographs pretty much

25  clinch that.

1          MR. HARDING:  But otherwise, this is not a case where

2     the time of death established by the medical examiner or the

3     toxicologist report or something like that is crucial in the

4     evidence.  And so this isn't, I'm not planning to spend an

5     enormous amount of time with the medical examiner.

6          THE COURT:  Okay.  All right.  We'll, I think, assuming

7     we break early this afternoon, that will give me a full

8     opportunity to look at Mr. Coburn's motion on the ballistics and

9     the government's response which came in.  I thank you for that.

10    And it may be that we'll start, say, at 11 tomorrow.  If you tell

11    me when we come back after lunch that you only have three hours

12    of witnesses tomorrow, then we probably won't start with the jury

13    until about 11 and just go straight through without a luncheon

14    recess.

15         MR. HARDING:  Okay.  We'll have an answer for you this

16    afternoon.

17         THE COURT:  Okay.  Very good.  All right.  We're in

18    recess until 2:00.

19              (Luncheon recess.)

20              (Proceedings at 2:10 p.m.)

21         THE COURT:  Anything new on the witness front?

22         MR. HARDING:  Well, we think we've got a couple of

23    witnesses for tomorrow, including one new one, Andre Drake.  We

24    think we may have Damita Green for tomorrow, Your Honor.

25         THE COURT:  Okay.

1          MR. HARDING:  We're still going to be seeking a warrant

2     for her this afternoon.

3          THE COURT:  All right.  Okay.  We'll have the jury.

4          (Jury enters the courtroom.)

5          THE COURT:  Good afternoon, ladies and gentlemen.  Mr.

6     Harding, you may call the government's next witness.

7          MR. HARDING:  Thank you, Your Honor.  Your Honor, the

8     United States calls Erin Wisnieski.

9          THE COURT:  Would you raise your right hand, please,

10    Ms. Wisnieski?

11           ERIN WISNIESKI, GOVERNMENT'S WITNESS, SWORN

12          THE WITNESS:  Yes.

13          THE CLERK:  Be seated.  Speak directly toward the mike.

14    State your name and spell it for the record, please.

15          THE WITNESS:  Erin Wisnieski.  E-R-I-N.

16    W-I-S-N-I-E-S-K-I.

17          DIRECT EXAMINATION

18    BY MR. HARDING:

19    Q    Good afternoon, Ms. Wisnieski.  Ms. Wisnieski, can I ask

20    you, back in 2002, were you living in Randallstown or Woodlawn?

21    A    Yes.

22    Q    Which was it, anyway?  Woodlawn or Randallstown?

23    A    Windsor Mill.

24    Q    Windsor Mill.  Sorry.  And specifically, what was your

25    address back then?

1    A    3249 Green Knoll Road.

2    Q    Okay.  Ms. Wisnieski, when you were living there on June 7th

3    of 2002, in the late afternoon, were you at home alone or did you

4    have other family members in the house with you?

5    A    My infant son was at home with me.

6    Q    Okay.  In the late afternoon, around 5:00, thereabouts, do

7    you recall, was there a knock at your front door?

8    A    Yes.

9    Q    And can you tell us what you did after you heard the knock

10   at your door?

11   A    I went to the door.  There were two men at my door.

12   Q    Okay.  Can you describe them and what they were doing?

13   A    Yes.  One man was standing facing my door.  One man was

14   sitting on the step, facing the street.

15   Q    Okay.  Maybe for the benefit of the jurors, do you see that

16   aerial photograph right behind you there?

17   A    Yes.

18   Q    Do you recognize what it depicts?

19   A    Yes.

20   Q    Could I ask you to get up and point to where your house is

21   on that map?

22   A    Okay.

23   Q    So it's actually obscured by some of the letters in the word

24   "Green Knoll", is that right?

25   A    Yes.  Under the N.

1    Q    Under the N.  Is it the second house from the end there or

2    the third house from the end?

3    A    The third.

4    Q    Okay.  You can resume the witness stand, Ms. Wisnieski.

5              Okay.  So there were two men.  One was standing and one

6    was sitting.  Can you tell us, did you notice anything unusual

7    about them?

8    A    Yes.  First of all, I thought it was unusual that someone

9    would be sitting on the step facing the street and not facing my

10   door.  Also, they were both breathing hard.

11   Q    Okay. Anything else? Nothing else? Okay.  Did you notice

12   anything else outside your house?

13   A    Yes.  There was a police jeep parked on the corner a couple

14   houses up.

15   Q    Up the street?  Okay.  So I'm going to use this pointer

16   thing.  If your house is there right below the pen, his car would

17   have been up the street in this direction, is that right?

18   A    Yes.  On this corner.

19   Q    Oh, is that the corner?  Okay.  All right.  So tell us what

20   happened after you went to the door and saw these two guys on

21   your front stoop.

22   A    The man that was standing asked if he could use my phone.

23   Q    Okay.  And what did you say?

24   A    At that time, since I noticed the police car, which was not

25   usually there, I asked if the police were looking for them.

DIRECT EXAMINATION OF WISNIESKI                    102

1    Q    And what, if any, response was there?

2    A    The man that was seated on the step said, No, sir, I mean,

3    No ma'am.

4    Q    Okay.  Can you describe the one who was seated on your front

5    stoop?

6    A    Yes.  He was or is an African-American man.  He had corn row

7    braids in his hair.  And he was wearing a black or a dark-colored

8    baggy shirt and dark-colored baggy pants.

9    Q    Okay.  And he's the one who was facing the street when you

10   first came to the door, is that correct?

11   A    Yes.

12   Q    And he's not the one who asked you if he could use your

13   phone, is that correct?

14   A    Yes.

15   Q    And the guy who asked you that was the one who was standing

16   up, is that correct?

17   A    Yes.

18   Q    Can you describe that guy?

19   A    He also was African-American.  He had a short haircut, dark

20   black hair, wearing a loose white shirt with a long string and a

21   single key around his necking and dark, baggy pants.

22   Q    Okay.  And let me just ask you, Ms. Wisnieski.  Did you

23   review, before you came here to testify today, a statement that

24   you had written out in your own hand immediately after this

25   happened back on June 7th, 2002?

Case 1:04-cr-00029-RDB   Document 687   Filed 06/12/09   Page 103 of 215

1    A    Yes.

2    Q    You wrote that out for the police, is that correct?

3    A    Yes.

4    Q    Right after all this happened?

5    A    Right.

6    Q    Okay.  Now, once you asked, one the guy who was standing

7    asked if he could come in and use your phone and you asked if the

8    police were looking for them, did he give you any kind of

9    explanation as to why he wanted to use your phone?

10   A    Yes.  That their car had broken down.

11   Q    Their car had broken down.  And was that the same standing

12   guy that said that?

13   A    I believe so.

14   Q    Okay.  And what did you, after you, you told us already that

15   you suggested, you asked them if the police were looking for

16   them.  And the one who was sitting down with the corn rows said

17   "No, sir, I mean, no, ma'am."  What did you say at that point?

18   A    I suggested that they ask police for some help.

19   Q    And what happened then?

20   A    Well, at that point during our conversation, a second police

21   car had arrived also on the corner.  And after I suggested they

22   ask the police for help, they stepped off of my front step,

23   taking one step towards the dead end of the street, and then

24   turned and walked in the direction towards the corner where the

25   police cars were there.

1    Q    And what happened then?

2    A    The police cars both very quickly and abruptly drove into

3    the street and met them in front of the house next door to mine.

4    Q    And what happened then?

5    A    The two men were handcuffed, sat down on the curb, had their

6    boots removed, and after what seemed like an eternity, were put

7    in the car and taken away.

8    Q    Okay.  You say what seemed like an eternity.  Could you give

9    us a better idea as to how long, how much time passed?  I assume

10   it wasn't really an eternity?

11   A    Maybe 15 minutes.

12   Q    Okay.  Let me just go back over something.

13        You said that when they first left your stoop after you

14   suggested that they go look for help from the police, they took a

15   step in this direction down here toward the dead end, is that

16   correct?

17   A    Yes.

18   Q    This is a dead end here down at the end of your street, is

19   that right?

20   A    Right.

21   Q    In fact, on the other side of the dead end is just woods

22   again, is that right?

23   A    At the time it was woods.

24   Q    Oh, what is it now?

25   A    There's a middle school there now.

1    Q    Okay.  And the woods up here, has this been torn down, also,

2    this woods?

3    A    No.

4    Q    No?  It hasn't?

5    A    No.

6    Q    Okay.  Just this woods?

7    A    Right.

8    Q    Okay.  All right.  But then you say they very quickly headed

9    back in the direction where the police were, is that correct?

10   A    Yes.

11   Q    And you say that these two police cars were up here on the

12   corner.  Did they actually move when the defendants started

13   walking away from your house?

14   A    The two police cars very quickly drove in and met the two

15   men in front of the house next door, yes.

16   Q    Okay.  And would that be the house immediately above your

17   house?

18   A    Yes.

19   Q    Is that right?

20   A    By the red star.

21   Q    By the red star on that.  Okay.  No further questions, Your

22   Honor.

23                  CROSS EXAMINATION

24   BY MR. KURLAND:

25   Q    Good afternoon, Ms. Wisnieski.  Did I get that right?

1    A    Yes.

2    Q    I just have a couple of questions.  You indicated, in

3    response to Mr. Harding's questions, that these, these entire

4    events took place at around, beginning around 5:00 or

5    thereabouts?

6    A    Yes.

7    Q    And when he asked you that question, your response was yes.

8    Any way to be a little bit more precise as to when you first

9    heard the knock on the door?  Was it a little before five?  A

10   little after five?  Or do you remember?  I know it was a long

11   time ago.

12   A    I don't specifically remember the minute.

13   Q    All right.  But you know it was 5:00 or thereabouts?

14   A    Thereabouts.

15   Q    When the, when the men left your front porch, and then you

16   testified that they seemed to start in one direction but then

17   decided to go back down the street toward the direction of the

18   police cars?  Is that your testimony?

19   A    Yes.

20   Q    And then the police, the police cars, it sounded like your

21   testimony was that the police cars at that point kind of drove up

22   and, did they block them or did the police cars -- strike that.

23   Did the police cars drive in cars toward the men as they walked

24   down the street?

25   A    Yes, they did.

1    Q    And did they just kind of abruptly stop their car right at

2    them?

3    A    Yes.

4    Q    And then the police officers, you are able to observe how

5    many police officers got out of the car?  Do you remember?

6    A    It was at least two police cars.  I don't remember how many

7    officers.

8    Q    It was at least two police cars.  And you actually observed

9    them being handcuffed?

10   A    Yes.

11   Q    Did that happen almost immediately after the police officers

12   got out of the car?

13   A    Yes.

14   Q    All right.  And then you said that there was about, you said

15   it was an eternity, but then with respect to Mr. Harding's

16   questions, it was about 15 minutes that they were still there

17   until they finally, the police cars drove away?

18   A    That's a rough estimate on the time.

19   Q    Do you recall if during that time any other police cars

20   drove up as well?

21   A    I can't say for sure.

22   Q    Were you watching the entire time after they had left your

23   porch?

24   A    Yes.

25   Q    Okay.  I have no further questions.  Thank you.

1           MR. HARDING:  Nothing further, Your Honor.

2           THE COURT:  Ms. Wisnieski, thank you very much.  You're

3   excused.

4           THE WITNESS:  You're welcome.

5           MR. HARDING:  Your Honor, the United States calls

6   Police Officer Alvin Barnes.

7         OFFICER ALVIN BARNES, GOVERNMENT'S WITNESS, SWORN

8           THE WITNESS:  I do.

9           THE CLERK:  Be seated.  Speak directly toward the mike.

10   State your name and spell it for the record, please.

11          THE WITNESS:  Detective Alvin Barnes.  Assigned to the

12   Baltimore City Police Department, Internal Investigation

13   Division.

14          DIRECT EXAMINATION

15   BY MR. HARDING:

16   Q    Good afternoon.  Is it Officer Barnes?

17   A    No.  Detective.

18   Q    Detective Barnes.  I'm sorry.

19   A    B-A-R-N-E-S, ma'am.

20   Q    You say you're now assigned to the Internal Affairs Division

21   of the police department, is that correct?

22   A    Yes, sir.

23   Q    How long have you been employed by the Baltimore City police

24   department?

25   A    Four years.

1    Q    Sorry.  How long?

2    A    Four years.

3    Q    How long for the whole police department?

4    A    I've been with the law enforcement for almost, going on 22

5    years.

6    Q    Okay.  Let me call your attention back to 2002.  What was

7    your assignment at that time?

8    A    I was with the Baltimore City Housing, Housing Authority

9    Police.

10   Q    Okay.  What part of town were you assigned to?

11   A    I was roughly assigned to the east and west side of town.

12   Q    Okay.  That's a broad area.  Let me ask you.  On June 21st

13   of 2002, in the late afternoon, were you involved in the

14   execution of a search warrant?

15   A    I was.

16   Q    Do you recall the location that you searched that day?

17   A    Yes.  205 North Amity Street, Apartment Nine.

18   Q    Okay.  I have a picture here that I'm going to put on this

19   screen and it's going to hopefully project on the screen you have

20   in front of you.  Can you identify what's in this picture, which

21   is Government Exhibit PH-48?

22   A    That's the 200 block of North Amity Street in the Lexington

23   Poe Homes.

24   Q    The Lexington Poe Homes?

25   A    Yes.

1    Q    So this is a city housing project, is that correct?

2    A    Yes.

3    Q    And do you remember, you said it was -- what apartment

4    number did you say it was?

5    A    Apartment Nine.

6    Q    Okay.  And is it fair to say that the apartments are

7    actually multi-story apartments in this complex, is that correct?

8    A    Some of them are two story.  Some of them are one story

9    where you can walk right in.

10   Q    I see.

11   A    Some of them require that you climb a flight of stairs to go

12   up to the first floor, to the foyer.

13   Q    Okay.  What about this apartment?  Was it a first floor or

14   second floor or both?

15   A    This was a second floor.  One you have to walk up a flight

16   of stairs to get in.

17   Q    I see.  Okay.  Can you tell us, what sort of evidence were

18   you looking for when you went there to that location that day?

19   A    When I was handed the search warrant, because I was the OIC

20   there, I was instructed to look for narcotics, weapons, and any

21   kind of contraband or any illegal contraband associated with the

22   drug organization.

23   Q    Okay.  Who was the lease holder for that apartment?

24   A    I believe it was Ms. Arlene Williams.

25   Q    Okay.  Did you, it was still daylight at that time, is that

1    correct --

2    A    Yes, sir.

3    Q    -- detective?  Okay.  It was around 5:00 in the afternoon?

4    A    Yes, sir.

5    Q    Did you use force to get into the apartment?

6    A    No.  We didn't use force because the door was, I believe it

7    was unlocked.  It was closed but unlocked, or it was open.  But

8    we didn't use the battering ram to gain entry.

9    Q    Okay.  Somebody just knocked on the door or something?

10   A    It was a no-knock warrant.

11   Q    Okay.  But did somebody knock on the door?  Is that how you

12   got in?

13   A    No.  We either tried the door or either the door was open.

14   Q    Okay.

15   A    It was a no-knock warrant.

16   Q    Okay.  How many people were there in the apartment when you

17   were there that day?

18   A    It was three females.  Three African-American females.

19   Q    And can you give us their names?

20   A    I believe Arlene Williams, Shannon Freeman, and there was

21   another I cannot recollect.

22   Q    Yeah.  You're looking at your report, is that right?

23   A    Yes, sir.  And I believe it's Ms. Delvison.

24   Q    What's Ms. Delvison's first name?

25   A    Shamier Delvison and Shannon Freeman and Arlene Williams.

1    Q    Okay.  Was Shannon Freeman related to Arlene Williams?

2    A    I believe that was her daughter.

3    Q    Okay.  How many officers were with you that day?  Do you

4    remember or have a rough estimate?

5    A    At least six of us.  It had to be at least one sergeant and

6    five officers because you have to have a permanent rank

7    supervisor to execute a search warrant.

8    Q    Okay.  Now, did you speak to the three women who were there

9    when you --

10    A    Yes, I did.

11    Q    Okay.  After you spoke to them, did you go somewhere?

12    A    Yes.  After giving them their Miranda warnings, in which we

13    filled out form, they filled out forms, explaining their rights,

14    that's when I asked the question to both, all three of them.  And

15    Ms. Shannon Freeman answered up to say --

16          MR. FLANNERY:  Objection, Your Honor.

17    Q    Okay.  You asked a question.  Can you tell us what question

18    you asked?

19    A    Yes, I asked them were there any drugs or guns in the

20    premises.

21    Q    And without telling us what anybody said, what did you do

22    after that?

23    A    Conducted a search of the front right bedroom.

24    Q    Okay.  Was that on the same floor you were on, then, on the

25    second floor?

1    A    No, one more floor up.

2    Q    One more floor up.  I see.

3    A    Yes.

4    Q    So you went up a flight of stairs?

5    A    Yes.

6    Q    To the front bedroom?

7    A    Right.

8    Q    Okay.  And you conducted a search?

9    A    Yes.

10   Q    Did you find drugs there?

11   A    Myself and other officers did conduct a search.  You want me

12   to give you the exact locations?

13   Q    Yes, please.

14   A    If I can recollect.  I was the recovering officer and

15   Officer Earnest Atwell was conducting the search in the second

16   front bedroom, where he pulled up the mattress.  And between the

17   mattress and the box spring was a plastic bag which contained 12

18   green top vials of suspected crack cocaine and 36 white top vials

19   which contained suspected, 36 white top vials which contained

20   crack cocaine.

21        At that time, when he discovered the contraband, I

22   photographed it.

23   Q    Okay.

24   A    And then secured it.

25   Q    Okay.

1   A    Because I was the seizing officer.

2   Q    And did you discover other evidence there?

3   A    Yes, we did.

4   Q    Can you tell us what else you got?

5   A    Okay.  And then went to the dresser drawer, top dresser

6   drawer in the same bedroom, observed a plastic bag containing two

7   large white rocks of suspected cocaine inside the drawer.  That

8   was seized and photographed, also.

9   Q    Okay.

10  A    And then from there we, I did a search of the drawers,

11  pulled out all the drawers.  At the bottom drawer, pulled that

12  out.  And sitting on the floor was a plate, a ceramic plate,

13  which contained narcotics and crack vials.  That was photographed

14  and seized, also.  You want the amount that was seized?

15  Q    Yes.

16  A    The plate contained 37 white top vials of suspected crack

17  cocaine and three green top vials containing crack cocaine and a

18  razor blade that was on the plate, also.

19  Q    Okay.  When you say it was on the floor in the chest of

20  drawers, do you mean that it was on the floor of the bottom

21  drawer or was it on the floor of the chest below the bottom

22  drawer?

23  A    It was on the floor itself.  When you pulled the last drawer

24  out, the bottom drawer, the plate was sitting on the floor.  So

25  you would have to remove the whole entire bottom drawer and then

1    you would see it sitting on the floor.  Picked it up, saw what it

2    was on it, seized it, and photographed it and secured it.

3    Q    Okay.  I have here an exhibit that's been marked Government

4    Exhibit A-6, and I'm going to put this on the screen, also.

5    Everything's still sealed inside this big plastic bag, Detective.

6    But I think I can point some things out, anyway.  You can see

7    some green top things in here.  Do you see them?

8    A    Yes, sir.

9    Q    You said you found some of these green top vials both on the

10   plate on the floor of the chest of drawers and also in the bed

11   between the mattress and the box springs, is that correct?

12   A    Yes, sir.

13   Q    And same thing for these white top vials here.  You found a

14   larger number of them both in the mattress and in the chest of

15   drawers, is that correct?

16   A    Yes, sir.

17   Q    And then you say you found a bag that just contained rocks

18   of crack, what appeared to be crack cocaine, is that correct?

19   A    Yes, sir.

20   Q    Is that this thing that I'm pointing to right now?

21   A    Well, it's cracked up right now.  But it was whole at one

22   time.

23   Q    I see.

24   A    It was two rocks.

25   Q    I see.  Two rocks.  And you said there was a razor blade on

DIRECT EXAMINATION OF BARNES

1    a plate on the chest of drawers, is that correct?

2    A    Yes, sir.

3    Q    Can you see that in here, also?

4    A    Yes, sir.

5    Q    There's a plate in here.  Is this the plate you were talking

6    about?

7    A    Yes, sir.  Looks like the one that was there.

8    Q    And there's also a bag in here.  Would that have been

9    something you put this evidence into when you submitted it or is

10   that something you also recovered?

11   A    Which one?

12   Q    The brown paper bag in here.  I'll show you what I'm talking

13   about.

14   A    Okay.  That was packaged more than likely down at ECU,

15   Evidence Control.

16   Q    Okay.

17   A    Because if it's loose, they're not going to take any loose

18   items down there.  So you would have to secure it.

19   Q    Your Honor, this is all packaged in a sealed bag.  Is there

20   any problem with publishing it to the jury?

21        THE COURT:  No.  You can hand it to the jury.  Don't

22   open it, ladies and gentlemen.

23   Q    Okay.  In addition to the drug evidence you've just told us

24   about, did you discover other paper evidence in the chest of

25   drawers?

1    A    Yes.  It was personal mail in the name of Mr. Shelton

2    Harris.

3    Q    Okay.  Let me show you, first of all, Government Exhibit

4    A-2.  Is this one of the letters that you found in the chest of

5    drawers?

6    A    Yes.  Because it was from an institution.

7    Q    When you say it's from an institution, what are you

8    referring to?

9    A    Well, incar -- well, somebody that was incarcerated, sent

10   from Jessup.

11   Q    Okay.  Actually, and the date is actually the previous

12   month, right?  January of 2002?  No.  No.  That would have been

13   four months, five months earlier, then?

14   A    Yes, sir.

15   Q    Okay.  And then A-3.  Another letter, appears to be from the

16   same guy but from a different institution, is that correct?

17   A    Yeah, from Hagerstown.

18   Q    And that's a state prison, also, is it not?

19   A    It is.

20   Q    And you can't see the date on here very well.  But --

21   A    It says 24.  Push it back a little bit.  25 November, 2001.

22   Q    Okay.  So that's a little earlier.  And then the next one is

23   actually from the same guy, also at Hagerstown?

24   A    That one, 9th of November, 2001, it looks like.

25   Q    Okay.  I notice this, this one is addressed to Shelton

1    Harris, as was the first one.  Who's this second one addressed

2    to?

3    A    Hard Roc.

4    Q    Okay.  And did you also find this in the chest of drawers?

5    A    Yes, I did.  Maryland check cashing ID.

6    Q    And read the name on it, please.

7    A    Harris, Jr., Shelton L, 205 North Avenue, Baltimore,

8    Maryland, 21223.  Social 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, date of birth, 12/4/82.

9    Was issued 4/28/2000.  Come to a male, he's five-eight in height,

10   140 pounds, brown hair, brown eyes.  And then it has a signature,

11   Shelton Harris, on it.

12   Q    And just to be clear, Detective, the location you searched

13   was 205 North Amity Street, not 205 North Avenue?

14   A    Yes, sir.  205 North Amity Street, Apartment Nine.

15   Q    And finally, I'm showing you A-5.  Can you tell us what this

16   is?

17   A    It was sandwich bags.

18   Q    Were they in the chest of drawers or where?

19   A    Let me recollect, sir.  It was in the same bedroom because

20   Officer Wahl recovered a box of sandwich bags utilized for

21   packaging of CDS and a black baseball cap from the second floor

22   front bedroom, which was found to be Shelton Harris's bedroom.

23   Q    Okay.  Now, did there come a time while you were conducting

24   the search that the telephone rang at the apartment?

25   A    Yes, it did.

1    Q     And who answered it?

2    A     I believe Ms. Williams did, his mother.

3    Q     Okay.  What happened after that?

4    A     Okay.  Shortly after he had a conversation, I spoke to the

5    person that was on the phone.  And that's when I found out it was

6    Shelton Harris.  At which time I spoke to him and I asked him was

7    he going to be a man or was he going to let his mother take the

8    charge for the narcotics, at which time he stated that he would

9    come to the house.

10            MR. FLANNERY:  Objection.

11            THE COURT:  I'm sorry.  Was there an objection?

12            MR. FLANNERY:  Yes, Your Honor.

13            THE COURT:  There was no objection?

14            MR. HARDING:  I believe there was, Your Honor, from Mr.

15   Flannery.

16            THE COURT:  There was an objection?

17            MR. FLANNERY:  Yes, Your Honor.

18            THE COURT:  All right.  Overruled.

19   BY MR. HARDING:

20   Q     Sir, you can go ahead.

21   A     At which time he stated that he would come to the house and

22   turn his self in.  He didn't want his mother to take the charge.

23   At which time he stated that he'd be there in about ten minutes.

24   I waited outside 205 North Amity Street, Apartment Nine, at which

25   time about, approximately about ten minutes later Mr. Shelton

1    came walking up.

2            At that time, that's when I approached him.  I

3    identified myself because I was in plain clothes.  At which time

4    he stated that he was Shelton Harris.  I then took him inside the

5    house, show that his mother was okay and everything.  And at that

6    time when he, I Mirandized him.  I gave him his verbal warning,

7    his rights.  Told him that he had the right to remain silent.

8    Anything he said or use, anything he say or write can be used

9    against him in a court of law.  At that time I also told him that

10   if he lacked the financial ability to retain a lawyer, a lawyer

11   would be appointed to him without cost.

12           At that time, that's when Mr. Harris told me that he

13   doesn't sell narcotics down in Lexington Poe, he sold narcotics

14   up on Park Heights Avenue, at which time that's when I placed the

15   handcuffs on r. Shelton Harris.  And at which time I waited for

16   the affiant who wrote the warrant to arrive at the, at the

17   location.

18   Q    And did he take responsibility for the drugs you'd found in

19   his bedroom?

20   A    Yes, he did.

21   Q    What happened to the three women that you told us about?

22   First let me clear up something.  What is Arlene Williams's

23   relationship to Shelton Harris?

24   A    Arlene, Arlene Williams is Shelton Harris's mom.

25   Q    And Shannon Freeman?

1    A    Shannon Freeman's his sister.

2    Q    Okay.  Did she also go by the name Shannon Harris, do you

3    know?

4    A    She wrote that on her Miranda warning.

5    Q    Okay.  And there was another woman there, Shamier Delvison.

6    What was her connection to Mr. Harris, if you know?

7    A    From my knowledge, from what I've found out, that she was

8    formerly involved with Mr. Shelton Harris.

9    Q    Involved in the sense of like having been his girlfriend?

10   A    Yes, sir.

11   Q    But it was your understanding she wasn't any more?

12   A    No, sir.

13   Q    Was she also friendly with Ms. Williams and Ms. --

14   A    Yes.

15   Q    -- Shannon Freeman or Shannon Harris?

16   A    Ms. Harris, yes.

17   Q    Okay.  So what happened to them?  Were they taken Downtown,

18   also?

19   A    Ms. Freeman wasn't arrested.  Ms. Delvison was arrested and

20   so was Ms. Williams.  The reason why I arrested Ms. Williams,

21   because she was the sole tenant at the house.  And then I had to

22   consult with the State's Attorney's Office whether they were

23   going to push for prosecuting her.  Took her down to Central

24   Booking and they declined to prosecute her.

25   Q    Okay.  Just one moment, Your Honor.

1          THE COURT:  Yes.

2          (Pause in proceedings.)

3     Q    Just to clear up, Detective.  When you had your initial

4     phone conversation with Shelton Harris, when you took the

5     receiver from his mother and started talking to him --

6     A    Yes, sir.

7     Q    You told us that you made a statement to him about being a

8     man or letting his mother take responsibility for what?

9     A    For the narcotics that we, that was seized out of the house.

10    Q    And what did he say, to the best of your recollection?

11    A    He didn't want his mother arrested and he didn't want her

12    evicted.

13    Q    Did he take responsibility for the narcotics at that time?

14    A    Yes, he did.

15    Q    Okay.  Do you remember what his words were, roughly?

16    A    He said the drugs were his and that he didn't sell drugs

17    down in Lexington Poe, he sold them up in Park Heights.

18    Q    Okay.  Did he say that on the phone or did he say that last

19    thing about selling in Park Heights after you met up with him

20    down at the apartment?

21    A    He told me that at the apartment.

22    Q    Oh, I see.  Okay.  So back at the apartment, you had a

23    similar discussion and he again took responsibility for the

24    drugs --

25    A    Yes, sir.

1    Q    -- that were recovered?  Were they, were they there still

2    when he showed up 10 or 15 minutes after?

3    A    Was the mother and the sister?

4    Q    No.  The drugs, the drugs.

5    A    No, the narcotics was secured in the vehicle.

6    Q    I see.

7    A    In our unmarked vehicle, alongside with all the forms.

8    That's why Mr. Harris wasn't written, he wasn't given his Miranda

9    warning written.  He was given to him orally because, like I

10   said, the property and everything was secured in the vehicle.  I

11   didn't want to give away which vehicle the narcotics and stuff

12   were put in.

13   Q    Okay.  All right.  I have no further questions.  Thank you,

14   Officer Barnes, or Detective Barnes.

15                CROSS EXAMINATION

16   BY MR. FLANNERY:

17   Q    Your Honor, could I ask the witness if I could take a look

18   at what he reviewed, please?

19                THE COURT:  Of course.

20   Q    Detective Barnes, my name is Paul Flannery.  I represent

21   Shelton Harris.  Good afternoon.

22   A    How are you doing, sir?

23   Q    Detective Barnes I notice you were referring earlier to the,

24   the Baltimore City Police Department report that you drafted on

25   June 21st, 2002, correct?

1    A    I was looking at the Statement of Probable Cause.

2    Q    Okay.  But you did, in fact, draft the police department

3    report on June 21st, 2002?

4    A    I did.

5    Q    That's the date the raid took place, correct?

6    A    June 21st, 2001, yes, sir.

7    Q    2002, was it not?

8    A    I'm sorry.  2002.

9    Q    So June 21st, 2002.  You wrote a report that day following

10   the search and seizure incident, correct?

11   A    Yes, sir.

12   Q    And you also, at a later date, drafted a Statement of

13   Probable Cause which you referred to earlier?

14   A    That was, that was done the same day.

15   Q    Okay.  But you did, in fact, draft a Statement of Probable

16   Cause arising out of this incident?

17   A    Yes, I did.

18   Q    Both those reports, well, the Baltimore City Police

19   Department, Statement of Probable Cause, both drafted on that

20   day?

21   A    Yes, sir.

22   Q    Okay.  And it's fair to say that on June 21st, 2002, the

23   events that occurred were fresher in your mind than they are

24   today?

25   A    They were fresher, yes.

1    Q    They were fresher in your mind when you drafted that report?

2    A    Yes, sir.

3    Q    Okay.  Now, the raid began at 1700 hours, correct?

4    A    Yes, sir.

5    Q    And at the time you entered the house, you spoke to three

6    individuals there?

7    A    After securing the premise, yes.

8    Q    Okay.  Spoke, after securing the premises, you spoke to

9    three individuals.  And in your report you outline as you went

10   through the various narcotics that you seized, correct?

11   A    Excuse me, sir?

12   Q    You outlined in your report the various narcotics that you

13   seized?

14   A    Yes, sir.

15   Q    And you described the narcotics as having green vial tops,

16   having white vial tops, some of them inside plastic bags.  You

17   described the locations that they were in.  That's all correct?

18   A    I don't quite say plastic bags.  But I remember that the

19   vials were loose, they were on, they were on a plate.  Also,

20   there were plastic bags in the mattress, between the mattress.

21   There was a plastic bag between the mattress.

22   Q    And you provide a lot of details in your report?

23   A    Yes, sir.

24   Q    And those details are fresh in your mind that day?

25   A    Yes, sir.

1    Q    But one thing that's not in your report, is it not, is the

2    fact that you spoke to, that you actually spoke to Shelton Harris

3    that day?

4    A    It's in my report that I spoke to him, in the Statement of

5    Probable Cause.  The only thing that is lacking was the fact that

6    I did not put in that he was verbally Mirandized.

7    Q    Okay.  In the report that you drafted on the day that the

8    raid occurred, you did not put in your report the fact that you

9    Mirandized Shelton Harris and then spoke to him following that?

10   A    Yes, sir.

11   Q    You did not put that in your report?

12   A    No, sir.

13   Q    And when you drafted the Statement of Probable Cause, you

14   did not put in your report the fact that you Mirandized Shelton

15   Harris and spoke to him thereafter?

16   A    Let me recollect.  I know in the police report I didn't.

17   Let me see in the Statement of Probable Cause.  No.  It's not.

18   It's not noted in there, either.

19   Q    Not noted in there.  And then almost three years to the day

20   following that raid you had a meeting with Prosecutor Harding and

21   with Special Agent Brian Klas of the ATF, that's correct?

22   A    I believe so.

23   Q    And in that meeting for the first time did you then state

24   that at that point you Mirandized Shelton Harris after he

25   returned to the apartment, and at that point he made a statement

1    to you that he didn't sell drugs on Lexington but, in fact, that

2    he sold them up in Park Heights?  That's the first time that we

3    see that in a written report?

4    A    I believe so because in the criminal court case --

5    Q    But that's true?

6    A    Yes.

7    Q    That's the first time we see that in a written report?

8    A    Yes, sir.

9         MR. HARDING:  Your Honor, the witness wasn't done

10   answering.

11        THE COURT:  Well, you can revisit it on redirect.  Go

12   ahead, Mr. Flannery.

13   BY MR. FLANNERY:

14   Q    Thank you, Your Honor.  Now, you were talking with Mr.

15   Harding on direct about how Ms. Williams, Shelton Harris's

16   mother, received a phone call during the execution of the search

17   warrant?

18   A    Yes.

19   Q    That's correct?  And when she received a phone call, you

20   understood that, you actually got on the phone and you understood

21   that you were actually talking with Shelton Harris?

22   A    Yes.

23   Q    And you then told him that, what you, as you stated, that he

24   was either going to be a man or was he going to let his mother

25   take the fall for this?

1   A   Yes.

2   Q   So you were, in fact, threatening him that if he didn't own

3   up to these drugs, if he didn't own up to what you found, that

4   you were, in fact, going to arrest his mother that day?

5   A   No, I wasn't threatening him.

6   Q   You weren't threatening him?

7   A   The whole thing was when you execute a warrant and people

8   are on the premises, and if narcotics are seized, the people that

9   are in the house are fair game.  They can be arrested and charged

10   with narcotics.  Now, he had the option on whether to not to show

11   up or to show up.  That's the only option I gave him.  If he

12   wanted, you know, not to show up, then yes, his mother would have

13   been arrested, as she, subsequently she was.  But she was

14   released for the simple fact that I spoke to the State's Attorney

15   about her involvement in the case.  So they declined to prosecute

16   her.

17   Q   Okay.  I understand that.  What I'm asking you is, what you

18   stated to him over the phone, are you either going to be a man or

19   are you going to let your mother take the fall for this charge?

20   That's what you stated to him?

21   A   Yes, but it wasn't a threat.

22   Q   What you stated to him was, are you going to be a man or are

23   you going to let your mother take the fall for this charge?

24          MR. HARDING:  Objection.  Asked and answered.

25          THE COURT:  Sustained.

1    BY MR. FLANNERY:

2    Q    You had an opportunity to review the warrant, did you not,

3    before this raid began?

4    A    We were in, we had a roll call.  Just before we execute any

5    warrants, we have a roll call, at which time we're briefed on

6    what to do, what to look for.  Unfortunate thing was we didn't

7    have time to go over the warrant because we had like maybe about

8    five locations that they were hitting.  So we couldn't go over

9    each location and say, hey, you're going here.  The only thing

10   they handed was the envelope.

11        They hand you an envelope with the warrants inside of

12   it.  They tell you, this is your premise, this is where you're

13   going.  They'll tell you how many officers are going with you,

14   who the raiding party was going to be.  That's it.  Once you get

15   to the location and you execute the warrant, you secure the

16   premise.  And then after that, the warrant is taken out of the

17   envelope and that's when you tell people what you're here there

18   for, what they're there for.  You're here to execute a warrant.

19   What you're there to seize.

20   Q    Okay.  You weren't the affiant on the warrant?

21   A    No, sir.

22   Q    One of the affiants on the was Sergeant Evans?

23   A    Yeah.  Sergeant Steve Evans.

24   Q    Right.  Okay.  And you, as you testified on direct, it was

25   your understanding before that you were looking for narcotics and

1    weapons?  That was your understanding?  That's correct?

2    A    Yes.  Yes, sir.

3    Q    And when you went into the house, at one point you have the

4    three individuals secured in the lower portion of the house,

5    correct?

6    A    Yes.  Brought them down.  Two were in the living room.  One

7    was up in the bedroom.  She was brought down.  They were secured.

8    And that's when they were Mirandized.

9    Q    And you, in fact, asked, you asked at that point, then, they

10   were Mirandized.  You asked them where are their drugs or weapons

11   in the house, correct?

12   A    No.  If there were any.

13   Q    If there were drugs or weapons in the house?

14   A    Right.

15   Q    And is it your understanding, having reviewed the warrant,

16   that, in fact, there was not an authorization to search for,

17   search and seize narcotics.  Is that your understanding?

18   A    No, sir.

19   Q    Okay.

20   A    I didn't know --

21   Q    That's not your understanding?

22   A    No.  I didn't know that the, that the warrant itself wasn't

23   for narcotics until way after, that the drugs that, what was

24   supposed to have been seized.

25   Q    I understand that.  So if I understand your testimony,

1    that's what you're acknowledging, is that I didn't understand

2    that the warrant was not for narcotics?

3    A    I'm not going to say I didn't understand.  It's that I

4    didn't know.

5    Q    Okay.  That the warrant was not for narcotics?

6    A    Exactly, at that time.

7    Q    And you asked the individuals if there are narcotics or

8    weapons in the house, is what you asked them?

9    A    Right.  Because that's what we're accustomed to.

10    Q    Okay.  So just to back up for one minute.  Like I said, the

11    raid started, as you indicated, 1700 hours?

12    A    Yes, sir.

13    Q    You entered the house and you did a protective sweep of the

14    house?

15    A    Yes.

16    Q    Okay.  And at that point you're looking for bodies and

17    weapons?

18    A    Looking for anybody else inside the premise because a lot of

19    times people aren't going to come out voluntarily.  So you have

20    to do a sweep.  And that's for officer's safety.

21    Q    Okay.  At that point you found Ms. Williams and Ms. Delvison

22    in the lower portion of the apartment?

23    A    In the living room.

24    Q    And you found Ms. Freeman, or Shannon Freeman or Shannon

25    Harris upstairs in a rear bedroom?

1   A    Yes, sir.

2   Q    And she was detained, the women on the lower floor were

3   detained, all brought to one central location in the living room?

4   A    Yes, sir.

5   Q    It's at that point, then, that you Mirandized them with

6   written forms?

7   A    Yes, sir.

8   Q    You had the written forms then?

9   A    Yes, sir.

10  Q    And at that point, then, is when you asked the question, Are

11  there any weapons or drugs in the house?

12  A    Yes, sir.

13  Q    Okay.  How much time had elapsed from the point they entered

14  the home to the point that you now Mirandized the women and

15  you've asked that question?

16  A    I'd say possibly maybe about 10 minutes, 10, 15 minutes.

17  Because we had a female officer.  The protocol is you search

18  everybody for weapons.  So with women, that would take a little

19  longer than with just men because we're allowed to pat down and

20  search a man, you know, a male, a male subject.  But a female,

21  she cannot be searched thoroughly in front of male officers.  So

22  they had to have been excused from the room, then brought back.

23  And then after the search was conducted, that's when they were

24  Mirandized and that's when the questions were asked.

25  Q    Okay.  So 10, 15 minutes has elapsed.  And at this point,

1    then, you are then directed to go to the upstairs and begin to

2    conduct a search at that point, in the upstairs third floor, if I

3    understand right, bedroom?

4    A    It's the second floor.  But to some it would be a third

5    floor.  But to most who understand the walk up in Lexington Poe

6    is just two floors.

7    Q    And at that point you and several officers are conducting a

8    search inside the bedroom?

9    A    The whole house.

10   Q    Okay.

11   A    The entire house.

12   Q    But you personally are upstairs executing the search of the

13   bedroom?

14   A    Yes.

15   Q    Okay.

16   A    Because I'm the recovering officer.

17   Q    Sure.  And you're finding various narcotics, you're finding

18   various pieces of property.  You're photographing those, you're

19   documenting those at that point, correct?

20   A    Yes, sir.

21   Q    How much time would you say elapsed at that point, then, to

22   the time that you have completed the search now?

23   A    Well over an hour.

24   Q    Well over an hour?

25   A    Well over an hour because we have, I believe it was three

1    bedrooms.  So you just don't stop searching at the one bedroom.

2    You go through the whole house.  That means the kitchen, the

3    bathroom, the whole shebang.  You know, you just look, look under

4    every crevice.

5    Q    When did Sergeant Evans arrive on the scene?

6    A    Shortly after the warrant was executed.  It was over an hour

7    before he even got there because by the time he got there, the

8    search was conducted, the narcotics were secured, and Shelton

9    Harris had just came in.  So Sergeant Evans arrived shortly after

10   Shelton Harris arrived at the house.

11   Q    And at this point, well over an hour has passed from the

12   time that you began the raid by the time Sergeant Evans comes on

13   the scene?

14   A    Sure.  Because he was at other locations, also.  Like I

15   said, we had hit five locations that day.  So he had to go, go to

16   every location because he's the affiant on all the warrants.

17   Q    And so in being the affiant on the warrant, it's your

18   understanding that Sergeant Evans actually executed the return

19   for the warrant?  You're aware of that?

20   A    You mean like wrote on the return sheet?

21   Q    Yes.

22   A    I don't think he did.  I don't think it's his writing.

23   Sergeant Murphy is the one that wrote on the return.  And he's

24   the, he was the permanent rank supervisor at the location.  And I

25   was the witness officer there.  The inventory was made in the

1    presence of Sergeant Murphy and PO Alvin Barnes.  And then Steve

2    Evans signed at the bottom.  Signature of affiant.

3    Q    One second, Your Honor, please.

4    A    Yes.

5         THE COURT:  Yes.

6    Q    So you witnessed, did you witness the actual execution of

7    the return, of the return of the warrant?

8    A    You mean when it was returned to the judge?

9    Q    Yeah.  If the inventory was made in the presence of Sergeant

10   Murphy and Alvin Barnes, did you actually witness Sergeant Evans

11   execute the return?

12   A    He don't execute the return, sir.  The only thing he did was

13   he responded to the location.  When he responded, we told him

14   what we recovered.  He saw everything -- he didn't see

15   everything.  But what happened was Sergeant Murphy, who was the

16   permanent rank supervisor, he was present when everything was

17   seized.  So Sergeant Murphy just wrote down the inventory was

18   made in the presence of Sergeant Murphy and Police Officer Barnes

19   and then Sergeant Steve Evans signed the bottom of it.  He's the

20   affiant.  I swear this inventory was true and detailed account of

21   all the property taken by me on the warrant.  And this was seized

22   out of the house.

23   Q    And that's what I'm asking you.  Were you there when

24   Sergeant Evans actually executed, were you there when Sergeant

25   Evans, as the affiant, executed, where it says, I swear that this

1    inventory is a true and detailed --

2    A    Yeah.  All three of us were there, yes, sir.

3    Q    You were there at that point?

4    A    Yes, sir.

5    Q    But it was completed, then, before Sergeant Evans arrived on

6    the scene?

7    A    Yes, sir.

8    Q    Okay.  And so at 17, if it indicates, does it indicate, does

9    it not, at the top of the return -- put this up on the for you.

10   A    I received the attached search warrant?

11   Q    You wouldn't generally fill this out until, until the search

12   is completed, right, and then Sergeant Evans would be on the

13   scene?

14   A    Yes, sir.

15   Q    Okay.

16   A    Well, not necessarily.  If he came on the scene, it's up to

17   the, the permanent ranking supervisor on the scene.  He could

18   have also signed it and stated that it was inventoried in front

19   of him, also.  But Sergeant Steve Evans, he appeared on the scene

20   and that was his signature.

21   Q    But you don't have it all inventoried and ready to be

22   itemized until you're about ready, the search now is over.  We're

23   going to inventory it all up, itemize it, and we're going to

24   execute this return?

25   A    It is itemized because what happened is you have a raid

1    sheet.  And on the raid sheet you put the location where the

2    property was seized from.

3    Q    Right.

4    A    Okay?  Every location.  Under the bed.  Under the drawer.

5    Wherever the property was seized.  What happened was the total

6    amount of narcotics, he broke it down.  He saw that it was 37

7    here, 3 there.  He just totaled it up.  And it came out to 88

8    vials of suspected crack cocaine.

9    Q    Okay.

10   A    That's how he inventoried it.  He didn't break it down and

11   say well, 33, 37 was found here.  Three was found there.  He

12   didn't do it.  He just combined everything that was found, all

13   the narcotics.

14   Q    I understand.  I guess what I'm asking you is that if this

15   is the return, it indicates up, it indicates that at 1730 is when

16   you're filling this out.  You're filling it out at 1730.  Is when

17   you're executing this.  And Sergeant Evans is right there with

18   you guys?

19   A    No.  He could have estimated that it was at 1730.  But in

20   all actuality, it was well after 1730 hours.

21   Q    Okay.  So you're saying that, in fact, it's not correct, is

22   what essentially --

23   A    It's possible that he, it was an oversight on his part.  But

24   I know it takes at least, at least an hour to do a thorough job

25   in searching a premise.  You just can't go in.  And especially if

1    it's a three bedroom house.  You have a bathroom, you have a

2    kitchen, you have to go through all the cabinets.  It's going to

3    take you well more than an hour to search any house.

4    Q    Okay.  And when you -- after the search, you come

5    downstairs, you're debriefing, then, the three individuals that

6    are still in the lower portion of 205 Amity.  After you've

7    completed the search, you then go down to debrief the three

8    individuals and that's when the phone call comes in?

9    A    Right.  They're secured.

10   Q    Go ahead.

11   A    And they are informed, they are advised who might be going

12   to jail and who probably won't.  Just so happens that Ms. Shannon

13   Freeman, I believe she never was arrested at all.  I'm not sure

14   the reason why.  But I believe she was pregnant or whatever.  But

15   she wasn't arrested.

16         But the rest, the other two, they were informed that

17   they would be arrested.  And then shortly thereafter, that's when

18   Mr. Shelton Harris called.

19   Q    And you spoke to Mr. Harris on the phone and he eventually

20   tells you that he will be there.  He didn't tell you any time

21   that he would arrive but you went outside and waited for him?

22   A    No, he said.  He said he would be there in about ten

23   minutes.

24   Q    Ten minutes.  So you went outside and waited for him?

25   A    Yeah.  I went outside.

1    Q    And at that point your testimony is that everything was

2    locked up and everything was put away and the raid kits were all

3    gone?

4    A    Yes, sir.  No, they are weren't all gone.  They were secured

5    in a vehicle.  They were secured in a vehicle right outside the

6    premises.

7    Q    Security in a vehicle right outside the premise at the time

8    that he shows up.  He shows up, identifies, you take him inside,

9    and that's when your testimony is that you orally Mirandized him

10   then at that point?

11   A    Yes, sir.

12   Q    Okay.  And so you couldn't go back outside, though, and get

13   one of the forms because you didn't want to give away where,

14   which cars the raid kits were in?

15   A    The narcotics.  The narcotics and the raid kit was in the

16   same vehicle.

17   Q    Okay.

18   A    I can't want to leave that car unattended for the simple

19   fact that if somebody know the evidence is in the car, they could

20   break in it.

21   Q    Understood.  But you understand it is important to use those

22   written Miranda forms?

23   A    Sure.  But he appeared after, after the raid was executed,

24   after the warrant was executed.  That's when he showed up.

25   Q    And you did, in fact, use those written Miranda forms on the

1    three women in the house?

2    A    Sure.  Because we had the raid packets and everything when

3    we entered into the premises.

4    Q    Thank you.  No further questions, Your Honor.

5                    REDIRECT EXAMINATION

6    BY MR. HARDING:

7    Q    Is it correct, Detective Barnes, that Miranda warnings are

8    generally given to people when they're in custody and when

9    they're being interrogated?  Is that correct?

10   A    Yes.  Or when there's an inclination that their involvement

11   in crime, that they might incriminate themselves.  So you give

12   them their Miranda warning.

13   Q    Of course, Mr. Harris took responsibility for the drugs when

14   he was on the phone with you, wasn't even at the premises, isn't

15   that correct?

16   A    That's right.  Yes, sir.

17   Q    And when he came back to the house you say you gave him the

18   Miranda warnings before you took another statement from him, but

19   you gave them to him verbally, is that correct?

20   A    Yes, sir.

21   Q    And is that your distinct recollection?

22   A    Yes, it is.

23   Q    Did you testify about that at a hearing back in 2005,

24   Officer Barnes?

25   A    I did.

1   Q    You also said that when you stated to Mr. Harris that if he

2   didn't come back his mother and others might be arrested, that

3   was not a threat.  Do you recall that?

4   A    Yes.  It wasn't a threat.

5   Q    What do you mean by that?

6   A    I just asked Mr., Mr. Shelton Harris, are you going to be a

7   man and take the charge like a man or are you going to let your

8   mother take the charge for these drugs, which weren't hers?

9   That's the only thing I was telling Mr. Harris.  And that's when

10  he was, he was convinced, and he surrendered his self to me.

11        I didn't tell him, Hey, get down here, anything.  I

12  spoke to him in a cool, monotone voice.  And I let him know, You

13  going to let your mother take this charge for you?  And he said

14  he was coming down there.  He came down there within ten minutes.

15  He walked from, from Lexington, from Lexington Street.  He was

16  coming from Lexington Street way.  And that's when I met him.

17  And as I saw him heading towards the house, that's when I met him

18  head on and I stopped him and I spoke to him.  He identified

19  himself after I identified myself.  I identified myself first.

20  Said I'm Officer Barnes.  He identified himself as Shelton

21  Harris.

22  Q    Now, his mother was the lease holder for the apartment, you

23  said, is that correct?

24  A    Yes, sir.

25  Q    So was it your intention before you got that phone call to

1    actually arrest her for possession of those drugs?

2    A    Yes, sir.

3    Q    Did you know that those drugs were actually Shelton Harris's

4    drugs after you, after you'd searched the room?  You'd found the

5    paperwork at that point, is that correct?

6    A    Yes.  It linked him.  It's a possibility there was a link

7    between Shelton Harris and the drugs.

8    Q    Yeah.  And you had also gotten information from one of the

9    three females down before you even started to search, is that

10   correct?

11   A    Yes, sir.

12        MR. FLANNERY:  Objection, Your Honor.

13        THE COURT:  Overruled.

14   Q    Yeah.  Why don't you tell us what she, what the female told

15   you down on the first floor?  This is, we've been all around

16   this.  Why don't you just tell us what she told you?

17        MR. FLANNERY:  Objection, Your Honor.

18        THE COURT:  The objection's sustained.  I think the

19   jury gets it.

20        MR. HARDING:  No further questions, Your Honor.

21        MR. FLANNERY:  Your Honor, briefly.  Very briefly.

22        RECROSS EXAMINATION

23   BY MR. FLANNERY:

24   Q    Detective Barnes, again, you did, in fact, tell Mr. Harris

25   that he was either going to man up or his mother was going to

1    talk the fall for this charge?  Those are your words?

2    A    I didn't tell him.  I asked him.

3    Q    Okay.  You asked him that.  And then, in fact, when he did

4    show up and then you testified that you made the statement to

5    him, you arrested his mother, anyway?  That's correct?

6    A    Exactly.  I did.

7    Q    Yes?

8    A    But I told --

9    Q    You arrested his mother and she was taken down to Central

10   Booking, not to be released until the State's Attorney's Office

11   eventually then did release her.  Is that correct?

12   A    I had to explain to the State's Attorney's Office what her

13   involvement in the case was, which is very minimal.  They felt

14   that they didn't want to prosecute her.  They declined to

15   prosecute her.  And I told them, I said, This is something I have

16   to do.  As a police officer, she's in the premises with the

17   narcotics, I'm inclined to arrest her.

18        Now, when we get down to Central Booking, it's up to

19   the State Attorneys whether or not they're going to prosecute

20   her.  It's up to me as a prudent officer to approach the State's

21   Attorney's Office and ask them, this is the charge, this is what

22   I have.  If they say, Hey, Officer, I understand the dilemma,

23   we're not going to prosecute her, there was no hair, there was no

24   hair loss.  I just said okay, fine.  If you're not going to

25   prosecute her, that's okay with me.

1    Q    And Mr. Harding went over with you the purpose of Miranda

2    warnings?  You understand as a police officer how important

3    Miranda warnings are, right?

4    A    I sure do.

5    Q    Sure.  So important that Mr. Harding and Mr. Klas had you

6    down for an interview almost three years to the day after this

7    happened in order to specifically discuss whether or not you

8    Mirandized Mr. Harris at this raid, that's correct?

9               MR. HARDING:  Objection.

10              THE COURT:  Sustained.

11              MR. FLANNERY:  No further questions, Your Honor.

12              MR. HARDING:  May I ask one question?

13              THE COURT:  Certainly, Mr. Harding.

14              REDIRECT EXAMINATION

15   BY MR. HARDING:

16   Q    When you came down to see Special Agent Klas and me three

17   years ago, Detective, was that to prepare for your testimony at

18   the hearing we referred to earlier?

19   A    Yes, it was.

20   Q    And did we cover all aspects of what you did that day?

21   A    Yes, you did.

22   Q    And did you testify under oath that day?

23   A    Yes, I did.

24   Q    Thank you.  No further questions.

25              THE COURT:  Thank you very much, Detective Barnes.

1    You're excused.  Is that it, counsel?

2              MR. HARDING:  Yes, Your Honor.

3              THE COURT:  All right.  Ladies and gentlemen, that's

4    going to conclude our court day a little early.  We hope you

5    don't mind.

6              I'm advised that there is a very good chance that we

7    are going to conclude the government's presentation next week.

8    My earlier plan that we would be in session through Thanksgiving

9    still holds, although there is now, I think, a good possibility

10   that the case will conclude before the Thanksgiving holiday.

11             I will advise you tomorrow, I think, in greater detail

12   of what our schedule is likely to be next week.  Not only might

13   the government finish its presentation next week but, in fact,

14   contrary to what I had planned and what I said to you earlier

15   today, having now conferred with counsel, it may be that we won't

16   be in session next Friday.

17             I don't want to give you too much information and I

18   certainly don't want to give you conflicting information.  But I

19   do want to give you as much information as I can so that you can

20   plan your lives.

21             So right now the plan is to be in session every day

22   next week, including Friday for half a day.  And if that changes,

23   I will advise you promptly either tomorrow or certainly on

24   Monday.  We'll know on Monday, I think, whether we're going to be

25   in session with you on Friday of next week.  So we're making good

1    progress.  And we all very much appreciate, again, the continuing

2    sacrifice that you all as jurors are making to enable you to

3    participate in this important exercise.

4            So leave your note pads on your chairs, please.  Have

5    no discussion about any of the evidence.  Continue to adhere to

6    all of my instructions.  Avoid media exposure about the case.  Do

7    not discuss the case.  Do not permit anyone to discuss the case

8    with you.  Do not visit any of the scenes.  Do not conduct any

9    investigation of any sort online, off line, books, newspapers, or

10   any similar activities.

11           Enjoy your evening.  We'll see you tomorrow morning,

12   please, at 9:30.  We'll start promptly at that time.

13           Jury's excused until 9:30 tomorrow, Wednesday.

14           (Jury exits the courtroom at 3:20 p.m.)

15           THE COURT:  So have a seat for a moment.  What do you

16   expect to have tomorrow now, Mr. Harding?

17           MR. HARDING:  In addition to Shamier Delvison, Arlene

18   Williams, Shannon Harris, Roy Jones.

19           THE COURT:  And what's Jones's area?

20           MR. HARDING:  He's the fingerprint guy.

21           THE COURT:  Oh, right.  Okay.

22           MR. HARDING:  And also Andre Drake.

23           THE COURT:  And what's Drake, Drake's area?

24           MR. HARDING:  Drake was -- remember, Mr. Harris got

25   arrested again in 2004.  He was in an apartment.  He was actually

1   living with two friends of his, Andre Drake and Sherri Fickling

2   at that time.  And that's where the gun and the rap lyrics were

3   recovered.  And so --

4           THE COURT:  What was the address?

5           MR. HARDING:  That was on Seamon Avenue, Your Honor.

6           THE COURT:  In Cherry Hill?

7           MR. HARDING:  Yes.

8           THE COURT:  Okay.  All right.

9           MR. HARDING:  Who else?  Am I leaving someone?  We have

10  Damita Green and Ernest Reynolds tomorrow.  So we could come

11  close to having a full day tomorrow, especially since we think we

12  may now have Damita Green.

13          THE COURT:  Okay.  Have you gotten some more recent

14  word since we started the afternoon session?

15          MR. HARDING:  Oh, have we -- we did speak to her over

16  lunch and we now think we may well be able to get her tomorrow.

17  But as a precaution, Mr. Hanlon has prepared an affidavit in

18  support of a material witness warrant.

19          THE COURT:  Are you going to want me to hold her

20  overnight?

21          MR. HARDING:  No.  We just want to have it available in

22  case she resists coming tomorrow.

23          THE COURT:  All right.  Yeah.  That sounds like it

24  could very easily be a full day tomorrow.

25          And then next week just in broad outline.

1          MR. HARDING:  Oh, and also one other thing.  Kenny

2     Welsh, the detective in the Eric Lee thing that, that Your Honor

3     knows about, he's available for tomorrow, also.  He's coming in

4     to prep with me after court today.

5          THE COURT:  Okay.  But you're going to put him at the

6     very end?

7          MR. HARDING:  Yes.  I don't know whether the Daubert

8     issue would preclude him from testifying or not.  So if Your

9     Honor wants me to postpone him until next week, just let me know.

10         THE COURT:  I think I would like you to do that.

11         MR. HARDING:  Okay.

12         THE COURT:  Okay?  Let's hold Welsh until I've had a

13     chance to read this.

14         Okay.  So next week, then, we'll have Welsh, we'll have

15     the medical examiner.  Has that stipulation on the chemist been

16     accepted by everybody?

17         MR. HARDING:  No, I haven't heard a peep.

18         THE COURT:  Well, you haven't heard an objection.

19         MS. RHODES:  Your Honor, we accept it.  We had

20     mentioned that initially, but we still accept it.

21         THE COURT:  Now I'm talking about the specific

22     stipulation that the government has drafted --

23         MS. RHODES:  Yes.

24         THE COURT:  -- and proposed.

25         MR. COBURN:  I have to confess to Your Honor, I haven't

1    really read it carefully yet.  But I don't think it's going to be

2    a problem.

3            THE COURT:  Okay.  All right.  So we'll have Welsh,

4    medical examiner.  Next week I'm talking now.

5            MR. HARDING:  Yes.  I want to, I would like, if the

6    Court permits, to call Rodney Hayes on Tuesday because it happens

7    to be his day off.  He's working now.

8            THE COURT:  Sure.

9            MR. HARDING:  And anxious to, he has to earn a living.

10           THE COURT:  All right.  Well, I want to talk about

11   Hayes before we break today.  And Reynolds.  Who else next week?

12           MR. HARDING:  Well, I wasn't actually prepared to go

13   through the whole list.  Could I have a few minutes?

14           THE COURT:  Just who's left?  I mean, surely you must

15   remember who's left.

16           MR. HARDING:  You would be surprised, Your Honor.

17           THE COURT:  I would be, I'm sure.

18           MR. HARDING:  Well, there's Sheri Fickling.

19           THE COURT:  And who is she, again?

20           MR. HARDING:  She was living in that Seamon Avenue

21   address.

22           THE COURT:  Oh, right.  Right.

23           MR. HARDING:  Judge, there are one or two people we're

24   still looking for.

25           THE COURT:  Okay.  No more witnesses in custody?

1          MR. HARDING:  Yes.  There's one more, Gregory Mungo,

2     Your Honor.

3          THE COURT:  Mungo.

4          MR. HARDING:  And we have the marshals to testify about

5     that assault in the marshal's lockup.

6          THE COURT:  Oh, right.  Who's Mungo?

7          MR. HARDING:  Mungo was a prisoner who was in the

8     lockup.

9          THE COURT:  He's on the Count 19.  All right.

10         MR. HARDING:  Oh, yeah.  In connection with the Eric

11    Little shooting and the shooting of Jason or Jerome Epps, we have

12    not only Kenny Welsh, but two firearms technicians, two

13    ballistics experts who have to testify.

14         THE COURT:  All right.

15         MR. HARDING:  And I guess that's about it.  But don't

16    hold me to it.

17         THE COURT:  Okay.  That sounds very much like you're

18    going to finish by Thursday.

19         MR. HARDING:  Oh, yeah.  The agents, of course.

20         THE COURT:  Of course.  Of course.

21         MR. HARDING:  And Doug Ellington, our expert on

22    narcotics trafficking organizations and --

23         THE COURT:  All right.

24         MR. HARDING:  -- some more issues.

25         THE COURT:  Can you walk me, please, through the Little

1    and Epps shootings?

2           MR. HARDING:  On March 11th, 2002, in other words,

3    after the McCaffity/Brown double murder but before the Wyche

4    brothers double murder, two men approached a group of men that

5    were leaving a party shortly before midnight on Lauretta Avenue

6    in West Baltimore.  And the two men ordered the men to get down

7    on to the ground.  A couple of men actually took off running.

8    But two of them got down on the ground.  And the two men who were

9    giving the orders opened fire on them, killing one of them and

10   wounding the other, Mr. Epps.

11          THE COURT:  Without further ado?  Without --

12          MR. HARDING:  Without further ado, yes.

13          THE COURT:  All right.

14          MR. HARDING:  So there were two kinds of .40 caliber

15   shell casings recovered from the scene and two kinds of .40

16   caliber bullets.  One set of casings and bullets matched the

17   evidence recovered from the Wyche brothers murder, where only one

18   gun was used and it was a .40 caliber.

19          The other casings and bullets were all fired by the .40

20   caliber semiautomatic that was recovered from the woods in the

21   Tonya Jones Spence murder, but which was never fired in the

22   course of that murder.  That is the weapon, you recall, from Mr.

23   Montgomery that they didn't want to actually fire that day

24   because, according to Mr. Gardner who owned it, it a body on it.

25   So they didn't want to actually have to use that one.

1          So that's government's evidence.  And the government

2     considers it to be probative not only as a way of linking these,

3     the Jones Spence and the Wyche brothers homicide together, but

4     also because it corroborates Will Montgomery, that this .40

5     caliber gun had a body on it.

6          The Court's prior ruling that we can't bring out the

7     fact that Mr. Lee was killed somewhat puts a crimp in that.  It

8     somewhat diminishes the value of the corroboration that the

9     evidence would offer for Will Montgomery.  And since the Court

10    has heard that, I would ask the Court to reconsider its ruling on

11    that, since it's relevant specifically to corroborating Will

12    Montgomery.  But as things stand now, the Court has admitted the

13    evidence but we're supposed to not include the fact that Eric Lee

14    was actually killed in the shooting.

15         THE COURT:  Will, and if not, why not, Epps testify?

16         MR. HARDING:  Neither of them could identify the

17    shooters.  They didn't know who the shooters were.  There's no

18    point in having them testify.  Will Montgomery -- did you say

19    Will?

20         THE COURT:  Will Epps testify and if not, why not?

21         MR. HARDING:  We have never talked to Epps because all

22    of our indications are that he knows nothing about this shooting.

23    He doesn't know who shot at him.  He can't describe them in any

24    way.  We don't have descriptions of the shooters.

25         THE COURT:  But you say that they were told to get down

1    on the ground.

2              MR. HARDING:  Yes.

3              THE COURT:  And it wasn't a robbery --

4              MR. HARDING:  No.

5              THE COURT:  -- from what you described.  It sounds like

6    an execution.

7              MR. HARDING:  It was.  Do you want the police

8    department hypothesis about it?

9              THE COURT:  Yes.  What's the police department

10   hypothesis?

11             MR. HARDING:  Detective Benson could go into more

12   detail.  But we believe that Goose, these guys were connected to

13   Goose, and were believed to have thwarted Goose, the guy who was

14   at that point employing Mr. Martin.  We believe that this was a

15   hit ordered by Goose, by Sherman Kemp, who has subsequently been

16   prosecuted but who has never cooperated.

17             THE COURT:  And who was himself a potential victim at

18   some point.

19             MR. HARDING:  Yes.

20             THE COURT:  Late in the developments.

21             MR. HARDING:  Yes.  Martin and Gardner decided to, and

22   Will Montgomery, were all going to rob and kill Goose.  That was

23   a plan that was very much in the works.

24             THE COURT:  How would you prove -- well, I guess you're

25   going to have the detective, you were going to have the detective

1    testify that he recovered the projectiles at the autopsy?

2            MR. HARDING:  Well, I will of course not do that if the

3    Court's --

4            THE COURT:  But I mean, that's how you were going to do

5    it before my preliminary ruling that we don't need another murder

6    in the case?

7            MR. HARDING:  I would, I would dance, dance around the

8    issue of where the bullets recovered at the autopsy were actually

9    recovered from.  I would say they were recovered from some

10   portion of the victim's body or something like that.

11           THE COURT:  Did you say there were two shots fired from

12   each of the .40 calibers?

13           MR. HARDING:  No.  There were multiple shots fired.  I

14   think there were seven shots fired from one gun and three from

15   another.

16           THE COURT:  And which was the murder weapon, as it

17   were?  Do you recall?

18           MR. HARDING:  No.

19           THE COURT:  But three and five, you recall?

20           MR. HARDING:  Three and seven.

21           THE COURT:  Three and seven.  Excuse me.  Three and

22   seven.  So remind me of the dates once again, please.  The

23   McCaffity was February 25th.

24           MR. HARDING:  Or February 28th.  27th into the 28.  And

25   then we have March 25th and, March 24th into the 25th.  Actually,

1    slightly after midnight on March 25th for the Wyche brothers

2    murder.

3              THE COURT:  And this Lee Epps?  And this shooting

4    happened at about close to midnight on March 11th.  I mean, we

5    believe the shooters were Mr. Gardner and Mr. Martin, but it may

6    have been a different combination of these defendants, Your

7    Honor.  But we can't prove it and we aren't charging it.  What we

8    need --

9              THE COURT:  You're going to argue, I take it, that

10   Mr. -- well, we have substantial evidence that Mr. Gardner was in

11   continuous possession of the .40 caliber for some period before

12   the Jones Spence murder?

13             MR. HARDING:  We know that from Mr. Montgomery, Your

14   Honor.  They took that gun, as well as the .357, every time they

15   went out on surveillance.  He says going on for a couple of

16   months prior to the murder.

17             THE COURT:  Right.  And what do we know from the

18   evidence or think we know from the evidence regarding the, the --

19   you never recovered the weapon in the Wyche brothers?  You just

20   have the ballistics, right?

21             MR. HARDING:  That's correct.

22             THE COURT:  So I'm sorry to repeat, ask you to repeat,

23   Mr. Harding.  So the Lee weapon comes back to the Wyche brothers.

24             MR. HARDING:  There are two Lee weapons.  Remember?

25             THE COURT:  Right.  When I say the Lee weapon -- well,

1    I'm saying there's a Lee weapon and there's an Epps weapon.

2              MR. HARDING:  Oh.

3              THE COURT:  Both .40 calibers.

4              MR. HARDING:  Actually, I haven't, I can't tell you

5    that the -- the guy who fired one of the .40 caliber weapons may

6    have hit both of these.

7              THE COURT:  I see.  I see what you mean.  So it wasn't

8    like the two shooters divided the two victims.

9              MR. HARDING:  They may have but I just don't know.

10   Maybe Benson --

11             THE COURT:  Okay.  Okay.

12             MR. HARDING:  Detective Benson believes that all of the

13   rounds were directed at Lee and that Epps was hit by a ricochet.

14             THE COURT:  Oh, I see.  I see.  Is there something

15   about the two of them that sort of gives color to that?  Was Lee

16   more closely associated with Goose or --

17             TFO BENSON:  Your Honor, in that incident, the only

18   individual that was, it was clearly an execution.  He was shot as

19   he was prone down on the ground, 10 or 11 times.  I believe Epps

20   was only hit with a ricochet.

21             THE COURT:  I see.

22             TFO BENSON:  The theory was that an individual was with

23   them named Donald Dukes, who we believe was being supplied

24   cocaine by Goose.  Dukes was on the phone that entire night,

25   looking over his shoulders.  He was one of the ones that ran as

1   the two individuals came up.  He was on the phone with County

2   Sports, which is owned by Sherman Kemp, and Shelly Wayne Martin

3   worked there.  That was the theory.

4               THE COURT:  Okay.  I see.  All right.  Well, I'll hear

5   from counsel, Mr. Harding.  But I mean, I agree with the

6   government.  In light of the evidence that the jury has heard

7   and, frankly, the extraordinary length that the government has

8   gone to to trace the .40 caliber found in the woods through

9   Montgomery, through the soil, although I realize that that was

10  inconclusive at best, I'm not going to ask you to dance around,

11  if you're going to tell the jury, as I think you clearly are

12  entitled to tell the jury, that ten shots were fired and -- how

13  many, how many fragments did you recover?  Well, you recovered

14  all ten shell casings?

15              MR. HARDING:  I believe so, Your Honor.

16              THE COURT:  Or most of them.

17              MR. HARDING:  I can't tell you the number of bullet

18  fragments that were recovered.  But there were several whole

19  bullets recovered from both autopsies.  Because there was a

20  bullet recovered, even though Epps was hit by a ricochet, there

21  was a bullet in him that had to be pulled out, i mean not in an

22  autopsy, but at the hospital.  He was taken to a hospital and a

23  bullet was taken out.

24              THE COURT:  When you say an old bullet --

25              MR. HARDING:  Whole, whole.

158

1          THE COURT:  Whole.  I'm sorry.

2          MR. HARDING:  And there may have been bullet fragments.

3    There probably were bullet fragments recovered from the scene as

4    well, although I just --

5          THE COURT:  Okay.  But your principal interest is the

6    shell casings?

7          MR. HARDING:  Yes.

8          THE COURT:  From the .40 calibers.  All right.

9          MR. KURLAND:  Your Honor, I'll resist --

10         THE COURT:  Just one moment, Mr. Kurland, please.

11         Do you have a theory, Mr. Harding, however speculative,

12   as to what happened to the other .40 caliber?

13         MR. HARDING:  No.

14         THE COURT:  No?  No idea?

15         MR. HARDING:  One of our witnesses next week will have

16   a lot of testimony about the firearms in this case and I'm trying

17   to remember if he had any information about that particular one.

18   But I can't recall if he does.

19         THE COURT:  And by the way, apart from Lee Epps, Wyche

20   brothers, Jones Spence, are there any other connections with

21   these two weapons to any other shootings of which you've been

22   advised?

23         MR. HARDING:  Well, actually, I vaguely recall another

24   one, but Benson has now left.  I would have to check the -- I

25   have reports upstairs that contain information about another

1    shooting I wasn't planning on getting into.

2            THE COURT:  All right.  The reason I asked that, and I

3    appreciate that, I'm trying to anticipate the cross examination,

4    obviously.  Because I don't want to take us too far afield.  It

5    looks like Agent Benson's coming back.  But you think there may

6    be one other?  You want to confer with the agent?

7            (Pause in proceedings.)

8            MR. HARDING:  Like me, Detective Benson thinks there

9    was another non-fatal shooting that was connected by trigger lock

10   comparisons.  But I would have to go examine the reports to give

11   the Court any more information.  In any case, I wasn't planning

12   on getting into that.

13           THE COURT:  Right.  Is it in the same time period?

14           MR. HARDING:  It would have been, yes.

15           THE COURT:  And which, which .40 caliber is it?

16           MR. HARDING:  Can't --

17           THE COURT:  Don't recall?

18           MR. HARDING:  No.

19           THE COURT:  Okay.  All right.  Mr. Kurland.

20           MR. KURLAND:  The world just continues to shift by the

21   moment because ten minutes ago, I was basically, I was going to

22   make it based on the Court's ruling that the evidence doesn't

23   come in but no reference to the homicide.

24           THE COURT:  Yeah.  I think that that's, frankly, I

25   think that would be a silly ruling.

1          MR. KURLAND:  Well, I think that -- well, I'm going to

2     ask, renew my motion that it should all be excluded under 403

3     because, Judge, this is -- first, we made a 404(b) demand and I'm

4     not 100% certain that we've received all the information we're

5     entitled to under 404(b).  With respect to other shootings, the

6     government's never, the government doesn't want them in.  The

7     government hasn't made an attempt to put them in.

8          THE COURT:  Well, the government is not going to

9     argue -- I say this, of course, not having heard from Mr.

10    Harding -- but the government's not going to argue that Mr.

11    Gardner was actually the shooter in the Lee Epps shooting.  The

12    government's not going to argue.  But the government clearly

13    should be entitled to argue that a firearm that Mr. Montgomery

14    says was Mr. Gardner's constant companion and which Mr. Gardner

15    had declaimed had bodies on it and which was left in the woods

16    within minutes after Tonya Jones Spence was murdered --

17         MR. KURLAND:  Your Honor, that's, factually, that's not

18    proven.  It was found two and a half weeks later.  But that's

19    sort of beside the point.

20         THE COURT:  Well, I take your point.  I don't think

21    it's beside the point.  I didn't say when it was -- I said when

22    it was left.  I didn't say when it was found.  I said it was left

23    in the woods within minutes of Tonya Jones Spence's murder.  Now,

24    that's speculative but it's a reasonable inference -- it's not

25    speculative.  It's a reasonable inference that a fact finder

1    could draw.

2            MR. KURLAND:  That's correct.

3            THE COURT:  All right.

4            MR. KURLAND:  But, Your Honor, here's the thing.  First

5    off, the evidence concerning the corroboration of Mr. Montgomery

6    and the certainty that Mr. Gardner lugged this gun around all the

7    time and was joined at the hip with it was not what Mr.

8    Montgomery testified to.  In fact, Mr. Montgomery testified back

9    and forth that either the Glock is the gun of choice of Mr

10   Gardner or he had a .357.  So there's a lot of inconsistencies in

11   Mr. Montgomery's testimony concerning how long the gun was.

12            But in addition to that, Judge, with respect to this

13   gun and the time period, even if you go back to the shooting

14   three -- wait -- on March 11th, and the surveillance period of at

15   least two months, so on, so forth, the timing doesn't match up

16   with respect to Gardner ever claiming that it had bodies on it.

17   Because if you put the time frame together, Gardner's claiming he

18   has bodies on the gun before this shooting.

19            THE COURT:  Well, I don't even, I'm not accepting as

20   true that the weapon had bodies on it, let alone that it had

21   three bodies on it.

22            MR. KURLAND:  Well, no.  But it just seems that when

23   there was a statement that was made earlier in the trial that Mr.

24   Mitchell allegedly made that was demonstrably false, the Court

25   took the extraordinary step and instructed the jury that the

1    statement was demonstrably false.

2         And here, there's no evidence at all, and maybe I have

3    it wrong, but there's no connection with regard to Mr. Gardner

4    ever taking orders to carry out a hit from Goose.

5         The other fact the government leaves a little bit out

6    is that Lee, I believe there was a search of the victim's house

7    after he died and he had tons of drugs at his house.  So there's

8    a million people leaving this party -- not a million, I'm

9    exaggerating.  There's a lot of people leaving the party.  For

10   there to be speculation that Gardner and, the Court said that he

11   doesn't think the government's going to argue that.  But that's

12   going to be the obvious 403 unfair prejudice inference.

13        Nobody was charged here.  I'm certainly going to be

14   able to ask the officer that nobody was arrested here.  Mr.

15   Gardner wasn't arrested.  I hope the Court is not going to limit

16   my cross examination on that point.  But Gardner was never

17   arrested.

18        THE COURT:  No.

19        MR. KURLAND:  Martin was never arrested.  And we have

20   all these testimony -- we had testimony today from the

21   government's own witness that Darius Spence, that these guns, you

22   know, promiscuously move around in the drug/gun community.

23        We also have testimony, I think it's the government's

24   theory that they elaborated on in their opening statement, that,

25   I think their theory is McCaffity took his girlfriend to a gun

163

1    sale, thought was a gun sale.  So gun sales and gun buys and gun

2    transfers apparently are Saturday night date activity in this

3    case.

4              There's nothing that ties this -- I shouldn't say

5    there's nothing that ties this.  The unfair prejudice to allow

6    this whole inquiry is that the guns which never really, if you do

7    the little chart on the guns, there is no gun that is used in the

8    Spence murder that is used in any of the other murders, there's

9    no common gun.  The common gun is this uncharged event where

10   there were many people around, many speculative motives.  The

11   only connection is through an uncharged act.  And that really is

12   the tail wagging the dog.  And I would ask that none of this come

13   in.

14             THE COURT:  All right.  I think what you just said, Mr.

15   Kurland, is exactly the government's argument.  What you contend

16   are factors that the Court should weigh on the undue, unfair

17   prejudice prong are exactly the factors that make this evidence

18   so extraordinarily probative.  You have, you have three homicides

19   involving a total of two weapons.  Homicide one is charged in

20   this case.  Homicide three is charged in this case.  And in

21   between you have an uncharged homicide.

22             And what the government is now prepared to show on very

23   compelling evidence, that the weapon used in homicide one shows

24   up in a homicide a few weeks later.  And a second weapon used in

25   homicide one, treating the shootings of Epps and Lee as sort of a

1    single homicide, shows up in a homicide a month and a half, two

2    months later.  And you have direct testimony from Will Montgomery

3    and others regarding possession of the one weapon, the recovery

4    of that weapon within a few hundred yards of the location of

5    homicide number three.  You have testimony in the form of an

6    admission by Mr. Gardner through Montgomery regarding his

7    possession of that weapon.

8              MR. KURLAND:  Which, by the way, the only evidence on

9    that is from Mr. Montgomery.

10             THE COURT:  Well, look, I'm not weighing the evidence.

11   I'm not weighing the evidence.  That's for the jury.

12             MR. KURLAND:  I understand.  But the thing is, though,

13   what the government is setting forth and what the Court seems to

14   find as being this compelling connection, the whole point is this

15   compelling connection, the strongest evidence is this uncharged

16   crime of which, you know, there's an that old saying, guns don't

17   kill people, people kill people.  The connection is through a

18   gun.  There's no evidence at all that Mr. Gardner or Mr. Martin

19   or anybody sitting on this side of the courtroom was involved in

20   those murders.

21             THE COURT:  And I absolutely acknowledge that.

22             MR. KURLAND:  So what's happening here is the

23   government is essentially going to have what I view as some of

24   the most compelling evidence on an uncharged, the most compelling

25   evidence, I find it to be unfairly prejudicial because it's this

1    gun evidence tied to some murder, tied to the connection, without

2    really tying it to the people involved.

3         THE COURT:  I don't find it unfairly prejudicial

4    whatsoever.  To the contrary, to the contrary, it will be for the

5    jury to determine, and you, and you and other counsel clearly

6    have laid a foundation, Mr. Coburn did this morning, these guns

7    are like currency to a certain extent in this world.  And you can

8    loan a gun.  You can borrow a gun.  You can, you can trade guns

9    for drugs.  You can do all kinds of things.  You can buy a gun on

10   the street.

11        The jury's heard Mr. Montgomery say in response to my

12   own question, why did you need another gun?  Because he had a

13   plan for this other gun.  The jury's heard all of that.

14        So it will be up to the jury to decide how compelling

15   is the circumstantial evidence that between two charged murders,

16   these two firearms, one of which is not shown to have been used

17   in one of the charged murders but is shown to have been present

18   at the uncharged murder, how plausible is it that between late

19   March, or I should say late February and mid June that these .40

20   caliber Glocks were really changing hands on a daily or a weekly

21   basis, as opposed to the inference that --

22        MR. KURLAND:  It's still months, it's still months

23   before.

24        Your Honor, I take it the government's not going to be

25   permitted, though, to have anybody testify to speculate as,

1   they're going to theorize that Mr. Martin, that Mr. Gardner and

2   Mr. Martin were involved in the Lee murder.  But I should be able

3   to elicit the factual information that Mr. Gardner was not

4   arrested, has never been arrested for that murder.

5        THE COURT:  Well, if you open that door, I don't know

6   what the government might want to do or what additional

7   information the government may have.  Obviously, I can't, I can't

8   predict a ruling on the basis of a door that's not yet opened,

9   Mr. Kurland.

10        MR. KURLAND:  No.  But this is concrete enough that,

11   obviously, they won't be able to get into it on direct.  But to

12   me, it would seem to me at minimum that I should be able to

13   elicit the factual information.  There's been no arrest.  And

14   speculation, inference and theorization is not fair game once

15   that door has been, opened that door.

16        THE COURT:  Of course.

17        MR. KURLAND:  Opened that door.

18        THE COURT:  Of course.  And I just wonder if you want

19   to just --  sometimes, you well know, I don't mean to lecture,

20   you save some things for closing argument.

21        MR. KURLAND:  I understand that.

22        THE COURT:  Now, the fact of the matter is the

23   government's presentation on the Lee/Epps murder, the Lee murder

24   is going to be fairly sanitized.  I mean, obviously, I'm not

25   going to tell counsel how to conduct the examination.  But the

1    focus here is on the ballistics.  So it will be summary testimony

2    that there was a shooting somewhere in Baltimore City, that there

3    were two victims, one of whom died as a result of his wounds, a

4    total of ten shots were fired, and yes, there were, these were

5    semiautomatics.  We recovered nine or ten shell casings and we

6    determined that there were two, because we did the ballistics and

7    we found that one firearm fired seven shots and one firearm fired

8    three.  I mean, that's pretty much it.  On or about March 11th.

9    All right?

10            MR. KURLAND:  And I want to make it clear that we still

11   are objecting.

12            THE COURT:  Now, if you want to get into, you know, the

13   investigation and who was questioned and photo arrays and, and

14   who was -- I mean, you know, obviously, I'm not going to preclude

15   you.  I just say, state the obvious, that to the extent you open

16   the door by impeaching the detective's investigation -- I don't

17   think the jury's going to infer that Mr. Gardner must have done

18   it.  I respect your disagreement.

19            MR. KURLAND:  Well, if they're not going to infer that,

20   then I see no relevance to the evidence, then.  It shouldn't come

21   in, then, at all.

22            THE COURT:  No.

23            MR. KURLAND:  Because that's the very reason --

24            THE COURT:  No.  That's not true.  The point is, the

25   point is --

1          MR. KURLAND:  I don't want to argue with the Court.

2          THE COURT:  The point is that did Gardner have the

3    weapon before those murders?  Did he have them, did he have it

4    after those murders?

5          MR. KURLAND:  I just want to restate for the record our

6    objection under 403 grounds, and sort of the tail wagging the

7    dog.  The strongest evidence the government is bringing in is an

8    uncharged murder in a case where there are five murders.  And

9    they've gone to great lengths already to try to link them.  I

10   just think that that's a 403 issue and the entire inquiry should

11   be kept out.  But I understand the Court's ruling.

12         THE COURT:  All right.  Anybody else on this point?

13         MR. MARTIN:  Well, actually, Your Honor, I was just

14   going to say I want it to come in.

15         THE COURT:  I thought there may be a difference of

16   opinion among counsel.

17         MR. MARTIN:  There is, Your Honor, a strong difference

18   of opinion.  But we have another issue.

19         THE COURT:  Let me just make sure that nobody else

20   needs to be heard on this.  All right.

21         MR. MARTIN:  Your Honor, one of the government's

22   witnesses tomorrow is going to be Shannon Harris.  I was looking

23   through her grand jury and I just didn't want to get caught in

24   the middle of objecting and you not knowing where I'm coming from

25   when I object.  They're going to be asking her if she knows

1    whether Mr. Harris was selling drugs.  And her basis for that, I

2    will be objecting on foundation, because her basis for that, at

3    least as she said in the grand jury, I wasn't aware he was

4    selling drugs, but when he was younger I knew he was into drug

5    selling.  And everything after that follows is how she believes

6    he was selling drugs, but not because she knew.

7             THE COURT:  Why do we care about what she knew?

8             MR. MARTIN:  I agree, Your Honor.  I don't think it

9    should come in.

10            THE COURT:  No.  I'm turning to the government.

11            MR. MARTIN:  If she doesn't know and she has no basis

12   for knowing, then he shouldn't be allowed to ask.

13            THE COURT:  Now, this is.

14            MR. MARTIN:  This is his sister.

15            THE COURT:  His sister.  Who's how old?

16            MR. MARTIN:  I honestly don't know, your Honor.

17            THE COURT:  I mean, an adult?

18            MR. MARTIN:  Yes.

19            THE COURT:  If not a teenager.  And she is present at

20   Amity Street --

21            MR. MARTIN:  During the raid.

22            THE COURT:  -- during the raid.

23            MR. MARTIN:  And then there are a lot of questions

24   asked of her afterwards about when he moved out of the house and

25   he was selling drugs.  I think that will, I've studied this, and

1      subject to being told I'm wrong, when I object tomorrow, I would

2      like Mr. Harding to set the foundation as to why she knew,

3      instead of just getting an answer.

4              THE COURT:  Perhaps Mr. Harding can clear this up very

5      quickly.  How does she know, Mr. Harding?

6              MR. HARDING:  I'm afraid I can't clear it up.  I don't

7      have my file with me right now and I don't remember what she's

8      going to say.  It's been a long time --

9              THE COURT:  All right.

10             MR. HARDING:  -- since I talked to her.

11             THE COURT:  I assume you would remember if she had said

12     either, I saw him do transactions or he told me.  I mean, that

13     kind, you would remember that?  You wouldn't need your file?

14             MR. HARDING:  No.  I think she may well.

15             THE COURT:  Okay.

16             MR. HARDING:  I think if she didn't tell me those

17     things, she may have been trying to protect her brother,

18     actually.  But I think she obviously knew.  She's the one who

19     directed the police up to the second floor bedroom when they were

20     looking for drugs on Amity Street.

21             THE COURT:  Remind me what she said when --

22             MR. HARDING:  She said, well, if there are any drugs in

23     the house, they are up in my brother's bedroom, Shelton's

24     bedroom.

25             THE COURT:  Well, if there any drugs in the house.

1    Well, check that out.  I'm going to count on you to remember, Mr.

2    Harding, and I know Mr. Martin will, when we start tomorrow

3    morning, be prepared with that answer.  Okay?

4              MR. HARDING:  We are not going to start with her

5    tomorrow.

6              THE COURT:  No.  No.  I mean before we start with the,

7    with the jury tomorrow, let Mr. Martin and the Court know what

8    your basis, what Ms. Harris's basis of knowledge is.  That's all.

9              MR. HARDING:  And by the way, Your Honor, Ms. Rhodes

10   asked me about who our first witness is going to be.  I am afraid

11   that due to the precarious situation with Ms. Green, I think

12   we're going to try to get her on the stand first just because

13   she's such a precarious witness.

14             THE COURT:  Okay.  Well, Ms. Rhodes has been excused

15   from 9:30 till 10.

16             MR. HARDING:  Is this somebody Mr. Lawlor could --

17             THE COURT:  No.  Ms. Rhodes is prepared on Ms. Green.

18   So we can hold Ms. Green until 10:30.  I mean, she doesn't have

19   to be the first witness.  Okay?

20             MR. HARDING:  Actually, Mr. Hanlon just tells me that

21   she's not being picked up until 9:30.  So she won't be here until

22   10:30.

23             THE COURT:  Great.  While you have the floor, Mr.

24   Harding, I was, actually, I got a little nervous with Detective

25   Barnes.  What was going on there?  Didn't we have a suppression

172

1    hearing?

2            MR. HARDING:  Yes.  Yes.  Your Honor has already ruled

3    on the Miranda issue.  I was going to ask the Court if the Court

4    would be willing to tell the jury that the Miranda issue has been

5    resolved and is not an issue for their consideration.  Mr.

6    Flannery spent most of his --

7            THE COURT:  Yeah.  The voluntariness is a part of it.

8    I agree with you, the way Mr. Flannery did it was potentially

9    misleading.  But I just wanted to be reassured that we did have

10   the hearing that I thought we had, that the Court had fully

11   considered --

12           MR. HARDING:  Yes, we did.

13           THE COURT:  -- all those issues.

14           MR. HARDING:  And Your Honor expressly ruled on it.

15           THE COURT:  Okay.  All right.  That's what I thought.

16   But Mr. Flannery is clearly entitled to argue that the statement

17   wasn't voluntary and that, therefore, it shouldn't be considered

18   by the jury.  And whether or not Miranda was given obviously is a

19   factor that goes into a voluntariness determination.  And he's

20   entitled, notwithstanding the Court's ruling, to argue to the

21   jury that the jury shouldn't credit Officer Barnes's statement

22   that he gave Miranda warnings.  Yes, Mr. Flannery.

23           MR. FLANNERY:  That is true, Your Honor.  The line of

24   questioning was more geared towards the detail in his report.

25           THE COURT:  Sure.

1          MR. FLANNERY:  The lack, then, of the Mirandization.

2    And the Mirandization doesn't come on the scene until, like I

3    said, almost three years to the day later.  That it then needs to

4    become an issue.

5          THE COURT:  I got that.

6          MR. FLANNERY:  That was my line.  I wasn't attempting

7    to be creative and misleading.  I'm not --

8          THE COURT:  No.  Not at all.

9          MR. KURLAND:  Your Honor, one quick other point.  As

10   the government's case apparently is going to end next week, I

11   would ask the Court if perhaps on Monday the Court would consider

12   giving, prior to the close of the government's case, a dual

13   sovereignty instruction.  And what I would propose doing is the

14   Court has the one that it worked on a week ago.  And I would like

15   the opportunity to have that as Option A and then work on

16   slightly refined one, Option B, present it over the weekend, and

17   have the Court make a determination.  But give it both, give one

18   to the jury on Monday and then as part of the packet of

19   instructions as well.

20         THE COURT:  I think that's very fair.  And I do plan to

21   give it on Monday.

22         MR. KURLAND:  Thank you very much, Your Honor.

23         THE COURT:  Whatever it is I'm going to give.

24         All right.  Now, quickly, before we conclude on

25   Reynolds.  This is your issue, Mr. Crowe, or Mr. Pyne?

1          MR. CROWE:  Yes, Your Honor.  On Monday, on behalf of

2     Mr. Martin, we filed a motion in limine with respect to certain

3     statements which we were afraid Mr. Reynolds was going to be

4     testifying to.  The first statement was one that Mr. Gardner had

5     allegedly made to Mr. Reynolds in a jail house conversation.  I

6     understand the government still wants to get that in.

7          There were also a series of statements that a fellow by

8     the name of Desmond Dicke had made to Mr. Reynolds.  And I

9     understand from a conversation with Mr. Harding this morning that

10    the government does not intend to get in anything that Mr. Dicke

11    said to Mr. Reynolds.  So we only have one issue.

12          THE COURT:  Okay.  So Reynolds and Martin --

13          MR. CROWE:  Reynolds and Gardner.

14          THE COURT:  I'm sorry.  Reynolds and Gardner are --

15          MR. CROWE:  Reynolds and Gardner were at some point

16    cell mates.  It is unclear from the discovery that I have gotten

17    when that conversation took place.

18          THE COURT:  When do you think it did?

19          MR. CROWE:  I think it took place in 2004.

20          THE COURT:  2004?

21          MR. CROWE:  The reason that I think that it took place

22    in 2004 was that in a grand jury session Mr. Harding read into

23    the record a letter which he had written to Mr. Graham's lawyer,

24    who was --

25          THE COURT:  Mr. Who's?

175

1          MR. CROWE:  To Mr. Reynold's lawyer, who was Andrew

2     Graham, saying that he was surprised to learn in March of 2004

3     that Mr. Reynolds and Mr. Gardner were actually cell mates.

4     That's the reason we think that the conversation took place in

5     2004.

6          It is apparently, except for the context in this case,

7     it would be a simply innocent statement that Mr. Martin needed

8     money for a lawyer.  We say that no matter when that statement --

9          THE COURT:  So that is the statement, that Gardner,

10    Gardner told Reynolds --

11         MR. CROWE:  That Martin needed money for a lawyer.

12         THE COURT:  Without any contextual -- I mean, weren't

13    they talking about the Tonya Jones Spence murder?

14         MR. CROWE:  Your Honor, I have no idea what they were

15    talking about.

16         THE COURT:  Let Mr. --

17         MR. CROWE:  Sure.

18         THE COURT:  Let Mr. Harding fill in the gaps here.

19         MR. HARDING:  My recollection -- first of all, Your

20    Honor, let me explain about this letter I wrote to Mr. Graham.

21         THE COURT:  All right.

22         MR. HARDING:  I had already spoken to Mr. Reynolds.

23    And then he came and, and he had given us information about this

24    case.  It then turned out that he was incarcerated with Mr.

25    Gardner.

1              THE COURT:  When?

2              MR. HARDING:  I believe March of 2004.  I am going to

3    take -- I don't remember the date.  But that's the date that Mr.

4    Crowe just gave you and I don't doubt that that's accurate.

5              THE COURT:  All right.

6              MR. HARDING:  I was writing Mr. Graham to alert him to

7    the fact that I did not instruct and did not intend to instruct

8    Mr. Reynolds to try to get any statements out of any defendants.

9    And I wanted Mr. Graham to get on top of that because I know what

10   the law is in this area.

11             THE COURT:  Right.

12             MR. HARDING:  And that was the purpose of the letter.

13             THE COURT:  How did you learn that they --

14             MR. HARDING:  I brought him in again.  And that's when

15   he told me about --

16             THE COURT:  And he was in custody at that time?

17             MR. HARDING:  Yes.  He was in custody at that time.

18   And he told me that he had been put into a cell with Mr. Gardner

19   for some period of time.  I don't think he was still in the cell

20   with Mr. Gardner when I talked to him.

21             THE COURT:  And they were at Central -- well, Gardner

22   was out in Baltimore County at that point?

23             MR. HARDING:  No.

24             THE COURT:  No?

25             MR. HARDING:  Mr. Gardner is back and forth, back and

1    forth, back and forth.

2         THE COURT:  He hadn't been convicted, had he?

3         MR. HARDING:  He was convicted in the Baltimore County

4    murder in about September or October of 2004.

5         THE COURT:  Right.  So this would have occurred before

6    he is, his trial.

7         MR. HARDING:  It may have.  May have.

8         THE COURT:  Well, it clearly was if it was March, '04.

9         MR. HARDING:  Yeah.  It would have.  Yes.

10        THE COURT:  But you're suggesting that Mr. Gardner may

11   have been in DOC on some kind of violation?

12        MR. HARDING:  No, they're both in Supermax.  They're

13   both in Supermax.

14        THE COURT:  Gardner was in -- oh, because he waived

15   interstate.

16        MR. HARDING:  Well, I'm not sure why Gardner was in

17   Supermax.

18        THE COURT:  Well, because he didn't go back to

19   Baltimore County.  I mean, he would have been in Baltimore County

20   pretrial detention in March of '04.  And we actually had the

21   issue, right, Mr. Coburn?

22        MR. COBURN:  We did.

23        THE COURT:  About the waiver of the interstate

24   agreement on detainers.  And he's that's why he would have been

25   at Supermax.

1          MR. HARDING:  Yeah.

2          THE COURT:  On the federal case, even though he was not

3     yet tried on the federal, on the state indictment.

4          MR. HARDING:  Meanwhile, Reynolds is picked up just on

5     some city narcotics charge.

6          THE COURT:  Not a federal charge?

7          MR. HARDING:  It became a federal charge, yes, it did.

8          THE COURT:  Oh, it became a federal charge.  And they

9     both end up in Supermax.

10         MR. HARDING:  His attorney came in for a proffer

11    session, completely unaware of what he was going to talk about.

12    And she eventually had to get out of the room because at that

13    time Mr. Martin was represented by Paul Hazlehurst.  And this was

14    Beth Farber.  And she had to, in fact, resign her, her job

15    representing Mr. Reynolds as a result of this conflict that

16    arose.  And that's when Andrew Graham got appointed.  Supplying

17    more background than the Court needs.

18         THE COURT:  No.  It's helpful to understand.

19         MR. HARDING:  So Mr. Graham gets involved.  I bring in

20    Mr. Reynolds again and he gives me statements that he had heard

21    from Mr. Gardner and told me that he had actually been placed in

22    the same cell with Mr. Gardner.  And that's when I wrote the

23    letter to Mr. Graham, alerting him to the fact that I do not

24    instruct his client to elicit statements from defendants.

25         THE COURT:  All right.

1          MR. HARDING:  And I sent this letter, together with the

2     other Jencks/Giglio material to all counsel.

3          THE COURT:  All right.  And so the statement is in the

4     context --

5          MR. HARDING:  The statement is clearly, whereas I don't

6     recall exactly what the statement came out as in the grand jury,

7     but it is my recollection that Mr. Reynolds says exactly what Mr.

8     Montgomery said, which is that Mr. Gardner wanted to get money in

9     that robbery that led to the Jones Spence murder because Mr.

10    Martin needed money for an attorney.  And that's why Mr. Crowe is

11    so eager to keep it out of evidence, I assume.

12         THE COURT:  And it's not coconspirator.  I mean, it's

13    not coconspirator exception.

14         MR. HARDING:  We're relying on the fact that it's an

15    admission, Your Honor.

16         THE COURT:  Oh, so you agree that Mr. Crowe is entitled

17    to a limiting instruction?

18         MR. HARDING:  Yes.  He can be entitled to a limiting

19    instruction.

20         THE COURT:  I see.  You just want it in against

21    Gardner?

22         MR. HARDING:  We want it in because it shows that, what

23    Gardner's motive was in the murder, which the defense in this

24    case is very concerned about for reasons I'm not entirely clear

25    about.

1          THE COURT:  Well, because it's, I mean, to a certain

2     extent it's Count One.  I don't want to overstate it.  But that's

3     why they're concerned about it.  All right.  I understand now,

4     Mr. Crowe.

5          So the government says you're entitled to a limiting

6     instruction, as would Mr. Mitchell and Mr. Harris, but it's

7     clearly admissible against Mr. Gardner.

8          MR. CROWE:  Well, the difficulty, of course, is that it

9     mentions Mr. Martin.  And although it is made in 2004, it

10    definitely, it will ask the jury to hearken back to what Mr.

11    Montgomery said Mr. Gardner had said really almost two years

12    earlier, in March or April of 2002, about needing a lawyer.

13         I don't quite understand why the fact that Mr. Martin

14    needed money for a lawyer in 2004 is any sort of an admission --

15         THE COURT:  No. I'm sorry.

16         MR. CROWE:  -- against Mr. Gardner.

17         THE COURT:  No.  I don't think that's what -- the

18    upshot of the statement -- correct me, please, Mr. Harding, if

19    I'm wrong.  It's not that Mr. Martin needed money for a lawyer in

20    2004.  In 2004, Mr. Martin had been indicted in this case and

21    he'd been appointed two very fine lawyers.  Actually, Mr. Martin

22    was still represented by the Public Defender at that point.

23         MR. CROWE:  That would be correct.

24         THE COURT:  Yeah.  I thought that the statement, though

25    made in 2004, was an historical statement about what was going on

1    in 2002.  Government counsel is nodding its head.  So the

2    statement was made two years after the fact.

3            MR. CROWE:  Well --

4            THE COURT:  According to Reynolds.

5            MR. CROWE:  What we have, we have his question.  I see.

6    Did he talk to you about Wayne needing money for something?  Yes.

7    What did he need money for?  Answer:  A lawyer.

8            THE COURT:  Right.

9            MR. CROWE:  There's certainly nothing, if that, if it

10   were, in fact, harkening back to the situation in 2002, one would

11   have expected that a, you know, that a lawyer of Mr. Harding's

12   caliber would have brought that out.

13           THE COURT:  I don't --

14           MR. CROWE:  This is all in the present tense.

15           THE COURT:  Mr. Harding, can you clarify?

16           MR. HARDING:  Yes.

17           THE COURT:  Look, there's always this issue -- Mr.

18   Martin's point was exactly the same.  You know, certain things

19   happen in the grand jury and before the grand jury.  And I

20   understand counsel have to work off of grand jury transcripts so

21   you're sort of left in the necessarily.  But this is an

22   opportunity, Mr. Harding, for you to clarify.

23           MR. HARDING:  As I said before, my recollection is that

24   he was talking about Gardner's motive in doing the Tonya Jones

25   Spence murder.  Now, Mr. Hanlon is actually going to handle Mr.

1   Reynolds and has spoken to him more recently than I.  And he can

2   perhaps elucidate this issue further.

3           In any event, he's prepared to counteract any argument

4   Mr. Crowe has about Bruton.

5           THE COURT:  Mr. Hanlon?  Can you just summarize that

6   part of Reynolds's testimony?

7           MR. HANLON:  Yes, Your Honor.  I anticipate that Mr.

8   Reynolds will testify that during the time that these

9   conversations took place --

10          THE COURT:  First of all, how do they know each other,

11  apart from being cell mates?

12          MR. HANLON:  They were members of the little same drug

13  trafficking chain.  Mr. Reynolds will, in addition to testifying

14  about these statements, was also involved in some earlier drug

15  dealing activities with Card and some of the other people that

16  the Court heard about during the '90s and before we got into the

17  recent stuff.

18          They're locked up together, I believe in 2004, and

19  they're having conversations about some of the charges that Mr.

20  Gardner was then facing.  And they talked about the charges and

21  what had happened.  And Mr. Gardner essentially explained that

22  the reason, one of the reasons he got involved in the murder he

23  was charged with, i.e., the Spence murder --

24          THE COURT:  Now, was he talking, if you know, about the

25  fact that he was facing murder charges in Baltimore County or

183

1    that he was facing a RICO conspiracy charge here in Federal

2    Court?

3              MR. HANLON:  I really don't know whether or not the

4    discussion was segmented that way.  And I don't know whether or

5    not Mr. Reynolds would have differentiated between them.

6              THE COURT:  Okay.  Do you know whether Mr. Gardner

7    would have differentiated?

8              MR. HANLON:  I don't know.

9              THE COURT:  Okay.  All right.

10             MR. HANLON:  Essentially, Mr. Gardner tied his

11   involvement in the Spence murder to the fact that he needed money

12   and, among, among other things, because Mr. Martin, his friend,

13   needed an attorney back in 2002.  And I anticipate that will be

14   the testimony.

15             THE COURT:  When were you appointed, Mr. Coburn?  Do

16   you recall?

17             MR. COBURN:  It was pretty much at the beginning.  I

18   wish I could give Your Honor the date.

19             THE COURT:  The indictment's January, '04.  But you're

20   sure it's by February you were appointed, you were in the case?

21             MR. COBURN:  I'm not 100%.  But I would bet.

22             THE COURT:  All right.

23             MR. COBURN:  I mean, I don't think Mr. Gardner had

24   anybody before me in this case.

25             THE COURT:  Okay.  All right.  All I can say, Mr.

1    Hanlon, you've already got it in -- well, I guess that's your

2    answer.  In terms of --

3              MR. HANLON:  Meaning I already got in the need for Mr.

4    Martin to get the attorney?

5              THE COURT:  Yeah.  Yeah.

6              MR. HANLON:  That is the most controversial point on

7    the Spence murder in this case, Your Honor.  The entire theory of

8    the defense by Mr. Gardner has been on that point.  This is an

9    important corroborating witness.

10             THE COURT:  Okay.  All right.  Mr. Crowe, anything

11   else?

12             MR. CROWE:  The only thing I can say is that Mr. Hanlon

13   is quite correct, that the motive for the Spence, without a

14   motive for the Darius Spence robbery, which led to the Tonya

15   Jones Spence killing, there is no way, at least in the defense's

16   mind, in which the whole Tonya Jones Spence matter can be part of

17   this, can be part of this RICO conspiracy.

18             For that reason, this statement which is made by Mr.

19   Gardner saying that, possibly saying that the motive for that

20   killing had something to do with my client's needing money to

21   get, to afford a lawyer is very, very, is a very, very

22   incriminating matter, and my client's name is mentioned in that.

23             This is not, by any stretch of the imagination, as the

24   government has conceded, a statement in furtherance of the

25   conspiracy.  What it is is an admission, conceivably an admission

1    by Mr. Gardner, but one which names and inculpates Mr. Martin.

2    We think that's the classic Bruton problem.

3            THE COURT:  What's peculiar is that it's an admission

4    by Mr. Gardner which in one strong sense is of no consequence to

5    Mr. Gardner.  It really, it really kind of turns the concept of

6    an admission on its head.  It's an admission, it's an admission

7    of one defendant whose real probative value for the government is

8    only related to the other three.

9            MR. CROWE:  I'm not sure, Your Honor --

10           THE COURT:  Because Mr. Gardner's motive for the Jones

11   Spence murder simply would be irrelevant.

12           MR. CROWE:  Your Honor, I believe Mr. Gardner has as

13   much interest as we do in decoupling these matters.

14           THE COURT:  Well, I don't think so.  Mr. Coburn hasn't

15   even objected.  Right, Mr. Coburn?

16           MR. COBURN:  I haven't objected and I'm not objecting

17   on this basis.  Although I do have to say, Your Honor, as I've

18   heard Mr. Harding's proffer earlier and I'm sort of cogitating on

19   it, I think there might be a separate point I would like to make

20   when Your Honor has a minute.

21           THE COURT:  Just give me the quick version because we

22   need to break.  You can stay there.  Just give me the three word

23   version.

24           MR. COBURN:  It sounds like Reynolds was already in

25   talking to the government before the government saying that these

1      statements were made.  So sort of putting that together with Your

2      Honor's question to me about whether I was appointed already, and

3      Mr. Gardner already had state counsel, seems like maybe there's

4      kind of a Sixth Amendment issue involved there, also.

5              THE COURT:  There's a lot going on there.

6              MR. CROWE:  There's a Massiah issue lurking in all

7      this.

8              THE COURT:  Yeah.  Yeah.  All right.

9              MR. CROWE:  Your Honor, might I suggest that perhaps

10     the government might have a more concrete idea as to precisely

11     what Mr. Reynolds is going to say tomorrow morning before he gets

12     on the stand.

13             THE COURT:  Yeah.  Let's revisit it tomorrow.

14             MR. HARDING:  If the Court is going to consider a

15     Massiah type argument here, would the Court give the government

16     an opportunity to be able to respond?  Because we --

17             THE COURT:  You want to hold him off until next week?

18             MR. HARDING:  Sure, Your Honor.

19             THE COURT:  I think, I think, I think this colloquy has

20     brought out a few things that I think Mr. Coburn's entitled to

21     reflect on.  And so let's hold off on Reynolds until next week.

22     Frankly, it just may be, I may be persuaded not to gild the lily,

23     so to speak.

24             You've already got it in.  The jury's heard the

25     evidence in what I think is an unobjectionable way.  I appreciate

1    you'd like to corroborate Montgomery but both on <u>Massiah</u> and --

2    let's all think about it a few more days.

3         MR. HARDING:  I am quite confident the other theme in

4    this defense case is to attack the credibility of Will

5    Montgomery.  So the fact that we have the evidence in through

6    Will Montgomery doesn't mean that the defense is now going to lay

7    off Will Montgomery.  They're going to attack him viciously in

8    their own cases and in their, and in their close arguments.

9         THE COURT:  Well, I appreciate that.  But I have to

10   say, now that you mention it, Mr. Harding, I don't believe the

11   defense touched Mr. Montgomery.  I think the government

12   thoroughly impeached Mr. Montgomery.  I don't think the defense

13   added anything to Mr. Montgomery.  I mean, the fact finder is

14   either going to believe Mr. Montgomery or they're not based on

15   his direct testimony.  That's just my sort of horseback view of

16   it.

17        I don't know how you can, I mean, I've never seen such

18   self-impeachment.  But anyway, we'll leave that for another day.

19        MR. LAWLOR:  Judge, can I just ask a couple quick

20   scheduling issues?  The Court had mentioned something about 11.

21   But we're still starting at 9:30?

22        THE COURT:  Yeah, we're going to start at 9:30.  And

23   Ms. Rhodes is going to be excused to step out to make a call.

24        MR. LAWLOR:  The second one is, next Tuesday, and I'll

25   just be very brief about this, I have a sentencing at ten in

1   front of Judge Nickerson that I really don't want to continue.

2   I'm wondering if I can be excused.  And if it's a witness that I

3   would be covering, which, given the potential lineup, it's

4   probably unlikely, would the Court permit a little juggling so I

5   can be out of here for an hour next Tuesday?

6          THE COURT:  Not only that, but depending on what we

7   achieve tomorrow and Monday and what the government tells me, I

8   mean, if there really is a chance that the government's going to

9   finish next week, frankly, I may take Tuesday off entirely and

10  bring the jury in on Friday.

11         MR. LAWLOR:  And you anticipate otherwise starting late

12  and ending early that day?

13         THE COURT:  Right.  I was thinking starting at ten.

14         MR. LAWLOR:  My sentencing's at ten.  I don't want to

15  hold up the Court.  But if the Court would just --

16         THE COURT:  How long do you expect it to take?

17         MR. LAWLOR:  No more than an hour.  There's no

18  witnesses.  Just argument.

19         THE COURT:  Yeah.  I hate for you to be not be here for

20  an hour, as much as an hour.

21         MR. LAWLOR:  I'll revisit on Monday when we have a

22  better idea of what witnesses are going to be.  May not be an

23  issue.

24         THE COURT:  Is there any chance that Judge Nickerson

25  could possibly do it at 9:30?

1          MR. LAWLOR:  You know what, Your Honor?  I'll call.

2     Even at nine.  I'll call.  That's a good idea.

3          THE COURT:  I could start at 10:30 and we could go

4     until one.

5          MR. LAWLOR:  I'll call the government and the Court and

6     ask them.

7          THE COURT:  Great.  Thank you all very much.  We're in

8     recess.  9:30 tomorrow.

9          (Conclusion of Proceedings at 4:29 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

190

1                                  INDEX

2

3                                                          PAGE

4    WITNESS: DET. BRIAN EDWARDS
     DIRECT EXAMINATION BY MR. HANLON                        11
5    CROSS EXAMINATION BY MR. KURLAND                        21
     REDIRECT EXAMINATION BY MR. HANLON                      23
6    RECROSS EXAMINATION BY MR. KURLAND                      23

7    WITNESS: DEANDRE WESLEY
     DIRECT EXAMINATION BY MR. HANLON                        25
8
     WITNESS: DARIUS SPENCE
9    DIRECT EXAMINATION BY MR. HANLON                        32
     CROSS EXAMINATION BY MR. COBURN                         51
10
     WITNESS: MAUREEN BOTTRELL
11   DIRECT EXAMINATION BY MR. HANLON                        61
     CROSS EXAMINATION BY MR. COBURN (QUALIFICATIONS)        64
12   CONT'D DIRECT EXAMINATION BY MR. HANLON                 65
     CROSS EXAMINATION BY MR. COBURN                         76
13   REDIRECT EXAMINATION BY MR. HANLON                      79

14   WITNESS: OFFICER TIMOTHY RUTHERFORD
     DIRECT EXAMINATION BY MR. HARDING                       87
15   CROSS EXAMINATION BY MR. KURLAND                        91

16   WITNESS: ERIN WISNIESKI
     DIRECT EXAMINATION BY MR. HARDING                       99
17   CROSS EXAMINATION BY MR. KURLAND                       105

18   WITNESS: OFFICER ALVIN BARNES
     DIRECT EXAMINATION BY MR. HARDING                      108
19   CROSS EXAMINATION BY MR. FLANNERY                      123
     REDIRECT EXAMINATION BY MR. HARDING                    140
20   RECROSS EXAMINATION BY MR. FLANNERY                    142
     REDIRECT EXAMINATION BY MR. HARDING                    144

21

22

23

24

25

<u>REPORTER'S CERTIFICATE</u>

1

2

3          I, Mary M. Zajac, do hereby certify that I recorded

4    stenographically the proceedings in the matter of USA v. Willie

5    Mitchell, et al., Case Number(s) AMD-04-029, on October 28, 2008.

6          I further certify that the foregoing pages constitute

7    the official transcript of proceedings as transcribed by me to

8    the within matter in a complete and accurate manner.

9          In Witness Whereof, I have hereunto affixed my

10   signature this _____ day of _____, 2009.

11

12

13

14          _____
            Mary M. Zajac,
15          Official Court Reporter

16

17

18

19

20

21

22

23

24

25

**'**

**'02** [5] - 12:25, 27:13, 39:7, 39:8, 41:25
**'04** [3] - 177:8, 177:20, 183:19
**'05** [1] - 38:9
**'90s** [1] - 182:16

**0**

**09410804943** [1] - 18:6

**1**

**10** [12] - 9:9, 36:2, 47:5, 83:11, 86:24, 123:2, 132:16, 132:25, 156:19, 171:15
**100%** [2] - 160:4, 183:21
**100-A** [1] - 12:22
**100-B** [1] - 13:2
**101** [1] - 1:25
**102** [1] - 26:1
**105** [1] - 190:17
**108** [1] - 190:18
**10:30** [4] - 86:24, 171:18, 171:22, 189:3
**11** [7] - 36:2, 83:17, 98:10, 98:13, 156:19, 187:20, 190:4
**11th** [4] - 151:2, 155:4, 161:14, 167:8
**12** [4] - 27:16, 27:21, 35:14, 113:17
**12/4/82** [1] - 118:8
**123** [1] - 190:19
**12:30** [1] - 95:3
**13** [1] - 63:15
**14-B** [1] - 23:6
**140** [2] - 118:10, 190:19
**142** [1] - 190:20
**144** [1] - 190:20
**15** [9] - 47:5, 80:14, 80:15, 80:23, 104:11, 107:16, 123:2, 132:16, 132:25
**17** [1] - 136:8
**1700** [2] - 125:3, 131:11
**1730** [4] - 137:15, 137:16, 137:19, 137:20
**1800** [1] - 91:12
**19** [1] - 150:9
**1990s** [1] - 3:10
**1:00** [1] - 95:3
**1:30** [1] - 86:20

**2**

**2** [2] - 15:12, 95:11
**20** [7] - 33:16, 37:11, 55:4, 55:7, 55:10, 80:23
**200** [1] - 109:22
**2000** [1] - 38:22
**2001** [3] - 117:21, 117:24, 124:6
**2002** [36] - 11:17, 11:25, 16:12, 25:24, 26:7, 38:5, 38:10, 38:17, 38:23, 39:9, 39:16, 41:25, 44:14, 46:9, 56:11, 87:20, 87:22, 99:20, 100:3, 102:25, 109:6, 109:13, 117:12, 123:25, 124:3, 124:7, 124:8, 124:9, 124:22, 151:2, 180:12, 181:1, 181:10, 183:13
**2004** [16] - 59:8, 146:25, 174:19, 174:20, 174:22, 175:2, 175:5, 176:2, 177:4, 180:9, 180:14, 180:20, 180:25, 182:18
**2005** [3] - 58:10, 58:15, 140:23
**2008** [2] - 1:11, 191:5
**2009** [1] - 191:10
**2034** [1] - 16:12
**205** [9] - 81:22, 86:4, 109:17, 118:7, 118:13, 118:14, 119:24, 138:6
**21** [1] - 190:5
**21201** [1] - 1:25
**21220** [1] - 18:16
**21223** [1] - 118:8
**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** [1] - 118:8
**21st** [6] - 109:12, 123:25, 124:3, 124:6, 124:9, 124:22
**22** [1] - 109:4
**23** [2] - 190:5, 190:6
**24** [1] - 117:21
**24th** [1] - 154:25
**25** [2] - 117:21, 190:7
**25th** [4] - 154:23, 154:25, 155:1
**27th** [1] - 154:24
**28** [3] - 1:11, 154:24, 191:5
**28th** [1] - 154:24
**29** [1] - 97:7
**2:00** [2] - 95:11, 98:18
**2:10** [1] - 98:20

**3**

**3** [1] - 137:7
**32** [1] - 190:9
**3249** [1] - 100:1
**33** [1] - 137:11
**35** [1] - 35:23
**357** [2] - 155:14, 161:10
**36** [2] - 113:18, 113:19
**37** [4] - 33:1, 114:16, 137:6, 137:11
**3901** [1] - 14:16
**3901-002** [1] - 14:15
**3901-006** [1] - 15:25
**3901-1** [1] - 15:2
**3901-10** [1] - 17:23
**3901-11** [1] - 18:11
**3901-12** [2] - 22:13, 23:8
**3901-15** [1] - 19:11
**3901-16** [1] - 19:3
**3901-19** [1] - 19:21
**3901-20** [1] - 20:23
**3901-22** [1] - 21:3
**3901-7** [1] - 17:9
**3901-8** [1] - 18:4
**3:20** [1] - 146:14

**4**

**4/28/2000** [1] - 118:9
**40** [18] - 46:3, 46:6, 57:9, 57:14, 151:14, 151:15, 151:18, 151:19, 152:4, 154:12, 155:11, 156:3, 156:5, 157:8, 158:8, 158:12, 159:15, 165:19
**403** [5] - 86:15, 160:2, 162:12, 168:6, 168:10
**404(b** [1] - 160:3
**404(b)** [1] - 160:5
**4:29** [1] - 189:9
**4:30** [1] - 46:17
**4:50** [1] - 26:6

**5**

**5** [2] - 68:15
**51** [1] - 190:9
**5165** [1] - 18:5
**5515** [1] - 1:24
**5:00** [5] - 87:23, 100:6, 106:4, 106:13, 111:3
**5K1.1** [1] - 35:19

**6**

**61** [1] - 190:11
**64** [1] - 190:11
**65** [1] - 190:12
**6:00** [3] - 91:12, 92:22, 92:23

**7**

**75** [1] - 8:24
**76** [1] - 190:12
**79** [1] - 190:13
**7th** [14] - 11:25, 12:25, 16:12, 25:24, 26:6, 38:22, 39:9, 44:14, 46:9, 58:10, 87:22, 95:2, 100:2, 102:25

**8**

**8/16/02** [1] - 19:15
**82** [1] - 18:16
**8618** [2] - 26:1, 39:4
**87** [1] - 190:14
**88** [1] - 137:7
**8:34** [1] - 16:12
**8th** [1] - 56:11

**9**

**91** [1] - 190:15
**99** [1] - 190:16
**9:30** [10] - 83:11, 95:3, 146:12, 146:13, 171:15, 171:21, 187:21, 187:22, 188:25, 189:8
**9:50** [1] - 2:1
**9th** [1] - 117:24

**A**

**A-2** [1] - 117:4
**A-3** [1] - 117:15
**A-5** [1] - 118:15
**A-6** [1] - 115:4
**a.m** [2] - 2:1, 9:9
**Aaron** [8] - 12:9, 12:10, 13:10, 69:1, 69:5, 77:12, 77:13
**ability** [2] - 3:16, 120:10
**able** [15] - 23:16, 74:19, 75:3, 76:2, 78:16, 79:13, 83:13, 93:4, 107:4, 147:16, 162:14, 166:2, 166:11, 166:12, 186:16

**abruptly** [3] - 72:24, 104:2, 107:1
**absence** [1] - 75:3
**Absolutely** [2] - 32:8, 80:20
**absolutely** [3] - 8:2, 8:14, 164:21
**accept** [2] - 148:19, 148:20
**accepted** [2] - 65:6, 148:16
**accepting** [1] - 161:19
**access** [1] - 45:18
**accordance** [1] - 10:4
**according** [2] - 67:15, 151:24
**According** [1] - 181:4
**account** [1] - 135:20
**accurate** [2] - 176:4, 191:8
**accustomed** [1] - 131:9
**achieve** [1] - 188:7
**acknowledge** [1] - 164:21
**acknowledging** [1] - 131:1
**act** [1] - 163:11
**action** [1] - 7:21
**activate** [1] - 23:12
**activities** [2] - 146:10, 182:15
**activity** [3] - 34:19, 39:21, 163:2
**actual** [2] - 71:4, 135:6
**actuality** [1] - 137:20
**Adam** [1] - 1:22
**added** [1] - 187:13
**addition** [7] - 5:11, 22:10, 63:25, 116:23, 146:17, 161:12, 182:13
**additional** [2] - 36:18, 166:6
**address** [6] - 18:14, 39:4, 83:8, 99:25, 147:4, 149:21
**addressed** [2] - 117:25, 118:1
**adhere** [1] - 146:5
**adhering** [1] - 10:7
**adjustment** [1] - 94:16
**administrative** [1] - 15:19
**admissible** [1] - 180:7
**admission** [6] - 164:6, 179:15, 180:14, 184:25, 185:3, 185:6
**admit** [1] - 55:25
**admitted** [2] - 34:13, 152:12
**ado** [2] - 151:11, 151:12

**adult** [1] - 169:17
**advice** [1] - 37:6
**advise** [2] - 145:11, 145:23
**advised** [3] - 138:11, 145:6, 158:22
**aerial** [3] - 88:14, 88:20, 100:16
**affair** [5] - 40:15, 41:8, 51:18, 52:1, 59:20
**Affairs** [1] - 108:20
**affiant** [7] - 120:16, 129:20, 134:16, 134:17, 135:2, 135:20, 135:25
**affiants** [1] - 129:22
**affidavit** [1] - 147:17
**affiliation** [1] - 22:25
**affixed** [1] - 191:9
**afford** [1] - 184:21
**afield** [1] - 159:4
**afraid** [5] - 24:22, 82:6, 170:6, 171:10, 174:3
**African** [3] - 102:6, 102:19, 111:18
**African-American** [3] - 102:6, 102:19, 111:18
**afternoon** [32] - 12:1, 26:6, 46:13, 81:7, 81:9, 82:8, 83:22, 84:2, 86:18, 87:2, 87:23, 92:2, 92:3, 94:19, 95:15, 95:18, 95:21, 96:2, 96:5, 98:7, 98:16, 99:2, 99:5, 99:19, 100:3, 100:6, 105:25, 108:16, 109:13, 111:3, 123:21, 147:14
**afterwards** [1] - 169:24
**agencies** [3] - 64:1, 64:5, 64:6
**agency** [1] - 65:19
**agent** [1] - 159:6
**Agent** [4] - 64:18, 126:21, 144:16, 159:5
**agents** [4] - 4:15, 35:2, 63:23, 150:19
**Agents** [1] - 32:6
**ages** [1] - 44:18
**ago** [14] - 2:24, 8:22, 9:14, 12:15, 33:14, 33:16, 55:7, 65:2, 65:17, 75:15, 106:11, 144:17, 159:21, 173:14
**agree** [6] - 8:2, 8:11, 157:5, 169:8, 172:8, 179:16
**agreed** [6] - 34:9, 34:17, 34:22, 35:15, 37:2, 59:8
**agreement** [10] - 34:3, 35:3, 35:12, 35:15, 36:22, 49:7, 58:7, 58:17,

59:4, 177:24
**agreements** [1] - 49:6
**ahead** [5] - 31:14, 36:23, 119:20, 127:12, 138:10
**air** [1] - 10:17
**airborne** [1] - 63:7
**al** [1] - 191:5
**alert** [1] - 176:6
**alerting** [2] - 81:6, 178:23
**allegedly** [2] - 161:24, 174:5
**allow** [2] - 71:6, 163:5
**allowed** [3] - 91:21, 132:19, 169:12
**allows** [1] - 71:25
**alluded** [1] - 23:10
**almost** [6] - 107:11, 109:4, 126:19, 144:6, 173:3, 180:11
**Almost** [1] - 11:14
**alone** [6] - 43:18, 43:19, 43:20, 43:25, 100:3, 161:20
**alongside** [1] - 123:7
**altercation** [4] - 41:10, 52:2, 52:3, 52:4
**altercations** [1] - 41:12
**alternative** [1] - 5:11
**ALVIN** [2] - 108:7, 190:18
**Alvin** [5] - 81:1, 108:6, 108:11, 135:1, 135:10
**Ambo** [1] - 18:16
**ambulance** [1] - 52:25
**AMD-04-029** [2] - 1:6, 191:5
**Amendment** [1] - 186:4
**AMERICA** [1] - 1:5
**American** [3] - 102:6, 102:19, 111:18
**Amity** [10] - 81:22, 86:4, 109:17, 109:22, 118:13, 118:14, 119:24, 138:6, 169:20, 170:20
**amount** [4] - 54:21, 98:5, 114:14, 137:6
**analysis** [13] - 62:18, 63:18, 64:1, 64:9, 65:12, 65:18, 69:9, 69:19, 71:13, 71:19, 78:7, 79:13
**analyze** [1] - 79:14
**analyzed** [1] - 78:5
**Andre** [4] - 1:13, 98:23, 146:22, 147:1
**Andrew** [2] - 175:1, 178:16
**Angeles** [1] - 8:23
**angry** [1] - 59:25

**annoyed** [2] - 96:12, 96:13
**Answer** [1] - 181:7
**answer** [8] - 46:5, 47:11, 62:7, 98:15, 170:3, 171:3, 184:2
**answered** [3] - 112:15, 119:1, 128:24
**answering** [2] - 48:10, 127:10
**anticipate** [5] - 94:24, 159:3, 182:7, 183:13, 188:11
**anxious** [1] - 149:9
**anyway** [8] - 43:24, 51:3, 59:22, 60:8, 99:22, 115:6, 143:5, 187:18
**apart** [6] - 2:19, 4:1, 74:16, 75:22, 158:19, 182:11
**Apartment** [5] - 26:1, 109:17, 110:5, 118:14, 119:24
**apartment** [24] - 26:19, 27:12, 29:4, 31:5, 44:8, 44:9, 44:11, 44:20, 47:20, 56:24, 57:6, 110:3, 110:13, 110:23, 111:5, 111:16, 118:24, 122:20, 122:21, 122:22, 126:25, 131:22, 141:22, 146:25
**apartments** [4] - 26:23, 27:23, 110:6, 110:7
**apologize** [2] - 38:8, 61:14
**Apologize** [1] - 38:10
**apparent** [1] - 14:9
**appear** [3] - 10:8, 12:24, 24:6
**Appearances** [1] - 1:15
**appeared** [5] - 21:10, 77:13, 115:18, 136:19, 139:23
**appointed** [6] - 120:11, 178:16, 180:21, 183:15, 183:20, 186:2
**appointment** [1] - 83:12
**appreciate** [5] - 9:7, 146:1, 159:3, 186:25, 187:9
**appreciation** [1] - 9:3
**apprehend** [1] - 88:3
**apprehended** [1] - 91:4
**approach** [6] - 14:6, 22:17, 23:22, 33:25, 92:5, 143:20
**approached** [2] - 120:2, 151:4
**approaching** [1] - 75:20

**Approximate** [1] - 88:19
**approximate** [1] - 71:23
**April** [1] - 180:12
**area** [42] - 15:14, 15:19, 26:16, 28:1, 39:2, 64:9, 65:11, 67:16, 69:13, 72:12, 72:15, 73:1, 73:19, 74:1, 74:7, 75:24, 76:1, 76:2, 76:21, 79:4, 82:19, 85:10, 85:12, 88:2, 88:9, 88:10, 88:13, 88:19, 89:1, 89:22, 89:23, 89:24, 90:13, 93:17, 93:18, 94:2, 109:12, 146:19, 146:23, 176:10
**areas** [4] - 40:3, 73:4, 75:5, 94:4
**argue** [9] - 155:9, 160:9, 160:10, 160:12, 160:13, 162:11, 168:1, 172:16, 172:20
**argument** [6] - 97:7, 163:15, 166:20, 182:3, 186:15, 188:18
**arguments** [1] - 187:8
**arise** [1] - 12:4
**arises** [1] - 4:10
**arising** [1] - 124:16
**Arlene** [10] - 85:14, 86:4, 110:24, 111:20, 111:25, 112:1, 120:22, 120:24, 146:17
**arm's** [2] - 70:22, 71:2
**arose** [2] - 35:12, 178:16
**array** [1] - 4:5
**arrays** [1] - 167:13
**arrest** [5] - 12:18, 128:4, 142:1, 143:17, 166:13
**arrested** [23] - 4:14, 37:12, 38:6, 58:15, 121:19, 121:20, 122:11, 128:9, 128:13, 138:13, 138:15, 138:17, 141:2, 143:5, 143:9, 146:25, 162:14, 162:15, 162:17, 162:19, 166:4
**arresting** [1] - 4:13
**arrests** [2] - 12:2, 12:4
**arrive** [4] - 73:7, 120:16, 134:5, 138:21
**arrived** [5] - 16:6, 103:21, 134:9, 134:10, 136:5
**article** [25] - 2:6, 2:16, 2:18, 4:11, 5:1, 5:5, 5:14, 5:24, 6:1, 6:6, 6:7,

6:9, 6:11, 6:13, 6:23, 6:25, 7:13, 9:13, 9:14, 9:16, 9:17, 9:22, 9:23, 10:3, 10:5
**articles** [1] - 7:15
**artificial** [1] - 62:1
**asbestos** [1] - 63:3
**aside** [2] - 5:16, 40:22
**aspects** [1] - 144:20
**assault** [1] - 150:5
**Assigned** [1] - 108:11
**assigned** [6] - 11:12, 11:21, 87:20, 108:20, 109:10, 109:11
**assignment** [1] - 109:7
**assistance** [3] - 12:2, 35:16, 37:5
**assisted** [1] - 88:3
**associate** [1] - 78:17
**associated** [3] - 20:4, 110:21, 156:16
**association** [1] - 73:16
**assume** [3] - 104:9, 170:11, 179:11
**assuming** [3] - 7:11, 65:12, 98:6
**assurance** [1] - 69:17
**ATF** [1] - 126:21
**attached** [1] - 136:10
**attack** [2] - 187:4, 187:7
**attempt** [2] - 63:2, 160:7
**attempted** [1] - 13:19
**attempting** [1] - 173:6
**attention** [12] - 7:20, 8:14, 11:25, 25:23, 28:16, 28:17, 30:1, 59:2, 87:22, 88:6, 88:14, 109:6
**attorney** [1] - 37:5, 178:10, 179:10, 183:13, 184:4
**Attorney** [1] - 128:14
**Attorney's** [5] - 34:6, 121:22, 143:10, 143:12, 143:21
**Attorneys** [1] - 143:19
**Atwell** [1] - 113:15
**Authority** [1] - 109:8
**authorization** [1] - 130:16
**autopsies** [1] - 157:19
**autopsy** [3] - 154:1, 154:8, 157:22
**available** [6] - 80:3, 82:14, 95:15, 97:10, 147:21, 148:3
**Avenue** [8] - 38:4, 39:23, 118:7, 118:13, 120:14, 147:5, 149:20, 151:5

**avoid** [5] - 9:18, 10:9, 10:16, 76:13, 76:14
**Avoid** [1] - 146:6
**aware** [5] - 35:22, 79:9, 94:1, 134:19, 169:3
**awkward** [1] - 31:10

## B

**Bachelor** [1] - 62:15
**background** [4] - 30:10, 62:4, 62:14, 178:17
**bad** [1] - 41:16
**bag** [32] - 15:17, 16:10, 16:15, 16:16, 16:18, 16:20, 16:21, 16:22, 16:23, 17:10, 17:20, 17:25, 19:4, 20:12, 20:16, 21:5, 21:25, 22:3, 22:5, 22:12, 22:19, 23:9, 78:2, 113:17, 114:6, 115:5, 115:17, 116:8, 116:12, 116:19, 125:21
**baggy** [3] - 102:8, 102:21
**bags** [6] - 66:10, 118:17, 118:20, 125:16, 125:18, 125:20
**balcony** [1] - 44:10
**ballistics** [7] - 85:6, 85:9, 98:8, 150:13, 155:20, 167:1, 167:6
**Ballistics** [1] - 85:12
**Baltimore** [38] - 1:12, 1:25, 2:12, 2:22, 9:14, 9:22, 11:11, 14:14, 14:16, 18:16, 26:2, 33:3, 33:4, 38:2, 39:3, 39:17, 39:19, 39:23, 65:18, 66:16, 69:7, 79:10, 87:16, 87:17, 108:12, 108:23, 109:8, 118:7, 123:24, 124:18, 151:6, 167:2, 176:22, 177:3, 177:19, 182:25
**Baltimore's** [2] - 2:8, 3:25
**bandanna** [4] - 19:21, 19:22, 20:2, 22:16
**bang** [3] - 26:25, 27:4, 27:25
**bangs** [1] - 26:25
**Banks** [1] - 59:10
**bar** [1] - 24:12
**BARNES** [3] - 108:7, 108:19, 190:18
**Barnes** [23] - 81:1, 81:16, 83:22, 95:18, 96:1, 96:4, 108:6,

108:11, 108:16, 108:18, 123:14, 123:20, 123:23, 135:1, 135:10, 135:18, 140:7, 140:24, 141:20, 142:24, 144:25, 171:25
**Barnes's** [1] - 172:21
**barrier** [1] - 84:24
**Barry** [1] - 1:22
**baseball** [1] - 118:21
**based** [7] - 66:16, 67:11, 76:20, 77:11, 78:22, 159:22, 187:14
**basis** [8] - 165:21, 166:8, 169:1, 169:2, 169:11, 171:8, 185:17
**bathroom** [2] - 134:3, 138:1
**battering** [1] - 111:8
**battery** [1] - 18:6
**beach** [1] - 73:2
**beat** [1] - 50:23
**became** [2] - 178:7, 178:8
**become** [3] - 12:1, 16:24, 173:4
**becomes** [1] - 82:10
**bed** [2] - 115:10, 137:4
**bedrock** [2] - 72:5, 73:4
**bedroom** [8] - 112:23, 113:6, 113:16, 114:6, 118:19, 118:22, 120:19, 130:7, 131:25, 133:3, 133:8, 133:13, 134:1, 138:1, 170:19, 170:23, 170:24
**bedrooms** [1] - 134:1
**beforehand** [1] - 74:12
**began** [3] - 125:3, 129:3, 134:12
**begin** [2] - 10:15, 133:1
**beginning** [2] - 106:4, 183:17
**Beginning** [1] - 15:23
**behalf** [1] - 174:1
**Behalf** [5] - 1:15, 1:17, 1:18, 1:20, 1:21
**behind** [4] - 27:7, 88:15, 88:20, 100:16
**belief** [4] - 7:18, 10:6, 41:4, 41:8
**believes** [2] - 156:12, 169:5
**belonged** [1] - 16:1
**belonging** [1] - 14:20
**below** [8] - 72:23, 90:10, 90:11, 92:12, 92:17, 101:16, 114:21
**Below** [1] - 92:18
**Bench** [1] - 24:15
**bench** [1] - 25:3

**beneficial** [1] - 3:17
**benefit** [1] - 100:15
**benefits** [1] - 49:7
**Benson** [5] - 153:11, 156:10, 156:12, 158:24, 159:8
**BENSON** [2] - 156:17, 156:22
**Benson's** [1] - 159:5
**beside** [2] - 160:19, 160:21
**best** [3] - 7:21, 122:10, 157:10
**bet** [1] - 183:21
**Beth** [1] - 178:14
**better** [3] - 12:19, 104:9, 188:22
**between** [26] - 6:16, 27:23, 41:2, 41:7, 51:23, 59:7, 70:7, 70:8, 70:16, 73:16, 75:11, 77:2, 77:4, 83:11, 88:25, 113:16, 115:11, 125:20, 125:21, 142:7, 163:21, 165:15, 165:18, 183:5
**Between** [1] - 26:23
**big** [2] - 33:17, 115:5
**biological** [1] - 72:9
**birth** [1] - 118:8
**bit** [11] - 17:3, 27:10, 39:25, 40:2, 62:2, 62:14, 72:3, 92:12, 106:8, 117:21, 162:5
**bits** [1] - 76:20
**black** [8] - 17:9, 17:13, 17:24, 21:4, 30:11, 102:7, 102:20, 118:21
**Black** [1] - 17:14
**blade** [2] - 114:18, 115:25
**blame** [1] - 2:10
**blend** [1] - 27:19
**block** [2] - 106:22, 109:22
**blocking** [1] - 92:13
**blood** [1] - 41:16
**blue** [5] - 14:20, 19:3, 19:5, 19:7, 22:21
**Bob** [1] - 3:24
**bodies** [6] - 131:16, 160:15, 161:16, 161:18, 161:20, 161:21
**body** [4] - 52:18, 151:24, 152:5, 154:10
**Bolondolay** [1] - 59:10
**Booking** [2] - 121:24, 143:10, 143:18
**books** [1] - 146:9
**boots** [26] - 16:1, 16:5, 16:19, 16:20, 20:23,

69:11, 73:8, 73:12, 73:14, 73:17, 73:19, 73:23, 74:24, 77:11, 77:12, 77:14, 77:16, 77:22, 77:23, 77:24, 78:1, 78:17, 78:20, 78:22, 104:6
**borrow** [1] - 165:8
**bother** [1] - 43:21
**bottom** [10] - 17:18, 59:4, 59:7, 114:11, 114:20, 114:21, 114:24, 114:25, 135:2, 135:19
**bottoms** [1] - 74:25
**Bottrell** [19] - 61:2, 61:7, 61:17, 63:14, 64:8, 64:12, 64:16, 65:15, 66:16, 69:10, 70:15, 71:25, 73:7, 73:18, 74:20, 76:1, 76:7, 79:8, 80:8
**BOTTRELL** [2] - 61:3, 190:10
**Bought** [1] - 58:4
**bought** [2] - 40:6, 57:16
**box** [4] - 70:18, 113:17, 115:11, 118:20
**boy** [2] - 13:2, 61:8
**braids** [1] - 102:7
**Bramble** [3] - 26:1, 39:4, 39:6
**brand** [1] - 21:10
**Bravo** [1] - 23:6
**breach** [1] - 73:3
**break** [11] - 81:2, 82:16, 83:3, 86:19, 94:14, 95:18, 98:7, 137:10, 139:20, 149:11, 185:22
**breathing** [1] - 101:10
**Brian** [3] - 10:24, 11:4, 126:21
**BRIAN** [2] - 10:25, 190:4
**brief** [5] - 24:12, 80:22, 81:1, 95:25, 187:25
**briefed** [2] - 84:24, 129:5
**briefly** [7] - 19:25, 23:21, 64:10, 80:18, 83:8, 142:21
**bring** [8] - 8:17, 8:18, 24:1, 38:5, 97:5, 152:6, 178:19, 188:10
**bringing** [2] - 32:6, 168:7
**brings** [1] - 29:18
**broad** [2] - 109:12, 147:25
**broadcast** [2] - 10:17, 88:12

**broke** [1] - 137:6
**broken** [3] - 93:12, 103:10, 103:11
**brother** [1] - 170:17
**brother's** [1] - 170:23
**brothers** [8] - 85:20, 151:4, 151:17, 152:3, 155:1, 155:19, 155:23, 158:20
**Brought** [1] - 130:6
**brought** [7] - 37:10, 130:7, 132:3, 132:22, 176:14, 181:12, 186:20
**brown** [6] - 15:25, 70:1, 70:3, 116:12, 118:10
**Brown** [7] - 12:11, 18:23, 19:4, 19:23, 20:17, 20:18, 20:19
**Brown's** [3] - 19:5, 19:7, 19:12
**Bruton** [2] - 182:4, 185:2
**building** [10] - 26:17, 26:18, 27:12, 31:5, 44:7, 44:8, 49:9, 61:24, 63:2, 91:21
**bullet** [7] - 157:17, 157:20, 157:21, 157:23, 157:24, 158:2, 158:3
**bullets** [7] - 85:22, 97:22, 151:16, 151:19, 154:8, 157:19
**Bureau** [1] - 61:18
**business** [1] - 66:3
**Butler** [1] - 4:16
**button** [1] - 6:18
**buy** [4] - 57:18, 57:19, 58:1, 165:9
**buys** [1] - 163:1
**BY** [49] - 11:6, 20:3, 21:18, 23:4, 23:25, 25:14, 32:22, 46:8, 51:10, 61:10, 61:16, 64:15, 65:9, 76:6, 79:3, 79:21, 87:13, 92:1, 99:18, 105:24, 108:15, 119:19, 123:16, 127:13, 129:1, 140:6, 142:23, 144:15, 190:4, 190:5, 190:5, 190:6, 190:7, 190:9, 190:10, 190:11, 190:11, 190:12, 190:12, 190:13, 190:14, 190:15, 190:16, 190:17, 190:18, 190:19, 190:19, 190:20, 190:20
**bye** [1] - 29:1

# C

**cabinets** [1] - 138:2
**caliber** [16] - 46:3, 46:6, 57:9, 57:14, 151:14, 151:16, 151:18, 151:20, 152:5, 155:11, 156:5, 157:8, 158:12, 159:15, 165:20, 181:12
**calibers** [3] - 154:12, 156:3, 158:8
**California** [2] - 40:8, 40:9
**canisters** [1] - 66:8
**cannot** [4] - 75:2, 79:17, 111:21, 132:21
**cap** [1] - 118:21
**car** [22] - 22:12, 22:15, 23:11, 23:13, 23:14, 24:1, 24:5, 24:6, 90:17, 92:11, 97:23, 101:16, 101:24, 103:10, 103:11, 103:21, 104:7, 107:1, 107:5, 107:12, 139:18, 139:19
**Card** [1] - 182:15
**care** [11] - 42:4, 42:9, 42:11, 42:12, 53:24, 54:1, 76:11, 77:19, 82:2, 97:10, 169:7
**careful** [1] - 77:24
**carefully** [2] - 77:5, 149:1
**Carl** [1] - 59:9
**Carlson** [4] - 88:19, 88:25, 89:10, 93:19
**carried** [2] - 5:4, 5:10
**carry** [2] - 5:9, 162:4
**cars** [18] - 24:4, 103:25, 104:2, 105:11, 105:14, 106:18, 106:20, 106:21, 106:22, 106:23, 107:6, 107:8, 107:17, 107:19, 139:14
**CASE** [1] - 1:6
**Case** [1] - 191:5
**case** [80] - 2:16, 2:17, 3:24, 4:5, 4:11, 4:19, 5:17, 5:18, 6:8, 7:14, 7:15, 7:16, 9:16, 9:19, 10:12, 10:14, 10:18, 10:19, 10:20, 12:14, 18:1, 20:14, 34:6, 34:13, 34:17, 35:8, 35:12, 35:21, 36:14, 36:24, 37:16, 38:6, 49:3, 49:9, 58:15, 58:17, 58:20, 58:24, 67:3, 67:10, 70:5, 73:9, 73:12, 74:23,

74:25, 75:19, 76:17, 78:11, 80:12, 95:9, 96:13, 96:18, 97:2, 98:1, 127:4, 128:15, 143:13, 145:10, 146:6, 146:7, 147:22, 154:6, 158:16, 159:11, 163:3, 163:20, 168:8, 173:10, 173:12, 175:6, 175:24, 178:2, 179:24, 180:20, 183:20, 183:24, 184:7, 187:4
**cases** [1] - 187:8
**cashing** [1] - 118:5
**casings** [8] - 85:22, 85:25, 151:15, 151:16, 151:19, 157:14, 158:6, 167:5
**cataloged** [1] - 20:13
**caught** [3] - 33:9, 33:10, 168:23
**caused** [1] - 33:8
**caution** [1] - 10:9
**CDS** [1] - 118:21
**cell** [12] - 15:16, 18:4, 49:25, 50:3, 50:6, 84:19, 174:16, 175:3, 176:18, 176:19, 178:22, 182:11
**central** [1] - 132:3
**Central** [4] - 121:23, 143:9, 143:18, 176:21
**ceramic** [1] - 114:12
**certain** [12] - 9:12, 10:9, 15:15, 69:18, 76:18, 94:15, 160:4, 165:7, 174:2, 180:1, 181:18
**certainly** [9] - 48:3, 74:9, 76:12, 96:25, 97:3, 145:18, 145:23, 162:13, 181:9
**Certainly** [3] - 64:11, 79:5, 144:13
**certainty** [1] - 161:6
**CERTIFICATE** [1] - 191:1
**certify** [2] - 191:3, 191:6
**chain** [1] - 182:13
**chairs** [3] - 80:11, 95:8, 146:4
**chance** [8] - 2:5, 5:6, 6:1, 49:19, 145:6, 148:13, 188:8, 188:24
**change** [4] - 57:21, 72:22, 72:24, 73:3
**changed** [3] - 42:5, 43:9, 54:14
**changes** [3] - 9:4, 9:6, 145:22
**changing** [3] - 70:9, 75:23, 165:20
**charge** [15] - 97:11,

119:8, 119:22, 128:19, 128:23, 141:7, 141:8, 141:13, 143:1, 143:21, 178:5, 178:6, 178:7, 178:8, 183:1
**charged** [2] - 37:12, 38:6, 128:9, 162:13, 163:19, 163:20, 165:15, 165:17, 182:23
**charges** [4] - 4:13, 182:19, 182:20, 182:25
**charging** [1] - 155:7
**Charlie** [1] - 13:5
**chart** [1] - 163:7
**charts** [1] - 71:9
**cheating** [1] - 59:25
**check** [4] - 66:5, 118:5, 158:24, 171:1
**chemist** [1] - 148:15
**Cherry** [5] - 3:24, 4:11, 7:14, 147:6
**chest** [9] - 114:19, 114:21, 115:10, 115:14, 116:1, 116:24, 117:4, 118:4, 118:18
**children** [5] - 44:16, 44:20, 45:15, 47:17, 74:10
**chilling** [1] - 26:10
**choice** [1] - 161:9
**choose** [1] - 51:6
**Circle** [1] - 18:16
**circle** [1] - 31:16
**circumstances** [1] - 83:19
**circumstantial** [1] - 165:15
**city** [5] - 2:14, 2:23, 4:14, 110:1, 178:5
**City** [6] - 108:12, 108:23, 109:8, 123:24, 124:18, 167:2
**civilian** [2] - 64:18, 64:19
**civilians** [1] - 85:18
**claiming** [2] - 161:16, 161:17
**clarify** [2] - 181:15, 181:22
**clarity** [1] - 19:15
**classes** [1] - 62:17
**classic** [1] - 185:2
**clean** [1] - 70:1
**cleaned** [1] - 69:22
**cleaning** [1] - 70:10
**clear** [12] - 7:9, 16:2, 18:17, 21:24, 75:25, 118:12, 120:22, 122:3, 167:10, 170:4, 170:6, 179:24

**clearly** [9] - 60:1, 156:18, 157:11, 160:12, 165:5, 172:16, 177:8, 179:5, 180:7
**CLERK** [7] - 11:2, 25:8, 32:13, 61:5, 87:8, 99:13, 108:9
**clerk** [2] - 2:5, 32:9
**client** [1] - 178:24
**client's** [2] - 184:20, 184:22
**climb** [1] - 110:11
**clinch** [1] - 97:25
**close** [6] - 96:17, 97:2, 147:11, 155:4, 173:12, 187:8
**closed** [1] - 111:7
**closely** [1] - 156:16
**closer** [2] - 32:16, 71:3
**closing** [1] - 166:20
**clothes** [1] - 120:3
**clothing** [3] - 14:2, 16:3, 67:8
**Coburn** [7] - 1:22, 7:7, 165:6, 177:21, 183:15, 185:14, 185:15
**COBURN** [21] - 7:8, 9:1, 46:4, 51:10, 60:19, 60:21, 64:10, 64:15, 65:13, 76:6, 79:21, 148:25, 177:22, 183:17, 183:21, 183:23, 185:16, 185:24, 190:9, 190:11, 190:12
**Coburn's** [2] - 98:8, 186:20
**cocaine** [9] - 37:25, 113:18, 113:20, 114:7, 114:17, 115:18, 137:8, 156:24
**coconspirator** [2] - 179:12, 179:13
**cogitating** [1] - 185:18
**coin** [1] - 77:7
**Cold** [1] - 2:13
**colleagues** [1] - 76:10
**collect** [1] - 70:3
**collected** [9] - 14:22, 66:9, 66:21, 67:2, 67:7, 67:14, 68:20, 68:25, 70:17
**collecting** [4] - 65:22, 66:15, 69:21, 69:22
**collection** [2] - 66:11, 85:22
**collectively** [1] - 78:5
**College** [1] - 3:7
**colloquy** [1] - 186:19
**color** [6] - 71:4, 71:5, 71:6, 71:7, 71:9, 71:10,

71:11, 71:13, 156:15
**colored** [2] - 102:7, 102:8
**colors** [1] - 75:1
**combination** [1] - 155:6
**combined** [1] - 137:12
**coming** [13] - 11:8, 62:22, 62:24, 63:8, 94:17, 95:16, 96:23, 141:14, 141:16, 147:22, 148:3, 159:5, 168:24
**common** [6] - 45:18, 57:17, 57:24, 79:15, 163:9
**community** [2] - 4:3, 162:22
**companion** [1] - 160:14
**compare** [1] - 63:17
**compared** [3] - 2:22, 62:13, 79:11
**comparing** [3] - 71:5, 71:19, 78:8
**comparison** [5] - 21:6, 62:12, 65:11, 71:4, 73:8
**comparisons** [3] - 70:16, 70:19, 159:10
**compelling** [6] - 163:23, 164:14, 164:15, 164:24, 165:14
**complaint** [1] - 88:2
**complete** [1] - 191:8
**completed** [4] - 133:22, 136:5, 136:12, 138:7
**completely** [2] - 73:6, 178:11
**completing** [1] - 97:2
**complex** [4] - 26:17, 26:18, 27:22, 110:7
**components** [1] - 71:21
**composed** [1] - 72:8
**conceded** [1] - 184:24
**conceivably** [1] - 184:25
**concept** [1] - 185:5
**concern** [4] - 2:11, 2:25, 3:2, 4:23
**concerned** [7] - 2:6, 2:14, 3:3, 3:21, 179:24, 180:3
**concerning** [3] - 21:25, 161:5, 161:11
**conclude** [5] - 73:18, 145:4, 145:7, 145:10, 173:24
**Conclusion** [1] - 189:9
**conclusion** [1] - 73:21
**conclusions** [2] - 73:7, 73:11
**concrete** [2] - 62:1, 166:10, 186:10

conduct [6] - 37:13, 37:15, 113:11, 133:2, 146:8, 166:25
Conducted [1] - 112:23
conducted [4] - 86:5, 113:8, 132:23, 134:8
conducting [4] - 70:15, 115:15, 118:23, 133:7
confer [1] - 159:6
conference [2] - 24:15, 25:3
conferred [1] - 145:15
confess [1] - 148:25
confident [1] - 187:3
confirms [1] - 10:6
conflict [1] - 178:15
conflicting [1] - 145:18
connect [1] - 50:14
connected [2] - 153:12, 159:9
connection [9] - 56:13, 121:6, 150:10, 162:3, 163:11, 164:14, 164:15, 164:17, 165:1
connections [1] - 158:20
conscientious [1] - 10:20
conscientiously [1] - 10:7
consequence [1] - 185:4
consider [4] - 5:17, 6:3, 173:11, 186:14
consideration [1] - 172:5
considered [2] - 172:11, 172:17
considers [1] - 152:2
conspiracy [6] - 34:9, 58:25, 59:5, 183:1, 184:17, 184:25
conspiring [1] - 59:9
constant [1] - 160:14
constitute [1] - 191:6
consult [1] - 121:22
CONT'D [1] - 190:12
contact [1] - 74:5
contain [1] - 158:25
contained [10] - 16:18, 18:10, 20:12, 69:6, 113:17, 113:19, 114:13, 114:16, 115:17
container [1] - 78:7
containing [3] - 20:7, 114:6, 114:17
contaminants [1] - 63:7
contamination [4] - 69:24, 70:11, 70:13, 76:14

contend [1] - 163:15
content [1] - 2:25
context [5] - 8:3, 49:3, 72:20, 175:6, 179:4
contextual [1] - 175:12
contiguous [1] - 93:19
continue [5] - 10:16, 10:21, 35:6, 74:8, 188:1
Continue [3] - 80:13, 95:9, 146:5
CONTINUED [1] - 65:8
continues [1] - 93:23, 159:20
continuing [2] - 70:25, 146:1
Continuing [1] - 17:4
continuous [1] - 155:11
continuously [1] - 55:9
contraband [3] - 110:21, 113:21
contrary [3] - 145:14, 165:4
contribute [1] - 82:22
contributes [1] - 82:23
Control [1] - 116:15
controversial [1] - 184:6
conversation [12] - 46:12, 46:21, 47:14, 55:1, 84:18, 103:20, 119:4, 122:4, 174:5, 174:9, 174:17, 175:4
conversations [3] - 53:9, 182:9, 182:19
convict [1] - 3:20
convicted [2] - 177:2, 177:3
conviction [3] - 8:7, 10:7, 37:15
convictions [3] - 4:10, 37:18, 37:20
convinced [1] - 141:10
cool [4] - 40:24, 42:2, 51:15, 141:12
cooperate [5] - 24:20, 24:22, 25:1, 34:17, 35:6
cooperated [1] - 153:16
cooperation [1] - 58:17
coordinated [1] - 88:8
copy [1] - 58:5
corn [2] - 102:6, 103:16
corner [6] - 101:13, 101:18, 101:19, 103:21, 103:24, 105:12
correct [121] - 11:19, 11:24, 12:6, 12:12, 12:13, 13:24, 14:4, 14:23, 14:24, 15:5, 15:9, 16:4, 16:7, 16:17, 17:15, 17:16, 17:19, 18:23,

18:24, 19:9, 19:18, 20:14, 20:25, 21:14, 22:11, 22:20, 27:17, 30:8, 33:20, 34:20, 34:24, 35:9, 35:12, 37:3, 46:2, 48:7, 48:17, 48:18, 49:1, 49:11, 56:5, 56:11, 56:23, 58:10, 58:12, 58:14, 63:23, 64:24, 65:15, 65:21, 65:23, 66:1, 66:19, 66:23, 67:17, 68:10, 68:17, 68:23, 69:3, 69:14, 75:7, 75:17, 75:18, 76:24, 78:14, 78:20, 78:25, 79:12, 80:2, 84:20, 89:9, 89:10, 89:11, 89:14, 89:18, 91:17, 93:20, 93:24, 102:10, 102:13, 102:16, 103:2, 104:16, 105:9, 108:21, 110:1, 110:7, 111:1, 115:11, 115:15, 115:18, 116:1, 117:16, 123:25, 124:5, 124:10, 125:3, 125:10, 125:17, 126:21, 127:19, 130:1, 130:5, 130:11, 133:19, 137:21, 140:7, 140:9, 140:15, 140:19, 141:23, 142:5, 142:10, 143:5, 143:11, 144:8, 155:21, 161:2, 180:18, 180:23, 184:13
Correct [6] - 7:1, 90:1, 93:21, 93:25, 94:3, 94:6
corrected [6] - 19:5, 19:8, 19:12, 19:24, 20:20, 58:16
correctly [4] - 51:12, 76:17, 77:10, 81:10
corroborate [1] - 187:1
corroborates [1] - 152:4
corroborating [2] - 152:11, 184:9
corroboration [2] - 152:8, 161:5
cost [2] - 54:10, 120:11
counsel [12] - 8:5, 9:6, 145:1, 145:15, 157:5, 165:5, 166:25, 168:16, 179:2, 181:1, 181:20, 186:3
counselor [1] - 92:8
count [1] - 171:1
Count [2] - 150:9, 180:2
counteract [1] - 182:3
counterparts [1] - 4:9
counting [3] - 56:23, 65:2, 81:10

country [1] - 8:25
county [1] - 67:15
County [18] - 11:11, 14:14, 14:16, 26:2, 39:3, 39:18, 39:19, 65:18, 66:17, 79:10, 87:16, 87:17, 157:1, 176:22, 177:3, 177:19, 182:25
couple [23] - 3:13, 12:24, 14:1, 14:5, 16:2, 19:14, 21:23, 31:11, 42:7, 49:3, 67:16, 68:16, 91:4, 92:4, 92:14, 96:14, 97:15, 98:22, 101:13, 106:2, 151:7, 155:15, 187:19
course [16] - 6:5, 7:21, 66:3, 73:23, 75:24, 123:19, 140:13, 150:19, 150:20, 151:22, 154:2, 160:9, 166:16, 166:18, 180:8
Court [47] - 5:6, 5:11, 5:15, 7:18, 7:22, 7:24, 8:3, 9:11, 34:10, 81:7, 82:17, 83:8, 93:20, 93:23, 96:22, 149:6, 152:9, 152:10, 152:12, 159:11, 161:24, 162:10, 162:15, 163:16, 164:13, 168:1, 171:7, 172:3, 172:10, 173:11, 173:14, 173:17, 178:17, 182:16, 183:2, 186:14, 186:15, 187:20, 188:4, 188:15, 189:5, 191:15
COURT [313] - 1:1, 2:2, 2:4, 5:21, 6:11, 6:22, 7:2, 7:5, 7:7, 7:11, 8:1, 8:20, 8:23, 9:2, 9:10, 10:1, 11:8, 14:8, 18:19, 20:1, 22:18, 23:20, 23:23, 24:8, 24:10, 24:14, 24:18, 31:1, 31:7, 31:14, 31:22, 32:1, 32:4, 32:7, 32:9, 32:16, 32:19, 34:2, 46:5, 60:18, 60:24, 61:13, 61:15, 64:11, 65:6, 65:14, 79:7, 80:8, 80:20, 81:8, 81:13, 81:15, 81:18, 81:20, 81:23, 82:1, 82:5, 82:9, 82:12, 82:15, 82:19, 82:22, 82:25, 83:3, 83:7, 83:18, 83:24, 84:1, 84:5, 84:8, 84:10, 84:12, 84:18, 84:21, 85:6, 85:9, 85:15, 85:18, 85:24, 86:2, 86:7, 86:12, 86:14, 86:17, 87:2, 92:6, 92:13,

94:11, 94:14, 95:13, 95:24, 96:4, 96:7, 96:11, 96:19, 96:24, 97:3, 97:17, 97:19, 97:24, 98:6, 98:17, 98:21, 98:25, 99:3, 99:5, 99:9, 108:2, 116:21, 119:11, 119:13, 119:16, 119:18, 122:1, 123:19, 127:11, 128:25, 135:5, 142:13, 142:18, 144:10, 144:13, 144:25, 145:3, 146:15, 146:19, 146:21, 146:23, 147:4, 147:6, 147:8, 147:13, 147:19, 147:23, 148:5, 148:10, 148:12, 148:18, 148:21, 148:24, 149:3, 149:8, 149:10, 149:14, 149:17, 149:19, 149:22, 149:25, 150:3, 150:6, 150:9, 150:14, 150:17, 150:20, 150:23, 150:25, 151:11, 151:13, 152:15, 152:20, 152:25, 153:3, 153:5, 153:9, 153:17, 153:20, 153:24, 154:4, 154:11, 154:16, 154:19, 154:21, 155:3, 155:9, 155:17, 155:22, 155:25, 156:3, 156:7, 156:11, 156:14, 156:21, 157:4, 157:16, 157:24, 158:1, 158:5, 158:8, 158:10, 158:14, 158:19, 159:2, 159:13, 159:15, 159:17, 159:19, 159:24, 160:8, 160:20, 161:3, 161:19, 162:18, 163:14, 164:10, 164:21, 165:3, 166:5, 166:16, 166:18, 166:22, 167:12, 167:22, 167:24, 168:2, 168:12, 168:15, 168:19, 169:7, 169:10, 169:13, 169:15, 169:17, 169:19, 169:22, 170:4, 170:9, 170:11, 170:15, 170:21, 170:25, 171:6, 171:14, 171:17, 171:23, 172:7, 172:13, 172:15, 172:25, 173:5, 173:8, 173:20, 173:23, 174:12, 174:14, 174:18, 174:20, 174:25, 175:9, 175:12, 175:16, 175:18, 175:21, 176:1, 176:5, 176:11, 176:13, 176:16, 176:21, 176:24, 177:2, 177:5, 177:8, 177:10, 177:14, 177:18, 177:23, 178:2, 178:6, 178:8, 178:18, 178:25, 179:3,

179:12, 179:16, 179:20, 180:1, 180:15, 180:17, 180:24, 181:4, 181:8, 181:13, 181:15, 181:17, 182:5, 182:10, 182:24, 183:6, 183:9, 183:15, 183:19, 183:22, 183:25, 184:5, 184:10, 185:3, 185:10, 185:14, 185:21, 186:5, 186:8, 186:13, 186:17, 186:19, 187:9, 187:22, 188:6, 188:13, 188:16, 188:19, 188:24, 189:3, 189:7

**court** [6] - 30:16, 37:10, 120:9, 127:4, 145:4, 148:4

**Court's** [12] - 9:3, 9:18, 10:10, 31:23, 32:5, 60:17, 83:9, 152:6, 154:3, 159:22, 168:11, 172:20

**Courthouse** [1] - 1:24

**courtroom** [10] - 6:4, 8:6, 9:9, 59:15, 80:17, 87:1, 95:12, 99:4, 146:14, 164:19

**courts** [1] - 64:23

**cover** [1] - 144:20

**coverage** [1] - 5:7

**covered** [1] - 94:8

**covering** [1] - 188:3

**crack** [8] - 113:18, 113:20, 114:13, 114:16, 114:17, 115:18, 137:8

**cracked** [1] - 115:21

**create** [2] - 7:17, 7:20

**creative** [1] - 173:7

**credibility** [1] - 187:4

**credit** [1] - 172:21

**crevice** [1] - 134:4

**crime** [4] - 6:11, 9:14, 140:11, 164:16

**crime-type** [1] - 6:11

**crimes** [2] - 3:17, 36:18

**Criminal** [2] - 3:7, 11:21

**criminal** [5] - 33:19, 34:19, 49:3, 49:9, 127:4

**CRIMINAL** [1] - 1:6

**crimp** [1] - 152:7

**CROSS** [14] - 21:17, 51:9, 64:14, 76:5, 91:25, 105:23, 123:15, 190:5, 190:9, 190:11, 190:12, 190:15, 190:17, 190:19

**cross** [7] - 23:10, 24:25, 70:11, 70:13, 84:1, 159:3, 162:16

**cross-contamination** [1] - 70:13

**crossed** [4] - 19:5, 19:12, 19:23, 20:20

**Crowe** [8] - 1:20, 173:25, 176:4, 179:10, 179:16, 180:4, 182:4, 184:10

**CROWE** [21] - 174:1, 174:13, 174:15, 174:19, 174:21, 175:1, 175:11, 175:14, 175:17, 180:8, 180:16, 180:23, 181:3, 181:5, 181:9, 181:14, 184:12, 185:9, 185:12, 186:6, 186:9

**crucial** [1] - 98:3

**crystals** [1] - 71:18

**culture** [2] - 2:9, 3:12, 4:13

**curative** [1] - 5:15

**curb** [1] - 104:5

**currency** [1] - 165:7

**current** [1] - 11:20

**custody** [7] - 13:17, 32:6, 86:12, 140:8, 149:25, 176:16, 176:17

## D

**D-A-R-I-U-S** [1] - 32:20

**D-E-A-N-D-R-E** [1] - 25:11

**daily** [1] - 165:20

**Damita** [5] - 82:4, 83:15, 98:24, 147:10, 147:12

**dance** [3] - 154:7, 157:10

**Darius** [5] - 32:3, 32:15, 32:18, 162:21, 184:14

**DARIUS** [2] - 32:11, 190:8

**dark** [4] - 102:7, 102:8, 102:19, 102:21

**dark-colored** [2] - 102:7, 102:8

**date** [11] - 16:12, 46:10, 117:11, 117:20, 118:8, 124:5, 124:12, 163:2, 176:3, 183:18

**dated** [2] - 19:15, 58:10

**dates** [1] - 154:22

**Daubert** [1] - 148:7

**daughter** [1] - 112:2

**daughter's** [1] - 83:10

**David** [2] - 25:19, 26:4

**David's** [1] - 24:19

**Davis** [1] - 1:13

**daylight** [1] - 110:25

**days** [7] - 9:13, 94:17, 94:23, 96:16, 97:1, 187:2

**dead** [4] - 103:23, 104:15, 104:18, 104:21

**deal** [8] - 4:7, 9:16, 37:24, 43:5, 43:8, 51:6, 76:11, 86:18

**dealer** [1] - 34:15, 37:11, 44:23, 48:12, 55:4, 55:21, 56:1, 58:3

**dealing** [9] - 18:21, 37:9, 38:11, 39:18, 40:8, 55:9, 56:14, 58:14, 182:15

**Deandre** [4] - 24:17, 24:19, 25:5, 25:11

**DEANDRE** [2] - 25:6, 190:7

**death** [4] - 47:22, 48:1, 48:7, 98:2

**debrief** [1] - 138:7

**debriefing** [1] - 138:7

**debris** [2] - 69:11, 77:16

**deceased** [1] - 13:15

**December** [2] - 11:14, 59:8

**decide** [2] - 97:12, 165:14

**decided** [3] - 59:19, 106:17, 153:21

**decision** [2] - 5:20, 48:25

**declaimed** [1] - 160:15

**declined** [3] - 121:24, 128:15, 143:14

**decoupling** [1] - 185:13

**Defendant** [4] - 1:17, 1:18, 1:20, 1:21

**defendant** [1] - 185:7

**defendants** [3] - 13:22, 82:24, 85:3, 105:12, 155:6, 176:8, 178:24

**Defendants** [1] - 1:9

**Defender** [1] - 180:22

**defense** [10] - 8:12, 8:13, 65:12, 79:6, 179:23, 184:8, 187:4, 187:6, 187:11, 187:12

**defense's** [1] - 184:15

**definitely** [1] - 36:7, 180:10

**deliberations** [1] - 10:15

**Delvison** [8] - 85:14, 86:3, 111:23, 111:25, 121:5, 121:19, 131:21, 146:17

**Delvison's** [1] - 111:24

**demand** [1] - 160:3

**demonstrably** [2] - 161:24, 162:1

**demote** [1] - 21:23

**denied** [1] - 5:21

**dental** [1] - 70:6

**department** [6] - 108:21, 108:24, 109:3, 124:2, 153:8, 153:9

**Department** [6] - 11:11, 65:18, 87:18, 108:12, 123:24, 124:19

**departments** [1] - 64:2

**dependent** [1] - 72:4

**depicts** [1] - 100:18

**depth** [1] - 72:23

**derived** [2] - 61:25, 72:6

**describe** [4] - 100:12, 102:4, 102:18, 152:23

**described** [9] - 9:22, 14:23, 77:19, 78:16, 125:15, 125:17, 153:5

**description** [4] - 22:13, 59:4, 76:9, 88:13

**descriptions** [1] - 152:24

**Desk** [1] - 15:14

**desk** [1] - 16:13

**Desmond** [1] - 174:8

**DET** [1] - 190:4

**detail** [3] - 145:11, 153:12, 172:24

**detailed** [1] - 95:5, 135:20, 136:1

**details** [2] - 125:22, 125:24

**detained** [2] - 132:2, 132:3

**detainers** [1] - 177:24

**detective** [7] - 11:23, 49:18, 49:22, 111:3, 148:2, 153:25

**Detective** [54] - 3:24, 7:14, 10:24, 11:4, 11:7, 11:8, 12:14, 13:13, 13:16, 13:17, 13:19, 13:21, 14:9, 15:6, 15:24, 17:4, 17:8, 17:12, 18:3, 18:10, 18:19, 19:2, 19:15, 20:5, 20:7, 21:2, 21:6, 21:15, 21:19, 21:20, 21:21, 23:5, 23:18, 23:20, 24:8, 50:9, 56:9, 108:11, 108:17, 108:18, 115:5, 118:12, 122:3, 123:14, 123:20, 123:23, 140:7, 142:24, 144:17, 144:25, 153:11, 156:12, 159:8, 171:24

**DETECTIVE** [1] - 10:25

**detective's** [1] - 167:16

**Detectives** [1] - 56:7

**detectives** [3] - 4:15,

48:3, 49:15

**detention** [1] - 177:20

**deter** [1] - 89:22

**determination** [3] - 23:16, 172:19, 173:17

**determine** [2] - 71:25, 165:5

**determined** [1] - 167:6

**deterred** [1] - 91:21

**developing** [1] - 72:13

**developments** [1] - 153:20

**device** [2] - 17:5, 18:9

**devote** [1] - 97:7

**dialed** [1] - 50:11

**Dicke** [2] - 174:8, 174:10

**died** [2] - 162:7, 167:3

**differ** [2] - 73:5, 80:1

**difference** [3] - 71:2, 168:15, 168:17

**differences** [3] - 70:24, 72:18, 75:11

**different** [20] - 12:9, 40:2, 70:24, 71:11, 72:13, 72:14, 72:17, 72:23, 73:1, 73:6, 73:14, 73:22, 76:14, 78:21, 79:5, 80:5, 117:16, 155:6

**differentiated** [2] - 183:5, 183:7

**difficulty** [2] - 8:2, 180:8

**dilemma** [1] - 143:22

**diminishes** [1] - 152:8

**dire** [2] - 6:24, 64:10

**Direct** [1] - 84:1

**DIRECT** [11] - 11:5, 25:13, 32:21, 61:9, 65:8, 87:12, 99:17, 108:14, 190:4, 190:7, 190:9, 190:11, 190:12, 190:14, 190:16, 190:18

**direct** [10] - 57:2, 58:6, 59:18, 60:6, 79:5, 127:15, 129:24, 164:2, 166:11, 187:15

**directed** [3] - 133:1, 156:13, 170:19

**directing** [2] - 25:23, 59:2

**Directing** [1] - 11:25

**direction** [9] - 30:23, 31:12, 68:13, 101:17, 103:24, 104:15, 105:9, 106:16, 106:17

**directly** [8] - 2:15, 11:2, 25:8, 32:13, 61:5, 87:8, 89:13, 108:9

**dired** [1] - 6:17

**dires** [1] - 7:19
**disagreement** [1] - 167:18
**discern** [1] - 75:4
**discontinued** [1] - 91:11
**discover** [3] - 63:2, 114:2, 116:24
**discovered** [1] - 113:21
**discovery** [1] - 174:16
**discretion** [1] - 35:18
**discuss** [5] - 3:14, 4:14, 144:7, 146:7
**discussed** [1] - 59:24
**discussion** [10] - 10:12, 43:1, 50:21, 54:9, 54:20, 80:12, 95:8, 122:23, 146:5, 183:4
**discussions** [1] - 50:20
**disregard** [2] - 6:4, 6:12
**distances** [1] - 75:23
**distinct** [2] - 75:1, 140:21
**distribute** [4] - 34:10, 37:19, 37:24, 59:10
**distributing** [1] - 34:14
**district** [1] - 8:8
**DISTRICT** [2] - 1:1, 1:2
**divided** [1] - 156:8
**DIVISION** [1] - 1:2
**Division** [4] - 3:10, 11:22, 108:13, 108:20
**DOC** [1] - 177:11
**doctor** [1] - 83:11
**doctors** [1] - 29:13
**document** [2] - 58:5, 59:9
**documenting** [1] - 133:19
**dog** [2] - 163:12, 168:7
**Dogwood** [1] - 46:20
**Donald** [1] - 156:23
**done** [7] - 43:14, 69:16, 78:13, 96:22, 124:14, 127:9, 167:17
**door** [27] - 15:13, 28:24, 29:2, 84:8, 91:20, 100:7, 100:10, 100:11, 100:13, 101:10, 101:20, 102:10, 104:3, 105:15, 106:9, 111:6, 111:9, 111:11, 111:13, 166:5, 166:8, 166:15, 166:17, 167:16
**double** [2] - 151:3, 151:4
**doubt** [1] - 176:4
**Doug** [1] - 150:21
**down** [53] - 8:6, 8:9, 17:18, 27:6, 31:13, 32:17, 46:25, 47:7,

69:23, 70:1, 70:9, 88:4, 89:15, 90:5, 92:19, 93:22, 93:23, 95:22, 103:10, 103:11, 103:16, 104:5, 104:15, 104:18, 105:1, 106:17, 106:24, 116:14, 116:18, 120:13, 121:23, 122:17, 122:20, 130:6, 130:7, 132:19, 135:17, 137:6, 137:10, 138:7, 141:11, 141:14, 142:9, 142:15, 143:9, 143:18, 144:6, 144:16, 151:6, 151:8, 152:25, 156:19
**Down** [1] - 52:11
**downstairs** [1] - 138:5
**Downtown** [1] - 121:17
**draft** [2] - 124:2, 124:15
**drafted** [7] - 123:24, 124:12, 124:19, 125:1, 126:7, 126:13, 148:22
**Drake** [5] - 98:23, 146:22, 146:23, 146:24, 147:1
**Drake's** [1] - 146:23
**draw** [4] - 17:17, 73:11, 87:22, 161:1
**drawer** [10] - 114:5, 114:6, 114:7, 114:11, 114:21, 114:22, 114:23, 114:24, 114:25, 137:4
**drawers** [6] - 114:10, 114:11, 114:20, 115:10, 115:15, 116:1, 116:25, 117:5, 118:4, 118:18
**dresser** [2] - 114:5
**drive** [2] - 47:12, 106:23
**driven** [1] - 24:4
**driver's** [1] - 18:12
**drove** [6] - 53:1, 104:2, 105:14, 106:21, 107:17, 107:20
**drug** [29] - 4:13, 4:15, 4:17, 4:21, 34:14, 37:9, 37:11, 37:13, 37:15, 37:20, 37:21, 39:21, 44:23, 44:25, 48:12, 49:10, 55:4, 55:21, 56:1, 56:12, 57:18, 57:24, 58:25, 84:15, 110:22, 116:23, 169:4, 182:12, 182:14
**drug-related** [4] - 37:13, 37:15, 37:21, 44:25
**drug/gun** [1] - 162:22
**drugs** [39] - 33:12, 33:14, 37:23, 38:11, 38:16, 55:9, 56:14,

56:15, 57:19, 58:14, 112:19, 113:10, 120:18, 122:16, 122:24, 123:4, 127:1, 128:3, 130:10, 130:13, 130:23, 132:11, 140:13, 141:8, 142:1, 142:3, 142:4, 142:7, 162:7, 165:9, 169:1, 169:4, 169:6, 169:25, 170:20, 170:22, 170:25
**dry** [1] - 74:3
**dual** [1] - 173:12
**duct** [1] - 47:20
**due** [1] - 171:11
**dug** [2] - 67:3, 67:4
**Dukes** [2] - 156:23, 156:24
**during** [17] - 6:18, 37:23, 38:13, 49:13, 52:4, 57:1, 58:6, 59:18, 63:16, 72:7, 93:4, 103:20, 107:19, 127:16, 169:22, 182:8, 182:16
**During** [3] - 37:11, 91:13, 169:21

---

## E

**E-D-W-A-R-D-S** [1] - 11:4
**e-mail** [1] - 9:6
**E-R-I-N** [1] - 99:15
**eager** [1] - 179:11
**Earl** [2] - 14:20, 18:13
**early** [5] - 95:14, 96:12, 98:7, 145:4, 188:12
**earn** [1] - 149:9
**Earnest** [1] - 113:15
**easel** [2] - 32:7, 88:15
**easily** [3] - 63:21, 79:17, 147:24
**east** [4] - 68:1, 68:2, 75:10, 109:11
**easy** [1] - 74:17
**ECU** [1] - 116:14
**edge** [1] - 6:21
**edges** [1] - 71:17
**Edmondson** [2] - 38:4, 39:23
**educational** [1] - 62:14
**Edwards** [5] - 10:24, 11:4, 11:9, 12:14, 21:15
**EDWARDS** [2] - 10:25, 190:4
**effort** [4] - 43:24, 76:12, 88:8, 90:2
**efforts** [1] - 81:3
**eight** [3] - 62:25, 87:19, 118:9

**Eighteen** [1] - 25:18
**either** [19] - 5:13, 12:15, 22:11, 30:6, 30:13, 30:15, 74:11, 74:19, 75:4, 111:13, 126:18, 127:24, 128:18, 142:25, 145:23, 161:9, 170:12, 187:14
**elaborated** [1] - 162:24
**elapsed** [3] - 132:13, 132:25, 133:21
**Election** [1] - 94:24
**electronic** [1] - 18:5
**elevation** [1] - 72:18
**eleventh** [1] - 33:7
**elicit** [4] - 24:24, 166:3, 166:13, 178:24
**elicited** [1] - 24:22
**Ellington** [1] - 150:21
**elucidate** [1] - 182:2
**employed** [4] - 61:17, 87:14, 87:17, 108:23
**employing** [1] - 153:14
**enable** [1] - 146:2
**encircle** [1] - 89:23
**end** [7] - 10:14, 36:23, 43:16, 51:2, 94:25, 95:17, 97:4, 101:1, 101:2, 103:23, 104:15, 104:18, 104:21, 148:6, 173:10, 178:9
**End** [1] - 25:3
**ended** [1] - 91:16
**ending** [1] - 188:12
**enforcement** [1] - 35:2, 49:1, 109:4
**enforcement's** [1] - 3:16
**enjoy** [2] - 49:8, 95:7
**Enjoy** [1] - 146:11
**enormous** [1] - 98:5
**enter** [1] - 89:24
**entered** [6] - 34:5, 82:23, 125:5, 131:13, 132:13, 140:3
**enters** [3] - 9:9, 87:1, 99:4
**entire** [11] - 63:11, 69:17, 93:4, 94:7, 106:3, 107:22, 114:25, 133:11, 156:24, 168:10, 184:7
**entirely** [2] - 179:24, 188:9
**entitled** [9] - 157:12, 160:5, 160:13, 172:16, 172:20, 179:16, 179:18, 180:5, 186:20
**entrance** [2] - 27:12, 44:7
**entry** [4] - 91:20, 94:1,

94:5, 111:8
**envelope** [8] - 17:8, 18:2, 18:9, 69:6, 77:13, 129:10, 129:11, 129:17
**environment** [1] - 73:2
**environmental** [1] - 63:5
**Epps** [14] - 150:11, 151:1, 151:10, 152:15, 152:20, 152:21, 155:3, 156:1, 156:13, 156:19, 157:20, 158:19, 160:11, 163:25
**Eric** [4] - 85:21, 148:2, 150:10, 152:13
**ERIN** [2] - 99:11, 190:16
**Erin** [3] - 84:6, 99:8, 99:15
**Ernest** [3] - 84:13, 85:1, 147:10
**erring** [1] - 10:8
**especially** [2] - 137:25, 147:11
**Esquire** [10] - 1:16, 1:16, 1:17, 1:18, 1:19, 1:19, 1:20, 1:21, 1:22, 1:22
**Essentially** [1] - 183:10
**essentially** [2] - 137:22, 164:23, 182:21
**establish** [2] - 88:7, 97:23
**established** [2] - 83:25, 107:18, 112:4
**estimate** [3] - 83:25, 107:18, 112:4
**estimated** [1] - 137:19
**et** [1] - 191:5
**eternity** [4] - 104:6, 104:8, 104:10, 107:15
**Evans** [15] - 129:22, 129:23, 134:5, 134:9, 134:12, 134:18, 135:2, 135:10, 135:19, 135:24, 135:25, 136:5, 136:12, 136:19, 137:17
**evening** [2] - 12:1, 146:11
**event** [5] - 27:25, 72:7, 86:23, 163:9, 182:3
**events** [3] - 39:15, 106:4, 124:23
**eventually** [3] - 138:19, 143:11, 178:12
**evicted** [1] - 122:12
**evidence** [48] - 6:4, 10:12, 15:4, 16:24, 19:17, 49:14, 66:13, 67:6, 67:9, 70:2, 70:4, 80:12, 95:8, 98:4, 110:17, 114:2, 116:9,

116:23, 116:24, 139:19,
146:5, 151:17, 152:1,
152:9, 152:13, 155:10,
155:18, 157:6, 159:22,
161:5, 162:2, 163:17,
163:23, 164:8, 164:10,
164:11, 164:15, 164:18,
164:24, 164:25, 165:1,
165:15, 167:20, 168:7,
179:11, 186:25, 187:5
**Evidence** [1] - 116:15
**evidentiary** [1] - 4:20
**exact** [1] - 113:12
**Exactly** [2] - 131:6,
143:6
**exactly** [6] - 6:1,
163:15, 163:17, 179:6,
179:7, 181:18
**exaggerating** [1] -
162:9
**examination** [13] -
23:10, 24:25, 57:2, 58:6,
59:18, 60:6, 62:3, 62:11,
70:25, 78:16, 159:3,
162:16, 166:25
**EXAMINATION** [43] -
11:5, 21:17, 23:3, 23:24,
25:13, 32:21, 51:9, 61:9,
64:14, 65:8, 76:5, 79:2,
79:20, 87:12, 91:25,
99:17, 105:23, 108:14,
123:15, 140:5, 142:22,
144:14, 190:4, 190:5,
190:5, 190:6, 190:7,
190:9, 190:9, 190:11,
190:11, 190:12, 190:12,
190:13, 190:14, 190:15,
190:16, 190:17, 190:18,
190:19, 190:19, 190:20,
190:20
**examinations** [1] -
76:11
**examine** [2] - 61:23,
159:10
**examined** [1] - 74:23
**examiner** [12] - 61:18,
61:20, 61:23, 62:25,
84:25, 97:12, 97:15,
97:20, 98:2, 98:5,
148:15, 149:4
**example** [2] - 66:25,
84:25
**except** [1] - 175:6
**exception** [1] - 179:13
**excluded** [1] - 160:2
**Excuse** [2] - 125:11,
154:21
**excuse** [2] - 86:20,
95:14
**excused** [16] - 24:10,

32:1, 60:24, 80:9, 80:14,
86:25, 94:12, 95:11,
96:12, 108:3, 132:22,
145:1, 146:13, 171:14,
187:23, 188:2
**execute** [8] - 112:7,
128:7, 129:4, 129:15,
129:18, 135:11, 135:12,
136:24
**executed** [6] - 134:6,
134:18, 135:24, 135:25,
139:23, 139:24
**executing** [2] - 133:12,
137:17
**execution** [5] - 109:14,
127:16, 135:6, 153:6,
156:18
**exercise** [1] - 146:3
**exhibit** [4] - 8:19, 24:3,
31:4, 115:3
**Exhibit** [30] - 12:21,
13:2, 13:5, 13:8, 14:6,
14:12, 14:25, 15:24,
17:2, 17:6, 17:21, 18:8,
19:1, 19:20, 20:22, 21:1,
21:8, 23:6, 27:9, 31:3,
33:22, 44:6, 45:21,
45:24, 57:2, 66:14,
109:21, 115:4, 117:3
**exhibits** [1] - 20:2
**exist** [2] - 3:8, 7:21
**exit** [2] - 89:24, 91:20
**exited** [1] - 82:24
**exits** [2] - 95:12, 146:14
**exodus** [1] - 3:9
**expect** [4] - 80:22, 95:2,
146:16, 188:16
**expected** [1] - 181:11
**experience** [3] - 22:24,
24:3, 62:23
**expert** [5] - 64:9, 64:20,
65:6, 65:11, 150:21
**experts** [1] - 150:13
**explain** [2] - 143:12,
175:20
**explained** [1] - 182:21
**explaining** [1] - 112:13
**explanation** [1] - 103:9
**exposure** [3] - 9:15,
10:16, 146:6
**Express** [2] - 66:4, 66:7
**express** [1] - 9:3
**expressly** [1] - 172:14
**extent** [4] - 5:17, 165:7,
167:15, 180:2
**extra** [1] - 18:6
**extraordinarily** [1] -
163:18
**extraordinary** [2] -
157:7, 161:25

**eyes** [1] - 118:10

## F

**face** [1] - 32:9
**faces** [3] - 8:3, 28:14,
30:6
**facing** [11] - 90:6,
90:21, 90:22, 100:13,
100:14, 101:9, 102:9,
182:20, 182:25, 183:1
**fact** [46] - 2:16, 4:8,
25:24, 35:22, 36:18,
40:21, 51:17, 74:20,
84:22, 97:4, 104:21,
124:2, 124:15, 126:2,
126:5, 126:8, 126:14,
127:1, 128:2, 128:4,
128:14, 130:9, 130:16,
137:21, 139:19, 139:25,
142:24, 143:3, 145:13,
152:7, 152:13, 160:25,
161:8, 162:5, 166:22,
176:7, 178:14, 178:23,
179:14, 180:13, 181:2,
181:10, 182:25, 183:11,
187:5, 187:13
**factor** [1] - 172:19
**factors** [4] - 72:4,
72:25, 163:16, 163:17
**facts** [1] - 5:17
**factual** [2] - 166:3,
166:13
**Factual** [1] - 59:7
**factually** [1] - 160:17
**failed** [1] - 96:2
**fails** [1] - 8:4
**fair** [11] - 34:15, 35:5,
36:3, 42:21, 48:9, 49:6,
110:6, 124:22, 128:9,
166:14, 173:20
**fairly** [7] - 57:17, 57:24,
73:1, 75:23, 80:21,
93:18, 166:24
**fall** [6] - 51:3, 74:10,
127:25, 128:19, 128:23,
143:1
**fallen** [2] - 69:8, 77:23
**falls** [1] - 74:9
**false** [4] - 56:19, 56:21,
161:24, 162:1
**falsehood** [1] - 58:12
**familiar** [1] - 88:15
**family** [7] - 6:14, 43:23,
44:1, 44:4, 59:21, 60:8,
100:4
**far** [7] - 33:6, 39:21,
43:9, 51:5, 53:4, 80:13,
159:4

**Farber** [1] - 178:14
**fatal** [1] - 159:9
**father's** [1] - 83:12
**FBI** [13] - 62:20, 62:22,
62:24, 63:8, 63:10,
63:13, 63:15, 63:23,
63:25, 64:4, 64:7, 76:10,
79:13
**feature** [1] - 57:24
**February** [4] - 154:23,
154:24, 165:19, 183:20
**Federal** [5] - 34:10,
61:18, 66:4, 66:7, 183:1
**federal** [4] - 4:9, 4:15,
4:21, 37:16, 64:23,
178:2, 178:3, 178:6,
178:7, 178:8
**feet** [6] - 68:2, 68:5,
68:8, 68:10, 75:16, 75:24
**fell** [1] - 97:13
**fellow** [1] - 174:7
**felt** [5] - 28:19, 48:21,
48:23, 143:13
**female** [1] - 132:17,
132:20, 142:14
**females** [1] - 111:18,
142:9
**few** [15] - 2:24, 8:10,
8:25, 16:19, 38:10,
38:15, 39:14, 44:5,
75:15, 92:11, 149:13,
163:24, 164:4, 186:20,
187:2
**Fickling** [2] - 147:1,
149:18
**fifth** [2] - 77:13, 77:23
**figure** [1] - 62:4
**file** [2] - 170:7, 170:13
**filed** [1] - 174:2
**fill** [3] - 97:1, 136:11,
175:18
**filled** [2] - 112:13
**filling** [2] - 137:16
**finally** [4] - 13:8, 69:2,
107:17, 118:15
**Finally** [2] - 18:8, 21:1
**financial** [1] - 120:10
**finder** [2] - 160:25,
187:13
**fine** [8] - 8:20, 18:20,
64:13, 82:18, 95:14,
97:13, 143:24, 180:21
**finger** [1] - 31:11
**fingerprint** [2] - 85:19,
146:20
**finish** [1] - 145:13,
150:18, 188:9
**fire** [2] - 151:9, 151:23
**firearm** [3] - 160:13,
167:7

**firearms** [5] - 67:16,
84:24, 150:12, 158:16,
165:16
**fired** [10] - 151:19,
151:21, 154:11, 154:13,
154:14, 156:5, 157:12,
167:4, 167:7
**first** [33] - 2:20, 13:25,
28:10, 28:17, 33:14,
48:3, 59:23, 70:22, 72:5,
73:23, 88:6, 88:7, 88:8,
94:23, 102:10, 104:13,
106:8, 110:12, 110:13,
111:24, 117:3, 118:1,
126:23, 127:2, 127:7,
141:19, 142:15, 160:3,
171:10, 171:12, 171:19,
174:4, 175:19
**First** [7] - 19:1, 20:7,
29:9, 101:8, 120:22,
161:4, 182:10
**five** [22] - 8:25, 47:8,
67:11, 75:9, 75:11,
76:24, 77:2, 77:5, 77:20,
77:21, 78:17, 94:23,
96:16, 106:9, 106:10,
112:6, 117:13, 118:9,
129:8, 134:15, 154:19,
168:8
**five-eight** [1] - 118:9
**Flannery** [1] - 1:19,
119:15, 123:20, 127:12,
172:6, 172:8, 172:16,
172:22
**FLANNERY** [17] -
112:16, 119:10, 119:12,
119:17, 123:16, 127:13,
129:1, 142:12, 142:17,
142:21, 142:23, 144:11,
172:23, 173:1, 173:6,
190:19, 190:20
**flat** [1] - 72:15
**fled** [1] - 88:13
**flight** [3] - 110:11,
110:15, 113:4
**flooding** [1] - 72:7
**floor** [25] - 29:5, 110:12,
110:13, 110:14, 110:15,
112:24, 112:25, 113:1,
113:2, 114:12, 114:19,
114:20, 114:21, 114:23,
114:24, 115:1, 115:10,
115:21, 132:2, 133:2,
133:4, 133:5, 142:15,
170:19, 171:23
**floors** [1] - 133:6
**focus** [1] - 167:1
**focused** [3] - 29:17,
30:1, 30:3
**follow** [2] - 23:5, 43:1

**follow-up** [2] - 23:5, 43:1
**followed** [1] - 28:4
**following** [4] - 69:20, 124:9, 126:9, 126:20
**follows** [1] - 169:5
**foot** [1] - 89:7
**FOR** [1] - 1:2
**force** [2] - 111:5, 111:6
**foregoing** [1] - 191:6
**forensic** [5] - 61:18, 61:20, 61:23, 64:9, 65:11
**forgot** [2] - 24:24, 79:8
**form** [3] - 66:2, 112:13, 164:5
**formerly** [1] - 121:8
**forms** [7] - 112:13, 123:7, 132:6, 132:8, 139:13, 139:22, 139:25
**forth** [4] - 4:25, 94:16, 161:9, 161:15, 164:13, 176:25, 177:1
**forties** [1] - 65:3
**forward** [2] - 4:4, 95:6
**foundation** [4] - 85:24, 165:6, 169:2, 170:2
**Four** [2] - 108:25, 109:2
**four** [6] - 8:17, 11:14, 81:10, 97:1, 117:13
**fourth** [1] - 59:3
**foyer** [1] - 110:12
**fragments** [4] - 157:13, 157:18, 158:2, 158:3
**frame** [3] - 38:14, 92:25, 161:17
**frankly** [5] - 7:22, 83:18, 157:7, 159:24, 188:9
**Frankly** [1] - 186:22
**Freeman** [10] - 111:20, 111:25, 112:1, 112:15, 120:25, 121:15, 121:19, 131:24, 138:13
**Freeman's** [1] - 121:1
**frequent** [1] - 3:1
**frequently** [4] - 57:21, 62:12, 63:16, 64:4
**fresh** [2] - 70:2, 125:24
**fresher** [3] - 124:23, 124:25, 125:1
**Friday** [11] - 94:20, 95:2, 95:4, 96:22, 96:23, 97:5, 97:7, 145:16, 145:22, 145:25, 188:10
**friend** [2] - 41:3, 183:12
**friendly** [1] - 121:13
**friends** [3] - 26:10, 26:15, 27:3, 28:4, 40:24, 147:1
**frightened** [1] - 30:18
**front** [25] - 9:15, 20:21,

26:18, 27:12, 28:9, 44:6, 72:17, 91:20, 98:21, 100:7, 101:21, 102:4, 103:22, 104:3, 105:15, 106:15, 109:20, 112:23, 113:6, 113:16, 118:22, 132:21, 136:18, 188:1
**full** [4] - 95:1, 98:7, 147:11, 147:24
**fully** [1] - 172:10
**furtherance** [1] - 184:24

## G

**gain** [1] - 111:8
**game** [2] - 128:9, 166:14
**gang** [1] - 22:25
**gaps** [1] - 175:18
**GARDNER** [1] - 1:8
**Gardner** [78] - 1:21, 12:9, 12:23, 13:3, 13:6, 13:11, 14:1, 14:21, 14:22, 15:3, 15:6, 15:8, 15:21, 16:1, 16:14, 17:11, 17:25, 18:7, 18:12, 18:14, 18:21, 20:9, 22:1, 22:11, 68:20, 151:24, 153:21, 155:5, 155:10, 160:11, 160:14, 161:6, 161:10, 161:16, 162:3, 162:10, 162:15, 162:16, 164:6, 164:18, 166:1, 166:3, 167:17, 168:2, 174:4, 174:13, 174:14, 174:15, 175:3, 175:9, 175:10, 175:25, 176:18, 176:20, 176:21, 176:25, 177:10, 177:14, 177:16, 178:21, 178:22, 179:8, 179:21, 180:7, 180:11, 180:16, 182:20, 182:21, 183:6, 183:10, 183:23, 184:8, 184:19, 185:1, 185:4, 185:5, 185:12, 186:3
**Gardner's** [13] - 14:2, 16:3, 20:11, 21:7, 21:12, 23:9, 77:11, 84:19, 160:14, 161:17, 179:23, 181:24, 185:10
**gather** [2] - 26:21, 30:18
**geared** [1] - 172:24
**gem** [1] - 61:24
**general** [2] - 2:16, 6:8
**generally** [4] - 6:23, 38:1, 136:11, 140:8
**generic** [3] - 79:15, 79:17, 79:23

**gentlemen** [5] - 64:25, 87:2, 99:5, 116:22, 145:3
**genuinely** [1] - 73:24
**geochemistry** [1] - 62:16
**geography** [1] - 72:12
**geologic** [2] - 61:25, 72:8
**geological** [2] - 62:5, 64:9
**geologist** [3] - 61:18, 61:20, 61:23
**geology** [1] - 62:15
**George** [1] - 34:6
**Georgia** [1] - 62:16
**Gerald** [1] - 37:5
**Gerard** [1] - 1:19
**gild** [1] - 186:22
**Gill** [1] - 90:8
**girlfriend** [2] - 121:9, 162:25
**given** [9] - 12:9, 16:17, 55:15, 123:8, 123:9, 140:8, 172:18, 175:23, 188:3
**glass** [2] - 61:24, 62:1
**Glock** [3] - 57:11, 57:12, 161:9
**Glocks** [1] - 165:20
**gloves** [14] - 28:15, 28:17, 29:13, 29:15, 29:19, 29:24, 29:25, 30:2, 47:20, 79:10, 79:14, 79:15, 79:17, 79:23
**Goose** [8] - 153:12, 153:13, 153:15, 153:22, 156:16, 156:24, 162:4
**government** [33] - 5:22, 34:18, 34:24, 35:15, 145:13, 148:22, 152:1, 157:6, 157:7, 160:6, 160:7, 160:8, 160:12, 162:5, 163:22, 164:13, 164:23, 166:6, 166:7, 168:7, 169:10, 174:6, 174:10, 180:5, 184:24, 185:7, 185:25, 186:10, 186:15, 187:11, 188:7, 189:5
**Government** [7] - 1:15, 10:21, 33:22, 109:21, 115:3, 117:3, 181:1
**Government's** [26] - 12:21, 13:2, 13:5, 13:8, 14:6, 14:12, 14:25, 15:24, 17:2, 17:6, 17:21, 18:8, 19:1, 19:10, 19:20, 20:22, 21:1, 21:8, 23:6, 27:9, 31:3, 44:6, 45:21,

45:24, 57:2, 66:14
**government's** [22] - 7:18, 24:12, 24:16, 32:2, 96:18, 98:9, 99:6, 145:7, 152:1, 160:6, 160:10, 160:12, 162:11, 162:21, 162:23, 163:15, 165:24, 166:23, 168:21, 173:10, 173:12, 188:8
**GOVERNMENT'S** [7] - 10:25, 25:6, 32:11, 61:3, 87:6, 99:11, 108:7
**grade** [1] - 33:7
**Graham** [7] - 175:2, 175:20, 176:6, 176:9, 178:16, 178:19, 178:23
**Graham's** [1] - 174:23
**grain** [1] - 71:15
**grains** [1] - 71:16
**grams** [1] - 59:11
**grand** [3] - 34:23, 168:23, 169:3, 174:22, 179:6, 181:19, 181:20
**grandfather** [1] - 47:18
**grant** [1] - 5:12
**granted** [1] - 79:7
**graph** [1] - 2:21
**graphic** [1] - 2:20
**grass** [1] - 74:5
**gray** [2] - 15:3, 17:2
**great** [2] - 76:11, 168:9
**Great** [2] - 171:23, 189:7
**greater** [1] - 145:11
**Green** [12] - 82:4, 82:5, 83:16, 93:22, 98:24, 100:1, 100:24, 147:10, 147:12, 171:11, 171:17, 171:18
**green** [5] - 113:18, 114:17, 115:7, 115:9, 125:15
**Greens** [1] - 84:7
**Gregory** [1] - 150:1
**ground** [5] - 67:4, 151:7, 151:8, 153:1, 156:19
**grounds** [1] - 168:6
**group** [1] - 151:4
**grow** [2] - 25:21, 33:2
**growth** [1] - 3:11
**guarded** [1] - 91:20
**guess** [8] - 8:24, 45:15, 47:5, 50:12, 82:9, 82:25, 137:14, 150:15, 153:24, 184:1
**guilty** [4] - 34:9, 34:14, 37:7, 58:24
**gun** [43] - 4:13, 28:15, 28:17, 29:17, 29:22,

29:24, 29:25, 30:2, 45:18, 45:25, 46:2, 57:6, 57:8, 68:2, 68:5, 68:8, 69:12, 69:13, 147:2, 151:18, 152:5, 154:14, 155:14, 161:6, 161:9, 161:11, 161:13, 161:18, 162:25, 163:1, 163:7, 163:9, 164:18, 165:1, 165:8, 165:9, 165:12, 165:13
**gun's** [1] - 58:1
**guns** [18] - 57:19, 57:21, 57:23, 67:23, 73:15, 73:19, 75:9, 77:21, 77:21, 78:18, 86:16, 112:19, 162:21, 163:6, 163:7, 164:16, 165:6, 165:8
**gunshots** [1] - 97:19
**guy** [11] - 85:19, 85:21, 102:15, 102:18, 103:6, 103:12, 117:16, 117:23, 146:20, 153:13, 156:5
**guys** [7] - 27:6, 28:1, 28:14, 30:8, 101:20, 137:18, 153:12

## H

**Hagerstown** [2] - 117:17, 117:23
**hair** [5] - 102:7, 102:20, 118:10, 143:23, 143:24
**haircut** [1] - 102:19
**half** [6] - 63:18, 87:19, 95:4, 145:22, 160:18, 164:1
**Hamilton** [1] - 52:13
**hand** [14] - 5:25, 6:24, 9:21, 9:24, 10:2, 23:15, 29:19, 32:10, 88:22, 99:9, 102:24, 116:21, 129:11
**handcuffed** [2] - 104:5, 107:9
**handcuffs** [1] - 120:15
**handed** [6] - 14:13, 14:25, 17:20, 18:1, 110:19, 129:10
**handle** [8] - 13:14, 21:4, 42:6, 42:10, 43:6, 43:10, 43:16, 181:25
**handled** [1] - 17:24
**handling** [1] - 43:7
**hands** [4] - 29:10, 29:12, 57:21, 165:20
**handwriting** [6] - 16:11, 16:22, 16:23, 19:4,

19:14, 19:17
  handwritten [1] - 19:22
  hanging [1] - 26:11
  Hanlon [23] - 1:16, 9:2,
20:2, 24:24, 53:9, 55:14,
57:2, 57:3, 57:11, 58:6,
58:7, 59:19, 60:5, 61:15,
79:7, 83:20, 95:13,
147:17, 171:20, 181:25,
182:5, 184:1, 184:12
  HANLON [47] - 10:23,
11:6, 20:3, 23:4, 24:25,
25:4, 25:14, 32:2, 32:5,
32:8, 32:22, 46:8, 60:23,
61:1, 61:10, 61:14,
61:16, 65:9, 79:3, 83:23,
83:25, 84:4, 84:6, 84:9,
84:11, 84:13, 84:20,
84:22, 85:8, 85:10,
85:16, 86:10, 86:13,
182:7, 182:12, 183:3,
183:8, 183:10, 184:3,
184:6, 190:4, 190:5,
190:7, 190:9, 190:11,
190:12, 190:13
  Hanlon's [3] - 51:21,
55:3, 77:1
  hard [1] - 101:10
  Hard [1] - 118:3
  HARDING [166] - 2:3,
7:13, 9:8, 80:18, 80:21,
81:12, 81:14, 81:17,
81:19, 81:22, 81:25,
82:4, 82:6, 82:11, 82:13,
82:17, 82:20, 82:23,
83:2, 83:6, 85:19, 86:1,
86:3, 86:8, 87:4, 87:13,
92:8, 95:22, 95:25, 96:6,
96:9, 96:17, 96:21,
96:25, 97:14, 97:18,
97:21, 98:1, 98:15,
98:22, 99:1, 99:7, 99:18,
108:1, 108:5, 108:15,
119:14, 119:19, 127:9,
128:24, 140:6, 142:20,
144:9, 144:12, 144:15,
145:2, 146:17, 146:20,
146:22, 146:24, 147:5,
147:7, 147:9, 147:15,
147:21, 148:1, 148:7,
148:11, 148:17, 149:5,
149:9, 149:12, 149:16,
149:18, 149:20, 149:23,
150:1, 150:4, 150:7,
150:10, 150:15, 150:19,
150:21, 150:24, 151:2,
151:12, 151:14, 152:16,
152:21, 153:2, 153:4,
153:7, 153:11, 153:19,
153:21, 154:2, 154:7,

154:13, 154:18, 154:20,
154:24, 155:13, 155:21,
155:24, 156:2, 156:4,
156:9, 156:12, 157:15,
157:17, 157:25, 158:2,
158:7, 158:13, 158:15,
158:23, 159:8, 159:14,
159:16, 159:18, 170:6,
170:10, 170:14, 170:16,
170:22, 171:4, 171:9,
171:16, 171:20, 172:2,
172:12, 172:14, 175:19,
175:22, 176:2, 176:6,
176:12, 176:14, 176:17,
176:23, 176:25, 177:3,
177:7, 177:9, 177:12,
177:16, 178:1, 178:4,
178:7, 178:10, 178:19,
179:1, 179:5, 179:14,
179:18, 179:22, 181:16,
181:23, 186:14, 186:18,
187:3, 190:14, 190:16,
190:18, 190:19, 190:20
  Harding [34] - 1:16,
7:12, 8:1, 9:2, 83:20,
84:23, 85:13, 85:17,
87:3, 95:13, 96:16, 99:6,
126:20, 127:15, 144:1,
144:5, 144:13, 146:16,
155:23, 157:5, 158:11,
160:10, 170:2, 170:4,
170:5, 171:2, 171:24,
174:9, 174:22, 175:18,
180:18, 181:15, 181:22,
187:10
  Harding's [4] - 106:3,
107:15, 181:11, 185:18
  harkening [1] - 181:10
  HARRIS [1] - 1:7
  Harris [44] - 1:18, 2:23,
85:14, 86:3, 117:2,
118:1, 118:7, 118:11,
119:6, 120:4, 120:12,
120:15, 120:23, 121:2,
121:6, 121:8, 121:15,
121:16, 122:4, 123:8,
123:21, 126:2, 126:9,
126:15, 126:24, 127:21,
131:25, 134:9, 134:10,
138:18, 138:19, 140:13,
141:1, 141:6, 141:9,
141:21, 142:7, 142:24,
144:8, 146:18, 146:24,
168:22, 169:1, 180:6
  Harris's [5] - 118:22,
120:24, 127:15, 142:3,
171:8
  hat [4] - 17:9, 17:10,
17:12, 17:15
  hate [1] - 188:19

  Hayes [2] - 149:6,
149:11
  Hazlehurst [1] - 178:13
  head [5] - 28:18, 96:15,
141:18, 181:1, 185:6
  headed [1] - 105:8
  heading [1] - 141:17
  hear [4] - 5:22, 26:25,
97:6, 157:4
  heard [26] - 2:7, 5:14,
5:16, 6:19, 26:14, 26:15,
26:25, 27:3, 27:25,
59:20, 80:12, 95:9,
100:9, 106:9, 148:17,
148:18, 152:10, 157:6,
160:9, 165:11, 165:13,
168:20, 178:20, 182:16,
185:18, 186:24
  hearing [7] - 3:4, 82:2,
140:23, 144:18, 172:1,
172:10
  hearken [1] - 180:10
  height [1] - 118:9
  Heights [4] - 120:14,
122:17, 122:19, 127:2
  held [5] - 83:20, 97:22,
103:18, 103:22, 104:14
  helped [1] - 88:7
  helpful [2] - 83:17,
178:18
  hereby [1] - 191:3
  hereunto [1] - 191:9
  heroin [4] - 34:10,
34:14, 37:25, 59:11
  hi [1] - 29:1
  Hill [1] - 147:6
  himself [4] - 12:11,
141:19, 141:20, 153:17
  hip [1] - 161:7
  historical [2] - 84:16,
180:25
  Hit [1] - 42:17
  hit [10] - 42:19, 54:5,
96:13, 134:15, 153:15,
156:6, 156:13, 156:20,
157:20, 162:4
  hitting [1] - 129:8
  hold [10] - 54:13, 54:18,
63:11, 147:19, 148:12,
150:16, 171:18, 186:17,
186:21, 188:15
  holder [2] - 110:23,
141:22
  holding [1] - 15:16
  holds [1] - 145:9
  holiday [1] - 145:10
  Holly [17] - 12:9, 12:10,
12:11, 13:10, 13:12,

18:22, 19:6, 19:8, 19:13,
19:24, 20:5, 20:17,
20:20, 22:1, 69:1, 69:5
  Holly's [12] - 18:25,
20:8, 20:14, 20:16,
20:24, 20:25, 21:4,
21:13, 22:19, 77:12,
77:14, 77:24
  home [5] - 26:7, 47:6,
100:3, 100:5, 132:14
  Homes [2] - 109:23,
109:24
  homicide [14] - 2:9,
2:24, 3:18, 4:13, 11:13,
152:3, 159:23, 163:21,
163:23, 163:24, 163:25,
164:1, 164:5
  Homicide [6] - 3:10,
11:12, 11:20, 13:15,
163:19, 163:20
  homicides [5] - 2:13,
3:9, 4:16, 4:18, 163:18
  honest [3] - 30:1, 48:9,
48:19
  honestly [1] - 169:16
  Honor [124] - 2:3, 6:16,
7:8, 10:23, 14:7, 17:1,
18:17, 19:25, 21:16,
22:17, 23:5, 23:18,
23:21, 24:7, 24:11,
24:16, 25:4, 30:25,
31:22, 31:25, 32:2, 32:5,
32:8, 33:25, 51:8, 60:17,
60:21, 60:23, 61:1,
61:11, 61:12, 64:8,
64:10, 65:4, 65:10,
66:12, 76:4, 79:4, 79:8,
79:19, 80:18, 81:14,
82:4, 82:7, 83:9, 83:23,
83:25, 84:4, 84:6, 84:13,
84:20, 84:22, 85:8,
85:11, 86:13, 87:4,
91:23, 92:4, 94:13,
96:18, 97:16, 98:24,
99:7, 105:22, 108:1,
108:5, 112:16, 116:19,
119:12, 119:14, 119:17,
121:25, 123:17, 127:9,
127:14, 135:3, 140:4,
142:12, 142:17, 142:20,
142:21, 144:11, 145:2,
147:5, 148:2, 148:9,
148:19, 148:25, 149:16,
150:2, 155:7, 155:14,
156:17, 157:15, 158:9,
160:17, 161:4, 165:24,
168:13, 168:17, 168:21,
169:8, 169:16, 171:9,
172:2, 172:14, 172:23,
173:9, 173:22, 174:1,

175:14, 175:20, 179:15,
182:7, 183:18, 184:7,
185:9, 185:12, 185:17,
185:20, 186:9, 186:18,
189:1
  Honor's [1] - 186:2
  Honorable [1] - 1:13
  hope [5] - 35:5, 35:6,
95:1, 145:4, 162:15
  Hopefully [2] - 8:16,
31:2
  hopefully [1] - 109:19
  hoping [1] - 58:22
  horseback [1] - 187:15
  Hospital [3] - 30:23,
30:24, 31:16
  hospital [5] - 52:24,
53:1, 53:2, 157:22
  hot [1] - 6:18
  hour [17] - 83:24, 92:24,
96:8, 96:9, 96:11,
133:23, 133:24, 133:25,
134:6, 134:11, 137:24,
138:3, 188:5, 188:17,
188:20
  hours [7] - 87:23,
91:12, 97:15, 98:11,
125:3, 131:11, 137:20
  house [51] - 23:12,
44:24, 45:3, 45:5, 47:8,
47:9, 47:10, 47:11, 48:4,
100:4, 100:20, 101:1,
101:2, 101:12, 101:16,
104:3, 105:13, 105:15,
105:16, 105:17, 119:9,
119:21, 120:5, 121:21,
122:9, 125:5, 128:9,
130:3, 130:4, 130:11,
130:13, 131:8, 131:13,
131:14, 132:11, 133:9,
133:11, 134:2, 134:10,
135:22, 138:1, 138:3,
140:1, 140:17, 141:17,
162:6, 162:7, 169:24,
170:23, 170:25, 174:5
  housekeeping/
evidentiary/jury [1] -
97:11
  houses [1] - 101:14
  Housing [2] - 109:8
  housing [1] - 110:1
  hum [4] - 26:22, 27:20,
32:24, 56:10
  hundred [2] - 59:11,
164:4
  Hundreds [1] - 63:20
  hypothesis [2] - 153:8,
153:10

# I

**i.e** [1] - 182:23
**ID** [5] - 14:17, 18:11, 18:13, 18:14, 118:5
**idea** [6] - 104:9, 158:14, 175:14, 186:10, 188:22, 189:2
**ideas** [1] - 43:15
**identification** [4] - 14:15, 62:7, 62:10, 71:21
**identified** [10] - 12:8, 12:10, 12:11, 18:22, 19:7, 120:3, 141:18, 141:19, 141:20
**identifies** [1] - 139:8
**identify** [4] - 71:23, 74:19, 109:20, 152:16
**illegal** [1] - 110:21
**imagination** [1] - 184:23
**immediately** [3] - 102:24, 105:16, 107:11
**immunity** [1] - 49:8
**impact** [3] - 3:17, 3:22, 85:4
**impeached** [1] - 187:12
**impeaching** [1] - 167:16
**impeachment** [1] - 187:18
**importance** [1] - 97:21
**important** [8] - 72:12, 81:5, 81:6, 139:21, 144:2, 144:5, 146:3, 184:9
**impressions** [1] - 4:24
**IN** [1] - 1:1
**inadvertent** [1] - 10:10
**incar** [1] - 117:9
**incarcerated** [2] - 117:9, 175:24
**inches** [2] - 73:6, 75:16
**incident** [6] - 13:14, 14:17, 53:7, 124:10, 124:16, 156:17
**inclination** [1] - 140:10
**inclined** [2] - 5:12, 143:17
**include** [2] - 63:22, 152:13
**included** [1] - 71:18
**including** [5] - 14:2, 16:19, 34:20, 98:23, 145:22
**incoming** [1] - 3:25
**inconclusive** [1] - 157:10
**inconsistencies** [1] -

161:10
**inconvenienced** [1] - 95:16
**incorporated** [1] - 72:11
**increase** [1] - 8:15
**incriminate** [1] - 140:11
**incriminating** [1] - 184:22
**inculpates** [1] - 185:1
**indeed** [1] - 10:8
**INDEX** [1] - 190:1
**indicate** [1] - 136:8
**indicated** [18] - 18:13, 20:11, 51:12, 55:3, 57:23, 58:21, 77:1, 92:9, 92:11, 92:18, 92:21, 106:2, 131:11
**indicates** [4] - 4:1, 136:8, 137:15
**indicating** [4] - 2:21, 3:7, 17:12
**indications** [1] - 152:22
**indicted** [1] - 180:20
**indictment** [1] - 178:3
**indictment's** [1] - 183:19
**individual** [6] - 6:24, 12:22, 13:9, 41:18, 71:16, 77:24, 84:14, 156:18, 156:22
**individually** [4] - 6:17, 7:19, 13:19, 16:20
**individuals** [1] - 12:7, 12:16, 29:8, 66:9, 125:6, 125:9, 130:4, 131:7, 138:5, 138:8, 157:1
**indulgence** [2] - 31:23, 60:17
**industry** [1] - 62:24
**infant** [1] - 100:5
**infer** [2] - 167:17, 167:19
**inference** [5] - 160:24, 160:25, 162:12, 165:21, 166:14
**influence** [1] - 5:19
**influenced** [1] - 3:3
**information** [18] - 32:5, 34:19, 66:16, 67:11, 67:15, 95:5, 142:8, 145:17, 145:18, 145:19, 158:17, 158:25, 159:11, 160:4, 166:3, 166:7, 166:13, 175:23
**informed** [2] - 138:11, 138:16
**initial** [2] - 49:13, 122:3
**inner** [1] - 27:22
**innocent** [1] - 175:7

**inquire** [4] - 8:4, 8:10, 8:18, 79:10
**inquiry** [4] - 7:25, 9:12, 163:6, 168:10
**inside** [12] - 16:9, 26:17, 28:1, 71:18, 114:7, 115:5, 120:4, 125:16, 129:11, 131:18, 133:8, 139:8
**instance** [1] - 73:2
**instead** [1] - 170:3
**institution** [3] - 117:6, 117:7, 117:16
**instruct** [1] - 176:7, 178:24
**instructed** [3] - 10:14, 110:20, 161:25
**instruction** [8] - 5:15, 6:2, 6:6, 173:13, 179:17, 179:19, 180:6
**instructions** [7] - 9:18, 10:5, 10:8, 10:10, 97:8, 146:6, 173:19
**instrumentation** [1] - 62:19
**intend** [2] - 174:10, 176:7
**intent** [3] - 34:10, 37:19, 59:10
**intention** [1] - 141:25
**interacted** [1] - 12:7
**interaction** [2] - 13:11, 13:25
**interest** [2] - 158:5, 185:13
**interested** [2] - 42:8, 42:21
**Internal** [2] - 108:12, 108:20
**interrogated** [1] - 140:9
**intersections** [1] - 38:3
**interstate** [2] - 177:15, 177:23
**interview** [3] - 13:18, 56:6, 144:6
**interviews** [1] - 13:19
**inventoried** [9] - 14:17, 14:23, 15:2, 15:7, 18:4, 18:11, 136:18, 136:21, 137:10
**inventory** [15] - 14:15, 17:11, 17:25, 18:7, 21:5, 21:25, 22:11, 22:19, 23:9, 134:25, 135:9, 135:17, 135:20, 136:1, 136:23
**investigate** [1] - 3:16
**investigation** [8] - 35:16, 47:23, 47:25, 62:9, 87:24, 146:9,

167:13, 167:16
**Investigation** [3] - 11:22, 61:19, 108:12
**investigator** [1] - 85:21
**Involved** [1] - 121:9
**involved** [19] - 4:18, 12:1, 12:3, 13:21, 53:4, 56:13, 57:18, 58:13, 82:20, 90:2, 109:13, 121:8, 164:19, 165:2, 166:2, 178:19, 182:14, 182:22, 186:4
**involvement** [4] - 128:15, 140:10, 143:13, 183:11
**involving** [1] - 163:19
**irrelevant** [1] - 185:11
**irreparably** [1] - 5:3
**issue** [24] - 4:2, 4:5, 4:10, 5:15, 6:18, 7:20, 24:13, 85:23, 148:8, 154:8, 168:10, 168:18, 172:3, 172:4, 172:5, 173:4, 173:25, 174:11, 177:21, 181:17, 182:2, 186:4, 186:6, 188:23
**issued** [1] - 118:9
**issues** [15] - 3:1, 4:1, 4:20, 7:16, 10:13, 10:19, 80:13, 86:15, 86:19, 94:15, 95:10, 150:24, 172:13, 187:20
**item** [24] - 14:12, 14:14, 14:19, 15:2, 17:7, 17:13, 17:18, 17:23, 18:2, 18:4, 18:11, 19:3, 19:11, 19:21, 20:18, 20:21, 21:7, 23:7, 23:8, 67:5, 67:6, 70:2, 70:12, 79:25
**Item** [14] - 14:15, 15:25, 17:9, 18:11, 20:23, 21:3, 22:13
**itemize** [1] - 136:23
**itemized** [2] - 136:22, 136:25
**items** [34] - 14:2, 14:5, 15:7, 15:23, 16:2, 16:7, 16:16, 16:19, 17:4, 18:25, 20:8, 21:24, 22:3, 22:8, 22:12, 44:24, 44:25, 63:22, 66:12, 68:16, 69:9, 69:11, 69:12, 70:4, 70:14, 70:16, 73:9, 73:12, 74:23, 116:18
**itself** [2] - 114:23, 130:22

# J

**jail** [2] - 138:12, 174:5
**Jamane** [17] - 40:11, 40:14, 40:20, 41:2, 41:8, 41:14, 42:3, 42:9, 42:11, 44:3, 50:21, 51:13, 51:23, 52:18, 59:21, 60:7, 60:12
**James** [1] - 1:21
**January** [3] - 59:8, 117:12, 183:19
**jargon** [1] - 76:18
**Jason** [1] - 150:11
**Jay** [1] - 3:7
**jeans** [6] - 14:20, 14:22, 19:4, 19:5, 19:7, 22:21
**jeep** [1] - 101:13
**Jencks/Giglio** [1] - 179:2
**Jerome** [1] - 150:11
**Jessup** [1] - 117:10
**job** [2] - 137:24, 178:14
**jobs** [1] - 38:15
**John** [1] - 3:7
**Johnson** [13] - 40:12, 40:14, 40:17, 40:21, 41:2, 41:8, 41:14, 42:3, 42:9, 42:11, 44:3, 51:13, 51:23
**Johnson's** [1] - 52:18
**join** [1] - 7:9
**joined** [1] - 161:7
**joins** [1] - 7:11
**Jones** [20] - 12:5, 38:20, 38:21, 52:17, 82:21, 85:13, 85:19, 146:18, 151:21, 152:3, 155:12, 158:20, 160:16, 160:23, 175:13, 179:9, 181:24, 184:15, 184:16, 185:10
**Jones's** [1] - 146:19
**Jr** [1] - 118:7
**judge** [2] - 8:8, 8:9, 135:8
**Judge** [10] - 1:13, 7:13, 25:2, 86:15, 149:23, 160:3, 161:12, 187:19, 188:1, 188:24
**juggling** [1] - 188:4
**July** [1] - 58:10
**June** [26] - 11:17, 11:25, 12:25, 16:12, 25:23, 25:24, 26:6, 27:13, 39:6, 39:9, 41:25, 44:14, 46:9, 56:11, 87:20, 87:22, 100:2, 102:25, 109:12, 123:25,

124:3, 124:6, 124:9, 124:22, 165:19
**juries** [1] - 3:20
**juror** [4] - 5:24, 6:13, 6:23, 10:2
**jurors** [11] - 2:14, 3:2, 3:21, 4:25, 6:1, 6:17, 6:25, 10:20, 92:14, 100:15, 146:2
**Jury** [7] - 1:14, 9:9, 80:17, 87:1, 95:12, 99:4, 146:14
**jury** [62] - 4:6, 5:12, 5:13, 5:23, 6:2, 6:5, 6:19, 7:17, 7:19, 7:25, 8:16, 8:18, 9:10, 17:3, 17:20, 19:25, 20:2, 31:2, 34:23, 51:20, 54:5, 54:15, 64:25, 77:19, 80:10, 80:19, 83:7, 86:20, 86:22, 94:14, 95:11, 95:14, 96:12, 97:5, 97:8, 98:12, 99:3, 116:20, 116:21, 142:19, 157:6, 157:11, 157:12, 161:25, 164:11, 165:5, 165:14, 168:23, 169:3, 171:7, 172:4, 172:18, 172:21, 173:18, 174:22, 179:6, 180:10, 181:19, 181:20, 188:10
**jury's** [6] - 19:16, 66:12, 165:11, 165:13, 167:17, 186:24
**Jury's** [1] - 146:13
**Justice** [1] - 3:7

## K

**K-1** [3] - 67:19, 67:22, 67:23
**K-2** [3] - 67:19, 67:25, 68:1
**K-3** [3] - 67:20, 68:3, 68:4
**K-4** [3] - 67:20, 68:7, 68:8
**K-5** [2] - 67:20, 68:10
**K-soil** [1] - 68:15
**Katrina** [1] - 52:17
**keep** [10] - 9:21, 10:13, 44:24, 45:5, 45:18, 47:19, 74:14, 80:13, 95:9, 179:11
**Kelly** [3] - 24:19, 25:19, 26:4
**Kelsey** [1] - 1:17
**Kemp** [2] - 153:15, 157:2

**Ken** [1] - 85:13
**Kenjac** [4] - 89:1, 89:15, 90:10, 90:11
**Kennedy** [1] - 3:15
**Kenneth** [1] - 2:23
**Kenny** [3] - 85:20, 148:1, 150:12
**kept** [5] - 16:20, 27:5, 45:1, 168:11
**key** [3] - 15:17, 16:18, 102:21
**keys** [14] - 22:12, 22:13, 22:14, 22:15, 23:8, 23:12, 23:13, 23:14, 23:17, 24:1, 24:5, 24:6
**kid** [1] - 41:24
**kids** [1] - 44:17
**kill** [6] - 42:12, 54:2, 54:10, 153:22, 164:17
**killed** [8] - 2:24, 24:23, 47:6, 48:24, 52:9, 55:22, 152:7, 152:14
**killing** [5] - 50:23, 151:9, 184:15, 184:20
**kind** [18] - 29:18, 40:20, 42:1, 57:8, 57:23, 62:3, 69:15, 79:15, 79:24, 85:4, 103:8, 106:21, 107:1, 110:21, 170:13, 177:11, 185:5, 186:4
**kinds** [5] - 37:23, 80:5, 151:14, 151:15, 165:9
**kit** [1] - 139:15
**kitchen** [1] - 134:2, 138:2
**kits** [2] - 139:2, 139:14
**Klas** [3] - 126:21, 144:5, 144:16
**knife** [5] - 17:23, 17:24, 21:3, 21:7, 21:11
**knock** [7] - 84:8, 100:7, 100:9, 106:9, 111:10, 111:11, 111:15
**knocked** [1] - 111:9
**Knoll** [2] - 100:1, 100:24
**knotted** [1] - 17:15
**knowing** [5] - 23:11, 30:12, 30:15, 168:24, 169:12
**knowledge** [5] - 34:20, 42:13, 47:19, 121:7, 171:8
**known** [19] - 62:13, 66:8, 66:20, 66:24, 67:1, 67:2, 67:10, 67:19, 69:12, 71:6, 73:8, 73:13, 75:5, 75:9, 75:11, 75:14, 75:20, 76:19, 78:21
**knows** [2] - 68:6, 74:10,

148:3, 152:22, 168:25
**Kurland** [6] - 1:22, 92:14, 158:10, 159:19, 163:15, 166:9
**KURLAND** [38] - 21:18, 23:21, 23:25, 24:11, 24:16, 24:19, 25:2, 31:23, 31:25, 86:15, 92:1, 105:24, 158:9, 159:20, 160:1, 160:17, 161:2, 161:4, 161:22, 162:19, 164:8, 164:12, 164:22, 165:22, 166:10, 166:17, 166:21, 167:10, 167:19, 167:23, 168:1, 168:5, 173:9, 173:22, 190:5, 190:6, 190:15, 190:17

## L

**lab** [6] - 62:20, 63:25, 69:15, 76:10, 79:9, 79:13
**label** [1] - 68:18
**labeled** [14] - 14:14, 15:17, 17:9, 17:23, 19:3, 19:4, 19:11, 19:12, 19:21, 20:17, 20:18, 22:5, 67:19
**laboratories** [1] - 63:6
**laboratory** [6] - 61:19, 62:25, 63:8, 63:9, 63:15, 74:17
**lack** [4] - 2:8, 2:13, 3:9, 173:1
**lacked** [1] - 120:10
**lacking** [1] - 126:5
**Ladies** [1] - 145:3
**ladies** [4] - 64:25, 87:2, 99:5, 116:22
**lady** [4] - 12:5, 28:15, 28:21, 30:22
**laid** [1] - 165:6
**lam** [2] - 81:5, 82:2
**Lane** [6] - 26:1, 39:4, 39:6, 88:19, 88:25, 89:10
**Lanvale** [8] - 33:5, 38:4, 39:23, 46:25, 52:11, 52:12, 52:13
**large** [2] - 93:18, 114:7
**larger** [1] - 115:14
**last** [13] - 22:16, 31:10, 31:17, 47:3, 47:15, 55:10, 63:7, 74:20, 81:2, 88:18, 88:24, 114:23, 122:18
**Last** [1] - 61:7
**Late** [1] - 153:20
**late** [9] - 11:25, 26:6,

87:22, 100:3, 100:6, 109:13, 165:18, 165:19, 188:11
**lately** [1] - 74:3
**latex** [10] - 28:15, 29:15, 29:19, 29:24, 29:25, 47:19, 79:10, 79:14, 79:15, 79:23
**Latex** [2] - 29:13, 79:17
**Laura** [1] - 1:17
**Lauretta** [1] - 151:5
**law** [8] - 3:16, 10:14, 35:2, 48:25, 63:1, 109:4, 120:9, 176:10
**LAWLOR** [8] - 187:19, 187:24, 188:11, 188:14, 188:17, 188:21, 189:1, 189:5
**Lawlor** [3] - 1:18, 83:13, 171:16
**lawyer** [12] - 120:10, 174:23, 175:1, 175:8, 175:11, 180:12, 180:14, 180:19, 181:7, 181:11, 184:21
**lawyers** [1] - 180:21
**lay** [2] - 8:24, 187:6
**lead** [10] - 2:12, 2:18, 5:24, 6:7, 7:24, 9:13, 9:22, 13:20, 63:6, 85:21
**leading** [4] - 39:15, 41:25, 45:7, 46:4
**leads** [1] - 31:16
**leaf** [2] - 72:10, 74:4
**learn** [2] - 175:2, 176:13
**learned** [4] - 2:7, 6:4, 8:7, 51:17
**learning** [1] - 40:22
**lease** [2] - 110:23, 141:22
**least** [16] - 4:16, 8:8, 8:15, 18:2, 59:11, 74:25, 75:20, 107:6, 107:8, 112:5, 137:24, 161:15, 169:3, 184:15
**leave** [10] - 33:8, 43:18, 43:20, 80:11, 93:7, 95:7, 139:18, 146:4, 187:18
**leaves** [1] - 162:5
**leaving** [5] - 43:25, 147:9, 151:5, 162:8, 162:9
**lecture** [1] - 166:19
**led** [4] - 33:19, 41:11, 179:9, 184:14
**Lee** [19] - 84:25, 85:21, 86:16, 148:2, 152:7, 152:13, 155:3, 155:23, 155:24, 155:25, 156:1, 156:13, 156:15, 158:19,

160:11, 162:6, 163:25, 166:2, 166:23
**Lee/Epps** [1] - 166:23
**left** [17] - 19:22, 81:11, 92:21, 93:10, 93:11, 93:13, 93:15, 104:13, 106:15, 107:22, 149:14, 149:15, 158:24, 160:15, 160:22, 181:21
**legal** [1] - 86:18
**length** [3] - 70:23, 71:2, 157:7
**lengths** [1] - 70:23
**less** [2] - 12:24, 92:24
**letter** [7] - 58:10, 117:15, 174:23, 175:20, 176:12, 178:23, 179:1
**lettered** [1] - 1:1
**letters** [2] - 100:23, 117:4
**letting** [1] - 122:8
**level** [4] - 40:25, 51:22, 51:23, 72:16
**Lexington** [9] - 109:22, 109:24, 120:13, 122:17, 127:1, 133:5, 141:15, 141:16
**license** [1] - 18:12
**life** [6] - 33:9, 33:11, 33:17, 33:19, 45:7, 45:17
**lifestyle** [1] - 48:15
**light** [3] - 5:2, 93:1, 157:6
**likely** [4] - 12:17, 16:24, 116:14, 145:12
**lily** [1] - 186:22
**limine** [1] - 174:2
**limit** [1] - 162:15
**limiting** [3] - 179:17, 179:18, 180:5
**line** [4] - 94:5, 146:9, 172:23, 173:6
**lined** [2] - 84:13, 86:10
**lines** [2] - 6:2, 74:22
**lineup** [2] - 9:5, 188:3
**link** [2] - 142:6, 168:9
**linked** [1] - 142:6
**linking** [1] - 152:2
**list** [1] - 149:13
**listened** [1] - 5:8
**litigation** [1] - 63:1
**litter** [2] - 72:10, 74:4
**live** [3] - 26:4, 39:7, 44:20
**lived** [4] - 27:13, 29:4, 39:6, 44:11
**lives** [1] - 145:20
**living** [18] - 25:24, 38:25, 39:2, 42:14, 44:23, 45:7, 45:17,

46:18, 54:7, 55:12, 99:20, 100:2, 130:6, 131:23, 132:3, 147:1, 149:9, 149:20
**load** [1] - 95:17
**loan** [1] - 165:8
**loathe** [1] - 8:13
**local** [4] - 5:10, 64:1, 64:6, 64:23
**locate** [1] - 81:6
**location** [23] - 62:13, 67:4, 67:23, 71:1, 72:4, 73:24, 74:12, 74:14, 74:18, 74:19, 109:16, 110:18, 118:12, 120:17, 129:9, 129:15, 132:3, 134:16, 134:24, 135:13, 137:1, 137:4, 164:4
**locations** [8] - 73:16, 73:17, 78:21, 113:12, 125:17, 129:8, 134:14, 134:15
**lock** [1] - 159:9
**Locke** [1] - 59:9
**locked** [3] - 33:12, 139:2, 182:18
**locker** [20] - 15:7, 15:17, 15:18, 15:21, 16:5, 16:9, 16:12, 16:16, 16:17, 17:4, 18:22, 20:4, 20:7, 20:9, 20:11, 20:24, 20:25, 21:8, 21:12, 22:6
**lockers** [3] - 13:23, 15:10, 15:12
**lockup** [2] - 150:5, 150:8
**logic** [1] - 71:11
**logos** [1] - 23:14
**Lombard** [1] - 1:25
**look** [23] - 23:22, 30:5, 62:4, 64:6, 70:6, 70:20, 70:23, 71:1, 71:2, 71:3, 71:22, 77:25, 88:15, 98:8, 104:14, 110:20, 123:17, 129:6, 134:3, 164:10
**Look** [1] - 181:17
**looked** [7] - 27:5, 28:13, 63:19, 77:5, 77:19, 77:20, 77:21
**Looking** [1] - 131:18
**looking** [20] - 12:19, 16:15, 63:2, 63:6, 67:1, 70:20, 72:7, 72:9, 101:25, 103:8, 103:15, 110:18, 111:22, 124:1, 129:25, 131:16, 149:24, 156:25, 168:22, 170:20
**looks** [5] - 19:15, 59:2, 73:2, 117:24, 159:5

**Looks** [1] - 116:7
**loose** [4] - 102:20, 116:17, 125:19
**Los** [1] - 8:23
**loss** [1] - 143:24
**loud** [5] - 26:14, 26:16, 26:25, 27:3, 27:25
**lower** [6] - 3:17, 35:7, 130:4, 131:22, 132:2, 138:6
**lugged** [1] - 161:6
**lunch** [11] - 80:24, 80:25, 82:11, 82:16, 83:3, 83:4, 86:20, 94:15, 95:7, 98:11, 147:16
**luncheon** [1] - 98:13
**Luncheon** [1] - 98:19
**lurking** [1] - 186:6
**lying** [1] - 72:15
**lyrics** [1] - 147:2

## M

**ma'am** [6] - 25:7, 76:4, 79:19, 102:3, 103:17, 108:19
**mail** [3] - 9:6, 50:16, 117:1
**maintain** [1] - 91:7
**male** [4] - 118:9, 132:20, 132:21
**Mama** [11] - 40:19, 40:20, 50:21, 51:12, 53:8, 53:11, 53:24, 54:10, 54:23, 55:1
**man** [18] - 29:25, 42:17, 42:19, 54:5, 100:13, 101:22, 102:2, 102:6, 119:7, 122:8, 127:24, 128:18, 128:22, 132:20, 141:7, 142:25
**manager** [1] - 63:8
**manner** [1] - 191:8
**manufacturer** [3] - 23:13, 63:4, 79:18
**map** [2] - 31:2, 100:21
**March** [14] - 39:8, 151:2, 154:25, 155:1, 155:4, 161:14, 165:19, 167:8, 175:2, 176:2, 177:8, 177:20, 180:12
**marijuana** [1] - 45:1
**Marijuana** [1] - 37:25
**mark** [1] - 23:6
**Marked** [1] - 17:6
**marked** [11] - 8:19, 12:21, 14:6, 14:25, 21:8, 23:13, 27:9, 33:22, 45:20, 89:8, 115:3

**marker** [1] - 20:19
**market** [1] - 79:16
**Marll** [5] - 49:20, 50:9, 56:7, 56:9
**married** [3] - 38:17, 38:21, 38:23
**marshal's** [1] - 150:5
**marshals** [1] - 150:4
**MARTIN** [12] - 1:8, 8:22, 168:13, 168:17, 168:21, 169:8, 169:11, 169:14, 169:16, 169:18, 169:21, 169:23
**Martin** [26] - 1:19, 1:20, 153:14, 153:21, 155:5, 157:2, 162:19, 164:18, 166:1, 166:2, 171:2, 171:7, 174:2, 174:12, 175:7, 175:11, 178:13, 179:10, 180:9, 180:13, 180:19, 180:20, 180:21, 183:12, 184:4, 185:1
**Martin's** [1] - 181:18
**Mary** [3] - 1:24, 191:3, 191:14
**MARYLAND** [1] - 1:2
**Maryland** [6] - 1:12, 1:25, 18:12, 18:16, 118:5, 118:8
**Massiah** [3] - 186:6, 186:15, 187:1
**Master** [1] - 62:15
**masthead** [1] - 2:19
**match** [3] - 72:1, 76:2, 161:15
**matched** [2] - 69:11, 151:16
**mate** [1] - 84:19
**material** [11] - 17:14, 61:25, 62:8, 62:12, 70:18, 72:5, 72:6, 72:9, 72:10, 147:18, 179:2
**materials** [5] - 61:24, 61:25, 62:18, 63:2, 72:8
**mates** [3] - 174:16, 175:3, 182:11
**math** [1] - 11:19
**matter** [11] - 48:22, 48:24, 59:24, 75:16, 83:9, 166:22, 175:8, 184:16, 184:22, 191:4, 191:8
**matters** [4] - 9:12, 97:9, 97:11, 185:13
**mattress** [7] - 113:16, 113:17, 115:11, 115:14, 125:20, 125:21
**Maureen** [2] - 61:2, 61:7
**MAUREEN** [2] - 61:3, 190:10

**McCaffity** [2] - 154:23, 162:25
**McCaffity/Brown** [1] - 151:3
**McLarney** [47] - 4:12 **mean** [47] - 3:19, 33:11, 42:11, 42:12, 43:7, 43:17, 43:22, 54:2, 56:2, 58:1, 58:16, 59:23, 66:24, 79:23, 79:24, 79:25, 82:11, 82:12, 102:2, 103:17, 114:20, 134:20, 135:8, 141:5, 149:14, 154:4, 155:4, 156:7, 157:5, 157:21, 166:19, 166:24, 167:8, 167:14, 169:17, 170:12, 171:6, 171:18, 175:12, 177:19, 179:12, 180:1, 183:23, 187:6, 187:13, 187:17, 188:8
**Meaning** [1] - 184:3
**meaning** [2] - 16:12, 49:8
**means** [3] - 61:22, 79:23, 134:2
**meant** [1] - 60:12
**Meanwhile** [1] - 178:4
**media** [6] - 5:4, 9:18, 10:17, 10:18, 146:6
**medical** [7] - 97:12, 97:14, 97:20, 98:2, 98:5, 148:15, 149:4
**meeting** [2] - 126:20, 126:23
**Members** [3] - 9:10, 80:10, 94:14
**members** [2] - 100:4, 182:12
**men** [21] - 28:3, 28:7, 29:15, 30:6, 30:13, 30:21, 31:12, 31:18, 100:11, 101:5, 104:5, 105:15, 106:15, 106:23, 132:19, 151:4, 151:6, 151:7, 151:8
**mention** [5] - 6:5, 23:8, 48:12, 48:15, 187:10
**mentioned** [13] - 17:11, 27:21, 29:9, 30:5, 40:21, 44:1, 45:17, 45:22, 75:8, 75:15, 148:20, 184:22, 187:20
**mentions** [1] - 180:9
**met** [8] - 18:22, 35:1, 104:3, 105:14, 122:19, 141:16, 141:17
**methodology** [1] - 76:9
**Michael** [2] - 1:16, 1:18
**micro** [1] - 72:16

**microphone** [4] - 31:8, 32:17, 34:1, 88:23
**mid** [2] - 3:10, 165:19
**middle** [2] - 104:25, 168:24
**midnight** [3] - 151:5, 155:1, 155:4
**might** [32] - 10:3, 10:18, 43:15, 54:10, 60:13, 62:9, 67:7, 72:6, 72:10, 74:3, 74:5, 76:19, 78:22, 78:23, 138:11, 140:11, 141:2, 145:12, 166:6, 185:19, 186:9, 186:10
**Might** [1] - 96:19
**mike** [7] - 11:2, 25:9, 32:13, 61:5, 87:8, 99:13, 108:9
**mild** [1] - 97:21
**Mill** [2] - 99:23, 99:24
**Millenium** [3] - 46:6, 46:7, 57:9
**million** [2] - 162:8
**mind** [12] - 10:13, 36:3, 42:5, 43:10, 54:14, 80:13, 95:9, 124:23, 125:1, 125:24, 145:5, 184:16
**mine** [2] - 41:3, 104:3
**minerals** [1] - 71:22
**minimal** [1] - 143:13
**minimum** [1] - 166:12
**minute** [5] - 24:13, 31:23, 106:12, 131:10, 185:20
**minutes** [22] - 8:10, 39:14, 47:5, 47:8, 80:14, 80:15, 80:23, 104:11, 107:16, 119:23, 119:25, 123:2, 132:16, 132:25, 138:23, 138:24, 141:14, 149:13, 159:21, 160:16, 160:23
**Miranda** [14] - 112:12, 121:4, 123:8, 139:22, 139:25, 140:7, 140:12, 140:18, 144:1, 144:3, 172:3, 172:4, 172:18, 172:22
**Mirandization** [2] - 173:1, 173:2
**Mirandized** [12] - 120:6, 126:6, 126:9, 126:14, 126:24, 130:8, 130:10, 132:5, 132:14, 132:24, 139:9, 144:8
**misleading** [2] - 172:9, 173:7
**mistrial** [5] - 5:2, 5:12, 5:21, 7:3, 7:10

**MITCHELL** [1] - 1:7
**Mitchell** [4] - 1:17, 161:24, 180:6, 191:5
**mixed** [3] - 74:19, 74:21, 75:5
**mixing** [1] - 76:14
**model** [2] - 18:5, 21:10
**mom** [4] - 25:19, 26:4, 27:13, 120:24
**moment** [11] - 5:22, 9:11, 9:21, 15:6, 18:17, 23:18, 27:8, 121:25, 146:15, 158:10, 159:21
**moments** [1] - 75:15
**momentum** [2] - 3:14, 3:15
**Monday** [10] - 94:21, 96:19, 145:24, 173:11, 173:18, 173:21, 174:1, 188:7, 188:21
**money** [19] - 38:13, 45:2, 45:3, 45:8, 54:12, 54:21, 54:23, 55:1, 56:23, 175:8, 175:11, 179:8, 179:10, 180:14, 180:19, 181:6, 181:7, 183:11, 184:20
**monotone** [1] - 141:12
**Monroe** [1] - 38:4
**Montgomery** [43] - 41:19, 41:21, 42:1, 42:8, 42:10, 42:13, 42:24, 43:2, 50:20, 50:22, 53:8, 53:12, 53:16, 54:5, 54:10, 59:24, 151:23, 152:4, 152:9, 152:12, 152:18, 153:22, 155:13, 157:9, 160:13, 161:5, 161:8, 164:2, 164:6, 164:9, 165:11, 179:8, 180:11, 187:1, 187:5, 187:6, 187:7, 187:11, 187:12, 187:13, 187:14
**Montgomery's** [1] - 161:11
**month** [2] - 117:12, 164:1
**months** [10] - 36:2, 41:25, 52:9, 117:13, 155:16, 161:15, 164:2, 165:22
**morning** [28] - 2:7, 5:6, 5:9, 9:10, 9:12, 11:7, 21:19, 21:22, 25:15, 25:16, 32:23, 51:11, 61:17, 64:16, 64:17, 76:7, 76:8, 80:10, 83:9, 83:16, 87:14, 97:7, 97:10, 146:11, 165:6, 171:3, 174:9, 186:11

**Mosher** [1] - 38:4
**most** [14] - 12:17, 16:23, 38:16, 39:18, 75:24, 81:5, 81:6, 83:24, 133:5, 157:16, 164:24, 172:6, 184:6
**mostly** [2] - 55:12, 63:1
**mother** [21] - 119:2, 119:7, 119:22, 120:5, 122:5, 122:8, 122:11, 123:3, 127:16, 127:24, 128:4, 128:12, 128:19, 128:23, 141:2, 141:8, 141:13, 141:22, 142:25, 143:5, 143:9
**motion** [7] - 5:21, 7:4, 7:9, 7:11, 98:8, 160:2, 174:2
**motions** [4] - 84:21, 84:24, 85:3, 85:23
**motive** [6] - 179:23, 181:24, 184:13, 184:14, 184:19, 185:10
**motives** [1] - 163:10
**mountainous** [1] - 72:14
**move** [3] - 32:7, 105:12, 162:22
**moved** [1] - 169:24
**movie** [1] - 28:18
**movies** [1] - 46:14
**MR** [329] - 2:3, 7:8, 7:13, 8:22, 9:1, 9:8, 10:23, 11:6, 20:3, 21:18, 23:4, 23:21, 23:25, 24:11, 24:16, 24:19, 24:25, 25:2, 25:4, 25:14, 31:23, 31:25, 32:2, 32:5, 32:8, 32:22, 46:4, 46:8, 51:10, 60:19, 60:21, 60:23, 61:1, 61:10, 61:14, 61:16, 64:10, 64:15, 65:9, 65:13, 76:6, 79:3, 79:21, 80:18, 80:21, 81:12, 81:14, 81:17, 81:19, 81:22, 81:25, 82:4, 82:6, 82:11, 82:13, 82:17, 82:20, 82:23, 83:2, 83:6, 83:23, 83:25, 84:4, 84:6, 84:9, 84:11, 84:13, 84:20, 84:22, 85:8, 85:10, 85:16, 85:19, 86:1, 86:3, 86:8, 86:10, 86:13, 86:15, 87:4, 87:13, 92:1, 92:8, 95:22, 95:25, 96:6, 96:9, 96:17, 96:21, 96:25, 97:14, 97:18, 97:21, 98:1, 98:15, 98:22, 99:1, 99:7, 99:18, 105:24,

108:1, 108:5, 108:15, 112:16, 119:10, 119:12, 119:14, 119:17, 119:19, 123:16, 127:9, 127:13, 128:24, 129:1, 140:6, 142:12, 142:17, 142:20, 142:21, 142:23, 144:9, 144:11, 144:12, 144:15, 145:2, 146:17, 146:20, 146:22, 146:24, 147:5, 147:7, 147:9, 147:15, 147:21, 148:1, 148:7, 148:11, 148:17, 148:25, 149:5, 149:9, 149:12, 149:16, 149:18, 149:20, 149:23, 150:1, 150:4, 150:7, 150:10, 150:15, 150:19, 150:21, 150:24, 151:2, 151:12, 151:14, 152:16, 152:21, 153:2, 153:4, 153:7, 153:11, 153:19, 153:21, 154:2, 154:7, 154:13, 154:18, 154:20, 154:24, 155:13, 155:21, 155:24, 156:2, 156:4, 156:9, 156:12, 157:15, 157:17, 157:25, 158:2, 158:7, 158:9, 158:13, 158:15, 158:23, 159:8, 159:14, 159:16, 159:18, 159:20, 160:1, 160:17, 161:2, 161:4, 161:22, 162:19, 164:8, 164:12, 164:22, 165:22, 166:10, 166:17, 166:21, 167:10, 167:19, 167:23, 168:1, 168:5, 168:13, 168:17, 168:21, 169:8, 169:11, 169:14, 169:16, 169:18, 169:21, 169:23, 170:6, 170:10, 170:14, 170:16, 170:22, 171:4, 171:9, 171:16, 171:20, 172:2, 172:12, 172:14, 172:23, 173:1, 173:6, 173:9, 173:22, 174:1, 174:13, 174:15, 174:19, 174:21, 175:1, 175:11, 175:14, 175:17, 175:19, 175:22, 176:2, 176:6, 176:12, 176:14, 176:17, 176:23, 176:25, 177:3, 177:7, 177:9, 177:12, 177:16, 177:22, 178:1, 178:4, 178:7, 178:10, 178:19, 179:1, 179:5, 179:14, 179:18, 180:23, 180:8, 180:16, 180:23, 181:3, 181:5, 181:9, 181:14, 181:16, 181:23, 182:7, 182:12, 183:3,

183:8, 183:10, 183:17, 183:21, 183:23, 184:3, 184:6, 184:12, 185:9, 185:12, 185:16, 185:24, 186:6, 186:9, 186:14, 186:18, 187:3, 187:19, 187:24, 188:11, 188:14, 188:17, 188:21, 189:1, 189:5, 190:4, 190:5, 190:5, 190:6, 190:7, 190:9, 190:9, 190:11, 190:11, 190:12, 190:12, 190:13, 190:14, 190:15, 190:16, 190:17, 190:18, 190:19, 190:19, 190:20, 190:20
**MS** [10] - 2:5, 6:10, 6:16, 7:1, 7:3, 7:6, 8:19, 83:8, 148:19, 148:23
**muddy** [1] - 74:3
**multi** [1] - 110:7
**multi-story** [1] - 110:7
**multiple** [1] - 154:13
**Mungo** [4] - 150:1, 150:3, 150:6, 150:7
**Munsell** [1] - 71:8
**murder** [37] - 48:16, 56:12, 56:14, 82:21, 84:15, 85:20, 85:21, 151:3, 151:4, 151:17, 151:21, 151:22, 154:5, 154:16, 155:2, 155:12, 155:16, 160:23, 163:8, 165:1, 165:18, 166:2, 166:4, 166:23, 168:8, 175:13, 177:4, 179:9, 179:23, 181:25, 182:22, 182:23, 182:25, 183:11, 184:7, 185:11
**murdered** [3] - 39:13, 55:16, 160:16
**Murders** [1] - 2:13
**murders** [7] - 163:8, 164:20, 165:15, 165:17, 168:3, 168:4, 168:8
**Murphy** [6] - 134:23, 135:1, 135:10, 135:15, 135:17, 135:18
**must** [2] - 149:14, 167:17

# N

**name** [42] - 11:3, 12:9, 15:20, 16:14, 18:11, 18:13, 19:6, 19:13, 19:23, 20:17, 20:18, 20:19, 22:5, 24:18, 25:9, 28:25, 32:14, 38:19, 40:11, 46:7, 49:18,

49:20, 50:4, 50:5, 51:13, 52:16, 61:6, 61:7, 71:8, 87:9, 90:7, 99:14, 108:10, 111:24, 117:1, 118:6, 121:2, 123:20, 174:8, 184:22
**named** [3] - 12:5, 41:18, 156:23
**names** [2] - 111:19, 185:1
**narcotics** [29] - 110:20, 114:13, 119:8, 120:13, 122:9, 122:13, 123:5, 123:11, 125:10, 125:12, 125:15, 128:8, 128:10, 129:25, 130:17, 130:23, 131:2, 131:5, 131:7, 133:17, 134:8, 137:6, 137:13, 139:15, 143:17, 150:22, 178:5
**national** [2] - 2:21, 5:10
**near** [7] - 15:12, 26:7, 31:3, 31:4, 88:24, 90:4
**nearby** [1] - 73:16
**necessarily** [3] - 56:4, 136:16, 181:21
**necessary** [1] - 66:6
**necking** [1] - 102:21
**need** [19] - 3:20, 4:24, 6:20, 9:20, 23:22, 24:12, 31:7, 92:9, 97:9, 97:20, 154:5, 155:8, 165:12, 170:13, 181:7, 184:3, 185:22
**needed** [8] - 34:22, 175:7, 175:11, 179:10, 180:14, 180:19, 183:11, 183:13
**needing** [3] - 180:12, 181:6, 184:20
**needs** [4] - 9:11, 168:20, 173:3, 178:17
**neglected** [1] - 79:4
**neighbor** [3] - 28:24, 29:2
**neighborhood** [2] - 40:15, 41:22
**neighborhoods** [2] - 33:4, 39:18
**nervous** [1] - 171:24
**never** [16] - 53:4, 54:20, 54:23, 55:25, 73:24, 138:13, 151:21, 152:21, 153:16, 155:19, 160:6, 162:16, 162:19, 163:6, 166:4, 187:17
**Never** [1] - 54:12
**nevertheless** [1] - 91:7
**new** [2] - 98:21, 98:23
**New** [2] - 3:7, 59:13

**news** [1] - 5:14
**newspaper** [1] - 8:20
**newspapers** [2] - 8:25, 146:9
**Next** [2] - 60:25, 149:4
**next** [47] - 10:22, 24:12, 24:16, 28:24, 29:2, 29:18, 32:2, 55:18, 55:21, 71:4, 71:13, 71:20, 80:21, 82:10, 84:23, 87:3, 94:21, 94:22, 95:1, 95:2, 95:4, 95:6, 96:16, 96:17, 96:18, 97:1, 99:6, 104:3, 105:15, 117:22, 145:7, 145:12, 145:13, 145:16, 145:22, 145:25, 147:25, 148:9, 148:14, 149:11, 158:15, 173:10, 186:17, 186:21, 187:24, 188:5, 188:9
**nice** [1] - 73:3
**Nickerson** [2] - 188:1, 188:24
**nicknames** [1] - 40:18
**night** [3] - 81:2, 156:24, 163:2
**nine** [3] - 3:10, 167:5, 189:2
**Nine** [4] - 109:17, 110:5, 118:14, 119:24
**NO** [1] - 1:6
**no-knock** [2] - 111:10, 111:15
**Nobody** [1] - 162:13
**nobody** [2] - 162:14, 168:19
**noise** [2] - 26:14, 26:16
**Nokia** [1] - 18:5
**non** [1] - 159:9
**non-fatal** [1] - 159:9
**none** [1] - 163:12
**None** [1] - 59:15
**normal** [4] - 66:3, 83:4, 94:25
**normally** [2] - 15:14, 46:16
**North** [8] - 86:4, 109:17, 109:22, 118:7, 118:13, 118:14, 119:24
**north** [2] - 68:8, 75:10
**NORTHERN** [1] - 1:2
**Northwest** [3] - 30:23, 30:24, 31:16
**note** [16] - 16:11, 17:23, 19:22, 21:6, 22:13, 74:22, 75:11, 80:11, 91:20, 95:7, 146:4
**noted** [4] - 21:3, 21:10, 126:18, 126:19

**notes** [1] - 66:5
**nothing** [10] - 6:7, 7:22, 7:23, 24:4, 27:5, 57:10, 152:22, 163:4, 163:5, 181:9
**Nothing** [7] - 36:17, 51:8, 65:4, 76:4, 79:1, 101:11, 108:1
**notice** [6] - 27:5, 30:21, 101:6, 101:11, 117:25, 123:23
**noticed** [6] - 10:3, 29:16, 29:17, 75:19, 101:24
**notified** [1] - 9:6
**noting** [1] - 84:23
**notwithstanding** [1] - 172:20
**November** [1] - 95:2, 117:21, 117:24
**NPR** [2] - 2:8, 5:8
**Number** [1] - 15:25
**number** [20] - 14:15, 14:17, 14:18, 15:2, 18:5, 50:6, 50:11, 50:13, 63:5, 63:19, 65:19, 72:4, 73:22, 84:23, 97:11, 110:4, 115:14, 157:17, 164:5
**Number(s** [1] - 191:5
**numbered** [4] - 14:18, 15:18, 23:8, 59:3
**numerical** [1] - 71:7
**numerous** [1] - 62:17
**nylon** [2] - 17:9, 17:14

## O

**O-T-T-R-E-L-L** [1] - 61:8
**oath** [1] - 144:22
**object** [2] - 168:25, 170:1
**objected** [2] - 185:15, 185:16
**objecting** [4] - 167:11, 168:24, 169:2, 185:16
**objection** [9] - 65:5, 65:12, 65:13, 65:14, 119:11, 119:13, 119:16, 148:18, 168:6
**Objection** [7] - 46:4, 112:16, 119:10, 128:24, 142:12, 142:17, 144:9
**objection's** [1] - 142:18
**obligated** [1] - 7:23
**obscured** [1] - 100:23
**observe** [2] - 93:4, 107:4
**observed** [2] - 107:8,

114:6
**obtained** [1] - 65:19
**obvious** [3] - 70:24, 162:12, 167:15
**Obviously** [1] - 166:7
**obviously** [9] - 46:10, 70:24, 97:5, 159:4, 166:11, 166:24, 167:14, 170:18, 172:18
**occasion** [1] - 63:17
**occasions** [2] - 35:2, 54:16
**occurred** [3] - 124:23, 126:8, 177:5
**occurrence** [1] - 57:17
**occurs** [1] - 6:3
**October** [3] - 1:11, 177:4, 191:5
**OF** [3] - 1:2, 1:5, 1:11
**offer** [2] - 56:2, 152:9
**offered** [1] - 53:23
**offering** [1] - 54:2
**offhand** [2] - 23:11, 50:6
**office** [4] - 9:4, 34:5, 35:15, 35:17
**Office** [5] - 34:6, 121:22, 143:10, 143:12, 143:21
**Officer** [25] - 21:19, 24:1, 81:1, 81:15, 82:13, 87:5, 87:10, 87:14, 90:8, 92:2, 92:9, 92:11, 94:10, 94:11, 108:6, 108:16, 113:15, 118:20, 123:14, 135:18, 140:24, 141:20, 143:22, 172:21
**officer** [18] - 11:15, 11:17, 22:24, 24:4, 87:16, 88:11, 88:12, 90:5, 90:7, 113:14, 114:1, 132:17, 133:16, 134:25, 143:16, 143:20, 144:2, 162:14
**OFFICER** [4] - 87:6, 108:7, 190:14, 190:18
**officer's** [5] - 16:13, 19:16, 92:18, 93:3, 131:20
**officers** [14] - 15:14, 67:15, 76:21, 88:11, 107:4, 107:5, 107:7, 107:11, 112:3, 112:6, 113:11, 129:13, 132:21, 133:7
**official** [1] - 191:7
**Official** [1] - 191:15
**OIC** [1] - 110:19
**old** [8] - 25:17, 27:15, 27:21, 32:25, 33:13,

157:24, 164:16, 169:15
**Old** [2] - 93:20, 93:23
**Once** [3] - 13:14, 70:14, 129:14
**once** [4] - 5:23, 103:6, 154:22, 166:14
**one** [137] - 3:8, 6:7, 8:17, 21:12, 21:25, 22:1, 22:7, 23:21, 24:12, 24:13, 27:2, 28:14, 29:10, 29:15, 29:16, 29:17, 29:18, 29:23, 29:24, 30:3, 30:21, 31:23, 34:23, 40:15, 41:11, 45:18, 49:6, 49:15, 51:2, 51:20, 63:17, 70:12, 71:25, 72:1, 72:4, 72:5, 72:25, 73:5, 73:23, 75:2, 75:5, 75:9, 77:1, 77:5, 77:19, 77:22, 77:23, 78:6, 78:7, 78:23, 79:8, 79:11, 79:18, 80:1, 80:25, 81:1, 82:23, 84:2, 84:21, 84:22, 85:23, 92:8, 93:17, 94:1, 97:12, 98:23, 101:5, 102:4, 102:9, 102:12, 102:15, 103:6, 103:16, 103:23, 106:16, 110:8, 112:5, 113:1, 115:21, 116:7, 116:11, 117:4, 117:22, 117:24, 117:25, 118:1, 121:25, 126:1, 130:3, 131:10, 132:3, 134:1, 134:23, 139:13, 142:8, 144:12, 148:1, 149:23, 150:1, 151:9, 151:17, 151:25, 154:14, 156:5, 156:25, 158:10, 158:17, 158:24, 159:6, 163:19, 163:23, 163:25, 164:3, 165:16, 165:17, 167:3, 167:7, 168:21, 170:18, 173:9, 173:14, 173:16, 173:17, 174:4, 174:11, 181:10, 182:22, 185:1, 185:4, 185:7, 187:24, 189:4
**One** [15] - 21:12, 52:21, 59:3, 62:7, 100:13, 101:5, 110:15, 113:2, 129:22, 130:6, 135:3, 151:16, 158:15, 180:2
**ones** [2] - 81:15, 156:25
**online** [1] - 146:9
**open** [9] - 10:13, 70:12, 80:13, 95:9, 111:7, 111:13, 116:22, 166:5, 167:15

**opened** [4] - 16:18, 151:9, 166:8, 166:15
**Opened** [1] - 166:17
**opening** [1] - 162:24
**operate** [1] - 15:11
**operating** [2] - 69:18, 78:9
**operation** [1] - 29:14
**opinion** [3] - 78:23, 168:16, 168:18
**opinions** [2] - 6:20, 73:7
**opportunity** [6] - 94:18, 98:8, 129:2, 173:15, 181:22, 186:16
**opposed** [2] - 53:17, 165:21
**opposite** [1] - 90:25
**opposition** [1] - 3:16
**Option** [2] - 173:15, 173:16
**option** [2] - 128:10, 128:11
**orally** [2] - 123:9, 139:9
**order** [2] - 4:10, 144:7
**ordered** [2] - 151:6, 153:15
**orders** [2] - 151:9, 162:4
**organization** [2] - 4:17, 110:22
**organizations** [1] - 150:22
**organized** [1] - 20:8
**original** [5] - 16:10, 16:15, 16:21, 20:12, 20:16
**originally** [1] - 12:11
**otherwise** [2] - 98:1, 188:11
**ought** [1] - 82:25
**outer** [1] - 16:9
**outlet** [1] - 5:8
**outlets** [1] - 5:4
**outline** [2] - 125:9, 147:25
**outlined** [1] - 125:12
**Outside** [1] - 26:10
**outside** [15] - 5:19, 6:4, 16:23, 26:7, 26:14, 28:7, 94:5, 101:12, 119:24, 138:21, 138:24, 138:25, 139:5, 139:7, 139:12
**outstanding** [1] - 85:3
**overhead** [4] - 17:5, 17:7, 18:9, 30:25
**overnight** [1] - 147:20
**Overruled** [3] - 46:5, 119:18, 142:13
**oversight** [1] - 137:23

**overstate** [1] - 180:2
**owed** [2] - 54:23, 55:1
**own** [13] - 34:20, 35:8, 43:6, 43:7, 49:3, 49:25, 102:24, 128:2, 128:3, 162:21, 165:12, 187:8
**owned** [2] - 151:24, 157:2

**P**

**P-15** [1] - 33:23
**p.m** [6] - 16:12, 26:6, 95:11, 98:20, 146:14, 189:9
**package** [3] - 66:4, 66:7, 77:15
**packaged** [8] - 16:20, 69:7, 70:9, 77:14, 78:1, 78:3, 116:14, 116:19
**Packaged** [1] - 69:5
**packaging** [6] - 16:9, 16:10, 16:24, 19:22, 118:21
**packet** [1] - 173:18
**packets** [1] - 140:2
**pads** [3] - 80:11, 95:7, 146:4
**PAGE** [1] - 190:3
**page** [5] - 2:20, 9:15, 9:16, 59:2, 59:4
**pages** [2] - 59:2, 191:6
**painstaking** [2] - 77:18, 78:15
**paint** [2] - 63:6, 66:8
**pair** [11] - 14:20, 19:3, 20:23, 68:19, 68:25, 69:5, 77:22, 78:2, 78:5, 78:6
**pairs** [4] - 70:8, 74:24, 78:1, 78:2
**panel** [1] - 8:9
**pants** [3] - 19:23, 102:8, 102:21
**paper** [8] - 7:15, 33:23, 66:10, 70:1, 70:3, 70:9, 116:12, 116:24
**paperwork** [1] - 142:5
**Paragraph** [1] - 35:14
**paragraphs** [1] - 3:13
**Park** [3] - 120:14, 122:17, 122:19, 127:2
**parked** [1] - 101:13
**parking** [1] - 93:19
**part** [23] - 2:10, 15:14, 31:4, 33:17, 34:13, 34:17, 38:1, 38:16, 39:2, 39:17, 46:19, 58:16, 59:5, 71:19, 82:20,

89:17, 109:10, 137:23, 172:7, 173:18, 182:6, 184:16, 184:17
**participate** [2] - 87:23, 146:3
**particular** [14] - 2:11, 2:25, 3:6, 20:21, 23:17, 33:4, 35:11, 38:3, 54:20, 62:7, 62:18, 67:6, 74:21, 158:17
**particularly** [1] - 57:18
**Particularly** [1] - 6:17
**partners** [1] - 4:21
**party** [4] - 129:14, 151:5, 162:8, 162:9
**passed** [3] - 15:18, 104:9, 134:11
**pat** [1] - 132:19
**patches** [1] - 96:14
**path** [2] - 31:15, 31:16
**patience** [1] - 9:11
**patrol** [5] - 89:8, 90:6, 90:17, 90:18, 90:19
**Paul** [3] - 1:19, 123:20, 178:13
**Pause** [4] - 31:24, 60:20, 122:2, 159:7
**paying** [3] - 28:16, 28:17, 30:1
**Payson** [2] - 38:4, 39:23
**peculiar** [1] - 185:3
**peep** [1] - 148:17
**pen** [1] - 101:16
**pending** [1] - 58:20
**people** [30] - 4:22, 4:23, 6:19, 6:21, 35:17, 40:5, 40:8, 40:9, 57:17, 57:18, 59:15, 66:21, 84:25, 90:2, 91:21, 111:16, 128:7, 128:8, 129:17, 131:19, 140:8, 149:23, 162:8, 162:9, 163:10, 164:17, 165:2, 182:15
**percentage** [1] - 71:23
**Perhaps** [4] - 32:7, 83:20, 96:15, 170:4
**perhaps** [4] - 95:18, 173:11, 182:2, 186:9
**perimeter** [14] - 82:21, 88:3, 88:4, 88:6, 89:17, 89:21, 91:1, 91:3, 91:7, 91:11, 91:16, 92:21, 93:12, 94:7
**period** [6] - 37:23, 155:11, 159:13, 161:13, 161:14, 176:19
**perjury** [1] - 36:19
**permanent** [4] - 112:6, 134:24, 135:16, 136:17
**Permission** [1] - 79:7

**permission** [1] - 83:10
**permit** [2] - 146:7, 188:4
**permits** [1] - 149:6
**permitted** [1] - 165:25
**person** [14] - 4:4, 14:2, 16:3, 16:8, 18:21, 19:1, 24:4, 40:6, 45:11, 45:17, 46:22, 66:15, 76:1, 119:5
**person's** [1] - 22:5
**personal** [3] - 16:11, 20:8, 117:1
**personally** [2] - 22:3, 133:12
**persuaded** [1] - 186:22
**PH-48** [1] - 109:21
**Phil** [1] - 49:20
**Phillip** [1] - 56:7
**phone** [34] - 18:4, 46:22, 46:23, 47:4, 47:10, 47:11, 47:14, 49:16, 49:24, 49:25, 50:3, 50:7, 50:12, 50:13, 83:10, 83:13, 101:22, 102:13, 103:7, 103:9, 119:5, 122:4, 122:18, 127:16, 127:19, 127:20, 128:18, 138:8, 138:19, 140:14, 141:25, 156:24, 157:1
**phonetic)** [1] - 46:19
**photo** [2] - 4:4, 167:13
**photograph** [9] - 12:19, 27:8, 45:20, 45:25, 66:13, 88:14, 88:20, 93:24, 100:16
**photographed** [4] - 113:22, 114:8, 114:13, 115:2
**photographing** [1] - 133:18
**photographs** [2] - 44:5, 97:24
**photos** [1] - 12:18
**pick** [2] - 70:7, 76:2
**Picked** [1] - 115:1
**picked** [2] - 63:23, 171:21, 178:4
**picks** [1] - 70:6
**picture** [5] - 2:20, 2:22, 28:13, 109:18, 109:20
**piece** [2] - 33:23, 67:9
**pieces** [2] - 19:14, 133:18
**place** [17] - 48:4, 69:16, 72:2, 72:23, 73:5, 74:9, 74:14, 74:15, 106:4, 124:5, 174:17, 174:19, 174:21, 175:4, 182:9
**placed** [8] - 15:4, 15:16,

16:5, 70:2, 70:17, 78:7, 120:14, 178:21
**placing** [2] - 18:2, 18:9
**plain** [1] - 120:3
**plan** [7] - 94:19, 145:8, 145:20, 145:21, 153:23, 165:13, 173:20
**planned** [1] - 145:14
**planning** [4] - 96:22, 98:4, 159:1, 159:11
**plastic** [8] - 70:18, 113:17, 114:6, 115:5, 125:16, 125:18, 125:20, 125:21
**plate** [10] - 114:12, 114:16, 114:18, 114:24, 115:10, 116:1, 116:5, 125:19
**plausible** [1] - 165:18
**played** [1] - 4:16
**plea** [15] - 34:3, 34:5, 34:9, 34:13, 34:17, 35:12, 35:14, 35:15, 36:22, 36:23, 36:24, 37:2, 49:7, 58:7, 58:17
**plead** [1] - 34:9
**pleaded** [1] - 58:24
**pleased** [1] - 97:6
**pled** [1] - 37:6
**plus** [1] - 71:7
**PO** [1] - 135:1
**Poe** [5] - 109:23, 109:24, 120:13, 122:17, 133:5
**point** [53] - 13:21, 26:13, 43:1, 70:25, 74:20, 88:23, 89:21, 100:20, 103:17, 103:20, 106:21, 115:6, 126:24, 126:25, 130:3, 130:9, 131:16, 131:21, 132:5, 132:10, 132:13, 132:14, 132:25, 133:2, 133:7, 133:19, 133:21, 134:11, 136:3, 139:1, 139:10, 142:5, 152:18, 153:14, 153:18, 160:19, 160:20, 160:21, 162:16, 164:14, 167:24, 167:25, 168:2, 168:12, 173:9, 174:15, 176:22, 180:22, 181:18, 184:6, 184:8, 185:19
**pointer** [4] - 89:2, 92:7, 92:10, 101:15
**pointing** [2] - 89:3, 115:20
**points** [1] - 75:10
**Police** [15] - 3:25, 11:11, 14:16, 65:18, 80:25, 82:13, 87:5,

87:16, 87:18, 108:6, 108:12, 109:9, 123:24, 124:18, 135:18
**police** [62] - 4:12, 11:15, 11:17, 19:16, 24:3, 24:20, 25:1, 47:13, 47:23, 47:25, 48:6, 48:10, 48:19, 49:13, 49:15, 49:18, 52:22, 53:4, 55:15, 55:20, 58:13, 64:1, 69:7, 76:21, 101:13, 101:24, 101:25, 103:2, 103:8, 103:15, 103:18, 103:20, 103:22, 103:25, 104:2, 104:14, 105:9, 105:11, 105:14, 106:18, 106:20, 106:21, 106:22, 106:23, 107:4, 107:5, 107:6, 107:8, 107:11, 107:17, 107:19, 108:21, 108:23, 109:3, 124:2, 126:16, 143:16, 144:2, 153:7, 153:9, 170:19
**politician** [1] - 2:23
**poll** [1] - 8:15
**polled** [1] - 5:13
**pool** [1] - 5:3
**pops** [1] - 8:4
**porch** [3] - 28:10, 106:15, 107:23
**portion** [4] - 130:4, 131:22, 138:6, 154:10
**position** [3] - 11:20, 63:7, 63:10
**positioned** [1] - 89:17
**possess** [2] - 34:10, 59:10
**Possession** [1] - 37:19
**possession** [4] - 142:1, 155:11, 164:3, 164:7
**possibility** [6] - 73:25, 74:1, 74:7, 74:11, 142:6, 145:9
**possible** [11] - 9:6, 12:17, 56:12, 68:21, 70:13, 76:1, 76:13, 81:7, 88:12, 89:22, 137:23
**possibly** [4] - 10:9, 132:16, 184:19, 188:25
**postpone** [1] - 148:9
**potential** [3] - 69:24, 153:17, 188:3
**potentially** [1] - 172:8
**pounds** [1] - 118:10
**precarious** [2] - 171:11, 171:13
**precaution** [1] - 147:17
**Precinct** [1] - 15:12
**precinct** [4] - 13:17,

15:11, 15:19, 87:21
**precise** [1] - 106:8
**precisely** [1] - 186:10
**preclude** [2] - 148:8, 167:14
**predict** [1] - 166:8
**pregnant** [1] - 138:14
**prejudice** [3] - 162:12, 163:5, 163:17
**prejudicial** [2] - 164:25, 165:3
**preliminary** [1] - 154:5
**premise** [6] - 125:7, 129:12, 129:16, 131:18, 137:25, 139:7
**premises** [7] - 112:20, 125:8, 128:8, 139:6, 140:3, 140:14, 143:16
**prep** [1] - 148:4
**prepare** [1] - 144:17
**prepared** [6] - 147:17, 149:12, 163:22, 171:3, 171:17, 182:3
**presence** [3] - 135:1, 135:9, 135:18
**present** [8] - 81:13, 85:1, 86:4, 135:16, 165:17, 169:19, 173:16, 181:14
**presentation** [3] - 145:7, 145:13, 166:23
**president** [1] - 3:25
**presumably** [1] - 16:13
**pretrial** [1] - 177:20
**pretty** [6] - 4:25, 55:9, 83:21, 97:24, 167:8, 183:17
**prevent** [1] - 70:13
**previous** [2] - 16:7, 117:11
**previously** [1] - 21:8
**price** [1] - 54:9
**principal** [1] - 158:5
**printed** [1] - 10:17
**prison** [1] - 117:18
**prisoner** [6] - 15:13, 16:9, 16:11, 17:11, 23:9, 150:7
**prisoner's** [1] - 15:20
**prisoners** [2] - 15:13, 15:15
**private** [1] - 62:24
**Probable** [7] - 124:1, 124:13, 124:15, 124:19, 126:5, 126:13, 126:17
**probative** [3] - 152:2, 163:18, 185:7
**problem** [8] - 4:3, 31:21, 81:7, 81:8, 86:23, 116:20, 149:2, 185:2

**problems** [1] - 3:8
**procedure** [6] - 15:4, 15:10, 15:15, 69:20, 70:15, 78:9
**procedures** [1] - 69:18
**proceed** [1] - 2:2
**proceedings** [6] - 31:24, 60:20, 122:2, 159:7, 191:4, 191:7
**Proceedings** [3] - 2:1, 98:20, 189:9
**processing** [3] - 12:18, 15:14, 70:5
**production** [1] - 72:21
**professional** [1] - 24:3
**professor** [1] - 3:6
**proffer** [2] - 178:10, 185:18
**profile** [2] - 13:3, 13:6
**progress** [1] - 146:1
**prohibit** [1] - 8:13
**project** [2] - 109:19, 110:1
**projectiles** [1] - 154:1
**projector** [2] - 17:5, 17:7
**prominent** [2] - 2:23, 9:15
**promiscuously** [1] - 162:22
**promises** [1] - 36:6
**promptly** [3] - 9:5, 145:23, 146:12
**prone** [1] - 156:19
**prong** [1] - 163:17
**properly** [1] - 69:16
**property** [17] - 13:22, 15:15, 15:16, 16:9, 17:11, 17:24, 18:21, 20:4, 20:12, 21:25, 22:11, 22:19, 123:10, 133:18, 135:21, 137:2, 137:5
**propose** [1] - 173:13
**proposed** [1] - 148:24
**prosecute** [8] - 3:17, 121:24, 128:15, 143:14, 143:15, 143:19, 143:23, 143:25
**prosecuted** [2] - 36:18, 153:16
**prosecuting** [1] - 121:23
**prosecution** [1] - 35:17
**prosecutor** [3] - 24:21, 34:6, 36:24
**Prosecutor** [1] - 126:20
**prosecutors** [1] - 35:1
**protect** [2] - 45:8, 170:17

**protective** [1] - 131:13
**protocol** [1] - 132:17
**prove** [2] - 153:24, 155:7
**proven** [1] - 160:18
**provide** [2] - 34:19, 125:22
**provided** [3] - 35:16, 37:6, 49:10
**providing** [1] - 12:1
**prudent** [1] - 143:20
**Public** [1] - 180:22
**publishing** [1] - 116:20
**pull** [1] - 32:17
**pulled** [6] - 28:14, 113:16, 114:11, 114:23, 157:21
**purpose** [3] - 62:2, 144:1, 176:12
**purposes** [1] - 17:8
**pursuant** [1] - 35:3
**push** [2] - 6:21, 121:23
**Push** [1] - 117:21
**put** [26] - 15:16, 15:17, 17:6, 20:21, 22:3, 58:15, 66:13, 70:1, 81:9, 82:14, 104:6, 109:18, 115:4, 116:9, 123:12, 126:6, 126:8, 126:11, 126:14, 136:9, 137:1, 139:2, 148:5, 160:7, 161:17, 176:18
**puts** [1] - 152:7
**putting** [1] - 186:1
**Pyne** [2] - 1:21, 173:25

**Q**

**Q-1** [2] - 68:18, 68:19
**Q-2** [2] - 68:18, 68:19
**Q-3** [2] - 68:24, 68:25
**Q-3.1** [1] - 69:2
**Q-4** [2] - 68:24, 68:25
**QUALIFICATIONS** [1] - 190:11
**Qualifications** [1] - 64:14
**qualified** [1] - 64:20
**quality** [1] - 69:17
**Quantico** [2] - 61:19, 62:20
**quarter** [2] - 96:9, 96:11
**quarters** [1] - 2:20
**questioned** [9] - 66:22, 66:25, 67:5, 68:16, 73:9, 73:12, 77:8, 78:8, 167:13
**questioning** [1] - 172:24
**questions** [31] - 8:8,

21:15, 21:24, 23:2, 31:11, 31:25, 39:16, 48:10, 51:21, 55:4, 59:19, 60:6, 60:22, 62:6, 77:2, 91:23, 92:4, 92:11, 94:10, 105:21, 106:2, 106:3, 107:16, 107:25, 123:13, 132:24, 140:4, 142:20, 144:11, 144:24, 169:23
**quick** [6] - 23:5, 23:22, 79:22, 173:9, 185:21, 187:19
**quickly** [5] - 83:21, 104:2, 105:8, 105:14, 170:5, 173:24
**quit** [1] - 65:2
**quite** [10] - 33:17, 61:15, 63:19, 65:2, 72:3, 73:3, 125:18, 180:13, 184:13, 187:3
**quote** [5] - 3:6, 3:9, 3:11, 3:14, 4:3
**quotes** [2] - 3:23, 4:11

**R**

**R-U-T-H-E-R-F-O-R-D** [1] - 87:11
**racial** [1] - 30:10
**raid** [17] - 124:5, 125:3, 126:8, 126:20, 129:3, 131:11, 134:12, 136:25, 137:1, 139:2, 139:14, 139:15, 139:23, 140:2, 144:8, 169:21, 169:22
**raiding** [1] - 129:14
**raise** [6] - 5:25, 6:24, 7:15, 9:21, 9:23, 99:9
**Raise** [1] - 32:9
**raised** [3] - 7:24, 9:21, 10:2
**ram** [1] - 111:8
**ran** [3] - 27:7, 30:23, 156:25
**Randallstown** [4] - 25:22, 26:2, 99:20, 99:22
**rang** [1] - 118:24
**rank** [3] - 112:6, 134:24, 135:16
**ranking** [1] - 136:17
**rap** [1] - 147:2
**rapidly** [1] - 75:23
**rate** [5] - 2:9, 2:21, 2:22, 3:18
**rather** [1] - 9:15
**razor** [2] - 114:18, 115:25
**re** [2] - 16:24, 20:13

**re-cataloged** [1] - 20:13
**re-packaging** [1] - 16:24
**reach** [1] - 11:9
**read** [24] - 2:15, 3:2, 3:21, 4:23, 5:14, 5:24, 6:1, 6:5, 6:12, 6:13, 6:17, 6:23, 6:25, 8:16, 9:17, 9:23, 10:5, 18:14, 19:8, 118:6, 148:13, 149:1, 174:22
**ready** [4] - 2:2, 10:21, 136:21, 136:22
**real** [2] - 51:13, 185:7
**realize** [1] - 157:9
**realized** [1] - 9:4
**really** [19] - 6:8, 39:18, 43:17, 46:7, 81:23, 82:10, 95:20, 104:10, 149:1, 163:6, 163:11, 165:2, 165:20, 180:11, 183:3, 185:5, 188:1, 188:8
**rear** [2] - 17:15, 131:25
**reason** [11] - 24:22, 97:18, 97:19, 121:20, 138:14, 159:2, 167:23, 174:21, 175:4, 182:22, 184:18
**reasonable** [2] - 160:24, 160:25
**reasonably** [1] - 80:25
**reasons** [3] - 73:22, 179:24, 182:22
**reassured** [1] - 172:9
**receive** [2] - 63:22, 64:5
**received** [16] - 16:8, 21:4, 22:4, 22:6, 65:17, 66:3, 66:8, 66:16, 67:10, 68:16, 79:9, 127:16, 127:19, 136:10, 160:4
**receiver** [1] - 122:5
**receives** [1] - 63:25
**receiving** [2] - 50:9, 69:9
**recent** [3] - 12:2, 147:13, 182:17
**recently** [1] - 182:1
**Recess** [1] - 80:16
**recess** [7] - 80:10, 80:14, 80:15, 98:14, 98:18, 98:19, 189:8
**recognize** [6] - 12:16, 12:22, 28:21, 33:23, 34:3, 44:6, 50:16, 100:18
**recognized** [1] - 29:2
**recollect** [7] - 46:12, 49:15, 66:6, 111:21, 113:14, 118:19, 126:16
**recollection** [5] -

122:10, 140:21, 175:19, 179:7, 181:23
**reconsider** [1] - 152:10
**record** [17] - 2:18, 10:1, 11:3, 17:1, 17:13, 18:14, 24:15, 25:9, 32:14, 32:19, 33:20, 61:6, 87:9, 99:14, 108:10, 168:5, 174:23
**recorded** [1] - 191:3
**recover** [1] - 157:13
**recovered** [36] - 22:21, 23:9, 62:12, 67:16, 67:24, 68:2, 68:5, 68:9, 69:6, 70:21, 71:5, 73:14, 73:15, 73:17, 73:20, 75:10, 78:20, 116:10, 118:20, 123:1, 135:14, 147:3, 151:15, 151:17, 151:20, 154:1, 154:8, 154:9, 155:19, 157:13, 157:18, 157:19, 157:20, 158:3, 167:5
**recovering** [2] - 113:14, 133:16
**recovery** [1] - 164:3
**RECROSS** [5] - 23:24, 79:20, 142:22, 190:6, 190:20
**red** [7] - 17:24, 19:21, 21:3, 22:16, 31:4, 105:20, 105:21
**redirect** [2] - 60:23, 127:11
**REDIRECT** [8] - 23:3, 79:2, 140:5, 144:14, 190:5, 190:13, 190:19, 190:20
**reduce** [1] - 35:18
**reduced** [1] - 35:23
**reduction** [5] - 35:8, 36:4, 36:7, 36:11, 58:22
**refer** [1] - 12:17
**reference** [4] - 3:1, 66:12, 66:20, 159:23
**referenced** [1] - 15:8
**referred** [5] - 57:1, 58:6, 66:21, 124:13, 144:18
**referring** [2] - 117:8, 123:23
**refined** [1] - 173:16
**reflect** [2] - 10:1, 186:21
**regard** [1] - 162:3
**regarding** [6] - 3:8, 4:2, 94:15, 155:18, 164:3, 164:6
**regards** [1] - 88:3
**registered** [1] - 58:1
**regular** [2] - 40:6, 40:7
**relate** [3] - 12:4, 62:9,

85:2
**related** [9] - 9:14, 10:19, 37:13, 37:15, 37:21, 44:25, 85:20, 112:1, 185:8
**relating** [1] - 17:21
**relationship** [10] - 40:7, 40:20, 40:23, 42:1, 44:3, 44:4, 51:5, 59:21, 60:7, 120:23
**release** [1] - 143:11
**released** [2] - 128:14, 143:10
**relevance** [1] - 167:20
**relevant** [1] - 152:11
**relying** [1] - 179:14
**remain** [1] - 120:7
**Remember** [1] - 155:24
**remember** [35] - 22:14, 27:1, 29:4, 30:8, 30:10, 46:10, 47:3, 47:21, 47:22, 47:25, 49:18, 50:3, 50:6, 50:8, 56:7, 56:9, 57:3, 90:7, 90:18, 106:10, 106:12, 107:5, 107:6, 110:3, 112:4, 122:15, 125:18, 146:24, 149:15, 158:17, 170:7, 170:11, 170:13, 171:1, 176:3
**remind** [5] - 5:18, 6:12, 10:11, 94:18, 154:22
**Remind** [1] - 170:21
**reminding** [1] - 6:2
**remove** [1] - 114:25
**removed** [2] - 16:19, 104:6
**renew** [1] - 160:2
**repackaged** [1] - 70:19
**Repeat** [2] - 53:10, 55:19
**repeat** [3] - 14:11, 155:22
**repeatedly** [1] - 10:11
**report** [19] - 98:3, 111:22, 123:24, 124:3, 124:9, 125:1, 125:9, 125:12, 125:22, 126:1, 126:4, 126:7, 126:8, 126:11, 126:14, 126:16, 127:3, 127:7, 172:24
**reported** [1] - 77:15
**Reported** [1] - 1:23
**Reporter** [1] - 191:15
**REPORTER'S** [1] - 191:1
**reports** [5] - 9:18, 10:17, 124:18, 158:25, 159:10
**represent** [1] - 123:20

**represented** [2] - 178:13, 180:22
**representing** [1] - 178:15
**request** [3] - 35:18, 65:17, 79:9
**requests** [1] - 63:25
**require** [2] - 69:18, 110:11
**research** [1] - 5:5
**resident** [1] - 84:6
**resign** [1] - 178:14
**resist** [1] - 158:9
**resists** [1] - 147:22
**resolved** [1] - 172:5
**respect** [14] - 22:16, 24:11, 58:12, 73:8, 73:11, 75:20, 86:16, 94:4, 107:15, 160:5, 161:12, 161:16, 167:18, 174:2
**respond** [1] - 186:16
**responded** [6] - 13:16, 88:2, 88:5, 88:10, 135:13
**responding** [1] - 88:9
**response** [9] - 9:25, 51:20, 55:3, 77:1, 98:9, 102:1, 106:3, 106:7, 165:11
**responsibility** [5] - 120:18, 122:8, 122:13, 122:23, 140:13
**rest** [3] - 96:18, 97:4, 138:16
**restate** [1] - 168:5
**result** [2] - 167:3, 178:15
**resume** [4] - 89:20, 94:21, 95:11, 101:4
**retain** [1] - 120:10
**rethink** [3] - 50:25, 60:2
**return** [10] - 134:18, 134:20, 134:23, 135:7, 135:11, 135:12, 136:9, 136:24, 137:15
**returned** [2] - 126:25, 135:8
**reverse** [1] - 13:6
**review** [2] - 102:23, 129:2
**reviewed** [2] - 123:18, 130:15
**revisit** [3] - 127:11, 186:13, 188:21
**Reynold's** [1] - 175:1
**Reynolds** [30] - 84:13, 85:2, 86:10, 147:10, 149:11, 173:25, 174:3, 174:5, 174:8, 174:11, 174:12, 174:13, 174:14,

174:15, 175:3, 175:10, 175:22, 176:8, 178:4, 178:15, 178:20, 179:7, 181:4, 182:1, 182:8, 182:13, 183:5, 185:24, 186:11, 186:21
**Reynolds's** [1] - 182:6
**RHODES** [10] - 2:5, 6:10, 6:16, 7:1, 7:3, 7:6, 8:19, 83:8, 148:19, 148:23
**Rhodes** [9] - 1:17, 2:4, 5:23, 8:5, 86:23, 171:9, 171:14, 171:17, 187:23
**Richmond** [1] - 8:6
**RICO** [2] - 183:1, 184:17
**ricochet** [2] - 156:13, 156:20, 157:20
**rights** [2] - 112:13, 120:7
**ring** [1] - 22:15
**risk** [5] - 7:20, 8:12, 8:13, 8:15, 24:2
**Road** [3] - 46:20, 90:10, 100:1
**road** [3] - 90:14, 90:23, 90:25
**rob** [1] - 153:22
**Robbery** [2] - 11:21, 13:14
**robbery** [2] - 153:3, 179:9, 184:14
**robbing** [1] - 42:19
**Robert** [1] - 1:16
**Roc** [1] - 118:3
**rocks** [5] - 62:1, 114:7, 115:17, 115:24, 115:25
**Rodney** [1] - 149:6
**ROHOS** [1] - 46:19
**role** [4] - 4:16, 13:12, 65:22, 66:11
**roll** [2] - 129:4, 129:5
**Rolling** [1] - 46:20
**room** [7] - 69:22, 130:6, 131:23, 132:3, 132:22, 142:4, 178:12
**Room** [1] - 1:24
**rooms** [1] - 13:18
**rough** [2] - 107:18, 112:4
**roughly** [2] - 109:11, 122:15
**rounding** [1] - 71:16
**rounds** [1] - 156:13
**Routine** [1] - 7:16
**row** [1] - 102:6
**rows** [1] - 103:16
**Roy** [3] - 85:13, 85:19, 146:18

**RPR** [1] - 1:24
**Ruby** [4] - 13:13, 13:16, 13:18, 13:19
**Rule** [2] - 35:23, 97:7
**ruled** [2] - 172:2, 172:14
**ruling** [8] - 152:6, 152:10, 154:5, 159:22, 159:25, 166:8, 168:11, 172:20
**run** [2] - 27:6, 83:21
**running** [3] - 31:12, 88:24, 151:7
**Russell** [2] - 34:7, 36:24
**Ruter** [1] - 37:6
**Rutherford** [8] - 82:13, 82:19, 84:2, 86:21, 87:5, 87:10, 92:2, 94:11
**RUTHERFORD** [2] - 87:6, 190:14

## S

**S-1** [2] - 31:3, 31:12
**S-100C** [1] - 13:5
**S-11** [3] - 14:6, 14:10, 14:12
**S-113** [2] - 45:21, 57:3
**S-12** [2] - 15:1, 17:2
**S-121** [1] - 45:24
**S-13** [2] - 15:24, 15:25
**S-14** [1] - 17:6
**S-14A** [2] - 18:1, 18:3
**S-15** [4] - 17:21, 17:22, 17:23, 21:9
**S-16** [3] - 18:8, 18:10, 18:11
**S-160** [1] - 66:14
**S-21** [3] - 21:1, 21:7
**S-22** [1] - 19:10
**S-23** [3] - 19:1, 19:2, 19:3
**S-24** [1] - 19:20
**S-25** [2] - 20:22
**S-56** [2] - 27:9, 44:6
**S-59** [1] - 13:8
**S-P-E-N-C-E** [1] - 32:20
**sacrifice** [1] - 146:2
**safeguards** [1] - 69:15
**safety** [1] - 131:20
**sale** [2] - 163:1
**sales** [1] - 163:1
**sample** [7] - 63:17, 66:24, 67:1, 67:23, 68:1, 68:4, 74:22
**samples** [41] - 62:5, 63:19, 63:22, 65:19, 65:23, 66:8, 66:9, 66:17, 66:20, 66:21, 66:22, 67:3, 67:10, 67:11,

67:19, 68:15, 68:21, 69:12, 69:21, 71:3, 71:24, 73:9, 73:13, 73:15, 75:9, 75:12, 75:13, 75:14, 75:21, 76:14, 76:19, 77:2, 77:4, 77:8, 77:10, 77:20, 78:8, 78:15, 78:18
**sandwich** [2] - 118:17, 118:20
**sandy** [1] - 73:3
**sanitized** [1] - 166:24
**sat** [1] - 104:5
**satisfied** [2] - 5:23, 6:15
**Saturday** [1] - 163:2
**save** [2] - 6:14, 166:20
**saw** [17] - 12:15, 22:14, 27:6, 28:16, 29:9, 29:12, 30:13, 30:18, 31:12, 31:17, 101:20, 115:1, 135:14, 137:6, 141:17, 170:12
**scene** [13] - 88:5, 91:17, 134:5, 134:13, 136:6, 136:13, 136:16, 136:17, 136:19, 151:15, 158:3, 173:2
**scenes** [1] - 146:8
**schedule** [4] - 81:7, 94:16, 95:5, 145:12
**scheduling** [2] - 80:19, 187:20
**Scheduling** [1] - 83:9
**school** [3] - 33:6, 33:8, 104:25
**Science** [2] - 62:15, 62:16
**Scoot** [1] - 25:8
**scrapings** [1] - 69:10
**scratch** [2] - 33:13, 35:7
**screen** [3] - 18:2, 27:10, 66:13, 109:19, 115:4
**seal** [1] - 4:6
**sealed** [3] - 66:10, 115:5, 116:19
**Seamon** [2] - 147:5, 149:20
**search** [31] - 81:22, 86:5, 109:14, 110:19, 112:7, 112:23, 113:8, 113:11, 113:15, 114:10, 118:24, 124:10, 127:16, 130:16, 130:17, 132:17, 132:20, 132:23, 133:2, 133:8, 133:12, 133:22, 134:8, 136:10, 136:11, 136:22, 138:3, 138:4, 138:7, 142:9, 162:6
**searched** [4] - 109:16, 118:12, 132:21, 142:4

**searching** [3] - 49:14, 134:1, 137:25
**seat** [3] - 88:22, 97:23, 146:15
**seated** [10] - 5:24, 11:2, 25:8, 32:13, 61:5, 87:8, 99:13, 102:2, 102:4, 108:9
**second** [16] - 14:18, 16:15, 54:18, 101:1, 103:20, 110:14, 110:15, 112:25, 113:15, 118:1, 118:21, 133:4, 135:3, 163:24, 170:19, 187:24
**Second** [1] - 74:1
**Section** [1] - 35:19
**secure** [2] - 116:18, 129:15
**secured** [11] - 22:5, 113:24, 115:2, 123:5, 123:10, 130:4, 130:7, 134:8, 138:9, 139:4, 139:5
**securing** [2] - 125:7, 125:8
**security** [1] - 88:5
**Security** [2] - 46:20, 139:7
**See** [1] - 8:7
**see** [51] - 5:7, 6:14, 8:16, 8:23, 20:18, 23:15, 27:10, 28:7, 28:13, 31:2, 34:2, 69:10, 70:23, 72:14, 72:16, 73:4, 75:22, 82:25, 83:4, 86:21, 88:20, 90:17, 91:13, 100:15, 110:10, 110:17, 113:2, 115:1, 115:6, 115:7, 115:23, 115:25, 116:3, 117:20, 122:22, 123:6, 126:17, 127:3, 127:7, 135:14, 144:16, 146:11, 156:7, 156:14, 156:21, 157:4, 167:20, 179:20, 181:5
**seeing** [2] - 89:25, 90:18
**seeking** [2] - 82:7, 99:1
**seem** [1] - 166:12
**segmented** [1] - 183:4
**segregated** [1] - 21:25
**seize** [3] - 14:16, 129:19, 130:17
**seized** [17] - 14:19, 15:3, 19:18, 77:21, 114:8, 114:14, 115:2, 122:9, 125:10, 125:13, 128:8, 130:24, 135:17, 135:21, 137:2, 137:5
**seizing** [1] - 114:1

**seizure** [1] - 124:10
**selection** [1] - 6:19
**self** [4] - 53:1, 119:22, 141:10, 187:18
**self-impeachment** [1] - 187:18
**sell** [3] - 120:13, 122:16, 127:1
**selling** [9] - 33:12, 33:14, 38:16, 122:19, 169:1, 169:4, 169:5, 169:6, 169:25
**semiautomatic** [2] - 46:3, 151:20
**semiautomatics** [1] - 167:5
**sending** [1] - 77:16
**sense** [3] - 95:19, 121:9, 185:4
**sent** [4] - 65:25, 66:2, 117:9, 179:1
**sentence** [6] - 35:7, 35:18, 35:23, 36:1, 36:4, 58:22
**sentenced** [3] - 35:11, 35:21, 58:21
**sentencing** [3] - 35:8, 36:11, 187:25
**sentencing's** [1] - 188:14
**separate** [5] - 4:2, 74:16, 75:2, 75:3, 185:19
**separated** [1] - 20:8
**separately** [1] - 20:13
**September** [3] - 4:15, 38:22, 177:4
**sequentially** [1] - 14:18
**Sergeant** [20] - 129:22, 129:23, 134:5, 134:9, 134:12, 134:18, 134:23, 135:1, 135:9, 135:10, 135:15, 135:17, 135:18, 135:19, 135:24, 136:5, 136:12, 136:19, 137:17
**sergeant** [1] - 112:5
**serial** [1] - 18:5
**series** [1] - 174:7
**service** [1] - 10:20
**session** [14] - 83:19, 94:19, 94:20, 94:22, 94:23, 95:3, 95:4, 145:8, 145:16, 145:21, 145:25, 147:14, 174:22, 178:11
**set** [11] - 4:25, 5:16, 15:12, 22:12, 69:20, 70:14, 71:5, 85:13, 91:3, 151:16, 170:2
**setting** [1] - 164:13
**Seven** [1] - 27:16
**seven** [6] - 27:16,

154:14, 154:20, 154:21, 154:22, 167:7
**several** [5] - 4:18, 65:17, 97:1, 133:7, 157:18
**Shamier** [5] - 85:13, 86:3, 111:25, 121:5, 146:17
**Shannon** [16] - 85:14, 86:3, 111:20, 111:25, 112:1, 112:15, 120:25, 121:1, 121:2, 121:15, 131:24, 138:12, 146:18, 168:22
**shared** [1] - 45:5
**SHAWN** [1] - 1:8
**Shawn** [12] - 12:8, 12:23, 14:20, 16:1, 17:11, 17:25, 18:7, 18:12, 18:13, 23:9, 68:20, 77:11
**shebang** [1] - 134:3
**sheet** [5] - 70:1, 70:2, 134:20, 137:1
**shell** [6] - 85:22, 85:24, 151:15, 157:14, 158:6, 167:5
**Shelly** [1] - 157:2
**SHELLY** [1] - 1:8
**Shelton** [27] - 117:1, 117:25, 118:7, 118:11, 118:22, 119:6, 119:25, 120:4, 120:15, 120:23, 120:24, 121:8, 122:4, 123:21, 126:2, 126:9, 126:14, 126:24, 127:15, 127:21, 134:8, 134:10, 138:18, 141:6, 141:20, 142:3, 142:7
**SHELTON** [1] - 1:7
**Shelton's** [1] - 170:23
**Sheri** [1] - 149:18
**Sherman** [2] - 153:15, 157:2
**Sherri** [1] - 147:1
**shift** [1] - 159:20
**shirt** [8] - 15:3, 17:2, 19:11, 19:12, 19:14, 19:19, 102:8, 102:20
**shoe** [1] - 78:4
**shoes** [20] - 68:19, 68:21, 68:25, 69:5, 69:7, 70:5, 70:7, 70:8, 70:19, 74:2, 74:4, 74:6, 74:8, 74:10, 74:12, 74:16, 75:1, 78:4, 78:6
**shooter** [2] - 97:23, 160:11
**shooters** [5] - 152:17, 152:24, 155:5, 156:8

**shooting** [15] - 12:4, 85:1, 88:2, 91:17, 150:11, 152:14, 152:22, 155:3, 159:1, 159:9, 160:11, 161:13, 161:18, 167:2
**shootings** [4] - 151:1, 158:21, 160:5, 163:25
**short** [4] - 50:23, 81:15, 84:3, 102:19
**Shortly** [2] - 119:4, 134:6
**shortly** [5] - 48:6, 55:15, 134:9, 138:17, 151:5
**shot** [8] - 13:3, 13:6, 28:15, 28:16, 28:21, 30:21, 152:23, 156:18
**shots** [7] - 28:16, 154:11, 154:13, 154:14, 157:12, 167:4, 167:7
**shoulder** [1] - 52:19
**shoulders** [1] - 156:25
**show** [18] - 2:6, 12:21, 14:5, 17:7, 19:25, 31:11, 33:22, 35:14, 44:5, 58:5, 116:12, 117:3, 120:5, 128:10, 128:11, 128:12, 143:4, 163:22
**showed** [2] - 123:2, 139:24
**showing** [2] - 17:20, 118:15
**Showing** [1] - 13:2, 14:5, 45:20, 57:1
**shown** [4] - 22:17, 23:5, 165:16, 165:17
**shows** [5] - 139:8, 163:23, 164:1, 179:22
**shut** [1] - 88:4
**sick** [1] - 74:4
**side** [11] - 10:9, 19:22, 24:12, 77:7, 90:23, 90:25, 91:4, 104:21, 109:11, 164:19
**sidewalk** [4] - 28:12
**Signature** [1] - 135:2
**signature** [3] - 118:10, 136:20, 191:10
**signed** [7] - 36:24, 37:2, 58:17, 59:8, 135:2, 135:19, 136:18
**signify** [1] - 22:24
**silent** [1] - 120:7
**silly** [1] - 159:25
**similar** [3] - 2:8, 122:23, 146:10
**simple** [2] - 128:14, 139:18
**simply** [6] - 5:7, 5:23,

6:13, 10:6, 175:7, 185:11
**single** [5] - 10:1, 78:2, 78:5, 102:21, 164:1
**sister** [5] - 52:15, 121:1, 123:3, 169:14, 169:15
**sit** [2] - 50:25, 83:13
**sitting** [10] - 5:18, 96:23, 100:14, 101:6, 101:9, 103:16, 114:12, 114:24, 115:1, 164:19
**situation** [6] - 4:19, 42:3, 43:8, 50:25, 171:11, 181:10
**six** [4] - 12:15, 52:9, 96:16, 112:5
**Sixth** [1] - 186:4
**sizes** [1] - 71:15
**sketch** [1] - 96:16
**slight** [2] - 72:18, 94:16
**slightly** [2] - 155:1, 173:16
**Slightly** [1] - 79:5
**sloping** [1] - 72:19
**slow** [1] - 96:14
**small** [5] - 63:8, 69:6, 70:6, 70:17, 71:18
**Snitching** [10] - 2:9, 2:10, 3:1, 3:4, 3:11, 3:14, 3:15, 4:2, 4:12, 6:18
**Social** [2] - 46:20, 118:8
**soil** [74] - 63:17, 63:18, 63:19, 64:1, 64:4, 64:6, 65:11, 65:19, 65:23, 67:3, 67:10, 67:11, 67:19, 67:23, 68:1, 68:4, 68:15, 68:21, 69:6, 69:10, 69:12, 70:7, 70:16, 70:17, 70:18, 70:20, 71:1, 71:5, 71:7, 71:8, 71:22, 72:1, 72:2, 72:3, 72:4, 72:5, 72:11, 72:13, 72:17, 72:21, 72:22, 73:9, 73:15, 73:17, 73:22, 73:23, 74:2, 74:3, 74:5, 74:8, 74:10, 74:12, 74:13, 74:14, 74:15, 74:25, 75:1, 75:4, 75:9, 75:12, 75:13, 75:16, 75:22, 75:23, 76:2, 76:20, 78:6, 78:17, 78:20, 78:21, 157:9
**Soil** [1] - 72:3
**soils** [7] - 61:24, 71:10, 71:14, 73:6, 73:14, 74:15, 74:21
**sold** [3] - 120:13, 122:17, 127:2
**sole** [1] - 121:21

**solution** [1] - 2:8
**solutions** [1] - 2:13
**solved** [1] - 2:24
**solving** [1] - 3:9
**someone** [3] - 16:23, 101:8, 147:9
**sometime** [1] - 53:7, 95:19
**sometimes** [10] - 4:8, 23:14, 40:2, 40:4, 56:23, 66:21, 72:2, 74:21, 75:15, 166:19
**Sometimes** [1] - 45:3
**somewhat** [2] - 152:7, 152:8
**somewhere** [3] - 65:3, 112:11, 167:2
**son** [2] - 24:19, 100:5
**sorry** [18] - 6:22, 14:11, 27:16, 31:7, 42:18, 43:12, 63:14, 73:10, 73:13, 81:8, 85:8, 108:18, 119:11, 124:8, 155:22, 158:1, 174:14, 180:15
**Sorry** [3] - 61:11, 99:24, 109:1
**sort** [35] - 20:12, 20:16, 22:25, 27:22, 28:4, 33:19, 37:10, 38:5, 39:14, 43:1, 48:4, 49:13, 61:24, 71:16, 71:17, 71:18, 72:9, 76:18, 77:18, 79:25, 84:24, 85:3, 95:17, 96:13, 110:17, 146:9, 156:15, 160:19, 163:25, 168:6, 180:14, 181:21, 185:18, 186:1, 187:15
**sound** [1] - 7:16
**sounded** [1] - 106:20
**Sounds** [1] - 83:24
**sounds** [8] - 4:19, 76:9, 86:17, 96:7, 147:23, 150:17, 153:5, 185:24
**source** [5] - 62:13, 67:2, 67:5, 67:6, 71:12
**sources** [3] - 62:5, 69:25, 76:15
**south** [1] - 75:10
**South** [2] - 68:14, 93:22
**sovereignty** [1] - 173:13
**space** [1] - 70:14
**Special** [2] - 126:21, 144:16
**specific** [1] - 148:21
**specifically** [9] - 39:16, 43:16, 56:3, 56:4, 65:10, 99:24, 106:12, 144:7,

152:11
**specifics** [1] - 46:2
**speculate** [2] - 93:14, 165:25
**speculation** [2] - 162:10, 166:14
**speculative** [4] - 158:11, 160:24, 160:25, 163:10
**spell** [7] - 11:3, 25:9, 32:14, 61:6, 87:9, 99:14, 108:10
**Spell** [1] - 32:19
**Spence** [57] - 12:5, 32:3, 32:15, 32:16, 32:18, 32:20, 32:23, 33:2, 33:14, 33:23, 34:3, 35:3, 35:5, 35:22, 36:3, 36:13, 36:22, 37:23, 38:20, 38:21, 41:18, 43:15, 43:21, 44:5, 44:24, 45:20, 46:2, 47:19, 48:9, 48:20, 49:7, 50:19, 51:8, 51:11, 51:12, 58:24, 60:24, 82:21, 84:15, 151:21, 152:3, 155:12, 158:20, 160:16, 162:21, 163:8, 175:13, 179:9, 181:25, 182:23, 183:11, 184:7, 184:13, 184:14, 184:15, 184:16, 185:11
**SPENCE** [2] - 32:11, 190:8
**Spence's** [1] - 160:23
**spend** [1] - 98:4
**spent** [1] - 172:6
**spoken** [2] - 175:22, 182:1
**sponsoring** [1] - 81:23
**Sports** [1] - 157:2
**spot** [2] - 67:15, 72:1
**spots** [1] - 67:14
**spring** [1] - 113:17
**springs** [1] - 115:11
**squads** [1] - 4:21
**squared** [1] - 71:17
**squared-off** [1] - 71:17
**stab** [2] - 52:18, 52:20
**stabbed** [6] - 41:10, 52:4, 52:5, 53:8, 53:11
**staffing** [1] - 4:1
**stairs** [3] - 110:11, 110:16, 113:4
**stairwell** [2] - 26:21, 27:22
**stand** [9] - 10:24, 25:5, 80:14, 80:22, 89:20, 101:4, 152:12, 171:12, 186:12

**standard** [3] - 69:18, 71:8, 78:9
**standardized** [1] - 71:7
**standards** [1] - 71:6
**standing** [7] - 8:6, 100:13, 101:5, 101:22, 102:15, 103:6, 103:11
**stands** [1] - 3:15
**star** [3] - 31:4, 105:20, 105:21
**start** [14] - 33:14, 39:15, 71:3, 86:24, 94:25, 98:10, 98:12, 106:16, 146:12, 171:2, 171:4, 171:6, 187:22, 189:3
**started** [4] - 47:12, 105:12, 122:5, 131:11, 142:9, 147:14
**starting** [3] - 187:21, 188:11, 188:13
**starts** [1] - 27:19
**State** [7] - 11:3, 25:9, 61:6, 87:9, 99:14, 108:10, 143:19
**state** [10] - 22:4, 24:20, 24:21, 32:14, 117:18, 126:23, 167:15, 178:3, 186:3
**State's** [5] - 121:22, 128:14, 143:10, 143:12, 143:20
**Statement** [7] - 124:1, 124:12, 124:15, 124:19, 126:4, 126:13, 126:17
**statement** [28] - 24:21, 48:6, 55:14, 59:18, 60:5, 102:23, 122:7, 126:25, 140:18, 143:4, 161:23, 162:1, 162:24, 172:16, 172:21, 174:4, 175:7, 175:8, 175:9, 179:3, 179:5, 179:6, 180:18, 180:24, 180:25, 181:2, 184:18, 184:24
**statements** [9] - 81:25, 85:2, 174:3, 174:7, 176:8, 178:20, 178:24, 182:14, 186:1
**STATES** [2] - 1:1, 1:5
**States** [6] - 10:23, 25:4, 61:1, 87:4, 99:8, 108:5
**stationed** [7] - 88:24, 88:25, 90:5, 90:9, 90:10, 90:19, 93:5
**stay** [1] - 185:22
**staying** [1] - 15:6
**stenographically** [1] - 191:4
**step** [9] - 71:21, 100:14, 101:9, 102:2, 103:22,

103:23, 104:15, 161:25, 187:23
**stepped** [1] - 103:22
**stepping** [1] - 84:14
**steps** [1] - 27:6
**Steve** [4] - 129:23, 135:1, 135:19, 136:19
**Stevenswood** [6] - 88:25, 89:12, 92:12, 92:16, 92:17, 92:18
**still** [23] - 3:20, 28:12, 35:23, 38:23, 58:13, 93:1, 99:1, 107:16, 110:25, 115:5, 123:1, 138:6, 145:9, 148:20, 149:24, 165:22, 167:10, 174:6, 176:19, 180:22, 187:21
**Stipulation** [1] - 59:7
**stipulation** [2] - 148:15, 148:22
**stock** [1] - 79:25
**stones** [1] - 61:24
**stoop** [3] - 101:21, 102:5, 104:13
**stop** [4] - 51:3, 51:5, 107:1, 134:1
**Stop** [10] - 2:9, 3:1, 3:4, 3:11, 3:14, 3:15, 4:2, 4:12, 6:18
**stopped** [1] - 141:18
**stored** [1] - 15:7
**stores** [1] - 80:5
**story** [9] - 2:8, 2:12, 5:9, 5:10, 5:14, 110:7, 110:8
**Straight** [1] - 31:13
**straight** [2] - 31:16, 98:13
**street** [21] - 33:9, 33:11, 57:16, 57:19, 58:4, 89:9, 89:12, 89:15, 90:5, 100:14, 101:9, 101:15, 101:17, 102:9, 103:23, 104:3, 104:18, 106:17, 106:24, 165:10
**Street** [18] - 1:25, 33:5, 39:23, 39:24, 46:25, 52:11, 52:12, 81:22, 86:4, 109:17, 109:22, 118:13, 118:14, 119:24, 141:15, 141:16, 169:20, 170:20
**streets** [1] - 38:3
**stretch** [1] - 184:23
**stretches** [1] - 93:23
**strike** [1] - 106:22
**string** [1] - 102:20
**strings** [3] - 17:10, 17:17, 17:18
**strong** [3] - 10:6,

168:17, 185:4
**strongest** [2] - 164:15, 168:7
**studied** [1] - 169:25
**stuff** [6] - 20:15, 84:16, 84:17, 86:6, 123:11, 182:17
**subject** [5] - 12:23, 13:18, 84:21, 132:20, 170:1
**subjects** [2] - 12:8, 13:17
**submitted** [3] - 74:24, 75:14, 116:9
**subsequent** [1] - 3:11
**subsequently** [2] - 128:13, 153:15
**substantial** [3] - 35:16, 80:25, 155:10
**succeeded** [1] - 81:4
**suddenly** [1] - 73:5
**suggest** [1] - 186:9
**suggested** [5] - 7:19, 103:15, 103:18, 103:21, 104:14
**suggesting** [1] - 177:10
**suits** [1] - 63:1
**summarize** [1] - 182:5
**summary** [1] - 167:1
**summoned** [1] - 87:23
**Sun** [5] - 2:12, 2:19, 9:13, 9:14, 9:16
**Sunday** [5] - 2:11, 2:19, 5:25, 9:13, 9:23
**Sunpapers** [2] - 5:24, 9:23
**Supermax** [5] - 177:12, 177:13, 177:17, 177:25, 178:9
**supervised** [1] - 85:21
**supervisor** [4] - 112:7, 134:24, 135:16, 136:17
**supplied** [1] - 156:23
**Supplying** [1] - 178:16
**support** [3] - 13:20, 63:1, 147:18
**supporting** [1] - 13:13
**supposed** [4] - 5:19, 46:14, 130:24, 152:13
**suppression** [1] - 171:25
**surely** [1] - 149:14
**surface** [1] - 72:23
**surfaces** [1] - 69:23
**surprise** [1] - 54:4
**surprised** [2] - 149:16, 175:2
**surrendered** [1] - 141:10
**surrounding** [1] - 69:13

**surveillance** [2] - 155:15, 161:14
**survive** [1] - 9:1
**suspect** [2] - 88:13, 97:6
**suspected** [5] - 113:18, 113:19, 114:7, 114:16, 137:8
**suspects** [7] - 4:13, 22:10, 88:4, 88:18, 88:24, 89:22, 91:4
**suspicion** [2] - 10:2, 41:4
**Sustained** [2] - 128:25, 144:10
**sustained** [1] - 142:18
**swamping** [1] - 3:17
**swear** [2] - 135:20, 135:25
**sweep** [2] - 131:13, 131:20
**swept** [1] - 72:6
**swoop** [1] - 97:13
**sworn** [1] - 61:11
**SWORN** [7] - 10:25, 25:6, 32:11, 61:3, 87:6, 99:11, 108:7
**system** [1] - 69:17

---

# T

**T-shirt** [5] - 15:3, 19:11, 19:12, 19:14, 19:19
**table** [4] - 16:7, 18:18, 70:2, 70:10
**tag** [2] - 16:22
**Tahlil** [1] - 59:9
**tail** [2] - 163:12, 168:6
**taint** [2] - 7:17, 7:20
**tainted** [1] - 5:3
**talent** [1] - 3:10
**talks** [2] - 4:8, 59:13
**tape** [2] - 47:20, 66:10
**target** [1] - 4:22
**task** [1] - 64:4
**tattered** [1] - 16:25
**Taurus** [1] - 46:3
**Tavon** [1] - 12:11
**team** [1] - 82:21
**technicians** [1] - 150:12
**teenager** [1] - 169:19
**telephone** [2] - 50:6, 118:24
**television** [1] - 5:7
**ten** [17] - 68:2, 68:4, 68:8, 68:10, 75:24, 119:23, 119:25, 138:22, 141:14, 157:12, 157:14, 159:21, 167:4, 167:5,

187:25, 188:13, 188:14
**Ten** [2] - 44:19, 138:24
**tenant** [1] - 121:21
**tender** [1] - 64:8
**tendered** [2] - 65:7, 65:10
**tense** [1] - 181:14
**tension** [1] - 41:7
**terms** [7] - 2:25, 14:1, 33:10, 37:2, 48:10, 74:22, 184:2
**terrain** [1] - 72:14
**terribly** [1] - 95:16
**terrified** [1] - 82:6
**test** [3] - 71:4, 71:13, 79:5
**tested** [1] - 75:6
**testified** [6] - 21:24, 106:16, 129:24, 143:4, 161:8
**testify** [19] - 34:18, 34:22, 82:6, 82:7, 84:16, 85:4, 86:5, 93:12, 102:23, 140:23, 144:22, 150:4, 150:13, 152:15, 152:18, 152:20, 154:1, 165:25, 182:8
**testifying** [4] - 12:14, 148:8, 174:4, 182:13
**testimony** [24] - 3:4, 49:8, 53:5, 53:16, 53:23, 57:1, 93:18, 106:18, 106:21, 130:25, 139:1, 139:9, 144:17, 158:16, 161:11, 162:20, 162:23, 164:2, 164:5, 167:1, 182:6, 183:14, 187:15
**textural** [1] - 71:19
**texture** [1] - 71:14
**TFO** [2] - 156:17, 156:22
**Thanksgiving** [2] - 145:8, 145:10
**THE** [345] - 1:1, 1:2, 2:2, 2:4, 5:21, 6:11, 6:22, 7:2, 7:5, 7:7, 7:11, 8:1, 8:20, 8:23, 9:2, 9:10, 10:1, 11:1, 11:2, 11:4, 11:8, 14:8, 18:19, 18:20, 20:1, 22:18, 23:20, 23:23, 24:8, 24:9, 24:10, 24:14, 24:18, 25:7, 25:8, 25:11, 31:1, 31:7, 31:14, 31:21, 31:22, 32:1, 32:4, 32:7, 32:9, 32:12, 32:13, 32:15, 32:16, 32:18, 32:19, 32:20, 34:2, 46:5, 46:6, 60:18, 60:24, 61:4, 61:5, 61:7, 61:13, 61:15, 64:11, 64:13, 65:6,

65:14, 79:7, 80:8, 80:17, 80:20, 81:8, 81:13, 81:15, 81:18, 81:20, 81:23, 82:1, 82:5, 82:9, 82:12, 82:15, 82:19, 82:22, 82:25, 83:3, 83:7, 83:18, 83:24, 84:1, 84:5, 84:8, 84:10, 84:12, 84:18, 84:21, 85:6, 85:9, 85:15, 85:18, 85:24, 86:2, 86:7, 86:12, 86:14, 86:17, 87:2, 87:7, 87:8, 87:10, 92:6, 92:13, 94:11, 94:13, 94:14, 95:13, 95:24, 96:4, 96:7, 96:11, 96:19, 96:24, 97:3, 97:17, 97:19, 97:24, 98:6, 98:17, 98:21, 98:25, 99:3, 99:5, 99:9, 99:12, 99:13, 99:15, 108:2, 108:4, 108:8, 108:9, 108:11, 116:21, 119:11, 119:13, 119:16, 119:18, 122:1, 123:19, 127:11, 128:25, 135:5, 142:13, 142:18, 144:10, 144:13, 144:25, 145:3, 146:15, 146:19, 146:21, 146:23, 147:4, 147:6, 147:8, 147:13, 147:19, 147:23, 148:5, 148:10, 148:12, 148:18, 148:21, 148:24, 149:3, 149:8, 149:10, 149:14, 149:17, 149:19, 149:22, 149:25, 150:3, 150:6, 150:9, 150:14, 150:17, 150:20, 150:23, 150:25, 151:11, 151:13, 152:15, 152:20, 152:25, 153:3, 153:5, 153:9, 153:17, 153:20, 153:24, 154:4, 154:11, 154:16, 154:19, 154:21, 155:3, 155:9, 155:17, 155:22, 155:25, 156:3, 156:7, 156:11, 156:14, 156:21, 157:4, 157:16, 157:24, 158:1, 158:5, 158:8, 158:10, 158:14, 158:19, 159:2, 159:13, 159:15, 159:17, 159:19, 159:24, 160:8, 160:20, 161:3, 161:19, 162:18, 163:14, 164:10, 164:21, 165:3, 166:5, 166:16, 166:18, 166:22, 167:12, 167:22, 167:24, 168:2, 168:12, 168:15, 168:19, 169:7, 169:10, 169:13, 169:15, 169:17, 169:19, 169:22, 170:4,

170:9, 170:11, 170:15, 170:21, 170:25, 171:6, 171:14, 171:17, 171:23, 172:7, 172:13, 172:15, 172:25, 173:5, 173:8, 173:20, 173:23, 174:12, 174:14, 174:18, 174:20, 174:25, 175:9, 175:12, 175:16, 175:18, 175:21, 176:1, 176:5, 176:11, 176:13, 176:16, 176:21, 176:24, 177:2, 177:5, 177:8, 177:10, 177:14, 177:18, 177:23, 178:2, 178:6, 178:8, 178:18, 178:25, 179:3, 179:12, 179:16, 179:20, 180:1, 180:15, 180:17, 180:24, 181:4, 181:8, 181:13, 181:15, 181:17, 182:5, 182:10, 182:24, 183:6, 183:9, 183:15, 183:19, 183:22, 183:25, 184:5, 184:10, 185:3, 185:10, 185:14, 185:21, 185:25, 186:5, 186:8, 186:13, 186:17, 186:19, 187:9, 187:22, 188:6, 188:13, 188:16, 188:19, 188:24, 189:3, 189:7
**theirs** [1] - 86:6
**theme** [1] - 187:3
**themselves** [3] - 71:3, 71:16, 140:11
**theorization** [1] - 166:14
**theorize** [1] - 166:1
**theory** [7] - 2:16, 156:22, 157:3, 158:11, 162:24, 162:25, 184:7
**thereabouts** [3] - 100:6, 106:5, 106:13
**Thereabouts** [1] - 106:14
**thereafter** [2] - 126:15, 138:17
**therefore** [1] - 172:17
**they've** [1] - 168:9
**thinking** [3] - 48:22, 60:1, 188:13
**thinks** [1] - 159:8
**third** [4] - 101:2, 101:3, 133:2, 133:4
**Thirteen** [1] - 11:16
**Thomas** [1] - 1:20
**thorough** [1] - 137:24
**thoroughly** [2] - 132:21, 187:12
**Thousands** [2] - 63:20, 63:21

**threat** [3] - 128:21, 141:3, 141:4
**threatening** [3] - 128:2, 128:5, 128:6
**three** [37] - 2:20, 4:16, 8:17, 59:3, 78:8, 95:19, 97:1, 98:11, 111:18, 112:8, 112:14, 114:17, 120:21, 125:5, 125:9, 126:19, 130:4, 133:25, 136:2, 138:1, 138:5, 138:7, 140:1, 142:9, 144:6, 144:16, 154:14, 154:19, 161:14, 161:21, 163:18, 163:20, 164:5, 167:8, 173:3, 185:8, 185:22
**Three** [7] - 81:14, 81:15, 111:18, 137:11, 154:20, 154:21
**three-quarters** [1] - 2:20
**Thursday** [6] - 94:20, 95:1, 96:20, 96:21, 97:5, 150:18
**thwarted** [1] - 153:13
**tied** [4] - 22:22, 165:1, 183:10
**ties** [2] - 163:4, 163:5
**tight** [2] - 43:23, 44:1
**Timberland** [2] - 15:25, 20:23
**timing** [2] - 94:15, 161:15
**TIMOTHY** [2] - 87:6, 190:14
**Timothy** [3] - 82:13, 87:5, 87:10
**Tincher** [1] - 56:7
**today** [18] - 7:24, 12:15, 24:2, 30:16, 37:10, 49:8, 59:15, 81:5, 81:11, 84:10, 84:11, 85:11, 102:23, 124:24, 145:15, 148:4, 149:11, 162:20
**together** [10] - 27:19, 70:9, 78:3, 81:9, 96:7, 152:3, 161:17, 179:1, 182:18, 186:1
**tomorrow** [37] - 83:9, 83:11, 83:16, 83:20, 84:12, 84:14, 85:7, 85:9, 86:9, 86:11, 94:20, 95:17, 98:10, 98:12, 98:23, 98:24, 145:11, 145:23, 146:11, 146:13, 146:16, 147:10, 147:11, 147:16, 147:22, 147:24, 148:3, 168:22, 170:1, 171:2, 171:5, 171:7,

186:11, 186:13, 188:7, 189:8
**tons** [1] - 162:7
**Tonya** [13] - 12:5, 38:20, 38:21, 41:2, 46:16, 82:21, 151:21, 160:16, 160:23, 175:13, 181:24, 184:14, 184:16
**Tonya's** [2] - 47:22, 48:1, 48:7
**Took** [1] - 121:23
**took** [25] - 13:15, 14:1, 16:3, 16:18, 22:7, 22:12, 52:25, 78:6, 104:14, 106:4, 120:4, 122:4, 122:23, 124:5, 140:13, 140:18, 151:7, 155:14, 161:25, 162:25, 174:17, 174:19, 174:21, 175:4, 182:9
**tools** [3] - 70:3, 70:6, 70:10
**top** [13] - 29:5, 96:15, 113:18, 113:19, 114:5, 114:16, 114:17, 115:7, 115:9, 115:13, 136:9, 176:9
**topic** [1] - 18:8
**tops** [2] - 125:15, 125:16
**torn** [2] - 16:25, 105:1
**total** [5] - 63:13, 67:12, 137:5, 163:19, 167:4
**totaled** [1] - 137:7
**touched** [1] - 187:11
**toward** [10] - 11:2, 25:9, 32:13, 61:5, 87:8, 99:13, 104:15, 106:17, 106:23, 108:9
**towards** [9] - 30:23, 90:6, 90:11, 90:22, 103:23, 103:24, 141:17, 172:24
**town** [6] - 8:21, 38:1, 39:2, 39:17, 109:10, 109:11
**toxicologist** [1] - 98:3
**trace** [1] - 157:8
**trade** [3] - 57:18, 57:24, 165:8
**trafficking** [4] - 49:10, 84:16, 150:22, 182:13
**Trail** [1] - 2:13
**training** [1] - 62:17
**trajectories** [1] - 97:22
**transactions** [1] - 170:12
**transcribed** [1] - 191:7
**transcript** [1] - 191:7
**transcripts** [1] - 181:20

**transferred** [4] - 67:9, 74:2, 74:6, 74:8
**transfers** [1] - 163:2
**travel** [1] - 59:13
**treads** [1] - 70:7
**treating** [1] - 163:25
**trial** [7] - 6:14, 10:4, 24:20, 24:21, 96:16, 161:23, 177:6
**trials** [1] - 34:23
**tried** [3] - 96:1, 111:13, 178:3
**trigger** [1] - 159:9
**true** [7] - 72:16, 127:5, 135:20, 136:1, 161:20, 167:24, 172:23
**truth** [2] - 36:12, 36:14
**truthful** [1] - 49:10
**try** [4] - 81:3, 168:9, 171:12, 176:8
**trying** [7] - 47:7, 62:4, 81:9, 88:3, 158:16, 159:3, 170:17
**Tuesday** [6] - 1:11, 94:24, 149:6, 187:24, 188:5, 188:9
**turn** [1] - 119:22
**Turn** [1] - 32:9
**turned** [3] - 24:2, 103:24, 175:24
**turning** [1] - 169:10
**turns** [1] - 185:5
**twelve** [1] - 44:19
**Two** [3] - 81:15, 115:25, 130:6
**two** [78] - 3:8, 9:13, 12:2, 12:7, 12:8, 13:17, 16:7, 27:6, 28:1, 28:3, 28:7, 29:8, 29:15, 30:6, 30:13, 30:21, 44:17, 54:16, 59:3, 62:6, 74:15, 74:25, 75:1, 75:3, 75:5, 77:10, 77:12, 77:22, 78:4, 80:24, 83:4, 95:18, 100:11, 101:5, 101:20, 104:5, 105:11, 105:14, 107:6, 107:8, 110:8, 114:6, 115:24, 133:6, 138:16, 147:1, 149:23, 150:12, 151:4, 151:6, 151:8, 151:14, 151:15, 154:11, 155:24, 156:8, 156:15, 157:1, 158:21, 160:18, 161:15, 163:19, 164:1, 165:15, 165:16, 167:3, 167:6, 180:11, 180:21, 181:2
**tying** [1] - 165:2
**type** [7] - 6:11, 17:14, 62:11, 69:19, 72:5,

72:17, 186:15
**types** [8] - 62:6, 62:17, 62:18, 72:13, 74:25, 75:3, 75:5
**typically** [3] - 15:16, 62:6, 74:17

## U

**U.S** [1] - 1:24
**ultimate** [1] - 67:6
**Ultimately** [2] - 33:19, 48:25
**ultimately** [3] - 35:7, 35:8, 37:10
**Um-hum** [4] - 26:22, 27:20, 32:24, 56:10
**unattended** [1] - 139:18
**unaware** [1] - 178:11
**uncharged** [7] - 163:9, 163:11, 163:21, 164:15, 164:24, 165:18, 168:9
**unclear** [2] - 23:15, 174:16
**Under** [4] - 100:25, 101:1, 137:4
**under** [14] - 14:17, 15:20, 28:9, 35:19, 35:23, 49:7, 59:7, 72:20, 83:18, 134:3, 144:22, 160:2, 160:5, 168:6
**understood** [5] - 51:11, 54:1, 127:20
**Understood** [2] - 46:9, 139:21
**undue** [1] - 163:16
**unfair** [2] - 162:12, 163:5, 163:16
**unfairly** [2] - 164:25, 165:3
**unfolded** [1] - 17:1
**Unfortunate** [1] - 129:6
**uniform** [1] - 89:5
**Union** [1] - 3:25
**Unit** [4] - 11:12, 11:20, 11:21, 13:14
**United** [6] - 10:23, 25:4, 61:1, 87:4, 99:8, 108:5
**UNITED** [1] - 1:1, 1:5
**University** [1] - 62:16
**Unless** [2] - 22:14, 24:25
**unless** [1] - 74:16
**unlikely** [1] - 188:4
**unlocked** [2] - 111:7
**unmarked** [1] - 123:7
**unobjectionable** [1] - 186:25
**unusual** [3] - 26:13,

101:6, 101:8
**up** [100] - 2:19, 8:4, 16:18, 23:5, 24:14, 25:8, 25:21, 28:9, 32:6, 33:2, 33:9, 33:10, 33:12, 38:5, 39:15, 39:16, 41:25, 43:1, 44:9, 50:23, 51:3, 54:13, 54:18, 63:23, 66:13, 67:3, 67:4, 69:12, 69:19, 70:14, 76:2, 77:14, 84:14, 85:13, 86:10, 88:22, 90:14, 91:3, 93:19, 97:1, 100:20, 101:14, 101:17, 102:16, 105:1, 105:11, 106:21, 107:20, 110:12, 110:15, 112:15, 113:1, 113:2, 113:4, 113:16, 115:1, 115:21, 120:1, 120:14, 120:22, 122:3, 122:17, 122:19, 123:2, 127:2, 128:3, 128:11, 128:12, 130:7, 131:10, 133:5, 136:9, 136:16, 136:23, 137:7, 137:15, 139:2, 139:8, 139:24, 142:25, 143:4, 143:18, 143:20, 157:1, 161:15, 163:24, 164:1, 165:14, 170:4, 170:6, 170:19, 170:23, 171:21, 178:4, 178:9, 182:18, 188:15
**Up** [1] - 101:15
**upper** [1] - 31:4
**Upper** [1] - 44:10
**upshot** [1] - 180:18
**upstairs** [1] - 131:25, 133:1, 133:2, 133:12, 158:25
**US** [1] - 34:5
**USA** [1] - 191:4
**utilized** [1] - 118:20

## V

**vacuumed** [1] - 69:23
**vaguely** [1] - 158:23
**value** [3] - 71:7, 152:8, 185:7
**variance** [1] - 75:16
**variances** [1] - 75:11
**variation** [3] - 75:13, 77:2, 77:4
**Various** [2] - 37:21, 37:22
**various** [15] - 22:14, 23:12, 35:3, 62:5, 62:17, 63:6, 66:17, 67:14, 67:19, 70:3, 75:8,

125:10, 125:12, 133:17, 133:18

**vary** [5] - 39:25, 40:2, 72:2, 72:3, 78:11

**vehicle** [18] - 89:7, 89:8, 90:6, 90:18, 90:19, 90:22, 92:15, 92:19, 93:3, 123:5, 123:7, 123:10, 123:11, 139:5, 139:7, 139:16

**verbal** [2] - 41:12, 120:6

**verbally** [2] - 126:6, 140:19

**version** [2] - 185:21, 185:23

**versus** [1] - 66:24

**veteran** [1] - 3:10

**vial** [2] - 125:15, 125:16

**vials** [10] - 113:18, 113:19, 114:13, 114:16, 114:17, 115:9, 115:13, 125:19, 137:8

**viciously** [1] - 187:7

**victim** [2] - 13:15, 153:17

**victim's** [2] - 154:10, 162:6

**victims** [2] - 156:8, 167:3

**video** [1] - 3:5

**videos** [1] - 2:10

**view** [4] - 45:24, 92:13, 164:23, 187:15

**violation** [4] - 6:6, 9:18, 10:10, 177:11

**Virginia** [1] - 61:19

**visible** [1] - 17:3

**vision** [1] - 94:5

**visit** [1] - 146:8

**voice** [2] - 50:16, 141:12

**voir** [4] - 6:17, 6:24, 7:19, 64:10

**VOLUME** [1] - 1:11

**voluntarily** [1] - 131:19

**voluntariness** [2] - 172:7, 172:19

**voluntary** [1] - 172:17

### W

**W-E-S-L-E-Y** [1] - 25:12

**W-I-S-N-I-E-S-K-I** [1] - 99:16

**wagging** [1] - 163:12, 168:6

**Wahl** [1] - 118:20

**waistband** [3] - 19:23, 22:21, 22:22

**wait** [2] - 83:16, 161:14

**waited** [5] - 47:10, 119:24, 120:15, 138:21, 138:24

**waiting** [1] - 47:2

**waived** [1] - 177:14

**waiver** [1] - 177:23

**walk** [6] - 74:1, 76:1, 110:9, 110:15, 133:5, 150:25

**walked** [4] - 74:7, 103:24, 106:23, 141:15

**walking** [5] - 74:4, 74:8, 74:14, 105:13, 120:1

**wants** [3] - 82:17, 148:9, 174:6

**warning** [4] - 120:6, 121:4, 123:9, 140:12

**warnings** [4] - 112:12, 140:7, 140:18, 144:2, 144:3, 172:22

**warrant** [28] - 82:7, 99:1, 109:14, 110:19, 111:10, 111:15, 112:7, 120:16, 127:17, 128:7, 129:2, 129:7, 129:15, 129:16, 129:18, 129:20, 130:15, 130:22, 131:2, 131:5, 134:6, 134:17, 134:19, 135:7, 135:21, 136:10, 139:24, 147:18

**warrants** [3] - 129:5, 129:11, 134:16

**watching** [1] - 107:22

**water** [2] - 18:19, 64:11

**Wayne** [3] - 12:10, 157:2, 181:6

**WAYNE** [1] - 1:8

**ways** [1] - 94:5

**weapon** [17] - 45:2, 45:5, 45:21, 151:22, 154:16, 155:19, 155:23, 155:25, 156:1, 161:20, 163:23, 163:24, 164:3, 164:4, 164:7, 168:3

**weapons** [12] - 110:20, 130:1, 130:10, 130:13, 131:8, 131:17, 132:11, 132:18, 155:24, 156:5, 158:21, 163:19

**wear** [1] - 29:13

**wearing** [3] - 29:15, 102:7, 102:20

**Wednesday** [2] - 95:1, 146:13

**week** [28] - 2:24, 83:15, 94:21, 94:22, 94:23, 95:2, 95:4, 96:17, 96:18, 97:1, 145:7, 145:12, 145:13, 145:22, 145:25,

147:25, 148:9, 148:14, 149:4, 149:11, 158:15, 173:10, 173:14, 186:17, 186:21, 188:9

**weekend** [1] - 173:16

**weekly** [1] - 165:20

**weeks** [2] - 160:18, 163:24

**weigh** [1] - 163:16

**weighing** [2] - 164:10, 164:11

**welcome** [1] - 108:4

**Welsh** [7] - 85:13, 85:20, 148:2, 148:12, 148:14, 149:3, 150:12

**Wesley** [16] - 24:17, 24:19, 25:5, 25:11, 25:15, 25:23, 27:8, 29:23, 30:12, 31:2, 31:7, 31:10, 31:14, 31:17, 31:20, 32:1

**WESLEY** [2] - 25:6, 190:7

**West** [6] - 1:25, 33:3, 33:4, 38:2, 39:23, 151:6

**west** [3] - 68:5, 75:10, 109:11

**whatsoever** [2] - 56:15, 165:4

**whereas** [1] - 179:5

**Whereof** [1] - 191:9

**white** [9] - 19:11, 73:3, 102:20, 113:18, 113:19, 114:7, 114:16, 115:13, 125:16

**whole** [17] - 8:25, 50:25, 60:2, 73:4, 109:3, 114:25, 115:21, 128:7, 133:9, 134:2, 134:3, 149:13, 157:18, 157:25, 163:6, 164:14, 184:16

**Whole** [2] - 157:25, 158:1

**widely** [1] - 80:3

**wife** [23] - 38:19, 38:25, 39:7, 39:10, 40:16, 40:22, 41:2, 41:9, 44:11, 45:6, 46:12, 46:16, 46:21, 47:4, 47:15, 49:24, 49:25, 51:18, 51:25, 52:9, 55:16, 56:15, 59:25

**wife's** [4] - 44:20, 48:16, 50:17, 52:15

**William** [1] - 41:18

**Williams** [14] - 85:14, 86:4, 110:24, 111:20, 111:25, 112:1, 119:2, 120:24, 121:13, 121:20, 127:15, 131:21, 146:18

**Williams's** [1] - 120:22

**Willie** [1] - 191:4

**WILLIE** [1] - 1:7

**willing** [3] - 4:4, 4:6, 172:4

**Windsor** [2] - 99:23, 99:24

**wiped** [1] - 69:23

**wiping** [1] - 70:9

**wish** [1] - 183:18

**Wisnieski** [12] - 84:6, 96:5, 99:8, 99:10, 99:15, 99:19, 100:2, 101:4, 102:22, 105:25, 108:2

**WISNIESKI** [2] - 99:11, 190:16

**Wisnieski's** [1] - 95:22

**withdrawing** [1] - 7:3

**WITNESS** [37] - 10:25, 11:1, 11:4, 18:20, 24:9, 25:6, 25:7, 25:11, 31:21, 32:11, 32:12, 32:15, 32:18, 32:20, 46:6, 61:3, 61:4, 61:7, 64:13, 87:6, 87:7, 87:10, 94:13, 99:11, 99:12, 99:15, 108:4, 108:7, 108:8, 108:11, 190:4, 190:7, 190:8, 190:10, 190:14, 190:16, 190:18

**Witness** [1] - 191:9

**witness** [45] - 3:23, 7:14, 9:5, 10:22, 13:20, 14:6, 23:22, 24:12, 24:16, 32:2, 32:6, 34:1, 60:25, 61:11, 65:6, 65:10, 79:5, 80:21, 80:22, 80:23, 81:2, 81:5, 81:6, 81:24, 83:15, 84:2, 85:11, 87:3, 89:20, 96:1, 98:21, 99:6, 101:4, 123:17, 127:9, 134:25, 135:6, 135:10, 147:18, 162:21, 171:10, 171:13, 171:19, 184:9, 188:2

**witnessed** [1] - 135:6

**witnesses** [20] - 3:20, 4:3, 80:24, 81:3, 81:10, 84:23, 84:25, 85:1, 85:4, 86:8, 94:15, 95:20, 96:3, 98:12, 98:23, 149:25, 158:15, 168:22, 188:18, 188:22

**woman** [1] - 121:5

**women** [6] - 112:8, 120:21, 132:2, 132:14, 132:18, 140:1

**wonder** [1] - 166:18

**wondering** [4] - 19:16, 82:15, 83:18, 188:2

**wooded** [3] - 67:16, 88:19, 94:2

**Woodlawn** [3] - 87:21, 99:20, 99:22

**woods** [18] - 73:10, 73:13, 75:9, 82:24, 91:5, 91:14, 93:17, 93:23, 104:21, 104:23, 105:1, 105:2, 105:6, 151:20, 157:8, 160:15, 160:23

**word** [4] - 91:3, 100:23, 147:14, 185:22

**words** [6] - 6:22, 51:22, 54:1, 122:15, 143:1, 151:2

**works** [1] - 153:23

**world** [2] - 159:20, 165:7

**worried** [1] - 47:12

**worry** [1] - 43:5

**worth** [5] - 43:13, 43:24, 51:1, 60:3

**wounding** [1] - 151:10

**wounds** [1] - 167:3

**write** [1] - 120:8

**writing** [4] - 16:13, 134:22, 176:6

**written** [10] - 102:24, 123:8, 123:9, 127:3, 127:7, 132:6, 132:8, 139:22, 139:25, 174:23

**wrote** [2] - 103:2, 120:16, 121:4, 124:9, 134:20, 134:23, 135:17, 175:20, 178:22

**Wyche** [8] - 85:20, 151:3, 151:17, 152:3, 155:1, 155:19, 155:23, 158:19

### X

**XVII** [1] - 1:11
**XXXVII** [1] - 1:11

### Y

**yard** [2] - 72:17

**yards** [1] - 164:4

**Yasin** [1] - 59:9

**year** [1] - 38:5

**years** [28] - 8:25, 11:14, 11:16, 12:15, 27:21, 33:16, 36:2, 37:11, 38:10, 49:4, 55:4, 55:7, 55:10, 62:25, 63:15, 65:17, 87:19, 108:25, 109:2, 109:5, 126:19, 144:6, 144:17, 173:3,

180:11, 181:2
  **yesterday** [4] - 2:7, 5:9,
9:4, 11:9
  **York** [2] - 3:7, 59:13
  **young** [2] - 27:17, 27:18
  **younger** [1] - 169:4
  **yourself** [2] - 42:10,
45:8

## Z

  **Zajac** [3] - 1:24, 191:3,
191:14
  **zoom** [1] - 27:10