1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION


UNITED STATES OF AMERICA

     v.                          CRIMINAL CASE NO.
                                  AMD-04-029

WILLIE MITCHELL,
SHELTON HARRIS,
SHELLY WAYNE MARTIN,
SHAWN GARDNER,

    Defendants
_____/

VOLUME XVIII OF XXXVII
Wednesday, October 29, 2008
Baltimore, Maryland


Before:  Honorable Andre M. Davis, Judge
            And a Jury

Appearances:
     On Behalf of the Government:
      Robert Harding, Esquire
      Michael Hanlon, Esquire
     On Behalf of Defendant Mitchell:
      Laura Kelsey Rhodes, Esquire
      Michael E. Lawlor, Esquire
     On Behalf of Defendant Harris:
      Gerard P. Martin, Esquire
      Paul Flannery, Esquire
     On Behalf of Defendant Martin:
      Thomas L. Crowe, Esquire
      James G. Pyne, Esquire
     On Behalf of Defendant Gardner:
      Adam H. Kurland, Esquire
      Barry Coburn, Esquire

Reported by:
Mary M. Zajac, RPR
Room 5515, U.S. Courthouse
101 West Lombard Street
Baltimore, Maryland 21201

2

1          (Proceedings at 9:44 a.m.)

2          THE COURT:  I understand we're still waiting for a

3     juror.

4          MR. KURLAND:  Judge, can I be heard briefly on one

5     issue which I believe relates to Detective Welsh, the officer who

6     is going to testify concerning the Lee shooting?

7          THE COURT:  Absolutely, Mr. Kurland.  Good morning.

8          MR. KURLAND:  Again, I know there's some, amongst

9     defense counsel there was some about whether or not he's going to

10    testify today.  But assuming he testifies today, I just wanted to

11    get clarification.  I thought about it and went back on my notes

12    about the Court's ruling and i just want to make clear that

13    they're going to be able to testify that there was a death in

14    order to, as fair evidence with respect to the corroboration of

15    the statements concerning the bodies.  But then with respect to

16    the underlying substance of what actually happened, it's my

17    understanding that this is setting up ballistics testimony.

18         So the government will be able to testify that there

19    was a shooting, but unless I get into it on cross, I don't think

20    they should be able to get into the fact that the guy that wasn't

21    shot ran away and first called County Sports, because that goes

22    beyond the ballistics.

23         That might be opened on a question from cross.  But

24    it's my understanding that if it's just limited to ballistics at

25    first, that the shooting and then the bullets are ultimately

1    going to be matched, but that they shouldn't be able to get into

2    the fact that Lee had drugs in his house and that the third

3    person ran away and called County Sports.

4         And I just want to make sure that that's the parameters

5    of the direct testimony, that's not going to come in on direct.

6    And whether it's open or not depends on what type of cross

7    examination the defense does.

8         THE COURT:  Let me hear from Mr. Harding, or Mr.

9    Hanlon.

10        MR. HARDING:  May I have just a moment, Your Honor?

11        THE COURT:  Certainly.

12        MR. HARDING:  Can I respond when Detective Benson gets

13   back, Your Honor?  I don't know where he is.

14        THE COURT:  Certainly.  But I'm not sure you need him

15   to answer this specific question.  I take it what Mr. Kurland is

16   saying in light of my ruling yesterday is that I think I used the

17   term "sanitized" or something like that.  But anyway, the point

18   of the Lee/Epps shooting is to show the connection and provide a

19   basis for an argument with respect to the continuity of

20   possession and use of these weapons as a basis for circumstantial

21   evidence, to show that, for example, it is likely that the person

22   who was involved in the Wyche murders was also involved in the

23   Tonya Jones Spence murder, and that's revealed by the fact that

24   the two respective weapons, one used in the Wyche murders and the

25   other found near or at the scene of the Tonya Jones Wyche (sic)

1    murder were several weeks after the Wyche brothers murders and a

2    month or so before the Tonya Jones Spence murder, were present at

3    the same time and were used in a street shooting in Baltimore

4    City.  And I wouldn't preclude evidence that the street shooting,

5    the uncharged shooting was drug-related.

6            So Mr. Kurland is essentially asking, how far do you

7    intend to go --

8            MR. HARDING:  Well --

9            THE COURT:  -- in proving up the Lee Epps shooting?

10           MR. HARDING:  I don't intend to go at all far, Your

11   Honor.  But the reason I wanted to talk to Benson is that there

12   is this telephone contact with County Sports.  And I know that

13   the agent who's going to be testifying about telephone toll

14   analysis in a general way at the end of this trial, I think he

15   intended to include the fact that there was a telephone call that

16   connected the Lee shooting to County Sports at least.

17           THE COURT:  Okay.

18           MR. HARDING:  Which is the place that was owned by

19   Goose and where Mr. Martin also worked.  That's not ballistics

20   evidence.  That's telephone toll evidence.

21           THE COURT:  Exactly.  And I'm trying to understand the

22   relevance of the telephone toll records in that regard.

23           Who do you assert made the phone call and using what

24   phone?

25           MR. HARDING:  That's what I need to talk to Detective

1    Benson about, Your Honor.  I'm actually a little hazy about this,

2    Your Honor.

3              THE COURT:  Okay.

4              MR. HARDING:  But the point is we're trying to connect

5    up some disparate events in this case that the defense claim are

6    not connected.

7              THE COURT:  Right.

8              MR. HARDING:  The telephone toll is not ballistics

9    evidence but it's connecting evidence.  It connects up the events

10   in this case.

11             THE COURT:  That's what I'm trying to understand.  What

12   does it connect?  Apart from the ballistics, what does the, I

13   guess my question is, what does the Lee/Epps shooting have to do

14   with any of the other events in this case?  Do you understand the

15   question?

16             Are you suggesting that Mr. Martin called, that Mr.

17   Martin was there?  You say you think Mr. Martin was there at the

18   Lee shooting.  Are you suggesting that after the hit, that Mr.

19   Martin called Goose or called County Sports?

20             MR. HARDING:  Well, it is something like is that, Your

21   Honor.  But I'd feel more comfortable if I could talk to

22   Detective Benson before I actually answered the Court's question.

23             THE COURT:  Sure.  Sure.

24             If you're suggesting or if the evidence is that a phone

25   shown by other evidence to be associated with any defendant

6

1    immediately after the Lee/Epps shooting, that there was a call to

2    County Sports owned by Goose --

3                MR. HARDING:  Yes.

4                THE COURT:  -- then I would probably admit that.

5                MR. HARDING:  Okay.  Thank you, Your Honor.

6                THE COURT:  But that really does now take us into

7    404(b).

8                MR. HARDING:  Well, we don't contend that any of this

9    evidence is 404(b), Your Honor.  The case law is quite expansive

10   in terms of permitting the Court in a RICO or 1959 prosecution to

11   let in crimes that are not charged as evidence of the existence

12   of the enterprise and as evidence to show the ongoing pattern of

13   racketeering activity.

14               I'm sure the Court is familiar with the case law in

15   this area.  And so we don't consider any evidence that relates to

16   firearms or shootings, even though it's uncharged, we don't

17   consider it 404(b) evidence.  We consider it intrinsic to the, to

18   the issue of did an enterprise exist and was there a pattern of

19   racketeering activity.

20               We think that the case law fully, especially in this

21   circuit, fully supports us in this.

22               THE COURT:  Why didn't you charge it as a racketeering

23   act, then?

24               MR. HARDING:  Judge, prosecutorial prudence prevents us

25   from charging crimes we don't believe we can prove beyond a

7

1    reasonable doubt.  We could have charged a lot of things as

2    racketeering acts, but the fact is we were trying to charge

3    things that we think we can prove beyond a reasonable doubt.

4    This is evidence that shows the existence of an enterprise and of

5    racketeering activity, regardless of whether we can prove beyond

6    a reasonable doubt who murdered Eric Lee.

7            THE COURT:  Just because somebody called County Sports?

8    See, that's the problem I'm having.  What if there were

9    substantial evidence that Joe Blow killed Eric Lee?  I mean,

10   surely, you wouldn't be standing there suggesting that just any

11   old body who happened to killer Eric Lee, that you could prove

12   that.  I'm having some difficulty.  But I understand you haven't

13   spoken to Agent Benson and you will.

14            Are we going to get into that today?

15            MR. HARDING:  No.

16            THE COURT:  No.  Okay.  So we have time.

17            MR. KURLAND:  Welsh is not testifying today?

18            MR. HARDING:  Who is?

19            MR. KURLAND:  Welsh.

20            MR. HARDING:  Welsh is testifying today.

21            THE COURT:  Who is Welsh?  Welsh is the detective?

22            MR. HARDING:  Yes.

23            THE COURT:  But we're not going to get into the Lee

24   shooting?

25            MR. HARDING:  We certainly are getting into his

1    recovery of the ballistics evidence.  Mr. --

2              MR. KURLAND:  Kurland.

3              MR. HARDING:  -- Kurland is concerned about this

4    telephone call, which is something Benson is going to testify

5    about.

6              THE COURT:  Oh, I see.  I see.  So Welsh is not the

7    witness on the phone call?  So we're not going to get into it

8    today.

9              MR. KURLAND:  Your Honor, I think, and again,

10   obviously, Detective Benson who knows the answer for sure.  But

11   it's my understanding, imperfect as it is, that the third person

12   who was with Lee and the other person who got shot, the one that

13   ran away, it's my understanding that it's that third person that

14   then calls County Sports.  And again, that's, the government has

15   candidly said that they can't prove this beyond a reasonable

16   doubt but they want to kind of throw it against the wall, so to

17   speak, to kind of, for, I guess to use evidence that they can't

18   prove beyond a reasonable doubt, which is, you know, a little bit

19   dicey, to essentially try to glob it on, I would argue

20   impermissibly or certainly unfairly prejudicially.

21             But the person, I would have a different argument if

22   the government's evidence was that one of the defendants was

23   going to, made a phone call.  It's my imperfect understanding,

24   and maybe somebody can correct me if they know for sure, but it's

25   my recollection that the telephone call was made by this third

1  person that calls County Sports.  And again --

2  THE COURT:  Okay.  So let me see if I can reconstruct

3  this from yesterday.

4  MR. KURLAND:  I hope I'm right.  I hope I'm not wasting

5  the Court's time by making assertions that are not factual.

6  THE COURT:  I guess we should wait for Benson.

7  MR. KURLAND:  Your Honor, the last point is that --

8  THE COURT:  Where is Agent Benson?

9  MR. HARDING:  Picking up a witness, Your Honor.

10  THE COURT:  So he's not in the courthouse?

11  MR. HARDING:  Unless he just got here.

12  MR. HANLON:  No.

13  THE COURT:  All right.

14  MR. KURLAND:  But Judge, I do have trouble with the

15  government now sort of injecting for the first time very clearly

16  that they want to prove this as a separate racketeering act.

17  That is not how it's been represented for the two and a half or

18  three years.  This was originally represented, or for a long

19  time, as ballistics evidence to prove, essentially, where the

20  guns were.

21  The government now --

22  THE COURT:  That's what I understood from yesterday.

23  MR. KURLAND:  But that's not what they're now saying.

24  And I want to renew the motion, then, to keep it out, any of the

25  other evidence, other than the fact -- because if they're going

1    to get into now, well, you know, Lee, was found at Lee's house

2    was drugs, you know, this third person, whatever they think, the

3    Goose, so on, so forth, Goose, Card, Purple, I mean, round up the

4    usual suspects, whatever, but the whole point is this is going

5    off into something that should have been articulated much earlier

6    as an additional racketeering act, as opposed to simply trying to

7    prove a connection of guns that hook up two murders that are

8    charged as racketeering acts.

9          THE COURT:  Do you understand the government to say or

10   assert that Goose was a member of the racketeering conspiracy?

11         MR. KURLAND:  Well, I'd have to go back and look at

12   their chart that I'm going to hope is here in closing argument.

13   But the government has never, has never articulated, even when

14   they showed their chart to the jury during opening statement,

15   they've never articulated what, what that chart means and who is

16   a member of the conspiracy.

17         They apparently have people that kill, that get killed.

18   When it's to their convenience, they put them into the

19   conspiracy.

20         I mean, all we know from Goose right now is that

21   Montgomery's testimony was that there was a plan to kill Goose.

22         THE COURT:  Right.

23         MR. HARDING:  Now, to me that wouldn't put him in any

24   conspiracy.

25         THE COURT:  Well, that's not true.

1      MR. KURLAND:  I understand that.  But that's, to me it

2  wouldn't.

3      THE COURT:  All right.  Benson will permit Mr. Harding

4  to speak more knowledgeably about this cell, this telephone call

5  and I'll hear it.  But right now it does sound extraneous to me

6  and not like something that I'm going to admit.  But I'll hear

7  from Mr. Harding once he has a chance.

8      MR. KURLAND:  Okay.  Is Benson, because how I cross

9  examine Welsh has some bearing on --

10      THE COURT:  Sure.

11      MR. KURLAND:  Thank you, Judge.

12      THE COURT:  All right.

13      MR. HARDING:  Judge, we never resolved, I think there

14  are several issues that aren't resolved.  But one of them is the

15  issue of this juror and the witness for Mr. Mitchell, who you had

16  asked a long time ago for Ms. Rhodes and Mr. Lawlor to prepare a

17  statement of what the witness would have testified to.

18      THE COURT:  Right.  And I still haven't received that

19  and I think I've been reasonably clear, although not as explicit

20  as you would have liked me to be, Mr. Harding.  But I think Ms.

21  Rhodes, and of course she stepped out to take care of a personal

22  matter, but I've been pretty clear that this witness is not going

23  to be permitted to testify in front of this jury.

24      MR. HARDING:  Okay.  Thank you, Your Honor.

25      THE COURT:  And I'll make that explicit at the

1    appropriate time.  Mr. Flannery.

2              MR. FLANNERY:  Good morning, Your Honor.

3              THE COURT:  Good morning.

4              MR. FLANNERY:  I think we also had another issue that I

5    think we were expecting an answer from Mr. Harding, regarding Ms.

6    Shannon Harris and the foundation for her understanding as to Mr.

7    Harris's drug dealing.

8              THE COURT:  Right.  We wanted to clarify that this

9    morning, Mr. Harding.

10             MR. HARDING:  Yes.  Ms. Harris says that she knows that

11   her brother was into drug dealing because he used to get arrested

12   for it.  But I'm not going to go into any testimony about that.

13   What I'm going to ask her to testify about, though, is that he

14   used to hang out on Woodland Avenue, and I'm going to show her a

15   couple of pictures of Woodland Avenue where he used to hang out.

16             THE COURT:  Okay.  So Mr. Flannery, the witness is not

17   going to be asked to testify to her knowledge about Mr. Harris's

18   drug dealing activities, but she clearly is competent to testify

19   as to where he hung out.

20             MR. FLANNERY:  Assuming she has, you know, a foundation

21   for that as well.

22             THE COURT:  It's within the personal knowledge of

23   family members as to where their family members work and go to

24   school and hang out.

25             MR. FLANNERY:  I'm one of six, Your Honor.  I don't

13

1    know.  Sometimes I disagree with that.

2            THE COURT:  You're number one or number six?

3            MR. FLANNERY:  I'm number three, Your Honor.

4            THE COURT:  Right in the middle.

5            MR. FLANNERY:  Not all the stereotypes that go with

6    that.

7            MR. COBURN:  Your Honor, I would not be delaying the

8    jury if I raised another issue?

9            THE COURT:  Not at all.  I'm hoping that people will

10   think of things we need to take care of while we're waiting for

11   the jury.

12           MR. COBURN:  Appreciate the opportunity.  Going back to

13   the Montgomery cross examination.

14           THE COURT:  Do we have to?

15           MR. COBURN:  I understand exactly where Your Honor's

16   coming from when you say that.  Your Honor will remember there

17   was a kind of a back and forth between, I guess you could sort of

18   say Mr. Harding and me through the witness, in terms of other

19   proffer sessions.  In other words, there were like nine of them.

20   And then there was redirect to the effect that, well, there were

21   other ones when he made some statements that weren't reflected in

22   the ones that we had.

23           I just wanted to let Your Honor know that, I mean, from

24   my point of view, and I realize, you know, that Mr. Harding's,

25   this is an important witness for him just like it is for us and

1    so on and so forth.

2         I had sent an e-mail asking for the handwritten notes

3    of those other proffer sessions and I haven't heard back on that

4    yet.  There's a Jencks issue there.

5         You know, the government may contend the notes aren't

6    Jencks, in which case --

7         THE COURT:  I think that's exactly what the government

8    contends.

9         MR. COBURN:  I think they probably will, too.  In which

10   case my request is that the Court do an in --  I hope there

11   aren't too many of them0, for the Court to do an in camera

12   inspection of the notes and see whether any of them appear to be

13   substantially verbatim.

14        Because it is kind, at least we think it's an important

15   issue from our point of view in terms of these things that

16   weren't in the proffer sessions that we had were, in fact, said

17   in other ones that we didn't have any record of.

18        THE COURT:  I'm going to deny that request, Mr. --

19   first let me hear from Mr. Harding.  I thought they did respond

20   to that.  But perhaps --

21        MR. COBURN:  I may have just missed it.

22        THE COURT:  Do you recall what he's referring to, Mr.

23   Harding?

24        MR. HARDING:  I do recall the e-mail, Your Honor, and I

25   don't believe I responded to it.  It's because, I think it's

1    because I can't recall ever, anybody ever having asked me in the

2    past for my handwritten notes of proffer sessions.  And so I

3    guess I considered it --

4              THE COURT:  I'm sorry.  I thought he was talking about

5    agent notes.

6              MR. HARDING:  No.

7              THE COURT:  He's not talking about your notes.

8              MR. HARDING:  No, I think he specifically asked for my

9    notes.

10             MR. COBURN:  No, I didn't.  Actually, I don't mean

11   to --

12             THE COURT:  No.  You're not asking for prosecutor's

13   notes?

14             MR. COBURN:  Well, I guess the question would be like

15   if that's all there is.  If Mr. Harding is saying this is like a

16   one-on-one thing between him and Montgomery, then, you know, I

17   guess prosecutor's notes, if I remember correctly from, you know,

18   back in the day when I was doing that, I think they could be

19   considered Jencks.  But I don't really want to go there, assuming

20   there are agent notes, which I'm just assuming there probably

21   are, because I don't think Mr. Harding is sitting down with Mr.

22   Montgomery by himself.

23             THE COURT:  Well, we know Mr. Harding's not going to be

24   in a room by himself with Mr. Montgomery.

25             MR. COBURN:  That's what I figured.

1          THE COURT:  But can you say anything about agent notes,

2    Mr. Harding?  See, I believe there's a presumption that I should

3    indulge that Mr. Harding has turned over everything.

4          MR. HARDING:  Yes.  Your Honor, the agents, I have no

5    Jencks material at all relating to my agents that hasn't been

6    turned over.  And my agents who sat in on the proffers with

7    Montgomery did on occasion take notes about things.  But there is

8    no Giglio or Brady material in that.

9          In fact, we had a discussion about that very recently.

10   And they all reviewed their notes to make sure of it.  And none

11   of it's Jencks.  None of these agents are going to be asked

12   anything about Montgomery.  So that's the government's position.

13         THE COURT:  Okay.  I think that sweeps the deck clean

14   on that issue, Mr. Coburn.  Mr. Crowe, good morning.

15         MR. CROWE:  Yes, Your Honor.  As long as we're waiting

16   for the jury, I have a matter closely related to the one which

17   Mr. Coburn raised.

18         We did receive from the government shortly before Mr.

19   Montgomery's testimony memoranda on five proffer sessions.  These

20   were proffer sessions which were not tape recorded.  I have asked

21   the government, the memos that were received do not have an

22   apparent author and I believe, and I have asked the government if

23   they can tell us who wrote the memoranda, which seems like a

24   pretty reasonable request.

25         And I think it's further reasonable because certainly

1    some of the notes of the proffer session appear to have passages

2    which seem to contradict Mr. Montgomery.

3            There is in particular one passage where it appears

4    that Mr. Montgomery is depicted as saying that he had actually

5    gone around and followed Darius Spence on the street, gone into

6    bars, talked to women that he associated with, and things of that

7    nature.

8            Probably more important, however, is --

9            THE COURT:  I'm sorry.  You regard that as

10   contradictory?

11           MR. CROWE:  Yes, because Mr. Spence said that he didn't

12   do that.  All that he did was -- I mean, Mr. Montgomery said that

13   he did not surveil him on the street.  All that they did was go

14   to the house.

15           THE COURT:  Well, I'm sorry.  I don't see that as

16   contradictory.

17           MR. CROWE:  Well, I asked him the question --

18           THE COURT:  If you know a person frequents a particular

19   bar and you take up a position to sort of pay attention to

20   whether it's true that he frequents that bar and so you see him

21   at that bar two or three or four times, I mean, is that

22   surveilling a person on the street?

23           MR. CROWE:  This went a little farther than that.

24   Obviously, I don't have the notes in front of me.  But my

25   recollection is that he would, he would go, he would go to haunts

1    where, where he knew that Spence frequented, that he would talk

2    with women that he associated with, that the women would tell him

3    about Spence's activities and things of that nature.

4            Obviously, to the extent that he's out there doing that

5    sort of work, which he testified on the stand he did not do,

6    because I asked him the question specifically, yeah, I think

7    it's, I think it's a prior inconsistent statement.

8            THE COURT:  I'm not persuaded that it means very much.

9    The testimony has been very clear that Mr. Montgomery, Mr. Holly,

10   and Mr. Gardner went to considerable effort to track Mr. Spence,

11   inform themselves about his movements, find out where he lives,

12   find out when he comes home, over several weeks.  And so if some

13   agent wrote a particular version of that that seems to suggest --

14   Agent Benson's here -- I just don't, I see your point, Mr. Crowe.

15           And certainly, it's passing strange that the government

16   can't identify the author of a memorandum.  But unless there's

17   some discrete concern you have about that.

18           MR. CROWE:  There is another matter of more importance

19   and that has to do with the September 26th proffer memorandum.

20   As the memorandum was written, apparently a Sergeant Garnell

21   Green from Baltimore City Homicide came in, spoke to an assembled

22   group, which included Mr. Montgomery, laid out for Mr. Montgomery

23   the history of the shootings at 27, on 2700 Lauretta Avenue,

24   which is --

25           THE COURT:  That's the Epps/Lee?

1        MR. CROWE:  -- the Lee/Epps shooting.  Told him how

2   those guns tied into other homicides in Baltimore City and

3   Baltimore County.  And immediately after that, just one or two

4   paragraphs after that, Mr. Montgomery comes up with the first

5   time for saying, Oh, yeah, Gardner told me that one of the guns

6   that he had was dirty because it had a body on it.

7        And then apparently sometime after that, we don't even

8   have this in writing, he testifies before the grand jury that

9   when my client was talking to him, when they were supposedly

10  planning a bunch of things, my client also said that he had a .40

11  caliber gun with three bodies on it.

12       THE COURT:  That he, Mr. Martin, had a .40 caliber gun?

13       MR. CROWE:  Yes.

14       THE COURT:  Well, he didn't testify to that, did he?

15       MR. CROWE:  Yes.

16       THE COURT:  Montgomery testified to that?

17       MR. CROWE:  Montgomery testified to that.

18       THE COURT:  I thought Gardner had the --

19       MR. CROWE:  Gardner had a gun with one body on it and

20  Martin supposedly said that he had a gun with three bodies on it.

21  And we believe this all happened after the police very

22  conveniently laid out all the ballistics and the connections.

23       We think, we think this is extraordinarily important.

24       THE COURT:  So are you going to call this Officer

25  Green?

1          MR. CROWE:  What I would like to do, talk to the guy

2     that wrote the memorandum.

3          THE COURT:  Well, wouldn't, is it Officer Green who you

4     say laid all this out that prompted Montgomery's --

5          MR. CROWE:  That's what the memorandum says.

6          THE COURT:  It seems to me that, forget who wrote the

7     memorandum.  It would be Green that you want to talk to.

8          MR. CROWE:  Well, I'd probably want to do that.  But

9     I'm kind of a belts and suspenders guy.  If Green says no, I want

10    the author of the memorandum.  Or I may just want the author of

11    the memorandum.

12         THE COURT:  Mr. Harding, is it correct that you can't

13    identify the author of these proffer memoranda?

14         MR. HARDING:  I contacted several of the agents who

15    were present and learned that they did not prepare the memo.

16    It's not signed, which is very atypical for agent's reports and

17    let me to conclude that it probably wasn't even an official

18    report at all.  I turned over five of these before Montgomery

19    testified.

20         THE COURT:  And then the other four during trial?

21         MR. HARDING:  No.  This was all turned over before

22    Montgomery testified.

23         THE COURT:  Okay.  I thought I heard that there were

24    nine proffer sessions.

25         MR. HARDING:  Well, there were some tape recorded --

1    there were also four tape recorded proffer sessions for which I

2    turned over transcripts.

3              THE COURT:  I see.  So you turned over four or so

4    transcripts and, separately, five or so memoranda?

5              MR. HARDING:  Yeah.

6              THE COURT:  I get it.

7              MR. HARDING:  I still am not certain who prepared those

8    memoranda.

9              THE COURT:  Any of them?

10             MR. HARDING:  The transcripts are, it's apparent who's

11   talking to Mr. Montgomery in the transcripts.

12             THE COURT:  Right.  But I'm talking now about the

13   memoranda.

14             MR. HARDING:  Yeah.  I'm still not certain.  However, I

15   got a call from Jim Green, former AUSA, former SAUSA.

16             THE COURT:  Yes, I saw Jim the other night.

17             MR. HARDING:  He had been contacted by Mr. Pyne,

18   inquiring as to whether he wrote them the.  And he told me that

19   he wasn't sure whether he wrote them, either, but he wanted to

20   talk to me about it.

21             THE COURT:  Is that the Green you think you referred

22   to, Mr. Crowe?  Was it Jim Green, Esquire, or you're sure it was

23   an officer?

24             MR. CROWE:  No.  I believe it was a Sergeant Garnell

25   Green.  I've got, I'll pull the memo out to make sure.

1          THE COURT:  Okay.  All right.  So Mr. Green doesn't

2    know who authored the memoranda?

3          MR. HARDING:  No.  He wants to look at them and he

4    hasn't had a chance to do so.  So he's going to come over and see

5    me tomorrow, as a matter of fact.

6          THE COURT:  I see.  Okay.  So hopefully, he'll be the

7    one who will be able to --

8          MR. HARDING:  He doesn't want to testify, Your Honor.

9          THE COURT:  Oh, no.  Of course he doesn't want to

10   testify.  I'm just now focused on who authored the memoranda.

11         MR. HARDING:  Yeah.  We'll find out.

12         THE COURT:  What I mean is will he, will his memory be

13   refreshed sufficiently?  Was he at most of the proffer sessions?

14         MR. HARDING:  I am not sure, Your Honor.  I know he was

15   at several of them.  I don't know if he was at all five.

16         THE COURT:  Okay.  Well, presumably, he's going to be

17   able to look at the memoranda, refresh his recollection, and the

18   transcripts, if that would be helpful, and presumably --

19         MR. HARDING:  Yeah.  The government's position would,

20   these would be prosecutor's notes if, in fact, Jim Green

21   authenticates them as his.  And we would, in fact, the Touhy

22   regulations preclude us from testifying and they apply even to an

23   AUSA who has left the office.  That's the --

24         THE COURT:  But might they have been prepared by

25   Baltimore County people?

23

1          MR. HARDING:  They might have.  But I haven't

2     determined who it could have been.  There were all these people

3     present.  And I, I have contacted the relevant people and told

4     Mr. Crowe that it didn't appear to be either Detective Giganti or

5     ATF Agent Michael Groth.  It's not Michael Coleman, either,

6     another ATF person.

7          THE COURT:  Okay.  All right.  I think my position on

8     Montgomery, and I realize full well that he occupies a uniquely

9     important role in this trial, as I hinted yesterday, my position

10    on Montgomery is that he has been thoroughly, thoroughly,

11    thoroughly, exhaustively, comprehensively impeached.

12          I can't imagine, based on what I've heard so far, that

13    any additional collateral impeachment of Mr. Montgomery, I mean,

14    you could call everybody who attended any one of these proffer

15    sessions with Mr. Montgomery and elicit some contradictions,

16    perhaps.  But this jury is either going to credit portions of Mr.

17    Montgomery's testimony or it's not.  I just don't see any point

18    in trying to go further to discredit Mr. Montgomery.

19          He's a hit man who would kill anybody in this courtroom

20    for 5,000 bucks.  And he was thoroughly impeached on his direct

21    testimony, just by his demeanor and by his record and by his plea

22    agreement and by his answers to counsel's questions.  And I just

23    don't see what more coal you can mine from that vein.

24          The jury's either going to credit it because of the

25    corroborating circumstances of the case and the other evidence or

24

1    the jury's going to say, I'm not willing to convict anybody on

2    the testimony of somebody as soulless as Mr. Montgomery.

3              So that's my perspective on Mr. Montgomery.  They're

4    either going to find that he's credible or not based on the

5    totality of the circumstances.

6              But Mr. Crowe, to the extent you want to continue to

7    pursue any of that, I will certainly give a listen.

8              Good morning, Ms. Rhodes.

9              MS. RHODES:  Good morning, Your Honor.  Thank you.

10             THE COURT:  We're still, I think, waiting for the jury.

11   Do you want to check or do they have a signal they're going to

12   give you?

13             THE CLERK:  They are ready.

14             THE COURT:  They are ready?  How long have they been

15   ready?

16             THE CLERK:  The last time I went and checked they were

17   ready.

18             THE COURT:  All right.  So we're ready to proceed.

19             MR. KURLAND:  Your Honor, can we get that clarification

20   from Detective Benson?

21             THE COURT:  Yes.  Mr. Harding, have you had a chance to

22   speak to Agent Benson?

23             MR. HARDING:  I was hoping we'd be able to, I haven't

24   had a chance to speak to Detective Benson.  Something we ought to

25   have a few minutes at least to talk about.  Could we proceed with

1   the witnesses and talk about this later?

2              THE COURT:  All right.

3              MR. KURLAND:  As long as it's not Welsh.

4              THE COURT:  Right.  It's not Welsh, right?

5              MR. HARDING:  It's not Welsh but this whole issue of

6   the telephone call isn't going to come up with Welsh today at

7   all.

8              THE COURT:  But Mr. Kurland may want to bring it up

9   with Welsh.

10             MR. HARDING:  Okay.  We aren't doing Welsh right now.

11  But we have these women that we're anxious to get out of here.

12             THE COURT:  Okay.  When is Welsh coming in?

13             MR. HARDING:  He's here, he's waiting, but he's like

14  sixth in line.

15             THE COURT:  Can you just have a 30 second conference

16  with Agent Benson?  It can't be that complicated.

17             (Pause in proceedings.)

18             THE COURT:  Mr. Coburn, could you approach the lectern,

19  please?

20             MR. COBURN:  Absolutely, Your Honor.  Did I do

21  something wrong?

22             THE COURT:  No.  Not at all.  Not at all.  I thought

23  while we're waiting for Mr. Harding, I think this is Mr. Hanlon's

24  issue, have you thought about the whole Massiah issue overnight?

25  Is there anything more on that with regard to Reynolds?

1          MR. COBURN:  I do think it's a significant issue,

2    having, having thought further about Mr. Harding's proffer about

3    kind of the sequence of events with Mr. Reynolds, the fact that

4    apparently Mr. Reynolds, Reynolds had already been in.  I don't

5    know if there was any sort of a formal proffer agreement or what

6    exactly existed.  But he'd already been in talking to them

7    before, I gather, they're saying this conversation occurred.

8          THE COURT:  But simply because he was cooperating, of

9    course, and simply because they were cell mates doesn't, doesn't

10   mean there was a Massiah violation.

11         Indeed, Mr. Harding's proffer yesterday seemed pretty

12   clear to me that what Mr. Harding said was that he wrote to Andy

13   Graham because he was surprised that they were cell mates.  So

14   that would certainly negative any suggestion to my mind that the

15   government purposely sought to have Mr. Reynolds elicit any

16   comments or statements from Mr. Gardner.

17         MR. COBURN:  Well, I don't, I don't think for a minute

18   that Mr. Harding, you know, told, sort of sent him in there as a

19   drone in order to do this.

20         THE COURT:  Okay.  But that would be the Massiah -- I

21   mean, that's the linchpin of Massiah.

22         MR. COBURN:  I'm not sure about that, Your Honor.

23   Maybe that's just because I haven't had a chance to sit down and,

24   you know, kind of thoroughly research the Massiah issue as I

25   thought or as I would like to.

1          But, you know, let's say, for example, you have a

2    situation in which there's a lot more ambiguity than that.

3    There's a conversation between Mr. Harding or people in Mr.

4    Harding's office and Mr. Reynolds.  And I guess, I'm not sure if

5    Mr. Graham's in it or if the Public Defender's in it at that

6    point or precisely whose in the room.  But I mean, Mr. Reynolds

7    walks out of there thinking, I'm playing on their team now, I've

8    got a chance to help myself out.  You know, I'm going to do what

9    they want me to do even if he hasn't been explicitly instructed

10   to do it.

11          THE COURT:  I see.

12          MR. COBURN:  So I think under those circumstances, if

13   the government has a relationship with him, that could raise a

14   Massiah issue.

15          THE COURT:  All right.  I think the way, we're not

16   going to get to Reynolds this week, today, meaning today.  We may

17   need to just voir dire Mr. Reynolds because, frankly, I'm very

18   much inclined to admit the testimony and to give a strong

19   limiting instruction and to caution the government as to the

20   manner in which it argues from Mr. Reynolds's testimony.  So it

21   may well be that the issue's going to turn on whether there was

22   Massiah, U.S. v. Henry violation.

23          MR. COBURN:  Well, I appreciate Your Honor raising it

24   again.  I will make sure to research that.

25          THE COURT:  On Monday.

1          MR. COBURN:  Will do.

2          THE COURT:  All right.  Mr. Harding.

3          MR. HARDING:  Well, the answer to the question is that

4   after the murder, Darnell Dukes, who was one of the four people

5   ordered to hit the ground, called County Sports.  And he had also

6   been in touch with County Sports prior to the murder of Eric Lee.

7          THE COURT:  So he's the one that ran away?

8          MR. HARDING:  Yeah.  He's the one who ran away.  He

9   actually wound up driving Mr. Epps to the hospital.  But I think

10  what --

11         THE COURT:  Wait.  So he ran away and came back after

12  the shooting?

13         MR. HARDING:  Yes.

14         THE COURT:  Took Mr. Epps to the hospital?

15         MR. HARDING:  Yes.

16         THE COURT:  All right.  Go ahead.

17         MR. HARDING:  I would say that at this point, we don't

18  have, we haven't figured out what the connection.

19         THE COURT:  I'm sorry.  They left Lee there?  Agent

20  Benson is shaking his head.

21         MR. HARDING:  Left Lee there, yes.  Left Lee, Lee was

22  still there when Welsh showed up.  So I think it's fair to say

23  that we haven't figured it out well enough so that we won't

24  elicit testimony about the telephone call.

25         THE COURT:  Great.  Thank you very much for clarifying

1    that.  Satisfied?

2              MR. KURLAND:  I am satisfied.  Thank you, Your Honor.

3              THE COURT:  All right.  We'll have the jury, please.

4              (Jury enters the courtroom.)

5              THE COURT:  Ladies and gentlemen, good morning.  Thank

6    you again for your patience.  We're ready to continue.  The

7    government may call its next witness.

8              MR. HARDING:  Yes.  Thank you, Your Honor.  Your Honor,

9    the United States calls Shannon Harris.

10             THE COURT:  Ms. Harris, if you would stand, please, and

11   direct your attention to the clerk.

12              SHANNON HARRIS, GOVERNMENT'S WITNESS, SWORN

13             THE WITNESS:  Yes, I do.

14             THE CLERK:  Be seated.  Speak directly toward the mike.

15   State your name and spell it for the record, please.

16             THE WITNESS:  Shannon Harris.  S-H-A-N-N-O-N.

17   H-A-R-R-I-S.

18              DIRECT EXAMINATION

19   BY MR. HARDING:

20   Q    Good morning, Ms. Harris.

21   A    Good morning.

22   Q    Can you tell us how old you are, please?

23   A    I'm 24.

24   Q    Ms. Harris, are you working right now?

25   A    Yes.

1    Q    And are you working to get your GED right now?

2    A    Yes.

3    Q    Have you ever been convicted of a crime?

4    A    No.

5    Q    And you don't use drugs, do you, Ms. Harris?

6    A    No.

7    Q    Okay.  Are you related to Shelton Harris?

8    A    Yes.

9    Q    How are you related?

10   A    That's my brother.

11   Q    Okay.  Is he your older brother or your younger brother?

12   A    My older brother.

13   Q    Did you grow up in the Park Heights area of town, Ms.

14   Harris?

15   A    Yes.

16   Q    Let me show you Government Exhibit P-17.  Can you tell us

17   what this is, Ms. Harris?

18   A    3517 Lucille Avenue, my old address.

19   Q    I'm sorry?  I missed the address.

20   A    3517 Lucille Avenue.

21   Q    Lucille Avenue?

22   A    Yes.

23   Q    Okay.  Did you live in that house?

24   A    Yes.

25   Q    With your family?

1    A    Yes.

2    Q    Who were you living with when you were living in that house?

3    A    It was me, my brother, my younger sister, and my mother.

4    Q    Okay.  What's your younger sister's name?

5    A    Sharmika.

6    Q    What's your mother's name?

7    A    Arlene Williams.

8    Q    Did there come -- well, let me ask you first.  When you were

9    living on Lucille, did Mr. Harris used to hang out on Woodland

10   Avenue?

11   A    Yes.

12   Q    Let me show you a couple more pictures.  PH-18.  Do you

13   recognize what that is?

14   A    Yes.

15   Q    What is it?

16   A    Woodland Avenue.

17   Q    What's this street down here where it looks like you can see

18   some, a traffic light and some store fronts?

19   A    Reisterstown Road.

20   Q    Okay.  And this is Government Exhibit PH-19.  Is that the

21   same area, a little closer to Reisterstown?

22   A    Yes.

23   Q    Okay.  And you say that your brother used to hang out on

24   that strip on Woodland Avenue, is that correct?

25   A    Yes.

1    Q    Do you remember about when it was that you moved to Amity

2    Street?

3    A    I think it was in 2008.  I mean -- sorry.  1998.

4    Q    Okay.  Let me show you PH-48, Ms. Harris.

5    A    Okay.

6    Q    Can you tell us what that shows?

7    A    My old address, 205 North Amity Street.

8    Q    Okay.  Now, when you moved there in 1998, how long did you

9    live there for?

10   A    Five years.

11   Q    Okay.  And was it the same group of people living there that

12   you named before?  Your little sister, your mother, and Shelton?

13   A    Yes.

14   Q    Okay.  Which room was Shelton's room?

15   A    When you come up the steps, his room was the first room to

16   the right.

17   Q    Okay.  Would that be in the front or the back?

18   A    In the front, yeah.

19   Q    Okay.  So it was like on the second floor of the apartment,

20   is that right?

21   A    Yes.

22   Q    Do you remember, did, was there ever a problem when your

23   mother discovered a gun in Shelton's room?

24   A    Yes.

25   Q    Did you see that gun?

1    A    Yes.

2    Q    Can you describe it?

3    A    It was a silver gun with a brown handle.

4    Q    Was your mother happy about that?

5    A    No.

6              MR. FLANNERY:  Objection, Your Honor.

7              THE COURT:  Overruled.

8    Q    Did you know a guy by the name of Bo?

9    A    Yes.

10   Q    Do you see him in the courtroom here today?

11   A    Yes.

12   Q    Could you point him out to us, please?

13   A    He's right there, on the right hand side.

14   Q    How far from, how many people away from me is he?

15   A    The second person.

16   Q    Okay.  Can the record reflect that the witness has

17   identified the defendant, Willie Mitchell, Your Honor?

18             THE COURT:  It does.

19   Q    Do you know how Shelton and Bo met, Ms. Harris?

20   A    My brother was incarcerated at Hickey, I think.  He was his

21   mentor.

22   Q    Who was his who?

23   A    Bo was his mentor.

24   Q    Okay.  Did they stay friends after, after Shelton got out of

25   Hickey School?

1    A    Yeah.

2    Q    Okay.  Did Bo used to come around there to Amity Street

3    after that?

4    A    Just to like pick him up to go to the studio and stuff like

5    that.

6    Q    Okay.  When you say "to the studio", what would they do at

7    the studio, if you know?

8    A    Rap, make raps, music, whatever.

9    Q    How often did Bo come around to pick up Shelton?

10   A    I don't know.  Like not every single day.  I don't know how

11   to, to say it.  Like not every single day.

12   Q    Okay.  Did Bo also call the house sometimes?

13   A    Yeah.

14   Q    Did there come a time when Shelton got into a fight, do you

15   remember, with a knife?

16   A    Yeah.

17   Q    What happened?

18   A    Well, from what I know, they got in a fight --

19            MR. FLANNERY:  Objection, Your Honor.

20            THE COURT:  What's the basis of your knowledge, Ms.

21   Harris?  How do you know what you know?

22            THE WITNESS:  From what he told us.

23            THE COURT:  Who told you?

24            THE WITNESS:  My brother.

25            THE COURT:  All right.  Overruled.  You may proceed.

1          THE WITNESS:  They went out to a bar, a club or

2    something, and they got into a fight.

3    BY MR. HARDING:

4    Q    And did Shelton get injured in that fight?

5    A    Yes, he did.

6    Q    How so?

7    A    His finger was cut off.

8    Q    Do you know how it got cut off?

9    A    I'm assuming with a knife.

10   Q    Okay.  Was it his knife or somebody else's?

11   A    I'm not sure.

12   Q    Okay.  Let me ask you, sometime later after that, were you

13   at home when the police raided your house, 205 North Amity

14   Street?

15   A    Yes.

16   Q    Who else was there at the time?

17   A    It was me, my mom, Shamier, and that was it.

18   Q    Okay.  Did the police discover drugs there that day, Ms.

19   Harris?

20   A    Yeah.

21   Q    And where did they discover the drugs?

22   A    In my brother's room.

23   Q    Okay.  Were those your drugs, Ms. Harris?

24   A    No.

25   Q    Did you know they were there before the police came?

1    A    No.

2    Q    To your knowledge, were they your mother's drugs?

3    A    No.

4    Q    Were they Shamier Delvison's drugs?

5    A    No.

6    Q    Who's Shamier Delvison, anyway?

7    A    My brother's ex-girlfriend.

8    Q    And she was there at the time, you say?

9    A    Yes.

10   Q    Even though she was Shelton's ex-girlfriend?

11   A    Yeah.  We were very close.  She was very close to us.

12   Q    I see.

13   A    As well.

14   Q    Very close to you and your mother?

15   A    Yes.

16   Q    So she was visiting you and your mother?

17   A    Yes.

18   Q    Okay.  I think those are all the questions I have for you

19   today, Ms. Harris.  Thank you very much.

20            THE WITNESS:  You're welcome.

21            CROSS EXAMINATION

22   BY MR. FLANNERY:

23   Q    Good morning, Ms. Harris.

24   A    Good morning.

25   Q    My name's Paul Flannery and I'm one of the attorneys that

1    represents your brother, Shelton Harris.  Ms. Harris, you

2    testified that Shamier Delvison is your brother's ex-girlfriend?

3    A    Yes.

4    Q    And at some point you were living at 205 North Amity Street?

5    A    Yes.

6    Q    Okay.  And you testified that you moved in there around

7    1998?

8    A    Yes.

9    Q    And I don't expect you to do all this math in your head, but

10   you said that Shelton Harris is, in fact, your older brother?

11   A    Yes.

12   Q    And he's about two years older than you?

13   A    Yeah.

14   Q    So in 1998 when you moved in there, he was around the age of

15   16 or so?

16   A    Yeah.

17   Q    And you were two years younger?

18   A    I was -- yeah.

19   Q    Okay.  And Ms. Delvison lived at 205 North Amity with you

20   guys for about a year and a half, is that correct?

21   A    Yeah.

22   Q    Okay.  But she wasn't, in fact, living there the day that

23   the police raided your home?

24   A    No.

25   Q    She was just visiting?

1    A    Yes.

2    Q    And she visited fairly frequently, is that correct?

3    A    Um-hum.  Yes.

4    Q    Because you and your mother and Ms. Delvison remained very

5    close even after she and Mr. Harris had stopped dating, that's

6    correct?

7    A    Yes.

8    Q    Okay.  And she actually had -- the raid, if you remember,

9    occurred back on June 23rd of 2002?

10   A    Yes.

11   Q    And she actually had moved out over a year earlier?

12   A    Yes.

13   Q    Okay.  So she was out by maybe the beginning of 2001, does

14   that sound correct?

15   A    Yeah.

16   Q    Okay.  And in fact, at that point she had been dating

17   somebody else?

18   A    Yes.

19   Q    After she had moved out, she had stopped dating your

20   brother, she had began dating somebody else?

21   A    Yes.

22   Q    And she was actually dating a gentleman by the name of

23   Michael Taylor?

24   A    Yes.

25   Q    Okay.  You testified that, in fact, you have met Bo?

1    A    Yes.

2    Q    He was a friend of your brother's?

3    A    Yes.

4    Q    And your understanding is that they had met when your

5    brother was at the Charles Hickey School?

6    A    Yes.

7    Q    And in fact, Mr. Mitchell was actually a counselor at the

8    Charles Hickey School at that time; that's him and your brother

9    met?

10   A    Yes.

11   Q    And your brother referred to Mr. Mitchell, actually, as his

12   mentor?

13   A    Yes.

14   Q    Or sometimes as his producer?

15   A    Um-hum.

16   Q    Because they were working on starting a rap label?

17   A    Yes.

18   Q    And they were working very hard at trying to get that rap

19   label off the ground?

20   A    Yes.

21   Q    And you testified in this proceeding before in front of the

22   grand jury?

23   A    Um-hum.

24   Q    And --

25            THE COURT:  You have to say yes or no.

CROSS EXAMINATION OF SHANNON HARRIS BY FLANNERY          40

1   A    I'm sorry.  Yes.

2   Q    Yes.  And in fact, you testified today that Mr. Mitchell

3   came to the house very often, is that correct?

4   A    Yes.

5   Q    But you're not sure that it was necessarily every day?

6   A    Yes.

7   Q    But it was quite frequently?

8   A    Yes.

9   Q    It was almost to the point of maybe on a daily basis, is

10  that correct?

11  A    Yeah.  Yes.

12  Q    But not every single day?

13  A    Not every single day, no.

14  Q    Fair enough.  The relationship between your brother and Bo,

15  they were friends but they also, in a sense, had some business

16  dealings together, is that correct?

17  A    I'm not sure about business.  What do you mean business?

18  Q    What I'm getting at, I guess, is they were friends, but at

19  the same time they were working on a rap label together.  That's

20  what you understand?

21  A    Yes.

22  Q    And he would come to the house to pick up Mr. Harris very

23  often?

24  A    Yes.

25  Q    Mr. Harris didn't actually have a car?

1    A    No.

2    Q    Okay.  And you understand that they would actually go to the

3    rap studio?

4    A    Yes.

5    Q    A lot?

6    A    Yes.

7    Q    To work on creating rap labels?

8    A    Yes.

9    Q    One second, Your Honor, please.  Ms. Harris, when you had

10   moved to Amity and from the time you were living on Amity to the

11   time that you understand that the raid had occurred in 2002, you

12   don't have any knowledge of a Mr. Shelly Wayne Martin?

13   A    No.

14   Q    And you don't have any knowledge of a Mr. Shawn Gardner?

15   A    No.

16   Q    That's correct?  And you had not heard of Goo?

17   A    No.

18   Q    Okay.  No further questions, Your Honor.

19        THE COURT:  Just a moment, Mr. Harding.

20        CROSS EXAMINATION

21   BY MR. COBURN:

22   Q    Ms. Harris, good morning.

23   A    Good morning.

24   Q    Just a follow-up briefly on what Mr. Flannery was just

25   asking you about.  Do I understand correctly that before your

1    family lived on North Amity, you lived at a place at 3517 Lucille

2    Avenue?

3    A    Yes.

4    Q    And how old were you when the Harris's started living there?

5    A    At 3517?

6    Q    Right.

7    A    My mom was living there before I was born.

8    Q    So you lived there basically --

9    A    My whole twelve years of life.

10    Q    -- your whole life until you all moved to North Amity?

11    A    Yes.

12    Q    And was your brother, your older brother, Mr. Harris, was he

13    living there, too, during that whole time?

14    A    Yes.

15    Q    And then after you all lived there, you all moved to the

16    Amity Street address, right?

17    A    Yes.

18    Q    What year was that?

19    A    That we moved?

20    Q    Right.

21    A    1998.

22    Q    And from that time until 2002, your family was living on

23    Amity Street, right?

24    A    Yes.

25    Q    And your brother was living there as part of the family,

1    right?

2    A    Yes.

3    Q    So if I understand correctly, you're aware of the fact that

4    your brother, Shelton Harris, was involved in the rap music

5    industry, right?

6    A    Yes.

7    Q    And he was trying to make CD's, right?

8    A    Yes.

9    Q    And you understood Bo to be what he described to you as his

10   producer, right?

11   A    Yes.  Yes.

12   Q    And aside from Mr. Harris and Bo, is it correct that the

13   people that you know of who used to rap with them are two twins,

14   Darryl and Dwayne?  You don't know their last name?

15   A    No.

16   Q    And then there was somebody named Slo that they called as a

17   nickname, right?

18   A    Yes.

19   Q    And nobody else, right?

20   A    That I know of.

21   Q    And you already told Mr. Flannery you don't know Shawn

22   Gardner, right?

23   A    No.

24   Q    And you don't know anyone named Goo?

25   A    No.

REDIRECT EXAMINATION OF SHANNON HARRIS                    44

1    Q    Thank you so much.

2    A    You're welcome.

3                REDIRECT EXAMINATION

4    BY MR. HARDING:

5    Q    Just to clarify, Ms. Harris.  When your brother got out of

6    jail in 2003, he wasn't living with you any more after that, was

7    he?

8    A    No.

9    Q    Where did he live then?

10   A    I think he lived in Cherry Hill with a friend.

11   Q    Did you ever go to his place where he was living in Cherry

12   Hill?

13   A    No.

14   Q    And do you know how long he lived there for?

15   A    No.

16   Q    And did he live apart from you and your mother and your

17   little sister at some points in time back when you were living on

18   Amity Street?

19   A    No.

20   Q    He didn't?

21   A    No.

22   Q    Okay.

23   A    You mean as far as when my mom threw him out for the house

24   raid?  Is that what you mean?

25   Q    Well, did she do that?

REDIRECT EXAMINATION OF SHANNON HARRIS                    45

1   A    You said when did she do that?

2   Q    No.  Did she do that?

3   A    Yes.

4   Q    Did she throw him out?

5   A    She asked him to leave.

6   Q    Did he leave?

7   A    Yes.

8   Q    And in fact, did your mother ultimately get evicted because

9   of the house raid?

10  A    Yes.

11  Q    You say that when Mr. Flannery was questioning you, Mr.

12  Mitchell, Bo, the guy you know as Bo, used to come by very

13  frequently, not necessarily every day?

14  A    Not every day.

15  Q    But very frequently, and picked up Mr. Harris, is that

16  correct?

17  A    Yes.

18  Q    By the way, was your mother working at that time?

19  A    Yes.

20  Q    And so was she necessarily there when Bo came by to pick up

21  Mr. Harris?

22  A    No, not all the time.

23  Q    You said that they went to the studio, or at least that's

24  what Mr. Harris told you, is that correct?

25  A    Yes.

1   Q    Did you go to the studio with him?

2   A    No.

3   Q    Did you ever go to the studio?

4   A    No.

5   Q    Do you know that they went to the studio from any other way

6   than your brother saying that's where he was going sometimes?

7   A    No.

8   Q    You said that he also continued to hang out on Woodland

9   Avenue in that period, is that correct?

10  A    Yes.

11          MR. FLANNERY:  Objection, Your Honor.

12          THE COURT:  Overruled.

13  Q    So they could have also gone to Woodland Avenue for all you

14  know, is that possible?

15  A    I don't know.

16          MR. FLANNERY:  Objection, Your Honor.

17          THE COURT:  Overruled.

18          MR. HARDING:  No further questions, Your Honor.

19          MR. FLANNERY:  Briefly, Your Honor, please.

20          THE COURT: Yes, Mr. Flannery.

21          RECROSS EXAMINATION

22  BY MR. FLANNERY:

23  Q    Ms. Harris, your mother works mornings to afternoon,

24  correct?  She worked at BWI airport?

25  A    Yes.

1    Q    And she worked like 7 a to 3 p, something to that effect?

2    A    Yes.

3    Q    Your mother was evicted from 205 North Amity because she was

4    arrested, isn't that correct?

5    A    Yes.

6    Q    Thank you.  No further questions, Your Honor.

7              THE COURT:  Thank you, Ms. Harris.  You're excused.

8    Next witness.

9              MR. HARDING:  Shamier Delvison.

10             SHAMIER DELVISON, GOVERNMENT'S WITNESS, SWORN

11             THE WITNESS:  Yes.

12             THE CLERK:  Be seated.  Speak directly toward the mike.

13   State your name and spell it for the record, please.

14             THE WITNESS:  Shamier S-H-A-M-I-E-R.  Delvison,

15   D-E-L-V-I-S-O-N.

16             DIRECT EXAMINATION

17   BY MR. HARDING:

18   Q    Good morning, Ms. Delvison.

19   A    Good morning.

20   Q    Can you tell us how old you are, please?

21   A    25.

22   Q    Okay.  Have you ever been convicted of a crime, Ms.

23   Delvison?

24   A    No.

25   Q    You don't use drugs, do you, Ms. Delvison?

1   A    No.

2   Q    How far did you get in school?

3   A    Like the eighth grade.

4   Q    What school was that?

5   A    I don't even remember.  Probably Diggs-Johnson.  Dickey Hill

6   Middle.

7   Q    Dickey Hill Middle School?

8   A    Um-hum.

9        THE COURT:  You have to say yes or no, Ms. Delvison.

10        THE WITNESS:  Yes.

11   BY MR. HARDING:

12   Q    Okay.  Did you grow up in Baltimore?

13   A    Yes.

14   Q    Do you know Shelton Harris?

15   A    Yes.

16   Q    Do you see him here in the courtroom?

17   A    Yes.

18   Q    Could you point to him, please, and tells us what color

19   shirt he's wearing?

20   A    Blue and white striped shirt.

21   Q    Can the record reflect, Your Honor, that the witness has

22   identified the defendant, Shelton Harris?

23        THE COURT:  So noted.

24   Q    What was his nickname?

25   A    Little Rock.

1    Q    Little Rock?

2    A    Yeah.  Yes.

3    Q    Okay.

4    A    Yes.

5    Q    Were you involved in a romantic relationship with him?

6    A    Yes, I was.

7    Q    When did that begin?

8    A    January of 1999.

9    Q    And did there come a time when you stopped seeing him

10   exclusively?

11   A    We had an on and off relationship from '99 all the way to

12   like 2002, 2003.

13   Q    Okay.  Did you get another boyfriend at some point?

14   A    Yes.

15   Q    When was that?

16   A    Probably like 2001, 2002.

17   Q    And what was his name?

18   A    Michael Taylor.

19   Q    Did you have a child by Michael Taylor?

20   A    Yes.

21   Q    Okay.  For a period of time, did you live at 205 North Amity

22   Street?

23   A    Yes.

24   Q    Can you tell us what period of time that was?

25   A    Probably from 1999 on and off, all the way up until like

DIRECT EXAMINATION OF SHAMIER DELVISON                    50

1    2001 or 2.

2    Q    Okay.  Did there come a time when you moved out?

3    A    Yeah.  Yes.

4    Q    Why was that?  Why did you move out?

5    A    We kept breaking up on and off.

6    Q    You and Mr. Harris?

7    A    Yes.

8    Q    Okay.  And when did, when did your son, Michael Taylor's

9    son, get born?

10   A    You mean my daughter, DeJanay?

11   Q    I'm sorry.  Your daughter?

12   A    October of 2002.

13   Q    Okay.  When you were involved with Mr. Harris, was he into

14   rap music?

15   A    Yes.

16   Q    And did he used to write raps?

17   A    Yes.

18   Q    Did he go to talent shows?

19   A    Yes.

20   Q    Did he perform at clubs sometimes?

21   A    I don't remember a club, but I remember like a talent show

22   that he went to and performed.

23   Q    Where was that?

24   A    I don't remember the name of the street it was on.  It was

25   like a rec center or something off of Martin Luther King

1   Boulevard.

2   Q    And did he, was he featured on some CD's?

3   A    What you mean?

4   Q    Did he sing on some CD's that you heard?

5   A    Yes.

6   Q    What, what was the name of his group or his company or

7   whatever?

8   A    I'm not sure of the name of the group.  But I know it was

9   either Shake Down something or Sheistyville something.

10  Q    Okay.  Were there other people involved in that group, I

11  assume?

12  A    Not that I know of.  I know it was other people in the group

13  but I ain't know them personally.

14  Q    Did you know a guy named Bo?

15  A    Yes.  Not personally.  I know of him.

16  Q    You don't know him personally?

17  A    No.

18  Q    So you wouldn't be able to recognize him?

19  A    Yeah, I'd be able to recognize him.  But I don't know him.

20  Q    Do you see him here in the courtroom?

21  A    Yes.

22  Q    Could you point him out?

23  A    Sitting right there next to the lady with the yellow marker.

24  Q    Okay.  May the record reflect that the witness has

25  identified Mr. Willie Mitchell, Your Honor?

1          THE COURT:  So noted.

2     Q    Okay.  Let me show you some pictures.  What was Bo's role,

3     if any, in the rap music business that Shelton was involved in?

4     A    From what I knew, he was his producer.

5     Q    Okay.  Did Bo used to come over there to Amity Street when

6     you were living with your brother back early part of 2000 -- when

7     you were living with your boyfriend back in early 2000?

8     A    He came over one time when I met him where we gave Shelton a

9     welcome home party, when we came home from the Hickey School.

10    That's about it.

11    Q    Okay.  Where did Bo meet Shelton, if you know?

12    A    I think at the Hickey School, where he was at.

13    Q    Okay.  How did they meet there, do you know?

14    A    No.

15    Q    Okay.  Do you recognize this photograph, PH-48?

16    A    Yes.

17    Q    What is it?

18    A    A house we used to live at on Amity Street.

19    Q    Okay.  Did there come a time when that house got raided, Ms.

20    Delvison?

21    A    Yes.

22    Q    Were you there at the time?

23    A    Yes.

24    Q    Did the police recover drugs from the apartment?

25    A    Yes.

1    Q    Where did they recover drugs from?

2    A    Upstairs in the front room.

3    Q    Were those yours drugs, Ms. Delvison?

4    A    No.

5    Q    Were those Michael Taylor's drugs?

6    A    No.

7    Q    Whose room were they recovered from?

8    A    Shelton's room.

9    Q    Did you ever have possession of drugs, Ms. Delvison?

10   A    No.

11   Q    Did Shelton come back to the house that day after the

12   search?

13   A    Yes.

14   Q    And in fact, did you get arrested for a brief time, along

15   with Shelton and Ms. Williams?

16   A    Yes.

17   Q    Who's Ms. Williams?

18   A    Shelton's mother.

19   Q    Were you and she released after a short time?

20   A    Yes.

21   Q    I have some exhibits here that I think I showed to you

22   earlier.  One is SE-12.  Do you recognize this handwriting, Ms.

23   Delvison?

24   A    No.

25   Q    Let me, may I approach the witness?

CROSS EXAMINATION OF SHAMIER DELVISON BY FLANNERY          54

1           THE COURT:  Yes.

2     Q     I'm putting out SE-12, SE-14, and SE-11.  Do you remember me

3     showing you these exhibits earlier?

4     A     Yes.

5     Q     And did I ask you whose handwriting that was?

6     A     Yes.

7     Q     And who did you tell me it was?

8     A     I told you I wasn't sure.

9     Q     All right.  I have no further questions, Your Honor.

10          CROSS EXAMINATION

11    BY MR. FLANNERY:

12    Q     Good morning, Ms. Delvison.

13    A     Good morning.

14    Q     My name's Paul Flannery.  I represent, I'm one of the

15    attorneys that represents Shelton Harris.  Now, Ms. Delvison, I

16    understand this is, we're going back ten years now.  So it might

17    be difficult to remember the specifics of all the various dates.

18    But you testified that you met Shelton Harris in the early

19    part -- did you testify it was January, 1998?

20    A     No.  That was when we started our relationship.  I met him

21    December of '98.

22    Q     December of '98.  Okay.  And at some point you started

23    living at 205 North Amity, that's correct?

24    A     Yes.

25    Q     Okay.  And in fact, you started living at North Amity

1    sometime in around, in 1999?

2    A    It was January of 1999.

3    Q    Okay.  And you were on and off between 1999 and 2001, is

4    that correct?

5    A    Well, actually, it was on and off up until he got arrested

6    in 2003 or 4.

7    Q    But you were living there on and off between 1999 and 2001?

8    A    Yeah.  2001 or 2.

9    Q    Okay.  And you had officially broken up with Mr. Harris, I

10   think you had testified that you had actually broken up in 2000,

11   is that correct?

12   A    Yes.

13   Q    Okay.  And you actually moved out, then, in the beginning of

14   2001.  Do you recall that?

15   A    Yes.

16   Q    Okay.  And you testified that you did have an opportunity to

17   meet an individual that you know as Bo?

18   A    Yes.

19   Q    And you understood him to be Shelton's producer?

20   A    Yes.

21   Q    Okay.  And you understood that they were working on a rap

22   label together?

23   A    Yes.

24   Q    And that they were trying to promote this rap label?

25   A    Yes.

1  Q    Okay.  When you were involved with Shelton Harris, you had

2  not heard of Shawn Gardner, that's correct?

3  A    Yes, that's correct.

4  Q    And you didn't, had not heard of Goo?

5  A    No.

6  Q    Or Shelly Wayne Martin?

7  A    No.

8  Q    Do you understand that Mr. Harris was often sick when you

9  were residing with him at 205 North Amity?

10 A    Yes.

11 Q    And in fact, you understood that he had suffered from

12 seizures?

13 A    Yes.

14 Q    Because you understand Mr. Harris is afflicted with

15 epilepsy?

16 A    Yes.

17 Q    So he could have seizures at different times and they were

18 really unexpected?

19 A    Yes.

20 Q    And you understood him actually to stay at home a lot?

21 A    Yes.

22 Q    Because he was sick?

23 A    Yes.

24 Q    Fair to say that Mr. Harris did not lavish you with money

25 and gifts?

1    A    No, he didn't.

2    Q    While you were dating?

3    A    That's right.  That's correct.

4    Q    And when you were at 205 North Amity, you had, you never saw

5    drugs in Mr. Harris's room, that's correct?

6    A    That's correct.

7    Q    Okay.  And you never saw any guns?

8    A    Correct.

9    Q    I have no further questions, Your Honor.

10              MR. HARDING:  Nothing further, Your Honor.

11              THE COURT:  Thank you very much, Ms. Delvison.

12              THE WITNESS:  You're welcome.

13              THE COURT:  You're excused.

14              MR. HARDING:  Could we have just a short break, Your

15   Honor?

16              THE COURT:  How short?

17              MR. HARDING:  Five minutes.

18              THE COURT:  How about two?

19              MR. HARDING:  Okay.

20              (Pause in Proceedings.)

21              MR. HARDING:  Your Honor, the United States calls

22   Arlene Williams.

23              ARLENE WILLIAMS, GOVERNMENT'S WITNESS, SWORN

24              THE WITNESS:  Yes.

25              THE CLERK:  Be seated.  Will you speak directly toward

DIRECT EXAMINATION OF ARLENE WILLIAMS                    58

1    the mike?  State your name and spell it for the record, please.

2              THE WITNESS:  My name's Arlene Williams.  What else I

3    say?  I forgot.

4              THE CLERK:  Spell it for the record.

5              THE WITNESS:  A-R-L-E-N-E.

6              DIRECT EXAMINATION

7    BY MR. HARDING:

8    Q    Good morning, Ms. Williams.

9    A    Good morning.

10   Q    Can you tell us how old you are?

11   A    47.

12   Q    How far did you get in school?

13   A    Twelfth.

14   Q    Okay.  Twelfth grade?

15   A    Yes.

16   Q    You've never been convicted of a crime, have you, Ms.

17   Williams?

18   A    No.

19   Q    Where did you grow up?

20   A    Baltimore City.

21   Q    Okay.  Did you live for a time in the Park Heights area?

22   A    Yes.

23   Q    Okay.  Let me call your attention to Government Exhibit

24   PH-17, which is going to flash up on that screen there right in

25   front of you.  Can you tell us, do you recognize this house?

1    A    Yes.

2    Q    What is it?

3    A    Where I used to live at, I used to live upstairs.

4    Q    Okay.  Do you remember the address?

5    A    3517 Lucille Avenue.

6    Q    Is that in Park Heights?

7    A    Yes.

8    Q    Okay.  Did there come a time when you moved to Amity Street?

9    A    Yes.

10   Q    And I also want to show you Government Exhibit PH-48.  Do

11   you recognize that?

12   A    Yes.

13   Q    What is it?

14   A    I used to live on Amity Street.  I used to live at.

15   Q    Okay.  That's a building.  But one of those townhomes in

16   there, I guess you'd call them, or apartments in there is the one

17   you were living in, is that it?

18   A    Yes.

19   Q    And who were you living with when you lived there on Amity

20   Street?

21   A    I was living with my daughters and my son.

22   Q    How many daughters do you have?

23   A    Two.

24   Q    And what's your son's name?

25   A    Shelton Harris.

DIRECT EXAMINATION OF ARLENE WILLIAMS                    60

1    Q    Okay.  Did you have, when you were living there on Amity

2    Street, was there an occasion when you found a gun in Shelton's

3    room?

4    A    One day I walked in and I seen one in his room.

5    Q    Do you remember what it looked like?

6    A    No.

7    Q    Were you happy about finding it?

8    A    No.

9    Q    What did you do?

10   A    I was mad.

11   Q    Okay.  Did you know a guy by the name of Bo?

12   A    Yes.

13   Q    Who is he?

14   A    He was my son producer.

15   Q    Your son's producer.  And what kind of business were they

16   in?

17   A    My son used to sing rap music.

18   Q    Okay.  Did he used to write raps sometimes?

19   A    Yeah.

20   Q    Okay.  Can I approach the witness, Your Honor?

21        THE COURT:  Yes.

22   Q    Do these look like some of the raps that your son would

23   write?

24        MR. FLANNERY:  Objection, Your Honor, leading.

25        THE COURT:  Overruled.

Case 1:04-cr-00029-RDB   Document 688   Filed 06/12/09   Page 61 of 209

1          THE WITNESS:  Yes.

2          MR. KURLAND:  I can't hear, Mr. Harding.

3   Q    I asked if these looked like some of the raps that your son

4   wrote, Ms. Williams?

5   A    Yes.

6          MR. MARTIN:  What exhibits?

7          THE COURT:  The exhibit numbers, Mr. Harding?

8   BY MR. HARDING:

9   Q    These are Exhibit Number S-11, S-14 and S-12.  SE-12 and

10  SE-14 and SE-11.  Do those all look like raps your son wrote, Ms.

11  Williams?

12  A    Yes.

13  Q    Showing you SE-10.  Do you recognize that?

14  A    Um-um.

15         THE COURT:  I'm sorry.  You have to say yes or --

16  A    No.

17         THE COURT:  All right.

18  Q    Okay.  Do you know what "Free Bo" means?

19  A    No.

20  Q    Or "Free Bo and Weaze?"

21         MR. FLANNERY:  Objection, Your Honor.

22  A    No.

23         THE COURT:  Just a moment.  The objection's overruled.

24  The question was, Do you know what Free Bo and Weaze means?  The

25  answer was no.

DIRECT EXAMINATION OF ARLENE WILLIAMS                    62

1   BY MR. HARDING:

2   Q    Which room in the Amity Street location, that should still

3   be on your screen there, Ms. Williams, which room was Shelton's

4   room?

5   A    Shelton, the first room.

6   Q    In the front?

7   A    Yeah, in the front, yes.

8   Q    Would that be on the second floor of the apartment?

9   A    Yes.

10  Q    Okay.  Let me call your attention to June 21st of 2002.  Did

11  the police raid your apartment that day?

12  A    Yes.

13  Q    Okay.  Where had you been earlier in the day?

14  A    I was working and I got off of work and came home.

15  Q    And so who was home when you got home?

16  A    Shamier was there and Shannon, my daughter.

17  Q    And Shamier is Shamier Delvison?

18  A    Yes.

19  Q    Was she living there at that time?

20  A    No.

21  Q    Okay.  She had lived there at some --

22  A    Yes.

23  Q    -- earlier time, is that correct?

24  A    Yes.  Yes.

25  Q    Okay.  What about Shelton?  Was he home when the police

1   raided the place?

2   A    No.

3   Q    Did you know that there were drugs in the house at the time?

4   A    No.  No, I didn't.

5   Q    Did the police discover drugs in the house?

6   A    Yes.

7   Q    Where did they discover drugs?

8   A    In Shelton's room.

9   Q    Were those your drugs, Ms. Williams?

10  A    No.  I don't do drugs.

11  Q    Were those, did they belong to, as far as you know, to

12  Shannon?

13  A    No.

14  Q    Or to Shamier?

15  A    No.

16  Q    Did you, did you unfortunately get evicted from that 205

17  North Amity Street apartment after the raid?

18  A    Yes.  Because they found drugs in my house so I had to be

19  evicted, because when you live in a low income place you cannot

20  have drugs in there.

21  Q    Okay.

22  A    Or you'll lose your place.

23  Q    Okay.  Is it your understanding that you were evicted

24  because there were drugs in the apartment?

25  A    No, I was evicted because it was drugs in the house.

CROSS EXAMINATION OF ARLENE WILLIAMS BY FLANNERY          64

1   Q    Okay.  You were arrested for --

2   A    Yes.

3   Q    -- a brief time.  But you were let go that night, is that

4   correct?

5   A    Yes.  Yes.

6   Q    Okay.  How long after the raid did you get evicted?

7   A    I got, I mean, I got my house raided.  Ever since that, I

8   were living here now, place to place.

9   Q    Don't tell us where you're living now but just tell us how

10  long after the raid was it that you got evicted?

11  A    How long I got evicted?

12  Q    Was it days or weeks or months or what?

13  A    It was months.

14  Q    Months?  Okay.  All right.

15  A    Yes.

16  Q    I think I have no further questions.  No further questions,

17  Your Honor.

18           CROSS EXAMINATION

19  BY MR. FLANNERY:

20  Q    Hi, Ms. Williams.

21  A    How you doing?

22  Q    Good.  My name's Paul Flannery and I'm one of the attorneys

23  that represents your son.

24  A    Yeah.

25  Q    Nice to see you.

1    A    Nice to see you, too.

2    Q    Ms. Williams --

3    A    Yeah.

4    Q    -- the drugs that were found at 205 North Amity, those

5    weren't your drugs?

6    A    No.

7    Q    You told the police those weren't your drugs?

8    A    Yes.

9    Q    But they arrested you, anyway?

10   A    Yes, because I was the, you know, head of the household.

11   Q    Put the cuffs on you, took you down to Central Booking?

12   A    Yes.

13   Q    Now, Ms. Williams, at the time of the raid, you were working

14   at BWI Airport?

15   A    Yes.

16   Q    And you're in kitchen prep or food prep, was it not?

17   A    Yes.

18   Q    And you worked like 7 a.m. to 3 p.m., something like that?

19   A    Yes.

20   Q    Okay.  How long had you worked there?

21   A    For three years.

22   Q    Three years from 2002 back?

23   A    Yes.

24   Q    Okay.  Seven a.m., kind of early in the morning to have to

25   be at work, right?

Case 1:04-cr-00029-RDB   Document 688   Filed 06/12/09   Page 66 of 209

1    A    Yes.

2    Q    What time do you usually go to bed if you have to be there?

3    A    At least about 8:00.

4    Q    That's good.  Full night's rest, right?

5    A    Yes.

6    Q    Good.  Ms. Williams, you had an opportunity to meet what you

7    understood to be a friend of your son's, a man by the name of Bo?

8    A    Yes.

9    Q    And you understood him to be his producer?

10   A    Yes.

11   Q    Producer in the sense that they were trying to create a rap

12   label?

13   A    Yes.

14   Q    Okay.  And your son and Bo working hard at creating that rap

15   label?

16   A    Yeah.

17   Q    And your son liked to write raps?

18   A    Yes.

19   Q    One of the things that he liked to do in life, right?

20   A    Yes.

21   Q    Okay.  And you only met Bo, though, two times, that's

22   correct?

23   A    Yes.  Yes.

24   Q    Okay.  And Ms. Williams, you do not know a gentleman by the

25   name of Shelly Wayne Martin, that's correct?

1   A    No.

2   Q    And you do not know a gentleman by the name of Shawn

3   Gardner?

4   A    No.

5   Q    Those names are unfamiliar to you?

6   A    No.

7   Q    And the nickname Goo?

8   A    No.

9   Q    Unfamiliar to you as well?

10  A    Um-um.

11  Q    Okay.  Ms. Williams --

12  A    Yeah.

13  Q    -- the day of the raid, you mentioned that you were there

14  and your daughter was there and --

15  A    And Shamier.

16  Q    Right.  One of your daughter was there?

17  A    Right.

18  Q    And Ms. Delvison was there, correct?

19  A    Yes.

20  Q    Ms. Delvison was visiting you that day?

21  A    Yes.

22  Q    You remained close after she, in fact, broke up with you

23  your son, is that correct?

24  A    Yes, yes.

25           THE COURT:  I'm sorry, Ms. Williams.  You have to wait

1    until counsel finishes asking the question before you answer.

2              THE WITNESS:  Okay.

3              THE COURT:  That's fine.

4    BY MR. FLANNERY:

5    Q    Sorry, Your Honor.

6    A    Sorry.  No.  No.  That happens.

7    Q    Ms. Williams, just a couple more questions.  At one point

8    you actually were going to school as well as working, isn't that

9    correct?

10   A    Yes.

11   Q    Okay.  And you unfortunately were called away a lot because

12   your son would have seizures sometimes at home and you would have

13   to come home and tend to him?

14   A    Yes.

15   Q    And your son is afflicted with epilepsy, unfortunately?

16   A    Yes.

17   Q    And he would have seizures fairly often and fairly

18   unexpected?

19   A    Yes.

20   Q    Okay.  Thank you.  I have no further questions.  Thank you,

21   Ms. Williams.

22             THE WITNESS:  You're welcome.

23             THE COURT:  Thank you very much, Ms. Williams.  You're

24   excused.

25             MR. HANLON:  Your Honor, the United States calls Damita

```
 1   Green.
 2              DAMITA GREEN, GOVERNMENT'S WITNESS, SWORN
 3              THE WITNESS:  Yes.
 4              THE CLERK:  Be seated.  Speak directly forward the
 5   make.  State your name and spell it for the record, please.
 6              THE WITNESS:  Damita Green.  D-A-M-I-T-A.  G-R-E-E-N.
 7              DIRECT EXAMINATION
 8   BY MR. HANLON:
 9   Q    Ms. Green, I know you're getting a cup of water poured for
10   you.  Let me ask you a couple of basic questions to begin.  How
11   old are you?
12   A    28.
13   Q    And did you grow up in the Baltimore area?
14   A    Yes.
15   Q    And what neighborhood did you grow up?  I don't need an
16   exact address, but what general area did you grow up in?
17   A    Baltimore County.
18   Q    And how far did you go in school, Ms. Green?
19   A    Twelfth grade.
20   Q    Did you graduate from high school?
21   A    Yes.
22   Q    And about when was that?
23   A    1998.
24   Q    Do you know -- well, you and I have spoken before about your
25   appearance today.  We've met and went over sort of the questions
```

DIRECT EXAMINATION OF DAMITA GREEN                              70

1    I would ask you.  We've talked a couple of times on the phone.

2    Is that right, Ms. Green?

3    A    Yes.

4    Q    And you've told me a number of times that you're not at all

5    happy to be here today, is that correct?

6    A    No.

7    Q    And in fact, you and I had a phone conversation --

8              MS. RHODES:  Objection, Your Honor.

9              THE COURT:  I guess it's overruled.  Why don't you

10   start over, Mr. Hanlon.

11   BY MR. HANLON:

12   Q    Sure, Your Honor.  I'll just ask you a question, Ms. Green,

13   and if there's an objection, hold on just for a second.  You and

14   I had a phone conversation yesterday about making arrangements

15   for you to come in and testify, is that correct?

16   A    Yes.

17   Q    And you indicated you didn't want to --

18             MS. RHODES:  Objection, Your Honor.

19             THE COURT:  Overruled.  Go ahead, Mr. Hanlon.

20   Q    Be fair to say that I essentially have insisted that you

21   come in, is that fair to say?

22   A    Yes.

23             MS. RHODES:  Objection.

24             THE COURT:  Overruled.

25   Q    And among, among some of the concerns that you have, Ms.

1    Green, is you've recently given birth to a baby, is that correct?

2    A    Yes.

3    Q    And you're still on the mend, you're still getting over your

4    birth.  There were some complications when you gave birth a few

5    weeks ago, is that right?

6    A    Yes.

7    Q    I will try to move through this quickly and I do appreciate

8    your being here.  Do you know a person named Anthony Wyche?

9    A    Yes.

10   Q    Or did you ever know a person named Anthony Wyche?

11          THE COURT:  I'm sorry, Ms. Green.  Can you get a little

12   closer to the microphone, please?  Thank you.

13   Q    Did you ever know a person named Anthony Wyche?

14   A    Yes.

15   Q    And how did you know Anthony Wyche?

16   A    I went to school with him.

17   Q    Showing you what's been marked as Government's Exhibit

18   PH-55.  Do you see that on the screen?

19   A    Yes.

20   Q    And who is this gentleman in this photograph?

21   A    Anthony Wyche.

22   Q    And did Anthony Wyche have a brother?

23   A    Yes.

24   Q    Was he Darryl Wyche?

25   A    Yes.

DIRECT EXAMINATION OF DAMITA GREEN                    72

1    Q    Did you know Darryl?

2    A    Yes.

3    Q    How did you know him?

4    A    From his brother.

5    Q    You knew Anthony Wyche better than Darryl Wyche?

6    A    Yes.

7    Q    Showing you what's been marked as Government's Exhibit

8    PH-56.  Who is this gentleman?

9    A    Darryl Wyche.

10   Q    You're aware or you became aware, Ms. Green, that Anthony

11   Wyche and Darryl Wyche were shot to death in March of 2002, is

12   that right?

13   A    Yes.

14   Q    Prior to that time, about how long had you known the two

15   brothers?

16   A    Maybe six years, seven years.

17   Q    What kind of a relationship generally did you have with them

18   as of 2002, March of 2002, just before they died?

19   A    Friend, just friends.

20   Q    Just friends?

21   A    Um-hum.

22   Q    About how frequently did you see them at that time?

23   A    Not often.

24   Q    Once in a while?

25   A    Yes.

1    Q    Just to socialize?

2    A    Yes.

3    Q    Sitting here today, Ms. Green, do you remember offhand the

4    date that they were killed?

5    A    No.

6    Q    Does March of 2002 sound accurate?

7    A    Yes.

8    Q    You remember finding out about their death, is that right?

9    A    Yes.

10   Q    And do you remember seeing them and hanging out with, with

11   Darryl Wyche and Anthony Wyche the night before their death,

12   leaving aside the date?

13   A    Yeah.

14   Q    Do you remember seeing them the night before their death?

15   A    Yes.

16   Q    Where was it, Ms. Green, that you saw Darryl Wyche and

17   Anthony Wyche the night before their death?

18   A    At a friend of mine's house.

19   Q    And what was your friend's name?

20   A    Brandy.

21   Q    Again, without getting into a particular address, what part

22   of town did Brandy live in?

23   A    In Baltimore County.

24   Q    Was it in the Randallstown section?

25   A    Yes.

1    Q    And that, that day or that night, about when was it that you

2    saw Darryl and Anthony Wyche at Brandy's house?

3    A    I'm not sure of the time, but it was at night.

4    Q    It was at night?

5    A    Um-hum.

6    Q    That's a yes?

7    A    Yes.

8    Q    And just hanging out that day?

9    A    Yes.

10   Q    Or that night, I should say.  Were there other people with

11   you?

12   A    Yes.

13   Q    If you remember, or do you remember all of the people that

14   were with you and Darryl Wyche and Anthony Wyche at Brandy's

15   house that night?

16   A    No.  I just remember Brandy's sister being there.

17   Q    You don't remember offhand whether there were other people

18   or anything like that?

19   A    No.

20   Q    Your Honor, may I approach the witness?

21        THE COURT:  Yes.

22   Q    Ms. Green, I've handed you a copy of your grand jury

23   testimony in January of 2004.  Do you remember appearing in the

24   grand jury?

25   A    Yes.

1  Q    I'm going to ask you right now, if it's okay, I would like

2  you to turn to Page Five of the grand jury transcript.  I'm going

3  to ask you to read something to yourself.  I want you to take a

4  look at Line Ten of Page Five of your grand jury transcript.

5  There's a question and answer.  Just read it to yourself and tell

6  me when you've had a chance to read that.

7  A    I read it.

8  Q    Does that refresh your recollection about who was present at

9  Brandy's house that night, the night before the Wyche brothers

10  were killed?

11  A    No.  I don't remember all those people being there.

12  Q    That's fine.  You do remember testifying in the grand jury,

13  is that correct?

14  A    Yes.

15  Q    And you were taken under oath at that time and you swore to

16  tell the truth, is that correct?

17  A    Yes.

18  Q    And you understood at the time it was important to be as

19  truthful and honest as you could, is that right?

20  A    Yes.

21  Q    And this was back, your grand jury appearance was in January

22  of 2004 so it was a little bit closer in time than we are today,

23  is that right?

24  A    Yes.

25  Q    Be fair to say your memory would have been a little fresher

1    when you appeared in the grand jury than it is today, is that

2    right?

3    A    Yes.

4    Q    I'm going to read this question and answer, the one I just

5    asked you to look at, on Page Five, Line Ten of your January

6    transcript.

7             Question:  Okay.  Who else was present with you at

8    Brandy's house that night?  For the record it's spelled "might"

9    in the transcript.  I'm reasonably certain that read "night."

10   Does that sound correct, that that would say "night?"

11   A    Yes.

12   Q    Who was present with you at Brandy's house that night?  Your

13   answer, Ms. Green, me, Brandy, my friend Keisha, I think Brandy's

14   sister was there, and Darryl, Anthony, and Deezo.  Have I read

15   the transcript correctly?

16   A    Yes.

17   Q    Now, moving off the transcript, there was a person you knew

18   at the time named Deezo, is that correct?

19   A    Yes.

20   Q    And how did you know Deezo?

21   A    I didn't really know him.

22   Q    You knew him by face?  You didn't know him well but you knew

23   his name?

24   A    Yes.

25   Q    And did you know anything about him or what relationship he

1    had with the Wyche brothers?

2    A    No.

3    Q    But you just, you recognized him and knew his name, things

4    like that?

5    A    Yes.

6    Q    Now, during the course of that evening while you were at

7    Brandy's house, Ms. Green, did Mr. Wyche, Darryl Wyche, take a

8    phone call?

9    A    Yes.

10   Q    Do you remember if Mr. Wyche, Darryl Wyche, received the

11   phone call or if he made the phone call?  Do you remember?

12   A    He received it.

13   Q    And you were present when he received that call?

14   A    Yes.

15   Q    Were you present for part of the time that Mr. Wyche spoke

16   on the phone?

17   A    Yes.

18   Q    Was that at Brandy's house?

19   A    Yes.

20   Q    Were you able to hear Darryl Wyche's half of that cell phone

21   conversation?

22   A    Yes.

23   Q    At any point during the course of the call, Ms. Green, do

24   you remember if Mr. Wyche used the name of the person he was

25   talking to?  Did he address the person on the phone by name?

1    A    Yes.

2    Q    And what name did Darryl Wyche use during that phone call?

3            MS. RHODES:  Objection, Your Honor.

4            THE COURT:  The objection's overruled.

5    Q    You can answer.

6            THE COURT:  You may answer.

7    A    Bo.

8    Q    How many times did he use the word "Bo" in addressing the

9    person on the other side of the cell phone call?

10   A    Just once that I remember.

11   Q    Did you hear, during this conversation, did you hear Darryl

12   Wyche ask anything of Bo on the phone?

13           MS. RHODES:  Objection, Your Honor.

14           MR. LAWLOR:  Your Honor, could we ask the grand jury

15   transcript be removed?  It appears the witness is reading from

16   that rather than testifying from memory.

17           THE COURT:  You can fold that up.  You can leave it in

18   front of you but you can close that up.  All right.  The

19   objection's overruled.  Do you remember the last question?

20           THE WITNESS:  No.

21           THE COURT:  Okay.  Go ahead, Mr. Hanlon.

22   BY MR. HANLON:

23   Q    I'll give you the question again, Ms. Green.  During the

24   time that you overheard this cell phone conversation between

25   Darryl Wyche and Bo, did you hear Mr. Wyche ask anything of Bo or

1    ask Bo any questions?

2    A    I don't remember.

3              MS. RHODES:  Standing objection to this.

4              THE COURT:  The objection's overruled.  The answer was

5    "I don't remember."

6    Q    You do not remember that?

7    A    No.

8    Q    Now, I'm going to ask you at this point to open up your

9    grand jury transcript again.  And I'm going to turn you to a

10   particular page.  And give me a moment.  Page Seven of your grand

11   jury transcript.  And I want you to take a look, if you would,

12   Ms. Green, at Line 15 of Page 7 of your transcript.  There's a

13   question and answer.  Read it to yourself and let me know when

14   you're done.

15   A    Okay.

16   Q    Have you had a chance to read that part of your transcript?

17   A    Yes.

18   Q    And does it refresh your recollection about whether Mr.

19   Wyche asked Bo any questions over that cell phone call?

20   A    No.

21   Q    Understood.  I'm going to read the question and answer from

22   Page 7, Line 15 of your January sworn grand jury transcript, Ms.

23   Green.  Read along with me to yourself and tell me if I get

24   anything wrong.

25              Question:  Okay.  After the conversation on the

1    telephone with Bo -- let me ask you one other question.  Do you

2    remember anything else that Darryl said during the conversation

3    that he was having?  Your answer:  All he said was, are you

4    trying to get, are you still trying to get that?

5            Did I read your transcript, your testimony accurately?

6    A    Yes.

7            MR. LAWLOR:  Your Honor, could I have a limiting

8    instruction, please, as to that testimony?

9            THE COURT:  Ms. Green, you said reading the transcript

10   does not refresh your recollection.  Is that what you're saying?

11           THE WITNESS:  Yes.

12           THE COURT:  Now, you're acknowledging that that's how

13   you testified before the grand jury?

14           THE WITNESS:  Yes.

15           THE COURT:  But as you sit here today, you don't

16   remember whether what you said then is true?

17           THE WITNESS:  It was a long time ago.

18           THE COURT:  Okay.  But my question is, do you remember

19   whether what you said in the grand jury was true?

20           THE WITNESS:  I wouldn't have lied.

21           THE COURT:  You wouldn't have lied.  Okay.  But reading

22   the transcript doesn't refresh your recollection about the event

23   back in 2002?

24           THE WITNESS:  No.  Not that night.

25           THE COURT:  Okay.  Is there a particular reason you

1    can't remember it?

2                THE WITNESS:  No.  It just was a long time ago.  It's

3    been a long time.

4                THE COURT:  Okay.  So if reading the transcript doesn't

5    help you remember, I guess nothing would help you remember?  In

6    others words, your memory of this event is just totally wiped

7    out?  I mean, if it is, it is.

8                THE WITNESS:  I remember testifying to it on the grand

9    jury.

10               THE COURT:  Right.

11               THE WITNESS:  I just --

12               THE COURT:  But you don't remember the actual event?

13               THE WITNESS:  I remember him taking the phone call.  I

14   just don't remember everything that was said on the call.

15               THE COURT:  Okay.  All right.  All right.

16               The grand jury testimony of this witness, ladies and

17   gentlemen, may not be considered by you as the actual substantive

18   testimony for purposes of this trial.  Mr. Hanlon has attempted,

19   and you just heard me question the witness to see whether the

20   witness has a recollection of this part of the phone call about

21   which she's testifying.  But you may not consider the grand jury

22   testimony as substantive evidence.  It was only introduced for

23   the purpose of trying to help the witness recall the actual

24   event.  Go ahead, Mr. Hanlon.

25               MR. HANLON:  Your Honor, actually, may the government

DIRECT EXAMINATION OF DAMITA GREEN                    82

1    be heard on that or may I at least --

2              THE COURT:  Yeah, I'll probably change it, but go

3    ahead.

4              MR. HANLON:  So I should continue with the witness?

5              THE COURT:  Yes.  Oh, yes.

6    BY MR. HANLON:

7    Q    Do you recollect after the call happened -- and again, I'm

8    asking you, don't look at your grand jury transcript until I tell

9    you to, Ms. Green -- after the phone call happened, Ms. Green, do

10   you remember how Mr. Wyche, how Darryl Wyche seemed after the

11   call?  Did he seem happy, sad?  Anything at all about his state

12   of mind?

13   A    I remember that night he was in a good mood.

14   Q    Was he in a good mood the whole evening or was he in a

15   better mood after the phone call ended with Bo?

16   A    We had been all laughing the whole night.  But he was in a

17   good mood when he hung up as well.

18   Q    And after the phone call ended, did you see Darryl Wyche

19   make arrangements to do anything or go any place?

20   A    No.  Well, they, he left after, a little while after he got

21   off the phone.

22   Q    About how long after he got off the phone did he leave?

23   A    I can't remember.

24   Q    Was it about 20 minutes?

25   A    Yes.  Maybe 20.  It wasn't an hour, so --

1    Q    And do you remember, did you see Darryl Wyche leave with

2    anyone else?

3    A    Yes.

4    Q    Who did he leave with?

5    A    I remember him leaving with his brother.

6    Q    His brother was Anthony Wyche?

7    A    Anthony Wyche.

8    Q    And everybody knew him as Pete, is that right?

9    A    Yes.

10   Q    Do you remember seeing the Wyche brothers have any

11   discussion about who was going to drive or anything like that?

12   A    His brother said he would drive.

13   Q    Do you remember if Anthony Wyche, also known as Pete, seemed

14   happy or unhappy to be driving?

15   A    He really didn't feel like driving but, you know what I

16   mean, he said he would drive.

17   Q    And it was late at night when they left, is that right?

18   A    Yes.

19   Q    And sitting here today, do you remember if it was just the

20   brothers who left or if they left with anyone else?

21   A    I just remembered them leaving.

22   Q    You never spoke to either Anthony Wyche or Darryl Wyche

23   again, is that correct?

24   A    No.

25   Q    And the next day you heard about the fact that they'd been

1    shot, is that correct?

2    A    Yes.

3    Q    Do you have any concerns about testifying here today, Ms.

4    Green, aside from what you --

5              MR. LAWLOR:  Objection.

6              THE COURT:  You can finish the question.

7    Q    Do you have any concerns about testifying here today or

8    about remembering the things you've talked about or that I've

9    asked you about?

10             MS. RHODES:  Objection.

11   Q    Aside from what you previously testified to?  And hold on.

12             THE COURT:  Overruled.  You may answer.

13   A    Can you repeat question?

14   Q    Yes, ma'am.  Do you have any concerns about testifying here

15   today or about remembering the things I've asked you about apart

16   from what you and I have already discussed, the fact that you're

17   on the mend from having a baby and things like that?

18             MS. RHODES:  Objection.

19             THE COURT:  Overruled.  You may answer.

20   A    I didn't want to testify.  But I don't have any concerns

21   about remembering anything.

22   Q    Why did you not want to testify?

23             MS. RHODES:  Objection.

24             THE COURT:  Overruled.  You may answer.

25   A    Out of fear.

1    Q    Your Honor, I believe I've concluded my testimony with the

2    witness.  The issue now is, I think, the treatment of the grand

3    jury transcript.  I don't know if the Court would like to be

4    heard, if the government may be heard on that point.

5               THE COURT:  Well, what's your theory, Mr. Hanlon?

6               MR. HANLON:  Past recollection recorded, Your Honor.

7               THE COURT:  No.  That's not past recollection recorded.

8    All right.  You may cross examine.

9               MR. HANLON:  Well, Your Honor, may I give one other

10   theory?

11              THE COURT:  Yes.

12              MR. HANLON:  Prior inconsistent statements, sworn.

13              THE COURT:  It's not inconsistent.  It's not

14   inconsistent.  She says she does not remember.  It doesn't

15   refresh her recollection.  A failure of recollection is not an

16   inconsistent statement.

17              MR. HANLON:  But it's also not a past recollection

18   recorded, Your Honor?

19              THE COURT:  And it's not a past recollection recorded.

20              MR. HANLON:  May I brief this subject, Your Honor?

21              THE COURT:  No.  No.  No.  Let's move on.

22              CROSS EXAMINATION

23   BY MS. RHODES:

24   Q    Hi, Ms. Green.  I have some questions for you.  First of

25   all, congratulations on your new baby.

1    A    Thank you.

2    Q    You testified, you said you recall testifying in front of

3    the grand jury, right?

4    A    Yes.

5    Q    And that date was around, in January of 2004.  Does that

6    sound right?

7    A    Yes.

8    Q    Okay.  And then do you also remember an interview with the

9    police shortly after the homicides?

10   A    Yes.

11   Q    Okay.  And that was around the 28th day of March, in 2002?

12   A    Yes.

13   Q    Okay.  Well, does it sound right that it was within, say, a

14   week after the homicides?

15   A    Yes.

16   Q    Okay.  So at that point certainly your memory would have

17   been even more fresh than it was at the grand jury, right?

18   A    Yes.

19   Q    Okay.  And do you remember in that interview who you, that

20   you spoke to Detective Niedermeier, he was one of the people

21   there?

22   A    Yes.

23   Q    And another officer was there, too?

24   A    Yes.

25   Q    Okay.  Now, in terms of the time, again, going back to the

1    interview in March of 2002, when everything was much more fresh,

2    do you remember that the, you told them that the call came in

3    that they were asking you about around 11:40 p.m.?

4    A    I don't remember the time the call came in.

5    Q    Okay.  Do you -- but if you told them that, that would have

6    been the truth then, right?

7    A    Yes.

8    Q    Okay.  And do you recall, you don't recall saying that it

9    was around 11:40 or do you recall that?

10   A    I don't recall.

11   Q    Okay.  Do you recall telling them that they left maybe half

12   an hour later?

13   A    Yes.

14   Q    Okay.  And do you recall telling them that Deezo, that the

15   three all left together, Deezo with the brothers?

16   A    No, I don't recall that.

17   Q    Okay.  Now, looking at these phone calls, they asked you

18   about one call in particular, right?

19   A    Yes.

20   Q    Okay.  They weren't asking you about every single call he

21   got or he made that evening, right?

22   A    No.

23   Q    Okay.  And if they had, you would have been able to give

24   them a little more information about other calls he had gotten,

25   right?

1    A    Yes.

2    Q    Okay.  Now, I know it's long time ago, but do you remember

3    how many times you talked, you got a call or made a call to

4    Darryl that day?

5    A    No.

6    Q    Would it, would it have been around ten times, do you think,

7    back and forth?

8    A    No.  I don't, I don't recall.  But I don't remember talking

9    to him ten times that day.

10   Q    How many times would you say you spoke to him that day?

11   A    Maybe twice, two or three times.  He was calling me, looking

12   for his cousin.

13   Q    His cousin being who?

14   A    Keisha.

15   Q    Okay.  And when he called you those times, were you at

16   Brandy's house?

17   A    I don't recall.  I wasn't at Brandy's house the whole day

18   so --

19   Q    Okay.  Do you remember when you got there to her house?

20   A    No.

21   Q    You remember telling the police that you had, that Darryl

22   had come over to the house, to Brandy's house, several times that

23   day, like three times?

24   A    Yes.

25   Q    Okay.  And I gather -- and that Pete had been there

Case 1:04-cr-00029-RDB    Document 688    Filed 06/12/09    Page 89 of 209

1    basically all day, I mean Anthony Wyche had been there basically

2    all day?

3    A    Yes.

4    Q    But Darryl wasn't there all day but several times?

5    A    Yes, he wasn't there all day.

6    Q    Okay.  And the last time he came back was when he came back

7    with Deezo?

8    A    Yes.

9    Q    Okay.  And then he had been there earlier and then left to

10   go get his daughter, is that right?

11   A    I don't recall.

12   Q    Do you remember him having to go with his wife and Tasha to

13   pick up their kids somewhere?

14   A    No.

15   Q    But if you told the police that, that would have been the

16   truth?

17   A    Yes.

18   Q    Okay.  So you must have gotten there, what time do you

19   think?  Would it have been around noon, say?  Or what?

20   A    Sometime that afternoon.

21   Q    Okay.  So he would have been there a couple times in the

22   afternoon at least, if not in the morning?

23   A    Yes.

24   Q    Do you know if he was there in the morning?

25   A    No, I don't know.

1   Q    You don't know?  Now, the car, this white Honda, they had,

2   Anthony had just gotten that car, is that right?

3   A    I don't recall.

4   Q    You remember that it was something that he'd had maybe for a

5   day or two?  Do you remember telling the police about that?

6   A    No.

7   Q    Okay.  You had known the Wyche brothers, well, you knew Pete

8   from back from middle school, right?

9   A    Yes.

10  Q    Okay.  And Anthony you'd met -- sorry -- Darryl you'd met

11  about six or seven years earlier?

12  A    Yes.

13  Q    Okay.  So how often would you say you'd talk to Darryl in a

14  week?  How many times?

15  A    Not often.

16  Q    A couple times a week?

17  A    No.

18  Q    Something like that?

19  A    No.

20  Q    What about that week?  I mean, would you say that there had

21  been a couple different days when you'd had phone calls with him?

22  A    Yes.

23  Q    Okay.  And did you know he was going to be getting a new car

24  or that he had gotten a new car, a white Honda?

25  A    No.

1   Q    No, or you don't remember?

2   A    I don't remember.

3   Q    Okay.  Okay.  Do you remember when Detective Niedermeier

4   asked you about the white Honda station wagon, if you'd ever seen

5   Darryl or Anthony in it before?

6   A    No.

7   Q    Okay.  Do you remember telling him, Anthony's never been in

8   that car before, because, well, up until Sunday, because Darryl

9   just got that car, Darryl might have been in it a couple of

10  times, he just got it two days before, it's a new car?

11       MR. HANLON:  Your Honor, objection to the reading of

12  the transcript.

13       THE COURT:  Rephrase the question, Ms. Rhodes.

14  Q    Do you remember telling Detective Niedermeier that Darryl

15  Wyche had just gotten that car two days before, it was a new car?

16  A    No, I don't remember.

17  Q    Okay.  Do you recall seeing that car parked outside of

18  Brandy's that night?

19  A    Yes.

20  Q    Okay.  And had you ever seen it, had you ever seen it the

21  day before or the day before that, after Darryl got it?

22  A    If I had seen him, he was driving that car.

23  Q    Okay.

24  A    I don't remember if I saw him a couple days prior to that

25  because I didn't see him all the time.

1    Q    Okay.  So do you think that was the first time you saw that

2    car?

3    A    Yes.

4    Q    Okay.  And you remember they also had a green car that

5    night, too?

6    A    No, I don't remember.

7    Q    Okay.  Did you know when -- at some point Darryl had a sedan

8    business, doing some chauffeuring and that sort of thing.  Do you

9    remember that?  Do you remember hearing about that?

10   A    Yes.

11   Q    And in that business he had, obviously had to have a lot of

12   different cars, right, to provide the services?

13   A    Yes.

14   Q    Okay.  And did you ever see any of those cars that he had?

15   A    No.

16   Q    All right.  Do you remember telling Detective Niedermeier

17   that Deezo and Darryl and Anthony left around 12:15?

18   A    I don't even remember Deezo being there, it was so long ago.

19   But I thought that Darryl and Anthony left around that time.

20   Q    Okay.  You know who Deezo is?  I mean, you know what he

21   looks like more or less?

22   A    Not really.  I've seen him but I probably don't remember

23   what he looks like.

24   Q    When was the last time you saw him?

25   A    That night, as I recall.

1    Q    Okay.  As far as you know, you've never seen him since then?

2    A    No.

3    Q    And were you aware what Darryl did for his money?

4    A    I heard what he did.  I wasn't, I've never witnessed.  But I

5    just --

6    Q    Okay.  Who did you hear it from?

7    A    Just the streets.  Nobody in particular.

8    Q    Okay.  And do you remember when, when Darryl went out

9    somewhere, just in general, did he like to drive?

10   A    No.

11   Q    Okay.  So if he was going with somebody else, he'd have them

12   drive?

13   A    Yes.

14   Q    Okay.  All right.  Do you remember Darryl telling, do you

15   remember telling the police when you were with them in March of

16   2002 some other things that Darryl had said he was going to do

17   that night?

18   A    No.

19   Q    Okay.  Do you remember -- Court's indulgence.  Do you

20   remember one of the officers asking you where they were going and

21   then your telling them that you had, that Darryl had said he had

22   to go out to Essex and he had to go over to East Baltimore and

23   that he had to go back over to West Baltimore?  Do you remember

24   that?

25   A    No.

1    Q    Okay.  But if -- all right.  Thank you.  And when do you

2    think that you kind of stopped remembering all of this stuff?  I

3    mean, you remembered it in March of 2002 and you remembered it, a

4    lot of things in 2004.

5    A    Well, in '04, I, they had to refresh my memory of some

6    things because I didn't remember in '04.

7    Q    Okay.  So in 2004, the prosecutors used your, the police

8    interviews to refresh your memory?

9    A    Yes.

10   Q    Okay.  Okay.  Do you remember Darryl's getting a whole bunch

11   of phone calls that night?

12   A    No.

13   Q    Okay.  Do you remember, you remember what time they got back

14   from DC around?  Maybe 9 or 10:00?

15   A    No.

16   Q    You don't remember?

17   A    No.  I don't remember him coming from DC.

18   Q    Oh, you don't remember that he and Deezo had gone to DC?

19   A    No.

20   Q    Okay.  Do you remember that -- and you have no idea what

21   time they came back?

22   A    No.

23   Q    Or do you remember what time they came in to the house?

24   A    I don't remember exact time.  It was at night, though.

25   Q    Okay.  Would you remember -- okay.  Court's indulgence.

1      Okay.  Do you remember saying before to the police that

2  when they came back, that when Deezo and Darryl came in, that it

3  was about roughly 10:00?

4  A    No, I don't remember.

5  Q    Okay.  Do you remember that Darryl got -- well, let me ask

6  you this.  When you would call Darryl to reach him, you would

7  call him on his cell phone?

8  A    Yes.

9  Q    And you would use your cell phone?

10 A    Yes.

11 Q    Okay.  Do you remember his cell phone number back then?

12 A    No.

13 Q    Does the number 443-691-9203 sound familiar?

14 A    No.

15 Q    Okay.  Do you remember your cell phone back then?

16 A    No.

17 Q    Okay.  Does the number 410-262-0798 sound familiar as one of

18 your old cell phone numbers or perhaps your current cell phone

19 number?

20 A    No.  It doesn't sound familiar.  That's not my current

21 number.

22 Q    Okay.  Could it have been your number in 2002?

23 A    Yes.

24 Q    All right.  And did Darryl usually have a couple different

25 cell phones or several cell phones?

1    A    Yes.

2    Q    Okay.  So to reach him, people would call him on different

3    numbers?

4    A    Yes.

5    Q    Okay.  So on one of his cell phones that night, do you

6    recall him getting four calls between 9 and 10:00?

7    A    I don't know how many calls he got.  His phones ring a lot.

8    Q    Okay.  Do you remember him getting, between 10 p.m. and

9    11:40 p.m., 14 calls?

10   A    No.

11   Q    Okay.  On one phone?  No?  Okay.  Now, is it -- I asked you

12   before but I want to clarify.  Is it possible that, that you

13   spoke to Darryl ten times that week?  Is it possible?

14   A    In the week?

15   Q    In the week.

16   A    Yes.  That's possible.

17   Q    Okay.  And it's possible that you spoke to him five times

18   that day?

19   A    It's possible.  I wouldn't think I spoke to him five times

20   on the phone because I saw him in person as well.  So --

21   Q    Well, or that maybe some of the calls didn't go through but

22   there were five attempts or five calls made back and forth?

23   A    That's possible.

24             MR. HANLON:  Objection, Your Honor.

25             THE COURT:  Well, you asked about whether she spoke to

1    him and then you asked about whether there were calls back and

2    forth, right?

3              MS. RHODES:  Right.  Is it possible some of the calls,

4    some of the calls didn't actually connect but there were five

5    attempts?

6              THE COURT:  Okay.  And I think she said that's

7    possible.

8    BY MS. RHODES:

9    Q    Right.  Okay.  So I'm going to ask you.  So you have no idea

10   what Deezo's relationship was with Darryl, right?

11   A    They were friends.

12   Q    Okay.  Friends.  Do you know of any other relationship they

13   had?

14   A    No.

15   Q    Okay.  And do you know if -- so you don't know if, you don't

16   know when Deezo hung out around Darryl?

17   A    No.

18   Q    And when he didn't?

19   A    No.

20   Q    Okay.  And do you remember the other nickname that you used

21   for Deezo when you talked to the police?

22   A    No.

23   Q    And you don't know anything -- do you know how, how much

24   Darryl made in a week from his drug business?

25   A    No.

1    Q    Do you know how much, how much in the way of drugs he was

2    moving a week, or selling?

3    A    No.

4    Q    Okay.

5    A    I just knew that, I've heard that he sold drugs because he's

6    been arrested for that.  I've never witnessed him doing anything

7    like that.

8    Q    Okay.  And do you know if his wife, Natasha, helped him in

9    that business at all?

10   A    No.

11   Q    Do you know Natasha?

12   A    Yes.

13   Q    You've met her?

14   A    Yes.

15   Q    Did Darryl ever mention going to church that morning?

16   A    I don't remember, but I know that he did go to church on

17   Sundays.

18   Q    Okay.  Did he use his phone a lot when he was in church?

19   A    I wouldn't know.

20   Q    Okay.  Do you recall being asked in the grand jury -- again,

21   this is back to January of 2004 -- that they asked a lot of

22   questions about this call that, where you heard the name Bo

23   mentioned by Darryl, right?

24   A    Yes.

25   Q    Okay.  And you were asked by Mr. Harding, okay, after the

1    phone conversation, did Darryl ask something of Anthony?  Do you

2    remember that question?

3    A    Yes.

4    Q    Okay.  And do you remember saying that he asked him before

5    the phone conversation to drive him?  Do you remember that?

6    A    No.

7    Q    Okay.  And Mr. Harding said, before the phone conversation?

8    Do you recall saying, um-hum.  And then he ask him if he was

9    still going to drive.  Do you remember that?

10    A    I don't remember him asking before the phone conversation.

11    I remember him asking could he drive him somewhere.

12    Q    Okay.  But now you're not sure whether it was before the

13    phone conversation or not?

14    A    No, I don't know if it was before or after, after the

15    conversation.

16    Q    But it could have been, when you were under oath before, you

17    have said to the judge you would not have lied, right?

18    A    Right.

19    Q    So we -- okay.  Thank you.  Court's indulgence.

20          (Pause in Proceedings.)

21          THE COURT:  Ms. Rhodes, you and Mr. Lawlor want to

22    withdraw your objection?

23          MS. RHODES:  We could leave that for another time, Your

24    Honor.

25          THE COURT:  Well, no.  The witness is here now.

1    MS. RHODES:  As to the grand jury issue?

2    THE COURT:  Yeah.

3    MS. RHODES:  I will withdraw Mr. Lawlor's objection,

4  yes.

5    THE COURT:  Okay.  Well, in that light, ladies and

6  gentlemen, the objection being withdrawn, you may consider the

7  prior statements made under oath in the grand jury by Ms. Green

8  back in 2004 as evidence in this case just as if she had

9  testified to those facts to you under oath here on the witness

10  stand.  The objection is withdrawn.  Go ahead, Ms. Rhodes.

11    MS. RHODES:  Thank you, Your Honor.  Your Honor, does

12  that ruling apply to the police, the recorded police statement as

13  well?

14    THE COURT:  No.  Only to the grand jury transcript.

15  BY MS. RHODES:

16  Q    All right.  Is it correct, Ms. Green, that you, that you're

17  saying today that you don't remember anything, anything that you

18  told the police that day in March of 2002?

19    THE COURT:  Well, wait.  Now, that's not a fair

20  question, Ms. Rhodes.

21    MS. RHODES:  Well, I need to narrow down where she is.

22  That's why I'm --

23    THE COURT:  But you're going to have to do it question

24  by question.  You can't ask somebody whether they don't remember

25  anything about what they said years ago.

1          MS. RHODES:  Okay.  Court Court's indulgence.

2          THE COURT:  Why don't you confer with Mr. Hanlon and

3    see if the two of you can't reach agreement on some of this

4    stuff?

5          MS. RHODES:  All right.

6          (Pause in Proceedings.)

7          THE COURT:  Would you like more water, Ms. Green?

8          (Pause in Proceedings.)

9          THE COURT:  It appears, ladies and gentlemen, that

10   counsel may need a few more minutes to work out their

11   arrangement, if any.

12         MS. RHODES:  That's correct, Your Honor.

13         THE COURT:  Why don't we take our morning recess at

14   this time?  Please leave your note pads in your chairs.  Have no

15   discussion about the evidence you've heard so far or any aspect

16   of the case.  Continue to keep an open mind about all issues.

17         We will stand in recess for 15 minutes.

18         (Recess at 11:55 a.m.)

19         (Defendants not present in courtroom.)

20         THE COURT:  Any agreement reached, Ms. Rhodes?

21         MS. RHODES:  They are still deciding.  But what we are

22   proposing is that the grand jury transcript come in as

23   substantive evidence and with one, one redaction that we've

24   agreed on.  Actually, two.  And then that what they're debating

25   about is how to deal with the police transcript.  And I've

1  proposed a couple of ways of doing that.

2           THE COURT:  Police transcript?

3           MS. RHODES:  The police interview transcript, which is

4  also a recorded statement.

5           THE COURT:  Oh, it's a recorded statement.  Not under

6  oath?

7           MS. RHODES:  Right.

8           THE COURT:  Obviously.  Mr. Hanlon?

9           (Defendants enter the courtroom.)

10          MS. RHODES:  Although she has said that it was used as

11 the basis for prepping her for the grand jury.

12          MR. HANLON:  Should I wait, Your Honor?

13          THE COURT:  No.  Go ahead.  What do you want to do, Mr.

14 Hanlon?

15          MR. HANLON:  Your Honor, here's the thing that the

16 government's struggling with.  I'm inclined to do this in the

17 most convenient way possible, which is to essentially, you know,

18 use both documents for whatever I think they could ultimately be

19 authenticated for.  Here is the concern the government has.

20          We have a sworn grand jury transcript on the one hand

21 and we have a police transcript and an underlying police

22 recording on the other.

23          My sense is that the witness has recollected being in

24 the grand jury and made reference to the fact that she was trying

25 to be truthful, would not lie to the grand jury.  She certainly

CROSS EXAMINATION OF DAMITA GREEN BY RHODES                    103

1    seemed to recognize her grand jury transcript.  I'm confident

2    that the defense could authenticate the transcript of the police

3    interview if they needed to by bringing in Detective Niedermeier.

4            What I think would ultimately be a little different at

5    the end of the day is the purposes for which these respective

6    documents would be used.  A sworn grand jury transcript, I think,

7    under certain circumstances could be admitted for the truth of

8    the matter asserted.  The police interview, I think, could be

9    used as impeachment material but it seems to me that it would be

10   subject to the regular limitations being used for impeachment,

11   not for the truth of the matter asserted, but simply as, as

12   impeachment material.  That's the difference that the government

13   sees between the two documents.

14           I don't want the defense to have to go through

15   authentication hoops, but I feel like at the end of the day that

16   is where we would be.

17           THE COURT:  I don't know if, I don't know if there's

18   anything for me to decide or not.  My ruling was clear.  The

19   objection having been withdrawn by the defense, specifically by

20   Mr. Mitchell, I'm perfectly satisfied to have the grand jury

21   transcript come in as substantive evidence.

22           The police interview stands on a very different

23   footing.  And if you two can't reach agreement, then, then I

24   don't know that there's anything more for me to do.

25           MR. HANLON:  Just so the Court's aware, I have no

1   problem with the defense presenting portions of the grand jury or

2   the police interview as impeachment material here, and rather

3   than calling back Detective Niedermeier to re-testify.

4           THE COURT:  But I thought Mr., I thought Ms. Rhodes's

5   point was that it's not impeachment because it's not

6   inconsistent.  If she doesn't remember something she said to

7   Niedermeier, it's on the same footing as the grand jury

8   testimony.  The only difference is the grand jury testimony is

9   under oath.  But in my judgment, and I'd love -- Mr. Hanlon, by

10   the way, I really want to see your memorandum on recorded

11   recollection of grand jury testimony.

12           MR. HANLON:  I'm sorry, Your Honor?

13           THE COURT:  I said I really want you to give me a

14   memorandum on grand jury testimony as past recollection recorded.

15           MR. HARDING:  I will, Your Honor.

16           THE COURT:  But we're past that now.  Perhaps Mr.

17   Kurland can help you out with that.

18           But anyway, before you speak, Mr. Kurland --

19           MS. RHODES:  Your Honor --

20           THE COURT:  I'm sorry?

21           MS. RHODES:  Go ahead.

22           THE COURT:  If there are specific facts that you want

23   in from the Niedermeier interview, I presume that Mr. Hanlon

24   would be willing to stipulate to those facts, or some of them.

25   In other words, what is it that you want, Ms. Rhodes, from the

Case 1:04-cr-00029-RDB   Document 688   Filed 06/12/09   Page 105 of 209

1    police interview?

2           MS. RHODES:  Several paragraphs, basically.  I mean,

3    you know.

4           THE COURT:  To what effect?  To what effect?

5           MS. RHODES:  You mean what's the information?

6           THE COURT:  Yeah.

7           MS. RHODES:  Oh, she says, her timing is a little bit

8    different.  She's very clear and precise in the police interview.

9           THE COURT:  What was date of that, by the way?

10          MS. RHODES:  It was the 28th of March.

11          THE COURT:  2002?

12          MS. RHODES:  Right.

13          THE COURT:  All right.

14          MS. RHODES:  And she's very clear that Deezo was there.

15   It's clear she knows Deezo.  She calls him Deezo.  He also goes

16   by Shabazz.  She is clear that he had been there three times that

17   day.

18          She says in this other paragraph, yeah, Darryl said he

19   had to go out Essex and he said he had to go over, he had to go

20   over East Baltimore, then he had to go back over West Baltimore,

21   but I don't think that he did all that because it's, it's not

22   coming out right in the time frame.  So she clearly --

23          THE COURT:  Wait.  Wait.  She doesn't believe that he

24   did all of that?

25          MS. RHODES:  Well, she said that's where he was going

1    to go.  But I don't think he did all that.

2              THE COURT:  Because he got murdered --

3              MS. RHODES:  Right.

4              THE COURT:  -- at midnight in West Baltimore.

5              MS. RHODES:  Right.  And she says, and she says, it's

6    not coming out right.  In other words, she's saying he didn't

7    have time to do all those things before he got murdered.

8              THE COURT:  Okay.

9              MS. RHODES:  But a part of what she does here is in

10   our, we believe undermines some of Deezo's testimony, Dwayne

11   Denham's testimony.  So that's another reason why it's important

12   for us to have this.

13             She also says --

14             THE COURT:  Well, if the government's objecting, the

15   Court's sustaining the objection.  It's not admissible just

16   because it's recorded.  This isn't state court.  I'm not even

17   sure it would be admissible in state court.

18             MS. RHODES:  I'm sorry, Your Honor.  You're saying it's

19   not --

20             THE COURT:  It's not admissible for the truth of the

21   matter asserted, her interview.

22             MS. RHODES:  Well, the only -- that's fine.  I just,

23   what I said to Mr. Hanlon was the way that, I was going to have

24   her in a lump deny remembering this.  But the Court didn't want

25   me to do that.  So I can go through the things that she denies

1    and then call Detective Niedermeier to say, this is what she told

2    me in the interview.

3              THE COURT:  You're not going to be able to impeach

4    Deezo by having --

5              MS. RHODES:  Not Deezo.  No.  It's impeaching --

6              THE COURT:  No.  But that's the point of, the prior

7    statements that you want in as substantive evidence coming from

8    Ms. Green are for the purpose of impeaching Denham.

9              MS. RHODES:  No.  No, Your Honor.  No.

10             THE COURT:  Okay.  Then I missed something.  I missed

11   something.

12             MS. RHODES:  I said it also undermines to some extent

13   the whole picture that Deezo is painting.  It's not a direct

14   impeachment of Deezo at all.  The impeachment would be of her

15   because she says, I don't recall this.  And so I think I'm

16   entitled to call Detective Niedermeier to say, yes, I had an

17   interview, and play some of the interview, or ask him, is this

18   what happened in the interview?

19             THE COURT:  But that's not -- I have no difficulty

20   whatsoever in concluding that the witness' assertion of a failure

21   of recollection is genuine.  I confess I've almost never seen it

22   quite this dramatically.  But your cross examination of this

23   witness bears out the testimony of this witness to Mr. Hanlon.

24   I'm sure we were all sitting here as she began her refrain of, I

25   don't recall, I don't recall, even when Mr. Hanlon showed her the

1  grand jury transcript and she, she, she validated the transcript.

2  And yet, I still don't recall.  And that's why I got into it.

3        Obviously, you saw I was a little bit incredulous; that

4  you read the transcript, you say, yes, I remember being in the

5  grand jury.  She'd already talked about that night.  She

6  remembers the phone call.  But your cross examination, again, as

7  I say, seems to me to justify my finding that her failure of

8  recollection is genuine.  It is a genuine failure of

9  recollection.  It's not some maneuver on her part or

10  disingenuousness.

11        So it's not inconsistent.  To say "I genuinely don't

12  remember" is not inconsistent with anything anybody previously

13  said.  So it's not impeaching of her to show the Niedermeier

14  interview.

15        Now, if you can get the Niedermeier interview before

16  the jury on some other basis, either by agreement of the

17  government or on some other exception to the hearsay rule,

18  obviously, you can do it.  But it's not impeaching of her to say,

19  I don't remember.  You can't impeach a genuine failure of

20  recollection.  It's just not there.

21        MS. RHODES:  Well, in any event, Your Honor --

22        THE COURT:  So, I mean -- I'm sorry?  So you can go

23  through and ask her the questions and see what she remembers and

24  what she doesn't.  But if she doesn't remember, it's not in for

25  the truth of the matter, nor is it in for impeachment.  It's only

1    in to refresh her recollection.

2              MS. RHODES:  Very well.

3              THE COURT:  There's a whole line now.  Mr. Kurland.

4              MR. KURLAND:  Your Honor, because her substantive

5    testimony, even to the fact that she claims that she heard the

6    name "Bo" on the telephone, is admissible in the coconspirator

7    context against everybody, we have standing to comment here.

8              I just wanted to point out that, to the extent that the

9    parties during the break tried to work out stipulations, any

10   stipulation obviously requires the consent of all of the

11   defendants.  And anything that's going to allow in blatantly

12   inadmissible evidence like the police statement shouldn't come in

13   as substantive evidence at all.  And we would never, we wouldn't

14   stipulate to that, even if the government, for whatever reason,

15   and one particular defendant would.

16             Now, with respect to some other stuff, I mean, if, I

17   would love to give a talk to all the district judges, evidence

18   stuff, if you want to arrange that after the trial.  It wasn't

19   past recollection recorded.  It couldn't come in under that.

20             THE COURT:  I still want to see Mr. Hanlon's

21   memorandum.

22             MR. KURLAND:  He'd never be able to do it.  I'll talk

23   to him friendly afterwards.  But with respect to the grand jury

24   transcripts, okay, we have a problem with the entirety coming in

25   for a variety of reasons.

1          If the Court's finding is that, and it's clearly

2     supported by the record, that it's a genuine recollection,

3     failure of memory, then the Court should strike it.  We would ask

4     the Court to strike the testimony that she was afraid because

5     that's, that's inconsistent because that sort of like leads, she

6     was unclear as to what she was afraid of.  But if it's a genuine

7     memory loss, which the Court has found, then the other testimony

8     should be stricken.  The government shouldn't be able to argue

9     anything with respect to the fear because that to some extent

10    conceivably could play into some argument with respect to some of

11    the charges.

12         THE COURT:  I admitted that because I thought it was

13    proper government impeachment.

14         MR. KURLAND:  All right.

15         THE COURT:  Despite what I said about the genuineness

16    of her failure of recollection, the government was entitled to

17    show that there may be some other reason she's not being

18    forthcoming.

19         MR. KURLAND:  But then with respect to the finding,

20    then, with respect to the, it's genuine memory refreshment, then

21    there's no basis for the parties to stipulate that the -- and

22    we'd object to that as well, then -- that the grand jury

23    testimony comes in as sub substantive evidence because it's not

24    going to be 801.  The only way to get it in would be parts of it

25    --

1          THE COURT:  No.  It's already in because Ms. Rhodes --

2     Mr. Mitchell was the only person who objected.  And while, yes,

3     we have, we've been operating under the rule that everybody is

4     deemed to have joined in an objection, under that rubric

5     everybody joined in the withdrawal of the objection as well.

6          MR. KURLAND:  But that came up --

7          THE COURT:  Just a moment, just a moment, just a

8     moment.  Thereafter, I invited Ms. Rhodes and Mr. Hanlon to

9     confer to do exactly what they've now done.  They've agreed that

10    this is ridiculous, that the jury has heard it all,

11    notwithstanding the Court's limiting instruction.  The witness

12    has testified.  She's here, available for cross examination to

13    everybody.  And Mr. Hanlon and Ms. Rhodes have reached what

14    appears to me to be the perfectly sensible decision to just put

15    the grand jury transcript in with whatever redactions the two of

16    them and any of you on the other side believe might be necessary

17    before we actually give it to the jury.  And that makes sense to

18    me.

19          Now, to the extent that Mr. Gardner or Mr. Martin or

20    Mr. Harris want to object, your objection is noted and overruled.

21    To the extent that any of those three defendants wish to fly spec

22    the grand jury transcript before it's given to the jury to ask

23    for additional redactions of particularly harmful testimony,

24    obviously, I'll consider that.  But that's where we are.

25          The grand jury transcript of this witness' testimony,

1    of this witness, Ms. Green, as redacted is admitted as an exhibit

2    by agreement of the government and Mr. Mitchell.

3            MR. KURLAND:  Then we want it clear on the record,

4    because this is hearsay coming in.

5            THE COURT:  I said your objection is noted.  But I

6    determined, as I say, not to repeat myself, when Ms., when Ms.,

7    Ms. Rhodes, I almost said Ms. Lawlor, when Ms. Rhodes withdrew

8    the -- by the way, with all respect, Mr. Lawlor, improper

9    objection and request for a limiting instruction by Mr. Lawlor

10   because Mr. Lawlor knew this wasn't his witness.  And under the

11   one lawyer/one witness rule, Mr. Lawlor should not have spoken up

12   at all.  And I suspected as much because Ms. Rhodes had already

13   told me yesterday, when we were arranging for her to step out it

14   take care of her personal matter, that she was going to handle

15   Ms. Green.

16           But I went ahead, anyway, because I thought it was

17   particularly important, and I knew that I would get a chance to

18   hear from Ms. Rhodes, I went ahead and gave the jury that

19   limiting instruction.  And all other counsel were deemed to have

20   joined in that objection.

21           And then Ms. Rhodes, when it became perfectly clear to

22   the jury -- several of them chuckled -- when it became perfectly

23   clear that Ms. Rhodes had stuff in that grand jury transcript

24   that she wanted in substantively, it became perfectly obvious to

25   everybody that the thing to do was just to put the grand jury

1    transcript in and forget about Ms. Green's failure of

2    recollection.

3              And when Ms. Rhodes withdrew the objection, counsel for

4    Mr. Gardner, Mr. Martin, and Mr. Harris were deemed to have

5    joined in Mr. Lawlor's improper objection and Ms. Rhodes's

6    binding and appropriate withdrawal of that objection.  And thus I

7    told the jury that --

8              MR. KURLAND:  Your Honor --

9              THE COURT:  -- what I told them.  All right.  Mr.

10   Kurland.

11             MR. KURLAND:  To make the record cleaner, then, with

12   respect to the evidentiary basis, the witness is saying that she

13   doesn't recall is genuine means that she's unavailable under Rule

14   804.  Then the grand jury testimony as a matter of evidence rule

15   should come in under Rule 804, but only the parts the defense

16   wants because the government has had an opportunity to examine

17   her at the grand jury.

18             That's the proper way of having the evidence

19   considered.  But that means that the defense should be able to go

20   through the transcript and pick out what it wants.  This is just

21   the way the rule operates.  Because no defendant had an

22   opportunity to examine her at the grand jury.  The government

23   did.  Unless they can prove they didn't have a similar motive.

24   That would be --

25             THE COURT:  Mr. Gardner's objection is noted and is

1    deemed joined in by Mr. Martin and Mr. Harris.  All right.  Let

2    me hear from Mr. Martin.  Good morning.

3              MR. MARTIN:  Your Honor --

4              THE COURT:  Good afternoon.

5              MR. MARTIN:  I'm not going to talk about that

6    particular subject.  I think my head is exploding from all this.

7    I'm not quite sure where we are.

8              My concern is the issue you addressed briefly a few

9    minutes ago about why you allowed her to answer the question as

10   to whether she was afraid.  My concern is that the way that Mr.

11   Hanlon asked the question was, are you failing to remember here

12   or -- it was a dual question -- you didn't want to come here and

13   you're not remembering why.  And eventually she said, because I'm

14   afraid.

15             There's no foundation for that.  What is she afraid of?

16   Is she afraid because this is a murder trial?  Lots of people are

17   afraid.  But there's an assumption that she's afraid because of

18   something these people did.  And that's unfair, Your Honor.  To

19   that extent, because you found that she has a genuine failure of

20   recollection, I would renew what Mr. Kurland said.  And that is

21   that the government should not be allowed to argue when they get

22   to the end of this case that this witness didn't remember because

23   she was afraid.

24             THE COURT:  Oh, oh.

25             MR. MARTIN:  That's what I think Mr. Kurland was trying

1   to say.

2            THE COURT:  Oh, is that what he was trying to say?

3            MR. MARTIN:  I think so, Your Honor.

4            THE COURT:  It's so helpful to have you, Mr. Martin.  I

5   totally missed what Mr. Kurland was trying to say.

6            No.  The government's not going to argue that.  Of

7   course not.  Of course not.

8            MR. MARTIN:  Otherwise, I have an objection and a

9   motion for a mistrial for allowing her to answer the question.

10           THE COURT:  No.  No.  The government's not going to

11  argue that.  And of course, any of you are free, if you're

12  feeling pretty robust this afternoon, to question her as to why

13  she's afraid.

14           MR. MARTIN:  I wouldn't touch that question.

15           THE COURT:  I knew you wouldn't, Mr. Martin.  But some

16  of your brethren over there might want to go there.

17           MR. MARTIN:  Thank you.

18           MR. HARDING:  Purely on scheduling, Your Honor.  We

19  have a civilian witness, Andre Drake, whom we would like to get

20  done with before lunch.  He's a very quick witness.

21           THE COURT:  Well, I'm not going to interrupt Ms. Green.

22  So let's hurry up with Ms. Green.

23           MR. HARDING:  I meant after we're done with Ms. Green,

24  can we extend the lunch hour?

25           THE COURT:  Sure.  Sure.  Assuming she's not on the

1    stand until 1:30 or something.

2            MS. RHODES:  Your Honor, Your Honor, I think it would

3    be helpful if I did take her after lunch because I need to get

4    the tape recording cued up because --

5            THE COURT:  Why do you need the tape recording?

6            MS. RHODES:  Because I want her to hear her own voice

7    and see if that refreshes her recollection.

8            THE COURT:  No.  I think you can use the transcript.

9            MS. RHODES:  I can't, Your Honor, I can't imagine

10   anything better than hearing the tape to refresh her

11   recollection.  I don't think that --

12           THE COURT:  You can use the transcript.

13           MS. RHODES:  All right.

14           THE COURT:  It's a case management issue, Ms. Rhodes.

15   Mr. Pyne.

16           MR. PYNE:  Just to let you know.  Judge Grimm set in an

17   initial appearance in a case of mine at 1:30.

18           THE COURT:  We should not be in here at 1:30.

19           MR. PYNE:  Okay.

20           THE COURT:  I'm not sure you'll get some lunch but we

21   shouldn't be in here at 1:30.  Thank you.  All right.  We'll have

22   the jury, please, and Ms. Green back.

23           So which one of you wants to announce to the jury that

24   the grand jury transcript is being marked as an exhibit?

25           MR. HARDING:  Mr. Hanlon will.

1          THE COURT:  Well, the witness is with Ms. Rhodes.  Do

2     you want to do that, Ms. Rhodes?  Or I'll do it.

3          MS. RHODES:  Sure.

4          THE COURT:  All right.

5          MR. HANLON:  That's fine, Your Honor.

6          THE COURT:  I'll do it.  Any idea how long you're going

7     to be, Ms. Rhodes?

8          MS. RHODES:  Probably not that long.

9          THE COURT:  Okay.  Are you going to have much, if at

10    all, Mr. Martin?

11         MR. MARTIN:  You know what question I might have asked,

12    I'm not asking.

13          THE COURT:  All right.  Mr. Crowe, Mr. Pyne?

14         MR. PYNE:  Twenty minutes, maybe.

15          THE COURT:  Mr. Kurland?

16         MR. KURLAND:  Mr. Coburn's going to do it.

17          THE COURT:  Mr. Coburn.

18         MR. COBURN:  With Ms. Green?  I don't think I have any

19    questions.

20          THE COURT:  Okay.  Good.  All right.  So it looks like

21    we can certainly get to, is it Mr. Davis?  Or Deandre?  No.

22         MR. HARDING:  Drake.  Did Mr. Pyne say he was going to

23    take 20 minutes, Your Honor?

24          THE COURT:  Yes.

25         MR. PYNE:  Possibly.

1          THE COURT:  Possibly.

2          MR. HARDING:  Okay.

3          THE COURT:  So who's the witness?

4          MR. HARDING:  Andre Drake.  He's the guy who, he has to

5    get to work at 3:00.

6          THE COURT:  We'll get to him.

7          (Jury enters the courtroom.)

8          THE COURT:  Good afternoon, ladies and gentlemen of the

9    jury.  Counsel have agreed, that is Ms. Rhodes and Mr. Hanlon,

10   have agreed that Ms. Green's grand jury testimony may properly be

11   marked as an exhibit in this case and will be made available to

12   you during your deliberations as an exhibit.  And you may

13   consider her testimony before the grand jury as contained in that

14   transcript as evidence in this case for all purposes.  You may

15   proceed when you're ready, Ms. Rhodes.

16         MS. RHODES:  Thank you, Your Honor.

17         THE COURT:  I should mention that that will be Court's

18   Exhibit Number One, the grand jury testimony of Ms. Green.

19   BY MS. RHODES:

20   Q    Good afternoon.  I just want to ask you a couple questions

21   about the statement that you gave to the police back in March of

22   2002.  You said you remember there were a couple of officers

23   there, right?

24   A    Yes.

25   Q    Okay.  And do you remember that one of them was Detective

1    Niedermeier?  Do you remember that name?

2    A    Yes.

3    Q    And another one was Detective Patton?  Does that ring a

4    bell?

5    A    Yes.

6    Q    Okay.  And do you recall that they recorded the statement,

7    they had a recording?

8    A    Yes.

9    Q    Had a cassette machine going?

10   A    Yes.

11   Q    Okay.  And they started out by saying what the date was and

12   what the time was.  And they said that they were, who was

13   present.  And they said present is Mr., is myself, Detective Gary

14   Niedermeier, Detective Bobby Patton, and Ms. Damita Green.  Do

15   you remember that kind of introduction?

16   A    Yes.

17   Q    Okay.  And then that they asked you to state your name and

18   your date of birth for the record?

19   A    Yes.

20   Q    Right?  Kind of like what happened in here, right?  And then

21   they asked you your, your address and the town that you were

22   living in, right?

23   A    Yes.

24   Q    Okay.  And you gave them that information, right?

25   A    Yes.

1    Q    And at the time you were telling them the truth, right?

2    A    Yes.

3    Q    And your intention was to tell them the truth?

4    A    Yes.

5    Q    Just as it was when you testified in front of the grand

6    jury, right?

7    A    Yes.

8    Q    And just as it is here today?

9    A    Yes.

10   Q    Okay.  And they told you that they were going to discuss the

11   homicide of the Wyche brothers, right?

12   A    Yes.

13   Q    Okay.  And they asked you if you knew when it had occurred.

14   And you told them early Monday morning, is that right?

15   A    Yes.

16          MR. HANLON:  Objection, Your Honor.

17          THE COURT:  Sustained to the form of the question.

18   Q    They told you, they asked you if you knew when it had

19   occurred, right?

20   A    Yes.

21   Q    Okay.  And you told them it had occurred Monday morning,

22   right?

23          MR. HANLON:  Objection, Your Honor.

24          THE COURT:  Sustained.

25   Q    And did you tell them it was on Monday morning?

1    MR. HANLON:  Objection, Your Honor.

2    THE COURT:  Sustained.

3    Q    And then Detective Niedermeier asked you if you had

4    information about the activities of Darryl and Anthony before

5    that, before they were murdered?

6    A    Yes.

7    Q    Okay.  And you told them -- do you recall what you told

8    them?

9    MR. HANLON:  Objection, Your Honor.

10    THE COURT:  Sustained.

11    Q    Do you recall now what you told them?

12    A    Not everything.

13    Q    Okay.  Would it refresh your recollection to look at the, at

14    a copy of the transcript of that recording?

15    A    Yes.

16    Q    Okay.  If you could turn the page on that document.  And why

17    don't you read through that page and see if that refreshes your

18    memory on what they asked you and what you said?

19    Does reading that page, Ms. Green, refresh your memory

20    about what you said in that interview?

21    A    Yes.  The second page?

22    Q    Yes.

23    A    Yes.

24    Q    Okay.  And do you recall, do you recall what you said to

25    them about when, what happened when Darryl left, or what happened

1    shortly before he left?

2    A    Yes.

3    Q    And what was that?

4         MR. HANLON:  Objection, Your Honor, as to what was

5    said.

6         THE COURT:  Put a question.

7    Q    What did you -- what happened after, before Darryl left?

8    A    He received a phone call.

9    Q    Okay.  And do you recall what they were talking about, what

10   he was talking about?

11   A    I could just hear his end.

12   Q    Okay.  And what did it sound like to you?

13   A    He was supposed to be meeting him is what it sounded like,

14   meeting somebody.

15   Q    Okay.  And who else was around, then, during that phone

16   call?

17   A    Me, Brandy, her sister, and Keisha, and his brother, Anthony

18   Wyche.

19   Q    Okay.  And was Deezo in the room, too, when that phone call

20   came?

21   A    Yes.  That's what it's saying.  I don't recall him being

22   there.

23        THE COURT:  I'm sorry to interrupt, Ms. Green.  What we

24   need you to do.  You've read the document?

25        THE WITNESS:  Um-hum.

CROSS EXAMINATION OF DAMITA GREEN BY RHODES                123

1       THE COURT:  Okay.  You can close the document.  And now

2  answer Ms. Rhodes's questions.

3  BY MS. RHODES:

4  Q    Okay.  Do you recall, was Deezo there that night?

5  A    Yes.

6  Q    Okay.  And was he --

7       MR. HANLON:  Objection, Your Honor.

8       THE COURT:  Overruled.

9  Q    And was he -- and he was there, everybody was there when

10 Darryl got that call, right?

11 A    Yes.

12 Q    Okay.  And they left about 12 or 12:15 that night, right?

13 A    Yes.

14 Q    Okay.  Back to the interview with Detective Niedermeier.  Do

15 you remember when he asked you if, about, about what time

16 everybody, or Darryl and Pete and Deezo left that night?

17 A    Can you repeat that?

18 Q    Do you remember when Detective Niedermeier asked you about

19 what time it was everybody left that night?

20 A    I don't remember.

21 Q    Okay.  If you could look at Page Three of the recording, the

22 transcript, then.  If you look down towards the bottom of the

23 page, where Detective Niedermeier, it says, and how close to the

24 time that they left was that?  And then you give an answer.

25 Could you read that and see if it refreshes your memory?

1    A    Yes.

2    Q    Okay.  And what time was it approximately that they left?

3    A    It doesn't say the time.

4        THE COURT:  The question, Ms. Green, is do you

5    remember?

6        THE WITNESS:  I don't remember --

7        THE COURT:  Okay.

8        THE WITNESS:  -- the exact time they left.

9        THE COURT:  All right.

10   BY MS. RHODES:

11   Q    Okay.

12   A    After the phone call, he, they left about maybe 30 minutes

13   after he got the call.  I don't know exactly the time.

14   Q    Okay.  That's fine.  And do you recall -- what did Darryl

15   say to anybody that you heard about where he was going?

16   A    I don't recall.

17   Q    Okay.  Can you look at Page Four of the transcript?  Sorry.

18   Can you look down at, after Officer Patton says, did they say

19   when they were leaving, where they were going, did they mention

20   that?  Do you see that line?

21   A    Yes.

22   Q    Okay.  And then if you could read your answer after that.

23       THE COURT:  To yourself.

24   Q    The rest of the page, and see if that refreshes your memory.

25   A    It doesn't refresh my memory.

1   Q    Okay.  Is there any reason you can think of now that you

2   would have not told the truth to the detectives that night when

3   they were asking you questions?

4   A    No.

5   Q    Okay.  And you would not have made up anything when you were

6   speaking to them, would you?

7   A    No.

8   Q    All right.  And when Deezo came over that day, the first

9   time he showed up was when Darryl came back for the last time, is

10  that right?

11  A    Yes.

12  Q    And are you telling us that you had no idea that Deezo

13  helped Darryl with his drug business?

14  A    No.

15  Q    No --

16  A    I don't know.

17  Q    You don't, you had no idea?

18  A    No.

19  Q    Okay.  Okay.  And you still are not sure about the Honda

20  station wagon, when Darryl got that, is that right?

21  A    Correct.

22  Q    Do you recall Detective Niedermeier asking you about it?

23  A    No.

24  Q    Okay.  Could you look at Page Eight of the transcript?  And

25  look at about halfway down the page, where it says "Niedermeier."

1   And he asks a question about the Honda.  And can you read that,

2   the next three paragraphs to yourself?

3   A    Okay.

4   Q    Okay.  And reading that, does that refresh your memory at

5   all about what you told Detective Niedermeier?

6   A    No.  I don't remember that he had just got that car.

7   Q    Okay.  Do you recall Detective Niedermeier showing you some

8   photographs that night?

9   A    Yes.

10  Q    Okay.  And do you recall signing on one of those

11  photographs?

12  A    Yes.

13  Q    Thank you.  Nothing further, Your Honor.

14          MR. MARTIN:  No questions, Your Honor.

15          CROSS EXAMINATION

16  BY MR. PYNE:

17  Q    Good afternoon, Ms. Green.  I'm Jim Pyne.  I represent

18  Shelly Wayne Martin.  Ms. Rhodes did cover some of the matters

19  that I was going to cover so I'll try to avoid repeating.  But

20  there are some matters I wanted to ask you about.

21          So this night in question you're at Brandy's house, is

22  that correct?

23  A    Yes.

24  Q    And am I correct in that looking over -- well, let me start

25  with this.  You do recall meeting with Detective Niedermeier

1    shortly after the murder happened?

2    A    Yes.

3    Q    And do you recall him interviewing you and you providing him

4    the information you had regarding the night before the murder?

5    A    Yes.

6    Q    And you've had a chance to review a transcript of that

7    interview?

8    A    Yes.

9    Q    And you have been able to remember some of those things

10   after, some of the things you told Detective Niedermeier now that

11   you've reviewed that transcript?

12   A    Yes.

13   Q    Okay.  And do you recall that Keisha was present at Brandy's

14   house that night?

15   A    Yes.

16   Q    And do you recall that Peaches was present as well?

17   A    Yes.

18   Q    And who is Peaches?

19   A    Brandy's sister.

20   Q    Okay.  Were you all together in one room in the house or

21   where were you in terms of the different individuals?

22   A    We were in different rooms.

23   Q    Okay.  Do you recall Anthony Wyche being there all day?

24   A    No.

25   Q    You don't?  Do you recall what part of the day Anthony Wyche

1    was present at that house?

2    A    No.  But he was there for a while.

3    Q    Okay.  Now, you do now recall that Deezo was there, the

4    individual you know as Deezo was there?

5    A    Yes.

6    Q    Okay.  Do you recall that Darryl Wyche and Deezo came to the

7    house about 11:00?

8    A    I'm not sure of the time.  But they came that night.

9    Q    Okay.  Can you approximate, does 11:00 sound like it was in

10   the area of when they came?

11   A    It's possible.

12   Q    Okay.  If you want to look at Page Six of your statement

13   that you gave to Detective Niedermeier.  If you want to read your

14   first answer at the top of the page and see if that refreshes

15   your recollection.

16   A    Okay.

17   Q    Does that refresh your recollection?

18   A    Yes.

19   Q    Okay.  So Darryl and Deezo did come back to Brandy's house

20   about 11 o'clock.  Is that what you told Detective Niedermeier?

21   A    Yes, that's what I told him.  Just today I don't know the

22   exact time.

23   Q    Okay.  But today, as you sit here today, you don't recall

24   exactly?

25   A    No.

1    Q    Okay.  I believe you told Ms. Rhodes, or it might have been

2    Mr. Hanlon, that you recall Darryl Wyche getting a phone call at

3    about 11:40, is that correct?

4    A    Correct.

5    Q    Okay.  And during the course of this call, you heard only

6    Darryl's part of the conversation?

7    A    Correct.

8    Q    And you heard him refer to, you heard him say the name "Bo"

9    during that conversation, is that correct?

10   A    Correct.

11   Q    Okay.  And I believe your testimony, again, I'm not sure you

12   recollect this today or not, that you heard Darryl also say, are

13   you still trying to get that?  Do you recall that or not?

14   A    No.

15   Q    Okay.  So you don't have a recollection of that?  Do you

16   recall telling the grand jury that you recalled that?

17   A    Yes.

18   Q    Okay.  Do you have any other recollection of anything else

19   you might have heard during that conversation?

20   A    No.

21   Q    Did you tell the grand jury anything else you might have

22   heard during that conversation?

23   A    No.

24   Q    And your testimony was that after this call, I think you've

25   given a couple different times.  I think at one point you said it

1  was about 20 minutes after that call that they left, and then

2  more recently I think you said about 30 minutes after that call

3  they left.  Do you recall exactly what your best estimate of the

4  time was that they left?

5  A    No.  I would say, well, 20 to 30 minutes.

6  Q    20 to 30 minutes?

7  A    I don't, I can't remember.

8  Q    Okay.  Do you recall whether or not it was after midnight?

9         MR. HANLON:  Objection, Your Honor.

10        THE COURT:  Overruled.  You may answer.

11 A    No.  I don't recall.

12 Q    Okay.  But you do recall that it was between 20 and 30

13 minutes after receiving the phone call?

14 A    Yes.

15 Q    Okay.  Now, do you recall telling Detective Niedermeier that

16 they were driving the white Honda Accord when they left?

17 A    Yes.

18 Q    Okay.  And do you recall telling him that Anthony was

19 driving?

20 A    Yes.

21 Q    Do you recall telling Detective Niedermeier that Darryl and

22 Anthony and Deezo all left together?

23        MR. HANLON:  Objection, Your Honor.

24        THE COURT:  Sustained.

25 Q    Do you recall when Deezo left?

1    A    They left together.

2    Q    Okay.  Did any of them make any statements about where they

3    were going, that you recall?

4    A    No, I don't recall.

5    Q    Do you recall any of them saying that they were going to

6    Essex?

7    A    No.

8    Q    Let me ask you to look at your statement to Detective

9    Niedermeier on Page 4.  Ms. Rhodes may have already asked you to

10   look at this.

11   A    Yes, she did.

12   Q    Okay.  And that did not refresh your recollection?

13   A    No.

14   Q    Okay.  You do recall Darryl asking Anthony to drive for him,

15   is that correct?

16   A    Yes.

17   Q    Do you recall if this was before or after -- again, you may

18   have testified to this already -- whether this was before or

19   after the telephone call?

20   A    I don't recall.

21   Q    Okay.  And it's your testimony today that you don't know

22   what the relationship with Deezo and Darryl Wyche was?

23   A    Correct.

24   Q    What kind of relationship?

25   A    Correct.  They were friends, to my knowledge.

1    Q    Now, I believe your testimony was that when Darryl got this

2    phone call at about 11:40 that Deezo was present, is that

3    correct?

4    A    Correct.

5    Q    And you were able to hear Darryl refer to Bo and say, are

6    you still trying to get that, is that correct?

7    A    Correct.

8    Q    And how far away from Darryl were you, if you recall?

9    A    I was in the living room, he was in the dining room.

10   Q    And where was Deezo?

11   A    I don't recall.

12   Q    So you don't know whether or not he would have been able to

13   hear the same phone call?

14   A    No.

15   Q    I don't think I have anything further, Your Honor.  Thank

16   you, Ms. Green.

17             THE WITNESS:  You're welcome.

18             MR. COBURN:  No questions, Your Honor.

19             THE COURT:  Redirect.

20             REDIRECT EXAMINATION

21   BY MR. HANLON:

22   Q    Brief, I think, Your Honor.  Ms. Green, at the end of Ms.

23   Rhodes's cross examination she asked you if you were shown any

24   photographs and if you were asked to sign any photographs?

25   A    Yes.

1   Q    You remember the detectives showed you some photographs and

2   asked you in any of six photographs of people you recognized the

3   person you'd referred to as Bo, is that right?

4   A    Yes.

5   Q    And did you identify somebody that you know of as the Bo

6   that you've talked about today?

7   A    Yes.

8   Q    I'm showing you, going to put up on the screen, a document

9   which is marked as W-37B.  Is this a copy of the photo array the

10  detective showed you?

11  A    Yes.

12  Q    On top of every one of these photographs there's a place to

13  sign.  Did you sign this photograph here as Bo?

14  A    Yes.

15  Q    Nothing further, Your Honor.

16        THE COURT:  Thank you very much, Ms. Green.  Good luck

17  with the baby.

18        MS. RHODES:  Your Honor --

19        THE COURT:  I'm sorry, Ms. Rhodes.  Ms. Green, I'm

20  sorry.  I apologize, Ms. Rhodes.

21        RECROSS EXAMINATION

22  BY MS. RHODES:

23  Q    Let me put this back up, that the government had up there.

24  That has the date of it of March 28th of 2002, right?

25  A    Yes.

1    Q    And the time of 7:30 p.m.?

2    A    Yes.

3    Q    Does that refresh your recollection of the date and time

4    that you were interviewing with Detective Niedermeier?

5    A    No.

6    Q    When you signed it, would you have checked -- is that your

7    handwriting, the date and time?

8    A    Yes.

9    Q    Okay.  So you would have put the correct date and time

10   that --

11   A    Yes.

12   Q    -- meant, right?  And you are telling us today that what you

13   told Detective Niedermeier was the truth, right?

14   A    Yes.

15   Q    Okay.  And you're under oath today, right?

16   A    Yes.

17   Q    So you are swearing under oath that what you told Detective

18   Niedermeier on that date was the truth?

19   A    Yes.

20   Q    Okay.  And you've also told us, to be clear, that when you,

21   before you did the grand jury testimony, the prosecutors went

22   over your police interview and transcript with you, is that

23   right?

24            MR. HANLON:  Objection.  Scope, Your Honor.

25            THE COURT:  Sustained.  That means don't answer.

1           MS. RHODES:  Nothing further.  Thank you, Your Honor.

2           THE COURT:  Thank you very much, Ms. Green.  You are

3   now excused.  We have one more brief witness, I think, ladies and

4   gentlemen, before we break for lunch.  And Mr. Harding, that

5   would be?

6           MR. HARDING:  Andre Drake, Your Honor.  The United

7   States calls Andre Drake.

8           ANDRE DRAKE, GOVERNMENT'S WITNESS, SWORN

9           THE WITNESS:  Yes.

10          THE CLERK:  Be seated.  Will you speak directly toward

11  mike?  State your name and spell it for the record, please.

12          THE WITNESS:  Andre Drake.  A-N --

13          MR. HARDING:  Good afternoon, Mr. Drake.

14          THE COURT:  He's going to spell it, Mr. Harding.

15          THE WITNESS:  A-N-D-R-E.  D-R-A-K-E.

16          DIRECT EXAMINATION

17  BY MR. HARDING:

18  Q    Good afternoon, Mr. Drake.  Can you tell us how old you are,

19  sir?

20  A    26.

21  Q    Have you ever been convicted of a crime, Mr. Drake?

22  A    Yes.  As a juvenile.

23  Q    Okay.  Just a juvenile adjudication, is that correct?

24  A    Yes.

25  Q    How far did you get in school?

DIRECT EXAMINATION OF DRAKE                                    136

1    A     Tenth grade.

2    Q     What school did you go to school at?

3    A     Harbor City.

4              THE COURT:  Can you get closer to the mike, please?

5              THE WITNESS:  Harbor City.

6              THE COURT:  Speak directly into the mike, please.

7    Thank you.

8    BY MR. HARDING:

9    Q     Are you employed right now, Mr. Drake?

10   A     Yes.

11   Q     Do you know Shelton Harris?

12   A     Yes.

13   Q     Could you point him out to us in the courtroom, please?

14   A     Right there.

15   Q     What kind of shirt is he wearing?

16   A     Blue and white shirt.

17   Q     Okay.  Just for the record, you understand, Mr. Drake, the

18   record can't see who you're pointing to so we have to put in some

19   kind of physical description just for the person who types up the

20   transcript.  Okay?

21   A     Yes.

22   Q     Also, do you know a guy named Willie Mitchell or Bo?

23   A     Yes.

24   Q     Do you see him here in the courtroom today?

25   A     Yes.

1    Q    Could you point him out and tell us what kind of shirt or

2    clothing he's wearing?

3    A    Right there.  Gray shirt.

4    Q    Okay.  Can the record reflect that the witness has

5    identified both Mr. Harris and Mr. Mitchell, Your Honor?

6              THE COURT:  So noted.

7    Q    How long have you known Mr. Harris, Mr. Drake?

8    A    All my life.

9    Q    Okay.  Let me call your attention to just the last few

10   years.  Did you, did there come a time when you moved into a

11   rental apartment or rental house at 2731 Seamon Avenue?

12   A    Yes.

13   Q    When was that?

14   A    2000.  You asking me when did I move?

15   Q    Yeah.

16   A    I'm not sure when I moved in.  Probably was around '99.

17   Q    Okay.  Very early on.  Was it your place or someone else's

18   place?

19   A    It was my child's mother place.

20   Q    And what was her name?

21   A    Shari Fickling.

22   Q    Shari Fickling.  Okay.  Let me show you what's been marked

23   as PH 2.  Can you tell us what that is?

24   A    That's the house we lived in.

25   Q    Okay.  And that's 2731 Seamon Avenue.  Is that in Cherry

1   Hill?

2   A    Yes.

3   Q    Okay.  Did someone, while you were living there, did someone

4   else come to live there with you?

5   A    Yes.

6   Q    Who was that?

7   A    Shelton.

8   Q    When did he come there to live with you?

9   A    After he came home in, came home in 2003.  Came to stay with

10  us in 2004.

11  Q    Okay.  Do you remember about how long he stayed with you?

12  A    Probably, I'd say about four or five months.

13  Q    And those would have been at the end of 2003 and the

14  beginning of 2004, then, is that correct?

15  A    Yes.

16  Q    Okay.  And you say he came home.  Where did he come home

17  from?

18  A    He was locked up.

19  Q    Okay.  Did he have a job during that three, four month

20  period when he was living with you?

21  A    No.

22  Q    Okay.  Did you have a job?

23  A    No.

24  Q    Okay.  Did he have some particular place in your house where

25  he used to sleep?

Case 1:04-cr-00029-RDB   Document 688   Filed 06/12/09   Page 139 of 209

1    A    Yes.  He slept on the couch.

2    Q    Okay.  Did he have a place where he used to keep his stuff?

3    A    Yes.

4    Q    Okay.  Where was that?

5    A    In the pantry.

6    Q    What room was the pantry in?

7    A    It was in between the living room and the kitchen.

8    Q    Okay.  Are you aware that on January 21st, 2004 your place

9    got searched?

10   A    Right.

11   Q    Okay.  Let me show you a picture that's been marked as SE-4.

12   You can't see this very well, I'm afraid.  But you had a chance

13   to look at it outside, did you not?

14   A    Yes.

15   Q    Okay.  Do you recognize, have you ever seen that gun before,

16   Mr. Drake?

17   A    No, I haven't.

18   Q    Is that your gun, Mr. Drake?

19   A    No.

20   Q    To your knowledge, did Shari Fickling have a gun?

21   A    No.

22   Q    And I also talked to you outside about what's underneath the

23   gun, which you also can't see very well.  But do you recognize

24   what that is underneath the gun?

25   A    No.

1    Q    I could show you the photograph closer, if that would be

2    better.  This is SE-4.

3    A    Notebook.

4    Q    A notebook.  Did you recognize that notebook?

5    A    Yes.

6    Q    Whose notebook was that?

7    A    It was a book of raps.

8    Q    A book of raps?  Did you say it was a book of raps, Mr.

9    Drake?

10   A    Yes.

11   Q    Okay.  Okay.  I'm just going to put on the screen here what

12   I'm going to mark as SE-20 and which, of course, you can't see at

13   all.  So I'm going to actually show it to you.  Does this look

14   like the book of raps that was in that photograph?

15   A    I can't tell you if it was or if it wasn't.

16   Q    Okay.  Whose notebook was that that the gun was on in the

17   picture?

18   A    It was a book of raps that Shelton wrote.

19   Q    Okay.  Shelton used to write raps when he was staying there

20   at your place?

21   A    Yes.  He wrote raps his whole life.

22   Q    Okay.  Because you knew him back, say, in 2002, 2003, the

23   years before he was living with you, too, didn't you?

24   A    Yes.

25   Q    Okay.  Was he in a rap group?

1   A    No.

2   Q    He was not?

3   A    No.

4   Q    Do you know, did he ever record his rap music?

5   A    Yes.

6   Q    Did you ever listen to CD's of his rap music?

7   A    Yes.  Plenty of them.

8   Q    Are you familiar with the titles of some of his CD's?

9   A    Yes.

10  Q    Can you tell us what you remember, names of some of them

11  were?

12  A    The Heights, if I could say Pure Shit.

13  Q    Pure Shit.  Yes, you can say that.

14  A    Yes.

15  Q    Okay.  Those are two of the names of the CD's you remember?

16  A    Yes.

17  Q    Did you used to help sell those CD's somewhat, sometimes?

18  A    Yes.

19  Q    And did Shelton sell those CD's, also?

20  A    Yes.

21  Q    Did Bo or Mr. Mitchell sell those CD's, also?

22  A    Yes, from my knowledge.

23  Q    Well, let me just ask you.  Do you know about how many

24  copies of Pure Shit Mr. Harris sold?

25  A    I'm not sure exact number.  But he didn't sell that many.

DIRECT EXAMINATION OF DRAKE                                    142

1    Just basically giving them away to try to get exposure.

2    Q    Okay.  Do you have any idea how many he basically gave away

3    to get exposure?

4    A    I would say probably 15, 20.

5    Q    Okay.  And you said you sold some of Pure Shit also, is that

6    correct?

7    A    Yes.

8    Q    How many did you sell?

9    A    Probably between two, five.  I don't know exact number.

10   Q    How much were you selling them for or trying to sell them

11   for?

12   A    $5, $4, $3, a dollar.

13   Q    Did Mr. Harris perform at clubs, to your knowledge?

14   A    Yes.

15   Q    Did you ever see him perform at a club?

16   A    Yes.

17   Q    Does the name Sheistyville or Shake Down mean anything to

18   you?

19   A    Yes.

20   Q    What are those names?

21   A    The name of probably like, like a company.  I wouldn't say a

22   company but I would say like, like the name of the movement he

23   was trying to be under, I guess.

24   Q    Okay.  The movement.  And was Mr. Mitchell or Bo involved in

25   that movement, also?

DIRECT EXAMINATION OF DRAKE                    143

1    A    Say like producing.

2    Q    He was like the producer?  Okay.  Do you know any clubs that

3    they used to perform in?

4    A    Only know one.  Five Seasons.

5    Q    The Five Seasons?  Did you ever see him perform there?

6    A    Yes.

7    Q    Okay.  Let me show you what's been marked as Government

8    Exhibit PH-64.  Do you recognize PH-64, Mr. Drake?

9    A    Yes.

10   Q    Where is Five Seasons located?

11   A    Couldn't tell you the exact street.

12   Q    Okay.  Do you know what part of town it's in?

13   A    Down by the jails.  That's the only thing I can tell you.

14   Q    Is it near Central Booking?

15   A    Yes.

16   Q    Okay.

17            THE COURT:  Mr. Harding, I think he actually didn't say

18   what that exhibit was.  Everybody could see it, but for the

19   record, just have the witness --

20   Q    Okay.  Can you tell us what the picture depicts?

21   A    Five Seasons.

22            THE COURT:  Okay.  Thank you.

23   Q    Did you ever hear Mr. Harris's raps on the radio?

24   A    Yes.  Like trying to, trying to get music on the radio,

25   basically.

1    Q    Did he ever succeed in getting music on the radio?

2    A    Yeah, once or twice.

3    Q    What radio station?

4    A    If I can remember, 88.9.  88.  Yeah.  I think it's 88.9.

5    Q    Okay.  So you actually heard the, one of Mr. Harris's rap

6    songs over, over the radio?

7    A    Yes.

8    Q    Once or twice, is that right?

9    A    Yes.

10   Q    Okay.  I want to call your attention now to the day your

11   place got searched in January of '04.  Were you home that day?

12   A    No.

13   Q    Was anybody home?

14   A    No.

15   Q    How did you find out that your place had gotten searched?

16   A    My friend.

17   Q    By a friend?

18   A    Yes.

19   Q    Did you speak to Shelton afterwards?

20   A    No.

21   Q    Were you aware that Shelton got arrested that morning?

22   A    No.

23   Q    Okay.  Did you find out eventually that he got arrested?

24   A    Eventually, yes.

25   Q    Did you ever talk to him about the 45, the .45 caliber

1   semiautomatic that was recovered from your place?

2   A    No.

3   Q    Let me show you finally, if I may, some particular examples,

4   SE-12, SE-14, and SE-11.  Do those look like Mr. Harris's raps?

5   A    Yes.

6   Q    And he used to write raps like that, is that correct --

7   A    Yes.

8   Q    -- during the time you knew him?

9   A    Yes.

10  Q    And I'm showing you also SE-10.  Do you know what Free Bo

11  and Weaze means?

12  A    Yes.

13  Q    What?

14  A    Exactly what it say.  Free Bo.

15  Q    Was Bo locked up at that time?

16  A    Exactly.  Yes.

17  Q    Okay.  Do you know Weaze personally?

18  A    No, I don't.

19  Q    The pantry where you say that Mr. Harris used to keep his

20  stuff, Mr. Drake, did that also have a small furnace in it?

21  A    Yes.  And a water heater.

22  Q    And a water heater.  Okay.

23  A    Yes.

24  Q    And I think you may have answered this before.  Was it in

25  the kitchen area of your place?

1    A    Yes.

2    Q    Okay.  I have no further questions, Your Honor.

3         CROSS EXAMINATION

4    BY MR. FLANNERY:

5    Q    Mr. Drake, good morning.  I'm sorry.  Good afternoon.  It's

6    well afternoon.  I promise not to keep you very long.  My name's

7    Paul Flannery.  I'm one of the attorneys that represents Shelton

8    Harris.

9    A    Yes.

10   Q    Mr. Drake, you've known Shelton Harris, you testified, your

11   whole life?

12   A    Yes.

13   Q    And you understand that Shelton Harris at one point lived in

14   the Park Heights neighborhood?

15   A    Yes.

16   Q    And you know that, in fact, he moved out of the Park Heights

17   neighborhood at some point when he was around the age of 16?

18   A    Yes.

19   Q    But he used to come back up and visit you?

20   A    Yes.

21   Q    And you guys used to hang out together?

22   A    Yes.

23   Q    You guys were boyhood friends?

24   A    Yes.

25   Q    In fact, he had some family there that lived in Park

Case 1:04-cr-00029-RDB   Document 688   Filed 06/12/09   Page 147 of 209

1    Heights?  Do you understand that?

2    A    No.

3    Q    You didn't understand.  Okay.  When you lived on Seamon

4    Avenue, you lived there with your girlfriend and your

5    three-year-old son, correct?

6    A    Yes.

7    Q    And at some point Shelton Harris came to reside with you?

8    A    Yes.

9    Q    And he kept his personal belongings in a pantry in the

10   kitchen?

11   A    Yes.

12   Q    And there was another place, was there not, that he also

13   kept belongings, that was at the downstairs of your residence?

14   Is that true?

15   A    The downstairs?

16   Q    Yes.

17   A    That was downstairs.

18   Q    Okay.  Is the pantry what you would sometimes refer to as a

19   boiler room?

20   A    Yes.

21   Q    Okay.  So it's the pantry between the kitchen is what you

22   also sometimes refer to as boiler room because there was a

23   furnace in there?

24   A    Yes.

25   Q    And he kept his personal belongings in there, CD's,

1    notebooks, things like that?

2    A    Yes.

3    Q    And you never saw a gun in that pantry before?

4    A    No, I didn't.

5    Q    And to your understanding, your girlfriend never saw a gun?

6    A    No.

7    Q    Okay.  It's fair to say, is it not, Mr. Drake, that you

8    never suspected at the time that Mr. Harris was living there that

9    he was involved in any type of narcotics activity?

10   A    No.

11        MR. HARDING:  Objection.  Suspected.

12        THE COURT:  Go ahead, Mr. Flannery.

13   Q    To your knowledge, Mr. Harris was not involved in any

14   narcotics activity while he was residing with you?

15   A    Yes.

16   Q    That's correct, that he was not?

17   A    Yes.

18   Q    To your understanding?

19        MR. HARDING:  Objection.

20   A    Yes.

21        THE COURT:  To his knowledge.

22   Q    And in fact, you wouldn't have allowed him to stay there if

23   you thought he was?

24   A    No.

25   Q    Okay.  He used to taxi your three-year-old son back and

1   forth from school, is that correct?

2   A    No.  He used to walk him back.

3   Q    He used to walk him and back and forth to school?

4   A    Yes.

5   Q    And I'm sure you wouldn't have allowed him to walk your son

6   back and forth to school if you suspected that he was involved in

7   some type of illegal activity, correct?

8   A    No.

9   Q    Okay.  About what times, if he was responsible for walking

10  your son back and forth from school, what times generally would

11  that be?  Could you please tell me?

12  A    Probably around, between 7:45 to 8:30 in the morning.

13  Q    And he'd have to be back at some point later on in the day,

14  then, to walk him home?

15  A    No.

16  Q    Okay.  So he would just walk him there?

17  A    He would take him there or either me or my child's mother

18  would pick him up.

19  Q    I see.  Okay.  Now, the pantry that is in the upstairs of

20  the apartment, you didn't go in there very often?

21  A    No.

22  Q    Okay.  But it's fair to say that you did go in there

23  sometimes?

24  A    Yes.

25  Q    Because sometimes you'd have to get something out of there,

1    like a broom or something that you stored there?  You would have

2    to get something out?

3    A    Yes.

4    Q    Okay.  So anyone who would store their stuff in there, like

5    Mr. Harris, would expect that at some point you're going to go in

6    there at some point to get something out?

7    A    Yes.

8              MR. HARDING:  Objection.

9              THE COURT:  Overruled.

10              MR. HARDING:  To what Mr. Harris would expect.

11              THE COURT:  Well, he's talking about someone who was

12    residing temporarily with another person and who was storing

13    their property in the premises.  Go ahead, Mr. Flannery.

14    BY MR. FLANNERY:

15    Q    And you never saw a gun in that pantry, correct, Mr. Drake?

16    A    No.

17    Q    Okay.  So to your knowledge, the day that your home was

18    raided, to the best of your knowledge, you never saw a gun there?

19    A    Right.

20    Q    Okay.  So to the best of your knowledge, you didn't know

21    that there was a weapon there?

22    A    Exactly.

23    Q    And you never saw Mr. Harris possess a gun when he was

24    residing with you inside your home?

25    A    No, I didn't.

1  Q    Never saw any gun.  Now, you've had an opportunity before to

2  meet an individual you know as Bo?

3  A    Yes.

4  Q    You met him one time?

5  A    Yes.

6  Q    And you understood him to be involved with Mr. Harris in the

7  rap business?

8  A    Yes.

9  Q    And you understood him and Mr. Harris to frequent rap

10  studios or studios in order to record or generate rap music?

11  A    Yes.

12  Q    Because they were involved in trying to get a rap label off

13  the ground?

14  A    Yes.

15  Q    And in fact, you even went to the studio several times with

16  Mr. Harris?

17  A    Yes, I did.

18  Q    In order to see him rap?

19  A    Yes, I did.

20  Q    And you witnessed them rap?

21  A    Yes, I did.

22  Q    No further questions, Your Honor.  Thank you, Mr. Drake.

23       THE COURT:  Just a moment, Mr. Harding.

24       MR. COBURN:  I know the hour is late, Your Honor.  If

25  the Court wants, I'm happy to do it after lunch.

1          THE COURT:  I'm hoping we can finish with Mr. Drake

2     before lunch.

3          MR. COBURN:  It won't be long.

4          THE COURT:  Okay.

5          CROSS EXAMINATION

6     BY MR. COBURN:

7     Q    Good afternoon, Mr. Drake.  Your understanding is that Mr.

8     Harris was trying to get on in the rap industry, is that right?

9     A    Yes.

10    Q    And it's a fact, isn't it, that you accompanied Mr. Harris

11    to places, one recording studio, and some other places where he

12    was trying to record his music, is that right?

13    A    Yes.

14    Q    One of them was on York Road, is that right?

15    A    Yes.

16    Q    Some of them were just basements where people would make

17    recording equipment available, is that right?

18    A    No.

19    Q    Okay.  Maybe I just misunderstood what you said before.

20    A    What did I say before?

21    Q    Okay.  Is it correct that some of the places you would go

22    would be places where there were connections with other people to

23    go in their basement and record things?  Is that right or is that

24    wrong?

25    A    That's wrong.

1    Q    Okay.

2    A    Only place I was that they recorded was at the studio.

3    Q    Okay.  And the reason you went along was because you wanted

4    to experience seeing somebody rap in the booth and being able to

5    put together a song using beats and different aspects of music,

6    is that right?

7    A    Yes.

8    Q    Now, you know the names of some of the other people that Mr.

9    Harris would meet up with at the studios, is that right?

10   A    Yes.

11   Q    One of them was TM, is that right?

12   A    Yes.

13   Q    And another one was Slo, is that right?

14   A    No.

15   Q    Is that wrong?

16   A    That's wrong.

17   Q    I'm not, I don't mean to quarrel with you at all.  But do

18   you remember testifying in the grand jury in this matter?

19   A    Yes.

20   Q    Okay.  And that was back in March of 2004, is that right?

21   A    Yes.

22   Q    Okay.  Page 14, Line 19.  Do you remember being asked this

23   question and giving this answer?  You may really just not

24   remember.  Just tell us if you do.

25             Do you know the names of any of these other people that

1    Mr. Harris would meet up with at the studios?  Answer:  I don't

2    know them by real names but I know it was TM and Slo.

3            Question:  TM and Slo?  Answer:  Transcript says

4    um-hum.

5            Does that, does that refresh your recollection at all

6    or do you think, you still think that's wrong?

7    A    I never said that they would meet up at nowhere.  I did say

8    that I knew the names but I never said nothing about meeting up

9    nowhere.

10   Q    Okay.  Okay.  Do you know somebody by the name of Shawn

11   Gardner?

12   A    No, I don't.

13   Q    Do you know somebody by the name of Goo?

14   A    No.

15   Q    So far as you know, was anybody like that -- well, of

16   course, you've never heard of them before, right?

17   A    Right.

18   Q    Okay.  Now, was your understanding that Shelton, TM, and,

19   and again, of course if this is wrong, just let me know, Shelton,

20   TM, and Slo were trying to form a little group, is that right?

21   A    Yes.

22   Q    And was that group or the record label they were trying to

23   form or be involved with, was that called Shake Down

24   Entertainment?

25   A    Yes.

155

1    Q    Okay.  Now, you told the prosecutor when he was asking you

2    questions just a couple of minutes ago that you've listened to

3    Mr. Harris's music on a lot of different occasions, right?

4    A    Yes.

5    Q    You've heard him play in a club, right?

6    A    Yes.

7    Q    It's on the radio at least once, right?

8    A    Yes.

9    Q    And you've listened to his CD's, I think you said, quite a

10   number of times, or something like that?

11   A    Yes.

12   Q    Would you describe this kind of music as, is this gangsta

13   rap?  Is that the right word or do you think that's not right?

14   A    No, that's not right.

15   Q    Okay.  Based on the fact that, I mean, you've been exposed,

16   you know, known Mr. Harris your whole life or his whole life and

17   you've been exposed to this music over a period of time, as you

18   told the prosecutors when they were asking you questions, I'm

19   just going to ask you about your own views of it, your opinions

20   about it.

21              MR. HARDING:  Objection.

22              THE COURT:  Sustained.

23              MR. COBURN:  May I be heard on that, Your Honor?

24              THE COURT:  No.  You want this witness to tell the jury

25   what he thinks about Mr. Harris's music?

1          MR. COBURN:  I do.  I would like to make an offer.

2          THE COURT:  No.  I'll sustain the objection.

3          MR. COBURN:  Okay.  Thank you.

4          THE COURT:  He's already said he didn't think it was

5   gangsta rap.  No objection to that.  If you want to, like, pursue

6   that a little bit.

7   BY MR. COBURN:

8   Q    Okay.  Just to follow up on your answer about the, you

9   didn't think this was gangsta rap.  Did you believe or do you

10  believe that it was the purpose of this music to try to

11  intimidate anyone?

12  A    No.

13         MR. HARDING:  Objection.

14         THE COURT:  I'll sustain the objection.

15         MR. COBURN:  Thank you, Your Honor.

16         THE COURT:  You may redirect.

17         REDIRECT EXAMINATION

18  BY MR. HARDING:

19  Q    When Mr. Flannery was questioning you, you said that you

20  never saw narcotics in your apartment when Mr. Harris, during

21  that three or four month period at the end of 2003, beginning of

22  2004, when Mr. Harris was living with you, you never saw him with

23  narcotics in your place, is that correct?

24  A    Yes.

25         MR. FLANNERY:  Objection, Your Honor.

1          THE COURT:  Overruled.  Go ahead.

2     Q    And you never saw him with that gun that was discovered out

3     of your apartment, either, did you?

4     A    No, I didn't.

5     Q    Thank you.  I have no further questions.

6          THE COURT:  Thank you, Mr. Drake.

7          MS. RHODES:  Your Honor, I have a few.

8          THE COURT:  Sorry, Ms. Rhodes.

9          RECROSS EXAMINATION

10    BY MS. RHODES:

11    Q    That's okay.  Raised on cross.  Mr. Drake, I just have a

12    couple of questions for you very briefly.  You said that the,

13    that when you all were selling or giving away these CD's, a lot

14    of it was just to get exposure for their music, right?

15    A    Yes.

16    Q    So sometimes you do give them away because you want people

17    to hear their beats and maybe they'll take off, right?

18    A    Right.

19    Q    Okay.  Thanks.  Nothing further, Your Honor.

20         THE COURT:  What's your definition of gangsta rap?

21         THE WITNESS:  My definition of gangsta rap is someone

22    that's from, that is a gangsta.

23         THE COURT:  I see.

24         THE WITNESS:  And I wouldn't put, I wouldn't put

25    Shelton as a gangster.

1          THE COURT:  I see.  Okay.  Thank you.  Any additional

2     questions?  Thank you, Mr. Drake.  Sorry to have to intruded on

3     your lunch hour, ladies and gentlemen, but we did want Mr. Drake

4     to be able to get back to work.  Thank you for your indulgence.

5          We will stand in recess.  It's now just about 1:30.

6     Please be back in the jury room by 2:45 p.m. and we'll resume at

7     that time.

8          Please leave your note pads on your chairs.  Have no

9     discussion about any of the evidence or any aspect of the case.

10    Continue to keep an open mind.

11         Jury's excused until 2:45 p.m.  We're in recess until

12    2:45.

13         (Luncheon recess at 1:25 p.m.)

14         THE COURT:  Ready to proceed?

15         MR. HARDING:  Yes.  Judge, I should let you know that

16    we have Roy Jones and Kenny Welsh.  Due to the cancellation of

17    Ernest Reynolds, we aren't going to take the rest of the

18    afternoon.  We're going to be done in, I don't know, 45 minutes

19    or something like that.

20         THE COURT:  All right.

21         MR. HARDING:  Also, if it would be efficient, I would

22    like to see if defense counsel will stipulate as to Roy Jones's

23    expertise, since he's only testifying essentially as a negative

24    witness.  He didn't actually recover any prints from the Wyche

25    brothers's car.  So it would just expedite things if we can

1    stipulate as to his qualifications as an expert in latent

2    fingerprint comparison.

3          THE COURT:  I think that's likely to happen.  Just do

4    your basic voir dire and counsel will submit.

5          MR. HARDING:  Okay.

6          THE COURT:  Thank you.  We'll have the jury, please.

7          Mr. Jones is first?

8          MR. HARDING:  Yes.

9          THE COURT:  Mr. Harding, you think we'll finish next

10   week, the government's case?

11         MR. HARDING:  Yes, more confident than ever, Your

12   Honor, and growing in confidence.

13         THE COURT:  Do you have a view that you wish to express

14   as to whether we take off all day Tuesday or should we go ahead

15   and keep what amounts, what will amount to about a half day

16   Tuesday, the late start and an early conclusion?  And then we'll

17   have Friday available.  Since counsel have already blocked that

18   out, we'll have that time available to us.

19         MR. HARDING:  One reason I prefer to preserve Tuesday

20   is because of Rodney Hayes and that being his day off.

21         THE COURT:  Okay.  That clinches it.  That's fine.

22   That's fine.  Were you able to get any response from Judge

23   Nickerson?

24         MR. LAWLOR:  Your Honor, I e-mailed the assistant.  I'm

25   waiting to hear.  If he's available I'll contact Judge

DIRECT EXAMINATION OF ROY JONES                    160

1    Nickerson's chambers.

2              THE COURT:  In any event, you'll be excused.

3              MR. LAWLOR:  Thank you.  I'll work it out.  I'll work

4    it out.

5              (Jury enters the courtroom.)

6              THE COURT:  Good afternoon, ladies and gentlemen.  Mr.

7    Harding, you may call your next witness.

8              MR. HARDING:  Yes.  Thank you, Your Honor.  The United

9    States calls Roy Jones.

10             ROY JONES, GOVERNMENT'S WITNESS, SWORN

11             THE WITNESS:  Yes, I do.

12             THE CLERK:  Be seated.  Will you speak directly toward

13   the mike?  State your name and spell it for the record, please.

14             THE WITNESS:  My name is Roy Jones.  R-O-Y.  J-O-N-E-S.

15   Latent Fingerprint Examiner for Baltimore City Police Department.

16             DIRECT EXAMINATION

17   BY MR. HARDING:

18   Q    Thank you.  Good afternoon, Mr. Jones.

19   A    Good afternoon.

20   Q    How long have you been a latent fingerprint examiner for

21   Baltimore City Police Department?

22   A    For 24 years.

23   Q    Okay.  And you took a break at one point, did you not?

24   Didn't you retire from the Fingerprint Unit?

25   A    Retired in 2003.

DIRECT EXAMINATION OF ROY JONES                                161

1    Q    And what did you do then?

2    A    I was off for maybe six months and I started working for the

3    Maryland State Police Department as a latent fingerprint

4    examiner.

5    Q    And then you returned to the Baltimore City Police

6    Department because you couldn't tear yourself away from Baltimore

7    City, is that right?

8    A    That's correct.

9    Q    How long did you spend working for the State Police?

10   A    Eight months.

11   Q    Okay.  Well, with all those years as a latent fingerprint

12   examiner, I assume that you've been qualified as an expert in

13   various courts, as an expert in latent fingerprint comparison, is

14   that correct?

15   A    Yes, I have.

16   Q    Dozens or how many times?

17   A    For federal court, I've been qualified maybe 10 to 12 times.

18   And in circuit court, more than a hundred.

19   Q    Okay.  Your Honor, I would like to offer Mr. Jones as an

20   expert in the area of latent fingerprint comparison.

21            THE COURT:  Any questions, counsel?

22            MS. RHODES:  No objection, Your Honor.

23            THE COURT:  All right.  The witness will be accepted as

24   an expert in latent fingerprint.

25   BY MR. HARDING:

1   Q    Mr. Jones, did you receive lift cards from crime scene

2   technicians that were prepared in processing a white Honda

3   station wagon in the case of the murders of Anthony and Darryl

4   Wyche?

5   A    Yes, I did.

6   Q    How many lift cards were there that the technicians were

7   able to put together for you?

8   A    They made 17 lift cards.

9   Q    Okay.  Did you, after you got the lift cards, did you

10  undertake to eliminate fingerprints of the victims of that double

11  homicide, Darryl and Anthony Wyche?

12  A    Yes, I did.

13  Q    Were there any fingerprints of Darryl Wyche recovered from

14  the car or from the contents of the car?

15  A    Yes, there was.

16  Q    How many?

17  A    Four.

18  Q    Four of Darryl?

19  A    Darryl Wyche.

20  Q    Were there any fingerprints recovered on the car or on the

21  contents of the car from Anthony Wyche?

22  A    No.

23  Q    Okay.  So how many prints that were suitable for comparison

24  were left after you eliminated the prints of Darryl Wyche?

25  A    There were nine suitable latent prints remaining that was

1    not Darryl Wyche.

2    Q    Okay.  And I assume some of those came from the car and some

3    came from the contents of the car, is that correct?

4    A    That's correct.

5    Q    Is it accurate that most of them, in fact, came from some

6    CD's that were in the console area of the car?

7    A    That's correct.

8    Q    How many of the, of the suitable latent prints were on the

9    CD's in the console?

10   A    Six.

11   Q    And how many were from the rest of the car?

12   A    Three.

13   Q    Were you able to identify any of those nine suitable prints?

14   A    They remain unidentified.

15   Q    Thank you.  I have no further questions, Your Honor.

16              THE COURT:  Mr. Jones, thank you very much.

17              THE WITNESS:  Thank you.

18              THE COURT:  You are excused.

19              MR. HARDING:  Your Honor, the United States calls

20   Kenneth Welsh.

21              THE COURT:  Now, ladies and gentlemen of the jury, you

22   are about to hear testimony from this next witness concerning an

23   incident which is not charged as an offense in this case.  I will

24   explain in greater detail at the appropriate time.  The witness

25   can come in.  The witness can come in.

1          I will explain in greater detail at the appropriate

2    time the appropriate uses you may make of this testimony, but I

3    simply caution you that the defendants in this case are not

4    charged with, and you may not consider any evidence regarding,

5    any homicides other than the homicides which are mentioned in the

6    indictment, which I will review with you as I have already, but I

7    will review with you in greater detail at the end of the case.

8          You may proceed, Mr. Harding.  Detective, would you

9    stand and be sworn, please?

10          KENNETH WELSH, GOVERNMENT'S WITNESS, SWORN

11          THE WITNESS:  Yes, I do.

12          THE CLERK:  Be seated.  Speak directly toward the mike.

13    State your name and spell it for the record, please.

14          THE WITNESS:  Kenneth Welsh.

15          DIRECT EXAMINATION

16    BY MR. HARDING:

17    Q    Mr. Welsh, are you retired from the Baltimore City Police

18    Department?

19    A    Yes, I am.

20    Q    How long have you been retired?

21    A    Since 2004.

22    Q    How long did you work for the Baltimore City Police

23    Department?

24    A    32 years.

25    Q    When you left, what unit were you employed in?

1    A    Homicide.

2    Q    How long did you work in the Homicide Unit?

3    A    Almost 20 years.

4    Q    Let me call your attention to the evening of March 11th,

5    2002.  Did you respond to a crime scene that night?

6    A    Yes, I did.

7    Q    And do you recall where the crime scene was?

8    A    It was in the 2700 block of Lauretta Avenue in West

9    Baltimore.

10   Q    Okay.  Actually, I have a big map of Baltimore here.

11        Okay.  Does Lauretta run east/west or north/south?

12   A    East/west.  East/west.

13   Q    Okay.  So I'm pointing right down around about in here.

14   Does Lauretta Avenue run east or west in West Baltimore there?

15   A    Yes, it does.

16   Q    What time did you arrive at this crime scene in the 2700

17   block of Lauretta Avenue?

18   A    2336 hours, which is 11:36 in the evening.

19   Q    What did you observe when you got there?

20   A    We observed the body of a black male, later identified as

21   Eric Lee, laying on the sidewalk in front of 2724 Lauretta

22   Avenue.  He was facing north and south, his head facing north,

23   his feet facing south, kind of perpendicular to the sidewalk.

24        He was surrounded, circled in a pool of blood.  He was

25   suffering from what appeared to be multiple gunshot wounds to the

1    head, neck, chest, back, torso.

2           We, the Crime Lab was called to come process the scene,

3    at which time we recovered ten shell casings that were on the

4    body, underneath the body, and around the area itself, along with

5    other evidence that was laying around.

6    Q    Okay.  Now, was there another person who was also shot at

7    that scene right near where the body of Mr. Epps was?

8    A    Yes.

9    Q    Where the body of Mr. Lee was?

10   A    Yes.  We received information there was an additional victim

11   who suffered a bullet wound to his calf.  And prior to our

12   arrival he had been transported to Bon Secours Hospital.

13   Q    Okay.  By an ambulance, I assume, is that right?

14   A    No, that's not correct.

15   Q    Oh, how did he get to the hospital?

16   A    By one of the, information was received after we got to the

17   scene that there were, in fact, four people initially standing on

18   Lauretta Avenue when they were approached by two suspects in this

19   case, who asked them to lie on the ground.  Two of them fled, two

20   stayed.  Two complied, went to the ground.  Two of them left.

21   One of the two that left then came back.  And when I mean

22   leaving, stayed in the area.  Came back, took Mr. Epps, who was

23   the person who got shot in the calf, put him in his car and took

24   him to Bon Secours Hospital.

25   Q    Okay.  Now you say you were there when the crime scene

1    technicians arrived to process the scene, is that correct?

2    A    Yes.

3    Q    I'd like to show you three exhibits, first of all.  I'm

4    going to put these on the screen.

5              LEE-1.  Can you see that, Detective?

6    A    Yes, I can.

7    Q    Can you tell us what's inside this envelope?

8    A    It's a description of property and has the number three in

9    parentheses, dash .40 caliber casings, which is three .40 caliber

10   casings.  Date of recovery, 3/12/2002.  And from whom recovered,

11   the crime scene, which means we got them from the area where we

12   found the victim.

13   Q    Okay.  And the date of recovery was 3/12.  But you said you

14   actually arrived there shortly before midnight on the 11th, is

15   that correct?

16   A    That's correct.

17   Q    Okay.  Here's another one.  LEE-2.  Can you tell us what's

18   in this envelope?

19   A    This has, again, it says, one, in parentheses, metal

20   fragment.  And that would be either part of the casing and/or

21   part of the bullet that was left when it hit, obviously, it's

22   bones or hit someone's shot or hits concrete or something solid,

23   it tends to break up in small pieces.

24             In addition, there were seven .40 caliber casings.

25   Q    Okay.  And this is LEE-3.  This one has a slightly later

1    date on it.  Can you tell us what this is?

2    A    This is one bullet.  And date of recovery was 3/15, which is

3    almost four days later.  That was recovered, a lot of times, when

4    you get a crime scene, it's at night.  You go back over and over

5    again because you see things you see in the daytime you didn't

6    see at night.  We went back that morning and, actually three days

7    later, and found a bullet.  There was, at that point in time, we

8    don't know that that was there prior to our shooting but was part

9    our shooting, or just had been there for, for a while.  There was

10   no way of telling at that point until it's submitted to

11   ballistics and checked.

12   Q    Okay.  Now, in addition to this crime scene evidence, did

13   you also respond to the autopsy for Mr. Lee?

14   A    Yes.

15   Q    Okay.  And now I'm going to show you LEE-4.  Can you tell us

16   what's in this envelope?

17   A    This is a description of property, five bullet fragments.

18   The date of recovery 13 March 02.  From whom recovered, Eric Lee.

19   Then the officer in the case, typically, when you go, the

20   homicide detective responds to the autopsy, which in this case

21   would have been the morning of the 12th.  And you participate in

22   the entire autopsy.  And the evidence that is recovered or, in

23   this case, bullet fragments that are taken from the body of the

24   victim, then given to us so we can take them to police

25   headquarters and have them submitted.

Case 1:04-cr-00029-RDB   Document 688   Filed 06/12/09   Page 169 of 209

1          And a description of where they were recovered, the

2     entry, where they went in, back to front, left to right.  Those

3     things are noted.  Then we take that stuff and that's submitted

4     to Evidence Control.

5     Q    Okay.  Now, Detective, did you also, or you or one of your

6     colleagues respond --

7          THE COURT:  I'm sorry to interrupt, Mr. Harding.  But

8     are you going to take the items out of the envelope?

9          MR. HARDING:  This one is a biohazard, Your Honor.  And

10    so I wasn't going to do that.  I can do it for the other three.

11         THE COURT:  Okay.  I think that would be appropriate.

12    Life is too uncertain to accept the testimony of what's in a

13    sealed envelope without opening the envelope.

14    BY MR. HARDING:

15    Q    Okay.  This is LEE-1, three shell casings.

16         Do you fill out the writing on these things, Detective,

17    or does someone else do that?  The Crime Lab technician does

18    that, I suppose, right?

19    A    Yes.

20    Q    And this is LEE-2, which is seven shell casings and metal

21    fragments.  This is actually labeled projectile, is that correct,

22    Detective?

23    A    Yes.

24    Q    And it looks like the crime scene technician wrote, From

25    under victim's head.  Is that what that says?

1    A    Yes, it does.

2    Q    And here's another one.  Metal fragment.  Here's another

3    shell casing.  Here's another one.  The crime scene technician

4    puts the caliber of these casings on here, is that correct?

5    A    That's correct.

6    Q    .40 caliber?  Were all of the casings recovered .40 caliber

7    casings?

8    A    Yes, they were.

9    Q    And were all of the bullets also .40 caliber, except for the

10    ones that were too damaged to tell?

11    A    That's correct.

12    Q    Okay.  That takes care of LEE-2.  And this is LEE-3, one

13    bullet.  And it says bullet from brass in front of 2726 Lauretta.

14    Is that the address in front of which the body of Eric Lee was

15    found?

16    A    I believe it's next door.  I would, it's this, I think, was

17    the house immediately to its left.  This one was the one that I

18    had indicated earlier that we went back to the scene three days

19    later and searched and found this.

20    Q    Okay.

21         THE COURT:  Thank you, Mr. Harding.

22    Q    Certainly.  Did you or one of your colleagues respond to Bon

23    Secours Hospital?

24    A    Yes.

25    Q    And was a bullet also recovered from the leg of Mr. Epps,

1  the shooting victim, who did not die?

2  A    That's correct.

3  Q    And was that entered into evidence, also?

4  A    Yes, it was.

5  Q    And did you go down to the Evidence Control Unit and gather

6  up these exhibits that we've just moved into evidence through

7  you?

8  A    I had it done for me, yes.

9  Q    And did you learn that that one, the bullet that was taken

10 out of Mr. Epps's leg was actually in a warehouse somewhere?

11 A    Yes.  It was, as one, when you saw in one of the envelopes

12 there, they have the red tape said Biohazard.  If it is, in fact,

13 biohazard, I guess that one wasn't put there.  But this,

14 apparently, was taken to a warehouse, which is stuff that is

15 stored separately from where all the rest of the evidence is,

16 simply because it is biohazard.  And all it means it had blood on

17 it, it was taken from somebody's body.

18        So it is stored in the warehouse and at this point in

19 time it was just unavailable this morning for pickup.

20 Q    Okay.  We'll try to get it in next week, Detective.  If you

21 could give us, though, the property number of that bullet that

22 was submitted.  Do you have that available or do you need to

23 look?

24 A    That was 017105, I believe, 02.

25 Q    Do you want to look at the reports in this case?  Would that

172

1    help?

2    A     No, I think I have something.  02 being the year, 2002.

3    017105.

4    Q     And that's the bullet that was taken out of Mr. Epps's leg?

5    A     That was recovered from the hospital on the 19th of March,

6    which was seven or eight days later.

7    Q     Now, after you recovered all these shell casings and

8    bullets, did you submit them to a unit that compares casings and

9    bullets from evidence recovered in other crimes?

10   A     Yes.  Other crimes that have occurred and are stored for the

11   purposes of crimes that may occur later where they have either

12   bullets or shell casings in evidence.

13   Q     Okay.  And did you eventually get back reports on

14   comparisons that were made between the evidence you had recovered

15   in this double shooting and the murders of Anthony and Darryl

16   Wyche?

17   A     Yes.

18   Q     As well as the murder of Tonya Jones Spence?

19   A     Yes.

20   Q     Okay.  And a ballistics examiner would be the one to testify

21   about that, is that correct?

22   A     That's correct.

23   Q     Okay.  Thank you.  I think those are all the questions I

24   have for you today, Detective.

25              CROSS EXAMINATION

1    BY MR. PYNE:

2    Q    I really just have one question, Mr. Welsh.  Do you know why

3    the shell casings were packaged the way they were, with three in

4    one envelope and seven in the other?

5    A    No, I do not.  I mean, I could assume certain things, how

6    they were recovered.  Sometimes it's more than one Crime Lab

7    technician.  They can find seven.  In some cases when they are

8    sent to ballistics later on, they don't necessarily want to

9    package lots of them all in one case.  They split them up a

10   little bit.  Just easier for ballistics to handle it.

11   Q    Okay.  But you don't, sitting here today, attach any

12   significance to the fact that they are packaged in that manner?

13   A    No.

14   Q    Thank you.  That's all I have, Your Honor.

15              CROSS EXAMINATION

16   BY MR. KURLAND:

17   Q    Is it Detective?

18   A    Ex.

19   Q    Ex-detective.  Sir?

20   A    That's fine.

21   Q    Just one question.  Mr. Lee, the victim.  As part of your

22   investigation, he had attended a party earlier that evening with

23   a large number of people?

24   A    That's correct.

25   Q    Thank you.  No further questions.

1                  REDIRECT EXAMINATION

2    BY MR. HARDING:

3    Q     You learned that, I assume, from talking to witnesses near

4    the scene, is that correct?

5    A     Witnesses at the scene and the surviving people that were

6    at, at there initially when the shooting occurred, as well as

7    people in the party, yes.

8    Q     Did you learn how many shooters there were?

9    A     Two.

10              MR. KURLAND:  Objection.

11              THE COURT:  Overruled.

12   A     Two.

13   Q     Okay.  Was anybody able to give you descriptions of the

14   shooter, Detective?

15              MR. KURLAND:  Objection.  Beyond the scope of my cross.

16              THE COURT:  Overruled.  You may answer yes or no,

17   Detective.

18              THE WITNESS:  No.

19              MR. HARDING:  Thank you.  I have no further questions,

20   Your Honor.

21              THE COURT:  Thank you very much, Detective.  You're

22   excused.  That's it.  Through no fault of the government's

23   whatsoever, ladies and gentlemen, we have no additional witnesses

24   available to testify this afternoon.  This arises from certain

25   legal issues that the Court has needed to give attention to.

1          What that means for you is that you get to leave a

2    little early today.  We will be in session, I anticipate, truly

3    for a full day on Monday.  And we'll all make our best effort to

4    start promptly at 9:30.  And we'll be in session certainly

5    through 4:30, and perhaps a little later than 4:30, on Monday but

6    not past 5:00.

7          On Tuesday, Election Day, I think it would be most

8    efficacious for us to start at 11:00 and go until 3:00.  That

9    means we won't break for lunch, obviously.  But my purpose in

10   doing this is to maximize the convenience and minimize the

11   inconvenience for Election Day.

12          I actually had sort of an argument with my wife about

13   this.  She said I should just not start until the afternoon.  I

14   said, but no, some people who want to vote in the morning and who

15   knows how long the lines will be.  Some people will want to vote

16   in the afternoon and who knows how long the lines will be.  So

17   the compromise that I've settled on, since I'm the judge and not

18   just the husband, is we're going to start at 11 and I'm hoping

19   that that will give everybody all the time they could possibly

20   need, no matter how long you have to wait in line, if you do.

21   And then we'll break at three o'clock.  And those of you who

22   would find it most convenient, given child care and other issues,

23   to vote in the evening, will have plenty of time to do that,

24   hopefully without having to stand in long lines.

25          So we'll be in session for about four hours.  I would

1    expect we will take probably only one break at around 12:30,

2    1:00.  And then we'll go through until three.

3            So my intention is, we'll be in session all day on

4    Monday.  For the four days, for four hours or so on Tuesday, late

5    start, 11:00.  I'll remind you on Monday.  And break at three.

6    And then a full day on Wednesday and a full day on Thursday of

7    next week.  And then only if needed will we be in session with

8    you on Friday of next week.  Right now the government has reason

9    to believe very strongly that it will conclude its presentation

10   of evidence by the end of the day on Thursday of next week.  If

11   that should happen, then we'll give you Friday off because there

12   will be certain issues that we'll have to deal with without your

13   presence.  And then we'll resume the following week.

14           I remind you, of course, that in a criminal case a

15   defendant never has the burden to call any witnesses or introduce

16   any evidence, but has the right to do so.  And I'm sure that, as

17   that time grows near, counsel for the defendants here will be

18   making decisions about whether they wish to call any witnesses or

19   introduce any evidence.  But those decisions won't be made,

20   obviously, until probably late next week at the earliest.

21           So I will keep you apprised as we go along of what the

22   schedule is likely to be.  Right now it looks very much like we

23   will conclude this case in its entirety before Thanksgiving.  And

24   frankly, I will tell you, well before Thanksgiving.

25           So we again express our appreciation to you for the

1    inconvenience to your lives and the sacrifices you are making to

2    be with us these many weeks.  This concludes, I think, week six

3    or maybe seven.  I lose count.  But you're off for the rest of

4    the week.

5          Continue to adhere scrupulously to all of my

6    instructions.  Have no discussion about the case or about any of

7    the evidence.  Continue to keep an open mind.  Do not conduct any

8    investigation of any sort whatsoever.  Do not visit the scene of

9    any locations that you've heard testified about.  Do not look up

10   any words.  Do not discuss the case with any family or friends.

11   Enjoy your weekend.

12         Please leave your note pads on your chair.  And we will

13   see you Monday morning, November 3rd, 9:30, and we'll start

14   promptly at that time.  Thank you, ladies and gentlemen.  The

15   jury is excused.

16         (Jury exits the courtroom.)

17         And happy birthday.  One of the jurors celebrated a

18   birthday today and the jurors gave her a card.  It was very nice.

19   Anything for the good of the order?

20         MR. KURLAND:  Judge, one procedural point.

21         THE COURT:  Yes.  Mr. Kurland.

22         MR. KURLAND:  Your Honor, at the end of the lunch break

23   I was speaking with Mr. Hanlon about a procedural point and also

24   checking with the court clerk.  In earlier testimony weeks ago,

25   there were several witnesses, I think three or four, were

1   references to other grand jury transcripts that haven't, that

2   during the testimony the predicates to admit them under Rule 801,

3   because they were clear, inconsistent statements, unlike this

4   witness who had issues with respect to memory, but those grand

5   jury transcripts have not yet been moved into evidence.

6            Is it the Court's preference to have the, if there's an

7   offer made to move in grand jury transcripts as a prior

8   inconsistent statement, to have it done during the witness'

9   testimony or can it be done any time before the close of the

10  evidence as long as it's before the jury?

11       THE COURT:  It is not my practice, nor do I believe it

12  appropriate, to admit a transcript of a prior inconsistent

13  statement.

14       MR. KURLAND:  That's what, the testimony today, when

15  the -- what's the Court's formal preference, then?

16       THE COURT:  The prior inconsistent statement, whether

17  it appears in a grand jury transcript or whatever the source is,

18  even if it's only orally, is presented to the witness.  The

19  witness either ratifies the prior statement or denies having made

20  it or testifies to the contrary, and thereby that prior

21  inconsistent statement, having been heard, in this instance seen

22  by the jury, is available to the jury for its consideration on

23  whether the witness should be believed.  But the transcript

24  itself is not sent into the jury.

25            What we did here today was an accommodation to the

1    interests of justice by Ms. Rhodes and the government.  The

2    witness had a failure of recollection, couldn't be refreshed.

3    And because there was prior testimony in the grand jury

4    transcript that both sides wanted in, although not the same

5    excerpts, they reached agreement to put the transcript in.  And I

6    told the jury that they could take the transcript as the witness'

7    testimony.

8         So that's just, from my perspective, it's just an

9    unobjected-to, stipulated exhibit.

10        MR. KURLAND:  But in a situation where a witness

11   testifies, say, to Point A on their testimony in court and they

12   are then presented with their grand jury transcript which says

13   something diametrically opposed, and the testimony, whether or

14   not the physical transcript is admitted, the testimony qualifies

15   as a prior inconsistent statement that's admissible for its

16   substantive truth under Rule 801, what's the Court's pleasure as

17   to how the procedure should go about as to getting that before

18   the jury, having the jury know that that isn't simply impeachment

19   evidence but could also be considered as substantive evidence?

20        It would be 801(d)(1)(1), I think, a prior inconsistent

21   statement which is definitionally not hearsay and can be used for

22   the truth of the matter asserted.  I believe that situation arose

23   before and is going to arise again.

24        THE COURT:  (D)(1)(a)?

25        MR. KURLAND:  I'm sorry.  It's 801 -- it's 801.

1          THE COURT:  Yeah, (D)(1)(a).

2          MR. KURLAND:  I think it is (D)(1)(a).

3          THE COURT:  It is, it is.

4          MR. KURLAND:  I just don't want to inadvertently -- I

5    don't want to inadvertently be in a position where something that

6    qualifies as substantive evidence that can be considered for the

7    truth of the matter asserted only comes in for impeachment value

8    when we want it in both for impeachment value and as substantive

9    evidence.

10         In the unique procedure this morning, the Court

11   correctly specifically gave an instruction to the jury that they

12   can consider the transcript for the truth of the matter asserted.

13   And even in the absence of a stipulation, I just want to make

14   sure that, that we all follow the right procedure so the evidence

15   can be admitted for all its purposes.  And even though Mr. Martin

16   gave me the book, I can't actually find it.

17         THE COURT:  No.  You're right.  You're right.  You're

18   right.  Have there been such instances?

19         MR. KURLAND:  There's been at least three that I know

20   of.

21         THE COURT:  Refresh my recollection, so to speak.

22         MR. KURLAND:  You mean you want to recollect?  Mr.

23   Hanlon brought up one, one I was talking about the break.  I

24   don't mean to -- it was, think it was Jaquetta Smith, there was

25   some reference to grand jury transcripts.  And my recollection is

1    also that the predicates, we'd have to look at the transcript,

2    also with respect to one of the Duganne sisters, there was, when

3    she made a statement about not, not naming people in the

4    Baltimore crew, I showed her her grand jury transcript and she

5    only named one and there was like three or four other ones that

6    she acknowledged that she had said that before the grand jury.

7              And again, I'm in the process of rereading all of Mr.

8    Montgomery's testimony.  The way it came in, I'm not sure it

9    raised evidence conceivable that even with respect to Mr.

10   Montgomery there are certain aspects of his grand jury testimony

11   that were, that the predicates were established, the foundations

12   were established during the testimony.  And there was a fairly

13   express or implicit acknowledgment that the grand jury

14   transcripts which he acknowledged making that statement was

15   inconsistent.

16             I just want to make sure that, one, we can deal with

17   that.  But also in the future us, because I know that one or two

18   witnesses, I think the issue's going to arise again.  I just want

19   to make sure for somebody that has not practiced before you

20   before, that when it's presented, that if we want it in for the

21   truth of the matter asserted in addition to impeachment value,

22   that it's done, one, in an appropriate way, in a way that is

23   consistent with the way the Court would want it done.

24             THE COURT:  Yeah.  I don't have any particular

25   requirement other than certainly, help me out, give me a list, or

1    whatever you can give me.  Because if in closing argument you

2    haven't alerted me that you're going to be urging the jury to

3    treat grand jury testimony as substantive evidence, then I'm

4    probably going to sustain the objection unless you help me out in

5    advance.

6              MR. KURLAND:  Sure, Your Honor.

7              THE COURT:  I just don't have a clear recollection of

8    any such instance.  I mean, sure there have been, you know, there

9    have been around the edges, different emphases.  And I guess one

10   or two outright inconsistent statements.  But nothing that struck

11   me as the kind of thing that you would want to actually stand up

12   and say, Although he said it here in the courtroom, what he said

13   in the grand jury is so different and so important that you ought

14   to accept what he said in the grand jury.

15             MR. KURLAND:  Well, there might be one or two coming

16   down the pike.

17             THE COURT:  Okay.

18             MR. KURLAND:  But I just wanted to generally alert the

19   Court now.  And we'll make sure that, one, that it's formally --

20   I know if you don't bring it up at the immediate time you might

21   loose the benefit of getting an immediate instruction.  But as

22   long as the Court at some point, the jury's made aware, okay.

23   That's sufficient.  Thank you, Your Honor.

24             THE COURT:  All right.  Mr. Harding.

25             MR. HARDING:  Judge, I have to object to an attorney

1     waiting until six weeks into a trial and then sort of invoking

2     vaguely the existence of all of this prior evidence that he

3     thinks ought to come in and can I please have a time to get

4     together a list.  Evidence should come in when the witness is on

5     the stand.  Otherwise, we don't have a chance to address the

6     issue when we do redirect or whatever.  And it's just completely

7     improper for Mr. Kurland to deal with this issue this way.

8              He needs to, if he wants a piece of substantive

9     evidence to come in, be it from a grand jury passage or whatever,

10    he needs to address that issue when the witness is on the stand.

11         THE COURT:  The point is well taken, Mr. Harding, to be

12    sure.  I mean, that's what I was getting at in my final comment

13    to Mr. Kurland.  But I don't think there's any harm done.  Mr.

14    Kurland.

15         MR. KURLAND:  Your Honor, the only, I appreciate the

16    Court's comments and the Court hasn't, and the Court's current

17    ruling.  Will be more my fault that in the future, but also the

18    general rule is that if evidence comes in absent any limitation,

19    even if it's otherwise inadmissible, whatever, it comes in, it

20    can be considered for all purposes.

21              So the kind of default rule is is that all the

22    statements and the references are admissible for all purposes,

23    including the truth of the matter asserted.  That's the general,

24    absent a limitation.

25              And the Court's been very, you know, on top of making

184

1   sure there are the limitations.  So absent a specific limitation,

2   the evidence is in for all purposes regardless.

3          THE COURT:  I think your point is well taken as well,

4   Mr. Kurland.  It's a practical problem.  You're bringing it up

5   now.  Mr. Harding feels you should have brought it up much sooner

6   on a witness.

7          MR. KURLAND:  Being a lawyer in all this.

8          THE COURT:  Sure.  I understand that.  But my point is

9   the reason you're bringing it up now, I think, is because as a

10  result of what we went through with Ms. Green this morning, it

11  was crystallized in your mind.  Of course.  I get that.

12         But you know as well is I do that if you had waited

13  until closing argument to say, oh, by the way, Judge, seven weeks

14  ago there was this witness --

15         MR. KURLAND:  Yes.

16         THE COURT:  -- who contradicted himself while on the

17  stand and I want to say to the jury that you can accept the

18  witness' grand jury testimony for the truth of the matter, you

19  know that wouldn't wash.

20         MR. KURLAND:  No, it would not.

21         THE COURT:  That's really all Mr. Harding is getting

22  at.  Okay.

23         Thank you very much.  All right.  Have a pleasant

24  weekend.  I think we're getting to the point where I'd really

25  like to get jury instructions at your earliest convenience.  I've

1    got them from the government.  I've got them from Mr. Martin.  If

2    anybody wants to add to what's been submitted, I'll be happy to

3    get that.

4            Mr. Coburn, I'd appreciate if you could, I know a

5    you're hard worker, I get these e-mails from you at one a.m.  But

6    if you can get something in or Massiah, whether you want to

7    pursue something, I'd like to, I would really like to conclude

8    the government's presentation by the end of the day on Thursday.

9    I think that would be very useful if we could, if we could do

10   that and then have Friday morning for argument on motions,

11   discussion of jury instructions, and scheduling and defense

12   witnesses and all the things that we're going to need to talk

13   about once we conclude the government's case in chief.

14           MR. COBURN:  Absolutely, Your Honor.  I'll do it in the

15   next couple of days.

16           THE COURT:  Thank you, Mr. Coburn.

17           MR. KURLAND:  Judge, two other quick things.  We'll get

18   in some proposed instructions early in the week.  The other thing

19   is we filed a motion prior to Montgomery's testimony with respect

20   to a particular piece of evidence being admitted under Rule 807,

21   the taped transcript.  We argue that that should be admitted for

22   the truth of the matter asserted under the residual exception.

23   It was timely filed prior to his testimony.  And if the Court

24   would take a look at that over the weekend as well.  Because that

25   kind of dovetails into some of the issues we've been raising.

1          THE COURT:  This was one of the proffer sessions?

2          MR. KURLAND:  It was, it was the, it was the taped

3   proffer session that Mr. Coburn played fairly substantial

4   excerpts of.  And we briefed that as to why we think under the

5   circumstances that should be admissible, not just for impeachment

6   value, but for the truth of the matter asserted.

7          THE COURT:  Is there a Bruton --

8          MR. KURLAND:  No.

9          THE COURT:  There's no Bruton issue in there?

10         MR. KURLAND:  No.  It largely goes to the issue of when

11  he said, when Montgomery said that Mr. Gardner said that he had

12  lost a significant amount of money.  And we specifically ask that

13  that be admissible, not just for the impeachment value that it's

14  obviously admissible for, but the truth of the matter asserted.

15  And that's briefed in our 807 motion.

16         THE COURT:  I'm not sure I'm following that.  The

17  government put that evidence in.  It's in affirmatively that Mr.

18  Montgomery said that Mr. Gardner said that.  And that's

19  substantive evidence.

20         MR. KURLAND:  I mean, if he said it separately, that's

21  one thing.  But it's also on the tape.  If he said it

22  substantively, it's mooted.  If he didn't say it specifically the

23  way he said it on the tape --

24         THE COURT:  Well, I recall that rather clearly he said

25  Mr. Gardner had lost a lot of money or whatever, and then there

1    was this business about Mr. Martin needing money.  And I remember

2    Mr. Harding's redirect specifically, there was questions about,

3    Did anybody ask you why else Mr. Gardner wanted to rob Darius

4    Spence?  And the answer was no.  And then there was some other

5    testimony around that.

6              So I am confident that it is in the record, that Mr.

7    Montgomery, and indeed Mr. Montgomery said, that's what I said,

8    that Mr. Martin, Mr. Gardner had lost sold money.  In fact, he

9    didn't say some money.  He dropped a thousand or --

10              MR. KURLAND:  Yes.

11              THE COURT:  There was some idiom used because there was

12    a follow-up about, what does that mean?

13              MR. KURLAND:  If that's in as substantive evidence then

14    that's --

15              THE COURT:  It's in as substantive evidence, yes,

16    absolutely.

17              MR. KURLAND:  I'll be quiet now.

18              THE COURT:  Okay.  Thank you all very much.  See you on

19    Monday.

20              (Conclusion of Proceedings at 3:35 p.m.)

21

22

23

24

25

1                              INDEX

2

3                                                    PAGE
    WITNESS: SHANNON HARRIS
4   DIRECT EXAMINATION BY MR. HARDING                  29
    CROSS EXAMINATION BY MR. FLANNERY                  36
5   CROSS EXAMINATION BY MR. COBURN                    41
    REDIRECT EXAMINATION BY MR. HARDING                44
6   RECROSS EXAMINATION BY MR. FLANNERY                46

7   WITNESS: SHAMIER DELVISON
    DIRECT EXAMINATION BY MR. HARDING                  47
8   CROSS EXAMINATION BY MR. FLANNERY                  54

9   WITNESS: ARLENE WILLIAMS
    DIRECT EXAMINATION BY MR. HARDING                  58
10  CROSS EXAMINATION BY MR. FLANNERY                  64

11  WITNESS: DAMITA GREEN
    DIRECT EXAMINATION BY MR. HANLON                   69
12  CROSS EXAMINATION BY MS. RHODES                    85
    CROSS EXAMINATION BY MR. PYNE                      126
13  REDIRECT EXAMINATION BY MR. HANLON                 132
    RECROSS EXAMINATION BY MR. RHODES                  133
14
    WITNESS: ANDRE DRAKE
15  DIRECT EXAMINATION BY MR. HARDING                  135
    CROSS EXAMINATION BY MR. FLANNERY                  146
16  CROSS EXAMINATION BY MR. COBURN                    152
    REDIRECT EXAMINATION BY MR. HARDING                156
17  RECROSS EXAMINATION BY MS. RHODES                  157

18  WITNESS: ROY JONES
    DIRECT EXAMINATION BY MR. HARDING                  160
19
    WITNESS: KENNETH WELSH
20  DIRECT EXAMINATION BY MR. HARDING                  164
    CROSS EXAMINATION BY MR. PYNE                      173
21  CROSS EXAMINATION BY MR. KURLAND                   173
    REDIRECT EXAMINATION BY MR. HARDING                174

22

23

24

25

REPORTER'S CERTIFICATE

3      I, Mary M. Zajac, do hereby certify that I recorded

4 stenographically the proceedings in the matter of USA v. Willie

5 Mitchell, Case Number(s) AMD-04-029, on October 29, 2008.

6      I further certify that the foregoing pages constitute

7 the official transcript of proceedings as transcribed by me to

8 the within matter in a complete and accurate manner.

9      In Witness Whereof, I have hereunto affixed my

10 signature this _____ day of _____, 2009.

_____
Mary M. Zajac,
Official Court Reporter

'

**'04** [3] - 94:5, 94:6, 144:11
**'98** [2] - 54:21, 54:22
**'99** [2] - 49:11, 137:16

# 0

**017105** [2] - 171:24, 172:3
**02** [3] - 168:18, 171:24, 172:2

# 1

**10** [2] - 96:8, 161:17
**101** [1] - 1:25
**10:00** [3] - 94:14, 95:3, 96:6
**11** [2] - 128:20, 175:18
**11:00** [4] - 128:7, 128:9, 175:8, 176:5
**11:36** [1] - 165:18
**11:40** [5] - 87:3, 87:9, 96:9, 129:3, 132:2
**11:55** [1] - 101:18
**11th** [2] - 165:4, 167:14
**12** [2] - 123:12, 161:17
**126** [1] - 188:12
**12:15** [2] - 92:17, 123:12
**12:30** [1] - 176:1
**12th** [1] - 168:21
**13** [1] - 168:18
**132** [1] - 188:13
**133** [1] - 188:13
**135** [1] - 188:15
**14** [2] - 96:9, 153:22
**146** [1] - 188:15
**15** [4] - 79:12, 79:22, 101:17, 142:4
**152** [1] - 188:16
**156** [1] - 188:16
**157** [1] - 188:17
**16** [2] - 37:15, 146:17
**160** [1] - 188:18
**164** [1] - 188:20
**17** [1] - 162:8
**173** [2] - 188:20, 188:21
**174** [1] - 188:21
**19** [1] - 153:22
**1959** [1] - 6:10
**1998** [7] - 32:3, 32:8, 37:7, 37:14, 42:21, 54:19, 69:23
**1999** [6] - 49:8, 49:25,

55:1, 55:2, 55:3, 55:7
**19th** [1] - 172:5
**1:00** [1] - 176:2
**1:25** [1] - 158:13
**1:30** [5] - 116:1, 116:17, 116:18, 116:21, 158:5

# 2

**2** [3] - 50:1, 55:8, 137:23
**20** [9] - 82:24, 82:25, 117:23, 130:1, 130:5, 130:6, 130:12, 142:4, 165:3
**2000** [4] - 52:6, 52:7, 55:10, 137:14
**2001** [7] - 38:13, 49:16, 50:1, 55:3, 55:7, 55:8, 55:14
**2002** [25] - 38:9, 41:11, 42:22, 49:12, 49:16, 50:12, 62:10, 65:22, 72:11, 72:18, 73:6, 80:23, 86:11, 87:1, 93:16, 94:3, 95:22, 100:18, 105:11, 118:22, 133:24, 140:22, 165:5, 172:2
**2003** [8] - 44:6, 49:12, 55:6, 138:9, 138:13, 140:22, 156:21, 160:25
**2004** [13] - 74:23, 75:22, 86:5, 94:4, 94:7, 98:21, 100:8, 138:10, 138:14, 139:8, 153:20, 156:22, 164:21
**2008** [3] - 1:11, 32:3, 189:5
**2009** [1] - 189:10
**205** [11] - 32:7, 35:13, 37:4, 37:19, 47:3, 49:21, 54:23, 56:9, 57:4, 63:16, 65:4
**21201** [1] - 1:25
**21st** [2] - 62:10, 139:8
**2336** [1] - 165:18
**23rd** [1] - 38:9
**24** [2] - 29:23, 160:22
**25** [1] - 47:21
**26** [1] - 135:20
**26th** [1] - 18:19
**27** [1] - 18:23
**2700** [3] - 18:23, 165:8, 165:16
**2724** [1] - 165:21
**2726** [1] - 170:13
**2731** [2] - 137:11, 137:25

# 3

**28** [1] - 69:12
**28th** [3] - 86:11, 105:10, 133:24
**29** [1] - 1:11, 188:4, 189:5
**2:45** [2] - 158:6, 158:11, 158:12

# 3

**3** [3] - 47:1, 65:18, 142:12
**3/12** [1] - 167:13
**3/12/2002** [1] - 167:10
**3/15** [1] - 168:2
**30** [2] - 25:15, 124:12, 130:2, 130:5, 130:6, 130:12
**32** [1] - 164:24
**3517** [5] - 30:18, 30:20, 42:1, 42:5, 59:5
**36** [1] - 188:4
**3:00** [2] - 118:5, 175:8
**3:35** [1] - 187:20
**3rd** [1] - 177:13

# 4

**4** [3] - 55:6, 131:9, 142:12
**40** [8] - 19:10, 19:12, 167:9, 167:24, 170:6, 170:9
**404(b** [2] - 6:9, 6:17
**404(b)** [1] - 6:7
**41** [1] - 188:5
**410-262-0798** [1] - 95:17
**44** [1] - 188:5
**443-691-9203** [1] - 95:13
**45** [3] - 144:25, 158:18
**46** [1] - 188:6
**47** [2] - 58:11, 188:7
**4:30** [2] - 175:5

# 5

**5** [1] - 142:12
**5,000** [1] - 23:20
**54** [1] - 188:8
**5515** [1] - 1:24
**58** [1] - 188:9
**5:00** [1] - 175:6

# 6

**64** [1] - 188:10
**69** [1] - 188:11

# 7

**7** [4] - 47:1, 65:18, 79:12, 79:22
**7:30** [1] - 134:1
**7:45** [1] - 149:12

# 8

**801** [5] - 110:24, 178:2, 179:16, 179:25
**801(d)(1)(1** [1] - 179:20
**804** [2] - 113:14, 113:15
**807** [2] - 185:20, 186:15
**85** [1] - 188:12
**88** [1] - 144:4
**88.9** [2] - 144:4
**8:00** [1] - 66:3
**8:30** [1] - 149:12

# 9

**9** [2] - 94:14, 96:6
**9:30** [2] - 175:4, 177:13
**9:44** [1] - 2:1

# A

**A-N-D-R-E** [1] - 135:15
**A-R-L-E-N-E** [1] - 58:5
**a.m** [5] - 2:1, 65:18, 65:24, 101:18, 185:5
**able** [24] - 2:13, 2:18, 2:20, 3:1, 22:7, 22:17, 24:23, 51:18, 51:19, 77:20, 87:23, 107:3, 109:22, 110:8, 113:19, 127:9, 132:5, 132:12, 153:4, 158:4, 159:22, 162:7, 163:13, 174:13
**absence** [1] - 180:13
**absent** [3] - 183:18, 183:24, 184:1
**Absolutely** [3] - 2:7, 25:20, 185:14
**absolutely** [1] - 187:16
**accept** [3] - 169:12, 182:14, 184:17
**accepted** [1] - 161:23
**accommodation** [1] - 178:25

**accompanied** [1] - 152:10
**Accord** [1] - 130:16
**accurate** [3] - 73:6, 163:5, 189:8
**accurately** [1] - 80:5
**acknowledged** [2] - 181:6, 181:14
**acknowledging** [1] - 80:12
**acknowledgment** [1] - 181:13
**act** [3] - 6:23, 9:16, 10:6
**activities** [2] - 12:18, 18:3, 121:4
**activity** [6] - 6:13, 6:19, 7:5, 148:9, 148:14, 149:7
**acts** [2] - 7:2, 10:8
**actual** [3] - 81:12, 81:17, 81:23
**Adam** [1] - 1:22
**add** [1] - 185:2
**addition** [3] - 167:24, 168:12, 181:21
**additional** [6] - 10:6, 23:13, 111:23, 158:1, 166:10, 174:23
**address** [12] - 30:18, 30:19, 32:7, 42:16, 59:4, 69:16, 73:21, 77:25, 119:21, 170:14, 183:5, 183:10
**addressed** [1] - 114:8
**addressing** [1] - 78:8
**adhere** [1] - 177:5
**adjudication** [1] - 135:23
**admissible** [9] - 106:15, 106:17, 106:20, 109:6, 179:15, 183:22, 186:5, 186:13, 186:14
**admit** [5] - 6:4, 11:6, 27:18, 178:2, 178:12
**admitted** [7] - 103:7, 110:12, 112:1, 179:14, 180:15, 185:20, 185:21
**advance** [1] - 182:5
**affirmatively** [1] - 186:17
**affixed** [1] - 189:9
**afflicted** [2] - 56:14, 68:15
**afraid** [1] - 110:4, 110:6, 114:10, 114:14, 114:15, 114:16, 114:17, 114:23, 115:13, 139:12
**afternoon** [20] - 46:23, 89:20, 89:22, 114:4, 115:12, 118:8, 118:20, 126:17, 135:13, 135:18,

146:5, 146:6, 152:7, 158:18, 160:6, 160:18, 160:19, 174:24, 175:13, 175:16
**afterwards** [2] - 109:23, 144:19
**age** [2] - 37:14, 146:17
**agent** [5] - 4:13, 15:5, 15:20, 16:1, 18:13
**Agent** [7] - 7:13, 9:8, 18:14, 23:5, 24:22, 25:16, 28:19
**agent's** [1] - 20:16
**agents** [5] - 16:4, 16:5, 16:6, 16:11, 20:14
**ago** [11] - 11:16, 71:5, 80:17, 81:2, 88:2, 92:18, 100:25, 114:9, 155:2, 177:24, 184:14
**agreed** [4] - 101:24, 111:9, 118:9, 118:10
**agreement** [8] - 23:22, 26:5, 101:3, 101:20, 103:23, 108:16, 112:2, 179:5
**ahead** [14] - 28:16, 70:19, 78:21, 81:24, 82:3, 100:10, 102:13, 104:21, 112:16, 112:18, 148:12, 150:13, 157:1, 159:14
**ain't** [1] - 51:13
**Airport** [1] - 65:14
**airport** [1] - 46:24
**alert** [1] - 182:18
**alerted** [1] - 182:2
**allow** [1] - 109:11
**allowed** [4] - 114:9, 114:21, 148:22, 149:5
**allowing** [1] - 115:9
**Almost** [1] - 165:3
**almost** [4] - 40:9, 107:21, 112:7, 168:3
**ambiguity** [1] - 27:2
**ambulance** [1] - 166:13
**AMD-04-029** [2] - 1:6, 189:5
**AMERICA** [1] - 1:5
**Amity** [28] - 32:1, 32:7, 34:2, 35:13, 37:4, 37:19, 41:10, 42:1, 42:10, 42:16, 42:23, 44:18, 47:3, 49:21, 52:5, 52:18, 54:23, 54:25, 56:9, 57:4, 59:8, 59:14, 59:19, 60:1, 62:2, 63:17, 65:4
**amount** [2] - 159:15, 186:12
**amounts** [1] - 159:15
**AN** [1] - 135:12

**analysis** [1] - 4:14
**ANDRE** [2] - 135:8, 188:14
**Andre** [6] - 1:13, 115:19, 118:4, 135:6, 135:7, 135:12
**Andy** [1] - 26:12
**announce** [1] - 116:23
**answer** [30] - 3:15, 8:10, 12:5, 28:3, 61:25, 68:1, 75:5, 76:4, 76:13, 78:5, 78:6, 79:4, 79:13, 79:21, 80:3, 84:12, 84:19, 84:24, 114:9, 115:9, 123:2, 123:24, 124:22, 128:14, 130:10, 134:25, 153:23, 156:8, 174:16, 187:4
**Answer** [1] - 154:1, 154:3
**answered** [2] - 5:22, 145:24
**answers** [1] - 23:22
**Anthony** [35] - 71:8, 71:10, 71:13, 71:15, 71:21, 71:22, 72:5, 72:10, 73:11, 73:17, 74:2, 74:14, 76:14, 83:6, 83:7, 83:13, 83:22, 89:1, 90:2, 90:10, 91:5, 92:17, 92:19, 99:1, 121:4, 122:17, 127:23, 127:25, 130:18, 130:22, 131:14, 162:3, 162:11, 162:21, 172:15
**Anthony's** [1] - 91:7
**anticipate** [1] - 175:2
**anxious** [1] - 25:11
**anyway** [5] - 3:17, 36:6, 65:9, 104:18, 112:16
**Apart** [1] - 5:12
**apart** [2] - 44:16, 84:15
**apartment** [10] - 32:19, 52:24, 62:8, 62:11, 63:17, 63:24, 137:11, 149:20, 156:20, 157:3
**apartments** [1] - 59:16
**apologize** [1] - 133:20
**apparent** [2] - 16:22, 21:10
**appear** [3] - 14:12, 17:1, 23:4
**appearance** [3] - 69:25, 75:21, 116:17
**Appearances** [1] - 1:15
**appeared** [2] - 76:1, 165:25
**appearing** [1] - 74:23
**apply** [2] - 22:22, 100:12

**appreciate** [4] - 27:23, 71:7, 183:15, 185:4
**Appreciate** [1] - 13:12
**appreciation** [1] - 176:25
**apprised** [1] - 176:21
**approach** [4] - 25:18, 53:25, 60:20, 74:20
**approached** [1] - 166:18
**appropriate** [8] - 12:1, 113:6, 163:24, 164:1, 164:2, 169:11, 178:12, 181:22
**approximate** [1] - 128:9
**area** [13] - 6:15, 30:13, 31:21, 58:21, 69:13, 69:16, 128:10, 145:25, 161:20, 163:6, 166:4, 166:22, 167:11
**argue** [6] - 8:19, 110:8, 114:21, 115:6, 115:11, 185:21
**argues** [1] - 27:20
**argument** [8] - 3:19, 8:21, 10:12, 110:10, 175:12, 182:1, 184:13, 185:10
**arise** [2] - 179:23, 181:18
**arises** [1] - 174:24
**ARLENE** [2] - 57:23, 188:9
**Arlene** [3] - 31:7, 57:22, 58:2
**arose** [1] - 179:22
**arrange** [1] - 109:18
**arrangement** [1] - 101:11
**arrangements** [2] - 70:14, 82:19
**arranging** [1] - 112:13
**array** [1] - 133:9
**arrested** [9] - 12:11, 47:4, 53:14, 55:5, 64:1, 65:9, 98:6, 144:21, 144:23
**arrival** [1] - 166:12
**arrive** [1] - 165:16
**arrived** [2] - 167:1, 167:14
**articulated** [3] - 10:5, 10:13, 10:15
**aside** [3] - 43:12, 73:12, 84:4
**Aside** [1] - 84:11
**aspect** [2] - 101:15, 158:9
**aspects** [2] - 153:5, 181:10

**assembled** [1] - 18:21
**assert** [2] - 4:23, 10:10
**asserted** [11] - 103:8, 103:11, 106:21, 179:22, 180:7, 180:12, 181:21, 183:23, 185:22, 186:6, 186:14
**assertion** [1] - 107:20
**assertions** [1] - 9:5
**assistant** [1] - 159:24
**associated** [3] - 5:25, 17:6, 18:2
**assume** [6] - 51:11, 161:12, 163:2, 166:13, 173:5, 174:3
**Assuming** [2] - 12:20, 115:25
**assuming** [4] - 2:10, 15:19, 15:20, 35:9
**assumption** [1] - 114:17
**ATF** [2] - 23:5, 23:6
**attach** [1] - 173:11
**attempted** [1] - 81:18
**attempts** [2] - 96:22, 97:5
**attended** [2] - 23:14, 173:22
**attention** [8] - 17:19, 29:11, 58:23, 62:10, 137:9, 144:10, 165:4, 174:25
**attorney** [1] - 182:25
**attorneys** [4] - 36:25, 54:15, 64:22, 146:7
**atypical** [1] - 20:16
**AUSA** [2] - 21:15, 22:23
**authenticate** [1] - 103:2
**authenticated** [1] - 102:19
**authenticates** [1] - 22:21
**authentication** [1] - 103:15
**author** [5] - 16:22, 18:16, 20:10, 20:13
**authored** [2] - 22:2, 22:10
**autopsy** [3] - 168:13, 168:20, 168:22
**available** [9] - 111:12, 118:11, 152:17, 159:17, 159:18, 159:25, 171:22, 174:24, 178:22
**Avenue** [21] - 12:14, 12:15, 18:23, 30:18, 30:20, 30:21, 31:10, 31:16, 31:24, 42:2, 46:9, 46:13, 59:5, 137:11, 137:25, 147:4, 165:8,

165:14, 165:17, 165:22, 166:18
**avoid** [1] - 126:19
**aware** [8] - 43:3, 72:10, 93:3, 103:25, 139:8, 144:21, 182:22

## B

**baby** [4] - 71:1, 84:17, 85:25, 133:17
**ballistics** [3] - 2:17, 2:22, 2:24, 4:19, 5:8, 5:12, 8:1, 9:19, 19:22, 168:11, 172:20, 173:8, 173:10
**Baltimore** [27] - 1:12, 1:25, 4:3, 18:21, 19:2, 19:3, 22:25, 48:12, 58:20, 69:13, 69:17, 73:23, 93:22, 93:23, 105:20, 106:4, 160:15, 160:21, 161:5, 161:6, 164:17, 164:22, 165:9, 165:10, 165:14, 181:4
**bar** [4] - 17:19, 17:20, 17:21, 35:1
**Barry** [1] - 1:22
**bars** [1] - 17:6
**Based** [1] - 155:15
**based** [2] - 23:12, 24:4
**basement** [1] - 152:23
**basements** [1] - 152:16
**basic** [2] - 69:10, 159:4
**basis** [8] - 3:19, 3:20, 34:20, 40:9, 102:11, 108:16, 110:21, 113:12
**bearing** [1] - 11:9
**bears** [1] - 107:23
**beats** [2] - 153:5, 157:17
**became** [4] - 72:10, 112:21, 112:22, 112:24
**bed** [1] - 66:2
**began** [2] - 38:20, 107:24
**begin** [2] - 49:7, 69:10
**beginning** [4] - 38:13, 55:13, 138:14, 156:21
**Behalf** [5] - 1:15, 1:17, 1:18, 1:20, 1:21
**bell** [1] - 119:4
**belong** [1] - 63:11
**belongings** [3] - 147:9, 147:13, 147:25
**belts** [1] - 20:9
**benefit** [1] - 182:21
**Benson** [16] - 3:12, 4:11, 5:1, 5:22, 7:13,

8:4, 8:10, 9:6, 9:8, 11:3, 11:8, 24:20, 24:22, 24:24, 25:16, 28:20
**Benson's** [1] - 18:14
**best** [4] - 130:3, 150:18, 150:20, 175:3
**better** [4] - 72:5, 82:15, 116:10, 140:2
**between** [16] - 13:17, 15:16, 27:3, 40:14, 55:3, 55:7, 78:24, 96:6, 96:8, 103:13, 130:12, 139:7, 142:9, 147:21, 149:12, 172:14
**beyond** [6] - 2:22, 6:25, 7:3, 7:5, 8:15, 8:18
**Beyond** [1] - 174:15
**big** [1] - 165:10
**binding** [1] - 113:6
**biohazard** [3] - 169:9, 171:13, 171:16
**Biohazard** [1] - 171:12
**birth** [4] - 71:1, 71:4, 119:18
**birthday** [2] - 177:17, 177:18
**bit** [6] - 8:18, 75:22, 105:7, 108:3, 156:6, 173:10
**black** [1] - 165:20
**blatantly** [1] - 109:11
**block** [2] - 165:8, 165:17
**blocked** [1] - 159:17
**blood** [2] - 165:24, 171:16
**Blow** [1] - 7:9
**Blue** [2] - 48:20, 136:16
**Bo** [47] - 33:8, 33:19, 33:23, 34:2, 34:9, 34:12, 38:25, 40:14, 43:9, 43:12, 45:12, 45:20, 51:14, 52:5, 52:11, 55:17, 60:11, 61:18, 61:20, 61:24, 66:7, 66:14, 66:21, 78:7, 78:8, 78:12, 78:25, 79:1, 79:19, 80:1, 82:15, 98:22, 109:6, 129:8, 132:5, 133:3, 133:5, 133:13, 136:22, 141:21, 142:24, 145:10, 145:14, 145:15, 151:2
**Bo's** [1] - 52:2
**Bobby** [1] - 119:14
**bodies** [3] - 2:15, 19:11, 19:20
**body** [11] - 7:11, 19:6, 19:19, 165:20, 166:4, 166:7, 166:9, 168:23,

170:14, 171:17
**boiler** [2] - 147:19, 147:22
**Bon** [3] - 166:12, 166:24, 170:22
**bones** [1] - 167:22
**book** [6] - 140:7, 140:8, 140:14, 140:18, 180:16
**Booking** [2] - 65:11, 143:14
**booth** [1] - 153:4
**born** [2] - 42:7, 50:9
**bottom** [1] - 123:22
**Boulevard** [1] - 51:1
**boyfriend** [2] - 49:13, 52:7
**boyhood** [1] - 146:23
**Brady** [1] - 16:8
**Brandy** [4] - 73:20, 73:22, 76:13, 122:17
**Brandy's** [7] - 74:2, 74:14, 74:16, 75:9, 76:8, 76:12, 76:13, 77:7, 77:18, 88:16, 88:17, 88:22, 91:18, 126:21, 127:13, 127:19, 128:19
**brass** [1] - 170:13
**break** [11] - 57:14, 109:9, 135:4, 160:23, 167:23, 175:9, 175:21, 176:1, 176:5, 177:22, 180:23
**breaking** [1] - 50:5
**brethren** [1] - 115:16
**brief** [4] - 53:14, 64:3, 85:20, 135:3
**Brief** [1] - 132:22
**briefed** [2] - 186:4, 186:15
**briefly** [4] - 2:4, 41:24, 114:8, 157:12
**Briefly** [1] - 46:19
**bring** [2] - 25:8, 182:20
**bringing** [1] - 103:3, 184:4, 184:9
**broke** [1] - 67:22
**broken** [2] - 55:9, 55:10
**broom** [1] - 150:1
**brother** [29] - 12:11, 30:10, 30:11, 30:12, 31:3, 31:23, 33:20, 34:24, 37:1, 37:10, 38:20, 39:5, 39:8, 39:11, 40:14, 42:12, 42:25, 43:4, 44:5, 46:6, 52:6, 71:22, 72:4, 83:5, 83:6, 83:12, 122:17
**brother's** [4] - 35:22, 36:7, 37:2, 39:2
**brothers** [9] - 4:1,

72:15, 75:9, 77:1, 83:10, 83:20, 87:15, 90:7, 120:11
**brothers's** [1] - 158:25
**brought** [2] - 180:23, 184:5
**brown** [1] - 33:3
**Bruton** [2] - 186:7, 186:9
**bucks** [1] - 23:20
**building** [1] - 59:15
**bullet** [12] - 166:11, 167:21, 168:2, 168:7, 168:17, 168:23, 170:13, 170:25, 171:9, 171:21, 172:4
**bullets** [5] - 2:25, 170:9, 172:8, 172:9, 172:12
**bunch** [2] - 19:10, 94:10
**burden** [1] - 176:15
**business** [12] - 40:15, 40:17, 52:3, 60:15, 92:8, 92:11, 97:24, 98:9, 125:13, 151:7, 187:1
**BWI** [2] - 46:24, 65:14
**BY** [66] - 29:19, 35:3, 36:22, 41:21, 44:4, 46:22, 47:17, 48:11, 54:11, 58:7, 61:8, 62:1, 64:19, 68:4, 69:8, 70:11, 78:22, 82:6, 85:23, 97:8, 100:15, 118:19, 123:3, 124:10, 126:16, 132:21, 133:22, 135:17, 136:8, 146:4, 150:14, 152:6, 156:7, 156:18, 157:10, 160:17, 161:25, 164:16, 169:14, 173:1, 173:16, 174:2, 188:4, 188:4, 188:5, 188:5, 188:6, 188:7, 188:8, 188:9, 188:10, 188:11, 188:12, 188:12, 188:13, 188:13, 188:15, 188:15, 188:16, 188:16, 188:17, 188:18, 188:20, 188:20, 188:21, 188:21

---

## C

**calf** [2] - 166:11, 166:23
**caliber** [10] - 19:11, 19:12, 144:25, 167:9, 167:24, 170:4, 170:6, 170:9
**camera** [1] - 14:11
**cancellation** [1] - 158:16
**candidly** [1] - 8:15

**cannot** [1] - 63:19
**car** [25] - 40:25, 90:1, 90:2, 90:23, 90:24, 91:8, 91:9, 91:10, 91:15, 91:17, 91:22, 92:2, 92:4, 126:6, 158:25, 162:14, 162:20, 162:21, 163:2, 163:3, 163:6, 163:11, 166:23
**card** [1] - 177:18
**Card** [1] - 10:3
**cards** [4] - 162:1, 162:6, 162:8, 162:9
**care** [5] - 11:21, 13:10, 112:14, 170:12, 175:22
**cars** [2] - 92:12, 92:14
**CASE** [1] - 1:6
**Case** [1] - 189:5
**case** [33] - 5:5, 5:10, 5:14, 6:9, 6:14, 6:20, 14:6, 14:10, 23:25, 100:8, 101:16, 114:22, 116:14, 116:17, 118:11, 118:14, 158:9, 159:10, 162:3, 163:23, 164:3, 164:7, 166:19, 168:19, 168:20, 168:23, 171:25, 173:9, 176:14, 176:23, 177:6, 177:10, 185:13
**cases** [1] - 173:7
**casing** [2] - 167:20, 170:3
**casings** [13] - 166:3, 167:9, 167:10, 167:24, 169:15, 169:20, 170:4, 170:6, 170:7, 172:7, 172:8, 172:12, 173:3
**cassette** [1] - 119:9
**caution** [2] - 27:19, 164:3
**CD's** [14] - 43:7, 51:2, 51:4, 141:6, 141:8, 141:15, 141:17, 141:19, 141:21, 147:25, 155:9, 157:13, 163:6, 163:9
**celebrated** [1] - 177:17
**cell** [16] - 11:4, 26:9, 26:13, 77:20, 78:9, 78:24, 79:19, 95:7, 95:9, 95:11, 95:15, 95:18, 95:25, 96:5
**center** [1] - 50:25
**Central** [2] - 65:11, 143:14
**certain** [8] - 21:7, 21:14, 76:9, 103:7, 173:5, 174:24, 176:12, 181:10
**certainly** [11] - 7:25, 8:20, 16:25, 18:15, 24:7, 26:14, 86:16, 102:25,

117:21, 175:4, 181:25
**Certainly** [3] - 3:11, 3:14, 170:22
**CERTIFICATE** [1] - 189:1
**certify** [2] - 189:3, 189:6
**chair** [1] - 177:12
**chairs** [2] - 101:14, 158:8
**chambers** [1] - 160:1
**chance** [12] - 11:7, 22:4, 24:21, 24:24, 26:23, 27:8, 75:6, 79:16, 112:17, 127:6, 139:12, 183:5
**change** [2] - 82:2
**charge** [2] - 6:22, 7:2
**charged** [5] - 6:11, 7:1, 10:8, 163:23, 164:4
**charges** [1] - 110:11
**charging** [1] - 6:25
**Charles** [2] - 39:5, 39:8
**chart** [3] - 10:12, 10:14, 10:15
**chauffeuring** [1] - 92:8
**check** [1] - 24:11
**checked** [3] - 24:16, 134:6, 168:11
**checking** [1] - 177:24
**Cherry** [3] - 44:10, 44:11, 137:25
**chest** [1] - 166:1
**chief** [1] - 185:13
**child** [2] - 49:19, 175:22
**child's** [2] - 137:19, 149:17
**chuckled** [1] - 112:22
**church** [3] - 98:15, 98:16, 98:18
**circled** [1] - 165:24
**circuit** [2] - 6:21, 161:18
**circumstances** [5] - 23:25, 24:5, 27:12, 103:7, 186:5
**circumstantial** [1] - 3:20
**City** [12] - 4:4, 18:21, 19:2, 58:20, 136:3, 136:5, 160:15, 160:21, 161:5, 161:7, 164:17, 164:22
**civilian** [1] - 115:19
**claim** [1] - 5:5
**claims** [1] - 109:5
**clarification** [2] - 2:11, 24:19
**clarify** [3] - 12:8, 44:5, 96:12
**clarifying** [1] - 28:25
**clean** [1] - 16:13

**cleaner** [1] - 113:11
**clear** [16] - 2:12, 11:19, 11:22, 18:9, 26:12, 103:18, 105:8, 105:14, 105:15, 105:16, 112:3, 112:21, 112:23, 134:20, 178:3, 182:7
**clearly** [5] - 9:15, 12:18, 105:22, 110:1, 186:24
**clerk** [2] - 29:11, 177:24
**CLERK** [10] - 24:13, 24:16, 29:14, 47:12, 57:25, 58:4, 69:4, 135:10, 160:12, 164:12
**client** [2] - 19:9, 19:10
**clinches** [1] - 159:21
**close** [9] - 36:11, 36:14, 38:5, 67:22, 78:18, 123:1, 123:23, 178:9
**closely** [1] - 16:16
**closer** [5] - 31:21, 71:12, 75:22, 136:4, 140:1
**closing** [3] - 10:12, 182:1, 184:13
**clothing** [1] - 137:2
**club** [4] - 35:1, 50:21, 142:15, 155:5
**clubs** [3] - 50:20, 142:13, 143:2
**coal** [1] - 23:23
**COBURN** [29] - 13:7, 13:12, 13:15, 14:9, 14:21, 15:10, 15:14, 15:25, 25:20, 26:1, 26:17, 26:22, 27:12, 27:23, 28:1, 41:21, 117:18, 132:18, 151:24, 152:3, 152:6, 155:23, 156:1, 156:3, 156:7, 156:15, 185:14, 188:5, 188:16
**Coburn** [8] - 1:22, 16:14, 16:17, 25:18, 117:17, 185:4, 185:16, 186:3
**Coburn's** [1] - 117:16
**coconspirator** [1] - 109:6
**Coleman** [1] - 23:5
**collateral** [1] - 23:13
**colleagues** [2] - 169:6, 170:22
**color** [1] - 48:18
**comfortable** [1] - 5:21
**coming** [9] - 13:16, 25:12, 94:17, 105:22, 106:6, 107:7, 109:24, 112:4, 182:15
**comment** [2] - 109:7,

183:12
**comments** [2] - 26:16, 183:16
**company** [3] - 51:6, 142:21, 142:22
**compares** [1] - 172:8
**comparison** [4] - 159:2, 161:13, 161:20, 162:23
**comparisons** [1] - 172:14
**competent** [1] - 12:18
**complete** [1] - 189:8
**completely** [1] - 183:6
**complicated** [1] - 25:16
**complications** [1] - 71:4
**complied** [1] - 166:20
**comprehensively** [1] - 23:11
**compromise** [1] - 175:17
**conceivable** [1] - 181:9
**conceivably** [1] - 110:10
**concern** [4] - 18:17, 102:19, 114:8, 114:10
**concerned** [1] - 8:3
**concerning** [3] - 2:6, 2:15, 163:22
**concerns** [5] - 70:25, 84:3, 84:7, 84:14, 84:20
**conclude** [5] - 20:17, 176:9, 176:23, 185:7, 185:13
**concluded** [1] - 85:1
**concludes** [1] - 177:2
**concluding** [1] - 107:20
**conclusion** [1] - 159:16
**Conclusion** [1] - 187:20
**concrete** [1] - 167:22
**conduct** [1] - 177:7
**confer** [2] - 101:2, 111:9
**conference** [1] - 25:15
**confess** [1] - 107:21
**confidence** [1] - 159:12
**confident** [3] - 103:1, 159:11, 187:6
**congratulations** [1] - 85:25
**connect** [3] - 5:4, 5:12, 97:4
**connected** [2] - 4:16, 5:6
**connecting** [1] - 5:9
**connection** [3] - 3:18, 10:7, 28:18
**connections** [2] - 19:22, 152:22
**connects** [1] - 5:9

**consent** [1] - 109:10
**consider** [9] - 6:15, 6:17, 81:21, 100:6, 111:24, 118:13, 164:4, 180:12
**considerable** [1] - 18:10
**consideration** [1] - 178:22
**considered** [7] - 15:3, 15:19, 81:17, 113:19, 179:19, 180:6, 183:20
**consistent** [1] - 181:23
**console** [2] - 163:6, 163:9
**conspiracy** [4] - 10:10, 10:16, 10:19, 10:24
**constitute** [1] - 189:6
**contact** [2] - 4:12, 159:25
**contacted** [3] - 20:14, 21:17, 23:3
**contained** [1] - 118:13
**contend** [2] - 6:8, 14:5
**contends** [1] - 14:8
**contents** [3] - 162:14, 162:21, 163:3
**context** [1] - 109:7
**continue** [3] - 24:6, 29:6, 82:4
**Continue** [4] - 101:16, 158:10, 177:5, 177:7
**continued** [1] - 46:8
**continuity** [1] - 3:19
**contradict** [1] - 17:2
**contradicted** [1] - 184:16
**contradictions** [1] - 23:15
**contradictory** [2] - 17:10, 17:16
**contrary** [1] - 178:20
**Control** [2] - 169:4, 171:5
**convenience** [3] - 10:18, 175:10, 184:25
**convenient** [2] - 102:17, 175:22
**conveniently** [1] - 19:22
**conversation** [19] - 26:7, 27:3, 70:7, 70:14, 77:21, 78:11, 78:24, 79:25, 80:2, 99:1, 99:5, 99:7, 99:10, 99:13, 99:15, 129:6, 129:9, 129:19, 129:22
**convict** [1] - 24:1
**convicted** [4] - 30:3, 47:22, 58:16, 135:21

**cooperating** [1] - 26:8
**copies** [1] - 141:24
**copy** [3] - 74:22, 121:14, 133:9
**Correct** [9] - 57:8, 125:21, 129:4, 129:7, 129:10, 131:23, 131:25, 132:4, 132:7
**correct** [80] - 8:24, 20:12, 31:24, 37:20, 38:2, 38:6, 38:14, 40:3, 40:10, 40:16, 41:16, 43:12, 45:16, 45:24, 46:9, 46:24, 47:4, 54:23, 55:4, 55:11, 56:2, 56:3, 57:3, 57:5, 57:6, 62:23, 64:4, 66:22, 66:25, 67:18, 67:23, 68:9, 70:5, 70:15, 71:1, 75:13, 75:16, 76:10, 76:18, 83:23, 84:1, 100:16, 101:12, 126:22, 126:24, 129:3, 129:9, 131:15, 132:3, 132:6, 134:9, 135:23, 138:14, 142:6, 145:6, 147:5, 148:16, 149:1, 149:7, 150:15, 152:21, 156:23, 161:8, 161:14, 163:3, 163:4, 163:7, 166:14, 167:1, 167:15, 167:16, 169:21, 170:4, 170:5, 170:11, 171:2, 172:21, 172:22, 173:24, 174:4
**correctly** [5] - 15:17, 41:25, 43:3, 76:15, 180:11
**corroborating** [1] - 23:25
**corroboration** [1] - 2:14
**couch** [1] - 139:1
**Counsel** [1] - 118:9
**counsel** [10] - 2:9, 68:1, 101:10, 112:19, 113:3, 158:22, 159:4, 159:17, 161:21, 176:17
**counsel's** [1] - 23:22
**counselor** [1] - 39:7
**count** [1] - 177:3
**County** [15] - 2:21, 3:3, 4:12, 4:16, 5:19, 6:2, 7:7, 8:14, 9:1, 19:3, 22:25, 28:5, 28:6, 69:17, 73:23
**couple** [18] - 12:15, 31:12, 68:7, 69:10, 70:1, 89:21, 90:16, 90:21, 91:9, 91:24, 95:24, 102:1, 118:20, 118:22, 129:25, 155:2, 157:12,

185:15
**course** [14] - 11:21, 22:9, 26:9, 77:6, 77:23, 115:7, 115:11, 129:5, 140:12, 154:16, 154:19, 176:14, 184:11
**COURT** [334] - 1:1, 2:2, 2:7, 3:8, 3:11, 3:14, 4:9, 4:17, 4:21, 5:3, 5:7, 5:11, 5:23, 6:4, 6:6, 6:22, 7:7, 7:16, 7:21, 7:23, 8:6, 9:2, 9:6, 9:8, 9:10, 9:13, 9:22, 10:9, 10:22, 10:25, 11:3, 11:10, 11:12, 11:18, 11:25, 12:3, 12:8, 12:16, 12:22, 13:2, 13:4, 13:9, 13:14, 14:7, 14:18, 14:22, 15:4, 15:7, 15:12, 15:23, 16:1, 16:13, 17:9, 17:15, 17:18, 18:8, 18:25, 19:12, 19:14, 19:16, 19:18, 19:24, 20:3, 20:6, 20:12, 20:20, 20:23, 21:3, 21:6, 21:9, 21:12, 21:16, 21:21, 22:1, 22:6, 22:9, 22:12, 22:16, 22:24, 23:7, 24:10, 24:14, 24:18, 24:21, 25:2, 25:4, 25:8, 25:12, 25:15, 25:18, 25:22, 26:8, 26:20, 27:11, 27:15, 27:25, 28:2, 28:7, 28:11, 28:14, 28:16, 28:19, 28:25, 29:3, 29:5, 29:10, 33:7, 33:18, 34:20, 34:23, 34:25, 39:25, 41:19, 46:12, 46:17, 46:20, 47:7, 48:9, 48:23, 52:1, 54:1, 57:11, 57:13, 57:16, 57:18, 60:21, 60:25, 61:7, 61:15, 61:17, 61:23, 67:25, 68:3, 68:23, 70:9, 70:19, 70:24, 71:11, 74:21, 78:4, 78:6, 78:17, 78:21, 79:4, 80:9, 80:12, 80:15, 80:18, 80:21, 80:25, 81:4, 81:10, 81:12, 81:15, 82:2, 82:5, 84:6, 84:12, 84:19, 84:24, 85:5, 85:7, 85:11, 85:13, 85:19, 85:21, 91:13, 96:25, 97:6, 99:21, 99:25, 100:2, 100:5, 100:14, 100:19, 100:23, 101:2, 101:7, 101:9, 101:13, 101:20, 102:2, 102:5, 102:8, 102:13, 103:17, 104:4, 104:13,

104:16, 104:20, 104:22,
105:4, 105:6, 105:9,
105:11, 105:13, 105:23,
106:2, 106:4, 106:8,
106:14, 106:20, 107:3,
107:6, 107:10, 107:19,
108:22, 109:3, 109:20,
110:12, 110:15, 111:1,
111:7, 112:5, 113:9,
113:25, 114:4, 114:24,
115:2, 115:4, 115:10,
115:15, 115:21, 115:25,
116:5, 116:8, 116:12,
116:14, 116:18, 116:20,
117:1, 117:4, 117:6,
117:9, 117:13, 117:15,
117:17, 117:20, 117:24,
118:1, 118:3, 118:6,
118:8, 118:17, 120:17,
120:24, 121:2, 121:10,
122:6, 122:23, 123:1,
123:8, 124:4, 124:7,
124:9, 124:23, 130:10,
130:24, 132:19, 133:16,
133:19, 134:25, 135:2,
135:14, 136:4, 136:6,
137:6, 143:17, 143:22,
148:12, 148:21, 150:9,
150:11, 151:23, 152:1,
152:4, 155:22, 155:24,
156:2, 156:4, 156:14,
156:16, 157:1, 157:6,
157:8, 157:20, 157:23,
158:1, 158:14, 158:20,
159:3, 159:6, 159:9,
159:13, 159:21, 160:2,
160:6, 161:21, 161:23,
163:16, 163:18, 163:21,
169:7, 169:11, 170:21,
174:11, 174:16, 174:21,
177:21, 178:11, 178:16,
179:24, 180:1, 180:3,
180:17, 180:21, 181:24,
182:7, 182:17, 182:24,
183:11, 184:3, 184:8,
184:16, 184:21, 185:16,
186:1, 186:7, 186:9,
186:16, 186:24, 187:11,
187:15, 187:18
    **Court** [19] - 6:10, 6:14,
14:10, 14:11, 85:3,
101:1, 106:24, 110:3,
110:4, 110:7, 151:25,
174:25, 180:10, 181:23,
182:19, 182:22, 183:16,
185:23, 189:15
    **court** [6] - 106:16,
106:17, 161:17, 161:18,
177:24, 179:11
    **Court's** [18] - 2:12,
5:22, 9:5, 93:19, 94:25,

99:19, 101:1, 103:25,
106:15, 110:1, 111:11,
118:17, 178:6, 178:15,
179:16, 183:16, 183:25
    **courthouse** [1] - 9:10
    **Courthouse** [1] - 1:24
    **courtroom** [13] - 23:19,
29:4, 33:10, 48:16,
51:20, 101:19, 102:9,
118:7, 136:13, 136:24,
160:5, 177:16, 182:12
    **courts** [1] - 161:13
    **cousin** [2] - 88:12,
88:13
    **cover** [2] - 126:18,
126:19
    **create** [1] - 66:11
    **creating** [2] - 41:7,
66:14
    **credible** [1] - 24:4
    **credit** [2] - 23:16, 23:24
    **crew** [1] - 181:4
    **Crime** [3] - 166:2,
169:17, 173:6
    **crime** [14] - 30:3, 47:22,
58:16, 135:21, 162:1,
165:5, 165:7, 165:16,
166:25, 167:11, 168:4,
168:12, 169:24, 170:3
    **crimes** [5] - 6:11, 6:25,
172:9, 172:10, 172:11
    **CRIMINAL** [1] - 1:6
    **criminal** [1] - 176:14
    **cross** [12] - 2:19, 2:23,
3:6, 11:8, 13:13, 85:8,
107:22, 108:6, 111:12,
132:23, 157:11, 174:15
    **CROSS** [20] - 36:21,
41:20, 54:10, 64:18,
85:22, 126:15, 146:3,
152:5, 172:25, 173:15,
184:4, 188:5, 188:8,
188:10, 188:12, 188:12,
188:15, 188:16, 188:20,
188:21
    **Crowe** [7] - 1:20, 16:14,
18:14, 21:22, 23:4, 24:6,
117:13
    **CROWE** [14] - 16:15,
17:11, 17:17, 17:23,
18:18, 19:1, 19:13,
19:15, 19:17, 19:19,
20:1, 20:5, 20:8, 21:24
    **crystallized** [1] - 184:11
    **cued** [1] - 116:4
    **cuffs** [1] - 65:11
    **cup** [1] - 69:9
    **current** [2] - 95:18,
95:20, 183:16
    **cut** [2] - 35:7, 35:8

# D

    **D)(1)(a** [1] - 179:24
    **D)(1)(a)** [2] - 180:1,
180:2
    **D-A-M-I-T-A** [1] - 69:6
    **D-E-L-V-I-S-O-N** [1] -
47:15
    **D-R-A-K-E** [1] - 135:15
    **daily** [1] - 40:9
    **damaged** [1] - 170:10
    **Damita** [3] - 68:25,
69:6, 119:14
    **DAMITA** [2] - 69:2,
188:11
    **Darius** [2] - 17:5, 187:3
    **Darnell** [1] - 28:4
    **Darryl** [79] - 43:14,
71:24, 72:1, 72:5, 72:9,
72:11, 73:11, 73:16,
74:2, 74:14, 76:14, 77:7,
77:10, 77:20, 78:2,
78:11, 78:25, 80:2,
82:10, 82:18, 83:1,
83:22, 88:4, 88:21, 89:4,
90:10, 90:13, 91:5, 91:8,
91:9, 91:14, 91:21, 92:7,
92:17, 92:19, 93:3, 93:8,
93:14, 93:16, 93:21,
95:2, 95:5, 95:6, 95:24,
96:13, 97:10, 97:16,
97:24, 98:15, 98:23,
99:1, 105:18, 121:4,
121:25, 122:7, 123:10,
123:16, 124:14, 125:9,
125:13, 125:20, 128:6,
128:19, 129:2, 129:12,
130:21, 131:14, 131:22,
132:1, 132:5, 162:3,
162:3, 162:11, 162:13,
162:18, 162:19, 162:24,
163:1, 172:15
    **Darryl's** [2] - 94:10,
129:6
    **dash** [1] - 167:9
    **date** [15] - 73:4, 73:12,
86:5, 105:9, 119:11,
119:18, 133:24, 134:3,
134:7, 134:9, 134:18,
167:13, 168:1, 168:2,
168:18
    **Date** [1] - 167:10
    **dates** [1] - 54:17
    **dating** [6] - 38:5, 38:16,
38:19, 38:20, 38:22, 57:2
    **daughter** [6] - 50:10,
50:11, 62:16, 67:14,
67:16, 89:10
    **daughters** [2] - 59:21,

59:22
    **Davis** [2] - 1:13, 117:21
    **days** [11] - 64:12, 90:21,
91:10, 91:15, 91:24,
168:3, 168:6, 170:18,
172:6, 176:4, 185:15
    **daytime** [1] - 168:5
    **DC** [3] - 94:14, 94:17,
94:18
    **deal** [4] - 101:25,
176:12, 181:16, 183:7
    **dealing** [3] - 12:7,
12:11, 12:18
    **dealings** [1] - 40:16
    **Deandre** [1] - 117:21
    **death** [6] - 2:13, 72:11,
73:8, 73:11, 73:14, 73:17
    **debating** [1] - 101:24
    **December** [2] - 54:21,
54:22
    **decide** [1] - 103:18
    **deciding** [1] - 101:21
    **decision** [1] - 111:14
    **decisions** [2] - 176:18,
176:19
    **deck** [1] - 16:13
    **deemed** [4] - 111:4,
112:19, 113:4, 114:1
    **Deezo** [34] - 76:14,
76:18, 76:20, 87:14,
87:15, 89:7, 92:17,
92:18, 92:20, 94:18,
95:2, 97:16, 97:21,
105:14, 105:15, 107:4,
107:5, 107:13, 107:14,
122:19, 123:4, 123:16,
125:8, 125:12, 128:3,
128:4, 128:6, 128:19,
130:22, 130:25, 131:22,
132:2, 132:10
    **Deezo's** [2] - 97:10,
106:10
    **default** [1] - 183:21
    **Defendant** [4] - 1:17,
1:18, 1:20, 1:21
    **defendant** [6] - 5:25,
33:17, 48:22, 109:15,
113:21, 176:15
    **defendants** [5] - 8:22,
109:11, 111:21, 164:3,
176:17
    **Defendants** [3] - 1:9,
101:19, 102:9
    **Defender's** [1] - 27:5
    **defense** [11] - 2:9, 3:7,
5:5, 103:2, 103:14,
103:19, 104:1, 113:15,
113:19, 158:22, 185:11
    **definition** [2] - 157:20,
157:21

    **definitionally** [1] -
179:21
    **DeJanay** [1] - 50:10
    **delaying** [1] - 13:7
    **deliberations** [1] -
118:12
    **Delvison** [20] - 36:6,
37:2, 37:19, 38:4, 47:9,
47:14, 47:18, 47:23,
47:25, 48:9, 52:20, 53:3,
53:9, 53:23, 54:12,
54:15, 57:11, 62:17,
67:18, 67:20
    **DELVISON** [2] - 47:10,
188:7
    **Delvison's** [1] - 36:4
    **demeanor** [1] - 23:21
    **Denham** [1] - 107:8
    **Denham's** [1] - 106:11
    **denies** [2] - 106:25,
178:19
    **deny** [2] - 14:18, 106:24
    **Department** [6] -
160:15, 160:21, 161:3,
161:6, 164:18, 164:23
    **depicted** [1] - 17:4
    **depicts** [1] - 143:20
    **describe** [2] - 33:2,
155:12
    **described** [1] - 43:9
    **description** [4] -
136:19, 167:8, 168:17,
169:1
    **descriptions** [1] -
174:13
    **Despite** [1] - 110:15
    **detail** [3] - 163:24,
164:1, 164:7
    **detective** [4] - 7:21,
133:10, 168:20, 173:19
    **Detective** [48] - 2:5,
3:12, 4:25, 5:22, 8:10,
23:4, 24:20, 24:24,
86:20, 91:3, 91:14,
92:16, 103:3, 104:3,
107:1, 107:16, 118:25,
119:3, 119:13, 119:14,
121:3, 123:14, 123:18,
123:23, 125:22, 126:5,
126:7, 126:25, 127:10,
128:13, 128:20, 130:15,
130:21, 131:8, 134:4,
134:13, 134:17, 164:8,
167:5, 169:5, 169:16,
169:22, 171:20, 172:24,
173:17, 174:14, 174:17,
174:21
    **detectives** [2] - 125:2,
133:1
    **determined** [2] - 23:2,

112:6
**diametrically** [1] - 179:13
**dicey** [1] - 8:19
**Dickey** [2] - 48:5, 48:7
**die** [1] - 171:1
**died** [2] - 72:18
**difference** [2] - 103:12, 104:8
**different** [16] - 8:21, 56:17, 90:21, 92:12, 95:24, 96:2, 103:4, 103:22, 105:8, 127:21, 127:22, 129:25, 153:5, 155:3, 182:9, 182:13
**difficult** [1] - 54:17
**difficulty** [2] - 7:12, 107:19
**Diggs** [1] - 48:5
**Diggs-Johnson** [1] - 48:5
**dining** [1] - 132:9
**dire** [2] - 27:17, 159:4
**DIRECT** [14] - 29:18, 47:16, 58:6, 69:7, 135:16, 160:16, 164:15, 188:4, 188:7, 188:9, 188:11, 188:15, 188:18, 188:20
**direct** [5] - 3:5, 23:20, 29:11, 107:13
**directly** [8] - 29:14, 47:12, 57:25, 69:4, 135:10, 136:6, 160:12, 164:12
**dirty** [1] - 19:6
**disagree** [1] - 13:1
**discover** [4] - 35:18, 35:21, 63:5, 63:7
**discovered** [2] - 32:23, 157:2
**discredit** [1] - 23:18
**discrete** [1] - 18:17
**discuss** [2] - 120:10, 177:10
**discussed** [1] - 84:16
**discussion** [6] - 16:9, 83:11, 101:15, 158:9, 177:6, 185:11
**disingenuousness** [1] - 108:10
**disparate** [1] - 5:5
**DISTRICT** [2] - 1:1, 1:2
**district** [1] - 109:17
**DIVISION** [1] - 1:2
**document** [4] - 121:16, 122:24, 123:1, 133:8
**documents** [3] - 102:18, 103:6, 103:13
**dollar** [1] - 142:12

**done** [11] - 79:14, 111:9, 115:20, 115:23, 158:18, 171:8, 178:8, 178:9, 181:22, 181:23, 183:13
**door** [1] - 170:16
**double** [2] - 162:10, 172:15
**doubt** [5] - 7:1, 7:3, 7:6, 8:16, 8:18
**dovetails** [1] - 185:25
**down** [11] - 15:21, 26:23, 31:17, 65:11, 100:21, 123:22, 124:18, 125:25, 165:13, 171:5, 182:16
**Down** [4] - 51:9, 142:17, 143:13, 154:23
**downstairs** [3] - 147:13, 147:15, 147:17
**Dozens** [1] - 161:16
**Drake** [28] - 115:19, 117:22, 118:4, 135:6, 135:7, 135:12, 135:13, 135:18, 135:21, 136:9, 136:17, 137:7, 139:16, 139:18, 140:9, 143:8, 145:20, 146:5, 146:10, 148:7, 150:15, 151:22, 152:1, 152:7, 157:6, 157:11, 158:2, 158:3
**DRAKE** [2] - 135:8, 188:14
**dramatically** [1] - 107:22
**drive** [9] - 83:11, 83:12, 83:16, 93:9, 93:12, 99:5, 99:9, 99:11, 131:14
**driving** [6] - 28:9, 83:14, 83:15, 91:22, 130:16, 130:19
**drone** [1] - 26:19
**dropped** [1] - 187:9
**drug** [6] - 4:5, 12:7, 12:11, 12:18, 97:24, 125:13
**drug-related** [1] - 4:5
**drugs** [29] - 3:2, 10:2, 30:5, 35:18, 35:21, 35:23, 36:2, 36:4, 47:25, 52:24, 53:1, 53:3, 53:5, 53:9, 57:5, 63:3, 63:5, 63:7, 63:9, 63:10, 63:18, 63:20, 63:24, 63:25, 65:4, 65:5, 65:7, 98:1, 98:5
**dual** [1] - 114:12
**Due** [1] - 158:16
**Duganne** [1] - 181:2
**Dukes** [1] - 28:4

**During** [1] - 78:23
**during** [21] - 10:14, 20:20, 42:13, 77:6, 77:23, 78:2, 78:11, 80:2, 109:9, 118:12, 122:15, 129:5, 129:9, 129:19, 129:22, 138:19, 145:8, 156:20, 178:2, 178:8, 181:12
**Dwayne** [2] - 43:14, 106:10

## E

**e-mail** [2] - 14:2, 14:24
**e-mailed** [1] - 159:24
**e-mails** [1] - 185:5
**earliest** [2] - 176:20, 184:25
**early** [9] - 52:6, 52:7, 54:18, 65:24, 120:14, 137:17, 159:16, 175:2, 185:18
**easier** [1] - 173:10
**east** [1] - 165:14
**East** [2] - 93:22, 105:20
**east/west** [1] - 165:11
**East/west** [1] - 165:12
**edges** [1] - 182:9
**effect** [4] - 13:20, 47:1, 105:4
**efficacious** [1] - 175:8
**efficient** [1] - 158:21
**effort** [2] - 18:10, 175:3
**Eight** [2] - 125:24, 161:10
**eight** [1] - 172:6
**eighth** [1] - 48:3
**either** [14] - 21:19, 23:4, 23:5, 23:16, 23:24, 24:4, 51:9, 83:22, 108:16, 149:17, 157:3, 167:20, 172:11, 178:19
**Election** [2] - 175:7, 175:11
**elicit** [3] - 23:15, 26:15, 28:24
**eliminate** [1] - 162:10
**eliminated** [1] - 162:24
**emphases** [1] - 182:9
**employed** [2] - 136:9, 164:25
**end** [12] - 4:14, 103:5, 103:15, 114:22, 122:11, 132:22, 138:13, 156:21, 164:7, 176:10, 177:22, 185:8
**ended** [2] - 82:15, 82:18
**Enjoy** [1] - 177:11

**enter** [1] - 102:9
**entered** [1] - 171:3
**enterprise** [3] - 6:12, 6:18, 7:4
**enters** [3] - 29:4, 118:7, 160:5
**Entertainment** [1] - 154:24
**entire** [1] - 168:22
**entirety** [2] - 109:24, 176:23
**entitled** [2] - 107:16, 110:16
**entry** [1] - 169:2
**envelope** [7] - 167:7, 167:18, 168:16, 169:8, 169:13, 173:4
**envelopes** [1] - 171:11
**epilepsy** [2] - 56:15, 68:15
**Epps** [6] - 4:9, 28:9, 28:14, 166:7, 166:22, 170:25
**Epps's** [1] - 171:10, 172:4
**Epps/Lee** [1] - 18:25
**equipment** [1] - 152:17
**Eric** [7] - 7:6, 7:9, 7:11, 28:6, 165:21, 168:18, 170:14
**Ernest** [1] - 158:17
**especially** [1] - 6:20
**Esquire** [11] - 1:16, 1:16, 1:17, 1:18, 1:19, 1:19, 1:20, 1:21, 1:22, 1:22, 21:22
**essentially** [6] - 4:6, 8:19, 9:19, 70:20, 102:17, 158:23
**Essex** [3] - 93:22, 105:19, 131:6
**established** [2] - 181:11, 181:12
**estimate** [1] - 130:3
**evening** [7] - 77:6, 82:14, 87:21, 165:4, 165:18, 173:22, 175:23
**event** [6] - 80:22, 81:6, 81:12, 81:24, 108:21, 160:2
**events** [4] - 5:5, 5:9, 5:14, 26:3
**eventually** [3] - 114:13, 144:23, 172:13
**Eventually** [1] - 144:24
**evicted** [9] - 45:8, 47:3, 63:16, 63:19, 63:23, 63:25, 64:6, 64:10, 64:11
**evidence** [68] - 2:14, 3:21, 4:4, 4:20, 5:9,

5:24, 5:25, 6:9, 6:11, 6:12, 6:15, 6:17, 7:4, 7:9, 8:1, 8:17, 8:22, 9:19, 9:25, 23:25, 81:22, 100:8, 101:15, 101:23, 103:21, 107:7, 109:12, 109:13, 109:17, 110:23, 113:14, 113:18, 118:14, 158:9, 164:4, 166:5, 168:12, 168:22, 171:3, 171:6, 171:15, 172:9, 172:12, 172:14, 176:10, 176:16, 176:19, 177:7, 178:5, 178:10, 179:19, 180:6, 180:9, 180:14, 181:9, 182:3, 183:2, 183:9, 183:18, 184:2, 185:20, 186:17, 186:19, 187:13, 187:15
**Evidence** [3] - 169:4, 171:5, 183:4
**evidentiary** [1] - 113:12
**ex** [3] - 36:7, 36:10, 37:2
**Ex** [2] - 173:18, 173:19
**Ex-detective** [1] - 173:19
**ex-girlfriend** [3] - 36:7, 36:10, 37:2
**exact** [7] - 69:16, 94:24, 124:8, 128:22, 141:25, 142:9, 143:11
**Exactly** [4] - 4:21, 145:14, 145:16, 150:22
**exactly** [7] - 13:15, 14:7, 26:6, 111:9, 124:13, 128:24, 130:3
**examination** [6] - 3:7, 13:13, 107:22, 108:6, 111:12, 122:23
**EXAMINATION** [48] - 29:18, 36:21, 41:20, 44:3, 46:21, 47:16, 54:10, 58:6, 64:18, 69:7, 85:22, 126:15, 132:20, 133:21, 135:16, 146:3, 152:5, 156:17, 157:9, 160:16, 164:15, 172:25, 173:15, 174:1, 188:4, 188:4, 188:5, 188:5, 188:6, 188:7, 188:8, 188:9, 188:10, 188:11, 188:12, 188:12, 188:13, 188:13, 188:15, 188:15, 188:16, 188:16, 188:17, 188:18, 188:20, 188:20, 188:21, 188:21
**examine** [4] - 11:9, 85:8, 113:16, 113:22
**Examiner** [1] - 160:15

**examiner** [4] - 160:20, 161:4, 161:12, 172:20
**example** [2] - 3:21, 27:1
**examples** [1] - 145:3
**except** [1] - 170:9
**exception** [2] - 108:17, 185:22
**excerpts** [2] - 179:5, 186:4
**exclusively** [1] - 49:10
**excused** [4] - 47:7, 57:13, 68:24, 135:3, 158:11, 160:2, 163:18, 174:22, 177:15
**exhaustively** [1] - 23:11
**exhibit** [7] - 61:7, 112:1, 116:24, 118:11, 118:12, 143:18, 179:9
**Exhibit** [9] - 30:16, 31:20, 58:23, 59:10, 61:9, 71:17, 72:7, 118:18, 143:8
**exhibits** [5] - 53:21, 54:3, 61:6, 167:3, 171:6
**exist** [1] - 6:18
**existed** [1] - 26:6
**existence** [3] - 6:11, 7:4, 183:2
**exits** [1] - 177:16
**expansive** [1] - 6:9
**expect** [4] - 37:9, 150:5, 150:10, 176:1
**expecting** [1] - 12:5
**expedite** [1] - 158:25
**experience** [1] - 153:4
**expert** [3] - 159:1, 161:12, 161:13, 161:20, 161:24
**expertise** [1] - 158:23
**explain** [2] - 163:24, 164:1
**explicit** [2] - 11:19, 11:25
**explicitly** [1] - 27:9
**exploding** [1] - 114:6
**exposed** [2] - 155:15, 155:17
**exposure** [3] - 142:1, 142:3, 157:14
**express** [3] - 159:13, 176:25, 181:13
**extend** [1] - 115:24
**extent** [8] - 18:4, 24:6, 107:12, 109:8, 110:9, 111:19, 111:21, 114:19
**extraneous** [1] - 11:5
**extraordinarily** [1] - 19:23

# F

**face** [1] - 76:22
**facing** [3] - 165:22, 165:23
**fact** [40] - 2:20, 3:2, 3:23, 4:15, 7:2, 9:25, 14:16, 16:9, 22:5, 22:20, 22:21, 26:3, 37:10, 37:22, 38:16, 38:25, 39:7, 40:2, 43:3, 45:8, 53:14, 54:25, 56:11, 67:22, 70:7, 83:25, 84:16, 102:24, 109:5, 146:16, 146:25, 148:22, 151:15, 152:10, 155:15, 163:5, 166:17, 171:12, 173:12, 187:8
**facts** [3] - 100:9, 104:22, 104:24
**factual** [1] - 9:5
**failing** [1] - 114:11
**failure** [10] - 85:15, 107:20, 108:7, 108:8, 108:19, 110:3, 110:16, 113:1, 114:19, 179:2
**fair** [8] - 2:14, 28:22, 70:20, 70:21, 75:25, 100:19, 148:7, 149:22
**Fair** [2] - 40:14, 56:24
**fairly** [5] - 38:2, 68:17, 181:12, 186:3
**familiar** [5] - 6:14, 95:13, 95:17, 95:20, 141:8
**family** [8] - 12:23, 30:25, 42:1, 42:22, 42:25, 146:25, 177:10
**far** [14] - 4:6, 4:10, 23:12, 33:14, 44:23, 48:2, 58:12, 63:11, 69:18, 93:1, 101:15, 132:8, 135:25, 154:15
**fault** [2] - 174:22, 183:17
**fear** [2] - 84:25, 110:9
**featured** [1] - 51:2
**federal** [1] - 161:17
**feet** [1] - 165:23
**few** [6] - 24:25, 71:4, 101:10, 114:8, 137:9, 157:7
**Fickling** [3] - 137:21, 137:22, 139:20
**fight** [4] - 34:14, 34:18, 35:2, 35:4
**figured** [3] - 15:25, 28:18, 28:23
**filed** [2] - 185:19,

185:23
**fill** [1] - 169:16
**final** [1] - 183:12
**finally** [1] - 145:3
**fine** [8] - 68:3, 75:12, 106:22, 117:5, 124:14, 159:21, 159:22, 173:20
**finger** [1] - 35:7
**fingerprint** [7] - 159:2, 160:20, 161:3, 161:11, 161:13, 161:20, 161:24
**Fingerprint** [2] - 160:15, 160:24
**fingerprints** [3] - 162:10, 162:13, 162:20
**finish** [3] - 84:6, 152:1, 159:9
**finishes** [1] - 68:1
**firearms** [1] - 6:16
**first** [13] - 2:21, 2:25, 9:15, 14:19, 19:4, 31:8, 32:15, 62:5, 92:1, 125:8, 128:14, 159:7, 167:3
**First** [1] - 85:24
**five** [12] - 16:19, 20:18, 21:4, 22:15, 96:17, 96:19, 96:22, 97:4, 138:12, 142:9, 168:17
**Five** [9] - 32:10, 57:17, 75:2, 75:4, 76:5, 143:4, 143:5, 143:10, 143:21
**FLANNERY** [26] - 12:2, 12:4, 12:20, 12:25, 13:3, 13:5, 33:6, 34:19, 36:22, 46:11, 46:16, 46:19, 46:22, 54:11, 60:24, 61:21, 64:19, 68:4, 146:4, 150:14, 156:25, 188:4, 188:6, 188:8, 188:10, 188:15
**Flannery** [14] - 1:19, 12:1, 12:16, 36:25, 41:24, 43:21, 45:11, 46:20, 54:14, 64:22, 146:7, 148:12, 150:13, 156:19
**flash** [1] - 58:24
**fled** [1] - 166:19
**floor** [2] - 32:19, 62:8
**fly** [1] - 111:21
**focused** [1] - 22:10
**fold** [1] - 78:17
**follow** [4] - 41:24, 156:8, 180:14, 187:12
**follow-up** [2] - 41:24, 187:12
**followed** [1] - 17:5
**following** [2] - 176:13, 186:16
**food** [1] - 65:16

**footing** [2] - 103:23, 104:7
**FOR** [1] - 1:2
**foregoing** [1] - 189:6
**forget** [2] - 20:6, 113:1
**forgot** [1] - 58:3
**form** [3] - 120:17, 154:20, 154:23
**formal** [2] - 26:5, 178:15
**formally** [1] - 182:19
**former** [2] - 21:15
**forth** [10] - 10:3, 13:17, 14:1, 88:7, 96:22, 97:2, 149:1, 149:3, 149:6, 149:10
**forthcoming** [1] - 110:18
**forward** [1] - 69:4
**foundation** [3] - 12:6, 12:20, 114:15
**foundations** [1] - 181:11
**four** [16] - 17:21, 20:20, 21:1, 21:3, 28:4, 96:6, 138:12, 138:19, 156:21, 166:17, 168:3, 175:25, 176:4, 177:25, 181:5
**Four** [2] - 124:17, 162:17, 162:18
**fragment** [2] - 167:20, 170:2
**fragments** [3] - 168:17, 168:23, 169:21
**frame** [1] - 105:22
**frankly** [2] - 27:17, 176:24
**free** [1] - 115:11
**Free** [5] - 61:18, 61:20, 61:24, 145:10, 145:14
**frequent** [1] - 151:9
**frequented** [1] - 18:1
**frequently** [5] - 38:2, 40:7, 45:13, 45:15, 72:22
**frequents** [2] - 17:18, 17:20
**fresh** [2] - 86:17, 87:1
**fresher** [1] - 75:25
**Friday** [4] - 159:17, 176:8, 176:11, 185:10
**Friend** [1] - 72:19
**friend** [7] - 39:2, 44:10, 66:7, 73:18, 76:13, 144:16, 144:17
**friend's** [1] - 73:19
**friendly** [1] - 109:23
**friends** [9] - 33:24, 40:15, 40:18, 72:19, 72:20, 97:11, 131:25, 146:23, 177:10

**Friends** [1] - 97:12
**front** [16] - 11:23, 17:24, 32:17, 32:18, 39:21, 53:2, 58:25, 62:6, 62:7, 78:18, 86:2, 120:5, 165:21, 169:2, 170:13, 170:14
**fronts** [1] - 31:18
**full** [4] - 23:8, 175:3, 176:6
**Full** [1] - 66:4
**fully** [2] - 6:20, 6:21
**furnace** [1] - 145:20, 147:23
**future** [2] - 181:17, 183:17

# G

**G-R-E-E-N** [1] - 69:6
**gangsta** [6] - 155:12, 156:5, 156:9, 157:20, 157:21, 157:22
**gangster** [1] - 157:25
**GARDNER** [1] - 1:8
**Gardner** [18] - 1:21, 18:10, 19:5, 19:18, 19:19, 26:16, 41:14, 43:22, 56:2, 67:3, 111:19, 113:4, 154:11, 186:11, 186:18, 186:25, 187:3, 187:8
**Gardner's** [1] - 113:25
**Garnell** [2] - 18:20, 21:24
**Gary** [1] - 119:13
**gather** [3] - 26:7, 88:25, 171:5
**GED** [1] - 30:1
**general** [5] - 4:14, 69:16, 93:9, 183:18, 183:23
**generally** [3] - 72:17, 149:10, 182:18
**generate** [1] - 151:10
**gentleman** [5] - 38:22, 66:24, 67:2, 71:20, 72:8
**gentlemen** [1] - 29:5, 81:17, 100:6, 101:9, 118:8, 135:4, 158:3, 160:6, 163:21, 174:23, 177:14
**genuine** [9] - 107:21, 108:8, 108:19, 110:2, 110:6, 110:20, 113:13, 114:19
**genuinely** [1] - 108:11
**genuineness** [1] - 110:15

**Gerard** [1] - 1:19
**gifts** [1] - 56:25
**Giganti** [1] - 23:4
**Giglio** [1] - 16:8
**girlfriend** [5] - 36:7, 36:10, 37:2, 147:4, 148:5
**given** [5] - 71:1, 111:22, 129:25, 168:24, 175:22
**glob** [1] - 8:19
**Goo** [5] - 41:16, 43:24, 56:4, 67:7, 154:13
**Goose** [8] - 4:19, 5:19, 6:2, 10:3, 10:10, 10:20, 10:21
**Government** [6] - 1:15, 30:16, 31:20, 58:23, 59:10, 143:7
**government** [34] - 2:18, 8:14, 9:15, 9:21, 10:9, 10:13, 14:5, 14:7, 16:18, 16:21, 16:22, 18:15, 26:15, 27:13, 27:19, 29:7, 81:25, 85:4, 102:19, 103:12, 108:17, 109:14, 110:8, 110:13, 110:16, 112:2, 113:16, 113:22, 114:21, 133:23, 176:8, 179:1, 185:1, 186:17
**Government's** [2] - 71:17, 72:7
**government's** [11] - 8:22, 16:12, 22:19, 102:16, 106:14, 115:6, 115:10, 159:10, 174:22, 185:8, 185:13
**GOVERNMENT'S** [7] - 29:12, 47:10, 57:23, 69:2, 135:8, 160:10, 164:10
**grade** [4] - 48:3, 58:14, 69:19, 136:1
**graduate** [1] - 69:20
**Graham** [1] - 26:13
**Graham's** [1] - 27:5
**grand** [76] - 19:8, 39:22, 74:22, 74:24, 75:2, 75:4, 75:12, 75:21, 76:1, 78:14, 79:9, 79:10, 79:22, 80:13, 80:19, 81:8, 81:16, 81:21, 82:8, 85:2, 86:3, 86:17, 98:20, 100:1, 100:7, 100:14, 101:22, 102:11, 102:20, 102:24, 102:25, 103:1, 103:6, 103:20, 104:1, 104:7, 104:8, 104:11, 104:14, 108:1, 108:5, 109:23, 110:22, 111:15, 111:22, 111:25, 112:23,

112:25, 113:14, 113:17, 113:22, 116:24, 118:10, 118:13, 118:18, 120:5, 129:16, 129:21, 134:21, 153:18, 178:1, 178:4, 178:7, 178:17, 179:3, 179:12, 180:25, 181:4, 181:6, 181:10, 181:13, 182:3, 182:13, 182:14, 183:9, 184:18
**Gray** [1] - 137:3
**Great** [1] - 28:25
**greater** [3] - 163:24, 164:1, 164:7
**green** [1] - 92:4
**Green** [57] - 18:21, 19:25, 20:3, 20:7, 20:9, 21:15, 21:21, 21:22, 21:25, 22:1, 22:20, 69:1, 69:6, 69:9, 69:18, 70:2, 70:12, 71:1, 71:11, 72:10, 73:3, 73:16, 74:22, 76:13, 77:7, 77:23, 78:23, 79:12, 79:23, 80:9, 82:9, 84:4, 85:24, 100:7, 100:16, 101:7, 107:8, 112:1, 112:15, 115:21, 115:22, 115:23, 116:22, 117:18, 118:18, 119:14, 121:19, 122:23, 124:4, 126:17, 132:16, 132:22, 133:16, 133:19, 135:2, 184:10
**GREEN** [2] - 69:2, 188:11
**Green's** [2] - 113:1, 118:10
**Grimm** [1] - 116:16
**Groth** [1] - 23:5
**ground** [5] - 28:5, 39:19, 151:13, 166:19, 166:20
**group** [9] - 18:22, 32:11, 51:6, 51:8, 51:10, 51:12, 140:25, 154:20, 154:22
**grow** [6] - 30:13, 48:12, 58:19, 69:13, 69:15, 69:16
**growing** [1] - 159:12
**grows** [1] - 176:17
**guess** [15] - 5:13, 8:17, 9:6, 13:17, 15:3, 15:14, 15:17, 27:4, 40:18, 59:16, 70:9, 81:5, 142:23, 171:13, 182:9
**gun** [21] - 19:11, 19:12, 19:19, 19:20, 32:23, 32:25, 33:3, 60:2, 139:15, 139:18, 139:20,

139:23, 139:24, 140:16, 148:3, 148:5, 150:15, 150:18, 150:23, 151:1, 157:2
**guns** [5] - 9:20, 10:7, 19:2, 19:5, 57:7
**gunshot** [1] - 165:25
**guy** [9] - 2:20, 20:1, 20:9, 33:8, 45:12, 51:14, 60:11, 118:4, 136:22
**guys** [3] - 37:20, 146:21, 146:23

# H

**H-A-R-R-I-S** [1] - 29:17
**half** [5] - 9:17, 37:20, 77:20, 87:11, 159:15
**halfway** [1] - 125:25
**hand** [2] - 33:13, 102:20
**handed** [1] - 74:22
**handle** [3] - 33:3, 112:14, 173:10
**handwriting** [1] - 53:22, 54:5, 134:7
**handwritten** [2] - 14:2, 15:2
**hang** [7] - 12:14, 12:15, 12:24, 31:9, 31:23, 46:8, 146:21
**hanging** [2] - 73:10, 74:8
**HANLON** [32] - 9:12, 68:25, 69:8, 70:11, 78:22, 81:25, 82:4, 82:6, 85:6, 85:9, 85:12, 85:17, 85:20, 91:11, 96:24, 102:12, 102:15, 103:25, 104:12, 117:5, 120:16, 120:23, 121:1, 121:9, 122:4, 123:7, 130:9, 130:23, 132:21, 134:24, 188:11, 188:13
**Hanlon** [24] - 1:16, 3:9, 70:10, 70:19, 78:21, 81:18, 81:24, 85:5, 101:2, 102:8, 102:14, 104:9, 104:23, 106:23, 107:23, 107:25, 111:8, 111:13, 114:11, 116:25, 118:9, 129:2, 177:23, 180:23
**Hanlon's** [2] - 25:23, 109:20
**happy** [8] - 33:4, 60:7, 70:5, 82:11, 83:14, 151:25, 177:17, 185:2
**Harbor** [2] - 136:3, 136:5

**hard** [3] - 39:18, 66:14, 185:5
**Harding** [39] - 1:16, 3:8, 11:3, 11:7, 11:20, 12:5, 12:9, 13:18, 14:19, 14:23, 15:15, 15:21, 16:2, 16:3, 20:12, 24:21, 25:23, 26:12, 26:18, 27:3, 28:2, 41:19, 61:2, 61:7, 98:25, 99:7, 135:4, 135:14, 143:17, 151:23, 159:9, 160:7, 164:8, 169:7, 170:21, 182:24, 183:11, 184:5, 184:21
**HARDING** [112] - 3:10, 3:12, 4:8, 4:10, 4:18, 4:25, 5:4, 5:8, 5:20, 6:3, 6:5, 6:8, 6:24, 7:15, 7:18, 7:20, 7:22, 7:25, 8:3, 9:9, 9:11, 10:23, 11:13, 11:24, 12:10, 14:24, 15:6, 15:8, 16:4, 20:14, 20:21, 20:25, 21:5, 21:7, 21:10, 21:14, 21:17, 22:3, 22:8, 22:11, 22:14, 22:19, 23:1, 24:23, 25:5, 25:10, 25:13, 28:3, 28:8, 28:13, 28:15, 28:17, 28:21, 29:8, 29:19, 35:3, 44:4, 46:18, 47:9, 47:17, 48:11, 57:10, 57:14, 57:17, 57:19, 57:21, 58:7, 61:8, 62:1, 104:15, 115:18, 115:23, 116:25, 117:22, 118:2, 118:4, 135:6, 135:13, 135:17, 136:8, 148:11, 148:19, 150:8, 150:10, 155:21, 156:13, 156:18, 158:15, 158:21, 159:5, 159:8, 159:11, 159:19, 160:8, 160:17, 161:25, 163:19, 164:16, 169:9, 169:14, 174:2, 174:19, 182:25, 184:4, 188:5, 188:7, 188:9, 188:16, 188:18, 188:20, 188:21
**Harding's** [6] - 13:24, 15:23, 26:2, 26:11, 27:4, 187:2
**harm** [1] - 183:13
**harmful** [1] - 111:23
**HARRIS** [3] - 1:7, 29:12, 188:3
**Harris** [77] - 1:18, 12:6, 12:10, 29:9, 29:10, 29:16, 29:20, 29:24, 30:5, 30:7, 30:14, 30:17, 31:9, 32:4, 33:19, 34:21,

35:19, 35:23, 36:19, 36:23, 37:1, 37:10, 38:5, 40:22, 40:25, 41:9, 41:22, 42:12, 43:4, 43:12, 44:5, 45:15, 45:21, 45:24, 46:23, 47:7, 48:14, 48:22, 50:6, 50:13, 54:15, 54:18, 55:9, 56:1, 56:8, 56:14, 56:24, 59:25, 111:20, 135:4, 136:11, 137:5, 137:7, 141:24, 142:13, 145:19, 146:8, 146:10, 146:13, 147:7, 148:8, 148:13, 150:5, 150:10, 150:23, 151:6, 151:9, 151:16, 152:8, 152:10, 153:9, 154:1, 155:16, 156:20, 156:22
**Harris's** [9] - 12:7, 12:17, 42:4, 57:5, 143:23, 144:5, 145:4, 155:3, 155:25
**haunts** [1] - 17:25
**Hayes** [1] - 159:20
**hazy** [1] - 5:1
**head** [7] - 28:20, 37:9, 65:10, 114:6, 165:22, 166:1, 169:25
**headquarters** [1] - 168:25
**hear** [20] - 3:8, 11:5, 11:6, 14:19, 61:2, 77:20, 78:11, 78:25, 93:6, 112:18, 114:2, 116:6, 122:11, 132:5, 132:13, 143:23, 157:17, 159:25, 163:22
**heard** [32] - 2:4, 14:3, 20:23, 23:12, 41:16, 51:4, 56:2, 56:4, 81:19, 82:1, 83:25, 85:4, 93:4, 98:5, 98:22, 101:15, 109:5, 111:10, 124:15, 129:5, 129:8, 129:12, 129:19, 129:22, 144:5, 154:16, 155:5, 155:23, 179:1, 178:21
**hearing** [2] - 92:9, 116:10
**hearsay** [3] - 108:17, 112:4, 179:21
**heater** [2] - 145:21, 145:22
**Heights** [7] - 30:13, 58:21, 59:6, 141:12, 146:14, 146:16, 147:1
**help** [7] - 27:8, 81:5, 81:23, 104:17, 141:17, 172:1, 181:25, 182:4

**helped** [2] - 98:8, 125:13
**helpful** [3] - 22:18, 115:4, 116:3
**Henry** [1] - 27:22
**hereby** [1] - 189:3
**hereunto** [1] - 189:9
**Hi** [2] - 64:20, 85:24
**Hickey** [6] - 33:20, 33:25, 39:5, 39:8, 52:9, 52:12
**high** [1] - 69:20
**Hill** [5] - 44:10, 44:12, 48:5, 48:7, 138:1
**himself** [3] - 15:22, 15:24, 184:16
**hinted** [1] - 23:9
**history** [1] - 18:23
**hit** [5] - 5:18, 23:19, 28:5, 167:21, 167:22
**hits** [1] - 167:22
**hold** [2] - 70:13, 84:11
**Holly** [1] - 18:9
**home** [21] - 18:12, 35:13, 37:23, 52:9, 56:20, 62:14, 62:15, 62:25, 68:12, 68:13, 138:9, 138:16, 144:11, 144:13, 149:14, 150:17, 150:24
**homicide** [3] - 120:11, 162:11, 168:20
**Homicide** [3] - 18:21, 165:1, 165:2
**homicides** [5] - 19:2, 86:9, 86:14, 164:5
**Honda** [7] - 90:1, 90:24, 91:4, 125:19, 126:1, 130:16, 162:2
**honest** [1] - 75:19
**Honor** [136] - 3:10, 3:13, 4:11, 5:1, 5:2, 5:21, 6:5, 6:9, 8:9, 9:7, 9:9, 11:24, 12:2, 12:25, 13:3, 13:7, 13:16, 13:23, 14:24, 16:4, 16:15, 22:8, 22:14, 24:9, 24:19, 25:20, 26:22, 27:23, 29:2, 29:8, 33:6, 33:17, 34:19, 41:9, 41:18, 46:11, 46:16, 46:18, 46:19, 47:6, 48:21, 51:25, 54:9, 57:9, 57:10, 57:15, 57:21, 60:20, 60:24, 61:21, 64:17, 68:5, 68:25, 70:8, 70:12, 70:18, 74:20, 78:3, 78:13, 78:14, 80:7, 81:25, 85:1, 85:6, 85:9, 85:18, 85:20, 91:11, 96:24, 99:24, 100:11,

101:12, 102:12, 102:15, 104:12, 104:15, 104:19, 106:18, 107:9, 108:21, 109:4, 113:8, 114:3, 114:18, 115:3, 115:18, 116:2, 116:9, 117:5, 117:23, 118:16, 120:16, 120:23, 121:1, 121:9, 122:4, 123:7, 126:13, 126:14, 130:9, 130:23, 132:15, 132:18, 132:22, 133:15, 133:18, 134:24, 135:1, 135:6, 137:5, 146:2, 151:22, 151:24, 155:23, 156:15, 156:25, 157:7, 157:19, 159:12, 159:24, 160:8, 161:19, 161:22, 163:15, 163:19, 169:9, 173:14, 174:20, 177:22, 182:6, 182:23, 183:15, 185:14
**Honor's** [1] - 13:15
**Honorable** [1] - 1:13
**hook** [1] - 10:7
**hoops** [1] - 103:15
**hope** [4] - 9:4, 10:12, 14:10
**hopefully** [2] - 22:6, 175:24
**hoping** [4] - 13:9, 24:23, 152:1, 175:18
**Hospital** [3] - 166:12, 166:24, 170:23
**hospital** [4] - 28:9, 28:14, 166:15, 172:5
**hour** [5] - 82:25, 87:12, 115:24, 151:24, 158:3
**hours** [3] - 165:18, 175:25, 176:4
**house** [4] - 3:2, 10:1, 17:14, 30:23, 31:2, 34:12, 35:13, 40:3, 40:22, 44:23, 45:9, 52:18, 52:19, 53:11, 58:25, 63:3, 63:5, 63:18, 63:25, 64:7, 73:18, 74:2, 74:15, 75:9, 76:8, 76:12, 77:7, 77:18, 88:16, 88:17, 88:19, 88:22, 94:23, 126:21, 127:14, 127:20, 128:1, 128:7, 128:19, 137:11, 137:24, 138:24, 170:17
**household** [1] - 65:10
**hum** [9] - 38:3, 39:15, 39:23, 48:8, 72:21, 74:5, 99:8, 122:25, 154:4
**hundred** [1] - 161:18
**hung** [3] - 12:19, 82:17, 97:16

**hurry** [1] - 115:22
**husband** [1] - 175:18

**I**

**idea** [6] - 94:20, 97:9, 117:6, 125:12, 125:17, 142:2
**identified** [5] - 33:17, 48:22, 51:25, 137:5, 165:20
**identify** [4] - 18:16, 20:13, 133:5, 163:13
**idiom** [1] - 187:11
**illegal** [1] - 149:7
**imagine** [2] - 23:12, 116:9
**immediate** [2] - 182:20, 182:21
**immediately** [3] - 6:1, 19:3, 170:17
**impeach** [2] - 107:3, 108:19
**impeached** [2] - 23:11, 23:20
**impeaching** [4] - 107:5, 107:8, 108:13, 108:18
**impeachment** [16] - 23:13, 103:9, 103:10, 103:12, 104:2, 104:5, 107:14, 108:25, 110:13, 179:18, 180:7, 180:8, 181:21, 186:5, 186:13
**imperfect** [2] - 8:11, 8:23
**impermissibly** [1] - 8:20
**implicit** [1] - 181:13
**importance** [1] - 18:18
**important** [9] - 13:25, 14:14, 17:8, 19:23, 23:9, 75:18, 106:11, 112:17, 182:13
**improper** [2] - 112:8, 113:5, 183:7
**IN** [1] - 1:1
**inadmissible** [2] - 109:12, 183:19
**inadvertently** [2] - 180:4, 180:5
**incarcerated** [1] - 33:20
**incident** [1] - 163:23
**inclined** [2] - 27:18, 102:16
**include** [1] - 4:15
**included** [1] - 18:22
**including** [1] - 183:23
**income** [1] - 63:19
**inconsistent** [18] - 18:7,

85:12, 85:13, 85:14, 85:16, 104:6, 108:11, 108:12, 110:5, 178:3, 178:8, 178:12, 178:16, 178:21, 179:15, 179:20, 181:15, 182:10
**inconvenience** [2] - 175:11, 177:1
**incredulous** [1] - 108:3
**indeed** [1] - 187:7
**Indeed** [1] - 26:11
**INDEX** [1] - 188:1
**indicated** [2] - 70:17, 170:18
**indictment** [1] - 164:6
**individual** [3] - 55:17, 128:4, 151:2
**individuals** [1] - 127:21
**indulge** [1] - 16:3
**indulgence** [5] - 93:19, 94:25, 99:19, 101:1, 158:4
**industry** [1] - 43:5, 152:8
**inform** [1] - 18:11
**information** [7] - 87:24, 105:5, 119:24, 121:4, 127:4, 166:10, 166:16
**initial** [1] - 116:17
**injecting** [1] - 9:15
**injured** [1] - 35:4
**inquiring** [1] - 21:18
**inside** [2] - 150:24, 167:7
**insisted** [1] - 70:20
**inspection** [1] - 14:12
**instance** [2] - 178:21, 182:8
**instances** [1] - 180:18
**instructed** [1] - 27:9
**instruction** [7] - 27:19, 80:8, 111:11, 112:9, 112:19, 180:11, 182:21
**instructions** [4] - 177:6, 184:25, 185:11, 185:18
**intend** [2] - 4:7, 4:10
**intended** [1] - 4:15
**intention** [2] - 120:3, 176:3
**interests** [1] - 179:1
**interrupt** [3] - 115:21, 122:23, 169:7
**interview** [22] - 86:8, 86:19, 87:1, 102:3, 103:3, 103:8, 103:22, 104:2, 104:23, 105:1, 105:8, 106:21, 107:2, 107:17, 107:18, 108:14, 108:15, 121:20, 123:14, 127:7, 134:22

**interviewing** [2] - 127:3, 134:4
**interviews** [1] - 94:8
**intimidate** [1] - 156:11
**intrinsic** [1] - 6:17
**introduce** [2] - 176:15, 176:19
**introduced** [1] - 81:22
**introduction** [1] - 119:15
**intruded** [1] - 158:2
**investigation** [2] - 173:22, 177:8
**invited** [1] - 111:8
**invoking** [1] - 183:1
**involved** [5] - 3:22, 43:4, 49:5, 50:13, 51:10, 52:3, 56:1, 142:24, 148:9, 148:13, 149:6, 151:6, 151:12, 154:23
**issue** [23] - 2:5, 6:18, 11:15, 12:4, 13:8, 14:4, 14:15, 16:14, 25:5, 25:24, 26:1, 26:24, 27:14, 85:2, 100:1, 117:4, 118:14, 183:6, 183:7, 183:10, 186:9, 186:10
**issue's** [2] - 27:21, 181:18
**issues** [7] - 11:14, 101:16, 174:25, 175:22, 176:12, 178:4, 185:25
**items** [1] - 169:8
**itself** [2] - 166:4, 178:24

**J**

**J-O-N-E-S** [1] - 160:14
**jail** [1] - 44:6
**jails** [1] - 143:13
**James** [1] - 1:21
**January** [11] - 49:8, 54:19, 55:2, 74:23, 75:21, 76:5, 79:22, 86:5, 98:21, 139:8, 144:11
**Jaquetta** [1] - 180:24
**Jencks** [5] - 14:4, 14:6, 15:19, 16:5, 16:11
**Jim** [5] - 21:15, 21:16, 21:22, 22:20, 126:17
**job** [2] - 138:19, 138:22
**Joe** [1] - 7:9
**Johnson** [1] - 48:5
**joined** [5] - 111:4, 111:5, 112:20, 113:5, 114:1
**Jones** [12] - 3:23, 3:25, 4:2, 158:16, 159:7,

160:9, 160:14, 160:18, 161:19, 162:1, 163:16, 172:18
**JONES** [2] - 160:10, 188:18
**Jones's** [1] - 158:22
**Judge** [14] - 1:13, 2:4, 6:24, 9:14, 11:11, 11:13, 116:16, 158:15, 159:22, 159:25, 177:20, 182:25, 184:13, 185:17
**judge** [2] - 99:17, 175:17
**judges** [1] - 109:17
**judgment** [1] - 104:9
**June** [2] - 38:9, 62:10
**juror** [2] - 2:3, 11:15
**jurors** [2] - 177:17, 177:18
**Jury** [5] - 1:14, 29:4, 118:7, 160:5, 177:16
**jury** [111] - 10:14, 11:23, 13:8, 13:11, 16:16, 19:8, 23:16, 24:10, 29:3, 39:22, 74:22, 74:24, 75:2, 75:4, 75:12, 75:21, 76:1, 78:14, 79:9, 79:11, 79:22, 80:13, 80:19, 81:9, 81:16, 81:21, 82:8, 85:3, 86:3, 86:17, 98:20, 100:1, 100:7, 100:14, 101:22, 102:11, 102:20, 102:24, 102:25, 103:1, 103:6, 103:20, 104:1, 104:7, 104:8, 104:11, 104:14, 108:1, 108:5, 108:16, 109:23, 110:22, 111:10, 111:15, 111:17, 111:22, 111:25, 112:18, 112:22, 112:23, 112:25, 113:7, 113:14, 113:17, 113:22, 116:22, 116:23, 116:24, 118:9, 118:10, 118:13, 118:18, 120:6, 129:16, 129:21, 134:21, 153:18, 155:24, 158:6, 159:6, 163:21, 177:15, 178:1, 178:5, 178:7, 178:10, 178:17, 178:22, 178:24, 179:3, 179:6, 179:12, 179:18, 180:11, 180:25, 181:4, 181:6, 181:10, 181:13, 182:2, 182:3, 182:13, 182:14, 183:9, 184:17, 184:18, 184:25, 185:11
**Jury's** [1] - 158:11
**jury's** [3] - 23:24, 24:1, 182:22
**justice** [1] - 179:1

**justify** [1] - 108:7
**juvenile** [2] - 135:22, 135:23

# K

**keep** [9] - 9:24, 101:16, 139:2, 145:19, 146:6, 158:10, 159:15, 176:21, 177:7
**Keisha** [4] - 76:13, 88:14, 122:17, 127:13
**Kelsey** [1] - 1:17
**Kenneth** [2] - 163:20, 164:14
**KENNETH** [1] - 164:10, 188:19
**Kenny** [1] - 158:16
**kept** [4] - 50:5, 147:9, 147:13, 147:25
**kids** [1] - 89:13
**kill** [3] - 10:17, 10:21, 23:19
**killed** [4] - 7:9, 10:17, 73:4, 75:10
**killer** [1] - 7:11
**kind** [21] - 8:16, 8:17, 13:17, 14:14, 20:9, 26:3, 26:24, 60:15, 65:24, 72:17, 94:2, 119:15, 131:24, 136:15, 136:19, 137:1, 155:12, 165:23, 182:11, 183:21, 185:25
**Kind** [1] - 119:20
**King** [1] - 50:25
**kitchen** [5] - 65:16, 139:7, 145:25, 147:10, 147:21
**knife** [3] - 34:15, 35:9, 35:10
**knowledge** [15] - 12:17, 12:22, 34:20, 36:2, 41:12, 41:14, 131:25, 139:20, 141:22, 142:13, 148:13, 148:21, 150:17, 150:18, 150:20
**knowledgeably** [1] - 11:4
**known** [6] - 72:14, 83:13, 90:7, 137:7, 146:10, 155:16
**knows** [5] - 8:10, 12:10, 105:15, 175:15, 175:16
**Kurland** [20] - 1:22, 2:7, 3:15, 4:6, 8:2, 8:3, 25:8, 104:17, 104:18, 109:3, 113:10, 114:20, 114:25, 115:5, 117:15, 177:21, 183:7, 183:13, 183:14,

184:4
**KURLAND** [55] - 2:4, 2:8, 7:17, 7:19, 8:2, 8:9, 9:4, 9:7, 9:14, 9:23, 10:11, 11:1, 11:8, 11:11, 24:19, 25:3, 29:2, 61:2, 109:4, 109:22, 110:14, 110:19, 111:6, 112:3, 113:8, 113:11, 117:16, 173:16, 174:10, 174:15, 177:20, 177:22, 178:14, 179:10, 179:25, 180:2, 180:4, 180:19, 180:22, 182:6, 182:15, 182:18, 183:15, 184:7, 184:15, 184:20, 185:17, 186:2, 186:8, 186:10, 186:20, 187:10, 187:13, 187:17, 188:21

# L

**Lab** [3] - 166:2, 169:17, 173:6
**label** [9] - 39:16, 39:19, 40:19, 55:22, 55:24, 66:12, 66:15, 151:12, 154:22
**labeled** [1] - 169:21
**labels** [1] - 41:7
**ladies** [10] - 81:16, 100:5, 101:9, 118:8, 135:3, 158:3, 160:6, 163:21, 174:23, 177:14
**Ladies** [1] - 29:5
**lady** [1] - 51:23
**laid** [3] - 18:22, 19:22, 20:4
**large** [1] - 173:23
**largely** [1] - 186:10
**last** [8] - 9:7, 24:16, 43:14, 78:19, 89:6, 92:24, 125:9, 137:9
**late** [5] - 83:17, 151:24, 159:16, 176:4, 176:20
**latent** [1] - 159:1, 160:20, 161:3, 161:11, 161:13, 161:20, 161:24, 162:25, 163:8
**Latent** [1] - 160:15
**laughing** [1] - 82:16
**Laura** [1] - 1:17
**Lauretta** [8] - 18:23, 165:8, 165:11, 165:14, 165:17, 165:21, 166:18, 170:13
**lavish** [1] - 56:24
**law** [3] - 6:9, 6:14, 6:20
**LAWLOR** [5] - 78:14,

80:7, 84:5, 159:24, 160:3
**Lawlor** [8] - 1:18, 11:16, 99:21, 112:7, 112:8, 112:9, 112:10, 112:11
**Lawlor's** [2] - 100:3, 113:5
**lawyer** [1] - 184:7
**lawyer/one** [1] - 112:11
**laying** [2] - 165:21, 166:5
**leading** [1] - 60:24
**leads** [1] - 110:5
**learn** [2] - 171:9, 174:8
**learned** [2] - 20:15, 174:3
**least** [9] - 4:16, 14:14, 24:25, 45:23, 66:3, 82:1, 89:22, 155:7, 180:19
**leave** [11] - 45:5, 45:6, 78:17, 82:22, 83:1, 83:4, 99:23, 101:14, 158:8, 175:1, 177:12
**leaving** [5] - 73:12, 83:5, 83:21, 124:19, 166:22
**lectern** [1] - 25:18
**Lee** [22] - 2:6, 3:2, 4:9, 4:16, 5:18, 7:6, 7:9, 7:11, 7:23, 8:12, 10:1, 28:6, 28:19, 28:21, 165:21, 166:9, 168:13, 168:18, 170:14, 173:21
**Lee's** [1] - 10:1
**LEE-1** [2] - 167:5, 169:15
**LEE-2** [3] - 167:17, 169:20, 170:12
**LEE-3** [2] - 167:25, 170:12
**LEE-4** [1] - 168:15
**Lee/Epps** [4] - 3:18, 5:13, 6:1, 19:1
**Left** [2] - 28:21
**left** [35] - 22:23, 28:19, 82:20, 83:17, 83:20, 87:11, 87:15, 89:9, 92:17, 92:19, 121:25, 122:1, 122:7, 123:12, 123:16, 123:19, 123:24, 124:2, 124:8, 124:12, 130:1, 130:3, 130:4, 130:16, 130:22, 130:25, 131:1, 162:24, 164:25, 166:20, 166:21, 167:21, 169:2, 170:17
**leg** [2] - 170:25, 171:10, 172:4
**legal** [1] - 174:25
**less** [1] - 92:21
**lie** [2] - 102:25, 166:19

**lied** [3] - 80:20, 80:21, 99:17
**life** [8] - 42:9, 42:10, 66:19, 137:8, 140:21, 146:11, 155:16
**Life** [1] - 169:12
**lift** [4] - 162:1, 162:6, 162:8, 162:9
**light** [3] - 3:16, 31:18, 100:5
**likely** [3] - 3:21, 159:3, 176:22
**limitation** [3] - 183:18, 183:24, 184:1
**limitations** [2] - 103:10, 184:1
**limited** [1] - 2:24
**limiting** [5] - 27:19, 80:7, 111:11, 112:9, 112:19
**linchpin** [1] - 26:21
**line** [4] - 25:14, 109:3, 124:20, 175:20
**Line** [5] - 75:4, 76:5, 79:12, 79:22, 153:22
**lines** [3] - 175:15, 175:16, 175:24
**list** [2] - 181:25, 183:4
**listen** [2] - 24:7, 141:6
**listened** [2] - 155:2, 155:9
**live** [15] - 30:23, 32:9, 44:9, 44:16, 49:21, 52:18, 58:21, 59:3, 59:14, 63:19, 73:22, 138:4, 138:8
**lived** [14] - 37:19, 42:1, 42:8, 42:15, 44:10, 44:14, 59:19, 62:21, 137:24, 146:13, 146:25, 147:3, 147:4
**lives** [2] - 18:11, 177:1
**living** [35] - 31:2, 31:9, 32:11, 37:4, 37:22, 41:10, 42:4, 42:7, 42:13, 42:22, 42:25, 44:6, 44:11, 44:17, 52:6, 52:7, 54:23, 54:25, 55:7, 59:17, 59:19, 59:21, 60:1, 62:19, 64:8, 64:9, 119:22, 132:9, 138:3, 138:20, 139:7, 140:23, 148:8, 156:22
**located** [1] - 143:10
**location** [1] - 62:2
**locations** [1] - 177:9
**locked** [2] - 138:18, 145:15
**Lombard** [1] - 1:25
**look** [27] - 10:11, 22:3,

22:17, 60:22, 61:10,
75:4, 76:5, 79:11, 82:8,
121:13, 123:21, 123:22,
124:17, 124:18, 125:24,
125:25, 128:12, 131:8,
131:10, 139:13, 140:13,
145:4, 171:23, 171:25,
177:9, 181:1, 185:24
  **looked** [2] - 60:5, 61:3
  **looking** [3] - 87:17,
88:11, 126:24
  **looks** [6] - 31:17, 92:21,
92:23, 117:20, 169:24,
176:22
  **loose** [1] - 182:21
  **lose** [2] - 63:22, 177:3
  **loss** [1] - 110:7
  **lost** [3] - 186:12,
186:25, 187:8
  **love** [2] - 104:9, 109:17
  **low** [1] - 63:19
  **Lucille** [4] - 30:18,
30:20, 30:21, 31:9, 42:1,
59:5
  **luck** [1] - 133:16
  **lump** [1] - 106:24
  **lunch** [10] - 115:20,
115:24, 116:3, 116:20,
135:4, 151:25, 152:2,
158:3, 175:9, 177:22
  **Luncheon** [1] - 158:13
  **Luther** [1] - 50:25

# M

  **ma'am** [1] - 84:14
  **machine** [1] - 119:9
  **mad** [1] - 60:10
  **mail** [2] - 14:2, 14:24
  **mailed** [1] - 159:24
  **mails** [1] - 185:5
  **male** [1] - 165:20
  **man** [2] - 23:19, 66:7
  **management** [1] -
116:14
  **maneuver** [1] - 108:9
  **manner** [3] - 27:20,
173:12, 189:8
  **map** [1] - 165:10
  **March** [15] - 72:11,
72:18, 73:6, 86:11, 87:1,
93:15, 94:3, 100:18,
105:10, 118:21, 133:24,
153:20, 165:4, 168:18,
172:5
  **mark** [1] - 140:12
  **marked** [8] - 71:17,
72:7, 116:24, 118:11,
133:9, 137:22, 139:11,

143:7
  **marker** [1] - 51:23
  **MARTIN** [11] - 1:8, 61:6,
114:3, 114:5, 114:25,
115:3, 115:8, 115:14,
115:17, 117:11, 126:14
  **Martin** [25] - 1:19, 1:20,
4:19, 5:16, 5:17, 5:19,
19:12, 19:20, 41:12,
50:25, 56:6, 66:25,
111:19, 113:4, 114:1,
114:2, 115:4, 115:15,
117:10, 126:18, 180:15,
185:1, 187:1, 187:8
  **Mary** [3] - 1:24, 189:3,
189:14
  **MARYLAND** [1] - 1:2
  **Maryland** [3] - 1:12,
1:25, 161:3
  **Massiah** [8] - 25:24,
26:10, 26:20, 26:21,
26:24, 27:14, 27:22,
185:6
  **matched** [1] - 3:1
  **material** [5] - 16:5, 16:8,
103:9, 103:12, 104:2
  **mates** [2] - 26:9, 26:13
  **math** [1] - 37:9
  **matter** [23] - 11:22,
16:16, 18:18, 22:5,
103:8, 103:11, 106:21,
108:25, 112:14, 113:14,
153:18, 175:20, 179:22,
180:7, 180:12, 181:21,
183:23, 184:18, 185:22,
186:6, 186:14, 189:4,
189:8
  **matters** [2] - 126:18,
126:20
  **maximize** [1] - 175:10
  **mean** [40] - 7:9, 10:3,
10:20, 13:23, 15:10,
17:12, 17:21, 22:12,
23:13, 26:10, 26:21,
27:6, 32:3, 40:17, 44:23,
44:24, 50:10, 51:3, 64:7,
81:7, 83:16, 89:1, 90:20,
92:20, 94:3, 105:2,
105:5, 108:22, 109:16,
142:17, 153:17, 155:15,
166:21, 173:5, 180:22,
180:24, 182:8, 183:12,
186:20, 187:12
  **meaning** [1] - 27:16
  **means** [12] - 10:15,
18:8, 61:18, 61:24,
113:13, 113:19, 134:25,
145:11, 167:11, 171:16,
175:1, 175:9
  **meant** [2] - 115:23,

134:12
  **meet** [8] - 52:11, 52:13,
55:17, 66:6, 151:2,
153:9, 154:1, 154:7
  **meeting** [4] - 122:13,
122:14, 126:25, 154:8
  **member** [2] - 10:10,
10:16
  **members** [2] - 12:23
  **memo** [2] - 20:15, 21:25
  **memoranda** [9] - 16:19,
16:23, 20:13, 21:4, 21:8,
21:13, 22:2, 22:10, 22:17
  **memorandum** [11] -
18:16, 18:19, 18:20,
20:2, 20:5, 20:7, 20:10,
20:11, 104:10, 104:14,
109:21
  **memory** [17] - 22:12,
75:25, 78:16, 81:6,
86:16, 94:5, 94:8, 110:3,
110:7, 110:20, 121:18,
121:19, 123:25, 124:24,
124:25, 126:4, 178:4
  **memos** [1] - 16:21
  **mend** [2] - 71:3, 84:17
  **mention** [3] - 98:15,
118:17, 124:19
  **mentioned** [3] - 67:13,
98:23, 164:5
  **mentor** [3] - 33:21,
33:23, 39:12
  **met** [13] - 33:19, 38:25,
39:4, 39:9, 52:8, 54:18,
54:20, 66:21, 69:25,
90:10, 98:13, 151:4
  **metal** [2] - 167:19,
169:20
  **Metal** [1] - 170:2
  **Michael** [9] - 1:16, 1:18,
23:5, 38:23, 49:18,
49:19, 50:8, 53:5
  **microphone** [1] - 71:12
  **middle** [2] - 13:4, 90:8
  **Middle** [2] - 48:6, 48:7
  **midnight** [3] - 106:4,
130:8, 167:14
  **might** [14] - 2:23, 22:24,
23:1, 54:16, 76:8, 91:9,
111:16, 115:16, 117:11,
129:1, 129:19, 129:21,
182:15, 182:20
  **mike** [8] - 29:14, 47:12,
58:1, 135:11, 136:4,
136:6, 160:13, 164:12
  **mind** [6] - 26:14, 82:12,
101:16, 158:10, 177:7,
184:11
  **mine** [2] - 23:23, 116:17
  **mine's** [1] - 73:18

  **minimize** [1] - 175:10
  **minute** [1] - 26:17
  **minutes** [16] - 24:25,
57:17, 82:24, 101:10,
101:17, 114:9, 117:14,
117:23, 124:12, 130:1,
130:2, 130:5, 130:6,
130:13, 155:2, 158:18
  **missed** [5] - 14:21,
30:19, 107:10, 115:5
  **mistrial** [1] - 115:9
  **misunderstood** [1] -
152:19
  **MITCHELL** [1] - 1:7
  **Mitchell** [16] - 1:17,
11:15, 33:17, 39:7,
39:11, 40:2, 45:12,
51:25, 103:20, 111:2,
112:2, 136:22, 137:5,
141:21, 142:24, 189:5
  **mom** [3] - 35:17, 42:7,
44:23
  **moment** [8] - 3:10,
41:19, 61:23, 79:10,
111:7, 111:8, 151:23
  **Monday** [10] - 27:25,
120:14, 120:21, 120:25,
175:3, 175:5, 176:4,
176:5, 177:13, 187:19
  **money** [7] - 56:24, 93:3,
186:12, 186:25, 187:1,
187:8, 187:9
  **Montgomery** [30] -
13:13, 15:16, 15:22,
15:24, 16:7, 16:12, 17:2,
17:4, 17:12, 18:9, 18:22,
19:4, 19:16, 19:17,
20:18, 20:22, 21:11,
23:8, 23:10, 23:13,
23:15, 23:18, 24:2, 24:3,
181:10, 186:11, 186:18,
187:7
  **Montgomery's** [6] -
10:21, 16:19, 20:4,
23:17, 181:8, 185:19
  **month** [3] - 4:2, 138:19,
156:21
  **months** [5] - 64:12,
64:13, 138:12, 161:2,
161:10
  **Months** [1] - 64:14
  **mood** [4] - 82:13, 82:14,
82:15, 82:17
  **mooted** [1] - 186:22
  **morning** [40] - 2:7,
12:2, 12:3, 12:9, 16:14,
24:8, 24:9, 29:5, 29:20,
29:21, 36:23, 36:24,
41:22, 41:23, 47:18,
47:19, 54:12, 54:13,

58:8, 58:9, 65:24, 89:22,
89:24, 98:15, 101:13,
114:2, 120:14, 120:21,
120:25, 144:21, 146:5,
149:12, 168:6, 168:21,
171:19, 175:14, 177:13,
180:10, 184:10, 185:10
  **mornings** [1] - 46:23
  **most** [5] - 22:13,
102:17, 163:5, 175:7,
175:22
  **mother** [15] - 31:3,
32:12, 32:23, 33:4,
36:14, 36:16, 38:4,
44:16, 45:8, 45:18,
46:23, 47:3, 53:18,
137:19, 149:17
  **mother's** [2] - 31:6,
36:2
  **motion** [4] - 9:24,
115:9, 185:19, 186:15
  **motions** [1] - 185:10
  **motive** [1] - 113:23
  **move** [5] - 50:4, 71:7,
85:21, 137:14, 178:7
  **moved** [8] - 32:1, 32:8,
37:6, 37:14, 38:11,
38:19, 41:10, 42:10,
42:15, 42:19, 50:2,
55:13, 59:8, 137:10,
137:16, 146:16, 171:6,
178:5
  **movement** [3] - 142:22,
142:24, 142:25
  **movements** [1] - 18:11
  **moving** [2] - 76:17, 98:2
  **MR** [292] - 2:4, 2:8, 3:10,
3:12, 4:8, 4:10, 4:18,
4:25, 5:4, 5:8, 5:20, 6:3,
6:5, 6:8, 6:24, 7:15,
7:17, 7:18, 7:19, 7:20,
7:22, 7:25, 8:2, 8:3, 8:9,
9:4, 9:7, 9:9, 9:11, 9:12,
9:14, 9:23, 10:11, 10:23,
11:1, 11:8, 11:11, 11:13,
11:24, 12:2, 12:4, 12:10,
12:20, 12:25, 13:3, 13:5,
13:7, 13:12, 13:15, 14:9,
14:21, 14:24, 15:6, 15:8,
15:10, 15:14, 15:25,
16:4, 16:15, 17:11,
17:17, 17:23, 18:18,
19:1, 19:13, 19:15,
19:17, 19:19, 20:1, 20:5,
20:8, 20:14, 20:21,
20:25, 21:5, 21:7, 21:10,
21:14, 21:17, 21:24,
22:3, 22:8, 22:11, 22:14,
22:19, 23:1, 24:19,
24:23, 25:3, 25:5, 25:10,

25:13, 25:20, 26:1, 26:17, 26:22, 27:12, 27:23, 28:1, 28:3, 28:8, 28:13, 28:15, 28:17, 28:21, 29:2, 29:8, 29:19, 33:6, 34:19, 35:3, 36:22, 41:21, 44:4, 46:11, 46:16, 46:18, 46:19, 46:22, 47:9, 47:17, 48:11, 54:11, 57:10, 57:14, 57:17, 57:19, 57:21, 58:7, 60:24, 61:2, 61:6, 61:8, 61:21, 62:1, 64:19, 68:4, 68:25, 69:8, 70:11, 78:14, 78:22, 80:7, 81:25, 82:4, 82:6, 84:5, 85:6, 85:9, 85:12, 85:17, 85:20, 91:11, 96:24, 102:12, 102:15, 103:25, 104:12, 104:15, 109:4, 109:22, 110:14, 110:19, 111:6, 112:3, 113:8, 113:11, 114:3, 114:5, 114:25, 115:3, 115:8, 115:14, 115:17, 115:18, 115:23, 116:16, 116:19, 116:25, 117:5, 117:11, 117:14, 117:16, 117:18, 117:22, 117:25, 118:2, 118:4, 120:16, 120:23, 121:1, 121:9, 122:4, 123:7, 126:14, 126:16, 130:9, 130:23, 132:18, 132:21, 134:24, 135:6, 135:13, 135:17, 136:8, 146:4, 148:11, 148:19, 150:8, 150:10, 150:14, 151:24, 152:3, 152:6, 155:21, 155:23, 156:1, 156:3, 156:7, 156:13, 156:15, 156:18, 156:25, 158:15, 158:21, 159:5, 159:8, 159:11, 159:19, 159:24, 160:3, 160:8, 160:17, 161:25, 163:19, 164:16, 169:9, 169:14, 173:1, 173:16, 174:2, 174:10, 174:15, 174:19, 177:20, 177:22, 178:14, 179:10, 179:25, 180:2, 180:4, 180:19, 180:22, 182:6, 182:15, 182:18, 182:25, 183:15, 184:7, 184:15, 184:20, 185:14, 185:17, 186:2, 186:8, 186:10, 186:20, 187:10, 187:13, 187:17, 188:4, 188:4, 188:5, 188:5, 188:6, 188:7, 188:8, 188:9, 188:10, 188:11, 188:12, 188:13,

188:13, 188:15, 188:15, 188:16, 188:16, 188:18, 188:20, 188:20, 188:21, 188:21

**MS** [63] - 24:9, 70:8, 70:18, 70:23, 78:3, 78:13, 79:3, 84:10, 84:18, 84:23, 85:23, 97:3, 97:8, 99:23, 100:1, 100:3, 100:11, 100:15, 100:21, 101:1, 101:5, 101:12, 101:21, 102:3, 102:7, 102:10, 104:19, 104:21, 105:2, 105:5, 105:7, 105:10, 105:12, 105:14, 105:25, 106:3, 106:5, 106:9, 106:18, 106:22, 107:5, 107:9, 107:12, 108:21, 109:2, 116:2, 116:6, 116:9, 116:13, 117:3, 117:8, 118:16, 118:19, 123:3, 124:10, 133:18, 133:22, 135:1, 157:7, 157:10, 161:22, 188:12, 188:17

**multiple** [1] - 165:25
**murder** [9] - 3:23, 4:1, 4:2, 28:4, 28:6, 114:16, 127:1, 127:4, 172:18
**murdered** [4] - 7:6, 106:2, 106:7, 121:5
**murders** [6] - 3:22, 3:24, 4:1, 10:7, 162:3, 172:15
**music** [18] - 34:8, 43:4, 50:14, 52:3, 60:17, 141:4, 141:6, 143:24, 144:1, 151:10, 152:12, 153:5, 153:3, 155:12, 155:17, 155:25, 156:10, 157:14
**must** [1] - 89:18

## N

**name** [39] - 29:15, 31:4, 31:6, 33:8, 38:22, 43:14, 47:13, 49:17, 50:24, 51:6, 51:8, 58:1, 59:24, 60:11, 66:7, 66:25, 67:2, 69:5, 73:19, 76:23, 77:3, 77:24, 77:25, 78:2, 98:22, 109:6, 119:1, 119:17, 129:8, 135:11, 137:20, 142:17, 142:21, 142:22, 154:10, 154:13, 160:13, 160:14, 164:13
**name's** [5] - 36:25, 54:14, 58:2, 64:22, 146:6
**named** [10] - 32:12,

43:16, 43:24, 51:14, 71:8, 71:10, 71:13, 76:18, 136:22, 181:5
**names** [8] - 67:5, 141:10, 141:15, 142:20, 153:8, 153:25, 154:2, 154:8
**naming** [1] - 181:3
**narcotics** [4] - 148:9, 148:14, 156:20, 156:23
**narrow** [1] - 100:21
**Natasha** [2] - 98:8, 98:11
**nature** [2] - 17:7, 18:3
**near** [5] - 3:25, 143:14, 166:7, 174:3, 176:17
**necessarily** [4] - 40:5, 45:13, 45:20, 173:8
**necessary** [1] - 111:16
**neck** [1] - 166:1
**need** [13] - 3:14, 4:25, 13:10, 27:17, 69:15, 100:21, 101:10, 116:3, 116:5, 122:24, 171:22, 175:20, 185:12
**needed** [3] - 103:3, 174:25, 176:7
**needing** [1] - 187:1
**needs** [2] - 183:8, 183:10
**negative** [2] - 26:14, 158:23
**neighborhood** [3] - 69:15, 146:14, 146:17
**never** [28] - 10:13, 10:15, 11:13, 57:4, 57:7, 58:16, 83:22, 91:7, 93:1, 93:4, 98:6, 107:21, 109:13, 109:22, 148:3, 148:5, 148:8, 150:15, 150:18, 150:23, 154:7, 154:8, 154:16, 156:20, 156:22, 157:2, 176:15
**Never** [1] - 151:1
**new** [5] - 85:25, 90:23, 90:24, 91:10, 91:15
**Next** [1] - 47:8
**next** [14] - 29:7, 51:23, 83:25, 126:2, 159:9, 160:7, 163:22, 170:16, 171:20, 176:7, 176:8, 176:10, 176:20, 185:15
**nice** [1] - 177:18
**Nice** [2] - 64:25, 65:1
**Nickerson** [1] - 159:23
**Nickerson's** [1] - 160:1
**nickname** [4] - 43:17, 48:24, 67:7, 97:20
**Niedermeier** [32] - 86:20, 91:3, 91:14,

92:16, 103:3, 104:3, 104:7, 104:23, 107:1, 107:16, 108:13, 108:15, 119:1, 119:14, 121:3, 123:14, 123:18, 123:23, 125:22, 125:25, 126:5, 126:7, 126:25, 127:10, 128:13, 128:20, 130:15, 130:21, 131:9, 134:4, 134:13, 134:18
**night** [41] - 21:16, 64:3, 73:11, 73:14, 73:17, 74:1, 74:3, 74:4, 74:10, 74:15, 75:9, 76:8, 76:9, 76:10, 76:12, 80:24, 82:13, 82:16, 83:17, 91:18, 92:5, 92:25, 93:17, 94:11, 94:24, 96:5, 108:5, 123:4, 123:12, 123:16, 123:19, 125:2, 126:8, 126:21, 127:4, 127:14, 128:8, 165:5, 168:4, 168:6
**night's** [1] - 66:4
**nine** [4] - 13:19, 20:24, 162:25, 163:13
**NO** [1] - 1:6
**nobody** [1] - 43:19
**Nobody** [1] - 93:7
**none** [1] - 16:10
**None** [1] - 16:11
**noon** [1] - 89:19
**North** [14] - 32:7, 35:13, 37:4, 37:19, 42:1, 42:10, 47:3, 49:21, 54:23, 54:25, 56:9, 57:4, 63:17, 65:4
**north** [2] - 165:22
**north/south** [1] - 165:11
**NORTHERN** [1] - 1:2
**note** [3] - 101:14, 158:8, 177:12
**Notebook** [1] - 140:3
**notebook** [4] - 140:4, 140:6, 140:16
**notebooks** [1] - 148:1
**noted** [7] - 48:23, 52:1, 111:20, 112:5, 113:25, 137:6, 169:3
**notes** [17] - 2:11, 14:2, 14:5, 14:12, 15:2, 15:5, 15:7, 15:9, 15:13, 15:17, 15:20, 16:1, 16:7, 16:10, 17:1, 17:24, 22:20
**nothing** [3] - 81:5, 154:8, 182:10
**Nothing** [5] - 57:10, 126:13, 133:15, 135:1, 157:19

**notwithstanding** [1] - 111:11
**November** [1] - 177:13
**nowhere** [2] - 154:7, 154:9
**number** [16] - 13:2, 13:3, 70:4, 95:11, 95:13, 95:17, 95:19, 95:21, 95:22, 141:25, 142:9, 155:10, 167:8, 171:21, 173:23
**Number** [2] - 61:9, 118:18
**Number(s** [1] - 189:5
**numbers** [3] - 61:7, 95:18, 96:3

## O

**o'clock** [2] - 128:20, 175:21
**oath** [8] - 75:15, 99:16, 100:7, 100:9, 102:6, 104:9, 134:15, 134:17
**object** [3] - 110:22, 111:20, 182:25
**objected** [1] - 111:2
**objecting** [1] - 106:14
**objection** [25] - 70:13, 79:3, 91:11, 99:22, 100:3, 100:6, 100:10, 103:19, 106:15, 111:4, 111:5, 111:20, 112:5, 112:9, 112:20, 113:3, 113:5, 113:6, 113:25, 115:8, 156:2, 156:5, 156:14, 161:22, 182:4
**Objection** [33] - 33:6, 34:21, 46:11, 46:16, 60:24, 61:21, 70:8, 70:18, 70:23, 78:3, 78:13, 84:5, 84:10, 84:18, 84:23, 96:24, 120:16, 120:23, 121:1, 121:9, 122:4, 123:7, 130:9, 130:23, 134:24, 148:11, 148:19, 150:8, 155:21, 156:13, 156:25, 174:10, 174:15
**objection's** [4] - 61:23, 78:4, 78:19, 79:4
**observe** [1] - 165:19
**observed** [1] - 165:20
**obvious** [1] - 112:24
**Obviously** [4] - 17:24, 18:4, 102:8, 108:3
**obviously** [9] - 8:10, 92:11, 108:18, 109:10, 111:24, 167:21, 175:9,

176:20, 186:14
  **occasion** [2] - 16:7, 60:2
  **occasions** [1] - 155:3
  **occupies** [1] - 23:8
  **occur** [1] - 172:11
  **occurred** [8] - 26:7, 38:9, 41:11, 120:13, 120:19, 120:21, 172:10, 174:6
  **October** [3] - 1:11, 50:12, 189:5
  **OF** [3] - 1:2, 1:5, 1:11
  **offense** [1] - 163:23
  **offer** [3] - 156:1, 161:19, 178:7
  **offhand** [2] - 73:3, 74:17
  **office** [2] - 22:23, 27:4
  **Officer** [3] - 19:24, 20:3, 124:18
  **officer** [4] - 2:5, 21:23, 86:23, 168:19
  **officers** [2] - 93:20, 118:22
  **official** [2] - 20:17, 189:7
  **Official** [1] - 189:15
  **officially** [1] - 55:9
  **often** [9] - 34:9, 40:3, 40:23, 56:8, 68:17, 72:23, 90:13, 90:15, 149:20
  **old** [12] - 7:11, 29:22, 30:18, 32:7, 42:4, 47:20, 58:10, 69:11, 95:18, 135:18, 147:5, 148:25
  **older** [5] - 30:11, 30:12, 37:10, 37:12, 42:12
  **Once** [2] - 72:24, 144:8
  **once** [5] - 11:7, 78:10, 144:2, 155:7, 185:13
  **one** [95] - 2:4, 3:24, 8:12, 8:22, 11:14, 12:25, 13:2, 15:16, 16:16, 17:3, 19:3, 19:5, 19:19, 22:7, 23:14, 28:4, 28:7, 28:8, 36:25, 52:8, 54:14, 59:15, 59:16, 60:4, 64:22, 68:7, 76:4, 80:1, 85:9, 86:20, 87:18, 93:20, 95:17, 96:5, 96:11, 101:23, 102:20, 109:15, 112:11, 116:23, 118:25, 119:3, 126:10, 127:20, 129:25, 133:12, 135:3, 143:4, 144:5, 146:7, 146:13, 151:4, 152:11, 153:13, 160:23, 166:16, 167:17, 167:19,

167:25, 168:2, 169:5, 169:9, 170:2, 170:3, 170:12, 170:17, 170:22, 171:9, 171:11, 171:13, 172:20, 173:2, 173:4, 173:6, 173:9, 173:21, 176:1, 177:20, 180:23, 181:2, 181:5, 181:16, 181:17, 181:22, 182:9, 182:15, 182:19, 185:5, 186:1, 186:21
  **One** [11] - 41:9, 53:22, 60:4, 66:19, 67:16, 118:18, 152:14, 153:11, 159:19, 166:21, 177:17
  **one-on-one** [1] - 15:16
  **ones** [5] - 13:21, 13:22, 14:17, 170:10, 181:5
  **ongoing** [1] - 6:12
  **open** [5] - 3:6, 79:8, 101:16, 158:10, 177:7
  **opened** [1] - 2:23
  **opening** [2] - 10:14, 169:13
  **operates** [1] - 113:21
  **operating** [1] - 111:3
  **opinions** [1] - 155:19
  **opportunity** [4] - 13:12, 55:16, 66:6, 113:16, 113:22, 151:1
  **opposed** [2] - 10:6, 179:13
  **orally** [1] - 178:18
  **order** [6] - 2:14, 26:19, 151:10, 151:18, 177:19
  **ordered** [1] - 28:5
  **originally** [1] - 9:18
  **Otherwise** [2] - 115:8, 183:5
  **otherwise** [1] - 183:19
  **ought** [3] - 24:24, 182:13, 183:3
  **outright** [1] - 182:10
  **outside** [3] - 91:17, 139:13, 139:22
  **overheard** [1] - 78:24
  **overnight** [1] - 25:24
  **Overruled** [10] - 33:7, 34:25, 46:12, 46:17, 60:25, 70:19, 70:24, 84:12, 84:19, 84:24, 123:8, 130:10, 150:9, 157:1, 174:11, 174:16
  **overruled** [6] - 61:23, 70:9, 78:4, 78:19, 79:4, 111:20
  **own** [2] - 116:6, 155:19
  **owned** [2] - 4:18, 6:2

**P**

  **P-17** [1] - 30:16
  **p.m** [9] - 65:18, 87:3, 96:8, 96:9, 134:1, 158:6, 158:11, 158:13, 187:20
  **package** [1] - 173:9
  **packaged** [2] - 173:3, 173:12
  **pads** [3] - 101:14, 158:8, 177:12
  **Page** [12] - 75:2, 75:4, 76:5, 79:10, 79:12, 79:22, 123:21, 124:17, 125:24, 128:12, 131:9, 153:22
  **PAGE** [1] - 188:3
  **page** [9] - 79:10, 121:16, 121:17, 121:19, 121:21, 123:23, 124:24, 125:25, 128:14
  **pages** [1] - 189:6
  **painting** [1] - 107:13
  **pantry** [9] - 139:5, 139:6, 145:19, 147:9, 147:18, 147:21, 148:3, 149:19, 150:15
  **paragraph** [1] - 105:18
  **paragraphs** [3] - 19:4, 105:2, 126:2
  **parameters** [1] - 3:4
  **parentheses** [2] - 167:9, 167:19
  **Park** [6] - 30:13, 58:21, 59:6, 146:14, 146:16, 146:25
  **parked** [1] - 91:17
  **part** [16] - 42:25, 52:6, 54:19, 73:21, 77:15, 79:16, 81:20, 106:9, 108:9, 127:25, 129:6, 143:12, 167:20, 167:21, 168:8, 173:21
  **participate** [1] - 168:21
  **particular** [14] - 17:3, 17:18, 18:13, 73:21, 79:10, 80:25, 87:18, 93:7, 109:15, 114:6, 138:24, 145:3, 181:24, 185:20
  **particularly** [2] - 111:23, 112:17
  **parties** [2] - 109:9, 110:21
  **parts** [2] - 110:24, 113:15
  **party** [3] - 52:9, 173:22, 174:7
  **passage** [2] - 17:3,

183:9
  **passages** [1] - 17:1
  **passing** [1] - 18:15
  **past** [8] - 15:2, 85:7, 85:17, 85:19, 104:14, 104:16, 109:19, 175:6
  **Past** [1] - 85:6
  **patience** [1] - 29:6
  **pattern** [2] - 6:12, 6:18
  **Patton** [3] - 119:3, 119:14, 124:18
  **Paul** [5] - 1:19, 36:25, 54:14, 64:22, 146:7
  **Pause** [5] - 25:17, 57:20, 99:20, 101:6, 101:8
  **pay** [1] - 17:19
  **Peaches** [2] - 127:16, 127:18
  **people** [33] - 10:17, 13:9, 22:25, 23:2, 23:3, 27:3, 28:4, 32:11, 33:14, 43:13, 51:10, 51:12, 74:10, 74:13, 74:17, 75:11, 86:20, 96:2, 114:16, 114:18, 133:2, 152:16, 152:22, 153:8, 153:25, 157:16, 166:17, 173:23, 174:5, 174:7, 175:14, 175:15, 181:3
  **perfectly** [5] - 103:20, 111:14, 112:21, 112:22, 112:24
  **perform** [5] - 50:20, 142:13, 142:15, 143:3, 143:5
  **performed** [1] - 50:22
  **perhaps** [4] - 14:20, 23:16, 95:18, 175:5
  **Perhaps** [1] - 104:16
  **period** [6] - 46:9, 49:21, 49:24, 138:20, 155:17, 156:21
  **permit** [1] - 11:3
  **permitted** [1] - 11:23
  **permitting** [1] - 6:10
  **perpendicular** [1] - 165:23
  **person** [26] - 3:3, 3:21, 8:11, 8:12, 8:13, 8:21, 9:1, 10:2, 17:18, 17:22, 23:6, 33:15, 71:8, 71:10, 71:13, 76:17, 77:24, 77:25, 78:9, 96:20, 111:2, 133:3, 136:19, 150:12, 166:6, 166:23
  **personal** [5] - 11:21, 12:22, 112:14, 147:9, 147:25
  **personally** [4] - 51:13,

51:15, 51:16, 145:17
  **perspective** [2] - 24:3, 179:8
  **persuaded** [1] - 18:8
  **Pete** [5] - 83:8, 83:13, 88:25, 90:7, 123:16
  **PH** [1] - 137:23
  **PH-17** [1] - 58:24
  **PH-18** [1] - 31:12
  **PH-19** [1] - 31:20
  **PH-48** [3] - 32:4, 52:15, 59:10
  **PH-55** [1] - 71:18
  **PH-56** [1] - 72:8
  **PH-64** [2] - 143:8
  **phone** [52] - 4:23, 4:24, 5:24, 8:7, 8:23, 70:1, 70:7, 70:14, 77:8, 77:11, 77:16, 77:20, 77:25, 78:2, 78:9, 78:12, 78:24, 79:19, 81:13, 81:20, 82:9, 82:15, 82:18, 82:21, 82:22, 87:17, 90:21, 94:11, 95:7, 95:9, 95:11, 95:15, 95:18, 96:11, 96:20, 98:18, 99:1, 99:5, 99:7, 99:10, 99:13, 108:6, 122:8, 122:15, 122:19, 124:12, 129:2, 130:13, 132:2, 132:13
  **phones** [4] - 95:25, 96:5, 96:7
  **photo** [1] - 133:9
  **photograph** [5] - 52:15, 71:20, 133:13, 140:1, 140:14
  **photographs** [7] - 126:8, 126:11, 132:24, 133:1, 133:2, 133:12
  **physical** [2] - 139:16, 179:14
  **pick** [7] - 34:4, 34:9, 40:22, 45:20, 89:13, 113:20, 149:18
  **picked** [1] - 45:15
  **Picking** [1] - 9:9
  **pickup** [1] - 171:19
  **picture** [4] - 107:13, 139:11, 140:17, 143:20
  **pictures** [3] - 12:15, 31:12, 52:2
  **piece** [2] - 183:8, 185:20
  **pieces** [1] - 167:23
  **pike** [1] - 153:8
  **place** [24] - 4:18, 42:1, 44:11, 63:1, 63:19, 63:22, 64:8, 82:19, 133:12, 137:17, 137:18,

137:19, 138:24, 139:2, 139:8, 140:20, 144:11, 144:15, 145:1, 145:25, 147:12, 153:2, 156:23
**places** [4] - 152:11, 152:21, 152:22
**plan** [1] - 10:21
**planning** [1] - 19:10
**play** [3] - 107:17, 110:10, 155:5
**played** [1] - 186:3
**playing** [1] - 27:7
**plea** [1] - 23:21
**pleasant** [1] - 184:23
**pleasure** [1] - 179:16
**Plenty** [1] - 141:7
**plenty** [1] - 175:23
**Point** [1] - 179:11
**point** [47] - 3:17, 5:4, 9:7, 10:4, 13:24, 14:15, 18:14, 23:17, 27:6, 28:17, 33:12, 37:4, 38:16, 40:9, 48:18, 49:13, 51:22, 54:22, 68:7, 77:23, 79:8, 85:4, 86:16, 92:7, 104:5, 107:6, 109:8, 129:25, 136:13, 137:1, 146:13, 146:17, 147:7, 149:13, 150:5, 150:6, 160:23, 168:7, 168:10, 171:18, 177:20, 177:23, 182:22, 183:11, 184:3, 184:8, 184:24
**pointing** [2] - 136:18, 165:13
**points** [1] - 44:17
**Police** [8] - 102:2, 160:15, 160:21, 161:3, 161:5, 161:9, 164:17, 164:22
**police** [35] - 19:21, 35:13, 35:18, 35:25, 37:23, 52:24, 62:11, 62:25, 63:5, 65:7, 86:9, 88:21, 89:15, 90:5, 93:15, 94:7, 95:1, 97:21, 100:12, 100:18, 101:25, 102:3, 102:21, 103:2, 103:8, 103:22, 104:2, 105:1, 105:8, 109:12, 118:21, 134:22, 168:24
**pool** [1] - 165:24
**portions** [2] - 23:16, 104:1
**position** [6] - 16:12, 17:19, 22:19, 23:7, 23:9, 180:5
**possess** [1] - 150:23
**possession** [2] - 3:20,

53:9
**possible** [11] - 46:14, 96:12, 96:13, 96:16, 96:17, 96:19, 96:23, 97:3, 97:7, 102:17, 128:11
**possibly** [1] - 175:19
**Possibly** [2] - 117:25, 118:1
**poured** [1] - 69:9
**practical** [1] - 184:4
**practice** [1] - 178:11
**practiced** [1] - 181:19
**precise** [1] - 105:8
**precisely** [1] - 27:6
**preclude** [2] - 4:4, 22:22
**predicates** [3] - 178:2, 181:1, 181:11
**prefer** [1] - 159:19
**preference** [2] - 178:6, 178:15
**prejudicially** [1] - 8:20
**premises** [1] - 150:13
**prep** [2] - 65:16
**prepare** [2] - 11:16, 20:15
**prepared** [3] - 21:7, 22:24, 162:2
**prepping** [1] - 102:11
**presence** [1] - 176:13
**present** [15] - 4:2, 20:15, 23:3, 75:8, 76:7, 76:12, 77:13, 77:15, 101:19, 119:13, 127:13, 127:16, 128:1, 132:2
**presentation** [2] - 176:9, 185:8
**presented** [3] - 178:18, 179:12, 181:20
**presenting** [1] - 104:1
**preserve** [1] - 159:19
**presumably** [2] - 22:16, 22:18
**presume** [1] - 104:23
**presumption** [1] - 16:2
**pretty** [4] - 11:22, 16:24, 26:11, 115:12
**prevents** [1] - 6:24
**previously** [2] - 84:11, 108:12
**prints** [6] - 158:24, 162:23, 162:24, 162:25, 163:8, 163:13
**problem** [5] - 7:8, 32:22, 104:1, 109:24, 184:4
**procedural** [2] - 177:20, 177:23
**procedure** [3] - 179:17,

180:10, 180:14
**proceed** [6] - 24:18, 24:25, 34:25, 118:15, 158:14, 164:8
**proceeding** [1] - 39:21
**Proceedings** [6] - 2:1, 57:20, 99:20, 101:6, 101:8, 187:20
**proceedings** [3] - 25:17, 189:4, 189:7
**process** [3] - 166:2, 167:1, 181:7
**processing** [1] - 162:2
**producer** [8] - 39:14, 43:10, 52:4, 55:19, 60:14, 60:15, 66:9, 143:2
**Producer** [1] - 66:11
**producing** [1] - 143:1
**proffer** [18] - 13:19, 14:3, 14:16, 15:2, 16:19, 16:20, 17:1, 18:19, 20:13, 20:24, 21:1, 22:13, 23:14, 26:2, 26:5, 26:11, 186:1, 186:3
**proffers** [1] - 16:6
**projectile** [1] - 169:21
**promise** [1] - 146:6
**promote** [1] - 55:24
**prompted** [1] - 20:4
**promptly** [2] - 175:4, 177:14
**proper** [2] - 110:13, 113:18
**properly** [1] - 118:10
**property** [4] - 150:13, 167:8, 168:17, 171:21
**proposed** [2] - 102:1, 185:18
**proposing** [1] - 101:22
**prosecution** [1] - 6:10
**prosecutor** [1] - 155:1
**prosecutor's** [3] - 15:12, 15:17, 22:20
**prosecutorial** [1] - 6:24
**prosecutors** [3] - 94:7, 134:21, 155:18
**prove** [10] - 6:25, 7:3, 7:5, 7:11, 8:15, 8:18, 9:16, 9:19, 10:7, 113:23
**provide** [2] - 3:18, 92:12
**providing** [1] - 127:3
**proving** [1] - 4:9
**prudence** [1] - 6:24
**Public** [1] - 27:5
**pull** [1] - 21:25
**Pure** [4] - 141:12, 141:13, 141:24, 142:5
**Purely** [1] - 115:18
**Purple** [1] - 10:3

**purpose** [4] - 81:23, 107:8, 156:10, 175:9
**purposely** [1] - 26:15
**purposes** [8] - 81:18, 103:5, 118:14, 172:11, 180:15, 183:20, 183:22, 184:2
**pursue** [2] - 24:7, 156:5, 185:7
**Put** [2] - 65:11, 122:6
**put** [18] - 10:18, 10:23, 111:14, 112:25, 133:8, 133:23, 134:9, 136:18, 140:11, 153:5, 157:24, 162:7, 166:23, 167:4, 171:13, 179:5, 186:17
**puts** [1] - 170:4
**putting** [1] - 54:2
**Pyne** [6] - 1:21, 21:17, 116:15, 117:13, 117:22, 129:17
**PYNE** [8] - 116:16, 116:19, 117:14, 117:25, 126:16, 173:1, 188:12, 188:20

# Q

**qualifications** [1] - 159:1
**qualified** [2] - 161:12, 161:17
**qualifies** [2] - 179:14, 180:6
**quarrel** [1] - 153:17
**questioning** [2] - 45:11, 156:19
**questions** [37] - 23:22, 36:18, 41:18, 46:18, 47:6, 54:9, 57:9, 64:16, 68:7, 68:20, 69:10, 69:25, 79:1, 79:19, 85:24, 98:22, 108:23, 117:19, 118:20, 123:2, 125:3, 126:14, 132:18, 146:2, 151:22, 155:2, 155:18, 157:5, 157:12, 158:2, 161:21, 163:15, 172:23, 173:25, 174:19, 187:2
**quick** [2] - 115:20, 185:17
**quickly** [1] - 71:7
**quiet** [1] - 187:17
**quite** [5] - 6:9, 40:7, 107:22, 114:7, 155:9

# R

**R-O-Y** [1] - 160:14
**racketeering** [9] - 6:13, 6:19, 6:22, 7:2, 7:5, 9:16, 10:6, 10:8, 10:10
**radio** [2] - 143:23, 143:24, 144:1, 144:3, 144:6, 155:7
**raid** [10] - 38:8, 41:11, 44:24, 45:9, 62:11, 63:17, 64:6, 64:10, 65:13, 67:13
**raided** [6] - 35:13, 37:23, 52:19, 63:1, 64:7, 150:18
**raise** [1] - 27:13
**Raised** [1] - 157:11
**raised** [3] - 13:8, 16:17, 181:9
**raising** [2] - 27:23, 185:25
**ran** [6] - 2:21, 3:3, 8:13, 28:7, 28:8, 28:11
**Randallstown** [1] - 73:24
**rap** [31] - 39:16, 39:18, 40:19, 41:3, 41:7, 43:4, 43:13, 50:14, 52:3, 55:21, 55:24, 60:17, 66:11, 66:14, 140:25, 141:4, 141:6, 144:5, 151:7, 151:9, 151:10, 151:12, 151:18, 151:20, 152:8, 153:4, 155:13, 156:5, 156:9, 157:20, 157:21
**Rap** [1] - 34:8
**raps** [17] - 34:8, 50:16, 60:18, 60:22, 61:3, 61:10, 66:17, 140:7, 140:8, 140:14, 140:18, 140:19, 140:21, 143:23, 145:4, 145:6
**rather** [3] - 78:16, 104:2, 186:24
**ratifies** [1] - 178:19
**re** [1] - 104:3
**re-testify** [1] - 104:3
**reach** [4] - 95:6, 96:2, 101:3, 103:23
**reached** [3] - 101:20, 111:13, 179:5
**read** [17] - 75:3, 75:5, 75:6, 75:7, 76:4, 76:9, 76:14, 79:16, 79:21, 80:5, 108:4, 121:17, 122:24, 123:25, 124:22, 126:1, 128:13

**Read** [2] - 79:13, 79:23
**reading** [7] - 78:15, 80:9, 80:21, 81:4, 91:11, 121:19, 126:4
**ready** [7] - 24:13, 24:14, 24:15, 24:17, 24:18, 29:6, 118:15
**Ready** [1] - 158:14
**real** [1] - 154:2
**realize** [2] - 13:24, 23:8
**really** [13] - 6:6, 15:19, 56:18, 76:21, 83:15, 92:22, 104:10, 104:13, 153:23, 173:2, 184:21, 184:24, 185:7
**reason** [10] - 4:11, 80:25, 106:11, 109:14, 110:17, 125:1, 153:3, 159:19, 176:8, 184:9
**reasonable** [7] - 7:1, 7:3, 7:6, 8:15, 8:18, 16:24, 16:25
**reasonably** [2] - 11:19, 76:9
**reasons** [1] - 109:25
**rec** [1] - 50:25
**recalled** [1] - 129:16
**receive** [2] - 16:18, 162:1
**received** [8] - 11:18, 16:21, 77:10, 77:12, 77:13, 122:8, 166:10, 166:16
**receiving** [1] - 130:13
**recently** [3] - 16:9, 71:1, 130:2
**recess** [5] - 101:13, 101:17, 158:5, 158:11, 158:13
**Recess** [1] - 101:18
**recognize** [13] - 31:13, 51:18, 51:19, 52:15, 53:22, 58:25, 59:11, 61:13, 103:1, 139:15, 139:23, 140:4, 143:8
**recognized** [2] - 77:3, 133:2
**recollect** [3] - 82:7, 129:12, 180:22
**recollected** [1] - 102:23
**recollection** [40] - 8:25, 17:25, 22:17, 75:8, 79:18, 80:10, 80:22, 81:20, 85:6, 85:7, 85:15, 85:17, 85:19, 104:11, 104:14, 107:21, 108:8, 108:9, 108:20, 109:1, 109:19, 110:2, 110:16, 113:2, 114:20, 116:7, 116:11, 121:13, 128:15,

128:17, 129:15, 129:18, 131:12, 134:3, 154:5, 179:2, 180:21, 180:25, 182:7
**reconstruct** [1] - 9:2
**record** [28] - 14:17, 23:21, 29:15, 33:16, 47:13, 48:21, 51:24, 58:1, 58:4, 69:5, 76:8, 110:2, 112:3, 113:11, 119:18, 135:11, 136:17, 136:18, 137:4, 141:4, 143:19, 151:10, 152:12, 152:23, 154:22, 160:13, 164:13, 187:6
**recorded** [17] - 16:20, 20:25, 21:1, 85:6, 85:7, 85:18, 85:19, 100:12, 102:4, 102:5, 104:10, 104:14, 106:16, 109:19, 119:6, 153:2, 189:3
**recording** [8] - 102:22, 116:4, 116:5, 119:7, 121:14, 123:21, 152:11, 152:17
**records** [1] - 4:22
**recover** [3] - 52:24, 53:1, 158:24
**recovered** [17] - 53:7, 145:1, 162:13, 162:20, 166:3, 167:10, 168:3, 168:18, 168:22, 169:1, 170:6, 170:25, 172:5, 172:7, 172:9, 172:14, 173:6
**recovery** [5] - 8:1, 167:10, 167:13, 168:2, 168:18
**RECROSS** [6] - 46:21, 133:21, 157:9, 188:6, 188:13, 188:17
**red** [1] - 171:12
**redacted** [1] - 112:1
**redaction** [1] - 101:23
**redactions** [2] - 111:15, 111:23
**redirect** [4] - 13:20, 156:16, 183:6, 187:2
**REDIRECT** [8] - 44:3, 132:20, 156:17, 174:1, 188:5, 188:13, 188:16, 188:21
**Redirect** [1] - 132:19
**refer** [4] - 129:8, 132:5, 147:18, 147:22
**reference** [2] - 102:24, 180:25
**references** [2] - 178:1, 183:22
**referred** [3] - 21:21,

39:11, 133:3
**referring** [1] - 14:22
**reflect** [4] - 33:16, 48:21, 51:24, 137:4
**reflected** [1] - 13:21
**refrain** [1] - 107:24
**Refresh** [1] - 180:21
**refresh** [18] - 22:17, 75:8, 79:18, 80:10, 80:22, 85:15, 94:5, 94:8, 109:1, 116:10, 121:13, 121:19, 124:25, 126:4, 128:17, 131:12, 134:3, 154:5
**refreshed** [2] - 22:13, 179:2
**refreshes** [5] - 116:7, 121:17, 123:25, 124:24, 128:14
**refreshment** [1] - 110:20
**regard** [3] - 4:22, 17:9, 25:25
**regarding** [3] - 12:5, 127:4, 164:4
**regardless** [2] - 7:5, 184:2
**regular** [1] - 103:10
**regulations** [1] - 22:22
**Reisterstown** [2] - 31:19, 31:21
**related** [4] - 4:5, 16:16, 30:7, 30:9
**relates** [2] - 2:5, 6:15
**relating** [1] - 16:5
**relationship** [11] - 27:13, 40:14, 49:5, 49:11, 54:20, 72:17, 76:25, 97:10, 97:12, 131:22, 131:24
**released** [1] - 53:19
**relevance** [1] - 4:22
**relevant** [1] - 23:3
**remain** [1] - 163:14
**remained** [2] - 38:4, 67:22
**remaining** [1] - 162:25
**remember** [138] - 13:16, 15:17, 32:1, 32:22, 34:15, 38:8, 48:5, 50:21, 50:24, 54:2, 54:17, 59:4, 60:5, 73:3, 73:8, 73:10, 73:14, 74:13, 74:16, 74:17, 74:23, 75:11, 75:12, 77:10, 77:11, 77:24, 78:10, 78:19, 79:2, 79:5, 79:6, 80:2, 80:16, 80:18, 81:1, 81:5, 81:8, 81:12, 81:13, 81:14, 82:10, 82:13,

82:23, 83:1, 83:5, 83:10, 83:13, 83:19, 85:14, 86:8, 86:19, 87:2, 87:4, 88:2, 88:8, 88:19, 88:21, 89:12, 90:4, 90:5, 91:1, 91:2, 91:3, 91:7, 91:14, 91:16, 91:24, 92:4, 92:6, 92:9, 92:16, 92:18, 92:22, 93:8, 93:14, 93:15, 93:19, 93:20, 93:23, 94:6, 94:10, 94:13, 94:16, 94:17, 94:18, 94:20, 94:23, 94:24, 94:25, 95:1, 95:4, 95:5, 95:11, 95:15, 96:8, 97:20, 98:16, 99:2, 99:4, 99:5, 99:9, 99:10, 99:11, 100:17, 100:24, 104:6, 108:4, 108:12, 108:19, 108:24, 114:11, 114:22, 118:22, 118:25, 119:1, 119:15, 123:15, 123:18, 123:20, 124:5, 124:6, 126:6, 127:9, 130:7, 133:1, 138:11, 141:10, 141:15, 144:4, 153:18, 153:22, 153:24, 187:1
**remembered** [3] - 83:21, 94:3
**remembering** [6] - 84:8, 84:15, 84:21, 94:2, 106:24, 114:13
**remembers** [2] - 108:6, 108:23
**remind** [2] - 176:5, 176:14
**removed** [1] - 78:15
**renew** [2] - 9:24, 114:20
**rental** [2] - 137:11
**repeat** [3] - 84:13, 112:6, 123:17
**repeating** [1] - 126:19
**Rephrase** [1] - 91:13
**report** [1] - 20:18
**Reported** [1] - 1:23
**Reporter** [1] - 189:15
**REPORTER'S** [1] - 189:1
**reports** [3] - 20:16, 171:25, 172:13
**represent** [2] - 54:14, 126:17
**represented** [2] - 9:17, 9:18
**represents** [4] - 37:1, 54:15, 64:23, 146:7
**request** [4] - 14:10, 14:18, 16:24, 112:9
**requirement** [1] - 181:25

**requires** [1] - 109:10
**rereading** [1] - 181:7
**research** [2] - 26:24, 27:24
**reside** [1] - 147:7
**residence** [1] - 147:13
**residing** [4] - 56:9, 148:14, 150:12, 150:24
**residual** [1] - 185:22
**resolved** [2] - 11:13, 11:14
**respect** [15] - 2:14, 2:15, 3:19, 109:16, 109:23, 110:9, 110:10, 110:19, 110:20, 112:8, 113:12, 178:4, 181:2, 181:9, 185:19
**respective** [2] - 3:24, 103:5
**respond** [6] - 3:12, 14:19, 165:5, 168:13, 169:6, 170:22
**responded** [1] - 14:25
**responds** [1] - 168:20
**response** [1] - 159:22
**responsible** [1] - 149:9
**rest** [6] - 66:4, 124:24, 158:17, 163:11, 171:15, 177:3
**result** [1] - 184:10
**resume** [2] - 158:6, 176:13
**retire** [1] - 160:24
**retired** [2] - 164:17, 164:20
**Retired** [1] - 160:25
**returned** [1] - 161:5
**revealed** [1] - 3:23
**review** [3] - 127:6, 164:6, 164:7
**reviewed** [2] - 16:10, 127:11
**Reynolds** [10] - 25:25, 26:3, 26:4, 26:15, 27:4, 27:6, 27:16, 27:17, 158:17
**Reynolds's** [1] - 27:20
**RHODES** [64] - 24:9, 70:8, 70:18, 70:23, 78:3, 78:13, 79:3, 84:10, 84:18, 84:23, 85:23, 97:3, 97:8, 99:23, 100:1, 100:3, 100:11, 100:15, 100:21, 101:1, 101:5, 101:12, 101:21, 102:3, 102:7, 102:10, 104:19, 104:21, 105:2, 105:5, 105:7, 105:10, 105:12, 105:14, 105:25, 106:3, 106:5, 106:9, 106:18,

106:22, 107:5, 107:9, 107:12, 108:21, 109:2, 116:2, 116:6, 116:9, 116:13, 117:3, 117:8, 118:16, 118:19, 123:3, 124:10, 133:18, 133:22, 135:1, 157:7, 157:10, 161:22, 188:12, 188:13, 188:17

**Rhodes** [33] - 1:17, 11:16, 11:21, 24:8, 91:13, 99:21, 100:10, 100:20, 101:20, 104:25, 111:1, 111:8, 111:13, 112:7, 112:12, 112:18, 112:21, 112:23, 113:3, 116:14, 117:1, 117:2, 117:7, 118:9, 118:15, 126:18, 129:1, 131:9, 133:19, 133:20, 157:8, 179:1

**Rhodes's** [4] - 104:4, 113:5, 123:2, 132:23
**RICO** [1] - 6:10
**ridiculous** [1] - 111:10
**ring** [2] - 96:7, 119:3
**Road** [2] - 31:19, 152:14
**rob** [1] - 187:3
**Robert** [1] - 1:16
**robust** [1] - 115:12
**Rock** [2] - 48:25, 49:1
**Rodney** [1] - 159:20
**role** [2] - 23:9, 52:2
**romantic** [1] - 49:5
**room** [28] - 15:24, 27:6, 32:14, 32:15, 32:23, 35:22, 53:2, 53:7, 53:8, 57:5, 60:3, 60:4, 62:2, 62:3, 62:4, 62:5, 63:8, 122:19, 127:20, 132:9, 139:6, 139:7, 147:19, 147:22, 158:6
**Room** [1] - 1:24
**rooms** [1] - 127:22
**roughly** [1] - 95:3
**round** [1] - 10:3
**Roy** [4] - 158:16, 158:22, 160:9, 160:14
**ROY** [2] - 160:10, 188:18
**RPR** [1] - 1:24
**rubric** [1] - 111:4
**Rule** [5] - 113:13, 113:15, 178:2, 179:16, 185:20
**rule** [7] - 108:17, 111:3, 112:11, 113:14, 113:21, 183:18, 183:21
**ruling** [5] - 2:12, 3:16,

100:12, 103:18, 183:17
**run** [2] - 165:11, 165:14

# S

**S-11** [1] - 61:9
**S-12** [1] - 61:9
**S-14** [1] - 61:9
**S-H-A-M-I-E-R** [1] - 47:14
**S-H-A-N-N-O-N** [1] - 29:16
**sacrifices** [1] - 177:1
**sad** [1] - 82:11
**sanitized** [1] - 3:17
**sat** [1] - 16:6
**Satisfied** [1] - 29:1
**satisfied** [2] - 29:2, 103:20
**SAUSA** [1] - 21:15
**saw** [20] - 21:16, 57:4, 57:7, 73:16, 74:2, 91:24, 92:1, 92:24, 96:20, 108:3, 148:3, 148:5, 150:15, 150:18, 150:23, 151:1, 156:20, 156:22, 157:2, 171:11
**scene** [19] - 3:25, 162:1, 165:5, 165:7, 165:16, 166:2, 166:7, 166:17, 166:25, 167:1, 167:11, 168:4, 168:12, 169:24, 170:3, 170:18, 174:4, 174:5, 177:8
**schedule** [1] - 176:22
**scheduling** [2] - 115:18, 185:11
**school** [16] - 12:24, 48:2, 48:4, 58:12, 68:8, 69:18, 69:20, 71:16, 90:8, 135:25, 136:2, 149:1, 149:3, 149:6, 149:10
**School** [6] - 33:25, 39:5, 39:8, 48:7, 52:9, 52:12
**scope** [1] - 174:15
**Scope** [1] - 134:24
**screen** [6] - 58:24, 62:3, 71:18, 133:8, 140:11, 167:4
**scrupulously** [1] - 177:5
**SE-10** [2] - 61:13, 145:10
**SE-11** [3] - 54:2, 61:10, 145:4
**SE-12** [4] - 53:22, 54:2, 61:9, 145:4

**SE-14** [3] - 54:2, 61:10, 145:4
**SE-20** [1] - 140:12
**SE-4** [2] - 139:11, 140:2
**sealed** [1] - 169:13
**Seamon** [3] - 137:11, 137:25, 147:3
**search** [1] - 53:12
**searched** [4] - 139:9, 144:11, 144:15, 170:19
**Seasons** [4] - 143:4, 143:5, 143:10, 143:21
**seated** [7] - 29:14, 47:12, 57:25, 69:4, 135:10, 160:12, 164:12
**second** [7] - 25:15, 32:19, 33:15, 41:9, 62:8, 70:13, 121:21
**Secours** [3] - 166:12, 166:24, 170:23
**section** [1] - 73:24
**sedan** [1] - 92:7
**See** [3] - 7:8, 16:2, 187:18
**see** [56] - 8:6, 9:2, 14:12, 17:15, 17:20, 18:14, 21:3, 22:4, 22:6, 23:17, 23:23, 27:11, 31:17, 32:25, 33:10, 36:12, 48:16, 51:20, 64:25, 65:1, 71:18, 72:22, 81:19, 82:18, 83:1, 91:25, 92:14, 101:3, 104:10, 108:23, 109:20, 116:7, 121:17, 123:25, 124:20, 124:24, 128:14, 136:18, 136:24, 139:12, 139:23, 140:12, 142:15, 143:5, 143:18, 149:19, 151:18, 157:23, 158:1, 158:22, 167:5, 168:5, 168:6, 177:13
**seeing** [6] - 49:9, 73:10, 73:14, 83:10, 91:17, 153:4
**seem** [2] - 17:2, 82:11
**sees** [1] - 103:13
**seizures** [4] - 56:12, 56:17, 68:12, 68:17
**sell** [6] - 141:17, 141:19, 141:21, 141:25, 142:8, 142:10
**selling** [3] - 98:2, 142:10, 157:13
**semiautomatic** [1] - 145:1
**sense** [4] - 40:15, 66:11, 102:23, 111:17
**sensible** [1] - 111:14
**sent** [4] - 14:2, 26:18,

173:8, 178:24
**separate** [1] - 9:16
**separately** [3] - 21:4, 171:15, 186:20
**September** [1] - 18:19
**sequence** [1] - 26:3
**Sergeant** [2] - 18:20, 21:24
**services** [1] - 92:12
**session** [7] - 17:1, 175:2, 175:4, 175:25, 176:3, 176:7, 186:3
**sessions** [1] - 13:19, 14:3, 14:16, 15:2, 16:19, 16:20, 20:24, 21:1, 22:13, 23:15, 186:1
**set** [1] - 116:16
**setting** [1] - 2:17
**settled** [1] - 175:17
**Seven** [2] - 65:24, 79:10
**seven** [9] - 72:16, 90:11, 167:24, 169:20, 172:6, 173:4, 173:7, 177:3, 184:13
**several** [11] - 4:1, 11:14, 18:12, 20:14, 22:15, 88:22, 89:4, 95:25, 112:22, 151:15, 177:25
**Several** [1] - 105:2
**Shabazz** [1] - 105:16
**Shake** [3] - 51:9, 142:17, 154:23
**shaking** [1] - 28:20
**SHAMIER** [2] - 47:10, 188:7
**Shamier** [11] - 35:17, 36:4, 36:6, 37:2, 47:9, 47:14, 62:16, 62:17, 63:14, 67:15
**Shannon** [5] - 12:6, 29:9, 29:16, 62:16, 63:12
**SHANNON** [2] - 29:12, 188:3
**Shari** [3] - 137:21, 137:22, 139:20
**Sharmika** [1] - 31:5
**SHAWN** [1] - 1:8
**Shawn** [5] - 41:14, 43:21, 56:2, 67:2, 154:10
**Sheistyville** [2] - 51:9, 142:17
**shell** [7] - 166:3, 169:15, 169:20, 170:3, 172:7, 172:12, 173:3
**SHELLY** [1] - 1:8
**Shelly** [4] - 41:12, 56:6, 66:25, 126:18
**Shelton** [37] - 30:7, 32:12, 33:19, 33:24, 34:9, 34:14, 35:4, 37:1,

37:10, 43:4, 48:14, 48:22, 52:3, 52:8, 52:11, 53:11, 53:15, 54:15, 54:18, 56:1, 59:25, 62:5, 62:25, 136:11, 138:7, 140:18, 140:19, 141:19, 144:19, 144:21, 146:7, 146:10, 146:13, 147:7, 154:18, 154:19, 157:25
**SHELTON** [1] - 1:7
**Shelton's** [9] - 32:14, 32:23, 36:10, 53:8, 53:18, 55:19, 60:2, 62:3, 63:8
**shirt** [6] - 48:19, 48:20, 136:15, 136:16, 137:1, 137:3
**Shit** [4] - 141:12, 141:13, 141:24, 142:5
**shooter** [1] - 174:14
**shooters** [1] - 174:8
**shooting** [20] - 2:6, 2:19, 2:25, 3:18, 4:3, 4:4, 4:5, 4:9, 4:16, 5:13, 5:18, 6:1, 7:24, 19:1, 28:12, 168:8, 168:9, 171:1, 172:15, 174:6
**shootings** [2] - 6:16, 18:23
**short** [3] - 53:19, 57:14, 57:16
**shortly** [5] - 16:18, 86:9, 122:1, 127:1, 167:14
**shot** [7] - 2:21, 8:12, 84:1, 166:6, 166:23, 167:22
**show** [20] - 3:18, 3:21, 6:12, 12:14, 30:16, 31:12, 32:4, 50:21, 52:2, 59:10, 108:13, 110:17, 137:22, 139:11, 140:1, 140:13, 143:7, 145:3, 167:3, 168:15
**showed** [8] - 10:14, 28:22, 53:21, 107:25, 125:9, 133:1, 133:10, 181:4
**showing** [4] - 54:3, 126:7, 133:8, 145:10
**Showing** [3] - 61:13, 71:17, 72:7
**shown** [2] - 5:25, 132:23
**shows** [3] - 7:4, 32:6, 50:18
**sic** [1] - 3:25
**sick** [2] - 56:8, 56:22
**side** [3] - 33:13, 78:9, 111:16

**sides** [1] - 179:4
**sidewalk** [2] - 165:21, 165:23
**sign** [3] - 132:24, 133:13
**signal** [1] - 24:11
**signature** [1] - 189:10
**signed** [2] - 20:16, 134:6
**significance** [1] - 173:12
**significant** [2] - 26:1, 186:12
**signing** [1] - 126:10
**silver** [1] - 33:3
**similar** [1] - 113:23
**simply** [7] - 10:6, 26:8, 26:9, 103:11, 164:3, 171:16, 179:18
**sing** [2] - 51:4, 60:17
**single** [5] - 34:10, 34:11, 40:12, 40:13, 87:20
**sister** [7] - 31:3, 32:12, 44:17, 74:16, 76:14, 122:17, 127:19
**sister's** [1] - 31:4
**sisters** [1] - 181:2
**sit** [3] - 26:23, 80:15, 128:23
**Sitting** [2] - 51:23, 73:3
**sitting** [4] - 15:21, 83:19, 107:24, 173:11
**situation** [3] - 27:2, 179:10, 179:22
**six** [8] - 12:25, 13:2, 72:16, 90:11, 133:2, 161:2, 177:2, 183:1
**Six** [2] - 128:12, 163:10
**sixth** [1] - 25:14
**sleep** [1] - 138:25
**slept** [1] - 139:1
**slightly** [1] - 167:25
**Slo** [5] - 43:16, 153:13, 154:2, 154:3, 154:20
**small** [2] - 145:20, 167:23
**Smith** [1] - 180:24
**socialize** [1] - 73:1
**sold** [4] - 98:5, 141:24, 142:5, 187:8
**solid** [1] - 167:22
**someone** [6] - 137:17, 138:3, 150:11, 157:21, 169:17
**sometime** [3] - 19:7, 35:12, 55:1
**Sometime** [1] - 89:20
**sometimes** [12] - 34:12, 39:14, 46:6, 50:20,

60:18, 68:12, 141:17, 147:18, 147:22, 149:23, 149:25, 157:16
**Sometimes** [2] - 13:1, 173:6
**somewhat** [1] - 141:17
**somewhere** [4] - 89:13, 93:9, 99:11, 171:10
**son** [18] - 50:8, 50:9, 59:21, 60:14, 60:17, 60:22, 61:3, 61:10, 64:23, 66:14, 66:17, 67:23, 68:12, 68:15, 147:5, 148:25, 149:5, 149:10
**son's** [3] - 59:24, 60:15, 66:7
**song** [1] - 153:5
**songs** [1] - 144:6
**sooner** [1] - 184:5
**sorry** [22] - 15:4, 17:9, 17:15, 28:19, 30:19, 32:3, 40:1, 50:11, 61:15, 67:25, 71:11, 90:10, 104:12, 104:20, 106:18, 108:22, 122:23, 133:19, 133:20, 146:5, 169:7, 179:25
**Sorry** [5] - 68:5, 68:6, 124:17, 157:8, 158:2
**sort** [12] - 9:15, 13:17, 17:19, 18:5, 26:5, 26:18, 69:25, 92:8, 110:5, 175:12, 177:8, 183:1
**sought** [1] - 26:15
**soulless** [1] - 24:2
**sound** [11] - 11:5, 38:14, 73:6, 76:10, 86:6, 86:13, 95:13, 95:17, 95:20, 122:12, 128:9
**sounded** [1] - 122:13
**source** [1] - 178:17
**south** [2] - 165:22, 165:23
**speaking** [2] - 125:6, 177:23
**spec** [1] - 111:21
**specific** [3] - 3:15, 104:22, 184:1
**specifically** [7] - 15:8, 18:6, 103:19, 180:11, 186:12, 186:22, 187:2
**specifics** [1] - 54:17
**Spell** [1] - 58:4
**spell** [8] - 29:15, 47:13, 58:1, 69:5, 135:11, 135:14, 160:13, 164:13
**spelled** [1] - 76:8
**Spence** [8] - 3:23, 4:2, 17:5, 17:11, 18:1, 18:10,

172:18, 187:4
**Spence's** [1] - 18:3
**spend** [1] - 161:9
**split** [1] - 173:9
**spoken** [3] - 7:13, 69:24, 112:11
**Sports** [11] - 2:21, 3:3, 4:12, 4:16, 5:19, 6:2, 7:7, 8:14, 9:1, 28:5, 28:6
**stand** [12] - 18:5, 29:10, 100:10, 101:17, 116:1, 158:5, 164:9, 175:24, 182:11, 183:5, 183:10, 184:17
**standing** [3] - 7:10, 109:7, 166:17
**Standing** [1] - 79:3
**stands** [1] - 103:22
**start** [9] - 70:10, 126:24, 159:16, 175:4, 175:8, 175:13, 175:18, 176:5, 177:13
**started** [6] - 42:4, 54:20, 54:22, 54:25, 119:11, 161:2
**starting** [1] - 39:16
**State** [9] - 29:15, 47:13, 58:1, 69:5, 135:11, 160:13, 161:3, 161:9, 164:13
**state** [4] - 82:11, 106:16, 106:17, 119:17
**statement** [21] - 10:14, 11:17, 18:7, 85:16, 100:12, 102:4, 102:5, 109:12, 118:21, 119:6, 128:12, 131:8, 178:8, 178:13, 178:16, 178:19, 178:21, 179:15, 179:21, 181:3, 181:14
**statements** [10] - 2:15, 13:21, 26:16, 85:12, 100:7, 107:7, 131:2, 178:3, 182:10, 183:22
**STATES** [2] - 1:1, 1:5
**States** [8] - 29:9, 57:21, 68:25, 135:7, 160:9, 163:19
**station** [4] - 91:4, 125:20, 144:3, 162:3
**stay** [4] - 33:24, 56:20, 138:9, 148:22
**stayed** [3] - 138:11, 166:20, 166:22
**staying** [1] - 140:19
**stenographically** [1] - 189:4
**step** [1] - 112:13
**stepped** [1] - 11:21
**steps** [1] - 32:15

**stereotypes** [1] - 13:5
**still** [18] - 2:2, 11:18, 21:7, 21:14, 24:10, 28:22, 62:2, 71:3, 80:4, 99:9, 101:21, 108:2, 109:20, 125:19, 129:13, 132:6, 154:6
**stipulate** [5] - 104:24, 109:14, 110:21, 158:22, 159:1
**stipulated** [1] - 179:9
**stipulation** [2] - 109:10, 180:13
**stipulations** [1] - 109:9
**stopped** [4] - 38:5, 38:19, 49:9, 94:2
**store** [2] - 31:18, 150:4
**stored** [4] - 150:1, 171:15, 171:18, 172:10
**storing** [1] - 150:12
**strange** [1] - 18:15
**Street** [18] - 1:25, 32:2, 32:7, 34:2, 35:14, 37:4, 42:16, 42:23, 44:18, 49:22, 52:5, 52:18, 59:8, 59:14, 59:20, 60:2, 62:2, 63:17
**street** [8] - 4:3, 4:4, 17:5, 17:13, 17:22, 31:17, 50:24, 143:11
**streets** [1] - 93:7
**stricken** [1] - 110:8
**strike** [2] - 110:3, 110:4
**strip** [1] - 31:24
**striped** [1] - 48:20
**strong** [1] - 27:18
**strongly** [1] - 176:9
**struck** [1] - 182:10
**struggling** [1] - 102:16
**studio** [11] - 34:4, 34:6, 34:7, 41:3, 45:23, 46:1, 46:3, 46:5, 151:15, 152:11, 153:2
**studios** [4] - 151:10, 153:9, 154:1
**stuff** [11] - 34:4, 94:2, 101:4, 109:16, 109:18, 112:23, 139:2, 145:20, 150:4, 169:3, 171:14
**sub** [1] - 110:23
**subject** [3] - 85:20, 103:10, 114:6
**submit** [2] - 159:4, 172:8
**submitted** [5] - 168:10, 168:25, 169:3, 171:22, 185:2
**substance** [1] - 2:16
**substantial** [2] - 7:9, 186:3

**substantially** [1] - 14:13
**substantive** [17] - 81:17, 81:22, 101:23, 103:21, 107:7, 109:4, 109:13, 110:23, 179:16, 179:19, 180:6, 180:8, 182:3, 183:8, 186:19, 187:13, 187:15
**substantively** [2] - 112:24, 186:22
**succeed** [1] - 144:1
**suffered** [2] - 56:11, 166:11
**suffering** [1] - 165:25
**sufficient** [1] - 182:23
**sufficiently** [1] - 22:13
**suggest** [1] - 18:13
**suggesting** [4] - 5:16, 5:18, 5:24, 7:10
**suggestion** [1] - 26:14
**suitable** [4] - 162:23, 162:25, 163:8, 163:13
**Sunday** [1] - 91:8
**Sundays** [1] - 98:17
**supported** [1] - 110:2
**supports** [1] - 6:21
**suppose** [1] - 169:18
**supposed** [1] - 122:13
**supposedly** [2] - 19:9, 19:20
**surely** [1] - 7:10
**surprised** [1] - 26:13
**surrounded** [1] - 165:24
**surveil** [1] - 17:13
**surveilling** [1] - 17:22
**surviving** [1] - 174:5
**suspected** [3] - 112:12, 148:8, 149:6
**Suspected** [1] - 148:11
**suspects** [2] - 10:4, 166:18
**suspenders** [1] - 20:9
**sustain** [3] - 156:2, 156:14, 182:4
**Sustained** [7] - 120:17, 120:24, 121:2, 121:10, 130:24, 134:25, 155:22
**sustaining** [1] - 106:15
**swearing** [1] - 134:17
**sweeps** [1] - 16:13
**swore** [1] - 75:15
**SWORN** [7] - 29:12, 47:10, 57:23, 69:2, 135:8, 160:10, 164:10
**sworn** [5] - 79:22, 85:12, 102:20, 103:6, 164:9

# T

**talent** [2] - 50:18, 50:21
**tape** [9] - 16:20, 20:25, 21:1, 116:4, 116:5, 116:10, 171:12, 186:21, 186:23
**taped** [2] - 185:21, 186:2
**Tasha** [1] - 89:12
**taxi** [1] - 148:25
**Taylor** [3] - 38:23, 49:18, 49:19
**Taylor's** [2] - 50:8, 53:5
**team** [1] - 27:7
**tear** [1] - 161:6
**technician** [4] - 169:17, 169:24, 170:3, 173:7
**technicians** [3] - 162:2, 162:6, 167:1
**telephone** [14] - 4:12, 4:13, 4:15, 4:20, 4:22, 5:8, 8:4, 8:25, 11:4, 25:6, 28:24, 80:1, 109:6, 131:19
**temporarily** [1] - 150:12
**Ten** [2] - 75:4, 76:5
**ten** [5] - 54:16, 88:6, 88:9, 96:13, 166:3
**tend** [1] - 68:13
**tends** [1] - 167:23
**Tenth** [1] - 136:1
**term** [1] - 3:17
**terms** [5] - 6:10, 13:18, 14:15, 86:25, 127:21
**testified** [23] - 11:17, 18:5, 19:16, 19:17, 20:19, 20:22, 37:2, 37:6, 38:25, 39:21, 40:2, 54:18, 55:10, 55:16, 80:13, 84:11, 86:2, 100:9, 111:12, 120:5, 131:18, 146:10, 177:9
**testifies** [4] - 2:10, 19:8, 178:20, 179:11
**testify** [19] - 2:6, 2:10, 2:13, 2:18, 8:4, 11:23, 12:13, 12:17, 12:18, 19:14, 22:8, 22:10, 54:19, 70:15, 84:20, 84:22, 104:3, 172:20, 174:24
**testifying** [14] - 4:13, 7:17, 7:20, 22:22, 75:12, 78:16, 81:8, 81:21, 84:3, 84:7, 84:14, 86:2, 153:18, 158:23
**testimony** [61] - 2:17, 3:5, 10:21, 12:12, 16:19,

18:9, 23:17, 23:21, 24:2, 27:18, 27:20, 28:24, 74:23, 80:5, 80:8, 81:16, 81:18, 81:22, 85:1, 104:8, 104:11, 104:14, 106:10, 106:11, 107:23, 109:5, 110:4, 110:7, 110:23, 111:23, 111:25, 113:14, 118:10, 118:13, 118:18, 129:11, 129:24, 131:21, 132:1, 134:21, 163:22, 164:2, 169:12, 177:24, 178:2, 178:9, 178:14, 179:3, 179:7, 179:11, 179:13, 179:14, 181:8, 181:10, 181:12, 182:3, 184:18, 185:19, 185:23, 187:5
**Thanksgiving** [2] - 176:23, 176:24
**THE** [389] - 1:1, 1:2, 2:2, 2:7, 3:8, 3:11, 3:14, 4:9, 4:17, 4:21, 5:3, 5:7, 5:11, 5:23, 6:4, 6:6, 6:22, 7:7, 7:16, 7:21, 7:23, 8:6, 9:2, 9:6, 9:8, 9:10, 9:13, 9:22, 10:9, 10:22, 10:25, 11:3, 11:10, 11:12, 11:18, 11:25, 12:3, 12:8, 12:16, 12:22, 13:2, 13:4, 13:9, 13:14, 14:7, 14:18, 14:22, 15:4, 15:7, 15:12, 15:23, 16:1, 16:13, 17:9, 17:15, 17:18, 18:8, 18:25, 19:12, 19:14, 19:16, 19:18, 19:24, 20:3, 20:6, 20:12, 20:20, 20:23, 21:3, 21:6, 21:9, 21:12, 21:16, 21:21, 22:1, 22:6, 22:9, 22:12, 22:16, 22:24, 23:7, 24:10, 24:13, 24:14, 24:16, 24:18, 24:21, 25:2, 25:4, 25:8, 25:12, 25:15, 25:18, 25:22, 26:8, 26:20, 27:11, 27:15, 27:25, 28:2, 28:7, 28:11, 28:14, 28:16, 28:19, 28:25, 29:3, 29:5, 29:10, 29:13, 29:14, 29:16, 33:7, 33:18, 34:20, 34:22, 34:23, 34:24, 34:25, 35:1, 36:20, 39:25, 41:19, 46:12, 46:17, 46:20, 47:7, 47:11, 47:12, 47:14, 48:9, 48:10, 48:23, 52:1, 54:1, 57:11, 57:12, 57:13, 57:16, 57:18, 57:24, 57:25,

58:2, 58:4, 58:5, 60:21, 60:25, 61:1, 61:7, 61:15, 61:17, 61:23, 67:25, 68:2, 68:3, 68:22, 68:23, 69:3, 69:4, 69:6, 70:9, 70:19, 70:24, 71:11, 74:21, 78:4, 78:6, 78:17, 78:20, 78:21, 79:4, 80:9, 80:11, 80:12, 80:14, 80:15, 80:17, 80:18, 80:20, 80:21, 80:24, 80:25, 81:2, 81:4, 81:8, 81:10, 81:11, 81:12, 81:13, 81:15, 82:2, 82:5, 84:6, 84:12, 84:19, 84:24, 85:5, 85:7, 85:11, 85:13, 85:19, 85:21, 91:13, 96:25, 97:6, 99:21, 99:25, 100:2, 100:5, 100:14, 100:19, 100:23, 101:2, 101:7, 101:9, 101:13, 101:20, 102:2, 102:5, 102:8, 102:13, 103:17, 104:4, 104:13, 104:16, 104:20, 104:22, 105:4, 105:6, 105:9, 105:11, 105:13, 105:23, 106:2, 106:4, 106:8, 106:14, 106:20, 107:3, 107:6, 107:10, 107:19, 108:22, 109:3, 109:20, 110:12, 110:15, 111:1, 111:7, 112:5, 113:9, 113:25, 114:4, 114:24, 115:2, 115:4, 115:10, 115:15, 115:21, 115:25, 116:5, 116:8, 116:12, 116:14, 116:18, 116:20, 117:1, 117:4, 117:6, 117:9, 117:13, 117:15, 117:17, 117:20, 117:24, 118:1, 118:3, 118:6, 118:8, 118:17, 120:17, 120:24, 121:2, 121:10, 122:6, 122:23, 122:25, 123:1, 123:8, 124:4, 124:6, 124:7, 124:8, 124:9, 124:23, 130:10, 130:24, 132:17, 132:19, 133:16, 133:19, 134:25, 135:2, 135:9, 135:10, 135:12, 135:14, 135:15, 136:4, 136:5, 136:6, 137:6, 143:17, 143:22, 148:12, 148:21, 150:9, 150:11, 151:23, 152:1, 152:4, 155:22, 155:24, 156:2, 156:4, 156:14, 156:16, 157:1, 157:6, 157:8, 157:20, 157:21, 157:23, 157:24,

158:1, 158:14, 158:20, 159:3, 159:6, 159:9, 159:13, 159:21, 160:2, 160:6, 160:11, 160:12, 160:14, 161:21, 161:23, 163:16, 163:17, 163:18, 163:21, 164:11, 164:12, 164:14, 169:7, 169:11, 170:21, 174:11, 174:16, 174:18, 174:21, 177:21, 178:11, 178:16, 179:24, 180:1, 180:3, 180:17, 180:21, 181:24, 182:7, 182:17, 182:24, 183:11, 184:3, 184:8, 184:16, 184:21, 185:16, 186:1, 186:7, 186:9, 186:16, 186:24, 187:11, 187:15, 187:18
**them0** [1] - 14:11
**themselves** [1] - 18:11
**theory** [2] - 85:5, 85:10
**Thereafter** [1] - 111:8
**thereby** [1] - 178:20
**they've** [2] - 10:15, 111:9
**They've** [1] - 111:9
**thinking** [1] - 27:7
**thinks** [2] - 155:25, 183:3
**third** [5] - 3:2, 8:11, 8:13, 8:25, 10:2
**Thomas** [1] - 1:20
**thoroughly** [5] - 23:10, 23:11, 23:20, 26:24
**thousand** [1] - 187:9
**three** [30] - 9:18, 13:3, 17:21, 19:11, 19:20, 65:21, 87:15, 88:11, 88:23, 105:16, 111:21, 126:2, 138:19, 147:5, 148:25, 156:21, 167:3, 167:8, 167:9, 168:6, 169:10, 169:15, 170:18, 173:3, 175:21, 176:2, 176:5, 177:25, 180:19, 181:5
**Three** [3] - 65:22, 123:21, 163:12
**three-year-old** [2] - 147:5, 148:25
**threw** [1] - 44:23
**throw** [2] - 8:16, 45:4
**Thursday** [3] - 176:6, 176:10, 185:8
**tied** [1] - 19:2
**timely** [1] - 185:23
**timing** [1] - 105:7
**titles** [1] - 141:8
**TM** [5] - 153:11, 154:2,

154:3, 154:18, 154:20
**today** [39] - 2:10, 7:14, 7:17, 7:20, 8:8, 25:6, 27:16, 33:10, 36:19, 40:2, 69:25, 70:5, 73:3, 75:22, 76:1, 80:15, 83:19, 84:3, 84:7, 84:15, 100:17, 120:8, 128:21, 128:23, 129:12, 131:21, 133:6, 134:12, 134:15, 136:24, 172:24, 173:11, 175:2, 177:18, 178:14, 178:25
**together** [11] - 40:16, 40:19, 55:22, 87:15, 127:20, 130:22, 131:1, 146:21, 153:5, 162:7, 183:4
**toll** [4] - 4:13, 4:20, 4:22, 5:8
**tomorrow** [1] - 22:5
**Tonya** [4] - 3:23, 3:25, 4:2, 172:18
**Took** [1] - 28:14
**took** [4] - 65:11, 160:23, 166:22, 166:23
**top** [3] - 128:14, 133:12, 183:25
**torso** [1] - 166:1
**totality** [1] - 24:5
**totally** [2] - 81:6, 115:5
**touch** [2] - 28:6, 115:14
**Touhy** [1] - 22:21
**toward** [6] - 29:14, 47:12, 57:25, 135:10, 160:12, 164:12
**towards** [1] - 123:22
**town** [4] - 30:13, 73:22, 119:21, 143:12
**townhomes** [1] - 59:15
**track** [1] - 18:10
**traffic** [1] - 31:18
**transcribed** [1] - 189:7
**transcript** [64] - 75:2, 75:4, 76:6, 76:9, 76:15, 76:17, 78:15, 79:9, 79:11, 79:12, 79:16, 79:22, 80:5, 80:9, 80:22, 81:4, 82:8, 85:3, 91:12, 100:14, 101:22, 101:25, 102:2, 102:3, 102:20, 102:21, 103:1, 103:2, 103:6, 103:21, 108:1, 108:4, 111:15, 111:22, 111:25, 112:23, 113:1, 113:20, 116:8, 116:12, 116:24, 118:14, 121:14, 123:22, 124:17, 125:24, 127:6, 127:11, 134:22, 136:20, 178:12, 178:17,

178:23, 179:4, 179:5, 179:6, 179:12, 179:14, 180:12, 181:1, 181:4, 185:21, 189:7
**Transcript** [1] - 154:3
**transcripts** [11] - 21:2, 21:4, 21:10, 21:11, 22:18, 109:24, 178:1, 178:5, 178:7, 180:25, 181:14
**transported** [1] - 166:12
**treat** [1] - 182:3
**treatment** [1] - 85:2
**trial** [7] - 4:14, 20:20, 23:9, 81:18, 109:18, 114:16, 183:1
**tried** [1] - 109:9
**trouble** [1] - 9:14
**true** [5] - 10:25, 17:20, 80:16, 80:19, 147:14
**truly** [1] - 175:2
**truth** [22] - 75:16, 87:6, 89:16, 103:7, 103:11, 106:20, 108:25, 120:1, 120:3, 125:2, 134:13, 134:18, 179:16, 179:22, 180:7, 180:12, 181:21, 183:23, 184:18, 185:22, 186:6, 186:14
**truthful** [2] - 75:19, 102:25
**try** [6] - 8:19, 71:7, 126:19, 142:1, 156:10, 171:20
**trying** [28] - 4:21, 5:4, 5:11, 7:2, 10:6, 23:18, 39:18, 43:7, 55:24, 66:11, 80:4, 81:23, 102:24, 114:25, 115:2, 115:5, 129:13, 132:6, 142:10, 142:23, 143:24, 151:12, 152:8, 152:12, 154:20, 154:22
**Tuesday** [5] - 159:14, 159:16, 159:19, 175:7, 176:4
**turn** [4] - 27:21, 75:2, 79:9, 121:16
**turned** [6] - 16:3, 16:6, 20:18, 20:21, 21:2, 21:3
**Twelfth** [3] - 58:13, 58:14, 69:19
**twelve** [1] - 42:9
**Twenty** [1] - 117:14
**twice** [3] - 88:11, 144:2, 144:8
**twins** [1] - 43:13
**two** [29] - 3:24, 9:17, 10:7, 17:21, 19:3, 37:12,

37:17, 43:13, 57:18, 66:21, 72:14, 88:11, 90:5, 91:10, 91:15, 101:3, 101:24, 103:13, 103:23, 111:15, 141:15, 142:9, 166:18, 166:19, 166:21, 181:17, 182:10, 182:15, 185:17
**Two** [6] - 59:23, 166:19, 166:20, 174:9, 174:12
**type** [3] - 3:6, 148:9, 149:7
**types** [1] - 136:19
**typically** [1] - 168:19

## U

**U.S** [2] - 1:24, 27:22
**ultimately** [4] - 2:25, 45:8, 102:18, 103:4
**um-hum** [2] - 99:8, 154:4
**Um-hum** [7] - 38:3, 39:15, 39:23, 48:8, 72:21, 74:5, 122:25
**Um-um** [2] - 61:14, 67:10
**unavailable** [2] - 113:13, 171:19
**uncertain** [1] - 169:12
**uncharged** [2] - 4:5, 6:16
**unclear** [1] - 110:6
**under** [23] - 27:12, 75:15, 99:16, 100:7, 100:9, 102:5, 103:7, 104:9, 109:19, 111:3, 111:4, 112:10, 113:13, 113:15, 134:15, 134:17, 142:23, 169:25, 178:2, 179:16, 185:20, 185:22, 186:4
**underlying** [2] - 2:16, 102:21
**undermines** [2] - 106:10, 107:12
**underneath** [2] - 139:22, 139:24, 166:4
**understood** [7] - 9:22, 43:9, 55:19, 55:21, 56:11, 56:20, 66:7, 66:9, 75:18, 151:6, 151:9
**Understood** [1] - 79:21
**undertake** [1] - 162:10
**unexpected** [2] - 56:18, 68:18
**unfair** [1] - 114:18
**unfairly** [1] - 8:20
**unfamiliar** [1] - 67:5

**Unfamiliar** [1] - 67:9
**unfortunately** [3] - 63:16, 68:11, 68:15
**unhappy** [1] - 83:14
**unidentified** [1] - 163:14
**unique** [1] - 180:10
**uniquely** [1] - 23:8
**Unit** [3] - 160:24, 165:2, 171:5
**unit** [2] - 164:25, 172:8
**UNITED** [2] - 1:1, 1:5
**United** [6] - 29:9, 57:21, 68:25, 135:6, 160:8, 163:19
**unless** [3] - 2:19, 18:16, 182:4
**Unless** [2] - 9:11, 113:23
**unlike** [1] - 178:3
**unobjected** [1] - 179:9
**unobjected-to** [1] - 179:9
**up** [69] - 2:17, 4:9, 5:5, 5:9, 9:9, 10:3, 10:7, 17:19, 19:4, 25:6, 25:8, 28:9, 28:22, 30:13, 32:15, 34:4, 34:9, 40:22, 41:24, 45:15, 45:20, 48:12, 49:25, 50:5, 55:5, 55:9, 55:10, 58:19, 58:24, 67:22, 69:13, 69:15, 69:16, 78:17, 78:18, 79:8, 82:17, 89:13, 91:8, 111:6, 112:11, 115:22, 116:4, 125:5, 125:9, 133:8, 133:23, 136:19, 138:18, 145:15, 146:19, 149:18, 153:9, 154:1, 154:7, 154:8, 156:8, 167:23, 171:6, 173:9, 177:9, 180:23, 182:11, 182:20, 184:4, 184:5, 184:9, 187:12
**Upstairs** [1] - 53:2
**upstairs** [2] - 59:3, 149:19
**urging** [1] - 182:2
**USA** [1] - 189:4
**useful** [1] - 185:9
**uses** [1] - 164:2
**usual** [1] - 10:4

## V

**vaguely** [1] - 183:2
**validated** [1] - 108:1
**value** [5] - 180:7, 180:8,

181:21, 186:6, 186:13
**variety** [1] - 109:25
**various** [2] - 54:17, 161:13
**vein** [1] - 23:23
**verbatim** [1] - 14:13
**version** [1] - 18:13
**victim** [5] - 166:10, 167:12, 168:24, 171:1, 173:21
**victim's** [1] - 169:25
**victims** [1] - 162:10
**view** [3] - 13:24, 14:15, 159:13
**views** [1] - 155:19
**violation** [2] - 26:10, 27:22
**visit** [2] - 146:19, 177:8
**visited** [1] - 38:2
**visiting** [3] - 36:16, 37:25, 67:20
**voice** [1] - 116:6
**voir** [2] - 27:17, 159:4
**VOLUME** [1] - 1:11
**vote** [3] - 175:14, 175:15, 175:23

## W

**W-37B** [1] - 133:9
**wagon** [3] - 91:4, 125:20, 162:3
**wait** [5] - 9:6, 67:25, 100:19, 102:12, 175:20
**Wait** [3] - 28:11, 105:23
**waited** [1] - 184:12
**waiting** [8] - 2:2, 13:10, 16:15, 24:10, 25:13, 25:23, 159:25, 183:1
**walk** [5] - 149:2, 149:3, 149:5, 149:14, 149:16
**walked** [1] - 60:4
**walking** [1] - 149:9
**walks** [1] - 27:7
**wall** [1] - 8:16
**wants** [7] - 22:3, 113:16, 113:20, 116:23, 151:25, 183:8, 185:2
**warehouse** [3] - 171:10, 171:14, 171:18
**wash** [1] - 184:19
**wasting** [1] - 9:4
**water** [4] - 69:9, 101:7, 145:21, 145:22
**WAYNE** [1] - 1:8
**Wayne** [4] - 41:12, 56:6, 66:25, 126:18
**ways** [1] - 102:1
**weapon** [1] - 150:21

**weapons** [2] - 3:20, 3:24
**wearing** [3] - 48:19, 136:15, 137:2
**Weaze** [4] - 61:20, 61:24, 145:11, 145:17
**Wednesday** [2] - 1:11, 176:6
**week** [20] - 27:16, 86:14, 90:14, 90:16, 90:20, 96:13, 96:14, 96:15, 97:24, 98:2, 159:10, 171:20, 176:7, 176:8, 176:10, 176:13, 176:20, 177:2, 177:4, 185:18
**weekend** [3] - 177:11, 184:24, 185:24
**weeks** [4] - 4:1, 18:12, 64:12, 71:5, 177:2, 177:24, 183:1, 184:13
**welcome** [1] - 36:20, 44:2, 52:9, 57:12, 68:22, 132:17
**Welsh** [21] - 2:5, 7:17, 7:19, 7:20, 7:21, 8:6, 11:9, 25:3, 25:4, 25:5, 25:6, 25:9, 25:10, 25:12, 28:22, 158:16, 163:20, 164:14, 164:17, 173:2
**WELSH** [2] - 164:10, 188:19
**West** [6] - 1:25, 93:23, 105:20, 106:4, 165:8, 165:14
**west** [1] - 165:14
**whatsoever** [3] - 107:20, 174:23, 177:8
**Whereof** [1] - 189:9
**white** [7] - 48:20, 90:1, 90:24, 91:4, 130:16, 136:16, 162:2
**whole** [16] - 10:4, 25:5, 25:24, 42:9, 42:10, 42:13, 82:14, 82:16, 88:17, 94:10, 107:13, 109:3, 140:21, 146:11, 155:16
**wife** [3] - 89:12, 98:8, 175:12
**Williams** [21] - 31:7, 53:15, 53:17, 57:22, 58:2, 58:8, 58:17, 61:4, 61:11, 62:3, 63:9, 64:20, 65:2, 65:13, 66:6, 66:24, 67:11, 67:25, 68:7, 68:21, 68:23
**WILLIAMS** [2] - 57:23, 188:9
**WILLIE** [1] - 1:7

**Willie** [4] - 33:17, 51:25, 136:22, 189:4

**willing** [2] - 24:1, 104:24

**wiped** [1] - 81:6

**wish** [3] - 111:21, 159:13, 176:18

**withdraw** [2] - 99:22, 100:3

**withdrawal** [2] - 111:5, 113:6

**withdrawn** [3] - 100:6, 100:10, 103:19

**withdrew** [2] - 112:7, 113:3

**Witness** [1] - 189:9

**witness** [58] - 8:7, 9:9, 11:15, 11:17, 11:22, 12:16, 13:18, 13:25, 29:7, 33:16, 47:8, 48:21, 51:24, 53:25, 60:20, 74:20, 78:15, 81:16, 81:19, 81:20, 81:23, 82:4, 85:2, 99:25, 100:9, 102:23, 107:23, 111:11, 112:1, 112:10, 112:11, 113:12, 114:22, 115:19, 115:20, 117:1, 118:3, 135:3, 137:4, 143:19, 155:24, 158:24, 160:7, 161:23, 163:22, 163:24, 163:25, 178:4, 178:18, 178:19, 178:23, 179:2, 179:10, 183:4, 183:10, 184:6, 184:14

**WITNESS** [58] - 29:12, 29:13, 29:16, 34:22, 34:24, 35:1, 36:20, 47:10, 47:11, 47:14, 48:10, 57:12, 57:23, 57:24, 58:2, 58:5, 61:1, 68:2, 68:22, 69:2, 69:3, 69:6, 78:20, 80:11, 80:14, 80:17, 80:20, 80:24, 81:2, 81:8, 81:11, 81:13, 122:25, 124:6, 124:8, 132:17, 135:8, 135:9, 135:12, 135:15, 136:5, 157:21, 157:24, 160:10, 160:11, 160:14, 163:17, 164:10, 164:11, 164:14, 174:18, 188:3, 188:7, 188:9, 188:11, 188:14, 188:18, 188:19

**witness'** [5] - 107:20, 111:25, 178:8, 179:6, 184:18

**witnessed** [3] - 93:4, 98:6, 151:20

**witnesses** [8] - 25:1,

174:3, 174:23, 176:15, 176:18, 177:25, 181:18, 185:12

**Witnesses** [1] - 174:5

**women** [4] - 17:6, 18:2, 25:11

**Woodland** [7] - 12:14, 12:15, 31:9, 31:16, 31:24, 46:8, 46:13

**word** [2] - 78:8, 155:13

**words** [5] - 13:19, 81:6, 104:25, 106:6, 177:10

**worker** [1] - 185:5

**works** [1] - 46:23

**wound** [2] - 28:9, 166:11

**wounds** [1] - 165:25

**write** [6] - 50:16, 60:18, 60:23, 66:17, 140:19, 145:6

**writing** [2] - 19:8, 169:16

**written** [1] - 18:20

**wrote** [12] - 16:23, 18:13, 20:2, 20:6, 21:18, 21:19, 26:12, 61:4, 61:10, 140:18, 140:21, 169:24

**Wyche** [65] - 3:22, 3:24, 3:25, 4:1, 71:8, 71:10, 71:13, 71:15, 71:21, 71:22, 71:24, 72:5, 72:9, 72:11, 73:11, 73:16, 73:17, 74:2, 74:14, 75:9, 77:1, 77:7, 77:10, 77:15, 77:24, 78:2, 78:12, 78:25, 79:19, 82:10, 82:18, 83:1, 83:6, 83:7, 83:10, 83:13, 83:22, 89:1, 90:7, 91:15, 120:11, 122:18, 127:23, 127:25, 128:6, 129:2, 131:22, 158:24, 162:4, 162:11, 162:13, 162:19, 162:21, 162:24, 163:1, 172:16

**Wyche's** [1] - 77:20

## X

**XVIII** [1] - 1:11
**XXXVII** [1] - 1:11

## Y

**year** [6] - 37:20, 38:11, 42:18, 147:5, 148:25, 172:2

**years** [18] - 9:18, 32:10,

37:12, 37:17, 42:9, 54:16, 65:21, 65:22, 72:16, 90:11, 100:25, 137:10, 140:23, 160:22, 161:11, 164:24, 165:3

**yellow** [1] - 51:23

**yesterday** [7] - 3:16, 9:3, 9:22, 23:9, 26:11, 70:14, 112:13

**York** [1] - 152:14

**younger** [4] - 30:11, 31:3, 31:4, 37:17

**yourself** [7] - 75:3, 75:5, 79:13, 79:23, 124:23, 126:2, 161:6

## Z

**Zajac** [3] - 1:24, 189:3, 189:14