1

1               IN THE UNITED STATES DISTRICT COURT
2                  FOR THE DISTRICT OF MARYLAND
                        NORTHERN DIVISION
3

4

5     UNITED STATES OF AMERICA

6          v.                          CRIMINAL CASE NO.
                                         AMD-04-029
7     WILLIE MITCHELL,
      SHELTON HARRIS,
8     SHELLY WAYNE MARTIN,
      SHAWN GARDNER,
9
           Defendants
10    _____/

11               VOLUME XXIV OF XXXVII
                 Monday, November 10, 2008
12               Baltimore, Maryland

13

      Before:  Honorable Andre M. Davis, Judge
14                    And a Jury

15    Appearances:
            On Behalf of the Government:
16           Robert Harding, Esquire
             Michael Hanlon, Esquire
17          On Behalf of Defendant Mitchell:
             Laura Kelsey Rhodes, Esquire
18           Michael E. Lawlor, Esquire
            On Behalf of Defendant Harris:
19           Gerard P. Martin, Esquire
             Paul Flannery, Esquire
20          On Behalf of Defendant Martin:
             Thomas L. Crowe, Esquire
21           James G. Pyne, Esquire
            On Behalf of Defendant Gardner:
22           Adam H. Kurland, Esquire
             Barry Coburn, Esquire
23
      Reported by:
24    Mary M. Zajac, RPR
      Room 5515, U.S. Courthouse
25    101 West Lombard Street
      Baltimore, Maryland 21201

1          (Defendants enter the courtroom.  Jury not present in

2     courtroom.)

3               THE COURT:  Are we ready to go on the record, counsel?

4               MR. HARDING:  Judge, could I raise something?

5               THE COURT:  Certainly.

6               MR. HARDING:  You recall that we have a section of the

7     courtroom disturbance to play to the jury.  Over the weekend, it

8     occurred to me and to Task Force Officer Benson that the section

9     really, it's really a little unfair to Mr. Mitchell in that it is

10    overwhelmingly Mr. Mitchell that appears on that section.  And we

11    actually made a revised CD that is no longer than the one the

12    Court permitted on Friday, but which includes a bit more of the

13    other defendants.  If the Court would permit us to use it

14    instead.

15              THE COURT:  Certainly.

16              MR. LAWLOR:  We haven't heard it, Your Honor.

17              MR. MARTIN:  We haven't heard it, Your Honor.  I don't

18    know what's on it.

19              MR. HARDING:  I could play it right now, Your Honor.

20              THE COURT:  All right.  Why don't you do that?

21              (CD played.)

22              MR. HARDING:  That's it, Your Honor.

23              THE COURT:  Obviously, you included more of the Court

24    in there that was in the prior excerpt, but I understand why that

25    was necessary, in order to get other defendants involved.

3

1          The same objections are preserved for the record,

2     counsel.  Obviously, we are in uncharted territory here.

3          And I have to say, by the way, some of you may be

4     aware, having recently, although not finally, from what I

5     understand from counsel who intend to file a petition for

6     certiori, but having recently been reversed by the Fourth Circuit

7     over a dissent by a district judge sitting by designation in the

8     case of United States of America v. Seigel, in which the court

9     provided a very expansive gateway to the introduction of evidence

10    on the basis of the government's decision to include in the

11    indictment there, I think, a third superseding indictment, a

12    whole history of activities by the defendant which I thought was

13    somewhat overreaching, to say the least.  And so I struck from

14    the indictment what I regarded as some surplusage and otherwise

15    indicated an intention to limit the government's proof.

16          Part of the Fourth Circuit's reasoning in that case, I

17    think, is directly relevant here to the effect that if, if the

18    grand jury includes it among its allegations in the indictment,

19    the Court is constrained in its ability to limit the government's

20    proof.

21          So here, the government, having elected to expand the

22    scope of the conspiracy to include these allegations, the Court

23    feels significantly hamstrung in its ability to limit the

24    government more than I already have by limiting the excerpt.

25          Obviously, I had, I think, signalled my belief even

1    before the Seigel decision came down, that if it was in the

2    indictment the government was entitled to offer some proof of it.

3    So I don't mean to suggest that I'm only admitting it because of

4    what the Fourth Circuit said in Seigel.  But certainly, I think

5    what the Fourth Circuit said in Seigel provides a very

6    significant support for the government's position that it's

7    entitled to introduce this evidence.

8         So the record is preserved on behalf of all of the

9    defendants.

10        Okay.  While we're very pleased to have Mr. Kurland

11   back with us after the misadventure of Friday, and unless there's

12   anything else, we'll invite Detective Benson to resume the stand

13   and we'll proceed.  Defendants have any witnesses for this

14   afternoon?

15        MR. CROWE:  We have one, Your Honor.

16        THE COURT:  The one who's in question?

17        MR. CROWE:  Pardon?

18        THE COURT:  I'm sorry.  Is it the one who's in

19   question?

20        MR. CROWE:  Is it the one in question.

21        THE COURT:  Will you have any other witnesses, Mr.

22   Crowe?

23        MR. CROWE:  We have another one under subpoena with

24   directions to come in today but that witness is not here yet, as

25   the witness should have been.

1          THE COURT:  Do you have any mechanism at all -- I'm

2    sure you don't -- if the witness shows up, would you recognize

3    the witness if the witness came in the courtroom?  I mean,

4    obviously, you don't have anybody outside waiting to greet the

5    witness.

6          MR. CROWE:  I believe Mr. Pyne would probably be able

7    to recognize her a little bit better than I was.  He's a bit

8    better with faces than I am.  We don't have a whole cadre of

9    agents who can sit out there, that's correct.

10          THE COURT:  But it is someone that you have spoken to

11   and that you would recognize, Mr. Pyne?

12          MR. PYNE:  I'm hoping I would, Your Honor.

13          THE COURT:  Have you spoken to her?

14          MR. PYNE:  I have not spoken to her recently.

15          THE COURT:  But I mean she's someone who is known to

16   you, generally?

17          MR. PYNE:  Generally.  Very generally.

18          THE COURT:  Very generally.  Okay.  Anybody else have

19   any witnesses this afternoon?

20          MR. MARTIN:  Your Honor, ours are Wednesday.

21          THE COURT:  Okay.

22          MR. MARTIN:  We had to subpoena them.

23          THE COURT:  Ms. Rhodes?

24          MR. HARDING:  Your Honor, we did have one that was

25   going to be a short witness this afternoon but that fell through.

1    It's just a records thing, but they can't come down as it turns

2    out.

3            THE COURT:  All right.  Maybe I'll be able to get a

4    hair cut.  I desperately need it, I guess.

5            MR. COBURN:  I'll see whether I can bring a couple of

6    people in, Your Honor.

7            THE COURT:  Okay.  Thank you.

8            MR. COBURN:  Could I just tell Your Honor, and we don't

9    need to discuss this substantively now as far as I'm concerned.

10   But the expert I referred to, you know, about this, the expert on

11   this very issue about the flesh and blood question, is, is

12   available to come up on Thursday and I just wanted to check that

13   out with Your Honor before I bought his ticket and put him on a

14   plane and contacted him.

15           THE COURT:  We need to have some discussion about that.

16   We can do that this afternoon.

17           All right.  We're ready, Belinda, I think.  Do you want

18   me to tell the jury any more than that you're just back, Mr.

19   Kurland?

20           MR. KURLAND:  That I'm back and I would expect to stay

21   for the remainder of the trial.

22           THE COURT:  Do you want them to know you were admitted?

23   Rather not?

24           MR. KURLAND:  No.  I'm feeling much better and I expect

25   to be.  Thank you, Your Honor.

7

1           THE COURT:  All right.

2           (Jury enters the courtroom at 10:34 a.m.)

3           THE COURT:  Ladies and gentlemen of the jury, good

4    morning.  We do trust that you enjoyed this beautiful fall

5    weekend we just had.  As you can see, Mr. Kurland is back with us

6    hale and hearty.  He got some attention that was appropriate, and

7    he expects to be with us for the duration of the trial.

8           He and all of us thank you for your understanding and

9    your patience and your indulgence over the events of Friday.

10   We're ready to proceed.

11          You'll recall that Detective Benson was on the stand on

12   Thursday when we broke, and we'll proceed with his direct at this

13   time.  Of course, Detective Benson remains under oath for this

14   trial.

15          THE WITNESS:  Yes, Your Honor.

16          THE COURT:  Whenever you're ready, Mr. Harding.

17          CONTINUED DIRECT EXAMINATION

18   BY MR. HARDING:

19   Q    Thank you, Your Honor.  First, Detective Benson, I'd like to

20   go over once again some locations in Park Heights.  So if you

21   could step down from the bench for just a moment.  I'm going to

22   use a new map, which shows a larger perspective on Park Heights.

23   And I just want you to put a push pin in some locations.  You

24   won't need that.

25          First of all, would you be good enough to take this

8

1    blue push pin and put it at the Finney Avenue location of the,

2    the double murders of Oliver McCaffity and Lisa Brown?

3              THE COURT:  Perhaps you should be holding the mike, Mr.

4    Harding.

5    Q    Good idea, Your Honor.  And you should be holding the push

6    pins.  Pick a different color one, please, Detective Benson,

7    and --

8              THE COURT:  I'm sorry.  Is the mike on?  Okay.  Good.

9    Q    Could you put a push pin at Edgecombe Circle?

10   A    North/south is here.  This right here.  Put it right in the

11   middle?

12   Q    Yeah.  Just put it on the middle.  Now, put another, put

13   another one on Dupont Avenue where -- you were here when Rodney

14   Hayes testified -- his mother's house was.

15             And put one on Woodland Avenue in the 3500 block near

16   Reisterstown Road, which we have heard about.

17   A    The 3400 block runs from here to here and the 3500 block is

18   here.

19             THE COURT:  I don't think the reporter heard that.

20             THE WITNESS:  Oh, the 3400 block runs up to

21   Reisterstown Road.  The 3500 block is up towards Park Heights.

22   Between Park Heights and Woodland.  I put the push pin right

23   between the two.

24   BY MR. HARDING:

25   Q    Okay.  Now, put another one at Violet Avenue, where the cell

1    tower was that we've heard so much testimony about.  Violet.  Put

2    it right about where the cell tower was located.

3            And also, put a push pin at Druid Hill Park, where the

4    reservoir was.  Okay.  Thank you.  I think that's all I needed to

5    do for right now.

6            THE COURT:  I think, Mr. Harding, several of the jurors

7    couldn't quite see it.  So if the witness could just hold it up

8    in front of the jury so that they can get a glance.

9            Thank you, Agent Benson.

10   Q    Now, you were here when Mr. Pyne was questioning Agent Klas

11   about the fact that the name "Wayne" does not appear in the rap

12   songs.  Instead, it's just the name "Weaze."  Do you recall that?

13   A    Yes.

14   Q    Let me, do you recall Detective Neidermeier's testimony --

15   this is Government Exhibit W-48, which is in evidence -- do you

16   recall Detective Niedermeier testifying about how Mr. Martin gave

17   both nicknames when he came in to be interviewed on April 17,

18   2002?

19   A    Yes, I remember that.

20           MR. COBURN:  Objection.  Asking the witness to comment

21   on another witness' testimony.

22           THE COURT:  I think it was a foundation for another

23   question.  Go ahead, Mr. Harding.  Perhaps it wasn't.

24           MR. HARDING:  Did you, Detective Benson --

25           MS. RHODES:  Your Honor, if we could wait one minute.

1    None of these monitors are working right now.  They're all off.

2            THE COURT:  Anybody know how to turn them on?

3            MR. MARTIN:  It isn't the monitor, Your Honor, it's the

4    feed.  There's no feed.

5            THE COURT:  Still nothing?

6            MS. RHODES:  We're still in the dark.

7            THE COURT:  Something is unplugged, I guess.  Melissa,

8    would you set your monitor up on the edge of the bench, please,

9    facing counsel, to see if they can, we can proceed until we get

10   help?  Can counsel make out?

11           MR. MARTIN:  We can see a document.  We can't make

12   anything out.

13           THE COURT:  Okay.  Let's see if it's sufficiently

14   controversial if you need to get a closer view.

15           Why don't you try proceeding, Mr. Harding?  And if

16   counsel find this unsatisfactory, just say so. I think we're

17   going to get some help in a moment but let's proceed.

18           MR. COBURN:  Is it okay if we come a little closer to

19   it, Your Honor?

20           THE COURT:  Certainly.

21   BY MR. HARDING:

22   Q    Well, did you, Detective Benson, analyze a Nokia cell phone

23   that was recovered from Valdavia Court and that has been admitted

24   into evidence as Government Exhibit V-2?

25   A    I did.

1    Q     How did you analyze it?

2    A     Obtained a search and seizure warrant for any electronic

3    data that was would be stored in the phone, the address book.  I

4    believe there was an old phone that was not having an active

5    service on it.  But we could obtain the address book and any

6    outgoing and incoming calls, the last few that are actually

7    stored on the physical phone.

8    Q     Okay.  And did you prepare a list of the names in the

9    address book, the missed calls, and the dialed, the last series

10   of dialed calls before the phone was seized on April 1st, 2002?

11   A     I did.

12   Q     And counsel, this is Discovery Item Number 1752.  Is this

13   your breakdown of Nokia model, the Nokia telephone that was

14   recovered from Valdavia Court on the day of Mr. Mitchell's

15   arrest?

16   A     Yes, it is.

17   Q     And does that contain in the address book a number for

18   Weaze?

19   A     Yes, sir.  That's the 443-838-1933 number, which is

20   subscribed to in Shelly Wayne Martin's name.

21   Q     Okay.  And in fact, did we get admitted into evidence as

22   Government Exhibit W-68 a big fat phone bill for that phone, 1933

23   phone?

24              MR. PYNE:  Objection, Your Honor.

25              THE COURT:  Excuse me one moment.  The monitors on the

12

1   defense side seem to have come unplugged.  If you'll wait just a

2   moment, Mr. Harding, we can perhaps get this taken care of.

3           Okay.  They're working.

4           MR. MARTIN:  Yes, sir.

5           THE COURT:  Thank you, Donna.  All right.  There was an

6   objection.

7           MR. PYNE:  To the characterization of the phone bill.

8           THE COURT:  All right.  Mr. Harding, you can proceed.

9   BY MR. HARDING:

10  Q    Was the account name for this phone, 1933 phone, Shelly

11  Wayne Martin?

12  A    Yes.  Additionally, if I can add to that, also, in an

13  address book that was seized at Two Cree Court, which is the home

14  of Shelly Wayne Martin, Joyce Martin, his mother, had an address

15  book where she had that same number handwritten in with "Wayne's

16  cell phone" written over the top of it.

17  Q    Okay.  And also in this phone that was recovered from Mr.

18  Mitchell's residence on April 1st of 2002, there was also a

19  number in the directory for this, for Goo, the 1241 number which

20  we've heard testimony about, is that correct?

21  A    That's correct.

22  Q    And also one of the missed calls that day was from Goo, is

23  that correct?

24  A    Correct.

25          MR. COBURN:  Objection to that day.

1    Q    Well, what day would these calls have come in?

2              MR. LAWLOR:  Objection, foundation, Your Honor.

3              THE COURT:  Based on his analysis is what Mr. Harding

4    is asking.  Overruled.  Go ahead.

5              THE WITNESS:  The records didn't show a date.  It just

6    showed a time.  So the last day that the phone was used, I

7    couldn't say when that was.

8    BY MR. HARDING:

9    Q    Okay.  Could it have been any time after April 1st of 2002?

10   A    No.  It had to be prior to my physically seizing the phone,

11   prior to April 1st, 2002.

12   Q    Okay.  Now, also, what number is this?  Do you recognize

13   this 410-669-6731 number?

14   A    Yes.  That's the number to 205 North Amity, Apartment Nine,

15   home of Shelton Harris.

16   Q    And is that also one of the missed calls on here?

17   A    Yes, it is.

18   Q    Okay.  Now, in addition to analyzing this phone, did you

19   analyze another Nokia phone that was recovered from the Dodge

20   Intrepid registered to Shawn Gardner, that we've heard testimony

21   about?

22   A    I did.  If I can refer to a note.  I have the actual phone

23   number.  443-739-2762.

24   Q    Was there a number under Weaze in the directory of that

25   book?

1    A    There was.

2    Q    And what was the number?

3    A    Listed under W-E-E-Z, Weez, was 443-677-3200.  And again,

4    that was handwritten in Joyce Martin's address book with that

5    telephone number, with Wayne's cell phone.  And then there was a

6    strike through on the 3200 number and the 1933 number that I just

7    referred to, was written in over the top of it, as if she had

8    updated her address book with that new number.

9    Q    Okay.  And I'm showing you now Government Exhibit W5-J.  Is

10   this Joyce Martin's phone book that you're talking about?

11   A    Yes, sir.

12   Q    And is this the entry where the 3200 number is crossed out

13   and the 1933 number is written in?

14   A    That's correct.

15   Q    And in this phone book it's listed not under the name Weaze,

16   but under the name Wayne, is that correct?

17   A    Yes, sir.

18   Q    Wayne's cell phone?

19   A    Correct.

20   Q    Now, another phone bill that was recovered from Mr. Martin's

21   residence was W5-F.  Do you recall this exhibit, Detective?

22   A    Yes, sir.

23   Q    And this is a phone bill for 410-963-3912.  Is that correct?

24   A    That's correct.

25   Q    And in whose name is that phone listed?

1    A    That's in the name Wayne Martin.

2    Q    Okay.  It doesn't say, actually doesn't say Shelly Wayne

3    Martin.  It just says Wayne Martin, is that correct?

4    A    That's correct.

5    Q    Okay.  And this was recovered from where?

6    A    From Two Cree Court, after the search warrant was conducted

7    there.

8    Q    Okay.  Now, this number, do you recall that after the Wyche

9    brothers murder there were some phones that were recovered --

10   A    Yes, sir.

11   Q    -- from the car.  And that Detective Niedermeier and his

12   colleagues went through those phones and wrote down the names

13   that appeared in the directories of those phones?

14   A    That's correct.  There were four, four phones recovered from

15   the car.

16   Q    And were there also some phones that were not recovered from

17   the car?

18   A    Yes.

19   Q    Okay.  This is Government Exhibit W-67 that we have already

20   seen and is admitted into evidence.  This 3912 number appeared in

21   two of the phone books?

22   A    That's correct.

23   Q    But it's under the name Alvin, is that correct?

24   A    That's correct.  Alvin is the brother of Shelly Wayne

25   Martin.

1   Q    Okay.  And the other phone that it appears on is?

2   A    I believe it's the 1681.

3   Q    Yeah.  There are also numbers for other defendants in here?

4   A    That's correct.

5   Q    All right.  I'm not going to take the time to try to find it

6   right now.  But is it your testimony, is it your recollection

7   that there was one other phone where this 3912 number appeared?

8   A    Yes.  I believe it was the one ending in 1681, the Wyche

9   phone, and also in the one that you just showed, 5570.

10  Q    I found it.  There's a helpful little tag.

11  A    Yes.

12  Q    The numbers, by the way, for Bo in here were older numbers,

13  right?

14  A    That's the Maryland Land Design that, in reference to the

15  Oliver McCaffity murder, the 5811 number.

16  Q    And 9323?

17  A    And that's the pager from Northwest Hospital.

18  Q    But it actually didn't contain the number for the phone that

19  Mr. Mitchell admitted using when he was calling the Wyche

20  brothers that night?

21  A    Not, not on those cell phones.

22  Q    All right.  Okay.  Now, let me call your attention back to

23  W-48, because Mr. Mitchell actually, I mean -- sorry -- Mr.

24  Martin, when he was filling out this information sheet with Mr.,

25  Detective Niedermeier following his arrest, he actually listed a

1    phone number for Mr. Martin, and it's not that 3912 number, is

2    it?

3    A    No, sir.

4    Q    And he doesn't list him as living at Two Cree Court, either,

5    is that correct?

6    A    No, sir.

7    Q    And was that 3912 phone in use for very long, Detective?

8    A    From what I could gather from subpoena of telephone records,

9    it was only in use for approximately two weeks.

10   Q    Were there numerous calls to any of the other defendants in

11   this case listed?

12   A    There were approximately 14 to Shawn Gardner and 10 received

13   from Gardner, and a few calls to Darryl Wyche's phones, but

14   that's basically it.  It was very low volume, brief period of

15   time it was used.

16   Q    Okay.  I have here Government Exhibit B-10.  Is this a

17   summary of the calls on the 3912 phone?

18   A    Yes, sir.

19   Q    To Darryl Wyche?

20   A    That's correct.

21   Q    During this time period from January -- no, they're all in

22   early March of '02, is that correct?

23   A    That's correct.

24   Q    All right.  Now, when you were testifying here last

25   Thursday, which seems like an eternity ago, you were talking

1    about the calls that were made between Mr. Martin and Mr. Gardner

2    on the one hand and Sherman Kemp, AKA Goose, on the other hand.

3    Do you recall that?

4    A    That's correct.

5    Q    And after court, did it occur to you that we actually had

6    another number for Goose besides that County Sports number that

7    you told us about that day?

8    A    It did.  And there was a slip of paper after Gardner's

9    arrest that was recovered from the Dodge Intrepid that had

10   handwritten, several handwritten telephone numbers, one of which

11   listed a number for Goose.  So I went back and re-ran it

12   against -- the database contains over 30,500 actual phone calls.

13   So I ran it against it to see if there were any additional

14   contacts between the defendants and this Goose number, and there

15   were.

16   Q    Okay.  First going back to Government Exhibit B-7, which was

17   the list of calls between Martin and Gardner and Sherman Kemp at

18   the County Sports number.

19   A    Yes, sir.

20   Q    There were only three and they occurred in February and

21   March of '02, is that correct?

22   A    That's correct.  One was the day after the Wyche murder.

23   Q    But then you say that in the list that was recovered from

24   the Dodge Intrepid registered to Mr. Gardner, where we had a

25   number for Bo --

1    A    Correct.

2    Q    -- and a number for Purple --

3    A    Yes, sir.

4    Q    -- there was also a number for Goose, is that correct?

5    A    Yes, sir.

6    Q    This 7774 number?

7    A    Correct.

8    Q    Okay.  This is Government Exhibit S-55.  So you say you went

9    back and determined that there were calls from defendants to that

10   number as well, is that correct?

11   A    Yes, sir.

12   Q    And I have here Government Exhibit B-9.  Is this a summary

13   of the calls from Mr. Martin and Mr. Gardner to this new number

14   attributed to Goose during the period of February and March of

15   2002?

16   A    Yes, sir.

17   Q    Actually, the last one, it looks like, is in May, is that

18   correct?

19   A    That's May 18th of 2002.

20   Q    Okay.  Now, you were here when Mr. Montgomery testified

21   about making a telephone call from the parking lot out in front

22   of Tonya Jones Spence's apartment?

23   A    Yes, sir.

24   Q    Just before the murder?

25   A    Yes, sir.

1    Q    Whose phone did he use to make that?

2    A    He used the phone --

3              MR. COBURN:  Objection.

4              THE COURT:  What's the basis for the objection?

5              MR. COBURN:  Well, my objection, Your Honor, should I

6    come around?

7              THE COURT:  No, you don't have to.  Is it his phone?

8    Is that what you're objecting to?

9              MR. COBURN:  No, the problem, the way the question is

10    phrased, it's asking him what happened.  But I mean, his

11    knowledge about this is just based on what other witnesses have

12    already testified.  So it's just --

13              THE COURT:  Okay.  In other words, according to Mr.

14    Montgomery's testimony, whose phone did he use?  You can answer.

15              THE WITNESS:  I ran the Jamane Johnson number.  There

16    was one single phone call from the Gardner phone.

17    BY MR. HARDING:

18    Q    First answer the question that the judge put to you, which

19    is, according to Mr. Montgomery's testimony, whose phone did he

20    use to make that call?

21    A    Shawn Gardner's.

22    Q    Okay.  Shawn Gardner's cell phone?

23    A    Yes, sir.

24    Q    Okay.  What were you about to tell us?

25    A    That was the only, I ran that, the number that he called,

1   the number that's attributed to Jamane Johnson was the only call

2   within the entire database, the one single contact on that day at

3   that time.

4   Q    You mean your computer went through all of the phone numbers

5   and all of the bills and all of the toll records that you

6   accumulated in this case and found only one call to Jamane

7   Johnson?

8   A    Yes, sir.  Of the, of the over 30,500, there was one call.

9   Q    Okay.  And I see that I've marked this one B-9, which I just

10  had another exhibit marked B-9.  So I'm call to call this B9-A

11  and put it up on the screen.  So this is the number associated

12  with -- wait.  This is the number associated with Jamane Johnson,

13  is that correct?

14  A    That's correct.

15  Q    And this, only call you got in our whole database was the

16  call from the Shawn Gardner's cell phone, 1253 cell phone, at

17  4:39 p.m. on June 7th, 2002, is that correct?

18  A    That's correct.

19  Q    Okay.  Now, did you also prepare a little map called B-11?

20  A    I did.

21  Q    Can you tell us what this shows?

22  A    This is all the cell tower analysis from the 1253 number

23  associated with Mr. Gardner the afternoon of the Spence murder.

24  And it basically shows as each of the calls are made which cell

25  tower that the telephone call is bouncing off of.  And it

1    basically shows the progression starting around 3:39 in the

2    afternoon, the afternoon of June 7th, the afternoon of the Tonya

3    Spence murder.  And it shows the calls as they progress,

4    basically up Liberty Road, 4:15, 4:26, 4:28, 4:32, making its way

5    up into the area of the murder.  And then there's a final four

6    phone calls at 4:39, 4:48, 5:42 and 5:44 p.m. that all are

7    hitting off the same cell tower, which is in close proximity to

8    the Tonya Spence murder.

9    Q    Okay.  This red push pin here, what does that indicate?

10   A    That's the Bramble Lane, 8618 Bramble Lane location.

11   Q    And then you've got marked up here Cell Tower 0863 BKO?

12   A    That's correct.  The cell tower number is 0863 and B is the

13   side of the tower that the phone call is bouncing off.  As we

14   referred to, the triangle goes from, the northeast quadrant is A.

15   The lower, southern quadrant is B.  And the upper northwest

16   quadrant would be C on these phone calls.

17   Q    So the 4:39 call, what one is that?

18   A    That is the call to the Jamane Johnson cell phone ending in

19   1107.

20   Q    And then after that call was placed, you say there were

21   three subsequent calls or attempts to make calls?

22   A    That's correct.

23   Q    Using Mr. Gardner's cell phone, that bounced off this same

24   cell tower, is that correct?

25   A    That's correct.

1    Q    Is this the nearest cell tower to the scene of the Jones

2    Spence murder?

3    A    It is.  I plugged in all of the cell towers in the

4    Randallstown area just to insure that that was, in fact, the

5    closest one.  If you flip, I believe there's a closer up where

6    it's zoomed in.  You can see the distances.  I actually measured

7    the distance between each cell tower to the location of the

8    murder scene and that was the closest.

9    Q    Okay.  Let me show you B-12.

10   A    Yes, sir.  This location is the woods where the items were

11   recovered, the handguns and the clothing items and Tonya Spence's

12   cell phone, at that location measured to the two nearest cell

13   towers.  The one that was actually receiving the calls is 1.25

14   miles away and the next closest is over off of Liberty Road.

15   It's 2.64 miles away.

16   Q    Is that the second closest cell tower to --

17   A    Yes, sir.

18   Q    -- the scene in the woods where the phone was recovered?

19   A    That's correct.

20   Q    Near, actually, it was recovered from Mr. Gardner's person,

21   was it not?

22   A    That's correct.  Right at Green Knoll Court, which is about

23   where the K in the BKO is.

24   Q    Yeah.  And also, would it also be true that this is the

25   scene of the murder up here on Bramble Lane, is that correct?

24

1    A    That's correct.

2    Q    Would this cell tower be the closest cell tower to the scene

3    of the murder?

4    A    Yes, sir.  Even closer than the woods.

5    Q    And this cell tower is the second closest, is that correct?

6    A    That is correct.

7    Q    Okay.  Finally, what does B-13 show?

8    A    This is the same cell tower that the cell phone calls are

9    bouncing off of.  Where the yellow push pin is is the wooded path

10   leading to Green Knoll Court.  And you can see up just north of

11   it is where the Spence murder scene was.  And off to the

12   northwest of the woods is the Cell Tower 0863 B, that was

13   receiving the last three phone calls from Mr. Gardner's phone.

14   Q    Okay.  Now, were you present, Detective Benson, when Dwayne

15   Denham came in to prepare for testifying in the grand jury?

16   A    Yes, sir.

17   Q    What kind of promise did we make to him regarding his

18   testifying?

19   A    Basically the same promise that anyone that we put in the

20   grand jury, use immunity.  Any words that he uses, anything that

21   he tells us, we're not going to turn around and use his words to

22   prosecute him.

23   Q    Did we promise him that we weren't going to prosecute him

24   for any crimes?

25   A    No, sir.

1    Q    Let me call your attention now to some exhibits that I have

2    marked Government Exhibit C-1 through C-12.  Have you gone

3    through these exhibits with me, Detective?

4    A    Yes, sir.

5    Q    Are these pro se pleadings filed by the defendants in this

6    case?

7    A    Yes, sir.

8    Q    All right.  I'm going to, for the sake of efficiency, Your

9    Honor, I'm going to list these exhibits with their exhibit

10   numbers and the dates of the court proceeding, or the dates, the

11   rough dates of the pleadings involved.

12             THE COURT:  Very well.

13   Q    And I should make it clear that there are multiple pleadings

14   in some of these exhibits, but they were all mailed around the

15   same time.

16             I'm moving in Government Exhibit C-1, November 8th of

17   2005; C-2, February 12th of '06.  Actually, that's a mistake,

18   Your Honor.  That should be November 8th of '05, also, I believe.

19   Let's say November 14th, '05, the date when it was actually filed

20   with the Court.

21             So C-2 is November 14th of '05.  C-3 is February 13th

22   of '06.  C-4 is February 27th of '06.  C-5 is between February

23   24th, '06 and March 8th of '06.  C-6 is August 18th of '06.  C-7

24   is May 11th of '07.  C-8 is May 28th of '07.  C-9 is January 10th

25   of '08.  C-10 is January 21st of '08.  C-11 is September 16th of

1    oh eight.  C-12 is October 1st of '08.

2              Let me put some of these on the screen, Detective.

3              MS. RHODES:  Your Honor, before you go there.  Some of

4    these, several of these are beyond the date of the termination of

5    the conspiracy.  We would object to those.

6              THE COURT:  So noted.  Ladies and gentlemen of the

7    jury, the indictment in this case charges that the defendants,

8    though detained, have engaged in a pattern of behavior which you

9    may consider and which the government will urge you to consider

10   as part and parcel of the conspiratorial acts in which the

11   defendants have allegedly engaged.  The defense will urge you to

12   take a different view of these activities by the defendants.

13             Now, I will instruct you in greater detail later.  But

14   let me just say that any person involved in the court system as a

15   litigant, whether or not that person is represented by an

16   attorney, is entitled to file papers with the court and to have

17   the court make a formal record of the papers that are filed.

18             It will be up to you, as I've said to you now

19   repeatedly, to determine what the facts are in this case, to

20   determine what the effect of evidence is in this case.  You are

21   not bound to interpret the evidence in this case as the

22   government urges you to interpret it, nor are you bound to

23   interpret the evidence in this case as the defendants urge you to

24   interpret it.  You are bound to follow my instructions on the

25   law, but insofar as the interpretation and the weight of any

1    evidence you will use your own mature judgment and common sense

2    in light of my instructions on the law in evaluating the evidence

3    in this case.

4            You may proceed, Mr. Harding.

5    BY MR. HARDING:

6    Q    Thank you, Your Honor.  Let me show you, first of all, C-1,

7    which is dated November 8th of 2005.  Do you see that?

8    A    Yes, sir.

9    Q    And it contains a document signed by Shelly Wayne Martin.

10   A    That's correct.

11   Q    And it's entitled Refusal For Fraud, is that correct?

12   A    Yes, sir.

13   Q    And there's a number of statements in here.  And by the way,

14   Your Honor, there was an attached document to this, which I have

15   redacted.

16           THE COURT:  Very well.

17   Q    Is there an identical pleading mailed in a separate

18   envelope, which is also part of this exhibit, from Shawn Earl

19   Gardner?

20   A    Yes, sir.

21   Q    Or at least purporting to be from Shawn Earl Gardner, is

22   that correct?

23   A    That's correct.

24   Q    And is there an identical one from Willie Edward Mitchell?

25   A    That's correct.

```
1    Q    Mailed in another envelope?

2              MR. MARTIN:  Is that a separate exhibit number?

3    Q    No.  This is all part of, these are marked collectively as

4    C-1.  And is there one, also, for Shelton Lee Harris that's

5    identical to the others?

6    A    Yes, sir.

7    Q    And let me show you some addresses.  Do you see this address

8    here on the return envelope for Shelton Lee Harris?

9    A    Yeah.  That's the address of Jaquetta Smith.

10   Q    Jaquetta Smith, who testified earlier here in this trial, is

11   that correct?

12   A    Yes, sir.

13   Q    And what is her relationship to --

14   A    She has a child with Mr. Mitchell.

15   Q    Okay.  And in fact, did Mr. Mitchell, does his return

16   address, is it the same?

17   A    That's correct.

18   Q    And what's the return address on Mr. Gardner's?

19   A    Mr. Gardner's is Mr. Martin's address, Two Cree Court.

20   Q    This is, in fact, the address where Mr. Martin was arrested

21   back on April 17th of 2002, is it not?

22   A    That's correct.

23   Q    And finally, the address for Shelly Wayne Martin?

24   A    Also Two Cree Court.

25   Q    Now, C-2 is from Mr. Gardner only, is that correct?
```

1    A    Yes, sir.

2    Q    And it's called Motion For Request For Understanding, is

3    that correct?

4    A    Yes, sir.

5    Q    And here it states that it appears to me that Barry Coburn

6    is incompetent to represent me.  Is that correct?

7    A    Yes, sir.

8    Q    And it says that that's because he has a conflict of

9    interest because he has sworn an oath to support my adversary,

10   the United States of America?

11   A    That's correct.

12   Q    And the U.S. District Court, is that correct?

13   A    Yes, sir.

14   Q    And then there's also another Refusal for Fraud document

15   attached to this same exhibit, is that correct?

16   A    Yes, sir.

17   Q    Now I want to show you Government Exhibit C-2.  Does this

18   contain two different kinds of pleadings on behalf of each

19   defendant?  The first one being from Shawn Gardner.  It's

20   entitled Administrative Notice.

21   A    Yes, sir.

22   Q    Signed by Mr. Gardner, is that correct?

23   A    That's correct.

24   Q    And then there's another kind of Administrative Notice, also

25   part of this exhibit, and also signed by Shawn Gardner, is that

```
1    correct?

2    A    That's correct.

3         MR. COBURN:  Objection who it's signed by.  Purported.

4    Q    It's purported to be signed by?

5    A    That's correct.

6    Q    Actually, it says on this particular document, it says

7    Michele Mitchell, 131 North Culver Street.  And then comes a

8    signature for Shawn Gardner, who is labeled aggrieved party, is

9    that correct?

10   A    That's correct.  I believe Ms. Mitchell is, I believe, an

11   aunt of Willie Mitchell.

12   Q    And her name appears on an attached document labeled, as a

13   notary public?

14   A    That's correct.

15   Q    And this attached document is called a jurat.

16   A    Yes.

17   Q    And then the jurat is subscribed and sworn to at, and then

18   what's the name that appears here?

19   A    Mr. Martin's mother, Joyce Ann Martin.

20   Q    This 15th day of February, 2006, is that correct?

21   A    Yes, sir.  I believe that might be a 12.  If you flip back.

22   12th day.  Yes.  12th day.

23   Q    The 12th.  Okay.  You're probably right.  And then there are

24   identical pleadings, first of all, on behalf of Mr. Mitchell, is

25   that correct?
```

1    A    Yes, sir.

2    Q    Administrative Notice.  And this one is purported to be

3    signed by Willie Edward Mitchell, III?

4    A    That's correct.

5    Q    Again, there's Michele Mitchell's name up here, is that

6    correct?

7    A    Yes, sir.

8    Q    And this jurat at the end is subscribed and sworn to at, and

9    then what's the signature here?

10   A    Jaquetta Smith, that same, 12th day of February, 2005.

11   Q    And this one's also notarized by Michele Mitchell, is that

12   correct?

13   A    Yes.

14   Q    And then here's the other kind of Administrative Notice on

15   behalf of Mr. Mitchell, with the same kind of jurat attached with

16   the same signatures, is that correct?

17   A    That is correct.

18   Q    And then here's one for Mr. Martin, with the same

19   Administrative Notices.  And this one has the purported signature

20   of Mr. Martin, is that correct?

21   A    That's correct.

22   Q    Ms. Mitchell's name?  And this one has a jurat signed by

23   Joyce Martin?

24   A    That's correct.

25   Q    And Michele Mitchell?

1   A    Correct.

2   Q    Again, another kind of Administrative Notice in Mr. Martin's

3   name.  Mr. Martin's purported signature, same kind of jurat.  And

4   then we have the same thing for Shelton Lee Harris?

5   A    Yes, sir.

6   Q    That purports to be his signature.  Again, Michele

7   Mitchell's name appears?

8   A    Correct.

9   Q    And this jurat is signed by?

10  A    You'll have to slide it up a little.

11  Q    Marvin Walker.

12  A    Marvin walker.  That's Slo.

13  Q    Slo, is he a member --

14  A    He's a member of the Shake Down, Sheistyville rap group.

15  Q    And here is Ms. Mitchell's signature, also, is that correct?

16  A    Correct.

17  Q    And I notice that Mr. Harris's address is still this

18  Whitecomb Circle address --

19  A    Yes, sir.

20  Q    -- that you told us was Jaquetta Smith's address, is that

21  correct?

22  A    That's correct.

23  Q    And the same kind of supplemental documents attached to this

24  one.  Another identical Administrative Notice, is that correct?

25  A    Yes, sir.

1    Q    Okay.  That's C-2.

2              C-3, Notices of Fault.  I'm not going to go through all

3    these in such detail.  Again, does this contain identical

4    pleadings, the same language, from all four defendants?

5    A    Yes, sir.

6    Q    A couple of different ones from Willie Edward Mitchell, III

7    and Shelly Wayne Martin, or purporting to be from Shelly Wayne

8    Martin, Shelton Harris?

9    A    Correct.

10   Q    Another one from Shelton Harris.  Another one from Shelton

11   Harris.  Shawn Earl Gardner and Shawn Earl Gardner, is that

12   correct?

13   A    Yes, sir.

14   Q    Actually, this one has one from Shelton Lee Harris -- no, it

15   has two from Shelton Lee Harris and two from Shelly Wayne Martin.

16   That's just out of order, is that correct?

17   A    Yes, sir.

18   Q    C-4, same kind of thing, Notice of Default this time.  Same

19   four defendants, same identical pleadings, is that correct?

20   A    Yes, sir.

21   Q    C-5 has two kinds of notice from each defendant, is that

22   correct?

23   A    That's correct, sir.

24   Q    C-6 has three or four pleadings from each defendant of

25   different types, all filed in the period of a couple of weeks?

1    A    Yes, sir.

2    Q    First one from Willie Mitchell care of Jaquetta Smith, is

3    that correct?

4    A    That's correct.

5    Q    Notice and demand to dismiss for lack of any criminal

6    jurisdiction whatsoever, is that correct?

7    A    Yes, sir.

8    Q    Again, Joyce A. Martin/Parsons appears with Mr. Gardner's

9    signature?

10   A    That's correct.

11   Q    As well as with Shelly Wayne Martin's signature, is that

12   correct?

13   A    Correct.

14   Q    And again, Slo is signing this document, Marvin Walker is

15   signing along with Shelton Lee Harris or purportedly Shelton Lee

16   Harris, is that correct?

17   A    That's correct.

18   Q    C-7 contains non-negotiable notices of acceptance, again,

19   from all four defendants, but mailed in separate envelopes, is

20   that correct?

21   A    That's correct.

22   Q    And it provides three days to respond to this notice or

23   dishonor will be the result of your failure to respond, is that

24   correct?

25   A    Yes, sir.

1    Q    And there are identical pleadings on behalf of all four

2    defendants, is that correct?

3    A    That's correct.

4    Q    And then C-8 is from Mr. Martin only and it says Notice of

5    Dishonor, is that correct?

6    A    Yes, sir.

7    Q    And this time Mr. Martin is identified as preferred

8    stockholder?

9    A    That's correct.

10   Q    Whereas on many of the earlier documents, for example, the

11   first one, each defendant is identified as live flesh and blood

12   man, is that correct?

13   A    That's correct.

14   Q    C-9 is from all defendants and were mailed in a single

15   envelope, again identifying each one as preferred stockholder?

16   A    That's correct.

17   Q    This is a non-negotiable notice of acceptance.  And then

18   C-10 is another notice of dishonor.  And this one, there are

19   notices from all four defendants.  This is C-10?

20   A    Yes, sir.

21   Q    Each defendant is a preferred stockholder.  C-11,

22   non-negotiable notice of acceptance from all four defendants.

23   This time in a single envelope, is that correct?

24   A    Correct.

25   Q    I notice that this one was mailed on the 16th day of the 9th

1    month of the year 2008?

2    A    Yes, sir.

3    Q    Is that the day after this trial started?

4    A    Yes, sir.  The trial began the 15th.

5    Q    And finally, another Notice of Dishonor from all defendants

6    in a single envelope, one for each defendant.  This one is dated

7    the first day of the tenth month of the year 2008, is that

8    correct?

9    A    Yes, sir.

10   Q    Thank you.  Now, in addition to these pleadings, were there

11   a number of hearings between November of 2005 and the middle part

12   of this year in which the defendants were brought into the

13   courtroom?

14   A    Yes, sir.  There were approximately nine, nine different

15   hearings.

16   Q    Okay.  Can you tell us, first of all, on November 16th,

17   2005, what happened at that hearing?

18   A    We were beginning the morning session.  Judge Davis had just

19   taken the bench and had barely said more than a few words when

20   Mr. Mitchell seized the microphone and began a two to three

21   minute speech about being live flesh and blood and basically

22   questioning the jurisdiction of the Court, questioning, basically

23   stating that the Court can't have jurisdiction over him as a

24   flesh and blood man.

25            Once he had finished his statement, he passed the

1    microphone to, at the time it was Mr. Martin was sitting to his,

2    Mr. Mitchell's right.  He passed the microphone to him.  Almost

3    verbatim Mr. Martin recited the same two, two to three minute

4    speech, and again on down the line until all four had recited the

5    basically identical recited speeches.

6    Q    Were they doing it from memory or were they reading

7    something?

8    A    The three, first three, Mr. Mitchell, Mr. Martin, Mr.

9    Harris, like they had rehearsed it from memory.  Mr. Gardner,

10   initial, the first time was reading it off a piece of paper.

11   Q    Okay.  Did the Court attempt to address the defendants after

12   they got done with their speeches?

13   A    He did.  And each time he would begin to speak, all four,

14   basically in unison, sometimes one, then the others, would

15   object, object, object, and not allow the Court to speak to

16   address their issues.

17   Q    Did the judge eventually issue an order to the marshals in

18   the courtroom?

19   A    Yeah.  After about, I'd say, maybe an hour of disruptions,

20   it got to the point where nothing was getting done and the Court

21   ordered the marshals to remove them from the courtroom.

22   Q    Did one defendant remain in the courtroom?

23   A    Yeah.  On that first date, I believe what the Court wanted

24   to address each of the four defendants individually to determine

25   if they were being threatened or coerced to cooperate with the

1    three others or if they were, in fact, acting in concert

2    together.  So Mr. Mitchell, Martin, and Harris were removed and

3    Mr. Gardner remained in the courtroom so that the judge could

4    have a one-on-one dialogue, which basically didn't go anywhere.

5    Every time --

6                MR. COBURN:  Objection to the characterization.

7                THE COURT:  Overruled.

8    A    Every time the Court would attempt to speak to Mr. Gardner,

9    to have dialogue with him to address his issues and what, in

10   fact, was going on, it was object, object, object over and over,

11   to the point where finally the marshals removed Mr. Gardner as

12   well.

13   Q    Did the judge repeatedly warn him not to disrupt the

14   proceedings?

15   A    Yes, sir.

16   Q    And did Mr. Gardner refuse to promise to not be disruptive?

17   A    He did.  In fact, he stated that he couldn't make a promise

18   to not object to the proceedings and to interrupt the

19   proceedings.

20   Q    Now, was there testimony scheduled for that day?  Was this

21   to be an evidentiary hearing?

22   A    There was.  We had several witnesses lined up to testify in

23   the motions portion of the hearing.

24   Q    So did the hearing have to be continued?

25   A    It did.

1        MR. COBURN:  Objection to what had to be.

2        THE COURT:  Overruled.

3    A    Basically, the disruptions were too much and --

4        MR. COBURN:  Objection.

5        THE COURT:  Overruled.

6    A    -- that date, the motions was set for a later date.

7    Q    Okay.  On January 10th of 2006, did the Court attempt to

8    conduct a colloquy with Mr. Gardner alone in the courtroom?

9    A    He did.

10   Q    And what happened then?

11   A    Again, on that date, I believe, my understanding, the

12   objective was to again see if any headway could be made with each

13   of the four defendants individually without the other three

14   present.  And beginning with Mr. Gardner, again, that same, every

15   time the Court would attempt to address him, if he referred to

16   him as defendant or Mr. Gardner, the same flesh and blood

17   statements and objections were repeated over and over to the

18   point where, again, the marshals needed to remove Mr. Gardner.

19   Q    Okay.  So was there any evidence taken that day?

20   A    No, there wasn't.

21   Q    On March 23rd of 2006, was Mr. Gardner again brought back

22   alone for a colloquy with the Court?

23   A    Yes, sir.  And again, similar to the January 10th, again,

24   each time the Court would attempt to explain to Mr. Gardner that

25   his objections were solidly on the record and that they were

1  being looked at, and the motions that he was basically stating to

2  the Court were being addressed, the Court couldn't even get the

3  words out before objections were made and the flesh and blood

4  statements were made.

5  Q    Okay.  So did the marshals remove Mr. Gardner that day,

6  also?

7  A    Yes, they did.

8  Q    Calling your attention to April 26th of 2007.  Were three of

9  the defendants brought to court that day -- Mr. Mitchell, Mr.

10  Martin, and Mr. Gardner?

11  A    Yes, they were.

12  Q    All except Mr. Harris, is that correct?

13  A    That's correct.

14  Q    And at the beginning of that proceeding, did the judge allow

15  each of the defendants to give a speech individually?

16  A    Yes.

17  Q    After that, what happened?

18  A    I think in an attempt to make progress with the motions

19  hearings, the Court allowed each, each of the defendants an

20  allotted period of time where they could make their statements

21  without being disruptive to the Court.  Kind of as a negotiation,

22  if I'll give you a time to speak if you give me --

23         MR. COBURN:  Objection to the characterization.

24         THE COURT:  The jury will disregard the word

25  "negotiation."

41

1    A    He was, the Court was giving each of the defendants a time

2    to speak.  This time the verbiage of the statements was, had

3    changed.  It was different.  It wasn't the same rehearsed

4    statements that we had seen the first three motions hearings.  It

5    dealt a lot more with Uniform Commercial Code and some, some

6    other, the verbiage was different but it was identical for the

7    three as they made their statements.  All three had changed the

8    verbiage.

9    Q    And did they, beginning with Mr. Mitchell, each of them make

10   five demands of their attorneys that must be satisfied before

11   they would be permitted to represent those defendants?

12   A    They did.  The argument basically was that they didn't want

13   to self-represent but being that the defense attorneys had sworn

14   an oath to the same Constitution that the prosecution and the

15   judge had, that there was a conflict of interest and that they

16   couldn't be fairly represented by that attorney.  And the

17   contract was basically to be signed by the defense attorneys,

18   saying you won't argue any of the facts -- I can't remember the

19   five verbatim.  But it was basically, I want you as my attorney

20   but I don't want you to do anything for me which, again, was no,

21   no evidence was able to be taken that day as well.

22   Q    Did they refuse to allow their attorneys to argue the facts?

23   A    They did.  Each time.

24   Q    Or to address the Court?

25   A    Each time the Court or the, or the defense attorneys would

1    attempt to speak on their behalf, again, it was the objections,

2    and they'd go into the same cancelling a contract, a lot of

3    Commercial Code speak.

4    Q    And did all three of the defendants who were present engage

5    in a similar series of demands on their attorneys and on the

6    Court?

7    A    Yes, sir.

8    Q    Did the Court order the marshals to remove Mr. Martin and

9    Mr. Gardner at separate points in those proceedings?

10   A    He did.

11   Q    Okay.  Was there any testimony taken that day?

12   A    No, sir.

13        MR. COBURN:  Objection.  None was scheduled that day.

14        THE COURT:  Overruled.

15   Q    Let me call your attention to May 7th of 2007.  Were all

16   four defendants brought to court that day?

17   A    I'm sorry.  Which date?

18   Q    May 10th, 2007?

19   A    I believe that day all four were, yes.

20   Q    Did Mr. Harris rise up as soon as the judge stepped into the

21   courtroom?

22        MS. RHODES:  Objection, Your Honor, leading.

23        THE COURT:  Overruled.

24   A    Yes, sir, he did.

25   Q    And what did he do?

1    A    The same, same colloquy basically that we had witnessed at

2    the earlier motions hearings.  Denying the subject matter

3    jurisdiction of the Court.  And each time the Court would attempt

4    to address him as Mr. Harris or the defendant, again, the

5    objections and statements were made to the point, again, where

6    they needed to be removed from the courtroom.

7    Q    Okay.  January 8th of 2008, did all four defendants come to

8    court that day?

9    A    Yes, sir.  And this particular occasion, the statements,

10   again, all four made the same statements.  As the Court ordered

11   the marshals to remove the defendants, two of them resisted.  Mr.

12   Mr. Mitchell and Mr. Gardner physically resisted the marshals'

13   removal.

14           MS. RHODES:  Objection to that characterization.

15           THE COURT:  I'll sustain the objection.

16           MS. RHODES:  Move to strike.

17           THE COURT:  You may proceed, Mr. Harding.

18   BY MR. HARDING:

19   Q    Go on with your description, Detective.

20           THE COURT:  No.  I sustain the objection, inviting you

21   to put another question.

22   Q    Did the judge order the defendants removed?

23   A    He did.

24   Q    I'm sorry.  I don't want to violate the Court's order.  May

25   I ask if there was physical resistance during that removal

44

1    process to the marshals?

2              THE COURT:  No.  Let's move on.

3    Q    Did you prepare a tape recording containing, actually a CD,

4    I should say, a CD containing excerpts of the proceedings on one

5    day?

6    A    I did.  I did.

7    Q    During this period of nearly three years, is that correct?

8    A    Yes, sir.

9    Q    And what is the day that you prepared?

10   A    It was the initial day, November 16th of '05, when the, when

11   they first began, Mr. Mitchell seize the microphone and they made

12   the statements.  I basically took, of the two hours or rough,

13   roughly two hours of proceedings, I took six individual,

14   basically, snippets of the, of the two hour period, which is

15   basically filled with these statements.  But I chose six small

16   portions of it.

17             (CD played.)

18   Q    Who's this talking right now?

19   A    What I did, because of the length of each of the colloquies,

20   I stopped at the, two-thirds of the way through Mr. Mitchell's

21   and basically Mr. Martin verbatim, Mr. Harris verbatim, and then

22   Mr. Gardner, I took the end of his so as to not have to sit

23   through the, the entire length of it.  It's quite long.

24             (CD played.)

25   Q    Detective Benson, you made this CD working from some

45

1    reel-to-reel tapes, is that correct?

2    A    That's correct.  That's why the voices sound a little deeper

3    than they typically are, especially His Honor.  Sounds very, very

4    deep.  The tape, reel-to-reel, there was no way to control the

5    speed to get it to that proper level.  So that's the best

6    recording I could make.

7    Q    Was the discussion that we just heard at a somewhat slower

8    speed than the actual discussion in the courtroom?

9    A    Yes.  Much slower.

10   Q    Okay.  Finally, Detective Benson, the Court has heard or the

11   jury has heard testimony about a man by the name of Felton Byrd,

12   is that correct?

13   A    Yes, sir.

14   Q    Do you know, is Felton Byrd dead or alive?

15   A    He's dead.

16   Q    And when did he die?  What year?

17   A    I believe it was in 2006, if I'm not mistaken.

18   Q    Could it have been early 2007?

19   A    It's possible.

20   Q    Okay.  And by the way, his death did not have anything to do

21   with these defendants?

22   A    No, sir.

23   Q    Okay.  No further questions, Your Honor.

24        THE COURT:  All right.  Members of the jury, we'll

25   stand in recess for 15 minutes.  Please leave your note pads on

1    your chairs.  Have no discussion about any of the evidence you've

2    heard so far or about the case.  Continue to keep an open mind

3    about all issues.  The jury is excused for a 15 minute recess.

4                We will stand in recess for 15 minutes.

5                (Recess at 11:45 a.m.)

6                THE COURT:  Ready, Ms. Rhodes?

7                MS. RHODES:  For?

8                THE COURT:  Cross examination.

9                MS. RHODES:  Actually, Mr. Lawlor's going to do it.

10               THE COURT:  Mr. Lawlor?

11               MR. LAWLOR:  Ready.

12               MR. MARTIN:  Your Honor, just for the record, when that

13   last sequence was played, it was obviously not the one I heard on

14   Friday because there were a lot of, out of, as Mr. Harding said,

15   it was unbalanced against Mr. Mitchell.  So what we then heard

16   was unbalanced against my client.  I wasn't prepared that all

17   that stuff was going to be added.  And I object to the Court

18   allowing it to be played and I move for mistrial.

19               THE COURT:  All right, Mr. Martin.  The motion for

20   mistrial is denied.  We'll have the jury, please.

21               Counsel, I'd like to give the jury some extra lunch

22   time, if you're willing to argue your motions before we resume.

23   Or I can just bring them back and we can conclude the cross

24   examination and then have argument, and then bring them back for

25   a couple of defense witnesses.  I'm happy to do it any way you

1    want.

2              I've gotten written arguments from everyone except Mr.

3    Mitchell, and I appreciate that.  But I'll confer before -- well,

4    anybody have a view as to how we might do it?

5              MR. COBURN:  No preference, Your Honor.

6              MR. MARTIN:  No preference, Your Honor.

7              THE COURT:  Okay.  So let's have argument, again,

8    technically, before the government rests.  Because I'm assuming

9    we won't conclude the cross before we break for lunch, close to

10   1:00.

11             MR. MARTIN:  We might, Your Honor.

12             THE COURT:  We might?  Okay.  Good.

13             MR. MARTIN:  Mr. Coburn says we won't.

14             (Jury enters the courtroom.)

15             THE COURT:  Mr. Lawlor, you may proceed whenever you're

16   ready.

17             CROSS EXAMINATION

18   BY MR. LAWLOR:

19   Q    Thank you, Your Honor.  Good afternoon.

20   A    Good afternoon.

21   Q    Is it all right if I call you Detective?  Is that

22   appropriate?

23   A    Whatever you want.

24   Q    I appreciate that.  Let me start off where you finished with

25   Mr. Harding.  That testimony about the pleadings and the conduct

1    of the defendant, conduct of the defendants in court, we have

2    collectively been calling that euphemistically the flesh and

3    blood defense, is that right?

4    A    That's correct.

5    Q    And that is vernacular; it comes straight from language from

6    the pleadings that the defendants have filed and things that

7    they've said in court, I'm a live flesh and blood man, right?

8    A    Correct.

9    Q    Okay.  And this flesh and blood defense is not unique to

10   these defendants, is it?

11   A    No.

12   Q    Okay.  In fact, did you hear, in fact, a court refer to it

13   on the tape as a phenomenon?  Did you hear him say that?

14   A    Yes.

15   Q    And is that a fair characterization of this, that it's a

16   phenomenon, at least in the District of Maryland?

17   A    Yes.

18   Q    Okay.  And you testified before the grand jury in December

19   of 2006, right?

20   A    Correct.

21   Q    And you testified about this phenomenon at that time, right?

22   A    Correct.

23   Q    And so you were then and are aware now of the fact that this

24   flesh and blood defense and these pleadings were well traveled in

25   this district, is that right?

1    A    I've heard of other cases, yes.

2    Q    Okay.  In fact, now Mr. Mitchell has been housed for the

3    better part of his incarceration in this case over at Supermax,

4    right?

5    A    Correct.

6    Q    Which is a euphemism, again, for the Maryland Correctional

7    Adjustment Center, right?

8    A    Yes.

9    Q    Which is a pretrial facility owned by the State but the feds

10   rent bed space there for pretrial detainees, right?

11   A    Correct.

12   Q    Okay.  And many of the defendant in this district who've

13   raised complaints similar to the defendants in this case were

14   housed at Supermax, right?

15   A    Correct.

16   Q    Okay.  And you actually are aware of sort of the background

17   of this defense.  Doesn't it come from sort of a tax protester, a

18   white supremacist movement?

19   A    That's my understanding of it, yes.

20   Q    Which makes it sort of ironic, then, that four

21   African-Americans would raise it in this court, right?

22   A    Correct.

23   Q    Okay.  And you're aware of the fact -- so it's been raised

24   by many other defendants in this courthouse, right?

25   A    I don't know about many.  I know of --

1    Q    Other?

2    A    -- one or two myself.

3    Q    And as at least, are you aware of the fact that at least one

4    defendant watched his trial from a video monitor up in the

5    marshal's lockup, right?  Have you heard of that?

6    A    I'm not aware of that.

7    Q    Have you compared the pleadings filed in this case to the

8    pleadings filed in other cases, other defendants not involved in

9    this case that raised the flesh and blood defense?

10   A    The pro se pleadings filed?

11   Q    Yes.

12   A    No, I haven't.

13   Q    Okay.  You haven't compared them to pleadings that were

14   filed by other defendants in this courthouse?

15   A    Outside of this case, no.

16   Q    All right.  And one of the things on there, I don't know if

17   you noticed, there's reference to the UCC.  Did you notice that?

18   A    Yes, sir.

19   Q    Do you know what the UCC is?

20   A    Uniform Commercial Code.

21   Q    All right.  Does that have anything to do at all with

22   criminal law or federal criminal jurisdiction?

23             MR. HARDING:  Objection.

24             THE COURT:  Overruled.  You can answer if you know.

25   A    My understanding is that it has to do with business law.

1    Q    Okay.

2    A    Contract law.

3    Q    And what's a preferred stockholder?  Do you know what that

4    is?

5    A    I wouldn't know.

6    Q    Okay.  So some of the pleadings, at least, are jibberish?

7    A    My opinion?

8    Q    Yeah.

9    A    Yes.

10   Q    Okay.  And then other parts, though, raise a challenge to

11   the jurisdiction of the court.  Is that fair?

12   A    Correct.

13   Q    Okay.  And you are, Mr. Harding was calling you a task force

14   officer.  Is that, task force agent?  Is that your other title

15   other than detective?

16   A    Yes, sir.

17   Q    But you're actually by and large the person, folks who pay

18   your salary are the Baltimore City Police, right?

19   A    That's correct.

20   Q    You're a Baltimore City, are you a homicide detective?

21   A    I'm currently with the Violent Crimes Impact Division as a

22   narcotics officer.

23   Q    Okay.  But you're a detective?

24   A    Yes.

25   Q    And you're employed by the Baltimore City Police Department?

1   A    Correct.

2   Q    And that's who pays your salary?

3   A    For the most part, correct.

4   Q    You're here investigating this case and present in this

5   trial by virtue of the task force?

6   A    Correct.

7   Q    Okay.  But you're aware of the fact, when you investigate

8   cases and file charging documents, that the Federal Court is a

9   court of limited jurisdiction, right?

10  A    Correct.

11  Q    Okay.  So if you have, and I don't mean to be cavalier, but

12  a run-of-the-mill murder case, and again, I don't say that

13  lightly to be cute, but jurisdiction lies with the state nine

14  times out of ten, right?

15        MR. HARDING:  Objection.

16        THE COURT:  Sustained.

17  Q    Are you aware of the fact, though, that jurisdiction does

18  not always lie with the Federal Court?

19        MR. HARDING:  Objection.

20        THE COURT:  Overruled.  You may answer.

21  A    As far as murder?

22  Q    As far as really any crime, let's say.  Murder included.

23  A    It depends.  I've charged it in both federal and state

24  court.

25  Q    Okay.  But there's not always federal jurisdiction, is

1  there?

2  A    No.

3  Q    All right.  So a complaint to, to this court that it lacks

4  jurisdiction to hear a matter is not the most unfounded thing

5  you've ever heard, is it?

6  A    No.

7         MR. HARDING:  Objection.

8         THE COURT:  Sustained.

9  Q    Now, you talked about, you talked about hearings where the

10  defendants' voice their complaints, you know, sort of commented

11  on their interrupting the court and so on, so forth.  How long

12  have we been in trial now, since the first day this trial

13  started?

14  A    September 15th.

15  Q    Well, the ninth week, eighth week?

16  A    About the eighth week, I believe.

17  Q    Okay.  And I don't know if the jury notices this because I

18  think the judge is already on the bench when they come in from

19  the jury room, but when the judge comes into the courtroom, we

20  all rise, is that right?

21  A    Correct.

22  Q    That's a symbol of respect to the Court and to His Honor,

23  right?

24  A    Yes.

25  Q    Likewise, when the jury comes in from the jury room, we all

CROSS EXAMINATION OF BENSON BY LAWLOR                              54

1    rise as a show of respect to the jury and for their service, is

2    that right?

3    A    Correct.

4    Q    And you've been sitting right here behind the defendants

5    through the entirety of the trial, right?

6    A    Yes.

7    Q    And the defendants, each and every one of them, when the

8    judge comes in, they all rise and show their courtesy to the

9    judge, right?

10   A    Correct.

11   Q    And when the jury comes in, they've risen and demonstrated

12   their courtesy to the jury, right?

13   A    Yes.

14   Q    They haven't interrupted the proceedings when the jury's

15   been out of the courtroom during this trial, have they?

16   A    No.

17   Q    Okay.  Okay.  In fact, wasn't it just a week or two, but

18   that Judge Davis commented to the defendants --

19           MR. HARDING:  Objection.

20           THE COURT:  Objection sustained.

21   A    If I could back up and answer that question that you,

22   previous question.  I misstated it.

23   Q    Actually, that's fine.  Thank you.  We'll move on.  Mr.

24   McCaffity.  Were you part of the investigation that ended up with

25   a GPS tracking device on his vehicle?

1    A    Not at that initial stage, no.

2    Q    Okay.  But as you investigated the case, you became aware of

3    the fact that Baltimore City detectives had placed a tracking

4    device, a GPS tracking device on his car, right?

5    A    Correct.

6    Q    And that is a, is that a unique, is that a fair

7    characterization, a unique investigative tool?

8    A    I wouldn't call it.

9    Q    How about this word?  Is it an uncommon investigative tool?

10   A    No.

11   Q    It's not?  Is that something you commonly do to investigate

12   cases?

13   A    I do regularly, yes.

14   Q    In what percentage of cases would you utilize a GPS device?

15   A    That I work now?

16   Q    Yes.

17   A    95%.

18   Q    What about back then in 2001 or 2?

19   A    Back then, I was a homicide detective.  I wouldn't, never.

20   Q    Were you aware of the frequency of a GPS device in 2002?

21   A    Yes.

22   Q    Okay.  What would you say its frequency was back then?

23   A    I would say it was very common.

24   Q    Very common?  Did you use the GPS tracking device on any

25   vehicle associated with Mr. Mitchell?

1    A    No.

2    Q    Okay.  You also referenced, I think, in discussion of your

3    background, Title III investigation.  Did I hear you comment that

4    you're --

5    A    Yes.

6    Q    -- have been in your experience, involved in Title III

7    investigations?

8    A    Yes, sir.

9    Q    What is Title III?

10   A    Well, it's a misused term.  It's technically Title 18, if

11   I'm not mistaken.  It's a wiretap, basically.  But it's been,

12   become known as a Title III investigation, for whatever reason.

13   Q    Okay.  Lawyers colloquially have used the term Title III to

14   mean when you all are utilizing wiretaps?

15   A    Correct.

16   Q    And that is something that typically you will need to have

17   approval of the Court to run a Title III wiretap?

18   A    Correct.

19   Q    Okay.  Did you use Title III or wiretapping of any of Mr.

20   Mitchell's calls?

21   A    No.

22   Q    All right.  Now, getting back to Mr. McCaffity.  You are

23   aware of who he is and how he plied his trade, correct?

24   A    Yes.

25   Q    And you commented on how he plied his trade when you

1    testified before the grand jury, right?

2    A    Correct.

3    Q    And Mr. McCaffity was, in fact, known and is known to you as

4    someone who engaged in the robbery and murder of other drug

5    dealers, right?

6    A    Correct.

7    Q    Okay.  And in terms of the phone calls that you showed the

8    ladies and gentlemen of the jury, Mr. Mitchell and Mr. McCaffity

9    had occasion to, at least their phones were connected for some

10   time, right?

11   A    Correct.

12   Q    And I realize that's a poorly worded question.  But your

13   phone analysis, your toll analysis showed that from time to time

14   they would talk?

15   A    Correct.

16   Q    So the fact that they spoke on the 26th or 27th of February,

17   the year 2002, that was not unique?  It was not uncommon.  It

18   wasn't unheard of for them to communicate via cell phone?

19   A    No.

20   Q    Okay.  And so your analysis, and I think this is Exhibit

21   B-1, it is Exhibit B-1, Government's Exhibit B-1, this goes back

22   to January 31st of 2002 through the end of, up to the 27th of

23   February, 2002, shows phone calls from Mr. McCaffity to Mr.

24   Mitchell?

25   A    Correct.

1    Q    And your analysis only went back to January 31st because

2    that's as far back as you could conduct analysis because either

3    Mr. Mitchell's phone or Mr. McCaffity's phone number wasn't known

4    to you prior to that, is that right?

5    A    No.  The phone was not in use prior to that.

6    Q    Okay.  The phone wasn't in use?

7    A    Right.

8    Q    But you're not, this doesn't suggest that the first time

9    they ever spoke on the phone was January 31st, 2002?

10   A    No.  No.  No.

11   Q    Okay.  And likewise, looking at Exhibit B-2, Mr. Mitchell,

12   your analysis showed, was known to call Mr. McCaffity?

13   A    Correct.

14   Q    Okay.  And then looking at Exhibit B-3 -- now, these phone

15   calls show, do they not, save for a call on the 26th, can you

16   read that or is that too faded?

17   A    I can read it.

18   Q    All right.  So save for an attempted call that was

19   unsuccessful on the 26th at 6:00 and a call from Mr. Mitchell to

20   Mr. McCaffity 9:43 on the 27th, these are all calls that Mr.

21   McCaffity's making to Mr. Mitchell, right?

22   A    No.  Oh, you're talking about except for --

23   Q    All right.  The first phone call, if we go from left to

24   right, the first phone call is unsuccessful.  That's Mr. Mitchell

25   trying to reach Mr. McCaffity, right?

1    A    Correct.

2    Q    And then moving from left to right.  Save for the call at

3    9:43 on the 27th, which is Mr. Mitchell to Mr. McCaffity, all

4    other calls are Mr. McCaffity trying to reach Mr. Mitchell,

5    correct?

6    A    Either trying to or, in fact, reaching him.

7    Q    Or in fact reaching him.  Right.  Fair enough.

8    A    Yes.

9    Q    Including between -- I'm having trouble reading this myself.

10   Between 8:33, 9:41, 18 times that he tried, Mr. McCaffity tries

11   to call Mr. Mitchell?

12   A    That's correct.

13   Q    Okay.  And likewise, and I don't have the records in front

14   of me, you showed the ladies and gentlemen of the jury, you and

15   other witness who has testified, phone contact between Mr.

16   Mitchell and Mr. Wyche?

17   A    Correct.

18   Q    And that would be Darryl Wyche, right?

19   A    Yes.

20   Q    Okay.  And similar to the questions that I just asked you

21   about conversations or communication between Mr. McCaffity and

22   Mr. Mitchell, it was not uncommon for Mr. Mitchell and Mr. Wyche

23   to converse?

24   A    Correct.

25   Q    And we heard testimony that they knew each other?

1    A    Yes.

2    Q    And were friendly?

3    A    Yes.

4    Q    And that Mr. Wyche may have even been Mr. Mitchell's

5    connect?

6    A    Correct.

7    Q    Okay.  Let me ask you a question.  This might dovetail back

8    into the flesh and blood.  I think I just have one question.

9    You'll forgive me.  But Mr. Mitchell was arrested on April 1st,

10   2002, is that right?

11   A    Yes, sir.

12   Q    And he's been in custody continuously since the date of his

13   arrest, is that right?

14   A    Yes, sir.

15   Q    And the first tape that you played is, the tape that you

16   played, let me ask you, which is November of 2005, was the first

17   time that Mr. Mitchell orally represented to the Court his

18   complaint about jurisdiction, or anything else for that matter,

19   correct?

20   A    Correct.

21   Q    Okay.  So that was some three and a half years later?

22   A    Yes.

23   Q    The case had been pending without a trial either in state

24   court or in federal court for three and a half years at the time

25   that Mr. Mitchell raised this complaint?

1    A    Correct.

2    Q    Okay.  Now, you saw the testimony of Mr. Hayes, correct?

3    A    I did.

4    Q    And you're aware of his relationship with Mark Herbert,

5    right?

6    A    Yes.

7    Q    That although they're not necessarily blood related, they

8    share a common sister, refer to themselves as brothers, right?

9    A    Correct.

10   Q    And Mr. Herbert goes by the nickname TM?

11   A    Correct.

12   Q    And did you interview TM?

13   A    I attempted to.

14   Q    You did?  He testified before the grand jury in this matter?

15   A    Not to my understanding, but we attempted to serve him with

16   a subpoena to do so.

17   Q    You attempted to serve him with a subpoena to testify before

18   the grand jury or you attempted to serve him with a subpoena to

19   testify at trial?

20   A    I believe it might have been both.  I'm not 100% sure.

21   Q    If I represented to you that Mr. Herbert testified before

22   the grand jury, would you accept that representation?

23   A    I would, yeah.

24   Q    Okay.  Were you there, are you aware of everyone who

25   testified before the grand jury?

1    A    For the most part.  There were many.  So like Mr. Herbert, I

2    wasn't completely aware that he had.

3    Q    Okay.  And there's just a lot of witnesses and a lot of

4    time?

5    A    Yes.

6    Q    Okay.  Forgive me, because I think you just answered this

7    and it went right past me.  But you attempted to serve Mr.

8    Herbert with a grand jury or a trial subpoena?

9    A    I didn't personally, but members of the investigation did,

10   yes.

11   Q    With which?  A trial or a grand jury subpoena?

12   A    Again, I believe, I believe it was both.  I'm not 100% sure.

13   Q    Okay.  Is there a reason why you would have been

14   unsuccessful in trying to serve him with a trial subpoena?

15   A    He was uncooperative to speak to us.  Did not wish to

16   cooperate with authorities.

17   Q    All right.  Well, you don't need to talk to him in order to

18   serve him with a subpoena, do you?

19   A    No.

20   Q    Okay.  So --

21   A    We need to see him face to face in person.

22   Q    Hasn't he been in court during this trial?

23   A    Yes, he has.

24   Q    Okay.  So you could have served him with a subpoena?

25   A    I didn't realize it was him until a good portion, maybe the

1    third, fourth week into the trial I realized that it was him that

2    had been seated in the courtroom almost every day.

3    Q    Okay.

4    A    I didn't know him by face.

5    Q    All right.  But the bottom line is he has not been served

6    with a subpoena?

7    A    Not by me, no.

8    Q    All right.  And you're the last government witness, aren't

9    you?

10   A    Correct.

11   Q    Okay.  So he will not be testifying on behalf of the

12   government?

13   A    Not to my knowledge, no.

14   Q    All right.  Now, you investigated, obviously, a lot of

15   different aspects of this case, correct?

16   A    Correct.

17   Q    And there was a search done, for example, of Mr. Mitchell's

18   home on, I can never pronounce the street.

19   A    Valdavia Court.

20   Q    Valdavia Court?

21   A    Yes.

22   Q    You were at that search or you're aware of the --

23   A    I was present.

24   Q    -- results of the search?

25   A    Yes.

1    Q    As I said, Mr. Mitchell was arrested in April of 2002.  Have

2    you been in the case since April of 2002?

3    A    Yes.

4    Q    Okay.  So six years.  I haven't seen any evidence that Mr.

5    Mitchell had any of the trappings of wealth that we've heard of

6    other individuals.  You know, there's been a lot of talk about

7    the Wyche brothers and their Rolls Royce.  There's been no

8    evidence, you haven't presented any evidence, the government

9    hasn't presented any evidence about trappings of wealth that Mr.

10   Mitchell was in possession of?

11   A    No.

12   Q    Is that a fair statement?

13   A    Yes.

14   Q    All right.  And like you mentioned, Mr. Kemp was on Stop

15   Snitching One and that he was flashing Rolexes and that he had

16   shown his cars?

17   A    Correct.

18   Q    And cash.  And we heard about the Wyche brothers Rolls

19   Royce, right?

20   A    Correct.

21   Q    And you were here when, I can't remember his Christian name,

22   but when White Boy testified about his plea agreement and all the

23   things that he had to forfeit, including real estate and Rolexes

24   watches and things like that?

25   A    Mr. Clash, yes.

1    Q    Mr. Clash.  That's right.  Thank you.  Okay.  So when you

2    searched Mr. Mitchell's home, you didn't find a large, a large

3    volume of money, for example?

4    A    No, sir.

5    Q    No Rolex watches?

6    A    No.

7    Q    No deeds to property?

8    A    No, sir.

9    Q    Anything of that ilk?  I believe this is the final topic I

10   want to cover with you, which concerns the voice identification.

11   You have, you've heard the tape, correct?

12   A    Yes, sir.

13   Q    And you've played it to any number of witnesses and asked

14   them to identify voices on it, correct?

15   A    Talking about the voice mail tape?

16   Q    The voice mail.  The inadvertent voice mail message that

17   went to Ms. Magginson's phone.

18   A    Yes.

19   Q    From Mr. Wyche's phone.  You've played that tape to any

20   number of witnesses?

21   A    Yes.

22   Q    How many, would you say?

23   A    That I was personally there for?  Three, maybe.

24   Q    Okay.  But if you were only there for the tape being played

25   at three, you certainly would be aware as the case agent other

1    times it was played, is that right?

2    A    Yes, sir.

3    Q    So how many times was it played total?

4    A    I believe Detective Niedermeier said there were maybe eight,

5    six to eight people at the house.  So I would, I would be

6    assuming, but I would say that he probably would have played it

7    for all six of them, plus the two or three that I played it for.

8    Maybe ten people total.

9    Q    All right.  And are you aware of the fact that the jury has

10   been shown a transcript that purports to summarize or capture

11   some of the things that were said on the tape, right?

12   A    Yes, sir, I prepared that.

13   Q    Do you know who produced that?

14   A    I did.

15   Q    And you're aware of the fact, are you not, that other

16   transcripts exist, are you not?

17   A    It came out that the State's Attorney's Office, the

18   Baltimore City State's Attorney's Office may have prepared one on

19   their own but I've never seen it.  The only one that I'm

20   personally aware of is the one that I prepared myself.

21   Q    Well, there's the one that you reference that the State's

22   Attorney's Office prepared.  And then there's also another one

23   that was prepared and shown to witnesses in the federal grand

24   jury, isn't that right?

25   A    Again, I'm not aware of that.  I've had the transcript that

1    I prepared.  And other than that, I have no knowledge of

2    specifics of anything else that might have existed or who might

3    have prepared it.

4    Q    You have access to all of the government's evidence, do you

5    not?

6    A    There's volumes and volumes and volumes, yes.

7    Q    Now, you were here when Natasha Wyche testified, right?

8    A    Yes, sir.

9    Q    Okay.  And I assume you're present when witnesses are

10   prepped for testimony?

11   A    Not every one of them.  But for the most part, yes.

12   Q    All right.  And she testified, did she not, that she heard

13   someone say the word 'Shorty' on the tape, right?

14   A    Correct.

15   Q    And that was, she attributed that to Mr. Martin, is that

16   right?

17   A    I believe that's what she testified to, yes.

18   Q    Okay.  And then Mr. Hayes testified more recently, and he

19   attributed certain comments to certain defendants, also, did he

20   not?

21   A    Correct.

22   Q    And on his, on the transcript where he could purportedly

23   identify a voice, you filled in the name of who he said was

24   making that comment, right?

25   A    I didn't fill that in.  But I saw the document, yes.

1  Q    You saw the document?

2  A    Yes.

3  Q    And it was filled in?  It's the second version of the same

4  transcript, in essence, right?

5  A    Correct.

6  Q    And on his, his purported identification, he said that at

7  different stages Mr. Mitchell said Shorty and Mr. Harris said

8  Shorty?

9  A    I would have to see the document.  I don't believe that's

10 true.  There's one statement about, having a fresh scale, Shorty.

11 I believe he attributed that to Mr. Martin -- I mean to Mr.

12 Harris.

13 Q    All right.  He didn't even know Mr. Martin, really, right,

14 or at all for that matter, did he?

15 A    I'd have to review his, his testimony.  But I don't believe

16 he did know him that well.

17 Q    All right.  So Ms. Wyche identified Mr. Mitchell and Mr.

18 Martin.  And then Mr. Hayes identified Mr. Harris and Mr.

19 Mitchell, right?

20 A    Mr. Hayes identified Mr. Mitchell and Mr. Harris, correct.

21 Q    And you testified about this in front of the grand jury,

22 right?

23 A    About the identification?

24 Q    The voice ID, right?

25 A    Not at that -- no.  The grand jury occurred before these

1    ID's were made.

2    Q    Let me show you your testimony and ask you if this refreshes

3    your recollection.  Page 30, 31.  And if I could just ask you to

4    read this to yourself.

5              MR. HARDING:  Your Honor, the government objects to

6    hearsay.

7    Q    Just asking if it refreshes his recollection about whether

8    or not he testified about the ID in front of the grand jury.  I'm

9    not asking a question at this time.

10   A    Which line are you referring to?

11   Q    Just toward the bottom of Page 30, on to 31.

12   A    Yes.

13   Q    All right.

14   A    I was testifying to --

15   Q    Well, just hold that thought.

16   A    Okay.

17   Q    All right.  You did testify in the grand jury about the

18   tape, right?

19   A    Correct.

20   Q    All right.  Now, my question is, for example, Ms. Wyche said

21   that it was Mr. Martin who used the vernacular "Shorty", right?

22   A    Initially, correct.  Yes.

23   Q    All right.  And then Mr. Hayes said that it was Mr. Mitchell

24   and/or Mr. Harris that used the vernacular "Shorty", right?

25   A    Mr. Harris, correct.

1    Q    All right.  And this wasn't the only time that a witness

2    attributed a certain comment to Individual A and then another

3    witness attributed the same comment to Individual B, right?

4            MR. HARDING:  Objection.

5            THE COURT:  Well, why don't you rephrase the question,

6    Mr. Lawlor?  I think you can rephrase it.

7    Q    Okay.  I'm trying to make this clear, Your Honor.  Multiple

8    witnesses identified or attempt to identify people on the tape,

9    right?

10   A    Correct.

11   Q    Okay.  And there were occasions where there would be a line

12   and a witness would say, That's Mr. Mitchell, for example?

13   A    Correct.

14   Q    And then someone else would come around, hear the same line

15   and say, That's Mr. Martin?

16           MR. HARDING:  Objection, Your Honor.

17           THE COURT:  Overruled.  You can answer that.

18   A    I wasn't present for the playing of the tape for the

19   individuals at the house during that initial part of the

20   investigation.  The grand jury testimony is basically a summary

21   of the facts in the case.  The fact was that the tape was played

22   for several witnesses and several witnesses made ID's, but I

23   can't tell you specifically who said what about what was said on

24   the tape other than what I know was said and what Mr. Hayes knows

25   was said.

1   Q    All right.  Let me, did you read the bottom of Page 30 and

2   the top of Page 31?

3   A    I read the bottom of Page 30.

4   Q    I ask you to read the bottom of Page 30 and the top of Page

5   31.

6   A    Yes.

7   Q    Okay.  Now, my question is, again, isn't it true that

8   passages on that voice mail recording, the same line might be

9   attributed to the same, to different people?  The same passage

10  would be attributed to different people?

11  A    It says, Is it possible that individuals identified

12  different words in the tape?  And I say, It's possible because I

13  wasn't present for the playing of it so I can't say what

14  identifications were made, other than what I was present for,

15  which was Mr. Hayes and what I attribute was said on the tape

16  myself.

17  Q    Let me read you the question so we can be clear.  Wasn't the

18  question posed to you:  Would it be fair to say, also, that some

19  of them could listen to the same passage on the tape and

20  attribute it to one of these guys and another might attribute it

21  to another of these guys?  Answer:  Yes.

22  A    Some of them could listen to, yes.

23  Q    All right.  Court's indulgence, please.

24       THE COURT:  Yes.

25  Q    That's all I have.  Thank you, Detective.

1          THE WITNESS:  Thank you.

2          CROSS EXAMINATION

3   BY MR. MARTIN:

4   Q    Good afternoon, Detective.

5   A    Good afternoon, Mr. Martin.

6   Q    You just read Page, I guess, 31 and 32?

7   A    Yes.

8   Q    Of your grand jury?

9   A    Or 30 and 31.

10  Q    30 and 31.  I'm sorry.  And if I understand it, though, you

11  only did this exercise with two or three people and that you know

12  Detective Niedermeier did it with a number of others?

13  A    Correct.

14  Q    And you know that the, there were identifications in some

15  instances of Mr. Harris and in other instances of Mr. Martin

16  saying the same thing?  That much you do know?

17  A    Correct, yes.

18  Q    Okay.  Now, at some point you did your own transcript; is

19  that what I heard you say?

20  A    Yes, sir.

21  Q    And prior to you doing that own transcript, you didn't look

22  at any other transcript?

23  A    That's correct.

24  Q    You just flat out put the earphones on and sat there for

25  hours?

1    A    Correct.

2    Q    Trying to figure it out, right?

3    A    Yes.

4    Q    And then when you testified in the grand jury, you told the

5    grand jury what you thought you had heard, didn't you?

6    A    I believe I may have.  The transcript was prepared after.

7    My transcript was prepared after, if I'm not mistaken, of the

8    grand jury.

9    Q    Well, let me show you -- Page 28, Mr. Harding.  Take a look

10    at Page 28, right there.  Line, I guess it's Line 13 or 14.

11    Could you read that?

12    A    Yes.

13    Q    Does that refresh your recollection, that there were

14    transcripts prepared before you testified in the grand jury?

15    A    That there was a transcript that had been done.  I believe I

16    was referencing the one the State's Attorney's Office had done.

17    At that, at the time of my grand jury testimony, I was

18    summarizing the case.  I hadn't actually listened to the tape and

19    done my own transcript myself until much later.

20    Q    So let me show you what was marked earlier as Defendant

21    Harris's Exhibit One.  Is this the transcript that you were

22    referring to in the grand jury?

23    A    Is it?  Where it says Cell Phone Transmission Transcript?

24    Q    If you read the transcript, that's just a cover letter.

25    A    I'm sorry.  Yes, sir.

1    Q    So that would appear to be the transcript that you were

2    referring to when you testified in the grand jury?

3    A    I hadn't read this.  I was testifying to a summary of the

4    case.

5    Q    You testified to a summary of the case?

6    A    Correct.

7    Q    But you hadn't read Defendant's Exhibit One?

8    A    That's correct.

9    Q    But you referred to transcripts that had been prepared,

10   correct?

11   A    Correct.

12   Q    And you had listened to the tape at that point in time,

13   hadn't you?

14   A    I had not at that point.

15   Q    Well, once again, let me show you, did you tell the grand

16   jury, there's several voices talking about the murders that were

17   just done; one individual says, I feel like a hit man?

18   A    Yes.  I was summarizing what was told to me by investigators

19   in the homicide case.

20   Q    You were under oath and you told the grand jury that you

21   heard, I feel like a hit man?

22   A    I believe I said that those statements were made, they were

23   relayed to me by the homicide investigators.  I didn't hear "I

24   feel like a hit man."

25   Q    Well, take a look at Page 28 again.  You could read it, and

1    let me ask you a question.

2    A    The entire page?

3    Q    No.  You could read just the part you were reading before.

4    I just want you to read it again.

5    A    Yes.

6    Q    Is it in anywhere where you told the grand jury that that

7    wasn't you that had that information, but someone else?

8    A    I told the grand jury that I was summarizing the case before

9    them.

10   Q    In general, that's what --

11   A    I didn't tell them that I personally heard those statements,

12   no.

13   Q    With respect to these statements that the, you say one

14   individual says, I feel like a hit man?

15   A    Yes.

16   Q    You didn't tell the grand jury that some third person told

17   you that's what they heard, did you?

18   A    I didn't tell them that, no.

19   Q    And at another point you say, Did you see how their heads

20   slumped forward?

21   A    Correct.

22   Q    Again, that's something someone else told you, but you never

23   listened to the tape and you didn't read the transcript,

24   Defendant's Exhibit One?  You hadn't read that transcript?

25   A    Until after the grand jury, correct.

1    Q    And then you told the grand jury, did you not, that at one

2    point an individual says, Yeah, I was like bup, bup, bup, bup,

3    bup, bup?  And he does five, makes the sound of five gunshots or

4    bups, B-U-P-S, as they sound on the tape.  That's what you told

5    the grand jury, isn't it?

6    A    I don't know how they transcribed it when, my testimony in

7    the grand jury, but I believe I said buc, buc, buc, buc.  Whether

8    it's buc or bup.

9    Q    It came out as bup, bup, though, didn't it?

10   A    Apparently it did, yes.

11   Q    Okay.  Let me show you Defendant's Exhibit One again.  The

12   state's attorney's transcript.  If you'll take a look at the page

13   numbered 1438 at the bottom.  Read that line beginning at 340.

14   What does it say?

15   A    Bup, bup, bup, bup, bup.

16   Q    Not buc, but bup, right?

17   A    That's correct.

18   Q    But you never read this transcript before you testified in

19   the grand jury?

20   A    That's correct.

21   Q    And as part of your summation of the case to the grand jury,

22   you told the grand jury about the incident in the marshal's

23   lockup here where Mr. Hayes claims that Mr. Harris beat him up?

24   A    I believe that was part of my testimony, yes.

25   Q    And you told the grand jury that, didn't you, that Mr. Hayes

1    was there because you had him in to talk to him that day, didn't

2    you?

3    A    I don't recall what I said.  I indicated that he was there.

4    Q    I'm sorry.  Please take a look at Page 64, Line 11.  You can

5    actually read the question above it.

6    A    Yes.

7    Q    So you told the grand jury on that day that Mr. Hayes was

8    there because he'd been brought in to talk to you, didn't you?

9    A    Correct.

10   Q    In your summary of phone conversations that you testified to

11   the other day and, I think it was the other day, I don't think it

12   was this morning, the one chart, you had all these calls,

13   hundreds of calls from different players in this, in this matter.

14   There was one call to Shelton Harris's Amity Street address from

15   Wayne, correct?

16   A    Correct.

17   Q    That's the only call you ever found?

18   A    Correct.

19   Q    With respect to Mr. Harris on, with respect to Mr. Harris

20   and Mr. Martin?

21   A    That's correct.

22   Q    Okay.  And you don't know who was actually making the call.

23   All you know is it's Phone A to Phone B, right?

24   A    I know that I could speak with a reasonable degree of

25   certainty that it was Mr. Martin contacting the house of Shelton

1    Harris.  I don't know who answered it on that end.

2    Q    And it could have been someone using Mr. Martin's phone,

3    too, couldn't it?

4    A    It's possible.

5    Q    Okay.  And over a three month period between January of '02

6    and, was it May of '02?  Is that when that?  The five month

7    period, when you had that chart with all the different calls

8    between everybody.

9    A    There's varying.  All the phones, some of them were active

10   for longer periods of time, shorter periods of time.  So there's

11   not one time period.  Mr. McCaffity's phone, I was able to go

12   back to maybe January.  Some of the other phones were active

13   only, like I said about the 3912 number, for maybe a two week

14   period.  So there's varying -- it wasn't, it wasn't one

15   particular time period.

16   Q    Mr. Mitchell's phone you could get back to January on, is

17   that right?

18   A    If you ask, there's several of them.  I can tell you which

19   ones.

20   Q    It's the one where you listed 89 calls between Mr. Mitchell

21   and Mr. Harris over a period beginning in January of '02.  And I

22   just can't remember when it ended.

23   A    Are you referring to this?

24   Q    I know you'll remember.

25   A    Yes, I will, of course.  Yes, this is a summary of the four

1    cellular telephones that I'm able to attribute to Mr. Mitchell,

2    two land lines, and the land line of Shelton Harris.  There were

3    89 calls between those four cellular telephones.

4    Q    I'm sorry.

5    A    Between the period of 1/18/02 to 3/31/02.

6    Q    And the number of calls between Mr. Mitchell and Mr. Gardner

7    during that same time period are what?

8    A    49 calls.

9    Q    Okay.  And the number of calls between Mr. Mitchell and Mr.

10   Martin are what?

11   A    169 calls.

12   Q    Okay.  And you were just answering some questions from Mr.

13   Lawlor about what you found when you searched Valdavia Court and

14   what you found in your investigation about assets that these

15   defendants have gathered during the course of the time period

16   we've been talking about here in court?

17   A    Yes, sir.

18   Q    Right?  Mr. Harris didn't even own a car, did he?

19   A    Not that I'm aware of, no.

20   Q    He didn't even own a cell phone, did he?

21   A    That's the best knowledge we have, yes.

22   Q    You don't know very many people these days who don't have a

23   cell phone, do you?

24   A    No, sir.

25   Q    Okay.  And do you remember telling the grand jury -- strike

Case 1:04-cr-00029-RDB    Document 694    Filed 06/16/09    Page 80 of 240

1    that.  You have testified under oath that Darryl Wyche was the

2    kind of person who was paranoid.  Do you recall that?

3    A    I don't recall.  I might have, might have summarized that

4    for the grand jury.  I don't --

5    Q    That wouldn't be, it wouldn't surprise you that you would

6    have said that about him?

7    A    No.  I had knowledge that he had been kidnapped twice and

8    that he was a cautious person, yes.

9    Q    And you told the grand jury that he was the kind of person

10   who wouldn't let somebody that he didn't know get in the back

11   seat of his car, would he?

12   A    Correct.

13   Q    Especially because he was sitting there with his seat belt

14   on, correct?

15   A    Correct.

16   Q    That's all I have, Detective.  Thank you.

17            THE WITNESS:  Thank you.

18            CROSS EXAMINATION

19   BY MR. PYNE:

20   Q    Good afternoon, Detective.

21   A    Good afternoon, Mr. Pyne.

22   Q    We're in the afternoon.  Now, I believe your testimony on

23   direct was that for most of the period of this investigation you

24   were in what you called the REDRUM group, is that correct?

25   A    Yeah.  In early 2002, I was assigned to the REDRUM Task

1    Force and it was, trying to think of when they got rid of it.

2    Maybe two years ago.  And it was morphed into a new group.  It's

3    a long explanation.  But yes, for the duration of this

4    investigation.

5    Q    Okay.  And the REDRUM group, I believe your testimony was,

6    designed to investigate drug-related homicides, is that correct?

7    A    Violent drug trafficking organizations and violent

8    offenders, yes.

9    Q    Okay.  And before you were in the REDRUM group, you had been

10   in Baltimore City Homicide, is that correct?

11   A    Yes.  I was in Homicide and I was detailed, still as a

12   homicide investigator from Homicide to the REDRUM task force.  I

13   was still operating as a homicide detective in that task force.

14   Q    Okay.  So technically, I guess, during most of this

15   investigation you were a homicide detective?

16   A    For the first four years of the investigation, yes.

17   Q    Okay.  So you're familiar with the skills that are needed to

18   investigate a homicide?

19   A    Absolutely.

20   Q    Okay.  And based on the testimony so far, am I correct that

21   you were the individual mainly responsible for the telephone

22   records in this case?

23   A    Correct.  Well, step back.  Early on in both investigations,

24   in the McCaffity murder and the Wyche murder, toll records were

25   obtained by other investigators.  But as a whole, for the, for

1   the overall picture of the investigation, I have done the toll

2   analysis, yes.

3   Q    In terms of putting together the various charts we've seen?

4   A    Correct.

5   Q    Those are basically your responsibility?

6   A    Yes.

7   Q    Okay.  Let me go to the chart that you were just referring

8   to.  Ask you a few questions about this.  First beginning with

9   Mr. Mitchell.  You have four cell phones attributed to Mr.

10  Mitchell and two land lines, is that correct?

11  A    Correct.

12  Q    Can you testify whether any of those four are what you

13  referred to as burn phones?

14  A    The 5811, 443-739-5811 was a burn phone, fraudulent account

15  phone.  6204 was not.  It was subscribed to by Jaquetta Smith.

16  The other two were, no -- the 3608 number was subscribed to in

17  the name, I believe it was Curtis Mitchell, the same address as

18  Michele Mitchell.  I don't know if it's a relative, maybe cousin

19  or somebody of Mr. Mitchell.  Not a burn phone.

20         And the final one, seven, 676-8684, I was unable to get

21  any actual toll records for.  So I can't say if it was a

22  legitimate account or not.

23  Q    And what is your definition of a burn phone again?

24  A    There's several different ways.  If someone has a connection

25  that, a cell phone company, they usually will target a company,

Case 1:04-cr-00029-RDB   Document 694   Filed 06/16/09   Page 83 of 240

1    like Maryland Land Design, for example.  If they have multiple

2    employees where they give out phones to all of their different

3    workers, it's very easy to have a phone that is unaccounted for

4    that's part of the bulk account.  Often times those are referred

5    to as burners.  Also, ones you can go to Radio Shack and for $34

6    you can get a boost mobile phone.  Basically, it's a pay as you

7    go.  You put minutes on the phone and when you're done with it,

8    if you want to get rid of it, you just throw it away.

9            To subscribe to it, I've personally done it myself

10   dozens of times -- you basically go on a computer, make up a

11   name, make up an address and contact information, and have the

12   phone activated.  And anyone that were to subpoena that would

13   just get whatever bogus information you put down.  That is

14   another term for a burner phone.

15           There's also clone phones which you don't see as often.

16   But there's devices that can capture, they'll sit on an overpass

17   and actually capture -- cell phones, when you're on your phone,

18   they have a device that acts as a GPS tower that can actually

19   intercept the number and can basically create a bogus SIM card

20   that you can then put in a phone.  And if I was able to snag your

21   phone number out of the air, I could activate, using your exact

22   same phone number.  That's also another term for burner phone.

23   Q    Okay.  So the way you're using burn phone here today,

24   correct me if I'm wrong, is not necessarily an illegal phone?

25   A    Not always, no.  It's just, it could be a pay as you go, put

Case 1:04-cr-00029-RDB    Document 694    Filed 06/16/09    Page 84 of 240

1    minutes on it, get rid of it.  It's not a stolen phone or

2    anything of that nature.  But it's a phone that's hard to trace

3    back to an individual.

4    Q    Okay.  But it could also, the way you're referring to it,

5    mean it is an illegal phone that an individual will use just

6    until the phone company figures it out and cuts it off?

7    A    Correct.

8    Q    Okay.  So you're using it several different manners.

9            Did you identify any of these four phones as a family

10   phone versus a drug phone?

11   A    Of the four Mitchell phones?

12   Q    Yes.

13   A    No.  The closest would come to that is the 6204 number,

14   418-6204, that is subscribed to by Jaquetta Smith and we had

15   testimony from her that she gave it to Mitchell, and that it was

16   his phone, that he was using it.

17   Q    Okay.

18   A    But as far as a family plan or anything like that, no.

19   Q    All right.  So in terms of Mr. Mitchell, at least, there

20   wasn't any distinction between a family phone or a drug phone?

21   A    Correct.

22   Q    Okay.  Why would you think Mr. Mitchell had four different

23   phones?

24   A    It's common for narcotics dealers to, and other --

25            MR. LAWLOR:  Objection, Your Honor.

1          THE COURT:  Sustained.

2     Q    Okay.  Let me just move on past that.  And it's correct that

3     Mr. Harris had no cell phone at all, is that correct?

4     A    Not that I was able to identify 100%.

5     Q    All right.  Let's move on to Mr. Gardner, then.  You have

6     two phones with Mr. Gardner.  The one ending in 1241 is the one

7     that's on top.  Do you know if that was a burn phone or what

8     you're referring to as a burn phone?

9     A    That was subscribed to in the name Samuel Handy.  I wasn't

10    able to nail down if that was, in fact, a person that got the

11    phone for Mr. Gardner or if it was, like I said, you can go on

12    and just make up, I mean, example, we'll get subscriber

13    information on phones sometimes and the name will come up O.J.

14    Simpson and Joe Montana and just, any name you could think of,

15    you'll get them back as subscribers.  So I couldn't say 100% sure

16    if that was, Samuel Handy is a real person or not.  But that's

17    the name it was in.

18    Q    Okay.  So that could have been a stolen phone that the phone

19    company cut off on that date, is that correct?

20    A    That's possible.  Yeah.

21    Q    Or it could have been, as you say, a pay-as-you-go phone?

22    A    Making reference to the 3/26/02 date?

23    Q    Yes.  Because you say it was used up until that day?

24    A    Right.  The service wasn't interrupted on that date.  That's

25    the date that toll, that calls ceased to be made.  The service

1    was actually terminated sometime in April, if I'm not mistaken.

2    Q    Okay.  So could it have been a pay-as-you-go phone that

3    just, the minutes ran out and they decided not to re-up it?

4    A    I'm not sure what company, 1241, I would have to look at

5    the, all the tolls that were moved into evidence and see what

6    phone company that is.  If they have, some of them have

7    pay-as-you-go plans and some don't.  Cingular has one.  AT&T

8    does.  Several of them do and some don't.

9    Q    Okay.  Sitting here today, you don't know why service

10   stopped or why the calls stopped.  You just know that calls

11   stopped as of that day, is that correct?

12   A    That's correct.

13   Q    All right.  And you noted that it appeared that service

14   began or calls began on another phone listed to Shelly Wayne

15   Martin, is that correct?

16   A    Yes.

17   Q    That phone you have listed here?

18   A    540-1253 was actually, that account was started on 3/26/02

19   by Mr. Martin.

20   Q    Okay.

21   A    And was used by Mr. Gardner.  He had a user name down as

22   Donte Eldo, which later on we were able to recover paperwork from

23   Ambo Circle that had that same name on it.  So it was apparent

24   that that phone was subscribed to by Mr. Martin for Mr. Gardner.

25   Q    Okay.  But I believe on direct you testified that you

Case 1:04-cr-00029-RDB   Document 694   Filed 06/16/09   Page 87 of 240

1   attributed that phone to Shawn Gardner because of the listings in

2   the Wyche phone book?

3   A    Yeah.  That there's, the more references you can have to one

4   phone, the more solid it is in my mind that that's the individual

5   using the phone.  And also the fact that he was arrested with it

6   on his person would obviously lead me to believe that he's using

7   that phone.

8   Q    I believe your direct was based on the two listings in the

9   Wyche brothers' phone book.  And also there was a listing for

10  that in Wayne, Joyce Martin's phone book, is that correct?

11  A    On the --

12  Q    On the Shawn Martin phone, or Shawn Gardner phone?  I'm

13  sorry.

14  A    No.  There's another phone that was listed in Joyce Martin.

15  If I can explain this.  There's a phone that's not on the chart

16  that was recovered from the Dodge Intrepid after the arrest of

17  Gardner on June 6th of '02.  That phone, I did a search and

18  seizure warrant for the data attributed to that phone.  And that

19  phone number that was ascribed to, there were, I think, eight

20  phones that were in that Dodge Intrepid.  One of those cell

21  phones had the number, let's see, 443-739-2762.  That phone was

22  recovered from the Dodge Intrepid and was listed in Joyce

23  Martin's phone book under the name Goo number.

24         Also, that phone had, when I did the search warrant for

25  the date of the address book that's in the phone, had the name

1    Weaze, and a number that was also in Joyce Martin's phone book.

2    Q    Okay.

3    A    If that makes sense to you.

4    Q    But you seem to put significance in this change happening

5    right after the Wyche brothers homicide, is that correct?

6    A    Excuse me?

7             MR. COBURN:  Objection.

8             THE COURT:  Overruled.  You can answer that, whether

9    you put significance.

10   A    I felt it was significant because it was the day after the

11   Wyche murder.

12   Q    Okay.  And would it make sense to you to switch from a

13   completely unlisted phone to a phone listed in the name of Shelly

14   Wayne Martin if you're trying to disguise your phone activity?

15   A    I would say getting rid of the phone that was active during

16   the time of that crime and then getting rid of it and whether you

17   got a phone in a nominee name or another burn phone or in a

18   relative's name.  I think what happens after is not significant.

19   It's the fact that it was dropped after the crime.

20   Q    Now, Shawn Gardner had not contacted any of the Wyche

21   brothers around the time of their murder, had he?

22   A    Refer to my charts.  I don't believe he did.  I believe it

23   was only Mr. Mitchell and Mr. Wayne -- Martin.  I don't believe

24   he did, no.

25   Q    Okay.  And Mr. Mitchell did, in fact, have contact with the

1    Wyche brothers before the murder, is that correct?

2    A     Correct.

3    Q     And he did not switch his phones, did he?

4    A     There were the Wyche -- no, he did not.

5              THE COURT:  Do you have much more, Mr. Pyne?

6              MR. PYNE:  I do, Your Honor.

7              THE COURT:  Why don't we break now?  Is that okay?

8              MR. PYNE:  That's fine.

9              THE COURT:  Okay.  Members of the jury, we'll break for

10   lunch at this time.  Let me tell you some information I've

11   learned that I assume you don't have.

12             There was just a minor incident this morning, having

13   absolutely nothing whatsoever to do with this trial, but I just

14   wanted you to be aware because you may hear something when you

15   leave for lunch.  There was an incident this morning on the upper

16   floors that prompted the marshals to alert authorities to conduct

17   an investigation of a package.  It turned out to be perfectly

18   harmless.  The matter has been concluded.  But there was a brief

19   evacuation of the upper floors of this courthouse this morning.

20             Again, I emphasize, it has nothing to do with this

21   trial or, so far as we know, nothing to do with anything.  It was

22   just a suspicious circumstance that the marshals thought it was

23   appropriate to conduct a further investigation.

24             Please leave your note pads on your chairs.  Have no

25   discussion about the case or about any of the evidence you've

1    heard.  Continue to keep an open mind about all issues.  Please

2    be back in the jury room by 2:20 this afternoon.  2:20 this

3    afternoon.  Jury's excused.

4                (Jury exits the courtroom.)

5                THE COURT:  So I guess, Mr. Coburn, how long do you

6    think, really?  Realistically?

7                MR. COBURN:  Twenty minutes, Your Honor.

8                THE COURT:  Twenty minutes?

9                MR. COBURN:  Maybe 25.

10                THE COURT:  So assuming the government gets Detective

11   Benson back by three, finishes by 3:15, 3:20.  You got a witness,

12   Mr. Crowe?

13                MR. CROWE:  I haven't seen the witness yet but I

14   understand there should be one out there.

15                THE COURT:  Okay.

16                MR. CROWE:  Lawyer's answer.

17                THE COURT:  All right.  And nobody else has a witness?

18                MS. RHODES:  No.

19                THE COURT:  You may, Ms. Rhodes?

20                MS. RHODES:  No, Your Honor.

21                THE COURT:  It fell through.

22                All right.  So it may be that we'll simply excuse the

23   jury at around 3:30 or so and then have argument and go to the

24   defense case on Wednesday.  We'll have lots of witnesses on

25   Wednesday.  In fact, I need to hear counsel on the rap music

1   expert and on the flesh and blood expert, and perhaps on

2   sequestration and perhaps one other thing.  In fact, I'm sure

3   there's at least one other thing.

4           We're in recess until 2:20.

5           MR. CROWE:  Excuse me, Your Honor.  Should I excuse the

6   witness and have the witness come back on Wednesday, or keep her

7   reserved?

8           THE COURT:  No.  If there's a witness, hold on to the

9   witness.

10          (Luncheon recess.)

11          THE COURT:  Ready, Mr. Crowe?  Excuse me.  Mr. Pyne.

12  Yes, Mr. Harding.

13          MR. HARDING:  Just one brief thing, Your Honor.  Mr.

14  Martin objected to C-13, the CD that contained the tape recording

15  and the courtroom disturbances.  And he mentioned that this was

16  not something that had been played for counsel on Friday or

17  Thursday of last week.  I just want the record to reflect that it

18  was played this morning before Your Honor ruled on it.

19          THE COURT:  Sure.  And I'm pretty sure Mr. Martin's was

20  in the courtroom.  And I understood his motion to be based on the

21  fact that, the difference, not so much that he hadn't heard it,

22  but that it was, as to Mr. Harris, quite different from the one

23  on Friday.  I understood that.  Thank you, Mr. Harding.  All

24  right.  We'll have the jury.

25          How are we doing with exhibits?  Is everything in order

1    or are you going to need some time with counsel and Ms.

2    Arrington?

3              MR. HARDING:  I need to change some of the numbers --

4              THE COURT:  Okay.

5              MR. HARDING:  -- before the jury.  And also mention

6    some exhibits that Ms. Arrington agrees were in evidence but was

7    not sure that it's on the record.

8              THE COURT:  All right.

9              MR. HARDING:  And although in most cases I believe it

10   is on the record.

11             THE COURT:  All right.

12             MR. HARDING:  We also have to read the stipulation,

13   Your Honor.

14             THE COURT:  All right.  What about the exhibit list,

15   Mr. Harding?  Are you and Mr. Hanlon going to be able to provide

16   a pretty --

17             MR. HARDING:  What we did was, we met with Ms.

18   Arrington on a couple of occasions and she has entered all of the

19   changes into --

20             THE COURT:  The jury can come out.  So she's been

21   working on it.  I can see she has been working very diligently on

22   it.

23             MR. HARDING:  Yes.  She is, in fact, keeping the list

24   right now.

25             THE COURT:  Good.  Thank you.  Any witnesses around?

Case 1:04-cr-00029-RDB   Document 694   Filed 06/16/09   Page 93 of 240

1          MR. PYNE:  We do have one here, Your Honor.

2          THE COURT:  Okay.  Good.

3          (Jury enters the courtroom.)

4          THE COURT:  Good afternoon, ladies and gentlemen.  Mr.

5     Pyne, you may proceed whenever you're ready.

6     BY MR. PYNE:

7     Q    Thank you, Your Honor.  Detective, I believe we were

8     discussing this chart which, for the record, is B-14.  Okay.

9     Moving on to the phones you have listed to Mr. Martin.

10    A    Yes, sir.

11    Q    The top one you have is 443-838-1933, is that correct?

12    A    Yes, sir.

13    Q    And you have another phone listed, 410 -- it ends in 3912,

14    the bottom phone here?

15    A    Yes.

16    Q    Now, this bottom phone, isn't it correct that this in the

17    Wyche brothers phone books was twice listed under the name Alvin,

18    isn't that correct?

19    A    Correct, Mr. Martin's brother, Alvin.

20    Q    Yeah.  And you testified that there is a brother of Wayne

21    Martin, Alvin Martin?

22    A    Yes, sir.

23    Q    And you were here when Ernest Reynolds testified that he was

24    friends, in fact, with Alvin Martin before he knew Wayne Martin?

25    A    Yes, I believe he told us he knew him first, correct.

1    Q    Okay.  But yet you list both these phones to Wayne Martin?

2    A    Correct.

3    Q    Okay.  Your 30,000 phone call database does reflect numerous

4    calls between these two phones, doesn't it?

5    A    I wouldn't say numerous.  It's not uncommon to have an

6    individual has more than one phone to call, from one phone to the

7    other to check voice mails and things of that nature.

8    Q    Okay.  But do you recall whether or not there are numerous

9    calls between these two phones?

10   A    I couldn't say how many, but I'm sure there probably are

11   some.

12   Q    Okay.  On your chart here you only reflect one call from

13   Shelly Wayne Martin's phone.  And that would be this top phone,

14   correct?

15   A    I can tell you in one second.

16   Q    The 1933 phone, if you would.  Not having much luck with

17   this monitor here today.

18   A    That's correct.  The 1933 number.

19   Q    Okay.  And since this is going to a land line phone, this

20   land line phone up here, we can't tell whether or not that was

21   actually a connected call, as we've discussed previously.

22   There's no indication of whether they spoke to an actual person

23   or got an answering machine, is there?

24   A    Right.  And it's a connected call that he was charged for

25   but there's no way of knowing if he spoke to an individual or

1    voice mail.  That's correct.

2    Q    And we don't know who was using the cell phone to place the

3    call, is that correct?

4    A    The 1933 number?  Attributed to Mr. Martin?

5    Q    Yes.

6    A    I wasn't there when the call was made.  I could not say, no.

7    Q    Exactly.  So we don't know who, if anyone, made the call

8    using that phone and we don't know whether or not the phone call

9    was received by anyone, any live person at that residence?

10   A    Correct.

11   Q    Okay.  And isn't it correct that this chart lists calls, not

12   just completed calls, any call?

13   A    That's attempts, voice mails and connected calls, correct.

14   Q    Okay.  So this doesn't reflect -- in your other chart you

15   would have four calls listed right in a row that appeared to be

16   getting a voice mail and hanging up immediately.  That would

17   reflect as four separate calls in this chart here when, in fact,

18   no one ever spoke?

19   A    No.  This, this shows attempts, like I said with the earlier

20   charts, with the Wyche brothers murder chart and the McCaffity

21   murder chart, I went through and hand searched.  And if you look

22   at an outgoing call from Phone A incoming to Phone B and look at

23   both sets of tolls to determine if it went to voice mail or if it

24   was connected, I didn't do that.  For purposes of this chart was

25   simply to show the total volume of attempts and/or connections

1    between the phones.  It would be very time consuming to hand

2    search several, several hundred phone calls.

3    Q    So really this is, when you have 89 calls up at the top

4    here, really that's 89 dialed numbers, is that correct?

5    A    That's 89 calls from the four phones associated with

6    Mitchell to that land line.  So there's no way to know if it was

7    89 voice mails or 89 -- I would assume it's not 89 voice mails

8    just based on the shear volume of it.  But there's no way to

9    know.

10   Q    But like I said, that reflects 89 dialed phone numbers?

11   A    Correct.

12   Q    Okay.  And again, just because the number's dialed, you

13   don't know, since you're not there, who was actually using the

14   phone to make those calls or dialing those numbers?

15   A    That's correct.

16   Q    And the chart reflects no calls whatsoever from Mr. Gardner

17   to Mr. Harris, is that correct?

18   A    Correct.

19   Q    And only the one call from the number associated with Mr.

20   Martin to the home phone or the home phone associated with Mr.

21   Harris?

22   A    Correct.

23   Q    Okay.  If I can move on to Government's Exhibit B-6.  Pull

24   that out a bit.  Now, most of this chart reflects calls listed as

25   Shelly Wayne Martin to Ernest Reynolds, is that correct?

1    A    Yes, sir.

2    Q    But again, the number listed for most of these calls is the

3    3912 number, is that correct?

4    A    I wouldn't say most.  I would say -- hold still for a

5    moment.  I can't count.  Can you back out for a little bit for

6    me?

7    Q    I'll do my best.

8    A    Right there.  That's fine.

9    Q    Would you say a majority of these calls are from the 3912

10   number?

11   A    I would say, I wouldn't say a majority.  I would say there

12   are more from the 3912 number than the 1933.  But I wouldn't

13   say --

14   Q    I think that would be a majority.

15   A    Yes.  My mistake.

16   Q    No problem.  And the 3912 number is the number that's listed

17   to Alvin Martin in the Wyche brothers' telephone books?

18   A    Correct.

19   Q    Okay.  And in fact, these calls are all to Ernest Reynolds,

20   who said that he was friends with Alvin Martin, correct?

21   A    He stated that he knew, he knows both of them and has done

22   business with both of them in the past.

23   Q    Okay.  His testimony was, though, that I believe he was of a

24   similar age to Alvin Martin and met Alvin Martin's little brother

25   later on?

1    A    Correct.

2    Q    Okay.  And did you also hear Mr. Reynolds testify that he

3    did not know Bo or Willie Mitchell until 2004?

4    A    That's correct.

5    Q    Yet at the beginning of your chart here -- for some reason

6    it's not letting me -- there we go -- we have three calls from

7    the number associated with Willie Mitchell in 2002, is that

8    correct?

9    A    There's three attempts showing zero duration.  So that would

10   indicate to me that they were attempts but they didn't go

11   through.

12   Q    And this is two years before Mr. Reynolds says he even knew

13   of this individual Bo?

14   A    Correct.

15   Q    And in fact, in 2004, Bo would have been locked up for two

16   years?

17   A    During what time frame?  I don't know the time frame that

18   you're referencing.

19   Q    2004, when Mr. Reynolds says he first heard of Bo?

20   A    He was, yes, Mr. Mitchell was in custody, correct.

21   Q    Had already been in custody for two years?

22   A    Correct.

23   Q    Okay.  If we move on to B-10.  Is your monitor still in the

24   middle?

25   A    Yes.

1   Q    Okay.  Good.  This is your chart reflecting three calls from

2   a Shelly Wayne Martin phone to what's listed as Darryl Wyche.

3   Again, this is the 3912 phone that Darryl Wyche in his phone book

4   has listed to Alvin Martin, is that correct?

5   A    Correct.  Subscribed in Shelly Wayne Martin's name.

6   Q    I understand.

7   A    Wayne Martin, rather.

8   Q    And Wayne Martin also subscribed to the phone that you have

9   attributed to Shawn Gardner, is that correct?

10  A    One, yes.  The 1253 number, yes.

11  Q    Okay.  So there's at least three phones listed in the name

12  of Shelly Wayne Martin?

13  A    Yes.

14  Q    Okay.  Or Shelly Wayne Martin or Wayne Martin?

15  A    Correct.

16  Q    Okay.  And the last of these calls is March 4th of 2002?

17  A    Yes, sir.

18  Q    Correct?  Okay.  And that is at least, what, 20 days before

19  the Wyche brothers homicide?

20  A    Twenty days, yes.

21  Q    Okay.  Did you prepare a chart reflecting the calls from the

22  other Shelly Wayne Martin phone, the 1833 phone, to Darryl Wyche?

23  A    This, this chart indicates all calls from, if you see where

24  it says, if you can slide it to the right a little bit for me.

25  The two target numbers, the 3912 number and the 1933 number to

1    all of the phones that I'm aware of that are Wyche phones.  So

2    they do not show any calls from the 1933 to any of these Wyche

3    phones.

4    Q    Okay.  I see what you're talking.  So this does include the

5    1933 phone?

6    A    Yes.

7    Q    So there were no calls at all from that, from that phone to

8    Darryl Wyche?

9    A    To any of these phones for Darryl Wyche, correct.

10   Q    Okay.  Now, did you run through a chart on contacts between

11   Shawn Gardner and the Wyche brothers?

12   A    I believe I did.  If you have it, I can -- I don't believe

13   there were any contacts between the two phones I had associated

14   with Gardner and Wyche brothers, or Darryl Wyche, rather.

15   Q    Okay.  And you already testified that Mr. Harris did not

16   have a cell phone at that point?

17   A    That I know of, no.

18   Q    Okay.  And did you try to run through any phone numbers

19   associated with Mr. Harris, with the Wyche brothers phone?

20   A    Well, being that the, the phone that I have attributed to

21   Mr. Harris is a land line, you can check calls going out to that

22   number but you can't get, local tolls aren't kept on land lines.

23   So there was no way to check that phone calling out to any

24   individuals.

25   Q    Okay.  So it was really not in your phone base?

1    A    Correct.

2    Q    Your database.  All right.  If I can move on to B-8.  B-8.

3    I believe these were the calls to Mr. Mitchell's phone just

4    before his arrest?

5    A    This is a, what I did was I ran the 418-6204 number

6    attributed to Willie Mitchell for the day of April 1st to see who

7    he was in contact with or who, who he was calling leading up to

8    the time that I arrested him.

9    Q    Okay.  And there's two calls reflected to Shelly Wayne

10   Martin?

11   A    Correct.

12   Q    And did you check Shelly Wayne Martin's records to see that

13   those two calls were not, in fact, connected calls?

14   A    I did not.  I see the 62 -- are you referring to the last

15   call?

16   Q    The first call and the last call.

17   A    I see the duration of 34 seconds for the first and 1:06 for

18   the second.  I don't know if they were connected or not.  I could

19   check the records and see if you have them.

20   Q    Okay.  I have a sheet right here if you want to check.

21   A    Yes.  It appears -- one second.  One second.  It appears

22   that the last one at 6:54:59 was connected for a one minute

23   duration.

24   Q    You're showing a call complete, an incoming call --

25   A    It shows, on Mr. Martin's tolls, the 1933 number, it's not

1    going to show an incoming number.  It's going to show an incoming

2    call that coincides with the time that the outgoing call from Mr.

3    Mitchell's phone was made.  That's how the connection is made.

4            The actual phone, the incoming phone number does not

5    show up on these Cingular records.  Only outgoing numbers.

6    Q    Okay.

7    A    And the first one at 4:39.  The first one does not appear to

8    have been connected.  Just the, just the final one.

9    Q    Which was?

10   A    Which was at the time that I actually observed him on the

11   phone at this time.

12   Q    All right.  Just so the jury is aware of what you're doing.

13   What you're doing, in fact, is you're looking at the time of this

14   call, which is 18:54:59, and then you look at Mr. Martin's phone

15   to see if he has an incoming call at that time, is that correct?

16   A    Correct.

17   Q    And so if I can put this down.  This is 18:54, in fact

18   6:54:59, right?

19   A    Correct.

20   Q    And what call here are you relying on to say it matches up

21   with 6:54:59?

22   A    If you can slide it up a little for me.  The 6:55:21.  No

23   two cell phones are going to be exactly in sync as far as time

24   down to the second.  So you can only rely on the closest call and

25   looking at the duration of it.  So the 6:55 -- I would have to be

103

1    able to look at more of the tolls to see that their phones are

2    off by roughly 20 seconds.  It looks like Mr. Martin's phone in

3    this case is time stamped at 6:55:21, which is 21 seconds beyond.

4    But he was charged for a one minute duration call at that time.

5    And there was a one minute outgoing phone from Mr. Mitchell's

6    phone at that time.

7    Q    Okay.  So you're saying that this 6:55:21 call is, in fact,

8    the same call as this 6:54:59 call?

9    A    I believe it is.  I would have to be able to check more

10   records to see for sure.  I believe it is, yes.

11   Q    But that's the way you prepared these charts, isn't that

12   correct, correlating these different calls?

13   A    Right.  When I did the, when I did this chart, I actually

14   looked at multiple calls throughout the day and I would see a

15   consistent pattern that showed that Phone A was, you know,

16   roughly 15 to 20 seconds ahead of Phone B.  And that consistency

17   comes throughout the duration of the calls.

18          If Phone A has an outgoing call for three minutes at,

19   you know, 12:01 and five seconds, Phone B has an incoming call at

20   12:01 and 25 seconds, but it also shows that three minute

21   duration, I can make the conclusion that the phone contact was

22   made between the two, matching up the durations.

23          And some of them, the 1933 phone doesn't show the

24   actual incoming digits, but some of the other phones do.

25   Q    Okay.

CROSS EXAMINATION OF BENSON BY PYNE                    104

1    A    And in that case it's easy because you look at outgoing

2    Phone A and it shows up as incoming Phone B.

3    Q    And what if you don't find consistency between the times?

4    A    If there were not consistency between the times, I wouldn't

5    make the conclusion that the contact was made.

6    Q    Now, did you speak to anyone in the phone company about

7    correlating these time differences?

8    A    Specifically about that matter?

9    Q    Yes.

10   A    No.

11   Q    Okay.  You just, on your own basis of your own knowledge,

12   you decided that that was the way you were going to decide

13   whether or not these phones were connected?

14   A    Correct.

15   Q    Okay.

16   A    Wait.  You're asking me if I spoke to someone about the

17   conclusion that Phone A contacts Phone B and they both show the

18   same duration at that time?  I did speak to someone at the phone

19   company about that.  I thought you were just speaking about the

20   few second discrepancy between phones.

21   Q    No.  That is what I'm talking about.  The fact that there's

22   discrepancies between the two phone companies.  Did you call the

23   phone company and saying, Look, this one says this time, this

24   phone says another time, you know, can I say that these two

25   phones connected a call here?

1    A    I have inquired with multiple different phone companies over

2    the years as to that, that matter, and they've basically, what

3    they say is that you're never going to have phone records exactly

4    the same exact time based, based on, like if any 12 of the jurors

5    look at their watches right now, they're going to be off by 15 to

6    20 seconds if they're even in the same exact minute at that same

7    exact time.  It's a similar matter.

8    Q    So you have to find a consistent --

9    A    Pattern.

10   Q    Pattern between the calls before you can say those are

11   complete?

12   A    Correct.

13   Q    Okay.  Now, B-9.  Back out a little bit.  These are calls

14   between Shelly Wayne Martin and Shawn Gardner to Sherman Kemp?

15   A    That's correct.

16   Q    Do we know if these are connected calls?

17   A    I don't have Sherman Kemp's records so all I can say is that

18   calls were made, that Mr. Martin and Mr. Gardner were charged for

19   a one minute duration.  But whether they actually spoke, I cannot

20   say that.

21   Q    Okay.  And again, same question, really, with B-7.  These

22   are the other phone you identified for Sherman Kemp?

23   A    Correct.  Same situation.  It shows the attempts and the

24   contact with duration but I can't say if Mr. Kemp answered or if

25   it went to voice mail.

1    Q    Okay.  And would you say, would you say that most people

2    involved in the drug business do not keep telephones in their

3    name?

4    A    No.  If you're asking my experience --

5    Q    Yes.

6    A    -- in narcotics investigations, like, for example, Mr. Kemp,

7    I conducted a wiretap investigation on him.  Typically, what

8    you'll see is you'll have one phone that will, may very well be

9    in that person's name that's their consistent, day-to-day number

10   that they don't really talk any criminal activity on.  They might

11   use it to call Mom and sisters and things like that.

12          Then they'll also have additional phones that,

13   sometimes you'll, like in the case of Mr. Kemp, there was

14   specific to, he had one phone that he used to contact his source

15   solely.  That was it.  Just that one number.  Other phones were

16   used for contacting his people below him, his street workers,

17   things of that nature.

18          So it's not uncommon for individuals to have multiple

19   cell phones with different purposes, sometimes in their name,

20   sometimes not.

21   Q    And didn't you identify that same pattern with the Wyche

22   brothers?  That you had a phone that you identified as the Wyche

23   family phone, if you would, and there was also a Wyche drug

24   phone, if you would?

25   A    Family phone?  I'm not sure I'm following you.

1    Q    Phone used to talk to his wife and non drug-related calls,

2    and then phones that he used just to make drug calls?

3    A    In speaking to Natasha Wyche, she indicated she did, she did

4    have one number at that time that she would contact him for the

5    most part but there were other cell phones.  I believe the 8844

6    number she actually said was her phone at one time and she had

7    given it to him.

8         So it's not unusual for, at least in the case of Darryl

9    Wyche, to have, she contacted him on different numbers.  Some are

10   more disciplined.  Some will only use it for family.  But it

11   depends on the given situation, the given person.

12   Q    If I can have one second.  If I can approach the witness,

13   Your Honor?

14        THE COURT:  Yes.

15   Q    Could you read the paragraph on the bottom and the top of

16   the next page?

17   A    Correct.

18   Q    Didn't you tell the grand jury that, in fact, the Wyche

19   brothers had a family phone and he also had a drug phone?

20   A    No.  What I said was that, in this investigation, Natasha

21   Wyche indicated that she had spoken to her husband on a certain

22   number, which was the same number that Mr. Mitchell had spoken to

23   him on.  And then up closer to the actual time of the incident,

24   there was a different phone that Mr. Wyche talked to Mr. Mitchell

25   on.  And then I said this is basically, paraphrasing, there are

1    phones that they, they being narcotics traffickers, often talk to

2    their families, other phones that are only used for business.

3              At that time, the early stages of this investigation, I

4    understand now why the change of the phones, because as she

5    indicated, one of the phones was close to dying and it was, the

6    battery signal was low on it.  But this is a general statement

7    about narcotic traffickers, yes.

8    Q    Well, you did tell the grand jury at that time?

9    A    That two different phones were used.

10   Q    And one was a family phone and one was a drug phone?

11   A    If you want to classify it as a family phone.  She spoke --

12   Q    I'm just trying to classify what you told the grand jury.

13   A    I told them that there were two different phones that Mr.

14   Mitchell, Mr. Wyche spoke to each other on.  And I said it's not

15   uncommon for narcotics dealers to have multiple phones, sometimes

16   ones that they only talk to family on.  I didn't classify it, I

17   didn't call it a family phone, just to be clear.

18   Q    Okay.  Let's proceed to chart W-66.  Starting at the top

19   left corner.  The first call you have as Mr. Mitchell to Shelton

20   Harris's land line phone, is that correct?

21   A    Yes.

22   Q    So all the information regarding this call came strictly

23   from Willie Mitchell's phone records, is that correct, because

24   nothing would be reflected in the land line records, is that

25   correct?

1    A    That's correct.

2    Q    Okay.  We don't know who, in fact, was using this phone at

3    that time, do we?

4    A    Which?  The land line?

5    Q    No.  This cell phone.

6    A    The phone attributed to Mr. Mitchell made a 14 second

7    duration contact to the land line associated with Mr. Harris.

8    Q    I understand that.  We don't know, because you weren't

9    there, who was actually dialing the numbers to make the call, do

10   we?

11   A    That's correct.

12   Q    Okay.  And in fact, that phone is listed to Jaquetta Smith,

13   is that right?

14   A    Yes.  But it was seized from his person by me upon his

15   arrest.

16   Q    Just answer my question --

17   A    Yes.

18   Q    -- if you would.  It's listed to Jaquetta Smith, correct?

19   A    Correct.

20   Q    And as we know from your other chart, Mr. Mitchell had three

21   other phones he could have used to make that call?

22   A    At that time, no.  The 5811 cell phone had ceased being used

23   after the McCaffity murder.  Was not active.  And 8684 was not

24   active at the time, nor was 3608.

25   Q    And when you did a search warrant on Valdavia Court, you

1    found numerous phones, didn't you?

2    A    Yes.

3    Q    So, in fact, we don't really know how many phones were

4    available to him to make that call?

5    A    All I can speak to is the phones that were seized at the

6    house were not active cell phones.  The 6204 was.  That's all I

7    can say.

8    Q    Proceeding on to the next call.  These five calls here

9    attributed to Wayne Martin's telephone?

10    A    Yes.

11    Q    I notice they're all one minute, one minute, two minute, one

12    minute, one minute.

13    A    Correct.

14    Q    Now, can you explain, obviously, the first call did not last

15    one minute because he's making the second call before one

16    minute's up.  Can you explain why they're billed that way?

17    A    You're asking me why the rapid succession of calls?

18    Q    No.  Why they all reflect one minute.

19    A    Because the billing on Mr. Martin's phone, which is a

20    Cingular, Cingular wireless, bills in one minute increments.  So

21    if, say he dialed out, it rang, it went to voice mail, if it was

22    only 20 seconds in duration, he's going to get charged the full

23    minute.  He hangs up, immediately dials again, he's actually

24    dialing within that same minute, actually 20 seconds apart.  And

25    again, if it goes to voice mail, which is what I would presume

1    for these first two or possibly even the first three, is that

2    they went to voice mail because of how close together they're

3    made, that the, actually, the duration on third one is two

4    minutes.  It's rounded up to the next minute for billing

5    purposes.

6    Q    So for some of these calls you're able to give the exact

7    time whereas Mr. Martin's phone you're always only going to get

8    rounded up minute, is that correct?

9    A    Unless the Martin phone is speaking to, like, for example,

10   in this case, the 6204 Mitchell phone, gave exact durations.  So

11   if the conversation or if the connection was between the two of

12   them, I could, Mr. Martin would show a one minute duration, Mr.

13   Mitchell would show 42 seconds, and we would know that that's the

14   actual duration of time because of the way the 6204 number is

15   billed.

16   Q    Okay.  Let's go on to, again, this next phone call here and

17   show you what's been marked by the government as Exhibit T-3.

18   Let me first show you.  Again, we're dealing with this call here

19   at 6:19:25?

20   A    Correct.

21   Q    Is that the call that is highlighted here, 6:19:25?

22   A    Yes.

23   Q    And you were able to verify that through what's been marked

24   as Government's Exhibit T-16, if I can put that up, as Mr.

25   Mitchell's phone records.

1      They show an incoming call at 6:19:46.

2    A    Correct.  Like as I stated, perfect example here, as I

3    stated earlier, there's about a 20 to 21 second time difference

4    between Mr. Martin's phone, which is showing 6:19:46 and Mr.

5    Mitchell's phone, which I believe was 6:19:20, somewhere in that

6    neighborhood.

7    Q    6:19:25?

8    A    Correct.  So a 21 second difference.  So that was consistent

9    throughout the analysis of the tolls.

10   Q    Okay.  Let's see.  The second call would have been at

11   8:17 -- on this one you just have 8:17 listed.  But if you go to

12   Mr. Mitchell's records, 20, again, adding 12 to the 8, 8:17:22,

13   is that correct?

14   A    Correct.

15   Q    And then if we look at Mr. Mitchell's records -- I'm

16   sorry -- Mr. Martin's records.

17   A    20:17:47.  So it's another 20 --

18   Q    Again, that's down here.  8:17:47.  A difference of 25

19   seconds this time?

20   A    Correct.

21   Q    Now, the first one was a 21 second difference.  The second

22   is a 25 second difference?

23   A    Correct.

24   Q    There's a four second difference there.  Did you speak to

25   the phone call to say, look, there's a four second discrepancy

1   here, can I say that both of these are a completed call?

2   A    No, I didn't.

3   Q    Let's go on to the third call between Mr. Mitchell, this

4   call here.  9:34.  We look at Mr. Mitchell's records.  We're

5   seeing a call of, at 21:34:33.

6   A    Correct.

7   Q    And then if you go to Mr. Martin's records, 9:35:10.  I did

8   go do the math.  That's 37 seconds difference.  That's not really

9   a pattern, is it?  You have 21 seconds, then 25 seconds, now

10  there is this third call, is 37 seconds.

11  A    That's correct.

12  Q    And yet you still put that call in the chart.  I mean, did

13  you speak to anyone in the phone company and say, Look, I've got

14  a 21 second discrepancy here, 25 second discrepancy, and then

15  I've got a 37 second discrepancy, are these all connected calls?

16  A    No, I didn't.

17  Q    All right.  Again, going pack to W-66.  Now, let's move on.

18  I'm sorry.  These are the ones I'm looking for.  These calls

19  here.  Let me see if I can zoom in on them.  These are four calls

20  from Mr. Martin, the phone associated with Mr. Martin, to the

21  phone associated with Shawn Gardner.  Again, they're rapid

22  succession.  9:48, 9:49, 9:50, 9:51, all exactly one minute.

23  A    Yes.

24  Q    Now, do you believe that those were four one-minute calls

25  from Mr. Martin to Mr. Gardner?

1   A    No.  I believe they were four calls that did not show up on

2   the 1241 tolls, leading me to believe that -- well, if one is

3   placed at 9:48, it could have theoretically lasted 59 seconds

4   before he hung up and dialed quickly again.  But I would assume

5   that they were all under a minute but he was charged for them.

6   Q    Okay.  They all are reflected as going to voice mail?

7   A    Correct.

8   Q    Meaning that Mr. Gardner never picked up any of these calls?

9   A    They were never charged on Mr. Gardner's tolls.  That's

10  correct.

11  Q    So wouldn't this be consistent with Mr. Martin making four

12  rapid in succession calls to Mr. Gardner before he goes into a

13  10:00 movie?

14  A    I can say it's four rapid succession calls.  I don't know

15  what his motivation for making the calls was.

16  Q    Okay.  And when it says voice mail here, you can't really

17  say that they did, in fact, go into voice mail, can you?

18  A    I can say that it went into voice mail.  I can't say whether

19  or not he left a voice mail.

20  Q    Well, can you say for certain that Mr. Gardner had a voice

21  mail mailbox set up?

22  A    I can't say that, no.

23  Q    And if you're, in fact, using a burn phone, are you able to

24  set up a voice mail box?

25  A    Yes.

1    Q    If it's a stolen phone, you're using someone else's service,

2    you can still use their voice mail boxes?

3    A    If it hasn't been set up and you can follow the, through the

4    prompts, yes, you can set up voice mail.  I don't know, with this

5    particular phone, I don't know if it was a prepaid, that this

6    Samuel Handy is a real person and he set up the account for him

7    and he was able to set up the voice mail or if it was a burn

8    phone.  But if he has the phone and he's able to access it, he

9    very well could set up the voice mail.  I don't know if he did or

10   didn't.

11   Q    Exactly.  So we can't say for sure.  We just know that it

12   did not connect to a live person?

13   A    Correct.

14   Q    So let me move on.  And based on the one minute nature of

15   these calls and the fact they're rounded up, we have no idea

16   whether or not a message was ever left on any of these calls?

17   A    There's no way of knowing that.

18   Q    Okay.  Now, after this 9:34 call -- I'm sorry.  Let me back

19   up.  I wanted to ask you about this.  After this 9:34 call from

20   Mr. Mitchell to Mr. Martin, there are no other completed

21   connected calls between Mr. Mitchell and Mr. Martin for the rest

22   of that night, is there?

23   A    I don't believe there were, no.  Yes, there were.  There was

24   11:37 p.m., a two minute call.

25   Q    Calls?

1    A    Yes.  From Gardner to Martin.

2    Q    I'm talking about Mr. Mitchell.  I'm sorry.  I backed up on

3    you.  I backed up to this call here.  The 9:34 call from Mr.

4    Mitchell to Mr. Martin.

5    A    Yes.

6    Q    That was the last time Mr. Mitchell spoke to Mr. Martin that

7    night?

8    A    Yes.

9    Q    Correct?

10   A    I believe you're correct.

11   Q    And at that time, 9:34 p.m., Mr. Mitchell had not yet even

12   spoken to Mr. Wyche, had he?

13   A    The first contact from Mitchell to Wyche was 10:42 p.m.

14   Q    So that was --

15   A    Correct.

16   Q    -- over an hour later?

17   A    Yes.

18   Q    And you don't have any contacts between Mr. Mitchell and Mr.

19   Wyche before that, do you?

20   A    Not on this chart from, I mean, I have historic connections

21   in the past before them.  But as far as concerning the day of

22   this incident, as far as this chart, no.

23   Q    Well, how far in the past do you have connections?

24   A    I'd have to check specifically.  But it was back on the 5811

25   phone.  See if I have that here.  I didn't run that specifically.

1    There was, I know there was historic calls between Mr. Mitchell

2    and Mr. Wyche.  I couldn't give you the exact times of them.  I

3    was concerned with the day of the murder.

4    Q    And at least the day of the murder, there was no other

5    contact between Mr. Mitchell and any of the Wyche phones on that

6    particular day, was there?

7    A    Repeat that.

8    Q    There's no contacts between Mr. Mitchell and any of the

9    Wyche phones on that particular day?

10   A    On the day of the murder?

11   Q    Before this time.  Before this ten --

12   A    Before the 10:43 connected call?

13   Q    Yes.

14   A    No, they were all after, leading up to the time of the

15   murder.

16   Q    So as far as we know, Mr. Mitchell with Mr. Wyche had not

17   spoken before this 10:30 time?

18   A    I can't say specifically.  I ran from the 24th around 4 p.m.

19   up to the time of the murder.

20   Q    Okay.  Well, let's then look at this call here.  These two

21   calls here.  You show these two calls as connected calls between

22   Willie Mitchell and Darryl Wyche?

23   A    Yes.

24   Q    And I have phone records that are Government P-18.  And are

25   these the records that reflect those two calls?

1    A    Yes.

2    Q    Now, you're saying that these two incoming calls reflect

3    contact between Mr. Mitchell and the Wyche brothers, is that

4    correct?

5    A    The telephone, the Wyche telephone received two connected

6    calls at that time, correct.

7    Q    And in fact, your records here continue to show connected

8    calls at 12:48, 1:02, 1:04, 1:14, 1:17, 1:18?

9    A    Right.

10   Q    These are all connected calls to the Wyche brothers?

11   A    If you slide it down, show the top, the classification of

12   the call, where you're seeing CF covering this entire column, it

13   stands for call forwarding.  So if I set my call on call forward,

14   forward it to another phone, every time a call comes in to me I'm

15   going to get charged and it's going to be re-routed out to

16   another.  But because it's being re-routed out, I'm charged for

17   the one minute.

18   Q    So all these calls are forwarded because, in fact, they were

19   believed to be killed at around 12:30 or so?

20   A    That's correct.  All of those, almost every call on this

21   record is call forwarded to another phone.

22   Q    Okay.  So when on your chart here you have this listed as

23   two connected calls --

24   A    Correct.

25   Q    -- can you, in fact, say that?

1   A    I can say that Mr. Mitchell had an outgoing call that lasted

2   49 and 40 seconds respectively, that he was charged for a call of

3   that duration, and that a call was received by the Wyche phone

4   and routed it out to another phone.  But I can't say what phone

5   that was.  I can say, all I can say is that the Wyche phone was

6   charged for the call, as was the Mitchell phone.  So that leads

7   me to believe that whatever, whatever phone that this 5570 number

8   was routed to was answered and there was a duration of call.

9   Q    Now, Mr. Mitchell was charged for these phones, phone calls

10  that went straight to voice mail, correct?

11  A    Correct.

12  Q    And the Wyche phone was also charged for all these calls

13  that took place after they're dead?

14  A    Correct.

15  Q    But you say you still have enough evidence to show that

16  these two were, in fact, connected somehow?

17  A    The 6204 number was connected to the 5570 phone, which then

18  routed it call forward to another unknown phone, not any of the

19  phones that are analyzed in this chart.  Could be, if you want my

20  thinking --

21  Q    We don't know where they wouldn't to, isn't that true?

22  A    They were routed to another phone, that's correct.

23  Q    And it wasn't any of the phones that you ran the records

24  for?

25  A    No, it wasn't.

CROSS EXAMINATION OF BENSON BY PYNE                                120

1    Q    Because they would have shown up, that forwarded call would

2    have shown up?

3    A    That's right.

4    Q    And we don't have any of that here?

5    A    That's correct.

6    Q    So, in fact, your chart should at best say that these calls

7    were forwarded to an unknown phone rather than being connected?

8    A    No.  I believe the call was made and the call was connected.

9    Whether it was routed to another phone and answered or whether it

10   was, I think as far as --

11   Q    Well, new calls were made to that phone and connected long

12   after they were dead, isn't that correct?

13   A    That's correct.  Because they were unable to turn off the

14   call forwarding.

15   Q    Okay.  We can move on to the bottom of the chart.  This

16   first call here, Willie Mitchell to Darryl Wyche at 11:18 p.m.?

17   A    Yes.

18   Q    Reflected it as 56 seconds in length?

19   A    Yes.

20   Q    Okay.  Let's first go to Mr. Mitchell's phone records.  Is

21   that this call here, reflected at 9:34:33?

22   A    No, sir.  It's the 23:18.  It's the one, 56 second call.

23   Q    There we go.  So Mr. Mitchell's phone shows that at

24   11:18:20.  That's what I'm looking at, right?

25   A    Correct.

1    Q    Get mixed up with my papers here.  Okay.  And then if we go

2    to T-17 -- make sure I get the proper -- we're looking at this

3    phone call, 11:18:44, is that correct?

4    A    Yes.

5    Q    And again, you have a discrepancy of 24 seconds between the

6    two calls, is that correct?

7    A    Correct.

8    Q    And in order to establish a pattern, we need to go to

9    another call.  Let's go to a second call which on your chart here

10   is going to be the 11:37 call here.  If we look at the Wyche

11   phone, again, 11:37:33.  And then we have to compare that to the

12   Wyche phone.

13   A    23 seconds off.

14   Q    11:37:56.  So that would be 23 seconds.  24, 23, that's

15   fairly close?

16   A    Yes, sir.

17   Q    Okay.  So let's go to the third call.  And that would be the

18   12, 12:08, this call here.  You have it listed as 12:08.  If we

19   go to Mr. Mitchell's phone we see 12:08:40.  Is that correct?  Is

20   that the call we're talking about?

21   A    Yes, sir.

22   Q    And then if we proceed to the Wyche brothers phone records,

23   you see 12:07:40.  That's exactly, the Wyche phone goes from

24   being 24 seconds behind and 23 seconds behind to now it's a full

25   minute ahead, isn't that correct, Detective?

1    A    That one actually may be an error.  Can you slide it over to

2    the right for me?

3    Q    This way?

4    A    Yeah.  Right.  It's, it is off by one minute, one full

5    minute.

6    Q    Okay.  So would it be your testimony here today that in all

7    likelihood this call at 12:08 probably never took place?

8    A    No.  Because Mr. Mitchell was billed for 1 minute 35 second

9    duration to that phone.

10   Q    But you see the discrepancy in the times.  It's a full

11   minute ahead.

12   A    It is.  But it was --

13   Q    Do you have any explanation for the error in that?

14   A    I don't.

15   Q    Now, Mr. Mitchell is billed for a call to that number, is

16   that correct?

17   A    That's correct.

18   Q    And it's my understanding that if that call does not line up

19   with the times, in all the other cases you said it went to voice

20   mail?

21   A    It's possible this one did.

22   Q    So that's my question to you.  Can you say that this call

23   here was, in fact, connected?

24   A    I can say it was connected for, and Mr. Mitchell was charged

25   the duration of 1 minute 35 seconds, yes.

1   Q    The other two you said were sufficiently within 23 seconds

2   or 24 seconds and, therefore, we knew it was a connected call.

3   This one goes from being 23 seconds and 24 seconds behind to a

4   minute ahead and you still confidently testify that that's a

5   connected call?

6   A    I can say that it's a connected call that possibly went to

7   his voice mail.  The other two, with the 22 and 23 second

8   discrepancies I would be certain that an actual conversation

9   occurred because Mr. Wyche was charged on the other end for those

10  calls.  But in light of, in light of the vast, the bigger

11  discrepancy which you've brought to my attention, I would say

12  that that call definitely was placed and either went to voice

13  mail or if the records are off by that much, it was a connected

14  call.  But most likely it went to voice mail.

15  Q    Okay.  So finally, you're saying now you agree with me, that

16  it must have gone to voice mail at the very best?

17  A    Which is a connection, yes.

18  Q    Well, that's a, it's a distinction that you did not make

19  anywhere else in your chart.  Everywhere else in your chart you

20  either classified them as connected calls or voice mail calls.

21  Now you're saying that the voice mail calls are connected calls

22  as well.

23  A    Well, they are connected from Phone A to Phone B.  So it is

24  a connected call.  But as far as this chart, for putting

25  "connected", I am indicating that a conversation occurred, both

1    parties were charged at the same time the call was made, there

2    was a conversation that occurred.  But all of these calls are

3    connected in one way or another.

4    Q    Both parties were not charged.

5    A    For this, for this call.

6    Q    The Wyche brothers phone call, phone was charged for a phone

7    call at 12:07.

8    A    Correct.

9    Q    The Wyche brothers didn't place a call until 12:08.  That's

10   the whole point.  The Wyche brothers phone was not charged for

11   this call.

12   A    This call, this --

13   Q    On the bill.

14   A    You talking about the Wyche brothers' phone?

15   Q    The call on the Wyche brothers bill came in a minute before

16   the Mitchell brothers or Mitchell phone even placed the call.  So

17   how can you say they're being billed for same thing?

18   A    Based on the duration of the call, the call was incoming at

19   12:07:40 and lasted two minutes, which would encompass 12:08:40,

20   12:09:40.  The outgoing call from the Mitchell phone was placed

21   at 12:08 and was connected for a minute 35 duration, which leads

22   me to believe that that two minute, because on the Wyche

23   brothers' tolls they're rounded up to the next minute.  They're

24   close enough that I believe that that, that call was connected

25   based on the durations of the call.

1    Q    Even though the times are a minute and 23 seconds off?

2    A    Correct.

3    Q    Next going down to the bottom of your chart.  This call here

4    at 12:13 a.m., Mr. Mitchell is attempting to get a hold of Shelly

5    Wayne Martin, is that correct?

6    A    Correct.

7    Q    As late as 12:13 a.m.?

8    A    That's correct.

9    Q    And it's your belief, based on these phone calls, that the

10   Wyche murder happened sometime between 12:30 and 12:38?

11   A    That's correct.

12   Q    And not all calls are reflected on this chart?  Not all

13   calls the parties made are reflected on this chart, are they?

14   A    That's correct.

15   Q    In fact, Mr. Mitchell also had a call to Tony Montana during

16   this period of time, didn't he?

17   A    If you could show me the tolls, I could say for sure.  What

18   time?

19   Q    I'm not sure of the time but sometime during the time frame

20   covered by this chart there was a call to Antonio Blue or Tony

21   Montana?

22   A    Yes.

23   Q    Okay.  And that's not reflected on the char?

24   A    No, sir.

25   Q    Now, you have had an opportunity to listen to the voice mail

1   that was left on Irene Magginson's phone?

2   A    Yes, I have.

3   Q    And you have heard the defendants speaking in court, have

4   you not?

5   A    Yes, I have.

6   Q    And do you believe that you could identify Mr. Martin's

7   phone (sic) on a voice mail message?

8   A    Mr. Martin's voice?

9   Q    Yes.

10  A    Probably, yes.

11  Q    And having listened to the Irene Magginson phone call, did

12  you recognize Mr. Martin's voice on that phone call, voice

13  message?

14  A    I recognized two days voices.  I can identify that there are

15  three voices that I can hear.  I can identify two of the three.

16  The third I can't say for sure, no.

17  Q    Did you, the question is, did you identify Mr. Martin's

18  voice on that voice mail?

19  A    No.

20       THE COURT:  Just, just phrase the question specifically

21  the way you intend it, Mr. Pyne.

22  Q    I'll try to do so, Your Honor.  Thanks.  And you also

23  listened to the Stop Snitching video?

24  A    Yes.

25  Q    Did you recognize Mr. Martin's voice on the Stop Snitching

1    video?

2    A    No, sir.

3    Q    Now, you testified that for most of the time that you were

4    involved in this investigation you were, in fact, a homicide

5    detective, is that correct?

6    A    That's correct.

7    Q    And have you ever investigated a homicide case in which the

8    suspect presented you with an alibi defense?

9    A    Yes.

10   Q    And isn't it very important to investigate that alibi

11   defense, to either prove or disprove that alibi?

12   A    Yes.

13   Q    And you would want to do that as quickly as possible?

14   A    Yes.

15   Q    And if someone told you that they were at the movies on a

16   particular night, you would want to go and either verify or

17   disprove the fact that they were at the movies that night?

18   A    If I was the primary investigator, yes.

19   Q    And in fact, in this particular case, Detective Berger even

20   went down and verified whether or not the victim had gone to the

21   movies that night, went and pulled a videotape that showed the

22   victim going to the movies?

23   A    That's my understanding, yes.

24   Q    But that wasn't done in this case, was it?

25   A    Not to my knowledge.

1    Q    Detective Niedermeier never -- well, he attempted to get, go

2    to the movie theater approximately six months after he was made

3    aware of the alibi witness or alibi defense in this case, is that

4    correct?

5    A    I don't know when he did it.

6    Q    And also, cell tower information is very important, isn't

7    it?

8    A    Yes, sir.

9    Q    And in fact, in the McCaffity murder, you're basically able

10   to diagram the path of Mr. McCaffity's car based on cell phone

11   records, as well as the GPS?

12   A    Correct.

13   Q    Device?  And also in the Spence murders, you showed the jury

14   where the different cell towers were being bounced off?

15   A    Correct.

16   Q    But that wasn't done in the Wyche murder, was it?

17   A    No, it wasn't.

18   Q    If it had been done, we would be able to tell exactly where

19   Mr. Martin's phone was on that particular night when he made any

20   phone calls, is that correct?

21   A    Correct.

22   Q    And in fact, going back to the chart.  After these attempts

23   to call Mr. Gardner just before 10:00, Mr. Martin's toll records

24   only show one connected call, isn't that correct, and that's this

25   call at 11:37 from Mr. Gardner?

1    A    That's correct.

2    Q    And after that, Mr. Martin's phone does not show any other

3    connected calls until the next morning, isn't that correct?

4    A    That's correct.

5    Q    So if Detective Niedermeier had acted in a timely fashion in

6    obtaining any security tapes from the movie theater, we would

7    know with certainty whether or not Mr. Martin was at the movies

8    at the time that he says he was?

9            MR. HARDING:  Objection.

10           THE COURT:  Rephrase the question.

11   Q    Had Detective Niedermeier obtained the videos from any

12   security cameras at the movie theater, we would know with

13   certainty whether or not Mr. Martin was seen on those videotapes

14   going into or out of the movie theater, isn't that correct?

15   A    We would know if he was seen on the video.  I would assume.

16   Depends how many people are coming in and out of the theater.

17   Q    And where the cameras are pointed?

18   A    Exactly.

19   Q    And if Detective Niedermeier had obtained cell site

20   information, we would know where Mr. Martin's phone call was or

21   phone was bouncing off of at that 11:37 call from Mr. Gardner,

22   wouldn't we?

23   A    Correct.

24   Q    Let me direct your attention to a proffer session with

25   William Montgomery that took place on September 26th of 2002.  I

1    believe the notes reflect that you were present for that proffer

2    session?

3    A    Yes, sir.

4    Q    Okay.  And were you present when Sergeant Green described

5    for William Montgomery the weapons used in the Eric Lee shooting

6    and how they matched other homicides in the city and the county?

7    A    No, sir.

8    Q    You weren't present for that?

9    A    I was present for the proffer session.  I don't recall any,

10   I don't recall Sergeant Green saying anything of that nature.

11   Q    If I showed you notes from the proffer session, would that

12   refresh your recollection?

13   A    My notes?

14   Q    No.  The notes that someone else that we've yet to identify

15   took at that proffer session.

16   A    I could look them over and tell you what I remember.  There

17   was, that particular proffer session, there were a lot of people

18   there.  People were in and out throughout the course of it.  I

19   don't recall this.  No.

20   Q    Okay.

21   A    As I said, people were in and out.  I may have not been

22   present at that time.  I don't recall any, any investigators

23   offering information about matching weapons.

24   Q    Okay.  And as a homicide detective, would you want to reveal

25   to a person or an individual who is a possible witness

1    information regarding ballistics on different homicide cases?

2    A    No.

3    Q    In fact, a proffer session is where the potential witness is

4    supposed to be providing you with information, isn't that

5    correct?

6    A    Correct.

7    Q    And it would not be, you would not want to provide them with

8    information that they could then incorporate into their own

9    testimony, would you?

10   A    Correct.

11   Q    If I could have one minute, Your Honor.

12            THE COURT:  Yes.

13            MR. PYNE:  That's all I have.  Thank you very much,

14   Detective.

15            THE WITNESS:  Thank you.

16            CROSS EXAMINATION

17   BY MR. COBURN:

18   Q    Good afternoon, Detective Benson.

19   A    Good afternoon, Mr. Coburn.

20   Q    Your Honor, may I be permitted to go up into the front just

21   to retrieve some of the government's exhibits?

22            THE COURT:  Of course.

23   Q    Detective, do you remember last week when Mr. Harding was

24   asking you questions on direct examination, he was showing you

25   some photos and some documents that were seized from the Valdavia

1    Court address?

2    A    Yes.

3    Q    And that address is the address that, in your view, in your

4    mind, is associated with Mr. Mitchell, right?

5    A    At one time, yes.

6    Q    At one time.  Okay.  Well, let me just ask you about a

7    couple of those, if I may.  Do you recall being shown this

8    photograph during the course of Mr. Harding's direct examination?

9    A    Yes.

10   Q    And this was one of the items which, according to your

11   testimony, this was seized from the Valdavia Court address when

12   the search warrant was executed there, is that correct?

13   A    Yes.

14   Q    Do you remember Mr. Harding asking you whether or not you

15   saw Mr. Gardner in this photo?

16   A    Yes.

17   Q    And you said that you did, correct?

18   A    Yes.

19   Q    And is this the person that you indicated you believe is Mr.

20   Gardner?

21   A    Yes.

22   Q    Okay.  Now, you've been here, of course, since you're the

23   case agent, one of the two case agents, you have been here in

24   trial for the entirety of the trial, right?

25   A    Correct.

1    Q    And according to your testimony, again, in response to some

2    of Mr. Harding's questions this morning, you were actually

3    present at either some or all of the pretrial hearings in this

4    case, right?

5    A    Correct.

6    Q    And I think you said there were at least nine of them,

7    right?

8    A    About that many, yes.

9    Q    So you've been in the courtroom at the same time as Mr.

10   Gardner for a long time, right?

11   A    Yes.

12   Q    And you know that gentleman over there sitting next to Mr.

13   Kurland, that's Mr., that's Mr. Gardner, right?

14   A    Yes.

15   Q    Now, looking at him today -- by the way, do you know what

16   Mr. Gardner's age is?

17   A    I believe he's 28 maybe.  29, 30.  I don't know exactly.

18   Somewhere in the late twenties, early thirties.

19   Q    Looking at him today and comparing his appearance -- maybe I

20   can just sort of zoom in a little bit here -- to the person

21   depicted in this photograph who you've indicated is Mr.

22   Gardner --

23   A    Yes.

24   Q    -- is it possible for you, just based on your own judgment,

25   based on the identification that you made, to give the ladies and

1    gentlemen of the jury any sense of how old you think Mr. Gardner

2    might be in this picture?

3    A    This photograph?  Based on the clothing and, if you back

4    out, they're all wearing BK shoes, based on some of the dress and

5    actually showing this photograph to several cooperating

6    witnesses --

7    Q    Well, I'm not asking you what they said.  I'm asking for

8    your judgment.

9    A    I would place it around '88, '89, '90.  Somewhere around

10   that range.

11   Q    '88, '89 or '90, right?  Now, the homicides, the five

12   homicides in this case?

13   A    Yes.

14   Q    All occurred in the year 2002, correct?

15   A    Right.

16   Q    And you've heard testimony, have you not, that a number of

17   the individuals who are codefendants in this case grew up and

18   went to school together, is that right?

19   A    Yes.

20   Q    Now, with respect to the other people that are in this

21   photograph here, can you tell us who any of them are?

22   A    Yes.  Well, first thing I did when I obtained this picture,

23   I attempted to identify everyone in the photograph.  I was able

24   to identify Mr. Mitchell, Mr. Gardner, Anthony Wyche.  Let me

25   see.  There was a guy named Kobe somewhere on here.  I believe

1    they refer to this guy as D. No one else that was really germane

2    to the investigation except for the three individuals.

3    Q    Okay.  Now, to show you a couple of other photographs, and I

4    believe that Mr. Harding showed you these photos as well during

5    your direct examination.

6    A    Yes.

7    Q    Did you tell us that Mr. Gardner was in this picture?

8    A    No.

9    Q    Did you tell us -- and these are all pictures that were

10   seized from the Valdavia Court address, right?

11   A    Yes.

12   Q    And is he in this picture?

13   A    No.

14   Q    He's obviously not in this picture because that's Mr.

15   Mitchell, you told us, right?

16   A    That's correct.

17   Q    Okay.  Do you also recall providing some testimony during

18   the course of your direct examination, when Mr. Harding was

19   asking you questions, about this document?

20   A    Yes.

21   Q    This was an item that you told the ladies and gentlemen of

22   the jury that was also seized, was it from the Valdavia Court

23   address?

24   A    Correct.

25   Q    And this is -- okay.  You know, I actually have no idea what

1    the exhibit number is.  It was displayed to the jury during the

2    direct examination, I believe.  V-7 is on the envelope that it

3    came out of.  That's what it says.  Government Exhibit V-7.

4              You remember telling the ladies and gentlemen of the

5    jury about this document?

6    A    Yes.

7    Q    Now, this appears to be a Meineke Discount Muffler receipt,

8    right?

9    A    That's correct.

10   Q    And it relates, again, if we go, trying to zoom in a little

11   bit, to, up in the upper left-hand corner there, an '82 Honda,

12   right?

13   A    Yes.

14   Q    And do you recall testifying, in response to a question from

15   Mr. Harding, that you believed that an '82 Honda Accord was

16   associated with Mr. Gardner?

17   A    I said I believed that at one time Mr. Gardner had a Honda

18   Accord.  I didn't say an '82.

19   Q    You didn't say an '82?

20   A    I don't believe I did, no.

21   Q    You don't have any reason to believe it's this Honda Accord,

22   right?

23   A    I would be guessing.  As I indicated, there's no license

24   number, there's no VIN number, so I couldn't say for sure.

25   Q    And what's the basis of your view that he had a Honda Accord

1    at all?

2    A    Running MVA, doing background investigation on all four of

3    the defendants, I'm thinking in the back of my mind that there

4    was a Honda associated with him in the past, but I can't say that

5    it's this one.

6    Q    Can you be any more specific than that about it?

7    A    No.  I would have to rerun his MVA record and check it.

8    Q    We've heard testimony about a number of arrests involving

9    Mr. Gardner --

10   A    Yes.

11   Q    -- back in the '90s, right?

12   A    Yes.

13   Q    Did any of them relate to a Honda Accord?

14   A    No.

15   Q    Okay.  You were also asked during your direct examination by

16   Mr. Harding about this, and I don't think this has a separate

17   exhibit number on it, Mr. Harding.  I guess it does.  It's

18   wrapped up in loosely in a piece of paper labeled V-17.  Do you

19   remember being asked about this business card?

20   A    Yes.

21   Q    And you indicated that the Nikki Gardner here is related to

22   Mr. Gardner, right?

23   A    Correct.

24   Q    And what is your understanding of what the relationship is

25   there?

1   A    I want to say it's his sister.  I'm not 100% sure.  I know

2   that Mr. Gardner has acted as a bail bondsman in the past for

3   that agency.  I don't know, I'm guessing that it's his sister.

4   Could be a cousin.

5   Q    Did you say that Mr. Gardner has worked for this agency?

6   A    I believe when he was arrested, he gave his occupation as a

7   bail bondsman.

8   Q    Do you know for a fact that it was this entity that he was

9   working for?

10  A    I believe that's what he indicated, yes.

11  Q    Okay.  Turning now, and the jury's heard a lot about these

12  so I'm going to try to run through them as quickly as I can, to

13  the toll records.

14  A    Yes.

15  Q    We're talking here about the records showing phone calls

16  between the various telephones, typically cell phones in this

17  case, right?

18  A    Yes.

19  Q    All right.  Do you remember, and I'm sorry, I don't have

20  exhibit numbers because all we have is the copies here, but I can

21  certainly identify them.  It's entitled Drug Enforcement

22  Administration, Description, McCaffity to all targets, right?

23  A    Correct.

24  Q    And is there a time period here or is it just during the

25  course of all the records you looked at?

1    A    That's correct.  It's, the two dates that you see up there,

2    1/1/1980 and 12/31/2009 are the default, if you want to encompass

3    the entire time frame.  Or you can set it at whatever dates you

4    want to run.  That's comprehensive.

5    Q    Do I understand correctly, then, from this chart that we're

6    looking at here that so far as you know there has never, back to

7    the beginning of time, been any telephone contact between Mr.

8    McCaffity and Mr. Gardner, so far as you know?

9    A    Not with these phones, no.

10   Q    So the answer to my question is yes, so far as you know?

11   A    As far as I know, from the records that I have, no.

12   Q    Okay.  Showing you now -- this one does have an exhibit

13   number on it -- government Exhibit B-6.  This one is entitled

14   Drug Enforcement Administration Description, all targets to

15   Reynolds.

16   A    Correct.

17   Q    And is it correct, then, looking at this document, that so

18   far as you know there has never been a phone call between Mr.

19   Reynolds and Shawn Gardner, at least according to the toll

20   records you looked at?

21   A    As far as the toll records, no.  But in speaking to Mr.

22   Reynolds.

23   Q    Well, I'm not asking you to recount what another witness

24   said.

25   A    Well, you're asking me if they've ever spoken.

1    Q    No, I was actually asking about, at least I meant to ask you

2    about what you're looking at there.  In terms of the toll

3    records --

4    A    No.

5    Q    -- the toll records you looked at, they show no contact

6    between them by telephone, is that right?

7    A    That's correct.

8    Q    Okay.  Showing you now a document which you've been asked

9    about already, it says All Targets to Goose.  Do you see that?

10   A    Yes.

11   Q    Now, Goose is the person whose real name you believe to be

12   Sherman Kemp, is that right?

13   A    A person I know to be Sherman Kemp, yes.

14   Q    Okay.  I don't mean to question that.  And you've testified

15   that Goose is associated with County Sports, is that right?

16   A    That's correct.

17   Q    That's a store, correct?

18   A    Right.  Loch Raven Boulevard.

19   Q    Pardon?

20   A    On Loch Raven Boulevard, yes.

21   Q    You've also heard testimony -- on Loch Raven Boulevard.  And

22   where in Baltimore is that?

23   A    It was in the county, just outside the city line.  I don't

24   remember the exact address.

25   Q    We've also heard testimony during the course of the trial

1    about there having been some discussion about an intention to

2    kill Goose, right?

3    A    Correct.

4    Q    Now, this call -- and actually, before I ask you that.  The

5    number dialed, this is the number that's associated with Sherman

6    Kemp, AKA Goose, right?

7    A    Correct.

8    Q    443-277 --

9    A    6655.

10   Q    8655, actually.  It's hard to see on the screen.  I'll

11   getting a little closer to it.  Now, is that a land line or a

12   cell phone?

13   A    A cell phone.

14   Q    I thought this thing had an auto focus on it but it's not

15   focusing.  That's a cell phone, is that right?

16   A    Correct.

17   Q    So is it your testimony, then, that Sherman Kemp had two

18   cell phones?

19   A    At this time?  I don't know how many cell phones he had.  I

20   know how many he had during my investigation.

21   Q    Okay.  Now, have you heard testimony to the effect that

22   calls to this number were calls to County Sports?

23   A    I don't recall testimony about it.  No.

24   Q    Okay.

25   A    Who, who testified to it?  I might remember better.

1    Q    Well, I'm not actually allowed to furnish you with that

2    information, I don't think.

3    A    I don't recall that testimony, no.

4    Q    Okay.  You don't actually know that Mr. Kemp had this phone

5    in his hand when these calls came in, is that right?

6    A    I don't know that.

7    Q    Now, this last call here, the one that says Shawn Earl

8    Gardner next to it, and you've got two phone numbers in the other

9    chart that you were using, which we're going to look at in a

10   second, which were associated with Mr. Gardner, right?

11   A    Correct.

12   Q    And this is the first one?

13   A    That's right.

14   Q    This is the one you talked about, your testimony was he

15   stopped using after the Wyche homicide?

16   A    Correct.

17   Q    Homicides?

18   A    The 25th was his last call, yes.

19   Q    Okay.  Now, the Wyche brothers were killed when?

20   A    The night of the 24th into the early morning of the 25th.

21   Q    Okay.  So this call is used by that phone, right?  The one

22   that you've indicated that he stopped using after the Wyche

23   brothers were killed?

24   A    Right.  The day after.

25   Q    He used it after they were killed to call the person, the

1    phone number --

2    A    Correct.

3    Q    -- you've associated with either, with Goose or County

4    Sports, right?

5    A    Correct.

6    Q    Okay.  Let me show you now a chart that you've looked at a

7    lot during the course of your testimony.  And I'm sorry, I don't

8    have the government exhibit number.  If the prosecutor wants to

9    furnish it, I have no objection to it.  But this is the chart

10   showing four pictures, like one in each corner, right?

11   A    Correct.

12   Q    Okay.  And we've got 274 calls from February 22nd, '02 to

13   April 15th, '02, between Shawn Earl Gardner and Shelly Wayne

14   Martin, right?

15   A    Correct.

16   Q    And you've heard testimony, have you not, during the course

17   of this trial that those two individuals have been very close

18   friends since childhood, right?

19   A    Yes.

20   Q    Now, what I'd like you to focus on is another prong of this

21   thing.  And you've already testified several times that there is

22   no line at all between Mr. Gardner and Mr. Harris, right?

23   A    That's correct.

24   Q    And in point of fact, again, since the beginning of time, so

25   far as the toll records show, the phone records show, there has

1    never been a telephone call so far as you know between those two

2    individuals, correct?

3    A    That's correct.

4    Q    Now, focusing, then, on this prong here.  Willie Edward

5    Mitchell, III, AKA Bo, and Shawn Earl Gardner, AKA Goo, you have

6    49 calls from February 23rd of '02 to April 1st of '02, is that

7    right?

8    A    That's correct.

9    Q    And as you've already told us, you believe that the evidence

10   shows that the Wyche brothers were killed on March 25th in the

11   early morning hours, right?

12   A    Correct.

13   Q    And Mr. McCaffity and Lisa Brown were killed when?

14   A    February 27th into the 28th, same thing, early morning

15   hours.

16   Q    That's actually the 26th into the 27th?

17   A    No.  The 27th into the 28th.

18   Q    Okay.  Well, I'm going to focus you sort of for the sake of

19   organizing this on those 49 calls.  Okay?

20   A    Yes.

21   Q    The 49 calls in that time period between Mr. Mitchell and

22   Mr. Gardner that, according to your chart, occurred, right?

23   A    Yes.

24   Q    Now, turning first to the period of time involving the

25   homicide of Mr. McCaffity and Ms. Brown.  You've got a chart here

1    showing a series of phone calls between Mr. McCaffity and Mr.

2    Mitchell --

3    A    Correct.

4    Q    -- from February 26 '02, to February 27th of '02, am I

5    right?

6    A    Correct.

7    Q    Okay.  Taking the time period when you believe that Mr.

8    McCaffity and Ms. Brown were killed and tracing it back, okay,

9    taking that as your reference point and tracing it back, when is

10   the most recent call of those 49 calls between Mr. Mitchell and

11   Mr. Gardner?  When's the most recent one?  When's the one that's

12   closest in proximity before those murders between those two

13   individuals?

14   A    I have to do this by hand.

15   Q    And if you can't tell from the records, you know, just let

16   us know that.

17   A    I'm sorry.  I'll look at the Wyche brothers' time.

18   Q    Let me, while you're looking.  I mean, you didn't do a chart

19   showing that, right?

20   A    I didn't.  The chart with the McCaffity incident only

21   encompasses Mr. McCaffity and Mr. Mitchell.

22   Q    The chart relating to the McCaffity incident that you did

23   only encompasses Mr. McCaffity and Mr. Mitchell, right?

24   A    Correct.

25   Q    Okay.  Well, let's turn, then, to the Wyche brothers.

1   A    Okay.

2   Q    Darryl and Anthony Wyche, who were murdered in the early

3   morning hours of March 25th, 2002, correct?

4   A    Yes.

5   Q    You did do a chart with respect to phone calls just prior to

6   that homicide involving all the defendants, right?

7   A    Correct.

8   Q    All right.  Looking at that chart now.  This chart shows

9   that a number of those 274 calls between Mr. Gardner and Mr.

10  Martin happened during this time period, right?

11  A    Correct.

12  Q    Does this chart, which encompasses the, what is it, about

13  two days or a day and half, looks like two days, prior to the

14  murder of the Wyche brothers, is that right?  March 24th, '02 to

15  March 25th, '02?

16  A    It's a little over 24 -- starts at 4:07 on the 24th.  It's

17  less than 24 hours.

18  Q    Okay.  Does this chart show any telephone contact at all

19  between Mr. Mitchell and Mr. Gardner during this time period?

20  Just during the hours prior to the Wyche brothers being murdered.

21  A    Actually, I misspoke.  I apologize.  It's roughly less than

22  a 12 hour period.

23  Q    Well, it says March 24th to March 25th, right?

24  A    March 24th at 4:07 p.m. to the 25th at 12 a.m.  So 4 a.m.

25  would have been 12 full hours.  So we're looking at eight, an

1    eight hour chart, basically.

2    Q    Just to make sure we're clear.

3    A    You asked about Gardner to Mitchell, was the question?

4    Q    Let me ask you this question first, okay?  The first call,

5    the earliest in time that you have depicted on this chart is the

6    March 24th, '02 call at 4:07 p.m., right?

7    A    Correct.

8    Q    And how many hours before the Wyche brothers were killed do

9    you believe that that earliest call in this chart was made?

10   A    You're asking from the, from the first call at 4:07.

11   Q    You said they were killed in the early morning hours of the

12   25th, right?

13   A    I missed -- it's right at midnight the 24th.

14   Q    So it's about eight hours, right?

15   A    Yes.

16   Q    During this eight hour period depicted on this chart, is

17   there one single call coming or going between Mr. Mitchell and

18   Mr. Gardner?

19   A    No.

20   Q    What is the next earliest call, if you can tell from looking

21   at the records -- and I may be able to help you with this by

22   handing you an exhibit -- what's the most recent contact, you

23   know, going back a little bit, since there's nothing during those

24   eight hours, as you've just told us, before the 4 p.m. call on

25   the 24th, when is the most recent time before that that,

1    according to the toll records, Mr. Mitchell and Mr. Gardner

2    talked on the telephone?

3    A    I have -- I can tell you.  Can you ask the question again

4    because I have all the data of the individual breakdown of the

5    calls.

6    Q    Sure.  I mean, the earliest call that's depicted on this

7    chart that you created here of phone contact, you know, in the

8    hours prior to the Wyche murders was at four, it looks like 4:07

9    p.m. on March 24th, 2002.  Going earlier than that, when's the

10   next closest time that Mr. Gardner and Mr. Mitchell talked to

11   each other on the phone as shown in all the records of the 30,000

12   calls that you have on your database.

13   A    I have March 11th of 2002 and I have six calls from March

14   30th to April 1st.

15   Q    Okay.  But that actually wasn't my question because that's

16   after the Wyche brothers were killed.  Is the next earliest time

17   prior to 4 p.m. on March 24th, 2002, when the two were in

18   contact, on March 11th, which I guess would have been 14 days

19   before the Wyche brothers' murder?

20   A    The tolls for the phone that, that Gardner was using at the

21   time of the Wyche murders, which is the 1241 number, the subpoena

22   that was sent out encompassed from February 20th to February 30th

23   to cover the McCaffity murder, and then a second block of tolls

24   from March 20th to March 30th to encompass the Wyche brothers

25   toll.  So it wasn't a comprehensive, huge block of tolls like I

1    received for, a lot of the other phones I was able to get almost

2    a year's world of tolls or months, at least.

3    Q    Let's actually look at that subpoena because I was just

4    about to show that to you.  Now, the subpoena that you're

5    referring to for the first of the two phone numbers you've

6    associated with Mr. Gardner is the one we're looking at on the

7    presenter right now, right?

8    A    That's correct.

9    Q    Okay.  As you just stated, it says February 20th to February

10   30th and March 20th to March 30th, right?

11   A    Correct.

12   Q    As you've already indicated, the Wyche brothers were

13   murdered in the early morning hours of March 25th?

14   A    Just, midnight the 24th.

15   Q    Midnight the 24th going into the 25th.  So from March 20th

16   until the time of the Wyche brothers being murdered, there's no

17   contact?  None?

18   A    That's correct.

19   Q    Between Mr. Mitchell and Mr. Gardner, right, according to

20   the records?

21   A    I believe that's correct, yes.

22   Q    Okay.  Actually, just to focus you for another minute on the

23   subpoena that you issued for these records.  Now the 1241 number,

24   just going back to that four corner chart that we looked at a

25   second ago.  As you've already indicated, and you've said this a

1    few times, so we're not going to kind of keep repeating the same

2    thing.  You've got two phone numbers on this chart that you've

3    told the jury are associated with Mr. Gardner, right?

4    A    That's correct.

5    Q    And the top one is 410-493-1241, right?

6    A    Yes.

7    Q    That's the one you indicated might be the burn phone, right?

8    A    That's subscribed to in the name Samuel Handy.

9    Q    We're going to talk more about that in one second.  And the

10   second one is 443-540-1253, right?

11   A    Yes.

12   Q    Now, this subpoena that we just looked at, the one you just

13   referred to, this is for the first number, right?

14   A    That's right.

15   Q    410-493-1241?

16   A    Correct.

17   Q    The one that was subscribed to by Mr. Handy, right?

18   A    That's correct.

19   Q    Now, may I approach the witness with an exhibit, Your Honor?

20        THE COURT:  Yes.

21   Q    I just handed you Government's Exhibit T-12.  Do you see

22   that?

23   A    Yes, sir.

24   Q    Now, you provided a description for the ladies and gentlemen

25   of the jury about how drug dealers sort of generally use burn

1    phones, right?

2    A    Correct.

3    Q    And they use them to avoid detection, right?

4    A    Yes.

5    Q    And you've indicated that this one, the 1241 number, could

6    be a burn phone, right?

7    A    Correct.

8    Q    Now, as part of this subpoena that you issued, and this was

9    a subpoena that you issued to Sprint, right?  Sprint Spectrum LP?

10   A    Yes.

11   Q    That's a big company, right?

12   A    Yes.

13   Q    I mean, you've issued, since you've done a lot of, you know,

14   sort of investigation into cell phone records, you've issued lots

15   of subpoena to Sprint?

16   A    Yes.

17   Q    You say in the subpoena, it's requested that your company

18   furnish subscriber and billing information, incoming and outgoing

19   calls and toll records, for those two time periods that we just

20   talked about, right?

21   A    That's correct.

22   Q    And that's what they did, right?

23   A    Yes.

24   Q    In fact, with respect to subscriber information, they gave

25   you a fair amount of information, didn't they?  And you can feel

1    free to refer to any part of that exhibit that you've got in

2    front of you there, Government's Exhibit T-12.

3    A    Yes, sir.

4    Q    And taking a look at some of that here, I mean, you've got

5    here, this is a document that came in response to that subpoena,

6    right?

7    A    Yes.

8    Q    It gives you the account number for the phone up top, right?

9    A    Correct.

10   Q    It says the name Samuel Handy, right?

11   A    Correct.

12   Q    And it gives you an address?

13   A    Correct.

14   Q    Right?  And a customer ID?

15   A    Correct.

16   Q    So you went to the address?

17   A    No.  I believe what I did in this circumstance was run an

18   MVA browse, if I remember correctly, and I didn't find a Samuel

19   Handy at that Ravenwood address.

20   Q    You didn't go there?

21   A    I wasn't concerned with who the phone was subscribed to, as

22   I testified to earlier.  I was concerned with the toll records

23   themselves.

24   Q    But you did tell the jury that you believe that this might

25   be a burn phone, the kind of thing used by drug dealers and --

1   A    Correct.

2   Q    To conceal identities, right?

3   A    Correct.

4   Q    Now, the next page of this document, it also provides the

5   address.  And then it has the words here, underneath where it

6   says Fraud Confirmed, it says Bill Credit, right?

7   A    Correct.

8   Q    Does that mean that a credit card was used to get this phone

9   by Mr. Handy or somebody who said they were Mr. Handy?

10  A    I don't know what their billing, that that -- sorry.

11  Q    Let's look at the next page.  Again, after providing his

12  address, it provides a Social Security number for him, right?

13  A    That's correct.

14  Q    And did you run that?

15  A    I believe I ran that, also, in the criminal database and

16  didn't come back with anything.  189 would be a northern,

17  somewhere up near New York or Connecticut.

18  Q    Provides what purports to be his date of birth, right?

19  A    Correct.

20  Q    Now, when you were testifying about this phone yesterday in

21  response to questions from Mr. Gardner, do you remember telling

22  the jury that Gardner cut off this phone right after the Wyche

23  brothers were killed?  Do you remember using those very words,

24  "cut off?"

25  A    I don't believe I used "cut off."  I believe I said "stopped

1    using", "ceased using."  I don't typically use the word "cut

2    off."  I could be wrong.  I don't believe I said that.

3    Q    Okay.

4    A    It was, it ceased being used.

5    Q    Were you aware that over the weekend I sent the prosecutors

6    an e-mail asking them to make sure to have the full records for

7    this phone number available today?

8    A    I am not aware that you sent an e-mail but I'll take your

9    word for it.

10   Q    I'm just asking if you knew about that.  According to the

11   records that you actually got with respect to this phone, the

12   phone continued in, at least in usable condition until April

13   24th, 2002, correct?

14   A    That's correct.

15   Q    That's the actual expiration date shown by Sprint for the

16   phone, right?

17   A    That's correct.

18   Q    So that, in fact, demonstrates the phone was not cut off,

19   right?

20   A    As I testified earlier, I said that the actual service was

21   terminated in April.  I couldn't remember the date.  But the last

22   telephone call was on the 25th of March.

23            THE COURT:  Is this a good point to break, Mr. Coburn?

24            MR. COBURN:  Absolutely, Your Honor.

25            THE COURT:  All right.  Take an afternoon recess,

1    ladies and gentlemen, at this point.

2              Please leave your note pads on your chairs and have no

3    discussion about the case or any of the evidence.  Continue to

4    keep an open mind.  Jury's excused for a 15 minute recess.

5              (Jury exits the courtroom.)

6              THE COURT:  You can certainly release your witness, Mr.

7    Crowe.  I am really, really hoping that we can conclude the

8    government's case today.  I'm willing to stay as late as, I think

9    the jury would want, want me to keep them here to get at least to

10   that point.  I appreciate counsel's cooperation in that regard.

11             We'll stand in recess for 15 minutes.

12             (Recess at 4:00 p.m.)

13             THE COURT:  Have the jury, please.  What's your best

14   guess, Mr. Coburn?

15             MR. COBURN:  Ten minutes, Your Honor.

16             THE COURT:  What's yours, Mr. Harding?

17             MR. HARDING:  Twenty minutes, Your Honor.

18             THE COURT:  Okay.  We night make it.  I have to be

19   mindful of needs of the marshals.  How much time are you all

20   going to want to argue on the motion?  A few minutes?

21             MR. KURLAND:  Five, ten minutes maybe.

22             THE COURT:  Maybe we'll put that over until Wednesday

23   morning.

24             MR. HARDING:  Does the Court want to put over the

25   government resting until Wednesday morning?  Since I also have

1    this stipulation and all these exhibit issues to take up.

2            THE COURT:  Let's see how it goes.  I may.

3            (Jury enters the courtroom.)

4            THE COURT:  Good afternoon, ladies and gentlemen.  Mr.

5    Coburn, whenever you're ready.

6    BY MR. COBURN:

7    Q    Thank you so much, Your Honor.  Good afternoon again,

8    Detective Benson.

9    A    Good afternoon, sir.

10   Q    Going back now to that first phone number, the one you've

11   attributed to Mr. Gardner, the one, phone number relating to Mr.

12   Handy, 410-493-1241.

13   A    Yes.

14   Q    Do you recall testifying, I believe you said it today, also,

15   but in response to one of Mr. Harding's questions yesterday, that

16   after the time of, or right after the Wyche brothers were

17   murdered, there were no further charges on that line.  In fact, I

18   think what you said was no charges on that line, that first phone

19   number, 410-493-1241, the Handy phone?

20   A    Correct.

21   Q    No further charges on that line after March 26th, right?

22   A    Yes.

23   Q    And that testimony is based, of course, on the cell phone

24   records, right?

25   A    Yes.

1    Q    Okay.  Now, as you told us, Detective Benson, just a few

2    moments ago, when you issued your subpoena for the toll records

3    for that phone, the Handy phone, you limited them by time period,

4    right?

5    A    Correct.

6    Q    You asked for February 20th, '02 to February 30th, '02,

7    correct?

8    A    Correct.

9    Q    And March 20th, '02 to March 30th, '02, right?

10   A    That's correct.

11   Q    But as you've also indicated, this phone was not cut off

12   until, again showing you the records received in response to your

13   subpoena, until April 24th, 2002, right?

14   A    That's correct.

15   Q    So that would be between three and four weeks after the last

16   toll record you have for that line, right?

17   A    That's correct.

18   Q    So you have actually absolutely no way of knowing, do you,

19   whether or not that phone was utilized to make phone calls

20   between April 1st, 2002 and April 24th, 2002, is that correct?

21   A    That's correct.

22   Q    Looking at the records themselves, given that the

23   limitations that you asked them to place -- may I have the

24   Court's indulgence just for a moment?

25            THE COURT:  Yes.

1    Q    The phone records themselves, which I believe you have up

2    there with you, marked as Government's Exhibit T-12.  Given the

3    time limitations that were placed on the subpoena, these records

4    are redacted, right?

5    A    Correct.

6    Q    Now, the term "redacted" means that parts of the, I guess

7    what were the original document, were obliterated?  They were cut

8    out so you can't see them, right?

9    A    Well, yeah.  Until the beginning period, if they pull a page

10   up and I only asked for the 20th to the 30th, they would not give

11   me up to the 19th because by law they could only give me what I

12   ask for on the subpoena.

13   Q    So with respect to that second time period, then, the 20th

14   through the 30th, the first page of records, toll records that

15   you received is what we're looking at right here, right?

16   A    That's correct.  If you come down to the bottom, it will

17   show the first call that was made on the 20th was at 3:02 p.m.

18   Q    So you didn't get any of the normal stuff that's at the

19   front of cell phone bills that we all are familiar with, right?

20   The thing like showing, you know, the name, the address, you

21   know, the front page of the bill, right?  I mean, the things

22   showing whether or not there was a payment made and a credit

23   given and what the additional total charges are.  You don't have

24   any of that for this phone, right?

25   A    I have the, what happens is if, after a certain time period,

1    the cell phone companies reduce all of their, sometimes tolls are

2    no longer available.  So what they have is they have copies of

3    the bills, basically, on their file, almost like a microfiche.

4    And they can send you copies of the bills at your request.  I'm

5    not sure I understand what you're asking.

6    Q    Let me put it this way.  With respect to this time period,

7    what we're looking at here is part of a bill, right?

8    A    It's the record of the bills that were sent by the cell

9    phone company.  They're not copies of the actual phone bills that

10   he received.

11   Q    That's not?

12   A    This is the record that the cell phone company keeps.

13   Copies of how they billed the client.

14   Q    Well, you got, for this time period, March 20th through

15   30th, starts on Page 8 of 34, right?

16   A    Correct.

17   Q    You don't have pages 1 through 7, right?

18   A    No, I don't.

19   Q    Okay.  And then it ends, again, with March 25th, right?

20   A    That's correct.

21   Q    Now, your testimony is that on March 26th, 2002, this second

22   phone, the one that you've associated with Mr. Gardner, was

23   activated, right?

24   A    That's correct.

25   Q    And you also subpoenaed records relating to that phone,

1   right?

2   A    Correct.

3   Q    And just to show you, just one page of them.  Is it correct

4   that what we're looking at here is part of what you received back

5   from Cingular with respect to this phone, 443-540-1253, right?

6   A    Correct.

7   Q    It says it was activated, as you said, on March 26th of '02,

8   right?

9   A    Correct.

10  Q    And it was suspended on June 13th of '02, right?

11  A    That's what it says, yes.

12  Q    And the subscriber name is Shelly W. Martin, right?

13  A    Correct.

14  Q    Now, do you remember being asked a question by Mr. Pyne,

15  asking you, I believe the word he used was "significance?"

16  What's the significance of the first phone no longer being used

17  and the second phone coming into use on March 26, '02?

18  A    Yes.

19  Q    Now, and as you've already told the jury a number of times,

20  the Wyches were murdered around midnight on the 25th, right?

21  A    Correct.

22  Q    So if I understand correctly, then, before that time, before

23  the 26th, Mr. Gardner was using a phone that was not registered

24  in his name, correct?

25  A    Correct.

1    Q    The phone was not actually cut off until late April,

2    correct?

3    A    According to the records, yes.

4    Q    And then on the 26th, rather than using a phone registered

5    to Samuel Handy, Mr. Gardner began using a phone that was

6    registered to Shelly Martin, right?

7    A    Correct.

8    Q    This second phone number, the one that you've associated

9    with Mr. Gardner, 443-540-1253, right?

10   A    Yes.

11   Q    That's the one that he started using, as you just told us,

12   on March 26th, correct?

13   A    Correct.

14   Q    Do you remember telling the ladies and gentlemen of the jury

15   how it was that you associated that phone with Mr. Gardner?

16   A    Yes.

17   Q    Was one of the ways that you associated that phone with him,

18   did you tell the jury, that that phone number was attributed to

19   him in the Wyche brothers' phone book?

20   A    Not the 1253 number.  The 1241 number was in two of the

21   Wyche brothers' personal address books in their phones.  The 1253

22   number was not.

23   Q    Are you sure that's not what you said earlier?

24   A    If I did, I misspoke.  That's the phone, the second phone,

25   the 1253 number is the one that was recovered from his person

1    after the Tonya Spence arrest.

2    Q    You've already told the jury that, and you will correct me

3    if I'm wrong, that Mr. Mitchell and Mr. Martin were locked up in

4    April of 2002, right?

5    A    Correct.

6    Q    And they were charged with a homicide offense, correct?

7    A    Correct.

8    Q    And Mr. Gardner was locked up just a little later in 2002,

9    right, on the day --

10   A    I'm not sure of the date, but yes, 2002.

11   Q    It was in June of 2002, right?

12   A    If that's -- I don't know the date.

13   Q    Okay.  Now, with respect to the, what I guess has already

14   been referred to in this courtroom as the flesh and blood

15   defense, the first incident that you described relating to that

16   offense happened in 2005, right?

17   A    That's correct.  April 26th.  Or April 16th, 2005.

18   Q    And as you've already told the ladies and gentlemen of the

19   jury, these individuals, since the time of their arrest in 2002,

20   have been locked up continuously from that time until now, right?

21   A    From the time of each of their respective arrests until the

22   present, yes.

23   Q    And so at the time this behavior --

24   A    Sorry.  Gardner's arrest, June 7th.  Is that what you're

25   referring to?  To the present?  Yes.

CROSS EXAMINATION OF BENSON BY COBURN

163

1    Q    I'm talking about all of them.  They've all been locked up

2    since '02, right?

3    A    If I can tell you the dates.  Shelly Wayne Martin was

4    arrested April 17th.  Mr. Mitchell was April 1st.  Mr. Gardner

5    was June 7th.  And Mr. Harris was sometime in early 2004, I

6    believe, late 2003.  I don't know the date of Mr. Harris.

7    Q    Okay.  Okay.  Then leaving Mr. Harris to one side for a

8    moment, just focusing on the other three, Mitchell, Martin,

9    Gardner.  Okay?  Have been locked up, had been locked up since

10   either early or mid 2002, have been, since that time, until now,

11   right?

12   A    Yes.

13   Q    And so in 2005, when this behavior that you've described for

14   the ladies and gentlemen of the jury, when it started, they had

15   been locked up for approximately three years, is that right?

16   A    Correct.

17   Q    Let me mark an item, if I may -- once again came up here

18   without a pen.  If I may, Your Honor, as defense exhibit, I think

19   I'm up to 10 and 11.  I'll show these to the government.

20        THE COURT:  Gardner 10 and 11.

21   Q    Thank you very much.  As you already indicated in response

22   to a question from a number of different lawyers here, I mean,

23   you've been in the courtroom pretty much for all the court

24   proceedings related to this case, right?

25   A    As far as I know, most of the motions hearings.  I was

1    present for at least seven of them, yes.

2    Q    You've heard a lot of discussion, a lot of discussion

3    between the lawyers and the Court relating to this defense, is

4    that correct?

5    A    Yes.

6    Q    Is it correct that you have heard a number of lawyers state

7    that this defense relates, at least in part, to a particular web

8    site?

9             MR. HARDING:  Objection.

10            THE COURT:  Sustained.

11   Q    Are you aware of something called the American Patriot

12   Friends Network?

13   A    No.

14   Q    Are you aware of something called the Lawyer's Secret Oath?

15   Have you heard that mentioned in this courtroom in connection

16   with the flesh and blood defense?

17   A    Not that I recall, no.

18   Q    You told Mr. Lawlor, in response to one of his questions,

19   that you were aware that this defense related to some white

20   supremacist tax protesters out in, I think, is it correct, in the

21   Pacific Northwest?

22   A    I don't know the location.  I know that, my understanding is

23   it's based on Aryan brotherhood, some sort of white supremacist

24   web site, yes.  I don't know the specific web site.  I've never

25   visited.  I don't know the name of it.  But I know that that's

1    what it's related to.

2    Q    Now, with respect to the excerpts that the government

3    spliced together in the tape that was played for the jury.

4    A    Yes.

5    Q    At any point in those excerpts did you hear -- I'm talking

6    about the tape that was played today -- at any point did you hear

7    Mr. Gardner say, I am Mr. Gardner, flesh and blood man?

8    A    I believe, I believe, yes.

9    Q    You sure?

10   A    I've been listening to and trying to condense a two hour

11   tape down to seven minutes.  It may have been there.  I know that

12   it's in the overall transcript, the overall recording.  But

13   whether it made it into that edited cut, I can't say for sure if

14   I know that, those words are in there.

15   Q    Is it correct that the most recent incident that you

16   described for the ladies and gentlemen of the jury in which the

17   kind of disruptions you were describing occurred was in January

18   of this year?

19   A    The most recent --

20   Q    I'm talking about what you've already told them.  In terms

21   of your testimony in response to Mr. Harding's questions, is the

22   last incident he asked you about in January of 2008?

23   A    Yes.

24   Q    Okay.  And this trial started on September 15th, is that

25   right?

1    A    Correct.

2    Q    Is it correct that a defendant has a constitutional right to

3    represent him or herself pro se?

4              MR. HARDING:  Objection.

5              THE COURT:  Sustained.

6    Q    The term "pro se" has been used repeatedly during your

7    testimony in response to Mr. Harding's questions, right?

8    A    Yes.

9    Q    Do you know what it means, pro se?

10   A    On behalf of one's self, I believe.

11   Q    That's exactly right.

12   A    My Latin's a little rusty.

13   Q    Well, it's pretty darn good.  It's a defendant representing

14   him or herself, correct?

15   A    Yes.

16   Q    That's not limited to this case.  It's happened in other

17   cases, right?

18   A    Yes.

19             MR. HARDING:  Objection.

20             THE COURT:  Overruled.

21   Q    These individuals here, the defendants, are not lawyers,

22   correct, as far as you know?

23   A    No.

24   Q    Is it correct, based on your own general knowledge, that

25   legal doctrines change over time in the United States?

1    A    Yes.

2    Q    Can you tell the ladies and gentlemen of the jury in how

3    many other cases this thing called the flesh and blood defense

4    has been used by a defendant?

5    A    I know of two cases.  I know one in particular relating to

6    the Rice organization.  One, one of the charged defendants used

7    the flesh and blood, the others didn't.  Eric Hall was one case.

8         I know that Itchy Man, Solothol Thomas, attempted to

9    use it.  I can't think of any others off the top of my head.  But

10   I've heard of other, other cases.

11   Q    You heard a reference, did you not, during the course of the

12   excerpt that was played, the tape excerpt that was played for the

13   jury, where one of the defendants says something about lawyers

14   having to swear an oath to the Constitution, right?

15   A    Yes.

16   Q    Is it true, in fact, that all lawyers have to do that?

17            MR. HARDING:  Objection.

18            THE COURT:  Sustained.

19   Q    Do you recall a proceeding, a pretrial proceeding in this

20   case in which the judge allowed the defendants to speak?

21   A    Yes.

22   Q    Directly to him, is that right?

23   A    Yes.

24   Q    Are you aware of the fact that with respect to the pro se

25   pleadings that you've testified about and that the government has

1   introduced into evidence, do you know whether or not they were

2   ever ruled upon by the Court?

3   A    Yes.

4   Q    They were, right?  Is that correct?

5   A    Yes.

6   Q    Just a couple more questions.  Do you remember testifying in

7   response to some questions at the very end of your direct

8   examination, some questions that were posed by Mr. Harding, and I

9   believe it was while you were looking at a piece of paper that

10  showed the cell phone tower locations in connection with the

11  Spence homicide?  Do you remember that testimony?

12  A    Yes.

13  Q    With respect to those last three calls from the phone, the

14  second phone that you've associated with Mr. Gardner, can you

15  tell the ladies and gentlemen who they were to?

16  A    I don't know that.  I have the records.  I can refer to

17  them.

18  Q    Go right ahead.

19  A    I believe the, they were unknown numbers.  They showed a

20  telephone number but I wasn't familiar with the number.

21  Q    Okay.  Now, that phone -- I'm sorry.  Strike that.  Go

22  ahead.

23  A    The only, the only number of the final ten or so calls, the

24  only number I recognize is the call to the Jamane Johnson, 1107

25  number.

1    Q    I just have a couple more questions if I may, Your Honor.

2    Remember the map that you were looking at, the one with the push

3    pins?

4    A    Yes.

5    Q    Is that still available, do you know?

6    A    The big one?

7    Q    Yeah.  Is it right there?

8    A    Yes.

9    Q    May I approach, Your Honor?

10         THE COURT:  Yes.

11   Q    You still have the push pins?

12   A    Mr. Harding, I believe, does.

13   Q    May I borrow a push pin, please?

14         THE COURT:  Are you going to ask him to put a new push

15   pin in there, Mr. Coburn?

16   Q    I was going to, with the Court's permission.

17         THE COURT:  If the government doesn't mind.  It's just

18   that it's a --

19         MR. HARDING:  The government has no objection.

20         THE COURT:  All right.

21   BY MR. COBURN:

22   Q    Detective, do you remember hearing some testimony about an

23   Amity Street address?

24   A    Yes, sir.

25   Q    Do you see that on the map?

1    A    No.  It's actually directly south down, it's actually south

2    of the Druid Hill Park community.

3    Q    Can you just point approximately to where it is?  You may

4    have already just done that.

5         THE COURT:  He just did.

6    Q    I'm sorry, Your Honor.

7    A    It's not on the map.

8    Q    Court's indulgence, Your Honor, just for a moment?

9         THE COURT:  All right.

10        MR. COBURN:  Thank you, Your Honor.  Nothing further.

11        THE COURT:  Mr. Harding.

12        REDIRECT EXAMINATION

13   BY MR. HARDING:

14   Q    Okay.  Detective Benson, I have a vague sense that everyone

15   wants me to hurry up so I'm going to go as fast as I can.  You

16   remember Mr. Lawlor this morning asked you about whether you knew

17   of any prior cases where flesh and blood claims were made by

18   defendants and you said you knew of one or two, is that correct?

19   A    Yes.

20   Q    And you just described them to us in more detail?

21   A    Yes, sir.

22   Q    And in fact, it's not a defense at all, is it?  It's a

23   repudiation of the jurisdiction of the courts.

24        MR. MARTIN:  Objection.

25        MS. RHODES:  Objection.

1          THE COURT:  Don't lead the witness, Mr. Harding.  Go

2     ahead.

3          MR. HARDING:  Is it a defense in any sense of the word?

4          MS. RHODES:  Objection.

5          MR. MARTIN:  Objection.

6          MR. COBURN:  Objection.

7          MR. CROWE:  Objection.

8          THE COURT:  Well, I'm going to overrule the objection.

9     You may answer, Agent.

10          THE WITNESS:  No, sir.  I wouldn't personally consider

11     it a defense.  It's basically just questioning the jurisdiction

12     of the court.

13     BY MR. HARDING:

14     Q    Do you remember the, in fact, Mr. Lawlor questioned you

15     about the Court's use of the word "phenomenon" in the taped

16     excerpt that we heard this morning.  Mr. Lawlor asked you if this

17     was something the Court had described as a phenomenon.

18     A    Yes.

19     Q    And do you recall the CD we heard well enough to know, was

20     the actual reference that the Court made to the fact that this

21     was a new twist to the phenomenon because it was the first

22     occasion when the claims were made being verbally disruptive?

23          MR. MARTIN:  Objection, Your Honor.  It's so leading.

24          THE COURT:  Sustained.  Don't lead the witness, Mr.

25     Harding.

1    Q    Do you recall the Court's actual?

2    A    Yes.  My recollection is the Court had seen this, what was

3    termed a phenomenon before, the use of the flesh and blood as a

4    defense, but without the persistent objections and protesting

5    that we've seen with these four defendants.

6              MR. MARTIN:  Objection, Your Honor.

7              THE COURT:  The objection's overruled.

8    Q    Mr. Lawlor was also asking you about the calls between

9    McCaffity and Mitchell in the days leading up to the murder of

10   Mr. McCaffity and Lisa Brown, and in particular the calls that

11   night just before the McCaffity and Brown murders in government

12   Exhibit B-3.  Do you recall that?

13   A    Yes.

14   Q    And he noted that most of the calls were from McCaffity to

15   Mitchell rather than from Mitchell to McCaffity.  Do you recall

16   that?

17   A    Yes, correct.

18   Q    Is that consistent with the purpose of Mr. McCaffity joining

19   up with Mr. Mitchell to obtain a gun from him?

20             MR. LAWLOR:  Objection, Your Honor.

21             THE COURT:  Sustained.

22   Q    He also asked you about, Mr. Lawlor did, about the fact that

23   Mr. Mitchell was receiving drugs from Darryl Wyche and therefore

24   had plenty of reason to talk to him on the telephone, is that

25   correct?  Do you recall that?

1    A    I recall that, yes.

2    Q    But do you recall, we listened to a tape here in the

3    courtroom where Mr. Mitchell described how he used his phone, his

4    cell phone, to guide Darryl Wyche to a meeting that night?

5    A    Yes.  He, in the statement to Niedermeier, the recorded

6    statement that we listened to, he stated that he used a -- you're

7    referring to the Wyche murder?

8    Q    Yes.

9    A    Yeah.  He used the 6204 number to contact Darryl Wyche

10   multiple times the night of the murder to set up a drug deal, to

11   guide him into an area.

12   Q    And that area was the corner of Wabash and Ridgewood in Park

13   Heights, right, where the bodies of the Wyche brothers were

14   recovered, isn't that correct?

15   A    That's correct.

16   Q    That's according to Mr. Mitchell's own description of where

17   the meeting took place, is that correct?

18   A    That's correct.

19   Q    Mr. Lawlor also questioned you about the transcript of the

20   voice mail conversation.  He did so in connection, first of all,

21   with the use of the term "Shorty."  And he mentioned that Natasha

22   Wyche described the person who she heard say "Shorty" as Mr.

23   Martin.  Do you recall that?

24   A    Yes.

25   Q    And just to call your attention again to Government Exhibit

1    W-66.  I know the jury doesn't want to see this again.  But

2    Natasha Wyche talked or listened to Darryl Wyche's phone, or

3    listened to the conversation through that phone after the

4    completion of the voice mail, isn't that correct?  Isn't that

5    your testimony?

6    A    Yes, that's correct.

7    Q    Because, in fact, she couldn't possibly have connected with

8    Darryl Wyche's phone until that voice mail was completed?

9    A    That's correct.

10   Q    So if Natasha Wyche heard the word "Shorty", it couldn't

11   have been the use of the word "Shorty" that occurred on the voice

12   mail, is that correct?

13   A    It's actually possible that it is.  The word "Shorty" is

14   used twice in the transcript.  And that last call basically

15   overlaps with the, the statement that I heard on the tape saying,

16   "I'm calling your house, Shorty."  And that would be, there's an

17   overlap of that call to that, at that same time.

18   Q    Well, let me call your attention to the transcript.  This is

19   the Transcript Number Nine that we heard with Mr. Hayes on the

20   stand.  And it's, by the way, a little bit different from the one

21   you and Detective Niedermeier prepared, is it not?

22   A    That's correct.

23   Q    Because, for example, you say at 18 seconds that you heard

24   "G man, Shorty" and Mr. Hayes heard "G's in his pants, Shorty."

25   Is that correct?

1    A    Yes.

2    Q    But there's a use of the word Shorty, I'm still ringing,

3    Shorty, that Mr. Hayes did not identify to a speaker, is that

4    correct?

5    A    Yes.

6    Q    But then he heard Mr. Harris address somebody as Shorty, is

7    that correct?

8    A    Correct.

9    Q    And over on the next page, he heard Mr., he heard Mr. Harris

10   address somebody as Shorty again, is that correct?

11   A    Correct.

12   Q    Why I ain't check his pockets, Shorty?  And at the very end,

13   he heard Mr. Mitchell address somebody as Shorty?

14   A    Correct.

15   Q    Now, you testified on direct that you heard three voices on

16   the tape, is that correct?

17   A    Yes.

18   Q    Did you hear the name "Wayne" clearly on the voice mail?

19   A    Yes, I heard the statement, "shit, Wayne."

20   Q    Okay.  You have no doubt about that?

21   A    No doubt.

22           MS. RHODES:  Objection.

23           THE COURT:  Overruled.

24   Q    You said that you could identify two of the voices on the

25   tape.  And Mr. Pyne did not elicit from you who those two persons

1   were.

2   A    Yes, sir.

3   Q    Is that correct?

4   A    That's correct.

5   Q    Would there be an objection if I elicited them?

6            MR. COBURN:  Yes.

7            MS. RHODES:  Yes, there would be.

8   Q    Now, Mr. Martin questioned you some about your grand jury

9   testimony, Detective Benson.  Were you testifying as what's known

10  as a summary witness in the grand jury?

11  A    Yes, sir.

12  Q    The grand jury in this case met for many, many months, is

13  that correct, Detective?

14  A    That's correct.

15  Q    And there were many dozens of witnesses in the grand jury,

16  is that correct?

17  A    Correct.

18  Q    So by the time it came, by the time the jury, the grand jury

19  had to decide whether to vote an indictment or not, a lot of time

20  had passed, is that correct?

21  A    That's correct.

22  Q    And what you were doing was being a summary witness.  Can

23  you tell the ladies and gentlemen of the jury what that means?

24  A    Essentially, just, I was brought in to sum up all of the

25  facts of the case from the beginning, all of the counts that were

1    indicted, to give a basic overall view of the case as a whole so

2    that the jury could understand all of the testimony.  I basically

3    stated what, you know, however many witnesses we had in the grand

4    jury, basically summed up what they had all said, all the aspects

5    of the investigation, parts of my, my personal investigation,

6    Detective Niedermeier's investigation, an overall view of the

7    case.

8    Q    So you were relying on a lot of what other people said, is

9    that correct?

10   A    That's correct.

11   Q    And that's partly because hearsay is admissible in the grand

12   jury, unlike in trial, is that correct?

13          MR. LAWLOR:  Objection.

14          MR. MARTIN:  Objection, Your Honor.

15          THE COURT:  Overruled.  You may answer.

16   A    That's correct.

17   Q    Now, Mr. Martin pointed out a passage in the grand jury

18   where you said that when Mr. Hayes was brought in on the day he

19   got assaulted in the lockup, you believed, you told the grand

20   jury that he was going to be questioned that day, is that

21   correct?

22   A    Yes.

23   Q    Do you now know that's incorrect?

24          MR. MARTIN:  Objection, Your Honor.

25          THE COURT:  Overruled.  You may proceed.

1    A    I didn't participate in an interview of Mr. Hayes, but my

2    understanding at that time, as I was doing the summary, was that

3    he was, that was, typically, that's the purpose of being brought

4    to the courthouse, is either to be interviewed or to be charged.

5    I must have made the assumption that it was to be interviewed.

6    Q    Have you since learned that it was, that it was because he'd

7    just been arrested?

8              MR. MARTIN:  Objection, Your Honor, leading again.

9              THE COURT:  Overruled.

10   Q    He'd just been arrested?

11   A    I later learned that he had been arrested by Agent Klas for,

12   for a charge and was being brought in for processing.

13   Q    Actually --

14             THE COURT:  Don't lead the witness.

15   Q    Do you know what the charge was that he was arrested on

16   federally?

17   A    I believe it was the bullets in his pocket, but I'm not 100%

18   sure.

19   Q    Okay.  Do you know that Agent Klas was actually assisting

20   another agent that day?

21   A    That's possible.

22   Q    Do you know who the case agent was from the ATF for that

23   charge against Rodney Hayes?

24   A    I don't believe I do.  If I do, it's not coming to me right

25   now.

1    Q    Do you know who John Cooney is?

2            MR. MARTIN:  Objection, Your Honor.

3            THE COURT:  Overruled.  You may answer.

4    A    I don't.

5    Q    Okay.  So you couldn't say whether he was in the videotape

6    that we saw of that assault, also?

7    A    I don't know who he is.

8    Q    Okay.  Mr. Martin showed you a transcript, what he called a

9    transcript, and asked you if you had ever seen it before.  And it

10   had a cover letter from the State's Attorney's Office.  Do you

11   recall that?

12   A    Yes.

13   Q    But you'd said you'd never seen it before, is that correct?

14   A    I hadn't seen that, no.

15   Q    So is it fair to say that you wouldn't know whether it had

16   been shown in the grand jury or not if you'd never seen it

17   before?

18   A    I could not say one way or another.

19   Q    Defense counsel have asked you a multitude of questions

20   about things your investigation disclosed.  You told us this

21   morning and prior to this morning that Mr. Harris didn't use a

22   cell phone, is that correct?

23   A    That's correct.

24   Q    And how do you know that?

25   A    In speaking to cooperating witnesses during the time that we

1    were attempting to have, or Chris Dobropolski get in touch with

2    him, our best understanding is that he didn't have a cell phone.

3    Q    And were you here in court when his family members and

4    Rodney Hayes testified?

5    A    Yes.

6    Q    Okay.  Did your investigation disclose how common it was for

7    Mr. Hayes to, Mr. Harris to be with Mr. Mitchell during the day

8    and night?

9    A    Yes.

10              MR. MARTIN:  Objection, Your Honor.  It's way beyond

11   the scope.

12              THE COURT:  Overruled.  You may answer.

13   A    They were constantly together.  I believe even counsel

14   referred to them as constant companions.

15   Q    Okay.  Mr., actually, I think it was Mr. Martin, asked you

16   about whether, he questioned you about your understanding of

17   Darryl Wyche being very paranoid, I believe was the word, or

18   apprehensive about being the victim of a kidnapping or a robbery.

19   Do you recall that?

20   A    Yes.

21   Q    And he asked you if that meant he wouldn't be likely to let

22   somebody he didn't know get into the back seat of his car with

23   him, is that correct?

24   A    Yes.

25   Q    Would there be a problem if he got into the back seat, if a

1    stranger got into the back seat along with somebody that he did

2    know?

3              MR. LAWLOR:  Objection.

4              THE COURT:  Overruled.  You may answer.

5    A    In speaking to individuals close to Mr. Wyche, like Dwayne

6    Denham, he said it would not be uncommon.

7              MR. MARTIN:  Objection, Your Honor.  That's all

8    hearsay.

9              THE COURT:  I think the door's been opened.  You may

10   answer it, Detective.

11   A    That it would not be uncommon for, if he knew one

12   individual, to have another individual that he didn't know get in

13   the car to do a deal.  It made Mr. Denham uncomfortable but it

14   was something that Darryl did, and it led to him being kidnapped

15   twice and some other problems.

16   Q    Okay.  Did Mr. Wyche, according to your investigation, know

17   the other three defendants in this case, meaning Mr. Mitchell,

18   Mr. Gardner, and Mr. Martin?

19   A    I believe he knew Mr. Mitchell, Mr. Gardner and Mr. Martin,

20   yes.

21   Q    Okay.  Mr. Pyne asked you about -- actually, I'm going to

22   come back to this later when we get to Mr. Coburn's questions.

23   Mr. Pyne asked you about the particular number associated with

24   Shelly Wayne Martin that ended in the digits 3912, this second

25   cell phone down here in the corner of Government Exhibit B-14.

182

1    Do you recall that?

2    A    Yes, sir.

3    Q    And you testified that although that was associated with the

4    name Alvin, Mr. Martin's brother, in the Wyche brothers' phone

5    directories, who was it subscribed to?

6    A    It was subscribed to by Wayne Martin.

7    Q    And were there a lot of calls to Mr. Gardner on those toll

8    records?

9    A    Yes.  There were, one thing we do in trying to establish

10   who's utilizing a phone is look at common calls.  If a call,

11   phone that I know is associated with Person A, is calling the

12   identical people to the phone of Phone B, it's reasonable to

13   establish that, plus the phone bill being in his name, it's

14   reasonable to establish that he was utilizing that phone.

15   Q    Now, this phone, I believe you testified this morning, was

16   not in use for very long, is that correct?

17   A    It was not a significant portion of the tolls.  I believe it

18   was maybe 10 or 12 days.

19   Q    Okay.  So the calls that you have listed, the 274 calls, for

20   example, between Mr. Martin and Mr. Gardner, are those, which of

21   these phones are involved?

22   A    The vast majority of them are to the 1933.  There was, I

23   believe, 14, maybe 25 total between the 3912.  14 from Gardner to

24   the 3912 and 11 from 3912 back to Gardner.  But the rest were the

25   1933 number.

1    Q    Okay.  How about the one call from --

2    A    That was also the 838-1933.

3    Q    The one call to Mr. Harris.  Yes.  Also, we went over the

4    fact this morning, did Mr. Martin provided a different phone

5    number for Alvin Martin, his brother, when he got, when he, Mr.

6    Wayne Martin, got arrested?

7    A    He did.

8    Q    And the phone bill for that phone was recovered from where?

9    A    From Two Cree Court.

10   Q    And who was living there?

11   A    Shelly Wayne Martin.

12   Q    Was Alvin Martin living there?

13   A    No.  To our understanding, he was living in a different

14   address.  Also in the Joyce Martin phone book, the handwritten

15   notes, there was I believe at least two times that the name

16   "Alvin" was there with a number that was not that 3912 number.

17   Q    Okay.  Can you tell the ladies and gentlemen of the jury,

18   Detective Benson, you said that you've spoken with phone

19   companies or phone company personnel numerous times about toll

20   information.  Can you tell the ladies and gentlemen of the jury

21   how it is that you've gotten your familiarity, let us say, with

22   telephone toll information and telephone equipment in general?

23   A    Basically, since being assigned to this group in 2002,

24   essentially, the bulk of what we do is wiretap investigations.

25   Cell phone toll analysis is a huge part of what we do to

REDIRECT EXAMINATION OF BENSON

1    establish links between conspirators and things of that nature.

2    Understanding how cell phones work, how cell sites work, I've

3    used it, used cell phones to track individuals, to effect

4    arrests, to show trips to and from, out of state.

5         The vast majority of what I do is cell phone related

6    for the past six years almost.

7    Q    So how many occasions have you had to consult with experts

8    from telephone companies about telephones and telephone toll

9    information?

10   A    I couldn't even begin to count.

11   Q    Mr. Pyne also asked you about this exhibit, W-66.  And

12   specifically, he questioned a lot of the calls between Mr.

13   Mitchell and -- sorry -- Mr. Mitchell and Darryl Wyche on the

14   night of the Wyche brothers murder.  Do you recall that?

15   A    Yes, sir.

16   Q    Again, did Mr. Mitchell himself admit, in the tape recording

17   that we all heard in this courtroom, using that phone repeatedly

18   to call Darryl Wyche that night?

19   A    Yes.

20   Q    Mr. Pyne also questioned you about the discrepancies in the

21   way phone calls are listed in the phone records, the time

22   discrepancies.  And the same phone call can be listed in one

23   phone company's records at one time and a slightly different time

24   in another phone company's records, is that correct?

25   A    That's correct.

1    Q    And you testified that that's partly because they just have

2    different timing devices, is that correct?

3    A    Correct.  And also, some of the phone companies will

4    actually use the time that the call's terminated.  Some will use

5    the time that it's initiated.  Some will use both.  Some will

6    actually show you the time the call started and the time the call

7    ended.  But any number of discrepancies that would cause a slight

8    variance in the times.

9    Q    Are there also variances in the call itself, in particular

10    to individual calls, depending upon how many cell towers it has

11    to bounce off of or the routing and relaying equipment that

12    telephone companies use?

13    A    Yes.  And also, calls that were to go to voice mail, the

14    number of rings, the time that the call actually connects when it

15    goes to voice mail until the actual recording, the recorded

16    voice, I'm not here to take your call, that type of thing.

17    There's going to be a vast number of variances that can cause

18    those minute discrepancies.

19    Q    Okay.  Do you know, Detective Benson, if that movie theater

20    in Owings Mills that was showing Blade Two on the night of the

21    Wyche brothers murder had any surveillance equipment cameras or

22    other equipment at all?

23    A    I, I seem to recall that they checked and that they did not

24    utilize recorded video surveillance.  But I didn't check myself

25    so I can't say for certain.  But based on what Niedermeier

1    testified to.

2                 MR. PYNE:  Object.  Asked it be stricken.  He has no

3    recollection.

4                 THE COURT:  The objection's overruled.

5    Q    Mr. Coburn questioned you about a Meineke receipt that was

6    marked as V-7 and admitted into evidence when you testified on

7    direct --

8    A    Yes.

9    Q    -- lo these many years ago, back last Thursday.  Do you

10   recall that?

11   A    Yes.

12   Q    And didn't you testify on direct that you could not

13   associate that Honda Accord with Mr. Gardner?

14   A    That's correct.

15   Q    Mr. Coburn asked you several times about whether you could,

16   whether there were ever any contacts between some defendants in

17   this case or whether, throughout all of time, there had ever been

18   phone calls between the defendants in this case.  My question to

19   you is, Detective, did your toll analysis depend on records for

20   telephones that were typically used for very short periods of

21   time?

22   A    Yes.

23   Q    And in fact, even when they were used for short periods of

24   time, you might not have toll records for the whole period, as we

25   just saw in connection with one of the telephones?

1    A    That's correct.

2    Q    The 1241 toll -- sorry.  The phone number for Mr. Gardner,

3    492-1241, that Mr. Coburn was asking you about at great length --

4    A    Yes.

5    Q    This phone right here, can you tell us, this 1253 was

6    actually recovered from Mr. Gardner.  1241 was the one that

7    stopped being used after the Wyche brothers' murder, is that

8    correct?

9    A    That's correct.

10   Q    Could you tell us how it was, again, that you associated

11   that phone with Mr. Gardner?

12   A    There were several, several factors that came into play.  It

13   was, when I did the search warrant at the Valdavia Court, Mr.

14   Mitchell's location, I recovered a cell phone that was

15   443-676-8684.  I did a search and seizure warrant for the

16   electronic data within that phone.  And in the electronic phone

17   book of a phone that was seized from Mr. Mitchell's house, that

18   number, 1241, was listed under Goo, G-O-O.  Also, the night of

19   the Mitchell arrest, there was a slip of paper in the console of

20   the car that had phone numbers written on it with no names

21   associated with it, but had phone numbers.  And that was one of

22   the phone numbers.

23        It was also listed in two of the Wyche phones as the,

24   under Goo as well, that 1241 number.

25   Q    Okay.  You testified that the arrest of Mr. Gardner was on

1   June 7th of 2002, right after the Tonya Jones Spence murder, is

2   that correct?

3   A    Yes.

4   Q    Mr. Harris was actually arrested twice in this case, is that

5   correct?

6   A    Yes.  I am not sure of the dates.  But it was twice, yeah.

7   Q    Okay.  Well, when he was living down on Amity Street, there

8   was a search of his mother's house.  Do you recall that?

9   A    Right.  That was June, I want to say, 21st of 2002?

10  Q    Right.  And then he was let go because he did time on that

11  charge, is that correct?

12  A    That's correct.

13  Q    And he got out and that's when he was doing these phone

14  conversations with Chris Dobropolski, toward the end of 2003,

15  going into the very start of 2004?

16  A    That's correct.

17  Q    And then did he get arrested again?

18  A    Ultimately, he was arrested again.  I don't know the date,

19  but it was early 2004, January or February of 2004.

20  Q    And is that when he was living at the Seamon Avenue address?

21  A    That's correct.

22  Q    That Agent Klas searched, along with others?

23  A    Yes, sir.

24           THE COURT:  Mr. Harding --

25           MR. HARDING:  I have only a couple more questions.

1          THE COURT:  Only a couple more?

2          MR. HARDING:  Yes.

3          THE COURT:  Okay.  But I think we're going to be into

4    tomorrow, anyway, if you want to hold off.  Or you can go ahead

5    if you only have a couple more.  I mean Wednesday.

6    BY MR. HARDING:

7    Q    Mr. Coburn asked you about whether his client, Mr. Gardner,

8    had ever described himself as a live flesh and blood man?

9    A    Yes, sir.

10         MR. COBURN:  Objection, I did not.

11         THE COURT:  The jury's recollection of the evidence

12   will control.

13   Q    Actually, I believe what he asked you was whether on the

14   tape, on the CD this morning that we heard in court Mr. Gardner

15   had ever so described himself?

16   A    Yes.  The, the brief seven minutes that we heard of the two

17   hours I don't believe contained Mr. Gardner saying that.  But it

18   was, like I originally testified to, each of the four defendants

19   gave that same soliloquy to, approximately two minutes long in

20   succession.

21   Q    Wasn't, in fact, the first words he uttered in that

22   courtroom this morning?

23   A    That's correct.

24   Q    That he was a life flesh and blood man?

25   A    Correct.

1    Q    You testified about the phone that was recovered from Mr.

2    Gardner, the one that ends in 1253, and how there were, there was

3    a call to Jamane Johnson shortly after 4:30 in the afternoon on

4    the day of the Tonya Jones Spence murder.

5    A    Yes.

6    Q    And then there were three other calls in the hour or so

7    following, is that correct?

8    A    That's correct.

9    Q    Were those incoming or outgoing calls, or could you tell?

10   A    I don't recall if it was.  The one at 4:48 p.m. was a

11   message retrieval.  So checking the voice mail.  And then there

12   were three that I have no way of saying.  I believe they were

13   incoming.  All three were incoming.

14   Q    Okay.  Do you have any recollection of whether he was trying

15   to get in touch with Mr. Montgomery at any time during that hour

16   after the call to Jamane Johnson?

17            MR. COBURN:  Objection, hearsay.

18            THE COURT:  I'll sustain the objection.  And I think,

19   Mr. Harding, I appreciate your effort to finish up but there are

20   likely to be just a very brief additional questions on recross.

21   So you might as we will wait until Wednesday morning.

22            MR. HARDING:  Okay.  Thank you, Your Honor.

23            THE COURT:  Okay.  Members of the jury, we are

24   literally at the very end of the government's case, with just a

25   few more questions, I think, by Mr. Harding, and perhaps some

1    very brief recross examination by one or the other or more of the

2    defense counsel.  So we'll take care of that on Wednesday

3    morning.

4           There are also a few housekeeping matters.  Counsel

5    will make sure that all of the exhibits are properly numbered and

6    properly admitted into evidence to avoid any oversights.  And

7    there is at least one stipulation that I know that Mr. Harding

8    and Mr. Hanlon will want to present to you.

9           So we're going to conclude in well under an hour on

10   Wednesday morning.  And then we will be prepared to go forward,

11   if appropriate, with a defense case.  Now, as I've told you

12   several times during these proceedings, in the federal system, in

13   any criminal justice system in this country, a defendant is never

14   required to call any witnesses or introduce any evidence but it

15   has the right to do so.  And I believe that one or more of the

16   defendants will be calling a few witnesses.

17          Of course, it's not the number of witnesses that

18   matter.  It is the quality of the evidence that will be before

19   you in considering your verdict in this case.  But it may well be

20   that the defendants will wish to call some witnesses.  And I

21   expect that they will be here on Wednesday.

22          So we'll be in session, I anticipate, all day on

23   Wednesday, and then I think more likely than not all day on

24   Thursday.  Whether the defense presentations will conclude by the

25   end of the day on Thursday remains to be seen.

1          But again, I emphasize it's not the number of witnesses

2     but the quality of the evidence that will be of concern to the

3     jury.  And the fact that one party calls more witnesses than

4     another is of no significance whatsoever.

5          In that regard, I'll tell you now and I'll remind you

6     on Wednesday, ordinarily, as you can tell, and I'm sure and as

7     you know, when we get to the defense case we would expect Mr.

8     Lawlor and Ms. Rhodes to call all their witnesses and then Mr.

9     Martin, Mr. Flannery, if they wish to call witnesses, call all of

10    theirs.  But in order to accommodate witnesses and because I'm

11    confident you won't be confused in any way, it may be that

12    counsel for the defendants will be calling witnesses not all at

13    one time, but perhaps a witness from one defendant and then a

14    witness from another defendant.

15         The point is, of course, that as you deliberate your

16    verdict in this case, you will permitted to consider all of the

17    evidence in the case regardless of who called any particular

18    witness, regardless of how many witnesses any particular party

19    called, and regardless of the order in which any witness

20    testified.

21         So enjoy your evening.  Please leave your note pads on

22    your chairs.  Please be back with us tomorrow morning at 9:30 and

23    we'll resume at that time.  I keep saying tomorrow.  I assure you

24    I won't be here tomorrow.  Actually, I will be here working

25    tomorrow, but you won't be here tomorrow.  We'll see you

1    Wednesday morning at 9:30.  Thank you, ladies and gentlemen.

2              (Jury exits the courtroom at 5:18 p.m.)

3              THE COURT:  The defendants are excused.  I think I'm

4    going to hold on to counsel for just a few minutes to talk

5    scheduling.

6              (Defendants exit the courtroom.)

7              THE COURT:  Counsel, I really, can you be here tomorrow

8    at 9:15?  Does that impose a hardship on anybody?

9              MR. MARTIN:  You mean Tuesday?

10             THE COURT:  I'm sorry.  I did it again.

11             MR. MARTIN:  I'm happy to be here tomorrow.  I wish we

12   could sit tomorrow.

13             THE COURT:  Wednesday at 9:15.

14             MR. MARTIN:  Yes, sir.

15             THE COURT:  Okay.  I would like to try to get some of

16   these legal issues hashed out.  And I don't think the defendants

17   need to be here for purely legal argument.  I guess I'm mainly

18   interested in the rap music expert, Ms. Rhodes, and the flesh and

19   blood expert, Mr. Coburn.

20             And I think I'd also like to use that time perhaps to

21   discuss what you all think I should say about the flesh and blood

22   evidence.

23             MR. MARTIN:  Do you really want to hear?

24             THE COURT:  In other words, I have to tell the jury, I

25   think I have to tell the jury that it is not a defense because I

1    intend to use that phraseology in an appropriate way, such as Mr.

2    Martin's alibi, and I don't want to confuse the jury.  So think

3    about that during the recess.

4              Do you have an update, Ms. Rhodes?  And each of you,

5    I'm going to ask each of you and then we'll break.  Do you have

6    an update on who you're going to have and how long they're likely

7    to be?  You don't have to identify the person.  Just how many

8    you're going to have, really.

9              MS. RHODES:  The way, how long is the Court

10   anticipating we'll need for the Rule 29 issues?

11             THE COURT:  I think no more than 30 minutes, from what

12   I heard briefly.  And I've read the written arguments.  So I'm

13   reasonably confident no more than 30 minutes.

14             MS. RHODES:  On behalf of Mr. Mitchell we are adopting

15   the other ones that have been submitted.

16             THE COURT:  Of course.

17             MS. RHODES:  I think that I will have, I don't have the

18   rap expert coming on Wednesday.  I have him coming Thursday

19   morning.  He's flying in from California Wednesday.  Other than

20   that, I think I would probably have about three hours' worth of

21   testimony for Wednesday.

22             THE COURT:  Can you -- go ahead.  I'm sorry.

23             MS. RHODES:  That's all right.

24             THE COURT:  Can you give us just a little bit of a

25   hint?  If you'd rather not, I'm not going to require it.

1          MS. RHODES:  Some relate to records and -- well, they

2     all relate to some sort of records.  Some have to do with

3     telephone toll records.

4          THE COURT:  Okay.  All right.  Okay.  Mr. Flannery,

5     what's your best guess at this point?

6          MR. FLANNERY:  Your Honor, right now we have one

7     gentleman coming to testify regarding the Infiniti.  We think

8     that will probably be maybe 45 minutes, including cross,

9     probably.

10         THE COURT:  I'm sorry.  The Infiniti or affinity?

11         MR. FLANNERY:  Yes, the Infiniti.  He's an expert

12    mechanic that we'll be calling.

13         THE COURT:  The McCaffity car?

14         MR. FLANNERY:  Yes.

15         THE COURT:  What's that about?

16         MR. FLANNERY:  He's going to be testifying, Your Honor,

17    regarding the locking mechanism on the car and the manner in

18    which you'd have to go about locking the, the manner in which

19    someone would have to go about locking that vehicle.

20         THE COURT:  In order to suggest that somebody was alive

21    in the vehicle when the vehicle --

22         MR. FLANNERY:  Well, the vehicle was found locked.

23         THE COURT:  Right.

24         MR. FLANNERY:  And so he, and someone was -- well, he's

25    going to go through scenarios that an individual that could be in

1   the car could exit the car and a vehicle could still be found

2   locked.

3          THE COURT:  Okay.  Well, that's pretty obvious to many

4   of us.

5          MR. FLANNERY:  Well, it's really not, Your Honor.

6          THE COURT:  You pull the handle.  Well, you lock the

7   doors and then you close the driver's side door while holding the

8   handle.  That's every car that I've ever had anything to do with

9   in many, many years.

10         MR. FLANNERY:  Well, there's some different variables.

11         THE COURT:  Well, actually, there's some cars now, my

12   wife's car locks automatically.

13         MR. FLANNERY:  That's the type of stuff he has to talk

14   about, in addition to, you know, things --

15         THE COURT:  But I --

16         MR. FLANNERY:  The fact already in evidence that the

17   car was running, that the key was in the ignition, the car was

18   running, things like that.  The manner in which you can go about

19   locking it.

20         THE COURT:  I'm sorry.  You don't have to tell me, but

21   what's point?  That the murder didn't occur when the government

22   suggests it did or --

23         MR. FLANNERY:  That it's inconsistent with the

24   government's theory at this point.

25         THE COURT:  Okay.  Do you want to tell me how?  I'm

1    sorry, I'm thick.  I'm being pretty thick.

2         MR. FLANNERY:  I guess what he's going to say, Your

3    Honor, is that if you take, going back to Mr. Harding's opening

4    statement, is that someone, that the fact that the car was found

5    locked is not consistent with someone being able -- he's going to

6    testify as to the different ways that an individual would exit

7    the car and that the car is still found locked at the time.

8         THE COURT:  In fact, I'll be an Infiniti, the doors

9    lock when the air bag deploys.  No?

10        MR. FLANNERY:  That's why we need a mechanic, Your

11   Honor, because I think you're incorrect.

12        THE COURT:  I think it would be a good thing to have,

13   wouldn't it?

14        MR. MARTIN:  No, it wouldn't be the opposite.

15        MR. FLANNERY:  You wouldn't want to be locked inside,

16   Your Honor, if the car is crashed or if the car is on fire or

17   something to that effect.  If anything, you would expect the

18   locks to unlock.

19        THE COURT:  I guess that's right.  But you wouldn't

20   want to be thrown out, either, in a crash.  Anyway, okay.  I get

21   it.  I get it.  It is, I think one of the big mysteries in the

22   case is how a car, assuming the car was in park when everything

23   happened, of course, I don't remember the position of his body

24   and I don't even remember whether it was a --

25        MR. FLANNERY:  It's a manual.  I'm sorry.  It's an

198

1    automatic.

2             THE COURT:  And nobody fell over on the gear shift or

3    anything.

4             MR. FLANNERY:  I believe it was found in neutral, Your

5    Honor.

6             THE COURT:  It was found in neutral?

7             MR. FLANNERY:  I believe so.

8             THE COURT:  Oh.  Oh, it was found in neutral.  That's

9    why it drifted down the hill.  Because I was, I was wondering how

10   it drifted down the hill if it was in park.

11            MR. MARTIN:  If it was in drive it could have drifted

12   down the hill, too.

13            THE COURT:  Apparently, he was just sitting there with

14   his foot on the brake with the car in neutral.  Okay.  Well,

15   that's, that's interesting.  All right.  So it's, it's an

16   Infiniti mechanic.

17            MR. FLANNERY:  Yes, sir.

18            THE COURT:  Or they don't call them mechanics.

19            MR. FLANNERY:  Technician, Your Honor.

20            THE COURT:  Technicians.  You don't pay mechanic's

21   rates for those kind of cars.  Anybody else?

22            MR. FLANNERY:  We'll have some documents as well.

23            THE COURT:  And documents relating to?

24            MR. FLANNERY:  We'll get everybody that's arrived here,

25   though, before, I think --

```
1                  THE COURT:  Okay.  All right.

2                  MR. CROWE:  Your Honor, I expect our case --

3                  THE COURT:  I'm sorry.  And when is he coming, Mr.

4      Flannery?

5                  MR. FLANNERY:  He's going to be here Wednesday morning

6      at nine.

7                  THE COURT:  Okay.  Great.  Excellent.

8                  MR. CROWE:  Your Honor, we expect to have two to three

9      witnesses, possibility of four, but that's just a very faint

10     possibility.  We'd expected to have two here today but we only

11     had one.

12                 THE COURT:  And who was that, again?

13                 MR. CROWE:  The witness who did show up was the

14     defendant's mother.  The one who did not was Lakeisha McCoy.

15                 THE COURT:  Now, the defendant's mother is the

16     sequestration problem, correct?

17                 MR. CROWE:  That's correct, Your Honor.

18                 THE COURT:  And can you make a proffer now as to the

19     subject matter of her testimony in light of Mr. Harding's letter?

20                 MR. CROWE:  Yeah.  She's essentially going to be

21     testifying to two, maybe roughly three, things.  The first is, of

22     course, she is the defendant's mother.  She can give certain

23     biographical information, such as the date of his birth.

24                 THE COURT:  Okay.

25                 MR. CROWE:  She's going to say that her work schedule
```

1    at that time was that she was working, restocking shelves at

2    Giant and that she typically would have been out from, and that

3    the job would either start at 11 at night or 12 at night,

4    depending on which position she had.

5              THE COURT:  She's an alibi witness?

6              MR. CROWE:  Well, we thought it was important to

7    explain why she did not see my client and his, and his girlfriend

8    there that night.  So no, she is not an alibi witness, strictly

9    speaking.

10             THE COURT:  Okay.  Why is it important that the jury

11   know why she didn't see the defendant that night?

12             MR. CROWE:  Because I think the jury has heard that it

13   was her house and they're going to wonder where she was.  We just

14   want to give that explanation.

15             THE COURT:  I'm sorry.  Which night?

16             MR. CROWE:  The night of the Wyche brothers, that the

17   night that the Wyche brothers were killed.

18             THE COURT:  Has there been testimony that they left for

19   the movies from her house?

20             MR. CROWE:  No, there is not.

21             THE COURT:  Okay.  I'm sorry.  I'm missing something.

22             MR. CROWE:  But there was testimony that they came back

23   to the house.

24             THE COURT:  Oh, testimony that they came back to the

25   house.  Okay.  So she is an alibi witness.  Sort of indirectly.

1          MR. CROWE:  Well, sort of a negative alibi witness.

2    I'm not quite sure however you classify it.  I also expect that

3    she's going to say that she was the, she and her sister were the

4    people who put up the money to pay Mr. Glaser, who was the second

5    lawyer who represented Mr. Martin in the state court system.

6          THE COURT:  On which charge?

7          MR. CROWE:  Pardon?  The murder charge.  The Wyche

8    murder charge.

9          THE COURT:  Is she going to be prepared to say how much

10   she paid him and all that?

11         MR. CROWE:  Yeah.

12         THE COURT:  Okay.  I don't think that that's a problem.

13   I'll see if Mr. Harding disagrees.  If that's, if that's the

14   limit of her testimony.

15         MR. CROWE:  Yeah.

16         THE COURT:  All right.  And Ms. McCoy, remind me who

17   Ms. McCoy is.

18         MR. CROWE:  Ms. McCoy is the --

19         THE COURT:  Was the girlfriend who went to the movies.

20         MR. CROWE:  Yeah.  She went to the movies.  Mr.

21   Niedermeier interviewed her.  She indicated that she had gone to

22   the -- he testified, I think in the government's case, that she

23   said she had gone to the movie with my client and also that the

24   night they went to the movie was her birthday, which Mr.

25   Niedermeier also, which Mr. Niedermeier also confirmed.

1          THE COURT:  Does she need counsel?

2          MR. CROWE:  I don't know.  We have raised the

3   possibility that she might want counsel and she indicated to Mr.

4   Pyne and myself that she didn't see any need for it.

5          THE COURT:  Okay.

6          MR. CROWE:  But I understand why the Court's asking the

7   question, because it's one we asked as well.

8          THE COURT:  All right.  Do you want me to ask her?

9          MR. CROWE:  I think it would be appropriate.  Certainly

10  don't have any objection to the Court's doing that.

11         THE COURT:  Okay.  I won't do it unless you want me to

12  affirmatively.  Obviously, I don't want to intimidate her.  I

13  don't want to be accused of anything improper.

14         MR. CROWE:  Well, first we have to get her here.

15         THE COURT:  Right.  It may all be moot.

16         MR. CROWE:  Thank you, Your Honor.

17         THE COURT:  Has she been served?

18         MR. CROWE:  She has been served.

19         THE COURT:  Okay.  But you're not going to ask for body

20  attachment?  You don't have to answer that.

21         MR. CROWE:  If she's not here on Wednesday, I don't

22  know what I'm going to do.  But not tonight.

23         THE COURT:  All right.  Thank you.  Mr. Coburn.

24         MR. COBURN:  Your Honor, we have two lay eyewitnesses

25  to the Spence homicide.

1          THE COURT:  Who?

2          MR. CROWE:  Two of the kids that were out there.  This

3   is the evidence the government knows well about because, you

4   know, years and years ago we got a Brady disclosure from

5   Christine Manuelian describing them.

6          THE COURT:  Yeah.  Yeah.

7          MR. COBURN:  We're not certain about it yet.  We're

8   contemplating it.

9          THE COURT:  How old are they now?

10          MR. COBURN:  I think they're like older teenagers.

11          THE COURT:  Still teenagers?

12          MR. COBURN:  I think so.  I have to recheck that.

13          THE COURT:  And you're confident, I mean, you won't

14   call them unless you really believe your professional

15   responsibility requires you to do that.

16          MR. COBURN:  I absolutely commit to the Court on that.

17          THE COURT:  Are you in touch with the parent or

18   guardian?

19          MR. COBURN:  Indirectly we are.

20          THE COURT:  All right.  Who else?

21          MR. COBURN:  We might call Nicole Gardner, who Your

22   Honor heard testimony about.  She's the bail bondsperson.

23          THE COURT:  Right.

24          MR. COBURN:  About her relationship with Mr. Gardner,

25   and the fact that he worked for her legitimately and so on.

1          THE COURT:  Right.

2          MR. COBURN:  And then the big question for us is Jamane

3    Johnson, who Your Honor was kind enough to issue a writ for.  And

4    that writ is returnable Wednesday.  And I have to tell Your Honor

5    that, you know, I haven't been able to do much in terms of

6    determining its status.  And it's probably just my fault.

7          THE COURT:  Did you confirm that it's in the hands of

8    DOC at least?

9          MR. COBURN:  I have not actually confirmed that yet and

10   I apologize to the Court for not having done that.

11         THE COURT:  Okay.  What do you need him for, if you can

12   say?

13         MR. COBURN:  I should probably let Mr. Kurland speak to

14   that because it's going to be his witness.  And then the last

15   thing is going to be, you know, the big question, the other

16   question is the expert, whether I should.  He's in Atlanta.  The

17   flesh and blood, quote-unquote "expert."  So the question is

18   should I bring him up here on Thursday so that he can be voir

19   dired and so on?

20         THE COURT:  I'm thinking you shouldn't.  I'm thinking,

21   I don't know, but I'm thinking I'm not going to admit it.  I

22   think, frankly, Agent Benson gave you pretty much everything you

23   need.  But I will talk to you on Wednesday about what I'm going

24   to say about it.  But the idea of an expert --

25         MR. COBURN:  If I could just mention one thing to Your

1    Honor.

2            THE COURT:  Yes.

3            MR. COBURN:  Every time you do a cross examination, you

4    always sit down and you say, geez, I wish I'd asked this other

5    question.  Agent Benson actually did say at one point during,

6    when I was cross examining him, he referred to the web site.  And

7    I kind of really wanted to get, you know, the web site in.

8            THE COURT:  Well, I think you can get the web site in

9    without a problem.

10           MR. COBURN:  If I can do that.  I don't want to speak

11   for any of the lawyers here, because they've all got their own

12   perspective on this.  But from my own point of view, if I can get

13   my copies of the web site in, I might conceivably not need him.

14           THE COURT:  I can't imagine the government's going to

15   object, but maybe it will.  But I doubt it.  You know, just, that

16   will take care of it, I would think.

17           MR. COBURN:  I'll discuss it with Mr. Kurland.

18           THE COURT:  All right.  Mr. Kurland.

19           MR. KURLAND:  Good afternoon, Your Honor.

20           THE COURT:  Good afternoon.

21           MR. KURLAND:  Still standing at 20 to 6.

22           THE COURT:  Yes.

23           MR. KURLAND:  Your Honor, Jamane Johnson testified in

24   the state trial and he also, as part of a plea agreement in state

25   court where he pled to conspiracy to commit an unarmed robbery

1    with respect to the Tonya Spence matter.  He made certain

2    statements under oath both times which conflict in substantial

3    points with Mr., with Mr. Montgomery's testimony, particularly

4    with respect to Mr. Gardner's involvement.  And without going

5    into too much detail, he's a vital witness.  He won't take very

6    long.  I would imagine it's 15 or 20 minutes.

7            But he's critical because he deals -- it does two

8    things.  One, it's a critical conflict under oath with Mr.

9    Montgomery but also in substance with respect to the

10   accentuating, exaggerating Mr. Gardner's role going back during

11   some of the surveillance period.  It's vitally important to the

12   defense.

13           THE COURT:  All right.  Well, you and Mr. Coburn better

14   get on the phone and see if they got the writ, make sure he's

15   available.

16           MR. KURLAND:  All right.  Two other quick things.

17           THE COURT:  Yes.

18           MR. KURLAND:  If he's not, I mean, I won't, I'll jump

19   off that bridge when I come to it.  But there might be ways to

20   get in the testimony.  We certainly want him here live.

21           The other thing, two other things, Your Honor.  One,

22   are we going to argue the Rule 29 motions first thing at 9:15?  I

23   have some matters.

24           THE COURT:  I'm hoping to be able to do that, yes.

25           MR. KURLAND:  Okay.  I waited all day for the Court to

1    give the dual sovereignty instruction.

2              THE COURT:  I was going to -- I have it right here.

3              MR. KURLAND:  All right.  So I could sleep tight

4    until --

5              THE COURT:  And I was going to give it, I was going to

6    give it today but the government didn't finish.

7              MR. KURLAND:  Well, I have to be healthy enough

8    Wednesday for sure.  Thank you, Your Honor.

9              THE COURT:  If that provides the motivation, that's all

10   the better.  Mr. Flannery.

11             MR. FLANNERY:  Your Honor, in talking to Mr. Martin, we

12   have one other witness, too, that we're working on, which was

13   Detective Laslett.  Detective Laslett is the one, he authored a

14   Baltimore City Police Department report regarding the search of

15   the Infiniti.  And he has an itemization there of the types of

16   things they took out of it.

17             Detective Laslett has now retired, we had just learned.

18   So we're trying to locate him.  I don't mean to put the

19   government on the spot.  But we had asked whether they would

20   object to us introducing his report.  The report doesn't make any

21   factual statements, any factual findings.  It's simply an

22   itemization, at least to my best recollection, of the items they

23   took out.

24             THE COURT:  Okay.

25             MR. FLANNERY:  One other person we're trying to bring

1    in.

2         THE COURT:  All right.  It sounds to me like it's very

3    possible, very much possible that we can get the entire defense

4    case in in two days.  That's part of my optimism showing.  But I

5    think there's a real good chance we could achieve that.  Which

6    brings me to the question, frankly, the reason we weren't sitting

7    on Monday and Tuesday of next week under the original plan was

8    because I have a Judicial Conference Committee meeting in

9    Washington on Monday and Tuesday.  But under the circumstances, I

10   would be more than -- are you coming to tell me you've got

11   something planned?

12        MR. COBURN:  I apologize for this, Your Honor.  I've

13   got major, really serious out-of-town commitments for both of

14   those two days.

15        THE COURT:  All right.  All right.  Then that gets me

16   off the hook.  Because I was going to suggest that I could

17   reschedule.

18        MR. COBURN:  I apologize.

19        THE COURT:  Does anybody else have any unalterables?

20   Mr. Lawlor?

21        MR. LAWLOR:  I have motions in a murder case in Prince

22   Georges County, which I could probably move those, if Mr.

23   Coburn's things fell out.  But it would be difficult.

24        THE COURT:  No.  No.  That's fine.  That's fine.  I was

25   just putting it out there just in the event.  I was going to ask

1    if anybody had any conflict.

2              MR. MARTIN:  Your Honor, I don't have any conflict,

3    I'll come in any day you want.  But on December 2nd, if I'm not

4    out of here, my wife is going to divorce me, probably kill me.

5              THE COURT:  I'm not going to have that happen, Mr.

6    Martin.

7              MR. MARTIN:  Thank you, Your Honor.

8              THE COURT:  I think -- well, we've got Friday next

9    week.  And so I've been telling the jury, I've been telling the

10   jury we'd only sit for half a day on Friday.  We'll see how it

11   goes.  I think we're going to be okay.  I think it will be in the

12   jury's hands, I think, by next Friday and they can decide what

13   they want to do.  Mr. Harding.

14             MR. HARDING:  Just two things I want to bring to the

15   Court's attention, Your Honor.  Jamane Johnson has a colossal

16   self-incrimination problem.  He was a coconspirator in the Tonya

17   Jones Spence homicide.  He's never been truthful about his

18   involvement in it.  I tried to talk to him four years or so ago.

19   And he was completely untruthful at that point and he was

20   represented by counsel at that time.

21             Obviously, if he shows up here on Wednesday, he's not

22   going to have an attorney.

23             THE COURT:  Well, yes, he will.  I mean, if he shows

24   up, first of all, he's going to show up in custody.  If Mr.

25   Coburn and Mr. Kurland are successful in getting the Division of

1    Correction to actually get him to the courthouse, I will promptly

2    have whoever's walking the halls go and talk to him.  He'll have

3    counsel.

4                MR. HARDING:  Okay.  One other thing, Your Honor.  Mr.

5    Coburn has mentioned a live flesh and blood expert.

6                THE COURT:  I've indicated that I'm pretty sure I'm not

7    going to --

8                MR. HARDING:  Well, that would certainly render this

9    moot.  But we have not received any notice at all, any CV,

10   anything at all even though he we filed a written demand for such

11   information well before the start of trial.

12               THE COURT:  Okay.  I think it's going to be moot.  Mr.

13   Harding, would you have any objection to some printed copies of

14   web sites?  I assume you wouldn't.

15               MR. HARDING:  Well, I can't, I'm very reluctant on

16   behalf of my client, the United States, to consent to

17   stipulations on things I have never even seen.  I don't see how I

18   could responsibly answer that question, Your Honor.

19               THE COURT:  Okay.  All right.  So Mr. Harding, Mr.

20   Coburn, if you can burn the midnight oil a little bit tonight and

21   bring in, and maybe you've got some with you already.  Good.

22   Share them with government counsel.  Let them take a look at it

23   overnight.

24               MR. KURLAND:  Your Honor, can I briefly just respond to

25   some of the aspects?  Jamane Johnson obviously has no Fifth

1    Amendment issue in state court.  With respect to any possible

2    prosecution in federal court, I just want the record to show,

3    this is now six years after the fact.  They have no intention of

4    prosecuting him other than to keep him from testifying in this

5    trial.  But in the meantime, if he comes in, asserts the Fifth

6    and it convinces the Court he's unavailable under the rules of

7    evidence, then I'm preparing a motion tomorrow, instead of

8    resting, to get his state court testimony admitted under the

9    residual exception.

10             THE COURT:  Okay.

11             MR. KURLAND:  We'll have it ready for filing if

12   necessary before the Court has to --

13             THE COURT:  Fine.  I do anticipate appointing counsel,

14   frankly, for just about any incarcerated defense witness.

15             MR. KURLAND:  Thanks, Judge.

16             THE COURT:  All right.  Ms. Rhodes.

17             MS. RHODES:  Yes, Your Honor.  Briefly.  On the free

18   man defense, as I call it, as opposed to the flesh and blood, we

19   had noted several defense attorneys in our list of witnesses, for

20   the purpose, primarily, of just discussing the number, sort of

21   the volume in this district of these cases and what's commonly

22   done.  If this witness is not going to be called or maybe even in

23   addition to it, actually, I was still planning on calling

24   somebody to do that.

25             So is that something that's encompassed by the Court's

1    ruling or is that going to be seen as separate?  It would be more

2    to sort of run through the practical aspect of what these cases

3    involve.

4              THE COURT:  No.  I think you can do that.  I don't know

5    about practical aspects.  But in terms of how many cases.  Are

6    these people who actually represented Itchy Man or something like

7    that?

8              MS. RHODES:  Yes.  Yes.

9              THE COURT:  I'll probably admit it very briefly, of a

10   factual nature, not expert testimony.

11             MS. RHODES:  Right.  Okay.  And other matter is I have

12   on the 24th, two weeks from today, I just got notice of a 7:30

13   a.m. interview for an asylum client in Arlington.  I see that

14   we're starting maybe at 10:30 that morning.  That's what my notes

15   said from sometime before.  But I might be a little bit late.

16   But I'm hoping I'll only miss the tail end of Mr. Kurland's

17   closing or something like that, and not anything important.  I

18   mean more important.

19             THE COURT:  I have no recollection whatsoever of why we

20   would be starting at 10:30.

21             MS. RHODES:  Anyway, but I might be, I probably would

22   not be getting here until about 10:30, if the Court can give me

23   permission for that.

24             THE COURT:  Well, call me naive, but I'm actually

25   hoping that the jury will have the case by then.

1          MS. RHODES:  That would be great.

2          THE COURT:  Yeah.  All right.  Thank you all very much.

3   9:15 tomorrow.

4          MS. RHODES:  Wednesday.

5          THE COURT:  Wednesday.

6          (Conclusion of Proceedings at 5:45 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                INDEX

2

3                                                      PAGE

4    WITNESS: TFO KEITH BENSON.

5    DIRECT EXAMINATION BY MR. HARDING                   7

6    CROSS EXAMINATION BY MR. LAWLOR                     47

7    CROSS EXAMINATION BY MR. MARTIN                     72

8    CROSS EXAMINATION BY MR. PYNE                       80

9    CROSS EXAMINATION BY MR. COBURN                    131

10   REDIRECT EXAMINATION BY MR. HARDING                170

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

215

1                    REPORTER'S CERTIFICATE

2

3          I, Mary M. Zajac, do hereby certify that I recorded

4   stenographically the proceedings in the matter of USA v. Willie

5   Mitchell, et al., Case Number(s) AMD-04-029, on November 10,

6   2008.

7          I further certify that the foregoing pages constitute

8   the official transcript of proceedings as transcribed by me to

9   the within matter in a complete and accurate manner.

10         In Witness Whereof, I have hereunto affixed my

11  signature this _____ day of _____, 2009.

12

13

14

15                         _____

16                         Mary M. Zajac,
                           Official Court Reporter

17

18

19

20

21

22

23

24

25

**$**

**$34** [1] - 83:5

**'**

**'02** [23] - 17:22, 18:21,
78:5, 78:6, 78:21, 87:17,
143:12, 143:13, 144:6,
145:4, 146:14, 146:15,
147:6, 157:6, 157:9,
160:7, 160:10, 160:17,
163:2
**'05** [4] - 25:18, 25:19,
25:21, 44:10
**'06** [5] - 25:17, 25:22,
25:23
**'07** [2] - 25:24
**'08** [3] - 25:25, 26:1
**'82** [4] - 136:11, 136:15,
136:18, 136:19
**'88** [2] - 134:9, 134:11
**'89** [2] - 134:9, 134:11
**'90** [2] - 134:9, 134:11
**'90s** [1] - 137:11
**'Shorty'** [1] - 67:13

**0**

**0863** [3] - 22:11, 22:12,
24:12

**1**

**1** [3] - 122:8, 122:25,
159:17
**1.25** [1] - 23:13
**1/1/1980** [1] - 139:2
**1/18/02** [1] - 79:5
**10** [6] - 1:11, 17:12,
163:19, 163:20, 182:18,
215:5
**100%** [6] - 61:20, 62:12,
85:4, 85:15, 138:1,
178:17
**101** [1] - 1:25
**10:00** [2] - 114:13,
128:23
**10:30** [4] - 117:17,
212:14, 212:20, 212:22
**10:34** [1] - 7:2
**10:42** [1] - 116:13
**10:43** [1] - 117:12
**10th** [4] - 25:24, 39:7,
39:23, 42:18
**11** [5] - 77:4, 163:19,
163:20, 182:24, 200:3

**1107** [2] - 22:19, 168:24
**11:18** [1] - 120:16
**11:18:20** [1] - 120:24
**11:18:44** [1] - 121:3
**11:37** [4] - 115:24,
121:10, 128:25, 129:21
**11:37:33** [1] - 121:11
**11:37:56** [1] - 121:14
**11:45** [1] - 46:5
**11th** [3] - 25:24, 148:13,
148:18
**12** [9] - 30:21, 105:4,
112:12, 121:18, 146:22,
146:24, 146:25, 182:18,
200:3
**12/31/2009** [1] - 139:2
**1241** [12] - 12:19, 85:6,
86:4, 114:2, 148:21,
149:23, 151:5, 161:20,
187:2, 187:6, 187:18,
187:24
**1253** [8] - 21:16, 21:22,
99:10, 161:20, 161:21,
161:25, 187:5, 190:2
**12:01** [2] - 103:19,
103:20
**12:07** [1] - 124:7
**12:07:40** [2] - 121:23,
124:19
**12:08** [5] - 121:18,
122:7, 124:9, 124:21
**12:08:40** [2] - 121:19,
124:19
**12:09:40** [1] - 124:20
**12:13** [2] - 125:4, 125:7
**12:30** [2] - 118:19,
125:10
**12:38** [1] - 125:10
**12:48** [1] - 118:8
**12th** [5] - 25:17, 30:22,
30:23, 31:10
**13** [1] - 73:10
**131** [2] - 30:7, 214:9
**13th** [2] - 25:21, 160:10
**14** [6] - 17:12, 73:10,
109:6, 148:18, 182:23
**1438** [1] - 76:13
**14th** [2] - 25:19, 25:21
**15** [8] - 45:25, 46:3,
46:4, 103:16, 105:5,
155:4, 155:11, 206:6
**15th** [5] - 30:20, 36:4,
53:14, 143:13, 165:24
**1681** [2] - 16:2, 16:8
**169** [1] - 79:11
**16th** [5] - 25:25, 35:25,
36:16, 44:10, 162:17
**17** [1] - 9:17
**170** [1] - 214:10
**1752** [1] - 11:12

**17th** [2] - 28:21, 163:4
**18** [3] - 56:10, 59:10,
174:23
**1833** [1] - 99:22
**189** [1] - 153:16
**18:54** [1] - 102:17
**18:54:59** [1] - 102:14
**18th** [2] - 19:19, 25:23
**1933** [15] - 11:22, 12:10,
14:6, 14:13, 94:16,
94:18, 95:4, 97:12,
99:25, 100:2, 100:5,
101:25, 103:23, 182:22,
182:25
**19th** [1] - 158:11
**1:00** [1] - 47:10
**1:02** [1] - 118:8
**1:04** [1] - 118:8
**1:06** [1] - 101:17
**1:14** [1] - 118:8
**1:17** [1] - 118:8
**1:18** [1] - 118:8
**1st** [11] - 11:10, 12:18,
13:9, 13:11, 26:1, 60:9,
101:6, 144:6, 148:14,
157:20, 163:4

**2**

**2** [1] - 55:18
**2.64** [1] - 23:15
**20** [11] - 99:18, 103:2,
103:16, 105:6, 110:22,
110:24, 112:3, 112:12,
112:17, 205:21, 206:6
**2001** [1] - 55:18
**2002** [40] - 9:18, 11:10,
12:18, 13:9, 13:11,
19:15, 19:19, 21:17,
28:21, 55:20, 57:17,
57:22, 57:23, 58:9,
60:10, 64:1, 64:2, 80:25,
98:7, 99:16, 129:25,
134:14, 146:3, 148:9,
148:13, 148:17, 154:13,
157:13, 157:20, 159:21,
162:4, 162:8, 162:10,
162:11, 162:19, 163:10,
183:23, 188:1, 188:9
**2003** [2] - 163:6, 188:14
**2004** [7] - 98:3, 98:15,
98:19, 163:5, 188:15,
188:19
**2005** [9] - 25:17, 27:7,
31:10, 36:11, 36:17,
60:16, 162:16, 162:17,
163:13
**2006** [5] - 30:20, 39:7,
39:21, 45:17, 48:19

**2007** [4] - 40:8, 42:15,
42:18, 45:18
**2008** [6] - 1:11, 36:1,
36:7, 43:7, 165:22, 215:6
**2009** [1] - 215:11
**205** [1] - 13:14
**20:17:47** [1] - 112:17
**20th** [11] - 148:22,
148:24, 149:9, 149:10,
149:15, 157:6, 157:9,
158:10, 158:13, 158:17,
159:14
**21** [6] - 103:3, 112:3,
112:8, 112:21, 113:9,
113:14
**21201** [1] - 1:25
**21:34:33** [1] - 113:5
**21st** [2] - 25:25, 188:9
**22** [1] - 123:7
**22nd** [1] - 143:12
**23** [8] - 121:13, 121:14,
121:24, 123:1, 123:3,
123:7, 125:1
**23:18** [1] - 120:22
**23rd** [2] - 39:21, 144:6
**24** [7] - 121:5, 121:14,
121:24, 123:2, 123:3,
146:16, 146:17
**24th** [18] - 25:23,
117:18, 142:20, 146:14,
146:16, 146:23, 146:24,
147:6, 147:13, 147:25,
148:9, 148:17, 149:14,
149:15, 154:13, 157:13,
157:20, 212:12
**25** [7] - 90:9, 103:20,
112:18, 112:22, 113:9,
113:14, 182:23
**25th** [3] - 142:18,
142:20, 144:10, 146:3,
146:15, 146:23, 146:24,
147:12, 149:13, 149:15,
154:22, 159:19, 160:20
**26** [2] - 145:4, 160:17
**26th** [13] - 40:8, 57:16,
58:15, 58:19, 129:25,
144:16, 156:21, 159:21,
160:7, 160:23, 161:4,
161:12, 162:17
**274** [3] - 143:12, 146:9,
182:19
**27th** [9] - 25:22, 57:16,
57:22, 58:20, 59:3,
144:14, 144:16, 144:17,
145:4
**28** [4] - 73:9, 73:10,
74:25, 133:17
**28th** [3] - 25:24, 144:14,
144:17
**29** [3] - 133:17, 194:10,

206:22
**2:20** [3] - 90:2, 91:4
**2nd** [1] - 209:3

**3**

**3/26/02** [2] - 85:22,
86:18
**3/31/02** [1] - 79:5
**30** [10] - 69:3, 69:11,
71:1, 71:3, 71:4, 72:9,
72:10, 133:17, 194:11,
194:13
**30,000** [2] - 94:3,
148:11
**30,500** [2] - 18:12, 21:8
**30th** [10] - 148:14,
148:22, 148:24, 149:10,
157:6, 157:9, 158:10,
158:14, 159:15
**31** [7] - 69:3, 69:11,
71:2, 71:5, 72:6, 72:9,
72:10
**31st** [3] - 57:22, 58:1,
58:9
**32** [1] - 72:6
**3200** [2] - 14:6, 14:12
**34** [2] - 101:17, 159:15
**340** [1] - 76:13
**3400** [2] - 8:17, 8:20
**35** [3] - 122:8, 122:25,
124:21
**3500** [3] - 8:15, 8:17,
8:21
**3608** [2] - 82:16, 109:24
**37** [3] - 113:8, 113:10,
113:15
**3912** [18] - 15:20, 16:7,
17:1, 17:7, 17:17, 78:13,
93:13, 97:3, 97:9, 97:12,
97:16, 99:3, 99:25,
181:24, 182:23, 182:24,
183:16
**3:02** [1] - 158:17
**3:15** [1] - 90:11
**3:20** [1] - 90:11
**3:30** [1] - 90:23
**3:39** [1] - 22:1

**4**

**4** [4] - 117:18, 146:24,
147:24, 148:17
**40** [1] - 119:2
**410** [1] - 93:13
**410-493-1241** [4] -
150:5, 150:15, 156:12,
156:19

**410-669-6731** [1] - 13:13
**410-963-3912** [1] - 14:23
**418-6204** [2] - 84:14, 101:5
**42** [1] - 111:13
**443-277** [1] - 141:8
**443-540-1253** [3] - 150:10, 160:5, 161:9
**443-676-8684** [1] - 187:15
**443-677-3200** [1] - 14:3
**443-739-2762** [2] - 13:23, 87:21
**443-739-5811** [1] - 82:14
**443-838-1933** [2] - 11:19, 93:11
**45** [1] - 195:8
**47** [1] - 214:6
**49** [6] - 79:8, 119:2, 144:6, 144:19, 144:21, 145:10
**492-1241** [1] - 187:3
**4:00** [1] - 155:12
**4:07** [5] - 146:16, 146:24, 147:6, 147:10, 148:8
**4:15** [1] - 22:4
**4:26** [1] - 22:4
**4:28** [1] - 22:4
**4:30** [1] - 190:3
**4:32** [1] - 22:4
**4:39** [4] - 21:17, 22:6, 22:17, 102:7
**4:48** [2] - 22:6, 190:10
**4th** [1] - 99:16

**5**

**540-1253** [1] - 86:18
**5515** [1] - 1:24
**5570** [3] - 16:9, 119:7, 119:17
**56** [2] - 120:18, 120:22
**5811** [4] - 16:15, 82:14, 109:22, 116:24
**59** [1] - 114:3
**5:18** [1] - 193:2
**5:42** [1] - 22:6
**5:44** [1] - 22:6
**5:45** [1] - 213:6

**6**

**6** [1] - 205:21
**62** [1] - 101:14

**6204** [7] - 82:15, 84:13, 110:6, 111:10, 111:14, 119:17, 173:9
**64** [1] - 77:4
**6655** [1] - 141:9
**676-8684** [1] - 82:20
**6:00** [1] - 58:19
**6:19:20** [1] - 112:5
**6:19:25** [3] - 111:19, 111:21, 112:7
**6:19:46** [2] - 112:1, 112:4
**6:54:59** [4] - 101:22, 102:18, 102:21, 103:8
**6:55** [1] - 102:25
**6:55:21** [3] - 102:22, 103:3, 103:7
**6th** [1] - 87:17

**7**

**7** [2] - 159:17, 214:5
**72** [1] - 214:7
**7774** [1] - 19:6
**7:30** [1] - 212:12
**7th** [6] - 21:17, 22:2, 42:15, 162:24, 163:5, 188:1

**8**

**8** [2] - 112:12, 159:15
**80** [1] - 214:8
**838-1933** [1] - 183:2
**8618** [1] - 22:10
**8655** [1] - 141:10
**8684** [1] - 109:23
**8844** [1] - 107:5
**89** [9] - 78:20, 79:3, 96:3, 96:4, 96:5, 96:7, 96:10
**8:17** [2] - 112:11
**8:17:22** [1] - 112:12
**8:17:47** [1] - 112:18
**8:33** [1] - 59:10
**8th** [5] - 25:16, 25:18, 25:23, 27:7, 43:7

**9**

**9323** [1] - 16:16
**95%** [1] - 55:17
**9:15** [4] - 193:8, 193:13, 206:22, 213:3
**9:30** [2] - 192:22, 193:1
**9:34** [5] - 113:4, 115:18, 115:19, 116:3, 116:11
**9:34:33** [1] - 120:21

**9:35:10** [1] - 113:7
**9:41** [1] - 59:10
**9:43** [2] - 58:20, 59:3
**9:48** [2] - 113:22, 114:3
**9:49** [1] - 113:22
**9:50** [1] - 113:22
**9:51** [1] - 113:22
**9th** [1] - 35:25

**A**

**a.m** [7] - 7:2, 46:5, 125:4, 125:7, 146:24, 212:13
**ability** [2] - 3:19, 3:23
**able** [25] - 5:6, 6:3, 41:21, 78:11, 79:1, 83:20, 85:4, 85:10, 86:22, 92:15, 103:1, 103:9, 111:6, 111:23, 114:23, 115:7, 115:8, 128:9, 128:18, 134:23, 147:21, 149:1, 197:5, 204:5, 206:24
**absolutely** [5] - 89:13, 157:18, 203:16
**Absolutely** [2] - 81:19, 154:24
**accentuating** [1] - 206:10
**accept** [1] - 61:22
**acceptance** [3] - 34:18, 35:17, 35:22
**access** [2] - 67:4, 115:8
**accommodate** [1] - 192:10
**Accord** [6] - 136:15, 136:18, 136:21, 136:25, 137:13, 186:13
**according** [10] - 20:13, 20:19, 132:10, 133:1, 139:19, 144:22, 148:1, 149:19, 173:16, 181:16
**According** [2] - 154:10, 161:3
**account** [7] - 12:10, 82:14, 82:22, 83:4, 86:18, 115:6, 152:8
**accumulated** [1] - 21:6
**accurate** [1] - 215:9
**accused** [1] - 202:13
**achieve** [1] - 208:5
**acted** [2] - 129:5, 138:2
**acting** [1] - 38:1
**activate** [1] - 83:21
**activated** [3] - 83:12, 159:23, 160:7
**active** [7] - 11:4, 78:9, 78:12, 88:15, 109:23,

109:24, 110:6
**activities** [2] - 3:12, 26:12
**activity** [2] - 88:14, 106:10
**acts** [2] - 26:10, 83:18
**actual** [16] - 13:22, 18:12, 45:8, 82:21, 94:22, 102:4, 103:24, 107:23, 111:14, 123:8, 154:15, 154:20, 159:9, 171:20, 172:1, 185:15
**Adam** [1] - 1:22
**add** [1] - 12:12
**added** [1] - 46:17
**adding** [1] - 112:12
**addition** [4] - 13:18, 36:10, 196:14, 211:23
**Additionally** [1] - 12:12
**address** [49] - 11:3, 11:5, 11:9, 11:17, 12:13, 12:14, 14:4, 14:8, 28:7, 28:9, 28:16, 28:18, 28:19, 28:20, 28:23, 32:17, 32:18, 32:20, 37:11, 37:16, 37:24, 38:9, 39:15, 41:24, 43:4, 77:14, 82:17, 83:11, 87:25, 132:1, 132:3, 132:11, 135:10, 135:23, 140:24, 152:12, 152:16, 152:19, 153:5, 153:12, 158:20, 161:21, 169:23, 175:6, 175:10, 175:13, 183:14, 188:20
**addressed** [1] - 40:2
**addresses** [1] - 28:7
**Adjustment** [1] - 49:7
**Administration** [2] - 138:22, 139:14
**Administrative** [7] - 29:20, 29:24, 31:2, 31:14, 31:19, 32:2, 32:24
**admissible** [1] - 177:11
**admit** [3] - 184:16, 204:21, 212:9
**admitted** [8] - 6:22, 10:23, 11:21, 15:20, 16:19, 186:6, 191:6, 211:8
**admitting** [1] - 4:3
**adopting** [1] - 194:14
**adversary** [1] - 29:9
**affinity** [1] - 195:10
**affirmatively** [1] - 202:12
**affixed** [1] - 215:10
**African** [1] - 49:21

**African-Americans** [1] - 49:21
**afternoon** [27] - 4:14, 5:19, 5:25, 6:16, 21:23, 22:2, 47:19, 47:20, 72:4, 72:5, 80:20, 80:21, 80:22, 90:2, 90:3, 93:4, 131:18, 131:19, 154:25, 156:4, 156:7, 156:9, 190:3, 205:19, 205:20
**age** [2] - 97:24, 133:16
**agency** [2] - 138:3, 138:5
**agent** [5] - 51:14, 65:25, 132:23, 178:20, 178:22
**Agent** [8] - 9:9, 9:10, 171:9, 178:11, 178:19, 188:22, 204:22, 205:5
**agents** [2] - 5:9, 132:23
**aggrieved** [1] - 30:8
**ago** [7] - 17:25, 81:2, 149:25, 157:2, 186:9, 203:4, 209:18
**agree** [1] - 123:15
**agreement** [2] - 64:22, 205:24
**agrees** [1] - 92:6
**ahead** [11] - 9:23, 13:4, 103:16, 121:25, 122:11, 123:4, 168:18, 168:22, 171:2, 189:4, 194:22
**ain't** [1] - 175:12
**air** [2] - 83:21, 197:9
**AKA** [1] - 18:2, 141:6, 144:5
**al** [1] - 215:5
**alert** [1] - 89:16
**alibi** [10] - 127:8, 127:10, 127:11, 128:3, 194:2, 200:5, 200:8, 200:25, 201:1
**alive** [2] - 45:14, 195:20
**allegations** [2] - 3:18, 3:22
**allegedly** [1] - 26:11
**allotted** [1] - 40:20
**allow** [3] - 37:15, 40:14, 41:22
**allowed** [3] - 40:19, 142:1, 167:20
**allowing** [1] - 46:18
**almost** [5] - 63:2, 118:20, 149:1, 159:3, 184:6
**Almost** [1] - 37:2
**alone** [2] - 39:8, 39:22
**Alvin** [15] - 15:23, 15:24, 93:17, 93:19, 93:21, 93:24, 97:17, 97:20, 97:24, 99:4,

182:4, 183:5, 183:12, 183:16
**Ambo** [1] - 86:23
**AMD-04-029** [2] - 1:6, 215:5
**Amendment** [1] - 211:1
**America** [2] - 3:8, 29:10
**AMERICA** [1] - 1:5
**American** [1] - 164:11
**Americans** [1] - 49:21
**Amity** [4] - 13:14, 77:14, 169:23, 188:7
**amount** [1] - 151:25
**analysis** [12] - 13:3, 21:22, 57:13, 57:20, 58:1, 58:2, 58:12, 82:2, 112:9, 183:25, 186:19
**analyze** [3] - 10:22, 11:1, 13:19
**analyzed** [1] - 119:19
**analyzing** [1] - 13:18
**Andre** [1] - 1:13
**Ann** [1] - 30:19
**Answer** [1] - 71:21
**answer** [18] - 20:14, 20:18, 50:24, 52:20, 54:21, 70:17, 88:8, 90:16, 109:16, 139:10, 171:9, 177:15, 179:3, 180:12, 181:4, 181:10, 202:20, 210:18
**answered** [5] - 62:6, 78:1, 105:24, 119:8, 120:9
**answering** [2] - 79:12, 94:23
**Anthony** [2] - 134:24, 146:2
**anticipate** [2] - 191:22, 211:13
**anticipating** [1] - 194:10
**Antonio** [1] - 125:20
**Anyway** [2] - 197:20, 212:21
**anyway** [1] - 189:4
**apart** [1] - 110:24
**Apartment** [1] - 13:14
**apartment** [1] - 19:22
**apologize** [4] - 146:21, 204:10, 208:12, 208:18
**apparent** [1] - 86:23
**appear** [3] - 9:11, 74:1, 102:7
**appearance** [1] - 133:19
**Appearances** [1] - 1:15
**appeared** [5] - 13:13, 15:20, 16:7, 86:13, 95:15
**appointing** [1] - 211:13

**appreciate** [4] - 47:3, 47:24, 155:10, 190:19
**apprehensive** [1] - 180:18
**approach** [3] - 107:12, 150:19, 169:9
**appropriate** [6] - 7:6, 47:22, 89:23, 191:11, 194:1, 202:9
**approval** [1] - 56:17
**April** [26] - 9:17, 11:10, 12:18, 13:9, 13:11, 28:21, 40:8, 60:9, 64:1, 64:2, 86:1, 101:6, 143:13, 144:6, 148:14, 154:12, 154:21, 157:13, 157:20, 161:1, 162:4, 162:17, 163:4
**area** [4] - 22:5, 23:4, 173:11, 173:12
**argue** [4] - 41:18, 41:22, 46:22, 155:20, 206:22
**argument** [5] - 41:12, 46:24, 47:7, 90:23, 193:17
**arguments** [2] - 47:2, 194:12
**Arlington** [1] - 212:13
**arrest** [12] - 11:15, 16:25, 18:9, 60:13, 87:16, 101:4, 109:15, 162:1, 162:19, 162:24, 187:19, 187:25
**arrested** [15] - 28:20, 60:9, 64:1, 87:5, 101:8, 138:6, 163:4, 178:7, 178:10, 178:11, 178:15, 183:6, 188:4, 188:17, 188:18
**arrests** [3] - 137:8, 162:21, 184:4
**Arrington** [3] - 92:2, 92:6, 92:18
**arrived** [1] - 198:24
**Aryan** [1] - 164:23
**ascribed** [1] - 87:19
**aspect** [1] - 212:2
**aspects** [4] - 63:15, 177:4, 210:25, 212:5
**assault** [1] - 179:6
**assaulted** [1] - 177:19
**asserts** [1] - 211:5
**assets** [1] - 79:14
**assigned** [2] - 80:25, 183:23
**assisting** [1] - 178:19
**associate** [1] - 186:13
**associated** [2] - 21:11, 21:12, 21:23, 55:25, 96:5, 96:19, 96:20, 98:7,

100:13, 100:19, 109:7, 113:20, 113:21, 132:4, 136:16, 137:4, 140:15, 141:5, 142:10, 143:3, 149:6, 150:3, 159:22, 161:8, 161:15, 161:17, 168:14, 181:23, 182:3, 182:11, 187:10, 187:21
**assume** [6] - 67:9, 89:11, 96:7, 114:4, 129:15, 210:14
**assuming** [4] - 47:8, 66:6, 90:10, 197:22
**assumption** [1] - 178:5
**assure** [1] - 192:23
**asylum** [1] - 212:13
**AT&T** [1] - 86:7
**ATF** [1] - 178:22
**Atlanta** [1] - 204:16
**attached** [6] - 27:14, 29:15, 30:12, 30:15, 31:15, 32:23
**attachment** [1] - 202:20
**attempt** [9] - 37:11, 38:8, 39:7, 39:15, 39:24, 40:18, 42:1, 43:3, 70:8
**attempted** [9] - 58:18, 61:13, 61:15, 61:17, 61:18, 62:7, 128:1, 134:23, 167:8
**attempting** [2] - 125:4, 180:1
**attempts** [8] - 22:21, 95:13, 95:19, 95:25, 98:9, 98:10, 105:23, 128:22
**attention** [10] - 7:6, 16:22, 25:1, 40:8, 42:15, 123:11, 129:24, 173:25, 174:18, 209:15
**attorney** [4] - 26:16, 41:16, 41:19, 209:22
**Attorney's** [5] - 66:17, 66:18, 66:22, 73:16, 179:10
**attorney's** [1] - 76:12
**attorneys** [7] - 41:10, 41:13, 41:17, 41:22, 41:25, 42:5, 211:19
**attribute** [4] - 71:15, 71:20, 79:1
**Attributed** [1] - 95:4
**attributed** [19] - 19:14, 21:1, 67:15, 67:19, 68:11, 70:2, 70:3, 71:9, 71:10, 82:9, 87:1, 87:18, 99:9, 100:20, 101:6, 109:6, 110:9, 156:11, 161:18
**August** [1] - 25:23

**aunt** [1] - 30:11
**authored** [1] - 207:13
**authorities** [2] - 62:16, 89:16
**auto** [1] - 141:14
**automatic** [1] - 198:1
**automatically** [1] - 196:12
**available** [6] - 6:12, 110:4, 154:7, 159:2, 169:5, 206:15
**Avenue** [5] - 8:1, 8:13, 8:15, 8:25, 188:20
**avoid** [2] - 151:3, 191:6
**aware** [31] - 3:4, 48:23, 49:16, 49:23, 50:3, 50:6, 52:7, 52:17, 55:2, 55:20, 56:23, 61:4, 61:24, 62:2, 63:22, 65:25, 66:9, 66:15, 66:20, 66:25, 79:19, 89:14, 100:1, 102:12, 128:3, 154:5, 154:8, 164:11, 164:14, 164:19, 167:24

## B

**B-1** [3] - 57:21
**B-10** [2] - 17:16, 98:23
**B-11** [1] - 21:19
**B-12** [1] - 23:9
**B-13** [1] - 24:7
**B-14** [2] - 93:8, 181:25
**B-2** [1] - 58:11
**B-3** [2] - 58:14, 172:12
**B-6** [2] - 96:23, 139:13
**B-7** [2] - 18:16, 105:21
**B-8** [2] - 101:2
**B-9** [4] - 19:12, 21:9, 21:10, 105:13
**B9-A** [1] - 21:10
**backed** [2] - 116:2, 116:3
**background** [3] - 49:16, 56:3, 137:2
**bag** [1] - 197:9
**bail** [3] - 138:2, 138:7, 203:22
**ballistics** [1] - 131:1
**Baltimore** [10] - 1:12, 1:25, 51:18, 51:20, 51:25, 55:3, 66:18, 81:10, 140:22, 207:14
**barely** [1] - 36:19
**Barry** [2] - 1:22, 29:5
**base** [1] - 100:25
**based** [20] - 20:11, 81:20, 87:8, 91:20, 96:8, 105:4, 115:14, 124:25,

125:9, 128:10, 133:24, 133:25, 134:4, 156:23, 164:23, 166:24, 185:25
**Based** [3] - 13:3, 124:18, 134:3
**basic** [1] - 177:1
**basis** [4] - 3:10, 20:4, 104:11, 136:25
**battery** [1] - 108:6
**beat** [1] - 76:23
**beautiful** [1] - 7:4
**became** [1] - 55:2
**become** [1] - 56:12
**bed** [1] - 49:10
**began** [6] - 36:4, 36:20, 44:11, 86:14, 161:5
**begin** [2] - 37:13, 184:10
**beginning** [12] - 36:18, 39:14, 40:14, 41:9, 76:13, 78:21, 82:8, 98:5, 139:7, 143:24, 158:9, 176:25
**Behalf** [5] - 1:15, 1:17, 1:18, 1:20, 1:21
**behalf** [10] - 4:8, 29:18, 30:24, 31:15, 35:1, 42:1, 63:11, 166:10, 194:14, 210:16
**behavior** [3] - 26:8, 162:23, 163:13
**behind** [4] - 54:4, 121:24, 123:3
**belief** [3] - 3:25, 125:9
**Belinda** [1] - 6:17
**below** [1] - 106:16
**belt** [1] - 80:13
**bench** [4] - 7:21, 10:8, 36:19, 53:18
**Benson** [22] - 2:8, 4:12, 7:11, 7:13, 7:19, 8:6, 9:9, 9:24, 10:22, 24:14, 44:25, 45:10, 90:11, 131:18, 156:8, 157:1, 170:14, 176:9, 183:18, 185:19, 204:22, 205:5
**BENSON** [1] - 214:4
**Berger** [1] - 127:19
**best** [9] - 45:5, 79:21, 97:7, 120:6, 123:16, 155:13, 180:2, 195:5, 207:22
**better** [7] - 5:7, 5:8, 6:24, 49:3, 141:25, 206:13, 207:10
**Between** [4] - 8:22, 59:10, 79:5, 149:19
**between** [65] - 8:23, 18:1, 18:14, 18:17, 23:7, 25:22, 36:11, 59:9,

59:15, 59:21, 78:5, 78:8, 78:20, 79:3, 79:6, 79:9, 84:20, 94:4, 94:9, 96:1, 100:10, 100:13, 103:22, 104:3, 104:4, 104:20, 104:22, 105:10, 105:14, 111:11, 112:4, 113:3, 115:21, 116:18, 117:1, 117:5, 117:8, 117:21, 118:3, 121:5, 125:10, 138:16, 139:7, 139:18, 140:6, 143:13, 143:22, 144:1, 144:21, 145:1, 145:10, 145:12, 146:9, 146:19, 147:17, 157:15, 157:20, 164:3, 172:8, 182:20, 182:23, 184:1, 184:12, 186:16, 186:18

**beyond** [3] - 26:4, 103:3, 180:10

**big** [6] - 11:22, 151:11, 169:6, 197:21, 204:2, 204:15

**bigger** [1] - 123:10

**Bill** [1] - 153:6

**bill** [10] - 11:22, 12:7, 14:20, 14:23, 124:13, 124:15, 158:21, 159:7, 182:13, 183:8

**billed** [6] - 110:16, 111:15, 122:8, 122:15, 124:17, 159:13

**billing** [4] - 110:19, 111:4, 151:18, 153:10

**bills** [7] - 21:5, 110:20, 158:19, 159:3, 159:4, 159:8, 159:9

**biographical** [1] - 199:23

**birth** [2] - 153:18, 199:23

**birthday** [1] - 201:24

**bit** [14] - 2:12, 5:7, 96:24, 97:5, 99:24, 105:13, 133:20, 136:11, 147:23, 174:20, 194:24, 210:20, 212:15

**BK** [1] - 134:4

**BKO** [2] - 22:11, 23:23

**Blade** [1] - 185:20

**block** [7] - 8:15, 8:17, 8:20, 8:21, 148:23, 148:25

**blood** [28] - 6:11, 35:11, 36:21, 36:24, 39:16, 40:3, 48:3, 48:7, 48:9, 48:24, 50:9, 60:8, 61:7, 91:1, 162:14, 164:16, 165:7, 167:3, 167:7, 170:17, 172:3, 189:8,

189:24, 193:19, 193:21, 204:17, 210:5, 211:18

**Blue** [1] - 125:20

**blue** [1] - 8:1

**Bo** [7] - 16:12, 18:25, 98:3, 98:13, 98:15, 98:19, 144:5

**bodies** [1] - 173:13

**body** [2] - 197:23, 202:19

**bogus** [2] - 83:13, 83:19

**bondsman** [2] - 138:2, 138:7

**bondsperson** [1] - 203:22

**book** [21] - 11:3, 11:5, 11:9, 11:17, 12:13, 12:15, 13:25, 14:4, 14:8, 14:10, 14:15, 87:2, 87:9, 87:10, 87:23, 87:25, 88:1, 99:3, 161:19, 183:14, 187:17

**books** [4] - 15:21, 93:17, 97:17, 161:21

**boost** [1] - 83:6

**borrow** [1] - 169:13

**bottom** [12] - 63:5, 69:11, 71:1, 71:3, 71:4, 76:13, 93:14, 93:16, 107:15, 120:15, 125:3, 158:16

**bought** [1] - 6:13

**Boulevard** [1] - 140:18, 140:20, 140:21

**bounce** [1] - 185:11

**bounced** [2] - 22:23, 128:14

**bouncing** [4] - 21:25, 22:13, 24:9, 129:21

**bound** [3] - 26:21, 26:22, 26:24

**box** [1] - 114:24

**boxes** [1] - 115:2

**Boy** [1] - 64:22

**Brady** [1] - 203:4

**brake** [1] - 198:14

**Bramble** [3] - 22:10, 23:25

**break** [5] - 47:9, 89:7, 89:9, 154:23, 194:5

**breakdown** [2] - 11:13, 148:4

**bridge** [1] - 206:19

**brief** [6] - 17:14, 89:18, 91:13, 189:16, 190:20, 191:1

**briefly** [3] - 194:12, 210:24, 212:9

**Briefly** [1] - 211:17

**bring** [7] - 6:5, 46:23,

46:24, 204:18, 207:25, 209:14, 210:21

**brings** [1] - 208:6

**broke** [1] - 7:12

**brother** [6] - 15:24, 93:19, 93:20, 97:24, 182:4, 183:5

**brotherhood** [1] - 164:23

**brothers** [42] - 15:9, 16:20, 61:8, 64:7, 64:18, 88:5, 88:21, 89:1, 93:17, 95:20, 99:19, 100:11, 100:14, 100:19, 106:22, 107:19, 118:3, 118:10, 121:22, 124:6, 124:9, 124:10, 124:15, 124:16, 142:19, 142:23, 144:10, 145:25, 146:14, 146:20, 147:8, 148:16, 148:24, 149:12, 149:16, 153:23, 156:16, 173:13, 184:14, 185:21, 200:16, 200:17

**brothers'** [10] - 87:9, 97:17, 124:14, 124:23, 145:17, 148:19, 161:19, 161:21, 182:4, 187:7

**brought** [10] - 36:12, 39:21, 40:9, 42:16, 77:8, 123:11, 176:24, 177:18, 178:3, 178:12

**Brown** [6] - 8:2, 144:13, 144:25, 145:8, 172:10, 172:11

**browse** [1] - 152:18

**buc** [6] - 76:7, 76:8, 76:16

**bulk** [2] - 83:4, 183:24

**bullets** [1] - 178:17

**bup** [14] - 76:2, 76:3, 76:8, 76:9, 76:15, 76:16

**Bup** [1] - 76:15

**bups** [1] - 76:4

**BUPS** [1] - 76:4

**burn** [15] - 82:13, 82:14, 82:19, 82:23, 83:23, 85:7, 85:8, 88:17, 114:23, 115:7, 150:7, 150:25, 151:6, 152:25, 210:20

**burner** [2] - 83:14, 83:22

**burners** [1] - 83:5

**business** [5] - 50:25, 97:22, 106:2, 108:2, 137:19

**BY** [24] - 7:18, 8:24, 10:21, 12:9, 13:8, 20:17, 27:5, 43:18, 47:18, 72:3, 80:19, 93:6, 131:17,

156:6, 169:21, 170:13, 171:13, 189:6, 214:5, 214:6, 214:7, 214:8, 214:9, 214:10

**Byrd** [2] - 45:11, 45:14

# C

**C-1** [4] - 25:2, 25:16, 27:6, 28:4

**C-10** [3] - 25:25, 35:18, 35:19

**C-11** [2] - 25:25, 35:21

**C-12** [2] - 25:2, 26:1

**C-13** [1] - 91:14

**C-2** [5] - 25:17, 25:21, 28:25, 29:17, 33:1

**C-3** [2] - 25:21, 33:2

**C-4** [2] - 25:22, 33:18

**C-5** [2] - 25:22, 33:21

**C-6** [2] - 25:23, 33:24

**C-7** [2] - 25:23, 34:18

**C-8** [2] - 25:24, 35:4

**C-9** [2] - 25:24, 35:14

**cadre** [1] - 5:8

**California** [1] - 194:19

**call's** [1] - 185:4

**cameras** [2] - 129:12, 129:17, 185:21

**cancelling** [1] - 42:2

**cannot** [1] - 105:19

**capture** [3] - 66:10, 83:16, 83:17

**car** [26] - 15:11, 15:15, 15:17, 55:4, 79:16, 80:11, 128:10, 180:22, 181:13, 187:20, 195:13, 195:17, 196:1, 196:8, 196:12, 196:17, 197:4, 197:7, 197:16, 197:22, 198:14

**card** [2] - 83:19, 137:19, 153:8

**care** [4] - 12:2, 34:2, 191:2, 205:16

**cars** [3] - 64:16, 196:11, 198:21

**CASE** [1] - 1:6

**case** [90] - 3:8, 3:16, 17:11, 21:6, 25:6, 26:7, 26:19, 26:20, 26:21, 26:23, 27:3, 46:2, 49:3, 49:13, 50:7, 50:9, 50:15, 52:4, 52:12, 55:2, 60:23, 63:15, 64:2, 65:25, 70:21, 73:18, 74:4, 74:5, 74:19, 75:8, 76:21, 81:22, 89:25, 90:24, 103:3, 104:1, 106:13,

156:6, 169:21, 170:13, 171:13, 189:6, 214:5, 214:6, 214:7, 214:8, 214:9, 214:10

107:8, 111:10, 127:7, 127:19, 127:24, 128:3, 132:23, 133:4, 134:12, 134:17, 138:17, 155:3, 155:8, 163:24, 166:16, 167:7, 167:20, 176:12, 176:25, 177:1, 177:7, 178:22, 181:17, 186:17, 186:18, 188:4, 190:24, 191:11, 191:19, 192:7, 192:16, 192:17, 197:22, 199:2, 201:22, 208:4, 208:21, 212:25

**Case** [1] - 215:5

**cases** [16] - 49:1, 50:8, 52:8, 55:12, 55:14, 92:9, 122:19, 131:1, 166:17, 167:3, 167:5, 167:10, 170:17, 211:21, 212:2, 212:5

**cash** [1] - 64:18

**cautious** [1] - 80:8

**cavalier** [1] - 52:11

**CD** [10] - 2:11, 2:21, 44:3, 44:4, 44:17, 44:24, 44:25, 91:14, 171:19, 189:14

**ceased** [2] - 85:25, 109:22, 154:1, 154:4

**Cell** [4] - 22:11, 24:12, 73:23, 183:25

**cell** [71] - 8:25, 9:2, 10:22, 12:16, 14:5, 14:18, 16:21, 20:22, 21:16, 21:22, 21:24, 22:7, 22:12, 22:18, 22:23, 22:24, 23:1, 23:3, 23:7, 23:12, 23:16, 24:2, 24:5, 24:8, 57:18, 79:20, 79:23, 82:9, 82:25, 83:17, 85:3, 87:20, 95:2, 100:16, 102:23, 106:19, 107:5, 109:5, 109:22, 110:6, 128:6, 128:10, 128:14, 129:19, 138:16, 141:12, 141:13, 141:15, 141:18, 141:19, 151:14, 156:23, 158:19, 159:1, 159:8, 159:12, 168:10, 173:4, 179:22, 180:2, 181:25, 184:2, 184:3, 184:5, 185:10, 187:14

**cellular** [2] - 79:1, 79:3

**Center** [1] - 49:7

**certain** [11] - 67:19, 70:2, 107:21, 114:20, 123:8, 158:25, 185:25, 199:22, 203:7, 206:1

**Certainly** [4] - 2:5, 2:15, 10:20, 202:9

certainly [6] - 4:4, 65:25, 138:21, 155:6, 206:20, 210:8
certainty [3] - 77:25, 129:7, 129:13
CERTIFICATE [1] - 215:1
certify [2] - 215:3, 215:7
certiori [1] - 3:6
CF [1] - 118:12
chairs [4] - 46:1, 89:24, 155:2, 192:22
challenge [1] - 51:10
chance [1] - 208:5
change [4] - 88:4, 92:3, 108:4, 166:25
changed [2] - 41:3, 41:7
changes [1] - 92:19
char [1] - 125:23
characterization [6] - 12:7, 38:6, 40:23, 43:14, 48:15, 55:7
charge [7] - 178:12, 178:15, 178:23, 188:11, 201:6, 201:7, 201:8
charged [22] - 52:23, 94:24, 103:4, 105:18, 110:22, 114:5, 114:9, 118:15, 118:16, 119:2, 119:6, 119:9, 119:12, 122:24, 123:9, 124:1, 124:4, 124:6, 124:10, 162:6, 167:6, 178:4
charges [5] - 26:7, 156:17, 156:18, 156:21, 158:23
charging [1] - 52:8
chart [59] - 77:12, 78:7, 82:7, 87:15, 93:8, 94:12, 95:11, 95:14, 95:17, 95:20, 95:21, 95:24, 96:16, 96:24, 98:5, 99:1, 99:21, 99:23, 100:10, 103:13, 108:18, 109:20, 113:12, 116:20, 116:22, 118:22, 119:19, 120:6, 120:15, 121:9, 123:19, 123:24, 125:3, 125:12, 125:13, 125:20, 128:22, 139:5, 142:9, 143:6, 143:9, 144:22, 144:25, 145:18, 145:20, 145:22, 146:5, 146:8, 146:12, 146:18, 147:1, 147:5, 147:9, 147:16, 148:7, 149:24, 150:2
charts [4] - 82:3, 88:22, 95:20, 103:11
check [12] - 6:12, 94:7, 100:21, 100:23, 101:12,

101:19, 101:20, 103:9, 116:24, 137:7, 175:12, 185:24
checked [1] - 185:23
checking [1] - 190:11
child [1] - 28:14
childhood [1] - 143:18
chose [1] - 44:15
Chris [2] - 180:1, 188:14
Christian [1] - 64:21
Christine [1] - 203:5
Cingular [5] - 86:7, 102:5, 110:20, 160:5
Circle [3] - 8:9, 32:18, 86:23
Circuit [3] - 3:6, 4:4, 4:5
Circuit's [1] - 3:16
circumstance [2] - 89:22, 152:17
circumstances [1] - 208:9
city [2] - 130:6, 140:23
City [7] - 51:18, 51:20, 51:25, 55:3, 66:18, 81:10, 207:14
claims [3] - 76:23, 170:17, 171:22
Clash [2] - 64:25, 65:1
classification [1] - 118:11
classified [1] - 123:20
classify [4] - 108:11, 108:12, 108:16, 201:2
clear [5] - 25:13, 70:7, 71:17, 108:17, 147:2
clearly [1] - 175:18
client [7] - 46:16, 159:13, 189:7, 200:7, 201:23, 210:16, 212:13
clone [1] - 83:15
close [9] - 22:7, 47:9, 108:5, 111:2, 121:15, 124:24, 143:17, 181:5, 196:7
closer [6] - 10:14, 10:18, 23:5, 24:4, 107:23, 141:11
closest [10] - 23:5, 23:8, 23:14, 23:16, 24:2, 24:5, 84:13, 102:24, 145:12, 148:10
closing [1] - 212:17
clothing [2] - 23:11, 134:3
Coburn [19] - 1:22, 29:5, 47:13, 90:5, 131:19, 154:23, 155:14, 156:5, 169:15, 186:5, 186:15, 187:3, 189:7,

193:19, 202:23, 206:13, 209:25, 210:5, 210:20
COBURN [46] - 6:5, 6:8, 9:20, 10:18, 12:25, 20:3, 20:5, 20:9, 30:3, 38:6, 39:1, 39:4, 40:23, 42:13, 47:5, 88:7, 90:7, 90:9, 131:17, 154:24, 155:15, 156:6, 169:21, 170:10, 171:6, 176:6, 189:10, 190:17, 202:24, 203:7, 203:10, 203:12, 203:16, 203:19, 203:21, 203:24, 204:2, 204:9, 204:13, 204:25, 205:3, 205:10, 205:20, 208:12, 208:18, 214:9
Coburn's [2] - 181:22, 208:23
coconspirator [1] - 209:16
Code [3] - 41:5, 42:3, 50:20
codefendants [1] - 134:17
coerced [1] - 37:25
coincides [1] - 102:2
colleagues [1] - 15:12
collectively [2] - 28:3, 48:2
colloquially [1] - 56:13
colloquies [1] - 44:19
colloquy [3] - 39:8, 39:22, 43:1
color [1] - 8:6
colossal [1] - 209:15
column [1] - 118:12
coming [9] - 129:16, 147:17, 160:17, 178:24, 194:18, 195:7, 199:3, 208:10
comment [5] - 9:20, 56:3, 67:24, 70:2, 70:3
commented [3] - 53:10, 54:18, 56:25
comments [1] - 67:19
Commercial [3] - 41:5, 42:3, 50:20
commit [2] - 203:16, 205:25
commitments [1] - 208:13
Committee [1] - 208:8
common [7] - 27:1, 55:23, 55:24, 61:8, 84:24, 180:6, 182:10
commonly [2] - 55:11, 211:21
communicate [1] - 57:18

communication [1] - 59:21
community [1] - 170:2
companies [7] - 104:22, 105:1, 159:1, 183:19, 184:8, 185:3, 185:12
companions [1] - 180:14
company [15] - 82:25, 84:6, 85:19, 86:4, 86:6, 104:6, 104:19, 104:23, 113:13, 151:11, 151:17, 159:9, 159:12, 183:19
company's [2] - 184:23, 184:24
compare [1] - 121:11
compared [2] - 50:7, 50:13
comparing [1] - 133:19
complaint [3] - 53:3, 60:18, 60:25
complaints [2] - 49:13, 53:10
complete [3] - 101:24, 105:11, 215:9
completed [4] - 95:12, 113:1, 115:20, 174:8
completely [2] - 62:2, 88:13, 209:19
completion [1] - 174:4
comprehensive [2] - 139:4, 148:25
computer [2] - 21:4, 83:10
conceal [1] - 153:2
conceivably [1] - 205:13
concern [1] - 192:2
concerned [4] - 6:9, 117:3, 152:21, 152:22
concerning [1] - 116:21
concerns [1] - 65:10
concert [1] - 38:1
conclude [5] - 46:23, 47:9, 155:7, 191:9, 191:24
concluded [1] - 89:18
Conclusion [1] - 213:6
conclusion [3] - 103:21, 104:5, 104:17
condense [1] - 165:10
condition [1] - 154:12
conduct [6] - 39:8, 47:25, 48:1, 58:2, 89:16, 89:23
conducted [2] - 15:6, 106:7
confer [1] - 47:3
Conference [1] - 208:8
confident [3] - 192:11,

194:13, 203:13
confidently [1] - 123:4
confirm [1] - 204:7
Confirmed [1] - 153:6
confirmed [2] - 201:25, 204:9
conflict [6] - 29:8, 41:15, 206:2, 206:8, 209:1, 209:2
confuse [1] - 194:2
confused [1] - 192:11
connect [2] - 60:5, 115:12
connected [42] - 57:9, 94:21, 94:24, 95:13, 95:24, 101:13, 101:18, 101:22, 102:8, 104:13, 104:25, 105:16, 113:15, 115:21, 117:12, 117:21, 118:5, 118:7, 118:10, 118:23, 119:16, 119:17, 120:7, 120:8, 120:11, 122:23, 122:24, 123:2, 123:5, 123:6, 123:13, 123:20, 123:21, 123:23, 123:24, 123:25, 124:3, 124:21, 124:24, 128:24, 129:3, 174:7
Connecticut [1] - 153:17
connection [8] - 82:24, 102:3, 111:11, 123:17, 164:15, 168:10, 173:20, 186:25
connections [3] - 95:25, 116:20, 116:23
connects [1] - 185:14
consent [1] - 210:16
consider [4] - 26:9, 171:10, 192:16
considering [1] - 191:19
consistency [3] - 103:16, 104:3, 104:4
consistent [7] - 103:15, 105:8, 106:9, 112:8, 114:11, 172:18, 197:5
console [1] - 187:19
conspiracy [3] - 3:22, 26:5, 205:25
conspiratorial [1] - 26:10
conspirators [1] - 184:1
constant [1] - 180:14
constantly [1] - 180:13
constitute [1] - 215:7
Constitution [2] - 41:14, 167:14
constitutional [1] - 166:2

**constrained** [1] - 3:19
**consult** [1] - 184:7
**consuming** [1] - 96:1
**contact** [22] - 21:2,
59:15, 83:11, 88:25,
101:7, 103:21, 104:5,
105:24, 106:14, 107:4,
109:7, 116:13, 117:5,
118:3, 139:7, 140:5,
146:18, 147:22, 148:7,
148:18, 149:17, 173:9
**contacted** [3] - 6:14,
88:20, 107:9
**contacting** [2] - 77:25,
106:16
**contacts** [7] - 18:14,
100:10, 100:13, 104:17,
116:18, 117:8, 186:16
**contain** [4] - 11:17,
16:18, 29:18, 33:3
**contained** [2] - 91:14,
189:17
**containing** [2] - 44:3,
44:4
**contains** [3] - 18:12,
27:9, 34:18
**contemplating** [1] -
203:8
**Continue** [3] - 46:2,
90:1, 155:3
**continue** [1] - 118:7
**CONTINUED** [1] - 7:17
**continued** [2] - 38:24,
154:12
**continuously** [2] -
60:12, 162:20
**contract** [2] - 41:17,
42:2
**Contract** [1] - 51:2
**control** [2] - 45:4,
189:12
**controversial** [1] -
10:14
**conversation** [6] -
111:11, 123:8, 123:25,
124:2, 173:20, 174:3
**conversations** [3] -
59:21, 77:10, 188:14
**converse** [1] - 59:23
**convinces** [1] - 211:6
**Cooney** [1] - 179:1
**cooperate** [2] - 37:25,
62:16
**cooperating** [2] - 134:5,
179:25
**cooperation** [1] -
155:10
**copies** [6] - 138:20,
159:2, 159:4, 159:9,
205:13, 210:13

**Copies** [1] - 159:13
**corner** [6] - 108:19,
136:11, 143:10, 149:24,
173:12, 181:25
**correct** [309] - 5:9,
12:20, 12:21, 12:23,
14:14, 14:16, 14:23,
14:24, 15:3, 15:4, 15:14,
15:22, 15:23, 15:24,
16:4, 17:5, 17:20, 17:22,
17:23, 18:4, 18:21,
18:22, 19:4, 19:10,
19:18, 21:13, 21:14,
21:17, 21:18, 22:12,
22:22, 22:24, 22:25,
23:19, 23:22, 23:25,
24:1, 24:5, 24:6, 27:10,
27:11, 27:22, 27:23,
27:25, 28:11, 28:17,
28:22, 28:25, 29:3, 29:6,
29:11, 29:12, 29:15,
29:22, 29:23, 30:1, 30:2,
30:5, 30:9, 30:10, 30:14,
30:20, 30:25, 31:4, 31:6,
31:12, 31:16, 31:17,
31:20, 31:21, 31:24,
32:15, 32:21, 32:22,
32:24, 33:12, 33:16,
33:19, 33:22, 33:23,
34:3, 34:4, 34:6, 34:10,
34:12, 34:16, 34:17,
34:20, 34:21, 34:24,
35:2, 35:3, 35:5, 35:9,
35:12, 35:13, 35:16,
35:23, 36:8, 40:12,
40:13, 44:7, 45:1, 45:2,
45:12, 48:4, 51:19, 52:3,
56:23, 59:5, 59:12,
60:19, 61:2, 63:15,
65:11, 65:14, 68:20,
69:22, 69:25, 72:23,
74:8, 74:10, 75:25,
76:17, 76:20, 77:15,
77:21, 80:14, 80:24,
81:6, 81:10, 81:20,
82:10, 83:24, 85:2, 85:3,
85:19, 86:11, 86:12,
86:15, 87:10, 88:5, 89:1,
93:11, 93:16, 93:18,
93:25, 94:14, 94:18,
95:1, 95:3, 95:11, 95:13,
96:4, 96:15, 96:17,
96:25, 97:3, 97:20, 98:4,
98:8, 98:20, 99:4, 99:9,
100:9, 102:15, 103:12,
105:15, 108:20, 108:23,
108:25, 109:1, 109:11,
109:18, 111:8, 112:13,
113:11, 114:10, 116:10,
118:4, 118:6, 118:20,
119:10, 119:22, 120:5,

120:12, 120:13, 121:3,
121:6, 121:19, 121:25,
122:16, 122:17, 125:5,
125:8, 125:11, 125:14,
127:5, 127:6, 128:4,
128:20, 128:24, 129:1,
129:3, 129:4, 129:14,
131:5, 132:12, 132:17,
134:14, 135:16, 136:9,
139:1, 139:17, 140:7,
140:16, 140:17, 143:23,
144:2, 144:3, 144:8,
146:3, 149:8, 149:18,
149:21, 150:4, 150:18,
151:21, 153:13, 154:13,
154:14, 154:17, 157:7,
157:10, 157:14, 157:17,
157:20, 157:21, 158:16,
159:20, 159:24, 160:3,
160:24, 161:2, 161:12,
162:2, 162:6, 162:17,
164:4, 164:6, 164:20,
165:15, 166:2, 166:14,
166:22, 166:24, 168:4,
170:18, 172:17, 172:25,
173:14, 173:15, 173:17,
173:18, 174:4, 174:6,
174:9, 174:12, 174:22,
174:25, 175:4, 175:7,
175:10, 175:16, 176:3,
176:4, 176:13, 176:14,
176:16, 176:20, 176:21,
177:9, 177:10, 177:12,
177:16, 177:21, 179:13,
179:22, 179:23, 180:23,
182:16, 184:24, 184:25,
185:2, 186:14, 187:1,
187:8, 187:9, 188:2,
188:5, 188:11, 188:12,
188:16, 188:21, 189:23,
190:7, 190:8, 199:16,
199:17
**Correct** [173] - 12:24,
14:19, 19:1, 19:7, 32:1,
32:8, 32:16, 33:9, 34:13,
35:24, 48:8, 48:20,
48:22, 49:5, 49:11,
49:15, 49:22, 51:12,
52:1, 52:6, 52:10, 53:21,
54:3, 54:10, 55:5, 56:15,
56:18, 57:2, 57:6, 57:11,
57:15, 57:25, 58:13,
59:1, 59:17, 59:24, 60:6,
60:20, 61:1, 61:9, 61:11,
63:10, 63:16, 64:17,
64:20, 67:14, 67:21,
68:5, 69:19, 70:10,
70:13, 72:13, 72:17,
73:1, 74:6, 74:11, 75:21,
77:9, 77:16, 77:18,
80:12, 80:15, 81:23,

82:4, 82:11, 84:7, 84:21,
89:2, 93:19, 94:2, 95:10,
96:11, 96:18, 96:22,
97:18, 98:1, 98:14,
98:22, 99:5, 99:15,
99:18, 101:1, 101:11,
102:16, 102:19, 104:14,
105:12, 105:23, 107:17,
109:19, 110:13, 111:20,
112:2, 112:8, 112:14,
112:20, 112:23, 113:6,
114:7, 115:13, 116:9,
116:15, 118:24, 119:11,
119:14, 120:25, 121:7,
124:8, 125:2, 125:6,
128:12, 128:15, 128:21,
129:23, 131:6, 131:10,
132:25, 133:5, 135:24,
137:23, 138:23, 139:16,
141:3, 141:7, 141:16,
142:11, 142:16, 143:2,
143:5, 143:11, 143:15,
144:12, 145:3, 145:6,
145:24, 146:7, 146:11,
147:7, 149:11, 150:16,
151:2, 151:7, 152:9,
152:11, 152:13, 152:15,
153:1, 153:3, 153:7,
153:19, 156:20, 157:5,
157:8, 158:5, 159:16,
160:2, 160:6, 160:9,
160:13, 160:21, 160:25,
161:7, 161:13, 162:5,
162:7, 163:16, 166:1,
175:8, 175:11, 175:14,
176:17, 185:3, 189:25
**Correction** [1] - 210:1
**Correctional** [1] - 49:6
**correctly** [3] - 139:5,
152:18, 160:22
**correlating** [2] - 103:12,
104:7
**counsel** [21] - 2:3, 3:2,
3:5, 10:9, 10:10, 10:16,
11:12, 90:25, 91:16,
92:1, 179:19, 180:13,
191:2, 192:12, 193:4,
202:1, 202:3, 209:20,
210:3, 210:22, 211:13
**Counsel** [3] - 46:21,
191:4, 193:7
**counsel's** [1] - 155:10
**count** [2] - 97:5, 184:10
**country** [1] - 191:13
**counts** [1] - 176:25
**County** [6] - 18:6,
18:18, 140:15, 141:22,
143:3, 208:22
**county** [2] - 130:6,
140:23

**couple** [12] - 6:5, 53:6,
33:25, 46:25, 92:18,
132:7, 135:3, 168:6,
169:1, 188:25, 189:1,
189:5
**course** [19] - 7:13,
78:25, 79:15, 130:18,
131:22, 132:8, 132:22,
135:18, 138:25, 140:25,
143:7, 143:16, 156:23,
167:11, 191:17, 192:15,
194:16, 197:23, 199:22
**court** [32] - 3:8, 18:5,
25:10, 26:14, 26:16,
26:17, 40:9, 42:16, 43:8,
48:1, 48:7, 48:12, 49:21,
51:11, 52:9, 52:24, 53:3,
53:11, 60:24, 62:22,
79:16, 126:3, 163:23,
171:12, 180:3, 189:14,
201:5, 205:25, 211:1,
211:2, 211:8
**COURT** [243] - 1:1, 2:3,
2:5, 2:15, 2:20, 2:23,
4:16, 4:18, 4:21, 5:1,
5:10, 5:13, 5:15, 5:18,
5:21, 5:23, 6:3, 6:7,
6:15, 6:22, 7:1, 7:3,
7:16, 8:3, 8:8, 8:19, 9:6,
9:22, 10:2, 10:5, 10:7,
10:13, 10:20, 11:25,
12:5, 12:8, 13:3, 20:4,
20:7, 20:13, 25:12, 26:6,
27:16, 38:7, 39:2, 39:5,
40:24, 42:14, 42:23,
43:15, 43:17, 43:20,
44:2, 45:24, 46:6, 46:8,
46:10, 46:19, 47:7,
47:12, 47:15, 50:24,
52:16, 52:20, 53:8,
54:20, 70:5, 70:17,
71:24, 85:1, 88:8, 89:5,
89:7, 89:9, 90:5, 90:8,
90:10, 90:15, 90:17,
90:19, 90:21, 91:8,
91:11, 91:19, 92:4, 92:8,
92:11, 92:14, 92:20,
92:25, 93:2, 93:4,
107:14, 126:20, 129:10,
131:12, 131:22, 150:20,
154:23, 154:25, 155:6,
155:13, 155:16, 155:18,
155:22, 156:2, 156:4,
157:25, 163:20, 164:10,
166:5, 166:20, 167:18,
169:10, 169:14, 169:17,
169:20, 170:5, 170:9,
170:11, 171:1, 171:8,
171:24, 172:7, 172:21,
175:23, 177:15, 177:25,
178:9, 178:14, 179:3,

180:12, 181:4, 181:9,
186:4, 188:24, 189:1,
189:3, 189:11, 190:18,
190:23, 193:3, 193:7,
193:10, 193:13, 193:15,
193:24, 194:11, 194:16,
194:22, 194:24, 195:4,
195:10, 195:13, 195:15,
195:20, 195:23, 196:3,
196:6, 196:11, 196:15,
196:20, 196:25, 197:8,
197:12, 197:19, 198:2,
198:6, 198:8, 198:13,
198:18, 198:20, 198:23,
199:1, 199:3, 199:7,
199:12, 199:15, 199:18,
199:24, 200:5, 200:10,
200:15, 200:18, 200:21,
200:24, 201:6, 201:9,
201:12, 201:16, 201:19,
202:1, 202:5, 202:8,
202:11, 202:15, 202:17,
202:19, 202:23, 203:1,
203:6, 203:9, 203:11,
203:13, 203:17, 203:20,
203:23, 204:1, 204:7,
204:11, 204:20, 205:2,
205:8, 205:14, 205:18,
205:20, 205:22, 206:13,
206:17, 206:24, 207:2,
207:5, 207:9, 207:24,
208:2, 208:15, 208:19,
208:24, 209:5, 209:8,
209:23, 210:6, 210:12,
210:19, 211:10, 211:13,
211:16, 212:4, 212:9,
212:19, 212:24, 213:2,
213:5

**Court** [70] - 2:12, 2:13,
2:23, 3:19, 3:22, 10:23,
11:14, 12:13, 15:6, 17:4,
23:22, 24:10, 25:20,
28:19, 28:24, 29:12,
36:22, 36:23, 37:11,
37:15, 37:20, 37:23,
38:8, 39:7, 39:15, 39:22,
39:24, 40:2, 40:19,
40:21, 41:1, 41:24,
41:25, 42:6, 42:8, 43:3,
43:10, 45:10, 46:17,
52:8, 52:18, 53:22,
56:17, 60:17, 63:19,
63:20, 79:13, 109:25,
132:1, 132:11, 135:10,
135:22, 155:24, 164:3,
168:2, 171:17, 171:20,
172:2, 183:9, 187:13,
194:9, 203:16, 204:10,
206:25, 211:6, 211:12,
212:22, 215:16

**Court's** [11] - 43:24,

71:23, 157:24, 169:16,
170:8, 171:15, 172:1,
202:6, 202:10, 209:15,
211:25

**courtesy** [2] - 54:8,
54:12

**courthouse** [5] - 49:24,
50:14, 89:19, 178:4,
210:1

**Courthouse** [1] - 1:24

**courtroom** [33] - 2:1,
2:2, 2:7, 5:3, 7:2, 36:13,
37:18, 37:21, 37:22,
38:3, 39:8, 42:21, 43:6,
45:8, 47:14, 53:19,
54:15, 63:2, 90:4, 91:15,
91:20, 93:3, 133:9,
155:5, 156:3, 162:14,
163:23, 164:15, 173:3,
184:17, 189:22, 193:2,
193:6

**courts** [1] - 170:23

**cousin** [2] - 82:18,
138:4

**cover** [4] - 65:10, 73:24,
148:23, 179:10

**covered** [1] - 125:20

**covering** [1] - 118:12

**crash** [1] - 197:20

**crashed** [1] - 197:16

**create** [1] - 83:19

**created** [1] - 148:7

**credit** [2] - 153:8,
158:22

**Credit** [1] - 153:6

**Cree** [6] - 12:13, 15:6,
17:4, 28:19, 28:24, 183:9

**crime** [3] - 52:22, 88:16,
88:19

**crimes** [1] - 24:24

**Crimes** [1] - 51:21

**criminal** [4] - 34:5,
50:22, 106:10, 153:15,
191:13

**CRIMINAL** [1] - 1:6

**critical** [2] - 206:7,
206:8

**Cross** [1] - 46:8

**cross** [5] - 46:23, 47:9,
195:8, 205:3, 205:6

**CROSS** [8] - 47:17,
72:2, 80:18, 131:16,
214:6, 214:7, 214:8,
214:9

**crossed** [1] - 14:12

**Crowe** [5] - 1:20, 4:22,
90:12, 91:11, 155:7

**CROWE** [34] - 4:15,
4:17, 4:20, 4:23, 5:6,
90:13, 90:16, 91:5,

171:7, 199:2, 199:8,
199:13, 199:17, 199:20,
199:25, 200:6, 200:12,
200:16, 200:20, 200:22,
201:1, 201:7, 201:11,
201:15, 201:18, 201:20,
202:2, 202:6, 202:9,
202:14, 202:16, 202:18,
202:21, 203:2

**Culver** [1] - 30:7

**Curtis** [1] - 82:17

**custody** [4] - 60:12,
98:20, 98:21, 209:24

**customer** [1] - 152:14

**cut** [11] - 6:4, 85:19,
153:22, 153:24, 153:25,
154:1, 154:18, 157:11,
158:7, 161:1, 165:13

**cute** [1] - 52:13

**cuts** [1] - 84:6

**CV** [1] - 210:9

# D

**dark** [1] - 10:6

**darn** [1] - 166:13

**Darryl** [23] - 17:13,
17:19, 59:18, 80:1, 99:2,
99:3, 99:22, 100:8,
100:9, 100:14, 107:8,
117:22, 120:16, 146:2,
172:23, 173:4, 173:9,
174:2, 174:8, 180:17,
181:14, 184:13, 184:18

**data** [4] - 11:3, 87:18,
148:4, 187:16

**database** [7] - 18:12,
21:2, 21:15, 94:3, 101:2,
148:12, 153:15

**date** [22] - 13:5, 25:19,
26:4, 37:23, 39:6, 39:11,
42:17, 60:12, 85:19,
85:22, 85:24, 85:25,
87:25, 153:18, 154:15,
154:21, 162:10, 162:12,
163:6, 188:18, 199:23

**dated** [2] - 27:7, 36:6

**dates** [7] - 25:10, 25:11,
139:1, 139:3, 163:3,
188:6

**Davis** [1] - 1:13, 36:18,
54:18

**day-to-day** [1] - 106:9

**days** [12] - 34:22, 79:22,
99:18, 99:20, 126:14,
146:13, 148:18, 172:9,
182:18, 208:4, 208:14

**dead** [4] - 45:14, 45:15,
119:13, 120:12

**deal** [2] - 173:10,
181:13

**dealers** [5] - 57:5,
84:24, 108:15, 150:25,
152:25

**dealing** [1] - 111:18

**deals** [1] - 206:7

**dealt** [1] - 41:5

**death** [1] - 45:20

**December** [2] - 48:18,
209:3

**decide** [3] - 104:12,
176:19, 209:12

**decided** [2] - 86:3,
104:12

**decision** [2] - 3:10, 4:1

**deeds** [1] - 65:7

**deep** [1] - 45:4

**deeper** [1] - 45:2

**Default** [1] - 33:18

**default** [1] - 139:2

**Defendant** [1] - 1:17,
1:18, 1:20, 1:21, 73:20

**defendant** [20] - 3:12,
29:19, 33:21, 33:24,
35:11, 35:21, 36:6,
37:22, 39:16, 43:4, 48:1,
49:12, 50:4, 166:2,
166:13, 167:4, 191:13,
192:13, 192:14, 200:11

**Defendant's** [3] - 74:7,
75:24, 76:11

**defendant's** [3] -
199:14, 199:15, 199:22

**Defendants** [4] - 1:9,
2:1, 4:13, 193:6

**defendants** [65] - 2:13,
2:25, 4:9, 16:3, 17:10,
18:14, 19:9, 25:5, 26:7,
26:11, 26:12, 26:23,
33:4, 33:19, 34:19, 35:2,
35:14, 35:19, 35:22,
36:5, 36:12, 37:11,
37:24, 39:13, 40:9,
40:15, 40:19, 41:1,
41:11, 42:4, 42:16, 43:7,
43:11, 43:22, 45:21,
48:1, 48:6, 48:10, 49:13,
49:24, 50:8, 50:14, 54:4,
54:7, 54:18, 67:19,
79:15, 126:3, 137:3,
146:6, 166:21, 167:6,
167:13, 167:20, 170:18,
172:5, 181:17, 186:16,
186:18, 189:18, 191:16,
191:20, 192:12, 193:3,
193:16

**defendants'** [1] - 53:10

**defense** [36] - 12:1,
26:11, 41:13, 41:17,

41:25, 46:25, 48:3, 48:9,
48:24, 49:17, 50:9,
90:24, 127:8, 127:11,
128:3, 162:15, 163:18,
164:3, 164:7, 164:16,
164:19, 167:3, 170:22,
171:3, 171:11, 172:4,
191:2, 191:11, 191:24,
192:7, 193:25, 206:12,
208:3, 211:14, 211:18,
211:19

**Defense** [1] - 179:19

**definitely** [1] - 217:12

**definition** [1] - 82:23

**degree** [1] - 77:24

**deliberate** [1] - 192:15

**demand** [2] - 34:5,
210:10

**demands** [2] - 41:10,
42:5

**demonstrated** [1] -
54:11

**demonstrates** [1] -
154:18

**Denham** [3] - 24:15,
181:6, 181:13

**denied** [1] - 46:20

**Denying** [1] - 43:2

**Department** [2] - 51:25,
207:14

**depicted** [4] - 133:21,
147:5, 147:16, 148:6

**deploys** [1] - 197:9

**described** [1] - 130:4,
162:15, 163:13, 165:16,
170:20, 171:17, 173:3,
173:22, 189:8, 189:15

**describing** [2] - 165:17,
203:5

**Description** [2] -
138:22, 139:14

**description** [3] - 43:19,
150:24, 173:16

**Design** [2] - 16:14, 83:1

**designation** [1] - 3:7

**designed** [1] - 81:6

**desperately** [1] - 6:4

**detail** [4] - 26:13, 33:3,
170:20, 206:5

**detailed** [1] - 81:11

**detained** [1] - 26:8

**detainees** [1] - 49:10

**detection** [1] - 151:3

**detective** [8] - 51:15,
51:20, 51:23, 55:19,
81:13, 81:15, 127:5,
130:24

**Detective** [52] - 4:12,
7:11, 7:13, 7:19, 8:6,
9:14, 9:16, 9:24, 10:22,

14:21, 15:11, 16:25, 17:7, 24:14, 25:3, 26:2, 43:19, 44:25, 45:10, 47:21, 66:4, 71:25, 72:4, 72:12, 80:16, 80:20, 90:10, 93:7, 121:25, 127:19, 128:1, 129:5, 129:11, 129:19, 131:14, 131:18, 131:23, 156:8, 157:1, 169:22, 170:14, 174:21, 176:9, 176:13, 177:6, 181:10, 183:18, 185:19, 186:19, 207:13, 207:17

**detectives** [1] - 55:3
**determine** [4] - 26:19, 26:20, 37:24, 95:23
**determined** [1] - 19:9
**determining** [1] - 204:6
**device** [7] - 54:25, 55:4, 55:14, 55:20, 55:24, 83:18
**Device** [1] - 128:13
**devices** [2] - 83:16, 185:2
**diagram** [1] - 128:10
**dialed** [8] - 11:9, 11:10, 96:4, 96:10, 96:12, 110:21, 114:4, 141:5
**dialing** [3] - 96:14, 109:9, 110:24
**dialogue** [2] - 38:4, 38:9
**dials** [1] - 110:23
**die** [1] - 45:16
**difference** [8] - 91:21, 112:3, 112:8, 112:18, 112:21, 112:22, 112:24, 113:8
**differences** [1] - 104:7
**different** [37] - 8:6, 26:12, 29:18, 33:6, 33:25, 36:14, 41:3, 41:6, 63:15, 68:7, 71:9, 71:10, 71:12, 77:13, 78:7, 82:24, 83:2, 84:8, 84:22, 91:22, 103:12, 105:1, 106:19, 107:9, 107:24, 108:9, 108:13, 128:14, 131:1, 163:22, 174:20, 183:4, 183:13, 184:23, 185:2, 196:10, 197:6
**difficult** [1] - 208:23
**digits** [2] - 103:24, 181:24
**diligently** [1] - 92:21
**direct** [15] - 7:12, 80:23, 86:25, 87:8, 129:24, 131:24, 132:8, 135:5, 135:18, 136:2, 137:15,

168:7, 175:15, 186:7, 186:12
**DIRECT** [2] - 7:17, 214:5
**directions** [1] - 4:24
**directly** [2] - 3:17, 170:1
**Directly** [1] - 167:22
**directories** [2] - 15:13, 182:5
**directory** [2] - 12:19, 13:24
**dired** [1] - 204:19
**disagrees** [1] - 201:13
**disciplined** [1] - 107:10
**disclose** [1] - 180:6
**disclosed** [1] - 179:20
**disclosure** [1] - 203:4
**Discount** [1] - 136:7
**Discovery** [1] - 11:12
**discrepancies** [6] - 104:22, 123:8, 184:20, 184:22, 185:7, 185:18
**discrepancy** [8] - 104:20, 112:25, 113:14, 113:15, 121:5, 122:10, 123:11
**discuss** [3] - 6:9, 193:21, 205:17
**discussed** [1] - 94:21
**discussing** [2] - 93:8, 211:20
**discussion** [10] - 6:15, 45:7, 45:8, 46:1, 56:2, 89:25, 141:1, 155:3, 164:2
**disguise** [1] - 88:14
**dishonor** [2] - 34:23, 35:18
**Dishonor** [2] - 35:5, 36:5
**dismiss** [1] - 34:5
**displayed** [1] - 136:1
**disprove** [2] - 127:11, 127:17
**disregard** [1] - 40:24
**disrupt** [1] - 38:13
**disruptions** [2] - 37:19, 39:3, 165:17
**disruptive** [3] - 38:16, 40:21, 171:22
**dissent** [1] - 3:7
**distance** [1] - 23:7
**distances** [1] - 23:6
**distinction** [2] - 84:20, 123:18
**district** [4] - 3:7, 48:25, 49:12, 211:21
**DISTRICT** [2] - 1:1, 1:2
**District** [2] - 29:12, 48:16

**disturbance** [1] - 2:7
**disturbances** [1] - 91:15
**Division** [2] - 51:21, 209:25
**DIVISION** [1] - 1:2
**divorce** [1] - 209:4
**Dobropolski** [2] - 180:1, 188:14
**DOC** [1] - 204:8
**doctrines** [1] - 166:25
**document** [18] - 10:11, 27:9, 27:14, 29:14, 30:6, 30:12, 30:15, 34:14, 67:25, 68:1, 68:9, 135:19, 136:5, 139:17, 140:8, 152:5, 153:4, 158:7
**documents** [6] - 32:23, 35:10, 52:8, 131:25, 198:22, 198:23
**Dodge** [6] - 13:19, 18:9, 18:24, 87:16, 87:20, 87:22
**done** [18] - 37:12, 37:20, 63:17, 73:15, 73:16, 73:19, 74:17, 82:1, 83:7, 83:9, 97:21, 127:24, 128:16, 128:18, 151:13, 170:4, 204:10, 211:22
**Donna** [1] - 12:5
**Donte** [1] - 86:22
**door** [1] - 196:7
**door's** [1] - 181:9
**doors** [2] - 196:7, 197:8
**double** [1] - 8:2
**doubt** [2] - 175:20, 175:21, 205:15
**dovetail** [1] - 60:7
**Down** [1] - 32:14
**down** [23] - 4:1, 6:1, 7:21, 15:12, 37:4, 83:13, 85:10, 86:21, 102:17, 102:24, 112:18, 118:11, 125:3, 127:20, 158:16, 165:11, 170:1, 181:25, 188:7, 198:9, 198:10, 198:12, 205:4
**dozens** [2] - 83:10, 176:15
**dress** [1] - 134:4
**drifted** [3] - 198:9, 198:10, 198:11
**drive** [1] - 198:11
**driver's** [1] - 196:7
**dropped** [1] - 88:19
**Drug** [2] - 138:21, 139:14
**drug** [14] - 57:4, 81:6,

81:7, 84:10, 84:20, 106:2, 106:23, 107:1, 107:2, 107:19, 108:10, 150:25, 152:25, 173:10
**drug-related** [2] - 81:6, 107:1
**drugs** [1] - 172:23
**Druid** [2] - 9:3, 170:2
**dual** [1] - 207:1
**Dupont** [1] - 8:13
**duration** [23] - 7:7, 81:3, 98:9, 101:17, 101:23, 102:25, 103:4, 103:17, 103:21, 104:18, 105:19, 105:24, 109:7, 110:22, 111:3, 111:12, 111:14, 119:3, 119:8, 122:9, 122:25, 124:18, 124:21
**durations** [3] - 103:22, 111:10, 124:25
**During** [4] - 17:21, 44:7, 98:17, 147:16
**during** [34] - 19:14, 43:25, 54:15, 62:22, 70:19, 79:7, 79:15, 81:14, 88:15, 125:15, 125:19, 132:8, 135:4, 135:17, 136:1, 137:15, 138:24, 140:25, 141:20, 143:7, 143:16, 146:10, 146:19, 146:20, 147:23, 166:6, 167:11, 179:25, 180:7, 190:15, 191:12, 194:3, 205:5, 206:10
**Dwayne** [2] - 24:14, 181:5
**dying** [1] - 108:5

# E

**e-mail** [2] - 154:6, 154:8
**Earl** [7] - 27:18, 27:21, 33:11, 142:7, 143:13, 144:5
**earliest** [5] - 147:5, 147:9, 147:20, 148:6, 148:16
**Early** [1] - 81:23
**early** [14] - 17:22, 45:18, 80:25, 108:3, 133:18, 142:20, 144:11, 144:14, 146:2, 147:11, 149:13, 163:5, 163:10, 188:19
**earphones** [1] - 72:24
**easy** [2] - 83:3, 104:1
**edge** [1] - 10:8
**Edgecombe** [1] - 8:9
**edited** [1] - 165:13

**Edward** [4] - 27:24, 31:3, 33:6, 144:4
**effect** [5] - 3:17, 26:20, 141:21, 184:3, 197:17
**efficiency** [1] - 25:8
**effort** [1] - 190:19
**eight** [9] - 26:1, 66:4, 66:5, 87:19, 146:25, 147:1, 147:14, 147:16, 147:24
**eighth** [2] - 53:15, 53:16
**Either** [1] - 59:6
**either** [11] - 17:4, 58:2, 60:23, 123:12, 123:20, 127:11, 127:16, 133:3, 143:3, 163:10, 178:4, 197:20, 200:3
**Eldo** [1] - 86:22
**elected** [1] - 3:21
**electronic** [2] - 11:2, 187:16
**elicit** [1] - 175:25
**elicited** [1] - 176:5
**emphasize** [2] - 89:20, 192:1
**employed** [1] - 51:25
**employees** [1] - 83:2
**encompass** [3] - 124:19, 139:2, 148:24
**encompassed** [2] - 148:22, 211:25
**encompasses** [3] - 145:21, 145:23, 146:12
**end** [11] - 31:8, 44:22, 57:22, 78:1, 123:9, 168:7, 175:12, 188:14, 190:24, 191:25, 212:16
**ended** [4] - 54:24, 78:22, 181:24, 185:7
**ending** [3] - 16:8, 22:18, 85:6
**ends** [3] - 93:13, 159:19, 190:2
**Enforcement** [2] - 138:21, 139:14
**engage** [1] - 42:4
**engaged** [2] - 26:8, 26:11, 57:4
**enjoy** [1] - 192:21
**enjoyed** [1] - 7:4
**enter** [1] - 2:1
**entered** [1] - 92:18
**enters** [4] - 7:2, 47:14, 93:3, 156:3
**entire** [6] - 21:2, 44:23, 75:2, 118:12, 139:3, 208:3
**entirety** [2] - 54:5, 132:24
**entitled** [7] - 4:2, 4:7,

26:16, 27:11, 29:20, 138:21, 139:13
**entity** [1] - 138:8
**entry** [1] - 14:12
**envelope** [7] - 27:18, 28:1, 28:8, 35:15, 35:23, 36:6, 136:2
**envelopes** [1] - 34:19
**equipment** [4] - 183:22, 185:11, 185:21, 185:22
**Eric** [2] - 130:5, 167:7
**Ernest** [3] - 93:23, 96:25, 97:19
**error** [2] - 122:1, 122:13
**Especially** [1] - 80:13
**especially** [1] - 45:3
**Esquire** [10] - 1:16, 1:16, 1:17, 1:18, 1:19, 1:19, 1:20, 1:21, 1:22, 1:22
**essence** [1] - 68:4
**Essentially** [1] - 176:24
**essentially** [2] - 183:24, 199:20
**establish** [5] - 121:8, 182:9, 182:13, 182:14, 184:1
**estate** [1] - 64:23
**et** [1] - 215:5
**eternity** [1] - 17:25
**euphemism** [1] - 49:6
**euphemistically** [1] - 48:2
**evacuation** [1] - 89:19
**evaluating** [1] - 27:2
**evening** [1] - 192:21
**event** [1] - 208:25
**events** [1] - 7:9
**eventually** [1] - 37:17
**Everywhere** [1] - 123:19
**evidence** [37] - 3:9, 4:7, 9:15, 10:24, 11:21, 15:20, 26:20, 26:21, 26:23, 27:1, 27:2, 39:19, 41:21, 46:1, 64:4, 64:8, 64:9, 67:4, 86:5, 89:25, 92:6, 119:15, 144:9, 155:3, 168:1, 186:6, 189:11, 191:6, 191:14, 191:18, 192:2, 192:17, 193:22, 196:16, 203:3, 211:7
**evidentiary** [1] - 38:21
**exact** [8] - 83:21, 105:4, 105:6, 105:7, 111:6, 111:10, 117:2, 140:24
**exactly** [7] - 102:23, 105:3, 113:22, 121:23, 128:18, 133:17, 166:11

**Exactly** [3] - 95:7, 115:11, 129:18
**exaggerating** [1] - 206:10
**EXAMINATION** [12] - 7:17, 47:17, 72:2, 80:18, 131:16, 170:12, 214:5, 214:6, 214:7, 214:8, 214:9, 214:10
**examination** [11] - 46:8, 46:24, 131:24, 132:8, 135:5, 135:18, 136:2, 137:15, 168:8, 191:1, 205:3
**examining** [1] - 205:6
**example** [12] - 35:10, 63:17, 65:3, 69:20, 70:12, 83:1, 85:12, 106:6, 111:9, 112:2, 174:23, 182:20
**Excellent** [1] - 199:7
**except** [4] - 40:12, 47:2, 58:22, 135:2
**exception** [1] - 211:9
**excerpt** [5] - 2:24, 3:24, 167:12, 171:16
**excerpts** [3] - 44:4, 165:2, 165:5
**Excuse** [4] - 11:25, 88:6, 91:5, 91:11
**excuse** [2] - 90:22, 91:5
**excused** [4] - 46:3, 90:3, 155:4, 193:3
**executed** [1] - 132:12
**exercise** [1] - 72:11
**Exhibit** [32] - 9:15, 10:24, 11:22, 14:9, 15:19, 17:16, 18:16, 19:8, 19:12, 25:2, 25:16, 29:17, 57:20, 57:21, 58:11, 58:14, 73:21, 74:7, 75:24, 76:11, 96:23, 111:17, 111:24, 136:3, 139:13, 150:21, 152:2, 158:2, 172:12, 173:25, 181:25
**exhibit** [19] - 14:21, 21:10, 25:9, 27:18, 28:2, 29:15, 29:25, 92:14, 136:1, 137:17, 138:20, 139:12, 143:8, 147:22, 150:19, 152:1, 156:1, 163:18, 184:11
**exhibits** [8] - 25:1, 25:3, 25:9, 25:14, 91:25, 92:6, 131:21, 191:5
**exist** [1] - 66:16
**existed** [1] - 67:2
**exit** [3] - 193:6, 196:1, 197:6

**exits** [3] - 90:4, 155:5, 193:2
**expand** [1] - 3:21
**expansive** [1] - 3:9
**expect** [8] - 6:20, 6:24, 191:21, 192:7, 197:17, 199:2, 199:8, 201:2
**expected** [1] - 199:10
**expects** [1] - 7:7
**experience** [2] - 56:6, 106:4
**expert** [6] - 6:10, 91:1, 193:18, 193:19, 194:18, 195:11, 204:16, 204:17, 204:24, 210:5, 212:10
**experts** [1] - 184:7
**expiration** [1] - 154:15
**explain** [5] - 39:24, 87:15, 110:14, 110:16, 200:7
**explanation** [1] - 81:3, 122:13, 200:14
**extra** [1] - 46:21
**eyewitnesses** [1] - 202:24

# F

**face** [3] - 62:21, 63:4
**faces** [1] - 5:8
**facility** [1] - 49:9
**facing** [1] - 10:9
**fact** [83] - 9:11, 11:21, 23:4, 28:15, 28:20, 38:1, 38:10, 38:17, 48:12, 48:23, 49:2, 49:23, 50:3, 52:7, 52:17, 54:17, 55:3, 57:3, 57:16, 59:6, 59:7, 66:9, 66:15, 70:21, 85:10, 87:5, 88:19, 88:25, 90:25, 91:2, 91:21, 92:23, 93:24, 95:17, 97:19, 98:15, 101:13, 102:13, 102:17, 103:7, 104:21, 107:18, 109:2, 109:12, 110:3, 114:17, 114:23, 115:15, 118:7, 118:18, 118:25, 119:16, 120:6, 122:23, 125:15, 127:4, 127:17, 127:19, 128:9, 128:22, 131:3, 138:8, 143:24, 151:24, 154:18, 156:17, 167:16, 167:24, 170:22, 171:14, 171:20, 172:22, 174:7, 183:4, 186:23, 189:21, 192:3, 196:16, 197:4, 197:8, 203:25, 211:3

**factors** [1] - 187:12
**facts** [5] - 26:19, 41:18, 41:22, 70:21, 176:25
**factual** [3] - 207:21, 212:10
**faded** [1] - 58:16
**failure** [1] - 34:23
**faint** [1] - 199:9
**fair** [7] - 48:15, 51:11, 55:6, 64:12, 71:18, 151:25, 179:15
**Fair** [1] - 59:7
**fairly** [2] - 41:16, 121:15
**fall** [1] - 7:4
**familiar** [3] - 81:17, 158:19, 168:20
**familiarity** [1] - 183:21
**families** [1] - 108:2
**family** [11] - 84:9, 84:18, 84:20, 106:23, 107:10, 107:19, 108:10, 108:11, 108:16, 108:17, 180:3
**Family** [1] - 106:25
**far** [25] - 6:9, 46:2, 52:21, 52:22, 58:2, 81:20, 84:18, 89:21, 102:23, 116:21, 116:22, 116:23, 117:16, 120:10, 123:24, 139:6, 139:8, 139:10, 139:11, 139:18, 139:21, 143:25, 144:1, 163:25, 166:22
**fashion** [1] - 129:5
**fast** [1] - 170:15
**fat** [1] - 11:22
**fault** [1] - 204:6
**Fault** [1] - 33:2
**February** [22] - 18:20, 19:14, 25:17, 25:21, 25:22, 30:20, 31:10, 57:16, 57:23, 143:12, 144:6, 144:14, 145:4, 148:22, 149:9, 157:6, 188:19
**Federal** [2] - 52:8, 52:18
**federal** [7] - 50:22, 52:23, 52:25, 60:24, 66:23, 191:12, 211:2
**federally** [1] - 178:16
**feds** [1] - 49:9
**feed** [2] - 10:4
**fell** [4] - 5:25, 90:21, 198:2, 208:23
**felt** [1] - 88:10
**Felton** [2] - 45:11, 45:14
**few** [12] - 11:6, 17:13, 36:19, 82:8, 104:20, 150:1, 155:20, 157:1, 190:25, 191:4, 191:16, 193:4

**Fifth** [2] - 210:25, 211:5
**figure** [1] - 73:2
**figures** [1] - 84:6
**file** [4] - 3:5, 26:16, 52:8, 159:3
**filed** [10] - 25:5, 25:19, 26:17, 33:25, 48:6, 50:7, 50:8, 50:10, 50:14, 210:10
**filing** [1] - 211:11
**fill** [1] - 67:25
**filled** [3] - 44:15, 67:23, 68:3
**filling** [1] - 16:24
**final** [5] - 22:5, 65:9, 82:20, 102:8, 168:23
**Finally** [1] - 24:7, 45:10
**finally** [5] - 3:4, 28:23, 36:5, 38:11, 123:15
**findings** [1] - 207:21
**Fine** [1] - 211:5
**fine** [5] - 54:23, 89:8, 97:8, 208:24
**finish** [2] - 190:19, 207:6
**finished** [2] - 36:25, 47:24
**finishes** [1] - 90:11
**Finney** [1] - 8:1
**fire** [1] - 197:16
**first** [54] - 27:6, 29:19, 30:24, 35:11, 36:7, 36:16, 37:8, 37:10, 37:23, 41:4, 44:11, 53:12, 58:8, 58:23, 58:24, 60:15, 60:16, 81:16, 93:25, 98:19, 101:16, 101:17, 102:7, 108:19, 110:14, 111:1, 111:18, 112:21, 116:13, 120:16, 120:20, 134:22, 142:12, 144:24, 147:4, 147:10, 149:5, 150:13, 156:10, 156:18, 158:14, 158:17, 160:16, 162:15, 171:21, 173:20, 189:21, 199:21, 202:14, 206:22, 209:24
**First** [6] - 7:19, 7:25, 18:16, 20:18, 34:2, 82:8
**Five** [1] - 155:21
**five** [8] - 41:10, 41:19, 76:3, 78:6, 103:19, 110:8, 134:11
**FLANNERY** [24] - 195:6, 195:11, 195:14, 195:16, 195:22, 195:24, 196:5, 196:10, 196:13, 196:16, 196:23, 197:2, 197:10, 197:15, 197:25,

198:4, 198:7, 198:17, 198:19, 198:22, 198:24, 199:5, 207:11, 207:25
**Flannery** [5] - 1:19, 192:9, 195:4, 199:4, 207:10
**flashing** [1] - 64:15
**flat** [1] - 72:24
**flesh** [27] - 6:11, 35:11, 36:21, 36:24, 39:16, 40:3, 48:2, 48:7, 48:9, 48:24, 50:9, 60:8, 91:1, 162:14, 164:16, 165:7, 167:3, 167:7, 170:17, 172:3, 189:8, 189:24, 193:18, 193:21, 204:17, 210:5, 211:18
**flip** [2] - 23:5, 30:21
**floors** [2] - 89:16, 89:19
**flying** [1] - 194:19
**focus** [4] - 141:14, 143:20, 144:18, 149:22
**focusing** [3] - 141:15, 144:4, 163:8
**folks** [1] - 51:17
**follow** [2] - 26:24, 115:3
**following** [3] - 16:25, 106:25, 190:7
**foot** [2] - 198:14
**FOR** [1] - 1:2
**force** [5] - 51:13, 51:14, 52:5, 81:12, 81:13
**Force** [2] - 2:8, 81:1
**foregoing** [1] - 215:7
**forfeit** [1] - 64:23
**forgive** [1] - 60:9
**Forgive** [1] - 62:6
**formal** [1] - 26:17
**forth** [1] - 53:11
**forward** [5] - 75:20, 118:13, 118:14, 119:18, 191:10
**forwarded** [4] - 118:18, 118:21, 120:1, 120:7
**forwarding** [2] - 118:13, 120:14
**foundation** [2] - 9:22, 13:2
**four** [46] - 15:14, 22:5, 33:4, 33:19, 33:24, 34:19, 35:1, 35:19, 35:22, 37:4, 37:13, 37:24, 39:13, 42:16, 42:19, 43:7, 43:10, 49:20, 78:25, 79:3, 81:16, 82:9, 82:12, 84:9, 84:11, 84:22, 95:15, 95:17, 96:5, 112:24, 112:25, 113:19, 113:24, 114:1, 114:11, 114:14,

137:2, 143:10, 148:8, 149:24, 157:15, 172:5, 189:18, 199:9, 209:18
**Fourh** [1] - 3:6
**fourth** [1] - 63:1
**Fourth** [3] - 3:16, 4:4, 4:5
**frame** [4] - 98:17, 125:19, 139:3
**frankly** [3] - 204:22, 208:6, 211:14
**Fraud** [3] - 27:11, 29:14, 153:6
**fraudulent** [1] - 82:14
**free** [2] - 152:1, 211:17
**frequency** [2] - 55:20, 55:22
**fresh** [1] - 68:10
**Friday** [9] - 2:12, 4:11, 7:9, 46:14, 91:16, 91:23, 209:8, 209:10, 209:12
**friendly** [1] - 60:2
**Friends** [1] - 164:12
**friends** [3] - 93:24, 97:20, 143:18
**front** [9] - 9:8, 19:21, 59:13, 68:21, 69:8, 131:20, 152:2, 158:19, 158:21
**full** [6] - 110:22, 121:24, 122:4, 122:10, 146:25, 154:6
**furnish** [3] - 142:1, 143:9, 151:18

## G

**G's** [1] - 174:24
**G-O-O** [1] - 187:18
**GARDNER** [1] - 1:8
**Gardner** [126] - 1:21, 13:20, 17:12, 17:13, 18:1, 18:17, 18:24, 19:13, 20:16, 21:23, 27:19, 27:21, 28:25, 29:19, 29:22, 29:25, 30:8, 33:11, 37:9, 38:3, 38:8, 38:11, 38:16, 39:8, 39:14, 39:16, 39:18, 39:21, 39:24, 40:5, 40:10, 42:9, 43:12, 44:22, 79:6, 85:5, 85:6, 85:11, 86:21, 86:24, 87:1, 87:12, 87:17, 88:20, 96:16, 99:9, 100:11, 100:14, 105:14, 105:18, 113:21, 113:25, 114:8, 114:12, 114:20, 116:1, 128:23, 128:25,

129:21, 132:15, 132:20, 133:10, 133:13, 133:22, 134:1, 134:24, 135:7, 136:16, 136:17, 137:9, 137:21, 137:22, 138:2, 138:5, 139:8, 139:19, 142:8, 142:10, 143:13, 143:22, 144:5, 144:22, 145:11, 146:9, 146:19, 147:3, 147:18, 148:1, 148:10, 148:20, 149:6, 149:19, 150:3, 153:21, 153:22, 156:11, 159:22, 160:23, 161:5, 161:9, 161:15, 162:8, 163:4, 163:9, 163:20, 165:7, 168:14, 181:18, 181:19, 182:7, 182:20, 182:23, 182:24, 186:13, 187:2, 187:6, 187:11, 187:25, 189:7, 189:14, 189:17, 190:2, 203:21, 203:24
**Gardner's** [15] - 18:8, 20:21, 20:22, 21:16, 22:23, 23:20, 24:13, 28:18, 28:19, 34:8, 114:9, 133:16, 162:24, 206:4, 206:10
**gateway** [1] - 3:9
**gather** [1] - 17:8
**gathered** [1] - 79:15
**gear** [1] - 198:2
**geez** [1] - 205:4
**general** [4] - 75:10, 108:6, 166:24, 183:22
**generally** [4] - 5:16, 5:17, 5:18, 150:25
**Generally** [1] - 5:17
**gentleman** [2] - 133:12, 195:7
**gentlemen** [21] - 7:3, 26:6, 57:8, 59:14, 93:4, 134:1, 135:21, 136:4, 150:24, 155:1, 156:4, 161:14, 162:18, 163:14, 165:16, 167:2, 168:15, 176:23, 183:17, 183:20, 193:1
**Georges** [1] - 208:22
**Gerard** [1] - 1:19
**germane** [1] - 135:1
**Giant** [1] - 200:2
**girlfriend** [2] - 200:7, 201:19
**given** [5] - 107:7, 107:11, 157:22, 158:23
**Given** [1] - 158:2
**glance** [1] - 9:8
**Glaser** [1] - 201:4
**Goo** [6] - 12:19, 12:22,

87:23, 144:5, 187:18, 187:24
**Goose** [12] - 18:2, 18:6, 18:11, 18:14, 19:4, 19:14, 140:9, 140:11, 140:15, 141:2, 141:6, 143:3
**Government** [17] - 1:15, 9:15, 10:24, 11:22, 14:9, 15:19, 17:16, 18:16, 19:8, 19:12, 25:2, 25:16, 29:17, 117:24, 136:3, 173:25, 181:25
**government** [26] - 3:21, 3:24, 4:2, 26:9, 26:22, 47:8, 63:8, 63:12, 64:8, 69:5, 90:10, 111:17, 139:13, 143:8, 155:25, 163:19, 165:2, 167:25, 169:17, 169:19, 172:11, 196:21, 203:3, 207:6, 207:19, 210:22
**Government's** [6] - 57:21, 96:23, 111:24, 150:21, 152:2, 158:2
**government's** [11] - 3:10, 3:15, 3:19, 4:6, 67:4, 131:21, 155:8, 190:24, 196:24, 201:22, 205:14
**GPS** [7] - 54:25, 55:4, 55:14, 55:20, 55:24, 83:18, 128:11
**grand** [55] - 3:18, 24:15, 24:20, 48:18, 57:1, 61:14, 61:18, 61:22, 61:25, 62:8, 62:11, 66:23, 68:21, 68:25, 69:8, 69:17, 70:20, 72:8, 73:4, 73:5, 73:8, 73:14, 73:17, 73:22, 74:2, 74:15, 74:20, 75:6, 75:8, 75:16, 75:25, 76:1, 76:5, 76:7, 76:19, 76:21, 76:22, 76:25, 77:7, 79:25, 80:4, 80:9, 107:18, 108:8, 108:12, 176:8, 176:10, 176:12, 176:15, 176:18, 177:3, 177:11, 177:17, 177:19, 179:16
**great** [2] - 187:3, 213:1
**Great** [1] - 199:7
**greater** [1] - 26:13
**Green** [4] - 23:22, 24:10, 130:4, 130:10
**greet** [1] - 5:4
**grew** [1] - 134:17
**group** [6] - 32:14, 80:24, 81:2, 81:5, 81:9,

183:23
**guardian** [1] - 203:18
**guess** [15] - 6:4, 10:7, 72:6, 73:10, 81:14, 90:5, 137:17, 148:18, 155:14, 158:6, 162:13, 193:17, 195:5, 197:2, 197:19
**guessing** [2] - 136:23, 138:3
**guide** [2] - 173:4, 173:11
**gun** [1] - 172:19
**gunshots** [1] - 76:3
**guy** [2] - 134:25, 135:1
**guys** [2] - 71:20, 71:21

## H

**hair** [1] - 6:4
**hale** [1] - 7:6
**half** [4] - 60:21, 60:24, 146:13, 209:10
**Hall** [1] - 167:7
**halls** [1] - 210:2
**hamstrung** [1] - 3:23
**hand** [7] - 18:2, 95:21, 96:1, 136:11, 142:5, 145:14
**handed** [1] - 150:21
**handguns** [1] - 23:11
**handing** [1] - 147:22
**handle** [2] - 196:6, 196:8
**hands** [2] - 204:7, 209:12
**handwritten** [5] - 12:15, 14:4, 18:10, 183:14
**Handy** [13] - 85:9, 85:16, 115:6, 150:8, 150:17, 152:10, 152:19, 153:9, 156:12, 156:19, 157:3, 161:5
**hanging** [1] - 95:16
**hangs** [1] - 110:23
**Hanlon** [3] - 1:16, 92:15, 191:8
**happy** [2] - 46:25, 193:11
**hard** [2] - 84:2, 141:10
**HARDING** [50] - 2:4, 2:6, 2:19, 2:22, 5:24, 7:18, 8:24, 9:24, 10:21, 12:9, 13:8, 20:17, 27:5, 43:18, 50:23, 52:15, 52:19, 53:7, 54:19, 69:5, 70:4, 70:16, 91:13, 92:3, 92:5, 92:9, 92:12, 92:17, 92:23, 129:9, 155:17, 155:24, 164:9, 166:4,

166:19, 167:17, 169:19, 170:13, 171:3, 171:13, 188:25, 189:2, 189:6, 190:22, 209:14, 210:4, 210:8, 210:15, 214:5, 214:10

**Harding** [39] - 1:16, 7:16, 8:4, 9:6, 9:23, 10:15, 12:2, 12:8, 13:3, 27:4, 43:17, 46:14, 47:25, 51:13, 73:9, 91:12, 91:23, 92:15, 131:23, 132:14, 135:4, 135:18, 136:15, 137:16, 137:17, 155:16, 168:8, 169:12, 170:11, 171:1, 171:25, 188:24, 190:19, 190:25, 191:7, 201:13, 209:13, 210:13, 210:19

**Harding's** [7] - 132:8, 133:2, 156:15, 165:21, 166:7, 197:3, 199:19

**hardship** [1] - 193:8

**harmless** [1] - 89:18

**HARRIS** [1] - 1:7

**Harris** [50] - 1:18, 13:15, 28:4, 28:8, 32:4, 33:8, 33:10, 33:11, 33:14, 33:15, 34:15, 34:16, 37:9, 38:2, 40:12, 42:20, 43:4, 44:21, 68:7, 68:12, 68:18, 68:20, 69:24, 69:25, 72:15, 76:23, 77:19, 78:1, 78:21, 79:2, 79:18, 85:3, 91:22, 96:17, 96:21, 100:15, 100:19, 100:21, 109:7, 143:22, 163:5, 163:6, 163:7, 175:6, 175:9, 179:21, 180:7, 183:3, 188:4

**Harris's** [4] - 32:17, 73:21, 77:14, 108:20

**hashed** [1] - 193:16

**Hayes** [19] - 8:14, 61:2, 67:18, 68:18, 68:20, 69:23, 70:24, 71:15, 76:23, 76:25, 77:7, 174:19, 174:24, 175:3, 177:18, 178:1, 178:23, 180:4, 180:7

**head** [1] - 167:9

**heads** [1] - 75:19

**headway** [1] - 39:12

**healthy** [1] - 207:7

**hear** [14] - 48:12, 48:13, 53:4, 56:3, 70:14, 74:23, 89:14, 90:25, 98:2, 126:15, 165:5, 165:6, 175:18, 193:23

**heard** [62] - 2:16, 2:17, 8:16, 8:19, 9:1, 12:20, 13:20, 45:7, 45:10, 45:11, 46:2, 46:13, 46:15, 49:1, 50:5, 53:5, 59:25, 64:5, 64:18, 65:11, 67:12, 72:19, 73:5, 74:21, 75:11, 75:17, 90:1, 91:21, 98:19, 126:3, 134:16, 137:8, 138:11, 140:21, 140:25, 141:21, 143:16, 164:2, 164:6, 164:15, 167:10, 167:11, 171:16, 171:19, 173:22, 174:10, 174:15, 174:19, 174:23, 174:24, 175:6, 175:9, 175:13, 175:15, 175:19, 184:17, 189:14, 189:16, 194:12, 200:12, 203:22

**hearing** [5] - 36:17, 38:21, 38:23, 38:24, 169:22

**hearings** [8] - 36:11, 36:15, 40:19, 41:4, 43:2, 53:9, 133:3, 163:25

**hearsay** [4] - 69:6, 177:11, 181:8, 190:17

**hearty** [1] - 7:6

**Heights** [5] - 7:20, 7:22, 8:21, 8:22, 173:13

**help** [3] - 10:10, 10:17, 147:21

**helpful** [1] - 16:10

**Herbert** [5] - 61:4, 61:10, 61:21, 62:1, 62:8

**hereby** [1] - 215:3

**hereunto** [1] - 215:10

**herself** [2] - 166:3, 166:14

**highlighted** [1] - 111:21

**hill** [3] - 198:9, 198:10, 198:12

**Hill** [2] - 9:3, 170:2

**himself** [3] - 184:16, 189:8, 189:15

**hint** [1] - 194:25

**historic** [2] - 116:20, 117:1

**history** [1] - 3:12

**hit** [4] - 74:17, 74:21, 74:24, 75:14

**hitting** [1] - 22:7

**hold** [7] - 9:7, 69:15, 91:8, 97:4, 125:4, 189:4, 193:4

**holding** [3] - 8:3, 8:5, 196:7

**home** [6] - 12:13, 13:15, 63:18, 65:2, 96:20

**Homicide** [3] - 81:10, 81:11, 81:12

**homicide** [21] - 51:20, 55:19, 74:19, 74:23, 81:12, 81:13, 81:15, 81:18, 88:5, 99:19, 127:4, 127:7, 130:24, 131:1, 142:15, 144:25, 146:6, 162:6, 168:11, 202:25, 209:17

**Homicides** [1] - 142:17

**homicides** [4] - 81:6, 130:6, 134:11, 134:12

**Honda** [8] - 136:11, 136:15, 136:17, 136:21, 136:25, 137:4, 137:13, 186:13

**Honor** [103] - 2:16, 2:17, 2:19, 2:22, 4:15, 5:12, 5:20, 5:24, 6:6, 6:8, 6:13, 6:25, 7:15, 7:19, 8:5, 9:25, 10:3, 10:19, 11:24, 13:2, 20:5, 25:9, 25:18, 26:3, 27:6, 27:14, 42:22, 45:3, 45:23, 46:12, 47:5, 47:6, 47:11, 47:19, 53:22, 69:5, 70:7, 70:16, 84:25, 89:6, 90:7, 90:20, 91:5, 91:13, 91:18, 92:13, 93:1, 93:7, 107:13, 126:22, 131:11, 131:20, 150:19, 154:24, 155:15, 155:17, 156:7, 163:18, 169:1, 169:9, 170:6, 170:8, 170:10, 171:23, 172:6, 172:20, 177:14, 177:24, 178:8, 179:2, 180:10, 181:7, 190:22, 195:6, 195:16, 196:5, 197:3, 197:11, 197:16, 198:5, 198:19, 199:2, 199:8, 199:17, 202:16, 202:24, 203:22, 204:3, 204:4, 205:1, 205:19, 205:23, 206:21, 207:8, 207:11, 208:12, 209:2, 209:7, 209:15, 210:4, 210:18, 210:24, 211:17

**Honorable** [1] - 1:13

**hook** [1] - 208:16

**hoping** [5] - 5:12, 155:7, 206:24, 212:16, 212:25

**Hospital** [1] - 16:17

**hour** [10] - 37:19, 44:14, 116:16, 146:22, 147:1, 147:16, 165:10, 190:6, 190:15, 191:9

**hours** [16] - 44:12, 44:13, 72:25, 144:11, 144:15, 146:3, 146:17, 146:20, 146:25, 147:8, 147:11, 147:14, 147:24, 148:8, 149:13, 189:17

**hours'** [1] - 194:20

**house** [12] - 8:14, 66:5, 70:19, 77:25, 110:6, 174:16, 187:17, 188:8, 200:13, 200:19, 200:23, 200:25

**housed** [2] - 49:2, 49:14

**housekeeping** [1] - 191:4

**huge** [2] - 148:25, 183:25

**hundred** [1] - 96:2

**hundreds** [1] - 77:13

**hung** [1] - 114:4

**hurry** [1] - 170:15

**husband** [1] - 107:21

**I**

**ID** [3] - 68:24, 69:8, 152:14

**ID's** [2] - 69:1, 70:22

**idea** [4] - 8:5, 115:15, 135:25, 204:24

**identical** [11] - 27:17, 27:24, 28:5, 30:24, 32:24, 33:3, 33:19, 35:1, 37:5, 41:6, 182:12

**identification** [4] - 65:10, 68:6, 68:23, 133:25

**identifications** [2] - 71:14, 72:14

**identified** [9] - 35:7, 35:11, 68:17, 68:18, 68:20, 70:8, 71:11, 105:22, 106:22

**identify** [17] - 65:14, 67:23, 70:8, 84:9, 85:4, 106:21, 126:6, 126:14, 126:15, 126:17, 130:14, 134:23, 134:24, 138:21, 175:3, 175:24, 194:7

**identifying** [1] - 35:15

**identities** [1] - 153:2

**ignition** [1] - 196:17

**III** [10] - 31:3, 33:6, 56:3, 56:6, 56:9, 56:12, 56:13, 56:17, 56:19, 144:5

**ilk** [1] - 65:9

**illegal** [2] - 83:24, 84:5

**imagine** [2] - 205:14, 206:6

**immediately** [2] - 95:16,

110:23

**immunity** [1] - 24:20

**Impact** [1] - 51:21

**important** [7] - 127:10, 128:6, 200:6, 200:10, 206:11, 212:17, 212:18

**impose** [1] - 193:8

**improper** [1] - 202:13

**IN** [1] - 1:1

**inadvertent** [1] - 65:16

**incarcerated** [1] - 211:14

**incarceration** [1] - 49:3

**incident** [10] - 76:22, 89:12, 89:15, 107:23, 116:22, 145:20, 145:22, 162:15, 165:15, 165:22

**include** [3] - 3:10, 3:22, 100:4

**included** [2] - 2:23, 52:22

**includes** [2] - 2:12, 3:18

**including** [2] - 64:23, 195:8

**Including** [1] - 59:9

**incoming** [17] - 11:6, 95:22, 101:24, 102:1, 102:4, 102:15, 103:19, 103:24, 104:2, 112:1, 118:2, 124:18, 151:18, 190:9, 190:13

**incompetent** [1] - 29:6

**inconsistent** [1] - 196:23

**incorporate** [1] - 131:8

**incorrect** [2] - 177:23, 197:11

**increments** [1] - 110:20

**incrimination** [1] - 209:16

**INDEX** [1] - 214:1

**indicate** [2] - 22:9, 98:10

**indicated** [20] - 3:15, 77:3, 107:3, 107:21, 108:5, 132:19, 133:21, 136:23, 137:21, 138:10, 142:22, 149:12, 149:25, 150:7, 151:5, 157:11, 163:21, 201:21, 202:3, 210:6

**indicates** [1] - 99:23

**indicating** [1] - 123:25

**indication** [1] - 94:22

**indicted** [1] - 177:1

**indictment** [7] - 3:11, 3:14, 3:18, 4:2, 26:7, 176:19

**indirectly** [1] - 200:25

**Indirectly** [1] - 203:19

**individual** [18] - 44:13, 74:17, 75:14, 76:2, 81:21, 84:3, 84:5, 87:4, 94:6, 94:25, 98:13, 130:25, 148:4, 181:12, 185:10, 195:25, 197:6
**Individual** [2] - 70:2, 70:3
**individually** [3] - 37:24, 39:13, 40:15
**individuals** [14] - 64:6, 70:19, 71:11, 100:24, 106:18, 134:17, 135:2, 143:17, 144:2, 145:13, 162:19, 166:21, 181:5, 184:3
**indulgence** [4] - 7:9, 71:23, 157:24, 170:8
**Infiniti** [6] - 195:7, 195:10, 195:11, 197:8, 198:16, 207:15
**information** [22] - 16:24, 75:7, 83:11, 83:13, 85:13, 89:10, 108:22, 128:6, 129:20, 130:23, 131:1, 131:4, 131:8, 142:2, 151:18, 151:24, 151:25, 183:20, 183:22, 184:9, 199:23, 210:11
**initial** [4] - 37:10, 44:10, 55:1, 70:19
**initiated** [1] - 185:5
**inquired** [1] - 105:1
**inside** [1] - 197:15
**insofar** [1] - 26:25
**instances** [2] - 72:15
**Instead** [1] - 9:12
**instead** [2] - 2:14, 211:7
**instruct** [1] - 26:13
**instruction** [1] - 207:1
**instructions** [2] - 26:24, 27:2
**insure** [1] - 23:4
**intend** [3] - 3:5, 126:21, 194:1
**intention** [3] - 3:15, 141:1, 211:3
**intercept** [1] - 83:19
**interest** [2] - 29:9, 41:15
**interested** [1] - 193:18
**interesting** [1] - 198:15
**interpret** [4] - 26:21, 26:22, 26:23, 26:24
**interpretation** [1] - 26:25
**interrupt** [1] - 38:18
**interrupted** [2] - 54:14, 85:24

**interrupting** [1] - 53:11
**interview** [3] - 61:12, 178:1, 212:13
**interviewed** [4] - 9:17, 178:4, 178:5, 201:21
**intimidate** [1] - 202:12
**Intrepid** [6] - 13:20, 18:9, 18:24, 87:16, 87:20, 87:22
**introduce** [2] - 4:7, 191:14
**introduced** [1] - 168:1
**introducing** [1] - 207:20
**introduction** [1] - 3:9
**investigate** [5] - 52:7, 55:11, 81:6, 81:18, 127:10
**investigated** [3] - 55:2, 63:14, 127:7
**investigating** [1] - 52:4
**investigation** [27] - 54:24, 56:3, 56:12, 62:9, 70:20, 79:14, 80:23, 81:4, 81:15, 81:16, 82:1, 89:17, 89:23, 106:7, 107:20, 108:3, 127:4, 135:2, 137:2, 141:20, 151:14, 177:5, 177:6, 179:20, 180:6, 181:16
**investigations** [4] - 56:7, 81:23, 106:6, 183:24
**investigative** [2] - 55:7, 55:9
**investigator** [2] - 81:12, 127:18
**investigators** [4] - 74:18, 74:23, 81:25, 130:22
**invite** [1] - 4:12
**inviting** [1] - 43:20
**involve** [1] - 212:3
**involved** [8] - 2:25, 25:11, 26:14, 50:8, 56:6, 106:2, 127:4, 182:21
**involvement** [2] - 206:4, 209:18
**involving** [3] - 137:8, 144:24, 146:6
**Irene** [2] - 126:1, 126:11
**ironic** [1] - 49:20
**issue** [4] - 6:11, 37:17, 204:3, 211:1
**issued** [6] - 149:23, 151:8, 151:9, 151:13, 151:14, 157:2
**issues** [7] - 37:16, 38:9, 46:3, 90:1, 156:1, 193:16, 194:10

**Itchy** [2] - 167:8, 212:6
**Item** [1] - 11:12
**item** [2] - 135:21, 163:17
**itemization** [2] - 207:15, 207:22
**items** [4] - 23:10, 23:11, 132:10, 207:22
**itself** [1] - 185:9

## J

**Jamane** [12] - 20:15, 21:1, 21:6, 21:12, 22:18, 168:24, 190:3, 190:16, 204:2, 205:23, 209:15, 210:25
**James** [1] - 1:21
**January** [16] - 17:21, 25:24, 25:25, 39:7, 39:23, 43:7, 57:22, 58:1, 58:9, 78:5, 78:12, 78:16, 78:21, 165:17, 165:22, 188:19
**Jaquetta** [9] - 28:9, 28:10, 31:10, 32:20, 34:2, 82:15, 84:14, 109:12, 109:18
**jibberish** [1] - 51:6
**job** [1] - 200:3
**Joe** [1] - 85:14
**John** [1] - 179:1
**Johnson** [12] - 20:15, 21:1, 21:7, 21:12, 22:18, 168:24, 190:3, 190:16, 204:3, 205:23, 209:15, 210:25
**joining** [1] - 172:18
**Jones** [5] - 19:22, 23:1, 188:1, 190:4, 209:17
**Joyce** [11] - 12:14, 14:4, 14:10, 30:19, 31:23, 34:8, 87:10, 87:14, 87:22, 88:1, 183:14
**judge** [14] - 3:7, 20:18, 37:17, 38:3, 38:13, 40:14, 41:15, 42:20, 43:22, 53:18, 53:19, 54:8, 54:9, 167:20
**Judge** [5] - 1:13, 2:4, 36:18, 54:18, 211:15
**judgment** [3] - 27:1, 133:24, 134:8
**Judicial** [1] - 208:8
**jump** [1] - 206:18
**June** [9] - 21:17, 22:2, 87:17, 160:10, 162:11, 162:24, 163:5, 188:1, 188:9

**jurat** [7] - 30:15, 30:17, 31:8, 31:15, 31:22, 32:3, 32:9
**jurisdiction** [14] - 34:6, 36:22, 36:23, 43:3, 50:22, 51:11, 52:9, 52:13, 52:17, 52:25, 53:4, 60:18, 170:23, 171:11
**jurors** [2] - 9:6, 105:4
**jury** [120] - 2:7, 3:18, 6:18, 7:3, 9:8, 24:15, 24:20, 26:7, 40:24, 45:11, 45:24, 46:3, 46:20, 46:21, 48:18, 53:17, 53:19, 53:25, 54:1, 54:11, 54:12, 57:1, 57:8, 59:14, 61:14, 61:18, 61:22, 61:25, 62:8, 62:11, 66:9, 66:24, 68:21, 68:25, 69:8, 69:17, 70:20, 72:8, 73:4, 73:5, 73:8, 73:14, 73:17, 73:22, 74:2, 74:16, 74:20, 75:6, 75:8, 75:16, 75:25, 76:1, 76:5, 76:7, 76:19, 76:21, 76:22, 76:25, 77:7, 79:25, 80:4, 80:9, 89:9, 90:2, 90:23, 91:24, 92:5, 92:20, 102:12, 107:18, 108:8, 108:12, 128:13, 134:1, 135:22, 136:1, 136:5, 150:3, 150:25, 152:24, 153:22, 155:9, 155:13, 160:19, 161:14, 161:18, 162:2, 162:19, 163:14, 165:3, 165:16, 167:2, 167:13, 174:1, 176:8, 176:10, 176:12, 176:15, 176:18, 176:23, 177:2, 177:4, 177:12, 177:17, 177:20, 179:16, 183:17, 183:20, 190:23, 192:3, 193:24, 193:25, 194:2, 200:10, 200:12, 209:9, 209:10, 212:25
**Jury** [9] - 1:14, 2:1, 7:2, 47:14, 90:4, 93:3, 155:5, 156:3, 193:2
**jury's** [4] - 54:14, 138:11, 189:11, 209:12
**Jury's** [2] - 90:3, 155:4
**justice** [1] - 191:13

## K

**keep** [9] - 46:2, 90:1, 91:6, 106:2, 150:1, 155:4, 155:9, 192:23,

211:4
**keeping** [1] - 92:23
**keeps** [1] - 159:12
**KEITH** [1] - 214:4
**Kelsey** [1] - 1:17
**Kemp** [13] - 18:2, 18:17, 64:14, 105:14, 105:22, 105:24, 106:6, 106:13, 140:12, 140:13, 141:6, 141:17, 142:4
**Kemp's** [1] - 105:17
**kept** [1] - 100:22
**key** [1] - 196:17
**kidnapped** [2] - 80:7, 181:14
**kidnapping** [1] - 180:18
**kids** [1] - 203:2
**kill** [2] - 141:2, 209:4
**killed** [12] - 118:19, 142:19, 142:23, 142:25, 144:10, 144:13, 145:8, 147:8, 147:11, 148:16, 153:23, 200:17
**Kind** [1] - 40:21
**kind** [16] - 24:17, 29:24, 31:14, 31:15, 32:2, 32:3, 32:23, 33:18, 80:2, 80:9, 150:1, 152:25, 165:17, 198:21, 204:3, 205:7
**kinds** [2] - 29:18, 33:21
**Klas** [4] - 9:10, 178:11, 178:19, 188:22
**Knoll** [2] - 23:22, 24:10
**knowing** [2] - 94:25, 115:17, 157:18
**knowledge** [8] - 20:11, 63:13, 67:1, 79:21, 80:7, 104:11, 127:25, 166:24
**known** [5] - 5:15, 56:12, 57:3, 58:3, 58:12, 176:9
**knows** [3] - 70:24, 97:21, 203:3
**Kobe** [1] - 134:25
**Kurland** [9] - 1:22, 4:10, 6:19, 7:5, 133:13, 204:13, 205:17, 205:18, 205:25
**KURLAND** [14] - 6:20, 6:24, 155:21, 205:19, 205:21, 205:23, 206:16, 206:18, 206:25, 207:3, 207:7, 210:24, 211:11, 211:15
**Kurland's** [1] - 212:16

## L

**labeled** [3] - 30:8, 30:12, 137:18

lack [1] - 34:5
lacks [1] - 53:3
Ladies [2] - 7:3, 26:6
ladies [19] - 57:8, 59:14, 93:4, 133:25, 135:21, 136:4, 150:24, 155:1, 156:4, 161:14, 162:18, 163:14, 165:16, 167:2, 168:15, 176:23, 183:17, 183:20, 193:1
Lakeisha [1] - 199:14
land [13] - 79:2, 82:10, 94:19, 94:20, 96:6, 100:21, 100:22, 108:20, 108:24, 109:4, 109:7, 141:11
Land [2] - 16:14, 83:1
Lane [3] - 22:10, 23:25
language [2] - 33:4, 48:5
large [3] - 51:17, 65:2
larger [1] - 7:22
Laslett [2] - 207:13, 207:17
last [25] - 11:6, 11:9, 13:6, 17:24, 19:17, 24:13, 46:13, 63:8, 91:17, 99:16, 101:14, 101:16, 101:22, 110:14, 116:6, 131:23, 142:7, 142:18, 154:21, 157:15, 165:22, 168:13, 174:14, 186:9, 204:14
lasted [3] - 114:3, 119:1, 124:19
late [6] - 125:7, 133:18, 155:8, 161:1, 163:6, 212:15
Latin's [1] - 166:12
Laura [1] - 1:17
law [8] - 26:25, 27:2, 50:22, 50:25, 51:2, 158:11
Lawlor [14] - 1:18, 46:10, 47:15, 70:6, 79:13, 164:18, 170:16, 171:14, 171:16, 172:8, 172:22, 173:19, 192:8, 208:20
LAWLOR [10] - 2:16, 13:2, 46:11, 47:18, 84:25, 172:20, 177:13, 181:3, 208:21, 214:6
Lawlor's [1] - 46:9
lawyer [1] - 201:5
Lawyer's [2] - 90:16, 164:14
Lawyers [1] - 56:13
lawyers [7] - 163:22, 164:3, 164:6, 166:21,

167:13, 167:16, 205:11
lay [1] - 202:24
lead [4] - 87:6, 171:1, 171:24, 178:14
leading [8] - 24:10, 42:22, 101:7, 114:2, 117:14, 171:23, 172:9, 178:8
leads [2] - 119:6, 124:21
learned [4] - 89:11, 178:6, 178:11, 207:17
least [25] - 3:13, 27:21, 48:16, 50:3, 51:6, 57:9, 84:19, 91:3, 99:11, 99:18, 107:8, 117:4, 133:6, 139:19, 140:1, 149:2, 154:12, 155:9, 164:1, 164:7, 183:15, 191:7, 204:8, 207:22
leave [5] - 45:25, 89:15, 89:24, 155:2, 192:21
leaving [1] - 163:7
led [1] - 181:14
Lee [8] - 28:4, 28:8, 32:4, 33:14, 33:15, 34:15, 130:5
left [8] - 58:23, 59:2, 108:19, 114:19, 115:16, 126:1, 136:11, 200:18
left-hand [1] - 136:11
legal [3] - 166:25, 193:16, 193:17
legitimate [1] - 82:22
legitimately [1] - 203:25
length [4] - 44:19, 44:23, 120:18, 187:3
less [2] - 146:17, 146:21
letter [3] - 73:24, 179:10, 199:19
letting [1] - 98:6
level [1] - 45:5
Liberty [2] - 22:4, 23:14
license [1] - 136:23
lie [1] - 52:18
lies [1] - 52:13
life [1] - 189:24
light [4] - 27:2, 123:10, 199:19
lightly [1] - 52:13
likelihood [1] - 122:7
likely [5] - 123:14, 180:21, 190:20, 191:23, 194:6
likewise [2] - 58:11, 59:13
Likewise [1] - 53:25
limit [4] - 3:15, 3:19, 3:23, 201:14

limitations [2] - 157:23, 158:3
limited [3] - 52:9, 157:3, 166:16
limiting [1] - 3:24
line [24] - 37:4, 63:5, 69:10, 70:11, 70:14, 71:8, 76:13, 79:2, 94:19, 94:20, 96:6, 100:21, 108:20, 108:24, 109:4, 109:7, 122:18, 140:23, 141:11, 143:22, 156:17, 156:18, 156:21, 157:16
Line [3] - 73:10, 77:4
lined [1] - 38:22
lines [3] - 79:2, 82:10, 100:22
links [1] - 184:1
Lisa [3] - 8:2, 144:13, 172:10
list [9] - 11:8, 17:4, 18:17, 18:23, 25:9, 92:14, 92:23, 94:1, 211:19
Listed [1] - 14:3
listed [31] - 14:15, 14:25, 16:25, 17:11, 18:11, 78:20, 86:14, 86:17, 87:14, 87:22, 88:13, 93:9, 93:13, 93:17, 95:15, 96:24, 97:2, 97:16, 99:2, 99:4, 99:11, 109:12, 109:18, 112:11, 118:22, 121:18, 182:19, 184:21, 184:22, 187:18, 187:23
listen [3] - 71:19, 71:22, 125:25
listened [9] - 73:18, 74:12, 75:23, 126:11, 126:23, 173:2, 173:6, 174:2, 174:3
listening [1] - 165:10
listing [1] - 87:9
listings [2] - 87:1, 87:8
lists [1] - 95:11
literally [1] - 190:24
litigant [1] - 26:15
live [8] - 35:11, 36:21, 48:7, 95:9, 115:12, 189:8, 206:20, 210:5
living [6] - 17:4, 183:10, 183:12, 183:13, 188:7, 188:20
lo [1] - 186:9
local [1] - 100:22
locate [1] - 207:18
located [1] - 9:7
location [7] - 8:1, 22:10, 23:7, 23:10,

23:12, 164:22, 187:14
locations [3] - 7:20, 7:23, 168:10
Loch [3] - 140:18, 140:20, 140:21
lock [2] - 196:6, 197:9
locked [13] - 98:15, 162:3, 162:8, 162:20, 163:1, 163:9, 163:15, 195:22, 196:2, 197:5, 197:7, 197:15
locking [1] - 195:17, 195:18, 195:19, 196:19
locks [2] - 196:12, 197:18
lockup [3] - 50:5, 76:23, 177:19
Lombard [1] - 1:25
Look [2] - 104:23, 113:13
look [25] - 72:21, 73:9, 74:25, 76:12, 77:4, 86:4, 95:21, 95:22, 102:14, 103:1, 104:1, 105:5, 112:15, 112:25, 113:4, 117:20, 121:10, 130:16, 142:9, 145:17, 149:3, 152:4, 153:11, 182:10, 210:22
looked [8] - 40:1, 103:14, 138:25, 139:20, 140:5, 143:6, 149:24, 150:12
Looking [3] - 133:19, 146:8, 157:22
looking [20] - 58:11, 58:14, 102:13, 102:25, 113:18, 120:24, 121:2, 133:15, 139:6, 139:17, 140:2, 145:18, 146:25, 147:20, 149:6, 158:15, 159:7, 160:4, 168:9, 169:2
looks [4] - 19:17, 103:2, 146:13, 148:8
loosely [1] - 137:18
low [2] - 17:14, 108:6
lower [1] - 22:15
LP [1] - 151:9
luck [1] - 94:16
lunch [4] - 46:21, 47:9, 89:10, 89:15
Luncheon [1] - 91:10

**M**

machine [1] - 94:23
Magginson [1] - 126:11
Magginson's [2] -

65:17, 126:1
mail [43] - 65:15, 65:16, 71:8, 95:1, 95:16, 95:23, 105:25, 110:21, 110:25, 111:2, 114:6, 114:16, 114:17, 114:18, 114:19, 114:21, 114:24, 115:2, 115:4, 115:7, 115:9, 119:10, 120:20, 123:7, 123:13, 123:14, 123:16, 123:20, 123:21, 125:25, 126:7, 126:18, 154:6, 154:8, 173:20, 174:4, 174:8, 174:12, 175:18, 185:13, 185:15, 190:11
mailbox [1] - 114:21
Mailed [1] - 28:1
mailed [5] - 25:14, 27:17, 34:19, 35:14, 35:25
mails [4] - 94:7, 95:13, 96:7
major [1] - 208:13
majority [5] - 97:9, 97:11, 97:14, 182:22, 184:5
man [13] - 35:12, 36:24, 45:11, 48:7, 74:17, 74:21, 74:24, 75:14, 165:7, 174:24, 189:8, 189:24, 211:18
Man [2] - 167:8, 212:6
manner [4] - 195:17, 195:18, 196:18, 215:9
manners [1] - 84:8
manual [1] - 197:25
Manuelian [1] - 203:5
map [5] - 7:22, 21:19, 169:2, 169:25, 170:7
March [35] - 17:22, 18:21, 19:14, 25:23, 39:21, 99:16, 144:10, 146:3, 146:14, 146:15, 146:23, 146:24, 147:6, 148:9, 148:13, 148:17, 148:18, 148:24, 149:10, 149:13, 149:15, 154:22, 156:21, 157:9, 159:14, 159:19, 159:21, 160:7, 160:17, 161:12
Mark [1] - 61:4
mark [1] - 163:17
marked [10] - 21:9, 21:10, 22:11, 25:2, 28:3, 73:20, 111:17, 111:23, 158:2, 186:6
marshal's [2] - 50:5, 76:22
marshals [11] - 37:17, 37:21, 38:11, 39:18,

40:5, 42:8, 43:11, 44:1,
89:16, 89:22, 155:19
  **marshals'** [1] - 43:12
  **MARTIN** [32] - 1:8, 2:17,
5:20, 5:22, 10:3, 10:11,
12:4, 28:2, 46:12, 47:6,
47:11, 47:13, 72:3,
170:24, 171:5, 171:23,
172:6, 177:14, 177:24,
178:8, 179:2, 180:10,
181:7, 193:9, 193:11,
193:14, 193:23, 197:14,
198:11, 209:2, 209:7,
214:7
  **Martin** [118] - 1:19, 1:20,
9:16, 12:11, 12:14, 15:1,
15:3, 15:25, 16:24, 17:1,
18:1, 18:17, 19:13, 27:9,
28:20, 28:23, 30:19,
31:18, 31:20, 31:23,
33:7, 33:8, 33:15, 35:4,
35:7, 37:1, 37:3, 37:8,
38:2, 40:10, 42:8, 44:21,
46:19, 67:15, 68:11,
68:13, 68:18, 69:21,
70:15, 72:5, 72:15,
77:20, 77:25, 79:10,
86:15, 86:19, 86:24,
87:12, 87:14, 88:14,
88:23, 91:14, 93:9,
93:21, 93:24, 94:1, 95:4,
96:20, 96:25, 97:17,
97:20, 97:24, 99:2, 99:4,
99:7, 99:8, 99:12, 99:14,
99:22, 101:10, 105:14,
105:18, 111:9, 111:12,
113:20, 113:25, 114:11,
115:20, 115:21, 116:1,
116:4, 116:6, 125:5,
129:7, 129:13, 143:14,
146:10, 160:12, 161:6,
162:3, 163:3, 163:8,
173:23, 176:8, 177:17,
179:8, 180:15, 181:18,
181:19, 181:24, 182:6,
182:20, 183:4, 183:5,
183:6, 183:11, 183:12,
183:14, 192:9, 201:5,
207:11, 209:6
  **Martin's** [39] - 11:20,
14:4, 14:10, 14:20,
28:19, 30:19, 32:2, 32:3,
34:11, 78:2, 87:10,
87:23, 88:1, 91:19,
93:19, 94:13, 97:24,
99:5, 101:12, 101:25,
102:14, 103:2, 110:9,
110:19, 111:7, 112:4,
112:16, 113:7, 126:6,
126:8, 126:12, 126:17,
126:25, 128:19, 128:23,

129:2, 129:20, 182:4,
194:2
  **Martin/Parsons** [1] -
34:8
  **Marvin** [3] - 32:11,
32:12, 34:14
  **Mary** [3] - 1:24, 215:3,
215:15
  **MARYLAND** [1] - 1:2
  **Maryland** [6] - 1:12,
1:25, 16:14, 48:16, 49:6,
83:1
  **matched** [1] - 130:6
  **matches** [1] - 102:20
  **matching** [2] - 103:22,
130:23
  **math** [1] - 113:8
  **matter** [16] - 43:2, 53:4,
60:18, 61:14, 68:14,
77:13, 89:18, 104:8,
105:2, 105:7, 191:18,
199:19, 206:1, 212:11,
215:4, 215:9
  **matters** [2] - 191:4,
206:23
  **mature** [1] - 27:1
  **McCaffity** [36] - 8:2,
16:15, 54:24, 56:22,
57:3, 57:8, 57:23, 58:12,
58:20, 58:25, 59:3, 59:4,
59:10, 59:21, 81:24,
95:20, 109:23, 128:9,
138:22, 139:8, 144:13,
144:25, 145:1, 145:8,
145:20, 145:21, 145:22,
145:23, 148:23, 172:9,
172:10, 172:11, 172:14,
172:15, 172:18, 195:13
  **McCaffity's** [4] - 58:3,
58:21, 78:11, 128:10
  **McCoy** [4] - 199:14,
201:16, 201:17, 201:18
  **mean** [28] - 4:3, 5:3,
5:15, 16:23, 20:10, 21:4,
52:11, 56:14, 68:11,
84:5, 85:12, 113:12,
116:20, 140:14, 145:18,
148:6, 151:13, 152:4,
153:8, 158:21, 163:22,
189:5, 193:9, 203:13,
206:18, 207:18, 209:23,
212:18
  **meaning** [1] - 181:17
  **Meaning** [1] - 114:8
  **means** [3] - 158:6,
166:9, 176:23
  **meant** [2] - 140:1,
180:21
  **meantime** [1] - 211:5
  **measured** [2] - 23:6,

23:12
  **mechanic** [3] - 195:12,
197:10, 198:16
  **mechanic's** [1] - 198:20
  **mechanics** [1] - 198:18
  **mechanism** [2] - 5:1,
195:17
  **meeting** [3] - 173:4,
173:17, 208:8
  **Meineke** [2] - 136:7,
186:5
  **Melissa** [1] - 10:7
  **member** [2] - 32:13,
32:14
  **members** [2] - 62:9,
180:3
  **Members** [3] - 45:24,
89:9, 190:23
  **memory** [2] - 37:6, 37:9
  **mention** [2] - 92:5,
204:25
  **mentioned** [5] - 64:14,
91:15, 164:15, 173:21,
210:5
  **message** [5] - 65:16,
115:16, 126:7, 126:13,
190:11
  **met** [3] - 92:17, 97:24,
176:12
  **Michael** [2] - 1:16, 1:18
  **Michele** [6] - 30:7, 31:5,
31:11, 31:25, 32:6, 82:18
  **microfiche** [1] - 159:3
  **microphone** [4] - 36:20,
37:1, 37:2, 44:11
  **mid** [1] - 163:10
  **middle** [4] - 8:11, 8:12,
36:11, 98:24
  **midnight** [4] - 147:13,
149:14, 160:20, 210:20
  **Midnight** [1] - 149:15
  **might** [25] - 30:21, 47:4,
47:11, 47:12, 60:7,
61:20, 67:2, 71:8, 71:20,
80:3, 106:10, 134:2,
141:25, 150:7, 152:24,
186:24, 190:21, 202:3,
203:21, 205:13, 206:19,
212:15, 212:21
  **mike** [2] - 8:3, 8:8
  **miles** [2] - 23:14, 23:15
  **mill** [1] - 52:12
  **Mills** [1] - 185:20
  **mind** [7] - 46:2, 87:4,
90:1, 132:4, 137:3,
155:4, 169:17
  **mindful** [1] - 155:19
  **minor** [1] - 89:12
  **minute** [45] - 9:25,
36:21, 37:3, 46:3,

101:22, 103:4, 103:5,
103:20, 105:6, 105:19,
110:11, 110:12, 110:15,
110:18, 110:20, 110:23,
110:24, 111:4, 111:8,
111:12, 113:22, 113:24,
114:5, 115:14, 115:24,
118:17, 121:25, 122:4,
122:5, 122:8, 122:11,
122:25, 123:4, 124:15,
124:21, 124:22, 124:23,
125:1, 131:11, 149:22,
155:4, 185:18
  **minute's** [1] - 110:16
  **minutes** [23] - 45:25,
46:4, 83:7, 84:1, 86:3,
90:7, 90:8, 103:18,
111:4, 124:19, 155:11,
155:15, 155:17, 155:20,
155:21, 165:11, 189:16,
189:19, 193:4, 194:11,
194:13, 195:8, 206:6
  **misadventure** [1] - 4:11
  **miss** [1] - 212:16
  **missed** [4] - 11:9,
12:22, 13:16, 147:13
  **missing** [1] - 200:21
  **misspoke** [2] - 146:21,
161:24
  **misstated** [1] - 54:22
  **mistake** [2] - 25:17,
97:15
  **mistaken** [4] - 45:17,
56:11, 73:7, 86:1
  **mistrial** [2] - 46:18,
46:20
  **misused** [1] - 56:10
  **MITCHELL** [1] - 1:7
  **Mitchell** [142] - 1:17,
2:9, 2:10, 16:19, 16:23,
27:24, 28:14, 28:15,
30:7, 30:10, 30:11,
30:24, 31:3, 31:11,
31:15, 31:25, 33:6, 34:2,
36:20, 37:8, 38:2, 40:9,
41:9, 43:12, 44:11,
46:15, 47:3, 49:2, 55:25,
57:8, 57:24, 58:11,
58:19, 58:21, 58:24,
59:3, 59:4, 59:11, 59:16,
59:22, 60:9, 60:17,
60:25, 64:1, 64:5, 64:10,
64:17, 68:17, 68:19,
68:20, 69:23, 70:12,
78:20, 79:1, 79:6, 79:9,
82:9, 82:10, 82:17,
82:18, 82:19, 84:11,
84:15, 84:19, 84:22,
88:23, 88:25, 96:6, 98:3,
98:7, 98:20, 101:6,

107:22, 107:24, 108:14,
108:19, 109:6, 109:20,
111:10, 111:13, 113:3,
115:20, 115:21, 116:2,
116:4, 116:6, 116:11,
116:13, 116:18, 117:1,
117:5, 117:8, 117:16,
117:22, 118:3, 119:1,
119:6, 119:9, 120:16,
122:8, 122:15, 122:24,
124:16, 124:20, 125:4,
125:15, 132:4, 134:24,
135:15, 144:5, 144:21,
145:2, 145:10, 145:21,
145:23, 146:19, 147:3,
147:17, 148:1, 148:10,
149:19, 162:3, 163:4,
163:8, 172:9, 172:15,
172:19, 172:23, 173:3,
175:13, 180:7, 181:17,
181:19, 184:13, 184:16,
187:19, 194:14, 215:5
  **Mitchell's** [29] - 11:14,
12:18, 31:5, 31:22, 32:7,
32:15, 37:2, 44:20,
56:20, 58:3, 60:4, 63:17,
65:2, 78:16, 101:3,
102:3, 103:5, 108:23,
111:25, 112:5, 112:12,
112:15, 113:4, 120:20,
120:23, 121:19, 173:16,
187:14, 187:17
  **mixed** [1] - 121:1
  **mobile** [1] - 83:6
  **model** [1] - 11:13
  **Mom** [1] - 106:11
  **moment** [8] - 7:21,
10:17, 11:25, 12:2, 97:5,
157:24, 163:8, 170:8
  **moments** [1] - 157:2
  **Monday** [3] - 1:11,
208:7, 208:9
  **money** [2] - 65:3, 201:4
  **monitor** [5] - 10:3, 10:8,
50:4, 94:17, 98:23
  **monitors** [2] - 10:1,
11:25
  **Montana** [3] - 85:14,
125:15, 125:21
  **Montgomery** [5] -
19:20, 129:25, 130:5,
190:15, 206:9
  **Montgomery's** [3] -
20:14, 20:19, 206:3
  **month** [4] - 36:1, 36:7,
78:5, 78:6
  **months** [3] - 128:2,
149:2, 176:12
  **moot** [5] - 202:15,
210:9, 210:12

morning [33] - 7:4, 36:18, 77:12, 89:12, 89:15, 89:19, 91:18, 129:3, 133:2, 142:20, 144:11, 144:14, 146:3, 147:11, 149:13, 155:23, 155:25, 170:16, 171:16, 179:21, 182:15, 183:4, 189:14, 189:22, 190:21, 191:3, 191:10, 192:22, 193:1, 194:19, 199:5, 212:14

morphed [1] - 81:2

most [22] - 52:3, 53:4, 62:1, 67:11, 80:23, 81:14, 92:9, 96:24, 97:2, 97:4, 106:1, 107:5, 123:14, 127:3, 145:10, 145:11, 147:22, 147:25, 163:25, 165:15, 165:19, 172:14

mother [5] - 12:14, 30:19, 199:14, 199:15, 199:22

mother's [2] - 8:14, 188:8

Motion [1] - 29:2

motion [4] - 46:19, 91:20, 155:20, 211:7

motions [10] - 38:23, 39:6, 40:1, 40:18, 41:4, 43:2, 46:22, 163:25, 206:22, 208:21

motivation [2] - 114:15, 207:9

Move [1] - 43:16

move [12] - 44:2, 46:18, 54:23, 85:2, 85:5, 96:23, 98:23, 101:2, 113:17, 115:14, 120:15, 208:22

moved [1] - 86:5

movement [1] - 49:18

movie [8] - 114:13, 128:2, 129:6, 129:12, 129:14, 185:19, 201:23, 201:24

movies [8] - 127:15, 127:17, 127:21, 127:22, 129:7, 200:19, 201:19, 201:20

moving [2] - 25:16, 59:2

Moving [1] - 93:9

MR [222] - 2:4, 2:6, 2:16, 2:17, 2:19, 2:22, 4:15, 4:17, 4:20, 4:23, 5:6, 5:12, 5:14, 5:17, 5:20, 5:22, 5:24, 6:5, 6:8, 6:20, 6:24, 7:18, 8:24, 9:20, 9:24, 10:3, 10:11, 10:18, 10:21, 11:24,

12:4, 12:7, 12:9, 12:25, 13:2, 13:8, 20:3, 20:5, 20:9, 20:17, 27:5, 28:2, 30:3, 38:6, 39:1, 39:4, 40:23, 42:13, 43:18, 46:11, 46:12, 47:5, 47:6, 47:11, 47:13, 47:18, 50:23, 52:15, 52:19, 53:7, 54:19, 69:5, 70:4, 70:16, 72:3, 80:19, 84:25, 88:7, 89:6, 89:8, 90:7, 90:9, 90:13, 90:16, 91:5, 91:13, 92:3, 92:5, 92:9, 92:12, 92:17, 92:23, 93:1, 93:6, 129:9, 131:13, 131:17, 154:24, 155:15, 155:17, 155:21, 155:24, 156:6, 164:9, 166:4, 166:19, 167:17, 169:19, 169:21, 170:10, 170:13, 170:24, 171:3, 171:5, 171:6, 171:7, 171:13, 171:23, 172:6, 172:20, 176:6, 177:13, 177:14, 177:24, 178:8, 179:2, 180:10, 181:3, 181:7, 186:2, 188:25, 189:2, 189:6, 189:10, 190:17, 190:22, 193:9, 193:11, 193:14, 193:23, 195:6, 195:11, 195:14, 195:16, 195:22, 195:24, 196:5, 196:10, 196:13, 196:16, 196:23, 197:2, 197:10, 197:14, 197:15, 197:25, 198:4, 198:7, 198:11, 198:17, 198:19, 198:22, 198:24, 199:2, 199:5, 199:8, 199:13, 199:17, 199:20, 199:25, 200:6, 200:12, 200:16, 200:20, 200:22, 201:1, 201:7, 201:11, 201:15, 201:18, 201:20, 202:2, 202:6, 202:9, 202:14, 202:16, 202:18, 202:21, 202:24, 203:2, 203:7, 203:10, 203:12, 203:16, 203:19, 203:21, 203:24, 204:2, 204:9, 204:13, 204:25, 205:3, 205:10, 205:17, 205:19, 205:21, 205:23, 206:16, 206:18, 206:25, 207:3, 207:7, 207:11, 207:25, 208:12, 208:18, 208:21, 209:2, 209:7, 209:14, 210:4, 210:8, 210:15, 210:24, 211:11, 211:15, 214:5, 214:6, 214:7, 214:8, 214:9, 214:10

MS [25] - 9:25, 10:6, 26:3, 42:22, 43:14, 43:16, 46:7, 46:9, 90:18, 90:20, 170:25, 171:4, 175:22, 176:7, 194:9, 194:14, 194:17, 194:23, 195:1, 211:17, 212:8, 212:11, 212:21, 213:1, 213:4

Muffler [1] - 136:7

Multiple [1] - 70:7

multiple [7] - 25:13, 83:1, 103:14, 105:1, 106:18, 108:15, 173:10

multitude [1] - 179:19

murder [47] - 15:9, 16:15, 18:22, 19:24, 21:23, 22:3, 22:5, 22:8, 23:2, 23:8, 23:25, 24:3, 24:11, 52:12, 52:21, 57:4, 81:24, 88:11, 88:21, 89:1, 95:20, 95:21, 109:23, 117:3, 117:4, 117:10, 117:15, 117:19, 125:10, 128:9, 128:16, 146:14, 148:19, 148:23, 172:9, 173:7, 173:10, 184:14, 185:21, 187:7, 188:1, 190:4, 196:21, 201:7, 201:8, 208:21

Murder [1] - 52:22

murdered [6] - 146:2, 146:20, 149:13, 149:16, 156:17, 160:20

murders [7] - 8:2, 74:16, 128:13, 145:12, 148:8, 148:21, 172:11

music [2] - 90:25, 193:18

must [3] - 41:10, 123:16, 178:5

MVA [3] - 137:2, 137:7, 152:18

mysteries [1] - 197:21

## N

nail [1] - 85:10

naive [1] - 212:24

name [48] - 9:11, 9:12, 11:20, 12:10, 14:15, 14:16, 14:25, 15:1, 15:23, 30:12, 30:18, 31:5, 31:22, 32:3, 32:7, 45:11, 64:21, 67:23, 82:17, 83:11, 85:9, 85:13, 85:14, 85:17, 86:21, 86:23, 87:23, 87:25, 88:13, 88:17,

88:18, 93:17, 99:5, 99:11, 106:3, 106:9, 106:19, 140:11, 150:8, 152:10, 158:20, 160:12, 160:24, 164:25, 175:18, 182:4, 182:13, 183:15

named [1] - 134:25

names [3] - 11:8, 15:12, 187:20

narcotic [1] - 108:7

narcotics [5] - 51:22, 84:24, 106:6, 108:1, 108:15

Natasha [6] - 67:7, 107:3, 107:20, 173:21, 174:2, 174:10

nature [7] - 84:2, 94:7, 106:17, 115:14, 130:10, 184:1, 212:10

near [2] - 8:15, 153:17

Near [1] - 23:20

nearest [2] - 23:1, 23:12

nearly [1] - 44:7

necessarily [2] - 61:7, 83:24

necessary [2] - 2:25, 211:12

need [20] - 6:4, 6:9, 6:15, 7:24, 10:14, 56:16, 62:17, 62:21, 90:25, 92:1, 92:3, 121:8, 193:17, 194:10, 197:10, 202:1, 202:4, 204:11, 204:23, 205:13

needed [4] - 9:4, 39:18, 43:6, 81:17

needs [1] - 155:19

negative [1] - 201:1

negotiable [3] - 34:18, 35:17, 35:22

negotiation [2] - 40:21, 40:25

Neidermeier's [1] - 9:14

neighborhood [1] - 112:6

Network [1] - 164:12

neutral [4] - 198:4, 198:6, 198:8, 198:14

never [19] - 55:19, 63:18, 66:19, 75:22, 76:18, 105:3, 114:8, 114:9, 122:7, 128:1, 139:6, 139:18, 144:1, 164:24, 179:13, 179:16, 191:13, 209:17, 210:17

New [1] - 153:17

new [7] - 7:22, 14:8, 19:13, 81:2, 120:11, 169:14, 171:21

Next [1] - 125:3

next [18] - 23:14, 107:16, 110:8, 111:4, 111:16, 124:23, 129:3, 133:12, 142:8, 147:20, 148:10, 148:16, 153:4, 153:11, 175:9, 208:7, 209:8, 209:12

nickname [1] - 61:10

nicknames [1] - 9:17

Nicole [1] - 203:21

Niedermeier [15] - 9:16, 15:11, 16:25, 66:4, 72:12, 128:1, 129:5, 129:11, 129:19, 173:5, 174:21, 185:25, 201:21, 201:25

Niedermeier's [1] - 177:6

night [16] - 16:20, 115:22, 116:7, 127:16, 127:17, 127:21, 128:19, 142:20, 155:18, 172:11, 173:4, 173:10, 180:8, 184:14, 184:18, 185:20, 187:18, 200:3, 200:8, 200:11, 200:15, 200:16, 200:17, 201:24

Nikki [1] - 137:21

Nine [2] - 13:14, 174:19

nine [5] - 36:14, 52:13, 133:6, 199:6

ninth [1] - 53:15

NO [1] - 1:6

nobody [2] - 90:17, 198:2

Nokia [4] - 10:22, 11:13, 13:19

nominee [1] - 88:17

non [4] - 34:18, 35:17, 35:22, 107:1

non-negotiable [3] - 34:18, 35:17, 35:22

None [3] - 10:1, 42:13, 149:17

normal [1] - 158:18

north [1] - 24:10

North [2] - 13:14, 30:7

North/south [1] - 8:10

northeast [1] - 22:14

northern [1] - 153:16

NORTHERN [1] - 1:2

Northwest [1] - 16:17, 164:21

northwest [2] - 22:15, 24:12

notarized [1] - 31:11

notary [1] - 30:13

note [5] - 13:22, 45:25, 89:24, 155:2, 192:21

noted [4] - 26:6, 86:13,

172:14, 211:19

**notes** [6] - 130:1, 130:11, 130:13, 130:14, 183:15, 212:14

**nothing** [7] - 10:5, 37:20, 89:13, 89:20, 89:21, 108:24, 147:23

**Nothing** [1] - 170:10

**Notice** [10] - 29:20, 29:24, 31:2, 31:14, 32:2, 32:24, 33:18, 34:5, 35:4, 36:5

**notice** [1] - 32:17, 33:21, 34:22, 35:17, 35:18, 35:22, 35:25, 50:17, 110:11, 210:9, 212:12

**noticed** [1] - 50:17

**Notices** [2] - 31:19, 33:2

**notices** [3] - 34:18, 35:19, 53:17

**November** [11] - 1:11, 25:16, 25:18, 25:19, 25:21, 27:7, 36:11, 36:16, 44:10, 60:16, 215:5

**Number** [2] - 11:12, 174:19

**number** [141] - 11:17, 11:19, 12:15, 12:19, 13:12, 13:13, 13:14, 13:23, 13:24, 14:2, 14:5, 14:6, 14:8, 14:12, 14:13, 15:8, 15:20, 16:7, 16:15, 16:18, 17:1, 18:6, 18:11, 18:14, 18:18, 18:25, 19:2, 19:4, 19:6, 19:10, 19:13, 20:15, 20:25, 21:1, 21:11, 21:12, 21:22, 22:12, 27:13, 28:2, 36:11, 58:3, 65:13, 65:20, 72:12, 78:13, 79:6, 79:9, 82:16, 83:19, 83:21, 83:22, 84:13, 87:19, 87:21, 87:23, 88:1, 94:18, 95:4, 96:19, 97:2, 97:3, 97:10, 97:12, 97:16, 98:7, 99:10, 99:25, 100:22, 101:5, 101:25, 102:1, 102:4, 106:9, 106:15, 107:4, 107:6, 107:22, 111:14, 119:7, 119:17, 122:15, 134:16, 136:1, 136:24, 137:8, 137:17, 139:13, 141:5, 141:22, 143:1, 143:8, 146:9, 148:21, 149:23, 150:13, 151:5, 152:8, 153:12, 154:7,

156:10, 156:11, 156:19, 160:19, 161:8, 161:18, 161:20, 161:22, 161:25, 163:22, 164:6, 168:20, 168:23, 168:24, 168:25, 173:9, 181:23, 182:25, 183:5, 183:16, 185:7, 185:14, 185:17, 187:2, 187:18, 187:24, 191:17, 192:1, 211:20

**number's** [1] - 96:12

**Number(s** [2] - 215:5

**numbered** [2] - 76:13, 191:5

**numbers** [23] - 16:3, 16:12, 18:10, 21:4, 25:10, 92:3, 96:4, 96:10, 96:14, 99:25, 100:18, 102:5, 107:9, 109:9, 138:20, 142:8, 149:5, 150:2, 168:19, 187:20, 187:21, 187:22

**numerous** [6] - 17:10, 94:3, 94:5, 94:8, 110:1, 183:19

# O

**O.J** [1] - 85:13

**Oath** [1] - 164:14

**oath** [8] - 7:13, 29:9, 41:14, 74:20, 80:1, 167:14, 206:2, 206:8

**Object** [1] - 186:2

**object** [11] - 26:5, 37:15, 38:10, 38:18, 46:17, 205:15, 207:20

**objected** [1] - 91:14

**objecting** [1] - 20:8

**objection** [12] - 12:6, 20:4, 20:5, 43:15, 43:20, 143:9, 169:19, 171:8, 176:5, 190:18, 202:10, 210:13

**Objection** [48] - 9:20, 11:24, 12:25, 13:2, 20:3, 30:3, 38:6, 39:1, 39:4, 40:23, 42:13, 42:22, 43:14, 50:23, 52:15, 52:19, 53:7, 54:19, 54:20, 70:4, 70:16, 84:25, 88:7, 129:9, 164:9, 166:4, 166:19, 167:17, 170:24, 170:25, 171:4, 171:5, 171:6, 171:7, 171:23, 172:6, 172:20, 175:22, 177:13, 177:14, 177:24, 178:8, 179:2, 180:10, 181:3, 181:7, 189:10, 190:17

**objection's** [2] - 172:7, 186:4

**objections** [7] - 3:1, 39:17, 39:25, 40:3, 42:1, 43:5, 172:4

**objective** [1] - 39:12

**objects** [1] - 69:5

**obliterated** [1] - 158:7

**observed** [1] - 102:10

**obtain** [2] - 11:5, 172:19

**obtained** [4] - 81:25, 129:11, 129:19, 134:22

**Obtained** [1] - 11:2

**obtaining** [1] - 129:6

**obvious** [1] - 196:3

**Obviously** [5] - 2:23, 3:2, 3:25, 202:12, 209:21

**obviously** [7] - 5:4, 46:13, 63:14, 87:6, 110:14, 135:14, 210:25

**occasion** [2] - 43:9, 57:9, 171:22

**occasions** [3] - 70:11, 92:18, 184:7

**occupation** [1] - 138:6

**occur** [2] - 18:5, 196:21

**occurred** [10] - 2:8, 18:20, 68:25, 123:9, 123:25, 124:2, 134:14, 144:22, 165:17, 174:11

**October** [1] - 26:1

**OF** [3] - 1:2, 1:5, 1:11

**offenders** [1] - 81:8

**offense** [2] - 162:6, 162:16

**offer** [1] - 4:2

**offering** [1] - 130:23

**Office** [5] - 66:17, 66:18, 66:22, 73:16, 179:10

**officer** [2] - 51:14, 51:22

**Officer** [1] - 2:8

**official** [1] - 215:8

**Official** [1] - 215:16

**Often** [1] - 83:4

**often** [2] - 83:15, 108:1

**oil** [1] - 210:20

**old** [3] - 11:4, 134:1, 203:9

**older** [2] - 16:12, 203:10

**Oliver** [2] - 8:2, 16:15

**Once** [1] - 36:25

**once** [3] - 7:20, 74:15, 163:17

**One** [14] - 18:22, 64:15, 73:21, 74:7, 75:24, 76:11, 87:20, 99:10, 101:21, 167:6, 206:8, 206:21, 207:25, 210:4

**one** [210] - 2:11, 4:15, 4:16, 4:18, 4:20, 4:23, 5:24, 8:6, 8:13, 8:15, 8:25, 9:25, 11:25, 12:22, 13:16, 16:7, 16:8, 16:9, 18:2, 18:10, 19:17, 20:16, 21:2, 21:6, 21:8, 21:9, 22:17, 23:5, 23:13, 27:24, 28:4, 29:19, 31:2, 31:18, 31:19, 31:22, 32:24, 33:10, 33:14, 34:2, 35:11, 35:15, 35:18, 35:25, 36:6, 37:14, 37:22, 38:4, 44:4, 46:13, 50:2, 50:3, 50:16, 54:7, 60:8, 66:18, 66:19, 66:20, 66:21, 66:22, 67:11, 68:10, 71:20, 73:16, 74:17, 75:13, 76:1, 77:12, 77:14, 78:11, 78:14, 78:20, 82:20, 85:6, 86:7, 87:3, 90:14, 91:2, 91:3, 91:13, 91:22, 93:1, 93:11, 94:6, 94:12, 94:15, 95:18, 96:19, 101:21, 101:22, 102:7, 102:8, 103:4, 103:5, 104:23, 105:19, 106:8, 106:14, 106:15, 107:4, 107:6, 107:12, 108:5, 108:10, 110:11, 110:12, 110:15, 110:18, 110:20, 111:3, 111:12, 112:11, 112:21, 113:22, 113:24, 114:2, 115:14, 118:17, 120:22, 122:1, 122:4, 122:21, 123:3, 124:3, 128:24, 131:11, 132:5, 132:6, 132:10, 132:23, 135:1, 136:17, 137:5, 139:12, 139:13, 142:7, 142:12, 142:14, 142:21, 143:10, 145:11, 147:17, 149:6, 150:5, 150:7, 150:9, 150:10, 150:12, 150:17, 151:5, 156:10, 156:11, 156:15, 159:22, 160:3, 161:8, 161:11, 161:17, 161:25, 163:7, 164:18, 167:5, 167:6, 167:7, 167:13, 169:2, 169:6, 170:18, 174:20, 179:18, 181:11, 182:9, 183:1, 183:3, 184:22, 184:23, 186:25, 187:6, 187:21, 190:2, 190:10, 191:1, 191:7, 191:15, 192:3, 192:13, 195:6, 197:21, 199:11, 199:14, 202:7, 204:25, 205:5, 207:12, 207:13

**one's** [2] - 31:11, 166:10

**one-minute** [1] - 113:24

**one-on-one** [1] - 38:4

**ones** [6] - 33:6, 78:19, 83:5, 108:16, 113:18, 194:15

**open** [3] - 46:2, 90:1, 155:4

**opened** [1] - 181:9

**opening** [1] - 197:3

**operating** [1] - 81:13

**opinion** [1] - 51:7

**opportunity** [1] - 125:25

**opposed** [1] - 211:18

**opposite** [1] - 197:14

**optimism** [1] - 208:4

**orally** [1] - 60:17

**order** [12] - 2:25, 33:16, 37:17, 42:8, 43:22, 43:24, 62:17, 91:25, 121:8, 192:10, 192:19, 195:20

**ordered** [2] - 37:21, 43:10

**ordinarily** [1] - 192:6

**organization** [1] - 167:6

**organizations** [1] - 81:7

**organizing** [1] - 144:19

**original** [2] - 158:7, 208:7

**originally** [1] - 189:18

**otherwise** [1] - 3:14

**out-of-town** [1] - 208:13

**outgoing** [1] - 11:6, 95:22, 102:2, 102:5, 103:5, 103:18, 104:1, 119:1, 124:20, 151:18, 190:9

**outside** [2] - 5:4, 140:23

**Outside** [1] - 50:15

**overall** [5] - 82:1, 165:12, 177:1, 177:6

**overlap** [1] - 174:17

**overlaps** [1] - 174:15

**overnight** [1] - 210:23

**overpass** [1] - 83:16

**overreaching** [1] - 3:13

**overrule** [1] - 171:8

**Overruled** [18] - 13:4, 38:7, 39:2, 39:5, 42:14, 42:23, 50:24, 54:20, 70:17, 88:8, 166:20, 175:23, 177:15, 177:25, 178:9, 179:3, 180:12, 181:4

**overruled** [2] - 172:7, 186:4

oversights [1] - 191:6
overwhelmingly [1] -
2:10
Owings [1] - 185:20
own [15] - 27:1, 66:19,
72:18, 72:21, 73:19,
79:18, 79:20, 104:11,
131:8, 133:24, 166:24,
173:16, 205:11, 205:12
owned [1] - 49:9

**P**

P-18 [1] - 117:24
p.m [17] - 21:17, 22:6,
115:24, 116:11, 116:13,
117:18, 120:16, 146:24,
147:6, 147:24, 148:9,
148:17, 155:12, 158:17,
190:10, 193:2, 213:6
Pacific [1] - 164:21
pack [1] - 113:17
package [1] - 89:17
pads [4] - 45:25, 89:24,
155:2, 192:21
PAGE [1] - 214:3
Page [1] - 69:3, 69:11,
71:1, 71:2, 71:3, 71:4,
72:6, 73:9, 73:10, 74:25,
77:4, 159:15
page [10] - 75:2, 76:12,
107:16, 153:4, 153:11,
158:9, 158:14, 158:21,
160:3, 175:9
pager [1] - 16:17
pages [2] - 159:17,
215:7
paid [1] - 201:10
pants [1] - 174:24
paper [5] - 18:8, 37:10,
137:18, 168:9, 187:19
papers [2] - 26:16,
26:17, 121:1
paperwork [1] - 86:22
paragraph [1] - 107:15
paranoid [2] - 80:2,
180:17
paraphrasing [1] -
107:25
parcel [1] - 26:10
Pardon [3] - 4:17,
140:19, 201:7
parent [1] - 203:17
Park [7] - 7:20, 7:22,
8:21, 8:22, 9:3, 170:2,
173:12
park [2] - 197:22,
198:10
parking [1] - 19:21

Part [1] - 3:16
part [24] - 26:10, 27:18,
28:3, 29:25, 36:11, 49:3,
52:3, 54:24, 62:1, 67:11,
70:19, 75:3, 76:21,
76:24, 83:4, 107:5,
151:8, 152:1, 159:7,
160:4, 164:7, 183:25,
205:24, 208:4
participate [1] - 178:1
particular [17] - 30:6,
43:9, 78:15, 115:5,
117:6, 117:9, 127:16,
127:19, 128:19, 130:17,
164:7, 167:5, 172:10,
181:23, 185:9, 192:17,
192:18
particularly [1] - 206:3
parties [3] - 124:1,
124:4, 125:13
partly [2] - 177:11,
185:1
parts [3] - 51:10, 158:6,
177:5
party [3] - 30:8, 192:3,
192:18
passage [3] - 71:9,
71:19, 177:17
passages [1] - 71:8
passed [3] - 36:25,
37:2, 176:20
past [8] - 62:7, 85:2,
97:22, 116:21, 116:23,
137:4, 138:2, 184:6
path [2] - 24:9, 128:10
patience [1] - 7:9
Patriot [1] - 164:11
pattern [5] - 26:8,
103:15, 106:21, 113:9,
121:8
Pattern [2] - 105:9,
105:10
Paul [1] - 1:19
pay [8] - 51:17, 83:6,
83:25, 85:21, 86:2, 86:7,
198:20, 201:4
pay-as-you-go [3] -
85:21, 86:2, 86:7
payment [1] - 158:22
pays [1] - 52:2
pen [1] - 163:18
pending [1] - 60:23
People [1] - 130:18
people [18] - 6:6, 66:5,
66:8, 70:8, 71:9, 71:10,
72:11, 79:22, 106:1,
106:16, 129:16, 130:17,
130:21, 134:20, 177:8,
182:12, 201:4, 212:6
percentage [1] - 55:14

perfect [1] - 112:2
perfectly [1] - 89:17
perhaps [6] - 12:2,
91:1, 91:2, 190:25,
192:13, 193:20
Perhaps [2] - 8:3, 9:23
period [34] - 17:14,
17:21, 19:14, 33:25,
40:20, 44:7, 44:14, 78:5,
78:7, 78:11, 78:14,
78:15, 78:21, 79:5, 79:7,
79:15, 80:23, 125:16,
138:24, 144:21, 144:24,
145:7, 146:10, 146:19,
146:22, 147:16, 157:3,
158:9, 158:13, 158:25,
159:6, 159:14, 186:24,
206:11
periods [5] - 78:10,
151:19, 186:20, 186:23
permission [2] -
169:16, 212:23
permit [1] - 2:13
permitted [4] - 2:12,
41:11, 131:20, 192:16
persistent [1] - 172:4
person [28] - 23:20,
26:14, 26:15, 51:17,
62:21, 75:16, 80:2, 80:8,
80:9, 85:10, 85:16, 87:6,
94:22, 95:9, 107:11,
109:14, 115:6, 115:12,
130:25, 132:19, 133:20,
140:11, 140:13, 142:25,
161:25, 173:22, 194:7,
207:25
Person [1] - 182:11
person's [1] - 106:9
personal [2] - 161:21,
177:5
personally [6] - 62:9,
65:23, 66:20, 75:11,
83:9, 171:10
personnel [1] - 183:19
persons [1] - 175:25
perspective [2] - 7:22,
205:12
petition [1] - 3:5
phenomenon [7] -
48:13, 48:16, 48:21,
171:15, 171:17, 171:21,
172:3
Phone [17] - 73:23,
77:23, 95:22, 103:15,
103:16, 103:18, 103:19,
104:2, 104:17, 107:1,
123:23, 182:12
phone [387] - 10:22,
11:3, 11:4, 11:7, 11:10,
11:22, 11:23, 12:7,

12:10, 12:16, 12:17,
13:6, 13:10, 13:18,
13:19, 13:22, 14:5,
14:10, 14:15, 14:18,
14:20, 14:23, 14:25,
15:21, 16:1, 16:7, 16:9,
16:18, 17:1, 17:7, 17:17,
18:12, 20:1, 20:2, 20:7,
20:14, 20:16, 20:19,
20:22, 21:4, 21:16, 22:6,
22:13, 22:16, 22:18,
22:23, 23:12, 23:18,
24:8, 24:13, 57:7, 57:13,
57:18, 57:23, 58:3, 58:5,
58:6, 58:9, 58:14, 58:23,
58:24, 59:15, 65:17,
65:19, 77:10, 78:2,
78:11, 78:16, 79:20,
79:23, 82:14, 82:15,
82:19, 82:23, 82:25,
83:3, 83:6, 83:7, 83:12,
83:14, 83:17, 83:20,
83:21, 83:22, 83:23,
83:24, 84:1, 84:2, 84:5,
84:6, 84:10, 84:16,
84:20, 85:3, 85:7, 85:8,
85:11, 85:18, 85:21,
86:2, 86:6, 86:14, 86:17,
86:24, 87:1, 87:2, 87:4,
87:5, 87:7, 87:9, 87:10,
87:12, 87:14, 87:15,
87:17, 87:18, 87:19,
87:21, 87:23, 87:24,
87:25, 88:1, 88:13,
88:14, 88:15, 88:17,
93:13, 93:14, 93:16,
93:17, 94:3, 94:6, 94:13,
94:16, 94:19, 94:20,
95:2, 95:8, 96:2, 96:10,
96:14, 96:20, 99:2, 99:3,
99:8, 99:22, 100:5,
100:7, 100:16, 100:18,
100:19, 100:20, 100:23,
100:25, 101:3, 102:3,
102:4, 102:11, 102:14,
103:2, 103:5, 103:6,
103:21, 103:23, 104:6,
104:18, 104:22, 104:23,
104:24, 105:1, 105:3,
105:22, 106:8, 106:14,
106:22, 106:23, 106:24,
106:25, 107:6, 107:19,
107:24, 108:10, 108:11,
108:17, 108:20, 108:23,
109:2, 109:5, 109:6,
109:12, 109:22, 110:19,
111:7, 111:9, 111:10,
111:16, 111:25, 112:4,
112:5, 112:25, 113:13,
113:20, 113:21, 114:23,
115:1, 115:5, 115:8,

116:25, 117:24, 118:14,
118:21, 119:3, 119:4,
119:5, 119:6, 119:7,
119:9, 119:12, 119:17,
119:18, 119:22, 120:7,
120:9, 120:11, 120:20,
120:23, 121:3, 121:11,
121:12, 121:19, 121:22,
121:23, 122:9, 124:6,
124:10, 124:14, 124:16,
124:20, 125:9, 126:1,
126:7, 126:11, 126:12,
128:10, 128:19, 128:20,
129:2, 129:20, 129:21,
138:15, 139:18, 141:12,
141:13, 141:15, 142:4,
142:8, 142:21, 143:1,
143:25, 145:1, 146:5,
148:7, 148:11, 148:20,
149:5, 150:2, 150:7,
151:6, 151:14, 152:8,
152:21, 152:25, 153:8,
153:20, 153:22, 154:7,
154:11, 154:12, 154:16,
154:18, 156:10, 156:11,
156:18, 156:19, 156:23,
157:3, 157:11, 157:19,
158:1, 158:19, 158:24,
159:1, 159:9, 159:12,
159:22, 159:25, 160:5,
160:16, 160:17, 160:23,
161:1, 161:4, 161:5,
161:8, 161:15, 161:17,
161:18, 161:19, 161:24,
168:10, 168:13, 168:14,
168:21, 173:3, 173:4,
174:2, 174:3, 174:8,
179:22, 180:2, 181:25,
182:4, 182:10, 182:11,
182:12, 182:13, 182:14,
182:15, 183:4, 183:8,
183:14, 183:18, 183:19,
183:25, 184:5, 184:17,
184:21, 184:22, 184:23,
184:24, 185:3, 186:18,
187:2, 187:5, 187:11,
187:14, 187:16, 187:17,
187:20, 187:21, 187:22,
188:13, 190:1, 206:14
phones [74] - 15:9,
15:12, 15:13, 15:14,
15:16, 16:21, 17:13,
57:9, 78:9, 78:12, 82:9,
82:13, 83:2, 83:15,
83:17, 84:9, 84:11,
84:23, 85:6, 85:13,
87:20, 87:21, 89:3, 93:9,
94:1, 94:4, 94:9, 96:1,
96:5, 99:11, 100:1,
100:3, 100:9, 100:13,
102:23, 103:1, 103:24,

104:13, 104:20, 104:25, 106:12, 106:15, 106:19, 107:2, 107:5, 108:1, 108:2, 108:4, 108:5, 108:9, 108:13, 108:15, 109:21, 110:1, 110:3, 110:5, 110:6, 117:5, 117:9, 119:9, 119:19, 119:23, 138:16, 139:9, 141:18, 141:19, 149:1, 151:1, 161:21, 182:21, 184:2, 184:3, 187:23

**photo** [1] - 132:15

**photograph** [6] - 132:8, 133:21, 134:3, 134:5, 134:21, 134:23

**photographs** [1] - 135:3

**photos** [2] - 131:25, 135:4

**phrase** [1] - 126:20

**phrased** [1] - 20:10

**phraseology** [1] - 194:1

**physical** [2] - 11:7, 43:25

**physically** [2] - 13:10, 43:12

**Pick** [1] - 8:6

**picked** [1] - 114:8

**picture** [6] - 82:1, 134:2, 134:22, 135:7, 135:12, 135:14

**pictures** [2] - 135:9, 143:10

**piece** [3] - 37:10, 137:18, 168:9

**pin** [9] - 7:23, 8:1, 8:9, 8:22, 9:3, 22:9, 24:9, 169:13, 169:15

**pins** [3] - 8:6, 169:3, 169:11

**place** [8] - 95:2, 119:13, 122:7, 124:9, 129:25, 134:9, 157:23, 173:17

**placed** [7] - 22:20, 55:3, 114:3, 123:12, 124:16, 124:20, 158:3

**plan** [2] - 84:18, 208:7

**plane** [1] - 6:14

**planned** [1] - 208:11

**planning** [1] - 211:23

**plans** [1] - 86:7

**play** [3] - 2:7, 2:19, 187:12

**played** [21] - 2:21, 44:17, 44:24, 46:13, 46:18, 60:15, 60:16, 65:13, 65:19, 65:24, 66:1, 66:3, 66:6, 66:7, 70:21, 91:16, 91:18,

165:3, 165:6, 167:12

**players** [1] - 77:13

**playing** [2] - 70:18, 71:13

**plea** [2] - 64:22, 205:24

**pleading** [1] - 27:17

**pleadings** [19] - 25:5, 25:11, 25:13, 29:18, 30:24, 33:4, 33:19, 33:24, 35:1, 36:10, 47:25, 48:6, 48:24, 50:7, 50:8, 50:10, 50:13, 51:6, 167:25

**pleased** [1] - 4:10

**pled** [1] - 205:25

**plenty** [1] - 172:24

**plied** [2] - 56:23, 56:25

**plugged** [1] - 23:3

**plus** [2] - 66:7, 182:13

**pocket** [1] - 178:17

**pockets** [1] - 175:12

**point** [26] - 37:20, 38:11, 39:18, 43:5, 72:18, 74:12, 74:14, 75:19, 76:2, 100:16, 124:10, 143:24, 145:9, 154:23, 155:1, 155:10, 165:5, 165:6, 170:3, 192:15, 195:5, 196:21, 196:24, 205:5, 205:12, 209:19

**pointed** [2] - 129:17, 177:17

**points** [2] - 42:9, 206:3

**Police** [3] - 51:18, 51:25, 207:14

**poorly** [1] - 57:12

**portion** [3] - 38:23, 62:25, 182:17

**portions** [1] - 44:16

**posed** [2] - 71:18, 168:8

**position** [3] - 4:6, 197:23, 200:4

**possession** [1] - 64:10

**possibility** [3] - 199:9, 199:10, 202:3

**possible** [14] - 45:19, 71:11, 71:12, 78:4, 85:20, 122:21, 127:13, 130:25, 133:24, 174:13, 178:21, 208:3, 211:1

**possibly** [3] - 111:1, 123:6, 174:7

**potential** [1] - 131:3

**practical** [2] - 212:2, 212:5

**preference** [2] - 47:5, 47:6

**preferred** [4] - 35:7, 35:15, 35:21, 51:3

**prepaid** [1] - 115:5

**prepare** [5] - 11:8, 21:19, 24:15, 44:3, 99:21

**prepared** [17] - 44:9, 46:16, 66:12, 66:18, 66:20, 66:22, 66:23, 67:1, 67:3, 73:6, 73:7, 73:14, 74:9, 103:11, 174:21, 191:10, 201:9

**preparing** [1] - 211:7

**prepped** [1] - 67:10

**present** [20] - 2:1, 24:14, 39:14, 42:4, 52:4, 63:23, 67:9, 70:18, 71:13, 71:14, 130:1, 130:4, 130:8, 130:9, 130:22, 133:3, 162:22, 162:25, 164:1, 191:8

**presentations** [1] - 191:24

**presented** [3] - 64:8, 64:9, 127:8

**presenter** [1] - 149:7

**preserved** [2] - 3:1, 4:8

**presume** [1] - 110:25

**pretrial** [4] - 49:9, 49:10, 133:3, 167:19

**pretty** [8] - 91:19, 92:16, 163:23, 166:13, 196:3, 197:1, 204:22, 210:6

**previous** [1] - 54:22

**previously** [1] - 94:21

**primarily** [1] - 211:20

**primary** [1] - 127:18

**Prince** [1] - 208:21

**printed** [1] - 210:13

**pro** [6] - 25:5, 50:10, 166:3, 166:6, 166:9, 167:24

**problem** [7] - 20:9, 97:16, 180:25, 199:16, 201:12, 205:9, 209:16

**problems** [1] - 181:15

**proceed** [13] - 4:13, 7:10, 7:12, 10:9, 10:17, 12:8, 27:4, 43:17, 47:15, 93:5, 108:18, 121:22, 177:25

**proceeding** [5] - 10:15, 25:10, 40:14, 167:19

**Proceeding** [1] - 110:8

**proceedings** [11] - 38:14, 38:18, 38:19, 42:9, 44:4, 44:13, 54:14, 163:24, 191:12, 215:4, 215:8

**Proceedings** [1] - 213:6

**process** [1] - 44:1

**processing** [1] - 178:12

**produced** [1] - 66:13

**professional** [1] - 203:14

**proffer** [8] - 129:24, 130:1, 130:9, 130:11, 130:15, 130:17, 131:3, 199:18

**progress** [2] - 22:3, 40:18

**progression** [1] - 22:1

**promise** [5] - 24:17, 24:19, 24:23, 38:16, 38:17

**prompted** [1] - 89:16

**promptly** [1] - 210:1

**prompts** [1] - 115:4

**prong** [2] - 143:20, 144:4

**pronounce** [1] - 63:18

**proof** [3] - 3:15, 3:20, 4:2

**proper** [2] - 45:5, 121:2

**properly** [2] - 191:5, 191:6

**property** [1] - 65:7

**prosecute** [2] - 24:22, 24:23

**prosecuting** [1] - 211:4

**prosecution** [2] - 41:14, 211:2

**prosecutor** [1] - 143:8

**prosecutors** [1] - 154:5

**protester** [1] - 49:17

**protesters** [1] - 164:20

**protesting** [1] - 172:4

**prove** [1] - 127:11

**provide** [2] - 92:15, 131:7

**provided** [3] - 3:9, 150:24, 183:4

**provides** [5] - 4:5, 34:22, 153:4, 153:12, 207:9

**Provides** [1] - 153:18

**providing** [3] - 131:4, 135:17, 153:11

**proximity** [2] - 22:7, 145:12

**public** [1] - 30:13

**Pull** [1] - 96:23

**pull** [2] - 158:9, 196:6

**pulled** [1] - 127:21

**purely** [1] - 193:17

**Purple** [1] - 19:2

**Purported** [1] - 30:3

**purported** [5] - 30:4, 31:2, 31:19, 32:3, 68:6

**purportedly** [2] - 34:15, 67:22

**purporting** [2] - 27:21,

33:7

**purports** [3] - 32:6, 66:10, 153:18

**purpose** [2] - 172:18, 178:3, 211:20

**purposes** [3] - 95:24, 106:19, 111:5

**push** [12] - 7:23, 8:1, 8:5, 8:9, 8:22, 9:3, 22:9, 24:9, 169:2, 169:11, 169:13, 169:14

**put** [32] - 6:13, 7:23, 8:2, 8:12, 8:15, 8:15, 8:22, 8:25, 9:3, 20:18, 21:11, 24:19, 26:2, 43:21, 72:24, 83:7, 83:13, 83:20, 83:25, 88:4, 88:9, 102:17, 111:24, 113:12, 155:22, 155:24, 159:6, 169:14, 201:4, 207:18

**Put** [2] - 8:10, 9:1

**putting** [3] - 82:3, 123:24, 208:25

**PYNE** [13] - 5:12, 5:14, 5:17, 11:24, 12:7, 80:19, 89:6, 89:8, 93:1, 93:6, 131:13, 186:2, 214:8

**Pyne** [16] - 1:21, 5:6, 5:11, 9:10, 80:21, 89:5, 91:11, 93:5, 126:21, 160:14, 175:25, 181:21, 181:23, 184:11, 184:20, 202:4

## Q

**quadrant** [3] - 22:14, 22:15, 22:16

**quality** [3] - 191:18, 192:2

**questioned** [8] - 171:14, 173:19, 176:8, 177:20, 180:16, 184:12, 184:20, 186:5

**questioning** [4] - 9:10, 36:22, 171:11

**questions** [21] - 45:23, 59:20, 79:12, 82:8, 131:24, 133:2, 135:19, 153:21, 156:15, 164:18, 165:21, 166:7, 168:6, 168:7, 168:8, 169:1, 179:19, 181:22, 188:25, 190:20, 190:25

**quick** [1] - 206:16

**quickly** [3] - 114:4, 127:13, 138:12

**quite** [4] - 9:7, 44:23,

91:22, 201:2
**quote** [1] - 204:17
**quote-unquote** [1] -
204:17

# R

**Radio** [1] - 83:5
**raise** [3] - 2:4, 49:21,
51:10
**raised** [5] - 49:13,
49:23, 50:9, 60:25, 202:2
**ran** [9] - 18:11, 18:13,
20:15, 20:25, 86:3,
101:5, 117:18, 119:23,
153:15
**Randallstown** [1] - 23:4
**rang** [1] - 110:21
**range** [1] - 134:10
**rap** [5] - 9:11, 32:14,
90:25, 193:18, 194:18
**rapid** [4] - 110:17,
113:21, 114:12, 114:14
**rates** [1] - 198:21
**rather** [6] - 99:7,
100:14, 120:7, 161:4,
172:15, 194:25
**Rather** [1] - 6:23
**Raven** [3] - 140:18,
140:20, 140:21
**Ravenwood** [1] -
152:19
**re** [4] - 18:11, 86:3,
118:15, 118:16
**re-ran** [1] - 18:11
**re-routed** [2] - 118:15,
118:16
**re-up** [1] - 86:3
**reach** [2] - 58:25, 59:4
**reaching** [2] - 59:6,
59:7
**Read** [1] - 76:13
**read** [22] - 58:16, 58:17,
69:4, 71:1, 71:3, 71:4,
71:17, 72:6, 73:11,
73:24, 74:3, 74:7, 74:25,
75:3, 75:4, 75:23, 75:24,
76:18, 77:5, 92:12,
107:15, 194:12
**reading** [4] - 37:6,
37:10, 59:9, 75:3
**Ready** [3] - 46:6, 46:11,
91:11
**ready** [8] - 2:3, 6:17,
7:10, 7:16, 47:16, 93:5,
156:5, 211:11
**real** [5] - 64:23, 85:16,
115:6, 140:11, 208:5
**Realistically** [1] - 90:6

**realize** [2] - 57:12,
62:25
**realized** [1] - 63:1
**really** [23] - 2:9, 52:22,
68:13, 90:6, 96:3, 96:4,
100:25, 105:21, 106:10,
110:3, 113:8, 114:16,
135:1, 155:7, 193:7,
193:23, 194:8, 196:5,
203:14, 205:7, 208:13
**reason** [6] - 56:12,
62:13, 98:5, 136:21,
172:24, 208:6
**reasonable** [3] - 77:24,
182:12, 182:14
**reasonably** [1] - 194:13
**reasoning** [1] - 3:16
**receipt** [2] - 136:7,
186:5
**received** [10] - 17:12,
95:9, 118:5, 119:3,
149:1, 157:12, 158:15,
159:10, 160:4, 210:9
**receiving** [2] - 23:13,
24:13, 172:23
**recent** [5] - 145:10,
145:11, 147:22, 147:25,
165:15, 165:19
**recently** [4] - 3:4, 3:6,
5:14, 67:18
**recess** [9] - 45:25, 46:3,
46:4, 91:4, 91:10,
154:25, 155:4, 155:11,
194:3
**Recess** [2] - 46:5,
155:12
**recheck** [1] - 203:12
**recited** [3] - 37:3, 37:4,
37:5
**recognize** [7] - 5:2, 5:7,
5:11, 13:12, 126:12,
126:25, 168:24
**recognized** [1] - 126:14
**recollection** [11] - 16:6,
69:3, 69:7, 73:13,
130:12, 172:2, 186:3,
189:11, 190:14, 207:22,
212:19
**record** [16] - 2:3, 3:1,
4:8, 26:17, 39:25, 46:12,
91:17, 92:7, 92:10, 93:8,
118:21, 137:7, 157:16,
159:8, 159:12, 211:2
**recorded** [4] - 173:5,
185:15, 185:24, 215:3
**recording** [7] - 44:3,
45:6, 71:8, 91:14,
165:12, 184:16, 185:15
**records** [72] - 6:1, 13:5,
17:8, 21:5, 59:13, 81:22,

81:24, 82:21, 101:12,
101:19, 102:5, 103:10,
105:3, 105:17, 108:23,
108:24, 111:25, 112:12,
112:15, 112:16, 113:4,
113:7, 117:24, 117:25,
118:7, 119:23, 120:20,
121:22, 123:13, 128:11,
128:23, 138:13, 138:15,
138:25, 139:11, 139:20,
139:21, 140:3, 140:5,
143:25, 145:15, 147:21,
148:1, 148:11, 149:20,
149:23, 151:14, 151:19,
152:22, 154:6, 154:11,
156:24, 157:2, 157:12,
157:22, 158:1, 158:3,
158:14, 159:25, 161:3,
168:16, 182:8, 184:21,
184:23, 184:24, 186:19,
186:24, 195:1, 195:2,
195:3
**recount** [1] - 139:23
**recover** [1] - 86:22
**recovered** [22] - 10:23,
11:14, 12:17, 13:19,
14:20, 15:5, 15:9, 15:14,
15:16, 18:9, 18:23,
23:11, 23:18, 23:20,
87:16, 87:22, 161:25,
173:14, 183:8, 187:6,
187:14, 190:1
**recross** [2] - 190:20,
191:1
**red** [1] - 22:9
**redacted** [3] - 27:15,
158:4, 158:6
**REDIRECT** [2] - 170:12,
214:10
**REDRUM** [5] - 80:24,
80:25, 81:5, 81:9, 81:12
**reduce** [1] - 159:1
**reel** [4] - 45:1, 45:4
**reel-to-reel** [2] - 45:1,
45:4
**Refer** [1] - 88:22
**refer** [6] - 13:22, 48:12,
61:8, 135:1, 152:1,
168:16
**reference** [7] - 16:14,
50:17, 66:21, 85:22,
145:9, 167:11, 171:20
**referenced** [1] - 56:2
**references** [1] - 87:3
**referencing** [2] - 73:16,
98:18
**referred** [11] - 6:10,
14:7, 22:14, 39:15, 74:9,
82:13, 83:4, 150:13,
162:14, 180:14, 205:6

**referring** [11] - 69:10,
73:22, 74:2, 78:23, 82:7,
84:4, 85:8, 101:14,
149:5, 162:25, 173:7
**reflect** [9] - 91:17, 94:3,
94:12, 95:14, 95:17,
110:18, 117:25, 118:2,
130:1
**Reflected** [1] - 120:18
**reflected** [7] - 101:9,
108:24, 114:6, 120:21,
125:12, 125:13, 125:23
**reflecting** [2] - 99:1,
99:21
**reflects** [3] - 96:10,
96:16, 96:24
**refresh** [2] - 73:13,
130:12
**refreshes** [2] - 69:2,
69:7
**Refusal** [2] - 27:11,
29:14
**refuse** [2] - 38:16, 41:22
**regard** [2] - 155:10,
192:5
**regarded** [1] - 3:14
**regarding** [6] - 24:17,
108:22, 131:1, 195:7,
195:17, 207:14
**regardless** [3] - 192:17,
192:18, 192:19
**registered** [5] - 13:20,
18:24, 160:23, 161:4,
161:6
**regularly** [1] - 55:13
**rehearsed** [2] - 37:9,
41:3
**Reisterstown** [2] - 8:16,
8:21
**relate** [3] - 137:13,
195:1, 195:2
**related** [8] - 61:7, 81:6,
107:1, 137:21, 163:24,
164:19, 165:1, 184:5
**relates** [2] - 136:10,
164:7
**relating** [7] - 145:22,
156:11, 159:25, 162:15,
164:3, 167:5, 198:23
**relationship** [4] - 28:13,
61:4, 137:24, 203:24
**relative** [1] - 82:18
**relative's** [1] - 98:13
**relayed** [1] - 74:23
**relaying** [1] - 185:11
**release** [1] - 155:6
**relevant** [1] - 3:17
**reluctant** [2] - 210:15
**rely** [1] - 102:24
**relying** [2] - 102:20,

177:8
**remain** [1] - 37:22
**remainder** [1] - 6:21
**remained** [1] - 38:3
**remains** [2] - 7:13,
191:25
**Remember** [1] - 169:2
**remember** [27] - 9:19,
41:18, 64:21, 78:22,
78:24, 79:25, 130:16,
131:23, 132:14, 136:4,
137:19, 138:19, 140:24,
141:25, 152:18, 153:21,
153:23, 154:21, 160:14,
161:14, 168:6, 168:11,
169:22, 170:16, 171:14,
197:23, 197:24
**remind** [2] - 192:5,
201:16
**removal** [2] - 43:13,
43:25
**remove** [5] - 37:21,
39:18, 40:5, 42:8, 43:11
**removed** [4] - 38:2,
38:11, 43:6, 43:22
**render** [2] - 210:8
**rent** [1] - 49:10
**Repeat** [1] - 117:7
**repeated** [1] - 39:17
**repeatedly** [4] - 26:19,
38:13, 166:6, 184:17
**repeating** [1] - 150:1
**Rephrase** [1] - 129:10
**rephrase** [2] - 70:5,
70:6
**report** [3] - 207:14,
207:20
**Reported** [1] - 1:23
**Reporter** [1] - 215:16
**reporter** [1] - 8:19
**REPORTER'S** [1] -
215:1
**represent** [4] - 29:6,
41:11, 41:13, 166:3
**representation** [1] -
61:22
**represented** [7] - 26:15,
41:16, 60:17, 61:21,
201:5, 209:20, 212:6
**representing** [1] -
166:13
**repudiation** [1] - 170:23
**request** [1] - 159:4
**Request** [1] - 29:2
**requested** [1] - 151:17
**require** [1] - 194:25
**required** [1] - 191:14
**requires** [1] - 203:15
**rerun** [1] - 137:7
**reschedule** [1] - 208:17

reserved [1] - 91:7
reservoir [1] - 9:4
residence [3] - 12:18, 14:21, 95:9
residual [1] - 211:9
resistance [1] - 43:25
resisted [2] - 43:11, 43:12
respect [20] - 53:22, 54:1, 75:13, 77:19, 134:20, 146:5, 151:24, 154:11, 158:13, 159:6, 160:5, 162:13, 165:2, 167:24, 168:13, 206:1, 206:4, 206:9, 211:1
respective [1] - 162:21
respectively [1] - 119:2
respond [3] - 34:22, 34:23, 210:24
response [11] - 133:1, 136:14, 152:5, 153:21, 156:15, 157:12, 163:21, 164:18, 165:21, 166:7, 168:7
responsibility [2] - 82:5, 203:15
responsible [1] - 81:21
responsibly [1] - 210:18
rest [2] - 115:21, 182:24
resting [2] - 155:25, 211:8
restocking [1] - 200:1
rests [1] - 47:8
result [1] - 34:23
results [1] - 63:24
resume [3] - 4:12, 46:22, 192:23
retired [1] - 207:17
retrieval [1] - 190:11
retrieve [1] - 131:21
return [3] - 28:8, 28:15, 28:18
returnable [1] - 204:4
reveal [1] - 130:24
reversed [1] - 3:6
review [1] - 68:15
revised [1] - 2:11
Reynolds [9] - 93:23, 96:25, 97:19, 98:2, 98:12, 98:19, 139:15, 139:19, 139:22
Rhodes [8] - 1:17, 5:23, 46:6, 90:19, 192:8, 193:18, 194:4, 211:16
RHODES [25] - 9:25, 10:6, 26:3, 42:22, 43:14, 43:16, 46:7, 46:9, 90:18, 90:20, 170:25, 171:4, 175:22, 176:7, 194:9,

194:14, 194:17, 194:23, 195:1, 211:17, 212:8, 212:11, 212:21, 213:1, 213:4
Rice [1] - 167:6
rid [5] - 81:1, 83:8, 84:1, 88:15, 88:16
Ridgewood [1] - 173:12
ringing [1] - 175:2
rings [1] - 185:14
rise [4] - 42:20, 53:20, 54:1, 54:8
risen [1] - 54:11
Road [4] - 8:16, 8:21, 22:4, 23:14
robbery [3] - 57:4, 180:18, 205:25
Robert [1] - 1:16
Rodney [3] - 8:13, 178:23, 180:4
role [1] - 206:10
Rolex [1] - 65:5
Rolexes [2] - 64:15, 64:23
Rolls [2] - 64:7, 64:18
Room [1] - 1:24
room [3] - 53:19, 53:25, 90:2
rough [2] - 25:11, 44:12
roughly [5] - 44:13, 103:2, 103:16, 146:21, 199:21
rounded [4] - 111:4, 111:8, 115:15, 124:23
routed [7] - 118:15, 118:16, 119:4, 119:8, 119:18, 119:22, 120:9
routing [1] - 185:11
row [1] - 95:15
Royce [2] - 64:7, 64:19
RPR [1] - 1:24
Rule [2] - 194:10, 206:22
ruled [2] - 91:18, 168:2
rules [1] - 211:6
ruling [1] - 212:1
run [10] - 52:12, 56:17, 100:10, 100:18, 116:25, 138:12, 139:4, 152:17, 153:14, 212:2
run-of-the-mill [1] - 52:12
running [2] - 196:17, 196:18
Running [1] - 137:2
runs [2] - 8:17, 8:20
rusty [1] - 166:12

# S

S-55 [1] - 19:8
sake [2] - 25:8, 144:18
salary [2] - 51:18, 52:2
Samuel [7] - 85:9, 85:16, 115:6, 150:8, 152:10, 152:18, 161:5
sat [1] - 72:24
satisfied [1] - 41:10
save [2] - 58:15, 58:18
Save [1] - 59:2
saw [6] - 61:2, 67:25, 68:1, 132:15, 179:6, 186:25
scale [1] - 68:10
scenarios [1] - 195:25
scene [6] - 23:1, 23:8, 23:18, 23:25, 24:2, 24:11
schedule [1] - 199:25
scheduled [2] - 38:20, 42:13
scheduling [1] - 193:5
school [1] - 134:18
scope [2] - 3:22, 180:11
screen [3] - 21:11, 26:2, 141:10
se [6] - 25:5, 50:10, 166:3, 166:6, 166:9, 167:24
Seamon [1] - 188:20
search [14] - 11:2, 15:6, 63:17, 63:22, 63:24, 87:17, 87:24, 96:2, 109:25, 132:12, 187:13, 187:15, 188:8, 207:14
searched [4] - 65:2, 79:13, 95:21, 188:22
seat [5] - 80:11, 80:13, 180:22, 180:25, 181:1
seated [1] - 63:2
second [40] - 23:16, 24:5, 68:3, 94:15, 101:18, 101:21, 102:24, 104:20, 107:12, 109:6, 110:15, 112:3, 112:8, 112:10, 112:21, 112:22, 112:24, 112:25, 113:14, 113:15, 120:22, 121:9, 122:8, 123:7, 142:10, 148:23, 149:25, 150:9, 150:10, 158:13, 159:21, 160:17, 161:8, 161:24, 168:14, 181:24, 201:4
seconds [30] - 101:17, 103:2, 103:3, 103:16, 103:19, 103:20, 105:6, 110:22, 110:24, 111:13, 112:19, 113:8, 113:9,

113:10, 114:3, 119:2, 120:18, 121:5, 121:13, 121:14, 121:24, 122:25, 123:1, 123:2, 123:3, 125:1, 174:23
Secret [1] - 164:14
section [3] - 2:6, 2:8, 2:10
Security [1] - 153:12
security [2] - 129:6, 129:12
see [55] - 6:5, 7:5, 9:7, 10:9, 10:11, 10:13, 18:13, 21:9, 23:6, 24:10, 27:7, 28:7, 39:12, 62:21, 68:9, 75:19, 83:15, 86:5, 87:21, 92:21, 99:23, 100:4, 101:6, 101:12, 101:14, 101:17, 101:19, 102:15, 103:1, 103:10, 103:14, 106:8, 112:10, 113:19, 121:19, 121:23, 122:10, 134:25, 139:1, 140:9, 141:10, 150:21, 156:2, 158:8, 169:25, 174:1, 192:25, 200:7, 200:11, 201:13, 202:4, 206:14, 209:10, 210:17, 212:13
See [1] - 116:25
seeing [2] - 113:5, 118:12
seem [3] - 12:1, 88:4, 185:23
Seigel [4] - 3:8, 4:1, 4:4, 4:5
seize [1] - 44:11
seized [10] - 11:10, 12:13, 36:20, 109:14, 110:5, 131:25, 132:11, 135:10, 135:22, 187:17
seizing [1] - 13:10
seizure [3] - 11:2, 87:18, 187:15
self [3] - 41:13, 166:10, 209:16
self-incrimination [1] - 209:16
self-represent [1] - 41:13
send [1] - 159:4
sense [6] - 27:1, 88:3, 88:12, 134:1, 170:14, 171:3
sent [4] - 148:22, 154:5, 154:8, 159:8
separate [7] - 27:17, 28:2, 34:19, 42:9, 95:17, 137:16, 212:1
September [4] - 25:25,

53:14, 129:25, 165:24
sequence [1] - 46:13
sequestration [2] - 91:2, 199:16
Sergeant [2] - 130:4, 130:10
series [3] - 11:9, 42:5, 145:1
serious [1] - 208:13
serve [6] - 61:15, 61:17, 61:18, 62:7, 62:14, 62:18
served [4] - 62:24, 63:5, 202:17, 202:18
service [8] - 11:5, 54:1, 85:24, 85:25, 86:9, 86:13, 115:1, 154:20
session [9] - 36:18, 129:24, 130:2, 130:9, 130:11, 130:15, 130:17, 131:3, 191:22
set [12] - 10:8, 39:6, 114:21, 114:24, 115:3, 115:4, 115:6, 115:7, 115:9, 118:13, 139:3, 173:10
sets [1] - 95:23
seven [4] - 82:20, 164:1, 165:11, 189:16
Several [1] - 86:8
several [19] - 9:6, 18:10, 26:4, 38:22, 70:22, 74:16, 78:18, 82:24, 84:8, 96:2, 134:5, 143:21, 186:15, 187:12, 191:12, 211:19
Shack [1] - 83:5
Shake [1] - 32:14
share [1] - 61:8
Share [1] - 210:22
SHAWN [1] - 1:8
Shawn [24] - 13:20, 17:12, 20:21, 20:22, 21:16, 27:18, 27:21, 29:19, 29:25, 30:8, 33:11, 87:1, 87:12, 88:20, 99:9, 100:11, 105:14, 113:21, 139:19, 142:7, 143:13, 144:5
shear [1] - 96:8
sheet [2] - 16:24, 101:20
Sheistyville [1] - 32:14
Shelly [30] - 11:20, 12:10, 12:14, 15:2, 15:24, 27:9, 28:23, 33:7, 33:15, 34:11, 86:14, 88:13, 94:13, 96:25, 99:2, 99:5, 99:12, 99:14, 99:22, 101:9, 101:12, 105:14, 125:4, 143:13,

160:12, 161:6, 163:3, 181:24, 183:11
**SHELLY** [1] - 1:8
**Shelton** [15] - 13:15, 28:4, 28:8, 32:4, 33:8, 33:10, 33:14, 33:15, 34:15, 77:14, 77:25, 79:2, 108:19
**SHELTON** [1] - 1:7
**shelves** [1] - 200:1
**Sherman** [9] - 18:2, 18:17, 105:14, 105:17, 105:22, 140:12, 140:13, 141:5, 141:17
**shift** [1] - 198:2
**shit** [1] - 175:19
**shoes** [1] - 134:4
**shooting** [1] - 130:5
**short** [3] - 5:25, 186:20, 186:23
**shorter** [1] - 78:10
**shortly** [1] - 190:3
**Shorty** [19] - 68:7, 68:8, 68:10, 69:21, 69:24, 173:21, 173:22, 174:10, 174:11, 174:13, 174:16, 174:24, 175:2, 175:3, 175:6, 175:10, 175:12, 175:13
**show** [49] - 13:5, 23:9, 24:7, 27:6, 28:7, 29:17, 54:1, 54:8, 58:15, 69:2, 73:9, 73:20, 74:15, 76:11, 95:25, 100:2, 102:1, 102:5, 103:23, 104:17, 111:12, 111:13, 111:17, 111:18, 112:1, 114:1, 117:21, 118:7, 118:11, 119:15, 125:17, 128:24, 129:2, 135:3, 140:5, 143:6, 143:25, 146:18, 149:4, 158:17, 160:3, 163:19, 184:4, 185:6, 199:13, 209:24, 211:2
**showed** [14] - 13:6, 16:9, 57:7, 57:13, 58:12, 59:14, 103:15, 127:21, 128:13, 130:11, 135:4, 168:10, 168:19, 179:8
**Showing** [2] - 139:12, 140:8
**showing** [15] - 14:9, 98:9, 101:24, 112:4, 131:24, 134:5, 138:15, 143:10, 145:1, 145:19, 157:12, 158:20, 158:22, 185:20, 208:4
**shown** [9] - 64:16, 66:10, 66:23, 120:1,

120:2, 132:7, 148:11, 154:15, 179:16
**shows** [17] - 5:2, 7:22, 21:21, 21:24, 22:1, 22:3, 57:23, 95:19, 101:25, 103:20, 104:2, 105:23, 120:23, 144:10, 146:8, 209:21, 209:23
**sic** [1] - 126:7
**side** [4] - 12:1, 22:13, 163:7, 196:7
**signal** [1] - 108:6
**signalled** [1] - 3:25
**signature** [9] - 30:8, 31:9, 31:19, 32:3, 32:6, 32:15, 34:9, 34:11, 215:11
**signatures** [1] - 31:16
**signed** [8] - 27:9, 29:25, 30:3, 30:4, 31:3, 31:22, 32:9, 41:17
**Signed** [1] - 29:22
**significance** [5] - 88:4, 88:9, 160:15, 160:16, 192:4
**significant** [4] - 4:6, 88:10, 88:18, 182:17
**significantly** [1] - 3:23
**signing** [2] - 34:14, 34:15
**SIM** [1] - 83:19
**similar** [6] - 39:23, 42:5, 49:13, 59:20, 97:24, 105:7
**simply** [3] - 90:22, 95:25, 207:21
**Simpson** [1] - 85:14
**single** [6] - 20:16, 21:2, 35:14, 35:23, 36:6, 147:17
**sister** [4] - 61:8, 138:1, 138:3, 201:3
**sisters** [1] - 106:11
**sit** [6] - 5:9, 44:22, 83:16, 193:12, 205:4, 209:10
**site** [8] - 129:19, 164:8, 164:24, 205:6, 205:7, 205:8, 205:13
**sites** [2] - 184:2, 210:14
**Sitting** [1] - 86:9
**sitting** [7] - 3:7, 37:1, 54:4, 80:13, 133:12, 198:13, 208:6
**situation** [2] - 105:23, 107:11
**six** [9] - 44:13, 44:15, 64:4, 66:5, 66:7, 128:2, 148:13, 184:6, 211:3
**skills** [1] - 81:17

**sleep** [1] - 207:3
**slide** [5] - 32:10, 99:24, 102:22, 118:11, 122:1
**slight** [1] - 185:7
**slightly** [1] - 184:23
**slip** [2] - 18:8, 187:19
**Slo** [3] - 32:12, 32:13, 34:14
**slower** [2] - 45:7, 45:9
**slumped** [1] - 75:20
**small** [1] - 44:15
**Smith** [8] - 28:9, 28:10, 31:10, 34:2, 82:15, 84:14, 109:12, 109:18
**Smith's** [1] - 32:20
**snag** [1] - 83:20
**snippets** [1] - 44:14
**Snitching** [3] - 64:15, 126:23, 126:25
**Social** [1] - 153:12
**solely** [1] - 106:15
**solid** [1] - 87:4
**solidly** [1] - 39:25
**soliloquy** [1] - 189:19
**Solothol** [1] - 167:8
**someone** [18] - 5:10, 5:15, 57:4, 67:13, 70:14, 75:7, 75:22, 78:2, 82:24, 104:16, 104:18, 115:1, 127:15, 130:14, 195:19, 195:24, 197:4, 197:5
**sometime** [5] - 86:1, 125:10, 125:19, 163:5, 212:15
**sometimes** [7] - 37:14, 85:13, 106:13, 106:19, 106:20, 108:15, 159:1
**somewhat** [2] - 3:13, 45:7
**Somewhere** [2] - 133:18, 134:9
**somewhere** [3] - 112:5, 134:25, 153:17
**songs** [1] - 9:12
**soon** [1] - 42:20
**sorry** [31] - 4:18, 8:8, 16:23, 42:17, 43:24, 72:10, 73:25, 77:4, 79:4, 87:13, 112:16, 113:18, 115:18, 116:2, 138:19, 143:7, 145:17, 153:10, 168:21, 170:6, 184:13, 187:2, 193:10, 194:22, 195:10, 196:20, 197:1, 197:25, 199:3, 200:15, 200:21
**Sorry** [1] - 162:24
**sort** [13] - 49:16, 49:17, 49:20, 53:10, 133:20, 144:18, 150:25, 151:14,

164:23, 195:2, 201:1, 211:20, 212:2
**Sort** [1] - 200:25
**sound** [3] - 45:2, 76:3, 76:4
**sounds** [1] - 208:2
**Sounds** [1] - 45:3
**source** [1] - 106:14
**south** [2] - 170:1
**southern** [1] - 22:15
**sovereignty** [1] - 207:1
**space** [1] - 49:10
**speaker** [1] - 175:3
**speaking** [8] - 104:19, 107:3, 111:9, 126:3, 139:21, 179:25, 181:5, 200:9
**specific** [3] - 106:14, 137:6, 164:24
**specifically** [6] - 70:23, 116:24, 116:25, 117:18, 126:20, 184:12
**Specifically** [1] - 104:8
**specifics** [1] - 67:2
**Spectrum** [1] - 151:9
**speech** [3] - 36:21, 37:4, 40:15
**speeches** [2] - 37:5, 37:12
**speed** [2] - 45:5, 45:8
**Spence** [13] - 21:23, 22:3, 22:8, 23:2, 24:11, 128:13, 162:1, 168:11, 188:1, 190:4, 202:25, 206:1, 209:17
**Spence's** [2] - 19:22, 23:11
**spliced** [1] - 165:3
**spoken** [5] - 5:10, 5:13, 5:14, 107:21, 107:22, 116:12, 117:17, 139:25, 183:18
**Sports** [5] - 18:6, 18:18, 140:15, 141:22, 143:4
**spot** [1] - 207:19
**Sprint** [2] - 151:9, 151:15, 154:15
**stage** [1] - 55:1
**stages** [2] - 68:7, 108:3
**stamped** [1] - 103:3
**stand** [6] - 4:12, 7:11, 45:25, 46:4, 155:11, 174:20
**standing** [1] - 205:21
**stands** [1] - 118:13
**start** [4] - 47:24, 188:15, 200:3, 210:11
**started** [7] - 36:3, 53:13, 86:18, 161:11, 163:14, 165:24, 185:6

**starting** [3] - 22:1, 212:14, 212:20
**Starting** [1] - 108:18
**starts** [2] - 146:16, 159:15
**State** [1] - 49:9
**state** [10] - 52:13, 52:23, 60:23, 164:6, 184:4, 201:5, 205:24, 211:1, 211:8
**state's** [1] - 76:12
**State's** [5] - 66:17, 66:18, 66:21, 73:16, 179:10
**statement** [9] - 36:25, 64:12, 68:10, 108:6, 173:5, 173:6, 174:15, 175:19, 197:4
**statements** [17] - 27:13, 39:17, 40:4, 40:20, 41:2, 41:4, 41:7, 43:5, 43:9, 43:10, 44:12, 44:15, 74:22, 75:11, 75:13, 206:2, 207:21
**States** [4] - 3:8, 29:10, 166:25, 210:16
**states** [1] - 29:5
**STATES** [2] - 1:1, 1:5
**stating** [2] - 36:23, 40:1
**status** [1] - 204:6
**stay** [2] - 6:20, 155:8
**stenographically** [1] - 215:4
**step** [2] - 7:21, 81:23
**stepped** [1] - 42:20
**Still** [3] - 10:5, 203:11, 205:21
**still** [10] - 10:6, 32:17, 81:11, 81:13, 97:4, 98:23, 113:12, 115:2, 119:15, 123:4, 169:5, 169:11, 175:2, 196:1, 197:7, 211:23
**stipulation** [3] - 92:12, 156:1, 191:7
**stipulations** [1] - 210:17
**stockholder** [4] - 35:8, 35:15, 35:21, 51:3
**stolen** [3] - 84:1, 85:18, 115:1
**Stop** [3] - 64:14, 126:23, 126:25
**stopped** [8] - 44:20, 86:10, 86:11, 142:15, 142:22, 153:25, 187:7
**store** [1] - 140:17
**stored** [2] - 11:3, 11:7
**straight** [2] - 48:5, 119:10

**stranger** [1] - 181:1
**street** [2] - 63:18, 106:16
**Street** [5] - 1:25, 30:7, 77:14, 169:23, 188:7
**stricken** [1] - 186:2
**strictly** [2] - 108:22, 200:8
**Strike** [1] - 168:21
**strike** [3] - 14:6, 43:16, 79:25
**struck** [1] - 3:13
**stuff** [3] - 46:17, 158:18, 196:13
**subject** [2] - 43:2, 199:19
**submitted** [1] - 194:15
**subpoena** [27] - 4:23, 5:22, 17:8, 61:16, 61:17, 61:18, 62:8, 62:11, 62:14, 62:18, 62:24, 63:6, 83:12, 148:21, 149:3, 149:4, 149:23, 150:12, 151:8, 151:9, 151:15, 151:17, 152:5, 157:2, 157:13, 158:3, 158:12
**subpoenaed** [1] - 159:25
**subscribe** [1] - 83:9
**subscribed** [14] - 11:20, 30:17, 31:8, 82:15, 82:16, 84:14, 85:9, 86:24, 99:8, 150:8, 150:17, 152:21, 182:5, 182:6
**Subscribed** [1] - 99:5
**subscriber** [4] - 85:12, 151:18, 151:24, 160:12
**subscribers** [1] - 85:15
**subsequent** [1] - 22:21
**substance** [1] - 206:9
**substantial** [1] - 206:2
**substantively** [1] - 6:9
**successful** [1] - 209:25
**succession** [5] - 110:17, 113:22, 114:12, 114:14, 189:20
**sufficiently** [2] - 10:13, 123:1
**suggest** [4] - 4:3, 58:8, 195:20, 208:16
**suggests** [1] - 196:22
**sum** [1] - 176:24
**summarize** [1] - 66:10
**summarized** [1] - 80:3
**summarizing** [3] - 73:18, 74:18, 75:8
**summary** [10] - 17:17, 19:12, 70:20, 74:3, 74:5,

77:10, 78:25, 176:10, 176:22, 178:2
**summation** [1] - 76:21
**summed** [1] - 177:4
**Supermax** [2] - 49:3, 49:14
**superseding** [1] - 3:11
**supplemental** [1] - 32:23
**support** [2] - 4:6, 29:9
**supposed** [1] - 131:4
**supremacist** [3] - 49:18, 164:20, 164:23
**surplusage** [1] - 3:14
**surprise** [1] - 80:5
**surveillance** [3] - 185:21, 185:24, 206:11
**suspect** [1] - 127:8
**suspended** [1] - 160:10
**suspicious** [1] - 89:22
**sustain** [3] - 43:15, 43:20, 190:18
**Sustained** [8] - 52:16, 53:8, 85:1, 164:10, 166:5, 167:18, 171:24, 172:21
**sustained** [1] - 54:20
**swear** [1] - 167:14
**switch** [2] - 88:12, 89:3
**sworn** [4] - 29:9, 30:17, 31:8, 41:13
**symbol** [1] - 53:22
**sync** [1] - 102:23
**system** [4] - 26:14, 191:12, 191:13, 201:5

## T

**T-12** [3] - 150:21, 152:2, 158:2
**T-16** [1] - 111:24
**T-17** [1] - 121:2
**T-3** [1] - 111:17
**tag** [1] - 16:10
**tail** [1] - 212:16
**tape** [34] - 44:3, 45:4, 48:13, 60:15, 65:11, 65:15, 65:19, 65:24, 66:11, 67:13, 69:18, 70:8, 70:18, 70:21, 70:24, 71:12, 71:15, 71:19, 73:18, 74:12, 75:23, 76:4, 91:14, 165:3, 165:6, 165:11, 167:12, 173:2, 174:15, 175:16, 175:25, 184:16, 189:14
**taped** [1] - 171:15
**tapes** [2] - 45:1, 129:6

**target** [2] - 82:25, 99:25
**targets** [2] - 138:22, 139:14
**Targets** [1] - 140:9
**Task** [2] - 2:8, 80:25
**task** [5] - 51:13, 51:14, 52:5, 81:12, 81:13
**tax** [2] - 49:17, 164:20
**technically** [3] - 47:8, 56:10, 81:14
**Technician** [1] - 198:19
**Technicians** [1] - 198:20
**teenagers** [2] - 203:10, 203:11
**telephone** [25] - 11:13, 14:5, 17:8, 18:10, 19:21, 21:25, 81:21, 97:17, 110:9, 118:5, 139:7, 140:6, 144:1, 146:18, 148:2, 154:22, 168:20, 172:24, 183:22, 184:8, 185:12, 195:3
**telephones** [7] - 79:1, 79:3, 106:2, 138:16, 184:8, 186:20, 186:25
**ten** [5] - 52:14, 66:8, 117:11, 155:21, 168:23
**Ten** [1] - 155:15
**tenth** [1] - 36:7
**term** [7] - 56:10, 56:13, 83:14, 83:22, 158:6, 166:6, 173:21
**termed** [1] - 172:3
**terminated** [3] - 86:1, 154:21, 185:4
**termination** [1] - 26:4
**terms** [7] - 57:7, 82:3, 84:19, 140:2, 165:20, 204:5, 212:5
**territory** [1] - 3:2
**testified** [49] - 8:14, 19:20, 20:12, 28:10, 48:18, 48:21, 57:1, 59:15, 61:14, 61:21, 61:25, 64:22, 67:7, 67:12, 67:17, 67:18, 68:21, 69:8, 73:4, 73:14, 74:2, 74:5, 76:18, 77:10, 80:1, 86:25, 93:20, 93:23, 100:15, 127:3, 140:14, 141:25, 143:21, 152:22, 154:20, 167:25, 175:15, 180:4, 182:3, 182:15, 185:1, 186:1, 186:6, 187:25, 189:18, 190:1, 192:20, 201:22, 205:23
**testify** [10] - 38:22, 61:17, 61:19, 69:17,

82:12, 98:2, 123:4, 186:12, 195:7, 197:6
**testifying** [15] - 9:16, 17:24, 24:15, 24:18, 63:11, 69:14, 74:3, 136:14, 153:20, 156:14, 168:6, 176:9, 195:16, 199:21, 211:4
**testimony** [62] - 9:1, 9:14, 9:21, 12:20, 13:20, 16:20, 20:14, 20:19, 38:20, 42:11, 45:11, 47:25, 59:25, 61:2, 67:10, 68:15, 69:2, 70:20, 73:17, 76:6, 76:24, 80:22, 81:5, 81:20, 84:15, 97:23, 122:6, 131:9, 132:11, 133:1, 134:16, 135:17, 137:8, 140:21, 140:25, 141:17, 141:21, 141:23, 142:3, 142:14, 143:7, 143:16, 156:23, 159:21, 165:21, 166:7, 168:11, 169:22, 174:5, 176:9, 177:2, 194:21, 199:19, 200:18, 200:22, 200:24, 201:14, 203:22, 206:3, 206:20, 211:8, 212:10
**TFO** [1] - 214:4
**THE** [252] - 1:1, 1:2, 2:3, 2:5, 2:15, 2:20, 2:23, 4:16, 4:18, 4:21, 5:1, 5:10, 5:13, 5:15, 5:18, 5:21, 5:23, 6:3, 6:7, 6:15, 6:22, 7:1, 7:3, 7:15, 7:16, 8:3, 8:8, 8:19, 8:20, 9:6, 9:22, 10:2, 10:5, 10:7, 10:13, 10:20, 11:25, 12:5, 12:8, 13:3, 13:5, 20:4, 20:7, 20:13, 20:15, 25:12, 26:6, 27:16, 38:7, 39:2, 39:5, 40:24, 42:14, 42:23, 43:15, 43:17, 43:20, 44:2, 45:24, 46:6, 46:8, 46:10, 46:19, 47:7, 47:12, 47:15, 50:24, 52:16, 52:20, 53:8, 54:20, 70:5, 70:17, 71:24, 72:1, 80:17, 85:1, 88:8, 89:5, 89:7, 89:9, 90:5, 90:8, 90:10, 90:15, 90:17, 90:19, 90:21, 91:8, 91:11, 91:19, 92:4, 92:8, 92:11, 92:14, 92:20, 92:25, 93:2, 93:4, 107:14, 126:20, 129:10, 131:12, 131:15, 131:22, 150:20, 154:23, 154:25, 155:6, 155:13, 155:16,

155:18, 155:22, 156:2, 156:4, 157:25, 163:20, 164:10, 166:5, 166:20, 167:18, 169:10, 169:14, 169:17, 169:20, 170:5, 170:9, 170:11, 171:1, 171:8, 171:10, 171:24, 172:7, 172:21, 175:23, 177:15, 177:25, 178:9, 178:14, 179:3, 180:12, 181:4, 181:9, 186:4, 188:24, 189:1, 189:3, 189:11, 190:18, 190:23, 193:3, 193:7, 193:10, 193:13, 193:15, 193:24, 194:11, 194:16, 194:22, 194:24, 195:4, 195:10, 195:13, 195:15, 195:20, 195:23, 196:3, 196:6, 196:11, 196:15, 196:20, 196:25, 197:8, 197:12, 197:19, 198:2, 198:6, 198:8, 198:13, 198:18, 198:20, 198:23, 199:1, 199:3, 199:7, 199:12, 199:15, 199:18, 199:24, 200:5, 200:10, 200:15, 200:18, 200:21, 200:24, 201:6, 201:9, 201:12, 201:16, 201:19, 202:1, 202:5, 202:8, 202:11, 202:15, 202:17, 202:19, 202:23, 203:1, 203:6, 203:9, 203:11, 203:13, 203:17, 203:20, 203:23, 204:1, 204:7, 204:11, 204:20, 205:2, 205:8, 205:14, 205:18, 205:20, 205:22, 206:13, 206:17, 206:24, 207:2, 207:5, 207:9, 207:24, 208:2, 208:15, 208:19, 208:24, 209:5, 209:8, 209:23, 210:6, 210:12, 210:19, 211:10, 211:13, 211:16, 212:4, 212:9, 212:19, 212:24, 213:2, 213:5
**theater** [6] - 128:2, 129:6, 129:12, 129:14, 129:16, 185:19
**theirs** [1] - 192:10
**themselves** [4] - 61:8, 152:23, 157:22, 158:1
**theoretically** [1] - 114:3
**theory** [1] - 196:24
**therefore** [2] - 123:2, 172:23
**They've** [1] - 163:1
**they've** [5] - 48:7, 54:11, 105:2, 139:25,

205:11
**thick** [2] - 197:1
**thinking** [5] - 119:20,
137:3, 204:20, 204:21
**third** [8] - 3:11, 63:1,
75:16, 111:3, 113:3,
113:10, 121:17, 126:16
**thirds** [1] - 44:20
**thirties** [1] - 133:18
**Thomas** [2] - 1:20,
167:8
**threatened** [1] - 37:25
**three** [47] - 18:20,
22:21, 24:13, 33:24,
34:22, 36:20, 37:3, 37:8,
38:1, 39:13, 40:8, 41:4,
41:7, 42:4, 44:7, 60:21,
60:24, 65:25, 66:7,
72:11, 78:5, 90:11, 98:6,
98:9, 99:1, 99:11,
103:18, 103:20, 109:20,
111:1, 126:15, 135:2,
157:15, 163:8, 163:15,
168:13, 175:15, 181:17,
190:6, 190:12, 190:13,
194:20, 199:8, 199:21
**Three** [1] - 65:23
**throughout** [5] -
103:14, 103:17, 112:9,
130:18, 186:17
**throw** [1] - 83:8
**thrown** [1] - 197:20
**Thursday** [9] - 6:12,
7:12, 17:25, 91:17,
186:9, 191:24, 191:25,
194:18, 204:18
**ticket** [1] - 6:13
**tight** [1] - 207:3
**timely** [1] - 129:5
**timing** [1] - 185:2
**Title** [8] - 56:3, 56:6,
56:9, 56:10, 56:12,
56:13, 56:17, 56:19
**title** [1] - 51:14
**TM** [2] - 61:10, 61:12
**today** [14] - 4:24, 83:23,
86:9, 94:17, 122:6,
133:15, 133:19, 154:7,
155:8, 156:14, 165:6,
199:10, 207:6, 212:12
**together** [6] - 38:2,
82:3, 111:2, 134:18,
165:3, 180:13
**toll** [29] - 21:5, 57:13,
81:24, 82:1, 82:21,
85:25, 128:23, 138:13,
139:19, 139:21, 140:2,
140:5, 143:25, 148:1,
148:25, 151:19, 152:22,
157:2, 157:16, 158:14,

182:7, 183:19, 183:22,
183:25, 184:8, 186:19,
186:24, 187:2, 195:3
**tolls** [16] - 86:5, 95:23,
100:22, 101:25, 103:1,
112:9, 114:2, 114:9,
124:23, 125:17, 148:20,
148:23, 148:25, 149:2,
159:1, 182:17
**tomorrow** [11] - 189:4,
192:22, 192:23, 192:24,
192:25, 193:7, 193:11,
193:12, 211:7, 213:3
**tonight** [2] - 202:22,
210:20
**Tony** [2] - 125:15,
125:20
**Tonya** [9] - 19:22, 22:2,
22:8, 23:11, 162:1,
188:1, 190:4, 206:1,
209:16
**took** [10] - 44:12, 44:13,
44:22, 119:13, 122:7,
129:25, 130:15, 173:17,
207:16, 207:23
**tool** [2] - 55:7, 55:9
**top** [14] - 12:16, 14:7,
71:2, 71:4, 85:7, 93:11,
94:13, 96:3, 107:15,
108:18, 118:11, 150:5,
152:8, 167:9
**topic** [1] - 65:9
**total** [5] - 66:3, 66:8,
95:25, 158:23, 182:23
**touch** [3] - 180:1,
190:15, 203:17
**toward** [2] - 69:11,
188:14
**towards** [1] - 8:21
**Tower** [2] - 22:11, 24:12
**tower** [18] - 9:1, 9:2,
21:22, 21:25, 22:7,
22:12, 22:13, 22:24,
23:1, 23:7, 23:16, 24:2,
24:5, 24:8, 83:18, 128:6,
168:10
**towers** [4] - 23:3, 23:13,
128:14, 185:10
**town** [1] - 208:13
**trace** [1] - 84:2
**tracing** [2] - 145:8,
145:9
**track** [1] - 184:3
**tracking** [4] - 54:25,
55:3, 55:4, 55:24
**trade** [2] - 56:23, 56:25
**traffickers** [2] - 108:1,
108:7
**trafficking** [1] - 81:7
**transcribed** [2] - 76:6,

215:8
**transcript** [25] - 66:10,
66:25, 67:22, 68:4,
72:18, 72:21, 72:22,
73:6, 73:7, 73:15, 73:19,
73:21, 73:24, 74:1,
75:23, 75:24, 76:12,
76:18, 165:12, 173:19,
174:14, 174:18, 179:8,
179:9, 215:8
**Transcript** [2] - 73:23,
174:19
**transcripts** [3] - 66:16,
73:14, 74:9
**Transmission** [1] -
73:23
**trappings** [2] - 64:5,
64:9
**traveled** [1] - 48:24
**trial** [30] - 6:21, 7:7,
7:14, 28:10, 36:3, 36:4,
50:4, 52:5, 53:12, 54:5,
54:15, 60:23, 61:19,
62:8, 62:11, 62:14,
62:22, 63:1, 89:13,
89:21, 132:24, 140:25,
143:17, 165:24, 177:12,
205:24, 210:11, 211:5
**triangle** [1] - 22:14
**tried** [2] - 59:10, 209:18
**tries** [1] - 59:10
**trips** [1] - 184:4
**trouble** [1] - 59:9
**true** [5] - 23:24, 68:10,
71:7, 119:21, 167:16
**trust** [1] - 7:1
**truthful** [1] - 209:17
**try** [6] - 10:15, 16:5,
100:18, 126:22, 138:12,
193:15
**Trying** [1] - 73:2
**trying** [14] - 58:25, 59:4,
59:6, 62:14, 70:7, 81:1,
88:14, 108:12, 136:10,
165:10, 182:9, 190:14,
207:18, 207:25
**Tuesday** [2] - 193:9,
208:7, 208:9
**turn** [4] - 10:2, 24:21,
120:13, 145:25
**turned** [1] - 89:17
**Turning** [1] - 138:11
**turning** [1] - 144:24
**turns** [1] - 6:1
**twenties** [1] - 133:18
**Twenty** [4] - 90:7, 90:8,
99:20, 155:17
**twice** [5] - 80:7, 93:17,
174:14, 181:15, 188:4,
188:6

**twist** [1] - 171:21
**Two** [9] - 12:13, 15:6,
17:4, 28:19, 28:24,
183:9, 185:20, 203:2,
206:16
**two** [94] - 8:23, 15:21,
17:9, 23:12, 29:18,
33:15, 33:21, 36:20,
37:3, 43:11, 44:12,
44:13, 44:14, 44:20,
50:2, 54:17, 66:7, 72:11,
78:13, 79:2, 81:2, 82:10,
82:16, 85:6, 87:8, 94:4,
94:9, 98:12, 98:15,
98:21, 99:25, 100:13,
101:9, 101:13, 102:23,
103:22, 104:22, 104:24,
108:9, 108:13, 110:11,
111:1, 111:3, 111:11,
115:24, 117:20, 117:21,
117:25, 118:2, 118:5,
118:23, 119:16, 121:6,
123:1, 123:7, 124:19,
124:22, 126:14, 126:15,
132:23, 139:1, 141:17,
142:8, 143:17, 144:1,
145:12, 146:13, 148:17,
149:5, 150:2, 151:19,
161:20, 165:10, 167:5,
170:18, 175:24, 175:25,
183:15, 187:23, 189:16,
189:19, 199:8, 199:10,
199:21, 202:24, 206:7,
206:21, 208:4, 208:14,
209:14, 212:12
**two-thirds** [1] - 44:20
**type** [2] - 185:16,
196:13
**types** [2] - 33:25,
207:15
**Typically** [1] - 106:7
**typically** [7] - 45:3,
56:16, 138:16, 154:1,
178:3, 186:20, 200:2

## U

**U.S** [2] - 1:24, 29:12
**UCC** [2] - 50:17, 50:19
**Ultimately** [1] - 188:18
**unable** [2] - 82:20,
120:13
**unaccounted** [1] - 83:3
**unalterables** [1] -
208:19
**unarmed** [1] - 205:25
**unavailable** [1] - 211:6
**unbalanced** [2] - 46:15,
46:16

**uncharted** [1] - 3:2
**uncomfortable** [1] -
181:13
**uncommon** [8] - 55:9,
57:17, 59:22, 94:5,
106:18, 108:15, 181:6,
181:11
**uncooperative** [1] -
62:15
**under** [21] - 4:23, 7:13,
13:24, 14:3, 14:15,
14:16, 15:23, 74:20,
80:1, 87:23, 93:17,
114:5, 187:18, 187:24,
191:9, 206:2, 206:8,
208:7, 208:9, 211:6,
211:8
**underneath** [1] - 153:5
**understood** [2] - 91:20,
91:23
**unfair** [1] - 2:9
**unfounded** [1] - 53:4
**unheard** [1] - 57:18
**Uniform** [2] - 41:5,
50:20
**unique** [4] - 48:9, 55:6,
55:7, 57:17
**unison** [1] - 37:14
**United** [4] - 3:8, 29:10,
166:25, 210:16
**UNITED** [2] - 1:1, 1:5
**unknown** [3] - 119:18,
120:7, 168:19
**unless** [3] - 4:11,
202:11, 203:14
**Unless** [1] - 111:9
**unlike** [1] - 177:12
**unlisted** [1] - 88:13
**unlock** [1] - 197:18
**unplugged** [2] - 10:7,
12:1
**unquote** [1] - 204:17
**unsatisfactory** [1] -
10:16
**unsuccessful** [3] -
58:19, 58:24, 62:14
**untruthful** [1] - 209:19
**unusual** [1] - 107:8
**up** [99] - 5:2, 6:12, 8:20,
8:21, 9:7, 10:8, 21:11,
22:4, 22:5, 22:11, 23:5,
23:25, 24:10, 26:18,
31:5, 32:10, 38:22,
42:20, 50:4, 54:21,
54:24, 57:22, 76:23,
83:10, 83:11, 85:12,
85:13, 85:23, 86:3,
94:20, 95:16, 96:3,
98:15, 101:7, 102:5,
102:20, 102:22, 103:22,

104:2, 107:23, 110:16, 110:23, 111:4, 111:8, 111:24, 114:1, 114:4, 114:8, 114:21, 114:24, 115:3, 115:4, 115:6, 115:7, 115:9, 115:15, 115:19, 116:2, 116:3, 117:14, 117:19, 120:1, 120:2, 121:1, 122:18, 124:23, 131:20, 134:17, 136:11, 137:18, 139:1, 152:8, 153:17, 156:1, 158:1, 158:10, 158:11, 162:3, 162:8, 162:20, 163:1, 163:9, 163:15, 163:17, 163:19, 170:15, 172:9, 172:19, 173:10, 176:24, 177:4, 190:19, 199:13, 201:4, 204:18, 209:21, 209:24

**update** [2] - 194:4, 194:6

**updated** [1] - 14:8

**upper** [4] - 22:15, 89:15, 89:19, 136:11

**urge** [3] - 26:9, 26:11, 26:23

**urges** [1] - 26:22

**USA** [1] - 215:4

**usable** [1] - 154:12

**user** [1] - 86:21

**uses** [1] - 24:20

**utilize** [2] - 55:14, 185:24

**utilized** [1] - 157:19

**utilizing** [3] - 56:14, 182:10, 182:14

**uttered** [1] - 189:21

## V

**V-17** [1] - 137:18

**V-2** [1] - 10:24

**V-7** [3] - 136:2, 136:3, 186:6

**vague** [1] - 170:14

**Valdavia** [11] - 10:23, 11:14, 63:19, 63:20, 79:13, 109:25, 131:25, 132:11, 135:10, 135:22, 187:13

**variables** [1] - 196:10

**variance** [1] - 185:8

**variances** [2] - 185:9, 185:17

**various** [2] - 82:3, 138:16

**varying** [2] - 78:9, 78:14

**vast** [4] - 123:10,

182:22, 184:5, 185:17

**vehicle** [7] - 54:25, 55:25, 195:19, 195:21, 195:22, 196:1

**verbally** [1] - 171:22

**verbatim** [4] - 37:3, 41:19, 44:21

**verbiage** [3] - 41:2, 41:6, 41:8

**verdict** [2] - 191:19, 192:16

**verified** [1] - 127:20

**verify** [2] - 111:23, 127:16

**vernacular** [3] - 48:5, 69:21, 69:24

**version** [1] - 68:3

**versus** [1] - 84:10

**via** [1] - 57:18

**victim** [3] - 127:20, 127:22, 180:18

**video** [5] - 50:4, 126:23, 127:1, 129:15, 185:24

**videos** [1] - 129:11

**videotape** [2] - 127:21, 179:5

**videotapes** [1] - 129:13

**view** [8] - 10:14, 26:12, 47:4, 132:3, 136:25, 177:1, 177:6, 205:12

**VIN** [1] - 136:24

**violate** [1] - 43:24

**violent** [1] - 81:7

**Violent** [2] - 51:21, 81:7

**Violet** [2] - 8:25, 9:1

**virtue** [1] - 52:5

**visited** [1] - 164:25

**vital** [1] - 206:5

**vitally** [1] - 206:11

**voice** [55] - 53:10, 65:10, 65:15, 65:16, 67:23, 68:24, 71:8, 94:7, 95:1, 95:13, 95:16, 95:23, 96:7, 105:25, 110:21, 110:25, 111:2, 114:6, 114:16, 114:17, 114:18, 114:19, 114:20, 114:24, 115:2, 115:4, 115:7, 115:9, 119:10, 122:19, 123:7, 123:12, 123:14, 123:16, 123:20, 123:21, 125:25, 126:7, 126:8, 126:12, 126:18, 126:25, 173:20, 174:4, 174:8, 174:11, 175:18, 185:13, 185:15, 185:16, 190:11

**voices** [7] - 45:2, 65:14, 74:16, 126:14, 126:15, 175:15, 175:24

**voir** [1] - 204:18

**VOLUME** [1] - 1:11

**volume** [5] - 17:14, 65:3, 95:25, 96:8, 211:21

**volumes** [1] - 67:6

**vote** [1] - 176:19

## W

**W-48** [2] - 9:15, 16:23

**W-66** [4] - 108:18, 113:17, 174:1, 184:11

**W-67** [1] - 15:19

**W-68** [1] - 11:22

**W5-F** [1] - 14:21

**W5-J** [1] - 14:9

**Wabash** [1] - 173:12

**wait** [4] - 9:25, 12:1, 21:12, 190:21

**Wait** [1] - 104:16

**waited** [1] - 206:25

**waiting** [1] - 5:4

**Walker** [2] - 32:11, 34:14

**walker** [1] - 32:12

**walking** [1] - 210:2

**wants** [2] - 143:8, 170:15

**warn** [1] - 38:13

**warrant** [8] - 11:2, 15:6, 87:18, 87:24, 109:25, 132:12, 187:13, 187:15

**Washington** [1] - 208:9

**watched** [1] - 50:4

**watches** [2] - 64:24, 65:5, 105:5

**WAYNE** [1] - 1:8

**Wayne** [46] - 9:11, 11:20, 12:11, 12:14, 14:16, 15:1, 15:2, 15:3, 15:24, 27:9, 28:23, 33:7, 33:15, 34:11, 77:15, 86:14, 87:10, 88:14, 88:23, 93:20, 93:24, 94:1, 94:13, 96:25, 99:2, 99:5, 99:7, 99:8, 99:12, 99:14, 99:22, 101:9, 101:12, 105:14, 110:9, 125:5, 143:13, 163:3, 175:18, 175:19, 181:24, 182:6, 183:6, 183:11

**Wayne's** [3] - 12:15, 14:5, 14:18

**ways** [4] - 82:24, 161:17, 197:6, 206:19

**wealth** [2] - 64:5, 64:9

**weapons** [2] - 130:5, 130:23

**wearing** [1] - 134:4

**Weaze** [5] - 9:12, 11:18, 13:24, 14:15, 88:1

**web** [8] - 164:7, 164:24, 205:6, 205:7, 205:8, 205:13, 210:14

**Wednesday** [26] - 5:20, 90:24, 90:25, 91:6, 155:22, 155:25, 189:5, 190:21, 191:2, 191:10, 191:21, 191:23, 192:6, 193:1, 193:13, 194:18, 194:19, 194:21, 199:5, 202:21, 204:4, 204:23, 207:8, 209:21, 213:4, 213:5

**week** [10] - 53:15, 53:16, 54:17, 63:1, 78:13, 91:17, 131:23, 208:7, 209:9

**weekend** [3] - 2:7, 7:5, 154:5

**weeks** [4] - 17:9, 33:25, 157:15, 212:12

**WEEZ** [1] - 14:3

**Weez** [1] - 14:3

**weight** [1] - 26:25

**West** [1] - 1:25

**whatsoever** [5] - 34:6, 89:13, 96:16, 192:4, 212:19

**whereas** [1] - 111:7

**Whereas** [1] - 35:10

**Whereof** [1] - 215:10

**white** [3] - 49:18, 164:19, 164:23

**White** [1] - 64:22

**Whitcomb** [1] - 32:18

**who've** [1] - 49:12

**whoever's** [1] - 210:2

**whole** [7] - 3:12, 5:8, 21:15, 81:25, 124:10, 177:1, 186:24

**wife** [2] - 107:1, 209:4

**wife's** [1] - 196:12

**William** [2] - 129:25, 130:5

**Willie** [13] - 27:24, 30:11, 31:3, 33:6, 34:2, 98:3, 98:7, 101:6, 108:23, 117:22, 120:16, 144:4, 215:4

**WILLIE** [1] - 1:7

**willing** [2] - 46:22, 155:8

**wireless** [1] - 110:20

**wiretap** [4] - 56:11, 56:17, 106:7, 183:24

**wiretapping** [1] - 56:19

**wiretaps** [1] - 56:14

**wish** [5] - 62:15,

191:20, 192:9, 193:11, 205:4

**witness** [47] - 4:24, 4:25, 5:2, 5:3, 5:5, 5:25, 9:7, 9:20, 59:15, 63:8, 70:1, 70:3, 70:12, 90:11, 90:13, 90:17, 91:6, 91:8, 91:9, 107:12, 128:3, 130:25, 131:3, 139:23, 150:19, 155:6, 171:1, 171:24, 176:10, 176:22, 178:14, 192:13, 192:14, 192:18, 192:19, 199:13, 200:5, 200:8, 200:25, 201:1, 204:14, 206:5, 207:12, 211:14, 211:22

**Witness** [1] - 215:10

**WITNESS** [9] - 7:15, 8:20, 13:5, 20:15, 72:1, 80:17, 131:15, 171:10, 214:4

**witness'** [1] - 9:21

**witnessed** [1] - 43:1

**witnesses** [33] - 4:13, 4:21, 5:19, 20:11, 38:22, 46:25, 62:3, 65:13, 65:20, 66:23, 67:9, 70:8, 70:22, 90:24, 92:25, 134:6, 176:15, 177:3, 179:25, 191:14, 191:16, 191:17, 191:20, 192:1, 192:3, 192:8, 192:9, 192:10, 192:12, 192:18, 199:9, 211:19

**wonder** [1] - 200:13

**wondering** [1] - 198:9

**wooded** [1] - 24:9

**Woodland** [2] - 8:15, 8:22

**woods** [4] - 23:10, 23:18, 24:4, 24:12

**word** [13] - 40:24, 55:9, 67:13, 154:1, 154:9, 160:15, 171:3, 171:15, 174:10, 174:11, 174:13, 175:2, 180:17

**worded** [1] - 57:12

**words** [11] - 20:13, 24:20, 24:21, 36:19, 40:3, 71:12, 153:5, 153:23, 165:14, 189:21, 193:24

**workers** [2] - 83:3, 106:16

**world** [1] - 149:2

**worth** [1] - 194:20

**wrapped** [1] - 137:18

**writ** [3] - 204:3, 204:4, 206:14

**written** [7] - 12:16,

14:7, 14:13, 47:2,
187:20, 194:12, 210:10
  **wrote** [1] - 15:12
  **Wyche** [118] - 15:8,
16:8, 16:19, 17:19,
18:22, 59:16, 59:18,
59:22, 60:4, 64:7, 64:18,
67:7, 68:17, 69:20, 80:1,
81:24, 87:2, 87:9, 88:5,
88:11, 88:20, 89:1, 89:4,
93:17, 95:20, 97:17,
99:2, 99:3, 99:19, 99:22,
100:1, 100:2, 100:8,
100:9, 100:11, 100:14,
100:19, 106:21, 106:22,
106:23, 107:3, 107:9,
107:18, 107:21, 107:24,
108:14, 116:12, 116:13,
116:19, 117:2, 117:5,
117:9, 117:16, 117:22,
118:3, 118:5, 118:10,
119:3, 119:5, 119:12,
120:16, 121:10, 121:12,
121:22, 121:23, 123:9,
124:6, 124:9, 124:10,
124:14, 124:15, 124:22,
125:10, 128:16, 134:24,
142:15, 142:19, 142:22,
144:10, 145:17, 145:25,
146:2, 146:14, 146:20,
147:8, 148:8, 148:16,
148:19, 148:21, 148:24,
149:12, 149:16, 153:22,
156:16, 161:19, 161:21,
172:23, 173:4, 173:7,
173:9, 173:13, 173:22,
174:2, 174:10, 180:17,
181:5, 181:16, 182:4,
184:13, 184:14, 184:18,
185:21, 187:7, 187:23,
200:16, 200:17, 201:7
  **Wyche's** [4] - 17:13,
65:19, 174:2, 174:8
  **Wyches** [1] - 160:20

## X

  **XXIV** [1] - 1:11
  **XXXVII** [1] - 1:11

## Y

  **year** [7] - 36:1, 36:7,
36:12, 45:16, 57:17,
134:14, 165:18
  **year's** [1] - 149:2
  **years** [18] - 44:7, 60:21,
60:24, 64:4, 81:2, 81:16,
98:12, 98:16, 98:21,

105:2, 163:15, 184:6,
186:9, 196:9, 203:4,
209:18, 211:3
  **yellow** [1] - 24:9
  **yesterday** [2] - 153:20,
156:15
  **York** [1] - 153:17
  **yourself** [1] - 69:4

## Z

  **Zajac** [3] - 1:24, 215:3,
215:15
  **zero** [1] - 98:9
  **zoom** [3] - 113:19,
133:20, 136:10
  **zoomed** [1] - 23:6