```
                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MARYLAND
                            NORTHERN DIVISION




   UNITED STATES OF AMERICA

          v.                              CRIMINAL CASE NO.
                                            AMD-04-029
   WILLIE MITCHELL,
   SHELTON HARRIS,
   SHELLY WAYNE MARTIN,
   SHAWN GARDNER,

          Defendants
   _____/

                   VOLUME XXV OF XXXVII
                   Thursday, November 13, 2008
                   Baltimore, Maryland



Before:  Honorable Andre M. Davis, Judge
              And a Jury

Appearances:
        On Behalf of the Government:
         Robert Harding, Esquire
         Michael Hanlon, Esquire
        On Behalf of Defendant Mitchell:
         Laura Kelsey Rhodes, Esquire
         Michael E. Lawlor, Esquire
        On Behalf of Defendant Harris:
         Gerard P. Martin, Esquire
         Paul Flannery, Esquire
        On Behalf of Defendant Martin:
         Thomas L. Crowe, Esquire
         James G. Pyne, Esquire
        On Behalf of Defendant Gardner:
         Adam H. Kurland, Esquire
         Barry Coburn, Esquire

Reported by:
Mary M. Zajac, RPR
Room 5515, U.S. Courthouse
101 West Lombard Street
Baltimore, Maryland 21201
```

1          (Proceedings at 9:38 a.m. Jury not present.  Defendants

2     present.)

3          THE COURT:  Well, counsel, this has turned into quite a

4     journey.  First of all, Mr. Martin, how is Mr. Harris?

5          MR. MARTIN:  He appears to be fine, Your Honor.

6          THE COURT:  All right.  Good.  Mr. Coburn, you have our

7     best wishes.

8          MR. COBURN:  Very kind of Your Honor.  Very kind.  I

9     really appreciate it very, very much.

10         THE COURT:  Certainly.  Belinda just handed me a note

11    and apparently one of the jurors has a family member at Shock

12    Trauma as a result of an incident last night.  So I anticipate

13    that she's going to want to be excused, but I'll wait and see.

14         Here's my present thinking, counsel.  We'll have all

15    day today.  By the way, if you haven't heard, Mr. Johnson is

16    still in Baltimore.  And I've issued an order extending the writ.

17    So the marshals will be able to get him over here this afternoon.

18    I believe we now have cleared for all counsel Monday to be in

19    session.  And I intend to get feedback from the jury.

20         It may be that one or more of them have plans for

21    Monday but I'm going to prevail upon them to alter their plans if

22    they've made any so that they can be here.

23         I've asked the marshals to make inquiry as to the

24    feasibility of an evening session next week.  I'm contemplating

25    perhaps Monday, if an evening session should prove necessary and

3

1    desirable.  Either Monday or perhaps Wednesday of next week, to

2    complete the evidence.

3             Now, for Tuesday, Mr. Coburn, I absolutely, absolutely,

4    unequivocally, fully understand your commitment and would have

5    absolutely, would not want you to do anything other than to

6    attend to that matter.  But I remain somewhat hopeful that Mr.

7    Kurland could carry the ball on Tuesday.  Whether that's so or

8    not, we can discuss.  But that is my hope.

9             And it could be that we could not bring in the jury on

10   Tuesday and still make good progress.  I don't think the charge

11   conference is going to take excessive amounts of time.  I don't

12   know how long it might take but I'd be surprised if it takes more

13   than two hours.  I would be mildly surprised if it takes more

14   than an hour.

15            So that's kind of where we are.  How many defense

16   witnesses, other than Mr. Johnson, do we have available today?

17   Mr. Flannery?

18                 MR. FLANNERY:  We have at least two, Your Honor.

19                 THE COURT:  Two, including the expert?

20                 MR. FLANNERY:  That's including the expert.

21                 THE COURT:  So that's a couple hours on your side?

22   Direct and cross?

23                 MR. FLANNERY:  Some documents as well.

24                 THE COURT:  Okay.  Mr. Crowe?

25                 MR. CROWE:  Your Honor, we have one, possibly two, that

4

1    we're still waiting to hear on the second.

2            THE COURT:  Basically the same situation?

3            MR. CROWE:  Same situation, yes.  But with different

4    people.  Character switch.  Same number.

5            THE COURT:  Mr. Lawlor, Ms. Rhodes?

6            MS. RHODES:  Your Honor, we are expecting one and some

7    other documents we need to put in.

8            THE COURT:  Okay.

9            MS. RHODES:  But we have several, we've kept most of

10   them for next week.

11           THE COURT:  For Monday?

12           MS. RHODES:  We have them on hold.

13           THE COURT:  Okay.  So you feel you can get them here on

14   Monday?

15           MS. RHODES:  Yeah.  I most of them.  I think there's

16   one who can't, one or two who can't.  But then they could come

17   Tuesday.

18           THE COURT:  Okay.  Mr. Coburn?

19           MR. COBURN:  Your Honor, aside from Mr. Johnson, we

20   have been thinking very carefully about the colloquy that we had

21   last week about the two juvenile eyewitnesses in the Spence

22   matter.  And I think, they're both, one of them is here right

23   now.  The other one, I believe, either has just arrived or is

24   expected very shortly.  At some point during a break or over the

25   lunch hour, I think there will be time to speak with her, also.

1    I think as of right now we are disinclined to call either of

2    them.

3            There is another lay witness who, aside from Mr.

4    Johnson, who I expect to be here very shortly, who I think we may

5    call and I expect her to be very brief, extremely brief.

6            Then there's this one issue, there's been some

7    correspondence about between me and the government about a

8    potential rebuttal firearms expert, which that won't be today.

9    It would be early next week if it worked out.

10           THE COURT:  All right.  If, Mr. Coburn, we're able to

11   get all of Mr. Gardner's witnesses on today and Monday, and if on

12   Tuesday all that we have left are Ms. Rhodes's witnesses and a

13   charge conference, would you have a level of comfort with that

14   situation, being away on Tuesday?

15           MR. COBURN:  Yes, Your Honor.

16           THE COURT:  Okay.  Mr. Kurland?

17           MR. KURLAND:  If that's --

18           THE COURT:  I know you would rather have Mr. Coburn

19   here.

20           MR. KURLAND:  If it's Ms. Rhodes witnesses and the

21   charge conference, I am confident that I could handle that.

22           THE COURT:  All right.  Okay.

23           MR. COBURN:  Thank you so much, Your Honor.

24           THE COURT:  And by the way, Mr. Coburn, I know you're

25   going to be very busy on Tuesday.  But you would be available by

1    phone for consultation, obviously?

2              MR. COBURN:  Absolutely.

3              THE COURT:  Okay.

4              MR. COBURN:  The one thing I probably should mention

5    about the evening session on Monday, I don't know --

6              THE COURT:  Well, sounds like now it won't be

7    necessary, frankly.

8              MR. COBURN:  That would be great because getting to

9    Shreveport is --

10             THE COURT:  Obviously, you couldn't be here for an

11   evening session on Monday.  I understand.  Let me hear from Mr.

12   Lawlor.

13             MR. LAWLOR:  Judge, I just, I hope we're not waiting on

14   the jury.  I do still have one thing scheduled on Monday.  I do

15   not anticipate a problem whatsoever.  But if it is, I would ask

16   the Court just to make a quick phone call.

17             THE COURT:  Absolutely.  Who's the judge?

18             MR. LAWLOR:  Well, it would be PG County.  And I think

19   they go to the criminal administrative judge.

20             THE COURT:  I'll call the judge.

21             MR. LAWLOR:  I'm just bringing it to your attention.  I

22   candidly don't anticipate a problem.  And I like your haircut.

23             THE COURT:  Thank you.  You know --

24             MR. LAWLOR:  I need one, too.

25             THE COURT:  I need somebody to notice it.  Thank you.

7

1              MR. MARTIN:  It's very noticeable.

2              THE COURT:  I was surprised my barber let me in the

3     shop.

4              MR. KURLAND:  Your Honor, the only other matter with

5     respect to Tuesday would be, I take it that would be the time the

6     government would put on its rebuttable case as well?

7              THE COURT:  If any.

8              MR. KURLAND:  But again, like I say, you know, I'm

9     obviously comfortable doing that as well.  Since there's

10    obviously a higher level of uncertainty with respect to that, I'm

11    a little bit, you know --

12             THE COURT:  If it came to something important, I would

13    put that over until Wednesday, when Mr. Coburn was here.

14             MR. KURLAND:  Your Honor, thank you.

15             THE COURT:  I can't imagine there's going to be much in

16    the way of a rebuttal case.

17             MR. KURLAND:  Any predictions here we obviously need to

18    be careful about.

19             THE COURT:  Yes, absolutely.

20             MR. HANLON:  Good morning, Your Honor.  Since Mr.

21    Coburn brought up the possibility of a defense firearms expert, I

22    want to make sure the Court's aware, the government is going to

23    object on the basis of notice.  Whenever the Court wishes us to

24    be heard would be fine.

25             THE COURT:  We may have some time today and I'd like to

1    take that up --

2              MR. HANLON:  Thank you, Your Honor.

3              THE COURT:  -- before the end of the day.  All right.

4    Would you ask Number Three to come out, please, by herself?

5    Apparently, it's Juror Number Three who's, I think, niece is in

6    Shock Trauma.

7              (Juror Number Three enters the courtroom.)

8              THE COURT:  Good morning, ma'am.

9              JUROR NUMBER 3:  Excuse my appearance.

10             THE COURT:  Can you take that microphone in your hand,

11   please, just so we can all hear you?

12             I understand your family has had a very unfortunate

13   occurrence.

14             JUROR NUMBER 3:  Yes.

15             THE COURT:  Is that right?  And do I understand it's

16   your niece?

17             JUROR NUMBER 3:  My stepdaughter.

18             THE COURT:  Your stepdaughter.  I'm sorry.  Your

19   stepdaughter is at Shock Trauma.

20             JUROR NUMBER 3:  Yes.

21             THE COURT:  And you need to be with her and with your

22   family.

23             JUROR NUMBER 3:  Yes.

24             THE COURT:  Okay.  We wish you well.  Our prayers are

25   with you and your stepdaughter.  And we're hopeful that, that the

1    doctors there can work another miracle because they are the best

2    in the world.  We wish you the best.

3              JUROR NUMBER 3:  Thank you.

4              THE COURT:  Thank you very much.  You are excused from

5    service.

6              JUROR NUMBER 3:  Thank you.

7              THE COURT:  Thank you.  Your notes will be destroyed or

8    you can take your pad with you.  Thank you very much.  God bless.

9              (Juror exits the courtroom.)

10             THE COURT:  I assume counsel were satisfied with that.

11   It's quite apparent that the juror had been up all night.  And

12   you could see the emotion in her face and in her body language.

13             MR. COBURN:  We agree, Your Honor.

14             THE COURT:  What she handed out was a form from Shock

15   Trauma.

16             So this is the way it sounds right now.  Government's

17   going to rest in about less than an hour.  We'll go to a recess

18   for brief argument on motions.  We'll bring the jury back and

19   begin the defense case.  I assume Mr. Johnson will be brought

20   over this afternoon.  It would appear to be prudent to have Mr.

21   Gardner go first with witnesses so that we are sure to get all of

22   Mr. Gardner's witnesses in while Mr. Coburn is here.  But I leave

23   it to counsel to agree among yourselves the order in which

24   they're called.

25             It sounds like we have sufficient witnesses available

1    through the luncheon recess and we can take a luncheon recess at

2    any time 12:00 or thereafter.  And then I'll speak to the

3    marshals and insure that Mr. Johnson is brought over this

4    afternoon.  So he'll be available.  And we'll just go until we

5    run out of witnesses today.

6          And then we'll be in session all day on Monday.  And

7    frankly, there's a good possibility, I think, that we could

8    finish the evidence on Monday, with the exception of Ms. Rhodes's

9    two Tuesday witnesses, which would make it possible for -- and

10   the two Tuesday witnesses, Ms. Rhodes, you think, couple of hours

11   at the most?

12         MS. RHODES:  Yes.

13         THE COURT:  So sounds like we could actually conclude

14   the evidence by midday on Tuesday.  Mr. Coburn can be excused for

15   Tuesday.  We can have a charge conference.  Then we can break

16   even early on Tuesday so that you'll have the rest of the day and

17   the evening to work on your closing arguments and we'll start

18   closing argument on Wednesday morning.

19         I'm hoping that we can either finish closing argument

20   by sitting a little bit late on Wednesday, just a little bit.

21   And if necessary, then we'll come back with the government's

22   rebuttal on Thursday morning, and then instructions.  And perhaps

23   the jury can get the case right after lunch on Thursday or

24   mid-afternoon on Thursday.

25         So that would be, I think, a very beneficial approach.

1    And I think that creates a strong possibility that we could have

2    a verdict by the end of the day on Tuesday before Thanksgiving.

3    Yes, Ms. Rhodes.

4              MS. RHODES:  Your Honor, will you be asking the jury

5    today about their availability for Monday?

6              THE COURT:  Yeah.  What I'm going to do, since we're

7    going to take a break very shortly after they come out, I'm going

8    to tell them in advance that I'm going to have some instructions

9    for them.  Then when we take our break for argument on motion,

10   I'm going to ask them to discuss among themselves their

11   availability on Monday and Tuesday, and to make any phone calls

12   they need to make in order to clear Monday and Tuesday.

13             MS. RHODES:  So I'll wait before telling anybody.

14   Thank you.

15             MR. KURLAND:  Judge, one quick thing.  Earlier the

16   Court allocated time, four hours for the government, one hour

17   each for the defendants.  Two questions.  The first, does the

18   government's four hours, does that include the rebuttal time?

19             THE COURT:  Yes.  Yes.

20             MR. KURLAND:  Because to the extent that it's possible,

21   since I'm going to go last, since it's the order of the defense

22   as they're listed in the indictment, my preference would be to be

23   able to get in my argument on Wednesday as well, even if it

24   requires a little bit of a more lengthy time --

25             THE COURT:  Sure.

1          MR. KURLAND:  -- on Wednesday.  I know that that's

2     cutting it --

3          THE COURT:  It might be, Mr. Kurland, actually, you

4     might prefer, assuming the government breaks its time up three

5     and one, I would rather suspect the government's not going to

6     take three hours.  I'd be surprised if the government takes three

7     hours in its opening close.

8          So I suspect that at the end of the day on Wednesday,

9     if that's the time line we're able to keep, you will have the

10    option, because it may be that the defense may not want to have

11    the government get up on Thursday morning and speak for an hour

12    and then not hear from the defense.  So I think, what I'm saying

13    is you probably will have the option of holding a half an hour or

14    15 minutes at the end of the day on Wednesday and then you can

15    come back on Thursday to finish your closing argument.  Then the

16    government would get its hour.  And then I would instruct.

17         MR. KURLAND:  Your Honor, if it comes to that --

18         THE COURT:  But I'm confident that we'll at least get

19    to you on Wednesday.

20         MR. KURLAND:  If that's the case, I know we're getting

21    a little bit ahead of ourselves.  If I have the option of doing a

22    little bit and then finishing up, as opposed to carrying the

23    whole thing over and doing it connected, I would like to have

24    that option.

25         THE COURT:  Sure.  No.  I will guarantee you at least

1    30 minutes on Wednesday.

2              MR. KURLAND:  But I also would like the opportunity, if

3    I want to just do it whole Thursday morning, not to break it up.

4              THE COURT:  Okay.  I won't promise you that.  But we'll

5    see how it goes.  But it sounds like it's quite possible that's

6    where we're going to end up.

7              MR. KURLAND:  Thanks, Judge.

8              THE COURT:  Sure.  Mr. Martin.

9              MR. MARTIN:  Your Honor, I also remember, I deferred my

10   opening.

11             THE COURT:  That's absolutely right.

12             MR. MARTIN:  Very short.  It won't interfere with

13   anybody's schedule.  Trust me.

14             THE COURT:  Mr. Martin, I'm absolutely certain you're

15   the only person here who remembered that.  And of course you

16   would.  And Mr. Flannery, I'm sure.

17             All right.  So that's how we'll start this afternoon.

18             MR. MARTIN:  Thank you.

19             THE COURT:  Not this afternoon, but after the recess.

20             Okay.  Anything else?  All right.  We'll have the jury,

21   please.  Who's pad is that on the ledge?  Is that Number Three?

22   Number One.

23             I thought she was a great juror.  I mean they all are.

24   On a scale of 1 to 10, she was an 11.

25             (Jury enters the courtroom.)

1          THE COURT:  Ladies and gentlemen of the jury, good

2    morning.  Well, we continue to encounter delays arising from the

3    fact that we're all human beings and stuff happens and we do the

4    best we can.

5          It was necessary to cancel yesterday's session, ladies

6    and gentlemen, because one of counsel had a family emergency out

7    of town.  And I just insisted that counsel attend to his family

8    matters.  And so appreciate your understanding and your patience.

9    And I'm pleased that Belinda's hard work managed to get word to

10   each of you, I believe, in time, so that you didn't come in

11   yesterday.

12         In addition, as I suppose, most, if not all, of you

13   know, former Juror Number Three has similarly had a major family

14   trauma.  And her stepdaughter was hospitalized last night.

15   Obviously, we have excused her to attend to her family matters.

16   So I'll ask our Alternate Number One, if you would, please, now

17   to step forward and bring your materials with you and take the

18   seat of Juror Number Three.

19         We, of course, have her in our prayers and her, and her

20   family in our prayers.  We will be looking after her to see if

21   there's anything we can do to help her through this difficult

22   period.

23         So we're ready to continue.  You will recall that

24   Detective Benson was nearing the end of his redirect examination

25   by Mr. Harding when we broke on Monday.  So I anticipate that

Case 1:04-cr-00029-RDB    Document 695    Filed 06/16/09    Page 15 of 261

1    we'll conclude the government's case very shortly, after which we

2    will take a recess while I confer with counsel.  And I'm going to

3    have some instructions and requests of you regarding scheduling

4    for you to attend to during the recess.  So we'll proceed now and

5    take a recess very shortly.

6            Of course, Detective Benson, you remain under oath --

7            THE WITNESS:  Yes, Your Honor.

8            THE COURT:  -- in these proceedings.  Mr. Harding, you

9    may proceed whenever you're ready.

10       TFO KEITH BENSON, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

11            CONTINUED DIRECT EXAMINATION

12   BY MR. HARDING:

13   Q    Yes.  Thank you, Your Honor.  Just a few more questions,

14   Detective.  First of all, Mr. Lawlor mentioned the voice

15   identifications on the voice mail that were done by Natasha Wyche

16   and also Rodney Hayes.

17   A    Yes, sir.

18   Q    And he mentioned that Natasha Wyche identified Mr. Martin as

19   well as Mr. Mitchell.  Do you recall that?

20   A    Yes, sir.

21   Q    Did Natasha Wyche know Shelton Harris?

22   A    No.

23   Q    And Rodney Hayes identified Mr. Mitchell and Mr. Harris, is

24   that correct?

25   A    That's correct.

1    Q    And I believe you already mentioned that Mr. Hayes did not

2    know Mr. Martin very well or knew who he was or --

3    A    That's correct.  He said he knew of him.

4    Q    Knew of him and knew things about him but didn't know him

5    personally.  Was that it?

6    A    That's correct.

7    Q    And he knew his, he knew who Weaze was, is that correct?

8    A    Correct.

9    Q    Okay.  Mr. Pyne asked you about whether Natasha Wyche was

10   using a family phone when she would call Darryl Wyche.  Do you

11   remember, Detective, did she try to reach Darryl on a number of

12   phones that night when he, the night he was killed?

13   A    Yes.  She indicated she spoke to him on at least two of the

14   cell phones, if I remember correctly.

15   Q    And did those include cell phones that Darryl Wyche was

16   using for drug business that very night with Mr. Mitchell?

17   A    Yes.

18   Q    Including the 6204?

19   A    The9203.  6204 was the Mitchell phone.

20   Q    I'm sorry.  Yes.

21   A    The 9203 number, yes, that's correct.

22   Q    And also, did she call the 8844 number that Darryl Wyche

23   also had in the car with him that night?

24   A    Yeah, I believe she did speak to him on that number as well.

25   Q    Now, Mr. Pyne, you remember, questioned you at some length

1    about the fact that different phone companies have different

2    timing devices and, therefore, when you try to match an outgoing

3    call to an incoming call they're off by 20 or 30 seconds or so

4    very often?

5    A    Yes, sir.

6    Q    And you explained that at some length.  But Mr. Pyne

7    concentrated on one particular call where it was a minute off.

8    Do you remember that?

9    A    Yes, sir.

10   Q    And that was, was that this call right here that I'm

11   pointing to right now, where Mr. Mitchell, on the night of,

12   actually, the early morning of March 25th, called Darryl Wyche?

13   A    Yes, sir.

14   Q    Is that the one that Mr. Pyne concentrated on with you the

15   other day?

16   A    Yes, sir.

17   Q    And even though Mr. Mitchell admitted he was using this

18   phone to call Darryl Wyche repeatedly that night?

19   A    That's correct.

20   Q    And you explained, first of all, you look at the tolls for

21   the outgoing phone, which in this case Mr. Mitchell's 6204 call?

22   A    That's correct.

23   Q    8:40 means?

24   A    That's 12, it's actually 08 and 40 seconds.  So that's 12:08

25   and 40 seconds a.m.

1    Q    Right?

2    A    On the 25th.

3    Q    So that's this call right here?

4    A    That's correct.

5    Q    And of course, this call lists on the outgoing, on the

6    outgoing tolls the number that was called, right?

7    A    Correct.

8    Q    No doubt on the outgoing tolls which number was called,

9    right?

10   A    Correct.  And it shows the actual duration of 95 seconds,

11   which is 1 minute 35 seconds.

12   Q    Okay.  Now, so we know that he called this number and that

13   the call lasted 95 seconds.  But what you explained was that you

14   then have to go to the incoming tolls for the 9203, is that

15   correct?

16   A    Correct.

17   Q    And that appears right here, an incoming call.  And the

18   difference is that instead of being 12:08 and 40 seconds, it's

19   12:07 and 40 seconds, is that correct?

20   A    That's correct.  And the duration of the charge is two

21   minutes, which is, as we talked about earlier, the rounding up of

22   the call.  Anything between one minute and one second and two

23   minutes even is going to be billed as a two minute call.

24   Q    Okay.  Now, first of all, this is Darryl Wyche's phone?

25   A    The 9203.

1    Q    9203 phone?

2    A    Correct.

3    Q    There are no other calls before or after that except for the

4    ones that are listed on your chart, the one that occurred at

5    11:49 p.m. and the one that occurred at 12:38 a.m.?

6    A    That's correct.  There's essentially 40 or, I'm sorry, 27

7    minutes to the previous call and 31 minutes to the next call.

8    Q    And we know this call went through, right?

9    A    That's correct.

10    Q    How do we know that?

11    A    It was connected as an incoming call and charged at the two

12    minute rate.

13    Q    Whereas if it were a voice mail it wouldn't appear on the

14    incoming tolls at all?

15    A    That's correct.

16    Q    So you know this was a completed call?

17    A    Correct.

18    Q    Is it unusual, in your toll analysis history, Detective

19    Benson, for an outgoing phone company's tolls to be a minute

20    different from an incoming phone company's tolls?

21    A    No.  I actually went back over a lot of the tolls yesterday.

22    Essentially, what you have is like a bell curve.  It can be as

23    much as a minute.  The most common duration discrepancy is going

24    to be 15 to 30 seconds.  It's very rare that you're going to have

25    one that's almost identical, like the same incoming and outgoing.

Case 1:04-cr-00029-RDB    Document 695    Filed 06/16/09    Page 20 of 261

1    You will have it within two or three seconds, which is rare.

2    Usually, there is a 20 to 30 second.  You're also going to have

3    those that fall just outside that bell curve in the minute to

4    minute 15 second range.

5            It actually varies even within a Cingular phone.  Like

6    I took Mr. McCaffity's phone.  I had two sets of tolls.  I have

7    the cell toll records and I have the actual billing records.  And

8    even those for the same telephone vary by 30 seconds, 40 seconds,

9    15, 10, varying amounts.

10   Q    You mean the same phone company's --

11   A    Yes.

12   Q    -- times --

13   A    Yes.

14   Q    -- will be little off depending on the kind of tolls they're

15   producing, whether they're --

16   A    Correct.

17           MR. LAWLOR:  Your Honor, object to the leading.

18           THE COURT:  Don't lead the witness.

19   A    Correct.  Correct.  If Mr. McCaffity made an outgoing call

20   at exactly 12 noon, it may show up on his cell toll records as

21   12, 12:00 and 40 seconds, whereas his billing record might show

22   it at 12:00 even or even 11:59 and some seconds.  There's

23   variation even within the same phone, not between two different

24   phones.

25   Q    I see.  Cell records being the cell tower records?

1    A    That's correct.

2    Q    And then there's also something called billing records?

3    A    There's actually, there's cell tower record, there's toll

4    records and there's billing records.  Some of what you're looking

5    at, like, for example, this, these are billing records.  It will

6    show you the time -- it's not an actual copy of the bill.  These

7    are toll records.  It shows the duration of the call, the

8    duration that they were charged, the time that the call was made,

9    the number that it was placed to.

10        Then you'll see some of the other records.  You'll

11   notice that they will be the name, the account number, and a date

12   range at the top.  Those are actually billing records.  They're

13   copies of the bill that the person received and would pay.

14        And then the cell tower records look completely

15   different.  They have, they're basically like computer printouts

16   that show --

17   Q    Actually, we've seen some of those.

18   A    Yes.  Yes.  They're more technical data lines.

19   Q    Are you completely satisfied, Detective, that this incoming

20   call on Darryl Wyche's phone, the 9203 phone at 12:07 and 40

21   seconds on the morning of the 25th is the, is the call that's

22   listed on the outgoing tolls of Mr. Mitchell's phone?

23   A    Yes, sir.

24   Q    At 12:08 and 40 seconds?

25   A    Yes, I am.

Case 1:04-cr-00029-RDB    Document 695    Filed 06/16/09    Page 22 of 261

1    Q    And so is the information in this column on your chart

2    correct?

3    A    Yes, sir.

4    Q    Also, there was some discussion, I believe when Mr. Coburn

5    was cross examining you, about the fact that the phone of Mr.

6    Gardner, that one that ends in 1241 --

7    A    Yes, sir.

8    Q    This phone right here, you testified that that stopped being

9    used on March 26th?

10    A    That's correct.

11    Q    Shortly after the Wyche brothers' murder?

12    A    Correct.

13    Q    And then Mr. Gardner got another phone that day?

14    A    That's correct.  The 1253 number.

15    Q    And Mr. Coburn pointed out that actually you only had the

16    tolls through the end of the month.  And that service wasn't

17    terminated by the phone company on that phone until mid April, is

18    that correct?  Do you recall that?

19    A    That's correct.

20    Q    Is there another way, besides the fact that no calls were

21    placed on that 1241 line for five days after the 26th, is there

22    another way we can be confident that Mr. Gardner was no longer

23    using that phone?

24    A    Yes.  What I did is I went back and I looked at Mr. Martin's

25    1933 number, which is subscribed to in his name.  And up to the

Case 1:04-cr-00029-RDB    Document 695    Filed 06/16/09    Page 23 of 261

1    26th, there were daily calls between the 1933 number and Mr.

2    Gardner's 1241 number.  Daily, daily.  After the 20, after the

3    25th, the afternoon of the 25th, 1241, I only had the tolls up

4    until the 30th.  So for an additional five days, there were no

5    calls at all on the 1241 line, which is the first indicator.

6          Second, what I did was I went back and looked at the

7    1933 number.  And after the 30th, I have more comprehensive tolls

8    for the 1933 line.  As of that date, there were no more calls to

9    the 1241 line but now there were calls to the 1253, the new

10   number that was recovered from Mr. Gardner after his arrest.  And

11   there were daily calls to the 1253 number like it had replaced

12   the 1241 number.

13   Q    Okay.  Let me show you the tolls for the, just very briefly,

14   the tolls for the 1933 phone that Mr. Martin was using.  And this

15   was in his own name, as I recall, is that correct?

16   A    That's correct.

17   Q    You say there were lots of calls to Mr. Gardner's 1241

18   number up until the 26th of March, is that correct?

19   A    That's correct.

20   Q    For example, here we have a whole series of them right here,

21   is that correct?

22   A    Right.

23   Q    And if we went through these, we'd find, you say, virtually

24   every day, 1241, calls to the 1241 number?

25   A    Yeah.  There's another one there.  You just passed it.

1    Essentially every day.  Multiple.

2    Q    Until --

3    A    At least a few times a day.

4    Q    Until we get up to March 25th, at 2:58 p.m.  Is this the

5    last call you could find on the tolls to the 1241 number?

6    A    Yes, sir.

7    Q    And then on the 26th at 5:23, is this the first call you get

8    to the new number associated with Mr. Gardner?

9    A    Yes, sir.

10   Q    The 1253 number.  The phone that was eventually recovered

11   from Mr. Gardner's person --

12   A    That's correct.

13   Q    -- after the Tonya Jones Spence homicide?

14   A    Correct.

15   Q    This is the first call to that number and it's on the 26th,

16   is that correct?

17   A    That's correct.

18   Q    And then there are no more after this, on these tolls, there

19   are no more calls to the 1241 number and all the calls are to the

20   1253 number?

21   A    Yes, sir.

22   Q    Okay.  No further questions.

23            MR. LAWLOR:  Court's indulgence, please.

24            THE COURT:  Just a moment.

25            (Pause in proceedings.)

1          MR. LAWLOR:  No questions, Your Honor.  Thank you.

2          THE COURT:  Mr. Martin.

3          RECROSS EXAMINATION

4    BY MR. MARTIN:

5    Q    Good morning, Detective Benson.

6    A    Good morning, Mr. Martin.

7    Q    Detective Benson, you ever hear of a legal concept known as

8    contempt of court?

9    A    Yes.

10   Q    What happens to somebody when they act up in court, isn't

11   it?

12   A    Yes.

13   Q    Now, you seemed to say to Mr. Harding the other day that the

14   discrepancies between what you may have said here in front of

15   this jury and what you said in the grand jury were due to the

16   fact that you were testifying as a summary witness in the grand

17   jury?

18   A    That's correct.

19   Q    So is it your position, then, as a summary witness, you're

20   not obligated to honor your oath and be accurate in what you

21   said?

22   A    I believe I was accurate in what I said based on the

23   information that I was given by the totality of the

24   investigation.

25   Q    So someone may have given you inaccurate information which

1    you then passed on?

2    A    I believe that the, the basis of the information was

3    accurate.

4    Q    Now, you seemed to say, in response to a question from Mr.

5    Harding, that it would not have been uncommon for Darryl Wyche,

6    if he knew one person, to allow that one person and another

7    person to get in the back of his car, correct?

8    A    Correct.

9    Q    You recall Detective Niedermeier testifying about the fact

10   that this was a Honda wagon?

11   A    A Honda station wagon?

12   Q    Correct.

13   A    Yes.

14   Q    Do you recall that?

15   A    Yes.

16   Q    It had two seats in the back, didn't it?

17   A    It's a, yeah, a four door vehicle with, I believe there's

18   probably three across the back.  I couldn't be sure.

19   Q    And there was a car seat in the back, wasn't there?

20   A    Yes.

21   Q    Baby seat?

22   A    Yes.

23   Q    And do you recall Detective Niedermeier that that was the

24   reason he surmised that there was only one person that got in the

25   car, because the baby seat was in there and it would have been

1    difficult for two people to get in the back with that baby seat

2    in there?

3    A    Yes, sir.

4    Q    And you said today that it is not unusual for the particular

5    call, and I don't remember which one it was, but the one where it

6    was a minute off between the records for the one cell phone and

7    the records for the other cell phone?

8    A    Yes.

9    Q    It's not unusual for that to happen, correct?

10   A    That's correct.

11   Q    And you're confident that, despite the fact that there was

12   that one minute off between the Mitchell phone and the Wyche

13   phone, at least as far as the records go, that it was the same

14   call?

15   A    Correct.

16   Q    Thank you, sir.

17              RECROSS EXAMINATION

18   BY MR. PYNE:

19   Q    Good morning, Detective.

20   A    Good morning, sir.

21   Q    A couple questions in regards to this chart.  The two

22   phones, again, that you have listed under Shelly Wayne Martin's

23   name?

24   A    Yes, sir.

25   Q    Am I correct that the top phone, the 1933 phone that I

1    believe Mr. Harding was just asking you about, that that was

2    found in Mr. Martin's possession?

3    A     No, sir.

4    Q     It was not?

5    A     No, sir.

6    Q     You recovered the cell phone records at his house?  Is that

7    how you --

8    A     There was a bill in his name for that phone at his house, as

9    there was for the 3912 number, and records were obtained by

10   subpoena from the cell phone company.

11   Q     Okay.  But you don't recall it being in his possession when

12   he was arrested?

13   A     Not -- I wasn't present when he was arrested.  Not that I'm

14   aware of, no.

15   Q     Okay.  But Mr. Gardner did have, I believe it was this

16   phone, in his possession when he was arrested, is that correct?

17   A     Correct.

18   Q     Okay.  And this second phone listed to Mr. Martin, was that

19   ever recovered, to your knowledge?

20   A     Not that I'm aware of, no.

21   Q     Okay.  And you said that you thought, based on the records,

22   that it was only used for approximately 10 to 12 days, is that

23   correct?

24   A     The tolls that I obtained showed usage for approximately

25   nine days.

1   Q    Approximately nine days?  But even though it was only used

2   for nine days, that phone number was listed in two different

3   Wyche brothers' phone directories as Alvin's phone number?

4   A    Correct.

5   Q    Now, with regards to, I believe Mr. Harding asked you about

6   the investigation run by Detective Niedermeier in regards to

7   obtaining any security tapes they might have had.  I believe your

8   testimony was that you had a vague recollection of something

9   about that.

10  A    I was trying to recall what Detective Niedermeier had

11  testified to.  I wasn't part of that investigation so I couldn't

12  speak clearly on it.

13  Q    Okay.  And that was my point exactly.  You weren't really

14  involved in that investigation, were you?

15  A    I was involved in the outside summary case involving that

16  murder but I wasn't involved in the actual homicide investigation

17  when it occurred.

18  Q    So you can't tell the ladies and gentlemen of the jury

19  whether or not there were security cameras at that particular

20  movie theater?

21  A    I cannot.

22  Q    Okay.  And do you recall Detective Niedermeier testifying

23  that it was approximately eight months, I believe it was

24  December, as opposed, December that he went out and actually

25  investigated this for a murder that, or an arrest that happened

Case 1:04-cr-00029-RDB    Document 695    Filed 06/16/09    Page 30 of 261

1    back in April, is that correct?

2    A    I believe that's what he said, yes.

3    Q    And do you recall Detective Niedermeier testifying that he

4    didn't even know that you could get cell site information?

5    Wasn't that his testimony?

6    A    Obtaining cell site information back at that time was not as

7    common.  And he was not aware that that was an investigative tool

8    that could be used, until later when it was too late to get the

9    cell site records.

10   Q    Do you know approximately how long telephone companies hold

11   on to cell site information?

12   A    Depends on the company.  Some, some companies like Sprint,

13   for example, I believe it is, purge all their records after 45

14   days.  Some hold them longer.  A lot of, in the case of this

15   case, going back to get some of the historic records, we're only

16   able to get copies of bills instead of actual tolls, which is

17   kind of where the rounded up billing occurs, instead of being

18   able to actually see the toll records.  Depends on the cell phone

19   company.  Some hold them longer.

20   Q    So you did attempt to obtain cell site information in

21   regards to the Wyche brothers case, but you just weren't able to

22   do so?

23   A    I obtained -- trying to recall if I actually inquired about

24   cell site records.  I obtained the toll records.  I'd have to

25   look back over my records and see if, for that particular phone,

1    if I tried to get cell site information.  The 5811 number had

2    already been subpoenaed for toll, cell site information.  So it's

3    possible that I did.

4    Q    Okay.  But we haven't been presented with any cell site

5    information --

6    A    For --

7    Q    With regard to the Wyche brothers' killing?

8    A    No.  Not for those phones, no.

9    Q    All right.  And in regards to the B-10, which was a chart

10   showing communications between this 3912 number listed to Alvin

11   in the Wyche brothers phone books, these communications are from

12   March 1st, March 1st, and March 4th, correct?

13   A    Yes, sir.

14   Q    And Shelly Wayne Martin, during that period of time, was in

15   the Volunteers of America, is that correct?

16   A    I believe he was.

17   Q    He was in --

18   A    I don't know the time frame.  But it's around that time,

19   yes.

20   Q    Wasn't he, in fact, in the Volunteers of America through

21   March the 7th of 2002, if you recall?

22   A    I don't recall the exact dates.  But it's around that time,

23   yes.

24   Q    Okay.  Now, you testified that the vast majority of what you

25   do is cell phone related, when Mr. Harding was asking you that on

1    recross examination or redirect examination?

2    A    Yes, sir.  Most of my cases involve cell phone toll

3    analysis.

4    Q    Okay.  And you recall testifying in front of the grand jury

5    as a summary witness, as you put it?

6    A    Yes.

7    Q    And did you tell the grand jury that you had cell phone

8    records that show seven lengthy phone calls from Shelly Wayne

9    Martin while he was supposed to be in the movie theater?

10    A    I believe that I said there were seven telephone activations

11    during the time of the movie theater.

12    Q    Okay.

13    A    That was prior to, at that time I had not done the, the

14    outgoing and incoming tolls to match them up to see about

15    connections.

16    Q    If I can approach the witness, Your Honor.

17            THE COURT:  Yes.

18    A    Yes, sir.

19    Q    Okay.  In fact, you did not have seven lengthy -- the toll

20    records did shot know seven lengthy phone calls during that time,

21    did they?

22    A    No, sir.  It showed attempts that went to voice mail.

23    Q    Okay.  I'm sure you did not intend to mislead the grand

24    jury, did you?

25    A    No.  That testimony, as I stated earlier, was summary

Case 1:04-cr-00029-RDB    Document 695    Filed 06/16/09    Page 33 of 261

1    testimony based on information given by the homicide

2    investigators, who, just looking at the raw tolls, showed seven

3    incoming calls during the time of the movie, not having matched

4    it up and seen that they were actually, went to voice mail.

5            So they were under the impression that they were one,

6    one, one, and two minute calls, which during a movie would be

7    considered a lengthy phone call, in my opinion.

8    Q    Okay.  So you had not done any telephone analysis before you

9    went to the grand jury?

10   A    I hadn't done the in-depth telephone analysis that we're

11   looking at now, no, not at that point.

12   Q    And in fact, the diagram that you have here you really

13   didn't do until the middle of this trial, did you?

14   A    I did the analysis over the past three and a half years.

15   This chart was created just prior, finalized and printed out just

16   prior to this trial.  But this was in, this overall chart was in

17   the works for the past three years or so.

18   Q    This chart was not prepared in the middle of trial?

19   A    This chart was finalized, finalized and printed out just

20   prior to when it was first presented to Detective Niedermeier.

21   It was a work in progress up until that point that it was

22   presented to the jury.

23   Q    Was it, in fact, prepared after the phone company expert

24   testified in this case?

25   A    It was finalized.  It was not prepared.  It was finalized

1    after.

2    Q    In fact, didn't you have another chart not nearly as

3    detailed which, in fact, did not reflect a distinction between

4    connected calls and voice mail calls?

5    A    I felt it was essential, based on the volume of calls and,

6    to show the proper progression of how the night progressed, to be

7    able to show calls that went to voice mail and calls that were,

8    in fact, connected.  It was important to show.

9          So I reworked the chart, went back through each of,

10   each of the lines that you see, determined whether they were

11   connected calls or voice mail calls, and marked them accordingly.

12   Q    Because it would be very misleading to the jury to just show

13   calls going from one party to another when, in fact, you knew

14   that they hadn't been connected the calls?

15   A    I wouldn't say it's misleading.  I mean, if you have party A

16   attempting to contact party B seven times in quick, rapid

17   succession, to me that says there's a reason why party A wants to

18   get in touch with party B, whether the calls are connected or

19   not.

20   Q    But attempts to get into contact with a party is much

21   different than two parties actually connecting with each other,

22   wouldn't you agree?

23   A    That's correct.  That's why I marked the chart accordingly.

24   Q    And in regards to what Mr. Harding was just asking you

25   about, this third call, this is from the Mitchell phone to the

1    Wyche phone?

2    A    Correct.

3    Q    At 12:08.  Now, this call, just looking at this chart, am I

4    correct in saying you do not know whether or not this is a

5    connected call or whether it goes to voice mail?

6    A    Just looking at this?

7    Q    Just looking at this.

8    A    At this toll?

9    Q    At this.

10   A    Not comparing it to the 9203?

11   Q    Exactly.

12   A    There is nothing on the 6204 tolls that indicate, well, it

13   indicates it's connected because of the duration, 95 seconds.

14   But --

15   Q    Well, again, that's a distinction you made early.  Connected

16   in the sense that it went to voice mail or connected in the sense

17   that there was a live, actual call?

18   A    Correct.  And that's why we go to the 9203 records and see

19   the incoming call with the matching duration and determine that

20   both parties were billed, therefore, the call was connected.

21         Had I gone to the 9203 tolls and showed no incoming

22   call whatsoever at that time, it would have been to voice mail.

23   Q    Well, my question to you right now is, looking at this call

24   just on Mr. Mitchell's phone records, you cannot tell, looking at

25   just this call, whether or not it was a connected call or it went

1    to voice mail?

2    A    Just looking at this toll, no.

3    Q    Okay.  And it shows a call at 12:08:40, correct?

4    A    Correct.

5    Q    Duration of 95 minutes?

6    A    95 seconds.

7    Q    Seconds.  That's correct.  So then we go to -- because you

8    can't say it's a connected call until you go to the other phone?

9    A    That's correct.

10   Q    Now, just looking at this phone records, all we know is that

11   there's an incoming call at 12:07?

12   A    That's correct.

13   Q    We don't know that that is an incoming call for Mr.

14   Mitchell's phone, do we?

15   A    No.  We know that it's an incoming call that 9203 received

16   and the duration was two minutes.

17   Q    Exactly.

18   A    Up to two minutes.

19   Q    So if the Wyche phone receives a call at 12:07, which would

20   be a minute before Mr. Mitchell's phone says he placed the call,

21   he would still be on this two minute call when Mr. Mitchell

22   tried, tried to call Mr. Wyche, isn't that correct?

23   A    And had a two, a matching two minute duration?

24   Q    Is a two minute call unusual?

25   A    No.

1  Q    Is there something so distinctive about a two minute call

2  that that is where you're putting all your weight?

3  A    No.  I actually, to, to be comfortable saying that that's a

4  connected call, I went back.  The easier way to do is to go over

5  the McCaffity to the 5811 Mitchell phone, which you can go line

6  by line.  And you'll see discrepancies in duration up to 40

7  seconds, a minute, that they are connected.

8  Q    My question to you is --

9        MR. HARDING:  May the witness finish?

10        THE COURT:  Yeah.  Let him finish answering the

11  question.

12  Q    Sorry, Detective.

13  A    I went through the McCaffity to Mitchell chart.

14  Q    Your Honor, his answer is not responsive to my question.  My

15  question to you, Detective, is, if an individual called this

16  Wyche phone at 12:07 and had a two minute conversation, Mr. Wyche

17  would still be on this phone when Mr. Mitchell called him at

18  12:08, isn't that correct?

19  A    I don't believe so.  No.  I believe that that was --

20  Q    I didn't ask you to explain.

21        THE COURT:  He's entitled to explain his answer.

22  A    Based on my totality of all of these tolls and how they

23  relate to each other, like I can show you, for example, tolls

24  that don't show just the word "incoming", that show the calls

25  from the McCaffity phone to the Mitchell phone, with their

1    numbers.  And the times are off by a minute but the durations are

2    identical.  Every one of these calls across this chart, the

3    durations that are connected are identical and the time

4    discrepancies are anywhere from 14 seconds up to a minute.  I

5    could show you --

6    Q    That's a great explanation.  But my question to you again --

7    A    Theoretically --

8    Q    If Mr. Wyche receives a call at 12:07 and the duration of

9    that call is two minutes, wouldn't he still be on the phone when

10   Mr. Mitchell calls him at 12:08?

11   A    It's theoretically possible but I don't believe that's

12   what's happened here.

13   Q    Okay.  And again, when I took you through these records

14   earlier, this first call here, what I have number one, the Wyche

15   phone was 24 seconds behind the Mitchell phone?

16   A    Correct.

17   Q    Is that correct?  And the second call, the Wyche phone was

18   23 seconds behind the Mitchell phone.  And in this third call,

19   the Wyche phone was one minute ahead of the --

20   A    Correct.

21   Q    -- Mitchell phone.  I don't think I have anything further.

22   Thank you, Your Honor.  Thank you, Detective.

23              THE WITNESS:  Thank you.

24              CROSS EXAMINATION

25   BY MR. COBURN:

1    Q    Detective Benson, good morning.

2    A    Good morning, sir.

3    Q    Following up on that very last series of questions that Mr.

4    Harding asked you when you were on redirect examination about Mr.

5    Gardner's, the two phones that you've indicated are associated

6    with Mr. Gardner.

7    A    Yes, sir.

8    Q    This will just be very brief.  You know, actually, just

9    before we go there, I wonder if I could inquire of the government

10   through the Court whether the government still has the copies

11   from the American Patriot Friends Network web site that I

12   provided to them at the end of the day last week.

13            MR. HARDING:  Yes.

14   Q    I wonder, can I retrieve them, please?  Because I had marked

15   them as exhibits.  Thank you so much.

16            May I approach the witness, Your Honor?

17            THE COURT:  Yes.

18   Q    Detective Benson, do you recall testifying at one point

19   during my initial cross examination last week that you were aware

20   of the fact that there was a web site relating to what's been

21   referred to in this case as the flesh and blood defense?

22   A    Yes, sir.

23   Q    Those two documents there, I think they're marked as Gardner

24   10 and 11, are they copies from that web site?

25            MR. HARDING:  Objection.

1    THE COURT:  I think you need to lay a foundation first.

2    Q    Have you looked at the web site?

3    A    I've never seen these until whatever day you printed them

4    out and gave them to Mr. Harding.  That's the first I've ever

5    heard of or seen this American Patriot Friends.

6         MR. HARDING:  Judge, this is well beyond the scope of

7    re-direct, Your Honor.

8         MR. COBURN:  But I thought we had discussed this at the

9    end of the day in terms of the web site.

10        THE COURT:  The objection's sustained.

11   BY MR. COBURN:

12   Q    Very well.  Turning back, then, to the cell phones that are

13   associated with Mr. Gardner.  Do you recall Mr. Harding asking

14   you some questions about that just a few minutes ago?

15   A    Yes, sir.

16   Q    So if I understand correctly, the Wyche brothers were killed

17   around midnight on the 25th, late on the night of the 24th or

18   midnight on the 25th, right?

19   A    Correct.

20   Q    And you told Mr. Harding just a minute ago that hours after

21   that, at approximately 2 p.m. on the 25th, was phone contact that

22   you identified between the first number, the one you said might

23   have been the burn phone, the Samuel Handy number at 1241?

24   A    Yes, sir.

25   Q    And the Mr., the number you've associated with Mr. Martin

1    ending with 1933, right?

2    A    Yes.

3    Q    And that was hours after the Wyches were killed, right?

4    A    Correct.

5    Q    You also testified previously that around the same time

6    period that afternoon on the 25th, hours after the Wyche brothers

7    were killed, there was telephone contact from that first number,

8    the 1241 number, the Samuel Handy number, and County Sports,

9    right?  Do you remember that?

10   A    I believe it was on the 20 -- yes, the 25th.

11   Q    25th.

12   A    Yes.

13   Q    Hours after the Wyches were killed, right?

14   A    Correct.

15   Q    Now, you indicated that prior to the 25th there was

16   virtually daily contact -- sorry to keep shifting this back and

17   forth -- between the 1241 number, the Samuel Handy line, the one

18   that might have been a burn phone associated with Mr. Gardner,

19   right?

20   A    Correct.

21   Q    And the 1933 number?

22   A    Correct.

23   Q    Associated with Mr. Martin, right?

24   A    Yes.

25   Q    Virtually daily, prior to the Wyche homicides, correct?

1   A   That's correct.

2   Q   Now, that 1933 number was in Mr. Martin's name, right?

3   A   Correct.

4   Q   Not in any sort of an AKA or something.  It was in Mr.

5   Martin's own name, correct?

6   A   That's correct.

7   Q   And you've already testified that based on your review of

8   the 30,000 toll records, there was no contact whatsoever that you

9   were ever able to identify between Mr. Gardner and the Wyches,

10  correct?

11  A   That's correct.

12  Q   And you also testified last week that the most recent

13  contact, telephone contact between Mr. Gardner and Mr. Mitchell

14  was on the 13th, correct, March 13th?

15  A   Of?

16  Q   March 13th, 2002?

17  A   Between any phones?

18  Q   Between any of Mr. Mitchell's phones and any of Mr.

19  Gardner's phones.

20  A   If you can zoom it out, I could tell you.

21  Q   Okay.  I thought you had said that last week, but feel free

22  to check again.

23  A   That's possible.  If you can zoom it out for me.

24  Q   Sure.

25  A   I can't tell from that.  It's possible it was the 13th, if I

1    looked it up when I testified to it.

2    Q    Okay.  Now, you've indicated that so far as you know, that

3    first number, the 1241 number, the number that was not in either

4    Mr. Gardner's or Mr. Mitchell's name, but rather in Mr. Handy's

5    name, that it stopped being used on the 25th, right?

6    A    Correct.

7    Q    And then on the 26th, Mr. Gardner, according to your

8    investigation, started using a new phone, the one down here, the

9    1253 number, right?

10   A    That's correct.

11   Q    But Mr. Gardner had been using the 1241 number to call Mr.

12   Martin at the 1933 number before the 25th, right?

13   A    Correct.

14   Q    And then after the 25th, Mr. Gardner was using the new

15   number, the 1253 number, to call Mr. Martin at the same number,

16   the 1933 number, right?

17   A    That's correct.

18   Q    And the 1933 number was registered in Mr. Martin's name,

19   right?

20   A    Correct.

21   Q    And whereas the 1241 number had been registered in somebody

22   else's name, Mr. Handy's name, the one he started using after the

23   Wyches were killed on the 26th, March 26th, the 1253 number, was

24   actually registered in Mr. Martin's name, correct?

25   A    Correct.

1    Q     Okay.  Thank you.  Nothing further.

2              THE COURT:  Thank you very much, Detective Benson.

3              THE WITNESS:  Thank you, Your Honor.

4              MR. HARDING:  Judge, the government has a stipulation

5    of the parties, which I will obviously not read in its entirety.

6    But I would put it on the screen because there's a sort of

7    summary first page.

8              The parties agree and stipulate that, one, the drugs

9    seized in the following arrests and investigations were analyzed

10   by chemists who are experts in the chemical analysis of

11   controlled substances and, two, as indicated in the attached lab

12   reports marked as Exhibits L-1 through L-5 and L-7 through 11,

13   which are admitted into evidence, the parties agree and stipulate

14   that the substances analyzed in L-1 through 5 and L-7 through 11

15   are, in fact, the control substances summarized below.

16             And then it goes through and identifies by date of

17   arrest and the officers who testified and were involved in the

18   arrests and the defendants and others who were arrested, what the

19   exhibits are that were introduced when the, or at least the

20   property numbers were introduced.  In some cases the drugs were

21   introduced.  In some cases the property numbers for the drugs

22   were introduced.  And then in the last column is a summary of the

23   actual chemical analysis of the controlled substances found in

24   those exhibits and continues on to a second page.  And attached

25   to it are the lab reports that I previously mentioned.

1          THE COURT:  And that exhibit number is what again, Mr.

2    Harding, the overall exhibit?

3          MR. HARDING:  I think, since it's a stipulation, we can

4    call it ST-1, Your Honor.

5          THE COURT:  ST-1 is admitted.

6          MR. HARDING:  Also, Your Honor, you may recall that the

7    Court admitted the grand jury testimony of Rodney Hayes on two

8    occasions.  He testified twice.  I have prepared copies of those

9    two and redacted a salient portion of one of them.  But defense

10   counsel haven't actually had a chance to go through them and see

11   if they want to approve.

12          What I would offer, then, is that these be admitted

13   provisionally on the understanding that defense counsel can still

14   look through them and see if they want to negotiate some further

15   redaction.

16          THE COURT:  Absolutely.  So why don't you tell us what

17   the exhibit numbers are and we will finalize the exhibit before

18   they're sent in to the jury?

19          MR. HARDING:  Well, there are two possibilities, Your

20   Honor.  The testimony of Damita Green was admitted simply as

21   Court One.  I could offer these as Court Two and Court Three.

22          THE COURT:  Okay.  Makes sense.

23          MR. HARDING:  So the testimony for February 4th, 2004

24   is Court Two.  And the testimony for July 12th, 2005 is Court

25   Three.

1          THE COURT:  So they are admitted.  We're referring, of

2     course, to the grand jury testimony of witness Rodney Hayes.  And

3     they are admitted conditionally, subject to defense counsel

4     having a final opportunity to review in their entirety the

5     redacted transcripts.  And they will be submitted to the jury.

6          MR. HARDING:  I also would like to put on the record

7     several changes in exhibit numbers and also make clear what some

8     exhibit numbers are, if I may, Your Honor.

9          THE COURT:  All right.

10          MR. HARDING:  There were two MB-38's admitted.  So the

11     MB-38 that was a letter from Chris Dobropolski to a state court

12     judge is now MB-38.  And a Panasonic telephone that was part of

13     that same investigation is now MB-38A.

14          THE COURT:  Very well.

15          MR. HARDING:  I have a couple more of these, Your

16     Honor.  There were two, MB-30's.  So the seven latent print cards

17     are now MB-30A.  And MB-30 remains a photograph.

18          THE COURT:  Very well.

19          MR. HARDING:  There were two MB-39's.  So the telephone

20     from the McCaffity car pocket is now MB-39A and MB-39 remains a

21     photo array.

22          THE COURT:  Very well.

23          MR. HARDING:  Your Honor, the photo arrays that were

24     shown to Will Montgomery, four of them were initially admitted as

25     W-34 through W-37.  Now they are all in evidence as S-62 through

1    S-66.

2              THE COURT:  Very well.

3              MR. LAWLOR:  66 or 65?

4              MR. HARDING:  66.  There's an additional photo array

5    that came in during the course of presentation that Mr. Hanlon

6    did of the evidence in the Spence, the Jones Spence homicide.

7              Just to clear up, Your Honor.  SE-6 is in evidence.

8    It's a little slip of paper that was admitted when Chris

9    Dobropolski was on the stand.  SE-19, some rap lyrics, are in

10   evidence.

11             W-37B is a photo array where Damita Green identified

12   one of the defendants.

13             W-41 is Mr. Mitchell's information sheet that he filled

14   out following his, at the time of his interrogation by Detectives

15   Niedermeier and Kirk Hastings.

16             There was an exhibit which got recorded by Ms.

17   Arrington as simply Exhibit 48.  It is really W-48.

18             The Mitchell activity log that was completed when Mr.

19   Mitchell was interrogated is W-59.  That is in evidence.

20             W-67 is the number for the contact phone numbers from

21   the Wyche phones.  We've used those lists of contact phone

22   numbers repeatedly.

23             And W-68 is the phone bill for 443-838-1933.

24             MR. LAWLOR:  Repeat that, please.

25             MR. HARDING:  W-68 is the phone bill for 443-838-1933.

1    Mr. Hanlon wants to go, too, Your Honor.

2                THE COURT:  All right.

3                MR. HANLON:  Just a handful, Your Honor.  Your Honor,

4    all of these relate to the Seamon Avenue search, and they're just

5    a few things I believe were shown to Special Agent Klas during

6    testimony.  But on review of the exhibit list, the numbers might

7    be confused or something like that.

8                There was some ammunition, which should be in evidence

9    and marked as SE-2.

10               THE COURT:  Very well.

11               MR. HANLON:  There was an ID Card in Mr. Harris's name

12   that is from a State Maintenance Administration that should be

13   marked as SE-5.

14               There was a scrap of paper with the name "Chris"

15   written on it, which should be marked as Government's Exhibit

16   SE-6.

17               There was some miscellaneous documents taken during the

18   search that should be marked as Government's Exhibit SE-7.  Some

19   miscellaneous documents taken during the search that should be

20   marked as Government's Exhibit SE-16.  And then additionally,

21   Your Honor, there was a black binder which I marked as

22   Government's SE-20.  It is still so marked.  But on review it

23   appears another SE-20 was used during Mr. Dobropolski's

24   testimony.  They are scraps of paper from Seamon Avenue.  We have

25   remarked the scraps of paper as Government's Exhibit SE-20A to

1    distinguish from the other 20.

2              THE COURT:  So noted.

3              MR. HANLON:  Then that's all the Seamon Avenue matters,

4    Your Honor.  The only thing remaining is that the government, as

5    it indicated, has memorialized stipulations with counsel

6    concerning prior convictions for Mr. Gardner and Mr. Harris

7    relative to those relative counts.  I have so memorialized.  They

8    have been reviewed by counsel and they have been marked as

9    Government's Exhibit PC-1 relating to Mr. Gardner and

10   Government's Exhibit PC-2 relating to Mr. Harris.

11             THE COURT:  All right.  Why don't you put them on the

12   DOAR for just a moment, Mr. Hanlon?

13             MR. HANLON:  This is PC-1 on the DOAR system, Your

14   Honor?  Should I read it into the record?

15             THE COURT:  Yes, why don't you?

16             MR. HANLON:  United States of America versus Shawn

17   Gardner.  It is agreed and stipulated between the parties that

18   the defendant, Shawn Gardner, had, prior to June 7, 2002, been

19   convicted of a crime punishable by imprisonment for a term

20   exceeding one year as defined in 18 USC Section 921, and his

21   civil rights had not been restored.  That is PC-1.

22             Government's PC-2, a stipulation, United States of

23   America versus Shelton Harris.  It is agreed and stipulated

24   between the parties that the defendant, Shelton Harris, had,

25   prior to January 22, 2004, been convicted of a crime punishable

1    by imprisonment for a term exceeding one year as defined in 18

2    USC Section 921, and his civil rights had not been restored.

3    That is PC-2.

4              THE COURT:  Thank you, Mr. Hanlon.

5              MR. HANLON:  That is all I have, Your Honor.

6              THE COURT:  All right.

7              MR. HARDING:  And the government rests, Your Honor.

8              THE COURT:  Very well.  So subject to final check as to

9    exhibits and the opportunity for defense counsel to review the

10   Hayes grand jury transcript, ladies and gentlemen, the government

11   has concluded its presentation in this case.

12             I'm going to ask you now to return to the jury room for

13   a recess.  Here's where we are, ladies and gentlemen.

14             As you will recall, we were not scheduled to be in

15   session next Monday and next Tuesday.  As a result of the delays

16   that we have encountered and because we all, including

17   yourselves, of course, would like to bring this matter to a final

18   conclusion as expeditiously, though as fairly and impartially, as

19   we can, I have conferred with counsel.  And I appreciate

20   counsel's efforts in these regards.  Counsel have rescheduled

21   matters that they had scheduled for next Monday and Tuesday

22   because they, like you, were in the belief that we would not be

23   in session next week, on Monday and Tuesday.  So all of counsel

24   are available on those days.

25             I have rescheduled my matters for next Monday and

1    Tuesday.  I had planned to be at a committee meeting on which I

2    serve for the federal judges over in Washington.  But in the

3    interest of trying to get the matter finished, we've all agreed

4    that we should be in session next Monday and next Tuesday.

5         So I would ask you during this recess to think about

6    whether, if you scheduled something for next Monday or Tuesday in

7    anticipation that you wouldn't need to be here, whether you can't

8    also change your schedules.  And I invite you, if you have your

9    cell phone with you during this recess while in the jury room, to

10   call your employer if you need to, or if you think that's a good

11   idea, or to call your spouse or significant other just to

12   doublecheck to see if you can't be available to come in on Monday

13   at 9:30 and, if necessary, on Tuesday at 9:30, so that we can

14   move the case along.

15        So in other words, we're modifying the schedule in

16   light of recent events and we are going to be in session next

17   Monday and Tuesday provided each of you can clear your schedules

18   as well and be with us next Monday and Tuesday.

19        If we are able to do that, our schedule will probably

20   be as follows.  We are likely to conclude all of the evidence by

21   the end of the day on Tuesday, perhaps even earlier than the end

22   of the day on Tuesday.  That would leave Wednesday and Thursday

23   of next week for closing argument and for my instructions to you

24   on the law.

25        If we were able to do that, then that would mean that

1    you would begin your deliberations on Friday of next week and

2    then you would have available the following Monday and Tuesday

3    before Thanksgiving perhaps to complete your deliberations before

4    Thanksgiving.

5          Obviously, neither I nor anyone else would ever try to

6    predict how long your deliberations might be.  And none of us,

7    frankly, are concerned about that right now.  But to the extent

8    that we can put the case in a posture where you have at least

9    three full days to work on your deliberations before the

10   Thanksgiving holiday, I think we all would benefit from that.

11         So that would be the purpose in changing the schedule,

12   so that we can conclude all the evidentiary matters by Monday or

13   Tuesday of next week.  And then we'll need about a day and a half

14   or so for closing argument and my instructions on the law.

15         So you're excused for a 30 minute recess.  Please leave

16   your note pads on your chairs.  Have no discussion about the case

17   except to the extent you find it necessary to speak to each other

18   about whether you can come in on Monday and Tuesday of next week.

19   And of course, as I say, if you need to call your employer or

20   your family to clear dates for Monday and Tuesday of next week,

21   feel free to do that as well.  And I'll ask for your response

22   when we resume in about 30 minutes or so.  The jury's excused for

23   a 30 minute recess.  Please leave your note pads on your chairs.

24         (Jury exits the courtroom.)

25         THE COURT:  All right.  Counsel, I have had a chance to

1    review all of your written arguments.  I'm happy to entertain

2    your motions at this time.

3              MR. KURLAND:  Your Honor, before we do the Rule 29,

4    there's a procedural issue with respect to the grand jury

5    testimony.  Can I raise it now or do you want me to wait until --

6              THE COURT:  Let's wait on that.

7              MR. LAWLOR:  Your Honor, I'm going to skip to the end

8    of the line, if that's okay.

9              THE COURT:  All right.  Mr. Flannery.

10             MR. FLANNERY:  Good morning, Your Honor.

11             THE COURT:  Good morning.

12             MR. FLANNERY:  Your Honor, in regards to Shelton

13   Harris, Shelton Harris's move for judgment of acquittal, Counts

14   1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13 and 14 of the fourth

15   superseding indictment, I'll be rather brief, Your Honor.

16             In particular, as you remember in our brief, we begin

17   first by essentially attacking the drug conspiracy count, Count

18   Eight, and racketeering Count Nine, largely on the premise that

19   the government has failed to prove the single conspiracy charged

20   in the indictment.  In fact, they've proven multiple distinct

21   conspiracies.  Of any of those distinct conspiracies that

22   they've, in fact, proven, that Mr. Harris is a member of one of

23   those and not the conspiracy charged in the indictment.

24             As we note in our brief, Your Honor, we, for purposes

25   of this motion at least, have identified four distinct

1    conspiracies, those essentially being what we term the New York

2    conspiracy between conspirators such as Martin, Gardner, Bacon,

3    and other unindicted coconspirators that span from, say, early

4    1994 until the latest being 1999, maybe as late as 2000.  The

5    latest evidence we see of that is Mr. Bacon at one point

6    testified that he thought Mr. Wyche had provided some drugs to

7    Mr. Mitchell for further resale.

8           The next conspiracies, Your Honor, that are clearly

9    distinct in the fact that there is, without the overlap of actors

10   or common agreement, are the Pennsylvania conspiracies, one

11   being, and we've heard brief evidence regarding Mr. Gardner.  And

12   we've heard evidence concerning Mr. Mitchell in Altoona.

13          Those conspiracies began after Mr. Gardner, I believe,

14   and even Mr. Martin would have, I believe, been locked up for a

15   portion of that time.  Or at best there's no evidence that they

16   were involved.  They certainly, Mr. Harris wasn't involved

17   because at that point there's no evidence that he had even met

18   Mr. Mitchell at that point.  And the two PA conspiracies in and

19   of themselves are seemingly unrelated as well.  There's no

20   evidence that Mr. Gardner and Mr. Mitchell had been involved

21   together in Pennsylvania.

22          The final one, Your Honor, which we, in a certain

23   sense, I guess lump together for purposes of the motion would be

24   what's termed, essentially, a post 2000 conspiracy, that could in

25   sense, in a certain sense be bifurcated into two other

1    conspiracies, one involving Mr. Martin and Mr. Gardner, and the

2    other at best involving Mr. Harris, Mr. Mitchell and other

3    unindicted coconspirators.

4           If anything, Your Honor, the limited evidence that

5    we've seen here regarding any common suppliers doesn't, certainly

6    does not span the term of this entire conspiracy.  And in cases

7    like this, Your Honor, where it's not a chain distribution,

8    unlike the cases that the government largely cited that they

9    would like, they wanted you to read in regards to their not

10   giving a multiple conspiracy instruction, this is a wheel

11   conspiracy, essentially, where this is not a chain distribution

12   where you're working with large scale wholesalers that are

13   providing then to mid-level wholesalers, they're then providing

14   to small level retailers, where each unit can essentially infer

15   that they're part of a larger organization based on the quantity

16   and based on the way that they're providing drugs to that market.

17   That's not what we have here.

18          If anything, we have distinct individuals operating

19   with distinct distribution schemes and often times operating with

20   distinct suppliers.

21          We would further supplement that argument, Your Honor,

22   by, when we get past 2000, we get into the meat of this case,

23   which are the violent crimes that have been alleged.  Those

24   cannot supply the government with the evidence that it is lacking

25   on the drug conspiracy because as we cite in the Bertolotti case,

56

1   well cited case, 1975, Second Circuit.  In that case it was again

2   alleged that there was a narcotics distribution scheme.  But what

3   the government had essentially proved there was four distinct

4   transactions, is what the Second Circuit found.  Two of those,

5   they deemed, were nothing more than cash robberies of drug

6   dealers and that they were unrelated to the umbrella overarching

7   drug conspiracy scheme.

8           And that's exactly what you have here, Your Honor.  The

9   government is going to try to say, well, regardless of what we've

10  proved in the past, we've proved here a drug conspiracy that is

11  engaged in violence and that these four defendants were all

12  somehow involved in it and that they then joined an umbrella drug

13  conspiracy that spanned back a decade earlier.

14          We would move, Your Honor, that that is not, does not

15  comport with the case law regarding single conspiracy.  And we

16  would move for a judgment of acquittal on Count Eight and, I

17  guess in that sense, Racketeering Act Nine.

18          A final point I would mention on that, too, Your Honor,

19  is that we have the Spence murder, which I'm sure you're going to

20  hear more from Mr. Coburn as well.  But it certainly is out there

21  as an outlier in this case.  And if anything, it's done nothing

22  more than to dirty up three of the other defendants that were

23  clearly unrelated to the Spence murder.

24          If anything, there's a scant relation between Mr.

25  Martin that we've heard from Mr. Montgomery, now testifying that,

1    if anything, the Spence murder was an effort to gain Mr. Martin a

2    lawyer when he certainly at the time, I think, was represented by

3    the Public Defender, certainly could have been represented by the

4    Public Defender.

5            Moving on to Count One, Your Honor, the RICO count.

6    First regarding just the substantive elements of RICO in and of

7    itself, Your Honor.  I think the government in this case has

8    certainly failed to prove, as you knew you were going to hear,

9    the existence of an enterprise.  The case law is very clear on

10   what the government needs to prove in an enterprise.  And that's

11   an ongoing organization that has continuity, shared purpose, and

12   structure.  I'm going to take them in somewhat reverse order.

13           The structure here, Your Honor, is entirely lacking.

14   There's no leader, so to speak, amongst this group.  And you're

15   going to hear Mr. Harding, of course, say that you don't have to

16   have a leader.  There's no hierarchy.  And he's going to say you

17   don't have to have that.  There's no structure.  There's no

18   sharing of profits.

19           I think this case quickly gets to the notion that the

20   pattern of racketeering is not synonymous with proof of an

21   enterprise.  And if you look at the, or if you have looked at the

22   Lemm case, it's an Eighth Circuit case.  It's also cited for

23   authority in U.S. v. Tillett.

24           And what the Lemm case says is that if you look at the

25   pattern of racketeering, if you take that away and you look at

1    what's left, that's where you get to the enterprise.  You have to

2    have some sort of structure, outside of the pattern of

3    racketeering activity, that minimal association that is necessary

4    for any two people to get together and commit any type of

5    conspiracy related or racketeering related crime.

6           Whatever is left, that's where you start to look for

7    the enterprise.  If you do that, Your Honor, here, you're left at

8    best with four, three boyhood friends and one individual that

9    came on later.

10          Now, what the government's going to try and do here is

11   they've made, they've introduced a lot of evidence and they've

12   tried to gain a lot of headway out of the existence of Shakedown.

13   Well, Shakedown Entertainment is not the enterprise that was

14   alleged in this indictment.  Crimes committed in furtherance in

15   promoting Shakedown Entertainment is not the overall 1994 to 2006

16   overarching umbrella RICO enterprise that was charged in this

17   indictment.

18          THE COURT:  Why don't we just have a drug gang as the

19   enterprise?

20          MR. FLANNERY:  Because a drug -- you know, this is

21   where the government wants to try to say that RICO is synonymous

22   with conspiracy.  And in one sense, Your Honor, RICO did

23   alleviate some of the problems in traditional conspiracy law.

24   But in another sense, it made it more difficult.

25          In a conspiracy, it's understood that it can be a

1    loosely knit association of individuals that don't need a

2    structure, they don't need any hierarchy or anything like that.

3    But that's not the case under RICO.  Under RICO now what they can

4    do agreeably is they can take what maybe under pre-RICO law would

5    have been seemingly unrelated crimes and bring them under the

6    umbrella of a RICO enterprise.  And that, in a sense, alleviates

7    some of the problems with traditional conspiracy law.

8         But what makes it more difficult for them, is they have

9    to prove more what generally would be a conspiracy under

10   traditional conspiracy law is not the same as an enterprise.

11   Now, association with an enterprise may, in fact, be easier to

12   prove than conspiring together.  But the enterprise itself is

13   certainly not synonymous with simple conspiracy.  It's not, Your

14   Honor.  It has to be something more than that.

15        It has to have that continuity, that structure, and

16   that common purpose that is akin to, what the case law generally

17   says is akin to, as we cite in the Bledsoe case, a mafia family.

18        Now, we're not arguing, certainly, that anyone has to

19   be a member of organized crime and that a mafia family is the

20   only enterprise that can somehow exist.  We're not arguing that

21   at all.  What we're saying is that it's that type of

22   organization, that type of unit that is the hallmark, even as the

23   government cites in the Griffin case, the hallmark of RICO is a

24   structure, an ascertainable, identifiable structure distinct from

25   the pattern of racketeering activity itself.

1          Finally, Your Honor, what I would also say is the

2    shared purpose here, again goes back to Shakedown.  Shakedown,

3    Mr. Martin, Mr. Gardner certainly had nothing to do with the rap

4    business, with the rap music business or with Shakedown

5    Entertainment.  If anything, that was a purpose amongst Mr.

6    Harris and Mr. Mitchell unrelated to these two defendants.  It's

7    a different enterprise altogether.

8          THE COURT:  That simply wouldn't be true to the extent,

9    if there's a drug gang and if part of the proceeds of the drug

10   gang were to be used to further the music business, it wouldn't

11   be true that members of the drug gang are totally unrelated to

12   Shakedown.  Shakedown clearly is not the enterprise.

13         MR. FLANNERY:  What I would say, Your Honor, there is

14   no evidence that that any of the proceeds were used to further

15   Shakedown.

16         Second of all, a drug gang in and of itself, just to

17   use the term lightly, is not synonymous with an enterprise.  They

18   have to show something --

19         THE COURT:  I think there's very compelling evidence

20   that part of what Mr. Mitchell earned or intended to earn in the

21   drug activities was going to Shakedown.  So it's simply not true

22   to say that the drug business had nothing to do with Shakedown.

23         MR. FLANNERY:  I'm not saying the drug business

24   necessarily had something to do with Shakedown.

25         THE COURT:  So my point is that if the drug gang is

1    doing the drug business and one or two members of the drug gang

2    were using the proceeds from the drug business generated by the

3    drug gang to pursue a music business, I'm not sure why that

4    doesn't, isn't a jury question.

5                MR. FLANNERY:  I'm sorry.  I apologize.

6                THE COURT:  Go ahead.

7                MR. FLANNERY:  The enterprise alleged in indictment

8    spans over from 1994 to 2006.

9                THE COURT:  See, that's a separate question.  And I'm

10   going to come to that.  But right now we're just talking about

11   the existence of the enterprise, not how long it existed.

12               MR. FLANNERY:  Fine.  But what I'm saying is the

13   enterprise that is alleged is the association, in fact, of these

14   four individuals.  That's the enterprise.

15               THE COURT:  No.  It's not these four individuals, it's

16   these four individuals and others known and unknown.

17               MR. FLANNERY:  That constitute the Randallstown/Park

18   Heights organization.

19               THE COURT:  And you can call it anything.  I'm using

20   the term "drug gang."

21               MR. FLANNERY:  Okay.  Fair enough, Your Honor.  What I

22   would say is that they haven't shown an enterprise that consists

23   of a drug gang including these four individuals.  If anything,

24   they've shown at best would be two distinct enterprises, if

25   anything.  They can't use, they can't use Shakedown as the

1    ascertainable structure aside --

2              THE COURT:  I'm not suggesting that.  Look, let's be

3    clear.  Maybe I should just read from the indictment.  The

4    indictment says, alleges, the indictment alleges in Paragraph 4-D

5    that one of the purposes of the enterprise was to maintain and

6    promote the rap music business in which members and associates

7    were involved, including Shakedown Entertainment, Limited.

8    That's what the indictment alleges.

9              So if Mr. Mitchell was a member of the enterprise, the

10   drug gang, and if Mr. Mitchell's purpose was in part joined in by

11   Mr. Harris to, quote-unquote, "maintain and promote the rap music

12   business", then that was a part of the purpose of the enterprise.

13             MR. FLANNERY:  I understand that.

14             THE COURT:  The fact that Martin and Gardner, for the

15   sake of discussion, had nothing to do with that part of the

16   enterprise just doesn't seem to get anybody anywhere.

17             MR. FLANNERY:  What I'm saying, Your Honor, is that you

18   can't, the enterprise itself consists of an ascertainable

19   structure that's distinct from the pattern of racketeering

20   activity.  And what I'm saying here --

21             THE COURT:  You don't have to convince me of that.  I

22   absolutely agree with you on that.

23             MR. FLANNERY:  And what the government has failed to

24   prove here is that distinct, identifiable ascertainable

25   structure, a continuing unit, an ongoing organization that has a

63

1    shared, a common purpose, Your Honor.  Common is common to all.

2              THE COURT:  The indictment says, the indictment lists

3    the five purposes of the enterprise.  Now, are you arguing that

4    every member of the enterprise and/or associate of the enterprise

5    must share in all five of those purposes?

6              MR. FLANNERY:  No.  No, I'm not, Your Honor.

7              THE COURT:  I didn't think so.  So the fact that only

8    Mitchell and Harris were interested in the rap music business

9    doesn't in any way undermine the government's presentation.

10             Another purpose was promoting and enhancing the

11   enterprise and its members and associates' activities.  Now, you

12   know, that's terribly vague.  I agree with you there.  But that's

13   what the grand jury alleges here.  What were their activities?

14   Well, their activities were dealing drugs, robbing drug dealers,

15   according to the indictment, according to the evidence, killing

16   drug dealers, killing witnesses, intimidating people.

17             MR. FLANNERY:  Your Honor --

18             THE COURT:  And indeed under the fourth superseding

19   indictment, disrupting court proceedings.

20             MR. FLANNERY:  That's fair enough, Your Honor.  Your

21   Honor, we've all sat through this trial.  We all are well aware

22   of --

23             THE COURT:  Including the jury.

24             MR. FLANNERY:  -- of the evidence of all the bad things

25   that these four individuals are alleged to have done.  That's the

1    pattern of racketeering activity, though.

2              THE COURT:  No.  It's not.

3              MR. FLANNERY:  That is the pattern of racketeering

4    activity.  The crimes themselves are the pattern of racketeering

5    activity.  You take that away --

6              THE COURT:  But promoting and enhancing the enterprise

7    and its members is not a crime.  When, just by way of example,

8    producing and selling a rap music CD is not a crime.  That's not

9    a crime.  Clearly, the jury could find that that was part of what

10   the enterprise engaged in here through Mr. Mitchell and Mr.

11   Harris.  That's not a crime.

12             MR. FLANNERY:  I guess what we're doing, Your Honor, in

13   a certain sense is we're starting from the supposition that the

14   enterprise is just a drug organization, and it's not.  Because

15   you have to prove the enterprise.  It's not fair enough, it's not

16   fair for the government to simply say, well, these four people

17   were together.

18             THE COURT:  But I'm not finding the facts.  What you

19   have to convince me of is that a reasonable fact finder couldn't

20   find that the enterprise was a drug gang.

21             MR. FLANNERY:  Okay, Your Honor.

22             THE COURT:  So tell me why a reasonable finder of fact

23   couldn't conclude that the enterprise here was a drug gang.

24             MR. FLANNERY:  Okay, Your Honor.  A couple reasons.

25   First of all, these four individuals --

```
 1                THE COURT:  Let me ask you this, before you do that.
 2      Just in the abstract, in the abstract, could a drug gang ever be
 3      an enterprise?
 4                MR. FLANNERY:  Absolutely.
 5                THE COURT:  Okay.  All right.
 6                MR. FLANNERY:  It could very well be.
 7                THE COURT:  So that makes it really easy for our
 8      dialogue.  Why is the evidence insufficient here to show,
 9      crediting, of course, the evidence in favor of the government,
10      why is this drug gang not an enterprise?  Why could a reasonable
11      finder of fact not conclude beyond a reasonable doubt that this
12      particular drug gang was an enterprise?
13                MR. FLANNERY:  The reason that they could not conclude
14      this a particular drug gang is an enterprise, Your Honor, is
15      because this particular enterprise is a loosely --
16                THE COURT:  You mean this particular drug gang.
17                MR. FLANNERY:  This particular drug gang, sorry, is a
18      loosely knit association of three boyhood friends and another
19      individual who came later, unrelated to the other two.  They
20      don't have --
21                THE COURT:  Why isn't that, why isn't that statement
22      jury argument?  You're asking me to reach that conclusion, that
23      all this was was three boyhood friends and another guy hanging
24      out, fellow travelers who liked each other.  That's up to the
25      jury to decide.
```

1          MR. FLANNERY:  Because, Your Honor, the reason why is

2     that the government has to come forward with the evidence of the

3     structure that, that the four, four together provide the jury

4     something to find, they have to present something to show that

5     this, these four individuals, aside from the association together

6     to commit the crimes that they committed, aside from that, aside

7     from that minimal association that they needed to get together

8     and commit those crimes, that there is some sort of identifiable

9     structure between them that you can identify that holds them

10    together as an enterprise, as something more than just a group,

11    as something more than just four people.

12          THE COURT:  It's clear here that there's continuity,

13    correct?

14          MR. FLANNERY:  No.  Your Honor, that goes right back to

15    what I finished arguing.

16          THE COURT:  What is your definition of "continuity?"

17          MR. FLANNERY:  Continuous, unbroken from time.

18          THE COURT:  It doesn't have to be unbroken.

19          MR. FLANNERY:  Well, it doesn't have --

20          THE COURT:  It doesn't have to be unbroken.  You're

21    absolutely wrong about that.

22          MR. FLANNERY:  It does not, Your Honor.  But it doesn't

23    have to be unbroken by definition in the sense that if there's a

24    break, then as a matter of law it's no longer continuous.  That's

25    not what I'm arguing.

1          THE COURT:  What are you arguing when you're saying it

2     has to be unbroken?

3          MR. FLANNERY:  No.  What I'm saying here, in fact, is

4     that it is broken.  And the fact if you look at it broken,

5     combined with the facts I mentioned, the lack of common

6     suppliers, the lack of common distribution schemes --

7          THE COURT:  But they do have common suppliers.  There's

8     testimony they went up to New York together.

9          MR. HARDING:  That's back in 1994, Your Honor, 1999.

10    Our argument would be that ended when, first of all, Mr. Mitchell

11    attended college.  The other two individuals, Martin and Gardner,

12    were locked up.  Mr. Harris wasn't even involved.

13         We don't even know at the time that Mr. Mitchell, in

14    fact, was even engaged in distributing those narcotics.  Mr.

15    Bacon said at one point, I believe it was one time that he bought

16    drugs.  The others were bringing it back.  But at that point that

17    conspiracy is a distinct conspiracy that ended.  If anything, the

18    PA conspiracies then picked up.  Those are certainly unrelated.

19         At that point then, you get into, we haven't even

20    gotten to Park Heights yet at that point.

21         THE COURT:  All right.  Let's talk about, let's talk

22    about the issue of time.  I think I've already told you, and I'll

23    hear from Mr. Harding, if not today, at the appropriate time,

24    it's pretty clear I'm going to give a multiple conspiracy

25    instruction, it seems to me.

68

1            The indictment says that the conspiracy existed from

2      '94 through 2006.  Twelve years.  First of all, I guess my

3      question is, have you or any counsel, if you've talked to them,

4      given any thought to the form of the verdict sheet in this case?

5            MR. FLANNERY:  We certainly haven't spoken to them.

6            THE COURT:  How about you and Mr. Martin?

7            MR. FLANNERY:  We have not, we have not discussed that

8      particularly.

9            THE COURT:  As you know, I'm confident you agree with

10     this proposition, what the government's got to prove is that the

11     dates alleged in an indictment are substantially accurate.  What

12     would, in your judgment, constitute substantially the same in

13     respect to a 12 year conspiracy?  And how do you, how do you

14     tease out of the jury its decision as to whether there has been

15     substantial, beyond mere instructions?

16           MR. FLANNERY:  I think I've seen case law as low as a

17     year, I think, as being, as being a substantial variance.

18           THE COURT:  8%?  In other words, if the government

19     proves that the conspiracy lasted for only 8% of the time alleged

20     in the indictment, that that would be enough?

21           MR. FLANNERY:  Well, I'm certainly not -- I mean, I'm

22     not going to purport without discussing with my colleagues to

23     simply throw out a number there.  But, you know, I think when

24     you're alleging years, so to speak, you should be pretty close to

25     within years of the indictment.

1         THE COURT:  In other words, what if a jury, what if a

2    jury were to say, well, you know what, I'm not terribly impressed

3    by the evidence of what was going on back in '94, '95, '96, even

4    '97.  But I think by '97, '98, these guys were really tight.

5    Would that be sufficient?

6         MR. FLANNERY:  I would argue not.

7         THE COURT:  If the jury lopped off the first --

8         MR. FLANNERY:  Lopped off the first three years?

9         THE COURT:  Yeah.

10         MR. FLANNERY:  I don't think so, Your Honor.  And

11    particularly because, I mean, I think there's, first of all, I'm

12    not sure how much evidence there is, even going back that far,

13    quite frankly.

14         THE COURT:  I agree with you there.

15         MR. FLANNERY:  In reading my notes.  But I think the

16    longer that it's alleged, the more it creates the inference that

17    there was a, you know, that there was continuity.  And since

18    that's such an important principle, I would say that, you know,

19    three years is a lot of time for the jury to simply say, well, we

20    don't find anything for those three years, it picks up in 1997.

21         THE COURT:  But three years would only be 25% of the

22    alleged conspiracy.

23         MR. FLANNERY:  That's a lot.

24         THE COURT:  Well, what if the government proved that a

25    conspiracy lasted for 12 months and the jury was only convinced

1    that it was in existence for 9 months?  That wouldn't be a basis

2    for granting a motion for judgment of acquittal, would it?

3              MR. FLANNERY:  It starts to -- the government was the

4    master of the indictment, as Mr. Coburn cites in his Weissman

5    case.  They had their shot.  They made their bed.  They have to

6    sleep in it, you know.  They had an opportunity to charge several

7    different conspiracies.  Probably if they would have chose to,

8    had a chance to craft a neater indictment, should they choose to.

9    They cast a broad net.  Now they have to live with what they

10   cast.

11             Our argument would be much more than getting outside,

12   you know, the years that are alleged in the indictment.  It's

13   going to start --

14             THE COURT:  Are you going to ask for a special

15   interrogatory, assuming the Court submits that issue to the jury?

16   Something like, what are the dates of the conspiracy you find

17   proven beyond a reasonable doubt?

18             MR. FLANNERY:  Yes.

19             THE COURT:  I'm not saying I will permit that.  I'm

20   just --

21             MR. FLANNERY:  You're just asking.

22             THE COURT:  Yeah.

23             MR. FLANNERY:  Well, Your Honor, sounds to me like

24   we've talked here.  But I would leave you with, I think we're

25   hard pressed to find that structure that's required for this RICO

1    enterprise.  I think we're hard-pressed to find an ongoing

2    organization, for one, personally, and also the continuity that's

3    required here.

4            The other thing, too, I would just say very briefly is

5    that particularly, I guess it's more an argument to Mr. Harris,

6    is that, you know, beyond just finding the enterprise and beyond

7    finding that pattern of racketeering activity, they still have to

8    show that there was an agreement on his part to engage in that

9    overall, overarching RICO conspiracy.

10           I certainly do want to put our argument on the record

11   that we think McCaffity/Brown has certainly been proven to be

12   what we would argue is really an act of personal vengeance,

13   unrelated to any enterprise, whatever that enterprise may be, and

14   any goal of that enterprise.  That, if anything, that was Mr.

15   Mitchell feeling a threat, making a preemptive strike at best,

16   Your Honor.  And that that's not -- an act of self-preservation,

17   an act of desperate self preservation is not in and of itself

18   going to be an act in furtherance of an enterprise.  The

19   government would have to show more.  And I don't think that

20   they've done.

21           Their theories even through the witnesses themselves

22   are inconsistent as to what the rationale for the McCaffity/Brown

23   murder was.

24           THE COURT:  Well, but what do you do about purpose 4-B?

25           MR. FLANNERY:  I'm sorry?

1           THE COURT:  I said, what do you do for the purpose, the

2      enterprise purpose 4-B, which reads, preserving and protecting

3      the power, territory, and profits of the enterprise and

4      retaliating against other individuals and organizations through

5      the use of intimidation, violence, threats of violence, murder

6      and murder for profit.

7           Now, if Mr. Mitchell -- and arguably the jury could

8      find this -- if Mr. Mitchell was the first among equals, as in

9      some context it said, if Mr. Mitchell gets beaten up at

10     Hammerjacks, it's not a stretch at all for a juror to conclude,

11     and for the government to argue, that the enterprise had to go

12     after anybody who put Mr. Mitchell's life at risk.

13          And I understand your argument, that certainly the

14     evidence can be interpreted as the McCaffity/Brown murders as

15     being like one of the worst mistakes, having nothing whatsoever

16     to do with anything except sort of a paranoid reaction by

17     individuals that Mr. McCaffity was out to commit a murder.

18          I mean, the evidence seems to suggest that that wasn't

19     even true.  That not only should Lisa Brown not have been

20     murdered, but McCaffity shouldn't have been murdered.  I mean,

21     that's one interpretation of the evidence.

22          But that's just one interpretation, it seems to me,

23     that a reasonable juror could place on that evidence.  And in

24     light of Paragraph 4-B, another reasonable interpretation is,

25     well, yeah, they were protecting Mitchell.  And sure, there was a

1    personal motivation but there was also, if you will, an

2    organizational or institutional motivation.  Understanding that

3    the institution or the organization is, as I put it, a drug gang.

4            MR. FLANNERY:  But Your Honor, I mean, they haven't

5    presented any evidence that Mr. McCaffity was somehow related to

6    another organization, was, you know, out to get Mr. Mitchell and

7    that Mr. Mitchell knew this.

8            THE COURT:  Well, that's what I was saying.  In fact,

9    it seems to have been a mistake.

10           MR. FLANNERY:  That what we're arguing.  It was an

11   aberration, if anything, an act of self-preservation, and that's

12   not related to the enterprise.

13           There's not substantial evidence for a rational juror

14   to make a finding that the McCaffity/Brown murder was done in any

15   way to protect the Park Heights territory, to intimidate the Rice

16   organization, or anything like that.  There just wasn't.  I don't

17   feel there's substantial evidence for a rational juror to make

18   that finding.  If anything, there they're going to find that

19   that, the only evidence that's been presented, you know -- one,

20   according to Mr. Dobropolski, would be a disagreement over the

21   rap music business.  And then according to the government would

22   be that, you know, Mr. Mitchell was worried.

23           THE COURT:  Okay.  But again, it said that part of the

24   enterprise's purpose was to maintain and promote the rap music

25   business.

1          MR. FLANNERY:  Right.  But that's, they're alleging was

2     part of the enterprise.  Again, that brings us back to where we

3     started before; that they want the enterprise to be the Willie

4     Mitchell organization and Shakedown Entertainment.  That's what

5     they would like the enterprise to be.  And that's what they want

6     the jury to believe, that that's, in fact, the enterprise, that

7     it's the Willie Mitchell criminal organization, now dubbed the

8     Randallstown/Park Heights organization.

9          THE COURT:  Or as I put it, a drug gang.

10          MR. FLANNERY:  Or a drug gang without any evidence of

11     any type of structure outside of the necessary association to

12     commit the acts of drug distribution, distinct conspiracies in

13     and of themselves, and any of the murders that are alleged here.

14          Again, Your Honor, I mean, a drug conspiracy, Count

15     Eight, is not synonymous with a RICO enterprise.

16          THE COURT:  Of course not.

17          MR. FLANNERY:  They're different.  And they have to

18     substantially prove that those are, in fact, different and they

19     have to provide that type of structure.

20          Your Honor, if this is a RICO enterprise, anything is a

21     RICO enterprise.  Any four individuals who commit crimes together

22     is a RICO enterprise.  At some point there has to be a real thing

23     known as an enterprise.  There just isn't here.  They haven't

24     provided substantial evidence that these four individuals, aside

25     from the crimes they've committed, constitute any type of

1    identifiable structure or organization.  They just haven't.

2                THE COURT:  All right.  Anything else, Mr. Flannery?

3                MR. FLANNERY:  I think that's it, Your Honor.

4                THE COURT:  Okay.  Thank you.  Mr. Pyne?

5                MR. KURLAND:  I think they want me to go next.

6                THE COURT:  Okay.  Mr. Kurland.

7                MR. KURLAND:  Your Honor, I had a slightly different

8    take on some of the interpretations of the evidence and the legal

9    principles.

10               The first thing that I would like to say is with

11   respect to the argument that Mr. Flannery made on Count Eight,

12   we'd adopt that with just a couple of slight modifications or

13   additions.  The first is that part of the issue with respect to

14   whether special interrogatories would be necessary, assuming the

15   case gets that far, would all, would depend on the specifics of

16   the Court's instruction on multiple conspiracies because a

17   thorough multiple conspiracy instruction would give the jury the

18   opportunity to simply just acquit on the grounds that if it found

19   different conspiracies other than the one charged, that to some

20   extent addresses the Court's concern or partially addresses the

21   Court's concern about what to do with respect to the dates.

22               So one of the things that I'm going to be thinking

23   about, assuming this motion is not granted in full, is the

24   interplay between the multiple conspiracy instruction, which

25   certainly should be given here, in addition to whatever special

1    interrogatory proposed instruction would go to, would go to the

2    scope.

3         Now, with respect to -- so other than that, we'll

4    submit on the arguments with respect to Count Eight.

5         Now, Count One, obviously, is different.  And it's our

6    position that for the Court to throw out Count One, at least with

7    respect to Gardner, it really is a legal issue as to whether or

8    not what's been established here, given all the benefits in favor

9    of the government and the interpretations of the evidence, which

10   is the Rule 29 standard, is whether or not there's effectively

11   been a fatal variance.  If there's a fatal variance as a matter

12   of law as to what the evidence proves, given all, you know,

13   interpreting the evidence in the light most favorable to the

14   government, the Court should grant the Rule 29 motion, if, as a

15   matter of law, there's been a fatal variance.

16        Looking at Count One, the government hasn't alleged a

17   Count One RICO conspiracy as synonymous with a drug organization.

18   They could have done that.  And as Mr. Flannery pointed out, the

19   government, the government has chosen to indict this case in this

20   peculiar manner and they need to be held to that.

21        With respect to that purpose of the enterprise 4-D, one

22   of the purposes listed is this maintaining and promoting the rap

23   music business in which members and associates were involved,

24   including Shakedown Entertainment.

25        Now, that, two things that are critical with respect to

1    that, Your Honor.  The first is that that language, it doesn't

2    say some of.  It's absolute.  That all members and associates,

3    and I believe that's a fair reading of the indictment.

4             THE COURT:  It's a reading that I absolutely

5    categorically reject.  I mean, you can certainly argue that to

6    the jury.

7             MR. KURLAND:  I understand that.  I understand that.

8    Even if the Court rejects that, that simply means all members

9    were involved, I want to understand it isn't just the members,

10   it's the associates, anybody tangentially related as to what the

11   law would permit.

12            But even if the Court rejects the argument that as a

13   matter of that includes everyone, there's no question that the

14   manner in which the government has tried this case, the focus on

15   Shakedown Entertainment has been central to the Count One RICO

16   enterprise.  It simply, and this is where, I don't know if the

17   judge was just trying, you were being just kind of just general

18   in making an observation, but it is not synonymous to say that

19   the Count One enterprise as alleged could have just as easily

20   been or synonymous with a drug gang, because this is far more

21   then a drug gang.

22            Central to the government's proof in this case was this

23   tie to Shakedown.  The first murder --

24            THE COURT:  Well, the tie is set out in Paragraph

25   Three, sub three, or Paragraph Three.  It says that the

1    enterprise consists of a group of individuals and an entity

2    associated in fact.  That entity is Shakedown.

3              MR. KURLAND:  Well, no, I understand that.

4              THE COURT:  Okay.  So Shakedown Limited is associated

5    with the enterprise.

6              MR. KURLAND:  That's right.  But my, but my argument is

7    that given the centrality of Shakedown, and again, if you look

8    back it's conceivable on this evidence to come to the conclusion

9    that the first murder, that the McCaffity/Brown murder was, was,

10   as we just talked about before, was a fall out of a rap music

11   dispute.  That was, Dobropolski testified to that.  There was

12   other evidence testified.  That the fight came out of the

13   incident at Hammerjacks in which they were jockeying --

14             THE COURT:  Well, I don't know when a rap music dispute

15   it.  The evidence is that there was a rap music celebration, a

16   party, whatever, and the fight between Mr. Mitchell and others

17   arose out of something that happened or didn't happen at

18   Hammerjacks.  Now, the fact that --

19             MR. KURLAND:  Judge, there's some evidence, certainly,

20   it's fair to make the argument that there's some evidence, and I

21   think this is the government's theory even based on what they

22   said in their opening statement, that it arose out of some

23   jockeying for position to try to get a rap music contract or

24   something along those lines.  But there's some connection with

25   respect to that murder.

1          But in any event, there is no evidence in this record

2     that Shawn Gardner had anything to do with any aspect of

3     Shakedown Entertainment.

4          THE COURT:  And because, and because I have rejected

5     your reading of 4-D, that's irrelevant.

6          MR. KURLAND:  Well, Your Honor --

7          THE COURT:  My take -- let me be very clear because I

8     think you preserved the record.  The fact that Gardner and

9     perhaps Martin had nothing to do with Shakedown in terms of

10    performing or playing music, I mean, they could care less about

11    Shakedown.  The alleged centrality of Shakedown to Count One,

12    simply, I don't care.  It doesn't matter to me.

13         MR. KURLAND:  Well, I would suggest, I won't suggest, I

14    would argue, I will argue, Your Honor, that with respect to the

15    stated purpose of the enterprise and the manner in which the

16    government has tried this case, that that creates, that because

17    there's evidence or there's no evidence that Mr. Gardner has

18    anything to do with that, that that's a fatal variance as a

19    matter of law and that should be the Court's grounds to throw out

20    Count One as to Mr. Gardner.

21         It's certainly an argument available for the jury for

22    them to argue, if the Court doesn't throw it out --

23         THE COURT:  Sure, you can argue that.

24         MR. KURLAND:  But again, for the purposes of Rule 29,

25    it's our position that the centrality of the focus on Shakedown,

1    which after all, and this is all with a legal argument to make

2    here and also will be a factual argument to the jury, the real

3    enterprise -- and this picks up on what Mr. Flannery said -- the

4    real enterprise that's been proven, if anything, is Shakedown.

5    But the government didn't indict it that way.  What the

6    government really has done in this case is put on, has put on

7    two, three, evidence of two, three, four conspiracies.

8          But at some point you have all this stuff that goes on

9    up till 1999, of which most of the defendants are convicted of

10   and sentenced for most of the drug offenses.  They kind of paint

11   this broad brush between '94 and '99.  Then you really have a

12   spasm of violent activity in a five week period between February

13   and March, the two double murders, and then arguably, and I'll

14   get to that in a minute, there's no question with respect to the

15   Spence murder, but you really have a spasm of violent activity

16   that covers a five to maybe eight week period, which would have

17   made this a two week trial.

18         But the government, for a variety of reasons, and they

19   have to be held to it, has decided to allege a conspiracy that

20   spans 12 years, including a lot of stuff that has absolutely

21   nothing to do with, with any real conspiracy here.

22         The Pennsylvania example is a perfect example.  There

23   was evidence of Mr. Mitchell being involved in some Pennsylvania

24   conspiracy in Altoona.  There is nothing, contrary to what Mr.

25   Flannery said, there is no evidence that Mr. Gardner had anything

1    to do with anything in Pennsylvania, save for one line from Mr.

2    Hayes when he said something about, Pennsylvania is sweet.  That

3    was it.

4              And then somebody opined, whatever, that might have

5    been a reference to something else.  But there's zero evidence

6    that any of these defendants other than Mr. Mitchell have

7    anything to do with the three or four days of testimony that we

8    heard about Pennsylvania.

9              Be that as it may, with respect to the RICO count, the

10   centrality of the manner in which the government has indicted

11   this case and has prosecuted the case means that if there's no

12   connection to Shakedown, which is really the only enterprise that

13   has been established, and proving the enterprise of Shakedown

14   with organizational structure and that these alleged racketeering

15   acts have to do with even robbing drug dealers or killing drug

16   dealers to fund Shakedown, I concede, I acknowledge there's

17   evidence in the record that supports that.  But that isn't what

18   Count One alleges.  And it should be an issue as a matter of law,

19   independent of whether or not it's also an issue for the jury.

20             With respect to right now, the government, adopting all

21   evidence and all inferences in favor of the government, the

22   government has not proved that Gardner is a member of the

23   enterprise as alleged in Count One.

24             Now, I understand the Court's position that the, that

25   the Court says, well, the Court's not going to read D as the way

82

1    I do.  And I appreciate that.  But the separate related issue has
2    to do with the centrality of that.  And it's our position as a
3    matter of law that if a defendant isn't related to number D,
4    given the way the government has put on the case, that that means
5    that they're not part of this conspiracy.  And it's not fair to
6    say, it's not like, what's that wrong I was pronouncing wrong.
7    Suplussage (sic) or whatever.
8            THE COURT:  Surplusage.
9            MR. KURLAND:  I never get that one right.  But it's not
10   like you can just scratch out D and say that, well, that's just
11   surplusage, whatever the word is -- I'll have to work on that
12   before the next time.
13           THE COURT:  Counsel was saying surplusages, Madam Court
14   Reporter, Ms. Zajac.
15           MR. KURLAND:  I've had a problem with that for years.
16   But in any event, it's not like you can just scratch out D and
17   say, well, because that changes the entire nature of what this
18   trial would have been about.  And the cases that we cite, we
19   argue that that's fundamentally essentially a fatal variance,
20   which the Court can rule on as a matter of law and throw out
21   Count One.
22           The only other counts that I would like to speak to, I
23   just want to amplify, I don't want to repeat what's in the
24   written motion, and that has to do with the, that has to do with
25   the Spence homicide, which we argue as a matter of law no

1    reasonable jury could find, even adopting all inferences in favor

2    of the government, that that event had anything to do with

3    maintaining one's position in the charged enterprise.  We think

4    that no rational jury can find, given the inconsistent statements

5    made under oath, which as a matter of law can be considered as

6    substantive evidence as well, no rational jury could find on the

7    evidence that the, that Mr. Gardner's motivation was to pay for

8    Mr. Martin's lawyer.

9            That evidence, I understand that there's evidence in

10   the record, but there's also contrary evidence in the record of

11   equal, of equal substantive weight.  And therefore no rational

12   jury could find that.  Therefore, that uncouples that killing,

13   that murder from having any connection at all with anybody else.

14           There's abundant evidence that the motivation for the

15   Spence robbery had to do with, you know, initially, if somebody's

16   approaching or there's a conflict as to who approached who.  But

17   initially, you know, Mr. Montgomery is thinking about, you know,

18   killing Jamane Johnson, which turns into a kind of a revenge

19   killing because it's tied into, you know, infidelity of Tonya

20   Spence and so on and so forth.  That has nothing to do with

21   maintaining anybody's position in the charged enterprise.

22           So those counts have really nothing to do with this,

23   with this case at all.  And again, I understand that there is

24   evidence in the record, based on what Montgomery said and what

25   Reynolds said.  But as I've pointed out, they have equal

84

1    inconsistent statement made under oath.  That goes to the RICO

2    case.

3           That even if there is, even if the Court ruled that

4    there was sufficient evidence to say that Montgomery was part of

5    the conspiracy, to having that statement as a coconspirator

6    statement, there's a huge difference between sufficiency for

7    evidentiary purposes and for sufficiency as a matter of law.

8    Both of the Rule 29 standard, and obviously if it gets to the

9    jury.

10          But as a matter of law, this should never even be a

11   jury issue.  As a matter of law that evidence needs to be

12   rejected and that there should be judgments of acquittal entered

13   on all counts which relate to the Spence homicide because, again,

14   we're not trying a state murder homicide here.  That homicide has

15   to be done in a manner that is done to maintain or increase one's

16   position in the charged enterprise.

17          THE COURT:  Well, as you know, Mr. Kurland, from my

18   ruling on the Motion to Dismiss counts, which I granted in part,

19   I am really quite troubled, "troubled" is too strong a word, I

20   guess, but I just don't know about these 1959(a) counts.  I mean,

21   it's indicted in the language of the statute but, for example,

22   clearly, with respect to Count Seven, there's no promise or

23   agreement to pay a thing of pecuniary value from the

24   Randallstown/Park Heights organization.

25          MR. KURLAND:  Zero.  There is zero evidence.

85

1          THE COURT:  So I'm not sure, frankly, how to instruct

2     the jury on that.  I anticipate that the government's going to

3     argue that Mr. Gardner aided and abetted that murder because I

4     think it's undisputed that he was not the shooter, correct?

5          MR. KURLAND:  No.  Well, the evidence that has been

6     presented to this jury, it is undisputed --

7          THE COURT:  That Holly was the shooter.

8          MR. KURLAND:  Yes.  Now, the government might argue

9     that Montgomery said that he carried, you know, the gun out that

10    was the murder weapon.  But the bottom line is, given the way

11    that these guns are musical chairs, there is no evidence, and it

12    would be improper for the government to argue, and I don't

13    believe they will, it would be improper for the government to

14    argue that there's any evidence in the record that Mr. Gardner

15    was the shooter, if he was involved at all.

16         THE COURT:  So I mean, I assume the linchpin of that

17    count is maintaining and increasing his position in the

18    enterprise.

19         MR. KURLAND:  Yes.  Judge, one other thing.  If it's

20    conjunctive, we get a judgment of acquittal as a matter of law.

21    That's the other argument I forgot to make.  The way it's

22    indicted, the "and" --

23         THE COURT:  Well, it's not, you indict it in the

24    conjunctive but the jury can consider it in the disjunctive.

25         MR. KURLAND:  I tried.

1              THE COURT:  Okay.

2              MR. KURLAND:  Again, so even in the disjunctive, it's

3    our position that as a matter of law, recognizing, again, the

4    difference between the Court's evidentiary rulings which went

5    against us, to at least having it considered, if you look at the

6    Orrico case, it talks about sort of the inverse situation where

7    the government relies on an inconsistent statement that is

8    inconsistent with the in-court trial testimony, but both of them

9    are admissible as substantive evidence.

10             And the court in Orrico says that as a matter of law,

11   just because there's evidentiary sufficiency to get it admitted,

12   it doesn't mean that it's sufficient as a matter of law.  That

13   certainly is going to be an argument that we make to the jury if

14   it gets that far.

15             But we would also argue that with respect to the

16   flimsy, slender read of evidence that even makes up the argument

17   that Gardner did this to maintain and increase his position in

18   the Randallstown/Park Heights organization, one, we would argue

19   that he's not part of that organization for the reasons we said

20   before.  But number two, that based on the evidentiary record and

21   all the factual conflicts up to whether or not it's to pay for

22   Martin's lawyer or not, and all the ways in which the witnesses

23   who testified to that were both impeached, not just as

24   impeachment evidence, but impeached with statements that can be

25   admissible as substantive evidence, even adopting all inferences

87

1    in favor of the government, no rational jury could conclude that

2    Gardner's role in that was to maintain and increase his position.

3    And we'd ask for a judgment of acquittal on those grounds.

4          THE COURT:  All right.  Thank you, Mr. Kurland.

5          MR. KURLAND:  I'm sorry.  One other thing.  The

6    government's proposed instruction -- and this just kind of

7    highlights that issue and the number one issue -- the

8    government's proposed instruction that we object to because we

9    think it's incomplete, but even the government's proposed

10   instruction 18, association with the enterprise says, and a

11   person can't be associated with or employed by an enterprise if

12   he doesn't know of the enterprise's existence or of the nature of

13   its activities.  Thus, in order to prove this element, the

14   government must prove beyond a reasonable doubt --

15         THE COURT:  Slow down, please.

16         MR. KURLAND:  I'm sorry.  That thus in order to prove

17   this element, the government must prove beyond a reasonable doubt

18   that the defendant was connected to the enterprise in some

19   meaningful way and that the defendant knew of the existence of

20   the enterprise and of the general nature of its activities.

21         Now, we object to this instruction as not being, as

22   being too vague in general.  But even taking this language to

23   amplify the point that this is not just a drug gang.  The general

24   nature of the activities as indicted by the government is

25   integrally related to Shakedown.  And even if there's the tie

1    between robbing drug dealers to fund Shakedown, because there is

2    evidence of that, that goes to the, even under this instruction,

3    that goes to the core of the general natures of the activity of

4    the enterprise as indicted by the government in Superseding

5    Indictment Number Four, Mr. Gardner doesn't fit that definition

6    as a matter of law.

7         THE COURT:  Okay.  Thank you, Mr. Kurland.  Mr. Crowe,

8    I assume you'll be concomitantly brief.  It's nearly 10 of 12.  I

9    think I'll excuse the jury for lunch and we'll continue this

10   after lunch.

11        MS. RHODES:  Your Honor, can we get their answer

12   because I need to contact --

13        THE COURT:  That's what I'm going to do.  Bring the

14   jury out, please.

15        (Jury enters the courtroom.)

16        THE COURT:  Don't get comfortable, ladies and

17   gentlemen.  Good morning.  My consultations with counsel have

18   lasted longer than I anticipated.  You're not surprised by that,

19   I'm sure.  So I decided to release you a little early for lunch,

20   and frankly, to give you a slightly longer lunch.  You've

21   certainly earned it.

22        But we're going to be under way fully this afternoon.

23   We've got defense witnesses ready to go.  But rather than keep

24   you waiting, and we haven't had a break since you took your

25   break.  So I really do need to give Ms. Zajac, the court

1   reporter, a break, and counsel as well.

2          So I'm going to excuse you now for lunch.  It's about

3   almost 5 of 12.  Please leave your note pads on your chairs.

4   You're excused until 2:15 this afternoon.

5          Please have no discussion about the case or any of the

6   evidence you've heard so far.  Enjoy your lunch.  The jury's

7   excused until 2:15 this afternoon.

8          MS. RHODES:  Your Honor, I meant are you going to ask

9   --

10          THE COURT:  Excuse me.  I'm sorry.  Thank you for

11   reminding me, Ms. Rhodes.  Do we have any problem with being

12   together on Monday and Tuesday of next week?

13          THE JURORS:  No.

14          THE COURT:  Excellent.  Excellent.  Thank you very

15   much, ladies and gentlemen.  I think this will be for the benefit

16   of all of us.  Thank you.

17          (Jury exits the courtroom.)

18          THE COURT:  Thanks for the reminder, Ms. Rhodes.  All

19   right.  Counsel, we will stand in recess until, please be back at

20   1:30.  What I anticipate is that we will, I'll hear from Mr.

21   Crowe and briefly from Mr. Lawlor or Ms. Rhodes, and then I'll

22   hear from the government.  And then hopefully by 2:00 or 2:15, I

23   told the jury, Mr. Martin will be standing there making his

24   opening statement.  And then we'll get through the defense

25   witnesses who are here today.  We're in recess until 1:30.

1          (Recess at 11:55 a.m.)

2          THE COURT:  Mr. Crowe.

3          MR. CROWE:  Your Honor, as the Court predicted before

4    we broke, I certainly hope to be very brief on this.

5          The principal arguments that we have to make, and those

6    are on the substantive counts, are contained in the written

7    memorandum that we filed, which I expect that the Court has

8    reviewed.

9          In going over this, we felt that it was probably best

10   to break down the counts of the indictment into the two

11   conspiracy counts with which Mr. Martin was charged, which are

12   One being the RICO conspiracy and, Eight, the drug conspiracy.

13   Then Five and Six, which are the murder counts for Darryl and

14   Anthony Wyche, which are entirely dependent on a RICO enterprise.

15   And then the firearms counts, which are 12 through 14, each of

16   which require proof by the government that Mr. Martin possessed

17   the firearm in furtherance of the murders of Darryl and Anthony

18   Wyche.  And of course, there are aiding and abetting charges on

19   all the substantive counts as well.

20          Our feeling is that, in terms of the murders, and that

21   really affects all of these counts, there's been no substantial

22   evidence offered to show that Mr. Martin participated in any of

23   these.  There is speculation.  There's some innuendo.  But there

24   really is no proof.  And I am confident that if Mr. Martin were

25   on trial for simply murder in state court, that there's little

1     question that the motions for judgment of acquittal would be

2     granted on those.

3          The government's evidence, as I understand it, is based

4     upon telephone, a couple of telephone conversations which

5     occurred on March 24, 2002, the day before the Wyches' murders,

6     some instances where Mr. Mitchell tried to call my client later

7     that day and in the early evening.

8          It's also based, as I understand it, on the, what are

9     very, very, very, very tentative identifications of my client's

10    voice on the voice mail message that went into Ms. Magginson's

11    cell phone, and upon a couple of references to Weaze in the CD's,

12    which Mr. Harris composed and sang.  We feel that that evidence

13    is very, very speculative.

14         This is a somewhat unusual case in that, really, the

15    guts of the alibi defense has come out in the government's case,

16    even to the extent that the government has produced on the stand

17    what it says is a copy of the charge slip which my client signed

18    9:41, the evening before, evening before the murder when my

19    client said that he was in the movie with Lakeisha McCoy.

20         And Detective Niedermeier further described what

21    information he had obtained from Ms. McCoy and the fact that it

22    was consistent with the information that Mr. Martin had provided.

23    And that in substance is that they went to the movie, the movie

24    started at 10:00, that thereafter they went home, and that they,

25    and that Ms. McCoy stayed the night at my client's home at Two

1    Cree Court.

2              That, we would submit to you, is evidence which is part

3    of the government's case and certainly justifies granting the

4    motion for judgment of acquittal.

5              There are any number of minor points which I could

6    make.  Certainly significant among them is the fact that my

7    client, like virtually everybody else in this case, is an

8    individual who used his own cell phone.  If the court has in

9    front of it Government's Exhibit 66, which is the principal chart

10   of the telephone calls, it will see that the phone calls on March

11   24th in which my client was involved were all the 1933 number,

12   which was a cell phone which is registered to his home.

13             There were no phone calls that were accepted between

14   9:51 and 11:37.  And 11:37, apparently, there was one fairly

15   short telephone conversation with Mr. Gardner, and nothing after

16   that.  We would submit that there is essentially nothing which

17   connects Mr. Martin with either of the murders.  And indeed, we

18   submit that all the government is left with is a lot of

19   conjecture and speculation.

20             With respect to the other counts, I think other counsel

21   have made the arguments very well as to why, as to Count One,

22   there is no RICO enterprise alleged.  As to Count One, why, if

23   there is any conspiracy, and we would submit that there is not,

24   it is not the continuing, ongoing conspiracy which persisted for

25   the entire period or a period substantially related to the 12

1    year period charged in Count One.

2           And again, for Count Eight, which is the drug

3    conspiracy, there is nothing, there simply isn't any evidence of

4    a single continuing conspiracy which persisted for ten years, or

5    anything even, even close to that period of time.

6           I would note, different lawyers have come up with

7    different views as to how many conspiracies there might be in

8    this thing.  I have to confess every too time I go over it, I

9    come up with, I come up with a different number myself.

10          The jury could clearly find that something was going on

11   between Mr. Gardner and my client back, back in the mid '90s.  I

12   think it could clearly come to the determination that Mr.

13   Mitchell had something going on all by himself in 2000, up in

14   Altoona, Pennsylvania.  But I don't see anything which really

15   connects all of those matters.

16          I think the arguments that, and I know the Court has

17   discounted this, but certainly the notion that the

18   McCaffity/Brown murder fit into any sort of a pattern on this is,

19   it just isn't warranted.

20          People went to a night club.  A fight broke out at a

21   night club, for whatever reason.  According to the government's

22   theory, Mr. Mitchell became convinced that there was a hit out on

23   him.  And in essentially what was an act of self-protection,

24   their theory is that McCaffity was murdered and Lisa Brown was

25   unfortunately there at the time that it happened.

1          I don't see that that has anything to do with any of

2     the purposes of the conspiracy, which are in the lettered

3     subparagraphs under Paragraph Four of the fourth superseding

4     indictment.

5          As to the Spence matter, I agree completely with Mr.

6     Kurland.  That is a matter which is really sui generis, and

7     there's no way that that can be connected.

8          With respect to my client, I think the Court also has

9     to take into consideration that he, and I think Mr., same is true

10    as Mr. Gardner for substantially the same period of time, my

11    client is in jail between June 18, 1999, when he is arrested in

12    the city on the gun charge by Detective Willard, Richard Willard,

13    as I recall.  It morphs into a federal felon in possession

14    charge.  And he doesn't get out until sometime until March of

15    2002.

16         As I say, there are any number of ways you can put this

17    together.  I think the government has essentially taken a bunch

18    of dots on the paper and drawn artificial lines between them.

19         We certainly think that my client should be acquitted

20    at this point of all of the substantive counts.  And we also feel

21    that he, motion for judgment of acquittal would be appropriate on

22    the two conspiracies with which he's charged.  The RICO

23    conspiracy, because, number one, there was no RICO enterprise.

24    And number two, if there were, there is no continuing, ongoing

25    conspiracy for any period of time which is reasonably related to

1     that charge in the superseding indictment.  And we've made

2     essentially the same argument with respect to the drug thing.

3     There are a couple of other things that I think --

4                THE COURT:  Mr. Crowe, is there actual affirmative

5     evidence in the record of the dates of incarceration of Mr.

6     Martin?

7                MR. CROWE:  He was certainly arrested on June 18th.

8     Mr. Pyne -- Mr. Pyne told me today that it was his recollection

9     that he had elicited from Detective Benson while he was on the

10    stand that my client was in jail for those periods of time.  I

11    know that Mr. Harding said it in his opening statement.

12               THE COURT:  That he was incarcerated?

13               MR. CROWE:  He was incarcerated from the time he was

14    arrested on the handgun charge until he got out after serving the

15    federal time.

16               THE COURT:  Do we know when he got out?  I mean, is

17    there evidence?

18               MR. CROWE:  The testimony, as I understand it, is that

19    he was released to the halfway house in November.

20               THE COURT:  Of '01?

21               MR. CROWE:  November of '01.  And I know I heard

22    Detective Benson say today on the stand that he thought March 7

23    of 2002 was reasonably close to the time he understood my client

24    had been released from VOA.  And we think March 7 is actually the

25    precise date.  But we're pretty close there.

1          THE COURT:  So why would -- well, this is apropos of

2     nothing particularly.  Why would Mitchell have been calling him

3     repeatedly within the hour or two before the Wyche brothers get

4     offed?

5          MR. CROWE:  I don't know, but if the Court would take,

6     if the Court also has with it, I don't have the exhibit number,

7     the chart that they had of the four individuals.  You can see

8     that for a period of months there were a lot of telephone

9     conversations exchanged between them.  They show 169 phone calls

10    in a period of what appears to be a month and a half between

11    February 16 of 2002 and April 1 of 2002.

12         THE COURT:  So even while your client's in the

13    Volunteers of America.

14         MR. CROWE:  It appears that during part of the time

15    when my client was in the Volunteers of America, he was having

16    telephone conversations with Mr. Mitchell.  I cannot tell you --

17         THE COURT:  Are people at VOA allowed to have cell

18    phones?

19         MR. CROWE:  Beats me.  I don't know.

20         THE COURT:  That would be rather shocking, I think.

21    Well, maybe not shocking.

22         MR. CROWE:  But, you know, if he had an illegal cell

23    phone and if he were making phone calls, if we posit that, that

24    doesn't add much, doesn't add much to the murder charges.

25         THE COURT:  Well, it adds an awful lot to his

1    non-withdrawal.  If the jury were to find that he was in a

2    conspiracy at the time he was arrested back in '99, that would be

3    very powerful evidence that he never withdraw from the

4    conspiracy.

5         MR. CROWE:  Just the fact that one has telephone

6    conversations of undetermined substance with somebody who was

7    previously a conspirator, I would submit, doesn't really show

8    much that you're still part, you're still part of an agreement to

9    participate in a criminal enterprise.

10        And with respect to that, remember Mr. Reynolds's

11   testimony when he advised to my client at VOA.  My client didn't

12   seem to know what he was going to do next.  And Reynolds said he

13   certainly didn't have, he certainly didn't say that he had this

14   ongoing enterprise that he was just going to drop back and

15   rejoin.

16        THE COURT:  The phone chart that we just referred to,

17   are the underlying toll records in the record for all those

18   calls?

19        MR. CROWE:  I believe they are, but I will tell you, I

20   certainly have not checked them.  I think Mr. Pyne may have.  Mr.

21   Pyne is nodding yes, they are.

22        THE COURT:  Okay.  So the jury could look at and see

23   exactly when Mr. Mitchell and Mr. Martin were in contact between

24   February 16th and April the 2nd.

25        MR. CROWE:  They could.  Again, I'm not sure how many

1    of those would be connected phone calls or things that went into

2    voice mail.

3            THE COURT:  I understand that.  But just, I mean, the

4    idea that Martin serves a couple of years on a gun charge, gets

5    released to a halfway house here in Baltimore, and while he's

6    there, either legally or improperly with a cell phone, he's in

7    contact with Mr. Mitchell, would say a lot about his

8    participation in the conspiracy.  And then, of course, I mean,

9    he's the last person Mr. Mitchell called before he made the final

10   contact, that is Mr. Mitchell made the final contact with Mr.

11   Wyche.

12           MR. CROWE:  Well, he never spoke to Mr. Martin on that

13   occasion.

14           THE COURT:  Well --

15           MR. CROWE:  Those are all voice mail phone calls.

16           THE COURT:  We could infer, I guess, if you're right,

17   and I'm sure you are, he didn't talk to him on the phone.  But if

18   he left him a voice mail as to where to meet him, or what was

19   going down, I don't see why a jury couldn't draw those

20   inferences.

21           MR. CROWE:  Well, the evidence that we have is that

22   there was, the evidence that we have is that the last connected

23   phone call between Mr. Mitchell and my client, on Government

24   Exhibit 66, is the one in the series of phone calls which is

25   number eight on that.  And that is a connected phone call for 48

1    seconds on 9:34.  That thereafter at 10:36, 10:38, 10:42, 10:43

2    -- no, I'm sorry, at 10:38 and 10:39, there are calls that go

3    into voice mail.  The testimony that we've gotten --

4                THE COURT:  There's a connected call at 11:35.

5                MR. CROWE:  Pardon?

6                THE COURT:  There's a connected call between Mr.

7    Mitchell and Mr. Martin at 11:35.

8                MR. CROWE:  No, there is not, Your Honor.

9                THE COURT:  I'm looking right at it.  I mean --

10               MR. CROWE:  That may be in the earlier version of the

11   chart.  The early version of the chart we got showed a connected

12   phone call between Mr. Mitchell and Mr. Martin at 11:36, which

13   was a minute and 22 seconds.  Is that what the Court has?

14               THE COURT:  Yes.

15   MR. CROWE:  The actual exhibit which was, we brought

16   this to Mr. Benson's attention and he went back and he amended

17   that.  And the official Government Exhibit 66 shows that that was

18   a voice mail phone call.

19               THE COURT:  For a minute and 22 seconds?

20               MR. CROWE:  That's -- yeah, for 82 seconds.

21               THE COURT:  Okay.  Which suggests that Mr. Mitchell

22   left a rather detailed message.

23               MR. CROWE:  May or may not have.

24               THE COURT:  Well, of course, may or may not have.  But

25   I'm just talking about what a jury could reasonably infer.

1          MR. CROWE:  I think this goes beyond, I don't think

2     this is inference.  I think this is speculation at this point.

3     And again, you know, Mr. Mitchell calls, Mr. Mitchell calls other

4     times and Mr. Martin never picks them up.

5          There are subsequent phone calls after that from Mr.

6     Mitchell to Mr. Martin and Mr. Martin doesn't pick them up.

7          What the jury could equally infer is that Mr. Martin

8     wasn't particularly interested in talking to Mr. Mitchell that

9     night, probably because his girlfriend was with him.  It seems to

10    me that's a much more logical inference the jury could draw.

11         THE COURT:  If Martin's in the movies at 11:37, it

12    would make sense for Mr. Mitchell to leave a rather detailed

13    voice mail.

14         MR. CROWE:  You know, what we do know is that,

15    actually, there was a connected phone call between Mr. Gardner

16    and Mr. Martin shown as two minutes.  I'm not sure, I guess it

17    could be anything from essentially 61 seconds up to a full two

18    minutes.  But there's no, there's no conversation between him and

19    Mitchell.  That is not something -- we don't feel that that is

20    damning evidence.  Quite to the contrary.  We think that it shows

21    that my client was not particularly interested in speaking to Mr.

22    Mitchell.

23         THE COURT:  All right.

24         MR. CROWE:  Your Honor, there are a couple of other

25    things.  Fourth Circuit cases, I've seen cases where motions for

1    severance have been denied because counsel haven't renewed them

2    during the course of the trial.  Just out of an abundance of

3    caution, we would renew our motion for severance or, in the

4    alternative, for mistrial, at least on the bases that my client

5    was not allowed to elicit from Detective Niedermeier that, in the

6    statement that he gave, he said that one of the voices on the

7    voice mail recorded by Ms. Magginson's cell phone might have been

8    Mr. Mitchell.

9          We think that's evidence, that's evidence, clearly

10   evidence that he was not involved in this matter because if he

11   were, why would, why would he identify Mr. Mitchell?

12         THE COURT:  I'm sorry.  I'm missing that.  Say that

13   again.

14         MR. CROWE:  I haven't had much luck in that the

15   previous time.  I realize that.

16         THE COURT:  No.  I just want to make sure I understand.

17         MR. CROWE:  We were not allowed to elicit from

18   Detective Niedermeier that when he talked with may client, my

19   client said, on April 17, that my client said when he listened to

20   the Irene Magginson voice mail, that one of those voices sounded

21   like Mitchell.

22         THE COURT:  Okay.

23         MR. CROWE:  We think that's inconsistent with

24   participation in this conspiracy.

25         THE COURT:  Okay.  I remember.  I remember.

1          MR. CROWE:  And I believe that's evidence that clearly

2     would have come in had there not been a joint trial.

3          There were also, there was also a portion of Mr.

4     Niedermeier's notes --

5          THE COURT:  How would it have come in had there not

6     been a joint trial?

7          MR. CROWE:  Pardon?

8          THE COURT:  How would there, how would Martin's

9     statement to Detective Niedermeier that one of the voices could

10    have been that of Mr. Mitchell have been admissible over a

11    hearsay objection if counsel for Mr. Martin, were he tried by

12    himself, attempted to elicit that testimony from Detective

13    Niedermeier?

14         MR. CROWE:  Because of the fact that the important

15    thing was that Mr. Martin had said it and he would not have said

16    it had he and Mr. Mitchell been involved in, in the Wyche

17    murders.

18         THE COURT:  So you're saying it's a statement not

19    against interest?

20         MR. CROWE:  It is a --

21         THE COURT:  I don't think that's the exception.

22         MR. CROWE:  It is a statement which serves to flesh out

23    the whole of the statement which he gave to Mr. Niedermeier.  And

24    Mr. Niedermeier was allowed to testify about some parts of it but

25    not about other parts of it.

1          THE COURT:  Okay.

2          MR. CROWE:  And I would point out, Your Honor, that

3     perhaps a little bit unusually in this case, that essentially the

4     alibi, the alibi testimony came out in the government's direct

5     case, which was, it's an unusual feature.  I was happy to see it

6     happen.

7          THE COURT:  The government gets to, with some

8     constraints, gets to pick and choose among the admissions that it

9     chooses to put into evidence.  But that doesn't open the door

10     either under the doctrine of completeness or on some newly

11     crafted hearsay exception exculpatory testimony which is not

12     testimony from a defendant.  Just because he said it to a police

13     officer doesn't make it admissible.

14          MR. CROWE:  But it's a statement which is inconsistent,

15     which is inconsistent with guilt.  Why would, you know, if you

16     participated in murdering, murdering a couple of brothers with

17     Mr. Mitchell, why would you want to pin the tail on Mr. Mitchell?

18          THE COURT:  There's just no hearsay exception called

19     statement inconsistent with guilt.  There's no such exception to

20     the hearsay rule.

21          MR. CROWE:  Okay.  We would also move on this basis, on

22     Trooper Wooden's extensive testimony on the June 18 -- sorry, not

23     the June 18 stop.

24          THE COURT:  I confess, I still haven't listened to

25     that.  I certainly, Ms. Zajac has given me quite a number of

1    transcripts, but I don't think that's one of them.  But I will go

2    back and look at that before all is said and done.

3            MR. CROWE:  That was the May, 1999, I-95 stop.

4            THE COURT:  Yeah.  I remember it.  You and Mr. Pyne are

5    going to have to decide whether you want me to mention that

6    specifically in my instructions or whether you're more

7    comfortable letting sleeping dogs lie.

8            MR. CROWE:  I remember the Court gave us that option.

9            THE COURT:  Yeah.

10           MR. CROWE:  And finally, as I recall, there was a brief

11   mention, over objection, in Mr. Dobropolski's testimony that

12   Mitchell was going to be okay because a guy that was locked up

13   with him for the murders, who the jury now certainly knows is

14   only Mr. Martin, who's going to take the charge.

15           In addition, Your Honor, the Court had invited us to

16   move to have a particular government exhibit which it had

17   provisionally admitted stricken if the government did not tie

18   that up.  That was a letter that was seized from my client's

19   house in the April 17 search.  It was a letter from a fellow by

20   the name of Dirty to Nephew.  The government has not tied that

21   up.  It has not shown that the Dirty is, is this fellow Watson.

22   And we would ask to have that stricken and we would ask to have

23   the Court tell the jury that there was one exhibit that was, that

24   there was one paper that was taken from Mr. Martin's house that

25   really doesn't have anything to do with the case that they'd

1   heard about, but it's no longer in evidence.

2              THE COURT:  What did the letter say?

3              MR. CROWE:  I've got a copy of it.  I can't --

4              THE COURT:  Can I take a look?

5              MR. CROWE:  Yes.  You certainly may.  It's, according

6   to my notes, it's Government's Exhibit W-5K.

7              MR. HARDING:  Judge, we'll agree to withdraw the

8   letter.

9              THE COURT:  All right.  So it's withdrawn.

10             So really the question -- you can give it back to Mr.

11  Crowe.  The question now, Mr. Crowe, is my guess is the jury's

12  not going to remember it.  They're not going to ask for it.  It

13  might be best just to let it go.  Or if, instead, you and Mr.

14  Pyne want me to in effect remind the jury of the letter and tell

15  them they're not going to get it, I'll do whichever one you

16  prefer.

17             MR. CROWE:  That's fine.  We'll get something into

18  writing to the Court, I would like to say tomorrow.  I think

19  Saturday or Sunday is probably more --

20             THE COURT:  That's fine.

21             MR. CROWE:  Thank you.

22             THE COURT:  Okay.  Thank you very much.  Mr. Lawlor.

23             MR. LAWLOR:  Your Honor, I can candidly tell the Court

24  I have nothing intelligent to add to this debate.  With that,

25  with the Court's permission, I would simply, pursuant to Rule 29,

1    move for judgment of acquittal as to all counts against Mr.

2    Mitchell and adopt the arguments that have been made orally and

3    in writing by my codefendants.

4              THE COURT:  Thank you, Mr. Lawlor.

5              MR. LAWLOR:  On top of that, Your Honor, I would also,

6    like Mr. Crowe just did, renew our motions for severance on the

7    grounds previously stated.

8              THE COURT:  All right.  So noted.  Mr. Harding?

9              MR. HARDING:  Judge, I do want to respond to Mr.

10   Crowe's statements just now.  But let me ask the Court if there

11   are issues you are especially interested in having the government

12   address.  Mr. Hanlon is prepared to address some issues and I'm

13   prepared to address others.

14             THE COURT:  Actually, you know, I would.  Could I have

15   your stipulation, please, with the drug reports?

16             MR. HARDING:  I put it up on Ms. Arrington's --

17             THE COURT:  Let me have that, please.

18             Could you just really, literally, the redacted Reader's

19   Digest version of your closing argument.  How do you tie it all

20   together?  I guess I'm really unclear about some of the pre, I

21   guess, pre-1999 conspiracy evidence.

22             MR. HARDING:  Okay.  Well --

23             THE COURT:  And the reason I asked for this exhibit,

24   because I thought it might help me frame -- we have Mr. Gardner

25   and Mr. Martin in October of '96 with marijuana.  We have Mr.

1   Martin in January, '97 with cocaine.  And we have Gardner in

2   September, '97 with heroin.  We have Gardner and Bacon in October

3   of '98 with heroin.  And we've got Harris in '98 with cocaine.

4           And then we've got Gardner and Martin in May, '99, and

5   Mitchell in January, 2000 -- what ties all of that together?

6           MR. HARDING:  Going back to the mid '90s, Your Honor.

7   Of course, Mr. Harris isn't part of the enterprise.

8           THE COURT:  Yeah.  When does, by the way, when does

9   Harris, in the government's submission, join in?

10          MR. HARDING:  End of 2000, when he is in Hickey School

11  with Mr. Mitchell.  Mr. Mitchell was employed there, you recall,

12  from October to December of 2000.  And so it must have been in

13  that two month period that Mr. Harris hooked up with him, and

14  according to all the accounts we've heard in the evidence, became

15  very tight with Mr. Mitchell.

16          Going back to 1994, Your Honor, I was happy to see that

17  Mr. Harris's Rule 29 motion acknowledged that the government had

18  established a drug conspiracy between Mr. Martin, Mr. Gardner,

19  and Mr. Mitchell from 1994 to 2000.  And the facts are, as we

20  heard from Mr. Bacon and from Mr. Reynolds most recently, going

21  back even before 1994, Mr. Gardner and Mr. Martin were very

22  actively distributing drugs, as you heard, in southwest

23  Baltimore.

24          THE COURT:  What was the Catonsville piece?  Do you

25  remember?  I remember the photograph in Catonsville.

1          MR. HARDING:  Well, Catonsville lasted a long time,

2    Your Honor.  Mr. Montgomery worked for Goo in Catonsville in the

3    period of around 1997, thereabouts.  1997, 1998.  And then Aaron

4    Holly took his place.  And both of them continued to supply Aaron

5    Holly on Winters Lane in Catonsville.

6          THE COURT:  Both Mr. --

7          MR. HARDING:  Both Mr. Montgomery and Mr. Gardner

8    supplied Mr. Holly in Catonsville.  And this actually brings up

9    an important point.

10          These guys morphed into wholesalers, except for Mr.

11    Harris.  Mr. Gardner, Mr. Martin, and Mr. Mitchell, all of them

12    became wholesalers, which meant that they didn't operate as if

13    they had street organizations.  Defense counsel keep trying to

14    ram this little clique of guys into their preconceived notion of

15    a retail street distribution organization.  In fact, they were a

16    coalition of wholesalers.  They had their own little shops

17    scattered around Baltimore.  They had the guys they distributed

18    to.

19          Mr. Gardner, in addition to having the guy in

20    Catonsville, he had Avon in Park Heights and somebody else in

21    southwest Baltimore, and an operation in Lancaster, Pennsylvania,

22    according to Mr. Bacon.

23          And Mr. Mitchell had Mr. Harris, whom he supplied in

24    Park Heights, but he was also arrested while he was standing in

25    southwest Baltimore on one occasion in 2000, also.  He was being

1    supplied by Darryl Wyche from the mid, from 1997, '98 on.  That's

2    when the earliest supplying by Darryl Wyche is, according to the

3    testimony that we have.

4            He then sets up this operation in Altoona,

5    Pennsylvania.  The Pennsylvania operations are no different from

6    the standpoint of this conspiracy than Avon in Park Heights and

7    Mr. Holly in Catonsville.  They're just suppliers.  They're just

8    retailers that these guys supply.

9            They are a coalition of wholesalers, which means that

10   what binds them together is, first of all, as Mr. Montgomery

11   explained, they're a family.  They are going to be available to

12   help one another in myriad ways, including protection, getting

13   drug connections for one another.  They were very good about

14   being able to obtain drugs for one another from other mutual

15   suppliers when the need be.

16           Remember, according to Mr. Bacon, he couldn't get drugs

17   directly from Darryl Wyche, so Mr. Mitchell got the drugs from

18   Darryl Wyche and supplied Mr. Bacon that way.  Mr. Bacon is very

19   tight with Mr. Gardner and Mr. Martin throughout this whole time

20   period.  Mr. Martin at one time supplied Mr. Mitchell, according

21   to Darryl Bacon.

22           THE COURT:  Mr. Martin?

23           MR. HARDING:  Mr. Martin did, yes, Wayne.  So it

24   becomes a much, it's not a simple hierarchical distribution the

25   way you would expect in a street organization.  This is a

1    coalition of wholesalers, just like the Rice organization.  One

2    of the fascinating things about watching the attempts to cross

3    exam, cross examine Travis Golder and Eric Clash is that the

4    defense attorneys were trying to ram those guys into a

5    preconceived notion of a street organization, also.  And they

6    kept saying things like, Oh, well, we were just a bunch of guys

7    who hung out together and tried to make a couple of bucks and we

8    had our own operations outside the bubble, is the way Mr. Golder

9    put it, meaning that he had his retailers scattered around town

10   who weren't getting from the other people in the Rice

11   organization.  They were just getting from him.  And they may

12   only have known him in the Rice organization.  But he had, he

13   called that his little operation on the side.

14          Same thing with these guys.  The defense attorneys have

15   in part misunderstood this conspiracy by failing to recognize

16   that these guys had long since abandoned street distribution and

17   become wholesalers.  And they were a gang of wholesalers.  And of

18   course they were much more than just drug wholesalers because

19   they paired up in various combinations to commit robberies from

20   time to time and to do all sorts of other operations, to get

21   firearms, to loan firearms to one another, to commit murders when

22   need be.

23          This is very much an organization which, at its

24   foundation, was a drug distribution organization.  But it was

25   also involved in all of these other kinds of violent crimes all

1     along the way.

2              And people grouped in different combinations.  And when

3     that happened, a leader might well emerge for a period of time.

4     Mr. Mitchell is the leader of the two double homicides in this

5     case.  There's no question about it.  He's the guy who

6     orchestrates them.  He's the guy who gives the directions on what

7     to do.  He's clearly, even though Mr. Harris is the only guy,

8     other guy involved in the McCaffity/Brown murder, he's the guy

9     who's telling Mr. Harris what to do.  So Mr. Mitchell emerges for

10    operational purposes as a leader.

11             And one of the interesting things about the testimony

12    of Mr. Montgomery, Your Honor, is that in the scheme to get

13    Goose, Mr. Martin was the operational leader of that.  And when

14    he got arrested, that was the end of that whole effort, at least

15    for the time being, because they couldn't carry it out without

16    Mr. Martin.  It was Martin's gig, was, I believe, the way Mr.

17    Montgomery put it.

18             So one of the structures of this ongoing enterprise was

19    that they would focus on operations for extended, for periods of

20    weeks or even months.  You know, the Tonya Jones Spence thing

21    spent two months in the incubator before it actually happened.

22    They would group in different combinations to do these things and

23    might have different leaders for different operations.

24             But always it was the same group of people, the same

25    group of guys.  This group that went back to school together.

1   Mr. Montgomery, Mr. Bacon, all three of the defendants except for

2   Mr. Harris, who were in this courtroom.  Darryl Wyche is another

3   one.

4           These guys were always available to one another.  They

5   were what Mr. Montgomery called a family.  And that meant that

6   they were very tight and could rely on one another.

7           The other thing about --

8           THE COURT:  Why was Wyche, why were the Wyches killed,

9   other than to be robbed?

10          MR. HARDING:  Well, if the Court is asking --

11          THE COURT:  Has it come out?

12          MR. HARDING:  Well, one of the cooperators that I have

13  spoken to, Your Honor, reminded me of the distinction in the drug

14  world between thugs and hustlers.  And thugs look down on

15  hustlers because although they make a lot of money, they're weak.

16          THE COURT:  They don't take many risks or they take

17  different risks?

18          MR. HARDING:  Yeah.  I guess you could say they take

19  different risks.  And my belief is that Mr. Mitchell in

20  particular, but also Mr. Gardner and Mr. Martin and Mr. Harris,

21  viewed the Wyche brothers as weak, as hustlers, men who could

22  make a lot of money but who weren't tough.

23          You know, we heard from Mr. Denham and also from

24  Natasha Wyche, to some extent, that Darryl Wyche wasn't

25  interested in getting into beefs with people.  If he, if somebody

1    didn't pay him back, his inclination was to just forget about it.

2    And that made him successful in the business world.  People

3    respected him.  But it also made him a target for many more

4    aggressive kinds of people around him, like Mr. Mitchell.

5             I think there may have been more to it than that.  I've

6    heard that, you know, Darryl Wyche was supplying Mr. Mitchell at

7    the time he was running that operation in Altoona, Pennsylvania

8    and Mr. Mitchell got arrested.  And there was some bad blood that

9    resulted from that.  I'm not entirely clear on what it was.  Of

10   course, it could have been that Mr. Mitchell never repaid Darryl

11   Wyche for the drugs he lost in that enterprise.

12            We know that Darryl Wyche continued to supply Mr.

13   Mitchell after Mr. Mitchell got arrested in January of 2000 in

14   Altoona, Pennsylvania.  But there may still have been some bad

15   blood as a result of that.

16            This is not stuff that's in evidence.  I'm simply

17   answering Your Honor's question.

18            THE COURT:  No.  I appreciate that.  All right.  Now,

19   what about the, the issue on the 1959's maintaining or enhancing

20   the membership?

21            MR. HARDING:  Yeah.  Actually, I did promise Mr. Hanlon

22   that he could address that issue.

23            THE COURT:  All right.  I'll wait.

24            MR. HARDING:  Could I just briefly respond to a few

25   points made by Mr. Martin in connection, I mean Mr. Crowe in

1    connection with the fact that Mr. Martin is charged in the Wyche

2    brothers' homicide?

3              THE COURT:  Yes.

4              MR. HARDING:  There's, of course, a certain amount of

5    standard evidence on that, apart from the fact that, I mean,

6    regardless of how strong it is, witnesses identified Wayne's name

7    on the voice mail tape.  And in fact, I don't think there's any

8    question but that it actually is quite clear that the word

9    "Wayne" is mentioned in the voice mail tape.  Now, what you make

10   of that is a classic issue for the jury to decide.

11             THE COURT:  But you think all four of them were in that

12   car?

13             MR. HARDING:  I think all four of them were involved in

14   the murder.  And I think that, I cannot, I think that three of

15   them were in the car, at a minimum.  I think that the, we had two

16   people identify Mr. Martin's voice on the voice mail tape as

17   well, not with 100% certainty.  But nevertheless, Mr. Denham and

18   Ms. Wyche both identified Martin's voice on that tape.

19             Some of the best evidence of Martin's involvement is

20   Mr. Montgomery's testimony, I believe, this is compelling to me,

21   that Mr. Martin had concocted this alibi for the Wyche brothers

22   murder and that's why he was going to get out.  He had actually,

23   Montgomery knew all this from talking to Gardner and there's no

24   other way he could have known this than as an insider, somebody

25   who was getting the inside information.

1          He knew that Mr. Martin had gone to the trouble of

2     going to a movie theater and buying a movie ticket, paying for it

3     with a credit card so that there would be a paper trail.  He knew

4     that this was arranged in advance as an alibi.  And I think

5     that's, that's very compelling evidence to me.

6          Your Honor, Mr. Gardner also, or Mr. Montgomery also

7     testified that Gardner told him that, according to the police,

8     they had left a brick in the car and he didn't believe it.  This

9     is something the jury can infer that Mr. Gardner learned from Mr.

10    Martin, who had just been arrested for the murder, and might well

11    have been told by the police that he had left a brick in the car.

12         THE COURT:  Was there any evidence on whether that was

13    public, that became part of the public reports about the murders?

14         MR. HARDING:  No, there's no evidence on that.

15         THE COURT:  Okay.

16         MR. HARDING:  Gardner also said, according to

17    Montgomery, that what had gotten him into trouble --

18         THE COURT:  Excuse me one moment, Mr. Harding.

19         Ladies, good afternoon.  I will tell you that I don't

20    believe it's appropriate for that young girl to be in here, but

21    it's entirely up to you.  I understand if you have child care

22    issues or something.  But this is not a trial that a child of her

23    age needs to be exposed to.  Just letting you know the Court's

24    views on the matter.

25         A SPECTATOR:  Thank you.

1              THE COURT:  Go ahead, Mr. Harding.

2              MR. HARDING:  Mr. Gardner also told Mr. Montgomery that

3     what had gotten him into trouble was a statement on the tape

4     recorded voice mail where Bo said, complained that they, that

5     somebody hadn't checked his pockets.  And even put in the word

6     "Wayne" there at that point.

7              The way Mr. Montgomery told it -- and this isn't

8     actually what's on the voice mail -- but the way Mr. Montgomery

9     told it was that Gardner told him that that person, Bo had said,

10    you didn't check his pockets, Wayne.  And Gardner points out to

11    Montgomery that, in fact, the police misunderstood "Wayne" and it

12    was actually "man."  But the fact remains that Mr. Montgomery is

13    getting information from insiders about the way they carried out

14    that murder.  And it's very compelling evidence.

15             Your Honor, we've already been through the toll

16    evidence.  Of course, Mr. Martin did get a call during that, or

17    did make a call during that movie.  He made it to Mr. Gardner.

18    And as the Court points out, he got a number of voice mails from

19    Mr. Mitchell.  He also got a phone call directly from Mr.

20    Mitchell before the movie started at 9:34 on the chart.  There's

21    a call, connected call, not a voice mail, between Mr. Martin and

22    Mr. Mitchell.

23             Your Honor, the movie alibi, of course, doesn't work in

24    any case because the movie let out at 11:48 and it takes 19

25    minutes to get to the scene of the Wyche brothers' murder, which

1    didn't happen until sometime between 12:31 and 12:38 in the

2    morning.

3          In addition, Your Honor, the jury has a right to infer

4    that when Mr. Martin told Mr. Montgomery that he had a .40

5    caliber handgun with three bodies on it, those three bodies were

6    the Wyche brothers and Eric Lee, the guy who was killed in

7    southwest Baltimore, whom we've heard about more recently.  We

8    know that that gun was used to kill Eric Lee, the same one that

9    was used in the Wyche brothers' murder.

10         Under Pinkerton, Your Honor, the government also has a

11   right to have the jury make the determination of Mr. Martin's

12   guilt or innocence of that murder because if the government can

13   establish that he was a member of the conspiracy and that

14   conspirators, other members of the conspiracy, committed this

15   murder, then under Pinkerton a jury could, doesn't have to, but

16   it could find, Mr. Martin guilty of the murder, also.

17         So for all those reasons, the government thinks that

18   the Court should deny the Rule 29 motion as to Mr. Martin on the

19   murder.

20         I'm going to let Mr. Hanlon address the issue that the

21   Court raised this morning about the 1959.

22         THE COURT:  All right.  Thank you, Mr. Harding.

23         MR. HANLON:  Thank you, Your Honor.  Good afternoon.

24   The Court's inquiry about the 1959 charge, as I recollect, came

25   up specifically with respect to the charge against Mr. Gardner

1    with respect to the Spence murder.  I've analyzed it through that

2    prism.

3           But I think the first point I was going to make about

4    that is that, number one, Mr. Gardner's counsel's argument about

5    this, number one, relies on an overly restrictive reading of the

6    law concerning the language.  And number two, I think, also

7    overly restricts the evidence.  I will begin with the law.  And

8    this applies really to the Gardner count as well as to all the

9    1959 counts.

10          With respect to the definition of maintaining or

11   increasing a position in the enterprise, which is really sort of

12   the language at issue, the proposed jury instructions in this

13   case, which I think are an accurate statement of the law, state

14   with respect to that definition as follows, and this is near the

15   end of the instruction, in terms of factors to take into

16   consideration.

17          For example, you, the jury, may consider evidence that

18   the crime, if proved, was committed in order to maintain

19   discipline within the enterprise and served to maintain the

20   defendant's position in the enterprise.  If the defendant

21   committed the crime because he knew it was expected of him by

22   reason of his membership in the enterprise or if he committed the

23   crime because he thought it would enhance his position or

24   prestige within the enterprise, or if he committed because he

25   thought it was necessary to maintain the position he already

1    held, this element would be established.

2            Critical here, Your Honor, would be the language "if

3    the defendant committed a crime because he knew it was expected

4    of him."  That puts us squarely within the evidence in this case

5    and the counts as charged.

6            The Spence murder was essentially a robbery/murder.

7    That's what was done.  The participants were committing it

8    because it was part and parcel of a RICO enterprises that

9    included, among its purposes, amongst its operations, among its

10    goals, committing robberies, including robberies of drug dealers.

11            The Spence murder was conceived originally as an

12    outgrowth of a plan to kill Darius Spence and also a sort of

13    corollary to the plan to rob Goose, something that Mr. Martin,

14    Mr. Gardner, and Will Montgomery, all long-standing members of

15    this continuing common unit, had been putting together for

16    sometime.  The crime is clearly committed by Mr. Gardner to

17    maintain his position in the enterprise because it would have

18    been expected of him as a member of this unit to engage in this

19    kind of conduct.  This is exactly what the charged enterprise did

20    as its business.

21            So the government would submit that the evidence and

22    the law support the count as charged on that theory at least.

23    And that's before we even get into the evidence about the part of

24    the motivation being to get money for Wayne's attorney, which is

25    really on top of what the government submits is already

1    sufficient evidence to satisfy that prong.

2          THE COURT:  I see your point.  Okay.  Does the

3    government have any views about the form of verdict sheet?

4          MR. HARDING:  I was going to draft one, Your Honor.  I

5    submitted, when I submitted the last set of proposed jury

6    instructions, the supplemental ones that just arrived the other

7    day --

8          THE COURT:  Which, by the way, if you could send me a

9    Word Perfect or Word version of all of your instructions, I'd

10   appreciate it.

11         MR. HARDING:  Be happy to, Your Honor.

12         THE COURT:  Okay.

13         MR. HARDING:  But I included a unanimity instruction

14   which is going to have to be keyed to a verdict sheet, I think.

15   And I haven't had a chance to draft a proposed verdict sheet yet,

16   but I will try to do that this weekend if that's all right.

17         THE COURT:  That would be great.  That would be great.

18   Because we do have some, as you mentioned, some very discrete

19   unanimity issues here.

20         MR. HARDING:  Yes.

21         THE COURT:  And so we need to, I agree with you fully,

22   that we need to tie that instruction to the actual verdict sheet

23   so that the jury understands fully that there's certain things

24   they're going to have to agree on.

25         All right.  Mr. Flannery, anybody want to have a final

1    parting word?

2         MR. KURLAND:  I would, if no one else.

3         THE COURT:  Mr. Kurland.

4         MR. KURLAND:  Your Honor, just very briefly in response

5    to a couple of things that the prosecutors just said.  On that

6    last point with respect to the maintain and increase the

7    position, that's the general language of the statute or of a

8    pattern instruction that Mr. Hanlon referred to.  We've submitted

9    a proposed special instruction that's, you know, that's geared

10   more toward the facts of the case.

11        I would also add, though, that the government's, the

12   way they've articulated here is inconsistent because the Goose

13   robbery, apparently no one suffered any problems when that was

14   like called off when, when Martin was arrested.  So this concept

15   that there was, there was an expectation that that robbery had to

16   take place of Spence, there's no factual foundation for that and

17   the law doesn't support that.

18        We're also entitled to an instruction that we've

19   submitted that says that every crime that is committed during the

20   12 year period that they have, that they have alleged isn't

21   automatically either in furtherance of the conspiracy or in

22   furtherance of the RICO conspiracy.

23        Now, to some point that is a factual issue to the jury.

24   But the jury at minimum should certainly be, should certainly be

25   instructed on that point; that just because they say so and it's

122

1    in the indictment doesn't mean as a matter of law, almost like a

2    directed verdict, that it's done to maintain or increase one's

3    position.

4              So government's free to argue that.  But at best,

5    that's argument.  At worst, it's an overstatement of the law, the

6    general legal principles that I apply, and the facts of the case.

7              The other thing that I would like to say, Your Honor,

8    is with respect to one of the comments that Mr. Harding made with

9    respect to Mr. Gardner's involvement in the Wyche brothers'

10   murders, there is no evidence that, that Mr. Gardner -- you asked

11   him, you know, is it the government's position, the Court asked

12   Mr. Harding, is it the government's position that all four were

13   in the car?  And Mr. Harding's answer was, well, it's our

14   position that all four were involved.

15             There is zero evidence, direct and inferential, that

16   Mr. Gardner was involved in that.  To the extent that you want to

17   make a big deal or that one can make a big deal about the cell

18   phone records, it shows, if anything, it shows that Gardner and

19   Martin were not together on the night.  They were, they called

20   each other all the time for a variety of reasons.  But there's

21   zero evidence that Mr. Gardner is, there's zero evidence that Mr.

22   Gardner is involved in that murder.

23             And the Counts Five and Six should be Rule 29'd as to

24   Mr. Gardner.  He's not on any of the voice tapes.  The arguable

25   tie to the Lee weapons, Mr. Harding just came up with an argument

1     that totally rules that out because the three bodies, they can't,

2     they can't say every reference to a body on a gun -- it becomes

3     musical chairs.  There's more gun or more guns than there are

4     bodies.

5          If the government is, I won't say correct, but if the

6     government's theory is that Martin's reference to the three

7     bodies are the two Wyche brothers and Lee, that means that there

8     is no connection, then, to, then the reference to another body

9     being on the Lee gun, there's nothing that ties Gardner to the

10    Wyche brothers' murders even through the convoluted ballistics

11    testimony that obviously would be the source of the argument.

12         THE COURT:  Well, and I had that ballistics sequence, I

13    finally realized when I looked at the chart, incorrect.  The

14    sequence was, I think, the Lee murder, the Wyche brothers'

15    murders, and then the .40 caliber found in the woods.  And Mr.

16    Gardner, a jury could find, left that .40 caliber in the woods,

17    wasn't the murder weapon in the Spence murder, but it was left at

18    the scene.  And there's ample evidence that Mr. Gardner had and

19    maintained a .40 caliber that had three bodies on it.

20         MR. KURLAND:  No.  No.  That the statement comes from

21    Martin, number one.  And number two, even if you accept the

22    government's testimony as to that Gardner had custody of that

23    gun, that's "custody" in quotes because the testimony is that gun

24    was kept in a stove at Holly's house for a long period of time.

25    And there is no way to infer legitimately -- one can speculate.

124

1    I mean, there's testimony all over the place that these people

2    can't, that their guns can't be kept track of even if a gun is in

3    somebody's ceiling.

4              THE COURT:  Okay.  I'm sorry.  What did I say that was

5    incorrect?

6              MR. KURLAND:  That the, that the reference to the three

7    bodies is a reference to --

8              THE COURT:  To Gardner's gun rather than Martin's gun?

9              MR. KURLAND:  Yeah.

10             THE COURT:  Okay.  So the reference to the three bodies

11   is not the Gardner gun?

12             MR. KURLAND:  That's my understanding.

13             THE COURT:  What we're referring to as the Gardner gun

14   is the Lee weapon, the Wyche weapon, and left in the woods?

15             MR. KURLAND:  No.

16             THE COURT:  No.  Okay.  Mr. Harding, help me out.  I

17   thought I had it at one time.  Walk me through that one more time

18   real quick.

19             MR. HARDING:  Mr. Montgomery testified that Mr. Martin

20   told him he had a .40 caliber with three bodies on it.

21             THE COURT:  Right.

22             MR. HARDING:  Mr. Montgomery also testified that Goo

23   had a .40 caliber that he didn't want to use because it had a

24   body on it.

25             THE COURT:  Okay, right.

1          MR. HARDING:  And that was the .40 caliber that they

2    took out to Tonya Jones Spence's house every single day they went

3    there on surveillance, along with the .357.

4          THE COURT:  Right.

5          MR. HARDING:  But Mr. Gardner always carried the .357.

6    And the reason was that the .40 caliber was dirty, and they were

7    going to try to avoid using that one.  And they did, in fact,

8    avoid using that one.

9          THE COURT:  And that .40 caliber was the Lee weapon.

10   One of the Lee weapons.

11         MR. HARDING:  Yes.  Well, now, just to further

12   complicate the issue.  You remember I asked Mr. Montgomery if the

13   .40 caliber that Goo had that was dirty was the same one that Mr.

14   Martin said had three bodies on it.  And Mr. Montgomery said he

15   didn't know.

16         THE COURT:  Okay.

17         MR. HARDING:  So it's not a perfectly clear picture.

18   But the jury could infer that the gun found in the woods at the

19   Tonya Jones Spence murder -- remember, there were two .40

20   calibers used in the Eric Lee murder.

21         THE COURT:  Right.

22         MR. HARDING:  And one of them was the Wyche brothers'

23   murder weapon, and the other one was the one found in the woods

24   at Tonya Jones Spence.  So both the Wyche brothers and the one

25   found in the woods in the Tonya Jones Spence were involved in the

1    Eric Lee murder.

2              THE COURT:  All right.

3              MR. KURLAND:  But Your Honor, my point is that it's not

4    clear from the record -- I take it back -- it's inconclusive in

5    the record and it would be wrong to say that there were two .40

6    caliber murder weapons in the Lee shootings.  No one has

7    testified to that.  There might have been --

8              THE COURT:  I don't think I said that.

9              MR. KURLAND:  I understand, you didn't.  But it's

10   important to understand that there is no way to say for certain

11   on this evidentiary record that the gun found in the forest with

12   respect to the Spence homicide was, in fact, the murder weapon in

13   Lee.  That is not --

14             THE COURT:  But was present at the Lee shooting.

15             MR. KURLAND:  According to the ballistics.  It just

16   matched beat up bullets.  But the other thing, Your Honor, is

17   there's also evidence in the record, I believe from Mr.

18   Montgomery, maybe from somebody else, that the reference to

19   bodies on it also refers to kidnappings.  At least two government

20   witnesses testified to that.

21             That's important, though, because, Your Honor,

22   acknowledging the Rule 29 standard that the Court has to adopt

23   every reasonable inference in favor of the government with

24   respect to this ballistics evidence, but that still falls short.

25   You could not convict, no rational jury could convict Mr. Gardner

1    of the Wyche homicides based on this record.  And we would ask

2    that those counts -- I mean, he's not alleged to be in the

3    McCaffity.  So he's not involved in that.

4            And there's no evidence, the government originally

5    planned to put on evidence, or in the pretrial proceedings they

6    had made references to his voice being on the tape.  That's the

7    only reason why he's stuck in that count.  And that evidence

8    didn't come in.

9            So we would respectfully argue that Counts Five and Six

10   should be Rule 29'd as to Mr. Gardner.  And again, the

11   government's own articulation of the evidence, including

12   background information which they concede wasn't even admitted

13   and is not evidence in this case, I think the Rule 29 standard is

14   unambiguously met with respect to Counts Five and Six.  Thank you

15   very much, Your Honor.

16           THE COURT:  Thank you, Mr. Kurland.

17           Well, Gardner could be in on a Pinkerton theory, don't

18   you think, Mr. Kurland?  At a minimum.  I mean, he did talk to

19   Martin at 11:37.

20           MR. KURLAND:  Well, if --

21           THE COURT:  I'm not suggesting that that's conclusive

22   of anything.

23           MR. KURLAND:  Well, the legal issue -- I mean, two

24   separate things, Your Honor.

25           THE COURT:  Mitchell talks to Martin at 11:30 or leaves

1   a voice mail, if I have the incorrect chart --

2           MR. KURLAND:  Phones attributed to these guys leave

3   voice mails.

4           THE COURT:  Right.  Right.  Of course.

5           MR. KURLAND:  Your Honor, Pinkerton, which, by the way,

6   the government did not include in their 85 pages of instructions,

7   but I understand they're going to apparently ask for a Pinkerton

8   instruction.  And as a matter of law, yes, because Pinkerton, if

9   you find them in the conspiracy, as a matter of law, then

10  Pinkerton applies to everything.

11          The government has not, I'm not going to ask them to

12  amend it, but the government, in going through the substantive

13  counts, hasn't added everybody in every count under a Pinkerton

14  theory.  So it's going to be a highly selective use of Pinkerton.

15          If they now want to argue that the sole basis of Mr.

16  Gardner's liability on the Wyche murders is Pinkerton, assuming

17  the Court doesn't still throw it out, I'll obviously deal with

18  that in closing.  But even with respect to Pinkerton, the tie

19  that Gardner had anything to do with that is really based on

20  telephone toll records of a couple of calls to Martin.  We've all

21  been in movie theaters when, when --

22          THE COURT:  No.  It's tied on, it's tied to Mr.

23  Gardner's alleged membership in the conspiracy.

24          MR. KURLAND:  Well, again, that's a correct statement

25  of the law, that Pinkerton, if it applies, the argument is that

1    if they're involved in the conspiracy, then they're involved in

2    every act in furtherance of the conspiracy.  And that would, you

3    know, if that's going to be the government's sole theory of

4    liability, then Gardner's liability on Counts Five and Six is

5    essentially dependent on the finding with respect to the Count

6    One conspiracy.  And if that's the argument, then if I would win

7    on Count One, then I'd also win on Count Five and Six, if the

8    government's sole theory of liability against Mr. Gardner on the

9    Wyche brothers murders is Pinkerton.

10           If that's going to be their theory, they need to say

11   that, if that's going to get them by Rule 29.  Because short of

12   that, he's out.  I don't think, I don't think a rational jury

13   could convict based on seven phone contacts on the night to his

14   best friend or to a very close friend of his who he repeatedly

15   calls all the time.  And calls in a movie theater are not

16   uncommon.  Even the movie theaters have those, we've all been in

17   the movies where they have the warning signs, the warnings to

18   turn off the cell phones, and the attenuation of the guns.

19           By the way, nobody has been charged in the Lee

20   homicide.  So this is a triple bootstrap.  I mean, the government

21   was able to get it in under an evidentiary standard that is far

22   lower than guilt beyond a reasonable doubt.  And so that's why I

23   think it's appropriate for the Court, even with respect to

24   dealing with the admissibility of the firearms evidence and the

25   alleged tie to the Lee homicide, it's important to understand

1   nobody was ever charged in the Lee homicide.  The detectives

2   have, basically have no evidence.

3         And what the government's going to try to do is argue

4   to the jury something that really should never go to the jury

5   because no rational jury would be able to convict on that

6   evidence.

7         THE COURT:  All right.  Thank you very much --

8         MR. KURLAND:  Thank you, Your Honor.

9         THE COURT:  -- Mr. Kurland.  And thank you, counsel.

10         The Court's going to deny all the motions.  It

11   certainly is not a classic RICO conspiracy by any means.  But I'm

12   satisfied that a rational finder of fact could conclude beyond a

13   reasonable doubt that this was a gang consisting of these four

14   individuals and others who, as Mr. Harding describes it,

15   basically everybody was an Executive Vice President working on an

16   operational basis, a project-by-project basis, to achieve the

17   purposes of the enterprise.

18         There's no question that Mr. Mitchell and Mr. Harris

19   had as part of their portfolio Shakedown Entertainment and the

20   rap music piece of this.  There's evidence that Mr. Gardner

21   operated a grocery store or owned a grocery store.  It would

22   appear, although the government didn't mention it, it would

23   appear that the Edgecombe Circle residence was something in the

24   nature of a headquarters or at least a club house, where guns

25   were stored, examined, exchanged.  People gathered, thus business

1    came and went.

2           I think it would be rational for the jury to conclude

3    that there's a sufficient structure, if only an operational

4    structure is present here.

5           I'm cognizant of Mr. Flannery's argument, joined in by

6    everybody, that although there's some ambiguity in the Fourth

7    Circuit law, the acts of racketeering cannot themselves compose

8    the structure.  But I think a rational juror could conclude that

9    we have more than that here.

10           So Count One survives.  The drug conspiracy count

11   survives.  And in light of the rather expansive jury instruction

12   that the Court is likely to give on the 1959 counts, I think the

13   motion has to be denied as to those counts as well.

14           Certainly, there's not overwhelming evidence, and

15   indeed, it's strictly inferential that any, that, for example,

16   that Mr. Mitchell, Mr. Martin, or Mr. Harris, well, Mr. Harris

17   wasn't even implicated at the time of the Jones Spence murder or

18   at least he hadn't been arrested.  But to argue that Mr. Mitchell

19   and Mr. Martin would have expected Mr. Gardner to continue the

20   kinds of activities that the evidence suggests the defendants

21   were involved in certainly takes the inference to the limit.  But

22   I don't think it takes it past the limit.

23           I think a reasonable juror could conclude, partly on

24   the basis of the friendship and the relationship going all the

25   way back to high school days and before, that there would be that

1    kind of expectation.

2         The idea that these three men are childhood buddies

3    cuts both against them and against the government.  One could

4    say, well, they were only childhood buddies, perhaps engaged in

5    some illegal activity, but that doesn't mean that their

6    activities were sufficiently connected in a structured way to

7    justify the description of an organization or an entity.  On the

8    other hand, the government no doubt will argue that it was

9    exactly that that provided the foundation for the kind of trust

10   and loyalty and commitment that one would expect to see in an

11   organization determined to engage in acts of violence, drug

12   distribution, and intimidation that one sees here.

13        So the inferences absolutely cut both ways.  And while

14   the defendants certainly should not and must not be convicted

15   simply because they are high school or elementary school friends

16   and they grew up in the same neighborhood, the government is

17   entitled to urge the jury under the totality of the evidence

18   presented to view that relationship through the prism of the

19   kinds of adult activities in which these defendants, according to

20   the evidence in this case, regularly engaged.

21        So for all those reasons, the Court will deny the

22   motion made by each defendant for judgment of acquittal on each

23   count, deny the motion for severance, and deny the motion for a

24   mistrial.

25        Now, Mr. Mitchell Mr. Harris, Mr. Martin and Mr.

1    Gardner, we have come to the stage in the case where pretty

2    shortly, not today, but perhaps on Monday and perhaps on Tuesday,

3    each of you will have to make a decision as to whether you wish

4    to testify in this case in your own defense.  None of you are

5    required to testify, not even expected to testify.  In our

6    system, as I'm sure you know, the privilege against compelled

7    self-incrimination means that a defendant in a criminal case has

8    absolutely the right to choose, hopefully in consultation with

9    his attorneys, whether to take the stand and testify in his own

10    defense or whether to remain silent.

11          I know that several of you, if not all of you, have

12    prior convictions for drug distribution and other offenses

13    perhaps.  And it may be that the government, if you choose to

14    take the stand and testify, will be able to bring before the jury

15    your prior convictions for the purpose of impeaching your

16    credibility.  Obviously, as you've heard the evidence, many of

17    your prior convictions and arrests have already been put before

18    the jury so the jury already knows a lot about you in that

19    regard.  But the limited purpose for which a prior conviction may

20    be introduced, if you take the stand, would be solely to impeach

21    your credibility.

22          Testifying could help you but testifying could hurt

23    you.  I hope you'll listen to what your lawyers tell you about

24    whether you should or should not testify.  But ultimately, it's

25    your decision and only your decision, each of you individually,

1    whether to testify.

2           The fact that one of chooses to testify does not mean

3    in any way that anybody else should testify.  It's your

4    individual decision that you have to make, again, hopefully in

5    consultation with your attorney.

6           If you choose to testify, as I say, you're going to be

7    cross examined by the government attorneys, who will be able to

8    ask you about any matter bearing on your direct testimony

9    relevant to this case.

10          Likewise, the attorney for any codefendant, if you

11   choose to testify, will have the opportunity and the duty to

12   cross examine you and bring out before the jury evidence from you

13   that might be helpful to their client.

14          So sometime next week the Court's going to ask each of

15   you whether you choose to testify or to remain silent.  And it

16   will be your decision, again, hopefully in consultation with your

17   attorney, in making that decision.  It's entirely up to you.  I

18   take it you understand what I've said to you.

19          All right.  I think we're ready to proceed.

20          MR. COBURN:  Your Honor, could I have just a moment?

21          THE COURT:  Yes, Mr. Coburn.

22          MR. COBURN:  Just have my eye on the clock there.

23          Made a little list of some of the items that we have

24   sort of in terms of balls in the air with respect to our defense

25   case.  This probably is not a good time.

1          THE COURT:  No.  Actually, go ahead.  Because I'm

2     hoping that Mr. Martin will give his opening and then I'm leaving

3     it to counsel the order in which you call your witnesses.  As I

4     say, Mr. Coburn, I think it would be appropriate to get Mr.

5     Gardner's witnesses in earlier rather than later.

6          MR. COBURN:  Well, it's really kind of Your Honor to

7     say that.  In terms of today, I think the only person that we

8     would present would be one relative of Mr. Gardner.  She'll be

9     relatively short.  She's been here pretty much all day.  She's

10    down from Pennsylvania.  So if we could get her in, it would be

11    much appreciated.

12          I know Mr. Flannery has a witness who I believe, his

13    expert who I believe is also in from out of town.  And I see Mr.

14    Pyne's hand in the air, also, about some concern there.

15          Mr. Flannery's witness is about 45 minutes.  Mine is

16    about 15, 20 minutes.  Not sure how long Mr. Pyne's is.  But it's

17    going to be a tight --

18          THE COURT:  We'll manage.

19          MR. COBURN:  -- tight afternoon, particularly given the

20    opening.  Then to the extent, the main reason I sit up was just

21    at the end of the day, if Your Honor could just give me time to

22    run through a little bit of a list of items.

23          THE COURT:  Sure.  We'll have time.  We'll have time

24    after we excuse the jury.

25          MR. KURLAND:  Judge, also, I just want to make sure

1    that Jamane Johnson --

2              THE COURT:  Oh, yeah.  Is he here?

3              MR. KURLAND:  He's here but it's complicated.

4              THE COURT:  No.  We need to get him on today.  Mr.

5    Coburn didn't mention him but we need to get him on today because

6    he's going back to Hagerstown.

7              MR. COBURN:  It's going to be so tight, Your Honor.

8              THE COURT:  Well, let's do it.  What's the problem with

9    Jamane Johnson?

10             MR. COBURN:  Well, I'll let Mr. Kurland, it's his

11   witness.  But I mean, there are some Fifth Amendment issues and

12   the government has indicated they may prosecute him if he

13   testified and that sort of thing.

14             MR. KURLAND:  And I wanted to, there's, can I give, Mr.

15   Coburn, need a sticker.  There's some letters that I want to give

16   a copy to the court.

17             THE COURT:  Just tell me --

18             MR. KURLAND:  To make a long story short, in a letter

19   dated September 14th, 2004, signed by Mr. Harding, it says that,

20   I understand that you need to have -- this is addressed to Dean

21   Stocksdale, the Assistant State's Attorney -- I understand you

22   need to have Jamane Johnson testify in the upcoming state trials.

23   And then Mr. Harding says, This letter is to assure you and Mr.

24   Johnson that the U.S. Attorney's Office will not use against Mr.

25   Johnson in any criminal case any statements he makes in

1    testifying in those two trials.  And then it says, Johnson's

2    complete truthfulness and candor are express material conditions

3    to the undertakings of the federal government set forth in this

4    letter.  Therefore, the federal government may use statements

5    made by Johnson for the purpose of cross examination in the event

6    that Johnson is a witness in any proceeding.

7              THE COURT:  I'm sorry.  Mr. Kurland, I'm not following.

8    Can you just tell me --

9              MR. KURLAND:  The government says here that they won't

10   prosecute him unless he offers testimony that is materially

11   different from any statements made in the state trials.  I expect

12   to elicit from him three or four points that I expect to be

13   absolutely consistent with his state court testimony.  So there

14   is nothing that I would intend to elicit that would do anything

15   to trigger --

16             THE COURT:  What do you want me to do?

17             MR. KURLAND:  I want him to testify.

18             THE COURT:  I can't testify for him.  He's here.  I'm

19   prepared to put him on.  Let me hear from Mr. Harding.

20             MR. HARDING:  Well, Judge, I actually went by the

21   lockup yesterday.

22             THE COURT:  I understand you spoke to him.

23             MR. HARDING:  Yeah.  I wanted to find out if he had a

24   lawyer and he said he didn't.

25             THE COURT:  Right.

1      MR. HARDING:  And I told him I thought the Court was

2  going to appoint one for him because I thought Your Honor said

3  that last week when we were --

4      THE COURT:  I'll ask him if he wants a lawyer when we

5  bring him down.  Let's try to bring him down at the break,

6  assuming we get a break.  Mr. Pyne.

7      MR. PYNE:  Your Honor, I have Lakeisha McCoy here.

8  She's been here since about noon.  If we aren't going to get to

9  her, I would like to excuse her.  I thought that we'd be able to

10  fit her on.

11      THE COURT:  I'm going to try.  I'm going to try.  I

12  don't know how long anybody's cross examination's going to be.

13  Doesn't seem to me it should be very long.

14      MR. PYNE:  The way we were talking, it sounded like the

15  afternoon was filling up quickly.

16      THE COURT:  I don't know why the expert's going to take

17  45 minutes to tell us about locks on an Infiniti.

18      MR. FLANNERY:  He won't.  He won't, Your Honor.

19      THE COURT:  Can we stipulate to his qualifications?

20  Does the government have any problem with that?

21      MR. HARDING:  No, Your Honor.

22      THE COURT:  Okay.  So we can get through it.

23      MR. FLANNERY:  Won't take 45 minutes, I promise you.

24      THE COURT:  Let's have the jury, please.  How long you

25  need, Mr. Martin?

1          MR. MARTIN:  If I go more than five minutes, you can

2     yank me off the floor, please.

3          MR. LAWLOR:  Can we sit a little late tonight, Your

4     Honor.

5          THE COURT:  Maybe we'll do that.

6          MR. HARDING:  Your Honor, would the Court ask the

7     jurors to retire when you make inquiry of Mr. Johnson  --

8          THE COURT:  Oh, yes.  We'll take a recess about 4:00 or

9     so.

10          MR. KURLAND:  We have not had an opportunity to talk to

11     Mr. Johnson.  So assuming he can testify, outside the presence of

12     the jury, the whole prior proceeding aspect, we might have to

13     talk to him about the question --

14          THE COURT:  Let's just see what he has to say.

15          (Jury enters the courtroom.)

16          THE COURT:  Good afternoon, ladies and gentlemen of the

17     jury, thank you again for your patience.  We're now ready to

18     proceed with the defense presentation of evidence.

19          I'm sure you don't remember, I certainly did not until

20     I was reminded, but you'll recall that these many weeks ago when

21     we began the trial, all of counsel for the defendants, that is

22     counsel representing each defendant and the government, made an

23     opening statement.  And you'll remember I told you that the

24     opening statements of counsel is not part of the evidence.  But

25     you will also now remember, I think, that Mr. Martin,

1    representing Mr. Harris, reserved his opening statement in

2    accordance with the rules.

3        So as we begin the opening of the defense case, Mr.

4    Martin will now present to you what I'm told will be a fairly

5    brief opening statement.  And then we'll proceed with the defense

6    witnesses, who will be called in an order that counsel for the

7    defendants have agreed, to minimize inconvenience to each of the

8    witnesses.

9        Mr. Martin, whenever you're ready.

10       MR. MARTIN:  Thank you, Your Honor.  Ladies and

11   gentlemen of the jury, I'm happy to finally be here.  I never

12   dreamed nine weeks ago that it would take nine weeks for us to

13   get to this point.

14       I thought that I'd stand up and talk to you for about a

15   half an hour in my opening back then when I waived or when I

16   deferred it.  But I'm not going to do that to you.  Everybody

17   here, probably especially you, wants to get out of here.  And I

18   apologize for any part that I may have played or we may have

19   played in extending this trial any longer than it has to be.

20       So given the delay, I won't take any more of your time

21   than I absolutely have to here.

22       It won't come as a surprise to any of you that in our

23   case for the four defendants and in our arguments that we'll be

24   making later on, we'll be pointing out to you that the government

25   hasn't lived up to the promises that they made to you when they

1    made their opening statement and, indeed, when they returned this

2    indictment.  And I want you to look at the indictment and I want

3    you to try to remember what Mr. Harding told you in his opening

4    statement.

5            That promise was to prove beyond a reasonable doubt

6    that this specific RICO enterprise that they charged here and

7    this specific drug conspiracy that they charged here, not some

8    other conspiracy that you may have heard of during the course of

9    this first eight weeks of this trial, but the specific one

10   charged is what they've proved beyond a reasonable doubt, and

11   that Mr. Harris participated in that and they've proved his

12   participation in those two specific conspiracies to you beyond a

13   reasonable doubt.

14           If you fail to find that the government has proved this

15   enterprise, and you'll hear the judge instruct you at some point,

16   hopefully early next week, instruct you as to the meaning of all

17   these terms, if you failed, if you find that the government has

18   failed to prove this enterprise existed beyond a reasonable

19   doubt, then you will be instructed, you will follow the

20   instructions.  You will be obligated to return an indictment, to

21   return a verdict of not guilty against Mr. Harris.  And we intend

22   to demonstrate to you that the government hasn't proved the

23   specific enterprise and the specific drug conspiracies that they

24   told you they would prove.

25           Now, the defense for all four defendants will take but

1    a few days.  It won't take weeks.  It will just take a few days.

2    And it will point out specific failings in the government's

3    proof.  It will demonstrate that some of the government's major

4    witnesses haven't been quite honest with you about the things

5    that they testified about.

6         It will demonstrate and call into serious question

7    whether two of the major racketeering acts that are alleged here,

8    the McCaffity/Brown murders and the Spence, and/or the Wyche

9    murders took place in the manner in which the government says

10   they took place and were committed by the people that the

11   government says committed those two acts.

12        All in all, if those acts weren't part of the larger

13   RICO enterprise, then you won't be able to find the defendants

14   guilty of them, anyway.

15        When all that evidence comes in that we intend to put

16   in, it will call into question what the government has done.  And

17   all the sides have argued to you, and that's one of the reasons

18   I'm not going to talk to you for very long today, because we're

19   going to be back here in a couple days arguing to you and we

20   really don't want to take any more out of your lives than we've

21   already done.  We really don't want to take much more of our own

22   lives than we've already done.

23        But when all that is said and done and all the sides

24   have argued to you, you will then be dutybound to listen to the

25   Judge's instructions and to follow those instructions and to

1    exercise your sworn duty to apply those instructions and the law

2    to the specific facts that the government has proved here and the

3    specific facts that the defense has brought out to you in our

4    case.  That will be, hopefully, sometime next week that you'll

5    get a chance to do that.

6            In the meantime, you will hear from us in particular

7    some information about the cell phone tape that the government

8    has played at least twice, maybe three times.  We will be

9    providing you with a transcript that we have prepared, much like

10   the transcripts that the government has prepared, only these are

11   prepared by us.  And we will ask you to listen very carefully to

12   that conversation again.  We will also ask you to, if you have

13   any questions when you get in the jury room, to listen to it.

14           I will also ask you at some point in time to take

15   another look at the altercation in the cell block and to

16   determine for yourselves who do you think threw the first punch,

17   who do you think caused the altercation, and why do you think,

18   when you get down to that point, why do you think that Mr. Hayes

19   would have embellished to you what was allegedly said to him in

20   the lockup?

21           We look forward to the day when the judge can give you

22   the case for your decision and you can return a verdict which is

23   fair to all sides in the case.  We look forward to that.  Mr.

24   Harris is anxious for you to take the case, to apply the law to

25   the evidence.  And when all is said and done we're confident that

1    you will find that the government hasn't proved the case against

2    Mr. Harris beyond a reasonable doubt.

3            Thank you very much.

4            THE COURT:  Thank you, Mr. Martin.  You may call your

5    first witness.

6            MR. COBURN:  Nicole Gardner, Your Honor.  May I go out

7    and get her?

8            THE COURT:  Please.  Take the witness stand, here,

9    please, Ms. Gardner.  Raise your right hand, please.

10        NICOLE GARDNER, DEFENDANT GARDNER'S WITNESS, SWORN

11           THE WITNESS:  Yes.

12           THE CLERK:  Thank you.  Be seated.  Speak directly

13   toward the mike.  State your name and spell it for the record.

14           THE WITNESS:  Nicole Gardner.

15           DIRECT EXAMINATION

16   BY MR. COBURN:

17   Q    Ms. Gardner, good afternoon.

18   A    Good afternoon.

19   Q    Where are you from originally?

20   A    New York.

21   Q    Do you know someone by the name of Shawn Gardner?

22   A    Yes, I do.

23   Q    Do you see him here in the courtroom?

24   A    Yes, I do.

25   Q    Can you let us know where he is?

1   A    Pardon?

2   Q    Can you point out where he is?

3   A    Right there in the white shirt, white striped shirt.

4   Q    How do you know him?

5   A    I was married to his brother for about ten years.

6   Q    What's that brother's name?

7   A    Carl Gardner.

8   Q    Does Mr. Gardner, Shawn Gardner, have other brothers as

9   well?

10  A    Yes, he does.

11  Q    What are their or his or their names?

12  A    The one that I know is Walter Gardner.

13  Q    Very well.  Are you still married to Carl Gardner?

14  A    No, I'm not.

15  Q    When did that marriage terminate?

16  A    Roughly 2004, 2005.  Something like that.

17         THE COURT:  Ms. Gardner, you can pull that microphone

18  out of your face and get it down.

19  Q    Thank you very much, Your Honor.  Ms. Gardner, how far did

20  you go in school?

21  A    I have three years of college and several licenses,

22  professional licenses.

23  Q    Well, taking the college first, where did you attend

24  college.

25  A    Morgan State University.

1    Q    Where is that located?

2    A    Baltimore, Maryland.

3    Q    You mentioned a number of licenses.  Could you tell the

4    ladies and gentlemen of the jury what they are?

5    A    The jury --

6    Q    That's the jury to your right there.

7    A    Hi.

8    Q    Sorry about that.

9    A    I have a property and casualty license, which allows me to

10   act as an insurance agent and a bail bondsman, and I'm also a

11   licensed realtor.

12   Q    Your Honor, can I come into the well to retrieve some

13   evidence that's been referred to earlier?

14           THE COURT:  Certainly.  Certainly.

15   Q    Can I confer with the prosecutors just for a moment, Your

16   Honor?

17           THE COURT:  Certainly.

18           (Pause in Proceedings.)

19   Q    How did you become involved in becoming a bail bonds person?

20   A    Well, I went to school.  I attended Catonsville Community

21   College.  I took the property and casualty exam, passed the exam.

22   And they, what they do is they run a background check and

23   fingerprint you and so forth.  And then you, once you pass those

24   series of tests you're licensed, I guess.

25   Q    How long have you been doing it?

1    A    For 14 years.

2    Q    What does the work involve?

3    A    Well, it involves going to several district, circuit and

4    federal courts, posting surety bonds for defendants who have been

5    charged with criminal activity or criminal charges and have

6    bails.  You fill out a form called a power of attorney, which

7    allows you to ensure that, to the court that you're going to

8    secure the appearance of the defendant in court.

9         If the defendant does not appear in court, you have to

10   apprehend them and bring them before the court.

11   Q    How close has your relationship been over the years with

12   Shawn Gardner?

13   A    Somewhat close.  We've had a working relationship as well.

14   Q    I'm going to ask you about that in just a moment.

15   A    Okay.

16   Q    Are you familiar with his family?

17   A    Yes, I am.

18   Q    Does he have any children?

19   A    Yes, he does.

20   Q    How many does he have?

21   A    Two.

22   Q    And how old are they?

23   A    Seven.

24   Q    You mentioned that you and Mr. Gardner had a working

25   relationship?

1    A    Yes.

2    Q    Would you be kind enough to tell the jury what that was,

3    what it consisted of, and particularly during what time periods?

4    A    It's been quite a while ago so I can't really tell you the

5    exact year.  It's been several years ago.  About, about seven

6    years ago since he was arrested.  He worked in my office.  He did

7    applications.  He picked up large amounts of cash for me,

8    several, on several occasions.  He met with clients either in the

9    office or at their homes.  And he also assisted with apprehension

10   of individuals that didn't appear in court.

11   Q    What was the quality of the services he provided to your

12   business?

13   A    They were excellent, to be honest.  He was very trustworthy.

14   He was at my office before I was most times.  He was a good

15   employee.  He was reliable.

16   Q    What were his hours like?

17   A    Well, I work seven days a week.  So basically, he was in the

18   office probably five to six days a week, partially, well, until

19   about 12 or 1 on Saturdays.  And on Sundays he would be on call.

20   Q    Did he come in when he said he was going to come in?

21   A    Yes, he did.

22   Q    Do you know someone by the name of Willie Mitchell or have

23   you had occasion to have contact with that person as a result of,

24   of your occupation?

25   A    I don't know Willie Mitchell.

1  Q    Is there, is there someone, I may have, you may know this

2  person by a different name.  Did there come a time when, with

3  respect to a friend of Shawn Gardner's, to whom you had been

4  introduced, you became involved in providing some bail bonds

5  services for that person?

6  A    Yes.

7  Q    Okay.  And simply because you provide bail bonds services

8  for an individual, does that mean that you're involved in any

9  sort of criminal conduct with that person?

10  A    Not at all.

11  Q    May I approach witness, Your Honor, with an item?

12        THE COURT:  Yes.  You can't put it on the DOAR?

13  Q    I would be happy to, Your Honor.

14        THE COURT:  Show it to government counsel.

15  Q    Absolutely, Your Honor.  This is an item that's been marked

16  and introduced in evidence as Government's Exhibit V-17.

17        THE COURT:  Oh, it's already in evidence.

18  Q    It is.  Just part of V-17.  Do you recognize that?

19  A    Yes, I do.

20  Q    And what do you recognize it to be?

21  A    My business card.

22  Q    Finally, does the name "Lisa Brown" mean anything to you?

23  A    Yes, it does.

24  Q    Is that somebody that you knew?

25  A    Yes.

1    Q    How was it that you knew her?

2    A    Well, on the occasions that I was not working, which was

3    rare, I lived in the county.  So a lot of times I would frequent

4    a restaurant in Baltimore City and I met her there.  And we kind

5    of became, not personal friends, but kind of casual friends.  I

6    came to know her kind of personally, I guess.

7    Q    Did there come a time when you learned that she had become

8    the victim of a homicide?

9    A    Yes, I did.

10   Q    And after you learned that, did you have any conversation

11   with Shawn Gardner about it?

12   A    I believe I called him and I told him that, I believe I

13   called him and told him that Lisa had been murdered.  And he was

14   kind of shocked.

15        MR. HANLON:  Objection, Your Honor.  Objection.

16   Q    I'm just asking what his demeanor was like after she talked

17   to him about it.

18        THE COURT:  You say he was shocked?

19        THE WITNESS:  He was in shock.  We were all in shock.

20        THE COURT:  To hear that she had been killed?

21        THE WITNESS:  Yes.

22        THE COURT:  Okay.  Go ahead, Mr. Coburn.

23   BY MR. COBURN:

24   Q    Did you attend her funeral?

25   A    Yes, I did.

1    Q    Thank you, Your Honor.  Can I have the Court's indulgence

2    for just a moment?

3                THE COURT:  Yes.

4                (Pause in Proceedings.)

5                MR. COBURN:  Thank you, Your Honor.  I have nothing

6    further.

7                THE COURT:  Thank you.

8                CROSS EXAMINATION

9    BY MR. HANLON:

10   Q    Ms. Gardner, good afternoon to you.

11   A    Good afternoon.

12   Q    Just to help me clarify.  If you remember, I think you

13   indicated that Mr. Gardner worked for you about seven years ago?

14   A    Yes.  It's been about, as long as he's been arrested, the

15   amount of years that he's been arrested, he was working for me

16   prior to that.

17   Q    Sure.  How long had he been working for you prior to his

18   arrest?

19   A    Honestly, I couldn't tell you.  I wasn't asked to review the

20   records or anything.  So I'm not really sure.

21   Q    That's fine.  The date of the arrest that you mentioned,

22   does June 7 of 2002 sound accurate?

23   A    Possibly.  Yeah.

24   Q    And just, your best approximation, would it be a year or

25   more or less than a year prior to June of '02 that Mr. Gardner

1    had been working for you?  Do you remember that?

2    A    Well, he always helped out in the business.  And I would

3    call on him when I had situations where I had to go and apprehend

4    someone.  Honestly, I can't say.  I believe it was longer than

5    that, though.

6    Q    Mr. Gardner, you're aware, had been away.  He had been away

7    for, in jail for a period of time, is that right?

8    A    Um-hum.

9    Q    And he got released from jail in 2001, is that correct?

10   A    I couldn't tell you.  I'm not sure.

11   Q    Leaving aside the specific dates of the sentence, or when he

12   got back or anything like that, did he begin working for you

13   immediately upon coming home, if you remember that?

14   A    I can't remember.

15   Q    Do you remember if Mr. Gardner had worked for you at all

16   prior to that jail term?

17   A    Yes, I believe he did.

18   Q    So there was some time prior to the jail term and then after

19   the jail term?

20   A    I believe so, yes.

21   Q    But you don't remember the specific dates or anything?

22   A    No, I don't.

23   Q    And you haven't been asked to obtain documents or records or

24   anything relating to it?

25   A    No.

1    Q    An any time, Ms. Gardner, if Mr. Gardner was an employee of

2    yours, did you ever do income tax withholding for him or anything

3    like that?

4    A    No.  Actually, he, to be quite honest, most of the employees

5    that I have, I have several bounty hunters that work for me as

6    well, and I don't do withholding taxes for them.  Some of them I

7    1099.  A lot of them just help out and I, you know, help them out

8    for coming in the system with an apprehension.

9    Q    What kind of relationship did Mr. Gardner have with you?

10   Was he an employee or was he a 1099 person?

11   A    He was more a 1099 person.

12   Q    So you have no tax records or anything like that for Mr.

13   Gardner's employ with you?

14   A    No, I don't.

15   Q    Are there 1099 forms that you would have issued to him or

16   anything like that?

17   A    I'm not sure if I was using a payroll service at that time

18   to process his payroll.  But I do know there were several checks

19   that I had written from my business account to him.

20   Q    So you have the checks but nothing in terms of work records,

21   tax records, employment insurance?

22   A    I'm not really sure.  My accountant would be able to answer

23   that best.

24   Q    And you haven't been asked to look into that prior to coming

25   to court today?

1    A    No, I have not.

2    Q    You indicated some of Mr. Gardner's responsibilities

3    included actually doing apprehensions?

4    A    He attended apprehensions.  He assisted with them, yes.

5    Q    Would he have to carry any equipment to do apprehensions?

6    Did he ever carry a firearm for that?

7    A    No, he didn't have to do that.  I carried one.

8    Q    And he would be with you during these apprehensions?

9    A    If I didn't, on the situations where I had to apprehend

10   females, I may go alone.  I had several bounty hunters that would

11   assist.  I don't believe that he accompanied me when I was

12   capable of doing it myself.  If there were a situation where I

13   would go to pick up someone who, say, may be a friend that I

14   didn't personally want to apprehend, I would take him with me.

15   It wouldn't require me to have a handgun.

16        I know he was convicted of a crime that would prevent

17   him from being in the company of me carrying a handgun so I

18   wouldn't put him in that position.

19   Q    On that last point, let me ask you a couple of questions.

20   You mentioned that there were licensing requirements and

21   background checks you had to do for your job.

22   A    Yes.

23   Q    Was there anything Mr. Gardner had to do since he was either

24   assisting or being present during apprehensions?

25   A    No, there wasn't.  It's not required by the State.

1    Q    So there was no special licensing or background check?

2    A    No.

3    Q    But he was assisting you in apprehensions?

4    A    Yes.

5    Q    Did Mr. Gardner ever have to do surveillance of people's

6    homes or follow people or do anything like that for the

7    apprehension work?

8    A    No.

9    Q    Do you know if he ever used walkie-talkies or anything like

10   that during apprehension work?

11   A    No.  We didn't use those.

12   Q    Understood.  You were asked some questions about the hours

13   that Mr. Gardner worked for, for your -- well, actually, strike

14   that.  Let me ask you this, Ms. Gardner.  Are you still at all

15   close with Mr. Gardner's family?  I understand you're no longer

16   married to Mr. Gardner's brother.  But do you still have a

17   relationship with the family?

18   A    No.

19   Q    When was the last time you talked to anybody in the Gardner

20   family?

21   A    Probably about 2000 -- I'm sorry.  No.  That's not correct.

22   I have spoken with his brother, a kind of hi and bye type of

23   thing.  We don't conversate at all.

24   Q    Meaning you've spoken with your ex-husband?

25   A    Well, yes, I have spoken to my ex-husband, yes.

1    Q    When was the last time you spoke with Walter Gardner, your

2    ex-husband?

3              MR. COBURN:  That's not --

4    A    No, Walter's not my ex-husband.

5    Q    I apologize.  Give me your ex-husband's name.

6    A    Carl.

7    Q    I'm sorry.  When was last time you talked to Carl?

8    A    About three days ago.

9    Q    So that's not an uncommon thing?

10   A    It's uncommon.

11   Q    Do you have any children with Carl?

12   A    Yes, I do.

13   Q    And how many children do you have?

14   A    One.

15   Q    And assuming I've got my relationships correct, that would

16   be the niece or nephew of our defendant, Shawn Gardner?

17   A    Yes.

18   Q    And how old is your child?

19   A    He's 12.

20   Q    One moment, Your Honor.

21              (Pause in proceedings.)

22   Q    Ms. Gardner, when Mr. Gardner, our defendant, Mr. Gardner,

23   came home in 2001, began working for you, do you know whether or

24   not any of his parole conditions would have required him to have

25   a job or to be able to report having employment?

1    A    I'm not, I don't recall.  I'm not real certain.

2    Q    Just don't recall one way or the other?

3    A    I just don't recall.

4    Q    And finally, you mentioned the hours that Mr. Gardner

5    worked.  It sounds like he was working some pretty substantial

6    hours during the time he was with you, is that right?

7    A    Right.

8    Q    Do you have any idea what he was doing in the woods off of

9    Carlson Lane on June 7th, 2002 at about 5 p.m.?

10            MR. COBURN:  Objection.

11            THE COURT:  Overruled.  You may answer.

12    A    Could you repeat the question?

13    Q    Absolutely.  We talk about the hours that Mr. Gardner

14    worked.  It sounded like it was pretty heavy hours.  Do you have

15    any idea what he would have been doing in the woods off of

16    Carlson Lane in Baltimore County on June 7th of 2002 at around

17    4:50, 5:00 p.m. or so?

18    A    I didn't know that he was in the woods on whatever street

19    you just mentioned at 4:50.

20    Q    That's fine.  You didn't know anything about that, is that

21    correct?

22    A    No, I didn't.

23    Q    That's fine, ma'am.  Nothing further, Your Honor.

24            MR. COBURN:  No redirect, Your Honor.

25            THE COURT:  All right.  Any of other counsel?  Ms.

1   Gardner, thank you very much.  You're excused.

2              Mr. Hanlon, perhaps you want to restore the exhibits.

3   You're excused.  Trying to keep track of them since they seem to

4   be in order.

5              (Pause in proceedings. )

6              MR. COBURN:  Jamane Johnson, Your Honor.

7              THE COURT:  No.  We're going to wait on Mr. Johnson.

8              MR. COBURN:  Okay.

9              THE COURT:  Until we take a break.

10             MR. COBURN:  Then Mr. Flannery's up.

11             MR. FLANNERY:  Patrick Dulaney, Your Honor.  Apologize.

12            PATRICK DULANEY, DEFENDANT HARRIS WITNESS, SWORN

13             THE WITNESS:  I do.

14             THE CLERK:  Be seated.  Speak directly toward the mike.

15  State your name and spell it for the record.

16             THE WITNESS:  My name is Patrick Dulaney.

17  D-U-L-A-N-E-Y.

18                 DIRECT EXAMINATION

19  BY MR. FLANNERY:

20  Q    Mr. Dulaney, good morning.

21  A    Good afternoon.

22  Q    Sorry.  Good afternoon.  Mr. Dulaney, where are you

23  presently employed?

24  A    Sheehy Infiniti of Annapolis.

25  Q    And what is your title there?

1  A    Shop foreman.

2  Q    And what types of duties do you perform?

3  A    Basic automative maintenance, diagnostics.  I also oversee

4  all the other technicians within the shop, quality controlling

5  their work and training them.

6  Q    Are you a certified Infiniti technician?

7  A    Yes, I am.

8  Q    And Your Honor, for the record, the government has

9  stipulated to Mr. Delaney's qualifications.  And I would offer

10  him as an expert in Infiniti mechanics and repair.

11        THE COURT:  The witness is accepted as an expert in

12  that regard.

13  Q    Mr. Dulaney, I am showing you what's been marked as Harris

14  Number Five.  This is for demonstration purposes only.  But what

15  I'd like you to do is go through a couple of terms that the jury

16  may hear while you're here testifying today, okay?

17  A    Okay.

18  Q    Mr. Delaney, if I could point out.  This device up here, as

19  you can see, what will you refer to that particular device as?

20  A    The main switch.

21  Q    Okay.  Where is that located?

22  A    That's on the driver's door.

23  Q    Okay.

24        THE COURT:  I'm sorry.

25  Q    What type of vehicle are we speaking --

1    THE COURT:  I'm sorry, Mr. Flannery.  Could you have

2    him tell the jury first what they're looking at in general?

3    Q    Yes.  Mr. Delaney, you recognize this document?

4    A    Yes.

5    Q    And could you describe, what is this?  What are we looking

6    at here?

7    A    This is the component location of all the systems that make

8    up the power locks in the Q-45.

9    Q    Okay.  Q-45, you mean a Q-45 Infiniti --

10   A    Yes.

11   Q    -- model?  Okay.  Is this a fair representation of a 1999

12   Infiniti Q-45 model?

13   A    This is the actual service manual page from a 1999 Infiniti

14   Q-45.

15   Q    And what I've circled there on Harris Number Five, could you

16   please describe what you will refer to that device as?

17   A    The main power window and lock switch assembly.

18   Q    Okay.  And where is that particularly located on that

19   vehicle?

20   A    That is on the driver's door arm rest.

21   Q    Okay.  Now, go back in this area here there's what lay men

22   typically would understand as a knob or some sort of cylinder

23   device that goes up and down when you lock the doors.  In your

24   field, what will you refer to that device as?

25   A    It's actually two parts that make up the component.  The

1    lower portion is the door handle to open the door.  And above it

2    is the lock lever.  We all just call it the flipper.

3    Q    Okay.  And so is the flipper, if I understand you correctly,

4    the device that actually goes up and down when you operate the

5    locking mechanism in the car?

6    A    Yes, it is.

7    Q    Okay.  I understand.  Now, Mr. Delaney, if an individual was

8    in the rear seat of a 1999 Q-45 and the keys are in the ignition

9    and the vehicle is running, could you please describe for the

10   jury how an individual could exit the vehicle and leave all of

11   the doors locked after they exit the vehicle?

12   A    Certainly.  They could reach forward between the passenger

13   and the driver and actually physically use the lock switch on the

14   main power assembly.  They could then, using the flipper on the,

15   say the left rear door, unlock the door, get out of the door,

16   close the flipper to the locked position, close the door, and

17   walk away.

18   Q    I see.  And would your analysis change if, for instance, the

19   individual was entering the car and the main locking mechanism

20   was depressed, would your analysis change at that point then when

21   they shut the door?

22   A    When they got into the vehicle?

23   Q    Yes.

24   A    No.  The same thing would have to occur.

25   Q    How would they get out of the vehicle at that point and

1    still leave the car locked?

2    A    They would, if the car had already been locked, they would

3    simply just have to unlock the flipper on that door, open the

4    door, close it after they press the lock button, then walk away.

5    Q    So in a sense they would delete the first step of what you

6    mentioned before?

7    A    Yes.

8    Q    Okay.  Now, is there a way that they could, so to speak,

9    manually lock all the doors if they were in the rear seat of the

10   vehicle?

11   A    They would have to physically push every flipper on every

12   door.

13   Q    And then I assume obviously open one and exit?

14   A    Yes.

15   Q    Okay.  Now, maybe present you with a different hypothetical.

16   If an individual is outside of a 1999 Q-45 at this point and the

17   keys are on and the vehicle is running, the doors are unlocked,

18   they have to be able to get in, could you describe now how an

19   individual could lock the vehicle and obviously not lock

20   themselves inside?

21   A    They would have to be in the vehicle to -- the driver's door

22   would have to be closed.  They would have to manually lock the

23   driver's door.  And then they could manually lock the other

24   doors, open them, push the flipper to lock it, close that door,

25   and follow through with the rear doors.

DIRECT EXAMINATION OF PATRICK DULANEY BY FLANNERY          163

1    Q    So one way they could do it essentially, just do what we

2    just talked about, get in and do what we said, undo the flipper,

3    get out, and when they shut the door, after locking it, all the

4    vehicle doors would be locked?

5    A    Yes.

6    Q    Okay.  Is there a way they could do it without even getting

7    into the car, just, you know, so to speak, open the rear door and

8    do it from there?

9    A    No.

10   Q    Well, let's say if they were to open the rear door, could

11   they reach forward, like you said, without shutting the rear

12   door, stand in the way, lock it, would all the vehicle doors lock

13   at that point, including the rear door that's opened?

14   A    If they reached forward to the power switch?

15   Q    Um-hum.

16   A    Yes, they could.

17   Q    Then if they shut it all the doors would be locked?

18   A    Yes, they could.

19   Q    Is there another way -- what if they had a key?

20   A    If they had a key, they could come up to the driver's door,

21   which has a key cylinder in it, and they could then move it to

22   the lock position and lock all of the doors.

23   Q    And by key cylinder, you mean the actual slot where you

24   stick the key in?

25   A    Yes.

1    Q    Okay.  Now, Mr. Delaney, I have really one final point for

2    you.  In your opinion, could you please describe the likelihood

3    that a 1999 Q-45 could be involved in an impact and have all of

4    its doors locked by virtue of, without human contact?

5    A    Highly unlikely, if not impossible.

6    Q    Okay.  Thank you.  I have no further questions, Your Honor.

7                   CROSS EXAMINATION

8    BY MR. HARDING:

9    Q    Good afternoon, Mr. Delaney.

10   A    Good afternoon.

11   Q    My name's Robert Harding and I represent the United States

12   in this case, along with Mr. Hanlon here.

13          I won't ask you how you got to know Mr. Flannery and

14   Mr. Martin.  But can you tell us, did they fill you in about what

15   this case is all about?

16   A    They gave me just a brief summary.  Two people were killed

17   inside of this vehicle.  They didn't go into details about how

18   they were killed or anything along those lines.

19   Q    Okay.  So obviously, you never saw the Q-45 that the murders

20   occurred in?

21   A    No, I did not.

22   Q    And you evidently were told that the car was involved in a

23   crash, is that correct?

24   A    Yes.

25   Q    Okay.  Did you see photographs of the car?  Did you have a

CROSS EXAMINATION OF PATRICK DULANEY BY HARDING                    165

1    chance to examine the crash scene or anything like that?

2    A    No, I did not.

3    Q    Okay.  Infinitis are very nice cars, I know, Mr. Delaney.

4    But the locking mechanisms that you have in Infinitis are not

5    unique to Infinitis, are they?  I mean, there are many cars that

6    have similar automatic locking systems, isn't that correct?

7    A    This would be what would you call a semi-automatic locking

8    system.  It doesn't, it doesn't lock on its own, whether you put

9    the vehicle in drive or start to move the vehicle forward.  There

10   has to be some input to actually make the vehicle lock.

11   Q    Right.  And there are many cars with similar systems, are

12   they not?

13   A    Yes.

14   Q    Are there not?

15   A    Yes, there are.

16   Q    The equipment that was in that diagram and the description

17   you gave of the mechanisms sounded similar to my own car, for

18   example, which I assure you is not an Infiniti, unfortunately.

19   So there are a good many cars that have similar operations,

20   right?

21   A    They are similar, yes.

22   Q    Okay.  And this includes, let me show you this picture right

23   here, which I guess I'll mark as an exhibit.  I need some

24   Post-Its to mark it.  Maybe I could bum some Post-Its from Ms.

25   Arrington.  I'm going to call this CR-1.

1        THE COURT:  Government's CR-1?

2    Q    Yes.

3        THE COURT:  All right.

4    Q    When Mr. Flannery told me that you were going to testify,

5    Mr. Dulaney, I went, an agent went up on a web site and pulled

6    this picture off of an Infiniti web site.  Do you recognize what

7    it is?

8    A    Yes.  That's the driver's door on an Infiniti Q-45.

9    Q    Okay.  And this is the, what you called the door handle or

10   flipper, is that correct?

11   A    Where your nail is is the door handle.  Above it and to your

12   left -- no, it's part of the door handle but it's --

13   Q    Oh, this?

14   A    Yeah.  That's the actual lock/unlock lever, flipper.

15   Q    Okay.  And this was a four door car that we have in this

16   case.  So these manually operated handles are on all four doors,

17   is that correct?

18   A    Yes.

19   Q    Okay.  And then there's also this key switch right here.

20   There's a little picture of a key on it.  And that's the actual

21   switch that permits you to lock all of the doors at the same time

22   or unlock them at the same time, is that correct?

23   A    Yes.

24   Q    Okay.  Or you could, if you wanted to -- correct me if I'm

25   wrong, Mr. Delaney -- if the doors were all locked, you could

1    just pull this flipper out and use the handle to open the door,

2    is that correct, if you were inside the car?

3    A    Yes, you could.

4    Q    Okay.  Here's another picture.  This is CR-2.

5         THE COURT:  Government's CR-2.

6    Q    Yeah.  This is just a picture of the key switch sticking up

7    on the same sort of pad, door handle pad on the driver's side of

8    a Q-45, is that correct?

9    A    Yes.

10   Q    And it's a very sensitive little button, isn't it?  You just

11   have to brush it, really, to make it lock or unlock the doors,

12   isn't that correct?

13   A    No.  You've got to push it forward.  Just a slight brush is

14   not enough to cause it to lock or unlock.  You do actually have

15   to push it or pull it.

16   Q    Okay.  Now, Mr. Flannery was running past some scenarios

17   with you about how you could get out of the Q-45 and nevertheless

18   leave all of the doors locked.  And you mentioned a way of doing

19   that.  Let me raise some other possible scenarios with you.

20   Okay?

21   A    Certainly.

22   Q    Supposing that the Q-45 were stopped and there were

23   occupants in the front seat, two of them.  And the doors were

24   locked and somebody approached the rear passenger side door.  And

25   one of the occupants reached back and used the handle to open the

CROSS EXAMINATION OF PATRICK DULANEY BY HARDING          168

1    door to let the person in.  That's perfectly possible, isn't it?

2    A    They would have to reach back and move the flipper first.

3    Q    Right.

4    A    Before they could open the door.  But yes.

5    Q    Okay.  So then supposing -- this is obviously where the

6    murder comes in -- supposing the person who got into the back

7    seat then shoots the people in the front seat.  All he would have

8    to do in leaving is to flip the flipper on the door handle to

9    make it lock because all the other doors are already locked,

10   isn't that right?

11   A    With the door open and then close it in?  Yes.

12   Q    In other words, if he'd left the door open all the time he

13   could just get in and lock his door without ever pushing the main

14   switch, isn't that right?

15   A    Yes.

16   Q    And isn't it true that if he got in -- let's raise another

17   scenario.  Supposing he approached the Q-45 and the driver let

18   him in by pushing the main switch to open all the doors.  And so

19   he was able to get in the rear passenger side door, sit down and

20   shoot the people in the front seat.  Let's say that when he shot

21   the driver, the driver's arm hit the main switch and caused it to

22   lock all the doors.  Is that a possibility?

23   A    It's a possibility.

24   Q    And then if he were to in the back seat, he could get out

25   just by moving the flipper and, on his rear passenger side door,

1    getting out, depressing the flipper again, and shutting the door;

2    isn't that possible?

3    A    Yes.

4    Q    Okay.  Let's say that the same thing happens.  Somebody

5    approaches the left rear passenger door.  The driver unlocks all

6    the doors to let him in.  He gets in.  Only the driver decides to

7    lock all the doors at that point.  Before anybody pulls out any

8    gun or anything, the driver knows that he's about to engage in an

9    illegal transaction so he thinks it's prudent to lock the doors

10   in the car.  So he depresses the main switch and locks all the

11   doors in the car.  Then the guy in the back seat pulls out a gun,

12   shoots both of the people in the front seat, and leaves the same

13   way, just by using the manual handle on the rear passenger side

14   door and pushing the flipper again as he leaves to lock that

15   door.  That would leave all of the doors locked and yet the guy

16   in the back seat would be able to get out, isn't that right?

17   A    Yes.

18   Q    Okay.  Another scenario.  Supposing the driver unlocks all

19   the doors to let the guy get into the back seat and the guy

20   enters.  And it doesn't really matter whether he shuts the door

21   or not.  He gets into the back seat, pulls a gun and shoots the

22   two people in the front of the car.  But before he, just before

23   he does that, the driver realizes what's happening and he reaches

24   for the handle to get out.  In that split second of alarm where

25   he's trying to get out of car, he depresses this button and locks

1    all the doors to the car.  The guy in the back seat could still

2    get out whether he'd shut the back door or not because he could

3    just, if he shut it, he would just use the manual handle to get

4    out and depress the flipper again to lock it when he got out.

5    Isn't that right?

6    A    Yes.

7    Q    Okay.  And you said that the crash in this case -- let me

8    show you a picture.  I'll mark this as CR-3, Your Honor.

9           THE COURT:  CR-3.

10   Q    This car was badly damaged, as you can see.  Do you see

11   that, Mr. Delaney?

12   A    Yes.

13   Q    And CR-4 is the same thing.  Supposing -- let me ask you

14   this.  Supposing that nobody ever touched the main switch at all,

15   that the guy got into the back seat, shot both the driver and the

16   other occupant of the front seat, exited the back seat and never

17   bothered even to lock the door.  But when he did so, the car

18   proceeded to roll down a hill and crash into a tree.  Now, you've

19   said that the crash itself is unlikely to have caused the door

20   locks to activate.  But of course, there's a driver in the front

21   seat of the car.  And the first thing that happens is that he's

22   thrown forward by the impact of the crash and, also, the air bag

23   inflates.

24           I don't know if you've ever seen pictures of dummies in

25   cars.  But when they're in a crash, they flail around.  It looks

CROSS EXAMINATION OF PATRICK DULANEY BY HARDING 171

1    like they're all shook up, sort of.  Is it possible that the

2    driver's hand could have depressed the switch and locked all the

3    doors at that point?

4              MR. FLANNERY:  Objection, Your Honor.

5              THE COURT:  Overruled.  You may answer, Mr. Dulaney.

6              MR. FLANNERY:  Beyond the witness' qualifications.

7              THE COURT:  You may answer.

8    A    I would say that's also highly unlikely based on the

9    location of the power lock switch in relation to the steering

10   wheel.  The power lock switch is ahead of the steering wheel.

11   And when the air bag deploys, it's going to push the individual

12   backwards, including their arms.

13   Q    That's when the air bag explodes.  But of course, the first

14   impact, the first thing that happens is the body flies forward,

15   isn't that right, right into the air bag?

16   A    That air bag goes off so quick there really is no going

17   forward.  I've seen them go off first-hand and I wouldn't want to

18   get hit with one.

19   Q    Okay.  And I hope you don't find this too gruesome or

20   shocking, Mr. Dulaney.  But I wanted to show you one more

21   picture.  See all the blood on the --

22   A    Um-hum.

23   Q    -- door handle?  Now, we don't know where that came from.

24   This is CR-5.

25              THE COURT:  CR-5.

1    Q    And this is the air bag, right here.  It's deflated now, it

2    looks like, or partially deflated.  But you think that it's

3    unlikely that if the body were thrown forward into the air bag

4    and the air bag exploded, that his hand could have brushed up

5    against this button right here and caused the doors to lock?  Is

6    that your testimony?

7    A    Well --

8         MR. FLANNERY:  Objection, Your Honor.

9    A    I would still have to say --

10        THE COURT:  Excuse me.  The objection's overruled.  You

11   may proceed.

12   A    I would still have to say that's highly unlikely, if not

13   impossible, especially considering that to lock the doors you

14   would have to pull the switch, not push the switch.  And in the

15   location of it so far forward of the steering wheel.

16   Q    Okay.  Let's try a different scenario.  The assailant

17   approaches the car and the driver unlocks all the doors to let

18   the assailant in the back seat.  The assailant does not shut his

19   door, or maybe he does shut it because it doesn't really matter.

20   He shoots both of the occupants of the car.  He then, as he's

21   leaving, decides to look for loot.  And he does stuff like rip

22   apart the console of the car.  You know, you know what I'm

23   talking about, right, the console?

24   A    Center console?

25   Q    Yeah.  In fact, I think I have one.  This is Government

1    Exhibit MP-2.  Does that look like the console top of a Q-45?

2    A    Yes, it does.

3    Q    And notice how there's dried blood on it.  Do you see that,

4    Mr. Dulaney?

5    A    Yes, I do.

6    Q    And I'm going to mark this as CR-6.

7              THE COURT:  CR-6.

8    Q    The top to the console wound up on the back seat.  Do you

9    see that?

10   A    Yes, I do.

11   Q    So that adds some, some credibility to my scenario here

12   because --

13             MR. MARTIN:  Objection.

14             MR. FLANNERY:  Objection, Your Honor.

15             THE COURT:  Sustained.

16   Q    I'm just raising a hypothetical, Your Honor.

17             THE COURT:  You may state a hypothetical.

18   Q    The assailant in the back seat is looking for stuff and he

19   rips off the console.  And while he's up there messing around in

20   the front he decides to lock all the doors just because that

21   would help to thwart law enforcement or thwart anybody else who

22   came across this crime scene.  And then he leaves the same way,

23   by going out the rear passenger door, either by unlocking it

24   manually or, if he never left, or if he never shut it in the

25   first place, all he has to do is depress the flipper and that

1    will make sure that that door is locked, also.  That would be a

2    possible scenario, too, wouldn't it, Mr. Dulaney?

3    A    Yes, it would.

4    Q    Of course, there are lots of other possible scenarios and

5    I'll just mention one more.  Supposing that the assailant gets

6    into the back seat and shoots the two occupants in the front

7    seat, but the assailant has an accomplice who helps him rummage

8    through the front seat.  He approaches from the outside of the

9    car, opens the driver's side door.  And after he's done looking

10   for loot, pushes down the lock switch, the main switch.  And both

11   of them leave together after shutting both of the doors.  That's

12   another possible scenario, isn't it?

13   A    Actually, no, it's not.  If the key is in the ignition and

14   the driver's door is open and the lock button is depressed to

15   lock the doors, they will lock and then unlock.  It's an

16   anti-lockout feature to try to keep the owner from locking their

17   keys in the car.  It only applies to the driver's door.

18   Q    Yeah, I know about that.  It only applies to the driver's

19   door.  But what about if the rear passenger door is open because

20   our friend, the assailant, has left it open?

21   A    And the driver's door is closed?

22   Q    Yes.

23   A    If the lock button is pushed, the rear door will lock and

24   stay locked.

25   Q    Okay.  Well, let's do it this way, then.  The guy opens the

1    driver's side door, depresses the main switch, as you call it.

2    That locks all the doors, right?

3    A    With the door open and the key in the ignition, they will

4    lock for a split second and then all of the doors will unlock.

5    Q    I see.  So what about if -- okay.  Well, forget that one.

6    I'm not, I'm going to get way too complicated in a minute.  So

7    I'm losing, I'm losing interest.

8         But the point is that there are eight or nine different

9    scenarios that we've been through already here today that could

10   explain how all, all of the doors wound up being locked even

11   though the assailant was able to get out of the back seat, isn't

12   that right?

13   A    Yes.

14   Q    Okay.  Just one moment, Your Honor.  No further questions,

15   Your Honor.

16             REDIRECT EXAMINATION

17   BY MR. FLANNERY:

18   Q    Mr. Dulaney, just a couple of quick points.  We talked, you

19   and I really set out the basic scenario that Mr. Harding really

20   just offered different variations of.  Is that your

21   understanding?

22   A    Yes.

23   Q    The general scenario is if you're inside the vehicle, the

24   way to lock all the doors mechanically is to depress the driver's

25   mechanical operation?

1    A    The lock switch on the main switch.

2    Q    Correct.

3    A    Yes.

4    Q    And that will lock all the doors?

5    A    Yes.

6    Q    And then it's up to the individual in the back seat to touch

7    the flipper, open the flipper, open the door, exit it, re-lock

8    the flipper, and shut it?

9    A    Yes.

10   Q    And there's different combinations.  For instance, if the

11   door was open in the beginning, like you discussed with Mr.

12   Harding, it's already locked at that point.  And an individual

13   could either shut it or not shut it?

14   A    Yes.

15   Q    If they shut it, the door's closed and locked?

16   A    Yes.

17   Q    If they leave it open, one door is open and the doors are

18   locked?

19   A    Yes.

20   Q    But in order for an individual to get out of the back seat

21   with the doors closed, and the vehicle is locked, they have to

22   touch the flipper, touch the handle, and then re-lock the

23   flipper?

24   A    Yes.

25   Q    And you didn't see any pictures before today regarding the

REDIRECT EXAMINATION OF PATRICK DULANEY                      177

1    accident, did you?

2    A    No, I did not.

3    Q    You didn't see any pictures of the vehicle?

4    A    No, I did not.

5    Q    But does that change your analysis as to the likelihood of

6    the Q-45 1999 year having all of its doors locked by running into

7    an object down an incline?

8    A    No, it does not.

9    Q    And I think you testified with Mr. Harding that that vehicle

10   was not equipped with an ability to lock this door simply by

11   being put in motion, is that correct?

12   A    Yes.

13   Q    It does not have that ability?

14   A    Yes, it does not.

15   Q    Thank you.  No further questions.

16          THE COURT:  Thank you very much, Mr. Dulaney.  You're

17   excused.  Thank you for coming in.

18          MR. COBURN:  Will this be a good time for an afternoon

19   break, Your Honor?

20          THE COURT:  No.  I was hoping we could do one more.

21   Isn't there another witness?

22          MR. COBURN:  Mr. Pyne has one.

23          THE COURT:  Okay.

24          MR. PYNE:  Lakeisha McCoy, Your Honor.

25          THE COURT:  All right.

1          LAKEISHA MCCOY, GOVERNMENT MARTIN WITNESS, SWORN

2               THE WITNESS:  Yes.

3               THE CLERK:  Be seated.  Speak directly toward the mike.

4     State your name and spell it for the record, please.

5               THE WITNESS:  Lakeisha --

6               THE COURT:  You can pull that mike down and get it out

7     of your face, Ms. McCoy.  All right.  State your name and spell

8     it, please.

9               THE WITNESS:  Lakeisha McCoy.  L-A-K-E-I-S-H-A.

10    M-C-C-O-Y.

11              DIRECT EXAMINATION

12    BY MR. PYNE:

13    Q    Good afternoon, Ms. McCoy.  I appreciate your waiting

14    around.  Where are you living now?

15    A    1103 West Lanvale.

16    Q    Okay.  And was there a time that you lived at 801 Kevin

17    Road?

18    A    Yes.

19    Q    And were you living there with your grandmother?

20    A    Yes.

21    Q    And when did you start living there, if you recall?

22    A    When, when did I start?

23    Q    If you recall, yeah.

24    A    Since I was born.

25    Q    Okay.  I'm going to ask you if you know an individual by the

1    name of Shelly Wayne Martin?

2    A    Yes.

3    Q    And how do you know him?

4    A    Friend.

5    Q    Okay.  And what did you call him when you knew him?

6    A    Wayne.

7    Q    Okay.  And did you meet a friend of his at the same time?

8    A    Yes.

9    Q    And what was his name?

10   A    Goo.

11   Q    And how did you come to meet Mr. Martin and this individual

12   you call Goo?

13   A    I met Shelly Martin and Mr. Wayne at a shopping center.

14   Then I met Goo because him and Wayne used to live together.

15   Q    And do you recall when it was, what year it was that you

16   first met them?

17   A    I was like 15, 16.

18   Q    Okay.

19             MR. HARDING:  I'm sorry.  Couldn't hear.

20             THE COURT:  Could you keep your voice up, please, Ms.

21   McCoy.

22   Q    Speak right into the mike and try and keep your voice up as

23   loud as possible, if you could.

24             THE COURT:  You say you were 15 or 16?

25             THE WITNESS:  Yes.

1   BY MR. PYNE:

2   Q    I'm going to direct you to March of 2002 and ask if you

3   recall the events surrounding your birthday.

4   A    Um-hum.

5   Q    Okay.

6              THE COURT:  You have to say yes or no.

7              THE WITNESS:  Yes.

8   Q    For the record, because the stenographer has to take down

9   everything you say and she can only take down a yes or no.  Okay?

10  Can you tell the ladies and gentlemen of the jury what you recall

11  happening around your birthday?  First of all, when is your

12  birthday?

13  A    March the 24th.

14  Q    Okay.  And what, if anything, do you recall happening around

15  March the 24th of 2002?

16  A    Shelly took me to the movies.

17  Q    Okay.  And how did that come about?

18  A    He called me and asked, he told me he was coming to get me

19  and I told him it was my birthday.  He told me he was taking me

20  to the movies.

21  Q    He was going to take you to the movies, is that what you

22  said?

23  A    Um-hum.

24  Q    Is that unusual?  Did you normally go to the movies with Mr.

25  Martin?

Case 1:04-cr-00029-RDB   Document 695   Filed 06/16/09   Page 181 of 261

1    A    No.  That was the first time he ever took me out.

2    Q    Okay.  What was your relationship with him, then?

3    A    We was just friends.

4    Q    But on that particular night, since it was your birthday, he

5    took you to the movies?

6    A    Yes.

7    Q    Do you recall what time you went to the movies?

8    A    It was after eight.

9    Q    Sometime after eight?

10   A    Yes.

11   Q    Now, do you have any children, Ms. McCoy?

12   A    Two.

13   Q    And what would their ages have been at that time, in 2002?

14   A    They was five and six.

15   Q    Okay.  And did you need to get a babysitter for them?

16   A    Yes.

17   Q    And who did you arrange to care for your children?

18   A    My mother.

19   Q    Okay.  Tell the ladies and gentlemen of the jury what

20   exactly you recall happening that night in terms of going to the

21   movie.

22   A    He came and picked me up.  He paid my mother to babysit.

23   And stopped at the liquor store, got a drink.  We went to the

24   movies, drunk our drink while we was waiting for the movies to

25   start.  Then we went in the movies.  After the movies, I went

1    over his house, stayed the night, and then left the next day,

2    like in the afternoon.

3    Q    Okay.  When you're saying "he", who are you referring to?

4    A    Shelly.

5    Q    Is that what you call him?

6    A    I call him Wayne.

7    Q    Okay.  I would ask you if you could look around the

8    courtroom here today and see if you see the individual you're

9    referring to?

10   A    Yes.

11   Q    Could you point him out for the ladies and gentlemen of the

12   jury?

13   A    (Indicating.)

14   Q    The individual all the way at the end of this row?

15   A    Yes.

16   Q    For the record, that is Mr. Martin.  Now, you say he picked

17   you up.  Do you recall what kind of car he used when he picked

18   you up?

19   A    It was a white Buick.  I think it was a Buick.

20   Q    Buick?

21   A    I think so.

22   Q    Okay.

23   A    I don't know.  It was white.

24   Q    Was there anyone else with you?

25   A    No.

1    Q    So it was just you and Mr. Martin?

2    A    Yes.

3    Q    And you said you went to the liquor store, is that correct?

4    A    Yes.

5    Q    And do you recall who, if anything -- who made any purchases

6    at the liquor store?

7    A    It was me.

8    Q    Okay.  And what did you buy?

9    A    Bacardi and soda.

10   Q    And you paid for that yourself, if you recall?

11   A    I don't remember if he gave me the money or not.  He

12   probably gave me the money.

13   Q    Okay.  I realize this is sometime ago.  Just to the best of

14   your recollection.  Do you recall what movie theater you went to?

15   A    Owings Mills.

16   Q    Owings Mills?

17   A    Yes.

18   Q    All right.  Do you recall, was there a particular movie you

19   were going to see?

20   A    Blade Two.

21   Q    All right.  And do you recall what time that movie started?

22   A    I think it was 10:00.

23   Q    Okay.  And you and Shelly, were you with anyone else or was

24   it just you and Shelly Wayne Martin?

25   A    Just me and him.

1    Q    Okay.  And you went into the movie.  Do you recall if you

2    stayed for the entire movie?

3    A    We stayed for the whole movie.

4    Q    All right.  Do you recall if either you or Mr. Martin were

5    making any phone calls during that movie?

6    A    I fell asleep so I don't know.  I didn't make any phone

7    calls.

8    Q    Okay.  You didn't make any phone calls.  Do you recall

9    approximately what time you left the movie theater?

10   A    No.

11   Q    All right.  Do you recall where you went after you left the

12   movie theater?

13   A    We went to his mother house.

14   Q    All right.  And would that be the house at Two Cree Court?

15   A    Yes.

16   Q    Okay.  And who was at Two Cree Court when you arrived there?

17   A    Nobody that I know of.

18   Q    All right.  And what, if anything, did you do when you

19   arrived there?

20   A    I went straight downstairs to his room.

21   Q    All right.  Can you describe a bit, for the ladies and

22   gentlemen of the jury, how Two Cree Court is set up, if you

23   recall?

24   A    It's like a complex.  And his mother house is like a corner

25   house.

1   Q    Okay.  And when you walk in the front door, where do you go

2   when you walk in the front door?

3   A    When I walk in the front door, I like went to my right down

4   some steps.

5   Q    Down some steps?  Is that where Shelly Wayne Martin's

6   bedroom was?

7   A    Yes.

8   Q    All right.  And what, if you went to the left and went up

9   steps, what was up there?

10  A    I don't know.  I never been up there.

11  Q    Okay.  So what happened once you got there?  You immediately

12  went down the steps and went to the bedroom?

13  A    Yes.

14  Q    And what happened then?

15  A    Then he went upstairs and fixed us something to eat.

16  Q    And did you eat that down in the bedroom?  Is that what

17  you're saying?

18  A    Yes.

19  Q    Okay.  And did you go anywhere after that?

20  A    No.

21  Q    Did there come any point in the night that Mr. Martin left

22  your presence?

23  A    No.

24  Q    And when -- after you had something to eat, I take it you

25  went to sleep, is that correct?

1    A    Yes.

2    Q    All right.  And do you recall what time was it you woke up

3    the next day?

4    A    I don't know exactly what time it was.  Might have been like

5    after nine.

6    Q    After nine sometime?

7    A    Yes.

8    Q    Okay.  And what did you do then?

9    A    Then he took me home.

10   Q    Do you recall what time it was that he took you home?

11   A    It was like noon.

12   Q    Okay.  When you got up the next morning, did you see anyone

13   else in the house?

14   A    No.

15   Q    Did you hear anyone else --

16   A    No.

17   Q    -- moving around in the house?  Were you aware of anyone

18   else being present in the house?

19   A    No.

20   Q    Okay.  Do you have any criminal record, Ms. McCoy?

21   A    I've been locked up a couple of times but I've never been

22   convicted.

23   Q    All right.  Your Honor, I don't think I have anything

24   further.  Thank you very much, Ms. McCoy.

25   A    You're welcome.

1          CROSS EXAMINATION

2     BY MR. HARDING:

3     Q     Hi, Ms. McCoy.

4     A     Hello.

5     Q     My name's Robert Harding, but we've already met, haven't we?

6     A     I don't remember you.

7     Q     You don't remember?

8     A     Nope.

9     Q     Well, my feelings are hurt.

10    A     I'm sorry.

11    Q     Do you remember getting subpoenaed to the grand jury about

12    three or four years ago?

13    A     Yeah.  I remember being there.

14    Q     Do you remember that there were a couple of prosecutors

15    involved when you appeared in the grand jury?

16    A     Yes.

17    Q     Okay.  Now, when you appeared in the grand jury you also

18    mentioned that Wayne was a friend of yours, but you actually

19    described it somewhat differently in the grand jury.  Do you

20    remember that?

21    A     How did I describe it?

22    Q     Best friend?

23    A     Yes.

24    Q     Okay.  But you said that you knew Wayne had never had a job.

25    Do you remember that?

1    A    Not to my knowledge.

2    Q    Okay.  And yet you remembered that back in the '90s he had a

3    Mercedes Benz and two Lexuses.  Do you remember that?

4    A    I ain't never say two.  I said one.

5    Q    You said one Lexus?

6    A    Yes.

7    Q    And one Mercedes Benz?

8    A    Yes.

9    Q    Okay.  Well, do you remember being asked this question?

10            MR. PYNE:  I'll object.

11            THE COURT:  Just read it to her, Mr. Harding.

12    Q    Do you remember what kind of cars he had?  Answer:  Lexus.

13            Question:  A Lexus?  Answer:  He had like two Lexuses

14    and a Benz.

15            Do you remember that?

16    A    I just said I remember one Lexus.

17    Q    Okay.  And then the next question was:  Two Lexuses and a

18    Mercedes Benz?  And you answered, yes.  Do you remember saying

19    that in the grand jury?

20    A    I don't remember.

21    Q    Okay.  And when he got out of -- you knew that he had just

22    gotten out of a halfway house in March of 2002.  Do you remember

23    that?

24    A    Yes.

25    Q    And he had a Chrysler LeBaron when he got out, is that

1    right?

2    A    Yes.

3    Q    Okay.  And you knew that when he, when you first met him,

4    you said just now on direct that you were 15 or 16.  But since we

5    don't know how old you are, it's hard for me to figure how long

6    ago that was.  May I ask how old you are?

7    A    29.

8    Q    Okay.  So we're talking about maybe 15 years ago.  1993,

9    does that sound right?  Or '94, something like --

10   A    Yes.

11   Q    And you said he was living with Mr. Gardner at that point?

12   A    Yes.

13   Q    Goo?

14   A    Yes.

15   Q    Where was he living?

16   A    I can't remember the name of the apartments but it was off

17   of Cooks Lane.

18   Q    Is that in Randallstown?

19   A    No.

20   Q    Where is it?

21   A    It's off of Cooks Lane.  I don't know the name of the

22   neighborhood.

23   Q    Northwest of Baltimore in the county?

24   A    Um-hum.  Yes.

25   Q    Okay.  Did there come a time when Wayne moved down to

1    southwest Baltimore with his mother, or was that before you met

2    him?

3    A    Yeah.  I remember when his mother used to live in south

4    Baltimore.

5    Q    You remember when his mother moved down there?

6    A    Not when she moved down there.  But I, I was down that house

7    before.

8    Q    Okay.  Was that after you met him on Cooks Lane?

9    A    I don't remember.

10   Q    Okay.  You knew that Wayne and Goo were tight, like

11   brothers, right?

12   A    Yes.

13   Q    Okay.  You knew that they had committed some robberies

14   together with one or two other people; did you know that?

15          MR. COBURN:  Objection.  Objection.

16          THE COURT:  Sustained.

17   Q    Okay.  Back to March of 2002.  You knew that he had just

18   gotten out of a halfway house a few weeks before this movie you

19   went to with him on your birthday, is that right?

20   A    Yes.

21   Q    And you knew that before he was in the halfway house, he'd

22   been locked up in a jail, right?

23   A    Yes.

24   Q    But you didn't know, did you, what prison he was locked up

25   in, isn't that correct?

1    A    I don't remember.

2              THE COURT:  I'm sorry.  Your answer again?

3    A    I don't remember.

4    Q    Well, did you testify in the grand jury, do you remember,

5    that you had lost touch with him for some years?  Is that

6    correct?

7    A    I talked to him when he was locked up, before he went to the

8    halfway house.

9    Q    I'm sorry, Ms. McCoy.  I'll be right with you.  Do you

10   remember being asked about the federal prison where Mr. Martin

11   was locked up and you answered, I have no idea; the only place I

12   do remember is the halfway house but I know we had lost contact

13   with each other and he was locked up for like two years before he

14   went to the halfway house.  Do you remember that question and

15   answer?

16   A    Yes.

17   Q    And do you remember the next question?  Oh, so you didn't

18   communicate with him during that period of time?  And your answer

19   was no.  Do you remember that?

20   A    No.  If I said no, I ain't remember that.  But now I

21   remember that I did talk to him.  Like before he came home I was

22   talking to him.

23   Q    Okay.  You remember when you got subpoenaed to the grand

24   jury, Ms. McCoy, you didn't want to talk to me or my co-counsel

25   or the agents before you went into the grand jury?  Do you

Case 1:04-cr-00029-RDB   Document 695   Filed 06/16/09   Page 192 of 261

1    remember that?

2    A    Um-um.  I don't remember that.

3    Q    Well, you don't, you didn't remember me so --

4    A    That's why I ain't remember that.

5    Q    Okay.  But you couldn't refuse to testify in the grand jury,

6    could you, because you got a subpoena to testify, right?

7    A    Right.

8    Q    And when you testified, there were a lot of things that you

9    didn't remember or didn't know when you testified in the grand

10   jury, isn't that right?

11   A    I remembered a lot of things back then.

12   Q    Okay.  Well, you didn't know where Wayne had been locked up

13   before he was in the halfway house and you didn't know what he

14   was locked up for, either, did you?

15   A    No.

16   Q    Okay.  You didn't know that he had been arrested on I-95

17   back in 1999 with Goo, did you?

18   A    No.

19   Q    You didn't know that he'd been arrested a few days before

20   that with a gun in his car here in Baltimore, did you?

21   A    No.

22   Q    And you didn't know anything at all about Goo's arrest.  You

23   never knew he was ever arrested, right?

24   A    No.

25   Q    And you had never met any of Goo's girlfriends, correct?

1   A    No.

2   Q    You didn't know the woman he was living with back in 2002

3   until you met her when you came in for the grand jury, because

4   she was subpoenaed for the same day you were, isn't that right?

5   A    Yes.

6   Q    Okay.  So you'd never been out to Goo's house?

7   A    No.

8   Q    Okay.  You didn't know Willie Mitchell or Bo, you said, is

9   that correct?

10  A    No.

11  Q    And you didn't know Shelton Harris, is that correct?

12  A    No.

13  Q    Let me call your attention to the night of the movie.  You

14  said, when you were asked in the grand jury, that you had no idea

15  what the movie was about.  Do you remember that?

16  A    Yes.

17  Q    And you said, as you did here today, that you, in fact, fell

18  asleep right at the beginning of the movie?

19  A    Yes.

20  Q    So that's why you don't know anything about what happened in

21  the movie?

22  A    Yes.

23  Q    But you remember the name of the movie, don't you?

24  A    Yes.

25  Q    What was the name of the movie?

1    A    Blade Two.

2    Q    You didn't remember when the movie ended, as you testified

3    here today, is that correct?

4    A    Yes.

5    Q    And you didn't see anyone you knew the entire time you were

6    with Wayne that night before the movie, during the movie, or

7    after the movie, or even the next day, until you got driven away

8    by Mr. Martin, is that correct?

9    A    Yes.

10   Q    And we asked you, also, whether he had ever used his cell

11   phone that night.  You said he used it a lot before the movie

12   started.  Do you remember that?

13   A    No.

14   Q    You don't remember saying that he was on the phone all the

15   time or words to that effect?

16   A    Not while we was in the movies.  When we was in the car,

17   yeah.

18   Q    Right.  When you were in the car.  Of course, you don't know

19   what happened during the movie because you were asleep, right?

20   A    Exactly.

21   Q    Okay.  Now, even though you didn't know a lot of stuff, when

22   you testified in the grand jury there were certain things that

23   you remembered very clearly, such as the name of the movie and

24   the fact that it began at 10 p.m., isn't that correct?

25   A    Yes.

CROSS EXAMINATION OF LAKEISHA MCCOY BY HARDING                195

1    Q    And you remembered the movie theater that it was in, is that

2    correct?

3    A    Yes.

4    Q    When you testified in the grand jury, you remembered that he

5    had paid for the movie tickets with a credit card.  Is that

6    correct?

7    A    I don't remember that.

8    Q    You don't --

9    A    I ain't never know he like paid with a credit card.  I don't

10   remember.

11   Q    Yeah.  And you weren't asked about that on direct, were you

12   Ms., I mean by Mr. Pyne, when he was questioning you.  He didn't

13   ask you about the method that Mr. Martin used to pay for the

14   tickets, did he?

15   A    No.

16   Q    Okay.  But back when you were interviewed by the homicide

17   detectives, you remember they took a taped statement from you

18   back in 2002?

19   A    Yes.

20   Q    Okay.  Do you remember them asking you, the detective asked,

21   All right, who paid for the movies?  And you answered, He did.

22   And then the detective said, And do you remember how he paid for

23   the movies?  You said, Credit card.  And then the detective said,

24   And that was his credit card?  And you said, Yes.  Do you

25   remember that?

1    A    No.

2    Q    Well, I happen to have a tape here of the conversation.

3    Would you like us -- let's just have a quick listen.

4              Oh, actually, I'm sorry.  No.  I'm going to have to

5    fast forward this a bit.

6              (Tape playing.)

7    Q    Does that refresh your recollection about your telling the

8    detectives back in November of 2002 that Mr. Martin paid for the

9    movie tickets with a credit card, his credit card?

10   A    I guess so.  That's my voice.

11   Q    Okay.  And do you remember submitting a sworn affidavit on

12   May 1st of 2002 to the Circuit Court for Baltimore City in

13   connection with Mr. Martin's state arrest in this case, Ms.

14   McCoy?  Do you remember that?

15   A    Ask me again.

16   Q    Do you remember filling out a sworn affidavit on May 1st of

17   2002, well before you were interviewed by the homicide

18   detectives?

19   A    No.

20   Q    You don't remember?

21   A    No.

22   Q    Is that your signature?

23   A    Yes.

24   Q    Does looking at this document refresh your recollection?

25   A    Yeah.  Yes.

1   Q    It does?  Okay.  Do you remember what you said about how the

2   tickets were acquired in your sworn affidavit?

3   A    It had to be what I said on the tape.

4   Q    Well, actually, it's not at all what you said on the tape.

5   Let me, maybe I should move this into evidence, Your Honor.  Or

6   should I just put it on the screen?

7        THE COURT:  Without objection, it's admitted.

8   Q    Okay.  This will be CR-7.

9        THE COURT:  Government's CR-7.

10  Q    You said, Mr. Martin and I arrived at the Owings Mills

11  theater at approximately 9:30 p.m.  We sat in the car and had a

12  drink.  Mr. Martin went into the theater and purchased the

13  tickets and returned to the car.  Mr. Martin and I then entered

14  the theater and remained in the theater for the entire 10:00

15  showing of Blade Two.

16        Do you remember that?

17  A    Yes.

18  Q    So what you initially told the police was that you weren't

19  even there when Mr. Martin bought the tickets?

20  A    When I said that?

21  Q    In this affidavit.

22  A    How wasn't I there?  I was there when he bought the tickets.

23  That's what the thing just said to me.  I was there.

24  Q    You waited in the car while he went in and bought the

25  tickets.  That's what it says, Ms. McCoy, doesn't it?

1    A    Yes.

2    Q    And then he returned to the car and then the both of you

3    went in and watched the movie?

4    A    Yes.

5    Q    So you have no idea how he paid for the tickets?

6    A    Right.

7    Q    So at some point someone came to you prior to your being

8    interviewed by the homicide detectives and told you that it was

9    important for you to say that he paid for the tickets with a

10   credit card, isn't that right, Ms. McCoy?

11   A    I don't remember.  Nobody ain't tell me it was important to

12   tell me he paid by a credit card.

13   Q    So your testimony here today is that you didn't know him to

14   pay with a credit card, is that correct, ever, for anything?

15   A    I don't remember.

16   Q    You don't remember.  Okay.  No further questions, Your

17   Honor.

18            REDIRECT EXAMINATION

19   BY MR. PYNE:

20   Q    Just two questions.  Just so the ladies and gentlemen of the

21   jury are clear.  You were not present when Shelly Wayne Martin

22   actually purchased the tickets.  You were in the car in the

23   parking lot?

24   A    Yes.

25   Q    And did anyone ever tell you that it was important for you

1   to say that Shelly Wayne Martin paid with a credit card?

2   A    No.

3   Q    All right.  That's all I have.  Thank you, Your Honor.

4            THE COURT:  Ms. McCoy, thank you very much.  You're

5   excused.

6            THE WITNESS:  Welcome.

7            THE COURT:  Ladies and gentlemen, we'll take a recess

8   at this time.  I think we have time for one more witness this

9   afternoon.  We're making good progress.

10           Please leave your note pads on your chairs.  Have no

11  discussion about the case or about any of the evidence you've

12  heard.  Continue to keep an open mind about all issues.  The

13  jury's excused for a 15 minute recess.

14           (Jury exits the courtroom.)

15           THE COURT:  Is Mr. Johnson the only one we've got left

16  today?  Nobody else has a witness?  Okay.  I'd like Mr. Johnson

17  brought down, please, when the defendants are brought back.

18  Immediately after, we'll deal with him first, and we'll have a

19  short voir dire.  And then we'll conclude.  We're in recess for

20  15 minutes.

21           (Recess at 4:17 p.m.)

22           (Jury not present in courtroom.  Defendants present.)

23           THE COURT:  All right.  Let's deal with Mr. Johnson.

24           MR. HARDING:  Could I raise one preliminary issue?

25           THE COURT:  Certainly.

1          MR. HARDING:  We have some of the witnesses in the

2     audience and I wish to invoke the sequestration rule.

3          THE COURT:  All right.  Who are the witnesses?

4          MR. HARDING:  Some of today's witnesses.

5          MR. MARTIN:  Already testified.

6          THE COURT:  They've already testified.  I think I

7     recognize Ms. Gardner and Ms. McCoy.

8          MR. HARDING:  Yes.

9          THE COURT:  Ms. Gardner and Ms. McCoy, you're free

10     remain in the courtroom for the balance of the trial so long as

11     you've been assured by counsel that you're not likely to be

12     recalled as a witness and so long as you do not discuss anything

13     that you see or hear in the courtroom with any other potential

14     witness in the case.  All right.  I think that takes care of it.

15          The record will reflect that I got a phone call from

16     the lead marshal, advising the Court that Mr. Johnson was

17     refusing to come down.  He did not wish to testify.  The message

18     I sent back was that the Court would like to address Mr. Johnson

19     and that it may well be that he will not have to testify, but I

20     need him to cooperate in coming to the courtroom.

21          Now, Mr. Kurland, I think you indicated, maybe I got it

22     wrong, that basically you wanted Mr. Johnson to answer, I thought

23     I heard four questions that, if I understood it, had already been

24     asked him in the state court trial.

25          MR. KURLAND:  Yes.

1          THE COURT:  What are those questions?

2          MR. KURLAND:  Okay.  The first question is when he went

3     and showed the apartment complex to Mr. Montgomery, he went with

4     Mr. Montgomery alone, which is consistent with his state court

5     testimony, where he says, I went out there with Will one time.

6     And also a page later he said --

7          THE COURT:  Wait.  Wait.  Wait.  Wait.

8          MR. KURLAND:  Okay.

9          THE COURT:  Just tell me what questions you wish to

10    ask.

11         MR. KURLAND:  The questions I wish to ask, I'm going to

12    ask him, I'm going to ask him, did there come a time in early

13    2002 that you pointed out the apartment building where Darius

14    Spence lived, you pointed that out to Mr. Will Montgomery?

15         THE COURT:  Okay.  That's one question.  What's the

16    next one?

17         MR. KURLAND:  And I wanted to clarify, just you and

18    him.

19         MR. HARDING:  That's a question that was not in the

20    state proceeding.

21         MR. KURLAND:  Well, he then goes on to say --

22         THE COURT:  What's the next question?

23         MR. KURLAND:  I'm going to ask him --

24         THE COURT:  What is the next question?  I just want to

25    hear the questions.

1          MR. KURLAND:  Sure.  I'm sorry.  At the time of the

2    June 7th, 2002 events, is it true that you had never met Mr.

3    Holly and Mr. Gardner?

4          THE COURT:  All right.  What's the next question?

5          MR. KURLAND:  The next question was going to be, at

6    that time, did you even, did you even know Mr. Holly or Mr.

7    Gardner?

8          THE COURT:  The next question?

9          MR. KURLAND:  The next question is going to be

10   questions concerning that he pled to a conspiracy to commit an

11   unarmed robbery, and show him the count of conviction.  This says

12   that he pled to unarmed robbery with Gardner and Holly, but then

13   ask him a question that was asked in the state court trial.  But

14   your agreement or anything you did with respect to this was with

15   Mr. Montgomery, to which he answered yes.

16         THE COURT:  I'm sorry, Mr. Kurland, I'm not following

17   you.  Was he asked about the unarmed robbery?  First of all, he

18   testified in the Gardner trial?

19         MR. KURLAND:  Yes.

20         THE COURT:  And he was asked about the armed robbery?

21         MR. KURLAND:  He was asked about his role in the events

22   and he said that he showed Will where --

23         THE COURT:  Right.  But I'm talking now about the armed

24   robbery.

25         MR. KURLAND:  He pled guilty.  He was originally

1    charged with murder and several other counts.  He pled guilty to

2    conspiracy to commit unarmed robbery with Holly and Gardner.

3    That was --

4              THE COURT:  In connection with the Spence matter?

5              MR. KURLAND:  Yes.  Yes.  That was elicited in the

6    state trial.  And he also went on to specifically be asked, but

7    you, your agreement or anything you did was with Mr. Montgomery?

8    And he said yes.

9              THE COURT:  Okay.  So if he doesn't want to testify,

10   you could actually read the transcript.  I mean, I think you

11   indicated that.

12             MR. KURLAND:  Yes.  And actually, we've worked out,

13   I've been talking over the break with Mr. Harding.  And we have

14   basically worked out a stipulation to read in portions of the

15   transcript.  There's a couple other points of disagreement

16   concerning how much of his prior criminal record he should be

17   able to get out, a 609(a)(1) issue, which we would put up to the

18   court.

19             We would ask that the transcript portions, over the

20   weekend Mr. Harding and I would work out the portions we want.

21   We would redact any reference to this specifically being --

22             THE COURT:  You're giving me way too much information,

23   Mr. Kurland.

24             MR. KURLAND:  I'm sorry.

25             THE COURT:  Way too much.  Maybe I jumped the gun.  Do

1    you no longer need Mr. Johnson?

2            MR. KURLAND:  I believe the government and myself has

3    worked out the contours of a stipulation that neither party is

4    going to renege on.  So no.

5            THE COURT:  So the answer is you don't need him?

6            MR. KURLAND:  As long as the government will represent

7    that we're going to be able to stipulate, I don't need him.

8            MR. HARDING:  Just so that it's clear, Your Honor, what

9    we agreed to, in view, we think that under Rule 804(b)(1), this

10   evidence would probably come in, the transcript of his trial

11   testimony.  We think that the entire trial testimony should come

12   in with the exception of anything that shows that Mr. Gardner was

13   on trial in state court for this crime.  I mean, it's, it could

14   be pretty easily redacted to do that.  So the government thinks

15   that what should come in is the entirety of the transcript.

16           THE COURT:  Okay.

17           MR. HARDING:  Plus we've agreed that he will, we will

18   get into evidence that particular charge from the charging

19   document that Mr. Johnson pled guilty to.

20           THE COURT:  All right.  Let me see if I have this

21   right.

22           MR. HARDING:  And just one more thing, Your Honor.

23           THE COURT:  Go ahead.

24           MR. HARDING:  And I hope I'm not causing a headache.

25           THE COURT:  No.  No, you're not.  Go ahead.

1          MR. HARDING:  If he were to testify, of course, I would

2     have a right to cross examine him about his prior convictions.

3          THE COURT:  Of course.

4          MR. HARDING:  So I wanted Mr. Kurland to stipulate to

5     the fact that he has about five prior convictions, four of them

6     narcotics offenses, and one of them the robbery that he pled to

7     in this case.

8          So Mr. Kurland, the hang-up, the only remaining hang-up

9     with that is that under Rule 609, he have a right to argue under

10    Rule 403 that some of those are more prejudicial than probative.

11    I think that the Court can indicate --

12         THE COURT:  Okay.  Now you are giving me a headache.

13         MR. HARDING:  I'd better sit down.

14         THE COURT:  Can we bring Mr. Johnson out, please?

15    Thank you.

16         (Mr. Johnson enters the courtroom.)

17         THE COURT:  Mr. Johnson, good afternoon.  This is Judge

18    Davis speaking to you, sir.  Over here.  Would you state, just

19    state your name, please?

20         MR. JOHNSON:  Jamane Johnson.

21         THE COURT:  All right.  Mr. Johnson, you've been

22    subpoenaed as a witness in this case to testify on behalf of the

23    defense.  The matters about which you will be questioned relate

24    almost entirely, as I understand it, to matters that you have

25    already testified about in state court.  It may be that you don't

1    have to testify at all because the lawyers have essentially

2    agreed to use your prior testimony in the form of a transcript so

3    that you don't have to testify.

4              It also appears that you have been granted immunity

5    both by the State and by the Federal Government such that you

6    cannot be prosecuted for anything that you might say so long as

7    you are truthful here this afternoon.

8              Now, I understand you are serving a sentence in state

9    Division of Correction.  Is that correct, sir?

10             MR. JOHNSON:  Yeah.

11             THE COURT :  All right.  You do not presently have an

12   attorney, is that correct?

13             MR. JOHNSON:  Correct.

14             THE COURT:  Okay.  So the question I have for you is,

15   are you willing to answer a few questions?  I'm told that it's

16   just a very few questions related to your relationship with Mr.

17   Montgomery and Mr. Gardner and the events of June 7, 2002, about

18   which you have already testified.

19             MR. JOHNSON:  No.

20             THE COURT:  Are you willing to testify?

21             MR. JOHNSON:  No.

22             THE COURT:  You would rather not testify?

23             MR. JOHNSON:  Right.

24             THE COURT:  Can you tell the Court why you would rather

25   not testify?

1          MR. JOHNSON:  Because I just don't know really the

2    whole situation I'm in.

3          THE COURT:  Okay.  If the Court says you don't have a

4    Fifth Amendment privilege and orders you to testify --

5          MR. JOHNSON:  I ain't --

6          THE COURT:  Just let me ask the question.  Will you

7    comply with the Court's order?

8          MR. JOHNSON:  I'm not testifying.

9          THE COURT:  So you would not comply with the Court's

10   order?

11         MR. JOHNSON:  I ain't testifying, period.

12         THE COURT:  You understand that you could found in

13   contempt of court if you don't testify?

14         MR. JOHNSON:  Yes.

15         THE COURT:  All right.  And your reason, again, is you

16   just don't want to be bothered?

17         MR. JOHNSON:  Yeah, right.

18         THE COURT:  Okay.  Counsel, from our earlier colloquy,

19   while it may well be that I could technically hold Mr. Johnson in

20   contempt, it sounds to me like you have substantially reached

21   agreement, perhaps with a couple of rulings from the Court, and

22   we can present Mr. Johnson's testimony by way of the transcript.

23   Is that satisfactory, Mr. Kurland?

24         MR. KURLAND:  Reluctantly, yes, Your Honor, that is

25   satisfactory.

1          MR. HARDING:  Yes, Your Honor.

2          THE COURT:  All right.  Mr. Johnson is excused.  Okay.

3          I thank counsel for your efforts this afternoon.  I

4     think we got through the afternoon very well.

5          Who do we have lined up for Monday?  Starting with Ms.

6     Rhodes.

7          MR. KURLAND:  Your Honor, one --

8          THE COURT:  I'll come back to you in a moment.  Just

9     want to get the jury out of here.

10         MR. HARDING:  Could I just say one thing about Jamane

11    Johnson, for the record?

12         THE COURT:  Go ahead.

13         MR. HARDING:  The government does not consider his

14    testimony in the state court proceedings to be truthful and the

15    use immunity letter that we gave him on that occasion was

16    conditioned upon his complete truthfulness.

17         THE COURT:  I see.  So he does have a Fifth Amendment

18    privilege.  I'm sorry.  I should have asked you, Mr. Harding.

19         MR. HARDING:  I just want that to be on the record.

20    We're still going to stipulate because even if he asserted his

21    Fifth Amendment right --

22         THE COURT:  Sure, of course.

23         MR. HARDING:  -- still would make him unavailable.

24         THE COURT:  Sure.  But I appreciate the correction

25    because, in fact, I was labeling under the misapprehension that

1    he had testified in a manner that the federal and state

2    governments believed to be truthful.  But thanks for clarifying

3    that.

4              All right.  Who do we have, Ms. Rhodes?

5              MS. RHODES:  Your Honor, first of all, I think Mr.

6    Flannery might have another five or ten minutes today.

7              THE COURT:  Mr. Who?

8              MS. RHODES:  Mr. Flannery.

9              THE COURT:  Oh, you got another witness?

10             MR. MARTIN:  Your Honor, we have, we want to play the

11   cell phone tape again with a transcript.

12             THE COURT:  With whom?  With whom on the stand?

13             MR. MARTIN:  Your Honor, we don't have to have anybody

14   on the stand.

15             THE COURT:  No.  I didn't say you had to.  But Ms.

16   Rhodes said you had -- well, I guess she said you had ten more

17   minutes.  I thought she meant another witness.  So you don't have

18   another witness?

19             MR. MARTIN:  No, not today, Your Honor.

20             THE COURT:  You have a witness on Monday?

21             MR. MARTIN:  We are not sure.  We were supposed to meet

22   with the witness last night.  We didn't, but we're going to try

23   to do it tomorrow.  I think we will have one.

24             THE COURT:  All right.  We'll do that.  So who do we

25   have, Ms. Rhodes?

1          You know, before I do that, I had forgotten.  Let's do

2     the tape and then we can deal with that.  Yes, Mr. Kurland?

3          MR. KURLAND:  Your Honor, particularly in light of the

4     last witness' testimony and, again, the government's cross

5     examination with the emphasis on state court proceedings, could

6     the jury be instructed today with the dual sovereignty

7     instruction so it doesn't just come --

8          THE COURT:  Of course.  And I, I frankly meant to do it

9     this morning.  And with the jurors being excused and all that, I

10    just had forgotten it.

11         MR. KURLAND:  My stress test will go so much better

12    tomorrow if that instruction is given.

13         THE COURT:  I will give it as soon as Mr. Martin has

14    concluded the tape.

15         MR. KURLAND:  Your Honor, thank you very much.

16         THE COURT:  Let's have the jury, please.

17         (Jury enters the courtroom.)

18         MR. MARTIN:  Your Honor, I have, you recall --

19         THE COURT:  Good afternoon, ladies and gentlemen.  Yes,

20    Mr. Martin.

21         MR. MARTIN:  Your Honor, I have what I marked as

22    Defendant's Exhibit 6, which is a state's request for discovery

23    from the state analog case to this case, to the Mitchell, the

24    transcript that we had earlier with Niedermeier several weeks

25    ago.  Seems like two years ago.  And I have a certified copy from

1   the court file of everything that was filed in the court record.

2   Mr. Harding is going to oppose me using this.

3           THE COURT:  May I see it, please?

4           MR. MARTIN:  Sure, Your Honor.  I'm really only

5   interested in the last couple pages, Your Honor, the transcript

6   itself.

7           THE COURT:  So Mr. Martin, are you able to identify the

8   author of this?

9           MR. MARTIN:  No, Your Honor, I'm not able to identify

10  anything other than it was filed in the state court by the State

11  Attorney's Office.  And I don't seek to admit it, Your Honor.  I

12  just would like to have the jury look at the transcript while we

13  play the tape.

14          THE COURT:  All right.  Well, the objection -- you

15  should state your objection, Mr. Harding.

16          MR. HARDING:  Yes.  Your Honor, this was, this was

17  filed with the Court but it's not an official court document.

18  It's just that the state court requires the state prosecutors and

19  the attorneys to deposit all of their discovery items with the

20  court file.

21          THE COURT:  All right.

22          MR. HARDING:  So it's not a real court record.  And we

23  have no author for this.

24          THE COURT:  Right.  Okay.  The objection's sustained,

25  Mr. Martin.  I understand, the certification certainly is fine

1    and I understand your contention that it is part of an official

2    record.  But as you well know, there's got to be a greater

3    showing of reliability than simply that it found its way into a

4    court record.

5          MR. MARTIN:  That's fine, Your Honor.  We have a

6    transcript.  You will recall in the beginning of this case you

7    said we could present our own transcripts.  We have one that we

8    have prepared, I would like the jury to follow along with.  I'll

9    give one to the Court now.

10         THE COURT:  Okay.  So this is prepared by you and Mr.

11   Flannery?  Okay.  All right.  You want to hand them out to the

12   jury?  So ladies and gentlemen, the same instruction applies to

13   the transcript that you're now going to be provided as you listen

14   to the tape of the voice mail recording which was previously made

15   in this case.  And thus, to the extent that you believe you hear

16   something on the tape that varies from what you believe you hear

17   in the transcript, you are to be guided by what you believe you

18   hear on the tape.  It is the tape that is the actual evidence in

19   the case.

20         MR. MARTIN:  Your Honor, I don't think I need to remain

21   here while we do this.

22         THE COURT:  Certainly.

23         MR. MARTIN:  Mr. Flannery's going to play it from over

24   here.

25         THE COURT:  All right.

1          MR. FLANNERY:  Government's Exhibit W-33.

2          (Tape played.)

3          MR. MARTIN:  Your Honor, I should collect these from

4     the jury?

5          THE COURT:  Yes.  Thank you.  Ladies and gentlemen,

6     that will -- there are a few more, Mr. Martin.

7          MR. MARTIN:  I'm sorry.

8          MR. HARDING:  Your Honor, before the jury goes.

9          THE COURT:  All right.

10          MR. HARDING:  Just like to suggest that Mr. Martin mark

11     for identification the transcript.  Mark for identification only.

12          THE COURT:  Yes.

13          MR. HARDING:  And also, Mr. Pyne and I have agreed that

14     the tape recording of Lakeisha McCoy's statement that was played

15     earlier will come into evidence as Government Exhibit CR-8.

16          THE COURT:  The entire statement?

17          MR. HARDING:  Yes.

18          THE COURT:  The entire --

19          MR. HARDING:  Tape.

20          THE COURT:  -- tape.  All right.  CR --

21          MR. HARDING:  CR-8.

22          THE COURT:  -- eight is the tape of Ms. McCoy's

23     interview.  And Harris Six.

24          MR. MARTIN:  Harris Six was already marked, Your Honor.

25     Belinda has it.

1          THE COURT:  For identification, the transcript

2     proffered by Mr. Harris.

3          All right.  Ladies and gentlemen, again, thank you so

4     very much for your patience, your cooperation, your

5     understanding, as we make our way through the balance of the

6     trial.

7          We will be in session on Monday, not tomorrow.  You

8     have tomorrow off.  We will resume at 9:30 on Monday morning.  I

9     expect we're going to have a full day on Monday.  I expect that

10    there's a chance that we will conclude all of the evidence on

11    Monday, but I think it's only a small chance.  I think we are

12    probably going to be over into Tuesday with additional evidence.

13    But I fully expect that the evidence will conclude on Tuesday.

14    And then we'll have the balance of next week for closing

15    argument, jury instructions, and for you to begin your

16    deliberations.

17         With regard to Juror Number Three, I don't know if any

18    of you have her address or if any of you would like to send her a

19    note or any such thing as that.  But I will tell you that if you

20    wish to do so, if any of you wish to send a card or best wishes

21    to that juror, while we can't give you her address, I assure you

22    that if you give a sealed envelope to Ms. Arrington, the Court

23    will see to it that whatever you wish to send to her in the way

24    of your expressions of good wishes we will forward to her under

25    the circumstances.

1          So with that, enjoy your weekend.  Please continue to

2     keep an open mind about all issues.  Conduct no investigation,

3     avoid any media reports about the case.  Do not discuss the case.

4     Conduct no investigation of any sort online, offline, or any

5     books.  Do not visit the location of any of the scenes mentioned

6     in the testimony.

7          Enjoy your weekend, ladies and gentlemen.  We'll see

8     you Monday morning at 9:30 to continue the trial.

9          MR. KURLAND:  Your Honor --

10          THE COURT:  I'm sorry.  If I can ask you to have a seat

11     for just a moment.  Thank you, Mr. Kurland.

12          MR. KURLAND:  All right.  I didn't mean to delay

13     proceedings.

14          THE COURT:  There is one instruction that I want to

15     give you today.  I could have given it to you at an earlier point

16     in the trial but this seems to be a particularly appropriate

17     time.  And I will repeat this instruction as a part of my larger

18     instructions next week.  But I want to leave you with this at the

19     end of the week.

20          This is a federal prosecution.  Many of the federal

21     charges in the indictment refer to and incorporate to some degree

22     violations of the criminal law of the State of Maryland.

23          You have heard some evidence in this trial concerning

24     the outcomes of some prior state prosecutions.  In some

25     circumstances a witness remembered the particular outcome and in

1   some circumstances they did not recall the particular outcome.

2   In other instances, you've heard references to testimony given at

3   a prior proceeding or trial but there was no inquiry concerning

4   the outcome.

5          You are not to speculate about the purpose or outcome

6   of any prior proceedings and you must reach your decision in this

7   case by evaluating the evidence in this case to determine whether

8   the government has proven each and every element of each offense

9   beyond a reasonable doubt.

10         Under our system of government, both the federal

11   government and the state government may undertake a criminal

12   prosecution for the same general underlying conduct if the

13   underlying conduct constitutes a crime under both state and

14   federal law.

15         Under the dual sovereignty doctrine, which is a

16   doctrine of the law, the federal government can bring federal

17   criminal charges even if state prosecutors may have previously

18   prosecuted the same general underlying conduct under state law.

19   Moreover, the federal government's decision to go forward with a

20   federal prosecution is based on a variety of factors.  It is not

21   dependent on a particular result, if any, of a prior prosecution.

22   Indeed, federal prosecutions often are authorized even after a

23   prior state prosecution has resulted in a conviction.

24         Even though the charges may sound similar and there may

25   be significant overlap of elements, the federal charges often

1    require proof of several elements that are not a part of any

2    state prosecution.

3            In addition, whether or not the State of Maryland has

4    previously prosecuted some of the alleged criminal acts that you

5    have heard about during this trial, your verdict in this case

6    will have no legal effect on whether the State of Maryland

7    determines to bring a state prosecution after this case.

8            You will consider this instruction together with all of

9    my instructions during your deliberations, ladies and gentlemen.

10   And I will remind you now that when I instruct you on the law

11   next week, I will read the instructions to you.  I hope, also, to

12   have my instructions programmed into the evidence system so that

13   you, if you choose to, can also read along with me as I read them

14   to you.

15           And then finally, each of you will have a separate copy

16   of the instructions, together with the exhibits that will be sent

17   into the jury room for your use during your deliberations.

18           So with that, have a pleasant weekend.  We'll see you

19   on Monday morning at 9:30.  Thank you very much.  Please leave

20   your note pads on your chairs.

21           (Jury exits the courtroom.)

22           THE COURT:  Nice catch, Mr. Kurland.  The grandfather's

23   brain works most of the time, not all of the time.

24           MR. MARTIN:  You didn't think he was going to let you

25   get away with it.

1          THE COURT:  Not a chance.  Not a chance.  Okay.  Ms.

2     Rhodes, who do we have?

3          MS. RHODES:  Your Honor, for Monday, I have about three

4     and a half hours worth of witnesses and about an hour and a half

5     Tuesday.

6          THE COURT:  I'm sorry?

7          MS. RHODES:  An hour and a half Tuesday.

8          THE COURT:  Okay.

9          MS. RHODES:  The rap expert is coming in for Tuesday

10     morning.

11          THE COURT:  Is Tuesday morning.  Okay.

12          MS. RHODES:  And there may be, I'm not 100% sure yet,

13     there may be, I'm assuming another half hour of somebody else who

14     night not be able to get here Monday.

15          THE COURT:  Okay.  All right.  Mr. Coburn?

16          MR. COBURN:  Am I next, Your Honor?

17          THE COURT:  You're next.

18          MR. COBURN:  I had mentioned earlier this afternoon

19     that I had a number of different things I was hoping to ask Your

20     Honor.  I know the hour is kind of late.

21          THE COURT:  No.  Let's see if we can get through them.

22          MR. COBURN:  Okay.  The first and most important thing,

23     I just wanted to give the Court and government a heads-up in

24     terms of what we're planning.  The first and most important has

25     to do with this expert issue.

1          THE COURT:  The ballistics?

2          MR. COBURN:  Exactly.

3          THE COURT:  What is that all about?

4          MR. COBURN:  Basically, Your Honor, if I could just

5     show Your Honor this thing which I marked.

6          THE COURT:  You don't have to show me.  Just tell me.

7          MR. COBURN:  Absolutely.  I'll be very direct about it.

8          THE COURT:  You described it as a rebuttal expert on

9     ballistics.

10         MR. COBURN:  Yeah.

11         THE COURT:  Okay.  Just cut to the chase.

12         MR. COBURN:  Their expert, Ms. Sullivan, the one from

13    Baltimore City, testified that she had made a bullet to bullet

14    comparison of the squashed bullets with respect to the Wyche

15    homicide and the Lee homicide.  I've got an expert, in fact,

16    possibly two experts, who will testify that that can't be done.

17    Can't be done.

18         THE COURT:  Well, you got to give me more than that.

19    That's all they're going to say, it can't be done?  I assume

20    you're saying that they've looked at the same bullets?

21         MR. COBURN:  They haven't.

22         THE COURT:  Well, then, they're not going to testify.

23         MR. COBURN:  Well, they're --

24         THE COURT:  No.  They cannot come in here in the

25    abstract and say that something that a witness claims to have

1    done using real evidence, microscopically, that that witness

2    can't do it.  You haven't shown them the bullets.  I'm not

3    faulting you.  But I'm not going to permit them to come in and

4    testify abstractly that something can't be done when a witness

5    with her experience has come in and said, that's what I've done.

6    I understand the government also has a notice issue.

7         MR. COBURN:  They do.  They do.  Your Honor, I have a

8    long proffer about this.  I will just seek to make it in writing,

9    if possible.

10        THE COURT:  I agree.  Please make it in writing.  I'll

11   look at it over the weekend.  Maybe I'll change my mind, but I

12   don't think I'm going to change my mind.  What's the next thing?

13        MR. COBURN:  Everything else is just a lot quicker.  I

14   just wanted to give the Court a heads-up.  Some of this may not

15   pan out at all.

16        THE COURT:  Go ahead.

17        MR. COBURN:  I wanted to let Your Honor know over the

18   last week or so I've been in touch repeatedly with Bell South and

19   with the particular entity that Bell South contracted with to

20   manufacture and market the Bell South Model 1010 walkie-talkie.

21        I may have a witness from there who will testify very

22   briefly about the way in which those walkie-talkies were

23   marketed.  But it's possible that I won't.  I just wanted to let

24   Your Honor know it's a possibility.

25        THE COURT:  Okay.

221

1          MR. COBURN:  Excuse me.  We've also, and this is

2     something I think we're just not going to go in this direction.

3     In fact, I'm not even going to bother Your Honor with it.

4          THE COURT:  Did you decide not to bring the

5     eyewitnesses in?

6          MR. COBURN:  One of them --

7          THE COURT:  You had one here today?

8          MR. COBURN:  The one that was here today, we're not

9     going to call.  There is another one who I think's going to be

10    very quick, who I think we are going to call.

11         THE COURT:  On Monday?

12         MR. COBURN:  On Monday, with the Court's permission.

13         THE COURT:  All right.

14         MR. COBURN:  I would still like, if possible, to get

15    the AFPN web site into evidence.  I misunderstood what we talked

16    about it last week in terms of how to go about it.

17         THE COURT:  You can't do it through Detective Benson.

18    He's never seen it.  If the government wants -- I think the

19    government's going to stipulate, if you can give them the web

20    site.  But the problem -- well, I'll hear from Mr. Harding.

21         Your problem, Mr. Coburn, I think, maybe, I don't know,

22    but it may be that you need to go back to 2005, 2006.  If you

23    just got something today, there's simply no way the government's

24    going to be able to stipulate that it was there in 2006, unless,

25    I suppose, unless it's dated.

222

1          MR. COBURN:  I may be able to call a witness who can

2     testify just about that.

3          THE COURT:  Okay.

4          MR. COBURN:  The other things I just wanted to apprise

5     Your Honor of, there's one other relative of Mr. Gardner who,

6     will probably be even shorter than Nicole Gardner, who we might

7     call.

8          And the last thing is, if Your Honor thinks back to, I

9     think it was the first government witness in this case was Darryl

10    Bacon, we had reserved -- pardon me -- the right to recall him.

11    And the reason was because, and this is going back quite a ways,

12    but it has to do with some materials that Mr. Gardner had in his

13    jail cell in Jessup.  And we have been trying since that time to

14    get access to those materials.  And it's been a long flurry of

15    phone calls back and forth with the Department of Corrections.

16         And basically, the upshot of those calls is that,

17    apparently, the DOC makes a distinction between what's called

18    base inmate possessions and other inmate possessions.  What

19    they're telling us is that the marshals can simply come by, I

20    don't know if, how this is done, precisely, or if it can be done,

21    but if the marshals go by the Jessup annex where he was

22    incarcerated, they will give the materials to them.  And we can

23    then have access to them.

24         There's something in there that relates directly to Mr.

25    Bacon which we were hoping to be able to use to examine him on.

1    Or possibly just put into evidence by stipulation with the

2    government.

3            THE COURT:  I can't help you, Mr. Coburn.  I'm sorry.

4    You're telling the Court that DOC will not release an inmate's

5    property to a family member?

6            MR. COBURN:  That's what they're telling us.  I'll

7    give, again, I'll do it in writing, Your Honor -- I'm going to

8    give Your Honor a point-by-point description of who we talked to

9    and what they told us.

10           THE COURT:  The only reason I can think of why that

11   would be is because if the inmate's not there, you know, the

12   inmate could say, you stole it.

13           MR. COBURN:  I'm sure Your Honor's right.  I don't

14   understand what the reasons for their procedures are.  But it's

15   been a tough --

16           THE COURT:  Can you say what it is that --

17           MR. COBURN:  A letter.

18           THE COURT:  You don't know for a fact that it's there?

19           MR. COBURN:  I believe for a fact that it's there.

20           THE COURT:  Well, what does that mean?  I believe for a

21   fact it's there?  You didn't send it there, did you?

22           MR. COBURN:  No.

23           THE COURT:  Okay.  All right.  So how could you

24   possibly know whether it's there and how could you possibly know

25   the contents of some letter among Mr. Gardner's belongings?

224

1          MR. COBURN:  Well, I'm sure Your Honor can infer my

2     source of information about this.

3          THE COURT:  Well, I understand the source of

4     information.  Is it a letter to or from Mr. Bacon?

5          MR. COBURN:  It's from Mr. Bacon to Mr. Gardner.

6          THE COURT:  I'm sorry, Mr. Coburn.  I have never

7     experienced on this court certainly that there was ever any

8     problem with, with defendants bringing their legal materials with

9     them into court.  It happens every day.  I'm not faulting Mr.

10    Gardner.  But Mr. Gardner knew on September 15th this trial was

11    starting.

12         And your original request had to do with his appeal and

13    post-conviction and there were papers he was working on.

14         MR. COBURN:  That's true.

15         THE COURT:  And now this, at this stage of the case, to

16    say, oh, and by the way, there was material back in his cell

17    related to a letter from Mr. Bacon.

18         MR. COBURN:  Well, I mean, I understand exactly.

19         THE COURT:  Look, I will sign an order.  If you can get

20    Mr. Gardner to sign something, and I suppose, I mean, it's hard

21    to get something, well, it's not too hard to get something

22    notarized when you're locked up.  He's going to be at Supermax

23    over the weekend, right?  So if you can get him to sign a

24    notarized statement, which I guess they would require.  In fact,

25    if he's at Supermax, he doesn't need to notarize it.  The

1     correctional officers at Supermax can witness his signature,

2     authorizing a release of his property, I would assume, to his

3     attorney, if you want to drive out to Jessup.

4           MR. COBURN:  I'll do whatever I need to do.

5           THE COURT:  Or send a family member.  I'll sign an

6     order sort of verifying Mr. Gardner's signature or something.

7     Okay?

8           MR. COBURN:  Much appreciated, Your Honor.  I'm going

9     to try to do it right now, and see if that's going to suffice.

10          THE COURT:  Okay.  Anything else?  I like that part

11    where you said you weren't going to even bother me with it.

12          MR. COBURN:  I don't think so, Your Honor.  Thank you.

13          THE COURT:  Anybody else?  Mr. Crowe?

14          MR. CROWE:  Yes, Your Honor.  We have the defendant's

15    mother, whom we expect to testify on Monday.

16          THE COURT:  Very briefly.

17          MR. CROWE:  Very briefly.  I don't expect my direct's

18    going to be more than ten minutes, maybe less than that.  We've

19    had, I have really messed up her schedule because I had her here

20    all day on Monday.  We had her scheduled to come down today and

21    when the whole list of witnesses came out, other people wanted to

22    go first and I told her to come back.

23          THE COURT:  Okay.

24          MR. CROWE:  So we'd just like some flexibility in

25    getting her on.  I expect it will be in the morning because she

1   typically goes to work about 2:00 in the afternoon.  We may have

2   one other witness who will be very, very brief.

3           THE COURT:  Thank you very much.  Mr. Kurland.

4           MR. KURLAND:  Your Honor, I've just been looking over

5   the Jamane Johnson state transcripts.  They're only about 21

6   pages long.  At the appropriate time once we work out, it would

7   take ten minutes to have them read into the record and perhaps

8   one of the law clerks could play the role of Mr. Johnson.

9           THE COURT:  No.  Not one of my law clerks.  But one of

10  your law clerks or --

11          MR. COBURN:  I can do it if that would be a problem.

12          MR. KURLAND:  If it's Tuesday, when Mr. Coburn's not

13  here, I'll find someone.

14          THE COURT:  I hope we can do it Monday when Mr. Coburn

15  is here.

16          MR. KURLAND:  I don't think that should be a problem.

17  Thank you.

18          MR. HARDING:  The government agreed to the admission of

19  the transcript, but not to their reading it aloud in the

20  courtroom.

21          THE COURT:  Well, that's typically the way to do it.

22  It's like a deposition.  I don't think it would take long.  Just

23  have Mr. Kurland read the questions and somebody read the

24  answers.

25          MR. KURLAND:  I'll work it out with Mr. Harding,

1    certainly by Monday.

2            THE COURT:  Okay.  All right.  Very good.

3            Well, here's the way it sounds to me.  It sounds to me

4    that we are going to be in a position to excuse the jury at

5    lunchtime on Monday, perhaps with late lunch, or perhaps actually

6    bring the jury back and excuse the jury in early afternoon.  And

7    then Ms. Rhodes has, did you say two hours or so, give or take?

8            MS. RHODES:  On Tuesday morning, probably.

9            THE COURT:  On Tuesday morning.  And there may be some

10   additional testimony perhaps on Tuesday.  And, of course, each of

11   the defendants has to make an election.

12           But in any event, it sounds like we're probably going

13   to have Tuesday afternoon available to us to review final

14   instructions and still get you out of here reasonably early on

15   Tuesday afternoon.  And so that would be great.

16           Please, please, please, even if you sent me or filed

17   jury instructions before, I would really appreciate if you could

18   e-mail a Word Perfect or Word version of your request for

19   instructions, all defendants and government.  And I assure you

20   I'm going to be hard at work this weekend trying to pull together

21   a draft of my charge.  And I hope to actually have it available

22   to you before we break on Monday so you can take it home with you

23   on Monday afternoon, look it over, and then when we come back

24   together on Tuesday, to really get down to cases and see if we

25   can't really polish it up so that when you argue on Tuesday, on

1    Wednesday morning, you will know exactly what the charge is going

2    to be.

3         Mr. Harding, was I anywhere near close to right, that

4    you probably wouldn't use the full three hours in your opening

5    close?  Or are you going to use the full three, assuming you do a

6    three and one?

7         MR. HARDING:  Mr. Hanlon is going to do the opening

8    close, Your Honor.  And I haven't discussed it with him.  We

9    have, I thought we had four hours for both that and rebuttal.

10        THE COURT:  Right.  Three and one.

11        MR. HARDING:  I imagine that Mr. Hanlon is not going to

12   want to use the full three hours, that's true.  But I hesitate

13   to --

14        THE COURT:  No. I understand.  And the reason I ask is,

15   you know, if we can get it all done on Wednesday, then all the

16   better.  But it may be, and I assume the government has no

17   objection, if Mr. Kurland wants to carry over to Thursday

18   morning, you won't have any objection to that?

19        MR. HARDING:  No, Your Honor.

20        THE COURT:  Okay.  Excellent.

21        MR. KURLAND:  Your Honor, I want to go complete, either

22   the end of the day Wednesday or the beginning --

23        THE COURT:  I see.  So you would rather not break it

24   up?

25        MR. KURLAND:  Yeah.

229

1          THE COURT:  Okay.  So we probably ought to have as our
2   working assumption that you will go on Thursday morning.
3          MR. KURLAND:  But I will be ready Wednesday afternoon
4   if need be.
5          THE COURT:  Otherwise, Ms. Zajac will have all our
6   heads.
7          All right.  Thank you all very much.  I look for those
8   jury instructions as soon as you can get them in the e-mail, and
9   I'll see you on Monday morning.
10         Sorry.  One last thing.  Mr. Martin, I'm going to hand
11  to Ms. Arrington Harris 6.  Or did we call the other one six?
12         MR. MARTIN:  We called the other one six, Your Honor.
13         THE COURT:  So let's make this Harris 7 for
14  identification.  That being the certified record from the Circuit
15  court.
16         (Conclusion of Proceedings at 5:25 p.m.)
17
18
19
20
21
22
23
24
25

230

1                                INDEX

2

3                                                          PAGE

4   WITNESS: TFO KEITH BENSON
    REDIRECT EXAMINATION BY MR. HARDING              15
5   RECROSS EXAMINATION BY MR. MARTIN                25
    RECROSS EXAMINATION BY MR. PYNE                  27
6   RECROSS EXAMINATION BY MR. COBURN                38

7   WITNESS: NICOLE GARDNER
    DIRECT EXAMINATION BY MR. COBURN                144
8   CROSS EXAMINATION BY MR. HANLON                 151

9   WITNESS: PATRICK DULANEY
    DIRECT EXAMINATION BY MR. FLANNERY              158
10  CROSS EXAMINATION BY MR. HARDING                164
    REDIRECT EXAMINATION BY MR. FLANNERY            175
11
    WITNESS: LAKEISHA MCCOY
12  DIRECT EXAMINATION BY MR. PYNE                  178
    CROSS EXAMINATION BY MR. HARDING                187
13  REDIRECT EXAMINATION BY MR. PYNE                198

14

15

16

17

18

19

20

21

22

23

24

25

231

1                      REPORTER'S CERTIFICATE

2

3          I, Mary M. Zajac, do hereby certify that I recorded

4   stenographically the proceedings in the matter of USA v. Willie

5   Mitchell, et al., Case Number(s) AMD-04-029, on November 13,

6   2009.

7          I further certify that the foregoing pages constitute

8   the official transcript of proceedings as transcribed by me to

9   the within matter in a complete and accurate manner.

10         In Witness Whereof, I have hereunto affixed my

11  signature this _____ day of _____, 2009.

12

13

14

15                       _____

                         Mary M. Zajac,
16                       Official Court Reporter

17

18

19

20

21

22

23

24

25

**'**

**'01** [2] - 95:20, 95:21
**'02** [1] - 151:25
**'90s** [3] - 93:11, 107:6, 188:2
**'94** [4] - 68:2, 69:3, 80:11, 189:9
**'95** [1] - 69:3
**'96** [2] - 69:3, 106:25
**'97** [4] - 69:4, 107:1, 107:2
**'98** [4] - 69:4, 107:3, 109:1
**'99** [3] - 80:11, 97:2, 107:4

**0**

**08** [1] - 17:24

**1**

**1** [5] - 13:24, 18:11, 53:14, 96:11, 148:19
**10** [7] - 13:24, 20:9, 28:22, 39:24, 53:14, 88:8, 194:24
**100%** [2] - 114:17, 218:12
**101** [1] - 1:25
**1010** [1] - 220:20
**1099** [4] - 153:7, 153:10, 153:11, 153:15
**10:00** [3] - 91:24, 183:22, 197:14
**10:36** [1] - 99:1
**10:38** [2] - 99:1, 99:2
**10:39** [1] - 99:2
**10:42** [1] - 99:1
**10:43** [1] - 99:1
**11** [5] - 13:24, 39:24, 44:12, 44:14, 53:14
**1103** [1] - 178:15
**11:30** [1] - 127:25
**11:35** [2] - 99:4, 99:7
**11:36** [1] - 99:12
**11:37** [4] - 92:14, 100:11, 127:19
**11:48** [1] - 116:24
**11:49** [1] - 19:5
**11:55** [1] - 90:1
**11:59** [1] - 20:22
**12** [15] - 17:24, 20:20, 20:21, 28:22, 53:14, 68:13, 69:25, 80:20, 88:8, 89:3, 90:15, 92:25, 121:20, 148:19, 156:19

**1241** [18] - 22:6, 22:21, 23:2, 23:3, 23:5, 23:9, 23:12, 23:17, 23:24, 24:5, 24:19, 40:23, 41:8, 41:17, 43:3, 43:11, 43:21
**1253** [8] - 22:14, 23:9, 23:11, 24:10, 24:20, 43:9, 43:15, 43:23
**12:00** [3] - 10:2, 20:21, 20:22
**12:07** [6] - 18:19, 21:20, 36:11, 36:19, 37:16, 38:8
**12:08** [6] - 17:24, 18:18, 21:24, 35:3, 37:18, 38:10
**12:08:40** [1] - 36:3
**12:31** [1] - 117:1
**12:38** [2] - 19:5, 117:1
**12th** [1] - 45:24
**13** [3] - 1:11, 53:14, 231:5
**13th** [4] - 42:14, 42:16, 42:25
**14** [4] - 38:4, 53:14, 90:15, 147:1
**144** [1] - 230:7
**14th** [1] - 136:19
**15** [12] - 12:14, 19:24, 20:4, 20:9, 135:16, 179:17, 179:24, 189:4, 189:8, 199:13, 199:20, 230:4
**151** [1] - 230:8
**158** [1] - 230:9
**15th** [1] - 224:10
**16** [4] - 96:11, 179:17, 179:24, 189:4
**164** [1] - 230:10
**169** [1] - 96:9
**16th** [1] - 97:24
**17** [2] - 101:19, 104:19
**175** [1] - 230:10
**178** [1] - 230:12
**18** [6] - 49:20, 50:1, 87:10, 94:11, 103:22, 103:23
**187** [1] - 230:12
**18th** [1] - 95:7
**19** [1] - 116:24
**1933** [12] - 22:25, 23:1, 23:7, 23:8, 23:14, 27:25, 41:1, 41:21, 42:2, 43:12, 43:16, 43:18, 92:11
**1959** [4] - 117:21, 117:24, 118:9, 131:12
**1959's** [1] - 113:19
**1959(a** [1] - 84:20
**1975** [1] - 56:1
**198** [1] - 230:13
**1993** [1] - 189:8
**1994** [7] - 54:4, 58:15,

61:8, 67:9, 107:16, 107:19, 107:21
**1997** [4] - 69:20, 108:3, 109:1
**1998** [1] - 108:3
**1999** [12] - 54:4, 67:9, 80:9, 94:11, 104:3, 160:11, 160:13, 161:8, 162:16, 164:3, 177:6, 192:17
**1:30** [2] - 89:20, 89:25
**1st** [4] - 31:12, 196:12, 196:16

**2**

**2** [2] - 40:21, 53:14
**20** [6] - 17:3, 20:2, 23:2, 41:10, 49:1, 135:16
**2000** [11] - 54:4, 54:24, 55:22, 93:13, 107:5, 107:10, 107:12, 107:19, 108:25, 113:13, 155:21
**2001** [2] - 152:9, 156:23
**2002** [24] - 31:21, 42:16, 49:18, 91:5, 94:15, 95:23, 96:11, 151:22, 157:9, 157:16, 180:2, 180:15, 181:13, 188:22, 190:17, 193:2, 195:18, 196:8, 196:12, 196:17, 201:13, 202:2, 206:17
**2004** [4] - 45:23, 49:25, 136:19, 145:16
**2005** [3] - 45:24, 145:16, 221:22
**2006** [5] - 58:15, 61:8, 68:2, 221:22, 221:24
**2008** [1] - 1:11
**2009** [2] - 231:6, 231:11
**21** [1] - 226:5
**21201** [1] - 1:25
**22** [3] - 49:25, 99:13, 99:19
**23** [1] - 38:18
**24** [2] - 38:15, 91:5
**24th** [4] - 40:17, 92:11, 180:13, 180:15
**25** [1] - 230:5
**25%** [1] - 69:21
**25th** [16] - 17:12, 18:2, 21:21, 23:3, 24:4, 40:17, 40:18, 40:21, 41:6, 41:10, 41:11, 41:15, 43:5, 43:12, 43:14
**26th** [9] - 22:9, 22:21, 23:1, 23:18, 24:7, 24:15, 43:7, 43:23
**27** [2] - 19:6, 230:5

**29** [12] - 53:3, 76:10, 76:14, 79:24, 84:8, 105:25, 107:17, 117:18, 126:22, 127:13, 129:11, 189:7
**29'd** [2] - 122:23, 127:10
**2:00** [2] - 89:22, 226:1
**2:15** [3] - 89:4, 89:7, 89:22
**2:58** [1] - 24:4
**2nd** [1] - 97:24

**3**

**3** [8] - 8:9, 8:14, 8:17, 8:20, 8:23, 9:3, 9:6, 53:14
**30** [8] - 13:1, 17:3, 19:24, 20:2, 20:8, 52:15, 52:22, 52:23
**30,000** [1] - 42:8
**30th** [2] - 23:4, 23:7
**31** [1] - 19:7
**35** [1] - 18:11
**357** [2] - 125:3, 125:5
**38** [1] - 230:6
**3912** [2] - 28:9, 31:10

**4**

**4** [1] - 53:14
**4-B** [3] - 71:24, 72:2, 72:24
**4-D** [3] - 62:4, 76:21, 79:5
**40** [22] - 17:24, 17:25, 18:18, 18:19, 19:6, 20:8, 20:21, 21:20, 21:24, 37:6, 117:4, 123:15, 123:16, 123:19, 124:20, 124:23, 125:1, 125:6, 125:9, 125:13, 125:19, 126:5
**403** [1] - 205:10
**443-838-1933** [2] - 47:23, 47:25
**45** [4] - 30:13, 135:15, 138:17, 138:23
**48** [2] - 47:17, 98:25
**4:00** [1] - 139:8
**4:17** [1] - 199:21
**4:50** [2] - 157:17, 157:19
**4th** [2] - 31:12, 45:23

**5**

**5** [4] - 44:14, 53:14, 89:3, 157:9
**5515** [1] - 1:24
**5811** [2] - 31:1, 37:5
**5:00** [1] - 157:17
**5:23** [1] - 24:7
**5:25** [1] - 229:16

**6**

**6** [3] - 53:14, 210:22, 229:11
**609** [1] - 205:9
**609(a)(1** [1] - 203:17
**61** [1] - 100:17
**6204** [4] - 16:18, 16:19, 17:21, 35:12
**65** [1] - 47:3
**66** [5] - 47:3, 47:4, 92:9, 98:24, 99:17

**7**

**7** [6] - 49:18, 95:22, 95:24, 151:22, 206:17, 229:13
**7th** [4] - 31:21, 157:9, 157:16, 202:2

**8**

**8** [1] - 53:14
**8%** [2] - 68:18, 68:19
**801** [1] - 178:16
**804(b)(1** [1] - 204:9
**82** [1] - 99:20
**85** [1] - 128:6
**8844** [1] - 16:22
**8:40** [1] - 17:23

**9**

**9** [2] - 53:14, 70:1
**9203** [9] - 16:21, 18:14, 18:25, 19:1, 21:20, 35:10, 35:18, 35:21, 36:15
**921** [2] - 49:20, 50:2
**95** [5] - 18:10, 18:13, 35:13, 36:5, 36:6
**9:30** [6] - 51:13, 197:11, 214:8, 215:8, 217:19
**9:34** [2] - 99:1, 116:20
**9:38** [1] - 2:1

**9:41** [1] - 91:18
**9:51** [1] - 92:14

# A

**a.m** [4] - 2:1, 17:25, 19:5, 90:1
**Aaron** [2] - 108:3, 108:4
**abandoned** [1] - 110:16
**aberration** [1] - 73:11
**abetted** [1] - 85:3
**abetting** [1] - 90:18
**ability** [2] - 177:10, 177:13
**able** [32] - 2:17, 5:10, 11:23, 12:9, 30:16, 30:18, 30:21, 34:7, 42:9, 51:19, 51:25, 109:14, 129:21, 130:5, 133:14, 134:7, 138:9, 142:13, 153:22, 156:25, 162:18, 168:19, 169:16, 175:11, 203:17, 204:7, 211:7, 211:9, 218:14, 221:24, 222:1, 222:25
**absolute** [1] - 77:2
**Absolutely** [7] - 6:2, 6:17, 45:16, 65:4, 149:15, 157:13, 219:7
**absolutely** [14] - 3:3, 3:5, 7:19, 13:11, 13:14, 62:22, 66:21, 77:4, 80:20, 132:13, 133:8, 137:13, 140:21
**abstract** [3] - 65:2, 219:25
**abstractly** [1] - 220:4
**abundance** [1] - 101:2
**abundant** [1] - 83:14
**accept** [1] - 123:21
**accepted** [2] - 92:13, 159:11
**access** - 222:14, 222:23
**accident** [1] - 177:1
**accompanied** [1] - 154:11
**accomplice** [1] - 174:7
**accordance** [1] - 140:2
**According** [2] - 93:21, 126:15
**according** [14] - 43:7, 63:15, 73:20, 73:21, 105:5, 107:14, 108:22, 109:2, 109:16, 109:20, 115:7, 115:16, 132:19
**accordingly** [2] - 34:11, 34:23
**account** [2] - 21:11,

153:19
**accountant** [1] - 153:22
**accounts** [1] - 107:14
**accurate** [7] - 25:20, 25:22, 26:3, 68:11, 118:13, 151:22, 231:9
**achieve** [1] - 130:16
**acknowledge** [1] - 81:16
**acknowledged** [1] - 107:17
**acknowledging** [1] - 126:22
**acquired** [1] - 197:2
**acquit** [1] - 75:18
**acquittal** [11] - 53:13, 56:16, 70:2, 84:12, 85:20, 87:3, 91:1, 92:4, 94:21, 106:1, 132:22
**acquitted** [1] - 94:19
**act** [9] - 25:10, 71:12, 71:16, 71:17, 71:18, 73:11, 93:23, 129:2, 146:10
**Act** [1] - 56:17
**activate** [1] - 170:20
**activations** [1] - 32:10
**actively** [1] - 107:22
**activities** [10] - 60:21, 63:11, 63:13, 63:14, 87:13, 87:20, 87:24, 131:20, 132:6, 132:19
**activity** [13] - 47:18, 58:3, 59:25, 62:20, 64:1, 64:4, 64:5, 71:7, 80:12, 80:15, 88:3, 132:5, 147:5
**actors** [1] - 54:9
**acts** [8] - 74:12, 81:15, 131:7, 132:11, 142:7, 142:11, 142:12, 217:4
**actual** [15] - 18:10, 20:7, 21:6, 29:16, 30:16, 35:17, 44:23, 95:4, 99:15, 120:22, 160:13, 163:23, 166:14, 166:20, 212:18
**Adam** [1] - 1:22
**add** [4] - 96:24, 105:24, 121:11
**added** [1] - 128:13
**addition** [6] - 14:12, 75:25, 104:15, 108:19, 117:3, 217:3
**additional** [4] - 23:4, 47:4, 214:12, 227:10
**additionally** [1] - 48:20
**additions** [1] - 75:13
**address** [8] - 106:12, 106:13, 113:22, 117:20, 200:18, 214:18, 214:21

**addressed** [1] - 136:20
**addresses** [2] - 75:20
**adds** [2] - 96:25, 173:11
**Administration** [1] - 48:12
**administrative** [1] - 6:19
**admissibility** [1] - 129:24
**admissible** [4] - 86:9, 86:25, 102:10, 103:13
**admission** [2] - 226:18
**admissions** [1] - 103:8
**admit** [1] - 211:11
**admitted** [15] - 17:17, 44:13, 45:5, 45:7, 45:12, 45:20, 46:1, 46:3, 46:10, 46:24, 47:8, 86:11, 104:17, 127:12, 197:7
**adopt** [3] - 75:12, 106:2, 126:22
**adopting** [3] - 81:20, 83:1, 86:25
**adult** [1] - 132:19
**advance** [2] - 11:8, 115:4
**advised** [1] - 97:11
**advising** [1] - 200:16
**affects** [1] - 90:21
**affidavit** [4] - 196:11, 196:16, 197:2, 197:21
**affixed** [1] - 231:10
**AFPN** [1] - 221:15
**afternoon** [40] - 2:17, 9:20, 10:4, 10:24, 13:17, 13:19, 23:3, 41:6, 88:22, 89:4, 89:7, 115:19, 117:23, 135:19, 138:15, 139:16, 144:17, 144:18, 151:10, 151:11, 158:21, 158:22, 164:9, 164:10, 177:18, 178:13, 182:2, 199:9, 205:17, 206:7, 208:3, 208:4, 210:19, 218:18, 226:1, 227:6, 227:13, 227:15, 227:23, 229:3
**age** [1] - 115:23
**agent** [2] - 146:10, 166:5
**Agent** [1] - 48:5
**agents** [1] - 191:25
**ages** [1] - 181:13
**aggressive** [1] - 113:4
**ago** [15] - 40:14, 40:20, 139:20, 140:12, 148:4, 148:5, 148:6, 151:13, 156:8, 183:13, 187:12, 189:6, 189:8, 210:25
**agree** [14] - 9:13, 9:23,

34:22, 44:8, 44:13, 62:22, 63:12, 68:9, 69:14, 94:5, 105:7, 120:21, 120:24, 220:10
**agreeably** [1] - 59:4
**agreed** [9] - 49:17, 49:23, 51:3, 140:7, 204:9, 204:17, 206:2, 213:13, 226:18
**agreement** [7] - 54:10, 71:8, 84:23, 97:8, 202:14, 203:7, 207:21
**ahead** [1] - 12:21, 38:19, 61:6, 116:1, 135:1, 150:22, 171:10, 204:23, 204:25, 208:12, 220:16
**aided** [1] - 85:3
**aiding** [1] - 90:18
**ain't** [7] - 188:4, 191:20, 192:4, 195:9, 198:11, 207:5, 207:11
**air** [10] - 134:24, 135:14, 170:22, 171:11, 171:13, 171:15, 171:16, 172:1, 172:3, 172:4
**AKA** [1] - 42:4
**akin** [2] - 59:16, 59:17
**al** [1] - 231:5
**alarm** [1] - 169:24
**alibi** [6] - 91:15, 103:4, 114:21, 115:4, 116:23
**allege** [1] - 80:19
**alleged** [24] - 55:23, 56:2, 58:14, 61:7, 61:13, 63:25, 68:11, 68:19, 69:16, 69:22, 70:12, 74:13, 76:16, 77:19, 79:11, 81:14, 81:23, 92:22, 121:20, 127:2, 128:23, 129:25, 142:7, 217:4
**allegedly** [1] - 143:19
**alleges** [5] - 62:4, 62:8, 63:13, 81:18
**alleging** [2] - 68:24, 74:1
**alleviate** [1] - 58:23
**alleviates** [1] - 59:6
**allocated** [1] - 11:16
**allow** [1] - 26:6
**allowed** [4] - 96:17, 101:5, 101:17, 102:24
**allows** [2] - 146:9, 147:7
**almost** [4] - 19:25, 89:3, 122:1, 205:24
**alone** [2] - 154:10, 201:4
**aloud** [1] - 226:19

**alter** [1] - 2:21
**altercation** [2] - 143:15, 143:17
**Alternate** [1] - 14:16
**alternative** [1] - 101:4
**altogether** [1] - 60:7
**Altoona** [6] - 54:12, 80:24, 93:14, 109:4, 113:7, 113:14
**Alvin** [1] - 31:10
**Alvin's** [1] - 29:3
**ambiguity** [1] - 131:6
**AMD-04-029** [2] - 1:6, 231:5
**amend** [1] - 128:12
**amended** [1] - 99:16
**Amendment** [4] - 136:11, 207:4, 208:17, 208:21
**AMERICA** [1] - 1:5
**America** [6] - 31:15, 31:20, 49:16, 49:23, 96:13, 96:15
**American** [2] - 39:11, 40:5
**ammunition** [1] - 48:8
**amount** [2] - 114:4, 151:15
**amounts** [3] - 3:11, 20:9, 148:7
**ample** [1] - 123:18
**amplify** [2] - 82:23, 87:23
**analog** [1] - 210:23
**analysis** [10] - 19:18, 32:3, 33:8, 33:10, 33:14, 44:10, 44:23, 161:18, 161:20, 177:5
**analyzed** [3] - 44:9, 44:14, 118:1
**Andre** [1] - 1:13
**Annapolis** [1] - 158:24
**annex** [1] - 222:21
**Answer** [2] - 188:12, 188:13
**answer** [14] - 37:14, 37:21, 88:11, 122:13, 153:22, 157:11, 171:5, 171:7, 191:2, 191:15, 191:18, 200:22, 204:5, 206:15
**answered** [4] - 188:18, 191:11, 195:21, 202:15
**answering** [2] - 37:10, 113:17
**answers** [1] - 226:24
**Anthony** [2] - 90:14, 90:17
**anti** [1] - 174:16
**anti-lockout** [1] -

174:16
  **anticipate** [6] - 2:12, 6:15, 6:22, 14:25, 85:2, 89:20
  **anticipated** [1] - 88:18
  **anticipation** [1] - 51:7
  **anxious** [1] - 143:24
  **anyway** [1] - 142:14
  **apart** [2] - 114:5, 172:22
  **apartment** [2] - 201:3, 201:13
  **apartments** [1] - 189:16
  **Apologize** [1] - 158:11
  **apologize** [3] - 61:5, 140:18, 156:5
  **apparent** [1] - 9:11
  **appeal** [1] - 224:12
  **appear** [6] - 9:20, 19:13, 130:22, 130:23, 147:9, 148:10
  **appearance** [2] - 8:9, 147:8
  **Appearances** [1] - 1:15
  **appeared** [2] - 187:15, 187:17
  **applications** [1] - 148:7
  **applies** [6] - 118:8, 128:10, 128:25, 174:17, 174:18, 212:12
  **apply** [3] - 122:6, 143:1, 143:24
  **appoint** [1] - 138:2
  **appreciate** [9] - 2:9, 14:8, 50:19, 82:1, 113:18, 120:10, 178:13, 208:24, 227:17
  **appreciated** [1] - 135:11, 225:8
  **apprehend** [4] - 147:10, 152:3, 154:9, 154:14
  **apprehension** [4] - 148:9, 153:8, 155:7, 155:10
  **apprehensions** [6] - 154:3, 154:4, 154:5, 154:8, 154:24, 155:3
  **apprise** [1] - 222:4
  **approach** [4] - 10:25, 32:16, 39:16, 149:11
  **approached** [3] - 83:16, 167:24, 168:17
  **approaches** [2] - 169:5, 172:17, 174:8
  **approaching** [1] - 83:16
  **appropriate** [7] - 67:23, 94:21, 115:20, 129:23, 135:4, 215:16, 226:6
  **approve** [1] - 45:11
  **approximation** [1] - 151:24

  **April** [6] - 22:17, 30:1, 96:11, 97:24, 101:19, 104:19
  **apropos** [1] - 96:1
  **area** [1] - 160:21
  **arguable** [1] - 122:24
  **arguably** [2] - 72:7, 80:13
  **argue** [24] - 69:6, 71:12, 72:11, 77:5, 79:14, 79:22, 79:23, 82:19, 82:25, 85:3, 85:8, 85:12, 85:14, 86:15, 86:18, 122:4, 127:9, 128:15, 130:3, 131:18, 132:8, 205:9, 227:25
  **argued** [2] - 142:17, 142:24
  **arguing** [8] - 59:18, 59:20, 63:3, 66:15, 66:25, 67:1, 73:10, 142:19
  **argument** [35] - 9:18, 10:18, 10:19, 11:9, 11:23, 12:15, 51:23, 52:14, 55:21, 65:22, 67:10, 70:11, 71:5, 71:10, 72:13, 75:11, 77:12, 78:6, 78:20, 79:21, 80:1, 80:2, 85:21, 86:13, 86:16, 95:2, 106:19, 118:4, 122:5, 122:25, 123:11, 128:25, 129:6, 131:5, 214:15
  **arguments** [8] - 10:17, 53:1, 76:4, 90:5, 92:21, 93:16, 106:2, 140:23
  **arising** [1] - 14:2
  **arm** [2] - 160:20, 168:21
  **armed** [2] - 202:20, 202:23
  **arms** [1] - 171:12
  **arose** [2] - 78:17, 78:22
  **arrange** [1] - 181:17
  **arranged** [1] - 115:4
  **array** [3] - 46:21, 47:4, 47:11
  **arrays** [1] - 46:23
  **arrest** [7] - 23:10, 29:25, 44:17, 151:18, 151:21, 192:22, 196:13
  **arrested** [21] - 28:12, 28:13, 28:16, 44:18, 94:11, 95:7, 95:14, 97:2, 108:24, 111:14, 113:8, 113:13, 115:10, 121:14, 131:18, 148:6, 151:14, 151:15, 192:16, 192:19, 192:23
  **arrests** [3] - 44:9,

44:18, 133:17
  **Arrington** [4] - 47:17, 165:25, 214:22, 229:11
  **Arrington's** [1] - 106:16
  **arrived** [5] - 4:23, 120:6, 184:16, 184:19, 197:10
  **articulated** [1] - 121:12
  **articulation** [1] - 127:11
  **artificial** [1] - 94:18
  **ascertainable** [4] - 59:24, 62:1, 62:18, 62:24
  **aside** [4] - 4:19, 5:3, 62:1, 66:5, 66:6, 74:24, 152:11
  **asleep** [2] - 184:6, 193:18, 194:19
  **aspect** [2] - 79:2, 139:12
  **assailant** [8] - 172:16, 172:18, 173:18, 174:5, 174:7, 174:20, 175:11
  **assembly** [2] - 160:17, 161:14
  **asserted** [1] - 208:20
  **assist** [1] - 154:11
  **Assistant** [1] - 136:21
  **assisted** [2] - 148:9, 154:4
  **assisting** [2] - 154:24, 155:3
  **associate** [1] - 63:4
  **Associated** [1] - 41:23
  **associated** [8] - 24:8, 39:5, 40:13, 40:25, 41:18, 78:2, 78:4, 87:11
  **associates** [4] - 62:6, 76:23, 77:7, 77:10
  **associates'** [1] - 63:11
  **association** [9] - 58:3, 59:1, 59:11, 61:13, 65:18, 66:5, 66:7, 74:11, 87:10
  **assume** [8] - 9:10, 9:19, 85:16, 88:8, 162:13, 219:19, 225:2, 228:16
  **assuming** [10] - 12:4, 70:15, 75:14, 75:23, 128:16, 138:6, 139:11, 156:15, 218:13, 228:5
  **assumption** [1] - 229:2
  **assure** [4] - 136:23, 165:18, 214:21, 227:19
  **assured** [1] - 200:11
  **attached** [2] - 44:11, 44:24
  **attacking** [1] - 53:17
  **attempt** [1] - 30:20
  **attempted** [1] - 102:12
  **attempting** [1] - 34:16

  **attempts** [3] - 32:22, 34:20, 110:2
  **attend** [6] - 3:6, 14:7, 14:15, 15:4, 145:23, 150:24
  **attended** [3] - 67:11, 146:20, 154:4
  **attention** [3] - 6:21, 99:16, 193:13
  **attenuation** [1] - 129:18
  **attorney** [7] - 119:24, 134:5, 134:10, 134:17, 147:6, 206:12, 225:3
  **Attorney** [1] - 136:21
  **Attorney's** [2] - 136:24, 211:11
  **attorneys** [5] - 110:4, 110:14, 133:9, 134:7, 211:19
  **attributed** [1] - 128:2
  **audience** [1] - 200:2
  **author** [2] - 211:8, 211:23
  **authority** [1] - 57:23
  **authorized** [1] - 216:22
  **authorizing** [1] - 225:2
  **automatic** [2] - 165:6, 165:7
  **automatically** [1] - 121:21
  **automative** [1] - 159:3
  **availability** [2] - 11:5, 11:11
  **available** [12] - 3:16, 5:25, 9:25, 10:4, 50:24, 51:12, 52:2, 79:21, 109:11, 112:4, 227:13, 227:21
  **Avenue** [3] - 48:4, 48:24, 49:3
  **avoid** [3] - 125:7, 125:8, 215:3
  **Avon** [1] - 108:20, 109:6
  **aware** [8] - 7:22, 28:14, 28:20, 30:7, 39:19, 63:21, 152:6, 186:17
  **awful** [1] - 96:25

**B**

  **B-10** [1] - 31:9
  **Baby** [1] - 26:21
  **baby** [2] - 26:25, 27:1
  **babysit** [1] - 181:22
  **babysitter** [1] - 181:15
  **Bacardi** [1] - 183:9
  **background** [4] - 127:12, 146:22, 154:21,

155:1
  **backwards** [1] - 171:12
  **Bacon** [16] - 54:2, 54:5, 67:15, 107:2, 107:20, 108:22, 109:16, 109:18, 109:21, 112:1, 222:10, 222:25, 224:4, 224:5, 224:17
  **bad** [3] - 63:24, 113:8, 113:14
  **badly** [1] - 170:10
  **bag** [8] - 170:22, 171:11, 171:13, 171:15, 171:16, 172:1, 172:3, 172:4
  **bail** [4] - 146:10, 146:19, 149:4, 149:7
  **bails** [1] - 147:6
  **balance** [3] - 200:10, 214:5, 214:14
  **ball** [1] - 3:7
  **ballistics** [4] - 123:10, 123:12, 126:15, 126:24, 219:1, 219:9
  **balls** [1] - 134:24
  **Baltimore** [18] - 1:12, 1:25, 2:16, 98:5, 107:23, 108:17, 108:21, 108:25, 117:7, 146:2, 150:4, 157:16, 189:23, 190:1, 190:4, 192:20, 196:12, 219:13
  **barber** [1] - 7:2
  **Barry** [1] - 1:22
  **base** [1] - 222:18
  **based** [17] - 25:22, 28:21, 33:1, 34:5, 42:7, 55:15, 55:16, 78:21, 83:24, 86:20, 91:3, 91:8, 127:1, 128:19, 129:13, 171:8, 216:20
  **Based** [1] - 37:22
  **bases** [1] - 101:4
  **basic** [1] - 175:19
  **Basic** [1] - 159:3
  **basis** [6] - 7:23, 26:2, 70:1, 103:21, 128:15, 130:16, 131:24
  **bearing** [1] - 134:8
  **beat** [1] - 126:16
  **beaten** [1] - 72:9
  **Beats** [1] - 96:19
  **became** [6] - 93:22, 107:14, 108:12, 115:13, 149:4, 150:5
  **become** [3] - 110:17, 146:19, 150:7
  **becomes** [2] - 109:24, 123:2
  **becoming** [1] - 146:19

**bed** [1] - 70:5
**bedroom** [3] - 185:6, 185:12, 185:16
**beefs** [1] - 112:25
**began** [4] - 54:13, 139:21, 156:23, 194:24
**begin** [7] - 9:19, 52:1, 53:16, 118:7, 140:3, 152:12, 214:15
**beginning** [4] - 176:11, 193:18, 212:6, 228:22
**Behalf** [5] - 1:15, 1:17, 1:18, 1:20, 1:21
**behalf** [1] - 205:22
**behind** [2] - 38:15, 38:18
**beings** [1] - 14:3
**belief** [2] - 50:22, 112:19
**Belinda** [2] - 2:10, 213:25
**Belinda's** [1] - 14:9
**bell** [2] - 19:22, 20:3
**Bell** [3] - 220:18, 220:19, 220:20
**belongings** [1] - 223:25
**below** [1] - 44:15
**beneficial** [1] - 10:25
**benefit** [2] - 52:10, 89:15
**benefits** [1] - 76:8
**Benson** [11] - 14:24, 15:6, 19:19, 25:5, 25:7, 39:1, 39:18, 44:2, 95:9, 95:22, 221:17
**BENSON** [2] - 15:10, 230:4
**Benson's** [1] - 99:16
**Benz** [4] - 188:3, 188:7, 188:14, 188:18
**Bertolotti** [1] - 55:25
**Best** [1] - 187:22
**best** [18] - 2:7, 9:1, 9:2, 14:4, 54:15, 55:2, 58:8, 61:24, 71:15, 90:9, 105:13, 114:19, 122:4, 129:14, 151:24, 153:23, 183:13, 214:20
**better** [3] - 205:13, 210:11, 228:16
**Between** [2] - 42:17, 42:18
**between** [43] - 5:7, 18:22, 20:23, 23:1, 25:14, 27:6, 27:12, 31:10, 34:3, 40:22, 41:17, 42:9, 42:13, 49:17, 49:24, 54:2, 56:24, 66:9, 75:24, 78:16, 80:11, 80:12,

84:6, 86:4, 88:1, 92:13, 93:11, 94:11, 94:18, 96:9, 96:10, 97:23, 98:23, 99:6, 99:12, 100:15, 100:18, 107:18, 112:14, 116:21, 117:1, 161:12, 222:17
**beyond** [17] - 40:6, 65:11, 68:15, 70:17, 71:6, 87:14, 87:17, 100:1, 129:22, 130:12, 141:5, 141:10, 141:12, 141:18, 144:2, 216:9
**Beyond** [1] - 171:6
**bifurcated** [1] - 54:25
**big** [2] - 122:17
**bill** [5] - 21:6, 21:13, 28:8, 47:23, 47:25
**billed** [2] - 18:23, 35:20
**billing** [7] - 20:7, 20:21, 21:2, 21:4, 21:5, 21:12, 30:17
**bills** [1] - 30:16
**binder** [1] - 48:21
**binds** [1] - 109:10
**birthday** [5] - 180:3, 180:11, 180:12, 180:19, 181:4, 190:19
**bit** [10] - 7:11, 10:20, 11:24, 12:21, 12:22, 103:3, 135:22, 184:21, 196:5
**black** [1] - 48:21
**Blade** [3] - 183:20, 194:1, 197:15
**Bledsoe** [1] - 59:17
**bless** [1] - 9:8
**block** [1] - 143:15
**blood** [5] - 39:21, 113:8, 113:15, 171:21, 173:3
**Bo** [3] - 116:4, 116:9, 193:8
**bodies** [11] - 117:5, 123:1, 123:4, 123:7, 123:19, 124:7, 124:10, 124:20, 125:14, 126:19
**body** [6] - 9:12, 123:2, 123:8, 124:24, 171:14, 172:3
**bonds** [4] - 146:19, 147:4, 149:4, 149:7
**bondsman** [1] - 146:10
**books** [2] - 31:11, 215:5
**bootstrap** [1] - 129:20
**born** [1] - 178:24
**bother** [2] - 221:3, 225:11
**bothered** [2] - 170:17, 207:16

**bottom** [1] - 85:10
**bought** [4] - 67:15, 197:19, 197:22, 197:24
**bounty** [2] - 153:5, 154:10
**boyhood** [2] - 58:8, 65:18, 65:23
**brain** [1] - 217:23
**break** [17] - 4:24, 10:15, 11:7, 11:9, 13:3, 66:24, 88:24, 88:25, 89:1, 90:10, 138:5, 138:6, 158:9, 177:19, 203:13, 227:22, 228:23
**breaks** [1] - 12:4
**brick** [3] - 115:8, 115:11
**brief** [14] - 5:5, 9:18, 39:8, 53:15, 53:16, 53:24, 54:11, 88:8, 90:4, 104:10, 140:5, 164:16, 226:2
**briefly** [8] - 23:13, 71:4, 89:21, 113:24, 121:4, 220:22, 225:16, 225:17
**bring** [15] - 3:9, 9:18, 14:17, 50:17, 59:5, 133:14, 134:12, 138:5, 147:10, 205:14, 216:16, 217:7, 221:4, 227:6
**Bring** [1] - 88:13
**bringing** [3] - 6:21, 67:16, 224:8
**brings** [2] - 74:2, 108:8
**broad** [2] - 70:9, 80:11
**broke** [3] - 14:25, 90:4, 93:20
**broken** [2] - 67:4
**brother** [3] - 145:5, 155:16, 155:22
**brother's** [1] - 145:6
**brothers** [14] - 30:21, 31:11, 40:16, 41:6, 96:3, 103:16, 112:21, 114:21, 117:6, 123:7, 125:24, 129:9, 145:8, 190:11
**brothers'** [10] - 22:11, 29:3, 31:7, 114:2, 116:25, 117:9, 122:9, 123:10, 123:14, 125:22
**brought** [7] - 7:21, 9:19, 10:3, 99:15, 143:3, 199:17
**Brown** [3] - 72:19, 93:24, 149:22
**brush** [3] - 80:11, 167:11, 167:13
**brushed** [1] - 172:4
**bubble** [1] - 110:8
**bucks** [1] - 110:7
**buddies** [1] - 132:2,

132:4
**Buick** [3] - 182:19, 182:20
**building** [1] - 201:13
**bullet** [2] - 219:13
**bullets** [4] - 126:16, 219:14, 219:20, 220:2
**bum** [1] - 165:24
**bunch** [2] - 94:17, 110:6
**burn** [2] - 40:23, 41:18
**business** [22] - 16:16, 60:4, 60:10, 60:22, 60:23, 61:1, 61:2, 61:3, 62:6, 62:12, 63:8, 73:21, 73:25, 76:23, 113:2, 119:20, 130:25, 148:12, 149:21, 152:2, 153:19
**busy** [1] - 5:25
**button** [6] - 162:4, 167:10, 169:25, 172:5, 174:14, 174:23
**buy** [1] - 183:8
**buying** [1] - 15:12, 25:4, 27:18, 38:25, 40:11, 144:16, 150:23, 151:9, 158:19, 164:8, 175:17, 178:12, 180:1, 187:2, 198:19, 230:4, 230:5, 230:5, 230:6, 230:7, 230:8, 230:9, 230:10, 230:10, 230:12, 230:12, 230:13
**BY** [27] - 15:12, 25:4, 27:18, 38:25, 40:11, 144:16, 150:23, 151:9, 158:19, 164:8, 175:17, 178:12, 180:1, 187:2, 198:19, 230:4, 230:5, 230:5, 230:6, 230:7, 230:8, 230:9, 230:10, 230:10, 230:12, 230:12, 230:13
**bye** [1] - 155:22

## C

**caliber** [11] - 117:5, 123:15, 123:16, 123:19, 124:20, 124:23, 125:1, 125:6, 125:9, 125:13, 126:6
**calibers** [1] - 125:20
**cameras** [1] - 29:19
**cancel** [1] - 14:5
**candidly** [2] - 6:22, 105:23
**candor** [1] - 137:2
**cannot** [8] - 29:21, 35:24, 55:24, 96:16, 114:14, 131:7, 206:6, 219:24
**capable** [1] - 154:12
**car** [42] - 16:23, 26:7, 26:19, 26:25, 46:20, 114:12, 114:15, 115:8, 115:11, 122:13, 161:5, 161:19, 162:1, 162:2, 163:7, 164:22, 164:25,

165:17, 166:15, 167:2, 169:10, 169:11, 169:22, 169:25, 170:1, 170:10, 170:17, 170:21, 172:17, 172:20, 172:22, 174:9, 174:17, 182:17, 192:20, 194:16, 194:18, 197:11, 197:13, 197:24, 198:2, 198:22
**card** [13] - 115:3, 149:21, 195:5, 195:9, 195:23, 195:24, 196:9, 198:10, 198:12, 198:14, 199:1, 214:20
**Card** [1] - 48:11
**cards** [1] - 46:13
**care** [5] - 79:10, 79:12, 115:21, 181:17, 200:14
**careful** [1] - 7:18
**carefully** [2] - 4:20, 143:11
**Carl** [2] - 145:7, 145:13, 156:6, 156:7, 156:11
**Carlson** [2] - 157:9, 157:16
**carried** [4] - 85:9, 116:13, 125:5, 154:7
**carry** [5] - 3:7, 111:15, 154:5, 154:6, 228:17
**carrying** [2] - 12:22, 154:17
**cars** [6] - 165:3, 165:5, 165:11, 165:19, 170:25, 188:12
**Case** [1] - 231:5
**CASE** [1] - 1:6
**case** [99] - 7:6, 7:16, 9:19, 10:23, 12:20, 15:1, 17:21, 29:15, 30:14, 30:15, 30:21, 33:24, 39:21, 50:11, 51:14, 52:8, 52:16, 55:22, 55:25, 56:1, 56:15, 56:21, 57:7, 57:9, 57:19, 57:22, 57:24, 59:3, 59:16, 59:17, 59:23, 68:4, 68:16, 70:5, 75:15, 76:19, 77:14, 77:22, 79:16, 80:6, 81:11, 82:4, 83:23, 84:2, 86:6, 89:5, 91:14, 91:15, 92:3, 92:7, 103:3, 103:5, 104:25, 111:5, 116:24, 118:13, 119:4, 121:10, 122:6, 127:13, 132:20, 133:1, 133:4, 133:7, 134:9, 134:25, 136:25, 140:3, 140:23, 143:4, 143:22, 143:23, 143:24, 144:1, 164:12, 164:15, 166:16,

170:7, 196:13, 199:11, 200:14, 205:7, 205:22, 210:23, 212:6, 212:15, 212:19, 215:3, 216:7, 217:5, 217:7, 222:9, 224:15

**cases** [9] - 32:2, 44:20, 44:21, 55:6, 55:8, 82:18, 100:25, 227:24

**cash** [2] - 56:5, 148:7

**cast** [2] - 70:9, 70:10

**casual** [1] - 150:5

**casualty** [2] - 146:9, 146:21

**catch** [1] - 217:22

**categorically** [1] - 77:5

**Catonsville** [9] - 107:24, 107:25, 108:1, 108:2, 108:5, 108:8, 108:20, 109:7, 146:20

**caused** [4] - 143:17, 168:21, 170:19, 172:5

**causing** [1] - 204:24

**caution** [1] - 101:3

**CD** [1] - 64:8

**CD's** [1] - 91:11

**ceiling** [1] - 124:3

**celebration** [1] - 78:15

**cell** [41] - 16:14, 16:15, 20:7, 20:20, 20:25, 21:3, 21:14, 27:6, 27:7, 28:6, 28:10, 30:4, 30:6, 30:9, 30:11, 30:18, 30:20, 30:24, 31:1, 31:2, 31:4, 31:25, 32:2, 32:7, 40:12, 51:9, 91:11, 92:8, 92:12, 96:17, 96:22, 98:6, 101:7, 122:17, 129:18, 143:7, 143:15, 194:10, 209:11, 222:13, 224:16

**Cell** [1] - 20:25

**center** [1] - 179:13

**Center** [1] - 172:24

**central** [1] - 77:15

**Central** [1] - 77:22

**centrality** [5] - 78:7, 79:11, 79:25, 81:10, 82:2

**certain** [8] - 13:14, 54:22, 54:25, 64:13, 114:4, 120:23, 126:10, 157:1, 194:22

**Certainly** [10] - 2:10, 92:6, 131:14, 146:14, 146:17, 161:12, 167:21, 199:25, 212:22

**certainly** [41] - 54:16, 55:5, 56:20, 57:2, 57:3, 57:8, 59:13, 59:18, 60:3, 67:18, 68:5, 68:21, 71:10, 71:11, 72:13,

75:25, 77:5, 78:19, 79:21, 86:13, 88:21, 90:4, 92:3, 93:17, 94:19, 95:7, 97:13, 97:20, 103:25, 104:13, 105:5, 121:24, 130:11, 131:21, 132:14, 139:19, 211:25, 224:7, 227:1

**certainty** [1] - 114:17

**CERTIFICATE** [1] - 231:1

**certification** [1] - 211:25

**certified** [3] - 159:6, 210:25, 229:14

**certify** [2] - 231:3, 231:7

**chain** [2] - 55:7, 55:11

**chairs** [7] - 52:16, 52:23, 85:11, 89:3, 123:3, 199:10, 217:20

**chance** [10] - 45:10, 52:25, 70:8, 120:15, 143:5, 165:1, 214:10, 214:11, 218:1

**change** [6] - 51:8, 161:18, 161:20, 177:5, 220:11, 220:12

**changes** [2] - 46:7, 82:17

**changing** [1] - 52:11

**Character** [1] - 4:4

**charge** [18] - 3:10, 5:13, 5:21, 10:15, 18:20, 70:6, 91:17, 94:12, 94:14, 95:1, 95:14, 98:4, 104:14, 117:24, 117:25, 204:18, 227:21, 228:1

**charged** [23] - 19:11, 21:8, 53:19, 53:23, 58:16, 75:19, 83:3, 83:21, 84:16, 90:11, 93:1, 94:22, 114:1, 119:5, 119:19, 119:22, 129:19, 130:1, 141:6, 141:7, 141:10, 147:5, 203:1

**charges** [7] - 90:18, 96:24, 147:5, 215:21, 216:17, 216:24, 216:25

**charging** [1] - 204:18

**chart** [22] - 19:4, 22:1, 27:21, 31:9, 33:15, 33:16, 33:18, 33:19, 34:2, 34:9, 34:23, 35:3, 37:13, 38:2, 92:9, 96:7, 97:16, 99:11, 116:20, 123:13, 128:1

**chase** [1] - 219:11

**check** [5] - 42:22, 50:8, 116:10, 146:22, 155:1

**checked** [2] - 97:20, 116:5

**checks** [3] - 153:18, 153:20, 154:21

**chemical** [2] - 44:10, 44:23

**chemists** [1] - 44:10

**child** [3] - 115:21, 115:22, 156:18

**childhood** [2] - 132:2, 132:4

**children** [5] - 147:18, 156:11, 156:13, 181:11, 181:17

**choose** [8] - 70:8, 103:8, 133:8, 133:13, 134:6, 134:11, 134:15, 217:13

**chooses** [2] - 103:9, 134:2

**chose** [1] - 70:7

**chosen** [1] - 76:19

**Chris** [3] - 46:11, 47:8, 48:14

**Chrysler** [1] - 188:25

**Cingular** [1] - 20:5

**Circle** [1] - 130:23

**circled** [1] - 160:15

**Circuit** [7] - 56:1, 56:4, 57:22, 100:25, 131:7, 196:12, 229:14

**circuit** [1] - 147:3

**circumstances** [3] - 214:25, 215:25, 216:1

**cite** [3] - 55:25, 59:17, 82:18

**cited** [3] - 55:8, 56:1, 57:22

**cites** [2] - 59:23, 70:4

**city** [1] - 94:12

**City** [3] - 150:4, 196:12, 219:13

**civil** [2] - 49:21, 50:2

**claims** [1] - 219:25

**clarify** [2] - 151:12, 201:17

**clarifying** [1] - 209:2

**Clash** [1] - 110:3

**classic** [1] - 114:10, 130:11

**clear** [16] - 11:12, 46:7, 47:7, 51:17, 52:20, 57:9, 62:3, 66:12, 67:24, 79:7, 113:9, 114:8, 125:17, 126:4, 198:21, 204:8

**cleared** [1] - 2:18

**clearly** [12] - 29:12, 54:8, 56:23, 60:12, 84:22, 93:10, 93:12, 101:9, 102:1, 111:7,

119:16, 194:23

**Clearly** [1] - 64:9

**CLERK** [3] - 144:12, 158:14, 178:3

**clerks** [3] - 226:8, 226:9, 226:10

**client** [21] - 91:6, 91:17, 91:19, 92:7, 92:11, 93:11, 94:8, 94:11, 94:19, 95:10, 95:23, 96:15, 97:11, 98:23, 100:21, 101:4, 101:18, 101:19, 134:13

**client's** [4] - 91:9, 91:25, 96:12, 104:18

**clients** [1] - 148:8

**clique** [1] - 108:14

**clock** [1] - 134:22

**close** [17] - 12:7, 68:24, 93:5, 95:23, 95:25, 129:14, 147:11, 147:13, 155:15, 161:16, 162:4, 162:24, 168:11, 228:3, 228:5, 228:8

**closed** [4] - 162:22, 174:21, 176:15, 176:21

**closing** [9] - 10:17, 10:18, 10:19, 12:15, 51:23, 52:14, 106:19, 128:18, 214:14

**club** [1] - 93:20, 93:21, 130:24

**co** [1] - 191:24

**co-counsel** [1] - 191:24

**coalition** [3] - 108:16, 109:9, 110:1

**Coburn** [25] - 1:22, 2:6, 3:3, 4:18, 5:10, 5:18, 5:24, 7:13, 7:21, 9:22, 10:14, 22:4, 22:15, 56:20, 70:4, 134:21, 135:4, 136:5, 136:15, 150:22, 218:15, 221:21, 223:3, 224:6, 226:14

**COBURN** [65] - 2:8, 4:19, 5:15, 5:23, 6:2, 6:4, 6:8, 9:13, 38:25, 40:8, 40:11, 134:20, 134:22, 135:6, 135:19, 136:7, 136:10, 144:6, 144:16, 150:23, 151:5, 156:3, 157:10, 157:24, 158:6, 158:8, 158:10, 177:18, 177:22, 190:15, 218:16, 218:18, 218:22, 219:2, 219:4, 219:7, 219:10, 219:12, 219:21, 219:23, 220:7, 220:13, 220:17, 221:1, 221:6, 221:8, 221:12, 221:14,

222:1, 222:4, 223:6, 223:13, 223:17, 223:19, 223:22, 224:1, 224:5, 224:14, 224:18, 225:4, 225:8, 225:12, 226:11, 230:6, 230:7

**Coburn's** [1] - 226:12

**cocaine** [2] - 107:1, 107:3

**coconspirator** [1] - 84:5

**coconspirators** [2] - 54:3, 55:3

**codefendant** [1] - 134:10

**codefendants** [1] - 106:3

**cognizant** [1] - 131:5

**colleagues** [1] - 68:22

**collect** [1] - 213:3

**college** [4] - 67:11, 145:21, 145:23, 145:24

**College** [1] - 146:21

**colloquy** [2] - 4:20, 207:18

**column** [2] - 22:1, 44:22

**combinations** [4] - 110:19, 111:2, 111:22, 176:10

**combined** [1] - 67:5

**comfort** [1] - 5:13

**comfortable** [4] - 7:9, 37:3, 88:16, 104:7

**coming** [7] - 152:13, 153:8, 153:24, 177:17, 180:18, 200:20, 218:9

**comments** [1] - 122:8

**commit** [10] - 58:4, 66:6, 66:8, 72:17, 74:12, 74:21, 110:19, 110:21, 202:10, 203:2

**commitment** [2] - 3:4, 132:10

**committed** [14] - 58:14, 66:6, 74:25, 117:14, 118:18, 118:21, 118:22, 118:24, 119:3, 119:16, 121:19, 142:10, 142:11, 190:13

**committee** [1] - 51:1

**committing** [2] - 119:7, 119:10

**common** [1] - 19:23, 30:7, 54:10, 55:5, 59:16, 63:1, 67:5, 67:6, 67:7, 119:15

**Common** [1] - 63:1

**communicate** [1] - 191:18

**communications** [2] -

31:10, 31:11
**Community** [1] - 146:20
**companies** [3] - 17:1,
30:10, 30:12
**company** [6] - 22:17,
28:10, 30:12, 30:19,
33:23, 154:17
**company's** [3] - 19:19,
19:20, 20:10
**comparing** [1] - 35:10
**comparison** [1] -
219:14
**compelled** [1] - 133:6
**compelling** [4] - 60:19,
114:20, 115:5, 116:14
**complained** [1] - 116:4
**complete** [6] - 3:2, 52:3,
137:2, 208:16, 228:21,
231:9
**completed** [2] - 19:16,
47:18
**completely** [3] - 21:14,
21:19, 94:5
**completeness** [1] -
103:10
**complex** [2] - 184:24,
201:3
**complicate** [1] - 125:12
**complicated** [2] -
136:3, 175:6
**comply** [2] - 207:7,
207:9
**component** [2] - 160:7,
160:25
**comport** [1] - 56:15
**compose** [1] - 131:7
**composed** [1] - 91:12
**comprehensive** [1] -
23:7
**computer** [1] - 21:15
**concede** [2] - 81:16,
127:12
**conceivable** [1] - 78:8
**conceived** [1] - 119:11
**concentrated** [2] - 17:7,
17:14
**concept** [2] - 25:7,
121:14
**concern** [3] - 75:20,
75:21, 135:14
**concerned** [1] - 52:7
**concerning** [7] - 49:6,
54:12, 118:6, 202:10,
203:16, 215:23, 216:3
**conclude** [16] - 10:13,
15:1, 51:20, 52:12,
64:23, 65:11, 65:13,
72:10, 87:1, 130:12,
131:2, 131:8, 131:23,
199:19, 214:10, 214:13

**concluded** [2] - 50:11,
210:14
**Conclusion** [1] - 229:16
**conclusion** [3] - 50:18,
65:22, 78:8
**conclusive** [1] - 127:21
**concocted** [1] - 114:21
**concomitantly** [1] -
88:8
**conditionally** [1] - 46:3
**conditioned** [1] -
208:16
**conditions** [2] - 137:2,
156:24
**conduct** [5] - 119:19,
149:9, 216:12, 216:13,
216:18
**Conduct** [2] - 215:2,
215:4
**confer** [2] - 15:2,
146:15
**conference** [4] - 3:11,
5:13, 5:21, 10:15
**conferred** [1] - 50:19
**confess** [2] - 93:8,
103:24
**confident** [7] - 5:21,
12:18, 22:22, 27:11,
68:9, 90:24, 143:25
**conflict** [1] - 83:16
**conflicts** [1] - 86:21
**confused** [1] - 48:7
**conjecture** [1] - 92:19
**conjunctive** [2] - 85:20,
85:24
**connected** [27] - 12:23,
19:11, 34:4, 34:8, 34:11,
34:14, 34:18, 35:5,
35:13, 35:16, 35:20,
35:25, 36:8, 37:4, 37:7,
38:3, 87:18, 94:7, 98:1,
98:22, 98:25, 99:4, 99:6,
99:11, 100:15, 116:21,
132:6
**Connected** [1] - 35:15
**connecting** [1] - 34:21
**connection** [8] - 78:24,
81:12, 83:13, 113:25,
114:1, 123:8, 196:13,
203:4
**connections** [2] -
32:15, 109:13
**connects** [2] - 92:17,
93:15
**consider** [4] - 85:24,
118:17, 208:13, 217:8
**consideration** [2] -
94:9, 118:16
**considered** [3] - 33:7,
83:5, 86:5

**considering** [1] -
172:13
**consisted** [1] - 148:3
**consistent** [3] - 91:22,
137:13, 201:4
**consisting** [1] - 130:13
**consists** [3] - 61:22,
62:18, 78:1
**console** [6] - 172:22,
172:23, 172:24, 173:1,
173:8, 173:19
**conspiracies** [18] -
53:21, 54:1, 54:8, 54:10,
54:13, 54:18, 55:1,
67:18, 70:7, 74:12,
75:16, 75:19, 80:7, 93:7,
94:22, 141:12, 141:23
**conspiracy** [73] - 53:17,
53:19, 53:23, 54:2,
54:24, 55:6, 55:10,
55:11, 55:25, 56:7,
56:10, 56:13, 56:15,
58:5, 58:22, 58:23,
58:25, 59:7, 59:9, 59:10,
59:13, 67:17, 67:24,
68:1, 68:13, 68:19,
69:22, 69:25, 70:16,
71:9, 74:14, 75:17,
75:24, 76:17, 80:19,
80:21, 80:24, 82:5, 84:5,
90:11, 90:12, 92:23,
92:24, 93:3, 93:4, 94:2,
94:23, 94:25, 97:2, 97:4,
98:8, 101:24, 106:21,
107:18, 109:6, 110:15,
117:13, 117:14, 121:21,
121:22, 128:9, 128:23,
129:1, 129:2, 129:6,
130:11, 131:10, 141:7,
141:8, 202:10, 203:2
**conspirator** [1] - 97:7
**conspirators** [2] - 54:2,
117:14
**conspiring** [1] - 59:12
**constitute** [4] - 61:17,
68:12, 74:25, 231:7
**constitutes** [1] - 216:13
**constraints** [1] - 103:8
**consultation** [4] - 6:1,
133:8, 134:5, 134:16
**consultations** [1] -
88:17
**contact** [18] - 34:16,
34:20, 40:21, 41:7,
41:16, 42:8, 42:13,
47:20, 47:21, 88:12,
97:23, 98:7, 98:10,
148:23, 164:4, 191:12
**contacts** [1] - 129:13
**contained** [1] - 90:6

**contemplating** [1] -
2:24
**contempt** [3] - 25:8,
207:13, 207:20
**contention** [1] - 212:1
**contents** [1] - 223:25
**context** [1] - 72:9
**Continue** [1] - 199:12
**continue** [6] - 14:2,
14:23, 88:9, 131:19,
215:1, 215:8
**continued** [2] - 108:4,
113:12
**CONTINUED** [1] - 15:11
**continues** [1] - 44:24
**continuing** [5] - 62:25,
92:24, 93:4, 94:24,
119:15
**continuity** [6] - 57:11,
59:15, 66:12, 66:16,
69:17, 71:2
**Continuous** [1] - 66:17
**continuous** [1] - 66:24
**contours** [1] - 204:3
**contract** [1] - 78:23
**contracted** [1] - 220:19
**contrary** [3] - 80:24,
83:10, 100:20
**control** [1] - 44:15
**controlled** [2] - 44:11,
44:23
**controlling** [1] - 159:4
**conversate** [1] - 155:23
**conversation** [6] -
37:16, 92:15, 100:18,
143:12, 150:10, 196:2
**conversations** [4] -
91:4, 96:9, 96:16, 97:6
**convict** [4] - 126:25,
129:13, 130:5
**convicted** [6] - 49:19,
49:25, 80:9, 132:14,
154:16, 186:22
**conviction** [4] - 133:19,
202:11, 216:23, 224:13
**convictions** [6] - 49:6,
133:12, 133:15, 133:17,
205:2, 205:5
**convince** [2] - 62:21,
64:19
**convinced** [2] - 69:25,
93:22
**convoluted** [1] - 123:10
**Cooks** [3] - 189:17,
189:21, 190:8
**cooperate** [1] - 200:20
**cooperation** [1] - 214:4
**cooperators** [1] -
112:12
**copies** [5] - 21:13,

30:16, 39:10, 39:24, 45:8
**copy** [6] - 21:6, 91:17,
105:3, 136:16, 210:25,
217:15
**core** [1] - 88:3
**corner** [1] - 184:24
**corollary** [1] - 119:13
**correct** [91] - 15:24,
15:25, 16:3, 16:6, 16:7,
16:21, 17:19, 17:22,
18:4, 18:15, 18:19,
18:20, 19:6, 19:9, 19:15,
21:1, 22:2, 22:10, 22:14,
22:18, 22:19, 23:15,
23:16, 23:18, 23:19,
23:21, 24:12, 24:16,
24:17, 25:18, 26:7, 27:9,
27:10, 27:25, 28:16,
28:23, 30:1, 31:12,
31:15, 34:23, 35:4, 36:3,
36:7, 36:9, 36:12, 36:22,
37:18, 38:17, 41:25,
42:1, 42:5, 42:6, 42:10,
42:11, 42:14, 43:10,
43:17, 43:24, 66:13,
85:4, 123:5, 128:24,
152:9, 155:21, 156:15,
157:21, 164:23, 165:6,
166:10, 166:17, 166:22,
166:24, 167:2, 167:8,
167:12, 177:11, 183:3,
185:25, 190:25, 191:6,
192:25, 193:9, 193:11,
194:3, 194:8, 194:24,
195:2, 195:6, 198:14,
206:9, 206:12
**Correct** [33] - 16:8,
18:7, 18:10, 18:16, 19:2,
19:17, 20:16, 20:19,
22:12, 24:14, 26:8,
26:12, 27:15, 28:17,
29:4, 35:2, 35:18, 36:4,
38:16, 38:20, 40:19,
41:4, 41:14, 41:20,
41:22, 42:3, 43:6, 43:13,
43:20, 43:25, 176:2,
206:13
**Correction** [1] - 206:9
**correction** [1] - 208:24
**correctional** [1] - 225:1
**Corrections** [1] -
222:15
**correctly** [3] - 16:14,
40:16, 161:3
**correspondence** [1] -
5:7
**Counsel** [5] - 50:20,
52:25, 82:13, 89:19,
207:18
**counsel** [34] - 2:3, 2:14,

2:18, 9:10, 9:23, 14:6, 14:7, 15:2, 45:10, 45:13, 46:3, 49:5, 49:8, 50:9, 50:19, 50:23, 68:3, 88:17, 89:1, 92:20, 101:1, 102:11, 108:13, 130:9, 135:3, 139:21, 139:22, 139:24, 140:6, 149:14, 157:25, 191:24, 200:11, 208:3

**counsel's** [2] - 50:20, 118:4

**count** [11] - 53:17, 57:5, 81:9, 85:17, 118:8, 119:22, 127:7, 128:13, 131:10, 132:23, 202:11

**Count** [27] - 53:17, 53:18, 56:16, 57:5, 74:14, 75:11, 76:4, 76:5, 76:6, 76:16, 76:17, 77:15, 77:19, 79:11, 79:20, 81:18, 81:23, 82:21, 84:22, 92:21, 92:22, 93:1, 93:2, 129:5, 129:7, 131:10

**counts** [23] - 49:7, 82:22, 83:22, 84:13, 84:18, 84:20, 90:6, 90:10, 90:11, 90:13, 90:15, 90:19, 90:21, 92:20, 94:20, 106:1, 118:9, 119:5, 127:2, 128:13, 131:12, 131:13, 203:1

**Counts** [5] - 53:13, 122:23, 127:9, 127:14, 129:4

**county** [2] - 150:3, 189:23

**County** [3] - 6:18, 41:8, 157:16

**couple** [24] - 3:21, 10:10, 27:21, 46:15, 64:24, 75:12, 91:4, 91:11, 95:3, 98:4, 100:24, 103:16, 110:7, 121:5, 128:20, 142:19, 154:19, 159:15, 175:18, 186:21, 187:14, 203:15, 207:21, 211:5

**course** [32] - 13:15, 14:19, 15:6, 18:5, 46:2, 47:5, 50:17, 52:19, 57:15, 65:9, 74:16, 90:18, 98:8, 99:24, 101:2, 107:7, 110:18, 113:10, 114:4, 116:16, 116:23, 128:4, 141:8, 170:20, 171:13, 174:4, 194:18, 205:1, 205:3,

208:22, 210:8, 227:10

**court** [37] - 25:8, 25:10, 46:11, 63:19, 86:8, 86:10, 88:25, 90:25, 92:8, 136:16, 137:13, 147:7, 147:8, 147:9, 147:10, 148:10, 153:25, 200:24, 201:4, 202:13, 203:18, 204:13, 205:25, 207:13, 208:14, 210:5, 211:1, 211:10, 211:17, 211:18, 211:20, 211:22, 212:4, 224:7, 224:9, 229:15

**Court** [63] - 6:16, 7:23, 11:16, 39:10, 45:7, 45:21, 45:24, 70:15, 76:6, 76:14, 77:8, 77:12, 79:22, 81:25, 82:13, 82:20, 84:3, 90:3, 90:7, 92:1, 93:16, 94:8, 96:5, 96:6, 99:13, 104:8, 104:15, 104:23, 105:18, 105:23, 106:10, 112:10, 116:18, 117:18, 117:21, 122:11, 126:22, 128:17, 129:23, 131:12, 132:21, 138:1, 139:6, 184:14, 184:16, 184:22, 196:12, 200:16, 200:18, 205:11, 206:24, 207:3, 207:21, 211:17, 212:9, 214:22, 218:23, 220:14, 223:4, 231:16

**COURT** [453] - 1:1, 2:3, 2:6, 2:10, 3:19, 3:21, 3:24, 4:2, 4:5, 4:8, 4:11, 4:13, 4:18, 5:10, 5:16, 5:18, 5:22, 5:24, 6:3, 6:6, 6:10, 6:17, 6:20, 6:23, 6:25, 7:2, 7:7, 7:12, 7:15, 7:19, 7:25, 8:3, 8:8, 8:10, 8:15, 8:18, 8:21, 8:24, 9:4, 9:7, 9:10, 9:14, 10:13, 11:6, 11:19, 11:25, 12:3, 12:18, 12:25, 13:4, 13:8, 13:11, 13:14, 13:19, 14:1, 15:8, 20:18, 24:24, 25:2, 32:17, 37:10, 37:21, 39:17, 40:1, 40:10, 44:2, 45:1, 45:5, 45:16, 45:22, 46:1, 46:9, 46:14, 46:18, 46:22, 47:2, 48:2, 48:10, 49:2, 49:11, 49:15, 50:4, 50:6, 50:8, 52:25, 53:6, 53:9, 53:11, 58:18, 60:8, 60:19, 60:25, 61:6, 61:9, 61:15, 61:19, 62:2, 62:14, 62:21, 63:2, 63:7,

63:18, 63:23, 64:2, 64:6, 64:18, 64:22, 65:1, 65:5, 65:7, 65:16, 65:21, 66:12, 66:16, 66:18, 66:20, 67:1, 67:7, 67:21, 68:6, 68:9, 68:18, 69:1, 69:7, 69:9, 69:14, 69:21, 69:24, 70:14, 70:19, 70:22, 71:24, 72:1, 73:8, 73:23, 74:9, 74:16, 75:2, 75:4, 75:6, 77:4, 77:24, 78:4, 78:14, 79:4, 79:7, 79:23, 82:8, 82:13, 84:17, 85:1, 85:7, 85:16, 85:23, 86:1, 87:4, 87:15, 88:7, 88:13, 88:16, 89:10, 89:14, 89:18, 90:2, 95:4, 95:12, 95:16, 95:20, 96:1, 96:12, 96:17, 96:20, 96:25, 97:16, 97:22, 98:3, 98:14, 98:16, 99:4, 99:6, 99:9, 99:14, 99:19, 99:21, 99:24, 100:11, 100:23, 101:12, 101:16, 101:22, 101:25, 102:5, 102:8, 102:18, 102:21, 103:1, 103:7, 103:18, 103:24, 104:4, 104:9, 105:2, 105:4, 105:9, 105:20, 105:22, 106:4, 106:8, 106:14, 106:17, 106:23, 107:8, 107:24, 108:6, 109:22, 112:8, 112:11, 112:16, 113:18, 113:23, 114:3, 114:11, 115:12, 115:15, 115:18, 116:1, 117:22, 120:2, 120:8, 120:12, 120:17, 120:21, 121:3, 123:12, 124:4, 124:8, 124:10, 124:13, 124:16, 124:21, 124:25, 125:4, 125:9, 125:16, 125:21, 126:2, 126:8, 126:14, 127:16, 127:21, 127:25, 128:4, 128:22, 130:7, 130:9, 134:21, 135:1, 135:18, 135:23, 136:2, 136:4, 136:8, 136:17, 137:7, 137:16, 137:18, 137:22, 137:25, 138:4, 138:11, 138:16, 138:19, 138:22, 138:24, 139:5, 139:8, 139:14, 139:16, 144:4, 144:8, 145:17, 146:14, 146:17, 149:12, 149:14, 149:17, 150:18, 150:20, 150:22, 151:3, 151:7, 157:11, 157:25, 158:7, 158:9, 159:11, 159:24,

160:1, 166:1, 166:3, 167:5, 170:9, 171:5, 171:7, 171:25, 172:10, 173:7, 173:15, 173:17, 177:16, 177:20, 177:23, 177:25, 178:6, 179:20, 179:24, 180:6, 188:11, 190:16, 191:2, 197:7, 197:9, 199:4, 199:7, 199:15, 199:23, 199:25, 200:3, 200:6, 200:9, 201:1, 201:7, 201:9, 201:15, 201:22, 201:24, 202:4, 202:8, 202:16, 202:20, 202:23, 203:4, 203:9, 203:22, 203:25, 204:5, 204:16, 204:20, 204:23, 204:25, 205:3, 205:12, 205:14, 205:17, 205:21, 206:11, 206:14, 206:20, 206:22, 206:24, 207:3, 207:6, 207:9, 207:12, 207:15, 207:18, 208:2, 208:8, 208:12, 208:17, 208:22, 208:24, 209:7, 209:9, 209:12, 209:15, 209:20, 209:24, 210:8, 210:13, 210:16, 210:19, 211:3, 211:7, 211:14, 211:21, 211:24, 212:10, 212:22, 212:25, 213:5, 213:9, 213:12, 213:16, 213:18, 213:20, 213:22, 214:1, 215:10, 215:14, 217:22, 218:1, 218:6, 218:8, 218:11, 218:15, 218:17, 218:21, 219:1, 219:3, 219:6, 219:8, 219:11, 219:18, 219:22, 219:24, 220:10, 220:16, 220:25, 221:4, 221:7, 221:11, 221:13, 221:17, 222:3, 223:3, 223:10, 223:16, 223:18, 223:20, 223:23, 224:3, 224:6, 224:15, 224:19, 225:5, 225:10, 225:13, 225:16, 225:23, 226:3, 226:9, 226:14, 226:21, 227:2, 227:9, 228:10, 228:14, 228:20, 228:23, 229:1, 229:5, 229:13

**Court's** [18] - 7:22, 24:23, 75:16, 75:20, 75:21, 79:19, 81:24, 81:25, 86:4, 105:25, 115:23, 117:24, 130:10, 134:14, 151:1, 207:7, 207:9, 221:12

**Courthouse** [1] - 1:24

**courtroom** [19] - 8:7,

9:9, 13:25, 52:24, 88:15, 89:17, 112:2, 139:15, 144:23, 182:8, 199:14, 199:22, 200:10, 200:13, 200:20, 205:16, 210:17, 217:21, 226:20

**courts** [1] - 147:4

**covers** [1] - 80:16

**CR** [1] - 213:20

**CR-1** [2] - 165:25, 166:1

**CR-2** [2] - 167:4, 167:5

**CR-3** [2] - 170:8, 170:9

**CR-4** [1] - 170:13

**CR-5** [2] - 171:24, 171:25

**CR-6** [2] - 173:6, 173:7

**CR-7** [2] - 197:8, 197:9

**CR-8** [2] - 213:15, 213:21

**craft** [1] - 70:8

**crafted** [1] - 103:11

**crash** [7] - 164:23, 165:1, 170:7, 170:18, 170:19, 170:22, 170:25

**created** [1] - 33:15

**creates** [3] - 11:1, 69:16, 79:16

**credibility** [3] - 133:16, 133:21, 173:11

**Credit** [1] - 195:23

**credit** [10] - 115:3, 195:5, 195:9, 195:24, 196:9, 198:10, 198:12, 198:14, 199:1

**crediting** [1] - 65:9

**Cree** [4] - 92:1, 184:14, 184:16, 184:22

**crime** [49] - 49:19, 49:25, 58:5, 59:19, 64:7, 64:8, 64:9, 64:11, 118:18, 118:21, 118:23, 119:3, 119:16, 121:19, 154:16, 173:22, 204:13, 216:13

**crimes** [8] - 55:23, 59:5, 64:4, 66:6, 66:8, 74:21, 74:25, 110:25

**Crimes** [1] - 58:14

**CRIMINAL** [1] - 1:6

**criminal** [14] - 6:19, 74:7, 97:9, 133:7, 136:25, 147:5, 149:9, 186:20, 203:16, 215:22, 216:11, 216:17, 217:4

**critical** [1] - 76:25

**Critical** [1] - 119:2

**cross** [11] - 3:22, 22:5, 39:19, 110:2, 110:3, 134:7, 134:12, 137:5, 138:12, 205:2, 210:4

**CROSS** [7] - 38:24, 151:8, 164:7, 187:1, 230:8, 230:10, 230:12
**CROWE** [47] - 3:25, 4:3, 90:3, 95:7, 95:13, 95:18, 95:21, 96:5, 96:14, 96:19, 96:22, 97:5, 97:19, 97:25, 98:12, 98:15, 98:21, 99:5, 99:8, 99:10, 99:15, 99:20, 99:23, 100:1, 100:14, 100:24, 101:14, 101:17, 101:23, 102:1, 102:7, 102:14, 102:20, 102:22, 103:2, 103:14, 103:21, 104:3, 104:8, 104:10, 105:3, 105:5, 105:17, 105:21, 225:14, 225:17, 225:24
**Crowe** [11] - 1:20, 3:24, 88:7, 89:21, 90:2, 95:4, 105:11, 106:6, 113:25, 225:13
**Crowe's** [1] - 106:10
**curve** [2] - 19:22, 20:3
**custody** [2] - 123:22, 123:23
**cut** [2] - 132:13, 219:11
**cuts** [1] - 132:3
**cutting** [1] - 12:2
**cylinder** [3] - 160:22, 163:21, 163:23

**D**

**D-U-L-A-N-E-Y** [1] - 158:17
**daily** [5] - 23:1, 23:2, 23:11, 41:16, 41:25
**Daily** [1] - 23:2
**damaged** [1] - 170:10
**Damita** [2] - 45:20, 47:11
**damning** [1] - 100:20
**Darius** [2] - 119:12, 201:13
**Darryl** [22] - 16:10, 16:11, 16:15, 16:22, 17:12, 17:18, 18:24, 21:20, 26:5, 90:13, 90:17, 109:1, 109:2, 109:17, 109:18, 109:21, 112:2, 112:24, 113:6, 113:10, 113:12, 222:9
**data** [1] - 21:18
**date** [5] - 21:11, 23:8, 44:16, 95:25, 151:21
**dated** [2] - 136:19, 221:25

**dates** [8] - 31:22, 52:20, 68:11, 70:16, 75:21, 95:5, 152:11, 152:21
**Davis** [2] - 1:13, 205:18
**days** [18] - 22:21, 23:4, 28:22, 28:25, 29:1, 29:2, 30:14, 50:24, 52:9, 81:7, 131:25, 142:1, 142:19, 148:17, 148:18, 156:8, 192:19
**deal** [6] - 122:17, 128:17, 199:18, 199:23, 210:2
**dealers** [7] - 56:6, 63:14, 63:16, 81:15, 81:16, 88:1, 119:10
**dealing** [2] - 63:14, 129:24
**Dean** [1] - 136:20
**debate** [1] - 105:24
**decade** [1] - 56:13
**December** [3] - 29:24, 107:12
**decide** [4] - 65:25, 104:5, 114:10, 221:4
**decided** [2] - 80:19, 88:19
**decides** [3] - 169:6, 172:21, 173:20
**decision** [10] - 68:14, 133:3, 133:25, 134:4, 134:16, 134:17, 143:22, 216:6, 216:19
**deemed** [1] - 56:5
**DEFENDANT** [2] - 144:10, 158:12
**Defendant** [4] - 1:17, 1:18, 1:20, 1:21
**defendant** [15] - 49:18, 49:24, 82:3, 87:18, 87:19, 103:12, 118:20, 119:3, 132:22, 133:7, 139:22, 147:8, 147:9, 156:16, 156:22
**Defendant's** [1] - 210:22
**defendant's** [2] - 118:20, 225:14
**Defendants** [3] - 1:9, 2:1, 199:22
**defendants** [22] - 11:17, 44:18, 47:12, 56:11, 56:22, 60:6, 80:9, 81:6, 112:1, 131:20, 132:14, 132:19, 139:21, 140:7, 140:23, 141:25, 142:13, 147:4, 199:17, 224:8, 227:11, 227:19
**Defender** [2] - 57:3, 57:4

**defense** [25] - 3:15, 7:21, 9:19, 11:21, 12:10, 12:12, 39:21, 45:9, 45:13, 46:3, 50:9, 88:23, 89:24, 91:15, 110:4, 110:14, 133:4, 133:10, 134:24, 139:18, 140:3, 140:5, 141:25, 143:3, 205:23
**Defense** [1] - 108:13
**deferred** [2] - 13:9, 140:16
**defined** [2] - 49:20, 50:1
**definition** [5] - 66:16, 66:23, 88:5, 118:10, 118:14
**deflated** [2] - 172:1, 172:2
**degree** [1] - 215:21
**Delaney** [8] - 159:18, 160:3, 161:7, 164:1, 164:9, 165:3, 166:25, 170:11
**Delaney's** [1] - 159:9
**delay** [2] - 140:20, 215:12
**delays** [2] - 14:2, 50:15
**delete** [1] - 162:5
**deliberations** [7] - 52:1, 52:3, 52:6, 52:9, 214:16, 217:9, 217:17
**demeanor** [1] - 150:16
**demonstrate** [3] - 141:22, 142:3, 142:6
**demonstration** [1] - 159:14
**Denham** [2] - 112:23, 114:17
**denied** [2] - 101:1, 131:13
**deny** [3] - 117:18, 130:10, 132:21, 132:23
**Department** [1] - 222:15
**dependent** [3] - 90:14, 129:5, 216:21
**deploys** [1] - 171:11
**deposit** [1] - 211:19
**deposition** [1] - 226:22
**depress** [3] - 170:4, 173:25, 175:24
**depressed** [3] - 161:20, 171:2, 174:14
**depresses** [3] - 169:10, 169:25, 175:1
**depressing** [1] - 169:1
**depth** [1] - 33:10
**describe** [7] - 160:5, 160:16, 161:9, 162:18, 164:2, 184:21, 187:21

**described** [3] - 91:20, 187:19, 219:8
**describes** [1] - 130:14
**description** [2] - 132:7, 165:16, 223:8
**desirable** [1] - 3:1
**desperate** [1] - 71:17
**despite** [1] - 27:11
**destroyed** [1] - 9:7
**detailed** [3] - 34:3, 99:22, 100:12
**details** [1] - 164:17
**detective** [3] - 195:20, 195:22, 195:23
**Detective** [31] - 14:24, 15:6, 15:14, 16:11, 19:18, 21:19, 25:5, 25:7, 26:9, 26:23, 27:19, 29:6, 29:10, 29:22, 30:3, 33:20, 37:12, 37:15, 38:22, 39:1, 39:18, 44:2, 91:20, 94:12, 95:9, 95:22, 101:5, 101:18, 102:9, 102:12, 221:17
**Detectives** [1] - 47:14
**detectives** [5] - 130:1, 195:17, 196:8, 196:18, 198:8
**determination** [2] - 93:12, 117:11
**determine** [3] - 35:19, 143:16, 216:7
**determined** [2] - 34:10, 132:11
**determines** [1] - 217:7
**device** [6] - 159:18, 159:19, 160:16, 160:23, 160:24, 161:4
**devices** [1] - 17:2
**diagnostics** [1] - 159:3
**diagram** [2] - 33:12, 165:16
**dialogue** [1] - 65:8
**difference** [3] - 18:18, 84:6, 86:4
**different** [33] - 4:3, 17:1, 19:20, 20:23, 21:15, 29:2, 34:21, 60:7, 70:7, 74:17, 74:18, 75:7, 75:19, 76:5, 93:6, 93:7, 93:9, 109:5, 111:2, 111:22, 111:23, 112:17, 112:19, 137:11, 149:2, 162:15, 172:16, 175:8, 175:20, 176:10, 218:19
**differently** [1] - 187:19
**difficult** [4] - 14:21, 27:1, 58:24, 59:8
**Digest** [1] - 106:19
**dire** [1] - 199:19

**direct** [8] - 40:7, 103:4, 122:15, 134:8, 180:2, 189:4, 195:11, 219:7
**DIRECT** [7] - 15:11, 144:15, 158:18, 178:11, 230:7, 230:9, 230:12
**Direct** [1] - 3:22
**direct's** [1] - 225:17
**directed** [1] - 122:2
**direction** [1] - 221:2
**directions** [1] - 111:6
**directly** [6] - 109:17, 116:19, 144:12, 158:14, 178:3, 222:24
**directories** [1] - 29:3
**dirty** [3] - 56:22, 125:6, 125:13
**Dirty** [2] - 104:20, 104:21
**disagreement** [2] - 73:20, 203:15
**discipline** [1] - 118:19
**discounted** [1] - 93:17
**discovery** [2] - 210:22, 211:19
**discrepancies** [3] - 25:14, 37:6, 38:4
**discrepancy** [1] - 19:23
**discrete** [1] - 120:18
**discuss** [4] - 3:8, 11:10, 200:12, 215:3
**discussed** [4] - 40:8, 68:7, 176:11, 228:8
**discussing** [1] - 68:22
**discussion** [5] - 22:4, 52:16, 62:15, 89:5, 199:11
**disinclined** [1] - 5:1
**disjunctive** [2] - 85:24, 86:2
**Dismiss** [1] - 84:18
**dispute** [2] - 78:11, 78:14
**disrupting** [1] - 63:19
**distinct** [14] - 53:20, 53:21, 53:25, 54:9, 55:18, 55:19, 55:20, 56:3, 59:24, 61:24, 62:19, 62:24, 67:17, 74:12
**distinction** [4] - 34:3, 35:15, 112:13, 222:17
**distinctive** [1] - 37:1
**distinguish** [1] - 49:1
**distributed** [1] - 108:17
**distributing** [2] - 67:14, 107:22
**distribution** [12] - 55:7, 55:11, 55:19, 56:2, 67:6, 74:12, 108:15, 109:24,

110:16, 110:24, 132:12, 133:12
**district** [1] - 147:3
**DISTRICT** [2] - 1:1, 1:2
**Division** [1] - 206:9
**DIVISION** [1] - 1:2
**DOAR** [3] - 49:12, 49:13, 149:12
**Dobropolski** [4] - 46:11, 47:9, 73:20, 78:11
**Dobropolski's** [2] - 48:23, 104:11
**DOC** [2] - 222:17, 223:4
**doctors** [1] - 9:1
**doctrine** [1] - 103:10, 216:15, 216:16
**document** [4] - 160:3, 196:24, 204:19, 211:17
**documents** [6] - 3:23, 4:7, 39:23, 48:17, 48:19, 152:23
**dogs** [1] - 104:7
**done** [30] - 15:15, 32:13, 33:8, 33:10, 56:21, 63:25, 71:20, 73:14, 76:18, 80:6, 84:15, 104:2, 119:7, 122:2, 142:16, 142:21, 142:22, 142:23, 143:25, 174:9, 219:16, 219:17, 219:19, 220:1, 220:4, 220:5, 222:20, 228:15
**door** [6] - 26:17, 103:9, 159:22, 160:20, 161:1, 161:15, 161:16, 161:21, 162:3, 162:4, 162:12, 162:21, 162:23, 162:24, 163:3, 163:7, 163:10, 163:12, 163:13, 163:20, 166:8, 166:9, 166:11, 166:12, 166:15, 167:1, 167:7, 167:24, 168:1, 168:4, 168:8, 168:11, 168:12, 168:13, 168:19, 168:25, 169:1, 169:5, 169:14, 169:15, 169:20, 170:2, 170:17, 170:19, 171:23, 172:19, 173:23, 174:1, 174:9, 174:14, 174:17, 174:19, 174:21, 174:23, 175:1, 175:3, 176:7, 176:11, 176:17, 177:10, 185:1, 185:2, 185:3
**door's** [1] - 176:15
**doors** [42] - 160:23, 161:11, 162:9, 162:17, 162:24, 162:25, 163:4, 163:12, 163:17, 163:22, 164:4, 166:16, 166:21,

166:25, 167:11, 167:18, 167:23, 168:9, 168:18, 168:22, 169:6, 169:7, 169:9, 169:11, 169:15, 169:19, 170:1, 171:3, 172:5, 172:13, 172:17, 173:20, 174:11, 174:15, 175:2, 175:4, 175:10, 175:24, 176:4, 176:17, 176:21, 177:6
**dots** [1] - 94:18
**double** [2] - 80:13, 111:4
**doublecheck** [1] - 51:12
**doubt** [14] - 18:8, 65:11, 70:17, 87:14, 87:17, 129:22, 130:13, 132:8, 141:5, 141:10, 141:13, 141:19, 144:2, 216:9
**Down** [1] - 185:5
**down** [31] - 43:8, 87:15, 90:10, 98:19, 112:14, 135:10, 138:5, 143:18, 145:18, 160:23, 161:4, 168:19, 170:18, 174:10, 177:7, 178:6, 180:8, 180:9, 185:3, 185:12, 185:16, 189:25, 190:5, 190:6, 199:17, 200:17, 205:13, 225:20, 227:24
**downstairs** [1] - 184:20
**draft** [3] - 120:4, 120:15, 227:21
**draw** [2] - 98:19, 100:10
**drawn** [1] - 94:18
**dreamed** [1] - 140:12
**dried** [1] - 173:3
**drink** [3] - 181:23, 181:24, 197:12
**drive** [2] - 165:9, 225:3
**driven** [1] - 194:7
**driver** [11] - 161:13, 168:17, 168:21, 169:5, 169:6, 169:8, 169:18, 169:23, 170:15, 170:20, 172:17
**driver's** [16] - 159:22, 160:20, 162:21, 162:23, 163:20, 166:8, 167:7, 168:21, 171:2, 174:9, 174:14, 174:17, 174:18, 174:21, 175:1, 175:24
**drop** [1] - 97:14
**drug** [63] - 16:16, 53:17, 55:25, 56:5, 56:7, 56:10, 56:12, 58:18, 58:20, 60:9, 60:11, 60:16, 60:21, 60:22, 60:23, 60:25, 61:1, 61:2, 61:3,

61:20, 61:23, 62:10, 63:14, 63:16, 64:14, 64:20, 64:23, 65:2, 65:10, 65:12, 65:14, 65:16, 65:17, 73:3, 74:9, 74:10, 74:12, 74:14, 76:17, 77:20, 77:21, 80:10, 81:15, 87:23, 88:1, 90:12, 93:2, 95:2, 106:15, 107:18, 109:13, 110:18, 110:24, 112:13, 119:10, 131:10, 132:11, 133:12, 141:7, 141:23
**drugs** [2] - 44:8, 44:20, 44:21, 54:6, 55:16, 63:14, 67:16, 107:22, 109:14, 109:16, 109:17, 113:11
**drunk** [1] - 181:24
**dual** [2] - 210:6, 216:15
**dubbed** [1] - 74:7
**due** [2] - 25:15
**DULANEY** [2] - 158:12, 230:9
**Dulaney** [12] - 158:11, 158:16, 158:20, 158:22, 159:13, 166:5, 171:5, 171:20, 173:4, 174:2, 175:18, 177:16
**dummies** [1] - 170:24
**duration** [11] - 18:10, 18:20, 19:23, 21:7, 21:8, 35:13, 35:19, 36:16, 36:23, 37:6, 38:8
**Duration** [1] - 36:5
**durations** [2] - 38:1, 38:3
**during** [33] - 4:24, 15:4, 31:14, 32:11, 32:20, 33:3, 33:6, 39:19, 47:5, 48:5, 48:17, 48:19, 48:23, 51:5, 51:9, 96:14, 101:2, 116:16, 116:17, 121:19, 141:8, 148:3, 154:8, 154:24, 155:10, 157:6, 184:5, 191:18, 194:6, 194:19, 217:5, 217:9, 217:17
**duties** [1] - 159:2
**duty** [2] - 134:11, 143:1
**dutybound** [1] - 142:24

## E

**e-mail** [2] - 227:18, 229:8
**earliest** [1] - 109:2
**early** [12] - 5:9, 10:16, 17:12, 35:15, 54:3,

88:19, 91:7, 99:11, 141:16, 201:12, 227:6, 227:14
**earn** [1] - 60:20
**earned** [2] - 60:20, 88:21
**easier** [2] - 37:4, 59:11
**easily** [2] - 77:19, 204:14
**easy** [1] - 65:7
**eat** [3] - 185:15, 185:16, 185:24
**Edgecombe** [1] - 130:23
**effect** [3] - 105:14, 194:15, 217:6
**effectively** [1] - 76:10
**effort** [2] - 57:1, 111:14
**efforts** [2] - 50:20, 208:3
**Eight** [7] - 53:18, 56:16, 74:15, 75:11, 76:4, 90:12, 93:2
**eight** [4] - 29:23, 80:16, 98:25, 141:9, 175:8, 181:8, 181:9, 213:22
**Eighth** [1] - 57:22
**Either** [1] - 3:1
**either** [15] - 4:23, 5:1, 10:19, 43:3, 92:17, 98:6, 103:10, 121:21, 148:8, 154:23, 173:23, 176:13, 184:4, 192:14, 228:21
**election** [1] - 227:11
**element** [4] - 87:13, 87:17, 119:1, 216:8
**elementary** [1] - 132:15
**elements** [3] - 57:6, 216:25, 217:1
**elicit** [5] - 101:5, 101:17, 102:12, 137:12, 137:14
**elicited** [2] - 95:9, 203:5
**embellished** [1] - 143:19
**emerge** [1] - 111:3
**emergency** [1] - 14:6
**emerges** [1] - 111:9
**emotion** [1] - 9:12
**emphasis** [1] - 210:5
**employ** [1] - 153:13
**employed** [2] - 87:11, 107:11, 158:23
**employee** [2] - 148:15, 153:1, 153:10
**employees** [1] - 153:4
**employer** [2] - 51:10, 52:19
**employment** [2] - 153:21, 156:25

**encounter** [1] - 14:2
**encountered** [1] - 50:16
**end** [18] - 8:3, 11:2, 12:8, 12:14, 13:6, 14:24, 22:16, 39:12, 40:9, 51:21, 53:7, 111:14, 118:15, 135:21, 182:14, 215:19, 228:22
**End** [1] - 107:10
**ended** [3] - 67:10, 67:17, 194:2
**ending** [1] - 41:1
**ends** [1] - 22:6
**enforcement** [1] - 173:21
**engage** [4] - 71:8, 119:18, 132:11, 169:8
**engaged** [5] - 56:11, 64:10, 67:14, 132:4, 132:20
**enhance** [1] - 118:23
**enhancing** [3] - 63:10, 64:6, 113:19
**Enjoy** [2] - 89:6, 215:7
**enjoy** [1] - 215:1
**ensure** [1] - 147:7
**entered** [2] - 84:12, 197:13
**entering** [1] - 161:19
**enterprise** [102] - 57:9, 57:10, 57:21, 58:1, 58:7, 58:13, 58:16, 58:19, 59:6, 59:10, 59:11, 59:12, 59:20, 60:7, 60:12, 60:17, 61:7, 61:11, 61:13, 61:14, 61:22, 62:5, 62:9, 62:12, 62:16, 62:18, 62:3, 63:4, 63:11, 64:6, 64:10, 64:14, 64:15, 64:20, 64:23, 65:3, 65:10, 65:12, 65:14, 65:15, 66:10, 71:1, 71:6, 71:13, 71:14, 71:18, 72:2, 72:3, 72:11, 73:12, 74:2, 74:3, 74:5, 74:6, 74:15, 74:20, 74:21, 74:22, 74:23, 76:21, 77:16, 77:19, 78:1, 78:5, 79:15, 80:3, 80:4, 81:12, 81:13, 81:23, 83:3, 83:21, 84:16, 85:18, 87:10, 87:17, 87:18, 87:20, 88:4, 90:14, 92:22, 94:23, 97:9, 97:14, 107:7, 111:18, 113:11, 118:11, 118:19, 118:20, 118:22, 118:24, 119:17, 119:19, 130:17, 141:6, 141:15, 141:18, 141:23,

142:13
  enterprise's [2] - 73:24, 87:12
  enterprises [2] - 61:24, 119:8
  enters [7] - 8:7, 13:25, 88:15, 139:15, 169:20, 205:16, 210:17
  entertain [1] - 53:1
  Entertainment [9] - 58:13, 58:15, 60:5, 62:7, 74:4, 76:24, 77:15, 79:3, 130:19
  entire [9] - 55:6, 82:17, 92:25, 184:2, 194:5, 197:14, 204:11, 213:16, 213:18
  entirely [6] - 57:13, 90:14, 113:9, 115:21, 134:17, 205:24
  entirety [3] - 44:5, 46:4, 204:15
  entitled [3] - 37:21, 121:18, 132:17
  entity [4] - 78:1, 78:2, 132:7, 220:19
  envelope [1] - 214:22
  equal [3] - 83:11, 83:25
  equally [1] - 100:7
  equals [1] - 72:8
  equipment [2] - 154:5, 165:16
  equipped [1] - 177:10
  Eric [5] - 110:3, 117:6, 117:8, 125:20, 126:1
  especially [3] - 106:11, 140:17, 172:13
  Esquire [10] - 1:16, 1:16, 1:17, 1:18, 1:19, 1:19, 1:20, 1:21, 1:22, 1:22
  essential [1] - 34:5
  essentially [18] - 19:6, 53:17, 54:1, 54:24, 55:11, 55:14, 56:3, 82:19, 92:16, 93:23, 94:17, 95:2, 100:17, 103:3, 119:6, 129:5, 163:1, 206:1
  Essentially [2] - 19:22, 24:1
  establish [1] - 117:13
  established [4] - 76:8, 81:13, 107:18, 119:1
  et [1] - 231:5
  evaluating [1] - 216:7
  evening [8] - 2:24, 2:25, 6:5, 6:11, 10:17, 91:7, 91:18
  event [5] - 79:1, 82:16,

83:2, 137:5, 227:12
  events [5] - 51:16, 180:3, 202:2, 202:21, 206:17
  eventually [1] - 24:10
  evidence [153] - 3:2, 10:8, 10:14, 44:13, 46:25, 47:6, 47:7, 47:10, 47:19, 48:8, 51:20, 54:5, 54:11, 54:12, 54:15, 54:17, 54:20, 55:4, 55:24, 58:11, 60:14, 60:19, 63:15, 63:24, 65:8, 65:9, 66:2, 69:3, 69:12, 72:14, 72:18, 72:21, 72:23, 73:5, 73:13, 73:17, 73:19, 74:10, 74:24, 75:8, 76:9, 76:12, 76:13, 78:8, 78:12, 78:15, 78:19, 78:20, 79:1, 79:17, 80:7, 80:23, 80:25, 81:5, 81:17, 81:21, 83:6, 83:7, 83:9, 83:10, 83:14, 83:24, 84:4, 84:11, 84:25, 85:5, 85:11, 85:14, 86:9, 86:16, 86:24, 86:25, 88:2, 89:6, 90:22, 91:3, 91:12, 92:2, 93:3, 95:5, 95:17, 97:3, 98:21, 98:22, 100:20, 101:9, 101:10, 102:1, 103:9, 105:1, 106:21, 107:14, 113:16, 114:5, 114:19, 115:5, 115:12, 115:14, 116:14, 116:16, 118:7, 118:17, 119:4, 119:21, 119:23, 120:1, 122:10, 122:15, 122:21, 123:18, 126:17, 126:24, 127:4, 127:5, 127:7, 127:11, 127:13, 129:24, 130:2, 130:6, 130:20, 131:14, 131:20, 132:17, 132:20, 133:16, 134:12, 139:18, 139:24, 142:15, 143:25, 146:13, 149:16, 149:17, 197:5, 199:11, 204:10, 204:18, 212:18, 213:15, 214:10, 214:12, 214:13, 215:23, 216:7, 217:12, 220:1, 221:15, 223:1
  evidentiary [7] - 52:12, 84:7, 86:4, 86:11, 86:20, 126:11, 129:21
  evidently [1] - 164:22
  ex [5] - 155:24, 155:25, 156:2, 156:4, 156:5
  ex-husband [4] -

155:24, 155:25, 156:2, 156:4
  ex-husband's [1] - 156:5
  exact [2] - 31:22, 148:5
  Exactly [4] - 35:11, 36:17, 194:20, 219:2
  exactly [10] - 20:20, 29:13, 56:8, 97:23, 119:19, 132:9, 181:20, 186:4, 224:18, 228:1
  exam [3] - 110:3, 146:21
  examination [7] - 14:24, 32:1, 39:4, 39:19, 137:5, 210:5
  EXAMINATION [24] - 15:11, 25:3, 27:17, 38:24, 144:15, 151:8, 158:18, 164:7, 175:16, 178:11, 187:1, 198:18, 230:4, 230:5, 230:5, 230:6, 230:7, 230:8, 230:9, 230:10, 230:10, 230:12, 230:12, 230:13
  examination's [1] - 138:12
  examine [5] - 110:3, 134:12, 165:1, 205:2, 222:25
  examined [2] - 130:25, 134:7
  examining [1] - 22:5
  example [11] - 21:5, 23:20, 30:13, 37:23, 64:7, 80:22, 84:21, 118:17, 131:15, 165:18
  exceeding [2] - 49:20, 50:1
  excellent [1] - 148:13
  Excellent [3] - 89:14, 228:20
  except [5] - 19:3, 52:17, 72:16, 108:10, 112:1
  exception [6] - 10:8, 102:21, 103:11, 103:18, 103:19, 204:12
  excessive [1] - 3:11
  exchanged [2] - 96:9, 130:25
  exculpatory [1] - 103:11
  excuse [6] - 88:9, 89:2, 135:24, 138:9, 227:4, 227:6
  Excuse [5] - 8:9, 89:10, 115:18, 172:10, 221:1
  excused [15] - 2:13, 9:4, 10:14, 14:15, 52:15, 52:22, 89:4, 89:7, 158:1,

158:3, 177:17, 199:5, 199:13, 208:2, 210:9
  Executive [1] - 130:15
  exercise [1] - 143:1
  Exhibit [47] - 47:17, 48:15, 48:18, 48:20, 48:25, 49:9, 49:10, 92:9, 98:24, 99:17, 105:6, 149:16, 173:1, 210:22, 213:1, 213:15
  exhibit [14] - 45:1, 45:2, 45:17, 46:7, 46:8, 47:16, 48:6, 96:6, 99:15, 104:16, 104:23, 106:23, 165:23
  exhibits [6] - 39:15, 44:19, 44:24, 50:9, 158:2, 217:16
  Exhibits [1] - 44:12
  exist [1] - 59:20
  existed [2] - 61:11, 68:1, 141:18
  existence [1] - 57:9, 58:12, 61:11, 70:1, 87:12, 87:19
  exit [4] - 161:10, 161:11, 162:13, 176:7
  exited [1] - 170:16
  exits [5] - 9:9, 52:24, 89:17, 199:14, 217:21
  expansive [1] - 131:11
  expect [13] - 5:4, 5:5, 90:7, 109:25, 132:10, 137:11, 137:12, 214:9, 214:13, 225:15, 225:17, 225:25
  expectation [2] - 121:15, 132:1
  expected [6] - 4:24, 118:21, 119:3, 119:18, 131:19, 133:5
  expecting [1] - 4:6
  expeditiously [1] - 50:18
  experience [1] - 220:5
  experienced [1] - 224:7
  expert [13] - 3:19, 3:20, 5:8, 7:21, 33:23, 135:13, 159:10, 159:11, 218:9, 218:25, 219:8, 219:12, 219:15
  expert's [1] - 138:16
  experts [2] - 44:10, 219:16
  explain [3] - 37:20, 37:21, 175:10
  explained [1] - 17:6, 17:20, 18:13, 109:11
  explanation [1] - 38:6
  exploded [1] - 172:4

explodes [1] - 171:13
  exposed [1] - 115:23
  express [1] - 137:2
  expressions [1] - 214:24
  extended [1] - 111:19
  extending [2] - 2:16, 140:19
  extensive [1] - 103:22
  extent [10] - 11:20, 52:7, 52:17, 60:8, 75:20, 91:16, 112:24, 122:16, 135:20, 212:15
  extremely [1] - 5:5
  eye [1] - 134:22
  eyewitnesses [2] - 4:21, 221:5

F

  face [3] - 9:12, 145:18, 178:7
  fact [61] - 14:3, 17:1, 22:5, 22:20, 25:16, 26:9, 27:11, 31:20, 32:19, 33:12, 33:23, 34:2, 34:3, 34:8, 34:13, 39:20, 44:15, 53:20, 53:22, 54:9, 59:11, 61:13, 62:14, 63:7, 64:19, 64:22, 65:11, 67:3, 67:4, 67:14, 73:8, 74:6, 74:18, 78:2, 78:18, 79:8, 91:21, 92:6, 97:5, 102:14, 108:15, 114:1, 114:5, 114:7, 116:11, 116:12, 125:7, 126:12, 130:12, 134:2, 172:25, 193:17, 194:24, 205:5, 208:25, 219:15, 221:3, 223:18, 223:19, 223:21, 224:24
  factors [2] - 118:15, 216:20
  facts [7] - 64:18, 67:5, 107:19, 121:10, 122:6, 143:2, 143:3
  factual [4] - 80:2, 86:21, 121:16, 121:23
  fail [1] - 141:14
  failed [5] - 53:19, 57:8, 62:23, 141:17, 141:18
  failing [1] - 110:15
  failings [1] - 142:2
  Fair [1] - 61:21
  fair [8] - 63:20, 64:15, 64:16, 77:3, 78:20, 82:5, 143:23, 160:11
  fairly [3] - 50:18, 92:14, 140:4

**fall** [2] - 20:3, 78:10
**falls** [1] - 126:24
**familiar** [1] - 147:16
**family** [20] - 2:11, 8:12, 8:22, 14:6, 14:7, 14:13, 14:15, 14:20, 16:10, 52:20, 59:17, 59:19, 109:11, 112:5, 147:16, 155:15, 155:17, 155:20, 223:5, 225:5
**far** [10] - 27:13, 43:2, 69:12, 75:15, 77:20, 86:14, 89:6, 129:21, 145:19, 172:15
**fascinating** [1] - 110:2
**fast** [1] - 196:5
**fatal** [5] - 76:11, 76:15, 79:18, 82:19
**faulting** [2] - 220:3, 224:9
**favor** [6] - 65:9, 76:8, 81:21, 83:1, 87:1, 126:23
**favorable** [1] - 76:13
**feasibility** [1] - 2:24
**feature** [2] - 103:5, 174:16
**February** [4] - 45:23, 80:12, 96:11, 97:24
**Federal** [1] - 206:5
**federal** [18] - 51:2, 94:13, 95:15, 137:3, 137:4, 147:4, 191:10, 209:1, 215:20, 216:10, 216:14, 216:16, 216:19, 216:20, 216:22, 216:25
**feedback** [1] - 2:19
**feelings** [1] - 187:9
**fell** [2] - 184:6, 193:17
**fellow** [2] - 65:24, 104:19, 104:21
**felon** [1] - 94:13
**felt** [2] - 34:5, 90:9
**females** [1] - 154:10
**few** [12] - 15:13, 24:3, 40:14, 48:5, 113:24, 142:1, 190:18, 192:19, 206:15, 206:16, 213:6
**field** [1] - 160:24
**Fifth** [4] - 136:11, 207:4, 208:17, 208:21
**fight** [3] - 78:12, 78:16, 93:20
**figure** [1] - 189:5
**file** [2] - 211:1, 211:20
**filed** [5] - 90:7, 211:1, 211:10, 211:17, 227:16
**fill** [2] - 147:6, 164:14
**filled** [1] - 47:13
**filling** [2] - 138:15, 196:16

**final** [10] - 46:4, 50:8, 50:17, 54:22, 56:18, 98:9, 98:10, 120:25, 164:1, 227:13
**finalize** [1] - 45:17
**finalized** [5] - 33:15, 33:19, 33:25
**finally** [5] - 104:10, 123:13, 140:11, 157:4, 217:15
**Finally** [2] - 60:1, 149:22
**finder** [4] - 64:19, 64:22, 65:11, 130:12
**fine** [9] - 2:5, 7:24, 105:17, 105:20, 151:21, 157:20, 157:23, 211:25, 212:5
**Fine** [1] - 61:12
**fingerprint** [1] - 146:23
**finish** [5] - 10:8, 10:19, 12:15, 37:9, 37:10
**finished** [2] - 51:3, 66:15
**finishing** [1] - 12:22
**firearm** [2] - 90:17, 154:6
**firearms** [6] - 5:8, 7:21, 90:15, 110:21, 129:24
**First** [7] - 2:4, 15:14, 57:6, 64:25, 68:2, 180:11, 202:17
**first** [50] - 9:21, 11:17, 17:20, 18:24, 23:5, 24:7, 24:15, 33:20, 38:14, 40:1, 40:4, 40:22, 41:7, 43:3, 44:7, 53:17, 67:10, 69:7, 69:8, 69:11, 72:8, 75:10, 75:13, 77:1, 77:23, 78:9, 109:10, 118:3, 141:9, 143:16, 144:5, 145:23, 160:2, 162:5, 168:2, 170:21, 171:13, 171:14, 171:17, 173:25, 179:16, 181:1, 189:3, 199:18, 201:2, 209:5, 218:22, 218:24, 222:9, 225:22
**first-hand** [1] - 171:17
**fit** [3] - 88:5, 93:18, 138:10
**Five** [8] - 90:13, 122:23, 127:9, 127:14, 129:4, 129:7, 159:14, 160:15
**five** [11] - 22:21, 23:4, 63:3, 63:5, 80:12, 80:16, 139:1, 148:18, 181:14, 205:5, 209:6
**fixed** [1] - 185:15
**flail** [1] - 170:25

**FLANNERY** [66] - 3:18, 3:20, 3:23, 53:10, 53:12, 58:20, 60:13, 60:23, 61:5, 61:7, 61:12, 61:17, 61:21, 62:13, 62:17, 62:23, 63:6, 63:17, 63:20, 63:24, 64:3, 64:12, 64:21, 64:24, 65:4, 65:6, 65:13, 65:17, 66:1, 66:14, 66:17, 66:19, 66:22, 67:3, 68:5, 68:7, 68:16, 68:21, 69:6, 69:8, 69:10, 69:15, 69:23, 70:3, 70:18, 70:21, 70:23, 71:25, 73:4, 73:10, 74:1, 74:10, 74:17, 75:3, 138:18, 138:23, 158:11, 158:19, 171:4, 171:6, 172:8, 173:14, 175:17, 213:1, 230:9, 230:10
**Flannery** [18] - 1:19, 3:17, 13:16, 53:9, 75:2, 75:11, 76:18, 80:3, 80:25, 120:25, 135:12, 160:1, 164:13, 166:4, 167:16, 209:6, 209:8, 212:11
**Flannery's** [4] - 131:5, 135:15, 158:10, 212:23
**flesh** [2] - 39:21, 102:22
**flexibility** [1] - 225:24
**flies** [1] - 171:14
**flimsy** [1] - 86:16
**flip** [1] - 168:8
**flipper** [23] - 161:2, 161:3, 161:14, 161:16, 162:3, 162:11, 162:24, 163:2, 166:10, 166:14, 167:1, 168:2, 168:8, 168:25, 169:1, 169:14, 170:4, 173:25, 176:7, 176:8, 176:22, 176:23
**floor** [1] - 139:2
**flurry** [1] - 222:14
**focus** [3] - 77:14, 79:25, 111:19
**follow** [5] - 141:19, 142:25, 156:6, 162:25, 212:8
**Following** [1] - 39:3
**following** [5] - 44:9, 47:14, 52:2, 137:7, 202:16
**follows** [2] - 51:20, 118:14
**FOR** [1] - 1:2
**foregoing** [1] - 231:7
**foreman** [1] - 159:1
**forest** [1] - 126:11

**forget** [2] - 113:1, 175:5
**forgot** [1] - 85:21
**forgotten** [2] - 210:1, 210:10
**form** [5] - 9:14, 68:4, 120:3, 147:6, 206:2
**former** [1] - 14:13
**forms** [1] - 153:15
**forth** [5] - 41:17, 83:20, 137:3, 146:23, 222:15
**forward** [17] - 14:17, 62:4, 143:21, 143:23, 161:12, 163:11, 163:14, 165:9, 167:13, 170:22, 171:14, 171:17, 172:3, 172:15, 196:5, 214:24, 216:19
**foundation** [4] - 40:1, 110:24, 121:16, 132:9
**four** [38] - 11:16, 11:18, 26:17, 46:24, 53:25, 56:3, 56:11, 58:8, 61:14, 61:15, 61:16, 61:23, 63:25, 64:16, 64:25, 66:3, 66:5, 66:11, 74:21, 74:24, 80:7, 81:7, 96:7, 114:11, 114:13, 122:12, 122:14, 130:13, 137:12, 140:23, 141:25, 166:15, 166:16, 187:12, 200:23, 205:5, 228:9
**Four** [2] - 88:5, 94:3
**fourth** [3] - 53:14, 63:18, 94:3
**Fourth** [2] - 100:25, 131:6
**frame** [2] - 31:18, 106:24
**frankly** [7] - 6:7, 10:7, 52:7, 69:13, 85:1, 88:20, 210:8
**free** [4] - 42:21, 52:21, 122:4, 200:9
**frequent** [1] - 150:3
**Friday** [1] - 52:1
**Friend** [1] - 179:4
**friend** [8] - 129:14, 149:3, 154:13, 174:20, 179:7, 187:18, 187:22
**Friends** [2] - 39:11, 40:5
**friends** [7] - 58:8, 65:18, 65:23, 132:15, 150:5, 181:3
**friendship** [1] - 131:24
**front** [16] - 25:14, 32:4, 92:9, 167:23, 168:7, 168:20, 169:12, 169:22, 170:16, 170:20, 173:20, 174:6, 174:8, 185:1,

185:2, 185:3
**full** [7] - 52:9, 75:23, 100:17, 214:9, 228:4, 228:5, 228:12
**fully** [5] - 3:4, 88:22, 120:21, 120:23, 214:13
**fund** [2] - 81:16, 88:1
**fundamentally** [1] - 82:19
**funeral** [1] - 150:24
**furtherance** [6] - 58:14, 71:18, 90:17, 121:21, 121:22, 129:2

**G**

**gain** [2] - 57:1, 58:12
**gang** [27] - 58:18, 60:9, 60:10, 60:11, 60:16, 60:25, 61:1, 61:3, 61:20, 61:23, 62:10, 64:20, 64:23, 65:2, 65:10, 65:12, 65:14, 65:16, 65:17, 73:3, 74:9, 74:10, 77:20, 77:21, 87:23, 110:17, 130:13
**GARDNER** [1] - 1:8, 144:10, 230:7
**Gardner** [143] - 1:21, 9:21, 22:6, 22:13, 22:22, 23:10, 24:8, 28:15, 39:6, 39:23, 40:13, 41:18, 42:9, 42:13, 43:7, 43:11, 43:14, 49:6, 49:9, 49:17, 49:18, 54:2, 54:11, 54:13, 54:20, 55:1, 60:3, 62:14, 67:11, 76:7, 79:2, 79:8, 79:17, 79:20, 80:25, 81:22, 85:3, 85:14, 86:17, 88:5, 92:15, 93:11, 94:10, 100:15, 106:24, 107:1, 107:2, 107:4, 107:18, 107:21, 108:7, 108:11, 108:19, 109:19, 112:20, 114:23, 115:6, 115:7, 115:9, 115:16, 116:2, 116:9, 116:10, 116:17, 117:25, 118:8, 119:14, 119:16, 122:10, 122:16, 122:18, 122:21, 122:22, 122:24, 123:9, 123:16, 123:18, 123:22, 124:11, 124:13, 125:5, 126:25, 127:10, 127:17, 128:19, 129:8, 130:20, 131:19, 133:1, 135:8, 144:6, 144:9, 144:14, 144:17, 144:21, 145:7, 145:8, 145:12, 145:13, 145:17,

145:19, 147:12, 147:24,
150:11, 151:10, 151:13,
151:25, 152:6, 152:15,
153:1, 153:9, 154:23,
155:5, 155:13, 155:14,
155:19, 156:1, 156:16,
156:22, 157:4, 157:13,
158:1, 189:11, 200:7,
200:9, 202:3, 202:7,
202:12, 202:18, 203:2,
204:12, 206:17, 222:5,
222:6, 222:12, 224:5,
224:10, 224:20

**Gardner's** [24] - 5:11,
9:22, 23:2, 23:17, 24:11,
39:5, 42:19, 43:4, 83:7,
87:2, 118:4, 122:9,
124:8, 128:16, 128:23,
129:4, 135:5, 149:3,
153:13, 154:2, 155:15,
155:16, 223:25, 225:6

**GARDNER'S** [1] -
144:10

**gathered** [1] - 130:25
**geared** [1] - 121:9
**general** [11] - 77:17,
87:20, 87:22, 87:23,
88:3, 121:7, 122:6,
160:2, 175:23, 216:12,
216:18

**generally** [2] - 59:9,
59:16

**generated** [1] - 61:2
**generis** [1] - 94:6
**gentlemen** [22] - 14:1,
14:6, 29:18, 50:10,
50:13, 88:17, 89:15,
139:16, 140:11, 146:4,
180:10, 181:19, 182:11,
184:22, 198:20, 199:7,
210:19, 212:12, 213:5,
214:3, 215:7, 217:9

**Gerard** [1] - 1:19
**gig** [1] - 111:16
**girl** [1] - 115:20
**girlfriend** [1] - 100:9
**girlfriends** [1] - 192:25
**given** [17] - 25:23,
25:25, 33:1, 68:4, 75:25,
76:8, 76:12, 78:7, 82:4,
83:4, 85:10, 103:25,
135:19, 140:20, 210:12,
215:15, 216:2

**goal** [1] - 71:14
**goals** [1] - 119:10
**God** [1] - 9:8
**Golder** [2] - 110:3,
110:8
**Goo** [5] - 108:2, 124:22,
125:13, 179:10, 179:12,

179:14, 189:13, 190:10,
192:17

**Goo's** [3] - 192:22,
192:25, 193:6
**Goose** [3] - 111:13,
119:13, 121:12
**government** [125] - 5:7,
7:6, 7:22, 11:16, 12:4,
12:6, 12:11, 12:16, 39:9,
39:10, 44:4, 49:4, 50:7,
50:10, 53:19, 55:8,
55:24, 56:3, 56:9, 57:7,
57:10, 58:21, 59:23,
62:23, 64:16, 65:9, 66:2,
68:18, 69:24, 70:3,
71:19, 72:11, 73:21,
76:9, 76:14, 76:16,
76:19, 77:14, 79:16,
80:5, 80:6, 80:18, 81:10,
81:20, 81:21, 81:22,
82:4, 83:2, 85:8, 85:12,
85:13, 86:7, 87:1, 87:14,
87:17, 87:24, 88:4,
89:22, 90:16, 91:16,
92:18, 94:17, 103:7,
104:16, 104:17, 104:20,
106:11, 107:17, 117:10,
117:12, 117:17, 119:21,
119:25, 120:3, 123:5,
126:19, 126:23, 127:4,
128:6, 128:11, 128:12,
129:20, 130:22, 132:3,
132:8, 132:16, 133:13,
134:7, 136:12, 137:3,
137:4, 137:9, 138:20,
139:22, 140:24, 141:14,
141:17, 141:22, 142:9,
142:11, 142:16, 143:2,
143:7, 143:10, 144:1,
149:14, 159:8, 204:2,
204:6, 204:14, 208:13,
216:8, 216:10, 216:11,
216:16, 218:23, 220:6,
221:18, 222:9, 223:2,
226:18, 227:19, 228:16

**GOVERNMENT** [1] -
178:1

**Government** [6] - 1:15,
98:23, 99:17, 172:25,
206:5, 213:15

**GOVERNMENT'S** [1] -
15:10

**Government's** [16] -
9:16, 48:15, 48:18,
48:20, 48:22, 48:25,
49:9, 49:10, 49:22, 92:9,
105:6, 149:16, 166:1,
167:5, 197:9, 213:1

**government's** [35] -
10:21, 11:18, 12:5, 15:1,

58:10, 63:9, 68:10,
77:22, 78:21, 85:2, 87:6,
87:8, 87:9, 91:3, 91:15,
92:3, 93:21, 103:4,
107:9, 121:11, 122:4,
122:11, 122:12, 123:6,
123:22, 127:11, 129:3,
129:8, 130:3, 142:2,
142:3, 210:4, 216:19,
221:19, 221:23

**governments** [1] -
209:2

**grand** [25] - 25:15,
25:16, 32:4, 32:7, 32:23,
33:9, 45:7, 46:2, 50:10,
53:4, 63:13, 187:11,
187:15, 187:17, 187:19,
188:19, 191:4, 191:23,
191:25, 192:5, 192:9,
193:3, 193:14, 194:22,
195:4

**grandfather's** [1] -
217:22

**grandmother** [1] -
178:19

**grant** [1] - 76:14
**granted** [4] - 75:23,
84:18, 91:2, 206:4
**granting** [2] - 70:2, 92:3
**great** [6] - 6:8, 13:23,
38:6, 120:17, 227:15
**greater** [1] - 212:2
**Green** [2] - 45:20, 47:11
**grew** [1] - 132:16
**Griffin** [1] - 59:23
**grocery** [2] - 130:21
**grounds** [4] - 75:18,
79:19, 87:3, 106:7
**group** [7] - 57:14,
66:10, 78:1, 111:22,
111:24, 111:25
**grouped** [1] - 111:2
**gruesome** [1] - 171:19
**guarantee** [1] - 12:25
**guess** [18] - 54:23,
56:17, 64:12, 68:2, 71:5,
84:20, 98:16, 100:16,
105:11, 106:20, 106:21,
112:18, 146:24, 150:6,
165:23, 196:10, 209:16,
224:24

**guided** [1] - 212:17
**guilt** [4] - 103:15,
103:19, 117:12, 129:22
**guilty** [6] - 117:16,
141:21, 142:14, 202:25,
203:1, 204:19
**gun** [21] - 85:9, 94:12,
98:4, 117:8, 123:2,
123:3, 123:9, 123:23,

124:2, 124:8, 124:11,
124:13, 125:18, 126:11,
169:8, 169:11, 169:21,
192:20, 203:25
**guns** [5] - 85:11, 123:3,
124:2, 129:18, 130:24
**guts** [1] - 91:15
**guy** [16] - 65:23, 104:12,
108:19, 111:5, 111:6,
111:7, 111:8, 117:6,
169:11, 169:15, 169:19,
170:1, 170:15, 174:25
**guys** [12] - 69:4, 108:10,
108:14, 108:17, 109:8,
110:4, 110:6, 110:14,
110:16, 111:25, 112:4,
128:2

## H

**Hagerstown** [1] - 136:6
**haircut** [1] - 6:22
**half** [9] - 12:13, 33:14,
52:13, 96:10, 140:15,
218:4, 218:7, 218:13
**halfway** [9] - 95:19,
98:5, 188:22, 190:18,
190:21, 191:8, 191:12,
191:14, 192:13
**hallmark** [2] - 59:22,
59:23
**Hammerjacks** [3] -
72:10, 78:13, 78:18
**hand** [9] - 8:10, 132:8,
135:14, 144:9, 171:2,
171:17, 172:4, 212:11,
229:10
**handed** [2] - 2:10, 9:14
**handful** [1] - 48:3
**handgun** [4] - 95:14,
117:5, 154:15, 154:17
**handle** [14] - 5:21,
161:1, 166:9, 166:11,
166:12, 167:1, 167:7,
167:25, 168:8, 169:13,
169:24, 170:3, 171:23,
176:22
**handles** [1] - 166:16
**Handy** [3] - 40:23, 41:8,
41:17
**Handy's** [2] - 43:4,
43:22
**hang** [2] - 205:8
**hang-up** [2] - 205:8
**hanging** [1] - 65:23
**Hanlon** [1] - 1:16, 47:5,
48:1, 49:12, 50:4,
106:12, 113:21, 117:20,
121:8, 158:2, 164:12,

228:7, 228:11
**HANLON** [12] - 7:20,
8:2, 48:3, 48:11, 49:3,
49:13, 49:16, 50:5,
117:23, 150:15, 151:9,
230:8
**happy** [6] - 53:1, 103:5,
107:16, 120:11, 140:11,
149:13
**hard** [7] - 14:9, 70:25,
71:1, 189:5, 224:20,
224:21, 227:20
**hard-pressed** [1] - 71:1
**Harding** [44] - 1:16,
14:25, 15:8, 25:13, 26:5,
28:1, 29:5, 31:25, 34:24,
39:4, 40:4, 40:13, 40:20,
45:2, 57:15, 67:23,
95:11, 106:8, 115:18,
116:1, 117:22, 122:8,
122:12, 122:25, 124:16,
130:14, 136:19, 136:23,
137:19, 141:3, 164:11,
175:19, 176:12, 177:9,
187:5, 188:11, 203:13,
203:20, 208:18, 211:2,
211:15, 221:20, 226:25,
228:3
**HARDING** [89] - 15:12,
37:9, 39:13, 39:25, 40:6,
44:4, 45:3, 45:6, 45:19,
45:23, 46:6, 46:10,
46:15, 46:19, 46:23,
47:4, 47:25, 50:7, 67:9,
105:7, 106:9, 106:16,
106:22, 107:6, 107:10,
108:1, 108:7, 109:23,
112:10, 112:12, 112:18,
113:21, 113:24, 114:4,
114:13, 115:14, 115:16,
116:2, 120:4, 120:11,
120:13, 120:20, 124:19,
124:22, 125:1, 125:5,
125:11, 125:17, 125:22,
137:20, 137:23, 138:1,
138:21, 139:6, 164:8,
179:19, 187:2, 199:24,
200:1, 200:4, 200:8,
201:19, 204:8, 204:17,
204:22, 204:24, 205:1,
205:4, 205:13, 208:1,
208:10, 208:13, 208:19,
208:23, 211:16, 211:22,
213:8, 213:10, 213:13,
213:17, 213:19, 213:21,
226:18, 228:7, 228:11,
228:19, 230:4, 230:10,
230:12
**Harding's** [1] - 122:13
**HARRIS** [2] - 1:7,

158:12
**Harris** [46] - 1:18, 2:4, 15:21, 15:23, 49:6, 49:10, 49:23, 49:24, 53:13, 53:22, 54:16, 55:2, 60:6, 62:11, 63:8, 64:11, 67:12, 71:5, 91:12, 107:3, 107:7, 107:9, 107:13, 108:11, 108:23, 111:7, 111:9, 112:2, 112:20, 130:18, 131:16, 132:25, 140:1, 141:11, 141:21, 143:24, 144:2, 159:13, 160:15, 193:11, 213:23, 213:24, 214:2, 229:11, 229:13
**Harris's** [3] - 48:11, 53:13, 107:17
**Hastings** [1] - 47:15
**Hayes** [8] - 15:16, 15:23, 16:1, 45:7, 46:2, 50:10, 81:2, 143:18
**headache** [2] - 204:24, 205:12
**headquarters** [1] - 130:24
**heads** [3] - 218:23, 220:14, 229:6
**heads-up** [2] - 218:23, 220:14
**headway** [1] - 58:12
**hear** [24] - 4:1, 6:11, 8:11, 12:12, 25:7, 56:20, 57:8, 57:15, 67:23, 89:20, 89:22, 137:19, 141:15, 143:6, 150:20, 159:16, 179:19, 186:15, 200:13, 201:25, 212:15, 212:16, 212:18, 221:20
**heard** [23] - 2:15, 7:24, 40:5, 54:11, 54:12, 56:25, 81:8, 89:6, 95:21, 105:1, 107:14, 107:20, 107:22, 112:23, 113:6, 117:7, 133:16, 141:8, 199:12, 200:23, 215:23, 216:2, 217:5
**hearsay** [4] - 102:11, 103:11, 103:18, 103:20
**heavy** [1] - 157:14
**Heights** [9] - 61:18, 67:20, 73:15, 74:8, 84:24, 86:18, 108:20, 108:24, 109:6
**held** [23] - 76:20, 80:19, 119:1
**Hello** [1] - 187:4
**help** [10] - 14:21, 106:24, 109:12, 124:16, 133:22, 151:12, 153:7,

173:21, 223:3
**helped** [1] - 152:2
**helpful** [1] - 134:13
**helps** [1] - 174:7
**hereby** [1] - 231:3
**hereunto** [1] - 231:10
**heroin** [2] - 107:2, 107:3
**herself** [1] - 8:4
**hesitate** [1] - 228:12
**hi** [1] - 155:22
**Hi** [2] - 146:7, 187:3
**Hickey** [1] - 107:10
**hierarchical** [1] - 109:24
**hierarchy** [2] - 57:16, 59:2
**high** [2] - 131:25, 132:15
**higher** [1] - 7:10
**highlights** [1] - 87:7
**highly** [3] - 128:14, 171:8, 172:12
**Highly** [1] - 164:5
**hill** [1] - 170:18
**himself** [2] - 93:13, 102:12
**historic** [1] - 30:15
**history** [1] - 19:18
**hit** [3] - 93:22, 168:21, 171:18
**hold** [5] - 4:12, 30:10, 30:14, 30:19, 207:19
**holding** [1] - 12:13
**holds** [1] - 66:9
**holiday** [1] - 52:10
**Holly** [5] - 85:7, 108:4, 108:5, 108:8, 109:7, 202:3, 202:6, 202:12, 203:2
**Holly's** [1] - 123:24
**home** [6] - 91:24, 91:25, 92:12, 152:13, 156:23, 186:9, 186:10, 191:21, 227:22
**homes** [2] - 148:9, 155:6
**homicide** [19] - 24:13, 29:16, 33:1, 47:6, 82:25, 84:13, 84:14, 114:2, 126:12, 129:20, 129:25, 130:1, 150:8, 195:16, 196:17, 198:8, 219:15
**homicides** [3] - 41:25, 111:4, 127:1
**Honda** [2] - 26:10, 26:11
**honest** [3] - 142:4, 148:13, 153:4
**Honestly** [2] - 151:19,

152:4
**Honor** [208] - 2:5, 2:8, 3:18, 3:25, 4:6, 4:19, 5:15, 5:23, 7:4, 7:14, 7:20, 8:2, 9:13, 11:4, 12:17, 13:9, 15:7, 15:13, 20:17, 25:1, 32:16, 37:14, 38:22, 39:16, 40:7, 44:3, 45:4, 45:6, 45:20, 46:8, 46:16, 46:23, 47:7, 48:1, 48:3, 48:21, 49:4, 49:14, 50:5, 50:7, 53:3, 53:7, 53:10, 53:12, 53:15, 53:24, 54:8, 54:22, 55:4, 55:7, 55:21, 56:8, 56:14, 56:18, 57:5, 57:7, 57:13, 58:7, 58:22, 59:14, 60:1, 60:13, 61:21, 62:17, 63:1, 63:6, 63:17, 63:20, 63:21, 64:12, 64:21, 64:24, 65:14, 66:1, 66:14, 66:22, 67:9, 69:10, 70:23, 71:16, 73:4, 74:14, 74:20, 75:3, 75:7, 77:1, 79:6, 79:14, 88:11, 89:8, 90:3, 99:8, 100:24, 103:2, 104:15, 105:23, 106:5, 107:6, 107:16, 108:2, 111:12, 112:13, 115:6, 116:15, 116:23, 117:3, 117:10, 117:23, 119:2, 120:4, 120:11, 121:4, 122:7, 126:3, 126:16, 126:21, 127:15, 127:24, 128:5, 130:8, 134:20, 135:6, 135:21, 136:7, 138:2, 138:7, 138:18, 138:21, 139:4, 139:6, 140:10, 144:6, 145:19, 146:12, 146:16, 149:11, 149:13, 149:15, 150:15, 151:1, 151:5, 156:20, 157:23, 157:24, 158:6, 158:11, 159:8, 164:6, 170:8, 171:4, 172:8, 173:14, 173:16, 175:14, 175:15, 177:19, 177:24, 186:23, 197:5, 198:17, 199:3, 204:8, 204:22, 207:24, 208:1, 208:7, 209:5, 209:10, 209:13, 209:19, 210:3, 210:15, 210:18, 210:21, 211:4, 211:5, 211:9, 211:11, 211:16, 212:5, 212:20, 213:3, 213:8, 213:24, 215:9, 218:3, 218:16, 218:20, 219:4, 219:5, 220:7, 220:17, 220:24, 221:3,

222:5, 222:8, 223:7, 223:8, 224:1, 225:8, 225:12, 225:14, 226:4, 228:8, 228:19, 228:21, 229:12
**honor** [1] - 25:20
**Honor's** [2] - 113:17, 223:13
**Honorable** [1] - 1:13
**hooked** [1] - 107:13
**hope** [3] - 3:8, 6:13, 90:4, 133:23, 171:19, 204:24, 217:11, 226:14, 227:21
**hopeful** [2] - 3:6, 8:25
**hopefully** [6] - 89:22, 133:8, 134:4, 134:16, 141:16, 143:4
**hoping** [5] - 10:19, 135:2, 177:20, 218:19, 222:25
**hospitalized** [1] - 14:14
**hour** [13] - 3:14, 4:25, 9:17, 11:16, 12:11, 12:13, 12:16, 96:3, 140:15, 218:4, 218:7, 218:13, 218:20
**Hours** [1] - 41:13
**hours** [21] - 3:13, 3:21, 10:10, 11:16, 11:18, 12:6, 12:7, 40:20, 41:3, 41:6, 148:16, 155:12, 157:4, 157:6, 157:13, 157:14, 218:4, 227:7, 228:4, 228:9, 228:12
**house** [26] - 28:6, 28:8, 95:19, 98:5, 104:19, 104:24, 123:24, 125:2, 130:24, 182:1, 184:13, 184:14, 184:24, 184:25, 186:13, 186:17, 186:18, 188:22, 190:6, 190:18, 190:21, 191:8, 191:12, 191:14, 192:13, 193:6
**huge** [1] - 84:6
**hum** [6] - 152:8, 163:15, 171:22, 180:4, 180:23, 189:24
**human** [2] - 14:3, 164:4
**hung** [1] - 110:7
**hunters** [2] - 153:5, 154:10
**hurt** [2] - 133:22, 187:9
**husband** [4] - 155:24, 155:25, 156:2, 156:4
**husband's** [1] - 156:5
**hustlers** [3] - 112:14, 112:15, 112:21
**hypothetical** [3] - 162:15, 173:16, 173:17

**I**

**I-95** [2] - 104:3, 192:16
**ID** [1] - 48:11
**idea** [8] - 51:11, 98:4, 132:2, 157:8, 157:15, 191:11, 193:14, 198:5
**identical** [3] - 19:25, 38:2, 38:3
**identifiable** [4] - 59:24, 62:24, 66:8, 75:1
**identification** [4] - 213:11, 214:1, 229:14
**identifications** [2] - 15:15, 91:9
**identified** [7] - 15:18, 15:23, 40:22, 47:11, 53:25, 114:6, 114:18
**identifies** [1] - 44:16
**identify** [6] - 42:9, 66:9, 101:11, 114:16, 211:7, 211:9
**ignition** [3] - 161:8, 174:13, 175:3
**illegal** [3] - 96:22, 132:5, 169:9
**imagine** [2] - 7:15, 228:11
**Immediately** [1] - 199:18
**immediately** [2] - 152:13, 185:11
**immunity** [2] - 206:4, 208:15
**impact** [3] - 164:3, 170:22, 171:14
**impartially** [1] - 50:18
**impeach** [1] - 133:20
**impeached** [2] - 86:23, 86:24
**impeaching** [1] - 133:15
**impeachment** [1] - 86:24
**implicated** [1] - 131:17
**important** [13] - 7:12, 34:8, 69:18, 102:14, 108:9, 126:10, 126:21, 129:25, 198:9, 198:11, 198:25, 218:22, 218:24
**impossible** [2] - 164:5, 172:13
**impressed** [1] - 69:2
**impression** [1] - 33:5
**imprisonment** [2] - 49:19, 50:1
**improper** [2] - 85:12, 85:13
**improperly** [1] - 98:6

**IN** [1] - 1:1
**in-court** [1] - 86:8
**in-depth** [1] - 33:10
**inaccurate** [1] - 25:25
**incarcerated** [3] - 95:12, 95:13, 222:22
**incarceration** [1] - 95:5
**incident** [2] - 2:12, 78:13
**inclination** [1] - 113:1
**incline** [1] - 177:7
**include** [3] - 11:18, 16:15, 128:6
**included** [3] - 119:9, 120:13, 154:3
**includes** [2] - 77:13, 165:22
**including** [12] - 3:19, 3:20, 50:16, 61:23, 62:7, 76:24, 80:20, 109:12, 119:10, 127:11, 163:13, 171:12
**Including** [2] - 16:18, 63:23
**income** [1] - 153:2
**incoming** [6] - 17:3, 18:14, 18:17, 19:11, 19:14, 19:20, 19:25, 21:19, 32:14, 33:3, 35:19, 35:21, 36:11, 36:13, 36:15, 37:24
**incomplete** [1] - 87:9
**inconclusive** [1] - 126:4
**inconsistent** [10] - 71:22, 83:4, 84:1, 86:7, 86:8, 101:23, 103:14, 103:15, 103:19, 121:12
**inconvenience** [1] - 140:7
**incorporate** [1] - 215:21
**incorrect** [3] - 123:13, 124:5, 128:1
**increase** [5] - 84:15, 86:17, 87:2, 121:6, 122:2
**increasing** [2] - 85:17, 118:11
**incrimination** [1] - 133:7
**incubator** [1] - 111:21
**Indeed** [1] - 216:22
**indeed** [4] - 63:18, 92:17, 131:15, 141:1
**independent** [1] - 81:19
**INDEX** [1] - 230:1
**indicate** [2] - 35:12, 205:11
**indicated** [11] - 16:13, 39:5, 41:15, 43:2, 44:11, 49:5, 136:12, 151:13, 154:2, 200:21, 203:11

**indicates** [1] - 35:13
**Indicating** [1] - 182:13
**indicator** [1] - 23:5
**indict** [3] - 76:19, 80:5, 85:23
**indicted** [5] - 81:10, 84:21, 85:22, 87:24, 88:4
**Indictment** [1] - 88:5
**indictment** [31] - 11:22, 53:15, 53:20, 53:23, 58:14, 58:17, 61:7, 62:3, 62:4, 62:8, 63:2, 63:15, 63:19, 68:1, 68:11, 68:20, 68:25, 70:4, 70:8, 70:12, 77:3, 90:10, 94:4, 95:1, 122:1, 141:2, 141:20, 215:21
**individual** [19] - 37:15, 58:8, 65:19, 92:8, 134:4, 149:8, 161:7, 161:10, 161:19, 162:16, 162:19, 171:11, 176:6, 176:12, 176:20, 178:25, 179:11, 182:8, 182:14
**individually** [1] - 133:25
**individuals** [18] - 55:18, 59:1, 61:14, 61:15, 61:16, 61:23, 63:25, 64:25, 66:5, 67:11, 72:4, 72:17, 74:21, 74:24, 78:1, 96:7, 130:14, 148:10
**indulgence** [2] - 24:23, 151:1
**infer** [9] - 55:14, 98:16, 99:25, 100:7, 115:9, 117:3, 123:25, 125:18, 224:1
**inference** [5] - 69:16, 100:2, 100:10, 126:23, 131:21
**inferences** [5] - 81:21, 83:1, 86:25, 98:20, 132:13
**inferential** [2] - 122:15, 131:15
**infidelity** [1] - 83:19
**Infiniti** [10] - 138:17, 158:24, 159:6, 159:10, 160:9, 160:12, 160:13, 165:18, 166:6, 166:8
**Infinitis** [3] - 165:3, 165:4, 165:5
**inflates** [1] - 170:23
**information** [22] - 22:1, 25:23, 25:25, 26:2, 30:4, 30:6, 30:11, 30:20, 31:1, 31:2, 31:5, 33:1, 47:13, 91:21, 91:22, 114:25, 116:13, 127:12, 143:7,

203:22, 224:2, 224:4
**initial** [1] - 39:19
**inmate** [3] - 222:18, 223:12
**inmate's** [2] - 223:4, 223:11
**innocence** [1] - 117:12
**innuendo** [1] - 90:23
**input** [1] - 165:10
**inquire** [1] - 39:9
**inquired** [1] - 30:23
**inquiry** [4] - 2:23, 117:24, 139:7, 216:3
**inside** [5] - 114:25, 162:20, 164:17, 167:2, 175:23
**insider** [1] - 114:24
**insiders** [1] - 116:13
**insisted** [1] - 14:7
**instance** [2] - 161:18, 176:10
**instances** [2] - 91:6, 216:2
**instead** [4] - 18:18, 30:16, 30:17, 105:13
**institution** [1] - 73:3
**institutional** [1] - 73:2
**instruct** [5] - 12:16, 85:1, 141:15, 141:16, 217:10
**instructed** [3] - 121:25, 141:19, 210:6
**instruction** [25] - 55:10, 67:25, 75:16, 75:17, 75:24, 76:1, 87:6, 87:8, 87:10, 87:21, 88:2, 118:15, 120:13, 120:22, 121:8, 121:19, 121:18, 128:8, 131:11, 210:7, 210:12, 212:12, 215:14, 215:17, 217:8
**instructions** [25] - 10:22, 11:18, 15:3, 51:23, 52:14, 68:15, 104:6, 118:12, 120:6, 120:9, 128:6, 141:20, 142:25, 143:1, 214:15, 215:18, 217:9, 217:11, 217:12, 217:16, 227:14, 227:17, 227:19, 229:8
**insufficient** [1] - 65:8
**insurance** [2] - 146:10, 153:21
**insure** [1] - 10:3
**integrally** [1] - 87:25
**intelligent** [1] - 105:24
**intend** [5] - 2:19, 32:23, 137:14, 141:21, 142:15
**intended** [1] - 60:20
**interest** [3] - 51:3,

102:19, 175:7
**interested** [6] - 63:8, 100:8, 100:21, 106:11, 112:25, 211:5
**interesting** [1] - 111:11
**interfere** [1] - 13:12
**interplay** [1] - 75:24
**interpretation** [3] - 72:21, 72:22, 72:24
**interpretations** [2] - 75:8, 76:9
**interpreted** [1] - 72:14
**interpreting** [1] - 76:13
**interrogated** [1] - 47:19
**interrogation** [1] - 47:14
**interrogatories** [1] - 75:14
**interrogatory** [2] - 70:15, 76:1
**interview** [1] - 213:23
**interviewed** [3] - 195:16, 196:17, 198:8
**intimidate** [1] - 73:15
**intimidating** [1] - 63:16
**intimidation** [2] - 72:5, 132:12
**introduced** [8] - 44:19, 44:20, 44:21, 44:22, 58:11, 133:20, 149:4, 149:16
**inverse** [1] - 86:6
**investigated** [1] - 29:25
**investigation** [9] - 25:24, 29:6, 29:11, 29:14, 29:16, 43:8, 46:13, 215:2, 215:4
**investigations** [1] - 44:9
**investigative** [1] - 30:7
**investigators** [1] - 33:2
**invite** [1] - 51:8
**invited** [1] - 104:15
**invoke** [1] - 200:2
**involve** [2] - 32:2, 147:2
**involved** [34] - 29:14, 29:15, 29:16, 44:17, 54:16, 54:20, 56:12, 62:7, 67:12, 76:23, 77:9, 80:23, 85:15, 92:11, 101:10, 102:16, 110:25, 111:8, 114:13, 122:14, 122:16, 122:22, 125:25, 127:3, 129:1, 131:21, 146:19, 149:4, 149:8, 164:3, 164:22, 187:15
**involvement** [2] - 114:19, 122:9
**involves** [1] - 147:3
**involving** [3] - 29:15,

55:1, 55:2
**Irene** [1] - 101:20
**irrelevant** [1] - 79:5
**issue** [24] - 5:6, 53:4, 67:22, 70:15, 75:13, 76:7, 81:18, 81:19, 82:1, 84:11, 87:7, 113:19, 113:22, 114:10, 117:20, 118:12, 121:23, 125:12, 127:23, 199:24, 203:17, 218:25, 220:6
**issued** [2] - 2:16, 153:15
**issues** [7] - 106:11, 106:12, 115:22, 120:19, 136:11, 199:12, 215:2
**item** [2] - 149:11, 149:15
**items** [3] - 134:23, 135:22, 211:19
**itself** [8] - 57:7, 59:12, 59:25, 60:16, 62:18, 71:17, 170:19, 211:6

---

**J**

---

**jail** [9] - 94:11, 95:10, 152:7, 152:9, 152:16, 152:18, 152:19, 190:22, 222:13
**Jamane** [8] - 83:18, 136:1, 136:9, 136:22, 158:6, 205:20, 208:10, 226:5
**James** [1] - 1:21
**January** [4] - 49:25, 107:1, 107:5, 113:13
**Jessup** [3] - 222:13, 222:21, 225:3
**job** [3] - 154:21, 156:25, 187:24
**jockeying** [2] - 78:13, 78:23
**JOHNSON** [12] - 205:20, 206:10, 206:13, 206:19, 206:21, 206:23, 207:1, 207:5, 207:8, 207:11, 207:14, 207:17
**Johnson** [36] - 2:15, 3:16, 4:19, 5:4, 9:19, 10:3, 83:18, 136:1, 136:9, 136:22, 136:24, 136:25, 137:5, 137:6, 139:7, 139:11, 158:6, 158:7, 199:15, 199:16, 199:23, 200:16, 200:18, 200:22, 204:1, 204:19, 205:14, 205:16, 205:17, 205:20, 205:21, 207:19,

208:2, 208:11, 226:5, 226:8

**Johnson's** [2] - 137:1, 207:22

**join** [1] - 107:9

**joined** [3] - 56:12, 62:10, 131:5

**joint** [2] - 102:2, 102:6

**Jones** [8] - 24:13, 47:6, 111:20, 125:2, 125:19, 125:24, 125:25, 131:17

**journey** [1] - 2:4

**judge** [7] - 6:17, 6:19, 6:20, 46:12, 77:17, 141:15, 143:21

**Judge** [13] - 1:13, 6:13, 11:15, 13:7, 40:6, 44:4, 78:19, 85:19, 105:7, 106:9, 135:25, 137:20, 205:17

**Judge's** [1] - 142:25

**judges** [1] - 51:2

**judgment** [11] - 53:13, 56:16, 68:12, 70:2, 85:20, 87:3, 91:1, 92:4, 94:21, 106:1, 132:22

**judgments** [1] - 84:12

**July** [1] - 45:24

**jumped** [1] - 203:25

**June** [11] - 49:18, 94:11, 95:7, 103:22, 103:23, 151:22, 151:25, 157:9, 157:16, 202:2, 206:17

**Juror** [6] - 8:5, 8:7, 9:9, 14:13, 14:18, 214:17

**juror** [9] - 9:11, 13:23, 72:10, 72:23, 73:13, 73:17, 131:8, 131:23, 214:21

**JUROR** [7] - 8:9, 8:14, 8:17, 8:20, 8:23, 9:3, 9:6

**jurors** [3] - 2:11, 139:7, 210:9

**JURORS** [1] - 89:13

**jury** [143] - 2:19, 3:9, 6:14, 9:18, 10:23, 11:4, 13:20, 14:1, 25:15, 25:17, 29:18, 32:4, 32:7, 32:24, 33:9, 33:22, 34:12, 45:7, 45:18, 46:2, 46:5, 50:10, 50:12, 51:9, 53:4, 61:4, 63:13, 63:23, 64:9, 65:22, 65:25, 66:3, 68:14, 69:1, 69:2, 69:7, 69:19, 69:25, 70:15, 72:7, 74:6, 75:17, 77:6, 79:21, 80:2, 81:19, 83:1, 83:4, 83:6, 83:12, 84:9, 84:11, 85:2, 85:6, 85:24,

86:13, 87:1, 88:9, 88:14, 89:23, 93:10, 97:1, 97:22, 98:19, 99:25, 100:7, 100:10, 104:13, 104:23, 105:14, 114:10, 115:9, 117:3, 117:11, 117:15, 118:12, 118:17, 120:5, 120:23, 121:23, 121:24, 123:16, 125:18, 126:25, 129:12, 130:4, 130:5, 131:2, 131:11, 132:17, 133:14, 133:18, 134:12, 135:24, 138:24, 139:12, 139:17, 140:11, 143:13, 146:4, 146:5, 146:6, 148:2, 159:15, 160:2, 161:10, 180:10, 181:19, 182:12, 184:22, 187:11, 187:15, 187:17, 187:19, 188:19, 191:4, 191:24, 191:25, 192:5, 192:10, 193:3, 193:14, 194:22, 195:4, 198:21, 208:9, 210:6, 210:16, 211:12, 212:8, 212:12, 213:4, 213:8, 214:15, 217:17, 227:4, 227:6, 227:17, 229:8

**Jury** [11] - 1:14, 2:1, 13:25, 52:24, 88:15, 89:17, 139:15, 199:14, 199:22, 210:17, 217:21

**jury's** [4] - 52:22, 89:6, 105:11, 199:13

**justifies** [1] - 92:3

**justify** [1] - 132:7

**juvenile** [1] - 4:21

**K**

**keep** [10] - 12:9, 41:16, 88:23, 108:13, 158:3, 174:16, 179:20, 179:22, 199:12, 215:2

**KEITH** [2] - 15:10, 230:4

**Kelsey** [1] - 1:17

**kept** [4] - 4:9, 110:6, 123:24, 124:2

**Kevin** [1] - 178:16

**key** [10] - 163:19, 163:20, 163:21, 163:23, 163:24, 166:19, 166:20, 167:6, 174:13, 175:3

**keyed** [1] - 120:14

**keys** [3] - 161:8, 162:17, 174:17

**kidnappings** [1] - 126:19

**kill** [2] - 117:8, 119:12

**killed** [11] - 16:12,

40:16, 41:3, 41:7, 41:13, 43:23, 112:8, 117:6, 150:20, 164:16, 164:18

**killing** [7] - 31:7, 63:15, 63:16, 81:15, 83:12, 83:18, 83:19

**kind** [23] - 2:8, 3:15, 20:14, 30:17, 77:17, 80:10, 83:18, 87:6, 119:19, 132:1, 132:9, 135:6, 148:2, 150:4, 150:5, 150:6, 150:14, 153:9, 155:22, 182:17, 188:12, 218:20

**kinds** [4] - 110:25, 113:4, 131:20, 132:19

**Kirk** [1] - 47:15

**Klas** [1] - 48:5

**knit** [2] - 59:1, 65:18

**knob** [1] - 160:22

**knowledge** [2] - 28:19, 188:1

**known** [5] - 25:7, 61:16, 74:23, 110:12, 114:24

**knows** [3] - 104:13, 133:18, 169:8

**KURLAND** [88] - 5:17, 5:20, 7:4, 7:8, 7:14, 7:17, 11:15, 11:20, 12:1, 12:17, 12:20, 13:2, 13:7, 53:3, 75:5, 75:7, 77:7, 78:3, 78:6, 78:19, 79:6, 79:13, 79:24, 82:9, 82:15, 84:25, 85:5, 85:8, 85:19, 85:25, 86:2, 87:5, 87:16, 121:2, 121:4, 123:20, 124:6, 124:9, 124:12, 124:15, 126:3, 126:9, 126:15, 127:20, 127:23, 128:2, 128:5, 128:24, 130:8, 135:25, 136:3, 136:14, 136:18, 137:9, 137:17, 139:10, 200:25, 201:2, 201:8, 201:11, 201:17, 201:21, 201:23, 202:1, 202:5, 202:9, 202:19, 202:21, 202:25, 203:5, 203:12, 203:24, 204:2, 204:6, 207:24, 208:7, 210:3, 210:11, 210:15, 215:9, 215:12, 226:4, 226:12, 226:16, 226:25, 228:21, 228:25, 229:3

**Kurland** [27] - 1:22, 3:7, 5:16, 12:3, 75:6, 84:17, 87:4, 88:7, 94:6, 121:3, 127:16, 127:18, 130:9, 136:10, 137:7, 200:21, 202:16, 203:23, 205:4,

205:8, 207:23, 210:2, 215:11, 217:22, 226:3, 226:23, 228:17

**L**

**L-1** [2] - 44:12, 44:14

**L-5** [1] - 44:12

**L-7** [2] - 44:12, 44:14

**L-A-K-E-I-S-H-A** [1] - 178:9

**lab** [2] - 44:11, 44:25

**labeling** [1] - 208:25

**lack** [2] - 67:5, 67:6

**lacking** [2] - 55:24, 57:13

**Ladies** [6] - 14:1, 115:19, 140:10, 199:7, 213:5, 214:3

**ladies** [17] - 14:5, 29:18, 50:10, 50:13, 88:16, 89:15, 139:16, 146:4, 180:10, 181:19, 182:11, 184:21, 198:20, 210:19, 212:12, 215:7, 217:9

**Lakeisha** [6] - 91:19, 138:7, 177:24, 178:5, 178:9, 213:14

**LAKEISHA** [2] - 178:1, 230:11

**Lancaster** [1] - 108:21

**Lane** [6] - 108:5, 157:9, 157:16, 189:17, 189:21, 190:8

**language** [8] - 9:12, 77:1, 84:21, 87:22, 118:6, 118:12, 119:2, 121:7

**Lanvale** [1] - 178:15

**large** [2] - 55:12, 148:7

**largely** [2] - 53:18, 55:8

**larger** [3] - 55:15, 142:12, 215:17

**last** [27] - 2:12, 4:21, 11:21, 14:14, 24:5, 39:3, 39:12, 39:19, 42:12, 42:21, 44:22, 98:9, 98:22, 120:5, 121:6, 138:3, 154:19, 155:19, 156:1, 156:7, 209:22, 210:4, 211:5, 220:18, 221:16, 222:8, 229:10

**lasted** [5] - 18:13, 68:19, 69:25, 88:18, 108:1

**late** [7] - 10:20, 30:8, 40:17, 54:4, 139:3, 218:20, 227:5

**latent** [1] - 46:16

**latest** [2] - 54:4, 54:5

**Laura** [1] - 1:17

**law** [50] - 51:24, 52:14, 56:15, 57:9, 58:23, 59:4, 59:7, 59:10, 59:16, 66:24, 68:16, 76:12, 76:15, 77:11, 79:19, 81:18, 82:3, 82:20, 82:25, 83:5, 84:7, 84:10, 84:11, 85:20, 86:3, 86:10, 86:12, 88:6, 118:6, 118:7, 118:13, 119:22, 121:17, 122:1, 122:5, 128:8, 128:9, 128:25, 131:7, 143:1, 143:24, 173:21, 215:22, 216:14, 216:16, 216:18, 217:10, 226:8, 226:9, 226:10

**Lawlor** [7] - 1:18, 4:5, 6:12, 15:14, 89:21, 105:22, 106:4

**LAWLOR** [13] - 6:13, 6:18, 6:21, 6:24, 20:17, 24:23, 25:1, 47:3, 47:24, 53:7, 105:23, 106:5, 139:3

**lawyer** [5] - 57:2, 83:8, 86:22, 137:24, 138:4

**lawyers** [3] - 93:6, 133:23, 206:1

**lay** [3] - 5:3, 40:1, 160:21

**lead** [2] - 20:18, 200:16

**leader** [6] - 57:14, 57:16, 111:3, 111:4, 111:10, 111:13

**leaders** [1] - 111:23

**leading** [1] - 20:17

**learned** [3] - 115:9, 150:7, 150:10

**least** [18] - 3:18, 12:18, 12:25, 16:13, 24:3, 27:13, 44:19, 52:8, 53:25, 76:6, 86:5, 101:4, 111:14, 119:22, 126:19, 130:24, 131:18, 143:8

**leave** [17] - 9:22, 51:22, 52:15, 52:23, 70:24, 89:3, 100:12, 128:2, 161:10, 162:1, 167:18, 169:15, 174:11, 176:17, 199:10, 215:18, 217:19

**leaves** [4] - 127:25, 169:12, 169:14, 173:22

**leaving** [3] - 135:2, 168:8, 172:21

**Leaving** [1] - 152:11

**LeBaron** [1] - 188:25

**ledge** [1] - 13:21

**Lee** [18] - 117:6, 117:8, 122:25, 123:7, 123:9, 123:14, 124:14, 125:9, 125:10, 125:20, 126:1, 126:6, 126:13, 126:14, 129:19, 129:25, 130:1, 219:15

**left** [24] - 5:12, 58:1, 58:6, 58:7, 92:18, 98:18, 99:22, 115:8, 115:11, 123:16, 123:17, 124:14, 161:15, 166:12, 168:12, 169:5, 173:24, 174:20, 182:1, 184:9, 184:11, 185:8, 185:21, 199:15

**legal** [4] - 25:7, 75:8, 76:7, 80:1, 122:6, 127:23, 217:6, 224:8

**legally** [1] - 98:6

**legitimately** [1] - 123:25

**Lemm** [1] - 57:22, 57:24

**length** [2] - 16:25, 17:6

**lengthy** [5] - 11:24, 32:8, 32:19, 32:20, 33:7

**less** [4] - 9:17, 79:10, 151:25, 225:18

**letter** [14] - 46:11, 104:18, 104:19, 105:2, 105:8, 105:14, 136:18, 136:23, 137:4, 208:15, 223:17, 223:25, 224:4, 224:17

**lettered** [1] - 94:2

**letters** [1] - 136:15

**letting** [2] - 104:7, 115:23

**level** [4] - 5:13, 7:10, 55:13, 55:14

**lever** [2] - 161:2, 166:14

**Lexus** [4] - 188:5, 188:12, 188:13, 188:16

**Lexuses** [3] - 188:3, 188:13, 188:17

**liability** [4] - 128:16, 129:4, 129:8

**license** [1] - 146:9

**licensed** [2] - 146:11, 146:24

**licenses** [3] - 145:21, 145:22, 146:3

**licensing** [2] - 154:20, 155:1

**lie** [1] - 104:7

**life** [1] - 72:12

**light** [5] - 51:16, 72:24, 76:13, 131:11, 210:3

**lightly** [1] - 60:17

**likelihood** [2] - 164:2, 177:5

**likely** [3] - 51:20,

131:12, 200:11

**Likewise** [1] - 134:10

**limit** [2] - 131:21, 131:22

**limited** [2] - 55:4, 133:19

   **Limited** [2] - 62:7, 78:4

**linchpin** [1] - 85:16

**line** [11] - 12:9, 22:21, 23:5, 23:8, 23:9, 37:5, 37:6, 41:17, 53:8, 81:1, 85:10

**lined** [1] - 208:5

**lines** [5] - 21:18, 34:10, 78:24, 94:18, 164:18

**liquor** [3] - 181:23, 183:3, 183:6

**Lisa** [4] - 72:19, 93:24, 149:22, 150:13

**list** [4] - 48:6, 134:23, 135:22, 225:21

**listed** [11] - 11:22, 19:4, 21:22, 27:22, 28:18, 29:2, 31:10, 76:22

**listen** [6] - 133:23, 142:24, 143:11, 143:13, 196:3, 212:13

**listened** [2] - 101:19, 103:24

**lists** [3] - 18:5, 47:21, 63:2

**literally** [1] - 106:18

**live** [4] - 35:17, 70:9, 179:14, 190:3

**lived** [4] - 140:25, 150:3, 178:16, 201:14

**lives** [2] - 142:20, 142:22

**living** [6] - 178:14, 178:19, 178:21, 189:11, 189:15, 193:2

**loan** [1] - 110:21

**located** [2] - 146:1, 159:21, 160:18

**location** [4] - 160:7, 171:9, 172:15, 215:5

**lock** [46] - 160:17, 160:23, 161:2, 161:13, 162:4, 162:9, 162:19, 162:22, 162:23, 162:24, 163:12, 163:22, 165:8, 165:10, 166:21, 167:11, 167:14, 168:9, 168:13, 168:22, 169:7, 169:9, 169:14, 170:4, 170:17, 171:9, 171:10, 172:5, 172:13, 173:20, 174:10, 174:14, 174:15, 174:23, 175:4, 175:24, 176:1, 176:4, 176:7, 176:22,

177:10

**lock/unlock** [1] - 166:14

**locked** [33] - 54:14, 67:12, 104:12, 161:11, 161:16, 162:1, 162:2, 163:4, 163:17, 164:4, 166:25, 167:18, 167:24, 168:9, 169:15, 171:2, 174:1, 174:24, 175:10, 176:12, 176:15, 176:18, 176:21, 177:6, 186:21, 190:22, 190:24, 191:7, 191:11, 191:13, 192:12, 192:14, 224:22

**locking** [7] - 161:5, 161:19, 163:3, 165:4, 165:6, 165:7, 174:16

**lockout** [1] - 174:16

**locks** [6] - 138:17, 160:8, 169:10, 169:25, 170:20, 175:2

**lockup** [2] - 137:21, 143:20

**log** [1] - 47:18

**logical** [1] - 100:10

**Lombard** [1] - 1:25

**long-standing** [1] - 119:14

**Look** [2] - 62:2, 224:19

**look** [27] - 17:20, 21:14, 30:25, 45:14, 57:21, 57:24, 57:25, 58:6, 67:4, 78:7, 86:5, 97:22, 104:2, 105:4, 112:14, 141:2, 143:15, 143:21, 143:23, 153:24, 172:21, 173:1, 182:7, 211:12, 220:11, 227:23, 229:7

**looked** [7] - 22:24, 23:6, 40:2, 43:1, 57:21, 123:13, 219:20

**looking** [18] - 14:20, 21:4, 33:2, 33:11, 35:3, 35:6, 35:7, 35:23, 35:24, 36:2, 36:10, 99:9, 160:2, 160:5, 173:18, 174:9, 196:24, 226:4

**Looking** [1] - 76:16

**looks** [2] - 170:25, 172:2

**loosely** [3] - 59:1, 65:15, 65:18

**loot** [2] - 172:21, 174:10

**lopped** [1] - 69:7

**Lopped** [1] - 69:8

**losing** [2] - 175:7

**lost** [3] - 113:11, 191:5, 191:12

**loud** [1] - 179:23

**low** [1] - 68:16

**lower** [2] - 129:22, 161:1

**loyalty** [1] - 132:10

**luck** [1] - 101:14

**lump** [1] - 54:23

**lunch** [9] - 4:25, 10:23, 88:9, 88:10, 88:19, 88:20, 89:2, 89:6, 227:5

**luncheon** [2] - 10:1

**lunchtime** [1] - 227:5

**lyrics** [1] - 47:9

**M**

**M-C-C-O-Y** [1] - 178:10

**ma'am** [2] - 8:8, 157:23

**Madam** [1] - 82:13

**mafia** [2] - 59:17, 59:19

**Magginson** [1] - 101:20

**Magginson's** [2] - 91:10, 101:7

**mail** [30] - 15:15, 19:13, 32:22, 33:4, 34:4, 34:7, 34:11, 35:5, 35:16, 35:22, 36:1, 91:10, 98:2, 98:15, 98:18, 99:3, 99:18, 100:13, 101:7, 101:20, 114:7, 114:9, 114:16, 116:4, 116:8, 116:21, 128:1, 212:14, 227:18, 229:8

**mails** [2] - 116:18, 128:3

**main** [13] - 135:20, 159:20, 160:17, 161:14, 161:19, 168:13, 168:18, 168:21, 169:10, 170:14, 174:10, 175:1, 176:1

**maintain** [2] - 62:5, 62:11, 73:24, 84:15, 86:17, 87:2, 118:18, 118:19, 118:25, 119:17, 121:6, 122:2

**maintained** [1] - 123:19

**maintaining** [6] - 76:22, 83:3, 83:21, 85:17, 113:19, 118:10

**maintenance** [1] - 159:3

**Maintenance** [1] - 48:12

**major** [3] - 14:13, 142:3, 142:7

**majority** [1] - 31:24

**man** [1] - 116:12

**manage** [1] - 135:18

**managed** [1] - 14:9

**manner** [8] - 76:20, 77:14, 79:15, 81:10, 84:15, 142:9, 209:1,

231:9

**manual** [3] - 160:13, 169:13, 170:3

**manually** [5] - 162:9, 162:22, 162:23, 166:16, 173:24

**manufacture** [1] - 220:20

**March** [22] - 17:12, 22:9, 23:18, 24:4, 31:12, 31:21, 42:14, 42:16, 43:23, 80:13, 91:5, 92:10, 94:14, 95:22, 95:24, 180:2, 180:13, 180:15, 188:22, 190:17

**marijuana** [1] - 106:25

**Mark** [1] - 213:11

**mark** [5] - 165:23, 165:24, 170:8, 173:6, 213:10

**marked** [18] - 34:11, 34:23, 39:14, 39:23, 44:12, 48:9, 48:13, 48:15, 48:18, 48:20, 48:21, 48:22, 49:8, 49:15, 159:13, 210:21, 213:24, 219:5

**market** [2] - 55:16, 220:20

**marketed** [1] - 220:23

**marriage** [1] - 145:15

**married** [3] - 145:5, 145:13, 155:16

**marshal** [1] - 200:16

**marshals** [5] - 2:17, 2:23, 10:3, 222:19, 222:21

**MARTIN** [29] - 1:8, 2:5, 7:1, 13:9, 13:12, 13:18, 25:4, 139:1, 140:10, 173:13, 178:1, 200:5, 209:10, 209:13, 209:19, 209:21, 210:18, 210:21, 211:4, 211:9, 212:5, 212:20, 212:23, 213:3, 213:7, 213:24, 217:24, 229:12, 230:5

**Martin** [116] - 1:19, 1:20, 2:4, 13:8, 13:14, 15:18, 16:2, 23:14, 25:2, 25:6, 28:18, 31:14, 32:9, 40:25, 41:23, 43:12, 43:15, 54:2, 54:14, 55:1, 56:25, 57:1, 60:3, 62:14, 67:11, 68:6, 79:9, 89:23, 90:11, 90:16, 90:22, 90:24, 91:22, 92:17, 95:6, 97:23, 98:4, 98:12, 99:7, 99:12, 100:4, 100:6, 100:7, 100:16,

102:11, 102:15, 104:14, 106:25, 107:1, 107:4, 107:18, 107:21, 108:11, 109:19, 109:20, 109:22, 109:23, 111:13, 111:16, 112:20, 113:25, 114:1, 114:21, 115:1, 115:10, 116:16, 116:21, 117:4, 117:16, 117:18, 119:13, 121:14, 122:19, 123:21, 124:19, 125:14, 127:19, 127:25, 128:20, 131:16, 131:19, 132:25, 135:2, 138:25, 139:25, 140:4, 140:9, 144:4, 164:14, 179:1, 179:11, 179:13, 180:25, 182:16, 183:1, 183:24, 184:4, 185:21, 191:10, 194:8, 195:13, 196:8, 197:10, 197:12, 197:13, 197:19, 198:21, 199:1, 210:13, 210:20, 211:7, 211:25, 213:6, 213:10, 229:10

**Martin's** [21] - 22:24, 27:22, 28:2, 42:2, 42:5, 43:18, 43:24, 83:8, 86:22, 100:11, 102:8, 104:24, 111:16, 114:16, 114:18, 114:19, 117:11, 123:6, 124:8, 185:5, 196:13

**Mary** [3] - 1:24, 231:3, 231:15

**MARYLAND** [1] - 1:2

**Maryland** [6] - 1:12, 1:25, 146:2, 215:22, 217:3, 217:6

**master** [1] - 70:4

**match** [2] - 17:2, 32:14

**matched** [2] - 33:3, 126:16

**matching** [2] - 35:19, 36:23

**material** [2] - 137:2, 224:16

**materially** [1] - 137:10

**materials** [5] - 14:17, 222:12, 222:14, 222:22, 224:8

**matter** [37] - 3:6, 4:22, 7:4, 50:17, 51:3, 66:24, 76:11, 76:15, 77:13, 79:12, 79:19, 81:18, 82:3, 82:20, 82:25, 83:5, 84:7, 84:10, 84:11, 85:20, 86:3, 86:10, 86:12, 88:6, 94:5, 94:6, 101:10, 115:24, 122:1, 128:8, 129:8, 134:8,

169:20, 172:19, 203:4, 231:4, 231:9

**matters** [9] - 14:8, 14:15, 49:3, 50:21, 50:25, 52:12, 93:15, 205:23, 205:24

**MB-30** [1] - 46:17

**MB-30's** [1] - 46:16

**MB-30A** [1] - 46:17

**MB-38** [2] - 46:11, 46:12

**MB-38's** [1] - 46:10

**MB-38A** [1] - 46:13

**MB-39** [1] - 46:20

**MB-39's** [1] - 46:19

**MB-39A** [1] - 46:20

**McCaffity** [10] - 20:19, 37:5, 37:13, 37:25, 46:20, 72:17, 72:20, 73:5, 93:24, 127:3

**McCaffity's** [1] - 20:6

**McCaffity/Brown** [8] - 71:11, 71:22, 72:14, 73:14, 78:9, 93:18, 111:8, 142:8

**McCoy** [21] - 91:19, 91:21, 91:25, 138:7, 177:24, 178:7, 178:9, 178:13, 179:21, 181:11, 186:20, 186:24, 187:3, 191:9, 191:24, 196:14, 197:25, 198:10, 199:4, 200:7, 200:9

**MCCOY** [2] - 178:1, 230:11

**McCoy's** [2] - 213:14, 213:22

**mean** [43] - 13:23, 20:10, 34:15, 51:25, 65:16, 68:21, 69:11, 72:18, 72:20, 73:4, 74:14, 77:5, 79:10, 84:20, 85:16, 86:12, 95:16, 98:3, 98:8, 99:9, 113:25, 114:5, 122:1, 124:1, 127:2, 127:18, 127:23, 129:20, 132:5, 134:2, 136:11, 149:8, 149:22, 160:9, 163:23, 165:5, 195:12, 203:10, 204:13, 215:12, 223:20, 224:18, 224:20

**Meaning** [1] - 155:24

**meaning** [2] - 110:9, 141:16

**meaningful** [1] - 87:19

**means** [8] - 17:23, 77:8, 81:11, 82:4, 109:9, 123:7, 130:11, 133:7

**meant** [5] - 89:8, 108:12, 112:5, 209:17,

210:8

**meantime** [1] - 143:6

**meat** [1] - 55:22

**mechanical** [1] - 175:25

**mechanically** [1] - 175:24

**mechanics** [1] - 159:10

**mechanism** [2] - 161:5, 161:19

**mechanisms** [2] - 165:4, 165:17

**media** [1] - 215:3

**meet** [4] - 98:18, 179:7, 179:11, 209:21

**meeting** [1] - 51:1

**member** [10] - 2:11, 53:22, 59:19, 62:9, 63:4, 81:22, 117:13, 119:18, 223:5, 225:5

**members** [11] - 60:11, 61:1, 62:6, 63:11, 64:7, 76:23, 77:2, 77:8, 77:9, 117:14, 119:14

**membership** [3] - 113:20, 118:22, 128:23

**memorandum** [1] - 90:7

**memorialized** [2] - 49:5, 49:7

**men** [3] - 112:21, 132:2, 160:21

**mention** [7] - 6:4, 56:18, 104:5, 104:11, 130:22, 136:5, 174:5

**mentioned** [18] - 15:14, 15:18, 16:1, 44:25, 67:5, 114:9, 120:18, 146:3, 147:24, 151:21, 154:20, 157:4, 157:19, 162:6, 167:18, 187:18, 215:5, 218:18

**Mercedes** [3] - 188:3, 188:7, 188:18

**mere** [1] - 68:15

**message** [3] - 91:10, 99:22, 200:17

**messed** [1] - 225:19

**messing** [1] - 173:19

**met** [14] - 54:17, 127:14, 148:8, 150:4, 179:13, 179:14, 179:16, 187:5, 189:3, 190:1, 190:8, 192:25, 193:3, 202:2

**method** [1] - 195:13

**Michael** [2] - 1:16, 1:18

**microphone** [2] - 8:10, 145:17

**microscopically** [1] - 220:1

**mid** [6] - 10:24, 22:17,

55:13, 93:11, 107:6, 109:1

**mid-afternoon** [1] - 10:24

**mid-level** [1] - 55:13

**midday** [1] - 10:14

**middle** [2] - 33:13, 33:18

**midnight** [2] - 40:17, 40:18

**Might** [1] - 186:4

**might** [24] - 3:12, 12:3, 12:4, 20:21, 29:7, 40:22, 41:18, 48:6, 52:6, 81:4, 85:8, 93:7, 101:7, 105:13, 106:24, 111:3, 111:23, 115:10, 126:7, 134:13, 139:12, 206:6, 209:6, 222:6

**mike** [5] - 144:13, 158:14, 178:3, 178:6, 179:22

**mildly** [1] - 3:13

**Mills** [3] - 183:15, 183:16, 197:10

**mind** [4] - 199:12, 215:2, 220:11, 220:12

**Mine** [1] - 135:15

**minimal** [2] - 58:3, 66:7

**minimize** [1] - 140:7

**minimum** [3] - 114:15, 121:24, 127:18

**minor** [1] - 92:5

**minute** [30] - 17:7, 18:11, 18:22, 18:23, 19:12, 19:19, 19:23, 20:3, 20:4, 27:6, 27:12, 33:6, 36:20, 36:21, 36:23, 36:24, 37:1, 37:7, 37:16, 38:1, 38:4, 38:19, 40:22, 52:15, 52:23, 80:14, 99:13, 99:19, 175:6, 199:13

**minutes** [25] - 12:14, 13:1, 18:21, 18:23, 19:7, 36:5, 36:16, 36:18, 38:9, 40:14, 52:22, 100:16, 100:18, 116:25, 135:15, 135:16, 138:17, 138:23, 139:1, 199:20, 209:6, 209:17, 225:18, 226:7

**miracle** [1] - 9:1

**misapprehension** [1] - 208:25

**miscellaneous** [2] - 48:17, 48:19

**mislead** [1] - 32:23

**misleading** [2] - 34:12, 34:15

**missing** [1] - 101:12

**mistake** [1] - 73:9

**mistakes** [1] - 72:15

**mistrial** [2] - 101:4, 132:24

**misunderstood** [3] - 110:15, 116:11, 221:15

**MITCHELL** [1] - 1:7

**Mitchell** [106] - 1:17, 15:19, 15:23, 16:16, 16:19, 17:11, 17:17, 27:12, 34:25, 36:21, 37:5, 37:13, 37:17, 37:25, 38:10, 38:15, 38:18, 38:21, 42:13, 47:18, 47:19, 54:7, 54:12, 54:18, 54:20, 55:2, 60:6, 60:20, 62:9, 63:8, 64:10, 67:10, 67:13, 71:15, 72:7, 72:8, 72:9, 72:25, 73:6, 73:7, 73:22, 74:4, 74:7, 78:16, 80:23, 81:6, 91:6, 93:13, 93:22, 96:2, 96:16, 97:23, 98:7, 98:9, 98:10, 98:23, 99:7, 99:12, 99:21, 100:3, 100:6, 100:8, 100:12, 100:19, 100:22, 101:8, 101:11, 101:21, 102:10, 102:16, 103:17, 104:12, 106:2, 107:5, 107:11, 107:15, 107:19, 108:11, 108:23, 109:17, 109:20, 111:4, 111:9, 112:19, 113:4, 113:6, 113:8, 113:10, 113:13, 116:19, 116:20, 116:22, 127:25, 130:18, 131:16, 131:18, 132:25, 148:22, 148:25, 193:8, 210:23, 231:5

**Mitchell's** [10] - 17:21, 21:22, 35:24, 36:14, 36:20, 42:18, 43:4, 47:13, 62:10, 72:12

**model** [2] - 160:11, 160:12

**Model** [1] - 220:20

**modifications** [1] - 75:12

**modifying** [1] - 51:15

**moment** [11] - 24:24, 49:12, 115:18, 134:20, 146:15, 147:14, 151:2, 156:20, 175:14, 208:8, 215:11

**Monday** [51] - 2:18, 2:21, 2:25, 3:1, 4:11, 4:14, 5:11, 6:5, 6:11, 6:14, 10:6, 10:8, 11:5, 11:11, 11:12, 14:25,

50:15, 50:21, 50:23, 50:25, 51:4, 51:6, 51:12, 51:17, 51:18, 52:2, 52:12, 52:18, 52:20, 89:12, 133:2, 208:5, 209:20, 214:7, 214:8, 214:9, 214:11, 215:8, 217:19, 218:3, 218:14, 221:11, 221:12, 225:15, 225:20, 226:14, 227:1, 227:5, 227:22, 227:23, 229:9

**money** [6] - 112:15, 112:22, 119:24, 183:11, 183:12

**Montgomery** [34] - 46:24, 56:25, 83:17, 83:24, 84:4, 85:9, 108:2, 108:7, 109:10, 111:12, 111:17, 112:1, 112:5, 114:23, 115:6, 115:17, 116:2, 116:7, 116:8, 116:11, 116:12, 117:4, 119:14, 124:19, 124:22, 125:12, 125:14, 126:18, 201:3, 201:4, 201:14, 202:15, 203:7, 206:17

**Montgomery's** [1] - 114:20

**month** [3] - 22:16, 96:10, 107:13

**months** [6] - 29:23, 69:25, 70:1, 96:8, 111:20, 111:21

**Moreover** [1] - 216:19

**Morgan** [1] - 145:25

**morning** [35] - 7:20, 8:8, 10:18, 10:22, 12:11, 13:3, 14:2, 17:12, 21:21, 25:5, 25:6, 27:19, 27:20, 39:1, 39:2, 53:10, 53:11, 88:17, 117:2, 117:21, 158:20, 186:12, 210:9, 214:8, 215:8, 217:19, 218:10, 218:11, 225:25, 227:8, 227:9, 228:1, 228:18, 229:2, 229:9

**morphed** [1] - 108:10

**morphs** [1] - 94:13

**most** [15] - 4:9, 4:15, 10:11, 14:12, 19:23, 42:12, 76:13, 80:9, 80:10, 107:20, 148:14, 153:4, 217:23, 218:22, 218:24

**Most** [1] - 32:2

**mother** [6] - 181:18, 181:22, 184:13, 184:24, 190:1, 190:3, 190:5, 225:15

**motion** [17] - 11:9, 53:25, 54:23, 70:2, 75:23, 76:14, 82:24, 92:4, 94:21, 101:3, 107:17, 117:18, 131:13, 132:22, 132:23, 177:11

**Motion** [1] - 84:18

**motions** [6] - 9:18, 53:2, 91:1, 100:25, 106:6, 130:10

**motivation** [5] - 73:1, 73:2, 83:7, 83:14, 119:24

**move** [11] - 51:14, 53:13, 56:14, 56:16, 103:21, 104:16, 106:1, 163:21, 165:9, 168:2, 197:5

**moved** [3] - 189:25, 190:5, 190:6

**movie** [45] - 29:20, 32:9, 32:11, 33:3, 33:6, 91:19, 91:23, 115:2, 116:17, 116:20, 116:23, 116:24, 128:21, 129:15, 129:16, 181:21, 183:14, 183:18, 183:21, 184:1, 184:2, 184:3, 184:5, 184:9, 184:12, 190:18, 193:13, 193:15, 193:18, 193:21, 193:23, 193:25, 194:2, 194:6, 194:7, 194:11, 194:19, 194:23, 195:1, 195:5, 196:9, 198:3

**movies** [15] - 100:11, 129:17, 180:16, 180:20, 180:21, 180:24, 181:5, 181:7, 181:24, 181:25, 194:16, 195:21, 195:23

**moving** [2] - 168:25, 186:17

**Moving** [1] - 57:5

**MP-2** [1] - 173:1

**MR** [430] - 2:5, 2:8, 3:18, 3:20, 3:23, 3:25, 4:3, 4:19, 5:15, 5:17, 5:20, 5:23, 6:2, 6:4, 6:8, 6:13, 6:18, 6:21, 6:24, 7:1, 7:4, 7:8, 7:14, 7:17, 7:20, 8:2, 9:13, 11:15, 11:20, 12:1, 12:17, 12:20, 13:2, 13:7, 13:9, 13:12, 13:18, 15:12, 20:17, 24:23, 25:1, 25:4, 27:18, 37:9, 38:25, 39:13, 39:25, 40:6, 40:8, 40:11, 44:4, 45:3, 45:6, 45:19, 45:23, 46:6, 46:10, 46:15, 46:19, 46:23, 47:3, 47:4, 47:24,

47:25, 48:3, 48:11, 49:3, 49:13, 49:16, 50:5, 50:7, 53:3, 53:7, 53:10, 53:12, 58:20, 60:13, 60:23, 61:5, 61:7, 61:12, 61:17, 61:21, 62:13, 62:17, 62:23, 63:6, 63:17, 63:20, 63:24, 64:3, 64:12, 64:21, 64:24, 65:4, 65:6, 65:13, 65:17, 66:1, 66:14, 66:17, 66:19, 66:22, 67:3, 67:9, 68:5, 68:7, 68:16, 68:21, 69:6, 69:8, 69:10, 69:15, 69:23, 70:3, 70:18, 70:21, 70:23, 71:25, 73:4, 73:10, 74:1, 74:10, 74:17, 75:3, 75:5, 75:7, 77:7, 78:3, 78:6, 78:19, 79:6, 79:13, 79:24, 82:9, 82:15, 84:25, 85:5, 85:8, 85:19, 85:25, 86:2, 87:5, 87:16, 90:3, 95:7, 95:13, 95:18, 95:21, 96:5, 96:14, 96:19, 96:22, 97:5, 97:19, 97:25, 98:12, 98:15, 98:21, 99:5, 99:8, 99:10, 99:15, 99:20, 99:23, 100:1, 100:14, 100:24, 101:14, 101:17, 101:23, 102:1, 102:7, 102:14, 102:20, 102:22, 103:2, 103:14, 103:21, 104:3, 104:8, 104:10, 105:3, 105:5, 105:7, 105:17, 105:21, 105:23, 106:5, 106:9, 106:16, 106:22, 107:6, 107:10, 108:1, 108:7, 109:23, 112:10, 112:12, 112:18, 113:21, 113:24, 114:4, 114:13, 115:14, 115:16, 116:2, 117:23, 120:4, 120:11, 120:13, 120:20, 121:2, 121:4, 123:20, 124:6, 124:9, 124:12, 124:15, 124:19, 124:22, 125:1, 125:5, 125:11, 125:17, 125:22, 126:3, 126:9, 126:15, 127:20, 127:23, 128:2, 128:5, 128:24, 130:8, 134:20, 134:22, 135:6, 135:19, 135:25, 136:3, 136:7, 136:10, 136:14, 136:18, 137:9, 137:17, 137:20, 137:23, 138:1, 138:7, 138:14, 138:18, 138:21, 138:23, 139:1, 139:3, 139:6, 139:10, 140:10, 144:6, 144:16,

150:15, 150:23, 151:5, 151:9, 156:3, 157:10, 157:24, 158:6, 158:8, 158:10, 158:11, 158:19, 164:8, 171:4, 171:6, 172:8, 173:13, 173:14, 175:17, 177:18, 177:22, 177:24, 178:12, 179:19, 180:1, 187:2, 188:10, 190:15, 198:19, 199:24, 200:1, 200:4, 200:5, 200:8, 200:25, 201:2, 201:8, 201:11, 201:17, 201:19, 201:21, 201:23, 202:1, 202:5, 202:9, 202:19, 202:21, 202:25, 203:5, 203:12, 203:24, 204:2, 204:6, 204:8, 204:17, 204:22, 204:24, 205:1, 205:4, 205:13, 205:20, 206:10, 206:13, 206:19, 206:21, 206:23, 207:1, 207:5, 207:8, 207:11, 207:14, 207:17, 207:24, 208:1, 208:7, 208:10, 208:13, 208:19, 208:23, 209:10, 209:13, 209:19, 209:21, 210:3, 210:11, 210:15, 210:18, 210:21, 211:4, 211:9, 211:16, 211:22, 212:5, 212:20, 212:23, 213:1, 213:3, 213:7, 213:8, 213:10, 213:13, 213:17, 213:19, 213:21, 213:24, 215:9, 215:12, 217:24, 218:16, 218:18, 218:22, 219:2, 219:4, 219:7, 219:10, 219:12, 219:21, 219:23, 220:7, 220:13, 220:17, 221:1, 221:6, 221:8, 221:12, 221:14, 222:1, 222:4, 223:6, 223:13, 223:17, 223:19, 223:22, 224:1, 224:5, 224:14, 224:18, 225:4, 225:8, 225:12, 225:14, 225:17, 225:24, 226:4, 226:11, 226:12, 226:16, 226:18, 226:25, 228:7, 228:11, 228:19, 228:21, 228:25, 229:3, 229:12, 230:4, 230:5, 230:5, 230:6, 230:7, 230:8, 230:9, 230:10, 230:10, 230:12, 230:12, 230:13

**MS** [16] - 4:6, 4:9, 4:12, 4:15, 10:12, 11:4, 11:13, 88:11, 89:8, 209:5, 209:8, 218:3, 218:7, 218:9, 218:12, 227:8

**multiple** [6] - 53:20, 55:10, 67:24, 75:16, 75:17, 75:24

**Multiple** [1] - 24:1

**murder** [52] - 22:11, 29:16, 29:25, 56:19, 56:23, 57:1, 71:23, 72:5, 72:6, 72:17, 73:4, 73:14, 77:23, 78:9, 78:25, 80:15, 83:13, 84:14, 85:3, 85:10, 90:13, 90:25, 91:18, 93:18, 96:24, 111:8, 114:14, 114:22, 115:10, 116:14, 116:25, 117:9, 117:12, 117:15, 117:16, 117:19, 118:1, 119:6, 119:11, 122:22, 123:14, 123:17, 125:19, 125:20, 125:23, 126:1, 126:6, 126:12, 131:17, 168:6, 203:1

**murdered** [4] - 72:20, 93:24, 150:13

**murdering** [2] - 103:16

**murders** [19] - 72:14, 74:13, 80:13, 90:17, 90:20, 91:5, 92:17, 102:17, 104:13, 110:21, 115:13, 122:10, 123:10, 123:15, 128:16, 129:9, 142:8, 142:9, 164:19

**music** [16] - 60:4, 60:10, 61:3, 62:6, 62:11, 63:8, 64:8, 73:21, 73:24, 76:23, 78:10, 78:14, 78:15, 78:23, 79:10, 130:20

**musical** [2] - 85:11, 123:3

**must** [6] - 63:5, 87:14, 87:17, 107:12, 132:14, 216:6

**mutual** [1] - 109:14

**myriad** [1] - 109:12

## N

**nail** [1] - 166:11

**name** [36] - 21:11, 22:25, 23:15, 27:23, 28:8, 42:2, 42:5, 43:4, 43:5, 43:18, 43:22, 43:24, 48:11, 48:14, 104:20, 114:6, 144:13, 144:21, 145:6, 148:22, 149:2, 149:22, 156:5, 158:15, 158:16, 178:4, 178:7, 179:1, 179:9, 189:16, 189:21, 193:23, 193:25, 194:23, 205:19

**name's** [2] - 164:11, 187:5

**names** [1] - 145:11

**narcotics** [3] - 56:2, 67:14, 205:6

**Natasha** [5] - 15:15, 15:18, 15:21, 16:9, 112:24

**nature** [5] - 82:17, 87:12, 87:20, 87:24, 130:24

**natures** [1] - 88:3

**near** [2] - 118:14, 228:3

**nearing** [1] - 14:24

**nearly** [2] - 34:2, 88:8

**neater** [1] - 70:8

**necessarily** [1] - 60:24

**necessary** [10] - 2:25, 6:7, 10:21, 14:5, 51:13, 52:17, 58:3, 74:11, 75:14, 118:25

**need** [38] - 4:7, 6:24, 6:25, 7:17, 8:21, 11:12, 40:1, 51:7, 51:10, 52:13, 52:19, 59:1, 59:2, 76:20, 88:12, 88:25, 109:15, 110:22, 120:21, 120:22, 129:10, 136:4, 136:5, 136:15, 136:20, 136:22, 138:25, 165:23, 181:15, 200:20, 204:1, 204:5, 204:7, 212:20, 221:22, 224:25, 225:4, 229:4

**needed** [1] - 66:7

**needs** [3] - 57:10, 84:11, 115:23

**negotiate** [1] - 45:14

**neighborhood** [2] - 132:16, 189:22

**Nephew** [1] - 104:20

**nephew** [1] - 156:16

**net** [1] - 70:9

**Network** [1] - 39:11

**never** [24] - 40:3, 82:9, 84:10, 97:3, 98:12, 100:4, 113:10, 130:4, 140:11, 164:19, 170:16, 173:24, 185:10, 186:21, 187:24, 188:4, 192:23, 192:25, 193:6, 195:9, 202:2, 221:18, 224:6

**nevertheless** [2] - 114:17, 167:17

**New** [3] - 54:1, 67:8, 144:20

**new** [4] - 23:9, 24:8, 43:8, 43:14

**newly** [1] - 103:10

**next** [47] - 2:24, 3:1, 4:10, 5:9, 19:7, 50:15,

50:21, 50:23, 50:25, 51:4, 51:6, 51:16, 51:18, 51:23, 52:1, 52:13, 52:18, 52:20, 54:8, 75:5, 82:12, 89:12, 97:12, 134:14, 141:16, 143:4, 182:1, 186:3, 186:12, 188:17, 191:17, 194:7, 201:16, 201:22, 201:24, 202:4, 202:5, 202:8, 202:9, 214:14, 215:18, 217:11, 218:16, 218:17, 220:12

**Nice** [1] - 217:22

**nice** [1] - 165:3

**Nicole** [3] - 144:6, 144:14, 222:6

**NICOLE** [2] - 144:10, 230:7

**niece** [3] - 8:5, 8:16, 156:16

**Niedermeier** [16] - 26:9, 26:23, 29:6, 29:10, 29:22, 30:3, 33:20, 47:15, 91:20, 101:5, 101:18, 102:9, 102:13, 102:23, 102:24, 210:24

**Niedermeier's** [1] - 102:4

**night** [26] - 2:12, 9:11, 14:14, 16:12, 16:16, 16:23, 17:11, 17:18, 34:6, 40:17, 91:25, 93:20, 93:21, 100:9, 122:19, 129:13, 181:4, 181:20, 182:1, 185:21, 193:13, 194:6, 194:11, 209:22, 218:14

**nine** [8] - 28:25, 29:1, 29:2, 140:12, 175:8, 186:5, 186:6

**Nine** [2] - 53:18, 56:17

**NO** [1] - 1:6

**nobody** [3] - 129:19, 130:1, 170:14

**Nobody** [3] - 184:17, 198:11, 199:16

**non** [1] - 97:1

**non-withdrawal** [1] - 97:1

**None** [1] - 133:4

**none** [1] - 52:6

**noon** [3] - 20:20, 138:8, 186:11

**normally** [1] - 180:24

**NORTHERN** [1] - 1:2

**Northwest** [1] - 189:23

**notarize** [1] - 224:25

**notarized** [2] - 224:22, 224:24

**note** [9] - 2:10, 52:16, 52:23, 53:24, 89:3, 93:6, 199:10, 214:19, 217:20

**noted** [1] - 49:2, 106:8

**notes** [4] - 9:7, 69:15, 102:4, 105:6

**nothing** [21] - 35:12, 56:5, 56:21, 60:3, 60:22, 62:15, 72:15, 79:9, 80:21, 80:24, 83:20, 83:22, 92:15, 92:16, 93:3, 96:2, 105:24, 123:9, 137:14, 151:5, 153:20

**Nothing** [2] - 44:1, 157:23

**notice** [5] - 6:25, 7:23, 21:11, 173:3, 220:6

**noticeable** [1] - 7:1

**notion** [4] - 57:19, 93:17, 108:14, 110:5

**November** [5] - 1:11, 95:19, 95:21, 196:8, 231:5

**number** [77] - 4:4, 16:11, 16:21, 16:22, 16:24, 18:6, 18:8, 18:12, 21:9, 21:11, 22:14, 22:25, 23:1, 23:2, 23:7, 23:10, 23:11, 23:12, 23:18, 23:24, 24:5, 24:8, 24:10, 24:15, 24:19, 24:20, 28:9, 29:2, 29:3, 31:1, 31:10, 38:14, 40:22, 40:23, 40:25, 41:7, 41:8, 41:17, 41:21, 42:2, 43:3, 43:9, 43:11, 43:12, 43:15, 43:16, 43:18, 43:21, 43:23, 45:1, 47:20, 68:23, 82:3, 86:20, 87:7, 92:5, 92:11, 93:9, 94:16, 94:23, 94:24, 96:6, 98:25, 103:25, 116:18, 118:4, 118:5, 118:6, 123:21, 146:3, 218:19

**Number** [12] - 8:4, 8:5, 8:7, 13:21, 13:22, 14:13, 14:16, 14:18, 88:5, 159:14, 160:15, 214:17

**NUMBER** [7] - 8:9, 8:14, 8:17, 8:20, 8:23, 9:3, 9:6

**Number(s** [1] - 231:5

**numbers** [9] - 38:1, 44:20, 44:21, 45:17, 46:7, 46:8, 47:20, 47:22, 48:6

# O

**oath** [4] - 15:6, 25:20, 83:5, 84:1

**object** [6] - 7:23, 20:17, 87:8, 87:21, 177:7, 188:10

**Objection** [10] - 39:25, 150:15, 157:10, 171:4, 172:8, 173:13, 173:14, 190:15

**objection** [7] - 102:11, 104:11, 197:7, 211:14, 211:15, 228:17, 228:18

**objection's** [3] - 40:10, 172:10, 211:24

**obligated** [2] - 25:20, 141:20

**observation** [1] - 77:18

**obtain** [3] - 30:20, 109:14, 152:23

**obtained** [3] - 28:9, 28:24, 30:23, 30:24, 91:21

**Obtaining** [1] - 30:6

**obtaining** [1] - 29:7

**obviously** [13] - 6:1, 7:9, 7:10, 7:17, 44:5, 76:5, 84:8, 123:11, 128:17, 162:13, 162:19, 164:19, 168:5

**Obviously** [4] - 6:10, 14:15, 52:5, 133:16

**occasion** [4] - 98:13, 108:25, 148:23, 208:15

**occasions** [3] - 45:8, 148:8, 150:2

**occupant** [1] - 170:16

**occupants** [4] - 167:23, 167:25, 172:20, 174:6

**occupation** [1] - 148:24

**occur** [1] - 161:24

**occurred** [5] - 19:4, 19:5, 29:17, 91:5, 164:20

**occurrence** [1] - 8:13

**occurs** [1] - 30:17

**October** [3] - 106:25, 107:2, 107:12

**OF** [3] - 1:2, 1:5, 1:11

**offed** [1] - 96:4

**offense** [1] - 216:8

**offenses** [3] - 80:10, 133:12, 205:6

**offer** [3] - 45:12, 45:21, 159:9

**offered** [2] - 90:22, 175:20

**offers** [1] - 137:10

**office** [4] - 148:6, 148:9,

148:14, 148:18

**Office** [2] - 136:24, 211:11

**officer** [1] - 103:13

**officers** [2] - 44:17, 225:1

**official** [4] - 99:17, 211:17, 212:1, 231:8

**Official** [1] - 231:16

**offline** [1] - 215:4

**often** [4] - 17:4, 55:19, 216:22, 216:25

**old** [4] - 147:22, 156:18, 189:5, 189:6

**once** [3] - 146:23, 185:11, 226:6

**one** [172] - 2:11, 2:20, 3:25, 4:6, 4:16, 4:22, 4:23, 5:6, 6:4, 6:14, 6:24, 11:15, 11:16, 12:5, 14:6, 17:7, 17:14, 18:22, 19:4, 19:5, 19:25, 22:6, 23:25, 26:6, 26:24, 27:5, 27:6, 27:12, 33:5, 33:6, 34:13, 38:2, 38:14, 38:19, 39:18, 40:22, 41:17, 43:8, 43:22, 44:8, 45:9, 47:12, 49:20, 50:1, 53:22, 54:5, 54:10, 54:22, 55:1, 58:8, 58:22, 61:1, 62:5, 67:15, 71:2, 72:15, 72:21, 72:22, 73:19, 75:19, 75:22, 76:21, 81:1, 82:9, 85:19, 86:18, 87:7, 92:14, 94:23, 97:5, 98:24, 104:1, 104:23, 104:24, 105:15, 108:25, 109:12, 109:13, 109:14, 109:20, 110:21, 111:11, 111:18, 112:3, 112:4, 112:6, 112:12, 115:18, 117:8, 118:4, 118:5, 120:4, 121:2, 121:13, 122:8, 122:17, 123:21, 123:25, 124:17, 125:7, 125:8, 125:13, 125:22, 125:23, 125:24, 126:6, 132:10, 132:12, 134:2, 135:8, 138:2, 141:9, 142:17, 145:12, 154:7, 157:2, 162:13, 163:1, 164:1, 167:25, 171:18, 171:20, 172:25, 174:5, 175:5, 175:14, 176:17, 177:20, 177:22, 188:18, 188:7, 188:16, 190:14, 199:8, 199:15, 199:24, 201:5, 201:15, 201:16,

204:22, 205:6, 208:7, 208:10, 209:23, 212:7, 212:9, 215:14, 219:12, 221:7, 221:8, 221:9, 222:5, 226:2, 226:8, 226:9, 228:6, 228:10, 229:11, 229:12

**One** [30] - 13:22, 14:16, 45:21, 57:5, 76:5, 76:6, 76:16, 76:17, 77:15, 77:19, 79:11, 79:20, 81:18, 81:23, 82:21, 87:5, 90:12, 92:21, 92:22, 93:1, 110:1, 125:10, 129:6, 129:7, 131:10, 132:3, 156:14, 156:20, 221:6, 229:10

**one's** [3] - 83:3, 84:15, 122:2

**ones** [2] - 19:4, 120:6

**ongoing** [7] - 57:11, 62:25, 71:1, 92:24, 94:24, 97:14, 111:18

**online** [1] - 215:4

**open** [24] - 103:9, 161:1, 162:3, 162:13, 162:24, 163:7, 163:10, 167:1, 167:25, 168:4, 168:11, 168:12, 168:18, 174:14, 174:19, 174:20, 175:3, 176:7, 176:11, 176:17, 199:12, 215:2

**opened** [1] - 163:13

**opening** [17] - 12:7, 13:10, 78:22, 89:24, 95:11, 135:2, 135:20, 139:23, 139:24, 140:1, 140:3, 140:5, 140:15, 141:1, 141:3, 228:4, 228:7

**opens** [2] - 174:9, 174:25

**operate** [2] - 108:12, 161:4

**operated** [2] - 130:21, 166:16

**operating** [2] - 55:18, 55:19

**operation** [5] - 108:21, 109:4, 110:13, 113:7, 175:25

**operational** [4] - 111:10, 111:13, 130:16, 131:3

**operations** [7] - 109:5, 110:8, 110:20, 111:19, 111:23, 119:9, 165:19

**opined** [1] - 81:4

**opinion** [2] - 33:7, 164:2

**opportunity** [7] - 13:2, 46:4, 50:9, 70:6, 75:18, 134:11, 139:10

**oppose** [1] - 211:2

**opposed** [2] - 12:22, 29:24

**option** [5] - 12:10, 12:13, 12:21, 12:24, 104:8

**orally** [1] - 106:2

**orchestrates** [1] - 111:6

**order** [16] - 2:16, 9:23, 11:12, 11:21, 57:12, 87:13, 87:16, 118:18, 135:3, 140:6, 158:4, 176:20, 207:7, 207:10, 224:19, 225:6

**orders** [1] - 207:4

**organization** [28] - 55:15, 57:11, 59:22, 61:18, 62:25, 64:14, 71:2, 73:3, 73:6, 73:16, 74:4, 74:7, 74:8, 75:1, 76:17, 84:24, 86:18, 86:19, 108:15, 109:25, 110:1, 110:5, 110:11, 110:12, 110:23, 110:24, 132:7, 132:11

**organizational** [2] - 73:2, 81:14

**organizations** [2] - 72:4, 108:13

**organized** [1] - 59:19

**original** [1] - 224:12

**originally** [4] - 119:11, 127:4, 144:19, 202:25

**Orrico** [2] - 86:6, 86:10

**Otherwise** [1] - 229:5

**ought** [1] - 229:1

**ourselves** [1] - 12:21

**outcome** [4] - 215:25, 216:1, 216:4, 216:5

**outcomes** [1] - 215:24

**outgoing** [10] - 17:2, 17:21, 18:5, 18:6, 18:8, 19:19, 19:25, 20:19, 21:22, 32:14

**outgrowth** [1] - 119:12

**outlier** [1] - 56:21

**outside** [9] - 20:3, 29:15, 58:2, 70:11, 74:11, 110:8, 139:11, 162:16, 174:8

**overall** [4] - 33:16, 45:2, 58:15, 71:9

**overarching** [3] - 56:6, 58:16, 71:9

**overlap** [2] - 54:9, 216:25

**overly** [2] - 118:5, 118:7

**overruled** [1] - 172:10

**Overruled** [2] - 157:11, 171:5

**oversee** [1] - 159:3

**overstatement** [1] - 122:5

**overwhelming** [1] - 131:14

**Owings** [3] - 183:15, 183:16, 197:10

**own** [12] - 23:15, 42:5, 92:8, 108:16, 110:8, 127:11, 133:4, 133:9, 142:21, 165:8, 165:17, 212:7

**owned** [1] - 130:21

**owner** [1] - 174:16

## P

**p.m** [9] - 19:5, 24:4, 40:21, 157:9, 157:17, 194:24, 197:11, 199:21, 229:16

**PA** [2] - 54:18, 67:18

**pad** [4] - 9:8, 13:21, 167:7

**pads** [5] - 52:16, 52:23, 89:3, 199:10, 217:20

**page** [4] - 44:7, 44:24, 160:13, 201:6

**PAGE** [1] - 230:3

**pages** [4] - 128:6, 211:5, 226:6, 231:7

**paid** [11] - 181:22, 183:10, 195:5, 195:9, 195:21, 195:22, 196:8, 198:5, 198:9, 198:12, 199:1

**paint** [1] - 80:10

**paired** [1] - 110:19

**pan** [1] - 220:15

**Panasonic** [1] - 46:12

**paper** [7] - 47:8, 48:14, 48:24, 48:25, 94:18, 104:24, 115:3

**papers** [1] - 224:13

**Paragraph** [5] - 62:4, 72:24, 77:24, 77:25, 94:3

**paranoid** [1] - 72:16

**parcel** [1] - 119:8

**Pardon** [3] - 99:5, 102:7, 145:1

**pardon** [1] - 222:10

**Park** [5] - 67:20, 73:15, 108:20, 108:24, 109:6

**parking** [1] - 198:23

**parole** [1] - 156:24

**part** [36] - 29:11, 46:12,

55:15, 60:9, 60:20, 62:10, 62:12, 62:15, 64:9, 71:8, 73:23, 74:2, 75:13, 82:5, 84:4, 84:18, 86:19, 92:2, 96:14, 97:8, 107:7, 110:15, 115:13, 119:8, 119:23, 130:19, 139:24, 140:18, 142:12, 149:18, 166:12, 212:1, 215:17, 217:1, 225:10

**partially** [5] - 75:20, 148:18, 172:2

**participants** [1] - 119:7

**participate** [1] - 97:9

**participated** [3] - 90:22, 103:16, 141:11

**participation** [3] - 98:8, 101:24, 141:12

**particular** [21] - 17:7, 27:4, 29:19, 30:25, 53:16, 65:12, 65:14, 65:15, 65:16, 65:17, 104:16, 112:20, 143:6, 159:19, 181:4, 183:18, 204:18, 215:25, 216:1, 216:21, 220:19

**particularly** [11] - 68:8, 69:11, 71:5, 96:2, 100:8, 100:21, 135:19, 148:3, 160:18, 210:3, 215:16

**parties** [7] - 34:21, 35:20, 44:5, 44:8, 44:13, 49:17, 49:24

**parting** [1] - 121:1

**partly** [1] - 131:23

**parts** [2] - 102:24, 102:25, 160:25

**party** [8] - 34:13, 34:15, 34:16, 34:17, 34:18, 34:20, 78:16, 204:3

**pass** [1] - 146:23

**passed** [3] - 23:25, 26:1, 146:21

**passenger** [8] - 161:12, 167:24, 168:19, 168:25, 169:5, 169:13, 173:23, 174:19

**past** [6] - 33:14, 33:17, 55:22, 56:10, 131:22, 167:16

**patience** [3] - 14:8, 139:17, 214:4

**Patrick** [2] - 158:11, 158:16

**PATRICK** [2] - 158:12, 230:9

**Patriot** [2] - 39:11, 40:5

**patterns** [1] - 57:20, 57:25, 58:2, 59:25, 62:19, 64:1, 64:3, 64:4,

71:7, 93:18, 121:8

**Paul** [1] - 1:19

**Pause** [5] - 24:25, 146:18, 151:4, 156:21, 158:5

**pay** [7] - 21:13, 83:7, 84:23, 86:21, 113:1, 195:13, 198:14

**paying** [1] - 115:2

**payroll** [2] - 153:17, 153:18

**PC-1** [3] - 49:9, 49:13, 49:21

**PC-2** [3] - 49:10, 49:22, 50:3

**peculiar** [1] - 76:20

**pecuniary** [1] - 84:23

**Pennsylvania** [14] - 54:10, 54:21, 80:22, 80:23, 81:1, 81:2, 81:8, 93:14, 108:21, 109:5, 113:7, 113:14, 135:10

**People** [3] - 93:20, 113:2, 130:25

**people** [23] - 4:4, 27:1, 58:4, 63:16, 64:16, 66:11, 96:17, 110:10, 111:2, 111:24, 112:25, 113:4, 114:16, 124:1, 142:10, 155:6, 164:16, 168:7, 168:20, 169:12, 169:22, 190:14, 225:21

**people's** [1] - 155:5

**Perfect** [2] - 120:9, 227:18

**perfect** [1] - 80:22

**perfectly** [2] - 125:17, 168:1

**perform** [1] - 159:2

**performing** [1] - 79:10

**perhaps** [17] - 2:25, 3:1, 10:22, 51:21, 52:3, 79:9, 103:3, 132:4, 133:2, 133:13, 158:2, 207:21, 226:7, 227:5, 227:10

**period** [22] - 14:22, 31:14, 41:6, 80:12, 80:16, 92:25, 93:1, 93:5, 94:10, 94:25, 96:8, 96:10, 107:13, 108:3, 109:20, 111:3, 121:20, 123:24, 152:7, 191:18, 207:11

**periods** [3] - 95:10, 111:19, 148:3

**permission** [2] - 105:25, 221:12

**permit** [3] - 70:19, 77:11, 220:3

**permits** [1] - 166:21

**persisted** [2] - 92:24, 93:4
**person** [20] - 13:15, 21:13, 24:11, 26:6, 26:7, 26:24, 87:11, 98:9, 116:9, 135:7, 146:19, 148:23, 149:2, 149:5, 149:9, 153:10, 153:11, 168:1, 168:6
**personal** [3] - 71:12, 73:1, 150:5
**personally** [4] - 16:5, 71:2, 150:6, 154:14
**PG** [1] - 6:18
**phone** [113] - 6:1, 6:16, 11:11, 16:10, 16:19, 17:1, 17:18, 17:21, 18:24, 19:1, 19:19, 19:20, 20:5, 20:6, 20:10, 20:23, 21:20, 21:22, 22:5, 22:8, 22:13, 22:17, 22:23, 23:14, 24:10, 27:6, 27:7, 27:12, 27:13, 27:25, 28:6, 28:8, 28:10, 28:16, 28:18, 29:2, 29:3, 30:18, 30:25, 31:11, 31:25, 32:2, 32:7, 32:8, 32:20, 33:7, 33:23, 34:25, 35:1, 35:24, 36:8, 36:10, 36:14, 36:19, 36:20, 37:5, 37:16, 37:17, 37:25, 38:9, 38:15, 38:17, 38:18, 38:19, 38:21, 40:21, 40:23, 41:18, 43:8, 47:20, 47:21, 47:23, 47:25, 51:9, 91:11, 92:8, 92:10, 92:12, 92:13, 96:9, 96:23, 97:16, 98:1, 98:6, 98:15, 98:17, 98:23, 98:24, 98:25, 99:12, 99:18, 100:5, 100:15, 101:7, 116:19, 122:18, 129:13, 143:7, 184:5, 184:6, 184:8, 194:11, 194:14, 200:15, 209:11, 222:15
**Phones** [1] - 128:2
**phones** [14] - 16:12, 16:14, 16:15, 20:24, 27:22, 31:8, 39:5, 40:12, 42:17, 42:18, 42:19, 47:21, 96:18, 129:18
**photo** [4] - 46:21, 46:23, 47:4, 47:11
**photograph** [2] - 46:17, 107:25
**photographs** [1] - 164:25
**physically** [2] - 161:13,

162:11
**pick** [3] - 100:6, 103:8, 154:13
**picked** [5] - 67:18, 148:7, 181:22, 182:16, 182:17
**picks** [3] - 69:20, 80:3, 100:4
**picture** [8] - 125:17, 165:22, 166:6, 166:20, 167:4, 167:6, 170:8, 171:21
**pictures** [3] - 170:24, 176:25, 177:3
**piece** [2] - 107:24, 130:20
**pin** [1] - 103:17
**Pinkerton** [13] - 117:10, 117:15, 127:17, 128:5, 128:7, 128:8, 128:10, 128:13, 128:14, 128:16, 128:18, 128:25, 129:9
**place** [8] - 72:23, 108:4, 121:16, 124:1, 142:9, 142:10, 173:25, 191:11
**placed** [3] - 21:9, 22:21, 36:20
**plan** [2] - 119:12, 119:13
**planned** [2] - 51:1, 127:5
**planning** [1] - 218:24
**plans** [2] - 2:20, 2:21
**play** [4] - 209:10, 211:13, 212:23, 226:8
**played** [5] - 140:18, 140:19, 143:8, 213:2, 213:14
**playing** [2] - 79:10, 196:6
**pleasant** [1] - 217:18
**pleased** [1] - 14:9
**pled** [6] - 202:10, 202:12, 202:25, 203:1, 204:19, 205:6
**Plus** [1] - 204:17
**pocket** [1] - 46:20
**pockets** [2] - 116:5, 116:10
**point** [52] - 4:24, 29:13, 33:11, 33:21, 39:18, 54:5, 54:17, 54:18, 56:18, 60:25, 67:15, 67:16, 67:19, 67:20, 74:22, 80:8, 87:23, 94:20, 100:2, 103:2, 108:9, 116:6, 118:3, 120:2, 121:6, 121:23, 121:25, 126:3, 140:13, 141:15, 142:2, 143:14,

143:18, 145:2, 154:19, 159:18, 161:20, 161:25, 162:16, 163:13, 164:1, 169:7, 171:3, 175:8, 176:12, 182:11, 185:21, 189:11, 198:7, 215:15, 223:8
**point-by-point** [1] - 223:8
**pointed** [5] - 22:15, 76:18, 83:25, 201:13, 201:14
**pointing** [2] - 17:11, 140:24
**points** [7] - 92:5, 113:25, 116:10, 116:18, 137:12, 175:18, 203:15
**police** [5] - 103:12, 115:7, 115:11, 116:11, 197:18
**polish** [1] - 227:25
**portfolio** [1] - 130:19
**portion** [4] - 45:9, 54:15, 102:3, 161:1
**portions** [3] - 203:14, 203:19, 203:20
**posit** [1] - 96:23
**position** [27] - 25:19, 76:6, 78:23, 79:25, 81:24, 82:2, 83:3, 83:21, 84:16, 85:17, 86:3, 86:17, 87:2, 118:11, 118:20, 118:23, 118:25, 119:17, 121:7, 122:3, 122:11, 122:12, 122:14, 154:18, 161:16, 163:22, 227:4
**possessed** [1] - 90:16
**possession** [4] - 28:2, 28:11, 28:16, 94:13
**possessions** [2] - 222:18
**possibilities** [1] - 45:19
**possibility** [6] - 7:21, 10:7, 11:1, 168:22, 168:23, 220:24
**possible** [18] - 10:9, 11:20, 13:5, 31:3, 38:11, 42:23, 42:25, 167:19, 168:1, 169:2, 171:1, 174:2, 174:4, 174:12, 179:23, 220:9, 220:23, 221:14
**Possibly** [1] - 151:23
**possibly** [5] - 3:25, 219:16, 223:1, 223:24
**Post** [2] - 165:24
**post** [2] - 54:24, 224:13
**post-conviction** [1] - 224:13

**Post-Its** [2] - 165:24
**posting** [1] - 147:4
**posture** [1] - 52:8
**potential** [2] - 5:8, 200:13
**power** [8] - 72:3, 147:6, 160:8, 160:17, 161:14, 163:14, 171:9, 171:10
**powerful** [1] - 97:3
**prayers** [3] - 8:24, 14:19, 14:20
**pre** [2] - 59:4, 106:20
**pre-1999** [1] - 106:21
**pre-RICO** [1] - 59:4
**precise** [1] - 95:25
**precisely** [1] - 222:20
**preconceived** [2] - 108:14, 110:5
**predict** [1] - 52:6
**predicted** [1] - 90:3
**predictions** [1] - 7:17
**preemptive** [1] - 71:15
**prefer** [2] - 12:4, 105:16
**preference** [1] - 11:22
**prejudicial** [1] - 205:10
**preliminary** [1] - 199:24
**premise** [1] - 53:18
**prepared** [12] - 33:18, 33:23, 33:25, 45:8, 106:12, 106:13, 137:19, 143:9, 143:10, 143:11, 212:8, 212:10
**presence** [2] - 139:11, 185:22
**present** [17] - 2:1, 2:2, 2:14, 28:13, 66:4, 126:14, 131:4, 135:8, 140:4, 154:24, 162:15, 186:18, 198:21, 199:22, 207:22, 212:7
**presentation** [4] - 47:5, 50:11, 63:9, 139:18
**presented** [7] - 31:4, 33:20, 33:22, 73:5, 73:19, 85:6, 132:18
**presently** [2] - 158:23, 206:11
**preservation** [3] - 71:16, 71:17, 73:11
**preserved** [1] - 79:8
**preserving** [1] - 72:2
**President** [1] - 130:15
**press** [1] - 162:4
**pressed** [2] - 70:25, 71:1
**prestige** [1] - 118:24
**pretrial** [1] - 127:5
**pretty** [8] - 67:24, 68:24, 95:25, 133:1, 135:9, 157:5, 157:14,

204:14
**prevail** [1] - 2:21
**prevent** [1] - 154:16
**previous** [2] - 19:7, 101:15
**PREVIOUSLY** [1] - 15:10
**previously** [7] - 41:5, 44:25, 97:7, 106:7, 212:14, 216:17, 217:4
**principal** [2] - 90:5, 92:9
**principle** [1] - 69:18
**principles** [2] - 75:9, 122:6
**print** [1] - 46:16
**printed** [3] - 33:15, 33:19, 40:3
**printouts** [1] - 21:15
**prism** [2] - 118:2, 132:18
**prison** [2] - 190:24, 191:10
**privilege** [3] - 133:6, 207:4, 208:18
**probative** [1] - 205:10
**problem** [11] - 6:15, 6:22, 82:15, 89:11, 136:8, 138:20, 221:20, 221:21, 224:8, 226:11, 226:16
**problems** [3] - 58:23, 59:7, 121:13
**procedural** [1] - 53:4
**procedures** [1] - 223:14
**proceed** [6] - 15:4, 15:9, 134:19, 139:18, 140:5, 172:11
**proceeded** [1] - 170:18
**proceeding** [4] - 137:6, 139:12, 201:20, 216:3
**Proceedings** [4] - 2:1, 146:18, 151:4, 229:16
**proceedings** [12] - 15:8, 24:25, 63:19, 127:5, 156:21, 158:5, 208:14, 210:5, 215:13, 216:6, 231:4, 231:8
**proceeds** [3] - 60:9, 60:14, 61:2
**process** [1] - 153:18
**produced** [1] - 91:16
**producing** [2] - 20:15, 64:8
**professional** [1] - 145:22
**proffer** [1] - 220:8
**proffered** [1] - 214:2
**profit** [1] - 72:6
**profits** [2] - 57:18, 72:3

**programmed** [1] -
217:12
**progress** [3] - 3:10,
33:21, 199:9
**progressed** [1] - 34:6
**progression** [1] - 34:6
**project** [2] - 130:16
**project-by-project** [1] -
130:16
**promise** [5] - 13:4,
84:22, 113:21, 138:23,
141:5
**promises** [1] - 140:25
**promote** [3] - 62:6,
62:11, 73:24
**promoting** [4] - 58:15,
63:10, 64:6, 76:22
**prong** [1] - 120:1
**pronouncing** [1] - 82:6
**proof** [6] - 57:20, 77:22,
90:16, 90:24, 142:3,
217:1
**proper** [1] - 34:6
**property** [6] - 44:20,
44:21, 146:9, 146:21,
223:5, 225:2
**proposed** [8] - 76:1,
87:6, 87:8, 87:9, 118:12,
120:5, 120:15, 121:9
**proposition** [1] - 68:10
**prosecute** [2] - 136:12,
137:10
**prosecuted** [4] - 81:11,
206:6, 216:18, 217:4
**prosecution** [7] -
215:20, 216:12, 216:20,
216:21, 216:23, 217:2,
217:7
**prosecutions** [2] -
215:24, 216:22
**prosecutors** [5] - 121:5,
146:15, 187:14, 211:18,
216:17
**protect** [1] - 73:15
**protecting** [2] - 72:2,
72:25
**protection** [2] - 93:23,
109:12
**prove** [17] - 2:25, 53:19,
57:8, 57:10, 59:9, 59:12,
62:24, 64:15, 68:10,
74:18, 87:13, 87:14,
87:16, 87:17, 141:5,
141:18, 141:24
**proved** [12] - 56:3,
56:10, 69:24, 81:22,
118:18, 141:10, 141:11,
141:14, 141:22, 143:2,
144:1
**proven** [6] - 53:20,

53:22, 70:17, 71:11,
80:4, 216:8
**proves** [2] - 68:19,
76:12
**provide** [3] - 66:3,
74:19, 149:7
**provided** [8] - 39:12,
51:17, 54:6, 74:24,
91:22, 132:9, 148:11,
212:13
**providing** [5] - 55:13,
55:16, 143:9, 149:4
**proving** [1] - 81:13
**provisionally** [2] -
45:13, 104:17
**prudent** [2] - 9:20,
169:9
**Public** [2] - 57:3, 57:4
**public** [2] - 115:13
**pull** [6] - 145:17, 167:1,
167:15, 172:14, 178:6,
227:20
**pulled** [1] - 166:5
**pulls** [2] - 169:7,
169:11, 169:21
**punch** [1] - 143:16
**punishable** [2] - 49:19,
49:25
**purchased** [2] - 197:12,
198:22
**purchases** [1] - 183:5
**purge** [1] - 30:13
**purport** [1] - 68:22
**purpose** [19] - 52:11,
57:11, 59:16, 60:2, 60:5,
62:10, 62:12, 63:1,
63:10, 71:24, 72:1, 72:2,
73:24, 76:21, 79:15,
133:15, 133:19, 137:5,
216:5
**purposes** [13] - 53:24,
54:23, 62:5, 63:3, 63:5,
76:22, 79:24, 84:7, 94:2,
111:10, 119:9, 130:17,
159:14
**pursuant** [1] - 105:25
**pursue** [1] - 61:3
**push** [6] - 162:11,
162:24, 167:13, 167:15,
171:11, 172:14
**pushed** [1] - 174:23
**pushes** [1] - 174:10
**pushing** [3] - 168:13,
168:18, 169:14
**put** [32] - 4:7, 7:6, 7:13,
32:5, 44:6, 46:6, 49:11,
52:8, 71:10, 72:12, 73:3,
74:9, 80:6, 82:4, 94:16,
103:9, 106:16, 110:9,
111:17, 116:5, 127:5,

133:17, 137:19, 142:15,
149:12, 154:18, 165:8,
177:11, 197:6, 203:17,
223:1
**puts** [1] - 119:4
**putting** [2] - 37:2,
119:15
**Pyne** [16] - 1:21, 16:9,
16:25, 17:6, 17:14, 75:4,
95:8, 97:20, 97:21,
104:4, 105:14, 138:6,
177:22, 195:12, 213:13
**PYNE** [11] - 27:18,
138:7, 138:14, 177:24,
178:12, 180:1, 188:10,
198:19, 230:5, 230:12,
230:13
**Pyne's** [2] - 135:14,
135:16

## Q

**Q-45** [16] - 160:8, 160:9,
160:12, 160:14, 161:8,
162:16, 164:3, 164:19,
166:8, 167:8, 167:17,
167:22, 168:17, 173:1,
177:6
**qualifications** [3] -
138:19, 159:9, 171:6
**quality** [2] - 148:11,
159:4
**quantity** [1] - 55:15
**questioned** [2] - 16:25,
205:23
**questioning** [1] -
195:12
**questions** [24] - 11:17,
15:13, 24:22, 25:1,
27:21, 39:3, 40:14,
143:13, 154:19, 155:12,
164:6, 175:14, 177:15,
198:16, 198:20, 200:23,
201:1, 201:9, 201:11,
201:25, 202:10, 206:15,
206:16, 226:23
**quick** [8] - 6:16, 11:15,
34:16, 124:18, 171:16,
175:18, 196:3, 221:10
**quicker** [1] - 220:13
**quickly** [2] - 57:19,
138:15
**Quite** [1] - 100:20
**quite** [11] - 2:3, 9:11,
13:5, 69:13, 84:19,
103:25, 114:8, 142:4,
148:4, 153:4, 222:11
**quote** [1] - 62:11
**quote-unquote** [1] -

62:11
**quotes** [1] - 123:23

## R

**Racketeering** [1] -
56:17
**racketeering** [14] -
53:18, 57:20, 57:25,
58:3, 58:5, 59:25, 62:19,
64:1, 64:3, 64:4, 71:7,
81:14, 131:7, 142:7
**Raise** [1] - 144:9
**raise** [4] - 53:5, 167:19,
168:16, 199:24
**raised** [1] - 117:21
**raising** [1] - 173:16
**ram** [2] - 108:14, 110:4
**Randallstown** [1] -
189:18
**Randallstown/Park** [4]
- 61:17, 74:8, 84:24,
86:18
**range** [2] - 20:4, 21:12
**rap** [16] - 47:9, 60:3,
60:4, 62:6, 62:11, 63:8,
64:8, 73:21, 73:24,
76:22, 78:10, 78:14,
78:15, 78:23, 130:20,
218:9
**rapid** [1] - 34:16
**rare** [3] - 19:24, 20:1,
150:3
**rate** [1] - 19:12
**rather** [14] - 5:18, 12:5,
43:4, 53:15, 88:23,
96:20, 99:22, 100:12,
124:8, 131:11, 135:5,
206:22, 206:24, 228:23
**rational** [12] - 73:13,
73:17, 83:4, 83:6, 83:11,
87:1, 126:25, 129:12,
130:5, 130:12, 131:2,
131:8
**rationale** [1] - 71:22
**raw** [1] - 33:2
**re** [3] - 40:7, 176:7,
176:22
**re-direct** [1] - 40:7
**re-lock** [2] - 176:7,
176:22
**reach** [6] - 16:11, 65:22,
161:12, 163:11, 168:2,
216:6
**reached** [3] - 163:14,
167:25, 207:20
**reaches** [1] - 169:23
**reaction** [1] - 72:16
**read** [15] - 44:5, 49:14,

55:9, 62:3, 81:25, 86:16,
188:11, 203:10, 203:14,
217:11, 217:13, 226:7,
226:23
**Reader's** [1] - 106:18
**reading** [6] - 69:15,
77:3, 77:4, 79:5, 118:5,
226:19
**reads** [1] - 72:2
**ready** [7] - 14:23, 15:9,
88:23, 134:19, 139:17,
140:9, 229:3
**real** [8] - 74:22, 80:2,
80:4, 80:21, 124:18,
157:1, 211:22, 220:1
**realize** [2] - 101:15,
183:13
**realized** [1] - 123:13
**realizes** [1] - 169:23
**really** [49] - 2:9, 29:13,
33:12, 47:17, 65:7, 69:4,
71:12, 76:7, 80:6, 80:11,
80:15, 81:12, 83:22,
84:19, 88:25, 90:21,
90:24, 91:14, 93:14,
94:6, 97:7, 104:25,
105:10, 106:18, 106:20,
118:8, 118:11, 119:25,
128:19, 130:4, 135:6,
142:20, 142:21, 148:4,
151:20, 153:22, 164:1,
167:11, 169:20, 171:16,
172:19, 175:19, 207:1,
211:4, 225:19, 227:17,
227:24, 227:25
**realtor** [1] - 146:11
**rear** [16] - 161:8,
161:15, 162:9, 162:25,
163:7, 163:10, 163:11,
163:13, 167:24, 168:19,
168:25, 169:5, 169:13,
173:23, 174:19, 174:23
**reason** [14] - 26:24,
34:17, 65:13, 66:1,
93:21, 106:23, 118:22,
125:6, 127:7, 135:20,
207:15, 222:11, 223:10,
228:14
**reasonable** [20] - 64:19,
64:22, 65:10, 65:11,
70:17, 72:23, 72:24,
83:1, 87:14, 87:17,
126:23, 129:22, 130:13,
131:23, 141:5, 141:10,
141:13, 141:18, 144:2,
216:9
**reasonably** [4] - 94:25,
95:23, 99:25, 227:14
**reasons** [8] - 64:24,
80:18, 86:19, 117:17,

122:20, 132:21, 142:17, 223:14

**rebuttable** [1] - 7:6
**rebuttal** [6] - 5:8, 7:16, 10:22, 11:18, 219:8, 228:9
**recalled** [1] - 200:12
**received** [2] - 21:13, 36:15
**receives** [2] - 36:19, 38:8
**recent** [2] - 42:12, 51:16
**recently** [2] - 107:20, 117:7
**Recess** [2] - 90:1, 199:21
**recess** [18] - 9:17, 10:1, 13:19, 15:2, 15:4, 15:5, 50:13, 51:5, 51:9, 52:15, 52:23, 89:19, 89:25, 139:8, 199:7, 199:13, 199:19
**recognize** [6] - 110:15, 149:18, 149:20, 160:3, 166:6, 200:7
**recognizing** [1] - 86:3
**recollect** [1] - 117:24
**recollection** [5] - 29:8, 95:8, 183:14, 196:7, 196:24
**record** [37] - 20:21, 21:3, 46:6, 49:14, 71:10, 79:1, 79:8, 81:17, 83:10, 83:24, 85:14, 86:20, 95:5, 97:17, 126:4, 126:5, 126:11, 126:17, 127:1, 144:13, 158:15, 159:8, 178:4, 180:8, 182:16, 186:20, 200:15, 203:16, 208:11, 208:19, 211:1, 211:22, 212:2, 212:4, 226:7, 229:14
**recorded** [4] - 47:16, 101:7, 116:4, 231:3
**recording** [2] - 212:14, 213:14
**records** [41] - 20:7, 20:20, 20:25, 21:2, 21:4, 21:5, 21:7, 21:10, 21:12, 21:14, 27:6, 27:7, 27:13, 28:6, 28:9, 28:21, 30:9, 30:13, 30:15, 30:18, 30:24, 30:25, 32:8, 32:20, 35:18, 35:24, 36:10, 38:13, 42:8, 97:17, 122:18, 128:20, 151:20, 152:23, 153:12, 153:20, 153:21
**recovered** [4] - 23:10, 24:10, 28:6, 28:19

**RECROSS** [5] - 25:3, 27:17, 230:5, 230:5, 230:6
**recross** [1] - 32:1
**redact** [1] - 203:21
**redacted** [4] - 45:9, 46:5, 106:18, 204:14
**redaction** [1] - 45:15
**REDIRECT** [5] - 175:16, 198:18, 230:4, 230:10, 230:13
**redirect** [4] - 14:24, 32:1, 39:4, 157:24
**refer** [4] - 159:19, 160:16, 160:24, 215:21
**reference** [9] - 81:5, 123:2, 123:6, 123:8, 124:6, 124:7, 124:10, 126:18, 203:21
**references** [3] - 91:11, 127:6, 216:2
**referred** [4] - 39:21, 97:16, 121:8, 146:13
**referring** [4] - 46:1, 124:13, 182:3, 182:9
**refers** [1] - 126:19
**reflect** [2] - 34:3, 200:15
**refresh** [2] - 196:7, 196:24
**refuse** [1] - 192:5
**refusing** [1] - 200:17
**regard** [4] - 31:7, 133:19, 159:12, 214:17
**regarding** [6] - 15:3, 54:11, 55:5, 56:15, 57:6, 176:25
**regardless** [2] - 56:9, 114:6
**regards** [9] - 27:21, 29:5, 29:6, 30:21, 31:9, 34:24, 50:20, 53:12, 55:9
**registered** [4] - 43:18, 43:21, 43:24, 92:12
**regularly** [1] - 130:20
**reject** [1] - 77:5
**rejected** [2] - 79:4, 84:12
**rejects** [2] - 77:8, 77:12
**rejoin** [1] - 97:15
**relate** [4] - 37:23, 48:4, 84:13, 205:23
**related** [13] - 31:25, 58:5, 73:5, 73:12, 77:10, 82:1, 82:3, 87:25, 92:25, 94:25, 206:16, 224:17
**relates** [1] - 222:24
**relating** [4] - 39:20, 49:9, 49:10, 152:24
**relation** [2] - 56:24, 171:9

**relationship** [9] - 131:24, 132:18, 147:11, 147:13, 147:25, 153:9, 155:17, 181:2, 206:16
**relationships** [1] - 156:15
**relative** [4] - 49:7, 135:8, 222:5
**relatively** [1] - 135:9
**release** [3] - 88:19, 223:4, 225:2
**released** [4] - 95:19, 95:24, 96:5, 152:9
**relevant** [1] - 134:9
**reliability** [1] - 212:3
**reliable** [1] - 148:15
**relies** [2] - 86:7, 118:5
**Reluctantly** [1] - 207:24
**rely** [1] - 112:6
**remain** [6] - 3:6, 15:6, 133:10, 134:15, 200:10, 212:20
**remained** [1] - 197:14
**remaining** [2] - 49:4, 205:8
**remains** [3] - 46:17, 46:20, 116:12
**remarked** [1] - 48:25
**Remember** [1] - 109:16
**remember** [84] - 13:9, 16:11, 16:14, 16:25, 17:8, 27:5, 41:9, 53:16, 97:10, 101:25, 104:4, 104:8, 105:12, 107:25, 125:12, 125:19, 139:19, 139:23, 139:25, 141:3, 151:12, 152:1, 152:13, 152:14, 152:15, 152:21, 183:11, 187:6, 187:7, 187:11, 187:13, 187:14, 187:20, 187:25, 188:3, 188:9, 188:12, 188:15, 188:16, 188:18, 188:20, 188:22, 189:16, 190:3, 190:5, 190:9, 191:1, 191:3, 191:4, 191:10, 191:12, 191:14, 191:17, 191:19, 191:20, 191:21, 191:23, 192:1, 192:2, 192:3, 192:4, 192:9, 193:15, 193:23, 194:2, 194:12, 194:14, 195:7, 195:10, 195:17, 195:20, 195:22, 195:25, 196:11, 196:14, 196:16, 196:20, 197:1, 197:16, 198:11, 198:15, 198:16
**remembered** [7] - 13:15, 188:2, 192:11, 194:23, 195:1, 195:4,

215:25
**remind** [2] - 105:14, 217:10
**reminded** [2] - 112:13, 139:20
**reminder** [1] - 89:18
**reminding** [1] - 89:11
**renege** [1] - 204:4
**renew** [2] - 101:3, 106:6
**renewed** [1] - 101:1
**repaid** [1] - 113:10
**repair** [1] - 159:10
**repeat** [3] - 82:23, 157:12, 215:17
**Repeat** [1] - 47:24
**repeatedly** [5] - 17:18, 47:22, 96:3, 129:14, 220:18
**replaced** [1] - 23:11
**report** [1] - 156:25
**Reported** [1] - 1:23
**reporter** [1] - 89:1
**Reporter** [2] - 82:14, 231:16
**REPORTER'S** [1] - 231:1
**reports** [5] - 44:12, 44:25, 106:15, 115:13, 215:3
**represent** [2] - 164:11, 204:6
**representation** [1] - 160:11
**represented** [2] - 57:2, 57:3
**representing** [2] - 139:22, 140:1
**request** [3] - 210:22, 224:12, 227:18
**requests** [1] - 15:3
**require** [4] - 90:16, 154:15, 217:1, 224:24
**required** [5] - 70:25, 71:3, 133:5, 154:25, 156:24
**requirements** [1] - 154:20
**requires** [2] - 11:24, 211:18
**resale** [1] - 54:7
**rescheduled** [2] - 50:20, 50:25
**reserved** [2] - 140:1, 222:10
**residence** [1] - 130:23
**respect** [40] - 7:5, 7:10, 53:4, 68:13, 75:11, 75:13, 75:21, 76:3, 76:4, 76:7, 76:21, 76:25, 78:25, 79:14, 80:14,

81:9, 81:20, 84:22, 86:15, 92:20, 94:8, 95:2, 97:10, 117:25, 118:1, 118:10, 118:14, 121:6, 122:8, 122:9, 126:12, 126:24, 127:14, 128:18, 129:5, 129:23, 134:24, 149:3, 202:14, 219:14
**respected** [1] - 113:3
**respectfully** [1] - 127:9
**respond** [2] - 106:9, 113:24
**response** [2] - 26:4, 52:21, 121:4
**responsibilities** [1] - 154:2
**responsive** [1] - 37:14
**rest** [3] - 9:17, 10:16, 160:20
**restaurant** [1] - 150:4
**restore** [1] - 158:2
**restored** [2] - 49:21, 50:2
**restrictive** [1] - 118:5
**restricts** [1] - 118:7
**rests** [1] - 50:7
**result** [5] - 2:12, 50:15, 113:15, 148:23, 216:21
**resulted** [2] - 113:9, 216:23
**resume** [2] - 52:22, 214:8
**retail** [1] - 108:15
**retailers** [3] - 55:14, 109:8, 110:9
**retaliating** [1] - 72:4
**retire** [1] - 139:7
**retrieve** [2] - 39:14, 146:12
**return** [4] - 50:12, 141:20, 141:21, 143:22
**returned** [3] - 141:1, 197:13, 198:2
**revenge** [1] - 83:18
**reverse** [1] - 57:12
**review** [6] - 42:7, 46:4, 48:6, 48:22, 50:9, 53:1, 151:19, 227:13
**reviewed** [2] - 49:8, 90:8
**reworked** [1] - 34:9
**Reynolds** [3] - 83:25, 97:12, 107:20
**Reynolds's** [1] - 97:10
**RHODES** [16] - 4:6, 4:9, 4:12, 4:15, 10:12, 11:4, 11:13, 88:11, 89:8, 209:5, 209:8, 218:3, 218:7, 218:9, 218:12, 227:8

**Rhodes** [14] - 1:17, 4:5, 5:20, 10:10, 11:3, 89:11, 89:18, 89:21, 208:6, 209:4, 209:16, 209:25, 218:2, 227:7

**Rhodes's** [2] - 5:12, 10:8

**Rice** [4] - 73:15, 110:1, 110:10, 110:12

**Richard** [1] - 94:12

**RICO** [30] - 57:5, 57:6, 58:16, 58:21, 58:22, 59:3, 59:4, 59:6, 59:23, 70:25, 71:9, 74:15, 74:20, 74:21, 74:22, 76:17, 77:15, 81:9, 84:1, 90:12, 90:14, 92:22, 94:22, 94:23, 119:8, 121:22, 130:11, 141:6, 142:13

**rights** [2] - 49:21, 50:2

**rip** [1] - 172:21

**rips** [1] - 173:19

**risk** [1] - 72:12

**risks** [3] - 112:16, 112:17, 112:19

**Road** [1] - 178:17

**rob** [1] - 119:13

**robbed** [1] - 112:9

**robberies** [5] - 56:5, 110:19, 119:10, 190:13

**robbery** [10] - 83:15, 121:13, 121:15, 202:11, 202:12, 202:17, 202:20, 202:24, 203:2, 205:6

**robbery/murder** [1] - 119:6

**robbing** [3] - 63:14, 81:15, 88:1

**Robert** [3] - 1:16, 164:11, 187:5

**Rodney** [4] - 15:16, 15:23, 45:7, 46:2

**role** [3] - 87:2, 202:21, 226:8

**roll** [1] - 170:18

**room** [5] - 50:12, 51:9, 143:13, 184:20, 217:17

**Room** [1] - 1:24

**Roughly** [1] - 145:16

**rounded** [1] - 30:17

**rounding** [1] - 18:21

**row** [1] - 182:14

**RPR** [1] - 1:24

**Rule** [16] - 53:3, 76:10, 76:14, 79:24, 84:8, 105:25, 107:17, 117:18, 122:23, 126:22, 127:10, 127:13, 129:11, 204:9, 205:9, 205:10

**rule** [3] - 82:20, 103:20, 200:2

**ruled** [1] - 84:3

**rules** [2] - 123:1, 140:2

**ruling** [1] - 84:18

**rulings** [2] - 86:4, 207:21

**rummage** [1] - 174:7

**run** [4] - 10:5, 29:6, 135:22, 146:22

**running** [5] - 113:7, 161:9, 162:17, 167:16, 177:6

**S**

**S-62** [1] - 46:25

**S-66** [1] - 47:1

**sake** [1] - 62:15

**salient** [1] - 45:9

**Samuel** [3] - 40:23, 41:8, 41:17

**sang** [1] - 91:12

**sat** [2] - 63:21, 197:11

**satisfactory** [1] - 207:23, 207:25

**satisfied** [3] - 9:10, 21:19, 130:12

**satisfy** [1] - 120:1

**Saturday** [1] - 105:19

**Saturdays** [1] - 148:19

**save** [1] - 81:1

**saw** [1] - 164:19

**scale** [2] - 13:24, 55:12

**scant** [1] - 56:24

**scattered** [2] - 108:17, 110:9

**scenario** [8] - 168:17, 169:18, 172:16, 173:11, 174:2, 174:12, 175:19, 175:23

**scenarios** [4] - 167:16, 167:19, 174:4, 175:9

**scene** [4] - 116:25, 123:18, 165:1, 173:22

**scenes** [1] - 215:5

**schedule** [5] - 13:13, 51:15, 51:19, 52:11, 225:19

**scheduled** [5] - 6:14, 50:14, 50:21, 51:6, 225:20

**schedules** [2] - 51:8, 51:17

**scheduling** [1] - 15:3

**scheme** [3] - 56:2, 56:7, 111:12

**schemes** [2] - 55:19, 67:6

**School** [1] - 107:10

**school** [6] - 111:25, 131:25, 132:15, 145:20, 146:20

**scope** [2] - 40:6, 76:2

**scrap** [1] - 48:14

**scraps** [2] - 48:24, 48:25

**scratch** [2] - 82:10, 82:16

**screen** [2] - 44:6, 197:6

**SE-16** [1] - 48:20

**SE-19** [1] - 47:9

**SE-2** [1] - 48:9

**SE-20** [2] - 48:22, 48:23

**SE-20A** [1] - 48:25

**SE-5** [1] - 48:13

**SE-6** [2] - 47:7, 48:16

**SE-7** [1] - 48:18

**sealed** [1] - 214:22

**Seamon** [3] - 48:4, 48:24, 49:3

**search** [4] - 48:4, 48:18, 48:19, 104:19

**seat** [32] - 14:18, 26:19, 26:21, 26:25, 27:1, 161:8, 162:9, 167:23, 168:7, 168:20, 168:24, 169:11, 169:12, 169:16, 169:19, 169:21, 170:1, 170:15, 170:16, 170:21, 172:18, 173:8, 173:18, 174:6, 174:7, 174:8, 175:11, 176:6, 176:20, 215:10

**seated** [3] - 144:12, 158:14, 178:3

**seats** [1] - 26:16

**Second** [4] - 23:6, 56:1, 56:4, 60:16

**second** [9] - 4:1, 18:22, 20:2, 20:4, 28:18, 38:17, 44:24, 169:24, 175:4

**seconds** [27] - 17:3, 17:24, 17:25, 18:10, 18:11, 18:13, 18:18, 18:19, 19:24, 20:1, 20:8, 20:21, 20:22, 21:21, 21:24, 35:13, 36:6, 37:7, 38:4, 38:15, 38:18, 99:1, 99:13, 99:19, 99:20, 100:17

**Seconds** [1] - 36:7

**Section** [2] - 49:20, 50:2

**secure** [1] - 147:8

**security** [2] - 29:7, 29:19

**see** [56] - 2:13, 9:12, 13:5, 14:20, 20:25,

21:10, 30:18, 30:25, 32:14, 34:10, 35:18, 37:6, 45:10, 45:14, 51:12, 54:5, 92:10, 93:14, 94:1, 96:7, 97:22, 98:19, 103:5, 107:16, 120:2, 132:10, 135:13, 139:14, 144:23, 159:19, 161:18, 164:25, 170:10, 173:3, 173:9, 175:5, 176:25, 177:3, 182:8, 183:19, 186:12, 194:5, 200:13, 204:20, 208:17, 211:3, 214:23, 215:7, 217:18, 218:21, 225:9, 227:24, 228:23, 229:9

**See** [2] - 61:9, 171:21

**seek** [2] - 211:11, 220:8

**seem** [4] - 62:16, 97:12, 138:13, 158:3

**seemingly** [2] - 54:19, 59:5

**sees** [1] - 132:12

**seized** [2] - 44:9, 104:18

**selective** [1] - 128:14

**self** [5] - 71:16, 71:17, 73:11, 93:23, 133:7

**self-incrimination** [1] - 133:7

**self-preservation** [2] - 71:16, 73:11

**self-protection** [1] - 93:23

**selling** [1] - 64:8

**semi** [1] - 165:7

**semi-automatic** [1] - 165:7

**send** [6] - 120:8, 214:18, 214:20, 214:23, 223:21, 225:5

**sense** [14] - 35:16, 45:22, 54:23, 54:25, 56:17, 58:22, 58:24, 59:6, 64:13, 66:23, 100:12, 162:5

**sensitive** [1] - 167:10

**sent** [4] - 45:18, 200:18, 217:16, 227:16

**sentence** [2] - 152:11, 206:8

**sentenced** [1] - 80:10

**separate** [4] - 61:9, 82:1, 127:24, 217:15

**September** [3] - 107:2, 136:19, 224:10

**sequence** [2] - 123:12, 123:14

**sequestration** [1] - 200:2

**series** [4] - 23:20, 39:3, 98:24, 146:24

**serious** [1] - 142:6

**serve** [1] - 51:2

**served** [1] - 118:19

**serves** [2] - 98:4, 102:22

**service** [4] - 9:5, 22:16, 153:17, 160:13

**services** [3] - 148:11, 149:5, 149:7

**serving** [2] - 95:14, 206:8

**session** [12] - 2:19, 2:24, 2:25, 6:5, 6:11, 10:6, 14:5, 50:15, 50:23, 51:4, 51:16, 214:7

**set** [5] - 77:24, 120:5, 137:3, 175:19, 184:22

**sets** [2] - 20:6, 109:4

**seven** [12] - 32:8, 32:10, 32:19, 32:20, 33:2, 34:16, 46:16, 129:13, 148:5, 148:17, 151:13

**Seven** [2] - 84:22, 147:23

**several** [15] - 4:9, 46:7, 70:6, 133:11, 145:21, 147:3, 148:5, 148:8, 153:5, 153:18, 154:10, 203:1, 210:24, 217:1

**severance** [4] - 101:1, 101:3, 106:6, 132:23

**Shakedown** [33] - 58:12, 58:13, 58:15, 60:2, 60:4, 60:12, 60:15, 60:21, 60:22, 60:24, 61:25, 62:7, 74:4, 76:24, 77:15, 77:23, 78:2, 78:4, 78:7, 79:3, 79:9, 79:11, 79:25, 80:4, 81:12, 81:13, 81:16, 87:25, 88:1, 130:19

**share** [1] - 63:5

**shared** [3] - 57:11, 60:2, 63:1

**sharing** [1] - 57:18

**SHAWN** [1] - 1:8

**Shawn** [9] - 49:16, 49:18, 79:2, 144:21, 145:8, 147:12, 149:3, 150:11, 156:16

**Sheehy** [1] - 158:24

**sheet** [6] - 47:13, 68:4, 120:3, 120:14, 120:15, 120:22

**Shelly** [12] - 27:22, 31:14, 32:8, 179:1, 179:13, 180:16, 182:4, 183:23, 183:24, 185:5,

198:21, 199:1
**SHELLY** [1] - 1:8
**Shelton** [6] - 15:21, 49:23, 49:24, 53:12, 53:13, 193:11
**SHELTON** [1] - 1:7
**shifting** [1] - 41:16
**shirt** [2] - 145:3
**Shock** [4] - 2:11, 8:6, 8:19, 9:14
**shock** [2] - 150:19
**shocked** [2] - 150:14, 150:18
**shocking** [3] - 96:20, 96:21, 171:20
**shook** [1] - 171:1
**shoot** [1] - 168:20
**shooter** [3] - 85:4, 85:7, 85:15
**shooting** [1] - 126:14
**shootings** [1] - 126:6
**shoots** [5] - 168:7, 169:12, 169:21, 172:20, 174:6
**shop** [2] - 7:3, 159:4
**Shop** [1] - 159:1
**shopping** [1] - 179:13
**shops** [1] - 108:16
**short** [7] - 13:12, 92:15, 126:24, 129:11, 135:9, 136:18, 199:19
**shorter** [1] - 222:6
**Shortly** [1] - 22:11
**shortly** [6] - 4:24, 5:4, 11:7, 15:1, 15:5, 133:2
**shot** [4] - 32:20, 70:5, 168:20, 170:15
**show** [28] - 20:20, 20:21, 21:6, 21:16, 23:13, 32:8, 34:6, 34:7, 34:8, 34:12, 37:23, 37:24, 38:5, 60:18, 65:8, 66:4, 71:8, 71:19, 90:22, 96:9, 97:7, 165:22, 170:8, 171:20, 202:11, 219:5, 219:6
**Show** [1] - 149:14
**showed** [7] - 28:24, 32:22, 33:2, 35:21, 99:11, 201:3, 202:22
**showing** [4] - 31:10, 159:13, 197:15, 212:3
**shown** [7] - 46:24, 48:5, 61:22, 61:24, 100:16, 104:21, 220:2
**shows** [8] - 18:10, 21:7, 36:3, 99:17, 100:20, 122:18, 204:12
**Shreveport** [1] - 6:9
**shut** [12] - 161:21,

163:3, 163:17, 170:2, 170:3, 172:18, 172:19, 173:24, 176:8, 176:13, 176:15
**shuts** [1] - 169:20
**shutting** [3] - 163:11, 169:1, 174:11
**sic** [1] - 82:7
**side** [9] - 3:21, 110:13, 167:7, 167:24, 168:19, 168:25, 169:13, 174:9, 175:1
**sides** [3] - 142:17, 142:23, 143:23
**sign** [4] - 224:19, 224:20, 224:23, 225:5
**signature** [4] - 196:22, 225:1, 225:6, 231:11
**signed** [2] - 91:17, 136:19
**significant** [3] - 51:11, 92:6, 216:25
**signs** [1] - 129:17
**silent** [2] - 133:10, 134:15
**similar** [6] - 165:6, 165:11, 165:17, 165:19, 165:21, 216:24
**similarly** [1] - 14:13
**simple** [2] - 59:13, 109:24
**simply** [22] - 45:20, 47:17, 60:8, 60:21, 64:16, 68:23, 69:19, 75:18, 77:8, 77:16, 79:12, 90:25, 93:3, 105:25, 113:16, 132:15, 149:7, 162:3, 177:10, 212:3, 221:23, 222:19
**single** [4] - 53:19, 56:15, 93:4, 125:2
**sit** [4] - 135:20, 139:3, 168:19, 205:13
**site** [18] - 30:4, 30:6, 30:9, 30:11, 30:20, 30:24, 31:1, 31:2, 31:4, 39:11, 39:20, 39:24, 40:2, 40:9, 166:5, 166:6, 221:15, 221:20
**sitting** [1] - 10:20
**situation** [6] - 4:2, 4:3, 5:14, 86:6, 154:12, 207:2
**situations** [2] - 152:3, 154:9
**Six** [8] - 90:13, 122:23, 127:9, 127:14, 129:4, 129:7, 213:23, 213:24
**six** [4] - 148:18, 181:14, 229:11, 229:12
**skip** [1] - 53:7

**sleep** [2] - 70:6, 185:25
**sleeping** [1] - 104:7
**slender** [1] - 86:16
**slight** [2] - 75:12, 167:13
**slightly** [2] - 75:7, 88:20
**slip** [2] - 47:8, 91:17
**slot** [1] - 163:23
**Slow** [1] - 87:15
**small** [2] - 55:14, 214:11
**soda** [1] - 183:9
**sole** [3] - 128:15, 129:3, 129:8
**solely** [1] - 133:20
**someone** [8] - 25:25, 144:21, 148:22, 149:1, 152:4, 154:13, 198:7, 226:13
**sometime** [7] - 94:14, 117:1, 119:16, 134:14, 143:4, 183:13, 186:6
**Sometime** [1] - 181:9
**somewhat** [4] - 147:13
**somewhat** [4] - 3:6, 57:12, 91:14, 187:19
**soon** [2] - 210:13, 229:8
**sorry** [33] - 8:18, 16:20, 19:6, 41:16, 61:5, 65:17, 71:25, 87:5, 87:16, 89:10, 99:2, 101:12, 103:22, 124:4, 137:7, 155:21, 156:7, 159:24, 160:1, 179:19, 187:10, 191:2, 191:9, 196:4, 202:1, 202:16, 203:24, 208:18, 213:7, 215:10, 218:6, 223:3, 224:6
**Sorry** [4] - 37:12, 146:8, 158:22, 229:10
**sort** [17] - 42:4, 44:6, 58:2, 66:8, 72:16, 86:6, 93:18, 118:11, 119:12, 134:24, 136:13, 149:9, 160:22, 167:7, 171:1, 215:4, 225:6
**sorts** [1] - 110:20
**sound** [3] - 151:22, 189:9, 216:24
**sounded** [4] - 101:20, 138:14, 157:14, 165:17
**sounds** [11] - 6:6, 9:16, 9:25, 10:13, 13:5, 70:23, 157:5, 207:20, 227:3, 227:12
**source** [3] - 123:11, 224:2, 224:3
**south** [1] - 190:3
**South** [3] - 220:18, 220:19, 220:20

**southwest** [5] - 107:22, 108:21, 108:25, 117:7, 190:1
**sovereignty** [2] - 210:6, 216:15
**span** [2] - 54:3, 55:6
**spanned** [1] - 56:13
**spans** [2] - 61:8, 80:20
**spasm** [2] - 80:12, 80:15
**speaking** [3] - 100:21, 159:25, 205:18
**special** [5] - 70:14, 75:14, 75:25, 121:9, 155:1
**Special** [1] - 48:5
**specific** [11] - 141:6, 141:7, 141:9, 141:12, 141:23, 142:2, 143:2, 143:3, 152:11, 152:21
**specifically** [4] - 104:6, 117:25, 203:6, 203:21
**specifics** [1] - 75:15
**SPECTATOR** [1] - 115:25
**speculate** [2] - 123:25, 216:5
**speculation** [5] - 90:23, 92:19, 100:2
**speculative** [1] - 91:13
**spell** [4] - 144:13, 158:15, 178:4, 178:7
**Spence** [28] - 4:21, 24:13, 47:6, 56:19, 56:23, 57:1, 80:15, 82:25, 83:15, 83:20, 84:13, 94:5, 111:20, 118:1, 119:6, 119:11, 119:12, 121:16, 123:17, 125:19, 125:24, 125:25, 126:12, 131:17, 142:8, 201:14, 203:4
**Spence's** [1] - 125:2
**spent** [1] - 111:21
**split** [2] - 169:24, 175:4
**spoken** [5] - 68:5, 112:13, 155:22, 155:24, 155:25
**Sports** [1] - 41:8
**spouse** [1] - 51:11
**Sprint** [1] - 30:12
**squarely** [1] - 119:4
**squashed** [1] - 219:14
**ST-1** [2] - 45:4, 45:5
**stage** [2] - 133:1, 224:15
**stand** [13] - 47:9, 89:19, 91:16, 95:10, 95:22, 133:9, 133:14, 133:20, 140:14, 144:8, 163:12,

209:12, 209:14
**standard** [6] - 76:10, 84:8, 114:5, 126:22, 127:13, 129:21
**standing** [3] - 89:23, 108:24, 119:14
**standpoint** [1] - 109:6
**start** [6] - 10:17, 13:17, 58:6, 70:13, 165:9, 178:21, 178:22, 181:25
**started** [7] - 43:8, 43:22, 74:3, 91:24, 116:20, 183:21, 194:12
**Starting** [1] - 208:5
**starting** [2] - 64:13, 224:11
**starts** [1] - 70:3
**state** [36] - 46:11, 84:14, 90:25, 118:13, 136:22, 137:11, 137:13, 173:17, 196:13, 200:24, 201:4, 201:20, 202:13, 203:6, 204:13, 205:18, 205:19, 205:25, 206:8, 208:14, 209:1, 210:5, 210:23, 211:10, 211:15, 211:18, 215:24, 216:11, 216:13, 216:17, 216:18, 216:23, 217:2, 217:7, 226:5
**State** [12] - 48:12, 144:13, 145:25, 154:25, 158:15, 178:4, 178:7, 206:5, 211:10, 215:22, 217:3, 217:6
**State's** [1] - 136:21
**state's** [1] - 210:22
**statement** [28] - 65:21, 78:22, 84:1, 84:5, 84:6, 86:7, 89:24, 95:11, 101:6, 102:9, 102:18, 102:22, 102:23, 103:14, 103:19, 116:3, 118:13, 123:20, 128:24, 139:23, 140:1, 140:5, 141:1, 141:4, 195:17, 213:14, 213:16, 224:24
**statements** [7] - 83:4, 86:24, 106:10, 136:25, 137:4, 137:11, 139:24
**STATES** [2] - 1:1, 1:5
**States** [3] - 49:16, 49:22, 164:11
**station** [1] - 26:11
**statute** [2] - 84:21, 121:7
**stay** [1] - 174:24
**stayed** [4] - 91:25, 182:1, 184:2, 184:3
**steering** [3] - 171:9,

171:10, 172:15
**stenographer** [1] - 180:8
**stenographically** [1] - 231:4
**step** [2] - 14:17, 162:5
**stepdaughter** [5] - 8:17, 8:18, 8:19, 8:25, 14:14
**steps** [4] - 185:4, 185:5, 185:9, 185:12
**stick** [1] - 163:24
**sticker** [1] - 136:15
**sticking** [1] - 167:6
**still** [28] - 2:16, 3:10, 4:1, 6:14, 36:21, 37:17, 38:9, 39:10, 45:13, 48:22, 71:7, 97:8, 103:24, 113:14, 126:24, 128:17, 145:13, 155:14, 155:16, 162:1, 170:1, 172:9, 172:12, 208:20, 208:23, 221:14, 227:14
**stipulate** [1] - 44:8, 44:13, 138:19, 204:7, 205:4, 208:20, 221:19, 221:24
**stipulated** [3] - 49:17, 49:23, 159:9
**stipulation** [7] - 44:4, 45:3, 49:22, 106:15, 203:14, 204:3, 223:1
**stipulations** [1] - 49:5
Stocksdale [1] - 136:21
**stole** [1] - 223:12
**stop** [2] - 103:23, 104:3
**stopped** [4] - 22:8, 43:5, 167:22, 181:23
**store** [2] - 130:21, 181:23, 183:3, 183:6
**stored** [1] - 130:25
**story** [1] - 136:18
**stove** [1] - 123:24
**straight** [1] - 184:20
Street [1] - 1:25
**street** [6] - 108:13, 108:15, 109:25, 110:5, 110:16, 157:18
**stress** [1] - 210:11
**stretch** [1] - 72:10
**stricken** [2] - 104:17, 104:22
**strictly** [1] - 131:15
**strike** [2] - 71:15, 155:13
**striped** [1] - 145:3
**strong** [3] - 11:1, 84:19, 114:6
**structure** [1] - 57:12, 57:13, 57:17, 58:2, 59:2, 59:15, 59:24, 62:1,

62:19, 62:25, 66:3, 66:9, 70:25, 74:11, 74:19, 75:1, 81:14, 131:3, 131:4, 131:8
**structured** [1] - 132:6
**structures** [1] - 111:18
**stuck** [1] - 127:7
**stuff** [7] - 14:3, 80:8, 80:20, 113:16, 172:21, 173:18, 194:21
**sub** [1] - 77:25
**subject** [2] - 46:3, 50:8
**submission** [1] - 107:9
**submit** [7] - 76:4, 92:2, 92:16, 92:18, 92:23, 97:7, 119:21
**submits** [2] - 70:15, 119:25
**submitted** [1] - 46:5, 120:5, 121:8, 121:19
**submitting** [1] - 196:11
**subparagraphs** [1] - 94:3
**subpoena** [2] - 28:10, 192:6
**subpoenaed** [5] - 31:2, 187:11, 191:23, 193:4, 205:22
**subscribed** [1] - 22:25
**subsequent** [1] - 100:5
**substance** [2] - 91:23, 97:6
**substances** [4] - 44:11, 44:14, 44:15, 44:23
**substantial** [7] - 68:15, 68:17, 73:13, 73:17, 74:24, 90:21, 157:5
**substantially** [6] - 68:11, 68:12, 74:18, 92:25, 94:10, 207:20
**substantive** [1] - 57:6, 83:6, 83:11, 86:9, 86:25, 90:6, 90:19, 94:20, 128:12
**successful** [1] - 113:2
**succession** [1] - 34:17
**suffered** [1] - 121:13
**suffice** [1] - 225:9
**sufficiency** [2] - 84:6, 84:7, 86:11
**sufficient** [6] - 9:25, 69:5, 84:4, 86:12, 120:1, 131:3
**sufficiently** [1] - 132:6
**suggest** [4] - 72:18, 79:13, 213:10
**suggesting** [2] - 62:2, 127:21
**suggests** [2] - 99:21, 131:20

**sui** [1] - 94:6
Sullivan [1] - 219:12
**summarized** [1] - 44:15
**summary** [8] - 25:16, 25:19, 29:15, 32:5, 32:25, 44:7, 44:22, 164:16
Sunday [1] - 105:19
Sundays [1] - 148:19
Supermax [3] - 224:22, 224:25, 225:1
**Superseding** [1] - 88:4
**superseding** [4] - 53:15, 63:18, 94:3, 95:1
Suplussage [1] - 82:7
**supplement** [1] - 55:21
**supplemental** [1] - 120:6
**supplied** [5] - 108:8, 108:23, 109:1, 109:18, 109:20
**suppliers** [6] - 55:5, 55:20, 67:6, 67:7, 109:7, 109:15
**supply** [4] - 55:24, 108:4, 109:8, 113:12
**supplying** [2] - 109:2, 113:6
**support** [2] - 119:22, 121:17
**supports** [1] - 81:17
**suppose** [3] - 14:12, 221:25, 224:20
**supposed** [2] - 32:9, 209:21
**Supposing** [6] - 167:22, 168:17, 169:18, 170:13, 170:14, 174:5
**supposing** [2] - 168:5, 168:6
**supposition** [1] - 64:13
**surety** [1] - 147:4
**surmised** [1] - 26:24
Surplusage [1] - 82:8
**surplusage** [1] - 82:11
**surpluses** [1] - 82:13
**surprise** [1] - 140:22
**surprised** [5] - 3:12, 3:13, 7:2, 12:6, 88:18
**surrounding** [1] - 180:3
**surveillance** [2] - 125:3, 155:5
**survives** [2] - 131:10, 131:11
**suspect** [2] - 12:5, 12:8
Sustained [2] - 173:15, 190:16
**sustained** [2] - 40:10, 211:24
**sweet** [1] - 81:2

**switch** [23] - 4:4, 159:20, 160:17, 161:13, 163:14, 166:19, 166:21, 167:6, 168:14, 168:18, 168:21, 169:10, 170:14, 171:2, 171:9, 171:10, 172:14, 174:10, 175:1, 176:1
**sworn** [4] - 143:1, 196:11, 196:16, 197:2
**SWORN** [4] - 15:10, 144:10, 158:12, 178:1
**synonymous** [8] - 57:20, 58:21, 59:13, 60:17, 74:15, 76:17, 77:18, 77:20
**system** [6] - 49:13, 133:6, 153:8, 165:8, 216:10, 217:12
**systems** [3] - 160:7, 165:6, 165:11

## T

**tail** [1] - 103:17
**talkie** [1] - 220:20
**talkies** [2] - 155:9, 220:22
**talks** [2] - 86:6, 127:25
**tangentially** [1] - 77:10
**Tape** [3] - 196:6, 213:2, 213:19
**tape** [21] - 114:7, 114:9, 114:16, 114:18, 116:3, 127:6, 143:7, 196:2, 197:3, 197:4, 209:11, 210:2, 210:14, 211:13, 212:14, 212:16, 212:18, 213:14, 213:20, 213:22
**taped** [1] - 195:17
**tapes** [2] - 29:7, 122:24
**target** [1] - 113:3
**tax** [3] - 153:2, 153:12, 153:21
**taxes** [1] - 153:6
**tease** [1] - 68:14
**technical** [1] - 21:18
**technically** [1] - 207:19
**technician** [1] - 159:6
**technicians** [1] - 159:4
**telephone** [17] - 20:8, 30:10, 32:10, 33:8, 33:10, 41:7, 42:13, 46:12, 46:19, 91:4, 92:10, 92:15, 96:8, 96:16, 97:5, 128:20
**ten** [6] - 93:4, 145:5, 209:6, 209:16, 225:18, 226:7

**tentative** [1] - 91:9
**term** [9] - 49:19, 50:1, 54:1, 55:6, 60:17, 61:20, 152:16, 152:18, 152:19
**termed** [1] - 54:24
**terminate** [1] - 145:15
**terminated** [1] - 22:17
**terms** [12] - 40:9, 79:9, 90:20, 118:15, 134:24, 135:7, 141:17, 153:20, 159:15, 181:20, 218:24, 221:16
**terribly** [2] - 63:12, 69:2
**territory** [2] - 72:3, 73:15
**test** [1] - 210:11
**testified** [34] - 22:8, 29:11, 31:24, 33:24, 41:5, 42:7, 42:12, 43:1, 44:17, 45:8, 54:6, 78:11, 78:12, 86:23, 115:7, 124:19, 124:22, 126:7, 126:20, 136:13, 142:5, 177:9, 192:8, 192:9, 194:2, 194:22, 195:4, 200:5, 200:6, 202:18, 205:25, 206:18, 209:1, 219:13
**testify** [39] - 102:24, 133:4, 133:5, 133:9, 133:14, 133:24, 134:1, 134:2, 134:3, 134:6, 134:11, 134:15, 136:22, 137:17, 137:18, 139:11, 166:4, 191:4, 192:5, 192:6, 200:17, 200:19, 203:9, 205:1, 205:22, 206:1, 206:3, 206:20, 206:22, 206:25, 207:4, 207:13, 219:16, 219:22, 220:4, 220:21, 222:2, 225:15
**testifying** [12] - 25:16, 26:9, 29:22, 30:3, 32:4, 39:18, 56:25, 133:22, 137:1, 159:16, 207:8, 207:11
**Testifying** [1] - 133:22
**testimony** [46] - 29:8, 30:5, 32:25, 33:1, 45:7, 45:20, 45:23, 45:24, 46:2, 48:6, 48:24, 53:5, 67:8, 81:7, 86:8, 95:18, 97:11, 99:3, 102:12, 103:4, 103:11, 103:12, 103:22, 104:11, 109:3, 111:11, 114:20, 123:11, 123:22, 123:23, 124:1, 134:8, 137:10, 137:13, 172:6, 198:13, 201:5,

204:11, 206:2, 207:22, 208:14, 210:4, 215:6, 216:2, 227:10

**tests** [1] - 146:24
**TFO** [2] - 15:10, 230:4
**Thanksgiving** [4] - 11:2, 52:3, 52:4, 52:10
**THE** [473] - 1:1, 1:2, 2:3, 2:6, 2:10, 3:19, 3:21, 3:24, 4:2, 4:5, 4:8, 4:11, 4:13, 4:18, 5:10, 5:16, 5:18, 5:22, 5:24, 6:3, 6:6, 6:10, 6:17, 6:20, 6:23, 6:25, 7:2, 7:7, 7:12, 7:15, 7:19, 7:25, 8:3, 8:8, 8:10, 8:15, 8:18, 8:21, 8:24, 9:4, 9:7, 9:10, 9:14, 10:13, 11:6, 11:19, 11:25, 12:3, 12:18, 12:25, 13:4, 13:8, 13:11, 13:14, 13:19, 14:1, 15:7, 15:8, 20:18, 24:24, 25:2, 32:17, 37:10, 37:21, 38:23, 39:17, 40:1, 40:10, 44:2, 44:3, 45:1, 45:5, 45:16, 45:22, 46:1, 46:9, 46:14, 46:18, 46:22, 47:2, 48:2, 48:10, 49:2, 49:11, 49:15, 50:4, 50:6, 50:8, 52:25, 53:6, 53:9, 53:11, 58:18, 60:8, 60:19, 60:25, 61:6, 61:9, 61:15, 61:19, 62:2, 62:14, 62:21, 63:2, 63:7, 63:18, 63:23, 64:2, 64:6, 64:18, 64:22, 65:1, 65:5, 65:7, 65:16, 65:21, 66:12, 66:16, 66:18, 66:20, 67:1, 67:7, 67:21, 68:6, 68:9, 68:18, 69:1, 69:7, 69:9, 69:14, 69:21, 69:24, 70:14, 70:19, 70:22, 71:24, 72:1, 73:8, 73:23, 74:9, 74:16, 75:2, 75:4, 75:6, 77:4, 77:24, 78:4, 78:14, 79:4, 79:7, 79:23, 82:8, 82:13, 84:17, 85:1, 85:7, 85:16, 85:23, 86:1, 87:4, 87:15, 88:7, 88:13, 88:16, 89:10, 89:13, 89:14, 89:18, 90:2, 95:4, 95:12, 95:16, 95:20, 96:1, 96:12, 96:17, 96:20, 96:25, 97:16, 97:22, 98:3, 98:14, 98:16, 99:4, 99:6, 99:9, 99:14, 99:19, 99:21, 99:24, 100:11, 100:23, 101:12, 101:16, 101:22, 101:25, 102:5,

102:8, 102:18, 102:21, 103:1, 103:7, 103:18, 103:24, 104:4, 104:9, 105:2, 105:4, 105:9, 105:20, 105:22, 106:4, 106:8, 106:14, 106:17, 106:23, 107:8, 107:24, 108:6, 109:22, 112:8, 112:11, 112:16, 113:18, 113:23, 114:3, 114:11, 115:12, 115:15, 115:18, 116:1, 117:22, 120:2, 120:8, 120:12, 120:17, 120:21, 121:3, 123:12, 124:4, 124:8, 124:10, 124:13, 124:16, 124:21, 124:25, 125:4, 125:9, 125:16, 125:21, 126:2, 126:8, 126:14, 127:16, 127:21, 127:25, 128:4, 128:22, 130:7, 130:9, 134:21, 135:1, 135:18, 135:23, 136:2, 136:4, 136:8, 136:17, 137:7, 137:16, 137:18, 137:22, 137:25, 138:4, 138:11, 138:16, 138:19, 138:22, 138:24, 139:5, 139:8, 139:14, 139:16, 144:4, 144:8, 144:11, 144:12, 144:14, 145:17, 146:14, 146:17, 149:12, 149:14, 149:17, 150:18, 150:19, 150:20, 150:21, 150:22, 151:3, 151:7, 157:11, 157:25, 158:7, 158:9, 158:13, 158:14, 158:16, 159:11, 159:24, 160:1, 166:1, 166:3, 167:5, 170:9, 171:5, 171:7, 171:25, 172:10, 173:7, 173:15, 173:17, 177:16, 177:20, 177:23, 177:25, 178:2, 178:3, 178:5, 178:6, 178:9, 179:20, 179:24, 179:25, 180:6, 180:7, 188:11, 190:16, 191:2, 197:7, 197:9, 199:15, 199:23, 199:25, 200:3, 200:6, 200:9, 201:1, 201:7, 201:9, 201:15, 201:22, 201:24, 202:4, 202:8, 202:16, 202:20, 202:23, 203:4, 203:9, 203:22, 203:25, 204:5, 204:16, 204:20, 204:23, 204:25, 205:3, 205:12, 205:14, 205:17, 205:21, 206:11, 206:14, 206:20, 206:22, 206:24,

207:3, 207:6, 207:9, 207:12, 207:15, 207:18, 208:2, 208:8, 208:12, 208:17, 208:22, 208:24, 209:7, 209:9, 209:12, 209:15, 209:20, 209:24, 210:8, 210:13, 210:16, 210:19, 211:3, 211:7, 211:14, 211:21, 211:24, 212:10, 212:22, 212:25, 213:5, 213:9, 213:12, 213:16, 213:18, 213:20, 213:22, 214:1, 215:10, 215:14, 217:22, 218:1, 218:6, 218:8, 218:11, 218:15, 218:17, 218:21, 219:1, 219:3, 219:6, 219:8, 219:11, 219:18, 219:22, 219:24, 220:10, 220:16, 220:25, 221:4, 221:7, 221:11, 221:13, 221:17, 222:3, 223:3, 223:10, 223:16, 223:18, 223:20, 223:23, 224:3, 224:6, 224:15, 224:19, 225:5, 225:10, 225:13, 225:16, 225:23, 226:3, 226:9, 226:14, 226:21, 227:2, 227:9, 228:10, 228:14, 228:20, 228:23, 229:1, 229:5, 229:13
**The9203** [1] - 16:19
**theater** [13] - 29:20, 32:9, 32:11, 115:2, 129:15, 183:14, 184:9, 184:12, 195:1, 197:11, 197:12, 197:14
**theaters** [2] - 128:21, 129:16
**themselves** [7] - 11:10, 54:19, 64:4, 71:21, 74:13, 131:7, 162:20
**Theoretically** [1] - 38:7
**theoretically** [1] - 38:11
**theories** [1] - 71:21
**theory** [10] - 78:21, 93:22, 93:24, 119:22, 123:6, 127:17, 128:14, 129:3, 129:8, 129:10
**thereabouts** [1] - 108:3
**thereafter** [3] - 10:2, 91:24, 99:1
**Therefore** [2] - 83:12, 137:4
**therefore** [3] - 17:2, 35:20, 83:11
**they've** [13] - 2:22, 53:20, 53:22, 58:11, 61:24, 71:20, 74:25, 121:12, 141:10, 141:11,

219:20
**They've** [1] - 200:6
**think's** [1] - 221:9
**thinking** [4] - 2:14, 4:20, 75:22, 83:17
**thinks** [4] - 117:17, 169:9, 204:14, 222:8
**third** [2] - 34:25, 38:18
**Thomas** [1] - 1:20
**thorough** [1] - 75:17
**threat** [1] - 71:15
**threats** [1] - 72:5
**three** [42] - 12:4, 12:6, 20:1, 26:18, 33:14, 33:17, 52:9, 56:22, 58:8, 65:18, 65:23, 69:8, 69:19, 69:20, 69:21, 77:25, 80:7, 81:7, 112:1, 114:14, 117:5, 123:1, 123:6, 123:19, 124:6, 124:10, 124:20, 125:14, 132:2, 137:12, 143:8, 145:21, 156:8, 187:12, 218:3, 228:4, 228:5, 228:6, 228:12
**Three** [12] - 8:4, 8:5, 8:7, 13:21, 14:13, 14:18, 45:21, 45:25, 77:25, 214:17, 228:10
**threw** [1] - 143:16
**throughout** [1] - 109:19
**throw** [6] - 68:23, 76:6, 79:19, 79:22, 82:20, 128:17
**thrown** [2] - 170:22, 172:3
**thugs** [2] - 112:14
**Thursday** [10] - 1:11, 10:22, 10:23, 10:24, 12:11, 12:15, 13:3, 51:22, 228:17, 229:2
**thwart** [2] - 173:21
**ticket** [1] - 115:2
**tickets** [11] - 195:5, 195:14, 196:9, 197:2, 197:13, 197:19, 197:22, 197:25, 198:5, 198:9, 198:22
**tie** [9] - 77:23, 77:24, 87:25, 104:17, 106:19, 120:22, 122:25, 128:18, 129:25
**tied** [4] - 83:19, 104:20, 128:22
**ties** [2] - 107:5, 123:9
**tight** [8] - 69:4, 107:15, 109:19, 112:6, 135:17, 135:19, 136:7, 190:10
**Tillett** [1] - 57:23
**timing** [1] - 17:2

**title** [1] - 158:25
**today** [34] - 2:15, 3:16, 5:8, 5:11, 7:25, 10:5, 11:5, 27:4, 67:23, 89:25, 95:8, 95:22, 133:2, 135:7, 136:4, 136:5, 142:18, 153:25, 159:16, 175:9, 176:25, 182:8, 193:17, 194:3, 198:13, 199:16, 209:6, 209:19, 210:6, 215:15, 221:7, 221:8, 221:23, 225:20
**today's** [1] - 200:4
**together** [27] - 54:21, 54:23, 58:4, 59:12, 64:17, 66:3, 66:5, 66:7, 66:10, 67:8, 74:21, 89:12, 94:17, 106:20, 107:5, 109:10, 110:7, 111:25, 119:15, 122:19, 174:11, 179:14, 190:14, 217:8, 217:16, 227:20, 227:24
**toll** [16] - 19:18, 20:7, 20:20, 21:3, 21:7, 30:18, 30:24, 31:2, 32:2, 32:19, 35:8, 36:2, 42:8, 97:17, 116:15, 128:20
**tolls** [26] - 17:20, 18:6, 18:8, 18:14, 19:14, 19:19, 19:20, 19:21, 20:6, 20:14, 21:22, 22:16, 23:3, 23:7, 23:13, 23:14, 24:5, 24:18, 28:24, 30:16, 32:14, 33:2, 35:12, 35:21, 37:22, 37:23
**tomorrow** [5] - 105:18, 209:23, 210:12, 214:7, 214:8
**tonight** [1] - 139:3
**Tonya** [7] - 24:13, 83:19, 111:20, 125:2, 125:19, 125:24, 125:25
**took** [12] - 20:6, 38:13, 88:24, 108:4, 125:2, 142:9, 142:10, 146:21, 180:16, 181:1, 181:5, 186:9, 186:10, 195:17
**tool** [1] - 30:7
**top** [6] - 21:12, 27:25, 106:5, 119:25, 173:1, 173:8
**totality** [3] - 25:23, 37:22, 132:17
**totally** [2] - 60:11, 123:1
**touch** [6] - 34:18, 176:6, 176:22, 191:5, 220:18
**touched** [1] - 170:14
**tough** [2] - 112:22,

223:15
 **toward** [4] - 121:10, 144:13, 158:14, 178:3
 **tower** [3] - 20:25, 21:3, 21:14
 **town** [3] - 14:7, 110:9, 135:13
 **track** [2] - 124:2, 158:3
 **traditional** [3] - 58:23, 59:7, 59:10
 **trail** [1] - 115:3
 **training** [1] - 159:5
 **transaction** [1] - 169:9
 **transactions** [1] - 56:4
 **transcribed** [1] - 231:8
 **transcript** [20] - 50:10, 143:9, 203:10, 203:15, 203:19, 204:10, 204:15, 206:2, 207:22, 209:11, 210:24, 211:5, 211:12, 212:6, 212:13, 212:17, 213:11, 214:1, 226:19, 231:8
 **transcripts** [5] - 46:5, 104:1, 143:10, 212:7, 226:5
 **Trauma** [4] - 2:12, 8:6, 8:19, 9:15
 **trauma** [1] - 14:14
 **travelers** [1] - 65:24
 **Travis** [1] - 110:3
 **tree** [1] - 170:18
 **trial** [30] - 33:13, 33:16, 33:18, 63:21, 80:17, 82:18, 86:8, 90:25, 101:2, 102:2, 102:6, 115:22, 139:21, 140:19, 141:9, 200:10, 200:24, 202:13, 202:18, 203:6, 204:10, 204:11, 204:13, 214:6, 215:8, 215:16, 215:23, 216:3, 217:5, 224:10
 **trials** [3] - 136:22, 137:1, 137:11
 **tried** [10] - 31:1, 36:22, 58:12, 77:14, 79:16, 85:25, 91:6, 102:11, 110:7
 **trigger** [1] - 137:15
 **triple** [1] - 129:20
 **Trooper** [1] - 103:22
 **trouble** [3] - 115:1, 115:17, 116:3
 **troubled** [2] - 84:19
 **true** [9] - 60:8, 60:11, 60:21, 72:19, 94:9, 168:16, 202:2, 224:14, 228:12
 **Trust** [1] - 13:13

 **trust** [1] - 132:9
 **trustworthy** [1] - 148:13
 **truthful** [3] - 206:7, 208:14, 209:2
 **truthfulness** [2] - 137:2, 208:16
 **try** [19] - 16:11, 17:2, 52:5, 56:9, 58:10, 58:21, 78:23, 120:16, 125:7, 130:3, 138:5, 138:11, 141:3, 172:16, 174:16, 179:22, 209:22, 225:9
 **trying** [19] - 29:10, 30:23, 51:3, 77:17, 84:14, 108:13, 110:4, 169:25, 222:13, 227:20
 **Trying** [1] - 158:3
 **Tuesday** [41] - 3:3, 3:7, 3:10, 4:17, 5:12, 5:14, 5:25, 7:5, 10:9, 10:10, 10:14, 10:15, 10:16, 11:2, 11:11, 11:12, 50:15, 50:21, 50:23, 51:1, 51:4, 51:6, 51:13, 51:17, 51:18, 51:21, 51:22, 52:2, 52:13, 52:18, 52:20, 89:12, 133:2, 214:12, 214:13, 218:5, 218:7, 218:9, 218:11, 226:12, 227:8, 227:9, 227:10, 227:13, 227:15, 227:24, 227:25
 **turn** [1] - 129:18
 **turned** [1] - 2:3
 **Turning** [1] - 40:12
 **turns** [1] - 83:18
 **Twelve** [1] - 68:2
 **twice** [2] - 45:8, 143:8
 **two** [87] - 3:13, 3:18, 3:25, 4:16, 4:21, 10:9, 10:10, 16:13, 18:20, 18:22, 18:23, 19:11, 20:1, 20:6, 20:23, 26:16, 27:1, 27:21, 29:2, 33:6, 34:21, 36:16, 36:18, 36:21, 36:23, 36:24, 37:1, 37:16, 38:9, 39:5, 39:23, 44:11, 45:7, 45:9, 45:19, 46:10, 46:16, 46:19, 54:18, 54:25, 58:4, 60:6, 61:1, 61:24, 65:19, 67:11, 76:25, 80:7, 80:13, 80:17, 86:20, 90:10, 94:22, 94:24, 96:3, 100:16, 100:17, 107:13, 111:4, 111:21, 114:15, 118:6, 123:7, 123:21, 125:19, 126:5, 126:19, 127:23, 137:1, 141:12, 142:7,

142:11, 160:25, 167:23, 169:22, 174:6, 188:3, 188:4, 188:13, 190:14, 191:13, 198:20, 210:25, 219:16, 227:7
 **Two** [16] - 3:19, 11:17, 45:21, 45:24, 56:4, 91:25, 147:21, 164:16, 181:12, 183:20, 184:14, 184:16, 184:22, 188:17, 194:1, 197:15
 **type** [8] - 58:4, 59:21, 59:22, 74:11, 74:19, 74:25, 155:22, 159:25
 **types** [1] - 159:2
 **typically** [3] - 160:22, 226:1, 226:21

## U

 **U.S** [3] - 1:24, 57:23, 136:24
 **ultimately** [1] - 133:24
 **Um-hum** [6] - 152:8, 163:15, 171:22, 180:4, 180:23, 189:24
 **Um-um** [1] - 192:2
 **umbrella** [4] - 56:6, 56:12, 58:16, 59:6
 **unambiguously** [1] - 127:14
 **unanimity** [2] - 120:13, 120:19
 **unarmed** [4] - 202:11, 202:12, 202:17, 203:2
 **unavailable** [1] - 208:23
 **unbroken** [5] - 66:17, 66:18, 66:20, 66:23, 67:2
 **uncertainty** [1] - 7:10
 **unclear** [1] - 106:20
 **uncommon** [4] - 26:5, 129:16, 156:9, 156:10
 **uncouples** [1] - 83:12
 **Under** [4] - 59:3, 117:10, 216:10, 216:15
 **under** [25] - 15:6, 27:22, 33:5, 59:3, 59:4, 59:5, 59:9, 63:18, 83:5, 84:1, 88:2, 88:22, 94:3, 103:10, 117:15, 128:13, 129:21, 132:17, 204:9, 205:9, 208:25, 214:24, 216:13, 216:18
 **underlying** [4] - 97:17, 216:12, 216:13, 216:18
 **undermine** [1] - 63:9
 **understood** [3] - 58:25, 95:23, 200:23
 **Understood** [1] -

155:12
 **undertake** [1] - 216:11
 **undertakings** [1] - 137:3
 **undetermined** [1] - 97:6
 **undisputed** [2] - 85:4, 85:6
 **undo** [1] - 163:2
 **unequivocally** [1] - 3:4
 **unfortunate** [1] - 8:12
 **unfortunately** [2] - 93:25, 165:18
 **unindicted** [2] - 54:3, 55:3
 **unique** [1] - 165:5
 **unit** [5] - 55:14, 59:22, 62:25, 119:15, 119:18
 **UNITED** [2] - 1:1, 1:5
 **United** [3] - 49:16, 49:22, 164:11
 **University** [1] - 145:25
 **unknown** [1] - 61:16
 **unless** [3] - 137:10, 221:24, 221:25
 **unlike** [1] - 55:8
 **unlikely** [5] - 164:5, 170:19, 171:8, 172:3, 172:12
 **unlock** [7] - 161:15, 162:3, 166:22, 167:11, 167:14, 174:15, 175:4
 **unlocked** [1] - 162:17
 **unlocking** [1] - 173:23
 **unlocks** [3] - 169:5, 169:18, 172:17
 **unquote** [1] - 62:11
 **unrelated** [9] - 54:19, 56:6, 56:23, 59:5, 60:6, 60:11, 65:19, 67:18, 71:13
 **unusual** [7] - 19:18, 27:4, 27:9, 36:24, 91:14, 103:5, 180:24
 **unusually** [1] - 103:3
 **Up** [1] - 36:18
 **up** [107] - 7:21, 8:1, 9:11, 12:4, 12:11, 12:22, 13:3, 13:6, 18:21, 20:20, 22:25, 23:3, 23:18, 24:4, 25:10, 30:17, 32:14, 33:4, 33:21, 37:6, 38:4, 39:3, 43:1, 47:7, 54:14, 56:22, 65:24, 67:8, 67:12, 67:18, 69:20, 72:9, 80:3, 80:9, 86:16, 86:21, 93:6, 93:9, 93:13, 100:4, 100:6, 100:17, 104:12, 104:18, 104:21, 106:16, 107:13, 108:8, 109:4, 110:19, 115:21,

117:25, 122:25, 126:16, 132:16, 134:17, 135:20, 138:15, 140:14, 140:25, 148:7, 154:13, 158:10, 159:18, 160:8, 160:23, 160:25, 161:4, 163:20, 166:5, 167:6, 171:1, 172:4, 173:8, 173:19, 175:10, 176:6, 179:20, 179:22, 181:22, 182:17, 182:18, 184:22, 185:8, 185:9, 185:10, 186:2, 186:12, 186:21, 190:22, 190:24, 191:7, 191:11, 191:13, 192:12, 192:14, 203:17, 205:8, 208:5, 218:23, 220:14, 224:22, 225:19, 227:25, 228:24
 **upcoming** [1] - 136:22
 **upshot** [1] - 222:16
 **upstairs** [1] - 185:15
 **urge** [1] - 132:17
 **USA** [1] - 231:4
 **usage** [1] - 28:24
 **USC** [2] - 49:20, 50:2

## V

 **V-17** [2] - 149:16, 149:18
 **vague** [3] - 29:8, 63:12, 87:22
 **value** [1] - 84:23
 **variance** [6] - 68:17, 76:11, 76:15, 79:18, 82:19
 **variation** [1] - 20:23
 **variations** [1] - 175:20
 **varies** [2] - 20:5, 212:16
 **variety** [3] - 80:18, 122:20, 216:20
 **various** [1] - 110:19
 **vary** [1] - 20:8
 **varying** [1] - 20:9
 **vast** [1] - 31:24
 **vehicle** [22] - 26:17, 159:25, 160:19, 161:9, 161:10, 161:11, 161:22, 161:25, 162:10, 162:17, 162:19, 162:21, 163:4, 163:12, 164:17, 165:9, 165:10, 175:23, 176:21, 177:3, 177:9
 **vengeance** [1] - 71:12
 **verdict** [10] - 11:2, 68:4, 120:3, 120:14, 120:15, 120:22, 122:2, 141:21, 143:22, 217:5
 **verifying** [1] - 225:6

**version** [5] - 99:10, 99:11, 106:19, 120:9, 227:18
**versus** [2] - 49:16, 49:23
**Vice** [1] - 130:15
**victim** [1] - 150:8
**view** [2] - 132:18, 204:9
**viewed** [1] - 112:21
**views** [3] - 93:7, 115:24, 120:3
**violations** [1] - 215:22
**violence** [4] - 56:11, 72:5, 132:11
**violent** [4] - 55:23, 80:12, 80:15, 110:25
**virtually** [3] - 23:23, 41:16, 92:7
**Virtually** [1] - 41:25
**virtue** [1] - 164:4
**visit** [1] - 215:5
**VOA** [3] - 95:24, 96:17, 97:11
**voice** [39] - 15:14, 15:15, 19:13, 32:22, 33:4, 34:4, 34:7, 34:11, 35:5, 35:16, 35:22, 36:1, 91:10, 98:2, 98:15, 98:18, 99:3, 99:18, 100:13, 101:7, 101:20, 114:7, 114:9, 114:16, 114:18, 116:4, 116:8, 116:18, 116:21, 122:24, 127:6, 128:1, 128:3, 179:20, 179:22, 196:10, 212:14
**voices** [3] - 101:6, 101:20, 102:9
**voir** [1] - 199:19
**volume** [1] - 34:5
**VOLUME** [1] - 1:11
**Volunteers** [4] - 31:15, 31:20, 96:13, 96:15

### W

**W-33** [1] - 213:1
**W-34** [1] - 46:25
**W-37** [1] - 46:25
**W-37B** [1] - 47:11
**W-41** [1] - 47:13
**W-48** [1] - 47:17
**W-59** [1] - 47:19
**W-5K** [1] - 105:6
**W-67** [1] - 47:20
**W-68** [2] - 47:23, 47:25
**wagon** [2] - 26:10, 26:11
**wait** [6] - 2:13, 11:13,

53:5, 53:6, 113:23, 158:7
**Wait** [4] - 201:7
**waited** [1] - 197:24
**waiting** [5] - 4:1, 6:13, 88:24, 178:13, 181:24
**waived** [1] - 140:15
**walk** [5] - 161:17, 162:4, 185:1, 185:2, 185:3
**Walk** [1] - 124:17
**walkie** [3] - 155:9, 220:20, 220:22
**walkie-talkie** [1] - 220:20
**walkie-talkies** [2] - 155:9, 220:22
**Walter** [2] - 145:12, 156:1
**Walter's** [1] - 156:4
**wants** [7] - 34:17, 48:1, 58:21, 138:4, 140:17, 221:18, 228:17
**warning** [1] - 129:17
**warnings** [1] - 129:17
**warranted** [1] - 93:19
**Washington** [1] - 51:2
**watched** [1] - 198:3
**watching** [1] - 110:2
**Watson** [1] - 104:21
**WAYNE** [1] - 1:8
**Wayne** [23] - 27:22, 31:14, 32:8, 109:23, 114:9, 116:6, 116:10, 116:11, 179:1, 179:6, 179:13, 179:14, 182:6, 183:24, 185:5, 187:18, 187:24, 189:25, 190:10, 192:12, 194:6, 198:21, 199:1
**Wayne's** [2] - 114:6, 119:24
**ways** [5] - 86:22, 94:16, 109:12, 132:13, 222:11
**weak** [2] - 112:15, 112:21
**weapon** [7] - 85:10, 123:17, 124:14, 125:9, 125:23, 126:12
**weapons** [3] - 122:25, 125:10, 126:6
**Weaze** [2] - 16:7, 91:11
**web** [9] - 39:11, 39:20, 39:24, 40:2, 40:9, 166:5, 166:6, 221:15, 221:19
**Wednesday** [15] - 3:1, 7:13, 10:18, 10:20, 11:23, 12:1, 12:8, 12:14, 12:19, 13:1, 51:22, 228:1, 228:15, 228:22, 229:3
**week** [31] - 2:24, 3:1,

4:10, 4:21, 5:9, 39:12, 39:19, 42:12, 42:21, 50:23, 51:23, 52:1, 52:13, 52:18, 52:20, 80:12, 80:16, 80:17, 89:12, 134:14, 138:3, 141:16, 143:4, 148:17, 148:18, 214:14, 215:18, 215:19, 217:11, 220:18, 221:16
**weekend** [8] - 120:16, 203:20, 215:1, 215:7, 217:18, 220:11, 224:23, 227:20
**weeks** [8] - 111:20, 139:20, 140:12, 141:9, 142:1, 190:18, 210:24
**weight** [2] - 37:2, 83:11
**Weissman** [1] - 70:4
**welcome** [1] - 186:25
**Welcome** [1] - 199:6
**West** [2] - 1:25, 178:15
**whatsoever** [4] - 6:15, 35:22, 42:8, 72:15
**wheel** [4] - 55:10, 171:10, 172:15
**Whereas** [1] - 19:13
**whereas** [2] - 20:21, 43:21
**Whereof** [1] - 231:10
**whichever** [1] - 105:15
**white** [4] - 145:3, 182:19, 182:23
**whole** [10] - 12:23, 13:3, 23:20, 102:23, 109:19, 111:14, 139:12, 184:3, 207:2, 225:21
**wholesalers** [10] - 55:12, 55:13, 108:10, 108:12, 108:16, 109:9, 110:1, 110:17, 110:18
**Willard** [2] - 94:12
**Willie** [6] - 74:3, 74:7, 148:22, 148:25, 193:8, 231:4
**WILLIE** [1] - 1:7
**willing** [2] - 206:15, 206:20
**win** [2] - 129:6, 129:7
**window** [1] - 160:17
**Winters** [1] - 108:5
**wish** [10] - 8:24, 9:2, 133:3, 200:2, 200:17, 201:9, 201:11, 214:20, 214:23
**wishes** [4] - 2:7, 7:23, 214:20, 214:24
**withdraw** [2] - 97:3, 105:7
**withdrawal** [1] - 97:1

**withdrawn** [1] - 105:9
**withholding** [2] - 153:2, 153:6
**Witness** [1] - 231:10
**WITNESS** [23] - 15:7, 15:10, 38:23, 44:3, 144:10, 144:11, 144:14, 150:19, 150:21, 158:12, 158:13, 158:16, 178:1, 178:2, 178:5, 178:9, 179:25, 180:7, 199:6, 230:4, 230:7, 230:9, 230:11
**witness** [37] - 5:3, 20:18, 25:16, 25:19, 32:5, 32:16, 37:9, 39:16, 46:2, 135:12, 135:15, 136:11, 137:6, 144:5, 144:8, 149:11, 159:11, 177:21, 199:8, 199:16, 200:12, 200:14, 205:22, 209:9, 209:17, 209:18, 209:20, 209:22, 215:25, 219:25, 220:4, 220:21, 222:1, 222:9, 225:1, 226:2
**witness'** [2] - 171:6, 210:4
**witnesses** [27] - 3:16, 5:11, 5:12, 5:20, 9:21, 9:22, 9:25, 10:5, 10:9, 10:10, 63:16, 71:21, 86:22, 88:23, 89:25, 114:6, 126:20, 135:3, 135:5, 140:6, 140:8, 142:4, 200:1, 200:3, 200:4, 218:4, 225:21
**woke** [1] - 186:2
**woman** [1] - 193:2
**wonder** [2] - 39:9, 39:14
**Wooden's** [1] - 103:22
**woods** [9] - 123:15, 123:16, 124:14, 125:18, 125:23, 125:25, 157:8, 157:15, 157:18
**word** [7] - 14:9, 37:24, 82:11, 84:19, 114:8, 116:5, 121:1
**Word** [4] - 120:9, 227:18
**words** [5] - 51:15, 68:18, 69:1, 168:12, 194:15
**works** [2] - 33:17, 217:23
**world** [3] - 9:2, 112:14, 113:2
**worried** [1] - 73:22
**worst** [2] - 72:15, 122:5

**worth** [1] - 218:4
**wound** [2] - 173:8, 175:10
**writ** [1] - 2:16
**writing** [5] - 105:18, 106:3, 220:8, 220:10, 223:7
**written** [4] - 48:15, 53:1, 82:24, 90:6, 153:19
**Wyche** [65] - 15:15, 15:18, 15:21, 16:9, 16:10, 16:15, 16:22, 17:12, 17:18, 22:11, 26:5, 27:12, 29:3, 30:21, 31:7, 31:11, 35:1, 36:19, 36:22, 37:16, 38:8, 38:14, 38:17, 38:19, 40:16, 41:6, 41:25, 47:21, 54:6, 90:14, 90:18, 96:3, 98:11, 102:16, 109:1, 109:2, 109:17, 109:18, 112:2, 112:8, 112:21, 112:24, 113:6, 113:11, 113:12, 114:1, 114:18, 114:21, 116:25, 117:6, 117:9, 122:9, 123:7, 123:10, 123:14, 124:14, 125:22, 125:24, 127:1, 128:16, 129:9, 142:8, 219:14
**Wyche's** [2] - 18:24, 21:20
**Wyches** [5] - 41:3, 41:13, 42:9, 43:23, 112:8
**Wyches'** [1] - 91:5

### X

**XXV** [1] - 1:11
**XXXVII** [1] - 1:11

### Y

**yank** [1] - 139:2
**year** [11] - 49:20, 50:1, 68:13, 68:17, 93:1, 121:20, 148:5, 151:24, 151:25, 177:6, 179:15
**years** [27] - 33:14, 33:17, 68:2, 68:24, 68:25, 69:8, 69:19, 69:20, 69:21, 70:12, 80:20, 82:15, 93:4, 98:4, 145:5, 145:21, 147:1, 147:11, 148:5, 148:6, 151:13, 151:15, 187:12, 189:8, 191:5, 191:13, 210:25
**yesterday** [3] - 14:11,

19:21, 137:21
  **yesterday's** [1] - 14:5
  **York** [3] - 54:1, 67:8,
144:20
  **young** [1] - 115:20
  **yourself** [1] - 183:10
  **yourselves** [3] - 9:23,
50:17, 143:16

## Z

  **Zajac** [7] - 1:24, 82:14,
88:25, 103:25, 229:5,
231:3, 231:15
  **zero** [5] - 81:5, 84:25,
122:15, 122:21
  **Zero** [1] - 84:25
  **zoom** [2] - 42:20, 42:23