1
                    IN THE UNITED STATES DISTRICT COURT
2                      FOR THE DISTRICT OF MARYLAND
                            NORTHERN DIVISION
3


4


5     UNITED STATES OF AMERICA

6          v.                              CRIMINAL CASE NO.
                                            AMD-04-029
7     WILLIE MITCHELL,
      SHELTON HARRIS,
8     SHELLY WAYNE MARTIN,
      SHAWN GARDNER,
9
           Defendants
10    _____/

11                  VOLUME XXVII OF XXXVII
                    Tuesday, November 18, 2008
12                  Baltimore, Maryland

13
      Before:  Honorable Andre M. Davis, Judge
14                    And a Jury

15    Appearances:
              On Behalf of the Government:
16             Robert Harding, Esquire
               Michael Hanlon, Esquire
17            On Behalf of Defendant Mitchell:
               Laura Kelsey Rhodes, Esquire
18             Michael E. Lawlor, Esquire
              On Behalf of Defendant Harris:
19             Gerard P. Martin, Esquire
               Paul Flannery, Esquire
20            On Behalf of Defendant Martin:
               Thomas L. Crowe, Esquire
21             James G. Pyne, Esquire
              On Behalf of Defendant Gardner:
22             Adam H. Kurland, Esquire

23
      Reported by:
24    Mary M. Zajac, RPR
      Room 5515, U.S. Courthouse
25    101 West Lombard Street
      Baltimore, Maryland 21201

2

1          (Proceedings at 9:50 a.m.)

2          THE COURT:  Jurors have arrived.  We're ready to

3     proceed?

4          MS. RHODES:  We're just finishing cueing up, Your

5     Honor.

6          THE COURT:  All right.  Mr. Flannery, good morning.  I

7     would hope that the government would be willing to stipulate to

8     your summary chart.  I don't see any harm in that.

9          What's the government's, what's your understanding of

10    the government's position on that exhibit?

11         MR. FLANNERY:  No.

12         THE COURT:  What's the problem, Mr. Harding?

13         MR. HARDING:  Well, one problem is that I haven't even

14    had a chance to look at the summary chart.  It was flashed in

15    front of me yesterday for a few seconds.  But I basically didn't

16    actually read it through.  I thought it contained stuff that

17    wasn't -- there was one reference I noticed on the first page to

18    an escape from some youth facility or something like that.  I

19    don't know how that's something that --

20         THE COURT:  Sounds like a walk away.  But basically,

21    the summary chart, if you take a look at it when you get a

22    chance, you and Mr. Hanlon, I don't see any problem.

23         I'm not going to admit the entire looseleaf.  But

24    obviously, Mr. Flannery had to compile the information.  And I

25    don't expect you to be able to study it for hours.  But I think

1    if you look through it, you'll see that it's just an accounting

2    of the dates when he was in custody and the dates when he was in

3    on the street and the addresses that the DOC had for him.

4    Perfectly harmless, it seems to me, and perfectly consistent with

5    his testimony that he was only on the street for about five years

6    or so.  Just basically dates, you know.  He was on the street

7    from September until April and then from December until January

8    and then that kind of stuff.  So take a look at it.

9              MR. HARDING:  I'll take a look at it if I can get a

10   copy of it.

11             MR. FLANNERY:  Okay.

12             THE COURT:  You didn't give him a copy?

13             MR. FLANNERY:  First of all, I gave them a copy two

14   weeks ago.

15             MR. HARDING:  Not of the summary sheet.

16             MR. FLANNERY:  I gave them a copy two weeks ago of the

17   summary sheet, Your Honor, with --

18             MR. HANLON:  Your Honor, I got it.  I candidly put it

19   some place.

20             THE COURT:  Of course.  I understand.

21             MR. HANLON:  It's my fault, not Mr. Harding.

22             THE COURT:  Paper's been flying all over this place.  I

23   understand.  So he'll take a look at it, Mr. Flannery.  I don't

24   see any problem with it.

25             MR. FLANNERY:  Your Honor, there's one other issue as

```
1    well.

2              THE COURT:  Yes.

3              MR. FLANNERY:  I'm expecting a phone call sometime soon

4    about a health issue with my father.  So if you wouldn't mind if

5    I could take that phone call.

6              THE COURT:  Of course.  Of course.

7              MR. HANLON:  Your Honor, can I raise just one matter.

8              THE COURT:  Mr. Hanlon.

9              MR. HANLON:  This morning, Mr. Flannery presented me --

10   this is not something I forgot about -- this is just a few

11   minutes ago, with some rap lyrics and internet materials that I

12   think they're going to be using with the rap expert.  Just been

13   presented with them this morning.  And this really strikes me as

14   Rule 16 material that could have been and should have been

15   produced earlier.

16             So the government objects for what it's worth, Your

17   Honor.  We've certainly been called out any time we've been less

18   than completely timely.

19             THE COURT:  Mr. Flannery.

20             MR. FLANNERY:  Your Honor, we did present them with

21   some lyrics this morning.  And largely the reason these

22   particular lyrics were pulled is to contrast them with specific

23   lyrics that the government went into, the lyrics that were pulled

24   from Seamon Avenue.  So that's the reason that we gathered these

25   lyrics and that's the, our understanding of the timing of them
```

1    was to contrast them against lyrics that the government has gone

2    into, specific lyrics that the government has gone into.  So that

3    was our intent behind them.

4            THE COURT:  I don't understand what it means to

5    contrast them.  Look, let's remember, I admitted rap lyrics as

6    coconspirator statements.  They are relevant material to the

7    issues in this case.  Now, whether other rap lyrics have been

8    admitted against the author of the lyrics for other purposes of

9    course is something we can discuss.

10            No one has asked, to my recollection, no one has asked

11   for a limiting instruction when the government has questioned

12   witnesses about rap lyrics.  Obviously, we had hearings before

13   you were in the case, Mr. Flannery, but perhaps after, when the

14   Court made its ruling that certain rap lyrics and the related

15   recordings would be admitted not for entertainment value in this

16   case, or in some abstract exploration of artistic merit, but

17   because they were coconspirator statements.

18            And so I don't know what anybody expects to do with

19   this so-called rap expert, but I do expect, frankly, to sustain a

20   lot of objections.  Now, I don't know what more I can say about

21   that.  I don't see the need to contrast rap lyrics.  Rap lyrics

22   are rap lyrics.

23            Ms. Rhodes, not over objection, was permitted to play

24   Straight Out of Compton in opening statement.  I don't know if

25   there had been an objection I would have sustained the objection

6

1    or not.  This case is not about who likes rap music and what rap

2    music is about.  This case is about the fact that I admitted

3    specific rap lyrics because they were coconspirator statements

4    based on the evidence presented.

5              So we're not going to go down some artistic path with

6    an expert or without over rap music.

7              MR. FLANNERY:  Well, I think, Your Honor, then, what we

8    would at least seek to do at a minimum is there is a particular

9    lyric, the reference to the term Woody or Whoodi, if you

10   remember, in one of the lyrics.  And I think that we should be

11   entitled to, through this expert, to present what we feel is in

12   fact the proper understanding of what that term is.

13             The government, through Agent Klas.

14             THE COURT:  I'm sorry.  Are you proffering that Woody

15   is a term of art in the rap music industry?

16             MR. FLANNERY:  Absolutely, Your Honor.

17             THE COURT:  Well, then, you don't need an exhibit for

18   that.  You ask the expert.  You ask the expert.  I'm not going to

19   admit exhibits, you know, 19 rap songs that use the term Woody.

20             Now, the issue in this case is, who is the Woody that

21   was referenced in these lyrics.  Not that there may be some other

22   Woody, not that other rap artists may use the term four-fifths

23   for a .45.  That's not relevant in this case.  What's relevant in

24   this case is the lyrics in this case.

25             MR. FLANNERY:  I understand that, Your Honor.  But I

1    think that there's, there's different interpretations of the term

2    Woody and Whoodi.

3              THE COURT:  And you can ask the expert that.

4              MR. FLANNERY:  I think the exhibits would help the jury

5    understand.

6              THE COURT:  No.  I think the exhibits would simply

7    distract the jury.  Okay.  All right?

8              MR. FLANNERY:  Thank you, Your Honor.

9              THE COURT:  Let's move.  Let's have the jury, please.

10   Does anybody have any reason to think that a defendant's going to

11   testify?  Not asking finally yet.

12             MR. MARTIN:  Don't we have to ask them?

13             THE COURT:  Of course.  We will.  I'm asking counsel

14   now.

15             MR. MARTIN:  I have no reason to believe --

16             THE COURT:  Okay.  All right.  I just was looking for a

17   nod of the head.

18             MS. RHODES:  I don't have any reason, Your Honor, to

19   make that proffer.

20             THE COURT:  Silence is your answer.  You don't have to

21   respond.

22             MR. LAWLOR:  My specialty.

23             (Jury enters the courtroom.)

24             THE COURT:  Ladies and gentlemen, good morning.  We're

25   ready to continue.  You may call your next witness, Ms. Rhodes.

1          MS. RHODES:  Thank you, Your Honor.  I would call Davey

2     Dee to the stand.

3          DAVID COOK, DEFENDANT MITCHELL WITNESS, SWORN

4          THE WITNESS:  Yes.

5          THE CLERK:  Be seated.  Speak directly toward the mike.

6     State your name and spell it for the record, please.

7          THE WITNESS:  Name is Davey D.  That's my professional

8     name.  Full name, Dave Cook.

9          DIRECT EXAMINATION

10    BY MS. RHODES:

11    Q    Thank you.  And the Court prefers that we use formal names

12    in here so I'm going to call you Mr. Cook, if that's all right.

13    A    Okay.

14    Q    Thank you.  Can you tell us just first of all where you work

15    and where you're employed?

16    A    I do a radio show out in California that's heard throughout

17    the West Coast, that focuses on hip-hop culture and politics.  I

18    write a column, which I've been doing since maybe 2000, for the

19    San Jose Mercury News, which focuses on hip-hop culture and

20    politics.

21          I run a web site, one of the oldest hip-hop oriented

22    web sites, Davey D's Hip-Hop Corner, which has been around since

23    1992.

24    Q    And what's the radio station you're working for now?

25    A    KPFA.

1   Q    And when does, how often is your show on the air?

2   A    It's on every afternoon.

3   Q    Okay.  How long?

4   A    We've been doing this for about ten years now.

5   Q    Okay.  And you said you were in California.  Where are you

6   in California?

7   A    Northern California, Oakland.

8   Q    Okay.  How did you get, going back in time, how did you get

9   interested in working in the hip-hop area, or rap area?

10  A    Well, I was born and raised in the Bronx and came up in

11  1977, and started rapping myself.  I was an emcee for a long time

12  and then morphed into somebody who took it as a profession in the

13  area of media.  So all forms of medias.

14  Q    And let me ask you a sort of personal question just relating

15  to how, you know, what age you were at different times.  What

16  year were you born?

17  A    1963.

18  Q    Okay.  What age were you when you started rapping?

19  A    If we're talking about '77, you know.  I guess 14, 15.

20  Q    Okay.  And that's, at that time you were in Brooklyn?

21  A    In the Bronx.

22  Q    In the Bronx.  Okay.  All right.  So then, and you say you

23  started DJ'ing after you were rapping?

24  A    Yes.  When I came out to California, maybe 1982, '83 is when

25  I started DJ'ing.  Then I moved into radio in 1987.  Started

Case 1:04-cr-00029-RDB   Document 697   Filed 06/19/09   Page 10 of 299

1  putting out a publication.

2  Q    So when you said you started DJ'ing at first, what do you

3  moon by DJ'ing then?

4  A    DJ'ing meaning that I was paying for school by doing

5  parties, spinning records.  And then there's a difference between

6  DJ's at spinning parties and being a DJ on the radio.  So I

7  started DJ'ing on the radio in '86, '87.

8  Q    And you were in school at the time?

9  A    Yeah.

10  Q    Where were you in school?

11  A    UC Berkeley.

12  Q    Okay.  And did you graduate from UC Berkeley?

13  A    Yes, I did.

14  Q    Where did you -- tell us about the rest of your career

15  during college and immediately afterwards.

16  A    In '86, '87, I started doing a publication that focuses us

17  on hip-hop, particularly out of the West Coast.  And that led me

18  into doing a column, one of the first hip-hop columns in the

19  country for a magazine called Bay Area Music Magazine, called

20  BAM.

21  Q    And what was the publication you first started?

22  A    That was a self-publication that I put out.

23  Q    Kind of an informal newsletter?

24  A    Yes.

25  Q    And was that distributed at UC Berkeley or where?

Case 1:04-cr-00029-RDB   Document 697   Filed 06/19/09   Page 11 of 299

1    A    That was distributed throughout northern California in most

2    of the record stores.

3    Q    And this is pre-Internet basically?

4    A    Beg your pardon?

5    Q    This is pre-Internet basically?

6    A    Pre-Internet.  This is all pre-Internet.  Then I started

7    doing a column for BAM magazine which was focused on hip-hop and

8    that was a result of the newsletter.  And then later that led to

9    me being approached by KPFA, which I'm still at.  And I started

10   doing a hip-hop show for them.

11            I got nominated as one of the people in the Bay area,

12   most focused hero of the bay, because of the work around hip-hop,

13   in '88.  Started an organization called the Bay Area Hip-Hop, the

14   Bay Area Hip-Hop Association.

15   Q    And what's that consist of?

16   A    That was taking most of the radio DJ's in the area, and we

17   all formed a little unit.  And that organization still exists to

18   this day.

19   Q    Okay.  And you said you got an award for your work in

20   hip-hop.  What was the award for and what do you mean by your

21   work?

22   A    There's been several awards.  But the first one was from the

23   San Francisco Bay Guardian, as one of the people to look out for,

24   because I was pretty outspoken.

25   Q    San Francisco Bay Guardian, that's one of the main

Case 1:04-cr-00029-RDB   Document 697   Filed 06/19/09   Page 12 of 299

1    newspapers in San Francisco?

2    A    That's the weekly newspaper.

3    Q    And so what were they recognizing in terms of your work?

4    A    Well, for one, I provided a lot of clarity for people who

5    were outside of the music industry in terms of what the culture

6    was about.  It was coming from the history and what have you.

7         Second thing was that I was pretty outspoken about the

8    types of material that was coming out and the way that it was

9    being distributed, sometime through radio, sometimes through

10   print.  Sometimes there were distortions.  Sometimes there were

11   certain types of glorifications.  So I was pretty known for that.

12        Also just pretty, pretty much being good at my craft.

13   A lot of groups, I could pretty much say I was maybe the first,

14   if not among the first, to play them and help launch their

15   careers in terms of exposing them to the public.

16   Q    Since college, have you ever worked in any other area

17   besides hip-hop and the radio and that sort of thing?

18   A    My whole career since '87, '88, has been around the music

19   industry.  So I, you know, moved into working for a commercial

20   radio station from '91 to 2001.  That station is called KMEL and

21   is probably the station that launched most of the hip-hop

22   stations around the country.  We were the brain trust of that.

23   People like myself and a number of other well-known DJ's who are

24   pretty prominent today, we're the ones that developed a lot of

25   ideas and direction that these stations took.

DIRECT EXAMINATION OF DAVID COOK                    13

1          I later started programming radio for AOL Time Warner,

2     Sprint Radio, my own operations.  These are all Internet based,

3     obviously.  And, you know, done syndicated shows with well-known

4     people, like Public Enemy's Chuck D.  We had a countdown show.

5     So my area in this, my involvement in this area is pretty

6     extensive.  I mean, I can give you a long list for days.  But

7     it's pretty much how I've made my living for the past 20 years.

8     Q    Okay.  And in terms of people that you have interviewed,

9     say, whether for your show or for some documentary or something

10    else, I'm trying to give the jury a sense of what your exposure

11    has been to artists, as well as producers and types like that in

12    the industry.

13    A    Well, in terms of who I've interviewed, most, most of the

14    main people I've interviewed them at least once or I've been

15    around them or I've been involved in some shape or form.

16         It's probably easier to tell you who I haven't

17    interviewed more than it is who I have.  I mean, just my nature

18    of working at the radio station and doing mornings meant that

19    anybody who was prominent, you know, between the years 1991 and

20    '94, '95, we would interview them.  Me just being a DJ who had

21    free rein on that radio station, most of these people I've

22    interviewed.

23         And I've been featured in maybe about 36 or 37

24    different documentaries, you know.  So there's other involvements

25    with that as well.

DIRECT EXAMINATION OF DAVID COOK                    14

1   Q    Okay.  Where else have you or where have you given speeches

2   or lectures or been a keynote speaker?  Just give us a couple of

3   those places, if you could.

4   A    And that goes from Harvard University down to Stanford, to

5   community colleges, in front of the FCC.

6   Q    FCC being the?

7   A    Federal Communications Commission.

8   Q    Okay.  What was that testimony about?

9   A    That was around --

10  Q    Issue?

11  A    Well, I've done that several times.  The primary one has

12  been around the issue of media consolidation and other times it's

13  been around the actual content or lack of content, goes across

14  the airwaves, because of that consolidation, which is why I was

15  asked to speak.

16  Q    Okay.  In terms of your, you know, we have a sense of what

17  you've done in terms of artists and the music.  And what about in

18  terms of the industry?  Where does your expertise in that come

19  from about how people get their music out there?  It may seem

20  obvious to you.  How do they get their music out?  And what's

21  been your exposure to that?

22  A    Well, working at a primary radio station was probably among

23  the first, you know, gave me a lot of insight.  The fact that I

24  refused to sign any sort of documents that would limit my ability

25  to speak on that put me in a unique situation because I've been

1    pretty outspoken about the payola practices that go on, the types

2    of pressuring and what have you that goes on behind the scene

3    that leads to airplay or prevents airplay.

4    Q    Can you explain for a second about what kind of documents

5    they want you or want people to sign?

6    A    Well, when you work at a commercial outlet, they usually

7    have you sign a document either before or after you leave.  And

8    that document basically prohibits you from talking about trade

9    secrets.  At least in mine it was kind of outlined when I left

10   KMEL that I couldn't talk to anybody who I had a legal connection

11   with, family or friends and what have you.

12          I served in management at the station at one point for

13   a number of years so the types of things that would go on behind

14   the scenes that might raise eyebrows or, or kind of clarify why

15   certain things were taking place were things that most DJ's and

16   people who work at commercial radio just don't speak out about

17   because it either means you'll be blackballed in the industry or

18   you will be in violation of your contract, depending on what

19   you're talking about.

20   Q    And what happened -- so did you, were you required to sign

21   those documents?

22   A    Yeah, I was required and I didn't do it.

23   Q    And what happened then?

24   A    Well, I, I gave up $15,000 and the opportunity to be

25   syndicated at the radio station.  At least that was the offer

1    they put at the table.

2    Q    Okay.

3    A    But because I'm a journalist in other areas, that would have

4    been limiting for me to speak out.

5    Q    Your Honor, at this time I would proffer Mr. Davey D or Dave

6    Cook as an expert in hip-hop, rap music and the music industry,

7    in those areas.

8         MR. HANLON:  Just a couple questions, Your Honor.

9         THE COURT:  Certainly.

10        CROSS EXAMINATION (On Qualifications)

11   BY MR. HANLON:

12   Q    Mr. Cook, good morning to you, sir.

13   A    Good morning.

14   Q    I'll have a chance to ask you a few questions in a little

15   while.  But just to focus you on your background for a sec.  Have

16   you ever had an occasion to testify as an expert witness about

17   rap and the hip-hop community as you're doing today?

18   A    No, not in a trial like this.

19   Q    This is the first time in trial, is that right?

20   A    Yes.

21   Q    You were asked about some of your writings and you're a

22   contributing writer to various articles and you run a web site as

23   well, is that correct?

24   A    Um-hum.

25   Q    Have you written or been a contributing editor to any books,

1    sir?

2    A    Yes.   The most recent one is called Be a Father and it's

3    about black manhood.   And it features 24 authors, many of us from

4    the hip-hop generation.   My being asked to contribute, because

5    I'm not a father per se --

6    Q    Sure.

7    A    -- was because of my understanding of hip-hop and the way

8    that it's impacted society.   So I'm featured in the very first

9    chapter of that book.   It just came out this year.

10        The other book that I contributed is a book called How

11   to Get Stupid White Men Out of Office.   It's a play off of

12   Michael Moore's book.   And it focuses on hip-hop in politics.

13   And again, my contribution was around the types of steps that

14   need to be taken to reach the so-called hip-hop generation in

15   terms of politicizing them.

16   Q    So hip-hop figures in both books, one in the family context,

17   in connection there, the other one in the political context?

18   A    Yes.

19        MR. HANLON:   Thank you, sir.   Your Honor, aside from

20   the government's previous positions, which the Court is aware of,

21   I don't have anything else.

22        THE COURT:   I've tried to get this out of my

23   stepdaughter so I'll ask you.   What is the difference, if any,

24   between hip-hop and rap?

25        THE WITNESS:   Well, the technical difference is that

1    hip-hop is the culture and rap is part of the culture.  And there

2    are a number of elements that feature into that culture,

3    including the dance, the music itself, style of dress.  You know,

4    general way of being.  And rap would be a component of that.

5          Sometimes people like to argue that the

6    commercialization of hip-hop, at least the music part, some

7    people who consider themself purists would deem that as rap and

8    that hip-hop itself doesn't have the contamination of

9    commercialism.  I don't agree with that.

10          THE COURT:  Am I mistaken?  Did rap precede hip-hop?

11    Or did they come at the same time?

12          THE WITNESS:  The act of saying beats to rhymes or,

13    yeah, saying rhymes to rhythm, that's been around all the way

14    back to Africa.  I mean, under the oral tradition, African oral

15    tradition, which was exemplified by story tellers called griots,

16    all the way up to field hollers during slavery.  You know, you

17    can look at Cab Calloway.

18          THE COURT:  But nobody ever called that rap, did they?

19          THE WITNESS:  Well, no.  But they didn't even call it

20    rap when I was coming up, either.  In 1977 it wasn't called rap.

21          THE COURT:  Right.

22          THE WITNESS:  The word "rap" emerged with the Sugarhill

23    Gang in 1979.  And then that word was given to describe something

24    that we had been doing for a good ten years, at least in the

25    modern area of what we call hip-hop.

CONT'D DIRECT EXAMINATION OF DAVID COOK                    19

1              THE COURT:  All right.  I'm going to permit you to

2    proceed, Ms. Rhodes, conditionally, and we'll see how it goes.

3              MS. RHODES:  Okay.

4              THE COURT:  Go ahead.

5              CONT'D DIRECT EXAMINATION

6    BY MS. RHODES:

7    Q    Mr. Cook, I want to ask you just a couple more questions

8    about some of your work before we get on to the other substance.

9    Which has to do with, you mentioned that you've sort of been

10   accused or renowned of being outspoken.  And we didn't really

11   completely clarify.  You mentioned the word "payola."  Can you

12   tell us what your position is on that in terms of the music

13   industry?

14   A    Well, most records that you hear on commercial radio is the

15   result of an illegal activity called payola, meaning you pay in

16   goods and services or, in a lot of cases, the exchange for the

17   artist doing free concerts like a summer jam or a winter jam or

18   some big party or some big event in exchange for air play.

19             There's been big court cases around that.  Sometimes

20   it's harder to prove than it is, because as I mentioned before, a

21   lot of DJ's won't go on record to talk about what they know and

22   how, and what they've seen behind the scenes, so to speak.

23   Q    All of that is an issue that you've been, you've been

24   speaking out against and you're concerned about?

25   A    Yeah.

1    Q    And what about the political side?  You said that earlier

2    your show today is about hip-hop and politics.  And what's the

3    connection there for you?

4    A    Well, I think the best way to describe it is that you have a

5    whole generation of people that identify with hip-hop culture in

6    the various aspects.  I wouldn't necessarily say it's unique.

7    But there's just a way of languaging yourself so that it reaches.

8    And what you talk about in terms of social and political issues

9    are relevant to people.

10          Just the same way that maybe Jon Stewart or Jay Leno

11   might be gathering point for people in the quote-unquote

12   "mainstream", they might be able to digest news and information

13   through comedy or through the type of lightheartedness that those

14   particular gentlemen provide, well, the same thing applies with

15   hip-hop.

16          How do you take somebody who is considered apathetic to

17   the political process and engage them?  And, you know, just using

18   that as a backdrop, the culture is a way that, you know, some of

19   us have been successful in doing it.

20   Q    Okay.  Well, it looks like very successful recently.

21   A    Yes.

22   Q    So you've given us a little bit of the sense of rap versus

23   hip-hop and how things are evolving.  How did, let's talk about

24   the issue of, I mean, we're going to get into some of the lyrics

25   and the types of lyrics we see.

CONT'D DIRECT EXAMINATION OF DAVID COOK                    21

1          Starting back, say, in the early '80s, what did rap

2     consist of then?

3     A    What do you mean?

4     Q    What types of, what types of songs were popular?  What was

5     coming up?  And then I want to ask about how people got their

6     music out.

7     A    Well, if you're talking about the early '80's, you're

8     talking about a new era in hip-hop, meaning that records were

9     first coming out, you know, going from Sugarhill Gang.  So you're

10    talking about '81 on up to maybe '85 or '84.  There was a period

11    of time where a lot of music focused on the conditions that

12    people were dealing with in the ghettos or in the hood.  Just

13    songs like The Message by Grandmaster Flash would be a prime

14    example of that.  But there were numerous other groups like

15    Houdini, even Run DMC, who were just coming on scene in '83, all

16    talk to those conditions.

17         You had a number of records that were party songs, you

18    know, we're here, we're having fun, have a good time, etc., etc.

19    Then you had the, what many people consider primary tenet of

20    hip-hop, at least rap music, is just people bragging about what

21    they have and what they're going to do and who they know, etc.,

22    etc., which, you know, is not unique to rap but it's part of that

23    tradition, a long tradition.

24         So you're bragging about your DJ, where you're from,

25    who you are, what you're about.

1    Q    Okay.  And who, where you're from.  So you said, when some

2    of us were meeting with you last night, you gave us an example

3    about a location.  Can you explain that?  About how, like if it's

4    New York?

5    A    Well, I mean, the primary thing is, you know, trying to give

6    yourself some sort of identification.  And a big part of

7    identification for many of us from the hood is where you're from.

8    So me being from the Bronx, which is considered the birth place

9    of hip-hop, meant that I might segregate myself from the rest of

10   my rapping peers and let people know that I'm from Soundview

11   section, which was considered one of the tougher neighborhoods in

12   the Bronx at that time.

13          Somebody else trying to get on to the scene would want

14   to make it known that they're not like these kids from the Bronx,

15   they're from Brooklyn.  And within Brooklyn you have various

16   sections, Bed-Stuy, Do or Die, Bed-Stuy, Brownsville, etc., etc.

17   The same goes on to the other burroughs.

18          It continues to this day.  I mean, with me being out on

19   the West Coast, everybody wants you to know exactly where they're

20   from.  So I'm in Oakland now.  So there's way too many songs to

21   name where people talk they're from, either the Bay, and in

22   particular Oakland or San Francisco.  And there are nicknames to

23   it.  You know, San Francisco might be called Sucker Free.  Or

24   Oakland might be called The Town.  It's not an unusual thing.  In

25   almost every city where you, or area where you find hip-hop and

1    people are participating in the culture, you could, without even

2    being in that city you can tell, I can pretty safely say that you

3    will find groups that will self-identify their city and hold it

4    up to high esteem.

5    Q    So giving your neighborhood a name or a special name in a

6    rap song is --

7    A    Yes, definitely.

8    Q    -- common?  Okay.  What about -- okay.  So you described

9    three different types of music.  You've got sort of the ones that

10   are talking about the neighborhood, talking about party songs,

11   where we're having a good time, and other genre, which is talking

12   about, bragging about what you have and things like that.  So

13   what, did that evolve, then, from the mid '80s or are those three

14   aspects still popular, or what happened after that?

15   A    Well, I think, you know, one of the things that should be

16   clear, that almost anything under the sun gets talked about in

17   hip-hop, period.  But in terms of what the industry is focused

18   on, on the beginning, those three things tended to be what the

19   music industry was gravitating around.

20            Over the years, we've seen it go through a number of

21   phases.  From '84 to maybe 87, you had what I call the paid in

22   full era.  So a lot of people talked about the type of money they

23   were making.  It wasn't unusual to see artists standing on the

24   cover, showing their dollar bills and really talking about their

25   wealth or their perceived wealth, because most of these people

1    weren't rich at all.  But that was something that they did.

2          And then between '87 and maybe '92, you had a number of

3    genres that were out there.  One was the Afro-centric period.  So

4    a lot of people talking about Black pride, uplifting the

5    community, taking a militant stance towards racism and people who

6    they perceived as racist, those sorts of things.

7          Then you had at the same time, we didn't call it

8    gangsta rap when it first came out, but it eventually got tagged.

9    You had people that kind of talked about the gritty side of where

10   they were coming from, in particular out of the West Coast in Los

11   Angeles.  So that narrative took hold.

12         And then in places like Miami you had people talking

13   about, you know, they were being a little more salacious with

14   their material.  So you heard a lot of sex or pimping references.

15   Q    Is that when, you know, you mentioned the gritty side of LA,

16   is that around the time that Straight Outta Compton came out?

17   A    Talking about '88, yeah.

18   Q    Okay.  I want to, Your Honor, with the Court's permission, I

19   would just play briefly about 30 seconds of that song.

20         MR. HANLON:  Objection, Your Honor.

21         THE COURT:  Sustained.

22   Q    Okay.  What else after, what was significant about Straight

23   Outta Compton that made it sort of a seminal song?

24   A    Well, it, it gave a different perspective of what California

25   was about.  When I came out there, I thought it was all palm

1    streets and beaches.

2         THE COURT:  Excuse me, Mr. Cook.  Ladies and gentlemen

3    of the jury, please return to the jury room for just a moment.

4    Please leave your note pads on your chairs.  Have no discussion

5    about the evidence or about the case.

6         (Jury exits the courtroom.)

7         THE COURT:  Ms. Rhodes, I'm really trying hard, however

8    it may look to observers, to permit you to do whatever it is you

9    want to do.  But you're wasting the jury's time.  Now, I'm going

10   to ask you to make a proffer as to what relevant and material

11   evidence you expect to elicit in the form of opinion testimony

12   from Mr. Cook.

13        MS. RHODES:  Your Honor, my intention is for them to

14   have a little bit of background about how gangsta rap, which is

15   what he's getting into now, came to be and how it, how it has

16   dominated the industry in terms of the money side of things in a

17   lot of ways.  That would be his opinion.

18        Also that the way to get into the industry,

19   particularly around, well, sort of from '95 through 2002, when

20   the defendants were both vulnerable and then getting into the

21   rap, listening to it and trying to get into it, or some of them

22   were, that that was, that how things were being promoted in the

23   industry, how somebody would have done it, which parallels, we

24   believe, what the evidence has shown they were doing.  So the

25   idea is to show that this is not some kind of a sham

1    organization.  This was a genuine effort on their part to do, to

2    do, have a viable rap business.  And then secondarily --

3            THE COURT:  So let me see if I can repeat that back to

4    you in a way that confirms my understanding of what you said.

5            You want Mr. Cook essentially to be a teaching expert,

6    to educate the jury as to how people who wanted to get a foothold

7    and progress in the music business, and in particular in the rap

8    music business, went about doing that?  Is that an accurate --

9            MS. RHODES:  That's a part of it.  In conjunction with

10   the, the influence -- yeah.  I guess that is it.  But in

11   conjunction with the gangsta rap influence and what was happening

12   specifically in that genre.

13           THE COURT:  That's what I'm not getting.  What do you

14   mean by "in conjunction with the influence of the gangsta rap

15   genre?"

16           MS. RHODES:  Well, because it kind of blends into the

17   second issue, which is the lyrics and what you had to put into

18   your songs, what you had to say or do in your songs for it to be

19   commercially viable.

20           THE COURT:  Okay.  So are you there now?

21           MS. RHODES:  I just have, we're just getting into the

22   gangsta stuff.  I just have a couple more things there.

23           THE COURT:  All right.  With all respect to Mr. Cook,

24   all this about Brooklyn and the Bronx, that's not helpful.

25           MS. RHODES:  As a teaching expert, I think it is.  It's

CONT'D DIRECT EXAMINATION OF DAVID COOK                    27

1    background.

2              THE COURT:  It's not helpful.

3              MS. RHODES:  Okay.

4              THE COURT:  Again, with all respect to the witness, he

5    clearly knows what he's talking about.  The problem is what he is

6    talking about so far is not helpful to the jury.

7              MS. RHODES:  But the location issue is Sheistyville.

8    That's why I wanted him to give that, that narrow example of how

9    you can't just say Baltimore, you've got to say --

10             THE COURT:  Perhaps what you need to do is, with all

11   respect, more focus your questions.  Because what you're doing is

12   you're asking a question and Mr. Cook is going on for two or

13   three or four minutes.  And I don't fault him for that.  That's

14   how he presents himself.  But that's not appropriate in this

15   courtroom.  Even an expert has to answer specific questions.

16   Okay?

17             All right.  I think we're up to 97 and you wanted to

18   play Straight Outta Compton.  I sustained the objection.  So if

19   you want to get into gangsta rap and how entrepreneurs undertake

20   to break into the business and what they have to do to do that,

21   seems to me that's perfectly okay.  It's just that it's now 10:30

22   and Mr. Cook took the stand at two after ten and we're not

23   anywhere near there so far as I can tell.

24             So I needed to confirm that you were getting pretty

25   close to what you believe is relevant evidence here.  That's all.

Case 1:04-cr-00029-RDB    Document 697    Filed 06/19/09    Page 28 of 299

1           Let's have the jury back, please, Ms. Arrington.

2           Again, I think the main problem, you're asking these

3     open-ended questions or what seem to be open-ended questions and

4     the witness is just going on and on.  It's not helpful.  Now, I

5     still haven't accepted him as an expert and I accepted him

6     conditionally because I wanted to hear how you were going to make

7     this work.

8           (Jury enters the courtroom.)

9           THE COURT:  Thank you, ladies and gentlemen of the

10    jury.  Whenever you're ready, Ms. Rhodes.

11    BY MS. RHODES:

12    Q    Thank you, Your Honor.  So I was just asking, what was

13    significant in terms of the lyrics in Straight Outta Compton that

14    affected the industry?

15    A    It gave a new perspective of what Los Angeles was about.

16    And the other thing was that it showed that these street tales,

17    with the coarseness that were displayed through the lyrics, could

18    be commercially viable in terms of, as far as the record labels

19    and even some of the radio stations that were starting to play

20    it.  One of the audiences that really came to support it were

21    the, quote-unquote, "kids out of the hood", the suburbs.  And

22    that became a big attraction for a lot of stations like my own,

23    which were considered Top 40 station, by playing these type of

24    songs and bringing these type of acts to the forefront.

25    Q    So in order to, so the commercial viability, the attraction

1  was that these lyrics that were harsh or crude sold, made money?

2  A    Um-hum.  Yes.

3  Q    And how did that, and that was Straight Outta Compton came

4  out what year?

5  A    '88.

6  Q    Okay.  Are you familiar, also, with Jay-Z's song, Threat?

7  A    I've heard of it, yes.

8  Q    Do you know roughly when that came out?

9  A    I want to say, because he put out a bunch of albums one

10  after the other, I want to say late '90s.

11  Q    Okay.  And just in terms of, in terms of that song and those

12  lyrics, was it unusual at all at that point to see, to hear

13  lyrics that had to do with threats being, you know, sent out in

14  the neighborhood?

15  A    No.  By the time that Jay-Z hit the scene, absolutely not.

16  Q    Okay.  So what was the evolution between those years, then,

17  from the early '90s to the late '90s, in terms of, in terms of

18  that kind of music with more violence, more crudity, in terms of

19  sexual issues or sexual language?

20  A    Well, when --

21           MR. HANLON:  Your Honor, objection to --

22           THE COURT:  Rephrase the question, please.

23  Q    Can you describe what was happening between the early and

24  late '90's in terms of the types of lyric we were seeing?

25  A    Well, if I understand your question, you start having groups

1    that kind of shock people, so to speak.  NWA and The Ghetto Boys

2    would be two primary groups.  And from that point on, it became a

3    thing of one-upmanship in terms of, okay, you can't just be like

4    NWA.  How can you top that?  And so some of the street narratives

5    became a little bit more gritty, some of them more forceful.

6    Those types of things is how it kind of kept hold.

7           So by the time you get to a song like Threat, it's,

8    it's in, it's looking at it from the standpoint of once upon a

9    time you're just talking about it, now you're actually saying

10   things that some might say are more direct, etc., etc.

11   Q    Okay.  What are the types of lyrics we're talking about that

12   are the gritty lyrics, the explicit lyrics?

13   A    I don't understand the question.

14   Q    What types --

15          THE COURT:  She actually, I think she wants you to use

16   the actual language that was appearing in the songs.  Is that

17   right, Ms. Rhodes?

18   Q    Well, that and the, we are talking about violence.  What

19   kind of things would they say?  Yes.

20   A    I mean, it ranges.  I mean, one of the things that --

21          THE COURT:  Let me say, Mr. Cook, certainly, we all

22   appreciate your sensitivity and your delicacy.  But we're in a

23   courtroom and the language is the language.  And so please try to

24   make yourself comfortable, even in these formal, in this formal

25   environment with the language that you are familiar with.

CONT'D DIRECT EXAMINATION OF DAVID COOK                    31

1    A    Well, I don't think the language per se changed.  I mean,

2    the N word was used, the B word.  Cursing in the early '80s was

3    kind, I mean the mid to late 80's was kind of a shock.  By the

4    90's, it's commonplace.

5          Threats, so to speak, on records, those weren't

6    unusual.  I mean, Tupac kind of had a market on that when he had

7    his beef with the Notorious BIG.  So those sorts of things were,

8    were already going on.

9          But if you're looking at a pattern, you saw the

10   one-upmanship maybe come in the form of people just talking about

11   themselves to almost taking on these personas with the influence

12   of movies like Scarface, admiration for mafia movies, people

13   relating themselves to foreign despots.

14         So it wasn't unusual to see people mention Noriega in a

15   song or call themself Kaddafi or talk about how they're Corleone

16   or some sort of spinoff of a mafia godfather name.  So these

17   types of things started to emerge and became the currency in

18   music.

19   Q    You described that as taking on a persona.  So somebody

20   would sort of act like they're going to be, that they're that

21   other person or talk like they're that other person?

22         MR. HANLON:  Objection, Your Honor.

23         THE COURT:  Overruled.  You may answer.

24   A    Well, yeah.  I think from my experience that people who were

25   talking about their rolling with Noriega absolutely didn't roll

Case 1:04-cr-00029-RDB    Document 697    Filed 06/19/09    Page 32 of 299

1    with Noriega because, I mean, you know, a lot of these guys had

2    these lyrics and they'd show up at the radio station and they

3    were nothing like the personas that they displayed on vinyl.

4            You heard people talking about how they were the head

5    of some sort of criminal enterprise in their song, you know.

6    Notorious BIG might say he's the head of the commission or

7    something like that, you know, like the godfather or based off, I

8    think in his terms, Nicky Barnes, who was a big drug dealer in

9    New York.  Well, there was definitely no relevance to that.

10           So you, you always had, you know, and this is what I

11   considered one-upmanship.

12           So you go from being, as NWA described himself, street

13   reporters, to people who are now the head of criminal enterprises

14   on vinyl.  But it didn't seem to add up in terms of, you know,

15   what they were in real life.

16   Q    Did it sell?

17   A    Yeah.  It definitely sold.  These things sold.

18   Q    Okay.  So getting to, say, somebody who wants to enter the

19   industry who, you know, has a couple friends, they're getting

20   together, putting down some tracks for rap.  How would they go

21   about that the in early 2000's?

22   A    Well, by 2000, I think the blueprint had been laid out in

23   terms of what labels were looking for, what radio was willing to

24   play, and what sort of artists were being rewarded.  There was a

25   big debate in the industry because a lot of artists who came with

1    more socially relevant lyrics were no longer being played.

2    Public Enemy, KRS One, those are two prominent artists and groups

3    that would fit the bill.  A group like Paris, you know, these

4    revolutionary type of lyrics, Dead Prez coming on the scene, all

5    those groups were not being played on the BET's and on the big

6    radio stations.

7            The groups that were, you know, representing this other

8    type of music, which we now call gangsta music, those were the

9    things that were being rewarded.  So when I would talk to groups

10   that were coming in and they would ask, what's it going to take

11   to get on the air and what's happening, the blueprint was pretty

12   clear.  You go in the direction of the people who were most

13   successful, which would have been like a Notorious BIG, which

14   would have been by that time a Jay-Z and others.  And you would

15   try to mimic what was going on.

16           And I think to a large degree, the industry itself, you

17   know, kind of really played to that.

18   Q    When you say to mimic what they're doing, what, what would

19   it take?  What would you have to put in your lyrics to make it?

20   A    Well, let me give you, the best way to answer would be from

21   the radio station standpoint.  There would be many a days that

22   groups would come to the station and we would tell them that

23   their lyrics weren't street enough.  You know, not me

24   particularly, but my bosses who had nothing to do with the

25   streets at all.  Like this isn't really what's happening in the

1    hood.  And so you have people who didn't live in the hood that

2    were telling people who were coming up often times from the hood

3    that their stuff wasn't hood enough.  So those folks went back

4    and came back with more hood tales.

5    Q    Meaning, meaning, what about in terms of violence or

6    sexually explicit lyrics?

7    A    All that sort of stuff became the currency that people,

8    which was going to be accepted.

9    Q    Is that what they meant by saying it's got to be more hood?

10   A    More hood, more grimy, more gritty.  In their mind more

11   realistic, you know, more street.  And that's what was selling.

12   Q    The shock value was important, then?

13   A    Um-hum.

14   Q    Okay.  Your Honor, I would ask permission to play a couple

15   of tracks as examples of what he's talking about.

16             THE COURT:  Go ahead.

17   Q    Okay.  You had selected a couple of songs that you thought

18   were examples of some of this, this type of music.  Do you have,

19   what would be the best example, do you think?

20   A    Well, for going up to that time period --

21   Q    And are you looking at your notes that you jotted down about

22   those?

23   A    Yes.  I think Notorious BIG's Ten Crack Commandments would

24   be one that would personify that.  That was a pretty popular

25   record.  It was one that got air play.  And the shocking thing

1    about it is that here's a guy that's basically talking about

2    rules of the crack game.  I can give you some other background,

3    because there was a conflict around that record, too.

4    Q    What was the conflict?

5    A    The conflict was that he sampled the voice of Chuck D from

6    Public Enemy, who was absolutely opposed to the direction of that

7    those lyrics.  He felt, you know, Chuck felt that artists who

8    were not going in that direction weren't getting a shine.  And

9    all of a sudden his lyrics, well, his voice is being used in the

10   sample of the song that was talking about, you know, crack sales,

11   which was being presented on commercial radio throughout the

12   country as literally a Top 40 record.

13   Q    Okay.

14          (Song playing.)

15          THE COURT:  Stop, please.  Do we have to hear all ten?

16   Or were you at the end?

17          MS. RHODES:  All ten?

18          THE WITNESS:  All the ten.

19          THE COURT:  Aren't you listening?

20   BY MS. RHODES:

21   Q    I was counting.  All right.  So this is, so what he's doing,

22   so what he's doing in that song is talking about the crack

23   business.  And what else would you say, is there another one of

24   those that you think is an example, too, that has, of the type of

25   lyrics that were, that basically were industry-wide?

1    A    I don't have them lined up in that particular thing because

2    I didn't know which direction we were going.  But by, you know,

3    by the time you get into 2000, I think 50 Cent would probably be

4    the ultimate personification and success story of that narrative.

5    You know, a guy who got shot nine times, who professes to be a

6    former drug dealer, who, you know, he's now at the top of the

7    heap, and not only at the top of the heap in terms of a rap

8    artist but also considered a keen executive, because he was

9    given, you know, an executive position with the label.

10         So you know, his, his narratives are pretty well known

11   because he's a pop culture icon now.

12   Q    Okay.  If you were, you know, on the street, trying to put

13   together some CD's, what would you, how would you go about

14   getting into the business?  How would you go about distributing

15   your music, that sort of thing?

16   A    Well, by the time you're getting into early 2000, you went

17   from being an artist who would bring a demo tape to a record

18   label and saying, Look, I'm a talented artist, listen to my

19   music.  The record label would usually invest some time and

20   energy into developing your career, giving you a particular

21   direction, and pushing you.  That was the traditional mode.

22         By the time you move into 2000, what the record labels

23   are looking for is how much noise, noise meaning buzz, are you

24   making in your particular area.  So from a radio standpoint, I

25   would frequently get phone calls from record labels, and they're

1    going, what's hot in your area?  What's hot in Oakland?  What's

2    hot in LA?  Once you say, well, it's this group and that group,

3    then they would go and check it out.  They would see a street

4    buzz on there.  Are they selling records?  Sometimes the record

5    sales --

6    Q    How would they even get to that point, though?  How would

7    the artist be getting to that point where they're creating a

8    buzz?

9    A    Well, some artists actually went and tried to start their

10   own labels and then would try to create as much buzz as they

11   possibly could because record sales by them wasn't going to be

12   the determining factor.  It was going to be, you know, we step

13   into your city and this is the people that we're hearing about.

14   And then the record labels would basically come along and provide

15   distribution and the necessary, the necessary resources to either

16   get them on radio, make sure that they were featured in record

17   stores, get them on video, and get them touring around the

18   country.

19   Q    Okay.  So getting on, so getting on the radio is key for a

20   group?

21   A    Well, that's when you got signed to label.  But for the

22   people that were on the, that were on the come up, getting on the

23   radio was pretty difficult because, you know, those, those areas

24   are often closed with very few slots and opportunities.

25   Q    Okay.

CONT'D DIRECT EXAMINATION OF DAVID COOK                    38

1    A    So yeah, if you did get on the radio, that really meant you

2    had a buzz and that was going to lead to, you know, you getting

3    signed.

4    Q    Then what about playing in clubs and sort of, I don't know

5    what the different --

6    A    Well, that would be part of the street buzz.  Are you heard

7    in the clubs?  You know.  Do you have what we call mix tapes

8    being sold?  So mix tapes are basically an artist taking, putting

9    out, like, basically a cassette or a CD of, you know, displaying

10   their talent but maybe using other people's music or sometimes

11   highlighting their own.  That would be, that was a pretty big

12   formula, especially after the success of 50 Cent.  But the main

13   thing --

14   Q    The mix tapes?

15   A    Right.  But the main thing for artists in that time period,

16   into the early 2000 was that you had to have a buzz.  And within

17   industry, the buzz was usually sex, violence, and controversy.

18   Controversy was a marketable tool, and to a certain degree still

19   is to this day.

20   Q    Did sometimes people trying to get distribution or get

21   attention create buzz, would they just sell their CD's on the

22   street or give them away?

23   A    Yeah.  I mean, you gave your CD's away because the more

24   people that talk about you, the better.  Some people would

25   obviously try to sell them.  But I think the main thing was to

1    get your material into as many hands of people as possible.  In

2    the Bay, Bay area, which kind of pioneered that whole aspect, you

3    know, selling records out the trunk of the car, the key

4    ingredient was going to taste makers, whoever was in a position

5    to chat up your material.

6    Q    What about, you're familiar with Kevin Lyles, right?  Can

7    you tell the jury who he is?

8    A    Kevin Lyles, well, he's a record executive.  He's from the

9    Baltimore area, or Maryland.  Was in 2000, was an executive at

10   Def Jam, used to be the person that would call our station and

11   talk to us about the records, you know, at least when I was

12   there.

13   Q    Okay.  So if you had a chance to get something, get some of

14   your music to him in Baltimore, that would be obviously a wise

15   move for somebody trying to get --

16   A    Anybody who was working at a record label in his position,

17   it would be, it would be a major step that you would want to

18   take.

19   Q    Okay.  Your Honor, I just have one more song, which is the

20   Track 11.  I would like you to listen to a track.  And this is

21   from, I think you've heard it before, from something called

22   Shakedown records.

23        THE COURT:  You need some help, Ms. Rhodes?

24        MS. RHODES:  No.  It just takes a while to load, for

25   some reason.

1          (CD playing.)

2    BY MS. RHODES:

3    Q    So what's your opinion in terms of commercial viability of

4    that, of that track?

5    A    Well, if you're talking about -- this came out what year?

6    Q    2002.

7    A    So 2002, that would have been probably typical of what you

8    would hear in mix tapes, you know.  The gun shooting, military

9    references.  You know, I'm a general, sergeants, those type of

10   things.  I mean, this is what 50 Cent made his career off of, you

11   know.  And so if you're an up and coming artist trying to get in

12   the industry, and the industry tends to be very slow and not as

13   adventurous as one would like to think.  They're always like,

14   well, we need somebody who sounds just like whoever is on top.

15   This would have been fitting the formula at that particular time

16   in terms of having that street buzz and, quote-unquote, "street

17   viability."

18   Q    Thank you.  I have no further questions, Your Honor.

19             CROSS EXAMINATION

20   BY MR. HANLON:

21   Q    Mr. Cook, good morning to you again, sir.

22   A    Good morning.

23   Q    Ms. Rhodes asked you a number of questions about individual

24   artists in the rap and hip-hop community.  And let me apologize

25   if I do not use those terms correctly.  I may well interchange

1    them.

2            But you were asked about a number of artists and how

3    they got into the business.  It is correct, Mr. Cook, that many

4    of the artists, including the people you testified about, have

5    sung and written about violence and drug trafficking and, in

6    fact, have been involved in violence and drug trafficking in

7    their backgrounds and sometimes even after they achieved some

8    success in the industry, is that right?

9    A    Well, trafficking, if you're talking about trafficking?

10   Q    Drug dealing, selling drugs.

11   A    There's definitely been artists who sold drugs.  Trafficking

12   is a whole other thing.  No.  That I don't know about.  And I'm

13   making a distinction between somebody who sells weed on the

14   corner and somebody who's moving keys, you know, which is what I

15   would consider trafficking.

16   Q    I understand.  Not necessarily legally, but I understand you

17   draw that distinction.  You mentioned 50 Cent, for example.  Very

18   successful figure in the music industry, is that right?

19   A    Yeah.

20   Q    But you also testified that he was shot nine times because

21   he was living a street life before he made some success, is that

22   right?

23   A    Right.

24   Q    And he also has admitted and talked about and sung about

25   being a crack dealer, and he was convicted of crack distribution

1    in 1994, is that right?

2    A    From what I understand, yes.

3    Q    In interviews of 50 Cent, he has talked very candidly about

4    the fact that he took one his first paychecks from the music

5    industry and actually put it into buying crack to fuel his

6    distribution activities, is that right?

7    A    I don't know.  But if that's what he said, yeah.

8    Q    Perfectly fair enough.  If this were a case about a science

9    fiction convention and violence, I would be talking to you about

10   sci-fi and violence.  But we have to talk about rap and hip-hop.

11   So again, I know you've worked in the industry most of your life.

12   So I hope you won't take offense by any of my questions, sir.

13        We can both agree, certainly, that not everyone

14   involved in rap and the hip-hop community has anything to do with

15   drugs and violence, is that right?

16   A    I would say the overwhelming majority, including the ones

17   that profess it in their songs.

18   Q    Certainly.  But as to some who have been involved, you

19   mentioned Tupac Shakur, and then Notorious BIG.  They had a feud

20   and both of them ended up getting shot.  Unclear as to whether it

21   was related to the feud.  People argue about that.  But both of

22   these important figures ended up getting shot even after they

23   achieved success, is that right?

24   A    Right.

25   Q    And there are some other individuals in the industry,

1    including successful individuals, who have a background of

2    violence.  C-Murder is a rapper who's had some success and also

3    --

4    A    Beg your pardon?

5    Q    C-Murder.

6    A    Oh, yeah.  Right.  C-Murder, um-hum.

7    Q    Bear with me just a moment, Mr. Cook.  Thank you, Ms.

8    Rhodes.  A rapper named Eazy-E also came from a background of

9    drugs and some violence that was real, and he's talked about it

10   and written about it.  Is that fair to say?

11   A    Well, actually what Eazy, Eazy's a little different.  First,

12   Eazy definitely came from that background but you have to put it

13   in historical context of what was going on at that time.  The key

14   to Eazy is that he was a gang member.  Everybody knew that he

15   sold drugs coming into the game.  But the big thing about Eazy

16   was his gang affiliation, which he never, ever mentioned.  People

17   kind of suspected that he was a Crip, but they never knew.

18        And I knew Eazy.  So he was always careful not to

19   really mention that he was a member of the Kelly Park Crips.  I

20   think it was some other artist that eventually kind of disposed

21   (sic) that.

22        But in terms of his gang affiliation, that was

23   something at that time in the '80s that, you know, you wasn't

24   going to be saying exactly who your set was.

25   Q    Sure.  But it's not, the point I want to make is that it's

CROSS EXAMINATION OF DAVID COOK BY HANLON                    44

1    not fiction.  This is an individual who actually in real life has

2    some of this in his background?

3    A    Yeah.  But the songs that he wrote were fiction.

4    Q    Understood.  How about the game?  He's written about things

5    in his songs that touch on the subjects we've talked about and

6    also has a gang background and affiliation with Crips and other

7    Los Angeles based gangs?

8    A    Right.  Yeah.  A lot of what gang, game talks about in terms

9    of this affiliation, that would be accurate.  And that would be a

10   part of the one-upmanship coming since he comes in around 2004.

11   Q    And a rapper named TI, an Atlanta-based rapper arrested I

12   think last year --

13   A    Right.

14   Q    -- on federal firearms charges, is that correct?

15   A    Right.

16   Q    So it's not all fiction.  Some of it is, but not all?

17   A    But TI is not rapping about, he's not rapping about his, his

18   gun running or the thing that he got caught with, at least in the

19   songs that I've known him to do.

20   Q    You've been critical in some of your own writings, Mr. Cook,

21   about the celebration and the glorification of violence.  You

22   agree that this is something that is not necessarily a good thing

23   for hip-hop or for rap, is that correct?

24   A    Yes.

25   Q    You've commented and you've written, in fact, that members

1    of the hip-hop community have gotten -- and forgive the term, I'm

2    not trying to be funny -- but they've gotten a bad rap because of

3    the association with violence and drug trafficking that's often

4    associated with the culture and with the genre; is that fair to

5    say?

6    A    Yeah.  To clarify so that we're on the same page.  My real

7    angst, with the industry of people who present it more so than

8    the artist.  Me being on radio and working behind the scenes, I

9    found it to be disturbing that you have 40 and 50-year-old men

10   and women who are in positions to talk to millions of people

11   every day, who have before them choices to make in terms of what

12   they present.  And they decide that, well, as I explained before,

13   we're sending an artist back to come back with something more

14   street versus putting a song that I think is more, that is less

15   glorifying of a lifestyle that is all too common in our

16   communities.

17        So a lot of my writings and angst have been directed

18   against that.

19   Q    The industry?

20   A    Yeah.

21   Q    And there are a couple of terms that come up sometimes that

22   not just industry people use, but also artists themselves.  Terms

23   like street cred and studio gangster, have you heard those terms?

24   A    Yes.

25   Q    These are terms that artists sometimes use, is that right?

1    A    Artists sometimes use them but they were originally derived

2    by writers.  My peers in the industry who didn't come from the

3    hood in particular would be the first ones to start questioning

4    people's street cred.  I go back to the radio station as being a

5    primary force because that's the one that influenced most of the

6    stations around the country.

7            We had a term about being true to the streets.  And the

8    argument that I would have behind the scenes --

9    Q    I understand where you're going, Mr. Cook.  If it's all

10   right, without getting into the history of the term, artists in

11   2002 and today use terms like "street credibility" and "studio

12   gangster", is that right?

13   A    Yes.  Absolutely.

14   Q    And in fact, I don't know if you had an opportunity to

15   review all of various lyrics.  There's a couple of hundred pages

16   of them in this case.  Did you have a chance to do that?

17   A    I saw a lot of them.  I don't remember them verbatim.

18   Q    Do you know, and forgive me the term, but there's a term

19   industry N word, if you know what I'm getting at, that's

20   incorporated in one of the songs in this case.  Do you know what

21   I mean by -- I don't want to use the word.  Industry N-I-G-G-A.

22   Do you understand what I'm getting at?

23   A    Um-hum.

24   Q    That would be a reference, something comparable certainly

25   sounds like, to a critique of a studio gangster; would that be

1    fair to say?

2    A     Not necessarily.  I mean, depending on the context in which

3    he used the word, you might just be referring to somebody who

4    works in the industry.

5    Q     How about comments like "spitting truth" and things like

6    that or talking about truth in songs, things like that?  Is that

7    something you take into consideration in reviewing lyrics or in

8    understanding what an artist is trying to say?

9    A     I think almost every artist says they're spitting truth.

10   Q     One of the things that you took into consideration in your

11   understanding of these lyrics and other lyrics, Mr. Cook, is that

12   occasionally rap artists will make references to Noriega, which

13   is a former world leader, or fictional characters from movies and

14   things like that.  Things that everyone has heard of, is that

15   correct?

16   A     Um-hum.

17   Q     That's a yes, sir?

18   A     Yes.

19   Q     And that's a fairly obvious example in those instances of

20   somebody who's puffing up a little bit because none of us know

21   General Noriega, is that fair to say?

22   A     Right.

23   Q     Some of the lyrics you saw, however, including, I think,

24   part of what was played here don't make references to Noriega,

25   but they make references to Bo, Slo, TM.  Correct?

1    A    Okay.  Yes.

2    Q    Do you have any understanding from your work with the

3    defense in this case about whether Bo, Slo and TM are world

4    leaders or real people who knew the author of these lyrics?

5    A    I don't know who any of them are.

6    Q    So you don't have any knowledge about that?

7    A    Right.

8    Q    Let me ask you.  I'm going to ask you about some of the

9    individual lyrics in a minute.  But I would like to ask you about

10   one thing relative to some of the culture and some of the

11   background that we've been discussing here.  You have written

12   extensively about rap music and about hip-hop.  You've been very

13   critical of what you perceive as a law enforcement targeting and

14   misunderstanding of the hip-hop and rap culture music industry.

15   A    Right.

16   Q    Mr. Cook, out of curiosity, do you think that the

17   prosecution in this case is suffering from a similar lack of

18   understanding?

19   A    I don't know all the things that you're doing in the case so

20   I can't really make that judgment.  But if, you know, I'm just

21   answering your questions at this point.

22   Q    Absolutely.  That's perfectly fair.  Thank you.  But you

23   have written extensively about what you think is law enforcement

24   in general's over-surveillance and over-attention and unfair

25   treatment of rap and hip-hop, is that right?

CROSS EXAMINATION OF DAVID COOK BY HANLON                    49

1    A    Well, I've had direct experience with that.  And if I can

2    give you an example to underscore where I'm coming from on that.

3    Your talking --

4    Q    Well, I'm really just interesting in your writing at this

5    point, if that's okay.

6    A    Beg your pardon?

7    Q    I'm just interested in your writings at this point.

8    A    Well, I mean my writings, my writing would be based on that.

9    So where I'm coming from on that is that I've, I've personally

10   experienced, in terms of my place of employment, police coming to

11   the table and being able to dictate what sort of groups can come

12   to town, play in a particular arena, or even us as a radio

13   station or individuals at a station, what sort of visibility

14   we're allowed to have based upon their, quote-unquote, "expertise

15   as law enforcement."

16          So groups that were pretty harmless, like Tribe Called

17   Quest, I've seen law enforcement deem them as gangsta rappers, or

18   somebody like E-40, gang affiliated, or even Public Enemy, be

19   considered gangsta rappers.  And the end result would be those

20   groups not being allowed to perform and us as a station or us as

21   promoters not being allowed to really do things with them.

22          It also results in insurance companies looking and

23   saying, well, if the police feel that this group is dangerous,

24   and often times it was based upon lyrics and things that I felt

25   was overreaching, then you might pay a higher insurance premium

1    just to have them come to town.

2             So that's where my writings and critique often came.

3    Q    And you think that's all unfair, is that correct?

4    A    From my experience, a lot of it was, yes.

5    Q    Have you ever referred to the New York Police Department as

6    dipshits --

7    A    Yes.

8    Q    -- in light of their view of rap music?

9    A    No.  It wasn't based around that.  It was, I referred to

10   them as dipshits for shooting Sean Bell 50 times and getting off.

11   I referred to them as dipshits for Amadou Diallo and numerous

12   other police shootings that I felt were unwarranted and that they

13   got off.  So I've referred to them specifically for that reason,

14   not because of the police task force that they had.

15   Q    35,000 police officers in New York, and you refer to the

16   department as dipshits?

17   A    I referred to, yeah, the institution.

18   Q    Let me ask you about something else.  Do you agree, sir,

19   that the Stop Snitching movement has created an atmosphere of

20   fear among rap artists, legitimate rap artists?

21             MS. RHODES:  Objection, Your Honor.

22             THE COURT:  Overruled.  You may answer.

23   A    Okay.  Repeat that.  Created fear among rap artists?

24   Q    Do you believe that the Stop Snitching movement, the ethos,

25   has created an atmosphere of fear among rap artists?

1    A    Yeah.  I think there's a fear, definitely.

2    Q    Do you believe that rap artists have experienced fear of

3    reprisals if they should provide information from people in the

4    industry who have the whistle blown on them?

5    A    Yes.

6    Q    Do you believe that there have been harsh videos floating

7    around the internet, and many tales within the industry, within

8    the community, detailing the harsh punishment laid out for people

9    who are perceived as snitches?

10   A    Yeah.  I've seen a few videos like that.

11   Q    And this has contributed to the atmosphere of fear and fear

12   of reprisals, is that fair to say?

13   A    Yes.

14   Q    And this includes T-shirts and videos and numerous rap songs

15   that celebrate this ethos, is that fair to say?

16   A    Yes.

17   Q    Let me ask you about some of the lyrics in this case, and

18   you heard part of it.  As part of your preparation in this case,

19   have you had the opportunity to talk to anyone involved in the

20   production of this music -- the producer, the writer, any of the

21   artists?

22   A    No.

23   Q    So just basically the words themselves, and you've consulted

24   with the defense?

25   A    Yeah.

CROSS EXAMINATION OF DAVID COOK BY HANLON                    52

1   Q    You've indicated that you wouldn't know whether or not Slo,

2   Bo, or TM are real people, is that correct?  That's just not

3   something --

4   A    If I was just looking at the lyrics, yeah.

5   Q    Do you know one way or the other whether they're real

6   people?

7   A    Beg your pardon?

8   Q    Do you know one way or the other whether they're real

9   people?

10  A    I mean I know.  I know because I was told.  If I just looked

11  at the lyrics, I would probably have come to a conclusion that if

12  I didn't know them, that they were probably just, you know,

13  neighborhood legends or people that the rapper knew about.

14  Q    Let me ask you about a couple of lyrics.  As a matter of

15  fact, this comes from a segment of Track 11, which you just read.

16  I'm going to read them, if it's all right to the Court.  And Mr.

17  Cook, if you need to see the transcript, I'm perfectly happy to

18  bring it to you.

19       That's why Bo and Weaze -- let me stop.  And I like to

20  clap rodents.  That's why Bo and Weaze on lock now and every day

21  on lock down, niggas getting shot down for running their mouth

22  clown.  Were you able to follow that?

23  A    Um-hum.

24  Q    That's a yes, sir?

25  A    Yes.

1    Q    Bo and Weaze, again, aside from what you've been told by the

2    defense, you wouldn't have any way of knowing whether or not

3    that's a reference to anything real?

4    A    Right.

5    Q    And as far as clapping rodents.

6    A    I mean, rodents is, you know, a rat.  Clapping means, is a

7    metaphor for shooting.

8    Q    Shooting as in a gun or shooting as --

9    A    Shooting as in a gun.

10   Q    Clapping rodents would be shooting rats, shooting snitches?

11   A    Right.

12   Q    Is this the kind of music that, in your opinion, would

13   contribute to the atmosphere of fear that we talked about a few

14   minutes ago?

15   A    Yeah, you could make that assessment.

16   Q    And the language "niggas getting shot down for running their

17   mouth clown", same question.

18   A    Same thing.

19   Q    Is this the same kind of thing you've written about,

20   providing an atmosphere of fear?  You never get close enough to

21   get Bo head hit.  Again, I'm reading a part of Track 11, which I

22   think you had an opportunity to hear a few minutes ago.  Again,

23   whether or not Bo is a real person or not.  Not a reference to

24   Noriega or anything like that.  But whether or not Bo is a real

25   person, aside from talking to the defense, you wouldn't know one

1    way or the other?

2    A    Right.

3    Q    But we can agree that Bo does not appear to be a world

4    figure or a character from a major movie like The Godfather?

5    A    Right.

6    Q    You mentioned that this is the kind of thing that comes up

7    in music all the time.  But I'll read it to you and ask you about

8    it.  In Track 11.  To you it might be entertainment but I'm

9    speaking the truth, it's a must that we ride, death before

10   dishonor, never talk to homicide.  And this may be part of Track

11   11 that you did not hear.  I'm not sure if the whole thing was

12   played.  Did you catch what I just read to you?

13   A    Yes.

14   Q    Again, it might be entertainment.  You're saying that comes

15   up in music all the time, doesn't necessarily mean anything, is

16   that correct?

17   A    Yeah, it come up a lot.

18   Q    How about "death before dishonor?"  Let me ask you about

19   this.  Death before dishonor, never talk to homicide.  Is this

20   something else where we see a reference to this atmosphere of

21   fear here?

22   A    Yes.

23   Q    How about tattoos that people might have, a tattoo of a

24   loyalty to people, to family, to friends, before dishonor?  Is

25   this the language, like in the rap that we sometimes see in a

Case 1:04-cr-00029-RDB    Document 697    Filed 06/19/09    Page 55 of 299

1    community?

2    A    I mean, you hear that a lot.

3    Q    And in some contexts, that can mean never talk to homicide,

4    never talk to the police, depending on the individual, is that

5    fair to say?

6    A    Right.

7         MS. RHODES:  Your Honor, I would object to this line as

8    not his expertise.

9         THE COURT:  The objection's overruled.

10   Q    You were asked about, and again, I'm not sure if this

11   portion of Track 11 was played, Mr. Cook, but you were asked

12   about, and again, on the topic of real versus fiction, you were

13   asked about Kevin Lyles at Def Jam records.  Kevin Lyles is a

14   real person, is that correct?

15   A    Yes.

16   Q    One reference in Track 11.  Sunday night at Lyles's party,

17   when it all went down, I wasn't there, but if I was, it would

18   have been more clowns.  Sunday night at Lyles's party.  Any way

19   for you to know from what I just read to you whether that's a

20   reference to Kevin Lyles or someone else?

21   A    No.

22   Q    Would you have any way of knowing whether there was a party

23   Sunday night, whether or not Lyles was there?

24   A    I wouldn't have known about Sunday night.  But Lyles is, him

25   being mentioned wouldn't have been unusual in rap.  You know, the

1    employees of Def Jam, Lyor Cohen, Kevin Lyles, Russell Simmons,

2    are frequently referenced in songs.  So if I saw Lyles's name,

3    that would have been pretty typical of a lot of artists because

4    they're often, you know, it wouldn't be unusual because they have

5    that sort of status in the community, in the industry.

6    Q    This is a name that comes up once in a while?

7    A    Yeah.

8    Q    And rap artists might be inclined to try to suggest a

9    relationship between them and Kevin Lyles when it wasn't really

10   there?

11   A    Sometimes it just makes a fancy rhyme or it just is a

12   referencing point that people can go, okay, I know what you're

13   talking about.

14   Q    Absolutely.  Sunday night at Lyles party when it all went

15   down, I wasn't there but if I was it would have been more clowns.

16   Here we have an artist admitting he was not there, though.  Is

17   that fair to say based on what I read?

18   A    Yes.

19   Q    And again, do you have any way of knowing whether or not

20   there was a party for Kevin Lyles and whether or not the producer

21   of these songs who had worked with the author on them got into a

22   knife fight during that party?

23   A    Based upon what you read, no, I wouldn't know one way or the

24   other.

25   Q    Part of your testimony, part of the approach you take to

1    this music, as we've talked about, sir, again, going back to the

2    referencing to Noriega, sometimes you just know it's fake because

3    it's obviously fake, correct?

4    A    Well, not necessarily.  I think, obviously, I mean, when you

5    talk about Noriega, I think very few artists are going to have

6    that sort of connection with him.  But i think a lot of times,

7    depending on how it's being used, how his name is being used.  Is

8    it being used as a metaphor?  Is it being used as just a

9    description of an action, etc., etc.?  You have to see the song

10   and hear it in the context.  But from my experience, most of the

11   time all of it is kind of not true.

12   Q    How about a reference to putting the Ruger to your nozzle,

13   we want all your shit.  And for the record, and for the benefit

14   of the defense, Your Honor, I'm reading from the Pure Shit, Track

15   8, Page 3.  This is not something that was played for you, sir.

16   If you want to see the transcript, that's fine.

17          Put the Ruger to your nozzle, we want all your shit.

18   You wouldn't know one way or the other whether this is fake,

19   real?  It's words on a paper, is that right?

20   A    I would assume that it's just words.

21   Q    To understand whether or not it was real it would be

22   necessary to examine whether or not somebody got shot with a

23   Ruger, whether or not they had things taken, like drug or money,

24   before we could just assume something was truthful from the

25   songs, is that right?

1    A    Well, it would be that.  But it would also be that,

2    depending on the context, again, my experience has been that when

3    people are describing a shooting in which they commit it in the

4    song, that that would be basically, we call it dry snitching.

5    You don't snitch on yourself and you don't snitch on your

6    peoples.  So most of the time I would see that as being fake.

7         Now, if you're describing, as 50 Cent, for example,

8    that he got shot nine times, you get in some sort of funny way

9    street cred because you actually survived a shooting.  So him

10   talking about being shot nine times, Tupac being shot five times,

11   those sorts of things would be normal.

12        But for a rap artist, you know, to actually describe a

13   real shooting that they've been involved in, I just haven't

14   really come across that in my experience with the artists that

15   I've interviewed and the records that I've, you know, listened

16   to.  It just would be kind of, it would be kind of out there to

17   really, you know, put yourself in a situation where somebody

18   could look at the lyrics and say, You really did this?

19   Q    Have to be kind of looney, kind of crazy to do something

20   like that?

21   A    You're snitching on yourself, yeah.

22   Q    Snitching on yourself.  And this is a community that doesn't

23   snitch, right, at least in this context?  It's a culture that

24   doesn't value that, right?

25   A    Right.

1    Q    How about if a rap artist talks about blowing someone's

2    brains all over a car and the bitch next to him and his

3    fingerprints come back to the crime scene.  Does that change your

4    analysis?

5    A    I mean, if they did that, then, I mean, you're the district

6    attorney or whatever.  So you would know better.  But it just

7    would be not my experience to see people rapping about something

8    that they would actually do on that level.

9    Q    One thing that does come up again is contributing to the

10    atmosphere of fear that we've talked about today, is that

11    correct?

12    A    Beg your pardon?

13    Q    Music that contributes to the atmosphere of fear that we've

14    been talking about today, is that correct?

15    A    Well, am I able to expound upon the question?  Because the

16    way you're asking it, it's a yes or no answer.  And I can give

17    you yes but I think it, it kind of mischaracterizes where I'm

18    coming from on that.

19    Q    You've written articles in which you've talked about the

20    Stop Snitching movement contributing to the atmosphere of fear

21    and creating an atmosphere of fear of reprisals among people who

22    might provide information to the police about criminal cases --

23    A    No, I haven't written articles like that.  If you are

24    talking about articles that I've written about Stop Snitching, to

25    be very, very clear about it, I'm coming from the standpoint, and

1    I've been involved with a number of meetings in cases where I

2    think there's been the Stop Snitching movement, as I've always

3    understood it, has always been a situation where you get, you get

4    not an artist, but somebody in the community who has done very

5    little in terms of -- how should I best put this?  I'm trying to

6    just formulate my words because I'm very clear.  I don't really

7    get caught up in, to the Stop Snitching movement in support or

8    against what people in the neighborhoods say.  But I'm more

9    concerned about the type of pressure that's often put on people

10   in the community to dime out on folks in exchange for something

11   that puts them in a Catch 22.  For example --

12   Q    Mr. Cook, and I apologize, sir.  Really doesn't answer my

13   question.  You've referred to the Stop Snitching movement as

14   something which creates an atmosphere of fear --

15   A    Not in articles, I haven't.  Not in any articles.

16          THE COURT:  You have to let him finish asking the

17   question, Mr. Cook.

18   A    Okay.

19   Q    You didn't refer to Stop Snitching in a July 5th, 2007

20   article which you wrote in a column for the San Jose Mercury News

21   as creating an atmosphere of fear?

22   A    No.

23   Q    The Stop Snitching campaign creating an atmosphere of fear?

24   A    Yes, I did that, but not in the context in which you're

25   asking the question.  So if you're talking about that column,

CROSS EXAMINATION OF DAVID COOK BY HANLON                61

1    then that column pretty much explains where I'm coming from.

2    Q    The column goes on to explain that Stop Snitching is

3    supposed to be about just discouraging informants from talking to

4    the police?

5    A    Right.

6    Q    But it's resulted in creating an overall atmosphere of fear

7    that discourages everyone from talking to the police.

8    A    If I'm correct about that column, that's not how I wrote

9    that.

10   Q    Very well, sir.  This article that -- I'm sorry, not

11   article -- but lyrics that I put up on the screen, this is

12   Government's Exhibit SE-45-12.  Do you see it before you?

13   A    Yes.

14   Q    I blast lungs but really aim for lips and that's for them

15   niggas who be talking shit?

16   A    Um-hum.

17   Q    Doesn't say anything about informants there.  Just talks

18   about blasting lungs but really aiming for lips, is that correct?

19   A    Yes.

20   Q    They're all references to snitch elsewhere in the body of

21   the article, is that correct?

22   A    Yes.

23   Q    And in all of the opinions you rendered today, sir, it's

24   based on your experience and the writings you've done but not

25   based on actually talking to anyone involved in the production of

1    any of these lyrics that we've been discussing here today, right?

2    A    You talking about in this case here?

3    Q    This case.

4    A    No.  Right, yes.

5    Q    Elsewhere in your writings you would routinely interview

6    people in the industry, talk to the producers, talk to the

7    artists.

8    A    Right.

9    Q    It would be common sense you would want to do that for your

10   testimony, or for your writings and your commentary, is that

11   right?

12   A    Depends.  It all depends on what I'm writing and how I'm

13   writing it.

14   Q    But you haven't done any of that in this case.  You've just

15   look at lyrics and testified about the history of rap and

16   hip-hop?

17   A    Right.

18         MR. HANLON:  Thank you, Mr. Cook, appreciate it.  Thank

19   you, Your Honor.

20         CROSS EXAMINATION

21   BY MR. FLANNERY:

22   Q    Good morning, Mr. Cook.

23   A    Good morning.

24   Q    Mr. Cook, going back briefly to what Mr. Hanlon was speaking

25   to you about, the avenue of snitching or talking to the police.

1    It's your understanding that many artists, many popular artists

2    such as, particular, Master P, often talk about the concept of

3    snitching?

4    A    Yes.

5    Q    As you testified earlier, it's fair to say that the record

6    labels in general, the music industry, the ones that are

7    generally pushing or promoting the particular topics that artists

8    coming up from behind are rapping about?

9    A    To a large degree, yes.

10   Q    Okay.  And you would agree that in particular rap songs,

11   that a particular artist may have a reference to a real

12   individual, maybe it's an individual that they know, maybe it's a

13   friend of theirs, that doesn't somehow in your opinion make their

14   entire song or all of their songs somehow now completely

15   truthful?

16           MR. HANLON:  Objection to leading, Your Honor.

17           THE COURT:  Overruled.  You may answer.

18   A    I would agree.

19   Q    Because you testified that the overwhelming majority of rap

20   music, in your opinion, your professional opinion, is essentially

21   boastful, artistic music?

22   A    Yes.

23   Q    And in fact, you may even find references to specific types

24   of weapons in rap songs?

25   A    Yes.

1    Q    In a lot of rap songs?

2    A    A good many.

3    Q    Particular models of weapons?

4    A    Yes.

5    Q    Okay.  Now, Mr. Cook, you are familiar with the artist

6    Juvenile?

7    A    Yes.

8    Q    And you are also familiar with the artist Lil Wayne?

9    A    Yes.

10   Q    And you understand both those artists to be from the New

11   Orleans area?

12   A    Yes.

13   Q    Louisiana.  And in that particular area, you are familiar

14   with a term that is pronounced Wodey?

15   A    Right.

16   Q    Sometimes pronounced Woody?

17   A    Right.

18   Q    And it's spelled in different fashions in different parts of

19   the country and in different songs?

20   A    Yes.

21   Q    And one particular spelling that you know of is W-H-O-O-D-I?

22   A    Yes.

23   Q    Would look phonetically as if it's pronounced Woody?

24   A    Yes.

25   Q    But it actually comes under your understanding and how

1    Juvenile and Lil Wayne being from New Orleans, it comes out of a

2    term that you also see often times, which is ward, ward?

3    A    Yeah.

4    Q    Because they come from a particular --

5    A    With that accent, yeah.

6    Q    Okay.  You're familiar, in fact, that there is a cartoon

7    entitled, Hey, Whoodi?

8    A    Yes.

9    Q    Showing you what's been marked --

10             MR. HANLON:  Objection, Your Honor.

11             THE COURT:  Sustained.

12             MR. FLANNERY:  Your Honor, I would proffer that the

13   expert is familiar with the particular cartoon.

14             THE COURT:  The objection's sustained.

15   BY MR. FLANNERY:

16   Q    Mr. Cook, you heard Track 11 that was played for you today?

17   A    Yes.

18   Q    Part of it was played for you today?

19   A    Right.

20   Q    And you heard in that song references to particular

21   generals, soldiers?

22   A    Yes.

23   Q    Okay.  That's very common in the rap industry, for a

24   particular record label to refer to particular individuals

25   amongst ranks in that sort?

1    A    Record labels, crews.  I mean, it spans the gauntlet.  I

2    mean, Public Enemy might have the S1W's.  And you might have a

3    mortal technique and you might have -- pretty much, most, most of

4    the labels that I know have that sort of reference, military

5    reference.

6    Q    And again, as we discussed, it's the labels, it's the

7    industry that's driving what sells?

8    A    Yes.

9    Q    What's popular is what sells?

10   A    Yes.

11   Q    That's how you make money in the rap business?

12   A    Yes.

13   Q    By giving the people what they want, essentially?

14   A    Basically.

15   Q    Mr. Cook, going back for a second to the term Wodey.  Would

16   you please describe for the ladies and gentlemen of the jury what

17   Wodey means to you?

18   A    Well, to me it's always meant friend or homey or somebody

19   that you know.  You know, that's my wodey over there.  So I've

20   just always seen it in terms of that.

21   Q    And it's actually, it's a popular term that's interchanged,

22   then, with friend or homey that you'll see in rap songs?

23   A    Yes.

24   Q    And is it your understanding in the particular cartoon uses

25   it in the same fashion, that the one individual is a friend of

1    the other?

2    A    Yes.

3    Q    You knew of that cartoon, you were aware of it spelled

4    W-H-O-O-D-I, you're aware of it from, in your profession, your

5    expertise --

6    A    Yes.

7    Q    -- in being associated with black culture, you came to be

8    aware of that cartoon?

9    A    Yes.

10   Q    And you're certainly familiar with the term Whoodi before?

11   A    Yes.

12   Q    Okay.  If I was to ask you to bring me back information

13   regarding Whoodi, that would have been very easy for you to do,

14   because you would have been able to find a number of different

15   lyrics and you would have been able to find background

16   information regarding that term?

17   A    I mean, it's commonly used in a lot of songs, yes.

18   Q    And that cartoon, which is easy to find?

19   A    Yeah.  I think they have a web site or something like that.

20   Q    You're aware that they actually do have a web site?

21   A    Yes.

22   Q    It's actually spelled in the same as W-H-O-O-D-I dot-com?

23   A    Right.

24   Q    Mr. Cook, the label, in a certain sense, in the rap

25   industry, has become more popular than even the artist?

1    A    Yeah.  Going back to what I was talking about before, in

2    terms of evolution and what, and kind of what people need to do

3    if they want to be signed and get into the industry, it used to

4    be that you had the artist who went up and had his tape and he

5    would try to be put on as an artist.  And then looking at the

6    success of people like P. Diddy, Jay-Z, Master P and others, the

7    people from Death Row, it became more profitable to be signed as

8    a label, where you got distribution from these major record

9    companies.  So part of the marketing strategy would be to blow up

10   your label.

11         And if you look on the back of rap albums and, and you

12   look at the type of marketing that is taking place over the past

13   10, 15 years, you see that there's been an emphasis on the entire

14   label or the executive producer behind that label more so than

15   just the artist.

16         So you take an artist like Game.  He's pushing Wall

17   Street Records.  You take an artist like Jay-Z, you're talking

18   about Rockefeller.  Some of that is based upon the success of

19   seeing Def Jam, seeing P. Diddy -- well, I mentioned that

20   already.  But that's been kind of like an approach that many

21   people have taken to really put forth the umbrella more so than

22   just the individual parts underneath it.

23   Q    And that's why it's common on rap songs to see shout outs,

24   so to speak, to the particular label that they're associated

25   with?

Case 1:04-cr-00029-RDB    Document 697    Filed 06/19/09    Page 69 of 299

1    A    Yes, definitely.  That's a marketing thing.

2    Q    Goes back to what you said, is that the label, these labels,

3    if you want to follow their business model, the labels are the

4    ones that have the final say on what goes into these songs?

5    A    Yes.

6    Q    And as you expressed in some of your professional opinions,

7    some of your writings, that you've been upset in some of the

8    trends that you've seen towards labels who have an ability to

9    make a choice to stop this, are promoting these types of violent

10   lyrics?

11   A    Well, it depends on where you're looking at.  Specifically,

12   what I'm focusing on in the major labels is maybe four now, and

13   they're the ones that control 90% of the distribution, get 90% of

14   the air play and video play, and what have you.  And so those

15   four major labels, Warner Brothers, Sony, Universal, and the

16   fourth one I'll remember in a second, BMG, I believe, Sony BMG,

17   would have you -- Atlantic -- they all set the tone in terms of

18   what it is that they're looking for.  Even if it's coming from an

19   independent label is what I would refer to.  You know, these

20   boutique type of operations that are sprouting up all over.

21        So you may get signed but you're going to get signed

22   and at the end of the day they're going to be looking to you to

23   reach certain thresholds, either content-wise or the type of buzz

24   you can generate.

25   Q    And as Mr. Hanlon showed you some of the lyrics in this

1    case, as Ms. Rhodes showed you some, as you listened to some of

2    lyrics that you had pointed out, you will see particular

3    references, as Mr. Hanlon showed you, particular weapons, you

4    will also see references to particular types of acts like

5    shooting people in the head?

6    A    Yes.

7    Q    Or shooting people in the dome or head busters.  You'll hear

8    artists refer to them like that.

9    A    Yes.

10   Q    Because that's what they're trying, they're trying to

11   satisfy that demand?

12   A    Yes.

13   Q    You would agree with that?  Now, even though rap artists in,

14   that you've been familiar with, it's not uncommon for them to

15   actually specifically refer to themselves as real or certified or

16   something to that effect, trying to essentially bolster the

17   notion that they, what they're talking about is, in fact, the

18   truth?

19   A    Yeah.  I mean, there's a phrase that comes out of hip-hop

20   called keeping it real.  And the keeping it real ethos is

21   something that, you know, it's, if you're not espousing to that

22   in terms of, you know, your presentation and, you know, you lose

23   credibility.  So of course there's no artist that's going to sit

24   up there and say these are fictional accounts that I'm talking

25   about, even, even when most of the time that they are.

1    Q    Okay.  Are you familiar with competitions in certain cities

2    that go on amongst rap groups, like at local radio stations,

3    sometimes they'll have actually open mike or competition type

4    things where people can try out?

5    A    Yes.

6    Q    And that you may get a particular song at some point played

7    on the radio?

8    A    Yes.

9    Q    Okay.  But you would agree that, generally, that's not the

10   type of thing in and of itself that's going to creating buzz on

11   some national scene?

12   A    No.  That doesn't lead to the thing that people are looking

13   for, the success that they're looking for.

14   Q    Okay.  Court's indulgence for one second, please.

15        THE COURT:  Yes.

16   Q    Thank you, sir.  No further questions.

17        REDIRECT EXAMINATION

18   BY MS. RHODES:

19   Q    Is it common in rap lyrics or hip-hop music to hear a

20   reference to Tims or Timberland boots?

21   A    Yes.

22   Q    Okay.

23   A    I mean, there's an artist named Timberland.  Pretty popular

24   artist.

25   Q    Thank you.

1           RECROSS EXAMINATION

2    BY MR. HANLON:

3    Q    Just a couple questions, Your Honor.  Mr. Cook, just a very

4    couple of questions.  I don't think I'll be very long.  You were

5    asked about a cartoon character named Woody?

6    A    Um-hum.

7    Q    Does Woody carry a .45 caliber handgun?

8    A    Well, I'm not, I don't read the cartoon so I don't know what

9    he does in the, but the ones that I've seen he doesn't.

10   Q    You've never seen him with a .45 caliber handgun?

11   A    Not in the cartoons that I've seen.

12   Q    As far as you know from the cartoons you've seen, you know

13   of its existence and the web site, but I understand you haven't

14   necessarily seen all the cartoons.  Does he work as a hit man?

15   A    I don't know that, either.

16   Q    Are there any cartoons in which Woody gets shot in the back

17   of the head next to his girlfriend?

18   A    Not that I know of.

19   Q    Are there any cartoons in which anybody introduces Woody to

20   the afterlife?

21   A    Not that I know of.

22   Q    You were asked about how some of these terms are used and

23   doesn't necessarily mean anything.  Even if an artist talks about

24   telling the truth, that doesn't necessarily mean they're telling

25   the truth, correct?

1   A    Yes.

2   Q    I just want to make sure I understand.  If an artist writes

3   about a four-fifth, that can mean a reference, fake or real, to a

4   .45 caliber handgun?

5   A    Yes, it can.

6   Q    Can we agree on that?  Not if it doesn't affect your opinion

7   if it turns out a .45 caliber handgun is found in the furnace

8   room of his house, is that correct?

9   A    I beg your pardon?

10  Q    If an artist writes about a four-fifth, .45 caliber handgun,

11  and a .45 caliber handgun's actually found in the furnace closet

12  of his kitchen, that doesn't change your opinion about the

13  meaning --

14  A    In terms of, no, because most of the time it's not really

15  the case.  And also, again, its context in which it's used.

16  Q    If an artist writes about introducing Whoodi to the

17  afterlife and then says words to the effect of, Whoodi, I'm

18  reaching out to you -- in fact, I do want to get the language

19  right.  Talks about introducing you fucks to the afterlife,

20  Whoodi, I know you feel me to the four-fifth.  W-H-O-O-D-I you

21  think is a reference to a cartoon character?

22  A    No.

23  Q    You don't know one way or the other?

24  A    Well, in the context of that first of all, I wouldn't think

25  of the cartoon character.  When I'm hearing that, I would think

Case 1:04-cr-00029-RDB   Document 697   Filed 06/19/09   Page 74 of 299

1    of Whoodi as the general street term, meaning friend or associate

2    or somebody that they know.

3    Q    Somebody who got introduced to the afterlife?

4    A    And the whole reference about being introduced to the

5    afterlife is a pretty common theme in a lot of rap songs.  I

6    mean, there are dozens of lyrics that make reference to being

7    introduce to the afterlife.  Some pretty popular songs, you know,

8    talk about that.  So it wouldn't stand out to me as something

9    that would be unusual.

10   Q    The lyrical construction of introducing someone to the

11   afterlife is not that uncommon?

12   A    No.

13   Q    It does mean death, can we agree on that?

14   A    Sometimes.  Sometimes it's just a metaphysical thing, I mean

15   it's a metaphor for other things as well.  But pretty much it's

16   death.

17   Q    So leaving aside the possibility that the author of this

18   lyric was delving into the realm of metaphysics and philosophy,

19   it's talking about --

20   A    Not metaphysics, metaphors.

21   Q    Metaphors.  I'm sorry.

22   A    Yes.  And there's a difference.

23   Q    Leaving aside that, very probably, very possibly reference

24   to the afterlife?

25   A    Yes.

RECROSS EXAMINATION OF DAVID COOK BY HANLON                75

1    Q    To death?

2    A    Yes.

3    Q    And again, the reference to Whoodi not being anybody in

4    particular, your opinion's not changed if the author of this rap

5    had his fingerprints or palm prints recovered from a car in which

6    Woody and his girlfriend were found dead?

7              MS. RHODES:  Objection.

8              THE COURT:  Sustained.  That means you don't have to

9    answer.

10   Q    Nothing further.  Thank you, Mr. Cook.

11             THE COURT:  We will take a recess in just a moment,

12   ladies and gentlemen.

13             You will recall that Ms. Rhodes tendered Mr. Cook as an

14   expert.  And the Court, you will recall, did not accept the

15   witness as an expert but conditionally permitted the witness to

16   testify.  I am instructing you and notifying Mr. Cook for future

17   reference that the Court is not accepting Mr. Cook as an expert

18   as he was tendered by counsel.

19             However, there is a provision under the law that will

20   permit the Court to allow an individual who has special

21   experience and knowledge about a particular area to testify even

22   though he may lack personal knowledge about the particular issues

23   involved in the case.  And I have determined that you are free to

24   consider Mr. Cook's testimony, both the direct and cross

25   examination of Mr. Cook, if you should find it helpful and useful

76

1    and/or probative in your consideration of all the evidence in the

2    case.

3            The Court concludes, in other words, that Mr. Cook's

4    testimony and, to the extent he relied on his opinions and his

5    inferences, his assumptions, which are basically rooted in his

6    experience in the business of commercial music and

7    telecommunications, as well as his writings, may or may not be

8    useful to you, as is true about the testimony of any witness.

9            So you may consider it and give it such weight as you

10   deem it appropriate.  But Mr. Cook is not being accepted as an

11   expert in the context of this case.

12           Please leave your note pads on your chairs.  Have no

13   discussion about the evidence or any of the aspects of the case.

14   Please remain in the jury room.  You're excused for a 15 minute

15   recess.

16           (Jury exits the courtroom.)

17           THE COURT:  Mr. Cook, you are excused.  It really was a

18   pleasure having you with us.  I would actually like to have lunch

19   with you but that wouldn't be appropriate, because I have a lot

20   of questions that I think you could answer.

21           I hope you're not insulted.  But I thought it was

22   important that the jury understand the context in which the Court

23   permitted your testimony.  And it's also important, I think, in

24   the event that you are ever called as a witness and, frankly,

25   given the breadth of your knowledge, you may well be called as a

1    witness, I don't want you to say inaccurately that you had been

2    accepted as an expert witness in federal court because I haven't

3    accepted you as an expert.  Having nothing to do with you or your

4    qualifications so much as the nature of the testimony that you

5    were offered to give.  And I have no reason to think that in the

6    proper context you might well qualify as an expert in your chosen

7    field.

8         Thank you very much.  I hope you'll stick around

9    Baltimore and enjoy the scene a little bit.

10        I admittedly jumped the gun, counsel, didn't give you a

11   chance -- you're excused -- didn't give you a chance to address

12   that issue any further.  But assuming that the government

13   obviously stands on its objection originally, in light of the

14   cross examination, I thought that it was appropriate for the

15   Court, frankly, to just, while not giving Ms. Rhodes and Mr.

16   Flannery everything that they wanted, essentially I'm not

17   striking the testimony.  I'm admitting it as lay witness opinion

18   testimony under Rule 701.  I assume, Ms. Rhodes, really, I assume

19   you don't care terribly.

20        MS. RHODES:  Well --

21        THE COURT:  But maybe you do.

22        MS. RHODES:  Well, I mean, I don't understand the

23   Court's ruling.

24        THE COURT:  Well, let me see if I can take just a

25   moment and explain it.

1          MS. RHODES:  And I do object to it.

2          THE COURT:  The witness made all kinds of assumptions

3     and inferences, and I can't count how many times Mr. Cook said,

4     "I assume."  He assumes things not to be true.  He assumed things

5     to be true.  And I have to say, without really quantifying it,

6     the vast bulk of his testimony was based on his actual experience

7     with rap music musicians, his direct, indirect and, frankly,

8     hearsay knowledge about rap music musicians.  His testimony was

9     overrun, and I don't mean this as an unfair criticism, with the

10    kind of jargon that frankly left the jury, I'm sure, in the dark

11    about much of what he said.

12         So that he would not have passed the Daubert

13    examination.  He simply wouldn't.

14         He's never been recognized as an expert before, and

15    that's not a big issue, although I must confess I don't recall in

16    my career where I was ever the first judge to accept a proffered

17    expert as an expert the first time.  But I mention that because

18    it's obvious.

19         But his testimony was not of the sort, based on

20    specialized knowledge, that the jury is incapable of forming

21    their own opinions about other than insofar as his many years of

22    experience in the rap music business.  He knows a lot of people.

23    He's talked to a lot of people.  He's listened to a lot of music.

24    And he's formed opinions based on those experiences.  He hasn't

25    studied.  He hasn't written peer reviewed articles.  He hasn't

1    validated anything.

2              So that's the basis for the Court's ruling.  It's lay

3    opinion.  It's like he's a record executive.  He's not, and I

4    hope he doesn't treat that as a pejorative.  But he has worked

5    for radio stations.  He's played music.  He's talked to rap music

6    artists.  And he's obviously very active in the community.

7              He's talked to community leaders.  He has opinions

8    about whether rap music is good for the community or not.  The

9    jury knows all that stuff or they don't, but it's not a function

10   of whether they know it or don't know it on the basis of some

11   expert's or ostensible expert's expertise.

12             So that's the, essentially, the Readers Digest version

13   of the Court's ruling.  It was not proper expert opinion.  The

14   government preserved the issue through its motion to exclude.

15             What the Court regards as an act of generosity, and I'm

16   being very honest, I'm not being flippant here, I thought it was

17   very generous for the Court to permit you to use two hours to put

18   Mr. Cook on.  That's the Court's ruling.  He's not an expert.

19   Okay?

20             MS. RHODES:  Could I just make --

21             THE COURT:  Go ahead, Ms. Rhodes.

22             MS. RHODES:  -- an objection?  Just for the record,

23   Your Honor.  I think he, since standard is whether or not the

24   person has specialized knowledge that will assist the trier of

25   fact to understand the evidence, I think that he fits rather

1    squarely, quintessentially into an expert in his field.  I don't

2    think that, in a field where there would not be peer reviewed

3    articles or scientific methods used to assess trends in the

4    industry or other things, that he has the exact experience and

5    knowledge and basis of knowledge that is precisely what an expert

6    would need to have in this field to testify.

7           THE COURT:  Well, I regard it as, you know, it's like

8    the general manager of a General Motors plant coming in to

9    testify about how they build cars.  He's not an engineer.  He

10   couldn't build a car himself.  But he sure knows how that line

11   runs and he sure knows that if people don't show up for the

12   second shift they're not going to be able to build as many cars

13   as they built last week.

14          That's what he is.  He's got great experience and

15   really, his opinions, his testimony insofar as it constituted

16   opinion and inference was really only valuable to the jury for

17   the jury to understand his testimony, not facts in issue.  Okay?

18          Mr. Flannery, you want to have a final word on this

19   issue?

20          MR. FLANNERY:  I just wanted to note our objection for

21   the record, Your Honor.  And I would say in my understanding of

22   what Mr. Cook testified about, his background and credentials and

23   what he's done and what the jury heard, I would be hard-pressed

24   to understand why they should consider Douglas Ellington, who

25   essentially is an agent, a police officer for several years, and

1    that's his experience, why he should be considered an expert and

2    be able to testify to his opinions as an expert and that Mr. Cook

3    is classified as lay opinion testimony.  So I just want to note

4    that for the record.

5           THE COURT:  All right.  We're in recess for 15 minutes.

6           Just so you know, counsel, I don't know if we're going

7    to finish the witnesses today or not.  We're going to certainly

8    try.  My plan for this evening is to excuse the defendants once

9    we close the evidence and stay as late as we need to to have a

10   charge conference.

11          I trust that everyone's gotten a copy of my draft from

12   last night.  I've already made a number of changes.  But I look

13   forward to your input in an informal setting here in the

14   courtroom but on the record after we conclude the day with the

15   jury and with the defendants.  All right.  We're in recess for 15

16   minutes.

17          (Recess at 11:45 a.m.)

18          THE COURT:  Ready to proceed?

19          MS. RHODES:  Yes, Your Honor.

20          MR. HARDING:  Judge --

21          THE COURT:  Mr. Harding.

22          MR. HARDING:  I have to object, Your Honor.  The

23   defense counsel, Ms. Rhodes specifically gave me a whole swatch

24   of papers here just now during the break that she's apparently

25   going to move into evidence forthwith.  I point it out that it

1    was rather late submission.  And she pointed out that I had

2    submitted some papers to counsel late during the trial.

3         The big difference is, of course, that even if they got

4    things during the trial, they still had weeks and weeks to

5    prepare for their own cases and to figure out how to deal with

6    the evidence.  I don't think that by submitting this literally

7    minutes or perhaps an hour or two before the end of the evidence

8    in this case is at all appropriate and I'm objecting to the

9    admission of these documents on that grounds.

10         THE COURT:  Okay.  Let me ask, first, are there any

11   witnesses we're ready to proceed to before I come to the

12   documents?

13         MS. RHODES:  Yes, Your Honor.  We have an officer here

14   who will just be about a five minute witness, and then we have

15   the playing of the Damita Green tape.

16         Detective Niedermeier -- the Damita Green tape.

17   Detective Niedermeier, I got a call this morning, is out sick

18   today, so will not be able to come in.  So I am just going to

19   play the tape through a witness, introducing it.

20         There were, of course, a couple of things I wanted to

21   ask Detective Niedermeier other than just having him play the

22   tape and set it up.  But I think that I will not proffer those.

23   I'm just going to try and get something in through an MVA witness

24   related to it and leave it at that.

25         THE COURT:  All right.  Can we put the documents off

1    until this afternoon?

2              MS. RHODES:  Yes, Your Honor.  Yes.  They're just

3    certified documents, but yeah.

4              THE COURT:  So that will give Mr. Harding a chance to

5    glance through them hopefully over lunch.  So we're not going to

6    do that.

7              Did you point to the officer seated in the courtroom?

8              MS. RHODES:  Yes, Your Honor.  I asked him to step in

9    here just a few minutes ago.

10             THE COURT:  Okay.  So we're ready to go?

11             MS. RHODES:  Yes.

12             THE COURT:  All right.  So we got the officer and then

13   you're going to play the tape.  And then who do we have after

14   that?

15             MS. RHODES:  Then that's, that's all I had, Your Honor.

16   I have two very short witnesses, witnesses, like 15 minutes each

17   coming in, but they're not coming until one.

18             THE COURT:  Okay.  So do we have anybody else this

19   morning?  Do we have anybody else at all?  Anybody expecting

20   somebody?

21             MS. RHODES:  After the two short ones, then we have

22   Coach Powers, which we're still opening to line up for the video

23   thing.  We're waiting to hear back from him, I think, about where

24   he's going to be, if he's going to be able to have the access.

25   We've talked to the technical services here and they're ready to

84

1    go with him.

2                THE COURT:  All right.  When do you expect to know the

3    answer to that?

4                MS. RHODES:  At 12:30.

5                THE COURT:  Okay.  Belinda, has IT, do they know we

6    need a monitor and so forth.

7                THE CLERK:  Everything's set up.

8                THE COURT:  Everything's set up?  Wonderful.  Thank

9    you.  Then that will be the end, Ms. Rhodes?  So two MVA, Coach

10   Powers.

11               MS. RHODES:  It's a MVA, it's an employer.  And then

12   Coach Powers and then some records.  It's a death certificate

13   and, oh, and some school records that go back to during the time

14   of the conspiracy.

15               THE COURT:  Okay.  Mr. Flannery, Mr. Martin, do you

16   have anything more?

17               MR. FLANNERY:  Your Honor --

18               THE COURT:  Other than the, the Dobropolski documents?

19               MR. FLANNERY:  No more witnesses.  The government is

20   working over the Dobropolski documents now.  And we have a police

21   report that we stipulated to its admissibility.

22               THE COURT:  Great.  Mr. Crowe, Mr. Pyne?

23               MR. CROWE:  We only have three records, Your Honor, the

24   things that we provided the government before the beginning of

25   trial.  I don't think there's going to be any problem with it.

1          THE COURT:  Great.  Mr. Kurland?

2          MR. KURLAND:  Addition of a couple of documents and a

3   grand jury transcript.  And --

4          THE COURT:  An additional grand jury transcript?

5          MR. KURLAND:  No.  No.  It's Reynolds.

6          THE COURT:  Reynolds.

7          MR. KURLAND:  The actual format.  And then there's an

8   issue with respect to a disagreement as to one of my exhibits in

9   closing.  But that's after the evidence closes.

10          THE COURT:  Okay.  Any rebuttal, Mr. Harding?

11          MR. HARDING:  I anticipate approximately two to three

12   minutes of rebuttal testimony.

13          THE COURT:  Excellent.  Okay.  So we're in good shape.

14   All right.  Let's have the jury and you can call down your

15   witness, Ms. Rhodes.

16          How you are you going to make up for Niedermeier, Ms.

17   Rhodes?

18          MS. RHODES:  What I was intending to do was have my

19   associate take the stand, just read the setting and then just

20   play the tape, basically.

21          THE COURT:  Okay.  But I meant on those other two.

22          MS. RHODES:  I think I'm just going to have to do one

23   of them through the MVA person.

24          THE COURT:  Okay.

25          MS. RHODES:  Let the other one go.

1              THE COURT:  Great.

2              (Jury enters the courtroom.)

3              THE COURT:  Good afternoon, ladies and gentlemen.  Ms.

4    Rhodes, you may call your next witness.  That would be officer?

5              MS. RHODES:  Sorry.  Andrew Seymour, please.

6          OFFICER ANDREW SEYMOUR, GOVERNMENT'S WITNESS, SWORN

7              THE WITNESS:  Yes.

8              THE CLERK:  Be seated.  Speak directly toward the mike

9    and state your name and spell it for the record.

10             THE WITNESS:  Officer Andrew Seymour.  Last name

11   S-E-Y-M-O-U-R.  Central District.

12             DIRECT EXAMINATION

13   BY MS. RHODES:

14   Q    Okay.  Officer Seymour, can you tell us how long you've been

15   with the police department, please?

16   A    Seven years, eight months.

17   Q    Okay.  And so you were working for the police department in

18   February of 2002?

19   A    Yes, ma'am.

20   Q    Okay.  And how were you assigned them?  Do you recall?

21   A    Uniformed foot patrol.

22   Q    Uniform foot patrol.  And what district?

23   A    Central District.

24   Q    Okay.  And are you familiar with the, what was there then

25   Hammerjacks Restaurant or Hammerjacks Club?

1    A    Yes, ma'am.

2    Q    Okay.  And was that location inside your district?

3    A    Yes.

4    Q    Okay.  You've been reviewing a couple of documents that we

5    provided you.  Do you recall, do you recall the night of this

6    incident that is dated on the report I'm going to show you in a

7    second, of February 18th?

8    A    Vaguely.

9    Q    Okay.

10         THE COURT:  Can you pull that mike a little closer

11   please, Officer?  Thank you.

12   Q    Apologize for that.

13         THE COURT:  That's okay.

14   Q    Showing you what's been marked as Defense Exhibit 11.  This

15   might be a copy.  Rather Mitchell Exhibit 11.  Do you recognize

16   that document?

17   A    Yes, ma'am.

18   Q    Okay.  And is that, can you describe what it is for the

19   jury?

20   A    Yes.  That's a supplement form that I completed and it's an

21   inventory of evidence that I submitted in this case.

22   Q    Okay.  And can you, do you recall the circumstances of how

23   you were, why you were submitting this report and what's shown on

24   here?

25   A    There was a stabbing at Hammerjacks and I was a foot unit on

Case 1:04-cr-00029-RDB   Document 697   Filed 06/19/09   Page 88 of 299

1    the block so I was considered an extra available unit.  So I

2    responded to Shock Trauma and I stood by the victim.

3    Q    Okay.  And what was, and what was your responsibility then

4    in terms of this report and the items on it?

5    A    To collect all the bloody clothes and to do a condition

6    check.

7    Q    A condition check?

8    A    Yes, ma'am.

9    Q    And that was to report to your superiors how the person was

10   doing?

11   A    Yes.

12   Q    Okay.  And can you just read the list here of the items that

13   you took off of this person?  Actually, first, down the sort of

14   sentence or paragraph at the bottom.  What is the name of the

15   person who these items belong to?

16   A    Willie Mitchell, III.

17   Q    Okay.  And can you read the items that you took off of him?

18   A    Yes, ma'am.  It was one pair of cut up black pair of jeans,

19   one cut up black long sleeve shirt, one white tank top, one black

20   sweater, one black belt, one black knit hat, one white pair of

21   socks, one compact disk, one black pair of Nike boots, and one

22   various business cards.

23   Q    Okay.  Thank you.  And that's a report that you prepared

24   shortly after you left the hospital or would have been at the

25   hospital still?

1  A    I'm not sure.  Sometimes we complete them at the hospital if

2  we have the forms with us.  But the whole thing was completed

3  afterwards because after you submit it, you put the property

4  number up in the top corner.

5  Q    Okay.  And the compact disk is the only, along with the

6  business cards, the only items aren't clothing, I guess, right?

7  A    That's correct.

8  Q    So that would have been somewhere on his person somehow or

9  in his clothing?

10  A    Yes.

11  Q    Okay.  Thank you.  I have no further questions for this

12  witness, Your Honor.

13              CROSS EXAMINATION

14  BY MR. HARDING:

15  Q    Good afternoon, Officer.

16  A    Hello, sir.

17  Q    My name's Robert Harding.  I'm an assistant U.S. Attorney.

18  And this is Michael Hanlon.  We represent the government in this

19  case.

20         Officer Seymour, you were called to Shock Trauma that

21  night, you said, to recover this stuff, is that right?

22  A    That's correct, sir.

23  Q    So you weren't at the scene underneath I-83 in a parking lot

24  three blocks north of Hammerjacks, where Mr. Mitchell was

25  recovered on the ground, is that correct?

1    A    That's correct, sir.

2    Q    So you weren't aware that a knife was recovered underneath

3    his body when he was recovered off the parking lot?

4    A    That's correct.

5    Q    Did you go to Hammerjacks at all that night?

6    A    No.

7    Q    You just responded to Shock Trauma.  And it says on your

8    report 457 hours?

9    A    Yes, sir.

10   Q    That's when you submitted this stuff to ECU, is that right,

11   or is that when you collected it from Shock Trauma?

12   A    I believe that's when I actually went to Evidence Control

13   and submitted it.

14   Q    Okay.  But in any case, that's several hours after the

15   stabbing incident at Hammerjacks, is that right?

16   A    That's correct.

17   Q    No further questions, Your Honor.

18             THE COURT:  Officer Seymour, thank you very much, sir.

19   You're excused.  Could you hand that exhibit to the clerk,

20   please?  Thank you.  Is that for identification only or --

21             MS. RHODES:  No, no.

22             THE COURT:  So it's in?

23             MS. RHODES:  Yes, Your Honor.

24             THE COURT:  All right.  Mitchell Number 11 is in.

25             MR. KURLAND:  Do we have a copy of that?

1          THE COURT:  Ms. Arrington will see to it.

2          MS. RHODES:  Copies.  Sorry.  Your Honor, in terms of

3     the next item is the tape.

4          THE COURT:  All right.

5          MS. RHODES:  May I have my associate just introduce

6     that or would the Court prefer to do that?

7          THE COURT:  Why don't you just tell the jury what it

8     is?  It's stipulated, correct?

9          Members of the jury, you will recall the witness,

10    Damita Green, who was the individual who came in and testified

11    concerning a gathering or the presence of certain individuals at

12    her home out in Randallstown on the night before the Wyche

13    brothers died.  And she testified here in court.

14         Ultimately, counsel agreed that her grand jury

15    transcript, transcript of her grand jury testimony, would be

16    admitted into evidence and available to you as an exhibit during

17    your deliberations.  In addition, you may recall that before she

18    testified before the grand jury, she was actually interviewed by

19    investigating detectives and a recording was made of that

20    interview by the detectives.  And by agreement of the parties

21    here, we are now going to hear the recording of Ms. Green's

22    interview with the detectives.

23         And I take it, Ms. Rhodes, you have prepared a

24    transcript?

25         MS. RHODES:  Yes, Your Honor, just with the redacted

1   portions.  If I could pass this up out to the jury or have it

2   passed it.

3            THE COURT:  Do you need a moment to take a look at it,

4   Mr. Harding?  Okay, Mr. Harding?

5            MR. HARDING:  Yes.

6            THE COURT:  All right.  So Ms. Rhodes and her office

7   has arranged to prepare a transcript for you while you listen to

8   the tape.  Of course, all of you will recall my standard

9   instruction when it comes to tape transcripts.  The actual

10  evidence that you are to consider is the actual voice recording

11  on the tape.  The transcript is being provided as an assist to

12  you as you listen to the tape.  To the extent that you believe

13  you hear something that is different, that is you hear something

14  on the tape that seems to be different from the words indicated

15  on the transcript, you are to be guided by what you hear on the

16  tape.

17           (Tape playing.)

18           MS. RHODES:  Your Honor, I would just move the

19  admission of this redacted transcript in.

20           THE COURT:  As I've told the jury, Ms. Rhodes, and as

21  you know, the transcripts are not admitted in evidence.  They are

22  not marked as exhibits other than for identification and they

23  will not be with the jury in the jury room.  So your request is

24  denied.

25           MS. RHODES:  Thank you, Your Honor.  Our next witnesses

1   will be available after lunch.

2           THE COURT:  Okay.  I understand that there are, I mean,

3   we have a few minutes.  There are some documents that various

4   counsel wish to move into the record and I'm hoping we can do a

5   little of that right now.  I realize the government needs to

6   still take a look at a few documents.  But I'm hoping that there

7   are a few that there's not much objection to, if any.  Mr.

8   Flannery.

9           MR. FLANNERY:  Yes, sir, Your Honor.  The government

10  and defense counsel have stipulated, just put this up for a

11  second, this is a --

12          THE COURT:  Give us the number please, first.

13          MR. FLANNERY:  Sure.  This is Harris Number Eight.

14          THE COURT:  Harris Eight.

15          MR. FLANNERY:  This is a Baltimore City Police

16  Department report authored by Detective Ray Laslett and the

17  government and defense have stipulated that if Detective Laslett

18  was called, that he would come here and he would, he would

19  testify that he drafted this report.

20          THE COURT:  All right.  And do you want to tell us

21  what's in the report?

22          MR. FLANNERY:  Certainly.  Briefly, the report, if the

23  jury will remember, there was a search conducted of the 1999 Q-45

24  Infiniti the following, the morning following the McCaffity/Brown

25  homicide and Detective Laslett was the detective that authored

1    the report, itemizing the particular items that were taken from

2    the Infiniti.  And the report also specifies where those

3    particular items were taken from in the car.  So there's an

4    itemization of it and there's some description as it where those

5    particular items were inside the car.  That's it, Your Honor.

6              THE COURT:  All right.  The exhibit is admitted.

7              MR. FLANNERY:  I'll hand this --

8              MS. RHODES:  Your Honor, before I forget.  On the

9    Damita Green matter, I don't have a redacted version of the

10   cassette yet but I will be getting that to the Court by the end

11   of the day, I hope.

12             THE COURT:  Great.

13             MS. RHODES:  Thank you.  And then that would be, was it

14   already in as a government exhibit?  No?  That will be

15   Mitchell --

16             THE COURT:  Don't say the number until you get it

17   marked.  Okay?  It will be marked before we take it.

18             Mr. Crowe, if you need to wait until this afternoon,

19   you can wait until this afternoon.

20             MR. CROWE:  I think we're just about ready, Your Honor.

21             Your Honor, Defendants' Exhibit 11 is a birth

22   certificate.

23             THE COURT:  That's Martin's 11.

24             MR. CROWE:  I'm sorry.  Defendant Martin's Exhibit 11

25   is a birth certificate for Patricia McCray -- for Patricia McCoy,

1    Lakeisha.

2            THE COURT:  Let's do that one more time.  Looks like

3    Lakeisha Patrice McCoy.

4            MR. CROWE:  That's correct, Your Honor.

5            THE COURT:  Birth certificate.

6            MR. CROWE:  Yes, Your Honor.  Shows her birthday as

7    March 24, 1979.

8            THE COURT:  All right.

9            MR. CROWE:  Your Honor, yesterday when I had some

10   photographs with Mrs. Martin, i told her those are Photographs A

11   through E. I told her I would mark them as Martin Exhibit 14.  In

12   fact, it should be Martin Exhibit 15.  I just wanted to correct

13   that for the record.

14           THE COURT:  So Martin's 15.  And Ms. Arrington, did you

15   get that?  Okay.  Good.  Martin's 15.

16           MR. CROWE:  Your Honor, the next matter is Defendant

17   Martin's Exhibit One.  It's a fingerprint report and it shows,

18   among other things, that on the Q-45 in which Mr. McCaffity and

19   Ms. Brown was found, that it was processed for fingerprints and

20   it was found negative for a group of individuals, including the

21   man by the name of Larry Price, which is a name associated with

22   Mr. Martin earlier in the case.

23           THE COURT:  All right.  That's Martin One.

24           MR. CROWE:  That is Martin One, yes, Your Honor.

25           THE COURT:  Is admitted.

1          MR. CROWE:  Finally, Your Honor --

2          MR. HARDING:  Objection, Your Honor.

3          THE COURT:  Okay.  So there's one I need to hear you

4    on?  All right.  We'll do that this afternoon.

5          Mr. Crowe, would you hand the two you marked, please,

6    to Ms. Arrington?  Thank you.

7          MS. RHODES:  Your Honor, we also have one that's very

8    quick, I think we can put in now.  The government does not object

9    to it.  This is just a record, if I can put it on the DOAR,

10   first, this is the certification from the Baltimore City public

11   schools.

12         THE COURT:  All right.

13         MS. RHODES:  A record for Mr. Mitchell.  Record they

14   had there, which relates to a witness' testimony about what, when

15   he knew him from.

16         THE COURT:  Okay.  Can you tell us --

17         MS. RHODES:  And the record just indicates the dates

18   that he was --

19         THE COURT:  Sorry.  Who?  Oh, it's a record of Mr.

20   Mitchell, a school record for Mr. Mitchell.

21         MS. RHODES:  That's all they have now, which is a

22   computer printout.

23         THE COURT:  I understand.

24         MS. RHODES:  And it shows his attendance was from '83

25   until '88, in the Baltimore City public schools.

97

1          THE COURT:  '83 through '88.  All right.

2          MS. RHODES:  September, '88.

3          THE COURT:  And that is Mitchell number?

4          MS. RHODES:  That would be 12, then?  I'm sorry.  It's

5    already on the first list.

6          THE CLERK:  Eight.

7          THE COURT:  Mitchell Eight is admitted.  Thank you, Ms.

8    Rhodes.

9          MS. RHODES:  Thank you, Your Honor.

10          THE COURT:  Mr. Kurland.

11     MR. KURLAND:  Your Honor, very briefly.  The first

12   thing I have, which is Defendant Gardner 13, which is a map of

13   the State of Pennsylvania.  The government has no objection to

14   it.  I would like the Court to take judicial notice that this is,

15   in fact, a map of the state of Pennsylvania.

16          THE COURT:  All right.  That will be Gardner number?

17          MR. KURLAND:  Gardner 13.

18          THE COURT:  Gardner 13 is admitted.

19     MR. KURLAND:  Gardner 14 is the appropriate portion of,

20   well, as the Court is aware, and the jury are aware, Ernest

21   Reynolds testified before the grand jury twice, once on July

22   21st, 2004, once on December 1st, 2004.  This is the excerpt of

23   his July 21st, 2004 testimony which the Court has admitted under

24   the appropriate evidence rule which the Court's going to fully

25   instruct.

1            THE COURT:  All right.

2            MR. KURLAND:  The government has no objection to the

3    manner in which we've excerpted the relevant portion.  That would

4    be Gardner 14.

5            THE COURT:  Gardner 14 is admitted.

6            MR. KURLAND:  And I'll just put that on the DOAR for a

7    second.  Then I'll give the Court the copy.

8            THE COURT:  Just for the record, Mr. Kurland, what

9    page?

10            MR. KURLAND:  The pages are, it's the bottom of Page 17

11    and the top of Page 18 from his first grand jury appearance on

12    July 21st, 2004.

13            THE COURT:  All right.  Thank you.

14            MR. KURLAND:  That will be Gardner 14.

15            THE COURT:  Gardner 14 is admitted.

16            MR. KURLAND:  There's one other matter that probably

17    needs a little discussion outside the presence of the jury.

18            THE COURT:  Thank you, Mr. Kurland.  Would you hand the

19    exhibits to Ms. Arrington, please?

20            Okay.  Ladies and gentlemen of the jury, we will break

21    for lunch at this time.  I believe we probably have, from my

22    consultation with counsel, perhaps an hour or two of additional

23    proceedings before I excuse you this afternoon.  Please continue

24    to adhere to all of my instructions.  Please leave your note pads

25    on your chairs.  Have no discussion about any of the evidence

1    you've heard so far.  Continue to keep an open mind about all

2    issues.

3            The jury is excused until 2:00 this afternoon.  Jury is

4    excused until 2.

5            (Jury exits courtroom.)

6            THE COURT:  Mr. Lawlor, Ms. Rhodes, please, I want you

7    to have some lunch, but please work with our IT people and

8    confirm just as soon as you can whether you need the monitor

9    brought up.  I'd hate to leave the jury sitting for 45 minutes

10   while we try to make this thing work.  Okay?  All right.  Thank

11   you.

12           Yes, Mr. Hanlon?

13           MR. HANLON:  Your Honor, a quick sort of question about

14   the closing arguments.  The Court indicated that the expectation

15   was that we would exchange any new demonstratives we would be

16   creating.

17           THE COURT:  Yes.  New or old, I want all the

18   demonstratives.

19           MR. HANLON:  That's perfectly fine.  I have a question

20   about the scope of that.  I am planning on putting together a

21   Power Point presentation that's essentially an outline of my

22   argument and it's going to be consistent with about a two hour

23   argument or something like that.  It's a work in progress.  Is

24   that the kind of thing the Court expects me to turn over to the

25   defense before I make the argument?

1          THE COURT:  I think so.  What I would hope is that you
2     would print out three to a page or six to a page, each slide, and
3     bring it with you tomorrow morning.
4          MR. HANLON:  Yes, Your Honor.
5          THE COURT:  Would that be a problem?
6          MR. HANLON:  I don't think it's a problem, no.
7          THE COURT:  All right.  You don't have to show them the
8     Power Point.  If you just point out, you can get six slides to a
9     page.  You probably can get more than that.
10          MR. HANLON:  I should be able to do that.
11          THE COURT:  And just print it out, hand it to them
12     tomorrow morning.  They can look through it.  I assume, is it
13     just text or text and some other stuff?
14          MR. HANLON:  It's just text.  What I'm planning to do
15     if I can manage it is that I may flip between the document camera
16     and the printer if I want to use something.  I may use some
17     posters.  But it's really just text in an outline.
18          THE COURT:  Just as a courtesy.  And you can, you can
19     provide one copy to each set of counsel.  You don't have to print
20     eight copies.
21          MR. HANLON:  That would be fine, Your Honor.
22          THE COURT:  Save a couple trees.
23          Thank you, counsel.  We're in recess until 2:00.
24          (Luncheon recess at 12:53 p.m.)
25          THE COURT:  What are we going to be able to do, Mr.

1    Lawlor?

2         MR. LAWLOR:  Your Honor, we have our next witness

3    hooked up via the video monitor thanks to the assistance of the

4    IT group.

5         THE COURT:  We thank you very much.

6         MR. LAWLOR:  I apologize for the delay.  So we're ready

7    if you want to bring the jury in.  We have the coach on standby.

8    I don't believe the direct will be very lengthy.

9         THE COURT:  Excellent.  Mr. Mitchell, the Court advised

10   you earlier of your right to testify or remain silent.  The Court

11   appreciates the cooperative way you have handled yourself during

12   these proceedings.  Do you wish to testify or remain silent?

13        DEFENDANT MITCHELL:  I wish to accept the government's

14   offer for value and return it for value, set off all public, I

15   mean all charges with public policy.  Request, request the Court

16   issue me an appearance bond, waive all public cost, request the

17   Court close the account, release the order of court to me

18   immediately, and request immediate discharge.

19        THE COURT:  Thank you, Mr. Mitchell.  I'll take that as

20   a no.  Mr. Harris, the Court has advised you of your right to

21   remain silent or to testify and the consequences of your

22   decision.  It appears that we're going to be at that point this

23   afternoon.  Do you wish to testify or remain silent?  And the

24   Court does appreciate the way you've conducted yourself during

25   these proceedings.

1          DEFENDANT HARRIS:  I accept your offer to testify for

2    value.  I return your offer to you for closure and settlement of

3    this account.  I request the following.  Do not argue the facts.

4    Request the Court issue me appearance bond and waive all public

5    costs.  Request the Court close the account and release the order

6    of the court to me immediately.  Request the court set off and

7    adjust all public charges by the exemption in accord with UCC

8    3-419, House Joint Resolution 192 and Public Law 73-10.  Request

9    immediate discharge.

10          THE COURT:  Thank you, Mr. Harris.  The Court takes

11    that as a no.  Mr. Martin, good afternoon.  Thank you for your

12    cooperation during these proceeding.  The Court previously at

13    advised you of your right to testify or to remain silent.  It

14    appears that the time for you to do so, that is to testify, will

15    be this afternoon.  Do you wish to testify, sir, or do you wish

16    to remain silent?

17          DEFENDANT MARTIN:  I accept your offer for value and

18    return your offer to you for value for settlement and closure of

19    the account.  I do not wish to argue the facts and request the

20    Court issue me an appearance bond and waive all public costs.  I

21    request the Court to set off and adjust all public charges by

22    exemption in accord with Uniform Commercial Code 3-419, House

23    Joint Resolution 192, and Public Law 73-10 and I request

24    immediate discharge.

25          THE COURT:  Thank you, Mr. Martin.  The Court takes

103

1    that as a no.

2         Mr. Gardner, good afternoon.  The Court appreciates

3    your cooperation during these many weeks.  The Court has

4    previously advised you of your right to testify or to remain

5    silent.  It appears that the time for you to testify, if you wish

6    to do so, will be this afternoon.  Do you wish to testify or

7    remain silent, sir?

8         DEFENDANT GARDNER:  I would like to accept your offer

9    for value for closure.  I will accept your offer for value and

10   return your offer for value for settlement, close that account.

11   I do not wish to argue the facts, request the judge issue me

12   appearance bond and waive all public costs.  Request the judge

13   close the account and release the order of the court to me

14   immediately.  Request the judge set off and adjudge all public

15   charges by exemption in accord with UCC 3-419, House Joint

16   Resolution 192, Public Law 73-10, and request immediate

17   discharge.

18        THE COURT:  Thank you, Mr. Gardner.  The Court treats

19   your response as a no.  If any of you gentlemen should change

20   your mind, all you need to do is just alert your attorney that

21   you've changed your mind, that you do wish to testify, and the

22   witness stand will be all yours.

23        All right.  Louis, are you going to stay with us during

24   the video testimony?  Thank you very much, sir.

25        Anything further before we bring the jury in, Mr.

1    Lawlor?

2            MR. LAWLOR:  No, not that I'm aware of.

3            THE COURT:  Now, can everybody see the large monitor or

4    the small monitors?  We're in good shape?

5            MR. LAWLOR:  Everyone can see it here, I think.  The

6    large monitor is not working.

7            THE COURT:  Can we get it out of here, then?

8            Let's have the jury, please, Ms. Arrington.  Thank you

9    for your patience, sir.  What is the gentleman's name?

10           MR. LAWLOR:  Coach George Powers, Your Honor.

11           THE COURT:  Mr. Powers, thank you for your availability

12   and for your patience.  And where are you, sir?

13           THE WITNESS:  Right now?

14           THE COURT:  I'm sorry?

15           MR. LAWLOR:  He can't really hear Your Honor without

16   the microphone.

17           THE COURT:  I see.  Okay.  He's at the Nausau Community

18   College.  Nassau Community College.  All right.  Does that mean

19   you're going to have to hold the microphone?

20           MR. LAWLOR:  I think so.

21           THE COURT:  Is the cord long enough?

22           MR. LAWLOR:  It's actually not so I guess I'm going to

23   have to stand --

24           THE COURT:  Should we move a table out there for you?

25           THE WITNESS:  I can hear the judge now.

1        MR. LAWLOR:  You can hear judge, sir?

2        THE WITNESS:  Yes, I can.

3        (Jury enters the courtroom.)

4        MR. LAWLOR:  Your Honor, I can just lean here.

5        THE COURT:  No.  I would rather you come out, if that's

6    okay, Mr. Lawlor.

7        MR. LAWLOR:  Sure.

8        THE COURT:  Members of the jury, good afternoon.  I

9    think I probably said to you more than once during this trial

10   that this trial has everything.  Just a moment.  Just a moment,

11   Belinda.

12       As you can see, ladies and gentlemen, we've set up to

13   see some testimony by video.  This is another recent innovation

14   that the advance in technology have permitted the court to

15   employ.  Mr. Lawlor will introduce his witness in a moment.  This

16   is a witness who's being called on behalf of Mr. Mitchell and you

17   are to treat this witness' testimony exactly as if he was here in

18   the courtroom.  He is live.  It's not a movie, as you will see

19   when Mr. Lawlor conducts his examination.

20       Mr. Lawlor, you may call your next witness.

21       MR. LAWLOR:  Thank you, Your Honor.  At this time, Mr.

22   Mitchell would call Coach George Powers.

23       THE COURT:  All right.  Now, Ms. Arrington will need to

24   swear the witness and I think she's going to need to look at him

25   when she does that.  Would you stand, please, Mr. Powers, and

1    raise your right hand?  Is it coming up on the monitor on the

2    witness stand?

3              THE CLERK:  Just his bottom.

4              THE COURT:  Okay.  You can remain seated.  Mr. Powers,

5    you can remain seated since there's no one there operating your

6    camera.

7              THE WITNESS:  He's trying to raise it up.

8              THE COURT:  You can be seated.  Don't move the camera.

9    That's fine.  Go ahead Ms. Arrington.

10             GEORGE POWERS, DEFENDANT MITCHELL WITNESS, SWORN

11             THE WITNESS:  Yes.

12             THE CLERK:  Will you state your name for the record and

13   spell your name?  Thank you.

14             THE WITNESS:  My name is George M. Powers.

15   P-O-W-E-R-S.

16             DIRECT EXAMINATION

17   BY MR. LAWLOR:

18   Q    Okay.  Coach, thank you for joining us today.  Do you

19   understand that we're in a federal courthouse down here and

20   there's a jury in the room?

21   A    Yes, I got that.

22   Q    Okay.  What do you do for a living, sir?

23   A    I'm an Associate Professor of Physical Education at Nassau

24   Community College.  I'm also assistant football coach and

25   assistant lacrosse coach here, also.

1    Q    And where is, I think we can probably guess from your

2    accent, but where is the Nassau Community College?

3    A    It's in Nassau County, which is on Long Island in New York.

4    Q    Not that I'm one to make fun of anybody's accent.  Now,

5    around the years 1996, 1997, were you similarly employed?

6    A    Yes, I was.

7    Q    Okay.  And were you also either the coach or the assistant

8    coach of the football team at that time?

9    A    Right.  From 1995 to 1998 I was the head football coach at

10   Nassau Community College.

11   Q    And there did there come a time that you got to know a young

12   man by the name of Willie Mitchell?

13   A    Yes, sir.

14   Q    And how did you get to know him?

15   A    Well, I think, I don't know how, I think Willie recruited

16   us.  But he was a football player, you know, coming out of the

17   Maryland area and we had been contacted.  I think it was by --

18        MR. HARDING:  Objection.  Objection.  Objection, Your

19   Honor.

20   Q    Hold on a second please, Coach.

21        THE COURT:  Now, Mr. Powers, the way this has got to

22   work is that, number one, we need you to talk very slowly.

23   A    Okay.

24        THE COURT:  We need you to hesitate before you answer

25   any question to make certain that there is no objection to the

1    question.  If you hear --

2            THE WITNESS:  Yes, sir.

3            THE COURT:  If you hear one of the attorneys say

4    'objection', you need to wait until the Court has ruled on the

5    objection.  The Court will either say sustained, and that means

6    you should not answer the question, or the Court will say

7    overruled, and that means you may answer the question.

8            THE WITNESS:  Yes, sir.

9            THE COURT:  I would ask you to do your best to answer

10   the question distinctly and only the question that is asked, and

11   simply wait for the next question.  Thank you, sir.

12   BY MR. LAWLOR:

13   Q    Okay.  Sir, let me just lead you through a couple quick

14   questions up to the point where he was enrolled at your school.

15   It's safe it say that he graduated from high school, Willie did,

16   correct?

17   A    Yes.

18   Q    All right.  And he came to you, in addition to getting an

19   education, but also to play football with you, correct?

20   A    Yes, sir.

21   Q    Okay.  And is your football program a well-known football

22   program in the community college ranks?

23   A    We're consistently a top 10 team.

24   Q    Okay.

25   A    Nationally.

1    Q    And what years, if you recall, was Mr. Mitchell enrolled at

2    the school?

3    A    1996 and 1997.

4    Q    Okay.  So he was, of course he had to be enrolled at the

5    school in order to play football, correct?

6    A    Yes, sir.

7    Q    All right.  And he played football both of those years?

8    A    Yes, sir.

9    Q    All right.  And you were the coach.  Did you get to know him

10   during that time period when you were the coach and he was on the

11   football team?

12   A    Yes, sir.

13   Q    Okay.  And could you just tell us a little bit about your

14   involvement with Mr. Mitchell at that time and the obligations

15   that he had to you and to the team?

16   A    Obligations?  We start mid August.  We have double session

17   practice.  That goes for two, approximately two weeks to three

18   weeks, depending on when school starts.  That's six days a week.

19   And when school starts, we practice five days and we play, by and

20   large play on Saturday afternoons.

21   Q    So you start practice in August and when does the football

22   season extend until?

23   A    The both years that Willie played we play in the bowl game.

24   So the first year he played, the season went till Thanksgiving

25   weekend.  And the next year we played in a bowl game first

Case 1:04-cr-00029-RDB    Document 697    Filed 06/19/09    Page 110 of 299

1   weekend in December.

2   Q    And did Mr. Mitchell adequately fulfill all the obligations

3   he had as a football player?

4   A    Yes, sir.

5   Q    Okay.  And did he need to remain in academic good standing

6   in order to be on the football team?

7   A    Yes, sir.

8   Q    Okay.  And is it your understanding that he was in good

9   standing academically in 1996 and 1997?

10  A    I know he was for a fact.

11  Q    Okay.  And although, during the fall, I assume you saw him

12  more in the fall semester than in the spring semester?

13  A    Well, in the spring semester we have a weight training class

14  that we have the kids Tuesdays and Thursdays, and then we had

15  study hall Monday and Wednesday.  So we had them four days a week

16  in the spring semester.

17  Q    You still saw Mr. Mitchell, then, quite a bit during the

18  spring semester?

19  A    Yes.

20  Q    But outside of those times, certainly when he wasn't playing

21  football or weight training, you weren't at his side during those

22  times, correct?

23  A    No.

24  Q    Were you ever aware of any problems that he had at your

25  institution?

1    A    Not at all.

2    Q    Okay.  Court's indulgence, please.  Your Honor, I have no

3    further questions.  Thank you, Coach.

4              THE WITNESS:  You're welcome.

5              CROSS EXAMINATION

6    BY MR. HARDING:

7    Q    Good afternoon, Coach Powers.  Can you see me?

8    A    Yes, sir.

9    Q    My name's Robert Harding.  I'm an Assistant United States

10   Attorney here in Baltimore.  How are you this afternoon?

11   A    Okay.  Doing good.  Thank you.

12   Q    Coach Powers, I understand this was a decade or so ago that

13   we're talking about, even more.  And how many guys did you have

14   on your football team back then, do you remember?

15   A    We average probably like 90 to a hundred kids.

16   Q    Okay.  So let me begin by asking you, Garden City is in Long

17   Island, right?

18   A    Yes, sir.

19   Q    That's where your community college is located, right?

20   A    Yes.

21   Q    And it's on, you just hop on the highway to get into

22   Manhattan from there, right?

23   A    It's a 30 minute, 30 minutes away, 30 miles away.

24   Q    Okay.

25   A    So the answer is yes.

1    Q    Right.  I don't, I'm going to ask you some questions and I'm

2    not trying to trip you up or anything because I can't imagine

3    that you necessarily remember the answers to these questions.

4    But I just want to ask them, anyway.

5              First, you said he graduated from high school, is that

6    correct?

7    A    Well, either, in order to be eligible to play, either had a

8    high school degree or GED in order to be eligible, so I'm not

9    sure which, what he had.

10   Q    And Willie's case -- oh, you weren't sure whether it was a

11   GED or a diploma?

12   A    Yes, sir.

13   Q    Okay.  Let's see.  Did you meet any of Mr. Mitchell's

14   friends from Baltimore while he was playing football up there for

15   you?

16   A    No, sir.

17   Q    And you, of course, would have no way of knowing, I assume,

18   how many times he returned to Baltimore during the, during the

19   academic year when he was enrolled up there, is that correct?

20   A    That's correct.

21   Q    I assume that you have the regular vacations that most

22   colleges have, the Thanksgiving vacation and Christmas vacation,

23   spring break, all those kinds of breaks?

24   A    Yes, sir.

25   Q    And of course a summer break, is that right?

1  A    Yes.  I know Willie did go to summer school one, for a

2  summer session.

3  Q    I was going to ask you about that.

4  A    Took an accounting class at 6:00 in the morning.

5  Q    Right.  That was in the summer of '97, is that right?

6  A    I'm not, I'm not sure.

7  Q    Okay.

8  A    I remember the accounting class.

9  Q    I suppose you wouldn't have seen much of him until August

10 when football practice started, is that right?

11 A    Well, when he went to summer school that year, I saw him

12 probably almost every day.  But yes.

13 Q    Okay.  So if he went home for weekends to Baltimore or to

14 somewhere else, you would have no way, maybe he went to New York,

15 you would have no way of knowing that kind of thing, right?

16 A    Yes, sir.

17 Q    If he went to Altoona, Pennsylvania, you would have no way

18 of knowing that, either, is that correct?

19 A    That's correct.

20 Q    Just one moment, Mr. Powers.  Mr. Powers, I don't have any

21 further questions.  Thank you very much for agreeing to

22 telecommute with us like this.

23       THE WITNESS:  That's my pleasure.

24       MR. LAWLOR:  Your Honor, I have no redirect.  Coach,

25 thank you again.

1          THE COURT:  Mr. Powers, thank you very much.  We would

2     have been delighted to have you with us.  But we're delighted

3     that we were able to lessen the inconvenience to you for the

4     travel.  Thank you very much, sir.

5          THE WITNESS:  No problem.

6          THE COURT:  Thank you.  All right.  Louis, if you'll do

7     your thing.  Thank you.  Get us hooked back up to the --

8          Nina, would you help remove the table, please?

9          MS. RHODES:  Your Honor, could Mr. Harding and I

10    approach briefly about the next witness?  While we're waiting for

11    this.

12         THE COURT:  Yes.  Come on up.

13         (Bench conference on the record:)

14         MS. RHODES:  The issue with detective Niedermeier, I

15    realized that what I was going to do with him sort of preceded

16    the MVA expert.  The MVA person's going to say that, when we

17    asked him for a search of the Alpha and Omega Sedan Service, any

18    cars registered to them during that time period.  And they came

19    back with a Buick, which is what is consistent with, that's

20    actually inconsistent with this, but consistent with his

21    statement, his transcribed statement, Mr. Mitchell 's.

22         So here he says, what Niedermeier wrote down is Big L

23    drives a blue Buick.  I'm going to introduce this anyway for

24    another part here, or mention it.

25         The problem I have is I don't have a witness to do it.

1    So what I would like to do is just show this to the jury and show

2    this to the jury before I call the MVA person.

3              THE COURT:  Okay.  Wait a minute.  What is this?

4              MS. RHODES:  This is Willie Mitchell's, the notes

5    Detective Niedermeier took from Mr. Mitchell on, actually, it's

6    4/17/02.

7              THE COURT:  And so it's just marked for identification

8    for now?

9              MS. RHODES:  Well, the government already has had it

10   admitted.

11             THE COURT:  Oh.  Then what's problem?

12             MS. RHODES:  Well, I just, I want to show it to the

13   jury again but I don't have a witness to do it with.

14             THE COURT:  It's in evidence.

15             MS. RHODES:  So I can just --

16             MR. HARDING:  I don't object.  I think you're probably

17   going to want to do it with the witness on the stand.  But

18   somehow --

19             THE COURT:  But you can.

20             MR. HARDING:  While he's on the stand.

21             THE COURT:  You can put it on the DOAR and say, ladies

22   and gentlemen, this is Government Exhibit W-42 that was admitted

23   while Detective Niedermeier was on the stand, his notes.  And

24   read whatever you want to read.

25             MS. RHODES:  Okay.  Well, I don't need to have the MVA

1    person on the stand when I do that.

2              THE COURT:  No, you don't.  I'm sorry.  What was the

3    other part?

4              MS. RHODES:  Just to show them this, this has already

5    also been admitted.

6              THE COURT:  Right.  That's the funeral program.

7              MS. RHODES:  Yeah.

8              THE COURT:  Right.

9              MS. RHODES:  And I just want to point out this, which

10   says Darryl was the owner of his own business, Alpha and Omega

11   Delivery and Sedan Service.  Because that's how we got the name

12   to subpoena MVA.  All right.  That's fine.

13             THE COURT:  Yes, Mr. Harding.

14             MR. HARDING:  Judge, no one suggested that we did

15   anything to bring, tell Detective Niedermeier not to appear

16   today.  But I just wanted to be clear on the record that I have

17   not spoken to Niedermeier since he testified here.  No one on the

18   government team has told him to take sick today or anything --

19             THE COURT:  All right.

20             MR. HARDING:  And I have no idea what's --

21             THE COURT:  Ms. Rhodes didn't suggest any anything of

22   the sort.

23             MR. HARDING:  No, she didn't.

24             MS. RHODES:  I've cast aspersions in so many other ways

25   on the government but I couldn't, didn't see a reason to today,

1    Your Honor.

2            THE COURT:  Did you actually talk to him or was it his

3    sergeant or somebody?

4            MS. RHODES:  No.  Somebody called my assistant at the

5    office this morning and said he's out sick, he hurt his back.

6            THE COURT:  So we could get him on the phone if you

7    really need him.  I mean, it sounds like you don't need him.

8            MS. RHODES:  I guess I'm okay.

9            THE COURT:  Okay.

10           MS. RHODES:  Yeah.  Thank you.

11           (End of bench conference.)

12           THE COURT:  You may proceed, Ms. Rhodes.

13           MS. RHODES:  Thank you, Your Honor.  Your Honor, before

14   the next witness comes in, I have two documents I want to show

15   the jury that relate to his testimony.  The first is Government's

16   W-5G, which they will possibly recall as the funeral program for

17   Darryl and Anthony Wyche.  And you'll see in the first page here

18   it says, Forever Brothers, Alpha and Omega.

19           And on the second page, where the flag identifies, it

20   says Darryl was the present owner of his own business, Alpha and

21   Omega Delivery and Sedan Service.

22           THE COURT:  You will just wait one moment, sir.  Just

23   wait one moment, please.  Go ahead, Ms. Rhodes.

24           MS. RHODES:  Thank you.  And the next exhibit I want to

25   show is Government's W-42.

1            THE COURT:  Each of which is already in evidence.

2            MS. RHODES:  Correct.  And as the jury may recall, this

3    is the notes from Detective Niedermeier when he interviewed

4    Willie Mitchell on April 17th, '02.  You will probably recall

5    that the date is incorrect there.  It says 3/17.  But that was

6    corrected in his testimony, I believe.

7            And you'll note that this is where Mr. Mitchell,

8    there's some questioning and some notes are taken, it says

9    Coldspring and Reisterstown McDonald's.  It then says, Big L

10   asked for four and a half, used his girlfriend's cell phone to

11   call D, and that's Darryl.  And then it says he says Big L drives

12   blue Buick.  Sets up meeting.

13           Down at the bottom you'll see it says Rick Fox movie on

14   when he was talking to D and L.  It also indicates that he's able

15   to identify L.

16           THE COURT:  All right.  Sir, if you'll now approach the

17   witness stand.  Thank you.

18       FRANK HUBBARD, DEFENDANT MITCHELL WITNESS, SWORN

19           THE CLERK:  Be seated.  Speak directly toward the mike.

20   State your name and spell it for the record.

21           THE WITNESS:  My name is Frank Hubbard, Jr.

22           THE COURT:  Spell that, please, sir.

23           THE WITNESS:  H-U-B-B-A-R-D.

24           DIRECT EXAMINATION

25   BY MS. RHODES:

1    Q    Mr. Hubbard, I'm going to hand you a copy of an exhibit that

2    is being marked as Mitchell Exhibit 15.  Thank you, Your Honor.

3    Can you tell us, first of all, where you're employed?

4    A    I'm employed at the Motor Vehicle Administration, State of

5    Maryland.

6    Q    And how long have you worked there?

7    A    Five years.

8    Q    Okay.  What's your position there now?

9    A    I'm an investigator.

10   Q    Okay.  And are you, as part of your, are part of your duties

11   to respond to subpoenas and come to court?

12   A    Yes.

13   Q    And what, what was your work before you began working at

14   MVA?

15   A    I was a patrol officer for the City of Baltimore.

16   Q    Okay.  And you retired from that?

17   A    Yes, I did.

18   Q    Okay.  And how long, how long was that your position?

19   A    31 years.

20   Q    So I bet you've testified before?

21   A    Yes, I have.

22   Q    Okay.  Can you tell us what the documents here show, just

23   starting with the very first page of what's Mitchell 15?

24   A    This is a document from our computer which shows an

25   ownership of a vehicle.

1    Q    Okay.  And who is, it says lien holder.  Murray's Used Cars.

2    What's that refer to?

3    A    Yes.  That is a person who is still owed money on this

4    vehicle, when it was sold.

5    Q    Okay.  And who's shown as the owner?

6    A    The owner is listed as an Alpha and Omega Sedan Service,

7    Liberty Road, Baltimore, Maryland.

8    Q    Okay.  And what's the number just above Alpha and Omega

9    Sedan Service?  What's that?

10    A    That is what you call a Soundex number.  Every organization

11    or every individual is, is given this number.  For this case,

12    it's precoded as a Z as in zebra.  And this is for businesses.

13    If it's an individual it would be the first initial of their last

14    name with the preceding of the four sets of three digit numbers

15    corresponding to last name, date of birth, and other pertinent

16    information.

17    Q    Okay.  So just all businesses start with a Z for their

18    Soundex number?

19    A    Yes.

20    Q    And the next page, if you could turn to that.  And just

21    briefly, what does this show?  Not every item, but just what is

22    this?

23    A    Yes.  This is what you call a title receipt.  When the

24    vehicle is titled, fees are paid to the Administration of

25    Maryland, at which time the left-hand side indicates when the

1    vehicle was, the transaction would be 3/9/01.  The next column

2    would be your receipts that were, fees that were paid for titling

3    and registering the vehicle.

4    Q    Okay.  And the transaction date, what does that refer to?

5    A    That is when Alpha and Omega Sedan Service submitted

6    documentation, which would be application for title, would be a

7    title reassignment, could be inspection certificates, to the MVA,

8    in which they paid fees for the state tax, titling fees, and it

9    looks like registration fees, lien fees, etc.

10   Q    Okay.  And turning to the next page, then.  What's this

11   document show?

12   A    Yes.  This is the application for the Certificate of Title,

13   in which the applicant fills out and states where pertinent

14   information on the vehicle, which would be lien fees, who they

15   bought the car from.  Down at the bottom you have insurance

16   information, and mileage odometer statements, and signatures of

17   the applicant and the sellers.

18   Q    Okay.  And directing your attention to the vehicle

19   description section, indicates it's a used vehicle, is that

20   right?

21   A    Yes.

22   Q    And can you tell us the model year, make?

23   A    As stipulated on the documents, 1987.  It's a Buick.  It

24   looks like a four door.  And has a seven digit and serial number.

25   Has six cylinders.  And it's a gas, fueled by gasoline.

1    Q    Okay.  And a little bit further down it's got the date of

2    the lien.  Does that mean the date that the title was transferred

3    to Alpha and Omega Sedan Service?

4    A    Yes.  That was when they secured the lien for this vehicle,

5    which would be, I believe it's like $1,000.

6    Q    Okay.  And over to the, to the right it says selling price.

7    Is that the --

8    A    Yes.  That would be the selling price.  Then your 5%, which

9    was back in '01, would be the $45 tax, state tax, which goes to

10   the State of Maryland.

11   Q    Okay.  Now, on this vehicle description, does it anywhere

12   indicate what color the car is?

13   A    No, it does not.

14   Q    Do MVA documents normally indicate that?

15   A    No, they do not.

16   Q    Do you know how, what is needed in order to figure out what

17   color this car was?

18   A    Sometimes in the, in the 17 digit code, sometimes some of

19   them are, they have a color code.  But that's only on, that might

20   have been on older vehicles.  I'm not familiar with it.

21   Q    Okay.  So other than that, the only other way would be to

22   have the car now?

23   A    Yes.

24   Q    Okay.  Looking at the next page, then.  Who's this Charles

25   Luttrell in Pennsylvania?

1    A    Yes.  This was the previous owner before Murray's Used Cars

2    had the vehicle.

3    Q    Okay.  Let me skip to the next page because that may have

4    more of an explanation on it.

5    A    Yes.  This is called the Dealer Reassignment form, at which

6    time the vehicle, the original owner was Charles Luttrell, at

7    which time he sold the vehicle to, which would be, would be a

8    dealer or another person.  Then you have a reassignment from, it

9    looks like Sloane Toyota.  Then Sloane Toyota sold this vehicle

10   to probably a wholesale dealer called Hub Auto Sales, in which

11   they just do a, the cars's not titled.  The original title says

12   from Pennsylvania.  Just like a reassignment form showing the,

13   where this vehicle has been going, and with the difference in the

14   first one was, I believe, this looks like the eighth month of

15   2000.  Then it got transferred on reassignment on the ninth month

16   of 2000.  Then it looks like on February the 14th of '01,

17   Murray's Used Cars obtained this vehicle.

18   Q    All right.  And looking, then, to the next page.  It looks

19   like here we have the, in addition to the make and the year and

20   the style, we have the model number, I mean the model type, is

21   that right?

22   A    Yes.

23   Q    Okay.  And that's a Century?

24   A    Century, yes.

25   Q    All right.  So what we have in total here is Alpha and Omega

1    Sedan Service is the owner of a 1987 Buick Century, is that

2    right?

3    A    Correct.

4    Q    Okay.  And the information you were asked for in the

5    subpoena, do you recall what that, what that was, what was

6    included in that?

7    A    I believe that was for all, all vehicles, all vehicles

8    being, might be owned by Alpha and Omega Sedan Service.

9    Q    Okay.  And by using, when the MVA would use the Z number for

10   that sedan service, would that come up with everything that they

11   owned?

12   A    Yes.  Every individual, even a private owner, has their own

13   number.  And when it goes through this number, our computers

14   stipulate any vehicle that is presently titled with this, as of

15   right now, is under that number, it would just under, be Alpha

16   and Omega Sedan Service would be the only one according to our

17   records.

18   Q    Okay.  So there were no other vehicles that came up at all

19   under Alpha and Omega Sedan Service, then?

20   A    Best of my knowledge, no.

21   Q    Okay.  Thank you.  Now, are you aware of other information

22   that was sought by subpoena from MVA in terms of, in terms of

23   some other ways of tracing a blue Buick?

24   A    Yes.

25   Q    Okay.  And is there a way that MVA can go back and tell us

1    today what, who owned or who had registered to them Buicks, not

2    even by color, just Buicks that were older models in 2002?

3    A    Yes.  We have what they call the Daiwa System in which

4    everything is, every time a vehicle is titled, it's put on

5    microfilm, at which time it, this car could have changed hands in

6    Maryland, could be five times or ten times, and it's recorded.

7    Q    Okay.  But would that information show today, show what cars

8    were registered in 2002?

9    A    No, it would not.

10   Q    Okay.  So there's no way of finding that historical

11   information out now?

12   A    No, it would not.

13   Q    Is there any way of searching by initial first letter or the

14   letters E-L as a hyphenated name --

15   A    No.

16   Q    -- in your database?

17   A    No, it would not.

18   Q    Court's indulgence.  Nothing further, Your Honor.  Thank

19   you.  Thank you.

20             CROSS EXAMINATION

21   BY MR. HARDING:

22   Q    Good afternoon, Mr. Hubbard.  My name's Robert Harding.

23   Just one quick question, really.  Ms. Rhodes just now asked you

24   about a search for a blue Buick.  It was your testimony, though,

25   that you have no information at all about the colors of the cars?

1    A    No, I do not.

2    Q    Okay.  Thank you.  That's all I have.

3            THE COURT:  Mr. Hubbard, thank you very much, sir.

4    You're excused.  I think that's his copy.

5            MS. RHODES:  Those, I believe, are all his.  Yes.

6            THE COURT:  Next.

7            MS. RHODES:  Your Honor, at this time I meant to, after

8    discussion with Mr. Harding over the lunch break, decided we're

9    not going to call the second witness that we were intending to

10   call.

11           THE COURT:  Okay.

12           MS. RHODES:  But I am going to call my associate to

13   introduce several of the certified records.

14           THE COURT:  Okay.

15           MS. RHODES:  So I would call Elizabeth Pentecost to the

16   stand.

17        ELIZABETH PENTECOST, DEFENDANT MITCHELL'S WITNESS, SWORN

18           THE WITNESS:  I do.

19           THE CLERK:  Be seated.  Speak directly toward the mike.

20   State your name and spell it for the record.

21           THE WITNESS:  Elizabeth Pentecost.  P-E-N-T-E-C-O-S-T.

22           DIRECT EXAMINATION

23   BY MS. RHODES:

24   Q    Can you state where you're employed and what your position

25   is?

DIRECT EXAMINATION OF PENTECOST                    127

1    A    Albright & Rhodes, associate.

2    Q    And is that my law firm?

3    A    Yes.

4    Q    And you're an associate what?

5    A    Attorney.

6    Q    Okay.  I'm going to actually let you start with the

7    documents in the order you have them, then.  What is the first

8    one you have there?

9    A    The thing I have on top is Certificate of Death.

10   Q    Okay.  And can you tell us what that is as I put this on the

11   DOAR?  This is Mitchell 13.

12   A    It's a Certificate of Death from the State Registrar of

13   Vital Records of Maryland.

14   Q    And is this certified?

15   A    This is a copy.

16   Q    I mean, the document we have, is it a certified copy?

17   A    Yes.

18   Q    A certified document?  Sorry.  Was that a yes?

19   A    Yes.

20   Q    And who is the, who is it for?

21   A    Tyrone Anthony Blanding, Sr.

22   Q    And what is the date of death?

23   A    October 5th, 2007.

24   Q    Okay.  Okay.  And what is his date of birth?

25   A    August 3rd, 1977.

1    Q    Okay.  And do you see in Part 30, 23-A, where it says what

2    the cause of death was?

3    A    I'm sorry.  What part?

4    Q    In 23-A?

5          THE COURT:  You might want to look at the monitor, Ms.

6    Pentecost.

7    A    I see.  Sorry, sir.  Gunshot wound of head and stab wound of

8    left arm.

9    Q    Okay.  Thank you.  Your Honor, we would move into evidence

10   Mitchell 13.

11         THE COURT:  Without objection, it's admitted.  Could

12   you remind the jury of who this person is?

13            MS. RHODES:  Yes.  Tyrone Blanding was mentioned by --

14            THE COURT:  Another witness?

15            MS. RHODES:  No, I'm trying to think.  Right.  Dwayne

16   Denham, Deezo, as being the last person who saw the Wyche

17   brothers alive.  And the issue was when did he tell anybody.

18            THE COURT:  All right.  Thank you.  It's admitted.  And

19   that was Mitchell Number 13.

20   BY MS. RHODES:

21   Q    Yes.  The other document, which is a brief one, is, you have

22   the Baltimore County School information, after I just said you

23   could tell me what the order was?

24   A    I do.

25   Q    Okay.  And what does this show?

1    A    It's a letter summarizing Mr. Mitchell's school records for

2    Baltimore County Public Schools.

3    Q    Okay.  And this looks like a letter and not really a

4    document.  Do you know why that is?

5    A    Their records were too old to have actual documents.  And

6    they had to go to some sort of source they couldn't print out to

7    summarize this, to make a summary.

8    Q    Okay.  So they compiled everything they had into this?

9    A    Yes.

10   Q    Okay.  And the elementary school, this was in 1988 he

11   attended, correct?

12   A    The first is an elementary school, yes.

13   Q    Okay.  Owings Mills Elementary?

14   A    Yes.

15   Q    And it indicates for tenth grade at the top there, Baltimore

16   County Public Schools Alternative High and then a withdrawal date

17   in '94.  Do you know what that signifies?

18   A    The last record ends in 04/94, with a withdrawal from that

19   school.

20   Q    Okay.  And do you know whether or not this means that was

21   the end of his schooling or whether that was just the end of the

22   formal county school system?

23   A    That's just the end of the formal county school records from

24   here, from the Baltimore County Public Schools.

25   Q    Okay.  Thank you.

1          THE COURT:  And that is Mitchell number?

2     Q    Mitchell Nine, Your Honor.

3          THE COURT:  Mitchell Nine.

4     Q    I would move that in at this time.  The government has

5     agreed to these exhibits.  All right.

6          Now, back to the schooling and some other issues.

7     Turning to the one that's from Youth Services International.

8     This is Mitchell 14.  First of all, do you know what Youth

9     Services International is?

10    A    It's a private company that took over the Hickey School in

11    the '90s, I believe.

12    Q    Okay.  And let me show you.  This is the second page there.

13    What is this document showing?

14    A    A copy of an ID Card for Willie Mitchell.

15    Q    Okay.  Issued by Youth Services International?

16    A    Um-hum.

17    Q    Okay.  And at this point was he a student or an employee of

18    Youth Services, do you know?

19    A    For 2000, employee.

20    Q    Okay.  And I just want to go through some of the, some of

21    the other things.  If you can turn to the next page.  This

22    indicates, see, I just want to show the jury the top here so you

23    can see it's from, from YSI.  And is CSC another, another

24    organization that either before or after YSI ran Hickey?

25    A    It is Correctional Services and I don't remember the full

1   name, no.

2   Q    Okay.  And this is, appears to be some kind of a hiring

3   form?

4   A    Yes.

5   Q    Okay.

6          THE COURT:  You know, this may be a good point, Ms.

7   Rhodes.  I don't remember anybody ever actually telling the jury

8   what the Hickey School was.  No doubt many of them, if not all of

9   them, know.  But maybe you want your associate to.  Maybe you

10  don't.

11  Q    No, it's been talked about enough.

12         THE COURT:  Yeah.  It's been talked about.

13  Q    There might be -- I guess there's not.  Okay.  Can you tell

14  us what the Hickey School is, what we're referring to here?

15  A    It was a juvenile detention center that also acted as a

16  school for having the kids while there receive GED's, continue in

17  classes while they're there.

18  Q    Okay.  And it was located in Baltimore County, is that

19  right?

20  A    I don't remember exactly where it was located.

21  Q    Okay.  All right.  And this indicates that Mr. Mitchell was

22  applying or was looking towards a job here.  Can you just

23  describe what the job was, what the salary was, from this?

24  A    It says that the job history information is an hourly job

25  with a pay rate of $8.41 an hour.  I guess they crossed out

1   full-time and part-time to put on call.  The title of the

2   position was Youth Counselor.  And then they used internal codes

3   for department code and physical location.

4   Q    Okay.  And show this briefly.  There's also, he had

5   completed a W-4 withholding, is that right?

6   A    Yes.

7   Q    Okay.  And this form indicates the shift, says it was on

8   call.  Again, it confirms a salary.  And then it's got the offer

9   date?

10  A    It says offer accepted, and I can't tell if that's a nine

11  cut off, 27/2000.

12  Q    Okay.  And the start date was then October?

13  A    Nine/2000.

14  Q    And it says leave, I guess that is packet, PKT, leave packet

15  at gate?

16  A    I think that's what --

17  Q    And is that because this is a secure facility?

18  A    Yes.

19  Q    Okay.  And when it says in the upper right there, position

20  requisition form, probably an internal document, is Impact

21  Kennedy a particular program, the name of a program at Hickey?

22  A    Yes.

23  Q    And their records -- okay.  Here we have at the top the

24  address there, just for people, so people know, Charles H. Hickey

25  Junior School, 2400 Cub Hill Road in Baltimore?

1    A    Yes.

2    Q    And this is, this page indicates an employment reference

3    check and that somebody was contacted and provided information to

4    confirm prior employment, is that right?

5    A    Yes.

6    Q    And that indicates the prior employment was March, '96 to

7    August, '96.  Is that right?

8    A    Yes.

9    Q    And the position was assistant in the Physical Education

10   Department?

11   A    Yes.

12   Q    Okay.  And was there also a Maryland tax withholding form

13   filled out in this application?

14   A    Yeah.  MW-507 form.

15   Q    Yes.  Okay.  On this form, did the person filling it out

16   indicate that they had a GED degree from Charles Hickey?

17   A    Yes.  Under education.

18   Q    It also indicates that they had attended Nassau Community

19   College but not graduated, is that correct?

20   A    Yes.

21   Q    Okay.  In the upper left-hand corner, for the position

22   applying for, you had mentioned before it says on call for the

23   position.  This also says 10 p.m. to 6 a.m. would be the shift,

24   is that right?

25   A    Yes.

1    Q    And as part of the application process, there was a drug

2    test administered.  Is that what this reflects?

3    A    Yes.

4    Q    And was that the very bottom there indicates negative?

5    A    Yeah.  That test result was negative.

6    Q    And at the end here we have a benefits enrollment form,

7    which indicated that Mr. Mitchell signed up for employee medical

8    and dental coverage, is that right, and long term disability

9    insurance?

10   A    Yes.

11   Q    All right.  I have nothing further on that document, Your

12   Honor.  We would move Mitchell 14 into evidence.

13        THE COURT:  It's admitted.

14   Q    Court's indulgence.  Okay.  Do you have this one with you?

15   A    I do.

16   Q    Okay.  I don't believe I have this marked.  This would be

17   Mitchell, this would be Mitchell 15.  And it is a copy of what?

18   A    TV Guide.

19   Q    Okay.  Can you tell me how you obtained this document and

20   what the date of it is?

21   A    I obtained it through TV Guide.

22   Q    How did you get it, find them?

23   A    Online, and then I e-mailed and called them.

24   Q    Okay.  So they, and they provided this to you, then?

25   A    Yeah.  Yes.

1    Q    Okay.  Just going to turn it around for one second so the

2    jury can see the date, which is on the spine of the document.

3    A    It's also on the front underneath the TV Guide part.

4    Q    Well, it's got the March 23rd to 29th.  I want the year to

5    show, which is in the middle there, 2002.  What's inside this

6    packet?  Is it the whole TV Guide?

7    A    No.  It's the first page, which is just for the Baltimore

8    area, gives a chart of channels, what channel correlates with

9    what TV station.

10   Q    Okay.  And what's the rest?

11   A    The rest is just the pages that cover Sunday, March 24th,

12   2002.

13   Q    Okay.  So this whole packet is just one day from the TV

14   Guide?

15   A    Yes.

16   Q    Okay.  Okay.  And I want you to turn to page 110 in the

17   document.

18   A    Okay.

19   Q    Going to bring this up to the top a little bit.  This is

20   Sunday or early Monday morning.  So this would be, you can see to

21   the right, it says March 24th and 25th?

22   A    Yes.

23   Q    Okay.  And there's a movie indicated here beginning what

24   time?

25   A    1:30 a.m.

1   Q    Okay.  And what is the movie?

2   A    The Collectors.

3   Q    And who is in it?

4   A    Casper van Dien and Rick Fox.

5   Q    Okay.  And Rick Fox, is that the same name we heard that was

6   mentioned earlier from Mr. Mitchell's statement?

7   A    Yes.

8   Q    Thank you, Your Honor.  We move in Mitchell 15.

9            THE COURT:  Mitchell 15 is admitted.

10  Q    I'm sorry, Ms. Arrington.  Did I get that wrong?  Is 15?

11  Court's indulgence.  Your Honor, that's all I have for now.  I

12  have one other matter I would like to briefly address the Court

13  with, that would involve a couple of documents the government has

14  but they're not stipulating to, that I've provided them but

15  they're not stipulating to.

16           THE COURT:  Well, why don't you go ahead?

17           MR. HARDING:  Your Honor, I object to the --

18           THE COURT:  Well, there's nothing to object to yet.  Do

19  you want to lay a foundation?

20           MS. RHODES:  Well, I think we might, part of the

21  problem is the witness, the witness is not here to do that.  So

22  we need to --

23           THE COURT:  Oh, okay.  Is there any cross of --

24           MR. HARDING:  Yes.

25           THE COURT:  -- Ms. Pentecost?

1              CROSS EXAMINATION

2    BY MR. HARDING:

3    Q    Good afternoon, Ms. Pentecost.

4    A    Good afternoon.

5    Q    You've been here during most of this trial, haven't you?

6    A    A lot of it.

7    Q    Sitting back here?

8    A    Yes.

9    Q    Okay.  I want to call your attention first to Mitchell

10   Exhibit 14.  Do you still have that there in front of you?

11   A    I don't have the numbers on them.

12   Q    Oh.  It's the Youth Services International document.

13   A    Okay.

14   Q    Do you have that?

15   A    Yes.

16   Q    Well, first, let me ask you.  You said that the Hickey

17   School was a juvenile detention center, correct?

18   A    Yes.

19   Q    That means it's a place where you get sent after a finding

20   of juvenile delinquency in juvenile court, is that correct?

21   A    Yes.

22   Q    It's run by the State of Maryland but it was contracted out

23   to this private firm back at that time, is that correct?

24   A    Yes.

25   Q    And in fact, it's been closed down now, has it not?

1    A    I believe so.

2    Q    It was first taken back over by the State and then closed

3    out altogether by Governor Ehrlich a few years ago, is that

4    right?

5    A    I believe so.

6    Q    On page, the very first page, actually, of this document,

7    Mitchell 14 -- well, first let me ask you.  You were here in

8    court, were you not, when we had another document about Mr.

9    Mitchell's employment at the Hickey School on the screen and it

10   showed that he was terminated in December of 2000, December of

11   2000.  Do you recall that?

12   A    I'm not sure that I was here.

13   Q    Okay.  Well, he started in October, on October 9th, we saw?

14   A    Um-hum.

15   Q    This gives the reason for his separation on the first page.

16   Do you see that?

17   A    Yes.

18   Q    And what's the reason?

19   A    Mishandling youth.

20   Q    And then it says, would you rehire?  And what's the answer?

21   A    No.

22   Q    And Ms. Rhodes also showed you a page later on in this

23   document.  Were you here during Jaquetta Smith's testimony?

24   A    I was not.

25   Q    Oh.  Ms. Rhodes showed you this page where it said that Mr.

1    Mitchell was previously employed as an assistant in the Physical

2    Education Department back in March to August of '96.  Do you see

3    that?

4    A    Yes.

5    Q    And that's when he was not an employee there, but

6    incarcerated there, is that correct?

7    A    I'm not sure.

8    Q    You're not sure?  Are you aware that he was incarcerated

9    there twice, once in 1995 -- once in 94/95 and once in '96?  Were

10   you aware of that?

11   A    I'm aware that he was incarcerated there but I don't

12   remember the exact dates.

13   Q    Were you aware that he was incarcerated there once for an

14   armed robbery and once for an assault?

15   A    Yes.

16   Q    Okay.  And this '96 stint was for the armed robbery, is that

17   correct?

18   A    I don't remember which, the dates of, which, which were

19   which dates.

20   Q    Did you know that Mr. Gardner and Mr. --

21        MR. KURLAND:  Objection.

22   Q    -- Martin were also there in '96 for the same offense?

23        THE COURT:  The objection's overruled.  You may answer.

24   A    I knew that they were also there but I don't know the dates

25   that they were there off the top of my head, either.

1   Q    Did you know that they were there for committing an armed

2   robbery with Willie Mitchell?

3            MS. RHODES:  Objection, Your Honor.

4            THE COURT:  Sustained.

5   Q    Okay.  Did you pull records for Mr. Gardner and Mr. Martin?

6   Is that how you know that they were there?

7   A    I've seen records in going through the records.

8   Q    You've got their records, too?

9   A    I have just seen what we have.  I didn't ever pull any

10  records of those defendants from Hickey or from Youth Services

11  International acting as Hickey.

12  Q    Okay.  Ms. Rhodes called your attention to this TV Guide.

13  Excuse me.  You've been here during the trial long enough to know

14  that the Wyche brothers murder occurred around 12, between 12:31

15  and 12:38 in the morning of March 25th, 2002, is that correct?

16  A    Yes.

17  Q    So this movie started at 1:30 in the evening, is that

18  correct?

19  A    1:30 in the morning.

20  Q    I'm sorry.  1:30 in the morning -- yeah, a.m., on the 25th,

21  right?

22  A    Yes.

23  Q    Do you know, Ms. Pentecost, does this 1:30 here, does that

24  mean it lasts an hour and a half, or do you know?

25  A    The 1:30 after drama?

```
1    Q    Yeah.

2    A    I'm not sure what that means.

3    Q    Okay.  Just one final question.  If somebody suddenly asked

4    you what movie you watched on TV three and a half weeks ago,

5    would you be able to tell them the answer?

6              MS. RHODES:  Objection, Your Honor.

7              THE COURT:  Overruled.  You may answer.

8    A    Probably not.

9    Q    Okay.  No further questions, Your Honor.

10             THE COURT:  Ms. Pentecost, thank you very much.

11             Mr. Flannery, have you and the government reached

12   agreement on that matter?

13             MR. FLANNERY:  We have, Your Honor.

14             THE COURT:  Great.  Please.

15             MR. FLANNERY:  This is Harris Number Nine.  Been marked

16   Harris Number Nine.  And the government and defense counsel have

17   stipulated that this is a summary chart based on a compilation of

18   public records, that summarizes the adult institutional movement

19   of Mr. Dobropolski.  So it's a summary chart of the dates that he

20   was incarcerated and the particular institution that he was

21   incarcerated at.  And then it also includes the addresses that he

22   reported at the time of his incarceration.

23             MR. HARDING:  Well --

24             THE COURT:  You want to clarify that last statement?

25             MR. FLANNERY:  I will clarify that.  The addresses are
```

1    the addresses that are reported on the public documents.

2              THE COURT:  Okay.  And just so the jury understands it,

3    Mr. Flannery, could you just walk the jury through just a --

4              MR. FLANNERY:  A couple lines?

5              THE COURT:  Yeah.  Three or four of the items so that

6    the jury, when they look at it, they'll have a sense of what the

7    documents communicate.

8              MR. FLANNERY:  Sure.

9              THE COURT:  Perhaps if you could, if you could zoom in

10   just a bit.  Okay.  Good.

11             MR. FLANNERY:  For instance, the first line is on

12   February 7, 1989.  That is the first adult arrest of Mr.

13   Dobropolski.  He had an address at that time that is reflected in

14   the public records as 6107 Western Run Drive, zip code 21209.

15             If you jump down to number, if you look at number two,

16   directly above that, there's a date of 2/7/89 to 12/29/89, and he

17   was on the street for that period.  The reason that that, be able

18   to say he's on the street for that period is based on the next

19   record of his next incarceration, which is 12/29/89 to 12/31/89.

20   And at that point he was in the Baltimore City Police precinct.

21   Again, based on public documents.

22             And you just follow down from there.

23             THE COURT:  So the highlighted portions -- and this is

24   what, a five or six page document, I believe?

25             MR. FLANNERY:  Yes.

1          THE COURT:  So the highlighted portions -- perhaps you

2     can turn the page just so the jury again can see -- the

3     highlighted portions, what you've done is you've attempted to

4     isolate the time periods that, based on your review of the

5     records, would show that Mr. Dobropolski was not incarcerated but

6     was on the street, as it's described there.

7          MR. FLANNERY:  That's correct, Your Honor.

8          THE COURT:  All right.  And the number once again is?

9          MR. FLANNERY:  Harris Nine.

10          THE COURT:  Harris Nine's admitted.  Thank you very

11     much.  And I appreciate counsel, you and Mr. Harding going over

12     those many documents.

13          MR. FLANNERY:  I appreciate, Mr. Harding.

14          THE COURT:  Thank you.  Anything further?

15          MR. CROWE:  Yes, Your Honor.  The Court may recall that

16     before the lunch break today we were considering Defendant

17     Martin's Exhibit Nine.  I think the Court can follow this a

18     little better if I hand you --

19          THE COURT:  Well, have you reached agreement?

20          MR. HARDING:  No, Your Honor.

21          THE COURT:  Okay.  Why don't we do this?  I understand,

22     so there's an issue with Mr. Crowe.  There's an issue, perhaps

23     one or two documents, with Ms. Rhodes.  Is that right, Ms.

24     Rhodes?

25          MS. RHODES:  Yes, Your Honor.

1          THE COURT:  And I don't believe, Mr. Flannery, you and

2     Mr. Martin have anything further?

3          MR. FLANNERY:  That's correct.

4          THE COURT:  And I don't believe, Mr. Kurland --

5          MR. KURLAND:  I have.

6          THE COURT:  Oh, you have one issue.  Okay.  So ladies

7     and gentlemen, we'll take a brief recess.  And counsel apparently

8     need me to rule on certain admission of evidence issues.  And

9     we'll do that.  And then after the recess, I expect all of the

10    evidence will be concluded.  But we'll see.

11         Please leave your note pads on your chairs.  Have no

12    discussion about the evidence or about the case.  Continue to

13    keep an open mind about all issues.  The jury is excused for 15

14    minutes.

15         (Jury exits the courtroom.)

16         THE COURT:  Mr. Crowe, you have, you have the lectern.

17         MR. CROWE:  Yes, Your Honor.  I think the Court could

18    perhaps follow along better --

19         THE COURT:  All right.  If you'll approach.

20         MR. CROWE:  Your Honor, Defendant's Exhibit Nine is a

21    two page document from the FBI laboratory concerning examination

22    of the Irene Magginson voice mail.

23         THE COURT:  Yes.

24         MR. CROWE:  And it indicates, and the results of the

25    examination are shown on the second page.  We believe that this

1    is a self-authenticating document and one which should come into

2    evidence because it is a report of a government, part of a

3    government investigation by an agency authorized to make the

4    examinations as a matter of law, and is the type of document

5    which is admissible against the United States in a criminal case

6    as an exception to the hearsay rule.

7         THE COURT:  And what particular exception?  Are you

8    relying on business records?

9         MR. CROWE:  No, Your Honor.

10        THE COURT:  What are you relying on?

11        MR. CROWE:  Sorry.  I had it marked a second ago and

12   now I've lost it.  If you'll give me just a second to find it.

13        THE COURT:  Sure.  By the way, you know the Supreme

14   Court heard argument last week, I think, on lab reports.

15        MR. CROWE:  I was not aware of that.

16        THE COURT:  No?

17        MR. CROWE:  I think I've been occupied by other things.

18        THE COURT:  Yes, of course.  The Supreme Court heard

19   argument in a case in which the absence of a stipulation, the

20   judge admitted a cocaine analyses.  I think it was cocaine.  And

21   the Supreme Court is going to look at it.

22        MR. HARDING:  It's 803(8).

23        MR. CROWE:  Yes, Your Honor.  The rule, Mr. Harding

24   helped me, is 803(8)(c).

25        THE COURT:  803(8)(c)?

1          MR. CROWE:  Yes, sir.

2          THE COURT:  Providing for the admission of --

3          MR. CROWE:  Records, reports, statements, data

4    compilations and any form of public office's or agency's --

5          THE COURT:  Public records.

6          MR. CROWE:  Setting forth, C, in civil actions and

7    proceedings and against the government in criminal cases, factual

8    findings resulting from an investigation made pursuant to

9    authority by granted, granted by law unless the sources of

10   information or other circumstances indicate a lack of

11   trustworthiness.

12         THE COURT:  And you contend that this is a factual

13   finding?

14         MR. CROWE:  Yes, Your Honor.  The factual findings are

15   that the quality of the tape was so poor that it, that it was,

16   quote, "of insufficient quality to conduct meaningful comparisons

17   with any voice samples."  And then the second factual finding

18   would be that a critical listening examination revealed at least

19   two different speakers talking probably in a moving vehicle.  A

20   more definitive conclusion could not be reached due to the poor

21   recording quality and the low level of the recorded voices.

22         THE COURT:  All right.  Well, I'm going to sustain the

23   objection.  First of all, we can all hear two different voices.

24   You don't need a spectrographic methodology to do that.  And that

25   the recording is of insufficient quality to conduct meaningful

1    comparisons with any voice samples I suppose is a fact.  It's

2    really more in the nature of this expert's conclusion.

3             MR. CROWE:  I think it's this expert's factual

4    conclusion, yes, Your Honor.

5             THE COURT:  I think it's his opinion.

6             MR. CROWE:  I believe that it is his opinion.  And I

7    don't, I don't know that the rule excludes, excludes opinions.

8             THE COURT:  Well, it says, factual findings.

9             Is there any reason you didn't call the witness?

10            MR. CROWE:  Quite honestly didn't want to get into,

11   didn't want to get into all of the things.

12            THE COURT:  I would think not.  Okay.

13            MR. CROWE:  Your Honor, I assume that will be marked

14   for identification for the record?

15            THE COURT:  For identification only.

16            MR. CROWE:  Thank you, Your Honor.

17            THE COURT:  Martin's Nine is, the objection is

18   sustained.

19            MR. LAWLOR:  Your Honor, I know the rule that the rule

20   has been that an objection for one is an objection for all.  Does

21   that apply to the seeking of the introduction of that document as

22   well?

23            THE COURT:  Yes indeed.

24            MR. LAWLOR:  Thank you.

25            THE COURT:  Mr. Kurland.

1              MR. KURLAND:  Your Honor, there's two matters with

2      respect to Mr. Gardner's evidence.  The first is with respect to,

3      think Gardner Number Three, which was a document that contained a

4      pleading filed by Mr. Montgomery, where he was going to withdraw

5      his guilty plea.  The government -- it was admitted.  The

6      government said it would be admitted if the cover page came in.

7      And inadvertently, in the cover page there's a reference to the

8      state case of State v. Gardner.  Before the case goes to the

9      jury, I just want to put on the record that we believe that line

10     should be redacted.

11             I don't think the government has any, has any objection

12     to having the cover, they wanted the cover page in for a

13     different reason.

14             THE COURT:  Let's pull, can you pull the exhibit out of

15     the array?

16             MR. HARDING:  Yeah.  But I don't think we should

17     interrupt the proceedings to do that, Your Honor, because it

18     might take a couple minutes to find it.

19             THE COURT:  Well, there's no time like now.

20             MR. KURLAND:  Your Honor, the other matter --

21             THE COURT:  Just a moment.  Let me -- oh, you mean it

22     may take a couple minutes just to find it.

23             MR. HARDING:  Yeah.

24             THE COURT:  Okay.  All right.  We can do it later.

25             MR. HARDING:  None of this stuff is in order.  All

1    counsel has been jumbling stuff back into the redwells helter

2    skelter.

3           MR. KURLAND:  I have not.  I object to the

4    characterization I have helter skeltered on anything with that

5    evidence.

6           THE COURT:  Let's not use the term "helter skelter" in

7    a murder trial.

8           No, I appreciate it.  I thought for the last week or

9    so, Mr. Harding, since you put your foot down, people have been

10   pretty conscientious with Ms. Arrington.

11          MR. HARDING:  Everything's grouped by the letter of the

12   alphabet in these redwells.  But within a redwell everything is

13   completely out of order.

14          THE COURT:  I see.  We just have to be sure to take

15   care of it.

16          MR. KURLAND:  All right.

17          THE COURT:  Remind me again.  What is it on the cover

18   sheet?

19          MR. KURLAND:  On the cover sheet --

20          THE COURT:  State of Maryland versus Gardner?

21          MR. KURLAND:  It was a letter, I think, addressed to

22   Mr. Gardner's state court lawyer.

23          THE COURT:  So is it just a question of yanking that

24   off?

25          MR. KURLAND:  Yeah.  And I believe, I don't want to

1   misrepresent the government's position, when I looked over that

2   letter, there was something in that letter that struck me as why

3   the government wanted it in as opposed to the caption.  I don't

4   think the government has any objection.

5          MR. HARDING:  No, we don't object to the redaction he

6   wants.

7          THE COURT:  Okay.

8          MR. HARDING:  We'll do it as soon as we find it.

9          THE COURT:  Very good.

10         MR. KURLAND:  The second thing, Your Honor, is a bit

11  more substantive.  I want to renew our, the motion we filed with

12  respect to, when Mr. Montgomery testified and Mr. Coburn played

13  the tape recording of his interview, I believe it was December

14  22nd or January 22nd, 2003, it was an interview that was, that's

15  before the jury.  And it was, Mr. Stocksdale was there.  And in

16  addition, the government since that point has essentially, this

17  government, not the State, they've obviously ratified the

18  substantial accuracy and truthfulness of that because they

19  haven't done anything with respect to Mr. Montgomery claiming

20  that he lied during that interview.

21         We would like that tape admitted as substantive

22  evidence.  I filed an 807 motion months ago on that, to have it

23  admitted under the residual exception, which the Court hasn't

24  ruled on.  If the Court rules favorably it's admissible as

25  substantive evidence under 807, I would ask to move that in.

1          That motion, again, was filed two months ago.  Again,

2     the critical issue with respect to that is does that tape

3     recording, which is an out-of-court statement, does it have

4     substantial guarantees of trustworthiness?  And the answer is yes

5     for three reasons.

6          The first is that, again, federal prosecutors were

7     there.

8          THE COURT:  Can I slow you down for a second?

9          MR. KURLAND:  Sure.  I'll also slow down for Mary.

10          THE COURT:  Is this the issue relating to whether Mr.

11     Gardner was motivated to raise money to pay Mr. Martin's lawyer?

12          MR. KURLAND:  It is related to that, Your Honor.

13          THE COURT:  Is it related to anything else?

14          MR. KURLAND:  For the purpose, well --

15          THE COURT:  In other words --

16          MR. KURLAND:  I'm sorry.

17          THE COURT:  In other words, I vaguely recall Mr. Coburn

18     playing what I thought was a very short excerpt of that

19     interview.

20          MR. KURLAND:  Yes.

21          THE COURT:  And that was the only material part of it.

22          MR. KURLAND:  Well, there were three parts.  There was

23     the other part about, are you family and are you tight or do you

24     honor and respect E and Goo, and he said yes or no.  So there's

25     about two or three relatively small snippets that, that Mr.

1    Coburn played.  Now, I'll just --

2              THE COURT:  Mr. Kurland, maybe I'm missing it.  It has

3    been admitted for its impeachment value.

4              MR. KURLAND:  Yes.

5              THE COURT:  And I don't see how any argument on that

6    particular point, how any argument could be different if I

7    admitted it --

8              MR. KURLAND:  I can explain that, Your Honor.

9              THE COURT:  -- for the truth.  Because the truth is

10   that he didn't say on the tape what he said in the courtroom and

11   in the grand jury.  So the argument isn't exactly the same.

12             MR. KURLAND:  Your Honor, it's with one minor -- strike

13   that.  With one small but significant detail.

14             THE COURT:  Teeny, tiny.

15             MR. KURLAND:  Well, put it this way.  Mr. Harding's

16   already told me that he's planning on jumping up several times

17   during my closing argument, which I haven't even given yet,

18   claiming I'm going to misstate the law on RICO.

19             THE COURT:  Well, we're going to practice the closing

20   arguments tonight.  We'll get all that worked out.

21             MR. KURLAND:  I don't want him to jump out on this.

22             THE COURT:  Please, just, if you can just tell me how

23   I'm wrong.  What earthly difference does it make?

24             MR. KURLAND:  Sure.

25             THE COURT:  Because in the statement, he left something

1    out.  In the courtroom he put something in.  And the prior

2    statement was presented to the jury so the jury has heard that he

3    didn't say in the statement precisely what he said here in the

4    courtroom.  So what is the difference?

5         MR. KURLAND:  The difference is, in addition to him not

6    saying that the money is to pay for lawyers, he did say he lost a

7    couple of thou.

8         THE COURT:  That's, that is in evidence.

9         MR. KURLAND:  Pardon?

10        THE COURT:  Somebody said that.

11        MR. KURLAND:  Well --

12        THE COURT:  I think two people said that.

13        MR. KURLAND:  But, again, as an officer of the court, I

14   don't want to misstate the facts.

15        THE COURT:  Of course not.

16        MR. KURLAND:  I don't want to misstate the law.  I've

17   reread Mr. Montgomery's testimony last night at three in the

18   morning and I read it over the break here.  He does say something

19   close to that in response in cross examination.  I want to be

20   able to argue to the jury affirmatively -- in addition, it goes

21   to one of the jury instructions that I hope to get as well --

22   that Mr. Gardner not only didn't say that he needed the money --

23        THE COURT:  You mean Mr. Montgomery.

24        MR. KURLAND:  I'm sorry.  That Mr. Montgomery, in

25   recounting what Mr. Gardner allegedly said, not only did he not

1   say that it was for lawyers, but that he did say that he had

2   dropped a couple of thou.

3            THE COURT:  You can say that.  That's in evidence.

4            MR. KURLAND:  All right.  Okay.

5            THE COURT:  That's in evidence.

6            MR. KURLAND:  Thank you very much, Your Honor.

7            THE COURT:  You're free to say that.

8            MR. KURLAND:  All right.  Thank you very much.

9            THE COURT:  Okay.  That leaves you, Ms. Rhodes.

10           MS. RHODES:  Thank you, Your Honor.  Two things.  One

11  document I forgot.  But the other thing is that --

12           THE COURT:  Well, let's take care.  What's the one you

13  forgot?  You mean one that there's an agreement?

14           MS. RHODES:  Yes.  He's stipulating to it.  It's the

15  Nassau Community College transcript.

16           THE COURT:  We can do that.

17           MS. RHODES:  We just couldn't show it to Mr. Powers at

18  the time.  The other is back to my favorite topic and yours, too,

19  Coach Lynch.  I have not had a chance to complete the --

20           MR. MARTIN:  We have him on video, Your Honor.

21           MS. RHODES:  -- stipulation.  But he's completely

22  covered so you can't tell who it is.

23           THE COURT:  I can't imagine that he would have been

24  better than Coach Powers.

25           MS. RHODES:  Well, this is the problem, though.  But in

1      light of what Mr. Harding has asked about, asked Ms. Pentecost

2      about, the dates are all wrong and confused now.

3             THE COURT:  Wait.  What dates are wrong?

4             MS. RHODES:  He implied that this 3/96 to 8/96 time

5      period was when Willie Mitchell was detained at Hickey.  He was

6      not.  He was on probation.  He had been released and he stayed up

7      there while he was on probation and was employed.  And that's

8      what Coach Lynch was going to testify to.  Now, I'm not asking

9      for him to come in.

10            THE COURT:  Wait.  Wait.  Wait.  Surely, you must have

11     the records that show when Mr. Mitchell was detained at Hickey.

12            MS. RHODES:  I have, I have a printout that shows a

13     release date, yes, December of '95.  I don't have anything

14     indicating what the period of probation was or that he was on

15     probation, or that he stayed up there while on probation and

16     worked.  But what I do have is what I put in, the YSI document

17     that shows that on the application, it lists a prior employment

18     up at Hickey.  But Mr. Harding thought that he was actually

19     detained during that time.  He was not.

20            THE COURT:  I didn't think that's what Mr. Harding did.

21     But maybe he did.  Let's hear from Mr. Harding.  I thought, I

22     thought there was no disagreement that Mr. Mitchell had two

23     periods of employment with Hickey.  And I thought there was no

24     disagreement that he had at least one period of actual

25     adjudicated detention at Hickey.  Am I right so far?

1      MS. RHODES:  Well, he actually had two of both.

2      THE COURT:  So he had two of both.

3      MS. RHODES:  Yes.

4      THE COURT:  Okay.  And if Mr. Harding misspoke, and I'm

5  not saying he did, but if he misspoke, and confused one of the

6  periods of employment with one of the periods of detention, I'm

7  sure he'd be happy to be corrected and probably do it himself in

8  front of the jury.

9      MR. HARDING:  Well, I'll agree to a stipulation with

10  Ms. Rhodes after looking at the records showing when he was

11  detained.

12      MS. RHODES:  Okay.  I still may need a little two

13  paragraph or something, I'm drafting one, that would be from

14  Coach Lynch, not named of course, an administrator at the school

15  indicating some of the other things that Coach Lynch would have

16  testified to.

17      THE COURT:  We're not going to Coach Lynch.  Look,

18  let's just solve the problem that we have.  Coach Lynch is a

19  problem for another day, if it is a problem.  Surely, you must be

20  able to say, Ms. -- I shouldn't put it that way.  When was he

21  detained at Hickey?  You don't have those dates?  Nobody has

22  those dates?

23      MS. RHODES:  First of all, Your Honor, nobody has those

24  records any more.  We had a huge fight with the Attorney

25  General's office over getting like a four line printout and we

1    have a four line printout, which is not entirely clear.  But I

2    think that's where I get the December 15th, '95 release date.

3                THE COURT:  So he was released in December of '95.

4                MS. RHODES:  Right.  But their records end there.  And

5    I have been working, in fact, when Mr. Harding and I were on the

6    phone with Coach Lynch, we went over this, and I think just

7    before that figured out why some of these things weren't adding

8    up, because I thought he left then.  But he didn't leave.  He was

9    on probation, Mr. Mitchell was on probation.  And because he

10   could work with Coach Lynch as an employee up there, he stayed in

11   the area.

12               So in fact, when Mr. Harding said, well, wasn't he

13   detained there during that time in '96, to Ms. Pentecost, she

14   didn't, I don't remember if she said, I'm not sure or I think so.

15   But that's not correct.  He was not detained during that period.

16   He was not required to be at Hickey.  He was, in fact, working.

17   Which also does, you know, refute the evidence they brought in of

18   this DLLR document saying that he had never been validly employed

19   in the State of Maryland, or something like that.

20               THE COURT:  Well, wait a minute.  So you're saying that

21   the only thing you and Mr. Harding know for certain is that Mr.

22   Mitchell was released from Hickey in December of '95, is that

23   right?

24               MS. RHODES:  Right.

25               THE COURT:  And that that was the end of a second

1   period of detention there and that there had been an earlier

2   period of detention that had ended sometime before December,

3   1995.

4            MS. RHODES:  Right.  We know, we know the second period

5   was from November, '94, almost 12 months, or just over.

6            THE COURT:  So we know, we know the second period was

7   November, '94 through in or about December, '95.

8            MS. RHODES:  Right.

9            THE COURT:  We don't know any dates, we don't have the

10  dates for the first period.

11           MS. RHODES:  I think it was in '93.  I have something

12  that gives a series of --

13           THE COURT:  Mr. Harding is disagreeing.

14           MS. RHODES:  Okay.

15           MR. HARDING:  I do have some documents upstairs, Your

16  Honor.  But I actually cannot verify right now what the dates

17  were.

18           MS. RHODES:  Those aren't really significant to me.

19  It's before, before November of '94, right?

20           THE COURT:  So your concern, Ms. Rhodes --

21           MR. HARDING:  Yes.  It's before December of '94.

22           THE COURT:  All right.  So let's see if we can work

23  this out.  What did Mr. Harding say in his cross examination of

24  Ms. Pentecost?

25           MS. RHODES:  I believe the question was that, Weren't

1    these dates, 3'96 to 8/96, when it's listed as a prior

2    employment, wasn't he actually detained then?

3              THE COURT:  And your, your belief, and perhaps your

4    certainty, is that he wasn't a juvenile detainee then.  You say

5    he was on probation.

6              MS. RHODES:  Right.

7              THE COURT:  Was he on juvenile probation or adult

8    probation?

9              MS. RHODES:  Juvenile probation.

10             THE COURT:  How old was he in December of '95?  How old

11   was Mr. Mitchell?

12             MS. RHODES:  I'm thinking 18.

13             MR. LAWLOR:  18 and two months.

14             THE COURT:  Well, he couldn't have been on juvenile

15   probation.

16             MS. RHODES:  No.  DJS can keep custody until 21.

17             THE COURT:  You can be on probation until 21?

18             MS. RHODES:  Yeah.  You can be in the custody of them

19   until 21.

20             THE COURT:  Well, custody is not probation.  I mean, it

21   is legal custody.

22             MS. RHODES:  Under the jurisdiction of the juvenile

23   court if they want to.  I believe just for probationary purposes.

24   I don't know if they can keep you beyond that.

25             THE COURT:  So are you saying --

160

1          MS. RHODES:  He certainly was not on adult probation.

2          THE COURT:  So you're saying, if I understand you, he

3     was released from Hickey on probation, on juvenile probation, in

4     or about December of '95 and during the early, I guess middle

5     part of '96 he was on the payroll at Hickey while on juvenile

6     probation?

7          MS. RHODES:  Right.  And I don't know if he was --

8     actually payroll, I don't know.  I think --

9          THE COURT:  Well, if he was employed, he must have been

10    on the payroll.

11         MS. RHODES:  He was, he was working for Coach Lynch as

12    an assistant in the Athletic Department.

13         THE COURT:  See.  That whole thing has bothered me

14    because you don't work for Coach Lynch.  If Coach Lynch -- well,

15    I mean, you could work for Coach Lynch.  But if you work for

16    Coach Lynch, you don't work for the Hickey School.

17         MS. RHODES:  Your Honor, all I know is that Coach Lynch

18    described to me and described to Mr. Harding what his activities

19    were.

20         THE COURT:  Was Coach Lynch an employee of --

21         MS. RHODES:  Yes.

22         THE COURT:  -- Youth Services International?

23         MS. RHODES:  He was, yes, of the State of Maryland as

24    it changed to Youth Services and CFC and back to the State.

25         THE COURT:  I'm sorry?

1        MS. RHODES:  An employee the whole time.

2        THE COURT:  But you don't have any records showing

3   earned W-2 or 1099 income for Mr. Mitchell for '96?  I mean, was

4   he paid under the table?  And I use that term because it's

5   commonly used.  Is that what you're suggesting, that Coach Lynch

6   sort of took him under his wing and just sort of took him on

7   informally as an assistant coach?  I just don't understand.

8        MS. RHODES:  Your Honor, I don't know if he paid him or

9   he was paid from the organization in Baltimore that was giving

10  him a stipend when he was in college.  I'm not sure.  But I know

11  what Coach Lynch said was that, yeah, he worked there.  And

12  that's what I have understood.  The only, only issue really now

13  is, and that appears to be what Hickey confirmed when they, when

14  they had his application and listed --

15       THE COURT:  What I saw up on this monitor didn't

16  confirm anything.  It was just --

17       MS. RHODES:  Well, I mean, they gave him the job

18  following that and they checked it out.  That's all I'm saying,

19  is they checked two references, one was Mr. Lynch and one was

20  somebody else who was also at Hickey.

21       THE COURT:  Okay.  I guess there's no way we can work

22  it out.  What's your proposal?

23       MS. RHODES:  My proposal is just a couple of paragraphs

24  of, that would be the, that would have been the testimony of

25  Coach Lynch.

1          THE COURT:  But why do you think Mr. Harding's going to

2    agree to that?  In other words, are you asking me to take like 30

3    minutes while you prepare this thing that Mr. Harding is not

4    going to agree to?

5          MS. RHODES:  I don't know.  I mean, Your Honor --

6          THE COURT:  Maybe I'm not understanding.

7          MS. RHODES:  This arises out of the fact that I can't

8    call Coach Lynch, right?  I mean, this is, the issue was I wanted

9    to call him as a witness.  He has a lot of information I believe

10   is relevant during the time period of the conspiracy.  I can't do

11   that.  So the Court has suggested, I don't think that Mr.

12   Harding -- well, when we spoke, he does not want to stipulate to

13   some of the things I think would be included that Mr. Lynch,

14   would be admissible, that he would have said.

15         What I'm saying is I'm just completing that now.  And I

16   don't think, it's not lengthy.  It's something that he can, can

17   look at briefly.  I mean --

18         THE COURT:  Well, we're going to take recess.  Maybe

19   I've wasted all of our time.  If you want to type something up

20   and show to Mr. Harding, that's fine.  But the evidence is

21   closing in like 20 minutes or so.  That's all I'm saying.

22   Subject to the government's three minute rebuttal case, if any.

23         MS. RHODES:  All right.  And the other, on the evidence

24   issue I don't know if Ms. Arrington --

25         THE COURT:  Yeah.  Now, what are you asking us to do

1   about that tape?

2          MS. RHODES:  We wanted to do a redacted version of the

3   tape.  The tape that I've played today I redacted as I was doing

4   it.

5          THE COURT:  Okay.

6          MS. RHODES:  That was the one of Damita Green.  I need

7   to get that but I can't really physically get a clean copy of it

8   until tomorrow morning.  So she had agreed to see if technical

9   services could do it.  I think they were going to try and do it

10  just on the CD instead of a cassette.

11         THE COURT:  I don't think it's appropriate to have

12  court staff handle evidence.  That tape is now real evidence in

13  this case.  And I understand --

14         MS. RHODES:  Actually, that's my copy of it.

15         THE COURT:  Is there another copy?

16         MR. HARDING:  I'm sorry.  I was talking to Mr. Hanlon.

17         THE COURT:  We're talking about the Damita Green.

18         MS. RHODES:  I'm sorry.  You're right.  Their copy

19  never went in.

20         THE COURT:  Right.

21         MS. RHODES:  Of Damita Green.  Right.

22         THE COURT:  Right.  So it's, that's the evidence.  And

23  I appreciate your concern.  The point is, though, if the jury

24  really wants to hear it, we're going to bring them back into the

25  courtroom.  And you can do exactly the same thing you did this

1    morning, which is stand there, stop it, and restart it, leaving

2    out the redacted portion.

3           Look, it would be great, and occasionally I've had

4    jurors who were sufficiently computer savvy, and I suspect we've

5    got several jurors in this instance, such that we could send in

6    CD's and let them listen to their heart's desire.  But if we

7    don't have that, and certainly if there's no agreement, if they

8    want to hear another tape they're going to have to come back in

9    here.  We're all going to have to reassemble and we're going to

10   have to play the tapes for them.

11          MS. RHODES:  Well, either one I can get on a CD

12   tonight.  I just thought if I could submit it tomorrow morning --

13          THE COURT:  That's fine.  I mean, if the government has

14   no objection, and I assume they don't.

15          MR. HARDING:  No, no objection.

16          THE COURT:  Okay.  So yeah, you can take it home.  You

17   can take it home.

18          MS. RHODES:  Very well.  I'll do that and bring that in

19   tomorrow morning, Your Honor.

20          THE COURT:  Okay.  Now, ordinarily I do not send in, of

21   course, as you saw me sustain the objection this morning, I do

22   not send in transcripts.  But I've had occasion where there's

23   agreement among counsel that transcripts of tape recorded

24   conversation should be sent in.  So that would be something for

25   you folks to discuss overnight or tomorrow morning or whenever.

1    If the government's satisfied, the defense are satisfied that

2    notwithstanding the customary instruction that the real evidence

3    is the tape recording itself, not the transcript, if you want to

4    help the jury out and send in the transcripts, I certainly don't

5    have any objection to that.  But if there is an objection, then I

6    won't send in the transcripts.  Okay?

7         So we'll stand in recess.  So nobody else has anything,

8    right?  I just want to make sure.  I keep asking.  I'm sorry.

9         MR. HANLON:  I have something.

10        THE COURT:  Mr. Hanlon has something, but not evidence.

11        MR. HANLON:  Not substantive at all.  Would it be

12   permissible if I be excused, Your Honor?  I would like to get

13   some things ready for tomorrow morning with my IT people.

14        THE COURT:  I need you here for jury instructions

15   conference, Mr. Hanlon.  Not really.  No.  That's fine.

16        MR. HANLON:  Is the Court certain?

17        THE COURT:  No.  I don't want to put the whole burden

18   on Mr. Harding.  Have you, have you two had a chance to go over

19   my draft?

20        MR. HANLON:  We have.

21        THE COURT:  Do you have many requests for changes?

22        MR. HANLON:  Nothing.

23        THE COURT:  Mr. Harding's doing all that.

24        MR. HANLON:  I think Mr. Harding is on point with

25   everything.

166

1        MR. HARDING:  I haven't actually, like, read through

2   it.  I skimmed through it quickly and I did have some places that

3   Your Honor might have caught in the meantime.

4        THE COURT:  Okay.  All right.  Let's stand in recess

5   for 15 minutes.  Ms. Rhodes will try to finalize that final

6   stipulation.  And again, I expect, are you going to have a

7   rebuttal?

8        MR. HARDING:  Oh, yes.  Very briefly, Your Honor.

9        THE COURT:  One of the agents?

10        MR. HARDING:  Yes.

11        THE COURT:  All right.  So I expect to excuse the jury

12   shortly after 4:30.  And then we'll take another break.  I'll

13   excuse the defendants.  I'll give counsel 45 minutes or whatever.

14   And then I would like to resume here in the courtroom and really

15   get, get the instructions done tonight.  All right?  Fifteen

16   minutes.

17        (Recess at 4:12 p.m.)

18        (Defendants present in courtroom. Jury not present.)

19        THE COURT:  On the record.  Ms. Rhodes, you and Mr.

20   Harding have been able to --

21        MR. HARDING:  Yes.  Although we still don't thoroughly

22   understand all the documents, we're going to arrive at a limited

23   oral stipulation, the thrust of which Ms. Rhodes is to give to

24   you.

25        THE COURT:  Do you want to practice, first, Ms. Rhodes

1    or do you want to wing it in front of the jury?

2          MS. RHODES:  No.  Let's practice since I'm making it up

3    as I go along.  We're saying that the, and I'll do this a little

4    bit better when we do it in front of the jury, that the second

5    period of incarceration for Mr. Mitchell at Charles Hickey School

6    was from December, '94 to December, '95.  We can't tell what the

7    first one was.  So we're just going to not refer to it.  Just

8    going to say the second one was this.  And that he was on

9    juvenile probation following that.

10         MR. HARDING:  Yeah.  Well, we don't, I think we should

11   just say that he was on juvenile probation when he started his

12   stint as an assistant in the Physical Education Department.

13         MS. RHODES:  So the second sentence would be he was on

14   juvenile probation in '96 when he began working as an assistant

15   in the Physical Education Department.

16         THE COURT:  Okay.  So you're going to put in the

17   transcript from Nassau Community?

18         MS. RHODES:  Yes.  Yes.  And I understand, just for the

19   record, the Court is not allowing me to do a proffer regarding

20   Lynch?

21         THE COURT:  No.

22         MS. RHODES:  Okay.  I mean not okay, but I understand.

23         THE COURT:  Do you want to file that, what was formally

24   your request for ex -- I mean, that's your proffer.

25         MS. RHODES:  Yes.  Essentially, that's the proffer.

1    That is.  That's fine.  I was revising it in a different format.

2    But that is the proffer, right.

3            THE COURT:  Okay.

4            MS. RHODES:  I think I --

5            THE COURT:  I don't think you ever formally filed it.

6    But I have it.  I'll remember to mark it and make it a part.

7    Yeah.  Here it is.  So since you called it under seal, I'll just

8    go ahead and have them mark it under seal.  File it.

9            MS. RHODES:  Well, I withdrew the request for it to be

10   under seal.  At this point it's moot as well.

11           THE COURT:  Right.  All right.  So do you want to redo

12   it or is it okay just to -- I'll strike through "under seal."

13           MS. RHODES:  That's fine.  Yes.

14           THE COURT:  Okay.  And we'll just mark it.  Ms.

15   Arrington, this is being filed in open court today.  Okay.  No.

16   File it as a pleading, not as a Court's exhibit.

17           MS. RHODES:  I'm sorry.  It's filed as what?

18           THE COURT:  As a pleading.  It will be whatever

19   pleading, whatever docket number the next pleading gets.

20           MS. RHODES:  So just for the record, then, we are

21   requesting that the Court call him as a witness.  And the proffer

22   is what he would have said if he had been called as a witness.

23           THE COURT:  Right.

24           MS. RHODES:  Okay.  But the Court's precluding us from

25   calling him.

169

1          THE COURT:  Right.  For the reasons stated on the

2    record.

3          MS. RHODES:  Right.

4          THE COURT:  We'll get the jury.  We'll have the jury,

5    please.

6          MR. HARDING:  Just one second, Your Honor.

7          THE COURT:  Yes, Mr. Harding.

8          MR. HARDING:  In the interest of saving time.  I'm

9    calling Agent Klas just to briefly say where a couple of

10   locations are that have come up, during a rebuttal case.  And the

11   other thing is, I was going to ask him, if the Court permits, you

12   remember when Gregory Mungo testified, the guy that was in the

13   lockup?

14         THE COURT:  Yes.  Yes, I remember.

15         MR. HARDING:  Okay.  He testified that, when I asked

16   him what Mr. Hayes said when he approached Rodney, I mean what

17   Mr. Harris said when he approached Rodney Hayes, he said he

18   couldn't remember.

19         THE COURT:  Right.

20         MR. HARDING:  And I challenged him on that.  And he

21   insisted that he couldn't remember.  But he had just told Agent

22   Klas and me earlier that same day, November 3rd, that he was

23   getting out so soon that he didn't want to say in court what he

24   had, what Mr. Harris had said.  And he was afraid of having

25   trouble on the streets and that sort of thing.  I was intending

1    to elicit that from Agent Klas, also.

2         THE COURT:  I'm sorry.  He said that after his

3    testimony or before?

4         MR. HARDING:  Before.  When we went to see him in the

5    lockup, before he took the stand and he told us he wasn't going

6    to cooperate with us.  And he said the reason was, not because he

7    couldn't remember anything, he said it was because he decided not

8    to testify since he was getting out in a few months and he didn't

9    want to take any chances on the street.

10         THE COURT:  So you just forgot to ask the agent that

11   when he was on the stand in your direct case, in your case in

12   chief?

13         MR. HARDING:  Yes.

14         THE COURT:  Okay.  You want to object for the record,

15   Mr. Martin?

16         MR. MARTIN:  Absolutely, Your Honor.  He could have

17   asked Mr. Mungo that when he had him on the stand.  And I do want

18   to object for the record.

19         MR. HARDING:  I did ask.

20         MR. MARTIN:  I don't think it's appropriate and it's

21   certainly not rebuttal.  I don't think the government should be

22   permitted to do that, Your Honor.  And I have one other issue

23   briefly.  I don't want to delay anything, so I should do it now?

24         THE COURT:  Sure.  Go ahead.  I'm going to overrule the

25   objection.  You don't have to repeat it in front of the jury, Mr.

1    Martin.  It is, I think --

2          MR. MARTIN:  It's not my only reason for objecting.  My

3    other reason for objecting is this will be the second or third

4    time in the trial when you've let something in where supposedly

5    the jury's going to think that these people are threatening these

6    witnesses.  These people didn't threaten Mungo.  They didn't even

7    see him.  That's the inference the jury's going to draw from this

8    and I think that's inappropriate, Your Honor.

9          THE COURT:  All right.  Your objection is noted.  What

10   strikes me, and in fact there was defense witness, there was

11   defense evidence, and I confess I can't pinpoint it, but I

12   remember very distinctly my state of mind at the time.  And I'm

13   not saying you put it on, Mr. Martin or Mr. Flannery, or even

14   that either one of you did, but there was some defense evidence

15   in the form of cross examination of somebody that actually

16   suggested that Mr. Hayes had attacked Mr. Harris, which, of

17   course, in light of that video was utterly absurd, with all

18   respect.  But again, I don't remember where it came from.  And it

19   might just have been volunteered by a defense witness.

20         MR. MARTIN:  I don't think you're right, Your Honor.

21         THE COURT:  I'm sorry?

22         MR. MARTIN:  I don't think there's any evidence in the

23   defense case about that.

24         THE COURT:  Oh, I remember it very distinctly.

25         MR. HARDING:  It was in Mr. Martin's opening the other

172

1   day.

2          MR. MARTIN:  I may have opened and I may have said, if

3   you look at the video, I'll still say that, if you look at the

4   video you might conclude that Mr. Hayes put his arm out first.

5          THE COURT:  Okay.  Maybe that's what I'm referring to.

6   Well, the videotape absolutely puts the lie to that.

7          MR. MARTIN:  Well, I disagree with Your Honor.  I think

8   you should take a look at it again.

9          THE COURT:  Mr. Hayes went to the cell, sat down.  And

10  there was a pause of two or three or four seconds.  And it's very

11  clear that Harris noticed who had just come in.

12         MR. MARTIN:  No question about it.

13         THE COURT:  And jumped right up and attacked the man.

14         MR. MARTIN:  Well, the question is who threw the first

15  punch.

16         THE COURT:  No question about it.  And if Mr. Hayes

17  threw his arms up, it was a defensive measure because he was

18  clearly under attack.  And the videotape doesn't --

19         MR. MARTIN:  I have to say, Your Honor, I'm not

20  surprised you would say that but I think you're wrong.

21         THE COURT:  Well, you're not surprised I would say that

22  because I saw the videotape.  And you saw it and everybody in

23  here saw it.  It's perfectly obvious.

24         MR. MARTIN:  I disagree with you.

25         THE COURT:  So I'm going to permit the agent in the

1    form of basically reopening the government's case in chief to

2    explain to the jury why Mr. Mungo was sitting on the stand

3    squirming like a little worm and clearly was in a position to

4    hear what might have been said, if anything, because he was

5    standing right there and jumped out of the way when Mr. Harris

6    attacked Mr. Hayes.

7         So the objection's noted.  Go ahead, Mr. Martin.

8         MR. MARTIN:  Your Honor, I also, I did not get, before

9    it went into evidence today, and if I did, I apologize, but the

10   documents that Mr. Harding used on cross examination of the

11   paralegal who was testifying, the evidence about Mr. Mitchell was

12   fired because he was abusing, I think he was abusing employees or

13   abusing residents.

14        THE COURT:  Mishandling youth, I think it said.

15        MR. MARTIN:  Yes, mishandling youth.  Your Honor, I'm

16   going to move for a mistrial only because of the juxtaposition of

17   that particular evidence with the thing that Mr. Harding put on

18   the DOAR several weeks ago that we all had this discussion about

19   where it said that Mr., you had ruled it would be inadmissible,

20   where it said that Mr. Mitchell had been using Mr. Harris to beat

21   up residents for him.  Do you recall that?  We had this big

22   discussion about how it got on the DOAR.  And you said, Well, I

23   don't think the jury saw it, anyway, blah, blah, blah.

24        Well, I disagree.  And think they'll connect those two

25   things, Your Honor.  So I want to put on the record that I'm

174

1    going to move for a mistrial because that came in.

2            I didn't object at the time today because I didn't have

3    the document, Your Honor.  I don't know why I didn't but I

4    didn't.  I have everything I was given and I wasn't given that.

5    I just want to put that on the record as well.

6            THE COURT:  All right.

7            MR. MARTIN:  Thank you, Your Honor.

8            THE COURT:  Motion for mistrial denied.  Let's have the

9    jury, please.

10           MS. RHODES:  One other exhibit that I'm just going to

11   submit that I would have used if Mr. Lynch had testified.

12   Something he could have testified about.  So just for the record,

13   I want to have it marked but not admitted.

14           THE COURT:  Okay.  We can do that after the jury

15   leaves.  In other words, you want it marked for identification?

16           MS. RHODES:  Correct.

17           (Jury enters the courtroom.)

18           THE COURT:  Thank you for your patience, ladies and

19   gentlemen.  We have just a few additional minutes of proceedings

20   before you're excused.

21           Ms. Rhodes, you may proceed.

22           MS. RHODES:  Thank you, Your Honor.  One document,

23   which is Mitchell 12, I would like to show to the jury, is the

24   transcript of Mr. Mitchell from Bryant University, where he --

25   sorry, Your Honor.  Okay.  As I said, Your Honor, Mitchell 12,

175

1     this just shows the date that Mr. Mitchell was at Bryant

2     University in Rhode Island, and that his previous education was

3     at Nassau Community College.  And it says that he withdrew at

4     Bryant on 12/17/98.  Indicates that he was not doing well

5     grade-wise during that semester.

6           THE COURT:  All right.  Mitchell 12 is admitted.

7           MS. RHODES:  Thank you.  And the last item, Your Honor,

8     is a stipulation that we have with the government.

9           THE COURT:  Very well.

10          MS. RHODES:  Okay.  This is a stipulation entered into

11    by Mr. Mitchell and the government.  These two parties stipulate

12    that Mr. Mitchell's second period of incarceration at the Charles

13    Hickey School was from December, 1994 to December, 1995.  Mr.

14    Mitchell was on juvenile probation following his release from the

15    Charles Hickey School when he began working as an assistant in

16    the Athletic Department in March of 1996.

17         THE COURT:  Thank you, Ms. Rhodes.

18         MS. RHODES:  Your Honor, I also need to indicate that

19    this MVA document I believe I misidentified and should be

20    Mitchell 16 and not Mitchell 15.

21         THE COURT:  This is the document that was sponsored by

22    Mr. Hubbard?

23         MS. RHODES:  Correct.

24         THE COURT:  All right.  So it's Mitchell 16.

25         MS. RHODES:  Correct.  Thank you.

Case 1:04-cr-00029-RDB   Document 697   Filed 06/19/09   Page 176 of 299

1          THE COURT:  It's admitted.  Anything further from you,

2     Ms. Rhodes, Mr. Lawlor?

3          MS. RHODES:  No, Your Honor.  Nothing further on behalf

4     of Mr. Mitchell.

5          THE COURT:  You rest?

6          MS. RHODES:  Yes, Your Honor.

7          THE COURT:  Mr. Martin, Mr. Flannery, anything further

8     on behalf of Mr. Harris?

9          MR. MARTIN:  No, Your Honor.  We rest.

10          THE COURT:  Mr. Pyne, Mr. Crowe, anything further on

11     behalf of Mr. Martin?

12          MR. PYNE:  No, Your Honor.  We rest.

13          THE COURT:  Mr. Kurland, anything further on behalf of

14     Mr. Gardner?

15          MR. KURLAND:  Your Honor, the defense rests.

16          THE COURT:  Thank you.  Mr. Harding, will there be a

17     defense, government rebuttal?

18          MR. HARDING:  Very briefly, Your Honor.

19          THE COURT:  All right.

20          MR. HARDING:  Your Honor, the United States calls

21     Special Agent Brian Klas.

22       S.A. BRIAN KLAS, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

23          THE COURT:  You remain under oath, Agent Klas.

24          THE WITNESS:  Yes, sir.  Brian Klas, K-L-A-S.

25          DIRECT EXAMINATION

DIRECT EXAMINATION OF KLAS                    177

1    BY MR. HARDING:

2    Q    Okay.  You're still under oath, Agent Klas.

3    A    Yes.

4    Q    Okay.  Did you, at my request, Agent Klas, check out a

5    couple of geographic locations that have come up in the course of

6    the defense rebuttal, I mean the defense case in this trial?

7    A    Yes.

8    Q    First of all, were you here yesterday I think it was, when a

9    transcript was read from a prior state proceeding where a guy

10   named Jamane Johnson testified?

11   A    Yes.

12   Q    And do you remember him describing the location where, you

13   remember there being testimony in the course of his testimony

14   about the location where Tonya Jones Spence and Darius Spence

15   resided?

16   A    Yes.

17   Q    And do you remember Sequoia and Wabash being that location?

18   A    Yes, I do.

19   Q    Do you, can you tell us, did you look up where that is?

20   A    Yes, I did.

21   Q    Where is it?

22   A    It's in northwest Baltimore City, north of Pimlico and Park

23   Heights.

24   Q    Okay.  Did you look it up on this map?

25   A    I'm sorry.  It is in northwest Baltimore, in Park Heights,

1    it appears.

2    Q    Okay.  Is it due west of Druid Hill Park?

3    A    Yes, it is.

4    Q    Okay.  How far is it from Bramblewood Lane, the location

5    that we have heard about so much in the course of this trial?

6    A    Seven miles.

7    Q    Okay.  Also, did you check a location that we learned about

8    just today, when Mr. Flannery introduced the report on when Mr.

9    Dobropolski was locked up and when he was out on the street?  Did

10   you check a location on Western Run Drive?

11   A    Yes.

12   Q    What part of town is that in?

13   A    That's also in northwest Baltimore City.

14   Q    And where in northwest Baltimore City?

15   A    That is actually just north of Park Heights and Pimlico.

16   Q    Is it near Park Heights Avenue?

17   A    Yes, it is.

18   Q    Okay.  Also, Agent Klas, were you here on November 3rd when

19   Gregory Mungo testified about the events in the marshal's lockup,

20   when Rodney Hayes was assaulted?

21   A    Yes, I was.

22   Q    Okay.  And do you remember his testimony that he couldn't

23   remember what Mr. Harris said that day when he approached Mr.

24   Hayes?

25   A    Yes, I believe that's what he stated, that he told us up in

1    the lockup.

2    Q    Okay.  Were you with me in the lockup with him earlier that

3    day when we went to see him before he actually took the stand?

4    A    Yes, I was.

5    Q    And what did he say in the lockup to us?

6    A    He was apologetic but stated that he had only 90 days left

7    on his sentence, was going to be returning to Baltimore possibly

8    in a halfway house, and didn't, wasn't sure if he was going to,

9    he wasn't sure if he was going to basically tell the truth about

10   what had happened.

11          He stated that he was concerned for his, for his well

12   being once he returns to Baltimore if he did that.  And basically

13   90 days left on a sentence, he wasn't certain if he was going to

14   cooperate and testify to what had actually happened.

15   Q    Okay.  Thank you.  I have no further questions.

16          MR. LAWLOR:  No questions, Your Honor.

17          CROSS EXAMINATION

18   BY MR. MARTIN:

19   Q    Good afternoon, Agent Klas.

20   A    Good afternoon.

21   Q    Mr. Mungo, this is the man who was in the lockup with all

22   the other people during the altercation?

23   A    Yes, that's correct.

24   Q    How many of those other people in the lockup did you

25   interview?

1   A    None.

2   Q    So you interviewed only Mr. Mungo?

3   A    I believe Mr. Mungo was the only one who indicated he had

4   information that he was willing to provide the government.

5   Q    So nobody else in that lockup spoke to you or anybody in the

6   government and you didn't try to speak with anybody else in the

7   lockup?

8   A    I personally did not try to speak to, but he was the only

9   one that was brought to my attention that was willing to speak

10  with the government.

11  Q    Do you know anybody else on the government team who tried to

12  speak with anybody else in the lockup?

13  A    I don't have that knowledge right now.  No.  I believe so

14  but I am not aware of who.

15  Q    Who was it, do you know?

16  A    I don't, I'm not sure if Mr. Harding was aware.  I don't

17  know what everyone else on that particular topic did.

18  Q    But despite that, of all the people in the lockup, Mr.

19  Mungo's the only one, then, who the government called other than

20  Mr. Hayes, right?

21  A    He was the only one who had any information that would speak

22  to the government.

23  Q    How do you know that if you didn't interview the others?

24  A    From my knowledge, no one else indicated they came forward

25  and said they wanted to speak with us.

1    Q    How do you know?

2    A    That's not surprising.

3    Q    If you didn't interview the others, how do you know that?

4    A    That's my recollection of the events.

5    Q    And -- Your Honor, I had something else I want to ask him.

6    But I can't even read my own writing.  So I guess I'll

7    just forego it.  Thank you.

8              CROSS EXAMINATION

9    BY MR. KURLAND:

10   Q    Agent Klas, I just have one or two questions.  You were in

11   court the day that Darius Spence testified?

12   A    No, I was not.

13   Q    Well, so you don't know that Mr. Spence testified that they

14   had just moved to --

15             MR. HARDING:  Objection.

16             THE COURT:  The objection is sustained.

17   Q    Okay.  Do you know whether or not Darius Spence had ever

18   lived at that address?

19             MR. HARDING:  Objection.

20   A    No, I don't.

21             THE COURT:  Just a moment.  You're asking the witness

22   whether he knows if Mr. Spence lived in the Wabash --

23             MR. HARDING:  I'll withdraw the objection to that

24   question, Your Honor.

25             THE COURT:  Is that the question?

1              MR. KURLAND:  Yeah.

2              THE COURT:  Okay.  You may answer it.

3              THE WITNESS:  I have no idea.

4              MR. KURLAND:  That's all.  Thank you, Your Honor.

5              THE COURT:  Thank you, Agent.  Go ahead, Mr. Harding.

6              REDIRECT EXAMINATION

7    BY MR. HARDING:

8    Q    The other people in the lockup, do you know, were they

9    represented by counsel, Agent Klas?

10   A    Yes.  Yes.

11   Q    So would it be a normal part of your duties to contact

12   attorneys representing incarcerated individuals?

13   A    No.  That would not be part of my duties.

14             MR. HARDING:  Thank you.

15             THE COURT:  Thank you, Agent.

16             MR. MARTIN:  Your Honor, can I ask one question based

17   on that?

18             THE COURT:  Certainly.  Go ahead.

19             RECROSS EXAMINATION

20   BY MR. MARTIN:

21   Q    Okay.  Agent Klas, how do you know those other people in the

22   lockup were represented by counsel?

23   A    How do I know they're represented?

24   Q    Yeah.  Do you really know that?

25   A    Like I said, it's not part of my duties.  If they were in

1    the U.S. Marshal's lockup, they would have been there for, with

2    an initial appearance, I understand.  So they would all have been

3    there for legal reasons.  That would have been my assumption.  I

4    would act upon that and not have taken it upon myself to contact

5    them.

6    Q    So that's your assumption.  You don't know that?

7    A    Yes.  My professional assumption.  Yes.

8    Q    Didn't bother the marshals that Mr. Harris was represented

9    by legal counsel when they went to talk to him, did it?

10          MR. HARDING:  Objection.

11          THE COURT:  Sustained.

12          MR. MARTIN:  I have nothing further, Your Honor.

13          THE COURT:  Thank you, Agent.  You may step down.

14   Anything further?

15          MR. HARDING:  No, Your Honor.

16          THE COURT:  Well, ladies and gentlemen, it's 4:59:59,

17   5:00.  And that concludes the evidentiary portion of this lengthy

18   trial.

19          While we all still have much work to do, particularly

20   you, I would be remiss not to just take a moment to thank you for

21   the extraordinary way you've conducted yourselves and to have

22   suffered the inconveniences that you've had to suffer these many

23   weeks.  And so I personally, and I know we all, appreciate the

24   sacrifices you've made.

25          Here's our schedule.  Tomorrow morning at 9:30 we will

1    begin the closing arguments.  Mr. Hanlon will make the initial

2    closing argument on behalf of the government.  He is likely to

3    use about two hours to summarize this lengthy trial.  We will

4    thereafter take a recess.  And Ms. Rhodes will present closing

5    argument on behalf of Mr. Mitchell.  Then we'll break for lunch.

6    And that will be about an hour.

7            And then we'll break for lunch and come back at about

8    2:00.  And then Mr. Martin will make a closing argument on behalf

9    of Mr. Harris.  And take a brief recess.  That will be about an

10   hour.  And Mr. Pyne will make a closing argument on behalf of Mr.

11   Martin, also about an hour.  That will take us to around 4, 4:30

12   tomorrow afternoon.

13           And then we will break for the day and we'll return

14   Thursday morning at 9:30, at which point Mr. Kurland will make

15   the closing argument on behalf of Mr. Gardner, which will be

16   about an hour.  And then Mr. Harding will make the final closing

17   argument on behalf of the government.  That will take us to about

18   11:30 or so.

19           I will begin my instructions to you on the law after

20   you're heard from Mr. Harding.  I imagine we'll go for 30, 45

21   minutes or so, and then we'll break for lunch.  And then we'll

22   come back, hopefully a little before two, and I will complete my

23   instructions to you.  And that will mark the point in the case

24   when you may begin your deliberations.

25           As I believe I told you earlier but I'll iterate now,

1    once the case is given to you to begin your deliberations, your

2    schedule will be entirely in your hands.  What I mean by that is,

3    on Friday morning, for example, when you return to continue your

4    deliberations, you can come in at 9:30, 9:15, 9:00, 8:45, 8:00.

5    We'll even be here at 7:30 if you want to start that early.  And

6    as late as you want to stay.  Again, entirely up to the jury in

7    terms of how late you stay on Friday.  Assuming you don't reach a

8    verdict on Friday, when you come back on Monday, same thing.  You

9    decide what time you want to come.

10          The only constraint on you will be that once you begin

11   your deliberations, you may not ever deliberate the case until

12   all 12 members of the jury are in the jury room.

13          So if six show up, eight show up, nine show up, eleven

14   are there, you may not resume your deliberations.  It will take

15   all 12 of you to be in the jury room at any time you are carrying

16   out your deliberations.

17          So it will be up to you how long you work and what time

18   you start and what time you end once you begin your

19   deliberations.  Obviously, it's our hope that the deliberations

20   can conclude before Thanksgiving.  But as I've said to you

21   several times, it's not speed that is critical, it is that you

22   actually deliberate.  Consider the evidence.  Consider the

23   arguments of counsel.  Consider my instructions and follow my

24   instructions.  Use your common sense and your mature judgment in

25   reaching a verdict in this case.

1          So enjoy your evening.  Let me, give me 30 more seconds

2     and just say to our alternates, you continue absolutely to be

3     important to us.  And indeed, I will tell you now what I was

4     going to tell, what I will tell you on Thursday, and that is,

5     even after the jury has retired to deliberate, I'm going to need

6     you to continue to serve your role as alternate jurors because it

7     does happen sometimes that even after the jury has begun its

8     deliberations, a family emergency of the sort that, indeed, we've

9     seen in this case or illness intervenes, and during deliberations

10    it's necessary to excuse one of the regular jurors.

11         So I will have additional instructions for you on

12    Thursday.  But even after you are excused, you're not really

13    excused.  You won't really be excused until after the 12 regular

14    jurors have been able to complete their work in the case.  And of

15    course, we'll be in touch with you.  We won't require you to come

16    to the courthouse but we will be in touch with you through Ms.

17    Arrington to keep you apprised of when you can, when you're free

18    to talk about the case, but not before we have a verdict in the

19    case.

20         Once again, ladies and gentlemen, thank you for your

21    boundless patience and cooperation.  Please leave your note pads

22    on your chairs.  Have no discussion about the case.  It is

23    equally important, if not more important now, that you adhere

24    scrupulously to my instructions.  Conduct no investigation.  Do

25    not visit any scenes.  Don't look up any concepts, any words.  Do

1    not discuss the case with anyone.  Continue to keep an open mind

2    about all issues.  We'll see you tomorrow morning at 9:30.

3            Jury is excused.  Thank you, ladies and gentlemen.

4            (Jury exits the courtroom.)

5            THE COURT:  Mr. Lawlor, you want to renew your motion?

6            MR. LAWLOR:  Yes, Your Honor.  At this time we renew

7    our motion under Rule 29 and just adopt the rationale put forth

8    previously by Mr. Mitchell, as well as co-counsel.

9            THE COURT:  Very well.  All counsel join in that

10   request?

11           MR. MARTIN:  Yes, Your Honor.

12           MR. CROWE:  Yes, Your Honor.

13           MR. KURLAND:  Your Honor, could I just have one

14   sentence?

15           THE COURT:  Of course, Mr. Kurland.

16           MR. CROWE:  Your Honor, while Mr. Kurland's approaching

17   the microphone, we also renew our motion for severance and for

18   mistrial.

19           THE COURT:  So noted.  All counsel join in those

20   requests.  Mr. Kurland?

21           MR. KURLAND:  Your Honor, in addition to renewing Mr.

22   Gardner's Rule 29 motion, even using the basis of the Court's

23   proposed instructions concerning the element of the RICO

24   enterprise and one has to have the general nature of the contours

25   of the enterprise, we would say that with respect to Count One,

1    since Mr. Gardner has no connection to any aspect of Shakedown

2    and that's central, though not exclusive, as the Court decided a

3    couple of days ago, on the totality of the evidence no rational

4    jury could find Mr. Gardner part of the Count One enterprise.

5           THE COURT:  Thank you, Mr. Kurland.  For the reasons

6    previously stated and because the evidence, if credited by the

7    jury as to each of the 19 counts and as to each of the 4

8    defendants named in those counts respectively, the Court is

9    satisfied that the government has educed sufficient evidence

10   which, if credited, believed, and embraced, could convince a

11   reasonable fact finder beyond a reasonable doubt of the

12   defendant's guilt.  And therefore, the Court denies the motion

13   for judgment of acquittal as to each defendant and as to each

14   count.

15          I want to thank the marshals.  You've really rendered

16   extraordinary service to the court, and we very much appreciate

17   it.  The defendants are excused to return at 9:30 tomorrow

18   morning.

19          (Defendants exit the courtroom.)

20          THE COURT:  Counsel, I'm prepared, if you're prepared,

21   to try to sail through this without taking a lengthy recess.  Can

22   we just try to get it done?  And I'll be available during the

23   overnight session for any final thoughts you may have if you want

24   to send me emails.  I'll be glad to get those.

25          Please remain seated, counsel.  And frankly, if you

1 | want to take off your jackets, I think you've earned that.

2 |        MS. RHODES:  Your Honor, can I be excused to make

3 | copies?

4 |        THE COURT:  Sure.  What I'd like to do is literally go

5 | through page by page and only stop when somebody has something to

6 | say.

7 |        MR. MARTIN:  Your Honor, can we waive the one spokesman

8 | rule here?  Mr. Flannery and I have not, he's got some ideas and

9 | I have some.

10 |        THE COURT:  Oh, of course.  Of course.  Absolutely.

11 | Absolutely, sure.

12 |        MR. LAWLOR:  Mr. Kurland can't speak twice as much just

13 | because he's the only one here.

14 |        THE COURT:  You think he's not going to do that,

15 | anyway?

16 |        MR. LAWLOR:  Actually, Your Honor, I have nothing to

17 | say about instructions but I'm kind of hoping he does.

18 |        MR. KURLAND:  Judge, the dual sovereignty instruction

19 | wasn't included.

20 |        THE COURT:  I know.  I was testing you, Mr. Kurland.

21 | No.  I'll tell you where I'm going to put it in.  And I'm going

22 | to put it in in exactly the same language that I used during the

23 | trial.

24 |        MR. KURLAND:  Thank you.  That takes care of one of my

25 | concerns.

1          THE COURT:  Please, don't hesitate to point out typos

2     or what you think is a typo as we go along.

3          All right.  Page 2, Page 3, Page 4, Page 5, Page 6.

4     And Page 7. Let me tell you what I've done to Page 7.

5          That second full paragraph where it begins, You have

6     seen two separate documents.  The change I've made there reads as

7     follows:  Regarding the tape of the Irene Magginson voice mail,

8     comma, you have seen two separate documents.  Etc.  And then

9     there's just some stylistic changes down at the bottom of that

10    paragraph.

11         Page 8.

12         MR. CROWE:  Your Honor, could I be heard on Page 7?

13         THE COURT:  You don't have to ask to be heard.  Please,

14    just speak up.

15         MR. CROWE:  Your Honor, the instruction talks about a

16    defense interpretation.  On behalf of Mr. Martin, we actually

17    like the government's transcript a bit better than Mr., than the

18    one that was prepared by Mr. Martin.  We think that the last

19    sentence really is, you know, "I'm calling your house, Shorty",

20    not "I'm coming to your house."  It may not be terribly important

21    if the jury never sees the transcript.

22         THE COURT:  All right.  So in other words, you want me

23    to --

24         MR. MARTIN:  You could change it to a defense

25    interpretation.  One of the defendant's interpretations.  It

1    doesn't matter to me.

2              THE COURT:  In the second paragraph of the last, in the

3    second sentence of the last paragraph, I'll make it read, You may

4    use both, and just strike the government version and the defense

5    version so that it reads, You may use both, both of the

6    transcripts.  Okay?

7              MR. CROWE:  The same problem appears in the prior

8    paragraph, the second line.

9              THE COURT:  Oh, I see.  Okay.  You have seen two

10   separate documents.  Okay.  So I'll change it to read, Containing

11   differing versions of what's on the tape.

12             MR. HARDING:  Sorry.  I'm not clear, Your Honor, why

13   you don't just say Defendant Harris's transcript.

14             MR. MARTIN:  It may be that others want to adopt it.  I

15   don't know.

16             THE COURT:  Okay.  Perhaps so.  Excuse me one moment.

17             Okay.  All right.  Maybe that's a better fix.  So

18   instead of, I'll just use government version and Mr. Martin's

19   version.

20             MR. MARTIN:  Mr. Harris.

21             THE COURT:  Excuse me.  Mr. Harris's version.  All

22   right.  Page 8.

23             MR. KURLAND:  Your Honor, will we get a printed, since

24   Mr. Coburn, he's not getting back late, will there be a way for

25   me to get a physical hard copy of all the corrections tomorrow

192

1    morning?

2                THE COURT:  You won't be able to print it out tonight?

3                MR. KURLAND:  I won't be able to personally.

4                MR. FLANNERY:  I can print it out for you.

5                THE COURT:  Thank you, Mr. Flannery.

6                MR. MARTIN:  Your Honor, Page 8.  Are we on Page 8?

7                THE COURT:  Page 8.

8                MR. MARTIN:  Second full paragraph sort of just below

9    the middle of the page where you're talking about the pro se

10   pleading.  You say, ordinarily there's nothing peculiar.  In the

11   context of this case and what the government has raised and what

12   your rulings are, I would ask that you strike the word

13   "ordinarily."  I think that implies to the jury in this case

14   there is something wrong with it.  And I don't think you mean to

15   say that.

16               THE COURT:  Actually, I specifically put the word

17   "ordinarily" in there.

18               MR. MARTIN:  I figured you probably did but I don't

19   think you, it's almost like directing the jury on that particular

20   issue and I object to it.

21               THE COURT:  Well, I think I'm going to leave it in

22   because it's perfectly peculiar and inappropriate in this case.

23   Now --

24               MR. KURLAND:  Your Honor, I'm sorry.

25               THE COURT:  Let me just tell you what I've added to

1    Page 8.  The last full paragraph reads as follows, as you're

2    looking at it:  The government has argued that the pro se

3    pleadings of various defendants are similar and employ identical

4    language and that the defendants' alleged use of the pro se

5    pleadings constitutes evidence of a continuation of the alleged

6    racketeering conspiracy charged in Count One of the indictment

7    insofar as, and then I have the following insertion, according to

8    the government, comma, and then it goes on, they represented

9    attempts to obstruct justice in this case, period.

10           And then I add the following to the last sentence.

11   Starting with that sentence.  The defense vigorously disputes the

12   government's assertion in these regards, comma, contending that

13   the pro se papers represent nothing more than a lay person's

14   untutored effort to assert legally immaterial defenses to serious

15   charges.

16           MR. LAWLOR:  Could you repeat that, please, Judge?

17   Contending that?

18           THE COURT:  Contending that -- I'm going to send these

19   to you tonight.

20           MR. LAWLOR:  Okay.

21           MR. MARTIN:  Could you read it again, Your Honor?

22           THE COURT:  Yeah, I will.  I will.  The defense

23   vigorously disputes the government's assertion in these regards,

24   contending that the pro se papers represent nothing more than a

25   lay person's untutored effort to assert legally immaterial

```
1    defenses to serious charges.

2              MR. KURLAND:  Legally immaterial?

3              THE COURT:  Legally immaterial.  I know that that's not

4    something that a lawyer or even a judge would ever say, but

5    that's the formulation that I wanted to use.  I don't want to use

6    "irrelevant."

7              MR. MARTIN:  No objection from me, Your Honor.

8              MR. KURLAND:  Judge, Your Honor --

9              THE COURT:  Yes.

10             MR. KURLAND:  With respect to then the following

11   language, did you delete that or does that still continue?

12   Because I have a problem --

13             THE COURT:  No.  The carry-over paragraph, Page 8 and

14   9?

15             MR. KURLAND:  In the pro se pleadings defendants have

16   raised so-called jurisdictional defenses?

17             THE COURT:  Yes, I left that in.

18             MR. KURLAND:  Your Honor, last week Mr. Coburn and I

19   submitted a letter in response to your question as to how you

20   wanted defense counsel to think about how to deal with that.

21             THE COURT:  I saw it.

22             MR. KURLAND:  My concern is, Judge, that there are

23   legitimate, quote "jurisdictional defenses", whether it's the

24   effect on commerce or other things.  And I'm concerned that this

25   thing sort of distorts and basically tells the jury that no
```

1    jurisdictional defense is valid.

2            THE COURT:  I don't agree with that.  If you're telling

3    me that you actually expect to argue to the jury that they should

4    find the defendants not guilty or Mr. Gardner not guilty because

5    the government hasn't proven jurisdiction --

6            MR. KURLAND:  No, Your Honor.

7            THE COURT:  I'll wonder about that and I'll try to fix

8    it.  But you're not going to argue that way.

9            MR. KURLAND:  No, I'm not going to argue there's no

10   interstate commerce or that the court lacks jurisdiction.  I'm

11   concerned, though, that to some extent the arguments with respect

12   to the 1959 counts that the killing, even if it's a murder, that

13   it wasn't in furtherance of the goals, that there might be some

14   concern, that's some sort of, that's what gives it federal

15   jurisdiction.

16           THE COURT:  Yeah.  But you're not going to argue that

17   as a jurisdictional defense is my point.  You're going to say

18   that the government didn't prove the elements of the offense.

19           MR. KURLAND:  That's true.

20           THE COURT:  And that means that the defendants are

21   found not guilty, not that the court doesn't have jurisdiction

22   over the case or over the defendants.

23           MR. KURLAND:  Okay.  I guess it's more of a concern as

24   to, like, how broadly somebody might perceive the concept

25   of jurisdiction.  -

1          THE COURT:  You notice when I say "jurisdictional

2     defenses" I put it in quotes.  For an astute juror, they'll

3     understand, I think, what I'm saying.

4          MR. KURLAND:  As long as the Court considered the

5     letter.

6          THE COURT:  I did.  I really did.  Page 9.

7          MR. HARDING:  Could I raise two problems on Page 8 very

8     quickly?

9          THE COURT:  Yes, Mr. Harding.

10          MR. HARDING:  I'm requesting that, in the second line

11     of that paragraph that begins "the government has argued that the

12     pro se pleadings of various defendants."  It says "are similar

13     and employ identical language and that the defendants alleged use

14     of the pro se pleadings, along with the courtroom demonstrations,

15     constitute evidence of a continuation."

16          THE COURT:  All right.  Let me think about that for a

17     second.

18          MR. KURLAND:  I would object to that.

19          THE COURT:  I understand.  Every defendant objects to

20     that.

21          MR. MARTIN:  I don't know that I do.

22          THE COURT:  Oh, okay.

23          MR. MARTIN:  It calls into question their conduct since

24     the trial started as well, Your Honor, something on which you've

25     commented several times now.

```
1            MR. HARDING:  If that's the case, you can say the
2     pretrial courtroom demonstrations.
3            THE COURT:  Yeah.  I think I'm going to leave that out,
4     Mr. Harding.  I certainly don't fault you for asking but you can
5     argue that.
6            MR. HARDING:  Can I ask one other thing, Your Honor?
7            THE COURT:  Of course.
8            MR. HARDING:  Up in the second --
9            THE COURT:  In other words, I don't want to be in the
10    position of commenting on how the defendants behaved.  In fact,
11    to be honest with you, I thought about whether I should include
12    something to the effect that I was not personally insulted or
13    felt disrespected to avoid, because, you know, there's the
14    mythology out there that jurors sort of identify with the judge.
15    And I certainly wouldn't want any of the jurors to take from what
16    they heard on that tape that I was somehow insulted.
17           So I think the balance that I've reached of not
18    mentioning them as opposed to affirmatively disclaiming any
19    personal affront is the proper balance to take, Mr. Harding.  But
20    you are free to argue that the pro se pleadings in the light of
21    the courtroom behavior that you heard on the tape, etc., etc.
22           MR. KURLAND:  Judge, that's not a fair balance.
23           THE COURT:  Well, I understand that, Mr. Kurland.
24           MR. KURLAND:  We can't argue --
25           THE COURT:  I understand.
```

198

1          MR. KURLAND:  I like your language that you just said,

2   and then Mr. Harding can have his language.  We can't argue that

3   you weren't offended.  I would love to argue that.

4          THE COURT:  You can argue that there is no evidence

5   that I was offended.  And you can argue that, I mean, if you want

6   to raise it, I'm not inviting you to raise it.  But I think you

7   should stay away from it.

8          MR. KURLAND:  Well, unless you tell me that I can say

9   that you're not offended personally.

10         THE COURT:  No.  I'm not telling you you can say that.

11  I'm not telling you what to argue.  It's obvious that you can say

12  there is no evidence that the judge was offended.  You've seen

13  him sit through this trial.  He's been -- I mean, you can --

14         MR. KURLAND:  I understand.

15         THE COURT:  All right.  But I'm not authorizing it.

16         MR. HARDING:  Judge, in the second paragraph, Your

17  Honor, it says, During trial the court admitted a letter.  Could

18  Your Honor, since it's no longer marked as an exhibit it can't be

19  identified by exhibit number.  But I don't want it to be confused

20  with other letters that are exhibits.  So could Your Honor simply

21  say from, quote, "Dirty?"

22         MR. MARTIN:  No.

23         MR. FLANNERY:  No.

24         THE COURT:  How about from someone who signed the

25  letter Dirty?

199

1          MR. HARDING:  That's fine.

2          MR. MARTIN:  No, Your Honor.

3          MR. LAWLOR:  No.

4          MR. MARTIN:  It was seized at Two Cree Court.  It's the

5    only letter admitted seized at Two Cree Court.

6          MR. HARDING:  It is not.  There was the Darryl Bacon

7    letter.

8          THE COURT:  You can remain seated.  I think it's a fair

9    request.  All right.  I'm going to add, "which was signed by

10   someone in the name of Dirty."

11         MR. MARTIN:  How about allegedly signed?

12         THE COURT:  Okay.

13         MR. CROWE:  Your Honor, that was an instruction which

14   Mr. Pyne and I proposed because it directly affected Mr. Martin.

15         THE COURT:  Right.

16         MR. CROWE:  Mentioning the name "Dirty" just brings up

17   what we're telling them to forget.

18         THE COURT:  Well, that's exactly Mr. Harding's point.

19   He doesn't want me to tell them to forget something that I don't

20   mean to tell them to forget.  And the name "Dirty" is what's

21   going to trigger their memory of that letter.  Now, do you want

22   to strike the whole thing in that light?

23         MR. CROWE:  I would like to have the whole thing in.

24   If the Court thinks it needs some identification, it could say

25   that the letter was addressed to Nephew, which it was, also.

1            THE COURT:  Okay.

2            MR. CROWE:  And omit any mention of Dirty.

3            THE COURT:  All right.  Which was signed by, which was

4      addressed, is that right, Mr. Harding, it was?

5            MR. HARDING:  Oh, I actually don't know.

6            THE COURT:  Okay.  I think that's right.  I vaguely

7      remember that.  Which was addressed to quote-unquote "Nephew."

8      All right.  Good catch, Mr. Crowe.  All right.  Page 9?

9            MR. KURLAND:  I have one objection.  The top paragraph,

10     five lines down, where it says, The pro se papers, as defense in

11     this case, means simply that.  Since nothing is simple, I would

12     ask that the Court delete the word "simply."

13           THE COURT:  Okay.  Your exception is noted.  In fact, I

14     actually deleted a lot of "simply's" in the substantive

15     instructions.  But here I actually mean simply.  So I'm leaving

16     it in.  But your exception is noted.

17           All right.  Page 10.  Page 11.  Page 12.

18           MR. MARTIN:  Your Honor --

19           THE COURT:  Yes.

20           MR. MARTIN:  The first full paragraph on Page 11.

21           THE COURT:  Yes.

22           MR. MARTIN:  Whether the witness purposely made a false

23     statement.

24           THE COURT:  Standard boilerplate.

25           MR. MARTIN:  It is, Your Honor.  I'm sorry.  I was

1    thinking of something else.

2            THE COURT:  Okay.  Page 12.

3            MR. HARDING:  Judge, at the, on the first paragraph,

4    you talk about the grand jury transcripts but you omitted Rodney

5    Hayes's two.

6            THE COURT:  I knew I left somebody out.  So it's Rodney

7    Hayes.

8            MR. HARDING:  And actually, Ernest Reynolds is just a

9    fragment of his testimony.  It's a few lines.

10           MR. LAWLOR:  Judge, just while we're on the Rodney

11   Hayes subject.

12           THE COURT:  Just one moment.

13           MR. LAWLOR:  Sorry.

14           THE COURT:  So it's not really a transcript for

15   Reynolds.  It's just that two page exhibit that Mr. Kurland moved

16   in today.  All right.  So Mr. Kurland, I'm going to strike

17   Reynolds.

18           MR. KURLAND:  Well, no, Your Honor.  I won't say no.

19           THE COURT:  All right.  So in other words, I should say

20   the grand jury transcripts of Rodney Hayes and Damita Green and

21   an excerpt of the grand jury testimony of.

22           MR. KURLAND:  Yes.

23           THE COURT:  All right.

24           MR. KURLAND:  That would be --

25           THE COURT:  All right.

1          MR. KURLAND:  Are all of Rodney Hayes's grand jury

2     transcripts in?

3          MR. HARDING:  Two of them.

4          MR. LAWLOR:  That was going to be my point.  We sent

5     our proposed redactions to Mr. Harding.

6          MR. HARDING:  Yes.

7          MR. LAWLOR:  See if those were appropriate.

8          MR. HARDING:  I have looked them over and I don't think

9     there's going to be a major issue on them.  I don't have redacted

10    versions prepared yet, however, Your Honor.

11         THE COURT:  All right.  You going to take care of that

12    tomorrow?

13         MR. HARDING:  I'm going to take care of it tonight if

14    we get out of here.

15         THE COURT:  Okay.  We're going to get out of here, if

16    we can get past Page 13.  Yes, Mr. Kurland.

17         MR. KURLAND:  Okay.  Never mind.

18         THE COURT:  All right.  Anything else on Page 12?

19         MR. CROWE:  Yes, Your Honor.  I have two things.  The

20    Sand instructions on informal immunity and plea agreement.

21         THE COURT:  I've condensed them, yes.

22         MR. CROWE:  The language that you've cut out is really

23    at the heart of what I think many of the defendants were going to

24    be arguing.

25         THE COURT:  And what is that?

1          MR. CROWE:  You should, in informal immunity, quote,

2    "you should scrutinize closely to determine whether or not it is

3    colored in such a way as to place guilt upon the defendant in

4    order to further the witness' own interest, for such a witness

5    confronted with a realization that he can win his or her own

6    freedom by helping to convict another has a motive to falsify his

7    or her testimony."

8          In the plea agreement, it's that you should bear in

9    mind that a witness who has entered into such an agreement that's

10   a plea agreement has an interest in this case different from any

11   ordinary witness.  A witness who realizes that he or she may be

12   able to obtain his or her own freedom or receive a lighter

13   sentence by giving testimony favorable to the prosecution has a

14   motive to testify falsely.

15         I think that those passages are really at the heart of

16   the two instructions and I think that the instruction which the

17   Court has crafted here, and I expect it's largely adopted what

18   the government has proposed, has really taken the heart out of

19   the standard instructions.  It doesn't talk about why the

20   cooperating individual may have a motive or an interest in

21   testifying falsely to place the blame on somebody else.

22         THE COURT:  All right.  Your exception is noted, Mr.

23   Crowe.  I disagree.  You know, as great as Sand is, it's just

24   incredibly wordy.  Certainly, if, you know, if this were a case

25   where the government had all circumstantial evidence and one

1    cooperator or one person who was immunized, I could see your

2    point.  But in a case where, you know, every lay witness the

3    government's called, or just about, has a plea agreement or an

4    immunity agreement, nothing's going to be lost on the jury.  They

5    know.

6            MR. CROWE:  Well, with respect, what's lost on the jury

7    is an instruction from the Court that those people have a motive

8    to testify falsely.

9            THE COURT:  Mr. Crowe, if that's lost on the jury,

10   you've got your exception.

11           MR. LAWLOR:  Your Honor, just for clarification.

12           THE COURT:  Yes, Mr. Lawlor.

13           MR. LAWLOR:  Exceptions of one apply to all?

14           THE COURT:  Yes.

15           MR. LAWLOR:  And we don't need to repeat these at a

16   later time?

17           THE COURT:  No.  No.  That's why I'm going through

18   this.

19           MR. KURLAND:  Same, we want to just register our

20   objection on that point as well.  There's a huge difference, Your

21   Honor, between how we argue, we can point to a jury instruction

22   with the imprimatur of the Court and the serial nature.  The

23   government's going to argue that the multiple corroboration

24   proves that they're truthful.  I guarantee you that Mr. Harding

25   will say that several times in his rebuttal.

1          So that's not, that's our position, that that, that

2     isn't a self-evident point, and adding that additional language

3     is vital to the defense ability to argue fairly in this case.

4          THE COURT:  So noted.  Page 13.  Page 14.

5          MR. CROWE:  Your Honor, on Page 13, we had submitted an

6     instruction on prior perjury.  We submitted.

7          THE COURT:  Yes.  Who committed perjury in this case?

8     I mean, who has a prior conviction for perjury?

9          MR. CROWE:  I don't believe the instruction requires a

10    prior --

11         THE COURT:  No.  I didn't ask that, Mr. Crowe.  Really,

12    we can get out of here by 9:00 if, gentlemen and lady, if you

13    would just answer my question.  Who was the witness who committed

14    perjury in this case?

15         MR. CROWE:  The witness who committed perjury in this

16    case was certainly Dwayne Denham.

17         THE COURT:  No.  No.  I'm sorry.  Not a witness who

18    committed perjury.  Who has been convicted of perjury?

19         MR. CROWE:  None that I'm aware of.

20         THE COURT:  All right.  Why would I give an instruction

21    about a witness who submitted perjury previously in a case where

22    no witness had been shown to have been convicted of perjury?

23         MR. CROWE:  Because we have witnesses who are admitted

24    perjurers by their own testimony.

25         THE COURT:  No.  Perjury is an offense under state and

1  federal law and a conviction for perjury requires a judgment of

2  conviction.  They are liars.  They are not perjurers until

3  they've been convicted of the offense of perjury in a court with

4  jurisdiction.

5          Now, of course, we use all kinds of loose language all

6  the time and I don't have any problem with that.

7          MR. CROWE:  Well, Your Honor --

8          THE COURT:  But they're not perjurers just because

9  somebody asked them, so you committed perjury?  Yeah, I committed

10  perjury; I lied in the grand jury.

11          MR. CROWE:  Your Honor --

12          THE COURT:  They lied in the grand jury.  They haven't

13  been convicted of perjury.

14          MR. CROWE:  Your Honor, the Sand and Siffert --

15          THE COURT:  And you can refer to them as perjurers.

16  Mr. Crowe, I'm moving on.  Really, your point is well taken.

17          MR. LAWLOR:  Your Honor, just very briefly.  Mr. Hayes

18  was another witness who admitted to lying before the grand jury

19  so we would ask that --

20          THE COURT:  They all did.  I mean, they all, they all

21  admitted lying.

22          MR. LAWLOR:  I just wanted to add that.

23          THE COURT:  All right.

24          MR. CROWE:  Your Honor, could I just throw in one thing

25  and I'll be very brief?

207

1          THE COURT:  Yes.

2          MR. CROWE:  The instruction says, There has been

3  evidence that a witness who testified at this trial lied under

4  oath at another proceeding.

5          THE COURT:  I'm sorry.  Where are you reading?

6          MR. CROWE:  I'm reading Sand Instruction Seven.

7          THE COURT:  Why are you reading to me from Sand?  I

8  want to move on to Page 14.

9          MR. CROWE:  Fine.

10          THE COURT:  Thank you.  Page 14.  Page 15.  Page 16.

11  Page 17.

12          MR. KURLAND:  Judge --

13          THE COURT:  Page 17?

14          MR. KURLAND:  I've got something marked off.

15          MR. LAWLOR:  I have one on 17, Your Honor.

16          THE COURT:  Okay.  Who wants to go first?

17          MR. LAWLOR:  The burden of proof and the standard of

18  proof, I'm aware of the fact that the Fourth Circuit does not

19  permit the district court to define the term "reasonable doubt."

20  I understand the Court will not do that.  We'd just like to note

21  our objection to the failure of the Court to define that term.

22          THE COURT:  Of course.  And all defendants join in that

23  request.

24          MR. MARTIN:  Your Honor, just for the record, even

25  though I know what you're going to say, you have in the paragraph

1    above that, Whether a person should be indicted as a defendant is

2    a matter within the sole discretion of the United States attorney

3    and the grand jury.

4                THE COURT:  Yes.

5                MR. MARTIN:  Just for the record, Your Honor, if the

6    United States attorney doesn't bring it to the grand jury,

7    they're not going to do anything.

8                THE COURT:  So noted.  Yes, Mr. Kurland.

9                MR. KURLAND:  On 17, there's a simply, I would note

10   that the government in that last full paragraph, note that the

11   government's burden is not to prove guilt beyond all possible

12   doubt but simply beyond a reasonable doubt.  Again, I think there

13   it should be deleted because that's deflecting the severity of

14   the government's burden.

15               THE COURT:  All right.  I'll strike the word "simply"

16   on Page 17 where you just noted it.

17               MR. KURLAND:  Thank you, Your Honor.

18               THE COURT:  Page 18.

19               MR. LAWLOR:  Yeah, Your Honor.  I have two things on

20   18.  I would suggest that that there's been evidence that one,

21   one or more of the defendants made certain statements,

22   essentially false exculpatory statements, we think, sort of

23   direct comment on the evidence.  There's no evidence to support

24   that.  We'd ask that the Court not give that instruction.

25               THE COURT:  Your exception is noted.

209

1          MR. LAWLOR:  Also, Your Honor, You have heard testimony

2     that one or more of the defendants may have attempted to

3     persuade, dot, dot, dot, we would except to that instruction.  To

4     the degree that the Court insists on giving it, we'd ask that the

5     Court identify which of the defendants attempted to persuade one

6     or more government witnesses not to testify.  I'm not aware of

7     any evidence that Mr. Mitchell made any efforts to dissuade

8     anyone from testifying.

9          THE COURT:  Your exception is noted.  All right.  If

10    you want to take a break, I need to take this telephone

11    conference in a grand jury matter.

12          So I don't think you need to leave the courtroom if you

13    choose not to.  But it's going to take a few minutes because --

14    it's not on the record.  And I'm not going to disclose any grand

15    jury matters.

16          (Recess.)

17          THE COURT:  Mr. Harding, you heard the news?

18          MR. HARDING:  Yes, Your Honor.

19          THE COURT:  All right.  Just let the record reflect

20    that during the break in the conference on instructions with

21    counsel, Deputy Shelton entered the courtroom to advise the Court

22    that a few minutes after the defendants were escorted up to the

23    marshal's lockup for transportation back to Supermax, Mr. Harris

24    essentially attacked one of the deputies, took a swing at one of

25    the deputies, made minor contact with that deputy, with his fist

1    in the face area, and something of a fracas occurred.

2    Fortunately, the other defendants were still restrained or

3    otherwise secured.

4         But I'm advised that it took four or five or six deputy

5    marshals finally to restrain Mr. Harris, who was Tasered and who

6    suffered what appear to be minor scrapes during the attempt to

7    subdue him.

8         Medical attention has been summonsed.  We all just

9    heard, I think, the ambulance approaching the courthouse.  The

10   other defendants have been returned to SuperMax.  Mr. Harris

11   remains upstairs awaiting medical attention.  There's no

12   indication that he has been seriously injured in any way but he

13   was Tasered in the effort to subdue him.

14        I'm told that the incident is probably captured on the

15   video monitors in the marshal's lockup.  It will take some time

16   for the appropriate personnel to retrieve those images.  Deputy

17   Marshal Akers was very clear that he intended to make a referral

18   of the matter to the United States Attorney's Office and my

19   response to him was I would insist that that happen.

20        And I further indicated to Deputy Akers that while we

21   will certainly talk tomorrow morning and decide how best to

22   proceed, it is my present inclination to leave Mr. Harris in the

23   marshal's lockup tomorrow.  As counsel will recall, we have a

24   setup up there whereby in anticipation of this trial and this

25   very kind of incident or some other incident we had arranged for

1    the defendants to be able to observe the proceedings in this

2    courtroom from the marshal's lockup in a cell.  And my

3    inclination is to leave Mr. Harris in that cell tomorrow and for

4    the duration of these proceedings.

5              I further advised Deputy Akers that, for the balance of

6    these proceedings and in accordance with prior plans, it seems to

7    me that all three remaining defendants should remain shackled at

8    the ankle while they're in the courtroom.

9              Counsel are aware, of course, that we installed the

10   skirts on trial tables so that if it should become necessary to

11   use restraints on the defendants, we could do so without the jury

12   observing that restraints were in use.

13             So that's what the Court's going to do tomorrow.  And

14   I'll speak further with Deputy Akers tomorrow and we'll see where

15   we go.

16             MR. MARTIN:  Your Honor, I'm not going to prolong

17   anything.  But of course, I'm going to object to the shackling

18   and leaving him upstairs and everything else you propose to do.

19   I'd rather get this over.  I got work to do tonight.

20             THE COURT:  Of course.

21             MR. KURLAND:  I just want to put on the record --

22             MR. MARTIN:  I'd also rather you have somebody else

23   appointed to represent him in the next case.

24             THE COURT:  I'll take that under advisement.

25             MR. MARTIN:  I may have to be a witness, Your Honor,

1  given what he's going to tell me about what he thinks happened in

2  here today.

3           MR. LAWLOR:  Mr. Flannery could do it, though.

4           MR. KURLAND:  Your Honor, just for the record, we would

5  object to Mr. Gardner being shackled.

6           THE COURT:  All right.  It's ironic that the very day

7  that I address the defendants directly and thank them for the

8  manner in which they conducted themselves during these

9  proceedings that this should happen.  But this case is overrun

10 with irony.

11          All right.  We're up to Page 18, I think.  Page 19.

12          MR. KURLAND:  I've got an objection.  Judge, this might

13 be standard language but since we rejected standard language in

14 other --

15          THE COURT:  Counsel, can I interrupt?

16          MR. KURLAND:  Sure.

17          THE COURT:  All of us really want and need to get out

18 of here.

19          MR. KURLAND:  I'll be quick.

20          THE COURT:  So if you could just state your objection,

21 your exception, I'll note it, and let's move on.

22          MR. KURLAND:  The medical science stuff, I think, is

23 unnecessary.

24          THE COURT:  All right.  Your exception is noted.  Page

25 20.

1          MR. KURLAND:  Yes.  I have an objection to 20.  It says

2     that motive is not relevant but in the 1959 counts it is.  So you

3     do --

4          THE COURT:  Well, I thought about that, Mr. Kurland.

5     And I also thought about it with respect to Count 19, the

6     obstruction.  I still don't think it's motive.  I think it's

7     intent.  It's not motive.  Does the government disagree?

8          MR. HARDING:  No, Your Honor.

9          THE COURT:  All right.  So Page 21?

10         MR. CROWE:  Your Honor, in the last paragraph, May,

11    2005, which was my instruction, should really be May, 1999.  I

12    had it wrong in what I submitted.

13         THE COURT:  All right.  We'll change 2005 to 1999.

14         MR. MARTIN:  Your Honor, in the top paragraph, and

15    correct me if I'm wrong if you say it elsewhere, the first

16    partial paragraph at the end where you talk about responsible for

17    such acts, declarations, statements and omissions.

18         THE COURT:  Yes.

19         MR. MARTIN:  I had written here provided you find the

20    conspiracy charged had been proved and each defendant joined that

21    conspiracy.  It may be clear some place else and I'm just not

22    picking it up.  But I think that's the law.

23         MR. HARDING:  Actually, the statements come in under

24    Bourjaily.  If the Court makes a preliminary determination about

25    the admissibility of the statements, it doesn't depend upon a

1    later verdict in favor of a conspiracy, Your Honor.

2            MR. MARTIN:  But the jury's finding does.

3            MR. HARDING:  It's a question of admissibility of

4    evidence, Your Honor.  It can't depend upon a later verdict.

5            MR. MARTIN:  Your Honor, you've already admitted it.

6    It's not a question of admissibility.  At this point it's a

7    question of what they may consider them as.

8            THE COURT:  Why doesn't the next paragraph do what --

9            MR. MARTIN:  You know, Your Honor, it does.  Remember I

10   said at the end -- I wasn't picking that up.  It does.

11           THE COURT:  Okay.  Okay.  All right.  Page 22.  Now,

12   let me read to you how I've changed the first full paragraph on

13   22.  And I think this will be quite satisfactory to the defense,

14   I think.  Where it says "finally", here's how it's actually going

15   to read:

16           Again, as I have instructed you concerning statements

17   which may have been made in furtherance of a conspiracy, those

18   statements can only be used against a defendant other than the

19   one who made the statement if you first determine that the

20   statement was made, one, during the existence of a conspiracy,

21   two, in furtherance of the existing conspiracy, and three, the

22   defendant against whom the statement is to be used was a member

23   of the existing conspiracy at the time the statement was made.

24           I think that's even a more favorable statement of the

25   law than the law actually provides from the defense perspective.

1    And it's obviously redundant of what I said earlier.  But I

2    think, I think you're entitled, the defense are entitled to that.

3           Okay.  Now, also on Page 22, and in other places, I'm

4    using the term overarching conspiracies when I refer to the RICO

5    conspiracy in Count One and the narcotics conspiracy in Count

6    Eight.  I think the government submitted, and I think Sand talks

7    about the overall.  I'm using the term "overarching."  Okay?  All

8    right.  Page 23.

9           MR. FLANNERY:  Yes, Your Honor.  23.  In the arrest of

10   conspirators.

11          THE COURT:  Yes.  Let me take a crack at it, Mr.

12   Flannery, and read to you how I've changed it.

13          MR. FLANNERY:  Okay.

14          THE COURT:  Trying to make sure I can read my

15   scratching.  Okay.  Here's how it's going to read.  Although you

16   may consider whether any defendant's participation in a

17   conspiracy ended when he was arrested, the mere arrest of a

18   conspirator does not, as a matter of law, terminate the

19   conspiracy, comma, or establish that the arrest, or establish the

20   arrested person's withdrawal from the conspiracy, period.  Shall

21   I read it again?

22          MR. KURLAND:  Yes, please.

23          THE COURT:  Okay.  Although you may consider -- and of

24   course this follows the prior paragraph, obviously.  Although you

25   may consider whether any defendant's participation in a

1    conspiracy ended when he was arrested, the mere arrest of a

2    conspirator does not as a matter of law terminate a conspiracy or

3    establish the arrested person's withdrawal from the conspiracy.

4    In the absence of definite proof, withdrawal from or abandonment

5    of the conspiracy should not be presumed merely because a

6    defendant has been arrested or becomes incarcerated.  A

7    defendant's membership in a conspiracy is presumed to continue

8    until he withdraws from the conspiracy by affirmative action.

9         MR. FLANNERY:  Your Honor, could we, could we add in,

10   it is not as a matter of law, but may as a matter of fact?

11   Because if you remember in our specific instructions that we

12   provided, we did, we did support Fourth Circuit case in a

13   footnote that cites the Second Circuit case, talking about how

14   the mere arrest or incarceration can be enough evidence to create

15   a jury question as to whether or not a particular defendant has

16   withdrawn from the conspiracy.

17        THE COURT:  Well, I mean, obviously, I'm agreeing that

18   there's a jury question here.

19        MR. FLANNERY:  I just think that the way it's written

20   out, to a lay person, to a juror, it sounds like if they only

21   find that there's just an arrest, even considering the timing or

22   the location of the arrest, that they can't consider that to be

23   withdrawal because that notion as a matter law is in there, as if

24   we're instructing them there has to be more.  And that's really

25   not --

1          THE COURT:  Would you be comfortable if I instruct "as

2     a matter of law" and said, instead, "inevitably?"  So that the

3     mere arrest of a conspirator does not inevitably terminate a

4     conspiracy or establish?

5          MR. HARDING:  Well, I'd object to that.

6          MR. FLANNERY:  I think we would, I mean, we would still

7     object, Your Honor, but we appreciate that better.

8          MR. HARDING:  I think that makes it appear as though in

9     the ordinary circumstance it does terminate the conspiracy.  I

10    think that the change that Mr. Flannery is requesting is

11    contained in the insertion Your Honor just created at the very

12    beginning.  Although you may consider whether any defendant's

13    participation ended at arrest.

14         THE COURT:  Yeah.  And what Mr. Flannery is concerned

15    about is articulating it as something they may consider without a

16    slightly stronger directive.

17         MR. KURLAND:  Judge, the language as written here with

18    the presumption reads like an irrebuttable presumption, which is

19    obviously legally improper.  And also, the concept of the

20    conspiracy might well terminate is a factual issue for the jury.

21    If it terminates at a time substantially different than the

22    government's allegations in the indictment, even with respect to

23    the on or about, that should lead to an acquittal.  And even with

24    the proposed, the proposed modification helps but it still takes

25    away from the jury the fact issue as to when the conspiracy has

1  terminated.  And if that's different from the government's

2  allegation of 12 years, we should be entitled to argue that as an

3  issue of fact for the jury.

4          I'm concerned that this reads too much like an

5  irrebuttable presumption even with the modifications, which help.

6          THE COURT:  I think "inevitably", Mr. Harding, is a

7  fair --

8          MR. LAWLOR:  I object.  I'm kidding.

9          THE COURT:  I think on the evidence in this case where

10 you have so many significantly lengthy absences as a result of

11 incarceration, I mean, this is not a case where we have one

12 defendant who's in a conspiracy who gets locked up for a period

13 of time and then comes back.  But I couldn't even keep track of

14 who was going and coming most of the time.  I think "inevitably"

15 is fair.

16         I'm not sure, I'm not ever sure, frankly, how jurors

17 really understand the term "as a matter of law", frankly.  So I

18 wasn't really enamored of it.  Was that statement out of Sand?

19         MR. HARDING:  I think it's straight out of the Fourth

20 Circuit case, Your Honor.  I don't remember for sure but I

21 believe I got that language directly from one of the cited Fourth

22 Circuit cases.

23         THE COURT:  I mean, it's a correct statement of the

24 law.

25         MR. FLANNERY:  It's a correct statement of the law.

1          THE COURT:  As we understand the meaning of the term

2     "as a matter of law."  And that's the problem.  Okay.  I'm going

3     to go with "inevitably."

4          MR. FLANNERY:  Thank you, Your Honor.

5          THE COURT:  And leave it --

6          MR. KURLAND:  The changes that the --

7          THE COURT:  No.  I don't think it's a rebuttable

8     presumption and it's a correct statement of the law, that

9     continued membership is presumed.

10          All right.  24.  25.

11          MR. KURLAND:  Your Honor, in some of this, on Page 24

12     and 25, that dovetails with one of my proposed special

13     instructions.  Do you want me to mention that now or later?

14          THE COURT:  Let's come back to where you want to insert

15     something more significant than just a phrase.  Okay?  All right.

16     Let me say this about the RICO.  Obviously, I haven't included

17     the Park Heights, Randallstown/Park Heights organization.  I'm

18     going to plug into this the excerpts from the indictment.  And I

19     probably will say, I don't know exactly where yet, but I will

20     say, in fact, I did write it in, I think -- yeah, if you jump

21     over to Page 26, that last paragraph, under the statute and

22     enterprise, I intend to assert after enterprise, "which is

23     described here as the Randallstown/Park Heights organization."

24     Okay?  So that will be in there.

25          And I also intend to adopt, I think it's Mr. Flannery's

1   request, I'm going to tell the jury that Shakedown is not the

2   enterprise.  I will actually say that.

3          Now, I'll say a little more than that.  I will probably

4   say Shakedown is a limited liability company under Maryland law

5   which is said to be associated with the enterprise.  But it is

6   not the enterprise under the indictment.

7          MR. KURLAND:  Judge, I don't think it's -- I would

8   object to that because it's not, it's "associated with the

9   enterprise" is a term of art.

10          THE COURT:  Well, that's what the indictment says.

11          MR. KURLAND:  I don't believe it does.  I think it does

12   not --

13          MR. HARDING:  It's one, it's only discussed in the

14   purposes section, as I recall, Your Honor.  Shakedown.

15          THE COURT:  No.  It's described -- just a moment.  Just

16   a moment.  I know that the purpose was to further the rap music

17   business of Shakedown.  But it is actually described, unless I'm

18   really --

19          MR. FLANNERY:  No.  Your Honor, what you're thinking of

20   is it's associated, in fact, Randallstown/Park Heights

21   organization is an association, in fact, of Defendant A, B, and

22   C, and an entity.

23          THE COURT:  Right.  That's what I meant.  It's an

24   association in fact of the entity and the individuals.  That's

25   what I meant by associated with.

1              MR. HARDING:  Yes.  That's right.  I do remember that.

2              THE COURT:  Yeah.  So that's in the indictment, Mr.

3    Kurland.

4              MR. HARDING:  I'm not sure it's actually a limited

5    liability corporation.

6              THE COURT:  Yeah.  Is it a corporation?

7              MR. HARDING:  It is a corporation.

8              THE COURT:  Corporation.  Now defunct.  I think the

9    evidence, obviously, its charter is forfeited and all that.

10             MR. HARDING:  Yeah.  Because that's what happens

11   automatically when they don't file income taxes.

12             THE COURT:  Right.  Actually, when they don't file --

13             MR. MARTIN:  When you don't renew at the end of the

14   year.

15             THE COURT:  -- personal property tax.

16             MR. MARTIN:  Personal property tax.

17             MR. KURLAND:  I think my indictment is back at the

18   hotel.  Your Honor, I just want to make sure whatever change is

19   made, it doesn't rule out the opportunity to argue that if the

20   jury finds that Shakedown is the enterprise and that's it,

21   they've got to acquit.

22             THE COURT:  I'm sorry?

23             MR. MARTIN:  I just want to be --

24             THE COURT:  No.  I'm going to tell them they can't

25   find.  That's not going to be possible.

1          MR. KURLAND:  No, I understand that.  But I'm saying if

2     the jury, in evaluating the evidence and the elements of the

3     illegal enterprise, think that all the government has proved is

4     Shakedown is the enterprise, that should be an acquittal.

5          THE COURT:  No.  The jury is not going to believe or

6     conclude that the government has proven that Shakedown is the

7     enterprise because I'm going to tell the jury that the, that

8     Shakedown is not the enterprise.

9          MR. KURLAND:  Your Honor, I understand that.  But I

10    want to be able to argue that if that's all the jury, in

11    evaluating the facts, comes to that conclusion, consistent with

12    what the Court just said, the result has to be an acquittal

13    because they would not, because the government would not have

14    proved the enterprise that's alleged in the indictment.

15         MR. HARDING:  No.  No.  It's one of the purposes.

16         THE COURT:  I can't process what you're saying to me,

17    honestly, Mr. Kurland.  When I tell the jury that Shakedown is

18    not the enterprise, the jury is not going to conclude that the

19    enterprise is Shakedown.  They're not even going to think about

20    that.

21         MR. KURLAND:  No.  No.  Your Honor, this is important.

22    Let me just say this.  I understand exactly what the Court is

23    saying and I agree with that.  But I think, though, that it is

24    still fair to argue that if in all of this evidence, the jury's

25    going to get all the elements of what a RICO enterprise is.

1          THE COURT:  Right.

2          MR. KURLAND:  If the jury, they're not going to come up

3    with a special finding saying, we find the enterprise, Shakedown,

4    because you're going to tell them that's improper.

5          THE COURT:  They're also not going to find any special,

6    they're not going to find an enterprise at all.

7          MR. KURLAND:  I understand that.  That's my point.  If

8    the jury, in evaluating the evidence, says, you know what, all

9    these RICO elements, we think that Shakedown is the enterprise,

10   that should lead to an acquittal because that by definition is

11   not the enterprise charged in the indictment.

12         THE COURT:  All right.  Mr. Kurland, obviously, you can

13   argue whatever you want.  The jury's going to be told that

14   Shakedown is not an enterprise.  It is not an enterprise.

15         MR. KURLAND:  It's not a charged enterprise.

16         THE COURT:  That the enterprise is an association in

17   fact of individuals and Shakedown, which is a Maryland

18   corporation, that's what the jury's going to be told.  And that's

19   the enterprise that they have to find the government has proven

20   beyond a reasonable doubt.

21         MR. KURLAND:  What about if, if they, you add that if

22   they, if they find that there's no enterprise beyond Shakedown,

23   then it's an acquittal?

24         THE COURT:  There is no enterprise called Shakedown.

25   Okay?  All right.  Let's move on.  All right.  Anybody else have

1    anything on Page 25, 26?

2            MR. FLANNERY:  Your Honor, did you say you wanted to

3    come back to more, like, substantive?

4            THE COURT:  Yeah.  I would like to come back if you

5    have like a chunk of something that you want inserted.  Let's

6    come back.  All right.  27?  28?  And I'm going to use, I'm going

7    to use the phraseology, achievement of the objective of the

8    enterprise.

9            MR. MARTIN:  Where is that, Your Honor?

10           THE COURT:  That starts on Page 29, very top.  It says,

11   The focus of this element is on the defendants' agreement to

12   participate in the objective of the enterprise.  And it seems to

13   make more sense to me to say "to participate in the achievement

14   of the objective of the enterprise."

15           MR. HARDING:  Can we say objectives, Your Honor?

16           THE COURT:  Oh, sure.  Of course.  Objectives, plural.

17   All right.

18           Now, I propose to insert the dual sovereignty

19   instruction, I guess just before the last paragraph on Page 29.

20           MR. HARDING:  Judge, could we, could I ask that the

21   Court insert just one word in that instruction, which is that

22   toward the end you say that the other sovereign can continue a

23   case even, even if there is a conviction.  Can Your Honor say

24   even if there is a conviction or an acquittal?  Because it seems

25   to suggest that there has been a conviction previously in this

1    case.

2              MR. KURLAND:  This was the instruction -- I would

3    object.  This is the instruction that was given.  There has been

4    no acquittals.  And I think the jury is entitled to hear the same

5    instruction the Court already gave.

6              THE COURT:  Is this the sentence you're referring to,

7    Mr. Harding?  Indeed, federal prosecutions sometimes are

8    authorized even after a prior state prosecution has resulted in a

9    conviction?

10             MR. HARDING:  Yes.

11             THE COURT:  And you want it to say "resulted in a

12   conviction or an acquittal?"

13             MR. HARDING:  Yes.

14             MR. KURLAND:  I would object to that, Your Honor.

15             THE COURT:  Well, I could just say federal prosecutions

16   sometimes are authorized even after a prior state prosecution.

17             MR. KURLAND:  Your Honor, that defeats the purpose of

18   the concern here about -- remember, this thing all evolves, and I

19   hate to take up the time here, but I fought hard to get this

20   instruction and this language before the jury.  And it was read

21   this way because of the concern here, it was inevitable, that

22   they know in one manner or form that there was a prior proceeding

23   of which Gardner has been tried.  And the concern that is

24   reflected in all the case law is that the jury is going to

25   convict him here regardless of whatever defense we mount because

1    they feel that he was acquitted in this prior proceeding.  And

2    that's why the government is going through all the time and

3    effort to do it.

4            THE COURT:  Okay.  You remind me that was part of the

5    motivation.  All right.  I'll leave it the way it is.

6            MR. KURLAND:  Thank you very much, Your Honor.

7            THE COURT:  They've heard it that way.  All right.

8    Page 30.  31.  32.  33.  34.

9            Now.  Mr. Harding, you sent, and I apologize, I

10   remember getting an e-mail from you that said, Please disregard a

11   prior submission, we're going to send something else.  And I'm

12   not sure I got the right thing you wanted me to get.  Do you know

13   what I'm referring to?

14           MR. HARDING:  Yes, I do, Your Honor.  I did send in

15   some instructions over the weekend that corrected.

16           THE COURT:  Have I picked those up in the draft?

17           MR. HARDING:  No.  No, I don't believe you have.  I was

18   going to call that to Your Honor's attention.

19           THE COURT:  Okay.  All right.  Why don't we go through

20   them and then you can do that?  I'm pretty sure I have what you

21   submitted.  It's just that I got confused on the, which was

22   which.  It was mainly about felony murder, wasn't it?  Or was it?

23           MR. HARDING:  That was part of it.  But the other is

24   that -- well, actually, that was, that was the crux of the

25   matter.  But there was a verdict sheet.

1          THE COURT:  Oh, I got the verdict sheet.  That 18 page

2     verdict sheet.

3          MR. HARDING:  Yeah.

4          THE COURT:  It's in here.

5          MR. HARDING:  Actually, there have been longer verdict

6     sheets in this district.

7          THE COURT:  Oh, of course.

8          MR. HARDING:  The problem with the instruction that

9     begins, The narcotics conspiracy in Racketeering Act Nine

10    instruction, it omits two of the drugs that are charged.

11         THE COURT:  Right.  I have here marijuana.  And what

12    else?  Powder?

13         MR. HARDING:  Crack.  Cocaine, heroin, crack and

14    marijuana are all charged.

15         THE COURT:  Okay.  So you are instructed as a matter of

16    law that cocaine, heroin -- cocaine, crack cocaine, heroin and

17    marijuana, is the way it should read, right?

18         MR. HARDING:  Right.

19         THE COURT:  Okay.  Now, marijuana is schedule what?

20         MR. HARDING:  One.

21         THE COURT:  One.  All right.  Okay.  But I don't need

22    to specify.

23         MR. HARDING:  No.

24         THE COURT:  Just says specifically Schedule One and

25    Schedule Two.

228

1          MR. HARDING:  Right.

2          THE COURT:  Okay.  All right.  Crack and marijuana.

3   Okay.  All right.

4          MR. HARDING:  And there are many other places in that

5   instruction in the next few pages where the same change would

6   have to be inserted.

7          THE COURT:  Okay.  Now, let me ask you, Mr. Harding.

8   You have left to the verdict sheet the issue around drug weights.

9   Unless I missed it, you did not submit a proposed instruction on

10  reasonable foreseeability.

11         MR. HARDING:  No.  That's what I meant to say, Your

12  Honor.  I have to do that, or maybe Your Honor has one.

13         THE COURT:  I have one.

14         MR. HARDING:  Okay.  Please insert that because --

15         THE COURT:  Okay.

16         MR. HARDING:  I realized after I sent that in that I

17  had omitted that crucial language.

18         THE COURT:  Okay.  All right.  So I'll put that in.

19  Reasonable foreseeability, the drugs, etc., etc.

20         All right.  By the way, I thought I had my copy of the

21  indictment and I seem not to.  Are we only concerned with the

22  crack and the heroin weights or is it all three?

23         MR. HARDING:  No.  You're right.  It's only those two

24  that involve a weight determination.

25         THE COURT:  Okay.  All right.  Thank you.

1                Page 37.  Page 38?  Page 39.  Page 40.  41.  42.

2                MR. KURLAND:  Your Honor, I just have a comment.  On

3       the "on or about" language that is --

4                THE COURT:  What page?

5                MR. KURLAND:  Well, on 42.  Conspiracy took place

6       during the time period reasonably related to that alleged in the

7       indictment.  Part of the issue is resolved by the multiple

8       conspiracy instruction.  But is the Court going to give -- I

9       proposed something, that we've talked about that issue before as

10      to, if they prove a 6 year conspiracy and a 12 year, that should

11      be, I don't know if we want a special verdict form or not.  But

12      that should be --

13               THE COURT:  No. I think the way we've handled it here

14      is the best way to do it.

15               MR. KURLAND:  But it's fair to argue, then, if they

16      find it considerably shorter, it's not guilty.

17               THE COURT:  Absolutely.  Okay.  44.  45.  46.  47.  48.

18               MR. KURLAND:  Your Honor --

19               THE COURT:  Yes.

20               MR. KURLAND:  That's where I want a special

21      instruction.

22               THE COURT:  All right.  We'll come back.  49.  50.  And

23      I'm going to take out, by the way, on style, you see like on Page

24      50, where I have Count Three, elements of conspiracy to commit.

25      That's coming out.  So those parentheticals, headings are coming

230

```
1    out.

2            MR. KURLAND:  Will the Court also take out, the

3    government's typewriter has, Subparagraph C look like a copyright

4    sign?

5            THE COURT:  Yeah.  I fixed all that.

6            MR. KURLAND:  I hate that.

7            THE COURT:  I fixed most of it.  There's still some in

8    there.  You're right.  All right.  Page 52.  53.  54.  55.  56.

9    57.

10           MR. HARDING:  Your Honor, 57 is where the instruction I

11   sent in about the felony murder instruction should go, because

12   there are actually two different theories of murder in those

13   murder counts.  And the fourth element only applies to

14   premeditated theory.

15           THE COURT:  Right.

16           MR. HARDING:  There's a different fourth element for

17   felony murder, obviously.  And that's why I submitted a new

18   instruction.

19           THE COURT:  Okay.  I'll find that.  And I think that's

20   why there's that gap there.  I think I intended to put it in

21   there.

22           All right.  58.  59.  I think you all are worn down

23   finally.

24           MR. KURLAND:  Not me.

25           THE COURT:  60.  61.  62.  63.  64.  65.  66.  67.  68.
```

1    69.  Unless I missed it, Mr. Flannery, you didn't ask for an

2    alibi.  But I assume -- Mr. Martin?

3              MR. MARTIN:  For the alibi?

4              THE COURT:  I'm sorry.

5              MR. CROWE:  Yes.

6              MR. MARTIN:  You have the Martin confused with the

7    Martin.

8              THE COURT:  I do.  That's the third time I've done it

9    today.  I apologize.  Mr. Crowe, you didn't ask for an alibi.

10   Are you signaling to the Court that you don't want it?

11             MR. CROWE:  No.  I simply forgot to ask for it.  We

12   appreciate the Court putting it in.

13             THE COURT:  So it's in there, as well as the false

14   alibi.

15             MR. HARDING:  Judge --

16             MR. LAWLOR:  Your Honor --

17             THE COURT:  Yes, Mr. Lawlor, then Mr. Harding.

18             MR. LAWLOR:  Your Honor, we would request an alibi

19   instruction on behalf of Mr. Mitchell as to the Wyche homicide.

20   The government introduced evidence through Jaquetta Smith that he

21   was at home packing for the better part of the night, that she

22   went to bed, didn't hear him leave.  Then his statement to the

23   police was that he was at home all night packing, never left the

24   house, made the phone call to L.

25             So even if Ms. Smith's testimony doesn't establish an

232

1    alibi, which we would argue it does, the combination of Ms.

2    Smith's testimony along with the statement introduced by the

3    government made by Mr. Mitchell to law enforcement establishes an

4    alibi.

5              THE COURT:  So you want Mr. Martin and Mr. Mitchell.

6              MR. LAWLOR:  Roger that.

7              MR. KURLAND:  Your Honor, with respect to Mr. Gardner,

8    it's our position there's no evidence he was there.  Now, I

9    didn't submit an alibi instruction because, I mean, it's

10   essentially a combination.  With respect to the Wyche murders,

11   there's no evidence that he had any involvement.  But there's no

12   affirmative evidence that he was anywhere else.  That's why I

13   didn't, up until this time.  But I'm concerned that if everybody

14   else gets an alibi --

15             THE COURT:  Well, Mr. Harris isn't getting one.

16             MR. MARTIN:  Who's not getting one?

17             MR. KURLAND:  Well, that's all the more reason to want

18   to be different from him.

19             MR. MARTIN:  Could I have one as to Wyche?

20             THE COURT:  No.

21             MR. MARTIN:  My argument is he wasn't there.  There's

22   evidence that there's a phone call made.

23             THE COURT:  But there's no proof that he was there.

24   But there's no, I don't think you generated the evidence of an

25   alibi.

233

1          MR. MARTIN:  I haven't put anybody on to say that he

2    was home.  But there's evidence.

3          THE COURT:  You didn't give a notice of alibi witness.

4          MR. MARTIN:  You're right, I didn't.

5          MR. FLANNERY:  Actually, we did, Your Honor.  We did

6    regarding the Wyche.

7          THE COURT:  You did?

8          MR. FLANNERY:  Stated that he was at home.

9          THE COURT:  All right.  So shall I just say

10   "defendants?"

11         MR. MARTIN:  Yes, Your Honor.

12         THE COURT:  So defendants have raised.  All right.  Mr.

13   Harding, any problem with that?

14         MR. HARDING:  No.

15         THE COURT:  All right.  You had something, Mr. Harding,

16   on Page 68 or 69.

17         MR. HARDING:  Actually, I was going to raise the very

18   point Mr. Lawlor made, that Mitchell also had an alibi.

19         THE COURT:  All right.

20         MR. HARDING:  Although it didn't really become

21   perfected until we got into the TV Guide today.

22         MS. RHODES:  Glad to hear that perfected something.

23         THE COURT:  Okay.

24         MR. LAWLOR:  Your Honor, actually, to that I would

25   object.  Well, I don't know now what you're going to do with the

1    government contends that Mr. Martin's alibi is false.  I'd be

2    happy, if Mr. Martin's the only one who's going to be left to

3    twist in the wind, then I have no objection.  But if you're going

4    to put Mr. Mitchell there, then I object.

5              THE COURT:  No.  I'm just going to say defendants have

6    raised.

7              MR. LAWLOR:  Right.  But then we're at 70.

8              THE COURT:  The government contends that the

9    defendants' alibi defenses are false.

10             MR. LAWLOR:  I object to that.

11             THE COURT:  Alibis are false.

12             MR. LAWLOR:  I object to that.

13             THE COURT:  All right.  Your objection's noted.

14             MR. CROWE:  We join in the objection.

15             THE COURT:  71?

16             MR. KURLAND:  Judge, on 70, also, again this is also

17   language with regard to the on or about.  The Court's position is

18   that that's adequately covered?

19             THE COURT:  Yes.  All right.  Anything on the verdict

20   form?

21             MR. MARTIN:  Can we have a little bit more time to look

22   at that?

23             THE COURT:  Of course.

24             MR. MARTIN:  You don't really need to do that.

25             THE COURT:  When you get here tomorrow morning, again,

1   overnight or tomorrow morning after you've had your dinner and

2   your breakfast and you see some things, I'm happy to consider it.

3           MR. MARTIN:  I confess, the shear size of this verdict

4   form makes me not want to tackle it tonight.

5           THE COURT:  Sure.  Just remember, I don't mean to

6   remember, of course, you know I'm not instructing until Thursday.

7   So I'm happy to consider anything anybody says.  If it's

8   something that the government might use, though, obviously, Mr.

9   Hanlon is somewhere in his office preparing his closing argument.

10  That's all.  Yeah.  But we can change anything right up until the

11  time I instruct the jury.

12          MR. HARDING:  And you will remember, Your Honor, to

13  insert that reasonable foreseeability language?

14          THE COURT:  Yes.  Yes.  I've got that in the can.  All

15  right.  So let's go back, then.  Thank you, counsel, for your

16  help in getting us through this.  Let me start with Ms. Rhodes

17  and Mr. Lawlor and go through and see if there's something you

18  want to plug in and hopefully you can tell me exactly what page.

19          MR. LAWLOR:  No, Your Honor.  I think we've covered

20  everything.

21          THE COURT:  All right.  Mr. Flannery.

22          MR. FLANNERY:  Page 24, Your Honor, which is the

23  multiple conspiracy --

24          THE COURT:  Yes.

25          MR. FLANNERY:  -- instruction.  And in the second

1    paragraph, You may find that there was a single overall

2    conspiracy despite changes in personnel by termination,

3    withdrawal or additions of new members.  We would propose that --

4    I'm sorry, Your Honor.  Last sentence talks about the fact that

5    members have changed.  We would submit that we add maybe to the

6    end of the sentence something along the lines of, But you may

7    consider the fact that membership in the conspiracy changes

8    evidence that one conspiracy ended and another separate

9    conspiracy began.

10            MR. HARDING:  I will object to that, Your Honor.

11            MR. KURLAND:  What page is that?

12            MR. FLANNERY:  Page 24.  The third paragraph.  The last

13    line reads, The fact that members of the conspiracy are not

14    always identical does not necessarily imply that separate

15    conspiracies exist.  And then we would submit that, You may

16    consider that membership in the conspiracy changed as evidence of

17    one conspiracy ended and another separate conspiracy began.

18            I mean, I think, Your Honor, the defense certainly

19    would like to bolster the separate conspiracy argument because it

20    really begins to go to the crux of the defense in this case.

21            THE COURT:  I tell you what.  I think it's a fair

22    request.  I'm not sure I'm going to grant it.  But I really need

23    to hear the multiple conspiracy arguments before I can finalize

24    beyond what I've already done.  I don't -- well, I guess -- I'm

25    sorry, Mr. Harding?

1          MR. HARDING:  I was just going to ask, is this a Sand

2    and Siffert instruction that you've given?

3          THE COURT:  Yeah, it basically is.

4          MR. HARDING:  See, the Sand and Siffert instruction --

5          THE COURT:  I shouldn't say that.  I took this from Mr.

6    Flannery, I think.  Or was it you, Mr. Crowe?

7          MR. CROWE:  We had one which was essentially the Sand

8    and Siffert thing.

9          THE COURT:  Yeah.  I took it from Mr. Crowe and Mr.

10   Crowe, I think, it was basically the Sand.

11         MR. HARDING:  Sand and Siffert undertakes to balance

12   all the competing interests into the jury instruction.  If you

13   start modifying it to add what a particular defense counsel

14   wants, you upset that balance, is the government's view.

15         THE COURT:  So I'm not going to change it tonight, Mr.

16   Flannery.  But what I meant, what I was getting at was, I really

17   need to hear the arguments to understand how multiple

18   conspiracies is going to be offered up to the jury as a defense.

19   We already have multiple conspiracies in this case.  We have the

20   RICO conspiracy.  We have the narcotics conspiracy.  We have the

21   discrete conspiracies between Harris and Mitchell.  And we have

22   all these little conspiracies running around.

23         So within the bigger conspiracy, we have other

24   conspiracies.  And of course we have racketeering acts as

25   conspiracies.  We have substantive.

1          So I want to hear it because I don't know how, how it

2     flies.

3          MR. FLANNERY:  Well, I'm not going to speak.  I'm sure

4     you don't want to hear it right now tonight.

5          THE COURT:  No.  I don't mean tonight.

6          MR. FLANNERY:  And I'm not going to speak for Mr.

7     Harding.  But I'm sure he's going to disagree with you that

8     there's several separate drug conspiracies particularly.

9          THE COURT:  No.  I didn't say separate drug conspiracy.

10    Of course, there's one drug conspiracy.  But there's a conspiracy

11    to murder Oliver McCaffity, which, is that a substantive count?

12         MR. HARDING:  Yes, it is, Your Honor.

13         THE COURT:  It's a substantive count and it's a

14    racketeering act.  So that's a conspiracy allegedly between Mr.

15    Harris and Mr. Mitchell.  Yeah.  Harris and Mitchell.  So you

16    have a conspiracy within a larger conspiracy.

17         So you inherently have multiple conspiracies.

18         MR. FLANNERY:  Well, there's really only two

19    overarching conspiracies that are mentioned.

20         THE COURT:  Right.

21         MR. FLANNERY:  One would be the drug conspiracy that

22    spans from '94 to '06.

23         THE COURT:  Right.

24         MR. FLANNERY:  The other one is --

25         THE COURT:  The RICO.  Right.

1          MR. FLANNERY:  And we acknowledge the RICO law tying

2     together under conspiracy some different angles.  We acknowledge

3     that.  But there still is the notion that the government has to

4     prove an overarching conspiracy.

5          THE COURT:  Oh, I agree.  I agree.

6          MR. FLANNERY:  So that's why when you begin to have

7     clear instances in front of the jury of defendants unrelated to

8     one another, new defendants coming in, arrests, it begins to

9     really --

10         THE COURT:  Yeah.  But if somebody were to argue,

11    somebody like Mr. Lawlor were to stand up and say, ladies and

12    gentlemen of the jury --

13         MR. LAWLOR:  Wait a minute, Judge, I got to write this

14    down.

15         THE COURT:  -- we have the Mitchell conspiracy before

16    he went back to Hickey and then we have another conspiracy when

17    he got out of Hickey the first time.  You know, I don't think

18    that's the way it's going to be argued, just to use as an

19    example.  It's not going to be argued that way.  It's not going

20    to be a series of linear conspiracies.  I mean, I don't know what

21    it's going to be.

22         MR. FLANNERY:  It's a combination, really.

23         THE COURT:  Well, if that's going to be the multiple

24    conspiracies --

25         MR. FLANNERY:  It's sets of conspiracies spanning

240

1    across time.

2              THE COURT:  A what?

3              MR. FLANNERY:  Sets of conspiracies, sets of

4    independent, distinct conspiracies spanning across time.

5              THE COURT:  I want to hear who's going to own up to

6    being in a conspiracy.  I mean, that's one of the things I want

7    to hear.

8              MR. LAWLOR:  Not me.

9              THE COURT:  I want to see which ones of you are going

10   to stand up and say, Now, ladies and gentlemen of the jury, you

11   know, Mr. X admits that he was in a conspiracy from Y date to Z

12   date in Catonsville or in Altoona or whatever.  Now, if that's

13   the argument that you all elect to make, then obviously I'm going

14   to have to rethink this.

15             MR. KURLAND:  But Judge, hold on a second, Your Honor.

16   I don't have my rule in front of me.  I hope the Court -- I think

17   under Rule 30 you've got, the Court has got to tell us the

18   instructions -- I mean --

19             THE COURT:  Well, that's what I've done tonight.

20             MR. KURLAND:  I understand that.  But you can't, look,

21   I haven't tried a case in a long time.  I do a lot of appeals and

22   I've looked at these things.  But one of the reasons why it

23   shouldn't be, the Rule 30, we have to know what the instructions

24   are.  The Court can't -- let me put it in a polite way.  I think

25   it's fundamentally unfair to change the instructions after we've

241

1    argued.  That's the stuff of Jack McCoy's, on Law and Order.

2              THE COURT:  No.  What I'm suggesting is I will change

3    the instruction to a more favorable slant --

4              MR. MARTIN:  Depending on what we say.

5              THE COURT:  -- depending on what you say.  I'm not

6    going to change it and make it more onerous.  No.

7              MR. KURLAND:  But you're going to add but you won't

8    change, you won't delete what is given?

9              THE COURT:  No.  No.  No.  That's what I'm saying.

10             MR. MARTIN:  That's fine, Your Honor.

11             THE COURT:  I'm not going to delete something that you

12   leave here tonight with.

13             MR. KURLAND:  Well, no.  But after the argument, I

14   don't want to be in a position where after argument, you change,

15   the government can argue --

16             THE COURT:  No.  No.  No.

17             MR. KURLAND:  But you can't, you can't change the

18   instructions more onerous to the defendant based on how we've

19   argued the nature of the instructions.

20             THE COURT:  Of course not.  Of course not.  Mr.

21   Kurland, you hurt my feelings.

22             MR. KURLAND:  Well, like I say, the last closing

23   argument0.

24             THE COURT:  I expect that kind of thing from Mr.

25   Martin.

1          MR. MARTIN:  Well, now, wait a minute.  I resent that.

2          THE COURT:  You hurt my feelings today, too.  You said,

3    Oh, I know how you're going to rule.

4          MR. MARTIN:  Well, I was right, wasn't I?

5          THE COURT:  But now Mr. Kurland is telling me that I'm

6    threatening to listen to the argument and improve the instruction

7    for the government after I hear the defense argument?

8          MR. KURLAND:  I totally misinterpreted what the Court

9    said.

10         MR. MARTIN:  Your Honor, I actually had that happen to

11   me once but it wasn't you.

12         THE COURT:  Thank you.  I hope it wasn't me.  Normally

13   I instruct first, anyway.  I'm only doing it like this --

14         MR. HARDING:  Judge, my feelings are hurt now.

15         THE COURT:  All right.

16         MR. HARDING:  The rule that Mr. Kurland is talking

17   about says the Court must inform the parties before closing

18   arguments how it intends to rule on the requested instructions.

19   It doesn't say that the Court is free after closing arguments to

20   re-weight them in favor of the defense.

21         THE COURT:  Right.

22         MR. HARDING:  I don't think that the Court should

23   change them at all after closing arguments.

24         THE COURT:  Well, I could be persuaded.  What we're

25   talking about -- and again, this goes back to Mr. Flannery's

1    request.  What we're talking about, what every party is entitled

2    to is a clear statement by the Court to the jury of its theory of

3    defense and a correct statement of the rules of law.  And I guess

4    what I'm talking about the former rather than the latter.

5            I think I have a correct statement of the law here.

6    And I take Mr. Flannery's last request to be more in the nature

7    of a request that the Court be more specific or pointed in

8    articulating the theory of the defense.  That's what it is.  And

9    the defense in a criminal case is entitled to have the court

10   articulate the theory of the defense.

11           And what I'm trying to say is, as I've approached this

12   onerous task of these instructions, it's difficult for me to

13   articulate a multiple conspiracy defense.

14           Mr. Harding, you objected.  You still object, right?

15           MR. HARDING:  Yes.

16           THE COURT:  You don't even think that a multiple

17   conspiracy issue has been generated in the case.  And I early and

18   frequently disagreed with the government on that.  But I have to

19   confess, I'm not sure why.  I'm not sure why I disagree with the

20   government.  It's almost like you folks over here have done such

21   a good job of, you know, sort of --

22           MR. KURLAND:  Doing our job.

23           THE COURT:  -- doing your job -- thank you, Mr.

24   Kurland, that's exactly right -- that it just sort of jumps out

25   at you, not particularly in any coherent manner, but the idea

1    that, you know, I mean, we have a defendant in this case who

2    actually served a federal firearms sentence.  Right?  Two years.

3    He was away for two years.  I mean, how can there not be at least

4    a jury question about multiple conspiracies?

5         So I'm taking a certain, you know, Rorschach approach

6    to it, I admit.  But I do need more than I've got now to change

7    what I've written.  That's all I'm saying.  I'm sorry to be so

8    long-winded.

9         MR. KURLAND:  But Your Honor, I think nobody here,

10   including the government, wants to be in a position after closing

11   argument, after they have in good faith and under the rule relied

12   on whatever is there, to be in a position where the Court

13   instructs something different than what we've argued.

14        THE COURT:  Well, of course.  Again, I'm talking about

15   the theory of the defense.  By the way, while we're having this

16   discussion -- I'm going to get you guys out of here really

17   quickly -- the same goes for the government.  I mean, in point of

18   fact, I'm going to listen to the closing argument because I told

19   you all weeks ago that while I normally don't comment on the

20   evidence except very minimally, I'm reserving the prerogative,

21   and of course I won't do it without notice to you, if the

22   government articulates some theory that, you know, that I think I

23   want to comment on, I'm going to comment on it.

24        Now, I'm not going to change my instruction.  I've

25   already said in here a couple times, now the government argues

1    this and the defense argues that.  So all I'm really saying is

2    that when I hear your arguments tomorrow, if it seems to me to be

3    appropriate to help this poor jury work its way through that 18

4    page verdict sheet, I'm going to take advantage of the

5    opportunity to do that and hopefully also avoid, you know, a

6    million questions from the jury.

7            All right?  That's all I'm saying.

8            So I'm not going to do anything without notice to

9    counsel.  All right.  Mr. Flannery, you got any more?

10           MR. FLANNERY:  Yes, sir.  Page 27.

11           THE COURT:  All right.

12           MR. FLANNERY:  It's the end of the first paragraph.  So

13   right before, The indictment charges.  We would submit that the

14   Court articulate to the jury the fact that the government must

15   prove beyond a reasonable doubt that the enterprise charged in

16   the indictment had an existence beyond the minimal organization

17   and association which was necessary to carry out the predicate

18   acts.

19           THE COURT:  Okay.  I saw that in your submission and I

20   understand it.  And I just have to resort to the age old, you

21   know, homily that just because an appellate court says it in

22   articulating it as a rule of law doesn't mean necessarily it

23   should show up in a Judge's jury instruction.

24           I think I've covered it.  I hear your point.  You know,

25   your request is noted.  But I just think it's more words meaning

246

1    the same thing of the words I've already got here.  Okay?  More?

2              MR. FLANNERY:  One other, Your Honor.  And this would,

3    I have to admit I'm not sure where exactly I pieced this in.  I

4    think on Page 29.  What we had submitted was essentially along

5    the lines of a separate enterprise instruction, similar to a

6    separate conspiracy instruction.

7              We had submitted, if I could just read this:  Although

8    I'll instruct you further on the concepts of multiple versus

9    single conspiracies, it is important to note here that proof of

10   several separate enterprises is not sufficient to prove the

11   single overall RICO enterprise or RICO conspiracy charged in

12   Count One of the indictment here.  Thus, if you find that a

13   particular defendant is a member of another enterprise or

14   conspiracy not the one charged in the indictment, you must acquit

15   that defendant.

16             THE COURT:  Okay.  Your request is noted.  I think it

17   would be very confusing.  I'm going to tell the jury that

18   Shakedown is not the enterprise, that the enterprise as described

19   in the indictment is the Randallstown/Park Heights organization.

20   And I'll go ahead and define an enterprise as an association in

21   fact of persons and entities, etc.

22             So your request is noted, but denied.  Okay?  Mr.

23   Crowe.

24             MR. CROWE:  Two matters, Your Honor.  On Page 23 under

25   withdrawal we had an instruction that was actually Martin's 18,

1    which dealt with termination of the conspiracy of the enterprise,

2    which we think should be given.  I think from the Court's

3    remarks, I understand that it's not inclined to do that.  But we

4    would request the instruction.

5         The other matter would be on Page 64.  We believe that

6    the Court should instruct the jury that the cell block

7    altercation is a matter which is strictly Mr. Harris's and should

8    not be seen as any evidence, should not be used against any of

9    the other defendants for any purpose, including showing

10   continuation of the conspiracy of the enterprise at that time.

11        The instruction asks the Court simply to say that this

12   was simply a reactive crime by Mr. Harris, that there was no way

13   any of the other defendants could have foreseen that Mr. Harris

14   was going to encounter Mr. Hayes at that time, and is simply not

15   evidence against any of the other defendants.

16        MR. HARDING:  Judge, it can still be in furtherance of

17   the conspiracy.

18        THE COURT:  Are you going to argue that?

19        MR. HARDING:  No.  But I think the jury has a right to

20   infer that.  I'm not planning on arguing that.  And I don't know

21   that Mr. Hanlon is.  I don't think he is.  But I think it was

22   very much a reaction.  But whether Mr. -- I think the jury has a

23   right to determine whether Mr. Harris was, what his motivations

24   were in doing what he did.

25        THE COURT:  Yeah.  I'm afraid I agree with the

1    government.  Mr. Harding, I suggest you write yourself a note and

2    be sure to mention to Mr. Hanlon that he should be very careful

3    when he argues Count 19 not to cross the line you just drew.  I

4    think it's exactly right the way you put it.

5            The government shouldn't argue that Mr. Harris was

6    acting on behalf of everybody else.  The most that can be said is

7    that Mr. Harris is the only one named in that count.  At the same

8    time, given the, frankly, very substantial evidence of conspiracy

9    here, very substantial evidence of the defendants individually

10   and together in varying pairs engaging in acts of intimidation

11   and threat, I think it's appropriate to leave to the jury,

12   absent, so long as there's not a defense opening of the door,

13   leave to the jury to decide, one, whether Mr. Harris did the

14   attack for the reason the indictment alleges, and to what extent,

15   if at all, his acts constitute, you know, background evidence

16   against Mr. Martin.

17           I mean, remember, even Mitchell says to that lady, you

18   know, something about -- what was it, about --

19           MR. LAWLOR:  I caught a body.

20           THE COURT:  What was it?

21           MR. LAWLOR:  I caught a body?

22           THE COURT:  Yeah.  Thank you, Mr. Lawlor.  Where you

23   been?  I caught a body.  So there's tons of that kind of

24   evidence.

25           What are we giving out?

249

1          MS. RHODES:  Exhibit list.

2          THE COURT:  Thank you.  Wonderful.  So Mr. Crowe,

3   that's a long-winded answer.  Sorry.  I'm going to leave it where

4   it is on the, on the assurance that Mr. Hanlon's not going to go

5   there.  Obviously, I've already instructed the jury that they're

6   to consider only the charges against each defendant in each count

7   in which he's named, and that each defendant's guilt is to be

8   considered, etc., etc. I think it's covered to the extent it

9   needs to be covered.

10          What else you got?

11          MR. CROWE:  Nothing.

12          THE COURT:  That's it?

13          MR. CROWE:  That's it for me.

14          THE COURT:  Did you have something else, Mr. Flannery?

15          MR. FLANNERY:  I just wanted to ask you if you could

16   clarify what you wanted to hear regarding the multiple

17   conspiracies and when you wanted it.  You don't necessarily have

18   to clarify more what you wanted to hear, but when you wanted to

19   hear it.

20          THE COURT:  Well, I wanted to hear it in closing

21   argument.

22          MR. FLANNERY:  Okay.  You didn't want to hear it before

23   --

24          THE COURT:  No.  I wasn't asking for a proffer or

25   anything like that.  I just want to see how it all fits together,

1    you know.  Mr. Kurland.

2              MR. KURLAND:  I'll be very brief.  We submitted some

3    proposed instructions.  Gardner proposed one, the Court said that

4    we're entitled to a theory of the case instruction.  Right after

5    the Shakedown language that the Court is going to insert,

6    Shakedown is not the entity, we would ask that we get the

7    Gardner's proposed one, which I submitted about a week and a half

8    ago.  Do you want me to just read the language?

9              THE COURT:  No.  I have it.  I've noted it.  Your

10   request is noted.

11             MR. KURLAND:  Okay.  It's a correct statement of the

12   law, Judge.  I guess that doesn't matter?

13             THE COURT:  I think I've covered it.  I think I've

14   covered it.

15             MR. KURLAND:  But again, I think that we're entitled,

16   the Fourth Circuit case law says I'm entitled to specific defense

17   theory of the case instruction.  This is tailored.  It's a

18   correct statement of the law.  And it's, and it's the evidence

19   that has been presented.  So I think that, I'm certainly going to

20   argue it.  I would certainly like to argue it with the additional

21   support of a court instruction since it's a correct statement of

22   the law.

23             THE COURT:  Are you talking about the request that if

24   Mr. Gardner was not involved with Shakedown, etc.?  Is that what

25   you're referring to?

1          MR. KURLAND:  This is different from my earlier

2    argument.  The correct language here is, if there is no or

3    insubstantial evidence that Gardner was involved with Shakedown,

4    you must decide whether Gardner was involved in any criminal

5    enterprise and, if so, was it the single enterprise that's

6    charged in the indictment.

7          THE COURT:  I think that's an incorrect statement of

8    the law and it's an incorrect cast of the facts in this case.

9    There's no requirement that any particular body other than Mr.

10   Mitchell be involved in Shakedown.

11         MR. KURLAND:  Well, that's not the allegation in the

12   indictment.  The allegation in the indictment is that all

13   members, that members and associates were involved with

14   Shakedown.

15         THE COURT:  Yeah.  See, we already had that argument

16   and I rejected that theory that when it says "members" that it

17   means "all members."

18         MR. KURLAND:  But that's not what this instruction

19   says.  I understand the Court's not going to give it.

20         THE COURT:  You don't have to read it.  I got it.  I've

21   noted it.  Gardner's One denied.

22         MR. KURLAND:  My Gardner two, the multiple conspiracy,

23   we've taken care of.

24         Gardner Three, the requested theory of the case

25   instruction with respect to Count 7 and 16.  This is, the germane

1    language here, again, this is the theory of the case instruction.

2    The last paragraph says that, that merely participating in a

3    robbery to obtain money or items of financial value is not

4    sufficient to establish that Gardner participated in the robbery

5    for the purpose of maintaining or increasing his position in the

6    charged enterprise.

7         Again, that's a correct statement of the law.  If the

8    jury finds that fact, Gardner is entitled to an acquittal.  It's

9    just simply a matter of getting, of asking the Court to give an

10   instruction that says that.

11        THE COURT:  Yeah.  I think that goes too far.  I think

12   you're asking me to argue your case there.

13        MR. KURLAND:  Okay.  So that's noted and rejected?

14   Okay.

15        Number Four, Your Honor, this one, I think, falls into

16   a different category because this is simply just, I would think

17   just a plain statement of the law concerning that acts not

18   further, acts not in furtherance of the conspiracy -- I don't

19   know exactly where it should plug in.

20        THE COURT:  I have actually covered that with respect

21   to Mr. Crowe's request regarding the Wooden statement.  That

22   redounds to everybody's benefit.

23        MR. KURLAND:  This would redound to everybody's

24   benefit.  I don't think -- unless I missed the language, the fact

25   that, even if you determine beyond a reasonable doubt that a

253

1   person is a member of a conspiracy, you must carefully consider
2   the evidence.  If you are not convinced beyond a reasonable doubt
3   that a particular criminal act or any act was done in furtherance
4   of the conspiracy, you may not consider it as evidence of any
5   defendant.
6           I think that that's a clear and fair statement of the
7   law.  That doesn't go over the line to argument because,
8   certainly, there are a lot of criminal acts where I think all the
9   defendants would like to be able to argue that even if you find
10  certain acts are established beyond a reasonable doubt, not every
11  criminal act that is, that is done during the time period of the
12  conspiracy is, in fact, in furtherance of the conspiracy.  I
13  think that clarification would, would be helpful to the jury.
14          THE COURT:  All right.  I think I covered it.  Okay.
15  And then finally, Gardner's Five?
16          MR. KURLAND:  Gardner's Five you already covered.
17          THE COURT:  Okay.
18          MR. KURLAND:  Your Honor, maybe I'm obtuse.  But where
19  exactly, because I looked for this.  I didn't, I did not see
20  where this was, where this was covered.
21          THE COURT:  Well, it's covered on page, Page 21.
22  Actually, starting over, I mean, there's a whole three or, three
23  and a half pages on conspiracy law.
24          MR. KURLAND:  No, I understand that, Judge.  But I
25  don't think there's anything that specifically says that not

1  every, not every criminal act done during a particular time

2  period, just because the government alleges it, is, in fact, in

3  furtherance of the conspiracy.  And you have to find not just

4  they did the act during that time period, but that it was, in

5  fact, in furtherance of that conspiracy.  And I just think that

6  should be stuck in somewhere on Pages 19 to 23.

7       THE COURT:  In other words, you're focused on the

8  specific language, not every, and I don't know why you're saying

9  criminal act.  An act doesn't have to be criminal.

10      MR. KURLAND:  True.  That's why I've said both, not a

11  particular criminal act or any act.  I think it's important to

12  emphasize both.  There's a lot of crimes that have been

13  established or at least have been presented here.  And the

14  government's allegations is that they're all in furtherance of

15  the conspiracy.

16      THE COURT:  That's not the government's allegation.

17      MR. KURLAND:  Sure it is.

18      MR. HARDING:  No, it's not.

19      THE COURT:  No, it isn't.  They're not saying every

20  criminal act here --

21      MR. KURLAND:  You're right.  Other than the assault, is

22  the only one.  But all the drug stuff, all the murders, it's the

23  government's position, they're named as racketeering acts.  The

24  jury should be able to find that even if they find that act was

25  committed during the time period, if it wasn't in furtherance of

1    the conspiracy, then it shouldn't be considered against, you

2    know, as evidence of the conspiracy.

3           And I don't see that, it's that Kessler language.  And

4    I understand the Court's position, that just because it's in an

5    appellate case doesn't mean it's in a jury instruction.  But here

6    I think that it's important in this one, unlike my other ones

7    which were tailored solely to Gardner.  This one applies across

8    the board and I think it's a correct statement of the law.

9           THE COURT:  I'm just not following you, Mr. Kurland.

10   The Court gives, as you just acknowledged, I don't know, three

11   pages of instructions, actually more than that, because I come

12   back to it later, on conspiracy law, consideration of

13   co-conspirators statements, the in-furtherance requirement, the

14   substantial time period requirement, and the multiple conspiracy

15   instructions.

16          MR. KURLAND:  Judge, here's the language, though.

17          THE COURT:  No.  Don't tell me about language.  Tell me

18   what is left out.  What is it that you think the jury doesn't get

19   from these instructions?

20          MR. KURLAND:  Okay.  The language that the Court has

21   given on the middle of 21.  If the acts were done or the

22   statements made by someone whom you did not find to have been a

23   member of the conspiracy or if they were not done or said in

24   furtherance of the conspiracy, then you may, then they may be

25   considered by you as evidence only against the member who did or

256

1    said them.  I think right after that, to amplify that point would

2    be the suggested language that I have in that one paragraph in

3    Gardner Proposed Four.

4              THE COURT:  And what is the thought that you wish to

5    convey to the jury?  Forget the language for a moment.  What is

6    the thought?

7              MR. KURLAND:  That not every, that even if they find

8    certain criminal acts have been committed by somebody during the

9    time period of the alleged conspiracy, that unless it's in

10   furtherance of -- not every criminal act that is done during the

11   time period is in furtherance of the conspiracy.

12             THE COURT:  But that's only important to the extent

13   that someone who did that act doesn't want responsibility for it.

14   But if you're a member of the conspiracy and it's committed

15   during the conspiracy --

16             MR. KURLAND:  No, if you don't intend to aid the

17   conspiracy in that act --

18             THE COURT:  No.  But we're talking about people who

19   didn't do the act.

20             MR. KURLAND:  No, no.  But if the person who did it, if

21   the person who did the act wasn't acting in furtherance of the

22   conspiracy, then it can't be considered as evidence in

23   furtherance of the conspiracy.

24             MR. LAWLOR:  Your Honor, can I --

25             THE COURT:  But if the person did it, that person

1    doesn't care whether it's in furtherance of the conspiracy.  Only

2    the people who didn't do it care whether it's in furtherance of

3    the conspiracy.  If Mr. Martin shot somebody, and there's

4    evidence that he shot somebody, nobody cares except Mr. Harding

5    whether the jury considers Mr. Martin shooting somebody to be in

6    furtherance of the conspiracy.

7              MR. KURLAND:  If a guy did a separate drug deal that

8    had nothing to do, if a guy did a separate drug deal where he was

9    going to keep all the money and it had nothing to do with all

10   these other guys.  Okay?  Take Montgomery, for instance, with the

11   murder of Cheeks.  Okay?  That was separate.  That has nothing to

12   do with this conspiracy.  The principal, even though that the

13   government's position on the little chart is that Montgomery was

14   part of the Randallstown/Park Heights organization, surely even

15   Mr. Harding isn't going to argue, or maybe I shouldn't say this,

16   but I don't think he's going to argue that that murder was in

17   furtherance of this conspiracy.  Because of it's done with a

18   different motivation, it's not part of the conspiracy and can't

19   be used as evidence of the conspiracy.  That's all that says.

20             THE COURT:  See, I'm neither disagreeing with you nor

21   understanding you.  I'm in that unique position.  It's covered.

22   It's covered.  It's covered.

23             MR. KURLAND:  All right.

24             THE COURT:  It's covered.  Yes, Mr. Lawlor.

25             MR. LAWLOR:  Your Honor, I was just noting that it's

1    now 7:03.  Mr. Harding looks exhausted.

2                 THE COURT:  Mr. Harding?

3                 MR. LAWLOR:  Looks exhausted.

4                 MR. MARTIN:  He's tougher than we are.  He can keep

5    going.

6                 THE COURT:  Thank you all very much.

7                 MR. MARTIN:  Your Honor, I want you to know I didn't

8    mean to insult you.

9                 THE COURT:  You did not insult me.

10                MR. MARTIN:  I think you signaled to me what you were

11   going to do before I said it.

12                MR. HARDING:  Your Honor, I do have some more

13   instructions, I'm afraid.  I do have some important points to

14   make.

15                THE COURT:  Go ahead, Mr. Harding.

16                MR. HARDING:  There was unanimity instruction that I

17   included in the material.

18                THE COURT:  Yeah.  That was part of the supplemental,

19   wasn't it?

20                MR. HARDING:  I submitted Government's Supplemental

21   Proposed Jury Instructions last week on October 12th, I believe

22   it was.

23                THE COURT:  Is the felony murder thing in that?

24                MR. HARDING:  No.  It was in a batch I sent this

25   weekend.

1           THE COURT:  Okay.  I got them both.  I remember seeing

2      them.

3           MR. HARDING:  There was a consciousness of guilt from

4      false exculpatory statement.

5           THE COURT:  Yeah.  I thought we covered enough

6      consciousness of guilt, false alibi, statements.  I think we

7      covered consciousness of guilt.

8           MR. HARDING:  And what about the language I, you mean

9      you do have language in this instruction?

10          THE COURT:  I think it's, I think the false alibi, the

11     false statement, I think is sufficient, what was the one you

12     mentioned just now?  The consciousness of guilt from what?

13          MR. HARDING:  There's consciousness of guilt from

14     intimidation of a witness.  Consciousness of guilt from

15     fabrication of an alibi.

16          THE COURT:  I have those two.  I didn't do the third

17     one.  I think --

18          MR. HARDING:  False exculpatory statement?

19          THE COURT:  No.  I did them all.  It's in there.

20          MR. HARDING:  Oh.  I'm sorry.  As I said, I didn't get

21     a chance to read through.

22          THE COURT:  It's in there.  Definitely in there.

23     Intimidation of witnesses.  Threatening and intimidating

24     witnesses is in there.

25          MR. HARDING:  I suggested some additional language in

1    the, in the instruction about membership in the conspiracy that

2    Your Honor did not include.  Namely, it is not necessary to prove

3    up a conspiracy that it have a leader or a discrete identifiable

4    organizational structure.  The requisite agreement to act in

5    concert need not result in any such formal structure.

6              THE COURT:  I decided that, for very similar reasons

7    that I addressed over here, I wouldn't go that far.  That gets me

8    too close, I think, to argument.  You can argue, obviously, that.

9    But particularly in a case where you're relying on this informal

10   association in fact, I don't want to go too far in trying to

11   convince the jury that you're right and they're wrong.  Okay?

12             MR. MARTIN:  That's good to hear.

13             THE COURT:  Thank you.

14             MR. KURLAND:  Judge, I e-mail you.

15             THE COURT:  No.  Let me say this.  Ms. Rhodes,

16   gentlemen, you have my everlasting respect.  I really, really,

17   really mean this.  I really do.  What you guys have gone through

18   is just incredible.  I will forever honor your service as members

19   of the Bar.  I really mean that.

20             MR. LAWLOR:  We'll be happy if you took us all out to

21   lunch.

22             THE COURT:  Well, if you can get Congress to give us a

23   cost of living raise, I'd give some consideration.  Actually

24   already owe you lunch.

25             MR. LAWLOR:  That's right.  I had forgotten about that.

1   Judge, one quick thing.  Ms. Rhodes was bringing in her closer to

2   do closing tomorrow.

3          THE COURT:  Excuse me?

4          MR. LAWLOR:  She's bringing me in as a closer to close

5   tomorrow after all.  The hour, do we get an hour or is that a

6   more or less?

7          THE COURT:  I'm happy to give you a 10 minutes or 30

8   minutes or 5 minutes --

9          MR. LAWLOR:  I say if I go an hour and five, I'm not

10  going to get the hook, am I?

11         THE COURT:  Well, I'm going to give you -- you want a

12  warning?

13         MR. LAWLOR:  No.  I just want to know if I go an hour

14  and five minutes, you're going to let me do that.

15         THE COURT:  Well, if you say you want a five minute

16  warning, I give you a five minute, you go seven or eight minutes,

17  no, I'm going to let you do that.  But if I don't give you a

18  warning then I don't know that you know it's only, that it's been

19  an hour.

20         MR. LAWLOR:  I'll keep my own time.  I just want to

21  know how hard and fast the rule is.

22         THE COURT:  Okay.  You know that, Mr. Lawlor.  I don't

23  cut anybody off.

24         MR. LAWLOR:  Yeah.  Well, it's a lot of argument.  I

25  know the jury can only sit through so much.

262

1            THE COURT:  Right.  All right.  Thank you all very

2    much.

3            (Conclusion of Proceedings at 7:05 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

263

```
 1                          INDEX

 2
                                                        PAGE
 3   WITNESS: DAVID COOK
     DIRECT EXAMINATION BY MS. RHODES                      8
 4   CROSS EXAMINATION BY HANLON (ON QUALIFICATIONS)      16
     DIRECT EXAMINATION BY MS. RHODES                     19
 5   CROSS EXAMINATION BY MR. HANLON                      40
     CROSS EXAMINATION BY MR. FLANNERY                    62
 6   REDIRECT EXAMINATION BY MS. RHODES                   71
     RECROSS EXAMINATION BY MR. HANLON                    72
 7
     WITNESS: OFFICER ANDREW SEYMOUR
 8   DIRECT EXAMINATION BY MS. RHODES                     86
     CROSS EXAMINATION BY MR. HARDING                     89
 9
     DAMITA GREEN TAPE                                    92
10
     WITNESS: GEORGE POWERS
11   DIRECT EXAMINATION BY MR. LAWLOR                    106
     CROSS EXAMINATION BY MR. HARDING                    111
12
     WITNESS: FRANK HUBBARD, JR.
13   DIRECT EXAMINATION BY MS. RHODES                    119
     CROSS EXAMINATION BY MR. HARDING                    125
14
     WITNESS: ELIZABETH PENTECOST
15   DIRECT EXAMINATION BY MS. RHODES                    126
     CROSS EXAMINATION BY MR. HARDING                    137
16
     WITNESS: SPECIAL AGENT BRIAN KLAS
17   DIRECT EXAMINATION BY MR. HARDING                   177
     CROSS EXAMINATION BY MR. MARTIN                     179
18   CROSS EXAMINATION BY MR. KURLAND                    181
     REDIRECT EXAMINATION BY MR. HARDING                 182
19

20

21

22

23

24

25
```

1                       REPORTER'S CERTIFICATE

2

3          I, Mary M. Zajac, do hereby certify that I recorded

4    stenographically the proceedings in the matter of USA v. Willie

5    Mitchell, et al., Case Number(s) AMD-04-029, on November 18,

6    2008.

7          I further certify that the foregoing pages constitute

8    the official transcript of proceedings as transcribed by me to

9    the within matter in a complete and accurate manner.

10         In Witness Whereof, I have hereunto affixed my

11   signature this _____ day of _____, 2009.

12

13

14

15                         _____
                           Mary M. Zajac,
16                         Official Court Reporter

17

18

19

20

21

22

23

24

25

## $

**$1,000** [1] - 122:5
**$15,000** [1] - 15:24
**$45** [1] - 122:9
**$8.41** [1] - 131:25

## '

**'01** [2] - 122:9, 123:16
**'02** [1] - 118:4
**'06** [1] - 238:22
**'77** [1] - 9:19
**'80s** [4] - 21:1, 23:13, 31:2, 43:23
**'81** [1] - 21:10
**'83** [4] - 9:24, 21:15, 96:24, 97:1
**'84** [2] - 21:10, 23:21
**'85** [1] - 21:10
**'86** [2] - 10:7, 10:16
**'87** [4] - 10:7, 10:16, 12:18, 24:2
**'88** [7] - 11:13, 12:18, 24:17, 29:5, 96:25, 97:1, 97:2
**'90s** [4] - 29:10, 29:17, 130:11
**'91** [1] - 12:20
**'92** [1] - 24:2
**'93** [1] - 158:11
**'94** [8] - 13:20, 129:17, 158:5, 158:7, 158:19, 158:21, 167:6, 238:22
**'95** [10] - 13:20, 25:19, 155:13, 157:2, 157:3, 157:22, 158:7, 159:10, 160:4, 167:6
**'96** [10] - 133:6, 133:7, 139:2, 139:9, 139:16, 139:22, 157:13, 160:5, 161:3, 167:14
**'97** [1] - 113:5
**'objection'** [1] - 108:4
**'s** [1] - 114:21

## 0

**04/94** [1] - 129:18

## 1

**10** [5] - 68:13, 108:23, 133:23, 200:17, 261:7
**101** [1] - 1:25
**106** [1] - 263:11
**1099** [1] - 161:3

**10:30** [1] - 27:21
**11** [16] - 39:20, 52:15, 53:21, 54:8, 54:11, 55:11, 55:16, 65:16, 87:14, 87:15, 90:24, 94:21, 94:23, 94:24, 200:17, 200:20
**110** [1] - 135:16
**111** [1] - 263:11
**119** [1] - 263:13
**11:30** [1] - 184:18
**11:45** [1] - 81:17
**12** [14] - 97:4, 140:14, 158:5, 174:23, 174:25, 175:6, 185:12, 185:15, 186:13, 200:17, 201:2, 202:18, 218:2, 229:10
**12/17/98** [1] - 175:4
**12/29/89** [2] - 142:16, 142:19
**12/31/89** [1] - 142:19
**125** [1] - 263:13
**126** [1] - 263:15
**12:30** [1] - 84:4
**12:31** [1] - 140:14
**12:38** [1] - 140:15
**12:53** [1] - 100:24
**12th** [1] - 258:21
**13** [9] - 97:12, 97:17, 97:18, 127:11, 128:10, 128:19, 202:16, 205:4, 205:5
**137** [1] - 263:15
**14** [14] - 9:19, 95:11, 97:19, 98:4, 98:5, 98:14, 98:15, 130:8, 134:12, 137:10, 138:7, 205:4, 207:8, 207:10
**14th** [1] - 123:16
**15** [19] - 9:19, 68:13, 76:14, 81:5, 81:15, 83:16, 95:12, 95:14, 95:15, 119:2, 119:23, 134:17, 136:8, 136:9, 136:10, 144:13, 166:5, 175:20, 207:10
**15th** [1] - 157:2
**16** [6] - 4:14, 175:20, 175:24, 207:10, 251:25, 263:4
**17** [7] - 98:10, 122:18, 207:11, 207:13, 207:15, 208:9, 208:16
**177** [1] - 263:17
**179** [1] - 263:17
**17th** [1] - 118:4
**18** [11] - 1:11, 98:11, 159:12, 159:13, 208:18, 208:20, 212:11, 227:1, 245:3, 246:25, 264:5

**181** [1] - 263:18
**182** [1] - 263:18
**18th** [1] - 87:7
**19** [7] - 6:19, 188:7, 212:11, 213:5, 248:3, 254:6, 263:4
**192** [3] - 102:8, 102:23, 103:16
**1959** [2] - 195:12, 213:2
**1963** [1] - 9:17
**1977** [3] - 9:11, 18:20, 127:25
**1979** [2] - 18:23, 95:7
**1982** [1] - 9:24
**1987** [3] - 9:25, 121:23, 124:1
**1988** [1] - 129:10
**1989** [1] - 142:12
**1991** [1] - 13:19
**1992** [1] - 8:23
**1994** [2] - 42:1, 175:13
**1995** [4] - 107:9, 139:9, 158:3, 175:13
**1996** [4] - 107:5, 109:3, 110:9, 175:16
**1997** [3] - 107:5, 109:3, 110:9
**1998** [1] - 107:9
**1999** [3] - 93:23, 213:11, 213:13
**1:30** [6] - 135:25, 140:17, 140:19, 140:20, 140:23, 140:25
**1st** [1] - 97:22

## 2

**2** [2] - 99:4, 190:3
**2/7/89** [1] - 142:16
**20** [4] - 13:7, 162:21, 212:25, 213:1
**2000** [12] - 8:18, 32:22, 36:3, 36:16, 36:22, 38:16, 39:9, 123:15, 123:16, 130:19, 138:10, 138:11
**2000's** [1] - 32:21
**2001** [1] - 12:20
**2002** [10] - 25:19, 40:6, 40:7, 46:11, 86:18, 125:2, 125:8, 135:5, 135:12, 140:15
**2003** [1] - 150:14
**2004** [5] - 44:10, 97:22, 97:23, 98:12
**2005** [2] - 213:11, 213:13
**2007** [2] - 60:19, 127:23
**2008** [2] - 1:11, 264:6

**2009** [1] - 264:11
**21** [6] - 159:16, 159:17, 159:19, 213:9, 253:21, 255:21
**21201** [1] - 1:25
**21209** [1] - 142:14
**21st** [3] - 97:22, 97:23, 98:12
**22** [4] - 60:11, 214:11, 214:13, 215:3
**22nd** [2] - 150:14
**23** [4] - 215:8, 215:9, 246:24, 254:6
**23-A** [2] - 128:1, 128:4
**23rd** [1] - 135:4
**24** [6] - 17:3, 95:7, 219:10, 219:11, 235:22, 236:12
**2400** [1] - 132:25
**24th** [2] - 135:11, 135:21
**25** [3] - 219:10, 219:12, 224:1
**25th** [2] - 135:21, 140:15, 140:20
**26** [2] - 219:21, 224:1
**27** [2] - 224:6, 245:10
**27/2000** [1] - 132:11
**28** [1] - 224:6
**29** [5] - 187:7, 187:22, 224:10, 224:19, 246:4
**29th** [1] - 135:4
**2:00** [3] - 99:3, 100:23, 184:8

## 3

**3** [2] - 57:15, 190:3
**3'96** [1] - 159:1
**3-419** [2] - 102:8, 102:22, 103:15
**3/17** [1] - 118:5
**3/9/01** [1] - 121:1
**3/96** [1] - 155:4
**30** [12] - 24:19, 111:23, 128:1, 162:2, 184:20, 186:1, 226:8, 240:17, 240:23, 261:7
**31** [2] - 119:19, 226:8
**32** [1] - 226:8
**33** [1] - 226:8
**34** [1] - 226:8
**35,000** [1] - 50:15
**36** [1] - 13:23
**37** [2] - 13:23, 229:1
**38** [1] - 229:1
**39** [1] - 229:1
**3rd** [3] - 127:25, 169:22, 178:18

## 4

**4** [3] - 184:11, 188:7, 190:3
**4/17/02** [1] - 115:6
**40** [5] - 28:23, 35:12, 45:9, 229:1, 263:5
**41** [1] - 229:1
**42** [2] - 229:1, 229:5
**44** [1] - 229:17
**45** [11] - 6:23, 72:7, 72:10, 73:4, 73:7, 73:10, 73:11, 99:9, 166:13, 184:20, 229:17
**457** [1] - 90:8
**46** [1] - 229:17
**47** [1] - 229:17
**48** [1] - 229:17
**49** [1] - 229:22
**4:12** [1] - 166:17
**4:30** [2] - 166:12, 184:11
**4:59:59** [1] - 183:16

## 5

**5** [2] - 190:3, 261:8
**5%** [1] - 122:8
**50** [9] - 36:3, 38:12, 40:10, 41:17, 42:3, 50:10, 58:7, 229:22, 229:24
**50-year-old** [1] - 45:9
**52** [1] - 230:8
**53** [1] - 230:8
**54** [1] - 230:8
**55** [1] - 230:8
**5515** [1] - 1:24
**56** [1] - 230:8
**57** [2] - 230:9, 230:10
**58** [1] - 230:22
**59** [1] - 230:22
**5:00** [1] - 183:17
**5th** [2] - 60:19, 127:23

## 6

**6** [3] - 133:23, 190:3, 229:10
**60** [1] - 230:25
**61** [1] - 230:25
**6107** [1] - 142:14
**62** [2] - 230:25, 263:5
**63** [1] - 230:25
**64** [2] - 230:25, 247:5
**65** [1] - 230:25
**66** [1] - 230:25

**67** [1] - 230:25
**68** [2] - 230:25, 233:16
**69** [2] - 231:1, 233:16
**6:00** [1] - 113:4

**7**

**7** [5] - 142:12, 190:4, 190:12, 251:25
**70** [2] - 234:7, 234:16
**701** [1] - 77:18
**71** [2] - 234:15, 263:6
**72** [1] - 263:6
**73-10** [3] - 102:8, 102:23, 103:16
**7:03** [1] - 258:1
**7:05** [1] - 262:3
**7:30** [1] - 185:5

**8**

**8** [10] - 57:15, 190:11, 191:22, 192:6, 192:7, 193:1, 194:13, 196:7, 263:3
**8/96** [2] - 155:4, 159:1
**80's** [2] - 21:7, 31:3
**803(8)** [1] - 145:22
**803(8)(c** [1] - 145:25
**803(8)(c)** [1] - 145:24
**807** [2] - 150:22, 150:25
**86** [1] - 263:8
**87** [1] - 23:21
**89** [1] - 263:8
**8:00** [1] - 185:4
**8:45** [1] - 185:4

**9**

**9** [3] - 194:14, 196:6, 200:8
**90** [3] - 111:15, 179:6, 179:13
**90%** [2] - 69:13
**90's** [2] - 29:24, 31:4
**92** [1] - 263:9
**94/95** [1] - 139:9
**97** [1] - 27:17
**9:00** [2] - 185:4, 205:12
**9:15** [1] - 185:4
**9:30** [5] - 183:25, 184:14, 185:4, 187:2, 188:17
**9:50** [1] - 2:1
**9th** [1] - 138:13

**A**

**a.m** [5] - 2:1, 81:17, 133:23, 135:25, 140:20
**abandonment** [1] - 216:4
**ability** [3] - 14:24, 69:8, 205:3
**able** [28] - 2:25, 20:12, 49:11, 52:22, 59:15, 67:14, 67:15, 80:12, 81:2, 82:18, 83:24, 100:10, 100:25, 114:3, 118:14, 141:5, 142:17, 153:20, 156:20, 166:20, 186:14, 192:2, 192:3, 203:12, 211:1, 222:10, 253:9, 254:24
**absence** [2] - 145:19, 216:4
**absences** [1] - 218:10
**absent** [1] - 248:12
**Absolutely** [8] - 6:16, 46:13, 48:22, 56:14, 170:16, 189:10, 189:11, 229:17
**absolutely** [5] - 29:15, 31:25, 35:6, 172:6, 186:2
**abstract** [1] - 5:16
**absurd** [1] - 171:17
**abusing** [3] - 173:12, 173:13
**academic** [2] - 110:5, 112:19
**academically** [1] - 110:9
**accent** [3] - 65:5, 107:2, 107:4
**accept** [7] - 75:14, 78:16, 101:13, 102:1, 102:17, 103:8, 103:9
**accepted** [7] - 28:5, 34:8, 76:10, 77:2, 77:3, 132:10
**accepting** [1] - 75:17
**access** [1] - 83:24
**accord** [2] - 102:7, 102:22, 103:15
**accordance** [1] - 211:6
**according** [2] - 124:16, 193:7
**account** [6] - 101:17, 102:3, 102:5, 102:19, 103:10, 103:13
**accounting** [3] - 3:1, 113:4, 113:8
**accounts** [1] - 70:24
**accuracy** [1] - 150:18
**accurate** [3] - 26:8,

44:9, 264:9
**accused** [1] - 19:10
**achieved** [2] - 41:7, 42:23
**achievement** [2] - 224:7, 224:13
**acknowledge** [2] - 239:1, 239:2
**acknowledged** [1] - 255:10
**acquit** [2] - 221:21, 246:14
**acquittal** [9] - 188:13, 217:23, 222:4, 222:12, 223:10, 223:23, 224:24, 225:12, 252:8
**acquittals** [1] - 225:4
**acquitted** [1] - 226:1
**act** [22] - 18:12, 31:20, 79:15, 183:4, 238:14, 253:3, 253:11, 254:1, 254:4, 254:9, 254:11, 254:20, 254:24, 256:10, 256:13, 256:17, 256:19, 256:21, 260:4
**Act** [1] - 227:9
**acted** [1] - 131:15
**acting** [3] - 140:11, 248:6, 256:21
**action** [2] - 57:9, 216:8
**actions** [1] - 146:6
**active** [1] - 79:6
**activities** [2] - 42:6, 160:18
**activity** [1] - 19:15
**acts** [14] - 28:24, 70:4, 213:17, 237:24, 245:18, 248:10, 248:15, 252:17, 252:18, 253:8, 253:10, 254:23, 255:21, 256:8
**actual** [8] - 14:13, 30:16, 78:6, 85:7, 92:9, 92:10, 129:5, 155:24
**Adam** [1] - 1:22
**add** [9] - 32:14, 193:10, 199:9, 206:22, 216:9, 223:21, 236:5, 237:13, 241:7
**added** [1] - 192:25
**adding** [2] - 157:7, 205:2
**Addition** [1] - 85:2
**addition** [7] - 91:17, 108:18, 123:19, 150:16, 153:5, 153:20, 187:21
**additional** [7] - 85:4, 98:22, 174:19, 186:11, 205:2, 250:20, 259:25
**additions** [1] - 236:3
**address** [6] - 77:11,

132:24, 136:12, 142:13, 181:18, 212:7
**addressed** [5] - 149:21, 199:25, 200:4, 200:7, 260:7
**addresses** [4] - 3:3, 141:21, 141:25, 142:1
**adequately** [2] - 110:2, 234:18
**adhere** [2] - 98:24, 186:23
**adjudge** [1] - 103:14
**adjudicated** [1] - 155:25
**adjust** [2] - 102:7, 102:21
**administered** [1] - 134:2
**Administration** [2] - 119:4, 120:24
**administrator** [1] - 156:14
**admiration** [1] - 31:12
**admissibility** [4] - 84:21, 213:25, 214:3, 214:6
**admissible** [3] - 145:5, 150:24, 162:14
**admission** [4] - 82:9, 92:19, 144:8, 146:2
**admit** [4] - 2:23, 6:19, 244:6, 246:3
**admits** [1] - 240:11
**admitted** [8] - 5:5, 5:8, 5:15, 6:2, 41:24, 91:16, 92:21, 94:6, 95:25, 97:7, 97:18, 97:23, 98:5, 98:15, 115:10, 115:22, 116:5, 128:11, 128:18, 134:13, 136:9, 143:10, 145:20, 148:5, 148:6, 150:21, 150:23, 152:3, 152:7, 174:13, 175:6, 176:1, 198:17, 199:5, 205:23, 206:18, 206:21, 214:5
**admittedly** [1] - 77:10
**admitting** [2] - 56:16, 77:17
**adopt** [3] - 187:7, 191:14, 219:25
**adopted** [2] - 203:17
**adult** [4] - 141:18, 142:12, 159:7, 160:1
**advance** [1] - 105:14
**advantage** [1] - 245:4
**adventurous** [1] - 40:13
**advise** [1] - 209:21
**advised** [6] - 101:9, 101:20, 102:13, 103:4,

210:4, 211:5
**advisement** [1] - 211:24
**affect** [1] - 73:6
**affected** [2] - 28:14, 199:14
**affiliated** [1] - 49:18
**affiliation** [4] - 43:16, 43:22, 44:6, 44:9
**affirmatively** [1] - 153:20, 197:18
**affixed** [1] - 264:10
**affront** [1] - 197:19
**afraid** [3] - 169:24, 247:25, 258:13
**Africa** [1] - 18:14
**African** [1] - 18:14
**Afro** [1] - 24:3
**Afro-centric** [1] - 24:3
**afterlife** [8] - 72:20, 73:17, 73:19, 74:3, 74:5, 74:7, 74:11, 74:24
**afternoon** [23] - 9:2, 83:1, 86:3, 89:15, 94:18, 94:19, 96:4, 98:23, 99:3, 101:23, 102:11, 102:15, 103:2, 103:6, 105:8, 111:7, 111:10, 125:22, 137:3, 137:4, 179:19, 179:20, 184:12
**afternoons** [1] - 109:20
**afterwards** [2] - 10:15, 89:3
**age** [3] - 9:15, 9:18, 245:20
**agency** [1] - 145:3
**agency's** [1] - 146:4
**agent** [3] - 80:25, 170:10, 172:25
**AGENT** [1] - 263:16
**Agent** [16] - 6:13, 169:9, 169:21, 170:1, 176:21, 176:23, 177:2, 177:4, 178:18, 179:19, 181:10, 182:5, 182:9, 182:15, 182:21, 183:13
**agents** [1] - 166:9
**ago** [16] - 3:14, 3:16, 4:11, 53:14, 53:22, 83:9, 111:12, 138:3, 141:4, 145:11, 150:22, 151:1, 173:18, 188:3, 244:19, 250:8
**agree** [19] - 18:9, 42:13, 44:22, 50:18, 54:3, 63:10, 63:18, 70:13, 71:9, 73:6, 74:13, 156:9, 162:2, 162:4, 195:2, 222:23, 239:5, 247:25
**agreed** [3] - 91:14, 130:5, 163:8

**agreeing** [2] - 113:21,
216:17
**agreement** [14] - 91:20,
141:12, 143:19, 154:13,
164:7, 164:23, 202:20,
203:8, 203:9, 203:10,
204:3, 204:4, 224:11,
260:4
**ahead** [13] - 19:4,
34:16, 79:21, 106:9,
117:23, 136:16, 168:8,
170:24, 173:7, 182:5,
182:18, 246:20, 258:15
**aid** [1] - 256:16
**aim** [1] - 61:14
**aiming** [1] - 61:18
**air** [5] - 9:1, 19:18,
33:11, 34:25, 69:14
**airplay** [1] - 15:3
**airwaves** [1] - 14:14
**Akers** [4] - 210:17,
210:20, 211:5, 211:14
**al** [1] - 264:5
**Albright** [1] - 127:1
**albums** [2] - 29:9, 68:11
**alert** [1] - 103:20
**alibi** [17] - 231:2, 231:3,
231:9, 231:14, 231:18,
232:1, 232:4, 232:9,
232:14, 232:25, 233:3,
233:18, 234:1, 234:9,
259:6, 259:10, 259:15
**Alibis** [1] - 234:11
**alive** [1] - 128:17
**allegation** [4] - 218:2,
251:11, 251:12, 254:16
**allegations** [2] - 217:22,
254:14
**alleged** [6] - 193:4,
193:5, 196:13, 222:14,
229:6, 256:9
**allegedly** [3] - 153:25,
199:11, 238:14
**alleges** [2] - 248:14,
254:2
**allow** [1] - 75:20
**allowed** [3] - 49:14,
49:20, 49:21
**allowing** [1] - 167:19
**almost** [8] - 22:25,
23:16, 31:11, 47:9,
113:12, 158:5, 192:19,
243:20
**Alpha** [12] - 114:17,
116:10, 117:18, 117:20,
120:6, 120:8, 121:5,
122:3, 123:25, 124:8,
124:15, 124:19
**alphabet** [1] - 149:12
**altercation** [2] - 179:22,

247:7
**alternate** [1] - 186:6
**alternates** [1] - 186:2
**Alternative** [1] - 129:16
**altogether** [1] - 138:3
**Altoona** [2] - 113:17,
240:12
**Amadou** [1] - 50:11
**ambulance** [1] - 210:9
**AMD-04-029** [2] - 1:6,
264:5
**AMERICA** [1] - 1:5
**amplify** [1] - 256:1
**analyses** [1] - 145:20
**analysis** [1] - 59:4
**Andre** [1] - 1:13
**Andrew** [2] - 86:5,
86:10
**ANDREW** [2] - 86:6,
263:7
**Angeles** [3] - 24:11,
28:15, 44:7
**angles** [1] - 239:2
**angst** [2] - 45:7, 45:17
**ankle** [1] - 211:8
**answer** [24] - 7:20,
27:15, 31:23, 33:20,
50:22, 59:16, 60:12,
63:17, 75:9, 76:20, 84:3,
107:24, 108:6, 108:7,
108:9, 111:25, 138:20,
139:23, 141:5, 141:7,
151:4, 182:2, 205:13,
249:3
**answering** [1] - 48:21
**answers** [1] - 112:3
**Anthony** [2] - 117:17,
127:21
**anticipate** [1] - 85:11
**anticipation** [1] -
210:24
**anyway** [5] - 112:4,
114:23, 173:23, 189:15,
242:13
**AOL** [1] - 13:1
**apathetic** [1] - 20:16
**apologetic** [1] - 179:6
**Apologize** [1] - 87:12
**apologize** [6] - 40:24,
60:12, 101:6, 173:9,
226:9, 231:9
**appeals** [1] - 240:21
**appear** [4] - 54:3,
116:15, 210:6, 217:8
**appearance** [6] - 98:11,
101:16, 102:4, 102:20,
103:12, 183:2
**Appearances** [1] - 1:15
**appearing** [1] - 30:16
**appellate** [2] - 245:21,

255:5
**applicant** [2] - 121:13,
121:17
**application** [6] - 121:6,
121:12, 133:13, 134:1,
155:17, 161:14
**applies** [3] - 20:14,
230:13, 255:7
**apply** [2] - 147:21,
204:13
**applying** [2] - 131:22,
133:22
**appointed** [1] - 211:23
**appreciate** [11] - 30:22,
62:18, 101:24, 143:11,
143:13, 149:8, 163:23,
183:23, 188:16, 217:7,
231:12
**appreciates** [2] -
101:11, 103:2
**apprised** [1] - 186:17
**approach** [6] - 56:25,
68:20, 114:10, 118:16,
144:19, 244:5
**approached** [5] - 11:9,
169:16, 169:17, 178:23,
243:11
**approaching** [2] -
187:16, 210:9
**appropriate** [13] -
27:14, 76:10, 76:19,
77:14, 82:8, 97:19,
97:24, 163:11, 170:20,
202:7, 210:16, 245:3,
248:11
**April** [2] - 3:7, 118:4
**area** [21] - 9:9, 9:13,
11:11, 11:16, 12:16,
13:5, 18:25, 22:25,
36:24, 37:1, 39:2, 39:9,
64:11, 64:13, 75:21,
107:17, 135:8, 157:11,
210:1
**Area** [3] - 10:19, 11:13,
11:14
**areas** [3] - 16:3, 16:7,
37:23
**arena** [1] - 49:12
**argue** [39] - 18:5, 42:21,
102:3, 102:19, 103:11,
153:20, 195:3, 195:8,
195:9, 195:16, 197:5,
197:20, 197:24, 198:2,
198:3, 198:4, 198:5,
198:11, 204:21, 204:23,
205:3, 218:2, 221:19,
222:10, 222:24, 223:13,
229:15, 232:1, 239:10,
241:15, 247:18, 248:5,
250:20, 252:12, 253:9,

257:15, 257:16, 260:8
**argued** [7] - 193:2,
196:11, 239:18, 239:19,
241:1, 241:19, 244:13
**argues** [3] - 244:25,
245:1, 248:3
**arguing** [2] - 202:24,
247:20
**argument** [32] - 46:8,
99:22, 99:23, 99:25,
145:14, 145:19, 152:5,
152:6, 152:11, 152:17,
184:2, 184:5, 184:8,
184:10, 184:15, 184:17,
232:21, 235:9, 236:19,
240:13, 241:13, 241:14,
242:6, 242:7, 244:11,
244:18, 249:21, 251:2,
251:15, 253:7, 260:8,
261:24
**argument0** [1] - 241:23
**arguments** [11] - 99:14,
152:20, 184:1, 185:23,
195:11, 236:23, 237:17,
242:18, 242:19, 242:23,
245:2
**arises** [1] - 162:7
**arm** [2] - 128:8, 172:4
**armed** [3] - 139:14,
139:16, 140:1
**arms** [1] - 172:17
**arranged** [2] - 92:7,
210:25
**array** [1] - 148:15
**arrest** [10] - 142:12,
215:9, 215:17, 215:19,
216:1, 216:14, 216:21,
216:22, 217:3, 217:13
**arrested** [4] - 44:11,
215:17, 215:20, 216:1,
216:3, 216:6
**arrests** [1] - 239:8
**Arrington** [13] - 28:1,
91:1, 95:14, 96:6, 98:19,
104:8, 105:23, 106:9,
136:10, 149:10, 162:24,
168:15, 186:17
**arrive** [1] - 166:22
**arrived** [1] - 2:2
**art** [2] - 6:15, 220:9
**article** [4] - 60:20,
61:10, 61:11, 61:21
**articles** [8] - 16:22,
59:19, 59:23, 59:24,
60:15, 78:25, 80:3
**articulate** [3] - 243:10,
243:13, 245:14
**articulates** [1] - 244:22
**articulating** [3] -
217:15, 243:8, 245:22

**artist** [32] - 19:17, 36:8,
36:17, 36:18, 37:7, 38:8,
40:11, 43:20, 45:8,
45:13, 47:8, 47:9, 56:16,
58:12, 59:1, 60:4, 63:11,
64:5, 64:8, 67:25, 68:4,
68:5, 68:15, 68:16,
68:17, 70:23, 71:23,
71:24, 72:23, 73:2,
73:10, 73:16
**artistic** [3] - 5:16, 6:5,
63:21
**Artists** [1] - 46:1
**artists** [36] - 6:22,
13:11, 14:17, 23:23,
32:24, 32:25, 33:2, 35:7,
37:9, 38:15, 40:24, 41:2,
41:4, 41:11, 45:22,
45:25, 46:10, 47:12,
50:20, 50:23, 50:25,
51:2, 51:21, 56:3, 56:8,
57:5, 58:14, 62:7, 63:1,
63:7, 64:10, 70:8, 70:13,
79:6
**aside** [5] - 17:19, 53:1,
53:25, 74:17, 74:23
**aspect** [2] - 39:2, 188:1
**aspects** [2] - 20:6,
23:14, 76:13
**aspersions** [1] - 116:24
**assault** [2] - 139:14,
254:21
**assaulted** [1] - 178:20
**assert** [2] - 193:14,
193:25, 219:22
**assertion** [2] - 193:12,
193:23
**assess** [1] - 80:3
**assessment** [1] - 53:15
**assigned** [1] - 86:20
**assist** [2] - 79:24, 92:11
**assistance** [1] - 101:3
**assistant** [2] - 89:17,
106:24, 106:25, 107:7,
117:4, 133:9, 139:1,
160:12, 161:7, 167:12,
167:14, 175:15
**Assistant** [1] - 111:9
**associate** [7] - 74:1,
85:19, 91:5, 126:12,
127:1, 127:4, 131:9
**Associate** [1] - 106:23
**associated** [4] - 45:4,
67:7, 68:24, 95:21,
220:5, 220:8, 220:20,
220:25
**associates** [1] - 251:13
**Association** [1] - 11:14
**association** [7] - 45:3,
220:21, 220:24, 223:16,

245:17, 246:20, 260:10
**assume** [12] - 57:20, 57:24, 77:18, 78:4, 100:12, 110:11, 112:17, 112:21, 147:13, 164:14, 231:2
**assumed** [1] - 78:4
**assumes** [1] - 78:4
**Assuming** [1] - 185:7
**assuming** [1] - 77:12
**assumption** [3] - 183:3, 183:6, 183:7
**assumptions** [2] - 76:5, 78:2
**assurance** [1] - 249:4
**astute** [1] - 196:2
**Athletic** [2] - 160:12, 175:16
**Atlanta** [1] - 44:11
**Atlanta-based** [1] - 44:11
**Atlantic** [1] - 69:17
**atmosphere** [14] - 50:19, 50:25, 51:11, 53:13, 53:20, 54:20, 59:10, 59:13, 59:20, 59:21, 60:14, 60:21, 60:23, 61:6
**attack** [2] - 172:18, 248:14
**attacked** [4] - 171:16, 172:13, 173:6, 209:24
**attempt** [1] - 210:6
**attempted** [3] - 143:3, 209:2, 209:5
**attempts** [1] - 193:9
**attendance** [1] - 96:24
**attended** [2] - 129:11, 133:18
**attention** [9] - 38:21, 48:24, 121:18, 137:9, 140:12, 180:9, 210:8, 210:11, 226:18
**Attorney** [4] - 89:17, 111:10, 127:5, 156:24
**attorney** [4] - 59:6, 103:20, 208:2, 208:6
**Attorney's** [1] - 210:18
**attorneys** [2] - 108:3, 182:12
**attraction** [2] - 28:22, 28:25
**audiences** [1] - 28:20
**August** [6] - 109:16, 109:21, 113:9, 127:25, 133:7, 139:2
**authenticating** [1] - 145:1
**author** [5] - 5:8, 48:4, 56:21, 74:17, 75:4

**authored** [2] - 93:16, 93:25
**authority** [1] - 146:9
**authorized** [3] - 145:3, 225:8, 225:16
**authorizing** [1] - 198:15
**authors** [1] - 17:3
**Auto** [1] - 123:10
**automatically** [1] - 221:11
**availability** [1] - 104:11
**available** [4] - 88:1, 91:16, 93:1, 188:22
**avenue** [1] - 62:25
**Avenue** [2] - 4:24, 178:16
**average** [1] - 111:15
**avoid** [2] - 197:13, 245:5
**awaiting** [1] - 210:11
**award** [2] - 11:19, 11:20
**awards** [1] - 11:22
**aware** [22] - 17:20, 67:3, 67:4, 67:8, 67:20, 90:2, 97:20, 104:2, 110:24, 124:21, 139:8, 139:10, 139:11, 139:13, 145:15, 180:14, 180:16, 205:19, 207:18, 209:6, 211:9

# B

**backdrop** [1] - 20:18
**background** [13] - 16:15, 25:14, 27:1, 35:2, 43:1, 43:8, 43:12, 44:2, 44:6, 48:11, 67:15, 80:22, 248:15
**backgrounds** [1] - 41:7
**Bacon** [1] - 199:6
**bad** [1] - 45:2
**balance** [6] - 197:17, 197:19, 197:22, 211:5, 237:11, 237:14
**Baltimore** [30] - 1:12, 1:25, 27:9, 39:9, 39:14, 77:9, 93:15, 96:10, 96:25, 111:10, 112:14, 112:18, 113:13, 119:15, 120:7, 128:22, 129:2, 129:15, 129:24, 131:18, 132:25, 135:7, 142:20, 161:9, 177:22, 177:25, 178:13, 178:14, 179:7, 179:12
**BAM** [2] - 10:20, 11:7
**Bar** [1] - 260:19
**Barnes** [1] - 32:8
**Based** [1] - 56:23

**based** [22] - 6:4, 13:2, 32:7, 44:7, 44:11, 49:8, 49:14, 49:24, 50:9, 56:17, 61:24, 61:25, 68:18, 78:6, 78:19, 78:24, 141:17, 142:18, 142:21, 143:4, 182:16, 241:18
**basis** [4] - 79:2, 79:10, 80:5, 187:22
**batch** [1] - 258:24
**bay** [1] - 11:12
**Bay** [9] - 10:19, 11:11, 11:13, 11:14, 11:23, 11:25, 22:21, 39:2
**beaches** [1] - 25:1
**bear** [1] - 203:8
**Bear** [1] - 43:7
**beat** [1] - 173:20
**beats** [1] - 18:12
**became** [6] - 28:22, 30:2, 30:5, 31:17, 34:7, 68:7
**become** [3] - 67:25, 211:10, 233:20
**becomes** [1] - 216:6
**Bed** [2] - 22:16
**bed** [1] - 231:22
**Bed-Stuy** [2] - 22:16
**beef** [1] - 31:7
**Beg** [5] - 11:4, 43:4, 49:6, 52:7, 59:12
**beg** [1] - 73:9
**began** [5] - 119:13, 167:14, 175:15, 236:9, 236:17
**begin** [8] - 111:16, 184:1, 184:19, 184:24, 185:1, 185:10, 185:18, 239:6
**beginning** [4] - 23:18, 84:24, 135:23, 217:12
**begins** [5] - 190:5, 196:11, 227:9, 236:20, 239:8
**begun** [1] - 186:7
**behalf** [14] - 105:16, 176:3, 176:8, 176:11, 176:13, 184:2, 184:5, 184:8, 184:10, 184:15, 184:17, 190:16, 231:19, 248:6
**Behalf** [1] - 1:15, 1:17, 1:18, 1:20, 1:21
**behaved** [1] - 197:10
**behavior** [1] - 197:21
**behind** [8] - 5:3, 15:2, 15:13, 19:22, 45:8, 46:8, 63:8, 68:14
**belief** [1] - 159:3

**Belinda** [2] - 84:5, 105:11
**Bell** [1] - 50:10
**belong** [1] - 88:15
**below** [1] - 192:8
**belt** [1] - 88:20
**Bench** [1] - 114:13
**bench** [1] - 117:11
**benefit** [3] - 57:13, 252:22, 252:24
**benefits** [1] - 134:6
**Berkeley** [3] - 10:11, 10:12, 10:25
**Best** [1] - 124:20
**best** [7] - 20:4, 33:20, 34:19, 60:5, 108:9, 210:21, 229:14
**bet** [1] - 119:20
**BET's** [1] - 33:5
**better** [10] - 38:24, 59:6, 143:18, 144:18, 154:24, 167:4, 190:17, 191:17, 217:7, 231:21
**between** [13] - 10:5, 13:19, 17:24, 24:2, 29:16, 29:23, 41:13, 56:9, 100:15, 140:14, 204:21, 237:21, 238:14
**beyond** [12] - 159:24, 188:11, 208:11, 208:12, 223:20, 223:22, 236:24, 245:15, 245:16, 252:25, 253:2, 253:10
**BIG** [4] - 31:7, 32:6, 33:13, 42:19
**big** [13] - 19:18, 19:19, 22:6, 28:22, 32:8, 32:25, 33:5, 38:11, 43:15, 78:15, 82:3, 173:21
**Big** [3] - 114:22, 118:9, 118:11
**BIG's** [1] - 34:23
**bigger** [1] - 237:23
**bill** [1] - 33:3
**bills** [1] - 23:24
**birth** [5] - 22:8, 94:21, 94:25, 120:15, 127:24
**Birth** [1] - 95:5
**birthday** [1] - 95:6
**bit** [14] - 20:22, 25:14, 30:5, 47:20, 77:9, 109:13, 110:17, 122:1, 135:19, 142:10, 150:10, 167:4, 190:17, 234:21
**bitch** [1] - 59:2
**Black** [1] - 24:4
**black** [8] - 17:3, 67:7, 88:18, 88:19, 88:20, 88:21
**blackballed** [1] - 15:17

**blah** [3] - 173:23
**blame** [1] - 203:21
**Blanding** [2] - 127:21, 128:13
**blast** [1] - 61:14
**blasting** [1] - 61:18
**blends** [1] - 26:16
**block** [2] - 88:1, 247:6
**blocks** [1] - 89:24
**bloody** [1] - 88:5
**blow** [1] - 68:9
**blowing** [1] - 59:1
**blown** [1] - 51:4
**blue** [4] - 113:23, 118:12, 124:23, 125:24
**blueprint** [2] - 32:22, 33:11
**BMG** [2] - 69:16
**Bo** [10] - 47:25, 48:3, 52:2, 52:19, 52:20, 53:1, 53:21, 53:23, 53:24, 54:3
**board** [1] - 255:8
**boastful** [1] - 63:21
**body** [6] - 61:20, 90:3, 248:19, 248:21, 248:23, 251:9
**boilerplate** [1] - 200:24
**bolster** [2] - 70:16, 236:19
**bond** [4] - 101:16, 102:4, 102:20, 103:12
**book** [4] - 17:9, 17:10, 17:12
**books** [2] - 16:25, 17:16
**boots** [2] - 71:20, 88:21
**born** [2] - 9:10, 9:16
**bosses** [1] - 33:24
**bother** [1] - 183:8
**bothered** [1] - 160:13
**bottom** [7] - 88:14, 98:10, 106:3, 118:13, 121:15, 134:4, 190:9
**bought** [1] - 121:15
**boundless** [1] - 186:21
**Bourjaily** [1] - 213:24
**boutique** [1] - 69:20
**bowl** [2] - 109:23, 109:25
**Boys** [1] - 30:1
**bragging** [3] - 21:20, 21:24, 23:12
**brain** [1] - 12:22
**brains** [1] - 59:2
**Bramblewood** [1] - 178:4
**breadth** [1] - 76:25
**break** [15] - 27:20, 81:24, 98:20, 112:23, 112:25, 126:8, 143:16,

153:18, 166:12, 184:5,
184:7, 184:13, 184:21,
209:10, 209:20
**breakfast** [1] - 235:2
**breaks** [1] - 112:23
**Brian** [2] - 176:21,
176:24
**BRIAN** [2] - 176:22,
263:16
**brief** [5] - 128:21, 144:7,
184:9, 206:25, 250:2
**Briefly** [1] - 93:22
**briefly** [13] - 24:19,
62:24, 97:11, 114:10,
120:21, 132:4, 136:12,
162:17, 166:8, 169:9,
170:23, 176:18, 206:17
**bring** [1] - 36:17,
52:18, 67:12, 100:3,
101:7, 103:25, 116:15,
135:19, 163:24, 164:18,
208:6
**bringing** [3] - 28:24,
261:1, 261:4
**brings** [1] - 199:16
**broadly** [1] - 195:24
**Bronx** [7] - 9:10, 9:21,
9:22, 22:8, 22:12, 22:14,
26:24
**Brooklyn** [4] - 9:20,
22:15, 26:24
**Brothers** [2] - 69:15,
117:18
**brothers** [3] - 91:13,
128:17, 140:14
**brought** [3] - 99:9,
157:17, 180:9
**Brown** [1] - 95:19
**Brownsville** [1] - 22:16
**Bryant** [3] - 174:24,
175:1, 175:4
**Buick** [7] - 114:19,
114:23, 118:12, 121:23,
124:1, 124:23, 125:24
**Buicks** [2] - 125:1,
125:2
**build** [3] - 80:9, 80:10,
80:12
**built** [1] - 80:13
**bulk** [1] - 78:6
**bunch** [1] - 29:9
**burden** [4] - 165:17,
207:17, 208:11, 208:14
**burroughs** [1] - 22:17
**business** [17] - 26:2,
26:7, 26:8, 27:20, 35:23,
36:14, 41:3, 66:11, 69:3,
76:6, 78:22, 88:22, 89:6,
116:10, 117:20, 145:8,
220:17

**businesses** [2] -
120:12, 120:17
**busters** [1] - 70:7
**buying** [1] - 42:5
**buzz** [12] - 36:23, 37:4,
37:8, 37:10, 38:2, 38:6,
38:16, 38:17, 38:21,
40:16, 69:23, 71:10
**BY** [45] - 8:10, 16:11,
19:6, 28:11, 35:20, 40:2,
40:20, 62:21, 65:15,
71:18, 72:2, 86:13,
89:14, 106:17, 108:12,
111:6, 118:25, 125:21,
126:23, 128:20, 137:2,
177:1, 179:18, 181:9,
182:7, 182:20, 263:3,
263:4, 263:4, 263:5,
263:5, 263:6, 263:6,
263:8, 263:8, 263:11,
263:11, 263:13, 263:13,
263:15, 263:15, 263:17,
263:17, 263:18, 263:18

## C

**C-Murder** [3] - 43:2,
43:5, 43:6
**Cab** [1] - 18:17
**caliber** [6] - 72:7, 72:10,
73:4, 73:7, 73:10, 73:11
**California** [7] - 8:16,
9:5, 9:6, 9:7, 9:24, 11:1,
24:24
**Calloway** [1] - 18:17
**camera** [3] - 100:15,
106:6, 106:8
**campaign** [1] - 60:23
**candidly** [2] - 3:18, 42:3
**cannot** [1] - 158:16
**caption** [1] - 150:3
**captured** [1] - 210:14
**car** [11] - 39:3, 59:2,
75:5, 80:10, 94:3, 94:5,
121:15, 122:12, 122:17,
122:22, 125:5
**Card** [1] - 130:14
**cards** [2] - 88:22, 89:6
**care** [9] - 77:19, 149:15,
154:12, 189:24, 202:11,
202:13, 251:23, 257:1,
257:2
**career** [5] - 10:14,
12:18, 36:20, 40:10,
78:16
**careers** [1] - 12:15
**careful** [2] - 43:18,
248:2
**carefully** [1] - 253:1

**cares** [1] - 257:4
**carry** [3] - 72:7, 194:13,
245:17
**carry-over** [1] - 194:13
**carrying** [1] - 185:15
**cars** [5] - 80:9, 80:12,
114:18, 125:7, 125:25
**Cars** [3] - 120:1, 123:1,
123:17
**cars's** [1] - 123:11
**cartoon** [5] - 65:6,
65:13, 66:24, 67:3, 67:8,
67:18, 72:5, 72:8, 73:21,
73:25
**cartoons** [5] - 72:11,
72:12, 72:14, 72:16,
72:19
**case** [97] - 5:7, 5:13,
5:16, 6:1, 6:2, 6:20,
6:23, 6:24, 25:5, 42:8,
46:16, 46:20, 48:3,
48:17, 48:19, 51:17,
51:18, 62:2, 62:3, 62:14,
70:1, 73:15, 75:23, 76:2,
76:11, 76:13, 82:8,
87:21, 89:19, 90:14,
95:22, 112:10, 120:11,
144:12, 145:5, 145:19,
148:8, 162:22, 163:13,
169:10, 170:11, 171:23,
173:1, 177:6, 184:23,
185:1, 185:11, 185:25,
186:9, 186:14, 186:18,
186:19, 186:22, 187:1,
192:11, 192:13, 192:22,
193:9, 195:22, 197:1,
200:11, 203:10, 203:24,
204:2, 205:3, 205:7,
205:14, 205:16, 205:21,
211:23, 212:9, 216:12,
216:13, 218:9, 218:11,
218:20, 224:23, 225:1,
225:24, 236:20, 237:19,
240:21, 243:9, 243:17,
244:1, 250:4, 250:16,
250:17, 251:8, 251:24,
252:1, 252:12, 255:5,
260:9
**CASE** [1] - 1:6
**Case** [9] - 264:5
**cases** [7] - 19:16,
19:19, 59:22, 60:1, 82:5,
146:7, 218:22
**Casper** [1] - 136:4
**cassette** [3] - 38:9,
94:10, 163:10
**cast** [2] - 116:24, 251:8
**Catch** [1] - 60:11
**catch** [2] - 54:12, 200:8
**category** [1] - 252:16

**Catonsville** [1] - 240:12
**caught** [6] - 44:18, 60:7,
166:3, 248:19, 248:21,
248:23
**CD** [4] - 38:9, 40:1,
163:10, 164:11
**CD's** [4] - 36:13, 38:21,
38:23, 164:6
**celebrate** [1] - 51:15
**celebration** [1] - 44:21
**cell** [5] - 118:10, 172:9,
211:2, 211:3, 247:6
**Cent** [6] - 36:3, 38:12,
40:10, 41:17, 42:3, 58:7
**center** [2] - 131:15,
137:17
**central** [1] - 188:2
**Central** [2] - 86:11,
86:23
**centric** [1] - 24:3
**Century** [3] - 123:23,
123:24, 124:1
**certain** [5] - 5:14,
12:11, 15:15, 38:18,
67:24, 69:23, 71:1,
91:11, 107:25, 144:8,
157:21, 165:16, 179:13,
208:21, 244:5, 253:10,
256:8
**Certainly** [5] - 16:9,
42:18, 93:22, 182:18,
203:24
**certainly** [19] - 4:17,
30:21, 42:13, 46:24,
67:10, 81:7, 110:20,
160:1, 164:7, 165:4,
170:21, 197:4, 197:15,
205:16, 210:21, 236:18,
250:19, 250:20, 253:8
**certainty** [1] - 159:4
**Certificate** [3] - 121:12,
127:9, 127:12
**certificate** [4] - 84:12,
94:22, 94:25, 95:5
**CERTIFICATE** [1] -
264:1
**certificates** [1] - 121:7
**certification** [1] - 96:10
**certified** [6] - 70:15,
83:3, 126:13, 127:14,
127:16, 127:18
**certify** [2] - 264:3, 264:7
**CFC** [1] - 160:24
**chairs** [5] - 25:4, 76:12,
98:25, 144:11, 186:22
**challenged** [1] - 169:20
**chance** [11] - 2:14,
2:22, 16:14, 39:13,
46:16, 77:11, 83:4,
154:19, 165:18, 259:21

**chances** [1] - 170:9
**change** [21] - 59:3,
73:12, 103:19, 190:6,
190:24, 191:10, 213:13,
217:10, 221:18, 228:5,
235:10, 237:15, 240:25,
241:2, 241:6, 241:8,
241:14, 241:17, 242:23,
244:6, 244:24
**changed** [9] - 31:1,
75:4, 103:21, 125:5,
160:24, 214:12, 215:12,
236:5, 236:16
**changes** [6] - 81:12,
165:21, 190:9, 219:6,
236:2, 236:7
**channel** [1] - 135:8
**channels** [1] - 135:8
**chapter** [1] - 17:9
**character** [4] - 54:4,
72:5, 73:21, 73:25
**characterization** [1] -
149:4
**characters** [1] - 47:13
**charge** [1] - 81:10
**charged** [4] - 193:6,
213:20, 223:11, 223:15,
227:10, 227:14, 245:15,
246:11, 246:14, 251:6,
252:6
**charges** [2] - 44:14,
101:15, 102:7, 102:21,
103:15, 193:15, 194:1,
245:13, 249:6
**Charles** [7] - 122:24,
123:6, 132:24, 133:16,
167:5, 175:12, 175:15
**chart** [7] - 2:8, 2:14,
2:21, 135:8, 141:17,
141:19, 257:13
**charter** [1] - 221:9
**chat** [1] - 39:5
**check** [7] - 37:3, 88:6,
88:7, 133:3, 177:4,
178:7, 178:10
**checked** [2] - 161:18,
161:19
**Cheeks** [1] - 257:11
**chief** [2] - 170:12, 173:1
**choice** [1] - 69:9
**choices** [1] - 45:11
**choose** [1] - 209:13
**chosen** [1] - 77:6
**Christmas** [1] - 112:22
**Chuck** [3] - 13:4, 35:5,
35:7
**chunk** [1] - 224:5
**Circuit** [6] - 207:18,
216:12, 216:13, 218:20,
218:22, 250:16

**circumstance** [1] -
217:9

**circumstances** [2] -
87:22, 146:10

**circumstantial** [1] -
203:25

**cited** [1] - 218:21

**cites** [1] - 216:13

**cities** [1] - 71:1

**city** [4] - 22:25, 23:2,
23:3, 37:13

**City** [9] - 93:15, 96:10,
96:25, 111:16, 119:15,
142:20, 177:22, 178:13,
178:14

**civil** [1] - 146:6

**claiming** [2] - 150:19,
152:18

**clap** [1] - 52:20

**clapping** [1] - 53:5

**Clapping** [2] - 53:6,
53:10

**clarification** [2] -
204:11, 253:13

**clarify** [7] - 15:14,
19:11, 45:6, 141:24,
141:25, 249:16, 249:18

**clarity** [1] - 12:4

**class** [3] - 110:13,
113:4, 113:8

**classes** [1] - 131:17

**classified** [1] - 81:3

**clean** [1] - 163:7

**clear** [13] - 23:16,
33:12, 59:25, 60:6,
116:16, 157:1, 172:11,
191:12, 210:17, 213:21,
239:7, 243:2, 253:6

**clearly** [3] - 27:5,
172:18, 173:3

**CLERK** [8] - 8:5, 84:7,
86:8, 97:6, 106:3,
106:12, 118:19, 126:19

**clerk** [1] - 90:19

**close** [10] - 27:25,
53:20, 81:9, 101:17,
102:5, 103:10, 103:13,
153:19, 260:8, 261:4

**closed** [3] - 37:24,
137:25, 138:2

**closely** [1] - 203:2

**closer** [3] - 87:10,
261:1, 261:4

**closes** [1] - 85:9

**closet** [1] - 73:11

**closing** [21] - 85:9,
99:14, 152:17, 152:19,
162:21, 184:1, 184:2,
184:4, 184:8, 184:10,
184:15, 184:16, 235:9,

241:22, 242:17, 242:19,
242:23, 244:10, 244:18,
249:20, 261:2

**closure** [3] - 102:2,
102:18, 103:9

**clothes** [1] - 88:5

**clothing** [2] - 89:6, 89:9

**clown** [2] - 52:22, 53:17

**clowns** [2] - 55:18,
56:15

**Club** [1] - 86:25

**clubs** [2] - 38:4, 38:7

**co** [2] - 187:8, 255:13

**co-conspirators** [1] -
255:13

**co-counsel** [1] - 187:8

**coach** [9] - 101:7,
106:24, 106:25, 107:7,
107:8, 107:9, 109:9,
109:10, 161:7

**Coach** [31] - 83:22,
84:9, 84:12, 104:10,
105:22, 106:18, 107:20,
111:3, 111:7, 111:12,
113:24, 154:19, 154:24,
155:8, 156:14, 156:15,
156:17, 156:18, 157:6,
157:10, 160:11, 160:14,
160:15, 160:16, 160:17,
160:20, 161:5, 161:11,
161:25, 162:8

**coarseness** [1] - 28:17

**Coast** [4] - 8:17, 10:17,
22:19, 24:10

**Coburn** [5] - 150:12,
151:17, 152:1, 191:24,
194:18

**Cocaine** [1] - 227:13

**cocaine** [5] - 145:20,
227:16

**coconspirator** [3] - 5:6,
5:17, 6:3

**Code** [1] - 102:22

**code** [4] - 122:18,
122:19, 132:3, 142:14

**codes** [1] - 132:2

**Cohen** [1] - 56:1

**coherent** [1] - 243:25

**Coldspring** [1] - 118:9

**collect** [1] - 88:5

**collected** [1] - 90:11

**Collectors** [1] - 136:2

**College** [8] - 104:18,
106:24, 107:2, 107:10,
133:19, 154:15, 175:3

**college** [5] - 10:15,
12:16, 108:22, 111:19,
161:10

**colleges** [2] - 14:5,
112:22

**color** [4] - 122:12,
122:17, 122:19, 125:2

**colored** [1] - 203:3

**colors** [1] - 125:25

**column** [9] - 8:18,
10:18, 11:7, 60:20,
60:25, 61:1, 61:2, 61:8,
121:1

**columns** [1] - 10:18

**com** [1] - 67:22

**combination** [3] -
232:1, 232:10, 239:22

**comedy** [1] - 20:13

**comfortable** [2] - 30:24,
217:1

**coming** [31] - 12:6,
12:8, 18:20, 21:5, 21:9,
21:15, 24:10, 33:4,
33:10, 34:2, 40:11,
43:15, 44:10, 49:2, 49:9,
49:10, 59:18, 59:25,
61:1, 63:8, 69:18, 80:8,
83:17, 106:1, 107:16,
190:20, 218:14, 229:25,
239:8

**comma** [4] - 190:8,
193:8, 193:12, 215:19

**Commandments** [1] -
34:23

**comment** [5] - 208:23,
229:2, 244:19, 244:23

**commentary** [1] - 62:10

**commented** [2] - 44:25,
196:25

**commenting** [1] -
197:10

**comments** [1] - 47:5

**commerce** [2] - 194:24,
195:10

**commercial** [8] - 12:19,
15:6, 15:16, 19:14,
28:25, 35:11, 40:3, 76:6

**Commercial** [1] -
102:22

**commercialism** [1] -
18:9

**commercialization** [1] -
18:6

**commercially** [2] -
26:19, 28:18

**Commission** [1] - 14:7

**commission** [1] - 32:6

**commit** [2] - 58:3,
229:24

**committed** [9] - 205:7,
205:13, 205:15, 205:18,
206:9, 254:25, 256:8,
256:14

**committing** [1] - 140:1

**common** [8] - 23:8,

45:15, 62:9, 65:23,
68:23, 71:19, 74:5,
185:24

**commonly** [2] - 67:17,
161:5

**commonplace** [1] -
31:4

**communicate** [1] -
142:7

**Communications** [1] -
14:7

**communities** [1] -
45:16

**Community** [9] -
104:17, 104:18, 106:24,
107:2, 107:10, 133:18,
154:15, 167:17, 175:3

**community** [17] - 14:5,
16:17, 24:5, 40:24,
42:14, 45:1, 51:8, 55:1,
56:5, 58:22, 60:4, 60:10,
79:6, 79:7, 79:8, 108:22,
111:19

**compact** [2] - 88:21,
89:5

**companies** [2] - 49:22,
68:9

**company** [2] - 130:10,
220:4

**comparable** [1] - 46:24

**comparisons** [2] -
146:16, 147:1

**competing** [1] - 237:12

**competition** [1] - 71:3

**competitions** [1] - 71:1

**compilation** [1] -
141:17

**compilations** [1] -
146:4

**compile** [1] - 2:24

**compiled** [1] - 129:8

**complete** [5] - 89:1,
154:19, 184:22, 186:14,
264:9

**completed** [3] - 87:20,
89:2, 132:5

**completely** [5] - 4:18,
19:11, 63:14, 149:13,
154:21

**completing** [1] - 162:15

**component** [1] - 18:4

**Compton** [6] - 5:24,
24:16, 24:23, 27:18,
28:13, 29:3

**computer** [3] - 96:22,
119:24, 164:4

**computers** [1] - 124:13

**concept** [3] - 63:2,
195:24, 217:19

**concepts** [2] - 186:25,

246:8

**concern** [8] - 158:20,
163:23, 194:22, 195:14,
195:23, 225:18, 225:21,
225:23

**concerned** [9] - 19:24,
60:9, 179:11, 194:24,
195:11, 217:14, 218:4,
228:21, 232:13

**concerning** [5] - 91:11,
144:21, 187:23, 214:16,
252:17

**concerns** [1] - 189:25

**concert** [1] - 260:5

**concerts** [1] - 19:17

**conclude** [5] - 81:14,
172:4, 185:20, 222:6,
222:18

**concluded** [1] - 144:10

**concludes** [2] - 76:3,
183:17

**Conclusion** [1] - 262:3

**conclusion** [5] - 52:11,
146:20, 147:2, 147:4,
222:11

**condensed** [1] - 202:21

**condition** [2] - 88:5,
88:7

**conditionally** [3] - 19:2,
28:6, 75:15

**conditions** [2] - 21:11,
21:16

**Conduct** [1] - 186:24

**conduct** [3] - 146:16,
146:25, 196:23

**conducted** [4] - 93:23,
101:24, 183:21, 212:8

**conducts** [1] - 105:19

**conference** [6] - 81:10,
114:13, 117:11, 165:15,
209:11, 209:20

**confess** [4] - 78:15,
171:11, 235:3, 243:19

**confirm** [4] - 27:24,
99:8, 133:4, 161:16

**confirmed** [1] - 161:13

**confirms** [2] - 26:4,
132:8

**conflict** [3] - 35:3, 35:4,
35:5

**confronted** [1] - 203:5

**confused** [5] - 155:2,
156:5, 198:19, 226:21,
231:6

**confusing** [1] - 246:17

**Congress** [1] - 260:22

**conjunction** [2] - 26:9,
26:11, 26:14

**connect** [1] - 173:24

**connection** [5] - 15:10,

17:17, 20:3, 57:6, 188:1
**conscientious** [1] - 149:10
**consciousness** [5] - 259:3, 259:6, 259:7, 259:12, 259:13
**Consciousness** [1] - 259:14
**consequences** [1] - 101:21
**consider** [21] - 18:7, 21:19, 41:15, 75:24, 76:9, 80:24, 92:10, 214:7, 215:16, 215:23, 215:25, 216:22, 217:12, 217:15, 235:2, 235:7, 236:7, 236:16, 249:6, 253:1, 253:4
**Consider** [3] - 185:22, 185:23
**considerably** [1] - 229:16
**consideration** [5] - 47:7, 47:10, 76:1, 255:12, 260:23
**considered** [14] - 20:16, 22:8, 22:11, 28:23, 32:11, 36:8, 49:19, 81:1, 88:1, 196:4, 249:8, 255:1, 255:25, 256:22
**considering** [2] - 143:16, 216:21
**considers** [1] - 257:5
**consist** [2] - 11:15, 21:2
**consistent** [5] - 3:4, 99:22, 114:19, 114:20, 222:11
**consistently** [1] - 108:23
**consolidation** [2] - 14:12, 14:14
**conspiracies** [19] - 215:4, 236:15, 237:18, 237:19, 237:21, 237:22, 237:24, 237:25, 238:8, 238:17, 238:19, 239:20, 239:24, 239:25, 240:3, 240:4, 244:4, 246:9, 249:17
**conspiracy** [99] - 84:14, 162:10, 193:6, 213:20, 213:21, 214:1, 214:17, 214:20, 214:21, 214:23, 215:5, 215:17, 215:19, 215:20, 216:1, 216:2, 216:3, 216:5, 216:7, 216:8, 216:16, 217:4, 217:9, 217:20, 217:25, 218:12, 227:9, 229:8, 229:10, 229:24, 235:23,

236:2, 236:7, 236:8, 236:9, 236:13, 236:16, 236:17, 236:19, 236:23, 237:20, 237:23, 238:9, 238:10, 238:14, 238:16, 238:21, 239:2, 239:4, 239:15, 239:16, 240:6, 240:11, 243:13, 243:17, 246:6, 246:11, 246:14, 247:1, 247:10, 247:17, 248:8, 251:22, 252:18, 253:1, 253:4, 253:12, 253:23, 254:3, 254:5, 254:15, 255:1, 255:2, 255:12, 255:14, 255:23, 255:24, 256:9, 256:11, 256:14, 256:15, 256:17, 256:22, 256:23, 257:1, 257:3, 257:6, 257:12, 257:17, 257:18, 257:19, 260:1, 260:3
**Conspiracy** [1] - 229:5
**conspirator** [3] - 215:18, 216:2, 217:3
**conspirators** [2] - 215:10, 255:13
**constitute** [3] - 196:15, 248:15, 264:7
**constituted** [1] - 80:15
**constitutes** [1] - 193:5
**constraint** [1] - 185:10
**construction** [1] - 74:10
**consultation** [1] - 98:22
**consulted** [1] - 51:23
**CONT'D** [1] - 19:5
**contact** [3] - 182:11, 183:4, 209:25
**contacted** [2] - 107:17, 133:3
**contained** [3] - 2:16, 148:3, 217:11
**Containing** [1] - 191:10
**contamination** [1] - 18:8
**contend** [1] - 146:12
**contending** [2] - 193:12, 193:24
**Contending** [2] - 193:17, 193:18
**contends** [2] - 234:1, 234:8
**content** [3] - 14:13, 69:23
**content-wise** [1] - 69:23
**context** [14] - 17:16, 17:17, 43:13, 47:2, 57:10, 58:2, 58:23, 60:24, 73:15, 73:24, 76:11, 76:22, 77:6,

192:11
**contexts** [1] - 55:3
**continuation** [3] - 193:5, 196:15, 247:10
**Continue** [3] - 99:1, 144:12, 187:1
**continue** [9] - 7:25, 98:23, 131:16, 185:3, 186:2, 186:6, 194:11, 216:7, 224:22
**continued** [1] - 219:9
**continues** [1] - 22:18
**contours** [1] - 187:24
**contract** [1] - 15:18
**contracted** [1] - 137:22
**contrast** [4] - 4:22, 5:1, 5:5, 5:21
**contribute** [2] - 17:4, 53:13
**contributed** [2] - 17:10, 51:11
**contributes** [1] - 59:13
**contributing** [4] - 16:22, 16:25, 59:9, 59:20
**contribution** [1] - 17:13
**control** [1] - 69:13
**Control** [1] - 90:12
**controversy** [1] - 38:17
**Controversy** [1] - 38:18
**convention** [1] - 42:9
**conversation** [1] - 164:24
**convey** [1] - 256:5
**convict** [2] - 203:6, 225:25
**convicted** [5] - 41:25, 205:18, 205:22, 206:3, 206:13
**conviction** [8] - 205:8, 206:1, 206:2, 224:23, 224:24, 224:25, 225:9, 225:12
**convince** [2] - 188:10, 260:11
**convinced** [1] - 253:2
**COOK** [2] - 8:3, 263:3
**Cook** [42] - 8:8, 8:12, 16:6, 16:12, 19:7, 25:2, 25:12, 26:5, 26:23, 27:12, 27:22, 30:21, 40:21, 41:3, 43:7, 44:20, 46:9, 47:11, 48:16, 52:17, 55:11, 60:12, 60:17, 62:18, 62:22, 62:24, 64:5, 65:16, 66:15, 67:24, 72:3, 75:10, 75:13, 75:16, 75:17, 75:25, 76:10, 76:17, 78:3, 79:18, 80:22, 81:2

**Cook's** [2] - 75:24, 76:3
**cooperate** [2] - 170:6, 179:14
**cooperating** [1] - 203:20
**cooperation** [3] - 102:12, 103:3, 186:21
**cooperative** [1] - 101:11
**cooperator** [1] - 204:1
**copies** [2] - 100:20, 189:3
**Copies** [1] - 91:2
**copy** [21] - 3:10, 3:12, 3:13, 3:16, 81:11, 87:15, 90:25, 98:7, 100:19, 119:1, 126:4, 127:15, 127:16, 130:14, 134:17, 163:7, 163:14, 163:15, 163:18, 191:25, 228:20
**copyright** [1] - 230:3
**cord** [1] - 104:21
**Corleone** [1] - 31:15
**Corner** [1] - 8:22
**corner** [3] - 41:14, 89:4, 133:21
**corporation** [4] - 221:5, 221:6, 221:7, 223:18
**Corporation** [1] - 221:8
**Correct** [6] - 47:25, 118:2, 124:3, 174:16, 175:23, 175:25
**correct** [60] - 16:23, 41:3, 44:14, 44:23, 47:15, 50:3, 52:2, 54:16, 55:14, 57:3, 59:11, 59:14, 61:8, 61:18, 61:21, 72:25, 73:8, 89:7, 89:22, 89:25, 90:1, 90:4, 90:16, 91:8, 95:4, 95:12, 108:16, 108:19, 109:5, 110:22, 112:6, 112:19, 112:20, 113:18, 113:19, 129:11, 133:19, 137:17, 137:20, 137:23, 139:6, 139:17, 140:15, 140:18, 143:7, 144:3, 157:15, 179:23, 213:15, 218:23, 218:25, 219:8, 243:3, 243:5, 250:11, 250:18, 250:21, 251:2, 252:7, 255:8
**corrected** [3] - 118:6, 156:7, 226:15
**Correctional** [1] - 130:25
**corrections** [1] - 191:25
**correctly** [1] - 40:25
**correlates** [1] - 135:8
**corresponding** [1] -

120:15
**corroboration** [1] - 204:23
**cost** [2] - 101:16, 260:23
**costs** [3] - 102:5, 102:20, 103:12
**Counsel** [2] - 188:20, 211:9, 212:15
**counsel** [32] - 7:13, 75:18, 77:10, 81:6, 81:23, 82:2, 91:14, 93:4, 93:10, 98:22, 100:19, 100:23, 141:16, 143:11, 144:7, 149:1, 164:23, 166:13, 182:9, 182:22, 183:9, 185:23, 187:8, 187:9, 187:19, 188:25, 194:20, 209:21, 210:23, 235:15, 237:13, 245:9
**Counselor** [1] - 132:2
**count** [6] - 78:3, 188:14, 238:11, 238:13, 248:7, 249:6
**Count** [10] - 187:25, 188:4, 193:6, 213:5, 215:5, 229:24, 246:12, 248:3, 251:25
**countdown** [1] - 13:4
**counting** [1] - 35:21
**country** [6] - 10:19, 12:22, 35:12, 37:18, 46:6, 64:19
**counts** [5] - 188:7, 188:8, 195:12, 213:2, 230:13
**County** [6] - 107:3, 128:22, 129:2, 129:16, 129:24, 131:18
**county** [2] - 129:22, 129:23
**couple** [28] - 14:2, 16:8, 19:7, 26:22, 32:19, 34:14, 34:17, 45:21, 46:15, 52:14, 72:3, 72:4, 82:20, 85:2, 87:4, 100:22, 108:13, 136:13, 142:4, 148:18, 148:22, 153:7, 154:2, 161:23, 169:9, 177:5, 188:3, 244:25
**course** [41] - 3:20, 4:6, 5:9, 7:13, 70:23, 82:3, 82:20, 92:8, 109:4, 112:17, 112:25, 145:18, 153:15, 156:14, 164:21, 171:17, 177:5, 177:13, 178:5, 186:15, 187:15, 189:10, 197:7, 206:5, 207:22, 211:9, 211:17,

211:20, 215:24, 224:16,
227:7, 234:23, 235:6,
237:24, 238:10, 241:20,
244:14, 244:21

**COURT** [682] - 1:1, 2:2,
2:6, 2:12, 2:20, 3:12,
3:20, 3:22, 4:2, 4:6, 4:8,
4:19, 5:4, 6:14, 6:17,
7:3, 7:6, 7:9, 7:13, 7:16,
7:20, 7:24, 16:9, 17:22,
18:10, 18:18, 18:21,
19:1, 19:4, 24:21, 25:2,
25:7, 26:3, 26:13, 26:20,
26:23, 27:2, 27:4, 27:10,
28:9, 29:22, 30:15,
30:21, 31:23, 34:16,
35:15, 35:19, 39:23,
50:22, 55:9, 60:16,
63:17, 65:11, 65:14,
71:15, 75:8, 75:11,
76:17, 77:21, 77:24,
78:2, 79:21, 80:7, 81:5,
81:18, 81:21, 82:10,
82:25, 83:4, 83:10,
83:12, 83:18, 84:2, 84:5,
84:8, 84:15, 84:18,
84:22, 85:1, 85:4, 85:6,
85:10, 85:13, 85:21,
85:24, 86:1, 86:3, 87:10,
87:13, 90:18, 90:22,
90:24, 91:1, 91:4, 91:7,
92:3, 92:6, 92:20, 93:2,
93:12, 93:14, 93:20,
94:6, 94:12, 94:16,
94:23, 95:2, 95:5, 95:8,
95:14, 95:23, 95:25,
96:3, 96:12, 96:16,
96:19, 96:23, 97:1, 97:3,
97:7, 97:10, 97:16,
97:18, 98:1, 98:5, 98:8,
98:13, 98:15, 98:18,
99:6, 99:17, 100:1,
100:5, 100:7, 100:11,
100:18, 100:22, 100:25,
101:5, 101:9, 101:19,
102:10, 102:25, 103:18,
104:3, 104:7, 104:11,
104:14, 104:17, 104:21,
104:24, 105:5, 105:8,
105:23, 106:4, 106:8,
107:21, 107:24, 108:3,
108:9, 114:1, 114:6,
114:12, 115:3, 115:7,
115:11, 115:14, 115:19,
115:21, 116:2, 116:6,
116:8, 116:13, 116:19,
116:21, 117:2, 117:6,
117:9, 117:12, 117:22,
118:1, 118:16, 118:22,
126:3, 126:6, 126:11,
126:14, 128:5, 128:11,

128:14, 128:18, 130:1,
130:3, 131:6, 131:12,
134:13, 136:9, 136:16,
136:18, 136:23, 136:25,
139:23, 140:4, 141:7,
141:10, 141:14, 141:24,
142:2, 142:5, 142:9,
142:23, 143:1, 143:8,
143:10, 143:14, 143:19,
143:21, 144:1, 144:4,
144:6, 144:16, 144:19,
144:23, 145:7, 145:10,
145:13, 145:16, 145:18,
145:25, 146:2, 146:5,
146:12, 146:22, 147:5,
147:8, 147:12, 147:15,
147:17, 147:23, 147:25,
148:14, 148:19, 148:21,
148:24, 149:6, 149:14,
149:17, 149:20, 149:23,
150:7, 150:9, 151:8,
151:10, 151:13, 151:15,
151:17, 151:21, 152:2,
152:5, 152:9, 152:14,
152:19, 152:22, 152:25,
153:8, 153:10, 153:12,
153:15, 153:23, 154:3,
154:5, 154:7, 154:9,
154:12, 154:16, 154:23,
155:3, 155:10, 155:20,
156:2, 156:4, 156:17,
157:3, 157:20, 157:25,
158:6, 158:9, 158:13,
158:20, 158:22, 159:3,
159:7, 159:10, 159:14,
159:17, 159:20, 159:25,
160:2, 160:9, 160:13,
160:20, 160:22, 160:25,
161:2, 161:15, 161:21,
162:1, 162:6, 162:18,
162:25, 163:5, 163:11,
163:15, 163:17, 163:20,
163:22, 164:13, 164:16,
164:20, 165:10, 165:14,
165:17, 165:21, 165:23,
166:4, 166:9, 166:11,
166:19, 166:25, 167:16,
167:21, 167:23, 168:3,
168:5, 168:11, 168:14,
168:18, 168:23, 169:1,
169:4, 169:7, 169:14,
169:19, 170:2, 170:10,
170:14, 170:24, 171:9,
171:21, 171:24, 172:5,
172:9, 172:13, 172:16,
172:21, 172:25, 173:14,
174:6, 174:8, 174:14,
174:18, 175:6, 175:9,
175:17, 175:21, 175:24,
176:1, 176:5, 176:7,
176:10, 176:13, 176:16,

176:19, 176:23, 181:16,
181:21, 181:25, 182:2,
182:5, 182:15, 182:18,
183:11, 183:13, 183:16,
187:5, 187:9, 187:15,
187:19, 188:5, 188:20,
189:4, 189:10, 189:14,
189:20, 190:1, 190:13,
190:22, 191:2, 191:9,
191:16, 191:21, 192:2,
192:5, 192:7, 192:16,
192:21, 192:25, 193:18,
193:22, 194:3, 194:9,
194:13, 194:17, 194:21,
195:2, 195:7, 195:16,
195:20, 196:1, 196:6,
196:9, 196:16, 196:19,
196:22, 197:3, 197:7,
197:9, 197:23, 197:25,
198:4, 198:10, 198:15,
198:24, 199:8, 199:12,
199:15, 199:18, 200:1,
200:3, 200:6, 200:13,
200:19, 200:21, 200:24,
201:2, 201:6, 201:12,
201:14, 201:19, 201:23,
201:25, 202:11, 202:15,
202:18, 202:21, 202:25,
203:22, 204:9, 204:12,
204:14, 204:17, 205:4,
205:7, 205:11, 205:17,
205:20, 205:25, 206:8,
206:12, 206:15, 206:20,
206:23, 207:1, 207:5,
207:7, 207:10, 207:13,
207:16, 207:22, 208:4,
208:8, 208:15, 208:18,
208:25, 209:9, 209:17,
209:19, 211:20, 211:24,
212:6, 212:15, 212:17,
212:20, 212:24, 213:4,
213:9, 213:13, 213:18,
214:8, 214:11, 215:11,
215:14, 215:23, 216:17,
217:1, 217:14, 218:6,
218:9, 218:23, 219:1,
219:5, 219:7, 219:14,
220:10, 220:15, 220:23,
221:2, 221:6, 221:8,
221:12, 221:15, 221:22,
221:24, 222:5, 222:16,
223:1, 223:5, 223:12,
223:16, 223:24, 224:4,
224:10, 224:16, 225:6,
225:11, 225:15, 226:4,
226:7, 226:16, 226:19,
227:1, 227:4, 227:7,
227:11, 227:15, 227:19,
227:21, 227:24, 228:2,
228:7, 228:13, 228:15,
228:18, 228:25, 229:4,

229:13, 229:17, 229:19,
229:22, 230:5, 230:7,
230:15, 230:19, 230:25,
231:4, 231:8, 231:13,
231:17, 232:5, 232:15,
232:20, 232:23, 233:3,
233:7, 233:9, 233:12,
233:15, 233:19, 233:23,
234:5, 234:8, 234:11,
234:13, 234:15, 234:19,
234:23, 234:25, 235:5,
235:14, 235:21, 235:24,
236:21, 237:3, 237:5,
237:9, 237:15, 238:5,
238:9, 238:13, 238:20,
238:23, 238:25, 239:5,
239:10, 239:15, 239:23,
240:2, 240:5, 240:9,
240:19, 241:2, 241:5,
241:9, 241:11, 241:16,
241:20, 241:24, 242:2,
242:5, 242:12, 242:15,
242:21, 242:24, 243:16,
243:23, 244:14, 245:11,
245:19, 246:16, 247:18,
247:25, 248:20, 248:22,
249:2, 249:12, 249:14,
249:20, 249:24, 250:9,
250:13, 250:23, 251:7,
251:15, 251:20, 252:11,
252:20, 253:14, 253:17,
253:21, 254:7, 254:16,
254:19, 255:9, 255:17,
256:4, 256:12, 256:18,
256:25, 257:20, 257:24,
258:2, 258:6, 258:9,
258:15, 258:18, 258:23,
259:1, 259:5, 259:10,
259:16, 259:19, 259:22,
260:6, 260:13, 260:15,
260:22, 261:3, 261:7,
261:11, 261:15, 261:22,
262:1

**court** [28] - 19:19, 77:2,
91:13, 101:17, 102:6,
103:13, 105:14, 119:11,
137:20, 138:8, 149:22,
151:3, 153:13, 159:23,
163:12, 168:15, 169:23,
181:11, 188:16, 195:10,
195:21, 198:17, 206:3,
207:19, 243:9, 245:21,
250:21

**Court** [98] - 5:14, 8:11,
17:20, 52:16, 75:14,
75:17, 75:20, 76:3,
76:22, 77:15, 79:15,
79:17, 91:6, 94:10,
97:14, 97:20, 97:23,
98:7, 99:14, 99:24,
101:9, 101:10, 101:15,

101:17, 101:20, 101:24,
102:4, 102:5, 102:10,
102:12, 102:20, 102:21,
102:25, 103:2, 103:3,
103:18, 108:4, 108:5,
108:6, 136:12, 143:15,
143:17, 144:17, 145:14,
145:18, 145:21, 150:23,
150:24, 162:11, 165:16,
167:19, 168:21, 169:11,
188:2, 188:8, 188:12,
196:4, 199:4, 199:5,
199:24, 200:12, 203:17,
204:7, 204:22, 207:20,
207:21, 208:24, 209:4,
209:5, 209:21, 213:24,
222:12, 222:22, 224:21,
225:5, 229:8, 230:2,
231:10, 231:12, 240:16,
240:17, 240:24, 242:8,
242:17, 242:19, 242:22,
243:2, 243:7, 244:12,
245:14, 247:6, 247:11,
250:3, 250:5, 252:9,
255:10, 255:20, 264:16

**Court's** [19] - 24:18,
71:14, 77:23, 79:2,
79:13, 79:18, 97:24,
111:2, 125:18, 134:14,
136:11, 168:16, 168:24,
187:22, 211:13, 234:17,
247:2, 251:19, 255:4

**courtesy** [1] - 100:18

**courthouse** [3] -
106:19, 186:16, 210:9

**Courthouse** [1] - 1:24

**courtroom** [29] - 7:23,
25:6, 27:15, 28:8, 30:23,
76:16, 81:14, 83:7, 86:2,
99:5, 105:3, 105:18,
144:15, 152:10, 153:1,
153:4, 163:25, 166:14,
166:18, 174:17, 187:4,
188:19, 196:14, 197:2,
197:21, 209:12, 209:21,
211:2, 211:8

**cover** [6] - 23:24,
135:11, 148:6, 148:7,
148:12, 149:17, 149:19

**coverage** [1] - 134:8

**covered** [19] - 154:22,
234:18, 235:19, 245:24,
249:8, 249:9, 250:13,
250:14, 252:20, 253:14,
253:16, 253:20, 253:21,
257:21, 257:22, 257:24,
259:5, 259:7

**Crack** [1] - 34:23,
227:13, 228:2

**crack** [10] - 35:2, 35:10,

35:22, 41:25, 42:5, 215:11, 227:13, 227:16, 228:22

**craft** [1] - 12:12
**crafted** [1] - 203:17
**crazy** [1] - 58:19
**create** [3] - 37:10, 38:21, 216:14
**created** [3] - 50:19, 50:25, 217:11
**Created** [1] - 50:23
**creates** [1] - 60:14
**creating** [7] - 37:7, 59:21, 60:21, 60:23, 61:6, 71:10, 99:16
**cred** [3] - 45:23, 46:4, 58:9
**credentials** [1] - 80:22
**credibility** [2] - 46:11, 70:23
**credited** [2] - 188:6, 188:10
**Cree** [2] - 199:4, 199:5
**crews** [1] - 66:1
**crime** [2] - 59:3, 247:12
**crimes** [1] - 254:12
**criminal** [17] - 32:5, 32:13, 59:22, 145:5, 146:7, 243:9, 251:4, 253:3, 253:8, 253:11, 254:1, 254:9, 254:11, 254:20, 256:8, 256:10
**CRIMINAL** [1] - 1:6
**Crip** [1] - 43:17
**Crips** [2] - 43:19, 44:6
**critical** [5] - 44:20, 48:13, 146:18, 151:2, 185:21
**criticism** [1] - 78:9
**critique** [2] - 46:25, 50:2
**cross** [8] - 75:24, 77:14, 136:23, 153:19, 158:23, 171:15, 173:10, 248:3
**CROSS** [18] - 16:10, 40:19, 62:20, 89:13, 111:5, 125:20, 137:1, 179:17, 181:8, 263:4, 263:5, 263:5, 263:8, 263:11, 263:13, 263:15, 263:17, 263:18
**crossed** [1] - 131:25
**Crowe** [18] - 1:20, 84:22, 94:18, 96:5, 143:22, 144:16, 176:10, 200:8, 203:23, 204:9, 205:11, 206:16, 231:9, 237:6, 237:9, 237:10, 246:23, 249:2
**CROWE** [60] - 84:23,

94:20, 94:24, 95:4, 95:6, 95:9, 95:16, 95:24, 96:1, 143:15, 144:17, 144:20, 144:24, 145:9, 145:11, 145:15, 145:17, 145:23, 146:1, 146:3, 146:6, 146:14, 147:3, 147:6, 147:10, 147:13, 147:16, 187:12, 187:16, 190:12, 190:15, 191:7, 199:13, 199:16, 199:23, 200:2, 202:19, 202:22, 203:1, 204:6, 205:5, 205:9, 205:15, 205:19, 205:23, 206:7, 206:11, 206:14, 206:24, 207:2, 207:6, 207:9, 213:10, 231:5, 231:11, 234:14, 237:7, 246:24, 249:11, 249:13
**Crowe's** [1] - 252:21
**crucial** [1] - 228:17
**crude** [1] - 29:1
**crudity** [1] - 29:18
**crux** [2] - 226:24, 236:20
**CSC** [1] - 130:23
**Cub** [1] - 132:25
**cueing** [1] - 2:4
**culture** [15] - 8:17, 8:19, 12:5, 18:1, 18:2, 20:5, 20:18, 23:1, 36:11, 45:4, 48:10, 48:14, 58:23, 67:7
**curiosity** [1] - 48:16
**currency** [2] - 31:17, 34:7
**Cursing** [1] - 31:2
**custody** [5] - 3:2, 159:16, 159:18, 159:20, 159:21
**customary** [1] - 165:2
**cut** [5] - 88:18, 88:19, 132:11, 202:22, 261:23
**cylinders** [1] - 121:25

# D

**D's** [1] - 8:22
**Daiwa** [1] - 125:3
**Damita** [8] - 82:15, 82:16, 91:10, 94:9, 163:6, 163:17, 163:21, 201:20
**DAMITA** [1] - 263:9
**dance** [1] - 18:3
**dangerous** [1] - 49:23
**Darius** [3] - 177:14, 181:11, 181:17
**dark** [1] - 78:10
**Darryl** [5] - 116:10,

117:17, 117:20, 118:11, 199:6
**data** [1] - 146:3
**database** [1] - 125:16
**date** [18] - 118:5, 120:15, 121:4, 122:1, 122:2, 127:22, 127:24, 129:16, 132:9, 132:12, 134:20, 135:2, 142:16, 155:13, 157:2, 175:1, 240:11, 240:12
**dated** [1] - 87:6
**dates** [17] - 3:2, 3:6, 96:17, 139:12, 139:18, 139:19, 139:24, 141:19, 155:2, 155:3, 156:21, 156:22, 158:9, 158:10, 158:16, 159:1
**Daubert** [1] - 78:12
**Dave** [2] - 8:8, 16:5
**Davey** [4] - 8:1, 8:7, 8:22, 16:5
**DAVID** [2] - 8:3, 263:3
**Davis** [1] - 1:13
**days** [8] - 13:6, 33:21, 109:18, 109:19, 110:15, 179:6, 179:13, 188:3
**Dead** [1] - 33:4
**dead** [1] - 75:6
**deal** [4] - 82:5, 194:20, 257:7, 257:8
**dealer** [5] - 32:8, 36:6, 41:25, 123:8, 123:10
**Dealer** [1] - 123:5
**dealing** [2] - 21:12, 41:10
**dealt** [1] - 247:1
**death** [8] - 54:9, 54:18, 74:13, 74:16, 75:1, 84:12, 127:22, 128:2
**Death** [4] - 54:19, 68:7, 127:9, 127:12
**debate** [1] - 32:25
**decade** [1] - 111:12
**December** [19] - 3:7, 97:22, 110:1, 138:10, 150:13, 155:13, 157:2, 157:3, 157:22, 158:2, 158:7, 158:21, 159:10, 160:4, 167:6, 175:13
**decide** [5] - 45:12, 185:9, 210:21, 248:13, 251:4
**decided** [4] - 126:8, 170:7, 188:2, 260:6
**decision** [1] - 101:22
**declarations** [1] - 213:17
**Dee** [1] - 8:2
**deem** [3] - 18:7, 49:17,

76:10
**Deezo** [1] - 128:16
**Def** [4] - 39:10, 55:13, 56:1, 68:19
**defeats** [1] - 225:17
**DEFENDANT** [8] - 8:3, 101:13, 102:1, 102:17, 103:8, 106:10, 118:18, 126:17
**defendant** [16] - 188:13, 196:19, 203:3, 208:1, 213:20, 214:18, 214:22, 216:6, 216:15, 218:12, 241:18, 244:1, 246:13, 246:15, 249:6, 253:5
**Defendant** [10] - 1:17, 1:18, 1:20, 1:21, 94:24, 95:16, 97:12, 143:16, 191:13, 220:21
**defendant's** [8] - 7:10, 188:12, 190:25, 215:16, 215:25, 216:7, 217:12, 249:7
**Defendant's** [1] - 144:20
**defendants** [37] - 25:20, 81:8, 81:15, 140:10, 166:13, 188:8, 188:17, 193:3, 194:15, 195:4, 195:20, 195:22, 196:12, 196:13, 197:10, 202:23, 207:22, 208:21, 209:2, 209:5, 209:22, 210:2, 210:10, 211:1, 211:7, 211:11, 212:7, 233:10, 233:12, 234:5, 239:7, 239:8, 247:9, 247:13, 247:15, 248:19, 249:6
**Defendants** [3] - 1:9, 166:18, 188:19
**Defendants'** [1] - 94:21
**defendants'** [3] - 193:4, 224:11, 234:9
**Defense** [1] - 87:14
**defense** [49] - 48:3, 51:24, 53:2, 53:25, 57:14, 81:23, 93:10, 93:17, 99:25, 141:16, 165:1, 171:10, 171:11, 171:14, 171:19, 171:23, 176:15, 176:17, 177:6, 190:16, 190:24, 191:4, 193:11, 193:22, 194:20, 195:1, 195:17, 200:10, 205:3, 214:13, 214:25, 215:2, 225:25, 236:18, 236:20, 237:13, 237:18, 242:7, 242:20, 243:3, 243:8, 243:9, 243:10, 243:13, 244:15, 245:1,

248:12, 250:16
**defenses** [6] - 193:14, 194:1, 194:16, 194:23, 196:2, 234:9
**defensive** [1] - 172:17
**define** [3] - 207:19, 207:21, 246:20
**definite** [1] - 216:4
**definitely** [7] - 23:7, 32:9, 32:17, 41:11, 43:12, 51:1, 69:1
**Definitely** [1] - 259:22
**definition** [1] - 223:10
**definitive** [1] - 146:20
**deflecting** [1] - 208:13
**defunct** [1] - 221:8
**degree** [6] - 33:16, 38:18, 63:9, 112:8, 133:16, 209:4
**delay** [2] - 101:6, 170:23
**delete** [4] - 194:11, 200:12, 241:8, 241:11
**deleted** [2] - 200:14, 208:13
**deliberate** [3] - 185:11, 185:22, 186:5
**deliberations** [11] - 91:17, 184:24, 185:1, 185:4, 185:11, 185:14, 185:16, 185:19, 186:8, 186:9
**delicacy** [1] - 30:22
**delighted** [2] - 114:2
**delinquency** [1] - 137:20
**Delivery** [2] - 116:11, 117:21
**delving** [1] - 74:18
**demand** [1] - 70:11
**demo** [1] - 36:17
**demonstrations** [2] - 196:14, 197:2
**demonstratives** [2] - 99:15, 99:18
**Denham** [2] - 128:16, 205:16
**denied** [4] - 92:24, 74:8, 246:22, 251:21
**denies** [1] - 188:12
**dental** [1] - 134:8
**Department** [8] - 50:5, 93:16, 133:10, 139:2, 160:12, 167:12, 167:15, 175:16
**department** [4] - 50:16, 86:15, 86:17, 132:3
**deputies** [2] - 209:24, 209:25
**Deputy** [5] - 209:21,

210:16, 210:20, 211:5, 211:14
**deputy** [2] - 209:25, 210:4
**derived** [1] - 46:1
**describe** [7] - 18:23, 20:4, 29:23, 58:12, 66:16, 87:18, 131:23
**described** [10] - 23:8, 31:19, 32:12, 143:6, 160:18, 219:23, 220:15, 220:17, 246:18
**describing** [3] - 58:3, 58:7, 177:12
**description** [4] - 57:9, 94:4, 121:19, 122:11
**desire** [1] - 164:6
**despite** [2] - 180:18, 236:2
**despots** [1] - 31:13
**detail** [1] - 152:13
**detailing** [1] - 51:8
**detained** [8] - 155:5, 155:11, 155:19, 156:11, 156:21, 157:13, 157:15, 159:2
**detainee** [1] - 159:4
**Detective** [10] - 82:16, 82:17, 82:21, 93:16, 93:17, 93:25, 115:5, 115:23, 116:15, 118:3
**detective** [2] - 93:25, 114:14
**detectives** [3] - 91:19, 91:20, 91:22
**detention** [6] - 131:15, 137:17, 155:25, 156:6, 158:1, 158:2
**determination** [2] - 213:24, 228:24
**determine** [4] - 203:2, 214:19, 247:23, 252:25
**determined** [1] - 75:23
**determining** [1] - 37:12
**developed** [1] - 12:24
**developing** [1] - 36:20
**Diallo** [1] - 50:11
**dictate** [1] - 49:11
**Diddy** [2] - 68:6, 68:19
**Die** [1] - 22:16
**died** [1] - 91:13
**Dien** [1] - 136:4
**difference** [10] - 10:5, 17:23, 17:25, 74:22, 82:3, 123:13, 152:23, 153:4, 153:5, 204:20
**different** [29] - 7:1, 9:15, 13:24, 23:9, 24:24, 38:5, 43:11, 64:18, 64:19, 67:14, 92:13,

92:14, 146:19, 146:23, 148:13, 152:6, 168:1, 203:10, 217:21, 218:1, 230:12, 230:16, 232:18, 239:2, 244:13, 251:1, 252:16, 257:18
**differing** [1] - 191:11
**difficult** [2] - 37:23, 243:12
**digest** [1] - 20:12
**Digest** [1] - 79:12
**digit** [3] - 120:14, 121:24, 122:18
**dime** [1] - 60:10
**dinner** [1] - 235:1
**diploma** [1] - 112:11
**dipshits** [4] - 50:6, 50:10, 50:11, 50:16
**direct** [7] - 30:10, 49:1, 75:24, 78:7, 101:8, 170:11, 208:23
**DIRECT** [14] - 8:9, 19:5, 86:12, 106:16, 118:24, 126:22, 176:25, 263:3, 263:4, 263:8, 263:11, 263:13, 263:15, 263:17
**directed** [1] - 45:17
**directing** [2] - 121:18, 192:19
**direction** [6] - 12:25, 33:12, 35:6, 35:8, 36:2, 36:21
**directive** [1] - 217:16
**directly** [8] - 8:5, 86:8, 118:19, 126:19, 142:16, 199:14, 212:7, 218:21
**Dirty** [6] - 198:21, 198:25, 199:10, 199:16, 199:20, 200:2
**disability** [1] - 134:8
**disagree** [7] - 172:7, 172:24, 173:24, 203:23, 213:7, 238:7, 243:19
**disagreed** [1] - 243:18
**disagreeing** [2] - 158:13, 257:20
**disagreement** [3] - 85:8, 155:22, 155:24
**discharge** [4] - 101:18, 102:9, 102:24, 103:17
**disclaiming** [1] - 197:18
**disclose** [1] - 209:14
**discourages** [1] - 61:7
**discouraging** [1] - 61:3
**discrete** [2] - 237:21, 260:3
**discretion** [1] - 208:2
**discuss** [3] - 5:9, 164:25, 187:1
**discussed** [2] - 66:6,

220:13
**discussing** [2] - 48:11, 62:1
**discussion** [10] - 25:4, 76:13, 98:17, 98:25, 126:8, 144:12, 173:18, 173:22, 186:22, 244:16
**dishonor** [4] - 54:10, 54:18, 54:19, 54:24
**disk** [2] - 88:21, 89:5
**displayed** [2] - 28:17, 32:3
**displaying** [1] - 38:9
**disposed** [1] - 43:20
**disputes** [2] - 193:11, 193:23
**disregard** [1] - 226:10
**disrespected** [1] - 197:13
**dissuade** [1] - 209:7
**distinct** [1] - 240:4
**distinction** [2] - 41:13, 41:17
**distinctly** [3] - 108:10, 171:12, 171:24
**distortions** [1] - 12:10
**distorts** [1] - 194:25
**distract** [1] - 7:7
**distributed** [3] - 10:25, 11:1, 12:9
**distributing** [1] - 36:14
**distribution** [8] - 37:15, 38:20, 41:25, 42:6, 68:8, 69:13
**district** [5] - 59:5, 86:22, 87:2, 207:19, 227:6
**DISTRICT** [2] - 1:1, 1:2
**District** [2] - 86:11, 86:23
**disturbing** [1] - 45:9
**DIVISION** [1] - 1:2
**DJ** [3] - 10:6, 13:20, 21:24
**DJ'ing** [6] - 9:23, 9:25, 10:2, 10:3, 10:4, 10:7
**DJ's** [5] - 10:6, 11:16, 12:23, 15:15, 19:21
**DJS** [1] - 159:16
**DLLR** [1] - 157:18
**DMC** [1] - 21:15
**DOAR** [6] - 96:9, 98:6, 115:21, 127:11, 173:18, 173:22
**Dobropolski** [6] - 84:18, 84:20, 141:19, 142:13, 143:5, 178:9
**DOC** [1] - 3:3
**docket** [1] - 168:19
**document** [33] - 15:7,

15:8, 87:16, 100:15, 119:24, 121:11, 127:16, 127:18, 128:21, 129:4, 130:13, 132:20, 134:11, 134:19, 135:2, 135:17, 137:12, 138:6, 138:8, 138:23, 142:24, 144:21, 145:1, 145:4, 147:21, 148:3, 154:11, 155:16, 157:18, 174:3, 174:22, 175:19, 175:21
**documentaries** [1] - 13:24
**documentary** [1] - 13:9
**documentation** [1] - 121:6
**documents** [31] - 14:24, 15:4, 15:21, 82:9, 82:12, 82:25, 83:3, 84:18, 84:20, 85:2, 87:4, 93:3, 93:6, 117:14, 119:22, 121:23, 122:14, 127:7, 129:5, 136:13, 142:1, 142:7, 142:21, 143:12, 143:23, 158:15, 166:22, 173:10, 190:6, 190:8, 191:10
**dollar** [1] - 23:24
**dome** [1] - 70:7
**dominated** [1] - 25:16
**done** [24] - 13:3, 14:11, 14:17, 25:23, 60:4, 61:24, 62:14, 80:23, 143:3, 150:19, 166:15, 188:22, 190:4, 231:8, 236:24, 240:19, 243:20, 253:3, 253:11, 254:1, 255:21, 255:23, 256:10, 257:17
**door** [2] - 121:24, 248:12
**dot** [4] - 67:22, 209:3
**dot-com** [1] - 67:22
**double** [1] - 109:16
**doubt** [10] - 131:8, 188:11, 207:19, 208:12, 223:20, 245:15, 252:25, 253:2, 253:10
**Douglas** [1] - 80:24
**dovetails** [1] - 219:12
**down** [26] - 6:5, 14:4, 32:20, 34:21, 52:21, 53:16, 55:17, 56:15, 85:14, 88:13, 106:19, 114:22, 122:1, 137:25, 142:15, 142:22, 149:9, 151:8, 151:9, 172:9, 183:13, 190:9, 200:10, 230:22, 239:14
**Down** [2] - 118:13,

121:15
**dozens** [1] - 74:6
**draft** [3] - 81:11, 165:19, 226:16
**drafted** [1] - 93:19
**drafting** [1] - 156:13
**drama** [1] - 140:25
**draw** [2] - 41:17, 171:7
**dress** [1] - 18:3
**drew** [1] - 248:3
**Drive** [2] - 142:14, 178:10
**drives** [2] - 114:23, 118:11
**driving** [1] - 66:7
**dropped** [1] - 154:2
**drug** [15] - 32:8, 36:6, 41:5, 41:6, 45:3, 57:23, 134:1, 228:8, 238:8, 238:9, 238:10, 238:21, 254:22, 257:7, 257:8
**Drug** [1] - 41:10
**drugs** [7] - 41:10, 41:11, 42:15, 43:9, 43:15, 227:10, 228:19
**Druid** [1] - 178:2
**dry** [1] - 58:4
**dual** [2] - 189:18, 224:18
**due** [2] - 146:20, 178:2
**duration** [1] - 211:4
**during** [49] - 10:15, 18:16, 56:22, 81:24, 82:2, 82:4, 84:13, 91:16, 101:11, 101:24, 102:12, 103:3, 103:23, 105:9, 109:10, 110:11, 110:17, 110:21, 112:18, 114:18, 137:5, 138:23, 140:13, 150:20, 152:17, 155:19, 157:13, 157:15, 160:4, 162:10, 169:10, 175:5, 179:22, 186:9, 188:22, 189:22, 209:20, 210:6, 212:8, 214:20, 229:6, 253:11, 254:1, 254:4, 254:25, 256:8, 256:10, 256:15
**During** [1] - 198:17
**duties** [4] - 119:10, 182:11, 182:13, 182:25
**Dwayne** [2] - 128:15, 205:16

---

**E**

**E-40** [1] - 49:18
**e-mail** [2] - 226:10, 260:14

**e-mailed** [1] - 134:23
**early** [12] - 21:1, 21:7, 29:17, 29:23, 31:2, 32:21, 36:16, 38:16, 135:20, 160:4, 185:5, 243:17
**earned** [2] - 161:3, 189:1
**earthly** [1] - 152:23
**easier** [1] - 13:16
**easy** [2] - 67:13, 67:18
**Eazy** [6] - 43:8, 43:11, 43:12, 43:14, 43:15, 43:18
**Eazy's** [1] - 43:11
**Eazy-E** [1] - 43:8
**ECU** [1] - 90:10
**editor** [1] - 16:25
**educate** [1] - 26:6
**Education** [5] - 106:23, 133:9, 139:2, 167:12, 167:15
**education** [3] - 108:19, 133:17, 175:2
**educed** [1] - 188:9
**effect** [4] - 70:16, 73:17, 194:24, 197:12
**effort** [5] - 26:1, 193:14, 193:25, 210:13, 226:3
**efforts** [1] - 209:7
**Ehrlich** [1] - 138:3
**eight** [4] - 86:16, 100:20, 185:13, 261:16
**Eight** [5] - 93:13, 93:14, 97:6, 97:7, 215:6
**eighth** [1] - 123:14
**either** [16] - 15:7, 15:17, 18:20, 22:21, 37:15, 69:23, 72:15, 107:7, 108:5, 112:7, 113:18, 130:24, 139:25, 164:11, 171:14
**EL** [1] - 125:14
**elect** [1] - 240:13
**element** [4] - 187:23, 224:11, 230:13, 230:16
**elementary** [2] - 129:10, 129:12
**Elementary** [1] - 129:13
**elements** [6] - 18:2, 195:18, 222:2, 222:25, 223:9, 229:24
**eleven** [1] - 185:13
**elicit** [2] - 25:11, 170:1
**eligible** [2] - 112:7, 112:8
**ELIZABETH** [2] - 126:17, 263:14
**Elizabeth** [2] - 126:15, 126:21

**Ellington** [1] - 80:24
**elsewhere** [2] - 61:20, 213:15
**Elsewhere** [1] - 62:5
**emails** [1] - 188:24
**embraced** [1] - 188:10
**emcee** [1] - 9:11
**emerge** [1] - 31:17
**emerged** [1] - 18:22
**emergency** [1] - 186:8
**emphasis** [1] - 68:13
**emphasize** [1] - 254:12
**employ** [3] - 105:15, 193:3, 196:13
**employed** [9] - 8:15, 107:5, 119:3, 119:4, 126:24, 139:1, 155:7, 157:18, 160:9
**employee** [7] - 130:17, 130:19, 134:7, 139:5, 157:10, 160:20, 161:1
**employees** [2] - 56:1, 173:12
**employer** [1] - 84:11
**employment** [9] - 49:10, 133:2, 133:4, 133:6, 138:9, 155:17, 155:23, 156:6, 159:2
**enamored** [1] - 218:18
**encounter** [1] - 247:14
**End** [1] - 117:11
**end** [19] - 35:16, 49:19, 69:22, 82:7, 84:9, 94:10, 129:21, 129:23, 134:6, 157:4, 157:25, 185:18, 213:16, 214:10, 221:13, 224:22, 236:6, 245:12
**ended** [10] - 28:3, 42:20, 42:22, 158:2, 215:17, 216:1, 217:13, 236:8, 236:17
**ends** [1] - 129:18
**Enemy** [4] - 33:2, 35:6, 49:18, 66:2
**Enemy's** [1] - 13:4
**energy** [1] - 36:20
**enforcement** [5] - 48:13, 48:23, 49:15, 49:17, 232:3
**engage** [1] - 20:17
**engaging** [1] - 248:10
**engineer** [1] - 80:9
**enjoy** [2] - 77:9, 186:1
**enrolled** [4] - 108:14, 109:1, 109:4, 112:19
**enrollment** [1] - 134:6
**enter** [1] - 32:18
**entered** [3] - 175:10, 203:9, 209:21
**enterprise** [45] - 32:5,

187:24, 187:25, 188:4, 219:22, 220:2, 220:5, 220:6, 220:9, 221:20, 222:3, 222:4, 222:7, 222:8, 222:14, 222:18, 222:19, 222:25, 223:3, 223:6, 223:9, 223:11, 223:14, 223:15, 223:16, 223:19, 223:22, 223:24, 224:8, 224:12, 224:14, 245:15, 246:5, 246:11, 246:13, 246:18, 246:20, 247:1, 247:10, 251:5, 252:6
**enterprises** [2] - 32:13, 246:10
**enters** [5] - 7:23, 28:8, 86:2, 105:3, 174:17
**entertainment** [3] - 5:15, 54:8, 54:14
**entire** [3] - 2:23, 63:14, 68:13
**entirely** [3] - 157:1, 185:2, 185:6
**entities** [1] - 246:21
**entitled** [12] - 6:11, 65:7, 215:2, 218:2, 225:4, 243:1, 243:9, 250:4, 250:15, 250:16, 252:8
**entity** [3] - 220:22, 220:24, 250:6
**entrepreneurs** [1] - 27:19
**environment** [1] - 30:25
**equally** [1] - 186:23
**era** [2] - 21:8, 23:22
**Ernest** [2] - 97:20, 201:8
**escape** [1] - 2:18
**escorted** [1] - 209:22
**especially** [1] - 38:12
**espousing** [1] - 70:21
**Esquire** [9] - 1:16, 1:16, 1:17, 1:18, 1:19, 1:19, 1:20, 1:21, 1:22
**Essentially** [1] - 167:25
**essentially** [14] - 26:5, 63:20, 66:13, 70:16, 77:16, 79:12, 80:25, 99:21, 150:16, 208:22, 209:24, 232:10, 237:7, 246:4
**establish** [6] - 215:19, 216:3, 217:4, 231:25, 252:4
**established** [2] - 253:10, 254:13
**establishes** [1] - 232:3
**esteem** [1] - 23:4

**et** [1] - 264:5
**etc** [19] - 21:18, 21:21, 21:22, 22:16, 30:10, 57:9, 121:9, 197:21, 228:19, 246:21, 249:8, 250:24
**Etc** [1] - 190:8
**ethos** [3] - 50:24, 51:15, 70:20
**evaluating** [3] - 222:2, 222:11, 223:8
**evening** [1] - 81:8, 140:17, 186:1
**event** [2] - 19:18, 76:24
**events** [2] - 178:19, 181:4
**eventually** [2] - 24:8, 43:20
**everlasting** [1] - 260:16
**Evidence** [1] - 90:12
**evidence** [94] - 6:4, 25:5, 25:11, 25:24, 27:25, 76:1, 76:13, 79:25, 81:9, 81:25, 82:6, 82:7, 85:9, 87:21, 91:16, 92:10, 92:21, 97:24, 98:25, 115:14, 118:1, 128:9, 134:12, 144:8, 144:10, 144:12, 145:2, 148:2, 149:5, 150:22, 150:25, 153:8, 154:3, 154:5, 157:17, 162:20, 162:23, 163:12, 163:22, 165:2, 165:10, 171:11, 171:14, 171:22, 173:9, 173:11, 173:17, 185:22, 188:3, 188:6, 188:9, 193:5, 196:15, 198:4, 198:12, 203:25, 207:3, 208:20, 208:23, 209:7, 214:4, 216:14, 218:9, 221:9, 222:2, 222:24, 223:8, 231:20, 232:8, 232:11, 232:12, 232:22, 232:24, 233:2, 236:8, 236:16, 244:20, 247:8, 247:15, 248:8, 248:9, 248:15, 248:24, 250:18, 251:3, 253:2, 253:4, 255:2, 255:25, 256:22, 257:4, 257:19
**evident** [1] - 205:2
**evidentiary** [1] - 183:17
**evolution** [2] - 29:16, 68:2
**evolve** [1] - 23:13
**evolves** [1] - 225:18
**evolving** [1] - 20:23
**ex** [1] - 167:24
**exact** [2] - 80:4, 139:12

**exactly** [16] - 22:19, 43:24, 105:17, 131:20, 152:11, 163:25, 189:22, 199:18, 219:19, 222:22, 235:18, 243:24, 246:3, 248:4, 252:19, 253:19
**EXAMINATION** [39] - 8:9, 16:10, 19:5, 40:19, 62:20, 71:17, 72:1, 86:12, 89:13, 106:16, 111:5, 118:24, 125:20, 126:22, 137:1, 176:25, 179:17, 181:8, 182:6, 182:19, 263:3, 263:4, 263:4, 263:5, 263:5, 263:6, 263:6, 263:8, 263:8, 263:11, 263:11, 263:13, 263:13, 263:15, 263:15, 263:17, 263:17, 263:18, 263:18
**examination** [11] - 75:25, 77:14, 78:13, 105:19, 144:21, 144:25, 146:18, 153:19, 158:23, 171:15, 173:10
**examinations** [1] - 145:4
**examine** [1] - 57:22
**example** [12] - 21:14, 22:2, 27:8, 34:19, 35:24, 41:17, 47:19, 49:2, 58:7, 60:11, 185:3, 239:19
**examples** [2] - 34:15, 34:18
**Excellent** [2] - 85:13, 101:9
**except** [3] - 209:3, 244:20, 257:4
**exception** [11] - 145:6, 145:7, 150:23, 200:13, 200:16, 203:22, 204:10, 208:25, 209:9, 212:21, 212:24
**Exceptions** [1] - 204:13
**excerpt** [3] - 97:22, 151:18, 201:21
**excerpted** [1] - 98:3
**excerpts** [1] - 219:18
**exchange** [4] - 19:16, 19:18, 60:10, 99:15
**exclude** [1] - 79:14
**excludes** [2] - 147:7
**exclusive** [1] - 188:2
**exculpatory** [2] - 208:22, 259:4, 259:18
**excuse** [5] - 81:8, 98:23, 166:11, 166:13, 186:10
**Excuse** [5] - 25:2, 140:13, 191:16, 191:21,

261:3
**excused** [16] - 76:14, 76:17, 77:11, 90:19, 99:3, 99:4, 126:4, 144:13, 165:12, 174:20, 186:12, 186:13, 187:3, 188:17, 189:2
**executive** [6] - 36:8, 36:9, 39:8, 39:9, 68:14, 79:3
**exemplified** [1] - 18:15
**exemption** [3] - 102:7, 102:22, 103:15
**exhausted** [2] - 258:1, 258:3
**Exhibit** [14] - 61:12, 87:14, 87:15, 94:21, 94:24, 95:11, 95:12, 95:17, 115:22, 119:2, 137:10, 143:17, 144:20, 249:1
**exhibit** [14] - 2:10, 6:17, 90:19, 91:16, 94:6, 94:14, 117:24, 119:1, 148:14, 168:16, 174:10, 198:18, 198:19, 201:15
**exhibits** [8] - 6:19, 7:4, 7:6, 85:8, 92:22, 98:19, 130:5, 198:20
**exist** [1] - 236:15
**existence** [3] - 72:13, 214:20, 245:16
**existing** [2] - 214:21, 214:23
**exists** [1] - 11:17
**exit** [1] - 188:19
**exits** [5] - 25:6, 76:16, 99:5, 144:15, 187:4
**expect** [10] - 2:25, 5:19, 25:11, 84:2, 144:9, 166:6, 166:11, 195:3, 203:17, 241:24
**expectation** [1] - 99:14
**expecting** [2] - 4:3, 83:19
**expects** [2] - 5:18, 99:24
**experience** [15] - 31:24, 49:1, 50:4, 57:10, 58:2, 58:14, 59:7, 61:24, 75:21, 76:6, 78:6, 78:22, 80:4, 80:14, 81:1
**experienced** [2] - 49:10, 51:2
**experiences** [1] - 78:24
**expert** [31] - 4:12, 5:19, 6:6, 6:11, 6:18, 7:3, 16:6, 16:16, 26:5, 26:25, 27:15, 28:5, 65:13, 75:14, 75:15, 75:17,

76:11, 77:2, 77:3, 77:6, 78:14, 78:17, 79:13, 79:18, 80:1, 80:5, 81:1, 81:2, 114:16
**expert's** [4] - 79:11, 147:2, 147:3
**expertise** [5] - 14:18, 49:14, 55:8, 67:5, 79:11
**explain** [6] - 15:4, 22:3, 61:2, 77:25, 152:8, 173:2
**explained** [1] - 45:12
**explains** [1] - 61:1
**explanation** [1] - 123:24
**explicit** [2] - 30:12, 34:6
**exploration** [1] - 5:16
**exposing** [1] - 12:15
**exposure** [2] - 13:10, 14:21
**expound** [1] - 59:15
**expressed** [1] - 69:6
**extend** [1] - 109:22
**extensive** [1] - 13:6
**extensively** [2] - 48:12, 48:23
**extent** [6] - 76:4, 92:12, 195:11, 248:14, 249:8, 256:12
**extra** [1] - 88:1
**extraordinary** [2] - 183:21, 188:16
**eyebrows** [1] - 15:14

# F

**fabrication** [1] - 259:15
**face** [1] - 210:1
**facility** [2] - 2:18, 132:17
**fact** [47] - 6:2, 6:12, 14:23, 41:6, 42:4, 44:25, 46:14, 52:15, 63:23, 65:6, 70:17, 73:18, 79:25, 95:12, 97:15, 110:10, 137:25, 147:1, 157:5, 157:12, 157:16, 162:7, 171:10, 188:11, 197:10, 200:13, 207:18, 216:10, 217:25, 218:3, 219:20, 220:20, 220:21, 220:24, 223:17, 236:4, 236:7, 236:13, 244:18, 245:14, 246:21, 252:8, 252:24, 253:12, 254:2, 254:5, 260:10
**factor** [1] - 37:12
**facts** [7] - 80:17, 102:3, 102:19, 103:11, 153:14, 222:11, 251:8
**factual** [7] - 146:7,

146:12, 146:14, 146:17, 147:3, 147:8, 217:20
**failure** [1] - 207:21
**fair** [19] - 42:8, 43:10, 45:4, 47:1, 47:21, 48:22, 51:12, 51:15, 55:5, 56:17, 63:5, 197:22, 199:8, 218:7, 218:15, 222:24, 229:15, 236:21, 253:6
**fairly** [2] - 47:19, 205:3
**faith** [1] - 244:11
**fake** [5] - 57:2, 57:3, 57:18, 58:6, 73:3
**fall** [2] - 110:11, 110:12
**falls** [1] - 252:15
**False** [1] - 259:18
**false** [10] - 200:22, 208:22, 231:13, 234:1, 234:9, 234:11, 259:4, 259:6, 259:10, 259:11
**falsely** [3] - 203:14, 203:21, 204:8
**falsify** [1] - 203:6
**familiar** [13] - 29:6, 30:25, 39:6, 64:5, 64:8, 64:13, 65:6, 65:13, 67:10, 70:14, 71:1, 86:24, 122:20
**family** [5] - 15:11, 17:16, 54:24, 151:23, 186:8
**fancy** [1] - 56:11
**far** [11] - 27:6, 27:23, 28:18, 53:5, 72:12, 99:1, 155:25, 178:4, 252:11, 260:7, 260:10
**fashion** [1] - 66:25
**fashions** [1] - 64:18
**fast** [1] - 261:21
**father** [2] - 4:4, 17:5
**Father** [1] - 17:2
**fault** [3] - 3:21, 27:13, 197:4
**favor** [2] - 214:1, 242:20
**favorable** [3] - 203:13, 214:24, 241:3
**favorably** [1] - 150:24
**favorite** [1] - 154:18
**FBI** [1] - 144:21
**FCC** [2] - 14:5, 14:6
**fear** [18] - 50:20, 50:23, 50:25, 51:1, 51:2, 51:11, 53:13, 53:20, 54:21, 59:10, 59:13, 59:20, 59:21, 60:14, 60:21, 60:23, 61:6
**feature** [1] - 18:2
**featured** [2] - 13:23, 17:8, 37:16

**features** [1] - 17:3
**February** [4] - 86:18, 87:7, 123:16, 142:12
**federal** [9] - 44:14, 77:2, 106:19, 151:6, 195:14, 206:1, 225:7, 225:15, 244:2
**Federal** [1] - 14:7
**feelings** [3] - 241:21, 242:2, 242:14
**fees** [7] - 120:24, 121:2, 121:8, 121:9, 121:14
**felony** [4] - 226:22, 230:11, 230:17, 258:23
**felt** [5] - 35:7, 49:24, 50:12, 197:13
**feud** [2] - 42:19, 42:21
**few** [19] - 2:15, 4:10, 16:14, 37:24, 51:10, 53:13, 53:22, 57:5, 83:9, 93:3, 93:6, 93:7, 138:3, 170:8, 174:19, 201:9, 209:13, 209:22, 228:5
**fi** [1] - 42:10
**fiction** [5] - 42:9, 44:1, 44:3, 44:16, 55:12
**fictional** [2] - 47:13, 70:24
**field** [5] - 18:16, 77:7, 80:1, 80:2, 80:6
**Fifteen** [1] - 166:15
**fifth** [3] - 73:3, 73:10, 73:20
**fifths** [1] - 6:22
**fight** [2] - 56:22, 156:24
**figure** [4] - 41:18, 54:4, 82:5, 122:16
**figured** [2] - 157:7, 192:18
**figures** [2] - 17:16, 42:22
**file** [3] - 167:23, 221:11, 221:12
**File** [2] - 168:8, 168:16
**filed** [7] - 148:4, 150:11, 150:22, 151:1, 168:5, 168:15, 168:17
**filled** [1] - 133:13
**filling** [1] - 133:15
**fills** [1] - 121:13
**final** [6] - 69:4, 80:18, 141:3, 166:5, 184:16, 188:23
**finalize** [2] - 166:5, 236:23
**Finally** [1] - 96:1
**finally** [5] - 7:11, 210:5, 214:14, 230:23, 253:15
**financial** [1] - 252:3
**finder** [1] - 188:11

**findings** [3] - 146:8, 146:14, 147:8
**Fine** [1] - 207:9
**fine** [12] - 57:16, 99:19, 100:21, 106:9, 116:12, 162:20, 164:13, 165:15, 168:1, 168:13, 199:1, 241:10
**fingerprint** [1] - 95:17
**fingerprints** [3] - 59:3, 75:5, 95:19
**finish** [2] - 60:16, 81:7
**finishing** [1] - 2:4
**firearms** [2] - 44:14, 244:2
**fired** [1] - 173:12
**firm** [2] - 127:2, 137:23
**First** [7] - 3:13, 43:11, 112:5, 130:8, 146:23, 156:23, 177:8
**first** [61] - 2:17, 8:14, 10:2, 10:18, 10:21, 11:22, 12:13, 12:14, 14:23, 16:19, 17:8, 21:9, 24:8, 42:4, 46:3, 73:24, 78:16, 78:17, 82:10, 88:13, 93:12, 96:10, 97:5, 97:11, 98:11, 109:24, 109:25, 117:15, 117:17, 119:3, 119:23, 120:13, 123:14, 125:13, 127:7, 129:12, 135:7, 137:9, 137:16, 138:2, 138:6, 138:7, 138:15, 142:11, 142:12, 148:2, 151:6, 158:10, 166:25, 167:7, 172:4, 172:14, 200:20, 201:3, 207:16, 213:15, 214:12, 214:19, 239:17, 242:13, 245:12
**fist** [1] - 209:25
**fit** [1] - 33:3
**fits** [2] - 79:25, 249:25
**fitting** [1] - 40:15
**Five** [3] - 119:7, 253:15, 253:16
**five** [12] - 3:5, 58:10, 82:14, 109:19, 125:6, 142:24, 200:10, 210:4, 261:9, 261:14, 261:15, 261:16
**fix** [2] - 191:17, 195:7
**fixed** [2] - 230:5, 230:7
**flag** [1] - 117:19
**FLANNERY** [66] - 2:11, 3:11, 3:13, 3:16, 3:25, 4:3, 4:20, 6:7, 6:16, 6:25, 7:4, 7:8, 62:21, 65:12, 65:15, 80:20, 84:17, 84:19, 93:9,

93:13, 93:15, 93:22, 94:7, 141:13, 141:15, 141:25, 142:4, 142:8, 142:11, 142:25, 143:7, 143:9, 143:13, 144:3, 192:4, 198:23, 215:9, 215:13, 216:9, 216:19, 217:6, 218:25, 219:4, 220:19, 224:2, 233:5, 233:8, 235:22, 235:25, 236:12, 238:3, 238:6, 238:18, 238:21, 238:24, 239:1, 239:6, 239:22, 239:25, 240:3, 245:10, 245:12, 246:2, 249:15, 249:22, 263:5

**Flannery** [29] - 1:19, 2:6, 2:24, 3:23, 4:9, 4:19, 5:13, 77:16, 80:18, 84:15, 93:8, 141:11, 142:3, 144:1, 171:13, 176:7, 178:8, 189:8, 192:5, 212:3, 215:12, 217:10, 217:14, 231:1, 235:21, 237:6, 237:16, 245:9, 249:14

**Flannery's** [3] - 219:25, 242:25, 243:6

**Flash** [1] - 21:13

**flashed** [1] - 2:14

**flies** [1] - 238:2

**flip** [1] - 100:15

**flippant** [1] - 79:16

**floating** [1] - 51:6

**flying** [1] - 3:22

**focus** [3] - 16:15, 27:11, 224:11

**focused** [5] - 11:7, 11:12, 21:11, 23:17, 254:7

**focuses** [4] - 8:17, 8:19, 10:16, 17:12

**focusing** [1] - 69:12

**folks** [4] - 34:3, 60:10, 164:25, 243:20

**follow** [6] - 52:22, 69:3, 142:22, 143:17, 144:18, 185:23

**following** [10] - 93:24, 102:3, 161:18, 167:9, 175:14, 193:7, 193:10, 194:10, 255:9

**follows** [3] - 190:7, 193:1, 215:24

**foot** [4] - 86:21, 86:22, 87:25, 149:9

**football** [17] - 106:24, 107:8, 107:9, 107:16, 108:19, 108:21, 109:5, 109:7, 109:11, 109:21,

110:3, 110:6, 110:21, 111:14, 112:14, 113:10

**foothold** [1] - 26:6

**footnote** [1] - 216:13

**FOR** [1] - 1:2

**force** [2] - 46:5, 50:14

**forceful** [1] - 30:5

**forefront** [1] - 28:24

**forego** [1] - 181:7

**foregoing** [1] - 264:7

**foreign** [1] - 31:13

**foreseeability** [3] - 228:10, 228:19, 235:13

**foreseen** [1] - 247:13

**Forever** [1] - 117:18

**forever** [1] - 260:18

**forfeited** [1] - 221:9

**forget** [4] - 94:8, 199:17, 199:19, 199:20

**Forget** [1] - 256:5

**forgive** [2] - 45:1, 46:18

**forgot** [5] - 4:10, 154:11, 154:13, 170:10, 231:11

**forgotten** [1] - 260:25

**form** [20] - 13:15, 25:11, 31:10, 87:20, 123:5, 123:12, 131:3, 132:7, 132:20, 133:12, 133:14, 133:15, 134:6, 146:4, 171:15, 173:1, 225:22, 229:11, 234:20, 235:4

**formal** [6] - 8:11, 30:24, 129:22, 129:23, 260:5

**formally** [2] - 167:23, 168:5

**format** [2] - 85:7, 168:1

**formed** [2] - 11:17, 78:24

**former** [3] - 36:6, 47:13, 243:4

**forming** [1] - 78:20

**forms** [2] - 9:13, 89:2

**formula** [2] - 38:12, 40:15

**formulate** [1] - 60:6

**formulation** [1] - 194:5

**forth** [4] - 68:21, 84:6, 146:6, 187:7

**forthwith** [1] - 81:25

**Fortunately** [1] - 210:2

**forward** [2] - 81:13, 180:24

**fought** [1] - 225:19

**foundation** [1] - 136:19

**Four** [2] - 252:15, 256:3

**four** [16] - 6:22, 27:13, 69:12, 69:15, 73:3, 73:10, 73:20, 110:15, 118:10, 120:14, 121:24,

142:5, 156:25, 157:1, 172:10, 210:4

**four-fifth** [1] - 73:3, 73:10, 73:20

**four-fifths** [1] - 6:22

**fourth** [3] - 69:16, 230:13, 230:16

**Fourth** [5] - 207:18, 216:12, 218:19, 218:21, 250:16

**Fox** [3] - 118:13, 136:4, 136:5

**fracas** [1] - 210:1

**fragment** [1] - 201:9

**Francisco** [5] - 11:23, 11:25, 12:1, 22:22, 22:23

**FRANK** [2] - 118:18, 263:12

**Frank** [1] - 118:21

**frankly** [9] - 5:19, 76:24, 77:15, 78:7, 78:10, 188:25, 218:16, 218:17, 248:8

**free** [7] - 13:21, 19:17, 75:23, 154:7, 186:17, 197:20, 242:19

**Free** [1] - 22:23

**freedom** [2] - 203:6, 203:12

**frequently** [3] - 36:25, 56:2, 243:18

**Friday** [3] - 185:3, 185:7, 185:8

**friend** [5] - 63:13, 66:18, 66:22, 66:25, 74:1

**friends** [4] - 15:1, 32:19, 54:24, 112:14

**front** [6] - 2:15, 14:5, 135:3, 137:10, 156:8, 167:1, 167:4, 170:25, 239:7, 240:16

**fucks** [1] - 73:19

**fuel** [1] - 42:5

**fueled** [1] - 121:25

**fulfill** [1] - 110:2

**full** [9] - 23:22, 130:25, 132:1, 190:5, 192:8, 193:1, 200:20, 208:10, 214:12

**Full** [1] - 8:8

**full-time** [1] - 132:1

**fully** [1] - 97:24

**fun** [2] - 21:18, 107:4

**function** [1] - 79:9

**fundamentally** [1] - 240:25

**funeral** [2] - 116:6, 117:16

**funny** [2] - 45:2, 58:8

**furnace** [2] - 73:7,

73:11

**furtherance** [21] - 195:13, 214:17, 214:21, 247:16, 252:18, 253:3, 253:12, 254:3, 254:5, 254:14, 254:25, 255:13, 255:24, 256:10, 256:11, 256:21, 256:23, 257:1, 257:2, 257:6, 257:17

**future** [1] - 75:16

# G

**game** [6] - 35:2, 43:15, 44:4, 44:8, 109:23, 109:25

**Game** [1] - 68:16

**gang** [6] - 43:14, 43:16, 43:22, 44:6, 44:8, 49:18

**Gang** [2] - 18:23, 21:9

**gangs** [1] - 44:7

**gangsta** [9] - 24:8, 25:14, 26:11, 26:14, 26:22, 27:19, 33:8, 49:17, 49:19

**gangster** [3] - 45:23, 46:12, 46:25

**gap** [1] - 230:20

**Garden** [1] - 111:16

**GARDNER** [2] - 1:8, 103:8

**Gardner** [38] - 1:21, 97:12, 97:16, 97:17, 97:18, 97:19, 98:4, 98:5, 98:14, 98:15, 103:2, 103:18, 139:20, 140:5, 148:3, 148:8, 149:20, 151:11, 153:22, 153:25, 176:14, 184:15, 188:1, 188:4, 195:4, 212:5, 225:23, 232:7, 250:3, 250:24, 251:3, 251:4, 251:22, 251:24, 252:4, 252:8, 255:7, 256:3

**Gardner's** [7] - 148:2, 149:22, 187:22, 250:7, 251:21, 253:15, 253:16

**gas** [1] - 121:25

**gasoline** [1] - 121:25

**gate** [1] - 132:15

**gathered** [1] - 4:24

**gathering** [2] - 20:11, 91:11

**gauntlet** [1] - 66:1

**GED** [3] - 112:8, 112:11, 133:16

**GED's** [1] - 131:16

**General** [2] - 47:21, 80:8

**general** [6] - 18:4, 40:9, 63:6, 74:1, 80:8, 187:24

**General's** [1] - 156:25

**general's** [1] - 48:24

**generally** [2] - 63:7, 71:9

**generals** [1] - 65:21

**generate** [1] - 69:24

**generated** [2] - 232:24, 243:17

**generation** [3] - 17:4, 17:14, 20:5

**generosity** [1] - 79:15

**generous** [1] - 79:17

**genre** [4] - 23:11, 26:12, 26:15, 45:4

**genres** [1] - 24:3

**gentleman's** [1] - 104:9

**gentlemen** [20] - 7:24, 20:14, 25:2, 28:9, 66:16, 75:12, 86:3, 98:20, 103:19, 105:12, 115:22, 144:7, 174:19, 183:16, 186:20, 187:3, 205:12, 239:12, 240:10, 260:16

**genuine** [1] - 26:1

**geographic** [1] - 177:5

**George** [3] - 104:10, 105:22, 106:14

**GEORGE** [2] - 106:10, 263:10

**Gerard** [1] - 1:19

**germane** [1] - 251:25

**Ghetto** [1] - 30:1

**ghettos** [1] - 21:12

**girlfriend** [2] - 72:17, 75:6

**girlfriend's** [1] - 118:10

**given** [14] - 14:1, 18:23, 20:22, 36:9, 76:25, 120:11, 152:17, 174:4, 185:1, 212:1, 225:3, 237:2, 241:8, 247:2, 248:8, 255:21

**glad** [1] - 188:24

**Glad** [1] - 233:22

**glance** [1] - 83:5

**glorification** [1] - 44:21

**glorifications** [1] - 12:11

**glorifying** [1] - 45:15

**goals** [1] - 195:13

**Godfather** [1] - 54:4

**godfather** [2] - 31:16, 32:7

**Goo** [1] - 151:24

**goods** [1] - 19:16

**government** [87] - 2:7, 4:16, 4:23, 5:1, 5:2, 5:11, 6:13, 77:12, 79:14,

84:19, 84:24, 89:18, 93:5, 93:9, 93:17, 94:14, 96:8, 97:13, 98:2, 115:9, 116:18, 116:25, 130:4, 136:13, 141:11, 141:16, 145:2, 145:3, 146:7, 148:5, 148:6, 148:11, 150:3, 150:4, 150:16, 150:17, 164:13, 170:21, 175:8, 175:11, 176:17, 180:4, 180:6, 180:10, 180:11, 180:19, 180:22, 184:2, 184:17, 188:9, 191:4, 191:18, 192:11, 193:2, 193:8, 195:5, 195:18, 196:11, 203:18, 203:25, 208:10, 209:6, 213:7, 215:6, 222:3, 222:6, 222:13, 223:19, 226:2, 231:20, 232:3, 234:1, 234:8, 235:8, 239:3, 241:15, 242:7, 243:18, 243:20, 244:10, 244:17, 244:22, 244:25, 245:14, 248:1, 248:5, 254:2
**Government** [2] - 1:15, 115:22
**government's** [23] - 2:9, 2:10, 17:20, 17:20, 101:13, 150:1, 162:22, 165:1, 173:1, 190:17, 193:12, 193:23, 204:3, 204:23, 208:11, 208:14, 217:22, 218:1, 230:3, 237:14, 254:14, 254:16, 254:23, 257:13
**Government's** [4] - 61:12, 117:15, 117:25, 258:20
**GOVERNMENT'S** [2] - 86:6, 176:22
**Governor** [1] - 138:3
**grade** [2] - 129:15, 175:5
**grade-wise** [1] - 175:5
**graduate** [1] - 10:12
**graduated** [3] - 108:15, 112:5, 133:19
**grand** [19] - 85:3, 85:4, 91:14, 91:15, 91:18, 97:21, 98:11, 152:11, 201:4, 201:20, 201:21, 202:1, 206:10, 206:12, 206:18, 208:3, 208:6, 209:11, 209:14
**Grandmaster** [1] - 21:13
**grant** [1] - 236:22
**granted** [2] - 146:9

**gravitating** [1] - 23:19
**Great** [5] - 84:22, 85:1, 86:1, 94:12, 141:14
**great** [3] - 80:14, 164:3, 203:23
**GREEN** [1] - 263:9
**Green** [8] - 82:15, 82:16, 91:10, 94:9, 163:6, 163:17, 163:21, 201:20
**Green's** [1] - 91:21
**Gregory** [2] - 169:12, 178:19
**grimy** [1] - 34:10
**griots** [1] - 18:15
**gritty** [5] - 24:9, 24:15, 30:5, 30:12, 34:10
**ground** [1] - 89:25
**grounds** [1] - 82:9
**group** [7] - 33:3, 37:2, 37:20, 49:23, 95:20, 101:4
**grouped** [1] - 149:11
**groups** [14] - 12:13, 21:14, 23:3, 29:25, 30:2, 33:2, 33:5, 33:7, 33:9, 33:22, 49:11, 49:16, 49:20, 71:2
**guarantee** [1] - 204:24
**guarantees** [1] - 151:4
**Guardian** [2] - 11:23, 11:25
**guess** [17] - 9:19, 26:10, 89:6, 104:22, 107:1, 117:8, 131:13, 131:25, 132:14, 160:4, 161:21, 181:6, 195:23, 224:19, 236:24, 243:3, 250:12
**Guide** [7] - 134:18, 134:21, 135:3, 135:6, 135:14, 140:12, 233:21
**guided** [1] - 92:15
**guilt** [10] - 188:12, 203:3, 208:11, 249:7, 259:3, 259:6, 259:7, 259:12, 259:13, 259:14
**guilty** [5] - 148:5, 195:4, 195:21, 229:16
**gun** [5] - 40:8, 44:18, 53:8, 53:9, 77:10
**Gunshot** [1] - 128:7
**guy** [6] - 35:1, 36:5, 169:12, 177:9, 257:7, 257:8
**guys** [5] - 32:1, 111:13, 244:16, 257:10, 260:17

# H

**H-U-B-B-A-R-D** [1] - 118:23
**half** [5] - 118:10, 140:24, 141:4, 250:7, 253:23
**halfway** [1] - 179:8
**hall** [1] - 110:15
**Hammerjacks** [6] - 86:25, 87:25, 89:24, 90:5, 90:15
**hand** [10] - 90:19, 94:7, 96:5, 98:18, 100:11, 106:1, 119:1, 120:25, 133:21, 143:18
**handgun** [5] - 72:7, 72:10, 73:4, 73:7, 73:10
**handgun's** [1] - 73:11
**handle** [1] - 163:12
**handled** [2] - 101:11, 229:13
**hands** [5] - 39:1, 125:5, 185:2
**HANLON** [31] - 3:18, 3:21, 4:7, 4:9, 16:8, 16:11, 17:19, 24:20, 29:21, 31:22, 40:20, 62:18, 63:16, 65:10, 72:2, 99:13, 99:19, 100:4, 100:6, 100:10, 100:14, 100:21, 165:9, 165:11, 165:16, 165:20, 165:22, 165:24, 263:4, 263:5, 263:6
**Hanlon** [15] - 1:16, 2:22, 4:8, 62:24, 69:25, 70:3, 89:18, 99:12, 163:16, 165:10, 165:15, 184:1, 235:9, 247:21, 248:2
**Hanlon's** [1] - 249:4
**happy** [7] - 52:17, 156:7, 234:2, 235:2, 235:7, 260:20, 261:7
**hard** [5] - 25:7, 80:23, 191:25, 225:19, 261:21
**hard-pressed** [1] - 80:23
**harder** [1] - 19:20
**Harding** [67] - 1:16, 2:12, 3:21, 81:21, 83:4, 85:10, 89:17, 92:4, 111:9, 114:9, 116:13, 125:22, 126:8, 143:11, 143:13, 145:23, 149:9, 155:1, 155:18, 155:20, 155:21, 156:4, 157:5, 157:12, 157:21, 158:13, 158:23, 160:18, 162:3,

162:12, 162:20, 165:18, 165:24, 166:20, 169:7, 173:10, 173:17, 176:16, 180:16, 182:5, 184:16, 184:20, 196:9, 197:4, 197:19, 198:2, 200:4, 202:5, 204:24, 209:17, 218:6, 225:7, 226:9, 228:7, 231:17, 233:13, 233:15, 236:25, 238:7, 243:14, 248:1, 257:4, 257:15, 258:1, 258:2, 258:15
**HARDING** [141] - 2:13, 3:9, 3:15, 81:20, 81:22, 85:11, 89:14, 92:5, 96:2, 107:18, 111:6, 115:16, 115:20, 116:14, 116:20, 116:23, 125:21, 136:17, 136:24, 137:2, 141:23, 143:20, 145:22, 148:16, 148:23, 148:25, 149:11, 150:5, 150:8, 156:9, 158:15, 158:21, 163:16, 164:15, 166:1, 166:8, 166:10, 166:21, 167:10, 169:6, 169:8, 169:15, 169:20, 170:4, 170:13, 170:19, 171:25, 176:18, 176:20, 177:1, 181:15, 181:19, 181:23, 182:7, 182:14, 183:10, 183:15, 191:12, 196:7, 196:10, 197:1, 197:6, 197:8, 198:16, 199:1, 199:6, 200:5, 201:3, 201:8, 202:3, 202:6, 202:8, 202:13, 209:18, 213:8, 213:23, 214:3, 217:5, 217:8, 218:19, 220:13, 221:1, 221:4, 221:7, 221:10, 222:15, 224:15, 224:20, 225:10, 225:13, 226:14, 226:17, 226:23, 227:3, 227:5, 227:8, 227:13, 227:18, 227:20, 227:23, 228:1, 228:4, 228:11, 228:14, 228:16, 228:23, 230:10, 230:16, 231:15, 233:14, 233:17, 233:20, 235:12, 236:10, 237:1, 237:4, 237:11, 238:12, 242:14, 242:16, 242:22, 243:15, 247:16, 247:19, 254:18, 258:12, 258:16, 258:20, 258:24, 259:3, 259:8, 259:13, 259:18, 259:20, 259:25, 263:8, 263:11, 263:13, 263:15, 263:17, 263:18
**Harding's** [4] - 152:15,

162:1, 165:23, 199:18
**harm** [1] - 2:8
**harmless** [2] - 3:4, 49:16
**HARRIS** [2] - 1:7, 102:1
**Harris** [35] - 1:18, 93:13, 93:14, 101:20, 102:10, 141:15, 141:16, 143:9, 143:10, 169:17, 169:24, 171:16, 172:11, 173:5, 173:20, 176:8, 178:23, 183:8, 184:9, 191:20, 209:23, 210:5, 210:10, 210:22, 211:3, 232:15, 237:21, 238:15, 247:12, 247:13, 247:23, 248:5, 248:7, 248:13
**Harris's** [3] - 191:13, 191:21, 247:7
**harsh** [3] - 29:1, 51:6, 51:8
**Harvard** [1] - 14:4
**hat** [1] - 88:20
**hate** [3] - 99:9, 225:19, 230:6
**Hayes** [15] - 169:16, 169:17, 171:16, 172:4, 172:9, 172:16, 173:6, 178:20, 178:24, 180:20, 201:7, 201:11, 201:20, 206:17, 247:14
**Hayes's** [2] - 201:5, 202:1
**head** [11] - 7:17, 32:4, 32:6, 32:13, 53:21, 70:5, 70:7, 72:17, 107:9, 128:7, 139:25
**headings** [1] - 229:25
**health** [1] - 4:4
**heap** [2] - 36:7
**hear** [45] - 19:14, 28:6, 29:12, 35:15, 40:8, 53:22, 54:11, 55:2, 57:10, 70:7, 71:19, 83:23, 91:21, 92:13, 92:15, 96:3, 104:15, 104:25, 105:1, 108:1, 108:3, 146:23, 155:21, 163:24, 164:8, 173:4, 225:4, 231:22, 233:22, 236:23, 237:17, 238:1, 238:4, 240:5, 240:7, 242:7, 245:2, 245:24, 246:19, 249:18, 249:19, 249:20, 249:22, 260:12
**heard** [27] - 8:16, 24:14, 29:7, 32:4, 38:6, 39:21, 45:23, 47:14, 51:18, 65:16, 65:20, 80:23, 99:1, 136:5, 145:14,

145:18, 153:2, 178:5,
184:20, 190:12, 190:13,
197:16, 197:21, 209:1,
209:17, 210:9, 226:7
  **hearing** [2] - 37:13,
73:25
  **hearings** [1] - 5:12
  **hearsay** [2] - 78:8,
145:6
  **heart** [3] - 202:23,
203:15, 203:18
  **heart's** [1] - 164:6
  **Heights** [10] - 177:23,
177:25, 178:15, 178:16,
219:17, 219:23, 220:20,
246:19, 257:14
  **Hello** [1] - 89:16
  **help** [8] - 7:4, 12:14,
39:23, 114:8, 165:4,
218:5, 235:16, 245:3
  **helped** [1] - 145:24
  **helpful** [6] - 26:24,
27:2, 27:6, 28:4, 75:25,
253:13
  **helping** [1] - 203:6
  **helps** [1] - 217:24
  **helter** [3] - 149:1, 149:4,
149:6
  **hereby** [1] - 264:3
  **hereunto** [1] - 264:10
  **hero** [1] - 11:12
  **heroin** [4] - 227:13,
227:16, 228:22
  **hesitate** [2] - 107:24,
190:1
  **Hickey** [29] - 130:10,
130:24, 131:8, 131:14,
132:21, 132:24, 133:16,
137:16, 138:9, 140:10,
140:11, 155:5, 155:11,
155:18, 155:23, 155:25,
156:21, 157:16, 157:22,
160:3, 160:5, 160:16,
161:13, 161:20, 167:5,
175:13, 175:15, 239:16,
239:17
  **high** [4] - 23:4, 108:15,
112:5, 112:8
  **High** [1] - 129:16
  **higher** [1] - 49:25
  **highlighted** [3] -
142:23, 143:1, 143:3
  **highlighting** [1] - 38:11
  **highway** [1] - 111:21
  **Hill** [2] - 132:25, 178:2
  **himself** [4] - 27:14,
32:12, 80:10, 156:7
  **hip** [45] - 8:17, 8:19,
8:21, 9:9, 10:17, 10:18,
11:7, 11:10, 11:12,

11:20, 12:17, 12:21,
16:6, 16:17, 17:4, 17:7,
17:12, 17:14, 17:16,
17:24, 18:1, 18:6, 18:8,
18:10, 18:25, 20:2, 20:5,
20:15, 20:23, 21:8,
21:20, 22:9, 22:25,
23:17, 40:24, 42:10,
42:14, 44:23, 45:1,
48:12, 48:14, 48:25,
62:16, 70:19, 71:19
  **Hip** [3] - 8:22, 11:13,
11:14
  **hip-hop** [45] - 8:17,
8:19, 8:21, 9:9, 10:17,
10:18, 11:7, 11:10,
11:12, 11:20, 12:17,
12:21, 16:6, 16:17, 17:4,
17:7, 17:12, 17:14,
17:16, 17:24, 18:1, 18:6,
18:8, 18:10, 18:25, 20:2,
20:5, 20:15, 20:23, 21:8,
21:20, 22:9, 22:25,
23:17, 40:24, 42:10,
42:14, 44:23, 45:1,
48:12, 48:14, 48:25,
62:16, 70:19, 71:19
  **Hip-Hop** [3] - 8:22,
11:13, 11:14
  **hiring** [1] - 131:2
  **historical** [2] - 43:13,
125:10
  **history** [4] - 12:6,
46:10, 62:15, 131:24
  **hit** [3] - 29:15, 53:21,
72:14
  **hold** [5] - 23:3, 24:11,
30:6, 104:19, 240:15
  **Hold** [1] - 107:20
  **holder** [1] - 120:1
  **hollers** [1] - 18:16
  **home** [8] - 91:12,
113:13, 164:16, 164:17,
231:21, 231:23, 233:2,
233:8
  **homey** [2] - 66:18,
66:22
  **homicide** [5] - 54:10,
54:19, 55:3, 93:25,
231:19
  **homily** [1] - 245:21
  **honest** [2] - 79:16,
197:11
  **honestly** [2] - 147:10,
222:17
  **Honor** [264] - 2:5, 3:17,
3:18, 3:25, 4:7, 4:17,
4:20, 6:7, 6:16, 6:25,
7:8, 7:18, 8:1, 16:5,
16:8, 17:19, 24:18,

24:20, 25:13, 28:12,
29:21, 31:22, 34:14,
39:19, 40:18, 50:21,
55:7, 57:14, 62:19,
63:16, 65:10, 65:12,
72:3, 79:23, 80:21,
81:19, 81:22, 82:13,
83:2, 83:8, 83:15, 84:17,
84:23, 89:12, 90:17,
90:23, 91:2, 91:25,
92:18, 92:25, 93:9, 94:5,
94:8, 94:20, 94:21, 95:4,
95:6, 95:9, 95:16, 95:24,
96:1, 96:2, 96:7, 97:9,
97:11, 99:13, 100:4,
100:21, 101:2, 104:10,
104:15, 105:4, 105:21,
107:19, 111:2, 113:24,
114:9, 117:1, 117:13,
119:2, 125:18, 126:7,
128:9, 130:2, 134:12,
136:8, 136:11, 136:17,
140:3, 141:6, 141:9,
141:13, 143:7, 143:15,
143:20, 143:25, 144:17,
144:20, 145:9, 145:23,
146:14, 147:4, 147:13,
147:16, 147:19, 148:1,
148:17, 148:20, 150:10,
151:12, 152:8, 152:12,
154:6, 154:10, 154:20,
156:23, 158:16, 160:17,
161:8, 162:5, 164:19,
165:12, 166:3, 166:8,
169:6, 170:16, 170:22,
171:8, 171:20, 172:7,
172:19, 173:8, 173:15,
173:25, 174:3, 174:7,
174:22, 174:25, 175:7,
175:18, 176:3, 176:6,
176:9, 176:12, 176:15,
176:18, 176:20, 179:16,
181:5, 181:24, 182:4,
182:16, 183:12, 183:15,
187:6, 187:11, 187:12,
187:13, 187:16, 187:21,
189:2, 189:7, 189:16,
190:12, 190:15, 191:12,
191:23, 192:6, 192:24,
193:21, 194:7, 194:8,
194:18, 195:6, 196:24,
197:6, 198:17, 198:18,
198:20, 199:2, 199:13,
200:18, 200:25, 201:18,
202:10, 202:19, 204:11,
204:21, 205:5, 206:7,
206:11, 206:14, 206:17,
206:24, 207:15, 207:24,
208:5, 208:17, 208:19,
209:1, 209:18, 211:16,
211:25, 212:4, 213:8,

213:10, 213:14, 214:1,
214:4, 214:5, 214:9,
215:9, 216:9, 217:7,
217:11, 218:20, 219:4,
219:11, 220:14, 220:19,
221:18, 222:9, 222:21,
224:2, 224:9, 224:15,
224:23, 225:14, 225:17,
226:6, 226:14, 228:12,
229:2, 229:18, 230:10,
231:16, 231:18, 232:7,
233:5, 233:11, 233:24,
235:12, 235:19, 235:22,
236:4, 236:10, 236:18,
238:12, 240:15, 241:10,
242:10, 244:9, 246:2,
246:24, 252:15, 253:18,
256:24, 257:25, 258:7,
258:12, 260:2
  **honor** [2] - 151:24,
260:18
  **Honor's** [1] - 226:18
  **Honorable** [1] - 1:13
  **hood** [11] - 21:12, 22:7,
28:21, 34:1, 34:2, 34:3,
34:4, 34:9, 34:10, 46:3
  **hook** [1] - 261:10
  **hooked** [2] - 101:3,
114:7
  **hop** [46] - 8:17, 8:19,
8:21, 9:9, 10:17, 10:18,
11:7, 11:10, 11:12,
11:20, 12:17, 12:21,
16:6, 16:17, 17:4, 17:7,
17:12, 17:14, 17:16,
17:24, 18:1, 18:6, 18:8,
18:10, 18:25, 20:2, 20:5,
20:15, 20:23, 21:8,
21:20, 22:9, 22:25,
23:17, 40:24, 42:10,
42:14, 44:23, 45:1,
48:12, 48:14, 48:25,
62:16, 70:19, 71:19,
111:21
  **Hop** [3] - 8:22, 11:13,
11:14
  **hope** [11] - 2:7, 42:12,
76:21, 77:8, 79:4, 94:11,
100:1, 153:21, 185:19,
240:16, 242:12
  **hopefully** [4] - 83:5,
184:22, 235:18, 245:5
  **hoping** [3] - 93:4, 93:6,
189:17
  **hospital** [3] - 88:24,
88:25, 89:1
  **hot** [3] - 37:1, 37:2
  **hotel** [1] - 221:18
  **Houdini** [2] - 21:15
  **hour** [14] - 82:7, 98:22,

99:22, 131:25, 140:24,
184:6, 184:10, 184:11,
184:16, 261:5, 261:9,
261:13, 261:19
  **hourly** [1] - 131:24
  **hours** [5] - 2:25, 79:17,
90:8, 90:14, 184:3
  **house** [5] - 73:8, 179:8,
190:19, 190:20, 231:24
  **House** [3] - 102:8,
102:22, 103:15
  **Hub** [1] - 123:10
  **HUBBARD** [2] - 118:18,
263:12
  **Hubbard** [5] - 118:21,
119:1, 125:22, 126:3,
175:22
  **huge** [2] - 156:24,
204:20
  **hum** [11] - 16:24, 29:2,
34:13, 43:6, 46:23,
47:16, 52:23, 61:16,
72:6, 130:16, 138:14
  **hundred** [2] - 46:15,
111:15
  **hurt** [4] - 117:5, 241:21,
242:2, 242:14
  **hyphenated** [1] -
125:14

## I

  **I-83** [1] - 89:23
  **icon** [1] - 36:11
  **ID** [1] - 130:14
  **idea** [4] - 25:25, 116:20,
182:3, 243:25
  **ideas** [1] - 12:25, 189:8
  **identical** [2] - 193:3,
196:13, 236:14
  **identifiable** [1] - 260:3
  **identification** [9] - 22:6,
22:7, 90:20, 92:22,
115:7, 147:14, 147:15,
174:15, 199:24
  **identified** [1] - 198:19
  **identifies** [1] - 117:19
  **identify** [5] - 20:5, 23:3,
118:15, 197:14, 209:5
  **Ill** [1] - 88:16
  **illegal** [2] - 19:15, 222:3
  **illness** [1] - 186:9
  **images** [1] - 210:16
  **imagine** [3] - 112:2,
154:23, 184:20
  **immaterial** [4] - 193:14,
193:25, 194:2, 194:3
  **immediate** [4] - 101:18,
102:9, 102:24, 103:16

**immediately** [4] - 10:15, 101:18, 102:6, 103:14
**immunity** [3] - 202:20, 203:1, 204:4
**immunized** [1] - 204:1
**Impact** [1] - 132:20
**impacted** [1] - 17:8
**impeachment** [1] - 152:3
**implied** [1] - 155:4
**implies** [1] - 192:13
**imply** [1] - 236:14
**important** [14] - 34:12, 42:22, 76:22, 76:23, 186:3, 186:23, 190:20, 222:21, 246:9, 254:11, 255:6, 256:12, 258:13
**imprimatur** [1] - 204:22
**improper** [2] - 217:19, 223:4
**improve** [1] - 242:6
**IN** [1] - 1:1
**in-furtherance** [1] - 255:13
**inaccurately** [1] - 77:1
**inadmissible** [1] - 173:19
**inadvertently** [1] - 148:7
**inappropriate** [2] - 171:8, 192:22
**incapable** [1] - 78:20
**incarcerated** [9] - 139:6, 139:8, 139:11, 139:13, 141:20, 141:21, 143:5, 182:12, 216:6
**incarceration** [6] - 141:22, 142:19, 167:5, 175:12, 216:14, 218:11
**incident** [5] - 87:6, 90:15, 210:14, 210:25
**inclination** [2] - 210:22, 211:3
**inclined** [1] - 56:8, 247:3
**include** [2] - 197:11, 260:2
**included** [5] - 124:6, 162:13, 189:19, 219:16, 258:17
**includes** [2] - 51:14, 141:21
**including** [8] - 18:3, 41:4, 42:16, 43:1, 47:23, 95:20, 244:10, 247:9
**income** [2] - 161:3, 221:11
**inconsistent** [1] - 114:20
**inconvenience** [1] -

114:3
**inconveniences** [1] - 183:22
**incorporated** [1] - 46:20
**incorrect** [3] - 118:5, 251:7, 251:8
**increasing** [1] - 252:5
**incredible** [1] - 260:18
**incredibly** [1] - 203:24
**Indeed** [1] - 225:7
**indeed** [3] - 147:23, 186:3, 186:8
**independent** [2] - 69:19, 240:4
**INDEX** [1] - 263:1
**indicate** [5] - 122:12, 122:14, 133:16, 146:10, 175:18
**indicated** [8] - 52:1, 92:14, 99:14, 134:7, 135:23, 180:3, 180:24, 210:20
**Indicates** [1] - 175:4
**indicates** [13] - 96:17, 118:14, 120:25, 121:19, 129:15, 130:22, 131:21, 132:7, 133:2, 133:6, 133:18, 134:4, 144:24
**indicating** [2] - 155:14, 156:15
**indication** [1] - 210:12
**indicted** [1] - 208:1
**indictment** [20] - 193:6, 217:22, 219:18, 220:6, 220:10, 221:2, 221:17, 222:14, 223:11, 228:21, 229:7, 245:13, 245:16, 246:12, 246:14, 246:19, 248:14, 251:6, 251:12
**indirect** [1] - 78:7
**individual** [14] - 40:23, 44:1, 48:9, 55:4, 63:12, 66:25, 68:22, 75:20, 91:10, 120:11, 120:13, 124:12, 203:20
**individually** [1] - 248:9
**individuals** [9] - 42:25, 43:1, 49:13, 65:24, 91:11, 95:20, 182:12, 220:24, 223:17
**indulgence** [5] - 71:14, 111:2, 125:18, 134:14, 136:11
**industry** [43] - 6:15, 12:5, 12:19, 13:12, 14:18, 15:17, 16:6, 19:13, 23:17, 23:19, 25:16, 25:18, 25:23, 28:14, 32:19, 32:25,

33:16, 35:25, 38:17, 40:12, 41:8, 41:18, 42:5, 42:11, 42:25, 45:7, 45:19, 45:22, 46:2, 46:19, 47:4, 48:14, 51:4, 51:7, 56:5, 62:6, 63:6, 65:23, 66:7, 67:25, 68:3, 80:4
**Industry** [1] - 46:21
**industry-wide** [1] - 35:25
**inevitable** [1] - 225:21
**inevitably** [5] - 217:2, 217:3, 218:6, 218:14, 219:3
**infer** [1] - 247:20
**inference** [2] - 80:16, 171:7
**inferences** [2] - 76:5, 78:3
**Infiniti** [2] - 93:24, 94:2
**influence** [4] - 26:10, 26:11, 26:14, 31:11
**influenced** [1] - 46:5
**inform** [1] - 242:17
**informal** [5] - 10:23, 81:13, 202:20, 203:1, 260:9
**informally** [1] - 161:7
**informants** [2] - 61:3, 61:17
**information** [21] - 2:24, 20:12, 51:3, 59:22, 67:12, 67:16, 120:16, 121:14, 121:16, 124:4, 124:21, 125:7, 125:11, 125:25, 128:22, 131:24, 133:3, 146:10, 162:9, 180:4, 180:21
**ingredient** [1] - 39:4
**inherently** [1] - 238:17
**initial** [4] - 120:13, 125:13, 183:2, 184:1
**injured** [1] - 210:12
**innovation** [1] - 105:13
**input** [1] - 81:13
**insert** [6] - 219:14, 224:18, 224:21, 228:14, 235:13, 250:5
**inserted** [2] - 224:5, 228:6
**insertion** [2] - 193:7, 217:11
**inside** [3] - 87:2, 94:5, 135:5
**insight** [1] - 14:23
**insist** [1] - 210:19
**insisted** [1] - 169:21
**insists** [1] - 209:4
**insofar** [3] - 78:21,

80:15, 193:7
**inspection** [1] - 121:7
**installed** [1] - 211:9
**instance** [3] - 142:11, 164:5, 257:10
**instances** [2] - 47:19, 239:7
**instead** [3] - 163:10, 191:18, 217:2
**institution** [3] - 50:17, 110:25, 141:20
**institutional** [1] - 141:18
**instruct** [6] - 97:25, 217:1, 235:11, 242:13, 246:8, 247:6
**instructed** [3] - 214:16, 227:15, 249:5
**instructing** [3] - 75:16, 216:24, 235:6
**instruction** [57] - 5:11, 92:9, 165:2, 189:18, 190:15, 199:13, 203:16, 204:7, 204:21, 205:6, 205:9, 205:20, 207:2, 208:24, 209:3, 213:11, 224:19, 224:21, 225:2, 225:3, 225:5, 225:20, 227:8, 227:10, 228:5, 228:9, 229:8, 229:21, 230:10, 230:11, 230:18, 231:19, 232:9, 235:25, 237:2, 237:4, 237:12, 241:3, 242:6, 244:24, 245:23, 246:5, 246:6, 246:25, 247:4, 247:11, 250:4, 250:17, 250:21, 251:18, 251:25, 252:1, 252:10, 255:5, 258:16, 259:9, 260:1
**Instruction** [1] - 207:6
**Instructions** [1] - 258:21
**instructions** [32] - 98:24, 153:21, 165:14, 166:15, 184:19, 184:23, 185:23, 185:24, 186:11, 186:24, 187:23, 189:17, 200:15, 202:20, 203:16, 203:19, 209:20, 216:11, 219:13, 226:15, 240:18, 240:23, 240:25, 241:18, 241:19, 242:18, 243:12, 250:3, 255:11, 255:15, 255:19, 258:13
**instructs** [1] - 244:13
**insubstantial** [1] - 251:3
**insufficient** [2] - 146:16, 146:25

**insult** [2] - 258:8, 258:9
**insulted** [3] - 76:21, 197:12, 197:16
**insurance** [4] - 49:22, 49:25, 121:15, 134:9
**intend** [3] - 219:22, 219:25, 256:16
**intended** [2] - 210:17, 230:20
**intending** [3] - 85:18, 126:9, 169:25
**intends** [1] - 242:18
**intent** [2] - 5:3, 213:7
**intention** [1] - 25:13
**interchange** [1] - 40:25
**interchanged** [1] - 66:21
**interest** [4] - 169:8, 203:4, 203:10, 203:20
**interested** [2] - 9:9, 49:7
**interesting** [1] - 49:4
**interests** [1] - 237:12
**internal** [2] - 132:2, 132:20
**International** [6] - 130:7, 130:9, 130:15, 137:12, 140:11, 160:22
**internet** [2] - 4:11, 51:7
**Internet** [5] - 11:3, 11:5, 11:6, 13:2
**interpretation** [2] - 190:16, 190:25
**interpretations** [2] - 7:1, 190:25
**interrupt** [2] - 148:17, 212:15
**interstate** [1] - 195:10
**intervenes** [1] - 186:9
**interview** [11] - 13:20, 62:5, 91:20, 91:22, 150:13, 150:14, 150:20, 151:19, 179:25, 180:23, 181:3
**interviewed** [9] - 13:8, 13:13, 13:14, 13:17, 13:22, 58:15, 91:18, 118:3, 180:2
**interviews** [1] - 42:3
**intimidating** [1] - 259:23
**intimidation** [2] - 248:10, 259:14
**Intimidation** [1] - 259:23
**introduce** [5] - 74:7, 91:5, 105:15, 114:23, 126:13
**introduced** [5] - 74:3, 74:4, 178:8, 231:20,

232:2
**introduces** [1] - 72:19
**introducing** [4] - 73:16, 73:19, 74:10, 82:19
**introduction** [1] - 147:21
**inventory** [1] - 87:21
**invest** [1] - 36:19
**investigating** [1] - 91:19
**investigation** [3] - 145:3, 146:8, 186:24
**investigator** [1] - 119:9
**inviting** [1] - 198:6
**involve** [2] - 136:13, 228:24
**involved** [14] - 13:15, 41:6, 42:14, 42:18, 51:19, 58:13, 60:1, 61:25, 75:23, 250:24, 251:3, 251:4, 251:10, 251:13
**involvement** [2] - 13:5, 109:14, 232:11
**involvements** [1] - 13:24
**Irene** [2] - 144:22, 190:7
**ironic** [1] - 212:6
**irony** [1] - 212:10
**irrebuttable** [2] - 217:18, 218:5
**irrelevant** [1] - 194:6
**Island** [3] - 107:3, 111:17, 175:2
**isolate** [1] - 143:4
**issue** [38] - 3:25, 4:4, 6:20, 14:12, 19:23, 20:24, 26:17, 27:7, 77:12, 78:15, 79:14, 80:17, 80:19, 85:8, 101:16, 102:4, 102:20, 103:11, 114:14, 128:17, 143:22, 144:6, 151:2, 151:10, 161:12, 162:8, 162:24, 170:22, 192:20, 202:9, 217:20, 217:25, 218:3, 228:8, 229:7, 229:9, 243:17
**Issue** [1] - 14:10
**Issued** [1] - 130:15
**issues** [9] - 5:7, 20:8, 29:19, 75:22, 99:2, 130:6, 144:8, 144:13, 187:2
**IT** [4] - 84:5, 99:7, 101:4, 165:13
**item** [3] - 91:3, 120:21, 175:7
**itemization** [1] - 94:4
**itemizing** [1] - 94:1

**items** [10] - 88:4, 88:12, 88:15, 88:17, 89:6, 94:1, 94:3, 94:5, 142:5, 252:3
**iterate** [1] - 184:25
**itself** [5] - 18:3, 18:8, 33:16, 71:10, 165:3

## J

**Jack** [1] - 241:1
**jackets** [1] - 189:1
**jam** [2] - 19:17
**Jam** [4] - 39:10, 55:13, 56:1, 68:19
**Jamane** [1] - 177:10
**James** [1] - 1:21
**January** [2] - 3:7, 150:14
**Jaquetta** [2] - 138:23, 231:20
**jargon** [1] - 78:10
**Jay** [6] - 20:10, 29:6, 29:15, 33:14, 68:6, 68:17
**Jay-Z** [4] - 29:15, 33:14, 68:6, 68:17
**Jay-Z's** [1] - 29:6
**jeans** [1] - 88:18
**job** [8] - 131:22, 131:23, 131:24, 161:17, 243:21, 243:22, 243:23
**Johnson** [1] - 177:10
**join** [4] - 187:9, 187:19, 207:22, 234:14
**joined** [1] - 213:20
**joining** [1] - 106:18
**Joint** [3] - 102:8, 102:23, 103:15
**Jon** [1] - 20:10
**Jones** [1] - 177:14
**Jose** [2] - 8:19, 60:20
**jotted** [1] - 34:21
**journalist** [1] - 16:3
**Jr** [1] - 118:21
**JR** [1] - 263:12
**judge** [10] - 78:16, 103:11, 103:12, 103:14, 104:25, 105:1, 145:20, 194:4, 197:14, 198:12
**Judge** [27] - 1:13, 81:20, 116:14, 189:18, 193:16, 194:8, 194:22, 197:22, 198:16, 201:3, 201:10, 207:12, 212:12, 217:17, 220:7, 224:20, 231:15, 234:16, 239:13, 240:15, 242:14, 247:16, 250:12, 253:24, 255:16, 260:14, 261:1
**Judge's** [1] - 245:23

**judgment** [4] - 48:20, 185:24, 188:13, 206:1
**judicial** [1] - 97:14
**July** [4] - 60:19, 97:21, 97:23, 98:12
**jumbling** [1] - 149:1
**jump** [3] - 142:15, 152:21, 219:20
**jumped** [3] - 77:10, 172:13, 173:5
**jumping** [1] - 152:16
**jumps** [1] - 243:24
**Junior** [1] - 132:25
**jurisdiction** [7] - 159:22, 195:5, 195:10, 195:15, 195:21, 195:25, 206:4
**jurisdictional** [5] - 194:16, 194:23, 195:1, 195:17, 196:1
**juror** [2] - 196:2, 216:20
**Jurors** [1] - 2:2
**jurors** [8] - 164:4, 164:5, 186:6, 186:10, 186:14, 197:14, 197:15, 218:16
**jury** [158] - 7:4, 7:7, 7:9, 13:10, 25:3, 26:6, 27:6, 28:1, 28:10, 39:7, 66:16, 76:14, 76:22, 78:10, 78:20, 79:9, 80:16, 80:17, 80:23, 81:15, 85:3, 85:4, 85:14, 87:19, 91:7, 91:9, 91:14, 91:15, 91:18, 92:1, 92:20, 92:23, 93:23, 97:20, 97:21, 98:11, 98:17, 98:20, 99:3, 99:9, 101:7, 103:25, 104:8, 105:8, 106:20, 115:1, 115:2, 115:13, 117:15, 118:2, 128:12, 130:22, 131:7, 135:2, 142:2, 142:3, 142:6, 143:2, 144:13, 148:9, 150:15, 152:11, 153:2, 153:20, 153:21, 156:8, 163:23, 165:4, 165:14, 166:11, 167:1, 167:4, 169:4, 170:25, 173:2, 173:23, 174:9, 174:14, 174:23, 185:6, 185:12, 185:15, 186:5, 186:7, 188:4, 188:7, 190:21, 192:13, 192:19, 194:25, 195:3, 201:4, 201:20, 201:21, 202:1, 204:4, 204:6, 204:9, 204:21, 206:10, 206:12, 206:18, 208:3, 208:6, 209:11, 209:15, 211:11,

216:15, 216:18, 217:20, 217:25, 218:3, 220:1, 221:20, 222:2, 222:5, 222:7, 222:10, 222:17, 222:18, 223:2, 223:8, 225:4, 225:20, 225:24, 235:11, 237:12, 237:18, 239:7, 239:12, 240:10, 243:2, 244:4, 245:3, 245:6, 245:14, 245:23, 246:17, 247:6, 247:19, 247:22, 248:11, 248:13, 249:5, 252:8, 253:13, 254:24, 255:5, 255:18, 256:5, 257:5, 260:11, 261:25
**Jury** [15] - 1:14, 7:23, 25:6, 28:8, 76:16, 86:2, 99:3, 99:5, 105:3, 144:15, 166:18, 174:17, 187:3, 187:4, 258:21
**jury's** [7] - 25:9, 171:5, 171:7, 214:2, 222:24, 223:13, 223:18
**justice** [1] - 193:9
**Juvenile** [3] - 64:6, 65:1, 159:9
**juvenile** [14] - 131:15, 137:17, 137:20, 159:4, 159:7, 159:14, 159:22, 160:3, 160:5, 167:9, 167:11, 167:14, 175:14
**juxtaposition** [1] - 173:16

## K

**K-L-A-S** [1] - 176:24
**Kaddafi** [1] - 31:15
**keen** [1] - 36:8
**keep** [9] - 99:1, 144:13, 159:16, 159:24, 165:8, 186:17, 187:1, 218:13, 257:9, 258:4, 261:20
**keeping** [2] - 70:20
**Kelly** [1] - 43:19
**Kelsey** [1] - 1:17
**Kennedy** [1] - 132:21
**kept** [1] - 30:6
**Kessler** [1] - 255:3
**Kevin** [8] - 39:6, 39:8, 55:13, 55:20, 56:1, 56:9, 56:20
**key** [3] - 37:19, 39:3, 43:13
**keynote** [1] - 14:2
**keys** [1] - 41:14
**kidding** [1] - 218:8
**kids** [5] - 22:14, 28:21,

110:14, 111:15, 131:16
**killing** [1] - 195:12
**kind** [37] - 3:8, 15:4, 15:9, 15:14, 24:9, 25:25, 26:16, 29:18, 30:1, 30:6, 30:19, 31:3, 31:6, 33:17, 39:2, 43:17, 43:20, 53:12, 53:19, 54:6, 57:11, 58:16, 58:19, 59:17, 68:2, 68:20, 90:24, 99:24, 113:15, 131:2, 189:17, 210:25, 241:24, 248:23
**Kind** [1] - 10:23
**kinds** [3] - 78:2, 112:23, 206:5
**kitchen** [1] - 73:12
**KLAS** [2] - 176:22, 263:16
**Klas** [14] - 6:13, 169:9, 169:22, 170:1, 176:21, 176:23, 176:24, 177:2, 177:4, 178:18, 179:19, 181:10, 182:9, 182:21
**KMEL** [2] - 12:20, 15:10
**knife** [2] - 56:22, 90:2
**knit** [1] - 88:20
**knowing** [6] - 53:2, 55:22, 56:19, 112:17, 113:15, 113:18
**knowledge** [12] - 48:6, 75:21, 75:22, 76:25, 78:8, 78:20, 79:24, 80:5, 124:20, 180:13, 180:24
**known** [8] - 12:11, 12:23, 13:3, 22:14, 36:10, 44:19, 55:24, 108:21
**knows** [6] - 27:5, 78:22, 79:9, 80:10, 80:11, 181:22
**KPFA** [2] - 8:25, 11:9
**KRS** [1] - 33:2
**Kurland** [30] - 1:22, 85:1, 97:10, 98:8, 98:18, 144:4, 147:25, 152:2, 176:13, 184:14, 187:15, 187:20, 188:5, 189:12, 189:20, 197:23, 201:15, 201:16, 202:16, 208:8, 213:4, 221:3, 222:17, 223:12, 241:21, 242:5, 242:16, 243:24, 250:1, 255:9
**KURLAND** [152] - 85:2, 85:5, 85:7, 90:25, 97:11, 97:17, 97:19, 98:2, 98:6, 98:10, 98:14, 98:16, 139:21, 144:5, 148:1, 148:20, 149:3, 149:16,

149:19, 149:21, 149:25,
150:10, 151:9, 151:12,
151:14, 151:16, 151:20,
151:22, 152:4, 152:8,
152:12, 152:15, 152:21,
152:24, 153:5, 153:9,
153:11, 153:13, 153:16,
153:24, 154:4, 154:6,
154:8, 176:15, 181:9,
182:1, 182:4, 187:13,
187:21, 189:18, 189:24,
191:23, 192:3, 192:24,
194:2, 194:8, 194:10,
194:15, 194:18, 194:22,
195:6, 195:9, 195:19,
195:23, 196:4, 196:18,
197:22, 197:24, 198:1,
198:8, 198:14, 200:9,
201:18, 201:22, 201:24,
202:1, 202:17, 204:19,
207:12, 207:14, 208:9,
208:17, 211:21, 212:4,
212:12, 212:16, 212:19,
212:22, 213:1, 215:22,
217:17, 219:6, 219:11,
220:7, 220:11, 221:17,
222:1, 222:9, 222:21,
223:2, 223:7, 223:15,
223:21, 225:2, 225:14,
225:17, 226:6, 229:2,
229:5, 229:15, 229:18,
229:20, 230:2, 230:6,
230:24, 232:7, 232:17,
234:16, 236:11, 240:15,
240:20, 241:7, 241:13,
241:17, 241:22, 242:8,
243:22, 244:9, 250:2,
250:11, 250:15, 251:1,
251:11, 251:18, 251:22,
252:13, 252:23, 253:16,
253:18, 253:24, 254:10,
254:17, 254:21, 255:16,
255:20, 256:7, 256:16,
256:20, 257:7, 257:23,
260:14, 263:18
  **Kurland's** [1] - 187:16

**L**

**LA** [2] - 24:15, 37:2
**lab** [1] - 145:14
  **label** [14] - 36:9, 36:18,
36:19, 37:21, 39:16,
65:24, 67:24, 68:8,
68:10, 68:14, 68:24,
69:2, 69:19
  **labels** [15] - 28:18,
32:23, 36:22, 36:25,
37:10, 37:14, 63:6, 66:1,
66:4, 66:6, 69:2, 69:3,

69:8, 69:12, 69:15
  **laboratory** [1] - 144:21
  **lack** [4] - 14:13, 48:17,
75:22, 146:10
  **lacks** [1] - 195:10
  **lacrosse** [1] - 106:25
  **ladies** [13] - 28:9, 66:16,
75:12, 86:3, 105:12,
115:21, 144:6, 174:18,
183:16, 186:20, 187:3,
239:11, 240:10
  **Ladies** [3] - 7:24, 25:2,
98:20
  **lady** [2] - 205:12,
248:17
  **laid** [2] - 32:22, 51:8
  **Lakeisha** [2] - 95:1,
95:3
  **Lane** [1] - 178:4
  **language** [42] - 29:19,
30:16, 30:23, 30:25,
31:1, 53:16, 54:25,
73:18, 189:22, 193:4,
194:11, 196:13, 198:1,
198:2, 202:22, 205:2,
206:5, 212:13, 217:17,
218:21, 225:20, 228:17,
229:3, 234:17, 235:13,
250:5, 250:8, 251:2,
252:1, 252:24, 254:8,
255:3, 255:16, 255:17,
255:20, 256:2, 256:5,
259:8, 259:9, 259:25
  **languaging** [1] - 20:7
  **large** [5] - 33:16, 63:9,
104:3, 104:6, 109:20
  **largely** [2] - 4:21,
203:17
  **larger** [1] - 238:16
  **Larry** [1] - 95:21
  **Laslett** [3] - 93:16,
93:17, 93:25
  **last** [28] - 22:2, 44:12,
80:13, 81:12, 120:13,
120:15, 128:16, 129:18,
141:24, 145:14, 149:8,
153:17, 175:7, 190:18,
191:2, 191:3, 193:1,
193:10, 194:18, 208:10,
213:10, 219:21, 224:19,
236:12, 241:22, 243:6,
252:2, 258:21
  **Last** [2] - 86:10, 236:4
  **lasts** [1] - 140:24
  **late** [10] - 29:10, 29:17,
29:24, 31:3, 81:9, 82:1,
82:2, 185:6, 185:7,
191:24
  **latter** [1] - 243:4
  **launch** [1] - 12:14

  **launched** [1] - 12:21
  **Laura** [1] - 1:17
  **Law** [4] - 102:8, 102:23,
103:16, 241:1
  **law** [44] - 48:13, 48:23,
49:15, 49:17, 75:19,
127:2, 145:4, 146:9,
152:18, 153:16, 184:19,
206:1, 213:22, 214:25,
215:18, 216:2, 216:10,
216:23, 217:2, 218:17,
218:24, 218:25, 219:2,
219:8, 220:4, 225:24,
227:16, 232:3, 239:1,
243:3, 243:5, 245:22,
250:12, 250:16, 250:18,
250:22, 251:8, 252:7,
252:17, 253:7, 253:23,
255:8, 255:12
  **Lawlor** [18] - 1:18, 99:6,
101:1, 104:1, 105:6,
105:15, 105:19, 105:20,
176:2, 187:5, 204:12,
231:17, 233:18, 235:17,
239:11, 248:22, 257:24,
261:22
  **LAWLOR** [64] - 7:22,
101:2, 101:6, 104:2,
104:5, 104:10, 104:15,
104:20, 104:22, 105:1,
105:4, 105:7, 105:21,
106:17, 108:12, 113:24,
147:19, 147:24, 159:13,
179:16, 187:6, 189:12,
189:16, 193:16, 193:20,
199:3, 201:10, 201:13,
202:4, 202:7, 204:11,
204:13, 204:15, 206:17,
206:22, 207:15, 207:17,
208:19, 209:1, 212:3,
218:8, 231:16, 231:18,
232:6, 233:24, 234:7,
234:10, 234:12, 235:19,
239:13, 240:8, 248:19,
248:21, 256:24, 257:25,
258:3, 260:20, 260:25,
261:4, 261:9, 261:13,
261:20, 261:24, 263:11
  **lawyer** [3] - 149:22,
151:11, 194:4
  **lawyers** [2] - 153:6,
154:1
  **lay** [8] - 77:17, 79:2,
81:3, 136:19, 193:13,
193:25, 204:2, 216:20
  **lead** [5] - 38:2, 71:12,
108:13, 217:23, 223:10
  **leader** [2] - 47:13, 260:3
  **leaders** [2] - 48:4, 79:7
  **leading** [1] - 63:16

  **leads** [1] - 15:3
  **lean** [1] - 105:4
  **learned** [1] - 178:7
  **least** [6] - 8:8, 13:14,
15:9, 15:25, 18:6, 18:24,
21:20, 39:11, 44:18,
58:23, 146:18, 155:24,
244:3, 254:13
  **leave** [23] - 15:7, 25:4,
76:12, 82:24, 98:24,
99:9, 132:14, 144:11,
157:8, 186:21, 192:21,
197:3, 209:12, 210:22,
211:3, 219:5, 226:5,
231:22, 241:12, 248:11,
248:13, 249:3
  **leaves** [2] - 154:9,
174:15
  **leaving** [4] - 74:17,
164:1, 200:15, 211:18
  **Leaving** [1] - 74:23
  **lectern** [1] - 144:16
  **lectures** [1] - 14:2
  **led** [2] - 10:17, 11:8
  **left** [16] - 15:9, 78:10,
88:24, 120:25, 128:8,
133:21, 152:25, 157:8,
179:6, 179:13, 194:17,
201:6, 228:8, 231:23,
234:2, 255:18
  **left-hand** [2] - 120:25,
133:21
  **legal** [4] - 15:10,
159:21, 183:3, 183:9
  **Legally** [2] - 194:2,
194:3
  **legally** [4] - 41:16,
193:14, 193:25, 217:19
  **legends** [1] - 52:13
  **legitimate** [2] - 50:20,
194:23
  **lengthy** [6] - 101:8,
162:16, 183:17, 184:3,
188:21, 218:10
  **Leno** [1] - 20:10
  **less** [3] - 4:17, 45:14,
261:6
  **lessen** [1] - 114:3
  **letter** [15] - 125:13,
129:1, 129:3, 149:11,
149:21, 150:2, 194:19,
196:5, 198:17, 198:25,
199:5, 199:7, 199:21,
199:25
  **letters** [2] - 125:14,
198:20
  **level** [2] - 59:8, 146:21
  **liability** [2] - 220:4,
221:5
  **liars** [1] - 206:2

  **Liberty** [1] - 120:7
  **lie** [1] - 172:6
  **lied** [4] - 150:20,
206:10, 206:12, 207:3
  **lien** [5] - 120:1, 121:9,
121:14, 122:2, 122:4
  **life** [4] - 32:15, 41:21,
42:11, 44:1
  **lifestyle** [1] - 45:15
  **light** [6] - 50:8, 77:13,
155:1, 171:17, 197:20,
199:22
  **lighter** [1] - 203:12
  **lightheartedness** [1] -
20:13
  **likely** [1] - 184:2
  **Lil** [2] - 64:8, 65:1
  **limit** [1] - 14:24
  **limited** [3] - 166:22,
220:4, 221:4
  **limiting** [2] - 5:11, 16:4
  **line** [12] - 55:7, 80:10,
83:22, 142:11, 148:9,
156:25, 157:1, 191:8,
196:10, 236:13, 248:3,
253:7
  **linear** [1] - 239:20
  **lined** [1] - 36:1
  **lines** [5] - 142:4,
200:10, 201:9, 236:6,
246:5
  **lips** [2] - 61:14, 61:18
  **list** [4] - 13:6, 88:12,
97:5, 249:1
  **listed** [3] - 120:6, 159:1,
161:14
  **listen** [7] - 36:18, 39:20,
92:7, 92:12, 164:6,
242:6, 244:18
  **listened** [3] - 58:15,
70:1, 78:23
  **listening** [3] - 25:21,
35:19, 146:18
  **lists** [1] - 155:17
  **literally** [3] - 35:12,
82:6, 189:4
  **live** [2] - 34:1, 105:18
  **lived** [2] - 181:18,
181:22
  **living** [4] - 13:7, 41:21,
106:22, 260:23
  **load** [1] - 39:24
  **local** [1] - 71:2
  **located** [3] - 111:19,
131:18, 131:20
  **location** [11] - 22:3,
27:7, 87:2, 132:3,
177:12, 177:14, 177:17,
178:4, 178:7, 178:10,
216:22

locations [2] - 169:10, 177:5
lock [2] - 52:20, 52:21
locked [2] - 178:9, 218:12
lockup [19] - 169:13, 170:5, 178:19, 179:1, 179:2, 179:5, 179:21, 179:24, 180:5, 180:7, 180:12, 180:18, 182:8, 182:22, 183:1, 209:23, 210:15, 210:23, 211:2
Lombard [1] - 1:25
long-winded [2] - 244:8, 249:3
Look [4] - 5:5, 36:18, 156:17, 164:3
look [33] - 2:14, 2:21, 3:1, 3:8, 3:9, 3:23, 11:23, 18:17, 25:8, 58:18, 62:15, 64:23, 68:11, 68:12, 81:12, 92:3, 93:6, 100:12, 105:24, 128:5, 142:6, 142:15, 145:21, 162:17, 172:3, 172:8, 177:19, 177:24, 186:25, 230:3, 234:21, 240:20
looked [2] - 52:10, 150:1, 202:8, 240:22, 253:19
looking [18] - 7:16, 30:8, 31:9, 32:23, 34:21, 36:23, 49:22, 52:4, 68:5, 69:11, 69:18, 69:22, 71:12, 71:13, 123:18, 131:22, 156:10, 193:2
Looking [1] - 122:24
Looks [2] - 95:2, 258:3
looks [9] - 20:20, 121:9, 121:24, 123:9, 123:14, 123:16, 123:18, 129:3, 258:1
looney [1] - 58:19
loose [1] - 206:5
looseleaf [1] - 2:23
Los [3] - 24:10, 28:15, 44:7
lose [1] - 70:22
lost [5] - 145:12, 153:6, 204:4, 204:6, 204:9
Louis [2] - 103:23, 114:6
Louisiana [1] - 64:13
love [1] - 198:3
low [1] - 146:21
loyalty [1] - 54:24
lunch [12] - 76:18, 83:5, 93:1, 98:21, 99:7, 126:8, 143:16, 184:5, 184:7,

184:21, 260:21, 260:24
Luncheon [1] - 100:24
lungs [2] - 61:14, 61:18
Luttrell [2] - 122:25, 123:6
lying [2] - 206:18, 206:21
Lyles [11] - 39:6, 39:8, 55:13, 55:20, 55:23, 55:24, 56:1, 56:9, 56:14, 56:20
Lyles's [3] - 55:16, 55:18, 56:2
Lynch [2] - 154:19, 155:8, 156:14, 156:15, 156:17, 156:18, 157:6, 157:10, 160:11, 160:14, 160:15, 160:16, 160:17, 160:20, 161:5, 161:11, 161:19, 161:25, 162:8, 162:13, 167:20, 174:11
Lyor [1] - 56:1
lyric [3] - 6:9, 29:24, 74:18
lyrical [1] - 74:10
lyrics [62] - 4:11, 4:21, 4:22, 4:23, 4:25, 5:1, 5:2, 5:5, 5:7, 5:8, 5:12, 5:14, 5:21, 5:22, 6:3, 6:10, 6:21, 6:24, 20:24, 20:25, 26:17, 28:13, 28:17, 29:1, 29:12, 29:13, 30:11, 30:12, 32:2, 33:1, 33:4, 33:19, 33:23, 34:6, 35:7, 35:9, 35:25, 46:15, 47:7, 47:11, 47:23, 48:4, 48:9, 49:24, 51:17, 52:4, 52:11, 52:14, 58:18, 61:11, 62:1, 62:15, 67:15, 69:10, 69:25, 70:2, 71:19, 74:6

**M**

ma'am [5] - 86:19, 87:1, 87:17, 88:8, 88:18
mafia [2] - 31:12, 31:16
magazine [2] - 10:19, 11:7
Magazine [1] - 10:19
Magginson [2] - 144:22, 190:7
mail [4] - 144:22, 190:7, 226:10, 260:14
mailed [1] - 134:23
main [6] - 11:25, 13:14, 28:2, 38:12, 38:15, 38:25
mainstream [1] - 20:12

maintaining [1] - 252:5
major [6] - 39:17, 54:4, 68:8, 69:12, 69:15, 202:9
majority [2] - 42:16, 63:19
makers [1] - 39:4
man [5] - 72:14, 95:21, 107:12, 172:13, 179:21
manage [1] - 100:15
management [1] - 15:12
manager [1] - 80:8
Manhattan [1] - 111:22
manhood [1] - 17:3
manner [5] - 98:3, 212:8, 225:22, 243:25, 264:9
map [3] - 97:12, 97:15, 177:24
March [8] - 95:7, 133:6, 135:4, 135:11, 135:21, 139:2, 140:15, 175:16
marijuana [5] - 227:11, 227:14, 227:17, 227:19, 228:2
mark [5] - 95:11, 168:6, 168:8, 168:14, 184:23
marked [16] - 65:9, 87:14, 92:22, 94:17, 96:5, 115:7, 119:2, 134:16, 141:15, 145:11, 147:13, 174:13, 174:15, 198:18, 207:14
market [1] - 31:6
marketable [1] - 38:18
marketing [3] - 68:9, 68:12, 69:1
Marshal [1] - 210:17
marshal's [5] - 178:19, 209:23, 210:15, 210:23, 211:2
Marshal's [1] - 183:1
marshals [3] - 183:8, 188:15, 210:5
MARTIN [79] - 1:8, 7:12, 7:15, 102:17, 154:20, 170:16, 170:20, 171:2, 171:20, 171:22, 172:2, 172:7, 172:12, 172:14, 172:19, 172:24, 173:8, 173:15, 174:7, 176:9, 179:18, 182:16, 182:20, 183:12, 187:11, 189:7, 190:24, 191:14, 191:20, 192:6, 192:8, 192:18, 193:21, 194:7, 196:21, 196:23, 198:22, 199:2, 199:4, 199:11, 200:18, 200:20, 200:22, 200:25, 207:24, 208:5, 211:16,

211:22, 211:25, 213:14, 213:19, 214:2, 214:5, 214:9, 221:13, 221:16, 221:23, 224:9, 231:3, 231:6, 232:16, 232:19, 232:21, 233:1, 233:4, 233:11, 234:21, 234:24, 235:3, 241:4, 241:10, 242:1, 242:4, 242:10, 258:4, 258:7, 258:10, 260:12, 263:17
Martin [33] - 1:19, 1:20, 84:15, 95:10, 95:11, 95:12, 95:22, 95:23, 95:24, 102:11, 102:25, 139:22, 140:5, 144:2, 170:15, 171:1, 171:13, 173:7, 176:7, 176:11, 184:8, 184:11, 190:16, 190:18, 199:14, 231:2, 231:6, 231:7, 232:5, 241:25, 248:16, 257:3, 257:5
Martin's [13] - 94:23, 94:24, 95:14, 95:15, 95:17, 143:17, 147:17, 151:11, 171:25, 191:18, 234:1, 234:2, 246:25
Mary [4] - 1:24, 151:9, 264:3, 264:15
MARYLAND [1] - 1:2
Maryland [17] - 1:12, 1:25, 39:9, 107:17, 119:5, 120:7, 120:25, 122:10, 125:6, 127:13, 133:12, 137:22, 149:20, 157:19, 160:23, 220:4, 223:17
Master [2] - 63:2, 68:6
material [6] - 4:14, 5:6, 12:8, 24:14, 25:10, 39:1, 39:5, 151:21, 258:17
materials [1] - 4:11
matter [29] - 4:7, 52:14, 94:9, 95:16, 98:16, 136:12, 141:12, 145:4, 148:20, 191:1, 208:2, 209:11, 210:18, 215:18, 216:2, 216:10, 216:23, 217:2, 218:17, 219:2, 226:25, 227:15, 247:5, 247:7, 250:12, 252:9, 264:4, 264:9
matters [3] - 148:1, 209:15, 246:24
mature [1] - 185:24
McCaffity [2] - 95:18, 238:11
McCaffity/Brown [1] - 93:24

McCoy [1] - 94:25, 95:3
McCoy's [1] - 241:1
McCray [1] - 94:25
McDonald's [1] - 118:9
mean [94] - 11:20, 13:6, 13:17, 18:14, 20:24, 21:3, 22:5, 22:18, 26:14, 30:20, 31:1, 31:3, 31:6, 32:1, 38:23, 40:10, 46:21, 47:2, 49:8, 52:10, 53:6, 54:15, 55:2, 55:3, 57:4, 59:5, 66:1, 66:2, 67:17, 70:19, 71:23, 72:23, 72:24, 73:3, 74:6, 74:13, 74:14, 77:22, 78:9, 93:2, 101:15, 104:18, 117:7, 122:2, 123:20, 127:16, 140:24, 148:21, 153:23, 154:13, 159:20, 160:15, 161:3, 161:17, 162:5, 162:8, 162:17, 164:13, 167:22, 167:24, 169:16, 177:6, 185:2, 192:14, 198:5, 198:13, 199:20, 200:15, 205:8, 206:20, 216:17, 217:6, 218:11, 218:23, 232:9, 235:5, 236:18, 238:5, 239:20, 240:6, 240:18, 244:1, 244:3, 244:17, 245:22, 248:17, 253:22, 255:5, 258:8, 259:8, 260:17, 260:19
meaning [9] - 10:4, 19:15, 21:8, 34:5, 36:23, 73:13, 74:1, 219:1, 245:25
Meaning [1] - 34:5
meaningful [2] - 146:16, 146:25
means [13] - 5:4, 15:17, 53:6, 66:17, 75:8, 108:5, 108:7, 129:20, 137:19, 141:2, 195:20, 200:11, 251:17
meant [11] - 13:18, 22:9, 34:9, 38:1, 66:18, 85:21, 126:7, 220:23, 220:25, 228:11, 237:16
meantime [1] - 166:3
measure [1] - 172:17
media [2] - 9:13, 14:12
medias [1] - 9:13
Medical [1] - 210:8
medical [3] - 134:7, 210:11, 212:22
meet [1] - 112:13
meeting [2] - 22:2, 118:12
meetings [1] - 60:1

**member** [8] - 43:14, 43:19, 214:22, 246:13, 253:1, 255:23, 255:25, 256:14
**Members** [2] - 91:9, 105:8
**members** [10] - 44:25, 185:12, 236:3, 236:5, 236:13, 251:13, 251:16, 251:17, 260:18
**membership** [5] - 216:7, 219:9, 236:7, 236:16, 260:1
**memory** [1] - 199:21
**Men** [1] - 17:11
**men** [1] - 45:9
**mention** [7] - 31:14, 43:19, 78:17, 114:24, 200:2, 219:13, 248:2
**mentioned** [15] - 19:9, 19:11, 19:20, 24:15, 41:17, 42:19, 43:16, 54:6, 55:25, 68:19, 128:13, 133:22, 136:6, 238:19, 259:12
**mentioning** [1] - 197:18
**Mentioning** [1] - 199:16
**Mercury** [2] - 8:19, 60:20
**mere** [4] - 215:17, 216:1, 216:14, 217:3
**merely** [2] - 216:5, 252:2
**merit** [1] - 5:16
**Message** [1] - 21:13
**metaphor** [3] - 53:7, 57:8, 74:15
**metaphors** [1] - 74:20
**Metaphors** [1] - 74:21
**metaphysical** [1] - 74:14
**metaphysics** [2] - 74:18, 74:20
**methodology** [1] - 146:24
**methods** [1] - 80:3
**Miami** [1] - 24:12
**Michael** [4] - 1:16, 1:18, 17:12, 89:18
**microfilm** [1] - 125:5
**microphone** [3] - 104:16, 104:19, 187:17
**mid** [3] - 23:13, 31:3, 109:16
**middle** [4] - 135:5, 160:4, 192:9, 255:21
**might** [35] - 15:14, 20:11, 20:12, 22:9, 22:23, 22:24, 30:10, 32:6, 47:3, 49:25, 54:8,

54:14, 54:23, 56:8, 59:22, 66:2, 66:3, 77:6, 87:15, 122:19, 124:8, 128:5, 131:13, 136:20, 148:18, 166:3, 171:19, 172:4, 173:4, 195:13, 195:24, 212:12, 217:20, 235:8
**mike** [6] - 8:5, 71:3, 86:8, 87:10, 118:19, 126:19
**mileage** [1] - 121:16
**miles** [2] - 111:23, 178:6
**militant** [1] - 24:5
**military** [2] - 40:8, 66:4
**million** [1] - 245:6
**millions** [1] - 45:10
**Mills** [1] - 129:13
**mimic** [2] - 33:15, 33:18
**mind** [10] - 4:4, 34:10, 99:1, 103:20, 103:21, 144:13, 171:12, 187:1, 202:17, 203:9
**mine** [1] - 15:9
**minimal** [1] - 245:16
**minimally** [1] - 244:20
**minimum** [1] - 6:8
**minor** [3] - 152:12, 209:25, 210:6
**minute** [11] - 48:9, 76:14, 82:14, 111:23, 115:3, 157:20, 162:22, 239:13, 242:1, 261:15, 261:16
**minutes** [30] - 4:11, 27:13, 53:14, 53:22, 81:5, 81:16, 82:7, 83:9, 83:16, 85:12, 93:3, 99:9, 111:23, 144:14, 148:18, 148:22, 162:3, 162:21, 166:5, 166:13, 166:16, 174:19, 184:21, 209:13, 209:22, 261:7, 261:8, 261:14, 261:16
**mischaracterizes** [1] - 59:17
**Mishandling** [2] - 138:19, 173:14
**mishandling** [1] - 173:15
**misidentified** [1] - 175:19
**misinterpreted** [1] - 242:8
**misrepresent** [1] - 150:1
**missed** [3] - 228:9, 231:1, 252:24
**missing** [1] - 152:2

**misspoke** [2] - 156:4, 156:5
**misstate** [3] - 152:18, 153:14, 153:16
**mistaken** [1] - 18:10
**mistrial** [4] - 173:16, 174:1, 174:8, 187:18
**misunderstanding** [1] - 48:14
**MITCHELL** [5] - 1:7, 8:3, 101:13, 106:10, 118:18
**Mitchell** [81] - 1:17, 87:15, 88:16, 89:24, 90:24, 94:15, 96:13, 96:20, 97:3, 97:7, 101:9, 101:19, 105:16, 105:22, 107:12, 109:1, 109:14, 110:2, 110:17, 114:21, 115:5, 118:4, 118:7, 119:2, 119:23, 127:11, 128:10, 128:19, 130:1, 130:2, 130:3, 130:8, 130:14, 131:21, 134:7, 134:12, 134:17, 136:8, 136:9, 137:9, 138:7, 139:1, 140:2, 155:5, 155:11, 155:22, 157:9, 157:22, 159:11, 161:3, 167:5, 173:11, 173:20, 174:23, 174:24, 174:25, 175:1, 175:6, 175:11, 175:14, 175:20, 175:24, 176:4, 184:5, 187:8, 209:7, 231:19, 232:3, 232:5, 233:18, 234:4, 237:21, 238:15, 239:15, 248:17, 251:10, 264:5
**Mitchell's** [6] - 112:13, 115:4, 129:1, 136:6, 138:9, 175:12
**MITCHELL'S** [1] - 126:17
**mix** [4] - 38:7, 38:8, 38:14, 40:8
**mode** [1] - 36:21
**model** [4] - 69:3, 121:22, 123:20
**models** [2] - 64:3, 125:2
**modern** [1] - 18:25
**modification** [1] - 217:24
**modifications** [1] - 218:5
**modifying** [1] - 237:13
**moment** [19] - 25:3, 43:7, 75:11, 77:25, 92:3, 105:10, 105:15, 113:20, 117:22, 117:23, 148:21, 181:21, 183:20, 191:16,

201:12, 220:15, 220:16, 256:5
**Monday** [3] - 110:15, 135:20, 185:8
**money** [11] - 23:22, 25:16, 29:1, 57:23, 66:11, 120:3, 151:11, 153:6, 153:22, 252:3, 257:9
**monitor** [8] - 84:6, 99:8, 101:3, 104:3, 104:6, 106:1, 128:5, 161:15
**monitors** [2] - 104:4, 210:15
**Montgomery** [7] - 148:4, 150:12, 150:19, 153:23, 153:24, 257:10, 257:13
**Montgomery's** [1] - 153:17
**month** [2] - 123:14, 123:15
**months** [6] - 86:16, 150:22, 151:1, 158:5, 159:13, 170:8
**moon** [1] - 10:3
**Moore's** [1] - 17:12
**moot** [1] - 168:10
**morning** [39] - 2:6, 4:9, 4:13, 4:21, 7:24, 16:12, 16:13, 40:21, 40:22, 62:22, 62:23, 82:17, 83:19, 93:24, 100:3, 100:12, 113:4, 117:5, 135:20, 140:15, 140:19, 140:20, 153:18, 163:8, 164:1, 164:12, 164:19, 164:21, 164:25, 165:13, 183:25, 184:14, 185:3, 187:2, 188:18, 192:1, 210:21, 234:25, 235:1
**mornings** [1] - 13:18
**morphed** [1] - 9:12
**mortal** [1] - 66:3
**most** [25] - 11:1, 11:12, 11:16, 12:21, 13:13, 13:21, 15:15, 17:2, 19:14, 23:25, 33:12, 42:11, 46:5, 57:10, 58:6, 66:3, 70:25, 73:14, 112:21, 137:5, 218:14, 230:7, 248:6
**motion** [9] - 79:14, 150:11, 150:22, 151:1, 187:5, 187:7, 187:17, 187:22, 188:12
**Motion** [1] - 174:8
**motivated** [1] - 151:11
**motivation** [2] - 226:5, 257:18

**motivations** [1] - 247:23
**motive** [7] - 203:6, 203:14, 203:20, 204:7, 213:2, 213:6, 213:7
**Motor** [1] - 119:4
**Motors** [1] - 80:8
**mount** [1] - 225:25
**mouth** [2] - 52:21, 53:17
**move** [18] - 7:9, 36:22, 39:15, 81:25, 92:18, 93:4, 104:24, 106:8, 128:9, 130:4, 134:12, 136:8, 150:25, 173:16, 174:1, 207:8, 212:21, 223:25
**moved** [4] - 9:25, 12:19, 181:14, 201:15
**movement** [7] - 50:19, 50:24, 59:20, 60:2, 60:7, 60:13, 141:18
**movie** [1] - 54:4, 105:18, 118:13, 135:23, 136:1, 140:17, 141:4
**movies** [3] - 31:12, 47:13
**moving** [3] - 41:14, 146:19, 206:16
**MR** [591] - 2:11, 2:13, 3:9, 3:11, 3:13, 3:15, 3:16, 3:18, 3:21, 3:25, 4:3, 4:7, 4:9, 4:20, 6:7, 6:16, 6:25, 7:4, 7:8, 7:12, 7:15, 7:22, 16:8, 16:11, 17:19, 24:20, 29:21, 31:22, 40:20, 62:18, 62:21, 63:16, 65:10, 65:12, 65:15, 72:2, 80:20, 81:20, 81:22, 84:17, 84:19, 84:23, 85:2, 85:5, 85:7, 85:11, 89:14, 90:25, 92:5, 93:9, 93:13, 93:15, 93:22, 94:7, 94:20, 94:24, 95:4, 95:6, 95:9, 95:16, 95:24, 96:1, 96:2, 97:11, 97:17, 97:19, 98:2, 98:6, 98:10, 98:14, 98:16, 99:13, 99:19, 100:4, 100:6, 100:10, 100:14, 100:21, 101:2, 101:6, 104:2, 104:5, 104:10, 104:15, 104:20, 104:22, 105:1, 105:4, 105:7, 105:21, 106:17, 107:18, 108:12, 111:6, 113:24, 115:16, 116:20, 116:14, 116:20, 116:23, 125:21, 136:17, 136:24,

137:2, 139:21, 141:13,
141:15, 141:23, 141:25,
142:4, 142:8, 142:11,
142:25, 143:7, 143:9,
143:13, 143:15, 143:20,
144:3, 144:5, 144:17,
144:20, 144:24, 145:9,
145:11, 145:15, 145:17,
145:22, 145:23, 146:1,
146:3, 146:6, 146:14,
147:3, 147:6, 147:10,
147:13, 147:16, 147:19,
147:24, 148:1, 148:16,
148:20, 148:23, 148:25,
149:3, 149:11, 149:16,
149:19, 149:21, 149:25,
150:5, 150:8, 150:10,
151:9, 151:12, 151:14,
151:16, 151:20, 151:22,
152:4, 152:8, 152:12,
152:15, 152:21, 152:24,
153:5, 153:9, 153:11,
153:13, 153:16, 153:24,
154:4, 154:6, 154:8,
154:20, 156:9, 158:15,
158:21, 159:13, 163:16,
164:15, 165:9, 165:11,
165:16, 165:20, 165:22,
165:24, 166:1, 166:8,
166:10, 166:21, 167:10,
169:6, 169:8, 169:15,
169:20, 170:4, 170:13,
170:16, 170:19, 170:20,
171:2, 171:20, 171:22,
171:25, 172:2, 172:7,
172:12, 172:14, 172:19,
172:24, 173:8, 173:15,
174:7, 176:9, 176:12,
176:15, 176:18, 176:20,
177:1, 179:16, 179:18,
181:9, 181:15, 181:19,
181:23, 182:1, 182:4,
182:7, 182:14, 182:16,
182:20, 183:10, 183:12,
183:15, 187:6, 187:11,
187:12, 187:13, 187:16,
187:21, 189:7, 189:12,
189:16, 189:18, 189:24,
190:12, 190:15, 190:24,
191:7, 191:12, 191:14,
191:20, 191:23, 192:3,
192:4, 192:6, 192:8,
192:18, 192:24, 193:16,
193:20, 193:21, 194:2,
194:7, 194:8, 194:10,
194:15, 194:18, 194:22,
195:6, 195:9, 195:19,
195:23, 196:4, 196:7,
196:10, 196:18, 196:21,
196:23, 197:1, 197:6,
197:8, 197:22, 197:24,

198:1, 198:8, 198:14,
198:16, 198:22, 198:23,
199:1, 199:2, 199:3,
199:4, 199:6, 199:11,
199:13, 199:16, 199:23,
200:2, 200:5, 200:9,
200:18, 200:20, 200:22,
200:25, 201:3, 201:8,
201:10, 201:13, 201:18,
201:22, 201:24, 202:1,
202:3, 202:4, 202:6,
202:7, 202:8, 202:13,
202:17, 202:19, 202:22,
203:1, 204:6, 204:11,
204:13, 204:15, 204:19,
205:5, 205:9, 205:15,
205:19, 205:23, 206:7,
206:11, 206:14, 206:17,
206:22, 206:24, 207:2,
207:6, 207:9, 207:12,
207:14, 207:15, 207:17,
207:24, 208:5, 208:9,
208:17, 208:19, 209:1,
209:18, 211:16, 211:21,
211:22, 211:25, 212:3,
212:4, 212:12, 212:16,
212:19, 212:22, 213:1,
213:8, 213:10, 213:14,
213:19, 213:23, 214:2,
214:3, 214:5, 214:9,
215:9, 215:13, 215:22,
216:9, 216:19, 217:5,
217:6, 217:8, 217:17,
218:8, 218:19, 218:25,
219:4, 219:6, 219:11,
220:7, 220:11, 220:13,
220:19, 221:1, 221:4,
221:7, 221:10, 221:13,
221:16, 221:17, 221:23,
222:1, 222:9, 222:15,
222:21, 223:2, 223:7,
223:15, 223:21, 224:2,
224:9, 224:15, 224:20,
225:2, 225:10, 225:13,
225:14, 225:17, 226:6,
226:14, 226:17, 226:23,
227:3, 227:5, 227:8,
227:13, 227:18, 227:20,
227:23, 228:1, 228:4,
228:11, 228:14, 228:16,
228:23, 229:2, 229:5,
229:15, 229:18, 229:20,
230:2, 230:6, 230:10,
230:16, 230:24, 231:3,
231:5, 231:6, 231:11,
231:15, 231:16, 231:18,
232:6, 232:7, 232:16,
232:17, 232:19, 232:21,
233:1, 233:4, 233:5,
233:8, 233:11, 233:14,
233:17, 233:20, 233:24,

234:7, 234:10, 234:12,
234:14, 234:16, 234:21,
234:24, 235:3, 235:12,
235:19, 235:22, 235:25,
236:10, 236:11, 236:12,
237:1, 237:4, 237:7,
237:11, 238:3, 238:6,
238:12, 238:18, 238:21,
238:24, 239:1, 239:6,
239:13, 239:22, 239:25,
240:3, 240:8, 240:15,
240:20, 241:4, 241:7,
241:10, 241:13, 241:17,
241:22, 242:1, 242:4,
242:8, 242:10, 242:14,
242:16, 242:22, 243:15,
243:22, 244:9, 245:10,
245:12, 246:2, 246:24,
247:16, 247:19, 248:19,
248:21, 249:11, 249:13,
249:15, 249:22, 250:2,
250:11, 250:15, 251:1,
251:11, 251:18, 251:22,
252:13, 252:23, 253:16,
253:18, 253:24, 254:10,
254:17, 254:18, 254:21,
255:16, 255:20, 256:7,
256:16, 256:20, 256:24,
257:7, 257:23, 257:25,
258:3, 258:4, 258:7,
258:10, 258:12, 258:16,
258:20, 258:24, 259:3,
259:8, 259:13, 259:18,
259:20, 259:25, 260:12,
260:14, 260:20, 260:25,
261:4, 261:9, 261:13,
261:20, 261:24, 263:5,
263:5, 263:6, 263:8,
263:11, 263:11, 263:13,
263:15, 263:17, 263:17,
263:18, 263:18
   **MS** [164] - 2:4, 7:18, 8:1,
8:10, 19:3, 19:6, 25:13,
26:9, 26:16, 26:21,
26:25, 27:3, 27:7, 28:11,
35:17, 35:20, 39:24,
40:2, 50:21, 55:7, 71:18,
75:7, 77:20, 77:22, 78:1,
79:20, 79:22, 81:19,
82:13, 83:2, 83:8, 83:11,
83:15, 83:21, 84:4,
84:11, 85:18, 85:22,
85:25, 86:5, 86:13,
90:21, 90:23, 91:2, 91:5,
91:25, 92:18, 92:25,
94:8, 94:13, 96:7, 96:13,
96:17, 96:21, 96:24,
97:2, 97:4, 97:9, 114:9,
114:14, 115:4, 115:9,
115:12, 115:15, 115:25,
116:4, 116:7, 116:9,

116:24, 117:4, 117:8,
117:10, 117:13, 117:24,
118:2, 118:25, 126:5,
126:7, 126:12, 126:15,
126:23, 128:13, 128:15,
128:20, 136:20, 140:3,
141:6, 143:25, 154:10,
154:14, 154:17, 154:21,
154:25, 155:4, 155:12,
156:1, 156:3, 156:12,
156:23, 157:4, 157:24,
158:4, 158:8, 158:11,
158:14, 158:18, 158:25,
159:6, 159:9, 159:12,
159:16, 159:18, 159:22,
160:1, 160:7, 160:11,
160:17, 160:21, 160:23,
161:1, 161:8, 161:17,
161:23, 162:5, 162:7,
162:23, 163:2, 163:6,
163:14, 163:18, 163:21,
164:11, 164:18, 167:2,
167:13, 167:18, 167:22,
167:25, 168:4, 168:9,
168:13, 168:17, 168:20,
168:24, 169:3, 174:10,
174:16, 174:22, 175:7,
175:10, 175:18, 175:23,
175:25, 176:3, 176:6,
189:2, 233:22, 249:1,
263:3, 263:4, 263:6,
263:8, 263:13, 263:15
   **multiple** [15] - 204:23,
229:7, 235:23, 236:23,
237:17, 237:19, 238:17,
239:23, 243:13, 243:16,
244:4, 246:8, 249:16,
251:22, 255:14
   **Mungo** [8] - 169:12,
170:17, 171:6, 173:2,
178:19, 179:21, 180:2,
180:3
   **Mungo's** [1] - 180:19
   **murder** [12] - 140:14,
149:7, 195:12, 226:22,
230:11, 230:12, 230:13,
230:17, 238:11, 257:11,
257:16, 258:23
   **Murder** [3] - 43:2, 43:5,
43:6
   **murders** [2] - 232:10,
254:22
   **Murray's** [3] - 120:1,
123:1, 123:17
   **Music** [2] - 10:19, 59:13
   **music** [53] - 6:1, 6:2,
6:6, 6:15, 12:5, 12:18,
14:17, 14:19, 14:20,
16:6, 18:3, 18:6, 19:12,
21:6, 21:11, 21:20, 23:9,

23:19, 26:7, 26:8, 29:18,
31:18, 33:8, 34:18,
36:15, 36:19, 38:10,
39:14, 41:18, 42:4,
48:12, 48:14, 50:8,
51:20, 53:12, 54:7,
54:15, 57:1, 63:6, 63:20,
63:21, 71:19, 76:6, 78:7,
78:8, 78:22, 78:23, 79:5,
79:8, 220:16
   **musicians** [2] - 78:7,
78:8
   **must** [10] - 54:9, 78:15,
155:10, 156:19, 160:9,
242:17, 245:14, 246:14,
251:4, 253:1
   **MVA** [16] - 82:23, 84:9,
84:11, 85:23, 114:16,
115:2, 115:25, 116:12,
119:14, 121:7, 122:14,
124:9, 124:22, 124:25,
175:19
   **MW-507** [1] - 133:14
   **mythology** [1] - 197:14

## N

   **N-I-G-G-A** [1] - 46:21
   **name** [33] - 8:6, 8:8,
22:21, 23:5, 31:16, 56:2,
56:6, 57:7, 86:9, 86:10,
88:14, 95:21, 104:9,
106:12, 106:13, 106:14,
107:12, 116:11, 118:20,
118:21, 120:14, 120:15,
125:14, 126:20, 131:1,
132:21, 136:5, 199:10,
199:16, 199:20
   **Name** [1] - 8:7
   **name's** [3] - 89:17,
111:9, 125:22
   **named** [10] - 43:8,
44:11, 71:23, 72:5,
156:14, 177:10, 188:8,
248:7, 249:7, 254:23
   **Namely** [1] - 260:2
   **names** [1] - 8:11
   **narcotics** [3] - 215:5,
227:9, 237:20
   **narrative** [2] - 24:11,
36:4
   **narratives** [2] - 30:4,
36:10
   **narrow** [1] - 27:8
   **Nassau** [9] - 104:18,
106:23, 107:2, 107:3,
107:10, 133:18, 154:15,
167:17, 175:3
   **national** [1] - 71:11

**Nationally** [1] - 108:25
**nature** [7] - 13:17, 77:4, 147:2, 187:24, 204:22, 241:19, 243:6
**Nausau** [1] - 104:17
**near** [2] - 27:23, 178:16
**necessarily** [13] - 20:6, 41:16, 44:22, 47:2, 54:15, 57:4, 72:14, 72:23, 72:24, 112:3, 236:14, 245:22, 249:17
**necessary** [7] - 37:15, 57:22, 186:10, 211:10, 245:17, 260:2
**need** [43] - 5:21, 6:17, 17:14, 27:10, 39:23, 40:14, 52:17, 68:2, 80:6, 81:9, 84:6, 92:3, 94:18, 96:3, 99:8, 103:20, 105:23, 105:24, 107:22, 107:24, 108:4, 110:5, 115:25, 117:7, 136:22, 144:8, 146:24, 156:12, 163:6, 165:14, 175:18, 186:5, 204:15, 209:10, 209:12, 212:17, 227:21, 234:24, 236:22, 237:17, 244:6, 260:5
**needed** [3] - 27:24, 122:16, 153:22
**needs** [4] - 93:5, 98:17, 199:24, 249:9
**negative** [2] - 95:20, 134:4, 134:5
**neighborhood** [4] - 23:5, 23:10, 29:14, 52:13
**neighborhoods** [2] - 22:11, 60:8
**Nephew** [2] - 199:25, 200:7
**never** [13] - 43:16, 43:17, 53:20, 54:10, 54:19, 55:3, 55:4, 72:10, 78:14, 157:18, 163:19, 190:21, 231:23
**Never** [1] - 202:17
**new** [6] - 21:8, 28:15, 99:15, 230:17, 236:3, 239:8
**New** [9] - 22:4, 32:9, 50:5, 50:15, 64:10, 65:1, 99:17, 107:3, 113:14
**News** [2] - 8:19, 60:20
**news** [2] - 20:12, 209:17
**newsletter** [2] - 10:23, 11:8
**newspaper** [1] - 12:2
**newspapers** [1] - 12:1
**next** [27] - 7:25, 59:2,

72:17, 86:4, 91:3, 92:25, 95:16, 101:2, 105:20, 108:11, 109:25, 114:10, 117:14, 117:24, 120:20, 121:1, 121:10, 122:24, 123:3, 123:18, 130:21, 142:18, 142:19, 168:19, 211:23, 214:8, 228:5
**Next** [1] - 126:6
**nicknames** [1] - 22:22
**Nicky** [1] - 32:8
**Niedermeier** [11] - 82:16, 82:17, 82:21, 85:16, 114:14, 114:22, 115:5, 115:23, 116:15, 116:17, 118:3
**niggas** [3] - 52:21, 53:16, 61:15
**night** [14] - 22:2, 55:16, 55:18, 55:23, 55:24, 56:14, 81:12, 87:5, 89:21, 90:5, 91:12, 153:17, 231:21, 231:23
**Nike** [1] - 88:21
**Nina** [1] - 114:8
**Nine** [9] - 130:2, 130:3, 141:15, 141:16, 143:9, 143:17, 144:20, 147:17, 227:9
**nine** [6] - 36:5, 41:20, 58:8, 58:10, 132:10, 185:13
**Nine's** [1] - 143:10
**Nine/2000** [1] - 132:13
**ninth** [1] - 123:15
**NO** [1] - 1:6
**Nobody** [1] - 156:21
**nobody** [6] - 18:18, 156:23, 165:7, 180:5, 244:9, 257:4
**noise** [2] - 36:23
**nominated** [1] - 11:11
**None** [3] - 148:25, 180:1, 205:19
**none** [1] - 47:20
**Noriega** [9] - 31:14, 31:25, 32:1, 47:12, 47:21, 47:24, 53:24, 57:2, 57:5
**normal** [2] - 58:11, 182:11
**normally** [2] - 122:14, 244:19
**Normally** [1] - 242:12
**north** [3] - 89:24, 177:22, 178:15
**northern** [1] - 11:1
**Northern** [1] - 9:7
**NORTHERN** [1] - 1:2
**northwest** [4] - 177:22,

177:25, 178:13, 178:14
**note** [14] - 25:4, 76:12, 80:20, 81:3, 98:24, 118:7, 144:11, 186:21, 207:20, 208:9, 208:10, 212:21, 246:9, 248:1
**noted** [20] - 171:9, 173:7, 187:19, 200:13, 200:16, 203:22, 205:4, 208:8, 208:16, 208:25, 209:9, 212:24, 234:13, 245:25, 246:16, 246:22, 250:9, 250:10, 251:21, 252:13
**notes** [5] - 34:21, 115:4, 115:23, 118:3, 118:8
**nothing** [14] - 32:3, 33:24, 77:3, 134:11, 136:18, 183:12, 189:16, 192:10, 193:13, 193:24, 200:11, 257:8, 257:9, 257:11
**Nothing** [5] - 75:10, 125:18, 165:22, 176:3, 249:11
**nothing's** [1] - 204:4
**notice** [5] - 97:14, 196:1, 233:3, 244:21, 245:8
**noticed** [2] - 2:17, 172:11
**notifying** [1] - 75:16
**noting** [1] - 257:25
**notion** [3] - 70:17, 216:23, 239:3
**Notorious** [5] - 31:7, 32:6, 33:13, 34:23, 42:19
**notwithstanding** [1] - 165:2
**November** [7] - 1:11, 158:5, 158:7, 158:19, 169:22, 178:18, 264:5
**nozzle** [2] - 57:12, 57:17
**Number** [7] - 90:24, 93:13, 128:19, 141:15, 141:16, 148:3, 252:15
**number** [33] - 12:23, 15:13, 18:2, 21:17, 23:20, 24:2, 40:23, 41:2, 60:1, 67:14, 81:12, 89:4, 93:12, 94:16, 97:3, 97:16, 107:22, 120:8, 120:10, 120:11, 120:18, 121:24, 123:20, 124:9, 124:13, 124:15, 130:1, 142:15, 143:8, 168:19, 198:19
**Number(s** [1] - 264:5
**numbers** [1] - 120:14,

137:11
**numerous** [3] - 21:14, 50:11, 51:14
**NWA** [3] - 30:1, 30:4, 32:12

## O

**Oakland** [5] - 9:7, 22:20, 22:22, 22:24, 37:1
**oath** [3] - 176:23, 177:2, 207:4
**object** [28] - 55:7, 78:1, 81:22, 96:8, 115:16, 136:17, 136:18, 149:3, 150:5, 170:14, 170:18, 174:2, 192:20, 196:18, 211:17, 212:5, 217:5, 217:7, 218:8, 220:8, 225:3, 225:14, 233:25, 234:4, 234:10, 234:12, 236:10, 243:14
**objected** [1] - 243:14
**objecting** [3] - 82:8, 171:2, 171:3
**Objection** [16] - 24:20, 31:22, 50:21, 63:16, 65:10, 75:7, 96:2, 107:18, 139:21, 140:3, 141:6, 181:15, 181:19, 183:10
**objection** [38] - 5:23, 5:25, 27:18, 29:21, 77:13, 79:22, 80:20, 93:7, 97:13, 98:2, 107:25, 108:5, 128:11, 146:23, 147:17, 147:20, 148:11, 150:4, 164:14, 164:15, 164:21, 165:5, 170:25, 171:9, 181:16, 181:23, 194:7, 200:9, 204:20, 207:21, 212:12, 212:20, 213:1, 234:3, 234:14
**objection's** [1] - 55:9, 65:14, 139:23, 173:7, 234:13
**objections** [1] - 5:20
**objective** [3] - 224:7, 224:12, 224:14
**objectives** [1] - 224:15
**Objectives** [1] - 224:16
**objects** [2] - 4:16, 196:19
**obligations** [2] - 109:14, 110:2
**Obligations** [1] - 109:16
**observe** [1] - 211:1

**observers** [1] - 25:8
**observing** [1] - 211:12
**obstruct** [1] - 193:9
**obstruction** [1] - 213:6
**obtain** [2] - 203:12, 252:3
**obtained** [3] - 123:17, 134:19, 134:21
**obtuse** [1] - 253:18
**obvious** [5] - 14:20, 47:19, 78:18, 172:23, 198:11
**Obviously** [4] - 5:12, 185:19, 219:16, 249:5
**obviously** [19] - 2:24, 13:3, 38:25, 39:14, 57:3, 57:4, 77:13, 79:6, 150:17, 215:1, 215:24, 216:17, 217:19, 221:9, 223:12, 230:17, 235:8, 240:13, 260:8
**occasion** [2] - 16:16, 164:22
**occasionally** [2] - 47:12, 164:3
**occupied** [1] - 145:17
**occurred** [2] - 140:14, 210:1
**October** [1] - 127:23, 132:12, 138:13, 258:21
**odometer** [1] - 121:16
**OF** [3] - 1:2, 1:5, 1:11
**offended** [4] - 198:3, 198:5, 198:9, 198:12
**offense** [5] - 42:12, 139:22, 195:18, 205:25, 206:3
**offer** [11] - 15:25, 101:14, 102:1, 102:2, 102:17, 102:18, 103:8, 103:9, 103:10, 132:8, 132:10
**offered** [2] - 77:5, 237:18
**Office** [2] - 17:11, 210:18
**office** [4] - 92:6, 117:5, 156:25, 235:9
**office's** [1] - 146:4
**officer** [7] - 80:25, 82:13, 83:7, 83:12, 86:4, 119:15, 153:13
**OFFICER** [1] - 86:6, 263:7
**Officer** [6] - 86:10, 86:14, 87:11, 89:15, 89:20, 90:18
**officers** [1] - 50:15
**official** [1] - 264:8
**Official** [1] - 264:16

**often** [10] - 9:1, 34:2, 37:24, 45:3, 49:24, 50:2, 56:4, 60:9, 63:2, 65:2
**old** [5] - 99:17, 129:5, 159:10, 245:20
**older** [2] - 122:20, 125:2
**oldest** [1] - 8:21
**Oliver** [1] - 238:11
**Omega** [12] - 114:17, 116:10, 117:18, 117:21, 120:6, 120:8, 121:5, 122:3, 123:25, 124:8, 124:16, 244:19
**omissions** [1] - 213:17
**omit** [1] - 200:2
**omits** [1] - 227:10
**omitted** [2] - 201:4, 228:17
**ON** [1] - 263:4
**once** [18] - 13:14, 30:8, 56:6, 81:8, 97:21, 97:22, 105:9, 139:9, 139:13, 139:14, 143:8, 179:12, 185:1, 185:10, 185:18, 242:11
**Once** [2] - 37:2, 186:20
**one** [173] - 2:13, 2:17, 3:25, 4:7, 5:10, 6:10, 8:21, 10:18, 11:11, 11:22, 11:23, 11:25, 12:4, 14:11, 15:12, 17:2, 17:16, 17:17, 22:11, 23:15, 29:9, 30:3, 30:20, 31:10, 32:11, 34:24, 34:25, 35:23, 39:19, 40:13, 42:4, 44:10, 46:5, 46:20, 48:10, 52:5, 52:8, 53:25, 56:23, 57:18, 64:21, 66:25, 69:16, 71:14, 73:23, 83:17, 85:8, 85:22, 85:25, 88:18, 88:19, 88:20, 88:21, 95:2, 96:3, 96:7, 98:16, 100:19, 106:5, 107:4, 107:22, 108:3, 113:1, 113:20, 116:14, 116:17, 117:22, 117:23, 123:14, 124:16, 125:23, 127:8, 128:21, 130:7, 134:14, 135:1, 135:13, 136:12, 141:3, 143:23, 144:6, 145:1, 147:20, 152:12, 152:13, 153:21, 154:12, 154:13, 155:24, 156:5, 156:6, 156:13, 161:19, 163:6, 164:11, 167:7, 167:8, 169:6, 170:22, 171:14, 180:3, 180:9, 180:19, 180:21, 180:24, 181:10, 182:16,

186:10, 187:13, 187:24, 189:7, 189:13, 189:24, 190:18, 191:16, 197:6, 200:9, 201:12, 203:25, 204:1, 204:13, 206:24, 207:15, 208:20, 208:21, 209:2, 209:5, 209:24, 214:19, 214:20, 218:11, 218:21, 219:12, 220:13, 222:15, 224:21, 225:22, 228:12, 228:13, 232:15, 232:16, 232:19, 234:2, 236:8, 236:17, 237:7, 238:10, 238:24, 239:8, 240:6, 240:22, 246:14, 248:7, 248:13, 250:3, 250:7, 252:15, 254:22, 255:6, 255:7, 256:2, 259:11, 259:17, 261:1
**One** [25] - 24:3, 28:20, 33:2, 47:10, 55:16, 59:9, 95:17, 95:23, 95:24, 154:10, 166:9, 174:10, 174:22, 187:25, 188:4, 190:25, 193:6, 215:5, 227:20, 227:21, 227:24, 238:21, 246:2, 246:12, 251:21
**one-upmanship** [4] - 30:3, 31:10, 32:11, 44:10
**onerous** [3] - 241:6, 241:18, 243:12
**ones** [1] - 12:24, 23:9, 42:16, 46:3, 63:6, 69:4, 69:13, 72:9, 83:21, 240:9, 255:6
**Online** [1] - 134:23
**open** [7] - 28:3, 71:3, 99:1, 144:13, 168:15, 187:1
**open-ended** [2] - 28:3
**opened** [1] - 172:2
**opening** [1] - 5:24, 83:22, 171:25, 248:12
**operating** [1] - 106:5
**operations** [2] - 13:2, 69:20
**opinion** [16] - 25:11, 25:17, 40:3, 53:12, 63:13, 63:20, 73:6, 73:12, 77:17, 79:3, 79:13, 80:16, 81:3, 147:5, 147:6
**opinion's** [1] - 75:4
**opinions** [9] - 61:23, 69:6, 76:4, 78:21, 78:24, 79:7, 80:15, 81:2, 147:7
**opportunities** [1] - 37:24
**opportunity** [6] - 15:24,

46:14, 51:19, 53:22, 221:19, 245:5
**opposed** [2] - 35:6, 150:3, 197:18
**oral** [3] - 18:14, 166:23
**Order** [1] - 241:1
**order** [14] - 28:25, 101:17, 102:5, 103:13, 109:5, 110:6, 112:7, 112:8, 122:16, 127:7, 128:23, 148:25, 149:13, 203:4
**ordinarily** [4] - 164:20, 192:10, 192:13, 192:17
**ordinary** [2] - 203:11, 217:9
**organization** [12] - 11:13, 11:17, 26:1, 120:10, 130:24, 161:9, 219:17, 219:23, 220:21, 245:16, 246:19, 257:14
**organizational** [1] - 260:4
**oriented** [1] - 8:21
**original** [2] - 123:6, 123:11
**originally** [2] - 46:1, 77:13
**Orleans** [2] - 64:11, 65:1
**ostensible** [1] - 79:11
**otherwise** [1] - 210:3
**out-of-court** [1] - 151:3
**outlet** [1] - 15:6
**outline** [1] - 99:21, 100:17
**outlined** [1] - 15:9
**outs** [1] - 68:23
**outside** [3] - 12:5, 98:17, 110:20
**outspoken** [4] - 11:24, 12:7, 15:1, 19:10
**Outta** [5] - 24:16, 24:23, 27:18, 28:13, 29:3
**over-attention** [1] - 48:24
**over-surveillance** [1] - 48:24
**overall** [4] - 61:6, 215:7, 236:1, 246:11
**overarching** [4] - 215:4, 215:7, 238:19, 239:4
**overnight** [3] - 164:25, 188:23, 235:1
**overreaching** [1] - 49:25
**overrule** [1] - 170:24
**Overruled** [4] - 31:23, 50:22, 63:17, 141:7
**overruled** [3] - 55:9,

108:7, 139:23
**overrun** [2] - 78:9, 212:9
**overwhelming** [2] - 42:16, 63:19
**owe** [1] - 260:24
**owed** [1] - 120:3
**Owings** [1] - 129:13
**own** [11] - 13:2, 28:22, 37:10, 38:11, 44:20, 78:21, 82:5, 116:10, 117:20, 124:12, 181:6, 203:4, 203:5, 203:12, 205:24, 240:5, 261:20
**owned** [3] - 124:8, 124:11, 125:1
**owner** [8] - 116:10, 117:20, 120:5, 120:6, 123:1, 123:6, 124:1, 124:12
**ownership** [1] - 119:25

# P

**P-E-N-T-E-C-O-S-T** [1] - 126:21
**P-O-W-E-R-S** [1] - 106:15
**p.m** [4] - 100:24, 133:23, 166:17, 262:3
**packet** [4] - 132:14, 135:6, 135:13
**packing** [2] - 231:21, 231:23
**pads** [5] - 25:4, 76:12, 98:24, 144:11, 186:21
**PAGE** [1] - 263:2
**Page** [66] - 57:15, 98:10, 98:11, 190:3, 190:4, 190:11, 190:12, 191:22, 192:6, 192:7, 193:1, 194:13, 196:16, 196:7, 200:8, 200:17, 200:20, 201:2, 202:16, 202:18, 205:4, 205:5, 207:8, 207:10, 207:11, 207:13, 208:16, 208:18, 212:11, 212:24, 213:9, 214:11, 215:3, 215:8, 219:11, 219:21, 224:1, 224:10, 224:19, 226:8, 229:1, 229:23, 230:8, 233:16, 235:22, 236:12, 245:10, 246:4, 246:24, 247:5, 253:21
**page** [41] - 2:17, 45:6, 98:9, 100:2, 100:9, 117:17, 117:19, 119:23, 120:20, 121:10, 122:24,

123:3, 123:18, 130:12, 130:21, 133:2, 135:7, 135:16, 138:6, 138:15, 138:22, 138:25, 142:24, 143:2, 144:21, 144:25, 148:6, 148:7, 148:12, 189:5, 192:9, 201:15, 227:1, 229:4, 235:18, 236:11, 245:4, 253:21
**pages** [7] - 46:15, 98:10, 135:11, 228:5, 253:23, 255:11, 264:7
**Pages** [1] - 57:19
**paid** [7] - 23:21, 120:24, 121:2, 121:8, 161:4, 161:8, 161:9
**pair** [4] - 88:18, 88:20, 88:21
**pairs** [1] - 248:10
**palm** [2] - 24:25, 75:5
**paper** [1] - 57:19
**Paper's** [1] - 3:22
**papers** [5] - 81:24, 82:2, 193:13, 193:24, 200:10
**paragraph** [30] - 88:14, 156:13, 190:5, 190:10, 191:2, 191:3, 191:8, 192:8, 193:1, 194:13, 196:11, 198:16, 200:9, 200:20, 201:3, 207:25, 208:10, 213:10, 213:14, 213:16, 214:8, 214:12, 215:24, 219:21, 224:19, 236:1, 236:12, 245:12, 252:2, 256:2
**paragraphs** [1] - 161:23
**paralegal** [1] - 173:11
**parallels** [1] - 23:25
**pardon** [6] - 11:4, 43:4, 49:6, 52:7, 59:12, 73:9
**Pardon** [1] - 153:9
**parentheticals** [1] - 229:25
**Paris** [1] - 33:3
**Park** [7] - 43:19, 177:22, 177:25, 178:2, 178:15, 178:16, 219:17
**parking** [2] - 89:23, 90:3
**part** [40] - 18:1, 18:6, 21:22, 22:6, 26:1, 26:9, 38:6, 44:10, 47:24, 51:18, 53:21, 54:10, 56:25, 68:9, 114:24, 116:3, 119:10, 128:3, 132:1, 134:1, 135:3, 136:20, 145:2, 151:21, 151:23, 160:5, 168:6, 178:12, 182:11, 182:13, 182:25, 188:4, 226:4,

226:23, 231:21, 257:14, 257:18, 258:18

**Part** [4] - 56:25, 65:18, 128:1, 229:7

**part-time** [1] - 132:1

**partial** [1] - 213:16

**participate** [2] - 224:12, 224:13

**participated** [1] - 252:4

**participating** [2] - 23:1, 252:2

**participation** [3] - 215:16, 215:25, 217:13

**particular** [49] - 4:22, 6:8, 20:14, 22:22, 24:10, 26:7, 36:1, 36:20, 36:24, 40:15, 46:3, 49:12, 63:2, 63:7, 63:10, 63:11, 64:13, 64:21, 65:4, 65:13, 65:20, 65:24, 66:24, 68:24, 70:2, 70:3, 70:4, 71:6, 75:4, 75:21, 75:22, 94:1, 94:3, 94:5, 132:21, 141:20, 145:7, 152:6, 173:17, 180:17, 192:19, 216:15, 237:13, 246:13, 251:9, 253:3, 254:1, 254:11

**Particular** [1] - 64:3

**particularly** [7] - 10:17, 25:19, 33:24, 183:19, 238:8, 243:25, 260:9

**parties** [5] - 10:5, 10:6, 91:20, 175:11, 242:17

**parts** [3] - 64:18, 68:22, 151:22

**party** [10] - 19:18, 21:17, 23:10, 55:16, 55:18, 55:22, 56:14, 56:20, 56:22, 243:1

**pass** [1] - 92:1

**passages** [1] - 203:15

**passed** [2] - 78:12, 92:2

**past** [3] - 13:7, 68:12, 202:16

**path** [1] - 6:5

**patience** [4] - 104:9, 104:12, 174:18, 186:21

**Patrice** [1] - 95:3

**Patricia** [2] - 94:25

**patrol** [3] - 86:21, 86:22, 119:15

**pattern** [1] - 31:9

**Paul** [1] - 1:19

**pause** [1] - 172:10

**pay** [5] - 19:15, 49:25, 131:25, 151:11, 153:6

**paychecks** [1] - 42:4

**paying** [1] - 10:4

**payola** [3] - 15:1, 19:11,

19:15

**payroll** [3] - 160:5, 160:8, 160:10

**peculiar** [2] - 192:10, 192:22

**peer** [2] - 78:25, 80:2

**peers** [2] - 22:10, 46:2

**pejorative** [1] - 79:4

**Pennsylvania** [5] - 97:13, 97:15, 113:17, 122:25, 123:12

**Pentecost** [10] - 126:15, 126:21, 128:6, 136:25, 137:3, 140:23, 141:10, 155:1, 157:13, 158:24

**PENTECOST** [2] - 126:17, 263:14

**people** [94] - 11:11, 11:23, 12:4, 13:4, 13:8, 13:14, 13:21, 14:19, 15:5, 15:16, 18:5, 18:7, 20:5, 20:9, 20:11, 21:5, 21:12, 21:19, 21:20, 22:10, 22:21, 23:1, 23:22, 23:25, 24:4, 24:5, 24:9, 24:12, 26:6, 30:1, 31:10, 31:12, 31:14, 31:24, 32:4, 32:13, 33:12, 34:1, 34:2, 34:7, 37:13, 37:22, 38:20, 38:24, 39:1, 41:4, 45:7, 45:10, 45:22, 48:4, 51:3, 51:8, 52:2, 52:6, 52:9, 52:13, 54:23, 54:24, 56:12, 58:3, 59:7, 59:21, 60:8, 60:9, 62:6, 66:13, 68:2, 68:6, 68:7, 68:21, 70:5, 70:7, 71:4, 71:12, 78:22, 78:23, 80:11, 99:7, 132:24, 149:9, 153:12, 165:13, 171:5, 171:6, 179:22, 179:24, 180:18, 182:8, 182:21, 204:7, 256:18, 257:2

**People** [3] - 12:23, 42:21, 43:16

**people's** [2] - 38:10, 46:4

**peoples** [1] - 58:6

**per** [2] - 17:5, 31:1

**perceive** [2] - 48:13, 195:24

**perceived** [3] - 23:25, 24:6, 51:9

**perfected** [2] - 233:21, 233:22

**Perfectly** [2] - 3:4, 42:8

**perfectly** [7] - 3:4, 27:21, 48:22, 52:17, 99:19, 172:23, 192:22

**perform** [1] - 49:20

**perhaps** [7] - 5:13, 82:7, 98:22, 143:1, 143:22, 144:18, 159:3

**Perhaps** [3] - 27:10, 142:9, 191:16

**period** [32] - 21:10, 23:17, 24:3, 34:20, 38:15, 109:10, 114:18, 142:17, 142:18, 155:5, 155:14, 155:24, 157:15, 158:1, 158:2, 158:4, 158:6, 158:10, 162:10, 167:5, 175:12, 193:9, 215:20, 218:12, 229:6, 253:11, 254:2, 254:4, 254:25, 255:14, 256:9, 256:11

**periods** [4] - 143:4, 155:23, 156:6

**perjurers** [4] - 205:24, 206:2, 206:8, 206:15

**perjury** [14] - 205:6, 205:7, 205:8, 205:14, 205:15, 205:18, 205:21, 205:22, 206:1, 206:3, 206:9, 206:10, 206:13

**Perjury** [1] - 205:25

**permissible** [1] - 165:12

**permission** [2] - 24:18, 34:14

**permit** [6] - 19:1, 25:8, 75:20, 79:17, 172:25, 207:19

**permits** [1] - 169:11

**permitted** [5] - 5:23, 75:15, 76:23, 105:14, 170:22

**person** [27] - 31:21, 39:10, 53:23, 53:25, 55:14, 79:24, 85:23, 88:9, 88:13, 88:15, 89:8, 115:2, 116:1, 120:3, 123:8, 128:12, 128:16, 133:15, 204:1, 208:1, 216:20, 253:1, 256:20, 256:21, 256:25

**person's** [5] - 114:16, 193:13, 193:25, 215:20, 216:3

**persona** [1] - 31:19

**personal** [4] - 9:14, 75:22, 197:19, 221:15

**Personal** [1] - 221:16

**personally** [6] - 49:9, 180:8, 183:23, 192:3, 197:12, 198:9

**personas** [2] - 31:11, 32:3

**personification** [1] - 36:4

**personify** [1] - 34:24

**personnel** [2] - 210:16, 236:2

**persons** [1] - 246:21

**perspective** [3] - 24:24, 28:15, 214:25

**persuade** [2] - 209:3, 209:5

**persuaded** [1] - 242:24

**pertinent** [2] - 120:15, 121:13

**phases** [1] - 23:21

**philosophy** [1] - 74:18

**phone** [6] - 4:3, 4:5, 36:25, 117:6, 118:10, 157:6, 231:24, 232:22

**phonetically** [1] - 64:23

**photographs** [1] - 95:10

**Photographs** [1] - 95:10

**phrase** [2] - 70:19, 219:15

**phraseology** [1] - 224:7

**Physical** [5] - 106:23, 133:9, 139:1, 167:12, 167:15

**physical** [2] - 132:3, 191:25

**physically** [1] - 163:7

**picked** [1] - 226:16

**picking** [2] - 213:22, 214:10

**pieced** [1] - 246:3

**Pimlico** [2] - 177:22, 178:15

**pimping** [1] - 24:14

**pinpoint** [1] - 171:11

**pioneered** [1] - 39:2

**PKT** [1] - 132:14

**place** [11] - 3:19, 3:22, 15:15, 22:8, 49:10, 68:12, 137:19, 203:3, 203:21, 213:21, 229:5

**places** [5] - 14:3, 24:12, 166:2, 215:3, 228:4

**plain** [1] - 252:17

**plan** [1] - 81:8

**planning** [4] - 99:20, 100:14, 152:16, 247:20

**plans** [1] - 211:6

**plant** [1] - 80:8

**play** [24] - 5:23, 12:14, 17:11, 19:18, 24:19, 27:18, 28:19, 32:24, 34:14, 34:25, 49:12, 69:14, 82:19, 82:21, 83:13, 85:20, 108:19,

109:5, 109:19, 109:20, 109:23, 112:7, 164:10

**played** [18] - 33:1, 33:5, 33:17, 47:24, 54:12, 55:11, 57:15, 65:16, 65:18, 71:6, 79:5, 109:7, 109:23, 109:24, 109:25, 150:12, 152:1, 163:3

**player** [2] - 107:16, 110:3

**playing** [9] - 28:23, 35:14, 38:4, 40:1, 82:15, 92:17, 110:20, 112:14, 151:18

**plea** [5] - 148:5, 202:20, 203:8, 203:10, 204:3

**pleading** [4] - 148:4, 168:16, 168:18, 168:19, 192:10

**pleadings** [6] - 193:3, 193:5, 194:15, 196:12, 196:14, 197:20

**pleasure** [2] - 76:18, 113:23

**plug** [3] - 219:18, 235:18, 252:19

**plural** [1] - 224:16

**Point** [2] - 99:21, 100:8

**point** [43] - 15:12, 20:11, 29:12, 30:2, 37:6, 37:7, 43:25, 48:21, 49:5, 49:7, 56:12, 71:6, 81:25, 83:7, 100:8, 101:22, 108:14, 116:9, 130:17, 131:6, 142:20, 150:16, 152:6, 163:23, 165:24, 168:10, 184:14, 184:23, 190:1, 195:17, 199:18, 202:4, 204:2, 204:20, 204:21, 205:2, 206:16, 214:6, 223:7, 233:18, 244:17, 245:24, 256:1

**pointed** [3] - 70:2, 82:1, 243:7

**points** [1] - 258:13

**police** [15] - 49:10, 49:23, 50:12, 50:14, 50:15, 55:4, 59:22, 61:4, 61:7, 62:25, 80:25, 84:20, 86:15, 86:17, 231:23

**Police** [3] - 50:5, 93:15, 142:20

**policy** [1] - 101:15

**polite** [1] - 240:24

**political** [4] - 17:17, 20:1, 20:8, 20:17

**politicizing** [1] - 17:15

**politics** [4] - 8:17, 8:20, 17:12, 20:2

**poor** [3] - 146:15, 146:20, 245:3
**pop** [1] - 36:11
**popular** [9] - 21:4, 23:14, 34:24, 63:1, 66:9, 66:21, 67:25, 71:23, 74:7
**portion** [5] - 55:11, 97:19, 98:3, 164:2, 183:17
**portions** [4] - 92:1, 142:23, 143:1, 143:3
**position** [27] - 2:10, 19:12, 36:9, 39:4, 39:16, 119:8, 119:18, 126:24, 132:2, 132:19, 133:9, 133:21, 133:23, 150:1, 173:3, 197:10, 205:1, 232:8, 234:17, 241:14, 244:10, 244:12, 252:5, 254:23, 255:4, 257:13, 257:21
**positions** [2] - 17:20, 45:10
**possibility** [1] - 74:17
**possible** [3] - 39:1, 208:11, 221:25
**possibly** [4] - 37:11, 74:23, 117:16, 179:7
**posters** [1] - 100:17
**Powder** [1] - 227:12
**Power** [2] - 99:21, 100:8
**POWERS** [2] - 106:10, 263:10
**Powers** [17] - 83:22, 84:10, 84:12, 104:10, 104:11, 105:22, 105:25, 106:4, 106:14, 107:21, 111:7, 111:12, 113:20, 114:1, 154:17, 154:24
**practice** [7] - 109:17, 109:19, 109:21, 113:10, 152:19, 166:25, 167:2
**practices** [1] - 15:1
**pre** [3] - 11:3, 11:5, 11:6
**Pre** [1] - 11:6
**pre-Internet** [3] - 11:3, 11:5, 11:6
**Pre-Internet** [1] - 11:6
**precede** [1] - 18:10
**preceded** [1] - 114:15
**preceding** [1] - 120:14
**precinct** [1] - 142:20
**precisely** [2] - 80:5, 153:3
**precluding** [1] - 168:24
**precoded** [1] - 120:12
**predicate** [1] - 245:17
**prefer** [1] - 91:6
**prefers** [1] - 8:11
**preliminary** [1] - 213:24

**premeditated** [1] - 230:14
**premium** [1] - 49:25
**preparation** [1] - 51:18
**prepare** [3] - 82:5, 92:7, 162:3
**prepared** [6] - 88:23, 91:23, 188:20, 190:18, 202:10
**preparing** [1] - 235:9
**prerogative** [1] - 244:20
**presence** [2] - 91:11, 98:17
**present** [9] - 4:20, 6:11, 45:7, 45:12, 117:20, 166:18, 184:4, 210:22
**presentation** [2] - 70:22, 99:21
**presented** [7] - 4:9, 4:13, 6:4, 35:11, 153:2, 250:19, 254:13
**presently** [1] - 124:14
**presents** [1] - 27:14
**preserved** [1] - 79:14
**pressed** [1] - 80:23
**pressure** [1] - 60:9
**pressuring** [1] - 15:2
**presumed** [2] - 216:5, 216:7, 219:9
**presumption** [4] - 217:18, 218:5, 219:8
**pretrial** [1] - 197:2
**Pretty** [1] - 71:23
**pretty** [26] - 11:24, 12:7, 12:11, 12:12, 12:13, 12:24, 13:5, 13:7, 15:1, 23:2, 27:24, 33:11, 34:24, 36:10, 37:23, 38:11, 49:16, 56:3, 61:1, 66:3, 74:5, 74:7, 74:15, 149:10, 226:20
**prevents** [1] - 15:3
**previous** [3] - 17:20, 123:1, 175:2
**PREVIOUSLY** [1] - 176:22
**previously** [7] - 102:12, 103:4, 139:1, 187:8, 188:6, 205:21, 224:25
**Prez** [1] - 33:4
**Price** [1] - 95:21
**price** [2] - 122:6, 122:8
**pride** [1] - 24:4
**primary** [6] - 14:11, 14:22, 21:19, 22:5, 30:2, 46:5
**prime** [1] - 21:13
**principal** [1] - 257:12
**print** [7] - 12:10, 100:2, 100:11, 100:19, 129:6,

192:2, 192:4
**printed** [1] - 191:23
**printer** [1] - 100:16
**printout** [4] - 96:22, 155:12, 156:25, 157:1
**prints** [1] - 75:5
**private** [3] - 124:12, 130:10, 137:23
**pro** [10] - 192:9, 193:2, 193:4, 193:13, 193:24, 194:15, 196:12, 196:14, 197:20, 200:10
**probation** [22] - 155:6, 155:7, 155:14, 155:15, 157:9, 159:5, 159:7, 159:8, 159:9, 159:15, 159:17, 159:20, 160:1, 160:3, 160:6, 167:9, 167:11, 167:14, 175:14
**probationary** [1] - 159:23
**probative** [1] - 76:1
**problem** [23] - 2:12, 2:13, 2:22, 3:24, 27:5, 28:2, 84:25, 100:5, 100:6, 114:5, 114:25, 115:11, 136:21, 154:25, 156:18, 156:19, 191:7, 194:12, 206:6, 219:2, 227:8, 233:13
**problems** [2] - 110:24, 196:7
**proceed** [7] - 2:3, 19:2, 81:18, 82:11, 117:12, 174:21, 210:22
**proceeding** [5] - 102:12, 177:9, 207:4, 225:22, 226:1
**proceedings** [12] - 98:23, 101:12, 101:25, 146:7, 148:17, 174:19, 211:1, 211:4, 211:6, 212:9, 264:4, 264:8
**Proceedings** [2] - 2:1, 262:3
**process** [3] - 20:17, 134:1, 222:16
**processed** [1] - 95:19
**produced** [1] - 4:15
**producer** [3] - 51:20, 56:20, 68:14
**producers** [2] - 13:11, 62:6
**production** [2] - 51:20, 61:25
**profess** [1] - 42:17
**professes** [1] - 36:5
**profession** [2] - 9:12, 67:4
**professional** [4] - 8:7,

63:20, 69:6, 183:7
**Professor** [1] - 106:23
**proffer** [11] - 7:19, 16:5, 25:10, 65:12, 82:22, 167:19, 167:24, 167:25, 168:2, 168:21, 249:24
**proffered** [1] - 78:16
**proffering** [1] - 6:14
**profitable** [1] - 68:7
**program** [6] - 108:21, 108:22, 116:6, 117:16, 132:21
**programming** [1] - 13:1
**progress** [2] - 26:7, 99:23
**prohibits** [1] - 15:8
**prolong** [1] - 211:16
**prominent** [3] - 12:24, 13:19, 33:2
**promoted** [1] - 25:22
**promoters** [1] - 49:21
**promoting** [2] - 63:7, 69:9
**pronounced** [3] - 64:14, 64:16, 64:23
**proof** [5] - 207:17, 207:18, 216:4, 232:23, 246:9
**proper** [4] - 6:12, 77:6, 79:13, 197:19
**property** [3] - 89:3, 221:15, 221:16
**proposal** [2] - 161:22, 161:23
**propose** [3] - 211:18, 224:18, 236:3
**proposed** [12] - 187:23, 199:14, 202:5, 203:18, 217:24, 219:12, 228:9, 229:9, 250:3, 250:7
**Proposed** [2] - 256:3, 258:21
**prosecution** [4] - 48:17, 203:13, 225:8, 225:16
**prosecutions** [2] - 225:7, 225:15
**prosecutors** [1] - 151:6
**prove** [8] - 19:20, 195:18, 208:11, 229:10, 239:4, 245:15, 246:10, 260:2
**proved** [1] - 213:20, 222:3, 222:14
**proven** [3] - 195:5, 222:6, 223:19
**proves** [1] - 204:24
**provide** [6] - 20:14, 37:14, 51:3, 59:22, 100:19, 180:4
**provided** [9] - 12:4,

84:24, 87:5, 92:11, 133:3, 134:24, 136:14, 213:19, 216:12
**provides** [1] - 214:25
**providing** [1] - 53:20
**Providing** [1] - 146:2
**provision** [1] - 75:19
**public** [17] - 12:15, 96:10, 96:25, 101:14, 101:15, 101:16, 102:4, 102:7, 102:20, 102:21, 103:12, 103:14, 141:18, 142:1, 142:14, 142:21, 146:4
**Public** [12] - 13:4, 33:2, 35:6, 49:18, 66:2, 102:8, 102:23, 103:16, 129:2, 129:16, 129:24, 146:5
**publication** [4] - 10:1, 10:16, 10:21, 10:22
**puffing** [1] - 47:20
**pull** [5] - 87:10, 140:5, 140:9, 148:14
**pulled** [4] - 4:22, 4:23
**punch** [1] - 172:15
**punishment** [1] - 51:8
**Pure** [1] - 57:14
**purists** [1] - 18:7
**purpose** [5] - 151:14, 220:16, 225:17, 247:9, 252:5
**purposely** [1] - 200:22
**purposes** [4] - 5:8, 159:23, 220:14, 222:15
**pursuant** [1] - 146:8
**pushing** [1] - 36:21, 63:7, 68:16
**put** [52] - 3:18, 10:22, 14:25, 16:1, 26:17, 29:9, 33:19, 36:12, 42:5, 43:12, 58:17, 60:5, 60:9, 61:11, 68:5, 68:21, 79:17, 82:25, 89:3, 93:10, 96:8, 96:9, 98:6, 115:21, 125:4, 127:10, 132:1, 148:9, 149:9, 152:15, 153:1, 155:16, 156:20, 165:17, 167:16, 171:13, 172:4, 173:17, 173:25, 174:5, 187:7, 189:21, 189:22, 192:16, 196:2, 211:21, 228:18, 230:20, 233:1, 234:4, 240:24, 248:4
**Put** [1] - 57:17
**puts** [2] - 60:11, 172:6
**putting** [7] - 10:1, 32:20, 38:8, 45:14, 57:12, 99:20, 231:12
**PYNE** [1] - 176:12

**Pyne** [5] - 1:21, 84:22, 176:10, 184:10, 199:14

## Q

**Q-45** [2] - 93:23, 95:18
**qualifications** [1] - 77:4
**Qualifications** [1] - 16:10
**QUALIFICATIONS** [1] - 263:4
**qualify** [1] - 77:6
**quality** [4] - 146:15, 146:16, 146:21, 146:25
**quantifying** [1] - 78:5
**Quest** [1] - 49:17
**questioned** [1] - 5:11
**questioning** [2] - 46:3, 118:8
**questions** [27] - 16:8, 16:14, 19:7, 27:11, 27:15, 28:3, 40:18, 40:23, 42:12, 48:21, 71:16, 72:3, 72:4, 76:20, 89:11, 90:17, 108:14, 111:3, 112:1, 112:3, 113:21, 141:9, 179:15, 179:16, 181:10, 245:6
**quick** [6] - 96:8, 99:13, 108:13, 125:23, 212:19, 261:1
**quickly** [3] - 166:2, 196:8, 244:17
**quintessentially** [1] - 80:1
**Quite** [1] - 147:10
**quite** [2] - 110:17, 214:13
**quote** [9] - 20:11, 28:21, 40:16, 49:14, 146:16, 194:23, 198:21, 200:7, 203:1
**quote-unquote** [5] - 20:11, 28:21, 40:16, 49:14, 200:7
**quotes** [1] - 196:2

## R

**racism** [1] - 24:5
**racist** [1] - 24:6
**Racketeering** [1] - 227:9
**racketeering** [4] - 193:6, 237:24, 238:14, 254:23
**Radio** [1] - 13:2
**radio** [33] - 8:16, 8:24, 9:25, 10:6, 10:7, 11:16,

12:9, 12:17, 12:20, 13:1, 13:18, 13:21, 14:22, 15:16, 15:25, 19:14, 28:19, 32:2, 32:23, 33:6, 33:21, 35:11, 36:24, 37:16, 37:19, 37:23, 38:1, 45:8, 46:4, 49:12, 71:2, 71:7, 79:5
  **raise** [10] - 4:7, 15:14, 106:1, 106:7, 151:11, 196:7, 198:6, 233:17, 260:23
  **raised** [5] - 9:10, 192:11, 194:16, 233:12, 234:6
  **ran** [1] - 130:24
  **Randallstown** [1] - 91:12
  **Randallstown/Park** [5] - 219:17, 219:23, 220:20, 246:19, 257:14
  **ranges** [1] - 30:20
  **ranks** [2] - 65:25, 108:22
  **rap** [86] - 4:11, 4:12, 5:5, 5:7, 5:12, 5:14, 5:19, 5:21, 5:22, 6:1, 6:3, 6:6, 6:15, 6:19, 6:22, 9:9, 16:6, 16:17, 17:24, 18:1, 18:4, 18:7, 18:10, 18:18, 18:20, 18:22, 20:22, 21:1, 21:20, 21:22, 23:6, 24:8, 25:14, 25:21, 26:2, 26:7, 26:11, 26:14, 27:19, 32:20, 36:7, 40:24, 42:10, 42:14, 44:23, 45:2, 47:12, 48:12, 48:14, 48:25, 50:8, 50:20, 50:23, 50:25, 51:2, 51:14, 54:25, 55:25, 56:8, 58:12, 59:1, 62:15, 63:10, 63:19, 63:24, 64:1, 65:23, 66:11, 66:22, 67:24, 68:11, 68:23, 70:13, 71:2, 71:19, 74:5, 75:4, 78:7, 78:8, 78:22, 79:5, 79:8, 220:16
  **Rap** [1] - 5:21
  **rapper** [5] - 43:2, 43:8, 44:11, 52:13
  **rappers** [2] - 49:17, 49:19
  **rapping** [8] - 9:11, 9:18, 9:23, 22:10, 44:17, 59:7, 63:8
  **rat** [1] - 53:6
  **rate** [1] - 131:25
  **Rather** [1] - 87:15

**rather** [6] - 79:25, 82:1, 105:5, 211:19, 211:22, 243:4
  **ratified** [1] - 150:17
  **rational** [1] - 188:3
  **rationale** [1] - 187:7
  **rats** [1] - 53:10
  **Ray** [1] - 93:16
  **re** [1] - 242:20
  **re-weight** [1] - 242:20
  **reach** [3] - 17:14, 69:23, 185:7
  **reached** [4] - 141:11, 143:19, 146:20, 197:17
  **reaches** [1] - 20:7
  **reaching** [2] - 73:18, 185:25
  **reaction** [1] - 247:22
  **reactive** [1] - 247:12
  **read** [33] - 2:16, 52:15, 52:16, 54:7, 54:12, 55:19, 56:17, 56:23, 72:8, 85:19, 88:12, 88:17, 115:24, 153:18, 166:1, 177:9, 181:6, 191:3, 191:10, 193:21, 214:12, 214:15, 215:12, 215:14, 215:15, 215:21, 225:20, 227:17, 246:7, 250:8, 251:20, 259:21
  **Readers** [1] - 79:12
  **reading** [5] - 53:21, 57:14, 207:5, 207:6, 207:7
  **reads** [6] - 190:6, 191:5, 193:1, 217:18, 218:4, 236:13
  **Ready** [1] - 81:18
  **ready** [9] - 2:2, 7:25, 28:10, 82:11, 83:10, 83:25, 94:20, 101:6, 165:13
  **real** [23] - 32:15, 43:9, 44:1, 45:6, 48:4, 52:2, 52:5, 52:8, 53:3, 53:23, 53:24, 55:12, 55:14, 57:19, 57:21, 58:13, 63:11, 70:15, 70:20, 73:3, 163:12, 165:2
  **realistic** [1] - 34:11
  **realization** [1] - 203:5
  **realize** [1] - 93:5
  **realized** [2] - 114:15, 228:16
  **realizes** [1] - 203:11
  **Really** [3] - 60:12, 205:11, 206:16
  **really** [69] - 4:13, 19:10, 23:24, 25:7, 28:20, 33:17, 33:25, 38:1,

43:19, 48:20, 49:4, 49:21, 56:9, 58:14, 58:17, 58:18, 60:6, 61:14, 61:18, 68:21, 73:14, 76:17, 77:18, 78:5, 80:15, 80:16, 100:17, 104:15, 117:7, 125:23, 129:3, 147:2, 158:18, 161:12, 163:7, 163:24, 165:15, 166:14, 182:24, 186:12, 186:13, 188:15, 190:19, 196:6, 201:14, 202:22, 203:15, 203:18, 212:17, 213:11, 216:24, 218:17, 218:18, 220:18, 233:20, 234:24, 236:20, 236:22, 237:16, 238:18, 239:9, 239:22, 244:16, 245:1, 260:16, 260:17, 260:19
  **realm** [1] - 74:18
  **reason** [19] - 4:21, 4:24, 7:10, 7:15, 7:18, 39:25, 50:13, 77:5, 116:25, 138:15, 138:18, 142:17, 147:9, 148:13, 170:6, 171:2, 171:3, 232:17, 248:14
  **reasonable** [11] - 188:11, 207:19, 208:12, 223:20, 228:10, 235:13, 245:15, 252:25, 253:2, 253:10
  **Reasonable** [1] - 228:19
  **reasonably** [1] - 229:6
  **reasons** [6] - 151:5, 169:1, 183:3, 188:5, 240:22, 260:6
  **reassemble** [1] - 164:9
  **Reassignment** [1] - 123:5
  **reassignment** [4] - 121:7, 123:8, 123:12, 123:15
  **rebuttable** [1] - 219:7
  **rebuttal** [9] - 85:10, 85:12, 162:22, 166:7, 169:10, 170:21, 176:17, 177:6, 204:25
  **receipt** [1] - 120:23
  **receipts** [1] - 121:2
  **receive** [2] - 131:16, 203:12
  **recent** [2] - 17:2, 105:13
  **recently** [1] - 20:20
  **recess** [14] - 75:11, 76:15, 81:5, 81:15, 100:23, 100:24, 144:7, 144:9, 162:18, 165:7,

166:4, 184:4, 184:9, 188:21
  **Recess** [3] - 81:17, 166:17, 209:16
  **recognize** [1] - 87:15
  **recognized** [1] - 78:14
  **recognizing** [1] - 12:3
  **recollection** [2] - 5:10, 181:4
  **Record** [2] - 66:1, 96:13
  **record** [59] - 8:6, 11:2, 19:21, 28:18, 34:25, 35:3, 35:12, 36:17, 36:19, 36:22, 36:25, 37:4, 37:11, 37:14, 37:16, 39:8, 39:16, 57:13, 63:5, 65:24, 68:8, 79:3, 79:22, 80:21, 81:4, 81:14, 86:9, 93:4, 95:13, 96:9, 96:13, 96:17, 96:19, 96:20, 96:8, 106:12, 114:13, 116:16, 118:20, 126:20, 129:18, 142:19, 147:14, 148:9, 166:19, 167:19, 168:20, 169:2, 170:14, 170:18, 173:25, 174:5, 174:12, 207:24, 208:5, 209:14, 209:19, 211:21, 212:4
  **recorded** [4] - 125:6, 146:21, 164:23, 264:3
  **recording** [8] - 91:19, 91:21, 92:10, 146:21, 146:25, 150:13, 151:3, 165:3
  **recordings** [1] - 5:15
  **records** [35] - 10:5, 19:14, 21:8, 21:17, 31:5, 37:4, 39:3, 39:11, 39:22, 55:13, 58:15, 84:12, 84:13, 84:23, 124:17, 126:13, 129:1, 129:5, 129:23, 132:23, 140:5, 140:7, 140:8, 140:10, 141:18, 142:14, 143:5, 145:8, 146:5, 155:11, 156:10, 156:24, 157:4, 161:2
  **Records** [3] - 68:17, 127:13, 146:3
  **recounting** [1] - 153:25
  **recover** [1] - 89:21
  **recovered** [4] - 75:5, 89:25, 90:2, 90:3
  **RECROSS** [3] - 72:1, 182:19, 263:6
  **recruited** [1] - 107:15
  **redacted** [6] - 91:25, 92:19, 94:9, 148:10, 163:2, 163:3, 164:2,

202:9
**redaction** [1] - 150:5
**redactions** [1] - 202:5
**REDIRECT** [4] - 71:17,
182:6, 263:6, 263:18
**redirect** [1] - 113:24
**redo** [1] - 168:11
**redound** [1] - 252:23
**redounds** [1] - 252:22
**redundant** [1] - 215:1
**redwell** [1] - 149:12
**redwells** [2] - 149:1,
149:12
**refer** [11] - 50:15, 60:19,
65:24, 69:19, 70:8,
70:15, 120:2, 121:4,
167:7, 206:15, 215:4
**reference** [22] - 2:17,
6:9, 46:24, 53:3, 53:23,
54:20, 55:16, 55:20,
57:12, 63:11, 66:4, 66:5,
71:20, 73:3, 73:21, 74:4,
74:6, 74:23, 75:3, 75:17,
133:2, 148:7
**referenced** [2] - 6:21,
56:2
**references** [11] - 24:14,
40:9, 47:12, 47:24,
47:25, 61:20, 63:23,
65:20, 70:3, 70:4, 161:19
**referencing** [2] - 56:12,
57:2
**referral** [1] - 210:17
**referred** [6] - 50:5, 50:9,
50:11, 50:13, 50:17,
60:13
**referring** [6] - 47:3,
131:14, 172:5, 225:6,
226:13, 250:25
**reflect** [1] - 209:19
**reflected** [2] - 142:13,
225:24
**reflects** [1] - 134:2
**refused** [1] - 14:24
**refute** [1] - 157:17
**regard** [2] - 80:7,
234:17
**regarding** [6] - 67:13,
67:16, 167:19, 233:6,
249:16, 252:21
**Regarding** [1] - 190:7
**regardless** [1] - 225:25
**regards** [3] - 79:15,
193:12, 193:23
**register** [1] - 204:19
**registered** [3] - 114:18,
125:1, 125:8
**registering** [1] - 121:3
**Registrar** [1] - 127:12
**registration** [1] - 121:9

**regular** [3] - 112:21,
186:10, 186:13
**rehire** [1] - 138:20
**rein** [1] - 13:21
**Reisterstown** [1] -
118:9
**rejected** [3] - 212:13,
251:16, 252:13
**relate** [1] - 117:15
**related** [6] - 5:14, 42:21,
82:24, 151:12, 151:13,
229:6
**relates** [1] - 96:14
**relating** [3] - 9:14,
31:13, 151:10
**relationship** [1] - 56:9
**relative** [1] - 48:10
**relatively** [1] - 151:25
**release** [6] - 101:17,
102:5, 103:13, 155:13,
157:2, 175:14
**released** [4] - 155:6,
157:3, 157:22, 160:3
**relevance** [1] - 32:9
**relevant** [10] - 5:6, 6:23,
20:9, 25:10, 27:25, 33:1,
98:3, 162:10, 213:2
**relied** [2] - 76:4, 244:11
**relying** [3] - 145:8,
145:10, 260:9
**remain** [16] - 76:14,
101:10, 101:12, 101:21,
101:23, 102:13, 102:16,
103:4, 103:7, 106:4,
106:5, 110:5, 176:23,
188:25, 199:8, 211:7
**remaining** [1] - 211:7
**remains** [1] - 210:11
**remarks** [1] - 247:3
**Remember** [1] - 214:9
**remember** [39] - 5:5,
6:10, 46:17, 69:16,
93:23, 111:14, 112:3,
113:8, 130:25, 131:7,
131:20, 139:12, 139:18,
157:14, 168:6, 169:12,
169:14, 169:18, 169:21,
170:7, 171:12, 171:18,
171:24, 177:12, 177:13,
177:17, 178:22, 178:23,
200:7, 216:11, 218:20,
221:1, 225:18, 226:10,
235:5, 235:6, 235:12,
248:17, 259:1
**remind** [2] - 128:12,
226:4
**Remind** [1] - 149:17
**remiss** [1] - 183:20
**remove** [1] - 114:8
**rendered** [2] - 61:23,

188:15
**renew** [5] - 150:11,
187:5, 187:6, 187:17,
221:13
**renewing** [1] - 187:21
**renowned** [1] - 19:10
**reopening** [1] - 173:1
**repeat** [4] - 26:3,
170:25, 193:16, 204:15
**Repeat** [1] - 50:23
**Rephrase** [1] - 29:22
**report** [16] - 84:21,
87:6, 87:23, 88:4, 88:9,
88:23, 90:8, 93:16,
93:19, 93:21, 93:22,
94:1, 94:2, 95:17, 145:2,
178:8
**reported** [2] - 141:22,
142:1
**Reported** [1] - 1:23
**Reporter** [1] - 264:16
**REPORTER'S** [1] -
264:1
**reporters** [1] - 32:13
**reports** [2] - 145:14,
146:3
**represent** [4] - 89:18,
193:13, 193:24, 211:23
**represented** [2] - 182:9,
182:22, 182:23, 183:8,
193:8
**representing** [2] - 33:7,
182:12
**reprisals** [3] - 51:3,
51:12, 59:21
**Request** [7] - 101:15,
102:4, 102:5, 102:6,
102:8, 103:12, 103:14
**request** [29] - 92:23,
101:15, 101:16, 101:18,
102:3, 102:19, 102:21,
102:23, 103:11, 103:16,
167:24, 168:9, 177:4,
187:10, 199:9, 207:23,
220:1, 231:18, 236:22,
243:1, 243:6, 243:7,
245:25, 246:16, 246:22,
247:4, 250:10, 250:23,
252:21
**requested** [2] - 242:18,
251:24
**requesting** [3] - 168:21,
196:10, 217:10
**requests** [2] - 165:21,
187:20
**require** [1] - 186:15
**required** [3] - 15:20,
15:22, 157:16
**requirement** [3] - 251:9,
255:13, 255:14

**requires** [2] - 205:9,
206:1
**requisite** [1] - 260:4
**requisition** [1] - 132:20
**reread** [1] - 153:17
**resent** [1] - 242:1
**reserving** [1] - 244:20
**resided** [1] - 177:15
**residents** [2] - 173:13,
173:21
**residual** [1] - 150:23
**Resolution** [3] - 102:8,
102:23, 103:16
**resolved** [1] - 229:7
**resort** [1] - 245:20
**resources** [1] - 37:15
**respect** [22] - 26:23,
27:4, 27:11, 85:8, 148:2,
150:12, 150:19, 151:2,
151:24, 171:18, 187:25,
194:10, 195:11, 204:6,
213:5, 217:22, 232:7,
232:10, 251:25, 252:20,
260:16
**respectively** [1] - 188:8
**respond** [2] - 7:21,
119:11
**responded** [2] - 88:2,
90:7
**response** [4] - 103:19,
153:19, 194:19, 210:19
**responsibility** [2] -
88:3, 256:13
**responsible** [1] -
213:16
**rest** [7] - 10:14, 22:9,
135:10, 135:11, 176:5,
176:9, 176:12
**restart** [1] - 164:1
**Restaurant** [1] - 86:25
**restrain** [1] - 210:5
**restrained** [1] - 210:2
**restraints** [2] - 211:11,
211:12
**rests** [1] - 176:15
**result** [7] - 11:8, 19:15,
49:19, 134:5, 218:10,
222:12, 260:5
**resulted** [3] - 61:6,
225:8, 225:11
**resulting** [1] - 146:8
**results** [2] - 49:22,
144:24
**resume** [2] - 166:14,
185:14
**rethink** [1] - 240:14
**retired** [2] - 119:16,
186:5
**retrieve** [1] - 210:16
**return** [8] - 25:3,

101:14, 102:2, 102:18,
103:10, 184:13, 185:3,
188:17
**returned** [2] - 112:18,
210:10
**returning** [1] - 179:7
**returns** [1] - 179:12
**revealed** [1] - 146:18
**review** [2] - 46:15,
143:4
**reviewed** [2] - 78:25,
80:2
**reviewing** [2] - 47:7,
87:4
**revising** [1] - 168:1
**revolutionary** [1] - 33:4
**rewarded** [2] - 32:24,
33:9
**Reynolds** [6] - 85:5,
85:6, 97:21, 201:8,
201:15, 201:17
**Rhode** [1] - 175:2
**Rhodes** [50] - 1:17,
5:23, 7:25, 19:2, 25:7,
28:10, 30:17, 39:23,
40:23, 43:8, 70:1, 75:13,
77:15, 77:18, 79:21,
81:23, 84:9, 85:15,
85:17, 86:4, 91:23, 92:6,
92:20, 97:8, 99:6,
116:21, 117:12, 117:23,
125:23, 127:1, 131:7,
138:22, 138:25, 140:12,
143:23, 143:24, 154:9,
156:10, 158:20, 166:5,
166:19, 166:23, 166:25,
174:21, 175:17, 176:2,
184:4, 235:16, 260:15,
261:1
**RHODES** [164] - 2:4,
7:18, 8:1, 8:10, 19:3,
19:6, 25:13, 26:9, 26:16,
26:21, 26:25, 27:3, 27:7,
28:11, 35:17, 35:20,
39:24, 40:2, 50:21, 55:7,
71:18, 75:7, 77:20,
77:22, 78:1, 79:20,
79:22, 81:19, 82:13,
83:2, 83:8, 83:11, 83:15,
83:21, 84:4, 84:11,
85:18, 85:22, 85:25,
86:5, 86:13, 90:21,
90:23, 91:2, 91:5, 91:25,
92:18, 92:25, 94:8,
94:13, 96:7, 96:13,
96:17, 96:21, 96:24,
97:2, 97:4, 97:9, 114:9,
114:14, 115:4, 115:9,
115:12, 115:15, 115:25,
116:4, 116:7, 116:9,

116:24, 117:4, 117:8,
117:10, 117:13, 117:24,
118:2, 118:25, 126:5,
126:7, 126:12, 126:15,
126:23, 128:13, 128:15,
128:20, 136:20, 140:3,
141:6, 143:25, 154:10,
154:14, 154:17, 154:21,
154:25, 155:4, 155:12,
156:1, 156:3, 156:12,
156:23, 157:4, 157:24,
158:4, 158:8, 158:11,
158:14, 158:18, 158:25,
159:6, 159:9, 159:12,
159:16, 159:18, 159:22,
160:1, 160:7, 160:11,
160:17, 160:21, 160:23,
161:1, 161:8, 161:17,
161:23, 162:5, 162:7,
162:23, 163:2, 163:6,
163:14, 163:18, 163:21,
164:11, 164:18, 167:2,
167:13, 167:18, 167:22,
167:25, 168:4, 168:9,
168:13, 168:17, 168:20,
168:24, 169:3, 174:10,
174:16, 174:22, 175:7,
175:10, 175:18, 175:23,
175:25, 176:3, 176:6,
189:2, 233:22, 249:1,
263:3, 263:4, 263:6,
263:8, 263:13, 263:15

**rhyme** [1] - 56:11

**rhymes** [2] - 18:12,
18:13

**rhythm** [1] - 18:13

**rich** [1] - 24:1

**Rick** [3] - 118:13, 136:4,
136:5

**RICO** [7] - 152:18,
187:23, 215:4, 219:16,
222:25, 223:9, 237:20,
238:25, 239:1, 246:11

**ride** [1] - 54:9

**Road** [2] - 120:7,
132:25

**robbery** [5] - 139:14,
139:16, 140:2, 252:3,
252:4

**Robert** [4] - 1:16, 89:17,
111:9, 125:22

**Rockefeller** [1] - 68:18

**rodents** [4] - 52:20,
53:5, 53:6, 53:10

**Rodney** [8] - 169:16,
169:17, 178:20, 201:4,
201:6, 201:10, 201:20,
202:1

**Roger** [1] - 232:6

**role** [1] - 186:6

**roll** [1] - 31:25

**rolling** [1] - 31:25

**Room** [1] - 1:24

**room** [7] - 25:3, 73:8,
76:14, 92:23, 106:20,
185:12, 185:15

**rooted** [1] - 76:5

**Rorschach** [1] - 244:5

**roughly** [1] - 29:8

**routinely** [1] - 62:5

**Row** [1] - 68:7

**RPR** [1] - 1:24

**Ruger** [3] - 57:12,
57:17, 57:23

**Rule** [6] - 4:14, 77:18,
187:7, 187:22, 240:17,
240:23

**rule** [16] - 97:24, 144:8,
145:6, 145:23, 147:7,
147:19, 189:8, 221:19,
240:16, 242:3, 242:16,
242:18, 244:11, 245:22,
261:21

**ruled** [3] - 108:4,
150:24, 173:19

**rules** [3] - 35:2, 150:24,
243:3

**ruling** [5] - 5:14, 77:23,
79:2, 79:13, 79:18

**rulings** [1] - 192:12

**Run** [3] - 21:15, 142:14,
178:10

**run** [3] - 8:21, 16:22,
137:22

**running** [4] - 44:18,
52:21, 53:16, 237:22

**runs** [1] - 80:11

**Russell** [1] - 56:1

## S

**S-E-Y-M-O-U-R** [1] -
86:11

**S.A** [1] - 176:22

**S1W's** [1] - 66:2

**sacrifices** [1] - 183:24

**safe** [1] - 108:15

**safely** [1] - 23:2

**sail** [1] - 188:21

**salacious** [1] - 24:13

**salary** [2] - 131:23,
132:8

**sales** [3] - 35:10, 37:5,
37:11

**Sales** [1] - 123:10

**sample** [1] - 35:10

**sampled** [1] - 35:5

**samples** [2] - 146:17,
147:1

**San** [7] - 8:19, 11:23,
11:25, 12:1, 22:22,
22:23, 60:20

**Sand** [12] - 202:20,
203:23, 206:14, 207:6,
207:7, 215:6, 218:18,
237:1, 237:4, 237:7,
237:10, 237:11

**sat** [1] - 172:9

**satisfactory** [1] -
214:13

**satisfied** [3] - 165:1,
188:9

**satisfy** [1] - 70:11

**Saturday** [1] - 109:20

**Save** [1] - 100:22

**saving** [1] - 169:8

**savvy** [1] - 164:4

**saw** [17] - 31:9, 46:17,
47:23, 56:2, 110:11,
110:17, 113:11, 128:16,
138:13, 161:15, 164:21,
172:22, 172:23, 173:23,
194:21, 245:19

**Scarface** [1] - 31:12

**scene** [9] - 15:2, 21:15,
22:13, 29:15, 33:4, 59:3,
71:11, 77:9, 89:23

**scenes** [5] - 15:14,
19:22, 45:8, 46:8, 186:25

**schedule** [3] - 183:25,
185:2, 227:19

**Schedule** [2] - 227:24,
227:25

**school** [23] - 10:4, 10:8,
10:10, 84:13, 96:20,
108:14, 108:15, 109:2,
109:5, 109:18, 109:19,
112:5, 112:8, 113:1,
113:11, 129:1, 129:10,
129:12, 129:19, 129:22,
129:23, 131:16, 156:14

**School** [11] - 128:22,
130:10, 131:8, 131:14,
132:25, 137:17, 138:9,
160:16, 167:5, 175:13,
175:15

**schooling** [2] - 129:21,
130:6

**schools** [2] - 96:11,
96:25

**Schools** [3] - 129:2,
129:16, 129:24

**sci** [1] - 42:10

**sci-fi** [1] - 42:10

**science** [2] - 42:8,
212:22

**scientific** [1] - 80:3

**scope** [1] - 99:20

**scrapes** [1] - 210:6

**scratching** [1] - 215:15

**screen** [2] - 61:11,
138:9

**scrupulously** [1] -
186:24

**scrutinize** [1] - 203:2

**se** [12] - 17:5, 31:1,
192:9, 193:2, 193:4,
193:13, 193:24, 194:15,
196:12, 196:14, 197:20,
200:10

**SE-45-12** [1] - 61:12

**seal** [4] - 168:7, 168:8,
168:10, 168:12

**Seamon** [1] - 4:24

**Sean** [1] - 50:10

**search** [3] - 93:23,
114:17, 125:24

**searching** [1] - 125:13

**season** [2] - 109:22,
109:24

**seated** [10] - 8:5, 83:7,
86:8, 106:4, 106:5,
106:8, 118:19, 126:19,
188:25, 199:8

**sec** [1] - 16:15

**Second** [3] - 12:7,
192:8, 216:13

**second** [39] - 15:4,
26:17, 66:15, 69:16,
71:14, 80:12, 87:7,
93:11, 98:7, 107:20,
117:19, 126:9, 130:12,
135:1, 144:25, 145:11,
145:12, 146:17, 150:10,
151:8, 157:25, 158:4,
158:6, 167:4, 167:8,
167:13, 169:6, 171:3,
175:12, 190:5, 191:2,
191:3, 191:8, 196:10,
196:17, 197:8, 198:16,
235:25, 240:15

**secondarily** [1] - 26:2

**seconds** [4] - 2:15,
24:19, 172:10, 186:1

**secrets** [1] - 15:9

**section** [3] - 22:11,
121:19, 220:14

**sections** [2] - 22:16

**secure** [1] - 132:17

**secured** [2] - 122:4,
210:3

**Sedan** [11] - 114:17,
116:11, 117:21, 120:6,
120:9, 121:5, 122:3,
124:1, 124:8, 124:16,
124:19

**sedan** [1] - 124:10

**See** [5] - 160:13, 202:7,
237:4, 251:15, 257:20

**see** [67] - 2:8, 2:22, 3:1,
3:24, 5:21, 19:2, 20:25,
23:23, 26:3, 29:12,
31:14, 37:3, 52:17,
54:20, 54:25, 57:9,
57:16, 58:6, 59:7, 61:12,
65:2, 66:22, 68:13,
68:23, 70:2, 70:4, 77:24,
91:1, 104:3, 104:5,
104:17, 105:12, 105:13,
105:18, 111:7, 112:13,
116:25, 117:17, 118:13,
128:1, 128:7, 130:22,
130:23, 135:2, 135:20,
138:16, 139:2, 143:2,
144:10, 149:14, 152:5,
158:22, 163:8, 170:4,
171:7, 179:3, 187:2,
191:9, 204:1, 211:14,
229:23, 235:2, 235:17,
240:9, 249:25, 253:19,
255:3

**seeing** [4] - 29:24,
68:19, 259:1

**seek** [1] - 6:8

**seeking** [1] - 147:21

**seem** [4] - 14:19, 28:3,
32:14, 228:21

**sees** [1] - 190:21

**segment** [1] - 52:15

**segregate** [1] - 22:9

**seized** [2] - 199:4,
199:5

**selected** [1] - 34:17

**self** [4] - 10:22, 23:3,
145:1, 205:2

**self-authenticating** [1]
- 145:1

**self-evident** [1] - 205:2

**self-identify** [1] - 23:3

**self-publication** [1] -
10:22

**sell** [3] - 32:16, 38:21,
38:25

**sellers** [1] - 121:17

**selling** [6] - 34:11, 37:4,
39:3, 41:10, 122:6, 122:8

**sells** [3] - 41:13, 66:7,
66:9

**semester** [6] - 110:12,
110:13, 110:16, 110:18,
175:5

**seminal** [1] - 24:23

**send** [9] - 164:5,
164:20, 164:22, 165:4,
165:6, 188:24, 193:18,
226:11, 226:14

**sending** [1] - 45:13

**sense** [8] - 13:10,
14:16, 20:22, 62:9,

67:24, 142:6, 185:24, 224:13
**sensitivity** [1] - 30:22
**sent** [8] - 29:13, 137:19, 164:24, 202:4, 226:9, 228:16, 230:11, 258:24
**sentence** [14] - 88:14, 167:13, 179:7, 179:13, 187:14, 190:19, 191:3, 193:10, 193:11, 203:13, 225:6, 236:4, 236:6, 244:2
**separate** [15] - 190:6, 190:8, 191:10, 236:8, 236:14, 236:17, 236:19, 238:8, 238:9, 246:5, 246:6, 246:10, 257:7, 257:8, 257:11
**separation** [1] - 138:15
**September** [2] - 3:7, 97:2
**Sequoia** [1] - 177:17
**sergeant** [1] - 117:3
**sergeants** [1] - 40:9
**serial** [2] - 121:24, 204:22
**series** [2] - 158:12, 239:20
**serious** [2] - 193:14, 194:1
**seriously** [1] - 210:12
**serve** [1] - 186:6
**served** [2] - 15:12, 244:2
**service** [3] - 124:10, 188:16, 260:18
**Service** [11] - 114:17, 116:11, 117:21, 120:6, 120:9, 121:5, 122:3, 124:1, 124:8, 124:16, 124:19
**services** [3] - 19:16, 83:25, 163:9
**Services** [9] - 130:7, 130:9, 130:15, 130:18, 130:25, 137:12, 140:10, 160:22, 160:24
**session** [3] - 109:16, 113:2, 188:23
**set** [11] - 43:24, 69:17, 82:22, 84:7, 84:8, 100:19, 101:14, 102:6, 102:21, 103:14, 105:12
**Sets** [2] - 118:12, 240:3
**sets** [3] - 120:14, 239:25, 240:3
**setting** [2] - 81:13, 85:19
**Setting** [1] - 146:6
**settlement** [1] - 102:2,

102:18, 103:10
**setup** [1] - 210:24
**seven** [2] - 121:24, 261:16
**Seven** [3] - 86:16, 178:6, 207:6
**several** [13] - 11:22, 14:11, 80:25, 90:14, 126:13, 152:16, 164:5, 173:18, 185:21, 196:25, 204:25, 238:8, 246:10
**severance** [1] - 187:17
**severity** [1] - 208:13
**sex** [2] - 24:14, 38:17
**sexual** [2] - 29:19
**sexually** [1] - 34:6
**Seymour** [5] - 86:5, 86:10, 86:14, 89:20, 90:18
**SEYMOUR** [2] - 86:6, 263:7
**shackled** [2] - 211:7, 212:5
**shackling** [1] - 211:17
**Shakedown** [25] - 39:22, 188:1, 220:1, 220:4, 220:14, 220:17, 221:20, 222:4, 222:6, 222:8, 222:17, 222:19, 223:3, 223:9, 223:14, 223:17, 223:22, 223:24, 246:18, 250:5, 250:6, 250:24, 251:3, 251:10, 251:14
**Shakur** [1] - 42:19
**Shall** [1] - 215:20
**shall** [1] - 233:9
**sham** [1] - 25:25
**shape** [3] - 13:15, 85:13, 104:4
**SHAWN** [1] - 1:8
**shear** [1] - 235:3
**sheet** [9] - 3:15, 3:17, 149:18, 149:19, 226:25, 227:1, 227:2, 228:8, 245:4
**sheets** [1] - 227:6
**Sheistyville** [1] - 27:7
**SHELLY** [1] - 1:8
**Shelton** [1] - 209:21
**SHELTON** [1] - 1:7
**shift** [3] - 80:12, 132:7, 133:23
**shine** [1] - 35:8
**shirt** [1] - 88:19
**shirts** [1] - 51:14
**shit** [3] - 57:13, 57:17, 61:15
**Shit** [1] - 57:14
**Shock** [4] - 88:2, 89:20,

90:7, 90:11
**shock** [3] - 30:1, 31:3, 34:12
**shocking** [1] - 34:25
**shooting** [12] - 40:8, 50:10, 53:7, 53:8, 53:10, 58:3, 58:9, 58:13, 70:5, 70:7, 257:5
**Shooting** [2] - 53:8, 53:9
**shootings** [1] - 50:12
**short** [3] - 83:16, 83:21, 151:18
**shorter** [1] - 229:16
**shortly** [2] - 88:24, 166:12
**Shorty** [1] - 190:19
**shot** [13] - 36:5, 41:20, 42:20, 42:22, 52:21, 53:16, 57:22, 58:8, 58:10, 72:16, 257:3, 257:4
**shout** [1] - 68:23
**show** [36] - 8:16, 9:1, 11:10, 13:4, 13:9, 20:2, 25:25, 32:2, 80:11, 87:6, 100:7, 115:1, 115:12, 116:4, 117:14, 117:25, 119:22, 120:21, 121:11, 125:7, 128:25, 130:12, 130:22, 132:4, 135:5, 143:5, 154:17, 155:11, 162:20, 174:23, 185:13, 245:23
**showed** [7] - 28:16, 69:25, 70:1, 70:3, 138:10, 138:22, 138:25
**showing** [6] - 23:24, 123:12, 130:13, 156:10, 161:2, 247:9
**Showing** [2] - 65:9, 87:14
**shown** [5] - 25:24, 87:23, 120:5, 144:25, 205:22
**Shows** [1] - 95:6
**shows** [7] - 13:3, 95:17, 96:24, 119:24, 155:12, 155:17, 175:1
**sic** [1] - 43:21
**sick** [3] - 82:17, 116:18, 117:5
**side** [6] - 20:1, 24:9, 24:15, 25:16, 110:21, 120:25
**Siffert** [5] - 206:14, 237:2, 237:4, 237:8, 237:11
**sign** [5] - 14:24, 15:5, 15:7, 15:20, 230:4

**signaled** [1] - 258:10
**signaling** [1] - 231:10
**signature** [1] - 264:11
**signatures** [1] - 121:16
**signed** [11] - 37:21, 38:3, 68:3, 68:7, 69:21, 134:7, 198:24, 199:9, 199:11, 200:3
**significant** [5] - 24:22, 28:13, 152:13, 158:18, 219:15
**significantly** [1] - 218:10
**signifies** [1] - 129:17
**Silence** [1] - 7:20
**silent** [8] - 101:10, 101:12, 101:21, 101:23, 102:13, 102:16, 103:5, 103:7
**similar** [5] - 48:17, 193:3, 196:12, 246:5, 260:6
**similarly** [1] - 107:5
**Simmons** [1] - 56:1
**simple** [1] - 200:11
**simply** [16] - 7:6, 78:13, 108:11, 198:20, 200:11, 200:12, 200:15, 208:9, 208:12, 208:15, 231:11, 247:11, 247:12, 247:14, 252:9, 252:16
**simply's** [1] - 200:14
**single** [4] - 236:1, 246:9, 246:11, 251:5
**sit** [3] - 70:23, 198:13, 261:25
**site** [5] - 8:21, 16:22, 67:19, 67:20, 72:13
**sites** [1] - 8:22
**sitting** [2] - 99:9, 173:2
**Sitting** [1] - 137:7
**situation** [3] - 14:25, 58:17, 60:3
**six** [7] - 100:2, 100:8, 109:18, 121:25, 142:24, 185:13, 210:4
**size** [1] - 235:3
**skelter** [2] - 149:2, 149:6
**skeltered** [1] - 149:4
**skimmed** [1] - 166:2
**skip** [1] - 123:3
**skirts** [1] - 211:10
**slant** [1] - 241:3
**slavery** [1] - 18:16
**sleeve** [1] - 88:19
**slide** [1] - 100:2
**slides** [1] - 100:8
**slightly** [1] - 217:16
**Slo** [3] - 47:25, 48:3,

52:1
**Sloane** [2] - 123:9
**slots** [1] - 37:24
**slow** [3] - 40:12, 151:8, 151:9
**slowly** [1] - 107:22
**small** [3] - 104:4, 151:25, 152:13
**Smith** [1] - 231:20
**Smith's** [3] - 138:23, 231:25, 232:2
**snippets** [1] - 151:25
**snitch** [4] - 58:5, 58:23, 61:20
**snitches** [2] - 51:9, 53:10
**Snitching** [11] - 50:19, 50:24, 58:22, 59:20, 59:24, 60:2, 60:7, 60:13, 60:19, 60:23, 61:2
**snitching** [4] - 58:4, 58:21, 62:25, 63:3
**so-called** [5] - 5:19, 17:14, 194:16
**social** [1] - 20:8
**socially** [1] - 33:1
**society** [1] - 17:8
**socks** [1] - 88:21
**sold** [9] - 29:1, 32:17, 38:8, 41:11, 43:15, 120:4, 123:7, 123:9
**soldiers** [1] - 65:21
**sole** [1] - 208:2
**solely** [1] - 255:7
**solve** [1] - 156:18
**someone** [6] - 55:20, 74:10, 198:24, 199:10, 255:22, 256:13
**sometime** [3] - 4:3, 12:9, 158:2
**sometimes** [14] - 12:9, 38:10, 38:20, 41:7, 45:21, 45:25, 46:1, 54:25, 57:2, 71:3, 122:18, 186:7, 225:7, 225:16
**Sometimes** [11] - 12:10, 18:5, 19:19, 37:4, 56:11, 64:16, 74:14, 89:1, 122:18
**somewhere** [4] - 89:8, 113:14, 235:9, 254:6
**Song** [1] - 35:14
**song** [7] - 23:6, 24:19, 24:23, 29:6, 29:11, 30:7, 31:15, 32:5, 35:10, 35:22, 39:19, 45:14, 57:9, 58:4, 63:14, 65:20, 71:6
**songs** [32] - 6:19, 21:4,

21:13, 21:17, 22:20,
23:10, 26:18, 28:24,
30:16, 34:17, 42:17,
44:3, 44:5, 44:19, 46:20,
47:6, 51:14, 56:2, 56:21,
57:25, 63:10, 63:14,
63:24, 64:1, 64:19,
66:22, 67:17, 68:23,
69:4, 74:5, 74:7
   **Sony** [2] - 69:15, 69:16
   **soon** [4] - 4:3, 99:8,
150:8, 169:23
   **Sorry** [9] - 86:5, 91:2,
96:19, 127:18, 128:7,
145:11, 191:12, 201:13,
249:3
   **sorry** [31] - 6:14, 61:10,
74:21, 94:24, 97:4,
104:14, 116:2, 128:3,
136:10, 140:20, 151:16,
153:24, 160:25, 163:16,
163:18, 165:8, 168:17,
170:2, 171:21, 174:25,
177:25, 192:24, 200:25,
205:17, 207:5, 221:22,
231:4, 236:4, 236:25,
244:7, 259:20
   **sort** [39] - 9:14, 12:17,
14:24, 19:9, 22:6, 23:9,
24:23, 25:19, 31:16,
31:20, 32:5, 32:24, 34:7,
36:15, 38:4, 49:11,
49:13, 56:5, 57:6, 58:8,
65:25, 66:4, 78:19,
88:13, 99:13, 114:15,
116:22, 129:6, 161:6,
169:25, 186:8, 192:8,
194:25, 195:14, 197:14,
208:22, 243:21, 243:24
   **sorts** [3] - 24:6, 31:7,
58:11
   **sought** [1] - 124:22
   **Soundex** [2] - 120:10,
120:18
   **sounds** [4] - 40:14,
46:25, 117:7, 216:20
   **Sounds** [1] - 2:20
   **Soundview** [1] - 22:10
   **source** [1] - 129:6
   **sources** [1] - 146:9
   **sovereign** [1] - 224:22
   **sovereignty** [2] -
189:18, 224:18
   **spanning** [2] - 239:25,
240:4
   **spans** [2] - 66:1, 238:22
   **speaker** [1] - 14:2
   **speakers** [1] - 146:19
   **speaking** [3] - 19:24,
54:9, 62:24

   **special** [7] - 23:5,
75:20, 219:12, 223:3,
223:5, 229:11, 229:20
   **Special** [1] - 176:21
   **SPECIAL** [1] - 263:16
   **specialized** [2] - 78:20,
79:24
   **specialty** [1] - 7:22
   **specific** [9] - 4:22, 5:2,
6:3, 27:15, 63:23,
216:11, 243:7, 250:16,
254:8
   **specifically** [7] - 26:12,
50:13, 70:15, 81:23,
192:16, 227:24, 253:25
   **Specifically** [1] - 69:11
   **specifies** [1] - 94:2
   **specify** [1] - 227:22
   **spectrographic** [1] -
146:24
   **speeches** [1] - 14:1
   **speed** [1] - 185:21
   **spell** [5] - 8:6, 86:9,
106:13, 118:20, 126:20
   **Spell** [1] - 118:22
   **spelled** [3] - 64:18,
67:3, 67:22
   **spelling** [1] - 64:21
   **Spence** [6] - 177:14,
181:11, 181:13, 181:17,
181:22
   **spine** [1] - 135:2
   **spinning** [2] - 10:5,
10:6
   **spinoff** [1] - 31:16
   **spitting** [2] - 47:5, 47:9
   **spoken** [1] - 116:17
   **spokesman** [1] - 189:7
   **sponsored** [1] - 175:21
   **spring** [5] - 110:12,
110:13, 110:16, 110:18,
112:23
   **Sprint** [1] - 13:2
   **sprouting** [1] - 69:20
   **squarely** [1] - 80:1
   **squirming** [1] - 173:3
   **Sr** [1] - 127:21
   **stab** [1] - 128:7
   **stabbing** [2] - 87:25,
90:15
   **staff** [1] - 163:12
   **stance** [1] - 24:5
   **stand** [24] - 8:2, 27:22,
74:8, 85:19, 103:22,
104:23, 105:25, 106:2,
115:17, 115:20, 115:23,
116:1, 118:17, 126:16,
164:1, 165:7, 166:4,
170:5, 170:11, 170:17,
173:2, 179:3, 239:11,

240:10
   **standard** [6] - 79:23,
92:8, 203:19, 207:17,
212:13
   **Standard** [1] - 200:24
   **standby** [1] - 101:7
   **standing** [4] - 23:23,
110:5, 110:9, 173:5
   **standpoint** [4] - 30:8,
33:21, 36:24, 59:25
   **stands** [1] - 77:13
   **Stanford** [1] - 14:4
   **start** [12] - 29:25, 37:9,
46:3, 109:16, 109:21,
120:17, 127:6, 132:12,
185:5, 185:18, 235:16,
237:13
   **started** [17] - 9:11, 9:18,
9:23, 9:25, 10:2, 10:7,
10:16, 10:21, 11:6, 11:9,
13:1, 31:17, 113:10,
138:13, 140:17, 167:11,
196:24
   **Started** [2] - 9:25, 11:13
   **Starting** [2] - 21:1,
193:11
   **starting** [3] - 28:19,
119:23, 253:22
   **starts** [3] - 109:18,
109:19, 224:10
   **state** [14] - 86:9, 97:15,
106:12, 121:8, 122:9,
126:24, 148:8, 149:22,
171:12, 177:9, 205:25,
212:20, 225:8, 225:16
   **State** [15] - 8:6, 97:13,
118:20, 119:4, 122:10,
126:20, 127:12, 137:22,
138:2, 148:8, 149:20,
150:17, 157:19, 160:23,
160:24
   **statement** [36] - 5:24,
114:21, 136:6, 141:24,
151:3, 152:25, 153:2,
153:3, 200:23, 214:19,
214:20, 214:22, 214:23,
214:24, 218:18, 218:23,
218:25, 219:8, 231:22,
232:2, 243:2, 243:3,
243:5, 250:11, 250:18,
250:21, 251:7, 252:7,
252:17, 252:21, 253:6,
255:8, 259:4, 259:11,
259:18
   **statements** [15] - 5:6,
5:17, 6:3, 121:16, 146:3,
208:21, 208:22, 213:17,
213:23, 213:25, 214:16,
214:18, 255:13, 255:22,
259:6

   **States** [6] - 111:9,
145:5, 176:20, 208:2,
208:6, 210:18
   **states** [1] - 121:13
   **STATES** [2] - 1:1, 1:5
   **station** [9] - 8:24,
12:20, 12:21, 13:18,
13:21, 14:22, 15:12,
15:25, 28:23, 32:2,
33:21, 33:22, 39:10,
46:4, 49:13, 49:20, 135:9
   **stations** [3] - 12:22,
12:25, 28:19, 28:22,
33:6, 46:6, 71:2, 79:5
   **status** [1] - 56:5
   **statute** [1] - 219:21
   **stay** [5] - 81:9, 103:23,
185:6, 185:7, 198:7
   **stayed** [3] - 155:6,
155:15, 157:10
   **stenographically** [1] -
264:4
   **step** [4] - 37:12, 39:17,
83:8, 183:13
   **stepdaughter** [1] -
17:23
   **steps** [1] - 17:13
   **Stewart** [1] - 20:10
   **stick** [1] - 77:8
   **still** [27] - 11:9, 11:17,
23:14, 28:5, 38:18, 82:4,
83:22, 88:25, 93:6,
110:17, 120:3, 137:10,
156:12, 166:21, 172:3,
177:2, 183:19, 194:11,
210:2, 213:6, 217:6,
217:24, 222:24, 230:7,
239:3, 243:14, 247:16
   **stint** [2] - 139:16,
167:12
   **stipend** [1] - 161:10
   **stipulate** [4] - 2:7,
124:14, 162:12, 175:11
   **stipulated** [2] - 84:21,
91:8, 93:10, 93:17,
121:23, 141:17
   **stipulating** [3] - 136:14,
136:15, 154:14
   **stipulation** [7] - 145:19,
154:21, 156:9, 166:6,
166:23, 175:8, 175:10
   **Stocksdale** [1] - 150:15
   **stood** [1] - 88:2
   **stop** [4] - 52:19, 69:9,
164:1, 189:5
   **Stop** [11] - 35:15, 50:19,
50:24, 59:20, 59:24,
60:2, 60:7, 60:13, 60:19,
60:23, 61:2
   **stores** [2] - 11:2, 37:17

   **story** [2] - 18:15, 36:4
   **Straight** [6] - 5:24,
24:16, 24:22, 27:18,
28:13, 29:3
   **straight** [1] - 218:19
   **strategy** [1] - 68:9
   **street** [26] - 3:3, 3:5,
3:6, 28:16, 30:4, 32:12,
32:23, 34:11, 36:12,
37:3, 38:6, 38:22, 40:16,
41:21, 45:14, 45:23,
46:4, 46:11, 58:9, 74:1,
142:17, 142:18, 143:6,
170:9, 178:9
   **Street** [2] - 1:25, 68:17
   **streets** [4] - 25:1, 33:25,
46:7, 169:25
   **strictly** [1] - 247:7
   **strike** [7] - 152:12,
168:12, 191:4, 192:12,
199:22, 201:16, 208:15
   **strikes** [2] - 4:13,
171:10
   **striking** [1] - 77:17
   **stronger** [1] - 217:16
   **struck** [1] - 150:2
   **structure** [2] - 260:4,
260:5
   **stuck** [1] - 254:6
   **student** [1] - 130:17
   **studied** [1] - 78:25
   **studio** [3] - 45:23,
46:11, 46:25
   **study** [2] - 2:25, 110:15
   **stuff** [14] - 2:16, 3:8,
26:22, 34:3, 34:7, 79:9,
89:21, 90:10, 100:13,
148:25, 149:1, 212:22,
241:1, 254:22
   **Stupid** [1] - 17:11
   **Stuy** [2] - 22:16
   **style** [3] - 18:3, 123:20,
229:23
   **stylistic** [1] - 190:9
   **subdue** [2] - 210:7,
210:13
   **Subject** [1] - 162:22
   **subject** [1] - 201:11
   **subjects** [1] - 44:5
   **submission** [3] - 82:1,
226:11, 245:19
   **submit** [1] - 89:3,
164:12, 174:11, 228:9,
232:9, 236:5, 236:15,
245:13
   **submitted** [18] - 82:2,
87:21, 90:10, 90:13,
121:5, 194:19, 205:5,
205:6, 205:21, 213:12,
215:6, 226:21, 230:17,

246:4, 246:7, 250:2, 250:7, 258:20

**submitting** [2] - 82:6, 87:23

**Subparagraph** [1] - 230:3

**subpoena** [3] - 116:12, 124:5, 124:22

**subpoenas** [1] - 119:11

**substance** [1] - 19:8

**substantial** [5] - 150:18, 151:4, 248:8, 248:9, 255:14

**substantially** [1] - 217:21

**substantive** [9] - 150:11, 150:21, 150:25, 165:11, 200:14, 224:3, 237:25, 238:11, 238:13

**suburbs** [1] - 28:21

**success** [9] - 36:4, 38:12, 41:8, 41:21, 42:23, 43:2, 68:6, 68:18, 71:13

**successful** [5] - 20:19, 20:20, 33:13, 41:18, 43:1

**Sucker** [1] - 22:23

**sudden** [1] - 35:9

**suddenly** [1] - 141:3

**suffer** [1] - 183:22

**suffered** [2] - 183:22, 210:6

**suffering** [1] - 48:17

**sufficient** [4] - 188:9, 246:10, 252:4, 259:11

**sufficiently** [1] - 164:4

**Sugarhill** [2] - 18:22, 21:9

**suggest** [5] - 56:8, 116:21, 208:20, 224:25, 248:1

**suggested** [5] - 116:14, 162:11, 171:16, 256:2, 259:25

**suggesting** [2] - 161:5, 241:2

**summarize** [2] - 129:7, 184:3

**summarizes** [1] - 141:18

**summarizing** [1] - 129:1

**summary** [8] - 2:8, 2:14, 2:21, 3:15, 3:17, 129:7, 141:17, 141:19

**summer** [6] - 19:17, 112:25, 113:1, 113:2, 113:5, 113:11

**summonsed** [1] - 210:8

**sun** [1] - 23:16

**Sunday** [7] - 55:16, 55:18, 55:23, 55:24, 56:14, 135:11, 135:20

**sung** [2] - 41:5, 41:24

**superiors** [1] - 88:9

**Supermax** [2] - 209:23, 210:10

**supplement** [1] - 87:20

**supplemental** [1] - 258:18

**Supplemental** [1] - 258:20

**support** [5] - 28:20, 60:7, 208:23, 216:12, 250:21

**suppose** [2] - 113:9, 147:1

**supposed** [1] - 61:3

**supposedly** [1] - 171:4

**Supreme** [3] - 145:13, 145:18, 145:21

**surely** [1] - 257:14

**Surely** [2] - 155:10, 156:19

**surprised** [2] - 172:20, 172:21

**surprising** [1] - 181:2

**surveillance** [1] - 48:24

**survived** [1] - 58:9

**suspect** [1] - 164:4

**suspected** [1] - 43:17

**sustain** [3] - 5:19, 146:22, 164:21

**sustained** [6] - 5:25, 27:18, 65:14, 108:5, 147:18, 181:16

**Sustained** [3] - 24:21, 65:11, 75:8, 140:4, 183:11

**swatch** [1] - 81:23

**swear** [1] - 105:24

**sweater** [1] - 88:20

**swing** [1] - 209:24

**SWORN** [6] - 8:3, 86:6, 106:10, 118:18, 126:17, 176:22

**syndicated** [2] - 13:3, 15:25

**system** [1] - 129:22

**System** [1] - 125:3

## T

**T-shirts** [1] - 51:14

**table** [5] - 16:1, 49:11, 104:24, 114:8, 161:4

**tables** [1] - 211:10

**tackle** [1] - 235:4

**tagged** [1] - 24:8

**tailored** [2] - 250:17, 255:7

**talent** [1] - 38:10

**talented** [1] - 36:18

**tales** [3] - 28:16, 34:4, 51:7

**talks** [7] - 44:8, 59:1, 61:17, 72:23, 190:15, 215:6, 236:4

**Talks** [1] - 73:19

**tank** [1] - 89:19

**Tape** [1] - 92:17

**tape** [31] - 36:17, 68:4, 82:15, 82:16, 82:19, 82:22, 83:13, 85:20, 91:3, 92:8, 92:9, 92:11, 92:12, 92:14, 92:16, 146:15, 150:13, 150:21, 151:2, 152:10, 163:1, 163:3, 163:12, 164:8, 164:23, 165:3, 190:7, 191:11, 197:16, 197:21

**TAPE** [1] - 263:9

**tapes** [5] - 38:7, 38:8, 38:14, 40:8, 164:10

**targeting** [1] - 48:13

**Tasered** [2] - 210:5, 210:13

**task** [2] - 50:14, 243:12

**taste** [1] - 39:4

**tattoo** [1] - 54:23

**tattoos** [1] - 54:23

**tax** [6] - 121:8, 122:9, 133:12, 221:15, 221:16

**taxes** [1] - 221:11

**teaching** [2] - 26:5, 26:25

**team** [8] - 107:8, 108:23, 109:11, 109:15, 110:6, 111:14, 116:18, 180:11

**technical** [3] - 17:25, 83:25, 163:8

**technique** [1] - 66:3

**technology** [1] - 105:14

**Teeny** [1] - 152:14

**telecommunications** [1] - 76:7

**telecommute** [1] - 113:22

**telephone** [1] - 209:10

**tellers** [1] - 18:15

**ten** [7] - 9:4, 18:24, 27:22, 35:15, 35:17, 35:18, 125:6

**Ten** [1] - 34:23

**tended** [1] - 23:18

**tendered** [2] - 75:13, 75:18

**tends** [1] - 40:12

**tenet** [1] - 21:19

**tenth** [1] - 129:15

**term** [28] - 6:9, 6:12, 6:15, 6:19, 6:22, 7:1, 45:1, 46:7, 46:10, 46:18, 64:14, 65:2, 66:15, 66:21, 67:10, 67:16, 74:1, 134:8, 149:6, 161:4, 207:19, 207:21, 215:4, 215:7, 218:17, 219:1, 220:9

**terminate** [5] - 215:18, 216:2, 217:3, 217:9, 217:20

**terminated** [2] - 138:10, 218:1

**terminates** [1] - 217:21

**termination** [2] - 236:2, 247:1

**Terms** [1] - 45:22

**terms** [50] - 12:3, 12:5, 12:15, 13:8, 13:13, 14:16, 14:17, 14:18, 17:15, 19:12, 20:8, 23:17, 25:16, 28:13, 28:18, 29:11, 29:17, 29:18, 29:24, 30:3, 32:8, 32:14, 32:23, 34:5, 36:7, 40:3, 40:16, 40:25, 43:22, 44:8, 45:11, 45:21, 45:23, 45:25, 46:11, 49:10, 60:5, 66:20, 68:2, 69:17, 70:22, 72:22, 73:14, 88:4, 91:2, 124:22, 185:7

**terribly** [2] - 77:19, 190:20

**test** [2] - 134:2, 134:5

**testified** [23] - 41:4, 41:20, 62:15, 63:5, 63:19, 80:22, 91:10, 91:13, 91:18, 97:21, 116:17, 119:20, 150:12, 156:16, 169:12, 169:15, 174:11, 174:12, 177:10, 178:19, 181:11, 181:13, 207:3

**testify** [26] - 7:11, 16:16, 75:16, 75:21, 80:6, 80:9, 81:2, 93:19, 101:10, 101:12, 101:21, 101:23, 102:1, 102:13, 102:14, 102:15, 103:4, 103:5, 103:6, 103:21, 155:8, 170:8, 179:14, 203:14, 204:8, 209:6

**testifying** [3] - 173:11, 203:21, 209:8

**testimony** [43] - 3:5, 14:8, 25:11, 56:25,

62:10, 75:24, 76:4, 76:8, 76:23, 77:4, 77:17, 77:18, 78:6, 78:8, 78:19, 80:15, 80:17, 81:3, 85:12, 91:15, 96:14, 97:23, 103:24, 105:13, 105:17, 117:15, 118:6, 125:24, 138:23, 153:17, 161:24, 170:3, 177:13, 178:22, 201:9, 201:21, 203:7, 203:13, 205:24, 209:1, 231:25, 232:2

**testing** [1] - 189:20

**text** [4] - 100:13, 100:14, 100:17

**Thanksgiving** [3] - 109:24, 112:22, 185:20

**THE** [171] - 1:1, 1:2, 2:2, 2:6, 2:12, 2:20, 3:12, 3:20, 3:22, 4:2, 4:6, 4:8, 4:19, 5:4, 6:14, 6:17, 7:3, 7:6, 7:9, 7:13, 7:16, 7:20, 7:24, 8:4, 8:5, 8:7, 16:9, 17:22, 17:25, 18:10, 18:12, 18:18, 18:19, 18:21, 18:22, 19:1, 19:4, 24:21, 25:2, 25:7, 26:3, 26:13, 26:20, 26:23, 27:2, 27:4, 27:10, 28:9, 29:22, 30:15, 30:21, 31:23, 34:16, 35:15, 35:18, 35:19, 39:23, 50:22, 55:9, 60:16, 63:17, 65:11, 65:14, 71:15, 75:8, 75:11, 76:17, 77:21, 77:24, 78:2, 79:21, 80:7, 81:5, 81:18, 81:21, 82:10, 82:25, 83:4, 83:10, 83:12, 83:18, 84:2, 84:5, 84:7, 84:8, 84:15, 84:18, 84:22, 85:1, 85:4, 85:6, 85:10, 85:13, 85:21, 85:24, 86:1, 86:3, 86:7, 86:8, 86:10, 87:10, 87:13, 90:18, 90:22, 90:24, 91:1, 91:4, 91:7, 92:3, 92:6, 92:20, 93:2, 93:12, 93:14, 93:20, 94:6, 94:12, 94:16, 94:23, 95:2, 95:5, 95:8, 95:14, 95:23, 95:25, 96:3, 96:12, 96:16, 96:19, 96:23, 97:1, 97:3, 97:6, 97:7, 97:10, 97:16, 97:18, 98:1, 98:5, 98:8, 98:13, 98:15, 98:18, 99:6, 99:17, 100:1, 100:5, 100:7, 100:11, 100:18, 100:22, 100:25,

101:5, 101:9, 101:19, 102:10, 102:25, 103:18, 104:3, 104:7, 104:11, 104:13, 104:14, 104:17, 104:21, 104:24, 104:25, 105:2, 105:5, 105:8, 105:23, 106:3, 106:4, 106:7, 106:8, 106:11, 106:12, 106:14, 107:21, 107:24, 108:2, 108:3, 108:8, 108:9, 111:4, 113:23, 114:1, 114:5, 114:6, 114:12, 115:3, 115:7, 115:11, 115:14, 115:19, 115:21, 116:2, 116:6, 116:8, 116:13, 116:19, 116:21, 117:2, 117:6, 117:9, 117:12, 117:22, 118:1, 118:16, 118:19, 118:21, 118:22, 118:23, 126:3, 126:6, 126:11, 126:14, 126:18, 126:19, 126:21, 128:5, 128:11, 128:14, 128:18, 130:1, 130:3, 131:6, 131:12, 134:13, 136:9, 136:16, 136:18, 136:23, 136:25, 139:23, 140:4, 141:7, 141:10, 141:14, 141:24, 142:2, 142:5, 142:9, 142:23, 143:1, 143:8, 143:10, 143:14, 143:19, 143:21, 144:1, 144:4, 144:6, 144:16, 144:19, 144:23, 145:7, 145:10, 145:13, 145:16, 145:18, 145:25, 146:2, 146:5, 146:12, 146:22, 147:5, 147:8, 147:12, 147:15, 147:17, 147:23, 147:25, 148:14, 148:19, 148:21, 148:24, 149:6, 149:14, 149:17, 149:20, 149:23, 150:7, 150:9, 151:8, 151:10, 151:13, 151:15, 151:17, 151:21, 152:2, 152:5, 152:9, 152:14, 152:19, 152:22, 152:25, 153:8, 153:10, 153:12, 153:15, 153:23, 154:3, 154:5, 154:7, 154:9, 154:12, 154:16, 154:23, 155:3, 155:10, 155:20, 156:2, 156:4, 156:17, 157:3, 157:20, 157:25, 158:6, 158:9, 158:13, 158:20, 158:22, 159:3, 159:7, 159:10, 159:14, 159:17, 159:20, 159:25, 160:2, 160:9, 160:13, 160:20, 160:22,

160:25, 161:2, 161:15, 161:21, 162:1, 162:6, 162:18, 162:25, 163:5, 163:11, 163:15, 163:17, 163:20, 163:22, 164:13, 164:16, 164:20, 165:10, 165:14, 165:17, 165:21, 165:23, 166:4, 166:9, 166:11, 166:19, 166:25, 167:16, 167:21, 167:23, 168:3, 168:5, 168:11, 168:14, 168:18, 168:23, 169:1, 169:4, 169:7, 169:14, 169:19, 170:2, 170:10, 170:14, 170:24, 171:9, 171:21, 171:24, 172:5, 172:9, 172:13, 172:16, 172:21, 172:25, 173:14, 174:6, 174:8, 174:14, 174:18, 175:6, 175:9, 175:17, 175:21, 175:24, 176:1, 176:5, 176:7, 176:10, 176:13, 176:16, 176:19, 176:23, 176:24, 181:16, 181:21, 181:25, 182:2, 182:3, 182:5, 182:15, 182:18, 183:11, 183:13, 183:16, 187:5, 187:9, 187:15, 187:19, 188:5, 188:20, 189:4, 189:10, 189:14, 189:20, 190:1, 190:13, 190:22, 191:2, 191:9, 191:16, 191:21, 192:2, 192:5, 192:7, 192:16, 192:21, 192:25, 193:18, 193:22, 194:3, 194:9, 194:13, 194:17, 194:21, 195:2, 195:7, 195:16, 195:20, 196:1, 196:6, 196:9, 196:16, 196:19, 196:22, 197:3, 197:7, 197:9, 197:23, 197:25, 198:4, 198:10, 198:15, 198:24, 199:8, 199:12, 199:15, 199:18, 200:1, 200:3, 200:6, 200:13, 200:19, 200:21, 200:24, 201:2, 201:6, 201:12, 201:14, 201:19, 201:23, 201:25, 202:11, 202:15, 202:18, 202:21, 202:25, 203:22, 204:9, 204:12, 204:14, 204:17, 205:4, 205:7, 205:11, 205:17, 205:20, 205:25, 206:8, 206:12, 206:15, 206:20, 206:23, 207:1, 207:5, 207:7, 207:10, 207:13, 207:16, 207:22, 208:4, 208:8, 208:15, 208:18,

208:25, 209:9, 209:17, 209:19, 211:20, 211:24, 212:6, 212:15, 212:17, 212:20, 212:24, 213:4, 213:9, 213:13, 213:18, 214:8, 214:11, 215:11, 215:14, 215:23, 216:17, 217:1, 217:14, 218:6, 218:9, 218:23, 219:1, 219:5, 219:7, 219:14, 220:10, 220:15, 220:23, 221:2, 221:6, 221:8, 221:12, 221:15, 221:22, 221:24, 222:5, 222:16, 223:1, 223:5, 223:12, 223:16, 223:24, 224:4, 224:10, 224:16, 225:6, 225:11, 225:15, 226:4, 226:7, 226:16, 226:19, 227:1, 227:4, 227:7, 227:11, 227:15, 227:19, 227:21, 227:24, 228:2, 228:7, 228:13, 228:15, 228:18, 228:25, 229:4, 229:13, 229:17, 229:19, 229:22, 230:5, 230:7, 230:15, 230:19, 230:25, 231:4, 231:8, 231:13, 231:17, 232:5, 232:15, 232:20, 232:23, 233:3, 233:7, 233:9, 233:12, 233:15, 233:19, 233:23, 234:5, 234:8, 234:11, 234:13, 234:15, 234:19, 234:23, 234:25, 235:5, 235:14, 235:21, 235:24, 236:21, 237:3, 237:5, 237:9, 237:15, 238:5, 238:9, 238:13, 238:20, 238:23, 238:25, 239:5, 239:10, 239:15, 239:23, 240:2, 240:5, 240:9, 240:19, 241:2, 241:5, 241:9, 241:11, 241:16, 241:20, 241:24, 242:2, 242:5, 242:12, 242:15, 242:21, 242:24, 243:16, 243:23, 244:14, 245:11, 245:19, 246:16, 247:18, 247:25, 248:20, 248:22, 249:2, 249:12, 249:14, 249:20, 249:24, 250:9, 250:13, 250:23, 251:7, 251:15, 251:20, 252:11, 252:20, 253:14, 253:17, 253:21, 254:7, 254:16, 254:19, 255:9, 255:17, 256:4, 256:12, 256:18, 256:25, 257:20, 257:24, 258:2, 258:6, 258:9, 258:15, 258:18, 258:23,

259:1, 259:5, 259:10, 259:16, 259:19, 259:22, 260:6, 260:13, 260:15, 260:22, 261:3, 261:7, 261:11, 261:15, 261:22, 262:1
  theirs [1] - 63:13
  theme [1] - 74:5
  themself [2] - 18:7, 31:15
  themselves [6] - 31:11, 31:13, 45:22, 51:23, 70:15, 212:8
  theories [1] - 230:12
  theory [11] - 230:14, 243:2, 243:8, 243:10, 244:15, 244:22, 250:4, 250:17, 251:16, 251:24, 252:1
  thereafter [1] - 184:4
  therefore [1] - 188:12
  they've [6] - 19:22, 45:2, 58:13, 150:17, 206:3, 221:21
  They've [1] - 226:7
  thinking [3] - 159:12, 201:1, 220:19
  thinks [2] - 199:24, 212:1
  third [4] - 171:3, 231:8, 236:12, 259:16
  Thomas [1] - 1:20
  thoroughly [1] - 166:21
  thou [2] - 153:7, 154:2
  thoughts [1] - 188:23
  Threat [2] - 29:6, 30:7
  threat [1] - 248:11
  threaten [1] - 171:6
  Threatening [1] - 259:23
  threatening [2] - 171:5, 242:6
  Threats [1] - 31:5
  threats [1] - 29:13
  Three [4] - 142:5, 148:3, 229:24, 251:24
  three [23] - 23:9, 23:13, 23:18, 27:13, 84:23, 85:11, 89:24, 100:2, 109:17, 120:14, 141:4, 151:5, 151:22, 151:25, 153:17, 162:22, 172:10, 211:7, 214:21, 228:22, 253:22, 255:10
  thresholds [1] - 69:23
  threw [2] - 172:14, 172:17
  throughout [3] - 8:16, 11:1, 35:11
  throw [1] - 206:24

  thrust [1] - 166:23
  Thursday [4] - 184:14, 186:4, 186:12, 235:6
  Thursdays [1] - 110:14
  TI [2] - 44:11, 44:17
  tight [1] - 151:23
  Timberland [2] - 71:20, 71:23
  timely [1] - 4:18
  timing [2] - 4:25, 216:21
  Tims [1] - 71:20
  tiny [1] - 152:14
  title [6] - 120:23, 121:6, 121:7, 122:2, 123:11, 132:1
  Title [1] - 121:12
  titled [4] - 120:24, 123:11, 124:14, 125:4
  titling [2] - 121:2, 121:8
  TM [3] - 47:25, 48:3, 52:2
  today [29] - 12:24, 16:17, 20:2, 46:11, 59:10, 59:14, 61:23, 62:1, 65:16, 65:18, 81:7, 82:18, 106:18, 116:16, 116:18, 116:25, 125:1, 125:7, 143:16, 163:3, 168:15, 173:9, 174:2, 178:8, 201:16, 212:2, 231:9, 233:21, 242:2
  together [2] - 32:20, 36:13, 99:20, 239:2, 248:10, 249:25
  Tomorrow [1] - 183:25
  tomorrow [22] - 100:3, 100:12, 163:8, 164:12, 164:19, 164:25, 165:13, 184:12, 187:2, 188:17, 191:25, 202:12, 210:21, 210:23, 211:3, 211:13, 211:14, 234:25, 235:1, 245:2, 261:2, 261:5
  tone [1] - 69:17
  tonight [13] - 152:20, 164:12, 166:15, 192:2, 193:19, 202:13, 211:19, 235:4, 237:15, 238:4, 238:5, 240:19, 241:12
  tons [1] - 248:23
  Tonya [1] - 177:14
  took [20] - 9:12, 12:25, 24:11, 27:22, 42:4, 47:10, 88:13, 88:17, 115:5, 130:10, 161:6, 170:5, 179:3, 209:24, 210:4, 229:5, 237:5, 237:9, 260:20
  Took [1] - 113:4
  tool [1] - 38:18

**Top** [1] - 28:23, 35:12
**top** [17] - 30:4, 36:6, 36:7, 40:14, 88:19, 89:4, 98:11, 108:23, 127:9, 129:15, 130:22, 132:23, 135:19, 139:25, 200:9, 213:14, 224:10
**topic** [3] - 55:12, 154:18, 180:17
**topics** [1] - 63:7
**total** [1] - 123:25
**totality** [1] - 188:3
**totally** [1] - 242:8
**touch** [3] - 44:5, 186:15, 186:16
**tougher** [2] - 22:11, 258:4
**touring** [1] - 37:17
**toward** [5] - 8:5, 86:8, 118:19, 126:19, 224:22
**towards** [3] - 24:5, 69:8, 131:22
**town** [3] - 49:12, 50:1, 178:12
**Town** [1] - 22:24
**Toyota** [2] - 123:9
**tracing** [1] - 124:23
**Track** [5] - 39:20, 52:15, 53:21, 54:8, 54:10, 55:11, 55:16, 57:14, 65:16
**track** [3] - 39:20, 40:4, 218:13
**tracks** [2] - 32:20, 34:15
**trade** [1] - 15:8
**tradition** [4] - 18:14, 18:15, 21:23
**traditional** [1] - 36:21
**trafficking** [6] - 41:5, 41:6, 41:9, 41:15, 45:3
**Trafficking** [1] - 41:11
**training** [2] - 110:13, 110:21
**transaction** [2] - 121:1, 121:4
**transcribed** [2] - 114:21, 264:8
**transcript** [12] - 52:17, 57:16, 85:3, 85:4, 91:15, 91:24, 92:7, 92:11, 92:15, 92:19, 154:15, 165:3, 167:17, 174:24, 177:9, 190:17, 190:21, 191:13, 201:14, 264:8
**transcripts** [10] - 92:9, 92:21, 164:22, 164:23, 165:4, 165:6, 191:6, 201:4, 201:20, 202:2
**transferred** [2] - 122:2, 123:15

**transportation** [1] - 209:23
**Trauma** [4] - 88:2, 89:20, 90:7, 90:11
**travel** [1] - 114:4
**treat** [2] - 79:4, 105:17
**treatment** [1] - 48:25
**treats** [1] - 103:18
**trees** [1] - 100:22
**trends** [2] - 69:8, 80:3
**trial** [22] - 16:18, 16:19, 82:2, 82:4, 84:25, 105:9, 105:10, 137:5, 140:13, 149:7, 171:4, 177:6, 178:5, 183:18, 184:3, 189:23, 196:24, 198:13, 198:17, 207:3, 210:24, 211:10
**Tribe** [1] - 49:16
**tried** [5] - 17:22, 37:9, 180:11, 225:23, 240:21
**trier** [1] - 79:24
**trigger** [1] - 199:21
**trip** [1] - 112:2
**trouble** [1] - 169:25
**true** [6] - 46:7, 57:11, 76:8, 78:4, 78:5, 195:19
**True** [1] - 254:10
**trunk** [1] - 39:3
**trust** [2] - 12:22, 81:11
**trustworthiness** [2] - 146:11, 151:4
**truth** [10] - 47:5, 47:6, 47:9, 54:9, 70:18, 72:24, 72:25, 152:9, 179:9
**truthful** [1] - 57:24, 63:15, 204:24
**truthfulness** [1] - 150:18
**try** [17] - 30:23, 33:15, 37:10, 38:25, 56:8, 68:5, 71:4, 81:8, 82:23, 99:10, 163:9, 166:5, 180:6, 180:8, 188:21, 188:22, 195:7
**Trying** [1] - 215:14
**trying** [20] - 13:10, 22:5, 22:13, 25:7, 25:21, 36:12, 38:20, 39:15, 40:11, 45:2, 47:8, 60:5, 70:10, 70:16, 106:7, 112:2, 128:15, 243:11, 260:10
**Tuesday** [1] - 1:11
**Tuesdays** [1] - 110:14
**Tupac** [3] - 31:6, 42:19, 58:10
**turn** [6] - 99:24, 120:20, 130:21, 135:1, 135:16, 143:2

**turning** [1] - 121:10
**Turning** [1] - 130:7
**turns** [1] - 73:7
**TV** [9] - 134:18, 134:21, 135:3, 135:6, 135:9, 135:13, 140:12, 141:4, 233:21
**twice** [3] - 97:21, 139:9, 189:12
**twist** [1] - 234:3
**Two** [7] - 154:10, 199:4, 199:5, 202:3, 227:25, 244:2, 246:24
**two** [58] - 3:13, 3:16, 27:12, 27:22, 30:2, 33:2, 79:17, 82:7, 83:16, 83:21, 84:9, 85:11, 85:21, 96:5, 98:22, 99:22, 109:17, 117:14, 142:15, 143:23, 144:21, 146:19, 146:23, 148:1, 151:1, 151:25, 153:12, 155:22, 156:1, 156:2, 156:12, 159:13, 161:19, 165:18, 172:10, 173:24, 175:11, 181:10, 184:3, 184:22, 190:6, 190:8, 191:9, 196:7, 201:5, 201:15, 202:19, 203:16, 208:19, 214:21, 227:10, 228:23, 230:12, 238:18, 244:3, 251:22, 259:16
**tying** [1] - 239:1
**type** [18] - 20:13, 23:22, 28:23, 28:24, 33:4, 33:8, 34:18, 35:24, 40:9, 60:9, 68:12, 69:20, 69:23, 71:3, 71:10, 123:20, 145:4, 162:19
**types** [18] - 12:8, 12:11, 13:11, 15:1, 15:13, 17:13, 20:25, 21:4, 23:9, 29:24, 30:6, 30:11, 30:14, 31:17, 63:23, 69:9, 70:4
**typewriter** [1] - 230:3
**typical** [2] - 40:7, 56:3
**typo** [1] - 190:2
**typos** [1] - 190:1
**Tyrone** [1] - 127:21, 128:13

## U

**U.S** [3] - 1:24, 89:17, 183:1
**UC** [3] - 10:11, 10:12, 10:25
**UCC** [2] - 102:7, 103:15

**ultimate** [1] - 36:4
**Ultimately** [1] - 91:14
**Um-hum** [10] - 16:24, 29:2, 34:13, 46:23, 47:16, 52:23, 61:16, 72:6, 130:16, 138:14
**um-hum** [1] - 43:6
**umbrella** [1] - 68:21
**unanimity** [1] - 258:16
**Unclear** [1] - 42:20
**uncommon** [2] - 70:14, 74:11
**under** [32] - 18:14, 23:16, 64:25, 75:19, 77:18, 97:23, 124:15, 124:19, 150:23, 150:25, 161:4, 161:6, 168:7, 168:8, 168:10, 168:12, 172:18, 176:23, 177:2, 187:7, 205:25, 207:3, 211:24, 213:23, 219:21, 220:4, 220:6, 239:2, 240:17, 244:11, 246:24
**Under** [2] - 133:17, 159:22
**underneath** [4] - 68:22, 89:23, 90:2, 135:3
**underscore** [1] - 49:2
**understood** [2] - 60:3, 161:12
**Understood** [1] - 44:4
**undertake** [1] - 27:19
**undertakes** [1] - 237:11
**unfair** [4] - 48:24, 50:3, 78:9, 240:25
**Uniform** [1] - 86:22, 102:22
**Uniformed** [1] - 86:21
**unique** [4] - 14:25, 20:6, 21:22, 257:21
**unit** [3] - 11:17, 87:25, 88:1
**United** [6] - 111:9, 145:5, 176:20, 208:2, 208:6, 210:18
**UNITED** [2] - 1:1, 1:5
**Universal** [1] - 69:15
**University** [3] - 14:4, 174:24, 175:2
**Unless** [2] - 228:9, 231:1
**unless** [5] - 146:9, 198:8, 220:17, 252:24, 256:9
**unlike** [1] - 255:6
**unnecessary** [1] - 212:23
**unquote** [5] - 20:11, 28:21, 40:16, 49:14, 200:7

**unrelated** [1] - 239:7
**untutored** [2] - 193:14, 193:25
**unusual** [8] - 22:24, 23:23, 29:12, 31:6, 31:14, 55:25, 56:4, 74:9
**unwarranted** [1] - 50:12
**Up** [1] - 197:8
**up** [103] - 2:4, 9:10, 15:24, 18:16, 18:20, 21:5, 21:10, 23:4, 27:17, 32:2, 32:14, 34:2, 34:20, 36:1, 37:22, 39:5, 40:11, 42:20, 42:22, 45:21, 47:20, 54:6, 54:15, 54:17, 56:6, 59:9, 60:7, 61:11, 63:8, 68:4, 68:9, 69:20, 70:24, 80:11, 82:22, 83:22, 84:7, 84:8, 85:16, 88:18, 88:19, 89:4, 92:1, 93:10, 99:9, 101:3, 105:12, 106:1, 106:7, 108:14, 112:2, 112:14, 112:19, 114:7, 114:12, 118:12, 124:10, 124:18, 134:7, 135:19, 152:16, 155:6, 155:15, 155:18, 157:8, 157:10, 161:15, 162:19, 167:2, 169:10, 172:13, 172:17, 173:21, 177:5, 177:19, 177:24, 178:9, 178:25, 185:6, 185:13, 185:17, 186:25, 190:14, 199:16, 209:22, 210:24, 212:11, 213:22, 214:10, 218:12, 223:2, 225:19, 226:16, 232:13, 235:10, 237:18, 239:11, 240:5, 240:10, 245:23, 260:3
**uplifting** [1] - 24:4
**upmanship** [4] - 30:3, 31:10, 32:11, 44:10
**upper** [2] - 132:19, 133:21
**upset** [2] - 69:7, 237:14
**upstairs** [2] - 158:15, 210:11, 211:18
**USA** [1] - 264:4
**useful** [2] - 75:25, 76:8
**uses** [1] - 66:24
**utterly** [1] - 171:17

## V

**vacation** [2] - 112:22
**vacations** [1] - 112:21
**Vaguely** [1] - 87:8
**vaguely** [2] - 151:17,

200:6
**valid** [1] - 195:1
**validated** [1] - 79:1
**validly** [1] - 157:18
**valuable** [1] - 80:16
**value** [13] - 5:15, 34:12, 58:24, 101:14, 102:2, 102:17, 102:18, 103:9, 103:10, 152:3, 252:3
**van** [1] - 136:4
**various** [8] - 16:22, 20:6, 22:15, 46:15, 88:22, 93:3, 193:3, 196:12
**varying** [1] - 248:10
**vast** [1] - 78:6
**Vehicle** [1] - 119:4
**vehicle** [19] - 119:25, 120:4, 120:24, 121:1, 121:3, 121:14, 121:18, 121:19, 122:4, 122:11, 123:2, 123:6, 123:7, 123:9, 123:13, 123:17, 124:14, 125:4, 146:19
**vehicles** [4] - 122:20, 124:7, 124:18
**verbatim** [1] - 46:17
**verdict** [14] - 185:8, 185:25, 186:18, 214:1, 214:4, 226:25, 227:1, 227:2, 227:5, 228:8, 229:11, 234:19, 235:3, 245:4
**verify** [1] - 158:16
**version** [8] - 79:12, 94:9, 163:2, 191:4, 191:5, 191:18, 191:19, 191:21
**versions** [2] - 191:11, 202:10
**versus** [5] - 20:22, 45:14, 55:12, 149:20, 246:8
**via** [1] - 101:3
**viability** [3] - 28:25, 40:3, 40:17
**viable** [3] - 26:2, 26:19, 28:18
**victim** [1] - 88:2
**video** [11] - 37:17, 69:14, 83:22, 101:3, 103:24, 105:13, 154:20, 171:17, 172:3, 172:4, 210:15
**videos** [3] - 51:6, 51:10, 51:14
**videotape** [3] - 172:6, 172:18, 172:22
**view** [2] - 50:8, 237:14
**vigorously** [2] - 193:11,

193:23
**vinyl** [2] - 32:3, 32:14
**violation** [1] - 15:18
**violence** [13] - 29:18, 30:18, 34:5, 38:17, 41:5, 41:6, 42:9, 42:10, 42:15, 43:2, 43:9, 44:21, 45:3
**violent** [1] - 69:9
**visibility** [1] - 49:13
**visit** [1] - 186:25
**vital** [1] - 205:3
**Vital** [1] - 127:13
**voice** [7] - 35:5, 35:9, 92:10, 144:22, 146:17, 147:1, 190:7
**voices** [2] - 146:21, 146:23
**VOLUME** [1] - 1:11
**volunteered** [1] - 171:19
**vulnerable** [1] - 25:20

# W

**W-2** [1] - 161:3
**W-4** [1] - 132:5
**W-42** [2] - 115:22, 117:25
**W-5G** [1] - 117:16
**Wabash** [2] - 177:17, 181:22
**wait** [8] - 94:18, 94:19, 108:4, 108:11, 117:22, 117:23, 157:20, 242:1
**Wait** [6] - 115:3, 155:3, 155:10, 239:13
**waiting** [2] - 83:23, 114:10
**waive** [5] - 101:16, 102:4, 102:20, 103:12, 189:7
**walk** [2] - 2:20, 142:3
**Wall** [1] - 68:16
**wants** [8] - 22:19, 30:15, 32:18, 150:6, 163:24, 207:16, 237:14, 244:10
**ward** [2] - 65:2
**Warner** [2] - 13:1, 69:15
**warning** [3] - 261:12, 261:16, 261:18
**wasted** [1] - 162:19
**wasting** [1] - 25:9
**watched** [1] - 141:4
**WAYNE** [1] - 1:8
**Wayne** [2] - 64:8, 65:1
**ways** [3] - 25:17, 116:24, 124:23
**wealth** [2] - 23:25

**weapons** [3] - 63:24, 64:3, 70:3
**Weaze** [3] - 52:19, 52:20, 53:1
**web** [6] - 8:21, 8:22, 16:22, 67:19, 67:20, 72:13
**Wednesday** [1] - 110:15
**weed** [1] - 41:13
**week** [8] - 80:13, 109:18, 110:15, 145:14, 149:8, 194:18, 250:7, 258:21
**weekend** [4] - 109:25, 110:1, 226:15, 258:25
**weekends** [1] - 113:13
**weekly** [1] - 12:2
**weeks** [11] - 3:14, 3:16, 82:4, 103:3, 109:17, 109:18, 141:4, 173:18, 183:23, 244:19
**weight** [5] - 76:9, 110:13, 110:21, 228:24, 242:20
**weights** [2] - 228:8, 228:22
**welcome** [1] - 111:4
**well-known** [3] - 12:23, 13:3, 108:21
**west** [1] - 178:2
**West** [5] - 1:25, 8:17, 10:17, 22:19, 24:10
**Western** [2] - 142:14, 178:10
**whereby** [1] - 210:24
**Whereof** [1] - 264:10
**whistle** [1] - 51:4
**white** [2] - 88:19, 88:20
**White** [1] - 17:11
**whole** [16] - 12:18, 20:5, 39:2, 41:12, 54:11, 74:4, 81:23, 89:2, 135:6, 135:13, 160:13, 161:1, 165:17, 199:22, 199:23, 253:22
**wholesale** [1] - 123:10
**Whoodi** [10] - 6:9, 7:2, 65:7, 67:10, 67:13, 73:16, 73:17, 73:20, 74:1, 75:3
**WHOODI** [4] - 64:21, 67:4, 67:22, 73:20
**wide** [1] - 35:25
**Willie** [12] - 88:16, 107:12, 107:15, 108:15, 109:23, 113:1, 115:4, 118:4, 130:14, 140:2, 155:5, 264:4
**WILLIE** [1] - 1:7

**Willie's** [1] - 112:10
**willing** [4] - 2:7, 32:23, 180:4, 180:9
**win** [1] - 203:5
**wind** [1] - 234:3
**winded** [2] - 244:8, 249:3
**wing** [2] - 161:6, 167:1
**winter** [1] - 19:17
**wise** [3] - 39:14, 69:23, 175:5
**wish** [12] - 93:4, 101:12, 101:13, 101:23, 102:15, 102:19, 103:5, 103:6, 103:11, 103:21, 256:4
**withdraw** [2] - 148:4, 181:23
**withdrawal** [12] - 129:16, 129:18, 215:20, 216:3, 216:4, 216:23, 236:3, 246:25
**withdrawn** [1] - 216:16
**withdraws** [1] - 216:8
**withdrew** [2] - 168:9, 175:3
**withholding** [2] - 132:5, 133:12
**WITNESS** [38] - 8:3, 8:4, 8:7, 17:25, 18:12, 18:19, 18:22, 35:18, 86:6, 86:7, 86:10, 104:13, 104:25, 105:2, 106:7, 106:10, 106:11, 106:14, 108:2, 108:8, 111:4, 113:23, 114:5, 118:18, 118:21, 118:23, 126:17, 126:18, 126:21, 176:22, 176:24, 182:3, 263:3, 263:7, 263:10, 263:12, 263:14, 263:16
**Witness** [1] - 264:10
**witness** [59] - 7:25, 16:16, 27:4, 28:4, 75:15, 76:8, 76:24, 77:1, 77:2, 77:17, 78:2, 82:14, 82:19, 82:23, 85:15, 86:4, 89:12, 91:9, 101:2, 103:22, 105:15, 105:16, 105:20, 105:24, 106:2, 114:10, 114:25, 115:13, 115:17, 117:14, 118:17, 126:9, 128:14, 136:21, 147:9, 162:9, 168:21, 168:22, 171:10, 171:19, 181:21, 200:22, 203:4, 203:9, 203:11, 204:2, 205:13, 205:15, 205:17, 205:21, 205:22, 206:18, 207:3, 211:25, 233:3, 259:14

**witness'** [3] - 96:14, 105:17, 203:4
**witnesses** [12] - 5:12, 81:7, 82:11, 83:16, 84:19, 92:25, 171:6, 205:23, 209:6, 259:23, 259:24
**wodey** [1] - 66:19
**Wodey** [3] - 64:14, 66:15, 66:17
**women** [1] - 45:10
**wonder** [1] - 195:7
**Wonderful** [2] - 84:8, 249:2
**Wooden** [1] - 252:21
**Woody** [13] - 6:9, 6:14, 6:19, 6:20, 6:22, 7:2, 64:16, 64:23, 72:5, 72:7, 72:16, 72:19, 75:6
**word** [14] - 18:22, 18:23, 19:11, 31:2, 46:19, 46:21, 47:3, 80:18, 192:12, 192:16, 200:12, 208:15, 224:21
**words** [18] - 51:23, 57:19, 57:20, 60:6, 73:17, 76:3, 92:14, 151:15, 151:17, 162:2, 174:15, 186:25, 190:22, 197:9, 201:19, 245:25, 246:1, 254:7
**wordy** [1] - 203:24
**works** [1] - 47:4
**world** [3] - 47:13, 48:3, 54:3
**worm** [1] - 173:3
**worn** [1] - 230:22
**worth** [1] - 4:16
**wound** [2] - 128:7
**write** [4] - 8:18, 219:20, 239:13, 248:1
**writer** [2] - 16:22, 51:20
**writers** [1] - 46:2
**writes** [2] - 73:2, 73:10, 73:16
**writing** [5] - 49:4, 49:8, 62:12, 62:13, 181:6
**writings** [11] - 16:21, 44:20, 45:17, 49:7, 49:8, 50:2, 61:24, 62:5, 62:10, 69:7, 76:7
**written** [16] - 16:25, 41:5, 43:10, 44:4, 44:25, 48:11, 48:23, 53:19, 59:19, 59:23, 59:24, 78:25, 213:19, 216:19, 217:17, 244:7
**wrote** [4] - 44:3, 60:20, 61:8, 114:22
**Wyche** [8] - 91:12,

117:17, 128:16, 140:14, 231:19, 232:10, 232:19, 233:6

**X**

**XXVII** [1] - 1:11
**XXXVII** [1] - 1:11

**Y**

**yanking** [1] - 149:23
**year** [15] - 9:16, 17:9, 29:4, 40:5, 44:12, 109:24, 109:25, 112:19, 113:11, 121:22, 123:19, 135:4, 221:14, 229:10
**years** [22] - 3:5, 9:4, 13:7, 13:19, 15:13, 18:24, 23:20, 29:16, 68:13, 78:21, 80:25, 86:16, 107:5, 109:1, 109:7, 109:23, 119:7, 119:19, 138:3, 218:2, 244:2, 244:3
**yesterday** [3] - 2:15, 95:9, 177:8
**York** [6] - 22:4, 32:9, 50:5, 50:15, 107:3, 113:14
**young** [1] - 107:11
**yourself** [10] - 20:7, 22:6, 30:24, 58:5, 58:17, 58:21, 58:22, 101:11, 101:24, 248:1
**yourselves** [1] - 183:21
**youth** [4] - 2:18, 138:19, 173:14, 173:15
**Youth** [9] - 130:7, 130:8, 130:15, 130:18, 132:2, 137:12, 140:10, 160:22, 160:24
**YSI** [3] - 130:23, 130:24, 155:16

**Z**

**Z's** [1] - 29:6
**Zajac** [3] - 1:24, 264:3, 264:15
**zebra** [1] - 120:12
**zip** [1] - 142:14
**zoom** [1] - 142:9